# EXHIBIT 3

CONFIDENTIAL



## Product Control

# Price testing policy

Date: May 2009



Version: 1.2

Highly Confidential

BCI-EX-00297183

BARCLAYS
CAPITAL

# Contents

| | |
|---|---|
| Overview | 3 |
| Scope | 3 |
| Frequency | 3 |
| Documentation | 3 |
| Price Testing Meetings | 3 |
| Reporting | 4 |
| Classification of testing (Hard, Medium, Soft) | 4 |
| Data Sources | 5 |
| Testing methodology model inputs vs. external prices | 6 |
| Untested items | 7 |
| Use of golden source internal data | 7 |
| Multi Asset Portfolios | 8 |
| Completeness Controls | 8 |
| Uncertainty Metrics | 8 |
| Limit monitoring | 9 |
| Review of price testing methodology | 9 |
| Application of reserves and offsets | 9 |
| Interaction with Model sign off and LTA process | 10 |
| Other work | 10 |
| Version Control | 10 |
| Appendix 1: Example range of inputs | 11 |
| Appendix 2: Central Price Testing guidance notes | 12 |
| Appendix 3: Limit Framework | 17 |

Highly Confidential

BCI-EX-00297184

## Overview

The price testing or independent price verification process is a key control in ensuring the material accuracy of valuations. This policy document details recommendations for performance of the process and policies with the aim of unifying practice and creating consistency in the price testing process. The firm has control principles determining the role of price testing in the control infrastructure.

*"**Mark to market:** All relevant trading positions are to be marked to market at bid/offer on a daily basis. For these purposes, the front office is responsible for ensuring that their inventory is appropriately priced. Product Control is responsible for independently reviewing and checking these prices"*

*Source: http://intra.barcapint.com/content/supportsites/operatio/operatio/usefulli0/selfasse3/controlp/*

*http://news.barcapint.com/newsapp/view/2/article?story=85822*

A front office and PCG Sarbox process exists to monitor this control principle.

## Scope

Price testing procedures should at a minimum cover all fair value positions in the trading book. Exceptions to this should be escalated to the head of product control and disclosed in the price testing results.

Other positions E.g. Fair value positions in the banking book and positions not marked to fair value should be considered in an overall review of valuation accuracy and where independent price verification procedures assist in this they should be adopted as best practice.

## Frequency

Price testing must be performed on a monthly basis at a minimum. Where information is readily available, resources permit and analysis meaningful consideration should be given to a more frequent testing procedure. Where data is not available or positions are deemed insignificant, a programme of periodic review that takes into account any changes to risk or balance sheet should be performed. Where monthly information is not used this should be explicitly disclosed in the price testing results.

## Documentation

In line with the firm's obligations under Sarbox, adequate documentation should be kept of the results and conclusions. All exceptions to the policy should be clearly disclosed on the report, results classified by quality Hard/Soft /Medium (see section on classification), commentary to include any adjustments to the balance sheet and documentation of the reason where external sources have not been used to adjust the valuation.

Price testing processes and methodology should be comprehensively documented and reviewed on a regular basis to ensure that documentation remains up to date. This should take account of factors such as completeness checks, data quality checks, systems used, valuation methodology (Price or model) and market data sources used.

## Price Testing Meetings

An important part of the price testing process is to ensure that all stakeholders in the process have been consulted. There are a number of ways that the results can be communicated but preference is given to formal meetings dedicated to this subject. It is essential that front office and front office management are

3

BCI-EX-00297185



involved in this process, have seen the results including any untested, are familiar with the testing methodologies and understand the conclusions. In addition to this, representatives from risk management, product control and any teams specifically performing price testing should discuss any issues raised and document conclusions in meetings either by business or group of businesses.

## Reporting

A summary of the price testing results for the firm and conclusions is prepared each month by the Central Price Testing team, based on pricing template submissions. More details of this process are contained in Appendix 2. The disclosure should be consistent with the firm's standard hierarchy as through CHORUS and associated systems, eg GMIS. The results should be summarised based on this hierarchy and at the relevant trading management responsibilities. The reporting should also place the results in a historic context.

The Central Price Testing reports have a wide audience, including senior management from Finance and Risk as well as external parties such as auditors and the FSA. Therefore it is important that price testing submissions accurately reflect the price testing results.

Additional reports can also be prepared if requested by business areas or regions. These should be consistent in population and conclusions to the Central Pricing template. It is important that the results and conclusions are fairly represented to all interested parties.

It is vital that all material price testing results are communicated to the Front Office in a timely manner. The need for P&L adjustments following price testing should also be discussed with the Front Office. If there is a significant unresolved disagreement over the action to be taken, the issue must be escalated to senior PCG management and as part of the price test reporting.

The reporting should summarise the conclusions of the price testing process and specify any re-marks or reserves that have been implemented. Unless an external source is used for valuation, it is unlikely that the result will be zero. The need for reserves should take into consideration the quality of the data, the size of position, the extent to which results offset on a portfolio-wide basis and the risk in the portfolio.

For the purpose of central reporting, materiality is currently defined as a price testing difference of £1m for detailed commentary. A lower materiality will generally exist for individual asset reporting or for regional governance.

The timeliness of price testing reporting is important. Results must be available soon enough for full analysis and investigation to be performed if required. Results must be presented to Front Office and Product Control management in time to be relevant for decision making purposes. Automation of price testing processes should be considered where it could significantly bring forward the reporting date.

## Classification of testing (Hard, Medium, Soft)

The actions taken as a result of price testing differences should take into account the quality of the data sources used in calculating them. To facilitate the consolidation of price testing results into a consistent format, results must be classified into Hard, Medium and Soft when reported. The classification will always involve judgement for example a Bloomberg source could be an average of market makers, a source from a single reference bank or using a Bloomberg model (Bloomberg fair value) and therefore the nature of the source should be fully understood for any underlying assumptions.. Characteristics of good sources are detailed in the next section.

| Classification | Conditions | Action* |
|---|---|---|
| Hard | Strong and reliable external source in data quality assessment (see | Results generally used to adjust the balance sheet unless exceptional circumstances exist |

4

BCI-EX-00297186

BARCLAYS CAPITAL

--------------------------------------------------------------------------------

| | | |
|---|---|---|
| | following section) | Generally have a low limit for adjustment |
| Medium | Good external source in data quality assessment, however concerns exist over at least one criteria (Eg only single market source, multiple external sources may be inconsistent, data may not be for month end date, data may be from small broker, consensus data may be subject to wide spreads). | Results actively considered for balance sheet adjustment requiring justification if no adjustment takes place<br><br>Generally have a medium limit for adjustment |
| Soft | External source of poor quality Eg proxy<br><br>Testing subject to analytical technique, e.g. extrapolation | Result adjusted if significantly different from external.<br><br>Generally have a high limit for adjustment. |
| Memo Item | Testing is a duplicate (E.g. testing to listed price where input testing is already taking place or to inputs where output price is available). Testing analyses arbitrage relationships (Eg stock quoted on two exchanges) | Result is an FYI and part of the body of evidence in any conclusions. Generally no reserves should be made based on these results. |

\* Also refer to Limit Framework Appendix 3

## Data Sources

Price testing should use data sources that are most representative of the market and readily available. These will have a number of characteristics detailed in the table. All data should be considered, assessed and applied to portfolio. Price testing will always involve professional judgement of the data. No data should be dismissed due to weakness in one area below instead its relevance should be assessed in the action and conclusions and the process should seek to mitigate the weakness by additional processes which could include, Product control directly sourcing broker runs, using additional sources, performing analysis against trading data, extending quote requests to structures relevant to the portfolio.

| Characteristic | Comment | Application |
|---|---|---|
| Independent | Data should be sourced directly by Product Control | Consensus data submissions should be run by product control using books and records market data and models<br><br>Broker quotes should come in a tamper-proof data format (either direct email or link) and should be received in the normal course of business rather than through trader prompting |
| Reliable | Data should be readily available and be in a consistent format | Consensus data - Indications of reliability are a service with long maturity on a stable number of structures, tight spreads and standard deviations, large number of quality participants<br><br>Broker data- Indications of reliability include a fixed Reuters quote page, a regular quote run, standard market structures and realistic bid/offer spreads |
| Regular market | Data should have well | Consensus/Broker data - Indications include generally |

Highly Confidential

BARCLAYS
CAPITAL

Price Testing policy

| quote conventions | understood market data quote conventions | accepted quote conventions for strike/skew, price vs volatility, regular structures (Eg American or European basis), regular terms (Eg Correlation). |
|---|---|---|
| Executable | Data should be consistent with executable quote prices | Consensus data- Indications include data consistent with trades/broker information, data uses active market participants, data has narrow spreads. Data should be a market price rather than a model price. |
| Consistent | Multiple data should be consistent | Data should be consistent between multiple sources and internally consistent if multiple terms and strikes are used.<br><br>Data should be consistent in terms of bid offer as shown by volume data and not a 1 sided market.<br><br>The data should also be consistently applied throughout the firm. |
| Timely | Data should be observed close to evaluation date | Where price testing is done at a specific date (Eg month end) the source should reflect the observation close to the valuation point<br><br>Consensus data- For exotic data, consensus data should be consistent with any evaluation of hedges.<br><br>Broker Data- Broker data can sometimes be sourced intra day when trading occurs. Reference points such as spot levels should be used appropriately |

## Testing methodology model inputs vs. external prices

There is a natural interaction between the inputs used for modelling and the outputs that a model produces. In addition many products can be valued either as a price or using a model based approach. This may change during the life of a product due to factors such as price illiquidity, change in the listed vs OTC balance of a portfolio, increase in trading of more exotic or second generation products, problems in model calibration process. The reasons for any change in valuation should be understood and evidenced. This affects the testing methodology. The degree of assurance provided by a type of testing will be dependent on a number of factors, including those detailed below.

A certain amount of judgement must be applied and it is recommended that where both input (model based) and output methods (price based) are available, they should both be considered and disclosed in the testing work. Priority should be given to the result that is believed to be the most accurate and double counting should be avoided in the disclosure and in the need for any valuation adjustments. This will usually involve reporting duplicate price testing results for the same position as memo items.

Where a large difference exists in the output testing that does not exist in the input, consideration should be given to whether the model being used is correct E.g. American Option being modelled as a European.

| Factor | Output testing indicator | Input testing indicator |
|---|---|---|
| Liquidity | Structure actively traded in fungible structures | Varied and inconsistent structures traded in the market |
| Complexity | Structure low complexity with one or two factors to model | Structure has high number of model inputs |

6

Highly Confidential

BCI-EX-00297188

BARCLAYS
CAPITAL

Price Testing policy

--------------------------------------------------------------------------------

| Reliability of data | Quote source is frequently updated, consistently quoted and a recognised industry source | Output quote source is infrequently updated – Eg single broker quote |
|---|---|---|
| Number of sources | Multiple sources available | Single quote source available |
| Market structure variability | Structures have common name, terms – Eg standard ISDA docs, generally accepted modelling | No common market name, terms or modelling |

Examples of the typical input and output testing are shown below.

| Market | Input | Mid | Output |
|---|---|---|---|
| FI | LMM product | IR swap | Government Bond |
| Equity | Multifactor option | Cliquet | Convertible bond |
| FX | Chooser tarn | FVA | FX Forward |
| Credit | $CDO^2$ | ABS Bonds | Corp Bond (Investment grade) |

For reference a range of inputs is contained in Appendix 1 which should be reviewed to determine whether they are significant inputs into the model.

## Untested items

In cases where neither input nor output price testing can be performed for a product (due to the lack of a suitable data source or any other reason) this must be reported along with the reasons why testing cannot be performed and any work undertaken to rectify this.

It will usually be the case that some model inputs for a product can be tested even if others cannot. The untested inputs should be disclosed and uncertainty metrics for these calculated (see below).

## Use of golden source internal data

Where technically feasible market data used to value positions should use golden sources relying on the desk within the firm that is the principal market maker. Testing should be consistent with any work performed by the relevant PCG department supporting that market maker. It should not be automatically assumed that results are immaterial either to the product to be tested or that the variance is insignificant as the source is another internal department. In addition care should be taken when interpreting the data that it is an appropriate input for the model, for example whether the market data tag correctly uses volatility skew in the model.

7

Highly Confidential

BCI-EX-00297189

## Multi Asset Portfolios

One area that deserves specific consideration is multi asset portfolios, also known as hybrid or in some business areas Joint venture portfolios. Testing should not be considered solely as a test of most significant input and active consideration should be given to any minor risk factors that are known to be used in pricing the positions. The risk on these is frequently higher as the trading business can in some cases not have as strong an expertise in products, trading patterns and conventions applied. In some cases this will involve using data or processes that another team is involved in sourcing, analysing and verifying. In addition quote conventions should be understood and any inconsistency in the modelling of the risk factors taken account in the valuation. Concerns in modelling should additionally be referred to risk management and model validation departments as part of the LTA process.

## Completeness Controls

As detailed above, the scope of testing is the population marked to fair value (including Available For Sale positions) and controls should be in place to identify this population. Controls that take account of the firm's balance sheet have a natural advantage in being aligned to the reporting in the financial statements and should be considered in the first instance.

For model based testing that uses the inputs and risk sensitivities controls based on the firm's official risk reporting when the feed is actively used in VaR calculations may be used as an alternative completeness control. The controls around the data should be understood and documented. The completeness controls should consider book and trade type. Where input based testing is used the controls should also ascertain whether the completeness of inputs is adequate to identify pricing variances

Where the firm has multiple positions which have inverse symmetry (back to back risk) this should be included in the testing process. Although the result will often have no impact to fair value there may be effects on other downstream processes E.g. Collateral/counterparty management.

## Uncertainty Metrics

Part of the price testing process involves providing a context for the result. In the same way that multiple brokers will publish different prices and banks will provide different levels of consensus pricing services, there is often no single definition of market levels. Therefore results should be presented in the context of the size of position and variability of external information.

The uncertainty metric may be part of the firm's internal reserving methodology or may use measures such as balance sheet, risk based or scenario based calculations. The pricing result should rarely be outside the uncertainty range. A default level is defined in the price testing guidance in appendix 2. The testing process should not simply focus on a point level of value but the range of scenarios that can exist which could include;

- Stressing inputs to testing Eg stressing default rates by 10%,

- Valuing based on a syndication vs a securitisation scenario

- Using consensus/broker ranges to look at market variation Eg using correlation ranges for exotic submissions,

- Scenario analysis. Eg applying worst case percentile to historic data.

8

BARCLAYS CAPITAL

## Limit monitoring

All positions should be considered in price testing and any known significant differences adjusted to P&L. For more details see the Limit Framework being implemented Q2 2009 Appendix 3.

## Review of price testing methodology

Testing methodologies should always be subject to scrutiny to ensure that no false assumptions are being made in the process, particularly when testing more exotic products.

Care should be taken to avoid the use of incorrect analytics or methodologies leading to incorrect conclusions. This is especially the case for risk based testing. Examples of some potential issues are shown below, along with control processes that could be used to avoid them. The onus is on the tester to be comfortable that the method represents the correct balance sheet difference.

| Problem | Controls |
|---|---|
| Methodology is risk-based but due to errors or assumptions in the derivation of inputs the result is inconsistent with balance sheet difference | Recommend recreating external price data using internal model input data. Eg recreate a MarkIt portfolio price using generated market data tags. |
| Incorrect assumption on the definition of risk. | Calculate the PV difference using externally generated market data tags and compare to risk based result |
| Exotic product results inconsistent with vanilla for same input | Compare any vanilla inputs derived from exotic services to vanilla inputs as part of vanilla services |

Price testing methodologies should be regularly reviewed to ensure that they remain appropriate in light of any changes to the portfolio of products, market events, availability of pricing data, IT systems, etc.

## Application of reserves and offsets

Fair value adjustments and reserves may be made against products for known weaknesses. The degree of judgment and uncertainty will be higher for more exotic products and for non executable external data. In evaluating this, PCG should take into account whether a model is industry standard, whether the reserve is a valuation adjustment or a parameter uncertainty, whether the application of the reserve supports the external price on a trade and portfolio basis. The use of multiple sources and trade data can assist in confirming that a price is executable.

Where a product is marked directly to bid/offer rather than a mid price, the price testing result should reflect the difference between internal and external fair value, ie if the internal is a mid price and external a bid/offer the effect of any bid/offer spread should be included in the result. If both prices are mid then no consideration should be given. The onus is on PCG to obtain evidence on whether it is a mid or bid/offer and document this.

In certain circumstances the valuation adjustment process uses market data in the calculation. This should apply the same standards as price testing in ensuring the data is preferably independent and reliable or otherwise subject to the testing process - Eg curve basis, volatility skew adjustments.

Where reserves are made as a result of price testing these should be calculated and disclosed in accordance with the Provisions Policy Statement and appropriately classified in PDB.

9

BARCLAYS
CAPITAL

## Interaction with Model sign off and LTA process

The LTA process is a fundamental control in the firm's model approval infrastructure. The process involves front office, Product Control, model validation and market risk. Documentation is disclosed on the Suzaku system. Queries relating to whether the process needs to be initiated should be forwarded to the model validation team in GFRM. For individual trades where LTA has not been granted the PTA approval process exists. Consideration of material inputs into the valuation of a product should be given for the conclusion of the LTA process. Where testing results raise concerns on the model usage this should be fed back into the LTA process this is especially relevant for exotic products where output prices are available. The LTA population will almost always have a defined, documented price testing process and will normally be a more advanced process then PTA.

Where PTA has been given, the model has not undergone as detailed a review as for LTA. The products should be reviewed for significant inputs and where possible tested and included in the price testing results. The conclusions will frequently be that an adjustment to balance sheet value should not be made given the model uncertainty. As the model has not been signed off there is a risk that either a significant input has not been identified or that it is being inappropriately used in the model. Concerns regarding this matter should be included in discussions on the prioritisation of LTA work.

## Other work

Under the umbrella of price testing, additional work may be performed if required. For example:

- Analysis of knock out, number of participants, spread and standard deviation of data from consensus services,
- Analysis of relationship between revenue and price testing results
- Analysis of price testing history on specific books, traders, underlyings, parameters
- Feedback from consensus services
- Ad hoc analysis of topical issues in the markets

## Version Control

| Version | Editor | Comment |
|---------|--------|---------|
| 1.0 | TF | |
| 1.1 | SB | Update for new price testing template guidance notes |
| 1.2 | SB | Update to remove details of old PCG Sarbox sign-off |
| 1.3 | TF | Limit Framework in appendix 3 and updates to relevant comments |

Highly Confidential

BCI-EX-00297192

**BARCLAYS CAPITAL**

## Appendix 1: Example range of inputs

Volatility (IR, equity, FX, commodity)

Volatility skew/smile

IR yield curve

IR yield curve Fin bias

IR yield curve basis

Dividend assumptions/forward curves/repo rates

Credit spreads

Correlation

Prepayment rates

Binary/Overhedge levels

Bond levels (Government, sovereign, agency, corporate and ABS)

Index/asset spot levels

Recovery rates

Interpolation methods (shape, seasonality, year end turn adjustments)

Highly Confidential

BARCLAYS
CAPITAL

-------------------------------------------------------------------------

## Appendix 2: Central Price Testing guidance notes

| The Pricing Template – A Product Controller's Guide |
| :---: |

### Purpose

The purpose of the pricing template is to be the standard communication medium for the delivery of price testing results and associated information.

This information is consolidated and presented to the heads of Product Control and Risk in the price testing meetings for the purpose of validation of the Barclays Capital month end financial statements.

Much of the consolidation of the templates is performed automatically so it is important that the standard format of the templates is maintained by all areas.

### Scope

All business areas within Barclays Capital which have assets and/or liabilities in either their trading or available for sale books are required to submit details of price testing and/or untested items in the required format on the pricing template.

To further clarify:

–   Full disclosure is required monthly on the entire portfolio, having being either tested or untested, irrespective of materiality.
–   Information has to be provided on the template in the prescribed format set out below for each field.

The template has been revised to be compatible with the bank's CHORUS hierarchy, the single hierarchy to be used for all p&l and risk reporting. This will allow price testing results to be reported against the same structure as other management reports and should aid understanding of price testing results.

### Template fields – Explanation and Format

| | |
|---|---|
| [Date] | Last London business date in the month. |
| | Mandatory date field. |
| [Region] | Region to which price testing relates or whether it is a global result. |
| | Mandatory text field chosen from drop down box. |
| [GMIS Product Area] | CHORUS hierarchy level 3 area. |
| | Mandatory text field chosen from drop down box. |
| [GMIS Business Area] | CHORUS hierarchy level 4 area. |
| | Mandatory text field chosen from drop down box. |
| [GMIS Sub Product Area] | CHORUS hierarchy level 5 area. |
| | Mandatory text field chosen from drop down box. |
| [Price Testing Area] | Field for other relevant area information related to the price testing, not covered in the previous fields. |
| | Optional free form text field. |
| [Testing Type] | Whether the result relates to the price testing of a model input, an output price or an untested item. |
| | Mandatory text field chosen from drop down box. |
| [Memo Item] | Field to show if the results are for informational purposes only and not to be included in headline price testing results. For example, this will be the case where a price test covers items also tested elsewhere (to avoid double counting) and where a listed versus theoretical price test is not considered reliable due to stale listed prices. |
| | Mandatory text field chosen from drop down box. |
| [Pricing Quality] | Indication of the strength of the price testing result: hard, medium or soft. Factors that should be considered when determining strength include the quality and number of sources of external data, the accuracy of methodologies used and the coverage of the external data over the portfolio. |

12

BCI-EX-00297194

**BARCLAYS CAPITAL**

Hard results are well supported by multiple sources of reliable external data and could potentially be used to re-mark the balance sheet.

Medium results use less reliable market data or approximations when calculating pricing results; however price testing results are indicative.

Soft results are based upon limited, proxy or historical market data and pricing results should be interpreted with care.

Mandatory text field chosen from drop down box.

| | |
|---|---|
| [Product] | Financial product asset classes. |

Mandatory text field chosen from drop down box.

| | |
|---|---|
| [Parameter] | Indication of which pricing parameter is being tested for products with multiple pricing inputs. For any product with a single pricing input choose 'Underlying' e.g. bond prices. For products such as basket options with multiple pricing inputs all three parameters (Underlying, Volatility & Correlation) would apply. |

Mandatory text field chosen from drop down box.

| | |
|---|---|
| [Product / Parameter Detail] | Used to provide more specific or granular detail into a product/asset class by splitting out the results on separate lines for the same parameter e.g. credit bonds/cds could be split into various credit classes, interest rate swaps and options could be split by currency, commodities options and forwards by resource, equity options by index/single stocks. |

Mandatory text field.

| | |
|---|---|
| [Benchmark source] | Indication of the pricing benchmark source used to price test. |

Mandatory text field chosen from drop down box.

| | |
|---|---|
| [Benchmark details] | Field for the specific details of the benchmark source(s) used for the price testing, for example the name of a broker source or pricing service. |

Mandatory text field.

**Note on Portfolio Size fields:**

Measurement of the portfolio size in GBP in terms of a balance sheet and/or risk value.

If documented reconciliations are in place these should be equal to the numbers provided to measure portfolio size.

Mandatory that at least one of the balance sheet fields contains a value.

| | |
|---|---|
| [Balance Sheet– Asset] | Total GBP monetary value of assets / positive NPV, MTM only. |

Positive values only.

| | |
|---|---|
| [Balance Sheet – Liability] | Total GBP monetary value of liabilities / negative NPV, MTM only. |

Negative values only.

| | |
|---|---|
| [Positive Risk Value] | Total GBP risk value of assets / positive. |

Positive values only.

| | |
|---|---|
| [Negative Risk Value] | Total GBP risk value of liabilities / negative. |

Negative values only.

**Note on Price Testing Variance fields:**

The net price testing variance is the sum of aggressive & conservative price testing results and month-end reserves - i.e. the overall over or under valuation to benchmark source as at the month-end date.

13

BCI-EX-00297195



Mandatory that the aggressive and/or conservative price test result fields contain a value for all tested items.

Post month-end reserves or re-marks should also be disclosed for informational purposes although these will not be included in month-end reporting.

Commentary is required on individual line variances in excess of £1m aggressive or conservative.

**[Aggressive Price Test Result]**

Month-end differences where Books & Records (ledger) have a higher asset or lower liability value than the PCG benchmark i.e. the over valuation of assets and under valuation of liabilities to a benchmark source. This is prior to valuation adjustments.

Negative GBP values only. Aggressive results are always shown in the negative to express the P&L loss required to correct the balance sheet to the benchmark valuation.

**[Conservative Price Test Result]**

Month-end differences where Books & Records (ledger) have a lower asset or higher liability value than the PCG benchmark i.e. the under valuation of assets and over valuation of liabilities to a benchmark source. This is prior to valuation adjustments.

Positive GBP values only. Conservative results are always shown in the positive to express the P&L gain required to correct the balance sheet to the benchmark valuation.

**[Month-end reserve]**
Price testing reserves held for the month-end date. These may be taken at the beginning of the following month but only reserves included in the month-end balance sheet should be included.

The reserve will usually be a positive value to represent an adjustment (P&L loss) to correct an aggressive pricing result. GBP values only.

**[Net Price Testing Variance]**
The sum of Aggressive Price Test, Conservative Price Test and Month-end Reserve. Automatically calculated.

**[Post month-end reserve]**
Price testing reserves taken after the month-end date, which do not affect the month-end balance sheet. These are included for informational purposes but are not included in headline price testing results.

The reserve will usually be a positive value to represent an adjustment (P&L loss) to correct an aggressive pricing result. GBP values only.

**[Post month-end re-mark]**
Re-marks taken during the following month. These are included for informational purposes but are not included in headline price testing results.

This will be a positive value to represent an adjustment (P&L loss) which corrects an aggressive pricing result, or a negative value to represent an adjustment (P&L gain) which corrects a conservative pricing result. GBP values only.

Where possible, the amount disclosed should be the effect that the re-mark would have had on the month-end price testing result.

**[Post month-end retesting]**
If further testing has been performed which provides new and better evidence around a month-end price testing result, the effect that the new result would have on the month-end result should be disclosed here.

This will be a positive value to represent a retesting result (P&L loss) which offsets an aggressive pricing result, or a negative value to represent a retesting result (P&L gain) which offsets a conservative pricing result. GBP values only.

For example, if a month-end aggressive result has been retested against better data leading to a lower aggressive result, the difference between the two results should be disclosed here.

**[Prior month net price testing variance]**

Previous month's net price testing variance, copied from the last template submitted.

GBP values only

14

BCI-EX-00297196

BARCLAYS
CAPITAL

--------------------------------------------------------------------------------

| | |
|---|---|
| **[Month-on-month movement]** | Movement between net price testing variance and prior month net price testing variance. Automatically calculated. |
| **[Result standard deviation]** | Standard deviation of result where this is available – for instance some Totem pricing services. |
| | Positive GBP values only |
| **[Result Range]** | Where a range of possible results is available, it should be include here. For instance, some pricing services provide bounded results and the value used in the template should represent the full + / - range bound. For example, if a Totem service has bounds of + or - £2m, a value of £4,000,000 should be entered into the template, to represent the entire range. |
| | Positive GBP values only |
| **[Exposure / Uncertainty]** | This field is for the quantification of uncertainty in monetary terms, representing either the untested exposure or the pricing uncertainty on tested items. |
| | Mandatory field. Negative GBP values only. |

**Untested Exposure**

Quantification of the potential loss that could be incurred on an untested item.

For untested items the exposure can be represented by the level of reserves (uncertainty) held specifically against the price/input. If no reserves exist, standard methods are provided to quantify untested exposure based on either gross balance sheet or gross risk values.

**Tested Uncertainty**

Quantification of the potential loss that could be incurred due to uncertainty of benchmark pricing inputs i.e. where an average market or consensus price benchmark is used, the actual price to exit the position may not be the average price but could lie in a range around the average, a single benchmark source may not be reliable and proxy, historic and extrapolated sources are inherently uncertain.

Reserves such as bid-offer/uncertainty can be used to represent the untested uncertainty. If no reserves exist standard methods are provided to quantify untested exposure based on either gross balance sheet or gross risk values.

### Exposure / Uncertainty Conventions

| | Untested Exposure | Tested Uncertainty |
|---|---|---|
| **1st** | | |
| All products | Specific Reserves | Specific Reserves |
| | or | |
| **2nd** | | |
| All products | Product specific methodology | Product specific methodology |
| | or | |
| **3rd** | | |
| Bonds | 50c (Gross BS x 0.5/100) | 20c (Gross BS x 0.2/100) |
| Volatility | 2 vols (2x Gross Vega) | 1 vols (Gross Vega) |
| Correlations | 10% Correlation bump | 5% Correlation bump |
| CDS DV01 | 5bps (5xDV01) | 2bps (2xDV01) |
| IR Delta | 5bps (5xDV01) | 2bps (2xDV01) |
| Forwards | 5bps (5xDV01) | 2bps (2xDV01) |
| Loans | 100c (Gross BS x 1/100) | 20c (Gross BS x 0.2/100) |
| ABS | Gross BS x 10% | Gross BS x 5% |

**[Exposure / Uncertainty Explain]**

15

BCI-EX-00297197

Price Testing policy

-------------------------------------------------------------------------------------------------

Description of the method used to quantify Exposure / Uncertainty

Mandatory text field.

| | |
|---|---|
| [Related reserves / implicit reserves] | Reserves held against each product line. This should reconcile back to the Provisions Database. |
| | Positive GBP values only. |
| [Reserve Type] | Description of the related reserves / implicit reserves value. |
| | Mandatory text field chosen from drop down box. |
| [Comments] | To provide additional commentary where an option was chosen 'Other – please comment', to provide any additional commentary or **mandatory** if net variance is > **£1m**. |
| [Level 3] | An indication of whether the tested product is classified as "Level 3" for observability purposes. |
| | Mandatory text field chosen from drop down box (Y/N). |
| [Accounting Treatment] | Accounting treatment used for instrument from the below list:- |
| | Fair Value (through p&l) |
| | Held-To-Maturity (amortised cost) |
| | Loans & Receivables (amortised cost) |
| | Available For Sale (through equity) |
| | Mandatory text field chosen from drop down box |
| [CP Node] | The CP node(s) of the pricing result. |
| | Optional text field |
| [Legal Entity] | The legal entity(ies) or company code(s) of the pricing result. |
| | Optional text field |
| [Notes] | Any other notes or comments relevant to the price testing result should be recorded here. |
| | Optional text field |

16

BCI-EX-00297198

## Appendix 3: Limit Framework

**Scope:** As an overarching principle all mark-to-market positions should be included in price testing and any significant differences adjusted to P&L. The framework looks at defining significance and placing a materiality limit on it coupled with a reporting/escalation process.

**Business level limits:** As a minimum, a limit should be set at a Sub business Unit level also known as GMIS level 5 Eg FI Rates – Options, vanilla and exotics. Additional limits can be actively considered at a trader, book or portfolio level where it is felt appropriate for the management of the business

**Size of limit:** The limit should have consideration for the reliability of the pricing data, historic context, uncertainty in the market and size of the portfolio. The limit should be split by quality of results with hard classified as zero or a de minmis number, as all material differences should be adjusted. For medium results, a non-zero limit should be set. For soft testing limit will generally be larger. The Soft limit framework will frequently consider prior months results and a limit based on consecutive month excess is permitted. On the first instance the exception should be issued as a warning of a limit breach. Limit should consider market events and any transition between medium or untested/soft to identify consistent and reliable patterns that evidence the external mark or testing procedure is representative of market levels.

**Acceptable methodologies:** Acceptable methodologies for determining limits are included in Appendix 1. They should be documented subject to periodic review and form part of annual governance monitoring. Exceptions to methods below should be communicated to the Valuations Committee.

**Approval:** Limit Framework falls under the governance of the Valuations Committee and will be subject to an annual review.

Any questions on the limit process should be forwarded to the head of valuations and the central price testing group. The limit framework chosen should not override the Price Testing policy or any requirements under the accounting standards.

**Limit communication process:** Having discussed and agreed the limit with trading management, a summary should be reviewed and authorised by the relevant Trading manager (generally an Exco member) and sent to the relevant business COO, the head of Product Control and the head of Valuations. An identical process should be followed for any limit changes. A summary of current limits and changes will be presented to the Valuation Committee, as will a list of any breaches during that period, actions taken and unresolved items.

**Interaction with other limits:** The existence of limits does not mitigate the necessity for limits on VaR, risk levels, stop loss, credit exposure or for other purposes, however the limits should be consistent with the level of risk on the books.

**Monitoring:** Price testing variances (defined as the variance net of month end and post month end adjustments in the price testing templates) and how they compare to limits must be monitored and reviewed on a monthly basis by product controllers discussed at the relevant valuation meeting.

**Action on breach:** On breaching a limit an email should be sent to the relevant valuation review committee dealing with that business area and discussed at the next meeting. The communication process should include the Exco member for that trading area, head of trading for the specific sub business group (GMIS level 5), head of valuations, Product Control Director for that area. A recommendation and action plan will usually be generated at the latest meeting. This will generally involve adjusting the balance sheet by the level of the excess variance over the limit. If the breach has not been resolved or no action taken by the time of the next Valuation Committee, it will be raised at that committee.

17

BCI-EX-00297199

BARCLAYS
CAPITAL

**Limit methodologies**

- Proportion of VaR

- Proportion of close-out reserves

- Proportion of market observed spreads/standard deviations  ( can be represented as a proportion of balance sheet)

- Limits that already exist as part of the stop loss process

- Zero

For soft results a limit process that refers to consecutive exceptions is permitted.

Highly Confidential

BCI-EX-00297200

# EXHIBIT 4

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                            Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

10                Debtors.

     ----------------------x

11

12        * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF RICHARD LANDREMAN

14            New York, New York

15            June 16, 2010

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 31053

Page 2

```
 1
 2              June 16, 2010
 3              9:37 A.M.
 4
 5         Deposition of RICHARD LANDREMAN,
 6    held at the law offices of Jones Day, LLP,
 7    222 East 41st Street, New York, New York,
 8    before Kathy S. Klepfer, a Registered
 9    Professional Reporter, Registered Merit
10    Reporter, Certified Realtime Reporter,
11    Certified Livenote Reporter, and Notary
12    Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1             HIGHLY CONFIDENTIAL
 2
 3        A P P E A R A N C E S :
 4
 5    JONES DAY, LLP
 6    Attorneys for Lehman Brothers, Inc.
 7        222 East 41st Street
 8        New York, New York  10017-6702
 9    BY:  KELLY A. CARRERO, ESQ.
10        TERRY McMAHON, ESQ.
11        RUSSELL LEINO (Summer Associate)
12
13    BOIES, SCHILLER & FLEXNER, LLP
14    Attorneys for Barclays
15        401 East Las Olas Blvd.
16        Fort Lauderdale, Florida 33301
17    BY:  W. TODD THOMAS, ESQ.
18
19
20
21
22
23
24
25
```

Page 4

```
 1            HIGHLY CONFIDENTIAL
 2        A P P E A R A N C E S :  (Cont'd.)
 3
 4    QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
 5    Attorneys for the Creditors Committee
 6        51 Madison Avenue
 7        22nd Floor
 8        New York, New York  10010
 9    BY:  ROBERT K. DAKIS, ESQ.
10
11    HUGHES, HUBBARD & REED, LLP
12    Attorneys for the SIPA Trustee
13        One Battery Park Plaza
14        New York, New York 10004-1482
15    BY:  SAMUEL C. McCOUBREY, ESQ.
16
17    ALSO PRESENT:
18        MARC VELLRATH, FSG
19
20
21
22
23
24
25
```

Page 5

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2    RICHARD LANDREMAN, called as a
 3        witness, having been duly sworn by a Notary
 4        Public, was examined and testified as
 5        follows:
 6    EXAMINATION BY
 7    MS. CARRERO:
 8        Q.   Good morning, Mr. Landreman.  My name
 9    is Kelly Carrero.  I'm with the law firm of
10    Jones Day.  We represent Lehman Brothers holding
11    Inc. in this matter.  I have with me my
12    colleague Terry milk man and one of our summer
13    associates, Russ Lino.  I'll let other counsel
14    introduce themselves?
15        MR. DAKIS:  Robert Dakis from Quinn,
16        Emanuel, Urquhart & Sullivan for the
17        Official Committee of Unsecured Creditors.
18        MR. McCOUBREY:  Sam McCoubrey from
19        Hughes, Hubbard & Reed for the SIPA trustee.
20        MR. THOMAS:  Todd Thomas from Boies,
21        Schiller & Flexner on behalf of Barclays and
22        the witness.
23    BY MS. CARRERO:
24        Q.   Mr. Landreman, have you ever been
25    deposed before?
```

Page 6

HIGHLY CONFIDENTIAL - Landreman
1
2      A.    No.
3      Q.    So perhaps it's best if we go over
4   some housekeeping rules.  It's easiest and
5   things run smoothly if you let me finish a
6   question before responding and I'll try to do
7   the same and wait to follow up with any
8   questions until you have finished your response.
9   If you need to take a break, I just ask that you
10  answer whatever question is pending and then
11  request a break and if it's an appropriate time
12  to break, we'll try to accommodate your request.
13         And, you know, if you have any
14  questions or don't understand a question,
15  please, you know, feel free to ask me to
16  rephrase it and I'll try to clarify.  So with
17  that, let's get started.
18         Mr. Landreman, can I ask you to tell
19  us a little bit about your position with
20  Barclays?
21     A.    I am a director of Securitized
22  Products Independent Valuation Group.  I've been
23  with the firm now for six years.  I manage a
24  team of 11 analysts who perform all
25  securitization tasks related to -- I'm sorry,

Page 7

HIGHLY CONFIDENTIAL - Landreman
1
2   all valuation tasks related to balance sheet
3   assets and that fall within the realm of
4   securitized products.
5      Q.    And when you say the Independent
6   Valuation Group, is that also what's known as
7   the Product Control Group?
8      A.    We're a subcomponent of Product
9   Control.  We're -- we report in to Product
10  Control, but within the Product Control lines,
11  Independent Valuations has been pulled out as a
12  specialty.  I think that was done even before
13  the Lehman acquisition in order to focus
14  valuation resources towards valuation as opposed
15  to line controllers and the accountants who do
16  the daily reconciliations.
17     Q.    Could you explain to me a little bit
18  more about how the PCG group is set up?  You
19  mentioned that the Independent Valuation Group
20  is a subpart.  What other parts are there of
21  PCG?
22     A.    Well, within Product Control, the --
23  or the middle office, they do a lot of
24  reconciliation of the P&L for the lines, the
25  businesses.  So, for example, there may be, for

Page 8

HIGHLY CONFIDENTIAL - Landreman
1
2   securitized products, there will be a group of
3   controllers who manage the daily balance sheet
4   P&L process for the business and then, on a
5   monthly basis, that group is tasked with having
6   the assets on the balance sheet independently
7   reviewed by a pricing expert to make sure that
8   the general ledger that's being reported and
9   published is reviewed.
10     Q.    And are there any other components of
11  PCG other than reconciliation of P&L as being
12  one group and then your Independent Valuation
13  Group?
14     A.    I mean, there's a Controls Group to
15  make sure that the controls that are set in
16  place are all managed, there's the Valuations
17  Group, there's a Tax Specialty Group and whether
18  those are part of Financial Control or Product
19  Control.  But every -- every business has its
20  own line controller groups.
21     Q.    And when you say every business, how
22  is it broken down?
23     A.    Well, by product specialties like
24  commodities, securitized products, you know,
25  agency debt, agency mortgages, fixed income,

Page 9

HIGHLY CONFIDENTIAL - Landreman
1
2   credit.  All the different businesses that the
3   bank's involved with.
4      Q.    And are those official divisions
5   within PCG by specialty group?
6      A.    I mean, there would be subject matter
7   experts who know those assets and those
8   businesses that would be managing the processes
9   for each group.
10     Q.    And is it divided between Global PCG
11  as opposed to US PCG?
12     A.    It's a big company.  They're all over.
13  Some businesses are global.  Some businesses are
14  local.  It depends upon the specialty.
15     Q.    And in your six years with Barclays,
16  have you been in the same role the entire time?
17     A.    With the growth of the mortgage
18  business within Barclays during the time that I
19  have been there, my role has gone from price
20  testing to managing larger groups, a larger
21  group of analysts who perform valuation on
22  different mortgage-related assets.
23         When I joined the firm, there was only
24  an agency mortgage desk.  We bought a mortgage
25  servicer.  We bought a sub-prime originator.

3 (Pages 6 to 9)

1    HIGHLY CONFIDENTIAL - Landreman
2    Q.   And what would be the difference
3    between price testing as opposed to valuation on
4    different mortgage-related assets?
5    A.   Well, I mean, if I'm giving -- we
6    would always call price testing a theoretical
7    process where the trader gives us a mark and we
8    test that price to see if it's valid.
9    Q.   And by contrast, what would valuation
10   on different mortgage-related assets be?
11   A.   Well, I mean, we'll be performing a
12   valuation on the mortgages.  It's the matter is
13   am I valuing mortgages or am I performing a test
14   of the trader's price?
15   Q.   And in the instance where you're
16   valuing mortgages, is that after the trader has
17   already done it himself or in lieu of the trader
18   doing it himself?
19   A.   Well, when we perform a valuation, it
20   would be the same process regardless of whether
21   I have a trader's price or not, so the way we
22   price or we value securities.
23   Q.   I guess what I'm trying to understand
24   is when would you have a trader's price and,
25   therefore, engage in price testing as opposed to

1    HIGHLY CONFIDENTIAL - Landreman
2    when would you and your group engage in
3    valuation of mortgages in the first instance?
4    A.   I'm not sure that -- what you're
5    asking on that question, because the valuation
6    is really -- it's the same.  It's we're
7    performing a valuation of a security.  The
8    question is, you know, do I have a data point
9    from a trader who is responsible for this to --
10   to review.
11   Q.   Following up on that, when would you
12   have a data point from a trader to review as
13   opposed to when would you not?
14   A.   We would have a data point to review
15   if the traders own the assets because they're
16   required to mark their portfolios to market on a
17   daily basis.
18   Q.   And so would you, in the event that
19   it's a new position, be the person or the group
20   to value it in the first instance?
21   A.   No, the trader would.  Whatever the
22   trader actually acquired the asset for or traded
23   it for.
24   Q.   And so you would be valuing it
25   subsequent to the acquisition of it at whatever

1    HIGHLY CONFIDENTIAL - Landreman
2    price the trader --
3    A.   Right, we would be given the
4    population at the end of the month and this is a
5    portfolio and these were the trader's marks at
6    the time.
7    Q.   And you would engage in a ground-up
8    valuation of the securities as opposed to just a
9    theoretical price testing in that instance?
10   A.   Correct.  Well, in all instances, the
11   valuation --
12       MR. THOMAS:  Go ahead and let her
13   finish her question.  You're starting to
14   anticipate the finish of her question.  But
15   pause and let her finish her question,
16   please.
17       THE WITNESS:  Okay.
18   Q.   It might help just to have a document
19   in front of us.
20       I'm going to put in front of you what
21   we have premarked as 799B.
22       (Exhibit 799B, Exhibit C, described as
23   Bio for ABS, marked for identification, as
24   of this date.)
25   Q.   Mr. Landreman, I have put in front of

1    HIGHLY CONFIDENTIAL - Landreman
2    you what I will represent to you was attached as
3    an exhibit to a brief filed by counsel for
4    Barclays in opposition to a motion we had filed
5    to exclude Barclays' expert, Professor Paul
6    Pfleiderer.
7       Have you ever seen this document
8    before?
9    A.   This document in front of me, yes.
10   Q.   And when did you see this document?
11   A.   I mean, I have a bio for my group and
12   I've had this and the bio for my group always in
13   existence because I always have qualifications
14   of my staff available for audit and regulatory
15   reviews.  So this is a standard document that we
16   normally have.
17   Q.   And is this document itself the bio
18   for your group that was already in existence?
19       MR. THOMAS:  Objection to form.
20   A.   I'm sorry?
21   Q.   Perhaps let me rephrase that.  Did you
22   assist in preparing this document for purposes
23   of this litigation?
24   A.   This document was in existence for at
25   least for my group prior to this litigation.  So

HIGHLY CONFIDENTIAL - Landreman
1
2 it wasn't prepared specifically for this
3 litigation. It was a standard document that we
4 would have on file.
5    Q.    And when you say for your group, do
6 you mean the people that fall in the first two
7 pages under I guess 1(A), Fixed Income APS, and
8 1(B), Fixed Income -- I'm sorry, I just mean 1A.
9    A.    Just 1(A).
10    Q.    And if you will look at the top of the
11 document, it says "Global Independent
12 Valuations." Is that the name of your group
13 within the Product Control Group?
14    A.    Correct.
15    Q.    And is that group run by Marcus
16 Morton?
17    A.    Yes, he is -- yes, it is.
18    Q.    And do you directly report to Mr.
19 Morton?
20    A.    In the U.S., there's a U.S. head of
21 Valuations, Charles Utley, and Charles reports
22 directly to Marcus.
23    Q.    And so would it be safe to say that
24 both you and Mr. Teague, who on this list fall
25 under Morton, actually have another layer

HIGHLY CONFIDENTIAL - Landreman
1
2 between, and that would be Mr. Utley?
3    A.    Correct. At the time of the Lehman
4 valuation, we were reporting directly to Marcus.
5 Charles was with the firm, but not in his role
6 as U.S. head of Valuations.
7    Q.    When you say at the time of the
8 acquisition, does that include throughout the
9 period of time thereafter that you were valuing
10 the assets acquired?
11        MR. THOMAS:  Objection to form.
12    Q.    Go ahead and answer.
13    A.    Charles was not involved in the
14 valuation of the opening day balance sheet for
15 or in supervising my group at that time.
16    Q.    Could you tell me a little bit about
17 what products would be covered under your group,
18 which appears to be titled "Fixed Income ABS"?
19    A.    We would be doing agency
20 mortgage-backed securities, agency
21 mortgage-backed securities CMOs, collateralized
22 mortgage obligations, all non-agency mortgage
23 structured products, including all day, option
24 ARM, prime, non-Agency RMBS, CDOs, CLOs that
25 were ABS or mortgage-related.

HIGHLY CONFIDENTIAL - Landreman
1
2 CMBS, commercial mortgage-backed
3 securities, asset-backed securities for
4 franchises, credit cards, student loans, auto
5 loans, et cetera.
6    Q.    Would your group also be responsible
7 for munis?
8    A.    No, they would not.
9    Q.    How about corporates?
10    A.    We would not be corporate or agency
11 debentures or Treasuries.
12    Q.    And by that, would another name be
13 rates?
14    A.    That would be under rates, yes.
15    Q.    And how about options?
16    A.    That would not be.
17    Q.    Futures?
18    A.    No.
19    Q.    Equities?
20    A.    No.
21    Q.    With respect to the acquisition of
22 assets from Lehman, what asset classes did your
23 group have direct responsibility for
24 independently valuing?
25    A.    Everything I mentioned earlier.

HIGHLY CONFIDENTIAL - Landreman
1
2 Agency mortgages, agency CMOs, non-agency,
3 mortgage-backed securities, franchise ABS,
4 credit card ABS, student loan ABS.
5    Q.    And is there a specific front office
6 desk or department that corresponds with the
7 assets that you are responsible for valuing?
8    A.    Yes. There's a front office flow desk
9 for various assets, including agency mortgages,
10 non-agency mortgages, all the asset-backed
11 securities, and we also had some proprietary
12 trading desks in place as well that may have
13 owned mortgages that would have been performing
14 valuations that we reviewed their prices as
15 well.
16    Q.    And if we could break it down a little
17 bit more in terms of, is it one desk that would
18 cover all of them? Is it various desks for each
19 of the respective assets?
20    A.    Well, as we manage the businesses, so,
21 for example, Tom Hamilton, who owns the
22 securitized product business, has several
23 traders who manage desks for him, so I will have
24 a trader who only trades agency pass-throughs,
25 who only trades agency CMOs, who only trades all

1      HIGHLY CONFIDENTIAL - Landreman
2  day mortgages.  So you can break it up by
3  product specialists and there's a managing
4  director or a director who runs that desk for
5  that business.
6      Q.    And in the process of your group
7  valuing the securities acquired in the Lehman
8  transaction, would you work hand-in-hand with
9  the traders in valuing them or are they
10  independent processes?
11      A.    They're independent processes.
12      Q.    And are they undertaken simultaneously
13  or concurrently?
14      A.    I'm sorry, I don't --
15      Q.    I'm just trying to understand, the
16  processes that are independent, are they being
17  undertaken one after the other or at the same
18  time?
19      A.    Well, the business is required to mark
20  their books on a daily basis, so they mark to
21  market every day.  We're mandated to test on a
22  monthly basis.
23      Q.    Now, this brings us back to something
24  that I think I wasn't understanding from earlier
25  line of questions.  The difference between price

1      HIGHLY CONFIDENTIAL - Landreman
2  testing as opposed to ground-up valuation.
3          When you say that your group would
4  normally test on a monthly basis, do you mean
5  price test or do you mean independently value on
6  a monthly basis?
7      A.    There really is not a difference.  I
8  have to perform a valuation in order to conduct
9  a test, so I have to value the securities.
10      Q.    Are there instances where price
11  testing wouldn't involve conducting an
12  independent valuation and might be some other
13  form of testing?
14          MR. THOMAS:  Objection to form.
15      A.    I mean, there could be, you know, some
16  tests that are performed that maybe are like a
17  proxy or a benchmark comparison to similar
18  assets.
19      Q.    I apologize.  I'm still not
20  understanding the distinction you were drawing
21  earlier in terms of the evolution of your role
22  and where you made the distinction between price
23  testing as opposed to valuation of the
24  mortgages, and if you could explain to me what
25  the difference is between what you were doing in

1      HIGHLY CONFIDENTIAL - Landreman
2  your earlier years at Barclays, price testing as
3  opposed to what you were doing in your later
4  years in terms of valuations.
5      A.    Well, early in my career, I was the
6  primary analyst performing the valuation of all
7  of the agency and non-agency mortgages.  It was
8  a smaller business when I first started, and the
9  businesses have all grown since I've been there.
10          So when we acquired the mortgage
11  servicer, I also brought on two staff members to
12  perform valuation of the mortgage servicing
13  rights and also assist in other asset categories
14  that were growing and becoming critical within
15  my world.
16          So I had a staff as of, you know, two
17  years into it, and then, as more and more
18  mortgage product was coming on and the credit
19  crisis was starting to evolve, there was a
20  centralization of all mortgage products into one
21  group.  So that all fell under me, so all of the
22  sub-prime mortgages, we also had sub-prime whole
23  loans when we acquired Equifirst down in North
24  Carolina.
25          So, as the business grew, my group

1      HIGHLY CONFIDENTIAL - Landreman
2  grew, and then we also consolidated all mortgage
3  analytics in one group.  Now I manage a group of
4  12 people, the people that I brought in, I built
5  the team, handpicked the analysts, and now it's
6  really, similar to how the businesses are
7  structured, I have specialists for each group
8  and that person would conduct the price testing
9  or the valuations for those assets and they
10  would perform that regardless of whoever owns
11  the assets.  Because you may have some
12  proprietary trading desks that might own similar
13  assets to what a flow business would be.
14      Q.    And in terms of the business growing,
15  which asset classes were not currently within
16  Barclays' portfolio at the time of the Lehman
17  acquisition that, subsequent to it, they added
18  acquired?
19          MR. THOMAS:  Objection to form.
20          Go ahead.
21      A.    The only category that I recall would
22  have been the franchise ABS.  We didn't have a
23  large presence in the franchise ABS for my
24  world.
25      Q.    How about Alt A?

Page 22

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2     A.   We had that business.
 3     Q.   And were there dedicated people within
 4  your group for each of the categories of ABS
 5  covered?
 6     A.   There would be people who could cover
 7  multiple categories.  So like Victor, Victor
 8  Tian would be my Alt A specialist.  He was hired
 9  from American Home Mortgage.  He worked on the
10  trading desk at American Home Mortgage
11  structuring Alt A securities.  I had worked with
12  Victor seven years ago in my prior life as a
13  consultant on a Freddie Mac, so I'm aware of his
14  expertise in the product space.
15     Q.   Why don't we continue down the list.
16  Under Victor, and I apologize if I butcher any
17  names here, what would Usman Babar cover?
18     A.   Usman was a Lehman employee, so he was
19  still in the integration period while we were
20  doing the valuations.  He now does like
21  asset-backed credit default swaps and illiquid
22  sub-prime and manages a portfolio valuation
23  which he distributes to people in the group.
24     Q.   And were former Lehman employees that
25  went over to Barclays, were they involved in the
```

Page 23

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2  valuation of the securities that were acquired?
 3     A.   No.
 4     Q.   Were they consulted in any way in the
 5  process of valuing securities?
 6     A.   To a very limited extent.
 7     Q.   And what extent would that be?
 8     A.   Well, Usman was, you know, familiar
 9  with who was doing some of the price testing of
10  the assets, but on my initial interviews with
11  certain people within the firm, I felt that we
12  had a superior process to the valuation
13  methodologies that were being employed within
14  the Product Control space and we only hired two
15  people out of their group.
16     Q.   And were those two people Usman and
17  Jay Park?
18     A.   Yes.
19     Q.   And is that reflective of all that was
20  hired or all that remained?
21     A.   All that was hired.
22     Q.   So let's just continue down the list.
23        Richard Beame?
24     A.   Richard Beame has been with Barclays
25  doing primarily all commercial mortgage-backed
```

Page 24

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2  securities and commercial whole loans.
 3     Q.   And was he the primary person
 4  responsible for valuing any CMBS that was
 5  acquired from Lehman?
 6     A.   No.
 7     Q.   And who would have been that person?
 8     A.   That would have been Victor Tian and
 9  myself.  We didn't receive any investment -- I
10  mean any quality CMBS.  Most of this was mapping
11  to one of the index for defaulted CMBS.
12     Q.   And moving down the list, Scott
13  Ginsberg, what product did he cover?
14     A.   He would have been doing the agency
15  mortgages.  He had been with me for four years
16  at that point.
17     Q.   And was he the primary person
18  responsible for valuing any agency mortgages
19  acquired from Lehman?
20     A.   Yes.  Under my supervision.
21     Q.   Moving down the list to Vincent Pini,
22  is -- would you tell me what his area of
23  specialty is?
24     A.   His area of specialty would have been
25  sub-prime mortgages and mortgage servicing
```

Page 25

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2  rights.
 3     Q.   And did he have primary responsibility
 4  for valuing any of the securities that were
 5  acquired from Lehman?
 6     A.   No.  He would have been a participant
 7  in the analysis.
 8     Q.   And did he participate in connection
 9  with any specific category?
10     A.   Mostly with the sub-prime
11  mortgage-backed securities.
12     Q.   And could you be a little more
13  specific when you say sub-prime?  Would those
14  fall within a specific asset category --
15     A.   The non-agency mortgage-backed
16  securities.
17     Q.   And who else would have been involved
18  in the valuation of the non-agency
19  mortgage-backed securities?
20     A.   Jessica Wong.  There was a large
21  portion of securities that she had a specialist
22  in -- specialist's knowledge in, which were like
23  net interest margin securities and post-NIM, net
24  interest margin residuals, which were very
25  popular in the sub-prime market which we
```

Page 26

HIGHLY CONFIDENTIAL - Landreman

1    received from Lehman, which we looked to see if
2    there was any value to those securities because
3    we had already written off nearly all of ours to
4    zero at that time. So when we got those
5    securities, we wondered what they were.
6    Q.    Was anybody else within your group
7    involved in the valuation of non-agency
8    mortgage?
9    A.    Imran Ansari would have been involved
10   in the CDOs and CLOs that would have been able
11   to have been modeled within our group.
12   Q.    I got confused there because I think
13   he's the only one whose name is backwards.
14   A.    No, Imran Ansari. Ansari is his last
15   name.
16   Q.    The others are first, last.
17   A.    Oh, okay.
18   Q.    So, okay. I got it.
19         Anyone else for non-agency mortgages?
20   A.    That should be about it.
21   Q.    And who had primary responsibility for
22   the valuation of non-agency mortgages?
23   A.    Victor Tian.
24   Q.    I think we've covered everybody but


Page 26

HIGHLY CONFIDENTIAL - Landreman

1    received from Lehman, which we looked to see if
2    there was any value to those securities because
3    we had already written off nearly all of ours to
4    zero at that time. So when we got those
5    securities, we wondered what they were.
6    Q.    Was anybody else within your group
7    involved in the valuation of non-agency
8    mortgage?
9    A.    Imran Ansari would have been involved
10   in the CDOs and CLOs that would have been able
11   to have been modeled within our group.
12   Q.    I got confused there because I think
13   he's the only one whose name is backwards.
14   A.    No, Imran Ansari. Ansari is his last
15   name.
16   Q.    The others are first, last.
17   A.    Oh, okay.
18   Q.    So, okay. I got it.
19         Anyone else for non-agency mortgages?
20   A.    That should be about it.
21   Q.    And who had primary responsibility for
22   the valuation of non-agency mortgages?
23   A.    Victor Tian.
24   Q.    I think we've covered everybody but

Page 27

HIGHLY CONFIDENTIAL - Landreman

1    perhaps the last name on the list.
2    A.    Eli Bloshtein.
3    Q.    Yes. And did he have any involvement
4    in valuing any of the securities?
5    A.    Minimal. He would have been -- he's a
6    junior analyst who was part of a finance
7    rotation analyst program. So he would have, if
8    anything, done formatting of reports and
9    learning how to value securities.
10   Q.    Earlier when I had asked you about
11   whether any of the former Lehman people who
12   joined your group had any involvement in valuing
13   any of the assets acquired, you had said no but
14   mentioned some interviews at the outset of
15   valuing. And perhaps I'm misstating that.
16         My question really is, at the outset
17   of the valuation process, did you conduct any
18   interviews of any former Lehman employees?
19         MR. THOMAS: Objection to form.
20   A.    No, I was -- I returned from vacation.
21   I was handed a group of securities that needed
22   to be valued and I assigned my team the
23   responsibility of commencing the valuations, and
24   we were working on that for a few weeks before I

Page 28

HIGHLY CONFIDENTIAL - Landreman

1    actually met anybody from Lehman.
2    Q.    So, in the process of valuing any of
3    the securities for which you and your team had
4    responsibility, you did not use any information
5    obtained from Lehman or any information based
6    off of interviews with anybody from Lehman?
7         MR. THOMAS: Objection to form.
8    A.    No.
9         (Exhibit 800B, a document bearing
10   Bates Nos. BCI-EX-(S)207964 through 207969,
11   with attachment, marked for identification,
12   as of this date.)
13   Q.    Mr. Landreman, I'm going to hand you
14   what has been premarked as Deposition Exhibit
15   800B.
16        MR. THOMAS: When you're saying
17   "premarked," they have been premarked for
18   this deposition? They haven't been
19   premarked in other depositions?
20        MS. CARRERO: Yes, thank you for
21   clarifying. In an effort to save time, I
22   had done it before we started.
23   Q.    Let's take a moment to look through
24   the document.

Page 29

HIGHLY CONFIDENTIAL - Landreman

1    A.    Okay.
2    Q.    If I could just direct your attention
3    to the e-mail at the top from Mr. Teague to you,
4    among others, dated October 27. Do you see
5    where in that e-mail it starts, "Each
6    spreadsheet should back up one of the tabs in
7    the attached file," which is followed by a list
8    of asset classes and names next to it?
9    A.    Yes.
10   Q.    Do the names next to each of these
11   asset classes fairly reflect the people that
12   were working on the valuations of each of those
13   asset classes?
14        MR. THOMAS: Objection to form.
15   Foundation.
16   A.    I really can speak to the areas that
17   I'm familiar with, which would be the PMTG and
18   RMBS, which it -- say yes. I would need to see
19   what he -- in terms of rates, I would only be
20   involved in the rates as it related to their
21   mortgage involvement, not the fixed income,
22   Treasuries or agency debentures.
23   Q.    Using the asset class names that we
24   had used before, what would PMTG cover?

HIGHLY CONFIDENTIAL - Landreman
1
2    A.    Everything in my world.
3    Q.    Could you be more specific?
4    A.    Agency mortgage-backed securities,
5 agency collateralized mortgage obligations,
6 non-agency, all day non-agency sub-prime,
7 non-agency ABS, credit card securitizations,
8 auto securitizations, student loans, franchise
9 securitizations.
10    Q.    And so would it be fair to say the
11 only thing not covered under PMTG that your
12 group is also responsible for is RMBS?
13        MR. THOMAS:  Objection to form.
14    A.    I'm sorry, could you repeat that?
15    Q.    My question is, based off of the
16 division within Deposition Exhibit 800B of RMBS
17 and PMTG, I'm asking, does that reflect what
18 your group would cover?
19    A.    Does -- so does the listing of the
20 product categories as defined by Sean in his
21 e-mail coincide with the products that I would
22 price test?
23    Q.    Exactly.
24    A.    As I said, yes, and PMTG, the assets
25 in PMTG that were related to my business would

HIGHLY CONFIDENTIAL - Landreman
1
2 be price tested or valued in my group; and if
3 they held corporates or if they held munis or
4 they held equities, we would distribute those to
5 the subject matter experts who would do the
6 valuation of those specific instruments for that
7 portfolio.
8    Q.    So you cover some asset categories
9 that would fall under PMTG, but not all asset
10 categories that fall under PMTG?
11    A.    Correct.
12    Q.    And your group would cover all RMBS;
13 is that correct?
14    A.    Correct.
15    Q.    And while your name is next to
16 "Rates," your group would not ordinarily cover
17 rates; is that correct?
18    A.    Correct.
19    Q.    And going down the list, starting with
20 rates, next to your name there's a name E-L-L-Y.
21        Do you know who that is?
22    A.    Yes.  That's Elly Pu.
23    Q.    And is Elly Pu within your group?
24    A.    She was in Sean's group working on the
25 municipals valuations.

HIGHLY CONFIDENTIAL - Landreman
1
2    Q.    And by Sean, you mean Sean Teague?
3    A.    Yes.
4    Q.    And how about Scott, do you know who
5 Scott is?
6    A.    Yes.  Scott would be reference to
7 Scott Ginsberg, and he would have been doing the
8 agency mortgage-backed securities.
9    Q.    So some securities within rates would
10 fall under your group's responsibilities; is
11 that correct?
12    A.    Only if they were mortgage-backed
13 securities.
14    Q.    And the term "agency" here reflects
15 agency mortgage-backed securities?
16    A.    I don't know that.  You should ask
17 Sean what he was referencing.
18    Q.    And RMBS next to your name, there's
19 Victor and Scott.  Would that be the Victor and
20 Scott that were referenced on Deposition Exhibit
21 799B?
22    A.    Correct.
23    Q.    Kevin Jhea and Heidi Su, would those
24 be individuals within Sean Teague's group?
25    A.    Correct.

HIGHLY CONFIDENTIAL - Landreman
1
2    Q.    And how about Mr. Washtell?
3    A.    Mr. Washtell is a director in charge
4 of equities.  He would be my counterpart in the
5 equities world.
6    Q.    And did he have primary responsibility
7 for valuing the equity positions acquired from
8 Lehman?
9    A.    It's my understanding that he did, but
10 you may want to check with him just to make
11 sure.
12    Q.    And are you aware of any other asset
13 classes for which he had responsibility valuing
14 securities from the Lehman acquisition?
15    A.    I couldn't say with certainty what
16 other asset categories he covers.
17    Q.    Mr. Landreman, I'm putting before you
18 what has been marked Deposition Exhibit 801B.
19        (Exhibit 801B, a document bearing
20    Bates Nos. BCI-EX-(S)201185 through 201187,
21    marked for identification, as of this date.)
22    Q.    Can you take a moment to review it.
23        If I could direct your attention to
24 the attachment to this document, and --
25    A.    Okay.

1     HIGHLY CONFIDENTIAL - Landreman
2    Q.    The very left-hand column has a list
3 of asset classes, and then a column or two
4 columns over, there are lists of names under a
5 column titled "PCG Owner."  Do you see that?
6    A.    Yes, I do.
7    Q.    Are you familiar with most of the
8 names on this list?
9    A.    Yes, I am.
10    Q.    Can we just take a look at the "U.S.
11 Agency CMO" line as well as the "U.S. Agency
12 Pool" line, there's an individual by the name of
13 Joe Kaczka.  Could you tell me who he is?
14    A.    Joe Kaczka is the controller for the
15 businesses, the line controller for the
16 businesses.  He's responsible for the day-to-day
17 middle office operation of the balance sheet
18 reconciliation, the P&L reporting.
19    Q.    So this would tie back to our earlier
20 discussion about the different subgroups within
21 Product Control and the functions of controller
22 as opposed to your group, which did independent
23 valuations?
24    MR. THOMAS:  Objection to the form of
25 the question.  Lack of foundation,

1     HIGHLY CONFIDENTIAL - Landreman
2 especially with respect to the document.
3    A.    My understanding is that the names
4 here were the line controllers for the
5 respective businesses that were on this
6 spreadsheet.
7    Q.    And these individuals were not within
8 the Valuation Group, whether it be yours or Sean
9 Teague's; they work for a different part of PCG;
10 is that correct?
11    MR. THOMAS:  Objection to form.
12    A.    Correct.  These were the line
13 controllers.
14    Q.    Are any of these line controllers
15 former Lehman employees?
16    A.    I don't know.
17    Q.    Can you tell me a little bit about --
18 can you tell me, starting with the non-Agency
19 RMBS, how in the normal course you and
20 individuals within your group would go about
21 valuing a security of that class?
22    MR. THOMAS:  Objection to form.
23    A.    For the non-Agency RMBS, as part of
24 our monthly process, we have full transparency
25 to see what our trading desk is doing, so we see

1     HIGHLY CONFIDENTIAL - Landreman
2 all of the positions that they buy and sell on a
3 daily basis.  So we monitor those trades and we
4 use those trades as observable benchmarks to
5 produce a spread matrix or a valuation input
6 from those observable trades.
7    Victor manages that process.  So, as
8 we're benchmarking our trades, we'll solve for,
9 using the trade price on that day, we'll solve
10 for a spread.  We'll look at the characteristics
11 of that bond and provide certain measurements in
12 terms of amounts of credit support, current
13 ratings, current delinquency pipelines of that
14 specific bond so we could take the trade price
15 from that bond and make a rationalization as to
16 what a comparable bond might trade.
17    So we track all of the spread
18 matrices.  We look at all of the historical
19 data.  We do also review our competitor spread
20 publications for standard market research.  We
21 do source and obtain vendor prices to see if
22 there's any reliability in some of their marks
23 or their indications.
24    So but it's really on a bond-by-bond
25 basis we will review each bond and we will look

1     HIGHLY CONFIDENTIAL - Landreman
2 to see what the current collateral performance
3 is of the underlying bond.  We'll apply a spread
4 to that from an observable trade matrix and
5 perform a valuation and review that in
6 conjunction with our expectations of where we
7 think things would trade or how we currently
8 price things in our existing books and records.
9    Q.    And is there a formal policy and
10 procedure that governs what steps are taken in
11 the valuation process of non-Agency RMBS?
12    A.    Yes.  There was a policy and a
13 procedure that's been published and documented
14 and reviewed by internal audit, by PwC.  The
15 entire process is regularly audited by our
16 external auditors and also our internal auditors
17 and other regulatory agencies.
18    (Exhibit 802B, a document bearing
19 Bates Nos. BCI-EX-297092 through 297113,
20 marked for identification, as of this date.)
21    (Exhibit 803B, a document bearing
22 Bates Nos. BCI-EX0297114 through 297134,
23 marked for identification, as of this date.)
24    (Exhibit 807B, a document bearing
25 Bates Nos. PwC-BarCap45788 through 45792,

HIGHLY CONFIDENTIAL - Landreman
1
2    marked for identification, as of this date.)
3        Q.    Mr. Landreman, I have put before you
4    what has been marked Deposition Exhibits 802B,
5    803B and 807B.  If you could take a moment to
6    look them over.
7        MR. THOMAS:  Could you just identify
8    the titles according to the number?
9        MS. CARRERO:  Sure.  No problem.
10        802B is titled "Fixed Income Credit
11    Products, Price Testing Policy," Bates
12    number on the first page is BCI-EX00297092.
13        Deposition Exhibit 803B is titled
14    "Global Financing Credit Products, Price
15    Testing Policy," and it has Bates numbers
16    BCI-EX-00297114 on the first page.
17        And Deposition Exhibit 807B is an
18    e-mail Bates-stamped PwC BarCap 00045788,
19    with attachments.
20        Q.    If you would like, we can just take
21    them one at a time.  If you've had a chance to
22    review Deposition Exhibit 802B, perhaps we can
23    start there.
24        A.    Sure.
25        Q.    Have you seen this document before?

HIGHLY CONFIDENTIAL - Landreman
1
2        A.    This is Sean's price testing policies
3    and procedures for his credit products.  It's
4    not my business line.
5        Q.    And so this would cover some ABS
6    securities, but not the non-Agency RMBS
7    securities?
8        A.    Not the cash bonds.  This would have
9    been any derivatives or swaps or CDS.
10        Q.    Would a similar policy exist for your
11    group?
12        A.    Yes.
13        Q.    And if I could just turn your
14    attention to page 5 of the document.  Looking
15    under the heading "Asset-Backed Securities," the
16    second paragraph, do you see the first sentence
17    that says, "The principal mortgage trading
18    group, PMTG, is the former CDO desk"?
19        A.    I see that.
20        Q.    Is that an accurate description of
21    PMTG?
22        A.    I don't know that for a fact.  I know
23    there were lots of people in PMTG.  I don't know
24    if all of them were from the CDO desk.  I don't
25    know the origin of all of the people who are on

HIGHLY CONFIDENTIAL - Landreman
1
2    PMTG.
3        Q.    But PMTG, the PMTG desk would cover
4    more than just CDOs; is that correct?
5        A.    It was -- the acronym was the
6    Proprietary Mortgage Trading Group, so -- or,
7    the Principal Mortgage Trading Group.  So they
8    were mostly mortgages, so they would do some
9    CDOs and CLOs.  But the market hadn't been
10    seized at that point, so there was no issuance
11    of CDOs or CLOs.
12        Q.    Turn your attention to what has been
13    marked Deposition Exhibit 803B.  And have you
14    seen this policy before?
15        A.    No, I have not.
16        Q.    And just from your quick review, does
17    it appear to be also a policy that governs Sean
18    Teague's area?
19        A.    Correct.
20        Q.    We can move on to the next document.
21        Take a look at Deposition Exhibit
22    807B.
23        A.    Uh-huh.
24        Q.    And do you see the e-mail at the
25    bottom from Scott Ginsberg to Christopher

HIGHLY CONFIDENTIAL - Landreman
1
2    Merchant at PwC CC-ing you, among others,
3    attaching what is titled a "Lehman Purchase
4    Outline"?
5        A.    Yes.
6        Q.    And if you could turn to the
7    attachment to the e-mail, which is titled
8    "Lehman Acquisition Price Verification Process,"
9    do you see that?
10        A.    Yes.
11        Q.    Have you seen this document before?
12        A.    I don't recall it, but it appears
13    accurate to my recollection of what the process
14    was at the time.
15        Q.    And when you say the process at the
16    time, do you know when this process was put in
17    place?
18        A.    I mean, it's really the same process
19    we've always employed.  The loss coverage ratio
20    and the current credit support calculations were
21    implemented several months earlier around the
22    time of the Bear Stearns crisis because the
23    market was met -- the market conditions
24    warranted reviewing Alt A collateral and
25    mortgage-related collateral based upon, you

Page 42

1    HIGHLY CONFIDENTIAL - Landreman
2  know, amounts of credit support that were
3  available.
4    Q.  Would the contents of this outline
5  reflect what would be found in the formal
6  policies and procedures governing this area of
7  your group?
8      MR. THOMAS:  Objection to form.
9    A.  This -- the hierarchy of sources and
10 the process should be in the policies and
11 procedures.
12   Q.  And did you have any involvement in
13 drafting this outline?
14   A.  I would have reviewed it before it
15 went out.
16   Q.  Do you recall if it was prepared at
17 the request of PwC?
18   A.  As part of PwC's detailed review of
19 our process, Christopher Merchant, their subject
20 matter expert, who focuses only on mortgage
21 price testing processes, asked us to give him a
22 general outline of what we were doing with the
23 process at the time.  So we provided him with
24 this document.
25   Q.  And would the price testing that PwC

Page 43

1    HIGHLY CONFIDENTIAL - Landreman
2  was undertaking, would it be similar to the
3  price testing that your group was undertaking?
4      MR. THOMAS:  Objection to form.
5    A.  We didn't see what PwC did to price
6  test.  We know that they came through and
7  reviewed everything we did and they checked
8  everything we said we were doing to determine
9  that we were in fact applying the processes that
10 we said we were applying.
11     So they did a full test of all of our
12 processes and how we applied our assumptions
13 within the model, checked to see that we were
14 running this, and they would get the same number
15 using the same assumptions.
16     If they did additional independent
17 valuation in terms of their own processes within
18 their firm, I don't know where that was, but I
19 know that they did a full review of everything
20 we did.
21   Q.  And when you say they did a full
22 review of everything you did, would that include
23 any work that the traders in the front office
24 were doing on each position as well?
25   A.  I'm sorry, I don't understand the

Page 44

1    HIGHLY CONFIDENTIAL - Landreman
2  question.
3    Q.  I'm just questioning whether PwC was
4  price testing only based off of what information
5  it received from your group or if it was also in
6  touch with other areas of Barclays such as front
7  office desks that were responsible for those
8  assets?
9      MR. THOMAS:  Objection to form.
10   A.  PwC has a slew of experts at their own
11 disposal internally within their firm.  So if --
12 in terms of their review of my process or the
13 mortgage valuation process, they would have the
14 same data I have.  They would have the trader's
15 price if they're reviewing the traders' marks as
16 part of our normal process, and they also have
17 our policies and procedures and all of the
18 assumptions that we derive and develop and use,
19 so they would be able to replicate our tests in
20 their own environment.
21     In terms of what they get from the
22 front office for the price testing, I'm not
23 aware that they obtain -- they obtain whatever
24 conversations we have with the front office, if
25 there are any, on specific products, but I'm not

Page 45

1    HIGHLY CONFIDENTIAL - Landreman
2  aware of their going to the traders for price
3  testing data or for valuation review data.
4      (Exhibit 804B, a document bearing
5  Bates Nos. PwC-BarCap15824 through 15843,
6  marked for identification, as of this date.)
7    Q.  Mr. Landreman, I have put before you
8  what has been marked Deposition Exhibit 804B.
9  If you want to take a moment to take a look.
10     (Document review.)
11   A.  Okay.
12   Q.  Have you seen this document before?
13   A.  The Commercial Mortgage-Backed
14 Securities Valuation Policy and Procedures, yes.
15   Q.  And would this policy govern your
16 group?
17   A.  This would govern the commercial
18 mortgages within my group.
19   Q.  And the commercial mortgages would
20 include yourself and Victor, primarily; is that
21 correct?
22   A.  No, this would be primarily Rich
23 Beame's world of we have a fairly substantial
24 position in private commercial real estate loans
25 which were either for taken whole purposes or

1    HIGHLY CONFIDENTIAL - Landreman
2  for securitization purposes, so the majority of
3  this policy was around the valuation of
4  commercial whole loans, and then there was a
5  subsection there for commercial mortgage-backed
6  securities.
7    Q.    Would this policy have governed any of
8  the commercial mortgage-backed securities that
9  were acquired from Lehman?
10    A.    To some degree.  Most of the
11  commercial mortgage-backed securities that we
12  received from Lehman were so bad that we would
13  have put them at the bottom of the scale in
14  terms of you really had to look at the
15  performance of these individual securities and
16  make some judgment around if you were going to
17  get your principal back and how long the
18  interest would be paying, and we looked through
19  each one of these positions bond-by-bond to
20  review the valuations.
21        So I think our policy would state in
22  there that we would look at non-investment grade
23  loan securities, or but it would -- it would
24  cover, you know, what to do to price these
25  securities.

1    HIGHLY CONFIDENTIAL - Landreman
2    Q.    So just so I understand, it does or it
3  doesn't cover the CMBS securities that came over
4  from Lehman?
5    A.    It's general guidelines for how we
6  should be pricing securities.  When we created
7  this policy, we never had the low-quality assets
8  that were given to us as part of the Lehman
9  asset group.
10    Q.    So some of the assets that were
11  acquired from Lehman were not valued according
12  to the policy and procedures because they were
13  of a lower grade; is that what you're saying?
14        MR. THOMAS:  Objection to form.
15    A.    They were generally poorly performing
16  securities that should have been priced to this
17  policy or would have been priced in a very
18  similar methodology.
19    Q.    So if they weren't priced to this
20  policy, what policy would they have been priced
21  according to?
22    A.    They would have been priced upon
23  observable trade data, which is part of our
24  policy, is to use observable trade information
25  and other proxy data to provide the best

1    HIGHLY CONFIDENTIAL - Landreman
2  estimate of where the security would trade in
3  the market.
4        MR. THOMAS:  To the extent we're going
5  to ask the witness questions about the
6  document, I just ask the witness be allowed
7  time to review the document.
8        MS. CARRERO:  That's fair.  Take as
9  much time as you need to take a look at it.
10        (Document review.)
11    A.    Okay.  So within this policy, 5.1 for
12  secondary trading, secondary bond testing, bond
13  price testing methodology is generally
14  consistent with how we value those securities
15  that we were given that would have fallen under
16  this policy.
17    Q.    And would it be accurate to say that
18  most of the CMBS securities that were acquired
19  from Lehman were valued using prices from late
20  September reflecting sales to desks within
21  Lehman?
22        MR. THOMAS:  Objection to form.
23    A.    We didn't sell anything to Lehman.
24    Q.    My apologies.  I misphrased.
25        Do the prices used for purposes of

1    HIGHLY CONFIDENTIAL - Landreman
2  Barclays' acquisition accounting for CMBS
3  reflect internal sales prices to desks within
4  Barclays?
5        MR. THOMAS:  Objection to form.
6    A.    The prices that my group created
7  reflected what we felt were the best estimates
8  of fair value at the time.
9    Q.    And how do those best estimates of
10  fair value correspond, though, with 5.1 of the
11  CMBS policy in Deposition Exhibit 804B?
12    A.    Well, for investment grade CMBS, we
13  would look at spreads that are currently
14  available in the marketplace, and for
15  non-investment grade bonds, we would -- we know
16  that these are much less liquid and we have
17  proxies that we can benchmark to, and also we
18  can model these specific positions and use
19  required yields that we would have expected or
20  we can proxy to comparable bonds in our own
21  books and records, if we had any at those
22  levels.
23    Q.    Perhaps we should take a step back,
24  because what I'm not understanding is, are the
25  prices at which the securities were sold to

1        HIGHLY CONFIDENTIAL - Landreman
2    various desks within Barclays the prices that
3    your group came up with using this section of
4    Barclays' CMBS policy, or were you price testing
5    the prices at which they were sold to Barclays'
6    desks?
7        A.    The desks --
8            MR. THOMAS:  Objection to form.
9            Go ahead.  Pause after the question.
10       A.    The desks would have determined the
11   values that they would be willing to acquire
12   assets at.
13       Q.    And so what price was your group
14   coming up with?
15       A.    The prices that we calculated and
16   published as part of the record.
17       Q.    Could you be more specific when you
18   say "part of the record"?
19       A.    I mean, we published the prices that
20   we tested to and our -- all of the support
21   around the prices we created, and the values
22   that we created were part of the working papers
23   that we provided.
24       Q.    Specific to the acquisition balance
25   sheet and the prices used therein for CMBS

1        HIGHLY CONFIDENTIAL - Landreman
2    securities, did you price test those prices?
3        A.    I would have to look at the specific
4    securities that you're talking about and see
5    those prices, because I know in my working
6    papers we would have defined how that price was
7    derived.
8        Q.    To save us all a lot of time, I mean,
9    I can go and pull out those working papers, but
10   if on the acquisition balance sheet a price at
11   which the security was sold to a desk within
12   Barclays was used, did you price test that
13   internal sales price?
14           MR. THOMAS:  Objection to form.
15       A.    We would have had our price as well or
16   we would have reviewed the trade price for
17   reasonability, yes.
18       Q.    So there may have been two prices:
19   One that your group generated according to your
20   policies and procedures, and another price that
21   would reflect the price used for purposes of
22   acquisition accounting based on the internal
23   sales price?
24           MR. THOMAS:  Objection to form.
25       A.    If there was a dialogue around a

1        HIGHLY CONFIDENTIAL - Landreman
2    trader's mark and it was different than our
3    mark, we would have documented the reason or the
4    rationale why those prices were different and
5    why we would have accepted one price over the
6    other.
7        Q.    So there was a process under way to
8    compare the prices at which positions were sold
9    to desks within Barclays and compared them to
10   the prices that your processes had generated
11   based on your policies and procedures?
12           MR. THOMAS:  Objection to form.
13       A.    It was my understanding that there was
14   a PMTG management book where all of the assets
15   came to and they distributed the assets to the
16   desks.  So the prices that the PMTG management
17   line items were using I thought were my prices,
18   but I don't know that for sure.
19       Q.    Normally would the prices that you
20   price test be the ones that would roll up into
21   any financial statements that are generated by
22   the firm?
23       A.    No, they would not.
24       Q.    And what prices would ordinarily roll
25   up into financial statements?

1        HIGHLY CONFIDENTIAL - Landreman
2        A.    The traders' marks.
3        Q.    Would they only roll up into financial
4    statements after your group had price tested the
5    traders' marks?
6        A.    Correct.
7        Q.    Where price testing shows a difference
8    between the traders' marks and where the
9    policies and procedures show the marks should
10   be, what ordinarily was the next step?
11       A.    Well, there are a full set of variance
12   procedures as to what is a required review for a
13   variance breach.  So we define by product
14   category and by asset quality limits that we
15   review price testing within.
16           If a specific position falls outside
17   of a certain range of variance, the analysts
18   would be required to go and get additional
19   detail or supporting assumptions to make sure
20   that, you know, we can either confirm or deny
21   whatever that price is.
22           There's a full review, and then at a
23   business level, we also present all of the
24   results to the traders and we also present it to
25   senior management as well if there are any

HIGHLY CONFIDENTIAL - Landreman

1    issues that require escalation.

2    Q.    And is that process usually an

3    informal one with various e-mails being

4    exchanged, or would you characterize it as more

5    formal?

6    A.    It's been more formal.  There's --

7    there was usually a price testing file that gets

8    produced, and management is reviewing the

9    results.  We would always send the business, for

10    example, Tom Hamilton's business of securitized

11    products, we would send him all of our price

12    testing results broken out by business and he

13    would review the file and acknowledge that he's

14    reviewed the data.

15    Q.    And did that happen with the

16    securities that were acquired from Lehman, would

17    there be a price testing file for each CUSIP

18    where there was any sort of deviation?

19    A.    Well, as we said, there was no trader

20    marks on the positions when we initially

21    received the portfolio, so we were asked to

22    provide a fair value on those positions that

23    were in that portfolio.

24    Q.    In the instance of where internal

HIGHLY CONFIDENTIAL - Landreman

1    sales prices were used to reflect the fair value

2    of the positions, would there have been any sort

3    of price testing file if those internal sales

4    prices deviated from --

5    A.    Once the positions are in that

6    trader's books, they would go through the

7    standard policies and procedures and processes

8    that we would normally price test.

9    MR. THOMAS:  Go ahead and make sure

10    you let her finish the question.  You're

11    starting to cut her off again.

12    Q.    So any of the positions that were

13    priced based off of internal sales prices, there

14    would be a price testing policy they would go

15    through, and if there were any differences, a

16    file would exist for those CUSIPS; is that

17    correct?

18    MR. THOMAS:  Objection to form.

19    A.    Once the securities are in a

20    portfolio, we would perform a monthly price test

21    on that portfolio.

22    Q.    So in this instance, if a September

23    30th internal sales price was used to price

24    securities acquired from Lehman, at what point

HIGHLY CONFIDENTIAL - Landreman

1    would that price be tested by your group?

2    MR. THOMAS:  Objection to form.

3    A.    A September 30th price would be priced

4    when we received the file within four to five

5    business days after day one once the books and

6    records are closed or once the population has

7    been confirmed.

8    Q.    So do you recall whether or not there

9    was a process under way to price test all of the

10    securities at which an internal sales price was

11    used four or five days after they were sold to

12    the desks or recorded as sold to the desks?

13    MR. THOMAS:  Objection to form.

14    A.    In the circumstance you're describing,

15    that portfolio would have been part of that

16    trader's books and records, so I would have had

17    those prices and whatever prices they assigned

18    it to those -- that portfolio would have been

19    the price I would have tested.

20    Q.    We're talking about a large number of

21    CUSIPS here.  Do you recall that process of

22    price testing a number of securities that were

23    sold to desks within Barclays which constituted

24    internal sales a couple of days after they were

HIGHLY CONFIDENTIAL - Landreman

1    sold to those desks?

2    A.    We price tested the portfolios and the

3    assets that came across at multiple points in

4    time during the review.  So if there was a group

5    of assets that were sold at month-end, we would

6    have price tested those file -- those assets as

7    well, and if they booked those at the sale

8    prices, we would have price tested the books and

9    records as the sale prices.

10    Q.    And based on your testimony, you're

11    saying that process would have taken place a

12    couple of days after the internal sale; is that

13    correct?

14    MR. THOMAS:  Objection to form.

15    A.    We received the trader's books and

16    records reconciled to the general ledger from

17    the line controllers usually within two to three

18    business days after the month-end.

19    Q.    And if there were any deviances

20    between the sale price and what your group

21    thought the fair value was, would that have been

22    conveyed for purposes of the acquisition

23    accounting?

24    A.    If there was a material variance or a

1     HIGHLY CONFIDENTIAL - Landreman
2 breach of a price testing limit threshold, we
3 would have reviewed those positions on a
4 case-by-case basis with the traders who marked
5 the positions, and if we were unable to resolve
6 a discrepancy, we would escalated that to senior
7 management or we would have had adjustment made
8 to books and records to reflect a change in the
9 trader's marks, but the trader's marks are the
10 books and records once they acquired the asset.
11     Q.    And do you recall that material
12 variances were determined and there were any
13 discussions with front office individuals or
14 with Finance in terms of preparing the
15 acquisition balance sheet?
16         MR. THOMAS:  Objection to form.
17     A.    There were lots of discussions, but
18 across every asset category.  The markets were
19 highly illiquid and there were lots of really,
20 really bad bonds that we were given that we had
21 never seen a portfolio of this low quality in
22 our experience.  So there were lots of questions
23 around how to value some of the most illiquid,
24 toxic assets that we received.
25     Q.    While the majority of the PMTG assets

1     HIGHLY CONFIDENTIAL - Landreman
2 appeared to be valued on the acquisition balance
3 sheet at internal sales prices, there are some
4 that are not.  Would those be situations where a
5 material variance was discovered?
6         MR. THOMAS:  Objection to the form.
7     A.    I don't know.  I would have to see the
8 cases and points, the specific positions.
9         MR. THOMAS:  We've been going for
10     about an hour and a half now.  I don't know
11     if this is a good time for a break.
12         MS. CARRERO:  That's fine.
13         (Recess; Time Noted:  11:03 A.M.)
14         (Time Noted:  11:10 A.M.)
15 BY MS. CARRERO:
16     Q.    Mr. Landreman, if you could just turn
17 your attention back to Deposition Exhibit 804B.
18 Just one last question before we move on from
19 this document.
20         Is this the policy and procedure that
21 was in place at the time of the Lehman
22 acquisition?
23         MR. THOMAS:  Objection to form.
24     A.    This should have been the policy and
25 procedure that was in process, yes.

1     HIGHLY CONFIDENTIAL - Landreman
2         (Exhibit 805B, a document bearing
3     Bates Nos. PwC-BarCap46090 through 46102,
4     marked for identification, as of this date.)
5         (Exhibit 806B, a document bearing
6     Bates Nos. BCI-EX-297183 through 297200,
7     marked for identification, as of this date.)
8     Q.    Mr. Landreman, I'm putting before you
9 what have been marked Deposition Exhibits 805B
10 and 806B.  I will identify them for the record.
11     805B is titled "Barclays Capital
12 Provisioning Policy Statement," dated December
13 2008.  Cover page Bates number is PwC-BarCap
14 00046090.  And Deposition Exhibit 806B is titled
15 "Product Control Price Testing Policy," dated
16 May 2009, and Bates number on the cover page is
17 BCI-EX-00297183.
18         Would you take a moment to review the
19 first, which is Deposition Exhibit 805B.
20         (Document review.)
21     Q.    Please let me know when you're ready.
22     A.    I think I'm ready.
23     Q.    Okay.  Have you ever seen this
24 document before?
25     A.    Which document are you referencing?

1     HIGHLY CONFIDENTIAL - Landreman
2     Q.    Deposition Exhibit 805B.
3     A.    805B.  No, I have not.
4     Q.    Have you seen similar earlier or a
5 later version of such document?
6         MR. THOMAS:  Objection to form.
7     A.    No, I have not.
8     Q.    Are you aware of any policy in place
9 at Barclays related to valuation adjustments to
10 securities?
11     A.    Yes.  Normally, valuation adjustments
12 in terms of provisioning of reserves are
13 calculated for the asset categories that they're
14 applicable to, which mostly do not fall in my
15 world.
16     Q.    In what world do they fall?
17     A.    Fixed Income and Credit.
18     Q.    And why do they not fall within your
19 world?
20     A.    The majority of the assets in the
21 securitized products world tend to be cash bond
22 basis, so there's -- the traders would be long
23 the position.  There's not a concept of being
24 long or short the majority of the positions.  So
25 they may be hedging the positions, but they

Page 62

1    HIGHLY CONFIDENTIAL - Landreman
2    would be taking a position in that bond.  So
3    there would be a cash bond with a price to that
4    bond.
5    Q.   If you could just turn to page 4 under
6    2.2, "Classification of Adjustment Type," the
7    last sentence of the first paragraph says, "Fair
8    value adjustments may arise for three main
9    reasons," and then it's followed by three bullet
10    points:  "Model uncertainty or adjustment;
11    market data uncertainty or adjustment;
12    transaction booking reflecting amended or
13    simplified economics."
14         Is it fair to say that the securities
15    that your group covers don't fall within any of
16    those three reasons?
17         MR. THOMAS:  Objection to form.
18    A.    They would.  However, we are mandated
19    to report fair value on our balance sheet, so
20    reserves or adjustments for cash bonds, we would
21    show that these positions are fair value assets.
22    So ...
23    Q.   Are the fair value adjustments that
24    are being discussed here different than the
25    liquidity adjustments or haircuts that were

Page 63

1    HIGHLY CONFIDENTIAL - Landreman
2    taken on certain asset classes in the Lehman
3    transaction?
4         MR. THOMAS:  Objection to form.
5    Foundation.
6    A.   As I'm not overly familiar with this
7    document, I'm not exactly clear what they're
8    trying to distinguish within this form.  This is
9    a very general classification across all asset
10    categories for a global database.
11    Q.   Would your understanding, though, of a
12    liquidity adjustment be similar to the concept
13    of a fair value adjustment?
14         MR. THOMAS:  Objection to form.
15    A.   A liquidity and a fair value
16    adjustment would be similar in my mind.
17    Q.   If you could turn your attention to
18    Deposition Exhibit 806B, and take a moment to
19    review, if you haven't already.
20         (Document review.)
21    A.   Okay.
22    Q.   Have you ever seen this document
23    before?
24    A.   Yes, I have.
25    Q.   And if you turn to the front page, you

Page 64

1    HIGHLY CONFIDENTIAL - Landreman
2    see it says, "Product Control, Price Testing
3    Policy, Date:  May 2009"; is that correct?
4    A.   Correct.
5    Q.   Is this the same policy that was in
6    place at the time of the Lehman transaction?
7    A.   This is a global policy for our
8    Central Price Testing Group, so this would be
9    the highest level of price testing policy.  So I
10    believe this would have been in place.  I don't
11    know for certain because I had my own regional
12    policies that I applied which would have been
13    supporting of this policy.
14    Q.   So let me just make sure that I
15    understand what you're saying.  You believe
16    there would have been an earlier policy that
17    governed the Central Price Testing, but this is
18    not it; is that correct?
19    A.   I don't know that.
20         MR. THOMAS:  Objection to form.
21    Q.   Would you agree that based on the date
22    of the document as May 2009, that it is dated
23    after the Lehman transaction?
24    A.   The date on this document is after the
25    Lehman transaction.

Page 65

1    HIGHLY CONFIDENTIAL - Landreman
2    Q.   You had mentioned regional policies
3    that would fall under this central policy.
4    Could you be more specific in naming those
5    policies?
6    A.   For example, you provided Exhibit
7    802B, which was your fixed income credit
8    products price testing policy, is an example of
9    a regional guidance or a product-specific policy
10    that would be supportive of this global policy.
11    Q.   If I could just ask you to be more
12    specific, though, about the ones that governed
13    the products you were directly responsible for.
14    A.   I do not see those specific policies
15    here, but we had those policies and procedures
16    in place at the time.
17    Q.   And could you name those for me?  Are
18    you familiar with the policies and procedures
19    that govern your area?
20    A.   Yes, I'm familiar with the policies
21    and procedures I wrote that govern my area, yes.
22    Q.   And would you be able to tell me how
23    many policies and procedures there are that
24    govern your area?
25    A.   There should be one policy that covers

17 (Pages 62 to 65)

HIGHLY CONFIDENTIAL - Landreman
all Agency RMBS products and non-Agency RMBS products.
Q.   And that would be in addition to the CMBS policy that we have already seen?
A.   Correct.
Q.   Would there be any other policies and procedures that govern your group?
A.   I don't recall.
Q.   Could you explain what the difference between the Central Price Testing guidance would be as opposed to the more specific regional policies that were in existence?
MR. THOMAS:  Objection to form. Foundation.
A.   I mean, if you look at the price testing policy as created by Central, it's really more of a generalized approach:  Timing, how to report the data, what are some of the requirements in terms of data sources or how to handle specific issues, like untested items.
So, I mean, it really provides a general framework that everybody is responsible for adhering to.  And then within your specific asset category or product specialty, you would

HIGHLY CONFIDENTIAL - Landreman
then document and fully, you know, list what your processes and your procedures and the acceptable values, et cetera, would be.
So, I mean, if your sources for mortgage-backed securities, pricing for vendors would be Financial Times, interactive data, we would specify those vendors in our policy, whereas somebody on the other side of a different product may not use that pricing source because it is not applicable to their product space.
Q.   If you could turn to page 12 of the exhibit.
A.   Okay.
Q.   At the top, do you see the line that says "The Pricing Template - A Product Controller's Guide"?
A.   Yes, I do.
Q.   Would this be the template used by your group in the event that any differences were found between a trader's marks and the results of your price testing?
MR. THOMAS:  Objection to form.
A.   No, this would not.  This would be

HIGHLY CONFIDENTIAL - Landreman
a -- a centralized, a standard reporting format that we can aggregate all of our pricing data and deliver that to Central for a central reporting database.
Q.   And was this template followed for any of the CUSIPs that were acquired in the Lehman transaction?
MR. THOMAS:  Objection to form.
A.   I don't recall.  This would have been not applicable to the assets in question because they were reported at a very detailed level, and once the assets were sold to a trading desk, then they would be reported in this format.
Q.   And so you would expect that any assets that were sold to a trading desk would have a pricing template at some point generated for it?
MR. THOMAS:  Objection to form.
A.   The business would have had their portfolio presented to Central Price Testing using this reporting format.
Q.   And would this be across all asset classes?
A.   Yes.

HIGHLY CONFIDENTIAL - Landreman
Q.   And when you say reported to Central, could you explain what you mean by that term?
A.   There is a group in London that is responsible for consolidated reporting of price testing results.
Q.   And what sort of reporting are they responsible for?
A.   Consolidated, high-level reporting of the price testing results, business-level or business-level variance explanations.
Q.   And when you say business-level variance explanations, who would those go to?
A.   These reports go into the Central Price Testing database.  They are all presented to -- we would present the business-level results to the head of the business or the trader responsible for the business.
Then we would also use this reporting format to create business-level summaries at the highest levels, whether it's for the head of mortgage-backed securities trading or if it's the head of fixed income rates trading, who the head of mortgage trading would report in to.
Q.   And how frequently would these reports

1    HIGHLY CONFIDENTIAL - Landreman
2    be generated?
3    A.    Monthly.
4    Q.    And would they be generated for every
5    CUSIP on a trader or a business' books?
6    A.    No, they would not.
7    Q.    And for which CUSIPS would they be
8    generated?
9    A.    Well, they would be generated for the
10    portfolio and presented by an asset category as
11    a summary line.  So, as opposed to every
12    individual security being reported in this
13    format, you would report all non-agency, all day
14    mortgages, and the results of the price testing,
15    with any meaningful commentary about the
16    portfolio.
17    Q.    You can put that aside.
18        Earlier we had talked about the marks
19    that roll up into Barclays' acquisition
20    accounting and whether those were values that
21    came from your group, and I believe your answer
22    was that it would be the trader's marks that
23    would roll up; is that correct?
24    A.    I didn't say that.
25    Q.    Okay.  I'm sorry.  Could you tell me

1    HIGHLY CONFIDENTIAL - Landreman
2    where do the prices that roll up into the
3    acquisition balance sheet come from?
4        MR. THOMAS:  Objection to form.
5    A.    For the components that I was
6    responsible for valuing, it is my understanding
7    that the majority of those prices would have
8    been either the Product Control prices or, if we
9    had trade prices, we would have reviewed the
10    trade prices.
11    Q.    Maybe we should take a step back and
12    just ask, in the ordinary course, when doing
13    financial statements, where do the prices come
14    from that feed into the financial statements?
15        MR. THOMAS:  Objection to form.
16    A.    As we said, the traders are
17    responsible for the positions that they manage
18    on their balance sheet to mark those positions
19    to market every day.
20    Q.    And how do they enter those marks?  Is
21    there a system into which they enter those
22    marks?
23    A.    There would be a trading system for
24    each business, whether -- you know, whatever is
25    appropriate for that product class, and they

1    HIGHLY CONFIDENTIAL - Landreman
2    would manage those -- the input of the pricing
3    on their -- within their own resources and they
4    would enter those prices in the system and we
5    would receive those prices and those inventories
6    from the line controllers.
7    Q.    And what's the name of the system
8    through which you receive those trader marks?
9    A.    Each business gives me a different
10    one, and the results are delivered to me on
11    Excel spreadsheets.
12    Q.    And of the businesses that you cover,
13    do you know which systems correspond to which
14    business?
15    A.    The mortgage trading uses an
16    application called Winfits, and some of the
17    other -- I believe everyone is using Winfits
18    now.  There may have been some different front
19    office systems at the time.  I don't know
20    exactly which systems were in place, but Winfits
21    has been the standard for the securitized
22    products business that I cover.
23    Q.    Is there any other system to which
24    Winfits feeds into?
25    A.    Yes.

1    HIGHLY CONFIDENTIAL - Landreman
2        MR. THOMAS:  Objection to form.
3    A.    Yes.
4    Q.    Are you familiar with the systems to
5    which it feeds?
6    A.    Not personally.
7    Q.    I don't want to go through a long
8    discussion on your systems.  I'm just trying to
9    get an understanding of whether there's some
10    sort of repository that houses most of the marks
11    that are entered by traders at Barclays and are
12    you aware of such a system?
13    A.    It's my understanding that the traders
14    will mark their positions in Winfits.  The data
15    is stored in the Winfits and all of the
16    repositories.
17        There's also individual bond pricing
18    data stored in a global referential called Asset
19    Control, but the front office trading systems
20    store all the pricing data for the bonds.
21    Q.    Are you familiar with a system that
22    would eventually generate the general ledger,
23    what that would be called?
24    A.    SAP.
25    Q.    So is it fair to say that at some

1          HIGHLY CONFIDENTIAL - Landreman
2   point Winfits feeds into SAP?
3          MR. THOMAS:  Objection to form.
4      A.    That would be a line controller
5   function, so I don't know if Winfits feeds
6   directly into SAP or if the line controllers
7   record entries into SAP or how that process
8   works operationally.
9      Q.    So when your group goes about price
10  testing a trader's marks, you would do so based
11  off of the marks that are handed to you on an
12  Excel spreadsheet; is that correct?
13     A.    We would be given a population with
14  all of the values and ask that those values be
15  reconciled back to the general ledger by the
16  line controllers, so we have a population
17  completeness control check as a part of our
18  standard course of doing business or price
19  testing or doing valuations.
20     Q.    And the general ledger being SAP; is
21  that correct?
22     A.    Correct.
23     Q.    Do you know what SOPHIS is?
24     A.    No.
25          MR. THOMAS:  This may not be necessary

1          HIGHLY CONFIDENTIAL - Landreman
2   under agreement, but to the extent it is,
3   I'm designating the transcript highly
4   confidential.
5      Q.    The marks that the traders enter and
6   that are subsequently price tested by your
7   group, what measure of value would they reflect?
8      A.    Fair value.
9      Q.    And would fair value -- what is your
10  definition of "fair value"?
11     A.    Definition of "fair value" would be a
12  value which we believe would reasonably be
13  expected to be obtained in the marketplace.
14     Q.    Would those marks be in accordance
15  with how "fair value" is defined under FAS 157?
16          MR. THOMAS:  Objection to form.
17     A.    I believe it would be consistent with
18  that.
19     Q.    Would it be consistent with the --
20  with IFRS?
21          MR. THOMAS:  Objection.  Form.
22     A.    I believe it would be.
23     Q.    To the extent that FAS 157 and IFRS
24  are not exactly the same, do you know if the
25  marks are reflective or favor one over the

1          HIGHLY CONFIDENTIAL - Landreman
2   other?
3          MR. THOMAS:  Objection to form.
4      A.    As an international firm, that is
5   subject to IFRS reporting standards, we would
6   probably defer to the International Accounting
7   Standards.
8      Q.    Does your --
9      A.    If there was a difference.
10     Q.    Does your group take into
11  consideration FAS 157 or IFRS when price
12  testing?
13          MR. THOMAS:  Objection to form.
14     A.    I'm not sure what you mean by that.
15     Q.    In terms of testing the marks that a
16  trader has ascribed to a security, what sort of
17  guidance does your group follow, whether it be
18  FAS 157 or IFRS or something else?
19          MR. THOMAS:  Objection to form.
20     A.    The International Accounting Standards
21  and the U.S. accounting standards tend to be
22  relatively similar.  To the extent that there
23  may be a minor difference, in the asset
24  categories that I review, it would be less of an
25  issue because there's a wide range of values and

1          HIGHLY CONFIDENTIAL - Landreman
2   there's a fairly common method as to how these
3   bonds trade and how they're priced in the
4   market.
5      Q.    Would a mark take into consideration
6   the size of the asset?  I'm sorry, let me strike
7   that.
8          Would a trader's mark take into
9   account the lot size of that specific security?
10          MR. THOMAS:  Objection to form.
11     A.    A trader's mark will reflect that
12  trader's view as to the ability to sell that
13  bond and at what level they could sell that bond
14  at.
15     Q.    And so is your answer that if the size
16  of the position would affect whether they could
17  sell or not, that they would take into
18  consideration the size of a position?
19          MR. THOMAS:  Objection to form.
20     A.    To the extent that it's within the
21  accounting guidelines, they might consider that,
22  but generally, that's less of an issue.
23     Q.    When price testing, does your group
24  take into consideration the size of a position
25  in determining whether or not a mark is

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2   reflective of fair value?
 3        A.   We look at all information that's
 4   available to us, and if we have a large trade of
 5   a position or a small trade of a position and
 6   that affects the data that goes into our model,
 7   we would consider that as part of our overall
 8   analysis.
 9        Q.   So is the answer yes, that size would
10   be considered in the analysis?
11        MR. THOMAS:  Objection to form.
12        A.   Size is one factor in reviewing a
13   trade to determine the validity of the trade
14   data.
15        Q.   Is it your understanding that any of
16   the assets that were acquired from Lehman were
17   valued at a lower price based off of the bulk
18   size of any given position?
19        MR. THOMAS:  Objection to form.
20        A.   I don't recall.  I'm not aware of any.
21        Q.   If that were the case, would it be
22   your opinion that that would be a proper basis
23   to mark down a security?
24        MR. THOMAS:  Objection to form.
25        A.   There would definitely be issues with
```

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2   the ability to trade certain positions and
 3   liquidate certain positions if the transaction
 4   costs might be higher than the actual nominal of
 5   the bond or if there were no buyers for specific
 6   instruments or you would have to repackage those
 7   securities.
 8        Q.   Are you aware of whether it's proper
 9   to take into consideration the size of a
10   position when marking to fair value under FAS
11   157 or IFRS?
12        MR. THOMAS:  Objection to form.
13        A.   I'm familiar with some of the
14   concepts, yes.
15        Q.   And is it your understanding that it
16   is or is not proper under either of those two
17   regs.?
18        MR. THOMAS:  Objection to form.
19        A.   I would need to confirm by seeing the
20   actual standard before I responded just to make
21   sure of that.  I believe it is considered that
22   block size is a factor, but it's not the
23   determinant in a bond's price.
24        Q.   Typically speaking, would a mark be
25   reflective of a so-called round lot of a
```

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2   particular CUSIP?
 3        MR. THOMAS:  Objection, form.
 4        A.   I'm not sure what you mean by that.
 5        Q.   As opposed to bulk size position,
 6   would you expect a mark to reflect what would be
 7   the typical lot of -- that a security would
 8   trade between a buyer and a seller?
 9        MR. THOMAS:  Objection to form.
10        A.   I mean, yes.  A lot of these concepts
11   are fine in other asset categories.  Most of
12   what my world reviews, it has, you know, highly
13   customized asset classes that are, you know,
14   different shapes and forms and have different
15   sizing.
16        So there is no round lot designation
17   to say that, you know, mezzanine bonds trade at,
18   you know, a hundred million dollar increments.
19   There's very little standardization, as opposed
20   to the fixed income world, where you might have
21   a hundred-million-dollar issuances that sell in
22   $20 million round lots.
23        So in the securitized products world
24   that's less of a concept that gets considered in
25   our analysis.
```

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2        Q.   What's your understanding of the
 3   meaning of an "orderly exit price"?
 4        A.   A willing buyer and a willing seller
 5   negotiating in an arm's length transaction.
 6        Q.   Is there any temporal limitations on
 7   the concept of an orderly exit?
 8        MR. THOMAS:  Objection to form.
 9        A.   Can you define what you mean by
10   "temporal."
11        Q.   When you say a willing buyer and a
12   willing seller, are you saying a minute from now
13   or five days from now?
14        MR. THOMAS:  Objection to form.
15        A.   I think it depends upon which asset
16   category you're talking about.  In many cases,
17   securitized products world, these are custom
18   bonds.  These are very unique, very few of these
19   structures are alike and there's always
20   something different, so it takes a fair amount
21   of analysis to price or to review each bond.
22        So to say that there's a temporal
23   difference in terms of I can have a price within
24   an hour, generally the trades that come in on
25   these positions are negotiated over time, and
```

Page 82

HIGHLY CONFIDENTIAL - Landreman

1    our flow business may buy a position and sell it
2    out, but that would that be prenegotiated. We
3    probably would not have bought the position
4    unless we had a seller on the other side.
5         So it isn't like I just push a button
6    and this trades and someone comes along and buys
7    it. It's generally a negotiated sale over time.
8         Q.   To the extent that a mark from a
9    trader is reflective of an orderly exit price,
10   when price testing that mark, what would you
11   expect that orderly exit to look like for the
12   asset classes that you cover?
13        MR. THOMAS: Objection to form.
14        A.   Since the beginning of 2007, I don't
15   know how to answer that question.
16        Q.   Are you saying, since the beginning of
17   2007, there is no such thing as an orderly exit?
18        A.   Since the beginning of 2007, during
19   the credit crisis, there's been a lot of, you
20   know, differing types of sales, and to say
21   that -- we look at every transaction that we
22   have the ability to see, but we also have to
23   look at the performance of the underlying
24   collateral and there's a lot of information that

Page 83

HIGHLY CONFIDENTIAL - Landreman

1    has to go into our analyses and a lot of data
2    has to be researched and reviewed.
3         So to say that in the last two to
4    three years there's been an orderly disposition,
5    I would say that there's -- we're starting to
6    come back to that, we've come back to that over
7    the last year, but for a long period of time
8    there were lots of chaos in the markets.
9         Q.   Would a distressed price be one that
10   arises out of an orderly exit?
11        MR. THOMAS: Objection. Form.
12        A.   What do you mean by "distressed
13   price"?
14        Q.   If I put a gun to your head and said I
15   need you to sell this in an hour.
16        A.   Well, that would be a forced seller.
17        Q.   And would that be reflective of an
18   orderly exit price?
19        MR. THOMAS: Objection to form.
20        Q.   The price that willing (sic) was
21   willing to purchase at?
22        A.   That would be considered a data point,
23   but that doesn't mean that that would be, you
24   know, the determining factor of a trade of a

Page 84

HIGHLY CONFIDENTIAL - Landreman

1    bond.
2         Q.   But would that be an orderly exit
3    price if you were a forced seller?
4         A.   Your definition contradicts itself.
5         An orderly sale and a forced seller
6    cannot be in the same.
7         Q.   When did you first become aware of the
8    possibility of a transaction with Lehman?
9         MR. THOMAS: Objection to form.
10        A.   I was on vacation and I saw the news
11   article on CNBC.
12        Q.   And when was that?
13        A.   I'm sorry?
14        Q.   And when was that?
15        A.   The day it happened. I was in Hawaii
16   on vacation. I think it was the 19th or the
17   18th.
18        I'm sorry, it may have been Saturday.
19   The exact day that the bankruptcy happened,
20   though, was --
21        Q.   So if I represent to you that the
22   bankruptcy filing of the holding company was
23   September 15, is it fair to say that's when you
24   first learned about it?

Page 85

HIGHLY CONFIDENTIAL - Landreman

1    A.   Yes.
2         MR. THOMAS: Objection to the form on
3    the last question.
4         (Exhibit 808B, a document bearing
5    Bates Nos. BCI-EX-(S)201329 through 201331,
6    marked for identification, as of this date.)
7    Q.   Mr. Landreman, you have before you
8    what has been marked as Deposition Exhibit 808B.
9    If you could turn your attention to the second
10   page, the e-mail that begins on that page from
11   Mr. Teague to Paul Copson, CC-ing Marcus Morton,
12   Philip Nash, James Walker.
13   A.   I see that.
14   Q.   Have you seen this e-mail before?
15   A.   No, I have not.
16   Q.   If you will turn your attention to the
17   first sentence, where Mr. Teague writes, "Paul:
18   High level, we should be able to provide pricing
19   support on a T+1 for much of the fixed income
20   rates and fixed income Credit products. ABS
21   will be a WIP," W-I-P. Do you see that?
22   A.   Yes, I do.
23   Q.   And then if you turn your attention
24   down to Roman numeral II, "ABS Testing - (A)

22  (Pages 82 to 85)

Page 86

HIGHLY CONFIDENTIAL - Landreman

1   Coverage." Roman (iii), "For Alt A positions,
2   an independent price is calculated via a matrix
3   developed by Landreman's group, which
4   incorporates recent trade levels by the Alt A
5   market making desk and loss curve based on home
6   equity roll rates." Do you see that?
7       A.   Yes, I do.
8       Q.   And this e-mail is dated on Monday,
9   September 15, do you see that?
10      A.   Yes.
11      Q.   Were you asked at or about this time
12  to work on providing pricing support for any of
13  the assets Lehman was -- Barclays was
14  contemplating purchasing from Lehman?
15          MR. THOMAS: Objection to form.
16      A.   As you notice, I wasn't on this
17  e-mail. This was actually Sean giving a
18  high-level overview to the executives in London.
19      Q.   I understand. I'm just asking whether
20  you --
21      A.   I was on vacation from the 12th
22  until -- I would have to confirm the dates, but
23  I thought I was gone like from the 12th of
24  September until that I was in Hawaii for the

Page 87

HIGHLY CONFIDENTIAL - Landreman

1   week, and as soon as I got back, I was given
2   everything. My BlackBerry wasn't working in
3   Hawaii.
4       Q.   So until you returned from your trip,
5   you were not involved in any sort of pricing
6   support in connection with the transaction; is
7   that correct?
8       A.   Correct.
9       Q.   Do you know if members of your team
10  were involved with pricing support prior to your
11  return from vacation?
12          MR. THOMAS: Objection. Form.
13      A.   They would have been involved in
14  pricing these portfolios, yes.
15      Q.   Is it your understanding that your
16  team received CUSIP-level information at the
17  positions that Barclays was contemplating
18  purchasing in order to do that price testing?
19          MR. THOMAS: Objection to form.
20      A.   It's my understanding that all of the
21  collateral that was pledged at the Fed window
22  was going to be delivered to us for review.
23      Q.   Was that your understanding as early
24  as September 15?

Page 88

HIGHLY CONFIDENTIAL - Landreman

1       A.   Again, I was not in the office on the
2   15th, so I would have to say what's -- the
3   earliest of my understanding is when I returned
4   from vacation.
5       Q.   Do you know when any members of your
6   team got started with price testing any
7   securities that Barclays was contemplating
8   purchasing?
9       A.   They would not have started until
10  there was a public announcement that we acquired
11  the firm, that we acquired or that we were --
12  there was a public announcement that we were
13  negotiating.
14      Q.   I believe you had said earlier that
15  you would expect that your team had been
16  involved with pricing support before your return
17  from vacation. Is that not accurate?
18      A.   They -- if my -- my team would have
19  been involved in pricing these assets once they
20  were delivered to us, assuming that we are
21  given a population. There's a very good chance
22  that we would not have been given a population
23  for a couple days after the deal was announced.
24      Q.   So you're not aware of any pricing

Page 89

HIGHLY CONFIDENTIAL - Landreman

1   support being given by your team prior to the
2   delivery of any securities simply to ascertain
3   whether Barclays wanted it or what price they
4   thought it was worth or anything of the sort?
5           MR. THOMAS: Objection to the form.
6       A.   I was not involved in the negotiation
7   of the transaction and we did not receive any of
8   the information in terms of what we were
9   receiving until the deal was made public.
10      Q.   And when you say "the deal was made
11  public," what do you mean by "the deal was made
12  public"?
13      A.   The announcement that Barclays was
14  negotiating a transaction.
15      Q.   So when it publicly announced in the
16  middle of the week that an Asset Purchase
17  Agreement had been signed, that's when your team
18  would have stepped in and started to provide
19  pricing support?
20          MR. THOMAS: Objection to form.
21      A.   Right. Correct. They would not have
22  been involved in any pre, pre-public
23  announcements. They would not have been
24  involved in any investment banking negotiations

25      Q.   So you're not aware of any pricing

23 (Pages 86 to 89)

1     HIGHLY CONFIDENTIAL - Landreman
2   or acquisition or merger advisory capacity.
3     Q.   So turning back to Deposition Exhibit
4   808B, is it your testimony that you're not aware
5   of anyone the Monday of Mr. Teague's e-mail
6   providing the pricing support discussed in his
7   e-mail?
8     MR. THOMAS:  Objection to form.
9     A.   The e-mail dated Monday, September 22,
10  contains pricing support for assets that would
11  have come from Sean's area of expertise.
12  There's nothing in here that would have come
13  from my group.
14    Q.   My question is simply, around the time
15  that Mr. Teague's e-mail goes out September 15,
16  whether you're aware if your team also got
17  involved in the process of pricing support
18  related to the Lehman transaction?
19    MR. THOMAS:  Objection. Form.
20    A.   Once we were informed that there would
21  be securities for us to price, we would have
22  been involved in pricing those securities.
23    Q.   So that could have been as early as
24  September 15; is that correct?
25    A.   If we knew what we were getting.  I

1     HIGHLY CONFIDENTIAL - Landreman
2   don't know when we knew what we were getting.
3     (Exhibit 809B, a document bearing
4   Bates Nos. BCI-EX-(S)201104, marked for
5   identification, as of this date.)
6     A.   Okay.
7     Q.   Mr. Landreman, do you see that this is
8   an e-mail from Mr. Teague to yourself CC-ing
9   Joseph Kaczka, dated September 19; is that
10  correct?
11    A.   Correct.
12    Q.   And do you see in the body of the
13  e-mail Mr. Teague writes, "Rich, Marcus wanted
14  the different price testing team pitch in to get
15  an idea of how the Lehman positions are priced
16  as of 15 September.  Can you ask your team to
17  perform some independent pricing on the
18  following spreadsheet?"
19    A.   I see that.
20    Q.   Do you recall if this was positions
21  that had already been transferred to Barclays
22  that you were being asked to pitch in and help
23  with price testing?
24    A.   I don't recall what was in these
25  files, but I'm sure if I saw what was in

1     HIGHLY CONFIDENTIAL - Landreman
2   there...
3     Q.   Do you recall being involved in the
4   valuation of the securities that were
5   transferred over in the Lehman/Barclays repo the
6   evening of September 18 either on that Friday,
7   the 19th, or Thursday itself?
8     A.   I do not recall being involved in the
9   Lehman/Barclays repo pricing or the information
10  from that as of that date.
11    Q.   In your mind, was the exercise that
12  you and your team was asked to undertake related
13  to the Lehman transaction and the securities
14  that Barclays was acquiring as opposed to any
15  specific repo transaction?
16    MR. THOMAS:  Objection to form.
17    A.   My understanding was that the assets
18  that were pledged to secure a repo line of
19  credit were being brought onto our balance sheet
20  and needed to be assigned a fair value on our
21  balance sheet as of the date that they were
22  going to be effectively put on our balance
23  sheet.
24    Q.   And do you recall being immersed in
25  that process from the moment that the positions

1     HIGHLY CONFIDENTIAL - Landreman
2   were transferred over?
3     MR. THOMAS:  Objection to form.
4     A.   I was immersed in that process for
5   months.
6     Q.   I'm trying to get a feel for when it
7   began.  Did the process begin two days before
8   delivery of the assets or did it begin
9   immediately upon transfer of the assets?
10    MR. THOMAS:  Objection to form.
11    A.   I don't know when all of the assets
12  were officially delivered.  That would be an
13  operations question.  I know that I was given
14  lists to price and to review at various points
15  in time and there would be different updates to
16  those lists at points in time because certain
17  securities may or may not have been delivered.
18    Q.   Were you involved in the
19  reconciliation of what was delivered and what
20  wasn't, or would that be Operations?
21    A.   That would be Operations and line
22  controller functions.
23    Q.   And were you involved in the creation
24  of any of the schedules related to the
25  transaction documentation?

1      HIGHLY CONFIDENTIAL - Landreman
2          MR. THOMAS:  Objection.
3      A.   I would not have been.
4      Q.   Did you have any contact with the
5  Finance people that were putting together the
6  acquisition balance sheet?
7      A.   Only to the extent that I would be
8  delivering work from my team to support their
9  work.
10     Q.   Did you receive any instructions from
11 the people preparing the acquisition balance
12 sheet that was out of the ordinary from what you
13 might do on a day-to-day basis outside of a
14 transaction like this?
15         MR. THOMAS:  Objection.  Form.
16     A.   Could you clarify what you mean?
17     Q.   Let me rephrase that one.
18         Did you and your team perform any
19 functions in connection with the Lehman
20 transaction that were outside of the normal
21 scope of what you and your team would undertake?
22     A.   We -- we did everything we could to
23 maintain our normal process, to be consistent in
24 how we valued the securities, how we reviewed
25 the securities in a normal course of business.

1      HIGHLY CONFIDENTIAL - Landreman
2          You know, not having a trader's price
3  to benchmark, we would have, you know, valued
4  the securities consistently with how we normally
5  would apply our policy and our procedure as to
6  how we priced and valued these securities.
7      Q.   But it was not an ordinary situation
8  because normally for this quantity of CUSIPs you
9  would have a trader's mark; is that correct?
10     A.   A combination of factors.  I think a
11 portfolio of this size usually doesn't transfer
12 every day.  The portfolio itself was of such
13 inferior quality to everything we had in our
14 books and records that it required a much more
15 exhaustive review as to how to ascribe fair
16 value to these positions because of the low
17 levels of quality within that portfolio.
18     Q.   Were you told prior to valuing any of
19 the asset classes that were transferred over in
20 the Lehman transaction how much the trading
21 desks wanted to write down certain asset classes
22 by?
23     A.   Explain what you mean by "write down."
24     Q.   Prior to undertaking any sort of
25 valuation process for individual CUSIPs, were

1      HIGHLY CONFIDENTIAL - Landreman
2  you given a target number by which anyone at
3  Barclays wanted to write down assets from the
4  price at which they had been held on Lehman's
5  books for?
6          MR. THOMAS:  Objection.  Form.
7      A.   We had no idea where these positions
8  were held on Lehman's books.
9      Q.   You never reviewed any of Lehman's
10 marks for any of the positions for which you
11 valued?
12     A.   I would not have had that data.
13     Q.   Are you aware that during the week
14 preceding the closing, that lists of CUSIPs were
15 exchanged that held marks corresponding to what
16 Lehman had it on its books for?
17         MR. THOMAS:  Objection to form.
18     A.   I don't recall seeing any list of
19 CUSIPs that may have had a Lehman mark or would
20 I have given consideration to where another firm
21 would have marked the position.
22     Q.   To you, the mark of another firm would
23 not be another data point that's worth
24 consideration?
25     A.   It would be a data point.

1      HIGHLY CONFIDENTIAL - Landreman
2      Q.   But it is not a data point that
3  Barclays considered in valuing the securities
4  that your group was responsible for; is that
5  correct?
6          MR. THOMAS:  Objection to form.
7      A.   I don't believe I had that data
8  available to me at the time we were valuing this
9  portfolio.
10     Q.   Did your group use as a data point the
11 price at which JPM or BoNY had marked any of the
12 securities within your group?
13     A.   We did look at that data as a data
14 point within our process.
15     Q.   And how was that used as a data point
16 within your process?
17     A.   In many cases, if there was no data
18 available or we were unable to model a position,
19 we may have defaulted to a BoNY price.  We did
20 review the prices that we derived using our own
21 proprietary methodologies to value these bonds
22 and compared that to the levels that we saw from
23 BoNY or JPMorgan or IDC or other vendors that
24 provide indicative pricing data for these types
25 of transactions, and we used all of that data to

1      HIGHLY CONFIDENTIAL - Landreman
2  measure pricing dispersion from the various
3  sources to measure our liquidity discounts as
4  one point to support the liquidity discount from
5  the pricing dispersion amongst all of the
6  sources that were around at that time.
7          (Exhibit 810B, a document bearing
8      Bates Nos. BCI-EX-(S)52667 through 52668,
9      with attachment, marked for identification,
10     as of this date.)
11     A.   Okay.
12     Q.   Mr. Landreman, you have before you
13  what has been marked as Deposition Exhibit 810B.
14  Have you had an opportunity to read it?
15     A.   Yes, I have.
16     Q.   This is an e-mail that I'll represent
17  to you is from Gary Romain to Rich Ricci, among
18  others, and if you will -- and it's dated
19  September 22.  If you'll turn your attention to
20  the body of the e-mail, the line that reads,
21  "The $2.83 billion valuation adjustment is S.
22  King's first cut only."  Do you see that?
23     A.   Yes, I do.
24     Q.   And do you know who S. King is?
25     A.   I believe that would be Stephen King.

1      HIGHLY CONFIDENTIAL - Landreman
2      Q.   And what was Stephen King's position
3  at Barclays?
4      A.   Stephen King was the head of the
5  Proprietary Mortgage Trading Group -- Principal
6  Mortgage Trading Group, PMTG.
7      Q.   And so your group was responsible for
8  price testing securities that would fall under
9  Stephen King's group; is that correct?
10     A.   If they would have been securitized
11  products, yes.
12     Q.   Are you aware that, as of September
13  22, there was already a determination that there
14  would be a valuation adjustment to securities
15  that had transferred to Barclays?
16         MR. THOMAS: Objection to form.
17     A.   I know by September 22 we had started
18  to review the data that we had received, and I
19  know that there was a lot of surprise about the
20  poor quality of the assets that were delivered
21  to us and the uncertainty around the ability of
22  certain assets to actually be considered real
23  securities or to be delivered.
24         In terms of Stephen King's valuation
25  adjustment, I don't know how he derived that

1      HIGHLY CONFIDENTIAL - Landreman
2  number or where he was ascribing that valuation
3  adjustment because that was a global number
4  because Stephen King managed the entire
5  portfolio of assets that was coming over, and I
6  only saw the securitized products portion of
7  that.
8      Q.   Did you or your group supply any
9  information to Stephen King or his group that
10  you feel would have been used to support a $2.83
11  billion valuation as of September 22?
12         MR. THOMAS: Objection. Form.
13     A.   Stephen King had his own team that was
14  able to make their own recommendations and look
15  at these assets on their own and to determine
16  what sort of adjustment or even valuation issues
17  needed to be addressed.
18     Q.   Would it be your expectation that, as
19  of September 22, Stephen King and his group had
20  decided how much an internal sales, a reasonable
21  internal sales price would be to them for the
22  securities that were being transferred from
23  Lehman?
24         MR. THOMAS: Objection to form.
25     A.   I don't know that.

1      HIGHLY CONFIDENTIAL - Landreman
2         (Discussion off the record.)
3      Q.   Prior to closing, were you involved in
4  any processes or communications that resulted in
5  a demand for additional collateral by Barclays
6  from Lehman?
7      A.   I'm not sure I understand the
8  question.
9      Q.   Are you aware on Friday, prior to the
10  closing of the Lehman transaction, that
11  additional securities were requested for
12  delivery from Lehman to Barclays?
13     A.   I wasn't involved in the negotiation
14  or the settlement of the deal or the structure.
15         MR. THOMAS: Objection. Form.
16     Q.   Were you providing any valuations that
17  would support that Barclays was getting less or
18  more consideration prior to closing that would
19  be used in any negotiations of the deal?
20         MR. THOMAS: Objection to form.
21     A.   When I came into the data, I was told
22  that these were the securities that would be
23  delivered to us and that we were to value those
24  securities.  We would not have been involved in
25  the negotiations or any requests for additional

1      HIGHLY CONFIDENTIAL - Landreman
2   collateral.
3      Q.   So, as far as you know, none of the
4   valuations that you or your team were working on
5   were being used in connection with the
6   negotiations of the transaction; is that
7   correct?
8      A.   Not that I'm aware of.
9      Q.   Are you aware of the price at which
10  Barclays booked the securities transferred to it
11  on day one?
12      MR. THOMAS:  Objection to form.
13      A.   I am not aware of the price that was
14  booked in the general ledger.
15      Q.   Is it your understanding that the
16  positions were booked at one price on day one,
17  and then subsequently amended for purposes of
18  acquisition accounting once Barclays had
19  concluded its valuation of the securities
20  transferred to it?
21      MR. THOMAS:  Objection to form.
22      A.   I'm not that involved with the
23  accounting aspects of how things get booked or
24  the operations aspect of how things get booked
25  and accounted for.  I know I was asked to

1      HIGHLY CONFIDENTIAL - Landreman
2   provide valuations on securities for specific
3   dates, and we did that.
4      Q.   And when did you and your team finish
5   valuing the securities it was asked to value?
6      A.   I don't recall the date that it was.
7      Q.   If you could ballpark it for me.  Was
8   it September 22?
9      A.   No.
10      Q.   Was it --
11      A.   I would have -- I thought --
12      Q.   Weeks after the transaction?  A month
13  after the transaction?
14      A.   It was -- it was definitely several
15  weeks.  It took some time to get everything, you
16  know, finalized.  There were some preliminary
17  numbers that came up within a couple weeks, but,
18  you know, the final numbers and the final review
19  ended up taking several weeks.
20      Q.   And is it your understanding that
21  prices were changed based off the results of
22  your valuation that didn't conclude until at
23  least weeks after the transaction closed?
24      MR. THOMAS:  Objection to form.
25      A.   I don't recall that.  It's possible

1      HIGHLY CONFIDENTIAL - Landreman
2   that there may have been some price adjustments
3   both up or down based upon what we saw as we
4   reviewed certain assets in more detail as more
5   data became available.
6      Q.   For purposes of valuing the
7   securities, were you and your team initially
8   valuing those securities as the date of receipt
9   or some other date?
10      A.   We were instructed to provide values
11  as of specific dates, whether it was the 19th,
12  the 22nd, or a number of days in between.  So
13  whenever we were asked to provide valuations as
14  of effective dates, we provided the valuation as
15  of the dates that we were requested.
16      Q.   And by whom were you requested to
17  provide valuations as of a specific date?
18      A.   I don't recall specifically who asked,
19  but I know that we've been asked on multiple
20  occasions by different senior management to
21  provide valuations as of specific dates.
22      Q.   And were you told or did you have an
23  understanding at any point what the basis for
24  using the close of business on September 19 was
25  initially?

1      HIGHLY CONFIDENTIAL - Landreman
2      A.   I was --
3      MR. THOMAS:  Objection to form.
4      A.   I was ambivalent.  To me, I was being
5   asked to value as of a certain day.  I valued as
6   of a certain date.
7      Q.   And so did you and your group never
8   opined as to what would be a more appropriate
9   measurement date for a security based off of a
10  point in time?
11      A.   That would be a dialogue with
12  Technical Accounting and Price -- PwC.  They
13  would be the experts that would opine on the
14  effective date of the transaction.
15      Q.   Most of the securities that your group
16  was responsible for valuing were received
17  through the repo; is that correct?
18      MR. THOMAS:  Objection to form.
19      A.   I believe so.
20      Q.   And those positions, most of them, had
21  been received as of Friday, September 19; is
22  that correct?
23      MR. THOMAS:  Objection to form.
24      A.   I don't know when we physically
25  received the securities.

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2        Q.   On some of the spreadsheets and
 3   throughout the matter, we've been referring to
 4   the securities that arrived on September 19
 5   through the repo as the initial inventory.
 6        Are you familiar with that term?
 7        A.   Vaguely.
 8        Q.   Do you have a ballpark figure of the
 9   number of CUSIPs that your team was responsible
10   for that would be considered initial inventory
11   securities?
12        MR. THOMAS:  Objection to form.
13        A.   I don't recall that, that -- I know it
14   was a large number, but I don't know what the --
15   what the count of securities was.
16        Q.   But there was a significant number of
17   CUSIPs that your team valued that came over as
18   part of the initial inventory; is that correct?
19        MR. THOMAS:  Objection to form.
20        A.   There was a large file of securities,
21   yes.
22        Q.   As part of the initial inventory, as
23   opposed to later securities transferred; is that
24   correct?
25        MR. THOMAS:  Objection to form.
```

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2        A.   Again, I don't know your definition of
 3   the "initial inventory" because it was really
 4   irrelevant to us.  We were given a list of
 5   positions to price as of effective specific
 6   days, and that's what we did.
 7        Q.   I'm handing you what's previously been
 8   marked as Deposition Exhibit 86B, and I will
 9   also hand you what's previously been marked as
10   Deposition Exhibit 87B.
11        Have you previously seen either of
12   these two documents?
13        A.   I don't recall seeing these documents
14   before.
15        Q.   Have you seen a variation of this
16   document before?
17        A.   I could have seen a variation of a
18   document like this before.
19        Q.   I ask because I have numerous,
20   numerous ones I can possibly show, so I just
21   want to shortcut this in the sense of, would a
22   document like this have been put together by
23   someone in PCG?  Let's start there.
24        MR. THOMAS:  Objection to form.
25        A.   This document would appear to be
```

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2   created by somebody potentially in PCG or in
 3   Financial Control.
 4        Q.   I'm going to give you what's
 5   previously been marked as Deposition Exhibit
 6   641A.  We have tabbed a couple of pages.  You
 7   don't need to turn to them yet, but just for
 8   convenience.
 9        Just let me know when you're ready.
10        (Document review.)
11        A.   I think I'm ready.
12        Q.   Okay.  Deposition Exhibit 641A was
13   produced to us and appears to be at least
14   substantially similar in parts to Deposition
15   Exhibit 86B and 87B, and perhaps, in its full
16   glory, it might be easier to question you based
17   off of 641A.
18        MR. THOMAS:  Do you want to direct him
19        to the parts that you think are
20        substantially similar?
21        Q.   Yes.  Why don't we start out with the
22   first page that we have tabbed, which is what
23   we'll use in lieu of 86B, which is one Excel tab
24   of a much larger Excel workbook, and the Excel
25   workbook is at BCI-EX-(S)-00213995 and it is the
```

```
 1        HIGHLY CONFIDENTIAL - Landreman
 2   summary tab, and the other tabs of that Excel
 3   workbook are broken out by asset category that
 4   at least roughly match up with those in the
 5   summary tab.
 6        Have you seen this workbook before?
 7        A.   Not that I recall.
 8        Q.   Do you believe that you or anyone on
 9   your team was responsible for creating it?
10        MR. THOMAS:  Objection to form.
11        A.   I believe that we contributed data to
12   Sean, who would have put this together.  I think
13   it would be Sean or somebody in the Financial
14   Control side.
15        Q.   If you'll turn to the fourth column,
16   fourth column, which is titled "PCG Value"?
17        A.   Uh-huh.
18        Q.   Would you expect that the values in
19   that column would reflect the valuations of your
20   group, where applicable?
21        MR. THOMAS:  Objection.  Foundation.
22        A.   I would say that those would have been
23   close to being the values that we derived, or
24   the values as they were calculated, without any
25   liquidity adjustments.
```

Page 110

HIGHLY CONFIDENTIAL - Landreman
1     Q.   In terms of price testing, how is the
2  process broken up between testing of value as
3  opposed to testing of liquidity adjustment?
4     A.   Normally, in the securitized products
5  world, there's a -- the liquidity adjustment
6  would not -- we would have a trader's mark, and
7  the difference between PCG price and the
8  trader's mark, or the variance, we would expect
9  it to be a conservative variance.
10    Q.   If you'll turn your attention to the
11 two rows titled "PMTG" and "PMTG II."  Your
12 group was responsible for valuing certain of the
13 securities within PMTG and PMTG II, correct?
14    A.   Correct.
15    Q.   Would you expect that for those assets
16 that your group was responsible for within PMTG
17 and PMTG II, that there would be any
18 contribution to the numbers within the column
19 "MV - 9-22 with Bid - Offer," which appears to
20 be the liquidity adjustment?
21        MR. THOMAS:  Objection.  Form.
22    A.   I don't know if that's what that
23 means.  I don't know --
24    Q.   I'm just trying to understand your

Page 111

HIGHLY CONFIDENTIAL - Landreman
1  earlier answer about the asset class that you
2  cover and that you wouldn't expect there to be
3  much of a liquidity adjustment for those assets,
4  and I just want to know, does that mean that
5  there is no liquidity adjustment for any of the
6  assets that your group was responsible for
7  valuing?
8        MR. THOMAS:  Objection to form.
9     A.   No, there were liquidity adjustments
10 for the assets that my group valued.
11    Q.   And would there be specific asset
12 classes for which there would be liquidity
13 adjustments?
14    A.   Yes.
15    Q.   And which would those be?
16    A.   We listed all of the assets that we
17 provided liquidity adjustments for and the
18 amount of the adjustment by the asset category.
19    Q.   Let's turn to the second tab, which is
20 also within the Excel workbook Bates-stamped
21 BCI-EX-(S)00213995 and is what is found within
22 the tab of that Excel workbook titled
23 "Liquidity."
24        Have you seen this document before?

Page 112

HIGHLY CONFIDENTIAL - Landreman
1     A.   Yes, I have.
2     Q.   Did you assist in its creation?
3     A.   Yes, I did.
4     Q.   Would you direct me to which of the
5  subtypes you and your group would have had
6  responsibility for?
7     A.   Might be easier if you just go by the
8  tabs.
9     Q.   Okay.  Let's go back to --
10    A.   I would have the RMBS.  That includes
11 all RMBS-Reperforming, U.S. agency CMOs, U.S.
12 agency pools, and the PMTG tab.
13    Q.   Everything within the PMTG tab?
14    A.   There will be certain corporate and
15 credit-related -- like the certificate of
16 deposits and the corporate credit senior was not
17 part of -- it's not familiar to me.
18    Q.   So it appears that there's a
19 significant number of securities within your
20 group that applied a liquidity haircut.  I'm
21 just trying to understand, reconcile it with
22 your earlier statement about your asset class
23 and liquidity adjustments.  So perhaps you can
24 just explain a little bit more for me in terms

Page 113

HIGHLY CONFIDENTIAL - Landreman
1  of --
2     A.   Within each asset category or asset
3  type, we reviewed all of the pricing data points
4  that we received for the various points in time,
5  and we looked at a dispersion of pricing,
6  assuming that each one of these indications was
7  considered to be a fair value measurement, to
8  show the variability amongst different opinions
9  as to what the values could be or the
10 uncertainty or the pricing dispersion, and
11 within each category, we calculated a generic
12 liquidity haircut based upon the pricing
13 dispersion that we saw within these positions.
14    Q.   But only for those securities that
15 were not priced based off of the internal sales
16 price; is that correct?
17        MR. THOMAS:  Objection to form.
18    A.   I would need to see if there were
19 traded prices that had liquidity adjustments.  I
20 didn't know if there would be or not.  I would
21 have to see.
22        (Luncheon Recess; Time Noted:  12:56
23    P.M.)

Page 114

HIGHLY CONFIDENTIAL - Landreman
1           HIGHLY CONFIDENTIAL - Landreman
2                  AFTERNOON SESSION
3                  (Time Noted: 1:42 P.M.)
4    RICHARD LANDREMAN, resumed and
5        testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. CARRERO:
8        Q.    Mr. Landreman, before the break, we
9    had left off looking at what has previously been
10   marked as Deposition Exhibit 641A.  If you could
11   put that in front of you as well as what we
12   marked earlier today as 800B.
13           Do you have it in front of you?
14       A.    Yes, I do.
15       Q.    Could you tell me a little bit about
16   the attachment to this e-mail from Mr. Teague to
17   you and others dated October 27, if you're
18   familiar with it.
19       A.    Where would you see the attachment?
20       Q.    Does your document not have -- I'm
21   sorry.  If you turn to what on my copy comes
22   after placeholder document Bates-stamped
23   BCI-EX-(S)-00207969 and then has what is an
24   Excel workbook printed out.
25       A.    Okay.

Page 115

1           HIGHLY CONFIDENTIAL - Landreman
2        Q.    Have you seen this document before?
3        A.    I don't recall this.
4        Q.    Do you recall providing data that was
5    used in its creation?
6        A.    I don't recall that.
7        Q.    Does that apply to each page of the
8    attachment or only to the first page?
9            MR. THOMAS:  Objection to form.
10       A.    I don't remember the data that went
11   into here, although it would have come from my
12   group, or pieces of it would have come from my
13   group.
14       Q.    Is the data that is within the
15   attachment to 800B an earlier point in time than
16   the data that ultimately feeds into Deposition
17   Exhibit 641A?
18           MR. THOMAS:  Objection to form.
19       A.    Which tab on 641A?
20       Q.    If you turn back to the first flag
21   that we have put on the document for you, that
22   summary page as well as all the supporting pages
23   that roll into that summary page.
24           Why don't we step back.  I'm just
25   trying to get an understanding of the process

Page 116

1           HIGHLY CONFIDENTIAL - Landreman
2    that was under way in the fall of 2008 in
3    valuing the securities that your group was
4    responsible for and how the outcome of that
5    analysis was subsequently disseminated and makes
6    its way into the acquisition balance sheet.
7            I've seen, and I can put a number --
8    I'm trying to make this as few documents as
9    possible, but I can put a number of documents in
10   front of you where we see correspondence
11   internally as well as with PwC.  Data is going
12   back and forth.  I want to understand your role
13   in that process of valuing the securities and
14   getting data into what are a number of
15   spreadsheets.
16           So with that said, were you personally
17   involved in the creation of any spreadsheets
18   that record the results of price testing by your
19   group?
20       A.    No.
21       Q.    Did you review a number of
22   spreadsheets that record the outcome of price
23   testing by your group?
24       A.    I would only have reviewed results as
25   it pertains to the asset categories that I price

Page 117

1           HIGHLY CONFIDENTIAL - Landreman
2    tested.
3        Q.    And could you describe for me what
4    those spreadsheets look like?  I've got so many
5    spreadsheets here.  I'm trying to shortcut it in
6    terms of what --
7        A.    The spreadsheets that I would have
8    reviewed would have been produced in my group
9    that showed that the assets that we were giving
10   to Sean to consolidate would have tied back to
11   the numbers of the population that we were given
12   in terms of number of securities and the
13   notional balances, and then we would have
14   provided market values and any adjustments that
15   would have been prescribed at the time.
16       Q.    So, turning back to 641A, if you go
17   back to the first page that's flagged, which is
18   a summary page, and that is within Excel
19   workbook Bates-stamped BCI-EX-00213995, in
20   addition to a summary tab in that Excel
21   spreadsheet, there are a number of tabs that
22   correspond to asset classes, including RMBS and
23   PMTG.
24           Would your group have created the
25   underlying CUSIP-by-CUSIP tabs of the

Page 118

HIGHLY CONFIDENTIAL - Landreman

1 spreadsheet -- let me see if I can find ones
2 that would correspond.  If you flip about 20
3 pages into the spreadsheet ending in Bates
4 number 995 and you come to what is the RMBS tab.
5 A.  I think I'm there.
6 Q.  Have you seen that tab, or something
7 similar, previously?
8 A.  You're referencing
9 BCI-EX-(S)-00213995, RMBS tab?
10 Q.  Exactly.
11 A.  I mean, I really can't read the copy
12 here.  So, I mean, it looks like a list of
13 agency mortgages, but I can't really read the
14 pricing or the titles to the columns.
15 Q.  Is it a document, the format of which
16 you feel you have seen before?
17 A.  It looks like a spreadsheet.
18 (Exhibit 811B, a document bearing
19 Bates Nos. BCI-EX-(S)207849 through 7850,
20 with attachment, marked for identification,
21 as of this date.)
22 Q.  Just let me know when you're ready.
23 (Document review.)
24 A.  I think I'm ready.

Page 119

HIGHLY CONFIDENTIAL - Landreman

1 Q.  Okay.  You have before you what has
2 been marked Deposition Exhibit 811B.  Turn your
3 attention to the e-mail at the bottom of the
4 first page.  It's from Mr. Teague to Phillip
5 Nash.  It's CC-ing you, among others, and it
6 attaches an acquisition PL 0930 Liquidity
7 10/10/08 file.  Do you see that?
8 A.  I see that.
9 Q.  And above that attachment it says,
10 "The below file includes liquidity adjustment as
11 per Patrick's request."  Do you see that?
12 A.  I see that.
13 Q.  And if you turn to the attachment, do
14 you recall this document?
15 A.  No, I do not.
16 Q.  You don't have any reason to believe
17 you did not receive it; is that correct?
18 A.  I may have received it, but this would
19 have been -- I would not have been involved in
20 the dialogue around this type of spreadsheet.
21 Q.  Looking at the attachment and the line
22 item for agency mortgages, which is number row
23 7?
24 A.  Okay.

Page 120

HIGHLY CONFIDENTIAL - Landreman

1 Q.  Would the securities within that asset
2 class have been your responsibility and your
3 group's?
4 A.  Yes, I believe so.
5 Q.  And there's a footnote 2 next to
6 agency mortgages which says, "As of COB 9/30."
7 Do you see that?
8 A.  Yes.
9 Q.  Do you know what that's a reference
10 to?
11 A.  I have no idea.
12 Q.  If you would look at column D, which
13 is titled "BARC COB 9/19 MV at 9/19" and compare
14 it to column titled "BARC COB 9/19 MV at 10/3,"
15 do you know how those two columns compare?
16 A.  I have no idea.  You could speak to
17 the author of this document what the intent of
18 this presentation was.
19 Q.  If you turn back to Deposition Exhibit
20 800B and look at the attachment four pages in,
21 on the bottom left-hand corner it says "FO Sum"?
22 A.  I'm sorry, where are you?
23 Q.  Four pages into the attachment to
24 Deposition Exhibit 800B, on the bottom left-hand

Page 121

HIGHLY CONFIDENTIAL - Landreman

1 corner it says "FO Sum"?
2 A.  Four pages in?
3 MR. THOMAS:  It's got 53 rows?
4 MS. CARRERO:  Exactly.
5 Q.  It looks a lot like the previous
6 document that we showed you, 811B.
7 A.  Okay.
8 Q.  Do you have an understanding of what
9 "FO Sum" would stand for?
10 A.  Where do you see that again?
11 Q.  Bottom left-hand corner.
12 A.  Bottom left-hand corner.  Which line?
13 Q.  It's actually the bottom left-hand
14 corner of the page.
15 A.  Oh.  I have no idea.  It looks like
16 the name of the document or ...
17 Q.  It's tab, it's the tab name of the
18 Excel workbook, but I'm wondering if
19 convention -- would you think it means front
20 office summary?
21 A.  You'd have to speak with the author of
22 the document.
23 Q.  You don't recall receiving attached to
24 a number of e-mails any front office summaries

Page 122

1    HIGHLY CONFIDENTIAL - Landreman
2  of the assets acquired in the Lehman
3  transaction?
4        MR. THOMAS: Objection to form.
5    A.   As what point in time and when? I
6  mean, I'm ...
7    Q.   At any time in the fall of 2008.
8    A.   There have been a lot of e-mail
9  traffic and a lot of spreadsheets and schedules,
10  and these types of accounting schedules and
11  these discussions as to what the net P&L would
12  be of the transaction I was not involved with.
13    Q.   And again, turning to the agency
14  mortgages footnote 2, as of close of business
15  9/30?
16    A.   Like I said, I was asked to perform
17  analyses on lots of didn't dates, and the 30th
18  would have been a standard pricing date for our
19  processes to be performed on the 30th, the end
20  of the month.
21    Q.   So it's not your understanding that
22  September 30th is reflective of the internal
23  sales sale date?
24    A.   I don't know that.
25        (Exhibit 812B, a document bearing

Page 123

1    HIGHLY CONFIDENTIAL - Landreman
2  Bates Nos. BCI-EX-(S) 207979 through 7980,
3  with attachment, marked for identification,
4  as of this date.)
5    Q.   Mr. Landreman, you have before you
6  what has been marked as Deposition Exhibit 812B.
7  If you want to take a moment to flip through it.
8        (Document review.)
9    Q.   Are you ready?
10    A.   Okay.
11    Q.   Looking at the e-mail at the bottom
12  from Mr. Teague to a number of people CC-ing
13  you, dated November 14, "Subject: Haircut," do
14  you see that?
15    A.   Yes, I do.
16    Q.   And you see that it says, "Please
17  provide data to support the bid/offer
18  assumptions on the liquidity tab for Agencies
19  (Kevin J) Corp. (Kevin J) Muni (Elly) and EM
20  (Heidi Su). Keep in mind this is for September
21  30 month-end.
22        "Suggestions - base it off real market
23  data if available. If only have consensus data,
24  what is the band of pricing you are getting?
25  Again, if lack specific data, just do high level

Page 124

1    HIGHLY CONFIDENTIAL - Landreman
2  across your tested population. More high level,
3  easier to explain and quicker you can provide
4  data to support haircut."
5        Do you see that?
6    A.   Yes, I do.
7    Q.   What's your understanding of the
8  statement, "Keep in mind this is for 30
9  September month-end"?
10    A.   I'm sorry, could you repeat that?
11    Q.   What's your understanding of the
12  sentence at the end of the first paragraph that
13  says, "Keep in mind this is for 30 September
14  month-end"?
15    A.   You'd have to ask Sean what he meant
16  by that. I'm assuming that he wanted people to
17  produce the analysis he requested as of
18  September 30.
19    Q.   Do you know why he was requesting as
20  of September 30?
21    A.   No, I do not.
22    Q.   Do you know how the bid/offer
23  assumptions differed from those that were used
24  on the Barclays' acquisition of Lehman assets?
25        MR. THOMAS: Objection to form.

Page 125

1    HIGHLY CONFIDENTIAL - Landreman
2    A.   I do not know what -- I don't --
3        Where do you see that?
4    Q.   Well, it's asking to support bid/offer
5  assumptions as of -- "keep in mind this is for
6  September 30." My question is, how, if at all,
7  does this relate to the acquisition of Lehman
8  assets?
9        MR. THOMAS: Objection to form.
10    A.   This e-mail I was included on as a
11  former supervisory capacity to Elly Pu because,
12  in terms of any sort of bid/offer documentation,
13  which was being requested from Elly, this would
14  have been in terms of how it related to
15  municipals, and Elly was working on that. So
16  the only reason I was on this e-mail was to make
17  sure that Elly was working to get this
18  performed.
19    Q.   So in the fall of 2008 was Elly Pu
20  within your group?
21    A.   She was performing valuations for
22  municipal bonds and she was in process of being
23  transferred over into Sean's group.
24    Q.   Who had the ultimate say on the
25  valuations for the muni bonds?

Page 126

HIGHLY CONFIDENTIAL - Landreman

1      HIGHLY CONFIDENTIAL - Landreman
2      A.   Sean would have.
3      Q.   Is it your understanding that the
4  September 30 date in this e-mail has no relation
5  to the date of any internal sales within
6  Barclays of assets acquired from Lehman?
7      MR. THOMAS:  Objection to form.
8      A.   I don't understand the question.
9      Q.   This September 30 date referenced in
10 this e-mail, does it relate at all to the
11 internal sale of assets within Barclays?
12     A.   I don't know that.
13     Q.   So looking first at what has been
14 previously marked as Deposition Exhibit 548A,
15 just take a quick look, and turning your
16 attention to the second page, there's a, at the
17 top, there's an e-mail from Marcus Morton dated
18 January 29 to you, among others.  Subject is
19 Opening BS Valuation Work, and it says, "Can you
20 please read and respond to the appropriate
21 points?"  Do you see that?
22     A.   Yes.
23     Q.   And then below there's an e-mail from
24 PwC to Morton, and it asks a series of
25 questions.  Do you see that?

Page 127

1      HIGHLY CONFIDENTIAL - Landreman
2      A.   Yes.
3      Q.   If you turn your attention to number
4  1, which says, "Bid/offer - The desk marks to
5  bid.  The valuation adjustment has been taken on
6  the desk price.  Therefore, this appears to be
7  double-counting.  From a consistency purpose,
8  the liquidity adjustment is not used at December
9  31."
10         Do you know what this is a reference
11 to?
12     A.   No, I do not.
13     Q.   Do you recall responding to PwC on
14 this point?
15     A.   Sean would have most likely responded
16 to question number 1.
17     Q.   And why would you expect that Sean
18 would have been the one to respond to question
19 number 1?
20     A.   The majority of the value
21 adjustment -- valuation adjustment dialogue and
22 discussion was managed by Sean.
23     Q.   And do you know why that was, that it
24 was managed by Sean?
25     A.   He was managing the majority of the

Page 128

1      HIGHLY CONFIDENTIAL - Landreman
2  consolidated reporting tasks for the portfolio.
3      Q.   And what were your roles with respect
4  to the consolidated reporting tasks?
5      A.   Responding to my segments to Sean.
6      Q.   Would any of the points raised below
7  have been points that fell within your area?
8      A.   Point 2.
9      Q.   Would that have been related to you
10 because it's to PMTG?
11     A.   The assets within PMTG, the majority
12 of which were securitized products, correct.
13     Q.   What about number 3?
14     A.   3 was more of a Sean Teague issue.
15     Q.   Did Mr. Teague have primary
16 responsibility for the valuation of Pine?
17     A.   I believe so.
18     Q.   If not Teague, is there anyone else
19 you would expect would have had primary
20 responsibility for the valuation of Pine?
21     A.   For the testing of it or for the --
22     Q.   Go ahead.
23     A.   That was a joint effort between the
24 business and the Product Control due to the
25 nature of the asset and the lack of available

Page 129

1      HIGHLY CONFIDENTIAL - Landreman
2  data for the specific structure and the fact
3  that this was a newly formed structure which was
4  really a bottom-of-the-barrel security which
5  really had no precedent in the market at that
6  time.
7      Q.   And who within the business would have
8  been involved in the valuation of Pine?
9      A.   Within Stephen King's world, there was
10 Jasen Yang and his team.
11     Q.   If you could turn to what has been
12 marked as Deposition Exhibit 813B.
13         (Exhibit 813B, a document bearing
14      Bates Nos. PwC-BarCap11225 through 11310,
15      marked for identification, as of this date.)
16         (Document review.)
17     A.   Okay.  I see this.
18     Q.   Okay.  Have you seen this document
19 before?
20     A.   No, I have not, or I don't recall.
21     Q.   Can you turn your attention to the
22 third page heading 10.2, "Positions prices using
23 other matrices, models or custodian price."  The
24 first sentence says, "The following portfolio
25 sub-portfolios were fair-valued as follows."  Do

HIGHLY CONFIDENTIAL - Landreman

1  you see that?
2      A.   Yes, I see that.
3      Q.   Would you have been the person to
4  supply PwC with the information on how the PMTG
5  assets below were valued?
6          MR. THOMAS: Objection. Form.
7      A.   PwC would have come to my team and
8  received all of its supporting detail for
9  everything that we performed in the valuations,
10 and they had their experts review everything we
11 did and they documented that here.
12     Q.   So, taking a step back and discussing
13 the process by which you and your team would
14 have interacted with PwC, when did that process
15 start?
16     A.   It was, as far as I could recollect,
17 it was nearly instantaneous.  They are always,
18 you know, conversing with my team about
19 different sources.  So when they started this
20 particular analysis, I couldn't give you the
21 exact date, but I'm sure it was -- they were
22 asking for data while we were still pricing the
23 portfolio and they were watching everything we
24 were doing while we were valuing the portfolio.

HIGHLY CONFIDENTIAL - Landreman

1      Q.   And were you yourself the primary
2  communicator for your asset classes, or did
3  someone else on your team play that role?
4      A.   I would have had the PwC auditors meet
5  with the analysts who performed the valuations.
6      Q.   If you would take a look at the
7  section labeled 8, "Bid/offer - JPM Portfolio."
8      A.   Where is that?  Oh, Section 8?
9      Q.   Section 8. Sorry.  And do you see
10 where it says, "Due to the fact that all
11 positions were priced by the FO at 12/31, no
12 bid/offer was required at 12/31 to adjust the
13 traders' prices (and all PMTG positions were in
14 PMTG trading desks at 12/31 and not the PMTG
15 management book) prove?"
16         Do you know if that is an accurate
17 statement?
18         MR. THOMAS: Objection to form.
19     A.   The physical movement from the
20 management book to the trading desk's books
21 would have been a line controller's function,
22 so...
23     Q.   I'm sorry, could you explain that a
24 little bit more in terms of the physical

HIGHLY CONFIDENTIAL - Landreman

1  movement as opposed to the valuation of?
2      A.   Where the securities reside, in which
3  books or which legal entities or wherever they
4  are being managed, is a function of the line
5  controllers.  The line controllers would give us
6  a list, a population of securities to value, and
7  we would value those securities and return the
8  results back to the line controllers and to the
9  business as well.
10     Q.   I guess my confusion lies with how
11 does the JPM portfolio differ from the initial
12 inventory with respect to the valuation process
13 that would have been undertaken by your group?
14     A.   Well, we priced it as of the dates
15 that we were told to price it as of.  In terms
16 of the process, the securities which we received
17 from JPMorgan even worse than these things
18 we received from Lehman Brothers.  So it was a
19 little more difficult to value these securities
20 just because of the nature of the assets.
21         However, it was a similar process that
22 we used to price both portfolios.
23     Q.   So in the section above 7, "Changes In
24 Measurement Dates - JPM Portfolio," do you see

HIGHLY CONFIDENTIAL - Landreman

1  where it says, "PT priced the JPM securities as
2  of December 22.  FO priced the PMTG portfolio at
3  12/31 and PT performed independent price
4  verification as of that date."  Do you see that?
5      A.   Okay.  Your question again was?
6      Q.   You see that?
7      A.   I see that, yes.
8      Q.   And what does "PT" stand for?
9          MR. THOMAS: Objection to form.
10     A.   Price testing.
11     Q.   And would PT be a reference to your
12 group?
13     A.   Right.
14         MR. THOMAS: Objection to form.
15     A.   Or our function within the firm.
16     Q.   And do you see the next line under 7
17 that says, "Management identified a significant
18 number of variances in the PMTG book between
19 December 22 and December 31"?
20     A.   Yes, I do.
21     Q.   Do you have an understanding of what
22 they mean by "management"?
23         MR. THOMAS: Object to the form.
24     A.   We identified significant variances

1        HIGHLY CONFIDENTIAL - Landreman
2   between the prices that we derived and Product
3   Control versus the prices that we did get on
4   12/31 from the business when the traders marked
5   the positions.
6        Q.   And what was done with that variance?
7        A.   We performed a detailed discussion and
8   a deep dive with the business in regards to the
9   individual assets just because these were --
10  were so bad.  These securities were 1998
11  manufactured housing bonds.  These were things
12  that nobody sees.
13       Q.   And in terms of Barclays' acquisition
14  accounting, is it your understanding that the PT
15  price as of December 22 is the one that was
16  used?
17       MR. THOMAS:  Objection to form.
18       A.   I don't know which price they used.
19       Q.   As a general matter, do you know which
20  prices were used for any CUSIP for
21  purposes of Barclays' acquisition accounting?
22       A.   Not with certainty.
23       Q.   Who made the decision of what price
24  would be used for purposes of Barclays'
25  acquisition accounting?

1        HIGHLY CONFIDENTIAL - Landreman
2        A.   That, I don't know the answer to that.
3        Q.   If you had to guess, who would make
4   that decision?
5        A.   I would assume that whoever is
6   responsible for publication of the financial
7   statements would have opined on which values
8   were to be used.
9        Q.   And when you say responsibility for
10  publication, who would that be?
11       A.   Whether that was the Technical
12  Accounting Group, which would be Gary Romain's
13  group for the financial reporting, or if it was
14  all the way to Patrick Clackson or James Walker
15  in the U.S., somebody who was, you know, whose
16  name is responsible on the financial statements.
17       At this point, it may have been James
18  Walker in the U.S.  I really don't know who
19  would have made that decision.
20       Q.   If you would take a look under 5,
21  "Changes in Measurement Dates - Lehman
22  Portfolio."  If you'll turn to the last
23  paragraph -- I'm sorry, second-to-last
24  paragraph, do you see where it says, "Barclays'
25  policies and procedures require the front office

1        HIGHLY CONFIDENTIAL - Landreman
2   FO or trader to value trades as the trading
3   experts and PT to independently verify FO marks.
4   Between September 22 and September 30, PMTG
5   transferred the majority of assets from the PMTG
6   management book to the PMTG trading desks
7   through an internal auction.
8        "As of September 30, front office
9   marked all positions and PT performed
10  independent price verification over the FO marks
11  in accordance with Barclays' policies and
12  procedures."
13       A.   I see that.
14       Q.   Is that an accurate statement?
15       A.   That would be accurate.
16       Q.   Earlier when we were discussing
17  internal sales prices, it was unclear whether or
18  not PT was valuing the securities independently
19  or were price testing the internal sales price.
20       Does this refresh your recollection?
21       A.   As of 9/30, we would have had a trader
22  mark on the book.  As of 9/22, we would not have
23  had a trader mark.
24       Q.   So, for purposes of the price of the
25  position on September 22, your group had come up

1        HIGHLY CONFIDENTIAL - Landreman
2   with its independent price through the process
3   that we discussed earlier?
4        A.   Uh-huh.
5        Q.   Is that correct?
6        A.   Correct.
7        Q.   And then later, come September 30,
8   there would be an internal sale within Barclays
9   that would generate a price which your group
10  subsequently price tested; is that correct?
11       MR. THOMAS:  Objection.
12       A.   I don't --
13       MR. THOMAS:  Objection to form.
14       A.   I don't know when the sale took place,
15  if it was any day in between there or if it was
16  September 30.  I don't know the official trade
17  date of any securities that were transferred off
18  the top of my head.
19       Q.   And do you know whether, for purposes
20  of Barclays' acquisition accounting, they
21  accounted for the majority, which is the way
22  that it is characterized here, the majority of
23  the PMTG assets acquired using the prices that
24  your group came up with with an earlier date in
25  September or if they accounted for it using the

Page 138

1      HIGHLY CONFIDENTIAL - Landreman
2  internal sales price as of September 30?
3      A.   You would need to check with the
4  accountants on that because I performed the
5  valuations that we performed, and how the
6  information we provided was used by the
7  accountants was really a function of the
8  accounting groups.
9      Q.   Would you agree that the value
10  potentially would be different as of an earlier
11  date in September that was over a week before
12  September 30?
13      MR. THOMAS:  Objection to form.
14      A.   It depends which assets you're
15  discussing.  There may have been no change in
16  value, depending upon the asset category, or
17  there could have been, depending upon what
18  happened in the markets during that time.
19      Q.   Was a process ever undertaken to
20  compare the prices that your group had come up
21  with as of the earlier date, the acquisition
22  date, versus the internal sales prices within
23  Barclays?
24      A.   I'm sorry, can you repeat that?
25      Q.   Was there a process by which the

Page 139

1      HIGHLY CONFIDENTIAL - Landreman
2  internal sales prices as of September 30 were
3  compared to the prices as of the acquisition
4  date before a determination was made as to which
5  to use for acquisition accounting?
6      A.   If you look at this attachment in
7  section 5, PwC did a full review of the 9/22
8  versus the 9/30 prices, as did we, and they
9  reviewed our work.
10      Q.   And were you involved in that process?
11      A.   I would have been involved in that
12  process for the review of the asset valuations.
13      Q.   But you were not involved in the
14  decision of whether to use the 9/19 estimates as
15  opposed to the 9/30 fair value estimates?
16      A.   I was not involved in the technical
17  accounting aspects.
18      Q.   Do you know if any of the securities
19  that were auctioned internally were offered to
20  third parties in the market before they were
21  acquired by Barclays' trading desks?
22      A.   I don't know that.
23      Q.   Do you know if the majority of assets
24  in PMTG were amortizing assets?
25      A.   The majority of the assets in PMTG

Page 140

1      HIGHLY CONFIDENTIAL - Landreman
2  were mortgage-related, so they would have been
3  amortizing, yes.
4      Q.   And do you know what a remittance
5  report is?
6      A.   Yes, I do.
7      Q.   Could you explain what one is?
8      A.   A remittance report is published by
9  the master trustee to present to the investors
10  the performance of the trust and also show any
11  cash inflows and outflows of the trust for that
12  period of time.  The remittance reports are
13  generally prepared on a monthly basis, but some
14  of the more esoteric assets may be produced on a
15  quarterly basis.
16      Q.   Do you know for the amortizing assets
17  the date of the remittance reports that would
18  have been used to value the assets acquired?
19      A.   Well, depending upon the structure,
20  the remittance reports may be issued on the 25th
21  or the 26th.  There are different dates that
22  remittance reports are issued, depending upon
23  the structure.
24      Q.   And do you know whether remittance
25  reports for September 25th as opposed to August

Page 141

1      HIGHLY CONFIDENTIAL - Landreman
2  25th were used for purposes of valuing the
3  securities as of September 19?
4      A.   We would have been using the publicly
5  available data as of the 22nd through the --
6  with backdating the analysis to the date in
7  question.  So it would have been using the
8  historical data, not the actual data from
9  September.
10      Q.   So you would have used the September
11  25th, but backdated it --
12      A.   When we opened the model, we would
13  have used the data that was available in the
14  model, but we would have asked the analysis to
15  be as of a specific date, which would have
16  ignored the updated information on the
17  remittance report.
18      Q.   If valuing a security as of September
19  19 and you had to enter a price on that day, and
20  a September 25 remittance report would not be
21  available, how do you account for that by
22  using -- scratch that.
23          Does the model, does making those
24  inputs within your model take into consideration
25  the fact that that information would not have

Page 142

HIGHLY CONFIDENTIAL - Landreman

1    been available as of September 19, or does it
2    simply just back out, you know, a week's time?
3    simply just back out, you know, a week's time?
4        MR. THOMAS:  Objection to form.
5        A.   The key driver in a securitized
6    product valuation is the spread information that
7    you input as well as any assumptions as it
8    relates to prepayments or defaults, and our
9    assumptions on the prepayments and defaults
10   would have been driven on more generalized
11   market parameters as opposed to, you know,
12   something we would have found specifically in
13   that bond's remittance report at that month.
14       Q.   So is it fair to say that the way it
15   was done, the September 25th remittance report,
16   to the extent it included any new pricing data,
17   it really wouldn't have been used in the model?
18       MR. THOMAS:  Objection to form.
19       A.   We already owned a large portfolio of
20   mortgage-backed securities, and we had been
21   applying pricing and methodologies that were
22   consistent with how we price our existing
23   portfolio.
24       We also owned our own mortgage
25   originator and our own mortgage servicer at the

Page 143

HIGHLY CONFIDENTIAL - Landreman

1    time, and we had trend data that we used in the
2    prediction or the estimation of the assumptions
3    that we would use in our valuation.
4        The remittance reports generally were
5    confirming our view of the trends that we were
6    using in our valuations.
7        Q.   So they were not inputs into your
8    model, they were simply used to confirm the
9    outputs that your model generated; is that
10   correct?
11       A.   Unless there was a material deviation
12   from our expectations of the performance of a
13   bond on any given basis, generally the updates
14   of the remittance reports had minimal effects on
15   our valuations.
16       Q.   September 25th remittance reports were
17   used and could have had some effect on your
18   valuations, even if minimal, correct?
19       A.   Within -- potentially.
20       Q.   If I could have you also put in front
21   of you what was previously marked 808B.
22       A.   Okay.  808B.
23       Q.   Turning your attention back to the
24   e-mail we were looking at earlier from Sean

Page 144

HIGHLY CONFIDENTIAL - Landreman

1    Teague dated September 15, Roman II, "ABS
2    Testing," and reference to a matrix developed by
3    your group for Alt A positions?
4        A.   Okay.
5        Q.   Was this matrix based on recent trade
6    levels even where there was little trading
7    activity?
8        Forgive me for being a layperson, I
9    might be butchering the terminology here, but
10   could you just tell me about the matrix being
11   used for Alt A securities?
12       A.   The prices that we observed for trades
13   in the market was the market at the time.  So
14   there was limited trading, but there was
15   trading.  We did have a running trend of the
16   trades so we were looking at what was happening
17   pretty much every day for the prior six months,
18   and every month we would calibrate these curves
19   to the trades that we would see in the market.
20       So, based upon the product and the
21   vintage and the performance of that specific
22   bond, we would track all of the trades and use
23   that in the process of creating these spread
24   matrices that we would apply toward comparable

Page 145

HIGHLY CONFIDENTIAL - Landreman

1    bonds.
2        Q.   And the same matrix would have been
3    used for ultimately price testing the internal
4    sales price within Barclays for any Alt A
5    securities acquired from Lehman?
6        A.   For all securities.
7        Q.   For all Alt A securities?
8        A.   Yes.
9        Q.   And the same matrix would have been
10   used for purposes of pricing the securities as
11   of the acquisition date for all Alt A securities
12   acquired?
13       A.   The prices derived in my group would
14   have been derived using the models that we had
15   internally.
16       Q.   And the models would have been the
17   matrix that is --
18       A.   The data within the matrix would have
19   been incorporated within the modeling of the
20   bond.
21       Q.   And how would the bond have been
22   modeled?  What would the next step be after
23   you've got a matrix?  Those are your inputs for
24   your model; is that correct?

Page 146

1      HIGHLY CONFIDENTIAL - Landreman
2      A.    Right.
3      Q.    And what kind of model is it?
4      A.    Well, there are vendor models like
5  Intex or, you know, Polypaths was another
6  application that we used which was really a
7  wrapper into Intex, or Bloomberg.  There are a
8  number of vendored models that we were able --
9  we could use to price, for example, an Alt A
10  bond, we would take the spread assumption, the
11  discount rate that we would derive from our
12  observable trades because we had a number of
13  trades that traded at a specific spread, we
14  would have used that spread to -- or a
15  comparable spread to price this bond if they
16  were of comparable quality or of comparable
17  vintage and performance.
18      But we would look at all of the
19  parameters in the bond in a very detailed manner
20  to make sure that we were projecting what we
21  thought was going to be the real performance of
22  that bond going forward to derive a fair value.
23      Q.    And would that include testing the
24  fundamentals of the underlying loans?
25      A.    We would be looking at the performance

Page 147

1      HIGHLY CONFIDENTIAL - Landreman
2  of the bonds that composed the entire security.
3      Q.    And are you aware of any document that
4  contains all of the inputs used for modeling Alt
5  A securities?
6      A.    Yes, that would be part of our working
7  papers.
8      Q.    I'm going to hand you what has been
9  previously marked as Deposition Exhibit 635A.
10      (Document review.)
11      Q.    You ready?
12      A.    Sure.
13      Q.    This is an attachment behind a letter
14  from counsel that accompanied the production.
15      Have you seen the attachment before,
16  which is Bates-numbered 00302803?
17      A.    Yes, I have.
18      Q.    And can you tell me what it is?
19      A.    Each of these boxes represents a
20  spread matrix that we would apply towards a
21  different asset category.  So, for example, a
22  prime bond was, you know, the best quality
23  mortgages at the time.  The LCR would stand for
24  a loss coverage ratio, which we would calculate.
25      There was a formula to say how much

Page 148

1      HIGHLY CONFIDENTIAL - Landreman
2  credit supporting existed within the structure,
3  and that loss coverage ratio, the higher the
4  ratio meant there was more credit support within
5  the bond to protect that investor from losses,
6  and as your loss coverage ratio would go down,
7  these spreads with widen to account for the
8  higher risk.
9      We calculated these spreads based upon
10  observable trades, where we would take any bond
11  that traded, we would look at the spread, and
12  then we would then graph and point out where the
13  loss coverage ratio was for that specific bond.
14  So we would be able to draw a curve that would
15  show where the loss coverage ratio could be or
16  should be in our matrix.
17      Q.    Okay.  To break that down a little
18  bit, is this the Alt A matrix that's referenced
19  in the document we had previously reviewed,
20  Deposition Exhibit 808B?
21      MR. THOMAS:  Objection to form.
22      A.    The three matrices on the top of this
23  page are Alt A matrices.  So, prime, Alt A and
24  option ARMs are all considered, theoretically,
25  Alt A for -- in mortgage vernacular.

Page 149

1      HIGHLY CONFIDENTIAL - Landreman
2      Q.    And the numbers within this matrix
3  would then, in turn, have been put into a model;
4  is that correct?
5      A.    Correct.
6      Q.    Are there any other inputs into that
7  model besides what's within this matrix, which
8  is the first page of the attachment?
9      A.    Yes.  There would be a prepayment
10  speed assumption.
11      Q.    And would that input be somewhere
12  within this same document?
13      A.    It should be, however I'm not able to
14  read the attachments clearly in the handout you
15  have given me.
16      Q.    We can pull it up electronically,
17  which I would rather not, but provided that this
18  copy is not the best, does it look as though
19  it's the type that would contain that
20  information, or should I bring up --
21      A.    The spreadsheet should contain some of
22  the other assumptions that were used, but I
23  don't know if I see it in this version of the
24  spreadsheet.
25      Q.    It's my understanding, you know, and

Page 150

HIGHLY CONFIDENTIAL - Landreman

1    HIGHLY CONFIDENTIAL - Landreman
2    we can have this conversation off the record if
3    you prefer, that based on the production letter
4    and our conversations for this type of material,
5    that this is it, this is what's supposed to
6    include that information, it's the backup.
7        And we can pull up the e-mail that's
8    referenced in Boies Schiller's February 22
9    letter dated -- the e-mail dated February 18
10   that's referenced for further discussion about
11   it.  I just would like to know, if not in this
12   type of document, where would we find the other
13   assumptions that would have been used?
14       A.   I mean, this spreadsheet was a
15   presentation that was the discount margin
16   application and then the pricing results.  So if
17   you needed to see the prepayment assumptions
18   that were used, they could be provided.
19       That may have been a column that was
20   hidden in this spreadsheet that was hidden when
21   it was printed.  There was lots of data
22   underlying these models, so ...
23       Q.   In addition to the matrix and the
24   prepayment input, what other sorts of inputs
25   went into the model and are they captured within

Page 151

1    HIGHLY CONFIDENTIAL - Landreman
2    this document?
3        A.   I mean, there's a lot of information
4    that we used in the valuation of a security
5    which we boiled down to a, you know, loss
6    coverage ratio and a discount margin that I
7    would not -- that I don't see on this specific
8    spreadsheet.
9        Q.   And where would you keep that type of
10   information?
11       A.   Again, in the working files.  We
12   downloaded indicative data.  We download data
13   about the performance of the bonds in our
14   spreadsheets.  And the working files get so
15   large that, in order to print a report out that
16   would fit on a spreadsheet, you would make it
17   smaller for the printout and, depending upon who
18   requested the data, we would present that data
19   that they requested.  So ...
20       Q.   If you could just put that aside and
21   we put before you a document that's previously
22   been marked Deposition Exhibit 646A.
23       A.   Yes.
24       Q.   Have you ever seen this document
25   before?

Page 152

1    HIGHLY CONFIDENTIAL - Landreman
2        A.   No, I have not.
3        Q.   Will you turn to page 5 of this
4    document, actually, at the very bottom of page
5    4, and the chart has a row related to non-agency
6    mortgage-backed securities and then a column
7    about the procedures performed by PwC followed
8    by a column of the observations/conclusions PwC
9    reached.
10       Without asking you to sit here and
11   read all of it, similar to what we previously
12   marked as Deposition Exhibit 813B, which was a
13   PwC e-mail recording --
14       A.   813B, okay.
15       Q.   What, if any, role did you have in
16   supplying this information to PwC?
17       A.   We provided PwC with all of our
18   working documentation and all of the paperwork
19   that they requested to perform a full audit of
20   the fair value process that we performed.
21       Q.   If you look at page 5 of 646A, and you
22   see within the document are embedded
23   spreadsheets, including you can see an
24   attachment called Matrix Comparison Summary.xls,
25   and then below that, Matrix Comparison (#3).

Page 153

1    HIGHLY CONFIDENTIAL - Landreman
2    Scratch that.
3        (Recess; Time Noted:  3:14 P.M.)
4        (Time Noted:  3:27 P.M.)
5        (Exhibit 814B, a document bearing
6    Bates Nos. PwC-BarCapWP_23318 through 23351,
7    marked for identification, as of this date.)
8    BY MS. CARRERO:
9        Q.   Mr. Landreman, I have put before you
10   what has been marked as Deposition Exhibit 814B.
11   If you could turn your attention to the third
12   page, there is an e-mail from Andrew Pickett to
13   you and Mr. Teague dated December 18, subject:
14   "Lehman Acquisition Prices."  Do you see that?
15       A.   Page 3, yes, I see that.
16       Q.   And do you see Mr. Pickett writes,
17   "Sean and Rich, we are trying to close out our
18   documentation of the positions acquired from
19   Lehman, and had two points of clarification to
20   run by you:
21       "1.  Is the 10 to 25 percent liquidity
22   haircut at 9/30 applied to call BarCap CDO/CLO
23   positions or the Lehman/JPM acquisition
24   positions?"
25       Do you see that?

Page 154

HIGHLY CONFIDENTIAL - Landreman
1
2    A.    I see that.
3    Q.    Are liquidity haircuts at September 30
4    applied to all of Barclays' CDO/CLO positions as
5    of that date, or is it only to the Lehman/JPM
6    positions that were acquired?
7    A.    You probably need to speak to Sean
8    about this specific question because, in terms
9    of the application of the liquidity haircuts as
10   of 9/30, I wasn't involved in the application of
11   that for the different portfolios.
12   Q.    Would the CDO/CLO positions be within
13   your group or Teague's group?
14   A.    The CDO/CLO positions for Barclays
15   would have been in my group.  They would not
16   have been applied on the Barclays' positions.
17   However, I don't know if at 9/30 they were being
18   applied to the Lehman/JPMorgan positions.
19       I thought we were pricing these as of
20   an acquisition date with the liquidity haircuts
21   and then the business would have priced this the
22   30th.  But Sean might be able to clarify that
23   for you.
24   Q.    Was your group, as of September 30,
25   applying liquidity haircuts in the range of 10

Page 155

HIGHLY CONFIDENTIAL - Landreman
1
2    to 25 percent on other CDO positions owned by
3    Barclays at that time?
4    A.    Not where we had trader prices.
5    Q.    Would the trader's price have included
6    a liquidity haircut of anywhere in the
7    neighborhood of 10 to 25 percent?
8        MR. THOMAS:  Objection to form.
9    A.    The trader's price would have been
10   reflective of fair value.
11   Q.    And would fair value include a
12   liquidity haircut of in the range of 10 to 25
13   percent?
14       MR. THOMAS:  Objection to form.
15   A.    I don't understand that question.
16   Q.    Isn't it your group's role to price
17   test the trader's mark?
18   A.    Correct.
19   Q.    If in that price testing you were to
20   determine that the trader's mark included a 10
21   to 25 percent liquidity haircut, would that
22   constitute a fair value mark?
23   A.    The trader would not be giving us a --
24   the trader would give us a single mark and we
25   would test that mark against data that we see in

Page 156

HIGHLY CONFIDENTIAL - Landreman
1
2    the market.
3    Q.    Do I understand that to mean that it
4    is PT, meaning your group, as opposed to the
5    front office that would be the one to apply a
6    liquidity haircut, if one was to be applied?
7        MR. THOMAS:  Objection to form.
8    A.    Well, the liquidity adjustments that
9    were made in the opening balance sheet were more
10   a function of, or at least my understanding is
11   that those were a function of not having trader
12   marks on those specific positions, and then once
13   the traders marked those positions, the
14   liquidity adjustments would be removed.
15   Q.    So, in the ordinary course, if you had
16   a trader's mark, there would be no need for a
17   liquidity adjustment; it's only in the absence
18   of one that a liquidity adjustment would be
19   added?
20       MR. THOMAS:  Objection to form.
21   A.    I think it's dependent upon the intent
22   of the analysis and what the -- which portfolios
23   we were talking about, which positions
24   specifically.
25   Q.    I'm just trying to get an

Page 157

HIGHLY CONFIDENTIAL - Landreman
1
2    understanding.  It's month-end, it's September
3    30, and you have positions that are within your
4    group's responsibility which includes CDOs.
5        Are you applying liquidity haircuts to
6    all CDO positions that Barclays owns, or is it
7    only with respect to those acquired from Lehman?
8        MR. THOMAS:  Objection.
9    A.    It was my understanding that the
10   liquidity adjustments were really only applied
11   on the opening day balance sheet.  So the 9/30
12   valuation for the CDO/CLO positions that were
13   already on Barclays' balance sheets would not
14   have received liquidity adjustments.
15   Q.    And then what would happen the
16   following day, October 1?  What price would be
17   reflected for those same CDO positions that had
18   a 10 to 25 percent liquidity haircut as of
19   September 30?
20   A.    I never said there was a liquidity
21   haircut as of September 30.
22   Q.    When was there a liquidity haircut as
23   of?
24   A.    The opening balance sheet?  As of --
25   was that September 22 or --

1          HIGHLY CONFIDENTIAL - Landreman
2     Q.    So the day after the acquisition
3   balance sheet, let's say, is there going to be a
4   liquidity haircut for any position --
5          MR. THOMAS: Objection to form.
6     Q.    -- on Barclays' balance sheet?
7     A.    The traders would have marked the
8   positions to fair value.
9     Q.    Is there a system within Barclays that
10  enables one to pull up what the marks are for
11  each CUSIP as of the day after the acquisition?
12    A.    I don't know if all of these assets --
13  I don't know where daily pricing would have been
14  stored on some of these assets. It depends on
15  which business they were in and which front
16  office system they were entered into.
17    Q.    But it would exist somewhere within
18  Barclays' information as to the mark on the day
19  after the acquisition --
20    A.    Potentially.
21    Q.    -- balance sheet date?
22          And any increases or decreases to the
23  value from the date of the acquisition balance
24  sheet would then be recorded as P&L; is that
25  correct?

1          HIGHLY CONFIDENTIAL - Landreman
2          MR. THOMAS: Objection to form.
3     A.    That would be my understanding, yes.
4     Q.    And would your group price test the
5   prices that were ascribed to each security on
6   the day after the acquisition balance sheet?
7     A.    No. We would price test at the end of
8   the month.
9     Q.    There would be no price test of the
10  day after the acquisition; is that correct?
11    A.    That would be correct.
12          (Exhibit 815B, a document bearing
13    Bates Nos. PwC-BarCap 45782 through 45787,
14    marked for identification, as of this date.)
15    Q.    Mr. Landreman, you have before you
16  what has been marked Deposition Exhibit 815B.
17  If you could take a look at the e-mail at the
18  bottom of the first page, which is from Mr.
19  Teague to yourself, among others. It's dated
20  January 28, and it says, "Chris, I put the
21  following overview together for PwC, as I will
22  be out of the office the remainder of the week.
23  Please contact Rich Landreman in my absence."
24          Do you see that?
25    A.    Yes.

1          HIGHLY CONFIDENTIAL - Landreman
2     Q.    And then attached, do you see a
3   document titled "Lehman Open Balance Sheet,
4   Barclays Capital Valuation Methodology"?
5     A.    Yes.
6     Q.    Did you assist in the preparation of
7   this document?
8     A.    I don't recall.
9     Q.    If you'll look at the A(I)(ii),
10  illiquid asset category, the third bullet down,
11  "Haircut - due to liquidity issues, following
12  logic was devised to best capture market price.
13  Lehman assets which were sold (auctioned by the
14  PMTG) prior to month-end, are considered trades
15  and therefore the traded price was applied with
16  no haircut. If a security was not auctioned by
17  September 30, the PMTG desk was utilized with
18  liquidity haircut applied to desk mark to bring
19  it to a fair value under the extenuating market
20  conditions."
21          Do you see that?
22    A.    I see that.
23    Q.    Where an internal sale price was used,
24  no haircut was applied; is that correct?
25          MR. THOMAS: Object to the form.

1          HIGHLY CONFIDENTIAL - Landreman
2     A.    Bullet 1, where Lehman assets were
3   sold, auctioned, prior to month-end are
4   considered trades and therefore trade prices
5   applied with no haircut, you know, I would agree
6   with that.
7     Q.    Do you know what happened to any
8   assets that were not auctioned to a desk within
9   Barclays?
10    A.    They stayed at PMTG.
11    Q.    PMTG is a desk within Barclays,
12  though, correct?
13    A.    Correct.
14    Q.    And are you simply distinguishing
15  between PMTG being the original receiver of the
16  assets as of the acquisition date and,
17  therefore, being the seller of those securities?
18          MR. THOMAS: Objection to form.
19    A.    My understanding was that PMTG took
20  all of the assets into a high-level management
21  account and then distributed or auctioned off
22  all of the assets or moved all of the assets out
23  to trading desks, and whatever was left over was
24  left in the PMTG business, whether it was at the
25  high level at the management or if it was

Page 162

HIGHLY CONFIDENTIAL - Landreman

1  distributed to one of the PMTG trading desks.
2  Q.   Do you know if any of those desks to
3  which these securities were auctioned were then
4  being run by former Lehman individuals?
5  A.   I was not aware of any Lehman
6  individuals in PMTG.
7  Q.   The auction of these securities was to
8  desks beyond PMTG, correct?
9  A.   Correct.
10  Q.   So the desks purchasing the securities
11  from PMTG would presumably include desks then
12  being run by former Lehman individuals; is that
13  correct?
14  MR. THOMAS:  Objection to form.
15  A.   I'm not aware of any desks for the
16  products I cover that were being run by former
17  Lehman people.
18  Q.   At the point in time of the sale,
19  September 30, there were a number of former
20  Lehman employees that were at that point
21  employed by Barclays; is that correct?
22  A.   I believe so, yes.
23  Q.   And that would include former Lehman
24  individuals that were on desks in the front
25

Page 163

HIGHLY CONFIDENTIAL - Landreman

1  office that would be purchasing these securities
2  for their books; is that correct?
3  MR. THOMAS:  Objection to form.
4  A.   Yes.
5  Q.   And those individuals would be
6  familiar with those assets, having had exposure
7  to them while at Lehman; is that correct?
8  MR. THOMAS:  Objection to form.
9  Foundation.
10  A.   I don't know that.
11  Q.   Were former Lehman traders consulted
12  with respect to the valuation of the securities
13  within the internal auction process?
14  MR. THOMAS:  Objection to form.
15  A.   If there were internal -- if there
16  were Lehman, former Lehman employees involved in
17  the bidding process, they would have been people
18  that were in the flow of businesses, and as I
19  said, those businesses had been managed by
20  Barclays people, but they had brought in some
21  staff from Lehman in certain areas.  But the
22  management was always Barclays.
23  Q.   But former Lehman people who were
24  responsible for marking positions while they
25

Page 164

HIGHLY CONFIDENTIAL - Landreman

1  were at Lehman would potentially have been in a
2  position to buy back securities they had priced
3  at X while at Lehman for a lower price at
4  Barclays; is that correct?
5  A.   I wouldn't know because I don't know
6  where Lehman had these assets on their books.
7  Q.   Mr. Landreman, I have put before you
8  what has been previously marked as Deposition
9  Exhibit 643A.  Take a moment to take a look.
10  (Document review.)
11  A.   Yes, I see that.
12  Q.   And it was your group that had
13  responsibility for valuing the Agency RMBS,
14  correct?
15  A.   Correct.
16  Q.   And a 10 percent liquidity haircut was
17  applied to Agency RMBS, correct?
18  A.   A 10 percent liquidity adjustment was
19  applied towards agency CMOs, not the entire
20  portfolio of Agency RMBS.  Only a 1 percent
21  adjustment was applied towards the pools and the
22  pass-throughs.
23  Q.   And Deposition Exhibit 643A is a memo
24  from you to PwC dated February 2, 2009, subject
25

Page 165

HIGHLY CONFIDENTIAL - Landreman

1  line: "RMBS Portfolio Acquired From Lehman -
2  bid/offer Reserve Agency CMOs," correct?
3  A.   Correct.
4  Q.   And this document provides the
5  methodology by which your team arrived at a 10
6  percent liquidity adjustment for agency CMOs; is
7  that correct?
8  A.   That's correct.
9  Q.   In your method 1, where did you take
10  your price observations from?
11  A.   From the data that we received from
12  the Bank of New York, from our pricing vendors,
13  and also from our own prices that we derive.  It
14  was really a dispersion analysis of pricing for
15  the different -- for the various products.
16  Q.   And do you know which pricing vendors
17  were used?
18  A.   IDC -- or, FTID.
19  Q.   Is that the only one?
20  A.   We also would have potentially used
21  Street software.  Street Analytics, I think it
22  is called.
23  Q.   Is that it?
24  A.   That would be it.
25

42 (Pages 162 to 165)

Page 166

1      HIGHLY CONFIDENTIAL - Landreman
2      Q.    And when you said "our prices," what
3    did you mean by that?
4      A.    The values that we derived using our
5    internal modeling methodologies for agency CMOs.
6      Q.    And what was your internal modeling
7    methodologies for CMOs, agency CMOs?
8      A.    We would use an internal OAS model,
9    which we would look at observable trades, when
10    available, and solve for option-adjusted spreads
11    for those specific asset categories and apply
12    that towards the portfolio by asset category.
13      Q.    And what definition of "bid/offer
14    spread" are you using within this methodology
15    for determining the liquidity adjustment?
16      A.    I mean, in terms of applying a
17    bid/offer, it's -- method 2 was really more of a
18    bid/offer analysis where we showed buys and
19    sells on the same day.  We showed which bonds we
20    bought and what we sold, and although it was not
21    an instantaneous buy and sell, these types of
22    transactions generally tend to be negotiated
23    ahead of time.  So you would only buy a position
24    like this if you had an outlet to distribute it,
25    so at least we had the observation that it went

Page 167

1      HIGHLY CONFIDENTIAL - Landreman
2    in and went out at the same day.  But again, to
3    say that it was instantaneous within the minute,
4    I can't prove that.
5          In terms of method 1, that was more of
6    a price dispersion amongst different points that
7    were available, and the largest dispersion
8    occurred in the categories where the majority of
9    the bonds were concentrated.  I think the last
10    paragraph where we said that we applied a 10
11    percent bid/offer as a proxy, subordinated by
12    both methods, 75 percent of the portfolio was
13    highly structured IO, PO and Z bonds, and the
14    majority of these bonds, you know, this supports
15    the use of an average, as the trade sample was
16    skewed by the high number of derivative trades
17    reflected in the trade sample.
18          So the trade sample had high levels of
19    derivatives which showed the bid/offer
20    adjustment in the 15 to 20 percent range, which,
21    again, when we did the original analysis on the
22    pricing dispersion, we saw that there was a high
23    level of dispersion amongst those derivative
24    assets which really comprised the bulk of the
25    portfolio.

Page 168

1      HIGHLY CONFIDENTIAL - Landreman
2      Q.    Are bid/offer spreads generally
3    simultaneous at a particular moment in time?
4      MR. THOMAS:  Objection to form.
5      A.    A bid/offer spread in its technical
6    sense for a product that trades regularly and
7    you have observability would be, you know, as
8    close as possible to a buy and sell
9    instantaneously.  In a market where positions
10    are traded randomly or as negotiated sales were
11    a buy and a sell will occur on the same day,
12    it's considered that these bid/offer spreads
13    would be indicative of a true, you know, almost
14    what a bid/offer should be.
15          But there's lots of -- in terms of
16    bid/offer spread on the agency CMO world, it's
17    less clear than, say, the Treasuries or agency
18    debentures, where there's more trading activity
19    and more observability.
20      Q.    Were these actual trading prices?
21      A.    The spreadsheet that we provided you
22    were actual trades with the trade date and the
23    amount of the trade.
24      Q.    So they're actual trades as opposed to
25    price indications?

Page 169

1      HIGHLY CONFIDENTIAL - Landreman
2      A.    Correct.
3      Q.    Okay.  And how was the sample size of
4    39 agencies CMO bonds assembled?
5      A.    For the timeframe that we selected,
6    these were all the trades where we had buys and
7    sells on the same date.
8      Q.    Is there a point at which the sample
9    size would not have been adequate in order to
10    derive a liquidity adjustment from the available
11    actual trades?
12      MR. THOMAS:  Objection to form.
13      A.    Again, this analysis was a secondary
14    analysis to support the concept of a liquidity
15    adjustment based upon the observability of
16    pricing dispersion, in addition to, you know, a
17    sample of bid/offer spreads at this time in the
18    market.  It was, in our opinion, although the
19    data may have been limited, it was the best
20    available data at the time.
21      Q.    In using this benchmark portfolio in
22    method 2, did you take into consideration
23    whether the positions within it were inverse IOs
24    as opposed to other types of agency CMOs?
25      A.    We put the collateral or the structure

43 (Pages 166 to 169)

1      HIGHLY CONFIDENTIAL - Landreman
2  type in here to demonstrate these were inverse
3  IOs in many cases.  There was also some general
4  IOs off of structured collateral.
5        Again, we presented the data that we
6  had at the time.  In absence of other data, we
7  felt this was a reasonable means to help
8  demonstrate as a secondary source the adjustment
9  for pricing.
10     Q.    Would you agree that inverse IOs have
11  a higher bid/offer spread than other agency
12  CMOs?
13     A.    Yes.
14     Q.    And the benchmark portfolio is
15  comprised of roughly 50 percent inverse IOs; is
16  that correct?
17     A.    Correct.
18     Q.    And the agency CMO positions that
19  transferred from Lehman to Barclays were only 13
20  percent of the CMO portfolio, correct?
21     A.    I'm sorry, can you repeat that?
22     Q.    The percentage of inverse IOs
23  comprising the agency CMOs that transferred from
24  Lehman to Barclays was much less than 50
25  percent, correct?

1      HIGHLY CONFIDENTIAL - Landreman
2     A.    The derivative portion of the agency
3  IOs or inverse IOs that came to us were
4  significantly different in the fact that they
5  were actually much worse than an inverse IO.
6  They were IOs created off of structured packs,
7  tax, things that were materially worse.
8     Q.    But as a percentage of the total
9  agency CMOs that were transferred from Lehman to
10  Barclays, the majority of them were not -- or
11  were better than an inverse IO, correct?
12     A.    No, they were not better than an
13  inverse IOs.  They were IOs created off of
14  seasoned structured collateral that, in many
15  cases, you know, the derivative nature of the
16  bond made it even less appealing than an inverse
17  IO.
18     Q.    With respect to the approach that
19  Barclays used and the pricing framework that
20  they used to value the agency CMOs, what was the
21  underlying option adjusted spread assumption
22  used to generate market values?
23     A.    I don't understand that question.
24     Q.    What assumptions were used in the
25  model, in the OAS model, that you described?

1      HIGHLY CONFIDENTIAL - Landreman
2     A.    OAS model would use the BlackRock
3  multi-factor prepayment models, which we had
4  licensed and were using as part of our regular
5  valuation process.  It was a multi-dimensional,
6  multi-factor econometric prepayment model that
7  is regularly used in the industry.  It is
8  considered one of the superior models on the
9  street.
10        And in terms of the spread assumptions
11  that we would use, we would calibrate spreads
12  that we would use as seeds to price the bonds
13  based upon our observed trading data from our
14  own portfolio and our own pass-throughs or our
15  own desk.
16     Q.    And did you compare the spreads with
17  OAS for comparable collateral published daily by
18  leading Wall Street firms?
19     A.    That would actually -- you would need
20  to make sure that you're using the exact same
21  model that any Wall Street firm would be
22  publishing.  So, generally, they would be
23  publishing their spread data off of a
24  calibration to yield book, and most of the data
25  that's being published is being published on the

1      HIGHLY CONFIDENTIAL - Landreman
2  more vanilla structures, like pass-throughs and
3  maybe even TBAs, but in terms of the POs and the
4  derivative structures that we were receiving,
5  the IO and the PO benchmarks that are being
6  published for trust IOs and POs were not
7  comparable to the assets that we received that
8  were IOs.
9        We received highly structured
10  derivative IOs that were not trust IOs.  And the
11  same with the POs.  The POs were structured off
12  of different classes of collateral that were not
13  comparable to trust POs.
14     Q.    What prepayment speeds did the model
15  generate?
16     A.    The model would generate prepayment
17  speeds that were specific to the underlying
18  collateral, so you would need to look at it
19  bond-by-bond and determine which -- what the
20  vector was and the average speed would have been
21  for that specific bond.
22     Q.    And is there a file that contains all
23  of the inputs bond-by-bond?
24     A.    There should be.  Should have been
25  provided to PwC and it should have been provided

1        HIGHLY CONFIDENTIAL - Landreman
2    as part of the analysis.
3            MS. CARRERO:  We'll take a look to see
4    whether that has been, but if not, we would
5    ask that that sort of information be
6    provided.
7            MR. THOMAS:  Why don't you shoot us an
8    e-mail.
9            MS. CARRERO:  That's fine.  We can
10   discuss after.
11       Q.    What was the source of discount rates
12   used to discount cash flows?
13       A.    For which products?
14       Q.    Still related to the agency CMOs
15   and --
16       A.    That's what the option adjusted spread
17   would be.
18       Q.    And were these rates risk-free or did
19   think involve a measure of risk premium?
20       A.    Explain what you mean, please.
21       Q.    I'm unable to do that, so if that
22   term -- do you not -- are those not terms that
23   you're familiar with, "risk-free"?
24       A.    I'm familiar with "risk-free."  It's
25   just a context of the question being asked.  You

1        HIGHLY CONFIDENTIAL - Landreman
2    know, it's not clear.
3        Q.    The inputs that were being inserted
4    into this model, were these rates, I mean, were
5    the discount rates that were inputs into the
6    model, were they risk-free, or did they involve
7    a measure of risk premium?
8            MR. THOMAS:  Objection to form.
9        A.    For the agency mortgage-backed
10   securities, the spreads would be based upon our
11   observable trade data, so that would imply some
12   level of a risk premium to that.
13       Q.    How many interest rate paths were
14   used?
15       A.    256.
16       Q.    Are you aware of any other firms that
17   use a static interest rate assumption for
18   mortgage analytics?
19       A.    We don't.
20       Q.    And what would be your definition of a
21   static interest rate assumption that --
22       A.    A single path.
23       Q.    And a single path is not what your
24   model is; is that what you're saying?
25       A.    Correct.

1        HIGHLY CONFIDENTIAL - Landreman
2        Q.    And if not a single path, what is it?
3        A.    We ran 256 paths.
4        Q.    If you could turn back to 643A.  Were
5    any of the trades used in method 2 in the
6    benchmark portfolio trades between interested
7    parties?
8        A.    I'm sorry?
9        Q.    Were they trades between Lehman and
10   Barclays, for instance?
11           MR. THOMAS:  Objection to form.
12       A.    I don't know that.
13       Q.    Are they interdealer trades?
14       A.    I would have to look at the detail of
15   the trade data who the counterparty was.
16       Q.    Do you know if the trades were
17   brokered?
18       A.    Again, I would need to see who the
19   counterparty was.
20       Q.    Is there a file that would have that
21   information of who the counterparties are to
22   these trades in the benchmark portfolio?
23       A.    That would be, yes.
24           (Exhibit 816B, a document bearing
25   Bates Nos. PwC-BarCap 48233 through 48236,

1        HIGHLY CONFIDENTIAL - Landreman
2    marked for identification, as of this date.)
3        Q.    Mr. Landreman, you have before you
4    what has been marked as Deposition Exhibit 816B.
5        A.    Yes.
6        Q.    Have you had a chance to review the
7    document?
8        A.    Not yet.
9        Q.    Let me actually shortcut this and turn
10   you to the third page -- I'm sorry, second page,
11   an e-mail from you to PwC dated February 3.
12       A.    Uh-huh.
13       Q.    If you would just -- and it's
14   questions on -- it's titled "Questions on
15   Barclays CMBS."  If you could just take a second
16   to read that e-mail.
17       A.    This piece I read.
18       Q.    For CUSIP 589929PT9?
19       A.    Uh-huh.
20       Q.    In your attempt to justify a price of
21   $5.52, part of your explanation involves the
22   fact that the CUSIP paid off in December 2008,
23   correct?
24       A.    I need to check and see if it was paid
25   off or if that was a loss allocated to wipe the

45 (Pages 174 to 177)

1    HIGHLY CONFIDENTIAL - Landreman
2  bond out.
3    Q.   But you wrote here "paid off,"
4  correct?
5    A.   The principal was gone, yes.
6    Q.   And so the price of $5.52 indicates
7  that one would not expect any principal to be
8  received on the bond in the future; is that
9  correct?
10    MR. THOMAS:  Objection to form.
11    And if you, despite the late hour, if
12    you need to review more of the document to
13    answer these questions, you're welcome to.
14    A.   I don't remember this specific bond,
15  but I would need to see the working papers as
16  to, you know, what was the notional as of the
17  day we priced it versus if we received any
18  principal or how much was there.
19    So we had a price of $5.52, and when
20  they questioned it as of December, there was no
21  nominal left.  So there was no reason to have a
22  discussion around the price of a bond that
23  doesn't exist.
24    Q.   So a $5.52 price could still be
25  reasonable even if that security had not taken a

1    HIGHLY CONFIDENTIAL - Landreman
2  principal write-down in the previous nine years
3  leading up to the valuation date?
4    A.   That is a reasonable price, yes.  That
5  could be an interest-only security.  I don't
6  know.  I would have to look at the specific bond
7  to see what it is.
8    Q.   Even if it were not an interest-only
9  security, the fact that it didn't take a
10  principal write-down at all would still warrant
11  a write-down potentially; is that what you're
12  saying?
13    MR. THOMAS:  Objection to form.
14    A.   A price of 5 on a bond that has not
15  received a principal write-down yet is -- could
16  still be a rational price.
17    Q.   And then, under --
18    A.   But again --
19    Q.   No, I understand.  If they -- and we
20  can speak hypothetically as opposed to the
21  specific CUSIP if you're more comfortable with
22  that, but under what circumstances would a
23  write-down of this nature be warranted where
24  there have been no principal write-downs in nine
25  years and if not an interest-only?

1    HIGHLY CONFIDENTIAL - Landreman
2    MR. THOMAS:  I'm not sure the
3    witness -- I'm not sure this is relevant,
4    but I know the witness didn't have a chance
5    to finish reading the e-mail chain.  If you
6    would allow the witness to finish reading
7    it.
8    MS. CARRERO:  I'm happy to allow the
9    witness to read it.
10    MR. THOMAS:  The information that he
11    didn't get through in the e-mail chain, I
12    don't know if it's relevant or not, but
13    might as well look at it.
14    MS. CARRERO:  That's fine.
15    (Document review.)
16    A.   Okay.  There's no additional
17  information in this that would really help this
18  conversation.
19    Q.   I'm trying to get an understanding for
20  where a write-down would be appropriate where
21  there have been no principal write-downs in the
22  past and it's not an interest-only.  What other
23  factors would be relevant in marking it down to
24  such a conservative level?
25    A.   You don't know whether a price of 5 is

1    HIGHLY CONFIDENTIAL - Landreman
2  conservative because you don't know what the
3  bond is, and a write-down is a meaningless term
4  unless you know what the bond was originally
5  marked at.
6    Q.   I mean, I'm taking the term
7  "conservative" from PwC's questioning about it.
8    A.   They're saying my price is low, but
9  they don't know -- well, first of all, there's
10  no nominal on the bond as of the pricing date,
11  so it's irrelevant, and unless we saw the
12  nominal and the bond itself, making any
13  speculation as to what the price of $5.52 means,
14  again, is highly speculative.
15    Q.   CMBS securities would fall underneath
16  the PMTG category of securities, correct?
17    A.   We have a secondary CMBS trading desk
18  that's managed under Tom Hamilton's securitized
19  products world, and any securities which they
20  would not take would have stayed within PMTG.
21    Q.   And do you know whether or not
22  internal sales prices were the primary prices
23  used for purposes of Barclays' acquisition
24  accounting for CMBS securities?
25    A.   I would have to go back and check on

Page 182

```
1        HIGHLY CONFIDENTIAL - Landreman
2   that.  I don't recall that.
3        Q.   If I were to represent to you that a
4   significant number of CMBS securities acquired
5   were valued at the internal sales price, would
6   that surprise you?
7            MR. THOMAS:  Objection to form.
8        A.   No, it would not.
9        Q.   And similar to your earlier testimony,
10  for CMBS securities, does the same apply where
11  PT undertook valuation as of the acquisition
12  date separate from the internal sale price
13  ultimately recorded for acquisition accounting
14  purposes?
15       A.   We would have performed a similar
16  process where we valued our securities and
17  compared our values to BoNY prices, any vendor
18  prices, and if we were to receive a trader mark
19  or a trade price, we would have compared our
20  prices to that at different points in time
21  during the analysis.
22       Q.   And at different points in time, you
23  mean during your ordinary course price testing
24  at the end of the month, September 30; is that
25  correct?
```

Page 183

```
1        HIGHLY CONFIDENTIAL - Landreman
2        A.   Correct.
3        Q.   But that price testing would not
4   necessarily affect the acquisition accounting
5   price that was ultimately used, is that correct?
6            MR. THOMAS:  Objection to form.
7        A.   It depends upon the variance itself
8   and the dialogue that was around the price, if
9   there was a large discrepancy.
10       Q.   Internal sales prices, would they
11  normally be used as a fair value mark for a
12  security?
13           MR. THOMAS:  Objection to form.
14       A.   If the prices were reviewed and
15  determined to be fair value, yes.
16       Q.   Those trades wouldn't constitute an
17  arm's length transaction, though, would they?
18           MR. THOMAS:  Objection to form.
19       A.   Depends who the trades were between.
20       Q.   If the trade is between two desks
21  within Barclays, is that an arm's length
22  transaction?
23           MR. THOMAS:  Objection to form.
24       A.   It depends if they're part of the same
25  business or if it's the proprietary trading desk
```

Page 184

```
1        HIGHLY CONFIDENTIAL - Landreman
2   or another business function that is not related
3   to the flow trading desk.
4        Q.   Did you or your group have any
5   involvement in pricing the Giants Stadium Bonds
6   that were acquired through the Lehman
7   transaction?
8        A.   That was not priced in my group.
9        Q.   And do you know whose group did
10  undertake primary responsibility for valuing the
11  Giants Stadium Bonds?
12       A.   That work was performed primarily in
13  Sean's world under Corporate Credit.
14       Q.   And do you know if there was front
15  office involvement in the pricing of the Giants
16  Stadium Bonds as well?
17       A.   I don't have personal knowledge of
18  that.
19       Q.   If you were to guess who else might
20  have been involved in the pricing of Giants
21  Stadium Bonds, what would be your best guess?
22       A.   Based upon my understanding of the
23  complexity of that structure and the lack of
24  data and the type of securities that were
25  involved, the desk would have been involved in
```

Page 185

```
1        HIGHLY CONFIDENTIAL - Landreman
2   that.
3        Q.   And what desk would that be?
4        A.   Would have been the PMTG desk.
5        Q.   And that at the time would have been
6   run by Stephen King; is that correct?
7        A.   Yes.
8        Q.   Mr. Landreman, I have handed you what
9   has been previously marked as Deposition Exhibit
10  533A.  If you take a moment to take a look at
11  that.
12       A.   Okay.
13       Q.   Have you seen this document before?
14       A.   No.
15       Q.   Can you take a look at the second
16  page, where it says "PMTG $7.2 billion," do you
17  see that?
18       A.   Okay.
19       Q.   Do you know whether a process was
20  undertaken to ascertain what gains Barclays
21  realized on PMTG assets it had acquired from
22  Lehman as of December 31?
23       A.   I'm not aware of that.
24       Q.   Would that have involved you or your
25  group?
```

Page 186

HIGHLY CONFIDENTIAL - Landreman

1       HIGHLY CONFIDENTIAL - Landreman
2       A.   As of December 31, we would have price
3    tested the portfolio, and the line controllers
4    would have had to have performed any accounting
5    reconciliation for P&L that was incurred during
6    the quarter because there's a number of factors
7    that would contribute to a P&L number that are
8    not specific to marked to market accounting.
9       Q.   And is the price testing that's done
10   at your end any different than the monthly price
11   testing?
12      A.   It would be the same process.
13      Q.   And would it be the controllers that
14   would be the ones to monitor any hedging
15   activities with respect to the assets acquired
16   in the Lehman transaction?
17      A.   What do you mean, "monitoring the
18   hedging activity"?
19      Q.   In connection with the controller's
20   function of recording P&L, would that process
21   involve any hedges that were placed on any of
22   the acquired securities?
23      A.   I'm not a line controller, so my
24   understanding is that they will perform a P&L on
25   all of the books that are comprised of a

Page 187

HIGHLY CONFIDENTIAL - Landreman

1       HIGHLY CONFIDENTIAL - Landreman
2    business, and some of those books may contain
3    hedges.
4       Q.   In valuing any of the securities that
5    were transferred over from Lehman, did you or
6    your group take into consideration whether any
7    of the positions were hedged in your valuation?
8       A.   For my portfolios, the hedges would be
9    irrelevant and they would be valued
10   independently.  The cash positions are valued
11   independently and the hedges would be valued
12   independently.
13      MS. CARRERO:  You want to take a
14   five-minute break?
15      MR. THOMAS:  Sure.
16      (Recess; Time Noted:  4:35 P.M.)
17      (Time Noted:  4:43 P.M.
18   BY MS. CARRERO:
19      Q.   Mr. Landreman, do you know who
20   Professor Paul Pfleiderer is?
21      A.   I have heard the name.
22      Q.   Have you -- let me first ask, are you
23   aware that Barclays has retained him as an
24   expert in this matter?
25      A.   Yes, I am.

Page 188

HIGHLY CONFIDENTIAL - Landreman

1       HIGHLY CONFIDENTIAL - Landreman
2       Q.   And have you had any meetings or
3    conversations with him?
4       A.   I don't recall.  I've had numerous
5    conference calls with people.
6       Q.   So I guess there's no point in asking
7    how long the meeting was.
8       Are you aware of other people within
9    price testing that have met or communicated with
10   Professor Pfleiderer?
11      A.   I don't know that they have met or
12   communicated with Professor Pfleiderer, but I
13   have been in conference calls with my colleagues
14   who have been on the phone with lawyers and he
15   may have been in the calls, but I don't know.  I
16   don't recall.
17      Q.   Did you or any of your staff provide
18   documents to Professor Pfleiderer?
19      A.   I'm not aware of providing him with
20   anything directly.  Anything that I would have
21   provided to PwC or to the lawyers, you know, I
22   don't know if he was a recipient of that
23   information directly from us.
24      Q.   Did you have any meetings or
25   conversations with any of Professor Pfleiderer's

Page 189

HIGHLY CONFIDENTIAL - Landreman

1       HIGHLY CONFIDENTIAL - Landreman
2    staff?
3       A.   I think I did.  I don't know who they
4    were or the context of those calls.
5       Q.   And --
6       A.   I don't recall the calls themselves.
7       Q.   And when would these calls have taken
8    place?
9       A.   Anytime in the last year.  I'm not
10   sure when he was contracted or, you know, I'm
11   regularly on the phone with the lawyers and the
12   auditors for various reasons.
13      Q.   With respect to PwC's audit, how does
14   the price testing that they undertook differ
15   from that which your group undertook?
16      A.   My understanding of the PwC pricing
17   review process is a detailed examination of the
18   policies and procedures, the control points that
19   we claim we execute.  So they will go through
20   and replicate what we say we do and then confirm
21   that we actually do what we say we're doing.
22      So they go very in detailed and they
23   test a spread matrix application and ask us why
24   this bond didn't, you know, did or did not get
25   applied a spread that we said it would have, and

48  (Pages 186 to 189)

1      HIGHLY CONFIDENTIAL - Landreman
2    then we explain why and then they look at that
3    and then they -- they review all of our data, in
4    addition to performing their own pricing, which
5    is all done internally at on their site, which
6    they don't share that with us.  And then they
7    come back with their opinions and any questions
8    they have around the results themselves and also
9    the process.
10        So they do look in detail at the
11    process that we perform and review that process
12    in addition to the actual values and results.
13        Q.   So would it be accurate to say that
14    they do not undertake independent valuation of
15    any of the securities at the price testing?
16        A.   I didn't say that.  They do perform an
17    independent test in their -- internally on their
18    own site and then produce that analysis, which
19    they do not share with us.  So they don't tell
20    us their values.  They just tell us if they
21    believe our values are reasonable.
22        Q.   Do they model securities themselves?
23        A.   They have that capability.
24        Q.   Do you know if that ordinarily is part
25    of the price testing that they undertake?

1      HIGHLY CONFIDENTIAL - Landreman
2        MR. THOMAS:  Objection to form.
3        A.   As I said, they don't share any
4    results with us of their analyses.  So they do
5    have people who I know ask about the assumptions
6    and claim to model, but they don't show me the
7    results of their model and they don't show me
8    the detail of their work.
9        Q.   So you don't know whether they do or
10    they don't model securities; is that correct?
11        A.   I know they have the capacity to model
12    securities.  I cannot tell you that I -- for
13    certain that they modeled our pricing because
14    they don't show me those results.
15        Q.   And do you know whether Professor
16    Pfleiderer or his staff who were retained by
17    Barclays, whether they have independently sought
18    prices and modeled the securities?
19        A.   I don't know what Professor Pfleiderer
20    was tasked to perform.
21        Q.   And have you been shown his report and
22    had an opportunity to read it?
23        A.   I have read his report, yes.
24        Q.   And was that prior to the serving of
25    his report or was that in connection with your

1      HIGHLY CONFIDENTIAL - Landreman
2    deposition today?
3        MR. THOMAS:  Objection to form.
4        A.   I don't know when his report was
5    served, so I couldn't tell you if it was before
6    it was being served.  I know that it was within
7    the last, you know, couple months that I have
8    seen his report in conjunction with other
9    reports related to this case.
10        Q.   Were you asked to comment on his
11    report and provide comments or edits in the
12    finalization process?
13        MR. THOMAS:  Well, I mean, you're
14      excluding conversations with lawyers, right?
15      I mean, if the attorneys had conversations
16      with you about any subject relating to
17      providing the legal advice for this case,
18      then that's going to be privileged.
19        MS. CARRERO:  Well, I guess we don't
20      need to get there.
21        Q.   I'm trying to understand whether you
22    had it in front of you and had the opportunity
23    to comment on it.
24        MR. THOMAS:  Well, he said he reviewed
25      it.  So, I mean --

1      HIGHLY CONFIDENTIAL - Landreman
2        Q.   Within the last -- I'm trying to
3    understand, did he review it after the report
4    was final or did you review it and were part of
5    the editing process of it.
6        MR. THOMAS:  I think that's been asked
7      and answered.
8        A.   I don't recall being part of the
9    editing process of his work papers.
10        MS. CARRERO:  I think that's it.  If
11      you want to take five minutes.
12        MR. THOMAS:  I'm ready to go.  I just
13      have a few questions.
14        MS. CARRERO:  Does anyone else have
15      questions?
16        MR. McCOUBREY:  No questions.
17        MR. DAKIS:  I just have one follow-up
18      question.
19    EXAMINATION BY
20    MR. DAKIS:
21        Q.   Robert Dakis from Quinn Emanuel for
22    the Official Committee of Unsecured Creditors.
23        During the last line of questioning,
24    you were asked if you saw Professor Pfleiderer's
25    report, and you testified that you reviewed it

Page 194

HIGHLY CONFIDENTIAL - Landreman

1  in connection with reviewing a number other
2  reports related to this case; is that correct?
3      A.   Correct.
4      Q.   Can you tell us if you remember what
5  the other reports you reviewed are?
6      A.   I mean, I was asked to respond to some
7  of the --
8          MR. THOMAS:  Well, if you're going to
9      go into conversations with attorneys,
10     counsel, in-house or outside counsel, then
11     I'm going to instruct you not to answer.
12         THE WITNESS:  Okay.
13         MR. THOMAS:  So let's exclude any
14     conversations with lawyers.
15     Q.   I'm not trying to get at conversations
16 that you had with counsel.  I guess let's start
17 with a yes or no.  Do you recall specifically
18 which other reports you reviewed?
19     A.   I think there were some follow-up
20 questions in terms of --
21         MR. THOMAS:  Don't get into the
22     substance of -- just answer his question,
23     which is, if you recall, if you can recall a
24     name of another report that you read, you

*Note: line numbers 1–25 shown; text as transcribed above.*

Page 195

HIGHLY CONFIDENTIAL - Landreman

1  can answer that question.
2      A.   I mean, I can't recall the reports
3  that I read, the name of the reports I could
4  identify that specifically.
5      Q.   We just ask one other follow-up.  And
6  again, this is a yes or no question and I'm not
7  trying to get at the substance of any
8  conversations you had with counsel.
9          Do you know whether the reports that
10 you reviewed were prepared by experts for the
11 movants in this case, or were these reports
12 prepared by experts for Barclays?
13     A.   I think there -- the testimony of the
14 movants, of the expert witness.
15     Q.   Of the movants, correct?
16     A.   Yes.
17         MR. DAKIS:  Nothing further.  Thank
18     you.
19         MS. CARRERO:  Thank you.
20         MR. THOMAS:  I've got a few questions.
21 EXAMINATION BY
22 MR. THOMAS:
23     Q.   Mr. Landreman, you were asked about
24 Barclays' use of internal sales prices in

Page 196

HIGHLY CONFIDENTIAL - Landreman

1  certain circumstances.  Does Barclays take any
2  steps to ensure the reasonableness of internal
3  sales pricing?
4      A.   A bond that goes through the price
5  testing process would be valued independently of
6  knowing what the sales price was.  We would then
7  compare that sales price to see if that price is
8  reasonable based upon our understanding of the
9  bond, and if there's a material difference
10 between the value that we derive and the value
11 that it was traded at, we would go back to the
12 trader and require that they document their
13 assumptions as to how they rationalized that
14 price.
15     Q.   So are they tested in a similar manner
16 as to other prices?
17     A.   Yes, they are.
18     Q.   For the Lehman positions that you
19 valued, you were asked something about bulk
20 discounts.
21         Did you reduce any values for the
22 Lehman positions you valued to reflect the large
23 size of a position?
24     A.   No, we did not.

Page 197

HIGHLY CONFIDENTIAL - Landreman

1      Q.   Mr. Landreman, you understand that
2  your testimony today is part of a court
3  proceeding and may be considered by the Court;
4  is that correct?
5      A.   Correct.
6      Q.   Were you asked to value a portion of
7  the assets Barclays received from Lehman
8  pursuant to the CL transaction between Lehman
9  and Barclays in September 2008?
10     A.   Yes.
11     Q.   Would you describe the group of assets
12 that you were asked to value?
13     A.   I was asked to value the agency
14 mortgage-backed securities, the agency CMOs, the
15 non-Agency RMBS collateral, which would include
16 Alt As, sub-prime, in addition to credit cards,
17 student loans, auto loans, and other securitized
18 products, including some CDOs and CLOs.
19     Q.   What was the goal of your valuation
20 effort?
21     A.   To provide a fair value for the
22 portfolio.
23     Q.   And was the direction given to you
24 from Barclays to state a fair value for those

HIGHLY CONFIDENTIAL - Landreman

1   HIGHLY CONFIDENTIAL - Landreman
2 assets?
3  A. Yes.
4  Q. And was that the direction that you
5 gave to members of your team that worked on the
6 valuation?
7  A. Yes, it was.
8  Q. Did you at all times during your work
9 attempt to fairly and reasonably value the
10 assets?
11  A. Yes, we did.
12  Q. At any time did anyone ever suggest to
13 you that you should do anything other than
14 attempt to calculate an appropriate fair value
15 of the assets?
16  A. No.
17  Q. Did anyone ever say to you, in form or
18 substance, that a result other than the fair
19 value of the assets was desired or should be
20 achieved?
21  A. No.
22  Q. Did anyone ever indicate to you or, to
23 your knowledge, anyone else working on the
24 valuation of the Lehman assets that you should
25 attempt to understate the fair value of the

1   HIGHLY CONFIDENTIAL - Landreman
2 assets in any way or to value them lower than
3 you otherwise would?
4  A. No.
5  Q. Would you please describe your
6 professional background and experience with
7 respect to valuing such assets?
8  A. I've been valuing securities in a
9 professional form since approximately 1996.  I
10 started with the Federal Home Loan Bank of New
11 York.  I was a secondary marketing analyst for
12 the securities that were pledged to the Federal
13 Home Loan Bank of New York for their
14 advancements program to their member banks.
15   I worked for consulting firms,
16 including the Mortgage Industry Advisory
17 Corporation, doing mortgage servicing valuation,
18 home loan mortgage valuation, risk analytics and
19 hedging analytics for mortgage originators,
20 mortgage servicers.
21   I have also worked in a National
22 Securities Pricing Center for Deloitte & Touche.
23 I have managed the RMBS price testing functions
24 within Deloitte's National Securities Pricing
25 Center reviewing all, several -- all of

1   HIGHLY CONFIDENTIAL - Landreman
2 Deloitte's clients' RMBS assets for audit
3 purposes.
4   I was part of the implementation team
5 that was tasked with implementing a valuation
6 control process at Freddie Mac seven years ago
7 as part of their accounting and audit
8 restatement.  That task included over a trillion
9 dollars of assets.
10   I've been with Barclays for over six
11 years now.  I have built this department from
12 scratch.  We've been audited and reviewed by
13 every regulator in the country and in the UK.
14 We are regularly audited by PwC.  We are
15 active -- you know, we are constantly having
16 dialogue with our peers in the industry, our
17 competitors.
18   We have full transparency to the
19 trading desks within our firm.  We see what's
20 happening on a daily basis, and we believe that
21 our processes and procedures that we have
22 implemented are industry best practices and are
23 consistent with what our view is is that
24 provides fair value that allow the investors of
25 Barclays Capital to have comfort that the

1   HIGHLY CONFIDENTIAL - Landreman
2 balance sheet assets that are being reported for
3 financial disclosure purposes are reasonable and
4 accurate.
5  Q. Do you believe the valuation you
6 ultimately reached for the Lehman assets that
7 you valued reflects their fair value as of
8 September 22, 2008?
9  A. Yes, we do.
10  Q. Did you attempt to value the Lehman
11 assets in a manner consistent with Barclays'
12 practices and policies?
13  A. Yes.
14  Q. Did you interact with PwC during the
15 review of their valuation you performed?
16  A. Yes.
17  Q. Would you please describe that
18 interaction and their efforts with respect to
19 the valuation?
20  A. PwC was already very familiar with our
21 policies and our procedures and how we price
22 tested bonds.  They came in and did a full
23 detailed review of the opening balance sheet and
24 the assets on the balance sheet.
25   They did a full review of the

Page 202

```
1        HIGHLY CONFIDENTIAL - Landreman
2   processes and the controls around how we
3   implement our policies or our price testing
4   processes.  They asked very detailed questions.
5   They went through this entire analysis with
6   very -- with high levels of scrutiny.
7           They sent out a large team to review
8   different asset categories.  They brought in
9   subject matter experts who were very
10  knowledgeable in the asset classes that were
11  presented to us, and they followed up and
12  produced high levels of documentation and
13  questioned everything that we did.
14     Q.   Did this work by PwC in reviewing
15  Barclays' valuation of these assets continue for
16  a period of months?
17     A.   For the opening balance sheet, they
18  produced their report on the date that was
19  presented for the opening balance sheet for the
20  financial release, and whatever date that was is
21  when they completed their analysis.
22     Q.   And had their work with respect to the
23  valuation of these assets been ongoing for
24  months prior?
25     A.   I guess they have been in my
```

Page 203

```
1        HIGHLY CONFIDENTIAL - Landreman
2   department reviewing my policies and procedures
3   every -- every quarter, and they're very
4   familiar with our practices and what we do.  So,
5   in terms of the extra work that was performed
6   here, it was definitely a deep dive into this
7   portfolio.
8      Q.   And is it your understanding that at
9   the end of all this work by PwC, that they
10  accepted Barclays' valuation of these assets?
11     A.   Correct.
12          MR. THOMAS:  Thank you.  I have
13  nothing further.
14          MS. CARRERO:  A couple of follow-up
15  questions.  I'll be brief.
16  FURTHER EXAMINATION BY
17  MS. CARRERO:
18     Q.   I believe in response to one of Mr.
19  Thomas' questions you stated that there was no
20  reduction of values to reflect large sizes of
21  positions; is that correct?
22     A.   We did not take a block size discount
23  on large positions.
24     Q.   Would that include any liquidity
25  discounts that were taken by asset class --
```

Page 204

```
1        HIGHLY CONFIDENTIAL - Landreman
2   strike that.  Would any liquidity discounts
3   taken by asset class reflect the size of any
4   individual position or size of that asset class
5   relative to the rest being acquired?
6          MR. THOMAS:  Objection to form.
7      A.   The calculation of the liquidity
8   adjustment was ambiguous to size.  It was really
9   a function of the pricing dispersion and it was
10  applied across asset categories.  It was not
11  applied across position size.
12     Q.   And you stated that you attempted to
13  fair value as of September 22, 2008; is that
14  correct?
15          MR. THOMAS:  Objection to form.
16     A.   We provided fair values as of
17  September 2008, September 22, 2008.
18     Q.   And that would be at what point in
19  time on September 22, 2008?
20          MR. THOMAS:  Objection to form.
21     A.   For the assets that we provided, that
22  would have been an end-of-day price.
23     Q.   And an end-of-day price would capture
24  any movement in the market throughout the day
25  September 22, 2008, correct?
```

Page 205

```
1        HIGHLY CONFIDENTIAL - Landreman
2      A.   For the majority of the assets that I
3   value, there would not have been tremendous
4   movement on a day-to-day basis of the primary
5   assumptions that would be used to value those
6   securities because they are not highly
7   interest-rate sensitive.  They would be highly
8   credit-sensitive and the credit data is released
9   on a monthly basis.
10     Q.   And would it follow, then, that you
11  would not expect a lot of movement from
12  September 19 close to September 22 close for the
13  assets which your group covers; is that correct?
14          MR. THOMAS:  Objection to form.
15     A.   That would be, depending upon how the
16  interest rates moved month over month -- or, day
17  over day, that would have been the primary
18  movement of those values.
19     Q.   Just so I make sure that it's clear,
20  you mean primary movement would have been
21  month-to-month, correct?
22     A.   The primary movement between Friday to
23  Monday would have been a reflection of changes
24  in interest rates or the yield curve.
25     Q.   So did your group undertake to measure
```

Page 206

HIGHLY CONFIDENTIAL - Landreman
1    HIGHLY CONFIDENTIAL - Landreman
2  what the difference was between the end of day
3  September 19 and end of day September 22?
4    A.   We priced the positions of the 19th
5  and the 22nd, yes.
6    Q.   And do you know what the difference
7  was between the two?
8    A.   Not off the top of my head.
9    Q.   Do you remember if it was a large
10 difference or small?
11   A.   It, again, in my world, the
12 securitized products world, it would have been a
13 relatively small movement in pricing.
14   MS. CARRERO:  That's it.
15   MR. DAKIS:  No further questions.
16   (Time Noted:  5:08 P.M.)
17       oOo
18
19
       _____
20       RICHARD LANDREMAN
21   Subscribed and sworn to
     before me this    day
22   of     2010.
23   _____
24
25

Page 207

1    HIGHLY CONFIDENTIAL - Landreman
2       CERTIFICATE
3  STATE OF NEW YORK )
            : ss
4  COUNTY OF NEW YORK)
5     I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9       That RICHARD LANDREMAN, the witness
10 whose deposition is herein before set forth,
11 was duly sworn by me and that such
12 deposition is a true record of the testimony
13 given by such witness.
14     I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18     I further certify that neither the
19 deponent nor a party requested a review of
20 the transcript pursuant to Federal Rule of
21 Civil Procedure 30(e) before the deposition
22 was completed.
23     In witness whereof, I have hereunto
24 set my hand this 16th day of June, 2010.
25   -------------------------------

Page 208

1    HIGHLY CONFIDENTIAL - Landreman
2       INDEX
3  WITNESS:       EXAMINATION BY       PAGE
4  RICHARD LANDREMAN  Ms. Carrero      5, 203
5       Mr. Dakis      193
6       Mr. Thomas     195
7  EXHIBITS:            PAGE
8  Exhibit 799B, Exhibit C, described as Bio     12
9  for ABS
10 Exhibit 800B, a document bearing Bates Nos.    28
11 BCI-EX-(S)207964 through 207969, with attachment
12 Exhibit 801B, a document bearing Bates Nos.    33
13 BCI-EX-(S)201185 through 201187
14 Exhibit 802B, a document bearing Bates Nos.    37
15 BCI-EX-297092 through 297113
16 Exhibit 803B, a document bearing Bates Nos.    37
17 BCI-EX0297114 through 297134
18 Exhibit 807B, a document bearing Bates Nos.    37
19 PwC-BarCap45788 through 45792
20 Exhibit 804B, a document bearing Bates Nos.    45
21 PwC-BarCap15824 through 15843
22 Exhibit 805B, a document bearing Bates Nos.    60
23 PwC-BarCap46090 through 46102
24 Exhibit 806B, a document bearing Bates Nos.    60
25 BCI-EX-297183 through 297200

Page 209

1    HIGHLY CONFIDENTIAL - Landreman
2       INDEX (Cont'd.)
3  EXHIBITS:            PAGE
4  Exhibit 808B, a document bearing Bates Nos.    85
5  BCI-EX-(S)201329 through 201331
6  Exhibit 809B, a document bearing Bates Nos.    91
7  BCI-EX-(S)201104
8  Exhibit 810B, a document bearing Bates Nos.    98
9  BCI-EX-(S)52667 through 52668, with attachment
10 Exhibit 811B, a document bearing Bates Nos.    119
11 BCI-EX-(S)207849 through 7850, with attachment
12 Exhibit 812B, a document bearing Bates Nos.    123
13 BCI-EX-(S) 207979 through 7980, with attachment
14 Exhibit 813B, a document bearing Bates Nos.    130
15 PwC-BarCap11225 through 11310
16 Exhibit 814B, a document bearing Bates Nos.    153
17 PwC-BarCapWP_23318 through 23351
18 Exhibit 815B, a document bearing Bates Nos.    159
19 PwC-BarCap 45782 through 45787
20 Exhibit 816B, a document bearing Bates Nos.    176
21 PwC-BarCap 48233 through 48236
22
23
24
25

Page 210

```
 1          HIGHLY CONFIDENTIAL - Landreman
 2   NAME OF CASE:  In re Lehman
 3   DATE OF DEPOSITION:  June 16, 2010
 4   NAME OF WITNESS:  Richard Landreman
 5   Reason Codes:
 6      1.  To clarify the record.
        2.  To conform to the facts.
 7      3.  To correct transcription errors.
 8   Page _____ Line _____ Reason _____
     From _____ to _____
 9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25          _____
```

# EXHIBIT 5

Page 1

1              HIGHLY CONFIDENTIAL

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                          Chapter 11

7    LEHMAN BROTHERS         Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

              Debtors.

10

     ----------------------x

11

12         * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF MARK WASHTELL

14           New York, New York

15            June 17, 2010

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 31054

Page 2

```
 1              HIGHLY CONFIDENTIAL
 2                June 17, 2010
 3                 9:45 A.M.
 4
 5        Deposition of MARK WASHTELL,
 6   held at the law offices of Jones Day, LLP,
 7   222 East 41st Street, New York, New York,
 8   before Kathy S. Klepfer, a Registered
 9   Professional Reporter, Registered Merit
10   Reporter, Certified Realtime Reporter,
11   Certified Livenote Reporter, and Notary
12   Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
        TSG Reporting - Worldwide    877-702-9580
```

Page 3

```
 1              HIGHLY CONFIDENTIAL
 2
 3              A P P E A R A N C E S :
 4
 5   JONES DAY, LLP
 6   Attorneys for Lehman Brothers, Inc.
 7      222 East 41st Street
 8      New York, New York  10017-6702
 9   BY:  KELLY A. CARRERO, ESQ.
10      MICHAEL DAILEY, ESQ.
11      JOSH BROMBERG (Summer Associate)
12
13   BOIES, SCHILLER & FLEXNER, LLP
14   Attorneys for Barclays
15      401 East Las Olas Boulevard
16      Suite 1200
17      Fort Lauderdale, Florida  33301
18   BY:  TODD THOMAS, ESQ.
19
20
21
22
23
24
25
        TSG Reporting - Worldwide    877-702-9580
```

Page 4

```
 1              HIGHLY CONFIDENTIAL
 2        A P P E A R A N C E S :  (Cont'd.)
 3
 4   QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
 5   Attorneys for the Creditors Committee
 6      51 Madison Avenue
 7      22nd Floor
 8      New York, New York  10010
 9   BY:  ERIC M. KAY, ESQ.
10
11   HUGHES, HUBBARD & REED, LLP
12   Attorneys for the SIPA Trustee
13      One Battery Park Plaza
14      New York, New York  10004
15   BY:  NEIL J. OXFORD, ESQ.
16
17
18
19   ALSO PRESENT:
20      MARC VELLRATH, FSG
21
22
23
24
25
        TSG Reporting - Worldwide    877-702-9580
```

Page 5

```
 1      HIGHLY CONFIDENTIAL - Washtell
 2   MARK WASHTELL, called as a
 3      witness, having been duly sworn by a Notary
 4      Public, was examined and testified as
 5      follows:
 6   EXAMINATION BY
 7   MS. CARRERO:
 8      Q.   Good morning, Mr. Washtell.  My name
 9   is Kelly Carrero.  I'm with the law firm of
10   Jones Day.  We represent Lehman Brothers
11   Holdings, Inc. in this matter.  I have with me
12   my colleague Michael Dailey and one of our
13   summer associates, Josh Bromberg.
14        And I'll let the other counsel around
15   the table introduce themselves.
16        MR. KAY:  Sure.  Eric Kay from Quinn
17      Emanuel for the Official Creditors
18      Committee.
19        MR. THOMAS:  Todd Thomas from Boies,
20      Schiller & Flexner on behalf of Barclays and
21      the witness.
22   BY MS. CARRERO:
23      Q.   Mr. Washtell, can you tell us what
24   your position, responsibilities, duties are at
25   Barclays?
        TSG Reporting - Worldwide    877-702-9580
```

Page 6

1    **HIGHLY CONFIDENTIAL - Washtell**
2        A.    Sure. I'm a director. I work within
3    the Independent Valuation Control Group.  I am
4    currently responsible for the global equities
5    asset class, in addition to the global FX and
6    European emerging markets business.
7        Q.    And was that your same title and
8    responsibilities as of September 2008 at the
9    time of the Lehman transaction?
10        A.    As of September 2008, I was vice
11    president in charge of, again, working with the
12    Independent Valuation Control, responsible for
13    the global equity derivative business for
14    Barclays Capital.
15        Q.    And when did the change in title and
16    responsibilities take place?
17        A.    At the start of 2009, I was promoted
18    from vice president to director, and at some
19    point in the end of Q1 '09, I took the
20    additional asset class responsibilities.
21        Q.    And who had responsibility for the
22    other asset classes prior to your taking those
23    on at the end of quarter 1 of 2009?
24        A.    I don't recall exactly who, but I'm
25    part of a management team, so the Global

Page 7

1    HIGHLY CONFIDENTIAL - Washtell
2    Independent Valuation Control Group is a team of
3    approximately 100 individuals globally.  Within
4    that there are different directors responsible
5    for different asset classes.
6        Q.    Do you know if anyone had direct
7    responsibility for global equities, for
8    instance?
9        A.    Well, that was, at the time -- at what
10    time?  Sorry.
11        Q.    In September of 2008.
12        A.    September 2008, Barclays did not have
13    what we call global equities.  We had a Global
14    Equity Derivatives Group or business, and I was
15    responsible for that.
16        Q.    And why in September 2008 was there no
17    global equities in existence?
18        A.    That was not a business that we had at
19    that time.
20        Q.    Is that a business --
21        A.    It's just the structure of the company
22    was such we had a global equity derivatives
23    group rather than a global equities business,
24    which is what we have now.
25        Q.    And was that change a consequence of

Page 8

1    **HIGHLY CONFIDENTIAL - Washtell**
2    the Lehman transaction?
3        MR. THOMAS:  Objection to form.
4        A.    That change was the consequence of a
5    decision on the part of senior management of the
6    bank, so ...
7        Q.    But is it a change in what types of
8    positions that Barclays held in 2008 as opposed
9    to subsequent to then?
10        MR. THOMAS:  Objection to form.
11        A.    We have a different business,
12    different equities business now than we had in
13    September 2008, if that's what you mean.
14        Q.    And how has that equities business
15    changed between September 2008 and now?
16        A.    I'm not best qualified to answer, that
17    would be someone in the business, but in general
18    terms, it's a much more global business.  It now
19    covers much more on the cash equity side than
20    previously, when it was very focused on
21    derivatives.
22        Q.    And in 2008, how many people were
23    within the Global Equities Derivatives Group?
24        A.    I don't know.
25        Q.    Besides yourself?

Page 9

1    **HIGHLY CONFIDENTIAL - Washtell**
2        A.    You mean, by Global Equity Derivatives
3    Group, what do you mean?
4        Q.    I mean within the independent
5    valuation function.
6        MR. THOMAS:  Objection to form.
7        A.    Within the Independent Valuation
8    Group, specifically focused on equity
9    derivatives working for me, I think
10    approximately five.
11        Q.    And did the Equity Derivatives PT
12    Group, if we can agree that "PT" refers to your
13    group, would that be an acceptable --
14        A.    You could call it PT if you want.  We
15    would call it Independent Valuation Control, so
16    IVC.
17        Q.    IVC.  Okay.  We'll use IVC then.
18        So within your IVC Group that had five
19    or so people in September of 2008, were you the
20    leader of that group?
21        A.    Yes.
22        Q.    And who did you report to?
23        A.    At that time, and still, Marcus
24    Morton.
25        Q.    And is Marcus Morton located in London

HIGHLY CONFIDENTIAL - Washtell

1  HIGHLY CONFIDENTIAL - Washtell
2  or in New York?
3      A.    At that time, he was located in New
4  York. He's now located in London.
5      Q.    And is there an equities counterpart
6  of yours in the New York office?
7      A.    At that time in 2008?
8      Q.    At that time in 2008, yes.
9      A.    No.
10     Q.    We should also establish that you are
11 located in London; is that correct?
12     A.    That's correct.
13     Q.    And you were located in London in
14 2008, correct?
15     A.    That's correct.
16     Q.    And to what size has the Equities IVC
17 Group grown since September 2008?
18     A.    We now have six full-time personnel in
19 London and five full-time personnel in New York.
20     Q.    And is that growth a consequence of
21 significant growth within Barclays' equities
22 business?
23     A.    That's a contributing factor, yes.
24     Q.    Were, in 2008, were any of the members
25 of the Equities IVC Group located in New York?

TSG Reporting - Worldwide    877-702-9580

1  HIGHLY CONFIDENTIAL - Washtell
2      A.    No, at that time, they were not.
3      Q.    Mr. Washtell, I'm handing you what was
4  previously marked as Deposition Exhibit 799B.
5      A.    Uh-huh.
6      Q.    Just take a moment to look it over.
7          (Document review.)
8      Q.    I will represent to you that this is a
9  document that was an exhibit to a brief
10 submitted by Barclays' counsel in connection
11 with the motion in limine to exclude one of
12 Barclays' experts retained in this matter, and
13 if you would turn to the second page titled
14 "Global Independent Valuation." Do you see
15 that?
16     A.    I do.
17     Q.    Have you seen this document before?
18     A.    Not this specific document, from my
19 recollection, but I've seen similar documents.
20     Q.    And you would agree that your name
21 does not appear on this document; is that
22 correct?
23     A.    I haven't read it completely, but it
24 doesn't stand out in bold like most of the other
25 names. So I'm happy to accept it probably does

TSG Reporting - Worldwide    877-702-9580

1      HIGHLY CONFIDENTIAL - Washtell
2  not.
3      Q.    If you would turn to the last page of
4  the document and look at the names listed under
5  "U.S. Equities Valuations"?
6      A.    Yes.
7      Q.    If your name were to appear on this
8  list, would you expect it to appear among the
9  names of the Equities IVC members?
10     A.    Were there a section for the Global
11 Equities IVC team, then yes. This seems very
12 specific to U.S. equity valuations.
13     Q.    So the names listed on Exhibit 799B
14 are the members of Equities IVC that are located
15 in the U.S.; is that correct?
16     A.    This looks correct as of a point in
17 time.
18     Q.    And what point in time would this be
19 correct as of?
20     A.    This looks correct to me as of the end
21 of 2008.
22     Q.    And how has it changed since the end
23 of 2008?
24     A.    Jerry Shi has left the firm, Katharine
25 Gee has moved to a different asset class, the

TSG Reporting - Worldwide    877-702-9580

1      HIGHLY CONFIDENTIAL - Washtell
2  two executives both being promoted to assistant
3  vice presidents, but it's still within the U.S.
4  Equity Valuation Team.
5      Q.    And what asset class has Katharine Gee
6  moved on to?
7      A.    She works in a sort of cross-asset
8  client valuation role within the Independent
9  Valuation Control Group.
10     Q.    Is it still related to equities
11 whatsoever?
12     A.    Only in the sense that it is related
13 to every other asset class. It's a cross-asset
14 class client valuation group. She's not engaged
15 in any day-to-day work in looking at the equity
16 portfolio specifically from a valuation control
17 perspective.
18     Q.    And were all four of the Equities IVC
19 individuals listed on 799B part of that group as
20 of September 2008?
21     A.    None of them were.
22         MR. THOMAS: Objection.
23     Q.    Do you know as of what date they
24 became part of the Equities IVC Group?
25     A.    I guess when you say -- could you say

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1  a specific date in September?
2
3      Q.   As of the Lehman acquisition, were any
4  of these four individuals --
5      A.   Well, three of the individuals worked
6  at Lehman Brothers.
7      Q.   Which three individuals?
8      A.   Jerry Shi, Yu Zhou and Kunal Kunde.
9      Q.   How do you pronounce that last name?
10     A.   Kunal Kunde.
11          At the time of the acquisition they
12  were not part of the Barclays Independent
13  Valuation Control Group.  They were after the
14  acquisition, obviously.
15     Q.   Will you agree with me that these
16  individuals don't have asterisks next to their
17  name, although the bottom of the document
18  indicates that there would be an asterisk if
19  individuals joined Barclays through the Lehman
20  acquisition.
21          MR. THOMAS:  Objection to form.
22     A.   I agree, I don't see an asterisk next
23  to their names on this document.
24     Q.   And you mentioned that Jerry Shi has
25  left the firm; is that correct?

HIGHLY CONFIDENTIAL - Washtell

1
2      A.   Uh-huh.
3      Q.   And --
4      A.   Yes.  Sorry.
5      Q.   And when did he leave?
6      A.   I believe it was October 2009.
7      Q.   And were the individuals listed under
8  U.S. Equities Valuations on 799B involved in the
9  valuation of securities acquired from Lehman?
10     A.   In a general sense?  You're not
11  specifically talking to equity securities,
12  you're saying in securities generally?
13     Q.   Generally, we can start there.
14     A.   Okay.  I know Jerry was involved, yes.
15     Q.   And do you know how he was involved?
16     A.   Not in a huge amount of detail.  Not
17  specifically.
18     Q.   Generally, how did Jerry Shi --
19     A.   Did we work together?  Did we work
20  together specifically on anything?  No.  I know
21  he worked on areas of it.
22     Q.   Do you know what areas of valuing any
23  of the securities acquired from Lehman that he
24  worked on?
25     A.   I know the listed option portfolio was

HIGHLY CONFIDENTIAL - Washtell

1
2  something he worked on.
3      Q.   And was that an area that he had
4  worked in while a member of the Lehman
5  counterpart to IVC?
6      A.   I don't know for definite, but based
7  on my understanding of his role, it's a
8  reasonable assumption.
9      Q.   You had asked me earlier whether I
10  meant generally or specifically to equities.  Is
11  the answer any different if I asked what he
12  worked on specific to equities?
13     A.   Not for him, no.  Some of the other
14  members of the team may have been involved in
15  some data collection at my direction in relation
16  to the equities portfolio, but it very much
17  would have been a data collection exercise and
18  them being directed by me to source data.
19     Q.   Why don't we go through the names on
20  this list.  Before we move on, let's just tie up
21  Jerry Shi.
22          Did he work on anything other than
23  testing the options portfolio?
24     A.   I can't say for definite, but I'm not
25  aware of anything.  But I'm also not aware of

HIGHLY CONFIDENTIAL - Washtell

1
2  all of the work that was done for the entire
3  acquisition.  I was specifically focused on
4  looking at the equity, what we called the equity
5  assets.
6      Q.   So, with respect to the equity assets,
7  the only thing that you're aware that Jerry Shi
8  worked on was the testing of the equity options?
9      A.   That's my recollection, yes.
10     Q.   How about we move down the list.
11          And Katharine Gee, was she involved in
12  valuing any of the assets that were acquired
13  from Lehman?
14     A.   I don't recall for -- I don't think
15  so, but I don't recall for definite.  I mean,
16  two years later, thinking about it, did I have
17  extensive interaction with Jerry, Katharine or
18  Yu Zhou on this?  No.  I recall asking Kunal to
19  specifically look for certain datasets for me.
20  Beyond that, I don't think these guys were
21  involved.
22     Q.   So I'm going to butcher the name here.
23          Yu Zhou?
24     A.   Yu Zhou, yes.
25     Q.   Was Yu Zhou involved at all in valuing

Page 18

HIGHLY CONFIDENTIAL - Washtell

1       any of the equities positions?
2       A.  Not as far as I recall, no.
3       Q.  I just ask -- we didn't really go over
4  the housekeeping rules, which maybe we should.
5  I should have asked you, have you ever been
6  deposed before?
7       A.  What's post?
8       Q.  Deposed in a deposition?
9       A.  I'm sorry, I thought you said have I
10  ever been to post.
11       No, I have never been deposed before.
12       Q.  So one thing that will help make
13  things go smoother is that if you just let me
14  finish asking a question before you offer an
15  answer, and I'll try to do same.  I'll wait for
16  you to complete your answer --
17       A.  Okay.
18       Q.  -- before starting a new question.
19       And if you need a break, I would just
20  ask that you finish up answering whatever
21  pending question might be in existence and --
22       A.  Okay.
23       Q.  -- then, if it's a good time to break,
24  we will.

TSG Reporting - Worldwide    877-702-9580

Page 19

HIGHLY CONFIDENTIAL - Washtell

1       I believe where we had left off was
2  that Yu Zhou, you don't recollect whether he was
3  involved in valuing any of the positions
4  acquired from Lehman other than perhaps going
5  out and gathering some datasets?
6       A.  Yes, that's correct.
7       Q.  And the same thing holds true for
8  Kunal Kunde?
9       A.  Yes.
10       Q.  Were any other members of the Equities
11  IVC Group involved in valuing any of the
12  equities acquired from Lehman?
13       A.  Members of my team in London at that
14  time were involved at my direction in obtaining
15  data which was used in determining the
16  valuation.
17       Q.  And who are the members of the team in
18  London?
19       A.  At that time, Jaspreet Bhatiwal.
20       Q.  I think you're going to need to spell
21  these for the court reporter.
22       A.  J-A-S-P-R-E-E-T.  The surname is
23  B-H-A-T-I-W-A-L.  He's a member of the London
24  Equity Independent Valuation Team, and has been

TSG Reporting - Worldwide    877-702-9580

Page 20

HIGHLY CONFIDENTIAL - Washtell

1  since 2006.
2       He was the person principally involved
3  in the data collection.
4       Q.  And who else within the London IVC
5  Group was involved?
6       A.  No one extensively.
7       Q.  Could you just name the individuals,
8  the other individuals of the Equities IVC Group
9  that were located in London?
10       A.  Ana Acuna.  Ana, as in A-N-A.  Acuna,
11  as is A-C-U-N-A.  Guillaume Froidure.
12  Guillaume, as in G-U-I-L-L-A-U-M-E for
13  Guillaume.  And Froidure, as in F-R-O-I-D-U-R-E.
14  That's better.
15       Polykarpos Pappadopolous -- can I
16  write this down?
17       Q.  There is not one easy name here.
18       A.  There's not.
19       P-O-L-Y-K-A-R-P-O-S, Polykarpos.
20       Can I have a pen to spell
21  Pappadopolous so I get it right?
22       Q.  Just your best guess.
23       A.  P-A-P-P-A-D-O-P-O-L-O-U-S.
24       Q.  Great.  Thank you.

TSG Reporting - Worldwide    877-702-9580

Page 21

HIGHLY CONFIDENTIAL - Washtell

1       Were members of IVC that covered other
2  asset classes involved to any extent with the
3  valuation of equity positions acquired from
4  Lehman in the transaction?
5       A.  Not to my knowledge.
6       Q.  So would the individuals that we've
7  discussed be an exhaustive list of the people
8  within Barclays IVG (sic) that were involved
9  with the valuation of equity positions?
10       A.  Was involved with IVC, yes.  The
11  individuals I have mentioned would be, to my
12  recollection now, the list of individuals I
13  would have used or consulted on in performing
14  the analysis of the equity portfolio.
15       Q.  And did you have primary
16  responsibility for valuing the equities that
17  were transferred over in connection with the
18  Lehman transaction?
19       A.  For the purposes of the opening
20  balance sheet?
21       Q.  Yes.
22       A.  Then, yes, I was principally
23  responsible for arriving at the fair value used
24  for the equity portfolio.

TSG Reporting - Worldwide    877-702-9580

Page 22

HIGHLY CONFIDENTIAL - Washtell

1    HIGHLY CONFIDENTIAL - Washtell
2    **Q.   Did you have primary responsibility**
3  **for the valuation of any other types of**
4  **securities that were acquired from Lehman for**
5  **purposes of the opening balance sheet?**
6    A.   No.  It was purely what we called the
7  equity portfolio, which included stocks,
8  preferred stocks and convertible bonds.
9    **Q.   What about equity options?**
10    A.   There were no OTC equity options, and
11  I was not involved in looking at the listed
12  option valuation.  That was, as I said before, I
13  believe Jerry Shi.
14    **Q.   And did Jerry Shi report to you upon**
15  **joining the Barclays IVC Group?**
16    A.   No.
17    **Q.   Who did he report to?**
18    A.   Marcus Morton.
19    **Q.   Were you involved in the valuation of**
20  **any securities other than securities within the**
21  **equities portfolio with respect to securities**
22  **acquired from Lehman for purposes of valuing**
23  **them on the opening balance sheet?**
24    A.   No, I was not.
25    **Q.   Is there a specific part of the**
      TSG Reporting - Worldwide    877-702-9580

Page 23

1    **HIGHLY CONFIDENTIAL - Washtell**
2  **business that the Equities IVC Group supports?**
3    A.   Now?
4    **Q.   Why don't we start back in September**
5  **of -- prior to the Lehman acquisition.**
6    A.   So we supported, if you want to call
7  it that, or primarily responsible for the Equity
8  Derivatives Group.  The IVC Group is part of the
9  Product Control function.
10    **Q.   And just to follow up on that, the IVC**
11  **Group is one of a number of subgroups within**
12  **PCG; is that correct?**
13    A.   That's correct.
14    **Q.   And how many subgroups are there**
15  **within PCG?**
16    A.   I don't know off the top of my head.
17    **Q.   And who is the head of PCG?**
18    A.   Paul Capson.
19    **Q.   And would Marcus Morton, who you**
20  **report to, report directly to Paul Capson?**
21    A.   Correct.
22    **Q.   If we can just go back to, so prior to**
23  **the Lehman acquisition, your group had primary**
24  **responsibility for the Equities Derivatives**
25  **Desk; is that correct?**
      TSG Reporting - Worldwide    877-702-9580

Page 24

1    **HIGHLY CONFIDENTIAL - Washtell**
2    A.   That's correct.
3    **Q.   And following the Lehman acquisition,**
4  **what desks does your group have primary**
5  **responsibility for?**
6    A.   Now?
7    **Q.   I'd only make the distinction if it's**
8  **changed between immediately after the**
9  **acquisition to present day.  So if we need to,**
10  **why don't we start with immediately after the**
11  **acquisition.**
12    A.   Immediately after the acquisition,
13  Jerry Shi, with the team that you see here, was
14  primarily responsible for the U.S. equities
15  business.  I was then primarily responsible for
16  the Europe and Asia equities business.
17        Following, just to clarify what I mean
18  by equities business as opposed to equity
19  derivatives business, following the acquisition
20  on the effective relaunch, if you will, of the
21  equities business, it was rebranded from equity
22  derivatives to global equities.
23    **Q.   And could you tell me what desks would**
24  **fall under the U.S. equities business?**
25    A.   That would be all desks trading cash
      TSG Reporting - Worldwide    877-702-9580

Page 25

1    HIGHLY CONFIDENTIAL - Washtell
2  equities or equity derivatives or equity-related
3  products, so convertible bonds, for instance.
4    **Q.   And would the same hold true for the**
5  **Europe and Asia equities business, the types of**
6  **desks that would fall under that?**
7    A.   The types of desks, yes.
8    **Q.   You had described your group as having**
9  **primary responsibility for, prior to the**
10  **acquisition, the Equities Derivatives Desk.**
11        **Could you explain what you mean by**
12  **"primary responsibility"?**
13    A.   That means I was responsible for all
14  Independent Valuation Control work in relation
15  to the Global Equity Derivatives Desk.  It means
16  I would meet with the global head of the Equity
17  Derivatives Desk on a monthly basis, for
18  example, to discuss our analysis of the
19  valuation of that portfolio.
20    **Q.   Could you explain what "independent**
21  **valuation work" means?**
22    A.   In simple terms, it means, on a
23  regular basis, generally, at a minimum, monthly,
24  that we will independently assess the valuation
25  of the firm's trading positions to ensure that
      TSG Reporting - Worldwide    877-702-9580

Page 26

HIGHLY CONFIDENTIAL - Washtell

1    HIGHLY CONFIDENTIAL - Washtell
2    they're marked at what we deem an appropriate
3    fair value as defined by the accounting
4    standards under which we operate.
5        Q.    And which accounting standards do you
6    turn to for definition of "fair value"?
7        A.    IS 39.
8        Q.    And what does the independent
9    assessment that you've described entail?
10        A.    Again, very generally, high level, it
11    entails us getting a complete population of all
12    trading book positions, looking at the valuation
13    in the trading systems of the firm, then going
14    externally to source independent data for all of
15    those positions to arrive at, effectively, an
16    independent valuation for the trading book
17    positions.
18        Q.    And at the time that this independent
19    assessment takes place, you would be starting
20    with what a trader has independently valued a
21    position at; is that correct?
22        MR. THOMAS:  Objection to form.
23        A.    We would start with the marks or the
24    valuations in the trading systems of the firm
25    which feed the subledgers, the balance sheet and

TSG Reporting - Worldwide    877-702-9580

Page 27

1    HIGHLY CONFIDENTIAL - Washtell
2    the financial statements, ultimately.  That's
3    the valuation that Barclays has at month-end for
4    trading positions.  We would then look to
5    independently assess the valuation of those
6    positions.
7        Q.    And could you tell me the names of the
8    different systems that feed -- the trading
9    systems, for instance, that would feed into the
10    subledger that would then feed into the general
11    ledger, et cetera?
12        A.    For equities?
13        Q.    For equities, yes.
14        A.    At that time, in 2008?
15        Q.    Why don't we start with, has it
16    changed since the acquisition?
17        A.    There are additional systems now.
18        Q.    Were those additional systems in
19    existence at the time that you were undertaking
20    the valuation of the assets acquired from
21    Lehman?
22        A.    Not within Barclays, no.
23        Q.    So if we can talk about the systems
24    that were in place at the time that the
25    valuation of the securities that were

TSG Reporting - Worldwide    877-702-9580

Page 28

1    HIGHLY CONFIDENTIAL - Washtell
2    acquired --
3        A.    Sure.
4        Q.    -- were being undertaken for purposes
5    of the opening balance sheet.
6        A.    The principal trading system was
7    called SOPHIS.  It still is called SOPHIS.  The
8    subledger I believe is called FISS, F-I-S-S.
9        What was the rest of the question?
10        Q.    And would FISS feed into --
11        A.    The general ledger.
12        Q.    -- a general ledger?
13        A.    SAP.
14        Q.    SAP.
15        And that would be the system from
16    which financial statements would be generated;
17    is that correct?
18        A.    That's correct.
19        Q.    And is there a specific system that
20    your group is looking at when they begin the
21    price testing process on a monthly basis?
22        A.    We would look at SOPHIS, for example,
23    to obtain a position listing.  The desk's risk
24    position.
25        Q.    And would --

TSG Reporting - Worldwide    877-702-9580

Page 29

1    HIGHLY CONFIDENTIAL - Washtell
2        A.    And the desk's valuations, obviously.
3        Q.    And that was going to be my next
4    question.  So SOPHIS would contain whatever the
5    current mark was for each position?
6        A.    Yes.  Yes.
7        Q.    And if your group had any -- if after
8    the price testing process there was a difference
9    found between the value that your group had
10    arrived at versus what was in SOPHIS, what would
11    be the next step?
12        A.    The first step is we would discuss
13    that valuation difference with the trader
14    concerned who owns that position and who marks
15    that position.  We would then, based on his
16    feedback, potentially take into account any
17    additional information that he's willing to
18    provide to try and reach agreement between us on
19    what is the appropriate valuation.
20        If we cannot reach agreement on that,
21    then subject to our policies and procedures of
22    the firm and materiality thresholds that are
23    defined therein, we would take adjustments to
24    the valuations to ensure that they're in line
25    with our independent valuations.

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1  Q.  And what sort of record would be
2  generated to document that there was a
3  disagreement as to price?
4  A.  All of these positions that are
5  tested, as well as any positions that are not
6  tested, with all variances are reported on a
7  monthly basis to the traders concerned, to the
8  heads of Trading Management, to Product Control,
9  Finance, Market Risk Management, and ultimately
10  this is all discussed with our auditors as well
11  as the regulators.
12  Q.  And do these variance reports have a
13  specific name?
14  A.  Price Testing Reports, so,
15  generically.
16  Q.  Do you know if any Price Testing
17  Reports were generated in connection with any of
18  the securities that were acquired from Lehman
19  and price tested by your group?
20  A.  We produced a valuation, obviously, in
21  the same way that we would perform our normal
22  price testing process.  That is, the list of
23  assets that we had, we went out to obtain the
24  independent market data that we would normally

HIGHLY CONFIDENTIAL - Washtell

1  do as part of that process to arrive at our
2  independent valuation.
3  Q.  In the process of going through that
4  independent valuation, would any differences
5  between a price that was in SOPHIS at the time
6  have been generated?
7  A.  In this case, this is different to our
8  normal process because these were not positions
9  on our books at the time that had a trader
10  marking them, these were positions that we were
11  effectively receiving in a spreadsheet and being
12  asked to value.  So I did not have a system
13  valuation or a trader valuation at that point in
14  time.
15  Q.  So there --
16  A.  So do I have a variance report?  Not
17  that I recall.
18  Q.  So there would be no marks in SOPHIS
19  at the time that your group began the
20  independent valuation process; is that correct?
21  A.  To the extent these positions were not
22  booked in SOPHIS, SOPHIS would not have had a
23  valuation for this position.  That doesn't mean
24  that if there were a stock in this portfolio,

HIGHLY CONFIDENTIAL - Washtell

1  let's take, for example, IBM, that we would not
2  have had a stock price for IBM in SOPHIS,
3  because we would have had that.
4  But this particular position I'm
5  saying is part of a spreadsheet that we're
6  assessing, a spreadsheet population, shall I
7  say, that we're assessing the valuation of.
8  Q.  To the extent that Barclays had in
9  SOPHIS already a position with the same CUSIP as
10  what was being acquired from Lehman, would your
11  independent valuation have resulted in the same
12  price as what that same position was marked for
13  in SOPHIS as of the same date?
14  A.  The pricing source we used is the
15  same.  It would be using SOPHIS.  So, yes.
16  Q.  I'm not asking just if it's the same
17  pricing source.  I'm asking would it be the same
18  price?
19  MR. THOMAS:  Objection to form.
20  A.  Because we're using the same pricing
21  source, it should be the same price.
22  Q.  I'm asking --
23  A.  Now, did we reconcile to see where we
24  had positions in SOPHIS with where we had

HIGHLY CONFIDENTIAL - Washtell

1  positions in this file?  No.  We didn't need to
2  because, what we needed to do was obtain
3  independent valuation data for the position in
4  this file and we have established sources of
5  information for doing that, and that's what we
6  used.  I did not go to SOPHIS to source that
7  price.
8  Q.  So the equity positions were valued
9  using a close of day September 22 price
10  ultimately for purposes of the opening balance
11  sheet, correct?
12  MR. THOMAS:  Objection to form.
13  A.  Say that again.
14  Q.  Is it correct that the equity
15  positions for purposes of Barclays' opening
16  balance sheet were valued using September 22
17  close of day price?
18  MR. THOMAS:  Objection to form.
19  A.  That's correct, we used the closing
20  price date of September 22.
21  Q.  So taking your example of IBM, if
22  Lehman acquired IBM stock -- sorry, if Barclays
23  acquired IBM stock from Lehman, if Barclays
24  already owned IBM stock with the exact CUSIP,

Page 34

HIGHLY CONFIDENTIAL - Washtell
1 would the September 22 valuation price be the
2 same for the same position on Barclays' books
3 and records?
4
5        MR. THOMAS: Objection to form.
6    A.    Yes, given it's using the same data
7 sources.
8    Q.    So if --
9    A.    Now, I should, just to clarify, most
10 of the positions we received and assessed the
11 value of would not, would not have been held in
12 Barclays' trading systems at that time because
13 the majority of the positions, or a large part
14 of them, they were all U.S. stocks, and a lot of
15 them were illiquid and names that we just would
16 not have been trading at that time.
17        In addition, we didn't have
18 significant cash eq. or we didn't have a cash
19 equity business at that time. We had an equity
20 derivative business. By definition, we would
21 have been trading the more liquid names, IBM
22 being an example.
23    Q.    There were a number of positions
24 already in SOPHIS; is that correct? I'm not
25 asking percentage-wise. There were, there were

TSG Reporting - Worldwide    877-702-9580

Page 35

HIGHLY CONFIDENTIAL - Washtell
1 some, correct?
2
3    A.    Did we hold stock positions in SOPHIS?
4 Yes.
5    Q.    Prior to the acquisition?
6    A.    Yes. For the purposes principally of
7 hedging, delta hedging our equity derivative
8 portfolio.
9    Q.    So my question is really as simple as,
10 for those positions already in SOPHIS, was the
11 same price applied for purposes of valuing those
12 securities that were acquired from Lehman?
13        MR. THOMAS: Objection to form.
14    A.    Yes, the same last price at exchange
15 close.
16    Q.    And was the same bid/offer applied?
17        MR. THOMAS: Objection to form.
18    A.    At the time, as I said before -- well,
19 firstly, all positions within the firm are
20 assessed for bid/offer, and our definition of
21 "fair value" within the firm, in line with the
22 accounting standards, is that we need to mark
23 long positions to a bid value.
24        Given at that time we did not have a
25 cash equity business and all stock positions

TSG Reporting - Worldwide    877-702-9580

Page 36

HIGHLY CONFIDENTIAL - Washtell
1 would have been used to delta hedge our equity
2 derivative portfolio, that is, to effectively
3 flatten our equity exposure so we have a zero
4 sensitivity to the stock price, we wouldn't have
5 been taking explicit bid/offer provision on
6 equities; we would have been applying bid/offer
7 to the derivative portfolio based on the
8 derivative risk factors.
9    Q.    A price for an existing position
10 within SOPHIS could have a different price than
11 what it was priced for for purposes of the
12 acquisition accounting of the Lehman
13 transaction; is that correct?
14        MR. THOMAS: Objection to form.
15    A.    What I'm saying is that we would not
16 have been holding the position in SOPHIS as an
17 outright position. Any positions held in SOPHIS
18 would have been held as part of a derivative
19 portfolio to delta hedge that portfolio. So, in
20 considering the valuation of those positions,
21 you need to consider the valuation of that
22 derivative portfolio.
23        If I delta hedge a derivative book
24 with stock, ultimately it doesn't matter where
25

TSG Reporting - Worldwide    877-702-9580

Page 37

HIGHLY CONFIDENTIAL - Washtell
1 I'm valuing that stock because I'm delta neutral
2 to the valuation of that stock. So whether I
3 value a range of prices ultimately, the purpose
4 of holding that stock position is to delta hedge
5 the book. There's not going to be a valuation
6 impact.
7
8    Q.    Can you say definitively that there
9 are no overlapping equities that were not held
10 by Barclays at the time of the acquisition that
11 was not acting as a hedge?
12        MR. THOMAS: Objection to form.
13    A.    I can't talk definitively to the, now,
14 to the characteristics of the whole portfolio.
15 What I can tell you is we did not have a cash
16 equity business at that point in time, and I've
17 been quite clear about that. We have what we
18 called the equity derivatives business.
19        That means we were not principally
20 engaged in trading cash equities. We were
21 principally engaged in trading equity
22 derivatives, and any cash equity positions on
23 our books would have been there specifically to
24 hedge the delta risk on the book.
25        Can I tell you what that list of

TSG Reporting - Worldwide    877-702-9580

Page 38

HIGHLY CONFIDENTIAL - Washtell

1  HIGHLY CONFIDENTIAL - Washtell
2  positions is or the composition of the
3  portfolio?  No.
4  **Q.  No process was undertaken at any point**
5  **to determine whether the price that was being**
6  **used for purposes of the opening balance sheet**
7  **acquisition did or did not match the price that**
8  **was being used for any existing positions; is**
9  **that correct?**
10  MR. THOMAS:  Objection to form.
11  A.  We applied the same policy framework
12  in which we operate.  We applied the same
13  principles.  We used the same data sources which
14  we would use to value our equity derivatives
15  portfolio.
16  Did we explicitly reconcile any
17  positions between what we were currently holding
18  and what was in this portfolio?  No, but from a
19  policy and a framework perspective, as I said,
20  fair value requires that we mark everything to a
21  bid price.  That's what we do within the firm.
22  That's what we were doing within the firm from
23  an equity derivatives perspective at that time.
24  You just, the way that you do it,
25  would do it for an equity derivative business is
TSG Reporting - Worldwide    877-702-9580

Page 39

1  HIGHLY CONFIDENTIAL - Washtell
2  not to split your positions out into individual
3  trades.  It would be to look, at a portfolio
4  level, what are your portfolio risks that you
5  need to apply a bid/offer to, and that's the way
6  it would be assessed, which is slightly
7  different to here's an outright long cash equity
8  portfolio which clearly also, in line with our
9  policies, needs to be assessed for bid/offer.
10  So the framework in which we operate,
11  the policy which we apply, the reasoning and the
12  way we arrived at this price is consistent.  All
13  I'm saying is, where we had an equity derivative
14  business rather than a cash equity business, the
15  way that you arrive at the appropriate fair
16  value for your portfolio is going to be
17  necessarily different.
18  **Q.  If Barclays had no existing cash**
19  **equity business prior to the acquisition, under**
20  **what policies and procedures and guidelines did**
21  **your group go about independently valuing the**
22  **cash equity positions that were being acquired?**
23  MR. THOMAS:  Objection.
24  A.  We have a global --
25  MR. THOMAS:  Objection to form.
TSG Reporting - Worldwide    877-702-9580

Page 40

1  HIGHLY CONFIDENTIAL - Washtell
2  Just pause a minute so I can get my
3  objection in.
4  A.  The firm has a global price testing
5  policy, has a global provisioning policy.  This
6  is the framework in which we operate across all
7  desks, across all asset classes, and it means
8  all positions within the firm, all trading
9  positions within the firm are assessed in the
10  same way.
11  **Q.  And in addition to a global price**
12  **testing policy and a global provisioning policy,**
13  **are there other policies and procedures specific**
14  **to the Equities IVC Group in place?**
15  A.  Yes.
16  **Q.  And could you identify the names of**
17  **those other existing policies and procedures?**
18  A.  There is a global equities policy
19  application document for price testing.
20  **Q.  And are there any others?**
21  A.  There would be other procedural
22  methodology documents.  I don't have the
23  specific names, but it would be more detailed in
24  terms of how procedures are performed,
25  calculations are done.
TSG Reporting - Worldwide    877-702-9580

Page 41

1  HIGHLY CONFIDENTIAL - Washtell
2  **Q.  And the global equities policy that**
3  **you refer to, was that in existence at the time**
4  **of the acquisition?**
5  A.  We certainly had a policy application
6  in place at the time.  It's clearly been revised
7  since reviewed and updated and things change.
8  **Q.  And the policies and procedures that**
9  **would have been in place at the time of the**
10  **acquisition would have been reflective of the**
11  **prior name of your group, the --**
12  A.  Equity Derivatives.
13  **Q.  -- Equity Derivatives Group?**
14  A.  Yes.
15  **Q.  And those policies and procedures**
16  **would have been specific to equity derivatives;**
17  **is that correct?**
18  A.  That's correct.
19  **Q.  And were there any policies and**
20  **procedures in place at that time specific to the**
21  **cash equities?**
22  A.  To the extent we did not have a cash
23  equity business, we did not have a policy
24  document for a cash equity business.
25  **Q.  And --**
TSG Reporting - Worldwide    877-702-9580

Page 42

1    **HIGHLY CONFIDENTIAL - Washtell**
2        A.    We had a policy document for the
3    equity derivative business.
4        **Q.    And how about -- I should ask, when**
5    **you say "cash equities," what would that**
6    **include?**
7        A.    That business would principally be
8    involved in trading equities securities.  That's
9    listed equities.  That could be preferred stock,
10   that could be ADRs, depository receipts, that
11   could be convertible bonds.
12       **Q.    Would it include equity-linked notes**
13   **and warrants?**
14       A.    I wouldn't classify those specifically
15   as cash equity products, necessarily.
16       **Q.    And what would you classify**
17   **equity-linked notes and warrants as?**
18       A.    Equity-linked notes is more of a
19   derivative.
20       **Q.    Did --**
21       A.    It's clearly a security the way that
22   an equity is a security, but it has a derivative
23   component normally, as a warrant has a
24   derivative component.  It's an option stock.
25       **Q.    And prior to the Lehman transaction,**
     TSG Reporting - Worldwide    877-702-9580

Page 43

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **did Barclays own equity-linked notes and**
3    **warrants for purposes other than hedging?**
4        A.    We certainly have an equity-linked
5    note issuance program, so we issue equity-linked
6    notes, yes.  Warrants, I'm not sure.
7            (Recess; Time Noted:  10:44 A.M.)
8            (Time Noted:  10:57 A.M.)
9    BY MS. CARRERO:
10       **Q.    Earlier, you were telling me that you**
11   **were involved with the valuation of the equity**
12   **portfolio acquired from Lehman.  When did the**
13   **valuation process begin for you?**
14           MR. THOMAS:  Objection to form.
15       A.    We first started looking at assets
16   positions, securities in relation to this around
17   the time of 9/22.  I don't remember the exact
18   date.  The process of trying to achieve an
19   opening balance sheet value was started at some
20   point after that time and lasted for a period of
21   months.
22       **Q.    Do you know who ultimately decided the**
23   **value that would be used for purposes of the**
24   **opening balance sheet?**
25           MR. THOMAS:  Objection to form.
     TSG Reporting - Worldwide    877-702-9580

Page 44

1        HIGHLY CONFIDENTIAL - Washtell
2        A.    Do you mean valuation in relation to
3    equity assets?
4        **Q.    I mean in relation to equity assets.**
5        A.    It's my understanding that the fair
6    values that we used for the opening balance
7    sheet calculation were those that we arrived at
8    following ongoing internal discussion, review
9    within valuations, as well as an extensive
10   review process with PwC, our external auditors.
11       **Q.    It's your understanding that the**
12   **values that your group calculated are the values**
13   **that ultimately roll up to the opening balance**
14   **sheet; is that correct?**
15       A.    That's my understanding.
16       **Q.    And were you involved in the valuation**
17   **of any of the assets contemplated to be**
18   **purchased from Lehman the week before the**
19   **closing?**
20           MR. THOMAS:  Objection to form.
21       A.    Could you repeat the question?
22       **Q.    Were you involved in any way with the**
23   **valuation of assets to be purchased from Lehman**
24   **prior to the closing of the transaction?**
25           MR. THOMAS:  Objection to form.
     TSG Reporting - Worldwide    877-702-9580

Page 45

1        HIGHLY CONFIDENTIAL - Washtell
2        A.    I was not involved in any work prior
3    to the closing of that transaction in relation
4    to that transaction, to my knowledge.
5        **Q.    Are you aware that a significant**
6    **portion of the assets were transferred to**
7    **Barclays on September 18 as part of a Repurchase**
8    **Agreement?**
9            MR. THOMAS:  Objection to form.
10       A.    I'm not aware of the specifics of what
11   was transferred and when or as to specifics of
12   the deal.  I was not involved.
13           (Exhibit 817, a document bearing Bates
14       Nos. BCI-EX-(S)-176597 through 176599, with
15       attachment, marked for identification, as of
16       this date.)
17       **Q.    Mr. Washtell, you have before you what**
18   **has been marked Deposition Exhibit 817.**
19       A.    Yes.
20       **Q.    Would you take a moment and read it**
21   **over.**
22       A.    Sure.
23           (Document review.)
24       A.    Okay.
25       **Q.    If you'll turn your attention to the**
     TSG Reporting - Worldwide    877-702-9580

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **e-mail at the top from you to Mr. Teague dated**
3    **September 19 at GMT time 16:58, which, my math**
4    **is bad, but I believe is roughly about noon on**
5    **the 19th, and in it, if you turn to the third**
6    **paragraph, the sentence says, "In both files I**
7    **have identified about 75 percent of the**
8    **positions by balance sheet size as being a**
9    **mixture of stocks, ETFs, pref. shares, REITs, et**
10    **cetera." Do you see that?**
11    A.   Yes.
12    **Q.   Do you know what files you were**
13    **referring to?**
14    A.   From my recollection at this point,
15    Sean had sent me some files with a position that
16    were a list of security positions to analyze.
17    **Q.   And those were security positions that**
18    **were to be acquired from Lehman; is that**
19    **correct?**
20    MR. THOMAS:  Objection to form.
21    A.   I mean, that was not my understanding
22    at this point in time.  I was reviewing this as
23    a request to provide a valuation on some assets
24    in the way that we would have similar requests
25    with the equity price testing function, as

1    HIGHLY CONFIDENTIAL - Washtell
2    Sean's e-mail says, "Marcus is looking for us to
3    review this data."  I was asked to review the
4    data.
5    **Q.   But your understanding is the data is**
6    **related to the Lehman transaction, correct?**
7    MR. THOMAS:  Objection to form.
8    A.   That is not my understanding.  We --
9    we looked at a number of different files over a
10    number of different days.  I don't know if these
11    files related to what was transacted in the
12    Lehman transaction in the closing of the deal.
13    I don't know that these files relate to the
14    final population.
15    **Q.   If you turn your attention to e-mails**
16    **below.**
17    A.   Uh-huh.
18    **Q.   Does that refresh your recollection**
19    **that the data was related to the Lehman**
20    **transaction?**
21    MR. THOMAS:  Objection to form.
22    A.   At this point in time, I was reviewing
23    files because I have been requested to review
24    files.  As I said before, I wasn't involved in
25    any discussions in relation to the transaction,

1    HIGHLY CONFIDENTIAL - Washtell
2    so ...
3    **Q.   Did you understand this to be LBI data**
4    **you were reviewing, as stated in the e-mail from**
5    **Mr. Teague below your response?**
6    A.   Pretty sure at the time.  I didn't
7    know what LBI was, what it stood for.  I'm still
8    unsure what it stands for.  I can guess Lehman
9    Brothers something, but ...
10    **Q.   This was not a small file, was it,**
11    **that you were asked to review?**
12    A.   No.
13    **Q.   And you have suspicion it was related**
14    **to the Lehman transaction when asked to review**
15    **huge files of equity positions identified as LBI**
16    **data?**
17    MR. THOMAS:  Objection to form.
18    A.   I was not involved in any way in
19    discussing the Lehman transaction, so I had no
20    knowledge of a transaction that was occurring,
21    bar what I read in the papers.
22    **Q.   You're telling me that you didn't**
23    **understand the exercise Mr. Teague was asking**
24    **you to undertake in a September 19, 2008 e-mail**
25    **where he writes, "Marcus is looking for the**

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **different price testing groups to review the LBI**
3    **data"?**
4    A.   Uh-huh.
5    **Q.   "Can you (Equity Price Testing)**
6    **coordinate the stocks and options portion,"**
7    **question mark, you didn't understand that to be**
8    **a request related to the Lehman transaction**
9    **whatsoever?**
10    MR. THOMAS:  Objection to form.
11    A.   It has no bearing on the work that I
12    did, what LBI means or where these positions
13    were from.  Marcus is the manager of the group
14    and has asked us to review some data.  At that
15    time, we were reviewing an awful lot of data in
16    relation to the Lehman bankruptcy which had
17    happened a week before where we had counterparty
18    exposure, for instance.  The main name being
19    thrown around that week was Lehman Brothers, not
20    for the purposes of analyzing anything in
21    relation to a deal.
22    **Q.   Now, in your e-mail back to Mr. Teague**
23    **when you write, "Once" -- do you see, turn to**
24    **the third paragraph in your e-mail to Mr. Teague**
25    **dated September 19, do you see where it says,**

Page 50

**HIGHLY CONFIDENTIAL - Washtell**

1  **HIGHLY CONFIDENTIAL - Washtell**
2  **"Once we have final data from the LB guys, we**
3  **can produce a price test on these positions"; do**
4  **you see that?**
5    A.   I do see that.
6    **Q.   So you didn't understand, based on**
7  **what you wrote there, that you were going to be**
8  **receiving final data and that what you had**
9  **received to date was preliminary data?**
10     MR. THOMAS:  Objection to form.
11    A.   That sentence reads like we're
12  expecting a final dataset, and this is a
13  preliminary dataset, but I don't recall the
14  specific discussions at that time.  Over a
15  period of days initially before, but more
16  extensively after September 22, I received a lot
17  of files to review.
18    **Q.   Related to the Lehman transaction?**
19     MR. THOMAS:  Objection to form.
20    A.   At some point after the transaction, I
21  was definitely made aware the positions related
22  to that transaction.  I don't recall being made
23  aware of that at this point.
24    **Q.   Were you involved over the weekend**
25  **before September 22 in connection with the**

TSG Reporting - Worldwide    877-702-9580

Page 51

1  **HIGHLY CONFIDENTIAL - Washtell**
2  **valuing of any positions that were being**
3  **acquired?**
4     MR. THOMAS:  Objection to form.
5    A.   No, not to my recollection.
6    **Q.   Did you receive any schedules with**
7  **pricing information for the equity portfolio**
8  **that had been delivered from Lehman to Barclays**
9  **on September 18 anytime before September 22?**
10    A.   Could you repeat the question?
11    **Q.   Did you receive any schedules with**
12  **pricing information for the equity positions**
13  **that had been transferred from Lehman to**
14  **Barclays on September 18, that Thursday, anytime**
15  **before the closing of the transaction?**
16    A.   I don't know if these positions
17  specifically relate to what was included in the
18  closing of the transaction.  I clearly, from
19  this e-mail, received some files with some
20  positions and information in them.
21    **Q.   That's fine.  Put that document aside**
22  **for now.  And I'm asking you, in general, you**
23  **were not aware that a large equity portfolio was**
24  **transferred from Lehman to Barclays on September**
25  **18 prior to the closing of the transaction?**

TSG Reporting - Worldwide    877-702-9580

Page 52

1  **HIGHLY CONFIDENTIAL - Washtell**
2     MR. THOMAS:  Objection to form.
3    A.   I do not recall being aware of that
4  before the closing of the transaction.
5    **Q.   And --**
6    A.   But just to clarify, I was in London
7  at this point.  I was not in New York.
8    **Q.   And if equity positions are part of a**
9  **repurchase transaction, would your group**
10  **ordinarily be involved in any sort of price**
11  **testing function of the values of any securities**
12  **received in connection with a repurchase**
13  **transaction?**
14    A.   Within the firm, so just talking
15  generically within Barclays Capital, where, for
16  instance, our Prime Services business has
17  collateral positions in relating to repo and
18  sort of return swap transactions, then my group
19  may and is in some cases involved in helping to
20  assess the valuation of those collateral assets
21  for or on behalf of the Prime Services Group.
22    **Q.   But only with respect to return swap**
23  **transactions, not with respect to tri-party**
24  **repurchase agreements?**
25    A.   I'm familiar with some total return

TSG Reporting - Worldwide    877-702-9580

Page 53

1  HIGHLY CONFIDENTIAL - Washtell
2  swap transactions.  I'm not familiar with
3  tri-party repo transactions.  I know any work we
4  do on behalf of Prime Services is very much us
5  receiving a position file and saying, okay,
6  here's a list of equity assets, I don't really
7  know what they relate to, but you're asking for
8  a valuation, here's a valuation.
9     It doesn't make any difference to us
10  what the -- the assets being held for.  We're
11  just being consulted as equity experts to assess
12  the valuation of the position listing.
13    **Q.   And upon the delivery of any**
14  **securities on September 18 in connection with**
15  **the repurchase transaction between Lehman and**
16  **Barclays, you were not asked to provide any sort**
17  **of valuation of any of the equity securities**
18  **that were transferred in connection with that**
19  **repurchase transaction; is that correct?**
20    A.   I was not asked to do anything in
21  relation to a repurchase transaction.
22    **Q.   And as of that point, you cannot**
23  **recall having been asked to ever value any**
24  **securities that were transferred in connection**
25  **with the repurchase transaction; is that**

TSG Reporting - Worldwide    877-702-9580

**HIGHLY CONFIDENTIAL - Washtell**

1  **HIGHLY CONFIDENTIAL - Washtell**
2  correct?
3      MR. THOMAS:  Objection to form.
4   A.   As of that time -- sorry.  As of that
5  time, I don't recall, that's correct.
6   **Q.   Any repurchase transaction, not just**
7  **the Lehman/Barclays one; is that correct?**
8      MR. THOMAS:  Objection.
9   A.   I don't recall at that point in time
10 being asked to review anything in relation to a
11 repurchase transaction.
12  **Q.   When your group began the process of**
13 **valuing the equity portfolio that had been**
14 **transferred from Lehman to Barclays, did your**
15 **group have access to the marks at which those**
16 **positions were being held on Lehman's books at**
17 **the time?**
18  A.   No.
19     MR. THOMAS:  Objection to form.
20 Sorry.
21  A.   I don't recall having access to data
22 Lehman Brothers' systems or books.
23  **Q.   At the time that your group began its**
24 **valuation of the equity portfolio transferred**
25 **from Lehman to Barclays, did your group have**

TSG Reporting - Worldwide    877-702-9580

1  **HIGHLY CONFIDENTIAL - Washtell**
2  **access to the marks that Barclays' custodian had**
3  **ascribed to those positions in connection with**
4  **the Lehman/Barclays repurchase transaction on**
5  **September 18?**
6   A.   I recall from the files that we
7  received and the data that we analyzed, we were
8  given a price source which was identified as
9  BoNY, to the extent BoNY was a custodian of the
10 repo.
11  **Q.   And what did your group do with those**
12 **BoNY prices?**
13  A.   Not a great deal.  We were asked to
14 independently assess or price test the value of
15 the listing of securities, not to principally
16 assess whether a BoNY price was correct, but to
17 assess the fair value of a list of securities.
18 We would have done that by obtaining independent
19 sources as part of our normal practice.
20  **Q.   Would a Lehman price or a BoNY price**
21 **be an example of another available price point**
22 **that could be used in a valuation of the**
23 **securities?**
24     MR. THOMAS:  Objection to form.
25  A.   The reason I would not use a BoNY

TSG Reporting - Worldwide    877-702-9580

1      HIGHLY CONFIDENTIAL - Washtell
2  price from a file in assessing an independent
3  valuation of something is our job is to assess
4  it independently.  In order to do that, I need
5  to understand what independent external data
6  sources I'm using, where they come from, and
7  what they represent.
8      Now, a price in a file that says this
9  is the value BoNY has in a system, I have no
10 understanding of what that price represents.  I
11 have no understanding of how BoNY derives that
12 price.  I could say the same of Lehman Brothers.
13 I have no visibility on what that data is, so I
14 would not use it in making an independent
15 assessment.
16  **Q.   Is it your understanding that no**
17 **securities are kept on Barclays' books at a**
18 **price that has been ascribed by its custodian,**
19 **BoNY?**
20     MR. THOMAS:  Objection to form.
21  A.   I'm not aware of anywhere that happens
22 within my agreement, within what I know of the
23 business.  In our day-to-day monthly work, we
24 don't look at custodian values as part of our
25 price testing analysis.

TSG Reporting - Worldwide    877-702-9580

1      HIGHLY CONFIDENTIAL - Washtell
2   **Q.   Earlier you had mentioned that there**
3  **were some illiquid equity positions within the**
4  **portfolio transferred; is that correct?**
5   A.   Illiquid?
6   **Q.   Yes.**
7   A.   Correct.
8   **Q.   For any illiquid equity securities**
9  **within the equity portfolio, where did your**
10 **group look to gather data for purposes of**
11 **marking those securities?**
12  A.   We used the standard sources that we
13 would use within the firm to mark equities.  So
14 we went principally to Reuters, being our main
15 source, looked for an exchange closing or last
16 price.  In some cases, we may have referenced
17 Bloomberg.  Potentially there are other sources.
18 I don't recall the full list.
19  **Q.   For an illiquid equity security, it**
20 **didn't seem to make sense to look at the price**
21 **at which a trader familiar with the product who**
22 **had held it on his books had marked it at prior**
23 **to its transfer to Barclays?**
24     MR. THOMAS:  Objection to form.
25  A.   I couldn't ascribe any level of

TSG Reporting - Worldwide    877-702-9580

1    HIGHLY CONFIDENTIAL - Washtell
2    independence to that price.
3    **Q.   But you didn't consider it at all?**
4    A.   No.
5        MR. THOMAS:  Objection to form.
6    A.   No.
7    **Q.   Do you know if a number of the**
8    **illiquid equity securities that may have been**
9    **part of the equity portfolio transferred were**
10   **ultimately -- ultimately ended up on a trading**
11   **book at Barclays -- scratch that.  Bad question.**
12   **Do you know if any former Lehman**
13   **traders that went over to Barclays after the**
14   **sale ended up with positions on their books that**
15   **they had previously owned while at Lehman prior**
16   **to the sale?**
17   A.   I don't know.
18   **Q.   But you would expect that there would**
19   **be former Lehman traders that went over to**
20   **Barclays and ran a book with similar positions**
21   **to what they had had on their books at Lehman;**
22   **is that correct?**
23       MR. THOMAS:  Objection.  Foundation.
24   Asked and answered.
25       THE WITNESS:  Do I need to answer
TSG Reporting - Worldwide    877-702-9580

1    HIGHLY CONFIDENTIAL - Washtell
2    that?
3        MR. THOMAS:  Yes, if you can.
4    A.   What was the question again?  Sorry.
5    **Q.   You would expect that some of the**
6    **former Lehman traders that went over to Barclays**
7    **would end up with some of these positions that**
8    **had been transferred over on their book once**
9    **they arrive at Barclays; is that correct?**
10       MR. THOMAS:  Objection.  Foundation.
11   Asked and answered.
12   A.   It's not necessarily a
13   straightforward, reasonable assumption to make.
14   The positions would be risk-managed by the
15   business in the way they see fit, and I was not
16   privy to that information or that decision.
17   **Q.   I'm not asking about whether they were**
18   **risk-managed, and so maybe it's just a matter**
19   **of terminology.**
20   A.   Well, you're asking me where they were
21   booked.
22       MR. THOMAS:  Let her finish.
23   **Q.   I'm asking whether a desk might have**
24   **on it some former Lehman employees that had**
25   **previously had primary responsibility for the**
TSG Reporting - Worldwide    877-702-9580

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **assets while at Lehman and now again primary**
3    **responsibility for trading those assets while at**
4    **Barclays?**
5        MR. THOMAS:  Same objection.
6    A.   Sorry.  Could you just repeat that
7    again?
8        (Record read.)
9    A.   There's nothing that I can confirm.  I
10   don't know that was the case.  I don't know what
11   role traders had at Lehman relative to what role
12   they now have at Barclays or what trading books
13   those assets have been booked in post the
14   acquisition.  I could conjecture whether or not
15   that would be a reasonable thing.
16   **Q.   To the extent that Barclays, prior to**
17   **the acquisition, as you said before, did not**
18   **have a cash equity business, would you expect**
19   **that the people, immediately upon the**
20   **acquisition of those assets that would be**
21   **trading those assets, were coming over from**
22   **Lehman?**
23       MR. THOMAS:  Objection to form.
24   A.   A group of traders, trading staff,
25   moved from Lehman to Barclays.  It's my
TSG Reporting - Worldwide    877-702-9580

1    HIGHLY CONFIDENTIAL - Washtell
2    understanding not all staff did.  I don't know
3    who did, who didn't, what their responsibilities
4    were before relative to after.  It's not
5    something I'm aware of or was involved in.
6    **Q.   You had said before that in the**
7    **ordinary course of price testing, you would have**
8    **communication with the traders about pricing.**
9    **Is that not a source that you would**
10   **consult in the process of price testing?**
11       MR. THOMAS:  Objection to form.
12   A.   As part of our normal process, as I
13   described, we would discuss our analysis with
14   the trading desk.
15   **Q.   And so --**
16   A.   I recall --
17       MR. THOMAS:  Let him finish.
18       MS. CARRERO:  I will.  I thought he
19   was done.
20   A.   I recall we may have had discussions
21   with the Barclays trading desk in London.  I
22   don't recall having discussions with anyone from
23   Lehman trading in New York.
24   **Q.   What about any Lehman counterparts**
25   **at -- and their equivalent of IVC?**
TSG Reporting - Worldwide    877-702-9580

**HIGHLY CONFIDENTIAL - Washtell**

1     A.   As I said previously, some staff were
2   engaged in obtaining data at my direction, but
3   that was very much an operational thing, them
4   responding to a request from me to obtain
5   certain information.
6     **Q.   And do you know what sort of data was**
7   **being requested?**
8     A.   Price data.
9     **Q.   So price data was being requested but**
10  **then not being used, is that correct?**
11     MR. THOMAS:  Objection to form.
12     A.   No, I'm not saying it wasn't being
13  used.  I'm saying I may have asked staff from
14  the U.S. IVC team who were listed in the
15  document you showed me earlier to source
16  independent data.  For example, Go and source me
17  these prices from Bloomberg for this date,
18  please," and that would have been done from an
19  operational perspective to share the work
20  amongst the global team at that point rather
21  than me asking someone in London to do it.  I
22  would not have been asking for anything from a
23  Lehman system.  I don't recall ever asking for
24  any information from Lehman's system.

HIGHLY CONFIDENTIAL - Washtell

1     **Q.   So you're not familiar with a system**
2   **called GFS?**
3     MR. THOMAS:  Objection to form.
4     A.   Not in anything other than I've heard
5   GFS before.  I have no idea specifically what it
6   does or is used for.
7     **Q.   Same question as with respect to the**
8   **Bank of New York marks.  With respect to the JPM**
9   **marks that were available in connection with a**
10  **September 17 repurchase agreement between Lehman**
11  **and the Fed, were the JPM marks used in any way**
12  **in equity IC -- IVC's valuation of the equity**
13  **portfolio?**
14     MR. THOMAS:  Objection to form.
15     A.   I don't recall using any JPMorgan
16  marks in our analysis.
17     **Q.   Do you recall seeing those marks?**
18     A.   I don't recall seeing those marks.
19     **Q.   Mr. Washtell, I'm putting before you**
20  **what has been marked as Deposition Exhibit 806B.**
21     **Have you seen this document before?**
22     A.   Yes, I believe so.
23     **Q.   And you see it says, "Product Control,**
24  **Price Testing Policy, date:  May 2009"; is that**

**HIGHLY CONFIDENTIAL - Washtell**

1   **correct?**
2     A.   That's what it says.
3     **Q.   Is this a policy that was put in place**
4   **after the Lehman transaction?**
5     A.   The firm had a process and policy
6   prior to the Lehman transaction.  The date of
7   this document suggests the version you have is
8   after the transaction.
9     **Q.   But to your knowledge, there was a**
10  **written policy in place dated at the time of the**
11  **transaction; is that correct?**
12     A.   That's correct, and I assume you have
13  the version controlling here somewhere.  I'm not
14  sure where, but ...
15     It doesn't help because it doesn't
16  have a date.  Yes, we had a process and policy
17  in place prior to the Lehman transaction.
18     **Q.   And in this policy is a Central Price**
19  **Testing guidance, correct?**
20     A.   It's a global, firm-wide policy.
21     **Q.   As opposed to a policy that is**
22  **specific to just the Equity IVC Group, correct?**
23     A.   Any equity-specific documentation
24  would be consistent with this policy, but this

HIGHLY CONFIDENTIAL - Washtell

1   is a global, firm-wide cross-asset policy.
2     **Q.   You can put that one aside, and I'm**
3   **going to give you what has been marked as**
4   **Deposition Exhibit 805B.**
5     **Have you seen this document before?**
6     A.   Yes.
7     **Q.   And you see it says "Barclays Capital**
8   **Provisioning Policy Statement, December 2008,**
9   **Product Control"; is that correct?**
10     A.   That's what it says.
11     **Q.   And this policy is dated after the**
12  **Lehman acquisition; is that correct?**
13     A.   That's correct.
14     **Q.   Was there a provisioning policy, a**
15  **written provision policy statement in place at**
16  **the time of the Lehman acquisition?**
17     A.   Yes.
18     **Q.   Do you know if it differs at all from**
19  **this document?**
20     A.   I don't know that specifically.
21     **Q.   Were the bid/offer adjustments taken**
22  **to any equity products taken pursuant to this**
23  **policy in front of you which has been marked as**
24  **Deposition Exhibit 805B?**

Page 66

HIGHLY CONFIDENTIAL - Washtell

1  **HIGHLY CONFIDENTIAL - Washtell**
2       A.    Any bid/offer adjustments that were
3   taken would have been taken in line with this
4   policy.  This is the policy within which we
5   operate within the firm.
6       **Q.    Do you know if the policy that existed**
7   **prior to this was at all different and, if so,**
8   **whether adjustments were taken with respect to**
9   **this policy or an earlier policy?**
10      A.    At what time?
11      **Q.    For purposes of the acquisition**
12  **balance sheet.**
13      A.    For purposes of --
14      **Q.    Which policy was followed, this**
15  **December 2008 policy or its predecessor policy,**
16  **if any policy at all?**
17      A.    The policy that was followed was the
18  policy that would have been in place at the time
19  of the acquisition.
20      **Q.    Could you turn to page 5.  Would the**
21  **bid/offer adjustments that were taken on any of**
22  **the equity positions acquired for purposes of**
23  **acquisition accounting been taken under 5,**
24  **Bid/Offer Adjustments (Level 1:  Price**
25  **Testing)"?**

TSG Reporting - Worldwide     877-702-9580

Page 67

1   **HIGHLY CONFIDENTIAL - Washtell**
2       A.    That's my understanding, yes, they
3   would.
4       **Q.    You can put that aside.**
5            Do you know if any of the equity
6   positions that were transferred to Barclays on
7   September 18 were hedged prior to the closing of
8   the transaction?
9            MR. THOMAS:  Objection to form.
10      A.    I'm not aware of that.  I have no
11  knowledge of that.
12      **Q.    If any of the positions had been**
13  **hedged prior to the closing of the transaction,**
14  **woula a bid/offer adjustment have been taken for**
15  **any of those cash equity positions?**
16           MR. THOMAS:  Objection to form.
17      A.    Could you repeat the question?
18      **Q.    If any of the positions that had been**
19  **hedged prior to the closing of the transaction,**
20  **would it be proper in those instances to take a**
21  **bid/offer adjustment on those cash equity**
22  **positions?**
23           MR. THOMAS:  Objection to form.
24      A.    For what purposes?  For the purposes
25  of the opening balance sheet?

TSG Reporting - Worldwide     877-702-9580

Page 68

1        HIGHLY CONFIDENTIAL - Washtell
2       **Q.    Let's start there, for the purposes of**
3   **the opening balance sheet.**
4       A.    It's my understanding for the opening
5   balance sheet we had, and I was provided, a
6   position listing of securities which I was asked
7   to arrive at a fair value.  There was nothing in
8   relation to positions that were hedged or not
9   hedged or any other positions.  They were just a
10  position listing, a portfolio of securities for
11  which we needed to derive an appropriate fair
12  value.
13      **Q.    For other purposes, I guess for the**
14  **next day's mark of those securities, if there**
15  **had been a hedge for that security, would a**
16  **bid/offer adjustment be applied to a cash equity**
17  **position?**
18           MR. THOMAS:  Objection to form.
19      A.    Are we talking about in the normal
20  course of business?
21      **Q.    In the normal course of business.**
22      A.    And depends what we mean by "hedge."
23           You have a cash equity position.  By
24  "hedge" do you mean sell the position and you no
25  longer have a position, or do you mean "hedge"

TSG Reporting - Worldwide     877-702-9580

Page 69

1        HIGHLY CONFIDENTIAL - Washtell
2   by using some other financial instruments, be
3   they futures, forwards, on indices or on stocks?
4   It would --
5       **Q.    I mean --**
6       A.    -- depend.
7       **Q.    -- for example, how you earlier said a**
8   **number of the cash equity positions that would**
9   **have been in SOPHIS prior to the acquisition**
10  **would not have had a bid/offer adjustment to**
11  **them because they were hedging another position?**
12      A.    A derivative book, yes.
13      **Q.    A derivative book in that instance.**
14           If any of the equity portfolio
15  positions acquired from Lehman were hedged prior
16  to the closing of the transaction, would they,
17  for purposes of SOPHIS, have a bid/offer
18  adjustment embedded in the mark?
19           MR. THOMAS:  Objection to form.
20      A.    Just to clarify, first of all, I don't
21  have any knowledge of whether anything was
22  traded to hedge anything over that time period.
23  If a position was put into SOPHIS to act as a
24  derivative hedge to some positions, it would be
25  included in our standard procedures processes

TSG Reporting - Worldwide     877-702-9580

Page 70

1    HIGHLY CONFIDENTIAL - Washtell
2  for assessing bid/offer.
3    **Q.  I'm trying to understand what those**
4  **standard procedures are.  Are those standard**
5  **procedures that if a cash equity is acting as a**
6  **hedge to, for instance, a derivatives portfolio,**
7  **no bid/offer adjustment would be taken in those**
8  **instances?**
9    A.   As I said previously, our cash equity
10 positions prior to the transaction were all
11 acting as hedges for the derivative portfolio,
12 in which case the application of fair value and
13 bid/offer adjustments for all that derivative
14 portfolio would be done on a portfolio level on
15 a risk-parameter basis.  Stocks would not be
16 looked at in isolation.  They would be looked at
17 as part of that portfolio.
18    **Q.   If it is an equity position that has**
19 **an observable market price on Bloomberg and**
20 **Reuters and it's acting as a hedge to a**
21 **derivatives portfolio, would there be a**
22 **bid/offer adjustment to that equity position or**
23 **not if you looked that CUSIP up in SOPHIS?**
24    MR. THOMAS:  Objection to form.
25    A.   As I said, we would apply bid/offer
      TSG Reporting - Worldwide     877-702-9580

Page 71

1    HIGHLY CONFIDENTIAL - Washtell
2  provisions to the portfolio while looking at the
3  portfolio risk factors as a whole.  To the
4  extent the stock position is there to delta
5  hedge the derivative portfolio, there would be a
6  zero or small residual delta risk position.
7    The principal risk factors through
8  which we would take a bid/offer adjustment would
9  be things like volatility or Vega exposure,
10 Epsilon or dividend exposure.  This is the
11 standard practice the way we would assess fair
12 value and assess bid/offer provisions for a
13 derivative book.
14    **Q.   But you did not look at whether or not**
15 **the equity positions that were transferred from**
16 **Lehman to Barclays were hedged at the time that**
17 **you were -- that you undertook the valuation of**
18 **the securities; is that correct?**
19    MR. THOMAS:  Objection to form.
20    A.   I did not look at whether the
21 portfolio was hedged in our analysis.
22    **Q.   Do you know, for purposes of what the**
23 **mark would have been in SOPHIS for any of the**
24 **equity positions on September 23, how those**
25 **marks were arrived at?**
      TSG Reporting - Worldwide     877-702-9580

Page 72

1    **HIGHLY CONFIDENTIAL - Washtell**
2    MR. THOMAS:  Objection to form.
3    A.   What positions are we talking about?
4    **Q.   We're talking about the equity**
5  **positions that were transferred from Lehman to**
6  **Barclays.  As I understand it, your group worked**
7  **on valuations for the opening day balance sheet;**
8  **is that correct?**
9    A.   That is correct.
10   **Q.   With respect to SOPHIS and the values**
11 **that would be entered in SOPHIS on September 22**
12 **or September 23, take your pick --**
13   A.   Uh-huh.
14   **Q.   -- where do those values come from?**
15   A.   One point to clarify is I'm not sure
16 those positions were booked in SOPHIS on
17 September 22 or 23 or 24.  It took a period of
18 time just to book the population into our
19 systems, and that was not -- it wasn't a short
20 period of time.  It took some time because of
21 the difficulties of things like establishing
22 standard data, et cetera.
23   To the extent the positions were
24 booked in SOPHIS, they would be valued using
25 standard pricing feeds which SOPHIS receives on
      TSG Reporting - Worldwide     877-702-9580

Page 73

1    HIGHLY CONFIDENTIAL - Washtell
2  a daily basis, for example, from Reuters.
3    **Q.   And what sort of bid/offer adjustment**
4  **would be taken on the positions once they do get**
5  **booked into SOPHIS?**
6    MR. THOMAS:  Objection.
7    A.   Bid/offer adjustments are something
8  that are assessed generally outside of the
9  trading systems on a periodic basis, be that
10 monthly, be that quarterly.  It's an off-line,
11 separate calculation.
12   So on the day that you book a position
13 into a trading book, you don't book a bid/offer
14 reserve into the trading system with that
15 position.  It's something that necessarily,
16 because of the way things operate, is done
17 separately.
18   **Q.   And what determines whether that**
19 **bid/offer reserve is booked on a monthly versus**
20 **a quarterly basis, for instance?**
21   A.   I think, generally, it would be done
22 on a monthly basis.
23   **Q.   For purposes of generating**
24 **month-end --**
25   A.   Exactly.
      TSG Reporting - Worldwide     877-702-9580

1     HIGHLY CONFIDENTIAL - Washtell
2         Q.   -- balance sheet?
3             And who generally determines what the
4     appropriate bid/offer reserve to be booked is?
5     Would that be your group?
6         A.   We would certainly be involved, yes,
7     along with the Product Control Group, along with
8     the trading desk.
9         Q.   When you say Product Control Group,
10    you're distinguishing the IVC function of PCG
11    from which other area of PCG?
12        A.   For example, the Equities Product
13    Control Team, who would be principally engaged
14    in profit and loss reporting, for instance.
15        Q.   And was it also the Equities Product
16    Control Team's responsibility to generate any
17    month-end equity-related balance sheets?
18        A.   Depending for what purpose that
19    information was needed, they may be involved.
20        Q.   And for purposes of calculating the
21    bid/offer reserve calculation for any of the
22    assets, the equity assets purchased from Lehman,
23    were the businesses or the Product Control Group
24    involved in calculating the bid/offer reserves?
25        A.   For the opening balance sheet?
      TSG Reporting - Worldwide    877-702-9580

1     HIGHLY CONFIDENTIAL - Washtell
2         Q.   For the opening balance sheet.
3         A.   No, from my recollection, they were
4     not involved.
5         Q.   Was it your team alone, then, that was
6     involved in calculating the bid/offer reserves
7     taken for purposes of the opening balance sheet?
8         A.   It was our team in conjunction with
9     extensive discussion and review with
10    PricewaterhouseCoopers, the external auditors.
11        Q.   Does PricewaterhouseCoopers usually
12    determine what Barclays' bid/offer reserve will
13    be for equity positions?
14        A.   No, but they review and audit all of
15    our calculations, methodology assumptions and
16    analysis and review all of those numbers as part
17    of their normal course of business.
18        Q.   And do they review all of the
19    positions or do they just take a sample set of
20    positions?
21        A.   Depends what they are reviewing.  They
22    would review numbers, generally, in total.  So
23    they would look at totality of the balance
24    bid/offer reserves.
25        Q.   But here do you know whether they
      TSG Reporting - Worldwide    877-702-9580

1         HIGHLY CONFIDENTIAL - Washtell
2     reviewed a sample set of the equity positions or
3     if they reviewed all of them?
4         A.   They were provided the data for all
5     positions.  I know they definitely did in-depth
6     sample-based analysis as well.
7         Q.   So you know of only a sample-based
8     analysis, not an analysis of its entirety?
9         A.   No, I said they were provided with all
10    of the information for all positions.  What they
11    did with that specifically I'm sure is
12    documented in their work papers.
13        Q.   Do you know if any of the equity
14    positions that were transferred from Lehman to
15    Barclays were originally booked into Barclays'
16    systems at the prices that its custodian, BoNY,
17    had marked them at for purposes of the
18    Lehman/Barclays repo?
19        A.   I'm not aware of what prices they were
20    booked into the system at.  I don't recall.
21        Q.   Do you have any reason to believe, if
22    Barclays receives the equities on September 18
23    in connection with the repurchase transaction,
24    that they would not have been free to trade
25    those securities upon receipt?
      TSG Reporting - Worldwide    877-702-9580

1         HIGHLY CONFIDENTIAL - Washtell
2         MR. THOMAS:  Objection.  Form.
3         A.   I don't have any knowledge of that.  I
4     don't know.
5         Q.   Do you know when Barclays was able to
6     transfer -- sorry.  Do you know when Barclays
7     was able to trade any of the securities that
8     were transferred to it from Lehman?
9         A.   No, I'm not aware of that.
10        Q.   So the tradability of the securities
11    did not dictate the valuation date that you used
12    for purposes of valuing the securities; is that
13    correct?
14        MR. THOMAS:  Objection to form.
15        A.   It was not a consideration in my use
16    of that date.
17        Q.   And the cash equity positions were
18    originally valued by your group using a
19    valuation date of September 19; is that correct?
20        A.   In the analysis, we --
21        MR. THOMAS:  I'm sorry.  Objection to
22    form.
23        A.   The analysis we performed on its
24    opening balance sheet, as I said, occurred over
25    a period of time, significant period of time,
      TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1  running to a few months.  For those purposes, we
2  obtained prices for various dates.
3        We definitely had price data for 9/19
4  as well as 9/22 as well as other dates.
5     **Q.   Ultimately, the price used for**
6  **purposes of acquisition accounting for the cash**
7  **equity positions is a 9/22 close date, is that**
8  **correct?**
9     A.   That's correct.
10    **Q.   Do you know at what point a change was**
11 **made from using a September 19 close date to a**
12 **September 22 close date?**
13       MR. THOMAS:  Objection to form.
14 Assumes facts not in evidence.
15    **Q.   Go ahead and answer.**
16    A.   I'm not sure what change you're
17 talking about in terms of we initially did
18 something.  You're suggesting we did something
19 on the 19th and then made a decision to change
20 on the 22nd.
21       In relation to the opening balance
22 sheet, it's my understanding the transaction
23 closed on the morning of September 22.  We were
24 asked to value the portfolio as of the

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1  opening -- the opening balance sheet at the
2  closing of the transaction.
3        Given my understanding that it closed
4  on the morning of September 22, the most
5  reasonable time to assess the valuation of the
6  portfolio would be the close of business on
7  September 22.
8     **Q.   It's your understanding that the**
9  **closing happened before the UK opened, correct?**
10    A.   I don't know the exact time.
11    **Q.   You understand it to be prior to the**
12 **close, correct, on September 22?**
13       MR. THOMAS:  Objection to form.
14       The closing happened prior to the
15 close?
16    **Q.   The close of the market.  I'm sorry.**
17    A.   The closing of the transaction, it's
18 my understanding, happened prior to the close of
19 the market on September 22.
20    **Q.   And is your understanding that the**
21 **close of the transaction happened before the**
22 **open of the market in the U.S.?**
23       MR. THOMAS:  Objection to form.
24 Foundation.

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1     A.   That's not my understanding, and I
2  don't recall being told a specific time that the
3  close happened.  I do recall that we had the
4  objective of trying to value a portfolio of
5  assets as at the open on September 22.
6        Now, the way that we would do that,
7  and the only reasonable way to do that, is to
8  look at the closing price information for
9  September 22 because you don't have reliable
10 opening information September 22.
11    **Q.   Did you and your group undertake to**
12 **analyze the movement in the market, if any, from**
13 **close of business on September 19 to open of the**
14 **market on September 22?**
15    A.   Could you just repeat that, sorry,
16 just so I have the dates?
17    **Q.   Did you and your group undertake to**
18 **analyze the movement in the market, if any, from**
19 **the close of business on September 19 to the**
20 **open of business on September 22?**
21       MR. THOMAS:  Objection to form.
22    A.   In the market generally?
23    **Q.   In the equities market.**
24    A.   Do I recall specific analysis on that?

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell

1  No.
2     **Q.   Did you or your group undertake an**
3  **analysis of what movement would have occurred**
4  **from September 22 open to the September 22 close**
5  **of business to determine what sort of market**
6  **movement there was and how that would affect the**
7  **price valuation exercise?**
8        MR. THOMAS:  Objection to form.
9     A.   To answer your second point, it
10 wouldn't have any effect on the analysis we did
11 or the valuation we arrived at, and the reason
12 for that is when we're being asked, which we
13 regularly are, to value positions at a certain
14 point in a day, it doesn't matter to us what
15 point of time during the day that transaction
16 happened because the only time we have reliable
17 information is the close of business.  We don't
18 have reliable information at the open of
19 business.
20       So if I'm asked as part of my normal
21 course of work practice to value a position on a
22 given day, I'm going to default by looking at
23 the closing price information.
24    **Q.   For months, though, you and your group**

TSG Reporting - Worldwide    877-702-9580

Page 82

**HIGHLY CONFIDENTIAL - Washtell**
1    **HIGHLY CONFIDENTIAL - Washtell**
2    **were valuing it using a close of business**
3    **September 19th date; is that correct?**
4         MR. THOMAS:  Objection to form.
5         A.   As I said before, I know we analyzed
6    various days' data.  I don't recall.
7         **Q.   And do you recall who made the**
8    **decision to ultimately use a September 22 close**
9    **date as opposed to a September 19 closing date?**
10        A.   I don't recall a specific person
11   making a specific decision.  I recall that we
12   were instructed, for want of a better word, that
13   we should be trying to obtain a valuation for
14   the open of September 22.
15        As I say, I think the most reasonable
16   data point to look at for that is the close of
17   business September 22.  I know -- my belief this
18   is something that was discussed extensively with
19   our auditors, which is something which they
20   supported and agreed was the appropriate, most
21   reasonable thing to do.
22        **Q.   Are you aware that the closing date is**
23   **defined within the Asset Purchase Agreement**
24   **governing the transaction as 12:01 A.M. on**
25   **September 22?**
        TSG Reporting - Worldwide    877-702-9580

Page 83

1    **HIGHLY CONFIDENTIAL - Washtell**
2         MR. THOMAS:  Objection to form.
3         A.   I was not aware of that and I haven't
4    read that particular document.  As I said, I
5    don't recall at the time being told of any
6    specific point in time other than the open.  I
7    don't mean a -- I mean a time of day I don't
8    recall.
9         **Q.   In the ordinary course, would you use**
10   **pricing information from after the valuation**
11   **date for purposes of valuing a security?**
12        MR. THOMAS:  Objection to form.
13        A.   After the valuation date?  So give me
14   a for example.
15        **Q.   For example, if you were valuing a**
16   **security in a different time zone where the**
17   **valuation date would be -- let's pick September**
18   **30th, and you would have no or little**
19   **information other than from markets**
20   **opened -- an opening price on October 1, let's**
21   **say.**
22        **Would you use that kind of ex post**
23   **information in a valuation exercise?**
24        MR. THOMAS:  Objection to form.
25        A.   We would otherwise consider the
        TSG Reporting - Worldwide    877-702-9580

Page 84

1         HIGHLY CONFIDENTIAL - Washtell
2    available information.  I'm not sure I quite
3    understand you're saying if a trade happened on
4    September 30th, would we use the opening price
5    on October 1 then?
6         **Q.   Let's go with a different example.  If**
7    **you are fair-valuing a position?**
8         A.   Uh-huh.
9         **Q.   Which is a willing buyer, a willing**
10   **seller concept; is that correct?**
11        A.   Yes.  Yes.
12        **Q.   Do you consider that concept to have**
13   **embedded in it a concept that that willing buyer**
14   **and willing seller at that point in time have**
15   **certain information available to it that drives**
16   **the value that they are willing to buy and sell?**
17        MR. THOMAS:  Objection to form.
18        A.   Okay.  Market participants have
19   information which will influence the level at
20   which they're willing to buy and sell at a given
21   point in time.
22        **Q.   Does a willing buyer or seller have**
23   **access to information that's not available until**
24   **after that time, that point in time?**
25        MR. THOMAS:  Objection to form.
        TSG Reporting - Worldwide    877-702-9580

Page 85

1         HIGHLY CONFIDENTIAL - Washtell
2         A.   Does someone have available
3    information -- sorry.  Does someone have
4    availability to information that's not available
5    at that point in time I think is your question?
6         **Q.   Let's rephrase that to say if a**
7    **willing buyer or seller does not have**
8    **availability to information at the time, is it**
9    **fair to say that that would not be information**
10   **that they would be taking into consideration in**
11   **connection with the transaction?**
12        MR. THOMAS:  Objection to form.
13        A.   Yes, I think you've said the same
14   thing.  The parties have access to information
15   that is available at a point in time.  They
16   don't have access to information that's
17   available or for something that's going to
18   happen in two hours' time, so ...
19        **Q.   So a willing buyer and seller at 12:01**
20   **A.M. on September 22nd would not have access to**
21   **information about what the closing price would**
22   **be on September 22; is that correct?**
23        MR. THOMAS:  Objection to form.
24        A.   Is it correct at 12:01 that a market
25   participant would not know the closing price for
        TSG Reporting - Worldwide    877-702-9580

Page 86

HIGHLY CONFIDENTIAL - Washtell
1  the close of business that day?  That's your
2  question?
3  **Q.  Yes.**
4  A.  I think that's correct.
5  (Exhibit 818, a document bearing Bates
6  Nos. PwC-BarCap71528 through 71531, marked
7  for identification, as of this date.)
8  THE WITNESS:  Can we take for about
9  two minutes?
10  (Recess; Time Noted:  12:16 P.M.
11  (Time Noted:  12:22 P.M.)
12  BY MS. CARRERO:
13  **Q.  Mr. Washtell, are you aware of what**
14  **the difference is in a valuation of the equity**
15  **portfolio using a September 19 date as opposed**
16  **to a September 22 date?**
17  A.  From a monetary perspective?
18  **Q.  From a monetary perspective, yes.**
19  A.  I'm not aware of the exact number.  I
20  can't recall.
21  **Q.  Can you ballpark it for me?**
22  MR. THOMAS:  Objection to form.
23  A.  Not reasonably.
24  **Q.  If I told you it was around 700**

TSG Reporting - Worldwide    877-702-9580

---

Page 87

**HIGHLY CONFIDENTIAL - Washtell**
1  **million, would that sound about right?**
2  MR. THOMAS:  Objection to form.
3  A.  Sounds a little high.
4  (Exhibit 819, a document bearing Bates
5  Nos. BCI-EX-(S)-218502 through 218503,
6  marked for identification, as of this date.)
7  (Document review.)
8  A.  Okay.
9  **Q.  Mr. Washtell, have you had an**
10  **opportunity to read over Deposition Exhibit 819?**
11  A.  Yes.
12  **Q.  And you see that it is an e-mail from**
13  **your boss, Marcus Morton, dated December 12 to**
14  **PwC related to the valuation of the equity**
15  **portfolio; is that correct?**
16  A.  It looks to be an e-mail from Marcus
17  Morton to John Holloway tied to the Lehman
18  equity portfolio.
19  **Q.  And do you see where Mr. Morton**
20  **writes, "The legal deal closed on 9/19"?**
21  A.  Yes.
22  **Q.  Do you see where he then says, "The**
23  **first Lehman equity portfolio was received by**
24  **Barclays on September 22, to settle same day"?**

TSG Reporting - Worldwide    877-702-9580

---

Page 88

**HIGHLY CONFIDENTIAL - Washtell**
1  A.  Yes, I see that.
2  **Q.  Do you have any reason to believe that**
3  **the equity positions in the Lehman/Barclays repo**
4  **were not delivered prior to September 22?**
5  MR. THOMAS:  Objection to form.
6  A.  I have no knowledge of the delivery
7  specifics.
8  **Q.  So you have no knowledge whether they**
9  **were delivered on September 18 as opposed to**
10  **September 22?**
11  MR. THOMAS:  Objection to form.
12  A.  I have no knowledge of the specific
13  delivery date.
14  **Q.  Do you see, if you turn to the second**
15  **page, the paragraph starting "combining these**
16  **together would reach an adjustment of at least**
17  **$667 million at the least conservative**
18  **assumption, or $799 million, using the full bid**
19  **to offer.  This compares with our original**
20  **estimate of $808 million"?**
21  A.  I see that, yes.
22  **Q.  Do you know what that refers to?**
23  MR. THOMAS:  Objection to form.  Lack
24  of foundation.

TSG Reporting - Worldwide    877-702-9580

---

Page 89

HIGHLY CONFIDENTIAL - Washtell
1  A.  I don't recall what this refers to.  I
2  wasn't on the e-mail, so I don't recall.
3  (Exhibit 820, a document bearing Bates
4  Nos. PwC-BarCapWP_00021953 through 22931,
5  marked for identification, as of this date.)
6  **Q.  Mr. Washtell, you have before you what**
7  **has been marked Deposition Exhibit 820?**
8  A.  Okay.
9  **Q.  Do you see that?**
10  A.  I do see it, yes.
11  **Q.  It's a big document, and it is titled**
12  **"[BoNY] PV of equity financial assets (UK)."  Do**
13  **you see that?**
14  A.  I see that, yes.
15  **Q.  And do you see under "Tailored**
16  **Procedures" it says, "The PwC Barclays team in**
17  **the UK has been instructed to price test the**
18  **equity securities that were purchased from**
19  **Lehman as they have been engaged in the past to**
20  **price test the legacy Barclays equity**
21  **securities"?**
22  A.  I see that, yes.
23  **Q.  And do you see that this is a document**
24  **that has been produced by PwC based off of a tag**

TSG Reporting - Worldwide    877-702-9580

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **at the bottom?**
3         MR. THOMAS:  Objection to form.
4    **Q.   I will just for the record say it's**
5    **been produced by PwC, and the starting Bates**
6    **number is PwC-BarCapWP_00021953.**
7         **If I could have you turn to the page**
8    **that is Bates-stamped 0021960.  Actually, if you**
9    **could start two pages before that at the page**
10   **ending 958, and --**
11        A.    And 960?  Do you want me to read also?
12   **Q.   Just if you could look over those**
13   **three pages.**
14        **(Document review.)**
15        A.    Okay.
16   **Q.   Do you see on the page ending 958,**
17   **number 1, which is written in an e-mail dated**
18   **January 7, 2009, and says, "Prices for equities**
19   **are to be revised from those of 9/19 to 9/22"?**
20        A.    Yes, I see that.
21   **Q.   And then do you see on the page of the**
22   **document ending 960, a chart that bottom line**
23   **says, "Net Increase/(Decrease)" which totals a**
24   **decrease of $685,736,298?**
25        A.    Yes, I see that.

TSG Reporting - Worldwide    877-702-9580

1    HIGHLY CONFIDENTIAL - Washtell
2    **Q.   Could you explain to me what this**
3    **chart is totaling?**
4         MR. THOMAS:  Objection.  Form.
5    Foundation.
6         A.    From looking at this, this looks like
7    an analysis of the valuation of the equity
8    portfolio at various points in time explaining
9    the movement from 9/19 to 9/22.
10   **Q.   And how much of a movement was there**
11   **from 9/19 to 9/22 based off of this analysis?**
12        MR. THOMAS:  Objection to form.
13   Foundation.
14        A.    I see 274,242,335 plus 29,318,981,
15   makes about 314.
16   **Q.   So a total of --**
17        A.    Just reading from this report.
18   **Q.   Approximately 314 million would be a**
19   **move from using 9/19 mid prices to the use of a**
20   **9/22 mid price at close of business for both**
21   **days; is that correct?**
22        MR. THOMAS:  Objection to form.  Lack
23   of foundation.
24        A.    This report seems to be saying that
25   market value changed equities 09/19 to 09/22,

TSG Reporting - Worldwide    877-702-9580

1         HIGHLY CONFIDENTIAL - Washtell
2    which I believe would be based on the last price
3    because you have a bid/offer calculation below.
4    That shows that that market value change for
5    equities was 274 million, and that same market
6    value change for converts was 29 million.
7    **Q.   And where does the remainder of the**
8    **decrease of approximately 685 million come from**
9    **in addition to moving the valuation date from**
10   **September 19 to September 22?**
11        MR. THOMAS:  Objection to form.
12   Foundation.
13        A.    I'm not sure because I can't see
14   numbers that cast to 685 on this schedule.
15   **Q.   Looking again at the line titled "Net**
16   **Increase/(Decrease)"?**
17        A.    Uh-huh.
18   **Q.   Does that not --**
19        A.    That seems to be comparing, what, 7993
20   to 7611, but it's not quite doing that, is it?
21        No, it's comparing 7611 with 8297, I
22   guess.
23   **Q.   Is it --**
24        A.    It would appear to add in the 382
25   under the "Bid/Offer Equities" line.

TSG Reporting - Worldwide    877-702-9580

1         HIGHLY CONFIDENTIAL - Washtell
2    **Q.   And what change is being made to the**
3    **"Bid/Offer" line as a consequence of a change in**
4    **valuation date from 9/19 close of business to**
5    **9/22 close of business?**
6         MR. THOMAS:  Objection to form.
7    Foundation.
8         A.    I don't believe there is a change.
9    That's just stating that that's the bid/offer
10   for the equities as calculated, I'm assuming,
11   for 9/22.
12   **Q.   So the change in valuation date has no**
13   **impact on the bid/offer adjustment that's being**
14   **taken; is that correct?**
15        MR. THOMAS:  Objection to form.  Vague
16   and foundation.
17        A.    When you say "change in valuation
18   date," I don't recall assessing a bid/offer
19   adjustment for 9/19.
20   **Q.   Okay.**
21        A.    I recall assessing the appropriate
22   fair value of a bid/offer adjustment for 9/22.
23   If you were to do that for 9/19, I don't know
24   how different it would be.
25   **Q.   Would you expect that --**

TSG Reporting - Worldwide    877-702-9580

Page 94

1    **HIGHLY CONFIDENTIAL - Washtell**
2      A.   If it would be different materially at
3    all, I don't know.
4      **Q.   You don't know whether it would or**
5    **would not be different if you were to calculate**
6    **the bid/offer as of September 19 as opposed to**
7    **as of September 22 close of business; is that**
8    **correct?**
9      A.   It's not something that we looked at
10   or considered, so I don't know.
11     **Q.   Would you expect it to be different if**
12   **different dates were being used to calculate the**
13   **bid/offer adjustment?**
14     A.   Potentially, but a lot of factors
15   would go into determining that.
16     **Q.   Could you identify what factors would**
17   **go into identifying if the date would play a**
18   **role in affecting the bid/offer adjustment to be**
19   **taken?**
20     A.   Well, given the position is the same,
21   and that's going to be the largest driver of the
22   bid/offer is the position on the book, and the
23   only change would be how you interpret or
24   calculate a bid/offer spread.
25     If you were to use a query data for
     TSG Reporting - Worldwide    877-702-9580

Page 95

1    HIGHLY CONFIDENTIAL - Washtell
2    9/19, could that lead you to slightly different
3    spread calculations than you observed on 9/22?
4    Potentially.
5      **Q.   Do you know if the market -- based on**
6    **of the decrease in value from September 19 close**
7    **to September 22 close, is it your understanding**
8    **that the market was up on September 19?**
9        MR. THOMAS:  Objection.  Form.
10     A.   I don't know where the market is on
11   September 19 and I don't know you can infer
12   anything from this to suggest what the market
13   did on September 19.
14     **Q.   You don't understand that the midpoint**
15   **values calculated by your group for September 19**
16   **is approximately 300 -- I think you had added**
17   **this as 314, but I think it might be actually**
18   **304 million, if you would take a look again at**
19   **the --**
20     A.   You're correct.  My arithmetic is out
21   slightly.
22     **Q.   I can't take all the credit, but...**
23       **Wouldn't this chart suggest that the**
24   **midpoint valuations that your group had**
25   **calculated for the equity portfolio as of close**
     TSG Reporting - Worldwide    877-702-9580

Page 96

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **of business 9/19 is approximately $304 million**
3    **higher than it was at close of business**
4    **September 22?**
5        MR. THOMAS:  Objection.  Form.
6      A.   This suggests, based on the closing
7    last price information that we had available,
8    that the movement in the value of the positions
9    between 9/19 and 9/22 was $304 million.
10     **Q.   And so based off of a move of $304**
11   **million, would you not say that the market for**
12   **those positions you were valuing was up on**
13   **September 19 as opposed to where it was by the**
14   **close of business on September 22?**
15       MR. THOMAS:  Objection to form.
16   That's a different question.
17     A.   I still think this number has no
18   bearing on whether the market was up or down on
19   September 19.  It says nothing about where the
20   market was on that day.
21     **Q.   For those positions?**
22     A.   Other than relative to 9/22.  It
23   doesn't tell you when the market is up or down
24   on September 19, and that is how I understand
25   your question.  And your initial question was
     TSG Reporting - Worldwide    877-702-9580

Page 97

1    HIGHLY CONFIDENTIAL - Washtell
2    does this suggest the market is up on 9/19.
3        MR. THOMAS:  And this is irrelevant to
4    that?
5        THE WITNESS:  Yes, and that's my
6    point.
7      **Q.   I'm asking simply the price for these**
8    **positions based on the mid value -- the midpoint**
9    **values that your group came up with for 9/19**
10   **indicates that the price was better for those**
11   **positions on 9/19 than they were by close of**
12   **business September 22?**
13       MR. THOMAS:  That's not the question
14   you asked.  That's a different question.
15     A.   Define "better."  I mean --
16     **Q.   $304 million better, higher on Friday,**
17   **September 19; is that correct?**
18       MR. THOMAS:  Objection to form.
19     A.   What this suggests to me, I'll
20   paraphrase into my words maybe to clarify, is
21   the valuation based on closing last prices on
22   9/19 was higher than the closing valuation based
23   on closing last prices on 9/22 by $304 million.
24   Does that answer what ...
25     **Q.   Were you one of the principal or the**
     TSG Reporting - Worldwide    877-702-9580

**HIGHLY CONFIDENTIAL - Washtell**

1    **principal liaison with PwC with respect to the**
2    **equity portfolio acquired by Barclays from**
3    **Lehman?**
4        A.    In terms of discussing the detailed
5    analysis that they did, yes.  The people they
6    had -- Polly I think was the principal contact,
7    Polly Ng, listed in the front of this document,
8    and I was principally engaged with her, helping
9    them in their assessment of the work we did in
10   relation to the equity portfolio.
11       **Q.    Do you have any reason to believe that**
12   **this chart that we were looking at on page**
13   **Bates-stamped 1 -- sorry, Bates-stamped ending**
14   **960 does not accurately reflect the data that**
15   **you had provided to PwC?**
16       MR. THOMAS:  Objection to form.
17       A.    If this is an official work document
18   from PwC, I have no reason to suggest it's
19   incorrect in any way, but I have not seen this
20   document before, so -- as in this PwC work
21   paper.
22       **Q.    And if you turn to the page ending 57,**
23   **which is starting at the page before that at 56,**
24   **that's where the e-mail starts, there is an**

**HIGHLY CONFIDENTIAL - Washtell**

1    **e-mail from Polly Ng dated January 8, 2009 to**
2    **other individuals at PwC.  Do you see that?**
3        A.    Halfway down page 56, that one?
4        **Q.    Yes.**
5        A.    Yes.
6        **Q.    Do you want to take a moment and read**
7    **that e-mail?**
8        A.    Sure.
9           (Document review.)
10       A.    Okay.
11       **Q.    Do you see the first line where it**
12   **says, "Lynsey refers your request re Lehman**
13   **equities valuation to me and I have briefly**
14   **discussed with Mark"?**
15       A.    Yes.
16       **Q.    Do you expect that that reference to**
17   **"Mark" is you?**
18       MR. THOMAS:  Object to form.
19       A.    It's reasonable.  I mean, I can't say
20   for certain, but it's an assumption, reasonable
21   assumption.
22       **Q.    And underneath it says, "Basically, as**
23   **you mentioned, the valuation date of these**
24   **Lehman equities had moved from 19th to 22nd**

**HIGHLY CONFIDENTIAL - Washtell**

1    **September.  There are around $700 million fall**
2    **in the value when comparing with 19th September**
3    **due to two reasons:  1) MtM goes down for around**
4    **$300 million and 2) bid/offer reserve of $400**
5    **million."**
6        **Do you see that?**
7        A.    Yes, I see that.
8        **Q.    Does that comport with your**
9    **understanding of the movement when using a**
10   **September 19 close of business day price as**
11   **opposed to a September 22 close of business day**
12   **price?**
13       MR. THOMAS:  Objection to form.
14       A.    No, I think it's -- it's a confused
15   point.  I think it's saying there's a movement
16   from September 19 to 22, and then there's the
17   application of a bid/offer reserve.  I think
18   it's confusing those two points.
19       **Q.    But you have no reason to believe that**
20   **the numbers are inaccurate, that the mark to**
21   **market goes down for around $300 million when**
22   **using the 9/19 close of day prices as opposed to**
23   **the 9/22 close of day prices; is that correct?**
24       MR. THOMAS:  Objection to form.

HIGHLY CONFIDENTIAL - Washtell

1        A.    I think the inverse of what you said,
2    but I have no reason to believe this $304
3    million number that's referenced here is
4    incorrect.
5        Q.    And when your group sought midpoint
6    prices for September 19, what sources were used?
7        A.    From my recollection, sources used to
8    obtain closing or last price information for
9    9/19 would have been the same as those used for
10   9/22.
11       Q.    And do you recall what those sources
12   were?
13       A.    I believe our principal source would
14   be Reuters.  The reason for that is it's the
15   principal source of equity pricing information
16   within Barclays Capital.  In addition, we may
17   have used Bloomberg, for instance, we may have
18   used that, or other sources that were available
19   to us.  I don't recall specifically, but I
20   expect the majority were Reuters.
21       Q.    And do you know what Asset Control is?
22       A.    So Asset Control is an internal market
23   data warehouse within Barclays Capital which
24   stores information that's obtained by the firm

Page 102

1    HIGHLY CONFIDENTIAL - Washtell
2  through data feeds from, for example, Reuters,
3  Bloomberg, and other data providers.  It's just
4  a data warehouse that you can query for any
5  particular security, a price from a number of
6  sources.
7    **Q.   So would Asset Control be the first**
8  **place that you would look to obtain observable**
9  **market data that would feed into Asset Control?**
10     MR. THOMAS:  Objection to form.
11     A.   You can go to Asset Control to query
12  Reuters data and go to Asset Control to query
13  Bloomberg data or you can go to the systems
14  directly.  I think we've done a mixture of both
15  of those things.
16     **Q.   And were any other pricing sources**
17  **obtained other than Reuters, Bloomberg, data**
18  **either from them directly or through Asset**
19  **Control?**
20     A.   I don't recall specifically other
21  sources that we used.  There may have been.  I
22  know the majority of what we used would have
23  been Reuters data, as I said.
24     **Q.   And do you recall the percentage of**
25  **the cash equities that you were able to obtain**
        TSG Reporting - Worldwide    877-702-9580

Page 103

1    **HIGHLY CONFIDENTIAL - Washtell**
2  **third party marks for by turning to Reuters,**
3  **Bloomberg, and any other available external**
4  **sources?**
5     A.   I don't recall the percentage, no.
6     **Q.   Could you turn to the page ending 961.**
7     A.   Yes.
8     **Q.   I believe this is part of --**
9     A.   Can I read it?
10     **Q.   Yes.**
11       (Document review.)
12     A.   Okay.
13     **Q.   If you turn to the last paragraph**
14  **where it starts, "Mark noted that where prices**
15  **were not available on September 22, either the**
16  **prices on September 19 were used or the closest**
17  **price on Bloomberg was obtained"?**
18     A.   Yes.
19     **Q.   Do you know whether prices were**
20  **obtained for any points in time after September**
21  **22?**
22     A.   I know we reviewed price information
23  after that date, yes.  To the extent it was used
24  in the valuation, I'm not sure.
25     **Q.   So the fact that this sentence says**
        TSG Reporting - Worldwide    877-702-9580

Page 104

1    **HIGHLY CONFIDENTIAL - Washtell**
2  **"used" doesn't necessarily mean that prices**
3  **after September 22 were used in the valuation of**
4  **the equity portfolio?**
5     MR. THOMAS:  Objection to form.
6     A.   This doesn't state that a price after
7  September 22 was used.  This states the closest
8  price available to September 22 was used.  I
9  read that as before or after.  I don't read that
10  as after.
11     **Q.   But it could include prices after**
12  **September 22 --**
13     MR. THOMAS:  Objection to form.
14     **Q.   -- that were used?**
15     A.   From reading this, yes, it certainly
16  reads like that.  As I said before, I don't
17  recall the specific proportion or the specific
18  dates that we used positions that were valued
19  this way.  I would assume it was quite a small
20  proportion.
21     I would also say this is quite
22  standard practice for us.  If we cannot obtain a
23  price on a specific day, we would always look
24  for the nearest observation that we can find.
25  If you have illiquid products, in a general
        TSG Reporting - Worldwide    877-702-9580

Page 105

1    HIGHLY CONFIDENTIAL - Washtell
2  sense, you may be in a situation that you don't
3  observe a valid price on a given day.  If you
4  see a price the next day, that is the most
5  reasonable indication of value.
6     **Q.   And again, the concept of fair value?**
7     A.   Yes.
8     **Q.   A willing buyer and seller on**
9  **September 22 would have available to them only**
10  **what information is available as of September**
11  **22; is that correct?**
12     MR. THOMAS:  Objection.
13     A.   The market participant on September 22
14  would only have information available that is
15  available to them?  I think that's what you
16  said, which is just a statement, fact.
17     **Q.   It's a fact that on September 22,**
18  **parties transacting would not have access to**
19  **subsequent data points for that same security;**
20  **is that correct?**
21     MR. THOMAS:  Objection to form.
22     A.   At this point in time, I have no
23  knowledge of anything that's going to happen in
24  the future, I believe is what you're saying.
25     Do you want me to agree to that?
        TSG Reporting - Worldwide    877-702-9580

Page 106

HIGHLY CONFIDENTIAL - Washtell

1  Then, yes, I agree.  I have got no knowledge of
2  what's going to happen in the market tomorrow or
3  next week or next year.
4      **Q.   And when you say "you," you mean as a**
5  **buyer or a seller, you would not have access to**
6  **information that's beyond the trade date?**
7      MR. THOMAS:  Objection to form.
8      **Q.   You have to verbalize a response.**
9      A.   As an individual, in a general sense,
10  as a market participant, as anybody, I don't
11  know what's going to happen in the future.
12      MR. THOMAS:  When you get to a good
13  point, probably should take our lunch break.
14      MS. CARRERO:  Why don't we take our
15  lunch break now.  Thanks.
16      (Luncheon Recess; Time Noted:  1:05
17  P.M.)
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 107

HIGHLY CONFIDENTIAL - Washtell

1      AFTERNOON SESSION
2      (Time Noted:  1:59 P.M.)
3  MARK WASHTELL, resumed and
4      testified further as follows:
5  EXAMINATION BY (Cont'd.)
6  MS. CARRERO:
7      **Q.   Mr. Washtell, I'm handing you what has**
8  **been marked as Deposition Exhibit 821.**
9      **(Exhibit 821, a document bearing Bates**
10  **Nos. BCI-EX-(S)-176696, marked for**
11  **identification, as of this date.)**
12      **Q.   Do you see that this is an e-mail from**
13  **Mr. Teague to you dated September 22, 2008**
14  **"Subject:  FYI on LBI"?**
15      A.   Yes, that's what this appears to be.
16      **Q.   Do you see Mr. Teague wrote to you,**
17  **"Mark, I asked Tom McCosker to include me when**
18  **he sends out that update of the 'LEHM' Position**
19  **2008-09-19 file which will show the desk**
20  **allocations"?**
21      A.   Yes, I see it.
22      **Q.   Who is Tom McCosker?**
23      A.   He was part of the Product Control
24  team in New York at this time, I believe.
25

TSG Reporting - Worldwide    877-702-9580

Page 108

HIGHLY CONFIDENTIAL - Washtell

1      **Q.   And what was his role within the**
2  **Product Control team in New York?**
3      A.   I know he was a director.  I'm not
4  sure exactly what his role was.
5      **Q.   Do you know what his role was in**
6  **connection with the Lehman transaction?**
7      A.   No.
8      **Q.   And do you know what Mr. Teague is**
9  **referring to when he says "a file which will**
10  **show the desk allocations"?**
11      MR. THOMAS:  Objection to form.
12      A.   No, I don't know specifically what
13  that refers to.  I don't recall.
14      **Q.   Is it your understanding that the**
15  **positions, once transferred from Lehman to**
16  **Barclays, were allocated to various trading**
17  **desks at Barclays?**
18      A.   It's my understanding they would have
19  been allocated to certain desks, yes.
20      **Q.   And is that what this file is**
21  **referring to, the desk allocations for the**
22  **securities that were being transferred?**
23      MR. THOMAS:  Objection to form.
24      A.   I don't know specifically.

TSG Reporting - Worldwide    877-702-9580

Page 109

HIGHLY CONFIDENTIAL - Washtell

1      **Q.   Do you recall seeing such a list at**
2  **any point showing to which desks the assets that**
3  **had been transferred by Lehman to Barclays were**
4  **being distributed to?**
5      A.   I don't recall that, no.
6      **Q.   Were any of the equity positions that**
7  **you and your team were responsible for valuing**
8  **part of the PMTG business?**
9      A.   Can you clarify what you mean?  Sorry.
10  In relation to what?
11      **Q.   We have seen numerous spreadsheets**
12  **that divide up the assets that were transferred**
13  **by asset class, and some of them are referenced**
14  **as equities, and there's another asset category**
15  **known as PMTG and another one as PMTG II.**
16      A.   Okay.
17      **Q.   And my question to you is whether any**
18  **of the assets that you and your team had**
19  **responsibility for valuing, whether any of those**
20  **would fall under the PMTG, PMTG II tabs in terms**
21  **of the collection of data?**
22      A.   I'm not aware of any, but I don't
23  know.
24      When you say "tabs of data," it would

TSG Reporting - Worldwide    877-702-9580

Page 110

1      HIGHLY CONFIDENTIAL - Washtell
2  depend which files we're looking at.
3      Q.  Mr. Washtell, I'm handing you what has
4  been previously marked as Deposition Exhibit
5  641A.  We've flagged some pages to make it
6  easier for you to turn to.  I have also flagged
7  counsel's copy.
8      MR. THOMAS:  That's so thoughtful.
9      Q.  Mr. Washtell, you can turn to the --
10  why don't we start at the first page.  Do you
11  see that the first page is an e-mail from Mr.
12  Teague to Tal Litvin dated February 12, 2009,
13  "Subject:  Acquisition balance sheet"?
14      A.  Yes.
15      Q.  And do you see where it says, "The
16  Lehman opening balance sheet is broken out into
17  four distinct portfolios.  The Lehman portfolio
18  1 asset settled on 9/22.  While the JPM
19  Portfolio 3 assets legal settlement date was
20  12/22.  The following winzip contains List A and
21  List B assets valued as of year-end that are
22  expected to settle shortly.  Here is the
23  valuation methodology"?
24      A.  Yes, I see that.
25      Q.  Behind the e-mail are Excel

TSG Reporting - Worldwide    877-702-9580

Page 111

1      HIGHLY CONFIDENTIAL - Washtell
2  spreadsheets that were produced to us in a
3  native version, and we have attempted to print
4  them out and for purposes of questioning, but
5  since they are lengthy, if you could turn to the
6  first flagged page within, and this is a tab of
7  an Excel workbook that was Bates-stamped
8  BCI-EX-(S)-00213995, and the summary tab, if you
9  just take a look at the summary tab.
10      A.  Okay.
11      (Document review.)
12      Q.  Do you understand this summary to
13  reflect the valuations undertaken by IVC in
14  connection with putting together the opening
15  balance sheet to reflect the Lehman transaction?
16      MR. THOMAS:  Objection to form.  Lack
17  of foundation.
18      A.  I don't recall this specific schedule.
19  There's clearly a line on here for equities.
20  There's clearly a PCG value, market value 9/22.
21      Q.  So you and your team didn't put
22  together the equities portion, at least, of this
23  spreadsheet?
24      A.  I believe we may --
25      MR. THOMAS:  Objection to form.

TSG Reporting - Worldwide    877-702-9580

Page 112

1      HIGHLY CONFIDENTIAL - Washtell
2      A.  I believe we may have done, but I
3  didn't put together this file.  This appears to
4  be a summary file of all positions.
5      Q.  Do you know if the positions that your
6  team was responsible for valuing would fall both
7  in the row titled "Equities" as well as perhaps
8  some in "PMTG," "PMTG II"?
9      MR. THOMAS:  Objection.  Lack of
10  foundation.
11      A.  I would interpret this as being the
12  positions my team looked at were purely in the
13  line "Equities."
14      Q.  And if you could turn to the next flag
15  within the document, which should be another
16  Excel tab within BCI-EX-(S)-00213995 titled
17  "EQ2(2)."  Take a moment to review and then let
18  me know when you have finished.
19      (Document review.)
20      A.  Okay.
21      Q.  Have you seen this document before?
22      A.  I have seen a schedule like this
23  before.
24      MR. THOMAS:  Do you mean this one page
25  as opposed to the whole exhibit?

TSG Reporting - Worldwide    877-702-9580

Page 113

1      HIGHLY CONFIDENTIAL - Washtell
2      MS. CARRERO:  I do mean this tab of
3  the Excel workbook relating to the EQ2(2).
4      Q.  Can you tell me what the "PCG Value
5  September 9" column totaling $10,016,000,000
6  reflects?
7      MR. THOMAS:  Objection to form.
8      A.  I believe that reflects the valuation
9  of these positions based on closing price data
10  that would have been obtained by my team for
11  September 19.
12      Q.  And can you tell me what the "PCG
13  Value September 22" column totaling
14  $9,725,000,000 reflects?
15      MR. THOMAS:  Objection to form.
16      A.  Is that the column next to it?
17  Because I can't see anything on this.
18      MS. CARRERO:  We can go off the record
19  for a second.
20      (Pause in the proceedings.)
21  BY MS. CARRERO:
22      Q.  Looking at the column labeled "PCG
23  Value September 22," can you tell me what that
24  column totaling $9,725,000,000 reflects?
25      MR. THOMAS:  Objection to form.

TSG Reporting - Worldwide    877-702-9580

Page 114

HIGHLY CONFIDENTIAL - Washtell

1
2      A.   I don't see 9,725,000,000.  Sorry.
3      Q.   In the column next to "PCG Value
4    September 19," next to the total of
5    10,016,000,000, what number --
6      A.   9712.
7      Q.   What does that number reflect?
8          MR. THOMAS:  Objection to form.
9      A.   I believe that number would reflect
10   the comparable value as of September 22, that
11   is, using closing price from September 22.
12     Q.   And what does the column titled "PCG
13   B/O of September 22" totaling $382 million
14   reflect?
15     A.   That would appear to reflect the
16   bid/offer that was applied to the equity
17   portfolio as of 9/22.
18     Q.   And what does "bid/offer" mean?
19     A.   In a general sense?  Bid/offer spread.
20     Q.   In the sense of how it is used here.
21         MR. THOMAS:  Objection to form.
22     A.   "Bid/offer," as it is used here,
23   represents an adjustment to get us to the
24   appropriate fair market value, which in the case
25   of a long equity portfolio is the bid value.

TSG Reporting - Worldwide    877-702-9580

Page 115

HIGHLY CONFIDENTIAL - Washtell

1
2    That's quite clearly as defined in the
3    accounting standards.
4      Q.   How is that bid/offer adjustment
5    calculated to arrive at the $382 million figure?
6          MR. THOMAS:  Objection to form.
7    Foundation.
8      A.   Would you like a detailed explanation?
9    It's -- it's a detailed calculation.
10     Q.   Before we get there, I just want to
11   ask, it was your group that calculated the
12   bid/offer adjustment that totaled $382 million,
13   correct?
14     A.   That's correct.
15     Q.   Now, if you could go on and tell me
16   how that bid/offer adjustment was calculated to
17   arrive at $382 million?
18         MR. THOMAS:  Objection to form.
19     A.   Due to the lack of available data, we
20   calculated a portfolio level bid/offer spread to
21   apply to the entire portfolio.  Ideally, if you
22   had position level data available for all
23   positions, you would do this calculation on a
24   position level, but given we were looking at
25   this after the fact, some time after the fact,

TSG Reporting - Worldwide    877-702-9580

Page 116

HIGHLY CONFIDENTIAL - Washtell

1
2    we did not have that data available.
3          The first step was to attempt to query
4    bid/offer spread information for the portfolio
5    as of 9/22.  In doing that, using Reuters, which
6    is our principal data source which we use within
7    Barclays, we had coverage of something like 450
8    to 500 names of a portfolio here which is
9    something like 3500 names.
10         The thing to know about that sample
11   and why that sample is not representative of the
12   portfolio and why you would not just, for
13   instance, take an average of that sample, is
14   that that spread information would have been
15   available for the more liquid names within the
16   portfolio.
17         What that means is that spread
18   information would have been much lower for those
19   names than for the names that we could not
20   observe at that time, so any average based on
21   that level would be substantially lower than the
22   true bid/offer that was applicable to the
23   portfolio as of that date.
24         Now, to adjust for that, we at some
25   point in December have looked at a live market

TSG Reporting - Worldwide    877-702-9580

Page 117

HIGHLY CONFIDENTIAL - Washtell

1
2    bid/offer data where we have a much better
3    coverage, and I think in that sample we were
4    able to get something like 2,000, 2100 names,
5    something like that, I don't know the exact
6    number, but it covered a much larger proportion
7    of the population.  So from a market value
8    perspective, it covered something like 80
9    percent of the outstanding market value of the
10   portfolio.
11         That is a much better average because
12   it covers much more of the portfolio, but then
13   you have the issue that you're looking at an
14   average of market data from December as opposed
15   to September.  So we've gone through a process
16   to calculate, effectively, a rebasing or a
17   benchmarking or a basis-type adjustment to
18   understand how the markets moved between
19   September 22 and I believe December 22 when we
20   queried the larger population of data.
21         On that basis, we come up with a ratio
22   to reflect how the market generally has become
23   more or less liquid, and in this case, it
24   reflected the fact that spreads had become
25   narrower in December as opposed to September.

TSG Reporting - Worldwide    877-702-9580

Page 118

1          HIGHLY CONFIDENTIAL - Washtell
2     I think the factor we looked at was a
3     little over 2, something like 2.2, that is to
4     say the spreads that we observed for a specific
5     position in September, where we had data also
6     observable for those positions in December, the
7     spreads we observed in September were larger by
8     a factor of, on average, about 2.2.
9          So we used that factor to then take
10    our December average and estimate a rescale, a
11    rebenchmarked, rebased average to apply to the
12    portfolio in September. Having done that, we
13    have arrived at the appropriate bid/offer spread
14    to apply to the portfolio in September.
15         **Q.   And when did this methodology come**
16    **about?  Was it in December at the time that you**
17    **queried for the December live sample?**
18         MR. THOMAS: Objection to form.
19         A.   We were doing work on this before
20    then, but it was very much an iterative process.
21    So, as I said, as a first step, we looked to get
22    as much information as we could from September
23    and what average did that imply for us, and that
24    was a first cut at the number.
25         **Q.   And what --**
      TSG Reporting - Worldwide    877-702-9580

Page 119

1          **HIGHLY CONFIDENTIAL - Washtell**
2          A.   It soon became apparent that, well,
3     no, if we think about this, this isn't the most
4     appropriate number because look at the stocks
5     that are in our sample. It's the S&P 500 names
6     or whatever that have been extremely liquid that
7     have much tighter spreads. The sample where we
8     don't have data is clearly the less liquid
9     stuff, and if you go and look at live market
10    spreads now, yes, there are much wider spreads.
11    So it was an evolving process.
12         **Q.   And between the acquisition date in**
13    **September and December when you changed your**
14    **bid/offer methodology, what were you seeing as**
15    **the number to be taken as a bid/offer**
16    **adjustment?**
17         MR. THOMAS: Objection to form.
18         A.   I'm not sure what you mean by the
19    question in terms of what changed. I'm not --
20         **Q.   I'm asking the percentage bid/offer**
21    **adjustment, how did it compare to the one**
22    **ultimately employed using the December live**
23    **sample that was not generated until December or**
24    **later when that data was obtained?**
25         MR. THOMAS: Objection.
      TSG Reporting - Worldwide    877-702-9580

Page 120

1          HIGHLY CONFIDENTIAL - Washtell
2          A.   How did what compare to that? Sorry.
3          **Q.   How did whatever methodology you were**
4     **using to calculate the bid/offer adjustment**
5     **prior to December differ from that which was**
6     **ultimately used employing December data?**
7          MR. THOMAS: Objection to form.
8          A.   I don't recall at any point that we
9     were using a different methodology. We did not
10    calculate the bid/offer adjustment as of -- as
11    of on the 22nd of September, we did not go and
12    calculate a bid/offer adjustment and then at a
13    later date revise that. That's not the way this
14    happened.
15         **Q.   But you're not telling me you waited**
16    **until December to calculate a bid/offer**
17    **adjustment, right?**
18         A.   I'm saying the valuation, the opening
19    balance sheet valuation, the work to come up
20    with a fair value that was appropriate was
21    undertaken over a period of time. That period
22    of time was a few months.
23         **Q.   But the data that was ultimately used**
24    **is data that was obtained months after the**
25    **acquisition; is that correct?**
      TSG Reporting - Worldwide    877-702-9580

Page 121

1          **HIGHLY CONFIDENTIAL - Washtell**
2          MR. THOMAS: Objection to form.
3          A.   To take into account the liquidity,
4     the relative availability of data, the
5     composition of the portfolio, we used all data
6     available to us. That included referencing data
7     where we could from September. It also included
8     referencing data from December to come up with,
9     as I've said, an effective benchmark or basis
10    adjustment between those two dates.
11         We could not query live data for
12    September 22 because it was after the fact that
13    we were trying to do this.
14         **Q.   But the only available live data is**
15    **data almost three months after the acquisition?**
16         MR. THOMAS: Objection to form.
17         A.   No, I'm saying there was a lot going
18    on at this particular point in time, and
19    clearly, you know, the sole responsibility of
20    our group and what we were doing in that
21    intervening period was not to calculate a
22    bid/offer adjustment.
23         **Q.   And so the calculation of a bid/offer**
24    **adjustment was not something that was undertaken**
25    **until December, at which point the only**
      TSG Reporting - Worldwide    877-702-9580

Page 122

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **available live data was December data; is that**
3    **what you're saying?**
4         MR. THOMAS:  Objection.  Form.
5      A.   I'm not sure exactly at what point we
6    first started calculating a bid/offer
7    adjustment.  The first point or the point at
8    which we clearly decided we needed to
9    rebenchmark it to get a better estimate I
10   believe was sometime in December, and I recall
11   there were a couple of different sampling dates
12   in December that we used.
13     **Q.   How long is live data available for**
14   **after the live event?**
15     A.   Well, it's not -- it's a point in
16   time.
17     **Q.   So it's available only -- it must be**
18   **collected contemporaneously with its happening?**
19     A.   What --
20         MR. THOMAS:  Objection.
21     A.   What I would consider the definition
22   of "live data" is we go to Reuters during
23   trading hours and take a live snap of current
24   bid/offer in the market.  30 seconds later, you
25   can have a slightly different bid/offer and a
     TSG Reporting - Worldwide    877-702-9580

Page 123

1      HIGHLY CONFIDENTIAL - Washtell
2    slightly different set of live data.  It's live.
3    It's ticking constantly.  That's the definition
4    of it.
5         By doing that, you ensure the data
6    that you get represents a true bid/offer that's
7    quoted in the market at a particular time.  So a
8    simultaneous bid and offer that's out there in
9    the market at one point in time rather than a
10   bid and offer that potentially, you know, are
11   being quoted at different times, which wouldn't
12   represent a true spread in the market.
13     **Q.   But how is a bid/offer in the market**
14   **three months after the Lehman acquisition more**
15   **representative of a true bid/offer than the data**
16   **that was available at the time of the actual**
17   **sale transaction?**
18         MR. THOMAS:  Objection.  Form.
19     A.   I think the distinction to make is the
20   data that was available at the time of the
21   transaction, if you could go and snap live
22   market data on September 22, you would do that
23   and that would be more representative, but
24   that's not something we were able to do because
25   we were looking at this after the fact.
     TSG Reporting - Worldwide    877-702-9580

Page 124

1      HIGHLY CONFIDENTIAL - Washtell
2         So the only information for 9/22 that
3    you could get is the closing bid-ask data, and
4    that's not available for a very wide proportion
5    of stocks.  It was only available for I think I
6    said 450 or so stocks, and that population of
7    450 stocks represents serious selection bias if
8    you're trying to use that as a sample to be an
9    indicator for the spread you should apply to
10   your population because it represents the most
11   liquid names within the sample.
12        So it would lead to a significant
13   understatement of any bid/offer spread that
14   would apply to the portfolio.  The only
15   reasonable way to get around that was to look at
16   live market data that we had available and try
17   to do some sort of rebasing between the dates.
18     **Q.   Do you have any idea how the December**
19   **snapshot of live data would compare to what a**
20   **live snapshot would have looked like in**
21   **September?**
22     A.   We have estimated based on the data
23   that we had available.  So anywhere we had, for
24   the sample of positions where we had a closing
25   spread for 9/22, we compared that spread to the
     TSG Reporting - Worldwide    877-702-9580

Page 125

1      HIGHLY CONFIDENTIAL - Washtell
2    live spread we had in December.  So we're
3    comparing like for like the same name, and we're
4    saying for this stock what was the bid/offer
5    spread in September, what was the bid/offer
6    spread in December, and on that basis we can
7    calculate ratio of how spreads on average have
8    moved between the two dates.  And that gives us
9    this ratio of this factor of something like 2.2.
10   That is to say they were narrower by that factor
11   in December than they were in September.
12     **Q.   Putting before you what has been**
13   **marked as Deposition Exhibit 824.**
14        **(Exhibit 824, a document bearing Bates**
15   **Nos. BCI-EX-00255172, with attachment,**
16   **marked for identification, as of this date.)**
17     **Q.   Have you had a chance to look it over?**
18     A.   Yes.  Quite helpfully describes what I
19   just said.
20     **Q.   So Deposition Exhibit 824, which is**
21   **Bates-stamped BCI-EX-00255172, the first page,**
22   **is an Excel spreadsheet that we have printed**
23   **out, and if you would turn to the summary page,**
24   **and look at that "Implied Provision" line**
25   **totaling $382,174,982, do you see that?**
     TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - Washtell
1
2      A.    Yes.
3      Q.    Does that tie out to the previous
4  document we were looking at, Deposition 641, the
5  bid/offer, the PCG B/O September 22 total of 382
6  million?
7      A.    Yes, it would appear to be the same
8  number.
9      Q.    And does the 8,852,000,000 number
10 listed as total asset value reflect the total of
11 tested and untested equities?
12         MR. THOMAS:  Objection to form.
13     A.    I would assume so.
14     Q.    And the use of December 18 live data
15 as opposed to any other date in December is
16 because that's the date the decision was made to
17 go out and take a snapshot of live data; is that
18 correct?
19     A.    I believe we took a snapshot on a few
20 different days in December.  They were all
21 broadly representative and similar.  So December
22 18 was the day that we chose.  I don't recall
23 exactly why that day was chosen.
24     Q.    Do you recall what other dates live
25 snapshots were taken?

HIGHLY CONFIDENTIAL - Washtell
1
2      A.    No, not specifically.
3      Q.    Were live snapshots taken at different
4  times of the day?
5      A.    I believe they would have been.
6      Q.    And who ultimately made the decision
7  as to which live snapshot to use for the
8  bid/offer calculation?
9      A.    That would have been taken by myself
10 in conjunction with other people, other members
11 of the team.
12     Q.    If you turn to the page behind that's
13 reflective of the Excel tab titled all data.
14     A.    Okay.
15     Q.    Can you explain why only approximately
16 400 CUSIPs have a reported bid-ask spread on
17 September 22 and approximately 2000 have a
18 reported bid-ask spread on December 18, or tell
19 me that that's what you have already explained?
20     A.    Okay.  That's kind of what I've
21 explained, I guess.  It's not the last data that
22 we had for 9/22.
23     Q.    And could you explain the process
24 again of how the data from December was
25 backdated to the September date?

HIGHLY CONFIDENTIAL - Washtell
1
2         MR. THOMAS:  Objection to form.
3      A.    For the population of positions where
4  we had spread data available on both observation
5  dates, we calculated a ratio for a relative
6  change I believe as it's defined on the
7  spreadsheet.  We then looked at the average of
8  those changes across that sample of 400 or so
9  names where data was available for both, and we
10 have used that as an indication of how market
11 bid/offer spreads have changed between those two
12 dates.
13     Q.    And has this methodology of backdating
14 a bid/offer adjustment ever been employed by
15 Barclays before?
16         MR. THOMAS:  Objection to the form.
17 Misstates the testimony.
18     A.    We apply bid/offer provisions to the
19 portfolio.  We applied similar techniques of
20 averaging to calculate spreads that are
21 applicable for those bid/offer adjustments, and
22 we do that as part of our ongoing function in
23 our role.
24     Q.    Does the provisioning policy that was
25 in place at the time specifically provide for

HIGHLY CONFIDENTIAL - Washtell
1
2  calculating bid/offer adjustments based on
3  future data and then backdating it to a date
4  prior?
5         MR. THOMAS:  Objection.  Form.
6  Mischaracterizes the testimony.
7      A.    I don't believe, to answer your
8  question, the bid/offer -- sorry, the
9  provisioning policy mentions anything in
10 relation to backdating.
11         What we did in this example is the
12 most reasonable thing to do to achieve an
13 appropriate estimate of the bid/offer provision
14 on the portfolio as of that point in time.
15         Using the information we had
16 available, it would have been inappropriate to
17 rely purely on the September spread information
18 because it represented a biased sample, a
19 non-representative sample.  It would have
20 significantly understated the true bid/offer on
21 the portfolio at that time.
22         So it would have been incorrect to
23 either not calculate a bid/offer because we
24 didn't have the data or to calculate based on a
25 sample of data which is not representative of

Page 130

HIGHLY CONFIDENTIAL - Washtell
1    the population. We needed to make reasonable
2    judgments to get to an appropriate bid/offer
3    spread based on available data we had at the
4    time that we were doing this, and that's what we
5    did.
6        And we believe that gets us to the
7    best estimate, the most reasonable estimate of
8    the appropriate fair value.
9    **Q.   Why did it take three months from the**
10   **sale transaction to determine that what had**
11   **previously been pulled was inadequate?**
12       MR. THOMAS: Objection to form.
13   A.   As I said before, we didn't spend
14   three months looking at the bid/offer
15   calculation. We did not -- or, I did not start
16   actively calculating an opening balance sheet
17   value as of 9/22 and then spend three months.
18   There was a lot of other stuff happening at this
19   point in time.
20       So it's not a case of, you know, we
21   spent three months and it took us three months
22   to determine that this was the appropriate
23   course of action.
24   **Q.   This bid/offer methodology totaled**

TSG Reporting - Worldwide    877-702-9580

Page 131

**HIGHLY CONFIDENTIAL - Washtell**
1    **almost $400 million, which you would agree is**
2    **not inconsequential, correct?**
3    A.   It's definitely not inconsequential.
4    **Q.   And do you recall what amount of the**
5    **previous data using the 400 or so observable**
6    **data points for September would have yielded?**
7        MR. THOMAS: Objection to form of the
8    question. Vague.
9    A.   I don't recall the exact number, no.
10   **Q.   And do you recall what the average --**
11   **let me rephrase the question.**
12       **Looking at the numbers on the summary**
13   **page again --**
14   A.   Yes.
15   **Q.   -- if you could walk me through where**
16   **it says average spread from December 18 data,**
17   **1.93 percent?**
18   A.   Yes.
19   **Q.   And what is that 1.93 percent**
20   **reflective of?**
21   A.   It's reflective of the average spread
22   from December 19 data, so the live data that we
23   created for bid-ask spreads as of December 18.
24   That's the average. It's described above how

TSG Reporting - Worldwide    877-702-9580

Page 132

HIGHLY CONFIDENTIAL - Washtell
1    it's calculated, excluding data above 50 percent
2    spread.
3    **Q.   What is the 2.3 next to average ratio**
4    **of spreads, September to December?**
5    A.   2.23?
6    **Q.   Sorry, 2.23, yes.**
7    A.   Is for the 400 observations, 400 or so
8    observations where we had data for both dates.
9    As I've described, that represents the relative
10   change or ratio on those positions between those
11   two dates.
12   **Q.   So 2.23 is the ratio that was**
13   **calculated?**
14   A.   Yes.
15   **Q.   And can you tell me what the 4.32**
16   **percent number next to "Applied Sep. Average**
17   **Spread" is?**
18   A.   I believe that's just the
19   multiplication of the previous two numbers, so
20   that represents the December spread, which
21   covers most of the population, rescaled based on
22   the ratio, to give us an approximate September
23   spread.
24   **Q.   So is the 4.32 percent number what is**

TSG Reporting - Worldwide    877-702-9580

Page 133

**HIGHLY CONFIDENTIAL - Washtell**
1    **applied in order to generate the $382 million**
2    **number?**
3    A.   That's correct.
4    **Q.   And it's applied to which universe of**
5    **equities within the equity portfolio that you**
6    **covered?**
7    A.   Everything that's not a convertible
8    bond, I believe, would have been included.
9    **Q.   So even for the 400 CUSIPs for which**
10   **you did have data as of September, the**
11   **backdating from December/September calculated**
12   **spread was applied; is that correct?**
13       MR. THOMAS: Objection to form.
14   Mischaracterizes the testimony.
15   A.   This spread was applied to all of the
16   positions, including those positions where we
17   had a spread observable from September. The
18   reason for that is that we're applying an
19   average methodology here. The reason we're
20   applying an average methodology is for a
21   significant portion of the portfolio we just did
22   not have spread information available.
23       So for, I think reading from this,
24   approximately 14 percent of the portfolio, which

TSG Reporting - Worldwide    877-702-9580

Page 134

HIGHLY CONFIDENTIAL - Washtell

1    HIGHLY CONFIDENTIAL - Washtell
2    is well in excess of a billion dollars worth of
3    assets, we had no spread information available
4    at all. So the question is what spread do you
5    apply to these positions?
6        Now, to get around that, we have used
7    what we think is the most reasonable approach,
8    which is to look at the portfolio average, and
9    that's what this describes. But if you use the
10   portfolio average approach but then only apply
11   that to the less liquid, unobservable parts of
12   the portfolio, as opposed to the liquid
13   observable parts of the portfolio, you're going
14   to completely undermine the point of doing that
15   calculation. It's not going to make any sense.
16       If I was to apply the September
17   spreads that we observed to the September
18   portfolio, then I would need to make some very
19   different assumptions about what spreads I apply
20   to those illiquid positions, that $1.2 billion
21   of illiquid assets where I just cannot observe
22   spreads.
23   **Q.   Just to finish up going through this**
24   **chart, back under the "Total Asset Value" line,**
25   **there's a line titled "Population Covered by**
        TSG Reporting - Worldwide    877-702-9580

Page 135

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **Spread Data December 18, 2008." It has a**
3    **7,621,881,970 number next to it and then an 86.1**
4    **percent. Can you tell me what that represents?**
5        MR. THOMAS: Objection to form.
6        A.   I believe that represents the market
7    value for those positions where we could obtain
8    live spread information for December 18. A
9    percentage is a simple percentage of that value
10   over the total population, which is just given
11   above. So I think that percentage is just one
12   number over the other.
13   **Q.   And for the line underneath**
14   **"Population Covered by Spread Data September 22,**
15   **2008," and it has a number of 1,529,424,507 and**
16   **17.3 percent, what does that reflect?**
17       A.   Same thing, but this is the market
18   value of those positions where we could get
19   spread information for 9/22.
20   **Q.   And the 86.1 percent figure reflects**
21   **the number where there was at least one instance**
22   **of spread data within that live shot on December**
23   **18; is that correct?**
24       A.   That represents where we have seen a
25   bid/offer in the market in that live sample of
        TSG Reporting - Worldwide    877-702-9580

Page 136

1    HIGHLY CONFIDENTIAL - Washtell
2    data, yes.
3    **Q.   Was there any analysis of whether**
4    **there was more than one sample of a bid/offer**
5    **spread for a given CUSIP on that date?**
6        A.   Because we go to the exchange for this
7    data, there's not at a point in time, there's
8    not going to be a range of bid-asks there. So
9    as we query this data from Reuters, which is our
10   query tool, there's going to be one bid and one
11   ask that's the current market-making bid-ask on
12   the exchange.
13   **Q.   So you wouldn't see multiple bids and**
14   **multiple offers for one CUSIP; is that correct?**
15       A.   At any one point in time?
16   **Q.   At any one point in time through this**
17   **query through Reuters of live data on December**
18   **18.**
19       A.   Through the query route, no, we
20   wouldn't see it.
21       MR. THOMAS: Let me just note the
22   transcript is designated highly
23   confidential.
24   **Q.   With respect to the calculation of the**
25   **ratio, is there a reason to use a ratio as**
        TSG Reporting - Worldwide    877-702-9580

Page 137

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **opposed to a median?**
3        A.   I think it would be nonsensical to use
4    a median for these purposes.
5    **Q.   How exactly was the ratio calculated?**
6    **Was it limited to just the 400 positions where**
7    **there was observable bids and offers on**
8    **September 22?**
9        A.   It was limited to that population
10   where we had observable bid-ask spreads on both
11   September 22 and December 18. By definition of
12   the ratio, you need a data point for both sides.
13   **Q.   And how big was that sampling where**
14   **there was for both September 22 and December 18?**
15       A.   This was the 400 or so names. I don't
16   recall the exact number.
17   **Q.   So 400 is the number for which there's**
18   **overlap between September and December?**
19       A.   Yes.
20   **Q.   It's not the number of CUSIPs for**
21   **which you had access to bids and offers for**
22   **September 22; is that correct?**
23       A.   That's correct. It represents --
24   **Q.   Only what overlaps between September**
25   **and December?**
        TSG Reporting - Worldwide    877-702-9580

Page 138

1        **HIGHLY CONFIDENTIAL - Washtell**
2    A.    Yes.
3        Now, in most cases, if we had a spread
4    in September, you would also have had a spread
5    in December, but there may have been a small
6    number where that was not the case.
7    **Q.    And do you know the size of or the**
8    **number of CUSIPs for which there were bids and**
9    **offers available on September 22?**
10    A.    This is the number around the 450 to
11    500, but I don't recall the exact number.
12    **Q.    So there was a large amount of**
13    **overlap -- I think I'm getting confused about**
14    **that 400 number.  There's --**
15    A.    For 400 read approximately 450, so I
16    think approximately for every position we had a
17    spread in September.  For most of those cases,
18    we would have also had a spread in December.
19    There were potentially a few where that was not
20    the case, but in general, that would have been
21    the case.
22    **Q.    And --**
23    A.    I don't know the exact numbers.
24    **Q.    Did you look at September 19 as well**
25    **to see for how many CUSIPs there were both bid**
        TSG Reporting - Worldwide    877-702-9580

Page 139

1        **HIGHLY CONFIDENTIAL - Washtell**
2    **and offer prices available?**
3    A.    I don't recall looking specifically at
4    September 19 bid-ask information because we were
5    trying to estimate the appropriate accurate
6    bid-ask for September 22.
7    **Q.    When you were previously calculating**
8    **using the September 19 valuation date, would**
9    **that process have yielded the type of**
10    **information necessary to determine whether or**
11    **not there were bids and offers for any given**
12    **CUSIP you were evaluating?**
13        MR. THOMAS:  Objection to form.
14    A.    I don't recall at any point that we
15    obtained bid-ask information for September 19 as
16    part of any analysis or process.  I don't recall
17    that we did.
18    **Q.    In order to calculate a midpoint as of**
19    **September 19, would you not access bid/offer**
20    **information for September 19?**
21        MR. THOMAS:  Objection to form.
22    A.    I'm not sure at what point or that we
23    were at any point trying to obtain what you call
24    a midpoint, a mid price, or a mid value for
25    September 19.  We were certainly looking at
        TSG Reporting - Worldwide    877-702-9580

Page 140

1        HIGHLY CONFIDENTIAL - Washtell
2    price data for September 19.
3    **Q.    If you could look back at what has**
4    **been marked as Deposition Exhibit 641A, the**
5    **spreadsheet with one column titled "PCG Value"?**
6    A.    Right.
7    **Q.    "Sep. 19."  It has a total of 10**
8    **billion-16?**
9    A.    Is the question would we have had
10    bid-ask information in the calculation of that
11    number?
12    **Q.    Yes.**
13    A.    The answer is no.
14    **Q.    And how does that differ, how does the**
15    **attaining of bid-ask information for September**
16    **19 differ from what was done in order to**
17    **calculate the September 19 midpoint?**
18        MR. THOMAS:  Objection to form.
19    A.    The September 19 value here represents
20    closing price information from the exchange, say
21    the last traded price of an exchange.  That
22    doesn't represent a bid/offer spread.
23    **Q.    And in order to access information for**
24    **September 19 bid-ask spreads, where would you**
25    **go?**
        TSG Reporting - Worldwide    877-702-9580

Page 141

1        **HIGHLY CONFIDENTIAL - Washtell**
2    A.    If I were asked to do that now?  I
3    would follow the same process we did here, which
4    is to use Reuters to query bid-ask spreads for
5    September 19 in the same way we used it to query
6    bid-ask spreads for September 22.
7        I assume you would have a similar
8    problem of sampling and the availability of
9    data.
10    **Q.    Turning back to Deposition Exhibit**
11    **641A, for the "PCG Value September 22" column,**
12    **total of 9 billion-odd?**
13    A.    Which one of the two?
14    **Q.    The one that on my column is blacked**
15    **out.  The one corresponding to the row titled**
16    **"Total Equities and Convertibles."**
17    A.    Yeah, I mean, there are two columns I
18    think entitled "PCG Value Sep. 22."
19    **Q.    The one that's next to "PCG Value Sep.**
20    **19."**
21    A.    Okay.
22    **Q.    That reflects a September 22 close of**
23    **business price, correct?**
24    A.    That's correct.
25    **Q.    Was any attempt made to adjust the**
        TSG Reporting - Worldwide    877-702-9580

Page 142

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **value to remove the impact of market activity**
3    **during the day on September 22?**
4       A.   Can you say that again?
5       Q.   **Was any attempt made to adjust the**
6    **value to remove the impact of market activity**
7    **over the course of the day on September 22?**
8       A.   What do you mean by "market activity"
9    in that sense?
10      Q.   **Market movements to any of the CUSIPs**
11   **that were within the portfolio being valued in**
12   **the "Total Equities and Convertibles" row using**
13   **a 9/22 close price.**
14      A.   No, I believe this represents the
15   closing market value as of 9/22.
16      Q.   **And this would be the number that**
17   **would roll into Barclays' acquisition balance**
18   **sheet; is that correct?**
19      A.   I believe the number that would roll
20   into Barclays' acquisition balance sheet would
21   also reflect the bid/offer, which is in the
22   column next to it.
23      Q.   **And what's the total of that?**
24      A.   So I think that the second "PCG Value
25   Sep. 22" column.

TSG Reporting - Worldwide    877-702-9580

Page 143

1    HIGHLY CONFIDENTIAL - Washtell
2       Q.   **And what would the total be that would**
3    **roll into the acquisition balance sheet for the**
4    **equities and convertibles?**
5          MR. THOMAS:   Objection to form.
6       A.   Taking as read from this, because I
7    can't remember the numbers, I'm not familiar
8    with the actual final document, 9.33 billion is
9    the number here.
10      Q.   **Did you or your group at your**
11   **direction seek to obtain any market information**
12   **from the foreign markets and indices that would**
13   **have been available between close of business on**
14   **September 19 and the September 22 opening of the**
15   **market?**
16      A.   Just to clarify, you're saying in
17   relation to the U.S. close from Sep. 19 to the
18   U.S. Open on Sep. 22 did we look at what you
19   call foreign markets?  You mean non-U.S., is
20   that --
21      Q.   **Non-U.S. would be one way of looking**
22   **at it, but we could also say from UK close to UK**
23   **open on the 19th to the 22nd.**
24      A.   Okay.
25      Q.   **Were any, any data points collected**

TSG Reporting - Worldwide    877-702-9580

Page 144

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **and analyzed in determining the move in the**
3    **market from September 19 to September 22?**
4       A.   From my recollection, they were not.
5       Q.   **Your group was also responsible for**
6    **valuing convertibles, correct?**
7       A.   That's correct.
8       Q.   **And what would be included in the**
9    **convertibles category?**
10      A.   This would principally be convertible
11   bonds.  I believe it may have included some
12   convertible preferred securities as well.
13      Q.   **And do you know what the distinction**
14   **is between tested and untested convertibles?**
15      A.   "Tested" would imply where we can
16   obtain an independent market data quote.
17   "Untested" would imply that we could not do
18   that.
19      Q.   **And why would there be no bid/offer**
20   **adjustment for convertible securities?**
21      A.   The price information that we obtained
22   for convertible securities would be in a
23   slightly different format, so we would
24   automatically get a bid and an ask and so we
25   would mark to the bid.  Therefore, no need to

TSG Reporting - Worldwide    877-702-9580

Page 145

1    HIGHLY CONFIDENTIAL - Washtell
2    take an adjustment just because of the data that
3    we get.
4       Q.   **And where does that data come from?**
5       A.   I believe most of the convertible bond
6    data would have been sourced through Bloomberg
7    and would represent broker quotes, market
8    quotes, indications from interdealer brokers,
9    which would be in line with our standard
10   practice for how we value convertible bonds and
11   price test convertible bonds on an ongoing
12   basis.
13      Q.   **Was your group responsible for valuing**
14   **equity-linked notes and warrants?**
15      A.   Yes.  As listed on here, yes.
16      Q.   **And what would fall under the category**
17   **"Untested Lehman Issued ELNs"?**
18         MR. THOMAS:   Objection to form.
19      A.   I can't recall exactly what's in each
20   of these categories, but two categories here,
21   Lehman issued ELNs and warrants would both
22   represent some form of Lehman paper.
23      Q.   **And "untested," does it have a similar**
24   **meaning as with the convertible bonds, meaning**
25   **that there would be no observable market price?**

TSG Reporting - Worldwide    877-702-9580

Page 146

1    **HIGHLY CONFIDENTIAL - Washtell**
2    A.   That would be correct, yes.
3    **Q.   When valuing the Lehman-issued ELNs or**
4    **the Lehman-issued warrants, did you or your**
5    **group look at the marks in existence from Bank**
6    **of New York or JPM or Lehman?**
7    A.   I don't recall looking at them in any
8    detail.
9    **Q.   Do you know what the column labeled**
10    **"BoNY September 18" references?**
11    A.   I believe that would reference the
12    valuation as of the BoNY prices for September
13    18, just reading the column.
14    **Q.   And so the BoNY price for the untested**
15    **Lehman-issued warrants would have been $178**
16    **million; is that correct?**
17    A.   That's how I read this, yes.
18    **Q.   And the BoNY price for the untested**
19    **Lehman-issued ELNs, $25 million?**
20    MR. THOMAS:   Objection to form.
21    Foundation.
22    A.   Again, that's how I would read this,
23    yes.
24    **Q.   And do you know why no value is**
25    **attributed to the Lehman-issued ELNs or the**
         TSG Reporting - Worldwide    877-702-9580

Page 147

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **Lehman-issued warrants by Barclays?**
3    MR. THOMAS:   Are we still talking
4    about Movants' Trial Exhibit 143?
5    MS. CARRERO:   We're talking about
6    Deposition Exhibit 641A.
7    MR. THOMAS:   Yes.
8    MS. CARRERO:   Which is --
9    MR. THOMAS:   Which?  The version you
10    gave us is Movants 143.  So objection.
11    MS. CARRERO:   It's the official marked
12    deposition exhibit that is in front of the
13    witness right now.
14    MR. THOMAS:   641A?
15    MS. CARRERO:   641A.
16    MR. THOMAS:   Yes.  I'm just confirming
17    that the question is, again, about this
18    document.  So, objection, lack of
19    foundation.
20    MS. CARRERO:   If you'd like, I can
21    pull out the correspondence from your
22    colleagues that describes exactly what this
23    document is and has been represented to us
24    as the document that's --
25    MR. THOMAS:   The objection is just
         TSG Reporting - Worldwide    877-702-9580

Page 148

1    HIGHLY CONFIDENTIAL - Washtell
2    based on what this witness -- you're asking
3    this witness to say what this document says,
4    and he's, I think, been carefully answering
5    that, as he reads this, that's what he
6    thinks it says, but I don't think he
7    actually prepared this document and I don't
8    think you have established a foundation for
9    him knowing exactly what these figures are.
10    But that's just the objection I'm reserving.
11    BY MS. CARRERO:
12    **Q.   If your group was responsible for**
13    **valuing the equity portfolio, would anybody else**
14    **have been able to supply the data that populated**
15    **this table, if not your group?**
16    A.   I don't believe they would for the
17    columns that say "PCG Market Value," but I
18    certainly didn't prepare this schedule.
19    **Q.   And that's fine.  Was it your group**
20    **who valued the untested Lehman-issued ELNs and**
21    **the untested Lehman-issued warrants at no value**
22    **as reflected on this chart, whether or not you**
23    **prepared it or not?**
24    MR. THOMAS:   Objection to form.
25    A.   Yes, that's correct.
         TSG Reporting - Worldwide    877-702-9580

Page 149

1    HIGHLY CONFIDENTIAL - Washtell
2    **Q.   And what was the basis for the**
3    **decision to value the untested Lehman-issued**
4    **ELNs and untested Lehman-issued warrants at**
5    **zero?**
6    A.   The warrants, a warrant, by
7    definition, is just an option in stock.  It's a
8    Lehman-issued warrant.  That means it's an
9    option on Lehman's stock.  At this point in
10    time, I don't believe Lehman's stock had any
11    value.  So ascribing any value other than zero
12    to these warrants would have been the incorrect,
13    nonsensical thing to do.
14    Likewise, the Lehman-issued ELNs
15    represent some equity-linked Lehman-issued
16    paper.  For similar reasons given, what was
17    happening in the Lehman bankruptcy at the time,
18    we -- and the fact we could not obviously source
19    any market data for these things, we deemed it
20    most appropriate to value them at zero.
21    **Q.   And is that based off an assumption**
22    **that the notes and the warrants would end up**
23    **being unenforceable?**
24    A.   I don't think it's based on an
25    assumption they would be unenforceable, but if a
         TSG Reporting - Worldwide    877-702-9580

Page 150

HIGHLY CONFIDENTIAL - Washtell

1  warrant is issued by Lehman Brothers on its own
2  stock, and you enforce exercise of that warrant,
3  what do you actually receive if Lehman's stock
4  is now worthless and it doesn't exist?  I'm not
5  sure what you would achieve from that.  I'm not
6  sure you would ever ascribe any value to that or
7  get any value from that.
8      Q.   And do you know if ultimately Barclays
9  has received any value from the Lehman-issued
10  ELNs or the Lehman-issued warrants?
11      A.   I'm not aware of that, no.
12      Q.   And where would you go if you wanted
13  to determine whether or not the Lehman-issued
14  ELNs or the Lehman-issued warrants had been
15  marked up later or redeemed in some way for
16  value?
17      A.   Sorry, where would I go?  What --
18      Q.   Where --
19      A.   Who would I ask?
20      Q.   Who would you ask?
21      A.   At this point, I don't know.  I don't
22  know if the position is -- I don't know the
23  answer to that.
24      Q.   What system within Barclays or report
25

TSG Reporting - Worldwide    877-702-9580

Page 151

HIGHLY CONFIDENTIAL - Washtell

1  that is generated would have information on a
2  CUSIP and what ends up happening on a day-to-day
3  basis to the mark?
4      A.   In these cases, where we valued them
5  at zero, I don't know what system they would
6  have been booked in and whether they would still
7  be in a system somewhere.  I don't know the
8  answer to that.
9      Q.   Assuming they're in a system with
10  other equity securities that were booked into
11  the system?
12      A.   At this point in time now?
13      Q.   At this point in time now.  If you
14  wanted to query whether Barclays still held the
15  position and if Barclays had sold it, at what
16  point it was sold, or if Barclays had redeemed
17  it and the value it redeemed it --
18      A.   Uh-huh.
19      Q.   -- where would you look?
20      A.   I would look, I guess, in whatever
21  settlement system is most appropriate, and where
22  this was actually booked, where it would have
23  settled, and where any corporate actions or
24  otherwise would have taken place and been
25

TSG Reporting - Worldwide    877-702-9580

Page 152

HIGHLY CONFIDENTIAL - Washtell

1  recognized, if any cash was received.  I'm not
2  aware of that happening, as I said.
3      Q.   So there are a number of settlement
4  systems within Barclays, depending on the type
5  of security, and that system would allow you to
6  see what sort of corporate actions have taken
7  place with respect to that CUSIP?
8      A.   I would assume that information would
9  be available from our systems.  I've never gone
10  in and asked to query that information, but if
11  you're asking how I would solve the problem,
12  should I have to solve it, to find out some
13  information, I would start there.
14      Q.   Above the untested Lehman-issued ELNs
15  row, there's a row for untested warrants, which
16  is also valued at zero.  Do you know why those
17  warrants were valued at zero?
18      A.   Given we deem the BoNY information
19  unreliable for the Lehman-issued warrants and
20  the ELNs, as we've just discussed, and I think
21  given if you look at the line above that where
22  it says "untested equities," where we have shown
23  the BoNY value to be significantly wrong, so 9
24  million of equities per the BoNY files were
25

TSG Reporting - Worldwide    877-702-9580

Page 153

HIGHLY CONFIDENTIAL - Washtell

1  actually only worth 1 million per our
2  independent data sources.  We have arrived at a
3  reasonable conclusion, which is that we don't
4  want to rely on the values in the BoNY file.  We
5  don't think they're reasonable.  As you can see,
6  the 9 million goes down to almost 1.  So, in the
7  absence of data, rather than go with the BoNY
8  value, we have ascribed them a zero value.
9      Q.   And for the tested -- sorry, returning
10  to the untested equities?
11      A.   Yes.
12      Q.   So they gave it 9 million, you say
13  it's 1 million?
14      A.   Yes.
15      Q.   And do you know what -- is it within
16  that "Untested Equities" line?
17      A.   No, I don't recall specifically what's
18  in there.  It would have been illiquid equities.
19      Q.   And --
20      A.   Generally, where we have classified it
21  as untested and are unable to through our, you
22  know, normal course of business extensive
23  sourcing external data were unable to source a
24  data point, I would be very wary of considering
25

TSG Reporting - Worldwide    877-702-9580

Page 154

1  HIGHLY CONFIDENTIAL - Washtell
2  the, you know, a data point from a bank like
3  BoNY to be reliable. Because if I cannot source
4  external data reliably, I don't see why BoNY
5  should be able to source external data reliably.
6  Q.  But in the ordinary course with an
7  illiquid security, you would, generally
8  speaking, start with a trader mark when you
9  would undertake price testing of that illiquid
10  security; is that correct?
11  A.  That's correct, in our normal course
12  of business.
13  Q.  And here you told us earlier that you
14  spoke to no one at Lehman and never looked at
15  the Lehman price in valuing the securities
16  within the equity portfolio; is that correct?
17  MR. THOMAS:  Objection to form.
18  A.  Say that again.  I --
19  Q.  Earlier we had discussed whether or
20  not you had access to Lehman data related to
21  illiquid positions and whether you had looked at
22  that and considered it in your valuation or
23  whether you had spoken to any former Lehman
24  traders that have come over to Barclays who had
25  familiarity with positions, and you said no; is
TSG Reporting - Worldwide    877-702-9580

Page 155

1  HIGHLY CONFIDENTIAL - Washtell
2  that correct?
3  A.  That's correct.  We did not discuss
4  with ex-Lehman traders, and I do not recall that
5  we looked at prices in the Lehman systems.
6  Q.  And so for illiquid securities where I
7  take it you're considering them illiquid because
8  there's not as much observable market data out
9  there as other securities; is that correct?
10  A.  Yes, illiquid, by illiquid, we would
11  say there's either little or, in some cases, no
12  market data available.
13  Q.  Your group doesn't take into
14  consideration either -- two available data
15  points, the Lehman data or the BoNY data; is
16  that correct?
17  MR. THOMAS:  Objection to form.
18  A.  The BoNY data, as you can see, for
19  Lehman-issued ELNs and Lehman-issued warrants is
20  clearly wrong.
21  Q.  It's not clearly wrong, necessarily;
22  it's just not used by you; is that correct?
23  MR. THOMAS:  Objection to form.
24  A.  I don't -- I don't think anyone at
25  that point in time would say $178 million is the
TSG Reporting - Worldwide    877-702-9580

Page 156

1  HIGHLY CONFIDENTIAL - Washtell
2  appropriate valuation for Lehman-issued
3  warrants, for an option on Lehman's stock, which
4  is now worthless because the company has gone
5  bankrupt.
6  It's not like a, you know, a creditor
7  claim or a bond or -- it's stock, which I
8  believe when a company goes bankrupt becomes
9  worthless.  If you price an option and put a
10  zero stock price into it, you're going to get a
11  zero price.
12  So those warrants, which are just
13  options on Lehman's stock, don't have any value.
14  I don't see how they can have any value.  I
15  don't see how anyone could reasonably argue they
16  have value.  I definitely don't see how Bank of
17  New York could argue they're worth $178 million.
18  That suggests to me they have some kind of stale
19  data price feeds.
20  This price feed from September 18,
21  which is, what, three days after Lehman declared
22  bankruptcy, still has $178 million of value
23  ascribed to positions which, by definition of
24  what they are and what's happened in the market
25  that week three days earlier, cannot have any
TSG Reporting - Worldwide    877-702-9580

Page 157

1  HIGHLY CONFIDENTIAL - Washtell
2  value at that point.
3  That to me suggests, as a data source,
4  BoNY is highly questionable for anything that's
5  illiquid.  It suggests to me they're not doing
6  any data integrity checks before sending this
7  information out.
8  Q.  Does Barclays still use BoNY as its
9  custodian bank?
10  MR. THOMAS:  Objection to form.
11  A.  I don't know.
12  Q.  You're not aware of Barclays switching
13  custodian banks since the Lehman transaction,
14  are you?
15  A.  I'm not aware, but I wouldn't be aware
16  of that.  I have no reason to be aware of that.
17  Q.  Are you aware that Bank of New York is
18  one of the largest, if not the largest,
19  tri-party repo custodian in the country?
20  A.  If you tell me they are, I would
21  believe you.
22  Q.  And are you aware that they value
23  trillions of dollars worth of securities daily
24  in connection with their function as tri-party
25  repo custodians?
TSG Reporting - Worldwide    877-702-9580

1      **HIGHLY CONFIDENTIAL - Washtell**
2          MR. THOMAS:  Objection to form.
3      A.   Again, if you tell me that's what they
4  do, then I wouldn't disagree with you.  I would
5  question what those valuations mean and what
6  they're for, but ...
7      **Q.   Do you have any role in calculating**
8  **the performance of any of the securities that**
9  **were transferred through the Lehman sale?**
10     A.   The performance?  What do you mean by
11 the "performance"?
12     **Q.   The performance of any of the assets**
13 **subsequent to the transfer from Lehman to**
14 **Barclays.**
15     A.   No, that's not something I was
16 involved in.
17     **Q.   The P&L function would be handled**
18 **through another part of PCG; is that correct?**
19     A.   That's correct.
20     **Q.   In December of 2008, there was a**
21 **settlement with JPMorgan, and another set of**
22 **securities were transferred which are referenced**
23 **as the JPM inventory.**
24         **If you're okay with that terminology,**
25 **we'll go with the "JPM inventory" for the**
           TSG Reporting - Worldwide    877-702-9580

1      **HIGHLY CONFIDENTIAL - Washtell**
2  **securities transferred in December 2008.  Is**
3  **that okay?**
4      A.   That's fine with me.
5      **Q.   Okay.  Did you have any role in**
6  **valuing securities that were transferred from**
7  **Lehman or from -- I'm sorry, from JPM to**
8  **Barclays in December of 2008?**
9      A.   I don't recall specifically.  It's
10 quite possible that we did, but I don't recall
11 the specific details.
12     **Q.   My question for you really is whether**
13 **or not there were any equities that your group**
14 **had responsibility for valuing that came over**
15 **through the settlement in December of 2008?**
16     A.   I can't recall any specifically.  I
17 can't say unequivocally no, but I can't recall
18 any.
19     **Q.   If you would turn to -- I think it**
20 **will be the third flag in Deposition Exhibit**
21 **641A.  Do you see where it says "Equity 9/30" --**
22     A.   What's the reference, sorry, just so I
23 know I'm looking at the right thing for this?
24     **Q.   It is the liquidity tab of the Excel**
25 **workbook Bates-stamped BCI-EX-(S)-00213995.**
           TSG Reporting - Worldwide    877-702-9580

1      **HIGHLY CONFIDENTIAL - Washtell**
2      **Have you ever seen this document**
3  **before?**
4      A.   Yes.  It looks very similar to
5  something you showed me earlier from the PwC
6  work paper.
7      **Q.   And is this the liquidity haircuts**
8  **that were taken by Barclays by asset class and**
9  **subtype with respect to the --**
10     A.   I think I'm looking at the wrong thing
11 here.  Or my answer would be no, it's not that.
12         Is this what I should be looking at or
13 not (indicating)?
14     **Q.   No, go to --**
15     A.   Shall I go to the other document?
16 This document, yes?  Which is still 641A.  I
17 still have the same thing.
18         (Document handed.)
19     MR. THOMAS:  Where have we gone to?  I
20 was at the same place as the witness.
21     MS. CARRERO:  It is -- what I had read
22 out was BCI-EX-(S)-00213995, Liquidity tab.
23 Is that what the page before you --
24     A.   I guess it's the same reference
25 because it says "Equity 9/22 tab."  Okay.
           TSG Reporting - Worldwide    877-702-9580

1      HIGHLY CONFIDENTIAL - Washtell
2  "Liquidity" tab.
3      MR. THOMAS:  It is the fourth flag.
4      MS. CARRERO:  I'm sorry, I didn't flag
5  my own as diligently as I flagged yours.
6      A.   Okay.
7      **Q.   Have you seen this document before?**
8      A.   No, not to my recollection.
9      **Q.   And if you would look at the two**
10 **"Equity 930" references about three-quarters of**
11 **the way down the page.**
12     A.   Okay.
13     **Q.   Does that reflect the liquidity**
14 **haircut being taken on any of the positions for**
15 **which you and your team had responsibility for**
16 **valuing?**
17     A.   I don't know what this is.  I could
18 conjecture what I think it says, but I'm not
19 really aware -- we did not take a liquidity
20 haircut for any of the positions that we
21 assessed.
22         We assess the fair market value,
23 which, as we've discussed previously, included
24 an element of bid/offer provision or bid/offer
25 adjustment, I should say.  But at no point did
           TSG Reporting - Worldwide    877-702-9580

Page 162

1      HIGHLY CONFIDENTIAL - Washtell
2  we discuss a liquidity haircut.
3        This file looks like it has a factor
4  of 1 anyway, which would imply a liquidity
5  haircut is zero for the equity in convertible
6  bond positions, but that's just me interpreting
7  what I see in front of me on the spreadsheet.
8        (Discussion off the record.)
9        (Recess; Time Noted:  3:37 P.M.)
10       (Time Noted:  3:59 P.M.)
11       THE WITNESS:  Before we start, can I
12  just make a clarification on that last, one
13  of the last points we were talking about?
14       So when we were talking about the
15  Lehman-issued warrants in particular, I
16  think I made the point that, I think I may
17  have said they were all issued on Lehman's
18  stock, which I think may not be the case.
19  There may be some that were issued by Lehman
20  but on a different stock or a different
21  underlying.
22       I don't recall the facts exactly now,
23  but just to clarify.  I still think the
24  point remains that, you know, they are still
25  warrants issued by a bankrupt counterparty,

TSG Reporting - Worldwide    877-702-9580

Page 163

1      HIGHLY CONFIDENTIAL - Washtell
2  Lehman Brothers, which is an equivalent to
3  having Lehman Brothers as a derivative
4  counterparty.  And therefore, I think the
5  valuation of zero is still correct, but just
6  to clarify the wording that I used on that.
7        I just don't recall specifically now
8  whether that was the case.
9  BY MS. CARRERO:
10      Q.  Do you know, subsequent to the
11  valuation for purposes of acquisition
12  accounting, whether Barclays marked those same
13  positions to?
14           MR. THOMAS:  Objection to form.
15      A.  I don't recall.
16      Q.  Is it possible that they were marked
17  to a higher value than zero subsequent to --
18      A.  I don't believe that was -- that was
19  the case, but as I say, I don't recall
20  specifically.  You know, it's not something --
21  information that I have at hand.  I don't
22  believe it would be the case.
23      Q.  Do you know if they were sold for any
24  value?
25      A.  Again, I don't believe that would be

TSG Reporting - Worldwide    877-702-9580

Page 164

1      HIGHLY CONFIDENTIAL - Washtell
2  the case, but I can't answer for definite.
3      Q.  If that were the case anytime between
4  the acquisition date and the publishing of the
5  acquisition balance sheet, would your team have
6  taken that into consideration in marking the
7  positions to zero simply because they were
8  issued by a bankrupt entity?
9           MR. THOMAS:  Objection.  Form.
10      A.  If I had information before the
11  finalization of the opening balance sheet that
12  these positions had been sold for some value,
13  then we would have taken that into consideration
14  in determining a non-zero value, but I did not
15  have that information.  I'm not aware of any
16  such information.
17      Q.  Where would you go if you wanted to
18  determine what happened to these positions
19  subsequent to the transfer from Lehman to
20  Barclays?
21      A.  As I said previously, I would start by
22  looking at the settlement systems that they were
23  booked in.
24      Q.  But you and your team never did that
25  in connection with valuing these securities; is

TSG Reporting - Worldwide    877-702-9580

Page 165

1      HIGHLY CONFIDENTIAL - Washtell
2  that what you're saying?
3           MR. THOMAS:  Objection to form.
4      A.  I'm saying that's not something we
5  didn't actively go look in the settlement system
6  to see if, on the day we finalized the opening
7  balance sheet, these positions were still booked
8  there or what had happened to them or any of the
9  other positions.
10      Q.  At any time after the transfer of the
11  positions from Lehman to Barclays, did you or
12  your team attempt to ascertain whether or not
13  Barclays was able to sell the position for any
14  value?
15      A.  No, but I don't believe that would
16  be -- as I said before, given that whether they
17  were warrants issued over Lehman's stock or
18  warrants issued over some other underlying this,
19  they're still warrants issued by Lehman
20  Brothers, which is now a bankrupt counterparty.
21      Q.  Did you look to see if any warrants or
22  ELNs issued by Lehman were trading for any value
23  in the market at that point in time?
24      A.  We looked for price information on
25  these securities, we looked for trading

TSG Reporting - Worldwide    877-702-9580

Page 166

1    HIGHLY CONFIDENTIAL - Washtell
2    information on these securities, but we could
3    not find any.
4    Q.    Did you look for any Lehman-issued
5    notes pricing information given that the premise
6    for valuing it at zero was that they were issued
7    by a bankrupt entity?
8    A.    I don't recall specifically.
9    Q.    Would that be relevant in valuing the
10   securities at zero if priced at that value
11   simply because issued by a bankrupt entity?
12       MR. THOMAS:  Objection to form.
13   A.    Could you repeat the question?
14       (Record read.)
15   A.    When we say "would that be relevant,"
16   we mean?
17   Q.    Whether or not any Lehman-issued
18   instruments were trading for value in spite of
19   their being a bankrupt entity at that point in
20   time?
21   A.    I don't think we would change our
22   valuation. I think the valuation that we
23   ascribed to them as zero is appropriate.
24   Q.    But you agree it would be a relevant
25   piece of information if Lehman instruments were
        TSG Reporting - Worldwide    877-702-9580

Page 167

1        HIGHLY CONFIDENTIAL - Washtell
2    trading for a value after the filing for
3    bankruptcy?
4    A.    It could be a factor, yes.
5    Q.    If you could turn to a previously
6    marked deposition exhibit, 819, as well as
7    Deposition Exhibit 824, which should also be in
8    front of you.
9        If you turn first to 819, the second
10   page under the heading "Bid/Offer Spread," and
11   turn to the line that provides, "Based on an
12   analysis of the securities, we were able to
13   obtain bid/offer spreads for about 2100 of the
14   3700 securities, which had an average bid/offer
15   of 2.64 percent."  Do you see that?
16   A.    Yes.
17   Q.    Earlier when we were discussing the
18   bid/offer spread, I believe you approximated the
19   number of bid/offer spreads available as of
20   September 22 as somewhere in the neighborhood of
21   450 to 500; is that correct?
22   A.    Yes, that is correct.
23   Q.    Do you know to what Mr. Morton is
24   referring to when he says that "we were able to
25   obtain bid/offer spreads for about 2100 of the
        TSG Reporting - Worldwide    877-702-9580

Page 168

1        HIGHLY CONFIDENTIAL - Washtell
2    3700 securities"?
3        MR. THOMAS:  Objection to form.
4    A.    I obviously wasn't on the e-mail and I
5    didn't write it, but looking at the number, 2100
6    seems consistent with the population for which
7    we were able to obtain spreads in December.
8    Q.    Have you read any of the expert
9    reports that were submitted by Movants in this
10   matter?
11   A.    Yes.
12   Q.    Can you name those reports that you
13   have read?
14   A.    I believe one by Zmijewski, if that's
15   how you say it. Zmijewski.
16   Q.    Don't ask me to say it either.
17       MR. THOMAS: Zmijeski.
18       MS. CARRERO:  You have learned since
19   the deposition.
20       MR. THOMAS:  Well, I went to school in
21   Poland and speak Polish.
22   A.    I think another one was Garvey. There
23   were -- there are other names. Slattery was
24   another one.
25   Q.    And do you recall in Mr. Zmijewski's
        TSG Reporting - Worldwide    877-702-9580

Page 169

1        HIGHLY CONFIDENTIAL - Washtell
2    report that he had come up with a number close
3    to 2100 of available bid/offer spreads on
4    September 19?
5    A.    Yes, I recall reading that in the
6    document.
7    Q.    I'm trying to understand the lack of
8    availability on September 22 -- scratch that.
9        The 2100 number in Mr. Zmijewski's
10   report for September 19 is similar to the 2100
11   number that you say was available in December,
12   correct?
13   A.    2100 in December.  2100 in the report.
14   The two numbers are the same.  Similar.
15   Q.    Why is it that Barclays was able to
16   only come up with 450 as of September 22?
17   A.    The data source I believe that's used
18   by Zmijewski in that report is Bloomberg.  I
19   believe, having looked at the data that's
20   available from Bloomberg, that it is flawed,
21   that there are problems with data integrity.
22       I believe these are highlighted by
23   Zmijewski in his report when he discusses the
24   fact that, in certain circumstances, he gets
25   negative prices which he has to exclude.  In
        TSG Reporting - Worldwide    877-702-9580

Page 170

1    HIGHLY CONFIDENTIAL - Washtell
2  certain other circumstances, he gets negative
3  bid/offer spreads, which he also has to exclude.
4       Now, the existence of negative
5  bid/offer spreads in particular would lead me to
6  have concerns about whether the data that's
7  available in Bloomberg represents a true
8  bid/offer, executable bid/offer that is
9  available in the market at a point in time
10 because you could not have a negative bid/offer
11 in the market. It doesn't exist. Couldn't
12 exist.
13     Q.  And --
14     A.  So the use of the Bloomberg data I
15 think is flawed. I think this doesn't just
16 apply to the illiquid stocks.
17       We had a look at this, I had a look at
18 this after I read the Zmijewski paper, and for
19 some of the more liquid stocks in the portfolio,
20 I think we looked at -- looking at the largest
21 15 positions, just glanced at Bloomberg data for
22 a random sample of data, and can clearly see
23 zero bid/offer spreads and negative bid/offer
24 spreads based on closing price information. So
25 I would question the integrity of that data of

TSG Reporting - Worldwide    877-702-9580

Page 171

1    HIGHLY CONFIDENTIAL - Washtell
2  Bloomberg.
3       Now, the reason we used Reuters is not
4  because I didn't trust Bloomberg data in
5  September 2008, but we used Reuters data because
6  that's our principal data provider within the
7  bank for equities data. Now, when we queried
8  information, we were able to obtain it for, as I
9  say, 450, 500 names, something like that.
10      We didn't observe examples of negative
11 spreads. We didn't observe anything that led us
12 to think there was any problem with the data
13 that we were using, any issues over the
14 integrity of that data. We just accepted that,
15 okay, it's after the fact here. The
16 availability of good closing bid-ask data is
17 going to be limited for this population after
18 the fact because it's not the same as getting
19 live bid-ask data.
20      So, coincidental to the fact that he
21 could query a similar number that we could query
22 in December, I can't really talk to that, but I
23 can say I think there are significant flawed
24 assumptions in what he's doing, and by excluding
25 certain data and just ignoring it and carrying

TSG Reporting - Worldwide    877-702-9580

Page 172

1    HIGHLY CONFIDENTIAL - Washtell
2  on with the data that's there, that doesn't seem
3  like a reasonable thing to do to me to arrive at
4  an appropriate number.
5     Q.  In turning back to 819, where the 2100
6  of the 3700 securities had an average bid/offer
7  of 2.64 percent?
8     A.  Yes.
9     Q.  Do you see that?
10    A.  Yes, I do.
11    Q.  How does that, if you then turn to
12 824, Deposition Exhibit 824, where the average
13 spread for December 18 data is listed as only
14 1.93 percent --
15    A.  Yes.
16    Q.  -- do you, from the difference of 2.64
17 percent to 1.93 percent, think that Mr. Morton's
18 e-mail is referencing the availability of
19 bid/offer spread information on Bloomberg as
20 opposed to the December spread information that
21 was ultimately used?
22    A.  No, I don't think he's doing that. I
23 think what you see in that e-mail, which is
24 dated December 12, which is clearly before
25 December 18, which is in the second file, would

TSG Reporting - Worldwide    877-702-9580

Page 173

1    HIGHLY CONFIDENTIAL - Washtell
2  be based on Reuters data. Because we were not
3  querying, as far as I recall, bid/offer data
4  from Bloomberg.
5       I believe one potential reason for the
6  difference, and again, I didn't write the e-mail
7  and I can't recall exactly the details, this is
8  conjecture, but potentially it was that it was
9  one of the sample days that we looked at earlier
10 in December, as I said earlier, hence a slightly
11 different number.
12      It may also have been because in his
13 final dataset we excluded spreads that were
14 wider than 50 percent, and I'm not sure if that
15 is represented in this 2.64 which is being
16 referenced by Marcus. I definitely don't
17 believe it was because Marcus is looking at
18 Bloomberg.
19    Q.  Again, looking at 824, and the
20 population covered by spread data is 86.1
21 percent; is that correct?
22    A.  That's what I read from the summary
23 page.
24    Q.  Yet, 2100 divided by 3700 securities
25 would be substantially lower than a 86.1 percent

TSG Reporting - Worldwide    877-702-9580

Page 174

HIGHLY CONFIDENTIAL - Washtell

1  figure; isn't that correct?
2      A.   What is correct is that 86.1 percent
3  figure represents the percentage of market value
4  that's covered within those 2100 stocks.  So
5  it's not 2100 divided by 3700, it's 7.6 billion
6  divided by 8.85 billion.
7          So, in terms of number of securities,
8  yes, it's a lower percentage.  In terms of what
9  this number represents, it doesn't represent
10  that.  It represents the proportion of the
11  market value, which is the more relevant
12  statistic.
13      Q.   Mr. Washtell, I'm putting before you
14  what has been marked as Deposition Exhibit 832.
15      (Exhibit 822, a document bearing Bates
16  Nos. BCI-EX-(S)-00176765 through 176767,
17  marked for identification, as of this date.)
18      Q.   So, Mr. Washtell, I stand corrected.
19  You have before you Deposition Exhibit 822.
20      A.   Okay.
21      Q.   Looking at the e-mail at the top
22  from --
23      A.   Can I just read it?
24      Q.   If you want to read the whole thing,

TSG Reporting - Worldwide    877-702-9580

Page 175

HIGHLY CONFIDENTIAL - Washtell

1  sure.
2      A.   If you don't mind.
3          (Document review.)
4      A.   Okay.
5      Q.   Looking at the e-mail at the top from
6  you to Steven Calick and Eric Clark dated
7  September 24, do you see that?
8      A.   Yes.
9      Q.   And the subject is "Update:  LBI
10  Positions Rec and IPV analysis."  Do you see
11  that?
12      A.   Yes.
13      Q.   And do you know what "IPV analysis"
14  refers to?
15      A.   Independent price verification.  It's
16  another terminology for price testing, i.e., the
17  core function of our valuations team, price
18  testing.
19      Q.   And do you see where you write, "Kate
20  and I have just spoken to Nick Leyhane on this.
21  He is happy in principle with what we have done
22  (based on the closing positions from yesterday)
23  and agrees we should be seeing approximately
24  $400 million increase in value between 18th and

TSG Reporting - Worldwide    877-702-9580

Page 176

HIGHLY CONFIDENTIAL - Washtell

1  19th"?
2      A.   I see that, yes.
3      Q.   Who is Nick Leyhane?
4      A.   At the time, he was the head of the
5  Arbitrage Trading Desk at Barclays, Equity
6  Arbitrage Trading Desk.
7      Q.   And why was Nick Leyhane happy about
8  $400 million increase in value between the 18th
9  and the 19th?
10          MR. THOMAS:  Objection to form.
11      A.   You're slightly misreading or
12  misinterpreting the sentence.  From my reading
13  of this, and albeit I don't recall writing this
14  because it was 18 months ago, it says "he is
15  happy in principle with what we have done."  I
16  don't think it says he's happy with a $400
17  million increase.  I think it says he agrees we
18  should be seeing a $400 million increase.
19      Q.   And why would he be involved in the
20  calculation?
21      A.   I believe at this time, as we were
22  reviewing positions to effectively perform a
23  price test, as you can see from the title of the
24  e-mail, this is very much us trying to perform

TSG Reporting - Worldwide    877-702-9580

Page 177

HIGHLY CONFIDENTIAL - Washtell

1  an IPV analysis on a set of positions we
2  received.
3          We have reviewed that with someone in
4  the business.  I believe I mentioned earlier
5  that we discussed with the traders on a regular
6  basis.  Nick Leyhane, as a senior member of
7  trading management within London, we have
8  reviewed our analysis and our views on this
9  portfolio with him.
10      Q.   And so does that mean that your group,
11  in valuing the securities within the equity
12  portfolio that came over from Lehman, did so in
13  conjunction with the trading desks or business
14  side of Barclays?
15      A.   No, I don't think this is saying we
16  did something in conjunction with them.  I think
17  this is saying we discussed some analysis we
18  have performed with them to ask them for their
19  opinion.
20      Q.   And when you write, "He agrees we
21  should be seeing approximately $400 million
22  increase in value between 18th and 19th," you're
23  saying he agrees with the analysis that your
24  team had run, is that correct, as opposed to his

TSG Reporting - Worldwide    877-702-9580

1    **HIGHLY CONFIDENTIAL - Washtell**
2    own --
3        A.   Yes.
4        **Q.   -- valuation?**
5        A.   I believe that's what he's saying,
6    based on his expectation and his understanding
7    of what had happened in the market, I guess.
8        **Q.   Was anyone else on the business side**
9    **or any Barclays traders reviewing the valuations**
10   **that your team was working on?**
11       A.   From reading this, it says at the
12   bottom, "We did not manage to catch Andrea." I
13   believe that's a reference to Andrea DeCarolis,
14   who is the global head of Convertible Bond
15   Trading at Barclays Capital.
16       It looks like at that time we would
17   have been discussing the valuation of the
18   convertible bond part of the portfolio and the
19   analysis we had done on that with him.  Again, I
20   don't recall specific conversations, but from
21   reading this e-mail, it would appear to be.
22       **Q.   And is there anyone else you recall**
23   **other than Nick and Andrea?**
24       A.   No, not that I recall.
25       **Q.   And if there were increases to the**

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **value of positions from the 18th to 19th, would**
3    **that flow onto the P&L of any specific desk or**
4    **business side of Barclays?**
5        MR. THOMAS:  Objection to form.
6        A.   I don't believe anything we were doing
7    here would have had an impact on P&L.  It would
8    have been flowing downstream anyway.
9        As I said, this is me discussing an
10   analysis on a list of positions we received in
11   the spreadsheet with Nick Leyhane.  It's not
12   driving any management accounting profit and
13   loss report.
14       **Q.   Would you agree with me that if a**
15   **position were to be marked subsequent to the**
16   **opening balance sheet at a price higher than**
17   **what it had been accounted for on the opening**
18   **balance sheet, that would trigger a P&L event**
19   **and reflect a higher profit for Barclays' desk?**
20       MR. THOMAS:  Objection to form.
21       A.   If I understand the question, if we
22   originally booked something at a value, and the
23   price goes up and we're long that position,
24   would we recognize a profit?  Yes.
25       **Q.   And do you see the e-mail below from**

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **Stephen Calick to you and others dated September**
3    **24 immediately below?**
4        A.   Right.  Okay.
5        **Q.   Do you see the last line where it**
6    **says, "The valuation date is the 19th"?**
7        A.   I do.
8        **Q.   Do you recall being told that by**
9    **Stephen Calick?**
10       MR. THOMAS:  Objection to form.
11       A.   I don't recall the discussions, but
12   clearly this is an e-mail addressed to me.  I
13   guess I would clarify that this is based -- this
14   is some IPV analysis, as you can see, as the
15   e-mail is titled.  This is regarding a position
16   reconciliation, an IPV analysis on some
17   positions, which it appears Steve has requested
18   or specified should be done as of a certain
19   date.
20       **Q.   You believe that valuation or IPV**
21   **analysis is related to the positions that were**
22   **transferred from Lehman as part of the sale**
23   **transaction; is that right?**
24       MR. THOMAS:  Objection to form.
25       A.   I believe, looking at this now, this

1    HIGHLY CONFIDENTIAL - Washtell
2    would have related to that population of
3    positions, but at this time, just to clarify, I
4    don't believe we would have been looking at
5    putting together an opening balance sheet
6    calculation in relation to any transaction.
7        We were, as this says, engaged in
8    performing a position reconciliation and an IPV
9    analysis for a set of positions that we had
10   received as of a date that we had been
11   instructed to do that.  So it's slightly
12   different, I guess, is what I'm saying.
13       **Q.   Back up to your e-mail above, in the**
14   **last paragraph you write, "We did not manage to**
15   **catch Andrea today so we will grab him tomorrow**
16   **morning.  This will be a more interesting**
17   **discussion, as we have limited coverage on the**
18   **converts, and I know he has expressed views that**
19   **the positions needed to be written down from the**
20   **BoNY values."  See that?**
21       A.   I do see that.
22       **Q.   Do you recall receiving commentary**
23   **from the business side of Barclays that the**
24   **positions needed to be written down?**
25       MR. THOMAS:  Objection to form.

Page 182

1    HIGHLY CONFIDENTIAL - Washtell
2    A.   No, I don't recall receiving that
3    commentary, as you put it.  Clearly, from my
4    e-mail here, it suggests I've been made aware
5    that Andrea has expressed concerns over the BoNY
6    values, concerns that I guess they may not be
7    appropriate and may reflect inflated prices for
8    these securities.
9    **Q.   And did that expression by the**
10   **Barclays traders impact the valuation that you**
11   **and your group undertook of those positions?**
12   A.   No, because we still independently
13   assessed the fair value.  We still sourced the
14   data that we used to arrive at that fair value
15   independently.  We didn't rely on the trading
16   desk for any valuations of those securities.
17   **Q.   But the trading desks were reviewing**
18   **and commenting on what they felt should be done**
19   **with the positions, according to this e-mail; is**
20   **that correct?**
21   A.   According to this e-mail, it sounds
22   like the trading desks are commenting that they
23   think the BoNY values are not correct.  It also
24   sounds like at the time I wrote this e-mail we
25   did not have complete coverage of the
         TSG Reporting - Worldwide    877-702-9580

Page 183

1    HIGHLY CONFIDENTIAL - Washtell
2    convertible population from the data that we had
3    sampled at that point in time.
4    So it sounds like we had incomplete
5    information.  The trading desk had expressed
6    their view, but that would not have had any
7    bearing on ultimately the valuations that we
8    used because they were based on independent data
9    which we, as I say, obtained independently and
10   independently from the trading desk.
11   **Q.   Mr. Washtell, I'm putting before you**
12   **what has been marked as Deposition Exhibit 823.**
13   **(Exhibit 823, a document bearing Bates**
14   **Nos. BCI-EX-(S)-179808 through 179821,**
15   **marked for identification, as of this date.)**
16   A.   Do I need to read all of this?
17   **Q.   If you will start at the top e-mail**
18   **from Jerry Shi to yourself and dated September**
19   **25, subject:  "Price testing -**
20   **Converts/Eqty/Preference," and read over that**
21   **e-mail as well as the attached, if you want to**
22   **turn to the attachment.**
23   A.   So read all of it, yeah?
24   **Q.   Well, that e-mail is what attaches the**
25   **document at the back.**
         TSG Reporting - Worldwide    877-702-9580

Page 184

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **(Document review.)**
3    A.   You wanted me to read all of this
4    attachment?
5    **Q.   Just if you want to take a look at the**
6    **front --**
7    A.   I can read it.  It'll just take me
8    five minutes.  Are you going to focus on a
9    specific part?
10   **Q.   Yes.  You don't have to read the whole**
11   **attachment.  Let's just start with the e-mail.**
12   **And do you see where Mr. Shi writes, "Most of**
13   **the cash equity products have observable market**
14   **prices"?**
15   A.   Yes.
16   **Q.   Would you agree with that statement?**
17   MR. THOMAS:  Objection to form.
18   A.   I don't recall specifics, but if Jerry
19   is saying for most cash equity products we have
20   observable market prices, and I believe from the
21   analysis we have been through today, for most of
22   the positions we were able to obtain data.  So
23   that doesn't sound like an unreasonable
24   statement.
25   **Q.   And is what Mr. Shi has attached for**
         TSG Reporting - Worldwide    877-702-9580

Page 185

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **you in this e-mail Lehman's convertibles**
3    **Americas price testing policy?**
4    A.   That is certainly what it appears to
5    be.
6    **Q.   And is he attaching that for you**
7    **because Barclays did not at the time have one of**
8    **its own price testing policies for converts,**
9    **equities and preferreds?**
10   A.   No, I don't believe that's the reason.
11   Because we did have convertible bonds, for
12   instance, and a process and policy around that.
13   **Q.   And so --**
14   A.   I've -- I guess he's just -- I can't
15   say specifically why he's attaching it.  I
16   assume he's attaching it to provide some
17   information as to what his team does.
18   **Q.   Do you see the e-mail below where you**
19   **write to Mr. Shi on September 15 -- I'm sorry,**
20   **September 25, introducing yourself, and then in**
21   **the second-to-last -- no, I'm sorry, the last**
22   **paragraph, you write, "Could you please send**
23   **over whatever analysis you have most recently**
24   **done for these positions?  And if you do have**
25   **anything on the cash equity side would be very**
         TSG Reporting - Worldwide    877-702-9580

Page 186

HIGHLY CONFIDENTIAL - Washtell

1  interested to see it for comparison to what we
2  have sourced"?
3      A.   Yes, I see that.
4      Q.   And Mr. Shi at the time was
5  transitioning from Lehman to Barclays; is that
6  correct?
7      A.   That's correct.
8      Q.   And so when you ask him if he has
9  anything, are you asking him if Lehman has
10 analysis on these positions?
11     A.   I believe I'm asking him in his role
12 as independent valuation controller for Lehman
13 Brothers for equities whether he has analysis on
14 the -- independent valuation analysis on their
15 population of convertible bonds.
16     Q.   And do you recall how that information
17 was used?
18     A.   I don't recall.  If you look at the
19 date of the file, the zip file, it says 08/29,
20 so it looks like he's provided the August
21 month-end price testing results for convertible
22 bonds along with the price testing policy.
23         I know we did not use any August price
24 data in our analysis, so I don't know

TSG Reporting - Worldwide    877-702-9580

Page 187

HIGHLY CONFIDENTIAL - Washtell

1  specifically how that was used.
2      Q.   And was Mr. Shi involved in the
3  valuation of any of the converts, equity or --
4  is that preference?
5      A.   Preference shares.  Yes, preference
6  shares.
7      Q.   Preference shares?
8      A.   Preference shares.
9      Q.   Preference shares.
10     A.   Sorry.  My accent.  End of the day.
11         Yes.
12         Sorry.  The question is, was Mr. Shi
13 involved?  As I said earlier, certainly members
14 of his team were involved in obtaining data for
15 me for the analysis.
16     Q.   And from the appearance of this
17 e-mail, it appears that data includes Lehman
18 data; is that correct?
19     A.   In this e-mail, he looks to have
20 provided some data and some analysis from Lehman
21 Brothers.  I don't believe any of the data, or I
22 don't recall that any of the data that we
23 sourced from his team for the valuation was
24 based on the Lehman Brothers' data.

TSG Reporting - Worldwide    877-702-9580

Page 188

HIGHLY CONFIDENTIAL - Washtell

1      From my recollection, members of his
2  team were principally involved, for example, in
3  querying data for me from Bloomberg or from IDC
4  or other external data vendors that they would
5  have access to.
6      Q.   Mr. Washtell, do you know who
7  Professor Paul Pfleiderer is?
8      A.   I'm aware of him, yes.
9      Q.   Can you tell me what your awareness is
10 of him?
11     A.   My awareness is that he's working on
12 behalf of our legal team as in the capacity as
13 some kind of expert.
14     Q.   And have you had any conversations
15 with Professor Pfleiderer?
16     A.   I don't believe I've had direct
17 conversations with him.  I've certainly been on
18 various conference calls with the legal team and
19 representatives from whatever financial
20 consultants, et cetera, are part of that team.
21 He may have been on those calls.  I don't know.
22     Q.   Were those all conference calls or
23 were they in-person meetings as well?
24     A.   Everything was a conference call prior

TSG Reporting - Worldwide    877-702-9580

Page 189

HIGHLY CONFIDENTIAL - Washtell

1  to meeting with the lawyers in preparation for
2  this today.  So everything prior to this week
3  was in conference call.
4      Q.   Have you read Professor Pfleiderer's
5  report?
6      A.   Not in full, in detail.
7      Q.   When did you review his report?
8      A.   I said I haven't read it in full, in
9  detail.  I've seen it.
10     Q.   And that's why I used the word --
11     A.   Review.
12     Q.   -- "review" as opposed to "read."
13         When did you receive a copy of
14 Professor Pfleiderer's report?
15     A.   I don't recall specifically.
16     Q.   Do you recall if it was a month or
17 less ago?
18     A.   It was more than that.
19     Q.   Was it three months ago?
20     A.   I don't know.  More than a month.  I
21 don't know beyond that.  It's ...
22     Q.   Was it in the winter?
23     A.   Was it this year or last year?  I
24 don't recall.  It may have been the start of

TSG Reporting - Worldwide    877-702-9580

Page 190

HIGHLY CONFIDENTIAL - Washtell

1    HIGHLY CONFIDENTIAL - Washtell
2  this year.  It may have been the end of last
3  year.  It may have been two months ago, four
4  months ago.  We've been looking at an awful lot
5  of documents.
6    **Q.   Had the report been finalized at the**
7  **point that you saw it?**
8    MR. THOMAS:  Objection to form.
9    A.   I don't know.  I don't recall if it
10  said final version.  I don't recall being told
11  if it was final version or draft.  I don't ...
12    **Q.   Were you asked to comment on it?**
13    A.   No.
14    **Q.   And prior to the submission of the**
15  **report, do you recall how many conversations you**
16  **had in connection with the preparation with it?**
17    MR. THOMAS:  Objection to form.
18    A.   I don't recall having any
19  conversations in relation to the preparation of
20  the document.
21    **Q.   And did you sit down with the -- did**
22  **you have conference calls with the Financial**
23  **Scholars Group prior to the submission of**
24  **Professor Pfleiderer's report?**
25    MR. THOMAS:  Objection to form.

TSG Reporting - Worldwide    877-702-9580

Page 191

1    HIGHLY CONFIDENTIAL - Washtell
2    A.   I don't know when it was submitted.  I
3  don't know when it was prepared.  I've been on
4  conference calls with representatives from the
5  legal team which may or may not have included
6  representatives from FSG.  I don't know
7  specifically who was on those calls and what the
8  output of those meetings was going towards.
9    **Q.   Do you recall if you had any calls**
10  **with the legal team or the Financial Scholars**
11  **Group prior to January 8 of this year in**
12  **connection with the preparation of Professor**
13  **Pfleiderer's report?**
14    MR. THOMAS:  Objection to the form.
15  Among other things, asked and answered and
16  assumes facts not in evidence.
17    A.   It sounds like I answered it already,
18  no?
19    MR. THOMAS:  Well, you can go ahead
20  and respond.
21    A.   What was the question?
22    (Record read.)
23    A.   I don't recall.  I don't recall having
24  any specific conversations in preparation --
25  with the purpose of preparation of a report, and

TSG Reporting - Worldwide    877-702-9580

Page 192

1    HIGHLY CONFIDENTIAL - Washtell
2  I don't recall the timing of the conference
3  calls that I have been involved in with these
4  guys.
5    **Q.   So you don't recall explaining to the**
6  **Financial Scholars Group or anyone else working**
7  **under Professor Pfleiderer's direction the**
8  **policies and procedures that were followed in**
9  **pricing the equities or the outcome of the**
10  **equity valuation; is that correct?**
11    MR. THOMAS:  You're going into the
12  content of calls with his attorneys.  The
13  only calls he remembers were with his
14  attorneys.  He doesn't even know if FSG was
15  on them and you're going into the content of
16  those calls, so I'm going to instruct the
17  witness not to answer based on privilege.
18    MS. CARRERO:  To the extent that
19  they're all an original source of
20  information that was used in any report
21  prepared by a Barclays' expert and any
22  testifying expert material, I'm not sure
23  that I agree that it would be subject to
24  privilege, but if those conversations didn't
25  happen and feed into a testifying expert's

TSG Reporting - Worldwide    877-702-9580

Page 193

1    HIGHLY CONFIDENTIAL - Washtell
2  report, then just that's fine and you can
3  just tell me to back off and end the
4  inquiry.  I just want to know whether or not
5  there were any conversations --
6    MR. THOMAS:  I'm not going to tell you
7  what the purposes of our privileged
8  conversations were with our client.  I'm
9  going to instruct the witness not to answer.
10  BY MS. CARRERO:
11    **Q.   Did you have any conversations with**
12  **the Financial Scholars Group or anyone working**
13  **at the direction of Barclays' testifying expert,**
14  **Professor Pfleiderer?**
15    MR. THOMAS:  Objection.  Asked and
16  answered.
17    A.   Exactly what I said previously.  All
18  calls, discussions I've had on this have been
19  conference calls with the lawyers.  Who else was
20  on those calls I don't recall.
21    **Q.   And can you recall how many**
22  **conversations you've had with the lawyers prior**
23  **to January of 2008 -- I'm sorry, prior to**
24  **January of 2010?**
25    MR. THOMAS:  Objection to form.

TSG Reporting - Worldwide    877-702-9580

Page 194

1    HIGHLY CONFIDENTIAL - Washtell
2    A.  I don't recall how many, no.
3    Q.  Do you recall if you supplied any
4    documents in connection with requests from
5    counsel?
6    MR. THOMAS:  Objection to form.
7    A.  I don't recall.
8    (Recess; Time Noted:  4:55 P.M.)
9    (Time Noted:  5:02 P.M.
10    MS. CARRERO:  I have no further
11    questions.  Thank you, Mr. Washtell.
12    EXAMINATION BY
13    MR. OXFORD:
14    Q.  Good afternoon, Mr. Washtell.  My name
15    is Neil Oxford.  I'm with the law firm of Hughes
16    Hubbard and we represent the LBI SIPA Trustee in
17    this matter.
18    Can you remind me, please, what your
19    title was in 2008?
20    A.  In September 2008, my corporate title
21    was vice president and was responsible for the
22    Independent Valuation Group for the equity
23    derivatives business.
24    Q.  In that capacity, sir, did you have
25    responsibility for valuing Barclays'
TSG Reporting - Worldwide    877-702-9580

Page 195

1    HIGHLY CONFIDENTIAL - Washtell
2    exchange-traded derivatives?
3    A.  We would have had responsibility for
4    assessing the valuation, the fair value of
5    equity-related exchange-traded derivatives
6    within the Barclays Capital, yes.
7    Q.  So just so we're talking the same
8    language here, sir, perhaps we can use an
9    example.  If Barclays had an equity derivative
10    that was cleared through the Options Clearing
11    Corporation in the U.S., would that have been
12    something that was within your responsibility?
13    A.  I'm not sure specifically what clears
14    through the OCC, but, for example, if we had a
15    listed option on the S&P 500, then, yes, that is
16    something -- and that was held at Barclays
17    Capital at that time, that is something my team
18    would have been engaged in assessing the
19    valuation of.
20    Q.  Was your team responsible for valuing
21    those exchange-traded derivatives on a regular
22    basis?  Was it daily? weekly? quarterly?
23    A.  In the same way as we performed
24    periodic price testing, price verification for
25    the rest of the derivatives portfolio, we would
TSG Reporting - Worldwide    877-702-9580

Page 196

1    HIGHLY CONFIDENTIAL - Washtell
2    have done a periodic review for the
3    exchange-traded derivatives.  That would
4    generally have been at month-end and been
5    performed on a monthly basis.
6    Q.  Was that something that you personally
7    were involved in, the periodic reviews around
8    the time of September 2008?
9    A.  I would have been reviewing the
10    results of all analysis that was performed.  I
11    would not have been performing the analysis.
12    Someone within my team would have been doing
13    that.
14    Q.  Did Barclays have written policies in
15    place in September/October 2008 to govern this
16    periodic review that you have testified to?
17    A.  The price testing policy?
18    Q.  Yes.
19    A.  Yes.  It's a similar document to the
20    one we reviewed earlier, which was dated I think
21    May 2009.
22    Q.  Does it have a particular name, the
23    policy that would be governing the price testing
24    policy for exchange-traded derivatives?
25    A.  The Global Price Testing Policy.  I
TSG Reporting - Worldwide    877-702-9580

Page 197

1    HIGHLY CONFIDENTIAL - Washtell
2    believe that's what it was called.
3    Q.  Broadly speaking, sir, can you tell me
4    what the price testing policy provides for in
5    connection with Barclays' valuation of
6    exchange-traded derivatives?  That's a
7    long-winded way of saying how does the price
8    testing work?
9    A.  The price testing policy would
10    merely -- or, not merely, would state that we
11    should assess all available data sources -- I'm
12    paraphrasing here, but it would say we should
13    use all available information, we should use
14    independent, reliable, where possible,
15    executable data sources, and use multiple
16    sources to arrive at an assessment of the
17    appropriate valuation of securities.
18    Q.  Now, we've heard a lot of testimony
19    about mid prices and bid prices and offer prices
20    and ask prices, et cetera.
21    In connection with the exchange-traded
22    derivatives, were these priced on Barclays'
23    books at mid, bid or ask, or some combination
24    thereof?
25    A.  We're talking now exchange-traded
TSG Reporting - Worldwide    877-702-9580

1      HIGHLY CONFIDENTIAL - Washtell
2   derivatives on Barclays' books, nothing to do
3   with acquisitions, just generically?
4      **Q.   Yes.  I'm asking just generally what**
5   **Barclays' policies were with respect to equity**
6   **options September/October 2008.**
7      A.   Right.  So, at that point in time,
8   listed equity options would have been valued at
9   a theoretical value in the same way we would
10  value an OTC equity option.
11        The way that is done is obviously a
12  series of option pricing input parameters are
13  marked, including, obviously, the spot prices, a
14  basic -- an interest rate, a dividend
15  assumption, a repo assumption, a volatility
16  assumption.
17        Those parameters would generally be
18  marked at a mid market level.  We would then,
19  offline, take bid/offer adjustments against
20  those parameters.
21     **Q.   And would the bid/offer adjustment be**
22  **different depending whether the position was**
23  **long or short?**
24     A.   Generally, the way bid/offer would
25  apply is a long position you would mark down to

TSG Reporting - Worldwide    877-702-9580

1      HIGHLY CONFIDENTIAL - Washtell
2   bid.  If you're marking your portfolio at mid,
3   you would mark it down to bid.  A short position
4   you would mark it up to the offer because that
5   represents the reasonable exit level that you
6   would expect to close out of that position.
7      **Q.   Sticking with the month-end price**
8   **testing that your group conducted in 2008, sir,**
9   **was the mid price taken for a particular day?**
10  **Would it be the last trading day of the month?**
11     A.   At month-end?
12     **Q.   Yes.**
13     A.   For a month-end analysis?
14     **Q.   Yes.**
15     A.   For our purposes, we would try and
16  ascertain the mid price as of the month-end
17  date, yes.  We would factor in information
18  available on that day as well as potentially
19  information available before and after that day
20  to assess.  And obviously, it depends on the
21  relative liquidity of instruments as to whether,
22  if you have an illiquid instrument, you don't
23  have maybe an observable trade that day, maybe
24  you haven't had an observable trade in the
25  previous four days, so you may have a trade the

TSG Reporting - Worldwide    877-702-9580

1      HIGHLY CONFIDENTIAL - Washtell
2   following morning, in which case we would take
3   that into account.
4        But the aim would be to achieve an
5   appropriate fair value for that month-end close
6   date, using all available data that's available
7   to us at that time.
8      **Q.   And if a mid price were available for**
9   **a particular instrument as of the very date that**
10  **is the month-end, you would use the mid price as**
11  **of that date, correct?**
12     A.   Generally speaking, yes.
13     **Q.   You mentioned that you would offline**
14  **apply a bid/offer adjustment.  Can you explain**
15  **what you meant by that?**
16     A.   Yes.  So when we are marking
17  derivative portfolios and the parameters that
18  you would use to value derivative portfolios,
19  they would be marked by the trading deck on a
20  daily basis at a midlevel.
21        The reason for that is you have one
22  parameter that goes in the system to value both
23  long and short positions and your modeling won't
24  distinguish between a long or a short in that
25  parameter.  It will pick up a volatility surface

TSG Reporting - Worldwide    877-702-9580

1      HIGHLY CONFIDENTIAL - Washtell
2   to price an option.  It won't give you a
3   different option price, whether you're long or
4   short.
5        But the reality is, from an accounting
6   fair value perspective, we need to hold -- and
7   the fair value of an instrument is different
8   whether we're long or short because fair value
9   represents an exit price.  For that reason,
10  bid/offer calculations for derivative portfolios
11  would generally be done while I would say
12  offline, i.e., outside of the trading system,
13  not part of the daily valuation, but a separate
14  monthly calculation -- for example, monthly, not
15  necessarily always monthly.
16     **Q.   And would the bid/offer data that's**
17  **used in that adjustment process you have just**
18  **testified to, sir, would that, in your month-end**
19  **price testing activity, would that bid/offer**
20  **data be the same date as the date on which the**
21  **mid price was taken, or would it be a different**
22  **date?**
23     A.   We would generally sample a series of
24  observation dates to increase the richness or
25  the quality, amount of data that we're getting.

TSG Reporting - Worldwide    877-702-9580

Page 202

1    HIGHLY CONFIDENTIAL - Washtell
2         We would generally sample over a
3    period of, say, one week, potentially over the
4    period of a month, and generally then apply some
5    kind of average to the spread that we observe
6    over that period, rather than taking a
7    point-in-time check.
8    **Q.   And can you explain to me why you**
9    **would use an average of bid/offer spreads to**
10   **adjust a midpoint price taken from one**
11   **particular day in this case, generally the**
12   **month-end?**
13   A.   The rationale behind it?
14   **Q.   Yes, that's what I'm looking for.**
15   A.   I mean the bid/offer spread is
16   slightly different to the current market price,
17   mid value -- not market price, the current mid
18   value of a security, which will be very much
19   dependent on, you know, key market factors,
20   developments, the macroeconomic environment,
21   whatever you can -- the markets will move.
22   Bid/offer spreads per se won't tend to move that
23   much over a period of, say, a week, but you can
24   have variability at various times in the market
25   depending on the broker that's publishing a
     TSG Reporting - Worldwide    877-702-9580

Page 203

1    HIGHLY CONFIDENTIAL - Washtell
2    quote.
3         You can also have variability because
4    brokers will at some point for derivative
5    portfolios we're talking here, you know,
6    initially publish a wide quote to get some
7    market interest, but then if you address or show
8    some interest in that quote, that potentially
9    tightens.
10        So there's variability about picking
11   one quote on one particular day.  For that
12   reason, we always like to apply an average to
13   get an average of what we would call these
14   initial market quotes, you know, the tightened
15   up market quotes, and then, you know, the final
16   quotes before something gets executed to, once
17   again, get an average across as many brokers as
18   possible.  So, yes, to get an average across
19   types of quotes that you would see in the market
20   as well as market participants and brokers.
21   **Q.   Thank you.  Tell me, Mr. Washtell, did**
22   **you have any role in valuing the exchange-traded**
23   **derivatives that Barclays purchased from Lehman**
24   **Brothers in the fall of 2008?**
25   A.   No, I don't recall having a role in
     TSG Reporting - Worldwide    877-702-9580

Page 204

1    HIGHLY CONFIDENTIAL - Washtell
2    that.
3    **Q.   Do you recall having any discussions**
4    **with anybody in connection with the valuation of**
5    **Lehman's exchange-traded options?**
6    A.   Beyond -- I recall there was a
7    discussion of a portfolio of exchange-traded
8    options, but the specifics of the valuation was
9    handled specifically by Jerry Shi rather than
10   myself, and that's not something that I have or
11   that I recall having detailed discussions on.
12        (Exhibit 825, a document bearing Bates
13   Nos. BCI-EX-(S)-00179867, marked for
14   identification, as of this date.)
15   **Q.   Mr. Washtell, I'm handing you what I**
16   **have marked as Exhibit 825.  We looked at a**
17   **similar, earlier version of this e-mail chain**
18   **when Ms. Carrero was asking you questions.**
19   A.   Okay.
20   **Q.   I'll identify it for the record as an**
21   **e-mail from you to Jerry Shi, S-H-I, on Friday,**
22   **the 26th of September, and the subject is "Price**
23   **Testing - Converts/Eqty/Preferen."**
24        **You're welcome to look through it.  I**
25   **wanted in the first instance to direct your**
     TSG Reporting - Worldwide    877-702-9580

Page 205

1    **HIGHLY CONFIDENTIAL - Washtell**
2    **attention to the third page, which has a Bates**
3    **number at the bottom right-hand corner that ends**
4    **in 863.  Do you have that page, sir?**
5    A.   Yes.
6    **Q.   You see midway down the page is your**
7    **initial e-mail to Mr. Shi on the 25th of**
8    **September?  Do you have that part of the page,**
9    **sir?**
10   A.   Yes.
11   **Q.   You say, "Hi, Jerry.  By way of**
12   **introduction, I work for Marcus Morton at BarCap**
13   **and am responsible for equity derivatives price**
14   **testing group over here.  I work out of London,**
15   **but we cover the asset class globally from**
16   **here."  Do you see that?**
17   A.   Yes.
18   **Q.   Do you remember reaching out to Mr.**
19   **Shi in that matter?**
20   A.   I don't recall writing this specific
21   e-mail, but I recall making contact with Jerry
22   and introducing myself, having conversations
23   with him at this time.
24   **Q.   Did someone instruct you to reach out**
25   **to Mr. Shi?**
     TSG Reporting - Worldwide    877-702-9580

Page 206

**HIGHLY CONFIDENTIAL - Washtell**

1  **HIGHLY CONFIDENTIAL - Washtell**
2  A.   We were generally all encouraged at
3  this point to reach out to our counterparts at
4  Lehman.
5  **Q.   I may have missed it earlier.  Did you**
6  **report to Mr. Teague?**
7  A.   No, I report to Marcus Morton.
8  **Q.   Marcus Morton.  And Mr. Teague's**
9  **responsibility compared with yours is what?**
10  A.   Mr. Teague works for Marcus also.  He
11  was in the U.S. at the time and he's -- he works
12  within Independent Valuation Control and he's
13  responsible for some of the other asset class
14  groups here in the U.S.
15  I dealt with Sean on -- or some of
16  these queries that we were receiving in relation
17  to this at the time that were coming from Marcus
18  were funneled to me through Sean.
19  **Q.   I understand.  The third paragraph of**
20  **your e-mail to Jerry Shi says, "For now, we are**
21  **looking to get price data for all the positions**
22  **that have been transferred across our books.**
23  **This is mostly cash, equities, ETFs, Pref's,**
24  **MFs, et cetera."**
25  **What's the "ETF" a reference to?**

TSG Reporting - Worldwide    877-702-9580

Page 207

1  **HIGHLY CONFIDENTIAL - Washtell**
2  A.   Exchange-traded fund.
3  **Q.   In this request to Mr. Shi, are you**
4  **looking for information in connection with the**
5  **valuation of the exchange-traded options that**
6  **Barclays acquired from Lehman?**
7  A.   I don't believe so, no.
8  **Q.   Okay.**
9  A.   From reading the e-mail, it doesn't
10  look like that to me.
11  **Q.   If you look on the front page of the**
12  **exhibit, which has the Bates number 861 at the**
13  **end of it?**
14  A.   Uh-huh.
15  **Q.   There's a reference to a list of a few**
16  **questions you have for a meeting that you have**
17  **with Mr. Shi?**
18  A.   Yes.
19  **Q.   And then that is actually attached as**
20  **the last page of the exhibit, which ends Bates**
21  **868.  Do you see that?**
22  A.   I'm missing that one.
23  MR. THOMAS:  I don't have it either.
24  **Q.   Well, that should speed up the**
25  **questions then.**

TSG Reporting - Worldwide    877-702-9580

Page 208

1  **HIGHLY CONFIDENTIAL - Washtell**
2  **(Discussion off the record.)**
3  **Q.   Let me do it this way.  It's missing**
4  **from the document in front of you, sir, but I**
5  **will represent to you that one of the questions**
6  **on your list to Mr. Shi is: "What is the**
7  **process for listed derivatives marking and**
8  **testing?"**
9  **Assuming that to be an accurate**
10  **representation of one of the many questions you**
11  **wrote to Mr. Shi, does that refresh your**
12  **recollection that that was a topic of discussion**
13  **with Jerry Shi on that call?**
14  MR. THOMAS:  Objection to form.
15  A.   It doesn't refresh my recollection of
16  what we discussed, but from the sounds of the
17  point you have there, it sounds like I wanted to
18  discuss generically with him their practices at
19  Lehman Brothers, and that makes sense to me.  At
20  that time, we would have been discussing our
21  policies and procedures, their policies and
22  procedures in relation to a number of different
23  products, obviously.
24  **Q.   That's all I have for that exhibit.**
25  **(Exhibit 826, a document bearing Bates**

TSG Reporting - Worldwide    877-702-9580

Page 209

1  **HIGHLY CONFIDENTIAL - Washtell**
2  **Nos. BCI-EX-(S)-182806 through 182807,**
3  **marked for identification, as of this date.)**
4  **Q.   It's only two pages so I think we**
5  **managed to copy this correctly.**
6  **Mr. Washtell, I've handed you a**
7  **document I marked as Exhibit 826, which is an**
8  **e-mail from Jerry Shi to you on September 30.**
9  **If you could take a look at that and let me know**
10  **when you've had a chance to review it.**
11  **(Document review.)**
12  A.   Okay.
13  **Q.   Turning to the second page of the**
14  **document, the first e-mail in the chain is an**
15  **e-mail from Eric Clark to you, subject matter is**
16  **"Listed Option Portfolio."  Do you see that?**
17  A.   Yes.
18  **Q.   And who is Mr. Clark?**
19  A.   Eric Clark was at that time a director
20  within Equity Derivatives Product Control in New
21  York.
22  **Q.   Did you have a reporting relationship**
23  **with Mr. Clark?**
24  A.   Not a reporting relationship, as in I
25  didn't report to him and he didn't report to me

TSG Reporting - Worldwide    877-702-9580

Page 210

HIGHLY CONFIDENTIAL - Washtell

1  he.
2
3      Q.   And he didn't report to you?
4      A.   But as in his role as equities
5  derivatives product controller, I would have
6  interacted with him.
7      Q.   He writes to you, "Mark, do you have
8  the info to be able to give a value as at the
9  19th for the listed option portfolio that has
10  been moving between Lehman and BarCap for the
11  period since the acquisition and can you tell me
12  what you would need if you do not?  Thanks,
13  Eric."  Do you see that?
14      A.   I do see that.
15      Q.   Do you remember Mr. Clark making that
16  request of you?
17      A.   I remember at this time there was
18  general uncertainty and confusion as to the
19  existence of a listed option portfolio and
20  whether or how we could ascertain what it was
21  and whether we needed to do anything with it, so
22  broadly consistent with what we see here.
23      Q.   Do you remember Mr. Clark asking you
24  if you can value the listed options portfolio as
25  he does in this e-mail on the 30th of September?

TSG Reporting - Worldwide    877-702-9580

Page 211

HIGHLY CONFIDENTIAL - Washtell

1
2      A.   I don't recall this specific e-mail,
3  receiving it or responding to it, but I have no
4  reason to believe that it didn't happen.
5      Q.   But it doesn't jog any memory that you
6  have?
7      A.   Like I say, I recall conversations
8  happening quite well after the fact.  And this
9  is clearly already a week and a day after the
10  closing of the deal, and it would appear there's
11  still significant uncertainty as to whether a
12  portfolio exists from my response above, "As
13  yet, I have not seen anything on this."
14      Q.   You see on the first page of the
15  document, a couple of e-mails up the chain, Mr.
16  Clark writes to you, after your reply, "Mark,
17  these are the positions per the exchange.  We'll
18  need to get the info into Excel or will be
19  unwieldy."  And he lists the accounts that
20  Barclays is viewing as theirs.  Do you see that?
21      A.   I see that.
22      Q.   And then at the end, he says, "Please
23  review and let's discuss how we can get an
24  acquisition value.  Thanks, Eric."
25      Did you have any discussions with Mr.

TSG Reporting - Worldwide    877-702-9580

Page 212

HIGHLY CONFIDENTIAL - Washtell

1
2  Clark after he sent you that e-mail about the
3  topic of how to get an acquisition value for
4  Lehman's exchange-traded options that Barclays
5  had purchased around this time?
6      A.   I don't recall specific discussions I
7  had with Eric.  As I say, I recall at that time
8  there was a lot of uncertainty around this
9  portfolio, around whether it existed, what it
10  was.  From reading this, there's clearly some
11  uncertainty about what systems it would or could
12  be booked in.
13      I believe ultimately it was booked in
14  the Lehman systems, and the valuation work was
15  performed by Jerry, to my understanding.
16      Q.   Do you know why the positions were
17  booked in the Lehman system, sir?
18      A.   I don't know for definite, but my
19  understanding from what I remember hearing at
20  the time is the volume of positions we were
21  talking about here would have been problematic
22  for the BarCap systems, which is consistent with
23  the fact Lehman was a market-making business and
24  listed options and trades, tens of thousands of
25  listed options positions, as opposed to BarCap,

TSG Reporting - Worldwide    877-702-9580

Page 213

HIGHLY CONFIDENTIAL - Washtell

1
2  which was not.
3      (Exhibit 827, a document bearing Bates
4  Nos. BCI-EX-(S)-00231432 through 1433,
5  marked for identification, as of this date.)
6      Q.   Mr. Washtell, I'm handing you what we
7  have marked as Exhibit 827, which is an e-mail
8  from Mr. Eric Clark to you and others on the
9  25th of September, 2008.  You'll let me know
10  when you've had a chance to review that, please.
11      (Document review.)
12      A.   Okay.
13      Q.   The original e-mail at the bottom of
14  the chain is not sent to you, but it's forwarded
15  to you and others by Mr. Clark.  Do you see
16  that?
17      A.   I see that, yes.
18      Q.   This relates to Lehman's positions at
19  the OCC, correct?
20      MR. THOMAS:  Objection to form.
21      A.   I mean, I didn't write the e-mail and
22  I can't talk specifically to what it relates to,
23  but my understanding is this relates to I would
24  know as the listed option positions that were
25  part of the transaction.

TSG Reporting - Worldwide    877-702-9580

Page 214

1    HIGHLY CONFIDENTIAL - Washtell
2    Q.   Was that your understanding when you
3    wrote your part of the chain to Eric Clark?
4    A.   Again, I don't recall the e-mail, but
5    it looks like my concern at the time is how
6    we're going to risk manage these positions, how
7    we're going to value these positions, how do we
8    ensure from a valuation control perspective that
9    these positions are covered.  That looks and I
10   would guess is what my primary concern is at
11   that point in time.
12   Q.   And your understanding that the
13   positions that you're writing about here, sir,
14   are the same listed equity positions that you
15   gave me you mentioned in your answer a moment
16   ago, correct?
17       MR. THOMAS:  Objection to form.
18       A.   Which answer?  Sorry.
19   Q.   Let me try it this way.  You write at
20   5:03 A.M. to Mr. Clark, "Thanks, Eric.  Per your
21   understanding, then, are these positions going
22   to remain in the Lehman systems to be
23   risk-managed going forward?"  You see that?
24   A.   Yes.
25   Q.   When you wrote the words "these
     TSG Reporting - Worldwide    877-702-9580

Page 215

1    HIGHLY CONFIDENTIAL - Washtell
2    positions," what did you mean?
3    A.   I assume I meant the listed option
4    positions that were part of the transaction, but
5    there's not a lot of information in this e-mail,
6    so it's -- it's, you know, OCC position.
7        My principal concern in this would
8    have been, as I say, there's a portfolio of
9    positions.  Our New York head of Equity
10   Derivatives Trading is saying he's macro-hedging
11   these.  They're booked in a system.  Let's
12   figure out how we risk-manage them.  My
13   principal concern is this is something we need
14   to look at from a valuation perspective.
15   Q.   Was it your understanding, sir, that
16   the positions referenced in this e-mail, the OCC
17   positions, were at the time of this e-mail, the
18   25th of September, still in OCC systems --
19   sorry, still in LBI's systems?
20   A.   From the e-mail I have written here, I
21   don't recall, again, I don't recall, but from
22   the e-mail here, I'm asking a question of
23   whether these positions are going to remain in
24   Lehman's systems, which implies they are
25   currently in Lehman's systems at this point in
     TSG Reporting - Worldwide    877-702-9580

Page 216

1    HIGHLY CONFIDENTIAL - Washtell
2    time.
3    Q.   Did you ever come to learn that the
4    positions were moved from Lehman's systems, sir?
5    A.   Not to my recollection.
6    Q.   Did you ever hear that Lehman's
7    systems were switched off after the closing
8    which necessitated a transfer of listed option
9    positions to Barclays?
10   A.   I don't recall hearing that, no.
11   Q.   That would be inconsistent, at least
12   as of the date of this e-mail, that would be
13   inconsistent with your understanding of the
14   position as reflected in the words you wrote on
15   this document, correct?
16       MR. THOMAS:  Objection to form.
17       A.   Again, not recalling specifics at the
18   time, from what I've written in this e-mail
19   about the positions remaining in the Lehman
20   system, implies at that time my knowledge was
21   that they were booked in the Lehman's system.
22       MR. OXFORD:  Thank you, sir.  I have
23   no more questions for you.
24       MR. KAY:  No questions from the
25   Committee.
     TSG Reporting - Worldwide    877-702-9580

Page 217

1    HIGHLY CONFIDENTIAL - Washtell
2        MR. THOMAS:  Okay.  I just have a
3    handful of questions.
4    EXAMINATION BY
5    MR. THOMAS:
6    Q.   Do you recall being asked if market
7    participants that conducted transactions would
8    take into consideration information about events
9    that had not yet happened?
10   A.   Yes.
11   Q.   Does the fact that a market
12   participant transacting something cannot take
13   into account future events which it doesn't
14   know, does it necessarily follow, does it
15   necessarily follow that, in estimating the fair
16   value of securities at a particular point in
17   time, you should ignore or exclude all
18   information about market conditions immediately
19   after that point in time?
20   A.   No, it does not follow.  I would say,
21   on the contrary, as I was just mentioning, in
22   assessing fair value as of a point in time, we
23   would generally consider all information that we
24   have both on a particular day, but also in the
25   time period leading up to that day and the time
     TSG Reporting - Worldwide    877-702-9580

Page 218

HIGHLY CONFIDENTIAL - Washtell

1  period after that day.
2
3       So if we are assessing as part of our
4  monthly processing process, for example, the
5  valuations as of September 30, would we consider
6  market information, market trades and quotes
7  that are available on the 1st, 2nd, 3rd of
8  October, then yes, we would as part of our
9  normal practice.
10      **Q.   Would it make any sense to you if you
11 were trying to measure, for example, an illiquid
12 security at a particular valuation point in time, let's
13 say 12 noon, that in doing so, you would ignore
14 a trade in that security that occurred an hour
15 later?**
16      A.   No, it would not make any sense to do
17 that.  You would definitely consider that piece
18 of information as is quite key to assessing the
19 fair value, I would say.
20      **Q.   Is considering market information
21 after a particular valuation point in time
22 something that is consistent with Barclays'
23 valuation practices and procedures?**
24      A.   Absolutely, yes, it's consistent with
25 how we perform our monthly processing process.

TSG Reporting - Worldwide     877-702-9580

Page 219

HIGHLY CONFIDENTIAL - Washtell

1
2  It's documented in our processing policy
3  application guidelines.  It's something that we
4  have regularly discussed with our auditors.
5  Additionally, it's something I have discussed
6  with our regulators.
7       **Q.   So your auditors and regulators are
8  aware of that approach and take no exception to
9  it?**
10      A.   That's correct.
11      **Q.   Earlier when you were being asked
12 about your use of data from December as part of
13 an analysis and calculating the fair value of
14 certain equities as of September 22, 2008,
15 counsel repeatedly described that in counsel's
16 questioning as, quote, backdating.  Would you
17 consider that to be backdating in any way?**
18      A.   No, I would not consider that to be
19 backdating in any way.  I would say as part of
20 our job we're always assessing the fair value of
21 something at a point in time after the fact by
22 definition of what we do.  In no way is that
23 backdating.
24      **Q.   And again, your auditors were fully
25 aware of the processes and procedures by which**

TSG Reporting - Worldwide     877-702-9580

Page 220

**HIGHLY CONFIDENTIAL - Washtell**

1      **you calculated fair value for the equities?**
2      A.   Absolutely.  For this, our normal
3  practices specifically for this balance sheet
4  calculation, our auditors were fully aware of
5  the methodology we used.  They were supportive
6  of it.  They were in agreement with it.
7      **Q.   You understand that your testimony
8  today is part of a court proceeding and may be
9  considered by the Court; is that correct?**
10      A.   That's correct.
11      **Q.   Were you asked to value a portion of
12 the assets Barclays received from Lehman
13 pursuant to the sale transaction between Lehman
14 and Barclays in September of 2008?**
15      A.   Yes.
16      **Q.   Will you please describe the group of
17 assets that you were asked to value?**
18      A.   I would describe those assets as the
19 equity assets, including convertible bonds.
20      **Q.   What was the goal of your valuation
21 effort?**
22      A.   The goal of our valuation effort was
23 to assess the fair value of that portfolio of
24 securities.

TSG Reporting - Worldwide     877-702-9580

Page 221

HIGHLY CONFIDENTIAL - Washtell

1
2       By "fair value," we mean in accordance
3  with the accounting guidelines, specifically, IS
4  39, under which we operate.
5      **Q.   Were all directions given to you by
6  Barclays consistent with the goal you just
7  stated of calculating an accurate fair value?**
8      A.   Yes.
9      **Q.   Did you at all times during your work
10 attempt to fairly and reasonably value the
11 assets?**
12      A.   Yes.
13      **Q.   When you made decisions concerning how
14 to calculate bid adjustments in accord with the
15 governing accounting standards, for example,
16 were you influenced by any desire to achieve a
17 lower valuation or any result other than an
18 accurate statement of fair value?**
19      A.   No.
20      **Q.   Were the decisions you made with
21 respect to calculating a fair value of the
22 equities as of September 22, 2008 governed
23 strictly by the goal of accurately stating fair
24 value?**
25      A.   Yes.

TSG Reporting - Worldwide     877-702-9580

Page 222

HIGHLY CONFIDENTIAL - Washtell

1    HIGHLY CONFIDENTIAL - Washtell
2    Q.   At any time did anyone ever suggest to
3    you that you should do anything other than
4    attempt to calculate an accurate fair value of
5    the assets?
6    A.   No.
7    Q.   Did anyone ever say to you, in form or
8    substance, that a result other than the fair
9    value of the assets was desired or should be
10   achieved?
11   A.   No.
12   Q.   Did anyone ever indicate to you or, to
13   your knowledge, anyone else working on the
14   valuation of the Lehman assets, that you should
15   attempt to understate the fair value of the
16   assets in any way or to value them lower than
17   you otherwise would?
18   A.   No.
19   Q.   Would you please describe your
20   professional background and experience with
21   respect to valuing such assets?
22   A.   My professional qualifications are I'm
23   a chartered accountant.  I'm a member of the
24   Association of Chartered Management Accountants
25   and have been since 2003.  I have worked at

TSG Reporting - Worldwide    877-702-9580

Page 223

1    HIGHLY CONFIDENTIAL - Washtell
2    Barclays for nine years in total, within the
3    Finance function for all of that time, but in
4    various different roles within the Product
5    Control team.
6         For the last four and a half years,
7    I've specifically worked in the Independent
8    Valuation Control Group, and for all of that
9    time I've been responsible for the valuation of
10   equity derivatives and equity products.
11   Q.   Do you believe the valuation you
12   ultimately reached for those assets that you
13   valued reflect their fair value as of September
14   22, 2008?
15   A.   Yes.
16   Q.   Did you attempt to value the Lehman
17   assets in a manner consistent with Barclays'
18   practices and policies?
19   A.   Yes.
20   Q.   Did you interact with PwC, your
21   auditors, during their review of the valuation
22   you performed?
23   A.   Yes, quite extensively.
24   Q.   Would you please describe that
25   interaction and their efforts with respect to

TSG Reporting - Worldwide    877-702-9580

Page 224

1    HIGHLY CONFIDENTIAL - Washtell
2    the valuation?
3    A.   Yes.  That interaction, from memory,
4    lasted a number of weeks, if not a couple of
5    months.  I was engaged with one or two members
6    of their team on a regular basis.  From
7    recollection, that was at least weekly that I
8    would be having meetings or discussing with
9    them.
10        They looked at all of the data that we
11   used for the valuation.  They did extensive
12   sampling analysis.  They questioned all the
13   assumptions.  They questioned the methodologies.
14   They effectively performed an audit of our, call
15   it a detailed audit of our methodology, as they
16   normally would as part of their sort of year-end
17   audit work, for example.
18   Q.   At the end of all that work, did they
19   accept your valuation and procedures?
20   A.   Yes, to my understanding, they did.
21        MR. THOMAS:  Thank you, I have nothing
22   further.
23        MS. CARRERO:  I just have one
24   follow-up question.
25   FURTHER EXAMINATION BY

TSG Reporting - Worldwide    877-702-9580

Page 225

1    HIGHLY CONFIDENTIAL - Washtell
2    MS. CARRERO:
3    Q.   In connection with any monthly price
4    testing work that your group does as of the end
5    of the month, when would the results of that
6    price testing be available?
7    A.   Our deadlines for reporting, final
8    reporting on global price testing results are
9    working day 12 after month-end.  In a period up
10   to working day 12, all results as they become
11   available would be discussed with the relevant
12   traders, trading desk heads, regional business
13   heads.  And we have a detailed timeline of
14   deadlines, what's available when, what reports
15   are produced when in our price testing policies.
16        MR. THOMAS:  Thank you very much.
17        THE WITNESS:  Okay.
18        (Time Noted: 5:43 P.M.)
              oOo
19   _____
          MARK WASHTELL
20
21   Subscribed and sworn to
     before me this    day
22   of      2010.
23
     _____
24
25

TSG Reporting - Worldwide    877-702-9580

Page 226

1    HIGHLY CONFIDENTIAL - Washtell
2    CERTIFICATE
3    STATE OF NEW YORK )
        : ss
4    COUNTY OF NEW YORK)
5        I, Kathy S. Klepfer, a Registered
6    Merit Reporter and Notary Public within and
7    for the State of New York, do hereby
8    certify:
9        That MARK WASHTELL, the witness whose
10   deposition is herein before set forth, was
11   duly sworn by me and that such deposition is
12   a true record of the testimony given by such
13   witness.
14       I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage and that I am in no way
17   interested in the outcome of this matter.
18       I further certify that neither the
19   deponent nor a party requested a review of
20   the transcript pursuant to Federal Rule of
21   Civil Procedure 30(e) before the deposition
22   was completed.
23       In witness whereof, I have hereunto
24   set my hand this 17th day of June, 2010.
25   -------------------------------

TSG Reporting - Worldwide    877-702-9580

Page 227

1    HIGHLY CONFIDENTIAL - Washtell
2    INDEX
3    WITNESS:        EXAMINATION BY        PAGE
4    M. WASHTELL      Ms. Carrero      5, 225
5        Mr. Oxford      194
6        Mr. Thomas      217
7
8    EXHIBITS:                PAGE
9    Exhibit 817, a document bearing Bates Nos.    45
10   BCI-EX-(S)-176597 through 176599, with
11   attachment
12   Exhibit 818, a document bearing Bates Nos.    86
13   PwC-BarCap71528 through 71531
14   Exhibit 819, a document bearing Bates Nos.    87
15   BCI-EX-(S)-218502 through 218503
16   Exhibit 820, a document bearing Bates Nos.    89
17   PwC-BarCapWP_00021953 through 22931
18   Exhibit 821, a document bearing Bates Nos.    107
19   BCI-EX-(S)-176696
20   Exhibit 824, a document bearing Bates Nos.    125
21   BCI-EX-00255172, with attachment
22   Exhibit 822, a document bearing Bates Nos.    174
23   BCI-EX-(S)-00176765 through 176767
24   Exhibit 823, a document bearing Bates Nos.    183
25   BCI-EX-(S)-179808 through 179821

TSG Reporting - Worldwide    877-702-9580

Page 228

1    HIGHLY CONFIDENTIAL - Washtell
2    INDEX (Cont'd.)
3    EXHIBITS:                PAGE
4    Exhibit 825, a document bearing Bates Nos.    204
5    BCI-EX-(S)-00179867
6    Exhibit 826, a document bearing Bates Nos.    209
7    BCI-EX-(S)-182806 through 182807
8    Exhibit 827, a document bearing Bates Nos.    213
9    BCI-EX-(S)-00231432 through 1433
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 229

1    HIGHLY CONFIDENTIAL - Washtell
2    NAME OF CASE:  In re Lehman Bros. Holding
3    DATE OF DEPOSITION:  June 17, 2010
4    NAME OF WITNESS:  Mark Washtell
5    Reason Codes:
6        1. To clarify the record.
         2. To conform to the facts.
7        3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
13   Page _____ Line _____ Reason _____
     From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
16   Page _____ Line _____ Reason _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25   _____

TSG Reporting - Worldwide    877-702-9580

# EXHIBIT 6

Page 1

1

2             UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                             Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                  Debtors.
10    ----------------------x

11

12

13

14          DEPOSITION OF SEAN TEAGUE

15             New York, New York

16             June 30, 2010

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 31617

Page 2

```
 1
 2              June 30, 2010
 3              9:30 A.M.
 4
 5       Deposition of SEAN TEAGUE, held
 6   at the law offices of Jones Day, LLP,
 7   222 East 41st Street, New York, New York,
 8   before Kathy S. Klepfer, a Registered
 9   Professional Reporter, Registered Merit
10   Reporter, Certified Realtime Reporter,
11   Certified Livenote Reporter, and Notary
12   Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2
 3          A P P E A R A N C E S:
 4
 5   JONES DAY, LLP
 6   Attorneys for Lehman Brothers, Inc.
 7       222 East 41st Street
 8       New York, New York  10017-6702
 9   BY: JAYANT TAMBE, ESQ.
10       KELLY A. CARRERO, ESQ.
11       MICHAEL DAILEY, ESQ.
12
13   BOIES, SCHILLER & FLEXNER, LLP
14   Attorneys for Barclays
15       5301 Wisconsin Avenue, N.W.
16       Washington, D.C.  20015
17   BY:  HAMISH HUME, ESQ.
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2       A P P E A R A N C E S: (Cont'd.)
 3
 4   QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
 5   Attorneys for the Creditors Committee
 6       51 Madison Avenue
 7       22nd Floor
 8       New York, New York  10010
 9   BY: ERIC M. KAY, ESQ.
10
11   HUGHES, HUBBARD & REED, LLP
12   Attorneys for the SIPA Trustee
13       One Battery Park Plaza
14       New York, New York  10004-1482
15   BY:  NEIL J. OXFORD, ESQ.
16       AMINA HASSAN, ESQ.
17
18
19   ALSO PRESENT:
20       MARC VELLRATH, FSG
21       ELIZABETH KROGER DAVIS, FSG
22
23
24
25
```

Page 5

```
 1                Teague
 2   SEAN TEAGUE, called as a
 3       witness, having been duly sworn by a Notary
 4       Public, was examined and testified as
 5       follows:
 6   EXAMINATION BY
 7   MR. TAMBE:
 8       Q.   Good morning, Mr. Teague.  My name is
 9   Jay Tambe from Jones Day.  With me from Jones
10   Day, Kelly Carrero and Michael Dailey.  We're
11   counsel to the Debtor, Lehman Brothers Holdings,
12   Inc.
13       I'm going to have the other lawyers
14   who are at the table introduce themselves and
15   then we'll get started.
16       MR. OXFORD:  Good morning, Mr. Teague.
17   My name is Neil Oxford.  I'm with Hughes,
18   Hubbard & Reed.  We represent the SIPA
19   Trustee in this case.  With me is my
20   colleague Amina Hassan.
21       MR. KAY:  Good morning.  Eric Kay from
22   Quinn Emanuel for the Official Creditors
23   Committee.
24       MR. HUME:  And I'm Hamish Hume from
25   Boies Schiller representing Barclays.  Here
```

2 (Pages 2 to 5)

Teague

1                 Teague
2  also is Elizabeth Davis and Marc Vellrath
3  from FSG.
4  BY MR. TAMBE:
5    Q.  Mr. Teague, you're currently employed
6  by Barclays, is that right?
7    A.  That's correct.
8    Q.  Which Barclays entity employs you?
9    A.  Barclays Capital.
10    Q.  How long have you been with Barclays
11  Capital?
12    A.  Approximately five years.
13    Q.  Back to 2005?
14    A.  Yes.
15    Q.  And what's your current position with
16  Barclays Capital?
17    A.  I perform independent valuations.
18    Q.  You perform valuations?
19    A.  Correct.  So I perform independent
20  valuations.  Part of the IVC team.
21    Q.  And do you have a title?
22    A.  Not specifically.  I manage the Fixed
23  Income and Credit Price testing for the
24  Americas.
25    Q.  If you could just keep your voice up

Teague

1                 Teague
2  because I'm having some trouble hearing you and
3  I know the court reporter might have some
4  trouble hearing you as well.  And there's folks
5  all the way at the end of the table, so it would
6  help all of us.
7       I've seen this documents which
8  identify you as a director of Fixed Income and
9  Credit Price Testing.  Is that also -- is that
10  an accurate description of your title?
11    A.  Yes.
12    Q.  And you were, in 2008 and 2009, you
13  had the same position?
14    A.  That's correct.
15    Q.  Before you got to Barclays in 2005, if
16  you could briefly describe your employment
17  background.  Where else did you work?
18    A.  Previous to Barclays, I worked for
19  three years at Commerce Bank.  I had multiple
20  roles at the firm.  I worked in the middle
21  office function for approximately a year, I
22  worked in the trading function for approximately
23  a year, and also in what's called Alternative
24  Investment Strategies, performing due diligence
25  on hedge funds for approximately a year.

Teague

1                 Teague
2    Q.  When you were performing the trading
3  function for approximately a year, what types of
4  products did you trade?  What markets did you
5  trade in?
6    A.  Credit correlation.
7    Q.  Credit correlation.
8       Any other type of trading while at
9  Commerce Bank?
10    A.  No, just hedging for the credit
11  correlation portfolio.
12    Q.  Prior to Commerce Bank, where did you
13  work?
14    A.  I worked at Deutsche Bank/Bankers
15  Trust for approximately seven years, performing
16  various roles, including the majority, probably
17  five of those seven years were in Product
18  Control for Fixed Income Credit products, and
19  two of those years were performing documentation
20  for trades.  So trade -- trade docs.
21    Q.  And the documentation for trades, what
22  types of products were you providing
23  documentation for?
24    A.  Majority would be rates and credit.
25    Q.  Rates and credit.  And prior to

Teague

1                 Teague
2  Deutsche Bank?
3    A.  Short period of time consulting at
4  HSBC as a rates analyst as well as ISDA
5  documentation, and a short stint as a consultant
6  at Barclays Capital, also in documentation.  But
7  that was not working for the firm.  I was a
8  Consultant.
9    Q.  And when you were consulting, who were
10  you employed by?
11    A.  I can't recollect.  I do not
12  recollect.  It was ten years ago.
13    Q.  If you could maybe go back to your
14  educational background.  College, when did you
15  graduate?
16    A.  I graduated in '94.
17    Q.  From where?
18    A.  Binghamton University.
19    Q.  What degree?
20    A.  A B.A.
21    Q.  In?
22    A.  Political science and a minor in
23  economics.
24    Q.  I haven't done all the math in terms
25  of your prior experience, but when you finished

3 (Pages 6 to 9)

Page 10

Teague

1
2  your BA is when you began your consulting work,
3  or did you have further education?
4      A.    Shortly after finishing is when I
5  began the consulting work.
6      Q.    And fair to say that you don't have
7  any postgraduate degrees?
8      A.    It's fair to say that.
9      Q.    So the B.A. was your last degree?
10     A.    Correct.
11     Q.    At any time have you held any
12  registrations or licenses in the securities
13  industry?
14     A.    Yes, Series 7 and 63.
15     Q.    63?
16     A.    Yes.
17     Q.    Anything else?
18     A.    I have the -- pause for a moment.  The
19  FRM, which is Financial Risk Manager Certificate
20  as well.
21     Q.    Are you current in your Series 7 and
22  63?
23     A.    Yes.
24     Q.    Going back to the beginning of your
25  work at Barclays, starting in 2005, what

Page 11

Teague

1
2  department or group in Barclays did you join in
3  2005?
4      A.    I joined the same team, the IVC, and
5  at the time I was managing secondary ABS
6  valuations.
7      Q.    And starting in the summer of 2008, so
8  prior to the Lehman bankruptcy, July/August of
9  2008, what was your role at Barclays?
10     A.    Same as today.
11     Q.    So you were part of the IVC team.  You
12  were responsible for fixed income and credit; is
13  that right?
14     A.    Prior to the acquisition, I had the
15  same role as I have today, fixed income and
16  credit.
17     Q.    If you could just describe for me
18  briefly, as of the summer of 2008, what the
19  organizational structure was for the IVC group.
20  To whom did you report?  Who report arid to you?
21  If you could just describe the team.
22     A.    I reported to Marcus Morton.  My team
23  at the time, I can't recollect all the team
24  members, approximately four people on the rates
25  side.  I'll just do it in my head.  Five people

Page 12

Teague

1
2  on the rates side reporting in to me, and on the
3  credit side approximately, approximately five
4  people on the credit side -- six people, I
5  believe, actually, on the credit side.
6      Q.    I have placed before you a document
7  that was previously identified as Exhibit 799.
8  If you would just take a moment to review that
9  document.  Let me know when you're done.  I'll
10  ask you some questions about it.
11     A.    Certainly.
12     (Document review.)
13     A.    Okay.
14     Q.    Have you seen this document before
15  today?
16     A.    Yes, I have.
17     Q.    Were you involved in preparing this
18  document?
19     A.    Yes, I was.
20     Q.    What role did you play in the
21  preparation of this document?
22     A.    I helped provide supporting
23  information for my team.
24     Q.    And what is your understanding as to
25  why this document had been prepared?

Page 13

Teague

1
2      A.    I don't recollect.
3      Q.    Well, is it your understanding you
4  were asked to prepare this document or to
5  provide information to prepare this document for
6  purposes of this litigation?
7      A.    I believe -- I had drafted this at one
8  point in time for the head of Fixed Income for
9  my portion.  So I don't recollect if that data
10  was then provided specifically for the purposes
11  of this litigation.
12     Q.    And you said the head of Fixed Income.
13  Who are you referring to?
14     A.    Eric Bommensath.
15     Q.    And is this a document that, as far as
16  you know, is used in the day-to-day business of
17  Barclays?
18     A.    No, it is not.
19     Q.    It is not used?
20     A.    Not in the day-to-day business of the
21  firm.
22     Q.    Okay.  Now, going back to your
23  description of the people who reported to you,
24  if you could look through this and help me
25  identify the people you were referring to.  You

4 (Pages 10 to 13)

Teague

1  say four people in rates, five people maybe on
2  credit.
3      Are those people listed in this
4  document, Exhibit 799?
5  A.  If we go to the document with "FI
6  Rates" on the top.
7  Q.  Third page in.  Okay.
8  A.  Grant Rusk at the time was overseeing
9  the fixed income rates valuations.  Alessandra
10 Riccardi oversaw the fixed income options
11 portion, the fixed income rates world.  Elly Po,
12 as stated here, was involved in the RMBS
13 Treasuries and agencies as well as the munis.
14 Kevin McAndrew was involved in the rates as well
15 as some of the agency valuation.
16     Pavan was not involved in the Lehman
17 opening balance sheet.  He was an ex-Lehman
18 employee who joined with Barclays after the
19 acquisition.  Neither was Rob or Qiron.
20 Q.  And other than Grant, Alessandra, Elly
21 and Kevin, were there any other folks back at
22 the time and during the time of the acquisition
23 who were in this Fixed Income/Rates division?
24 A.  There was Mark Hollander, who was no

Teague

1  longer with the firm shortly thereafter.  He was
2  not involved.  And another individual Sam, I
3  can't recollect his last name offhand, who was
4  not involved in the Lehman acquisition, who is
5  no longer with the firm shortly after the
6  acquisition.
7  Q.  Okay.  And then moving on to Fixed
8  Income Credit at the bottom of that third page
9  over onto the fourth page, how many of those --
10 which of those folks were involved in the Lehman
11 acquisition back in the fall of 2008 onwards?
12 A.  Kevin Jhea is how you state his name,
13 was managing FI Credit at the time of the Lehman
14 acquisition.  David Wei, managed the correlation
15 aspects of the FI Credit world.  Heidi Su's main
16 role was Emerging Market Independent Valuations
17 at the time.  Amine came on through the Lehman
18 acquisition.  He was not part of the overall
19 analysis of the IVC of the opening balance
20 sheet.
21     Ilya Riskin was a member of the team,
22 still is, but was not involved in the Lehman
23 acquisition.  Mohemmed Khan was involved in
24 valuations of the corporates for the Lehman

Teague

1  acquisition.
2      Ethan Zheng, analyst, he was not
3  involved in the Lehman opening balance sheet
4  valuation, and Kartik Kothari was in the credit
5  area, mainly focusing on CDS and corporate
6  bonds.  He was not involved in the Lehman
7  opening balance sheet valuation.
8  Q.  There's one name over on the last page
9  of this exhibit, Dara Mao?
10 A.  Oh, apologies.  Dara came on through
11 Lehman.  She was not involved in the
12 acquisition.
13 Q.  In preparing this document or
14 providing information for the preparation of
15 this document, Exhibit 799, do you recall
16 whether it was sometime this year that you
17 provided that information or was it prior to
18 this year?
19 A.  I believe it would be prior to this
20 year.  Yes, during that week.  Again, this is based on information that
21 I provided much earlier to senior management and
22 on a very unrelated note.  It was just something
23 I provided to the head of the business on the
24 trading side who wanted to understand better the

Teague

1  people within my team, and that was what I used
2  to update this document.  But this document to
3  me must have been done last year.  I don't
4  recall when this was done.
5  Q.  Going back to the week of September
6  15, 2008, if you could briefly describe the role
7  or the duties that you played, and I want to
8  just focus on the time period the 15th of
9  September through the 22nd of September, so that
10 first week, roughly, what was -- what role, if
11 any, did you play in connection with the Lehman
12 transaction or the contemplated, the one that
13 was finally executed, what were you doing in
14 connection with Lehman that week?
15     MR. HUME:  Object to the form of the
16 question.
17 Q.  Do you understand my question?
18 A.  I guess what was my specific role in
19 regards to the Lehman transaction?
20 Q.  Yes, during that week.
21 A.  I guess the 15th was the -- was that
22 the weekend before?
23 Q.  15th was the day that Lehman filed for
24 bankruptcy.  It was a Monday.

Page 18

Teague

A.   That was a Monday.  So my role that
week, after they had -- after Monday, the first
objective was to perform independent valuations
for any derivative transactions we had with the
firm.  Barclays was at risk in any derivative
transactions that we had.  We had to make sure
that they were valued correctly.

So we were focusing in interest rate
swaps and credit derivatives within my team
where Lehman would have been the counterparty.
I was consolidating that data, and then, by the
end of the week, my function turned more into
focus on working with Operations to determine
the assets which were going to be brought
onboard I believe we had the Friday and then the
Monday.

Q.   In the first part of your answer you
talked about providing some support in
connection with derivatives positions where
Lehman was the counterparty.  Those were not
transactions or assets that were being acquired
as part of the transaction; those were deals on
with Lehman, existing deals?

A.   That is correct.

Page 19

Teague

Q.   The second part of your answer in
terms of your role, where you got involved with
Operations to provide some support around the
assets that were coming over from Lehman as part
of the purchase transaction, describe for me who
it was that got you involved in that.  Who asked
you to become involved?  Who from Operations?

A.   Marcus Morton and James Walker within
Product Control asked me to get a better
understanding of what was happening from an
operations perspective.

Q.   Now, Mr. Walker, where does he fit
into the Product Control or Independent
Valuation Division or structure of the bank?

A.   I believe at the time he was CFO.  I
can't remember his exact title.

Q.   So he would be someone that Mr. Morton
would report up to?

A.   Yes.

Q.   Were the others from Product Control
and from Independent Valuation who would be
working with you, were you leading that effort
on the part -- on the side of Product Control
and Independent Valuation?

Page 20

Teague

A.   I was involved in mainly in what I
would consider reconciliation view, trying to
understand what data we would be receiving.  The
Operations team would be coordinating with the
Lehman team from the Lehman's Operations team to
determine what is -- what was expected to be
delivered, and I was working with them as well
as certain members of Product Control, for
instance, Steve Calick, who would have been
working from an equities perspective to see what
assets would be moving over to Barclays.

So the majority of the analysis, of
course, was within the Operations function.  Our
role was just to try to get, gain a deeper
understanding of what was happening.

Q.   And this role about getting a deeper
understanding of what was happening, was there a
point in time where sort of that role ended and
you reverted to a Product Control price,
independent price verification role?

A.   In certain aspects it was just
intertwined.  If you didn't know what you were
supposed to value, you couldn't really perform a
valuation.  So that's why I was involved, was to

Page 21

Teague

ensure I understood, you know, what paper, what
securities were being delivered so we could
value them.

Q.   And was it your understanding that
your role would be initially to sort of identify
what's coming over, and ultimately you would be
part of the team that would be valuing what had
come over?

A.   Yes.

Q.   You said Mr. Calick played a role with
respect to equities.  Other than you and Mr.
Calick, were there other people from Price
Control or IVC who had other asset classes that
they were responsible for cracking and
reconciling?

A.   Well, to clarify, Steve Calick was in
Product Control outside of IVC.  His function
was just more so to, again, gain an
understanding of what was coming on in
discussions with Operations.

Within IVC, you know, I can't
recollect if Rich Landreman was heavily
involved, but he was aware that, you know, we
were getting assets delivered.

Page 22

Teague

1    Teague
2      Q.   And how would you sort of describe
3    where Mr. Landreman fits into the hierarchy
4    within Product Control and IVC?
5      A.    Mr. Landreman works in Independent
6    Valuation Control.  He also reports in to Marcus
7    Morton and his function, as per here, is to
8    review the -- to perform independent valuations
9    for securitized products.
10     Q.   I just want to be clear on sort of the
11   distinction between Product Control and IVC.
12     A.    Certainly.
13     Q.   Can you just describe what the
14   distinction is and how those two divisions or
15   teams work together or separately?
16     A.    Independent Valuation and Control is
17   essentially a subset of the Product Control
18   world.  Product Control, which I'm referring to
19   a separate team, would be considered the daily
20   P&L function for the firm.  They would perform
21   the P&L analysis of the books and records of the
22   firm, of the marked to market assets for the
23   books that I would be overseeing.  They would,
24   you know, determine what the -- what mark to
25   market happened on a daily basis and how that

Page 23

Teague

1    Teague
2    P&L explain works for the firm's earnings and
3    losses.
4      Q.    All right.  So you described what the
5    P&L -- what the Product Control Group function
6    is.  And what is it that you do differently or
7    what is it that IVC does differently from
8    Product Control Group?
9      A.    IVC's function is more so to
10   independently value those assets that are on the
11   books and records to ensure that positions are
12   properly marked to market.
13     Q.    Well, are you doing something more or
14   differently than what the Product Control Group
15   does?
16     A.    To clarify, we would be analyzing the
17   pricing of assets, cash and derivatives, while
18   they would be -- function more of an accounting
19   role of reporting the daily P&L related to those
20   assets.
21     Q.    When we get to the acquisition balance
22   sheet that was prepared by Barclays for the
23   Lehman transaction, the valuations that appear
24   there for the trading portfolio that was
25   acquired, what role did PCG, Product Control

Page 24

Teague

1    Teague
2    Group, play in determining those values?
3      A.    They would not have played a role in
4    that valuation aspect.
5      Q.    Who would have determined those values
6    or who did determine those values on the
7    acquisition balance sheet?
8      A.    That was chairmaned by the Independent
9    Valuation Group.  Some of the marks were
10   chairmaned by the trading desk.  It's all
11   product-specific.
12     Q.    And you're familiar with the
13   acquisition balance sheet, correct?
14     A.    Yes, I am.
15     Q.    And you helped prepare it?
16     A.    Yes, I have.
17     Q.    And you could, by looking at the
18   acquisition balance sheet and the underlying
19   data, identify where prices were provided by
20   trading desks, where prices were the result of
21   independent price testing, et cetera?  Could you
22   do that?
23         MR. HUME:  Object to the form.
24     Q.    Do you understand the question?  Do
25   you want it read back?

Page 25

Teague

1    Teague
2      A.    I can answer for the products that I
3    covered.
4      Q.    Okay.  What products did you cover?
5      A.    The rates and credit products within
6    the Lehman opening balance sheet, which would be
7    corporates, emerging markets, munis, and
8    agencies as well as some of the securitized
9    products.
10     Q.    So you covered Pine, correct?
11     A.    That's correct.
12     Q.    You covered Giants Stadium?
13     A.    That's correct.
14     Q.    When you say agencies, what types of
15   securities would you include -- are included
16   within the agencies that you covered?
17     A.    It would be the agency corps.
18     Q.    Just roughly, by dollar value or
19   percentage, what percentage of the trading
20   portfolio acquired by Barclays is covered by you
21   and your analysis?
22     A.    Approximately a quarter.
23     Q.    One-quarter by CUSIP or by value?
24     A.    I believe by market value.
25     Q.    When you say market value, you mean

7 (Pages 22 to 25)

Teague

1    the value ascribed by Barclays to those assets?
2    A.    That is correct.
3    Q.    So you got a quarter by market value.
4    Who is covered -- who else has covered the rest
5    of it?
6    A.    It would be Rich Landreman.
7    Q.    And what would he have covered?
8    A.    The ABS valuations, all agencies
9    outside of the agency corporates, and for the
10    equity side, that would be Mark Washtell.
11    Q.    Any other asset classes that were
12    covered by others other than the three of you,
13    you, Rich and Mark?
14    A.    And for any valuations where the
15    trading data was utilized and reviewed by PwC, I
16    don't recollect who the proper contact would be.
17    Q.    For those valuations where trading
18    data was utilized and you say reviewed by PwC,
19    what types of assets were those?
20    A.    I believe those were the CDOs.
21    Q.    Do you have any particular CDO name by
22    way of example that comes to mind, any
23    particular names?
24    A.    No, I do not.

Teague

1    Q.    By dollar volume or CUSIPs, any sense
2    of the magnitude of the number of the valuations
3    that fall into this bucket where trading data
4    was used?
5    A.    No, I do not.
6    Q.    The assets that were -- that are
7    identified in some documents as PMTG assets, who
8    covered those?
9    A.    I believe that the majority of it
10    would have been Rich Landreman.
11        MR. HUME:  Can I just ask, Jay, this
12    document you showed earlier, 799B?
13        MR. TAMBE:  Yes.
14        MR. HUME:  That's a deposition exhibit
15    number?
16        MR. TAMBE:  That's a deposition
17    exhibit number.
18        MR. HUME:  So it came in in a prior
19    deposition?
20        MR. TAMBE:  Yes.
21    Q.    Sir, I've had placed before you a
22    document marked Exhibit 133.  We'll refer to it
23    at least here as Exhibit 133.  It also carries a
24    movants trial exhibit number.  It's a two-page

Teague

1    document.  My question to you is simply is do
2    you recognize this document?
3    A.    No, I do not.
4    Q.    Turning to the first page of the
5    document, Exhibit 133, you'll see there's a
6    couple e-mails there.  The one at the bottom is
7    from Jasen Yang to Patrick Clackson, do you see
8    that?
9    A.    Yes.
10    Q.    Do you know Mr. Yang?
11    A.    He works on the trading side.
12    Q.    Is Mr. Yang someone that you had
13    interactions with in connection with the Lehman
14    acquisition?
15    A.    Yes.
16        MR. HUME:  Objection to the form.
17    Q.    And what was the nature of your
18    interaction with Mr. Yang on the Lehman
19    acquisition?
20        MR. HUME:  Object to the form.
21    A.    Mr. Yang reviewed the portfolio from
22    the perspective of the trading desk of what was
23    going to be acquired, and his team was involved
24    in the CDO valuation.

Teague

1    Q.    And when you say the "CDO valuation,"
2    is that again those trader valuations that you
3    referenced earlier that were provided to PwC and
4    reviewed by PwC?
5    A.    Yes.
6    Q.    You also see in Mr. Yang's e-mail,
7    that's an e-mail to Patrick Clackson.  Who is
8    Mr. Clackson?
9    A.    Patrick I believe is the CFO.
10    Q.    Is Mr. Clackson someone that you
11    interacted with in connection with the Lehman
12    acquisition?
13        MR. HUME:  Objection.  Vague and
14    ambiguous.
15    A.    Any involvement with Patrick was, the
16    majority of it was really with Marcus Morton.
17    Q.    So you would not have been directly
18    dealing with Mr. Clackson; is that right?
19    A.    No.
20    Q.    How about Stephen King, was that
21    someone that you dealt with directly in
22    connection with the Lehman acquisition?
23    A.    No.  I've been on phone calls with
24    Stephen King, but I did not deal with him

Teague

1 directly.
2    Q.   And were you on phone calls with
3 Stephen King with respect to the Lehman
4 acquisition?
5    A.   I have been on phone calls with him
6 regarding the Lehman acquisition, but I have not
7 had any, you know, direct phone calls with
8 Stephen King where Stephen and I, you know,
9 would discuss the Lehman acquisition.  It was
10 more conference calls where we were both on the
11 same phone.
12    Q.   Describe for me briefly the kind of
13 calls you have been on with Stephen King in
14 connection with the Lehman acquisition.
15    A.   Just discussions on what -- what
16 valuations we were assigning and getting --
17 trying to get an understanding as well as how
18 the CDO valuations performed by the desk.  We
19 ran our own independent valuations which were
20 also provided to Product -- to PwC.
21       So mostly an understanding of if there
22 are aspects of structured deals where we needed
23 more information such that if they had any
24 Trustee reports, things of that nature.

Teague

1    Q.   Did you have any conversations with
2 Mr. King in or around the time of the
3 acquisition about the valuation of specific
4 assets that were being acquired from Lehman?
5    A.   No.
6       MR. HUME:  Objection.  Vague.
7    A.   No, I did not.
8    Q.   Do you recall any interactions with
9 Mr. King in the time period immediately after
10 the acquisition, so late September, early
11 October 2008?
12    A.   Yes.  The majority of the
13 conversations were in regard to the acquisition
14 itself and what had settled and any issues that
15 were outstanding mostly from an operational
16 perspective.
17    Q.   In one your previous answers you said
18 that there was some discussion about valuations.
19 That was a topic discussed in these conference
20 calls where you were involved and Mr. King was
21 involved.
22       Who else was involved in those
23 conversations?
24    A.   I don't recollect.  Marcus Morton,

Teague

1 James Walker, and just Jasen Yang, potentially.
2 But again, those conversations were on the
3 assets that were coming onboard.
4    Q.   The assets coming onboard from Lehman?
5    A.   Correct.
6    Q.   And certain numbers of those assets
7 were being assigned to trading desks, correct?
8    A.   Yes, at the time.
9    Q.   And those trading desks would have
10 been run by people like Stephen King and others?
11    A.   Yes.
12    Q.   He was the trader, correct?
13    A.   Correct.
14    Q.   Do you recall any conversations where
15 Mr. King expressed a different point of view on
16 valuations than the one that you and your team
17 were expressing?
18       MR. HUME:  Objection.  Lacks
19 foundation.  He said they didn't discuss
20 valuations.
21    A.   The context of what was discussed was
22 mostly, again, in the context not of the
23 valuations, it was really in the context of the
24 positions themselves and how they were going to

Teague

1 get booked onto the balance sheet, not the
2 valuations of the assets coming onboard.
3    Q.   Were there any discussions, as you
4 recall, with Mr. King where Mr. King expressed
5 disagreement with the valuations that were
6 prepared by you and your team?
7    A.   Any discussions of that nature were
8 more to deal with getting a deeper understanding
9 of the assets themselves, again such as the CDOs
10 to obtain better market data.
11    Q.   Okay.  I guess I want to get a better
12 understanding of what you mean by that.  There
13 were discussions where Mr. King expressed a
14 disagreement over the value being ascribed by
15 you and your team to an asset or classes of
16 assets?
17    A.   More specifically, to an asset.  If an
18 asset valuation was performed where we didn't
19 have full market data, there was times where the
20 trading desk would provide us additional
21 information, such as if there were aspects of a,
22 you know, of a security that they had a better
23 understanding of.
24       So that was, again, going back to the

Teague

1
2  CDOs, more so the CDOs were valued by the desk.
3  We performed a secondary analysis, which PwC
4  also incorporated into their overall view.  In
5  performing that analysis, Stephen King and Jasen
6  would provide us information if we didn't know
7  fully every aspect of the waterfall of the CDO.
8      Q.   I want to make sure I'm not
9  misunderstanding your answer.
10     A.   Okay.
11     Q.   I understand and appreciate your
12  telling me that when you needed information to
13  understand how to value a particular product,
14  you might have asked Mr. Yang and Mr. King to
15  provide information.
16         My question is a very specific one:
17  Do you recall any conversations on these
18  conference calls where Mr. King participated and
19  you were on these conference calls where Mr.
20  King expressed disagreement with a value that
21  you and your team were placing on any asset --
22         MR. HUME:  Objection.
23     Q.   -- in connection with the Lehman
24  acquisition?
25         MR. HUME:  Objection.  Asked and

Teague

1
2  answered and vague and ambiguous.
3      A.   The desk had their view of what the
4  portfolio was worth.  Independent Valuations had
5  their view of what the portfolio was worth.
6      Q.   So you had different views as to the
7  valuation; is that correct?
8      A.   From a high level perspective,
9  everyone will have a different methodology.
10     Q.   Again, I'm not talking about everyone.
11  I'm talking about Mr. King specifically and Mr.
12  Yang.  He was working with Mr. King on this.
13         If I understand your last answer, Mr.
14  King expressed a different view on valuation
15  than that being expressed by you and your team
16  with respect to at least some of the assets that
17  you were valuing in the Lehman acquisition; is
18  that correct?
19     A.   Yes, that can happen.
20     Q.   These weren't pleasant conversations
21  with Mr. King, were they, sir?  These were
22  heated conversations you had with Mr. King?
23         MR. HUME:  Objection.  Vague and
24  ambiguous.
25     A.   I wouldn't say that.  I wouldn't agree

Teague

1
2  with that.
3      Q.   The value that you put on these assets
4  or that the bank puts on these assets, they
5  ultimately would affect the P&L from Mr. King
6  and his desk, correct?
7      A.   I wouldn't know the specifics of how
8  that aspect of the firm works, sir.
9      Q.   But the decisions that you make on
10  valuation can have an impact on the trader's
11  P&L, correct?
12     A.   I wouldn't have known the specifics of
13  how the trader's P&L was going to drive their
14  earnings.
15     Q.   I'm not asking for the specifics.  I'm
16  asking for the general -- there is a connection
17  between what you do and what happens to the
18  amount of money the trader takes home, correct?
19     A.   Correct.  But conceptually, this was
20  an acquisition more so than a trading book that
21  was managed by a trader that they had acquired
22  through the regular course of actions.  I
23  wouldn't know how the trader's income was going
24  to be derived through this acquisition.
25     Q.   Well, was that a topic of discussion,

Teague

1
2  as to how the trader's income would be derived
3  with respect to the assets acquired through the
4  acquisition?
5      A.   I would not have been involved in
6  anything at that level.
7      Q.   Were you aware that that was a topic
8  of discussion?
9      A.   No, I was not.
10     Q.   Given the nature of how these assets
11  were acquired through an acquisition as opposed
12  to through the course of trading, did that
13  affect the way that you went about doing your
14  price-testing analysis and price-verification
15  analysis?
16         MR. HUME:  Objection.  Vague and
17  ambiguous.
18     A.   No, it did not.
19     Q.   You applied exactly the same policies,
20  procedures, methodologies that you applied to a
21  trading book?
22     A.   Yes.  There were some differences in
23  the respect that, from a trading book
24  perspective, the analysis would be based on the
25  desk marking to bid and the analysis would be

Page 38

Teague

1
2  then performed based on that bid price.  For
3  this portfolio we did not have the assets
4  already marked to bid.  The assets were not
5  already marked to bid or being held at bid by
6  the firm.  That would have been the difference.
7      Q.    So you had to take an additional step
8  with respect to these assets and mark them to a
9  bid or an ask before you did your price
10  verification; is that right?
11     A.    Correct.
12     Q.    Sir, I have placed before you a
13  document that was previously marked as
14  Deposition Exhibit 817.  If you could take a
15  moment to review it.  Let me know when you're
16  done.  I'll ask you a couple of questions about
17  it.
18         (Document review.)
19     A.    Yes.
20     Q.    I want to start with the e-mail chain
21  that begins on page 2 of this exhibit and work
22  our way to page 1.  You'll see the first e-mail
23  in the chain appears to be an e-mail from
24  someone called Brendan Davis to Clement Bernard.
25  Do you see that?

Page 39

Teague

1
2      A.    Clement, yes.
3      Q.    Clement.  And then the next e-mail up
4  is from Clement to James Walker, Marcus Morton,
5  Jasen Yang, Steven King.  Do you see that?
6      A.    Yes.
7      Q.    That shows Clement as with an e-mail
8  address of clementbernard@lehman.com; is that
9  correct?
10     A.    Yes.
11     Q.    Is Clement someone who eventually
12  joined Barclays as part of the acquisition?
13     A.    No, he is not.
14     Q.    Is he someone that you dealt with in
15  connection with the acquisition?
16     A.    To a very small degree.
17     Q.    What was the extent of your
18  interaction with Mr. Clement?
19     A.    The majority of my interaction with
20  Mr. Clement was through e-mails such as this.
21     Q.    Now, you will see that the e-mail
22  chain begins on page 2 on the evening of
23  Wednesday, September 17, 6:19 P.M.; do you see
24  that?
25     A.    Yes.

Page 40

Teague

1
2      Q.    And it's attaching a series of zip
3  files, do you see that?
4      A.    Yes.
5      Q.    And as you follow that e-mail chain up
6  to page 1 of the Exhibit 817, you will see the
7  most recent e-mail in the chain, which is the
8  top of page 1.  It's from Mark Washtell to you,
9  do you see that?
10     A.    Yes.
11     Q.    And he's basically talking about the
12  three files, and the three files that are
13  referenced are the three files on the second
14  page, do you see that?
15     A.    Yes.
16     Q.    During that week of the 15th of
17  September and over into the week of the 22nd,
18  did you at any time analyze the valuation of a
19  portfolio of assets other than what are
20  referenced in various documents as the Fed repo
21  assets or the assets that came over to Barclays
22  as part of the Fed repo?  Did you analyze any
23  other portfolios of assets for the Lehman
24  acquisition?
25         MR. HUME:  Objection to the form.

Page 41

Teague

1
2  Vague and ambiguous.
3      A.    Can you restate the question?
4      Q.    Let me ask it a different way.  And
5  here's the reason I'm asking it.  The files that
6  are being analyzed or that are subject of this
7  e-mail --
8      A.    Uh-huh.
9      Q.    -- begin with these attachments in an
10  e-mail Wednesday, September 17, do you see that?
11     A.    Yes.
12     Q.    You know that, by the end of the week,
13  the transaction took a shape and a form where
14  assets that had been pledged to the Fed were
15  then transferred over to Barclays, you
16  understand that, correct?
17     A.    Yes.
18     Q.    Do you have any understanding of what
19  the connection is, if any, between these files
20  that are being transferred over on Wednesday,
21  September 17, and the Fed repo assets that
22  ultimately become part of the Barclays/Lehman
23  transaction?  The same stuff?  Different stuff?
24     A.    In all honesty, I've never done a
25  reconciliation.  I would assume these -- these

11 (Pages 38 to 41)

Teague

1
2  were the same assets that would have eventually
3  be part of the acquisition.
4      Q.   And certainly by Friday, September 19,
5  Barclays had already received some, but not all,
6  of the repo assets, correct?
7      A.   I have no idea what percentage, but
8  yes, I believe there was potentially certain
9  aspects, yes, were announced by Friday.
10     Q.   And things had been transferred over
11 Thursday night, correct?
12         MR. HUME:  Objection.  Lacks
13 foundation.
14     A.   I didn't work in Operations.  I
15 couldn't speak to that subject.
16     Q.   But the role that you were playing in
17 reconciling what was coming over, you knew
18 things had come -- securities had come over
19 Thursday night?
20         MR. HUME:  Objection.  Lacks
21 foundation.
22     Q.   Did you not, sir?
23     A.   I did not perform that role.  That
24 role was within Operations.
25     Q.   I'm not talking about role.  I'm

Teague

1
2  talking about your understanding based on where
3  you were in the process.
4      A.   My review was essentially, just say
5  from these -- from these files, I was provided a
6  summary file and it didn't reconcile to these
7  files.  I was trying to understand (A) how to
8  value based on the underlying and why it didn't
9  make sense through the summary file I was
10 provided.  I didn't look at it from a "what has
11 come on balance sheet" perspective.  I was being
12 told what would come on balance sheet, and it
13 didn't reconcile from two different files that
14 they provided me.
15     Q.   I have placed before you a document
16 marked Exhibit 860, which is a cover -- two
17 pages are cover e-mails, and then a spreadsheet
18 that's been printed out or a series of
19 spreadsheets that have been printed out from
20 native files.  Take a look at the document and
21 let me know when you're done.
22         (Document review.)
23         MR. HUME:  Sorry.  Jay, was this
24 produced as a single document?  Can you just
25 say again what --

Teague

1
2          MR. TAMBE:  Yes.  That's my
3  understanding, is that what has been printed
4  out and attached is what was produced as a
5  single document as part of --
6          MR. HUME:  As the attachment?
7          MR. TAMBE:  As the attachment to this
8  e-mail.
9      A.   Yes, I have reviewed this document.
10         MR. HUME:  There's a different e-mail
11 on page 954 with an additional attachment or
12 additional attachments and another e-mail at
13 963.
14         MR. TAMBE:  Yes, and I think all the
15 printouts are printouts off the files that
16 are attached to each of those e-mails.
17 That's what this exhibit is.
18         MR. HUME:  I'm just noting for the
19 record there are a number of e-mails within
20 the document that are followed by other
21 spreadsheets.
22         MR. TAMBE:  And my understanding is
23 all of that is what gets sent by Mr. Marcus
24 Morton to Sean Teague on Thursday, September
25 18, 2008.  That's the way the e-mail chain

Teague

1
2  reads.  It's a series of e-mails being
3  forwarded by Mr. Morton to Mr. Teague.
4      Q.   Do you see those?
5      A.   Yes, I do.
6      Q.   If you turn to the second page of the
7  exhibit, it's literally page 2, the second page
8  of this bound exhibit, you'll see another e-mail
9  from Clement Bernard to James Walker, Marcus
10 Morton and others, and has a subject line
11 "Details of 9/16 inventory."  Do you see that?
12     A.   Yes.
13     Q.   Did you ever perform any kind of
14 independent price verification or analysis of
15 the securities that were in Lehman's -- on
16 Lehman's balance sheet as of 9/16?
17     A.   State it again.  You're saying have I
18 on any date performed an analysis of their 9/16
19 data?
20     Q.   Yes.
21     A.   We did a, which would have been on
22 Thursday or Friday, an initial analysis to see
23 if we could -- what percentage of these
24 portfolios could be independently valued to get
25 an idea of the assets that were going to be

Teague

1 delivered.
2   Q.   Okay.  Just so I understand your
3 answer, then, at some point around the Thursday
4 or Friday of that week, the 18th or the 19th of
5 September, you looked at spreadsheets of Lehman
6 inventory to see what percentage of that
7 inventory could be independently valued from
8 third-party sources, is that fair?
9   A.   Correct.
10   Q.   And did you prepare any reports or any
11 e-mails that set forth your conclusions about
12 that analysis?
13   A.   Well, the first stumbling block on
14 that was, again, of these eight files that were
15 provided, they did not match off to the summary
16 file provided by Lehman.  As to what the final
17 results of what could and could not be valued, I
18 do not believe anything was fully consolidated
19 by myself to that nature.
20        There were probably some e-mails from
21 this original file that were provided as
22 feedback to be it Marcus Morton or James Walker
23 on what -- to provide color on what we could
24 value, but that would have been the extent of
25

Teague

1 it, to my knowledge.
2        As per your earlier document, there
3 was work done by Mark Washtell to show, you
4 know, what data could or could not be valued
5 from third-party data.
6   Q.   And the earlier document you were
7 referring to was Exhibit 817; is that right?
8   A.   Correct.
9   Q.   During the week of the 15th, were you
10 part of any efforts to value portfolios of the
11 Lehman securities to account for any alleged
12 failures by Lehman to update their marks from
13 the 12th of September to the 15th of September?
14 Was that a project that you were involved in at
15 all?
16   A.   No, it was not.
17   Q.   Did you hear any conversations or
18 comments during the week of the 15th about
19 Lehman having failed to update its marks from
20 the 12th of September?
21   A.   This is the first I've heard of it.
22   Q.   So, up until this morning sitting in
23 this conference room, that's not something
24 you've heard of?
25

Teague

1   A.   No.
2   Q.   During the week of the 15th of
3 September, 2008, or thereafter, have you had any
4 conversations or communications with anyone from
5 the Bank of New York about valuing the Lehman --
6 the securities that were transferred over as
7 part of the Lehman acquisition?
8   A.   No, I have not.
9   Q.   Do you know whether anyone at Barclays
10 has spoken with anyone at BoNY about that topic?
11   A.   Not that I'm aware of.
12   Q.   You are aware, are you not, that the
13 Bank of New York had ascribed certain values to
14 some of the securities that were transferred to
15 Barclays as part of the Lehman acquisition?
16   A.   Yes.
17   Q.   Have you conducted any analyses of the
18 Bank of New York valuations to determine if
19 they're accurate, inaccurate, or to what extent?
20   A.   We did a review from an independent
21 valuation perspective of what those prices were.
22 They were (A) stale.  They were not reflective
23 of the date of acquisition.
24        In addition, the problem with the BoNY
25

Teague

1 marks, in a very, very volatile marketplace,
2 they were not reflective of -- I believe the
3 last date for the BoNY's was a few days before
4 the acquisition -- they were not reflective of
5 for more illiquid assets of the data that we
6 were seeing.
7   Q.   So you rejected all the BoNY values?
8   A.   It was used as a last resort.
9   Q.   What was the criteria that you used to
10 determine that the BoNY marks were the last
11 resort?
12   A.   Well, upon initial review, we found
13 some discrepancies where we didn't think the
14 BoNY valuations were strong.  The BoNY
15 valuations were most likely derived strictly
16 from third-party data and it was outdated
17 third-party data, vendor data.
18        If -- I have not worked at BoNY or
19 with BoNY to have a deep understanding of how
20 their prices are attributed, but it was
21 determined instead of doing a full-on analysis
22 of what was wrong with BoNY, it's best to start
23 fresh and perform an independent valuation and
24 just step aside and only use BoNY pricing when
25

13 (Pages 46 to 49)

Page 50

Teague

1  and if no other pricing was available.
2
3      Q.    So that was the rule, that you would
4  only use BoNY when no other pricing was
5  available?
6      A.    Essentially, yes, that was the
7  hierarchy.  We tried to perform independent
8  valuations, and when we couldn't find other
9  pricing, we used the BoNY prices.
10     Q.    So anytime I go through the
11 acquisition balance sheet and see a BoNY price
12 used by Barclays, what you're telling me is that
13 means that you have satisfied yourself that
14 there are no other sources of pricing available
15 for that security and that's why you used the
16 BoNY price?
17     A.    To the best of my knowledge, yes.
18     Q.    Do you know whether other people on
19 your team used the same hierarchy or approach to
20 using or not using BoNY prices?
21     A.    That was the overall view for, to
22 clarify, for any assets such as securitized
23 products where there may not have been
24 third-party vendor data, i.e., CDOs or ABS
25 products, the BoNY prices would have just been

Page 51

Teague

1
2  thrown out even if there is no other price data
3  available and independent analysis would have
4  been performed using research data.
5      Q.    So, in some cases where there was no
6  other price data available, you would not have
7  used BoNY, right?
8      A.    For illiquid assets, BoNY would not be
9  reliable.
10     Q.    But where BoNY was used, you used it
11 because there was no other data available?
12     A.    Correct.
13     Q.    Sir, I've handed you a document marked
14 as Deposition Exhibit 83B.
15     A.    Uh-huh.
16     Q.    It's a cover e-mail and has some
17 spreadsheet pages attached to it.  Take a moment
18 to review it.  Let me know when you're done.
19     (Document review.)
20     A.    Okay.
21     Q.    You'll see the front page of this
22 exhibit is an e-mail from Stephen Sell to
23 various people.  Do you see that?
24     A.    Yes.
25     Q.    Do you know Mr. Sell?

Page 52

Teague

1
2      A.    Yes.
3      Q.    And where does he fit into the
4  Barclays structure?
5      A.    I believe at the time he was COO for
6  Stephen King.
7      Q.    So, again, I'm just trying to figure
8  out where people fit in the structure.  Is he a
9  trader?
10     A.    No, he would be the business manager,
11 in a sense, for Stephen King's desk.
12     Q.    And you'll see his e-mail is sent
13 Sunday, September 21, do you see that?
14     A.    Yes.
15     Q.    And the e-mail is CC'd to people like
16 Marcus Morton, James Walker, Stephen King and
17 others.  Do you see that?
18     A.    Yes.
19     Q.    In his e-mail, Steve Sell states, "I
20 have received agreement/consensus from Stephen
21 King and James Walker.  We should progress down
22 the following path," and he sets out some bullet
23 points, do you see that?
24     A.    Yes.
25     Q.    Do you have an understanding or

Page 53

Teague

1
2  knowledge about what this agreement or consensus
3  was that Mr. Sell was referring to in his
4  e-mail?
5      A.    Is my name on this?
6          MR. HUME:  Objection.  Lacks
7      foundation.
8      A.    Is my --
9      Q.    I didn't hear what you said.
10     A.    Apologies.  Is my name on this e-mail?
11     Q.    Your name is not on this e-mail, no.
12     A.    Yeah, I've never seen this e-mail.  So
13 what was the question again?
14     Q.    Do you have an understanding or
15 knowledge about what this agreement or consensus
16 was that Mr. Sell was referring to in his
17 e-mail?
18     A.    No.  From reading the e-mail, I
19 believe it looks as though they're talking about
20 how to book these assets onto Barclays' system.
21     Q.    And in your view or your
22 understanding, booking the phrase "onto the
23 system" is different from doing an independent
24 valuation of those trades; is that right?
25     A.    That's correct.

14  (Pages 50 to 53)

Page 54

Teague

1
2     Q.   And your understanding was there was a
3  two-stage process:  The trades were booked into
4  Barclays, and then you and your team went about
5  ascribing a value to those transactions or
6  trades; is that right?
7     A.   Yes.
8     Q.   So, going to his bullet points on his
9  e-mail where he says, "We should book all
10  positions from the Lehman financing facility to
11  BCI," he's got a parenthetical there, was that
12  done?  Were all trades booked to BCI?
13          MR. HUME:  Objection.  Lacks
14     foundation.
15     A.   Again, I was looking at it more from
16  an independent valuation perspective.  I can't
17  speak to the -- how the accounting was
18  originally performed and how the booking was
19  handled by Operations.
20     Q.   The next bullet point says, "We should
21  book based on the price within the BoNY file, at
22  least for day one."  Do you see that?
23     A.   Yes.
24     Q.   Do you know whether that was done?
25          MR. HUME:  Objection.  Lacks

Page 55

Teague

1
2  foundation.
3     A.   Again, I wasn't -- it was outside of
4  my role.
5     Q.   So you don't know whether it was done
6  or wasn't done?
7     A.   Correct.  I couldn't -- couldn't
8  opine.
9     Q.   Were you involved at all in the
10  process or the decision as to how the securities
11  that were being taken on as part of the Lehman
12  acquisition, how those would be allocated or
13  placed with different trading desks?
14     A.   It was placed, from a very, very high
15  level, it was placed as a means to whatever
16  systems were managed by whatever trading desks
17  could handle these assets.  So you wouldn't book
18  it to a trading desk where they were unable to
19  properly book those assets, which is why it was
20  split between different trading desks.
21          So Stephen King oversaw the, you know,
22  what came on the balance sheet, but because we
23  don't have one system to handle all products, it
24  was booked to different areas.
25     Q.   So, taking Mr. King as an example,

Page 56

Teague

1
2  what types of assets would have been booked to
3  his trading desk?
4     A.   The structured or securitized
5  products.
6     Q.   Including mortgage products?
7     A.   I can't say if it was all underneath
8  him or not, but yes.
9     Q.   So securitized and structured products
10  would be placed with Mr. King?
11     A.   Again, speaking very high level,
12  that's how it would work.
13     Q.   And when those transactions or trades
14  were allocated to Mr. King's desk, they would be
15  allocated at a certain value, correct?
16     A.   Again, whatever price they used to put
17  it onto the systems was just a function of
18  bringing it onto the systems.
19     Q.   Once they were onto the systems, at
20  some point, either subsequent days and weeks,
21  you and your team would go -- did go through and
22  revalue those securities; is that right?
23     A.   For the purposes of opening balance
24  sheet, correct.
25     Q.   Again, I just want to understand the

Page 57

Teague

1
2  mechanics of this process.  Say a security had
3  been taken onto Mr. King's books at $100, and
4  you came by two weeks later and said, well, that
5  should only be $90, what impact would
6  that adjustment of valuation of that security
7  have on Mr. King's P&L, if any?
8          MR. HUME:  Objection.  Lacks
9     foundation.
10     A.   You would have to talk to the Product
11  Control area to go into the nuances of how the
12  accounting aspects were performed.  I'm really
13  not privy to the specifics of that because it
14  was more so done on a portfolio, the overall
15  valuation, so that was most likely not how the
16  prices were updated in the system, as you're
17  suggesting.
18     Q.   I don't understand, I guess, the
19  answer.
20     A.   It would be most likely a portfolio
21  adjustment.  We wouldn't go CUSIP-by-CUSIP and
22  change prices in the system.
23     Q.   Okay.  Just so --
24     A.   Because time moves on.
25     Q.   Right.

15  (Pages 54 to 57)

Page 58

Teague

1  A.   So a price today will not be the price
2  tomorrow.  So I wouldn't -- by the time the
3  analysis was done, it would not be a number that
4  would then be ascribed to a position for a
5  previous date.  So, after that point in time, it
6  would be a desk's responsibility to mark that
7  position on a going forward basis to ensure it's
8  in line with the market, and any adjustment
9  would be what would, you know, would be on a
10  portfolio basis against all of the assets.
11  Q.   If you can just stick with the
12  example.  Assume there's a security that's been
13  allocated or transferred to Mr. King's desk at
14  100, initially.  It's now on the systems of
15  Barclays at 100.
16  A.   Yes.
17  Q.   Correct?  Two weeks later, you come
18  through and say, well, it shouldn't have been
19  put on at 100, the right value as of the right
20  measurement date was actually 90.
21  A.   Yes.
22  Q.   In that example, would there be any
23  impact, forget about the specific impact, would
24  there be any impact on the P&L for Mr. King's
25

Page 59

Teague

1  trading desk?
2  MR. HUME:  Objection.  Lacks
3  foundation.
4  A.   From a more high-level perspective, it
5  would be more so, taking it from 9/22 to 12/31,
6  it would be at whatever value we attributed to
7  the portfolio for 9/22 and the value at to say
8  year-end, you could just look at the difference
9  between the portfolio value.  Again, I don't
10  think trying to bring it to the security level
11  value probably reflects the way any P&L would
12  have been performed.
13  Q.   Maybe to simplify it, assume that the
14  only security that was transferred to Mr. King's
15  desk was the one security with $100 value,
16  initially.  You came by later and said, well
17  that should have been 90, not 100, and at the
18  end of the year, at 12/31, when you do your
19  valuation for that security again for year-end
20  purposes, you say it's got a value of 120.
21  Just looking at that security, based
22  on your valuations, there's been a $30
23  appreciation in the value of that security.
24  Based on the initial $100 valuation of that
25

Page 60

Teague

1  security, there's only been a $20 appreciation
2  in that security.  Which value would be used by
3  Mr. King's desk for their P&L purpose, 20 or 30?
4  A.   Whatever price we attributed is the
5  opening price.  The price that the desk
6  attributed for year-end would essentially be the
7  closing price, and any analysis on that price
8  would be performed by Independent Valuations at
9  year-end; and if we thought that price was out
10  of line, we would raise it to senior management
11  to ensure adjustments were made to that price.
12  So, just in short, opening price would
13  be determined within the Valuations, and the
14  price at year-end would be determined by the
15  desk, and that's essentially how the P&L aspect
16  would work, would be IVC assign a price for the
17  opening balance sheet, and from that date
18  forward, it would be the desk's responsibility
19  to mark and manage the positions within the
20  portfolio.
21  Q.   Let's take a concrete example.  Let's
22  look at the Giants Stadium Bonds.  For
23  acquisition balance sheet purposes, you assign
24  values of $10 or $40 per hundred for those
25

Page 61

Teague

1  securities, correct?
2  A.   We used the prices that were
3  provided --
4  Q.   By BoNY?
5  A.   -- from BoNY.
6  Q.   So that's an example where you used
7  BoNY because you had nothing else?
8  A.   That's correct.
9  Q.   All right.  So let's use that example.
10  Independent Valuation Group says the
11  Giants Bonds as of the acquisition date as
12  worth either $10 per hundred or $40 per hundred,
13  correct?  Right?
14  A.   Correct.
15  Q.   That's what you did?
16  A.   Yes.
17  Q.   Right?  And the Giants Bonds by 12/31
18  had been valued by Barclays at 100 cents on the
19  collar, correct?
20  A.   That's correct.
21  Q.   So on those valuations of those Giants
22  Bonds, the difference from $10 per hundred to
23  $100 per hundred would be a gain on that
24  position for whatever desk held those Giants
25

16  (Pages 58 to 61)

Page 62

Teague

1  Stadium Bonds, correct?
2  
3      A.   That's correct.
4      Q.   And the same for the Giants Stadium
5  bonds that were valued by the Independent
6  Valuation Group at 40, and at 12/31 or by 12/31
7  were marked up to hundred percent.  There would
8  be a gain from the 40 per hundred to a hundred
9  per hundred, correct?
10     A.   That's correct.  Market conditions had
11 changed over that time period.
12     Q.   Is that what happened with Giants
13 Stadium, the market conditions change?
14     A.   A combination of market conditions and
15 legal aspects of the Giants themselves, of the
16 auction rate notes themselves.
17     Q.   What happened?
18     A.   As of the acquisition, using the
19 dataset that we knew at the time of the
20 acquisition, we were looking at a handful of
21 auction rate notes which had not been brought to
22 auction since March of 2008.  The last time one
23 was brought to auction in March of 2008, it had
24 failed auction, and it would appear Lehman made
25 no attempt to bring them to auction again.  And

Page 63

Teague

1  at such time of the acquisition, there was still
2  no means to value these, as they had not been
3  auctioned at that point in time for six months,
4  and a full process would have to be put in place
5  for the firm to be able to bring them to auction
6  and we had no knowledge if these would fail
7  auction again as they had failed auction the
8  last time they were brought.
9      Q.   Had the Giants been paying a default
10 rate of interest on the bonds as of the
11 acquisition date?
12     A.   Yes.
13     Q.   So the auction that had failed back in
14 March of 2008 had resulted in a default rate
15 being applied, correct?
16     A.   That specific default rate for the
17 asset that had failed auction was I believe
18 approximately 22 percent.  As Lehman never
19 brought it to auction again, it was paying
20 somewhere in the neighborhood of Libor plus 25
21 or Libor plus 50 after that.
22     Q.   Other than looking to see whether
23 there had been failed auctions or no auctions,
24 did you do any other analysis to determine what
25 

Page 64

Teague

1  value should be ascribed to the Giants Stadium
2  Bonds as of the acquisition date?
3      A.   The reinsurer that wrapped the
4  Barclays -- the Barclays positions, the Giants
5  notes were being held by a double C I believe
6  rated reinsurance.  Due to that fact, you could
7  not compare those to any other assets that would
8  be out there and wrapped by a much better
9  reinsurance firm, and munis do not trade
10 actively without a strong wrap in that market
11 for auction rate notes.  So, again, it brought
12 into question if -- if these would actually
13 succeed if brought back to auction.
14     Q.   You said munis do not trade actively.
15 Do you consider the Giants Stadium issuance to
16 be a muni issuance?
17     A.   It's an auction rate note, in
18 actuality.  But auction rates notes had been
19 having issues since October of 2007, and the
20 market completely shut down for auction rate
21 notes in March 2008.
22         So we had really limited -- there was
23 actually no data from March on, and just as
24 an -- as a product group, auction rate notes

Page 65

Teague

1  were limping along for over a year at that point
2  in time.
3      Q.   Was it the case that any other auction
4  rate securities held by Barclays were marked at
5  10 cents on the dollar or 40 cents on the
6  dollar, was that the case?
7      A.   I don't recollect without having the
8  dataset in front of me, but any auction rate
9  notes in this situation were marked to BoNY
10 because we had no other available data, and
11 doing a cursory analysis, there was limited
12 information to, you know, to price it in any
13 other way.
14     Q.   That's what I'm trying to figure out.
15 Was your analysis detailed or cursory when you
16 ascribed a value to the Giants Stadium Bonds for
17 purposes of the acquisition balance sheet?
18         MR. HUME:  Objection.  Vague and
19 ambiguous.
20     Q.   Your word, "cursory."  What do you
21 mean by "cursory"?
22     A.   The overall view of the book was that
23 if we didn't have a price, then we would ascribe
24 the price provided by BoNY.

Page 66

Teague

1      I had not performed a large amount of
2  auction rate note analysis in the past because
3  we as a firm did not have an auction rate desk
4  like Lehman had.  We were not bringing positions
5  to market.
6      At that point in time, there was the
7  issue of breaking the dollar, as they stated,
8  where some firms were having issues,
9  specifically, money market funds, because their
10  assets had been worth less than a dollar, so
11  there was no auction rate market.
12      Looking at it from that perspective,
13  and here is an asset that hadn't traded for six
14  months, we put our, you know, our understanding
15  was, well, if BoNY was able to ascribe a price
16  to this, they, you know, must have additional
17  detailed information, so let's work with the
18  BoNY price because we have no other market data
19  out there, there's no, again, for an asset that
20  hasn't traded in six months, you're not going to
21  have additional market data to ascribe to it
22  directly from the marketplace.
23  Q.   Just so I understand your answer, you
24  guessed that BoNY may have had some additional

Page 67

Teague

1  information about these securities and that's
2  why you felt comfortable taking the BoNY price;
3  is that right?
4      MR. HUME:  Objection to the form.
5  A.   I can't speak to how BoNY performed
6  any of their valuations.
7  Q.   You have no idea, right?  You had no
8  idea whether they had any special insights into
9  this security versus any of the others?
10  A.   No, I would not have known how
11  specific -- any of the specifics of any of the
12  BoNY valuations.
13  Q.   And in general, you thought that their
14  valuations were riddled with stale information,
15  improper third-party marks, all sorts of
16  problems?
17  A.   Which is why we used them as the
18  last -- that was our last resort in the
19  hierarchy.
20  Q.   Going back to the monoline wrapper you
21  talked about --
22  A.   Again, going with no other data
23  available, you have to take what data is
24  available to you.

Page 68

Teague

1  Q.   Did you look at values at which other
2  corporate auction rate securities had been
3  trading, if they had traded in the past week, in
4  the past month?
5  A.   That's illogical.  Why would you take
6  an asset --
7  Q.   Did you do that?  I understand you
8  think it's illogical.  Did you do that?
9  A.   It's illogical.
10  Q.   So you didn't do it?
11  A.   If you were going to look at something
12  that was selling versus something that's not
13  selling, it doesn't work.
14  Q.   So you didn't do it?
15  A.   No.  Nothing with a double C was about
16  to trade on the street.  If I were to do that, I
17  would be looking at something that's triple A.
18  That would not reflect these assets.
19  Q.   What was the credit rating for the
20  Giants -- the issuer itself?
21  A.   That I do not recollect.
22  Q.   Had there been any default on the
23  payment of any interest by the Giants Stadium
24  issuing authority that had issued the bonds?

Page 69

Teague

1  Had they failed to make interest payments?
2  A.   Not that I'm aware.
3  Q.   As far as you know, at any point had
4  the Giants Stadium issuer failed to make
5  interest payments on any of these bonds?
6  A.   Not that I'm aware of.
7  Q.   The wrap, the monoline --
8  A.   There would have been no reason for
9  them to at that point as well because the rates
10  were set artificially low by Lehman if they were
11  not bringing it to market.  So if you were not
12  paying the market rate, then there was limited
13  reason for you to not pay your coupon.  If we
14  were to bring it back to auction, it's very
15  difficult to say if that would be the same
16  scenario.
17  Q.   Well, when you did bring it back to
18  auction, did the Giants default on the interest
19  obligations?
20  A.   No, they did not.
21  Q.   And when you brought it back to
22  auction, the rate was what, 16 percent?
23  A.   Yes, it was 16, 17 percent.
24  Q.   And they paid that?

Page 70

Teague

1    A.    Yes.
2    Q.    As part of trying to do whatever
3  analysis you did on the Giants Stadium Bonds
4  when you got them for acquisition balance sheet
5  purposes, did you talk to any of the Lehman
6  traders that had traded auction rate securities?
7    A.    No, I did not.
8    Q.    Did none of them come over to
9  Barclays?
10    A.    I couldn't speak to that.
11    Q.    You don't know one way or the other?
12    A.    No.  If -- I mean, in all honesty, I
13  think many traders came over at first, and I
14  don't know if they ended up staying, so I
15  couldn't speak to that.
16    Q.    Did you look to see how Lehman had
17  marked the Giants Stadium Bonds on Lehman's
18  books?
19    A.    I honestly would imagine they marked
20  everything to par, which wouldn't probably make
21  any sense if nothing was passing, but no I did
22  not.
23    Q.    You didn't check to see?
24    A.    No.

Page 71

Teague

1    Q.    When you say you imagined they marked
2  everything to par, you're just guessing?
3    A.    I'm just guessing because I think
4  there was a small issue in the marketplace at
5  that point in time where there was potential
6  issues where, you know, there was no market
7  color.
8         MR. HUME:  Jay, would now be a good
9  time for a break?
10         MR. TAMBE:  If you could just wait for
11  five or ten minutes. I'm going on to
12  another document on Giants Stadium.  Is that
13  okay with you?
14         THE WITNESS:  Sure.
15         (Deposition Exhibit 864, a document
16  bearing Bates Nos. PwC-BarCap00046054
17  through 056, marked for identification, as
18  of this date.)
19    Q.    Sir, I have handed you a three-page
20  document.  It's an e-mail chain that's been
21  marked as Exhibit 864.  If you take a moment to
22  review this e-mail chain.  Let me know when
23  you're done.  My question at least for this pass
24  through are going to be limited to the Giants

Page 72

Teague

1  Stadium issue.  We'll come back and talk about
2  the Pine issue, which is also in this e-mail
3  traffic.
4         (Document review.)
5    A.    Okay. I'm done.
6    Q.    This e-mail chain begins, the oldest
7  e-mail I believe is on the third page of this
8  exhibit. It's from Paul Cobson to you.  Do you
9  see that?
10    A.    Yes.
11    Q.    And who is Mr. Copson?
12    A.    Mr. Copson is the head of Product
13  Control for Barclays Capital.
14    Q.    So, again, in terms of hierarchy?
15    A.    He reports in to Patrick Clackson.
16    Q.    So it's Marcus Morton to Copson to --
17    A.    At that point in time, it was Marcus
18  Morton in to James Walker.
19    Q.    Okay.
20    A.    And James Walker in New York would
21  have reported in to -- I'm not quite sure. It
22  was either Paul Copson or directly in to Patrick
23  Clackson.  I think it was in to Paul Copson.  So
24  the --

Page 73

Teague

1    Q.    Marcus to Walker to Copson?
2    A.    Correct.
3    Q.    Sean to Marcus?
4    A.    Correct.
5    Q.    And on up the chain.  Okay.
6         So the boss had some questions about
7  the markups in the Giants Stadium, correct?
8    A.    Correct.
9    Q.    And you provide your analysis, you
10  provide an answer on the second page, and then
11  some more detail in the first and second page.
12         When you were providing this
13  explanation to Mr. Copson, you were trying to be
14  complete and accurate, correct?
15    A.    Correct.
16    Q.    And you believed you were complete and
17  accurate in describing the reasons and the
18  rationale for why you had marked the Giants
19  Stadium bonds the way you had and then why they
20  was subsequently marked up, correct?
21    A.    Correct.
22         MR. HUME:  Objection. Vague and
23  ambiguous.
24    Q.    Was it your understanding that this

19  (Pages 70 to 73)

Page 74

Teague

1           Teague
2 information that you were providing Mr. Copson
3 was going to be provided to outside auditors for
4 the bank as well?
5    A.   At that moment, no.
6    Q.   Other than this e-mail traffic, did
7 you have any face-to-face meetings or telephonic
8 discussions with Mr. Copson about the Giants
9 Stadium valuation?
10    A.   Not that I recollect.  I believe this
11 e-mail at the time, he was -- he found it
12 sufficient.
13    Q.   Subsequent to this e-mail traffic, at
14 any point since the time you worked on the
15 acquisition balance sheet, have you had
16 face-to-face or telephonic discussions with Mr.
17 Copson about the Giants Stadium valuation?
18    A.   I kept him aware of any other
19 improvements in the pricing of Giants Stadium.
20    Q.   So my understanding is, subsequent to
21 this e-mail chain, which looks like it's in
22 November of 2008?
23    A.   Yes.
24    Q.   There would have been a further
25 revaluation or marking up of the Giants Stadium

Page 75

1           Teague
2 bonds before year-end, correct?
3    A.   As course of regular action, we were
4 price-testing the portfolio at month-end as well
5 as the opening balance sheet.  So, yes, through
6 the month-end independent price testing, we were
7 also reviewing where the desks were marked and
8 where we thought assets were marked for this
9 portfolio.
10    Q.   So for the Giants Stadium bonds in
11 particular, by the end of the year, those marks
12 were at 100 percent?
13    A.   That's correct.
14    Q.   And you would have kept Mr. Copson
15 advised of that?
16    A.   Yes, I would have sent him e-mails as
17 far as improvements in the pricing of Giants.
18    Q.   Other than Giants Stadium bonds and
19 the Pine CLO that's referenced in this e-mail
20 chain, were there any other particular positions
21 that you had e-mail traffic with Mr. Copson on?
22    A.   Not that I recollect.
23    Q.   And other than specific e-mails on
24 Pine and Giants Stadium, were you providing any
25 general reports to Mr. Copson via e-mail about

Page 76

1           Teague
2 price improvements in the portfolio?
3    A.   Upon request, if he had any specific,
4 I don't know, CUSIP level questions or anything
5 of that nature, then I would reply, but there
6 was nothing, there was nothing formalized.
7       MR. TAMBE:  Let's take a break now.
8       (Recess; Time Noted:  11:12 A.M.)
9       (Time Noted:  11:34 A.M.)
10 BY MR. TAMBE:
11    Q.   Mr. Teague, I want to go back to the
12 desk allocation issue just to understand a few
13 of the mechanics a little bit more.
14       Ordinarily when a desk acquired a
15 security through a transaction, they would have
16 to take money out of one of their accounts or
17 their funds and go buy the security, correct?
18    A.   Yes.
19    Q.   In this case, did the desks have to
20 buy the securities that were being allocated to
21 them?
22    A.   I couldn't speak to that aspect of it.
23 I was just looking at the valuations of the
24 underlying assets.
25    Q.   Were there any type of charges

Page 77

1           Teague
2 assessed to the desks when they were allocated
3 securities?
4    A.   Again, I only focused on the valuation
5 of the assets to determine market value.  I
6 couldn't speak to the, you know, that aspect of
7 the deal.
8    Q.   So you know nothing about it?
9    A.   No.  That would be more of a P&L
10 question.  If you spoke with the Product
11 Control, not IVC, Product Control could provide
12 you more clarity.
13    Q.   Who should I speak to to get clarity
14 on that issue?
15       MR. HUME:  The answer should be given
16    without prejudice to the fact that discovery
17    is over.  A hypothetical question.
18    A.   Yeah, I guess the individual who is no
19 longer with the firm who oversaw the specifics
20 of the Product Control would have been Tom --
21    Q.   McCosker?
22    A.   Yes.  Thanks.
23    Q.   Do you know where Tom is?
24    A.   C12.
25    Q.   What's C12?

20 (Pages 74 to 77)

Page 78

Teague

1    A.    It's a -- he's still --
2    Q.    It's not sub-basement 12 or something
3  like that?
4    A.    No, he's with Stephen King.
5    Q.    Oh, okay.
6    A.    A separate hedge fund.
7    Q.    All right.
8    A.    Carbon.
9    Q.    Do you have any understanding as to
10  any capital charges that are assessed to the
11  desks against positions that they're holding?
12        MR. HUME:  Objection.  Asked and
13  answered.
14    A.    That's outside of my scope.
15    Q.    Once securities were allocated to
16  particular trading desks following the
17  acquisition, you do understand that there would
18  be in certain situations capital charges that
19  would be assessed to desks for the regulatory
20  capital that the bank has to carry against those
21  assets; is that right?
22    A.    Yes.  Conceptually, yes, that's how it
23  works.
24    Q.    And the charges that are assessed

Page 79

Teague

1  against the desks would be driven in part by the
2  values at which those securities are being
3  carried on the books of Barclays, correct?
4    A.    Yes.
5    Q.    And the value that's used for those
6  capital charge purposes is the value that is
7  derived by your group, not by the traders,
8  correct?
9    A.    Sorry, you're saying as of day one or
10  as of day two?
11    Q.    As soon as you have done your
12  valuation, as soon as you completed your
13  valuation.
14    A.    I don't believe -- I can't speak
15  freely to that, but I believe, you know, as the
16  world keeps moving forward, again, I don't think
17  anyone after the day of the acquisition would be
18  looking at the opening balance sheet price.  It
19  would be wherever the desk is marking it, so
20  it's really the desk price.
21    Q.    And at month-end when you come in and
22  do an independent valuation on the desk prices,
23  those levels would be adjusted based on what
24  your view was of an independent valuation of

Page 80

Teague

1  those positions, correct?
2    A.    So if we found a potential issue with
3  a mark at month-end, if it's done and if we --
4  if we perform a remark within the first just say
5  four business days of the month, that price will
6  be adjusted for month-end.  If for more illiquid
7  assets or assets where we don't have the market
8  data in that short a time period, the remarks
9  will take place within the following month.
10    Q.    Sir, I have handed you a three-page
11  document previously marked as Deposition Exhibit
12  801B.  Take a moment to look at it and let me
13  know when you're done and I'll ask you some
14  questions about it.
15        (Document review.)
16    A.    Okay.
17    Q.    The attachment to this e-mail chain,
18  which is the table that appears on the last page
19  of the exhibit, is it a document that you're
20  familiar with?  Have you seen that before today?
21    A.    I've seen, yes, I remember this
22  e-mail.
23    Q.    And does this e-mail relate to the
24  process you described earlier about the

Page 81

Teague

1  reconciliation of what was coming over and where
2  it was being placed?
3    A.    This would be, yes, so from an
4  operational perspective, where Operations would
5  speak to -- the Lehman Operations would be in
6  discussions with Barclays' Operations on what
7  was coming over, and they would make sure
8  nothing was what they call in the industry DKed,
9  where essentially it was kicked back because of
10  any potential issues.  When they were bringing
11  these onboard, Operations needed to make sure
12  they were putting it in the proper placeholders,
13  and in that sense, because there was assets of
14  many different types, these all would not
15  usually land on one trading desk because of
16  systems issues.
17        So this was Phil Nash, who was head of
18  Product Control for the Americas, still is
19  Product Control head of the Americas, was
20  helping coordinate the data for settlement to
21  ensure that the individual Mike Goldstein in the
22  e-mail, as you see on the first page, managed
23  projects for Product Control, and Mike Goldstein
24  was trying to coordinate to ensure the product

21 (Pages 78 to 81)

Teague

1
2    controllers update the attached file so it would
3    basically be a means to capture where everything
4    is going to settle, who the contacts are and,
5    you know, what systems it'll be located in by
6    asset class.
7        Q.    The second page of the e-mail at the
8    bottom at the page is from Michael Goldstein to
9    James Walker, Marcus Morton and Phil Nash, do
10   you see that?
11       A.    Yes.
12       Q.    And he's got a few points, enumerated
13   points, do you see that?
14       A.    Yes.
15       Q.    The first point is, "Agreed to have
16   trade date of September 22." Do you see that?
17       A.    Yes.
18       Q.    Do you have an understanding as to
19   what he was referring to, "Agreed to have trade
20   date of September 22"? Agreed with whom?
21       A.    I can't -- I can't say with whom. As
22   far as Mike I think was trying to confirm with
23   management what the proper settlement date
24   should be for the system.
25       Q.    Is it your understanding that there

Teague

1
2    was a discussion and agreement internally at
3    Barclays as to what the trade date would be for
4    pricing, valuation, allocation purposes?
5        A.    There was some confusion as to what
6    the trade date would be, as there was a lot of
7    moving pieces going on at that point in time.
8        Q.    And the discussion of the moving
9    pieces you're talking about, those are
10   discussions within Barclays, or are you talking
11   about discussions between Barclays and Lehman?
12       A.    Just in speaking with different
13   managers, I wasn't quite sure what the proper
14   date was. It was just everyone aligning to
15   what, you know, what date would be the -- the
16   date for the transfer.
17             The assets themselves, there was
18   questions over what was coming over, how much
19   was coming over, what the settlement date was,
20   how to do this. I mean, as a firm, we had never
21   been through an acquisition of a firm probably
22   four times our size before, so there was quite a
23   few questions that were coming up as -- as the
24   acquisition was taking place.
25       Q.    When you say an acquisition of a firm

Teague

1
2    four times your size, what are you comparing,
3    are you comparing Barclays Capital to Lehman
4    Brothers, Inc.?
5        A.    Just Capital, yeah, not all of
6    Barclays. But, you know, this was a large
7    undertaking.
8        Q.    Because the acquisition was a fraction
9    of the size of Barclays, PLC, correct?
10       A.    Barclays, PLC is much larger than
11   Barclays Capital, yes.
12       Q.    Have you seen updated versions of this
13   spreadsheet, the third page of Exhibit 801B,
14   where the boxes have been filled in?
15       A.    Not that I'm aware.
16       Q.    I've handed you a document previously
17   marked as Deposition Exhibit 808B. Take a
18   moment to look at these three pages. Let me
19   know when you're done. I'll ask you some
20   questions.
21             (Document review.)
22       A.    Okay.
23       Q.    If you look at the e-mail chain, it
24   starts on the third page with an e-mail dated
25   Monday, September 15. Do you see that?

Teague

1
2        A.    Uh-huh.
3        Q.    And the most recent e-mail is on the
4    first page dated September 23. See that?
5        A.    Yes.
6        Q.    Going to the oldest e-mail, the last
7    page, it's the e-mail from Paul Copson to
8    several people and he's inquiring about
9    additional price testing procedures. Do you see
10   that?
11       A.    Yes.
12       Q.    And you understand that e-mail to be
13   independent of the Lehman acquisition; this is
14   just -- that was an e-mail that you sent in
15   light of market conditions; is that right?
16       A.    Correct. This is in light of
17   potential, yeah, disruption in the markets.
18       Q.    And then on the 15th itself, you
19   respond to Copson, Morton, Nash and others about
20   price testing procedures, correct?
21       A.    Yes, so what we were -- I believe at
22   this point in time it was expected anytime --
23   anytime a potential bankruptcy is expected, be
24   it Lehman, be it Bear Stearns, be it WaMu, what
25   we do is this analysis to clarify was on any

22 (Pages 82 to 85)

Teague

1 derivatives transactions that we have.
2        So we didn't do a specific to Lehman
3 in this analysis.  This was an overall analysis
4 of the price testing results as of midmonth to
5 see where we were marked.  So this was not --
6 these results were not specific to Lehman.
7 These were the results of the overall books as
8 of the 15th of September since the markets were
9 entering a free-fall.
10       Q.   And then when you turn to the first
11 page of the exhibit, there's a reference,
12 there's an e-mail from you in the middle of the
13 page with a file embedded it, "Lehman
14 Exposures/Status Tracking," do you see that?
15       A.   Yes.
16       Q.   So, again, these would be -- this is a
17 list of exposures where Lehman is the
18 counterparty to Barclays on transactions; is
19 that what's being captured here?
20       A.   Yes.  So this was to -- this was to
21 determine if, again, in the case of bankruptcy,
22 we do this every time there is a counterparty
23 which is a potential risk of not, you know,
24 paying as far as the -- any derivative

Teague

1 transactions that you have if you're going to
2 lose that counterparty and if you do analysis on
3 your overall exposure.
4        Q.   All right.  So this is not related to
5 the valuation of the inventory that came over
6 from Lehman to Barclays as part of the
7 acquisition?
8        A.   Specific to any derivatives we had on
9 the firm that were facing Lehman as a
10 counterparty.
11            (Deposition Exhibit 865, a document
12            bearing Bates Nos. BCI-EX-(S)-00201234
13            through 241, marked for identification, as
14            of this date.)
15       Q.   Sir, I have placed before you a
16 multi-page document marked Exhibit 865.  It's a
17 long e-mail chain.  If you want to take a moment
18 to review it and I'll ask you a few questions
19 about it.
20            (Document review.)
21       A.   Okay.
22       Q.   Starting with the back of the e-mail
23 chain in Exhibit 865, that last e-mail is a
24 Stephen Sell e-mail that we had seen as a

Teague

1 stand-alone previously, correct?
2        A.   Yes.
3        Q.   So, moving forward in time from that
4 e-mail, if you'll turn to the page that has at
5 the bottom the last four digits 1238, you there?
6        A.   Yes.
7        Q.   Top of the page there's an e-mail from
8 Stephen Sell, Sunday, September 21, 2008, 9:08
9 P.M.
10       A.   Yes, I see this.
11       Q.   He's providing an update and he's got
12 two bullet points in that e-mail.  Do you see
13 those?
14       A.   Uh-huh.
15       Q.   Yes?
16            You have to answer aloud.
17       A.   Yes, I see this.
18       Q.   In the second bullet point he says,
19 "We have determined we have looks like
20 approximately 3100 securities/CUSIPs not set up
21 within our systems."  Do you see that?
22       A.   Yes.
23       Q.   Do you understand that to mean that
24 out of the total number of CUSIPs that were

Teague

1 coming over, there were 3,100 securities and
2 CUSIPs that were not already set up within the
3 Barclays systems?
4        A.   Yes, that's how I interpret that.
5        Q.   So the rest of the securities and
6 CUSIPs had some match on the Barclays system,
7 that is, you already had a position with that
8 CUSIP or security?
9        A.   Not a position.
10       Q.   Okay.
11       A.   The ability to book that asset.  For
12 equities, we were unable to book an asset if we
13 didn't have the proper data in a system for it
14 to understand the asset that was coming on.  So
15 it's not that we were holding these positions.
16       Q.   Was an analysis done of how many
17 positions Barclays was holding that matched up
18 with positions that it was acquiring?
19       A.   I can't speak to that.
20       Q.   Well, when you did your independent
21 valuation of the securities that had come over,
22 and in the case of many securities you made
23 liquidity adjustments and other adjustments to
24 come up with a valuation, did you look to see if

Page 90

```
                 Teague
 1                Teague
 2   Barclays had other similar securities in its
 3   inventory that would also need to be valued
 4   consistently with the approach you were taking
 5   with the Lehman securities?
 6     A.   Well, in situations where --
 7          Can you ask that question one more
 8   time?
 9          (Record read.)
10     A.   I did not.  I would not have looked
11   specifically at any securities that we had on
12   where, especially as market-maker, we may have
13   been marking assets to mid.  If we had
14   market-maker status in those situations, that
15   would be different than whatever price you would
16   be acquiring it at.
17          Again, the analysis here was where
18   something -- we were looking at the transaction
19   in that stress marketplace to determine what the
20   market value was.
21     Q.   Well, I need to understand that answer
22   a little better then.  The way the transaction
23   occurred, you hadn't actually -- there hadn't
24   been an auction of these securities in the open
25   market, correct?
```

Page 91

```
 1                Teague
 2     A.   Correct.
 3     Q.   These securities were purchased as
 4   part of Barclays stepping into the shoes of the
 5   Fed on the Fed repo, correct?
 6          MR. HUME:  Objection.  Calls for
 7   speculation.
 8     Q.   Is that your understanding of how
 9   these securities came over?
10     A.   Can you restate the question?
11     Q.   What is your understanding of how
12   these securities came from Lehman to Barclays?
13     A.   In the acquisition of the repo
14   collateral.
15     Q.   And it was repo collateral that had
16   previously been pledged by Lehman to the Fed,
17   correct?
18          MR. HUME:  Objection.  Lacks
19   foundation.
20     A.   Yes, it was the data -- it was the
21   positions held in that DTC account.
22     Q.   As far as you know, there wasn't a
23   CUSIP-by-CUSIP valuation that was done between
24   Barclays and Lehman as part of the sale
25   transaction, where they sat down and said I want
```

Page 92

```
 1                Teague
 2   to buy this CUSIP for this much and this CUSIP
 3   for so much, right?
 4     A.   No, not that I'm aware of.
 5          MR. HUME:  Objection.  Lacks
 6   foundation.
 7     Q.   Not that you're aware of?
 8     A.   Not that I'm aware of.
 9     Q.   So you have to allocate values to the
10   securities that have come over because there
11   wasn't a trading ticket or a confirmation saying
12   Barclays paid X dollars to buy the security,
13   correct?
14     A.   That's correct.
15     Q.   In your valuation process were you
16   effectively trying to recreate, given the market
17   conditions of that week, what the price would
18   have been if there had been an individual
19   transaction on that security?
20     A.   We were trying to reflect the
21   market -- we were reflecting the market bid.  We
22   were looking at it to reflect the market in a
23   stressed scenario, which was the 22nd of
24   September, correct.
25     Q.   So, in doing your valuation, you were
```

Page 93

```
 1                Teague
 2   trying to capture for those securities the
 3   stressful market conditions that existed on the
 4   22nd, correct?
 5     A.   Trying to mark it to a market bid as
 6   of the 22nd of September.
 7     Q.   And did you make any adjustments for
 8   the size of the positions?
 9     A.   The majority of the haircuts were
10   performed on a portfolio level, so I don't --
11   apologies, I don't believe we had any specifics
12   on the CUSIP level.
13     Q.   So you decided to, on a liquidity -- a
14   liquidity adjustment that you would apply to an
15   entire portfolio of similar securities?
16          MR. HUME:  Objection.  Vague and
17   ambiguous.
18     Q.   Is that right?
19     A.   The bid/offer was applied at a product
20   level.
21     Q.   Not an individual CUSIP level?
22          MR. HUME:  Objection.  Vague and
23   ambiguous.
24     A.   No.  For corporates, we priced them
25   slightly differently, where they were to the
```

24  (Pages 90 to 93)

Page 94

Teague

1
2    minimum of the available prices available from
3    third-party vendors because we had a larger
4    dataset of information.
5        Q.    And when you did this valuation
6    exercise, you didn't look to see if you had
7    other similar securities already in your
8    inventory that you had valued at the last
9    month-end, August 31, or that the traders had
10   valued during the month of September?
11       A.    No, not that I recollect.
12       Q.    Was there a decision made not to look
13   at that data?
14       A.    Not that I recollect.
15       Q.    Sitting here today do you have any
16   idea as to what percentage or number of the
17   CUSIPs that were acquired through the Lehman
18   acquisition were CUSIPs for which Barclays
19   already had positions preexisting in its
20   inventory?
21       A.    I wouldn't know that information.
22       Q.    And then by dollar value of the
23   securities, do you have that information?
24       A.    No, I wouldn't know that information.
25       Q.    Not something you have looked at all?

Page 95

Teague

1
2        A.    Not that I'm aware of.
3        Q.    There were instances with some of
4    these securities where you took a mid price and
5    you made a mid to bid adjustment by applying a
6    liquidity discount or a liquidity factor of some
7    type, correct?
8        A.    That's correct.
9        Q.    Once you had determined what the
10   appropriate liquidity factor should be for that
11   product type, did you make any effort to apply a
12   similar liquidity factor to other securities of
13   a similar type that were in the Barclays
14   inventory?
15       A.    Independent valuations was performed
16   at month-end.  We didn't do an independent
17   valuation of the Barclays books as of September
18   22.  This analysis was done for a specific date
19   underneath specific market conditions.
20       Q.    September 30 was month-end, correct?
21       A.    That's correct.
22       Q.    When you did the independent valuation
23   for the entire Barclays inventory, both the
24   Lehman-acquired inventory and the preexisting
25   Barclays inventory, did you apply a similar

Page 96

Teague

1
2    methodology to do a liquidity adjustment
3    product-type-by-product-type?
4        A.    No, we did not perform that analysis.
5    The dataset at that point in time was being
6    marked to bid by the desks as opposed to taking
7    in mid marks from vendor pricing, so the desk
8    would be marking to bid.
9            We would be looking at our own
10   independent analysis of where the desk is
11   marking to bid, and if deemed appropriate, we
12   would take remarks.  By the 30th, the market had
13   started functioning again.  It was hard to say
14   if it was fully functioning, but as of the 22nd
15   of September, the market was essentially frozen,
16   as the Dow had dropped I believe something like
17   800 points that day.
18       Q.    On the 22nd?
19       A.    Yes, something on or around the 22nd
20   was a, quite a large market dislocation day,
21   versus September 30, where there was more
22   information from just say the government was now
23   considering to help support the markets.  As of
24   that date, it was just basically essentially a
25   market free-fall.

Page 97

Teague

1
2        Q.    The market free-fall on the 22nd, did
3    that get captured in the end-of-day pricing for
4    the 22nd?
5        A.    I guess it depends on the asset type.
6    Some assets may have improved as a flight to
7    safety.  Other assets may have gone down.  Very
8    illiquid assets would probably not have been
9    dramatically affected, as these were already very
10   illiquid assets.
11       Q.    So but pricing securities at the end
12   of day on the 22nd would capture whatever effect
13   market movements on the 22nd during the day on
14   the 22nd had on the various markets, correct?
15       A.    Again, but it depends on the asset
16   type.  So it can go in either direction.
17       Q.    You just described as a day of huge
18   dislocation and free-fall.  So there were asset
19   classes that were negatively impacted by price
20   movements on the 22nd, correct?
21       A.    Yes.
22       Q.    But there were others that were
23   positively impacted?
24       A.    Potentially, yes.
25       Q.    In all of the analyses that you have

25  (Pages 94 to 97)

Page 98

Teague

1    done at Barclays with respect to the Lehman
2    valuation, are you aware of any valuations that
3    were done by Barclays for the open of business
4    on the 22nd as opposed to the end-of-day on the
5    22nd?
6        A.    No, I am not aware of any, any attempt
7    to perform analysis for open.
8        Q.    As part of the independent valuation
9    work that you did, there were certain values
10    that you and your team arrived at based on
11    end-of-the-day 22nd values, correct?
12       A.    Yes.
13       Q.    There were other values that you
14    arrived at based on September 30 values,
15    correct?
16       A.    Yes.
17       Q.    And where you used September 30
18    values, that would -- your valuation would
19    incorporate movements in the price of a security
20    in the functioning of the markets between the
21    22nd and the 30th, correct?
22           MR. HUME:  Objection.  Vague and
23    ambiguous.
24       A.    I believe any analysis supported by

Page 99

Teague

1    PwC of positions valued closer to month-end were
2    for positions where there was essentially no
3    markets whatsoever and the dataset was in order
4    to obtain I guess additional pricing discovery,
5    if any.
6        Q.    Well --
7        A.    I believe, I mean, you can tell me, I
8    mean, what asset classes was it again?
9        Q.    Any asset classes.  I know there's
10    some asset classes, I don't have them memorized,
11    where -- you do know that there were some asset
12    classes that were priced as of 30th of
13    September, correct?
14           MR. HUME:  You mean on the final
15    acquisition balance sheet?  I don't think
16    the question is clear.
17       Q.    On the final acquisition balance
18    sheet, yes.
19       A.    Yes, I would have to look at the -- I
20    would have to look at the asset classes.  It
21    was -- it is broken out in -- I did send out a
22    memo discussing the valuations of the opening
23    balance sheet.  I would have to review that to
24    see and speak to that.

Page 100

Teague

1        Q.    And other than the end of day 22nd,
2    September 30th, there was also a set of
3    securities that were acquired by Barclays in
4    connection with the Lehman acquisition that were
5    valued as of December 22, correct?
6        A.    Yes.
7        Q.    Other than those data points, are
8    there any other data points -- date points that
9    were used for valuation purposes for the opening
10    day acquisition balance sheet?
11       A.    Initial analysis for munis were
12    performed as of the, I believe the 19th as,
13    again, going back to there was confusion over
14    what was the proper date to perform the
15    analysis, and in the end, it was determined and
16    agreed that it would have immaterial effect on
17    the overall valuation results.
18           PwC opined that they didn't really
19    consider it affecting the pricing, as there
20    hadn't been really an active market between the
21    two dates.
22       Q.    On all securities or just the munis?
23       A.    On the munis, as that had been
24    performed as of the 19th, that analysis.

Page 101

Teague

1        Q.    Was it PwC that told Barclays as of
2    what date to value these securities or was it
3    Barclays telling PwC what its views were as to
4    when these things should be valued?
5           MR. HUME:  Objection.  Lack of
6    foundation.
7        A.    Any decisions of that nature were
8    outside of anything I was involved in.  I mean,
9    to be honest, I'm sure you have a chain of
10    e-mails, I didn't quite know what date at first.
11    There was a lot of uncertainty from my
12    perspective.  And then the final resulting date
13    was the 22nd.
14       Q.    But I'm not saying you made the
15    decision, but given --
16       A.    I understand.
17       Q.    -- where you were in the organization,
18    who made the decision as to what date to pick,
19    PwC or Barclays?
20           MR. HUME:  Objection.  Lacks
21    foundation.
22       A.    Again, I can't state because I
23    wouldn't have been involved in those
24    conversations to be able to speak to who -- who

26 (Pages 98 to 101)

Page 102

Teague

1
2  made the decision and how it was finally
3  determined the 22nd.
4      Q.   You're not saying that PwC directed
5  you to pick the 22nd, are you, sir?
6      A.   I would not say that, no.  I mean, as
7  you can see, there's e-mails where people are
8  stating we should use the 22nd.  Based on that
9  e-mail traffic, I would have used the 22nd.
10     Q.   I've seen e-mail traffic between you
11 and PwC on various issues.  Other than the
12 Lehman acquisition, have you routinely
13 corresponded with PwC on other valuation issues?
14     A.   PwC is the auditor for the firm, so I
15 do deal with PwC for any of the, say,
16 semiannual, annual reporting.
17     Q.   And in connection with the Lehman
18 acquisition, other than the e-mail traffic, were
19 there any face-to-face meetings that you had
20 with anyone from PwC?
21     A.   Yes, I would have walked through some
22 of the analysis performed with members of PwC
23 working for Rob MacGoey at the time.
24     Q.   Who were the key PwC individuals that
25 you had sit-down meetings with?

Page 103

Teague

1
2      A.   I can't recollect their name, but one
3  of Rob MacGoey's directs was assigned as one of
4  the go-to's that I dealt with.
5      Q.   Other than that direct report to Rob
6  MacGoey, any other people in particular that
7  were your main points of contact at PwC in
8  connection with the Lehman acquisition account?
9      A.   Postally would probably have been Rob
10 MacGoey.
11     Q.   The announcement of the acquisition
12 accounting was done in February of 2009,
13 correct?
14     A.   I'm not quite sure.  That makes sense.
15     Q.   Just using that roughly as the period
16 in time, have you had any discussions with PwC
17 about the valuation and accounting for the
18 Lehman acquisition anytime since February 2009
19 to the present?
20     A.   Not that I can recollect, no.
21     Q.   Have you spoken with an individual by
22 the name of Professor Pfleiderer?
23     A.   I believe there's been -- apologies.
24 One moment.  He's the -- can you refresh me as
25 to who he is?  I know he's done the -- I know he

Page 104

Teague

1
2  was a part of the depositions, correct?
3      Q.   Well, you tell me.  What does that
4  name mean to you?
5      A.   I'm trying to think.  If I've had --
6  I've had -- I believe there's been e-mails
7  involving the professor.  I just don't think
8  I've ever had any -- much in the way of
9  conversation with him.
10     Q.   Do you remember as you sit here today
11 a single conversation with Professor Pfleiderer?
12         THE WITNESS:  Can we take a break?
13     Q.   No, it's not a good time to take a
14 break.  I would like you to answer the question.
15     A.   If anything, it's just me trying to
16 piece it all together.  I may have been on calls
17 with the professor, but I think any
18 conversations have been more -- if there was any
19 e-mail traffic where he may have been in the
20 background, but no, I'm not quite sure, to be
21 honest.
22     Q.   Just to get the best of your
23 recollection as you sit here, you don't have a
24 specific recollection of any e-mail traffic with
25 Professor Pfleiderer, do you, sir?

Page 105

Teague

1
2      A.   No, I do not.
3      Q.   And do you have specific recollections
4  of a conversation you've had with Professor
5  Pfleiderer?
6      A.   No, I do not.
7      Q.   The two individuals that are sitting
8  on your side of your table, do you know who they
9  are?
10     A.   Yes.  You mean Marc?
11     Q.   Marc?
12     A.   Yes.  I've had quite a few
13 conversations with Marc.
14     Q.   Okay.  When was the first time you had
15 a conversation with Marc Vellrath?
16     A.   Quite some time ago.  Sometime last
17 year, I take it.
18     Q.   And I take it from your answer you've
19 had face-to-face meetings with Mr. Vellrath?
20     A.   Yes, I've met -- I've discussed and
21 we've -- yes, we've met in the past.
22     Q.   Okay.  And approximately how many
23 meetings have you had with Mr. Vellrath?
24     A.   I couldn't say, to be honest.  Less
25 than a handful.

27 (Pages 102 to 105)

Teague

1  Q.   Less than six meetings?
2  A.   Yes.  We've been on phone calls, but
3  face-to-face, just handful times.
4  Q.   And have you discussed documents with
5  Mr. Vellrath?
6  A.   Yes.
7  Q.   And you've discussed your analyses and
8  your valuations with Mr. Vellrath?
9  A.   Yes, I've provided replies to requests
10  from the movants or questions that came out of
11  the movants.
12  Q.   I'm not sure I follow the last answer.
13  You provided --
14  A.   Is it the movants?  Is that the
15  proper way to say it?
16      MR. HUME:  Movants.
17  Q.   Movants.
18  A.   Apologies.  To the movants.
19  Q.   So you have looked at documents filed
20  by the movants and you have discussed responses
21  with Mr. Vellrath?
22  A.   Yes.
23  Q.   Have you drafted documents for Mr.
24  Vellrath, answers, descriptions?

Teague

1  A.   I've given a summary from my
2  perspective of, you know, how I would -- how I
3  saw the question at hand and, you know, if it
4  was relevant at all from my viewpoint.  I think
5  there is, of course, going to be some issues
6  between how we're valuing something or how the
7  movants would be valuing something and help
8  provide additional clarity.
9  Q.   When you provided your responses or
10  input to Mr. Vellrath, did you do that orally or
11  by e-mail?
12  A.   A combination thereof.
13  Q.   So there will be some amount of e-mail
14  traffic where you provided that information?
15  A.   Yes.
16  Q.   Have you drafted any affidavits,
17  declarations, things like that?
18  A.   No.
19  Q.   Have you reviewed drafts of affidavits
20  and declarations?
21  A.   Not that I'm aware of.
22  Q.   Other than Mr. Vellrath, have you
23  spoken with members of his staff that you
24  recall?

Teague

1  A.   Not that I recall.  Could have been on
2  conference calls, but not that I recall.
3  Q.   And other than Mr. Vellrath and maybe
4  some of his staff who may have been on
5  conference calls, what other people -- were
6  there any other people who attended those
7  conference calls?
8  A.   Just members of the legal team, if at
9  all.
10  Q.   In preparation for your deposition,
11  did you review deposition transcripts provided
12  by anyone else in this case?
13  A.   The only depositions I reviewed were
14  the ones for the movants.
15  Q.   Do you remember any of the names of
16  the people or descriptions of their titles?
17  A.   The professor was one of them.
18  Q.   Professor Pfleiderer?
19  A.   Yes.
20  Q.   He's actually on your side.
21  A.   He's on my side, I know, but I don't
22  think I've ever spoken to him.  And the policies
23  and for the asset classes that I covered, I
24  reviewed the -- you know, the replies from the

Teague

1  movants on how we performed our analysis.
2  Q.   Did you review depositions or expert
3  reports that were submitted by the movants
4  valuing the securities that your group had
5  valued?
6  A.   Yes.  And I provided replies to those,
7  yes.
8  Q.   When you say you provided replies to
9  those, were those in e-mail form?
10  A.   Combination thereof.  E-mail and phone
11  call.
12      MR. TAMBE:  I don't think any e-mails
13  have been produced authored by this witness
14  on any of those topics, so we would request
15  that those documents be produced.  They
16  would have been called for by our
17  outstanding discovery requests.
18      MR. HUME:  First, I don't think it's
19  called for by your discovery requests, but
20  more importantly, I think it's all work
21  product.
22      MR. TAMBE:  I would disagree on that,
23  but we'll have our request, our request
24  outstanding.

Teague
1
2    Q.    Did you meet with Mr. Vellrath to
3    prepare for your deposition?
4    A.    Say again?
5    Q.    Did you meet with Mr. Vellrath to
6    prepare for your deposition?
7    A.    No, I have not.
8    Q.    Now, there were other members of
9    Barclays' PCG group who have been deposed in the
10   last couple of weeks?
11   A.    Yes.
12   Q.    Mr. Landreman.  Mr. Washtell.
13   A.    Yes.
14   Q.    Have you spoken with them about their
15   depositions?
16   A.    Only to the point of they said "good
17   luck."
18   Q.    But you didn't discuss substance,
19   either of what they were going to testify to or
20   had testified to or what you would be testifying
21   to; is that right?
22   A.    No, I hadn't.
23   Q.    In your work on the Lehman acquisition
24   and the reconciliation of the valuation, did you
25   keep any kind of a notebook?

Teague
1
2    A.    No.
3    Q.    You don't keep notebooks as part of
4    your day-to-day work at Barclays?
5    A.    No, I mean, if anything, a notebook is
6    just my to-do list.  I don't have anything as
7    far as detailed notes.
8    Q.    Did you look through your file for
9    notes relating to the Lehman acquisition?
10   A.    Essentially, it's, if anything, it was
11   just looking at e-mails if there was anything.
12   Q.    As far as you know, other than your
13   e-mails, you don't have any other notes
14   specifically relating to the Lehman
15   acquisition --
16   A.    No, I do not.
17   Q.    -- or valuation?
18   A.    No, I do not.
19         (Deposition Exhibit 866, a document
20   bearing Bates Nos. LBHI 017959 through 964,
21   with attachment, marked for identification,
22   as of this date.)
23   A.    Is there a specific page?
24   Q.    I have placed before you a document we
25   have marked as 866.  It's an e-mail chain and

Teague
1
2    there's a spreadsheet attached to it.  I just
3    want to draw your attention to the e-mail
4    traffic.  You're welcome to look at the
5    spreadsheet as well.  Let me know when you're
6    done.
7         (Document review.)
8    A.    Yes.
9    Q.    Starting with the e-mail chain with
10   your e-mail on the second page of the exhibit,
11   it carries over onto the third page of the
12   exhibit, that's your e-mail to Clement Bernard,
13   do you see that?
14   A.    Yes.
15   Q.    And you are raising with him some of
16   the issues that you had run into into
17   reconciling those eight backup spreadsheets that
18   we discussed earlier, do you see that?
19   A.    Yes.
20   Q.    And Clement asked you to speak with
21   either Kevin Horan or Mike McGarvey, do you see
22   that?
23   A.    Yes.
24   Q.    And then on the first page of the
25   exhibit you provide them with a phone number.

Teague
1
2    Did you ever speak to Kevin or Mike on those
3    issues that you had identified?
4    A.    On the weekend, no.
5    Q.    You did not?
6    A.    No.
7    Q.    Subsequent to that weekend, did you
8    end up speaking to them?
9    A.    Yes.  I don't recollect how this was
10   resolved.  I think we ended up moving forward on
11   to the next step.  Most of this, again, was just
12   trying to get a better understanding of the
13   assets that were coming on, and I'm -- at a
14   future date, we moved past this on to a
15   different set of spreadsheets that were
16   considered I believe it was Schedule A and
17   Schedule B, so then a lot of the work done here
18   was kind of pushed aside to Schedule A and
19   Schedule B, which is a new set of spreadsheets.
20   Q.    Did you do any work to compare
21   Schedule A and Schedule B to these
22   spreadsheets --
23   A.    Not --
24   Q.    -- or reference to 866?
25   A.    Not that I can recollect.  It was, due

Page 114

Teague

1 to the ever-changing environment of different
2 people getting involved, it was more a, you
3 know, let's move on to this, you know, this new
4 spreadsheet.
5    Q.    In your e-mail to Kevin Horan and Mike
6 McGarvey at the bottom of page 1, you state, "I
7 believe the idea is to value the portfolio as of
8 15 September since that is the legal close
9 date." Do you see that?
10    A.    Yes.
11    Q.    What was the basis for your
12 understanding that September 15 was the legal
13 close date?
14    A.    As per the e-mail, I said "I believe
15 the idea" because I wasn't quite sure. So,
16 again, any reference to that being the legal
17 close date, I wasn't quite sure what the legal
18 close date would have been.
19        I think the 15th was when Lehman
20 initially -- the initial analysis was done for
21 Lehman on the 15th for the derivatives, so I
22 thought that might be the same date.
23    Q.    Okay.  And you'll see in the two
24 e-mails on page 1 in your e-mail to Kevin Horan
25

Page 115

Teague

1 and Michael McGarvey, the subject line reads
2 "LBI Inventory 9-16-08." Do you see that?
3    A.    Yes.
4    Q.    And then on top of the page, you've
5 got a different subject line, "LBI Inventory
6 9-19-08 (repo)," do you see that?
7    A.    Yes.
8    Q.    And again, do you have a recollection
9 of having done any kind of a valuation or
10 reconciliation analysis on two different
11 populations of transactions during that week,
12 the 9/16 inventory and the 9/19 inventory?
13    A.    No, I do not.
14    Q.    And are you aware of anyone else at
15 Barclays having done any such analysis?
16    A.    Not that I'm aware of.
17        Apologies.  There is no -- it appears
18 there would be no -- there's no attachment for
19 the first e-mail.  That attachment would be all
20 the way down in the later e-mails the way I'm
21 looking at it.  Appears so.
22    Q.    You're looking for a spreadsheet of
23 the 9/19 inventory, is that what you're looking
24 for?
25

Page 116

Teague

1    A.    Yes, I didn't know if there was
2 multiple attachments.
3    Q.    Okay.
4        (Deposition Exhibit 867, a document
5 bearing Bates Nos. BCI-EX-(S)-00201262
6 through 263, with attachment, marked for
7 identification, as of this date.)
8    Q.    I've handed you an exhibit marked
9 Deposition Exhibit 867.  It's a cover e-mail and
10 then an attached spreadsheet.  If you could take
11 a look at that, let me know when you're done,
12 and I'll ask you some questions.
13        (Document review.)
14    A.    Yes. Yes.
15    Q.    At the bottom of the e-mail, you send
16 a spreadsheet to an address that's listed as
17 GFNY Price Test, do you see that?
18    A.    Yes.
19    Q.    What does the "GFNY" stand for?
20    A.    Global Finance New York Price Testing.
21    Q.    So that would be part of -- that's
22 part of the Product Control group?
23    A.    That's part of IVC.
24    Q.    That's part of IVC, okay.
25

Page 117

Teague

1        And you get a response back from Kevin
2 Jhea asking you what date, and you respond in
3 your e-mail, "As per Phil Nash, assets were
4 acquired using BoNY prices which I have heard on
5 Thursday close, as well as being generally
6 inaccurate.  We need to test against our
7 acquisition date which is first thing Monday
8 which equals to Friday close (test the execution
9 price reasonableness as of Friday close)."  Do
10 you see that?
11    A.    Uh-huh.
12    Q.    Yes?
13    A.    Yes.
14    Q.    You did do an analysis of the
15 valuation as of the Friday close, correct?
16    A.    Correct.
17    Q.    And at some subsequent date, you did
18 another analysis as of the Monday close,
19 correct?
20    A.    Correct.
21    Q.    Did you prepare a comparison table or
22 a spreadsheet that set out all of your
23 calculations as of the Friday close and compare
24 it to your calculations as of the Monday close?
25

30 (Pages 114 to 117)

Teague

1                  Teague
2     A.   It's all in the spreadsheet.  Both of
3 those are in the spreadsheet.
4     Q.   Both of those are in the spreadsheet?
5     A.   Correct.
6     Q.   Do you understand the reference to
7 "execution price reasonableness," "test the
8 execution price reasonableness as of Friday
9 close"?  What was that a reference to?
10     A.   I don't know what Phil was talking
11 about, to be honest.  I think he's just trying
12 to determine what the -- perform an independent
13 valuation as of, you know, the first thing
14 Monday morning is the gist of it.  As far as
15 what the close, I wasn't quite sure, so I didn't
16 reword his -- his e-mail.
17     Q.   Okay.  I'm handing an original exhibit
18 that was previously marked as Exhibit 641A, and
19 I'm handing you the original just because
20 photocopying of that document you tend to lose a
21 little bit of the legibility, so that should be
22 easier for you to read.  It also references a
23 bunch of spreadsheets and we'll put those up in
24 the screen, but just in terms of the basics, you
25 recognize the cover of Exhibit 641 as an e-mail

Teague

1                  Teague
2 from you to Tal Litvin, do you see that?
3     A.   Yes.
4     Q.   And who is Tal Litvin?
5     A.   I have -- I don't recollect where he
6 fits in.  He's part of Product Control.
7     Q.   But he asked for schedules and you
8 provided those schedules to him?
9     A.   Correct.
10     Q.   Okay.
11     A.   I think he's part of the COO team.  So
12 he would be basically reporting to Phil Nash.
13     Q.   Right behind page 1 of this document
14 is what appears to be a memo.
15     A.   Yes.
16     Q.   Do you see that?  And it has a number
17 at the bottom that ends in 991, correct?
18     A.   Yes.
19     Q.   And that's a document that you
20 prepared?
21     A.   Yes.
22     Q.   And that's a document you prepared at
23 the end of your valuation process to summarize
24 what you had done?
25     A.   That's correct.  Not just to summarize

Teague

1                  Teague
2 what I had done, what was performed for the
3 overall valuation.
4     Q.   Okay.  So your memo covers not just
5 the work that you personally did, but that
6 others may have done as part of the overall
7 valuation process; is that right?
8     A.   From a very high level perspective
9 if -- if it was included in the spreadsheets,
10 then, yes, it was a guide.
11     Q.   And then when you turn further in this
12 exhibit to the tabs, you'll see there's a
13 placeholder tab that references a document and
14 then there's a printout that follows that, which
15 is the printout of a spreadsheet that's
16 referenced.  And these are all produced in
17 native format, which is why it's broken out.
18         These are all spreadsheets that you're
19 familiar with, generally, sir?
20     A.   Before I say "yes," let me look at the
21 stack.
22         (Document review.)
23     A.   So this is probably JPMorgan.
24     Q.   Why don't you take a moment and flip
25 through it, and then once you're done, I'll ask

Teague

1                  Teague
2 you questions so we can get oriented as to
3 what's in this document.
4         (Document review.)
5     A.   Okay.
6     Q.   So the question is, are you generally
7 familiar with all of these spreadsheets, sir?
8     A.   Yes.
9     Q.   And these are the spreadsheets that
10 set out the valuation of the trading assets
11 acquired as part of the Lehman acquisition; is
12 that right?
13     A.   Yes.
14     Q.   If you turn in your exhibit to a tab
15 that reads BCI-EX ending in 996?
16     A.   To where the -- okay.
17     Q.   You have it?
18         MR. HUME:  I don't have it.
19         Okay, I see it.
20         MR. TAMBE:  You can look over what the
21 witness has.
22     Q.   If you just turn behind that tab, the
23 first page behind that tab.  If we can just pull
24 up this document on the overhead projector.
25     A.   It's saying 00213996?

Teague

1
2  Q.    Yes, and it says Liquidity tab.
3  A.    Mine says, "Sheet 2."
4  Q.    You should find one that says
5  Liquidity tab.  It's a tab with a spreadsheet
6  that's located at that number.  We'll put up the
7  spreadsheet.  That may be the easiest way of
8  doing it.  It's about 20 pages past where you
9  were.
10  A.    Okay.
11      MR. HUME:  It's 996?
12      MR. TAMBE:  It's 996.  It's 213996,
13  Liquidity tab.  There's a series of tabs in
14  that spreadsheet.  This is the printout of
15  the Liquidity tab.
16  Q.    The question is a basic one.  The
17  Liquidity tab that appears in these
18  spreadsheets, that's used as a grid or that's a
19  cross-reference for purposes of making liquidity
20  adjustments by product type; is that right?
21  A.    Yes.
22  Q.    And the "Liquidity Haircut" column
23  that is shown on this tab, the individual
24  liquidity haircuts there are expressed as a
25  percentage, 1 being 100 percent and anything

Teague

1
2  less than 1 being less than 100 percent, right?
3  A.    Correct.
4  Q.    There was a methodology or an approach
5  you followed to determine what the liquidity
6  haircut would be for each product type; is that
7  right?
8  A.    That's correct.
9  Q.    And which of these liquidity haircuts
10  were you personally responsible for developing
11  or deriving?
12  A.    I would have been involved in the --
13  for the Rates, say Treasuries, agencies, munis,
14  corps.  The next piece I think was all Rich
15  Landreman:  Sovereigns, corporate credit, EM
16  Corp., EM.  And then from there down would be
17  Mark Washtell for the Equities, and PMTG would
18  have been Rich Landreman.  And I may have, but I
19  don't recollect, for the CDO mezz and CDO
20  senior.
21  Q.    So we've pulled up on the screen --
22  A.    CLS.
23  Q.    We have pulled up on the screen that
24  tab.
25  A.    Yes.

Teague

1
2  Q.    Just for purposes of the record, we
3  can just read in the row numbers.
4  A.    Certainly.
5  Q.    So if we can just scroll down the rows
6  until we get to Rates, if they're there.
7  A.    You have to scroll back up.
8  Q.    So, starting with row 35, it says
9  Rates, Treasuries.  That would have been
10  something you covered?
11  A.    Yes, I would have been involved in row
12  35, 36, 37, 38 and then jump down to 44, 45, 46,
13  47.
14  Q.    Are there any other liquidity haircuts
15  that you calculated that don't appear on this
16  table?
17  A.    On the PMTG tab?
18  Q.    Yes.
19  A.    I may have been involved in the -- you
20  have to scroll down a bit -- the 62 and 63.
21  Q.    So 62 is PMTG and then CDO Mezz and
22  CDO Senior?
23  A.    Yes.
24  Q.    Those two lines?
25  A.    And 66 and 67, which would be CLO Mezz

Teague

1
2  and CLO Senior.
3  Q.    So, going back up into the Rates rows,
4  38 was one of the first ones, just so we
5  understand, row 35, this table says it's for
6  Rates, Treasuries, the liquidity haircut, the
7  entry is .999.  So that's one-tenth of 1
8  percent, that's the liquidity haircut?
9  A.    Correct.
10  Q.    And then for Rates, Agencies, there's
11  a 5 percent liquidity haircut?
12  A.    That's correct.
13  Q.    And that's applied across the board to
14  all products, all individual CUSIPs that are
15  classified as Rates, Agencies; Is that right?
16  A.    Yes.
17  Q.    That methodology of deriving a
18  liquidity haircut and applying it across all
19  CUSIPs in a particular product type, have you
20  ever done that before in your work at Barclays?
21  A.    Basically, the analysis was performed
22  looking at third-party data, looking at yields.
23  For the Treasuries what we did was, as a means
24  in this marketplace, again, what we're looking
25  at is a very distressed marketplace that was

Page 126

Teague

1 outside of the normal market environment that
2 one usually receives -- one usually sees this,
3 you know, potential once-in-a-lifetime event,
4 hopefully, resulted in us having to determine,
5 using vendor data, what -- what type of haircut
6 would be appropriate for marking all of the
7 assets to bid.
8 Q.   Have you ever used that kind of a
9 process before in your work at Barclays?
10 A.   I haven't been through a market
11 environment of this in my life.
12 Q.   Putting aside the market environment,
13 have you taken those kinds of liquidity haircuts
14 and applied them across an entire class of
15 securities?
16 MR. HUME:  Objection.  Asked and
17 answered.
18 A.   No, I have not.  There would not have
19 been a need.  And again, this was -- this
20 haircut was taken on vendor data, not on
21 traders' marks.  So it would be marked to bid.
22 So that would be a mid to bid, not looking at a
23 bid already marked by the traders.
24 Q.   For Rates, Corporate, you have a

*(Note: lines numbered 1–25; line 1 is "Teague" heading)*

Page 127

Teague

1 comment that reads, "Lowest third-party price
2 utilized in place of V-O."  Do you see that?
3 A.   Yes.
4 Q.   And so there you did not do a
5 liquidity adjustment, but if you had multiple
6 third-party prices, you'd pick the lowest price
7 as the price you would apply, correct?
8 A.   That's correct.
9 Q.   Is that an approach that you have used
10 previously in your work at Barclays?
11 A.   No, I have not used that approach
12 before.
13 Q.   When you go down to rows 45 and 46,
14 there, too, you have comments, a similar
15 comment, "Minimum third-party price utilized in
16 place of V-O."  Do you see that?
17 A.   Yes.
18 Q.   And again, there you didn't apply a
19 percentage liquidity haircut; you took the
20 lowest third-party price that you had obtained;
21 is that right?
22 A.   Yes, that was the methodology we chose
23 to use.
24 Q.   And that's not a methodology that you

Page 128

Teague

1 have used previously at Barclays, correct?
2 A.    No.  Based on the market environment
3 that we were looking at, Corporates as an asset
4 class have quite a few vendor sources.  Some
5 other asset classes may not have as robust
6 third-party data.
7 The question with the Corporates was,
8 in looking at all this vendor data, how much of
9 this vendor data is stale as the market was
10 dropping considerably day over day.  So the
11 overall theme is, in short, whoever is marked
12 the lowest is the best reflection of the
13 marketplace.
14 If the majority of the positions are
15 going in one direction, why would you take an
16 average and take a bid/offer against the
17 average?  Because we have, again, for this asset
18 class, we have multiple vendors.  So now we have
19 a lot of data points to look at and with a lot,
20 you know, the issue with the vendors is a lot of
21 times the vendors call up, will talk to say a
22 broker, a dealer and ask where something is
23 priced and that's where they'll mark it.
24 It's an indicative price.  It's not a

Page 129

Teague

1 clearing price.  If the trader is not seeing any
2 transactions, that trader may actually refer
3 back to just say the vendor with the same price
4 they had yesterday, the day before, the day
5 before that in a free-falling market.  So
6 whichever vendor has the best data is most
7 likely the vendor with the lowest price because
8 that means they're actually getting updated
9 information.
10 Q.   Did you actually do that?  When you
11 had multiple prices from vendors, did you go
12 back to the vendors and say what's this based
13 on?  Do you have more current data?  Why are you
14 using this price?  Or did you simply look at the
15 price quoted and pick the lowest one?
16 A.   We went with the lowest price because
17 I know how the vendors operate.  I know how
18 they're -- they're pricing.  They're obtaining
19 their pricing.  If they're obtaining their
20 pricing through -- they either price by calling
21 and getting information or through -- they can
22 also price through a model, but in a
23 free-falling market, what you end up having is a
24 lot of very stale prices, prices that reflect

33 (Pages 126 to 129)

Page 130

Teague

1           Teague
2 what the price was two, three, five days ago,
3 ten days ago.
4    Q.   Did you do that, where you had say
5 three prices and one is at -- say the three
6 prices are 10, 5 and 1.  Under your test for
7 corporate rates, you would have used 1 as the
8 lowest of the three prices, correct?
9    A.   Yes.
10    Q.   Okay.  You would not have gone back to
11 the vendor who quoted the 5 and seen what that
12 vendor had quoted yesterday or the day before or
13 the day before that, correct?  You assumed that
14 it was a stale price?
15    A.   Yes, I assumed it was a stale price
16 based on the fact that there was quite a few
17 stale prices in the marketplace without having
18 to --
19    Q.   And you wouldn't have had --
20        MR. HUME:  Object to form.
21    A.   -- without going into the specifics, I
22 have the 19th and I have the 22nd's, you know,
23 third-party data.
24    Q.   Did you do that?  Did you, for
25 purposes of applying this test, lowest

Page 131

Teague

1           Teague
2 third-party price utilized, look at how the same
3 vendor had quoted a particular security on the
4 19th and then on the 22nd, and based on that
5 make a determination, well, this is clearly a
6 stale price versus here's another price that has
7 been updated, therefore, it must be superior?
8 Did you do that analysis?
9        MR. HUME:  Objection.  Objection,
10    vague.  Are you asking whether he did it on
11    every security?
12    Q.   On any of them.
13    A.   No, it wasn't done on a security
14 basis.
15    Q.   Was it done on any basis?
16    A.   We did a review to see if, you know,
17 what price movement.  There wasn't a dramatic
18 price movement between the two dates, and we
19 went with the lowest price that was available.
20    Q.   So if corporate rates in general as a
21 category had moved, you went for the lowest
22 price; is that what you're telling me?
23    A.   Yes.  As a category, there was
24 dramatic free-fall in the corporates that, you
25 know, we're not seeing reflected as a -- so we

Page 132

Teague

1           Teague
2 went with the lowest prices out there because
3 that being the logic that that would be the best
4 reflection of the marketplace if you were
5 looking for a bid price.
6    Q.   You did the same thing on corporate
7 credits and corporates; is that right?
8    A.   Yes.  They're all essentially
9 corporates.  It just had different titles for
10 some reason.
11       Keeping in mind most the vendor prices
12 are mid, that's the other aspect of it, so a
13 vendor price may not provide you a reflection of
14 where the bid would be.  It's an indicative
15 level.  It's a market level.  It does not
16 actively reflect it being a bid level.
17       So taking that doesn't make us overly
18 conservative.  What we could be looking at there
19 could even be an ask, that lowest price.
20    Q.   On any of these categories where you
21 applied this rule, which is the lowest third
22 price -- third-party price was the one utilized,
23 did you look to see if Barclays traders had
24 transacted on any similar securities on the 19th
25 or the 22nd; and, if so, at what prices?

Page 133

Teague

1           Teague
2    A.   I did not.  I don't believe there was
3 any trading activity going on really at that
4 point in time.
5    Q.   Well, did you do something to
6 determine whether or not there was trading
7 activity on any of these CUSIPs at that point in
8 time?
9    A.   Not that I recollect.
10    Q.   If there had been trading activity on
11 the 19th and 22nd in these CUSIPs by Barclays
12 traders or other traders, that would be a
13 relevant data point, correct?
14    A.   Correct.
15    Q.   It would be actual trade data,
16 correct?
17    A.   If we look back at the valuations that
18 was performed on 12/22, the TRACE data is -- is
19 the overriding prior to any other third party,
20 and the TRACE data did line up pretty well with
21 all the lowest prices that we were looking at
22 from the vendors.
23    Q.   So your last answer refers to the
24 valuation you did on what you refer to as the
25 JPM portfolio, correct?

34 (Pages 130 to 133)

Page 134

Teague

1    A.    Correct.
2    Q.    That's not an answer that applies to
3    the initial inventory, correct?
4    A.    I'm just saying it aligned properly,
5    so it had aligned, the TRACE prices had aligned,
6    so I'll just leave it at that.  So, no, this was
7    a -- TRACE was not incorporated into this
8    original Lehman opening balance sheet 9/22 data.
9        MR. HUME:  Did you say trade data or
10   TRACE data?
11       MR. TAMBE:  TRACE.
12       MR. HUME:  TRACE data.
13       MR. TAMBE:  Let's break for lunch.
14   Pick it up when we're done.
15       (Luncheon Recess; Time Noted:  12:55
16   P.M.)
17
18
19
20
21
22
23
24
25

Page 135

Teague

1        AFTERNOON SESSION
2        (Time Noted:  2:03 P.M.)
3    SEAN TEAGUE, resumed and
4        testified further as follows:
5    EXAMINATION BY (Cont'd.)
6    MR. TAMBE:
7    Q.    Sir, I've handed you a document
8    previously marked as Deposition Exhibit 822.  If
9    you could take a moment just to review that
10   e-mail chain and let me know when you're done.
11       (Document review.)
12   A.    Okay.
13   Q.    If you start reviewing this e-mail
14   chain from the back, the e-mail from Mark
15   Washtell to you and Stephen Calick?
16   A.    Uh-huh.
17   Q.    Do you recognize that as an e-mail
18   concerning the reconciliation of the LBI
19   positions and the beginning of the IPV analysis;
20   is that right?
21   A.    This is specific to Equities.  I
22   believe this is a separate file because it's
23   "Rec of LBI trades to SOPHIS marks."  So it's
24   SOPHIS is a system for Equities.  So this would

Page 136

Teague

1    be outside of any of the larger files that I
2    would have been looking at.
3    Q.    But this is part of the overall
4    reconciliation on IPV process, but dedicated to
5    Equities?
6    A.    Correct.  So keep in mind, again, my
7    analysis was on the rates and credits, Mark's
8    was on equities, and Rich Landreman's would have
9    been on the securitized products.
10   Q.    And the reason that you're included in
11   this e-mail chain, is that because you're
12   collecting data and the work that's being done
13   by others as well in IPV?
14   A.    Yes, I was collating the data from
15   Mark as well as Rich to put it in the final.
16   Q.    The first e-mail in the chain, so the
17   most recent e-mail in the chain on page 1, is
18   from Mark Washtell to Steven Calick and Eric
19   Clark, do you see that?
20   A.    Yes.
21   Q.    And in the fourth paragraph, which
22   begins, "We did not manage to catch Andrea," do
23   you see that?  It's on the first page of the
24   exhibit.

Page 137

Teague

1    A.    First page.  Okay.  Yes.
2    Q.    Do you know who that's a reference to,
3    the Andrea who's mentioned in that e-mail in
4    that paragraph?
5    A.    No, I do not.
6    Q.    And on the first paragraph there's a
7    reference to a Nick Leyhane.  Do you know who
8    that is?
9    A.    No, I do not.
10   Q.    In this time period, the last two
11   weeks of September, was there interaction
12   between the independent -- between the IPV folks
13   and traders on prices and values that were being
14   ascribed by IPV?
15   A.    With the overall objective of
16   obtaining the proper market value, there was
17   discussions that would have happened, yes.
18   Q.    Okay.
19       (Deposition Exhibit 868, a document
20   bearing Bates Nos. BCI-EX-(S)-00207849
21   through 850, with attachment, marked for
22   identification, as of this date.)
23   Q.    I have placed before you a two-page
24   document marked Exhibit 868.  If you could take

35 (Pages 134 to 137)

Teague

1    a look at it.  Let me know when you're done.
2    I'll ask you a couple of questions.
3        (Document review.)
4        A.    Yes.
5        Q.    And you recognize this as an e-mail
6    chain that was discussing setting up some kind
7    of a shared drive for exchanging information
8    with people, do you see that?
9        A.    Yes.
10        Q.    Was that in fact done?  Was there a
11    shared drive for exchanging information?
12        A.    I don't recollect.  I take it --
13    there's a good chance, apologies, but no, I
14    don't remember.
15        Q.    In your e-mail to Tom, it looks like
16    Shashaty, which is on the first page?
17        A.    Yeah.
18        Q.    Do you see that?  In your e-mail to
19    Tom, you identify people from the Barclays side
20    who would need access to the Lehman data, and
21    then you make some recommendation as to who
22    should be included from the Lehman side, do you
23    see that?
24        A.    Yes.

Teague

1        Q.    Do you have any reason to believe that
2    this shared drive or information-sharing process
3    was not set up?
4        A.    No, no reason to believe it was not
5    set up in the system.  No reason to believe it
6    did not happen.  I just don't recollect the
7    shared drive being set up.
8        Q.    The subject line on the e-mails on the
9    first page read, Price testing -
10    Converts/Equity/Preference"; is that right?
11        A.    It would be preferred eqs.
12        Q.    Any reason to believe that this shared
13    drive was limited to price testing on just those
14    products or whether this was a broader shared
15    drive?
16        A.    If it were to have happened, I take it
17    it would have been a broader shared drive.
18        Q.    I'd asked some specific questions
19    about interactions with former Lehman as part of
20    your work.  Let me ask you a broader question.
21        In general, did you have any
22    conversations with Lehman traders in the course
23    of your independent price valuation work for the
24    acquisition balance sheet?

Teague

1        A.    We might have touched base with a
2    couple of traders just to get some
3    understanding, but I believe that was far enough
4    outside of the spectrum of when the analysis was
5    done.  If, like for this aspect, these were the,
6    you know, this was the Barclays valuations that
7    we were trying to reach out to I think the
8    Lehman valuations individuals who -- that's
9    Neeraj was on the Lehman valuations team -- to
10    start working together.
11        Q.    And was Neeraj someone who had come
12    over from Lehman to Barclays?
13        A.    As of that date, everyone had come
14    over, as of the 26th of September.  Neeraj was
15    no -- by the end of 2008, I don't know what date
16    Neeraj was no longer with the firm.
17        Q.    And do you know whether people like
18    Neeraj, who were formerly with the Lehman
19    valuation team, played any role in the
20    valuations that Barclays came up with for the
21    acquisition balance sheet?
22        A.    No, Neeraj didn't -- didn't play a
23    role in the valuations process.
24        Q.    Did any other former Lehman valuation

Teague

1    professionals play a role in that acquisition
2    balance sheet valuation?
3        A.    No.
4        Q.    No?
5        A.    No.
6        Q.    So let's go into a document that's
7    been marked previously.  And I'll pull it up on
8    the screen as well.  I'm handing you the hard
9    copy.  I'm handing you what has been marked as
10    Exhibit 86B.  It's a printout from a
11    spreadsheet.  It's not the entire spreadsheet.
12    And what I have pulled up on the screen is the
13    native version of that document, that same
14    spreadsheet.
15        A.    Okay.
16        Q.    Which has been marked as Movants'
17    Trial Exhibit 102N, "N" for native.
18        Looking at the hard copy, the paper
19    document Exhibit 86B, is that a document you are
20    generally familiar with?
21        A.    Yes, I am.
22        Q.    And do you recognize that as the
23    valuation of the non-JPM assets?
24        A.    This would be the 9/22.  So, yes,

Teague

1 these were the non-JPM assets.
2   Q.    What I'm going to do, if I'm able to
3 navigate my way around the spreadsheet, is pull
4 up in the native format what is the electronic
5 version of that first page of the hard copy
6 document which you're looking at.
7       Can you just look at the numbers and
8 confirm that that is in fact the same document?
9   A.    Yes, it appears to be the same
10 document.
11  Q.    And just so we understand, then, your
12 knowledge about the various columns starting
13 with column B, that's the -- the dollar amounts
14 that appear there, those are the notional
15 amounts off the securities?
16  A.    Yes.
17  Q.    And what does that mean when you say
18 they are the notional amounts of those
19 securities?
20  A.    That would be the face value amounts
21 of the securities themselves.  So the notional
22 times price times factor would come up with your
23 market value.
24  Q.    The next column C, which is BoNY

Teague

1 Value, what is that a reference to?
2   A.    That's the Bank of New York value that
3 they attributed to the assets.
4   Q.    When you move over to column D, it
5 says at the top "22-September" and then it says
6 "PCG Value."  What is that column?
7   A.    That's the independent valuation that
8 was determined by Product Control.
9   Q.    And the 22 September indicates that
10 that's a valuation as of end of day September
11 22; is that right?
12  A.    That's correct, that would be the
13 valuation used for September 22.
14  Q.    Would that include certain -- for
15 certain securities valuations that were done as
16 of September 30?
17  A.    As it was deemed there was no true
18 difference between the 30th and 22nd, then there
19 was still, yes, there would be a 30th in there,
20 but there was no discernible material difference
21 between the two valuations.  So it was deemed
22 appropriate still from December -- I mean,
23 sorry, for September 22.
24  Q.    But my question was a very basic one,

Teague

1 which is, even though it says September 22,
2 included in that column for certain CUSIPs are
3 values that were actually calculated on
4 September 30th.  Your additional explanation is,
5 well, those September 30th values are not that
6 different from September 22.  Is that fair?
7       MR. HUME:  Object to the form of the
8 question, and objection, asked and answered.
9       You may answer the question.
10  Q.    Is that a fair way of capturing what
11 you just said?  I'm just trying to understand
12 what you said.
13  A.    We could go back and look at the
14 Independent Valuation document where I
15 summarized how the valuation was performed, but
16 the data in there that was for September 30th,
17 it was deemed to be no -- it wasn't deemed to be
18 materially different than the 22nd because the
19 markets for those illiquid assets hadn't really
20 moved.
21  Q.    You said you had a summary of the
22 methodology, and you're referring to the bound
23 document Exhibit 641A.
24  A.    641.

Teague

1   Q.    You're referring to that two-page,
2 three-page memo at the front of that document;
3 is that correct?
4   A.    That's correct.
5   Q.    What in particular were you referring
6 to when you were talking about September 30th
7 versus September 22?
8   A.    That would only cover, based on this,
9 the last bullet point on 0213991 for the PMTG
10 assets.
11  Q.    Okay.  So and if I -- I just want to
12 understand what it is that you are summarizing
13 there on that last bullet point on the page that
14 ends 991 in Exhibit 641A.
15      This is an explanation that appears
16 under the Illiquid Assets section of that memo,
17 correct?
18  A.    That is correct.
19  Q.    And this particular bullet point
20 reads, "Haircut due to liquidity issues.
21 Following logic was devised to best capture
22 market price," and then there are two
23 sub-bullets, correct?  Right?
24  A.    Correct.

Page 146

Teague

1
2    Q.   The first of the sub-bullet states,
3    "Lehman assets which were sold (auctioned by the
4    PMTG) prior to month-end are considered trades
5    and therefore the traded price was applied with
6    no haircut."
7         In that sub-bullet, when you refer to
8    assets which were sold, are you differentiating
9    between assets that were sold outside of
10   Barclays from assets that were sold internally
11   within Barclays, or does that include assets
12   which were sold both inside and outside?
13   A.   That includes -- this specifically was
14   for assets that, in this case, were sold
15   internally to another desk within Barclays.  So
16   the assets here were sold out to the PMTG desk.
17        I believe, as you can see here, so the
18   marks were used for where they were sold, the
19   traded price, and if the security was not
20   auctioned by September 30, the desk mark was
21   used.
22   Q.   All right.  And the sales, the
23   internal sales that occurred, would have
24   occurred after the 22nd of September, correct?
25   A.   That's correct.

Page 147

Teague

1
2    Q.   So, nonetheless, the value for those
3    securities that were sold after 22nd of
4    September, internally sold within Barclays,
5    would be captured and those trade prices would
6    be reflected in column D on the spreadsheet
7    we're looking at on 86B, correct?
8    A.   That is correct.  And clarified by the
9    Lehman opening balance sheet document would take
10   those along with.
11   Q.   Is it the case that every time you
12   have an internal sale of a security to a trading
13   desk within Barclays you used the traded price
14   as the acquisition date price for that asset?
15   A.   The only assets it was done for were
16   the illiquid assets in the PMTG desk.  Any
17   trading activity that happened for the other
18   assets post-acquisition was not part of the
19   opening balance sheet price.
20   Q.   So but within the illiquid PMTG assets
21   where you did follow this methodology, it was
22   the case that every time there was an internal
23   sale, that is the price you used, you used the
24   internal sale price, or did you use some other
25   price, even though there was an internal sale of

Page 148

Teague

1
2    an illiquid PMTG asset?
3    A.   To the best of my knowledge, the sheet
4    is broken out to show any trading activity, and
5    that trading activity is then utilized in the --
6    in the final value as represented on this page,
7    summary page of the Excel spreadsheet.
8    Q.   As you sit here are you aware of any
9    instances where IPV assigned a value to an asset
10   that was sold internally by PMTG, assigned a
11   value that was lower than the traded price?
12   A.   Can you restate the question?
13   Q.   Sure.
14        (Record read.)
15   A.   I couldn't say off the top of my head.
16   Q.   Would you expect that to have
17   happened, given your methodology?
18        MR. HUME: Objection to the form.
19   A.   Without reviewing the numbers, I
20   wouldn't care to guess.  I'm not quite sure --
21   I'm not quite sure where -- apologies -- where
22   the question is going.  I don't have the data in
23   front of me to review it.
24   Q.   Well, if you go over to the PMTG tab
25   in Exhibit 86B, that should capture

Page 149

Teague

1
2    CUSIP-by-CUSIP the valuation for each of those
3    securities, correct?
4    A.   Correct.
5    Q.   And to the extent that any of the
6    securities there were sold internally, that
7    spreadsheet or that tab would indicate what
8    price you had used for valuation purposes,
9    correct?
10   A.   Correct.
11   Q.   Because those tabs all roll up into
12   the Summary tab, correct?
13   A.   That's the case, yes.
14   Q.   So, I mean, at the risk of seeing if
15   this works, let's try that.  So I have gone into
16   the PMTG tab of the same spreadsheet, 86B, which
17   is Movants' 102 native.
18        Where would it be indicated whether or
19   not there was an internal sale of that security,
20   taking any one of these lines?
21   A.   That column that you're in now.
22   Q.   Column AF?
23   A.   Yes.
24   Q.   It says "Market Value Sales"?
25   A.   Correct.

38 (Pages 146 to 149)

Page 150

Teague

1
2    Q.    The fact that a number appears in that
3    column, does that indicate to you that that's a
4    security for which there has been a trade?
5    A.    Yes.
6    Q.    And what it indicates to you is that
7    trade was an internal trade?
8    A.    It doesn't necessarily indicate that
9    it was an internal trade.  It indicates that it
10    was a trade.
11    Q.    Okay.  Is there some other part of
12    this spreadsheet or another tab in this
13    spreadsheet that differentiates internal trades
14    from external trades?
15    A.    I do not have that information in this
16    spreadsheet.
17    Q.    Do you know that from any other
18    spreadsheet, whether there's a document that
19    differentiates internal and external sales?
20    A.    I do not know.
21    Q.    Is it fair to say that for purposes of
22    your analysis you treated internal and external
23    sales, at least within this category, the PMTG
24    category, as the same?
25    MR. HUME:  Objection.  Lacks

Page 151

Teague

1
2    foundation.  Isn't this -- well, go ahead.
3    A.    I mean, this is, you know, as per this
4    spreadsheet, basically the thought process was
5    we're looking at the most illiquid assets.  Any
6    trading activity was deemed to be the best
7    indication of where an asset would clear, most
8    important thing, right, when trying to determine
9    a market price is to have a market, as the
10    majority of the assets in this pool have no
11    market, no discernible market, no discernible
12    market data because the trade data -- I'm sorry,
13    the trade's prior price was used as the level
14    for which we independently valued the assets.
15    Q.    And following that methodology, you
16    did not differentiate between internal sales
17    within Barclays from external sales that were
18    sales by Barclays to a third party?
19    MR. HUME:  Objection.  Lacks
20    foundation.  These are Rich Landreman's
21    assets, if I understand correctly, from the
22    prior testimony.
23    A.    Yes.
24    MR. HUME:  I'm objecting as lack of
25    foundation on that basis.

Page 152

Teague

1
2    MR. TAMBE:  I would prefer if you just
3    kept your objection to a legal basis as
4    opposed to signaling to the witness what he
5    might say in his answer.
6    MR. HUME:  I'm suggesting to you that
7    your question lacks foundation.
8    MR. TAMBE:  If you want to explain
9    something to me, you can do it outside the
10    earshot of the witness, which would be more
11    appropriate.
12    Q.    The next question I have is, is there
13    any way for you to tell from looking at this
14    spreadsheet whether the price that was
15    ultimately used by Barclays IPV to value one of
16    these CUSIPs is different from the price that
17    was -- that appears in the "MV Sales" column or
18    that is implied by the "MV Sales" column?
19    A.    If you go to your left, I could see.
20    Q.    Just tell me when to stop.
21    A.    You can stop there.
22    Q.    You're comparing column AA to column
23    AE?
24    A.    Just one moment.
25    So column AA will equal column AE.

Page 153

Teague

1
2    Column X was the original --
3    Can you go to your left?  Keep going.
4    9/19.  Pardon me.  So column X was the market
5    value originally put on those assets by Product
6    control as a cross-reference to the pricing at
7    which it was sold.
8    Q.    Okay.  And so let's just look at the
9    row that we're looking at right now, which is
10    row 6 in the PMTG tab of 86B, and column T for
11    that CUSIP row, which is row number 6, has a
12    BoNY price of 73.04, correct?
13    A.    Yes.
14    Q.    Has a PCG price of 19.16?
15    A.    Yes.
16    Q.    Right?
17    A.    Correct.
18    Q.    Do you know where that PCG price is
19    derived from?
20    A.    I would not be the proper person to
21    question.  That would be definitely Rich
22    Landreman.
23    Q.    Column W is "BoNY Market Value, 9/19."
24    Do you see that?
25    A.    Yes.

39 (Pages 150 to 153)

Page 154

Teague

1
2  Q.   And then that's simply using the BoNY
3  price times the quantity?
4  A.   Yes.
5  Q.   Times a factor, if there's a factor?
6  A.   Correct.
7  Q.   Column X is the PCG market value using
8  PCG price from column U, correct?
9  A.   Correct.
10  Q.   Then you have column Z, which does not
11  have a heading.
12       Column AA, which has a PMTG PX?
13  A.   Yes.
14  Q.   9/30, correct?
15  A.   Correct.
16  Q.   For this particular row, that carries
17  a value of 72, and if we go over to column AE,
18  "Sale Price," that has a value of 72 for that
19  particular security?
20  A.   Yes.
21  Q.   So, in that instance, would you say
22  that what this calculation is showing is that
23  the sale price is the price that was used for
24  determining the value that rolls up into the
25  acquisition balance sheet?

Page 155

Teague

1
2  A.   That's correct.  So the higher price
3  assigned by the desk would have been the price
4  assigned for the opening balance sheet.
5  Q.   Okay.  And the question is, are you
6  aware of any instances where a lower price was
7  assigned, a price lower than the desk price, the
8  traded price was used?
9  A.   The desk price would have been the
10  price utilized for the opening balance sheet I
11  believe in all situations.
12  Q.   Would it have been wrong to use a
13  lower price than the desk price?
14  A.   I don't see why we would have.  I
15  mean, that's not how the spreadsheet is set up.
16  The spreadsheet is set up to take the desk price
17  for 9/30.
18  Q.   All right.  Going back to 86B, the
19  Summary tab, you've got PCG value of 42 -- I'm
20  looking at row 14, column D.  You've got a PCG
21  value of 42.578 billion, do you see that?
22  A.   Yes.
23  Q.   But that number gets adjusted further,
24  correct?  To come up with the acquisition value
25  for those assets?

Page 156

Teague

1
2  A.   Yes.
3  Q.   And the further adjustment you make is
4  you apply the liquidity calculation from column
5  F; is that right?
6  A.   That's correct.
7  Q.   And so the final values that you
8  derive for the non-JPM assets are row 14, column
9  E, which is $40.7 billion, correct?
10  A.   That's correct.
11  Q.   The liquidity value adjustments that
12  are reflected on the summary sheet of 86B, just
13  to confirm, those are derived by applying those
14  liquidity factors that we had talked about in
15  the morning?
16  A.   So each of the experts by the --
17  within Independent Valuations, based on the
18  asset class, would have performed analysis to
19  determine appropriate bid/offer for which to
20  capture bid for the market value for each of the
21  asset classes.
22  Q.   What experts?
23  A.   So each of the IVC individuals, like,
24  for instance, for my world, people within my
25  team would have performed analysis for

Page 157

Teague

1
2  corporates, somebody would have performed
3  analysis for munis, somebody would have
4  performed analysis for agencies, and that would
5  be data that, yes, we utilized then to calculate
6  a bid/offer.
7       For Rich's team, within his team, that
8  would be how it would have worked for the
9  securitized products.
10  Q.   And the net result of this, with
11  respect to non-JPM assets, was that assets that
12  were valued by the Bank of New York at 45
13  billion were valued by Barclays at 40.69
14  billion; is that right?
15  A.   Yes, but there was a time period of
16  difference there between the two dates.
17  Q.   And the time period difference that
18  you're alluding to is the BoNY values were as of
19  what date, sir?
20       MR. HUME:  Objection.  Lacks
21  foundation.
22  A.   I'm not quite sure.  I believe it was,
23  if we go back to one of the other tabs --
24  Q.   Pick any tab?
25  A.   Try the Rates tab, I guess.

Page 158

Teague

1    Q.    Because you would be familiar with the
2    Rates tab, right?
3    A.    Yes.  I don't know whether it would be
4    on that tab.
5    If you go to the right.  Sorry.  Keep
6    going to your left, actually.
7    I take it it was 9/19 or 9/18 based on
8    the dataset on the top, where it says cell F2 on
9    that tab.
10   Q.    Cell F2, okay.  So I'm on cell 2.  So
11   you see that as an indication that those are the
12   BoNY prices as of 9/19?
13   A.    That's correct.
14   Q.    Okay.  So the BoNY prices are as of
15   9/19, and you said that your prices, the
16   Barclays prices are as of end of day 9/22, as
17   further explained by your memo on methodology
18   followed?
19   A.    Yes.
20   Q.    Sir, I've now handed you a one-page
21   document previously marked as Deposition Exhibit
22   87B.  I have pulled up on the screen the native
23   version of that document, which is marked as
24   Movants' Trial Exhibit 103N, for native.

Page 159

Teague

1    Looking first at the hard copy
2    document, Exhibit 87B, do you recognize that as
3    a summary of the valuation of the JPM Chase
4    assets?
5    A.    Yes, I do.
6    Q.    And maybe you should read on the
7    screen, do you recognize the summary sheet that
8    appears there as the same summary in electronic
9    format?
10   A.    Yes.
11   Q.    And again, to confirm, column D, line
12   18, the $5.9 billion number?
13   A.    Yes.
14   Q.    Is your understanding that that is the
15   value of the JPM assets as of September 30?
16   A.    Yes.  I'd have to go back to the other
17   sheets, but yes, that appears to be the case.
18   Q.    And that the same assets are valued by
19   Barclays as of December 22 at $3.739 billion,
20   which is column F, line 18; is that right?
21   A.    Yes.
22   Q.    What role did you play in the
23   valuation of these assets, the JPM Chase assets?
24   A.    I would have been involved in

Page 160

Teague

1    coordinating the assets for the spreadsheet,
2    specifically for row 6 through rows 10.  Rich
3    Landreman's team would have handled rows 13 and
4    14 labeled "PMTG."
5    Q.    In terms of liquidity adjustments that
6    are reflected in column G for these JPM assets?
7    A.    Uh-huh.
8    Q.    What was the approach taken by you
9    with respect to the assets that you valued to
10   make liquidity adjustments?  Was it the same as
11   you had done with the other assets?  Was there a
12   different approach with these assets?
13   A.    I'd have to go back again to the
14   Lehman opening balance sheet, Barclays Capital
15   Valuation Methodology document.
16   Q.    So if you have it before you, that's
17   the bound document, and where specifically in
18   that?  How do you address this issue?
19   A.    Page 0213992.
20   Q.    And for the assets that you valued,
21   what part of this page refers to the liquidity
22   approach that you took?
23   A.    Just a moment.  I would have been
24   involved again in the, what would be considered

Page 161

Teague

1    the more liquid assets portion, and Rich
2    Landreman would have been involved in anything
3    regarding PMTG for the illiquid assets.
4    Q.    Can I stop you there for a second?  Do
5    you generally bucket it that way, that the PMTG
6    assets, in your view, were generally the
7    illiquid assets, or are there liquid and
8    illiquid assets within PMTG?
9    A.    There could be some.  I mean, again,
10   it goes down to the -- analysis would be the
11   Haircut tab on -- where it breaks down the
12   specific bid/offers by product.  So it can be
13   cross-referenced to what bid/offer was applied
14   to which product would help give an insight.
15   Q.    Okay.  Again, just looking at the PMTG
16   rows in this spreadsheet, 87B, Movants' 103
17   Native, is it your understanding that for the
18   PMTG securities covered by this spreadsheet,
19   that it's Mr. Landreman who would have been
20   responsible for determining what the liquidity
21   haircuts were for these securities?
22   A.    Yes.
23   Q.    And that you would have been
24   responsible for determining the liquidity

41 (Pages 158 to 161)

Page 162

Teague

1    haircuts for rows 6 through 10?
2    A.   Yes, my team would have -- would have
3    performed the analysis, each of the individuals
4    who has the expertise in each of the product
5    classes.
6    Q.   And the approach that you took on rows
7    6 through 10, the liquidity approach, liquidity
8    adjustment approach you took with respect to
9    these assets, was it a different approach than
10   the one you had taken with respect to the
11   initial inventory?
12   A.   There was some slight differences.  We
13   would have to go and look at the Liquidity tab.
14   Just one moment.
15   Q.   The Liquidity tab in this spreadsheet?
16   We can go there?
17   A.   Yes, I believe that might --
18   Q.   So we're now on the Liquidity tab
19   which has the liquidity haircuts expressed as
20   percentages, do you see that?
21   A.   Yes.  Yes, I do.  So this is -- these
22   are the -- these are the bid/offer adjustments
23   that were again applied by product type.
24   Q.   And for the products that you valued,

Page 163

Teague

1    what did you do to ensure that the bid/offer
2    adjustments or the liquidity adjustments that
3    you were applying as of December 22 were
4    consistent with the liquidity adjustments that
5    you had applied as of September 22?
6        MR. HUME:  Objection to the form of
7        the question.
8    A.   So some of the differences were for
9    corporates, as per this page.  The majority or
10   much of the data was from TRACE.  So we were
11   using pricing data for what was clearing, which
12   was either minimum of third party or TRACE.
13   Much of the data was actually TRACE.
14       And for munis, there was no bid/offer
15   applied for the 12/22 assets if you look at the
16   second page.
17   Q.   So for the munis you say no bid/offer
18   adjustment was applied.  Why was that?
19   A.   For the muni market, the market itself
20   had showed signs of stability, and there was
21   also not -- I don't believe there was a, as far
22   as acquisition one for the second piece, I don't
23   believe there was many munis, either.  But for
24   the most part, it was the dataset itself was

Page 164

Teague

1    deemed much more stable.
2    Q.   In your memo, which is in Exhibit 641,
3    you say for munis, "No bid/offer FTID and
4    research pricing data applied to valued
5    product."  Do you see that?
6    A.   Yes.
7    Q.   And FTID is a reference to what?
8    A.   FTID is a vendor.
9    Q.   And it's a vendor that you used to
10   obtain prices from?
11   A.   Correct.
12   Q.   And you believed those to be reliable
13   prices?
14   A.   So the 12/22 utilized that along with
15   research data.  So --
16   Q.   And the question was you believe FTID
17   to be a reliable source of data?
18   A.   It can be when the markets are stable,
19   yes.
20   Q.   So on December 22, it was reliable?
21   A.   On December 22, for the munis at
22   products, munis were deemed to be stable, so IDC
23   was deemed appropriate.
24   Q.   Did you use similar data for September

Page 165

Teague

1    19 and September 22?
2    A.   For munis?
3    Q.   For munis.
4    A.   For munis, the IDC price was not
5    deemed reliable.  A different analysis was
6    performed for the munis based on the markets.
7    Q.   What did you do to determine that IDC
8    was not reliable September 19 to September 22?
9    A.   We looked at the market information
10   that we had.  We also spoke with the trading
11   desk, the traders for -- if you go back to
12   this -- the trader for munis was saying that
13   there was, you know, he placed little faith in
14   the, you know, numbers coming out of FTID at the
15   time, and working with the desk, that's where
16   the marks for 9/22 came from.
17       We did a haircut based on the market
18   analysis of how much market prices were moving
19   in the munis market because the underlying
20   prices were stale.
21   Q.   Maybe I missed this in your answer.
22   So for the 9/19, 9/22 timeframe, what prices
23   were you using for munis?
24   A.   For munis, it was a -- the trader

Page 166

```
                  Teague
1
2    mark, essentially, which was a haircut to the --
3    our own front office trader view as well as
4    Independent Valuation view of where the market
5    was for 9/22 looking at the haircut that we
6    applied.  So the overall haircut was I believe 5
7    to 8 percent based on the drop in the munis.
8    That is a separate document, I believe, where
9    there's -- that goes through the analysis on the
10   munis.
11       Q.   Are you aware that certain munis were
12   priced in that time period, 9/19-9/22, by you at
13   .0001?
14       A.   I believe there was a position that we
15   had no external data on that, yes, I believe
16   that did happen.
17       Q.   So you basically priced it at close to
18   zero?
19       A.   As a placeholder we didn't know the --
20   we didn't have any data at all on the document.
21       Q.   And if it was meant to be a
22   placeholder, what were your plans for updating
23   that placeholder?
24       A.   I believe that was -- I don't have
25   that in front of me.  That was one of the assets
```

Page 167

```
                  Teague
1
2    that was brought up by the previous deposition.
3    I believe that was just an oversight on our
4    side.
5        Q.   I'm sorry, what was an oversight?
6    Pricing it at .0001 was an oversight?
7        A.   Yes, I believe that was an oversight
8    on our part.  We had no data to mark those
9    assets.
10       Q.   What have you done to correct that
11   oversight?
12       A.   The oversight itself was brought up
13   after the opening balance sheet was closed.
14       Q.   How was it brought up?  Who brought it
15   up?
16       A.   The oversight -- I only became aware
17   of it recently.
18       Q.   Well, you became aware of it because
19   of the testimony that was provided in this case,
20   right?
21       A.   Correct.
22       Q.   So we brought it to your attention?
23       A.   That's correct.
24       Q.   And so now that we brought it to your
25   attention, what have you done about it?
```

Page 168

```
                  Teague
1
2        A.   From a valuation perspective, I have
3    not reopened the opening balance sheet.  I think
4    that's really more something from the accounting
5    perspective or if the firm has any opinion on
6    that.
7        Q.   Have you spoken with anyone about
8    going back and restating the acquisition balance
9    sheet to correct this oversight that's been
10   brought to your attention?
11       A.   No, I have not.
12       Q.   Do you know whether others within
13   Barclays have had that discussion?
14       A.   No, I do not know if that discussion
15   has occurred.
16       Q.   Putting aside this particular example
17   about the .0001 pricing, are there other
18   oversights that we have brought to your
19   attention?
20       A.   Not that I can recall.  I believe the
21   munis were a, out of the 12,000 securities that
22   we reviewed, there was an oversight on my part
23   or on my team's part for less than a handful of
24   muni positions.
25       I think those positions also were,
```

Page 169

```
                  Teague
1
2    correct me if I'm wrong, I believe they were all
3    auction rate.  So there was no data outstanding.
4        Q.   On the point of no other data
5    outstanding, at least some of the muni bonds at
6    issue that were valued at .00001 by your group
7    were obligations of the State of Massachusetts,
8    does that ring a bell?
9        A.   Yes.
10       Q.   Did you --
11       A.   I think it was one.  I don't think it
12   was some.
13       Q.   So one.  The one obligation that you
14   recall being a State of Massachusetts
15   obligation, did you look to see how
16   Massachusetts' general obligation bonds were
17   trading, for example?
18       A.   Again, the handful of securities out
19   of the 12,000 securities that you are
20   referencing, that was an oversight on our side.
21   The volume of assets that we were going through
22   at that moment, we did have an oversight on
23   munis where there was assets that we had no
24   market data on that were marked all the way
25   down.
```

Teague

1
2     Q.   Again, I'm not sure how that -- maybe
3  you have answered my question, but it's not
4  clear to me.  Did you look to see how other
5  Massachusetts obligations were trading?
6     A.   Again, out of the 5 positions you're
7  talking to versus 12,000 assets that came into
8  the firm, there was an oversight on our part.
9     Q.   So the answer to my question is you
10  didn't look at other pricing data for other
11  bonds issued by the State of Massachusetts?
12     A.   No, we did not at that moment look at
13  State of Massachusetts for 5 positions out of
14  12,000 securities that we priced.
15     Q.   And it would not have been improper
16  for you to have looked at those, you just didn't
17  do it, correct?
18     A.   If we performed that analysis, it
19  would have been something above the, you know,
20  work that had been performed, and that analysis
21  was not performed.
22     Q.   Coming back to Exhibit 87B, the
23  summary, the Summary tab on the electronic
24  document, which is the hard copy document in
25  front of you, the decision to value the JPM

Teague

1
2  Chase assets as of December 22, 2008, that was a
3  decision made by Barclays, correct?
4        MR. HUME:  Objection.  Lacks
5  foundation.
6     A.   I can't speak to the date and the
7  decision for the date.
8     Q.   So, just so I understand what your
9  knowledge or understanding is, then, you were
10  simply told to value those as of December 22?
11     A.   That's correct.  I believe that's when
12  they came -- when the delivery, or I believe
13  that's when they were delivered.  I'm not quite
14  sure.
15     Q.   And who directed you to value those as
16  of December 22?
17     A.   That would have been Marcus Morton.
18     Q.   Do you recall having any discussions
19  with Mr. Morton about whether it was appropriate
20  to value these assets as of the 22 of December?
21     A.   Versus?
22     Q.   Versus the 22nd of September.
23     A.   If they hadn't come in, I don't think
24  we would have valued them.  No, I didn't really
25  have any specific conversations of that nature.

Teague

1
2     Q.   Did you have any discussions or
3  conversations with Price Waterhouse on that
4  topic?
5     A.   No.  The analysis we show the JP
6  assets as of that date, but the valuations were
7  performed as of September 22.
8     Q.   And is it your understanding that
9  these JPM assets which were valued as of
10  December 22 were assets received in lieu of the
11  $7 billion in cash that was being reflected in
12  certain accounting documents as of September 22,
13  2008?
14     A.   Yes.  The assets were to be delivered
15  in place of cash, which made we very upset,
16  because I prefer cash because I don't have to do
17  any further valuations.
18     Q.   And in fact, in some of your early
19  work you had a placeholder for $7 billion of
20  cash?
21     A.   Yes.
22     Q.   Did you have any discussions with
23  Marcus Morton or anyone else within Barclays as
24  to how the decision was made to accept these
25  securities in lieu of the $7 billion of cash?

Teague

1
2     A.   I think that was something above and
3  beyond, as far as I was concerned.  It was more
4  so somehow JPMorgan had managed to provide us
5  with assets that they potentially no longer
6  wanted and, in place, they took $7,000 in cash.
7     Q.   You mean $7 billion in cash.
8     A.   $7 billion in cash, yes.
9     Q.   My question was did you have any
10  discussions with Marcus Morton or anyone else
11  within Barclays on that topic?
12     A.   Why we received this instead of $7
13  billion?
14     Q.   Yes.
15     A.   I think the overall view is, as I
16  stated, that, well, this is what ended up
17  happening at the end of the day.  This is what
18  ended up being delivered as opposed to cash.
19  Gary Romain would probably be best able to speak
20  to why we received this versus why we received
21  cash.
22     Q.   The name you mentioned was Gary
23  Romain?
24     A.   Yes.
25     Q.   Explain to me what your interaction or

44 (Pages 170 to 173)

Teague

1
2  level of interaction was with Gary Romain
3  through this process. What were you doing?
4  What's he doing? How did the two of you
5  interact on the acquisition balance sheet?
6      A.   I would -- Gary oversaw, I take it,
7  the whole -- I'm trying to think of the right
8  wording for it. My part was just the -- I was
9  consolidating the assets themselves, the
10 valuations, and that was provided to Gary to
11 include in all of his data since his scope was
12 much larger.
13     Q.   Is it your understanding that Gary was
14 doing any independent valuation of the assets
15 other than what the IPV group was doing?
16     A.   Yeah, no, Gary wouldn't have been
17 involved in that aspect.
18     Q.   So Gary would take, when he needed to
19 plug in the value of the assets, he would take
20 your output?
21     A.   Yes, that's the case.
22     Q.   We talked this morning about
23 conversations, conference calls that Stephen
24 King was on, you were on, others may have been
25 on.

Teague

1
2      Do you recall Gary Romain being a
3  party to any of those conference calls?
4      A.   Yes, Gary would have been on some of
5  the conference calls.
6      Q.   And I apologize if I have asked you
7  this in terms of the timing of those calls. Do
8  you recall any of those conference calls taking
9  place the week of the 15th of September, 2008,
10 the week of the 22nd of September 2008?
11     MR. HUME:  Objection to form.
12     A.   I don't recollect.
13     Q.   So it might have been, you just don't
14 remember?
15     A.   Potentially. I would tend to believe
16 it was later on in the process, but I don't
17 recollect.
18     Q.   In terms of the decision-making
19 process, the IPV group does its analysis, comes
20 up with values for these assets, you collect
21 those values and then you handed those over to
22 Gary Romain; is that right?
23     A.   Yes.
24     Q.   Were there any values that were
25 proposed by IPV that Gary did not accept or

Teague

1
2  others objected to?
3      A.   No, that wasn't Gary's role in the
4  process.
5      Q.   Was this process of valuing at least
6  the initial inventory, putting aside the JPM
7  assets, the initial inventory, was it an
8  iterative process? Did you have initial
9  valuations that were then refined and updated
10 through the course of October and November,
11 December?
12     A.   Yes, the numbers had changed between,
13 say, I don't know, September 22nd, 23rd and
14 later on. Much of it had to do also with the --
15 in confirming the delivered assets themselves,
16 scrubbing data, ensuring you had the right
17 ISINs, ensuring you had the right market
18 information as far as not even just saying third
19 party, but the dataset required for the
20 structured products, things of that nature, that
21 you -- it took some time to scrub out of the
22 12,000 assets.
23     Q.   In the time period, the 22nd of
24 September through the end of September, do you
25 recall there being uncertainty or confusion

Teague

1
2  about the actual assets that had been
3  transferred, CUSIPs, reconciling lists, things
4  like that?
5      A.   I believe Operations were continually
6  updating reconciliations for quite some time,
7  specifically on the equity side.
8      Q.   Other than reconciliation issues and
9  the issues you described with respect to the
10 structured products, were there any approach or
11 method changes or policy changes that were
12 responsible for the changing valuations as you
13 moved through October, November and into
14 December?
15     A.   Just refinements.
16     Q.   What kinds of refinements?
17     A.   Just in the -- in the data itself,
18 more putting a structure around the data, such
19 as the Lehman opening balance sheet valuation
20 methodology, trying to document the thought
21 process of the -- of how the spreadsheets were
22 oriented; try to, you know, where possible,
23 ensure consistency.
24     Just basically show the robustness of
25 the process that was performed in such a manner

45 (Pages 174 to 177)

Page 178

Teague

1  where it would be -- I didn't know it would be
2  me, but it would be something where a person
3  would be able to speak to it one day.
4          And that's basically, you know, had a
5  lot -- a lot of the data that was done at that
6  time was also helpful in the discussions with
7  PwC.
8      Q.   Was any of the data or any of the
9  analysis prepared specifically to respond to
10  questions raised by PwC?
11      A.   I'd say a lot of it was a -- a
12  continual discussion more so than a creation of
13  information for PwC.  It was they were basically
14  working closely with Barclays from time to time
15  with the valuation team to get a deeper
16  understanding of the process and the analysis
17  that was being performed.
18      Q.   Well, they would have questions about
19  why you did what you did, correct?
20      A.   That's correct.
21      Q.   They would ask you to support why you
22  did what you did, correct?
23      A.   Yes, there would have been e-mails
24  back and forth to -- and they would have sat

Page 179

Teague

1  down with us.  So there was -- there was
2  in-depth conversations that would have occurred.
3      Q.   And you would provide the information
4  they were looking for?  You would provide the
5  backup or the data to answer their questions; is
6  that right?
7      A.   Correct.  And then most of that data
8  would then be consolidated in one place, for
9  instance, the Liquidity tab or something of that
10  nature, to help provide more clarity going
11  forward.
12      Q.   And just to be clear, PwC wasn't
13  telling you what liquidity adjustments to make,
14  correct?  They were asking you to explain what
15  you had done?
16      A.   That's correct.  They were --
17      Q.   Similarly, PwC wasn't telling you what
18  valuation dates to use for particular assets;
19  they were asking you to explain why you had
20  picked the ones that you had?
21          MR. HUME:  Objection.  Lacks
22  foundation.
23      A.   I couldn't talk to that.  Again, I
24  received no direction from that aspect.

Page 180

Teague

1      Q.   Were you party to communications with
2  PwC in which that was a topic of discussion, the
3  picking of dates for valuation of assets?
4      A.   No.
5      Q.   Where they basically said to you
6  that's not their job, that's your job?
7      A.   That's -- any discussions of that
8  nature would not happen at my level, to be
9  honest.  I was performing the independent
10  valuations.
11          (Deposition Exhibit 869, a document
12          bearing Bates Nos. BCI-EX-(S)-00207919
13          through 920, with attachment, marked for
14          identification, as of this date.)
15      Q.   I've had placed before you, sir, a
16  document marked Exhibit 869.  It's an e-mail
17  exchange that you are involved in.  It has a
18  spreadsheet attached to it which has been
19  printed out from the native format.  Take a
20  minute to look at it.  I'll ask you some
21  questions about it.
22          (Document review.)
23      A.   This is a piggyback of a front office
24  view versus the sheets you were looking at were

Page 181

Teague

1  my view.  I don't think -- at the time, I think
2  there was changes made, being made to this
3  document, but then over the coming weeks, you
4  see this format, which is our document.
5      Q.   Okay.  Let me ask you some questions
6  about it.
7      A.   Sure.
8      Q.   So the cover e-mail, e-mails, are as
9  of October 10, 2008.  Do you see that?
10      A.   Yes.
11      Q.   And what you were just saying is this
12  is a work in progress that evolves over time and
13  takes on the format that we see in 86B and 87B,
14  right?
15      A.   Yes.
16      Q.   What I want to draw your attention to
17  is the last page of this exhibit, which is the
18  printout of the Summary tab from the
19  spreadsheet.  There's a little footer you will
20  see that says "Summary."
21      A.   Okay.
22      Q.   Can you read that?
23      A.   Yes.  Yes.
24      Q.   And if you'll look all the way over

Page 182

Teague

1
2  to the right-hand side of that summary sheet?
3      A.    Uh-huh.
4      Q.    Columns Q and R have some notes in
5  them, do you see that?
6      A.    Yes.
7      Q.    So on the row for Agency Mortgages,
8  the comment or the note reads, "All sold onto
9  desk."  Do you see that?
10     A.    Yes.
11     Q.    And you understand that to be a
12 reference to the fact that these securities in
13 Agency Mortgages were all sold internally on to
14 the desk, correct?
15     A.    Just a moment.
16         (Document review.)
17     A.    I'm not sure who wrote these notes, so
18 I can't speak to them.  I can just read them,
19 similar to yourself, but I -- I'm not sure who
20 wrote the notes.
21     Q.    Well, going back to the process and
22 the team in place doing this work, who
23 would have prepared this type of a spreadsheet?
24     A.    I'm just saying if some of this
25 piggybacked on the front office analysis, I may

Page 183

Teague

1
2  have taken -- this data could have been coming
3  from those -- from a spreadsheet utilized by
4  front office.  So I can't -- I can't quite state
5  what -- so as of 10/10, no reason to doubt the
6  note, I just don't know who wrote the note.
7      Q.    We're going to see if we can pull up
8  the native format of the document.  But the
9  spreadsheet that you're forwarding on the
10 e-mail, that's a spreadsheet that you would have
11 worked on, that you would have revised and
12 updated, correct?
13         MR. HUME:  What spreadsheet?
14         MR. TAMBE:  The one that's referenced
15     in his e-mail from Sean Teague to Landreman,
16     Elly Pu and Scott Ginsberg.
17     Q.    We have pulled up the native version
18 of this document.  I'm not sure if that helps
19 you identify or answer my question any better,
20 sir.
21     A.    If we go to the page "Rates 1," which
22 is about, I don't know, ten pages from the back.
23     Q.    It's the "Rates, page 1."  Okay.  We
24 have pulled that up on the screen.
25     A.    Based on that specific page, if you go

Page 184

Teague

1
2  to the next page, the "CCL Price," the only
3  thing I see sale prices for on September 30 were
4  the Treasuries on the previous page and then
5  anything listed here as agencies.  They're not
6  showing up as the sales price.  So it makes me
7  just question the comments on the other page.
8  I'm not quite sure.
9          So, again, I'm just looking through
10 the document trying to make sense of the
11 comment, and it doesn't seem to line up to the
12 supporting information.
13     Q.    Well, do you know who would have put
14 the comments into the Summary tab of this
15 spreadsheet?
16     A.    It might have just been sold on to the
17 agency mortgage desk, but to be honest, I can't
18 say as it's not in the backup sheet, like it
19 might have just been moved into their books.
20 Because at the time, the PMTG desk had to borrow
21 other people's -- other desks, again, going back
22 to the original thought process of how an asset
23 needed to -- needed to get booked in the firm's
24 systems, for rates, the agency desk would be the
25 ones holding the positions that Stephen would be

Page 185

Teague

1
2  overseeing because they would have the systems
3  where the positions could settle into their
4  systems.
5          So I can't talk to this comment as far
6  as stating that assets were sold out of PMTG to
7  another desk except to say, looking at the
8  supporting documentation, it doesn't appear to
9  be the case.  So potentially that note could
10 mean all of the positions were sold on to those
11 desks to manage.  Not quite sold on to the desk
12 as far as P&L discovery.  So it might just be in
13 their systems since they have the proper systems
14 to manage the P&L for these types of assets.
15         So, again, going to the backup pages,
16 it doesn't show that all these were sold based
17 on the Excel file that goes to the summary page.
18     Q.    You don't know one way or the other
19 what that comment then might mean, "All sold on
20 to desk"?
21     A.    It doesn't quite make sense to the
22 backup sheets are all I can say.
23     Q.    The "Hedging P&L" column and the "Sep.
24 P&L" column, columns M and N on this summary
25 sheet, do you have any understanding as to what

47 (Pages 182 to 185)

Teague

1 those columns are?
2
3      A.   Not that I recollect.  If you go to
4 that "Hedge P&L" column, if you could show me
5 cell M3, I guess.
6      Could one of you go to cell M3?
7      Thank you.
8      Q.   It's reference to another worksheet.
9      A.   If you go to that tab, Hedge P&L tab,
10 it might be one of the end tabs.  Yes, any tab
11 in gray isn't a tab that I would have looked at
12 from an IVC perspective.  We went with hot pink.
13     Q.   Hot pink was your color?
14     A.   You can put that in there.
15     Q.   It's in there.
16     So the gray tabs are work done by
17 other people.  The pink tabs were the IVC
18 spreadsheets that you worked on?
19     A.   For this spreadsheet, yes.  Not all
20 the spreadsheets.
21     Q.   So who else would have been working
22 on --
23     A.   Again, this was a --
24     Q.   -- on the spreadsheet?
25     A.   This spreadsheet at that point in time

Teague

1
2 before we separated out, this spreadsheet was
3 something I believe that we received kind of
4 from the front office, and we --
5      Q.   The front office, is that the traders?
6      A.   The traders, yes.  And we had
7 piggybacked information into the spreadsheet.
8 So I can't speak to -- I can't really speak to
9 the spreadsheet that well until at such point in
10 time we had a separate spreadsheet, which is
11 solely, you know, solely managed by Valuations.
12     Q.   Okay.
13     A.   Again, in the early days, it was, you
14 know, we were just putting a process in place.
15     Q.   One question on the summary sheet,
16 which is a gray sheet, so you may not have an
17 answer to this, but did you have any
18 understanding that there was a hedge profit as
19 of the 10th of October for a billion dollars?
20     A.   Yeah, I couldn't really speak to that.
21     Q.   You just don't know one way or the
22 other?
23     A.   Yeah, I don't know one way or the
24 other.  That would be more Tom McCosker.
25     Q.   Let's try another spreadsheet.

Teague

1
2 Handing you what has been previously marked as
3 Deposition Exhibit 811B, and you'll see on the
4 cover e-mail that is an e-mail from you
5 attaching a zip file and you're sending it on to
6 Phillip Nash, copying others.  Do you see that?
7      A.   Yes.
8      Q.   And turning to the printout of the
9 native format document, is that a document you
10 recognize?  It's the first page reads "FO Sum,"
11 page 1?
12     A.   Yes.
13     Q.   And this is a document that you would
14 have worked on?
15     A.   Yes, this is very similar to the other
16 document, something that we were probably
17 piggybacking on the desk file before we got our
18 own file.
19     Q.   On the cover e-mail to this
20 spreadsheet, you have some figures that you note
21 to Phil Nash.  You have a 9/19 PCG Value, 9/19
22 Diff with Liquidity, and then Front Office, do
23 you see that?
24     A.   Yes.
25     Q.   What is the information that you are

Teague

1
2 conveying there?
3      A.   To be honest, I can't recollect.  It
4 was I guess the dataset following a discussion.
5 Apologies.  I don't recall.
6      Q.   Would there be any reason why you
7 would be comparing PCG values, PCG values with
8 liquidity and front office values on this day?
9      A.   Again, early in the process, I think
10 the analysis was piggybacked on their data.  So
11 we provided a breakdown before we had our own
12 separate spreadsheets.
13     Q.   When you say "piggybacked on their
14 data," what do you mean?  Are you starting with
15 a dataset that you get from the front office and
16 then editing and revising that; is that what
17 you're doing?
18     A.   Yeah, I'm not quite sure who created
19 the original spreadsheet.  I don't recollect.
20 But we were adding information to -- we were
21 combining information from a couple of files at
22 that point in time.
23     Q.   And the comments you make in your
24 e-mail, the cover e-mail, you state, "The below
25 file includes a liquidity adjustment as per

Teague

1
2 Patrick's request." Which Patrick are you
3 referring to there?
4     A.    That would be Patrick Clackson to
5 ensure that we captured the bid/offer; if we
6 were utilizing vendor data, we should ensure
7 that the vendor data properly reflects the
8 market. That's a lot of vendor data is actually
9 mid.
10     Q.    And do you recall a specific
11 discussion or conversation with Mr. Clackson in
12 which he asks you to be sure you're capturing
13 that bid-ask or bid/offer adjustment?
14     A.    No, I do not. I believe it was just
15 conversations between Marcus Morton and myself
16 where he was stating that, you know, we need to
17 ensure that we, you know, to reflect market, we
18 need to ensure that we make sure everything is
19 marked to bid.
20         (Recess; Time Noted:  3:21 P.M.)
21         (Time Noted:  3:40 P.M.)
22         (Deposition Exhibit 870, a document
23     bearing Bates Nos. BCI-EX-(S)-00207943
24     through 944, with attachment, marked for
25     identification, as of this date.)

Teague

1
2 BY MR. TAMBE:
3     Q.    Sir, I've handed you a document marked
4 870, a cover e-mail with an attached
5 spreadsheet. Take a moment to review it and let
6 me know when you're done.
7         (Document review.)
8     A.    Yes.  Sorry.  Continue.
9     Q.    And drawing your attention to the
10 spreadsheet that's attached to your cover
11 e-mail, you'll recognize that is in a format
12 similar to the last couple of exhibits we have
13 looked at. Do you see that?
14     A.    Yes.
15     Q.    You recognize that as sort of a
16 continuing refinement or build-out of the
17 spreadsheet?
18     A.    Yes.
19     Q.    Again, this is a spreadsheet that you
20 would have worked on, at least in part?
21     A.    Yes.  Correct.
22     Q.    In your cover e-mail, you have a few
23 bullet points that I want to draw your attention
24 to. Your e-mail is, first of all, sent to
25 Patrick Clackson and Paul Copson, correct?

Teague

1
2     A.    Correct.
3     Q.    Both senior individuals within the
4 bank, correct?
5     A.    That's the case, yes.
6     Q.    And drawing attention to the first
7 bullet point, you are drawing their attention to
8 column F, do you see that?
9     A.    The nominal. I'm on a different page
10 probably.
11     Q.    Probably a different page. But the
12 reference you make is you're saying, "Column F
13 represents a combination of prices taken from
14 books and records as they currently stand in
15 conjunction with overrides from PMTG for the
16 majority of their positions." Do you see that?
17     A.    Yes.  Which page is that you're
18 referring? Which page is this referring to or
19 do we believe this is referring to?
20     Q.    It probably is, if you want to draw
21 your attention to the Executive Summary page,
22 which is probably halfway through the exhibit,
23 or the Executive Summary tab, that might be the
24 tab that it's referring to.
25         We've got it up on -- we'll have it up

Teague

1
2 on the screen in a second so you can look at it.
3     A.    Okay.
4     Q.    For the sake of identification, we
5 have pulled up on the computer screen the native
6 file, which is Movants' Trial Exhibit -- no,
7 it's not. It's Deposition Exhibit 870. And we
8 have opened the Executive Summary tab, and if
9 you'll look at lines 12, 14 and 18, I'm not sure
10 if that helps you place what your comment in
11 better context.
12     A.    Yeah. I think this is an -- at this
13 point, the analysis, we're still looking at
14 September 30 data. So the analysis I take it
15 was the difference between the initial
16 September -- in, actuality, I guess 22nd pricing
17 versus the September 30th pricing, where similar
18 positions have already been booked into the
19 system and the desks were marking those
20 positions.
21         So it would be your -- your September
22 P&L is what this file would, in an extremely
23 crude state, represent.
24     Q.    What I'm trying to sort of drill down
25 on this is reference to overrides from PMTG.

Teague

1
2  What did you mean by "overrides"?
3      A.    Well, for -- so the rows 12, 14 and
4  18, 14 doesn't look like there's anything there,
5  to be honest, and 18 looks like there's nothing
6  there. So I'm not quite sure. I guess it means
7  this page, but again, looking up at the
8  spreadsheet, row 12 has PMTG positions in there,
9  and then -- sorry, rows 14 and 18, those cells
10 for column F are blank. So I can't provide any
11 clarity since two of the three are blank.
12     Q.    Well, let's see if it refers to some
13 other sheet -- tab in the spreadsheet. I just
14 want to get an understanding of what you meant
15 by "overrides for PMTG."
16           What is it that PMTG is overriding?
17 The books and records or some other entity?
18     A.    It would have been, I take it, their
19 pricing that they are putting in for September
20 30th. Again, the analysis is regarding the, if
21 you look at the next section, it's just a desk
22 marking values for September 30. I take it, as
23 all of assets had not been booked yet, they
24 potentially just put in marks.
25           So, apologies. The logic here would

Teague

1
2  just be I don't think this is to clarify
3  anything to do with the opening balance sheet,
4  per se, as much as we were trying to get the
5  desk values for September 30th. I mean, they're
6  sheets of both, but the commentary is regarding
7  the September 30th numbers.
8      Q.    Okay. And at some point you end up
9  taking those September 30th numbers for purposes
10 of the acquisition balance sheet, correct?
11     A.    For, yes, for PMTG, it would be
12 their -- the desk would be marking those assets
13 that are listed on the Lehman opening balance
14 sheet, Barclays Capital Valuation Methodology
15 document.
16     Q.    On the next bullet point in your cover
17 e-mail, you state, "Corporate marks represent
18 mid marks as supplied by corporate desk," and
19 then (traders are no longer with the firm)." Do
20 you see that?
21     A.    They were all let go. All the
22 Barclays traders were let go post Lehman
23 acquisition and they, specifically, in the
24 Corporate Investment Grade and High-Yield Desks,
25 we -- the firm took on the high-yield traders

Teague

1
2  and --
3      Q.    From Lehman?
4      A.    -- and investment grade traders from
5  Lehman. So the individuals responsible for
6  marking those positions were no longer with the
7  firm or were no longer responsible for marking
8  the books.
9      Q.    But you had, as part of the
10 acquisition, taken over the traders, the
11 high-yield traders from Lehman, correct?
12     A.    Correct.
13     Q.    Why were they not a resource to ask
14 questions of with respect to the marking of the
15 corporate bonds?
16     A.    I think the biggest thing for the firm
17 as far as time well spent was to ensure that
18 individuals were properly hedging any of the
19 risk that the firm already had on its books and
20 records, so the breakdown was mostly we were
21 working -- you know, we weren't working alone,
22 we reached out to other people to get additional
23 information where necessary, but the reliance
24 was not on the desk to perform the valuations
25 because the desk was busy hedging the books and

Teague

1
2  records that they have already acquired.
3           So day one is day one. They were
4  making sure day two, day three, day four, the
5  firm weren't losing a lot of money and the
6  positions already on our balance sheet be it
7  through the Lehman acquisition or positions we
8  already had. From the Lehman's traders'
9  perspective, they were all given brand-new
10 books, if you look at it that way, so they had
11 to determine how to value their own books and
12 how to hedge their own positions.
13     Q.    I'm trying to understand then your
14 next observation on that same bullet point. "No
15 asset level marks received to substantiate PMTG
16 Corp. MV." Do you see that?
17     A.    So at that moment we didn't have the,
18 I take it, in that much earlier question of what
19 positions we would have had on the books, we
20 wouldn't have had no asset level marks received
21 to substantiate the PMTG corporate market value.
22 We didn't have any levels from the desk for
23 those positions. So we had --
24     Q.    So if you had no level from the desk
25 for those positions, what would you use?

Page 198

Teague

1
2    A.    The trading desk essentially wouldn't
3    have had the positions in the PMTG portfolio, so
4    the corporate desk wouldn't be able to
5    substantiate.  That's from what I -- what I see
6    reading this bullet point.
7    Q.    And then in the spreadsheet, is there
8    a particular section of the spreadsheet that
9    that comment is directed to?
10    A.    One moment.  Can you do me one favor
11    and go to PMTG and PMTG Not Yet Settled?
12    Q.    So I have pulled up the PMTG Not Yet
13    Booked tab in the native format of 807.
14    A.    Thank you.  Can you scroll down?  If
15    you could do the same for the PMTG tab.
16    Q.    The PMTG tab.  Scroll down?
17    A.    Can you shrink it a tad and then go
18    home?  Can you hit "home" or just go back to
19    cell A-1?  Can you page down?  Keep going,
20    please.  Keep going.  Thank you.
21        I don't recall.  I was looking to see
22    if there was corporates in the PMTG tab, but I
23    don't see any.
24    Q.    And using your handy reference before,
25    I'm going to the hot pink Corporates tab and see

Page 199

Teague

1
2    if that has the information you're looking for.
3    A.    Apologies.  I'm not quite sure --
4    Q.    You don't know what that comment in
5    your e-mail refers to, what particular section
6    of the spreadsheet?
7    A.    Apologies.  It's been some time and it
8    doesn't stand out at the moment to have any
9    meaning.
10    Q.    Okay.  Sir, I've handed you what has
11    been marked as Deposition Exhibit 800B.  If you
12    could take a moment to review it.  Cover e-mail
13    with an attached spreadsheet.  Let me know when
14    you're done.
15        (Document review.)
16    A.    Yes.  Any particular page?
17    Q.    Let's start with the e-mail chain.
18    Let's start with the oldest e-mail and work
19    forward.  The oldest e-mail is on the page that
20    ends 967.
21    A.    Okay.
22    Q.    And it's an e-mail from Robert MacGoey
23    to Marcus Morton, you see that?
24    A.    Yes.
25    Q.    And it's an e-mail dated October 17,

Page 200

Teague

1
2    2008, and Mr. MacGoey from PwC is asking for
3    documentation concerning the opening balance
4    sheet, do you see that?
5    A.    Yes.
6    Q.    And you respond to that e-mail on page
7    966, where you provide him with a breakdown and
8    I assume with other data, the spreadsheet,
9    correct?
10    A.    Yes.
11    Q.    Is it safe to say that October 17 --
12    your e-mail is actually dated October 22.  Was
13    that the first set of documents that you had
14    provided PwC in connection with the valuation?
15    A.    I don't recall.
16    Q.    And the document that was provided,
17    the spreadsheet that you have provided Mr.
18    MacGoey, do you recognize that document?
19        It's printed out behind the e-mails.
20    A.    Yes, it looks similar to the other
21    documents that -- the document style that was
22    being used at the time, yes.
23    Q.    Then you'll see in the rest of the
24    e-mail chain as you work your way to the front
25    of the document, Mr. MacGoey asks for backup,

Page 201

Teague

1
2    correct?  Sources of the prices use by PCG,
3    correct?
4    A.    Yes.
5    Q.    And you, in turn, send that request
6    along to other folks within the Independent --
7    within the IPD group to pull that data and
8    provide it to you to be provided to PwC,
9    correct?
10    A.    Yes.
11    Q.    In the data that you provided PwC,
12    both in this e-mail and through the -- through
13    your -- through this process of finalizing the
14    acquisition balance sheet, did you provide PwC
15    with access to any models that you had prepared
16    for valuing securities?
17    A.    Rich Landreman may have walked them
18    through models.  That would be outside of my
19    scope.
20    Q.    As far as you're concerned for any of
21    the securities that you valued, you did not --
22    you did not use any models to value the
23    securities?
24    A.    I would have -- it would have been
25    actually a member of Rich's team.  The only

Page 202

Teague

1
2 thing I helped in some of the coordination were
3 for the CDOs, but those values again would have
4 been something within Rich Landreman's team.
5    Q.   And who within Rich Landreman's team?
6    A.   It would be potentially Imran Ansari,
7 but Rich would have been overseeing a lot of
8 that analysis, and that would have been nothing
9 regarding models, just inputs to cash flow
10 analysis is what PwC would have asked for.
11    Q.   Okay.  And you would have provided
12 those inputs to PwC?
13    A.   Yes.
14    Q.   Do you know one way or the other
15 whether such inputs were requested and were
16 provided PwC?
17    A.   Yes, data was provided to PwC.  Be it
18 from myself or Rich, I don't recollect, but data
19 was provided to PwC as backup to support the
20 spreads, the research data, which was used to
21 calculate the prices, taking into account
22 discount margin, prepayment, severity, all of
23 the data was provided.
24    Q.   And in terms of any of the specific
25 models that were used by Rich Landreman's team,

Page 203

Teague

1
2 do you know what those models were?  Were they
3 proprietary models?  Off-the-shelf models?
4    A.   Intex would have been the main model.
5 Intex is a vendor model, you know, any
6 investment bank can purchase, essentially.
7    Q.   And that's a model that Barclays did
8 use for valuing certain of the Lehman assets?
9    A.   For cash flow analysis, yes, Intex
10 would have been utilized.
11    Q.   Any other model?
12    A.   I can't speak for anything outside of
13 my team outside of that.
14    Q.   And do you know if the inputs that
15 were used for the Intex model have been provided
16 to the movants in this case?
17    A.   Outside of my scope.  I wouldn't know.
18    Q.   You don't know one way or the other?
19    A.   No.
20    Q.   If you had to locate the inputs that
21 were provided to PwC, is that something that you
22 could do readily?
23    A.   Again, Rich Landreman would be best to
24 talk to on that.  That would be outside of my
25 scope.

Page 204

Teague

1
2    Q.   Did you, for example, for the work
3 that you did with PwC, keep a record of the
4 information that you had provided PwC?
5    A.   I would have whatever data I provided
6 them.
7    Q.   Any reason to believe Mr. Landreman
8 wouldn't have similar data if he provided to it
9 PwC?
10    MR. HUME:  Objection.  Lacks
11 foundation.
12    A.   I can't really talk on his behalf.
13    Q.   I'm handing you what has been
14 previously marked as Exhibit 812B.  Again, it's
15 a cover e-mail from you and an attached
16 spreadsheet.  Take a moment to look at the
17 document and let me know when you're done.
18    A.   Okay.
19    Q.   In your cover e-mail, which is dated
20 Friday, November 14, to Kevin Jhea, Elly Pu and
21 others, titled "Haircut" or subject "Haircut,"
22 do you see that?
23    A.   Uh-huh.
24    Q.   Yes?
25    A.   Yes.

Page 205

Teague

1
2    Q.   And you are asking them to provide
3 data to support the bid/offer assumptions on the
4 Liquidity tab for agencies.  Do you see that?
5    A.   Yes, for all of the tabs they
6 provided the independent analysis of agencies
7 was Kevin, corporates was Kevin Jhea, Elly did
8 munis, and Heidi Su handled the emerging
9 markets.
10    Q.   I'm sorry, I misread that.  You're
11 absolutely right.  So you're asking for data to
12 support bid/offer assumptions for agencies,
13 corporates, munis, and emerging markets?
14    A.   Yes.
15    Q.   And is that because PwC has made that
16 request of you to get that backup data?
17    A.   I don't recall.
18    Q.   Now, further down in your e-mail you
19 state, "Suggestions: Base it off real market
20 data if available."  Do you see that?  What did
21 you mean by that?
22    A.   The initial analysis we knew that
23 there would be -- there was very limited broker
24 quotes or true market information as far as
25 market activities involving -- for instance, for

52 (Pages 202 to 205)

Page 206

Teague

1
2 emerging markets, we did have runs which we were
3 able to see through Bloomberg where brokers were
4 sending out runs for that data and that data was
5 then used as part of the analysis for EM on how
6 the bid/offer would be viewed.
7      We didn't really have such data for
8 other asset classes. So for other asset classes
9 when the data was not ready available, we relied
10 more on vendor data versus broker data or, you
11 know, other dealer runs.
12     Q.   I guess what I'm trying to understand
13 from the cover e-mail is, did you have bid/offer
14 assumptions in the Liquidity tab already in
15 place by November 14 and you were looking for a
16 backup for those assumptions, or were you
17 looking to come up with a bid/offer assumptions
18 to be included in the Liquidity tab?
19     A.   I think it was we had -- sorry, could
20 you restate the question?
21     Q.   I'm trying to understand what your
22 suggestion is directed to. Maybe if we can pull
23 up the native version of this document.
24      As of this point in time, November 14,
25 2008, did you already have assumptions in your

Page 207

Teague

1
2 Liquidity tab and what you were suggesting is
3 ways to back up those assumptions, or are you
4 suggesting ways to come up with assumptions to
5 be included in the Liquidity tab?
6     A.   I don't believe, and we can look at
7 the file, I don't believe --
8     Q.   We just pulled up the Liquidity tab of
9 the attached spreadsheet.
10     A.   And this is as of what date?
11     Q.   Well, this is from the file that
12 you're looking at, so this is --
13     A.   This is November 14.
14     Q.   A native version of 812B and that is
15 as of November 14, 2008. And the Liquidity tab
16 has entries for the Liquidity Percentage column?
17     A.   Okay.
18     Q.   Do you see that?
19     A.   Yes.
20     Q.   And turning your attention back to the
21 suggestions that you're making to the team, are
22 you asking for backup for those percentages, or
23 are you asking them to go do work to add
24 additional bid/offer assumptions on the
25 liquidity table?

Page 208

Teague

1
2     A.   This analysis had been performed at
3 that time. I think we're just looking for -- I
4 think we're just looking for something to refine
5 the process of what was in place.
6     Q.   Okay. So I understand, then, that you
7 already had your bid/offer assumptions; you were
8 going back and looking for support for those
9 assumptions?
10     A.   I believe some of the assumptions
11 changed based on further analysis, but yes.
12     Q.   Do you know that, or are you just
13 guessing that the assumptions changed based on
14 further analysis?
15     A.   It was -- it was part of the overall
16 process. We just, you know, to substantiate the
17 initial bid/offer that was summarized on this
18 page to ensure that, you know, the dataset,
19 you know, we had the dataset to support this
20 file. So that was really what the request was
21 for. And if there was any issues on how the
22 initial dataset was derived, it should, you
23 know, they should follow it following logical
24 hierarchy to ensure that they have proper
25 dataset.

Page 209

Teague

1
2     Q.   Well, that's what I'm trying to
3 understand is the process question. If you had
4 a dataset here where you had bid/offer
5 assumptions, you had based those assumptions on
6 data, correct?
7     A.   Yes, there was -- there was some data
8 out there already. For instance, I know on
9 corporates we had some data and it was -- it was
10 essentially already in place. I can't speak for
11 the other asset types, but ...
12     Q.   Well, was your direction to the team
13 or your suggestion to the team to go back and
14 try and find real market data to support the
15 assumptions that you had already made?
16     A.   No, it was really more the -- the
17 dataset, there was already -- there was already
18 assumptions being made. They weren't just made.
19 They were made out of, you know, be it consensus
20 data or market data, but this was a means to get
21 people to actually put some -- pull all their
22 ideas together.
23      At this moment when they gave me their
24 names, a lot of the numbers I had received from
25 people was more just a haircut number. I didn't

53 (Pages 206 to 209)

Page 210

```
                    Teague
 1
 2    have any supporting documentation for where the
 3    individuals had done any analysis.  So this was
 4    a means to ask everybody to come up with
 5    something that supports what they were providing
 6    me.
 7            In general, keep in mind people within
 8    the team have a view of the market because they
 9    perform independent analysis, but having a view
10    did not mean they supporting documentation
11    to provide me.  So any documentation that they
12    may have used was thin, so I needed actual
13    supportable documentation.
14       Q.   Okay.  So you asked them to go back
15    and substantiate their view of their respective
16    markets by getting supporting documentation, is
17    that --
18            MR. HUME:  Objection.
19       Q.   Is that what you're doing with the
20    suggestion that you're making to them?
21            MR. HUME:  Objection.
22    Mischaracterizes the testimony.
23       A.   Can you ask the question again?
24            (Record read.)
25       A.   I'm asking them to support the
```

Page 211

```
                    Teague
 1
 2    bid/offer assumptions that were being utilized.
 3    The bid/offer assumptions would have been
 4    directed from the individuals within the team.
 5       Q.   Once you had these bid/offer
 6    assumptions and you had obtained supporting data
 7    and information from the various team members,
 8    do you recall being part of any process where
 9    those assumptions were tested against particular
10    CUSIPs to which they were being applied to see
11    if it made sense?
12       A.   The analysis for the bid/offer was
13    performed at the asset level utilizing
14    supporting documentation of, again, datasets
15    that was readily available, be it market data or
16    vendor pricing data, and that data was used to
17    derive what the bid would be, looking at it from
18    an asset type because there was a limited amount
19    of data to do a full-on analysis any lower than
20    that.
21            So if we had readily available data,
22    it was a properly functioning marketplace.  That
23    would be much easier to go down a road where
24    you're looking at readily available market data
25    but really in a market where that type of data
```

Page 212

```
                    Teague
 1
 2    wasn't readily available.
 3       Q.   Having done that, having decided to do
 4    this on an asset class or product class basis,
 5    did you then go and see how the application of
 6    that type of an asset-wide approach affected the
 7    valuation of the particular CUSIPs?
 8       A.   On CUSIP level you may see swings,
 9    wherein at one CUSIP it would overvalue and
10    another CUSIP it would undervalue that
11    bid/offer.  But again, this was performed on an
12    asset level, so by going down to the CUSIP level
13    may only confuse the conversation further at
14    times because you could cherrypick one and not
15    look at the other side of the picture.
16       Q.   Just so I understand your answer,
17    then, if we are looking at particular CUSIPs
18    then, your view is that your liquidity
19    adjustment may over-correct or under-correct the
20    value of any particular CUSIP, because your view
21    is, taken together as an asset class, those
22    differences even out?
23       A.   They should even out.  There should
24    not be any significant issues because it's done
25    on the asset class level and these are quite
```

Page 213

```
                    Teague
 1
 2    large portfolios or quite large -- apologies --
 3    it's a quite large population.
 4            So in that sense it would be easy to,
 5    again, cherrypick a specific CUSIP in a large
 6    number of CUSIPs and say, well, it doesn't work
 7    for here without performing a full analysis that
 8    has it performed everywhere.
 9       Q.   Did you do that type of analysis,
10    where you looked to see, okay, now that we have
11    picked an adjustment for an asset class or
12    product type, let's see what impact it actually
13    has on the particular CUSIPs that we have that
14    we are valuing?
15       A.   By going the CUSIP level, again, I
16    don't think it may tell you the full set of
17    information.  Why -- what may work at a higher
18    level may not work at the CUSIP level.
19       Q.   I understand it may or may not work at
20    a CUSIP level, but did you do any analysis to
21    determine that it did not work at the CUSIP
22    level?
23       A.   That analysis will reveal different
24    results based on your sample set, which is why
25    I'm stating it has to be more high level.
```

54 (Pages 210 to 213)

Page 214

Teague

1
2    Q.    Did you do any such analysis?
3    A.    No, any such signals to determine on a
4    CUSIP level, again, would not have proven much
5    to me because I would have to, you know, it
6    would really depend on the sample set that one
7    chose.
8        The analysis itself, the backup
9    analysis was performed using quite a number of
10    CUSIPs, depending on the asset class, so there
11    was already a large population which was used as
12    the -- as a means for deriving the bid/offer.
13    So then if you stayed to it from that
14    perspective and then apply that thought process
15    to a asset class, it should be much more in line
16    in trying to delve into a CUSIP-by-CUSIP.
17        If that data, again, was readily
18    available, then that would be a logical thing in
19    an extremely liquid marketplace where all the
20    data is available.
21    Q.    Let's go back to Exhibit 864, which
22    was an e-mail exchange that you had with Paul --
23    I think it was Copson, Paul Copson on Pine and
24    Giants Stadium.  We talked about the Giants
25    Stadium part of it.  I want to go back and talk

Page 215

Teague

1
2    about the Pine part of it.
3        The number is 864.
4    A.    Yes.
5    Q.    Again, this e-mail chain begins with
6    Paul Copson asking for an explanation on the
7    markup from Pine and Giants Stadium?
8    A.    Yes.
9    Q.    Correct?  And we talked about Giants
10    Stadium.  Briefly, what was the reason why the
11    Pine security was marked up between the
12    acquisition date and the year-end?
13    A.    A lot of that I believe had to do with
14    legal reasoning.  There was questions over
15    potential issues that the Pine CDO needing to
16    fund itself in the sense where the underlying
17    assets and the underlying structure should be
18    providing the funding for the portfolio, but the
19    commercial paper was Lehman's CP and Lehman's CP
20    was in default.  They were part of the
21    bankruptcy.
22        So the question was, you know, where
23    would there be any future payments coming out of
24    the -- out of Lehman's CP where that could help
25    fund.  If Lehman were not to fund, then by -- I

Page 216

Teague

1
2    wouldn't say default, not to get confused with
3    the other word "default," but in a sense, we as
4    a firm are the super senior holder.  If there
5    was nobody else putting money into the deal and
6    there was no way to unlock the money that was in
7    the deal, would most likely have to provide
8    funding due to the fact that this, this note, to
9    take a step back, was designed strictly as a
10    repo.  This note was never designed for sale
11    based on reviewing the assets in the note.
12        It's an extremely lumpy CDO.  20
13    percent of the note consisted of Archstone.  You
14    don't usually design a CDO where one name makes
15    up 20 percent of the note.  I believe, looking
16    back in the e-mail, two-thirds of the note was
17    12 positions.  Again, not the structure you
18    usually would use to create a CDO or a structure
19    you would use to try to repo out.  I'll use as
20    repo paper, in theory, see if one of the -- like
21    BoNY would potentially mark it to par based on
22    what you're telling them, but this structure
23    itself had no natural buyer.
24        So through the repo, when we acquired
25    this, you're looking at an asset that the

Page 217

Teague

1
2    underlying positions were -- sorry, were
3    revolvers, meaning they needed to be funded.
4        The majority of this was positions
5    that required funding.  In this marketplace,
6    just say XYZ firm has a revolver loan within
7    this CDO.  They could just go and ask for money.
8    At such a time where nobody is giving out money,
9    where banks are not loaning money, this is a
10    credit card, an open credit card for them.
11    Q.    Was it your --
12    A.    So if they were to draw down on this,
13    we as a firm could potentially be issued,
14    because we could be the -- we wouldn't want to
15    cause any valuation issues for the underlying
16    that could be in here.
17        So if XYZ firm, if everybody wanted to
18    draw done and there was nobody to draw down on
19    it, we may have to provide that funding if you
20    look at it from the perspective you don't want
21    the values of those underlying positions
22    getting -- getting eroded further.  So any loans
23    within there would get drastically eroded, any
24    of those firm would get drastically eroded if
25    they were unable to access funding.

Page 218

Teague

1
2    So all of this became cleared up from
3    my perspective or more so from the, you know,
4    legal perspective of what, you know, what the
5    firm could potentially be on the hook for after
6    the event of default trigger.
7    Basically, put the 367 million, I
8    believe, in the -- would be accessible or would
9    be pledged, I guess, to the super senior holder,
10    meaning Barclays would have access to that money
11    at a super senior holder; and it basically
12    terminated, from my understanding, the
13    requirement of the CDO to provide funding,
14    revolving funding to any of the underlying
15    assets within the portfolio.
16    Q.    What was the EOD trigger?
17    A.    The event of default trigger was
18    sometime in October, where I think Lehman --
19    Lehman missed a payment period.  I'm not quite
20    sure.
21    Q.    Was the bankruptcy of Lehman an EOD
22    trigger?
23    A.    In and of itself, no, I don't believe
24    it was.
25    Q.    Do you know that one way or the other?

Page 219

Teague

1
2    A.    As the EOD didn't happen until
3    October, I believe that would not have been the
4    trigger because the EOD didn't happen until time
5    in October.
6    Q.    So the EOD you're talking about
7    happened in October, but you don't know one way
8    or the other if the deal documents have an EOD
9    trigger of the Lehman bankruptcy?
10    A.    If the deal documents had that, then I
11    would imagine that in and of itself would have
12    been the EOD trigger, not the October event.
13    But again, yes, I do not know the specifics of
14    that aspect to comment.
15    Q.    At the time the initial decision was
16    made to have the Pine CLO valued at a value
17    placed on it, which was roughly the 50s,
18    correct?
19    A.    That's correct.
20    Q.    As of the acquisition date, that
21    decision was made on the basis of your analysis
22    of deal documents?  Did you study the deal
23    documents to do that?
24    A.    There was three different -- the front
25    office spent more time working on the deal

Page 220

Teague

1
2    document aspect.  That was Jasen Yang.
3    My analysis was performed mostly based
4    on the underlying assets themselves and
5    reviewing if there was any potential
6    repercussions if the deal does not continue to
7    perform as expected.  The part of my analysis,
8    which is, you know, where I could see that there
9    must be some, you know, legal risk out there,
10    was post -- post Lehman's default.  You know,
11    the Pine went from highly rated to double C.
12    So at that point in time, you know,
13    Standard & Poors was of the view that, due to
14    the bankruptcy, there's definitely a lot of
15    unknowns in this deal which would result again
16    in a, you know, in a pricing haircut to a deal
17    where you priced the underlying, all the
18    underlying that's outstanding is (A) lumpy and
19    (B) the prices are usually coming from a
20    consensus pricing service.  The only pricing
21    provider for said consensus pricing service is
22    possibly Lehman.
23    So you're relying on Lehman to tell
24    you the price of the underlying and you're
25    relying on S&P to tell you now that this is

Page 221

Teague

1
2    double C, there's also a huge legal aspects on
3    top of the pricing aspects you're already
4    worried about.
5    Q.    All of these questions and
6    uncertainties you had about Pine, those all --
7    you got more information about that as time went
8    on, correct?
9    A.    Yes.
10    Q.    And by the time you reported the final
11    acquisition balance sheet in February 2009, the
12    value of Pine had already been written up on the
13    books of Barclays, correct?
14    A.    Yes, that's the case.
15    Q.    Had written up to what value?
16    A.    I can't say for --
17    Q.    Was it written back up to par?
18    A.    No.
19    Q.    What was it written back up to?
20    A.    It was I believe in the 70s by end of
21    the year.
22    Q.    Was there any discussion within the
23    IPV as to whether, given all you knew about the
24    Pine CLO, whether it was still appropriate to
25    list for acquisition date purposes a value that

Page 222

Teague

1
2  was in the 50s as opposed to 70s or higher?
3      A.   Based on the data available, again, I
4  don't think it would be appropriate to take in
5  data considering, again, the event of default
6  trigger that happened later in October and any
7  clarity as far as whose responsibilities it
8  would have been.  You need to like take a view
9  what would happen if I acquired this asset
10  today, which is exactly what happened; what
11  would it be worth on the street to anyone with
12  all of these legal unknowns.
13      Q.   What you were valuing for purposes of
14  the acquisition balance sheet is what the A-1
15  notes were worth as of the acquisition date,
16  correct?
17      A.   That's correct, but by reviewing the
18  pricing of the underlying assets.
19      Q.   And in addition to reviewing the
20  pricing of the underlying assets, you also
21  factored in the risk, in your words, that the
22  A-1s might have to fund or provide funding on
23  the revolving notes that were included in the
24  CLO, correct?
25          MR. HUME:  Objection.  Lacks

Page 223

Teague

1
2  foundation.  Misstates the testimony.
3      A.   The risk was just an overall legal
4  risk in the sense that, with the double C
5  rating, who knew what responsibility Lehman
6  would have in their -- within the deal.  And
7  again, this is from S&P perspective.  If S&P
8  downgraded the deal to double C, there's a lot
9  of red flags there.  It's not something we're in
10  the marketplace and you could readily trade a
11  double C asset because there would be a lot of
12  legal risks and it would be perceived as legal
13  risks throughout the marketplace.  So that would
14  bring down the market value that much further.
15      Q.   My question is a lot simpler and
16  narrower.  Including in your pricing assumptions
17  for pricing as of the acquisition date you
18  included some factor or discount for these legal
19  risks that Barclays may have to provide funding
20  on the revolvers; is that correct?
21          MR. HUME:  Objection.  Vague and
22  ambiguous.
23      A.   It would be part of the overall
24  thought process of the rating agencies basically
25  downgrading this almost to D because there is

Page 224

Teague

1
2  legal questions on, you know, how this deal
3  would basically happen.  Until the EOD trigger
4  occurred in October, there was a lot of legal
5  questions.  There was no clarity.
6          There's not a lot of history previous
7  to this where you could just say what happened
8  when XYZ firm put together a document strictly
9  for repo purposes that they were holding all the
10  bottom tranches and now they're in default.
11      Q.   Again, my question is not what
12  analysis the rating agencies went through.  I'm
13  only asking what you analysis you went through
14  at Barclays.  When you went through the analysis
15  at Barclays, trying to value this as of the
16  acquisition date, you included in your analysis
17  some discount or some haircut --
18      A.   Yes.
19      Q.   -- for the legal risk associated with
20  the possibility of having to fund the revolver,
21  correct?
22          MR. HUME:  Objection.  Vague and
23  ambiguous.
24      A.   Going back to, completely unrelated,
25  we have had SIVs in our books of the bank that

Page 225

Teague

1
2  have gone through restructuring.  Anytime you
3  have a major restructuring where the underlying
4  assets are not liquid, you can expect to see
5  further haircuts.
6          If the restructuring is set up in such
7  a manner where the Court decides to do something
8  that was not originally anticipated in the case
9  of the SIVs, what they did was wrap up all the
10  different assets and sold them in small pools.
11  That resulted in a larger discount to the
12  underlying asset.
13          So if something of that nature were to
14  occur, not knowing how the courts would decide
15  this one, similarly nobody knew how the court
16  would decide the SIVs.  You have a legal aspect.
17  We have a large writedown on your books.  At
18  that point in time we took 15 to 20 dollar
19  writedowns due to the SIVs that were
20  restructured.
21          So, not knowing how the judge would
22  decide how to handle this case, when we went
23  through an EOD trigger, there was a serious
24  potential for large writedowns.
25      Q.   And what you're telling me is that was

57 (Pages 222 to 225)

Teague

1
2  the analysis and thought process you went
3  through in deciding what value to ascribe to
4  Pine as of the acquisition date; is that
5  correct?
6      A.   That is correct.  That is part of the
7  analysis we did.
8      Q.   And who did that analysis?  Was that
9  you?  Was that someone else?
10     A.   For Pine there was three different
11 analyses performed.  There was one within IVC.
12 Jasen Yang performed the analysis from the front
13 office perspective, which I believe you already
14 would have.  And there was an analysis performed
15 by DPWC in reference to the analysis that was
16 performed by IVC as well as the analysis
17 performed by Jasen Yang.
18     Q.   When you say the analysis performed by
19 PwC?
20     A.   They just did an overall -- I wouldn't
21 saw cursory -- an overall review of the pricing
22 that was independent pricing as well as the
23 front office pricing and opined that it seemed
24 to be reasonable.
25     Q.   They basically looked to see what work

Teague

1
2  you had done and what work Jasen Yang had done?
3      A.   Yes.
4      Q.   They didn't do an independent
5  analysis, correct?
6      A.   Yeah, I couldn't say.  It was more a
7  review to state that if the analysis was
8  appropriate.
9      Q.   Did you also discuss with PwC the fact
10 that you got later written up the value of Pine,
11 of the Pine CLO on Barclays' books?
12     A.   Any subsequent write-ups, PwC would
13 have been privy to that as far as the opening
14 balance sheet and they would have, you know, I'm
15 sure there was a couple e-mails and follow-up
16 conversations to better understand the trigger
17 event.  And I believe that was in their final
18 review of the Pine assets.
19     Q.   Was there any Day 1 P&L recorded by
20 Barclays in connection with any of the assets
21 acquired from Lehman?
22          MR. HUME:  Objection.  Vague and
23 ambiguous.
24     A.   That is more of a Product Control
25 question.  I couldn't speak to that.

Teague

1
2      Q.   One of the documents that's been
3  produced in this case is a Barclays Capital
4  Provisioning Policy Statement.  Are you familiar
5  with that?
6      A.   Yes.
7      Q.   And there's a reference in that
8  statement to "Day 1 P&L."  Are you familiar with
9  that?
10     A.   Yes, I am.  Usually applied for
11 derivatives, trading derivatives.
12     Q.   Are you aware of it applying to
13 trading instruments other than derivatives?
14     A.   It can apply to other instruments.
15     Q.   I misspoke.  The policy is called
16 Marking Illiquid & Unobservable Prices.  That's
17 the title of the policy.  I'll show you a copy
18 of it and we can talk about it.
19          (Deposition Exhibit 871, a document
20     bearing Bates Nos. BCI-EX-(S)-00180042
21     through 80063, marked for identification, as
22     of this date.)
23     Q.   I have placed before you a document
24 marked Exhibit 871.  It's titled Marking
25 Illiquid & Unobservable Prices (Day 1 P&L

Teague

1
2  Recognition)."  The date on the front page is
3  July 2007.  Do you see that?
4      A.   Yes.
5      Q.   And generally, are you familiar with
6  this document?
7      A.   Yes.
8      Q.   And was this a document that featured
9  in any way in the independent valuation work
10 that you did in connection with the Lehman
11 acquisition?
12          MR. HUME:  Object to the form of the
13 question.
14     A.   I'm sorry, can you ask the question
15 again?  I'm just trying to review it.
16     Q.   Why don't you finish reviewing it and
17 I'll ask the question again.  Let me know when
18 you're done.
19          (Document review.)
20     A.   Sorry, what was the question again?
21          (Record read.)
22     A.   Not that I'm aware of.  Not for the
23 work that I overlooked.
24     Q.   I guess the next question was, are you
25 aware of whether this policy and procedure was

Page 230

Teague

1          Teague
2  used by any of the other folks doing independent
3  price valuations?
4      A.   I cannot speak on their behalf.
5      Q.   And just so I can get some clarity on
6  it, is the reason that this was not something
7  relevant to your work is because there was no
8  Day 1 P&L that resulted from the valuation that
9  you did, or was it for some other reason?
10     A.   There is no Day 1 P&L that I'm aware
11 of for the Lehman opening day balance sheet.
12     Q.   If there had been Day 1 P&L for the
13 Lehman opening day balance sheet, would this
14 policy and procedure have been applicable?
15     A.   I can't speak to that.
16         MR. HUME:  Objection.  Lacks
17     foundation.
18     A.   I can't speak to that.
19     Q.   Do you know under what circumstances
20 this policy and procedure would have been
21 applicable?
22     A.   This policy and procedure is
23 applicable when we do a new trade.  Again, the
24 majority of it is derivatives, and there are a
25 lot of -- where there's unobservable data for

Page 231

Teague

1          Teague
2  the purposes of inputs to the deal, so input
3  pricing parameters, reflect input pricing
4  parameters for the Lehman opening balance sheet.
5      Q.   I missed the end of your answer.
6      A.   We can show input pricing parameters
7  for the Lehman opening balance sheet.
8      Q.   Okay.  So you offered that as a reason
9  why this policy would not be applicable to the
10 Lehman opening day balance sheet?
11     A.   For the assets I reviewed, this would
12 not be applicable.
13     Q.   For the assets you reviewed.
14         (Recess; Time Noted:  4:40 P.M.)
15         (Time Noted:  5:04 P.M.)
16         (Deposition Exhibit 872, a document
17     bearing Bates Nos. BCI-EX-(S)-00176591
18     through 591, with attachment, marked for
19     identification, as of this date.)
20         (Deposition Exhibit 873, a document
21     bearing Bates Nos. PwC-BarCap00008679
22     through 80, marked for identification, as of
23     this date.)
24 BY MR. TAMBE:
25     Q.   Sir, I'm handing you a document that's

Page 232

Teague

1          Teague
2  been marked Exhibit 873.  It's a two-page
3  document.  If you could take a moment to review
4  it.  Let me know when you're done.
5          (Document review.)
6      A.   Oh, okay.  Okay.
7      Q.   Drawing your attention to the oldest
8  e-mail in the chain, do you recognize that as an
9  e-mail from Marcus Morton to you on or about
10 December 19, 2008?
11     A.   Okay.  I didn't look at the other
12 page.  Apologies.  One moment.
13         (Document review.)
14     A.   Okay.
15     Q.   Do you have my question in mind?
16         (Record read.)
17     A.   Yes.
18     Q.   And was this the earliest point in
19 time that someone from Barclays was suggesting
20 valuing the portfolio assets the 22nd as opposed
21 to the 19th, sir?
22         MR. HUME:  Objection.  Lacks
23     foundation.
24     A.   I can't recall.  I believe in some of
25 the older documentation the 22nd was part of the

Page 233

Teague

1          Teague
2  discussion, but I can't recall.
3      Q.   It had been part of the discussions,
4  but then you had prepared valuations and you
5  were preparing spreadsheets that we had looked
6  at before which had 9/19 values on them,
7  correct?
8      A.   Yes.
9      Q.   Do you have an explanation as to why
10 Mr. Morton, in or about December 2008, was
11 asking and raising the question about doing the
12 valuation as of 9/22?
13     A.   Appears there was more clarity on the
14 valuation date in question.  There was
15 originally quite a bit of confusion.  As of this
16 date, there was additional clarity, which I take
17 it was why I replied to Robert MacGoey to ask
18 additional questions to, again, gain further
19 clarity.
20     Q.   Do you know what it was that happened
21 in December that gave additional clarity on the
22 acquisition date?
23     A.   That I can't speak to.
24     Q.   Did you ask Mr. Morton that?
25     A.   No, I believe it was -- I really can't

TSG Reporting 877-702-9580

Page 234

Teague

1    speak to specifics. It was just that was the --
2    the 9/22 was the final date. So, from my
3    perspective, it seemed logical that 9/22 was the
4    date for which to value the assets, but I'm not
5    the best person to speak to on this question
6    because I wasn't really involved in the thought
7    process of why 9/22 versus 9/19.
8    Q.    Who would be the best person to speak
9    to on this?
10    A.    I guess being based on this e-mail
11    would be possibly Marcus Morton or Robert
12    MacGoey could provide better clarity.
13    Q.    Was the decision to pick 9/22 as
14    opposed to 9/19 valuations, was that made at the
15    Patrick Clackson level or higher levels of the
16    bank? Where was that decision made?
17        MR. HUME: Objection. Lacks
18    foundation.
19    A.    I don't have the ability to speak to
20    that. Again, I would say, from my perspective,
21    it was just more, you know, the information that
22    was brought to my attention. It was not
23    something I was involved in the discussions.
24    Q.    And that's not something you asked Mr.
25

Page 235

Teague

1    Morton, where this direction comes from?
2    A.    Again, based on the e-mail, the
3    follow-up e-mail, it's more me reaching out to
4    Robert MacGoey to get more clarity. That was my
5    attempt to gain more clarity.
6    Q.    So are you telling me that, other than
7    sending on this e-mail to Robert MacGoey, you
8    did not respond to Mr. Morton by asking him why
9    the change, what's the rationale behind the 9/22
10    move?
11    A.    Again, I believe the rationale had
12    more to do with, if it was as of September 22,
13    looking at the earlier e-mails, then the best
14    reflection of the valuation would be as of
15    September 22 because the acquisition was as of
16    the morning, I believe, of the 22nd.
17    Q.    Prior to the open of the 22nd.
18    A.    Yes, and there's really no way to
19    easily -- the Friday value would not be
20    reflective of any additional market movements
21    that could have happened over the weekend, be
22    it, you know, Asia is open and Europe is open
23    before the U.S. is open. So any snapshot you
24    would try to take as of Monday morning, no one
25

Page 236

Teague

1    really provides that type of data from the
2    vendors. So the thought process is you could
3    use the end of day data to reflect 9/22.
4    Q.    In responding to Marcus Morton, did
5    you try to collect any data over the weekend or
6    any preopening data from the morning of the
7    22nd?
8    A.    In all honesty, there's no such data
9    available from the vendors. No data -- no
10    vendor runs a morning opening price. That's not
11    something that you can readily get from the
12    vendors. They run the end of day price.
13    Q.    So that's not something you tried to
14    obtain; is that right?
15    A.    It's not something that could be
16    obtained. It's not a question of tried to
17    obtain. One is unable to obtain opening vendor
18    level.
19    Q.    Turning to the first page of the
20    exhibit, which is Robert MacGoey's e-mail to
21    you, did you have any discussions with Robert
22    MacGoey in response to this e-mail? Did you
23    call him up, talk to him about any of the points
24    that he had raised in this e-mail?
25

Page 237

Teague

1    A.    One moment.
2        (Document review.)
3    A.    I think any discussions to the effect
4    was more so a review of the, as stated here, the
5    bid/offer analysis that we had performed. At
6    this point in time, we had used the, for
7    instance, for the corporates, there was a, I
8    believe a standard deviation of pricing vendors
9    that was reviewed in light of the commentary of
10    PwC.
11    Q.    And after you reviewed it in light of
12    commentary from PwC, what did you do?
13    A.    We reviewed in place of a standard
14    deviation of movings to capture the bid price to
15    utilize the lowest price available from the
16    vendors, as the market was again falling between
17    the original date and the 9/22 date.
18    Q.    Just so I understand your answer, in
19    response to this commentary from PwC, you moved
20    from taking the lowest price to -- you moved to
21    taking the lowest price from using the standard
22    deviation approach?
23    A.    That is correct.
24        MR. TAMBE: Thank you. I have no
25

Page 238

Teague

1          Teague
2    further questions.
3    EXAMINATION BY
4    MR. OXFORD:
5        Q.    Mr. Teague, I introduced myself
6    earlier on. I'm Neil Oxford.  I represent the
7    Trustee in this matter.
8            I want to ask you some questions about
9    the exchange-traded derivatives that Barclays
10   acquired from Lehman, but first of all,
11   independent of the particular derivatives that
12   Barclays acquired from Lehman, can you tell me
13   if in 2008 you had any role in the valuing or
14   price testing of Barclays' exchange-traded
15   derivatives?
16       A.    No, that was actually handled within
17   the equities IVC team.
18       Q.    And who is responsible for that?
19       A.    That was Mark Washtell.
20       Q.    Did you, prior to 19 -- sorry, prior
21   to 2008, have you had any responsibility within
22   Barclays for valuing Barclays' exchange-traded
23   derivatives?
24       A.    No.
25       Q.    Did you have any role in valuing the

Page 239

Teague

1          Teague
2    exchange-traded derivatives that Barclays
3    acquired from Lehman in the fall of 2008?
4        A.    No, I did not.
5        Q.    Do you know who was?
6        A.    All the exchange-traded derivatives
7    were valued within, again, the IVC equities
8    team.
9        Q.    And to your knowledge, that's Mark
10   Washtell who is responsible for that?
11       A.    That is correct.
12       Q.    Can I ask you to take a look at a
13   document I marked as Exhibit 872.
14       A.    Yes.
15       Q.    We looked at a similar document --
16       A.    Yes.
17       Q.    -- when Mr. Tambe was asking you
18   questions earlier today.
19       A.    Yes.
20       Q.    You'll see that this document has a
21   spreadsheet attached.  Could you take a look at
22   the spreadsheet?
23       A.    Sure.
24       Q.    Do you recognize the spreadsheet
25   attached to that document?

Page 240

Teague

1          Teague
2        A.    Yes, I do.
3        Q.    Is that something that you created,
4    sir?
5        A.    This is something I consolidated, yes.
6    I was basically trying to tie out the data LBI
7    gave me to the backup spreadsheets that they
8    provided, and these were the breaks that
9    resulted from trying to reconcile the two sets
10   of data.
11       Q.    If you could turn to the e-mail that
12   is on the first page of the exhibit for a
13   moment, sir.
14       A.    Yes.
15       Q.    You write on the 18th of September,
16   "Hi, Clement.  By way of introduction, I work
17   for Marcus Morton at Barclays.  I am having
18   difficult tying out the LBI schedule to the 8
19   backup spreadsheets you provided.  I have
20   attached a spreadsheet below which highlights
21   the breaks.  Can you possible," presumably that
22   was meant to be "possibly," "provide me with had
23   some color on the differences?"  Do you see
24   that?
25       A.    Yes.

Page 241

Teague

1          Teague
2        Q.    When you write to Mr. Bernard saying
3    you attached the spreadsheet highlighting the
4    breaks, that's the spreadsheet that appears on
5    the third page of the exhibit?
6        A.    That's correct.
7        Q.    You say to Mr. Bernard, "I'm having
8    difficulty tying out the LBI schedule."  Do you
9    see that?
10       A.    Yes.
11       Q.    What's the LBI schedule that you are
12   referring to there?
13       A.    This schedule is the summary, this
14   page.  Everything -- I believe everything on the
15   top left-hand corner was a snapshot of what they
16   gave us as a summary page.  Essentially, it's
17   probably a pivot table to the eight backup files
18   that they ended up providing us.
19           Where I was seeing breaks was when I
20   took this table that you see up top and the
21   bottom portion, you'll see there's eight
22   different sections.  I believe those were the
23   eight separate tabs that I was trying to tie
24   back to this summary page that was provided by
25   Clement and his team, and these were the breaks

Teague

1
2  I was getting between the numbers in the one
3  page versus the numbers on the summary.
4     Q.   I see.  So when you said "top
5  left-hand side" a moment ago, sir, can you be a
6  little more specific as to what you were
7  referring to?
8     A.   Certainly.  It's everything that was
9  within the square I believe was what was
10  provided to me.
11    Q.   And by "square," do you mean the
12  section of the spreadsheet --
13    A.   Underneath "per balance sheet group,"
14  there's a, what appears to be some sort of pivot
15  table or some Excel breakdown.
16    Q.   And there's a black rectangle that has
17  four column headings in it, is that what you're
18  referring to?
19    A.   Yes.
20    Q.   So it's your testimony, sir, that the
21  data that appears immediately below the four
22  headings, "GAAP Asset Class 1 Name," "Division,"
23  "Long" and "Short" is the summary information
24  that Lehman provided to you; is that your
25  testimony?

Teague

1
2     A.   Yes.  It could potentially be that
3  piece or, in all honesty, it could be the whole
4  square in and of itself.
5     Q.   And by "square" do you mean rectangle,
6  sir?
7     A.   The whole rectangle all the way up to
8  the word "file" may have been provided by
9  Lehman.  The analysis that I remember performing
10  is the bottom portion that's outside of the
11  rectangle, which is trying to reconcile those
12  numbers that show up, the first numbers right
13  after the words, to the same name in the GAAP
14  Asset Class 1 to determine, on a reconciliation
15  perspective, if there is, again, eight
16  spreadsheets that tie to this summary sheet by
17  name in the GAAP Asset Class 1 Name, what is
18  that total versus the total I'm seeing on the
19  other spreadsheets.
20    Q.   So, to the best of your recollection,
21  sir, your analysis of the breaks appears in the
22  eight lines and the grand total that appear
23  outside of the lines on this exhibit, sir?
24    A.   That is correct.
25    Q.   Okay.  At the top left-hand side, it

Teague

1
2  reads "LBI Inventory By GAAP Asset Class and
3  BPM."  What's BPM?
4     A.   I have no idea.
5     Q.   Is that something that came from
6  Lehman?
7     A.   That would be correct.
8     Q.   Are you familiar with GAAP asset
9  classes generally, sir?
10    A.   Not -- not so much.  I mean, if you're
11  saying accounting-wise, where I have -- we're in
12  National Accounting Standards because we're a
13  British bank.
14    Q.   So you're not familiar with U.S. GAAP?
15    A.   Not in relation to any of the data on
16  this page.
17    Q.   Do you know whether the category "CDs
18  and Other Money Market Instruments" is also
19  known as commercial paper?
20    A.   It would be an assumption, but again,
21  I didn't create this spreadsheet.
22    Q.   I understand that, sir, but if someone
23  were to tell you that the "CDs and Other Money
24  Market Instruments" were also known as
25  commercial paper, would that sound right to you?

Teague

1
2     A.   It would be logical.
3     Q.   With respect to the "Corporate
4  Obligations and Spots," if that was also known
5  as corporate debt, would that sound correct to
6  you?
7     A.   Yes.  I'm not sure what "spot" means,
8  though.
9     Q.   And with respect to "Corporate Stocks
10  and Options," if that was also known as
11  corporate equity, would that sound right to you?
12    A.   Yes.  As with the options, it could
13  also be equities and exchange-traded equities.
14    Q.   Do you know, sir, whether within any
15  of the long and short positions reflected in the
16  Derivatives row is included any margin that
17  relates to exchange-traded derivatives?
18       MR. HUME:  Objection.  Lacks
19  foundation.
20    A.   I couldn't -- couldn't talk to that.
21  I don't even -- I'm not even quite sure if you
22  went through the whole e-mail chain if there
23  was -- if I got a row-by-row reply to this
24  e-mail from anybody.
25    Q.   So you simply don't know one way or

Page 246

Teague

1  the other, sir?
2      A.   No, I do not.
3      Q.   Was it your responsibility, sir, to
4  tie in each of these GAAP asset classes the
5  summary data that you obtained from Lehman to
6  the detailed backup spreadsheets that you
7  testified to earlier?
8
9      A.   Yes. So the logic was we were going
10  to be getting delivered assets and here's the
11  totals of those assets, and then Clement was
12  sending all the backup files and my
13  responsibility in respect to this particular
14  function was to make sure that they actually
15  made some sense to the backup files.
16      Q.   And were you able to determine --
17      A.   Based on the e-mail, the answer is not
18  so much.
19      Q.   And independent of the e-mail, sir?
20      A.   There was some breaks. I had sent
21  Clement an e-mail to see if somebody could
22  clarify what those breaks were. They appeared
23  to be related to derivatives. Many of the
24  derivatives that could have been on the Lehman
25  balance sheet would not be something that would

Page 247

Teague

1  be transferred over to Barclays.
2      Apologies. I can't really speak much
3  further because I don't know if anyone at Lehman
4  provided me a reply to these requests.
5      Q.   And what is it from the information
6  that relates to derivatives on the spreadsheet
7  that is the basis for your answer that many of
8  these appear to be derivatives that were not to
9  be transferred to Barclays?
10      A.   So on number 2, is there a reason why
11  we didn't get a spreadsheet for "Total Derivs.
12  and Other Contr, Total," essentially we were
13  supposed to get that number from them because
14  that would just help reconcile to two
15  spreadsheets to each other. So I just didn't,
16  out of the eight backup files, I was missing
17  that backup file to perform a reconciliation as
18  for number 2.
19      Q.   And did you ever receive that file,
20  sir?
21      A.   Not to my knowledge.
22      Q.   Do you know whether anybody at
23  Barclays ever received such file?
24      A.   I wouldn't know.
25

Page 248

Teague

1      Q.   Who asked you to undertake this
2  reconciliation process, sir?
3      A.   Most likely Marcus Morton at the time
4  we were trying to determine what assets were
5  coming onto the balance sheet. You can't
6  price-test anything if you don't know what
7  you're getting, so the first step is let's see
8  what we're getting in the door. And the first
9  step didn't make any sense if we didn't know
10  what we were getting in the doors and they sent
11  us a summary that didn't line up with the backup
12  file.
13      Q.   Does the spreadsheet that's attached
14  to Exhibit 872 reflect in any way what Barclays
15  understood that it was to be receiving by way of
16  these six GAAP asset classes under the
17  transaction with Lehman?
18      MR. HUME: Objection. Lacks
19  foundation.
20      A.   I can't really speak to that point.
21  It was expecting that these were the assets that
22  potentially were pledged, but that being said,
23  things moved rather quickly at that point in
24  time so I don't even think Lehman ever got back
25

Page 249

Teague

1  to me in regards to the spreadsheet.
2      Q.   I understand that, sir, but what do
3  you mean "potentially pledged"?
4      A.   Just, you know, looking at it now,
5  these could potentially be some of the assets
6  that would be part of the repo that we ended up
7  acquiring through the acquisition.
8      That being said, I, again, I never
9  gained any clarity because I never received any
10  clarity from Lehman on this. So I fully admit
11  I'm hypothesizing at the moment based on I never
12  got any color back from the people who sent me
13  the file.
14      Q.   Did anybody represent to you, sir,
15  that the inventory reflected on the spreadsheet
16  was inventory that was to be transferred by
17  Lehman to Barclays?
18      A.   At the time, the overall analysis was
19  what -- apologies. There was a previous e-mail
20  by way of Clement. I believe these were the,
21  from my perspective, these were going to be the
22  assets that we would need to independently
23  value.
24
25      Q.   Right. And you would need to

Page 250

Teague

1 independently value them because it was your
2 understanding that these were the assets that
3 were to be transferred from Lehman to Barclays,
4 correct?
5    A.   Yes, that's what I would anticipate,
6 that this, looking back in time, this was most
7 likely the assets we were expecting to get
8 delivered.  Again, since it couldn't be
9 reconciled, I didn't go very far because, first,
10 you know, again, apologies, but the first part
11 of the policies was to reconcile the data, so I
12 don't know if we ever got much further since we
13 were never able to reconcile the data.
14    Q.   I understand that, sir.  Can you take
15 a look at a document that has been marked
16 previously in these depositions as Exhibit 19.
17    A.   Okay.
18    Q.   And just let me know whether you have
19 seen this document before, sir.
20    A.   It looks familiar.  I'm not quite sure
21 where it came from.  I don't know what it is.  I
22 mean, many documents are broken out by assets
23 and liabilities, so I apologize, I'm not sure if
24 I've seen this before.

Page 251

Teague

1
2    Q.   Do you recall seeing this document at
3 or about the time of the Lehman transaction in
4 September 2008?
5    A.   Apologies.  I received -- I was on a
6 few different e-mail chains at that point in
7 time, so I don't recollect if I've seen this
8 particular document.
9    Q.   Is it fair to say, then, you don't
10 recall any effort to reconcile detailed
11 spreadsheets that you received with the data
12 that's contained on Exhibit 19?
13    A.   I don't recall.  To be honest, I'm not
14 quite sure what some of these acronyms stand
15 for.  I don't believe this was the backup to
16 this, if that is the question.  I do not believe
17 this was one of the eight files, so I'm not
18 quite sure I've seen this.
19    Q.   Okay.  That's all I have for that
20 document, sir.
21       (Deposition Exhibit 874, a document
22       bearing Bates Nos. BCI-EX-(S)-00176594
23       through 596, marked for identification, as
24       of this date.)
25    Q.   I'm handing you what I have marked as

Page 252

Teague

1
2 Exhibit 874, sir.  It's a two-page document that
3 ends with an e-mail sent from you to Steven
4 Davies on September 19, 2008.  Would you take a
5 look at that and let me know when you've done
6 so, please.
7       (Document review.)
8    A.   Yes.  So that was my follow-up as
9 Clement had passed me on to different
10 individuals.
11    Q.   I think you told Mr. Tambe earlier in
12 connection with a related e-mail that you didn't
13 recall any conversations with Kevin Horan or
14 Mike McGarvey over the weekend prior to the
15 closing on September 22.  Do you remember that
16 testimony?
17    A.   Yes.
18    Q.   And you see that you write to Steven
19 Davies here, "FYI, I asked Kevin Horan and Mike
20 McGarvey at Lehman to forward the portfolio as
21 of 15 September since that is the legal close
22 date."
23       Do you see that, sir?
24    A.   Yes.
25    Q.   Does that refresh your recollection

Page 253

Teague

1
2 about any conversations you had with either Mr.
3 Horan or Mr. McGarvey prior to the closing of
4 the transaction on the 22nd?
5    A.   So then they would be forwarding, at
6 this point in time, then, I guess the logic they
7 would be forwarding me the data on.  There was
8 no clarity if they were going to send over the
9 same specifics, to be honest, or what was
10 missing, so there was additional e-mails that
11 were sent then post this e-mail as far as what
12 positions we were receiving.
13       I believe Kevin Horan was in the Prime
14 Services team at Lehman.  So Steven Davies would
15 have been his counterpart I believe in some
16 capacity at Barclays Capital.
17    Q.   Does this refresh your recollection,
18 sir, that you spoke to Mr. Horan and Mr.
19 McGarvey on or around September 19 in connection
20 with your effort to reconcile the data that had
21 been provided to you by Lehman?
22    A.   Yes.  At this point in time it looks
23 like I was still waiting for the information,
24 but they were going to forward on the
25 portfolios.

Page 254

Teague

1    Q.    Right.  My question is a little
2  different.  Is looking at this e-mail, sir, does
3  this refresh your recollection that you had a
4  conversation with these two individuals, Mr.
5  Horan and Mr. McGarvey?
6    A.    Yes.  Apologies.  I had a conversation
7  with them.
8    Q.    Can you tell me what you recall now
9  about that conversation?
10    A.    No.  Apologies.  I don't recall any
11  specifics of the conversation above and beyond
12  that.  I remember Clement did pass me on to talk
13  to them, and the follow-up conversation was to,
14  keeping the original goal in mind of trying to
15  reconcile the summary to the, you know,
16  supporting documents, I reached out to them and
17  they were going to forward on the portfolios for
18  us to understand what would be -- I guess what
19  would be transferred.
20    Q.    Okay.  That's all I have for that
21  document, sir.
22         Independent of any document, sir, I
23  want to ask you a few questions about the margin
24  that is associated with exchange-traded

Page 255

Teague

1  derivatives.
2         Do you have any understanding, sir, of
3  whether or not the transaction between Lehman
4  and Barclays included the transfer to Barclays
5  of margin, whether it be cash or securities,
6  that was posted by Lehman in connection with
7  exchange-traded derivatives?
8    A.    That would have been outside of my
9  area.
10    Q.    You haven't had any conversations with
11  anybody at any point about that?
12    A.    No, I wouldn't know any of the details
13  of that.
14         (Deposition Exhibit 875, a document
15         bearing Bates Nos. BCI-EX-(S)-00201554,
16         marked for identification, as of this date.)
17    Q.    Mr. Teague, I've handed you what I
18  have marked as Exhibit 875, please.  It's a
19  one-page e-mail from Mr. Washtell to you and
20  Marcus Morton.
21    A.    Uh-huh.
22    Q.    The subject is "EDG Valuations at
23  Lehman" from the 26th of September.  If you
24  could just review that briefly and let me know

Page 256

Teague

1  when you've done so, please.
2         (Document review.)
3    A.    Okay.
4    Q.    First of all, what does "EDG"
5  reference, do you know?
6    A.    That is the Equity Derivative Group
7  valuations at Lehman.
8    Q.    Turning to the first concern that Mr.
9  Washtell expresses, he says, "Listed equity
10  option positions being transferred to us as part
11  of the bankruptcy, but still booked in the
12  Lehman systems, from what I hear approx 75,000
13  positions"?
14    A.    Yes.
15    Q.    Do you see that?
16    A.    Yes.
17    Q.    Was it your understanding as of the
18  date of this e-mail, the 26th of September, sir,
19  that the equity option positions that were
20  transferred from Lehman to Barclays under the
21  transaction were still held in Lehman's systems?
22    A.    My knowledge at the time was there --
23  the Lehman systems were, I can't say for what
24  period of time, but they were still closed where

Page 257

Teague

1  I don't believe Lehman was able to effectively
2  transfer assets in the beginning because, due to
3  the bankruptcy, there was some I guess questions
4  regarding, I don't know, vendor licensing,
5  things of that nature, to where the positions
6  were being held.
7         And there was additional issues of
8  getting all of the proper data set up in our
9  systems to transfer the assets.  So at this
10  point in time there was a lot of questions over,
11  as stated here by Mark Washtell, getting the
12  assets moved over and so there were some loose
13  ends that needed to get addressed.
14    Q.    My question is a little different from
15  that answer, which is, as of the date of this
16  e-mail, the 26th of September, where were those
17  positions held, sir?
18         MR. HUME:  Objection.  Lacks
19  foundation.
20    Q.    The equity option positions, do you
21  know where they were held?
22    A.    Again, I can't speak specifically to
23  this date.  My answer was just, in general,
24  there was legal issues regarding bankruptcy that

Teague

1
2  was affecting Lehman's ability to transfer
3  assets.  There was also issues from the Barclays
4  side as far as data getting updated in the
5  systems to transfer the positions onto Barclays'
6  systems.  I can't speak to the day-to-day.  That
7  would be more of the IVC equities team.
8      Q.   So you don't know the answer to my
9  question one way or the other?
10     A.   I can only speak high level.  I can't
11 speak to specifics.
12     Q.   What is the basis of the understanding
13 that you have testified, your high level
14 understanding as to the difficulties in
15 transferring positions, sir, where does that
16 come from?
17     A.   As far as the Independent Valuations,
18 being responsible helping collate the data.
19 There was quite a bit of back and forth with the
20 individuals, be it Mark and be it Rich
21 Landreman, as well as the individuals on my team
22 to get a status update on how things are
23 progressing as well as, initially, one thing I
24 was looking to do was to try to have a file that
25 was a consolidated file, which is, you know,

Teague

1
2  when we received information from Clement, I had
3  to have some sort of consolidated file, but that
4  consolidated file was not -- we were unable to
5  reconcile that consolidated file at that point
6  in time to itself.  So I was just basically
7  helping provide some level of coordination
8  because I was trying to get everything into just
9  one spreadsheet so I would have one number.
10     Q.   Okay.  So, back to my question, which
11 was what is the basis of your understanding that
12 there was difficulty in transferring assets,
13 particularly exchange-traded derivatives, from
14 Lehman's systems?  Is the answer to that
15 question conversations with Mark Washtell?
16     A.   It would be conversations with Mark
17 Washtell and conversations with Steve Calick,
18 who was in the equities P&L team.
19     Q.   Now, you told me in answer to my
20 initial questions, sir, that you have no role in
21 valuing the exchange-traded derivatives that
22 Barclays purchased from Lehman, correct?
23     A.   That's correct.
24     Q.   Do I understand your answer to me a
25 moment ago that you had a role in collating data

Teague

1
2  relating to those derivative positions?
3      A.   I was involved in pulling together all
4  of the final numbers, in a sense.  So, because
5  of that, I was also involved in trying to
6  determine what we were getting delivered.  But
7  anything involving the valuations, it was much
8  more of a conversation with Operations where do
9  we have potential issues; questions with Product
10 Control, where do we have potential issues in
11 regards to securities that had not been
12 delivered, had been decayed, and if something
13 wasn't on the balance sheet, it was more
14 difficult for someone to perform the independent
15 valuations.
16     Q.   Okay.  You gave me a broad answer to a
17 narrow question, sir.  As I told you at the
18 start of the deposition, my questions are going
19 to relate to the derivative positions that
20 Barclays --
21     A.   Okay.
22     Q.   -- obtained from Lehman, unless I
23 specifically say otherwise.
24     A.   I had no specific responsibility in
25 valuing.

Teague

1
2      Q.   If I can just stop you there.  If you
3  let me finish before you answer my questions,
4  it's going to be a lot easier for Kathy to take
5  it down.  When we talk over each other, it makes
6  a difficult job harder for Kathy.
7           So what role, if any, did you have in
8  collating or reviewing data relating to
9  Barclays' valuation or price testing of the
10 exchange-traded derivative positions that
11 Barclays acquired from Lehman?
12     A.   My role would specifically be in
13 collating any data and obtaining valuations
14 performed by the Independent Valuations Equities
15 Team to put in a summary document.
16     Q.   And did you apply any review or
17 analysis to the data that you collated, sir?
18     A.   The only review or analysis would be a
19 sanity check.
20     Q.   What does that mean, a sanity check,
21 sir?
22     A.   Which is when you are putting data
23 together, you perform a sanity check to make
24 sure there were no issues.  I could take one
25 piece of data, trying to put it into a file and

Page 262

Teague

1  do it incorrectly.  I could be making a wrong
2  assumption based on the data given to me if I
3  wasn't given clear instructions, and in those
4  situations, I would, you know, again, rely on
5  them to be the final answer.
6      (Deposition Exhibit 876, a document
7      bearing Bates Nos. BCI-EX-(S)-00231490, with
8      attachment, marked for identification, as of
9      this date.)
10     Q.   Mr. Teague, I've handed you what I've
11 marked as Exhibit 876, which is a one-page
12 e-mail and one-page attachment.  If you could
13 briefly review that and let me know what you've
14 done so.
15     A.   Okay.
16     Q.   Do you see, sir, that's an e-mail
17 from Eric Clark to you and Phillip Nash on
18 October 9, 2008?
19     A.   Yes.
20     Q.   And the subject line is "Listed
21 options value, hedge out costs, and related
22 margin," do you see that?
23     A.   Yes.
24     Q.   Do you know why Mr. Clark was sending

Page 263

Teague

1  this data to you?
2      A.   Mr. Clark is in the Product Control
3  line group, and at this point, the, you know,
4  again, I was disseminating some of the data that
5  we were getting in, so this is the type of
6  information that I would be passing on to either
7  senior management in the view of what's the
8  overall acquisition market value, what's the
9  market value of the Lehman opening balance
10 sheet.
11     So I would be taking in information
12 from multiple people and, in this case, I would
13 most likely be passing it on to Mark Washtell
14 and potentially Jerry Shi for, you know, if
15 there was any specific numbers behind it.
16     Q.   I'm confused by that last answer.  I
17 had understood from your testimony and from
18 testimony from Mr. Washtell that Washtell and
19 Jerry Shi were responsible for the valuation of
20 the exchange-traded derivatives.  Is that also
21 your understanding?
22     A.   Yes.  Eric Clark is in the Product
23 Control team, so he would -- the Valuations team
24 wouldn't have gotten -- we would be relying on

Page 264

Teague

1  the Product Control team to reconcile any data,
2  along with Operations.  They were working closer
3  with Operations of what dataset had come in the
4  door, and they were, you know, would be looking
5  at any P&L aspects of the deal, in this case,
6  the acquisition date versus the September 30
7  date, from the looks of it.
8      Q.   Do you know what acquisition date was
9  used in this document, sir?
10     A.   That I do not.
11     Q.   There's a reference in this
12 spreadsheet to "MTD P&L."  Do you know what
13 that's a reference to?
14     A.   Month to date P&L.
15     Q.   Were you involved in any way in the
16 hedging of the derivative positions that
17 Barclays acquired from Lehman?
18     A.   No, I was not.
19     Q.   Were you involved in tracking the
20 costs related to those hedging assets?
21     A.   That's something that would be within
22 the P&L team.  Anything P&L-related would be
23 handled by Tom McCosker or someone within P&L.
24 If something was in a schedule that I had, it

Page 265

Teague

1  would be in there, but it would not be anything
2  that I would be personally responsible for
3  owning or reviewing.
4      Q.   That's all I have for that document.
5      (Deposition Exhibit 877, a document
6      bearing Bates Nos. BCI-EX-(S)-00207941, with
7      attachments, marked for identification, as
8      of this date.)
9      Q.   Sir, I've handed you what I have
10 marked as Exhibit 877.  You have a full copy of
11 the e-mail and all attachments.  What we have
12 for other counsel are just excerpts in an effort
13 to save some trees.
14     I'm only going to be asking you about
15 three attachments, which are flagged on your
16 copy and are also contained in the copies we
17 have for counsel.
18     A.   Okay.
19     Q.   For the record, I'll identify this as
20 an e-mail from you to Tom McCosker, copying
21 Marcus Morton, subject line, "Acquisition PL
22 0930," which you sent on October 15, sir.  Do
23 you recognize this document, sir?
24     A.   Yes, as a high level view of a -- I

67 (Pages 262 to 265)

Page 266

Teague

1    Teague
2    take it a month-to-date P&L.
3    Q.    And you're sending this document to
4    Mr. McCosker asking him to update the hedges,
5    options, cash and reserves, do you see that?
6    A.    Yes.
7    Q.    Why were you asking him to do that?
8    A.    So senior management could have a view
9    of what the P&L of the opening balance sheet.
10   Tom wouldn't have had all the data booked in the
11   system, so they were looking to leverage any
12   data that we would potentially already have as
13   far as independent valuations to show the
14   Product Control values as of the 19th is in the
15   spreadsheet.  So it was just leveraging the
16   spreadsheet.
17   Q.    Could you turn to the first
18   attachment, which is flagged in your copy after
19   the first blue sheet.  On the top left-hand
20   side, the first words are "traded assets."  Are
21   you on the same page, sir?
22   A.    Yes.
23   Q.    Do you see that there are -- there are
24   boxes headed "PCG" and "PMTG"?
25   A.    Uh-huh.

Page 267

Teague

1    Teague
2    Q.    Can you describe for me, if you're
3    able, the different roles that the Product
4    Control Group and the PMTG organization had in
5    valuing the derivatives positions that Barclays
6    acquired from Lehman?
7    A.    I can't really speak in-depth to that.
8    I think there was still some questions at that
9    point in time over, you know, all the numbers.
10   It appears the numbers between the two areas are
11   identical, except for portfolio 2 seems to be
12   broken out in a separate capacity, looking at
13   the sheet itself.
14   Q.    If you look at the "Exchange-Traded
15   Options" line, sir, you will see that the
16   numbers for PCG for the 19th and 30th of
17   September are both negative 498 million?
18   A.    Uh-huh.
19   Q.    And that the numbers in the PMTG group
20   are different, they're larger, sir; do you see
21   that?
22   A.    Yes.
23   Q.    And do you have any understanding as
24   to why the numbers are different?
25   A.    No, that I do not.

Page 268

Teague

1    Teague
2    Q.    You do not?
3    A.    That I do not.
4    Q.    Could you turn to the next attachment,
5    sir, which is again a one-page spreadsheet
6    entitled "Project Long Island P&L Summary,
7    October 3, 2008"?
8    A.    Uh-huh.
9    Q.    And turning your attention to the
10   entry "OCC Margin" on the left-hand side, are
11   you with me?
12   A.    Yes.
13   Q.    There are two numbers after that 5, 7.
14   Do you understand that those are a reference to
15   the data?
16   A.    To the dataset below.
17   Q.    To the footnote below.
18         And you see that footnote 5 says,
19   "Assumes we owe $65 million to LBSF on the
20   closeout and all Govies ($408 million) are
21   realized.  Also assumes fixed positions are
22   closed out at a loss of $30 million."  Do you
23   see that?
24   A.    Yes.
25   Q.    Did you have any involvement in any

Page 269

Teague

1    Teague
2    way, sir, with the LBSF positions that Barclays
3    appears to have acquired from Lehman?
4    A.    One moment.  In all honesty, I believe
5    for this page, I believe Jasen Yang may have,
6    these comments and the numbers on the left-hand
7    side --
8         MR. HUME:  The question is did you
9    have any involvement.
10        THE WITNESS:  Not that I recollect.
11   I'm trying to see the numbers.
12   Apologies for the commentary.
13        Not that I recollect.
14        MR. OXFORD:  You should only apologize
15   to Mr. Hume for the commentary.
16        MR. HUME:  You don't want him to
17   answer your question?
18        MR. OXFORD:  I'm happy to have my
19   question answered.
20        MR. HUME:  With commentary, okay.
21        MR. OXFORD:  And my next --
22        MR. HUME:  He's happy to have his
23   questions answered with commentary.
24   Q.    To your knowledge, sir, who wrote
25   these footnotes 5 and 7 here?

68  (Pages 266 to 269)

Page 270

Teague

1    A.   To my -- to my best of my
2  recollection, it would have been Jasen Yang or
3  potentially Tom McCosker.
4    Q.   What was Mr. Yang's role in connection
5  with the exchange-traded derivatives that
6  Barclays acquired from Lehman, sir?
7    A.   Mr. Yang was a trader at the firm and
8  he was looking at performing a similar task to
9  myself of consolidating all the data and making
10  sense of it from a front office perspective.
11    Q.   Did you have any discussions, sir,
12  with anybody about the LBSF options that
13  Barclays acquired from Lehman?
14    A.   That's a very generic, generalized
15  question.  Say that again.  Did I have anything
16  regarding?
17    Q.   Did you have any discussions, sir,
18  with anybody about the LBSF options that
19  Barclays acquired from Lehman?
20    A.   It would be, do we know the valuations
21  associated with those would basically be any
22  question I would usually have asked.
23    Q.   Did you have any conversations about
24  the basis on which Lehman -- sorry, Barclays was

Page 271

Teague

1  entitled to those LBSF options?
2    A.   That would have been outside of the
3  scope of the work I was performing.  That would
4  be something much more with potentially Legal,
5  potentially Independent Valuations, but it
6  wouldn't be one of my core functions.
7    Q.   So the answer is no?
8    A.   The answer is no, based on the fact
9  that if I was involved, I don't recollect being
10  involved in any capacity.
11    Q.   Do you know the source of the data for
12  the options and delta hedges that appears in the
13  spreadsheet, sir?
14       MR. HUME:  Objection.  Lacks
15  foundation.
16    A.   That I do not.
17    Q.   You see there's an entry on the
18  left-hand side, sir, that reads "Excess Customer
19  Margin"?
20    A.   Yes.
21    Q.   Do you know what that's a reference
22  to, sir?
23    A.   No, I do not.  Appears that it's
24  blank.

Page 272

Teague

1    Q.   And then just beneath the subtotal,
2  there's an entry "Potential Additional
3  Collateral" and there's an eight after it?
4    A.   Yes.
5    Q.   And footnote 8 talks about $200
6  million in the OCC account, $300 million in the
7  customer accounts, and $65 million allocated to
8  LBIE, do you see that?
9    A.   Yes.
10    Q.   Did you have any discussions about
11  that potential additional collateral with
12  anyone, sir?
13    A.   No, I did not.  I wouldn't be involved
14  in that, that level of detail.
15    Q.   If you could turn to the third tab
16  that I have flagged in your copy, which is the
17  spreadsheet entitled "Lehman Inventory Take On
18  Values as at September 30, 2008"?
19    A.   Yes.
20    Q.   Are you with me, sir?
21    A.   Yes.
22    Q.   Have you seen this spreadsheet before?
23    A.   Yes, looks familiar.
24    Q.   Again, turning to the "Options"

Page 273

Teague

1  section of this, do you see there's an
2  adjustment for LBSF positions taken at 9/24?
3    A.   Yes.
4    Q.   Do you know why the LBSF positions
5  were taken on at 9/24?
6    A.   I do remember there was some -- yeah,
7  I don't recall.  I remember there was some
8  issue.  There was a later date for part of the
9  overall population, but I can't speak to why
10  9/24 was the date.
11    Q.   Do you know why -- sorry.  I didn't
12  mean to cut you off, sir.
13    A.   No.  Apologies.  I don't know the
14  date -- I don't know why it happened later.
15    Q.   Can I ask you to turn, sir, to 827,
16  which is the document Mr. Tambe marked for you.
17  Sorry.  873.  Apologies.
18    A.   Okay.
19    Q.   Do you have it there, sir?
20    A.   Yes.
21    Q.   This is a document from PwC that
22  reflects an e-mail exchange between you and
23  Robert MacGoey?
24    A.   Uh-huh.

Teague

1
2    Q.   Do you see that?
3    A.   Yes.
4    Q.   Do you recall this e-mail exchange,
5    sir?
6    A.   Yes.
7    Q.   Would you agree that Mr. MacGoey of
8    PwC is discussing with you the bid, mid
9    adjustment to the exchange-traded derivatives
10   pricing that Barclays is proposing?
11       A.   I see nothing specific to the
12   exchange-traded in this e-mail that I can see.
13   If you give me a moment, is there anything you
14   can point out?
15       Q.   I believe the reference to $500
16   million at bid/offer adjustment at item 7 is a
17   reference to exchange-traded derivatives.  Does
18   that refresh your recollection, sir?
19           MR. HUME:  Objection to the form of
20       the question and assumes facts not in
21       evidence.
22       A.   I thought that related to corporates.
23   Apologies.  If I am incorrect, then it
24   doesn't -- then, no, I don't recollect
25   specifically for exchange-traded.

Teague

1
2    Q.   Were you involved in any discussions,
3    sir, with anyone, whether at PwC or within
4    Barclays, about the appropriate valuation date
5    for exchange-traded options?
6    A.   I know there was -- it was a
7    discussion point, but, again, I'm not the best
8    person to speak to since I wasn't performing the
9    analysis.  Any, you know, the -- the dates,
10   again, going back to all asset classes, were
11   something that was up for discussion originally.
12   I think there was some -- there wasn't clarity
13   on day one and the clarity came later on.
14       Q.   I understand you may not be the best
15   person for me to speak to about this, sir, but
16   unfortunately, you're the only person I have
17   under oath today.  So notwithstanding your
18   caveat that there may be others more qualified
19   to testify to it, I'm asking about your
20   recollection, sir.
21           Do you recall having any conversations
22   with anyone, whether PwC or within Barclays,
23   about the appropriate valuation date for the
24   exchange-traded options that Barclays acquired
25   from Lehman?

Teague

1
2            MR. HUME:  Objection.  Asked and
3        answered.
4        A.   Any discussions I would have had on
5    that would have been high level, and I don't
6    recollect any specifics.
7            (Deposition Exhibit 878, a document
8        bearing Bates Nos. PwC-BarCap 00025971
9        through 974, marked for identification, as
10       of this date.)
11       Q.   Mr. Teague, I've handed you what I
12   have marked as Exhibit 878.  If you could take a
13   look at that.  It's a PwC document that includes
14   an e-mail exchange between you and Mr. MacGoey
15   at PwC?
16       A.   Uh-huh.
17       Q.   And if it speeds things up, I'm
18   principally going to ask you about what's on the
19   first page.
20       A.   Okay.
21       Q.   However, you are, of course, at
22   liberty to review the whole document.
23       A.   Okay.
24       Q.   Do you recall this e-mail exchange,
25   sir?

Teague

1
2    A.   Let's see, the date on this is dated
3    January.
4        (Document review.)
5    A.   Okay.  Okay.
6    Q.   My question is do you recall this
7    e-mail exchange, sir?
8    A.   Yes.
9    Q.   And does this refresh your
10   recollection, sir, that you had at least one
11   conversation with Mr. MacGoey in connection with
12   the valuation of the exchange-traded options
13   portfolio that Barclays acquired from Lehman?
14           MR. HUME:  Objection.  Vague and
15       ambiguous.
16       A.   And based on this e-mail, for the
17   specifics, I guess PwC at that point were going
18   to be reaching out to tell Marcus and myself
19   that it was outside of their scope.
20       Q.   Right, that's what the document says,
21   sir, but do you recall having any conversation
22   with Mr. MacGoey about this subject?
23       A.   I don't remember the specifics of the
24   conversation.  Apologies.  Looking through some
25   of the older e-mails.  Prior to me, it seemed

Page 278

Teague

1 like it was something that was going on between
2 Operations, the head of Operations and Marcus,
3 and I was just trying to get clarity as to what
4 the -- what the date was and he was saying,
5 "Please see the below e-mail." So I was just, I
6 guess, getting into the process rather late to
7 provide some clarity, if I could get any
8 clarity, from PwC.
9     Q.   And do you recall getting any clarity
10 from PwC, sir?
11     A.   I do not. Much of the involvement I
12 performed on the equities was because Mark
13 Washtell is located in London, so I was just
14 working to help coordinate some of these
15 aspects.
16         MR. OXFORD: I don't have any further
17 questions for you, Mr. Teague. Thank you.
18         MR. HUME: You have no questions?
19         MR. KAY: No questions.
20         MR. HUME: I have a few questions for
21 the witness and then we can finish up.
22 EXAMINATION BY
23 MR. HUME:
24     Q.   Mr. Teague, as you know, I'm Hamish

Page 279

Teague

1 Hume, representing Barclays.
2         You understand your testimony in this
3 deposition is part of a court proceeding and may
4 potentially be considered by the Court in this
5 case?
6     A.   Yes.
7     Q.   And you've been asked a lot of
8 questions about the valuation of certain assets
9 that Barclays acquired from Lehman pursuant to
10 the September 2008 sale transaction, correct?
11     A.   Yes.
12     Q.   Can you just state again for the
13 record which of those assets you and your
14 specific group in Independent Valuation Control
15 were responsible for valuing?
16     A.   That would be the fixed income rates
17 and corporate assets.
18     Q.   And did the valuations that you and
19 the members of your group arrived at for those
20 assets flow up into Barclays' acquisition
21 balance sheet that was publicly reported in
22 early 2009?
23     A.   Yes, that was the case.
24     Q.   And in all of the work that you did to

Page 280

Teague

1 determine values to ascribe to those assets,
2 what was the goal of your valuation efforts?
3         MR. TAMBE: Objection to the form of
4 the question.
5     A.   The goal was to ensure that we were
6 appropriately marking the assets to a bid price
7 and the market as of 9/22.
8     Q.   And when you say "at bid price," was
9 that -- what relationship does that have to a
10 fair market value for those assets?
11     A.   We were looking to use a fair market
12 value at which these assets could be -- could be
13 valued in light of the market conditions. We
14 were trying to derive or obtain the proper
15 market values as of 9/22 for the assets in the
16 Lehman portfolio.
17     Q.   And was the direction that you were
18 given, to the extent you were given any
19 direction by anyone internally at Barclays,
20 consistent with the overall goal of determining
21 an accurate fair market value for the assets you
22 were responsible for valuing?
23     A.   Yes.
24     Q.   And looking back at all of your

Page 281

Teague

1 efforts in the course of this deposition and
2 preparing for it, do you believe that at all
3 times during your work you attempted to fairly
4 and reasonably determine the fair market value
5 for all of those assets?
6     A.   Yes, I believe that is the case.
7     Q.   Do you have any recollection of anyone
8 at Barclays at any time suggesting to you that
9 you should do anything other than attempt to
10 calculate and determine the appropriate fair
11 market value of the assets you were responsible
12 for valuing?
13     A.   No, I do not.
14     Q.   Did anyone ever say to you, in form or
15 substance, that a result other than fair market
16 value at an appropriate bid price was the
17 desired goal or should be what you aim to
18 achieve?
19     A.   No.
20     Q.   Did anyone ever indicate to you or
21 anyone else working for you, to your knowledge,
22 that you should attempt to understate the fair
23 market value of the assets that had been
24 acquired, to state values that were below that

Page 282

Teague

1    fair market value?
2    A.   No.
3    Q.   And do you believe the valuations you
4    ultimately reached for the assets you and your
5    team were responsible for valuing reflect the
6    fair market value as of September 22, 2008?
7    A.   Yes, I do.
8    Q.   And you have been asked some questions
9    about PwC during this deposition.  Did you
10   interact with PwC professionals during your work
11   in valuing the assets that had been acquired by
12   Barclays?
13   A.   Yes.
14   Q.   Were they involved before the
15   acquisition balance sheet was finalized?
16   A.   Yes.
17   Q.   And did PwC look closely at the
18   different methodologies that were used to value
19   the different types of assets that you were
20   responsible for valuing?
21        MR. TAMBE:  Objection to the form of
22   the question.
23   A.   Yes, PwC did an analysis of the
24   independent valuations and reviewed different
25

Page 283

Teague

1    methodologies that were utilized in their
2    oversight of the Lehman opening balance sheet.
3    Q.   And was PwC, to your knowledge, aware
4    of the valuation date that Barclays was using to
5    arrive at these fair market values?
6    A.   Yes.
7    Q.   And to your knowledge, did PwC agree
8    that that valuation date was a reasonable
9    valuation date?
10   A.   Yes.
11   Q.   And to your knowledge and
12   understanding, did PwC ultimately conclude that
13   Barclays' valuations of the securities acquired
14   in the Lehman sale transaction were fairly
15   stated in all material respects?
16   A.   Yes.
17   Q.   You were asked some questions earlier
18   in the deposition about work that you may have
19   done during the week of September 15, 2008, do
20   you recall that?
21   A.   Yes.
22   Q.   You were asked some questions about
23   reconciliation efforts you may have done that
24   week on some of the assets that might have been
25

Page 284

Teague

1    involved in the transaction, do you recall that?
2    A.   Yes.
3    Q.   You were asked some questions about
4    specifically Lehman's marks on some of those
5    assets, do you recall that?
6    A.   Yes.
7    Q.   Let me ask you, in the work that you
8    did that week, do you have any recollection of
9    ever at any time relying on any of the Lehman
10   marks on any of the securities that you looked
11   at?
12   A.   No, I don't even believe I had the
13   Lehman marks available to me.
14   Q.   Were you ever asked by anyone to
15   assess the accuracy or potential staleness of
16   those Lehman marks?
17   A.   No.
18   Q.   And are you sure one way or the other
19   whether you even saw the Lehman marks on those
20   securities?
21   A.   I do not believe I have seen the marks
22   on those securities.
23   Q.   Would it surprise you if someone told
24   you that the Lehman marks on some of the
25

Page 285

Teague

1    securities acquired by Barclays were stale by
2    the week of September 15, 2008 after Lehman
3    Holding Company filed bankruptcy?
4        MR. TAMBE:  Object to the form.  Lack
5    of foundation.
6        MR. KAY:  Same objection.
7        MR. TAMBE:  Objection.  Calls for
8    speculation.
9    A.   Based on conversations after the
10   acquisition, I would not be surprised if marks
11   were not being updated from the Lehman side.
12   Q.   You also were asked some questions
13   about which assets were going to be included in
14   the transaction and whether assets from one of
15   the exhibits you were shown were the assets that
16   were to be transferred to Barclays, do you
17   recall that?
18   A.   Yes.
19   Q.   Did you have any involvement at all in
20   the negotiations over the terms of the sale
21   transaction?
22   A.   No, I did not.
23   Q.   Were you closely involved in any
24   indirect way with the negotiations in the sale
25

72 (Pages 282 to 285)

Page 286

Teague

1    transaction?
2    A.   No, I was not.
3    Q.   Do you think you would have a clear
4    and good understanding at any given point in
5    time during the week of September 15, 2008 of
6    the specific assets that were supposed to be
7    included in the sale transaction?
8    MR. OXFORD:  Object to the form.
9    Q.   Would you know what was being
10   negotiated in terms of which securities were
11   going to be included or not?
12   A.   From a negotiation perspective, no, I
13   would not know that.
14   Q.   You testified earlier in the
15   deposition about the market free-fall that was
16   going on in September 2008, and you made a
17   reference at one point to September 22.
18       Do you have any specific recollection
19   of whether September 22 in particular was a date
20   of market free-fall, or were you testifying
21   generally about the time period around the
22   Lehman bankruptcy?
23   MR. TAMBE:  Objection to form.
24       Objection to the extent it seeks to

Page 287

Teague

1    recharacterize prior testimony or suggests
2    an answer to the witness.
3    Q.   The testimony is what it is.  I just
4    want to know what it is that you recall
5    specifically about September 22 as opposed to
6    generally around the time of the Lehman
7    bankruptcy.
8    A.   Generally around the time, it was in
9    market free-fall.  The number I was referring to
10   earlier was actually the Monday prior, where the
11   market had fallen dramatically that day.  The
12   market on the 22nd, while volatile, was not
13   the -- was not the day that I was speaking to
14   when the market fell by 800.  The market I
15   believe only fell about 3 or 400 that day.
16   Q.   You were asked about whether or not
17   you ever attempted to determine the value of
18   assets or securities acquired by Barclays as of
19   the open of business on September 22 as opposed
20   to other times on September 22.  Do you recall
21   that?
22   A.   Yes.
23   Q.   Can you explain why it is -- well, let
24   me ask this question first.  In the typical

Page 288

Teague

1    course of business, does Barclays ever have to
2    determine the value of its securities as of a
3    particular time of day?
4    A.   We would have no ability to value
5    something as of a particular time of day.  Only
6    if something maybe potentially on
7    exchange-traded.
8    Q.   Does Barclays attempt to value
9    securities as of a particular date on a daily
10   basis?
11   A.   On a -- the regular IVC process that's
12   performed on a month-end basis.  Any pricing
13   that is performed on a daily basis, either by
14   the desk or using external data, has to be close
15   of business.  That's the only place for the data
16   to be readily available.
17   Q.   And when Barclays attempts to value
18   assets as of a particular date, whether it's the
19   front office or IVC, what is the data that is
20   available for market activity as of any
21   particular date?  Is it the data from the
22   beginning of business or the end of business?
23   A.   All data available from the vendors is
24   the data for the end of business.

Page 289

Teague

1    Q.   Is there any data that could have been
2    used to value securities as of the open of
3    business on September 22?
4    A.   Not that I'm aware of.
5    Q.   You were asked some questions in this
6    deposition about liquidity haircuts and whether
7    they were taken on a CUSIP-by-CUSIP basis or
8    portfolio basis.  Do you recall that?
9    A.   Yes, I do.
10   Q.   Can you first explain what it is in
11   the context of your valuation work in this case
12   is meant by the phrase "liquidity haircut"?
13   A.   "Liquidity haircut" was a reference to
14   a means to mark the vendor data, which is mid
15   price to a bid price to reflect fair value.
16   Q.   When you talked about liquidity
17   haircuts on a portfolio basis, did that in any
18   way reflect any judgments about what would
19   happen if that entire portfolio was going to be
20   liquidated?
21   A.   No, that number was not derived in
22   that light.
23   Q.   Were the liquidity haircuts an effort
24   to determine the correct fair market value for

73 (Pages 286 to 289)

Page 290

Teague

1
2    the specific CUSIPs within the portfolio on a
3    CUSIP-by-CUSIP basis?
4         MR. TAMBE: Objection to the form of
5    the question.
6    Q.   Let me rephrase the question. Were
7    the liquidity haircuts an effort to determine
8    the fair market value at which you could sell
9    each CUSIP as opposed to what you would get for
10   liquidating the entire portfolio?
11        MR. TAMBE: Objection to the form of
12   the question.
13   A.   The liquidity haircut or bid/offer
14   which was performed at the product level was
15   done in a way to capture what it would -- what
16   pricing it would take essentially to sell the
17   underlying, but in no way to sell them all at
18   the same time. It was a haircut based on
19   utilizing data from other CUSIPs as a means to
20   determine what a high-level bid/offer would be
21   for those assets.
22   Q.   You were asked a question about one
23   spreadsheet that showed a column for notional
24   value as opposed to market value. Do you recall
25   that?

Page 291

Teague

1
2    A.   Yes, I do.
3    Q.   Does notional value bear any necessary
4    relationship to fair market value when you're
5    talking about the types of securities that were
6    acquired in this transaction?
7    A.   No, notional value would be the size
8    of a position based on the price. The notional
9    of -- a very large notional can end up having a
10   very small market value.
11   Q.   You were asked some questions about
12   the Pine collateralized loan obligation. Do you
13   recall that?
14   A.   Yes.
15   Q.   And I believe you testified there were
16   different valuations performed by the front
17   office traders and by IVC; is that correct?
18   A.   That is correct.
19   Q.   You were asked some questions about
20   the funding risk and the relevance of funding
21   risk to the valuations performed by IVC -- well,
22   to the valuations performed by Barclays. Do you
23   recall those questions?
24   A.   Yes.
25   Q.   Did funding risk have any relevance to

Page 292

Teague

1
2    the valuation work you performed in IVC?
3    A.   No. Funding risk, from our
4    perspective, was more so an aspect of the
5    overall legal risk.
6    Q.   You gave some testimony about an
7    analogy to SIVs. Was that an analogy based upon
8    funding risks or something else?
9    A.   That was an analogy based on a legal
10   risk where an event of default, when triggered,
11   one is never certain of what the outcome will
12   be. In that scenario the firm had to take large
13   writedowns due to the judgment that occurred
14   based on EOD triggers, and that's where the
15   legal risk can result in large writedowns.
16   Q.   In your work in IVC in valuing Pine,
17   did you make any specific judgment one way or
18   the other as to whether Barclays specifically
19   might have to contribute additional money into
20   Pine in the future based on borrower calls on
21   the underlying revolver and credits?
22   A.   No.
23   Q.   The movants have said in this case or
24   their expert has said that Barclays' valuation
25   of Pine was based on an incorrect reading of the

Page 293

Teague

1
2    underlying contract or indenture because the
3    contract says that Barclays, as the owner of the
4    Senior Tranche A participation interest, had no
5    obligation to contribute funding to Pine.
6         Do you believe that the Barclays
7    valuation of Pine was incorrectly based on an
8    assumption that Barclays might have a funding
9    risk contrary to the terms of that contract?
10   A.   No, I do not.
11   Q.   Do you recall that the front office in
12   its valuation of Pine did review a variety of
13   scenarios, at least one of which might have a
14   risk of future funding?
15   A.   Yes.
16   Q.   Did you understand that the funding
17   risk that the front office was concerned about
18   was, in the first instance, that the CLO itself,
19   the Pine entity as opposed to the tranche
20   holders like Barclays, would be called upon to
21   contribute the money it held as cash in eligible
22   investments to the borrowers?
23        MR. TAMBE: Objection to the form of
24   the question.
25   A.   Yes, that was my understanding.

74 (Pages 290 to 293)

Teague

1                   Teague
2 That --
3    Q.   So could there be a funding risk
4 relevant to valuing Pine that had nothing to do
5 with Barclays having to contribute money?
6    A.   Yes.
7    Q.   Can you explain that?
8    A.   If the money, that $367 million, is
9 used to provide future funding for the
10 revolvers, that is money that would no longer be
11 going to the senior tranche. In the event of
12 default, if that were an event -- if an event of
13 default were to occur, as it did, and the ending
14 result was that money would be allocated to the
15 super senior holder, then that's money that can
16 be applied towards our valuation.
17      If we are unable to utilize that money
18 and that money can then, instead of going to a
19 super senior holder, could then go to provide
20 funding to all the underlying revolvers, that
21 would money we wouldn't have, in a sense money
22 that would be removed from the valuation of the
23 super senior.
24    Q.   And as of the time you were trying to
25 value Pine, as of September 22, Barclays would

1                   Teague
2 not have known whether or not that money in the
3 CLO would be dispersed to Barclays and the other
4 tranche holders or, instead, be required to fund
5 future borrowing calls by the borrowers,
6 correct?
7    A.   That's correct.
8      MR. TAMBE: Objection to form.
9    Q.   Do you recall how much money that was
10 that was held by the CLO?
11    A.   That I do not. I believe somewhere in
12 the neighborhood of $200 million at the end of
13 the year.
14    Q.   Do you know whether, to this day,
15 almost two years after Barclays acquired Pine,
16 Barclays is yet to receive even one dollar in
17 distribution payment to the tranche holder?
18    A.   No, we have never received any money,
19 to my knowledge.
20    Q.   As far as you know, does Pine continue
21 to hold eligible investments that it has refused
22 to distribute to Barclays?
23    A.   Yes.
24    Q.   Is that consistent with some of the
25 skepticism that was implicit in your valuation

1                   Teague
2 of Pine on the acquisition balance sheet?
3      MR. TAMBE: Objection to form.
4      MR. KAY: Same objection.
5    A.   Yes.
6    Q.   In addition to the funding risk of
7 Pine using its eligible investments to
8 contribute to borrowers and fund borrower calls
9 rather than distribute to tranche holders, was
10 there also a funding risk that, irrespective of
11 what the contract might require, the borrowers
12 might need funding in order to keep their
13 businesses operating?
14    A.   Yes.
15      MR. TAMBE: Objection to form.
16    A.   It would not be a contractual
17 obligation, but it would be logical, as the
18 owner of the noteholder, to ensure that you not
19 hurt the underlying firms in a way that it would
20 negatively affect the value of the CLO that
21 you're holding.
22    Q.   So even if the contract clearly stated
23 that the senior tranche holder did not have an
24 obligation under the contract to fund money, is
25 it your view, given your familiarity with these

1                   Teague
2 assets, that there might be a risk of needing to
3 fund in order to keep the underlying borrowers
4 healthy enough to repay -- to operate their
5 businesses through the crisis and pay off the
6 debts in the future?
7    A.   Yes, and it's an unknown and that's
8 why there was legal risk.
9    Q.   In terms of the funding risk of the
10 CLO itself, Pine, contributing its eligible
11 investments to fund borrower calls rather than
12 to pay out to tranche holders, is it your
13 understanding that that risk was eliminated by
14 the event of default in October 2008?
15    A.   Yes, that's my understanding.
16    Q.   And why was that information from
17 October 2008 not used in valuing Pine as of
18 September 22, 2008?
19    A.   Until such time it was an unknown and
20 there was a valuation perspective from the front
21 office to run different scenarios to what the
22 outcome would be, but there was no means of
23 seeing into the future. The valuation was
24 performed as of 9/22 based on the data available
25 as of 9/22.

Page 298

Teague

1
2    Q.   You were asked questions about the
3  extent to which Barclays used internal auctions
4  to value some of the assets acquired in the
5  Lehman transaction.  Do you recall those
6  questions?
7    A.   Yes.
8    Q.   And you gave testimony about PMTG
9  illiquid assets sometimes being valued based
10  upon those internal auctions.  Do you recall
11  that?
12    A.   Yes.
13    Q.   Do you know with any certainty the
14  volume of assets and the precise population of
15  assets for which internal auctions were used to
16  value the assets as valued on the acquisition
17  balance sheet?
18    A.   I don't recollect.
19    Q.   Would that information be available in
20  the spreadsheets that have been produced in this
21  case?
22    A.   Yes, they would.
23    Q.   You were asked in one of exhibits you
24  were shown by Mr. Oxford -- maybe we can just
25  look at Exhibit 873.

Page 299

Teague

1
2    Do you have that in front of you?
3    A.   Yes.
4    Q.   This was a PwC e-mail from Mr. MacGoey
5  where he lists out a number of points, one of
6  which relates to the mid to bid adjustment, the
7  point that begins "as it relates."  Do you see
8  that point?
9    A.   Yes.
10    Q.   It says, "As it relates to the
11  adjustments from mid to bid, we have not
12  received any documentation to support why the
13  standard deviation of the pricing vendors is
14  reasonable."  And when you were shown that
15  earlier, you said, in response, you recalled
16  moving to a system where you would use the
17  lowest vendor price.  Do you recall that?
18    A.   Yes.
19    Q.   Did you use the lowest vendor price
20  for every single category of assets that you
21  were involved with or only for those where there
22  were multiple vendor sources that were
23  well-developed?
24    A.   Only for corporate bonds where we had
25  multiple vendor sources that were

Page 300

Teague

1
2  well-developed.
3    Q.   Can you explain the difference between
4  the nature of the vendor, third-party vendors
5  with pricing data for corporate debt and for
6  other asset classes such as agency rates or
7  other securities?
8    A.   For the corporate debt, there are
9  quite a number of vendors that provide
10  independent values, indicative values on a daily
11  or monthly basis.  This is due to the fact that,
12  as an asset class, there is quite a bit of noise
13  as far as pricing goes and it creates the
14  foundation for more vendors to be able to get
15  into that space, and that's why historically
16  there is more pricing vendors for corporate
17  bonds than for sometimes more liquid assets.
18    Q.   As a general matter, was PwC familiar
19  with the methodologies used, ultimately used by
20  you and your group to adjust to bid prices, fair
21  market values and bid prices?
22    MR. TAMBE:  Objection.  Foundation.
23    A.   Yes.
24    Q.   And to your knowledge and
25  recollection, did they raise any material

Page 301

Teague

1
2  concerns with any of those methodologies that --
3  did they have any disagreement with your
4  methodologies that resulted in material
5  differences in valuations?
6    A.   No, not that I can recollect.
7    MR. HUME:  I have no more questions.
8    MR. TAMBE:  Thank you.  No questions.
9    MR. OXFORD:  No more.  Thank you, Mr.
10  Teague.
11    THE WITNESS:  You're welcome.
12    (Time Noted:  6:34 P.M.)
13      oOo
14
15
16
17
18
     _____
     SEAN TEAGUE
19
20  Subscribed and sworn to
    before me this    day
21  of      2010.
22
     _____
23
24
25

Page 302

```
 1              Teague
 2         CERTIFICATE
 3    STATE OF NEW YORK )
                        : ss
 4    COUNTY OF NEW YORK)
 5         I, Kathy S. Klepfer, a Registered
 6    Merit Reporter and Notary Public within and
 7    for the State of New York, do hereby
 8    certify:
 9         That SEAN TEAGUE, the witness whose
10    deposition is herein before set forth, was
11    duly sworn by me and that such deposition is
12    a true record of the testimony given by such
13    witness.
14         I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage and that I am in no way
17    interested in the outcome of this matter.
18         I further certify that neither the
19    deponent nor a party requested a review of
20    the transcript pursuant to Federal Rule of
21    Civil Procedure 30(e) before the deposition
22    was completed.
23         In witness whereof, I have hereunto
24    set my hand this 30th day of June, 2010.
25    -------------------------------
```

Page 303

```
 1              Teague
 2         INDEX
 3    WITNESS:        EXAMINATION BY        PAGE
 4    S. TEAGUE        Mr. Tambe           5
 5              Mr. Oxford       238
 6              Mr. Hume         278
 7
 8    EXHIBITS:                    PAGE
 9    Exhibit 864, a document bearing Bates Nos.    71
10    PwC-BarCap00046054 through 056
11    Exhibit 865, a document bearing Bates Nos.    87
12    BCI-EX-(S)-00201234 through 241
13    Exhibit 866, a document bearing Bates Nos.    111
14    LBHI 017959 through 964, with attachment
15    Exhibit 867, a document bearing Bates Nos.    116
16    BCI-EX-(S)-00201262 through 263, with attachment
17    Exhibit 868, a document bearing Bates Nos.    137
18    BCI-EX-(S)-00207849 through 850, with attachment
19    Exhibit 869, a document bearing Bates Nos.    180
20    BCI-EX-(S)-00207919 through 920, with attachment
21    Exhibit 870, a document bearing Bates Nos.    191
22    BCI-EX-(S)-00207943 through 944, with attachment
23    Exhibit 871, a document bearing Bates Nos.    228
24    BCI-EX-(S)-00180042 through 80063
25
```

Page 304

```
 1              Teague
 2         INDEX (Cont'd.)
 3    EXHIBITS:                    PAGE
 4    Exhibit 872, a document bearing Bates Nos.    231
 5    BCI-EX-(S)-00176591 through 591, with
 6    attachment
 7    Exhibit 873, a document bearing Bates Nos.    231
 8    PwC-BarCap00008679 through 80
 9    Exhibit 874, a document bearing Bates Nos.    251
10    BCI-EX-(S)-00176594 through 596
11    Exhibit 875, a document bearing Bates Nos.    255
12    BCI-EX-(S)-00201554
13    Exhibit 876, a document bearing Bates Nos.    262
14    BCI-EX-(S)-00231490, with attachment
15    Exhibit 877, a document bearing Bates Nos.    265
16    BCI-EX-(S)-00207941, with attachments
17    Exhibit 878, a document bearing Bates Nos.    276
18    PwC-BarCap 00025971 through 974
19
20    REQUEST FOR PRODUCTION:
21    Page 109, Line 13
22
23
24
25
```

Page 305

```
 1                    Teague
 2    NAME OF CASE:  In re Lehman Brothers Holdings
 3    DATE OF DEPOSITION:  June 30, 2010
 4    NAME OF WITNESS:  Sean Teague
 5    Reason Codes:
 6       1. To clarify the record.
         2. To conform to the facts.
 7       3. To correct transcription errors.
 8    Page _____ Line _____ Reason _____
      From _____ to _____
 9
      Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
      From _____ to _____
12
      Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
      From _____ to _____
15
      Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
      From _____ to _____
18
      Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
      From _____ to _____
21
      Page _____ Line _____ Reason _____
22    From _____ to _____
23    Page _____ Line _____ Reason _____
      From _____ to _____
24
25    _____
```

# EXHIBIT 7

Michael Guarnuccio/US/ABAS/PwC

02/07/2009 10:14 AM

To  Christopher A Fisher/US/ABAS/PwC@Americas-US

cc

bcc

Subject  Fw: OBS - Valuation

---

Michael Guarnuccio | PricewaterhouseCoopers LLP

300 Madison Avenue | New York, NY 10017 | (646-471-2949 | 7: 813-375-6840| *: Michael.Guarnuccio@us.pwc.com

----- Forwarded by Michael Guarnuccio/US/ABAS/PwC on 02/07/2009 10:14 AM -----

Robert MacGoey/US/ABAS/PwC

02/07/2009 03:59 AM

300 Madison Avenue, New York, NY10017

"Reply to All" is Disabled

To  Jon Holloway/UK/ABAS/PwC@EMEA-UK@INTL

cc  Michael Guarnuccio/US/ABAS/PwC@Americas-US

Subject  OBS - Valuation

## 1. Introduction

Barclays entered into an Acquisition Purchase Agreement (APA) on 16 September which was amended in a Clarification Letter (CL) dated 20 September. As part of the acquisition, Barclays acquired securities with fair value of approximately $42.7bn (the "Lehman Portfolio") on Septmeber 22, 2008 through a $45bn reverse repurchase agreement ("Repo") which was ultimately busted and Barclays took possession of the collateral. Barclays also received additional securities with a fair value of approximately $3.7bn (the "JPM Portolio") on  December 22, 2008 in accordance with a Settlement Agreement approved by the Bankruptcy Court between Barclays, JP Morgan ("JPM") and LBI's Trustee.  As of December 31, 2008 Barclays had also identified additional unencumbered securities of $0.7bn which management believe Barclays have legal title to under paragraph 1(ii) of the CL which references assets held in LBI clearance boxes at the time of "Closing" which were listed in Schedule B.  Even though the securities in the clearance boxes were not the same as those specified on Schedule B, the language of clause (b) of the CL is clear, according to Barclays Capital's Global General Counsel that Barclays is entitled to securities in the LBI clearance boxes at the time of Closing regardless of whether they were listed on Schedule B.

## 2. Date of Acquisition & Lehman Portfolio

The APA became effective before the opening of the UK stock markets on September 22, 2008 as confirmed with Jonathan Hughes (BarCap Global General Counsel) and Alan Kaplan (Associate General Counsel).  The APA/CL stated that all securities held by Barclays under the repo would form part of the APA and both parties would be deemed to have no further obligations to each other.  Legal title to the securities therefore passed on September 22, 2008 in accordance with the APA/CL, as confirmed with Jonathan Hughes (BarCap General Counsel) and Alan Kaplan (Associate General Counsel).

Consideration is often looked to as an indicator of the acquisition date.  The $45bn receivable from LBI under the Repo was waived on September 22, 2008, in accordance with the APA/CL, and therefore was effectively paid to LBI on that date. [Note that purchase consideration for the building at 745 7th Avenue and the $250m cash amount per the APA were also wired to LBI on September 22, 2008].

From a control perspective, the Lehman Portfolio was received in Barclays custodian account as pledged collateral on September 18 and 19.  Barclays could therefore sell or hedge the securities from the morning of September 22, 2008, as confirmed with John Rodefeld (US Central Operations).

Therefore, the acquisition date is September 22, 2008.  Legal title to the Lehman Portfolio passed to Barclays, the securities were received by Barclays and Barclays paid for the securities on September 22, 2008.

## 3. JPM Portfolio & Additional Unencumbered Securities

The JPM Portfolio and the additional unencumbered securities (securities in teh clearance boxes discussed in first paragrpah above) are classified as receivables on the opening balance sheet and valued on the opening balance sheet at dates other than September 22, 2008.  See critical matter: "Recording of the Securities Received from JPM & Unencumbered Assets as Receivables."

## 4. Basis of Measurement

Paragraph 37a of SFAS 141, Business Combinations, ("FAS 141") requires marketable securities to be recorded at fair value.  The Lehman Portfolio was fair valued as of September 22, 2008.

Confidential Treatment Requested by PwC LLP



EXHIBIT
813 19
KK 6/16/10

depobook.com

PwC-BarCap 00011225

As noted above, the JPM Portfolio and the additional unencumbered securities are classified as receivables on the opening balance sheet. The JPM Portfolio and the Additional Unencumbered Assets were fair valued on December 22, 2008 and December 31, 2008, respectively, representing the estimate of the present value of amounts to be received in the future as of September 22, 2008.

**5. Changes in Measurement Dates - Lehman Portfolio**

September 19 (Friday) closing prices were originally used to estimate the fair value of the Lehman Portfolio as of opening September 22 (Monday). Management reconsidered its view and decided to use Closing prices September 22 as a better estimate of fair value as of opening September 22 due to the following reasons:
   The commencement of LBI's SIPA liquidation on September 19, 2008 caused significant turmoil in the markets at that time and there was further downward pressure on prices over that weekend; and
   Management could not source reasonable intra-day numbers for most asset classes and the S&P opening is a poor proxy for much of the Equity portfolio purchased.

For liquid assets, vendor pricing was used and therefore Barclays 9/19 vendor prices were updated with 9/22 vendor prices. Product Control Group - Price Testing ("PT") were asked to value the entire portfolio as of September 19. From inquiries, we understand that PT completed the process for approximately 8,000 CUSIPs in two days. Illiquid assets, which were originally held in the Portfolio Management Trading Group ("PMTG") Management Book, were priced by PT using matrix pricing (adjusted judgementally based on qualitative factors for each asset) or cash flow models as of September 19. There were no changes in marks from 9/19 to 9/22 as PT, due to lack of observability, could not differentiate prices between these two dates.

Barclays' policies and procedures require the Front-Office ("FO" or "Trader") to value trades (as the trading experts) and PT to independently verify FO marks. Between 9/22 and 9/30 PMTG transferred the majority of assets from the PMTG Management Book to the PMTG Trading Desks through an internal auction. As of 9/30, FO marked all positions and PT performed independent price verification over the FO marks, in accordance with Barclays policies and procedures. Management noted many differences in the 9/19 versus 9/30 prices. Due to lack of observability in prices for the products in PMTG, Management concluded that no significantly new pricing data was available on 9/30 that was not available on 9/19 and that the changes in prices were the result of the improved process (FO pricing and IPV testing, as opposed to PT only pricing) and the additional time afforded to PT as part of the month end process. PT produced a memo explaining that the differences between 9/19 and 9/30 for the top 50 positions were the result of errors in the 9/19 process (see below).

Therefore, for PMTG securities, Management used the results of the 9/30 pricing process as the best estimate of fair value as of 9/22. The impact of using the 9/30 fair value estimates versus the 9/19 estimates are captured in the table below.

**6. Bid / Offer - Lehman Portfolio**

Column 2 - 9/19 PT FV
Column 3 - Change in prices 9/19-9/22 for vendor prices
Column 4 - Change due to remark when transferred from PMTG mngt book to PMTG trading desk
Column 5 - Change in PMTG mngt book marks 9/19 - 9/30
Column 6 - Bid/offer adjustment
Column 7 - Estimated FV recorded in SAP

Barclays policies and procedures are that FO mark cash securities to bid prices. Therefore, no bid/offer adjustment is taken on cash securities. However, the liquid assets were priced using vendor prices as of 9/22, as noted above. Management believe that vendor prices received are mid-prices and therefore a bid-offer spread was applied to all liquid products. The following bullets address managements' rationale for the bid/offer reserves on the liquid Lehman Portfolio assets:
   Emerging markets - A flat 3% was used. PT used a Bloomberg functionality that allows PT access to the runs the traders receive. The data is only available for a limited period and as the analysis was run in January 2009, November bid-offers were therefore used as indicative. The amount is deemed de minimis and no additional work performed.
   Rates (Treasuries) - A 0.1% bid/offer was applied toTreasuries which is $5.3m. The amount is deemed de minimis and no additional work performed.
   Rates (Agencies) - A 5% bid/offer reserve was applied to Agency debt product. This comprises $462.7m. Management's support for the 5% is that IPV results based on implied yield testing shows a desk conservative variance of approximately 5%. SFG noted this in their memo and therefore the adjustment of the implied yield to the trader price of approxi,mately 5% would support a mid to bid adjustment.

The rationale for bid/offer on the remaining portfolios is as follows:
   RMBS (Agency Mortgages) - Although vendor prices were available for Agency Mortgages, PT used an implied yield methodology. This implied yield methodology is consistent with their independent price verification approach to the legacy Barclays Agency Mortgage portfolios. Management applied a 10% bid/offer to Agency CMO ($359.5m) and a 1% bid/offer to Agency Pools ($90.4m). Two methods were used to estimate the bid/offer reserve. Method 1 was to take observable pricing indications from various sources and measure the differences at bond level. These variances were then averaged for Agency CMO product types. The Agency Pools variance was 1% and 10% for Agency CMOs. Method 2, using limited trade data available for the month of September, Management reviewed the Agency CMOs that had a BUY and a SELL on the same day. Using this information, the weighted average Bid/Offer spread for Agency CMOs was 10.5%. This was based on a trade sample of 39 Agency bonds. SFG reviewed the suport provided and noted that this is a reasonable process for the Company's determination of the bid/offer reserve.
   PMTG II - $142.5m of the bid/offer spread is to adjust the price of the Pine CDO to 46, which is the FO price and the price PwC's FAVG believe is reasonable. Therefore, the bid/offer on PMTG appears reasonable and the $1m excess is deemed de minimis.
   PMTG - The majority of the positions are held in the PMTG management book. Management believes that the additional bid/offer is warranted given the additional write-downs taken upon transfers to PMTG trading desks, which they believe is indicative of mid-level prices in the PMTG Management Book.

**7. Changes in Measurement Dates - JPM Portfolio**

PT priced the JPM securities as of 12/22. FO priced the PMTG portfolio at 12/31 and PT performed independent price verification as at that date. Management identified a significant number of variances in the PMTG book between 12/22 and 12/31. Management concluded, using the same ratioanle as the 9/30 pricing point for 9/22 PMTG fair values, that 12/31 fair value estimates were a better indicator of the 12/22 fair value because of the inclusion of FO and PT in the pricing process. The following support was provided by the client. The difference in 12/22 final mark and 12/31 final mark for PMTG was $33m, which was not recorded by Management and therefore posted to our SUD. The entry is Dr Negative Goodwill, Cr Trading Losses.

JPM 12-22 12-30 PCG Price Change_xls.zip    JPM Port 3 12-22 vs. 12-31 Diff_doc.zip

**8. Bid / Offer - JPM Portfolio**

Due to the fact that all positions were priced by the FO at 12/31, no bid/offer was required at 12/31 to adjust the Traders' prices (and all PMTG positions were in PMTG trading desks at 12/31 and not the PMTG Management Book) PROVE??. Therefore, no bid/offer is applied to the fair value estimate at 12/31 (and therefore not at 12/22 as 12/31 is used a better indication of fair value).

**9. Reconciliation of the above Tables to the Opening Balance Sheet**

The following table reconciles the Lehman Portfolio and JPM Portfolio to the OBS:

Confidential Treatment Requested by PwC LLP

The difference of $20m was just above our de minimis level of $18.75m.  No further work performed on the reconciliation of the securities to the OBS as a result of the magnitude of the difference.

**10. Summary of Valuation Procedures Performed - Lehman Portfolio**

From a valuation testing perspective, the engagement team first divided the portfolio into positions priced using a vendor price and those priced in some other manner.

**10.1 Positions priced using vendor prices [$16.7bn]**

Through our price testing across all areas of the business during the 2008 integrated audit, we have high controls reliance over the independent price verification function.  Within that funtion we test the accuracy of pricing downloads from independent sources and are satisfied that the process of obtaining and attributing external prices accurately to positions is operating effectively.  The process was performed centrally by the Credit Fixed Income PT team under Sean Teague.  We therefore selected a sample of 60 prices as of 9/19 and sent the sample to IMSAG for testing.  From the results of testing we concluded that the vendor prices used were appropriate.

We considered the source of the vendor prices and the instances where only one vendor price was used.  The products priced using vendor prices were Agencies and Treasuries, Corporates and Emerging Markets.  The inherent risk of the Agencies and Treasuries prices being materially mistated for these portfolios is considered remote given the liquidity in these markets.  The inherent risk in the Corporate and Emerging Markets vendor prices increases because the markets in general and in certain single names will be less liquid.  In addition, as part of the 1060 tax allocation work performed by the client, certain vendor prices were classed as Class III for tax purposes based on research performed by the traders whereby the last trade date or lot size called into question the accuracy of the vendor price.

Given the immaterial change in fair value from 9/19 - 9/22 and the fact that we concluded that no exceptions were noted from our 9/19 sample, we did not perform additional testing over the 9/22 marks.

**10.2 Positions prices using other matrices, models or custodian price [$16.2bn]**

The following portfolios / sub-portfolios were fair valued as follows:

PMTG - Private Label Alt-A & Subprime MBS [$1.3bn] - Front-office priced the portfolio and PCG performed independent price verification. PCG used discount margin matricies for subprime, alt-a and option ARM depending on collateral type which is consistent with the pricing testing approach for the legacy BarCap portfolio.  However, there were many isoteric securities exhibiting different credit and structural features which the client applied spread adjustments, hand pricing or in some cases vendor pricing.  PCG document the key judgements in pricing the top 50 positions and proved that the sensitivity of the remainder of the portfolio to a 10% adjustment in price resulted in a $35m adjustment.  PwC's Financial Instruments and Credit Group reviewed the explanations for the top 50 positions, agreed a sample of discount margins ("DMs") on various collateral types to the matrices, compared the September portfolio DMs to May DMs per the matrices to determine the reasonableness of the yields.  As noted in 5 above, the 9/30 prices were used as a better indicator of fair value as of 9/22.  The client provided explanations for any signficant price changes from 9/19 to 9/30 and ultimately FICG concluded that the Company's process of using models and observable market data provide a reasonable basis for determining fair value.  FICG also concluded that the pricing comparison provides a reasonable basis for their conclusion that the Lehman portfolio's credit characteristics and profile are different than legacy BarCap's assets and that the price differences between the Lehman and legacy BarCap portfolios are consistent with the differences.
PMTG - CDOs & CLOs [$1.1bn] - PwC's Financial Analytics and Valuation Group (FAVG) reviewed PCG's initial discounted cash flow approach, agreeing the assumptions (CDR, CPR, yields and severity) to indistry published data and assessing the reasonableness of the yields (as the valuation was insensitive to CDR & CPR) based on the tranch chacteristics.  FAVG also benchmarked the ending prices to LCDX derived prices.  As noted in 5 above, the 9/30 prices were used as a better indicator of fair value as of 9/22.  FAVG examined the changes in marks, where applicable, and ultimately FAVG concluded that the fair value as of 9/30 for the positions reviewed was not unreasonable, except for one position which they could not conclude on the change in price due to a lack of support (the further write-down of $9.5m is immaterial but was aggregated with all other untested balances).
PMTG - CMBS [$0.3bn] - PwC's REBAS proxy priced a sample of deals to TRIPs (vendor pricing) and observed pricing variances within the Lehman bonds due to the fact that many of the bonds are not triple A and therefore third party pricing is not as reliable.  However, the prices did not appear unreasonable.
Rates - Munis [$0.4bn] - Municipal bonds were priced using vendor prices with a 5-8% haircut to reflect liquidity conditions at 9/22.  All Auction Rate Securities ("ARS") were priced at 80.  FICG obtained prices for 60 municipal securities and found the clients prices to be within a reasonable range.  FICG concluded that the clients process was a reasonable basis for determining fair value.
RMBS Agency Mortgages [$13.1bn] - PCG priced the portfolio using a discounted cash flow approach incorporating the Blackrock prepayment speed model and estimated market yields.  FICG stratified the portfolio into various categories and compared the implied yield on the Lehman portfolio to the implied yield on the legacy BarCap portfolio and concluded that the Lehman portfolio was within a reasonable range of the legacy portfolio.  This benchmarking exercise provided comfort as the engagement team obtained high controls reliance over the independent price verification process which operated over the legacy portfolio which FICG benchmarked against.
Other [$XXX] - FAVG examined four securities with a mtm of $0.04m where PCG defaulted of the BNY price due a lack of collateral information.  FAVG concluded that the write-up of one position due an EOD was the result of a post 9/22 date and therefore the pre-EOD mark was more appropriate (the write-up of $10m was not recorded on the SUD as the amount is considered a difference in fair value  views, immaterial and not an error ).

**11.  Summary of Valuation Procedures Performed - JPM Portfolio [$3.7bn]**

The following portfolios / sub-portfolios were fair valued as follows:

Corporates [$1.5bn] - The portfolio was priced using vendor prices. Consistent with 10.1 above, we selected a sample of 60 prices as of 9/19 and sent the sample to IMSAG for testing.  From the results of testing we concluded that the vendor prices used were appropriate.
Corporates [$0.1bn] - The
Agency Mortgages [$0.2bn] - The Agency Portolio was priced using the average of two vendor prices which SFG deemed reasonable.
PMTG - Non-Agency Securities [$0.4bn] - The process was consistent with the process over non-agency mortgages fair valued in the Lehman portfolio.  SFG concluded this was reasonable.
PMTG - Manufactured Housing [$0.2] - PCG use the Barclays servicer (HomEq) subprime roll rate matrix, a 60% loss severity, CPR of 10, 20% yield and a 150% loss multiplier.  SFG concluded that the assumptions are reasonable and reflective of the underlying collateral and current market conditions.  SFG benchmarked the subprime roll rate matrix to the JP Morgan 6 month average and noted the assumptions utilized were consistent with market data.  SFG concluded that
PMTG - Life Insurance ABS [$0.5] - [COMMENT TO BE ADDED]
PMTG - Other ABS [$0.3bn] - Other ABS included the following:
  Auto Other ABS (Vendor Pricing)
  Credit Cards Other ABS (5 CPR and DM between 590 - 1550 based on observable market research)
  FHA Other ABS (170 PSA, 15% Yield)
  Floor Plan Other ABS (Vendor Price)
  Litigation Fees (Desk Price due to lack of information)
  Franchise Other ABS (Vendor Price or Observable Trades)
  Student Loan Other ABS (FELP and 10 CPR 300DM)
  Unguaranteed Portions of SBA Loans (1300 DM, 0-1 CPR)
  Other ABS including Aircraft (Vendor Prices, Desk Prices)
Where analytics were not available, PCG observed the desk price.  In contrast to the MBS book, PCG did not observe any reasonable volume of trades.  PCG applied vendor pricing for autos and model pricing for credit cards.  In the event that model pricing was used, PCG used observable spreads from market participants.  SFG concluded that PCG's process provides a reasonable process for determining fair value, utilizing available, observable market based data points.  SFG concluded that the pricing methodology for the respective asset classes noted above provides a reasonable basis for the Company's determination fair value and the prices noted with the portfolio are directionally in line with those in the market.

Confidential Treatment Requested by PwC LLP

**Conclusion:**

Re # 5 - Due ot the commencement of LBI's SIPA liquidation on September 19, 2008 causing significant turmoil in the markets at that time, further downward pressure on prices over that weekend, the fact that management could not source reasonable intra-day numbers for most asset classes, we do not take exception to the use of close of 9/22 as the measurment date.

Re # 6 - The bid/offer reserves appear reasonable based on the support provided

Re # 5 & 8 - Based on the more robust pricing process which is consistent with the results of our specialists, the 9/30 and 12/31 prices for PMTG appear to be a better indication of fair value as of 9/22 and 12/22, respectively.

Re # 11 - Based on our controls work performed during the audit and substantive procedures performed in reaction to the acquisition, we believe that the fair value of the financial instruments acquired is within a range of acceptable fair values. That acceptable range has been impacted by the current credit environment and is wider than it would otherwise be in a normal market because of the high level of subjectivity required due to the lack of observable market data. This is especially pronounced in the illiquid assets concentrated in the PMTG portfolio.

Robert MacGrory | Banking & Capital Markets Assurance Services | PricewaterhouseCoopers | Telephone: +1 646 471 4632 | Facsimile: +1 813 329 5758 | robert.macgrory@us.pwc.com

Confidential Treatment Requested by PwC LLP

# EXHIBIT 8

# B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

575 LEXINGTON AVENUE • 7TH FLOOR • NEW YORK, NY 10022 • PH. 212.446.2300 • FAX 212.446.2350

April 13, 2010

BY E-MAIL AND BY HAND

Tracy V. Schaffer, Esq.
Jones Day
222 East 41st Street
New York, NY 10017

*In re Lehman Brothers Holdings Inc., et al.,* Case No. 08-13555 (JMP)

Dear Tracy:

Enclosed on disc are transcripts of depositions with blocked testimony that Barclays has designated. We also enclose Barclays' list of the individuals Barclays may call as witnesses during the evidentiary hearing either in person or by deposition designation.

Barclays reserves its right to counter-designate additional deposition testimony in response to the testimony designated by the Movants and also reserves its right to designate the testimony of the Movants' expert witnesses and any testimony of fact witnesses whose depositions have not yet been taken.

We expect that the witness list may be reduced substantially depending on the witnesses that the Movants plan to call and by the reduction of fact issues through stipulated core facts. We expect to be able to send you a proposed stipulation by tomorrow or Thursday.

Finally, we have included a supplement to our Exhibit List and ask that Movants supplement as soon as they have additions to their list.

Very truly yours,

Jack G. Stern

JGS:ck

cc:    James C. Teece, Esq. (By Email and By-Hand, with Enclosures)
       William R. Maguire, Esq. (By Email and By-Hand, with Enclosures)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) |

**BARCLAYS CAPITAL INC. WITNESS LIST**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

Barclays intends to call the following witnesses either to testify in person at the
evidentiary hearing or by designation of their deposition testimony.

Azerad, Robert

Blackwell, Alastair

Brown, Alvin

Burian, Saul

Clackson, Patrick

Clark, Eric

Coles, David

Cox, Archie

Del Missier, Jerry

Diamond, Bob

Dziemian, Dan

Exall, Paul

Fazio, Michael

Felder, Eric

Fleming, Dan

Fogarty, James

Frelinghuysen, Anson

Hraska, James

Hughes, Jonathan

James, Elizabeth

Johnson, Alan

Jones, Craig

Kaplan, Alan

Karp, Marlo

Keegan, Mike

Keller, Andrew

Kelly, Martin

King, Stephen

Kiplok, Christopher

Kirk, Alex

Klein, Michael

Kobak, James

Korycki, Mary

Krishnan, Uma

Kruse, Philip

Landreman, Richard

LaRocca, Gerard

Leitner, Anthony

Leventhal, Shari

Lewkow, Vic

Lowitt, Ian

Malloy, Martin

Marsal, Bryan

Martini, Robert

McDade, Bart

McGee, Skip

Messineo, Robert

Miller, Harvey

O'Donnell, Dennis

Petrie, David

Pfleiderer, Paul

Purcell, Noel

Raisler, Ken

Ricci, Rich

Ridings, Barry

Rodefeld, John

Romain, Gary

Rosen, Edward

Seery, James

Shapiro, Mark

Teague, Sean

Tonucci, Paolo

Tully, Conor

Ullman, Neil

Varley, John

Vinella, Peter

Washtell, Mark

Yang, Jasen