# EXHIBIT 10

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

              Debtors.

10

     ----------------------x

11

12

13          DEPOSITION OF UMA KRISHNAN

14          New York, New York

15          June 29, 2010

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 31616

Page 2

```
 1
 2              June 29, 2010
 3              10:05 a.m.
 4
 5       Deposition of UMA KRISHNAN,
 6   held at the law offices of Jones Day,
 7   LLP, 222 East 41st Street, New York
 8   New York, before Kathy S. Klepfer,
 9   a Registered Professional Reporter,
10   Registered Merit Reporter, Certified
11   Realtime Reporter, Certified Livenote
12   Reporter, and Notary Public of the State
13   of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2
 3          A P P E A R A N C E S :
 4
 5   JONES DAY, LLP
 6   Attorneys for Lehman Brothers, Inc.
 7       222 East 41st Street
 8       New York, New York  10017-6702
 9   BY:  KELLY A. CARRERO, ESQ.
10        ERIC STEPHENS, ESQ.
11
12   BOIES, SCHILLER & FLEXNER, LLP
13   Attorneys for Barclays
14       401 East Las Olas Boulevard
15       Suite 1200
16       Fort Lauderdale, Florida  33301
17   BY:  W. TODD THOMAS, ESQ.
18        CAMILLE OBERKAMPF, ESQ.
19
20
21
22
23
24
25
```

Page 4

```
 1
 2       A P P E A R A N C E S :  (Cont'd.)
 3
 4   QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
 5   Attorneys for the Creditors Committee
 6       51 Madison Avenue
 7       22nd Floor
 8       New York, New York  10010
 9   BY:  ROBERT K. DAKIS, ESQ.
10
11   HUGHES, HUBBARD & REED, LLP
12   Attorneys for the SIPA Trustee
13       One Battery Park Plaza
14       New York, New York  10004-1482
15   BY:  NEIL J. OXFORD, ESQ.
16        AMINA HASSAN, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              Krishnan
 2   UMA KRISHNAN, called as a
 3       witness, having been duly sworn by a Notary
 4       Public, was examined and testified as
 5       follows:
 6   EXAMINATION BY
 7   MS. CARRERO:
 8       Q.   Good morning, Ms. Krishnan.  My name
 9   is Kelly Carrero.  I'm with the law firm of
10   Jones Day.  We represent Lehman Brothers
11   Holdings, Inc. in this matter.
12           I'll let counsel around the table
13   introduce themselves.
14           MR. STEPHENS:  Eric Stephens, also
15   with Jones Day.
16           MR. OXFORD:  Good morning.  I'm Neil
17   Oxford.  I'm with Hughes, Hubbard & Reed.
18   We represent the SIPA Trustee.
19           MS. HASSAN:  Amina Hassan with Hughes
20   Hubbard & Reed.
21           MR. DAKIS:  Good morning.  Robert
22   Dakis with Quinn, Emanuel, Urquhart &
23   Sullivan.  We represent the Official
24   Committee of Unsecured Creditors.
25           MR. THOMAS:  Todd Thomas from Boies,
```

Page 6

Krishnan

1    Krishnan
2    Schiller & Flexner on behalf of Barclays and
3    the witness.
4    BY MS. CARRERO:
5    Q.    Ms. Krishnan, have you ever been
6    deposed before?
7    A.    No.
8    Q.    Perhaps it's best if we go over some
9    housekeeping rules that might make things
10   easier.  If you would let me finish a question
11   before you answer, and I will try to do the same
12   thing.
13   A.    Okay.
14   Q.    And wait to pose another question
15   until you have finished your response.
16        If you feel like you need to take a
17   break at some point, I just ask that you finish
18   answering whatever pending question there is,
19   and if it's an appropriate time to break, we
20   will do so.
21        The court reporter needs verbal
22   answers to be able to take it down on the
23   record, so I ask that you give verbal responses
24   rather than nodding your head or the like.
25   A.    Okay.

Page 7

Krishnan

1    Krishnan
2    Q.    So with that, let's begin.
3        What is your current title,
4    responsibilities and duties at Barclays?
5    A.    I'm responsible for the GFS system at
6    this time.
7    Q.    And --
8    A.    And I manage a team of four people.
9    Q.    And what is your title?
10   A.    It's assistant vice president.
11   Q.    And do you have any other
12   responsibilities or duties other than for GFS?
13   A.    No, that's about it.
14   Q.    And what do those responsibilities and
15   duties entail?
16   A.    We interact with the users to make
17   sure that they are happy with the data that the
18   system produces, you know, on day-to-day issues.
19   With the system we assist them with any changes
20   that they want, things like that.
21   Q.    When you say the users, who are you
22   referring to?
23   A.    Barclays users.
24   Q.    And who are those Barclays users?
25   A.    Product controllers and financial

Page 8

Krishnan

1    Krishnan
2    controllers.
3    Q.    Does Barclays currently use the GFS
4    system?
5    A.    Yes, they do.
6    Q.    And when did they begin using the GFS
7    system?
8    A.    Probably somewhere in the end of
9    September 2008.  I don't remember the exact
10   date, but around that time.  After the
11   acquisition.
12   Q.    Do you know if it replaced an existing
13   system at Barclays?
14   A.    No, it was -- because they acquired a
15   lot of, you know, like the Lehman business,
16   they -- and GFS was still processing the data
17   from Lehman businesses, they decided to continue
18   to use GFS.
19   Q.    You had mentioned that you were an
20   assistant vice president.  Could you tell me of
21   what group?
22   A.    Finance Technology.
23   Q.    And when did you join Barclays?
24   A.    I joined Barclays in end of September
25   of 2008 like everybody else from Lehman, so ...

Page 9

Krishnan

1    Krishnan
2    Q.    And who do you report to within
3    Finance Technology?
4    A.    Right now I report to Daylas Fuentes.
5    Q.    And Ms. Krishnan, I see that you have
6    notes in front of you.
7        MR. THOMAS:  Go ahead and put those
8    away.
9        THE WITNESS:  Okay.
10   Q.    Were those prepared for purposes of
11   your testimony today?
12   A.    I wanted to, you know, recall myself
13   because it's a long time back, so I just ...
14   Q.    If we could just take one minute for a
15   second.
16        (Pause in the proceedings.)
17   Q.    Ms. Krishnan, what did you do to
18   prepare for your deposition today?
19   A.    We were just talking about the reports
20   that we made for -- for the attorneys.
21   Q.    And did you --
22   A.    How we extracted them.
23        MR. THOMAS:  If you're referring to
24   conversations with the attorneys, you don't
25   want to get in the substance of that because

3

Page 10

1              Krishnan
2      that's privileged.
3          THE WITNESS:  Okay.
4      Q.    Did you meet with your attorneys in
5  preparation for your deposition today?
6      A.    Yes, we did.
7      Q.    And did you meet with anybody else
8  other than your attorneys in preparation for
9  your deposition?
10      A.    No.  Anybody else?  No.
11      Q.    Did you speak to any former Lehman or
12  Barclays employees?
13      A.    No.
14      Q.    Did you prepare your notes yourself or
15  with the assistance of others?
16      A.    I --
17          MR. THOMAS:  Objection to form.
18      Q.    You can go ahead and answer.
19          MR. THOMAS:  If you're asking about
20  the notes, she wasn't using them to answer
21  questions.  She does not have them in front
22  of her.  They were notes of conversations
23  taken with counsel.  They're privileged.
24          MS. CARRERO:  For now, we'll accept
25  that, and if need be, we'll follow up later.

Page 11

1              Krishnan
2      Q.    Prior to your employment at Barclays,
3  what was your position at Lehman Brothers?
4      A.    I was part of a team called Run the
5  Bank.  We were responsible for infrastructure
6  and day-to-day issues with the system, user
7  queries.
8      Q.    And when you say the "system," are you
9  referring to only the GFS system?
10      A.    Yes, primarily the GFS system, but we
11  were trying to get trained in other systems in
12  Finance Technology.
13      Q.    And what other systems were you
14  getting trained in?
15      A.    G Quest and a data system calls PALS,
16  P-A-L-S.
17      Q.    And what is G Quest?
18      A.    I didn't really know that much
19  because, you know, we were just starting to get
20  trained.  It's a P&L system.
21      Q.    Was it replacing an existing system?
22      A.    No, it was a Lehman system.
23      Q.    And what is PALS?
24      A.    PALS was also a P&L system.
25      Q.    Were they P&L systems for different

Page 12

1              Krishnan
2  businesses of Lehman Brothers?
3      A.    Yes, I think so.
4      Q.    What is GFS?
5      A.    GFS stands for Global Funding System.
6  It produced daily balances and P&L reporting for
7  use -- for product controllers and financial
8  controllers.
9      Q.    And what were your day-to-day
10  responsibilities and duties with respect to GFS?
11      A.    The day-to-day responsibilities
12  included making sure that the system is running
13  fine, without any issues, answering user
14  questions, user issues, infrastructure
15  responsibilities, anything to do with the
16  database, you know, any issues with the
17  database, fix -- reaching out to the right
18  person to fix them.
19      Q.    And are those your same day-to-day
20  responsibilities for GFS in your current
21  position at Barclays as well?
22      A.    I have more responsibilities now in
23  the sense that we are responsible for changing
24  anything in the system plus maintaining the
25  system.

Page 13

1              Krishnan
2      Q.    And when you say responsible for
3  changing anything in the system, what do you
4  mean?
5      A.    Well, users want different
6  functionalities at different points in time, so
7  depending on what they want and whether it's
8  doable in the system, we make changes.
9      Q.    And who are the users that would be
10  requesting such changes?
11      A.    The users would be product controllers
12  and financial controllers.
13      Q.    And with respect to maintaining the
14  system, what does that entail?
15      A.    That we make sure they are rerun
16  batches, like automated batches, we make sure
17  that there are no failures and failures are
18  handled without affecting the numbers in the
19  system.
20      Q.    And how do you do that?
21      A.    It depends on what the problem is, so
22  depending on it could be like a data issue that
23  the system is not built to handle, we might --
24  we might face something like that, or it could
25  be a very simple problem because the database

Page 14

Krishnan

1 was down or something, so it could be ...
2    Q.    And who was responsible for changing
3 and maintaining the system while you were at
4 Lehman?
5    A.    We were split into two groups.  There
6 was another group called Change the Bank or
7 Build the Bank.  I'm not sure, I don't remember
8 who was the manager was for that system at that
9 time.
10    Q.    And the other group perhaps called
11 Build the Bank was responsible for changing or
12 maintaining the GFS system?
13    A.    Changing.  We were responsible for
14 maintaining it.  Run the Bank was responsible
15 for maintaining.
16    Q.    And what did it entail to maintain the
17 system while you were at Lehman?
18    A.    The same things that we do now, like
19 the system issues, any batch job failures, you
20 know, and answering user questions.
21    Q.    Were user questions about the
22 technology itself?
23    A.    The use -- sometimes the users think
24 that the numbers should be some way, and if it's

Page 15

Krishnan

1 different, they just need an explanation on why
2 the system generated that number.  So, you know,
3 we look at the code and tell them what exactly
4 it does.  Sometimes the users may be new and
5 they don't know what's going on so they may ask
6 questions.  Sometimes it could be just user
7 training.
8    Q.    Did you or your group have any
9 responsibility for the actual numbers input into
10 GFS?
11    A.    No, we did not have any.
12    Q.    I should say did you or your group
13 have any responsibility for the numbers input
14 while you were at Lehman?
15    A.    No, we did not have any responsibility
16 towards that.
17    Q.    Is that the same answer in your
18 current position at Barclays?
19    A.    Yes, that's correct.
20    Q.    And do you or your group have any
21 responsibility for generating any of the
22 financial reports that might come from GFS while
23 you were at Lehman?
24    A.    No.  Users had access to our -- we had

Page 16

Krishnan

1 like a graphical user interface and they would
2 run the reports themselves.  They did not come
3 to us for the reports.
4    Q.    And is that the same answer in your
5 current position at Barclays?
6    A.    Yes, that's correct.
7    Q.    Are you familiar with the reports that
8 were run from GFS while you were at Lehman?
9    MR. THOMAS:  Objection to form.
10    You can answer.
11    A.    Yes.  I'm sorry, what was the question
12 again?
13    Q.    Were you familiar with the types of
14 reports that were run from GFS while you were at
15 Lehman?
16    A.    To some extent, yes, but there were a
17 lot of reports, so I -- I probably was familiar
18 with some of the reports, but there's like a
19 whole lot of reports.
20    Q.    And which reports would you have been
21 familiar with?
22    A.    All the reports were built off tables
23 in the system.  So, you know, we had a very
24 user-friendly environment in which we could go

Page 17

Krishnan

1 and click on the report to see what table it's
2 based off.  So I don't remember any of the
3 report names off the top of my head, but if the
4 user sees this report, I could go and find out
5 what it is.
6    Q.    Would you know the report paths that
7 used to generate any given report?
8    A.    I'm sorry?
9    Q.    Would you be familiar with the report
10 paths that would be used to generate any given
11 report?
12    A.    Yes, I would know how the report is
13 getting generated.
14    Q.    Is that a query that you can put into
15 GFS in order to generate the report that you
16 want?
17    A.    Yes, you can put a query to generate
18 the report.
19    Q.    And is the GFS system that's used by
20 Barclays today identical to the one that was
21 used at Lehman?
22    A.    It is identical, yes, but it has a lot
23 of -- I mean, it has some changes post the
24 Barclays acquisition.

Page 18

1           Krishnan
2      Q.   And what would those post-acquisition
3    changes be?
4      A.   Changes because GFS had this
5    functionality to net down, so they wanted to net
6    down, meaning like it would net the longs with
7    the shorts.  So they wanted to prevent any net
8    down happening between Barclays and these Lehman
9    entities, so that was one of the main changes
10   that they made.
11     Q.   And would those changes have been made
12   only for prospective periods of time or was it a
13   retroactive change to the system?
14     A.   It -- I don't remember exactly when
15   the change was made, but it was sometime around
16   the end of September that change was made.  So
17   we split Barclays entities from the Lehman
18   entities.
19     Q.   And that split would happen for only
20   future dates?
21     A.   Yes, that's correct.
22     Q.   How many people were there in the Run
23   the Bank group at Lehman?
24     A.   Probably ten to twelve, or maybe more
25   globally.  I don't remember the exact number.

Page 19

1           Krishnan
2      Q.   And who did you report to while in
3    that group at Lehman?
4      A.   While I was at Lehman, I reported to
5    Daylas also.  Daylas Fuentes.
6      Q.   And do you know who -- Mr. Winters did
7    you say?
8      A.   Fuentes.  Daylas Fuentes.
9      Q.   Fuentes, do you know who he reported
10   to?
11     A.   She reported to Dan Marcus.
12     Q.   What systems flow into GFS?
13         MR. THOMAS:  Objection to form.
14     A.   ITS, MTS, Loan I.Q., TMS.  I might
15   miss a few because there's a whole lot of
16   systems.  That's one of the -- some of the main
17   systems.
18     Q.   Perhaps we should back up.  Could you
19   explain to me how the GFS system is set up to
20   receive feeds from other systems?
21     A.   We receive most of the feeds through
22   FTP, File Transfer Protocol, FTP.
23     Q.   And other systems feed into FTP which
24   then feeds into GFS; is that correct?
25     A.   No.  FTP is just a means of

Page 20

1           Krishnan
2    transferring files from one place to another, so
3    that's the mechanism by which the files were
4    transferred from those source systems to GFS.
5      Q.   And the systems that would transfer
6    into GFS, what type of systems are they?
7      A.   They are -- most of them are
8    settlement systems.
9      Q.   And are there different settlement
10   systems for the various different product
11   classes?
12     A.   I think so.
13     Q.   Would prices for any given security be
14   entered directly into GFS or into another system
15   that would then flow into GFS?
16     A.   It usually flows into GFS.  The only
17   way a price could be entered in GFS is by a user
18   if he were -- he or she were to make like an
19   adjustment.
20     Q.   What would be the process in order to
21   make an adjustment within GFS?
22     A.   There was a specific set of users who
23   have access to adjustments in GFS and the users
24   are trained on, you know, how to make the
25   adjustments on like what security and what

Page 21

1           Krishnan
2    account.
3      Q.   And who would those users be that
4    would have access to make adjustments?
5      A.   I don't remember the users now.
6      Q.   Within GFS, can you tell if any
7    adjustment has been made to the price of any
8    given security?
9          MR. THOMAS:  Objection to form.
10         THE WITNESS:  I'm sorry.
11         MR. THOMAS:  You can answer, if you
12   can.
13     A.   Yes, I'm sorry, I forget the question.
14     Q.   Sure.  I'll repeat that for you.
15         Within GFS, can you tell if any
16   adjustment has been made to the price of any
17   given security?
18     A.   Yes, there were a lot of adjustments
19   made.
20     Q.   Is there an indication within GFS when
21   an adjustment is made?
22     A.   We have -- we capture the adjustments
23   in a table which has like the user ID who made
24   the adjustment and what it was adjusted to the
25   security and the account.

Page 22

1              Krishnan
2      Q.   Would it show up as an additional
3  column if you were to run a GFS report?
4      A.   No, it would modify the existing -- if
5  it's a price adjustment, it would modify the
6  existing column that was holding that position.
7      Q.   And so if you wanted to see if any
8  adjustment had been made to that value, how
9  would you do that?
10     A.   You mean like if the adjustment was
11 applied or was actually processed through the
12 system?
13     Q.   Yes.
14     A.   You would -- I would go to that
15 account and security and I would check if it has
16 the price that it was supposed to be adjusted
17 to.
18     Q.   And would it tell you the date which
19 it -- on which it was adjusted?
20     A.   Yes, it would tell the date.
21     Q.   And would it tell you what had
22 previously been entered on that date prior to
23 adjustment?
24     A.   I think it holds -- I'm not sure about
25 this -- I think it holds just the price that it

Page 23

1              Krishnan
2  was at the start of the day and then, you know,
3  if a price was adjusted twice, I don't know if
4  it will hold both the prices.
5      Q.   So just to make sure I'm understanding
6  correctly, when an adjustment is made, you're
7  not sure whether the previous price prior to the
8  adjustment would be recorded somewhere; is that
9  correct?
10     A.   Right.
11     Q.   Do you know what GFS captures in terms
12 of value?
13     A.   Meaning?
14         MR. THOMAS:  Objection to form.
15     Q.   Let me see if I can make that clearer.
16 Do you know what GFS is capturing with respect
17 to the value of any given security that can be
18 found in the system?
19         MR. THOMAS:  Objection to form.
20     A.   I think what it does is it presents
21 the trade date balances and the settlement date
22 balances for any given date.
23     Q.   What do you mean by "balances"?
24     A.   By balances, I mean like what the --
25 what an account was holding at the end of the

Page 24

1              Krishnan
2  day.
3      Q.   How about any given security within an
4  account, do you know what value for a security
5  is being recorded?
6         MR. THOMAS:  Objection to form.
7      A.   You mean market value?  I don't
8  understand the question.
9      Q.   That's my question to you, is what is
10 GFS capturing with respect to any given
11 security?
12     A.   It would have the market value of the
13 security and for the security and the account.
14     Q.   And that market value for any given
15 security within GFS would flow in from a
16 settlement system; is that correct?
17     A.   No, the settlement system would send
18 us the quantity and the price in most cases, and
19 we would calculate the market value.
20     Q.   And the market value would be
21 calculated using the price and the size of the
22 position; is that correct?
23     A.   Yes, in most cases.  There are some,
24 you know, there may be some changes for some
25 products.  They could have like a multiplying

Page 25

1              Krishnan
2  factor, a pricing factor, or a multiplier.  It
3  depends on the -- on the security.
4      Q.   And would there be formulas within GFS
5  that would do the calculation of market value
6  using the price and position size and get the --
7  any other relevant information?
8      A.   Yes, that's correct.
9      Q.   And who was responsible for
10 determining what those formulas would be that
11 were entered into GFS?
12     A.   The formulas were built in the form of
13 code in GFS.  I was not there when the formulas
14 were put in so I don't know who was responsible
15 for putting those in.
16     Q.   Would you expect that the formulas
17 would be determined by someone in finance or on
18 the business side?
19         MR. THOMAS:  Objection to form.
20     A.   I don't know.  I really cannot answer
21 that because I was not there with the system
22 then.
23     Q.   In addition to prices that might have
24 flowed into GFS from the various settlement
25 systems, is there anywhere else that the prices

Krishnan

1
2  would flow into GFS from?
3      A.    There might have been other systems.
4  There was a Prime Broker system which might have
5  given prices.
6      Q.    Would there have been feeds into GFS
7  or into the settlement systems that flow into
8  GFS from third-party vendors such as Bloomberg
9  or Reuters, for instance?
10     A.    No, we did not get anything from
11 Bloomberg or Reuters or any third party.  We
12 always got prices from internal Lehman systems.
13     Q.    But would other internal Lehman
14 systems which then flowed into GFS get feeds
15 from various third-party vendors such as
16 Bloomberg and Reuters?
17     A.    I don't know.  I would think they
18 would have got it from third-party vendors, but
19 I don't know where they got their prices from.
20     Q.    And are there any other internal
21 Lehman systems other than settlement systems or
22 the Prime Broker systems that would have flowed
23 into GFS?
24     A.    Could you repeat the question?
25     Q.    Are there any other internal Lehman

Krishnan

1
2  systems other than settlement systems or the
3  Prime Broker systems that would have flowed into
4  GFS?
5      A.    We had a product reference data
6  flowing from a system called Global Products.
7      Q.    And what is Global Products?
8      A.    That was holding information about all
9  securities.  Like, you know, a security could
10 have a currency and like a description of the
11 security and a security has various identifiers
12 like SEDOL, ISIN, so all these would be -- would
13 be sourced from Global Products.
14     Q.    Could you perhaps explain a little bit
15 more what you mean by "various identifiers"?
16     A.    A security could have a lot of
17 identifiers.  So the system called ISIN, it's --
18 I think European securities have the ISIN.  Then
19 there's a SEDOL.  It could be a CUSIP.
20     Q.    And would Global Products also include
21 any sort of pricing or valuation information
22 about any given security?
23     A.    I'm not sure if they had, but we did
24 not get the pricing information from them.
25     Q.    Do you know how pricing information

Krishnan

1
2  was entered into the settlement systems?
3      A.    No, I do not know that.
4      Q.    Do you know how information flowed
5  into GFS?  Let me rephrase that.  We had
6  discussed earlier FTP.
7      A.    Right.
8      Q.    Is that how information flowed into
9  GFS?
10     A.    For the most part, yes.  Sometimes we
11 used to, for example, the Global Products, we
12 used to execute what is called as a remote
13 procedure call in their system to get the data
14 out.
15     Q.    Does that mean that, in order to get
16 information from Global Products, it was not an
17 automated process?
18     A.    We had different types of getting
19 information from Global Products.  One of them
20 was doing a remote procedure call.  The other --
21 there were also other ways.  We also got files
22 through FTP from Global Products.
23     Q.    When you say a remote procedure, is
24 that an automated procedure?
25     A.    Yes, it -- what it means is my system

Krishnan

1
2  makes a call to their system through a remote
3  procedure.  That means I'm remotely sitting
4  somewhere and my system is making that call.
5  That's why it's called a remote procedure call.
6      Q.    And does that remote procedure call
7  happen every day at a set --
8      A.    Every day --
9            I'm sorry.
10     Q.    -- every day at a set time?
11     A.    Every time we see a new product that
12 we don't have we initiate a remote procedure
13 call to get the information for that product.
14     Q.    So I just want to make sure that the
15 record isn't confused here.  You initiate rather
16 than it being an automatic process by which you
17 would receive the information from Global
18 Products; is that correct?
19     A.    No, we do not do it manually.  The
20 system is coded to do that when it sees a
21 security that is not there in our system, it
22 goes to Global Products to get the information.
23     Q.    So the system is set up to
24 automatically, if it sees a product that it does
25 not have information for, to obtain that

Page 30

1              Krishnan
2    information from Global Products; is that
3    correct?
4        A.   Yes, that's correct.
5        Q.   How about any other systems that flow
6    into GFS, is that an automated process?
7        A.   Any -- most of the systems --
8    actually, all of the systems are automated
9    process through FTP.
10       Q.   And how does that automated process
11   work?
12       A.   I think the system from which we are
13   getting the feed, they would have some sort of
14   automated job set up to deliver the files to us
15   through FTP.
16       Q.   And do you know how frequently that
17   automated process occurs?
18       A.   Every night we get feeds from the
19   systems.
20       Q.   And do you know if each system feed
21   occurs at roughly the same time every night?
22       A.   No, it depends on some of the feeds
23   may come in earlier, like around 8 P.M. or 9
24   P.M.  Some of them are later, around 12 or 1
25   A.M. the next day morning.

Page 31

1              Krishnan
2        Q.   And is there a procedure that takes
3    place after the nightly feeds into GFS?
4            MR. THOMAS:  Objection to form.
5        A.   The system takes care of loading the
6    feeds and processing them.
7        Q.   Is that an automated process or does
8    it involve some sort of human input?
9        A.   No, it's an automated process.
10       Q.   Within GFS, how are the various --
11   scratch that.  Before I start handing you
12   documents, just one last question:  How long
13   were you employed by Lehman Brothers?
14       A.   I was employed in 2005 June.
15       Q.   And you worked there through September
16   2008; is that correct?
17       A.   Yes, that's correct.
18       Q.   And did you have the same position the
19   whole time you were at Lehman?
20       A.   I've been with the same group.
21       Q.   Did you have the same duties and
22   responsibilities for the roughly three years
23   while you were at Lehman?
24       A.   For the most part, yes.
25       Q.   Were you working with GFS during that

Page 32

1              Krishnan
2    whole period of time?
3        A.   Yes.
4            (Deposition Exhibit 828, Barclays'
5        Exhibit List, marked for identification, as
6        of this date.)
7        Q.   Ms. Krishnan, I'm putting before you
8    what has been marked as Deposition Exhibit 828.
9    It is a copy of Barclays' exhibit list that was
10   attached to a June 28 e-mail from Barclays'
11   counsel.
12           I'm also going to hand you what has
13   been marked as Deposition Exhibit 829.  It is a
14   copy of movants' exhibit list in this matter
15   which is attached to a June 17 e-mail from Fara
16   Tabatabai.
17           (Deposition Exhibit 829, Movants'
18       Exhibit List attached to a June 17 e-mail
19       from Fara Tabatabai, marked for
20       identification, as of this date.)
21       Q.   I'm also going to hand you what has
22   been marked as Deposition Exhibits 830 through
23   856, which are copies of various GFS reports
24   that have been produced in this matter.
25           (Deposition Exhibit 830 through 856,

Page 33

1              Krishnan
2    copies of various GFS reports, marked for
3    identification, as of this date.)
4        Q.   Deposition Exhibit 857, which is a
5    compilation of document production letters from
6    Barclays' counsel producing the various GFS
7    reports.
8            (Deposition Exhibit 857, a compilation
9        of document production letters from
10       Barclays' counsel producing the various GFS
11       reports, marked for identification, as of
12       this date.)
13       Q.   And finally, Deposition Exhibit 858,
14   which appear to be summary reports that were
15   produced to us by Barclays' counsel last evening
16   which we, you know, object to the production of
17   these documents after the close of discovery and
18   ask Barclays' counsel if there's a reason that
19   they're being produced now.
20           (Deposition Exhibit 858, Summary
21       Reports, marked for identification, as of
22       this date.)
23           MR. THOMAS:  Which document request do
24   you think it's responsive to?
25           MS. CARRERO:  These are documents that

Krishnan

1
2 were produced to us last night and --
3     MR. THOMAS:  As a courtesy because we
4 thought it may come up in the deposition.
5     MS. CARRERO:  We had not requested
6 them and view them as a production
7 subsequent to the close of discovery.
8     MR. THOMAS:  You don't have to use
9 them.
10     MS. CARRERO:  But we can discuss that
11 later and have been told that Bates-stamped
12 copies are on their way.
13     MR. THOMAS:  Right.  Obviously if it
14 wasn't clear, we object to the
15 characterization about the timeliness of
16 production.
17     MS. CARRERO:  And again, we just state
18 our objection to the production after the
19 cut-off.
20     MR. THOMAS:  And --
21     MS. CARRERO:  As well as reserve our
22 right to object on any other grounds.
23     Q.   So with all those exhibits in front of
24 you now, why don't we proceed in identifying
25 them for the record so it's clear.

Krishnan

1
2     Starting with what should be
3 Deposition Exhibit 829, which is a copy of
4 movants' trial exhibit list, turning to page 20
5 of that list, do you see the items corresponding
6 to Movants' Trial Exhibits 301 through 306?
7     A.   Uh-huh.  Yes, I do.
8     Q.   Those are identified as GFS Detailed
9 Exposure Reports dated September 12 through
10 September 19.  Do you see that?
11     A.   Yes.
12     Q.   We have for purposes of this
13 deposition marked those as Deposition Exhibits
14 830 through 835, which are before you as well.
15 Do you see those?
16     A.   Yes, I do.
17     Q.   Did you prepare these reports for
18 their production?
19     A.   Either me or my team would have
20 prepared these.
21     Q.   And do you know who requested
22 preparation of these reports?
23     A.   I don't remember who requested.  There
24 are a lot of requests to the GFS system.  Unless
25 there's a ticket number, I would not know who

Krishnan

1
2 requested them.
3     Q.   Do you know the report path that was
4 used to generate any of the reports that are at
5 Deposition Exhibits 830 through 835?
6     A.   You mean do I recognize these reports?
7     Q.   Do you recall being asked to generate
8 them or recognize the reports in order to be
9 able to tell us the report paths that were used
10 to generate them?
11     We can also pull up any of them
12 electronically.  We have the projector set up
13 for purposes of doing so, if necessary.
14     A.   I recognize these reports and the
15 report names and, you know, I do not remember
16 the query or anything because we usually look at
17 this report and we pull the query from the
18 system.
19     Q.   If I were to tell you they had been
20 produced to us in connection with the Expert
21 Report of Professor Paul Pfleiderer in January
22 of 2010, would that refresh your recollection of
23 what query was entered in order to generate
24 these reports that are marked Deposition
25 Exhibits 830 to 835?

Krishnan

1
2     MR. THOMAS:  Objection to form.
3     A.   I have to look at the ticket that was
4 raised to, you know, exactly remember what were
5 the queries, and the queries are pretty long and
6 there's no way I could remember.
7     Q.   And what exactly is a ticket?
8     A.   There is a system called SAM in which
9 any -- any request, data requests related to
10 Lehman are entered and, upon approval, we
11 process those requests.
12     Q.   And who can enter requests through
13 SAM?
14     A.   I know a person who enters requests.
15 I don't know who all can.  There's a person
16 called Rudy Santa Maria.  I don't remember her
17 last name.  I don't even know if it's a she or a
18 he.  First name is Rudy, I think.
19     Q.   And is it your understanding that Rudy
20 would receive requests that he or she would then
21 enter into SAM?
22     A.   Yes, kind of.
23     Q.   And would those requests contain a
24 specific report path or an explanation of the
25 type of end product one wanted and leave

Page 38

Krishnan

1
2  discretion to you and your group to determine
3  how to query that information?
4      A.   No.  Most cases they will let us know
5  exactly what they want.  They mostly give us
6  like the report name, any filters that need to
7  be applied, any filters to exclude or include
8  data, everything is specified in the ticket, and
9  the date for which they need the data.
10     Q.   And do you know if Rudy or whoever may
11 have entered the information into SAM would be
12 given that specific information or would be the
13 one entering that specific information after
14 being told what was needed?
15     A.   I don't know who puts that
16 information, but that information is there in
17 the SAM ticket, so that's the one we look at.
18     Q.   Are there ever instances where a SAM
19 ticket might have a query that is not possible
20 or needs to be revised?
21         MR. THOMAS:  Objection to form.
22     A.   Yes, there have been cases like that.
23     Q.   And what do you do in cases like that?
24     A.   We communicate with them that whatever
25 the reason we are not able to do it and they

Page 39

Krishnan

1
2  come back with an additional request or they
3  change the request.
4      Q.   And the types of queries that are
5  entered into SAM, are they generally uniform
6  type of requests of reports that are generally
7  run on a daily or monthly or regular basis?
8          MR. THOMAS:  Objection to form.
9      A.   We would have the -- it's -- I don't
10 know how frequently it happens, but whenever we
11 get a request, we would run the report for that
12 specific date that's in the ticket, that's in
13 the SAM ticket.
14     Q.   But the report that would be run, is
15 that necessarily a report that would be run
16 regularly, daily, monthly, quarterly, yearly, or
17 could it be a unique query that just captures
18 what's being requested at that moment?
19     A.   I wouldn't know that because I do not
20 run the reports.  None of us in Technology
21 really runs the reports unless they are for
22 dates like these, which may not be available in
23 the system anymore.  It's the users who run the
24 reports, so I don't know which ones they run
25 monthly, quarterly.

Page 40

Krishnan

1
2      Q.   And when you say may not be available
3  in the system anymore, what do you mean?
4      A.   The system holds only last 23 business
5  dates and last 13 month-ends and last 2
6  year-ends.
7      Q.   And what happens to anything that is
8  older than what the system holds?
9      A.   It -- every night we have an archive
10 process which saves all the data.  So if we need
11 for a date that's not available online, we'll
12 have to -- we have a Tape Archive Team which
13 restores the data.
14     Q.   And do you know what the process of
15 restoration entails?
16     A.   I know the -- that we have to raise a
17 request to have it restored, but other than that
18 it's between the DBAs and the Restore Team,
19 which the Restore Team restores it to a path and
20 the DBAs load it up.
21     Q.   And if a SAM ticket were entered for a
22 query, for instance, of September 2008 data,
23 what would be the next step given the data
24 requested is older than what is stored?
25     A.   For the September 12 and the 19, GFS

Page 41

Krishnan

1
2  has special environments because those dates
3  were requested very often.  Any date other than
4  that, we would raise a request to the Data
5  Archive Team and they will load it to the right
6  path.
7      Q.   And what exactly do you mean by
8  special environments?
9      A.   GFS -- since GFS production could not
10 hold more than, you know, the 23 business days,
11 and since September 12 was not a month-end, we
12 had to maintain a special environment because it
13 was an important date which a lot of Lehman
14 entities were asking the data for, we -- we set
15 up a special environment for the September 12
16 and the 19.
17     Q.   But by "special environment," you mean
18 on the existing GFS system without it going
19 through the normal archive process?
20     A.   What I mean is we have a production
21 environment which has the last 23 business days
22 and we have a separate GFS instance, which is a
23 completely different way to get into there and
24 that one was holding the September 12 data.
25     Q.   As well as the September 19 data; is

Krishnan

1  that correct?
2      A.   Yes.
3      Q.   And who has responsibility for
4  changing or maintaining the September 12 and
5  September 19 data within the special
6  environment?
7      A.   Any user who has adjustment access.
8      Q.   And do you know who those users are
9  that have adjustment access?
10     A.   I don't recall who are the users.
11     Q.   Are you or your group responsible for
12  changing or maintaining the September 12 and
13  September 19 GFS data?
14     A.   We are responsible for systematically
15  maintaining it, but we do not change anything in
16  the data.
17     Q.   And what does it entail to
18  systematically maintain it?
19     A.   We make sure that we do not touch that
20  database and it's available for users to view,
21  if necessary.
22     Q.   Have you or your group ever undertaken
23  to analyze the accuracy of any of the
24  information within the September 19 or September

Krishnan

1  12 data contained in the special environment?
2      A.   No, we were not involved in checking
3  the accuracy.
4      Q.   Were you or your group involved in the
5  input of any of the September 12 or September 19
6  GFS data?
7      A.   We were responsible for systematically
8  making it work, but we were not responsible for
9  making any changes to the data.
10     Q.   And any other data within the
11  September 12 to September 30, 2008 date range,
12  other than the 12th and 19th that we just
13  discussed, would be subject to the archive
14  process we discussed before; is that correct?
15     A.   That's correct.
16     Q.   And if a SAM ticket were entered for
17  data related to any of those archive dates, what
18  would be the next step?
19     MR. THOMAS:  Objection to form.
20     A.   The next step would be to -- the Tech
21  Team to get to the Archive Team to restore it
22  and then raise a ticket to the DBAs to load it
23  up in a free environment.
24     Q.   And who are the DBAs?

Krishnan

1      A.   The database administrators.
2      Q.   And what do you mean by a "free
3  environment"?
4      A.   In order to load the archived data, we
5  need the database to load it.  So we have to
6  free up some environment in the GFS instance to
7  have it loaded.
8      Q.   And once it -- once the archive data
9  was restored and loaded into the free
10  environment, who would run the query requested
11  on the SAM ticket?
12     A.   Because GFS has this limitation with
13  the available front ends, if it's -- if it's a
14  date that's not the 12th or the 19th, we
15  would -- the Technology Team would run the
16  report.
17     Q.   And do you recall if anyone has
18  requested that you or your team run any reports
19  in connection with this matter?
20     MR. THOMAS:  Objection to form.
21     A.   I don't recall anything like that.
22     Q.   Whether that be through a verbal
23  request or a SAM ticket, you have no
24  recollection?

Krishnan

1      A.   We get a whole lot of tickets, so --
2  like a lot of, two and a half years, all of the
3  time we've had like a lot of tickets.  I don't
4  know specifically which -- I mean, unless you
5  give me the ticket number, I wouldn't know.
6      Q.   If you could take a look at Deposition
7  Exhibit 828 and turn to page 31.  Do you see
8  listed BCI Exhibit Nos. 501 through 503 which
9  are described as GFS reports for September 12,
10  September 15 and September 19, respectively?
11     A.   Uh-huh.
12     Q.   If you would turn to what has been
13  marked as Deposition Exhibits 836 through 843,
14  do you see that Deposition Exhibit 836
15  corresponds with BCI Exhibit 501 and Deposition
16  Exhibit 837 corresponds with BCI Exhibit No.
17  502, and then because the deposition exhibits
18  are in date order, BCI Exhibit No. 503
19  corresponds with Deposition Exhibit 841?
20     MR. THOMAS:  Take as much time as you
21  need to look through all these documents.
22     Q.   There's a lot of paperwork.
23     (Document review.)
24     A.   Okay.

1           Krishnan
2        Q.   And then if you would turn to page 41
3   of Deposition Exhibit 828, do you see where BCI
4   Exhibit No. 667 through 671 are listed?  Do you
5   see that, 667 through 671 BCI exhibit numbers?
6        A.   Yes, I see it here on page 41.
7        Q.   And do you see that the descriptions
8   listed next to BCI Exhibit Numbers 667 through
9   671 correspond with what we have marked as
10   Deposition Exhibits 838 through 843?
11           MR. THOMAS:  Objection to form.
12        A.   These are just I guess file names.
13   Here it's report names.  Right?
14        Q.   What we have done here is we have
15   marked as an exhibit the placeholder or cover
16   page of the GFS reports produced which were
17   available in native form, which is how most of
18   them were produced to us, to the extent that we
19   want to go through them in detail.
20        A.   Okay.
21        Q.   Do --
22           MR. THOMAS:  This stack of papers
23   seems to be spreadsheets or something that
24   says 844 through 856.
25           MS. CARRERO:  That stack corresponds

1           Krishnan
2   with what has been marked as 844 through
3   856, which we have not gotten to yet, but
4   will be the next grouping.
5           MR. THOMAS:  Is there a way to tell --
6   for example, you also have a stack of 846
7   through 843.  Is there a way to tell what is
8   Exhibit 836 versus 837 versus 838?
9           MS. CARRERO:  On the witness's copies
10   there is a deposition exhibit --
11           MR. THOMAS:  Oh.  Yeah, thanks.
12           MS. CARRERO:  -- stamp.
13   Unfortunately, we were not able to
14   simultaneously make copies of it, but if you
15   want to take a moment to go off-record and
16   just write down the numbers on each relevant
17   page, we can do that, if that would be of
18   assistance.
19           MR. THOMAS:  Okay.  I'll try to follow
20   now that I know that I have something
21   different than the witness has.
22           MS. CARRERO:  I tried very hard to
23   make it a usable system.  So whatever we
24   need to do to make this as smooth as
25   possible, given --

1           Krishnan
2           MR. THOMAS:  I understand.  I was
3   having trouble following the whole thing.
4   Now that I understand that the documents
5   that the witness has been marked as
6   different exhibits, I'll try to look over
7   her shoulder and follow.
8           MS. CARRERO:  Okay.  Great.
9        Q.   So, with that said, do you see on
10   Barclays trial exhibit list on page 41, BCI
11   Exhibit Nos. 667 through 671, which are
12   described as GFS reports, including equities for
13   September 16 through September 22, and have what
14   we call in legal-speak Bates numbers next to
15   each respective report?
16        A.   Yes, I see that.
17        Q.   And then do you see in front of you
18   what we have marked at this deposition as
19   Deposition Exhibits 838 through 843, which are
20   the placeholder or cover sheets to the GFS
21   reports which were produced to us in native form
22   and should correspond with 667 through 671 on
23   Barclays' trial exhibit list?
24        A.   Yes, I see that.
25        Q.   Did you prepare the reports that were

1           Krishnan
2   produced to us as deposition -- did you produce
3   any of the reports that we have marked for
4   purposes of this deposition as Deposition
5   Exhibits 836 through 843?
6        A.   Unless I know the actual ticket number
7   for this, these dates seem to be the dates that
8   are not -- I mean, except for the 19th, the
9   other dates seem to be dates that's not available
10   online in the system.  So 16th, 17th, 18th and
11   22nd, based on some SAM ticket and approvals, my
12   team or myself might have generated these
13   reports, but for the September 19, I'm not sure
14   because it is online; a user might have
15   retrieved the report.
16        Q.   So if I were to tell you that these
17   have been produced to us in April of 2010, that
18   would not refresh your recollection as to
19   whether or not you, yourself, generated these
20   reports; is that correct?
21        A.   That's correct.
22           MR. THOMAS:  Objection to form.
23        A.   I need the ticket number.
24        Q.   And the same thing, you would need the
25   ticket number to tell us the report paths that

1                Krishnan
2    were used to generate any of the reports that we
3    have marked Deposition Exhibits 836 through 843
4    which correspond to BCI Exhibit Nos. 501 through
5    503, 667 through 671; is that correct?
6        A.    That's correct.
7            MR. THOMAS:  Objection to form.
8        Q.    For any of the preceding GFS reports
9    that we have discussed, would you know when such
10   reports had been run?
11       A.    For the 19th, you mean?
12       Q.    I'm wondering if, when reports are
13   run, is there some way to query when a certain
14   report was run and the report path that was used
15   to generate it?
16       A.    There might be.  I'm not really sure
17   about that.
18           MR. THOMAS:  Counsel, we've been going
19   over an hour.  Probably need a break at some
20   point.
21           MS. CARRERO:  This is a fine time to
22   break.
23           (Recess; Time Noted:  11:16 A.M.)
24           (Time Noted:  11:38 A.M.)
25   BY MS. CARRERO:

1                Krishnan
2        Q.    So, before the break, we were
3    discussing what we have been referring to as
4    Deposition Exhibits 836 through 843, which
5    correspond to the BCI Exhibits 501 through 503
6    and 667 through 671, and if you want to turn
7    back to Deposition Exhibit 828, which is the BCI
8    exhibit list, I just have a question about that,
9    the title of the report.
10           If, for instance, on page 41, Exhibits
11   667 through 671 say "GFS Report (Including
12   Equities)"?
13       A.    Yes.
14       Q.    Do you know, is that a standard name
15   for a GFS report?
16       A.    This is no -- I think this is
17   something that you put in, right?  This doesn't
18   look like a GFS report name.
19       Q.    Okay.  So I believe it was Barclays'
20   counsel.  I was just trying to confirm whether
21   that would be a formal name of a GFS report or
22   it was something that had been a name given to
23   it by counsel.
24           So am I correct to say that your
25   testimony is that's not the actual name of the

1                Krishnan
2    report, correct?
3        A.    I don't remember exactly the report
4    name, but this does not look like a GFS report
5    name.  I think they put the name here for you,
6    know, whatever report they gave, they put the
7    name here.
8        Q.    And would equities data normally be
9    contained within GFS?
10       A.    Yes.
11       Q.    And would that be both inventory and
12   financing positions?
13       A.    I think so.
14       Q.    And would equities finance use GFS in
15   order to prepare balance sheet numbers with
16   respect to equities?
17           MR. THOMAS:  Objection to form.
18       A.    I would think so, but I'm not sure for
19   that.
20       Q.    Are you familiar with how any of the
21   balance sheets were generated by Finance within
22   Lehman?
23       A.    You mean like how the users used it?
24       Q.    How, if at all, GFS was used in order
25   to generate balance sheets at Lehman?

1                Krishnan
2        A.    No, I'm not familiar with that.
3        Q.    So is it safe to say, then, you don't
4    know whether GFS is used to create -- was used
5    to create Lehman's balance sheets?
6        A.    I know that they were using to pull
7    some number out of GFS in the 10-Q or something,
8    but I don't know exactly how they did it or what
9    numbers they used.
10       Q.    And do you know if any systems other
11   than GFS were used in order to generate Lehman's
12   books or balance sheets?
13       A.    I wouldn't know.
14       Q.    Would you know if the population of
15   securities within GFS changed day-to-day?
16       A.    Could you repeat the question?
17       Q.    Would you know whether the population
18   of CUSIPs or securities in GFS would change on a
19   day-to-day basis?
20       A.    Yes, they could change.
21       Q.    So, for instance, would you expect
22   that the securities or CUSIPs in GFS on, say,
23   September 12 would be identical to the
24   securities and CUSIPs that were in GFS on
25   September 15, September 16, et cetera?

Page 54

Krishnan

1
2         MR. THOMAS:  Objection to form.
3     A.    There will definitely be differences,
4  I think, because every night we do get fresh
5  feed files from the systems.  So there may be
6  some securities which are common, but some
7  things might have changed.
8     Q.    And would you expect that the prices
9  or market value within GFS for any given
10  security would be different on any given day,
11  so, for instance, September 12 to September 15,
12  September 15 to September 16, et cetera?
13         MR. THOMAS:  Objection to form.
14     A.    You're asking if the market values
15  would be different between the -- if I think the
16  market values would be different between the
17  12th and the 15th?
18     Q.    I'm asking if your expectation is that
19  securities cvdd have different prices on
20  different days?
21         MR. THOMAS:  Objection to form.
22     A.    Yes, that's correct.
23     Q.    Let's go through the last set of GFS
24  reports before you which have been marked for
25  purposes of this deposition as Deposition

Page 55

Krishnan

1
2  Exhibits 844 through 856.  Do you see that stack
3  in front of you?
4     A.    Yes.
5     Q.    And if you could turn to Deposition
6  Exhibit 828, which again is Barclays' trial
7  exhibit list, and if you turn to page 30, do you
8  see BCI Exhibit Numbers 488 through 500, which
9  are Global Financing System reports dated
10  September 12 through September 30?
11     A.    Yes.
12     Q.    We have marked these reports with BCI
13  Exhibit Numbers 488 through 500 as Deposition
14  Exhibits 844 through 856.  So if you would like
15  to turn to the deposition exhibits, I'll ask you
16  whether or not you know whether you or your
17  group generated the reports that correspond to
18  Deposition Exhibits 844 through 856.
19     A.    Yes, these reports look like something
20  that we might have run because the date is
21  September 16 and the data is not online, so --
22  and any report that was requested by the
23  attorneys we needed to run because they did not
24  have access to GFS.
25     Q.    And would those reports requested by

Page 56

Krishnan

1
2  attorneys have been requested through a SAM
3  ticket, as we discussed before?
4     A.    Yes, through a SAM ticket.
5     Q.    And would you expect that counsel
6  would have entered that ticket itself,
7  themselves, or have requested it from someone
8  else at Barclays?
9     A.    I think there was a coordinator who
10  was --
11         MR. THOMAS:  Objection to form.
12     A.    -- who entered the tickets in order
13  for people who didn't have access to the system.
14     Q.    And do you know the report path that
15  was used to generate these reports?
16     A.    The report path was in the ticket and
17  that's the path that we used to generate the
18  reports.
19         (Deposition Exhibit 859, a letter from
20  Kelly Carrero to Hamish Hume dated August 7,
21  2009, marked for identification, as of this
22  date.)
23     Q.    Ms. Krishnan, you have before you what
24  has been marked as Deposition Exhibit 859.  It
25  is an e-mail from me to Barclays' counsel with a

Page 57

Krishnan

1
2  request for GFS reports.  If you want to take a
3  minute to read the top e-mail.
4         (Document review.)
5         MR. THOMAS:  Counsel, again, you
6  handed her one piece of paper.  Did you mean
7  to include the entire e-mail chain?
8         MS. CARRERO:  That I believe is the
9  entire e-mail chain.
10         MR. THOMAS:  Okay.
11         MS. CARRERO:  From my e-mail at least
12  it is.
13         MR. THOMAS:  Okay.  So when it just
14  stops at the end of the paragraph, there's
15  no like header or anything.  We've got a
16  fuller e-mail chain, but we can mark that
17  later, that's fine.
18     Q.    Have you had an opportunity to read
19  it?
20     A.    Yes.  The top portion, yes.
21     Q.    Do you know if Deposition Exhibits 844
22  through 856 which were produced to us between
23  August 27 and November 17 were generated using
24  the report path in Deposition Exhibit 859?
25     A.    Yes, it seems like they were, because

Page 58

Krishnan

1           Krishnan
2 I see the name here and the name here; they tie
3 out.
4    Q.   Can I ask you where you're pointing to
5 on Deposition Exhibit 8 --
6    A.   844.
7    Q.   -- 44?  And you're pointing to the
8 title "BA: B-S Detailed Exposure Report (Cross
9 System) - 12 Sep. 2008"; is that correct?
10    A.   That's correct.
11    Q.   And that corresponds to the report
12 name --
13    A.   Yes.
14    Q.   -- that's listed in Deposition Exhibit
15 859; is that correct?
16    A.   Yes, that's correct.
17    Q.   And going through the other parts of
18 the report path that are listed in Deposition
19 Exhibit 859, could you tell me what "report
20 group" means?
21    A.   Users belonging to different groups,
22 they put a report under the -- I'm sorry.  Okay,
23 a report group means of which table, because all
24 these reports are running off some tables in the
25 database.  So this one says of which table it

Page 59

Krishnan

1           Krishnan
2 runs.  So this report group Balance Sheet
3 Positions means it runs off a table called Bal
4 Pos Report.
5    Q.   I'm sorry, could you repeat what the
6 name of that report is?
7    A.   The report, the report group balance
8 sheet positions, that would tell the system what
9 table it has to run this query of.
10    Q.   And what would balance sheet positions
11 mean?
12    A.   It would be the balance sheet
13 information in GFS.
14    Q.   And would balance sheet information
15 mean inventory positions?
16    A.   Yes, inventory positions.
17    Q.   And would it exclude any financing
18 positions?
19    A.   I don't think it has financing
20 positions in balance sheet positions.  I'm not
21 sure, though.
22    Q.   And do you know if any financing
23 positions were transferred to Barclays through
24 the sale transaction?
25    MR. THOMAS:  Objection to form.

Page 60

Krishnan

1           Krishnan
2    A.   I don't know.
3    Q.   Do you know if GFS captures all
4 positions that may have subsequently been
5 transferred to Barclays through the sale
6 transaction?
7    A.   I can -- I don't know the answer to
8 that because I -- GFS processes anything that we
9 get from the source systems, from the other --
10 from the, let me say upstream systems.  So we,
11 if they have captured it, then it would have
12 come down to us.
13    Q.   But you don't know if all of the
14 positions that were transferred to Barclays
15 through the sale transaction are in fact within
16 GFS; is that correct?
17    MR. THOMAS:  Objection to form.
18    A.   I don't know.
19    Q.   Going down the list in Deposition
20 Exhibit 859 of the report path, the next one is
21 report category.  Can you tell me what that
22 means?
23    A.   This is -- the report category is for
24 users to, you know, like if a user comes under
25 "FID," it's easier for them to put the report

Page 61

Krishnan

1           Krishnan
2 under "FID" so they are able to easily access
3 it.  So they have various categories.  Like they
4 have probably Equity Product Control.  They
5 probably have like a balance sheet group or
6 something.  This is for ease of the users, so
7 that's a report category.
8    Q.   And would it be FID Product Control,
9 for instance, which is listed next to "report
10 category" here, who would determine what
11 information it would want captured in a query
12 and then your group would help to standardize
13 that format in order to make that query
14 possible?
15    MR. THOMAS:  Objection to form.
16    A.   The user would put his report under
17 FID Product Control.  He will have -- he or she
18 will have control on what the filters.  By
19 "filters," I mean any inclusions/exclusions he
20 wants.  They will have control over that.
21    Q.   And those filters would be entered on
22 a report-by-report basis or standardized and
23 then run regularly by a group such as FID
24 Product Control?
25    A.   They would be -- the filters would be

Krishnan

1    based on a report-by-report basis.
2        Q.    And so I guess, moving down the list,
3    the next part of the report path is report type,
4    and it says "custom."  Do you know what that
5    means?
6        A.    Custom is a report that a user has
7    built.
8        Q.    And what other types of report types
9    are there?
10       A.    There's another type called standard.
11       Q.    Are there any others?
12       A.    No, that's it.
13       Q.    And custom would be custom filters, is
14   that what it's referencing?
15       A.    Custom would be any report that is
16   built by the user to customize for their use.
17       Q.    And when you say "user," would the
18   user here be FID Product Control?
19       A.    It would be FID Product Control, yes.
20       Q.    Well, could it be anyone other than
21   FID Product Control where the report path lists
22   no other user?
23       A.    It's up to the users.  If an equity
24   product controller wants to put it in a FID

Krishnan

1    Product Control, I think he had the capability
2    to do it, but this report category itself is for
3    ease of use for the users so they would probably
4    not do that.
5        Q.    If an equity product controller wanted
6    to run a report using the custom report type FID
7    Product Control, would it provide a report path
8    similar to the one that's in Deposition Exhibit
9    859?
10       A.    Yes.
11       Q.    And the Equity Product Control Group
12   might have its own custom report type; is that
13   correct?
14       A.    They would -- the equity product
15   controllers could have their own reports, but
16   they also have the capability to run any report
17   in any other report category in GFS.
18       Q.    Given that no filters are specified in
19   this e-mail Deposition Exhibit 859, would you
20   expect that report type custom already has those
21   filters saved?
22             MR. THOMAS:  Objection to form.
23       A.    Well, when a user creates a report, he
24   usually saves the filters that he wants.

Krishnan

1        Q.    And if those filters were not a
2    regular report where they had been saved from
3    previous uses, what sort of information would be
4    needed -- let me rephrase that.
5             How can the information be filtered?
6    What are the options for a user in terms of
7    providing a query that might not be one that's
8    already saved on the system?
9             MR. THOMAS:  Objection to form.
10       A.    I don't understand the question.
11       Q.    Can a user request a report other than
12   a standard report or a custom report that has
13   previously been generated?
14       A.    Yes, the user has the ability to
15   create their own report if they don't like this.
16       Q.    And how does a user create his own
17   report?
18       A.    There are options in the GFS front end
19   to create a new report.
20       Q.    And --
21       A.    And they can -- I'm sorry.  They can
22   mention like which report group they want it to
23   be under, the report category, and it defaults
24   to custom if a user is creating it, and then

Krishnan

1    they give the report name and they can apply
2    filters on it and they can save it.
3        Q.    And what do you mean by "GFS front
4    end"?
5        A.    That's the graphical user interface I
6    talked about earlier.  GFS has a graphical user
7    interface which helps the users build these
8    inquiries without actually writing the query
9    themselves.  So they have this friendly
10   interface which they tell, okay, this is the
11   report that I want and I want it to be under
12   this report category and these are the filters
13   that I want.
14       Q.    What are its options, user's options
15   in terms of filters that it might want?
16       A.    It depends on what the user wants.  He
17   could filter a security.  He could say that I
18   want only anything that is related to this
19   security.  He could say that I want only
20   anything related to this account or some
21   management code or some entity.
22       Q.    And would report group, for instance,
23   be one of those filters?
24       A.    Report group is the base on which you

Krishnan

1 build the report. So that will not be a filter.
2 Q. Would a filter be, for instance, a
3 column title like "Trade Date Position"?
4 A. That's correct.
5 Q. And going down the list of the report
6 paths in Deposition Exhibit 859, we had
7 discussed the next one already, "Report Name."
8 Do you see that?
9 A. Yes, I do.
10 Q. Are there other regularly used reports
11 that have a report name that would be entered
12 into a query of GFS?
13 A. Yes, there are a lot of report names
14 like this.
15 Q. And would that report name change if
16 the other components of the report path were to
17 change?
18 A. If the user creates a report and he
19 wants to change the same report, he could rename
20 it as the same, but if he -- it depends on what
21 the user wants.
22 Q. So there could be a number of
23 different reports named "BA: B-S Detailed
24 Exposure Report," but they might have used

Krishnan

1 different filters; is that correct?
2 A. No, there can only be one report with
3 this name. So if another user tries to name it
4 the same, it would give an error. It would ask
5 them to name it differently.
6 Q. And going down the list to the next
7 component of the report path, "custom filter,"
8 do you see that?
9 A. Yes, I do.
10 Q. It says "LBI Entity," do you see that?
11 A. Yes.
12 Q. Is that the ability to filter GFS data
13 for only LBI positions?
14 A. This -- the user could define the
15 filter I think based on what they want to
16 include and exclude. This particular filter
17 includes LBI and excludes equities.
18 Q. And would it exclude other parts of
19 Lehman and include only LBI?
20 A. Yes, it would include only LBI.
21 Q. Do you know if any of the other GFS
22 reports that we have discussed and marked as
23 Deposition Exhibits 830 to 835 and Deposition
24 Exhibits 836 to 843 were created with the same

Krishnan

1 report path that is in Deposition Exhibit 859?
2 MR. THOMAS: Could we maybe just note
3 the BCI numbers to the Bates numbers, the
4 Barclays numbers?
5 MS. CARRERO: Sure.
6 Q. So, again, my question being whether
7 the report path in Deposition Exhibit 859 is the
8 same report path that was used to generate
9 Deposition Exhibits 830 through 835, which
10 correspond with Movants' Trial Exhibit Numbers
11 301 to 306, and Deposition Exhibits 836 through
12 843, which correspond with BCI Exhibits 501 to
13 503 and 667 through 671.
14 MR. THOMAS: That's an awful lot.
15 Maybe just break it down to one group at a
16 time.
17 MS. CARRERO: Sure.
18 Q. Let's do starting with the Deposition
19 Exhibits 830 to 835, which are the ones that
20 correspond to Movants' Exhibit 301 to 306.
21 MR. THOMAS: Do you have those in front of you?
22 Q. Do you have those in front of you?
23 MR. THOMAS: And have the Barclays
24 Bates Nos. BCI Exhibit 297155?

Krishnan

1 MR. STEPHENS: That's correct.
2 Q. Looking at those exhibits, can you
3 tell now whether or not Deposition Exhibit 830
4 through 835 were created with the same report
5 path that is in Deposition Exhibit 859?
6 A. Yes. They were created with the same
7 report. The report name is on the top.
8 Q. And when you say at the top, you're
9 looking at Deposition Exhibit 830 --
10 A. To 835.
11 Q. -- to 835. But looking at Deposition
12 Exhibit 830, for instance --
13 A. Yes.
14 Q. -- it's a placeholder page that lists
15 the name and it says "Detailed Exposure Report
16 912.xls," and then has the Bates stamp; is that
17 correct?
18 A. Here it says 15 September.
19 Q. Okay. So you're looking at Deposition
20 Exhibit 831, which corresponds to Movants' Trial
21 Exhibit 302.
22 Where are you looking in order to
23 determine whether it's been run using the same
24 report path as the report path used or specified

1                    Krishnan
2    in Deposition Exhibit 859?
3        A.   I'm looking at this row 1 where it
4    says "BA: B-S Detailed Exposure Report, 15
5    September, 2008."
6        Q.   So you're looking at the second page
7    of the exhibit which is one of the exhibits
8    where we printed out an excerpt so that we could
9    see all the column headings.  The title would
10   tell you that it is the same report path as
11   specified in Deposition Exhibit 859; is that
12   correct?
13        MR. THOMAS:  Objection to form.
14       Q.   You can go ahead and answer.
15       A.   Yes.  Yes.
16       Q.   And you would expect that because the
17   report name is the same, that all other
18   components of the report path would also be the
19   same; is that correct?
20        MR. THOMAS:  Objection to form.
21   Assumes facts not in evidence.
22       A.   Yes, the report name is the same and
23   this is -- if this is a request that we did for
24   the attorneys, yes, we did this report.
25       Q.   Do you know if all the reports that

1                    Krishnan
2    were generated and are before you as Deposition
3    Exhibits 830 through 835 differ at all from the
4    GFS reports that we previously discussed with
5    the same report name that are marked as
6    Deposition Exhibits 844 through 856?
7        MR. THOMAS:  Can she take her time to
8    look through those?
9        MS. CARRERO:  Absolutely.
10        MR. THOMAS:  Just for the record,
11   there's a big stack of papers here, and I
12   understand these are partial printouts of
13   the files.
14        MS. CARRERO:  If we take the three
15   sets of GFS reports that we received to
16   date, the ones we received in 2009, the ones
17   we received in January of 2010 and then the
18   ones we received in April of 2010, and we
19   have printed out for September 15 an excerpt
20   of the report that covers all of the column
21   headings to enable us to go through them,
22   and to the extent needed, we can also pull
23   up all of them in native in their entirety.
24        MR. THOMAS:  So we produced them in
25   native format and they're large files, and

1                    Krishnan
2    what you have done is printed some pages of
3    excerpts of the files and made them into
4    deposition exhibits, which you're asking the
5    witness to refer to; is that correct?
6        MS. CARRERO:  No.  For most of them,
7    we have printed out the placeholder sheet
8    which provides a name and location, and only
9    for the September 15 report for each
10   grouping have we printed out an excerpt and
11   we can --
12        MR. THOMAS:  Only for the September
13   15.  I'm totally lost.  I don't know if the
14   witness is totally lost or not.
15        MS. CARRERO:  Do you want to go off
16   the record and discuss this and figure out a
17   way to proceed that might be clearer?
18        MR. THOMAS:  Sure.  Sure.
19        (Discussion off the record.)
20   BY MS. CARRERO:
21       Q.   We, during the break, have set up
22   things so that we can go through the reports
23   electronically in the native format that they
24   were produced to us.  We discussed before the
25   break that we received GFS reports in three

1                    Krishnan
2    groupings, and we have taken the time to pull up
3    on the screen the September 15 GFS reports from
4    each of those three groupings.  Deposition
5    Exhibit 831, which corresponds to M302 being one
6    of the reports that was produced to us.
7        MR. THOMAS:  So the one you have on
8    the screen is one of the 2010 reports, the
9    later bucket?
10        MS. CARRERO:  It is one of the ones
11   that was produced to us in January of 2010,
12   and if you would turn to Deposition Exhibit
13   857, which is the January 18 production
14   letter, is referenced as documents related
15   to the Expert Report of Professor Paul
16   Pfleiderer.
17   BY MS. CARRERO:
18       Q.   We also have up, to enable you to go
19   through them, Deposition Exhibit 837, which
20   corresponds with BCI Exhibit 502.  It is the
21   September 15 GFS report that was produced to us
22   in April of 2010.
23        And finally, we have up the September
24   15 report, which is Deposition Exhibit 845,
25   which corresponds with BCI Exhibit 489, and was

Krishnan

1
2  produced to us in or around August 27, 2009.
3       MR. THOMAS:  Can you give me the Bates
4  on that one?
5       MS. CARRERO:  Sure.  It is Bates No.
6  BCI-EX-00116255.
7       Q.  In addition to having it up
8  electronically on the screen, you also have in
9  front of you an excerpted printout of all three
10  of the September 15 GFS reports marked
11  Deposition Exhibit 831, 837 and 845.
12       So with that, let's see if we can try
13  this again.  And I'm happy to let you drive this
14  if you want, if that makes it easier for you.
15       Looking at -- well, for the time being
16  let's see how it works with me driving it, but I
17  have up Deposition Exhibit 831.  If you also
18  want to look at your hard copy of it, and we can
19  try to again to determine the, if you know, the
20  report path that was used to generate Deposition
21  Exhibit 831.
22       Do you have it in front of you?
23       A.  Yes, I do.
24       Q.  Do you know, looking at the report,
25  the report path that was used to generate

Krishnan

1
2  Deposition Exhibit 831?
3       A.  This was a report that was generated
4  in April -- January of 2010?
5       Q.  Yes, it was -- I can't tell you when
6  it was run.  I can only tell you it was produced
7  to us in January of 2010.
8       A.  Okay.  So, yes, I know about this
9  report.  We generated it and, I mean, that's
10  what you want to know, right?
11       Q.  Yes, I want to know if you know the
12  report path that was used to generate Deposition
13  Exhibit 381 which was produced to us in January
14  2010?
15       A.  Yes, I know this report, yes.
16       Q.  And could you tell me the report path
17  that was used to generate it?
18       A.  It's as given in this e-mail.
19       Q.  And you're referring to Deposition
20  Exhibit 859; is that correct?
21       A.  Yes, that's correct.
22       Q.  And do you know ---
23       A.  I'm sorry, I just want to mention one
24  thing here is this custom filter LBI entity,
25  that was excluding -- that was excluding

Krishnan

1
2  equities.  So we had to modify that for, if this
3  is the report that was generated in 2010, then
4  we had to modify this, this filter, to include
5  the equities.
6       Q.  Do you know if you and your group
7  generated reports using the same report path
8  both in late 2009 as well as in January 2010?
9       MR. THOMAS:  Objection to form.
10       A.  The same report path except for this
11  modification in the filter.
12       Q.  Well, I think we might be talking past
13  each other a little bit only because the
14  modification in the filter would be the April
15  2010 reports that we're not talking about right
16  now.
17       A.  Okay.
18       Q.  Is that correct?
19       MR. THOMAS:  Objection to form.  I
20  think that misstates record.
21       Q.  Let me rephrase here.  We're not
22  talking about the GFS reports that were run with
23  any equities data.
24       A.  Okay.
25       Q.  We're talking about the reports that

Krishnan

1
2  we received in late 2009 and in January 2010,
3  and my question is were those groupings of
4  reports run using the exact identical report
5  path that's in Deposition Exhibit 859?
6       MR. THOMAS:  Objection to form.
7       Are you sure the January ones don't
8  have --
9       MS. CARRERO:  Only one of them does.
10       MR. THOMAS:  So one January report
11  does and one doesn't?
12       (Discussion off the record.)
13       MS. CARRERO:  Counsel and I just spoke
14  off the record about trying to clarify some
15  of the confusion around the different time
16  periods in which reports were produced and
17  the report paths that might have been used
18  to generate those reports and for the time
19  being are going to move on from inquiring
20  about the report path for the January 2010
21  reports with the representation from counsel
22  that he will get us more information on what
23  report path might have been used to generate
24  those reports during lunch.  Is that
25  correct?

1              Krishnan
2              MR. THOMAS:  I will seek to get all
3    information available.
4              MS. CARRERO:  Great.  Thank you.
5    BY MS. CARRERO:
6         Q.    If you could look at the hard copy of
7    Deposition Exhibit 831, 837 and 845.  Do you
8    have those in front of you?
9         A.    Yes.
10        Q.    If you were to look at a column
11   labeled "Trade Date Position," which is column
12   AU in 831, column AV in 837, and column AU in
13   845, my question is what is meant by "trade date
14   position"?
15        A.    The quantity on the trade date.
16        Q.    And by "quantity," do you mean the
17   face value or notional amount as opposed to a
18   market value?
19        A.    By "quantity," I mean like the number
20   of positions that we hold.  It's the number.
21        Q.    So, for instance, with stock, it would
22   be the number of shares of a given stock that
23   were held at trade date; is that correct?
24        A.    That's correct.
25        Q.    And what does it mean when the trade

1              Krishnan
2    date position is positive?
3         A.    It would be a long.
4         Q.    And what does it mean when the trade
5    date position is negative?
6         A.    It would be a short.
7         Q.    And is it reflective of original
8    notional or factored notional?
9         A.    I'm not familiar with that.  I don't
10   know.
11        Q.    Would there be a specific column that
12   would capture the original notional amount of a
13   fixed income product?
14        A.    What do you mean by "original
15   notional"?
16        Q.    I mean the face value of the security
17   before any sort of amortization if it were an
18   amortizing security.
19             MR. THOMAS:  Objection to form.
20        A.    I don't know.  I'm not sure if we have
21   that.  I think we did not capture the original
22   values.  It would always -- the reports would
23   always show the current market value.  You're
24   asking, by original market value, you mean like
25   at the time that those positions, those

1              Krishnan
2    securities were acquired, what they bid?
3         Q.    I mean --
4         A.    What the market value was at that
5    time?
6         Q.    I'm distinguishing the original
7    notional from market value, and it is the face
8    value of the security as opposed to what it
9    would trade for on any given day?
10        A.    Okay.  The way I understand it, I
11   don't think we have it in this report.  I'm not
12   sure, though.
13        Q.    Would that be one of the filters that
14   is possible for inputting when you query GFS?
15        A.    I think that it's not -- if it's not
16   available in GFS, then even if you change your
17   filters, you're not going to get it.
18        Q.    So it might be information that is
19   unavailable or not captured within GFS, it has
20   nothing to do with how GFS is queried?
21        A.    That's what I think it is.
22        Q.    Do you know how one would identify the
23   factor in the GFS data?
24        A.    I'm not really sure if factor was part
25   of this report.

1              Krishnan
2         Q.    And again, would factor -- would the
3    factor be in the GFS data and just not within
4    the specific report?
5         A.    Yes, that's possible.
6         Q.    And would factor be a filter that you
7    could enter into a query?
8              MR. THOMAS:  Objection to form.
9         A.    When you say "the filter," that means
10   that it -- you are saying that including or
11   excluding a column in this report?
12        Q.    I am thinking of, I guess, of a filter
13   as the potential addition or exclusion of a
14   column in the report.  Is that incorrect?
15        A.    The way that I perceive filter is you
16   have -- you have data and then I say I want only
17   the columns which have this value.  That is a
18   filter for me.  I want only the entries which
19   have the entity as LBI.  That's a filter.
20             But again, the columns, the users have
21   the ability to pick which ones they want.  That
22   is -- we don't call that a filter.  So the users
23   are able to drag and drop the column.  They have
24   the whole list of columns that are available and
25   they can drag and drop the columns that they

Page 82

1          Krishnan
2  want.
3     Q.    And so for if, for instance, if it was
4  a custom report, that user would have already
5  set the column headings that it wanted in the
6  report; is that correct?
7     A.    That's correct.
8     Q.    Why would a trade date position be
9  reported as zero?
10    A.    If we don't have a position for that
11 security, then it would be reported as zero.
12    Q.    If you could look at the column --
13    A.    I'm sorry, or if the mark was zero.
14 No.  No.  I'm sorry.  Sorry.
15       Trade date position is zero means we
16 do not have a position for that security.
17    Q.    Or could it also mean that it was net
18 zero position?
19       MR. THOMAS:  Objection to form.
20    A.    I don't know what net zero position
21 is.
22    Q.    If there were an equal number of longs
23 and shorts, would that also come up as zero in
24 "Trade Date Position"?
25    A.    We report in GFS, we report on an

Page 83

1          Krishnan
2  account and a security level.  So for -- for an
3  account and a security, if it netted to zero,
4  then it could be like that.
5     Q.    What does the column "Clean Market
6  Price" in column AX of 831, column Y of 837, and
7  column AX in 845 mean?
8     A.    The clean market prices without
9  including the accrued interest.
10    Q.    And what does it mean when the clean
11 market price is negative?
12    A.    I do not know.
13    Q.    What is meant by column heading "Dirty
14 Market Price," which, for example, is column AY
15 in Deposition Exhibit 831?
16    A.    The dirty market price includes the
17 accrued interest.
18    Q.    What does the column heading "Security
19 Type" mean, for instance, column BF in
20 Deposition Exhibit 831?
21    A.    The security type could be an equity
22 or -- here, I'm just looking.  There it has like
23 debt.  It could be -- these are the values that
24 we source.  The security types are some things
25 that we source from the Global Products,

Page 84

1          Krishnan
2  security type and the security subtype.
3     Q.    And the security subtype, I'm sorry,
4  would be what?
5     A.    Both the security type and the subtype
6  would be sourced from Global Products, except I
7  think that there are some adjustments here which
8  have that in column -- in 836 I see some --
9  there are some adjustments.
10    Q.    And are these types used for reporting
11 purposes?
12    A.    Yes, reporting purposes.
13    Q.    And what type of reporting?
14    A.    For balance sheet reports.
15    Q.    And what do the column headings "Asset
16 Category 1," "Asset Category 2," "Asset Category
17 3" mean?  For example, columns BH, BI and BJ of
18 Deposition Exhibit 831?
19    A.    The asset categories are derived in
20 GFS based on the security type and subtype.
21    Q.    Are they a reference to GAAP asset
22 categories?
23    A.    The asset categories are then used to
24 derive the GAAP asset classes.
25    Q.    Do they represent a hierarchy?

Page 85

1          Krishnan
2     A.    Yes, I think what they do is they
3  classify the securities into different asset
4  groups.
5     Q.    Which is the most detailed of the
6  categories?
7     A.    Are you asking if the security type is
8  more detailed or the asset category is more
9  detailed.
10    Q.    I'm asking actually about Asset
11 Category 1 versus Asset Category 2 versus Asset
12 Category 3, which is the most detailed of the
13 asset categories?
14    A.    I think the Asset Category 1 and 2 are
15 the same level of detail.  I'm not sure about
16 that.
17    Q.    If you turn to column S in Deposition
18 Exhibit 831, for instance, what does the "Gross
19 Long Inventory, TD@MV" mean?
20    A.    That is the long market value, I
21 think, based on the trade date quantity, a
22 traded position.
23    Q.    And what does the column T, the Gross
24 "Long BPM CUSIP Netdown" column refer to?
25    A.    It's a column U in 381?  836?

1              Krishnan
2      Q.    I thought it was column T.  Yes,
3   column T, "Long BPM CUSIP Netdown, TD@MV" in
4   831 -- in 837, it is U, if that's what you're
5   looking at.
6      A.    Yes, it says "Long BPM CUSIP Netdown,"
7   right?
8      Q.    Yes.
9      A.    GFS, it nets the longs and the shorts
10  based on some hierarchies, so these columns are
11  the numbers after the netdown.
12     Q.    And then if you turn to the column
13  next to it that is "Long Inventory, TD,MV," what
14  does that column capture?
15     A.    I think that's the straight market
16  value, the long market value, you know, without
17  the netdown.
18     Q.    And is the column U in 831, "Long
19  Inventory, TD@MV" sum of columns S and T, the
20  "Gross Long Inventory, TD@MV" and the "Long BPM
21  CUSIP Netdown, TD@MV"?
22        MR. THOMAS:  Objection to form.
23     A.    Looking at 836 and -- I'm sorry, could
24  you repeat what you said?  Sum two columns, you
25  were asking if it was the sum?

1              Krishnan
2      Q.    I was asking about the columns headed
3   "Gross Long Inventory, TD@MV" and "Long BPM
4   CUSIP Netdown, TD@MV"?
5      A.    Uh-huh.
6      Q.    Whether those two together are summed
7   up in the column titled "Long Inventory, TD@MV"?
8      A.    No, I don't think so.
9      Q.    What is the interplay between those
10  three columns?
11     A.    The -- I don't -- I don't know just by
12  looking at this what's the interplay, but I can
13  see that the -- this is, because of its name,
14  the netdown, it's the -- it's the value after
15  the longs and shorts are netted.  So we don't
16  expect that to be the same as the column T or be
17  in any way related to column T.
18     Q.    And when you say "column T" ---
19     A.    Or in "Gross Long Inventory, TD at
20  Market Value."
21     Q.    So "Gross Long Inventory, TD at Market
22  Value" is -- how does that differ from "Long
23  Inventory, TD@MV"?
24     A.    I don't know off the top of my head.
25  I have to look at the formula that maps it.

1              Krishnan
2      Q.    Would the formula be embedded in the
3   native versions of any of the reports that were
4   produced to us?
5      A.    I don't think the formula's embedded
6   in any of these, in any of the reports.
7      Q.    How would you go about finding out
8   what the formula is for any given column in GFS?
9      A.    We have a table which maps what this
10  column means, you know, in our language.  So
11  that's the --
12     Q.    And when you say "table," what do you
13  mean and does it have a name?
14     A.    Yes, it has a name.  GRT_Attributes.
15     Q.    The GFS reports that were produced to
16  us were produced to us in Excel.  What sort of
17  system -- I'm sorry, the GFS reports that we
18  received are in Excel.  Is that the system to
19  which reports are done through or extracted
20  from?
21     A.    GFS has --
22        MR. THOMAS:  Objection to form.
23     A.    GFS has the capability to -- it has
24  given the capability to the users to export any
25  of the report to the Excel.  So there's a button

1              Krishnan
2   there that you can click which would export it
3   to Excel.
4      Q.    GFS itself, though, is not a report or
5   system in Excel; is that correct?
6      A.    Right.
7      Q.    Is there an ability to export to Excel
8   while maintaining the embedded formulas within
9   GFS?
10     A.    It just exports the values into Excel.
11  So these are -- see, what I meant is that this
12  column has a meaning in the table.  So we looked
13  at that report category balance sheet positions,
14  right?  So this name, if the user picks this
15  column, that has a meaning in that table.  So
16  that is the mapping that the GRT_Attributes
17  holds.
18     Q.    And when data from GFS is exported to
19  Excel, are the Excel reports then compared to
20  the GFS system to ensure that the exportation
21  happened correctly?
22     A.    No, we don't -- we don't do the
23  comparison, but we know that it's the same.
24     Q.    And how do you know it's the same?
25     A.    Because that's the way the system is

Page 90

                    Krishnan

1  set up and I -- I joined in 2005, so this was
2  functional at the time that I joined, you know,
3  exporting to Excel and that export being
4  correct, you know, when -- when they released
5  that feature for the system, they probably
6  tested it. When I joined Lehman, this
7  functionality was already there.
8     Q.   And there has never been a situation
9  where files exported to Excel are found to be
10 corrupted or inaccurate?
11    A.   Not that I know of.
12    Q.   It's possible, though, that some
13 export of GFS data to Excel could have been
14 corrupted or inaccurate; is that correct?
15       MR. THOMAS:  Objection to form.
16    A.   I don't expect it to happen.  I've
17 never seen it in my five years.
18    Q.   But you don't know that it has not
19 happened; is that correct?
20       MR. THOMAS:  Objection to form.
21    A.   I don't know what I've not seen, so I
22 have not seen it happen.
23    Q.   Similar to my questions about the
24 interplay between the long inventory columns, I

Page 91

                    Krishnan

1  have the same question about the columns labeled
2  "Gross Short Inventory" versus the "Short BPM
3  CUSIP Netdown, Trade Date at MV," and then the
4  column named "Short Inventory, TD@MV."
5     A.   I would have to look at the attribute
6  mappings.  I don't know.
7     Q.   And the table you describe, the
8  attribute mapping, is it a discrete document or
9  is it a system in itself?
10    A.   It is just a table and it says like,
11 for example, this gross long inventory, this
12 means maybe the field name in the table is some
13 TD gross market value or something, or it could
14 be that it's populating this value only in some
15 cases because the TD gross market value could be
16 a negative or a positive so it could have a
17 condition saying this -- populate this feed only
18 if the TD gross market value is greater than
19 zero.  I mean, or it could have other
20 conditions.
21    Q.   Do you know which of the three columns
22 that I just identified would be included in
23 financial reporting?
24    A.   I don't know.

Page 92

                    Krishnan

1     Q.   Do you know why the column labeled
2  "Long Inventory, TD@MV," which is column U of
3  831, is sometimes negative?
4     A.   I -- I'm just guessing.  I think it
5  may be negative and when it's grouping rows and
6  the sum of those two rows is a negative number.
7  I'm not sure.
8     Q.   Would you expect a long position to be
9  a negative number?
10    A.   Maybe if the price was negative or --
11 I guess in that case it could have been a
12 negative number.
13    Q.   There could be a negative price within
14 GFS?
15    A.   You asked your question whether I knew
16 why the prices were negative, right?  So I have
17 not really seen -- see, as technologists, we
18 don't look at the data day-to-day, so there
19 might have been a negative price, I don't know.
20 I thought you had seen a negative price, that's
21 why you're asking.
22    Q.   Would you expect to see a negative
23 price for anything other than a short position?
24    A.   I wouldn't expect to see a negative

Page 93

                    Krishnan

1  price for anything.  I don't know.
2     Q.   And in general, do you know which
3  columns are used for purposes of financial
4  reporting, if any?
5     A.   I don't know.
6     Q.   And if you look at column AA in
7  Deposition Exhibit 831, which is titled "Short
8  Inventory, TD@MV," what does that mean?
9     A.   The "Short Inventory, TD at Market
10 Value," That is the same as the long inventory,
11 but it would be populated if it's a short.
12    Q.   And what does it mean if the number
13 within that column is negative?
14    A.   The "Short Inventory, TD Market Value"
15 is probably a negative a lot because it's --
16 it's populated only if it is negative.
17    Q.   And do you know which column related
18 to short inventories would be included in
19 financial reporting?
20    A.   No, I don't know.
21       MS. CARRERO:
22       (Discussion off the record.)
23    Q.   Do you know what it means when the
24 column "Trade Date Position" is positive but the

Page 94

1           Krishnan
2  column "Short Inventory, Trade Date at MV" is
3  negative?
4      A.  I don't know what it means, but I
5  would guess that the price was negative.
6  Something has got to be negative to make the
7  market value negative.
8      Q.  Would it -- what sort of procedures
9  were in place to confirm the GFS data was
10  correct -- or, let me rephrase that.
11         If there was a concern that any data
12  within GFS may have been incorrect, what sort of
13  procedures were in place to identify any errors
14  and to fix those errors?
15      A.  Any data-related issues would be
16  detected by the users, financial controllers,
17  product controllers, who look at the report
18  every day.  They would say -- they would come to
19  us saying why this is not what I expect it to be
20  and then we would debug to, you know, we would
21  look at the code to see what it is set up to do
22  or maybe the input was incorrect or maybe there
23  was an adjustment that was incorrect report, so
24  then we find out what are the reasons behind it.
25      Q.  So you and your group would not have

Page 95

1           Krishnan
2  been responsible for analyzing the data for any
3  potential inaccuracies?
4      A.  No.
5         MR. THOMAS:  Objection to form.
6      Q.  And if any inaccuracies were the
7  consequence not of a technological issue but,
8  rather, a deliberate input, would that come to
9  your attention or would the product controllers
10  or finance take that elsewhere in order to make
11  any necessary adjustments?
12      A.  If they -- if they find something
13  wrong, they would come to us, normally, unless
14  they're able to fix it from their side.  They
15  would come to us and we would tell them like
16  this is why this has happened and, you know, as
17  I said earlier, it could be there could have
18  been a problem with the input that we got.
19      Q.  If a product controller in Finance had
20  an issue with a price input into one of the
21  settlement systems deliberately by, for
22  instance, a trader, would that come to your
23  attention or would that be fixed by Finance or
24  the front office directly?
25      A.  It would be fixed by the user who

Page 96

1           Krishnan
2  detected it.  They would probably put like an
3  adjustment, a price adjustment, to correct it.
4  We don't even have to know about it.  It just
5  goes through the system.
6      Q.  What does it mean when two rows with
7  the same value in the column headed "Real World
8  CUSIP" have two different values in the column
9  labeled "Fair Value Level"?  If you're looking
10  at 831, you can turn to column N and column BQ.
11      A.  The "Real World CUSIP" is a security
12  identifier.  And I think the "Fair Value Level"
13  is something that the users assign.
14      Q.  I'm sorry, could you repeat that?
15      A.  The "Fair Value Level" is something
16  that the users tag positions.  I'm not sure why
17  you want -- if the CUSIP is the same, why the
18  fair value levels were different.
19      Q.  I mean, do you know if it's possible
20  for one security to be assigned two different
21  fair value levels?
22      A.  I don't -- I don't know about the fair
23  value levels because I think that the fair value
24  levels is something that the user tags, and I
25  don't know, it could have been any reason why

Page 97

1           Krishnan
2  they didn't tag the other CUSIP.
3      Q.  So you don't know if, when this
4  happens, which fair value level should be
5  considered, correct?
6      A.  No, I don't know.
7      Q.  And do you know why some securities
8  have not been assigned a fair value level?
9      A.  I don't know.  Sorry.
10      Q.  If we wanted to recalculate the long
11  inventory value based on data in GFS, do you
12  know which columns would be used?
13      A.  I think it would be the, for the
14  traded market value, long market value to be the
15  traded position and the price.
16      Q.  Which columns are you looking at in --
17      A.  I'm actually looking at 836.
18      Q.  So in 836, which columns numbers would
19  be the ones used?
20         MR. STEPHENS:  I think, just for
21  clarity, you have an excerpt of 836 behind
22  the first -- what you have there.  Sorry.  I
23  believe if you turn -- you've got a second
24  sticker.  I think you're in 837, just for
25  clarity.

Krishnan

1    THE WITNESS:  Thank you.  837.
2
3    A.   There was a trade date position
4 somewhere.  AV.
5    Q.   So in using Deposition Exhibit 836,
6 you would go to column AB?
7    A.   AV, as in Victor.
8    Q.   AV, as in Victor.  And what else would
9 you use in order --
10    A.   I'm not sure if we used the AY or the
11 AZ.  AY is the clean market price and AZ is the
12 dirty market price.
13    Q.   Would you also need the factor in
14 order to calculate?
15    A.   Yes, I would need the factor and the
16 multiplier.  I don't think it's in here.
17    Q.   Is anything else needed in order to
18 calculate the long inventory value using that
19 report?
20    A.   As far as I can remember, I think if
21 you have those values, we can calculate it.
22    Q.   So if you have the values in AV along
23 with either the clean or the dirty market price,
24 and then you would need the factor and
25 multiplier, which is not within the report; is

Krishnan

1
2 that correct?
3    A.   That's correct.
4    Q.   Is there a rounding convention for
5 clean or dirty prices using a certain amount of
6 decimals?
7    A.   I think when they export to Excel, it
8 automatically rounds, but I'm not sure if
9 they're able to specify that.  I'm not sure
10 about the rounding.
11    MS. CARRERO:  This is a fine time to
12 break.
13    (Luncheon recess; time noted:  1:15
14 P.M.)
15
16
17
18
19
20
21
22
23
24
25

Krishnan

1
2    AFTERNOON SESSION
3    (Time Noted:  2:12 P.M.)
4 UMA KRISHNAN, resumed and
5    testified further as follows:
6 EXAMINATION BY (Cont'd.)
7 MS. CARRERO:
8    Q.   Ms. Krishnan, before lunch, we had
9 been discussing the various GFS reports
10 produced, and we had talked about three separate
11 productions of GFS reports received, one set in
12 the fall of 2009, a set in January of 2010, and
13 another set in April of 2010.
14    We had stopped our questioning about
15 the January 2010 reports to receive confirmation
16 from counsel on something, and I think that
17 we're ready to proceed now on questioning about
18 the January 2010 reports, those run without
19 equities.
20    If you can look at Deposition Exhibit
21 831, for instance, that being September 15 GFS
22 report that was produced to us on January 18.
23 Do you have that in front of you?
24    A.   Yes.
25    Q.   Looking at Deposition Exhibit 831, can

Krishnan

1
2 you determine from the title of that report the
3 report path that would have been used to
4 generate the report for you?
5    A.   From the title, we cannot say like
6 what filter we applied while running the report,
7 but maybe if we look at the data, we can make a
8 guess.
9    Q.   And so from the report name itself,
10 you would not know exactly what would be
11 captured in the report; is that correct?
12    A.   We would be sure about what data is --
13 what the data is built off, but filters are
14 not -- are not obvious from the report name.
15    Q.   So you wouldn't know just from the
16 report name whether it includes equities, for
17 instance, or doesn't include equities; is that
18 fair?
19    A.   That's correct.
20    Q.   So if we were to turn to the
21 electronic version of 831, is there any specific
22 column or row that would help you to determine
23 what the report path used to generate such a
24 report would have been?
25    A.   I think if we are able to look at "Sum

Page 102

```
1              Krishnan
2  Equities" in the "Division," if you can filter,
3  it's actually all capitals.
4      Q.   Would it be a specific column heading
5  that we should be looking?
6      A.   Yes, the "Division," the first one.
7      Q.   The "Division"?
8      A.   That's the first column.
9      Q.   Okay.  So if in the "Division" column
10 there are I believe no equities, would it be
11 your understanding that you only used, in
12 connection with this matter, two distinct report
13 paths to generate any GFS reports?
14     A.   Sorry, could you repeat that?
15     Q.   Do you know if you used more than just
16 two report paths in order to generate any
17 reports, GFS reports, in connection with this
18 matter?
19     A.   No, we used only this -- that one
20 report path that we gave for all the reports.
21     Q.   However, I think we had discussed
22 before that the later April 2010 reports that
23 were produced have equities data in addition to
24 fixed income data; is that correct?
25     A.   That's correct.  So we modified the
```

Page 103

```
1              Krishnan
2  filter for doing that.
3      Q.   And would that not constitute a
4  distinct report path if the filters were
5  modified with respect to the April 2010 reports?
6          MR. THOMAS:  Objection to form.
7      A.   I wouldn't say it's completely
8  different.  We just changed the filter.  I think
9  we still ran it with the same report name, so
10 you could say that they are different reports,
11 yes.
12     Q.   And the April 2010 reports which are
13 Deposition Exhibits 836 to 843, what were the
14 additional filters that were added to the report
15 path specified in Deposition Exhibit 859?
16     A.   We removed the -- this custom filter
17 LBI entity was including LBIs and excluding Sum
18 Equities, in you know, the Division Sum
19 Equities, so we changed -- we removed the
20 exclusion of Sum Equity and reran the same
21 reports.
22     Q.   If you could just go into more detail
23 about what would have been removed or added?
24     A.   The custom filter, it had an inclusion
25 of LBI and exclusion of sum equities.
```

Page 104

```
1              Krishnan
2      Q.   And was it exclusion of sum equities
3  by virtue of the election of LBI?
4      A.   I don't know who created the report,
5  so this was a user-created report that we --
6  that we got in the description of the ticket.
7  So I don't know how they made it.
8      Q.   So the report group would be the same
9  for the April-produced GFS reports, Deposition
10 Exhibits 836 to 843, the report group would be
11 balance sheet positions; is that correct?
12     A.   Yes, that's correct.
13     Q.   And the report category would be FID
14 Product Control, is that correct?
15     A.   That's correct.  Uh-huh.
16     Q.   And the report type would be custom;
17 is that correct?
18     A.   Yes.
19     Q.   And the report name would be BA: B-S
20 Detailed Exposure Report; is that correct?
21     A.   That's correct.
22     Q.   And the custom filter, what was the
23 custom filter?
24     A.   The custom filter was probably we
25 removed the exclusion of Sum Equities and ran it
```

Page 105

```
1              Krishnan
2  when we reran it in April.
3      Q.   Would that change the report type from
4  the custom report used previously if a custom
5  filter were changed or added?
6      A.   No, it would still be report type
7  custom.
8      Q.   And was the -- did the custom filter
9  have a specific name?
10     A.   That's the LBI entity.  That's the
11 name.
12     Q.   The custom filter used to generate the
13 April-produced reports, Deposition Exhibit 836
14 to 843?
15     A.   I don't know if we had a separate name
16 for that.  I think what we probably did was
17 removed that exclusion of Sum Equities and ran
18 the report, and I don't know, I think probably
19 we did not save it like that.  You know, we just
20 did like a one-time run removing that exclusion.
21     Q.   So it was -- the exclusion wasn't one
22 that was normally done when running GFS reports?
23         MR. THOMAS:  Objection to form.
24     A.   I cannot answer that question because
25 I don't really normally run reports on this, you
```

Page 106

1          Krishnan
2  know.  I get tickets like this.
3      Q.    And would the Fixed Income Department
4  Product Control -- or FID Product Control, would
5  they be ones that ordinarily would run the
6  reports?
7      A.    Yes.
8      Q.    And they would be the ones that
9  ordinarily choose if there would be a custom
10 filter, is that correct?
11     A.    Yes.
12     Q.    And you're not aware if they would use
13 a custom filter that would include the equities;
14 is that correct?
15         MR. THOMAS:  Objection to form.
16     A.    No, I don't know.
17     Q.    Do you know if you or your group are
18 the ones who ran the reports that were produced
19 in April, Deposition Exhibits 836 to 843?
20     A.    Yes, my -- either I or a person from
21 my group ran the reports.
22     Q.    And earlier you had indicated that the
23 report would have been requested through a SAM
24 ticket; is that correct?
25     A.    Yes, that's correct.

Page 107

1          Krishnan
2      Q.    Is that your recollection with respect
3  to these reports, that you generated them in
4  connection with a SAM ticket?
5      A.    Yes, that's what I recall.
6      Q.    And do you know who entered that
7  request?
8      A.    I don't remember who entered the
9  request.
10     Q.    Do you know when it was entered?
11     A.    I think there was a ticket sometime
12 around November of 2009 and probably later in
13 January or February.  I'm not sure.
14     Q.    And do you know if the report path
15 that you described to me is what was written on
16 that ticket to be run?
17     A.    Yes, this; all these details right
18 there.
19     Q.    And do you know who requested that
20 information, even if not the person to put in
21 the SAM ticket?
22     A.    Who --
23         MR. THOMAS:  Objection to form.
24     A.    It was a request from the attorneys.
25     Q.    And do you know if the attorneys are

Page 108

1          Krishnan
2  the ones who picked the report path to be run?
3      A.    I don't know who picked the path.
4      Q.    Ms. Krishnan, if I could put before
5  you what has been marked as Deposition Exhibit
6  858, and I am going to also hand you what has
7  previously been marked as Deposition Exhibit 791
8  and BCI Exhibit No. 779.
9          Turning first to Deposition Exhibit
10 858, do you recognize this document?
11     A.    Yes.
12     Q.    Did you prepare this document?
13     A.    Yes.
14     Q.    And could you describe for me what
15 this document is?
16     A.    We wanted to summarize based on the
17 GAAP asset classes because the other Excel
18 reports were really big, so these were for that
19 purpose.
20     Q.    And what sort of filter or report path
21 was used to generate the summaries by asset --
22 by GAAP asset class in Deposition Exhibit 858?
23     A.    The filter we used were the same as
24 the ones we used for this 836 and the others --
25 I mean, the ones with the including the

Page 109

1          Krishnan
2  equities.  And we included only the long
3  inventory market value because that's the
4  numbers that they wanted to be summarized, and
5  we included the GAAP Asset Class 1 number and
6  the name, you know, to group by that feed, those
7  feeds.
8      Q.    And you said that they wanted to
9  summarize.  Who were you referring to?
10     A.    The attorneys.
11     Q.    And is this a summary that you would
12 have prepared regularly in your position?
13         MR. THOMAS:  Objection to form.
14     A.    No, I have not prepared this
15 previously.
16     Q.    And was there a particular report path
17 that you used to generate this summary?
18     A.    It was -- it was based on the big
19 reports, the 831 or 83 -- I don't remember the
20 numbers, the equities.  It was based off that,
21 but when you group the data by just the GAAP
22 asset class and, you know, the GAAP Asset Class
23 1 Number and the name, it sums up the long
24 inventory market value.  So that's how we got a
25 summary.

Page 110

1              Krishnan
2      Q.   And the "Long Inventory Trade Date at
3  MV" column is a column that comes straight from
4  the GFS reports that we were discussing, is that
5  correct?
6      A.   Yes, it's the same that you see in the
7  other reports.  I don't remember the column
8  name -- I mean the column heading.
9      Q.   When did you run these reports?
10     A.   I think we ran this in April.
11     Q.   If I were to want to recreate this
12  report from the GFS reports with equities that
13  were produced in April, how would I go about
14  doing that?
15     A.   If you wanted to the same reports?
16     Q.   If I wanted to get to, for instance,
17  looking at the first page next to "Total
18  Governments & Agencies" of 37,310,795,798?
19     A.   Uh-huh.
20     Q.   If I wanted to get to that number
21  using the September 12 data, which I believe
22  we've been referring to as Deposition Exhibit
23  836, how would I do that?
24     A.   It could be a tedious process, but in
25  Excel you can -- you can just filter the ones,

Page 111

1              Krishnan
2  the GAAP Asset Class 1 Name, Total Governments &
3  Agencies.  Is that part of this report?  Should
4  be, I think.
5      Q.   I believe it is at column V.
6      A.   It's not column V.  It's column BK in
7  831.
8      Q.   If we could go to Deposition Exhibit
9  836 and that grouping through 843, because as I
10  understand it, it was those reports produced in
11  April that would be summarized within Deposition
12  Exhibit 858; is that correct?
13     A.   Yes, that's correct.  Let me see.
14  It's column BL and BM.  So you could, in Excel,
15  you could filter BM for the total government and
16  agencies and BL for the, you know, for the
17  number that's there, GAAP Asset Class 1 Number,
18  which is, I think, 70500.  I see "Total
19  Governments & Agencies" has two numbers, 70500
20  and 72260.
21         So if you filter this Excel on those
22  values and you sum those long inventory TD market
23  value, you should get this 37 billion plus that.
24  Okay, 37 billion.
25     Q.   So it would not be limited to just the

Page 112

1              Krishnan
2  GAAP asset class 70500, which is listed on 858
3  in the column corresponding to the 37 billion
4  figure?
5      A.   Actually, there are two GAAP Asset
6  Class 1 numbers which are associated with the
7  same name, Total Government & Agencies, but for
8  September 12, I can see that the 72260 has a
9  zero long inventory.
10     Q.   Okay.  And where on Deposition Exhibit
11  836, for instance, you see the word "null" under
12  "GAAP Asset Class 1 Name" in column BM, do you
13  know what that's a reference to?
14     A.   That refers to something that the
15  system is not able to map to -- it's not able to
16  put into any of the existing GAAP asset classes.
17     Q.   And would such securities in GFS be
18  captured on your summary?
19     A.   Yes, I believe so.  There is a 7999 in
20  the summary.
21     Q.   So the 488 million figure in
22  Deposition Exhibit 858 would be where that asset
23  class is characterized as null?
24     A.   Yes.
25     Q.   And if you'd look at column BH?

Page 113

1              Krishnan
2      A.   Uh-huh.
3      Q.   And that column is titled "Security
4  Subtype" and says "Adjustment" in the
5  corresponding rows to where the GAAP asset class
6  is null, what does "adjustment" mean?
7      A.   "Adjustment" means that a user might
8  have entered something to, you know, change that
9  row or maybe it's an entirely new row that the
10  user entered.
11     Q.   And can you tell when any such
12  adjustments would have been made?
13     A.   Adjustments are made in GFS every day.
14     Q.   But can you tell when these specific
15  adjustments would have been made?
16     A.   These are for 9/12, right?  So they
17  were probably made on -- they were probably --
18  they could have been made on September 15 when
19  the system was open for adjustments, but again,
20  we also set up a special environment for the
21  9/12 sometime late in October 2008 and it could
22  have been made at that time.
23     Q.   So adjustments could be made for a
24  previous day at any point after that date; is
25  that correct?

Page 114

1          Krishnan
2      A.   No, adjustments can be made only on
3  the day after.  Say for September 12 was a
4  Friday, so it can be made only on September 15
5  till 6 P.M.  But because the users thought that
6  the data was not -- maybe the input was not
7  correct or the maybe the data was not verified
8  by the users on that day, on September 15, they
9  had requested us to set up a special environment
10  for them for the September 12.
11      Q.   I think we're talking past each other
12  because my question right now is about the
13  September 12 data and the "Adjustment" comment
14  in column BH and whether that adjustment could
15  be made at any point after September 15; is that
16  correct?
17          MR. THOMAS:  Objection to form.
18      A.   I'm trying to explain that.  Any
19  adjustment that was made for September 12 could
20  have been done on September 15, which is the
21  normal time that adjustments would have been
22  made for September 12, but since September 12
23  was an important date for the users and they
24  thought that the input data may not have been
25  right or maybe the users did not check the data

Page 115

1          Krishnan
2  on September 15, they had a special environment
3  set up to be able to make adjustments at a later
4  date.  Normally doesn't happen.
5          So this adjustment could have come in
6  on September 15 or it could have been entered at
7  any time when we had the special environment
8  open for users to make adjustments.
9      Q.   So is there a way of telling when any
10  adjustment was made from the report that's in
11  front of you?
12      A.   No, not from this report.
13      Q.   Is there a way of telling when any
14  adjustment was made from the actual GFS data
15  itself?
16      A.   We have a table that records all the
17  adjustments, so we should be able to tell from
18  that.
19      Q.   And adjustments to September 12 data
20  is still possible even today; is that right?
21      A.   I don't think it's possible today.  I
22  think it's closed for adjustments.
23      Q.   Do you know when the period for
24  adjustments was closed?
25      A.   I think it was closed sometime --

Page 116

1          Krishnan
2          MR. THOMAS:  Objection to form.
3      A.   -- sometime in January of or February
4  of 2009, but I'm not too sure.
5      Q.   And is it your understanding that
6  adjustments were made up through the period when
7  it was closed in January or February of 2010 --
8  or, 2009?
9          MR. THOMAS:  Objection to form.
10      A.   I think so.
11      Q.   And do you know who would have made
12  those adjustments?
13      A.   I would guess that it would be the LBI
14  and LBHI users because we brought up the
15  environment for them, but I have not really
16  checked the users and which group they belong
17  to.
18      Q.   Could adjustments be made to any of
19  the data in the week from September 15 through
20  September 22 after those dates?
21      A.   For September 12, users had to have
22  completed the adjustments by September 15, 6
23  P.M.
24      Q.   I'm confused now, because your earlier
25  testimony was that for September 12 there could

Page 117

1          Krishnan
2  be adjustments all the way until the adjustment
3  period was closed a month later; is that
4  correct?
5      A.   Right, that was a special case for
6  just September 12.
7      Q.   So now what would be the case for,
8  say, September 15, when could adjustments be
9  made to data for September 15?
10      A.   Up to September 16, 6 P.M.
11      Q.   And what would the protocol be in
12  order to make any adjustments after 6 P.M. on
13  the following day?
14      A.   We can't do that.
15      Q.   The GFS data cannot be adjusted,
16  generally speaking, after the cut-off period at
17  6 P.M. the day after?
18      A.   That's correct.
19      Q.   But a special exception was made for
20  the September 12 data; is that correct?
21      A.   Yes, that's correct.
22      Q.   And was a special exception made for
23  data for any other day other than September 12?
24      A.   We had that -- the September 19 data
25  available as well for users to make adjustments,

Page 118

1          Krishnan
2  but I don't think users made adjustments for
3  September 19.
4      Q.   If you could turn your attention to
5  Deposition Exhibit 791.
6      A.   Is this the one?
7      Q.   Yes.  And if you could turn to the
8  Exhibit 1 -- actually, let me first ask you,
9  have you seen this document before?
10     A.   Yes.
11     Q.   When did you see this document?
12     A.   I have seen this because we -- I think
13  the attorneys tried to match up the summaries
14  with what we had here in GFS.
15     Q.   And you're pointing to what has been
16  marked as Deposition Exhibit 858; is that
17  correct?
18     A.   Yes, 858.  Sorry.
19     Q.   And how did they try to match those
20  up?
21     A.   For 9/12, you can see here that we
22  have the long inventory market value as 37.3
23  billion.
24     Q.   And were you asked to create a summary
25  that also arrived at 37.3 billion?

Page 119

1          Krishnan
2      MR. THOMAS:  Objection to form.
3      A.   No, I created a summary and we
4  confirmed that the numbers match.
5      Q.   And when did you do that?
6      A.   April of 2010, I think.
7      Q.   Did you speak with Professor
8  Pfleiderer in that exercise?
9      A.   No.
10     Q.   Have you ever communicated with
11  Professor Pfleiderer?
12     A.   No, I have never heard of his name
13  before.
14     Q.   Are you aware that Professor
15  Pfleiderer is an expert that's been retained by
16  Barclays in this matter?
17     A.   No, I don't know.
18     Q.   Have you ever read any expert report
19  that's been prepared by Professor Pfleiderer?
20     A.   No, I have not.
21     Q.   Have you ever read the contents of
22  Professor Pfleiderer's declaration that's part
23  of Deposition Exhibit 791?
24     A.   No, I don't recall reading this.
25     Q.   If you turn to footnote 3 of Professor

Page 120

1          Krishnan
2  Pfleiderer's declaration, "Strictly speaking,
3  the asset categories correspond to the various
4  values given in the GFS system for the 'GAAP
5  Asset Class 1 Name' variable associated with
6  each observation.  (The specific category names
7  are slightly different when one observes entries
8  for long versus short positions, but the
9  categories are materially the same; for example,
10  'CDs & Other Money Market' versus 'Total CDs and
11  Other Money Market Instruments.'  Exhibits 1 and
12  2 to this affidavit are based only on data for
13  long positions)."  Do you see that?
14     A.   Yes.
15     Q.   Is that your understanding of how the
16  summaries in Deposition Exhibit 858 that you
17  said you prepared were prepared?
18     MR. THOMAS:  Objection to the form of
19  the question.
20     A.   I'm sorry, what was the question?
21     Q.   My question is, the statements in
22  footnote 3, is it your understanding that they
23  hold true with respect to the summaries you
24  prepared that are in Deposition Exhibit 858?
25     MR. THOMAS:  Objection to form.

Page 121

1          Krishnan
2      A.   I'm sorry, I don't understand why this
3  is not --
4      Q.   Why don't I just break it down a
5  little bit.  Where it says, "For instance,
6  Exhibits 1 and 2 to this affidavit are based
7  only on data for long positions," do you see
8  that?
9      A.   Uh-huh.
10     Q.   Is that also the case for the
11  summaries that you prepared that we have marked
12  in this deposition as Deposition Exhibit 858?
13     A.   It has only long positions.
14     Q.   Only long positions.  Was it created
15  using a GFS report that only contained long
16  positions as opposed to the GFS reports with
17  both longs and shorts that have been produced to
18  us and that we have marked here as Deposition
19  Exhibits 836 through 843?
20     A.   I think that we did not select a short
21  inventory -- I mean, if I remember right, we did
22  not select the feed which had the "Short
23  Inventory, TD at Market Value," because this is
24  what we wanted to compare with that, that other
25  PBF exhibit.  I don't remember what the name

Page 122

Krishnan

1  was.
2      Q.   The other PBF, you mean the
3  declaration that you're looking at, Deposition
4  Exhibit 791?
5      A.   Right.  Uh-huh.
6      Q.   You were comparing when you prepared
7  858; is that correct?
8      A.   No.  No.  We prepared this.
9      Q.   You prepared 858?
10     A.   And then we confirmed that these
11  numbers tie.  These numbers are long inventory
12  positions, right?  So we selected only long
13  inventory positions.  So that's how we can
14  verify that what we have here is the same as
15  what we would if we generated a report in the
16  system.
17     Q.   And were you able to do the summary
18  using the actual GFS reports that were produced
19  in this matter with the GFS reports with the
20  equities, or did you need to go back into the
21  GFS system in order to run the summary?
22     A.   We went back to the GFS system to run
23  the summary, meaning we created a new report
24  which would give us a summary.
25

Page 123

Krishnan

1      Q.   And the new report was a report that
2  contained only the long positions; is that
3  correct?
4      A.   We selected only this feed, the long
5  inventory.  So, you know, if we had selected the
6  short inventory, that would show up here.
7      Q.   And so you can't say with a hundred
8  percent certainty that the summary in 858 is a
9  summary of, for instance, the September 12 data
10  that's in Deposition Exhibit 836; is that
11  correct?
12         MR. THOMAS:  Objection to form.
13     A.   No, I can say that because we built
14  this data off what we did here.
15     Q.   But correct me if I'm wrong, but you
16  used the reports that were generated in order to
17  prepare the summary that is Deposition Exhibit
18  858, or did you go back into the GFS system in
19  order to create the summary that is in
20  Deposition Exhibit 858?
21     A.   We went back into the system to create
22  this.
23     Q.   So my question is, did you test the
24  summary in 858 against what a summary of the
25

Page 124

Krishnan

1  actual GFS report, that is, for instance,
2  Deposition Exhibit 836, would have generated
3  using the relevant columns that we had discussed
4  before?
5         MR. THOMAS:  Objection to form.
6         THE WITNESS:  Can I -- can I talk to
7  you before I answer this?
8         MR. THOMAS:  Does it relate to an
9  attorney-client communications?
10         THE WITNESS:  I don't know.
11         MR. THOMAS:  Or just confusion about
12  the question?
13         THE WITNESS:  Because I just want a
14  few minutes to talk to one of you.
15         MR. THOMAS:  Okay.
16         MS. CARRERO:  If we can just -- just
17  get a yes/no answer and then we can take a
18  break of was a comparison done to the
19  reports, to the --
20         MR. THOMAS:  If she's -- I'm not sure
21  whether it involves attorney-client
22  privilege, so I don't want to just -- if
23  you're able to answer that question without
24  getting into attorney-client privilege, you
25

Page 125

Krishnan

1  can do that.  If not, if you're not sure if
2  it may involve something that we have
3  discussed, then we should take a break and
4  talk about it first.
5      Q.   I'm happy -- I just don't like to
6  leave a question pending before we take a break.
7  I'm happy to let you take a break and you can
8  answer further or clarify your answer, but in
9  terms of a yes/no as far as was any sort of
10  comparison done between a summary of the GFS
11  reports produced versus what a summary of, going
12  back into the GFS system, and what a summary of
13  that data would generate as in 858.
14     A.   I would think that this is the
15  comparison, you know, this was built off the
16  Excel, I think.
17     Q.   791 you think was built off of the
18  actual GFS reports that would be Deposition
19  Exhibits 836 to --
20     A.   That's correct.
21     Q.   -- to 843?  And then your summaries
22  you went back into the GFS system and prepared;
23  is that correct?
24     A.   That's correct.
25

Page 126

1              Krishnan
2      Q.   Thank you.  If you still --
3      A.   No.  I just wanted to find out if I
4  could say that.
5      Q.   And for purposes of arriving at the --
6  so looking at 858 and the totals that appear
7  next to each of the GAAP Asset Class 1 names, is
8  it not a net -- let me reformulate this.
9          If I were to go into the GFS reports
10  and look for the long inventory market value, I
11  could do so by looking at this column "Long
12  Inventory, TD@MV"; is that correct?
13      A.   That's correct.
14      Q.   Are market values also contained
15  within the reports using a net position?
16      A.   I'm sorry, could you repeat that?
17      Q.   Is there a column that calculates
18  market values for the net position for any given
19  CUSIP, meaning both the longs and the shorts of
20  that CUSIP?
21      A.   I think there are feeds which do --
22  which are populated whether it's long or a
23  short, but I'm not sure if they are captured in
24  this report.
25      Q.   And in order to determine the price of

Page 127

1              Krishnan
2  any given CUSIP that rolls up into the sum by
3  asset class, how would you go about finding out
4  the price for each CUSIP that, for instance,
5  rolls up into the 37-billion-odd in governments
6  and agencies?
7      A.   You would go back to this Excel
8  report, the 836, right?
9      Q.   Yes.
10      A.   So the 836, and you would -- you would
11  filter all the total governments and agencies,
12  that is, I think I mentioned it earlier, column
13  BL and BM.
14      Q.   So the "GAAP Asset Class 1" and the
15  "GAAP Asset Class 1 Name"?
16      A.   That's correct.
17      Q.   Okay.  So --
18      A.   And --
19      Q.   Filter those, go ahead.
20      A.   And you would look for this column
21  "Long Inventory, TD Market Value," which is
22  column V.
23      Q.   Okay.
24      A.   And that would be the individual
25  market value for each position.

Page 128

1              Krishnan
2      Q.   And those are market values as opposed
3  to prices; is that correct?
4          MR. THOMAS:  Objection to form.
5      A.   That's correct, they are market
6  values.
7      Q.   And how would you go about determining
8  what the price was for any given security that
9  rolls up into the sum?
10      A.   So now that you have all the total
11  governments and agencies, you can -- there's
12  another feed here, which is "Clean Price" and
13  "Dirty Price."
14      Q.   Column AY and AZ?
15      A.   Yes.
16      Q.   And in order to arrive at the market
17  value, would you need the factor as well?
18      A.   Yes, we would need a factor, which is
19  not here, and we would need the traded position,
20  which is in the AV.
21      Q.   And where would one find the factor
22  that was used to calculate the market value?
23      A.   I'm not sure if it is not included in
24  this report or if it's not part of that report
25  table that we have in GFS.  So it may be part of

Page 129

1              Krishnan
2  some of the product information.
3      Q.   And looking at the business date
4  listed in the right-hand column of each of the
5  pages of Deposition Exhibit 858, on the second
6  page, for instance, it says September 15, 6 A.M.
7          Is the total reflective of the total
8  at 6 A.M. on the business date reference?
9      A.   No, the business date does not have
10  the time in it.  I think it was the data that
11  was formatted in Excel.
12      Q.   So 6 A.M. is not reflective of the
13  time of day which this GFS data would reflect;
14  is that correct?
15      A.   Yes, that's correct.
16      Q.   Turning your attention back to
17  Deposition Exhibit 791, and looking at Exhibit
18  1, do you know if the CUSIPs on each of the days
19  reflected between September 12 and September 19
20  were identical population of securities?
21      A.   I don't know.
22      Q.   And do you know if the price for the
23  CUSIPs for the population of CUSIPs on each day
24  would have changed between September 12 and
25  September 19?

Page 130

1              Krishnan
2      A.   No, I don't know if they changed or
3  not.
4      Q.   And do you know in the ordinary course
5  how frequently prices for different types of
6  securities such as level 1 or level 2 or level 3
7  would have changed?
8      A.   No, I don't know based on the GAAP
9  asset class how they changed.
10     Q.   And is it your understanding that the
11 six GAAP asset classes that are listed here in
12 Exhibit 1, "Total Government and Agencies,"
13 "Total CDs and Other Market Instruments," "Total
14 Mortgages and Mortgage-Backed," "Total Corporate
15 Obligations and Spot," "Total Corporate Stocks
16 and Options," "Total Derivatives and Other
17 Contracts" are the exhaustive list of GAAP asset
18 classes?
19     A.   Yes, that's correct.
20     Q.   I'm going to hand you what has
21 previously been marked as Deposition Exhibit 19.
22 Have you seen this document before?
23     A.   No, I don't recall seeing this.
24     Q.   Do you know if this document was
25 prepared from GFS?

Page 131

1              Krishnan
2       MR. THOMAS:  Objection to form.
3      A.   I don't know.
4      Q.   Would you have been involved in the
5  creation of any balance sheets in your position
6  at Lehman?
7      A.   I don't know because I might -- I
8  might or my group might have run some reports
9  too and which in turn helped generating these
10 reports.  I don't know.
11     Q.   Do you know if the, on the asset side,
12 the total amounting to 10 billion for short --
13 for collateralized short-term agreements,
14 whether that would be found anywhere in GFS?
15     A.   I have no idea.
16     Q.   Would financing positions generally be
17 found in GFS?
18     A.   I'm not sure if financing positions
19 are part of this balance sheet report, but I
20 think there is another report which is called
21 Balance Sheet Movements that might have the
22 financing positions.
23     Q.   Are you familiar with box reports?
24     A.   No, I'm not.
25     Q.   And so do you know if any of the -- if

Page 132

1              Krishnan
2  all of the positions that would be on box
3  reports would, for instance, be within GFS?
4      A.   I don't know anything about box
5  reports.
6      Q.   I'd like to hand you what's previously
7  been mark as Deposition Exhibit 644A, which
8  corresponds to BCI Exhibit No. 486A.
9          Have you seen this document before?
10     A.   No.  I might have seen parts of it.
11 This report seems to be like -- the headers seem
12 to be like GFS header names.
13     Q.   You're looking at the fourth page of
14 the document titled "Lehman Brothers, Inc.
15 Balance Sheet by GAAP Asset Class -- GAAP Asset
16 Type, 9/12/2008"; is that correct?
17     A.   I'm actually looking at the last three
18 pages, which has sort of like an Excel report.
19     Q.   How about if you were to turn to the
20 page before that, which is the fourth page
21 titled "Lehman Brothers, Inc. Balance Sheet by
22 GAAP Asset Type, 9/12/2008," do you recognize
23 the form of the report as being generated by
24 GFS?
25     A.   I don't -- I don't know.  I don't

Page 133

1              Krishnan
2  recall.
3      Q.   You're not familiar with this report?
4      A.   These column names, they seem familiar
5  because there's "GAAP Asset Class 1 Name," "GAAP
6  Asset Class 2 Name."  I have seen these field
7  names in GFS, but I don't know -- I don't know.
8  I don't think there is a report in GFS that
9  gives this thing.
10     Q.   And is it your understanding that
11 there would be several steps from GFS or several
12 steps removed from GFS that would be taken in
13 order to generate the balance sheets that Lehman
14 would generate on a regular basis?
15       MR. THOMAS:  Objection to form.
16     A.   I think so, but I'm just guessing
17 because I was never involved in the process.
18       MR. THOMAS:  Hence the objection.
19     Q.   Is your understanding that GFS was the
20 subledger of Lehman Brothers or what role did it
21 play within financial reporting that Lehman
22 engaged in?
23     A.   It was not -- it was not a subledger.
24 It was more like a financial data warehouse kind
25 of which produced trade date balances and

Page 134

1              Krishnan
2 settlement date balances.
3      Q.    And do you know what systems were the
4 subledger and general ledger of Lehman Brothers?
5      A.    The general ledger was a system called
6 DBS, and I'm not really sure about the
7 subledger.  It could be Posting Engine.  I'm not
8 sure.
9          (Deposition Exhibit 860, a document
10         bearing Bates Nos. BCI-EX-(S)-00200951
11         through 53, with attachment, marked for
12         identification, as of this date.)
13     Q.    Ms. Krishnan, you have before you what
14 has been marked as Deposition Exhibit 860.  If
15 you could turn to the last page of that
16 document, which is titled "LBI Inventory by GAAP
17 Asset Class & BPM as at 9/16/2008," and which is
18 a native version of a document produced as
19 BCI-EX-(S)-00200964.  Do you see that?
20     A.    The last page, right?
21     Q.    Yes.
22     A.    Yes.
23     Q.    Do you recognize the format of this
24 report as one being generated from GFS?
25     A.    I think this is something that could

Page 135

1              Krishnan
2 have been generated from GFS, but I cannot be
3 sure unless I know this title here, "LBI
4 Inventory by GAAP Asset Class & BPM."  I don't
5 know, but these columns look like they could
6 have been pulled from a GFS report.
7      Q.    But you have never seen a report
8 exactly in this format before; is that correct?
9      A.    Yes, I have not seen anything like
10 this before.
11     Q.    And in the title do you know what
12 "BPM" stands for?
13     A.    Business Process Mapping, I think.
14     Q.    And that's a reference to Lehman's
15 specific nomenclature, would that be correct?
16     A.    Yes.
17     Q.    For a specific asset types; is that
18 correct?
19     A.    I think it may be for the asset type
20 or sometimes the accounts are also split into
21 BPMs.
22     Q.    Or would it be a reference to the
23 divisions in column B?
24     A.    In this context, it seems to be the
25 division, but I don't know why they said BPM.

Page 136

1              Krishnan
2      Q.    And are you familiar with the
3 different division names that are listed in
4 column B?
5      A.    Yes, these look familiar.
6      Q.    And looking at the divisions
7 corresponding to "Total Corporate Stocks &
8 Options," for instance, what would "Principal
9 Investing" relate to?
10     A.    I don't know what it would relate to,
11 but these look familiar.  The data looks
12 familiar.
13     Q.    Do you know if all of the divisions
14 that are listed in column B in this exhibit
15 would be captured within the summaries in 858 as
16 well as the reports between Deposition Exhibit
17 836 through 843?
18     A.    I would think so, but you can also
19 verify by, you know, looking up each of these in
20 the 836.
21     Q.    And would you in your role at Lehman
22 have been one to have generated a report such as
23 this one in Deposition Exhibit 860?
24     A.    I have not generated a report like
25 this before.

Page 137

1              Krishnan
2      Q.    And who would you expect would be the
3 group that would normally generate such reports?
4      A.    I would expect the users to -- I would
5 think that the users would generate reports like
6 this because they had the capability to make
7 their -- customize their own reports, and we
8 have no responsibility over what kinds of
9 reports they generate.
10     Q.    And the users would be the Product
11 Control Group and Finance?
12     A.    Project Control and Finance.
13     Q.    So that's yes, the Product Control
14 Group and the financial controllers, correct?
15     A.    Yes.  And when I said we have no
16 responsibility, what I mean is if someone gives
17 us the report and tells us to look at it, we can
18 look at it, but on a daily basis, we are not
19 looking at what reports the users generate and
20 what reports they run.
21         MS. CARRERO:  If we can just take five
22     minutes, I think I'm done, but I just want
23     to look over my notes really quick.
24         (Recess; Time Noted:  3:12 P.M.)
25         (Time Noted:  3:30 P.M.)

Page 138

Krishnan

1
2       MS. CARRERO:  I just have a couple and
3   then we'll pass the torch to Neil.
4   BY MS. CARRERO:
5       Q.   So a question about, if in the morning
6   one were to query the data for the previous day,
7   would they be able to do that?
8       MR. THOMAS:  Objection to form.
9       A.   Yes, they would be able to do that,
10  but it could change during the day because of
11  the adjustments that come in.
12      Q.   And that was your reference earlier to
13  that adjustments could be made up until 6 P.M.
14  the evening following the --
15      A.   The business day.
16      Q.   -- the trade date or --
17      A.   Uh-huh.
18      Q.   And the fact that adjustments could be
19  made, however, does not affect the ability to
20  query the system the following morning for
21  whatever data would have fed into GFS that
22  previous night; is that correct?
23      A.   That's correct.
24      Q.   You had previously testified about the
25  summaries that are in Deposition 858.  Were any

Page 139

Krishnan

1
2   other summaries than those in 858 prepared in
3   connection with an attempt to summarize the data
4   within GFS?
5       A.   I don't recall doing any other
6   summaries.  I'm just trying to see if 858 has
7   all the dates that we did.
8       No, I don't recall doing anything
9   other than these summaries.
10      MS. CARRERO:  Then with that, I have
11  no further questions at this time and I will
12  give my seat up to Neil Oxford.
13  EXAMINATION BY
14  MR. OXFORD:
15      Q.   Good afternoon, Ms. Krishnan.  When
16  you were preparing for your deposition, did you
17  review any documents?
18      A.   I don't recall reviewing documents.
19      Q.   So when you met with your attorneys,
20  you didn't have any documents that you reviewed
21  as part of that process; is that your testimony?
22      MR. THOMAS:  You can answer yes or no,
23  if you recall.
24      A.   I don't remember going through any
25  documents.

Page 140

Krishnan

1
2       Q.   Did you look at any tickets from the
3   SAM system?
4       A.   I'm sorry?
5       Q.   Did you look at any of the tickets
6   that you told Ms. Carrero about that are created
7   through the SAM system?
8       MR. THOMAS:  Objection to form.
9       A.   I didn't look at any tickets in the
10  SAM system.
11      Q.   Did you look at any of the reports
12  that we have looked at today, the GFS reports
13  either in the particular form they're in as
14  shown to you at this deposition or in a similar
15  form?
16      A.   I don't recall looking at any specific
17  reports.
18      Q.   Okay.  You testified in response to
19  Ms. Carrero's questions that there were a number
20  of reports that were run out of GFS, do you
21  remember that testimony?
22      A.   Yes.
23      Q.   But you said you didn't recall any of
24  the specific report names?
25      A.   Right.

Page 141

Krishnan

1
2       Q.   Is one of those report names a Daily
3   Exposure Report?
4       A.   It could --
5       Q.   Is that a name that you're familiar
6   with?
7       A.   It sounds familiar, but ... is it part
8   of any of these?
9       Q.   It's referred to in Professor
10  Pfleiderer's declaration, which is Exhibit 791.
11      A.   Detailed Exposure, you mean?
12      Q.   He calls it a Daily Exposure Report?
13      A.   796.
14      Q.   791.  This one here (indicating).
15      MR. THOMAS:  I think Pfleiderer is
16  779.
17      Oh, deposition Exhibit 791?
18      MR. OXFORD:  Yes.
19      A.   This one?
20      Q.   Yes.
21      A.   You're talking about these reports?
22      Q.   You have Deposition Exhibit 791 in
23  front of you?
24      A.   Yes.
25      Q.   You'll see that the exhibits to that

Page 142

```
1              Krishnan
2   are summaries of GFS Daily Exposure Reports.
3       A.   Uh-huh.
4       Q.   Are you familiar with what a Daily
5   Exposure Report is?
6       A.   I mean, I don't know.  The name could
7   mean anything, but --
8       Q.   It doesn't mean anything to you?
9       A.   Yes.
10      Q.   Before you've seen this Deposition
11  Exhibit 791, had you heard the phrase "Daily
12  Exposure Report"?
13      A.   I might have.  I don't remember
14  anything now.
15      Q.   But sitting here today you couldn't
16  tell me one way or the other whether or not it
17  was a standard report within GFS, correct?
18      A.   See, we have a number of reports in
19  GFS.  So if you just give me a name, I wouldn't
20  be able to say if it's a GFS report or not.
21      Q.   Okay.
22      A.   But I have the ability to check if I'm
23  in front of my computer, I can check if that's a
24  GFS report or not.
25      Q.   But sitting here today in front of us,
```

Page 143

```
1              Krishnan
2   without reference to your computer, you just
3   don't know the answer to my question one way or
4   the other, correct?
5       A.   That's correct.  Because that's
6   because of my memory.  I don't remember that
7   much.
8       Q.   I understand entirely.  I'm just
9   asking you for your memory and your recollection
10  as sitting here today.  That's all.
11           Is there, to your knowledge, Ms.
12  Krishnan, a standard report in the GFS system
13  that is called a GAAP report?
14      A.   Yes, I have heard of GAAP report.
15      Q.   An that's GAAP, G, double A, P, not
16  G-A-P, correct?
17      A.   That's correct.
18      Q.   And to your knowledge, ma'am, what is
19  contained in that report?
20      A.   The name is longer than the GAAP
21  Report and it's -- I think there are GAAP
22  reports for each of the source systems that ITS,
23  MTS, TMS.  I'm not sure if Loan I.Q. has it or
24  not.  To my understanding, what it does is it
25  shows the -- it shows the start of day balances
```

Page 144

```
1              Krishnan
2   from the actual source systems in comparison to
3   what GFS has it at the end of the day.
4       Q.   I see.  And is there a GAAP report for
5   GFS only, or are the only GAAP reports you're
6   aware of reports that compare data in GFS to one
7   of the source systems you've just told me about,
8   ITS, TMS, et cetera?
9       A.   The only GAAP reports that I know of
10  are the ones that sort of do a reconciliation
11  with the ITS or the MTS or TMS.
12      Q.   You testified earlier about a version
13  of the GFS data that is set up within a special
14  environment?
15      A.   Uh-huh.
16      Q.   Do you remember that testimony?
17      A.   Yes.
18      Q.   And the data, as I understand it, is
19  from the 12th of September and the 19th of
20  September, correct?
21      A.   That's correct.
22      Q.   Is that data in the special
23  environment from the end of the day on those two
24  dates or the start of the day or some other
25  timeframe?
```

Page 145

```
1              Krishnan
2       A.   It's the end of the day of September
3   12.
4       Q.   And is that for all Lehman entities,
5   ma'am, in this special environment, or is the
6   data -- does the data relate to only certain
7   Lehman entities?
8           MR. THOMAS:  Objection to form.
9       A.   All Lehman entities that GFS has.
10      Q.   Is it your understanding, ma'am, that
11  GFS did not contain data on all Lehman entities?
12      A.   I do not know what we don't have, so I
13  don't -- I don't want to say that we had on here
14  the Lehman entities.
15      Q.   I understand that you may not know
16  conclusively whether every single last Lehman
17  entity was in there, but was it your
18  understanding that all Lehman data relating to
19  all Lehman entities was contained within GFS, or
20  do you believe it was some subset?
21          MR. THOMAS:  Objection to form.
22      A.   I would have thought that we didn't
23  have all the data.  I don't know.
24      Q.   Okay.
25      A.   I have no idea.
```

Page 146

Krishnan

1
2    Q.  Do you have an understanding of any
3    specific LBI entities -- sorry, Lehman-related
4    entities whose data relating to which was not
5    contained within GFS?
6    A.  Again, I wouldn't know what we don't
7    have, so I can't answer that.
8    Q.  Could you have Exhibit 831 in front of
9    you, please?  And Ms. Carrero took you through a
10   number of the column headings.
11   A.  Uh-huh.
12   Q.  And I'd like to ask you some questions
13   about a couple of additional ones.  If you could
14   turn to column BK, please.
15   A.  Okay.
16   Q.  Do you have it there?
17   A.  Uh-huh.
18   Q.  You see the column BK has a heading
19   "GAAP Asset Class 1"?
20   A.  Uh-huh.
21   Q.  Do you know what that's a reference
22   to?
23   A.  That's a number that is assigned to
24   the GAAP Asset Class 1 Name.
25   Q.  And that's assigned to the GAAP Asset

Page 147

Krishnan

1
2    Class 1 Name that appears in column BL?
3    A.  That's correct.
4    Q.  One over to the right, correct?  And
5    is it your understanding that the -- that there
6    are six GAAP asset classes?
7    A.  Yes, I would think so.
8    Q.  And those are the six that you told
9    Ms. Carrero about, correct?
10   A.  That's correct.
11   Q.  If you turn the page on the exhibit,
12   you get to column BM, and it's headed "GAAP
13   Asset Class 2."  Do you see that?
14   A.  Yes.
15   Q.  Do you know what that's a reference
16   to?
17   A.  I'm just guessing here.  I think these
18   are just, you know, several different levels.
19   Like GAAP Asset Class 1 is one level and 2 is
20   another way of looking at it or something.
21   Q.  I see, so you don't have any personal
22   familiarity with what --
23   A.  No.
24   Q.  -- GAAP Asset Class 2 is, correct?
25   A.  Uh-huh.

Page 148

Krishnan

1
2    Q.  Do you know what GAAP Asset Class 3
3    is?
4    A.  I think the GAAP Asset Class 3, that
5    number is the GL account.
6    Q.  Does "GL" stand for general ledger?
7    A.  Yes.
8    Q.  Does the GFS system, ma'am, contain
9    information -- rather, did it in September 2008
10   contain information on Lehman's cash?
11   A.  I don't know.  "Lehman's cash"
12   meaning?
13   Q.  You testified a few moments ago that
14   there were -- there are six GAAP asset classes?
15   A.  Uh-huh.
16   Q.  Data relating to which is contained
17   within GFS, correct?
18   A.  Right.
19   Q.  And I can take you through each of
20   these in turn, but those categories are
21   "Government and Agencies"?
22   A.  Uh-huh.
23   Q.  Correct?  Yes?
24   A.  Yes, I see those.
25   Q.  And just for the record, the other

Page 149

Krishnan

1
2    entries are "CDs and Other Money Market
3    Instruments," "Mortgages and Mortgage-Backed
4    Securities," "Corporate Obligations and Spots,"
5    "Corporate Stocks and Options" and "Derivatives
6    and Other Contracts," correct?
7    A.  Uh-huh.
8    Q.  To your knowledge, ma'am, as someone
9    who is familiar with the GFS system, do either
10   of -- any of those six asset classes contain
11   cash?
12   A.  I don't know.
13   Q.  Or include cash?
14   A.  I don't know.
15   Q.  You don't know one way or the other?
16   A.  Yeah.
17   Q.  Are you aware that, as part of
18   Lehman's business in September of 2008, Lehman
19   had posted securities as collateral for
20   derivatives positions at various clearing
21   organizations --
22   MR. THOMAS:  Objection to form.
23   Q.  -- and exchanges?
24   Were you aware of that?
25   A.  Yes.  I mean, just like any other

Page 150

Krishnan

1 company, I guess they would have put collateral.
2    Q.    And do you know one way or the other,
3 ma'am, whether securities posted as collateral
4 for derivative positions would be included or
5 excluded from the assets that are under any of
6 the six GAAP asset classes within GFS?
7    A.    I don't know.
8    Q.    You referenced in your testimony
9 earlier a DBS system?
10    A.    Uh-huh.
11    Q.    Can you tell me again what that is,
12 please?
13    A.    The DBS is also called the general
14 ledger.  I don't really know what "DBS" stands
15 for.  It's called general ledger or DBS.
16    Q.    And the number for LBI is quadruple
17 zero?
18    MR. THOMAS:  Objection to form.
19    Q.    Quadruple zero, 0000?
20    A.    I think so.
21    Q.    If, and you may not know this one way
22 or the other, if LBI held securities for an
23 affiliate of LBI, do you know if those --
24 withdrawn.  Let me try again.

Page 151

Krishnan

1    If LBI held option positions for an
2 affiliate of LBI, would those options positions
3 be reflected in GFS under the DBS number 0000
4 for LBI or the DBS number for the relevant
5 affiliate?
6    A.    I don't know.
7    Q.    The GAAP asset class "Derivatives and
8 Other Contracts," ma'am, do you know whether
9 that includes or excludes over-the-counter
10 derivatives?
11    A.    I'm sorry?
12    Q.    The GAAP asset class within GFS of
13 "Total Derivatives and Other Contracts"?
14    A.    Uh-huh.
15    Q.    Are you with me?
16    A.    Yes.
17    Q.    Does that -- do you know one way or
18 the other whether or not that includes
19 over-the-counter derivatives?
20    A.    I don't know.
21    Q.    Could you have in front of you Exhibit
22 858, please?  Do you have it there?
23    A.    Uh-huh.
24    Q.    I believe you testified that you

Page 152

Krishnan

1 created this summary, correct?
2    A.    Yes.
3    Q.    And this has only long inventory
4 positions and not short inventory positions,
5 correct?
6    A.    Yes.
7    Q.    Can you tell me why you excluded from
8 this the short inventory positions?
9    A.    The purpose of this was to create a
10 report of GFS and see if these numbers tie out
11 with the other number.  I don't remember the
12 number.
13    Q.    With the numbers that are in Professor
14 Pfleiderer's declaration, Exhibit 791?
15    A.    Yes.  So these are long inventory
16 market values, right?
17    Q.    Right.
18    A.    So that's why we did not pick the
19 short inventory here.  That's why we did not
20 choose them.
21    Q.    If you wanted to create a summary
22 similar to Exhibit 858 --
23    A.    Uh-huh.
24    Q.    -- for short --

Page 153

Krishnan

1    A.    Uh-huh.
2    Q.    -- inventory positions with respect to
3 the same dates that are in your summaries at
4 858, how would you go about that?
5    A.    I would -- I would include the short
6 inventory instead of this long inventory, and I
7 would create a new report on it of GFS.
8    Q.    With a little more specificity, and
9 with reference perhaps to Exhibit 837, if that
10 would be helpful for you, could you tell me how
11 it is you would go about creating that report?
12    A.    837 is this Excel?  The full report?
13    Q.    Yes.
14    A.    Okay.  First of all, I did not make
15 this report from here.  I ran it from GFS
16 system.
17    Q.    Okay.  And just so the record is
18 clear, when you say "this report," you're
19 referring to Exhibit 858?
20    A.    Yes, Exhibit 858.
21    Q.    Okay.  So let's try it this way.  Can
22 you tell me with reference to -- withdrawn.
23    Would it be possible to create the
24 short inventory analog of Exhibit 858 from

Page 154

Krishnan

1  Exhibit 837?
2
3      A.   Yes, I think so.
4      Q.   Can you please tell me how you would
5  go about that?
6      A.   You would filter on the "GAAP Asset
7  Class 1 Number" and the name and you would --
8  you would pick just the "Short Inventory, TD at
9  Market Value."
10     Q.   Uh-huh.
11     A.   And then you may have to, you know,
12 like do some sort of summing or pivoting in
13 Excel, I'm not very familiar with how they do it
14 in Excel, and you would get the numbers for the
15 short inventory.
16     Q.   Could you looking at Exhibit 837,
17 could you identify the particular columns that
18 you would use in order to create the short
19 inventory analog of Exhibit 858?
20     A.   I would pick the -- 836.  I would pick
21 the AB and BL and BM and probably the business
22 date -- I don't know where that is -- which is
23 BU.
24     Q.   Sticking with Exhibit 837, the column
25 BU that you just referred to includes not just

Page 155

Krishnan

1
2  the date but also the time, ma'am, you see that?
3      A.   Yeah, but I was just telling --
4      Q.   Ms. Carrero?
5      A.   -- that the time is not relevant
6  because it's based on the date I think it's some
7  formatting in Excel.
8      Q.   So there's no -- the time of 6 A.M.?
9      A.   It just --
10     Q.   -- is inaccurate?
11     A.   Yeah.
12     Q.   And separate and apart from the
13 inclusion in Deposition Exhibit 837, column BU,
14 of the 6 A.M. time, is this data reflective of
15 end of day or beginning of day prices?
16     A.   End of day.
17     Q.   And if you could turn to Exhibit 831
18 and to the last column, which is BT, again
19 headed "Business Date"?
20     A.   Uh-huh.
21     Q.   Is the answer the same to the same
22 question:  Does the data in Exhibit 831 reflect
23 the values within GFS -- and I use values
24 generally speaking, not specifically
25 monetarily -- as at the end of the business day?

Page 156

Krishnan

1
2      A.   Yes, that's correct.
3      Q.   Could you have Exhibit 19 in front of
4  you briefly, please?  That's a one-page document
5  shown to you at the end of the deposition.
6          Do you have it there?
7      A.   Uh-huh.
8      Q.   You see at the top left-hand side
9  under "Assets" --
10     A.   Uh-huh.
11     Q.   -- that there are seven entries above
12 the line that says "Total," beginning with "Gov.
13 and AG"?
14     A.   Uh-huh.
15     Q.   And going down through "Cash," do you
16 see those?
17     A.   Yes.  Yes.
18     Q.   With the exception of the cash, do you
19 agree that those six asset categories are
20 reflective of the six GAAP asset categories that
21 are held within GFS?
22         MR. THOMAS:  Objection to form.
23 Foundation.
24     A.   I -- I don't know.  The names are
25 different, so I'll go by the names.

Page 157

Krishnan

1
2      Q.   Which names are different, ma'am?
3      A.   I'm sorry?
4      Q.   Which names are different?
5      A.   The GAAP asset class names that I have
6  in the GFS summary report are different from
7  what they are here.
8      Q.   Do you think it's possible that these
9  are -- the entries, those six entries on Exhibit
10 19, are shorthand for the GAAP asset classes as
11 reflected in the GFS system?
12         MR. THOMAS:  Objection to form.
13 Foundation.  Calls for speculation.
14         You can answer or respond at least.
15     A.   I'm too tired.  I don't know what it
16 means.  I don't know.  I -- I really don't know.
17         MR. OXFORD:  Okay.  I have no further
18 questions.  I believe Mr. Thomas has some
19 for you.
20         MR. THOMAS:  I do.
21 EXAMINATION BY
22 MR. THOMAS:
23     Q.   Let me ask you to turn to Deposition
24 Exhibit 859, please, which is the e-mail chain
25 from Ms. Carrero.

Page 158

1           Krishnan
2           At some point in 2009 were you asked
3   to run -- asked by Barclays' lawyers to run GFS
4   reports?
5       A.   Yes, that's correct.
6       Q.   Are the reports that you were asked to
7   run at that time described in Ms. Carrero's
8   e-mail here under "Report Group"?
9       A.   Uh-huh.  Balance sheet positions, yes.
10      Q.   So you recognize this report with the
11  description "Report Group," "Report Categories,"
12  "Report Type," "Report Name," "Custom Filter and
13  Dates," you recognize that as the report that
14  Barclays' attorneys asked you to run in 2009?
15      A.   That's correct, yes.
16      Q.   And did you in fact run that report?
17      A.   Yes, we did.
18      Q.   And did you provide it to Barclays'
19  lawyers?
20      A.   Yes.
21      Q.   And is it your understanding those
22  reports were provided to movants in this case?
23  Is it your understanding that those reports were
24  provided to LBHI in this case?
25      A.   Yes, it looks like it.  I see it in

Page 159

1           Krishnan
2   the exhibits.
3       Q.   If I can ask you to turn -- That's
4   good point.  If I ask you to turn to the stack
5   of deposition exhibits which are 844 to 856.  I
6   know you were asked questions about this
7   previously.
8           Does this appear to be excerpts of the
9   reports that you ran consistent with the report
10  request described in Deposition Exhibit 859?
11      A.   Yes, that's correct.
12      Q.   Okay.  And looking at it up on the
13  screen, and if I could ask you to just scroll
14  down, please, so we're looking at the electronic
15  version of 844, and does this appear to be the
16  report that you ran in response to the report
17  request described in Deposition Exhibit 859?
18      A.   That's correct.
19      Q.   And did there come a time when you
20  were asked to modify the report or the filter in
21  any way?
22      A.   Yes, we were asked to modify the
23  filter so we would also include the equities in
24  this report.
25      Q.   Was that sometime in 2010?

Page 160

1           Krishnan
2       A.   Yes.
3       Q.   And did you run such reports?
4       A.   Yes, we did.
5       Q.   And if I could ask you to look at the
6   stack of deposition exhibits that contain Depo
7   Exhibits 836 through 843, please.
8       A.   Yeah.
9       Q.   And does this appear to be extracts of
10  the reports that you were later asked to do that
11  contained equities?
12      A.   That's correct.
13      Q.   And in order to produce this report,
14  you had to modify or change the report requests
15  contained in Deposition Exhibit 859?
16      A.   Right, we had to change the filter to
17  include the LBIs and remove the exclusion that
18  it had on the equities.
19      Q.   And if I could ask you to look
20  electronically on the screen at Deposition
21  Exhibit 836?
22      A.   Uh-huh.
23      Q.   And if I could ask counsel to scroll
24  down for me, please.
25          And you're pointing at the screen.

Page 161

1           Krishnan
2   What are you pointing to?
3       A.   "Sum Equities."
4       Q.   Okay.  And do you recognize this as a
5   report you produced in 2010 that included the
6   equities?
7       A.   That's correct.
8       Q.   And did this include all the long
9   positions in the GFS system?
10      A.   Yes, it included everything in GFS
11  with that filter, with the LBI filter.  It just
12  included everything that was in LBI.
13      Q.   Okay.  And that would be all the long
14  positions including equities?
15      A.   Yes.
16      Q.   When you produced these reports, did
17  you try to make sure you did so accurately?
18      A.   Yes, we did.
19      Q.   And you believe the reports accurately
20  reflect the data in the GFS system?
21      A.   That's correct.
22      Q.   And you were also shown Deposition
23  Exhibit 791, which is BCI Exhibit 779, and in
24  the middle of the page -- you've got it there --
25  it's a chart entitled "Summary of GFS Daily

Page 162

1          Krishnan
2  Exposure Report," do you see that?
3      A.   Yes.
4      Q.   At some point then were you asked to
5  ensure or to check whether these summary data
6  were consistent with the data in the GFS system?
7      A.   That's correct.
8      Q.   For good measure, let me go ahead and
9  mark Deposition Exhibit 808 -- excuse me.  Let
10 me ask that we mark BCI Exhibit No. 808 as
11 Deposition Exhibit number 861.
12         (Deposition Exhibit 861, Summary of
13     GFS Daily Exposure Reports, September 12-19,
14     2008, marked for identification, as of this
15     date.)
16         MR. THOMAS:  Let me also ask that we
17     mark BCI Exhibit No. 809 as Deposition
18     Exhibit 862.
19         (Deposition Exhibit 862, a document
20     bearing Bates Nos. BCI-EX-00302963, with
21     attachment, marked for identification, as of
22     this date.)
23         MR. OXFORD:  Just so I'm clear, Todd,
24     are these the exhibits to Professor
25     Pfleiderer's April declaration?

Page 163

1          Krishnan
2          MR. THOMAS:  I think they are
3      free-standing exhibits, although they may be
4      the exact same.
5          MR. OXFORD:  Thank you.
6      Q.   And I'm going ask you to look at -- we
7  now have three charts in front of you,
8  Deposition Exhibit 861, Deposition Exhibit 862,
9  and Deposition Exhibit 791 --
10     A.   Okay.
11     Q.   -- titled "Summary of GFS Daily
12 Exposure Report"?
13     A.   Uh-huh.
14     Q.   And if you could take a moment to
15 confirm whether the data is essentially the same
16 in the charts.
17     A.   Yes.
18     Q.   Okay.  And did you confirm that the
19 data reflected in the three deposition exhibits
20 you're looking at is accurate and accurately
21 reflects the data contained in the GFS system
22 for these dates?
23     A.   Yes, I did.
24     Q.   And as part of that effort, did you
25 create Deposition Exhibit 858?

Page 164

1          Krishnan
2      A.   Yes, that's correct.
3      Q.   And this was something you created out
4  of GFS yourself?
5      A.   Yes.
6      Q.   Did the numbers that you looked at in
7  GFS and used to create 858 match up with the
8  numbers in Deposition Exhibits 861, 862 and 791?
9      A.   Yes, they matched.
10     Q.   So do the numbers in these charts in
11 Deposition Exhibits 861, 862 and 791 accurately
12 reflect the data in the GFS system?
13     A.   Yes.
14     Q.   Are you familiar with the expression
15 "T+1"?
16     A.   Yes.
17     Q.   Would you explain what that means?
18     A.   It means trade date plus one.
19     Q.   Can you explain how that relates to
20 the Lehman GFS system as of September 2008?
21     A.   What it means is that when, for
22 September 12, the data is available the next
23 business date, which is the Monday.  "T+1"
24 actually means the trade date plus one business
25 date.  So for the 12th, the data is available

Page 165

1          Krishnan
2  for users to view on the 15th morning.
3      Q.   Let's, for example, use the date of
4  September 16.  When would the data for the 16th
5  initially, initial data, come into the system?
6          MR. OXFORD:  Objection.  Form.
7      A.   Can I answer it?
8      Q.   You can answer.
9      A.   So the data would come in on the
10 evening of September 16.  It would keep coming
11 between September 16 night and September 17
12 early morning, and by September 17, say around 8
13 A.M. or 9 A.M., the system is ready with the
14 start of day numbers.
15     Q.   And are there further adjustments that
16 are made to the September 16 numbers on the
17 17th?
18     A.   Yes.
19         MR. OXFORD:  Objection.  Form.
20     A.   Yes.  The users have the capability to
21 make adjustments on September 17 for September
22 16 data.
23     Q.   Is there a cut-off time in the system
24 for such adjustments on the day after?
25     A.   Yes.  6 P.M. is the cut-off time.

Page 166

Krishnan

1
2 Users usually put in adjustments before 5:30 to
3 make sure that the adjustments go through.
4     Q.    So for data, for example, on September
5 16, when would complete data on Lehman's
6 positions be available for September 16?
7     A.    Somewhere between 6 P.M. on September
8 17 and 7 P.M., somewhere between that time you
9 would have the complete data.
10     Q.    And is that what's referred to as T+1
11 because the data isn't available until the night
12 of the next day?
13     A.    We refer to it as T+1 because even the
14 start of day data is not available till, for
15 September 16, is not available until September
16 17. So it's trade date September 16 plus one,
17 September 17.
18     Q.    And the data that flows into the GFS
19 system, that's from other Lehman systems?
20     A.    Yes.
21     Q.    And several times in your testimony
22 today you have used the term "market value," and
23 we've looked at the term "market value" as used
24 in the GFS system and the GFS reports.  Do you
25 recall that?

Page 167

Krishnan

1
2     A.    Uh-huh.  Yes.  Sorry.
3     Q.    And what is your understanding of what
4 the term "market value" means in the GFS system
5 and as you were using it?
6     A.    My understanding is that, based on the
7 end-of-day balances and the end-of-day prices,
8 the system calculates the market value, and
9 also, the system is open for users to make any
10 adjustments to the price or the quantity, to
11 modify it in any way.
12     Q.    If we see something that says "market
13 value" in the GFS system or a GFS report, is
14 that simply a calculation of whatever price is
15 there times the quantity of the position?
16     A.    Most times that's true, but sometimes
17 there is a pricing factor or a multiplier
18 involved.
19     Q.    The price that's in the GFS system?
20     A.    Uh-huh.
21     Q.    Do you know, is that -- that price is
22 being fed into the GFS system by some other
23 system, correct?
24     A.    Sorry?
25     Q.    That price is being fed, flowed into

Page 168

Krishnan

1
2 GFS from some other system?
3     A.    That's correct.
4     Q.    And do you know if the price that's
5 coming into GFS is an exit or last price?
6     A.    I think --
7         MR. OXFORD:  Objection.  Form.
8     A.    I think it may be the last price
9 because we get the end-of-day balances.
10     Q.    So the "market value" phrase used in
11 GFS and the GFS reports, as you understand it,
12 would be the last price that you receive from
13 another source times the quantity of the
14 position held?
15     A.    Yes, that's my understanding.
16     Q.    You were asked earlier about a special
17 environment that was created for data as of
18 September 12, do you recall that?
19     A.    Yes.
20     Q.    And I think you were asked some
21 questions concerning whether you could --
22 whether the data for September 12 in the GFS
23 system could have been modified anytime after
24 September 15, and I just want to be specific.
25         What periods of time could the data in

Page 169

Krishnan

1
2 the GFS have been modified?
3     A.    For September 12, specifically, it
4 could have been modified on September 15, or at
5 the time that we set up the special environment,
6 after October 28 of 2008.
7         MR. THOMAS:  And let me go ahead and
8     mark another document.  We'll mark as
9     Deposition Exhibit 863.
10         (Deposition Exhibit 863, an e-mail
11     from Nadya Romero dated October 27, 2008,
12     with attachment, marked for identification,
13     as of this date.)
14     Q.    Were you personally involved in
15 helping set up this special environment for
16 September 12?
17     A.    Yes, I was.
18     Q.    And I've shown you a document that's
19 an e-mail chain and attachment entitled "9/12
20 Global Consolidated Close - on behalf of Alvarez
21 & Marsal"?
22     A.    Uh-huh.
23     Q.    You see it's sent to some group named
24 "DBS USERS"?
25     A.    That's right.

Page 170

1          Krishnan
2     Q.   Do you believe that you would have
3   been included as part of that group?
4     A.   I might have been included.
5     Q.   Do you recall this project that's
6   being described here in this e-mail chain?
7     A.   Yes, I was very much involved in this
8   project and but I cannot remember exactly
9   getting this e-mail because it was way back in
10  October 2008.
11    Q.   But you were personally involved in
12  this project?
13    A.   Yes, I was.
14    Q.   And at whose request was this project
15  done?
16    A.   It -- my understanding was that it was
17  done for LBHI and LBI.
18    Q.   And at the top of this it says "on
19  behalf of Alvarez & Marsal."  Did you have an
20  understanding that Alvarez & Marsal was kind of
21  running LBHI at this time?
22    A.   Yes, that's correct.
23    Q.   And in one of the recipients here, do
24  you see David Coles?
25    A.   Uh-huh.

Page 171

1          Krishnan
2     Q.   Were you aware that he was the CFO of
3   Lehman, LBHI?
4     A.   I'm not -- I'm not sure.
5     Q.   Okay.  And what was your understanding
6   of why there was a special environment being set
7   up?
8     A.   My understanding was that the input
9   data that we received for September 12 might
10  have had some problems, or on September 15, the
11  users did not probably do the adjustments that
12  they were supposed to do and that's why we had
13  to set up this whole new environment so that
14  they are able to put in adjustments for
15  September 12.
16    Q.   So normally adjustments for a
17  particular day can only be made in the GFS
18  system for the next day up until a certain time?
19    A.   That's correct.  Next day until 6 P.M.
20    Q.   And did you mention earlier something
21  about a 23-day period?
22    A.   GFS just holds the last 23 business
23  days of data, but users are not able to adjust
24  this.
25    Q.   So for someone at Lehman who stayed at

Page 172

1          Krishnan
2   Lehman after the closing of the Barclays deal on
3   September 22, those that had access to the GFS
4   prior to the closing, would they have continued
5   to have access afterwards?
6     A.   I believe so.
7     Q.   Was there anything, to your knowledge,
8   done that would have stopped that access?
9     A.   I don't think we did anything in GFS
10  to stop anybody's access.
11    Q.   And so on September 22 someone with
12  access at Lehman could go into GFS and look at
13  whatever values in the GFS system they wanted?
14    A.   Yes, I believe so.
15    Q.   And for 23 days, they could -- they
16  could go back 23 days in time to see any values
17  they wanted to in GFS?
18    A.   That's correct.  Yes.
19    Q.   This effort, this project described in
20  this e-mail, Exhibit 863, would have been more
21  than 23 days after September 12; is that
22  correct?
23    A.   That's correct.
24    Q.   Now, was this special environment set
25  up so that Alvarez and LBHI and LBI could do

Page 173

1          Krishnan
2   whatever they wanted to do with respect to
3   September 12 data?
4         MR. OXFORD:  Objection.  Form.
5   Foundation.
6         MS. CARRERO:  Same objection.
7         MR. DAKIS:  Same objection.
8     A.   Can I answer it?
9     Q.   You can answer.
10    A.   I don't know what -- I mean, I don't
11  know what they did, but what I can say is that
12  I've seen adjustments for September 12 in the
13  special environment that was set up.  So I guess
14  they did change the data after this environment
15  was set up.
16    Q.   And by "they," you're referring to
17  Lehman and Alvarez & Marsal?
18    A.   That's correct.
19    Q.   And you personally have seen those
20  adjustments?
21    A.   Yes, I've seen those adjustments.
22    Q.   Were there many adjustments?
23    A.   I think there were about 7,000
24  adjustments.
25    Q.   Now, the data that's reflected in the

Page 174

1           Krishnan
2    GFS reports that you ran and that we've
3    discussed here today and that were marked as
4    deposition exhibits, were they, the data for
5    September 12, would that reflect the adjustments
6    made to the September 12 data by Alvarez &
7    Marsal and Lehman as part of this project?
8        A.   Yes, that's correct.  We pulled the
9    September 12 data from the special environment
10   that we set up.
11           MR. DAKIS:  Objection to the form of
12   the question.
13       Q.   Now, after 23 days had passed, could a
14   user then ask your group to check the archives
15   and provide data from GFS?
16       A.   Yes, they could.
17       Q.   Was it common for there to be a
18   significant number of adjustments to pricing
19   information in the GFS system on the day after?
20       A.   Yes.
21       Q.   And were those adjustments frequently
22   significant?
23           MR. OXFORD:  Objection.  Form.
24       A.   Yes, they would -- they could
25   potentially affect the numbers.

Page 175

1           Krishnan
2        Q.   So when you were previously asked
3    about the process being automated with feeds,
4    were you not including the day-after process of
5    people going in and making adjustments to the
6    price?
7        A.   That's correct, I only included the
8    feed files that we get from the rating systems.
9            MR. THOMAS:  I have nothing further.
10   FURTHER EXAMINATION BY
11   MS. CARRERO:
12       Q.   I have a few follow-up questions for
13   you, Ms. Krishnan.
14           When Mr. Thomas asked you about
15   adjustments to the September 12 data and you
16   said something in the neighborhood of 7,000
17   adjustments had been made; is that correct?
18       A.   Somewhere in the neighborhood.  I
19   don't know the exact number.
20       Q.   And does that include adjustments that
21   were made on September 15 as well as any later
22   adjustments?
23       A.   It -- I don't think that number
24   includes the -- it's too far back.  I don't
25   remember, but I think it's the 7,000 adjustments

Page 176

1           Krishnan
2    was just in the special environment that we had
3    set up.
4        Q.   And how would you determine how many
5    adjustments had been made on September 15?
6        A.   We have a table which records on what
7    date the adjustments were made, so based on that
8    we can determine.
9        Q.   And Mr. Thomas asked you about the
10   concept of trade date plus one, do you recall
11   that?
12       A.   Yes.
13       Q.   And does trade date plus one refer to
14   only the closing of the adjustment period the
15   day after?
16       A.   The trade date plus one means that,
17   after the actual trade date, one date after the
18   actual trade date, the reports are available for
19   the trade date.  So the trade date and the
20   business date mean the same.
21       Q.   But earlier you had testified that if
22   one were to go into the system the following
23   morning, that any of the feeds into GFS would be
24   in the GFS system; is that correct?
25       A.   Yes.

Page 177

1           Krishnan
2        Q.   And so when we talk about trade date
3    plus one?
4        A.   Uh-huh.
5        Q.   Are we referring to the close of the
6    adjustment period as opposed to the availability
7    of the flow of information into GFS; is that
8    correct?
9            MR. THOMAS:  Objection to form.
10       A.   On the trade date plus one morning,
11   the reports are available, but the data keeps
12   changing continuously because of the adjustments
13   that come through during the day.
14       Q.   So if one were to access the system
15   say at 8 P.M. on September 12, is it fair to say
16   that feasibly some of the information has
17   already flowed into the system and one would be
18   able to see what systems had already flowed in?
19           MR. THOMAS:  Objection to form.
20       A.   On for -- like let's -- can we take an
21   example like September 12?
22       Q.   Sure.  So, for instance, if one were
23   to look at the GFS system at 8 P.M. on September
24   12 and say the TMS system had already fed into
25   GFS, would you be able to ascertain that that

Krishnan

1 flow had happened already?
2     A.    No, we would have to have all the --
3 all the feeds in before the TMS -- before the
4 balance sheet is ready.
5     Q.    My question is not about the entire
6 balance sheet being ready, but if a moment in
7 time, say 8 P.M. on September 12, you were to go
8 into GFS --
9     A.    Uh-huh.
10     Q.    -- and look at any given CUSIP, if the
11 system -- if a system related to that CUSIP had
12 already fed in and updated a price, would you be
13 able to tell that at 8 P.M.?
14         MR. THOMAS:  Objection to form.
15     A.    See, when we get the feeds, we load
16 them into some tables and we do a lot of
17 processing after that.  So just because we got
18 one feed at 8 P.M. doesn't mean that a user is
19 able to view a report based off that feed.
20     Q.    If one were to query a specific CUSIP,
21 for instance, at 8 P.M. and that system -- that
22 CUSIP, whatever system it is that updates that
23 particular CUSIP had already fed in, would one
24 at 8 P.M. see a new price for that CUSIP?

Krishnan

1         MR. THOMAS:  Objection to form.
2     A.    First of all, the system takes some
3 time.  Take, for example, September 12 night we
4 get a feed.  It takes -- it is ready for
5 September 12 viewing only after like a few hours
6 after it gets all the feeds and it processes.
7         So if you are talking about a user
8 being able to see a price that was entered at 8
9 P.M., I don't think that's possible.  They're
10 not going to be able --
11     Q.    I'm not asking about it being entered
12 at 8 P.M., I'm asking about a system that has
13 already fed into GFS.  I believe your earlier
14 testimony that was between 8 P.M. and 2 A.M., a
15 number of systems feed into GFS.
16         My question is if one of the systems
17 that feeds in around 8 P.M., if for a CUSIP
18 related to that system you were to go into GFS
19 and look at the price for that CUSIP, would you
20 be able to see the price that had just fed in
21 from whatever system populates the price for
22 that CUSIP?
23         MR. THOMAS:  Objection to form.  Asked
24 and answered.

Krishnan

1     A.    I don't know if the user can see it
2 based on the feeds that got in, but GFS was
3 built to serve the European users as well as the
4 New York users, so at some point earlier in the
5 morning of September -- I mean, September 12 is
6 a Friday.  It's a bad example.  Say September
7 15.  At some point early in the morning on
8 September 16, the European users, you know, if
9 they still were looking at GFS at that point of
10 time, they would have been able to look at the
11
12     Q.    And so if, take, for instance, the
13 London market would be five hours ahead of New
14 York; is that correct?
15     A.    Uh-huh.
16     Q.    And so if the London office wanted to
17 see the close of day prices for, say, September
18 15, would it be your expectation they would have
19 been able to see that at UK open, you know,
20 which would have been around --
21         MR. THOMAS:  You were off by two hours
22 last time.
23     Q.    -- 4 A.M.  So around 4 A.M. New York
24 time, if someone in the UK would query the GFS

Krishnan

1 system at 9 A.M. their time, would they be able
2 to see certain feeds from the previous evening's
3 close in the U.S.?
4     A.    I think that's possible.
5     Q.    Are some of the positions within GFS
6 updated by traders in other offices other than
7 just the U.S.?
8     A.    I think European users had access to
9 making adjustments, so --
10     Q.    And would you expect that their
11 adjustments, given the time difference, would
12 have been made earlier than those for anyone in
13 the U.S.?
14         MR. THOMAS:  Objection to form.
15     A.    I would -- I would expect that they
16 might have made adjustments earlier.
17     Q.    And just to confirm, all of the GFS
18 reports that you were asked to create for
19 purposes of this litigation and that were
20 produced include both long and short positions
21 within GFS; is that correct?
22         MR. THOMAS:  Objection to form.
23     A.    The full reports included the long and
24 the short positions.

Page 182

Krishnan

1
2     Q.    And in order to ascertain the price
3  for a number of the fixed income positions
4  captured within the GFS reports, you would need
5  to know the factor; is that correct?
6     A.    Yes, that's correct.
7     Q.    And do you know where the factor comes
8  from?
9     A.    I'm not sure if it's one place for all
10 the systems.  For some systems it might have
11 come in the systems feeds or for some systems we
12 might have picked it from some other source.  I
13 don't -- I don't know that, where we get it
14 exactly.
15    Q.    And how many people within your group
16 at Lehman went over to Barclays?
17    A.    Actually, all of us in New York went
18 to Barclays.
19    Q.    And did all of you go to Barclays in
20 September of 2008?
21    A.    Sometime in September, that's correct.
22    Q.    And do you know if there was any
23 trainings provided with respect to GFS to the
24 estate or any of its -- anyone left to manage
25 the estate?

Page 183

Krishnan

1
2     A.    Training for the people who were part
3  of the Lehman estate?
4     Q.    My question I guess relates to the
5  departure of your group from Barclays and how
6  was the estate brought up to speed on the
7  existence and functions of GFS?
8     A.    From the technology side, we were
9  supporting also the Lehman estate.  So if they
10 had any questions or issues, they would still
11 come to us.
12    Q.    And that would include the TSA?
13    A.    Yes.
14       MR. THOMAS:  Objection to form.
15    Q.    And so, in order for any adjustments
16 to be made to September 12 data, would it have
17 been routed through your group?
18       MR. THOMAS:  Objection to form.
19    A.    The users in the Lehman side, most of
20 them had already access to adjustments so they
21 were able to make the adjustments
22 systematically.  They didn't have to come to us
23 to enter the adjustment.
24    Q.    And who would those users have been
25 that were able to make adjustments?

Page 184

Krishnan

1
2     A.    I don't have the list with me.
3     Q.    Is it a certain group that would have
4  been making adjustments?
5     A.    I would think that they were from LBI
6  and LBHI because we made the special environment
7  for them.
8     Q.    But my question is, within those
9  entities, was it a specific group that would
10 have been making any such adjustments?
11    A.    I would think that they would be --
12 they would have been part of Financial Control
13 in Lehman who probably moved to the Lehman
14 estate and they helped in the close.
15    Q.    And just one last point of
16 clarification.  When Mr. Thomas asked you if you
17 recalled seeing the report path in Deposition
18 Exhibit 859 and whether you had been asked by
19 the lawyers to run those reports in late 2009, I
20 believe you had answered yes; is that correct?
21       MR. THOMAS:  Objection to form.
22    A.    Yes.
23    Q.    Earlier I believe that when we had
24 discussed Deposition Exhibits 844 to 856 you had
25 referenced SAM tickets and didn't recall any

Page 185

Krishnan

1
2  specific requests from anyone in particular.
3       Is it -- has that testimony changed?
4       MR. THOMAS:  Objection to form.
5     A.    No.  What I meant is this detail was
6  there in the SAM ticket when we ran the reports.
7     Q.    And do you recall being asked by
8  anyone in particular to run the report, or you
9  just saw a SAM ticket; is that your testimony?
10       MR. THOMAS:  Objection to form.
11    A.    Usually what happens is there are
12 coordinators who line up these requests in a SAM
13 ticket and let us know that there is a ticket
14 for us and request for us to generate the
15 reports, and that's what probably happened.
16    Q.    And so do you recall the lawyers
17 asking you to run the reports, or you just
18 recall a SAM ticket that had a specific report
19 path and that you ran?
20       MR. THOMAS:  Objection to form.
21    A.    I don't understand what difference it
22 makes because, you know, the SAM ticket has all
23 the details, the same details that you have in
24 this e-mail, and that's what we ran.  So when he
25 asked if this is what we ran, and this detail,

47

Page 186

```
1              Krishnan
2   the same detail was there in the SAM ticket, and
3   that's what we based the reports off and we ran
4   the reports.
5       Q.   And when you reran the reports with
6   the equities, did you have conversations about
7   the reports to be run or was it based solely on
8   SAM tickets with a different report path --
9           MR. THOMAS:  Objection to form.
10      Q.   -- satisfied?
11          MR. THOMAS:  Objection to form.
12      A.   We might have had conversations.  I
13  don't remember.
14      Q.   And your testimony about the reports
15  that were generated with the equities, which
16  were Deposition Exhibits 836 to 843, was that
17  the custom entity filter was removed; is that
18  correct?
19      A.   Yes, the custom filter was changed so
20  this LBI entity would include the equities.
21      Q.   And do you know if a report using the
22  custom filter that was used to generate the GFS
23  reports with equities was used regularly by the
24  product controllers at Lehman?
25          MR. THOMAS:  Objection to form.
```

Page 187

```
1              Krishnan
2       A.   I don't know.
3       Q.   And do you recall how it was
4   determined that the custom filter would be
5   changed?
6       A.   I don't know, but I think it is
7   because we had -- we didn't have -- I mean, the
8   report didn't have the equities and we found
9   that the reason is because the filter was
10  excluding them and we included the equities.
11      Q.   And do you know if the equities
12  balance sheets were created based off of GFS?
13          MR. THOMAS:  Objection to form.
14      A.   I don't know.
15          MS. CARRERO:  That's it.
16          MR. OXFORD:  I've got a couple
17  follow-up questions.
18          MR. DAKIS:  Me too, actually.
19          MR. OXFORD:  I don't mind who goes
20  first.
21          MR. THOMAS:  I'll go last.
22          MR. OXFORD:  Do you want to --
23          MR. DAKIS:  No, you might pick up on
24  it.
25  FURTHER EXAMINATION BY
```

Page 188

```
1              Krishnan
2   MR. OXFORD:
3       Q.   Ms. Krishnan, you told Mr. Thomas, I
4   believe, that the reports that you ran from GFS
5   that were marked as the deposition exhibits that
6   we looked at today, for the 12th they were run
7   from the special environment, correct?
8       A.   That's correct.
9       Q.   Is the same also true of the data in
10  these reports from the 19th of September?
11      A.   For the 19th, I'm not -- see, there
12  were no changes made to the 19th data, so the --
13  we might have pulled it from Production all the
14  special environment that we set up.
15      Q.   Can you explain what you mean by
16  "production" in that last answer?
17      A.   The Production is a GFS online system.
18      Q.   And for the data for the days between
19  the 12th and the 19th, that would have been
20  pulled from what you call the Production
21  environment, correct?
22      A.   No, between the 12th and the 19th, the
23  15th, 16th, 17th and 18th, they were not
24  available online at the time that we had got
25  this request, so we had to pull it from the data
```

Page 189

```
1              Krishnan
2   archive.
3       Q.   And was the 19th available online or
4   was that also needed to be pulled from the data
5   archive?
6       A.   The 19th was available online because
7   we had the special environment, but if we had
8   the 19th data from the data archive, we might
9   have pulled it from there or we might have
10  pulled it from the special environment.
11      Q.   The adjustments that you have
12  testified that were made to the GFS data between
13  the -- withdrawn.  I'll start it again.
14          You testified that certain adjustments
15  were made to the GFS data in your reports from
16  the 12th through the 19th of September, 2008?
17          MR. THOMAS:  Objection to form.
18      A.   I'm sorry?
19      Q.   Is it your testimony that adjustments
20  were only made to the September 15th data in the
21  special environment?
22      A.   The September 12th data.
23      Q.   Only September 12 data in the special
24  environment was adjusted.  The 7,000 adjustments
25  didn't relate to data from the 15th to the 19th?
```

Page 190

Krishnan

1
2    A.    That's correct.
3    Q.    And can you tell me how it is you're
4    aware that these 7,000 adjustments were made?
5    A.    Because we record the adjustments in a
6    table in GFS.
7    Q.    And who is "we"?
8    A.    The system.
9    Q.    The GFS automatically records any
10   adjustment made in the special environment,
11   correct?
12   A.    That's correct.
13   Q.    And does it record the user who made
14   that adjustment?
15   A.    Yes, it has a user.
16   Q.    And have you reviewed those 7,000
17   adjustments?
18   A.    No.
19   Q.    Have you reviewed any one of those
20   7,000 adjustments?
21   A.    No.
22   Q.    So how is it that you're able to
23   testify under oath that you know who made those
24   adjustments?
25   A.    This special environment was created

Page 191

Krishnan

1
2    for LBI and LBHI.
3    Q.    Uh-huh.
4    A.    And the users that made the
5    adjustments are recorded in the table, but I
6    don't think I said I am -- I said I'm guessing
7    that they would have made the adjustments.
8    Q.    Right.  But you don't know?
9    MR. THOMAS:  Objection to form.
10   A.    I don't.  I would say I would expect
11   that LBI and LBHI would have made the
12   adjustments.
13   Q.    Who from LBI do you believe has access
14   to this data?
15   A.    I don't know.
16   Q.    You couldn't identify a person from
17   LBI?
18   A.    Okay, this happened almost more than a
19   year back, so if you had asked me this question
20   in January of 2009, I might have remembered some
21   names because we used to get e-mails.  I don't
22   have a clue what e-mails we got at that time.
23   Q.    But sitting here today, you couldn't
24   identify a single person who is a representative
25   of the LBI estate who had access to the data in

Page 192

Krishnan

1
2    the special environment; is that correct?
3    A.    Right, because that's because of my
4    memory loss.
5    Q.    It happens to us all, Ms. Krishnan.
6    The reports that you and your team
7    generated that have been marked as exhibits, and
8    I'll focus specifically on Exhibits 381 and 837
9    that I asked you about earlier, is it your
10   testimony that they relate only to LBI data?
11   A.    Yes, we applied the filter to include
12   only LBI.
13   Q.    Did you or anybody operating on your
14   behalf check that data to make sure that it
15   didn't include data that relates to a Lehman
16   entity other than LBI?
17   A.    Well, we don't have to check because
18   when we run the query to include only the LBI,
19   that's what the system would do.
20   Q.    So no one ever checked, that's your
21   testimony?
22   MR. THOMAS:  Objection to form.
23   A.    We don't go there and check like so
24   many records to see if there is only LBI
25   entities.  That's the way the system is supposed

Page 193

Krishnan

1
2    to work and --
3    Q.    Okay.
4    A.    -- if the entity's here, you can
5    always check.
6    Q.    If, for example, Exhibit 837 did
7    include non-LBI entities, would you have any
8    explanation for that?
9    MR. THOMAS:  Objection to form.
10   A.    I don't know.  I would be surprised.
11   Q.    Okay.  We've got Exhibit 837 on the
12   screen here.  Do you see the column I has "DBS
13   Entity Name"?
14   A.    Uh-huh.
15   Q.    If you could drop down, there should
16   be two options so you can filter it by the two
17   values in there.  One is Lehman Brothers, Inc.,
18   correct?
19   A.    Uh-huh.
20   Q.    And that's the only entity you would
21   expect to see in there, correct?
22   A.    Actually, I would have filtered with
23   the DBS entity number, that 0000.
24   Q.    Okay.  Can you explain to me why the
25   DBS entity name LBIE is in column I?

Page 194

Krishnan

1
2    A.   I'm sorry?
3    Q.   You see above Lehman Brothers, Inc. in
4    the drop down menu from column I, there's also
5    Lehman Brothers International Europe?
6    A.   Uh-huh.
7    Q.   Can you explain to me why that is?
8    A.   I don't know.  The system goes by the
9    number, and this filter was built for the DBS
10   entity 0000, if I remember it right.
11   Q.   So if we wanted to check whether there
12   was any extraneous -- and by "extraneous," I
13   mean non-LBI data -- you would check column H,
14   the "DBS Entity"?
15   A.   Yes, I think so, but I'm still not
16   sure why the DBS entity is the same for those
17   two, you know, the number in H.
18   Q.   If I understand your last answer, you
19   don't understand why the DBS entity name for "I"
20   in column "I" includes LBIE, is that what you're
21   saying?
22   A.   I'm saying that the system goes by
23   column H, and you are having both LBIE and LBI
24   under the DBS entity 0000, and that is what we
25   filtered for and that's what we have, and I

Page 195

Krishnan

1
2    don't know why the DBS entity 0000 has two
3    different DBS entity names.
4    Q.   And you didn't check for that when you
5    were creating your report, did you?
6    A.   I based everything on this filter, and
7    this filter said probably DBS entity 0000 and
8    that's what we got.
9    Q.   Okay.  And can you just for the
10   record --
11   A.   Exhibit 859.
12   Q.   Thank you.
13       MR. OXFORD:  I don't have any further
14   questions for you, Ms. Krishnan.
15       MR. DAKIS:  Neil picked up most of
16   mine, but I just wanted to ask a couple more
17   follow-up questions.
18   FURTHER EXAMINATION BY
19   MR. DAKIS:
20   Q.   You testified earlier about a special
21   environment you created for the September 12 GFS
22   data, and you testified that Lehman Brothers
23   employees have access to that data, correct?
24   A.   That's correct.
25   Q.   Do any Barclays employees have access

Page 196

Krishnan

1
2    to that system?
3        MR. THOMAS:  Objection to form.
4    A.   I am not sure.  Any -- let me phrase
5    it any Barclays employees who were part -- who
6    were part of Lehman might have had access, but
7    any new -- any new Barclays user after the
8    actual bankruptcy wouldn't have had access.
9    Q.   Just to make sure I'm clear, if there
10   was -- let's call them a legacy employee, is
11   that okay?
12   A.   Okay.
13   Q.   If there was a legacy employee in the
14   Product Control Group, would that -- could that
15   employee have access to the September 12 GFS
16   data?
17       MR. THOMAS:  Objection to form.
18   A.   I think they might have had access.
19       MR. DAKIS:  No further questions.
20       MR. THOMAS:  A couple follow-up.
21   FURTHER EXAMINATION BY
22   MR. THOMAS:
23   Q.   Can you just describe in a little more
24   detail what you mean by "special environment"
25   just for us lawyers who don't really understand

Page 197

Krishnan

1
2    this computer stuff?
3    A.   Okay.  By "special environment," what
4    I mean is we -- the data that was saved up on
5    the evening of September 15 which was for
6    September 12 end of day, was loaded up into a
7    very similar database as the Production GFS with
8    all the functionalities that the Production GFS
9    has, and users were -- who had access to the
10   Production GFS at that time on September 12 also
11   had access to the special environment and they
12   could use the graphical user interface to modify
13   the data or run the reports for that date.
14   Q.   And it was your understanding that
15   this was done at the request of Lehman and/or
16   Alvarez & Marsal, as indicated in Deposition
17   Exhibit 863?
18   A.   Yes, that's correct.
19       MR. OXFORD:  Objection to form.
20       MS. CARRERO:  Same objection.
21       MR. DAKIS:  Same objection.
22   Q.   And was a special environment also set
23   up for September 19, 2008?
24   A.   Yes, a special environment was set up
25   for September 19.

Page 198

Krishnan

1
2      Q.   Was that done roughly in the same time
3    period of October/November 2008?
4      A.   It was done after -- after the
5    September 12th was -- I think it was done after
6    the -- our users were comfortable with September
7    12.  You know, after they finished, after they
8    were done with the September 12, they said,
9    okay, we don't need September 12 anymore to be
10   adjusted; that's the time we brought the
11   September 19 online.
12     Q.   And when you refer to "users," can you
13   describe generally what entity you're speaking
14   of?
15     A.   The LBI and LBHI.
16     Q.   So you think that September 19 live
17   environment may have been established in roughly
18   the November 2008 time period?
19     A.   I would think more like February or
20   March of 2009.
21     Q.   And do you recall there being any data
22   dumps of September 19 data in the November 2008
23   time period for any reason?
24     A.   Yes, we might have asked for a
25   September 19 dump to -- end of day dump to be

Page 199

Krishnan

1
2    loaded into the special environment.
3      Q.   Do you know someone named Dipesh
4    Patel?
5      A.   I don't remember now.
6      Q.   After the close of the Barclays
7    transaction on September 22, 2008, were there
8    any major changes done to the GFS system?
9          MR. OXFORD:  Objection.  Form.
10         MR. DAKIS:  Same objection.
11     A.   There was one major change to split
12   the entities so they would not -- the Lehman
13   entities and Barclays entities do not, you know,
14   interact with each other.
15     Q.   And when was that done, approximately?
16     A.   Probably done by the end of September.
17   Maybe in the 24th, 25th timeframe of September.
18   I'm not sure.  I don't remember the dates.
19     Q.   Did that result in any change in
20   functionality for the users in terms of how you
21   log into the system and so forth?
22     A.   It did not change anything to the
23   functionality.
24     Q.   So, on September 23, a Lehman user
25   with access to GFS could log in and use GFS the

Page 200

Krishnan

1
2    way they had previously?
3      A.   Yes.
4      Q.   And in that GFS system, that would
5    have all -- they would be able to run whatever
6    reports they wanted to run, including the type
7    of reports that we've seen today as deposition
8    exhibits?
9      A.   That's correct.
10         MR. THOMAS:  Thanks.  I have nothing
11     further.
12         MR. DAKIS:  I have just one more
13     follow-up question.
14   FURTHER EXAMINATION BY
15   MR. DAKIS:
16     Q.   Mr. Thomas just asked you when you
17   talk about the users, you know, what entity
18   generally are you speaking of, and you testified
19   the LBI or the LBHI, correct?
20     A.   That's correct.
21     Q.   Are you including in the LBI and LBHI
22   employees who were with Lehman but went to
23   Barclays after the sale?
24         MR. THOMAS:  Objection to form.
25     A.   I don't know what is included, but

Page 201

Krishnan

1
2    what I mean by LBI and LBHI is the Alvarez &
3    Marsal would be LBHI and I think LBI was some
4    other consulting company.  I don't remember
5    their name now.
6      Q.   But you testified that Barclays
7    employees, the legacy Barclays employees would
8    also have access to the September 12 system, is
9    that correct?
10         MR. THOMAS:  Objection to form.
11     A.   The legacy Barclays employees would
12   have had access, yes, that's correct.
13     Q.   So they would also be users, correct?
14         MR. THOMAS:  Objection to form.
15     A.   Well, it was not set up for them.
16     Q.   But they have access to it and can use
17   it, correct?
18     A.   Yeah, they could have used it.
19         MR. DAKIS:  Nothing further.
20   FURTHER EXAMINATION BY
21   MR. THOMAS:
22     Q.   Could you turn back to Deposition
23   Exhibit 863, please.  Could you read the subject
24   line of the e-mail chain?
25     A.   "9/12 Global Consolidated Close - on

Page 202

1                    Krishnan
2    Behalf of Alvarez & Marsal."
3        Q.    And is that consistent with your
4    recollection that this project was driven in
5    part by Alvarez & Marsal?
6        A.    Yes.
7            MS. CARRERO:  Objection.
8            MR. DAKIS:  Same objection.
9            MR. THOMAS:  Thanks.
10           THE WITNESS:  One more thing, I
11   don't -- for your question, if you look at
12   this e-mail, this probably does not include
13   any user who -- legacy employees who went to
14   Barclays.  So they wouldn't even know how to
15   access the September 12 environment.
16   BY MR. THOMAS:
17       Q.    But in any event, whoever this was
18   sent to and whoever might have theoretically had
19   access, it's your understanding that this was a
20   project driven by Lehman and Alvarez & Marsal?
21       A.    Yes.
22           MR. OXFORD:  Objection to form.
23           MS. CARRERO:  Objection to form.
24           MR. DAKIS:  Objection.
25       Q.    And there's no question that Lehman

Page 203

1                    Krishnan
2    and Alvarez & Marsal were involved in this
3    project and process of making any adjustments?
4            MS. CARRERO:  Objection to form.
5            MR. DAKIS:  Objection to form.
6            MR. OXFORD:  Objection to form.
7        A.    This was initiated by Alvarez & Marsal
8    and LBI, so this environment was set up for
9    them.
10       Q.    And they remain involved in the
11   project?
12       A.    Yes, that's correct.
13           MR. DAKIS:  Objection to form.
14       Q.    And do you have an understanding of
15   why they wanted to try to get a consolidated
16   close for 9/12?
17           MR. OXFORD:  Objection.
18           MR. DAKIS:  Objection.  Form.
19           MR. OXFORD:  Foundation.
20           MR. DAKIS:  Foundation.
21           MS. CARRERO:  Same objection.
22       A.    I can answer, right?
23       Q.    Yes.
24       A.    My understanding is that they, Alvarez
25   & Marsal and LBI, thought the data might have

Page 204

1                    Krishnan
2    been incorrect because of the input and users
3    not looking at the data on September 15, so they
4    wanted to have the capability to make it right.
5            MR. THOMAS:  Thanks.  I have nothing
6    further.
7            MS. CARRERO:  One follow-up.
8    Hopefully I won't prompt any additional
9    questions.
10   FURTHER EXAMINATION BY
11   MS. CARRERO:
12       Q.    Is it possible to query the GFS data
13   for September 12 absent any sort of adjustment
14   that might have taken place within the special
15   environment?
16       A.    I'm sorry?  The September 12?  What
17   are you saying?
18       Q.    Is a query of GFS data for September
19   12 --
20       A.    Uh-huh.
21       Q.    -- possible using data before any
22   purported subsequent adjustments while part of
23   the special environment?
24       A.    It may be possible to do it if we are
25   able to restore the data from the night of

Page 205

1                    Krishnan
2    September 15 and load it into another
3    environment, you know, like that was the data
4    before the adjustments for these took place for
5    the 863.
6        Q.    So your understanding would be that
7    the September 12 data was potentially archived
8    as well as loaded onto the special environment
9    that you testified about?
10           MR. THOMAS:  Objection to form.
11       A.    The special environment started with
12   the end of day of September 12 data, which was
13   September 15 evening.  So on September -- on the
14   actual September 15, around 7:30 P.M. the data
15   was saved somewhere.
16           So your question was can we get the
17   September 12 data without these -- the special
18   environment, right?  So if we go back to the
19   data save that we did on September 15 evening,
20   we'll be able to do that.
21       Q.    And have you undertaken any sort of
22   analysis of the September 12 data versus what
23   has been produced to us and based on your
24   testimony comes from the special environment?
25       A.    You mean if --

Page 206

1          Krishnan
2     Q.   Would you like me to rephrase?
3     A.   Yes.
4     Q.   Have you or, as far as you know, has
5  there been any analysis of the September 12 data
6  that would have been saved on September 15 --
7     A.   Uh-huh.
8     Q.   -- versus the September 12 data that
9  was produced to the movants in this matter from,
10 based on your testimony, the special environment
11 location?
12    A.   I have not done any analysis to that
13 effect.  I'm not aware of anything like that.
14       MS. CARRERO:  Nothing further.
15       MR. THOMAS:  Just one clarification.
16 FURTHER EXAMINATION BY
17 MR. THOMAS:
18    Q.   When you said the special environment
19 started with the end of day of September 12
20 data, which was September 15 evening --
21    A.   Uh-huh.
22    Q.   -- you don't mean the special
23 environment was set up right after then, do you?
24    A.   No.
25    Q.   The special environment was set up at

Page 207

1          Krishnan
2  the request of Alvarez & Marsal sometime in
3  October 2008?
4       MS. CARRERO:  Objection to form.
5       MR. DAKIS:  Objection to form.
6     A.   Yes, that's correct.
7     Q.   Okay.  So the adjustments we have been
8  discussing would not have been made between
9  September 15th and the time that the special
10 environment was set up sometime in October of
11 2008; is that correct?
12    A.   That's correct.
13       (Continued on the next page to include
14    the jurat.)

Page 208

1          Krishnan
2     Q.   So the adjustments in the special
3  environment we're talking about would have been
4  in the October 2008 period, correct?
5     A.   Yes, between October 2008 and January
6  2009.
7       MR. THOMAS:  Thank you.  Nothing
8  further.
9       MS. CARRERO:  Nothing further.
10      MR. DAKIS:  Nothing further.
11      MR. OXFORD:  Nothing further.
12      (Time Noted:  5:04 P.M.)
13           oOo
14
15
16
17
18
        _____
      UMA KRISHNAN
19
20  Subscribed and sworn to
    before me this     day
21  of       2010.
22
    _____
23
24
25

Page 209

1          Krishnan
2        CERTIFICATE
3  STATE OF NEW YORK )
                     : ss
4  COUNTY OF NEW YORK )
5     I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
   certify:
8
9     That UMA KRISHNAN, the witness whose
10 deposition is herein before set forth, was
11 duly sworn by me and that such deposition is
12 a true record of the testimony given by such
13 witness.
14    I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18    I further certify that neither the
19 deponent nor a party requested a review of
20 the transcript pursuant to Federal Rule of
21 Civil Procedure 30(e) before the deposition
22 was completed.
23    In witness whereof, I have hereunto
24 set my hand this 29th day of June, 2010.
   ------------------------------
25       KATHY S. KLEPFER, RPR, RMR, CRR, CLR

Page 210

1             Krishnan
2        INDEX
3    WITNESS:          EXAMINATION BY          PAGE
4    U. KRISHNAN        Ms. Carrero        5, 175, 204
5             Mr. Oxford          139, 188
6             Mr. Thomas    157, 196, 201, 206
7             Mr. Dakis         195, 200
8    EXHIBITS:                    PAGE
9    Exhibit 828, Barclays' Exhibit List        32
10   Exhibit 829, Movants' Exhibit List attached    32
11   to a June 17 e-mail from Fara Tabatabai
12   Exhibit 830 through 856, copies of various GFS   32
13   reports
14   Exhibit 857, a compilation of document        33
15   production letters from Barclays' counsel
16   producing the various GFS reports
17   Exhibit 858, Summary Reports          33
18   Exhibit 859, a letter from Kelly Carrero to    56
19   Hamish Hume dated August 7, 2009
20   Exhibit 860, a document bearing Bates Nos.    134
21   BCI-EX-(S)-00200951 through 53, with attachment
22   Exhibit 861, Summary of GFS Daily Exposure    162
23   Reports, September 12-19, 2008
24   Exhibit 862, a document bearing Bates Nos.    162
25   BCI-EX-00302963, with attachment

Page 211

1             Krishnan
2        INDEX (Cont'd.)
3    EXHIBITS:                    PAGE
4    Exhibit 863, an e-mail from Nadya Romero      169
5    dated October 27, 2008, with attachment
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 212

1             Krishnan
2    NAME OF CASE:  In re Lehman Brothers Holding
3    DATE OF DEPOSITION:  June 29, 2010
4    NAME OF WITNESS:  Uma Krishnan
5    Reason Codes:
6       1. To clarify the record.
        2. To conform to the facts.
7       3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25        _____

# EXHIBIT 11

Contains Highly Confidential Information

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.,* | Case No. 08-13555 |
| Debtors | (Jointly Administered) |

**EXPERT REPORT OF**

**JOHN P. GARVEY**

**MARCH 15, 2010**



MOVANTS' TRIAL
EXHIBIT

_____151_____

**Contains Highly Confidential Information**

## Table of Contents

List of Appendices……………….…………………………………………………iii

I.  Introduction………………………….………………………………………………..1

II. Summary of Qualifications……………………………..………………………2

III. Summary of Opinions...…………………………………………………………2

IV. Opinions and Bases Thereof……………………………….………………………......3

    Opinion 1: Professor Pfliederer's Opinions Regarding
Book Value are Flawed……………………………………………….........3

    Opinion 2: The Acquisition Balance Sheet is Not Representative
of the Values Barclays Received in the Acquisition and Had a
Claim on as of September 19, 2008………………………………………….7

        A.  Schedules A and B………….……....……………………………..7

        B.  Annex A……………….………...…………………………10

        C.  Valuation Adjustments and "Haircuts"…………………………11

    Opinion 2(a): The Practice of Marking Securities from Mid to Bid
is Driven by Fair Value Accounting Rules and Results in a
Conservative Valuation of the Securities...………………….…………..12

    Opinion 2(b): Barclays Inconsistently and Subjectively Applied
the Methods Used to Mark Securities from Mid to Bid
in the Acquisition Balance Sheet………………………..……………14

        A.  General Inconsistencies and Subjectivity in Barclays'
Mid to Bid Adjustments in the Acquisition Balance Sheet...……15

        B.  Barclays Inconsistently and Subjectively Applied
the Methods Used to Mark Lehman's Equity Positions
from Mid to Bid in the Acquisition Balance Sheet………………16

        C.  Barclays Inconsistently and Subjectively Applied
the Methods Used to Mark the Exchange Traded
Options (ETO) Portfolio from Mid to Bid in the
Acquisition Balance Sheet………………………………………17

**Contains Highly Confidential Information**

D. Barclays Inconsistently and Subjectively Applied
the Methods Used to Mark its Agency CMO Portfolio
from Mid to Bid in the Acquisition Balance Sheet………………18

E. Professor Pfleiderer either Ignores the Inconsistencies and
Subjectivity in Barclays' Mid to Bid Adjustments
in the Acquisition Balance Sheet in His Analysis or
Accepts These Flaws and Inconsistencies without Any
Analysis or Consideration of the Effects of such
Information on His Opinions…...………………………..………19

Opinion 2(c): Barclays' Use of Valuation Dates after
September 22, 2008 Is Not Supported by the Accounting Literature
and Results in Understated Values for Certain Securities
in the Acquisition Balance Sheet……………………………...…...……20

A. There Is No Support in IAS or U.S. GAAP……………………...20

B. The Valuation Dates Chosen by Barclays
are Inconsistent and Unsupported………..………………………21

C. The Opinions Offered by Professor Pfleiderer Regarding
the Use of Subsequent Measurement Dates Are Flawed………...22

Opinion 3: Professor Pfleiderer's Evaluation and Reliance on PwC's
"Extensive" Testing of Barclays' Exit Price Marks are Flawed………...23

A. Professor Pfleiderer Did Not Evaluate
PwC's Testing Procedures………………………...………………24

B. Professor Pfleiderer's Reliance on PwC's "Extensive"
Testing of Barclays' Exit Price Marks is
Unsupported…………………………………………………...…..24

C. Review of the PwC Workpapers
Professor Pfleiderer Relied Upon………………………………25

D. Review of the PwC Workpapers Produced after
Professor Pfleiderer Filed His Report…………………….……...26

Opinion 4: Professor Pfleiderer is Misguided in His Analysis
of the Negative Goodwill Barclays Recorded.…………………………..31

Contains Highly Confidential Information

# List of Appendices

Appendix I        Curriculum Vitae

Appendix II       List of Documents Considered

Appendix III      Summary of Relevant Accounting Principles

Appendix IV       Fair Value Considerations

Appendix V        Overview of the Audit Process

Appendix VI       Auditing Fair Value Measurements and Disclosures

**Contains Highly Confidential Information**

## I.    INTRODUCTION

1.    This report is submitted by John P. Garvey.  I am a Managing Director at Navigant Economics, a subsidiary of Navigant Consulting, Inc., a consulting firm that specializes in accounting, economic and financial analyses.  I discuss my qualifications in more detail in Section II and present my curriculum vitae in Appendix I.

2.    I have prepared this report at the request of Counsel for Movants to set forth the subject matters on which I expect to testify, the substance of the facts and opinions on which I expect to testify, and a summary of the foundations for each such opinion.[1, 2]  In preparing this report, I have reviewed various documents related to this issue, as cited in the text and footnotes in this report and exhibits and/or Appendix II.

3.    Navigant Economics (Chicago Partners) charges an hourly rate of $580 for my time.  Other Navigant Economics (Chicago Partners) professionals, working under my direction and supervision, assisted in my analyses and Navigant Economics (Chicago Partners) was or will be compensated for their work at their customary hourly rates.  This compensation is not contingent upon the substance of my testimony or the outcome of this matter.

4.    The remainder of the report is organized as follows.  Section III summarizes my opinions.  Section IV provides the bases for my opinions.

---

[1] This report concerns three motions before the Court:
1) Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order, September 15, 2009;
2) The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), September 15, 2009; and
3) Debtor's Motion for an Order Modifying the September 20, 2008 Sale Order and Granting Other Relief, September 15, 2009.

[2] If I receive additional data, facts, or information, I will review, evaluate, and analyze these additional data, facts, or information as they become available, including, but not limited to, the report(s) of experts in this matter.  I may modify or supplement my report as necessary in response to any newly produced evidence or in rebuttal to any further opinions offered by Barclays' witnesses.

---

**Contains Highly Confidential Information**

## II.    SUMMARY OF QUALIFICATIONS

5.      My present position is Managing Director at Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc.  Navigant Economics (Chicago Partners) specializes in consulting in the areas of accounting, economics, and finance.  I am a CPA licensed in Illinois and my areas of expertise include accounting and auditing, finance and business valuation.

6.      Prior to rejoining Chicago Partners in 2001, I was Market Team Leader for Business Fraud and Investigation Services at Arthur Andersen, specializing in forensic accounting, board-directed investigations and accounting irregularities.  Prior to joining Chicago Partners initially, I was Vice President with Fort Dearborn Partners, Inc., specializing in business valuation, mergers and acquisitions, turnaround consulting, and litigation consulting.  Prior to joining Fort Dearborn Partners, I was a Partner with Deloitte & Touche, where I spent fourteen years in the audit group.


## III.    SUMMARY OF OPINIONS

7.      This section of my report summarizes my opinions.  In the remaining sections of the report, I provide the substance of the facts and opinions on which I expect to testify, and the bases for each such opinion.  If I receive additional data, facts or information, I will review, evaluate, and analyze these additional data, facts or information as they become available, including, but not limited to, the report(s) of experts in this matter.  I may modify or supplement my report as necessary to reflect any additional information that I receive.

> **Opinion 1:**    Professor Pfleiderer's opinions regarding book value are flawed.[3]

---

[3] Professor Paul Pfleiderer was retained by Counsel for Barclays and submitted a report dated January 8, 2010 (the "Pfleiderer Report") "to analyze certain economic, financial, accounting, and valuation issues arising in this matter." Pfleiderer Report, ¶2.

**Contains Highly Confidential Information**

**Opinion 2:**    The Acquisition Balance Sheet is not representative of the values Barclays received in the acquisition and had a claim on as of September 19, 2008.

**Opinion 2(a):** The practice of marking securities from mid to bid is driven by fair value accounting rules and results in a conservative valuation of the securities.

**Opinion 2(b):** Barclays inconsistently and subjectively applied the methods used to mark securities from mid to bid in the Acquisition Balance Sheet.

**Opinion 2(c):** Barclays' use of valuation dates after September 22, 2008 is not supported by the accounting literature and results in understated values for certain securities in the Acquisition Balance Sheet.

**Opinion 3**:    Professor Pfleiderer's evaluation and reliance on PriceWaterhouseCoopers' ("PwC") "extensive" testing of Barclays' exit price marks are flawed.

**Opinion 4:**    Professor Pfleiderer is misguided in his analysis of the negative goodwill Barclays recorded.


## IV.    <u>OPINIONS AND BASES THEREOF</u>

8.    This section discusses my opinions and the bases of my opinions.

### Opinion 1:  Professor Pfleiderer's Opinions Regarding Book Value are Flawed

9.    Professor Pfleiderer's opinions regarding the definition of *book value* are flawed. Paragraph 82 in the Pfleiderer Report states: "[f]urthermore, to the best of my knowledge, 'book value' does not have a definite meaning in this context, such that a financial professional would understand it, as the Movants apparently do, to be synonymous with the 'marked' value of the assets and liabilities on Lehman's books as of any arbitrary date and without regard to the quality and timeliness of Lehman's marks on such date."

**Contains Highly Confidential Information**

10.     However, the term *book value* is not an obscure term as Professor Pfleiderer indicates. Financial professionals have many sources to gain an understanding of the term *book value*.[4]  A generic search of web-based dictionaries and encyclopedias provides the following definitions of *book value*:

- The monetary amount by which an asset is valued in business records, a figure not necessarily identical to the amount the asset could bring on the open market.[5]

- [T]he value of a business, property, etc., as stated in a book of accounts (distinguished from market value).[6]

- The value at which an asset is carried on a balance sheet. . . .[7]

- In accounting, book value or carrying value is the value of an asset according to its balance sheet account balance. . . .[8]

11.     In addition, the term *book value*, as commonly used in commerce and industry, does not contemplate any of the restrictions Professor Pfleiderer mentions in paragraph 82 of his report.  As illustrated above, the term *book value* denotes the value of an asset (or a liability) recorded in the books at any point in time.  The term *book value* makes no reference to the specific date an asset or a liability is recorded in the accounting records nor does the term *book value* embody the concept of timely review or update of the value of an asset or liability to ensure that the account reflects the latest information.

12.     Professor Pfleiderer's assertions in paragraph 82 of his report are inconsistent with how the term *book value* is used in the Asset Purchase Agreement ("APA") to describe components of the Purchased Assets and Assumed Liabilities:

> "Purchased Assets" means all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets), including;
>
> * * *

---

[4] *See* Appendix III.
[5] http://www.thefreedictionary.com/book+value, based on <u>The American Heritage Dictionary of the English Language</u>, 4th edition, last visited on March 10, 2010.
[6] http://dictionary.reference.com/browse/book+value, based on <u>The Random House Dictionary</u>, last visited on March 10, 2010.
[7] http://www.investopedia.com/terms/b/bookvalue.asp, last visited on March 10, 2010.
[8] http://en.wikipedia.org/wiki/Book_value, last visited on March 10, 2010.

**Contains Highly Confidential Information**

(d) government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion.

\* \* \*

On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the following Liabilities of Seller and its Subsidiaries (collectively, the "Assumed Liabilities"):

\* \* \*

(i) all short positions and "repos" relating to any securities or interests of the types included in the definition of "Long Positions" with a book value as of the date hereof of approximately $69 billion[9]

13.    Moreover, the APA used the term *book value* interchangeably with the term *Lehman (LBI's) marks*.[10]   The source of Lehman's marks is a central database system for pricing and other data called Lehman Global Funding System ("GFS").[11]   GFS tracked financial assets at their fair value marks and updated these marks on a periodic basis. GFS gathered pricing data from the trading desks each evening; therefore, GFS contained the most recent information from the previous trading day.[12]   Marks, however, were updated at various intervals, depending on the type of security, as explained by Steven Berkenfeld in his deposition:

> [N]ot all types of securities were marked every day.  We did not mark our entire book of securities on a daily basis.  We owned lots of level 3 securities, esoteric securities, and so we didn't go through a daily process of marking those.  Some of those positions would be marked on a monthly or even a quarterly basis.[13]

---

[9] Asset Purchase Agreement, September 16, 2008, page 6, and pages 11-12.

[10] Section 3.3 of the APA, "Adjustment to Cash Amount", states: "Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof)."  (APA, Section 3.3).
However this provision was removed by the Sale Hearing on September 19, 2008, Lori Fife told the court: "There was an upside sharing in the original transaction.  There was going to be a true-up twelve months later on and that has been eliminated from this transaction."  (9/19/08 Hearing Tr. 47:7-10)
Further, Paragraph 9 of the Clarification Letter removed this provision from the APA.

[11] "GFS" is Lehman's Global Funding System, "a global data warehouse that provides strategic and flexible reporting capabilities related to the Firm's financial resources." (BCI-EX-(S)-00213941 and BCI-EX-(S)-00213939)  It is also sometimes referred to as Global Finance System, Global Financing System, or Global Financial System.

[12] Paolo Tonucci stated in his deposition:  "Market data is received from other systems.  GFS is just an aggregation tool, so would source data from settlement systems or from other pricing sources and apply that to the inventory positions or collateral positions. . . . It runs on an overnight basis so it should pick up all of the most current information."  (Deposition of Paolo Tonucci, August 14, 2009, 95:5 – 96:3)

[13] Deposition of Steve Berkenfeld, August 6, 2009, 299:14-21.

14.     Both Lehman and Barclays use the term *book value* in their respective annual reports and regulatory filings.  In its Annual Report for the fiscal year ended December 31, 2008, Barclays PLC offered a table analyzing "the book value of securities which are carried at fair value."[14]  In this table, Barclays PLC clearly distinguished "the book value of securities which are carried at fair value" from the "amortized cost" of the securities. Similarly, in its Form 10-K for the fiscal year ended December 31, 2007, Lehman Brothers Holdings Inc. stated: "Lehman Brothers Bank disposed of a leasing subsidiary, Dolphin Capital Corp., acquired in the acquisition of Capital Crossing. The transaction was an asset sale and amounts were transferred at approximately book value."[15]

15.     In addition, Professor Pfleiderer contradicts himself regarding *book value* in his report.  Professor Pfleiderer asserts that the term *book value* has no definite meaning, yet in Footnote 61 to his report, he quotes the APA to describe the "approximate valuation of the trading assets it [Barclays] would be acquiring" as having a "book value as of the date hereof or approximately $70 billion."[16]  Further, Exhibit 8 to the Pfleiderer Report, uses "book value of target's net assets" as a basis for computing goodwill in seven bank acquisitions.  The regulatory filings of financial institutions in Exhibit 8 define the meaning of *book value* as the amount at which an asset or a liability is reflected in accounting records.[17]

---

[14] Barclays PLC, Annual Report for the fiscal year ended Dec-31-2008 at 34, 26, 88.

[15] Lehman Brothers Holdings Inc., Annual Report (Form 10-K) for the fiscal year ended Nov-30-2007 at 46.

[16] Footnote 61, to ¶73, in the Pfleiderer Report states:  "First, even though there was no reason do to so, Barclays allowed to be included in the Asset Purchase Agreement a description and **approximate valuation of the trading assets it would be acquiring**: 'government securities, commercial paper, corporate debt, corporate equities, exchange traded derivatives, and collateralized short term agreements **with a book value as of the date hereof of approximately $70 billion**." (emphasis added).

[17] "Book Value' means, with respect to any Asset and any Liability Assumed, the dollar amount thereof stated on the Accounting Records of the Failed Bank. The Book Value of any item shall be determined as of Bank Closing after adjustments made by the Receiver for differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections and for setoffs, whether voluntary or involuntary." (WestAmerica, (Form 8-K) (2/6/2009) at 2).
*See also* JP Morgan (Form 10-K) for the fiscal year ended Dec-31-2008 at 140: "The gain represents the amount by which the fair value of the net assets acquired (predominantly intangible assets and goodwill) exceeded JPMorgan Chase's book basis in the net assets transferred to First Data Corporation."
*See also* JP Morgan (Form 10-K) for the fiscal year ended Dec-31-2008 at 220: "Derivative guarantees also include contracts such as stable value derivatives that require the Firm to make a payment of the difference between the market value and the book value of a counterparty's reference portfolio of assets in the event that market value is less than book value and certain other conditions have been met." (JP Morgan, Form 10-K for the fiscal year ended Dec-31-2008, page 220).

---

**Contains Highly Confidential Information**

**Opinion 2:   The Acquisition Balance Sheet is not Representative of the Values Barclays Received in the Acquisition and had a Claim on as of September 19, 2008.**

16.    This section highlights several flaws and inconsistencies in the valuation methods Barclays employed to determine the "exit price marks" included in the Acquisition Balance Sheet.[18]  Professor Pfleiderer either ignores these flaws and inconsistencies in his analysis or accepts them without any analysis or consideration of the effects of such information in his opinions.

17.    Barclays' Product Control Group ("PCG") was responsible for independently verifying the valuations developed by Barclays' business teams.[19]  The record contains conflicting information regarding the valuation methods Barclays used to value the acquired assets on the Acquisition Balance Sheet.  The securities acquired comprise of several components described below.

A.  SCHEDULES A AND B

18.    Not valuing the securities on Schedules A and B on the Closing Date of the Sale Transaction is incorrect.  Schedules A and B contain lists of securities that were transferred to Barclays in September 2008.  Schedule A contains securities that were part of the repurchase agreement collateral, and Schedule B contains assets in the "clearance boxes."[20]  According to the Romain Declaration, the Schedule A securities were valued as of September 22, 2008.[21]  The Romain Declaration is not clear regarding the valuation date for the Schedule B securities, but the underlying data indicate that the Schedule B securities were valued as of various dates discussed below.

19.    In addition, the data used to develop the Acquisition Balance Sheet contradicts the Romain Declaration and indicates that not all Schedule A and B securities were valued as

---

[18] Barclays' opening balance sheet for its acquisition of Lehman Brothers North American businesses is contained in Barclays' 2008 Form 20-F and Annual Report (footnote 39(a) on page 235).  In depositions, Exhibit 377A is commonly referred to as the opening balance sheet.  The net assets acquired shown in Exhibit 377A match those in Barclays' 2008 Form 20-F.  There are, however, some differences in several individual line items.

[19] Declaration of Gary Romain, January 26, 2010 ("Romain Declaration"), ¶5.

[20] Romain Declaration, ¶17 and ¶18.

[21] Romain Declaration, ¶18.

---

**Contains Highly Confidential Information**

of September 22, 2008.  A Barclays' spreadsheet with CUSIP-level price detail[22] that supports the Acquisition Balance Sheet indicates that Principal Mortgage Trading Group ("PMTG")[23] securities were valued using September 30, 2008 price data if the securities were still held at that date.  PMTG securities that were sold between the Closing Date[24] and September 30 were valued at the sale price.

20.    Barclays' rationale for using a September 30 valuation date appears to be based in part on or supported by a statement by Romain in an email dated December 11, 2008, in which he states:  "we [Barclays] got control of /access to the assets on that day (possibly the day before)."[25]

---

[22] BCI-EX-00099519 - 108699.xls (a file in MS Excel native format).

[23] Declaration of Stephen King, January 27, 2010, ¶2.

[24] Documents in the record refer to September 19 (Friday at market closing), September 20 (Saturday – a non-trading day), September 21 (Sunday – a non-trading day) or September 22 (Monday –opening) as the Closing Date.  For example, Romain states "[t]he measurement date is the acquisition date (Sunday 21 September – practically 19 September close)" at BCI-EX-00218500-501.
The facts are:
- The Sale Hearing occurred on September 19, 2008.  (Hearing Transcript, September 19, 2008.)
- The Sale Order was approved in the early hours of September 20, 2008.  (Hearing Transcript, September 19, 2008.)
- Paragraph 4.1 of the APA states:  "Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the Closing Date."  (APA, ¶4.1.)

[25] BCI-EX-00218500-501.  In the same e-mail (e-mail to Jon Holloway (of PwC) et. al. (including Patrick Clackson), titled, "Valuation of Securities," and dated Dec-11-2008, Romain continues:

> I believe that is also the argument just presented to Patrick [Clackson] as acceptable from your [PwC] perspective… [happy to view the balance as a receivable for the intervening 10 days if that helps, as per JP portfolio]
>
> The mid-prices that have been used to date are for 19 Sep. However, that's not too relevant – we could replace these prices with mid-prices for the 30th instead – the valuation adjustment necessary to get to 30th Sep bid would then be a different balancing number.  However there is no point conducting that exercise since the net fair value number will be the same (i.e. 30th Sep bid).

In a subsequent e-mail (e-mail to Jon Holloway  et. al. (including Clackson), dated Dec-14-2008 (also at BCI-EX-00218500), Romain enclosed the Dec-11-2008 e-mail cited above and added:

> The measurement date is the acquisition date (Sunday 21 September – practically 19 September close).  However, our objective is to measure an appropriate bid level for the acquired securities.  By bid we mean a genuinely attainable exit price for Barclays taking into account the way in which securities were acquired and the pattern of events in the days following the completion.  In my mail below, by "control" I do not refer to legal ownership, which was established immediately upon completion of the acquisition, but rather practical control and the substantive ability to transact.
>                                        * * *
> We believe this to be the most representative way we look at the transaction for valuation purposes.  The opposing view is that we must use a market /model bid price on the date of legal ownership and the identified circumstances cannot be taken into account.  I [Gary

**Contains Highly Confidential Information**

21.     The use of September 30, 2008 as the "measurement date" for certain securities is confirmed by a Barclays document entitled "Lehman Opening Balance Sheet – Barclays Capital Valuation Methodology"[26] ("Barclays' Valuation Memo"), which describes the use of different valuation dates for certain types of securities.  According to Barclays' Valuation Memo, security types perceived as liquid (agency mortgages, corporate bonds, emerging markets, equities, and Treasuries/agencies) were valued using market data as of September 22, 2008.  Exceptions to this rule include corporate bonds, which were valued using "min of available 3rd party data (much of it Trace)."[27]

22.     A Barclays' valuation memo also describes the process for valuing securities perceived as illiquid (municipal bonds, and structured and securitized products of the PMTG).[28]  Municipal bonds were valued as of September 19, 2008, net of an "imbedded haircut."[29]  For PMTG assets sold between the Closing Date and September 30, 2008, the traded price was used to value the asset.  For PMTG assets that were still on hand at September 30, 2008, "the PTMG desk was utilized with liquidity haircut applied to desk mark to bring it to a fair value under the extenuating market conditions."[30]

23.     In his deposition, Professor Pfleiderer testified that the PMTG spreadsheet had many CUSIPs valued at sale price.  He stated:

> And whenever Barclays in those cases had an initial mark as they oftentimes did, and then a sale transaction that occurred very shortly thereafter, they took the initial mark with the liquidity adjustment as the – as the value to be assigned for that particular CUSIP.[31]

24.     Professor Pfleiderer opined further:

> And so it would be rather presumptuous for me to say that Barclays who is marking this at the actual sale that they realized is wrong and that there's a better

---

Romain] hope we can reach some common ground here [between Barclays and PwC] – happy to discuss further.

[26] BCI-EX-(S)-00213991-92.
[27] BCI-EX-(S)-00213991.
[28] BCI-EX-(S)-00213991.
[29] This may refer to a "liquidity haircut," as this asset class was described as "extremely illiquid at the time" in Barclays' Valuation Memo.  See discussion of Barclays' use of the terms "haircut" and "liquidity haircut" below.
[30] BCI-EX-(S)-00213991.
[31] Deposition of Professor Paul Pfleiderer, February 23, 2010, 110:20-111:12.

**Contains Highly Confidential Information**

indication of what value they could have realized than what they actually realized immediately after the transaction.[32]

25.    Professor Pfleiderer fails to acknowledge that the majority of the purported sales Barclays "realized" were internal transfers from one Barclays' book of accounts to another Barclays' book of accounts.  Specifically, Exhibit 533A distinguishes between $37.2 billion of assets transferred internally from the central book to a Barclays trading desk and $7.2 billion of assets that were sold externally to the market.[33]

26.    In addition, Professor Pfleiderer fails to define what sale constitutes a sale occurring "immediately after the transaction" and what sale constitutes a sale occurring "very shortly after the transaction."  He does not define how far out into the future a date ceases to meet his notion of "very shortly" or "immediately" after the September 30, 2008 transaction.  Professor Pfleiderer's notions of "very shortly after" and "immediately after" are vague and unscientific.  Moreover, any choice of a valuation date other than the Closing Date is incorrect and does not comply with relevant accounting principles.  (See Section 2(c) below).

   B.    <u>ANNEX A</u>

27.    Not valuing the securities on Annex A on the Closing Date of the Sale Transaction is incorrect.  Annex A is a list of securities delivered to Barclays in December 2008 under the Settlement Agreement between JPMorgan Chase Bank, N.A. ("JPMorgan"), Barclays Capital Inc., and James W. Giddens, as Trustee in the Securities Investor Protection Act Liquidation of Lehman Brothers Inc. dated December 5, 2008 ("Settlement Agreement").[34]  The Annex A securities were intended to be transferred to Barclays on the Closing Date as part of the Sale Transaction.[35]  The securities were held by JPMorgan and were not transferred to Barclays on the Closing Date due to various operational issues.[36]

---

[32] Pfleiderer Dep., 110:7-16.
[33] Exhibit 533A (BCI-EX-00295932-33, at BCI-EX-00295932)
[34] Settlement Agreement from SIPA.
[35] Declaration of Shari D. Leventhal, Federal Reserve Bank of New York, ¶22.
[36] Leventhal Declaration, ¶14.

**Contains Highly Confidential Information**

28.    The Annex A securities were valued as of December 22, 2008, the date of receipt by Barclays.[37]  Barclays' accounting/valuation rationale for using this valuation date appears to relate to a theory posited by Romain that they did not have "practical control and the substantive ability to transact".[38]  An email from Romain to Barclays' independent auditors, PwC, dated October 24, 2008, written in anticipation of delivery of the Annex A securities, states:

> Re the securities that JPM are (finally…) going to deliver to us – we need to value these on the date we receive them.  To go back to 19/9 would be inappropriate since we had no control over these securities between close date and delivery date.  The negotiation with JPM was over what value of cash/securities they were going to deliver to us – that value is determined by reference to the valuation on delivery date.[39]

29.    The documents and analyses supporting the Acquisition Balance Sheet also indicate that Annex A assets were valued as of December 22, 2008.[40]  Professor Pfleiderer concurred with Barclays' choice of December 22, 2008 (and not the Closing Date) as the measurement date for Annex A:

> [I]t was appropriate to judge, or value, I should say – again as an upper bound – the repo capital that was received as of December as of a December and not as of a September date.  So because of the complexity of what actually occurred, there is not a single date involved here.[41]

30.    Barclays' choice of a valuation date other than the Closing Date is incorrect and does not comply with relevant accounting principles.  (See Section 2(c) below).

## C.  VALUATION ADJUSTMENTS AND "HAIRCUTS"

31.    Barclays used the terms "haircut," "liquidity haircut," and "liquidity discount" in its valuation analyses to describe different types of adjustments Barclays made to the value of securities included in the Acquisition Balance Sheet.  Barclays vested these terms with multiple meanings and the related Barclays adjustments include various components as described below.

---

[37] Romain Declaration, ¶19.
[38] BCI-EX-00218500-501.
[39] BCI-EX-(S)-00110050.
[40] BCI-EX-00108700.xls.
[41] Pfleiderer Dep., 131:8-16.

**Contains Highly Confidential Information**

32.    The values in the Schedule A and Schedule B spreadsheets (Exhibit 86A and 641A) and the Annex A spreadsheets (Exhibit 87B and 641A), which support the amounts in the Acquisition Balance Sheet, contain a "market value w/ liquidity" table which is used to adjust the values reported in the Acquisition Balance Sheet.[42]  The "market value w/ liquidity" table is often net of various adjustments in addition to the typical "haircut" applied to repo collateral.  For example, the "market value w/ liquidity" table typically reflects a bid-offer adjustment (described below), but may also reflect an adjustment designed to result in an exit price mark as of a subsequent valuation date.  Below I discuss how Barclays used different valuation adjustments and related terminology to systematically understate the value of securities included in the Acquisition Balance Sheet.


### Opinion 2(a): The Practice of Marking Securities from Mid to Bid is Driven by Fair Value Accounting Rules and Results in a Conservative Valuation of the Securities.

33.    Barclays intended to record the securities acquired from Lehman at "exit price marks".

34.    Gary Romain, Head of Technical Accounting and Private Equity Finance for Barclays Capital, stated Barclays' objective was "to measure an appropriate bid level for the acquired securities."[43]  Patrick Clackson, Chief Financial Officer of Barclays Capital, further described Barclays' rationale for why positions were valued at bid level "under IFRS accounting rules":

> All trading positions, where you have a long position you value it at the bid and short position you value at the offer price.  The specific accounting rules around acquisitions are you have to fair value all the assets and liabilities when you acquire, when you do the acquisition, and in terms of fair valuing financial instruments you have to value long at bid and short at offer.[44]

35.    International accounting standards (i.e. IAS 39, ¶AG70) use the terms *bid-price*, *asking price*, and *current-offer price* but do not reference the term *exit price*.  Fair value

---

[42] Deposition Exhibits 86B (BCI-EX-00099519-521), 87B (BCI-EX-00108700), and 641A (BCI-EX-(S)-00213990-993).
[43] BCI-EX-00218500-1.
[44] Deposition of Patrick Clackson, September 4, 2009, 142:16-24.

---

**Contains Highly Confidential Information**

accounting rules under U.S. GAAP allow the practice of marking from mid to bid in an effort to approximate an "exit price."[45]  The practice of marking from mid to bid yields a conservative measure of fair value.  Such conservative measures of fair value recorded by Barclays on the Acquisition Balance Sheet serve to understate the value of Barclays' Windfall rather than overstate the value of Barclays' Windfall as Professor Pfleiderer states in his report.

36.     Professor Pfleiderer incorrectly opined that:

> Because the applicable accounting standards do not permit recognition of some economically important factors such as the sheer size (and consequent illiquidity) of the positions, which in this case would have made the "fair value" of many positions difficult or impossible to realize in an actual sale, these **"fair values" likely overstate the actual economic value of the acquired trading assets** and should be viewed as stating an upper bound on the range of actual economic value.[46]

37.     Professor Pfleiderer further stated:

> Importantly, there are additional factors that may be relevant to understanding the economics of the Transaction that are not reflected in exit/bid prices developed by Barclays. These are not "fire sale" prices, nor are these "bulk" prices that take into account either the size of individual positions or the overall size of the transaction. (As I mentioned before, it is my understanding that applicable accounting rules do not allow these factors to be taken into account for purposes of developing "fair value" estimates of asset values of the type set forth in Barclays' acquisition accounting statement.) These factors, had they been taken into account, would have led to lower marks and to a lower assessment of the value of the trading assets acquired by Barclays. Importantly, these considerations would be relevant to an economic assessment of what Barclays received. Thus, the "fair value" valuation of the securities and assets Barclays received from Lehman in the Fed Replacement Repo at Barclays exit price marks is an upper bound on the reasonably estimated value of those assets.[47]

38.     Professor Pfleiderer's opinions appear to ignore the relevant accounting rules, such as IFRS 39 ¶48A, which explicitly states: "The chosen valuation technique makes maximum use of market inputs and relies as little as possible on entity-specific inputs.  It

---

[45] SFAS 157 *Fair Value Measurements,* ¶7.  For similar references to exit price see SFAS 157 Summary and SFAS 157 ¶16, 17, 30, A2, A8, A27, C13, C16, C21, C23, C26, C29, C52, C63, C84.
[46] Pfleiderer Report, Footnote 40 (emphasis added).
[47] Pfleiderer Report, ¶59.

**Contains Highly Confidential Information**

incorporates all factors that market participants would consider in setting a price and is consistent with accepted economic methodologies for pricing financial instruments."[48]

39.    Fair value measurement methods do not stipulate that exit price marks establish the upper bound on the economic values.  To the contrary, relevant accounting principles require the preparer to incorporate all factors that market participants would consider when measuring the exit price marks.

40.    In addition to the understatement to the Barclays Windfall caused by the fair value methods used in the Acquisition Balance Sheet, Barclays' inconsistent and subjective use of its methods intended to establish exit price marks further understates the value of Barclays' Windfall.

### Opinion 2(b): Barclays Inconsistently and Subjectively Applied the Methods Used to Mark Securities from Mid to Bid in the Acquisition Balance Sheet.

41.    This opinion describes various inconsistencies and flaws in the methods Barclays employed in measuring the securities included in the Acquisition Balance Sheet.  In addition, I alert the court that Professor Pfleiderer either ignores these flaws and inconsistencies in his analysis or accepts them without any analysis or consideration of the effects of such information on his opinions.

42.    In some cases, Barclays computed exit price marks by adjusting the mid-value (the midpoint between bid and ask prices) by what it called a "bid-offer adjustment," which was computed as half of the spread between the bid and ask prices.  Subtracting the bid-offer adjustment from the mid-value results in a hypothetical price Barclays would receive if it sold the asset.  Patrick Clackson described how Barclays determined bid prices in the Acquisition Balance Sheet:

> So for some things you would be able to see bid offer quotes on things for those markets at that point in time, and where those are available those are what we used.  For more illiquid markets you would have to try and look at trades or trades near that date to try and work out what the right bid price for those assets were.

---

[48] IAS 39, ¶48A (emphasis added.) (cited in Appendix III of this report).

**Contains Highly Confidential Information**

As I said, it was a lot of work done, which is partly why it took a lot of time to complete the acquisition balance sheet.[49]

## A. GENERAL INCONSISTENCIES AND SUBJECTIVITY IN BARCLAYS' MID TO BID ADJUSTMENTS IN THE ACQUISITION BALANCE SHEET.

43.    This section documents how Barclays deviated without any explanation, reason or support from its own alleged mid to bid adjustment policy and procedure.

44.    In an e-mail to PwC, Mark Washtell of Barclays claims: "The methodology is consistent with the firms [*sic*] provisioning policy statement which states we can apply bid-offer [discount] at portfolio level rather than instrument by instrument."[50]  In the same e-mail Mr. Washtell admits Barclays' subjective application of the purportedly compliant method: "**Most of what we do is subjective to some degree**, this is not the only example, and **we regularly use our experience to recommend the most appropriate approach in such circumstances**, this is no different."[51]

45.    Similarly, Mr. Clackson described the process for updating the asset valuations once the assets were recorded:

> We do different things for different portfolios.  So for some portfolios we revalue them daily at midmarket, and then we have a bid offer adjustment across the whole portfolio.  For other portfolios we may value individual positions on bid and offer.  More normally I think for the bigger portfolios we have a bid offer adjustment across the portfolio and we use a similar mechanism to work out what that should be.[52]

46.    Exhibits 86B, 87B and 641A (which support the Acquisition Balance Sheet amounts for Schedules A and B, and for Annex A, respectively) each include a tab called "liquidity" which contains a table of "haircuts" for various asset classes.  These tables represent Barclays' purported bid-offer adjustments for each asset class and security type.  However, Barclays did not apply the liquidity haircuts uniformly to each asset class.[53]

---

[49] Deposition of Patrick Clackson, September 4, 2009, 144:17 – 145:2.
[50] BCI-EX-00248365-79, at BCI-EX-00248368 (underline in the original).
[51] BCI-EX-00248365-79, at BCI-EX-00248368 (emphasis added).
[52] Clackson Dep., 145:11-19.
[53] *See* Clackson's testimony related to Barclays' determination of bid prices in the Acquisition Balance Sheet. (Clackson Dep., 145:11-19).  A review of Exhibits 86B and 87B confirms Clackson's statement and Barclays' inconsistent valuation adjustments within asset classes.  For example, regardless of asset class, Barclays applied no liquidity discount to Annex A securities with unit price lower than $10.00.  (*See* if-

**Contains Highly Confidential Information**

47.    In several instances the "market value w/ liquidity" table comingles the liquidity discount on a position with a price adjustment Barclays arbitrarily applied by choosing a valuation date other than September 19 or September 22, 2008.[54]  Professor Pfleiderer's testimony is relevant:

> And whenever Barclays in those cases had an initial mark as they oftentimes did, and then a sale transaction that occurred very shortly thereafter, they took the sale transaction rather than the initial mark with the liquidity adjustment as the -- as the value to be assigned for that particular CUSIP. [55]

### B.  BARCLAYS INCONSISTENTLY AND SUBJECTIVELY APPLIED THE METHODS USED TO MARK LEHMAN'S EQUITY POSITIONS FROM MID TO BID IN THE ACQUISITION BALANCE SHEET.

48.    In an email to PwC dated December 12, 2008, Barclays described a purported 1.32% bid-mid spread adjustment to Lehman's equity positions:

> The values that we receive for the Equity prices are based on last traded.  For simplicity we have assumed that these are mids and so we need to make an adjustment to move these to the bid side of the market.  A more conservative assumption would be that the prices are offers (which is [*sic*] a rapidly falling market is probably more realistic) which would obviously lead to a larger adjustment.
> Based on an analysis of the securities we were able to obtain bid/offer spreads for about 2100 of the 3700 securities which had an average bid/offer of 2.64%.  This again would be a conservative estimate as the securities with a quoted bid offer would most likely be the most liquid and hence trading at the tightest spreads.  The mid to bid spread would then be 1.32% leading to a mid-bid adjustment of $132 mm or an offer to bid adjustment of $264mm.[56]

49.    In practice, Barclays applied arbitrary bid-offer adjustments.  Specifically, Barclays applied a 4.32% (and not the 1.32%) bid-offer adjustment to the value of equities.[57]  This 4.32% bid-offer adjustment Barclays applied is incorrectly computed.

---

statement formula in column W, tab "Portfolio 3" in the native file format of Exhibit 87B (BCI-EX-00108700.xls).

[54] My Opinion 2(c) (below) addresses Barclays' non-compliant and arbitrary choice of alternative valuation dates.

[55] Deposition of Professor Paul Pfleiderer, February 23, 2010, 111:3-12. (emphasis added)

[56] BCI-EX-00218502-503, at BCI-EX-00218503.

[57] This was derived by computing the spread as of December 18, 2008 and deriving the implied spread as of September 22, 2008.  The implied spread was based on the change in spread over that time frame for securities for which spread data was available on both dates (0922 Equities Bid-Offer (BCI-EX-00255172).xls).

**Contains Highly Confidential Information**

C.  BARCLAYS INCONSISTENTLY AND SUBJECTIVELY APPLIED THE
METHODS USED TO MARK THE EXCHANGE TRADED OPTIONS
(ETO) PORTFOLIO FROM MID TO BID IN THE ACQUISITION
<u>BALANCE SHEET.</u>

50.    Barclays intended to apply the following method to adjust the valuation of

exchange traded options ("ETO"):

> In principle, we [Barclays] value long positions at bid and value short
> positions at ask.  In practice, we [Barclays] value a position in the following
> formula:
> Net Valuation    = mid-value + bid-value
>                         = position*(bid+ask)/2*100 – abs[position*(ask-bid)/2*100]
>    where position is positive (negative) if long (short, resp.).
> Please note that the formula exactly reflects the principle.  The advantage of
> this formula provides us a way to better estimate the bid-mid value in order
> to minimize the data noise in the market.[58]

51.    In practice, Barclays employed multiple valuation methods to ETOs leading to

exceptions and inconsistencies when calculating the mid-to-bid adjustments in the

Acquisition Balance Sheet.  Specifically:

- For positions with no independent pricing data, Barclays used the ADP

    prices[59] as ask and generated a bid based on the formula:[60]

$$\text{Bid} = \text{Max [ask*(1-95\%), \$6]}$$

    Barclays' choice of ADP prices as a proxy for ask prices is unsupported.  The

    record is unclear whether the ADP prices were *bid*, *ask* or *daily closing* prices

    and how frequently the ADP prices were updated.  In addition, Barclay's

    choice of $6 as a parameter in the formula is subjective and unsupported.

- When applying its net valuation adjustment for ETOs, Barclays used different

    dates for the bid-mid value and mid-value inputs for the same computation.

    Specifically, Barclays used mid-value ($509 million) as of end-of-day

    ("EOD") on September 22, 2008 and bid-mid value ($531 million) as of EOD

    on September 19, 2008 in the same net valuation.[61]  Regardless of whether

    September 19th or September 22nd is the proper measurement date, if Barclays

---

[58] BCI-EX-(S)-00110233-38, at BCI-EX-(S)-00110237.
[59] I understand that Automatic Data Processing, Inc. (ADP) served as pricing-data repository for Barclays.
[60] BCI-EX-(S)-00110233-38, at BCI-EX-(S)-00110237.
[61] BCI-EX-(S)-00110233-38, at BCI-EX-(S)-00110237-38.

performed the same net valuation and used both the mid-value ($509 million) and the bid-mid value ($352 million)[62] as of EOD on September 22, 2008, the net valuation of Barclays exchange traded option portfolio would have been $861 million rather than $1,040 billion. This inconsistency again understates Barclays Windfall.

### D. BARCLAYS INCONSISTENTLY AND SUBJECTIVELY APPLIED THE METHODS USED TO MARK ITS AGENCY CMO PORTFOLIO FROM MID TO BID IN THE ACQUISITION BALANCE SHEET.

52.     Barclays' PCG applied a ten percent bid-offer discount to Agency Collateralized Mortgage Obligations ("Agency CMO") "to appropriately measure the market uncertainty and potential valuation adjustments resulting from more observable data."[63] PCG rationalized the ten percent discount to PwC (i) by comparing differences in observable pricing indicators from "various sources" at the bond level, and (ii) by analyzing a trade sample of 39 agency bonds that had a buy and a sell on the same day.[64]

53.     The PCG rationalization for the ten percent discount on Agency CMOs is subjective and unsupported. PCG incorrectly used an intra-day trading range (i.e. the spread between "a buy and a sell on the same day")[65] as a proxy for bid-ask spread, which is measured using trading prices as of the exact same instant in time. Using intraday trading ranges instead of bid-ask spreads introduces bias in PCG's measure of the bid-offer discount for Agency CMOs.

54.     PCG incorrectly applied the same 10% liquidity discount to the whole Agency CMO portfolio. A review of the limited sample of 39 CUSIPs that Barclays used proves that the Agency CMOs have significantly different risk profiles and daily trading patterns. One half of the sample had intraday trading ranges of 15.92% to 23.93%. The second half of the sample had intraday trading ranges of 0.03% to 1.48%.[66] Barclays had no basis in applying the same 10% across the whole Agency CMO portfolio, without further investigating the risk characteristics and the trading profiles of the Agency CMO securities.

---

[62] BCI-EX-(S)-00110233-38, at BCI-EX-(S)-00110238.
[63] BCI-EX-00248415-58, at BCI-EX-00248415.
[64] BCI-EX-00248415-58, at BCI-EX-00248415.
[65] BCI-EX-00248415-58, at BCI-EX-00248415.
[66] BCI-EX-00248415-58, at BCI-EX-00248416 (see column "B/O %").

**Contains Highly Confidential Information**

E.  PROFESSOR PFLEIDERER EITHER IGNORES THE INCONSISTENCIES
AND SUBJECTIVITY IN BARCLAYS' MID TO BID ADJUSTMENTS IN
THE ACQUISITION BALANCE SHEET IN HIS ANALYSIS OR
ACCEPTS THESE FLAWS AND INCONSISTENCIES WITHOUT ANY
ANALYSIS OR CONSIDERATION OF THE EFFECTS OF SUCH
<u>INFORMATION ON HIS OPINIONS.</u>

55.    In his report Professor Pfleiderer stated:

Adjustments of mid-point marks to bid-quote levels was intended to assure that
the valuations used in Barclays' financial statements were computed at "exit
prices" that reflected what Barclays likely would receive in an orderly sale of the
assets in question, as I understand is required by applicable accounting
standards.[67]

56.    Professor Pfleiderer further stated:

Barclays typically reduced mid-point prices for ALT-A mortgage backed
securities by 10% or 15% to adjust them to exit prices, with the size of the
adjustment varying across different types of ALT-A products. [68]

57.    At his deposition, Professor Pfleiderer acknowledged the exceptions,

inconsistencies and subjectivity Barclays applied when making the mid to bid

adjustments:

It was not the case that the haircut was uniformly applied to securities based upon
type. And one example where that's not true are [*sic*] the corporate securities, ones
that are labeled "corporate".
                                    * * *
[N]o liquidity discount is being taken off of that on the spreadsheets that are
related to liquidity discounts. Rather what is done is keying off of the minimum of
the various quotations that were obtained.
So what that means, of course, is that within the class of corporate securities, it is
not the case that a uniform treatment is being applied in terms of a percentage
reduction because it's based upon actual quotations that are coming from the
market.
                                    * * *
[A]nd there were asset classes where it was generally the case that a haircut,
liquidity haircut is what I believed they called it at time, was applied generally
across CUSIPs.  But there were exceptions to that. So I would have to go back
and look to see if there were any asset classes for which all of the CUSIPs within
that class -- and that would include the initial inventory and the J.P. Morgan

---

[67] Pfleiderer Report, ¶51(9).
[68] Pfleiderer Report, Footnote 100.

**Contains Highly Confidential Information**

inventory. It was uniform across all of those because there were some exceptions.[69]

58.     Professor Pfleiderer failed to analyze the impact of the incorrect and subjective mid to bid adjustments Barclays made.


### Opinion 2(c): Barclays' Use of Valuation Dates after September 22, 2008 is not Supported by the Accounting Literature and Results in Understated Values for Certain Securities in the Acquisition Balance Sheet.

59.     This opinion describes the flaws in the valuation date methods employed by Barclays in the Acquisition Balance Sheet and how Professor Pfleiderer accepted the flaws and inconsistencies with no discussion or analysis in his report.

### A.   THERE IS NO SUPPORT IN IAS OR U.S. GAAP.

60.     IAS and U.S. GAAP instruct the acquirer to use the acquisition date as the measurement date when accounting for assets acquired in a business combination.[70] Gary Romain was fully aware of this reporting requirement: "[t]he measurement date is the acquisition date (Sunday 21 September – practically 19 September close)".[71] Yet, in the same email, Romain develops and applies his alternative theories of "practical control" and "substantive ability to transact," both of which are not referenced anywhere in US GAAP or IFRS.[72]

61.     Barclays' use of alternate valuation dates other than the acquisition or measurement date (September 19, 2008) is unsupported and results in a lower valuation of assets in the Acquisition Balance Sheet and serves to increase Barclays' Windfall.

62.     Paradoxically, Barclays applied judgment in choosing several different measurement dates to value the assets acquired, yet as of September 19, 2008, Barclays recognized the obligation for and began servicing liabilities related to the financial assets Barclays acquired from Lehman.  For example, in a letter to the Commodity Futures

---

[69] Pfleiderer Dep., 27:5 – 29:23.
[70] IFRS 3, ¶24 (cited in Appendix III).
[71] BCI-EX-00218500-501.
[72] BCI-EX-00218500-501.

**Contains Highly Confidential Information**

Trading Commission dated September 19, 2008, Archibald Cox, Chairman of Barclays Americas stated:

> [B]arclays will be responsible for any variation margin or other payment obligations due to derivatives clearing organizations on Monday, September 22, 2008, arising from positions in futures or options on futures carried in the accounts of LBI customers that are transferred to Barclays pursuant to the Agreement[73]

63.     Similarly, the Transfer and Assumption Agreement between Barclays and the Options Clearing Corporation ("OCC") indicates that Barclays assumed the obligations related to the margin accounts at the OCC as of the acquisition date.[74]

## B.  THE VALUATION DATES CHOSEN BY BARCLAYS ARE INCONSISTENT AND UNSUPPORTED.

64.     Barclays chose inconsistently and selectively and without regard to the accounting rules the dates on which to value certain securities. The dates chosen and the rationale used to support the decision are not well developed and lead to an understatement of Barclays' Windfall. Such subjectivity in Barclays' choice of measurement dates introduces managerial bias. It is unclear when in the minds of Barclays' management a subsequent sale loses its probative value with respect to the Acquisition Balance Sheet – is it 10 days, 30 days, 90 days, 180 days, or 365 days. Taken to an extreme, Barclays' choice of subsequent valuation dates could have extended to measurement dates as far as twelve months after the acquisition date which is not the spirit of the business combination accounting standards.

65.     The Giants Stadium Bonds illustrate the effects of the arbitrary nature of Barclays' choice of valuation dates. Professor Pfleiderer describes the bonds issued by The New York Giants in Item 6 on Appendix Four to his report: "[a]ccording to Barclays' position detail spreadsheets, Barclays valued the Giants auction rate securities it acquired, for accounting purposes, at their indicated values using BoNY's marks (which ranged from about $10 per $100 of face value to about $44 per $100 of face value), without further downward adjustment."[75] Subsequently, on various dates from

---

[73] BCI-EX-00258394.
[74] Exhibit 51.
[75] Pfleiderer Report, Appendix Four, Item 6, *Giants Stadium Bonds*, page 112.

**Contains Highly Confidential Information**

April 28 through May 19, 2009, Barclays sold the Giants Stadium Bond positions and realized a cumulative gain of at least US$349,329,865.[76]  Barclays chose not to use the subsequent sales price in this case to value the Giants Stadium Bonds in the Acquisition Balance Sheet but to use the lower BoNY mark to value the bonds in the Acquisition Balance Sheet.[77]

### C.  THE OPINIONS OFFERED BY PROFESSOR PFLEIDERER REGARDING THE USE OF SUBSEQUENT MEASUREMENT DATES ARE FLAWED.

66.    Professor Pfleiderer appears to understand how subsequent events and market movements affect the fair value of an asset.  Discussing his hypothetical example at paragraph 66 of his report, Professor Pfleiderer correctly concludes that the $200,000 price a classic automobile attains in an auction "says little or nothing" about "whether the buyer in the original transaction paid fair value for the car six months ago."[78]

67.    However, Professor Pfleiderer fails to consider the effects of subsequent events or market movements on the trading portfolio assets Barclays acquired from Lehman from the acquisition date to the subsequent date of sale.  For example, when discussing how Barclays recorded the "125 different CMOs" with "aggregate indicated value of $237.7 million" (at BoNY marks), Professor Pfleiderer states: "Because these positions were sold off quickly, Barclays did not finalize September 22 exit price marks for these positions, but **instead valued them for financial accounting purposes at their actual sales value**."[79]  Professor Pfleiderer accepts Barclays' choice of valuation date without any analysis or discussion of the accounting rules.  He does not examine how the subsequent sale prices for the collateralized Alt-A securities differ from their respective fair values as of the acquisition date.

68.    Similarly, in his deposition testimony Professor Pfleiderer acknowledged Barclays' choice of alternative valuation dates for PMTG assets as follows:

---

[76] BCI-EX-00297320 (a native format document produced by Defendants in support of Exhibit 533-A).
[77] BCI-EX-00297320 (a native format document produced by Defendants in support of Exhibit 533-A) and BCI-EX-00295932-33 (Dep. Ex. 533A), (showing a reduction of the four Giants Stadium Bonds held by Dec-31-2008 of $102,000,000 and a gain of $349,329,865).  The actual transactions between Sep-19-2008 and Dec-31-2008 that resulted in these gains were not produced in discovery.
[78] Pfleiderer Report, ¶66.
[79] Pfleiderer Report, Appendix Four, Item 1, *Collateralized ALT-A mortgage obligations issued by Structured Adjustable Rate Mortgage Loan Trust*, at 107.

**Contains Highly Confidential Information**

[W]henever Barclays in those cases had an initial mark as they oftentimes did, and then a sale transaction that occurred very shortly thereafter, they took the sale transaction rather than the initial mark with the liquidity adjustment as the value to be assigned for that particular CUSIP.  And if we open up that spreadsheet, I can show you numerous examples.[80]

69.    Moreover, Professor Pfleiderer appears to ignore the fact that many of the sale prices were realized from internal transfers that may not represent arms-length transactions.  In fact, many of the alleged "subsequent sales" represent internal transfer prices among Barclays' related trading entities at prices influenced by Barclays' management.  Such internal transfer prices warrant additional testing and verification before serving as proxies for fair value.

70.    Professor Pfleiderer also repeatedly stated in his report and deposition that he is not a Certified Public Accountant ("CPA") and that he was not qualified to interpret accounting rules.  Yet in his deposition, Professor Pfleiderer indicated that the use of the subsequent sale price as a proxy for an exit price in the Acquisition Balance Sheet was correct.[81]  Professor Pfleiderer's statements in his deposition are logically inconsistent with the assertions in his report.  In addition, Professor Pfleiderer provides insufficient foundation and insufficient evidence to support his testimony.  Professor Pfleiderer admits that he is not a CPA and not qualified to interpret the rules while at the same time he opines that the methods and judgments made by Barclays are correct from a financial accounting perspective.

### Opinion 3:  Professor Pfleiderer's Evaluation and Reliance on PwC's "Extensive" Testing of Barclays' Exit Price Marks are Flawed.

71.    This section analyzes the flaws in Professor Pfleiderer's reliance on the "extensive investigation and testing of Barclays exit price marks by PwC."  As highlighted below, Professor Pfleiderer's assumptions and assertions regarding PwC's procedures lack foundation and appear to be predicated on an incomplete analysis and insufficient understanding of the facts.

---

[80] Pfleiderer Dep., 111:3-12.
[81] Pfleiderer Dep., 89:13-90:17, 110:7-113:23, 131:3-133:9

**Contains Highly Confidential Information**

## A. PROFESSOR PFLEIDERER DID NOT EVALUATE PWC'S TESTING PROCEDURES.

72.     In Paragraph 51(12) to his report, Professor Pfleiderer concludes that "PriceWaterhouseCoopers conducted an extensive audit of Barclays' final summary of the Acquisition, which included extensive investigation and testing of Barclays exit price marks."  Similarly, in his deposition Professor Pfleiderer includes several references describing his reliance on the PwC reviews.[82]

73.     In his report, Professor Pfleiderer does not provide the basis for his opinion regarding the extensiveness and reliability of PwC audit procedures.  He does not provide any evaluation of the procedures PwC performed and does not assess nor identify which PwC procedures meet his definition of "extensive audit."  In addition, in his deposition, Professor Pfleiderer admitted that his understanding of the "thorough review" PwC performed of Barclays' procedures is based on hearsay or perhaps on a telephonic conversation.[83]

## B. PROFESSOR PFLEIDERER'S RELIANCE ON PWC'S "EXTENSIVE" TESTING OF BARCLAYS' EXIT PRICE MARKS IS UNSUPPORTED.

74.     Professor Pfleiderer does not provide any analysis of his understanding of the professional responsibilities of PwC regarding its audit of Barclays' Acquisition Balance Sheet.  He does not analyze the audit assertions PwC is making in its engagement for Barclays nor does he provide any analysis or explanation for many of the misstatements and aggressive judgments utilized by Barclays in the Acquisition Balance Sheet.

75.     Professor Pfleiderer's opinion regarding the "extensive investigation and testing of Barclays exit price marks by PwC" is not supported by a review of the procedures documented in the PwC work papers and made available to Professor Pfleiderer at the time he included this opinion in his Pfleiderer Report.

76.     Appendix V presents an overview of the audit process.  Appendix VI summarizes the relevant standards and guidance auditors should consider when auditing fair value measurements and disclosures.

---

[82] Pfleiderer Dep., 253:25-254:8, 260:3-10, 322:5-11.
[83] Pfleiderer Dep., 260:11-24.

**Contains Highly Confidential Information**

### C.  REVIEW OF THE PWC WORKPAPERS PROFESSOR PFLEIDERER RELIED UPON.

77.     Counsel for Defendant Barclays identified that Professor Pfleiderer relied on data and documents in BCI-EX-00247453 – BCI-EX-00295654 to arrive at his conclusion regarding the "extensive audit" PwC performed.[84]

78.     I reviewed the PwC production Professor Pfleiderer relied upon (BCI-EX-00247453 – BCI-EX-00295654) and noted that PwC performed extremely limited tests of Barclays exit price marks recorded on Barclays Acquisition Balance Sheet.[85]  PwC testing of Barclays' exit price marks, as documented in BCI-EX-00247453 – BCI-EX-00295654, was limited to:

- Collecting emails that documented Barclays' procedures;

- Collecting from PCG price changes of JPM securities from December 22 to December 30, 2008;

- Checking for arithmetic accuracy;

- Annotating a draft acquisition balance sheet;[86]

- Confirming par values (and not fair values) for small samples of securities or positions;[87]

- Verifying with Bloomberg the imputed interest on a small-sample (15 out of 8,839 positions) of acquired securities;

---

[84] Letter from Jonathan W. Davenport, dated February 6, 2010, ¶3(k).  The range BCI-EX-00247453 – BCI-EX-00295654, specified in Davenport's letter, corresponds to data and documents produced on two disks (Disk 9 and 10) as part of a larger production by Defendants in January 2010.

[85] PwC workpapers document other testing procedures not related to testing the valuation of the financial assets acquired. Some of these unrelated procedures, PwC performed include:
- Cash balance and bank reconciliations,
- E&Y workpapers testing the cash-flow based valuations of real estate,
- PwC testing of fixed assets and E&Y schedules of Fixed Asset contributory charges,
- PwC cash reconciliation, E&Y assembled workforce workpapers and PwC bonus testing,
- Customer relationship valuation tests,
- Testing internal controls and account balances over PIM and 15c3 customer accounts,
- Testing system capabilities, data transfers and functionality for Lehman's legacy information technology systems, and
- Testing of FTD (failed-to-deliver) and FTR (failed-to-receive) trade exceptions

[86] BCI-EX-00248592

[87] BCI-EX-00249452.xls (*PwC Testing-Additional Securities* produced in native file format).

**Contains Highly Confidential Information**

- Testing the 12/31/2008 prices of 886 CUSIPS of additional unencumbered assets: equities, corporate bonds, municipal bonds and one CMO (DLJ Mortgage Acceptance);[88] and

- Testing a sample at 12/31/2008 (40 out of 161) PL1 Municipals America GQE positions – PwC tested price versus S&P, FTID, MSRB, SCPG, GFS.[89]

79.    All of the tests above used Bloomberg and S&P as pricing benchmarks.  I was not able to find any independent valuation model or logarithm that PwC used to test Barclays' exit price marks.

80.    The documents Professor Pfleiderer alleges he reviewed while preparing his report do not seem to support his conclusion that PwC undertook an "extensive investigation and testing of Barclays' exit price marks".  Professor Pfleiderer's assertions in his report are flawed and lack sufficient foundation as illustrated by his understanding of audit work undertaken by PwC and his conclusion regarding PwC's "extensive investigation and testing of Barclays exit price marks".

### D.  REVIEW OF THE PWC WORKPAPERS PRODUCED AFTER PROFESSOR PFLEIDERER FILED HIS REPORT

81.    On February 12, 2010, PwC produced additional documents, hereafter referenced as "the February 12, 2010 PwC production."[90]

82.    While PwC performed certain procedures, it is not clear whether an extensive investigation and testing was performed.  "An extensive investigation and testing of Barclays exit price marks" includes

- Examination of evidence regarding the existence of a right on an asset;

---

[88] BCI-EX-00255181.xls (*New LBI Firm Asset List A 12312008 FINAL* produced in native file format).

[89] BCI-EX-00258590.xls (*Lehman Cash Muni Price Testing 20081231 PwC* produced in native file format)

[90] *See* Letter from Martine M. Beamon (Davis Polk & Wardwell LLP) to William J. Hine, dated February 12, 2010, describing the PwC production to include documents bearing production numbers PwC-BarCapWP 000000001 – 00128004.  The documents produced in the February 12, 2010 production "include (1) documents from the section of the electronic PwC LLP audit workpaper database related to the work performed in connection with the Lehman acquisition, (2) external workpaper documents corresponding to those electronic workpapers, and (3) emails collected from seven custodians for the time period between September 12, 2008 and March 31, 2009."  Footnote one to this letter lists the seven custodians: Michael Guarnuccio, Paul Lameo, Robert MacGoey, Jalen Tan, Eric McGuinn, Lissette Palacios and Norbert Porlein.

**Contains Highly Confidential Information**

- Inspection of the facilities, such as the Giants Stadium or architectural drawings, building site thereto;

- Documentation of the reasonableness of management assumptions and models used for deriving Barclays measures of fair value and independent assessments of the fair values Barclays derived;

- Selection and testing of a sample of appropriate size and characteristics from the eleven thousand securities Barclays acquired from Lehman (evaluate additional sampling requirements for Level II and Level III securities which represent greater audit risks);

- Analysis of the contractual documents for each security valued to understand its characteristics such as: (1) structure of the security and it tranches, (2) the priority of cashflow distributions, (3) the events triggering default of additional margin requirements;

- Construction of cash flow scenarios and alternative scenarios based on varying market inputs (e.g. prepayment rates, default rates, mortality rates; interest rates and expected interest rate; political risk for government bonds).

83.    Based on my review of the PwC procedures performed on Barclays' exit price marks (as documented in the February 12, 2010 PwC production), PwC most likely did not perform an extensive investigation and testing in light of the following deficiencies in the valuations included in Barclays' Acquisition Balance Sheet:

- Pine CLO:

  o Without reviewing the underlying deal documents and without testing or investigation, PwC accepted Barclays' incorrect valuation of the Pine CLO.  In deriving its valuation, Barclays failed to recognize the inverted structure of the CLO and its own senior position within that structure. This means that Barclays itself failed to recognized that in the Pine structure, Barclays' senior Class A-1 position was fully funded and not responsible for any additional cash contributions that could arise from additional funding requests from the underlying borrowers.

**Contains Highly Confidential Information**

    o  Barclays incorrectly assumed a 70% probability that Barclays, as the holder of the Class A-1 tranche, would be obligated to fund the entire amount of the remaining balance available to be drawn upon by the underlying borrowers.  Barclays also failed to recognize, as provided in the deal documents, that Lehman, a bankrupt entity, would be responsible for providing any additional funding.  Barclays incorrectly assigned a "ZERO" probability to the most likely outcome that the Pine Trustee or the Lehman Bankruptcy Trustee or both, post Lehman bankruptcy, would prevent the funding of any additional advances due to the Lehman bankruptcy.

    o  Barclays, as the holder of the class A-1 tranche, would have first claim on the assets of the CLO, which according to Barclays, included $367 million of cash investments and $697 million of funded loans.  Barclays valued this cash and loans totaling $1,064 million at $428.6 million (or at a price of 40.3 cents on the dollar).  Had Barclays properly recognized the structure of Pine, and left all of Barclays' other valuation assumptions, probabilities and scenarios the same, Barclays' valuation would have been significantly higher.[91]

• Barclays' PCG applied a ten percent bid-offer discount to Agency Collateralized Mortgage Obligations ("Agency CMO") "to appropriately measure the market uncertainty and potential valuation adjustments resulting from more observable data."[92]  PCG rationalized the ten percent discount to PwC (i) by comparing differences in observable pricing indicators from "various sources" at the bond level, and (ii) by analyzing a trade sample of 39 agency bonds that had a buy and a sell on the same day.[93]  The PCG rationalization for the ten percent discount on Agency CMOs is subjective and supported by an incomplete analysis.  Certain buy and sell quotations for the select securities appear to be from different periods of the day and not from

---

[91] Expert Report of Mark E. Slattery, CFA filed in this litigation on March 15, 2010, at 22.
[92] BCI-EX-00248415-418
[93] BCI-EX-00248415-418

**Contains Highly Confidential Information**

the same trading instant. Such buy and sell quotations serve to approximate the intraday trading range for a security and not the bid-ask spread.

- Barclays applied a five percent "liquidity discount" to notes that were maturing within days of the acquisition date or exhibited risk profiles inconsistent with Barclays discounting. Such unwarranted liquidity discounts resulted in exorbitant yields on specific Barclays' discount notes. For example, CUSIP RTD019828 resulted in an implied yield of 643.4% on a $50 million bond three days prior to the bond's maturity. Similarly, CUSIP RTD019885 resulted in an implied yield of 276.8% seven days prior to its maturity. Cumulatively, the yield analysis of the discount notes resulted in approximately $140 million understatement of Barclays Acquisition Balance Sheet.[94]

- Barclays relied on aggressive and unsupported concepts of control by using Romain's theories of "practical control" and "substantive ability to transact" as a premise to support subsequent valuation dates for the securities Barclays acquired from Lehman. The valuations resulting from the subsequent valuation dates serve to understate Barclays Windfall.

- Barclays PCG used proxies (Lehman CDS) for an actively traded instrument (Lehman commercial paper) with recorded prices (on the TRACE system).[95] Specifically, on September 22, 2008, Barclays PCG remarked $2.2 million of Lehman commercial paper "positions at 9.5%, using Lehman CDS as a proxy for senior unsecured recoveries." Lehman senior unsecured bonds were actively trading with recorded prices on the TRACE database. The TRACE database was developed by FINRA and dealer adherence to timely reporting is regulated by the SEC. Barclays PCG approach to approximate Lehman bond prices with Lehman CDS was unwarranted and allowed Barclays PCG to apply managerial judgment and introduce bias in valuing an instrument with an observable price.

---

[94] Expert Report of Mark E. Slattery, CFA filed in this litigation on March 15, 2010, Table 4 "Yield Analysis of Discount Notes".
[95] PwC-BarCapWP_00022935-48, at PwC-BarCapWP_00022943.

**Contains Highly Confidential Information**

- Barclays asserted that "Utilizing vendor pricing including BONY, Bloomberg
  or other sources provides a reasonable basis for the Company's estimation of
  fair value."[96] The record indicates that Barclays inconsistently and
  subjectively applied this pricing procedure in estimating fair value.  For
  example, Barclays recorded CUSIP 656533AA4 and CUSIP 458204AD6 in
  the Acquisition Balance Sheet at prices different from the BoNY marks.
  Specifically, Barclays recorded CUSIP 656533AA4 (with nominal principal
  value of $62,346,775 and BoNY mark of $55,319,670) in the Acquisition
  Balance Sheet at $49,715,318.[97]  Similarly, Barclays recorded CUSIP
  458204AD6 (with nominal principal value of $15,000,000 and BoNY mark of
  $12,825,000) in the Acquisition Balance Sheet at zero.[98]  These are just two
  examples of securities that were recorded in the Acquisition Balance Sheet
  using procedures that deviated from Barclays' stated policy.

- Barclays PCG appears to have made an aggressive valuation of the Giants
  Stadium Bonds in the Acquisition Balance Sheet.[99]  PwC wrote: "Utilizing
  vendor pricing including BONY, Bloomberg or other sources provides a
  reasonable basis for the Company's estimation of fair value."  Barclays PCG
  subjectively chose to use BONY prices for the Giants Stadium bonds despite
  e-mails, attached to the Summary indicating that Barclays substantially moved
  the price marks in October – one month following the transfer of the bonds to
  Barclays. Further, in its price testing, PwC seems to indicate a non-investment
  grade rating for Giants Stadium LLC resulting in a deeply discounted price.
  For example, the memo[100] states that the monoline insurance provider for the
  securities transferred to Barclays is rated CC (i.e. non-investment grade) but
  Moody's provided an independent "stand-alone" rating of Baa3 to these
  Giants Stadium LLC bonds on September 17, 2008 and no longer rated the
  series of notes held by Barclays at the non-investment grade rating of the

---

[96] PwC-BarCapWP_00022935-48, at PwC-BarCapWP_00022943.
[97] BCI-EX-00099519.xls – produced in native file format, see tab [Corps], row 326.
[98] BCI-EX-00099519.xls – produced in native file format, see tab [Corps], row 202.
[99] PwC-BarCapWP_00022935-48, at PwC-BarCapWP_00022943.
[100] PwC-BarCapWP_00022935-48, memo "Giants Stadium – Description of Movem" embedded at PwC-
BarCapWP_00022943.

**Contains Highly Confidential Information**

monoline insurer.  It is hard to understand how PwC accepted the deeply
discounted price and the non-investment grade rating in light of all the
information available at the time the Giants Stadium valuation was made.

- PwC accepted without further investigation Barclays' inconsistent accounting
treatment of assets with similar economic characteristics.  PwC agreed with
Barclays' incorrect recoding of a redeemed bond at par while at the same time
recording a matured bond at zero or no value.  Specifically, PwC agreed that
Barclays reasonably priced a bond CUSIP 74256AA1 – that was called (i.e.
redeemed by the issuer) – at Par or full principal value.[101]  Yet, PwC also
agreed that Barclays reasonably price three investment-grade bonds[102] and
four high-yield bonds[103] that matured at zero or no value.  The economic
impact to the holder of the bond is the same in both cases (redemption by
issuer or maturity) in that the holder received prior to 12/22/2008 all of the
principal and interest due from the investment.

- PwC concluded, with respect to a high-yield bond that "The fifth position,
CUSIP 8265Q0YD8, is in default, therefore, a price of zero does not appear
unreasonable."[104]  In general, however, a bond that has defaults still has a
recovery value and should be valued to reflect such recovery value.  Yet, PwC
accepted the price of zero without performing additional tests of the potential
recovery value of CUSIP 8265Q0YD8.


### Opinion 4:    Professor Pfleiderer is Misguided in His Analysis of the Negative Goodwill Barclays Recorded.

84.    Professor Pfleiderer's analysis of Barclays reported negative goodwill "of
approximately $2 billion, post tax"[105] is misguided and flawed for several reasons.

85.    Professor Pfleiderer argues that there is only $0.5 billion of the negative
goodwill(gain) on financial assets and this calculation results in  "very close to a

---

[101] PwC-BarCapWP_00023570-76, at PwC-BarCapWP_00023575.
[102] PwC-BarCapWP_00023570-76, at PwC-BarCapWP_00023575.
[103] PwC-BarCapWP_00023570-76, at PwC-BarCapWP_00023576.
[104] PwC-BarCapWP_00023570-76, at PwC-BarCapWP_00023576.
[105] Pfleiderer Report, ¶5(c).

**Contains Highly Confidential Information**

mathematical wash"[106] when excluding any gains associated with the exchange and non-financial assets. That is, Professor Pfleiderer contends that the repo transaction was a wash as consummated. This analysis is misguided for several reasons.

86.     The accounting model for business combinations looks at the transaction in total when valuing assets and liabilities acquired [107] Pfleiderer's arbitrary exclusion of gains on non-financial assets is flawed and not a proper determination of negative goodwill in this transaction.

87.     In addition, Professor Pfleiderer contradicts his own calculation in his report when he states: "It is an important fact that Barclays did not acquire the Repo Collateral in a separate, standalone transaction, but instead acquired these assets as part of a larger bundle of assets and liabilities associated with LBI's North American broker-dealer businesses. This means, first, that there was no separate identifiable 'price' paid by Barclays for the trading portfolio securities and, second and more specifically, that the $45 billion that Barclays lent to LBI in the Fed Replacement Repo should not be viewed as the 'price' Barclays paid for the Repo Collateral."[108]

88.     Second, Professor Pfleiderer concludes that it is appropriate to exclude the $2.1 billion gain on positions at exchanges from his negative goodwill analysis because Barclays "neither knew *nor could have known or even roughly estimated* the net value of these accounts at the time of the Sale Hearing."[109] This determination again is misguided. Barclays' inability to assess the value of an asset at the precise moment of the Sale Transaction has no bearing in either U.S. GAAP or IFRS[110] nor does it comport with the fact that Barclays determined and reported in their financial statements that they recognized a $2.1 billion pre-tax gain on these same assets. The accounting rules contemplate that this type of risk, perceived or otherwise, could arise and directs the financial statement preparer to assess both the value of the collateral and the value of the associated liabilities rather than ignore the value of the assets and liabilities. The

---

[106] Pfleiderer Report, ¶116.
[107] IFRS 3, ¶IN7(c) (cited in Appendix III of this report).
[108] Pfleiderer Report, ¶10.
[109] Pfleiderer Report, ¶117 (emphasis as shown).
[110] IFRS 3, ¶44.

**Contains Highly Confidential Information**

associated risk is one more item that must be evaluated in making a determination of the fair value of the assets and liabilities acquired in a business combination.[111]

89.    Finally, Professor Pfleiderer also attempts to exclude the negative goodwill (gain) associated with other categories of assets acquired, including intangibles in his attempt to demonstrate that the sale as consummated was a wash.[112]  Excluding the real property[113] Barclays acquired additional assets of approximately $2.08 billion comprised primarily of intangibles, furniture and other assets.[114]  Intangibles included the use of Lehman's name for two years, customer lists, relationships, and a variety of other assets.[115]  However, total consideration for all these non-financial assets was $250 million.  This results in a negative goodwill (gain) of $1.83 billion ($2.08 - $0.25).  This calculation is improper because these assets, like the other enumerated assets, were contemplated in the APA and representations made to the Court.  They should not be considered separately when determining the amount of negative goodwill associated with the Sale transaction.[116]  In any event, and as demonstrated in Professor Zmijewski's Report, Barclays' negative goodwill on the transaction as consummated was far greater – Barclays' Windfall was at least $13.051 billion.[117]


Submitted by:

_John P. Garvey_
_____

John P. Garvey
March 15, 2010

---

[111] IAS 39, ¶48A.

[112] Pfleiderer Report, ¶116.

[113] Each of the three buildings Barclays acquired from Lehman was valued by at least one independent appraiser.  Specifically, CB Richard Ellis ("CBRE", PwC-BarCapWP_00042693-808) and Cushman & Wakefield (PwC-BarCapWP_00042671-692) independent of each other appraised the *745 Seventh Avenue* building.  Barclays recorded that property at the average of the two valuations (PwC-BarCapWP_00042499-502).  CBRE independently appraised the value of the *40 Corporate (Piscataway)* property (PwC-BarCapWP_00042583-670) and the *27 Commerce (Cranford)* property (PwC-BarCapWP_00042504-82).   Barclays recorded these properties at their appraised values in the Acquisition Balance Sheet (PwC-BarCapWP_00042499-502).

[114] Exhibit 377A.

[115] Report by Ernst & Young LLP, dated January 30, 2009, titled "Valuation advisory services related to the acquisition of certain assets of Lehman Brothers Holdings, Inc." (BCI-EX-00292153 – 2237).

[116] IFRS 3, ¶51 and ¶52.

[117] Expert Report of Mark E. Zmijewski, Ph. D. filed in this litigation on March 15, 2010, at 9.

---

Contains Highly Confidential Information

## Appendix I

## Curriculum Vitae

## JOHN P. GARVEY

Principal
Chicago Partners (A Subsidiary of Navigant Consulting)
30 South Wacker Drive, Suite 3100
Chicago, Illinois 60606
Telephone: (312) 251-4571
Facsimile: (312) 251-5201

## CURRENT EMPLOYMENT

CHICAGO PARTNERS (A Subsidiary of Navigant Consulting)

<u>Principal</u>, (Present; 1996 – 1999)

## EDUCATION

M.B.A.      (Finance), The University of Chicago, 1988

B.B.      (Accounting), Western Illinois University, 1978

Certified Public Accountant, Licensed in Illinois

## PROFESSIONAL EXPERIENCE

CHICAGO PARTNERS (A Subsidiary of Navigant Consulting)

John Garvey, *Principal*, is a CPA.  He is the former President of Chicago
Partners and currently serves as the Segment Leader of the Economics
Practice of Navigant Consulting, Inc.  He has testified or directed complex
litigation matters regarding fraud and forensic accounting, securities fraud,
accounting irregularities, merger and acquisition disputes, derivative
disputes, professional liability, bankruptcy and solvency, business
valuation and general damages issues.  Mr. Garvey has represented
numerous companies and individuals before regulatory bodies including
the Securities and Exchange Commission and the CFTC. Mr. Garvey has
also assisted counsel in many high profile board directed investigations of
allegations of fraud and accounting irregularities.  He has appeared as an
expert in Delaware Chancery Court, Bankruptcy Court, State and Federal
courts and in various administrative forums.  Mr. Garvey has also served
as an independent arbitrator.

**Contains Highly Confidential Information**

## PROFESSIONAL EXPERIENCE (con't.)

ARTHUR ANDERSEN LLP

<u>Partner and Market Team Leader for Business Fraud and Investigation Services</u>, (1999-2001)

Assisted in house or special counsel in conducting internal corporate investigations into alleged fraud and/or illegal acts perpetrated by employees and/or officers of publicly held and privately owned enterprises.

Assisted outside counsel in the investigation of liability and damages issues in numerous large class action Federal securities suits and the defense of several "Big Five" accounting firms regarding the interpretation and application of GAAP, GAAS and public disclosure issues.

Assisted special counsel to the audit committees of the board of directors of numerous Fortune 500 companies in the investigation and resolution of alleged accounting irregularities.

Have participated in over 30 board directed investigations into alleged accounting irregularities.

Represented various companies in front of regulatory bodies including the Securities and Exchange Commission and the Commodity Futures Trading Commission.

Represented both buyers and sellers in post-acquisition disputes regarding the analysis of and interpretation of contractual and GAAP issues and related valuation questions. Served as an independent arbitrator for several post-acquisition disputes.

FORT DEARBORN PARTNERS, INC.

<u>Vice President</u>, (June, 1994 - December, 1995)

Vice President in a financial and management consulting firm specializing in mergers and acquisitions and related financing transactions.

Represented buyers and sellers of middle market companies in mergers and acquisitions and financing transactions.

**Contains Highly Confidential Information**

## PROFESSIONAL EXPERIENCE (con't.)

Provided business valuation, merger and acquisition analysis and general damage analysis consulting in litigation matters related to fraud, securities, mergers and acquisitions, professional liability, business valuation and general damages issues.

DELOITTE & TOUCHE

Partner, (1980 - June, 1994)

Partner with fourteen years of general audit and consulting experience servicing a variety of publicly and privately held companies, with an emphasis in manufacturing and distribution and financial services. Clients served included Beatrice Companies, Borg-Warner Corporation, the Chicago Board of Trade, Hollister, Inc., ICM Industries, Inc., the Keebler Company and Navistar International Corporation.

Other specialized experience included:

Special Acquisition Services

Supervised numerous due diligence engagements in a broad spectrum of transactions, including leveraged buyouts, acquisitions, dispositions, mergers, joint ventures, refinancings and restructurings. Engagements ranged in size from several of the largest leveraged buyouts to transactions in the $50 to $100 million ranges. Financial buyers served included KKR, The Blackstone Group, Merrill Lynch Capital Partners and ICM Industries, Inc.

Participated in several financial and operational restructurings for a Fortune 100 Company providing technical consulting in the areas of recapitalizations and debt restructurings, disposition strategies, strategic cost management and financial and regulatory reporting.

Litigation Services

Provided financial and damage analyses to attorneys in connection with lawsuits related to patent infringement, fraud and misappropriation of assets, accounting malpractice and negligence, mergers and acquisition disputes, securities fraud, breach of contract, lost profits, business valuation, market analysis, and other matters in the commodities and securities industries, professional service industry, retailing and manufacturing and distribution industries. Also provided consulting

**Contains Highly Confidential Information**

## PROFESSIONAL EXPERIENCE (con't.)

assistance to attorneys on technical accounting, auditing and corporate finance issues.  Personally directed or involved in approximately 20 cases. Served as Arbitrator in binding arbitration.

Member of Deloitte & Touche National Litigation Steering Committee.

## PROFESSIONAL AFFILIATIONS

Association of Certified Fraud Examiners
American Institute of Certified Public Accountants
Illinois CPA Society
Boys & Girls Clubs of Chicago - Corporate Board Member

## SELECTED LITIGATION ENGAGEMENTS

Securities and Exchange Commission v. Delphi Corp., et al. United States District Court – Eastern District of Michigan. Securities Fraud. Testified on behalf of plaintiff at deposition.

Delphi Corporation v. Appaloosa Management L.P., et. al.  United States Bankruptcy Court – Southern District of New York.  Breach of Contract.  Testified on behalf of defendants at deposition.

Dr. Anthony Cerami v. Novartis Vaccines and Diagnostics, Inc.  United States District Court – Southern District of New York.  Breach of Contract.  Testified on behalf of defendant at deposition.

Banco Espirito Santo International, Ltd., ESB Finance, Ltd. and Banco Espirito Santo S.A. v. BDO Seidman, LLP and BDO International B.V.  Circuit Court – Miami Dade County, Florida.  Professional Negligence/Malpractice. Testified on behalf of defendants at deposition and trial.

Appleton Papers Inc. v. Andritz BMB AG.  Circuit Court - State of Wisconsin. Breach of Contract and Fraud. Testified on behalf of plaintiff at deposition.

United States of America v. Gregory L. Reyes.  United States District Court – Northern District of California – San Francisco Division.  Securities Fraud.  Testified on behalf of plaintiff at trial.

Marsulex, Inc., Claimant v. Trelleborg Corporation, et al., Respondents. AAA Arbitration. Fraud and breach of contract. Testified on behalf  of Claimant at deposition and arbitration.

**Contains Highly Confidential Information**

## SELECTED LITIGATION ENGAGEMENTS (con't.)

In re Parmalat Securities Litigation. MDL 1653. United States District Court - Southern District of New York. Securities Fraud. Testified on behalf of defendant, Grant Thornton International, at deposition.

Parmalat Capital Finance Limited v. Grant Thornton International, et al. Circuit Court of Cook County Illinois - Law Division. Securities Fraud. Testified on behalf of defendant at deposition.

Securities and Exchange Commission v. Gregory L. Reyes, et al. United States District Court – Northern District of California. Securities Fraud. Testified on behalf of plaintiff at deposition.

Securities and Exchange Commission v. Jeffrey P. Jorissen, Gary A. Shipman and Mary A. Perella. United States District Court – Eastern District of Michigan. Testified on behalf of defendant, Jeffrey P. Jorissen at deposition.

American Farm Bureau, Inc. Claimant v. IBFA Acquisition Company, LLC; Respondent. AAA Arbitration – Central Case Management Center. Fraud and breach of contract. Testified on behalf of Claimant at deposition.

Panolam Industries International, Inc. and Pioneer Plastics Corporation v. Neste Resins Corporation, Neste Resins Canada and Dynea U.S.A., Inc. United States District Court - District of Connecticut. Breach of contract. Testified on behalf of defendants at deposition.

Joseph White v. Heartland High-Yield Municipal Bond Fund, et al. United States District Court - Eastern District of Wisconsin. Testified on behalf of defendant, PricewaterhouseCoopers at deposition.

The State of Oregon, By and Through the Oregon Public Employees Retirement Board v. McKesson HBOC, Inc. , et al. Superior Court of California. Securities fraud. Testified on behalf of defendants at deposition.

## SERVED AS INDEPENDENT ARBITRATOR IN SEVERAL POST ACQUISTION CONTRACT AND BREACH OF CONTRACT DISPUTES

## BOARD AND REGULATORY (SEC) INVESTIGATIONS

Waste Management, Inc.
Sunbeam Corporation
Kmart Corporation
OfficeMax, Inc.
Hanover Compressor
Flowserve Corporation

**Contains Highly Confidential Information**

## BOARD AND REGULATORY (SEC) INVESTIGATIONS (con't.)

Dana Corporation
General Mills

**Contains Highly Confidential Information**

## Appendix II

## Documents Relied Upon

| Documents in the Record | | |
|---|---|---|
| **Depositions** | | |
| Deponent | Date | |
| Steven Berkenfeld | 8/6/2009 | |
| Paolo Tonucci | 8/14/2009 | |
| Bart McDade | 9/2/2009 | |
| John Varley | 9/3/2009 | |
| Patrick Clackson | 9/4/2009 | |
| Stephen King | 9/10/2009 | |
| Gary Romain | 9/10/2009 | |
| John Varley | 9/11/2009 | |
| Gary Romain | 1/13/2010 | |
| Paul Pfleiderer | 2/23/2010 | |
| James Seery | 3/3/2010 | |
| | | |
| **Deposition Exhibits** | | |
| Exhibit | Beginning Bates | Ending Bates |
| 1 - Asset Purchase Agreement | | |
| 24 - First Amendment to the Asset Purchase Agreement | | |
| 25 - Clarification Letter | | |
| 51- Transfer and Assumption Agreement, dated Sept. 22, 2008 | | |
| 86B - Summary of the numbers for Schedules A and B provided to auditors | BCI-EX 00099519 | BCI-EX 00099521 |
| 87B - JPM Inventory, Annex A Assets | BCI-EX-00108700 | |
| 88B - Barclays' Acquisition Balance Sheet | BCI-EX-00109154 | BCI-EX-00109161 |
| 205 - Settlement Agreement between JPM, Barclays and Giddens, dated Dec. 5, 2008 | | |
| 377A - Barclays' Opening Balance Sheet | BCI-EX-00115843 | BCI-EX-00115846 |
| 444- Declaration of Shari D. Leventhal, in Support of Trustee's Motion For Entry of an Order Approving a Settlement Agreement | | |
| 495 - Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, Sept. 15, 2009 | | |
| 533A - Lehman Acquisition Assets Summary | BCI-EX-00295932 | BCI-EX-00295933 |
| 591 - Report of Peter Vinella, dated Jan. 1, 2010 | | |
| 600 - Report of Anthony Saunders, dated Jan. 1, 2010 | | |
| 633A - Expert Report of Prof. Paul Pfleiderer, Volume 1 | | |
| 634A - Expert Report of Prof. Paul Pfleiderer, Volume 2 | | |
| 641A - Email from Sean Teague to Tal Litvin, et al., Feb. 12, 2009, re: "Acquisition Balance Sheet," (with attachments). | BCI-EX-(S)-00213990 | BCI-EX-(S)-00213996 |
| 652 - Report of Anthony J. Leitner, dated Jan. 1, 2010 | | |
| | | |
| **BCI Opposition Brief Exhibits** | | |
| 146 - Romain's Handwritten Notes | | |
| 147 - Romain's Typed Notes | | |
| 357 - Declaration of Romain, dated Jan. 26, 2010 | | |
| 363 - Declaration of Stephen King, dated Jan. 27, 2010 | | |
| | | |
| **Other Documents** | | |
| Description | Beginning Bates | Ending Bates |
| Summary of the numbers for Schedules A and B provided to auditors (native file) | BCI-EX 00099519 | |
| Email from Romain to PwC, dated Oct. 24, 2008, Re: JPM securities | BCI-EX-(S)-00110050 | |
| Email chain between PwC and Barclays, dated Feb. 1, 2009, Re: Opening BS Valuation Work | BCI-EX-(S)-00110233 | BCI-EX-(S)-00110238 |
| Balance Sheet Close – Inventory, ITS Close Narrative | BCI-EX-(S)-00213939 | BCI-EX-(S)-00213940 |
| Balance Sheet Close – Inventory, MTS Close Narrative | BCI-EX-(S)-00213941 | BCI-EX-(S)-00213945 |
| Barclays Capital Valuation Methodology | BCI-EX-(S)-00213991 | BCI-EX-(S)-00213992 |
| Email from Romain to Clackson, et. al., dated Dec. 14, 2008, Re: Valuation of securities | BCI-EX-00218500 | BCI-EX-00218501 |
| Email from Morton to Holloway, dated Dec. 12, 2008 | BCI-EX-00218502 | BCI-EX-00218503 |
| Email from Romain, dated Jan. 27, 2009, Opening Balance Sheet attached | BCI-EX-00247453 | BCI-EX-00247454 |
| Email chain between Mark Washtell and PwC, dated Oct. 20, 2008 - Jan. 13, 2009, Re: Bid offer calculation | BCI-EX-00248365 | BCI-EX-00248379 |
| Memorandum dated February 2, 2009 from Richard Landreman to PwC, subject "RMBS Portfolio Acquired from Lehman - Bid/Offer Reserve Agency CMOs" | BCI-EX-00248415 | BCI-EX-00248418 |
| Long Island - Gross Acquisition Balance Sheet (draft) with Romain's notes | BCI-EX-00248592 | |
| PwC Testing-Additional Securities | BCI-EX-00249452 | |

---

Expert Report of John P. Garvey

| | | |
|---|---|---|
| Equity Bid-Offer Calculation, dated Sept. 22, 2008 | BCI-EX-00255172 | |
| New LBI Firm Asset List A 12312008 FINAL | BCI-EX-00255181 | |
| Letter from Ananda K. Radhakrishnan, dated Sept. 19, 2008 | BCI-EX-00258394 | |
| Lehman Cash Muni Price Testing 20081231 PwC.xls | BCI-EX-00258590 | |
| Barclays Lehman Report and Exhibits | BCI-EX-00292153 | BCI-EX-00292237 |
| Sched B LehOBS 5 | BCI-EX-00295934 | |
| Support for Exhibit 533-A (produced in native format) | BCI-EX-00297320 | |
| Bloomberg screen shots, Giants Stadium Bonds | BCI-EX-00297526 | BCI-EX-00297541 |
| Barclays Capital NA - FMV of Investments Testing | PwC-BarCapWP_00021945 | PwC-BarCapWP_00021952 |
| Final- BarCap - Lehman Acquisition Memo Revised 2/08/09 Draft | PwC-BarCapWP_00022935 | PwC-BarCapWP_00022948 |
| Review of JPM Acquisition Valuation (12/22/08) for CDOs and Corporate Bonds | PwC-BarCapWP_00023570 | PwC-BarCapWP_00023576 |
| Barclays JPM Draft Memo v13 | PwC-BarCapWP_00023595 | PwC-BarCapWP_00023604 |
| Summary Meeting_Unencumbered Assets | PwC-BarCapWP_00027533 | |
| Valuation of Buildings | PwC-BarCapWP_00042499 | PwC-BarCapWP_00042502 |
| CBRE - 27 Commerce (Cranford) Appraisal | PwC-BarCapWP_00042504 | PwC-BarCapWP_00042582 |
| CBRE - 40 Corporate (Piscataway) Appraisal | PwC-BarCapWP_00042583 | PwC-BarCapWP_00042670 |
| 745 Seventh Avenue Appraisal | PwC-BarCapWP_00042671 | PwC-BarCapWP_00042692 |
| 745 Seventh Ave - CBRE Appraisal | PwC-BarCapWP_00042693 | PwC-BarCapWP_00042808 |
| BCI Rule 60 Opposition and Undelivered Assets Brief, dated Jan. 29, 2010 | | |
| Debtors' Adversary Complaint, dated Nov. 16, 2009 | | |
| Expert Report of Harrison J. Goldin, dated Mar. 15, 2010 | | |
| Expert Report of John J. Schneider, dated Mar. 15, 2010 | | |
| Expert Report of John Olvany, dated Mar. 15, 2010 | | |
| Expert Report of Joseph Schwaba, dated Mar. 15, 2010 | | |
| Expert Report of Mark E. Slattery, dated Mar. 15, 2010 | | |
| Expert Report of Mark E. Zmijewski, dated Mar. 15, 2010 | | |
| Hearing Transcript, dated Sept. 19, 2008 | | |
| Hearing Transcript, dated Dec. 22, 2008 | | |
| Letter from Davenport to Carrero, dated Feb. 6, 2010 | | |
| Letter from Jonathan W. Davenport, dated Feb. 6, 2010 | | |
| Letter from Martine M. Beamon (Davis Polk & Wardwell LLP; counsel for PwC) to William J. Hine, dated Feb. 12, 2010 | | |
| Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006, dated Sept. 15, 2009 | | |
| Official Committee of Unsecured Creditors' Adversary Complaint, dated Nov. 16, 2009 | | |
| Report of Anton R. Valukas, Examiner in re Lehman Brothers Holdings, Inc. et al, Chapter 11 Case No. 08-13555 (JMP), Volume 7, Appendix 3, Key Individuals | | |
| The Trustee's Adversary Complaint, Nov. 16, 2009 | | |
| The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), Sept. 15, 2009 | | |
| | | |
| | | |
| **Documents that are Publicly Available** | | |
| Accounting Terminology Bulletin 3 *Book Value* | | |
| AU Section 328 *Auditing Fair Value Measurements and Disclosures* | | |
| Barclays Annual Report, year ended Dec. 31, 2008 | | |
| Barclays PLC, Form 20-F, year ended Dec. 31, 2008 | | |
| David N. Ricchiute, *Auditing* , 8th edition (United States: Thomson / South-Western, 2006 (ISBN: 0-324-22629-2)) | | |
| http://dictionary.reference.com/browse/book+value | | |
| http://en.wikipedia.org/wiki/Book_value | | |
| http://www.fasb.org/intl/convergence_iasb.shtml | | |
| http://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526495&pf=true | | |
| http://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526571&pf=true | | |
| http://www.iasb.org/The+organisation/IASCF+and+IASB.htm | | |
| http://www.investopedia.com/terms/b/bookvalue.asp | | |
| http://www.thefreedictionary.com/book+value | | |
| IAS 39 *Financial Instruments Recognition and Measurement* | | |
| IASB *Information for Observers*  (IASB Board Meeting, London, Dec. 12, 2007) | | |
| IFRIC 1 *Changes in Existing Decommissioning, Restoration and Similar Liabilities* | | |
| IFRS 3 *Business Combinations* | | |
| JP Morgan, Form 10-K, year ended Dec. 31, 2008 | | |
| Lehman Brothers Holdings Inc., Form 10-K, year ended Nov. 30, 2007 | | |
| SEC Regulation S-K, *Non Financial Statement Requirements* | | |
| SEC Regulation S-X, *Financial Statement Requirements* | | |
| SFAS 157 *Fair Value Measurements* | | |
| WestAmerica Bancorporation, Form 8-K, filed Feb. 6, 2009 | | |

**Contains Highly Confidential Information**

# Appendix III

## Summary of Relevant Accounting Principles

1.      This Appendix presents a summary of relevant accounting principles.

2.      The management of Barclays PLC and Barclays Bank PLC is responsible for "the preparation of financial statements for external reporting purposes in accordance with International Financial Reporting Standards (IFRS) as adopted by the European Union and the International Accounting Standards Board (IASB)."[118]

3.      This assertion is stated clearly in the financial statements (Annual Report and Form 20-F) issued by Barclays for the fiscal year ended December 31, 2008.[119]

4.      Lehman Brothers Holdings Inc. and its subsidiaries prepared their financial statements in accordance with U.S. generally accepted accounting principles ("U.S. GAAP").[120]  U.S. GAAP and IFRS standards are developed using similar processes.[121] "In October 2002, the FASB and the International Accounting Standards Board (IASB) announced the issuance of a memorandum of understanding ("Norwalk Agreement"), marking a significant step toward formalizing their commitment to the convergence of U.S. and international accounting standards."[122]  When discussing relevant generally accepted accounting principles, I focus on IFRS (the standards governing Barclays's external financial reporting), and highlight commonalities and differences between IFRS and U.S. GAAP.

---

[118] Barclays PLC and Barclays Bank PLC Form 20-F for the fiscal year ended December 31, 2008, page 173.  *Identical disclosure in* Barclays PLC Annual Report 2008, page 187.
*See also* Barclays PLC and Barclays Bank PLC Form 20-F for the fiscal year ended December 31, 2008, page 176.  *Identical disclosure in* Barclays PLC Annual Report 2008, page 190.
[119] Barclays PLC and Barclays Bank PLC Form 20-F for the fiscal year ended December 31, 2008, page 173.  *Identical disclosure in* Barclays PLC Annual Report 2008, page 187.
*See also* Barclays PLC and Barclays Bank PLC Form 20-F for the fiscal year ended December 31, 2008, page 176.  *Identical disclosure in* Barclays PLC Annual Report 2008, page 190.
[120] Lehman Brothers Holding, Inc., Form 10-K for the fiscal year ended November 30, 2007, page 84.
[121] http://www.iasb.org/The+organisation/IASCF+and+IASB.htm, last visited March 10, 2010, http://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526571&pf=true last visited March 10, 2010,
http://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526495&pf=true last visited March 10, 2010.
[122] http://www.fasb.org/intl/convergence_iasb.shtml, last visited March 10, 2010.

---

**Contains Highly Confidential Information**

## A. BOOK VALUE

5.     "The term *book value* is one of several widely used expressions in which the word value appears with a particular qualifying adjective to denote a particular concept of value. Book value is to be distinguished from such terms as fair or market value or liquidating value, in that it refers to amounts reflected on accounting records and in financial statements."[123]

6.     In reference to individual items in books of accounts or in financial statements, the term *book value* "signifies the amount at which an item is stated in accordance with the accounting principles related to the item."[124]  The United States Securities and Exchange Commission ("SEC") uses the term *book value* to denote the "book value of the securities as carried by the registrant."[125]  Such interpretation of the term *book value* is in line with the implicit meaning of *book value* as used by the IASB.[126]  The IASB made a distinction between "pre-combination book values" and "fair values at the date of the combination."[127]  The IASB recognizes that there is a difference between the pre-combination book value and the fair value an acquirer may assign in a transaction.

## B. FAIR VALUE

7.     This section presents an overview relevant accounting principles for measuring fair value.  Appendix IV discusses fair value hierarchy and related fair value measurement considerations.

8.     IAS 39 *Financial Instruments: Recognition and Measurement,* (IAS 39) was originally issued in March 1999.  In December 2003 IASB issued a revised IAS 39 which "applied for annual periods beginning on or after 1 January 2005."[128]  The discussion below focuses on the revised IAS 39, including amendments up to December 2008.

---

[123] Accounting Terminology Bulletin 3, *Book Value* (ATB 3), ¶1.

[124] Accounting Terminology Bulletin 3, *Book Value* (ATB 3), ¶5.

[125] SEC Regulation S-X, *Financial Statement Requirements*, SEC RegS-X.T.Rule3-16.
*Also see* SEC RegS-X.I.Rule3-05.Determining Significance – Asset Test [5].
*Also see* SEC Regulation S-K, *Non Financial Statement Requirements*, RegS-K.T.Item914.

[126] *See* IFRIC 1 *Changes in Existing Decommissioning, Restoration and Similar Liabilities*, ¶IE8, Note (3).

[127] IFRS 3, ¶BC51: "…[b]ecause the assets and liabilities of all the combining entities would be recognised at their pre-combination book values rather than at their fair values at the date of the combination, users of the combined entity's financial statements would be unable to assess reasonably the nature, timing and extent of future cash flows expected to arise from the combined entity as a result of a combination..."

[128] IAS 39, ¶IN1.

---

9.      IAS 39 establishes "principles for recognising and measuring financial assets, financial liabilities and some contracts to buy or sell non-financial items."[129]  IAS 39 requires that "[w]hen a financial asset or financial liability is recognised initially, an entity shall measure it at its fair value."[130]

10.      IAS 39 defines fair value as "the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction."[131]  IAS 39 uses the terms *bid-price*, *asking price*, and *current-offer price* but does not reference the term *exit price*.[132]  U.S. GAAP explicitly references *exit price* – "the objective of a fair value measurement is to **determine the price that would be received to sell the asset or paid to transfer the liability at the measurement date (an exit price)**."[133]  In an effort to align the interpretations of exit price in international accounting standards and U.S. GAAP:

> The [IASB] Board confirmed its plan to complete a standard-by-standard review of fair value measurements currently required or permitted in IFRSs to assess whether each standard's measurement basis was intended to be an exit price.  For situations in which the measurement basis was not intended to be an exit price, the Board plans to assess whether it should develop additional measurement guidance.[134]

11.      IAS 39 lists fair-value measurement considerations:

> The best evidence of fair value is quoted prices in an active market. If the market for a financial instrument is not active, an entity establishes fair value by using a valuation technique. The objective of using a valuation technique is to establish what the transaction price would have been on the measurement date in an arm's length exchange motivated by normal business considerations. Valuation techniques include using recent arm's length market transactions between knowledgeable, willing parties, if available, reference to the current fair value of another instrument that is substantially the same, discounted cash flow analysis and option pricing models. If there is a valuation technique commonly used by market participants to price the instrument and that technique has been demonstrated to provide reliable estimates of prices obtained in actual

---

[129] IAS 39, ¶1.
[130] IAS 39, ¶43.
[131] IAS 39, Definitions, ¶9 (footnote omitted)
[132] IAS 39, ¶AG70
[133] SFAS 157 *Fair Value Measurements,* ¶7 (emphasis added).  For similar references to exit price, see SFAS 157 Summary, and SFAS 157 ¶16, 17, 30, A2, A8, A27, C13, C16, C21, C23, C26, C29, C52, C63, C84.
[134] IASB *Information for Observers* (IASB Board Meeting, London, December 11, 2007, in re: Project *Fair Value Measurement*, Subject Cover Note (*Agenda Paper 2A*), ¶4).

**Contains Highly Confidential Information**

market transactions, the entity uses that technique. The chosen valuation technique makes maximum use of market inputs and relies as little as possible on entity-specific inputs. It incorporates all factors that market participants would consider in setting a price and is consistent with accepted economic methodologies for pricing financial instruments. Periodically, an entity calibrates the valuation technique and tests it for validity using prices from any observable current market transactions in the same instrument (ie without modification or repackaging) or based on any available observable market data.[135]

12.    IAS 39 provides additional guidance about how to determine fair values using valuation techniques:

- The objective is to establish what the transaction price would have been on the measurement date in an arm's length exchange motivated by normal business considerations.

- A valuation technique (a) incorporates all factors that market participants would consider in setting a price and (b) is consistent with accepted economic methodologies for pricing financial instruments.

- In applying valuation techniques, an entity uses estimates and assumptions that are consistent with available information about the estimates and assumptions that market participants would use in setting a price for the financial instrument.

- The best estimate of fair value at initial recognition of a financial instrument that is not quoted in an active market is the transaction price unless the fair value of the instrument is evidenced by other observable market transactions or is based on a valuation technique whose variables include only data from observable markets.[136]

## C. BUSINESS COMBINATIONS

13.    IFRS 3 *Business Combinations,* issued in March 2004, applied "to the accounting for business combinations for which the *agreement date* is on or after 31 March 2004."[137] "The objective of this IFRS [IFRS 3 *Business Combinations*] is to specify the financial

---

[135] IAS 39, ¶48A.
[136] IAS 39, ¶IN18.
[137] IFRS 3, ¶78.

**Contains Highly Confidential Information**

reporting by an entity when it undertakes a *business combination*. In particular, it specifies that all business combinations should be accounted for by applying the purchase method. Therefore, the acquirer recognises the acquiree's identifiable assets, liabilities and *contingent liabilities* at their *fair values* at the *acquisition date*, and also recognises *goodwill*, which is subsequently tested for impairment rather than amortised." [138]

14.    IFRS 3 *Business Combinations* requires:

- all business combinations within its scope to be accounted for by applying the purchase method.[139]

- an acquirer to measure the cost of a business combination as the aggregate of: the fair values, at the date of exchange, of assets given, liabilities incurred or assumed, and equity instruments issued by the acquirer, in exchange for control of the acquiree; plus any costs directly attributable to the combination.[140]

- **an acquirer to recognise separately, at the acquisition date**, the acquiree's identifiable assets, liabilities and contingent liabilities that satisfy the following recognition criteria at that date, regardless of whether they had been previously recognised in the acquiree's financial statements:

  (i) in the case of an asset other than an intangible asset, it is probable that any associated future economic benefits will flow to the acquirer, and its fair value can be measured reliably;

  (ii) in the case of a liability other than a contingent liability, it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation, and its fair value can be measured reliably; and

  (iii) in the case of an intangible asset or a contingent liability, its fair value can be measured reliably.[141]

---

[138] IFRS 3, ¶1 (italics in the original)
[139] IFRS 3, ¶IN7(a).  IAS 22, the predecessor to IFRS 3, "permitted business combinations to be accounted for using one of two methods: the pooling of interests method for combinations classified as unitings of interests and the purchase method for combinations classified as acquisitions." (IFRS 3, ¶IN9)
[140] IFRS 3, ¶IN7(c).
[141] IFRS 3, ¶IN7(d) (emphasis added).

---

**Contains Highly Confidential Information**

- the identifiable assets, liabilities and contingent liabilities that satisfy the above recognition criteria **to be measured initially by the acquirer at their fair values at the acquisition date**, irrespective of the extent of any minority interest.[142]

- goodwill acquired in a business combination to be recognised by the acquirer as an asset from the acquisition date, initially measured as the excess of the cost of the business combination over the acquirer's interest in the net fair value of the acquiree's identifiable assets, liabilities and contingent liabilities recognised in accordance with IFRS 3, ¶IN7(d).[143]

- the acquirer to reassess the identification and measurement of the acquiree's identifiable assets, liabilities and contingent liabilities and the measurement of the cost of the business combination if the acquirer's interest in the net fair value of the items recognised in accordance with IFRS 3, ¶IN7(d) exceeds the cost of the combination.  Any excess remaining after that reassessment must be recognised by the acquirer immediately in profit or loss.[144]

    1.   <u>Measurement Date</u>

15.    IFRS 3 *Business Combinations* requires the acquirer to "**measure the cost of a business combination as the aggregate of: (a) the fair values, at the date of exchange, of assets given, liabilities incurred or assumed, and equity instruments issued by the acquirer, in exchange for control of the acquiree; plus (b) any costs directly attributable to the business combination.**"[145]

    2.   <u>Acquisition Date Fair Value</u>

16.    IFRS 3 states:

> **The acquirer shall measure the cost of a business combination as the aggregate of:**

---

[142] IFRS 3, ¶IN7(e) (emphasis added).

[143] IFRS 3, ¶IN7(f).  *See* IFRS 3, ¶IN7(d) cited above.

[144] IFRS 3, ¶IN7(h).  *See* IFRS 3, ¶IN7(d) cited above

[145] IFRS 3, ¶24 (bold-face type in the original).  IFRS 3 states: "All the paragraphs have equal authority. Paragraphs in bold type state the main principles."

**Contains Highly Confidential Information**

> **(a) the fair values, at the date of exchange, of assets given, liabilities incurred or assumed, and equity instruments issued by the acquirer, in exchange for control of the acquiree; plus**
> **(b) any costs directly attributable to the business combination.**[146]

17.    Paragraph 27 elevates the published price of a quoted instrument as the best evidence of the instrument's fair value:

> **The published price at the date of exchange of a quoted equity instrument provides the best evidence of the instrument's fair value and shall be used, except in rare circumstances.** Other evidence and valuation methods shall be considered only in the rare circumstances when the acquirer can demonstrate that the published price at the date of exchange is an unreliable indicator of fair value, and that the other evidence and valuation methods provide a more reliable measure of the equity instrument's fair value. The published price at the date of exchange is an unreliable indicator only when it has been affected by the thinness of the market. If the published price at the date of exchange is an unreliable indicator or if a published price does not exist for equity instruments issued by the acquirer, the fair value of those instruments could, for example, be estimated by reference to their proportional interest in the fair value of the acquirer or by reference to the proportional interest in the fair value of the acquiree obtained, whichever is the more clearly evident. The fair value at the date of exchange of monetary assets given to equity holders of the acquiree as an alternative to equity instruments may also provide evidence of the total fair value given by the acquirer in exchange for control of the acquiree. In any event, all aspects of the combination, including significant factors influencing the negotiations, shall be considered. Further guidance on determining the fair value of equity instruments is set out in IAS 39 *Financial Instruments: Recognition and Measurement.*[147]

### 3.    Negative Goodwill (a.k.a. Bargain Purchase)

18.    According to IFRS, "Goodwill acquired in a business combination represents a payment made by the acquirer in anticipation of future economic benefits from assets that are not capable of being individually identified and separately recognised."[148]

19.    Negative goodwill arises in business combinations when the net fair value of identifiable assets, liabilities and contingent liabilities acquired exceeds the purchase price (hence, *bargain purchases*) and yields a gain to the acquirer:

---

[146] IFRS 3, ¶24 (bold-face type in the original.)  IFRS 3 states: "All the paragraphs have equal authority. Paragraphs in bold type state the main principles."
[147] IFRS 3, ¶27. (emphasis added)
[148] IFRS 3, ¶52.

Contains Highly Confidential Information

**If the acquirer's interest in the net fair value of the identifiable assets, liabilities and contingent liabilities recognised in accordance with paragraph 36 exceeds the cost of the business combination, the acquirer shall:**

**(a) reassess the identification and measurement of the acquiree's identifiable assets, liabilities and contingent liabilities and the measurement of the cost of the combination; and**

**(b) recognise immediately in profit or loss any excess remaining after that reassessment.**[149]

---

[149] IFRS 3, ¶56. (bold-face type in the original)

---

**Contains Highly Confidential Information**

## Appendix IV

### Fair Value Considerations

1.      This Appendix presents an overview of relevant accounting principles for measuring fair value.  This Appendix summarizes specific guidance provided by international accounting standards (such as IAS 39 *Financial Instruments: Recognition and Measurement*, ("IAS 39")) and generally accepted accounting principles (such as SFAS 157, *Fair Value Measurements* ("SFAS 157")).

2.      IAS 39 ¶48A states:

> The best evidence of fair value is quoted prices in an active market. If the market for a financial instrument is not active, an entity establishes fair value by using a valuation technique. The objective of using a valuation technique is to establish what the transaction price would have been on the measurement date in an arm's length exchange motivated by normal business considerations. Valuation techniques include using recent arm's length market transactions between knowledgeable, willing parties, if available, reference to the current fair value of another instrument that is substantially the same, discounted cash flow analysis and option pricing models. If there is a valuation technique commonly used by market participants to price the instrument and that technique has been demonstrated to provide reliable estimates of prices obtained in actual market transactions, the entity uses that technique. The chosen valuation technique makes maximum use of market inputs and relies as little as possible on entity-specific inputs. It incorporates all factors that market participants would consider in setting a price and is consistent with accepted economic methodologies for pricing financial instruments. Periodically, an entity calibrates the valuation technique and tests it for validity using prices from any observable current market transactions in the same instrument (ie without modification or repackaging) or based on any available observable market data.[150]

3.      IAS 39 ¶AG69 through ¶AG82 offer additional fair value measurement considerations:

- AG69: Underlying the definition of fair value is a presumption that an entity is a going concern without any intention or need to liquidate, to curtail materially the scale of its operations or to undertake a transaction on adverse

---

[150] IAS 39 ¶48A.

**Contains Highly Confidential Information**

terms. **Fair value is not, therefore, the amount that an entity would receive or pay in a forced transaction, involuntary liquidation or distress sale. However, fair value reflects the credit quality of the instrument**.[151]

- AG70: **This Standard** [IAS 39] **uses the terms 'bid price' and 'asking price' (sometimes referred to as 'current offer price') in the context of quoted market prices, and the term 'the bid-ask spread' to include only transaction costs. Other adjustments to arrive at fair value (e.g. for counterparty credit risk) are not included in the term 'bid-ask spread'**.[152]

*Active market: quoted price*

- AG71: A financial instrument is regarded as quoted in an active market if quoted prices are readily and regularly available from an exchange, dealer, broker, industry group, pricing service or regulatory agency, and those prices represent actual and regularly occurring market transactions on an arm's length basis. **Fair value is defined in terms of a price agreed by a willing buyer and a willing seller in an arm's length transaction**. **The objective of determining fair value for a financial instrument that is traded in an active market is to arrive at the price at which a transaction would occur at the end of the reporting period in that instrument (i.e. without modifying or repackaging the instrument) in the most advantageous active market to which the entity has immediate access.** However, the entity adjusts the price in the more advantageous market to reflect any differences in counterparty credit risk between instruments traded in that market and the one being valued. The existence of published price quotations in an active market is the best evidence of fair value and when they exist they are used to measure the financial asset or financial liability.[153]

- AG72: **The appropriate quoted market price for an asset held or liability to be issued is usually the current bid price and, for an asset to be acquired or liability held, the asking price. When an entity has assets and**

---

[151] IAS 39 ¶AG69 (emphasis added).
[152] IAS 39 ¶AG70 (emphasis added).
[153] IAS 39 ¶AG71 (emphasis added).

**Contains Highly Confidential Information**

**liabilities with offsetting market risks, it may use mid-market prices as a basis for establishing fair values for the offsetting risk positions and apply the bid or asking price to the net open position as appropriate.** When current bid and asking prices are unavailable, the price of the most recent transaction provides evidence of the current fair value as long as there has not been a significant change in economic circumstances since the time of the transaction. If conditions have changed since the time of the transaction (e.g. a change in the risk-free interest rate following the most recent price quote for a corporate bond), the fair value reflects the change in conditions by reference to current prices or rates for similar financial instruments, as appropriate. Similarly, if the entity can demonstrate that the last transaction price is not fair value (e.g. because it reflected the amount that an entity would receive or pay in a forced transaction, involuntary liquidation or distress sale), that price is adjusted. **The fair value of a portfolio of financial instruments is the product of the number of units of the instrument and its quoted market price. If a published price quotation in an active market does not exist for a financial instrument in its entirety, but active markets exist for its component parts, fair value is determined on the basis of the relevant market prices for the component parts.**[154]

*<u>No active market: valuation technique</u>*

- AG73: **If a rate (rather than a price) is quoted in an active market, the entity uses that market-quoted rate as an input into a valuation technique to determine fair value. If the market-quoted rate does not include credit risk or other factors that market participants would include in valuing the instrument, the entity adjusts for those factors.**[155]

- AG74: **If the market for a financial instrument is not active, an entity establishes fair value by using a valuation technique. Valuation techniques include using recent arm's length market transactions**

---

[154] IAS 39 ¶AG72 (emphasis added).
[155] IAS 39 ¶AG73 (emphasis added).

Contains Highly Confidential Information

**between knowledgeable, willing parties, if available, reference to the current fair value of another instrument that is substantially the same, discounted cash flow analysis and option pricing models.**

**If there is a valuation technique commonly used by market participants to price the instrument and that technique has been demonstrated to provide reliable estimates of prices obtained in actual market transactions, the entity uses that technique.**[156]

- AG75: The objective of using a valuation technique is to establish what the transaction price would have been on the measurement date in an arm's length exchange motivated by normal business considerations. **Fair value is estimated on the basis of the results of a valuation technique that makes maximum use of market inputs, and relies as little as possible on entity-specific inputs. A valuation technique would be expected to arrive at a realistic estimate of the fair value if (a) it reasonably reflects how the market could be expected to price the instrument and (b) the inputs to the valuation technique reasonably represent market expectations and measures of the risk-return factors inherent in the financial instrument.**[157]

- AG76: Therefore, a valuation technique (a) incorporates all factors that market participants would consider in setting a price and (b) is consistent with accepted economic methodologies for pricing financial instruments. Periodically, an entity calibrates the valuation technique and tests it for validity using prices from any observable current market transactions in the same instrument (i.e. without modification or repackaging) or based on any available observable market data. An entity obtains market data consistently in the same market where the instrument was originated or purchased. The best evidence of the fair value of a financial instrument at initial recognition is the transaction price (i.e. the fair value of the consideration given or received)

---

[156] IAS 39 ¶AG74 (emphasis added).
[157] IAS 39 ¶AG75 (emphasis added).

**Contains Highly Confidential Information**

unless the fair value of that instrument is evidenced by comparison with other observable current market transactions in the same instrument (i.e. without modification or repackaging) or based on a valuation technique whose variables include only data from observable markets.[158]

- AG76A: The subsequent measurement of the financial asset or financial liability and the subsequent recognition of gains and losses shall be consistent with the requirements of this Standard. The application of paragraph AG76 may result in no gain or loss being recognised on the initial recognition of a financial asset or financial liability. In such a case, IAS 39 requires that a gain or loss shall be recognised after initial recognition only to the extent that it arises from a change in a factor (including time) that market participants would consider in setting a price.[159]

- AG77: The initial acquisition or origination of a financial asset or incurrence of a financial liability is a market transaction that provides a foundation for estimating the fair value of the financial instrument. In particular, if the financial instrument is a debt instrument (such as a loan), its fair value can be determined by reference to the market conditions that existed at its acquisition or origination date and current market conditions or interest rates currently charged by the entity or by others for similar debt instruments (ie similar remaining maturity, cash flow pattern, currency, credit risk, collateral and interest basis). Alternatively, provided there is no change in the credit risk of the debtor and applicable credit spreads after the origination of the debt instrument, an estimate of the current market interest rate may be derived by using a benchmark interest rate reflecting a better credit quality than the underlying debt instrument, holding the credit spread constant, and adjusting for the change in the benchmark interest rate from the origination date. If conditions have changed since the most recent market transaction, the corresponding change in the fair value of the financial instrument being valued is determined by reference to current prices or rates for similar

---

[158] IAS 39 ¶AG76.
[159] IAS 39 ¶AG76A.

**Contains Highly Confidential Information**

financial instruments, adjusted as appropriate, for any differences from the instrument being valued.[160]

- AG78: The same information may not be available at each measurement date. For example, at the date that an entity makes a loan or acquires a debt instrument that is not actively traded, the entity has a transaction price that is also a market price. However, no new transaction information may be available at the next measurement date and, although the entity can determine the general level of market interest rates, it may not know what level of credit or other risk market participants would consider in pricing the instrument on that date. An entity may not have information from recent transactions to determine the appropriate credit spread over the basic interest rate to use in determining a discount rate for a present value computation. It would be reasonable to assume, in the absence of evidence to the contrary, that no changes have taken place in the spread that existed at the date the loan was made. However, the entity would be expected to make reasonable efforts to determine whether there is evidence that there has been a change in such factors. When evidence of a change exists, the entity would consider the effects of the change in determining the fair value of the financial instrument.[161]

- AG79: In applying discounted cash flow analysis, an entity uses one or more discount rates equal to the prevailing rates of return for financial instruments having substantially the same terms and characteristics, including the credit quality of the instrument, the remaining term over which the contractual interest rate is fixed, the remaining term to repayment of the principal and the currency in which payments are to be made. Short-term receivables and payables with no stated interest rate may be measured at the original invoice amount if the effect of discounting is immaterial.[162]

---

[160] IAS 39 ¶AG77.
[161] IAS 39 ¶AG78.
[162] IAS 39 ¶AG80.

**Contains Highly Confidential Information**

### _No active market: equity instruments_

- AG80: The fair value of investments in equity instruments that do not have a quoted market price in an active market and derivatives that are linked to and must be settled by delivery of such an unquoted equity instrument (see IAS 39 paragraphs 46(c) and 47) is reliably measurable if (a) the variability in the range of reasonable fair value estimates is not significant for that instrument or (b) the probabilities of the various estimates within the range can be reasonably assessed and used in estimating fair value.[163]

- AG81: There are many situations in which the variability in the range of reasonable fair value estimates of investments in equity instruments that do not have a quoted market price and derivatives that are linked to and must be settled by delivery of such an unquoted equity instrument (see paragraphs 46(c) and 47) is likely not to be significant. Normally it is possible to estimate the fair value of a financial asset that an entity has acquired from an outside party. However, if the range of reasonable fair value estimates is significant and the probabilities of the various estimates cannot be reasonably assessed, an entity is precluded from measuring the instrument at fair value.[164]

### _Inputs to valuation techniques_

- AG82: An appropriate technique for estimating the fair value of a particular financial instrument would incorporate observable market data about the market conditions and other factors that are likely to affect the instrument's fair value. The fair value of a financial instrument will be based on one or more of the following factors (and perhaps others). [165]

  (a) _The time value of money (ie interest at the basic or risk-free rate)._ Basic interest rates can usually be derived from observable government bond prices and are often quoted in financial publications. These rates typically vary with the expected dates of the projected cash flows

---

[163] IAS 39 ¶AG80.
[164] IAS 39 ¶AG81.
[165] IAS 39 ¶AG82.

**Contains Highly Confidential Information**

along a yield curve of interest rates for different time horizons. For practical reasons, an entity may use a well-accepted and readily observable general rate, such as LIBOR or a swap rate, as the benchmark rate. (Because a rate such as LIBOR is not the risk-free interest rate, the credit risk adjustment appropriate to the particular financial instrument is determined on the basis of its credit risk in relation to the credit risk in this benchmark rate.) In some countries, the central government's bonds may carry a significant credit risk and may not provide a stable benchmark basic interest rate for instruments denominated in that currency. Some entities in these countries may have a better credit standing and a lower borrowing rate than the central government. In such a case, basic interest rates may be more appropriately determined by reference to interest rates for the highest rated corporate bonds issued in the currency of that jurisdiction.

(b) *Credit risk*. The effect on fair value of credit risk (ie the premium over the basic interest rate for credit risk) may be derived from observable market prices for traded instruments of different credit quality or from observable interest rates charged by lenders for loans of various credit ratings.

(c) *Foreign currency exchange prices*. Active currency exchange markets exist for most major currencies, and prices are quoted daily in financial publications.

(d) *Commodity prices*. There are observable market prices for many commodities.

(e) *Equity prices*. Prices (and indexes of prices) of traded equity instruments are readily observable in some markets. Present value based techniques may be used to estimate the current market price of equity instruments for which there are no observable prices.

(f) *Volatility (ie magnitude of future changes in price of the financial instrument or other item)*. Measures of the volatility of actively traded

items can normally be reasonably estimated on the basis of historical
market data or by using volatilities implied in current market prices.

(g) *Prepayment risk and surrender risk*. Expected prepayment patterns for
financial assets and expected surrender patterns for financial liabilities
can be estimated on the basis of historical data. (The fair value of a
financial liability that can be surrendered by the counterparty cannot
be less than the present value of the surrender amount—see IAS 39
paragraph 49.)

(h) *Servicing costs for a financial asset or a financial liability*. Costs of
servicing can be estimated using comparisons with current fees
charged by other market participants. If the costs of servicing a
financial asset or financial liability are significant and other market
participants would face comparable costs, the issuer would consider
them in determining the fair value of that financial asset or financial
liability. It is likely that the fair value at inception of a contractual right
to future fees equals the origination costs paid for them, unless future
fees and related costs are out of line with market comparables

4.    SFAS 157 defines and discusses the Fair Value Hierarchy as follows:

## *Fair Value Hierarchy*

- 22. To increase consistency and comparability in fair value measurements and
related disclosures, the fair value hierarchy prioritizes the inputs to valuation
techniques used to measure fair value into three broad levels. The fair value
hierarchy gives the highest priority to quoted prices (unadjusted) in active
markets for identical assets or liabilities (Level 1) and the lowest priority to
unobservable inputs (Level 3). In some cases, the inputs used to measure fair
value might fall in different levels of the fair value hierarchy. The level in the
fair value hierarchy within which the fair value measurement in its entirety
falls shall be determined based on the lowest level input that is significant to

**Contains Highly Confidential Information**

the fair value measurement in its entirety. Assessing the significance of a particular input to the fair value measurement in its entirety requires judgment, considering factors specific to the asset or liability.[166]

- 23. The availability of inputs relevant to the asset or liability and the relative reliability of the inputs might affect the selection of appropriate valuation techniques. However, the fair value hierarchy prioritizes the inputs to valuation techniques, not the valuation techniques. For example, a fair value measurement using a present value technique might fall within Level 2 or Level 3, depending on the inputs that are significant to the measurement in its entirety and the level in the fair value hierarchy within which those inputs fall.[167]

### _Level 1 inputs_

- 24. Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities that the reporting entity has the ability to access at the measurement date. An active market for the asset or liability is a market in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis. **A quoted price in an active market provides the most reliable evidence of fair value and shall be used to measure fair value whenever available,** except as discussed in SFAS 157 paragraphs 25 and 26.[168]

- 25. If the reporting entity holds a large number of similar assets or liabilities (for example, debt securities) that are required to be measured at fair value, a quoted price in an active market might be available but not readily accessible for each of those assets or liabilities individually. In that case, fair value may be measured using an alternative pricing method that does not rely exclusively on quoted prices (for example, matrix pricing) as a practical expedient.

---

[166] SFAS 157 ¶22.
[167] SFAS 157 ¶23.
[168] SFAS 157 ¶24 (emphasis added).

---

Contains Highly Confidential Information

However, the use of an alternative pricing method renders the fair value measurement a lower level measurement.[169]

- 26. In some situations, a quoted price in an active market might not represent fair value at the measurement date. That might be the case if, for example, significant events (principal-to-principal transactions, brokered trades, or announcements) occur after the close of a market but before the measurement date. The reporting entity should establish and consistently apply a policy for identifying those events that might affect fair value measurements. However, if the quoted price is adjusted for new information, the adjustment renders the fair value measurement a lower level measurement.[170]

- 27. **If the reporting entity holds a position in a single financial instrument (including a block) and the instrument is traded in an active market, the fair value of the position shall be measured within Level 1 as the product of the quoted price for the individual instrument times the quantity held. The quoted price shall not be adjusted because of the size of the position relative to trading volume (blockage factor). The use of a blockage factor is prohibited, even if a market's normal daily trading volume is not sufficient to absorb the quantity held and placing orders to sell the position in a single transaction might affect the quoted price.[171]**

## _Level 2 inputs_

- 28. Level 2 inputs are inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly. If the asset or liability has a specified (contractual) term, a Level 2 input must be observable for substantially the full term of the asset or liability. Level 2 inputs include the following:[172]

    a. Quoted prices for similar assets or liabilities in active markets

---

[169] SFAS 157 ¶25.
[170] SFAS 157 ¶26.
[171] SFAS 157 ¶27 (emphasis added, footnote omitted).
[172] SFAS 157 ¶28.

**Contains Highly Confidential Information**

b. Quoted prices for identical or similar assets or liabilities in markets that are not active, that is, markets in which there are few transactions for the asset or liability, the prices are not current, or price quotations vary substantially either over time or among market makers (for example, some brokered markets), or in which little information is released publicly (for example, a principal-to-principal market)

c. Inputs other than quoted prices that are observable for the asset or liability (for example, interest rates and yield curves observable at commonly quoted intervals, volatilities, prepayment speeds, loss severities, credit risks, and default rates)

d. Inputs that are derived principally from or corroborated by observable market data by correlation or other means (market-corroborated inputs).

- 29. Adjustments to Level 2 inputs will vary depending on factors specific to the asset or liability. Those factors include the condition and/or location of the asset or liability, the extent to which the inputs relate to items that are comparable to the asset or liability, and the volume and level of activity in the markets within which the inputs are observed. **An adjustment that is significant to the fair value measurement in its entirety might render the measurement a Level 3 measurement, depending on the level in the fair value hierarchy within which the inputs used to determine the adjustment fall.**[173]

## *Level 3 inputs*

- 30. Level 3 inputs are unobservable inputs for the asset or liability. **Unobservable inputs shall be used to measure fair value to the extent that observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the**

---

[173] SFAS 157 ¶29 (emphasis added).

**Contains Highly Confidential Information**

measurement date. However, the fair value measurement objective remains the same, that is, an exit price from the perspective of a market participant that holds the asset or owes the liability. Therefore, unobservable inputs shall reflect the reporting entity's own assumptions about the assumptions that market participants would use in pricing the asset or liability (including assumptions about risk). Unobservable inputs shall be developed based on the best information available in the circumstances, which might include the reporting entity's own data. In developing unobservable inputs, the reporting entity need not undertake all possible efforts to obtain information about market participant assumptions. However, the reporting entity shall not ignore information about market participant assumptions that is reasonably available without undue cost and effort. Therefore, the reporting entity's own data used to develop unobservable inputs shall be adjusted if information is reasonably available without undue cost and effort that indicates that market participants would use different assumptions.[174]

### *Inputs based on bid and ask prices*

- 31. **If an input used to measure fair value is based on bid and ask prices (for example, in a dealer market), the price within the bid-ask spread that is most representative of fair value in the circumstances shall be used to measure fair value, regardless of where in the fair value hierarchy the input falls** (Level 1, 2, or 3). **This Statement does not preclude the use of midmarket pricing or other pricing conventions as a practical expedient for fair value measurements within a bid-ask spread.**[175]

---

[174] SFAS 157 ¶30 (emphasis added).
[175] SFAS 157 ¶31 (emphasis added).

**Contains Highly Confidential Information**

## Appendix V

## Overview of the Audit Process

1.      "To minimize the risk of materially misstated financial statements, users demand that an unbiased auditor monitor (an independent auditor) report on whether the assertions embodied within management's financial statements are reliable."[176] "Financial statements are audited by independent auditors, but the statements are the representations and responsibility of management, not the auditor.  An independent auditor is responsible for expressing an opinion on management's financial statements, but management is responsible for the assertions embodied within the financial statements.  For example, management, not the auditor, is responsible that all recorded assets and liabilities exist, that all recorded transactions occurred, that no transactions are omitted, that assets are the rights and liabilities are the obligations of the entity, that all disclosed amounts are appropriate, and that the financial statements are properly classified and disclosed."[177]

2.      "If an 'absolute' basis were necessary to form an [audit] opinion, then auditors would have to examine entire populations rather than samples, thereby rendering financial statement audits far too costly.  Furthermore, audit risk cannot be totally eliminated by 100 percent testing, because audit risks not related to sampling, such as human error, would still exist." [178]

3.      "There is neither sufficient time nor, given the laws of probability, sufficient reason to test all of the transactions underlying an entity's account balances or classes of transactions.  As a result, many if not most of the conclusions auditors reach about controls, balances and classes of transactions are based on testing samples rather than entire populations."[179]

---

[176] David N. Ricchiute, *Auditing*, 8th edition (United States: Thomson / South-Western, 2006 (ISBN: 0-324-22629-2)), 6.

[177] David N. Ricchiute, *Auditing*, 8th edition (United States: Thomson / South-Western, 2006 (ISBN: 0-324-22629-2)), 6.

[178] David N. Ricchiute, *Auditing*, 8th edition (United States: Thomson / South-Western, 2006 (ISBN: 0-324-22629-2)), 357.

[179] David N. Ricchiute, *Auditing*, 8th edition (United States: Thomson / South-Western, 2006 (ISBN: 0-324-22629-2)), 355.

**Contains Highly Confidential Information**

## Appendix VI

## Auditing Fair Value Measurements and Disclosures

1.      PwC conducted its audits of Barclays in accordance with the standards of the Public Accounting Oversight Board (United States).[180]

2.      The Public Accounting Oversight Board codified Statement on Auditing Standards ("SAS") 101, *Auditing Fair Value Measurements and Disclosures*, into Auditing Section 328 (AU 328), *Auditing Fair Value Measurements and Disclosures.* AU 328 establishes standards and provides guidance on auditing fair value measurements and disclosures contained in financial statements:

- 2.    The auditor should obtain sufficient competent audit evidence to provide reasonable assurance that fair value measurements and disclosures are in conformity with GAAP. GAAP requires that certain items be measured at fair value.[181]

- 4.    Management is responsible for making the fair value measurements and disclosures included in the financial statements.  As part of fulfilling its responsibility, management needs to establish an accounting and financial reporting process for determining the fair value measurements and disclosures, select appropriate valuation methods, identify and adequately support any significant assumptions used, prepare the valuation, and ensure that the presentation and disclosure of the fair value measurements are in accordance with GAAP.[182]

- 8.    The measurement of fair value may be relatively simple for certain assets or liabilities, for example, investments that are bought and sold in active markets that provide readily available and reliable information on the prices at

---

[180] Report of the Independent Registered Public Accounting Firm (PriceWaterhouseCoopers LLP – Chartered Accountants and Registered Auditors) to the Board of Directors and Shareholders of Barclays PLC (Barclays PLC and Barclays Bank PLC Form 20-F for the fiscal year ended December 31, 2008, page 177).
[181] AU Section 328, ¶2.
[182] AU Section 328, ¶4.

**Contains Highly Confidential Information**

which actual exchanges occur. For those items, the existence of published price quotations in an active market is the best evidence of fair value. The measurement of fair value for other assets or liabilities may be more complex. A specific asset may not have an observable market price or may possess such characteristics that it becomes necessary for management to estimate its fair value based on the best information available in the circumstances (for example, a complex derivative financial instrument). The estimation of fair value may be achieved through the use of a valuation method (for example, a model premised on discounting of estimated future cash flows).[183]

- 8.– 9.    The auditor should obtain an understanding of the entity's process for determining fair value measurements and disclosures and of the relevant controls sufficient to develop an effective audit approach.[184] When obtaining an understanding of the entity's process for determining fair value measurements and disclosures, the auditor considers, for example:[185]

  - Controls over the process used to determine fair value measurements, including, for example, controls over data and the segregation of duties between those committing the entity to the underlying transactions and those responsible for undertaking the valuations.

  - The expertise and experience of those persons determining the fair value measurements.

  - The role that information technology has in the process.

  - The types of accounts or transactions requiring fair value measurements or disclosures (for example, whether the accounts arise from the recording of routine and recurring transactions or whether they arise from nonroutine or unusual transactions).

  - The extent to which the entity engages or employs specialists in determining fair value measurements and disclosures.

---

[183] AU Section 328, ¶8.
[184] AU Section 328, ¶9.
[185] AU Section 328, ¶12.

**Contains Highly Confidential Information**

- o  The significant management assumptions used in determining fair value.

- o  The documentation supporting management's assumptions.

- o  The process used to develop and apply management assumptions, including whether management used available market information to develop the assumptions.

- o  The process used to monitor changes in management's assumptions.

- o  The integrity of change controls and security procedures for valuation models and relevant information systems, including approval processes.

- o  The controls over the consistency, timeliness, and reliability of the data used in valuation models.

- 13.  The auditor uses his or her understanding of the entity's process, including its complexity, and of the controls when assessing the risk of material misstatement. Based on that risk assessment, the auditor determines the nature, timing, and extent of the audit procedures. The risk of material misstatement may increase as the accounting and financial reporting requirements for fair value measurements become more complex.[186]

- 18.  When there are no observable market prices and the entity estimates fair value using a valuation method, the auditor should evaluate whether the entity's method of measurement is appropriate in the circumstances. That evaluation requires the use of professional judgment. It also involves obtaining an understanding of management's rationale for selecting a particular method by discussing with management its reasons for selecting the valuation method. The auditor considers whether:[187]

  a.)  Management has sufficiently evaluated and appropriately applied the criteria, if any, provided by GAAP to support the selected method.

---

[186] AU Section 328, ¶13.
[187] AU Section 328, ¶18.

**Contains Highly Confidential Information**

    b.) The valuation method is appropriate in the circumstances given the nature of the item being valued.

    c.) The valuation method is appropriate in relation to the business, industry, and environment in which the entity operates.

- 23.   Based on the auditor's assessment of the risk of material misstatement, the auditor should test the entity's fair value measurements and disclosures. Because of the wide range of possible fair value measurements, from relatively simple to complex, and the varying levels of risk of material misstatement associated with the process for determining fair values, the auditor's planned audit procedures can vary significantly in nature, timing, and extent.[188]

- 24.   Some fair value measurements are inherently more complex than others. This complexity arises either because of the nature of the item being measured at fair value or because of the valuation method used to determine fair value. For example, in the absence of quoted prices in an active market, an estimate of a security's fair value may be based on valuation methods such as the discounted cash flow method or the transactions method. Complex fair value measurements normally are characterized by greater uncertainty regarding the reliability of the measurement process. This greater uncertainty may be a result of: [189]

    o   The length of the forecast period

    o   The number of significant and complex assumptions associated with the process

    o   A higher degree of subjectivity associated with the assumptions and factors used in the process

    o   A higher degree of uncertainty associated with the future occurrence or outcome of events underlying the assumptions used

---

[188] AU Section 328, ¶23.
[189] AU Section 328, ¶24.

**Contains Highly Confidential Information**

    o   Lack of objective data when highly subjective factors are used

- 25.  The auditor uses both the understanding of management's process for determining fair value measurements and his or her assessment of the risk of material misstatement to determine the nature, timing, and extent of the audit procedures. The following are examples of considerations in the development of audit procedures:[190]

  o   The fair value measurement (for example, a valuation by an independent appraiser) may be made at a date that does not coincide with the date at which the entity is required to measure and report that information in its financial statements. In such cases, the auditor obtains evidence that management has taken into account the effect of events, transactions, and changes in circumstances occurring between the date of the fair value measurement and the reporting date.

  o   Collateral often is assigned for certain types of investments in debt instruments that either are required to be measured at fair value or are evaluated for possible impairment. If the collateral is an important factor in measuring the fair value of the investment or evaluating its carrying amount, the auditor obtains sufficient competent audit evidence regarding the existence, value, rights, and access to or transferability of such collateral, including consideration of whether all appropriate liens have been filed, and considers whether appropriate disclosures about the collateral have been made.

  o   In some situations, additional procedures, such as the inspection of an asset by the auditor, may be necessary to obtain sufficient competent audit evidence about the appropriateness of a fair value measurement. For example, inspection of the asset may be necessary to obtain information about the current physical condition of the asset relevant to its fair value, or inspection of a security may reveal a restriction on its marketability that may affect its value.

---

[190] AU Section 328, ¶25.

**Contains Highly Confidential Information**

- 26. The auditor's understanding of the reliability of the process used by management to determine fair value is an important element in support of the resulting amounts and therefore affects the nature, timing, and extent of audit procedures. When testing the entity's fair value measurements and disclosures, the auditor evaluates whether:[191]

  a.) Management's assumptions are reasonable and reflect, or are not inconsistent with, market information.

  b.) The fair value measurement was determined using an appropriate model, if applicable.

  c.) Management used relevant information that was reasonably available at the time.

- 32. Audit procedures dealing with management's assumptions are performed in the context of the audit of the entity's financial statements. The objective of the audit procedures is therefore not intended to obtain sufficient competent audit evidence to provide an opinion on the assumptions themselves. Rather, the auditor performs procedures to evaluate whether the assumptions provide a reasonable basis for measuring fair values in the context of an audit of the financial statements taken as a whole.[192]

- 34. The auditor considers the sensitivity of the valuation to changes in significant assumptions, including market conditions that may affect the value. Where applicable, the auditor encourages management to use techniques such as sensitivity analysis to help identify particularly sensitive assumptions. If management has not identified particularly sensitive assumptions, the auditor considers whether to employ techniques to identify those assumptions.[193]

- 36. To be reasonable, the assumptions on which the fair value measurements are based (for example, the discount rate used in calculating the present value

---

[191] AU Section 328, ¶26.
[192] AU Section 328, ¶32.
[193] AU Section 328, ¶34.

**Contains Highly Confidential Information**

of future cash flows), individually and taken as a whole, need to be realistic and consistent with:[194]

a.) The general economic environment, the economic environment of the specific industry, and the entity's economic circumstances;

b.) Existing market information;

c.) The plans of the entity, including what management expects will be the outcome of specific objectives and strategies;

d.) Assumptions made in prior periods, if appropriate;

e.) Past experience of, or previous conditions experienced by, the entity to the extent currently applicable;

f.) Other matters relating to the financial statements, for example, assumptions used by management in accounting estimates for financial statement accounts other than those relating to fair value measurements and disclosures; and

g.) The risk associated with cash flows, if applicable, including the potential variability in the amount and timing of the cash flows and the related effect on the discount rate.

- 39.  The auditor should test the data used to develop the fair value measurements and disclosures and evaluate whether the fair value measurements have been properly determined from such data and management's assumptions. Specifically, the auditor evaluates whether the data on which the fair value measurements are based, including the data used in the work of a specialist, is accurate, complete, and relevant; and whether fair value measurements have been properly determined using such data and management's assumptions. The auditor's tests also may include, for example, procedures such as verifying the source of the data, mathematical recomputation of inputs, and reviewing of information for internal consistency, including whether such information is consistent with

---

[194] AU Section 328, ¶36.

**Contains Highly Confidential Information**

management's intent and ability to carry out specific courses of action discussed in paragraph 17.[195]

- 40.   The auditor may make an independent estimate of fair value (for example, by using an auditor developed model) to corroborate the entity's fair value measurement.  When developing an independent estimate using management's assumptions, the auditor evaluates those assumptions as discussed in paragraphs 28 to 37. Instead of using management's assumptions, the auditor may develop his or her own assumptions to make a comparison with management's fair value measurements. In that situation, the auditor nevertheless understands management's assumptions. The auditor uses that understanding to ensure that his or her independent estimate takes into consideration all significant variables and to evaluate any significant difference from management's estimate. The auditor also should test the data used to develop the fair value measurements and disclosures as discussed in paragraph 39.[196]

---

[195] AU Section 328, ¶39.
[196] AU Section 328, ¶40.

# EXHIBIT 12

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS, INC., *et al.,*<br><br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
| In re:<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) |

## DECLARATION OF MARK E. ZMIJEWSKI

I, MARK E. ZMIJEWSKI, declare as follows:

1.      I am the Leon Carroll Marshall Professor of Accounting and Deputy Dean at The University of Chicago Booth Graduate School of Business.  I am also a founder and principal of Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc., which is an economics consulting firm that specializes in the application of accounting, economics, and

finance to business consulting, legal, and regulatory issues. I have been retained by counsel for the Movants in these matters.[1]

2.        On March 15, 2010, I submitted my expert report in these matters, entitled "Expert Report of Mark E. Zmijewski," which accurately sets forth my opinions ("Zmijewski Report").[2] I provided deposition testimony on April 14, 2010.

3.        I understand counsel for Barclays Capital Inc. ("Barclays") filed a motion with this Court dated April 20, 2010 to exclude my prospective testimony in these matters ("Barclays Motion").[3] Exhibit D to the Barclays Motion is the declaration of Professor Paul Pfleiderer dated April 19, 2010 ("Pfleiderer Declaration") in which he purports to "examine whether Movants' experts based the opinions they expressed in their reports and depositions on reliable data, whether Movants' experts employed sound principles and methods in their investigations, and whether Movants' experts applied such principles and methods in appropriate ways likely to generate reliable findings and conclusions."[4] This same declaration is also appended as Exhibit A to Barclays' April 19, 2010 opposition to Movants' motion to exclude the testimony of Professor Pfleiderer ("Barclays' Opposition"). Since the date of Barclays' Opposition, three of Barclays' employees — Richard Landreman, Mark Washtell, and Sean Teague — have been deposed. Professor Pfleiderer also issued a declaration dated April 23, 2010 ("April 23, 2010

---

[1] "Movants" refers to: (a) Lehman Brothers Holdings, Inc. (the "Debtor" or "LBHI"); (b) James W. Giddens, as Trustee for the Securities Investor Protection Act Liquidation of Lehman Brothers Inc. (the "Trustee"); and (c) the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. and its affiliated debtors and debtors in possession (the "Creditors' Committee").

[2] Capitalized terms that are not defined in this Declaration have the same meaning as defined in the Zmijewski Report.

[3] See Motion *In Limine* of Barclays Capital Inc. for an Order Excluding the Expert Testimony of John P. Garvey, Mark E. Slattery, Joseph Schwaba, John J. Schneider, John J. Olvany, Harrison J. Goldin, and Professor Mark E. Zmijewski, *In re: Lehman Brothers Holdings Inc., et al.*, Chapter 11 Case No. 08-13555 (JMP) and *In re: Lehman Brothers Inc.*, Case No. 08-01420 (JMP), April 20, 2010 (hereinafter referred to as the "Barclays Motion").

[4] Pfleiderer Declaration, ¶ 3.

Pfleiderer Declaration") in which he summarizes additional GFS data Barclays has provided to

Movants since the filing of my expert report ("Additional GFS Data").  I was asked by Counsel

for the Movants to review and respond to all of the above.  I base this Declaration on my review

of the relevant documents and analysis of relevant facts and data.  I was not asked to opine, and I

do not opine, on any legal issues raised in the Barclays Motion.


I.    <u>OVERVIEW</u>

4.    The Barclays Motion and the Pfleiderer Declaration object to a limited subset of

opinions in the Zmijewski Report.  Most of the opinions in the Zmijewski Report are not

challenged in either the Barclays Motion or the Pfleiderer Declaration.  After reviewing the

Barclays Motion, the Pfleiderer Declaration, and additional information provided by Barclays to

Movants since the date of my report, I reaffirm all of the opinions in the Zmijewski Report.

5.    The Barclays Motion and the Pfleiderer Declaration comment on the following

opinions or issues discussed in my report:

> **Opinion 1:**  Movants engaged valuation experts with expertise in valuing certain types of
> securities that are at issue in this matter.  These securities are assets in the Initial
> Inventory and the JPM Inventory, but do not include other assets at issue in this matter.
> Based on my analyses and the analyses of Movants' valuation experts, I show that
> Barclays undervalued these securities by at least $5.112 billion as of September 19, 2008.
> (*See* Section IV.A. and Exhibit A-2.)  I summarize Barclays' undervaluation below:[5]

---

[5] Zmijewski Report, pp. 4-5.

| Summary of Barclays' Undervaluation of Initial and JPM Inventory (amounts in billions of dollars) | |
|---|---|
| Residential Mortgage Backed Securities | $0.941 |
| Corporate Bonds | $0.366 |
| Emerging Markets | $0.003 |
| Equities | $0.541 |
| Rates | $0.631 |
| Principal Mortgage Trading Group | $0.974 |
| JPM Inventory (Annex A Assets) | $1.657 |
| Total Barclays' Undervaluation | $5.112[6] |

**Opinion 2:**  In simple terms, in the Rule 60(b) Motions, Movants claim that, based on the Court-approved transaction, Barclays received more assets than were approved by the Court in the Sale Transaction, paid less for those assets than was represented to the Court, and thus, benefited from the Sale Transaction beyond what was approved by the Court (the "Barclays Windfall").  The Pfleiderer Report fails to compare the Court-approved transaction to the transaction that actually occurred, and thus, should not be considered in the economic analysis of the Movants' overall claims.  Using the Movants' valuation experts to value the Lehman financial assets acquired by Barclays and assuming a Court-approved Sale Transaction that included a payment of $1.850 billion by Barclays to Lehman, the Barclays Windfall is at least $13.051 billion.  (*See* Section IV.B and Exhibit B-1.)  I summarize these calculations below:[7]

---

[6] $0.186 billion of this amount results from undervaluation of CUSIPs contained in "Sched B LehOBS 5.xls," referred to as "Schedule B breakout analysis" in the Pfleiderer Report.  (Pfleiderer Report, footnote 77.)

[7] Zmijewski Report, pp. 5-6.

4

| **Summary of Barclays Windfall** | |
| --- | --- |
| | Value ($ Billions) |
| **Assets** | |
| Total Financial Assets on Barclays Opening Balance Sheet | 50.165 |
| Adjusted for: Unrecognized, Undelivered Assets | 0.775 |
| Adjustment to Valuation of OCC Assets (net of liabilities) | 0.103 |
| *Adjusted Barclays Opening Balance Sheet and Claimed Assets* | 51.043 |
| Adjustment for Barclays' Undervaluation | 5.112 |
| *Adjusted Total Financial Assets* | 56.155 |
| Non Financial Assets | 2.085 |
| *Adjusted Total Assets Acquired* | 58.239 |
| | |
| **Reported Cash Consideration and Liabilities Assumed** | |
| Total on Barclays Opening Balance Sheet | 47.474 |
| Adjusted Comp (severance subtracted) | (0.450) |
| Adjusted Cure | 0.014 |
| *Adjusted Cash Consideration and Liabilities Assumed* | 47.038 |
| | |
| **Adjusted Acquisition Gain/Negative Goodwill** | 11.201 |
| | |
| **Net Transaction Value to Barclays[8]** | (1.850) |
| | |
| **Barclays Windfall[9]** | 13.051 |

**Opinion 3:**  In reviewing documents and testimony related to Barclays' acquisition accounting, I have determined Barclays used a December 22, 2008 closing price to account for the JPM Inventory.  I calculate the effect of Barclays using December 22, 2008 closing prices to value the JPM Inventory instead of the time of the Sale Transaction.  My analyses document that Barclays' undervaluation is at least $1.657 billion.  (*See* Section IV.C and Exhibit C-1.)[10]

**Opinion 4:**  The Pfleiderer Report provides insufficient foundation to reject, for purposes of valuing the Repo Collateral, contemporaneous marks from JPMorgan and Bank of New York/Mellon ("BoNY"), who were the tri-party collateral agents in the Fed Repo and Fed Replacement Repo, respectively.  Using the BoNY and JPMorgan price marks to

---

[8] See expert report of Harrison J. Goldin dated March 15, 2010 (the "Goldin Report") describing the net value of the transaction to Barclays.

[9] I am assuming that all of these amounts reflect the same concept of value.

[10] Zmijewski Report, p. 6.

value these securities, Barclays underpaid for assets it acquired from Lehman in the Fed Replacement Repo by at least $4.418 billion.  (*See* Section IV.C and Exhibit C-3.)[11]

6.      The Barclays Motion and the Pfleiderer Declaration also comment on the following opinions in my deposition testimony:

- No information that was not known or knowable as of 12:01 a.m. on September 22, 2008 should be considered in valuing the Purchased Assets.[12]

- My reliance on the work of other valuation experts in computing Barclays' undervaluation of purchased assets.[13]

- My reliance on the testimony of Mr. John Schneider about JPMorgan and the role of a custodian, and my comparison of JPMorgan price marks to BoNY price marks, to support my use of the JPMorgan price marks.[14]

7.      I respond to the comments listed above in this declaration.  As I state above, most of the opinions in the Zmijewski Report are not challenged or discussed or addressed in any way in the Barclays Motion or the Pfleiderer Declaration:

**Opinion 5:**  Using Barclays' own calculations, Barclays underpaid for assets it acquired from Lehman in the Fed Replacement Repo by at least $545.8 million.  (*See* Section VI.C and Exhibit C-3.)[15]

**Opinion 6**:  A comparison of the mortgages in the Global Funding System ("GFS") as of September 16, 2008 totaling approximately $6 billion and the schedules setting forth the positions transferred to Barclays demonstrate that Barclays actually received more than two-thirds of the value of all Lehman mortgages in GFS.  The custodial valuation as of September 19, 2008 of the Lehman mortgages acquired by Barclays is $4.034 billion, which represents 67.1% of the $6.014 billion value of all Lehman mortgages in GFS as of September 16, 2008.  (*See* Section IV.D and Exhibit D-1.)[16]

---

[11] Zmijewski Report, p. 7.

[12] Videotape Deposition of Mark E. Zmijewski, April 14, 2010, 56:3-56:16.

[13] Videotape Deposition of Mark E. Zmijewski, April 14, 2010, 32:5-13 and 37:17-38:4.

[14] Videotape Deposition of Mark E. Zmijewski, April 14, 2010, 125:21-126:15.

[15] Zmijewski Report, p. 7.

[16] Zmijewski Report, pp. 7-8.

**Opinion 7:**  Section II of the Pfleiderer Report provides insufficient foundation and analyses and fails to use accepted and consistent methodologies to support the opinions that there was no $5 billion discount in the Fed Replacement Repo.  Barclays does not present its own independent expert valuation to substantiate the conclusion that ". . . the Repo Collateral was worth *at most* the approximately $45.5 billion at which Barclays accounted for it in its 2008 Results Announcement summary of the Acquisition."  (*See* Section IV.E.)[17]

**Opinion 8:**  The opinion in Section III of the Pfleiderer Report that ". . . the Movants' assertion of a secret $5 billion discount from inception is implausible" is flawed and lacks foundation.  To the contrary, Movants' assertion of a $5 billion discount from inception is possible.  (*See* Section IV.F.)[18]

**Opinion 9:**  The Pfleiderer Report argues in Section IV that Barclays' "… immense financial and business risks …" should be considered in an economic analysis of Movants' claims.  As I explain and document below, and as acknowledged in the Pfleiderer Report, Barclays was aware of these risks when the Court approved the Sale Transaction; thus, such issues should not be considered in the economic analysis and quantification of the Barclays Windfall.  (*See* Section IV-G.)[19]

**Opinion 10:**  The Pfleiderer Report erroneously concludes in Section V that "[t]he fact that Barclays reported an accounting gain on the Acquisition does not indicate that Barclays received a secret or unfair discount on the Repo Collateral, nor does it imply that Barclays earned an unexpected or unreasonable profit from the Transaction."  This argument is not supported by appropriate and reasonable analyses.  Based on the Court approved Sale Transaction as described in the Goldin Report, Barclays' accounting gain on the Sale Transaction is consistent with and indicates a Barclays Windfall.  (*See* Section IV-H.)[20]

**Opinion 11:**  The Pfleiderer Report argues that certain potential benefits from the transaction should be considered in an economic analysis of Movants' claims.  As I explain and document below, to the extent such benefits resulted from the transaction, the Court and others attending the Sale Hearing acknowledged these types of benefits when the Court approved the Sale Transaction; thus, such issues should not be considered in the economic analysis and quantification of the Barclays Windfall.  (*See* Section IV-I.)[21]

---

[17] Zmijewski Report, p. 8.

[18] Zmijewski Report, p. 8.

[19] Zmijewski Report, p. 8.

[20] Zmijewski Report, pp. 8-9.

[21] Zmijewski Report, p. 9.

**Opinion 12:**  The Pfleiderer Report argues that without Barclays' acquisition of Lehman, "… it is virtually certain that the LBHI and LBI estates, Lehman's creditors, Lehman's customers, and public financial markets all would have been worse off."  As I explain and document below, to the extent there were benefits to the transaction, the Court and others acknowledged them when the Court approved the Sale Transaction; thus, such issues should not be considered in the economic analysis and quantification of the Barclays Windfall.  (*See* Section IV-I.)[22]

## II.    VALUATION DATE

### A.  APPROPRIATENESS OF SEPTEMBER 19 CLOSING PRICES AS THE PROXY FOR SEPTEMBER 22, 2008 12:01 A.M. PRICE MARKS

8.      The Barclays Motion and the Pfleiderer Declaration assert that my use of September 19 closing prices as proxies for the price marks at 12:01 a.m. on September 22, 2008 is inconsistent with valuation practices, accounting rules and common sense.[23]  However, neither the Barclays Motion nor the Pfleiderer Declaration cite to any standards to substantiate their assertions.

9.      Regardless, since most of the Equities are publicly traded and have publicly traded prices, it is appropriate to use those publicly traded prices to value these securities.[24]  Publicly traded prices did not exist for these securities as of the valuation date of 12:01 a.m. on Monday September 22, 2008.  To value these securities, as they would be valued in real time, one would use the prices that existed as of that point in time.  The prices in existence at that time are the closing prices on Friday, September 19, 2008, as supplemented by any additional information that became available between Friday's closing and 12:01 a.m. on Monday, September 22, 2008.

---

[22] Zmijewski Report, p. 9.

[23] Barclays Motion, ¶64.

[24] *See* the Expert Report of John P. Garvey, March 15, 2010, for explanation of the relevant accounting standards.

10.     As I stated in my deposition, after considering information that became available

between the time the closing prices were available on Friday, September 19, and 12:01 a.m. on

Monday, September 22, I concluded that the closing prices on September 19, 2008 are the

appropriate measures of market prices as of 12:01 a.m. on September 22, 2008:

> [Q]     . . . you are not saying the 19th is the appropriate day to value these assets. You're
> saying that the appropriate day is very early on the 22nd, but that in your view, the best
> proxy for the value of the assets 12:01 a.m. on the 22nd is the value of the assets on
> September 19th; is that correct?
>
> A       To the best of my knowledge, it is the last price that is available and known as of
> 12:01 on the 22nd. 12:01 a.m. on the 22nd.
>
> . . .
>
> Q       And do you think that is the best measure of market value as of 12:01 a.m. on
> Monday?
>
> A       Yes.  Now, when I went through this exercise, one of the things that I did was also
> what other information do we have between the close of the market on Friday, and 12:01
> a.m. Other information, I travel to Europe and Asia quite often, so I know the Europe and
> Asia exchanges, so I did take a look at what happened in the early hours U.S. time in the
> Europe and Asia markets, and on average that was a positive return.
>
> So I had no reason to think that something was happening in the global security markets,
> financial markets, that would have caused that price to differ from the Friday close.[25]

11.     As I discuss below, Barclays ignored the fact that the prices of equity securities

generally declined on Monday, September 22 and inappropriately used closing prices on that day

as a proxy for prices as of 12:01 a.m. on September 22.


B.    EX POST INFORMATION

12.     The Barclays Motion argues that my opinion concerning *ex post* information not

available on the valuation date is a potential basis to exclude my testimony.[26]  In discussing the

---

[25] Videotape Deposition of Mark E. Zmijewski, April 14, 2010, 50:3-51:12.

[26] Barclays Motion, ¶64.

use of *ex post* information, the Pfleiderer Declaration also states, ". . . it is widely accepted by accounting and valuation professionals and in the relevant literature that a price observed in an actual transaction, when available, is an important piece of information that should be given considerable weight in reaching a value determination."[27]  These arguments are flawed and without basis; further, the Pfleiderer Declaration does not identify any support for this assertion. As I document below, the facts contradict this assertion.

13.    First, I use a standard and widely-accepted approach to value Equities using observable market prices that were known as well as additional information that was available as of the appropriate valuation date, 12:01 a.m., Monday, September 22, 2008.  As discussed below, Barclays, on the other hand, used market prices that were not known as of the appropriate valuation date and, given the change in the market on that date, were downward biased, making these prices inappropriate to use to value these securities as of the appropriate valuation date, 12:01 a.m., Monday, September 22, 2008.

14.    Second, it is a fact that if, in real time, one is measuring the value of an asset at a specific point in time, only information that is available as of that point in time can be used to make that assessment because no other information exists.  It is only when one is valuing an asset as of some previous point in time that one even has the opportunity to use *ex post* information; that is, information that became available after the valuation date.  Thus, if one is attempting to measure the value that could have been assessed in real time, then it is inappropriate to use information that became available after the valuation date unless and only unless such *ex post* information is identical to the information that would have been available as of the valuation date.  In other words, using hindsight information is appropriate if, and only if,

---

[27] Pfleiderer Declaration, ¶10.

that information is shown to reflect the facts and circumstances that existed as of the point in time the asset is to be valued.

15.     Third, Barclays' employees agree with this view.  While he may have later expressed a different view, Mr. Gary Romain, Barclays' head of technical accounting and private equity finance who prepared the acquisition balance sheet and related SEC disclosure, stated on December 14, 2008, "The measurement date is the acquisition date (Sunday 21 September – practically 19 September close). . . ."[28]  Mr. Sean Teague, the Barclays employee responsible for valuing Rates and Credit products acquired in the transaction, described how he determined which information to consider in his valuation of the Pine CLO:  ". . . [T]here was no means of seeing into the future. . . ."[29, 30]

16.     In his deposition, Mr. Mark Washtell, the Barclays employee responsible for measuring the value for Equities in Barclays' Acquisition Balance Sheet,[31] admitted that a willing buyer and willing seller would not have considered this information in connection with the transaction:[32]

> Q. . . . [I]f a willing buyer or seller does not have availability to information at the time, is it fair to say that that would not be information that they would be taking into consideration in connection with the transaction?

---

[28] M. 287 [Deposition Exhibit 543A].

[29] Deposition of Sean Teague, June 30, 2010, 25:4-17 and 297:16-297:23.

[30] Sean Teague was responsible for valuing the Rates and Credit products acquired from Lehman, including corporate, emerging markets, municipal bonds, agencies, Pine, Giants, and some securitized products.  (Deposition of Sean Teague, June 30, 2010, 25:4-17.)

[31] The term "Acquisition Balance Sheet" is used interchangeably with the term "Opening Balance Sheet," as defined in the Zmijewski Report.

[32] Mark Washtell is a Director in Barclays' Independent Valuation Control Group (IVC), part of the PCG, responsible for the global equity derivative business for Barclays Capital.  (Deposition of Mark Washtell, June 17, 2010, 6:2-14.)

A. Yes, I think you've said the same thing. The parties have access to information that is available at a point in time. They don't have access to information that's available or for something that's going to happen in two hours' time, so . . .

Q. So a willing buyer and seller at 12:01 A.M. on September 22nd would not have access to information about what the closing price would be on September 22; is that correct?

A. Is it correct at 12:01 that a market participant would not know the closing price for the close of business that day? That's your question?

Q. Yes.

A. I think that's correct.[33]

17.    Fourth, contrary to the unsubstantiated assertions in the Pfleiderer Declaration, both valuation practices and accounting rules are consistent with my view.  The American Society of Appraisers Business Valuation Standards state, "The conclusion of value reached by the appraiser shall be based upon the applicable standard of value, the purpose and intended use of the valuation, and **all relevant information available as of the valuation date** in carrying out the type of engagement for the assignment."[34, 35]  U.S. Internal Revenue Service Revenue Ruling 59-60, which provides guidance for preparing valuations for estate and gift tax purposes, states, "Valuation of securities is, in essence, a prophesy as to the future and **must be based on facts available at the required date of appraisal**."[36]

---

[33] Deposition of Mark Washtell, June 17, 2010, 85:6-86:5 (objections omitted).

[34] "The American Society of Appraisers is an international organization of appraisal professionals and others interested in the appraisal profession. ASA is the oldest and only major appraisal organization representing all of the disciplines of appraisal specialists. The society originated in 1936 and incorporated in 1952. ASA is headquartered in the metropolitan Washington, D.C., area. The American Society of Appraisers:
- Helps the public and professionals find an ASA accredited appraiser
- Is the only professional valuation organization that accredits members in every appraisal discipline
- Works to grow the appraisal profession
- Fosters professional excellence in its membership through education, accreditation, publication and other services with an emphasis on professional ethics to protect the public"
(http://www.appraisers.org/ASAHome.aspx, accessed on May 28, 2010.)

[35] 2009 ASA Business Valuation Standards, BVS-VI, Section II, paragraph A (emphasis added).

[36] Internal Revenue Service, Revenue Ruling 59-60, 1959-1 CB 237, Section 3, paragraph .03 (emphasis added).

18.     The Uniform Standards of Professional Appraisal Practice ("USPAP")[37, 38]

Statement on Appraisal Standards No. 3 states that market data subsequent to the valuation date

should not be used unless there is evidence in the market that such data were consistent with and

confirmed market expectations as of the valuation date:

> A retrospective appraisal is complicated by the fact that the appraiser already knows what occurred in the market after the effective date of the appraisal.[39]  Data subsequent to the effective date may be considered in developing a retrospective value as a confirmation of trends that would reasonably be considered by a buyer or seller as of that date. . . .  **In the absence of evidence in the market that data subsequent to the effective date were consistent with and confirmed market expectations as of the effective date, the effective date should be used as the cut-off date for data considered by the appraiser**.[40]

19.     The AICPA Audit and Accounting Guide *Auditing Derivative Instruments,*

*Hedging Activities, and Investments in Securities* ("Investment Audit Guide") states that the sale

of an investment shortly after the balance sheet date may provide evidence to the auditor

regarding management's fair value measurements as of the balance sheet date; in other words,

the price in a sale shortly after the balance sheet date can be used as corroborating evidence of

---

[37] "The Uniform Standards of Professional Appraisal Practice (USPAP) are the generally accepted standards for professional appraisal practice in North America. USPAP contains standards for all types of appraisal services. Standards are included for real estate, personal property, business and mass appraisal.

"The Financial Institutions Reform, Recovery and Enforcement Act of 1989 recognizes USPAP as the generally accepted appraisal standards and requires USPAP compliance for appraisers in federally related transactions. State Appraiser Certification and Licensing Boards; federal, state, and local agencies, appraisal services; and appraisal trade associations require compliance with USPAP." (https://netforum.avectra.com/eWeb/DynamicPage.aspx?Site=TAF&WebCode=USPAP accessed on May 27, 2010.)

[38] The Appraisal Standards Board and USPAP, Information for Appraisers and Their Clients. (https://appraisalfoundation.sharefile.com/d-sd342877f2794368a accessed on May 28, 2010.)

[39] "The effective date of the appraisal establishes the context for the value opinion.  Three categories of effective date – retrospective, current, or prospective - may be used, according to the intended use of the appraisal assignment."  An appraisal is retrospective when the effective date is prior to the date of the report, and prospective when the effective date is subsequent to the date of the report.  (USPAP 2010-2011, Statement on Appraisal Standards No. 3.)  The effective date of the appraisal is the valuation date.

[40] USPAP 2010-2011, Statement on Appraisal Standards No. 3 (emphasis added).

management's estimate of fair value.[41]  However, the Investment Audit Guide indicates that

prices of actively traded marketable securities that change after the balance sheet date do not fall

into this category; in addition, the Investment Audit Guide specifies that the auditor should only

consider transactions that reflect circumstances that exist at the measurement date:

> Some subsequent events or transactions may reflect changes in circumstances occurring after the balance-sheet and thus do not constitute competent evidence of the fair value measurement at the balance-sheet date (for example, the prices of actively traded marketable securities that change after the balance-sheet date).  When using a subsequent event or transaction to substantiate a fair value measurement, the auditor considers **only those events or transactions that reflect circumstances existing at the balance-sheet date.**[42, 43]

20.    The AICPA issued Statement on Standards for Valuation Services No. 1

*Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset* ("SSVS No.

1") in June 2007.  AICPA members must follow these standards when performing valuation

engagements.[44]  SSVS No. 1 states:

> Generally, the valuation analyst should **consider only circumstances existing at the valuation date and events occurring up to the valuation date**.  An event that could affect the value may occur subsequent to the valuation date; such an occurrence is referred to as a subsequent event.  Subsequent events are indicative of conditions that were not known or knowable at the valuation date, including conditions that arose subsequent to the valuation date.  The valuation would not be updated to reflect those events or conditions. ...[45]

---

[41] Management, in developing its fair value estimate, must comply with SFAS 157.  *See* the Expert Report of John P. Garvey, March 15, 2010, for explanation of the relevant accounting standards.

[42] AICPA Audit and Accounting Guide *Auditing Derivative Instruments, Hedging Activities, and Investments in Securities*, ¶7.95 (emphasis added).

[43] For this transaction, the balance sheet date is September 22, 2008 at 12:01 a.m.

[44] SSVS No. 1, p. 5.

[45] SSVS No. 1, ¶43 (emphasis added).

C.   BARCLAYS' USE OF END OF DAY SEPTEMBER 22 CLOSING PRICES AND
OTHER SUBSEQUENT PRICES AS THE PROXY FOR 12:01 A.M., SEPTEMBER
22, 2008 PRICE MARKS[46]

21.     Barclays' use of closing prices on September 22, 2008 as the proxy for market

values as of 12:01 a.m. on September 22 is downward biased.  As I establish in Exhibit II-1,

prices decreased during the day of September 22; thus, using closing prices on September 22 as a

proxy for the value as of 12:01 a.m. on September 22 results in downward biased valuations of

the Equities transferred as of 12:01 a.m. on that date.  In this exhibit, I present the change in

various equity market indices between the open and close of the markets on September 22, 2008.

The market values of the indices decreased during the day by an average of -3.93% and a median

of -3.97%, indicating that the end of day price marks on September 22 incorporate *ex post*

information and are biased downward and do not represent market value as of 12:01 a.m. on that

date.  Mr. Washtell testified that he did not consider the market movement between close of

business on September 19 to open of the markets on September 22, nor did he consider the

market movement from open to close of the markets on September 22 when valuing Equities.[47]

22.     The PwC workpapers and the testimony of Mr. Washtell indicate that the

valuation of Equities decreased by approximately $300 million when Barclays changed the

valuation date from September 19 to September 22.[48]  Barclays valued Equities at $10.015

billion using mid-point price marks as of September 19 and $9.725 billion using mid-point price

marks as of September 22, a decrease of $290 million.[49]  The Barclays undervaluation of $541

---

[46] Barclays Motion, ¶58 and ¶63.

[47] Deposition of Mark Washtell, June 17, 2010, 80:18-81:24.

[48] Deposition Exhibit 820, at PwC-BarCapWP_00021956, PwC-BarCapWP_00021957, and PwC-BarCapWP_00021960; Deposition of Mark Washtell, June 17, 2010, 95:23-96:9 and 97:21-23.

[49] M.102 [Deposition Exhibit 86B], at BCI-EX-00099519.

million (shown in Exhibit A-1 of the Zmijewski Report) for Equities consists of $290 million as a result of the different valuation dates and the remainder is due to the difference in the mid-to-bid liquidity adjustment, which I discuss below in Section III.

23.      In addition, Barclays values certain securities using prices from dates subsequent to September 22, 2008.  For example, the spreadsheets that contain Barclays' exit price marks used in its Acquisition Balance Sheet indicate that 828 of 1,110 PMTG and PMTG II securities in the Initial Inventory that were sold between September 22 and September 30 were reported at sale values in the Acquisition Balance Sheet.[50]  Neither Barclays nor the Pfleiderer Report nor subsequent declarations make adjustments to remove the effect of changes in circumstances or conditions after the measurement date.

### D.  THE JPM INVENTORY

24.      The Barclays Motion argues that the proper valuation date for the JPM Inventory is the date Barclays received those securities – December 22, 2008 – rather than 12:01 a.m., September 22, 2008.[51]  Valuing securities as of December 22, 2008 is inconsistent with valuing the assets as of the Closing Date of the transaction.  The 12:01 a.m. September 22, 2008 Closing Date is clearly identified in the Asset Purchase Agreement approved by the Court.[52]  As I stated in my deposition, the transfer of ownership took place at 12:01 a.m. on the Closing Date; therefore, the JPM Inventory should be valued as of that time.[53]

---

[50] M.102 [Deposition Exhibit 86B], at BCI-EX-00099519; M.143 [Deposition Exhibit 641A], at BCI-EX-(S)-00213995.

[51] Barclays Motion, ¶59.

[52] Asset Purchase Agreement, ¶4.1.

[53] Videotape Deposition of Mark E. Zmijewski, April 14, 2010, 97:14-98:6, 99:7-17, 100:2-7, and 187:7-15.

25.     The valuations of JPM Inventory as of the December 22, 2008 settlement date
used by Barclays do not represent the value of these assets as of the Closing Date.[54]  In addition,
the Expert Report of John P. Garvey ("Garvey Report") provides additional foundation on this
issue, "Not valuing the securities on Annex A [the JPM Inventory] on the Closing Date of the
Sale Transaction is incorrect."[55]

III.    BARCLAYS' MID-TO-BID ADJUSTMENT OF EQUITY SECURITIES

26.     The Barclays Motion asserts that I computed a different mid-to-bid adjustment for
the non-convertible Equities than Barclays[56] and that my adjustment is incorrect.  The Barclays
Motion is incorrect in both of its assertions.  To address these issues, I first describe Barclays'
mid-to-bid adjustment process.  Then, I describe my implementation of that process in the
Zmijewski Report and address Barclays' assertions regarding the use of Bloomberg data.

27.     Barclays developed an *ad hoc* and biased methodology to calculate a biased bid-
ask spread of 4.32% for September 22, 2008 using December 18, 2008 data.  Barclays' basis for
using December 18, 2008 data is not justified because, contrary to Barclays' claim, bid-offer
spread data was available through both Bloomberg and Reuters for more than 2,000 of the non-
convertible Equities for both September 19 and September 22, 2008 (about the same number of

---

[54] Barclays valued JPM Inventory at $3.916 billion using mid-point price marks and applied a liquidity adjustment of $0.177 billion (BCI-EX-00108700 [Deposition Exhibit 87B] and BCI-EX-(S)-00213996 [Deposition Exhibit 641A]).  I valued JPM Inventory at $5.789 billion using JPM Calculated Custodial Price Marks and applied a liquidity adjustment of $0.392 billion ($5.789 - $5.397 billion in Zmijewski Report, Exhibit C-1).  Barclays' undervaluation for the JPM Inventory is $1.657 billion. (Zmijewski Report, Exhibit A-2.)  $1.872 billion ($5.789 - $3.916 billion) of the undervaluation of JPM Inventory results from the incorrect valuation date.  The liquidity adjustment in the Zmijewski Report is higher than Barclays' and results in an offsetting difference of $215 million ($0.177 - $0.392 billion).

[55] Expert Report of John P. Garvey, March 15, 2010, ¶27.

[56] Barclays Motion, ¶64.

CUSIPs and percentage of value of the portfolio which Barclays had for December 18 when it applied its *ad hoc* methodology).[57]

28.    Consistent with Barclays' methodology, I calculated an *actual* bid-offer spread of 1.484% using September 19, 2008 data from Bloomberg, resulting in a $131 million mid-to-bid adjustment.  Barclays used Reuters data to calculate its implied bid-ask spread and questioned the quality of the Bloomberg data I used.  As shown below, the bid and ask data from Bloomberg and Reuters, when properly applied, provide similar results.

### A.  BARCLAYS' MID-TO-BID ADJUSTMENT PROCESS

29.    The Barclays mid-to-bid adjustment process is summarized below.  In an email from Marcus Morton at Barclays to its auditors, PricewaterhouseCoopers, dated December 12, 2008,  Barclays described the process it used to value the Equities acquired from Lehman:[58]

> The values that we receive for the Equity prices are based on last traded.  For simplicity we have assumed that these are mids and so we need to make an adjustment to move these to the bid side of the market.  A more conservative assumption would be that the prices are offers (which is [*sic*] a rapidly falling market is probably more realistic) which would obviously lead to a larger adjustment.[59]  Based on an analysis of the securities we were able to obtain bid/offer spreads for about 2100 of the 3700 securities which had an average bid/offer of 2.64%.  This again would be a conservative estimate as the securities with a quoted bid offer would most likely be the most liquid and hence trading at the tightest spreads.  The mid-to-bid spread would then be 1.32% . . .[60]

---

[57] BCI-EX-00255172; *see also* Deposition of Mark Washtell, June 17, 2010, 123:19-124:17.

[58] Marcus Morton is a senior Barclays employee and is the head of Barclays' Global Independent Valuations (GIV) group.  (Exhibit C of Memorandum of Barclays Capital Inc. in Opposition to Motion *In Limine* for an Order Excluding the Expert Testimony of Professor Paul Pfleiderer; *see also* Deposition of Richard Landreman, June 16, 2010, 14:10-14:17.)

[59] Contrary to this statement, in a declining market, prices are more likely to be bids than offers.  By making this assumption, Barclays is overstating its mid-to-bid liquidity adjustment and understating the asset values.  If the market prices were actually bids, no mid-to-bid adjustment would be needed.

[60] M.288 [Deposition Exhibit 819].

30.    A spreadsheet with Barclays' bid-offer calculation contains a summary page with the following explanation of its method for September 22:

1    Get observed live bid-offer spreads from Dec (covers >85% of the portfolio)

2    From this calculate an average spread to apply across whole portfolio (exclude data where spread >50%)

3    Get historical bid-offer spreads from September on available sample data (covers 17% of the portfolio)

4    Where we have data for both dates calculate the relative change from Sep-to-Dec to get a scaling factor

5    Apply this scaling factor to the Dec average spread above to get revised Sep spread for the calculation[61]

31.    In steps 1 and 2, Barclays calculates the bid-ask spread for 2,103 CUSIPs and identifies an average bid-offer spread on December 18, 2008 of 1.93%.[62]  In step 3, Barclays collected bid-offer spreads for 459 CUSIPs for September 22, which were also available on December 18, 2008.  In step 4, for each of the 459 CUSIPs where Barclays obtained bid-offer spread data for both December 18, 2008 and September 22, 2008, Barclays first calculates the ratio of the September spread to the December spread.  Then, Barclays calculates a scaling factor of 2.23 by taking the simple average of the ratios from those 459 CUSIPs.[63]  As I explain below, the distributional properties of this ratio are skewed to higher values and thus, the simple average is not representative of the entire sample.

---

[61] M.294 at BCI-EX-00255172.

[62] M.294 at BCI-EX-00255172.

[63] M.294 at BCI-EX-00255172. According to Mr. Washtell, because Barclays did not collect the data until several months after the transaction, Barclays was only able to obtain a limited number of historical bid-offer spreads for September  (Deposition of Mark Washtell, June 17, 2010, 115:19-125:11).

32.    Finally, in step 5, the multiplication of the amounts in steps 2 and 4 results in the implied September spread, or 4.32% (1.93% x 2.23).[64]  This spread of 4.32% is applied to Barclays' valuation based on mid-point price marks on September 19, 2008 for non-convertible Equities, $8.852 billion, to determine the bid-offer adjustment of $0.382 billion ($8.852 x 4.32%).[65]  Since the average ratio is not representative of the entire sample, this adjustment is not representative of the entire sample.  To the best of my knowledge, Barclays had never before calculated a bid-offer adjustment for Equities positions at a CUSIP level, and its policy for computing mid-to-bid adjustments did not provide for backdating data.[66]

33.    Barclays' process for September 22 is inappropriate for multiple reasons.  First, as I state above, had it collected the available data Barclays would not have needed to use this *ad hoc* methodology which resulted in a biased mid-to-bid adjustment.  According to Barclays, Reuters had data for about four times as many CUSIPS for December 18 relative to September 22.[67, 68]  I contacted Reuters directly regarding the availability of bid and ask spread information

---

[64] M.294 at BCI-EX-00255172 (difference due to rounding).

[65] M.294 at BCI-EX-00255172.

[66] Deposition of Mark Washtell, June 17, 2010, 35:16-36:9 and 128:24-130:9.  *See also* the Declaration filed by John P. Garvey on July 15, 2010 for additional examples of Barclays' deviation from its standard practices for mid-to-bid adjustments

[67] According to Mr. Washtell, because Barclays did not collect the data until several months after the transaction, Barclays was only able to obtain a limited number of historical bid-offer spreads for September [17% of the value of the portfolio]  (Deposition of Mark Washtell, June 17, 2010, 115:19-125:11; M.294 at BCI-EX-00255172.)  Hence, Barclays calculated its implied average spread as the average ratio of September 22 bid-ask spreads to December 18 bid-ask spreads based on 17% of the portfolio.

[68] The PwC workpapers related to the testing of the "revised Bid Offer Reserve" for Equities in the Acquisition Balance Sheet state, "Obtaining historical data back to September is almost impossible – as shown by the fact they can only get 17% of the data out of the total population."  PwC also indicates that Barclays originally prepared a mid-to-bid adjustment for a valuation date of September 19.  (Dep. Ex. 820, at PwC-BarCapWP_00021967.)

and determined that I could obtain bid and ask spreads for 2,138 CUSIPs for September 19, 2008

and 2,145 CUSIPs for September 22, 2008.[69]

34.    Since I was able to obtain actual Reuters data for September 22, 2008 for a similar

percentage of CUSIPs as Barclays did for December, I calculate an actual average spread using

the data provided by Reuters.  Using the simple average spread for the 2,145 CUSIPs, the actual

percentage mid-to-bid (liquidity) adjustment to the non-convertible Equities is 1.597%, which is

63% lower than the implied spread of 4.32% calculated by Barclays from 17% of the

population.[70, 71]

35.    Second, Barclays' *ad hoc* methodology used the simple average of the ratios of

the bid-ask spreads as a measure of central tendency.  Since this is a ratio of two positive

spreads, the minimum ratio is bounded by zero, while the maximum ratio is unbounded.  This

creates a skewed distribution where the simple average is an inappropriate measure of central

tendency in this case.[72]  The average of the ratios is sensitive to outliers, which are positive by

the nature of the ratio.  The properties of that ratio result in the simple average being upwardly

biased as a measure of central tendency.  As I state in my report, the median is a more

---

[69] The 2,138 CUSIPs for September 19, 2008 and 2,145 CUSIPs for September 22, 2008 represent CUSIPs with bid and ask prices for the respective date, non-negative spreads, and excludes CUSIPs with bid-ask spreads in excess of 50%.

[70] Like Barclays, I eliminate CUSIPs with bid-ask spreads in excess of 50% and calculate the simple average spread for the sample to determine the mid-to-bid liquidity adjustment to apply to the non-convertible Equities.

[71] M. 294 [BCI-EX-00255172]; Deposition of Mark Washtell, June 17, 2010, 115:19-125:11; Dep. Ex. 820, at PwC-BarCapWP_00021967.

[72] An average is a poor measure of central tendency for a skewed distribution such as this.  ". . . [A]n important weakness of the mean as a measure of center [is]:  *the mean is sensitive to the influence of a few extreme observations*.  These may be outliers, but a skewed distribution that has no outliers will also pull the mean toward its long tail.  Because the mean cannot resist the influence of extreme observations, we say that it is not a resistant measure of center.  A measure that is resistant does more than limit the influence of outliers.  Its value does not respond strongly to changes in a few observations, no matter how large those changes may be.  The mean fails this requirement . . ."  (David S. Moore and George McCabe, *Introduction to the Practice of Statistics* (New York: W. H. Freeman and Company, 2006), 42 (bold emphasis omitted).)

appropriate measure of central tendency when there is a skewed distribution.[73]  Mr. Washtell

dismisses the use of a median in this calculation as "nonsensical;" however, he provides no

foundation for his assertion and statistical textbooks disagree with his view.[74]

36.    Barclays uses the average ratio of spreads from September to December, which is

2.23, while the median ratio is 0.68.  As discussed above, the median is typically used to reduce

the influence of outliers in the data.  If Barclays used the median ratio in its calculation, its

spread would have been 1.31% (1.93% x 0.68) instead of 4.32% (1.93% x 2.23).  It is clear that

using the median of that ratio results in a spread (1.31%) that is closer to the average spread for

the entire sample (1.597%) than using Barclays' inappropriate method to calculate a spread

(4.32.%).  Using the median bid-ask spread percentage, Barclays' mid-to-bid adjustment

decreases from $382 million to $116 million ($8.852 billion x 1.31%).[75]  Regardless, however,

Barclays did not need to use this process because the data to calculate an actual September 22

spread was available.

B.    IMPLEMENTATION OF BARCLAYS' MID-TO-BID ADJUSTMENT IN THE
ZMIJEWSKI REPORT

37.    In order to reduce the points of disagreement with Barclays and its experts, I used

Barclays' methodology for valuing Equities with two exceptions:  (1) because September 19,

2008 is a better proxy for value as of the Closing Date at 12:01 a.m. on September 22, 2008, I

used Barclays' price marks on September 19, 2008 instead of the price marks on September 22,

2008;  (2) because I was able to obtain actual September 19 data for a similar number of CUSIPs

---

[73] Zmijewski Report, footnote 37.

[74] Deposition of Mark Washtell, June 17, 2010, 136:24-137:4.  *See also* footnote 72.

[75] The value of non-convertible equities, $8.852B, is obtained from M. 294 (BCI-EX-00255172).

as Barclays did in December, I did not need to calculate an "implied" spread based on the

relationship between the September and December spreads; instead, I calculated an *actual* spread

for September 19.[76]  I present the result of that analysis in the Zmijewski Report.[77]

38.    To address issues raised in my deposition, I further describe the collection of the

sample I used for the mid-to-bid adjustment process in Exhibit III-1.  I began with Barclays' list

of CUSIPs for non-convertible Equities.[78]  I restricted the list to CUSIPs with bid, ask, and last

prices from Bloomberg, which removed 1,436 CUSIPs from the analysis, I removed CUSIPs

with negative bid-ask spreads, and I restricted the analysis to eliminate CUSIPs with bid-ask

spreads in excess of 50%.[79, 80]  This resulted in a list of 2,106 CUSIPs representing 88% of the

total value of non-convertible Equities, using the values in Barclays Acquisition Balance Sheet.

This percentage is similar to the 86% obtained by Barclays for December 18, 2008.  Since I was

able to obtain actual September data for a similar percentage of CUSIPs as Barclays did for

December, I did not need to calculate an "implied" spread for these CUSIPs; I calculated an

actual spread.  I calculated the actual simple average spread for the 2,106 CUSIPs of 1.484%.

Like Barclays, I applied the resulting mid-to-bid (liquidity) adjustment to the mid-point price

marks for September 19 for non-convertible Equities, or $8.852 billion, to determine the bid-

---

[76] Like Barclays, I analyze non-convertible equities, eliminate CUSIPs with bid-ask spreads in excess of 50%, and calculate the simple average spread for the sample to determine the mid-to-bid liquidity adjustment to apply to all of the non-convertible Equities.

[77] Zmijewski Report, Exhibit A-1.

[78] *See* Deposition of Mark Washtell, June 17, 2010, 144:19-145:3, for explanation of why a liquidity adjustment is not applied to convertible Equities.

[79] Filtering the data to include CUSIPs with prices "greater than or equal to 0" also eliminates CUSIPs with missing prices.  There were no negative Bloomberg prices.

[80] According to the Bloomberg Help Desk, negative bid-ask spreads are usually due to a data error.  Therefore, I remove them from my analysis.

offer adjustment of $0.131 billion ($8.852 x 1.484%).[81]  Based on its inappropriate methodology,

Barclays overstated its bid-offer adjustment by $0.251 billion ($0.382 billion – $0.131 billion).

       1.   Use of Bloomberg Data

39.     In his deposition, Mr. Washtell states that Bloomberg is not a useful source of

information:

> I believe, having looked at the data that's available from Bloomberg, that it is flawed, that
> there are problems with data integrity.

> I believe these are highlighted by Zmijewski in his report when he discusses the fact that,
> in certain circumstances, he gets negative prices which he has to exclude. In certain other
> circumstances, he gets negative bid/offer spreads, which he also has to exclude.

> Now, the existence of negative bid/offer spreads in particular would lead me to have
> concerns about whether the data that's available in Bloomberg represents a true bid/offer,
> executable bid/offer that is available in the market at a point in time because you could
> not have a negative bid/offer in the market. It doesn't exist. Couldn't exist.[82]

40.     Mr. Washtell's statements are unfounded and he contradicts himself later in his

deposition regarding the appropriateness of Bloomberg data.[83, 84]  As I state above, the

Bloomberg data did not contain negative prices for the CUSIPs in my sample.[85]  I observed 42

negative bid-ask spreads, which represents less than 2% of the sample by number of CUSIPs.

Contrary to Mr. Washtell's assertion, this does not indicate that the remaining data are flawed.

---

[81] M.102 [Deposition Exhibit 86B], at BCI-EX-00099519; M.143 [Deposition Exhibit 641A], at BCI-EX-(S)-
00213995.  The value of non-convertible equities, $8.852B, is obtained from M. 294 (BCI-EX-00255172).

[82] Deposition of Mark Washtell, June 17, 2010, 169:18-170:12.

[83] Deposition of Mark Washtell, June 17, 2010, 57:8-18, 101:6-21, 144:19-145:12, and 185:18-188:6.

[84] The PwC workpapers related to the testing of the "revised Bid Offer Reserve" for Equities on the Acquisition
Balance Sheet indicate that bid/offer spreads for December 18 were obtained from both Reuters and Bloomberg.
(Dep. Ex. 820, at PwC-BarCapWP_00021967.)

[85] The filter to include only non-negative price marks discussed in the Zmijewski Report was designed to eliminate
CUSIPs with missing prices in the Bloomberg data.

Reviewing the data and eliminating errors is a standard practice in conducting empirical

research.

41.    Mr. Washtell later states regarding the September 22 analysis:

Now, the reason we used Reuters is not because I didn't trust Bloomberg data in
September 2008, but we used Reuters data because that's our principal data provider
within the bank for Equities data.  Now, when we queried information, we were able to
obtain it for, as I say, 450, 500 names, something like that.

We didn't observe examples of negative spreads. We didn't observe anything that led us
to think there was any problem with the data that we were using, any issues over the
integrity of that data.  We just accepted that, okay, it's after the fact here.  The availability
of good closing bid-ask data is going to be limited for this population after the fact
because it's not the same as getting live bid-ask data.[86, 87]

42.    While Mr. Washtell states that Bloomberg data are "flawed," Mr. Washtell also

uses Bloomberg prices to value several types of securities, such as illiquid securities and

convertible bonds.[88]  In addition, the Pfleiderer Report also relies on Bloomberg prices:[89]

Bloomberg is widely recognized as the premier source of pricing data and other
information about securities and trading activity in US and international financial
markets. According to the product website, Bloomberg is "employed by over 300,000
professionals in central banks, investment institutions, commercial banks, government
offices and agencies, law firms, corporations and news organizations around the world."
They cover "over 5 million financial instruments" and provide "the most comprehensive
and advanced set of financial data, real time market coverage, news, analytic tools,
portfolio solutions, and research." Market data crosses "all asset classes, [including]
Equities, Futures, Options, Fixed Income and Currency Markets and others" and provides
"connectivity to more than 350 exchanges."[90]

---

[86] Deposition of Mark Washtell, June 17, 2010, 171:3-19.

[87] The Reuters data I obtained for September 19, 2008, included 4 CUSIPs with negative bid-ask spreads.

[88] Deposition of Mark Washtell, June 17, 2010, 57:8-18, 101:6-21, 144:19-145:12, and 185:18-188:6.

[89] Pfleiderer Report, ¶29 and ¶99.

[90] Pfleiderer Report, footnote 30.

2. Comparison of Bloomberg Data to Reuters Data

43.    Mr. Washtell used data from Reuters to calculate Barclays' mid-to-bid adjustment

on September 22.  I provide empirical evidence that refutes Mr. Washtell's unfounded assertions

regarding the inappropriateness of Bloomberg data in Exhibit III-2A, in which I compare the bid

and ask prices that Barclays obtained from Reuters to those in Bloomberg.  Barclays was able to

obtain September 22 bid and ask prices for 459 CUSIPs.  Bloomberg had prices for 449 of those

459 CUSIPS.  The percentage difference in the bid and percentage difference in the ask were, on

a value-weighted basis, approximately 0.0001%.

44.    In Exhibit III-2B, I compare the bid and ask prices for CUSIPs used in the

Zmijewski Report that are also available from Reuters for September 19, 2008.  In the Zmijewski

Report, I use bid and ask spreads from 2,106 CUSIPs from Bloomberg.  I was able to obtain

1,988 of those 2,106 CUSIPs from Reuters for September 19, 2008.  The percentage difference

in the bid and percentage difference in the ask were, on a value-weighted basis, within 0.4%.

IV.    BARCLAYS' OTHER COMMENTS CONCERNING MY VALUATION OF
       EQUITIES

    A. INDEPENDENT VALUATION

45.    The Barclays Motion incorrectly asserts that I did not independently value the

Equities and that I accept and use Barclays' valuation.[91]  As I state above, I use a standard and

widely accepted approach to value Equities using observable market prices that were known as

well as additional information that was available as of the appropriate valuation date, 12:01 a.m.,

Monday September 22, 2008.  The Pfleiderer Declaration also misinterprets or mischaracterizes

---

[91] Barclays Motion, ¶64.

that my valuation was conducted on a portfolio basis.[92]  I conducted an independent valuation on a security by security (or at the CUSIP level) basis.  Since most of the Equities are publicly traded and have publicly traded prices, it is appropriate to use those prices to value these securities.[93]  I collected third party closing prices for September 19, 2008 at a CUSIP level for all of the Equities securities for which data are available.[94]  I then compared these prices to the Barclays' valuation of Equities on that date.

46.    Exhibit IV-1 contains additional analysis on this point.  This exhibit provides a comparison of Barclays' valuation of Equities based on mid-point price marks on September 19, 2008 to the market value of Equities using third party price marks.  Third party price marks were first obtained from Bloomberg and supplemented by prices from Capital IQ.  Third party prices from Bloomberg and Capital IQ are available for 3,043 CUSIPs out of 4,028 Equity CUSIPs.  As shown in this exhibit, the market value for these 3,043 CUSIPs on September 19, 2008 is $10.004 billion using Bloomberg and Capital IQ data.  The Barclays valuation based on its September 19 mid-point price marks for the same CUSIPs is $9.950 billion.  The difference is 0.5%.

47.    While third party prices are not available for 985 equity securities in the Initial Inventory, these securities are, according to Barclays, less than 1% of the total value of the Equities.  Given the results of the above analysis, and in order to reduce the number of points of

---

[92] Pfleiderer Declaration, ¶20.

[93] *See* the Expert Report of John P. Garvey dated March 15, 2010 for explanation of the relevant accounting standards.

[94] As I stated in my deposition, I utilized Barclays' price marks after comparing them to Bloomberg price marks.  I ". . . checked to make sure that those September 19th prices were indeed close to what the Bloomberg prices would be, and they were.  I don't believe Barclays uses Bloomberg, but the prices would naturally be close, and they were, so I was comfortable with that."  (Videotape Deposition of Mark E. Zmijewski, April 14, 2010, 46:6-11.)

In addition, for the CUSIPs that did not have Bloomberg prices, I supplemented with prices from Capital IQ.

disagreement with Barclays and its experts, I used Barclays' valuation of the mid-price marks of

the Equities as of September 19, 2008 in my analysis instead of my own third party-based

analysis.

48.    In spite of the fact that neither Barclays nor its experts quantify or even discuss a

margin of error or confidence interval for any of the valuations they conduct, the Barclays

Motion  asserts that my analyses are not appropriate because I do not quantify the margin of

error or confidence interval around my valuation.[95]  Barclays' assertion is misguided because, in

my valuation of Equity securities, I use actual third party prices and Barclays' values for the

Equity securities.

## B.  VALUATION OF LEHMAN-ISSUED WARRANTS AND LEHMAN-ISSUED EQUITY-LINKED NOTES

49.    The Pfleiderer Declaration states that I do not contest Barclays' decision to write

down the Lehman-issued warrants and Lehman-issued equity-linked notes to $0.[96]  The

Pfleiderer Declaration mischaracterizes my report.  I did not accept Barclays' values for these

securities; rather, I used these prices as a conservative assumption in my analyses and to reduce

the points of disagreement with Barclays and its experts.

50.    Since issuing the Zmijewski Report, I read the deposition testimony of Mr.

Washtell, who managed the Barclays group responsible for valuing the Lehman-issued warrants

and Lehman-issued equity-linked notes.  It turns out that Barclays did not use third party prices

for the Lehman-issued warrants and Lehman-issued equity-linked notes.[97]  Mr. Washtell could

---

[95] Barclays Motion, ¶65.

[96] Pfleiderer Declaration, ¶11.

[97] Five of the 157 CUSIPs had third party prices on September 22, with a total value of approximately $100,000, or approximately 0.001% of the value of Equities (BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-

not recall if he looked for pricing for any Lehman-issued notes where Lehman itself was not the reference entity.[98]  Mr. Washtell also stated that Barclays' IVC Group normally considers *ex post* information in verifying the trading desk valuations.[99]  Contrary to its normal practice, Barclays did not consider *ex post* information when valuing the Lehman-issued warrants:

> Q. At any time after the transfer of the positions from Lehman to Barclays, did you or your team attempt to ascertain whether or not Barclays was able to sell the position for any value?
>
> A. No, but I don't believe that would be -- as I said before, given that whether they were warrants issued over Lehman's stock or warrants issued over some other underlying this, they're still warrants issued by Lehman Brothers, which is now a bankrupt counterparty.[100]

51.    I do not endorse Barclays' value for these securities.  Valuing these securities at $0 is conservative and understates Barclays' Windfall.

## V.    VALUATION OF JPM INVENTORY

52.    Ignoring the expert report and deposition testimony of Mr. John Schneider, the Barclays Motion objects to my reliance on the JPMorgan price marks for September 17, 2008.[101]  Mr. Schneider discusses the role of a custodian and the skills required to perform custodial services in his expert report:

> BoNY and JPM are the two tri-party repo agents that control the vast majority of the triparty repurchase custodial business in the United States and as discussed above, as tri-

---

00213995 (Deposition Exhibit 641A) for Initial Inventory; Bloomberg; Capital IQ; Interactive Data; FactSet; Expert Report of Mark E. Zmijewski dated March 15, 2010).  I utilized BCI's valuation instead to conservatively calculate Barclays' undervaluation of Equities and to minimize the points of disagreement with Barclays.

[98] Deposition of Mark Washtell, June 17, 2010, 166:4-8.

[99] Deposition of Mark Washtell, June 17, 2010, 217:11-219:6.

[100] Deposition of Mark Washtell, June 17, 2010, 165:10-20.

[101] Barclays Motion, ¶60 and ¶61.

party Agents, they are responsible for marking collateral values each day (and sometimes intra-day) to ensure that the collateral is sufficient to secure the loans in accordance with their agreements and accompanying eligible securities schedules. As such, BoNY and JPM are required to have and maintain valuation capabilities to: (1) fulfill their contractual obligations; and (2) remain the dominant commercial tri-party repo agents serving the U.S. market.[102]

53.    Non-traditional and "illiquid" collateral were eligible for tri-party repo

transactions and became a significant portion of the repo market:

> Far from being new or esoteric, therefore, nontraditional or illiquid collateral had been commonly acceptable in tri-party repo arrangements both in private and Central Bank markets for well over a decade at the time of the Lehman bankruptcy, and comprised a substantial portion of the market in the US since at least 2005.[103]

54.    Barclays presented two documents to me in my deposition regarding the

reliability of JPMorgan price marks. I reviewed these documents drafted by Mr. Harold

Novikoff, JPMorgan's counsel at Wachtell, Lipton, Rosen & Katz, in which he comments on the

JPMorgan price marks for September 17.[104] In a November 3, 2008 email he states, "JPM

cautions that Collateral Value may not be a reliable indicator of realizable value."[105] I again

reviewed and considered these emails, including the context and timing in which they were

prepared, the lack of specificity regarding the terms used, and the available testimony regarding

these exhibits. I conclude that Barclays' interpretation of these emails is unsupported.[106] One of

these documents also includes a spreadsheet attachment with the "Collateral Value" as of

---

[102] John J. Schneider Expert Report, March 15, 2010, ¶27.

[103] John J. Schneider Expert Report, March 15, 2010, ¶42.

[104] BCI Exhibit 443 [Deposition Exhibit 570]; BCI Exhibit 444 [Deposition Exhibit 571].

[105] BCI Exhibit 444 [Deposition Exhibit 571].

[106] I note that Ms. Marlo Karp of Deloitte and Touche, at whose deposition these exhibits were introduced, was also uncertain of the meaning of these emails. (Deposition of Marlo Karp, January, 20, 2010, 55:17-56:3, 57:9-15, 88:18-89:16, and 92:6-14.)

September 17, 2008 and "JPMorgan's estimate of market value as of November 3."[107]  For

reasons outlined in my report and deposition testimony, the estimates of market value as of

November 3, 2008 were not known or knowable at 12:01 a.m. on September 22, 2008 and are

not relevant to my opinions.[108]

55.    The Barclays Motion also objects to my reliance on GFS data to roll forward the

JPMorgan price marks from September 17 to September 19, 2008,[109] and states that I ". . . [fail]

to show regular updating of marks in the period of September 17 to September 19, which is the

relevant time period."[110]  The Pfleiderer Declaration makes a similar comment,[111] and states:

". . . [T]o the extent that securities prices generally were falling during the week of September

15, 2008, the GFS system failed to capture the full extent of the decline; this means that the error

in Prof. Zmijewski's mid-to-bid adjustment method and data clearly bias his valuations in favor

of Movants, i.e., towards artificially higher valuations compared to Barclays' marks."[112]  Again,

neither the Barclays Motion nor the Pfleiderer Declaration provides any data or analysis to

support their claims.

56.    Exhibit V-1 contains an analysis of the method I used to roll the JPMorgan price

marks forward from September 17 to September 19.  In this exhibit, I compare the value based

on my method with the value from third party price marks to test the validity of my method.  I

---

[107] BCI Exhibit 444 [Deposition Exhibit 571].

[108] Zmijewski Report, ¶30; Videotape Deposition of Mark E. Zmijewski, April 14, 2010, 48:17-49:10, 97:14-98:6, 99:7-100:7, and 187:7-15.

[109] Barclays Motion, ¶58.

[110] Barclays Motion, ¶62.

[111] Pfleiderer Declaration, footnote 27.

[112] Pfleiderer Declaration, ¶21.

was able to obtain third party prices for 485 of the 1,195 CUSIPs in the JPM Inventory, with a

value of over $2 billion.[113]  In this exhibit, the Valuation Based on JPM Calculated Custodial

Price Marks 9-19 Using Roll-Forward Methodology With GFS is calculated using the same

methodology as the valuation for September 19 in Exhibit C-1 of the Zmijewski Report.[114]  As

seen in Exhibit V-1, the method I used to derive JPMorgan price marks as of September 19 is

conservative, and results in a value that is 0.83% lower than the value computed using third party

price marks for September 19.

57.    The Barclays Motion incorrectly interprets the Zmijewski Report when it states

that, for securities not in GFS, I assume "that the change from September 17 to September 19

experienced by a different set of securities (according to the GFS system) would have been

identical for the JPM Inventory securities."[115]  In my computation of the change in JPMorgan

price marks from September 17 to 19, all of the securities I analyzed were included in JPM

Inventory.  The JPM Inventory is comprised of 1,195 CUSIPs.  902 of the CUSIPs in the JPM

Inventory are also in GFS and 293 CUSIPs are not.  Therefore, I was able to obtain GFS pricing

on a CUSIP by CUSIP basis for the 902 CUSIPs that were also in the JPM Inventory.

---

[113] I calculate third party prices for the JPM Inventory securities using Mr. Slattery's methodology, which utilizes prices from the following sources:  Bloomberg BGN bid price, Bloomberg BVAL bid price, Interactive Data, Capital IQ, and FactSet.

[114] Since the JPM 9-19 values were not provided, I estimate them using the JPM 9-17 value provided in the spreadsheets from the Ricky Policke e-mail "Re Collateral file" (LEH-NAVIGANT 000001 – 000015) and the Clean Market Price change in the GFS data from September 17 to 19.  For the 283 CUSIPs overlapping with the GFS data with positive trade date position and positive clean market price on September 17 and 19, I calculate the September 19 value by applying the percentage change in GFS prices to the JPMorgan September 17 values.  For the remaining 202 CUSIPs not in GFS, I calculate the JPMorgan September 19 value by applying the weighted average price change by asset class to the JPMorgan September 17 value.  I calculate this average price change for each Barclays' asset class using the CUSIPs included in the GFS data, weighted by the JPMorgan September 17 value.

[115] Barclays Motion, ¶58.

58.     This sample represented 75% of the CUSIPs and 60% of the custodial value of

JPM Inventory on September 17.  I also group the 902 CUSIPS according to Barclays' asset

class and calculate the average price change for each asset class, weighted by the JPMorgan

value as of September 17.  For the 293 CUSIPs in JPM Inventory but not in GFS, I calculate the

September 19 value by applying the weighted average price change by asset class to the

JPMorgan values as of September 17.

59.     Again, in spite of the fact that neither Barclays nor its experts quantify or even

discuss a margin of error or confidence interval for any of the valuations they conduct, the

Barclays Motion asserts that my analyses are not appropriate because I do not quantify the

margin of error or confidence interval around my valuation.[116]  And again, Barclays' assertion is

misguided because, like Barclays, I provide point estimates for the securities in the JPM

Inventory, which is the relevant valuation to measure the Barclays Windfall.  Barclays and the

Pfleiderer Report also use point estimates when valuing the JPM Inventory and, like them, I do

not provide analysis of the margin of error or confidence interval around those values.


VI.     <u>RELIANCE ON OTHER EXPERTS</u>

60.     From the very start of the work for this matter, I worked with the other valuation

experts.  I discussed the approaches and methods used by the other valuation experts and

provided input into their work.  I therefore appropriately relied upon the valuations of other

experts.  As I stated in my deposition, I participated in a series of calls in which we discussed the

methods, approaches, and data sources used by the other valuation experts:

---

[116] Barclays Motion, ¶65.

Q        Can you describe your level of collaboration with these other individuals in coming up with the values reflected in [Exhibit] A-2 [Summary of Valuations of Experts]?

A        We have had several conversations starting from the first day they were each brought into this matter to do valuation, and we discussed the valuation approaches, the type of data that was necessary, the type of valuation systems which they discuss in the report, that was necessary, for them to do valuations of this sort.

So, we discussed the inputs and how they would measure the inputs, so, you know, we essentially discussed how they were going to go about valuing all the securities.

. . .

You know, we had this series of conversations. I don't remember who was on the phone. Everyone was participating in the calls. . . .  I felt it was important, so, I was first on the team, so, my goal, when we brought . . . other experts on board, was to make sure we were all discussing what methodologies are we using, what views do we have.  Let's make sure that we have the same view.  If we don't have the same view, we better figure out why.  Let's make sure we have the same inputs, so that there is a consistency in the approach, and the analysis.

Therefore, we had a series of calls, Mr. Olvany and Mr. Slattery -- calls and meetings -- and Mr. Schwaba, sometimes they were on, sometimes they weren't on.  They had calls with me and without me.

There was a long series of calls.

Q        What were the main issues that came up in terms of approach that you recall?

A        The main issue was, what are good software . . .  methodologies that are used . . . in the marketplace.  So, FINCAD was one of them, and everyone was comfortable with FINCAD. It's not good for the mortgages, so, they talked about a lot -- I don't have specific knowledge of what the different trading desks were using at the time.  That's not my area of expertise.  That was their area of expertise, and they talked about it and concluded, everyone concluded that PolyPath was a very good program to use with dynamic interest rate generation, and it would be valuable, so it's something that we acquired for this particular engagement.

Q        Were there any disagreements amongst you in terms of approach and methodology?

A        None that I can recall.  It was -- if you think about it, everybody has the basic framework that there is expected cash flows from these securities, and you have to get a present value of those securities -- or cash flows.  So it was a discussion of what is the best way to measure this and make sure that we were consistent with what the market was using as well.

. . .

I believe their valuations are reliable based on fairly detailed discussions about how they were going to conduct their valuations and execute the methodologies.[117]

61.    These calls took place at the very beginning of the planning stage and continued

throughout the engagement.  Based on these discussions of their approaches and methods, I

appropriately relied on the work of Mr. Olvany, Mr. Schwaba, and Mr. Slattery.


VII.    ADDITIONAL GFS DATA PROVIDED AFTER THE DATE OF MY REPORT

62.    In this section I analyze additional data from Lehman's Global Funding System

("GFS") received after the filing of the Zmijewski Report.  In addition to the GFS data available

to Movants as of the date of my report, Barclays provided additional GFS data to Movants since

the filing of my expert report that it failed to provide previously in response to Movants' request

("Additional GFS Data").  Professor Pfleiderer issued a declaration dated April 23, 2010 in

which he summarizes the Additional GFS Data.  The Additional GFS Data cannot be used to

replicate the September 19 values in Exhibits 1 and 2-F to the April 23, 2010 Pfleiderer

Declaration.

63.    The Additional GFS Data includes price marks for September 15 through 22,

2008.[118]  Generally, the Additional GFS Data serve to supplement the GFS data previously

---

[117] Videotape Deposition of Mark E. Zmijewski, April 14, 2010, 31:15-38:4.

[118] BCI Exhibit 502 (BCI-EX-00302949.xlsx) for September 15; BCI Exhibit 667.xlsx (BCI-EX 00302955) and BCI-EX-00302955.xlsx for September 16; BCI Exhibit 668.xlsx (BCI-EX 00302956) and BCI-EX-00302956.xlsx for September 17; BCI Exhibit 669.xlsx (BCI-EX 00302957) and BCI-EX-00302957.xlsx for September 18; BCI Exhibit 670.xlsx (BCI-EX 00302964) and BCI-EX-00302964.xlsx for September 19; BCI Exhibit 671 (BCI-EX-00302965.xlsx) for September 22. Note that when multiple files were provided for a given date, the files are identical.

provided.[119]  The original GFS data did not have any observations with the Division variable equal to "SUM-EQUITIES."  The new files have approximately 150,000 such records for each date.  For all other Divisions, the Additional GFS Data and original data are typically the same, but not always. Also note that the "SUM-EQUITIES" records represent securities in almost all GFS GAAP asset classes, so this division is made up of more than simply equity CUSIPs.

64.      In the April 23, 2010 Pfleiderer Declaration, Professor Pfleiderer presents exhibits that show the GFS values by asset class for each trading day from September 12 through 19, 2008.  He states, "As Exhibit 1 shows, the total value of long inventory held by LBI declined over the period, from approximately $62.36 billion on September 12 to approximately $55.95 billion on September 19."[120]

65.      I have reviewed the Additional GFS Data.  Based on my analysis, the Additional GFS Data cannot be used to replicate the September 19 values in Exhibits 1 and 2-F to the April 23, 2010 Pfleiderer Declaration.  Using the Additional GFS Data, I compute $54.69 billion in total Long Inventory Market Value, which is $1.26 billion less than the $55.95 billion shown in Exhibit 1 to the April 23, 2010 Pfleiderer Declaration.  Thus, I cannot determine the reliability of the Additional GFS Data.


VIII.   <u>INCLUSION OF ASSETS PURCHASED BY BARCLAYS</u>

66.      In this section I analyze additional Purchased Assets.

67.      The Barclays Motion states that:

---

[119] M.309 (BCI-EX-00297253.xls); M.302 (BCI-EX-00297156.xls); M. 303 (BCI-EX-00297157.xls); M.304 (BCI-EX-00297158.xls); M.305 (BCI-EX-00297159.xls); M.306(BCI-EX-00297160.xls); BCI-EX-00297161.xls.

[120] Declaration of Paul Pfleiderer, April 23, 2010, ¶3.

Mark Zmijewski relies on all of the foregoing experts to opine that Barclays received a
$13 billion windfall, and that Barclays was not entitled to *any* of the assets specifically
itemized in the APA, including even intangible assets, customer lists, furniture, software
– anything – if those assets were not included in Lori Fife's $47.4 billion number (a
number she used in describing what had happened to the $70 billion of Long Positions
referenced in subsection (d) of the APA – *not* as describing a valuation of *all* Purchased
Assets combined, for which even the Trustee admits no appraisal was ever performed).[121]

68.    The Barclays Motion mischaracterizes my analysis.[122]  In both the Zmijewski

Report and my deposition,[123] and as shown in Exhibit B-1 of the Zmijewski Report, I include

non-financial assets, which include intangible assets, in my calculation of Adjusted Total Assets

Acquired by Barclays.


IX.    FED REPO VS. LEHMAN-BARCLAYS REPO

69.    The Barclays Motion states:

. . . the actual Repo Collateral transferred to Barclays was worth substantially less and
included many securities that differed from those pledged to the Fed. The Repo Collateral
actually transferred contained a significant proportion of illiquid securities;
approximately 40% of the securities by number, and approximately 25% by value, were
of the kind that could not be valued by looking at observable pricing data (from a
Standard & Poors, Bloomberg, or similar terminal). . . .[124]

70.    Barclays' assertion is unsupported.  The repo custodians (BoNY in the case of the

Initial Inventory and JPMorgan in the case of the JPM inventory) valued the Repo Collateral that

overlaps with that in the Fed Repo at approximately $41.203 billion.[125]  Movants' valuation

---

[121] Barclays Motion, ¶6.

[122] Expert Report of Mark E. Zmijewski, March 15, 2010, Exhibit B-1.

[123] Videotape Deposition of Mark E. Zmijewski, April 14, 2010, 175:5-178:10 and 197:22-198:8.

[124] Barclays Motion, ¶2.

[125] JPM-60(b)00006364; BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition
Exhibit 641A) for Initial Inventory; BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996
(Deposition Exhibit 641A) for JPM Inventory; BCI-EX-00297090 (Sched B Inventory LehOBS 6); Policke, Ricky.

experts have valued these same securities, which overlap with those in the Fed Repo, at $40.092

billion.[126] Barclays, meanwhile, has valued the securities that overlap with the Fed Repo at only

$35.968 billion on its acquisition balance sheet.[127] Thus, Barclays' valuation of securities

overlapping with the Fed Repo accounts for over $4 billion of the undervaluation calculated by

Movants' Experts.

71.    I also compared the collateral pledged for the Fed Repo to the Repo Collateral

received by Barclays using Barclays' definition of liquidity outlined above. I obtained

"observable pricing data" for September 19, 2008 from Capital IQ (formerly Standard & Poor's)

and Bloomberg for the CUSIPs in the Fed Repo and the Repo Collateral received by Barclays.[128]

I expect that use of additional sources for third party data could increase the percentage of value

considered liquid.

72.    Contrary to Barclays' contention, and accepting Barclays' definition of illiquid,

the ratio of liquid to illiquid securities by value was consistent between the Fed Repo collateral

and the Repo Collateral Barclays received, and the ratio in the Repo Collateral in fact appears

---

"RE Collateral file." Email to John Haley of Barclays with attachments, 18 Sept. 2008 (LEH-NAVIGANT 000001 – 000015).

[126] JPM-60(b)00006364; BCI-EX-00297090 (Sched B Inventory LehOBS 6); Expert Report of Mark E. Zmijewski, March 15, 2010; BCI-EX-00099519 [Deposition Exhibit 86B] and BCI-EX-(S)-00213995 [Deposition Exhibit 641A] for Initial Inventory; BCI-EX-00108700 [Deposition Exhibit 87B] and BCI-EX-(S)-00213996 [Deposition Exhibit 641A] for JPM Inventory; BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData); Policke, Ricky. "RE Collateral file." Email to John Haley of Barclays with attachments, 18 Sept. 2008 (LEH-NAVIGANT 000001 – 000015); Lehman GFS system data (BCI-EX-00297158.xls and BCI-EX-00297160.xls); Expert Report of Mark Slattery, March 15, 2010; LEH-NAVIGANT 026179.xls; LEH-NAVIGANT 026180.xlsx; LEH-NAVIGANT 026181.xlsx; LEH-NAVIGANT 026182.xlsx; LEH-NAVIGANT 026183.xlsx; LEH-NAVIGANT 026203.xlsx; Expert Report of John Olvany, March 15, 2010; LEH-NAVIGANT 026167.xlsx; Expert Report of Joseph Schwaba, March 15, 2010; LEH-NAVIGANT 026174.xlsx.

[127] JPM-60(b)00006364; BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; BCI-EX-00297090 (Sched B Inventory LehOBS 6); BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData).

[128] Barclays Motion, ¶2.

more favorable to Barclays.  As shown in Exhibit IX-1, 28.4% of the value of the collateral
pledged for the Fed Repo did not have Bloomberg or Capital IQ prices.  In the Repo Collateral
Barclays actually received, 23.3% of the value received did not have Bloomberg or Capital IQ
prices on September 22, 2008 based on the value included in Barclays Acquisition Balance
Sheet.  28.0% of the value received did not have Bloomberg or Capital IQ prices on September
22, 2008 based on the values from Movants' valuation experts.

73.    It is important to note that, if a security is "illiquid," that does not mean it does
not have value, or cannot be valued, or is difficult to value.

## X.    COMPARISON OF VALUES

74.    In Exhibit X-1, I compare valuations based on various sources of price marks.
Barclays' valuation is the outlier among the various valuations.  JPMorgan and BoNY price
marks, comparing CUSIPs they both valued, are 1.28% apart.  The values developed by
Movants' valuation experts are 1.99% lower than BoNY's values and 3.83% lower than
JPMorgan's values.  Barclays' values, by contrast, are 12.94% lower than BoNY and JPMorgan,
and 10.31% lower than Movants' valuation experts.

## XI.    BARCLAYS' FAILURE TO CONSIDER ALL AVAILABLE INFORMATION

75.    Despite the difficulty that Barclays states it had valuing the portfolio it purchased
from Lehman, Barclays' valuation professionals did not make use of all of the available data and
expertise it could draw on to develop its valuations.[129, 130]

---

[129] Mr. Landreman was responsible for valuing "agency mortgage-backed securities, the agency CMOs, the non-
Agency RMBS collateral, which would include Alt As, sub-prime, in addition to credit cards, student loans, auto
loans, and other securitized products, including some CDOs and CLOs."  (Deposition of Richard Landreman, June

76.    When valuing Equities, Rates, and Credit products, Barclays' valuation professionals did not consider its existing holdings of identical or similar CUSIPs to ensure it valued the purchased assets consistently.[131]  Barclays' valuation professionals did not consider Lehman price marks in valuing the purchased assets.[132]  Mr. Washtell did not consult the former Lehman employees Barclays now employed to obtain their knowledge about the positions that were acquired from Lehman.[133]  Barclays did not use or consider Lehman or BoNY price marks in valuing the Equities purchased from Lehman.[134]  In addition, Mr. Teague did not check to see if Barclays had traded in similar securities on September 19 or 22.[135]

---

16, 2010, 197:7-19.)  Mr. Teague was responsible for valuing the Rates and Credit products acquired from Lehman, including corporate, emerging markets, municipal bonds, agencies, Pine, Giants, and some securitized products. (Deposition of Sean Teague, June 30, 2010, 25:4-17.)  Mr. Washtell was responsible for valuing Equities on the Acquisition Balance Sheet.  (Deposition of Mark Washtell, June 17, 2010, 21:6-22:8.)

[130] To the extent that I did not make use of this data or expertise, I did so to conservatively calculate the Barclays Windfall and to minimize points of disagreement with Barclays.

[131] Deposition of Mark Washtell, June 17, 2010, 31:4-33:8 and 38:4-39:17; Deposition of Sean Teague, June 30, 2010, 89:17-91:16 and 94:15-95:2.

[132] Deposition of Richard Landreman, June 16, 2010, 28:3-28:9 and 95:24-96:21; Deposition of Mark Washtell, June 17, 2010, 55:25-56:15; Deposition of Sean Teague, June 30, 2010, 284:8-284:14.

[133] Deposition of Mark Washtell, June 17, 2010, 61:20-61:24 and 155:3-155:5.

[134] Deposition of Mark Washtell, June 17, 2010, 54:12-56:15.

[135] Deposition of Sean Teague, June 30, 2010, 132:20-133:4.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 15, 2010 in Chicago, Illinois.

_____

Mark E. Zmijewski

# Exhibit II-1

## Macroeconomic Indicators

Selected Equity Indices From Open to Close of Markets
on September 22, 2008

| Description | Bloomberg ID | Percentage Change from Open to Close of Market | Percentile Based on Magnitude of Percentage Change |
|---|---|---|---|
| S&P 500 Growth | SGX | -2.92% | 0% |
| Dow Jones | INDU | -3.32% | 11% |
| NASDAQ | CCMP | -3.65% | 22% |
| S&P 500 | SPX | -3.85% | 33% |
| Russell 3000 | RAY | -3.95% | 44% |
| S&P SmallCap 600 | SML | -3.98% | 56% |
| Wilshire 5000 | W5000 | -4.03% | 67% |
| NASDAQ 100 | NDX | -4.13% | 78% |
| S&P MidCap 400 | MID | -4.66% | 89% |
| S&P 500 Value | SVX | -4.81% | 100% |
| **Average** | | **-3.93%** | **42%** |
| **Median** | | **-3.97%** | **50%** |

Source: Bloomberg

# Exhibit III-1

## Sample Used for the Calculation of Actual September 19, 2008, Average Bid-Ask Spread for Equities[1]

| Condition on CUSIPs Removed | Number of CUSIPs Removed | Remaining Number of CUSIPs | | Percentage of Total CUSIPs Remaining | | Value of Remaining CUSIPs in Barclays Acquisition Balance Sheet | | Percentage of Total Value Remaining | |
|---|---|---|---|---|---|---|---|---|---|
| (1) All Non-Convert Equities | | 3,731 | [A] | 100% | [A]/[A] | $8,195,707,576 | [E][3] | 100% | [E]/[E] |
| (2) Removing CUSIPs with Any Bloomberg Prices Missing | 1,436 | 2,295 | [B] | 62% | [B]/[A] | $7,667,164,930 | [F] | 94% | [F]/[E] |
| (3) Removing CUSIPs with Negative Bid-Ask Spread[2] | 42 | 2,253 | [C] | 60% | [C]/[A] | $7,253,457,803 | [G] | 89% | [G]/[E] |
| (4) Removing CUSIPs with Percentage Spread > 50% | 147 | 2,106 | [D] | 56% | [D]/[A] | $7,210,080,706 | [H] | 88% | [H]/[E] |

Notes:

[1] Footnote 35 from the Zmijewski Report says, "Barclays classifies 4,028 CUSIPs as Equities. I restrict the sample for calculation in the following steps. First, I eliminate all convertible equities, which leaves 3,731 CUSIPs. Then, I select CUSIPs with non-negative bid price, ask price, and last price from Bloomberg, leaving 2,295 CUSIPs. Further restricting to CUSIPs with non-negative bid-ask spread, there are 2,253 CUSIPs. The final sample set is the 2,106 CUSIPs for which the ratio of the bid-ask spread to the PCG 9-19 price is ≤ 50%." The condition "non-negative" in Footnote 35 effectively serves to remove missing prices, as there are no negative Bloomberg prices.

[2] According to the Bloomberg Help Desk, negative bid-ask spreads are usually due to a data error.

[3] The valuation based on Barclays' mid-point price marks for 9-19-08 for non-convertible equities totals $8.852 billion.

Sources:
BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData); Expert Report of Mark E. Zmijewski, March 15, 2010.

# Exhibit III-2A

## Comparison of Reuters and Bloomberg Bid and Ask Prices on September 22, 2008

**Panel A: Breakdown of Sample**

| Condition | Number of CUSIPs | Percentage of Total | Value in Barclays Acquisition Balance Sheet | Percentage of Total |
|---|---|---|---|---|
| (1) CUSIPs with Reuters 9-22 Bid-Ask Spread Used by Barclays | 459 [A] | 100% [A]/[A] | $1,346,769,639 [C] | 100% [C]/[C] |
| (2) CUSIPs with Bloomberg 9-22 Bid-Ask Spread, and with Reuters 9-22 Bid-Ask Spread Used by Barclays | 449 [B] | 98% [B]/[A] | $1,302,067,277 [D] | 97% [D]/[C] |

**Panel B: CUSIPs with both Reuters and Bloomberg Bid and Ask Prices (449 CUSIPs)**

| | Reuters | Bloomberg | Percent Difference |
|---|---|---|---|
| | [E] | [F] | ([F] - [E])/[E] |
| Value based on Bid Prices | 1,361,951,255 | 1,361,952,223 | 0.0001% |
| Value based on Ask Prices | 1,366,718,054 | 1,366,719,027 | 0.0001% |

Sources:
BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData); Bloomberg.

# Exhibit III-2B

## Comparison of Reuters and Bloomberg Bid and Ask Prices on September 19, 2008

**Panel A: Breakdown of Sample**

| Condition | Number of CUSIPs | Percentage of Total | Value in Barclays Acquisition Balance Sheet | Percentage of Total |
|---|---|---|---|---|
| (1) CUSIPs with Bloomberg 9-19 Bid-Ask Spread Used in the Zmijewski Report | 2,106 [A] | 100% [A]/[A] | $7,210,080,706 [C] | 100% [C]/[C] |
| (2) CUSIPs with Bloomberg 9-19 Bid-Ask Spread Used in the Zmijewski Report, and with Reuters 9-19 Bid-Ask Spread (excluding negative and > 50% spreads) | 1,988 [B] | 94% [B]/[A] | $6,898,880,677 [D] | 96% [D]/[C] |

**Panel B: CUSIPs with both Reuters and Bloomberg Bid and Ask Prices (1,988 CUSIPs)**

| | Reuters | Bloomberg | Percent Difference |
|---|---|---|---|
| | [E] | [F] | ([F] - [E])/[E] |
| Value based on Bid Prices | 7,427,158,315 | 7,433,390,157 | 0.084% |
| Value based on Ask Prices | 7,485,727,581 | 7,460,016,190 | -0.343% |

Sources:
BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData); Bloomberg; Reuters; Expert Report of Mark E. Zmijewski, March 15, 2010.

# Exhibit IV-1
## Valuation of Equities on September 19, 2008
## Using Barclays Price Marks and Third Party Price Marks[1]

| ($ Billions) | Number of CUSIPs | Based on PCG Mid-Point Price Marks 9-19 [A] | Based on Third Party Price Marks 9-19 [B] | Percentage Difference [B]/[A]-1 |
|---|---|---|---|---|
| CUSIPs having Third Party Price Marks | 3,043 | $ 9.950 | $ 10.004 | 0.5% |
| CUSIPs without Third Party Price Marks | 985 | $ 0.065 | | |

Note:

[1] Third Party Price Marks refer to prices from either Bloomberg or Capital IQ. If both are available, the Bloomberg price is chosen.

Sources:

BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory.

# Exhibit V-1
## Comparison of JPM Roll-Forward Methodology With GFS
## Data And Third Party Price Marks 9-19[1]

**($ Billions)**

| | | |
|---|---|---|
| Value Using JPM Custodial Price Marks 9-17 | | $ 2.309 |
| Valuation Based on JPM Calculated Custodial Price Marks 9-19 Using Roll-Forward Methodology With GFS | [A] | $ 2.254 |
| Valuation Based on Third Party Price Marks 9-19 | [B] | $ 2.273 |
| Comparison of Valuation Based on Roll-Forward Methodology With GFS and Third Party Price Marks | [A]/[B]-1 | -0.83% |

Note:

[1] Third party prices are available for 485 of the 1,195 CUSIPs in the JPM Inventory.  I calculate an average third party price by CUSIP for the JPM Inventory securities using Slattery's methodology, which utilizes prices from the following sources:  Bloomberg BGN bid price, Bloomberg BVAL bid price, Interactive Data, Capital IQ, and FactSet.

Sources:

BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; LEH-NAVIGANT 000001 - 000015; Lehman GFS system data (BCI-EX-00297158.xls and BCI-EX-00297160.xls); Expert Report of Mark Slattery, March 15, 2010.

# Exhibit IX-1

## Pricing Coverage of Federal Reserve (Fed Repo)/Repo Collateral[1]
### in Bloomberg and Capital IQ

| | Fed Repo | Repo Collateral | |
|---|---|---|---|
| | By JPM 9-17 Valuation[2] | By Barclays Acquisition Balance Sheet Valuation (at Exit Price Marks)[3] | By Movants' Experts' Valuation (at Exit Price Marks)[4] |
| **Panel A: Sept 19, 2008** | | | |
| *CUSIPs with Third Party Prices Available on 9-19* | 71.6% | 76.9% | 72.2% |
| *CUSIPs without Third Party Prices Available on 9-19* | 28.4% | 23.1% | 27.8% |
| *Total CUSIPs* | **100.0%** | **100.0%** | **100.0%** |
| **Panel B: Sept 22, 2008** | | | |
| *CUSIPs with Third Party Prices Available on 9-22* | 71.6% | 76.7% | 72.0% |
| *CUSIPs without Third Party Prices Available on 9-22* | 28.4% | 23.3% | 28.0% |
| *Total CUSIPs* | **100.0%** | **100.0%** | **100.0%** |

Notes:

[1] For a definition of Repo Collateral, see Expert Report of Mark E. Zmijewski, March 15, 2010, footnote 5.

[2] Based on Market Value with Interest as of September 17, 2008, from the Fed Repo.

[3] Maturity cash adjustment of $0.196 billion to JPM inventory is not included in this analysis as CUSIP-level allocation of the adjustment is not available.

[4] Value presented in the Zmijewski, Slattery, Olvany, and Schwaba Reports, March 15, 2010.

Source:

BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData); Heller, Stephanie. "Securities listing." Email to Gerard LaRocca of Barclays with attachments, 26 Sept. 2008 (JPM-60(b)00006364); Expert Report of Mark E. Zmijewski, March 15, 2010; Expert Report of Mark Slattery, March 15, 2010; Expert Report of John Olvany, March 15, 2010; Expert Report of Joseph Schwaba, March 15, 2010; Bloomberg; Capital IQ.

# Exhibit X-1
## Percentage Difference Between Available Valuations
### BoNY, JPM, Barclays, and Movants' Experts' Valuation[1]

| Panel A ($ Billions) | Number of CUSIPs | BoNY Value | JPM Value | Percentage Difference |
|---|---|---|---|---|
| | | [A] | [B] | [A]/[B]-1 |
| CUSIPs Valued by Both BoNY and JPM | 8,047 | $ 38.858 | $ 39.363 | -1.28% |

| Panel B ($ Billions) | Number of CUSIPs | Movants' Experts' Valuation | BoNY Value | Percentage Difference |
|---|---|---|---|---|
| | | [A] | [B] | [A]/[B]-1 |
| CUSIPs Valued by Both Movants' Experts' and BoNY | 10,743 | $ 44.143 | $ 45.037 | -1.99% |

| Panel C ($ Billions) | Number of CUSIPs | Movants' Experts' Valuation | JPM Value | Percentage Difference |
|---|---|---|---|---|
| | | [A] | [B] | [A]/[B]-1 |
| CUSIPs Valued by Both Movants' Experts and JPM | 9,242 | $ 43.619 | $ 45.358 | -3.83% |

| Panel D ($ Billions) | Number of CUSIPs | Barclays Acquisition Balance Sheet Valuation | BoNY or JPM Value | Percentage Difference |
|---|---|---|---|---|
| | | [A] | [B] | [A]/[B]-1 |
| CUSIPs Valued by Both Barclays and BoNY or JPM | 11,938 | $ 44.430 | $ 51.031 | -12.94% |

| Panel E ($ Billions) | Number of CUSIPs | Barclays Acquisition Balance Sheet Valuation | Movants' Experts' Valuation | Percentage Difference |
|---|---|---|---|---|
| | | [A] | [B] | [A]/[B]-1 |
| CUSIPs Valued by Both Barclays and Movants' Experts | 11,938 | $ 44.430 | $ 49.540 | -10.31% |

Note:

[1] Barclays and Movants' Experts' Valuations are based on exit price marks. The Movants' Experts' Valuation is based on 9-19 price marks, and is presented in the Zmijewski, Slattery, Olvany, and Schwaba Reports, March 15, 2010. The BoNY value is based on 9-19 price marks. The JPM value is based on 9-17 price marks.

Source:
BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; LEH-NAVIGANT 000001 - 000015; Expert Report of Mark E. Zmijewski, March 15, 2010; Expert Report of Mark Slattery, March 15, 2010; Expert Report of John Olvany, March 15, 2010; Expert Report of Joseph Schwaba, March 15, 2010.

# EXHIBIT 13

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Lehman Brothers Holdings, Inc., et al.,<br><br><br>　　　　　　　　　　Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
| In re:<br><br><br>Lehman Brothers Inc.,<br><br><br>　　　　　　　　　　Debtor. | Case No. 08-01420 (JMP) |

### DECLARATION OF MARK E. SLATTERY

I, MARK E. SLATTERY, declare as follows:

1.     I am an independent consultant with Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc., which specializes in applying accounting, economics, and finance to business, legal, and regulatory issues.  I hold an MBA and CFA and have over 23 years of experience in the fixed income markets, including Agency and non-Agency residential

1

mortgage-backed securities ("RMBS") and other securitized products, financial modeling, risk

management, and valuation.

2.      I have been retained by counsel for the Movants in these matters.[1]  On March 15,

2010, I submitted my expert report in this matter, a document entitled "Expert Report of Mark E.

Slattery, CFA" ("Slattery Report"), which accurately sets forth my opinion.  I provided

deposition testimony on April 16, 2010.

3.      I understand counsel for Barclays Capital Inc. ("Barclays") filed a motion with

this Court dated April 20, 2010 to exclude my prospective testimony in these matters ("Barclays

Motion").[2]  This Motion incorporated a declaration issued by Professor Paul Pfleiderer dated

April 19, 2010, ("Pfleiderer Declaration") in which he purports to "examine whether Movants'

experts based the opinions they expressed in their reports and depositions on reliable data,

whether Movants' experts employed sound principles and methods in their investigations, and

whether Movants' experts applied such principles and methods in appropriate ways likely to

generate reliable findings and conclusions."[3]  This same declaration is also appended as Exhibit

A to Barclays' April 19, 2010 Opposition to Movants' Motion to Exclude the Testimony of

Professor Pfleiderer ("Barclays' Opposition").  In Barclays' Opposition, Barclays asserts that

"Professor Pfleiderer carefully examined the actual marks established by Barclays' valuation

---

[1] "Movants" refers to: (a) Lehman Brothers Holdings, Inc. (the "Debtor" or "LBHI"); (b) James W. Giddens, as Trustee for the Securities Investor Protection Act Liquidation of Lehman Brothers Inc. (the "Trustee"); and (c) the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. and its affiliated debtors and debtors in possession (the "Creditors' Committee").

[2] See Motion *In Limine* of Barclays Capital Inc. for an Order Excluding the Expert Testimony of John P. Garvey, Mark E. Slattery, Joseph Schwaba, John J. Schneider, John J. Olvany, Harrison J. Goldin, and Professor Mark E. Zmijewski, *In re: Lehman Brothers Holdings Inc., et al.*, Chapter 11 Case No. 08-13555 (JMP) and *In re: Lehman Brothers Inc.*, Case No. 08-01420 (JMP), April 20, 2010 (hereinafter referred to as the "Barclays Motion").

[3] Declaration of Paul Pfleiderer, April 19, 2010 ("Pfleiderer Declaration"), ¶3.

professionals in the ordinary course of business."[4]  Since the date of Barclays' Opposition,

certain Barclays valuation professionals—Richard Landreman and Sean Teague—have been

deposed.  I was asked by Counsel for the Movants to review and respond to both of these

depositions.  I base this Declaration on my review and analysis of the relevant documents, facts,

and data.  I was not asked to opine, and I do not opine, on any legal issues raised the in Barclays

Motion.

## I.    **OVERVIEW**

4.    In the Slattery Report, I opine that Barclays significantly undervalued 6,667 U.S.

Treasury, Agency debt, Agency and non-Agency RMBS, and other securitized products by at

least $2.38 billion.[5]  After reviewing the Barclays Motion, the Pfleiderer Declaration, and

additional information provided by Barclays to Movants since the date of my report, I reaffirm

my opinion as stated in the Slattery Report.  My opinion is based on sufficient data, is the

product of reliable principles and methods, and represents the application of these principles and

methods to the facts of the case.

5.    Most of the work supporting my opinion in the Slattery Report is not challenged

in either the Barclays Motion or Pfleiderer Declaration[6], including the accuracy of my

transaction/market data (i.e., security/deal details and underlying interest rates/volatilities), the

robustness of my analytical models (e.g., Polypaths[7], Intex[8], Andrew Davidson & Company[9]),

---

[4] Barclays' Opposition, p. 9.

[5] Expert Report of Mark E. Slattery, March 15, 2010, ¶6.

[6] Pfleiderer Declaration, ¶25 - ¶28.

[7] Polypaths is the market leader in fixed income analytics and is used by bond traders, risk managers, and portfolio managers throughout the industry.

the derivation of my mid prices, and the sourcing of the vast majority of my liquidity adjustments (i.e., the conversion of mid prices to bid prices). In fact, according to Mr. Landreman, Barclays used Polypaths and Intex in the pricing of certain securities at issue.[10]

6.      The Barclays Motion and Pfleiderer Declaration object to a limited subset of the work supporting my opinion in the Slattery Report, specifically the derivation of liquidity adjustments for U.S. Agency debt securities and Agency RMBS.[11]  Barclays applied a 5% liquidity discount to U.S. Agency debt securities, which accounts for $377 million of the $424 million undervaluation related to U.S. Treasury and Agency debt securities of the total $2.83 billion undervaluation I calculated. Barclays applied a 10% liquidity discount to Agency RMBS, which accounts for $181 million of the $728 million undervaluation related to Agency RMBS of the total $2.38 billion undervaluation I calculated.

7.      Upon review of the Barclays Motion and the Pfleiderer Declaration, I have found that the arguments in these documents misrepresent the facts, methodologies, and opinion I presented in my report. My opinion is supported by extensive experience in the valuation of fixed income securities acquired through formal training, certification, and the practical implementation of the principles and methods I applied. The models and methodologies I applied were consistent with recognized industry standards contemporaneous to the valuation date. My involvement in the markets during September 2008 was significant and directly

---

[8] Intex Solutions, Inc., is the world's leading independent provider of structured fixed-income cash flow models and related analytical software.

[9] Andrew Davidson & Co., Inc. is a leading provider of risk analytics and consulting for the RMBS and ABS markets.

[10] Deposition of Richard Landreman, June 16, 2010, 146:4-5.

[11] Pfleiderer Declaration, ¶25 - ¶28.

relevant to the work I performed.  My use of market intelligence from traders to ascertain

representative bid-ask spreads is consistent with widely accepted market practices.  My

application of a multiplier to convert "typical" to "stressed" bid-ask spreads is supported by

published research.  I am very familiar with industry standard techniques for measuring liquidity

risk and have executed projects that have incorporated these methods as a practitioner for the

purchase of at-risk securities and as a consultant.  My base of knowledge stems from over two

decades of actual market experience in varying analytical roles and is certainly not limited to a

purely theoretical, academic understanding.

## II.    <u>QUALIFICATIONS</u>

8.    The Barclays Motion suggests that I lacked any "significant personal

involvement" in the fixed income markets at the time of the transaction.  This assertion is

incorrect.  My opinion is supported by extensive experience in the valuation of fixed income

securities acquired through formal training, certification, and the practical implementation of the

principles and methods I applied, including during the September 2008 time period.  With a

career spanning over 23 years including analyzing the constituents of two non-discretionary

RMBS funds, providing consulting services to leading financial institutions, implementing

valuation and risk systems, and serving as a thrift regulator, I am highly qualified to value and

opine on the securities covered in my report.

9.    In September 2008, as a Senior Consultant with JMN Financial ("JMN"), I valued

and performed in depth analyses of non-Agency RMBS, Credit Default Swaps ("CDS") backed

by non-Agency RMBS, a portfolio of over $100 billion of Collateralized Debt Obligations

("CDOs"), and the ABX indices on behalf of global private investment syndicates.  I served as

an Assistant Portfolio Manager of a non-discretionary fund dedicated to the purchase of non-Agency RMBS.  The fund was primarily backed by pay-option adjustable rate and subprime mortgages.  I was responsible for the daily valuation and risk assessment of non-Agency RMBS as offered to JMN by a variety of Wall Street firms and regional security brokers.  My experiences and practices while in this role made me keenly aware of prevailing conditions in the RMBS markets as of September 2008.  In addition to my responsibilities as Assistant Portfolio Manager, I measured and monitored the market value and related risk exposures for a multi-million dollar portfolio of CDS backed by non-Agency RMBS.  I also produced monthly fair market valuations and sensitivity profiles for the 2006-1, 2006-2, 2007-1, and 2007-2 ABX Indices.  Furthermore, during the month of September 2008, I actively participated in the evaluation of an extensive portfolio of CDOs backed by non-Agency RMBS on behalf of an investment syndicate.

10.    Immediately prior to JMN, I served as a Senior Vice President in the Asset/Liability Management & Economics Group at LaSalle Bank Corporation (a member of the ABN AMRO Group), where the focus of my work was to enhance the Bank's valuation and risk measurement frameworks with respect to all of its mortgage investments and related lines of business.  Furthermore, I co-chaired the Mortgage Advisory Council ("MAC"), which was dedicated to ensuring that the Bank's mortgage analytical models and processes provided the most accurate valuation of mortgage assets and related lines of business.  As the co-chairman of the MAC, I spearheaded projects to determine the most appropriate term structure model, prepayment model, and basis model to utilize to value mortgage assets and related lines of business.

11.    At Quantitative Risk Management ("QRM"), I spent 8 years as the Co-Managing Director of the firm's Subject Matter Consultants.  QRM is the world's leading provider of enterprise risk management analytics.  Their client list includes 9 of the top 10 US banking companies and over 50 mortgage originators.[12]  During my tenure at QRM, I drafted the manual for the QRM Framework, the model that drove the industry to utilize stochastic simulations within their portfolio valuations and risk sensitivity metrics.  I assisted leading financial institutions with the implementation of this model to value a wide array of fixed income securities and related hedge vehicles, including RMBS, Commercial Mortgage-Backed Securities ("CMBS"), Collateralized Mortgage Obligation ("CMOs"), government and corporate-issued notes and bonds, mortgage servicing portfolios, swaps, swaptions, and futures.  These implementations involved integration of leading methodologies, deal libraries, market data sources and models including Intex, Bloomberg, and the Andrew Davidson & Company Prepayment Model ("ADCo").

12.    During my employment at the Federal Home Loan Bank of Chicago, I was a Senior Financial Analyst and a Federal Thrift Regulator.  As a Regulator, I was charged with review of the investment activities and positions of member thrift institutions.  The scope of this work included providing regulatory oversight related to the implementation of models and methodologies used by institutions to quantify and measure the value of fixed income portfolios.

13.    In 1992, I earned the right to use the Chartered Financial Analyst[®] ("CFA") designation, which demonstrates mastery of the CFA Candidate Body of Knowledge

---

[12] http://www.qrm.com/

("CBOK").[13]  The CBOK represents the core knowledge, skills, and competencies that are

generally accepted and applied by investment professionals throughout the world and is both

developed and continuously updated by active practitioners to ensure that charter holders possess

knowledge grounded in the real world of today's global investment industry.  I successfully

passed three rigorous examinations that, in part, tested my understanding of fixed income

securities valuation to earn the right to use the CFA designation.

14.    I hold a Bachelor of Arts degree in economics and a Master of Business

Administration degree in finance and accounting from Northwestern University and the Kellogg

School of Management (Northwestern University), respectively.

### III.    MID-TO-BID ADJUSTMENTS

15.    Barclays alleges that I estimated my mid-to-bid adjustments by "concocting an

unorthodox and untested technique solely for litigation purposes."[14]  This statement is simply

inaccurate.  The approach I applied is consistent with both published literature and best practices

I have observed as a practitioner and consultant in the mortgage space.

16.    In support of my assertion that the use of this technique is accepted and well

tested, I reference Dr. Frank Fabozzi, who is one of the most well-respected and widely-read

academics in the financial community.  Based on my own personal experience, Dr. Fabozzi's

books are viewed as authoritative by market participants worldwide and are commonly cited as

reliable information sources for fixed income securities valuation methods.  One of Dr. Fabozzi's

---

[13] CFA Institute.  Candidate Body of Knowledge Topical Outline.
http://www.cfainstitute.org/cfaprogram/courseofstudy/cbok/Pages/index.aspx

[14] Barclays Motion, ¶27.

books incorporated data from traders at Salomon Brothers, Lehman Brothers, and Sanford C.
Bernstein to determine bid-ask spreads in "typical" and "distressed" markets in 1997.[15]  The
study focused on the effect of illiquid markets on bid-ask spreads.  What is common to the
Fabozzi related analysis and my analysis is that both assist in quantifying the effects of illiquidity
on the fixed income market.  The data underlying the Fabozzi related analysis was informed by
and representative of the result of major stress events resulting in illiquid markets in the mid
1990's.

17.    The Barclays Motion suggests that the method I applied to convert "typical" to
"stressed" bid-ask spreads was vaguely sourced.[16]  My application of a multiplier to convert
"typical" to "stressed" bid-ask spreads is additionally supported by published research.  In fact,
my approach for adjusting fixed income pricing to reflect illiquidity in markets is widely
accepted among academics and market participants alike.  To the extent that Barclays has
challenged this approach, I would supplement my original report to reflect that the propriety of
this methodology is further evidenced by published peer reviewed research and practitioner
white papers that describe how to incorporate liquidity risk into a Value-at-Risk ("VaR")
framework, which is an extensively utilized measure of market risk within the financial
industry.[17]

---

[15] See Frank J. Fabozzi, ed., Managing Fixed Income Portfolios. New Hope:  FJF, 1997, p. 279.  Frank J. Fabozzi is
Professor in the Practice of Finance and Becton Fellow at the Yale School of Management.  Professor Fabozzi has
published numerous leading texts and academic articles in the area of securities valuation.  His extensive curriculum
vitae lists over 100 books that he authored, co-authored or edited during his 38-year career, as well as 178 articles.
His writings are considered authoritative and used extensively on Wall Street and in undergraduate and graduate
business schools.

[16] Barclays Motion, ¶30.

[17] Basel II: International Convergence of Capital Measurement and Capital Standards: A Revised Framework –
Comprehensive Version. June 2006.

18.    My use of bid-ask spread data as a means of discounting for liquidity is supported by peer-reviewed literature including a paper authored by Professors Timotheos Angelidis and Alexander Benos in January 2005[18] that illustrates how to incorporate bid-ask spread data into the valuation process.  The authors based their work on research published six years earlier in 1999 by Bangia, et al.[19]  The application of bid-ask spread data to adjust prices for liquidity risk is not a new or novel concept, but a well-established and widely-known methodology.

19.    In addition to the Angelidis and Benos January 2005 paper, Philippe Jorion, a distinguished securities valuation and risk expert, describes the practice of incorporating bid-ask spreads in valuations within the context of measuring "Liquidity-adjusted" VaR.[20]  Jorion (October 2006) discussed adjusting midpoint prices to bid prices to reflect liquidity risk in VaR. The author cites the size of the position traded (endogenous factor) and price impact for unit trade (exogenous factor) as the sources of asset liquidity risk.  In the case of U.S. Agency debt and Agency MBS, the sale of assets to Barclays represented a small fraction of the total outstanding volume of these particular markets.  According to the Securities Industry and Financial Markets Association, outstanding Treasury, U.S. Agency debt and mortgage related securities as of September 2008 totaled approximately $18.0 trillion.[21]  Treasury, U.S. Agency debt and mortgage related securities that were part of the Barclays acquisition totaled

---

[18] Angelidis, Timotheos and Benos, Alexander. Liquidity Adjusted Value-at-Risk Based on the Components of the Bid-Ask Spread. January 2005.

[19] Bangia, A., Diebold, F.X., Schuermann, T and Stroughair, J. (2001), "Modeling Liquidity Risk, With Implications for Traditional Market Risk Measurement and Management," in S. Figlewski and R. Levich (eds.), Risk Management: The State of the Art. Amsterdam: Kluwer Academic Publishers, 2002, 1-13. Published in abridged form as "Liquidity on the Outside," Risk, 12, 68-73, 1999.

[20] Jorion, Philippe, Value at Risk: The New Benchmark for Managing Risk. 3rd Ed. October 19, 2006.

[21] Securities Industry and Financial Markets Association, Outstanding U.S. Bond Market Data.

approximately $59.5[22] billion or less than 0.33% of the broader market for these securities as of

September 2008.  Therefore, the size of the position (endogenous factor) had a negligible impact

on liquidity.  The primary source of liquidity risk that existed for these particular positions was

exogenous risk.  Jorion uses bid-ask spreads as the sole measure of "exogenous" liquidity risk in

his exposition.  My approach, consistent with Jorion, correctly utilized bid-ask spreads to reflect

liquidity risk in the calculation of the value of the acquired positions.

20.    Jorion describes Treasury bonds as being "highly liquid" assets that are

characterized by deep markets.  He states that during times of market distress, there is typically a

"flight to quality" to U.S. Treasury bonds.  Therefore, "highly liquid" U.S. Treasury bonds

experience a boost in liquidity in times of market distress.  It is worth noting that U.S. Agency

bonds are viewed by market participants as having implicit government backing and therefore

also serve as a safe haven in times of crisis.  In September 2008, there was a "flight to quality"

which supported the already high liquidity of bonds with explicit and implicit U.S. Government

backing and kept bid-ask spreads of these instruments narrow.  In my experience, a 5% liquidity

discount as taken by Barclays on U.S. Agency bond prices would be excessive given the market

environment in September 2008.

21.    These citations underscore that my use of bid-ask spread data to adjust mid prices

for liquidity risk is not a new or novel concept, represents a well-established and widely-

recognized methodology.  In contrast, I have not found any academic or practitioner studies that

would support Barclays' and Professor Pfleiderer's use of haircuts in the ranges they applied

them as they attempted to mark the Lehman bonds to market prices.  The Barclays Motion

---

[22] Stated or calculated current par amount from M.102 [Dep. Ex. 86B].

alleges that I had never applied mid-to-bid adjustments to market values in the past.[23] This
allegation is completely false. I am very familiar with techniques for measuring liquidity risk
and have executed projects that have incorporated these methods as a valuation expert.

22.    In contrast to the sound and supported approach to liquidity haircuts I applied,
Barclays used a deficient construct for the bid-ask spread as described in Deposition Exhibit
814B (PWC-BarCap WP_00023327). Barclays appears to have relied upon the buy prices at one
time of day and the sell prices from another time of day to determine representative bid-ask
spreads with which to set the values of acquired assets. In addition, Barclays appears to have
applied the bid-ask spread in its entirety to adjust mid prices. Barclays failed to use half of the
bid-ask spread in their haircut process, and then incorrectly applied this haircut to mid-point
prices equal to the entire bid-ask spread, thus doubling the spread.

23.    To the extent that Barclays now seeks to challenge the use of the liquidity
adjustments that I used in my valuation in comparison to their own, I would add that in practice
the "stressed" liquidity spreads I generated were wider than actual bid-ask spreads realized in the
marketplace in September 2008. In other words, the wider the adjustments I applied to the
securities, the less value I assigned to them. In fact, according to a report[24] issued by Fannie
Mae in August/September 2009, the Agency stated that at the height of the financial crisis in
2008, the widest bid-ask spread for their debt was only 0.04% or 4 basis points as compared to
the liquidity discounts that I conservatively applied which ranged from 0.14% to 1.22% or 14 to
122 basis points. Had I used what Fannie Mae suggested it would have added $54.7 million to

---

[23] Barclays Motion, ¶27.

[24] Fannie Mae. Funding Notes. "Comparison of Fannie Mae Benchmark Notes to Investment Grade Corporate
Bonds over the Past Year". August/September, 2009.

the amount of Barclays' undervaluation.  Ultimately, my application of "stressed" liquidity

spreads was conservative relative to actual market conditions in September 2008.

24.    It is common for the liquidity of a given class of securities to vary by maturity.

For example, a ten year bond typically has a higher bid-ask spread than a one year bond.  It is

therefore crucial to consider maturity in any calculation of bid-ask spreads for U.S. Agency debt

securities.  I used market research to assign bid-ask spreads to U.S. Agency debt securities by

maturity.[25]  In contrast, Barclays assigned a 5% liquidity factor adjustment to virtually all U.S.

Agency debt securities regardless of maturity, resulting in implied yields as high as 643%.[26]

25.    The Barclays Motion also alleges that my opinion relies on estimates, not

empirical data.[27]  The framework I used to value securities was based on empirical data available

on September 19, 2008, including prices for Agency RMBS obtained from Citigroup, Credit

Suisse, Lehman Brothers and Goldman Sachs.  It is based on accepted methodologies to adapt

these prices to a broader range of mortgage instruments, a robust modeling framework that

included Polypaths, Intex, the ADCo Model, published ABX price data, and prices obtained

from independent third parties.  Based on my experience, this approach would have been

accepted as a robust approach for valuing a portfolio of fixed income securities on September 19,

2008.

---

[25] "Are Liquidity and Information Risks Priced in the Treasury Bond Market?", Li, H., Wang, J., Wu, C. and Y. He. The Journal of Finance.  2009.

[26] Expert Report of Mark E. Slattery, March 15, 2010, ¶19.

[27] Barclays Motion, ¶30.

## IV.    **FIRE SALE PRICES**

26.    The Barclays Motion suggests that I had no factual basis for testifying about fire-sale prices.[28]  In my report, I noted that Barclays appeared to use prices from ex-post dispositions in lieu of fair market prices as of the transaction date.  I also noted that "it remains unclear how many of these 'sales' were transfers within Barclays to internal trading desks and how many were legitimate third party sales."[29]  This opinion was grounded in an understanding that due to the size and nature of these positions, a rapid disposition of these assets would likely have impacted the market.  I stated that the resulting loss on these securities would "signify a 'fire sale' and/or sales to internal trading desks at deeply discounted prices."[30]  Subsequent to my deposition, Sean Teague testified for Barclays that these sales were internal transfers that occurred after September 22, 2008.[31]  So while I would dispute the assertion that my statement about fire-sale prices had no factual basis, this statement is no longer relevant as the record has shown that the transactions I referenced were indeed priced by Barclays using sales to internal desks and were therefore not representative of "fair value."

27.    On Barclays' Opening Balance Sheet[32], 828 of 1,110 or 75% of assets by count were apparently marked using internal sales prices.  In terms of the $2.38 billion undervaluation I calculated, $389 million or 16.3% of the differential is directly attributable to securities Barclays apparently valued using internal sales prices.

---

[28] Barclays Motion, ¶33.

[29] Expert Report of Mark E. Slattery, March 15, 2010, ¶48.

[30] Expert Report of Mark E. Slattery, March 15, 2010, ¶48.

[31] Deposition of Sean Teague, June 30, 2010, 146:1-25.

[32] M.102 [Dep. Ex. 86B], at BCI-EX-00099519; M.143 [Dep. Ex. 641A], at BCI-EX-(S)-00213995.

## V.    AGENCY CMOs

28.    As stated in my report, I independently valued 308 distinct Agency RMBS, which included Agency CMOs, and concluded that Barclays undervalued these securities by approximately $728 million.[33]  This $728 million undervaluation reflects a $547 million mid price differential and a $181 million liquidity adjustment differential.  In contrast to Barclays' 10% liquidity adjustment for these securities, I used empirical bid-offer spreads to derive liquidity discounts.  I also, unlike Barclays, did not use trading ranges for various securities as proxies for bid-offer spreads.

29.    The Barclays' liquidity adjustment of 10% for Agency CMOs was supported via two calculation methods.  Via Method 1, Barclays calculated the adjustment using data from the Bank of New York, Financial Times Interactive Data and internal pricing models.  According to Mr. Landreman, "it was really a dispersion analysis of pricing for the different – for the various products."[34]  Via Method 2, Barclays conducted "more of a bid/offer analysis where we showed buys and sells on the same day."[35]  Despite acknowledging in his own testimony that a bid/offer spread should reflect transactions "as close as possible to a buy and sell instantaneously," Mr. Landreman conceded that he could not prove that the transactions underlying Method 2 were, in fact, instantaneous.[36]  Ultimately, Mr. Landreman's testimony confirms that Barclays' methodology, which culminated in a 10% value reduction for Agency CMOs, was arbitrary and factually unsupportable.

---

[33] Expert Report of Mark E. Slattery, March 15, 2010, ¶28.

[34] Deposition of Richard Landreman, June 16, 2010, 165:15-16.

[35] Deposition of Richard Landreman, June 16, 2010, 166:17-19.

[36] Deposition of Richard Landreman, June 16, 2010, 166:21.

30.     According to Mr. Landreman, the data used by Barclays to determine the liquidity factor adjustments for Agency CMOs was "limited."[37]  Barclays applied a liquidity factor adjustment derived from a sample consisting primarily of Inverse IOs to assets that according to the same research were more liquid products.  Mr. Landreman acknowledged that Inverse IO products are less liquid than other types of Agency CMO products.[38]  In contrast, I did not apply the liquidity factor adjustment for one type of product to a wide array of dissimilar products.  I used a more granular approach that correctly varied the liquidity factor adjustment according to the specific Agency CMO product type.

31.     According to Mr. Landreman, Barclays' valuation procedures do not in the normal course of business include a liquidity adjustment.[39]  He noted that his team would normally receive marks from the traders and test these marks for validity.[40]  The process Barclays used to value the assets acquired from Lehman however was unique.  Rather than test prices from traders, Mr. Landreman's team valued securities with a series of as-of dates, then constructed liquidity adjustments.[41]  These liquidity adjustments were only applied to the Opening  Balance Sheet, while other similar securities on Barclays balance sheet reflected no such liquidity adjustment.[42]

---

[37] Deposition of Richard Landreman, June 16, 2010, 170:5-6

[38] Deposition of Richard Landreman, June 16, 2010, 170:10-13.

[39] Deposition of Richard Landreman, June 16, 2010, 157:5-14.

[40] Deposition of Richard Landreman, June 16, 2010, 156:3-15.

[41] Deposition of Richard Landreman, June 16, 2010, 104:6-21, 110:2-10.

[42] Deposition of Richard Landreman, June 16, 2010, 157:5-14.

32.    Mr. Landreman contends that Barclays used an option adjusted spread ("OAS") model to estimate the value of Agency CMOs.[43]  He conceded that spreads Barclays applied to Agency CMO products were not compared for reasonableness against spreads available from third-party broker/dealers.[44]  Mr. Landreman also conceded that he did not leverage the use of third-party price quotes from broker/dealers to inform his valuations.[45]  In contrast, my methodology incorporated appropriate price quotes from broker/dealers to calculate mid-prices for Agency CMO products.  Mr. Landreman acknowledged that he did not use widely-available Trust IO and PO price quotes from broker/dealers to inform his estimates of Structured IO and PO values.[46]  In contrast, I used a well-known, theoretically-sound methodology known as the "breakeven method"[47] to accurately calculate the value of Structured IO and PO positions based on comparable Trust IO and PO prices.

## VI.    PINE CLO

33.    The Barclays Motion does not challenge my opinion that the Pine CCS CLO was undervalued by $388.7 million.[48]  This is reasonably supported by Barclays own valuation-related actions when it reported its year end valuation as of December 2008.  At that time,

---

[43] Deposition of Richard Landreman, June 16, 2010, 172:2.

[44] Deposition of Richard Landreman, June 16, 2010, 172:19-22.

[45] Deposition of Richard Landreman, June 16, 2010, 173:3-8.

[46] Deposition of Richard Landreman, June 16, 2010, 173:9-13.

[47] Expert Report of Mark E. Slattery, March 15, 2010, footnote 15.

[48] Expert Report of Mark E. Slattery, March 15, 2010, ¶54.

Barclays increased the carrying value of Pine from $429 million to approximately $708 million.[49]

 

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 15, 2010 in Chicago, Illinois.

_____

Mark E. Slattery

[49] M.310 at BCI-EX-00297320.xls

# EXHIBIT 14

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS, INC., *et al.,*<br><br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
| In re:<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) |

## DECLARATION OF JOSEPH SCHWABA

I, JOSEPH SCHWABA, declare as follows:

1.    I am an Independent Contractor with Navigant Economics, a subsidiary of

Navigant Consulting, Inc.  I have over thirty years of experience in fixed income and

derivative markets trading and risk management.  Presently, I own an institutional

advisory business focusing on market-based risk management, which includes managing

a wide range of projects related to fixed income and derivative products, as well as

providing expert testimony.  Previously, I was a Director of Corporate Risk Management

at the Federal Home Loan Bank – Pittsburgh.  Prior to that position I managed successful

businesses in the fixed income and derivative markets at firms such as AG Becker (since

merged into Merrill Lynch), Prudential–Bache Securities (now Prudential Financial), and

Continental Bank (since acquired by Bank of America). I have been retained by counsel

for the Movants in these matters.[1]

2.      On March 15, 2010, I submitted my Expert Report in this matter; a

document entitled "Expert Report of Joseph Schwaba," which accurately sets forth my

opinion in this matter. I provided deposition testimony on April 12, 2010.

3.      I understand counsel for Barclays Capital Inc. ("Barclays") filed a motion

with this Court dated April 20, 2010 to exclude my prospective testimony in these

matters ("Barclays Motion").[2]  In addition, in support of Barclays Motion at Exhibit D, is

a declaration issued by Professor Paul Pfleiderer dated April 19, 2010 ("Pfleiderer

Declaration") in which he purports to "examine whether Movants' experts based the

opinions they expressed in their reports and depositions on reliable data, whether

Movants' experts employed sound principles and methods in their investigations, and

whether Movants' experts applied such principles and methods in appropriate ways likely

to generate reliable findings and conclusions."[3]  This same declaration is also appended

as Exhibit A to Barclays' April 19, 2010 opposition to Movants' motion to exclude the

testimony of Professor Pfleiderer.  ("Barclays' Opposition"). In Barclays' Opposition,

---

[1] "Movants" refers to: (a) Lehman Brothers Holdings, Inc. (the "Debtor" or "LBHI"); (b) James W. Giddens, as Trustee for the Securities Investor Protection Act Liquidation of Lehman Brothers Inc. (the "Trustee"); and (c) the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. and its affiliated debtors and debtors in possession (the "Creditors' Committee").

[2] See Motion *In Limine* of Barclays Capital Inc. for an Order Excluding the Expert Testimony of John P. Garvey, Mark E. Slattery, Joseph Schwaba, John J. Schneider, John J. Olvany, Harrison J. Goldin, and Professor Mark E. Zmijewski, *In re: Lehman Brothers Holdings Inc., et al.*, Chapter 11 Case No. 08-13555 (JMP) and *In re: Lehman Brothers Inc.*, Case No. 08-01420 (JMP), April 20, 2010 (herein after referred to as the "Barclays Motion").

[3] Pfleiderer Declaration, ¶ 3.

Barclays asserts Professor Pfleiderer carefully examined the actual marks established by Barclays' valuation professionals in the ordinary course of business.[4] Since the date of Barclays' Opposition, three of Barclays' valuation professionals—Richard Landreman, Mark Washtell, and Sean Teague—have been deposed. I was asked by Counsel for the Movants to review and respond to all of the above. I base this Declaration on my review of the relevant documents and analysis of relevant facts and data. I was not asked to opine, and I do not opine, on any legal issues raised in Barclays' Motion.

4.    As noted above, I have over thirty years experience in the fixed income capital and derivatives markets, including senior management positions at Prudential Bache Securities, Continental Bank, Federal Home Loan Bank – Pittsburgh, and as an independent consultant. This experience includes involvement in the management, valuation, and risk management activities of a municipal trading and dealer business, and the design of a global risk analysis system for senior managers, among other activities. While at Federal Home Loan Bank – Pittsburgh my responsibilities included overseeing market-based risk management, income forecasting and analysis, and being a voting member of the Bank Asset Liability Committee ("ALCO"), among other activities. This array of experience qualifies me to offer this independent valuation.

## I.    AUCTION RATE SECURITIES

5.    In the Motion, Barclays complains that I valued 20 auction-rate securities at par that had failed at auction instead of valuing them at a discount to par to account for the failed auction process for these bonds:

---

[4] Barclays' Opposition, pages 3-4.

> Movants offer the testimony of Joseph Schwaba for the proposition
> that Barclays undervalued 26 securities by approximately $150
> million. Twenty of those 26 securities were auction-rate securities
> that Mr. Schwaba valued *close to*, *at, or above* par. Mr. Schwaba's
> methodology for valuing those securities was flawed in that it
> utterly failed to take into account the fact that he was valuing
> auction-rate securities that had failed at auction, even though he
> acknowledged in his report that failed auction-rate securities
> "would trade *below* par."[5]

6.      The Motion contains inaccurate assertions about my valuation of the

auction rate securities as a subset of the Municipal Bond Portfolio and the basis of my

opinion.  These inaccurate assertions mischaracterize my opinion on the value of these

auction rate securities at the time of the Sale Transaction.

7.      As a threshold matter I was asked questions by counsel in my deposition

in this matter about auction rate securities, having been asked to adopt a definition for

auction rate securities that equated auction rate securities to adjustable rate securities.

The question I was asked and answered is as follows:

> Q: So can we agree on a definition of "Auction Rate Securities" as
> adjustable rate securities whose adjustable rate is determined
> through an auction process?
> A: I would accept that.[6]

8.      In answering this question and subsequent questions I understood

Barclays' counsel to be asking me to equate auction-rate securities with adjustable rate

securities and my responses were based upon that understanding.  This may have resulted

in Barclays' confusion as to the manner in which auction rate securities factored into my

---

[5] Barclays' Motion, ¶ 34.

[6] Deposition of Joseph M. Schwaba, April 12, 2010, 31:3-7.

analysis.[7]  To be clear, auction rate securities are a type of adjustable rate securities but not all adjustable rate securities are auction rate securities.

9.      As explained in my Expert Report, I performed an independent valuation of the 26 municipal bonds that Barclays acquired.[8]  Of these 26 bonds, 21 were a type of adjustable rate bond, 3 were zero coupon bonds and 2 were fixed rate bonds.[9]

10.      Of the 21 adjustable rate bonds, 9 were auction rate securities (7 unique cusips).  I priced these 9 auction rate securities at or near par (i.e. 100 cents on the dollar).  I priced them in accordance with my methodology, as defined in Appendix III of my Expert Report, which calculated a mean price from a set of proxy bonds to arrive at an estimated market price for each adjustable bond.  Comparable securities were selected on the basis of credit rating, issuer location and maturity.  Barclays incorrectly priced these same 9 securities at 80 cents on the dollar.  These 9 securities account for $25,520,000 of the $150 million undervaluation that I calculated.

## II.     OTHER ADJUSTABLE RATE SECURITIES

11.      Of the 12 remaining adjustable rate bonds, 10 were variable rate demand obligations, 1 was a hybrid adjustable rate bond and 1 was a conventional floating rate bond.  Of the 10 variable rate demand obligations, Barclays priced 5 incorrectly at .0001

---

[7] At my deposition, I was asked by Counsel for Barclays to recall or estimate both the number of comparables that were failed auction rate securities as well as the number of Lehman municipal bonds valued by me that were auction rate securities.  The estimates I provided were from memory and my answers did not differentiate failed auction rate securities as a subset of adjustable rate securities.

[8] Expert Report of Joseph Schwaba, March 15, 2010, ¶ 9.

[9] I priced them in accordance with my methodology, as defined in Appendix III of my Expert Report, which priced the bonds based on a spread to LIBOR, determined through the review of spreads on comparable bonds that traded on September 19, 2008. These account for $7,232,803 of Barclays' $150 billion undervaluation that I calculated.

cents on the dollar. These 5 securities account for $43,295,287 of the $150 million undervaluation. As further discussed below, Barclays acknowledges that it's pricing of these securities at .0001 were an oversight. The other 5 variable demand obligations were priced incorrectly by Barclays at 80 cents on the dollar. These account for $11,678,955 of the $150 million undervaluation.

12.    I valued these 10 variable rate demand obligations at or around par. I priced them in accordance with my methodology, as defined in Appendix III of my Expert Report, which calculated a mean price from a set of proxy bonds to arrive at an estimated market price for each adjustable bond. Comparable securities were selected on the basis of credit rating, issuer location and maturity.

13.    The hybrid adjustable rate bond was priced incorrectly by Barclays at 80 cents on the dollar. I priced this hybrid adjustable bond according to the bond's underlying risk characteristics and consistent with comparable securities trading in the market and valued it at 86.99. This accounts for $862,648 of the $150 million undervaluation that I calculated.

14.    The conventional floating rate bond was priced incorrectly by Barclays at .0001 cents on the dollar. I priced this conventional floating rate bond according to the terms in the Official Statement and consistent with comparable securities trading in the market and valued it at 81.78. This accounts for $61,335,750 of the $150 million undervaluation.

15.    Subsequent to my deposition, I was able to review the Deposition of Sean Teague,[10] dated June 30, 2010.  In his deposition, Mr. Teague states that it was in fact the traders in Barclays' front office who priced municipal securities.[11]  Furthermore, Sean Teague testified that he disregarded the marks of an independent third party ("Interactive Data Corp.") in favor of prices obtained through an unsubstantiated process devised by Barclays' traders.[12]  Significantly, independent third party data was available for all of the 26 bonds, and using the third party data alone, would result in a valuation that is greater than Barclays' valuation by $131,782,520.  Indeed, any information used by Barclays' front office traders that substantiates Barclays' claim regarding the prices of the 26 acquired municipal bonds has not been provided through discovery that I am aware of to date.  Consequently, there is no reason to believe that the values Barclays assigned to these securities are representative of prices from arms-length transactions.

16.    Moreover, some of the values assigned by Barclays – notably the values of .0001 they lifted from the Bank of New York ("BoNY") valuations for 7 of the bonds – apparently were "place holders" that were never updated.[13]  When asked in deposition about the municipal securities priced by Barclays priced at .0001, Mr. Teague acknowledges these prices as an "oversight" and also alludes to the fact that my expert

---

[10] Mr. Teague testified in his deposition that he had worked at Barclays' for five years and currently served as Barclays' Director of Fixed Income and Credit Price Testing.  Deposition of Sean Teague, June 30, 2010, 6:10-14 and 7:7-11.

[11] Deposition of Sean Teague, June 30, 2010, 165:25-166:10.

[12] Deposition of Sean Teague, June 30, 2010, 165:5-21.

[13] Deposition of Sean Teague, June 30, 2010, 166:11-20.

report made him aware of Barclays' mistake.[14] It should be noted that this "oversight" alone is responsible for about $60,000,000 of the $150,000,000 undervaluation.

17.    In my Expert Report dated March 15, 2010, in Appendix III paragraph 30 I state that "Failed ARS would trade below par and may be subject to restricted liquidity."[15] This statement incorrectly characterizes my opinions regarding failed auction rate securities.  As stated in my deposition, when asked if "auction rate securities that have failed at auction would trade below par," I respond correctly that "They could trade below par, but not necessarily."[16] This statement correctly characterizes my opinion regarding failed auction rate securities.  A failed auction does not necessarily affect the value of a security because it does not mean that the security is bad or that the underlying strength of the security has changed.

18.    The Motion ignores and mischaracterizes my testimony at deposition in responding to a hypothetical question that it is *possible* – but not certain – that auction-rate securities subject to a failed auction would also be subject to restricted liquidity:

> Q. Would it be fair to say that auction rate securities that failed at auction may be subject to restricted liquidity?
> MR. TAMBE: Objection to form.
> A. Would it be fair -- is your question would it be fair to say that they could be?
> Q. No. Would it be fair to say that auction rate securities that failed at auction may be subject to restricted liquidity?
> MR. TAMBE: Objection to form.
> MR. DAKIS: Same objection.
> A. That's a possibility, yes. It may --that may happen. It could happen.
> Q. Would you expect it to happen?
> A. I would -- not necessarily based on our analysis.

---

[14] Deposition of Sean Teague, June 30, 2010, 167:3-23.

[15] Expert Report of Joseph Schwaba, March 15, 2010, ¶ 30.

[16] Deposition of Joseph Schwaba, April 12, 2010, 23:17-19.

Q. And what analysis precisely is that, sir?
A. The prices of market traded securities as it relates to auction rate securities who both -- both failed and didn't fail.[17]

19.    From the universe of adjustable rate securities[18] that traded on September 19, 2008, and using Bloomberg reported auction history, I was able to identify 93 out of 157 auction rate securities that traded on September 19, 2008 and experienced a failed auction on or before September 19, 2008. All of these securities that had experienced a failed auction previously traded at par for September 19, 2008.[19] This data is fully consistent with the opinion I express in my Expert Report. At the very least, this data does not support Barclays' contention that auction rate securities that have experienced prior auction failures must be priced at a significant discount to par. No such conclusion can be drawn absent careful consideration of each bond's individual characteristics, as I did in my Expert Report.

20.    In its Motion, Barclays states:

> Twenty of those 26 securities were auction-rate securities that Mr. Schwaba valued close to, at, or above par. Mr. Schwaba's methodology for valuing those securities was flawed in that it utterly failed to take into account the fact that he was valuing auction-rate securities that had failed at auction, even though he acknowledged in his report that failed auction-rate securities "would trade below par."[20]

---

[17] Deposition of Joseph M. Schwaba, April 12, 2010, 41:2-22.

[18] Expert Report of Joseph Schwaba, March 15, 2010, ¶ 17.

[19] Bloomberg receives pricing and market disclosure data from the Municipal Securities Rulemaking Board's ("MSRB") Electronic Municipal Market Access database ("EMMA"): "Trade data made available by the MSRB provides price transparency to the municipal market and facilitates market surveillance. The MSRB is the only comprehensive source of data on the more than 40,000 daily municipal market transactions, this data is crucial to promoting the fair pricing of municipal securities transactions. The MSRB also provides all transaction data to municipal securities regulators charged with market surveillance, inspection for compliance and enforcement of MSRB rules", (http://www.msrb.org/Market-Disclosures-and-Data/Access-Data/Trade-Data.aspx).

[20] Barclays' Motion, ¶ 34.

21.    Neither Barclays nor Professor Pfleiderer has provided any justification for a discounted value for the bonds I priced nor have they offered any theory as to why such a discount would necessarily follow from a failed auction process. Further, my testimony at deposition was that such a discount was possible, not that it was warranted as to these particular bonds, whether or not they previously had been subject to a failed auction process.[21]

## III.    REPLY TO BARCLAYS' CRITICISM OF THE USE OF MODELS IN ARRIVING AT MY VALUATIONS

22.    Barclays argues the following in its Motion:

> Mr. Schwaba purports to have used models to derive these valuations, but admitted at deposition that he did not personally examine the models and was not familiar with how the models used worked. Indeed, Mr. Schwaba entirely failed to even recognize one of the models produced as backup for one or more of his valuations.[22]

23.    In my thirty plus years of experience in the trading, pricing, valuation, and risk management of fixed income instruments I have personally developed my own model, used investment bank proprietary models, as well as many other industry standard modeling products including, for example, the models of QRM. QRM is an industry standard fixed income pricing model service provider that employs models similar to those used here and provides them to many of the world's largest commercial and

---

[21] In my Expert Report dated March 15, 2010, in Appendix III paragraph 30 I did write "Failed ARS would trade below par and may be subject to restricted liquidity". I intended to communicate that a failed auction rate security could trade below par.

[22] Barclays' Motion, ¶ 40.

investment banks. I also used fixed income pricing models as a professional within the Federal Home Loan Bank System.

24.      I worked with staff at my direction to employ valuation models to supplement my analysis of the Barclays bonds at issue. While I instructed the staff as to particular inputs, they actually ran the models to produce the pricing output. This is similar to how I operated with modeling staff within the investment banks and at Federal Home Loan Bank – Pittsburgh. Most fixed income pricing models have similar characteristics in that they employ discounted cash flow calculations and incorporate calculations of the probability of credit default and recovery rates. The models I used share these common characteristics and are recognized as industry standard models.[23] I am amply familiar with fixed income pricing models to understand the results of the modeling efforts undertaken by my staff.

25.      Finally, Barclays refers in its motion to my not having recognized a document related to pricing models that Barclays believed I used and that I was shown in my deposition (Exhibit 700), was asked about, and didn't recognize. While Exhibit 700 does appear to reflect output from a computerized pricing model it is not related to my analysis and I was therefore not able to answer questions about it. I have since reconfirmed that this document is unrelated to my analysis.

26.      In summary, the testimony that I have provided to the Court is reliable, correct, and sound practice vis-à-vis this subset of the Municipal Bond Portfolio. The methods and extensive analysis that I have employed in my valuation are based on a detailed understanding of the securities, my experience in valuing and managing the risk

---

[23] See a more detailed description of Chicago Partners pricing models in the Expert Report of Mark E. Slattery, CFA at Appendix III.

of these types of securities in the normal course of my broad and long career in the fixed

income markets, market inputs and evaluation of comparable securities. All of the

market information that I employed in my independent valuation of the securities was

available to a market participant at the time of the Sale Transaction.


**IV.    REPLY TO BARCLAYS' CRITICISM OF THE FAILURE TO USE
FAILED AUCTION RATE SECURITIES AS COMPARABLES**

27.    Barclays argues the following in its Motion:

> Moreover, Mr. Schwaba derived his valuations for these securities by
> looking at 152 transactions involving purportedly comparable securities
> that he selected. But Mr. Schwaba was unable to identify which of his
> comparables were auction-rate securities and had no idea which, if any,
> were failed auction-rate securities. As a result, in selecting the
> comparables that he used to value failed auction-rate securities at or
> above par, Mr. Schwaba completely failed to consider a key factor that
> he himself admitted (correctly) would have caused those securities to
> trade below par.[24]

28.    At my deposition, counsel for Barclays asked questions regarding my

selection of comparable securities. Subsequent to my deposition dated April 12, 2010, I

have conducted additional analysis that treats as comparables the 93 auction rate

securities with previously failed auctions for which MSRB recorded transaction prices as

of September 19, 2008. As noted in paragraph 19 *supra*, all of these securities traded at

par. Furthermore, four[25] of the 93 failed auction rate security comparables trading on

September 19, 2008 were also part of the Lehman Municipal Bond Portfolio transferred

to Barclays as part of the Sale Transaction, and were correctly priced at 100 cents on the

---

[24] Barclays' Motion, ¶ 38.

[25] These four securities are: 649842BM2, 649842BN0, 649842CE9 and 930868BL7.

dollar by Barclays. Additionally, nine[26] other auction rate securities that were part of the Lehman Municipal Bond Portfolio transferred to Barclays as part of the Sale Transaction did not show MSRB traded prices on September 19, 2008. However, Barclays *also* priced these correctly at 100 cents on the dollar. Using the universe of all 93 failed auction rate securities as comparables for the 9 auction rate securities that I valued in this transaction justifies adjusting the values of these 9 securities to 100 cents on the dollar. This adjustment results in a decreased market value differential of $182,789 (less than 1%) between my original market value and my updated opinion. [27]

29.    I declare under penalty of perjury that the foregoing is true and correct.


Submitted by,

Joseph Schwaba
July 15, 2010


---

[26] These nine securities are: 162362FR3, 254839M34, 254839UE1, 544712VD1, 544712VJ8, 584631AX3, 639672XJ8, 649713CF9 and 649713CH5.

[27] In my valuation analysis and consideration of comparable securities, I identified 157 auction rate securities that traded on September 19, 2008. Of these 157 securities, 93 were auction rate securities that had previously failed auction. All 157 securities, including the 93 failed auction rate securities, traded at par on September 19, 2008. As noted above, of the 21 adjustable rate securities I valued, 12 consisted of 10 variable rate demand obligations, 1 conventional floating rate bond and 1 hybrid adjustable rate bond. These 12 securities had a notional value of approximately $189,000,000. The 9 auction rate securities I valued had a notional value of approximately $127,000,000. As discussed in paragraph 14 above, my deposition testimony allowed for the general possibility that a failed auction rate security could trade below par, not necessarily these specific 9 securities.

# EXHIBIT 15

Contains Highly Confidential Information

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

               Debtors.

Chapter 11

Case No. 08-013555

(Jointly Administered)

**Expert Report of**

**Mark E. Slattery, CFA**

**March 15, 2010**

MOVANTS' TRIAL
EXHIBIT

155

**Contains Highly Confidential Information**

# Table of Contents

I.      Introduction.........................................................................................1

II.     Scope of Analysis Performed.................................................................1

III.    Summary of Qualifications....................................................................3

IV.     Summary of Opinion............................................................................4

V.      Opinion and Basis Thereof...................................................................5

  A.    Barclays undervalued 125 U.S. Treasury and Agency debt Securities by $424
        million..............................................................................................6

     1) Barclays took a 5% across-the-board liquidity discount on
        U.S. Agency debt securities without considering the
        maturity of each individual instrument; this resulted in
        implicit and indefensible annualized yields as high as
        643.4%..........................................................................................6

     2) In contrast to Barclays' generic approach, I valued U.S.
        Treasury and Agency securities using either actual,
        observable price quotes or by discounting each security-
        specific structured cash flow by actual, observable
        comparable market yields.................................................................9

  B.    Barclays undervalued 308 Agency RMBS by $728 million................................10

     1) Neither Barclays, nor its expert Professor Pfleiderer,
        provided any detailed model documentation or analysis to
        support the values they ascribe to these securities. .................................11

     2) Barclays apparently calculated liquidity discounts using
        differences between purchase and sales prices, which
        provided no description as to the source,  the time of day
        for which they were provided, or whether the prices were
        actual traded prices, bids, offers, or price indications. .............................11

     3) In contrast to Barclays' modeling approach, I valued these
        securities   using a pricing framework that accounted for
        the variability of potential outcomes by incorporating
        prepayments under multiple interest rate scenarios to
        capture the value associated with embedded options.............................14

  C.    Barclays undervalued 162 non-Agency RMBS by $387 million. ......................14

     1) Barclays did not provide detail or support for its valuation
        of non-Agency RMBS...................................................................15

     2) The Pfleiderer report accepts Barclays' use of sales prices
        obtained after September 22, 2008 in valuing non-Agency
        RMBS despite Professor Pfleiderer's acknowledgement

**Contains Highly Confidential Information**

that "as a general matter, one must use ex post outcomes
with considerable care." ........................................................................ 15

    3)    Contrary to Barclays' ad hoc approach, my approach for
valuing credit sensitive non-Agency RMBS was consistent
with industry practice. ............................................................ 17

D.    Barclays undervalued 6 CLOs (excluding the Pine CLO) by $12 million. .......... 18

    1)    Barclays' values as of September 19, 2008, were very
similar to the values that I calculated; however, Barclays
failed to demonstrate any basis or analytical justification
for taking a 21% discount to arrive at their exit value. ........................... 19

E.    Barclays undervalued the Pine CCS CLO by $389 million................................ 19

    1)    Barclays materially misunderstood the structure of Pine,
apparently concluding that Pine had the typical structure
of a "revolver" CLO. ............................................................... 19

    2)    In deriving its valuation, Barclays failed to recognize the
inverted structure of the CLO and its own senior position
within that structure.................................................................. 21

    3)    Barclays inappropriately applied a 20% "participation"
discount when valuing the underlying collateral..................................... 21

    4)    Professor Pfleiderer performed little to no due diligence
when reviewing Barclays' valuation of Pine.......................................... 22

F.    Barclays undervalued 30 CDOs and CMBS by $22 million. .............................. 23

G.    Barclays undervalued 6,035 other CUSIPs by over $400 million. ...................... 24

**Contains Highly Confidential Information**

## List of Appendices

Appendix I    Curriculum Vitae

Appendix II    Documents Relied Upon

Appendix III    Description of Dynamic Pricing of Agency RMBS and Related Model Components

Appendix IV    Description of Valuation of Credit Sensitive non-Agency RMBS

**Contains Highly Confidential Information**

## I.    INTRODUCTION

1.    This report is submitted by Mark E. Slattery.  I am an independent consultant with

Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc.,

which specializes in applying accounting, economics, and finance to business

consulting, legal, and regulatory issues.  My qualifications are detailed in Section III and

my Curriculum Vitae is included in Appendix I.

2.    I have prepared this report at the request of Movants' Counsel.  In this report, I set

forth subject matter on which I expect to testify, including the substance of the facts and

opinions on which I expect to testify, and summarize the foundations for each opinion.[1]

As cited within the text and footnotes of this report and/or Appendix II to this report, I

have reviewed various documents to prepare this analysis.

## II.    SCOPE OF ANALYSIS PERFORMED

3.    I have been asked by counsel to value certain securities in connection with

Barclays' acquisition ("the Acquisition") of certain Lehman Brothers Holdings Inc.

("LBHI") and Lehman Brothers Inc. ("LBI") assets.

4.    As an initial matter, in my evaluation of the information available to value the

securities Barclays acquired, I observed certain valuation issues highlighted by

---

[1] Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order.  In re Lehman Brothers Holdings Inc., et al., Debtors Case No. 08-13555 (JMP) (Bankr. S.D. N.Y. Sept. 15, 2009).
The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), (Bankr. S.D. N.Y. Sept. 15, 2009).
Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief (Bankr. S.D. N.Y. Sept. 15, 2009).

---

**Contains Highly Confidential Information**

substantial divergences between Barclays' acquisition price and that of Barclays' custodial bank, the Bank of New York ("BoNY"). BoNY is a premier custodian in the U.S. marketplace and is subject to extensive regulations and contractual obligations.[2] As such and in light of the substantial divergences, I have identified securities where the absolute value of the difference between Barclays' valuation for any given security and BoNY's valuation exceeded $1 million. In my experience, a valuation difference this significant should have triggered further investigation. These pricing differences included 632 securities, for which I performed an in-depth analysis and valuation. I present valuations based on third party pricing sources for approximately 6,035[3] securities acquired by Barclays in addition to the 632 security valuations.

5.      I calculated the fair value of a total of 6,667 securities acquired by Barclays in the Acquisition. My independently calculated values are based on a robust valuation framework, state of the art models and data libraries customarily used by market participants, including Barclays itself, and are supported by currently available empirical research of the actual market conditions and pricing information that was available to Barclays at the time of its valuations. For the securities that were not part of my independent value calculations, I assigned unbiased prices collected from independent third party market pricing sources.

6.      Barclays' estimated values were based on arbitrary and indefensible discounts taken by Barclays. Indeed, Barclays employed certain valuation techniques in the Acquisition that massively undervalued acquired assets. As a result of this flawed

---

[2] See Expert Report of John Schneider.
[3] In the case of 40 securities, where Barclays failed to provide information related to the particular security, and where I was able to obtain third party pricing information but unable to obtain information other than third party pricing, I performed valuations based on third party pricing.

**Contains Highly Confidential Information**

process, Barclays significantly undervalued the aforementioned securities by at least $2.38 billion.[4]

7.      Navigant Economics (Chicago Partners) charges an hourly rate of $500 for my time.  Other Navigant Economics (Chicago Partners) professionals, working under my direction and supervision, assisted in my analysis and they will be compensated for their work at their customary hourly rates.  Our compensation is not contingent in any way on the outcome of this matter.

8.      The remainder of the report is organized as follows:  Section III summarizes my qualifications and the qualifications of my team; Section IV summarizes my opinion; Section V details my opinion and provides the bases thereof.

III.    <u>**SUMMARY OF QUALIFICATIONS**</u>

9.      My present position is Independent Consultant at Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc.  Navigant Economics (Chicago Partners) specializes in consulting in the areas of accounting, economics, and finance.  I am a Chartered Financial Analyst and my areas of expertise include residential mortgage investments, financial modeling and risk management.

10.     Prior to joining Navigant Economics (Chicago Partners), I was a Senior Vice President in the Asset/Liability Management & Economics Group at LaSalle Bank Corporation (a member of the ABN AMRO Group), specializing in residential mortgage analytics and investment portfolio activities.  Before joining LaSalle Bank, I spent 8 years as the Co-Managing Director of the Subject Matter Consultants at Quantitative

---

[4] I have reviewed the available data regarding market conditions from the close of business in the United States on Friday, September 19, 2008 to the opening of business in the United States on Monday, September 22, 2008 and have concluded that my valuations that are based on closing prices on September 19, 2008 would not change materially if rolled forward to September 22, 2008.

**Contains Highly Confidential Information**

Risk Management, specializing in consulting on the modeling and valuation of a wide array of fixed income securities and related hedge vehicles.  Previous to joining QRM, I worked as a Thrift Regulator and Senior Financial Analyst for the Federal Home Loan Bank of Chicago, specializing in the oversight of capital markets activities of member institutions.

11.    The team that has supported me includes fixed income and mortgage securities valuation professionals with extensive experience at major financial institutions.  My team has significant experience in trading fixed income securities and valuing them for financial reporting purposes.  I have worked with these team members previously to analyze and value other similar products.

## IV.    SUMMARY OF OPINION

12.    In this section of my report, I summarize my opinion.  In the remaining sections of the report, I provide the substance of the facts and opinion of which I expect to testify, and the bases for this opinion.  I reserve the right to supplement my analysis in response to any newly produced evidence or in rebuttal to any further opinions offered by Barclays' witnesses.  I also reserve the right to do a more comprehensive CUSIP-by-CUSIP valuation, if necessary, of those securities I did not independently value for purposes of my report.

### Opinion 1: Barclays undervalued 6,667 securities acquired by Barclays from LBHI and LBI by at least $2.38 billion.

13.    As detailed in Table 1 below, I have replicated the results from Professor Pfleiderer's Table 1 analysis[5] by comparing my own valuation results with Barclays' valuation results.

---

[5] Expert Report of Professor Pfleiderer, ¶53.

**Contains Highly Confidential Information**

| Table 1: Summary of Valuation Differences for All Valuations (amounts in millions of dollars) | | | |
|---|---|---|---|
| Replication of Professor Pfleiderer Table 1 Report Category | Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| Residential Mortgage Backed Securities | 3,834 | $12,620 | $13,561 | $941 |
| Corporate Bonds | 501 | $1,119 | $1,111 | -$7 |
| Emerging Markets | 69 | $225 | $224 | $0 |
| Equities | | | | |
| Rates | 1,154 | $14,507 | $14,983 | $476 |
| Principal Mortgage Trading Group | 1,109 | $2,064 | $3,036 | $972 |
| Total | 6,667 | $30,534 | $32,915 | $2,380 |

## V.    OPINION AND BASIS THEREOF

14.    This section discusses my opinion and the bases of my opinion.

**Opinion 1: Barclays undervalued 6,667 securities acquired by Barclays from LBHI and LBI by at least $2.38 billion.**

15.    Barclays undervalued U.S. Treasury and Agency debt securities, Agency and non-Agency Residential Mortgage-Backed Securities ("RMBS"), Collateralized Loan Obligations ("CLOs"), Collateralized Debt Obligations ("CDOs"), Commercial Mortgage-Backed Securities ("CMBS") and other securities acquired from LBHI & LBI by an amount of at least $2.38 billion.  As detailed in Table 1 above, I have replicated the results from Professor Pfleiderer's Table 1 analysis[6] by comparing my own valuation results with Barclays' valuation results.

16.    In the following section of the report, I describe the valuation results from each of the categories identified in Table 2, below.  These descriptions correspond to the order in which the securities are described in Table 2.  The total undervaluation described in my Table 2 equals the total undervaluation in Table 1.

---

[6] Expert Report of Professor Pfleiderer, ¶53.

---

**Contains Highly Confidential Information**

| Table 2: Summary of Valuation Differences for All Valuations (amounts in millions of dollars) | | | | |
|---|---|---|---|---|
| Expert Report Valuation Summary by Individual Asset Class | Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| A. U.S. Treasury and Agency Debt Securities | 125 | $12,778 | $13,203 | $424 |
| B. Agency RMBS | 308 | $5,821 | $6,549 | $728 |
| C. Non-Agency RMBS | 162 | $512 | $898 | $387 |
| D. Collateralized Loan Obligations excl. Pine | 6 | $46 | $58 | $12 |
| E. Pine CLO | 1 | $429 | $817 | $389 |
| F. CDOs and CMBS | 30 | $192 | $213 | $22 |
| G. Third Party Valuations | 6,035 | $10,757 | $11,176 | $419 |
| Total | 6,667 | $30,534 | $32,915 | $2,380 |

### A.    BARCLAYS UNDERVALUED 125 U.S. TREASURY AND AGENCY DEBT SECURITIES BY $424 MILLION.

17.    I independently valued 125 distinct U.S. Treasury and Agency securities. I valued those securities at $13,202,512,065, as of September 19, 2008.  Barclays' values were very similar to those that I calculated before Barclays' liquidity discounts were applied that were, based upon my research and analysis, unjustified and excessive for those securities at that point in time.  Table 3 below summarizes the difference between my valuations and those of Barclays.

| Table 3: Summary of Valuation Differences for US Treasury and Agency Debt Securities (amounts in millions of dollars) | | | |
|---|---|---|---|
| Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| 125 | $12,778 | $13,203 | $424 |

18.    Several reasons for Barclays' undervaluation of these securities are identified below.

   1)    **Barclays took a 5% across-the-board liquidity discount on U.S. Agency debt securities without considering the maturity of each**

**Contains Highly Confidential Information**

**individual instrument; this resulted in implicit and indefensible annualized yields as high as 643.4%.**

19.    Barclays' valuation of the security listed as the first security in Table 4 below was a $50 million discount note that Barclays initially valued at $99.99 for a note maturing on September 22, 2008.  Barclays took a 5% discount from the $99.99 value to revalue that note at acquisition.  The result of this was a discount of the note's value by $2.5 million.  This note would have provided the holder a payment of $100.00, or its par value, providing a total return of principal to the holder three days after the September 19, 2008 acquisition.  Based on a $99.99 price, this $100.00 payment reflected an approximate 1.2% yield.  In stark contrast, Barclays' adjusted price of $94.99 implied a "yield" or return of 643.4%.  Furthermore, Barclays' valuation is more suspect because this security would have settled at par and payment would actually have been received by Barclays long before Barclays' acquisition balance sheet was prepared.

20.    This example highlights the deficiencies in Barclays' valuation methodology. Barclays' approach was indiscriminate, unsupported by market data and excessive in light of prevailing market conditions.  Table 4 below exemplifies the deficiencies in Barclays' valuation.

**Contains Highly Confidential Information**

| | | | | | | | | | | Yield |
|---|---|---|---|---|---|---|---|---|---|---|
| **Table 4: Yield Analysis of Discount Notes** | | | | | | | | | | |
| Settlement Date: | 9/19/2008 | | | | | Fair Value ($ millions) | | | | Yield |
| | CUSIP | Description | Face Amount ($ millions) | Maturity Date | | Barclays | Chicago Partners | | Difference | Barclays |
| 1 | RTD019828 | USD Fmcdn 0.0 22 Sep 2008 Rg | $ 50.0 | 09/22/08 | $ | 47.5 | $ 49.9 | $ | 2.4 | 643.4% |
| 2 | RTD019885 | USD FHLBDN 0.0 26 Sep 2008 Rg | $ 28.8 | 09/26/08 | $ | 27.4 | $ 28.8 | $ | 1.4 | 276.8% |
| 3 | 313396H89 | USD Fmcdn 0.0 30 Sep 2008 Rg | $ 926.9 | 09/30/08 | $ | 880.2 | $ 925.1 | $ | 44.9 | 176.2% |
| 4 | RTD019971 | USD Fmcdn 0.0 01 Oct 2008 Rg | $ 50.0 | 10/01/08 | $ | 47.5 | $ 49.9 | $ | 2.4 | 162.8% |
| 5 | 313588K79 | USD Fndn 0.0 15 Oct 2008 Rg | $ 400.0 | 10/15/08 | $ | 379.5 | $ 399.0 | $ | 19.4 | 76.0% |
| 6 | 313384M71 | USD FHLBDN 0.0 31 Oct 2008 Rg | $ 100.0 | 10/31/08 | $ | 94.8 | $ 99.7 | $ | 4.9 | 48.0% |
| 7 | 313384P52 | USD FHLBDN 0.0 14 Nov 2008 Rg | $ 61.8 | 11/14/08 | $ | 58.5 | $ 61.5 | $ | 3.0 | 36.7% |
| 8 | 313396Q71 | USD Fmcdn 0.0 24 Nov 2008 Rg | $ 250.0 | 11/24/08 | $ | 236.6 | $ 248.8 | $ | 12.3 | 31.5% |
| 9 | 313588R31 | USD Fndn 0.0 28 Nov 2008 Rg | $ 100.0 | 11/28/08 | $ | 94.6 | $ 99.5 | $ | 4.9 | 29.9% |
| 10 | 313384T41 | USD FHLBDN 0.0 15 Dec 2008 Rg | $ 44.8 | 12/15/08 | $ | 42.4 | $ 44.6 | $ | 2.2 | 24.5% |
| 11 | 313588T62 | USD Fndn 0.0 17 Dec 2008 Rg | $ 100.0 | 12/17/08 | $ | 94.5 | $ 99.4 | $ | 4.9 | 24.0% |
| 12 | 313396V34 | USD Fmcdn 0.0 30 Dec 2008 Rg | $ 150.0 | 12/30/08 | $ | 141.6 | $ 149.0 | $ | 7.4 | 21.3% |
| 13 | 313396V42 | USD Fmcdn 0.0 31 Dec 2008 Rg | $ 150.0 | 12/31/08 | $ | 141.6 | $ 149.0 | $ | 7.4 | 21.1% |
| 14 | 313588V44 | USD Fndn 0.0 31 Dec 2008 Rg | $ 150.0 | 12/31/08 | $ | 141.6 | $ 149.0 | $ | 7.4 | 21.1% |
| 15 | 313397DS7 | USD Fmcdn 0.0 30 Mar 2009 Rg | $ 150.0 | 03/30/09 | $ | 140.5 | $ 147.8 | $ | 7.3 | 12.9% |
| 16 | 313589GE7 | USD Fndn 0.0 29 May 2009 Rg | $ 150.0 | 05/29/09 | $ | 139.8 | $ 147.1 | $ | 7.4 | 10.6% |
| | **Total/Weighted Average** | | $ 2,862.2 | | $ | 2,708.3 | $ 2,848.2 | $ | 139.9 | 96.6% |

21.     I applied discounts on U.S. Agency debt securities based on actual market data for comparable instruments taking into account the maturity of the bond and prevailing bid-offer spreads on a bond-by-bond basis.  These discounts ranged from 0.14% to 1.22% of midpoint values, significantly smaller than Barclays' 5.0% discount.

22.     Barclays' liquidity discount was particularly excessive given that the U.S. government acted to provide additional liquidity prior to September 22, 2008 to the U.S. Agency securities market. For example, on September 7, 2008, the U.S. Treasury entered into senior preferred stock purchase agreements with Fannie Mae and Freddie Mac, which effectively provided protection to holders of senior debt, subordinated debt, and MBS issued or guaranteed by these entities.  As an additional measure to support the financial markets, the Federal Reserve announced on September 19, 2008 that it would begin purchasing short term debt obligations issued by Fannie Mae, Freddie Mac, and

**Contains Highly Confidential Information**

the Federal Home Loan Banks in the secondary market.  These facts further undermine the validity of the approach taken by Barclays.

23.    Barclays did not differentiate between asset types and their inherent risk characteristics when applying the 5% liquidity discount.  For example, Barclays applied a 5% liquidity discount to both covered bonds and U.S. Agency debt.  Covered bonds are foreign bank debt instruments secured by mortgage loans.  In the U.S. market, covered bonds are much less liquid than U.S. Agency debentures.  Nevertheless, Barclays applied the same high 5% discount to U.S. Agency debt securities that it applied to covered bonds.

24.    Barclays' universal application of a 5% liquidity discount on all U.S Agency securities resulted in an excessive $462.7 million discount in the valuation.  For Agency securities, as reflected on Schedules A and B,[7] Barclays listed an aggregate value of $9.255 billion prior to assigning the liquidity discount and an aggregate value of $8.792 billion after universally integrating the 5% discount, a reduction of $462.7 million.[8]

> 2)    **In contrast to Barclays' generic approach, I valued U.S. Treasury and Agency securities using either actual, observable price quotes or by discounting each security-specific structured cash flow by actual, observable comparable market yields.**

25.    U.S. Treasury securities are AAA rated and are essentially credit-risk free.  U.S. Treasury securities are, in fact, the most liquid instruments in the capital markets universe, and typically trade at prices where the difference between the "bid," meaning the price at which such a security could be purchased and the "offer," meaning the price at which such a security could be sold, i.e., the "bid-offer spread," are as small as 0.00 to

---

[7] BCI-EX-00099159 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).
[8] BCI-EX-00099159 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

**Contains Highly Confidential Information**

0.03%.  Based on my research and analysis of observed actual market data for the "bid-offer spread," I incorporated a liquidity discount on U.S. Treasury securities ranging from 0.03% to 0.06% of the price.

26.    Unlike U.S. Treasury securities, U.S. Agency securities do have some credit risk. For U.S. Agency securities with no available market quotes, I valued them by discounting their associated cash flows while taking into account the credit risk component by applying actual observable market yields from comparable Agency securities.

27.    Finally, I calculated fair values for each U.S. Treasury and Agency security by reducing their midpoint values by an applicable and supportable liquidity discount as evidenced by actual market data.

B.    <u>BARCLAYS UNDERVALUED 308 AGENCY RMBS BY $728 MILLION.</u>

28.    I independently valued 308 distinct Agency RMBS.  I valued those securities at $6,549,047,039 as of September 19, 2008.  These results are summarized below in Table 5.

| Table 5: Summary of Valuation Differences<br>Agency RMBS<br>(amounts in millions of dollars) | | | |
|---|---|---|---|
| Number of<br>CUSIPs | Barclays' Opening<br>Balance Sheet<br>Valuation | 9/19/2008<br>Valuation<br>(at Exit Marks) | Valuation Difference<br>(Barclays'<br>Undervaluation) |
| 308 | $5,821 | $6,549 | $728 |

29.    Barclays' value of $5,821,257,372 is understated for a number of distinct reasons set forth below.

**Contains Highly Confidential Information**

> 1) **Neither Barclays, nor its expert Professor Pfleiderer, provided any detailed model documentation or analysis to support the values they ascribe to these securities.**

30.    Professor Pfleiderer did not, in fact, independently value any of these securities. Instead, he simply accepted Barclays' methodology for deriving an "exit price" for these securities by taking a flat, across-the-board 10% discount from the value of these securities.[9]

31.    Professor Pfleiderer opined that Barclays valued Agency Collateralized Mortgage Obligations ("CMOs"), specifically complex floaters, interest only ("IO")[10] and inverse IO securities, using midpoint marks that were subsequently reduced by a 10% liquidity discount to establish exit price marks. According to Professor Pfleiderer, Barclays' "exit price marks were reasonable and appropriate given the relevant risks and liquidity issues associated with these securities."[11]

32.    Barclays used two approaches to estimate the liquidity discount for Agency CMOs. In the first approach, Barclays took price observations from various unnamed sources and noted that the average variance was 10%. The second approach involved reviews of observed buys and sells of 39 Agency CMOs that occurred on the same date. The weighted average difference between these prices was noted as 10.5%.[12] Barclays incorrectly used this data as a proxy for its liquidity discount.

> 2) **Barclays apparently calculated liquidity discounts using differences between purchase and sales prices, which provided no description as to the source, the time of day for which they were provided, or**

---

[9] Expert Report of Professor Pfleiderer, Appendix Four, Section Four, P. 110.
[10] An Interest Only mortgage security pays a coupon based only on a notional principal; it receives no principal payments from amortization or prepayments. An Inverse Interest Only mortgage security pays a coupon that moves opposite to its index based only on a notional principal.
[11] Expert Report of Professor Pfleiderer, Appendix Four, Section Four, P. 110.
[12] PwC-BarCapWP_00023327.

**Contains Highly Confidential Information**

**whether the prices were actual traded prices, bids, offers, or price indications.**

33.     Prices were simply given by Barclays to PwC over a given day, as if they represented the simultaneous bid-offer spread, justifying its determination of the liquidity discounts.  A review of a listing of combined bid and offer prices, without regard to whether they occur at the same or a different time of day, and with no information as to the source, is not representative of the bid-offer spread.  The commonly used definition of a bid-offer spread is the difference between the price at which a dealer is willing to purchase or sell a given security simultaneously at a particular moment in time.  Barclays neither provided nor incorporated such an analysis in its valuation.

34.     In contrast to Barclays' flawed methodology, I used empirical bid-offer spreads to derive liquidity discounts.  I did not use trading ranges for various securities as proxies for bid-offer spreads.

35.     Although Professor Pfleiderer did not conduct any independent analysis, he reviewed documentation from PwC and stated that Barclays used an "average" for the liquidity discount and that this "average" was a fair representation of the population of securities.[13]  These are not accurate statements.

36.     First, the percentage composition of the portfolio Barclays used for deriving the average was not the same as the percentage composition of the Lehman portfolio of securities that is the subject of the valuation.  For example, Inverse IO securities comprised 51% of Barclays' benchmark portfolio.  However, Inverse IO securities only comprised 13% of the Agency MBS portfolio subject to valuation.  This means that the

---

[13] PwC-BarCapWP_00023327.

**Contains Highly Confidential Information**

average liquidity discount used by Barclays is significantly skewed towards one type of security and is not representative of the population subject to valuation.

37.    Second, the Inverse IOs had a much higher bid-offer spread, as defined by Barclays, than the other types of securities in Barclays' benchmark portfolio.  For example, Barclays claims that the bid-offer spread was approximately 16% for Inverse IOs.  The majority of the other types of securities in Barclays' own benchmark portfolio had a bid-offer spread of approximately 0.03%.  Therefore, the "average" liquidity discount applied by Barclays was not only skewed on a "frequency" basis, but also a "magnitude" basis.

38.    Lastly, Barclays incorrectly assessed a 10% liquidity discount across a broad and diverse set of asset types within the Agency RMBS category.  In contrast, I applied liquidity discounts by product type and did not use an average to generalize across all the various types of tranches of a CMO deal.  I did so because each tranche has a different level of liquidity in the marketplace as the liquidity of a particular type of CMO tranche is directly related to its complexity, hedging difficulty, and term-to-maturity.

39.    Barclays made other fundamental errors in its valuation of the Agency RMBS. According to Barclays' accountants, certain RMBS were valued by Barclays using a discounted cash flow approach incorporating the BlackRock prepayment model and an estimate of required market yields.  Based on my understanding of this analytical configuration, Barclays used a valuation methodology that did not take into account the variability of outcomes given different market conditions.  This means that Barclays assumed a single set of cash flows and assigned a single discount rate to value each security.  As a result, the variability of potential outcomes, e.g., differences in mortgage

**Contains Highly Confidential Information**

prepayment rates by borrowers leading to variable valuation outcomes, was not accurately factored into Barclays' valuation.[14]

> 3)    **In contrast to Barclays' modeling approach, I valued these securities using a pricing framework that accounted for the variability of potential outcomes by incorporating prepayments under multiple interest rate scenarios to capture the value associated with embedded options.**

40.    Further discussion regarding dynamic pricing of Agency RMBS and each of the related model components is provided in Appendix III of this report.

41.    For a subset of the Agency RMBS that I valued, specifically 24 CUSIPs, I obtained actual price quotes from multiple broker/dealers.

42.    For the remaining Agency RMBS that I valued, I used an industry standard and widely recognized valuation technique to establish "mid" prices, i.e., prices midway between prevailing bids and offers.[15]  I applied liquidity discounts to midpoint prices to reflect varying levels of liquidity for different mortgage product types in order to derive market values.  The liquidity discounts I used are based on empirical research and market intelligence related to bid-offer spreads for various mortgage product types in both "normal" and "stressed" market environments.  I calculated market values for each Agency RMBS by reducing midpoint prices by their liquidity discounts in a "stressed" market environment.

C.    BARCLAYS UNDERVALUED 162 NON-AGENCY RMBS
        BY $387 MILLION.

---

[14] Although appropriate for non-contingent cash flow instruments, including corporate debt instruments that contain no option-like features (e.g., call/put provisions), the pricing approach used by Barclays is insufficient for purposes of valuing Agency RMBS.  Barclays' approach does not accurately capture the value associated with options embedded in the underlying collateral and it led to a substantial undervaluation of this collateral.

[15] This standard methodology is referred to as "breakeven analysis."  Barclays Capital, Securitization Research, January 8, 2010; Bank of America RMBS Trading Desk Strategy, October 23, 2006.

43.    I independently valued 162 distinct non-Agency RMBS.  I valued those securities at $898,447,679, as of September 19, 2008.  The results are summarized below in Table 6.

| | Table 6: Summary of Valuation Differences for Non-Agency RMBS (amounts in millions of dollars) | | |
|---|---|---|---|
| Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| 162 | $512 | $898 | $387 |

1)    **Barclays did not provide detail or support for its valuation of non-Agency RMBS.**

2)    **The Pfleiderer report accepts Barclays' use of sales prices obtained after September 22, 2008 in valuing non-Agency RMBS despite Professor Pfleiderer's acknowledgement that "as a general matter, one must use ex post outcomes with considerable care."[16]**

44.    For analytical purposes, the non-Agency RMBS that I valued were segregated into two categories:  stripped non-Agency RMBS, i.e., private label IOs and POs and non-Agency RMBS.  The segregation was warranted due to key valuation drivers.  For non-Agency IOs and POs, voluntary prepayments represent the key value driver.  For the other non-Agency RMBS that I valued, credit-related events, i.e., defaults and losses, represent the key value drivers.

45.    The approach I took to value private label RMBS IOs and POs was very similar to the one used to value Agency RMBS.  In particular, the valuation framework included a standard state of the art term structure model,[17] a current coupon model,[18] a prepayment

---

[16] Expert Report of Professor Pfleiderer, ¶66.
[17] The Brace Gatarek Musiela model (See Appendix III).

**Contains Highly Confidential Information**

model,[19] and a deal cash flow library.[20]  I applied specific liquidity discounts on an individual bond-to-bond basis to midpoint prices to reflect the appropriate level of additional credit and liquidity risk.  The amount of the liquidity discount in percentage terms was based on the difference between the price of select non-Agency RMBS and Agency RMBS with similar characteristics as of the valuation date.

46.     Material public information exists for an overwhelming majority of these credit sensitive non-Agency RMBS.  One such source of this material public information is known as the 'remittance report.'  A remittance report contains updated information on payments and collateral performance and it is issued in accordance with the pay date of the given security, which is, in the majority of cases, the 25th of each month.[21]  The vast majority of the credit sensitive non-Agency RMBS that I valued make monthly payments on or after the 25th of the month.  Monthly remittance reports contain substantial information on the status of the deal and, therefore, could easily change the market's assessment of the performance of the bond.  Given the material change in market information after September 25, 2008, Barclays' use of post-September 25, 2008 prices was inappropriate for valuing the assets' market values as of September 19, 2008.

47.     The use of ex-post pricing is inappropriate as market conditions change over time, as market conditions impact the value of any particular security.  In addition, Barclays sold a significant amount of the acquired non-Agency RMBS portfolio during a short

---

[18] See Appendix III for details of the current coupon model (See Appendix III).
[19] The Andrew Davidson & Co, model (See Appendix III).
[20] Intex (See Appendix III).
[21] Or the first business day following if the 25th lands on a weekend.  The 25th of September 2008 was a Thursday.

---

**Contains Highly Confidential Information**

time frame.  Therefore, the sale prices do not reflect an orderly disposition of these
assets, but a "fire sale."[22]

48.    Barclays' valuation does not represent the "fair value" of the credit sensitive non-
Agency RMBS that I valued, and therefore, should be disregarded.  It remains unclear
how many of these "sales" were transfers within Barclays to internal trading desks and
how many were legitimate third party sales.  In any event, Barclays' use of post-
transaction prices was inappropriate.  All of the sales occurred after the assets had been
transferred to Barclays and are irrelevant for purposes of this valuation.  In addition,
when measured against Barclays own internal marks, the resulting loss on these
securities signifies a "fire sale" and/or sales to internal trading desks at deeply
discounted prices.  Since the "fair value" of any asset should reflect an orderly
disposition of the asset, Barclays' reliance on such "sale prices" to value these securities
is clearly inappropriate.[23]

>    3)    **Contrary to Barclays' ad hoc approach, my approach for valuing
>    credit sensitive non-Agency RMBS was consistent with industry
>    practice.**

49.    In my valuation of these securities, I used the Intex deal library to obtain
information regarding the structure of the bonds as well as the characteristics and
delinquency status of the underlying mortgages as of September 19, 2008.  I also used
contemporaneous research to develop an appropriate loss curve and industry standard
ABX[24] indices to derive an appropriate discount rate.  After determining an appropriate

---

[22] Expert Report of Professor Pfleiderer, Appendix Four, Section Six, P. 110.

[23] Expert Report of Professor Pfleiderer, Appendix Four, Section Three, P. 109.

[24] As stated on Markit's website the ABX is "A barometer of the conditions in the subprime mortgage
market throughout the financial crisis has been the ABX.HE indices administered by Markit.  There are
four Markit ABX.HE indices, each a synthetic tradeable index referencing a basket of 20 subprime
mortgage-backed securities from a particular vintage by period of issuance.  Each ABX.HE index covers a

**Contains Highly Confidential Information**

loss curve, i.e., calculation of default expectation based on detailed analysis of

underlying mortgage collateral data,[25] prepayment input and discount rate, I used the

Intex modeling platform to value each of these securities.  Finally, to be conservative, I

applied an additional liquidity discount to derive my final values.

D.    BARCLAYS UNDERVALUED 6 CLOS (EXCLUDING THE PINE CLO)
      BY $12 MILLION.

50.    I independently valued 6 distinct CLO securities, other than the Pine CLO, which

is discussed on pp. 19, below.  My independent valuation of these securities was

$57,834,688 as of September 19, 2008.  The results are summarized below in Table 7.

| Table 7: Summary of Valuation Differences for Collateralized Loan Obligations (amounts in millions of dollars) | | | |
|---|---|---|---|
| Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| 6 | $46 | $58 | $12 |

51.    Barclays did not provide details or analysis to support its modeling of CLO

securities.

52.    In my independent valuation of the 6 non-Pine CLOs, I applied industry accepted

valuation techniques and developed market based inputs for reinvestment rates, loss

rates and prepayments.

---

six-month period of subprime MBS originations from the second half of 2006 through the first half of
2007.  Each ABX.HE index consists of six tranches corresponding to different ratings and positions in the
capital structure.  ABX.HE has become a benchmark for the performance of subprime RMBS.  Its liquidity
and standardization allows investors to accurately gauge market sentiment around the asset-class, and to
take short or long positions accordingly."
[25] See Appendix IV.

**Contains Highly Confidential Information**

53.    These inputs were then loaded into the Intex cash flow model.  I discounted these cash flows based on a discount rate[26] determined from broker/dealer research as of September 19, 2008 based on each CLOs credit rating and capital structure. I then applied an additional liquidity discount to derive my final CLO values.

1)    **Barclays' values as of September 19, 2008, were very similar to the values that I calculated; however, Barclays failed to demonstrate any basis or analytical justification for taking a 21% discount to arrive at their exit value.**

E.    <u>BARCLAYS UNDERVALUED THE PINE CCS CLO BY $389 MILLION.</u>

54.    Barclays misunderstood the structure of and materially undervalued the Pine[27] CCS CLO ("Pine") by $388.7 million.  The value of the Class A-1 tranche of Pine that I valued independently was $817,297,291 as of September 19, 2008.  The results are summarized below in Table 8.

| Table 8: Summary of Valuation Differences for the Pine CLO (amounts in millions of dollars) | | | |
|---|---|---|---|
| Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| 1 | $429 | $817 | $389 |

1)    **Barclays materially misunderstood the structure of Pine, apparently concluding that Pine had the typical structure of a "revolver" CLO.**

55.    Barclays' assumption that the unfunded obligations accrue to the senior tranche was erroneous.  More typically with CLOs, but not in the case of Pine, when an underlying borrower requests an additional draw on its credit line, the holder of the

---

[26] DM (discount margin).

[27] Pine is a collateralized loan obligation backed by revolving lines of credit to 55 corporations from different industry sectors.  The loans were originated by Lehman who then established a Trust to issue the CLO.  Only the senior Class A-1 tranche was acquired by Barclays as a result of the Acquisition.  All of the junior tranches continue to be held by Lehman.

**Contains Highly Confidential Information**

senior tranche is usually responsible for providing the additional funds.  However, Pine had an "inverted" structure—i.e., any additional funding came from the holder(s) of the junior tranche, which in this case was a bankrupt entity as of the closing date.

56.    At the time that Barclays acquired the Class A-1 tranche, information in Barclays' possession indicated that Pine had $367 million in cash, $697 million in funded loans, and another $1,140 million in unfunded commitments, i.e., the additional funding required if borrowers went to their full credit limits.[28] The Class A-1 tranche had an initial notional value of $1,025 million, representing the initial funding of the CLO.  The Pine structure is pictured in Table 9 below.



---

[28] Information available from the Trustee for the Pine CLO on September 19, 2008, shows that the CLO has cash of $307 million, funded loans of $864 million, and unfunded commitments of $968 million. Included in the 307 million of cash is the variable funding account of approximately $265 million.  I have reviewed several trustee reports for the months before and after September 2008 and have been unable to find the source of Barclays amounts reflected in this paragraph.

---

**Contains Highly Confidential Information**

2)    **In deriving its valuation, Barclays failed to recognize the inverted structure of the CLO and its own senior position within that structure.**

57.    Barclays itself failed to recognize that in the Pine structure, Barclays' senior Class A-1 position was fully funded and not responsible for any additional cash contributions that could arise from additional funding requests from the underlying borrowers.

58.    Instead, Barclays incorrectly assumed a 70% probability that Barclays, as the holder of the Class A-1 tranche, would be obligated to fund the entire amount of the remaining balance available to be drawn upon by the underlying borrowers.  Barclays also failed to recognize that the deal documents provided that Lehman, a bankrupt entity, would be responsible for providing any additional funding.

59.    Barclays incorrectly valued cash and loans totaling $1,064 million at $428.6 million (or at a price of 40.3 cents on the dollar).  Barclays, as the holder of the class A-1 tranche, would have first claim on the assets of the CLO, which according to Barclays, included $367 million of cash investments and $697 million of funded loans, totaling to over $1 billion.

60.    Had Barclays properly recognized the structure of Pine, and left all of their other valuation assumptions, probabilities and scenarios the same, Barclays' valuation would have been significantly higher.  Correcting Barclays' analysis only for the fact that its A-1 tranche is fully funded and completely protected from any funding risk, Barclays' model would have valued Pine at $883 million.

3)    **Barclays inappropriately applied a 20% "participation" discount when valuing the underlying collateral.**

61.    Given that the collateral is owned by the CLO trust and not Lehman, the security interest in the loans is not at risk.  I have researched this issue and have found no

**Contains Highly Confidential Information**

instance where a master participation agreement in a CLO was not enforced in a
bankruptcy.

62.     The security Barclays received is the highest and only funded tranche of the CLO.
Since Barclays is in the first loss position and has no additional funding liabilities, any
hypothetical funding by subordinate tranches would accrue to Barclays benefit.  As a
result, Barclays is not subject to the funding risks that would convert additional capital
in the form of cash advanced to a borrower to funds worth 80 cents, or less, on the
dollar.  This risk belongs solely to the subordinate tranches.

    4)    **Professor Pfleiderer performed little to no due diligence when reviewing Barclays' valuation of Pine.**

63.     Professor Pfleiderer and his team, or those under his direction, failed to consider
important variables of the Pine deal that are integral to valuation of such securities.
Aside from an "extensive search on -- on Google,"[29] Professor Pfleiderer, or those
working at his direction, apparently did not review offering documents, trustee
remittance reports, or any other relevant deal documents.

64.     Appendix IV to Professor Pfleiderer's report incorrectly attempts to support
Barclays' value for Pine.  One comment in Professor Pfleiderer's report focuses on the
alleged credit quality and concentration risks of the underlying portfolio of loans.[30]  In
reviewing LoanX,[31] I observed that on September 19, 2008, 20 of the 55 underlying
loans making up approximately 50% of the value of the underlying collateral reflected a
weighted average price of 90.2.  Both Barclays internal valuation memo prepared by

---

[29] Professor Pfleiderer Deposition, page 219.
[30] Expert Report of Professor Pfleiderer, Appendix Four, Section 8, P. 116.
[31] LoanX is provided by Markit.  Markit is the leading provider of independent loan market data and loan
portfolio management software and is currently used by over 400 financial institutions to manage over $1
trillion in assets.

**Contains Highly Confidential Information**

Barclays' Product Control Group and the Pfleiderer Report ignore readily available market data for the underlying loans and fail to properly interpret relevant Trustee reports and the September 16, 2008 S&P downgrade.[32]

65.    The Pfleiderer Report provided no relevant analysis of any kind and simply accepted the material errors in Barclays' exit values.

### F.    BARCLAYS UNDERVALUED 30 CDOS AND CMBS BY $22 MILLION.

66.    I independently valued 30 CDO and CMBS.   My independent valuation of those securities was $213,394,108 as of September 19, 2008. The results are summarized in Table 10, below.

| | Table 10: Summary of Valuation Differences for Collateralized Debt Obligations and Commercial Mortgage-Backed Securities (amounts in millions of dollars) | | |
|---|---|---|---|
| Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| 30 | $192 | $213 | $22 |

67.    CDO valuations were conducted using market indices and market research based on the Intex cash flow modeling platform.   These market based inputs included both collateral and cash flow timing and discount rates.   The collateral inputs and discount rates were input into the Intex cash flow model to arrive at a price; an additional liquidity discount was then applied to derive my final CDO values.

---

[32] S&P's downgrade of Barclays' A-1 tranche was purely technical and due to Lehman's bankruptcy and is not related to the value or performance of the underlying collateral.  The A-1 tranche receives all of the cash flow from the underlying loans post-Lehman bankruptcy regardless of the credit downgrade.  As noted above, the underlying loans were reflected slightly above 90 in the market on September 19, 2008.

**Contains Highly Confidential Information**

68.    I independently valued CMBS using market research to determine the appropriate

Constant Default Rate ("CDR"), severity rate, and prepayment rate of the underlying

commercial mortgages.  Each CMBS was then categorized by rating, seniority, and

security type.   Using published research, a discount rate was determined for each

category and assigned to the CMBS.  The collateral inputs and discount rate were input

into the Intex cash flow model to arrive at a price; an additional liquidity discount was

applied to derive my final CMBS values.

G.    BARCLAYS UNDERVALUED 6,035 OTHER CUSIPS BY
       OVER $400 MILLION.

69.    As summarized in Table 11 below, Barclays undervalued 6,035 securities by $419

million.

| Table 11: Summary of Valuation Differences for for Third Party Valuations (amounts in millions of dollars) | | | |
|---|---|---|---|
| Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| 6,035 | $10,757 | $11,176 | $419 |

70.    For these securities, including duplicates, I extracted prices from multiple sources:

Bloomberg ("BVal" 2,933 CUSIPs; "BGN" 3,059 CUSIPs), Capital IQ (1,005 CUSIPs),

FactSet (863 CUSIPs), and Interactive Data (749 CUSIPs).  The total count of CUSIPs

with at least one third party price was 4,608 (76.4%).  No prices were available for 1,427

securities (23.6%).  The gathered prices represented closing or bid prices on September

19, 2008, and were treated as midpoint prices for purposes of this analysis.  For 31

**Contains Highly Confidential Information**

CUSIPs, the prices were thrown out as inconsistent with the underlying security (credit, scaling issues, etc.). [33]

71.    For the remaining 4,577 securities with prices, an average price was then computed by CUSIP. [34]  The average prices generated were then screened for compatibility with BoNY and Barclays prices (i.e., scaling issues, outlier observations, etc.).  To facilitate this, all 6,035 securities in the third party universe were classified into 8 categories (including Other/Unknown) across the various groups (Rates, PMTG, Corps, etc.).  When third party prices were available, percentage differences were calculated from both BoNY and Barclays' prices in each of the 8 categories.  Where price percentage differences were outside two standard deviations from both BoNY and Barclays, the third party prices were discarded as outside of range.  An additional 62 prices were thus discarded, leaving a total of 4,515 securities for which third party pricing was used.

72.    To facilitate the application of liquidity discounts, sub-categories were then created in the Agency RMBS section.  Liquidity discounts that were derived through empirical research were then applied to the average prices by asset sub-category.  Agency debentures were separated into maturity buckets before liquidity discounts were

---

[33] Interactive prices are excluded on 6 CUSIPs (31396X6J8, 31397T4K5, 3837H13L3, 50177AAP4, 86361JAE0, and 94983KAJ8) based on scaling issues on notional IO products. Interactive price for CUSIP 31395WA31 is excluded due to incompatibility with inverse floater pricing. For 24 CUSIPs of Lehman structured notes (5249083B4, 5249083H1, 5249087D6, 5249087K0, 524908L73, 524908MB3, 524908MG2, 524908N30, 524908UK4, 524935BE2, 524935BG7, 524935CX9, 524935DK6, 52517P4M0, 52517P6Z9, 5252M0AW7, 5252M0BG1, 5252M0BQ9, 5252M0CJ4, 5252M0CX3, 5252M0DT1, 5252M0FB8, 5252M0FR3, 5252M0FV4), prices from FactSet and Capital IQ are excluded due to inconsistency with prices observed for Lehman underlying credit exposure.
[34] For 13 CUSIPs (912795K75, 912795K59, 912795J77, 912795S28, 313384J83, 313588L86, 313588M77, 313384M30, 313384Q44, 313384Q77, 313589CF8, 313589CN1, and 912795J28), Bloomberg data pulled was expressed in terms of yields and conversion was made to prices.  For 3 CUSIPs, (76116EFH8, 76116EBZ2, and 31771JKU3) Bloomberg data pulled was inconsistent with observed prices and thus discarded. Prices from FactSet and/or Capital IQ were available and used on these 16 CUSIPs.

---

**Contains Highly Confidential Information**

applied.  For corporate debentures, emerging markets, corporate asset-backed securities, private label mortgage securities and municipals, Barclays' discounts were used.

73.     For securities where no third-party pricing information was available, I applied liquidity discounts (following the aforementioned logic) to the BoNY prices as of September 19, 2008.

Submitted by

*Mark E. Slattery*

Mark E. Slattery, CFA

March 15, 2010

Contains Highly Confidential Information

Appendix I

Curriculum Vitae

## MARK E. SLATTERY, CFA

30 South Wacker Drive, Chicago IL 60606

Phone: (312) 251-5200    Email: Mark.Slattery@naviganteconomics.com

## EXPERIENCE

**NAVIGANT ECONOMICS**                                              **Chicago, IL**
**Independent Consultant**                          **January 2010 – Current**
- Manage a team of professionals dedicated to valuing a multi-billion dollar portfolio, consisting of a broad range of securities.
- Lead all aspects of related effort ranging from implementing requisite analytical configuration to writing papers intended to describe model specifications.

**FLAGSTAR BANK**                                                      **Troy, MI**
**Internal Consultant**                              **March 2009 – January 2010**
- Served as an internal asset/liability management consultant; participated in a wide array of projects covering all aspects of the on- and off-balance sheet positions.
- Directed the Bank's market valuation and risk measurement efforts related to its $52 billion mortgage servicing rights portfolio.
- Developed and maintained an analytical framework designed to capture the structural risks associated with the Bank's consolidated residential mortgage operations.

**JMN CONSULTING**                                                  **Chicago, IL**
**Senior Consultant**                          **October 2006 – November 2008**
- Functioned as the Assistant Portfolio Manager of non-discretionary funds dedicated to the purchase of non-Agency RMBS primarily backed by pay-option adjustable rate mortgages and subprime mortgages.
- Measured market value and related risk metrics for a credit default swap ("CDS") portfolio backed by non-Agency RMBS on a bi-weekly basis.
- Provided monthly fair market valuations and sensitivity profiles for the 2006-1, 2006-2, 2007-1 and 2007-2 ABX Indices.
- Evaluated an extensive portfolio of CDOs on behalf of an investment syndicate.
- Led consulting engagements culminating in physical deliverables written with respect to applicable regulatory guidance.

**LASALLE BANK CORPORATION**                                        **Chicago, IL**
**Senior Vice President**                          **October 2005 – October 2006**
- Managed a team of professionals dedicated to Asset-Liability research; key initiatives included quantifying the Interest Rate Risk component of the Bank's Economic Capital position and enhancing the Bank's market valuation and risk measurement frameworks.

Contains Highly Confidential Information

- Co-chair of the Mortgage Advisory Council, which was dedicated to ensuring that the Bank's mortgage analytical models and processes provided the most accurate estimate of the Bank's exposure to mortgage assets and related lines of business.

- Participated as a voting member on two of the Bank's senior committees:  the Mortgage Asset-Liability Committee and the Investment Portfolio Committee.

- Ran the Bank's Asset/Liability Consulting Services practice, which was dedicated to enhancing the balance sheet management policies and practices of financial institutions of varying asset size and business focus.

**First Vice President**                              **February 2003 – September 2005**

**SLATTERY ENTERPRISES**                              **Orland Park, IL**
**Principal**                              **January 2002 – January 2003**

- Operated an organization dedicated to the financial services industry, specializing in the disciplines of Asset-Liability Management and Risk Management.

- Acted as Project Manager responsible for the implementation of a commercially available Asset-Liability Management application for a newly formed financial services holding company of a major international corporation.

-  Designed a framework to integrate and support analytical routines ranging from the basic (e.g., contractual cash flow generation) to the advanced (e.g., capital optimization).

**QUANTITATIVE RISK MANAGEMENT**                              **Chicago, IL**
**Vice President, Consultant**                              **February 1994 – December 2001**

- Managed a team of Subject Matter Consultants dedicated to the implementation and on-going support of QRM Asset-Liability clients.

- Provided subject matter consulting on issues related to the QRM Asset-Liability System and the QRM Mortgage Servicing Evaluation System.

  - Modeled financial instruments including MBS, CMOs, callable/puttable notes/bonds, leases, indeterminate deposits, mortgage servicing, cap/floor agreements, swaps, swaptions, futures, futures options.

  - Quantified risk profiles of static balance sheets using subjective rate and volatility shock analysis and objective Monte Carlo VaR Analysis.

  - Derived earnings sensitivity measures using deterministic as well as stochastic analysis; analyzed portfolios using total return analysis.

  - Assisted clients to formulate and execute hedging strategies.

- Wrote and presented materials at industry conferences (Bank Administration Institute), QRM user conferences, and QRM client training sessions.

**COOPERS & LYBRAND**                              **Chicago, IL**
**Senior Associate**                              **May 1992 – January 1994**

**FEDERAL HOME LOAN BANK OF CHICAGO**                              **Chicago, IL**
**Senior Financial Analyst**                              **January 1990 – April 1992**

**Contains Highly Confidential Information**

**Federal Thrift Regulator**                      **August 1986 – December 1989**

---

## EDUCATION

**KELLOGG SCHOOL OF MANAGEMENT,**          **Evanston, IL**
**NORTHWESTERN UNIVERSITY**                      **June 1992**
**MBA, Finance/Accounting**


**NORTHWESTERN UNIVERSITY**                      **Evanston, IL**
**BA, Economics**                                        **June 1986**


**CERTIFICATION**
**Chartered Financial Analyst**                    **June 1992**

Contains Highly Confidential Information

# Appendix II

# Documents Relied Upon

**Documents in the Record**

Depositions

| Deponents | Date |
| --- | --- |
| Paul Pfleiderer | 2/23/2010 |

Deposition Exhibits

| Exhibit | Beginning Bates | Ending Bates |
| --- | --- | --- |
| 86B - Initial Inventory, Schedule A and B Assets | BCI-EX-00099519 | |
| 87B - JPM Inventory, Annex A Assets | BCI-EX-00108700 | |
| 495 - Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief (Bankr. S.D. N.Y. Sept. 15, 2009). | | |
| 641A - Email from Sean Teague to Tal Litvin | BCI-EX-(S)-00213990 | BCI-EX-(S)-00213996 |

Other Documents

| Description | Beginning Bates | Ending Bates |
| --- | --- | --- |
| Initial Inventory, Schedule A and Schedule B Assets | BCI-EX-00099519 | |
| Debtors' Adversary Complaint 11-16-2009 | | |
| Expert Report of John J. Schneider 3-15-2010 | | |
| Expert Report of Mark Zmijewski 3-15-2010 | | |
| The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), (Bankr. S.D. N.Y. Sept. 15, 2009). | | |
| Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order. In re Lehman Brothers Holdings Inc., et al., Debtors Case No. 08-13555 (JMP) (Bankr. S.D. N.Y. Sept. 15, 2009). | | |
| Report of Paul Pfleiderer, Volumes 1 & 2, 1-8-2010 | | |
| Review of Barclays JP Morgan Portfolio Price Testing Methodology and Framework | PwC-BarCapWP_00023595 | |
| Review of Barclays Capital Price Testing Methodology and Framework for Lehman Acquired as of September 19, 2008 | PwC-BarCapWP_00022935 | |
| Summary of Barclays Desk Prices and Third Party Prices | IE5_JX9ESSE9PwC_BarCapWP_00022935 | |
| Bid-Offer Reserve Agency CMOs | PwC-BarCapWP_00023327 | |

**Documents that are Publicly Available**

Bloomberg.com

WallStreetJournal.com

**Other Documents Not Cited in the Record and Not Publicly Available**

Bloomberg LP Data

Capital IQ Data

Interactive Data

ADCo

Polypaths Fixed Income System

Intex

Barclays Capital Live

Markit Group Limited

Morgan Stanley US Liquid Rates Tracker

Citigroup Capital Markets - Mortgage Key Issue Package MB275

Credit Suisse Mortgage Daily Report

Goldman Sachs Mortgage Strategies TBA Pass-Through Performance Summary - GS2006

Lehman Brothers Lehman Live - Pass Through Summary

Barclays Capital, Securitization Research, January 8, 2010

Bank of America RMBS Trading Desk Strategy, October 23, 2006

Formal Consultation Memo (PwC-BarCapWP_00000047)

PINE CCS, Ltd. Trustee Report - Measurement Date: 10/06/2008

**Contains Highly Confidential Information**

## Appendix III

## Description of Dynamic Pricing of Agency RMBS and Related Model Components

74.     The holder of a mortgage-backed security can be viewed as having a long position

in a straight bond and a short position in an American call option.  In this case, the

American call option is the prepayment option embedded in the security that gives the

homeowner the right to prepay all (prepayment) or some of their principal (curtailment)

at any time prior to maturity.

75.     Mortgage cash flows include scheduled and unscheduled principal payments

(prepayments) and interest.  Prepayments depend on the path of future interest rates and

non-rate related factors.  Path-dependent options, such as the prepayment option

embedded in mortgage securities, are typically valued using a dynamic pricing approach

via Monte Carlo simulation.

76.     Mortgage pass-throughs and sequential CMO tranches are relatively straight-

forward to value within the Option Adjusted Spread ("OAS") framework.  IOs are

securities that only pay investors interest cash flows.  On the other hand, POs are

securities that only pay investors principal cash flows.  IOs and POs are labeled as either

"Trust" securities if they are stripped from a mortgage pass-through or "Structured"

securities if they are tranches within a CMO.

77.     There are two general approaches that can be used to value MBS:  static pricing

and dynamic pricing.  Static pricing assumes one future path of rates and one

corresponding set of cash flows.  The single set of cash flows is discounted using the

London Interbank Offered Rate ("LIBOR") or U.S. Treasury rates plus a static spread.

A key disadvantage arising from this method is that the actual spread or yield earned by the investor can vary significantly due to future rate and cash flow uncertainty.

78.    In the dynamic pricing framework, a large number of random rate paths and corresponding mortgage cash flows are generated. Each set of cash flows are discounted back to the present using underlying LIBOR rates. The model price is the average of the present value ("PV") of cash flows calculated for each random rate path. In order to equate the MBS price generated by the model (model price) to the MBS price observed in the marketplace (market price), a single interest rate spread is added to LIBOR. This spread is known as the OAS.

79.    I used a dynamic pricing framework, i.e., an OAS approach, to value Agency MBS. The valuation framework is comprised of three major components: 1) the term structure model; 2) the current coupon model; 3) and the prepayment model. In the case of CMOs and structured product, a deal cash flow model is also utilized. A description of each component of the valuation framework follows.

*Term Structure Model*

80.    An OAS approach to pricing MBS requires the use of a term structure model. A term structure model describes the progression of interest rates through time. The starting point for a term structure model is the initial term structure of interest rates, i.e., various maturity term points and zero coupon bond rates. The term structure is based on U.S. Treasury or LIBOR/Swap rates.

81.    The LIBOR market model, also known as the BGM Model (Brace Gatarek Musiela Model), is a financial model of interest rates. The quantities that are modeled

**Contains Highly Confidential Information**

are a set of forward rates that have the advantage of being directly observable in the market, with volatilities that are naturally linked to traded contracts.

*Current Coupon Model*

82.    A term structure model is used to create a tree of LIBOR short rates or forward rate paths.  However, mortgage prepayments are primarily driven by movements in the primary market mortgage rate, i.e., the current coupon rate.  Therefore, a current coupon model is needed to derive prospective mortgage rates.  The 30 year mortgage rate is customarily expressed as a premium over the 10 year U.S. Treasury or Swap/LIBOR rate.  The ten year underlying rate can be derived from the term structure model.

83.    One approach to modeling the mortgage rate is to assign a constant spread, i.e., interest rate premium, to the underlying rate or weighted average rate.  More advanced modeling approaches take into account that the spread varies over time and/or as a function of rate volatility.  Theoretically, the spread varies directly with the level of volatility, due to the fact that a portion of the spread reflects the cost of the prepayment option.  Assuming a constant OAS, higher volatility increases the cost of the option and the mortgage rate.  I used the OAS current coupon model, which is the more appropriate approach since it allows the spread to vary based on volatility.

*Prepayment Model*

84.    The purpose of a prepayment model is to quantify prospective mortgage prepayments or curtailments.  Prepayments can be voluntary or involuntary, as in the case of default.  Prepayment models are a critical component of the OAS valuation

---

**Contains Highly Confidential Information**

framework.  Prepayment models must be able to capture the variation of prepayments on a given mortgage pool in different interest rate environments.

85.    There are two general types of prepayment models: 1) Market-implied and 2) Econometric.  The market-implied prepayment model is derived by holding the OAS constant and backing into the prepayment model that results in the observed MBS prices.  The econometric prepayment model is derived by applying statistical techniques, e.g., multiple regression analysis, to actual historical prepayments (dependent variable) and known predictor variables.  I used both a market implied and an econometric prepayment model in the MBS valuation process.

86.    The econometric prepayment model I used for valuation purposes was the ADCo Model.  Based on my own experience, I am aware of the substantial extent to which the ADCo model is used by market participants.  The ADCo Model was developed by Andrew Davidson & Company, a highly-regarded firm that provides mortgage analytics solutions to the financial services industry.

*Deal Cash Flow Model*

87.    The modeling and valuation of CMOs require the use of a deal cash flow model.  The deal cash flow model includes the rules for how the mortgage principal and interest in a CMO will be disbursed to holders of various tranches.  Each CMO is unique and may include numerous tranches with different levels of prepayment sensitivity.  To value CMO tranches, I used the market standard Intex model as the Deal Cash Flow Model.  Based on my own experience, I am aware of the substantial extent to which the Intex model is used by market participants.

**Contains Highly Confidential Information**

## Appendix IV

## Valuation of Credit Sensitive Non-Agency RMBS

88.     The first step in my valuation process was to quantify the timing and magnitude of prospective losses, which was done by first classifying the underlying loans in the pool according to current delinquency status, (e.g., current, 30 days past due, 60 days past due, etc.), and then applying "roll rates" to quantify the timing and number of future defaults, measured in dollar volume.

89.     Next, I used average loss severity rates based on the underlying collateral's vintage, type, and payment characteristics [i.e., fixed vs. adjustable rate mortgages ("ARMs")] to translate defaults into future losses.  Roll rates and loss severity rates were obtained from broker/dealer research reports which were available on September 19, 2008. After I derived a loss curve and deal-specific prepayment rates, I calculated each security's future cash flows using the Intex platform.  Intex is widely accepted in the industry and commonly used for the valuation of non-Agency RMBS.

90.     The next step in my valuation process was to derive an appropriate discount rate to apply to the security cash flows.  I conducted a separate analysis of the discount rates implied by ABX indices for comparable non-Agency RMBS and used these implied rates to discount the cash flows in the Intex model.  To be conservative, I applied an additional liquidity discount to derive my final values.

# EXHIBIT 16

**Contains Highly Confidential Information**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | Case No. 08-013555 |
| Debtors. | (Jointly Administered) |

# EXPERT REPORT OF JOHN J OLVANY

## MARCH 15, 2010



MOVANTS' TRIAL
EXHIBIT

152

**Contains Highly Confidential Information**

# TABLE OF CONTENTS

**Page**

I.  Introduction…………………………......................................................................1

II.  Summary of Qualifications………………….................................................................2

III. Summary of Opinion……………………....................................................................3

IV. Opinion and Base Thereof……………….. .................................................................3

  A.  BARCLAYS UNDERVALUED THE GIANTS STADIUM BONDS BY OVER
      $349 MILLION..........................................................................................................3

    1.  Description of the Giants Stadium Bonds ....................................................... 4

    2.  The Sale of the Giants Stadium Bonds to Barclays and Barclays' Alternatives
        as the Holder of the Giants Stadium Bonds..................................................... 5

    3.  The Correct Valuation of the Giants Stadium Bonds....................................... 8

    4.  Barclays' Errors in Valuing the Giants Stadium Bonds................................ 10

  B.  BARCLAYS UNDERVALUED THE CORPORATE BONDS BY NEARLY $29
      MILLION..............................................................................................................11

    1.  Background and Introduction to Analysis of Corporate Bond    Pricing ...... 12

    2.  Barclays Misapplied Third Party Pricing It Obtained................................... 13

  C.  BARCLAYS UNDERVALUED THE COVERED BONDS BY OVER $3
      MILLION…………………………………………………………...............16

**Contains Highly Confidential Information**

## LIST OF EXHIBITS AND APPENDICES

Exhibit I:       List of CUSIPs valued

Exhibit II:      Valuation Results by CUSIP

Exhibit III:     Valuation Results by Desk


Appendix I:    Curriculum Vitae

Appendix II:   Documents Considered

Appendix III: Methodology

**Contains Highly Confidential Information**

## I.  **INTRODUCTION**

1.      This report is submitted by John J. Olvany, Senior Advisor with Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc., which specializes in applying accounting, economics, and finance to business consulting, legal, and regulatory issues.  I discuss my qualifications in more detail in Section II and present my curriculum vitae in Appendix I.

2.      I have been asked by Movant's counsel to value certain corporate securities Barclays' acquired as part of the Sale Transaction, including the Giants Stadium LLC Project Revenue Bonds Series 2007A (Auction Rate Securities) Subseries 2007A-4, 2007A-5,2007A-6, and 2007A-7 ("Giants Stadium Bonds"). [1]  As part of this analysis, I reviewed Barclays' methodologies, procedures, and data used to value these same corporate securities and reviewed Barclays' valuation expert Professor Paul Pfleiderer's January 8, 2010 report (the "Pfleiderer Report") which accepts Barclays' methodologies, procedures, and data in their entirety without independently valuing them. I reserve the right to supplement my analysis in response to any newly produced evidence or in rebuttal to any further opinions offered by Barclays' witnesses.  I also reserve the right to do a more comprehensive CUSIP-by-CUSIP valuation, if necessary, of those securities I did not independently value for purposes of my report.

3.      Navigant Economics (Chicago Partners) charges an hourly rate of $500 for my time.  Other Navigant Economics (Chicago Partners) professionals, working under my direction and supervision, assisted in my analyses and Navigant Economics (Chicago

---

[1] I submit this report on behalf of (a) Lehman Brothers Holdings, Inc. (the "Debtor" or "LBHI", (b) James W. Giddens, as Trustee for the Securities Investor Protection Act Liquidation of Lehman Brothers Inc. (the "Trustee"); and (c) the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. and its affiliated debtors and debtors in possession (the "Creditors' Committee," together with LBHI and the Trustee, the "Movants") in connection with Movants' motions filed under. Federal Rule of Civil Procedure 60(b) (the "Rule 60(b) Motions").  In the Rule 60(b) Motions, Movants' seek relief from the Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008 (the "Sale Order").  In the Sale Order, the Court approved the sale (the "Sale Transaction") of certain assets of LBHI, LB 745 LLC, and Lehman Brothers Inc. ("LBI," and together with LB 745 LLC and LBHI, the "Sellers," and together with LBHI's various other foreign and domestic affiliates, "Lehman") to Barclays Capital Inc. ("Barclays") in accordance with the terms set forth in an Asset Purchase Agreement, dated September 16, 2008 ("Asset Purchase Agreement") and related agreements, modifications and purported "clarification[s]" thereof.

**Contains Highly Confidential Information**

Partners) was or will be compensated for their work at their customary hourly rates. Our compensation is not contingent in any way upon the outcome of this matter.

4.    The remainder of the report is organized as follows. In Section II, I summarize my qualifications. In Section III, I summarize my opinion. In Section IV, I provide the base for my opinion

## II.    <u>SUMMARY OF QUALIFICATIONS</u>

5.    After graduating from Williams College in 1982 with a degree in Political Science, I began my career in the fixed income markets. For over 22 years, I was an active participant in the global credit markets in New York, Tokyo, and Chicago. Most recently, I was a Managing Director and Senior Manager of the Institutional Sales and Trading Group for the Chicago Office of Morgan Stanley. In that capacity, I managed all compliance matters for the fixed income division and supervised a team of sales professionals trading all classes of fixed income products with institutional investors, such as pension funds, banks, insurance companies, investment advisers, and hedge funds. In the last 17 years of my career in finance, my work was concentrated in the global corporate credit markets trading bonds, loans, structured products, and derivatives. As a credit salesperson, I bought and sold all credit products, including high yield corporate bonds, investment grade corporate bonds, and derivatives. More specifically, I have bought and sold corporate bonds similar to those I have valued in this matter.

6.    My present position is Senior Advisor at Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting Inc. Navigant Economics specializes in consulting in the areas of accounting, economics, and finance. My main area of expertise is in the fixed income credit markets, especially corporate securities. I have not authored any publications within the last ten years. My curriculum vitae also lists the expert testimony I have given within the last four years.

**Contains Highly Confidential Information**

## III.    SUMMARY OF OPINION

7.    In this section of my report, I summarize my opinion.  In the remaining sections of the report, I provide the substance of the facts and opinion on which I expect to testify, and the basis for this opinion.  If I receive additional data, facts or information, I will review, evaluate, and analyze these additional data, facts or information as they become available, including, but not limited to, the report(s) of experts in this matter.  I may modify or supplement my report as necessary to reflect any additional information that I receive.

> **Opinion:**  Barclays has undervalued the Giants Stadium bonds as well as the corporate and covered bonds that it acquired from Lehman Brothers Holding, Inc. and Lehman Brothers, Inc. by at least $381,439,055.

## IV.    OPINION AND BASE THEREOF

8.    The following table summarizes the results of my valuation analysis.  The details of my valuations are discussed below in sections A, B, and C.

| **TABLE 1** | | | | |
| :-- | :-- | :-- | :-- | :-- |
| **Value Difference for Corporate and Covered Bonds** | | | | |
| Bond Type | Number of Bonds | Correct Valuation | Barclays Value | Valuation Difference |
| Giants Stadium LLC Project Revenue Bonds | 4 | $408,325,000 | $58,995,135 | $349,329,865 |
| Corporate Bonds (Exc. Giants Stadium LLC) | 16 | $298,058,457 | $269,092,447 | $28,966,009 |
| Covered Bonds | 2 | $296,626,594 | $293,483,414 | $3,143,180 |
| Total | 22 | $1,003,010,051 | $621,570,996 | $381,439,055 |

### A.    BARCLAYS UNDERVALUED THE GIANTS STADIUM BONDS BY OVER $349 MILLION

9.    I conducted an independent valuation of the four Giant Stadium Bonds.  Barclays' valuation of the Giants Stadium Bonds totaled $58,995,135, or $349,329,864 less than my independent valuation.[2]  This $349,329,864 difference represents the

---

[2] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

**Contains Highly Confidential Information**

magnitude of Barclays' undervaluation of the Giant Stadium Bonds at the time of the Sale Transaction.

### 1.    Description of the Giants Stadium Bonds

10.    As part of the Sale Transaction, Barclays acquired four Giants Stadium Bonds with a total principal amount of $408,325,000 and a final maturity date of April 4, 2047.  These four bonds were part of a $650,000,000 bond offering that included a total of seven different bonds or subseries ("Subseries" or "Tranche").[3]

11.    The Giants Stadium Bonds were issued by Giants Stadium LLC ("Giants") to finance the costs of developing and constructing a new open air stadium at the Meadowlands Sports Complex in New Jersey ("Stadium").[4]  The Giants is a special purpose entity, separate from the New York Football Giants, Inc., formed to construct and operate the Stadium.

12.    The Giants Stadium Bonds are Auction Rate Securities ("ARS").  The coupon rate for each Sub-series or Tranche is determined by an auction process.[5]  Until its bankruptcy filing, LBI conducted the auction which set the coupon rate for these bonds.[6] Following Lehman's bankruptcy filing, Goldman Sachs was appointed as broker-dealer for the Giants Stadium Bonds.[7]  At the option of the Giants, the Giants Stadium

---

[3] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, Cover Page and p.6.

[4] Giants Stadium LLC Project Revenue Bonds, Series 2007A (Auction Rate Securities) Overview: "The Series 2007A Bonds (defined below) are being issued by Giants Stadium LLC, a New Jersey limited liability company (the "Issuer") in part to finance a portion of the costs of the design, development, construction and operation of a new, approximately 82,000 seat, open-air National Football League ("NFL") stadium, including related concession areas and other improvements (the "Stadium"), which will be used by New York Football Giants, Inc., owner and operator of the New York Giants professional football team (such entity and team each being referred to as the "Giants"), and New York Jets LLC, owner and operator of the New York Jets professional football team (such entity and team each being referred to as the "Jets"), for their Respective NFL home games."

[5] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 51, "Auction Rate Securities- Interest."

[6] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, "Auction Rate Securities-Broker-Dealers; Broker-Dealer Agreements."

[7] "Goldman Sachs to act as broker dealer," November 14, 2008, available at, http://www.giants.com/news/giants_stadium_llc/story.asp?story_id=31900-.

---

Expert Report of John J Olvany        Page 4

**Contains Highly Confidential Information**

Bonds were subject to redemption at a redemption price equal to the principal amount plus accrued and unpaid interest on the Interest Payment Date at the end of every 28 day Auction Period.[8]

13.    At the time of the initial offering of Giants Stadium Bonds, Lehman Brothers entered into a fixed/floating interest rate swap with the Giants with a notional value of $408,325,000 and a termination date of April 4, 2047, set to coincide with the bond maturities.[9]    Under the terms of the swap, Lehman paid a floating rate set by the auctions every 28 days to Giants, while Giants paid a fixed rate of 6.1885% to a Lehman Brother subsidiary, Lehman Brothers Special Financing ("LBSF").[10]    As a result, the Giants fixed their interest cost on the financing at 6.1885% even though the Giants Stadium Bonds themselves would have a variable rate as determined by the auction process.

14.    As stated in the Offering Memorandum:

The Lehman Swap Agreements are intended to hedge the interest rate risk on the Series 2007 A-4 Bonds, Series 2007 A-5 Bonds, Series 2007 A-6 Bonds and the Series 2007 A-7 Bonds (the "Lehman Related Bonds") by providing for payments to the issuer based on the actual rate on the Lehman Related Bonds…[11]

2.    The Sale of the Giants Stadium Bonds to Barclays and Barclays' Alternatives as the Holder of the Giants Stadium Bonds

15.    An ARS auction is deemed to have failed when a sufficient amount of bidders do not participate in the periodic auction. In the case of the Giants Stadium

---

[8] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 11, "Optional Redemption."

[9] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 26 – 28, "The Swap Transactions : The Lehman Swap Agreements."

[10] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 28, "The Lehman Swap Agreements" and Amended and Restated Confirmation, August 16, 2007 (Global ID 3286267).

[11] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 28, "The Lehman Swap Agreements."

**Contains Highly Confidential Information**

Bonds, auction failure triggers a reset of the coupon to a failed coupon rate, a rate set at 22% or the maximum allowable rate by law, whichever is lower.[12]

16.    Prior to filing bankruptcy, Lehman held $408,325,000 of Giants Stadium Bonds in the following four sub-series: 2007-A4, 2007-A5, 2007-A6 and 2007-A7.[13]  The coupon history of these bonds shows rate setting from 2.825% to 3.494% between February and September 2008.[14] During this period, both parties to the swap performed according to the agreed terms as the Giants paid Lehman the fixed rate of 6.1885% and Lehman paid the Giants the coupon rate received from the Giants Stadium Bonds each period.

17.    After closing of the Sale Transaction, Barclays took possession of the four Giants Stadium Bonds, but did not step into and assume Lehman's position in the swap agreement with Giants.  Giants had already terminated the swap agreement on September 18, 2008, but were obligated to continue paying the coupon rate set at each auction, regardless of the rate, without receiving that same rate from the swap with Lehman.[15]

18.    As the holder of the Giants Stadium Bonds, Barclays could either bid in the auction at any interest rate they were willing to receive each period or make their $408,325,000 principal amount of securities available for sale to other bidders.  It is well documented that there were few bidders for auction rate securities at this point in time.

---

[12] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, "(Bidding by Broker-Dealers…"*Auction Failure*" (which occurs if there are insufficient clearing bids and results in the auction rate being set at the Maximum Interest Rate))";  First Supplemental Indenture of Trust Dated as of August 1, 2007 to Indenture of Trust Dated as of August 1, 2007 Relating to Project Revenue Bonds, Series 2007A Offering Circular, Definitions and Other Provisions of General Application : "Maximum Interest Rate" shall mean the lesser of 22% per annum and the maximum rate of interest permitted by applicable law.

[13] See BCI-EX-00099519 (Dep. Ex. 86B)( providing inventory details); BCI-EX-(S)-00213995 (Dep. Ex. 641A) (same).

[14] Bloomberg: Giants Stadium Corporate Bond Description page (Floating Rate History).

[15] Giants Stadium LLC Proof of Claim, Court Claim Number 316, filed September 22, 2009). Letter from Giants Stadium LLC regarding Statement pursuant to Section 6(d) of ISDA Master Agreement (FGIC-insured) (October 2, 2008) ("Pursuant to our notice, September 18, 2008 (the "Notice") the Early Termination Date for the Transaction under the Agreement is September 18, 2008 and you are the Defaulting Party.").

---

Expert Report of John J Olvany        Page 6

**Contains Highly Confidential Information**

Nevertheless, as the holder, Barclays had a number of attractive alternatives at subsequent rate setting auctions, including:

   i.    Offering their securities for sale to another bidder at any rate lower than the maximum rate of 22%, thereby redeeming the full principal amount;

   ii.    Electing to bid to hold the entire position at any rate up to a maximum rate of 22%;

   iii.    Electing to bid for a portion of the position at any rate up to a maximum rate of 22% while offering the balance of their securities to any potential bidder willing to bid at any rate up to a maximum of 22%.

19.     Barclays could receive rates as high as 22% for each period those bonds were either not redeemed by Giants or other potential bidders did not submit bids lower than Barclays in the auctions. In either scenario where the bonds were redeemed, Barclays would receive the full principal value.

20.     It is also highly likely that Barclays was aware of the Giants willingness to redeem the bonds in the event of extremely high periodic coupon rate. According to Barclays' trading records and publically available sources, the Giants did in fact redeem many, and possibly all of the remaining notes held by Barclays at the full principal value between April 28, 2009 and May 21, 2009.[16] The Giants also had redeemed $100,000,000 of the bonds on April 15, 2008.[17] The Giants likely took these actions to avoid high interest costs resulting from the lack of sufficient bidders willing to hold these securities at these rates.[18] Additionally, Barclays reduced its holdings of Giants Stadium Bonds by $102,000,000 between September 19, 2008 and December 31, 2008 and recorded a gain of $349,329,865.[19]

---

[16] BCI-EX-00297526 (Barclays Trading Data); BCI-EX-00297526-00297541 (Bloomberg Security Descriptions and Corporate Actions).

[17] "NFL's Giants Redeeming $100 million in Auction Debt" by Aaron Kuriloff and Michael McDonald, Bloomberg.com, April 15, 2008.

[18] Bloomberg: Giants Stadium Corporate Bond Description page (Floating Rate History).

[19] BCI-EX-00297320 (supporting "Post Sale Transaction gains and losses for acquired inventory"); BCI-EX-00295932-BCI-EX-00295933(Dep. Ex 533A) (showing a reduction of the four Giants Stadium Bonds held by 12/31/2008 of $102,000,000 and a gain of $349,329,865). The actual

**Contains Highly Confidential Information**

3.    <u>The Correct Valuation of the Giants Stadium Bonds</u>

21.    In order to arrive at a proper valuation of the Giants Stadium Bonds, I assessed the financial condition of the Giants at the time of the Sale Transaction.  On September 17, 2008, just prior to Barclays' acquisition of the Giants Stadium Bonds on September 22, 2008, Moody's Investor Service published an investment grade rating for the Giants and deemed the outlook to be stable.[20]  In its assessment of Giants' financial condition, among other items, Moody's cited the investor protection of a 6 to 12 month debt service reserve fund and the significant amount of long-term contractually obligated revenue sources sufficient to pay approximately 80% of pledged project revenues.[21]  A debt service reserve fund requires that Giants maintain cash sufficient to make timely interest payments for the next 6 to 12 months.  Given the breakdown of the ARS market, investor protective measures are especially important because they permit bond holders to be certain of interest payments regardless of auction outcomes.  In addition to the long-term contractual revenue sources, and the debt service reserve fund, Moody's cited the additional benefit of "two major football teams with well-established franchises."[22]  In addition to Moody's assessment, the Giants themselves stated their "strong underlying credit" in the weeks immediately following the closing of the Sale Transaction.[23]

22.    Based on the Giants' option to redeem, incentive to refinance, and its financial condition, I determined that the Giants were able to pay high periodic coupon rates or redeem the Giants Stadium Bonds either in full or partially every period.

---

transactions between September 19, 2008 and December 31, 2008 that resulted in these gains were not produced in discovery.

[20] Moody's Investor Service Rating Action September 17, 2008, "Moody's Publishes Baa3 Underlying Rating of Giants Stadium LLC; Underlying Outlook is Stable."

[21] Ibid.

[22] Ibid.

[23] Giants Stadium LLC Proof of Claim, Court Claim Number 316, filed on October 22, 2008; stamped as Letter from Giants Stadium LLC regarding Statement pursuant to Section 6(d) of ISDA Master Agreement (FGIC-insured) October 2, 2008: "it is important to note that the stadium project is at this time on budget and a strong underlying credit…"

23.    Establishing Barclays' ability to set a high periodic coupon rate up to 22% on all four Giants Stadium Bonds and Giants' ability to meet its financial obligation to pay the periodic interest payments is the first step toward valuation of these bonds. The remaining step for valuation is to determine how long the Giants would be willing to pay the high coupon or, alternatively, when would they refinance the Giants Stadium Bonds held by Barclays.

24.    Based on the Giants' previous actions with other failed auctions, I have valued the securities under various redemption scenarios.[24]  Given the Giants' prior actions, the investment grade credit rating and profile of the project, it is reasonable to conclude that the Giants would use their option to redeem the bonds now. As discussed above, the Giants did redeem the notes Barclays held at the full principal value between April 28, 2009 and May 21, 2009.[25]

25.    It is my opinion that a reasonable market participant would have expected the Giants Stadium Bonds to be refinanced and repaid at par, and I have valued them accordingly.  I priced the bonds at various rates from up to 16% with a variety of redemption timing scenarios.[26]  All the redemption and coupon rate scenarios resulted in valuations of *at least* the full principal value.

26.    It is plausible that market conditions for ARS could be expected to change, and that other potential buyers would be willing to bid for the Giants Stadium Bonds.   Under these conditions, Barclays would also receive full principal value if the new investor's bid was lower than Barclays' and the bids were sufficient to purchase all the bonds held by Barclays.[27]  In this scenario, the value of the bonds would be of equal value as if redeemed by the Giants.

---

[24] "NFL's Giants Redeeming $100 million in Auction Debt" by Aaron Kuriloff and Michael McDonald, Bloomberg.com, April 15, 2008.

[25] BCI-EX-00297526 (Barclays Trading Data); BCI-EX-00297526-00297541- (Bloomberg Security Descriptions and Corporate Actions).

[26] November 19, 2008, Email from Sean Teague to Paul Copson within document Bates- stamped PwC-BarCapWP_00022935.

[27] BCI-EX-00297320 (supporting "Post Sale Transaction gains and losses for acquired inventory"); BCI-EX-00295932-BCI-EX-00295933(Dep Ex 533A), (showing a reduction of the four Giants Stadium Bonds held by 12/31/2008 of $102,000,000 and a gain of $349,329,865). The actual

**Contains Highly Confidential Information**

27.    Based on my thorough review of the Giants Stadium Bonds deal documentation and my experience in operating in the ARS market during 2008, I valued the four Giants Stadium Bonds at $408,325,000 on September 19, 2008. Barclays valued these same securities at $58,995,135, or $349,329,864 less than my independent valuation.[28] This $349,329,864 difference represents the extent to which the Barclays underestimated the value of the Giant Stadium Bonds at the time of the Sale Transaction.

### 4.    Barclays' Errors in Valuing the Giants Stadium Bonds

28.    In valuing the Giants Stadium Bonds, Barclays used the prices provided by its custodian, Bank of New York ("BoNY"), of $10.01, $10.04, $10.09 and $43.94 on a principal face amount of $100 each.[29] Barclays utilized the custodial value based on BoNY prices in the absence of vendor pricing from any of its primary sources.[30] It is understandable that vendor pricing was not available for these securities because none of them are public securities and it was well known in the financial markets that the auction rate securities market was not functioning as it had historically. However, it was unreasonable for Barclays to accept these deeply discounted prices for a group of securities rated investment grade by Moody's on September 17, 2008, only a few days prior to Barclays' valuation date. Moreover, the Giants had demonstrated their ability to pay debt service and willingness to redeem the securities at full principal face amount of $100.[31] Prior to accepting a deeply discounted price of this magnitude, Barclays should have undertaken further due diligence and review to understand the various characteristics of the securities. In fact, on October 31, 2008, Barclays increased its

---

transactions between September 19, 2008 and December 31, 2008 that resulted in these gains were not produced in discovery.

[28] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[29] Securities Listing and Pricing Sources.xls, embedded file within PwC-BarCapWP_00022935; BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[30] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[31] Moody's Investor Service-Ratings Action (September 17, 2008), "Moody's Publishes Baa3 Underlying Rating of Giants Stadium LLC; Underlying Outlook is Stable";NFL's Giants Redeeming $100 million in Auction Debt," by Aaron Kuriloff and Michael McDonald, Bloomberg.com, April 15, 2008.

---

**Contains Highly Confidential Information**

marks from $10.01, $10.04, and $10.09 to $75 for three bonds and from $43.94 to $80 for an increase in valuation of $249,898,615.[32] On December 31, 2008, Barclays increased the valuation yet again to full value for all four bonds, an increase of $349,329,865.[33]

29.    In reaching his conclusion that Barclays' valuation of the Giants Stadium Bonds was reasonable in "an orderly sale under current conditions," Professor Pfleiderer has not provided sufficient reliance materials that would have been necessary to reach the conclusion that the prices provided by BoNY were reasonable.[34] It does not appear that Professor Pfleiderer reviewed any offering memoranda or any other documents specifically related to these securities, including the Moody's report which published an underlying investment grade rating for the Giants Stadium Bonds despite Moody's downgrade of the Financial Guaranty Insurance Company ("FGIC") to non-investment grade, which guaranteed the Giants Stadium Bonds.[35] The only documents produced by Professor Pfleiderer were articles in the financial press discussing the financing, which did not demonstrate adequate due diligence in reaching these conclusions.  Additionally, with regard to the Giants Stadium Bonds, Professor Pfleiderer stated that:

> I just can't remember the particular things that were done with respect to these as opposed to other sets of securities.[36]

B.    **BARCLAYS UNDERVALUED THE CORPORATE BONDS BY NEARLY $29 MILLION.**

30.    I conducted an independent valuation of 16 corporate bonds that were included in the Sale Transaction.  In my opinion, these bonds had a market value of $298,058,457 on September 19, 2008.  Barclays valued these securities at $269,092,447,

---

[32] PwC-BarCapWP_00022935; (Additional Assets- "Giants Stadium-Description of Movement").

[33] BCI-EX-00295932-BCI-EX-00295933, (Dep. Ex. 533A); BCI-EX-00297320.

[34] Expert Report of Paul Pfleiderer, January 8,2010, Volume 1. Appendix 4 at 114.

[35] Moody's Investor Service-Ratings Action September 17.2008 "Moody's Publishes Baa3 Underlying Rating of Giants Stadium LLC; Underlying Outlook is Stable."

[36] Professor Pfleiderer Deposition, February 23, 2010, at 316:23-25.

**Contains Highly Confidential Information**

$28,966,009 less than the correct valuation.[37]  This $28,966,009 difference represents Barclays' undervaluation of these securities at the time of the Sale Transaction.

31.    Barclays received a portfolio of corporate bonds as part of the Sale Transaction.  This portfolio included a wide variety of corporate bonds, including securities paying interest on a fixed schedule, securities paying interest on a floating schedule based on a pre-determined formula, and hybrid securities paying interest on a combination of both.  In addition, the portfolio included investment-grade[38] and non-investment-grade bonds issued by foreign and domestic companies.

1.    Background and Introduction to Analysis of Corporate Bond
Pricing

32.    Corporate Bonds are traded in private transactions between a dealer and an investor or between two dealers.  Trades for many corporate bonds are reported within 15 minutes of the transaction and included in Trade Reporting and Compliance Engine ("TRACE") database which is supported by the Financial Industry Regulatory Authority ("FINRA") and regulated by the Securities and Exchange Commission ("SEC").  Details of actual transactions are available for many corporate bonds.  However, due to the infrequent trading of these securities, at times, alternative approaches must be considered in valuing corporate bonds.

33.    Using actual transaction data from the TRACE database, I initially researched whether there was actual September 19, 2008 transaction data for these 16 corporate bonds. My analysis of actual transaction data only considered comparable transactions for either the investment grade or non-investment grade corporate bonds.[39]

34.    Where actual transaction price data was unavailable, I valued these 16 corporate bonds using a discounted cash flow analysis, which determines the stream of cash flows due from a bond and discounts them to account for the time value of money,

---

[37] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[38] Issues rated BBB- (S&P/Fitch) or Baa3 (Moody's) or higher by major credit rating services are generally considered investment grade.

[39] My valuation of investment grade bonds only considered transactions greater than $3 million and for non-investment grade bonds transactions greater than $500,000.

**Contains Highly Confidential Information**

the risk of default, and other possible market factors. Barclays apparently did not attempt to value any bonds in the portfolio by any method other than external pricing sources.[40]

35.    Using available market sources to determine the risk-free interest rate term structure and default probability curve, I generated model bond prices for the relevant specified dates using a state of the art bond pricing model. This methodology assigns weights to each of the cash flows, which reflect the survival probability of receiving the expected cash flow from the issuer. In particular, the model determines the likelihood of timely repayment of principal and interest and the likelihood of default.

36.    Using my methodology of valuing the corporate bonds on September 19, 2008, I valued 16 corporate bonds at $298,058,457. Barclays' valuation for these securities is $28,966,009 less than my independent valuation.[41]    This $28,966,009 difference represents the extent of Barclays' undervaluation of these securities. Consistent with Barclays' methodology described below, I did not reduce the valuation of the corporate bonds to reflect liquidity conditions in the market.

### 2.    Barclays Misapplied Third Party Pricing It Obtained

37.    In arriving at a valuation for the corporate securities, Barclays calculated its valuation using the ***lowest*** price provided to it by pricing sources. Barclays elected to follow this practice regardless of the number of prices provided by its sources.[42]    In addition, Barclays did not evaluate the reliability of the low price in the context of the other prices provided for that security. The low price was used regardless of the range of prices between the highest and lowest price provided by its sources or its proximity to the average price that could have been calculated by Barclays. If only one price was provided for a security, that single price was utilized to value the entire position in that

---

[40] Barclays' valuation methodology resulted in mistakes that undervalued some bonds in the portfolio. For example, Barclays gave no value to a high yield bond issued by Intelsat Bermuda Ltd at the time of the Sale Transaction. Barclays increased the valued of its Intelsat Bermuda bond to $8,400,000 at December 31, 2008. I valued the bonds as of September 19, 2008, at $10,602,670. (BCI-EX-00099519) (Dep. Ex 86-B);(BCI-EX-(S)-00213995) (Dep-Ex-641A); (BCI-EX-00297320).

[41] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[42] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

**Contains Highly Confidential Information**

security. Finally, Barclays did not adjust its valuations for liquidity or use a reliable actual transactional date from TRACE.

38. Table 2, below, demonstrates that if Barclays used the average price provided by its third party pricing source instead of the lowest price, the value of the corporate bond portfolio would be higher by $20,289,948.

<table>
<tr><th colspan="13" style="text-align:center">TABLE 2<br>Third Party Valuation Differences</th></tr>
<tr><th rowspan="2">Total CUSIPs Analyzed</th><th rowspan="2">Average Quantity of Prices per Bond</th><th rowspan="2">Bonds with Single Price</th><th rowspan="2">Bonds with No Price</th><th rowspan="2">Percent not in Sort</th><th rowspan="2">Bonds with at Least Two Prices</th><th rowspan="2">Total Market Value with Min</th><th colspan="4">Bonds with at Least Two Prices</th></tr>
<tr><th>Market Value Difference, Min to Avg</th><th>Market Value Difference, Min to Max</th><th>Percent Change from Min to Avg</th><th>Percent Change from Min to Max</th></tr>
<tr><td>517</td><td>2.69</td><td>54</td><td>83</td><td>26.50%</td><td>380</td><td>$1,179,308,003</td><td>$20,289,948</td><td>$21,790,857</td><td>1.72%</td><td>1.85%</td></tr>
</table>

39. By utilizing the lowest price provided for each corporate bond, Barclays valued the entire corporate bond portfolio at the lowest price possible. This method would seek out prices that are erroneous, defensive, or otherwise unreliable, but Barclays did not make any effort to eliminate prices that may have been reported by its sources that were unreasonable or unreliable in the context of the other prices provided to them. Where Barclays obtained multiple prices significantly above a single low price, Barclays ignored clear evidence that the lowest price was unreliable based on these other prices.

40. Finally, while Barclays used third party pricing sources, it chose not to use the only actual transaction data available for corporate securities from the TRACE database.[43] Barclays did not use this data source which is based on actual market transactions and not on price information obtained from dealers' trading books or other third party sources.

---

[43] The reported trade volume is capped at $1 million for high yield and unrated bonds and at $5 million for investment grade bonds; Since the final implementation on July 1, 2005, reporting any transaction in qualifying corporate bonds is obligatory for broker-dealers and follows a set of rules approved by the Securities and Exchange Commission (SEC) where all transactions must be reported within 15 minutes of the transaction time. "SEC Approves Amendments to TRACE Rule 6230 to Reduce the Reporting Period to #0 minutes on October 1,2004, and to 15 minutes on July 1, 2005" available at http://www.finra.org/web/groups/industry/@ip/@reg/@notice/documents/notices/p006136.pdf.

---

**Contains Highly Confidential Information**

41.     In his report, Professor Pfleiderer acknowledges that Barclays generally used the minimum quoted price provided by third party sources to value corporate bonds.[44] Professor Pfleiderer apparently accepted this methodology, based on a general view obtained from his staff's conversations with Barclays' representatives regarding falling market prices.  Specifically Professor Pfleiderer states; "the notion was within the time period that they were looking at, prices were falling."[45]  In fact, Professor Pfleiderer acknowledges that discussions "about falling prices" may not have even related to corporate bonds where the valuations were based on minimum prices provided by third parties:

> But that may have been a discussion on corporate or it may have been a discussion on some other group of assets. But I do recall that there was justification for taking the minimum based upon the fact that markets were falling at the time.[46]

42.     In his deposition, Professor Pfleiderer admits that he did not review Barclays' policy for valuing corporate securities to determine whether using minimum prices to value securities was appropriate.[47]

43.     In accepting Barclays' valuation, Professor Pfleiderer accepts the lowest possible valuation for this entire portfolio of assets without any analysis of the portfolio on a CUSIP by CUSIP basis.  The general policy of utilizing the minimum price of third party provider is unreasonable because no market participant in the corporate bond market would attempt to exit his position at the minimum price available in the corporate bond or any other market.  A rational investor would not sell assets at the minimum price quoted in the market.  Instead, it is customary to get prices from multiple sources and sell to the highest bidder, not the lowest.

---

[44] Professor Pfleiderer Deposition, February 23, 2010, at 27: 20.

[45] Professor Pfleiderer Deposition, February 23, 2010, at 265:8-10, at 276:24, 277:1-25.

[46] Professor Pfleiderer Deposition, February 23, 2010, at 265:8-10, 265:13-18.

[47] Professor  Pfleiderer Deposition, February 23, 2010, at 264:16, 264-22.

**Contains Highly Confidential Information**

C.    **BARCLAYS UNDERVALUED THE COVERED BONDS BY OVER
$3 MILLION**

44.    I conducted an independent valuation of two covered bonds included in
the Transaction.  In my opinion, these bonds had a September 19, 2008 market value of
$296,626,594.  Barclays valued these same securities at $293,483,413, $3,143,180 less
than my valuation.    This difference represents Barclays' undervaluation of these
securities at the time of the Sale Transaction.

45.    Some of the largest positions of corporate securities transferred to
Barclays are a sub-category of bonds commonly referred to as Covered Bonds.  Covered
Bonds are debt obligations of banks that offer investors two levels of protection from loss
of principal.  Generally issued by European banks, they are backed by a special pool of
collateral, typically high grade mortgages that remain on the bank's balance sheet, and
the general credit of the issuer.  Though backed by mortgages, covered bonds are not
subject to amortization or prepayment because the pools are managed, i.e. prepayments
are replaced by comparable assets.    The dual protection offered by covered bonds
distinguishes them from both senior unsecured debt and asset-backed securities.[48]

46.    Due to their additional protections, covered bonds are valued with
significantly lower risk premiums than the senior unsecured obligations of the same
issuer.  To value these instruments, I applied the pricing convention used for the deep and
liquid U.S. Agency debenture market. This pricing convention is used for the U.S.
debenture market because of the minimal default probability recognized by market
participants.

47.    The U.S. agency debenture market is priced relative to the matched
maturity U.S. dollar swap curve.  Similarly, I valued European bank issued U.S. dollar
covered bonds based on secondary market spreads for comparable securities acquired
from contemporaneous market research.    This methodology is consistent with the
methodology followed by market participants in the U.S. agency, sovereign and
supranational bond markets.

---

[48] BIS Quarterly Review (September 2007).

**Contains Highly Confidential Information**

48.    Using my methodology of valuing the covered bonds with contemporaneous data sources specific to this category of highly-rated corporate securities, I valued the two covered bonds at $296,626,594.  Even after reducing this value by the same 5% discount that Barclays used to account for the liquidity conditions in the covered bond market, Barclays' valuation was $3,143,180 less, which reflects Barclays' undervaluation of these securities at the time of the Sale Transaction.

49.    In arriving at a valuation for the covered bonds, Barclays calculated an average of two pricing sources also used to provide prices for the U.S. Treasuries and Agency securities.  After calculating the average of the prices received, Barclays reduced the valuation by 5%, presumably as a liquidity discount.  Due to the depth of contemporaneous market information, my valuations are only 1.12% different from Barclays' after including the same reduction for liquidity.

50.    The total amount of covered bonds in the portfolio was $375,475,000, including a covered bond issued by a Spanish Bank, Banco Bilbao Vizcaya Argentari, S.A. (CUSIP 05946KAA9) that was the 12th largest position in the entire portfolio of 1,182 which included U.S. Government and Agency securities. Despite the size of this portfolio and particularly the size of one of the positions relative to the portfolio, the Pfleiderer Report did not analyze any of this asset group and instead viewed it as the same as the U.S. Agency Securities portfolio.  The lack of discussion or analysis put toward valuing these securities in the Pfleiderer Report is indicative of the lack of review conducted for the Pfleiderer Report in arriving at an opinion on the reliability of the Barclays' valuation of the portfolio of securities included in the Sale Transaction.

---

**Contains Highly Confidential Information**

Submitted by

John J. Olvany

March 15, 2010

---

**Contains Highly Confidential Information**

**Appendix I**

**Curriculum Vitae**

## JOHN J. OLVANY

30 South Wacker Drive, Chicago IL 60606
john.olvany@naviganteconomics.com
(312) 251-5200

_____

## CURRENT EMPLOYMENT

**NAVIGANT ECONOMICS, Chicago IL**                    **December 2008-Present**
**Senior Advisor**

## PROFESSIONAL EXPERIENCE

**CHILTON PARTNERS LLC, Wilmette, IL**                    **September 2008-Present**
**Founder and Managing Partner**
Provide consulting services for disputes and investigations in financial services sector. Primarily focused on litigation support regarding fixed income securities and derivatives including mortgage-backed securities, structured products, credit default swaps, corporate bonds, and collateralized debt obligations.

**MORGAN STANLEY, Chicago, IL**                    **2000-2008**
**Managing Director**, **Institutional Securities Group**
*Head of Chicago Institutional Fixed Income Distribution Office*
Managed and supervised team of thirteen sales professionals trading fixed income products with more than 100 investors including pension funds, banks, insurance companies, investment advisors, and hedge funds.

Products traded by team included residential mortgage backed securities, corporate bonds, structured products, CDOs, and government and agency securities

Monitored Legal and Compliance matters across all major product areas of fixed income including futures and derivatives.

Responsibilities included oversight of marketing materials and valuation distribution for all fixed income products to entire client base.

*Senior Credit Sales Professional*
Provided senior sales coverage for institutional client base of hedge funds, insurance companies, banks, and asset managers.

Traded all fixed income products with primary concentration in credit products including corporate bonds, credit default swaps, credit index and CDOs.

Developed and executed portfolio strategies and trade recommendations by utilizing firm's trading, research, and analytic resources.

Negotiated and executed complex distressed portfolio liquidations to maximize value for client and minimize firm's principal risk in turbulent market conditions.

Contains Highly Confidential Information

## PROFESSIONAL EXPERIENCE (CONTINUED)

***Senior Manager of Institutional Sales and Trading Group-Midwest Region***

Acted as Cross-Divisional Relationship Manager for Morgan Stanley with key Midwest institutional clients including Principal Financial, Allstate, Nationwide, and Aegon.

Coordinated with other business units in Chicago (Private Wealth Management, Investment Banking, Prime Brokerage, and Institutional Equity) in matters relating to Institutional Fixed Income Products and assisted with cross-selling of products and services.

**CREDIT SUISSE FIRST BOSTON**, Chicago, IL                        1996-2000

**Executive Director**, **Fixed Income Sales**

Responsible for fixed income sales relationships with institutional client base of Insurance Companies, Pension Funds and Asset Managers located in the Midwest
Executed transactions in corporate bonds, derivatives, and securitized products including CMOs, ABS, CMBS, structured notes and CDOs.

**MORGAN STANLEY, Chicago, IL**        1991-1996 Vice President, Fixed Income Sales

Responsible for fixed income sales relationships with institutional client base of Insurance Companies, Pension Funds, Banks and Asset Managers.
Executed transactions in corporate bonds, derivatives, and securitized products including Index and Fund-linked notes, CMOs, ABS, CMBS, and CDOs.
Traded the first generation of collateralized debt obligations, including CBOs backed by high yield bonds.

**CONTINENTAL ILLINOIS BANK, Chicago, IL**                        1989-1991
**Vice President, Capital Markets Group**
Senior market maker for Long Intermediate Treasury Securities.
Traded with Central Banks, Asset Managers, Regional Banks and Arbitrage Funds.

**S.G. WARBURG, Tokyo, Japan**                        1986-1989
**Vice President, U.S. Treasury Dealer Desk**
Tokyo Representative of U.S. Treasury Dealer

# TESTIMONIAL AND CONSULTING EXPERIENCE

- Authored three expert reports and testified before the London Court of International Arbitration in the matter between fixed income relative value hedge fund and its administrator.                        **September 2008-June 2009**
- Authored expert report for Grand Court of the Cayman Islands in the matter between Phoenix Meridian Equity Limited vs. Lyxor Asset Management S.A., a wholly owned subsidiary of Societe Generale and Scotiabank & Trust (Cayman) Limited
  Cause Number 311 of 2007                        **June 2009**

Expert Report of John J Olvany

**Contains Highly Confidential Information**

## TESTIMONIAL AND CONSULTING EXPERIENCE (CONTINUED)

- Consulted with Respondent's counsel prior to arbitration before Financial Industry Regulatory Authority (FINRA) in matter between several institutional investors and a global bank.                              **March-April 2009**
- Authored expert report for United States District Court Southern District of New York in a matter between Securities and Exchange Commission v. Jon-Paul Rorech and Renato Negrin (Civil Action No. 09-CIV-4329)                  **February 2010**

## EDUCATION

**B.A., Political Science, Williams College, Williamstown, MA                  1982**

## REGISTRATIONS

Series 7, 9, 10 and 63

Expert Report of John J Olvany

Contains Highly Confidential Information

**Appendix II**
**Documents Relied Upon**

## Documents in the Record

### Depositions

| Deponent | Date |
|---|---|
| Gary Romain | 9/10/2009 |
| Gary Romain | 1/13/2010 |
| Paul Pfleiderer | 2/23/2010 |

### Deposition Exhibits

| Exhibit | Beginning Bates | Ending Bates |
|---|---|---|
| 86B - Summary of the numbers for Schedules A and B provided to auditors | BCI-EX 00099519 | BCI-EX 00099521 |
| 495 - Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, dated Sept. 15, 2009 | | |
| 533A - Lehman Acquisition Assets Summary | BCI-EX-00295932 | BCI-EX-00295933 |
| 633A - Expert Report of Prof. Paul Pfleiderer, Volume 1 | | |
| 634A - Expert Report of Prof. Paul Pfleiderer, Volume 2 | | |
| 641A - Email from Sean Teague to Tal Litvin, et al., Feb. 12, 2009, re: "Acquisition Balance Sheet," (with attachments). | BCI-EX-(S)-00213990 | BCI-EX-(S)-00213996 |

## Other Documents

| Description | Beginning Bates | Ending Bates |
|---|---|---|
| Giants Stadium Contributing Pricing Factors | BCI-EX_00297331 | |
| Post Sale Transaction Gains & Losses for Acquired Inventory | BCI-EX-00297320 | |
| Bloomberg screen shots, Giants Stadium Bonds | BCI-EX-00297526 | BCI-EX-00297541 |
| Email from Sean Teague to Paul Copson | PwC-BarCapWP_00022935 | |
| Additional Assets -"Giants Stadium - Description of Movements" | PwC-BarCapWP_00023300 | |
| Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular | | |
| Giants Stadium LLC Proof of Claim, Court Claim Number 316, filed on Oct. 17, 2008 | | |
| Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006, dated Sept. 15, 2009 | | |
| Review of Barclay's Capital Price Testing Methodology and Framework | | |
| The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), dated September 15, 2009 | | |
| The Trustee's Adversary Complaint, dated Nov. 16, 2009 | | |

## Documents that are Publicly Available

Bank of International Settlements (BIS) Quarterly Review (September 22, 2008)
Bloomberg LP Data
http://www.finra.org/web/groups/industry/@ip/@reg/@notice/documents/noticse/p006136.pdf
http://www.giants.com/news/giants_stadium_llc/story.asp?story_id=31900-
NFL's Giants Redeeming $100 million in Auction Debt
Port Authority Auction Bonds Reset at 8% After Surge, Bloomberg.com
The Port Authority of new York and New Jersey, Press Release No. 24-2008

## Other Documents Not Cited in the Record and Not Publicly Available

Barclay's Capital Live Data Pull
BT Bulk DD - MABondTicker 09 28 2009 (Spread)
CDS 19-09-2008+12-22-2008
Mabon Ticker 091908
Mabon Ticker 092208

Contains Highly Confidential Information

## Appendix III

## Methodology and Data Used

### <u>Giants Stadium</u>

1.     Due to the lack of a pricing model for securities with coupon rates set by an auction process and uncertainty of expected future cash flows based on the willingness and ability of Giants to fully redeem the securities at face value or extend the securities each period, I constructed a model to value the securities with the assistance of my staff working at my direction.

2.     To price the bonds, I used the default forecasts embedded in the Credit Default Swap ("CDS") spreads to discount the expected cash flows on each Giants Stadium Bond.  The actively traded CDS market is a recognized by market participants as a market based indicator of default and survival probability in the fixed income market. No published pricing of CDS spreads is available for Giants Stadium. However, CDS prices on comparable Baa3 credits provide a proxy for valuing the Giants Stadium bonds. Due to the lack of observable CDS pricing, I increased the comparable CDS spreads significantly.

3.     I then discounted each cash flow received from the Giants Stadium bonds using the LIBOR curve plus a spread obtained from the CDS market and added to the LIBOR rates. Although the scheduled timing of these cash flows is known, the number of payments is not because Giants can choose to redeem. Using a 16% coupon rate for the Giants Stadium Bonds, well below the maximum possible coupon of 22%, I discounted the monthly cash flow using a discount rate incorporating LIBOR and a survival

Expert Report of John J Olvany

**Contains Highly Confidential Information**

probability for each period.  I then calculated prices for each period over the next two years.  Finally, I analyzed the redemption scenario for each period using various discount rates and concluded that the Giants Stadium Bonds' value would never be less than the full principal amount.

4.　　　Alternatively, I analyzed scenarios where the bonds would default at the end of each period and the investor would either receive the cash flow of each coupon period or some recovery rate for their investment.  In each instance, this method provided similar valuations in excess of par.

## **Corporate Bonds**

5.　　　The heart of corporate bond valuation is discounted cash flow analysis: determining the stream of cash flows due and discounting them to account for the time value of money, the risk of default, and other possible market factors.  Discounts are applied using an interest rate term structure[1] and an adjustment for credit risk determined through appropriate survival probability, or equivalent default probability.

6.　　　Credit risk can be handled either by adjusting the cash flows or the discount factors.  I applied the more widely used method of adjusting the bond cash flows, using the survival probability to determine the bond's value.

7.　　　To determine the market based inputs for corporate bond cash flow survival probability, I observed the CDS prices across a range of maturities. CDS price data documents the way traders accounted for the risk that the issuer of a bond defaults,

---

[1] Per standard industry convention, I have used LIBOR rates to represent the interest rate term structure.

Expert Report of John J Olvany

**Contains Highly Confidential Information**

i.e. a company. CDS closing price data was obtained from Markit Group Ltd., Bloomberg and Barclays Capital Live.

8.      The interest rate data and bond cash flow descriptions for each individual bond were sourced from Bloomberg. Prices implied by default probabilities from the credit default swap market and actual bond prices are distinct; this difference is commonly referred to as the "basis."  In order to adjust for this basis, I relied on Morgan Stanley data from contemporaneously published research reports.[2]  When I did not have the basis for individual bonds, I relied upon the credit default swap basis provided by Morgan Stanley for the industry Bloomberg classified the bond within.

9.      If a specific corporate bond cash flow was dependent on optional redemption by the issuer or changes in the coupon rate based on a predetermined formula, I valued the optional features.

10.      I valued the corporate bonds using the CDS data and basis.  I checked my results by calculating an option adjusted spread for each security from the prices derived from the CDS data and basis pricing.  I found the results obtained from both methods to be consistent.

## **Covered Bonds**

11.      In addition to the interest rate data gathered from Bloomberg for the September, 19, 2008 valuation of the corporate bonds, I used contemporaneous market research available from Barclays Capital Live to determine primary and secondary market trading levels for the covered bond sector of the corporate bond market. The research provided

---

[2] The credit default swap basis defines the relationship in pricing between the corporate bond and credit derivatives market.

Expert Report of John J Olvany

**Contains Highly Confidential Information**

pricing information for covered bonds issued by numerous banks in North America and Europe.

12.     The bond description information available for each covered bond from Bloomberg was imported into the pricing model. Using contemporaneous pricing for interest rates and the market spreads observed, I calculated prices for these securities. To test these results, I compared the valuation of these securities to other highly rated securities such as U.S. agency debentures and sovereign bonds.  The results were consistent.

Expert Report of John J Olvany

| Asset Class | CUSIP |
|---|---|
| **Corporate Bonds** | 413627AY6 |
| | 656533AA4 |
| | 962166BP8 |
| | 80927GAH9 |
| | 52517PK59 |
| | 00386SAE2 |
| | 026874BU0 |
| | 52517PA35 |
| | 52517PYN5 |
| | 458204AD6 |
| | 89354FAE1 |
| | G46715AD3 |
| | 00254ECN0 |
| | 026874BR7 |
| | 48121CA97 |
| | 06739GAD1 |
| **Covered Bonds** | 05946KAA9 |
| | 40411EAA6 |
| **Giants Stadium LLC** | 374593AL5 |
| | 374593AM3 |
| | 374593AN1 |
| | 374593AP6 |
| **Corporate Bond** | **16** |
| **Covered Bond** | **2** |
| **Giants Stadium LLC** | **4** |
| **Total Sum** | **22** |

Expert Report of John J Olvany

| Asset Class | CUSIP | Chicago Partners Bid Value 09/19/08 | Barclays Bid Value | Difference between Chicago Partners and Barclays Values (bid to bid) |
|---|---|---|---|---|
| Corporate Bonds | 413627AY6 | 50,964,636.617 | 45,126,579.375 | 5,838,057.242 |
| | 656533AA4 | 54,409,412.587 | 49,715,318.385 | 4,694,094.202 |
| | 962166BP8 | 57,115,313.390 | 56,719,949.955 | 395,363.435 |
| | 80927GAH9 | 28,920,783.211 | 26,244,893.237 | 2,675,889.974 |
| | 52517PK59 | 4,227,300.000 | 5,736,150.265 | (1,508,850.265) |
| | 00386SAE2 | 19,122,918.601 | 18,122,337.505 | 1,000,581.096 |
| | 026874BU0 | 10,747,241.000 | 10,865,932.838 | (118,691.838) |
| | 52517PA35 | 2,898,006.250 | 4,178,002.235 | (1,279,995.985) |
| | 52517PYN5 | 2,707,052.500 | 4,417,693.566 | (1,710,641.066) |
| | 458204AD6 | 10,602,669.702 | 0.000 | 10,602,669.702 |
| | 89354FAE1 | 13,789,751.526 | 11,829,659.250 | 1,960,092.276 |
| | G46715AD3 | 6,803,836.080 | 6,825,648.750 | (21,812.670) |
| | 00254ECN0 | 5,010,610.000 | 5,072,856.300 | (62,246.300) |
| | 026874BR7 | 8,404,635.942 | 4,216,784.850 | 4,187,851.092 |
| | 48121CA97 | 12,924,304.250 | 11,002,532.676 | 1,921,771.574 |
| | 06739GAD1 | 9,409,985.160 | 9,018,108.258 | 391,876.902 |
| Covered Bonds | 05946KAA9 | 260,281,000.000 | 258,337,209.750 | 1,943,790.250 |
| | 40411EAA6 | 36,345,594.000 | 35,146,203.753 | 1,199,390.248 |
| Giants Stadium LLC | 374593AL5 | 118,400,000.000 | 11,848,524.800 | 106,551,475.200 |
| | 374593AM3 | 118,400,000.000 | 11,892,688.000 | 106,507,312.000 |
| | 374593AN1 | 118,525,000.000 | 11,964,980.225 | 106,560,019.775 |
| | 374593AP6 | 53,000,000.000 | 23,288,942.000 | 29,711,058.000 |
| Corporate Bond | 16 | 298,058,456.816 | 269,092,447.445 | 28,966,009.372 |
| Covered Bond | 2 | 296,626,594.000 | 293,483,413.503 | 3,143,180.498 |
| Giants Stadium LLC | 4 | 408,325,000.000 | 58,995,135.025 | 349,329,864.975 |
| Total Sum | 22 | 1,003,010,050.816 | 621,570,995.972 | 381,439,054.844 |

## Summary of Valuation Differences for Corporates as Distinguished by Exhibit 86-B
### (amounts in millions of dollars)

|  | | Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | Olvany 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
|---|---|---|---|---|---|
| **Residential Mortgage Backed Securities** | | | | | |
| **Corporate Bonds** | | 16 | $280 | $654 | $373 |
| **Emerging Markets** | | 3 | $37 | $40 | $3 |
| **Equities** | | | | | |
| **Rates** | | 2 | $293 | $297 | $3 |
| **Principal Mortgage Trading Group** | | 1 | $11 | $13 | $2 |
| | **Total** | **22** | **$622** | **$1,003** | **$381** |

Expert Report of John J Olvany