Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 08-13555(JMP)

5  - - - - - - - - - - - - - - - - - - - - - - -x

6

7  In the Matter of:

8

9  LEHMAN BROTHERS HOLDINGS INC., et al.

10

11          Debtors.

12

13  - - - - - - - - - - - - - - - - - - - - - - -x

14

15          United States Bankruptcy Court

16          One Bowling Green

17          New York, New York

18

19          July 14, 2010

20          10:03 AM

21

22  B E F O R E:

23  HON. JAMES M. PECK

24  U.S. BANKRUPTCY JUDGE

25

Page 2

1

2    HEARING re Motion of JPMorgan Chase Bank, N.A for Relief from

3    the Automatic Stay

4

5    HEARING re Debtors' Motion for Authorization to Sell Its

6    Limited Partnership Interest in New Silk Route PE Asia Fund,

7    L.P.

8

9    HEARING re Debtors' Motion for Approval of Settlement Agreement

10   Between Lehman Brothers Holdings Inc., Lehman Commercial Paper

11   Inc., Silver Lake Credit Fund, L.P. and Silver Lake Financial

12   Associates, L.P.

13

14   HEARING re LBHI's Motion for Authorization to Transfer Certain

15   Mortgage Servicing Rights to Aurora Bank FSB

16

17   HEARING re Motion of the Chapter 11 Trustee of the SunCal

18   Master Debtors for Relief from the Automatic Stay

19

20   HEARING re Debtors' Motion for an Order Enforcing the Automatic

21   Stay Against Greenbrier Minerals Holdings, LLC

22

23

24

25

Page 3

1

2    HEARING re Debtors' Motion to Compel Performance by Norton Gold

3    Fields Limited of its Obligations Under an Executory Contract

4    and to Enforce the Automatic Stay

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

Page 4

1

2   A P P E A R A N C E S :

3   WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors and Debtors-in-Possession

5         700 Louisiana

6         Suite 1600

7         Houston, TX 77002

8

9   BY:   ALFREDO R. PEREZ, ESQ.

10

11  WEIL, GOTSHAL & MANGES LLP

12        Attorneys for Debtors and Debtors-in-Possession

13        767 Fifth Avenue

14        New York, NY 10153

15

16  BY:   HARVEY MILLER, ESQ.

17        SHAI Y. WAISMAN, ESQ.

18        GARRETT A. FAIL, ESQ.

19        BRENNAN HACKETT, ESQ.

20        EVERT J. CHRISTENSEN JR., ESQ.

21        ANTHONY J. ALBANESE, ESQ.

22

23

24

25

```
 1

 2    JONES DAY

 3         Attorneys for the Debtors and Debtors-in-Possession

 4         222 East 41st Street

 5         New York, NY 10017

 6

 7    BY:   RICHARD H. ENGMAN, ESQ.

 8         JAMES K. GOLDFARB, ESQ.

 9

10    CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

11         Conflicts Counsel to Debtors and Debtors-in-Possession

12         101 Park Avenue

13         New York, NY 10178

14

15    BY:   JOSEPH D. PIZZURRO, ESQ.

16         MICHAEL J. MOSCATO, ESQ.

17         L.P. HARRISON 3RD, ESQ.

18         CINDI M. EILBOTT, ESQ.

19

20    TOGUT SEGAL & SEGAL LLP

21         Special Counsel to Debtors and Debtors-in-Possession

22         One Penn Plaza

23         New York, NY 10119

24

25    BY:   ALBERT TOGUT, ESQ.
```

Page 6

1

2    HUGHES HUBBARD & REED LLP

3          Attorneys for James Giddens, SIPC Trustee

4          One Battery Park Plaza

5          New York, NY 10004

6

7    BY:   JEFFREY S. MARGOLIN, ESQ.

8          KENNETH E. LEE, ESQ.

9

10   MILBANK, TWEED, HADLEY & MCCLOY LLP

11         Attorneys for the Official Committee of Unsecured

12          Creditors

13         One Chase Manhattan Plaza

14         New York, NY 10005

15

16   BY:   DENNIS C. O'DONNELL, JR.

17         DENNIS F. DUNNE, ESQ.

18         EVAN R. FLECK, ESQ.

19

20

21

22

23

24

25

Page 7

```
 1

 2    MILBANK, TWEED, HADLEY & MCCLOY LLP

 3         Attorneys for the Official Committee of Unsecured

 4          Creditors

 5         International Square Building

 6         1850 K Street, NW

 7         Washington, DC 20006

 8

 9    BY:   DAVID S. COHEN, ESQ.

10

11    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

12         Conflicts Counsel to the Official Committee of Unsecured

13          Creditors

14         51 Madison Avenue

15         22nd Floor

16         New York, NY 10010

17

18    BY:   JAMES C. TECCE, ESQ.

19         JOHN B. QUINN, ESQ.

20         ANDREW ROSSMAN, ESQ.

21

22

23

24

25
```

Page 8

```
 1
 2     QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
 3          Conflicts Counsel to the Official Committee of Unsecured
 4           Creditors
 5          865 South Figueroa Street
 6          10th Floor
 7          Los Angeles, CA 90017
 8
 9     BY:   ERICA P. TAGGART, ESQ.
10           (TELEPHONICALLY)
11
12     U.S. DEPARTMENT OF JUSTICE
13          Office of the United States Trustee
14          33 Whitehall Street
15          Suite 2100
16          New York, NY 10004
17
18     BY:   ANDREW D. VELEZ-RIVERA, ESQ.
19
20     BROWN RUDNICK LLP
21          Attorneys for Ad Hoc Consortium of LBSF Claimants
22          Seven Times Square
23          New York, NY 10036
24
25     BY:   GORDON Z. NOVOD, ESQ.
```

Page 9

1

2    BUCHANAN INGERSOLL & ROONEY PC

3         Attorneys for Greenbrier Minerals Holdings, LLC

4         Two Liberty Place

5         50 South 16th Street

6         Suite 3200

7         Philadelphia, PA 19102

8

9    BY:   WILLIAM H. SCHORLING, ESQ.

10

11   CLEARY GOTTLIEB STEEN & HAMILTON LLP

12        Attorneys for Goldman Sachs Bank USA (successor by merger

13         to Goldman Sachs Capital Markets, L.P), Goldman Sachs

14         International, D. E. Shaw Composite Portfolios L.L.C.

15         and D. E. Shaw Oculus Portfolios, L.L.C.

16        One Liberty Plaza

17        New York, NY 10006

18

19   BY:   THOMAS J. MOLONEY, ESQ.

20

21

22

23

24

25

Page 10

1

2     DAVIS POLK & WARDWELL LLP

3          Attorneys for Natixis Creditors, et al.

4          450 Lexington Avenue

5          New York, NY 10017

6

7     BY:   MARSHALL S. HUEBNER, ESQ.

8

9     KING & SPAULDING LLP

10          Special Counsel to the Debtors and Debtors-in-Possession

11          1185 Avenue of the Americas

12          New York, NY 10036

13

14     BY:   ARTHUR STEINBERG, ESQ.

15

16     LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.

17          Attorneys for the Official Committee of Unsecured

18           Creditors in the SunCal Cases

19          10250 Constellation Boulevard

20          Suite 1700

21          Los Angeles, CA 90067

22

23     BY:   DANIEL H. REISS, ESQ.

24

25

Page 11

1

2    LINKLATERS LLP

3          Attorneys for Joint Administrators of Lehman Brothers

4           International Europe

5          1345 Avenue of the Americas

6          New York, NY 10105

7

8    BY:   MARTIN N. FLICS, ESQ.

9

10   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

11         Attorneys for Citibank, N.A.

12         1285 Avenue of the Americas

13         New York, NY 10019

14

15   BY:   STEPHEN J. SHIMSHAK, ESQ.

16

17   PICK & ZABICKI LLP

18         Attorneys for JPMorgan Chase Bank, N.A.

19         369 Lexington Avenue

20         12th Floor

21         New York, NY 10017

22

23   BY:   ERIC C. ZABICKI, ESQ.

24

25

Page 12

1

2    SHEARMAN & STERLING LLP

3         Attorneys for Bank of America Securities

4         599 Lexington Avenue

5         New York, NY 10022

6

7    BY:   DOUGLAS P. BARTNER, ESQ.

8          SOLOMON J. NOH, ESQ.

9

10   SHEPPARD MULLIN RICHTER & HAMPTON, LLP

11        Attorneys for Norton Gold Fields Limited

12        30 Rockefeller Plaza

13        24th Floor

14        New York, NY 10112

15

16   BY:   EDWARD G. TILLINGHAST, III, ESQ.

17

18   SILLS CUMMIS & GROSS, P.C.

19        Attorneys for Alfred H. Siegel, Chapter 11 Trustee of the

20         SunCal Master Debtors

21        One Riverfront Plaza

22        Newark, NJ 07102

23

24   BY:   BORIS J. MANKOVETSKIY, ESQ.

25

Page 13

1

2    TROUTMAN SANDERS LLP

3          Attorneys for PT. Bank Negara Indonesia (Parser) TAB

4          The Chrysler Building

5          405 Lexington Avenue

6          New York, NY 10174

7

8    BY:   LEE W. STREMBA, ESQ.

9          HOLLACE T. COHEN, ESQ.

10

11   WACHTELL, LIPTON, ROSEN & KATZ

12          Attorneys for JPMorgan Chase Bank, N.A.

13          51 West 52nd Street

14          New York, NY 10019

15

16   BY:   HAROLD S. NOVIKOFF, ESQ.

17          PAUL VIZCARRONDO, ESQ.

18

19

20

21

22

23

24

25

Page 14

```
 1

 2    WEILAND, GOLDEN, SMILEY, WANG EKVALL & STROK, LLP

 3         Attorneys for Alfred H. Siegel, Chapter 11 Trustee of the

 4          SunCal Master Debtors

 5         650 Town Center Drive

 6         Suite 950

 7         Costa Mesa, CA 92626

 8

 9    BY:   ROBERT S. MARTICELLO, ESQ.

10

11    WHITE & CASE LLP

12         Attorneys for DNB NOR Bank ASA

13         1155 Avenue of the Americas

14         New York, NY 10036

15

16    BY:   J. CHRISTOPHER SHORE, ESQ.

17

18    ALSTON & BIRD LLP

19         Attorneys for Azora Bank

20         1201 West Peachtree Street

21         Atlanta, GA 30309

22

23    BY:   WILLIAM S. SUGDEN, ESQ.

24         (TELEPHONICALLY)

25
```

Page 15

1

2  CHAPMAN & CUTLER LLP

3       Attorneys for U.S. Bank National Association

4       11 West Monroe Street

5       Chicago, IL 60603

6

7  BY:   JAMES M. HEISER, ESQ.

8        FRANKLIN H. TOP, III, ESQ.

9        (TELEPHONICALLY)

10

11  FELDERSTEIN FITZGERALD WILLOUGHBY & PASCUZZI LLP

12       Attorneys for California Public Employees Retirement

13        System

14       400 Capitol Mall

15       Suite 1450

16       Sacramento, CA 95814

17

18  BY:   HOLLY A. ESTIOKO, ESQ.

19        (TELEPHONICALLY))

20

21

22

23

24

25

Page 16

1

2    HENNIGAN, BENNETT & DORMAN LLP

3         Attorneys for the DCP Parties

4         865 South Figueroa Street

5         Suite 2900

6         Los Angeles, CA 90017

7

8    BY:   MONIKA WIENER, ESQ.

9         (TELEPHONICALLY)

10

11   LEO & WEBER, P.C.

12        Attorneys for Liberty Mutual

13        1 North LaSalle

14        Suite 3600

15        Chicago, IL 60602

16

17   BY:   MICHAEL J. DUDEK, ESQ.

18        (TELEPHONICALLY)

19

20

21

22

23

24

25

Page 17

1

2   MCCARTER & ENGLISH LLP

3       Attorneys for Occidental Energy Marketing, Inc.

4       405 North King Street

5       8th Floor

6       Wilmington, DE 19801

7

8   BY:   KATHARINE L. MAYER, ESQ.

9       (TELEPHONICALLY)

10

11   STUTMAN TREISTER & GLATT P.C.

12       Attorneys for TPG-Austin

13       1901 Avenue of the Stars

14       Twelfth Floor

15       Los Angeles, CA 90067

16

17   BY:   JEFFREY H. DAVIDSON, ESQ.

18       MARINA FINEMAN, ESQ.

19       WHITMAN L. HOLT, ESQ.

20       (TELEPHONICALLY)

21

22

23

24

25

1              P R O C E E D I N G S

2          THE COURT:  Be seated, please.  Good morning.

3          MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

4    on behalf of the debtors.  Your Honor, the very first matter on

5    the agenda is an uncontested matter.  It's a stipulation

6    lifting the automatic stay so that JPMorgan can proceed in a

7    lawsuit.  We have the stipulation ready to present if we can do

8    that at the appropriate time.

9          THE COURT:  Might as well do it now.

10         MR. PEREZ:  Okay.  Your Honor, this is -- in essence,

11   BNC, which is one of the debtors, had originated a loan and

12   foreclosed on a single asset, a home, and subsequently was sold

13   to a securities agent trust and JPMorgan is now the holder of

14   that loan.  There's litigation between the homeowners and

15   JPMorgan.  BNC, the debtor, has no further interest in the

16   property.  And we just want to lift the stay so that they can

17   proceed with their state court lawsuit.

18         THE COURT:  That's fine.

19         MR. ZABICKI:  Thank you.  Just for the record, Your

20   Honor, Eric Zabicki, of the firm Pick & Zabicki for JPMorgan

21   Chase.  No objection to the entry of the stipulation.

22         THE COURT:  Fine.  You can add the stipulation to

23   other orders to be submitted at the end of today's hearing.

24         MR. PEREZ:  Thank you, Your Honor.  The next two

25   matters are going to be handled by Mr. Fail.

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 19 of 121

Page 19

1          MR. FAIL:  Good morning, Your Honor.  Garrett Fail,

2    Weil Gotshal for the debtors.  The next item on the agenda is a

3    motion of Lehman Brothers Holdings Inc. for authorization to

4    sell its limited partnership interest in New Silk Route PE Asia

5    Fund, L.P.  It is supported by the declaration of Christopher

6    Mosher which was filed in support thereof.  Mr. Mosher is

7    present in the courtroom this morning.

8          As set forth in the motion and the declaration, LBHI

9    seeks authorization to sell its limited partnership interest in

10   an approximately 1.4 billion dollar India-focused first time

11   private equity fund.  This interest is one of many private

12   equity investments that LBHI made prior to the commencement of

13   these cases.  LBHI's investment was made in April of 2007.

14   Currently, LBHI's interest is represented by a commitment to

15   contribute to the fund capital of up to 125 million dollars.

16         As of the commencement of the cases, LBHI funded

17   approximately twenty-eight million dollars leaving an unfunded

18   portion of approximately ninety-seven million dollars.  LBHI

19   proposes to sell the interest to Berkeley Investment Ltd.

20   pursuant to a transfer agreement dated June 4, 2010 which was

21   negotiated among LBHI, Berkeley and the fund's general partner.

22   A copy of the agreement was attached to the motion.

23         Pursuant to the agreement, Berkeley will pay LBHI

24   approximately 441,000 dollars and assume LBHI's outstanding and

25   future contributions -- obligations to contribute capital to

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 20

1    the fund.  The general partner will also withdraw its claim

2    which has been numbered claim number 1011 -- 11,042 against

3    LBHI.

4            As set forth in the motion and the declaration, the

5    proposed sale represents the best opportunity to realize value

6    from a diminishing asset.  Absent the relief requested, the

7    value of LBHI's interest will continue to erode as fees and

8    expenses of the fund and other charges accrue against LBHI's

9    investment.  LBHI will recover none of the amount it has

10   already funded and LBHI may be liable and ultimately required

11   to make distributions to the fund for its claim.

12           Prior to filing the motion, LBHI approached over forty

13   potential secondary buyers in an effort to market and sell its

14   interest.  In addition, LBHI solicited indications of interest

15   through the motion.  LBHI did not receive any interest other

16   than the offer made by Berkeley.

17           In coming to its decision to enter into this

18   transaction, LBHI coordinated with the creditors' committee and

19   its financial and legal advisors.  And prior to filing the

20   motion, LBHI was informed that the creditors' committee did not

21   object to the transaction.

22           Only one objection was interposed.  It was filed by

23   Mr. Kuntz.  We received an e-mail last night indicating that

24   Mr. Kuntz would not be attending the hearing this morning.  And

25   I don't see him in the courtroom as we stand here now.

Page 21

1          At this time, LBHI would request that the Court

2     overrule the objection and enter and grant the motion -- enter

3     an order granting the motion.

4          THE COURT:  I'm prepared to do that.  I'd like to hear

5     from the creditors' committee simply as to the oversight

6     functions that were exercised in the business judgment of any

7     subcommittee of the committee that may have been involved in

8     reviewing this transaction.

9          MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank,

10    Tweed, Hadley & McCloy, on behalf of the official committee of

11    unsecured creditors.  Your Honor, the private equity

12    subcommittee of the committee did evaluate this transaction and

13    spent a couple of months, actually, looking at it and concluded

14    for many of the reasons as Mr. Fail alluded to, primarily the

15    avoidance, the elimination of the unfunded commitment here.

16    And the committee's advisors' views of the opportunities in the

17    relevant market that this sale represent the best available

18    option at this time.  And the committee has no objection to its

19    approval.

20         THE COURT:  Fine.  Based upon my review of the motion

21    and the declaration of Christopher Mosher in support of the

22    motion, I'm satisfied that this is the best available

23    transaction in respect of this investment at this time.  And

24    I'm prepared to approve it and overrule Mr. Kuntz' objection

25    which is not being prosecuted today.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 22

1           MR. FAIL:  Thank you very much, Your Honor.  The next

2    item on the agenda is the motion of Lehman Brothers Holdings

3    Inc. and Lehman Commercial Paper Inc. for approval of a

4    settlement agreement with Silver Lake Credit Fund, L.P. and

5    Silver Lake Financial Associates, L.P.

6           Your Honor, with the Court's permission, I'd like to

7    offer as a proffer testimony that would be given by Christopher

8    Mosher, a managing director in LAMCO LLC's Private Equity and

9    Principal Investments Group.  As I mentioned in connection with

10   the previous motion, Mr. Mosher is in the courtroom today.

11   Thank you, Your Honor.

12          If Mr. Mosher were called to testify, his direct

13   testimony would be as follows:

14          Mr. Mosher would testify that as a managing director

15   for LAMCO, he's responsible for advising LBHI on its private

16   equity and principal investments assets including Silver Lake

17   Credit Fund pursuant to the asset management agreement between

18   LBHI and LAMCO.

19          Specifically, and among his other responsibilities, he

20   is senior responsibility within the private equity and

21   principal investments group for general and limited partnership

22   interest and third party private equity and hedge funds and

23   certain direct principal investments.  Prior to the formation

24   of LAMCO, he was the managing director of LBHI and part of

25   LBHI's private equity and principal investments groups with the

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 23 of 121

Page 23

1    same responsibility he now has for LAMCO.

2         Prior to the commencement of LBHI's Chapter 11 case,

3    he was a managing director of Lehman Brothers Inc. and global

4    head of corporate development with responsibility for leading

5    strategic acquisitions.  Prior to that, he was a vice president

6    in the investment banking division of Goldman Sachs & Co.

7    focusing on financial institutions.  He's familiar with the

8    activities of the private equity and principal investment

9    groups including the various types of assets, disposition

10   agreement entered into by LBHI as it winds up its estate.

11        Mr. Mosher would testify that prior to the

12   commencement date, LBHI's businesses included numerous

13   investments in hedge funds located in the United States and

14   internationally.  In 2008, LBHI acquired a limited partnership

15   interest in the Silver Lake Credit Fund, a credit-focused hedge

16   fund by making five capital contributions totaling one hundred

17   million dollars.

18        Mr. Mosher would testify that LBHI's investment in the

19   Silver Lake Credit Fund was subject to a two-year lockup period

20   that expired with respect to the first capital contribution in

21   January of 2010.

22        Mr. Mosher would further testify that in the months

23   leading up to the expiration of the lockup period, LBHI

24   reviewed its options with respect to its investment in the

25   Silver Lake Credit Fund and, consistent with his general

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 24 of 121

Page 24

1    investment strategy, determined to withdraw from the fund as

2    soon as the lockup period expired.  This decision was primarily

3    based on three factors:  LBHI's general desire to limit its

4    exposure to market fluctuations; LBHI's belief that within the

5    time frame of these Chapter 11 cases, monetizing the interest

6    in Silver Lake Credit Fund in the near term is the prudent

7    course of action.  And given the fact that LBHI is one of the

8    significant investors in the fund, the withdrawal of another

9    significant investor could divert much of the fund's available

10   cash and limit withdrawal options in the future.  LBHI thus

11   delivered a redemption notice to Silver Lake in March of 2010.

12   It informed Silver Lake of LBHI's intent to withdraw one

13   hundred percent of the balance of the fund.

14        Mr. Mosher would testify that Silver Lake filed a

15   number of proofs of claim in LBHI's chapter case.  And he would

16   testify that following the receipt of the redemption notice,

17   Silver Lake advised LBHI that it intended to recoup amounts

18   related to its claims against amounts that are due to LBHI from

19   its investment.

20        Silver Lake further informed LBHI that it intended to

21   enforce provisions of its limited partnership agreement that

22   restrict or limit all limited partners' withdrawal of the

23   interest in the funds.  These provisions include a provision

24   that gives Silver Lake a discretion to limit the aggregate

25   withdrawals made by all limited partners in a particular

Page 25

1    semiannual period; a provision that gives Silver Lake

2    discretion to spend or limit withdrawals and defer payments of

3    distributions or withdrawals; and provisions that provide

4    distributions that may be made in kind including illiquid

5    securities.

6           Mr. Mosher would testify that LBHI disputes the amount

7    and validity of Silver Lake's claims and the enforceability of

8    restrictions contained in the partnership agreement but that in

9    order to avoid delay on certainty and expense of litigation,

10   LBHI agreed to the settlement agreement with Silver Lake.  The

11   material terms of the settlement agreement are as follows:

12          Unless Silver Lake elects to enter into an alternative

13   transaction, 92.5 percent of the amount that would otherwise be

14   payable to LBHI in connection with its withdrawal shall be paid

15   to LBHI in three installments.  In lieu of the foregoing,

16   Silver Lake may, in its discretion cause LBHI to sell all or a

17   designated portion of its interest in Silver Lake pursuant to

18   an assignment and assumption agreement that was also filed in

19   connection with the motion.

20          The purchase price for such an alternative transaction

21   shall not be less than 92.5 percent of the value in the

22   investment.  Silver Lake agrees to waive and release any and

23   all rights to recoup amounts owed by LBHI on account of its

24   claims.  In addition, claim 15157 shall be deemed withdrawn

25   with prejudice.

Page 26

1          Mr. Mosher would testify that LBHI's decision to enter

2     into this settlement agreement is well-informed and represents

3     a reasonable exercise of LBHI's business judgment.  LBHI has

4     considered the cost and benefits associated with litigation and

5     believes that the settlement agreement is reasonable and

6     appropriate.

7          And that would conclude Mr. Mosher's direct testimony,

8     Your Honor.

9          THE COURT:  Is there any objection to my receipt of

10    Mr. Fail's rendition of Mr. Mosher's testimony as a proffer?

11    There's no objection.  I accept the proffer as evidence in

12    support of the motion.

13         MR. FAIL:  Thank you, Your Honor.  We received only

14    one objection to the motion, again by Mr. Kuntz.  I do not

15    believe that the objection was filed on the docket but I do

16    believe that we submitted a copy to Your Honor in connection

17    with the hearing binder in advance of the hearing.

18         THE COURT:  I don't believe that Mr. Kuntz is here to

19    prosecute that objection.  Is there anyone in person or on the

20    telephone representing Mr. Kuntz's interests?  I hear nothing.

21    So his objection is not being prosecuted today.

22         MR. FAIL:  Thank you, Your Honor.  At this time,

23    unless you have any further questions, the debtors request that

24    the Court overrule the objection and grant the motion.

25         THE COURT:  I do have one question which really goes

Page 27

1    to the heart of the agreement itself.  And it may be that

2    someone from Silver Lake needs to comment on this.  I don't

3    understand under what circumstances the alternative transaction

4    structure is implemented and what, if any, impact that has on

5    the debtors.  I understand the 92.5 percent floor.  But I'm not

6    sure I understand why this has been structured in so complex a

7    manner.

8           MR. FAIL:  I'll see if anyone is here for Silver Lake

9    today.

10          THE COURT:  Is anyone here from Silver Lake?

11   Apparently, they didn't think this was important enough to send

12   anybody.

13          MR. FAIL:  I don't know if that's the case, Your

14   Honor.  There is no one here in the courtroom today.  From the

15   debtors' perspective, it's neutral to the debtors.  The 92.5

16   percent is the floor that the debtors could receive -- it is

17   the amount that the debtors will receive if the installments

18   are paid.  And if Silver Lake finds a new investor that would

19   like to take over and perhaps do ongoing business with the

20   fund, it would sell the interest.

21          THE COURT:  Is this purely neutral from the

22   perspective of the estate in that the 92.5 percent is paid in

23   the same manner and in the same time sequence or is there

24   anything negative associated with the exercise of an

25   alternative transaction?

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 28 of 121

Page 28

1          MR. FAIL:  If you give me one moment, Your Honor, I'll

2     confer with my clients.  I believe that it is neutral or it

3     could be positive.

4          THE COURT:  All right.

5        (Pause)

6          MR. FAIL:  Your Honor, my previous statement is

7     correct.  It is neutral to the debtors.  It may be positive in

8     the fact that the debtors may receive cash sooner if the

9     investment is sold to a third party.  And an additional reason

10    that Silver Lake may elect to do the alternative transaction is

11    that it cannot obtain liquidity from its own assets but seeks

12    to have a third party provide that liquidity.

13         THE COURT:  Okay.  And the same question that I asked

14    in connection with the earlier matter of the committee.  I'd be

15    interested in the committee's evaluation of this transaction.

16         MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

17    Tweed again on behalf of the committee.  Just as a preface,

18    Your Honor, the committee has a private equity subcommittee

19    that regularly evaluates proposed transactions with respect to

20    private equity assets.  And the committee has been engaged for

21    some time and continues to be engaged in the process of

22    determining when it's appropriate to sell and when it's

23    appropriate to hold.  And there have not been many sales of

24    private equity assets to date in this case.  And it's an

25    ongoing discussion amongst us and the debtors as to when it's

Page 29

1   appropriate and when it's not appropriate.  In this case, like

2   the one before, we believe that the proposed transaction here

3   makes sense for all the reasons articulated by Mr. Fail, in

4   particular, the waiving of the claims on top of the sale of the

5   asset here.  We think the combination provides a good value for

6   the debtors.  And the alternative transaction, we also agree,

7   is neutral to the debtors and no manner which way it turns out

8   should be in the debtors' best interest.

9        THE COURT:  Okay.  Thank you for that.  This motion to

10  approve the transaction with Silver Lake is approved.

11       MR. FAIL:  Thank you very much, Your Honor.  The next

12  item on the agenda will be handled by Mr. Perez.

13       MR. PEREZ:  Good morning, Your Honor, Alfredo Perez.

14  The fourth matter on the agenda is the motion to authorize to

15  transfer of certain mortgaging servicing rights from LBHI to

16  Aurora.  This is a matter, Your Honor, that we have been --

17  that I've been before the Court on many, many times.

18       In essence, Your Honor, when I was last here, I

19  believe in January, the debtor was in the process of

20  negotiating an overall settlement.  In fact, we continued to

21  try to negotiate that overall settlement.  I do have a proffer

22  from Mr. Lambert who will advise the Court as to the status of

23  that and what's happened in the last seven months since that

24  time.

25       But in essence, this particular motion is kind of what

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 30 of 121

Page 30

1    I would call the first step or an initial step with respect to

2    the overall settlement.  The plan and disclosure statement that

3    we filed and is currently on file anticipates that the overall

4    settlement would be done and discounts the economics on the

5    basis of that.  So I think everybody's well aware of the steps

6    that we would take assuming we achieve regulatory approval.  So

7    the dollar amounts have already been taken into account in the

8    recoveries.

9         So, in essence, the debtor -- LBHI has servicing

10   rights, but not the underlying loans, for approximately 117,

11   120,000 Fannie Mae loans.  As part of the settlement, those

12   loans would all be transferred to Aurora.  There is a

13   population of those loans which, in the motion that we filed,

14   we thought it was about 40,000.  It's actually a little bit

15   less; it's about 37,000 -- that are what we call distressed

16   loans.  And those loans will, in fact, be transferred to Aurora

17   without having to make any of the seller representations which

18   we obviously wouldn't be able to do.  We'd have to sell as is.

19   And then Aurora, in turn, is going to transfer those to Fannie

20   Mae and receive a payment for those.  Had we had the -- had we

21   had the ability to make the seller reps, the value of the --

22   the appraised value of those servicing rights are about between

23   forty and forty-four million dollars.  Fannie Mae is going to

24   be paying Aurora approximately twenty-five and a half million.

25   And in the motion, we put twenty-six but since the population

1   has come down, it's about 25.3 million to 25.5 million

2   depending on the exact number.

3            So that's, in essence, an additional funding for the

4   bank.  The bank is currently well capitalized.  But this is

5   part of one of the steps that would be taken in connection with

6   the overall settlement.

7            And with the Court's permission, I'd like to -- a

8   brief proffer from Mr. Lambert on the issue.  We did receive

9   one objection from Mr. Kuntz.  Additionally, Your Honor, we

10  received a reservation of rights from Fannie Mae.  We spoke to

11  them.  They withdrew that.  We made it clear -- we filed an

12  amended motion to make clear that the claims that they've

13  asserted in the LBHI bankruptcy are not in any way, shape or

14  form touched or impacted by this motion.  And I think it was a

15  clarification.  It was never -- there was no intent to do

16  anything with Fannie Mae's proof of claim on file.  Obviously,

17  that's going to be resolved in the context of the overall

18  settlement.  So this didn't attempt to do that.  We just made

19  that clear.  Winston & Strawn, who represents Fannie Mae, could

20  not attend this morning and they said that we had permission to

21  indicate to the Court that they were in favor of entering into

22  this -- approval of this motion.

23           THE COURT:  Just as a point of clarification, you said

24  will be resolved in the context of the overall settlement.

25  What settlement are you referring to?

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 32 of 121

Page 32

1          MR. PEREZ:  The overall settlement with Aurora and the

2     OTS, the settlement that we've been waiting for since --

3          THE COURT:  The settlement that has been alluded to

4     but not yet described in any detail.

5          MR. PEREZ:  Correct, Your Honor.

6          THE COURT:  Okay.

7          MR. PEREZ:  Yes.  So with the Court's permission, I'd

8     like to proffer the testimony.

9          THE COURT:  Yes, please.

10          MR. PEREZ:  Okay.

11          THE COURT:  Go ahead.

12          MR. PEREZ:  Your Honor, if called to testify, Mr.

13     Lambert, who is in court today at the very back, would testify

14     that he has more than twenty years of experience in connection

15     with financial and operational restructuring; that he is a

16     managing director of Alvarez & Marsal and has been assigned to

17     the Lehman matter since October 1, 2008; and that his areas of

18     responsibility include managing the combined bankbook, the bank

19     platforms for LBHI which include both Aurora Bank, FSB and

20     Woodlands Commercial Bank.

21          Mr. Lambert has been intimately involved in the

22     affairs of the banks since October 1st, 2008.  And since that

23     time, he has independently reviewed and been advised by the

24     bank's business and its operations, records, financial

25     statements and other data in connection with his communications

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 33 of 121

Page 33

1    with the bank's management, the creditors' committee as well as

2    respective counsel and professionals for both the bank and the

3    estate.

4         And in addition, Mr. Lambert would testify that he,

5    from time to time, has been in contact with the bank -- with

6    the bank's regulators to discuss the issues surrounding the

7    overall resolution of the claims asserted against LBHI by the

8    bank.

9         Mr. Lambert is the primary representative on behalf of

10   the debtors in connection with all matters relating to the bank

11   and this motion, in particular.

12        Mr. Lambert would testify that based on an independent

13   review of the bank's affairs by LBHI and its professionals,

14   LBHI believes that the bank is a valuable asset of the estate

15   and needs to preserve that value for the benefit of its

16   creditors.  In its most recent financial report, dated March

17   31, the bank's book equity is in excess of 640 million dollars.

18        Mr. Lambert would further testify that, as the Court

19   is aware, the bank is subject to authority of both the Office

20   of Thrift Supervision and the FDIC and that in response to

21   diminished capital levels reported on the December 31, 2008

22   Thrift financial report, in February of 2009, the OTS issued a

23   prompt corrective action directing the bank to impose

24   significant restrictions on its operations including, among

25   other things, the inability to issue certificates of deposits,

Page 34

1    issuing new loans and conducting certain areas of business

2    without the OTS' approval.

3         In response to those concerns caused by the prompt

4    corrective action, including the potential seizure of the bank,

5    LBHI has taken a series of steps to support the bank and

6    preserve the opportunity to recover significant value therein.

7         And, Your Honor, just as an aside, in our pleading,

8    there's a footnote which details all of the actions that we

9    have taken in order to support the bank since the beginning of

10   the case.

11        Mr. Lambert would further testify that after very

12   prolonged and extensive negotiations with the bank that were

13   overseen by the group of independent directors at the bank and

14   extensive discussions with the OTS, LBHI has negotiated a

15   comprehensive settlement with the bank.  The settle -- this

16   proposed settlement will settle the bank's claims asserted in

17   the master forward agreement between the bank and LBHI which is

18   related, in addition, to the 365(o) claim which are currently

19   stated in the amount of 2.1 billion dollars.  And it will also

20   virtually settle all other open claims between the bank and

21   LBHI.

22        When the settlement is implemented, it will

23   significantly increase the bank's capital.  It will

24   substantially lessen the regulatory restrictions on the bank's

25   operations.  The settlement will also allow the bank to

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 35 of 121

Page 35

1    continue to originate high quality residential mortgage loans

2    and to enter into new business lines and possibly access the

3    market for brokered certificates of deposits.

4         The settlement has been submitted to the OTS for

5    approval and has been under review for the past several months.

6    The regulators have provided comments to the party (sic)

7    regarding the settlement and the parties have incorporated

8    those modifications into the settlement.  Formal approval has

9    not yet been issued.  The delay -- and Mr. Lambert would

10   testify that delay is unfortunate as it has kept the bank in a

11   position of operating under the prompt corrective action

12   notwithstanding that the bank has now been "well capitalized",

13   as that term is defined, in the regulations for over six months

14   and is capable of conducting new business.

15        While the banks have been reviewing the settlement,

16   LBHI and the banks have been focused, their attention on

17   ensuring that delay does not impair or erode the value to LBHI

18   estates.  LBHI -- Mr. Lambert would testify that LBHI is

19   becoming increasingly concerned that members of the bank's

20   management team could terminate their employment with the bank

21   because the PCA has prevented the bank from, for instance,

22   paying bonuses to such employees that are standard in the

23   bank's industry and that were due to be paid at the beginning

24   of the year.  Upon approval and consummation of the settlement,

25   the immediate risk of the appointment of a receiver for the

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 36 of 121

Page 36

1    bank and any assertion of a claim under 365(o) will be

2    eliminated.

3          Now, with respect to the motion at hand, Mr. Lambert

4    would testify that LBHI is the owner of certain mortgage

5    servicing rights with respect to a portfolio of Fannie Mae

6    loans.  Aurora Loan Services is the subservicer of those

7    rights.  The entire portfolio of the Fannie Mae servicing

8    rights totals approximately 114,000 loans with a principal

9    balance of 21.7 million.  They are all being currently serviced

10   by Aurora.  LBHI is not the lender and does not otherwise own

11   the underlying loans.  Rather, LBHI was the seller of the

12   mortgage loan and owns the rights to service the loans.  LBHI's

13   mortgage servicing rights for the entire Fannie Mae portfolio,

14   assuming that they were able to give the seller reps, were

15   valued at approximately 154 million in May of 2009.

16          As part of the overall settlement, LBHI would transfer

17   all of the mortgage servicing rights of Fannie Mae to Aurora.

18   By this motion, LBHI seeks to contribute to the bank in advance

19   of the settlement a portion of the portfolio mortgage servicing

20   rights, whether it's the so-called "high risk" portfolio.  This

21   portfolio totals approximately 37,000 loans with a principal

22   balance of between 8.2 and 8.3 billion dollars.  Again, Mr.

23   Lambert would testify that LBHI does not own the loans but only

24   the servicing rights and that they were recently -- those

25   servicing rights were recently appraised assuming that LBHI

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 37 of 121

Page 37

 1   could give the seller reps for approximately forty-four billion

 2   (sic) dollars.

 3          Fannie Mae has --

 4          THE COURT:  You must mean million.

 5          MR. PEREZ:  Forty-four million.  Sorry.

 6          Fannie Mae has requested that LBHI transfer the

 7   designated amounts to the bank on or before August 1st and that

 8   the bank will, in turn, transfer the designated servicing

 9   rights to Fannie Mae as part of the transaction that Fannie Mae

10   is developing as to concentrate the servicing of high risk

11   loans.

12          In exchange, Fannie Mae has proposed to approve LBHI's

13   transfer without the assumption of the seller obligations or

14   seller reps and has agreed -- the bank has agreed to the terms

15   of the settlement -- will not be changed by the reason of

16   LBHI's transfer of the designated service rights to the bank

17   after completion of the settlement.  In addition, Fannie Mae

18   will get approximately between 24.4 and 28 -- 24.8 million

19   dollars for the servicing rights.

20          In addition to the immediate benefits from the

21   transaction, Fannie Mae has indicated that it will consent to

22   the transfer of all of LBHI's mortgage servicing rights for

23   Fannie Mae-sponsored loans to the bank as contemplated in the

24   overall settlement and will consent to such transfer without

25   the assumption of the seller obligation.

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 38 of 121

Page 38

1          In response to the motion, Fannie Mae filed a

2     reservation of rights.  That reservation of rights has now been

3     withdrawn.

4          As it relates to the business judgment, Mr. Lambert

5     would testify that LBHI's decision to immediately transfer the

6     rights is based on an exercise of the debtors' business

7     judgment.  LBHI is receiving significant benefits as a result

8     of further capitalizing the bank even if it's prior to the

9     overall settlement with the bank.  The bank will receive

10    between 24.8 and -- 24.4 and 24.8 million dollars.  And LBHI

11    will not have to make the seller reps and warranties and the

12    designated servicing rights will not be subject to the seller

13    obligations.

14         Mr. Lambert believes that the transfer of the

15    designated rights are in the best interest of the estate's and

16    its creditors and that these transfers have been long

17    contemplated as a strategy to recover the value of the banks

18    and that, as a result of this, the bank's invest -- LBHI's

19    investment in the bank will be maximized.

20         That concludes this proffer, Your Honor.

21         THE COURT:  Is there any objection to that proffer?  I

22    hear no objection.  I accept the proffer.  Mr. Kuntz is not

23    here as the only current objector.  But this is an important

24    transaction and I have a couple of questions of my own.  One

25    is, I am concerned about the twenty million dollar difference

Page 39

1    between the appraised value of the mortgage servicing rights at

2    forty-four million dollars and the approximate amount to be

3    realized here of twenty-four million dollars.  And I'm

4    interested in Mr. Lambert's business judgment that that

5    represents fair value for the assets being transferred.

6    Alternatively, I'd be interested in also hearing from counsel

7    for the committee after Mr. Lambert has had a chance to make

8    his way to the front of the room

9         MR. PEREZ:  Your Honor, just -- the only footnote is,

10   the forty-four million included the reps and warranties.

11        THE COURT:  I understand that but, in effect, what

12   we're talking about is, is it really twenty million dollars

13   worth of reps that we just gave up.

14        MR. LAMBERT:  Good morning, Your Honor.  Doug Lambert

15   with Alvarez & Marsal for the debtor.

16        THE COURT:  Good morning.

17        MR. LAMBERT:  Yes, Your Honor, this has been a fairly

18   complicated transaction as Mr. Perez had read my proffer.  This

19   is sort of the culmination of over nine months of negotiations

20   with Fannie Mae.  The value of the mortgage servicing rights,

21   as indicated, first of all, that valuation was last done

22   several months ago.  So a portion of the difference would be

23   just attributable to timing.  We do not do on a monthly basis

24   these valuations because they're time consuming and costly,

25   but, generally, they proceed in a downward decline.

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 40 of 121

Page 40

1              As Mr. Perez had indicated, the valuation which we had

2    obtained for those mortgage servicing rights presupposed that

3    those rights would be transferred to a purchaser free and clear

4    of seller reps and warranties.  By virtue of this transaction

5    that we're seeking Court approval today to enter into, we will

6    be transferring the remaining mortgage servicing rights owned

7    and held by LBHI to the bank.  The bank will not be obligated

8    to step into LBHI's shoes or the seller reps and warranties

9    which we believe if there was a dollar value associated with

10   assumption of those seller reps and warranties would far exceed

11   the discount that's indicated through the subsequent sale from

12   the bank to another mortgage servicer designated by Fannie Mae.

13             So, sort of a long way of trying to answer your

14   question to give you some background and context.

15             THE COURT:  Just so I understand this, is this, in

16   fact, a benefit to Aurora to receive these without seller reps

17   so if any --

18             MR. LAMBERT:  I would argue, certainly, it is both a

19   benefit to LBHI as well as to the bank.

20             THE COURT:  A benefit because LBHI would not be able

21   to give the reps?

22             MR. LAMBERT:  Correct --

23             THE COURT:  Okay.

24             MR. LAMBERT:  -- without stepping into a -- I guess, a

25   administrative undertaking.

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 41 of 121

Page 41

1          THE COURT:  All right.  And then without meaning to

2     put you not the spot, there have been some references to this

3     transaction as being part of a broader settlement with the

4     Office of Thrift Supervision that would lead to the removal of

5     the limitations upon the current operations of Aurora Bank.

6     What's the timing as far as you can estimate?

7          MR. LAMBERT:  Your Honor, as I think we were last in

8     court in December when we last sought to make a contribution,

9     which was, in fact, at that time, a hundred million capital

10    contribution in the form of cash to Aurora Bank, we had put

11    forth a settlement, a global settlement, not only for Aurora

12    Bank but also Woodlands Commercial Bank, the other banking

13    institution owned by the estate.  We believed at that time we

14    had submitted to the regulators a comprehensive global

15    settlement, one, and which was fair to all parties, took into

16    consideration all matters and facts of law as well as economics

17    to ensure that both institutions would remain financially

18    sound.  We still believe that that settlement accomplishes

19    those goals.  There has been virtually no deviation from the

20    terms proposed back in December.  And we have continued to wait

21    as Mr. Perez has indicated for the past seven months for a

22    definitive acceptance.  The proposal has not been rejected.

23    And as of latest last night, speaking with regulatory counsel

24    for both institutions, we believe that the acceptance by not

25    only OTS but the FDIC and the Federal Reserve is, in fact,

Page 42

1    imminent.

2        I can't give you a definitive answer but I am hoping

3    within the next week or two following perhaps passage of the

4    Dodd-Frank bill that we would receive a definitive answer and

5    hopefully acceptance --

6        THE COURT:  Is there any --

7        MR. LAMBERT:  -- of the settlement.

8        THE COURT:  -- incremental risk here as a result of

9    the regulatory overhaul legislation that's currently pending in

10   Congress?

11       MR. LAMBERT:  Specifically, as it relates to this

12   transaction and the institutions?  None that I am aware of.

13   But as Your Honor I'm sure is aware, the legislation is,

14   whatever, twenty-three or a hundred pages or so leaving, I

15   think, open regulations that still need to be drafted and

16   constructed by the various regulators.  But there's nothing to

17   my knowledge today, as I stand here before the Court, that

18   would lead me to either change my recommendation to move

19   forward with the proposed settlements that have been with the

20   regulators these past seven months.

21       THE COURT:  And would you be proposing the current

22   settlement relating to the mortgage servicing rights transfer

23   if it were not instrumental in developing an overall resolution

24   of the problems with the bank?

25       MR. LAMBERT:  Again, Your Honor, separate and apart

Page 43

1    from the settlement, though these, as Mr. Perez indicated, were

2    an interval (sic) part of the overall settlement, we believe

3    that those mortgage servicing rights retained the most value on

4    behalf of the estate in the hands of the bank which is actually

5    the subservicer providing servicing under those servicing

6    rights.

7            So, regardless of the settlement, I believe that

8    maximizing value, ultimate value to the estate would be to have

9    those servicing rights transferred into Aurora which I think

10   will be able to derive the most value, if that answers your

11   question.

12           THE COURT:  It does.  And I'd simply like to note

13   that, Mr. Lambert, you've been giving the functional equivalent

14   of testimony.  But I haven't asked you to come to the witness

15   stand and I haven't sworn you.  And I don't treat this as

16   testimony as much as representations that you're making in

17   response to my questions.  And I'm treating it with the

18   formality that would otherwise apply if you were sworn as a

19   witness.

20           MR. LAMBERT:  Understood, Your Honor.

21           THE COURT:  Thank you very much.

22           MR. LAMBERT:  My testimony wouldn't --

23           THE COURT:  I'm confident that --

24           MR. LAMBERT:  -- or my responses wouldn't change.

25           THE COURT:  I'm confident that -- I'm confident that

Page 44

1    in front of this large a crowd, you would not be saying

2    anything other than truth.

3              MR. LAMBERT:  Thank you, Your Honor.

4              THE COURT:  All right.  I'd like to hear from the

5    creditors' committee on this.

6              MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

7    Tweed, on behalf of the committee again.  Generally, Your

8    Honor, as you know, we've been involved with the Aurora and

9    Woodland situation for the better part of the last two years.

10   We've supported the debtors in the past with respect to the

11   investments that were made to keep the bank going and to

12   promote an ultimate resolution.  And we believe, like the

13   debtors have represented, that ultimate approval of a global

14   settlement is imminent.  Anything's possible with the

15   regulators in Washington, but we do believe that it's highly

16   likely to reach fruition in the near future.

17             And we believe that this motion is part and parcel.  I

18   think, as Mr. Lambert just represented as well, we believe that

19   even without the settlement, these mortgage servicing rights

20   have greater value in the hands of Aurora because of the rep

21   and warranties situation than anywhere else.  So that even

22   without the settlement, we would probably be inclined to

23   support this motion.  But given that it's part of the overall

24   settlement would happen anyhow under the settlement which we

25   believe will go forward and will happen, by virtue of the

1    motion, in a more favorable way for the debtors, given the

2    waiver of the reps and warranties with respect to these

3    mortgages, the overall waiver of the reps and warranties with

4    respect to all the other mortgage servicing rights and the

5    approval of Aurora for seller and servicing purposes, the

6    overall package is -- represents a good deal for the debtors

7    both in the context of this individual motion -- this motion by

8    itself and with respect to the settlement which we hope is

9    actually before the Court sometime in the relatively near

10   future.

11          THE COURT:  All right.  Thank you.  Anything more?

12          MR. PEREZ:  No, Your Honor.  We have nothing further.

13   We'd request that the Court grant the motion.

14          THE COURT:  All right.  We spent a lot of time on what

15   is fundamentally an uncontested motion but it's an important

16   matter.  I'm satisfied based upon the proffer that has been

17   made of Mr. Lambert's testimony and also Mr. Lambert's candid

18   responses to some of my questions that this is a transaction

19   which is in the best interest of the estate and may be

20   instrumental in helping to bring about an overall settlement of

21   issues relating to the viability of Aurora Bank, an important

22   asset of the estate.

23          I'm also satisfied that the creditors' committee has

24   examined the transaction and supports the transaction.  The

25   motion is approved.

Page 46

1           MR. PEREZ:  Thank you, Your Honor.  Your Honor, the

2     next matter on the agenda is the motion of the SunCal Master

3     debtors for relief from the automatic stay.

4           MR. MANKOVETSKIY:  Good morning, Your Honor.  Boris

5     Mankovetskiy, Sills Cummis & Gross, on behalf of Al Siegel, the

6     Chapter 11 trustee of certain SunCal debtors in cases pending

7     in the Central District of California.  With Your Honor's

8     permission, I'd like to introduce to the Court Mr. Robert

9     Marticello of the Weiland Golden firm who's the lead counsel on

10    this matter and he will argue the motion.  Mr. Marticello's pro

11    hac papers have been submitted to Your Honor and the order is

12    pending, I presume.  But we would ask your permission to allow

13    Mr. Marticello to speak.

14          THE COURT:  The pro hac vice admission will be deemed

15    granted --

16          MR. MANKOVETSKIY:  Thank you, Your Honor.

17          THE COURT:  -- nunc pro tunc to the first words

18    spoken.

19          MR. MARTICELLO:  Good morning, Your Honor.  Robert

20    Marticello of Weiland Golden on behalf of Al Siegel, the

21    Chapter 11 trustee for the SunCal debtors.  Thank you for

22    allowing me to address the Court today.

23          The trustee's requesting relief from the automatic

24    stay is necessary to fulfill his statutory duties, administer

25    the assets of the SunCal Master estates and to resolve any

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 47 of 121

Page 47

```
 1    claims and liens that relate to those assets.  We think the

 2    Sonnex factors overwhelmingly support granting the motion.

 3           THE COURT:  Can I just break in for one second?  I

 4    don't mean to interrupt the flow of your argument with respect

 5    to the Sonnex factors but I'm sure you're aware that I have

 6    recently dealt with some other issues relating to the SunCal

 7    parties.  And I just want to clarify whether or not you

 8    represent the same trustee or a different trustee that was

 9    reported to have been withdrawing certain motions that I heard

10    a few months ago.  I'm not sure how many trustees are involved

11    in the SunCal bankruptcy cases in California.

12           MR. MARTICELLO:  The tru -- Mr. Siegel is the trustee

13    in four cases.  He is not the trustee in the cases that were

14    referred to as the "affiliated SunCal matters".  Those are

15    entirely different cases.

16           THE COURT:  Okay.  There's a trustee who's represented

17    by William Lobel?

18           MR. MARTICELLO:  Correct.  Correct.

19           THE COURT:  And that's a different person altogether?

20           MR. MARTICELLO:  That's correct.

21           THE COURT:  Okay.  I'm just trying to understand the

22    players.

23           MR. MARTICELLO:  No, I understand.  As I was saying, I

24    believe the Sonnex factors overwhelmingly support the motion.

25    But I'd like to focus on what I think are typically the most
```

Page 48

1    significant factors which are judicial economy and a balance of

2    the harms.

3           The trustee absolutely needs stay relief to administer

4    the assets of the SunCal Master estates, to move those cases

5    forward.  The parties attempted settlement discussions for over

6    a year but unfortunately were unable to reach an agreement.

7    And the trustee has no alternative but to pursue other

8    alternatives in those cases.  And, in fact, LCPI has criticized

9    the trustee for not moving forward sooner.

10          In administering the SunCal estates, the parties are

11   going to have to deal with the validity of the liens and the

12   issues related to LCPI's claims.  So it's inevitable.  And the

13   California court is the most appropriate forum to deal with

14   these issues.  California court has exclusive jurisdiction over

15   the properties.  It's the only Court that can order the sale,

16   consider the sale motion relief and because it's the only Court

17   that can order the sale of the properties, it's going to have

18   to deal with the issues related to the validity of LCPI's

19   liens.  To deny the motion to require that the trustee pursue

20   claims in this forum would create a situation where we have a

21   potential for inconsistent rulings and duplicitous litigation

22   because we're going to have to deal with these issues in both

23   forums.  Again, a sale motion to deny credit bid rights or sale

24   free and clear, the issue is going to be the disputes as to

25   LCPI's liens as to validity and priority.

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 49 of 121

Page 49

1    So when the goal of bankruptcy is to have one forum

2    that adjudicates all of the issues, there's only one court here

3    that can do that and that's California.

4        THE COURT:  Well, there's an argument that this is the

5    Court that can do it as well since the trustee, I believe,

6    filed proofs of claim here.

7        MR. MARTICELLO:  That's correct.  And --

8        THE COURT:  So the argument cuts both ways.  It's

9    either here or there.

10       MR. MARTICELLO:  I don't think it does because this

11   Court cannot adjudicate the property, cannot order the sale of

12   the property.  Again, the California court will decide these

13   issues to some extent.

14       THE COURT:  But I can determine whether or not you

15   have a valid claim against the Lehman estate.  And that claim

16   is based upon, I think, the complaint that you're preparing to

17   file if you get stay relief in California.

18       MR. MARTICELLO:  Correct.  To the extent that this

19   Court has jurisdiction to adjudicate an avoidance action claim

20   or the action to -- or the claim to equitably subordinate

21   LCPI's lien and claim, this Court could do so.  But again, I

22   think when you have a situation that the California court's

23   going to have to deal with these issues and this Court will

24   only do so if we pursue that claim in this forum, it makes

25   sense that you do everything in one forum.

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 50 of 121

Page 50

 1          THE COURT:  I understand the argument.  What I don't

 2    understand is the timing.  Why are you here now?

 3          MR. MARTICELLO:  The reason we're here now is, again,

 4    we spent a year -- over a year negotiating with LCPI.  And

 5    unfortunately, it fell apart.  So once LCPI terminated the term

 6    sheet, which was at the end of March --

 7          THE COURT:  You're saying it fell apart as if there

 8    was some force of nature as opposed to human beings.

 9          MR. MARTICELLO:  No.  It was, again, as stated in the

10    brief, Fidelity, the title insurance company, objected to the

11    compromise and that objection raised what ended up being an

12    ambiguous term in the term sheet.  And the parties materially

13    disagreed as to the interpretation of the term sheet.  And the

14    trustee could have went forward with that term sheet.  But it

15    was our -- it was the trustee's --

16          THE COURT:  You're saying the trustee could have moved

17    forward with that term sheet?

18          MR. MARTICELLO:  Well, if he accepted LCPI's

19    interpretation.  But it was the trustee's belief that LCPI's

20    interpretation was contrary to the parties' intent and would

21    have resulted in zero dollars to the unsecured creditors of

22    those estates.  We could --

23          THE COURT:  Have you abandoned efforts to try to

24    resolve these disagreements?  Because looking at the exhibits

25    attached to Mr. Steinberg's declaration, it appears that there

Page 51

1    was a remarkably detailed settlement agreement with everything

2    that conceivably could have been covered, covered.  And then

3    there's a problem and instead of solving the problem, you're

4    here to start litigation.

5            MR. MARTICELLO:  We attempted to solve the problem.

6            THE COURT:  How?

7            MR. MARTICELLO:  There were -- as stated in LCPI's

8    brief, there was a subsequent proposal.  But it was patently

9    unacceptable to the trustee.  The parties attempted to

10   negotiate a resolution to resolve the dispute.  But they were

11   so far apart that they were unable to do so.  And again, it

12   came down to the fact that the trustee did not believe that the

13   term sheet as interpreted by LCPI or even as proposed to be

14   revised would have provided zero value to the unsecured

15   creditors of that estate.  The professionals and trustee's fees

16   would have been paid.  But there would have been zero value for

17   the unsecured creditors.  And so the trustee believed, in the

18   exercise of his fiduciary duties, it wasn't acceptable.

19           THE COURT:  Well, there's an argument that there's no

20   value there for the unsecured creditors anyway because the

21   assets are deeply under water.

22           MR. MARTICELLO:  That's true.  But we do believe we

23   have valid claims against LCPI to avoid this lien.

24           THE COURT:  Yeah.  But those claims were settled in a

25   settlement agreement nine months ago.

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 52 of 121

Page 52

1          MR. MARTICELLO:  But the compromise was never

2     documented and, again, the parties were unable to reach a

3     binding agreement.

4          THE COURT:  To what extent is this litigation an echo

5     of the litigation that the other SunCal debtors intend to

6     pursue in California and the motion for stay relief which was

7     brought here a few months ago?  One of my concerns here is that

8     this is a me-too.

9          MR. MARTICELLO:  Your Honor, I'm not that familiar

10    with the --

11         THE COURT:  You're aware that there was litigation

12    brought in this court by the SunCal voluntary debtors seeking

13    stay relief; that the motion for stay relief was denied; that

14    there were issues relating to a transaction with Fenway that

15    prompted that litigation; that there was a motion for a stay

16    pending appeal which was also denied; and that there's an

17    appeal currently pending in the district court all relating to

18    litigation which, as I understand it, is currently pending

19    before the Ninth Circuit relating to whether or not equitable

20    subordination litigation can properly be brought in California

21    without first obtaining stay relief here.

22         MR. MARTICELLO:  I understand --

23         THE COURT:  You're aware of all that?

24         MR. MARTICELLO:  I am aware of all that.  I believe

25    that the facts for that particular case are entirely different.

1    I read the transcript that was attached to the opposition

2    pleading.

3             We -- the trustee did not pursue an equitable

4    subordination action first.  What we did was we marketed the

5    properties -- and this goes back to the question that Your

6    Honor originally posed, was why are we here now.  Once the term

7    sheet was terminated, we retained a broker.  We marketed the

8    properties.  We negotiated with multiple buyers.  We've engaged

9    in due diligence.  We wanted to bring this case to a point

10   where we could move and move forward once we obtained stay

11   relief from Your Honor.

12            But as far as the other matters, we've done everything

13   differently than that particular group of SunCal entities.  We

14   didn't go forward with the litigation first and then when we

15   lost on appeal come here and say well, please give us stay

16   relief.  We're asking this Court to allow us to go forward

17   first.

18            And I don't think that the Ninth Circuit's decision

19   will moot this motion.  Even if the Ninth Circuit reverses the

20   BAP and says that equitable subordination does not violate the

21   automatic stay when it's defensive in relation to a proof of

22   claim, this Court would still have to grant this motion as to

23   the sale motion relief.  So even if the Ninth Circuit --

24   regardless of how the Ninth Circuit decides that particular

25   appeal, this motion will need to be decided.

Page 54

```
 1           THE COURT:  Do you have a stalking horse bidder
 2   contract today?
 3           MR. MARTICELLO:  Yes, we do.  And I believe it was
 4   filed last night.  And we sent a copy to your chambers this
 5   morning.
 6           THE COURT:  I haven't seen it.
 7           MR. MARTICELLO:  I know it's very short notice.  And I
 8   believe we have another copy here.
 9           MR. MANKOVETSKIY:  We have a copy, Your Honor.  But
10   indeed it was filed last night.
11           THE COURT:  I just want to know what that contract
12   provides.
13           MR. MANKOVETSKIY:  Your Honor, actually, I was en
14   route and have not -- may I approach, Your Honor?
15           THE COURT:  Has a copy been provided to other counsel?
16           MR. MANKOVETSKIY:  I have extra copies for them, too.
17           THE COURT:  Yes --
18           MR. MANKOVETSKIY:  They may have one but --
19        (Pause)
20           THE COURT:  Okay.  You don't need to go into it now.
21   I was just wondering if you had it.
22           MR. MARTICELLO:  We do, Your Honor.  And in a
23   nutshell, it's a sale free and clear of forty million dollars
24   in cash.  We are currently in escrow.  And that really goes
25   to -- when you consider the balance of the harms, this is one
```

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 55 of 121

Page 55

1    of the biggest harms that the trustee has put in significant

2    time and energy into obtaining a offer to sell the properties.

3    And if this Court denies the motion -- the buyers would walk.

4    There's no question about that.  If the trustee cannot obtain

5    approval of an asset purchase agreement, there's no buyer out

6    there that's going to sign one.

7             THE COURT:  But as I understand the original

8    settlement that you had with Lehman, the property was to be

9    sold under and pursuant to a plan of reorganization not as part

10   of a -- an intermediate 363 sale which is a bridge to

11   litigation over the proceeds.  This is a very different kind of

12   arrangement.  I'm frankly baffled by the trustee's business

13   judgment.  I'd like you to explain it.

14            MR. MARTICELLO:  Well, again -- well, first, the

15   California bankruptcy court will decide all these issues.  I

16   mean, if the sale proves not --

17            THE COURT:  But you're here right now and I'm asking

18   you a direct question --

19            MR. MARTICELLO:  I understand.

20            THE COURT:  -- about your client's business judgment.

21   What is the business judgment that says this is the right time

22   to sell this property and that it will maximize value?

23            MR. MARTICELLO:  We've spent a significant time

24   marketing the properties.  These are the highest offers that

25   we've gotten to date.  It's an all cash forty million dollar

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 56 of 121

Page 56

```
1    offer.  There are overbidders.  There will be continuous --

2    there will be other marketing efforts prior to the sale and an

3    overbid proceeding.  And, Your Honor, these properties

4    together, are 5,000 acres -- over 5,000 acres.  There's

5    continuing issues with these properties.  The longer we hold

6    them, the more issues arise with health and safety, making sure

7    there's no vandalism, complying with municipal regulations.

8    And there are numerous disputes with LCPI over use of cash

9    collateral.  So there's a lot of cost in just holding these

10   properties.  So the trustee has to do something.  And --

11           THE COURT:  Yes.  But you're also proposing depriving

12   Lehman of its credit bid rights.  That's going to be very hotly

13   litigated.  And you're likely to create more administrative

14   expense than you're going to avoid.  I don't understand why you

15   want to do this.

16           MR. MARTICELLO:  One, it's a matter of what the

17   options are to the trustee.  And again, we think that we can

18   deny LCPI's credit bid rights because its claims are a bona

19   fide dispute and its liens are a bona fide dispute.  If we're

20   wrong, the motion will be denied.  But LCPI will have a chance

21   to defend that and the California bankruptcy court will

22   consider it.  But if we're right, we'll generate significant

23   unencumbered cash that he can distribute to the unsecured

24   creditors.

25           THE COURT:  So this is just another example of bi-
```

1    coastal litigation in order to gain litigation advantage.

2            MR. MARTICELLO:  I don't think so.  We're not trying

3    to gain litigation advantage.  We're trying to be on --

4            THE COURT:  Of course you are.  Of course you are.

5    You're here seeking the ability to do something adverse to the

6    Lehman estate in a foreign bankruptcy court in order to advance

7    the interest of unsecured creditors in that case and, in

8    effect, abandoning a fully documented settlement agreement by

9    saying there are issues you can't resolve.  It's a tactical

10   move.  It's pretty clear to me.  Are you telling me it's not?

11           MR. MARTICELLO:  Well, yes, we are attempting to get

12   stay relief to do what Your Honor just said.  The settlement

13   agreement fell apart because the parties could not reach an

14   agreement.

15           THE COURT:  It fell apart because you chose not to

16   pursue resolution of the disputes.

17           MR. MARTICELLO:  I mean -- we attempted to settle.  It

18   didn't work.  The parties were not able to reach an agreement.

19   But we spent over a year trying to do that.

20           THE COURT:  Not according to the papers I've read.

21   You spent some time and then abandoned.

22           MR. MARTICELLO:  Well, the initial settlement

23   negotiations took over a year.  And then when the disagreement

24   arose, I'm not sure -- Mr. Reiss may be a better party to

25   address that issue 'cause he was actually involved in the

Page 58

1    discussions.

2           THE COURT:  So you invest a year in a settlement, have

3    a problem relating to some mechanics' lien claims and then

4    decide to abandon that very carefully crafted settlement and

5    instead pursue scorched-earth litigation.  That's what I'm

6    hearing.

7           MR. MARTICELLO:  It wasn't a minor issue, Your Honor.

8    That's all I can say about the disagreement.  It was a

9    substantial issue.  I mean, the trustee can't go forward and

10   ask for a --

11          THE COURT:  I don't need to get into the merits of the

12   negotiation that relates to a bankruptcy case which is not in

13   front of me.  The only thing that's in front of me is your

14   request for stay relief.  And let's go into the Sonnex factors

15   in light of all this colloquy.

16          MR. MARTICELLO:  Okay.  To go back to what I was

17   saying.  When we're looking for one Court to adjudicate the

18   issues, the California bankruptcy court's the best position to

19   do that.  When you look at the balance of the harms, if the

20   motion is denied, the buyers will walk, will lose the

21   opportunity to sell the properties.  The trustee -- the

22   administration of the SunCal Master estates will be paralyzed.

23   We cannot move the cases forward other than seek use of cash

24   collateral to maintain the status quo which LCPI objects to.  I

25   mean, so -- that's -- when Your Honor says it's a strategic --

Page 59

1   we're looking for a strategic advantage, we're just looking for

2   equal footing because we really can't do anything if this

3   motion is denied because LCPI's liens and claims have to be

4   dealt with.  They have to be dealt with.

5           THE COURT:  Why can't you go back to the settlement

6   table, take a look at the document that you spent a year

7   creating and solve the problem?  Whether it's big or small,

8   it's clearly solvable.

9           MR. MARTICELLO:  Your Honor, we tried to do that and

10  it just didn't work.

11          THE COURT:  When did you last try to do that?  Give me

12  a date.

13          MR. MARTICELLO:  Just one moment, Your Honor.  Mr.

14  Reiss was actually involved in the discussions and probably

15  would have a better idea.

16          MR. REISS:  Would Your Honor like me to address the

17  Court on that issue?

18          THE COURT:  I just want to know when last there was an

19  attempt to settle the dispute which is allegedly impossible to

20  settle.

21          MR. REISS:  Your Honor, Daniel Reiss, Levene, Neale,

22  Bender, Rankin & Brill for the official committee of the

23  unsecured creditors in the SunCal cases.  There have been

24  discussions as of yesterday and even this morning and late last

25  week.  The settlement negotiations -- there were settlement

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 60

1    negotiations subsequent to and prior to and after the

2    withdrawal of the motion under 9019.  There was a significant

3    economic issue that the trustee, the committee and the debtor

4    and the committee for Lehman Commercial Paper could not bridge

5    that gap.  Because they could not bridge that gap -- and it is

6    a large number -- the trustee then decided to move forward --

7    move the case forward with respect to a sale for the reasons

8    that Mr. Martina (sic) has said, because it's costly to

9    maintain these properties, because there are also issues

10   potentially of a statute of limitation with regard to certain

11   causes of action.

12          THE COURT:  That's not a big issue.  You can always

13   get a toll on the agreement.

14          MR. REISS:  Oh, okay.  Grant -- I agree, Your Honor.

15   I think the issue of carrying costs and risks to the Chapter 11

16   estate of managing over 5,000 acres of property where Lehman

17   Commercial Paper is objecting to the use of cash collateral,

18   there is a point at which the trustee, in its business

19   judgment, needs to move the case forward.  The only logical way

20   to do that is to administer the properties.

21          THE COURT:  I hear what you're saying but my question

22   was when last there was an attempt to settle the disputes.  And

23   you're telling me it's happened as recently as this morning

24   that you've had conversations, is that right?

25          MR. REISS:  I received an e-mail this morning that I

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 61 of 121

Page 61

1   believe came from the lender group's counsel.  There has been a

2   gap.  There's been a three or four month gap of really lack of

3   negotiations.  But there certainly were negotiations subsequent

4   to the trustee's expression to Lehman Commercial that the

5   settlement wasn't going to work out the way that was intended

6   to create a dividend for general unsecured creditors.

7           THE COURT:  Now do I understand that you have been

8   personally involved in these negotiations?

9           MR. REISS:  Certain aspects of them, Your Honor, yes.

10          THE COURT:  Okay.  And is it correct that there have

11  been no serious attempts to resolve the disagreements relating

12  to the documented settlement agreement for the last three or

13  four months until perhaps that e-mail today?

14          MR. REISS:  There was more than just the e-mail today.

15  There was --

16          THE COURT:  Answer --

17          MR. REISS:  -- correspondence late last week.

18          THE COURT:  Answer the first question.  Is it correct

19  that there have been no serious attempts to deal with the

20  breakdown in the settlement negotiations for a period of

21  approximately three or four months?

22          MR. REISS:  Yes, Your Honor.

23          THE COURT:  All right.  That's really my question.

24  Thank you.

25          MR. REISS:  Thank you, Your Honor.  So the --

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 62 of 121

Page 62

1          THE COURT:  That's all I want to hear from you.

2          MR. REISS:  Oh.  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          MR. MARTICELLO:  So it would have been around March

5    that the parties ceased settlement discussions.  And I would

6    submit it's because we're moving forward that LCPI reached out

7    today or last night.  If we had done nothing the period of no

8    discussions would have been longer.  But it's because we're

9    moving forward that discussions have been renewed.  And we're

10   open to discussions.  But the point is, the trustee has to

11   pursue other alternatives, has to move these cases forward and

12   has already executed an APA and is doing so.

13          And just to summarize my point on the harm, Your

14   Honor, if the motion is denied today, the potential buyers will

15   be lost, will be unable to move those cases forward.  And

16   without the ability to test the validity of Lehman's liens,

17   move the cases in some other direction, it's really just a

18   matter of time before LCPI gets stay relief.  And that would be

19   prejudicial to the creditors because if LCPI is able to obtain

20   stay relief on liens that we have valid claims against and we

21   don't have the opportunity to prove the merits of those claims,

22   that's prejudicial.

23          THE COURT:  Well, what you're really telling me,

24   cutting through your remarks, is that you want the opportunity

25   to take property away from this bankruptcy estate.  You want

Page 63

1    the ability to pursue litigation claims that will deprive

2    Lehman's creditors of Lehman's asset.  Lehman's asset being the

3    5,000 acres you just described in California.  What you're

4    really saying is give me stay relief so I can take action

5    that's detrimental to the interest of the Lehman estate,

6    correct?

7            MR. MARTICELLO:  Correct, but they will have --

8            THE COURT:  How can you possibly prevail if you say

9    correct to that question?

10            MR. MARTICELLO:  Because the harm -- because they will

11    have an opportunity to vet everything we're going to do in

12    California.  But granting the motion, they have failed to

13    identify any harm.  They said it's going to be costly.  It's

14    going to interfere with our case.  Vague assertions.  They've

15    already demonstrated they have the ability to participate

16    actively in both cases -- are going to do so regardless of what

17    happens today.  The cost?  As I said, the litigation's

18    inevitable.  It's not going to get less costly.  It's going to

19    be more costly because there's holding costs.  And again, every

20    time we file a cash collateral motion, there's a dispute.

21    These disputes need to be resolved.  The most efficient

22    economical way to do that is to grant the motion and let us go

23    forward.

24            THE COURT:  Isn't the most economical and efficient

25    way to go back to the table and solve the problem whether it's

Page 64

1    big or small and use the structure that you've already invested

2    a year in developing in order to develop a plan of

3    reorganization that's consensual with Lehman and it gets

4    something for creditors?  Isn't that the most efficient thing

5    for you to do?

6            MR. MARTICELLO:  It would be if it was possible.  But

7    the parties -- this isn't a case -- I think, like the other

8    SunCal case, where no discussions have taken place.  The

9    parties spent a significant amount of time trying to settle

10   these disputes.  We tried to do that first.  It didn't work.

11   This is the trustee's alternative.  And I don't think it's

12   prejudicial to the Lehman estate because they're going to get

13   what they're entitled to.  If the Lehman has valid liens, we'll

14   lose.  But we should have the opportunity to prove our claims.

15   And again, they've identified no specific harm if this motion

16   is granted.  And we've identified several if it's denied.

17           THE COURT:  All right.  I think I should hear from

18   other counsel.  And looking at how crowded the courtroom is

19   today, we have a standing room only crowd of lawyers who are

20   all charging their clients to listen to you argue this issue.

21           MR. MARTICELLO:  I understand, Your Honor.

22           THE COURT:  So I think that there is, even in

23   presenting the motion, an administrative burden to the Lehman

24   estate.  But that's just an observation about the number of

25   people observing this.

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 65 of 121

Page 65

 1          MR. MARTICELLO:  I understand, Your Honor.

 2          THE COURT:  Okay.

 3          MR. MARTICELLO:  Thank you.

 4          MR. PEREZ:  Your Honor, I'll try to be as brief as

 5     possible.  I do have a witness here that I could proffer, Mr.

 6     Brusco.  But let me just highlight three things.  Number one,

 7     with respect to the limitations issue, that's not an issue at

 8     all.  We can enter into a tolling agreement.  They filed a

 9     proof of claim.  That's not an issue.  So to the extent that

10     they just want the ability to bring litigation, that raises

11     many of the same issues that are already pending in front of

12     the BAP.  That's not an issue whatsoever.

13          So, Your Honor, when you go to the motion to lift stay

14     so that they can sell property, their cause is, is that the

15     settlement is dead.  And, Your Honor, with all due respect to

16     my co-counsel, it's just simply not correct.  The difference --

17     the difference between the bid and the ask after they came back

18     and said we can't do this and then we made a counterproposal is

19     630,000 dollars.  That is the difference.  Your Honor, today

20     we're making a large dent in that.  So to say that we're miles

21     apart, the difference is 630,000 dollars.  And on all of these

22     allegations about it was unacceptable and we weren't going to

23     get anything and the unsecured creditors weren't going to

24     receive anything, I mean, that's all absolutely -- there's no

25     factual basis for that, Your Honor.  So to the extent that the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 66

1    cause is that the settlement -- I think the only -- the only

2    thing that the Court can surmise on the basis of the record in

3    front of you is exactly what the Court said.  They've decided

4    to abandon this and pursue litigation.  That's it.  There's no

5    other -- there's no cause as a result of the fact that we can't

6    come together because it was 630,000 dollars.  I dare say that

7    people trying to get to a settlement can breach 630,000 dollars

8    in the context of both of these cases.

9           The allegations about the -- we have 5,000 acres and

10   stuff like -- they also have fourteen -- approximately fourteen

11   million dollars of cash collateral that's been depleted -- you

12   know, from twenty million starting at the beginning of the case

13   in order to maintain the property.  So that's not an argument.

14          Yes, we did object the last time they sought -- use

15   cash collateral because they didn't -- we hadn't heard anything

16   after the last proposal.  But if Mr. Brusco testifies, and I'm

17   happy to proffer him, I mean, he's going to say, we made this

18   counteroffer.  We heard nothing until I called as a result of

19   this case and said what's going on.  I mean, this is

20   ridiculous.  Why can't we settle this?

21          THE COURT:  I don't think I need testimony.  This is

22   the first hearing on a contested matter.  This testimony is not

23   appropriate except in extraordinary circumstances under our

24   local rules and the case management order.  And I'm familiar

25   generally with the dispute.  The issue here is a fairly

Page 67

1    standard application of Sonnax factors to a nonstandard

2    situation because it involves parallel bankruptcy proceedings.

3    I'm very familiar with the SunCal cases as a result of a motion

4    for relief from the stay that was brought in November of 2008.

5    So this has been part of the landscape of the Lehman bankruptcy

6    case for a very long time.

7            What do you say to the Sonnax factors?

8            MR. PEREZ:  Well, Your Honor, I can certainly go

9    through them.  And I don't think that -- I mean, I don't

10   believe judicial economy is going to be served by litigating

11   this thing ad nauseum when there hasn't even been an effort to

12   settle this.  We're perfectly happy -- if the Court says, you

13   got to go to mediation, we're perfectly happy to do that to see

14   -- if we need adult supervision, I mean, I don't think we do,

15   but if the Court thinks we need adult supervision to see if we

16   can breach a gap, we're perfectly happy to do that.  But as it

17   relates to that California is the most expedient forum, we just

18   don't think that spending millions and millions of dollars on

19   litigation when you haven't even tried to broach the 630,000

20   dollar difference makes any sense whatsoever.

21           THE COURT:  Let me parse the question a little more

22   finely.  Reading the papers with some care, I find that there

23   really is a two-part question here.  One is whether or not

24   there should be stay relief to pursue litigation.  The other is

25   whether there should be stay relief to pursue a sale of the

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 68 of 121

Page 68

1   property.  My sense from looking at some of the papers that had

2   been filed is that maybe the sale of the property wouldn't be

3   as major an issue from Lehman's perspective as having

4   litigation unleashed in California.  How do the Sonnax factors

5   apply as to their request that this forty million dollar

6   transaction be pursued?

7          MR. PEREZ:  Couple things, Your Honor.  They did

8   request, basically, that we be stripped of our credit lien

9   rights.  You know and that implies that we don't have a good

10  lien.  So to the extent that their premise in their sale motion

11  is that we're being stripped of our credit lien rights then

12  that -- the Sonnax factors clearly fall in our favor on that

13  issue because, clearly, the balance of the harms are going to

14  be with respect to us.

15         And the settlement that was negotiated over a year and

16  which the Court -- you know, the statements made by the trustee

17  in connection with the compromise motion -- I mean, they're

18  just running away from those statements that it would be

19  protractive litigation to determine the liens.  All of those

20  things that they said in order to get the motion approved which

21  was set for hearing and continued and continued as a result of

22  this alleged ambiguity.  They would have to completely back off

23  for all of those things in order for the Sonnax factors to say

24  that it's judicially economic to do it and that the balance of

25  the harms don't tip in our favor.

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 69 of 121

Page 69

1        Your Honor, in our pleading, we said that to the

2    extent that the Court conditioned the automatic -- lifting of

3    the automatic stay with our credit bid rights and after we

4    determine that, in fact, we don't have a settlement and we

5    can't broach the 630,000 dollars then I think that that might

6    be appropriate.  And remember, Your Honor, Lehman acts here --

7    Lehman has been -- this motion is in Lehman's capacity as a

8    lender.  Lehman is also the collateral agent.  I don't

9    represent Lehman in connection with their being the collateral

10   agent.  Cadwalader does that.  So I'm here representing Lehman

11   only as a lender.  And it has pieces of the first, the second

12   and the third lien, all liens on the property.

13        So as it relates to their ability to basically deny

14   our right to credit bid and to protect what was the basis of

15   the prior settlement, I think that implies the balance of the

16   harms is in our favor on that, Your Honor.

17        THE COURT:  Well, assuming for the sake of discussion

18   that it is the bankruptcy court in California that determines

19   whether or not you have a credit bid right, and assuming

20   further that Lehman has access to cash to protect its positions

21   with respect to the value of the property and could even be a

22   bidder -- which, if I recall correctly, was an issue in the

23   Philadelphia Newspapers case.  Assuming I just rather simply

24   were to decide that allowing the sale of the property to

25   proceed does not harm Lehman Brothers because you can always go

Page 70

1    into bankruptcy court in California and persuade, if you're

2    successful, Judge Smith that you should be entitled to pursue

3    your credit bidding rights, how are you hurt?

4            MR. PEREZ:  Well, Your Honor, a couple of things.

5    Number one, Lehman only holds thirty percent of the first lien

6    debt.  So we have a syndicate that has seventy percent.  We

7    also have fifteen percent of the second lien and we have sixty-

8    five percent of the third lien.  So a large amount of Lehman's

9    exposure is not in the first lien.  So we only control less

10   than a third of the first lien.  So the Court's initial

11   comment -- I don't -- that premise I don't think is necessarily

12   correct.

13           THE COURT:  Where's counsel for that entity?

14           MR. PEREZ:  Well, it's a syndicate of about fifteen

15   banks.

16           THE COURT:  So who's representing that syndicate?

17           MR. PEREZ:  Cadwalader represents Lehman as agent for

18   that syndicate.

19           THE COURT:  Did they join in your papers or did they

20   file separate papers?

21           MR. PEREZ:  No, Your Honor, 'cause it was directed at

22   Lehman as a lender.  It wasn't directed -- it didn't implicate

23   the other parties or not in bankruptcy.

24           THE COURT:  So if those other parties have the ability

25   upon a sale of the property to protect their interests, can't

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 71 of 121

Page 71

1    Lehman, in effect, be part of the crowd and protected by the

2    benefits of the crowd's actions?

3              MR. PEREZ:  Your Honor, I believe that if Mr. Brusco

4    were to testify on that particular issue, I think the answer is

5    no because some of the other members of that crowd are CLOs and

6    CDOs which don't have the ability to do that.  Very different

7    than what the position is that Lehman finds itself in.  So I

8    don't believe that's correct.

9              But also, Your Honor, we first learned of a possible -

10   - of a marketing of the property or of the fact that they've

11   been out there marketing and they have this thing -- we first

12   learned of this just a few days ago after I started

13   conversations in response to this.  We have no visibili --

14   we're the largest creditor.  The first, second and third liens

15   are owed 395 million dollars plus.  We learned about this stuff

16   just in the last hours, not even days, not even weeks.  So

17   after we made our last proposal, there was nothing until the

18   discussions which, frankly -- which I started.  And after that

19   occurred, Your Honor, we received this -- I mean, we saw this

20   offer last night at 9:00 for the first time.  We didn't know

21   anything about any of this until maybe the day or two before

22   that.  So the fact -- when they're saying there's been this

23   marketing process, they have a motion on file to hire a broker

24   and they want 50,000 dollars to start the marketing process.

25   So all of this talk about this has been going on for a long

1    time and people have been marketing it for a long time and this

2    has all been going on, that's absolutely news to the person --

3    the lienholder on the property that has a substantial stake on

4    the property.

5            So to that extent, Your Honor, that has not been --

6    that is not -- yeah, they came in with a document this morning

7    or last night.  We haven't had a chance to review it.  Don't

8    know who it is or any of the bona fides.  Not to say that it

9    might not be appropriate and we're certainly not saying that it

10   isn't appropriate, but we just don't know.  And there's

11   certainly not been a marketing process that we've been involved

12   in or that we've had anything to do with.  This is all kind

13   of -- it is a litigation tactic, unfortunately, and it

14   shouldn't be.

15           THE COURT:  You're saying the sale of the property

16   that's proposed is part of the litigation tactic?

17           MR. PEREZ:  No.  I don't think the sale of the

18   property is part of the litigation tactic but having it sprung

19   on us and not engaging us in this process is certainly part of

20   the litigation process (sic).

21           THE COURT:  Okay.

22           MR. PEREZ:  We can't even say yea or nay on it because

23   we don't know.

24           THE COURT:  Okay.  We've given this quite a lot of

25   time already.  What's King & Spaulding's role in all this?

Page 73

1          MR. PEREZ:  Your Honor, King & Spaulding represents

2     LCPI as a lender in that specific property.  And the reason

3     that occurred, Your Honor, is at the beginning of the case,

4     there's another Lehman entity that is now managed by third

5     parties which had originally, at the very beginning of the

6     case, was managed by A&M.  And so, it was felt at the time that

7     since they were managed by A&M that we couldn't represent them.

8     So that's the difference.

9          There are other Lehman -- the other -- Lehman

10    Lakeside, which is a fund, is now managed separately and

11    represented by Kirkland & Ellis.  And, in fact, LCPI is

12    somewhat adverse to them at this point.

13         THE COURT:  By Kirkland & Ellis or King & Spaulding?

14         MR. PEREZ:  Kirkland & Ellis represents Lehman

15    Lakeside.  King & Spaulding represents LCPI in conne -- as a

16    lender in the California action.

17         THE COURT:  All right.  I'm sorry I asked because this

18    becomes more complicated than I even thought it was.  Okay.

19         Is there anything more on this from the trustee's

20    perspective?  I think I've heard enough to make some statements

21    that I hope are helpful.  But I'll hear anything more you want

22    to say.  I think I know the issues.

23         MR. MARTICELLO:  May I just make one brief point, Your

24    Honor?

25         THE COURT:  Sure.

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 74 of 121

Page 74

1          MR. MARTICELLO:  I think what Your Honor identified as

2     being kind of a two-issue analysis is correct.  And I think a

3     fair compromise is to let us to go forward with the sale motion

4     relief in light of LCPI's willingness to enter into a tolling

5     arrangement.  We can deal with the litigation later.  But we

6     can move forward with the sale relief.  Every harm LCPI stood

7     up here and identified is an issue that will be dealt with on

8     regular notice in California:  marketing, the price, the credit

9     bid.  It will all be dealt with.  They're already participating

10    in both forums.  He's identified three counsel just standing up

11    here today that are involved in the case.  So they'll be

12    protected.  That's all I have, Your Honor.

13         THE COURT:  Okay.  I know that the creditors'

14    committee filed some responsive papers that reserved rights on

15    the question of the sale of the property.  So let me give

16    committee counsel an opportunity to comment on that.

17         MR. O'DONNELL:  Yes, Your Honor.  I think we would

18    support the debtor in all of the other positions they've taken.

19    We were of the view until -- and when we filed our pleading,

20    there was no APA on file.  We now have an APA that we got it

21    late last night.  There are no bidding procedures or any other

22    indication as to how the sale process has been conducted to

23    date or how it will be conducted going forward.  And our view

24    is the Court shouldn't be in a position to rule on the

25    appropriateness of -- really, from the stay for a sale process.

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 75 of 121

Page 75

1    It hasn't been adequately presented to the Court.  So we would

2    ask that they -- that at least the sale motion be made

3    available before the Court rules on the relief requested.

4              THE COURT:  Okay.

5              MR. PEREZ:  Your Honor, can I just say one last thing?

6    I apologize.

7              THE COURT:  Sure.

8              MR. PEREZ:  But -- and perhaps I want to make sure

9    that I answered your question correctly.  To the extent that

10   the sale motion implies that our liens are going to be stripped

11   and we were going to be denied our credit bid right, that is,

12   in fact, a litigation tactic.  So that's the result of that,

13   Your Honor.

14        (Pause)

15             THE COURT:  Okay.  I understand the frustration of

16   counsel for the trustee in the SunCal Master Debtors bankruptcy

17   cases in California.  But I also sense as a result of this

18   argument and the information developed during colloquy that

19   this really is a litigation tactic.  I'm not saying there's

20   anything wrong with the adoption of a litigation tactic in this

21   case that may benefit the trustee in his negotiations and plan

22   administration in California.  But this emperor has no clothes.

23   This is a unabashed attempt on the part of the trustee to take

24   steps in California that are calculated to be detrimental to

25   the interest of the Lehman estate.

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 76 of 121

Page 76

1          I'm sensitive to the fact that this has been going on

2     for a very long time.  But I'm equally sensitive to the fact

3     that, admittedly, for a period of three or four months, a very

4     well developed agreement to settle all differences with Lehman

5     appears to have been abandoned.

6          I'm not going to rule on the motion today.  And I'm

7     going to propose that it be carried to the next omnibus hearing

8     where I may consider stay relief in connection with a sale

9     process of the property that is otherwise consensual from the

10    perspective of the Lehman estate.  I'm also going to direct

11    that the parties return to the negotiating table and endeavor

12    between now and the next omnibus hearing to resolve all issues

13    not just those relating to the sale process.  I note that the

14    original term sheet attached to Mr. Steinberg's declaration

15    provides for a sale of the property pursuant to a plan.  That

16    suggests that the sale of the asset is not really the issue.

17    It's the manner in which it's sold and the effect of the sale

18    upon the rights of Lehman as secured creditor.  The parties

19    simply need to talk to one another again.

20         I'm otherwise reserving judgment on the motion and

21    will consider it at the next omnibus hearing.

22         MR. PEREZ:  Thank you, Your Honor.

23         MR. MARTICELLO:  Thank you, Your Honor.

24         MR. PEREZ:  I believe matter number 6 is a Jones Day

25    matter, Your Honor --

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 77 of 121

Page 77

1          THE COURT:  Okay.

2          MR. PEREZ:  -- and I believe all the rest of them

3    after that.  May I be excused?

4          THE COURT:  You may be.

5       (Pause)

6          THE COURT:  You can't find a seat?

7       (Pause)

8          MR. ENGMAN:  Thank you, Your Honor.  Richard Engman of

9    Jones Day on behalf of the partner LCPI in this case.  Your

10   Honor, we're here because on May 29th, 2010, Greenbrier

11   Holdings LLC, an entity that LPCI (sic) is both a lender and an

12   equity owner of, took the position for the first time that the

13   filing of LPC -- excuse me, LCPI's Chapter 11 filing caused the

14   forfeiture of LCPI's ownership interest, its membership

15   interest in the LLC and that as a follow-on consequence of the

16   loss of those membership interests, the elected mana -- LCPI's

17   elected manager never -- effectively, never was a manager of

18   Greenbrier.  And as a follow-on consequence of that, for the

19   last evidently twenty months, Greenbrier has been without a

20   quorum of its board of managers.

21          The concern -- the immediate concern that we have,

22   Your Honor, as Your Honor knows, and I was on the telephone

23   call with you earlier in the week, there are certainly a number

24   of other issues that the parties have been trying to work out

25   and, frankly, we had believed we're making progress on right up

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 78 of 121

Page 78

1    until May 29th.  The immediate issue and cause for concern from

2    LCPI was the effect of what I just stated:  an entity that by

3    the terms of its own governing documents, if their counsel, and

4    again, we believe it's wrong on both the facts and the law, but

5    the consequence of the position taken by Greenbrier's counsel

6    has been to create a company that, by its own governing

7    documents, can no longer act.

8         It might help and I know Your Honor has been through

9    the pleadings and we did have a call on the phone.  It might

10   help to summarize some of the material facts and some of the

11   history that went -- that -- between the parties before we got

12   to where we are.

13        THE COURT:  Well, since that telephone conference

14   which, if I recall correctly, took place last week, and was

15   dedicated to an emergency motion filed by Greenbrier Minerals

16   in reference to whether it would need to file papers

17   immediately after the July 4th holiday weekend and raising

18   certain questions as to the compliance of the debtors with the

19   provisions of the case management order, that was all resolved

20   by agreement and by direction from the Court.  I've read the

21   papers that have been filed and I'm familiar with the facts.

22   So I don't think it's necessary -- you're certainly free to do

23   it -- to go through the facts.  I know a lot more about the

24   facts now than I did at the time of that telephone conference.

25   And I have read the declarations of both Mr. McCarthy and Mr.

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 79 of 121

Page 79

1    Furley (sic).  So I'm pretty familiar with the facts.

2            MR. ENGMAN:  Okay.  Thank you, Your Honor.  And we

3    work -- we did appreciate Your Honor's time on that phone call.

4    We did take Your Honor's direction seriously.  One of Your

5    Honor's directions was an attempt to not be here today.

6            THE COURT:  Yes.  And here you are.

7            MR. ENGMAN:  We did take it seriously.  Unfortunately,

8    we haven't been successful.  I did want to -- I think if it

9    doesn't come clear -- if it doesn't come through clearly in our

10    papers, to the extent this is -- seems as an attempt of control

11    or takeover or the like, nothing -- by LCPI, that, frankly,

12    just is not the case.  LCPI, even prior to this action, did not

13    have majority control of the board, couldn't take any action by

14    itself on the board, needed at least one other manager to carry

15    any motion, to carry any action, could do nothing by itself on

16    its own.  As part of in an effort to not be here today, we

17    offered -- there's five managers on the board.  Each one of

18    them can have one vote.  We'll only take one vote.  We don't

19    need the increase that's in there.  Unfortunately, we haven't

20    been able to resolve them on something like that.

21            I think some of the facts or at least pointing out

22    some of the -- actually, I'll change actually.  Before I get to

23    the facts, because at the end of the day, I think the facts in

24    reading the document, while relevant, if the position taken by

25    Greenbrier wasn't dramatically and unequivocally just opposite

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 80 of 121

Page 80

1    of the law, especially in this district, then the facts in

2    reading them and being very specific about the terms would be

3    important.  But perhaps in an effort to move quicker, as the

4    committee pointed out in the supplemental pleading in support

5    that they filed, the Section 18.304 of the Delaware Limited

6    Liability Act, which is the statute that Greenbrier is relying

7    on for the proposition that upon twenty months ago LCPI's

8    membership interests were forfeit, in pursuant to Section 541

9    of the Bankruptcy Code, however, that provision would -- is

10   unenforceable and has no -- and can't be relied on by

11   Greenbrier.

12          In their papers, Greenbrier, while not mentioning

13   541 -- in fact, I believe that they say in their papers the

14   only provision that arguably might be applicable to prevent

15   this ipso facto issue from applying is 365(e)(1).  And their

16   argument with respect to 365(e)(1) is that while ipso facto

17   clauses, whether they be in the contract or as a consequence of

18   law, are ordinarily unenforceable under Bankruptcy Code.

19   (e)(2) represents a specific carve-out from the general rule.

20   And they cite to the Milford case specifically for what I think

21   they argue saves 18.304.  The saving in the Milford case is a

22   Delaware chancery court relying on -- looking at an opinion by

23   Judge Farnan in the Delaware district court analyzed 18.304 not

24   to cause a forfeiture in toto of membership interest but

25   separated -- looked at cases applying 365(e)(2) and looked at

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 81 of 121

Page 81

1     what was preempted -- what that Court felt was preempted and

2     what it did apply to and said that participatory and certainly

3     non -- excuse me, certainly economic rights whether the state

4     law would abide it or not, that is an unenforceable ipso facto

5     clause.  But Milford drew a distinction between the noneconomic

6     participatory rights that are inherent in the membership

7     interest to conclude that (e)(2) saved the forfeitu --

8     effectively, saved that aspect of 18.304 and made it applicable

9     to cause the forfeiture of the noneconomic rights.

10          THE COURT:  Let me ask you a question.  Is there a

11     dispute between the parties as to the forty-nine percent

12     economic interest that Lehman has?  Is there any dispute that

13     you continue to retain that interest?

14          MR. ENGMAN:  Not -- yes.  Not for -- not in, I think,

15     in anything that's relevant for our instant concern or for the

16     merits here.

17          THE COURT:  That's why I wanted to hone in on this.

18     The economics.  Let's just say for the sake of discussion that

19     there's no dispute, that Lehman continues to hold forty-nine

20     percent of the economics that hasn't been taken away under any

21     reading of Delaware law, okay?  Is this current dispute simply

22     about governance?

23          MR. ENGMAN:  Yes.  The immediate dispute is.  I think

24     contrary -- it's a little difficult to follow sometimes

25     because, contrary to their papers, I think underlying the

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 82 of 121

Page 82

```
 1   governance arguments made here and the -- that 18.304 doesn't

 2   affect our economic interest, their underlying argument is

 3   that, either as a matter of equity or the like, we shouldn't

 4   have forty-nine percent economically, not on account of 18.304

 5   but because of the alleged failure to fund on the part of

 6   Lehman as a lender, allegations that part of our subscription

 7   for the forty-nine percent was tied up in -- notwithstanding

 8   the -- I can't -- maybe I should get back into some of the

 9   expressed provisions of the operating agreement because

10   notwithstanding the expressed provisions, the expressed

11   integration clause that says no course of dealing, nothing else

12   will change what's in the written document notwithstanding the

13   provisions in the operating agreement that expressly say we

14   have a forty-nine percent interest.  Schedule A that lists us

15   as having a forty-nine percent interest -- I believe it's

16   Section 2.4 -- or, excuse me, 2.8 that obligates the board of

17   managers to promptly modify and amend Schedule A to the extent

18   there's any change to any of the membership interest

19   notwithstanding that for the last twenty months Schedule A

20   hasn't changed.

21         At every single meeting of the board, all of the

22   minutes prepared by the corporate secretary of Greenbrier start

23   with the proviso Present at the board were the following --

24   were Bill Karis, Jack McCarth -- were managers, excuse me, Bill

25   Karis, Jack McCarthy.  Then it goes on to say, "In addition,
```

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 83 of 121

Page 83

1    also attending was legal counsel, Don Malecki, and also

2    attending and if there was anyone other than a manager or a

3    legal counsel, identifies them as "Others that were attending".

4    In each one of those minutes, we're referred to as a manager.

5    Nothing has changed in the operating agreement.  Every -- all

6    the conduct along the way has treated us as a forty-nine

7    percent owner and certainly a manager along the way.  I believe

8    the arguments are that notwithstanding that a course of dealing

9    or a failure or the claims against us somehow reduce the -- our

10   economic interest.

11           One of the reasons I don't want to get too tied in

12   those, is that is the -- I mentioned before, I think that the

13   declaration of Jack McCarthy also touches on it, prior to May

14   25th.  That is the area that I think Lehman Billiards' progress

15   was being made on.  Essentially, beginning in October of 2005,

16   at least in earnest, the parties, for a significant period of

17   time, have been discussing the situation and the right thing to

18   do with Greenbrier.  I think their general agreement that is

19   something that would maximize the value of Greenbrier is in

20   everyone's interest.  The questions have been, I think, four-

21   fold:  whether that value would be maximized by a joint sale of

22   Greenbrier together with a -- I'll call it a sister.  It's not

23   in a technical sense but a sister company called Midland Coal

24   that produces low sulfur coal that -- and sells it to

25   Greenbrier which Greenbrier mixes to meet its contracts.

Page 84

1    Midland is majority owned by the CEO of Greenbrier.  So the

2    initial question was, is Greenbrier's value maximized, by

3    selling it separately, apart from Midland figuring out if

4    there's another way to get low sulfur coal, figuring out if the

5    contracts are -- ought to stay in place or should we package

6    them together and sell the two jointly.

7           The next effort, and I think the real sticking point

8    is, if the decision is that packaging them together maximizes

9    value, how do you allocate value?  If a purchaser just is

10   providing you with a purchase price for the package, how do you

11   allocate amongst the two?  LCPI's position has been, we need an

12   independent -- an independent source to provide a view on

13   value.  Midland is indebted -- there's a fifty million dollar

14   receivable to Greenbrier.  There's -- whether or not, Midland

15   is worth more than that receivable, and how much of any sale

16   proceeds ought to go, in addition to just paying off Midland's

17   debt, are questions that ought to be answered by an independent

18   marketer and -- has been LCPI's view.

19          The other significant issue that I think progress was

20   being made is the net amount of LCPI's claim against the

21   company -- against Greenbrier.  As Your Honor knows, LCPI is a

22   lender with over 180 million outstanding.  Greenbrier has

23   asserted that a failure to fund on the part of LCPI caused

24   damage and has filed a claim in this case.  There had been

25   negotiations regarding how to solve that.  And then finally,

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 85 of 121

Page 85

 1   the last sharing related issue is, assuming there's

 2   proceeds --  excess proceeds from the Greenbrier -- from a

 3   Greenbrier maximization, how do you share them among the

 4   members with -- and that piece of it is, I think, where, does

 5   LCPI own forty-nine percent or should LCPI own forty-nine

 6   percent -- it's that last piece of all these puzzles where the

 7   forty-nine percent comes in.

 8           THE COURT:  Okay.  Well, you've said a lot about how

 9   complex this is.  And assume for a moment that you were

10   successful today and I were to say motion granted, what have

11   you realized as a result of that?  And what of the multiple

12   issues you've just described would be settled or resolved or

13   determined?  And my impression from what you've said is not

14   very many because the only thing that would happen is that Mr.

15   McCarthy's management rights, presumably, would be preserved

16   but not necessarily in a final and definitive way because these

17   are fundamental questions of contract interpretation in

18   Delaware law.

19           If I were to grant your motion, it's not clear to me

20   what I've done for you other than give you maybe a stronger

21   negotiating hand in trying to resolve the other disputes that

22   remain.

23           MR. ENGMAN:  You know, I'm not sure that -- that's why

24   I started with the premise of Your Honor's question was, it

25   seems, if we win, not a lot has happened on all these disputes.

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 86 of 121

Page 86

1          THE COURT:  Do you agree?

2          MR. ENGMAN:  Absolutely.  And that's been the premise

3     of what -- where I started, Your Honor, which was these other

4     things have been thrown into this.  But they're not the issue

5     in front of the Court.  The issue in front of the Court is the

6     governance of this entity, and --

7          THE COURT:  How can I resolve a governance dispute

8     that's this subtle by granting a motion that's based upon

9     enforcement of the stay?

10          MR. ENGMAN:  I don't believe -- it's why another --

11     why I started actually and I was going to get into the Footstar

12     line of cases from Judge Hardin and also Judge Gerber's

13     decision in Adelphia.  I don't -- at the end of the day, I

14     don't think it is that subtle.

15          What we're asking you to do, Your Honor, is find that

16     what -- that LCPI did not forfeit its membership interest, did

17     not forfeit its rights as a member under the operating

18     agreement as a consequence of 18.30 -- as a consequence of its

19     Chapter 11 filing.  At the end of the day, if there's an

20     argument to be had, either in negotiation, mediation, lifting

21     the stay and going somewhere else, that whatever our membership

22     interests are, ought to be reduced from forty-nine.  They're

23     free to make that, but at least in the moment, the agreement is

24     very clear how the votes work and how a quorum is achieved.

25     And the only reason that there isn't currently a quorum is

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 87 of 121

Page 87

1   because of the argument that Lehman's --LCPI's membership

2   interests were forfeited as a consequence of 18.304. Again, I

3   think that that flies in the face of both 541(c) as well as

4   365(e)(1), especially in the Southern District of New York

5   which applies not the hypothetical test to whether a contract

6   provision is enforceable under (e)(2), but the actual test.

7          This is the debtor; this is not the trustee -- they're

8   not seeking to enforce this against the trustee, they're not

9   seeking to enforce it against an assignee. They're seeking to

10  enforce a forfeiture provision against the debtor. And I think

11  the Footstar line of cases in this district have made -- and I

12  acknowledge that other districts have come to different --

13  have -- read (e)(2) differently, but not here. And, frankly, I

14  think Judge Hardin got it right and Judge Gerber, in his

15  decision in Adelphia, in referring to the Footstar line of

16  cases and cites Judge Hardin, not only refers to the -- he

17  didn't use the word comity, but to the general rule in this

18  district where Courts generally do agree with each other on

19  issues that haven't been decided by the Second Circuit. In a

20  footnote, he makes it clear that he's not just simply based on

21  that general rule agreeing with Judge Hardin, but that Judge

22  Gerber thinks that he -- that Judge Hardin absolutely got the

23  issue right. And, frankly, Your Honor, so do we. It's a plain

24  language issue.

25         The (e)(2) only applies if they -- ipso facto clause

Page 88

```
 1    is being asserted against a trustee or an assignee.  The debtor

 2    is neither, as Judge Hardin points out.  The Code knows how to

 3    use the difference between debtor or debtor in possession while

 4    a debtor is subject to the limitations -- the same limitations

 5    as a trustee, it's not the same thing as a trustee and I think

 6    I would urge it -- Your Honor, to -- that under Footstar and

 7    Adelphia, the issue before us just simply isn't one, that

 8    18.304 is simply preempted by Section 365(e), and as well as

 9    Section 561.

10           That said, I think, in addition to simply being

11    preempted, even without -- next, without again, trying to --

12    while I think the documents are clear, I can under -- I can --

13    I don't think Your Honor has to pick through the documents in

14    order to determine whether or not they over -- the default

15    section of 18.304 applies.  Because, again, 18.305 -- or

16    18.304, the Delaware LLC Act, only applies to cause of

17    forfeiture if, assuming preemption doesn't apply, 18.304 would

18    only cause a forfeiture if the operating agreement doesn't

19    otherwise deal with membership interest.  Again, the --

20    Greenbrier attemp -- makes their argument based on what it

21    really means is economic interests and yes, there is a nine-

22    seven in our operating agreement, expressly provides that upon

23    a sale -- or upon a filing, the company can acquire the

24    membership interest of the entity that filed.  What that really

25    means is just that economic interest that isn't terminated as a
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 89

1    consequence of 18.304.

2         The problem with that argument is the definition of

3    membership interest in the operating agreement expressly

4    includes, not just the economic interest, which it also

5    expressly includes the economic interest, but also expressly

6    includes all of the participatory management and voting rights

7    of a member.  And given that, just on its face, it is a section

8    that deals with a member's intere -- with membership of a

9    member that has filed bankruptcy.  If -- and under 18.304, if

10   the operating agreement deals with what happens to a member

11   upon a member's bankruptcy, then the rest of 18.304 doesn't --

12   is irrelevant, it doesn't apply.

13        Lastly, even if preemption didn't apply, even if the

14   document -- even if the agreement wasn't -- didn't take --

15   contain a provision that -- for dealing with a member's

16   interest in bankruptcy, even if neither of that applied, you've

17   got waiver and consent issues that for twenty months we've been

18   operating as a manager, all of the conduct has been as if we

19   own -- that we are a member, that our manager is a manager.

20   The provision in 18.304, there's two ways that 18.304 doesn't

21   apply.  Either because the operating agreement says -- has some

22   other provision dealing with a member's filing, or if all of

23   the other members consent.  And, again, I go back to every

24   single board minute in this case that lists every member

25   including Jack McCarthy and would argue that sitting in board

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 90 of 121

Page 90

```
 1    meetings, treating Jack McCarthy as a board member, resolving

 2    to have Jack McCarthy be the compensation committee to

 3    negotiate a compensation for the CEO are all consents to Jack

 4    McCarty being a manager of the entity.

 5            As Your -- not that long ago, Your Honor decided the

 6    Benevante (ph.) case, which had similar issues in that for a

 7    long time the contract counterparty in that case just didn't do

 8    anything and didn't do -- what they were supposed to do was

 9    either terminate the agreement or pay the swap payments that

10    were due and owing to the debtor; they just sat back and relied

11    on a provision that said the debtors -- filing is a default and

12    the nondefaulting party doesn't have to make payments to the

13    defaulting party.  After a period of time, on a motion to

14    enforce the automatic stay, Your Honor ultimately held that in

15    a -- this is not what Your Honor held, but effectively it was

16    use it or lose it.  You can't sit around for that long in the

17    case and not paying a debtor.  You had a right to terminate.

18    You had a right not to make these payments, but you had a right

19    to deal with that in a timely manner.

20            Here, the first instance that we even heard about that

21    anyone at Greenbrier thought that there was an issue regarding

22    our membership, LCPI's membership, was fourteen months after

23    LCPI filed and then, that was in the context of the e-mail

24    which I know Your Honor has already seen in our pleadings, but

25    an e-mail that the first 18.304 doesn't make this an economic
```

Page 91

1   versus participatory argument.  In fact, the exact opposite;

2   the argument in December had nothing to do with our

3   membership -- our voting interests, our participatory interest,

4   the argument in December was, "As a consequence of 18.304, you

5   don't have forty-nine percent economic interest, so this

6   sharing argument that -- this sharing proposal that you gave to

7   us is inadequate.  Go back to the drawing boards, LCPI, because

8   you don't have forty-nine percent because of 18.304."

9         Flash forward five months to May 25th when there's a

10  governance issue that is -- that at least -- that went against

11  at least one manager, now all of the sudden, the argument is

12  not that 18.304 caused us to forfeit our economic interest, the

13  argument is 18.304, all it did was make you lose your voting

14  rights, which, by the way, has all these other negative

15  consequences to the company itself.  We don't have an answer

16  for them, but we're willing to trade a company that can't

17  operate for not having the ability of this vote that was

18  carried by a ten to one vote.  In fairness, four to five, not

19  counting the way the voting works, but four persons voting

20  against one, in order to avoid the effects of that vote, we're

21  willing to throw this company into a situation that, frankly,

22  we believe is untenable, unsafe.

23        It's not -- we mentioned it in our pleadings; the

24  operating agreement is express -- and I'm sorry to keep going

25  back to the operating agreement, but it really is express on

Page 92

1   these terms.  The company cannot operate, cannot conduct

2   business except by and through and is authorized by its board

3   of managers.  It can't -- it can hire -- it can retain a

4   president to the extent that president is appointed by the

5   board of managers.  The board of managers, according to the

6   debtors' argument, hasn't been in existence for the last twenty

7   months.  Your Honor had said that you've read the declarations

8   of both Bill Karis and Joe Turley.  One of the arguments --

9   nowhere in that argument or -- and conveniently forgotten, I

10  guess, by the debtors, is that the appointment of Bill Turley

11  as an independent manager is an appointment that is made at the

12  direc -- by all four of the voting members, jointly.  So, if

13  Jack McCarthy isn't a manager because LCPI couldn't appoint

14  him, under the operating agreement, Bill Karris isn't a manager

15  because LCPI wasn't there to appoint him.

16        We don't think that -- again, we don't think that

17  that's the case.  We think that that argument is wrong on both

18  the facts and the law, but it is the conclusion -- if they're

19  right, that's the concl -- if they're right that LCPI hasn't

20  had a vote for fourteen months and they haven't found a way to

21  amend the operating agreement which expressly states that the

22  Class D member has to vote to appoint -- is part of the joint

23  vote to appoint even the independent manager, we're not down to

24  four managers, we're down to three managers of this entity.

25        THE COURT:  But that's not really your concern.  Your

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 93 of 121

Page 93

1    concern is getting Mr. McCarthy back into the room and issues

2    relating to whether or not the entity is engaged in ultra vires

3    acts right now may make for good legal argument, but it doesn't

4    have much to do with whether or not the business is

5    functioning.  My understanding is it's mining coal and

6    presumably, selling it.

7            MR. ENGMAN:  And I don't want to -- as I said on the

8    call that we had, Your Honor, I'm -- we are being rational and

9    I don't want to sound like Chicken Little.  We're not claiming

10   the sky is falling, but there is a ephemeral issue when a

11   company in the lon -- certainly the longer it goes on it's a

12   real issue.  I'm not sure how to quantify the danger or the

13   concern, but it's real.  Real enough that my client has offered

14   to be one -- just one vote among all five.  And we're -- and I

15   would make that suggestion to Your Honor.  If Your Honor noted

16   that there lots of other things that need to be resolved, we're

17   happy to keep talking to the company about all of those other

18   issues, we're happy to keep -- whether that be through

19   mediation or just ongoing negotiations.  But we think that this

20   management issue needs to be resolved and we're willing to just

21   be one vote among five.  But there needs -- I can't think of a

22   fairer answer than that.

23           THE COURT:  Okay.  Let me hear from Mr. Schorling.

24           MR. SCHORLING:  May it please the Court, William

25   Schorling, Buchanan Ingersoll & Rooney on behalf of Greenbrier

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 94 of 121

Page 94

1    Minerals Holdings LLC.

2           Your Honor, as the argument has demonstrated so far,

3    there are a number of disputes; the effect of Section 18.304 on

4    the Delaware LLC Act is merely one of them.  I would note that

5    I hadn't intended to engage in negotiation in front of the

6    Court, but that the other members have countered the debtors'

7    suggestion.  The debtor rejected the other members' proposal,

8    we then have gone back to the debtor and asked for -- if there

9    are perhaps areas where we can compromise and we suggested

10   mediation, which is in fact one of the procedures provided for

11   in the operating agreement in Article 12 to try to resolve not

12   just this dispute, but all of the others.

13          The others are fairly important, dealing with the sale

14   of the mine, the impact of the debtors' breach.  The debtor

15   notes in its motion that it performed through the sixth

16   amendment; unfortunately there was a seventh amendment.  They

17   failed to fund a ten million dollar request made and approved

18   prior to filing of the petition, the debtors' petition and then

19   anticipatorily repudiated by saying that they would not fund

20   the remaining thirty-nine million dollars.  There, following

21   the in and out of the Midland mine, the debtors stopped

22   negotiating some two months ago and have not resumed.  So that

23   is, as of right now, at a stop.  Obviously, that informs our

24   view as to why we're here today.

25          We do view this as an attempt to gain leverage and

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 95 of 121

Page 95

1    sympathy.  Whether -- whatever happens with regard to a quorum

2    isn't going to have any impact on the negotiation of the

3    underlying disputes.  Everybody has a seat at the table;

4    everybody has to participate because everyone's interest is

5    involved.

6         THE COURT:  Let me stop you in reference to that last

7    statement.  Is it Greenbrier's position that regardless of the

8    hat that Mr. McCarthy wears, that he's welcome to be in the

9    room?  He needs to be in the room and the resolution of the

10   disputes that we've been talking about cannot occur unless he's

11   in the room?

12        MR. SCHORLING:  That's correct.  And I would like

13   to -- our view of history is different from the debtors'.

14   There was no issue as to the manager's duties and powers prior

15   to the appointment of Mr. McCarthy.  There was a prior manager

16   who'd been appointed, prior to the debtors' filing its

17   petition; 18.304, on its face, doesn't speak to managers.  It

18   speaks to right of members to vote and to participate in

19   management, not on the power of managers to act.  The manager

20   who had been appointed by the debtors resigned.  Mr. McCarthy

21   was purported to be appointed by the debtors in March of '09.

22        In December of '09, Mr. Karis, the independent

23   manager, raised the issue as to whether or not the debtor had

24   an ability to vote.  It went to more than the debtors' economic

25   interest.  From and after the December 17th memorandum which

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 96 of 121

Page 96

1    was attached to the pleadings here, at all of the managers'

2    meetings, the meeting began with a statement that the nondebtor

3    parties were reserving their rights as to the debtors' interest

4    in Greenbrier and right to participate.  All of the actions

5    until we get to the main meeting are unanimous.  So that no one

6    raised the issue of whether -- of the impact of the debtors

7    having filed bankruptcy on its interest, other than Mr. Karis'

8    December 17th memo, until the main meeting.

9            Following that meeting, as Mr. Karis says in his

10   declaration, and again, he's the independent manager, he asked

11   Buchanan Ingersoll & Rooney to look at the impact of the

12   debtors' bankruptcy on its interest and it was at that time

13   that we discovered that there was an unusual provision in the

14   operating agreement which required more than a majority for a

15   quorum.  The language is, more than six to be present for a

16   quorum.  That's when the debtor now raises the issue about the

17   quorum, but it's been clear since December that there was an

18   issue about the debtor's right to vote while the parties were

19   negotiating, while everything was being done consensually.

20   There wasn't any reason to go further.  Indeed, it would have

21   been counterproductive to the negotiations.

22            We get here today --

23            THE COURT:  Mr. Schorling, I just want to break in and

24   ask a question, not in your capacity as an advocate, but in

25   your capacity as counsel for an entity that is currently under

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 97 of 121

Page 97

1    something of a governance cloud.  Isn't it in your client's

2    best interest that there be some kind of prompt resolution of

3    disputes in reference to acts of the board of managers and the

4    allegations that had been made publicly now concerning ultra

5    vires acts and a governance vacuum of sorts, particularly if

6    what you're trying to accomplish is a capital transaction that

7    involves a disposition of the mine's assets.

8            MR. SCHORLING:  Your Honor, the disposition of the

9    mine's assets as I indicated, because of all the interests that

10   are implicated, that is going to go forward one way or the

11   other, whether we have a quorum and because all the members

12   have to participate in that, including the debtor because of

13   the various interests.  The issue on governance, do we have an

14   interest in --

15           THE COURT:  What are fighting about here?

16           MR. SCHORLING:  Do we have an interest in a quorum?

17   Yes, we do.  The nondebtor members have made a counterproposal,

18   and I -- and that is all of the nondebtor members have made a

19   counterproposal.  The debtor rejected it; they don't view this

20   as the appropriate forum --

21           THE COURT:  It's not the appropriate forum.

22           MR. SCHORLING:  -- in which to negotiate.  But I want

23   the Court to be clear.  We have proceeded, we are proceeding.

24   The other nondebtor members are proceeding; there is a

25   provision in the agreement, I think it's Section 9.7 which

Page 98

1    deals with amendments to the operating agreement.  We could

2    resort to that.  The debtor is likely to take issue with that

3    because if the other members take a position that the debtor

4    can't vote, the debtor's vote wouldn't count.  But there could

5    be an amendment to the LLC operating agreement which would do

6    away with the quorum issue.  Now, the voting issue; we don't

7    have to touch voting, just deal with the quorum issue.

8          The issue that the debtor raises as to why it's so

9    critical that we address that issue -- it's important; it's not

10   critical.  If you look at the action that the board of managers

11   has taken, as outlined in the debtors' motion of footnote 4,

12   they approved a release of claims.  There was credit to Midland

13   for some commissions earned and pursuit of a coal sales

14   agreement, it was with ArcelorMittal.  Not -- there's nothing

15   time sensitive about any of that.  The debtor has management in

16   place, it has professional management in place.  It's an

17   operating deep mine.

18          The duties are delegated to the officers by Section

19   5.3 which is on page 26 of the operating agreement which is

20   Exhibit C.  The provisions that the debtor points to about this

21   being manager-managed, are those typical provisions in an LLC

22   agreement, which differentiate between manager action and

23   member action.  It's a board of manager-managed LLC, not a

24   member-managed LLC.  That's what those provisions go to; they

25   don't go to the delegation of duties to the officers.  That's

Page 99

1    done in a separate provision, Section 5.3, they've been

2    delegated, the mine can operate.  It's executive decisions that

3    require the board of management decision making.

4         To go back to the sale, the only sale that's going to

5    occur is one that's consensual.  At which point we aren't going

6    to have an issue.  It will be approved.

7         THE COURT:  Well, tell me why that has to happen.  I

8    mean, if I'm understanding what this dispute is principally

9    about, it's about the rights of Lehman in its capacity as an

10   equity owner of a certain percentage of the business of

11   Greenbrier Minerals.  And we have this dispute because there is

12   controversy concerning the rights of Lehman's representative to

13   vote in reference to entity action and to participate in entity

14   decision making.  Are you saying now that that's really not an

15   issue, because in order to deal with something as fundamental

16   as a sale of the assets of the business or substantially all

17   the assets of the business, which apparently is currently under

18   contemplation, that they be involved in all events?  And if so,

19   under what authority?

20        MR. SCHORLING:  A sale of the business has to take

21   into account a resolution of Lehman's economic interest and

22   membership interest and capacity as a lender in any resolution

23   of the sale.  That won't be resolved other than through

24   litigation which nobody wants, or through a consensual

25   agreement.  It is our view that we were, two months ago, fairly

Page 100

1   close to a consensual resolution of how to deal with the sale

2   and with the impact of Lehman's failure to fund on its

3   membership interest, both economic and managerial.

4           THE COURT:  And what's your view as to the best means

5   to accomplish that desirable objective?

6           MR. SCHORLING:  Mediation.  Mediation, arbitration if

7   we can't get beyond that.  Hopefully -- well, no, the best

8   resolution?  Negotiation.  Clearly it's in the parties'

9   interests to negotiate a resolution.  Failing that, and as

10  Article 12 provides, there is a provision for mediation.  It's

11  contractual, so we've got a right to mediation.

12          THE COURT:  Let me ask you this additional question.

13  The debtors, both in the telephone conference that has been

14  adverted to in earlier colloquy and in papers that have been

15  filed, suggest that there are some significant health and

16  safety issues that may present themselves because the business

17  is operating a coal mine.  And presumably, there is some

18  unforeseeable risk of an emergency associated with that

19  operation.  Assuming for a moment that there were such an

20  emergency, and there were an overhang of doubt concerning the

21  capacity of the business to function at the management level,

22  how would that problem be resolved?  Or is it a problem in your

23  view?

24          MR. SCHORLING:  I suppose it's a hypothetical

25  problem --

Page 101

```
 1              THE COURT:  Right, well I'm asking it.

 2              MR. SCHORLING:  -- and there are lots of hypothetical

 3    issues.  The mine is operating safely, it has always operated

 4    safely.  There is professional management in place.  Indeed,

 5    even when the debtor proposed replacing Mr. Turley, he was

 6    going to be retained at his salary in his management capacity,

 7    so that there's no issue here about the capability of

 8    management.  That's not at issue; no one's ever raised that

 9    issue.  The mine is operating, it's got professional operators.

10    They are the ones who are responsible for making sure that it

11    operates.

12              THE COURT:  I understand, but let's go just to the

13    basics of governance.  Management is presumed to be experienced

14    in the mining industry and that's not the issue.  The manager

15    has to get direction from its board, particularly if there's

16    something critical going on.  How does that happen in the

17    context in which there is a cloud over the ability of the board

18    to function?

19              MR. SHAW:  Your Honor, you're asking a

20    hypothetical -- I'll respond hypothetically.  The other members

21    can modify or amend the LLC agreement under Section 9.7 and

22    they can fix the quorum issue.  They haven't been engaged in

23    negotiation.  We believe that this needs to be a negotiated

24    resolution among all the parties, but they have the right to do

25    so and they could do so if they wanted to.
```

Page 102

```
 1              THE COURT:  Well, let me ask you a question that's

 2    comparable to the question that I was asking in the earlier

 3    matter involving the SunCal negotiated settlement that went

 4    into three to four months of hiatus.  Without going into the

 5    specifics of the negotiations themselves, have negotiations

 6    taken place since our last telephone conference that you

 7    participated in?  Are additional negotiations scheduled and in

 8    your capacity now as an advocate, that is, someone who's

 9    interested in some kind of peaceful resolution of this, is

10    there promise that ongoing negotiations will produce some kind

11    of favorable outcome here?

12              MR. SHAW:  May I make a slightly long-winded response?

13              THE COURT:  You can make a response as long as you

14    wish.  However, it's almost getting to be lunchtime --

15              MR. SHAW:  It's our view that the debtor walked away

16    from the negotiating table two months ago.  On the substantive

17    issues, there has been little to no negotiation because the

18    debtor is not communicating.  There has been negotiation over

19    the narrow issue presented here.  The debtor made a proposal,

20    we responded, the debtor rejected our response.  As I said, we

21    asked if there were scenarios where compromise might be

22    possible and in the alternative, if they would agree to

23    mediate.  So --

24              THE COURT:  When you said agree to mediate, is that

25    only with respect to the governance issue?
```

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 103 of 121

Page 103

 1          MR. SHAW:  It was raised in the governance context,

 2     meditation overall would be fine with us.

 3          THE COURT:  Okay.

 4          MR. SHAW:  So, you know, I can't speak for the debtor,

 5     but I can tell you what our view is and that is our view of the

 6     facts.

 7          THE COURT:  Okay.  Based upon what I've heard and

 8     without getting into the merits of the underlying dispute that

 9     involves an operating agreement and its interpretation,

10     provisions of the Delaware Limited Liability Company Law and

11     the interpretation of Section 18.304 of that law, questions of

12     waiver and estoppel and consent, it seems to me that it is

13     probably in the best interest of the parties to this dispute

14     for me not to rule today, but to encourage ongoing

15     conversations along the lines described by Mr. Schorling

16     focused, at least initially, on resolution of the voting issue

17     within a board of managers of Greenbrier Minerals Holdings and

18     the question of Mr. McCarthy's role or the role of any

19     successor who may take Mr. McCarthy's place.

20          Mr. Schorling has made a variety of representations

21     which I accept that the Lehman representative needs to be a

22     part of the solution here and that it's in the best interest of

23     Greenbrier Minerals that there be such a solution, including a

24     possible sale of the business in a manner that takes into

25     account the high sulfur content of the coal generated by

Page 104

1    Greenbrier and allows that to be mixed with other coal of low

2    sulfur quality.  Nobody said that but I read that somewhere.

3             I think, under the circumstances, the parties should

4    meet and confer with that goal in mind, recognizing that a

5    failure to reach an understanding on governance will lead to

6    further litigation, not only as it relates to governance, but

7    all the other subsidiary issues that have been identified by

8    the parties in their pleadings that I have read.

9             I also note that while there is a dispute between the

10   parties as to whether enforcement of the automatic stay is the

11   proper procedural means to achieve the end of resolving the

12   governance issue that's before the Court, I believe that I do

13   not have at this juncture a sufficient record in order to make

14   a determination, at least as it relates to the questions of

15   consent and waiver and course of conduct of the parties at

16   various meetings that took place during the period when

17   everybody was acting consensually after the Lehman bankruptcy

18   filing.

19             Accordingly, I wouldn't be prepared to rule today even

20   if I wanted to because I think I would need more of a record

21   than I have.  And I would want to see Mr. McCarthy in person;

22   I'd want to see Mr. Turley, I'd want to see the independent

23   manager and know more about the way this enterprise actually

24   has functioned and governed itself in the ordinary course,

25   particularly since the commencement of the bankruptcy case.

1        So my ruling for today is that I'm not ruling but I am

2    encouraging the parties to do exactly what Mr. Schorling has

3    said he believes needs to be done.  And if the parties can

4    negotiate a resolution, that would be, obviously, the best

5    outcome.  If there is a fundamental difficulty in reasonable

6    discourse, without getting into the question of whether the

7    disputes are fundamentally arbitrable or subject to a mediation

8    provision in the agreement, as to which I am not making any

9    judgment at this time, I believe it will be useful for a third

10   party to act as an intermediary in order to help get to a

11   resolution.

12        I note this because as was clear from the argument of

13   debtors' counsel, even were I to rule that the actions of

14   Greenbrier constituted a stay violation or maybe a continuing

15   stay violation as it relates to the interests of Lehman as

16   holder of membership interests in Greenbrier, that doesn't

17   solve the problem.  It's just one step along the way toward a

18   possible solution.  So not only do I encourage that cooperative

19   dialogue, but I would like to be kept advised not as to the

20   specifics but as to the level of progress being made and I

21   would suggest that we schedule a telephone conference report to

22   chambers sometime in the next week or two.  I'm not

23   micromanaging this to tell you when that call should be placed,

24   but my notion of this is that the leash on this needs to be

25   fairly short.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 106

 1          And if the parties are not making material progress in

 2     reaching some kind of business solution here, that conversation

 3     will turn into a scheduling conference to talk about when next

 4     we'll be in court; what discovery, if any, the parties may need

 5     in order to prepare for an evidentiary hearing.  And the

 6     scheduling of that hearing for a day that will not be on the

 7     omnibus calendar because I presume it will take more time.  And

 8     I'll see you when next I see you and I'll hear from you in the

 9     next week or two.

10          Please work cooperatively to at least find a date and

11     time when I will be in chambers for that call and you can find

12     that out by checking with my courtroom deputy.  And that's all

13     I have to say on this right now.

14          MR. SHAW:  Thank you, Your Honor.

15          THE COURT:  Okay.  Norton Gold Fields.

16          MR. GOLDFARB:  Good morning, Your Honor.  My name is

17     James Goldfarb.  I'm with the law firm of Jones Day; we

18     represent the debtors and debtors in possession.  To cut to the

19     chase, we have some positive news to report to you and I think

20     this will be a lot quicker than what's gone before, this

21     morning.

22          We were last before you on May 12th.  The reason we

23     were here was to have a hearing on debtors' motion.  It was

24     debtors' motion to compel and also to pursue a violation of the

25     automatic stay against a counterparty of one of the

Page 107

1  constituents of the estate, that would be Norton Gold Field

2  (sic), which is an Australian gold producer and mining

3  operation.  Specifically, it was the estate's contention that

4  Norton was not paying as it was obligated to under a swap

5  arrangement that it had dealing with the gold prices with this

6  constituent number of the estate, specifically LBCC, Lehman

7  Brothers Commercial Corporation.

8           Your Honor suggested that the parties, rather than

9  have a full-blown hearing, mediate the dispute.  The parties

10 took Your Honor up on that suggestion and we've made

11 substantial progress towards a positive resolution and a

12 consensual resolution.  There is still some more work to be

13 done but after confirming with Mr. Tillinghast, who represents

14 Norton, the feeling is there's no need to have a hearing on the

15 motion today and we would ask to adjourn until the next omnibus

16 date, giving the parties an opportunity to finalize along the

17 positive path that they've embarked on.

18          THE COURT:  Fine.  That's a very promising report and

19 it's too bad you had to spend the whole day to make it, but --

20 just in terms of your use of time.  But I'll see you next month

21 and I hope you continue to make progress.

22          MR. GOLDFARB:  Thank you, Your Honor.

23          MR. MILLER:  Good morning, Your Honor.

24          THE COURT:  It's actually good afternoon, now.  It's

25 12:30.

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 108 of 121

Page 108

1          MR. MILLER:  Happy Bastille Day.  Your Honor, the next

2     matter -- that concludes the omnibus calendar.  The next

3     matter, I think, Your Honor, is not on the record; it was in

4     connection with a telephone conference that was scheduled for

5     yesterday afternoon which Your Honor kindly agreed to put over

6     to today because of an inconvenience on my part.  So I don't

7     know whether Your Honor wants this on the record or off the

8     record.  It relates to a request by White & Case for, I think,

9     a status conference.  And we have a position.

10         THE COURT:  Well, we have a very full courtroom still

11    and I'm guessing that we have as many people here as we have in

12    part because of the telephone conference that you just

13    described and the request made by the ad hoc creditors

14    represented by White & Case to discuss procedures relating to

15    the plan process here.  It may be that people are here for a

16    different reason or --

17         MR. MILLER:  I believe they're all here for that, Your

18    Honor.

19         THE COURT:  I kind of figured that.  So let's hear

20    from White & Case on what they are proposing at this point.

21    Their papers had requested an opportunity to speak at today's

22    hearing and here they are.

23         MR. SHORE:  Thank you, Your Honor.  Chris Shore from

24    White & Case for the ad hoc committee of Lehman Brothers

25    Creditors.  And we represent about sixteen billion dollars of

Page 109

1    claims in the case.  We filed an objection on June 29th that,

2    Your Honor's correct, requested today's conference.  And the

3    nature of that objection, I don't want to discuss today.

4    Actually, I think we can handle this quickly; it's really just

5    a request to establish a notice procedure to a next hearing.

6    And let me explain what I mean by that.

7         We understand -- we filed the objection.  I've heard

8    from a number of people, I've discussed it with the committee,

9    I've discussed it with the debtors and I understand they may --

10   both the committee and the debtors may have something to set

11   today, but there's been some confusion about whether we would

12   have the status conference today that was only resolved

13   yesterday afternoon.  So I'm not even sure that everybody who

14   wanted to speak on procedures would be here today and I think

15   that's probably premature.

16        What we'd like to do right now is set a date, whether

17   it's at the next omnibus or some other date that's convenient

18   to the Court to have people back to discuss two issues; whether

19   there need to be procedures at all with respect to inter-debtor

20   issues, the dissemination of information and the manner of

21   conducting depositions and the like, and I understand the

22   debtors have some firm views on that, and then if there are

23   going to proceed to be procedures, what those procedures would

24   be like.

25        The committee has offered to solicit views from

Page 110

1     creditors as to what procedures they would find acceptable,

2     with the idea being in the interim between now and that

3     scheduled hearing, we'd get as close as we could to some sort

4     of negotiated order and then have the Court resolve, if it all,

5     any issues that remain at that point, including the dating

6     issue of whether there should be procedures at all.  And that

7     way, we can get people and get notice out to people as

8     inclusively as possible to provide what is essentially a notice

9     and comment period, so that we can come back to Your Honor with

10    a more fully baked set of procedures.

11          MR. MILLER:  Your Honor, in the spirit of all the

12    discussion about consensual proceedings this morning, we

13    certainly have no objection to what Mr. Shore has said.  But I

14    would like to point out, Your Honor, that this all started with

15    the filing of what is denominated as a preliminary objection to

16    the plan that was filed on March 14th on the disclosure

17    statement which was filed on April 15th of this year.  Though

18    we tried to point out to Mr. Shore and Mr. Uzzi, Your Honor,

19    that plan that's on file which was filed, as Your Honor well

20    knows, because of the eighteen-month limitation.  Basically it

21    has served as a catalyst for further negotiations and the

22    position that we have taken is there are constant negotiations

23    going on.  We now have, Your Honor, in addition to the ad hoc

24    committee, we have an alliance of LBRF (sic) creditors who have

25    engaged the Blackstone firm as their financial advisor --

08-13555-mg    Doc 10378    Filed 07/16/10    Entered 07/22/10 14:48:22    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 111 of 121

Page 111

 1              MR. MALONEY:  LBSF.

 2              MR. MILLER:  I'm sorry?

 3              MR. MALONEY:  SF.

 4              MR. MILLER:  SF -- I'm sorry.  Thank you, Tom.  Which

 5    we have a NDA with Blackstone.  We have an NDA that's almost

 6    finalized, resolved and could go representing a group in the

 7    LBT case.  We have other groups that have been involved.

 8              THE COURT:  Is that --

 9              MR. MILLER:  Maybe I've got the initials wrong.  But

10    I'll -- there are multiple negotiations going on, Your Honor.

11    And as Your Honor knows, the protocol meetings are going on.

12    What we have said, Your Honor, is the plan is -- will undergo

13    revision, Your Honor.  There's another meeting next week in

14    Berlin with the foreign administrators and receivers, all of

15    which have blossomed off the plan that was filed and lots of

16    comments, Your Honor, and comments, I might say, Your Honor,

17    from the ad hocs also which are being considered.

18              It was argued that this was preliminary but in light

19    of Mr. Shore's comments, we have no objection, Your Honor, to

20    spending the next period between now and the next omnibus

21    hearing in negotiating a discovery order, protocol, whatever is

22    necessary in this case.  But in the context, Your Honor, that

23    the preliminary objection is filed to a plan that's not being

24    prosecuted.  That plan is going to be substantially revised, I

25    believe.  And a new disclosure statement.  So, to a certain

Page 112

```
 1   extent, this is premature.

 2            We are also have been in negotiations for a long time,

 3   and I don't want to repeat anything anybody else said about

 4   parties coming to a stalemate and respective an NDA agreement

 5   with AlixPartners, which has been engaged by the ad hoc group,

 6   and I use "the group" loosely.  Your Honor, we have offered

 7   them the same NDA agreement that the Blackstone Group has

 8   signed.  That's unacceptable.  We're still prepared to

 9   negotiate with them, Your Honor, and hopefully before -- well

10   before the next omnibus hearing, we will have an NDA and they

11   can go and do their investigation.

12            The issue here, Your Honor, is practically nobody

13   wants to be restricted.  So there is an issue about nonpublic

14   information and how it gets distributed and who has access to

15   that.  That's what has to be negotiated, Your Honor.  So I

16   would join in Mr. Shore's presentation; we will take the time

17   and try and work out an appropriate order.  Thank you, Your

18   Honor.

19            THE COURT:  Okay.  It looks like the committee wants

20   to say a few words.

21            MR. FLECK:  Thank you, Your Honor, and good afternoon.

22   Evan Fleck of Milbank Tweed on behalf of the committee.  As is

23   evident from the remarks already on this matter, what I was

24   prepared to start with is that from the committee's view

25   there's not much dividing the bits and parties, the ad hoc
```

1   group and their request and the debtors.  It's also consistent

2   where the committee has been since before the plan was filed

3   that it's appropriate that there be an information sharing

4   process and this is a good opportunity for us to be before the

5   Court.  It's not -- certainly not solely because of the ad hoc

6   group's pleading, but it's not really a controversial issue in

7   the committee's view that there should be information sharing

8   pursuant to an appropriate process.

9          And I also wanted to mention to Your Honor that the

10  committee was prepared to file a pleading to memorialize its

11  position on this but, as was mentioned, it was unclear whether

12  there was going to be an opportunity to speak on this today.

13  That will probably be unnecessary to do that, but we can

14  certainly put it in a written pleading.

15         Also, Your Honor, I think from the committee's

16  perspective, it's important to note that the issues, the

17  substantive issues that are set forth in the ad hoc group's

18  preliminary objection are important and we think they're

19  important with respect to any plan that is ultimately

20  prosecuted.  We are certainly aware of the fact of the current

21  posture of the plan that was filed, why it was filed when it

22  was filed and the fact that a hearing on the disclosure

23  statement has not yet been scheduled.  But it's the committee's

24  view that there's not a reason to wait to start to come up with

25  a process, together with all the parties that are relevant,

Page 114

1    that want to participate in the process, that will maximize and

2    promote efficiency to getting the information that -- the raw

3    data.  To start with the raw data as opposed to jumping into

4    depositions, but start to share the raw data that we, the

5    committee, know exists.  Obviously, the debtors do and it

6    should be shared among parties.

7            And that's something there has been a process underway

8    to start to do that, but we think through the filing of the

9    objection and this discussion with the Court today, we'll

10   hopefully jump-start that into a more organized process so that

11   all the parties who want to participate pursuant to an

12   appropriate protective order will be able to do that and draw

13   their own legal conclusions about one issue that's been raised

14   is the appropriateness of substantive consolidation of the

15   debtors' estates.  And there may be, through the course of the

16   discussion with the parties-in-interest, other issues that

17   people feel are appropriate to be folded into this process.

18   It's not just any issue, these -- what in the committee's view,

19   it would be issues that are clearly going to be a part of this

20   plan or any plan that would be prosecuted for these estates, to

21   bring these estates out of these proceedings.

22           As I mentioned, Your Honor, we have been discussing

23   the information sharing process with the debtors and the

24   various constituencies and we are aware of the fact that

25   certain of the financial advisors, two groups that have formed,

Page 115

1   have finalized their agreements and it's really, in the

2   committee's view, a matter of converting these nondisclosure

3   agreements that have been put in place into an appropriate

4   protective order.  As Mr. Shore mentioned, the committee is

5   happy to perform the role that it has in certain other

6   disputes, although as I said, I don't think this is a true

7   dispute, but an issue that needs to get resolved through a

8   process.

9        The committee's happy to serve as a clearinghouse for

10   comments, should the Court be receptive to us doing so.  And we

11   would expect to, if the Court is willing, work through that

12   process with the relevant parties and come back to the Court

13   with, hopefully, a procedure -- not necessarily the one that

14   was put in place in Adelphia.  We've heard from many, many --

15   we have our own views about that process; we've heard from many

16   creditors about it.  But a process that, hopefully, a critical

17   mass of the parties including the debtors and the ad hoc group

18   and others are comfortable with for moving forward and come

19   before the Court, hopefully with something that's acceptable.

20   Otherwise, we would come, identify the issues and look for

21   guidance from the Court for further direction.

22        THE COURT:  Okay.  Thanks.  It looks like others wish

23   to be heard, just as I was ready to foreclose further comment.

24        MR. HUEBNER:  I could sit down if you'd like, Your

25   Honor, but I'll be extremely brief.

Page 116

1           For the record, Your Honor, Marshall Huebner of Davis

2     Polk & Wardwell, here as now co-counsel to Linklaters for LBIE

3     and the foreign administrators of the European entities

4     centered in England.  Two brief comments, Your Honor.

5           Number one, I think it should probably not go

6     unmentioned that the ad hoc committee, of course, expressed a

7     view on a variety of substantive issues about what they don't

8     like about the plan in their pleading and that was really the

9     vehicle for their requesting to begin discovery.  We didn't

10    think it was appropriate to file any sort of response on the

11    pleading.  We didn't think it was necessarily procedurally

12    appropriate but, of course, it goes without saying that there's

13    a strong second view about the propriety of the plan in the

14    other direction on the treatment of various parties including

15    certain foreign affiliates.

16          Second, Your Honor, more to the point for today and

17    with this I'll close.  I heard, I think, Mr. Shore volunteered,

18    as well as Mr. Fleck, to each be the clearinghouse and

19    essentially hold the pen on these proposed procedures.  Given,

20    obviously, that Mr. Shore, with all due respect, is a strong

21    advocate for a specific point of view and a specific outcome on

22    the plan, it's not clear to me that he as a nonfiduciary would

23    ever be the appropriate person to coalesce the comments and

24    hold the pen or the computer.  I would probably guess that the

25    debtors would have a much stronger interest in helping design

Page 117

1    the discovery procedures around their own plan.  We're happy to

2    see what the Court's pleasure is.  Mr. Fleck also volunteered.

3    I'm not going to volunteer because I think it's not the job of

4    an individual creditor with a point of view to say, "Oh, I'll

5    help by designing the procedures," but I would have an interest

6    in seeing how and who helps design it.

7                THE COURT:  Okay.

8                It's always good to know when it's probably best to

9    sit down.

10               MR. MALONEY:  It's probably best, but I just -- Your

11   Honor, Tom Maloney on behalf of Goldman --

12               THE COURT:   That's my way of saying it's probably

13   best to sit down.

14               MR. MALONEY:  I was going to sit down.

15               THE COURT:  Okay.  Here's the point.  I mean, there

16   are a lot of people in the room, many of whom have been here

17   since 10 a.m. when we started, with a greater interest in this

18   unscripted portion of the agenda than that which was on the

19   agenda.  And I don't want, by hearing certain people, to limit

20   the interests of others who may have different clients to get

21   up and say something.  This is not the time for comment,

22   really, and Mr. Huebner, in effect, got in last licks.

23               This is instructive to me as to what's happening

24   behind the scenes.  The telephone conference that led to this

25   discussion lasted less than thirty seconds yesterday at 4:30 in

08-13555-mg   Doc 10378   Filed 07/16/10   Entered 07/22/10 14:48:22   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 118 of 121

Page 118

1    the afternoon and the purpose of the conference was to discuss

2    whether we were going to have a status conference today to talk

3    about the procedures requested by the ad hoc committee

4    represented by White & Case.

5         Mr. Shore's comments were brief and not particularly

6    controversial.  And Mr. Miller's rejoinder, equally brief and

7    not controversial.  Let me just tell you what I see happening

8    and what I would propose for next time.  At this moment, the

9    Court has no role in establishing procedures for the sharing of

10   information, for the management of that information, for the

11   taking of any discovery with reference to that information and

12   for the development of a protocol in reference to the plan

13   process.  That may happen, but it's not before me today.

14        I do think, though, that this informal discussion, on

15   the record as it turns out, is useful in identifying publicly,

16   for the benefit of those who are taking notes and reporting to

17   third parties, that there is a process that parties are at

18   least thinking about.  I also think it is good and useful

19   information to know that there are groups of creditors who are

20   forming with the benefit of sophisticated financial advisors

21   and counsel to assess the plan as it exists and alternatives

22   that may be developed.

23        I am uncertain as to whether it is a good idea or not

24   to schedule a status conference in reference to this general

25   subject matter as soon as next month.  And I am going to allow

Page 119

1    the natural processes of the case to percolate.  To the extent

2    that the debtors believe that it would be useful and

3    informative to have an agenda item next month dealing,

4    generally, with the topic of communication and information

5    sharing -- I may not have given that the right label, but I

6    think you all know what I'm referring to, I'm prepared to hear

7    that status conference at the next omnibus hearing date, on a

8    special date and also in a different month or two.  I am

9    concerned about saying now, "See me in August and we'll talk

10   about this," because it may not yet be ripe.  But it may also

11   be useful in terms of providing a public report as to how

12   things are moving along.

13          I don't really have a clear view of this at the moment

14   because I don't know enough about what's going on and I don't

15   need to know it.  It's probably best that I not know it at the

16   moment.  So I'm going to leave it to Mr. Miller in consultation

17   with the creditors' committee and other parties-in-interest

18   who've expressed themselves on the record and those who are in

19   the courtroom or may not be in the courtroom who have not yet

20   expressed themselves on the record to determine what's best for

21   the case.  And if that means having a status conference next

22   month, fine.  If it means having it another time, fine.

23          We have a calendar at 2:00 relating to adversary

24   proceedings and we're adjourned until then.

25          (Whereupon these proceedings were concluded at 12:48 p.m.)

Page 120

1

2                                I N D E X

3

4                              R U L I N G S

5    DESCRIPTION                                    PAGE      LINE

6    Stipulation lifting the automatic stay so       18        22

7    that JPMorgan can proceed in a lawsuit

8    approved

9    Motion of LBHI for authorization to sell its    21        25

10   limited partnership interest in New Silk Route

11   PE Asia Fund, L.P. granted

12   Motion of Lehman Brothers Holdings Inc. and     29        10

13   Lehman Commercial Paper Inc. for approval of a

14   settlement agreement with Silver Lake Credit

15   Fund, L.P. and Silver Lake Financial

16   Associates, L.P. granted

17   LBHI's motion to authorize to transfer certain  45        25

18   mortgaging servicing rights from LBHI to Aurora

19

20

21

22

23

24

25

Page 121

1

2                          C E R T I F I C A T I O N

3

4      I, Lisa Bar-Leib, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6      Lisa Bar-Leib   Digitally signed by Lisa Bar-Leib
                       DN: cn=Lisa Bar-Leib, c=US
                       Reason: I am the author of this document
7      _____   Date: 2010.07.16 15:57:18 -04'00'

8      LISA BAR-LEIB

9      AAERT Certified Electronic Transcriber (CET**D-486)

10

11     Also transcribed by:    Sara Davis

12

13     Veritext

14     200 Old Country Road

15     Suite 580

16     Mineola, NY 11501

17

18     Date:  July 16, 2010

19

20

21

22

23

24

25