WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :    Case No. 08-13555 (JMP)
                                          :
                    Debtors.              :    (Jointly Administered)
                                          :
-------------------------------------------------------------------x
```

**NOTICE OF MOTION OF LEHMAN COMMERCIAL PAPER INC.**
**PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE**
**FOR AUTHORITY TO (I) CONSENT TO ITS NON-DEBTOR**
**AFFILIATE LEHMAN ALI INC. (A) ENTRY INTO PLAN SUPPORT**
**AGREEMENT RELATED TO THE RESTRUCTURING OF**
**INNKEEPERS USA TRUST; AND (B) CONSUMMATION OF THE**
**TRANSACTIONS SET FORTH IN THE PLAN TERM SHEET;**
**AND (II) PROVIDE FUNDS TO SOLAR FINANCE INC., A NON-DEBTOR**
**AFFILIATE, TO PROVIDE DEBTOR-IN-POSSESSION FINANCING**

PLEASE TAKE NOTICE that a hearing on the annexed motion (the

"Motion") of Lehman Commercial Paper Inc. ("LCPI"), and its affiliated debtors in the

above-referenced chapter 11 cases, as debtors and debtors in possession (together, the

"Debtors") for an order pursuant to section 363 of title 11 of the United States Code (the

"Bankruptcy Code") for authority to (i) consent to its non-Debtor affiliate Lehman ALI

Inc. (a) entry into plan support agreement related to the restructuring of Innkeepers USA

Trust, and (b) consummation of the transactions set forth in the Plan Term Sheet (as

defined in the Motion); and (ii) provide funds to Solar Finance Inc., a non-Debtor

affiliate, to provide debtor-in-possession financing, will be held before the Honorable

James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court,

Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York,

New York 10004 (the "Bankruptcy Court"), on **August 18, 2010 at 10:00 a.m.**

**(prevailing Eastern Time)** (the "Hearing").

       PLEASE TAKE FURTHER NOTICE that objections, if any, to the

Motion shall be in writing, shall conform to the Bankruptcy Rules and the Local Rules of

the Bankruptcy Court for the Southern District of New York, shall set forth the name of

the objecting party, the basis for the objection and the specific grounds thereof, shall be

filed with the Bankruptcy Court electronically in accordance with General Order M-242

(which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk,

preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-

based word processing format (with two hard copies delivered directly to Chambers), and

shall be served upon:  (i) the chambers of the Honorable James M. Peck, One Bowling

Green, New York, New York 10004, Courtroom 601; (ii) Weil, Gotshal & Manges LLP,

767 Fifth Avenue, New York, New York 10153, Attn:  Alfredo R. Perez, Esq., counsel to

the Debtors; (iii) the Office of the United States Trustee for the Southern District of New

York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn:  Andy Velez-

Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and

Tracy Hope Davis; Esq., (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase

Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis

O'Donnell, Esq., and Evan Fleck, Esq., counsel to the official committee of unsecured

creditors appointed in these cases, and (v) all parties who have requested notice in these

chapter 11 cases, so as to be so filed and received by no later than August 11, 2010 at

4:00 p.m. (prevailing Eastern Time) (the "<u>Objection Deadline</u>").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is

not received by the Objection Deadline, the relief requested shall be deemed unopposed,

and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required

to attend the Hearing, and failure to appear may result in relief being granted or denied

upon default.

Dated:  July 27, 2010
      Houston, Texas

                                         /s/ Alfredo R. Pérez
                                         Alfredo R. Pérez
                                         WEIL, GOTSHAL & MANGES LLP
                                         700 Louisiana Street, Suite 1600
                                         Houston, Texas  77002
                                         Telephone: (713) 546-5000
                                         Facsimile: (713) 224-9511

                                         Attorneys for Debtors
                                         and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                    :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | : | **Case No. 08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------------x

<div align="center">

**MOTION OF LEHMAN COMMERCIAL PAPER INC.
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE
FOR AUTHORITY TO (I) CONSENT TO ITS NON-DEBTOR
AFFILIATE LEHMAN ALI INC. (A) ENTRY INTO PLAN SUPPORT
AGREEMENT RELATED TO THE RESTRUCTURING OF
INNKEEPERS USA TRUST; AND (B) CONSUMMATION OF THE
TRANSACTIONS SET FORTH IN THE PLAN TERM SHEET;
AND (II) PROVIDE FUNDS TO SOLAR FINANCE INC., A NON-DEBTOR
AFFILIATE, TO PROVIDE DEBTOR-IN-POSSESSION FINANCING**

</div>

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Commercial Paper Inc. ("LCPI"), as debtor and debtor in possession (together with its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), moves for authority to (i) consent to Lehman ALI Inc.'s ("ALI"), a non-Debtor affiliate of LCPI, (a) entry into a plan support agreement, attached hereto as Exhibit A (the "Plan Support Agreement"), related to the proposed restructuring of Innkeepers USA Trust (together

with its affiliates, "Innkeepers")[1] ; and (b) consummation of the transactions consistent

with the plan term sheet, attached to the Plan Support Agreement and attached hereto as

Exhibit B (the "Plan Term Sheet"); including the subsequent sale of 50% of the equity of

the reorganized Innkeepers for a price not less than $107.5 million, and (ii) provide funds

to Solar Finance Inc. ("Solar"), a non-Debtor affiliate, for the purposes of extending

debtor-in-possession financing to Innkeepers, and respectfully represents:

## Introduction

1.    In June 2007, ALI originated a $367,658,725 financing (the

"Financing") with Innkeepers.  The Financing was bifurcated into a $250,000,000

floating-rate first mortgage loan (the "Mortgage Loan")[2] and a $117,658,725 floating-rate

mezzanine loan (the "Mezzanine Loan" and, together with the Mortgage Loan, the

"Loans").[3]   ALI remains as the lender under the Mortgage Loan, with a current balance

of approximately $220.2 million (plus late fees and any other charges payable under the

Mortgage Loan Agreement).  The Mortgage Loan represents a potential significant

source of recovery for creditors of the Debtors.

---

[1] On July 19, 2010, Innkeepers USA Trust and certain of its affiliates filed for chapter 11 protection in the
United States Bankruptcy Court for the Southern District of New York.  The chapter 11 case is pending
under case number 10-13800 before the Honorable Shelley C. Chapman.  As part of its "first day"
pleadings, Innkeepers filed Debtors' Motion for an Order (A) Authorizing the *Debtors to Assume the Plan
Support Agreement and (B) Granting Related Relief* [Docket No. 15].  The Innkeepers' pleading is more
than 225 pages long.  For purposes of this Motion, only the material agreements and/or documents are
attached.

[2] The Mortgage Loan is evidenced by, *inter alia*, that certain Loan Agreement, dated as of June 29, 2007
(as amended, restated or otherwise modified from time to time, the "Mortgage Loan Agreement").

[3] The Mezzanine Loan is currently held by SASCO 2008-C2 LLC (the "Mezzanine Lender").  The Debtors
do not make any representations with respect to the Mezzanine Lender and are not requesting any approval
with respect to the Mezzanine Lender.

2.      As Innkeepers' financial situation has become more dire recently, this Mortgage Loan has received a significant amount of attention by the Debtors, and, over the previous several months, the Debtors and their legal and financial advisors have been focusing on how to maximize recovery on this asset.

3.      Beginning in April 2010, Innkeepers and ALI engaged in numerous good faith and arms'-length negotiations to outline a potential restructuring of Innkeepers that would maximize ALI's recovery on the Mortgage Loan.  In conjunction with these discussions, the Debtors have worked closely with their legal and financial advisors to determine which alternatives the Debtors should pursue, which included, among others, seeking to foreclose on the collateral securing the Mortgage Loan, seeking the appointment of one or more receivers to manage the hotel properties that serve as collateral, and seeking to lift the automatic stay in a potential Innkeepers' bankruptcy to pursue rights and remedies.  In considering these alternatives, the Debtors' analysis included economic and non-economic factors, including the expected recovery, the costs to pursue each alternative, the timing of potential recoveries, and the likelihood of being able to achieve value through each alternative.  Additionally, the Debtors considered the potential impact on the hotel properties serving as collateral and hotel franchise agreements.  Ultimately, after extensive negotiations with Innkeepers and its legal and financial advisors, the Debtors determined that the transactions described in this Motion represent the best alternative for the Debtors to maximize value of the Mortgage Loan.

## **Relief Requested**

4.      By this Motion, pursuant to section 363 of chapter 11 of the United States Code ("the Bankruptcy Code"), LCPI seeks authority (a) to consent to ALI

entering into the Plan Support Agreement relating to the proposed restructuring of
Innkeepers under chapter 11 of the Bankruptcy Code, (b) for ALI to consummate the
transactions consistent with the Plan Term Sheet which outlines the proposed
restructuring of Innkeepers and contemplates the conversion of ALI's secured debt into
all of the equity in a reorganized Innkeepers and, by means of a separate agreement with
Apollo Investment Corporation ("Apollo"), the sale of 50% of that equity for not less
than $107.5 million, and (c) to loan up to approximately $17.5 million of funds
previously paid by ALI to LCPI to LCPI's non-Debtor affiliate, Solar, for the purposes of
Solar extending a DIP Facility (as defined herein), which is necessary to fund
improvements on the properties.  One of the key provisions of the Plan Support
Agreement allows ALI to terminate its obligations under the Plan Support Agreement
after a specified period of time and cause Innkeepers to sell or allow ALI to foreclose on
the properties subject to the Mortgage Loan.

5.      Although this Motion seeks relief related to non-Debtor ALI, such
relief is required pursuant to the *Order Pursuant to Section 363 of the Bankruptcy Code
and Bankruptcy Rule 6004 Authorizing the Transfer of Loans from Variable Funding
Trust 2007-1 to Non-Debtor Affiliates* [Docket No. 9025], entered by this Court on May
13, 2010 (the "Transfer Order").  As set forth in the Transfer Order, LCPI was authorized
to transfer mortgage loans in the possession of VFT 2007 (as defined below) to any non-
Debtor affiliate subject to certain conditions.  Among other things, the Transfer Order
required that any non-Debtor affiliate transferee "obtain all consents and approvals from
the Creditors' Committee and the Court that LCPI would otherwise have been required to
obtain had LCPI been the owner of such [transferred loan]…"  Transfer Order at p. 3.

**Jurisdiction**

6.      This Court has subject matter jurisdiction to consider and

determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to

28 U.S.C § 157(b).  The statutory basis for the relief requested herein is section 363(b) of

the Bankruptcy Code.

**Background**

7.      Commencing on September 15, 2008, and periodically thereafter

(as applicable, the "Commencement Date"), the Debtors commenced with this Court

voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases

have been consolidated for procedural purposes only and are being jointly administered

pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  The Debtors are

authorized to operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of

unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors'

Committee").

9.      On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA is administering LBI's estate.

10.     On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas

as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order,

dated January 20, 2009 [Docket No. 2583], the Court approved the U.S. Trustee's

appointment of the Examiner.  The Examiner issued a report of his investigation pursuant to section 1106 of the Bankruptcy Code on March 11, 2010 [Docket No. 7531].

11.     On April 14, 2010, the Debtors filed a revised joint chapter 11 plan and disclosure statement [Docket No. 8330 and 8332].

### Lehman's Business

12.     Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

13.     Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

### Innkeepers

14.     In June 2007, ALI originated the Financing to fund a portion of the approximately $1.8 billion acquisition of all the outstanding shares of Innkeepers by Apollo.  At that time, Innkeepers held 76 hotel properties.

15.     The Mortgage Loan currently is secured by 20 hotel properties in total (the "Collateral Portfolio"), the majority of which are branded extended stay or limited service hotels, including five Residence Inns (Marriott), three Hampton Inns (Hilton), and two Courtyards by Marriott (Marriott).  The Mezzanine Loan is secured by pledges of the equity of the entities holding the 20 hotel properties.  The current balance

of the Mezzanine Loan is approximately $134.3 million (plus late fees and any other charges payable under the documents evidencing the Mezzanine Loan).

16.     Throughout the second half of 2008 and during 2009, net operating income from the Collateral Portfolio declined.  Prior to Innkeepers' chapter 11 cases, the franchise agreements for three of the "Residence Inn" hotels in the Collateral Portfolio with Marriott terminated by their terms.  Additionally, in March and May 2010, four additional hotels in the Collateral Portfolio received notices of default from Marriott due to the failure of Innkeepers to complete certain property improvement plan work at the hotels ("PIPs").  There were similar issues with certain of the other properties held by Innkeepers.  These factors, coupled with the high amount of outstanding debt on Innkeepers' entire portfolio, similar net operating income declines across Innkeepers other hotels and payment defaults on all of Innkeepers' debt obligations have led to the need for Innkeepers to file for chapter 11 relief.

17.     After evaluating all of its strategic options and extensive negotiations with Innkeepers, the Debtors agreed to convert their debt into substantially all of the equity in the reorganized Innkeepers, which the Debtors believe will maximize recovery of their Mortgage Loan. Additionally, the Debtors agreed to provide DIP financing to address the PIPs and certain other necessary capital expenditure for the hotels securing the Mortgage Loan.

18.     In order to minimize their downside exposure, ALI entered into separate arrangements with Apollo to sell 50% of the equity it receives under the Innkeepers' chapter 11 plan to it for $107.5 million. The Debtors further negotiated a provision in the Plan Term Sheet that provides that if the Debtors are unable to find a

purchaser for such 50% of the equity they receive under Innkeepers' chapter 11 plan for

at least $107.5 million, the Debtors can (but are not required to) terminate the Plan

Support Agreement.  Finally, if the restructuring is not finalized within the time periods

set forth in the Plan Support Agreement, the Plan Support Agreement provides that the

Collateral Portfolio will be sold to a third-party, transferred to ALI, or ALI will be

allowed to foreclose, all as more fully set forth below.

### LCPI's Interest in the Mortgage Loan

19.    On November 30, 2007, Variable Funding Trust 2007-1 ("VFT

2007"), a Delaware statutory trust, entered into a Note Purchase Agreement pursuant to

which VFT 2007 issued notes (the "VFT 2007 Notes") collateralized by certain mortgage

loans (the "VFT Loans") which were sold and assigned by LCPI to VFT 2007.  The

Mortgage Loan, which, upon information and belief, had been repo'd from ALI to LCPI,

was included in the VFT Loans.

20.    On February 23, 2010, this Court entered an order (the

"Prepayment Order")[4] authorizing LCPI to prepay, in full, the VFT 2007 Notes, and on

March 19, 2010, LCPI transferred cash to VFT 2007 in an amount sufficient to payoff the

outstanding amount of the VFT 2007 Notes.  The Prepayment Order did not specify

whether the VFT Loans were to remain in VFT 2007 or be transferred to LCPI or any

other entities.  As a result, on May 13, 2010, this Court entered the Transfer Order, which

authorized LCPI to cause the transfer of the VFT Loans to any non-Debtor affiliate,

provided that (i) such non-Debtor affiliate provides LCPI with a note in the amount of the

---

[4] The *Order Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 Authorizing Debtor to Prepay Notes Issued by Variable Funding Trusts*, dated February 23, 2010 [Docket No. 7220].

outstanding balance of each such transferred VFT Loan (the "Note") with payment terms

reflecting the payment terms of the applicable VFT Loan, and (ii) such non-Debtor

affiliate provides LCPI with a pledge of the transferred VFT Loan for which control

rights will attach upon non-payment of the Note by such non-Debtor affiliate.

21.    The Transfer Order further requires that "any non-Debtor affiliate

to which a [VFT Loan] is transferred shall be required to obtain all consents and

approvals from the Creditors' Committee and the Court that LCPI would otherwise have

been required to obtain had LCPI been the owner of such [VFT Loan]…."  Transfer

Order at p. 3.  Pursuant to the Transfer Order, and subject to the requirements thereof, the

Mortgage Loan was transferred to ALI, which currently holds the Mortgage Loan.

Therefore, as required by the Transfer Order, ALI (through LCPI) must obtain Creditors'

Committee and Court approval prior to entering into the Plan Support Agreement, as,

pursuant thereto and detailed below, ALI will, *inter alia*, consent to the exchange of the

Mortgage Loan for equity in reorganized Innkeepers.

22.    Further, on June 24, 2010, ALI and LCPI entered into that certain

(i) Intercompany Promissory Note, dated as of June 24, 2010, by ALI for the benefit of

LCPI (the "Intercompany Note") and (ii) Intercompany Collateral Agreement, dated as of

June 24, 2010, by and between ALI and LCPI (the "Intercompany Collateral Agreement"

and together with the Intercompany Note, the "Intercompany Loan Documents"),

pursuant to which ALI pledged to LCPI ALI's interest in the Mortgage Loan.

**The Plan Support Agreement and Plan Term Sheet**[5]

23.     Beginning in April 2010, Innkeepers and ALI engaged in
numerous good faith and arms'-length negotiations to outline a potential restructuring of
Innkeepers that would maximize ALI's recovery on the Mortgage Loan.  Following these
negotiations ALI and Innkeepers agreed to the terms of the restructuring embodied in the
Plan Term Sheet, which will be effectuated through a plan of reorganization in
Innkeepers' chapter 11 case.

24.     Specifically, with respect to ALI, the Plan Term Sheet contains,
among other provisions, the following terms:

    (a)    Conversion of Debt to Equity:  ALI receiving, in full and final satisfaction of its approximately $220.2 million secured claim with respect to the Mortgage Loan, 100% of the new shares of common stock issued by reorganized Innkeepers pursuant to its chapter 11 plan (the "New Equity"), subject to dilution by a management equity incentive program;

    (b)    Releases:  Customary, consensual releases of liability by Innkeepers in favor of ALI and its affiliates, including LCPI, and, among others, its respective principals, employees, agents, officers, directors, and professionals under the Plan;

    (c)    Milestones:  Upon the failure to meet one or more of certain delineated milestones, including, *inter alia*, the failure by Innkeepers (i) to secure an order confirming a plan of reorganization consistent with the terms of the Plan Support Agreement no later than 240 days from the commencement of the Innkeepers Chapter 11 Case, or (ii) to go effective on such plan of reorganization no later than 270 days from the commencement of the Innkeepers Chapter 11 Case, the Plan Support Agreement shall terminate upon one business day's notice; and

[5] The descriptions and discussions of the Plan Support Agreement and the Plan Term Sheet contained herein are summary in nature.  In the event of any inconsistency between the terms of any of those documents and their descriptions contained herein, the terms of the actual documents will control.

(d)     <u>Remedies Upon Termination</u> – Upon the occurrence of any Termination Event (as defined in the Plan Support Agreement), Lehman may terminate the Plan Support Agreement and Innkeepers' use of its cash collateral.  Upon the occurrence of certain Termination Events related to the timing of confirmation or the effective date of the plan, Innkeepers shall immediately elect one of the following remedies or, if Innkeepers does not make the election within one day, the Debtors will be allowed to elect:

1.      Innkeepers will be deemed to have consented to the modification of the automatic stay to permit ALI to exercise any and all remedies with respect to its collateral without any need for further Bankruptcy Court approval;

2.      Innkeepers will sell ALI's collateral pursuant to section 363 of the Bankruptcy Code, provided that (i) the sale procedures shall be agreed upon no later than 120 days after Innkeepers files for chapter 11; (ii) Lehman shall have the right to credit bid the Floating Rate Debt; (iii) if sale proceeds are not paid to Lehman within 60 days of the Termination Event, title to the Floating Rate Collateral shall be conveyed to Lehman free and clear of all liens, claims, and encumbrances; and (iv) the 60-day period shall not be extended and Innkeepers waives its right to seek any extension of such period.

25.     As means of implementation, the Plan Support Agreement contemplates, among other things:

(a)     all material pleadings filed by Innkeepers during the Innkeepers Bankruptcy, including so-called "first day" pleadings, being in form and substance reasonably acceptable to ALI;

(b)     entry into two proposed postpetition debtor-in-possession financing facilities (each a "<u>DIP Facility</u>" and, collectively, the "<u>DIP Facilities</u>"), consisting of the (a) approximately $50.75 million DIP Facility provided by Five Mile Capital Partners LLC, which proceeds will be used primarily to perform property improvement programs on certain hotels securing the Debtors' obligations under the Fixed Rate Debt, the Residence Inn in San Diego, and the Residence Inn in Tyson's Corner (each as defined in the Plan Support Agreement); and (b) approximately $17.5 million DIP Facility provided by an affiliate of Lehman, which will be used to perform PIPs and certain other investments on

certain hotels securing the Debtors' obligations under the Floating
Rate Mortgage Loan Agreement;

(c)     consensual use of ALI's cash collateral, and use of all other
secured lenders' cash collateral, on terms and conditions
acceptable to ALI and subject to the milestones set forth in the
Plan Term Sheet;

(d)     Innkeepers securing additional funding of no less than $75 million
to finance its exit from chapter 11; and

(e)     this Bankruptcy Court having jurisdiction to hear and decide this
Motion; the Bankruptcy Court presiding over Innkeepers' Chapter
11 Case shall have exclusive jurisdiction with respect to any matter
under or arising out of or in connection with the Plan Support
Agreement or the transactions contemplated therein.

26.     As set forth above, the Plan Term Sheet provides the framework
for a chapter 11 plan of reorganization pursuant to which ALI will receive 100% (subject
to dilution for a management incentive program) of the New Equity in exchange for the
Mortgage Loan.  ALI's willingness to enter into the Plan Support Agreement is
conditioned on its ability to mitigate its risk by selling a portion of the New Equity.  To
that end, ALI has reached an agreement with Apollo (the "<u>AIC Agreement</u>") to sell a
50% stake in its New Equity distribution for not less than $107.5 million, which will be
effectuated after Innkeepers' plan becomes effective.  Although the AIC Agreement can
be terminated by ALI or Apollo under certain circumstances subject to a date certain,
ALI is not required to consummate the transactions in the Plan Support Agreement unless
it is able to sell 50% of its New Equity to Apollo or another third-party for a price of no
less than $107.5 million.

**<u>The Solar DIP Term Financing</u>**

27.     Pursuant to the terms of the Mortgage Loan Agreement, ALI held
certain reserves and escrows, including reserves for the performance of the PIPs and

certain other investments for the hotels securing Innkeepers' obligations under the

Mortgage Loan.  On May 19, 2010, events of default occurred under the Mortgage Loan

Agreement, which events of default allowed ALI to apply the reserves and escrows held

by ALI to the principal balance of the Mortgage Loan.  On or about July 16, 2010, ALI

applied substantially all of the reserves and escrows to the principal balance of the

Mortgage Loan, which amounts shall be paid by ALI to LCPI pursuant to the

Intercompany Loan Documents.  Such amounts shall then be lent to Solar to fund the

Solar DIP Facility (as defined herein).

    28. Innkeepers entered into an agreement with Marriott related to the

PIPs at the hotels securing the Mortgage Loan as well as certain of its other hotels.  This

agreement with Marriott provides that subject to certain conditions, including the funding

of the PIPs, Marriott will forbear from exercising its potential rights to terminate its

franchise agreements.  This agreement is important to maintain the value of the Collateral

Portfolio.  Therefore, the restructuring contemplates the provision by Solar of a DIP

Facility up to approximately $17.5 million to Innkeepers.  These funds will be used by

Innkeepers for PIPs and other necessary capital investments in the Collateral Portfolio.

As Solar does not have the necessary funds to provide the DIP Facility, LCPI now wishes

to advance certain of the funds paid by ALI to LCPI as set forth in paragraph 25 hereof to

Solar in order to fund the DIP Facility.

    29. The key terms of the DIP Facility to be provided by Solar are

summarized herein as follows:[6]

---

[6] Any capitalized term used but not defined in the below summary shall have the meaning ascribed to such
term in the DIP Term Sheet, attached hereto as Exhibit C.

(a)    <u>DIP Facility</u>:  A term facility of up to $17.5 million (the "<u>Solar DIP Facility</u>"), allocated to the Collateral Portfolio securing the Financing, shall be extended to the Borrower pursuant to the terms and provisions of a DIP loan agreement (the "<u>DIP Loan Agreement</u>").  The loan funded by the Solar under the Solar DIP Facility is referred to herein as the "<u>Solar DIP Loan</u>."

(b)    <u>Material Terms</u>:  A Closing Fee of 0.5% and a Commitment Fee equal to 1.0%, each of the amounts committed in connection with the Solar DIP Facility shall be paid by the Borrower (as defined in the DIP Term Sheet) to Solar on the closing date of the Solar DIP Facility and shall be fully earned and non-refundable on such date.

Interest on the Solar DIP Loan shall be paid monthly in arrears, accruing at a per annum floating rate equal to the sum of the 30-day LIBOR (subject to a floor of 2.0%) plus 5.0% (the "<u>Non-Default Interest Rate</u>").

(c)    <u>Maturity Date</u>:  360 days from the closing of the DIP Facility.

(d)    <u>Recovery</u>:  If a plan consistent with the Plan Term Sheet is confirmed and goes effective, the Debtors agreed to waive the right to a recovery under the Solar DIP Loan except under certain circumstances.

(e)    <u>Termination Date</u>:  The earliest to occur of: (a) acceleration by Solar of the obligations under the Solar DIP Loan due to the occurrence and continuation of an Event of Default (as defined in the DIP Term Sheet) with respect to the Solar DIP Loan; (b) the acceleration of the obligations under any other debtor-in-possession financing provided to Innkeepers due to the occurrence and continuation of an event of default under such financings; (c) the effective date of any plan in the bankruptcy proceeding that provides for payment in full in cash of all obligations owing under the Solar DIP Facility or is otherwise acceptable to Solar; (d) the date that is the closing date of any sale of all or substantially all of any Borrower's assets that constitute collateral for the Solar DIP Facility; (e) the entry of an order by the Bankruptcy Court granting relief from the automatic stay permitting foreclosure of any assets of any Borrower constituting collateral with respect to the DIP Facility in excess of $1,000,000 in the aggregate; or (f) the entry of an order of dismissal or conversion of the Chapter 11 Cases with respect to all of the Borrowers with respect to the Solar DIP Facility.

(f)     <u>Additional Terms</u>:    The Debtors shall seek an order by the Bankruptcy Court, which the Debtors are seeking by this Motion, that includes provisions that (a) the Plan Support Agreement is approved without condition or delay, including approval for the Debtors to comply with each provision of the Plan Support Agreement and (b) the automatic stay in the Debtors' chapter 11 cases is modified to permit any party to the Plan Support Agreement to take any or all actions permitted by the Plan Support Agreement.

30.    The above summaries set forth the current material terms of the Plan Term Sheet and Solar DIP Facility.  Although LCPI anticipates that the Innkeepers restructuring will be on terms similar to those set forth above, because this comprehensive restructuring requires the agreement of a large number of entities and approval in the Innkeepers' Chapter 11 case, it is possible that certain of the terms of the restructuring will be different than those set forth herein.  As such, ALI and LCPI require the flexibility to enter into a Plan Support Agreement that contemplates a restructuring according to modified terms, and submits that allowing ALI and LCPI the flexibility to do so, subject to the consent of the Creditors' Committee, is in the best interests of LCPI and its estate.

<div align="center"><b><u>The AIC Stock Purchase Agreement</u></b></div>

31.    As set forth above, before confirmation by the Innkeepers Bankruptcy Court of Innkeepers' plan of reorganization pursuant to the terms of the Plan Term Sheet, ALI and Apollo will enter into a stock purchase agreement (the "<u>AIC SPA</u>") whereby ALI will agree to sell Apollo, and Apollo, subject to the terms therein, will agree to purchase from ALI the right to receive 50% of the New Equity that ALI receives in connection with the consummation of the plan in exchange for cash in an amount equal to $107.5 million.  On July 16, 2010, ALI and Apollo entered into a letter agreement (the

"Letter Agreement") evidencing this transaction.  The key terms of the transaction with

Apollo are set forth on the AIC Term Sheet, which is attached hereto as Exhibit D.

        32.     As set forth above, ALI is not required to consummate any of the

transactions set forth in the Plan Support Agreement or the Plan Term Sheet unless ALI

enters into an agreement with Apollo or another third party which provides for the sale of

50% of the New Equity ALI receives under Innkeepers' chapter 11 plan for a purchase

price of not less than $107.5 million.

<div align="center">

**ALI's Entry into the Plan Support Agreement,
Consummation of the Transactions Contemplated by the
Plan Term Sheet and the AIC Agreement, and LCPI's Provision of Fund
for Solar's DIP Financing Is in the Best Interests of LCPI and its Creditors**

</div>

        33.     ALI's entry into the Plan Support Agreement, and LCPI's consent

to such, is in the best interest of LCPI, its creditors and all parties in interest, is an

exercise of the sound business judgment of both ALI and LCPI, and should be approved

by this Court.  Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee,

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate."  Id. § 363(b)(1).  When considering a transaction outside

the ordinary course of business, courts in the Second Circuit, and others, require that such

transaction be based upon the sound business judgment of the debtor.  Comm. of Equity

Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983);

accord In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); In re Martin, 91 F.3d

389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In Re Schipper), 933 F.2d

513, 515 (7th Cir. 1991)); Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l

Airlines, Inc. (In re Cont'l Airlines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986).

34.  It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.  Id. (citing Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)).

35.  The Plan Term Sheet and Plan Support Agreement are the result of extensive, good-faith, and arms'-length negotiations between ALI/LCPI and Innkeepers, and their respective counsel and financial advisors.  The Debtors and their financial advisors believe that these transactions will maximize ALI's recovery on the Mortgage Loan.

36.  ALI has determined that the transactions contemplated by the Plan Support Agreement, including the conversion of its debt to equity under a pre-arranged plan of reorganization followed by the sale of half of the New Equity to Apollo or a third-party will provide it with a better recovery than it would likely obtain by restructuring its debt in a "free fall" bankruptcy.  Furthermore, the Plan Support Agreement allows for a quicker and less costly restructuring of Innkeepers and enables ALI to mitigate its risk by receiving significant upfront cash.  If Innkeepers is unable to consummate the plan, the

milestones provided for in the Plan Support Agreement will enable ALI to liquidate its collateral in a structured sale or foreclosure.

37.    The provision of up to approximately $17.5 million by LCPI to Solar so that Solar can extend the Solar DIP Facility to Innkeepers is a necessary aspect of the transaction, and benefits LCPI by improving the value of the collateral which is currently securing the Mortgage Loan (in which LCPI holds a secured interest). Without this commitment for funds, Marriott's obligation to forebear will cease and it may seek to exercise its rights with respect to certain hotels in the Collateral Portfolio, a value-destroying result for the Debtors. Furthermore, the funds being provided by LCPI are funds that were paid by ALI to LCPI from escrows and reserves that ALI held related to Innkeepers' debt obligations. As such, the provision of the funds to Solar is in the best interest of LCPI and its estate and creditors.

38.    The agreement between ALI and Innkeepers set forth in the Plan Support Agreement and Plan Term Sheet is one of several mutually-dependant, global agreements among Innkeepers and its key constituents. For example, Marriott's entry into the Marriott Agreement, pursuant to which it has agreed to forebear from exercising its potential rights to terminate its franchise agreements is conditioned on, among other things, Innkeepers securing debtor-in-possession financing and completing the property improvement work plan. The proposed DIP Facilities, in turn, are conditioned on Marriott's willingness to support the proposed transaction and to forebear from "de-flagging" substantially all of Innkeepers' properties provided that the property improvement plan work is completed by Innkeepers in accordance with the Marriott Agreement. Taken together, these agreements have positioned Innkeepers to accomplish

a necessary balance-sheet restructuring that will preserve and maximize Innkeepers'

value for the benefit of all parties.  If these agreements were to unravel, it could result in

a protracted non-consensual restructuring of Innkeepers which could severely deplete the

asset value and impair the recovery on the Mortgage Loan.

39.    Based on the foregoing, LCPI respectfully submits that the

determination that ALI enter into the Plan Support Agreement and consummate the

transactions set forth in the Plan Term Sheet, the AIC Agreement (or a sale of 50% of the

New Equity to a third-party for a purchase price of not less than $107.5 million), and

LCPI's provision of up to approximately $17.5 million to Solar was an exercise of sound

business judgment.

## Reservation of Rights

40.    The Debtors request that nothing contained herein be deemed to be

a waiver or the relinquishment of any rights, claims, interests, obligations, benefits, or

remedies of LCPI, or any of the Debtors or their non-debtor affiliates except as otherwise

expressly provided in this Motion, that any of the Debtors or non-debtor affiliates may

have or choose to assert on behalf of their respective estates under any provision of the

Bankruptcy Code or any applicable non-bankruptcy law, including against each other or

third parties.  Additionally, the parties seek authorization to execute such further

documentation necessary to reflect this reservation of rights.

## Notice

41.    The Debtors have served notice of this Motion in accordance with

the procedures set forth in the second amended order entered on June 17, 2010 governing

case management and administrative procedures for these cases [Docket No. 9635] on (i)

the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and

Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney

for the Southern District of New York; (vi) the attorneys for ALI; (vii) the attorneys for

Innkeepers; (viii) the attorneys for Apollo; and (ix) all parties who have requested notice

in these chapter 11 cases.  The Debtors submit that no other or further notice need be

provided.

               42.     No previous request for the relief sought herein has been made by

the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the

relief requested herein and such other and further relief as is just.

Dated:      July 27, 2010
            Houston, Texas

                                        /s/ Alfredo R. Pérez
                                        Alfredo R. Pérez

                                        Weil, Gotshal & Manges LLP
                                        700 Louisiana, Suite 1600
                                        Houston, TX 77002
                                        Telephone: (713) 546-5040
                                        Facsimile: (713) 224-9511

                                        Attorneys for Debtors
                                        and Debtors in Possession

**<u>Exhibit A</u>**

**(The Plan Support Agreement)**

**EXECUTION COPY**

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (this "**Agreement**") is made and entered into as of July 17, 2010, by and among (i) Innkeepers USA Trust, a Maryland real estate investment trust ("**Innkeepers**" and collectively with its subsidiaries, the "**Company**" or the "**Debtors**"), including each obligor under the Floating Rate Debt (defined below) and (ii) Lehman ALI Inc., a Delaware corporation ("**Lehman**"), as mortgage lender.  The Company and Lehman are sometimes collectively referred to herein as the "**Parties**" and individually as a "**Party**."

The following exhibits are attached hereto and incorporated herein:

Exhibit A      Plan Term Sheet

Exhibit B      Marriott Agreement

Exhibit C      Floating Rate DIP Loan Term Sheet

Exhibit D      Fixed Rate DIP Loan Term Sheet

Exhibit E      Cash Collateral Order

Exhibit F      Form of Joinder

Exhibit G      Floating Rate Franchise Agreements

Capitalized terms not defined in this introduction or in the recitals to this Agreement shall have the meanings assigned thereto in Section 1 hereof.

### *RECITALS*

WHEREAS, the Company is a borrower, and has obligations, under that certain mortgage loan agreement (the "**Floating Rate Debt Agreement**"), dated as of June 29, 2007, to Lehman and the parties thereto, as lenders;

WHEREAS, the Parties, with the assistance of their legal and financial advisors, have engaged in good faith negotiations with the objective of reaching an agreement with regard to the conversion of the Floating Rate Debt into significantly all of the equity of the reorganized Company, on substantially the terms and conditions set forth in the Plan Term Sheet attached hereto as Exhibit A (the "**Transaction**");

WHEREAS, it is anticipated and a fundamental assumption and requirement of this Agreement, that the Transaction will be effectuated through a prearranged plan of reorganization (the "**Plan**") in chapter 11 bankruptcy cases under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") filed by the Company (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the Bankruptcy Court presiding over the Chapter 11 Cases and not the Lehman Bankruptcy Cases, the "**Bankruptcy Court**");

15818454.2

WHEREAS, the Company shall use its commercially reasonable efforts to obtain Bankruptcy Court approval and confirmation of the Plan in accordance with the Bankruptcy Code, on terms consistent in all respects with this Agreement;

WHEREAS, Innkeepers has determined that the Transaction is advisable and in the best interests of its creditors and equity holders;

WHEREAS, entry into this Agreement is within the sound business judgment of Innkeepers and is in furtherance of Innkeepers' directors' and officers' fiduciary duties;

WHEREAS, this Agreement sets forth the terms and conditions of the Parties' respective obligations hereunder.

WHEREAS, Lehman Brothers Holding, Inc. and certain of its affiliates have commenced chapter 11 cases in the Southern District of New York (the "**Lehman Bankruptcy Cases**").

NOW, THEREFORE, in consideration of the foregoing, the promises and mutual covenants, conditions and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

Section 1.    Definitions.

*"Business Day"* shall mean any day, other than a Saturday, Sunday, or a legal holiday, as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

*"Confirmation Date"* shall mean the date of entry by the Bankruptcy Court of the Confirmation Order.

*"Confirmation Order"* shall have the meaning set forth in Section 6(a)(vi) hereof.

*"Disclosure Statement"* shall mean the disclosure statement related to the Plan to be filed in the Chapter 11 Cases, which shall be in such form and substance as is reasonably satisfactory to Lehman and with any changes or modifications required by the Bankruptcy Court.

*"Effective Date"* shall have the meaning set forth in Section 10 hereof.

*"Fiduciary Out"* shall have the meaning set forth in Section 24 hereof.

*"**Firm Alternative Transaction**"* shall have the meaning set forth in Section 24 hereof.

*"Fixed Rate Franchise Agreements"* shall mean those certain Residence Inn by Marriott Relicensing Franchise Agreements, between Marriott and Grand Prix Fixed Lessee LLC, a Delaware limited liability company, dated as of June 29, 2007.

2

*"Fixed Rate Collateral"* shall mean the forty-five (45) properties securing the Fixed Rate Debt.

*"Fixed Rate Debt"* shall mean the Company's obligations under that certain mortgage loan agreement, dated as of June 29, 2007, among Lehman and the affiliates of the Company parties thereto collateralized by the Fixed Rate Collateral.

*"Fixed Rate DIP Facility"* shall mean a senior secured super-priority debtor-in-possession credit facility in conformity with the Fixed Rate DIP Loan Term Sheet.

*"Fixed Rate DIP Loan Term Sheet"* shall mean the Fixed Rate DIP Loan Term Sheet attached to this Agreement as Exhibit D.

*"Floating Rate Collateral"* shall mean the twenty (20) properties securing the Floating Rate Debt.

*"Floating Rate Debt"* shall mean the Company's obligations under that certain mortgage loan agreement, dated as of June 29, 2007, among Lehman and the affiliates of the Company parties thereto, collateralized by the Floating Rate Collateral.

*"Floating Rate DIP Facility"* shall mean a senior secured super-priority debtor-in-possession credit facility in conformity with the Floating Rate DIP Loan Term Sheet.

*"Floating Rate DIP Loan Term Sheet"* shall mean the Floating Rate DIP Loan Term Sheet attached to this Agreement as Exhibit C.

*"Floating Rate Franchise Agreements"* shall mean those agreements set forth on Exhibit G attached hereto.

 *"Franchise Agreements"* shall mean collectively the Fixed Rate Franchise Agreements, the Floating Rate Franchise Agreements and the LNR Franchise Agreements.

*"Lehman Shares"* shall mean shares of the New Equity representing 100% of the issued and outstanding New Equity, subject to dilution by the Management Equity Incentive Program (as defined in the Plan Term Sheet) that will be distributed to Lehman pursuant to the Plan.

*"LNR Franchise Agreements"* shall mean those certain Residence Inn by Marriott Relicensing Franchise Agreements, between Marriott and Grand Prix General Lessee LLC, and Marriott and Grand Prix RIMV Lessee LLC, respectively, dated as of June 29, 2007.

*"Marriott"* shall mean Marriott International, Inc., a Maryland corporation.

*"Marriott Agreement"* shall mean the Marriott Agreement attached to this Agreement as Exhibit B.

*"Milestones Covenant"* shall mean the covenant by the Company not to take any action, and not to solicit, encourage or support any action by a third party, seeking to amend, annul, modify, or extend the Plan Milestones.

*"New Equity"* shall mean the new shares of common stock to be issued by Innkeepers under the Plan.

*"New Equity Sale Transaction"* shall have the meaning set forth in <u>Section 6(b)</u> hereof.

*"New Funding"* shall mean funding incurred by Innkeepers in the amount of no less than $75 million, plus such additional amounts in form and substance as may be determined by the parties.

*"Petition Date"* shall mean the date on which the Company shall have commenced the Chapter 11 Cases in the Bankruptcy Court.

*"PIP Work"* shall mean the construction labor and materials necessary to satisfy Marriott or any other applicable franchisor that each of the requirements of each of the PIPs has been satisfied, as identified and approved by Lehman.

*"PIP"* shall mean the Property Improvement Plans included within and made a part of the Franchise Agreements covering certain of the hotel properties owned by the Borrower, which Property Improvement Plans shall have been approved by Marriott or any other applicable franchisor, and shall have been received and reasonably approved by Lehman, unless such Property Improvement Plans have been previously approved by Lehman in accordance with the terms and conditions of the Floating Rate Debt.

*"Plan"* shall mean a prearranged chapter 11 plan of reorganization for the Company consistent in all respects with the terms and conditions contained in the Plan Term Sheet.

*"Plan Effective Date"* shall mean the effective date of the Plan.

*"Plan Milestones"* shall have the meaning set forth in <u>Section 6</u> hereof.

*"Plan Related Documents"* shall mean the Plan and all documents required to effectuate the Plan or the Transaction, including, but not limited to, all documents and agreements contemplated by the Plan Term Sheet and, to the extent not included in the above, (a) the Disclosure Statement, (b) the materials related to the Solicitation, (c) the proposed Confirmation Order and (d) any other documents or agreements filed with the Bankruptcy Court by Innkeepers or at the Company's direction that are necessary to implement the Plan, including any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement.  All Plan Related Documents shall be in form and substance reasonably acceptable to Lehman and materially consistent in all respects with this Agreement, the Plan and the Transaction.

*"Plan Term Sheet"* shall mean the term sheet attached hereto as Exhibit A.

4

*"Pro Forma Capital Structure"* shall mean the capital structure of the reorganized Company following the consummation of the Plan as set forth in the Plan Term Sheet.

*"Solicitation"* shall mean the solicitation of votes in respect of the Plan in the Chapter 11 Cases.

*"Termination Date"* shall mean the date on which this Agreement is terminated in its entirety pursuant to Section 6 hereof.

*"Termination Event"* shall have the meaning set forth in Section 6 hereof.

*"Transfer"* shall have the meaning set forth in Section 30 hereof.

Section 2.    Approval of the Plan Term Sheet and Related Agreements.

(a)    The Parties severally acknowledge and agree that (i) the terms and conditions set forth in the Plan Term Sheet, the Marriott Agreement, the Floating Rate DIP Loan Term Sheet, the Fixed Rate DIP Loan Term Sheet and the Cash Collateral Order are acceptable in all respects to the Parties and their respective counsel and (ii) the Plan Related Documents shall contain terms and conditions consistent in all material respects with those set forth in the Plan Term Sheet, the Marriott Agreement, the Floating Rate DIP Loan Term Sheet and the Fixed Rate DIP Loan Term Sheet.

Section 3.    Bankruptcy Process for Innkeepers.    The Company hereby agrees to use commercially reasonable efforts to obtain approval of this Agreement and confirmation and consummation of the Plan as soon as reasonably practicable on terms consistent in all respects with the Plan Term Sheet and this Agreement, and each Party shall use their commercially reasonable efforts to support confirmation and consummation of the Plan; *provided*, *however*, that the Company and Lehman, may from time to time agree in writing to further extend any time period or deadline set forth herein as provided in this Agreement.

Section 4.    Support of the Transaction; Additional Covenants.    From the Effective Date of the Agreement until the occurrence of a Termination Event (as defined herein), and subject to the conditions set forth in this Agreement, the Company and Lehman, as applicable, agree and covenant that:

(a)    Prior to the Termination Date, no Party will:

(i)    object to confirmation of the Plan or object to or otherwise commence any proceeding to oppose, alter, delay or impede or take any other action, directly or indirectly, to interfere with entry of one or more orders approving the Plan or other Plan Related Documents;

(ii)    directly or indirectly seek, solicit, negotiate, vote for, consent to, support or participate in the formulation of any plan of reorganization or other restructuring other than the Plan;

(iii)    directly or indirectly seek, solicit, negotiate, support or engage in any discussions regarding any chapter 11 plan other than the Plan;

(iv)    object to the Solicitation or support any such objection by a third party; or

(v)    take any other action not required by law that is inconsistent with, or that would materially delay, the confirmation or consummation of the Plan or that is otherwise inconsistent with this Agreement.

(b)    Unless the Termination Date has occurred, (i) so long as its vote has been solicited in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, including but not limited to its receipt of the Disclosure Statement, Lehman agrees to (A) vote (or cause the voting of) its Claims arising from the Floating Rate Debt to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the Solicitation and agrees that the solicitation period may be as short as five (5) Business Days; *provided*, *however*, that such vote shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement pursuant to the terms hereof; and (B) not change or withdraw (or cause to be changed or withdrawn) such vote and (ii) Lehman consents to the treatment of the Floating Rate Debt as set forth in the Plan Term Sheet and the Plan.    The Company hereby agrees that in the event this Agreement terminates by its terms, the Company shall not challenge or otherwise object to (i) the revocation of Lehman's vote pursuant to this section or (ii) any action by Lehman to confirm the revocation or cancellation of its vote.

(c)    Nothing in this Agreement shall be construed to (i) prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and the Transaction and are not for the purpose of and could not reasonably be expected to have the effect of, hindering, delaying or preventing the confirmation of the Plan or consummation of the Transaction pursuant to the Plan and (ii) require Lehman to file any pleadings or take any other action in support of the Plan that would require it to hire and pay for counsel to represent it unless the Company agrees to pay the fees and expenses of such counsel.

Section 5.    <u>Further Agreements</u>.

(b)    <u>Additional Transaction Matters</u>.    The Company hereby agrees (i) to use its reasonable best efforts to prepare or cause the preparation of the Plan and the other Plan Related Documents, (ii) to take all reasonably necessary and appropriate actions to achieve confirmation and consummation of the Plan and the Transaction contemplated therein, and (iii) that it shall provide to Lehman draft copies of all pleadings and other documents (including all "first day" and any other motions, applications and other pleadings and documents, as well as all exhibits, supplements and related orders) it intends to file in connection with the Chapter 11 Cases with the Bankruptcy Court, or any other court, as soon as is reasonably practicable before such documents are filed with such court, all of which documents (a) shall be in form and substance reasonably acceptable to Lehman prior to any such proposed filing and (b) shall be consistent in all respects with the Plan Term Sheet.

6

(c)    Approvals.  Each Party agrees to use its commercially reasonable efforts to (i) obtain Bankruptcy Court approval of this Agreement, confirmation of the Plan by the Bankruptcy Court and consummate the Transaction pursuant to the Plan and all other actions contemplated under the Plan Related Documents related thereto, (ii) take any and all necessary and appropriate actions in furtherance of the Transaction and the other actions contemplated under this Agreement, the Plan Term Sheet and the Plan Related Documents, (iii) obtain any and all required regulatory approvals and material third-party approvals for the Transaction and (iv) not take any actions inconsistent with this Agreement, the Plan Term Sheet or other Plan Related Documents.  Neither Party shall, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to or enter into any agreements relating to, any restructuring, plan of reorganization, dissolution, winding up, liquidation, reorganization, merger, transaction, sale or disposition (or all or substantially all of their assets or equity) other than as set forth in the Plan Term Sheet and the Plan, nor shall either Party solicit or direct any person or entity, including, without limitation, any member of any of the Parties' board of directors or, as to the Company, any holder of equity in the Company, to undertake any of the foregoing; *provided*, *however*, that the Parties may agree to modifications to the Plan Related Documents as provided herein.

(d)    Professionals.  The Company shall pay all reasonable professional fees and expenses incurred by Lehman in connection with the Transaction.  In connection therewith, prior to the Petition Date, the Company shall pay all reasonable fees and expenses owing to Lehman as invoiced by counsel for Lehman on the date hereof.

(e)    Compliance With Agreements.  The Company shall comply, including to the extent authorized by an order of the Bankruptcy Court, after the Petition Date and through the Plan Effective Date, with the terms and conditions of the Floating Rate Debt Agreement, as such may have been modified by the existing waiver agreements in place as of the date hereof, including the payment of all interest, fees and expenses owing thereunder, *provided*, *however*, that after the Petition Date, (i) the Company shall not be in default under the foregoing agreement for purposes of this Agreement as a result of the filing of the Chapter 11 Cases and (ii) the Company shall not be required to pay interest, fees and expenses absent entry of an order of the Bankruptcy Court permitting such payment or upon consummation of the Plan to the extent authorized by an order of the Bankruptcy Court.

(f)    Automatic Stay Relief.  For the avoidance of doubt, the Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder solely for purposes of providing any notices, elections, or waivers under this Agreement (and agree not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay solely in connection with the giving of any such notice, election, or waiver).  Nothing in this Agreement shall preclude Lehman from delivering any notice of default, waiver, or election to the Company at any time.

Section 6.    Termination of this Agreement.  Upon the occurrence of any of the following events (each, a "**Termination Event**"), this Agreement shall automatically terminate on the first calendar day immediately following one (1) Business Day after the date of such Termination Event, unless (a) Lehman, in its sole discretion, provides the Company with a written waiver of any such Termination Event in this Section 6 within one (1) Business Day from

the date of such Termination Event or (b) Lehman and the Company, in their respective sole discretion, provide the other party with a written waiver of Termination Events in <u>Section 6(r)</u> and <u>6(s)</u> within one (1) Business Day from the date of such Termination Event:

(a)    Failure to meet any of the following milestones (each a "**Plan Milestone**" and together, the "**Plan Milestones**"):

(i)    Motion to assume this Agreement filed by the Company on the Petition Date;

(ii)    Order entered authorizing the assumption of this Agreement no later than 45 days after the Petition Date;

(iii)    Orders entered on a final (and not interim) basis authorizing the Fixed Rate DIP Facility, Floating Rate DIP Facility, the use of Lehman's cash collateral and the use of the cash collateral securing the Fixed Rate Debt consistent with the terms set forth in the Plan Term Sheet no later than 45 days after the Petition Date;

(iv)    Disclosure Statement and Plan consistent with the terms set forth in the Plan Term Sheet filed no later than 45 days after the Petition Date;

(v)    Disclosure Statement consistent with the terms set forth in the Plan Term Sheet approved by the Bankruptcy Court no later than 120 days after the Petition Date;

(vi)    Lehman and the Company shall have reached mutual agreement no later than 120 days after the Petition Date on the terms of a sale process upon the occurrence of the Termination Event set forth in <u>Section 6(a)(vii)</u> or <u>6(a)(viii)</u> below;

(vii)    Order confirming the Plan consistent with the terms set forth in the Plan Term Sheet entered by the Bankruptcy Court no later than 240 days after the Petition Date; and

(viii)    Occurrence of the Plan Effective Date no later than 270 days after the Petition Date;

(b)    Lehman has not executed definitive agreements with respect to the sale of 50% of the Lehman Shares for a purchase price of at least $107.5 million (the "**New Equity Sale Transaction**") no later than 45 days after the Petition Date;

(c)    Lehman has not consummated the New Equity Sale Transaction no later than 270 days after the Petition Date;

(d)    The entry by the Bankruptcy Court of an interim order authorizing the use of Lehman's cash collateral in form and substance not acceptable to Lehman;

(e)    The entry of any order of the Bankruptcy Court granting relief from the automatic stay (i) to permit any exercise of remedies by the lenders or special servicer under the

Fixed Rate Debt, the Other Secured Debt or the Mezzanine Debt (as each such term is defined in the Plan Term Sheet) other than limited relief solely to permit the delivery of default notices under the terms of the Fixed Rate Debt, the Other Secured Debt or the Mezzanine Debt and (ii) to permit termination of any Franchise Agreement with Marriott or any other hotel brand other than those Franchise Agreements listed in the Marriott Schedule attached as Exhibit E to the Plan Term Sheet;

(f)     The filing by the Company of any motion or other request for relief seeking to (i) dismiss any of the Chapter 11 Cases, (ii) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (iii) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(g)     (i) The filing by the Company of any motion or other request for relief seeking an extension of the Plan Milestones or any alteration of the remedies upon termination set forth herein without the express written consent of Lehman in its sole discretion; (ii) the filing by the Company of any pleading supporting any motion from any other party to obtain such extension or alteration; (iii) the failure of the Company to oppose any motion from any other party to obtain such extension; or (iv) the violation by the Company of the Milestones Covenant;

(h)     The entry of an order by the Bankruptcy Court (i) dismissing any of the chapter 11 cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases or (iv) making a finding of fraud, dishonesty or misconduct by any officer or director of the Company, regarding or relating to the Company;

(i)     The withdrawal, amendment or modification by the Company of, or the filing by the Company of a pleading seeking to amend or modify, the Plan or this Agreement, which withdrawal, amendment, modification or pleading is materially inconsistent with the terms set forth in the Plan Term Sheet or the Plan or is materially adverse to Lehman, in each case in a manner not reasonably acceptable to Lehman, or if the Company files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with the terms set forth in the Plan Term Sheet or the Plan (in each case with such amendments and modifications as have been effected in accordance with the terms set forth in the Plan Term Sheet) and such motion or pleading has not been withdrawn within three (3) Business Days;

(j)     The filing of any motion to approve a Disclosure Statement or Plan by the Company that incorporates a Pro Forma Capital Structure or any other terms inconsistent with the terms and conditions set forth Plan Term Sheet;

(k)     The granting by the Bankruptcy Court of relief that is inconsistent with the terms set forth in the Plan Term Sheet or the Plan in any material respect (in each case with such amendments and modifications as have been effected in accordance with the terms set forth in the Plan Term Sheet);

(l)     The issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling, determination or order making illegal or otherwise restricting, preventing or enjoining the consummation of a material portion of the Transaction, including an order denying confirmation of the Plan and such ruling, determination or order has not been vacated or reversed within five (5) Business Days of issuance;

(m)     The occurrence and continuation of a default under the Fixed Rate DIP Facility, provided that a cure of such default before the expiration of the notice period shall be a cure of such default hereunder;

(n)     The occurrence and continuation of a default under the Floating Rate DIP Facility, including those set forth on Exhibit B to the Plan Term Sheet, *provided* that a cure of such default before the expiration of the notice period shall be a cure of such default hereunder;

(o)     The occurrence and continuation of a default in connection with the Company's use of Lehman's cash collateral, *provided* that a cure of such default before the expiration of the notice period shall be a cure of such default hereunder; and

(p)     The occurrence after execution of this Agreement of (i) a change that has a material adverse effect on the use, value or condition of the Company, its assets or the legal or financial status or business operations of the Company or (ii) a material disruption or material adverse change in the financial, real estate, banking or capital markets;

(q)     Lehman has determined, in its sole discretion, after completion of its tax due diligence, that the Transaction cannot be structured in a manner acceptable to Lehman, which determination shall be made no later than 45 days after the Petition Date;

(r)     The material breach by any Party of any of their undertakings, representations, warranties or covenants set forth in this Agreement; and

(s)     All Parties agree in writing to terminate this Agreement.

The foregoing Termination Events are intended solely for the benefit of the Parties to this Agreement; *provided* that no Party may seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions.

Section 7.    Default Notices.  The Company shall furnish to Lehman prompt written notice of any Termination Event as soon as it becomes aware that the Termination Event will occur, specifying the nature and extent thereof and the corrective action, if any, taken or proposed to be taken with respect thereto.

Section 8.    Effect of Termination.  Upon occurrence of a Termination Event, this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertaking, and agreements under or related to this Agreement except (i) to the extent provided in Section 13 of this Agreement and (ii) with respect to the remedies set forth in Sections 8(a) and 8(b) below:

(a)     Upon the occurrence of any of the Termination Events set forth in Section 6(a) through 6(s) hereof, Lehman may terminate this Agreement and the use of its cash collateral.

(b)     As long as this Agreement has not otherwise been terminated, (x) upon the occurrence of a Termination Event set forth in Section 6(a)(vii) or 6(a)(viii); (y) if a trustee is appointed for the Chapter 11 Cases of all of those Debtors obligated under the Floating Rate Debt, Fixed Rate Debt, Mezzanine Debt, and Other Secured Debt, or (z) if the Company files a motion to dismiss all of the Chapter 11 Cases for those Debtors obligated under the Floating Rate Debt, Fixed Rate Debt, Mezzanine Debt, and Other Secured Debt, the Company shall, immediately upon the occurrence of such Termination Event, elect one of the following remedies, *provided, however*, that if the Company fails to make such election within one day after the occurrence of the applicable Termination Event, Lehman shall have the right to elect either option:

(i)     The Company will be deemed to have consented to the modification of the automatic stay to permit Lehman to exercise any and all remedies with respect to the Floating Rate Collateral, the automatic stay shall be so modified and no further Bankruptcy Court approval shall be required; or

(ii)     The Company will sell the Floating Rate Collateral pursuant to section 363 of the Bankruptcy Code, subject to the following conditions, which shall be incorporated into any order approving this Agreement: (i) the sale procedures shall be agreed upon no later than 120 days after the Petition Date; (ii) Lehman shall have the right to credit bid the Floating Rate Debt; (iii) if sale proceeds are not paid to Lehman within 60 days of the Termination Event, title to the Floating Rate Collateral shall be conveyed to Lehman free and clear of all liens, claims and encumbrances; (iv) the 60-day period shall not be extended and the Company waives its right to seek any extension such period.

Section 9.     Good Faith Cooperation; Further Assurances; Transaction Documents. The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Transaction.  Furthermore, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement.  Each Party hereby covenants and agrees (a) to negotiate in good faith the Plan Related Documents, each of which shall (i) contain the same economic terms as and other terms consistent in all material respects with, the terms set forth in the Plan Term Sheet, (ii) be in form and substance acceptable in all respects to each of the Company and Lehman and (iii) be consistent with this Agreement in all material respects and (b) to execute the Plan Related Documents subject to the terms of this Agreement (to the extent such Party is a party thereto).

Section 10.     Representations and Warranties.  Each Party hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof and as of the date of any amendment of this Agreement approved by such Party:

(t)    No Conflicts.  To the Parties' actual knowledge, the execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(u)    Governmental Consents.  The execution, delivery and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of or notice to or other action to, with or by, any Federal, state or governmental authority or regulatory body other than the Bankruptcy Court.

(v)    Binding Obligation.  This Agreement is the legally valid and binding obligation of such Party, enforceable against it, and its officers, directors and agents, in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

Section 11.    Effectiveness.  This Agreement shall become effective and binding on each Party upon (i) the payment of all reasonable fees and expenses owing to Lehman as invoiced by counsel for Lehman on the date hereof and (ii) the receipt by Lehman of signature pages executed by the Company, including each obligor under the Floating Rate Debt (the "**Effective Date**"); *provided*, *however*, that this Agreement shall not become binding on Lehman unless and until (a) the Marriott Agreement, in the form attached hereto as Exhibit B, have been executed by all relevant parties thereto, (b) the bankruptcy court presiding over the Lehman Bankruptcy Cases enters an order approving this Agreement, which approval (x) Lehman shall seek as soon as practicable after the Petition Date (by a motion and order in substance subject to the Company's reasonable consent), (y) shall be an order in form and substance reasonably acceptable to Innkeepers and materially consistent in all respects with this Agreement, and (z) shall include provisions that provide, among other things, that: (i) the Agreement is approved without condition or delay, including approval for Lehman to comply with each provision of the Agreement and (ii) the automatic stay in the Lehman Bankruptcy Cases is modified to permit any Party to take any or all of the actions permitted by the Agreement; *provided*, *further*, *however*, that if such if such order approving this Agreement is not entered in the Lehman Bankruptcy Cases by August 27, 2010, the Company has the right to terminate this Agreement upon one (1) Business Day's written notice by the Company.  Delivery by telecopier or electronic mail of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart hereof.

Section 12.    GOVERNING LAW; JURISDICTION; JURY TRIAL WAIVER.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN

CONNECTION WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL COURT IN THE STATE OF NEW YORK AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, UPON THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT PRESIDING OVER THE CHAPTER 11 CASES AND NOT THE BANKRUPTCY COURT PRESIDING OVER THE LEHMAN BANKRUPTCY CASES SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREIN; *PROVIDED*, *HOWEVER*, THE BANKRUPTCY COURT PRESIDING OVER THE LEHMAN BANKRUPTCY CASES SHALL HAVE EXCLUSIVE JURISDICTION TO DETERMINE WHETHER TO APPROVE LEHMAN'S ENTRY INTO THIS AGREEMENT. THE PARTIES WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN THE PARTIES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

Section 13.    <u>Specific Performance; Exclusive Remedy</u>.  Each Party hereto recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement will cause the other Parties to sustain damages for which such Parties would not have an adequate remedy at law for money damages, and therefore each Party hereto agrees that in the event of any such breach the other Parties shall be entitled to the remedy of specific performance of such covenants and agreements and injunctive relief, without the necessity of securing or posting a bond or other security in connection with such remedy.  Notwithstanding anything to the contrary set forth above, the Parties also agree that the remedy of specific performance shall be the exclusive remedy of the Parties under this Agreement in the event of a breach of this Agreement by another Party hereto.

Section 14.    <u>Survival</u>.    Notwithstanding the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in <u>Sections 7</u> (effect of termination), <u>11</u> (governing law), <u>12</u> (specific performance), <u>13</u> (survival), <u>15</u> (successors and assigns), <u>16</u> (no third party beneficiaries, <u>21</u> (reservation of rights), <u>22</u> (publicity), <u>24</u> (fiduciary duties), <u>25</u> (indemnification), and <u>26</u> (continued banking practices) hereof shall survive such termination and shall continue in full force and effect for the benefit of the Parties hereto in accordance with the terms hereof.

Section 15.    <u>Headings</u>.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

Section 16.    <u>Successors and Assigns; Severability; Several Obligations</u>.    This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not

affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction.   The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint.

Section 17.     No Third Party Beneficiaries.   Unless otherwise expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof.

Section 18.     Entire Agreement.   This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations, but shall not supersede either of the Plans or the other Plan Related Documents.

Section 19.     Counterparts.   This Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

Section 20.     Notices.     All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties (unless otherwise stated in the Agreement) and deemed given when delivered, if delivered by hand or upon confirmation of transmission, if delivered by email and facsimile, during standard business hours (from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the addresses and facsimile numbers set forth below:

        If to the Company:

        Innkeepers USA Trust
        340 Royal Poinciana Way, Suite 306
        Palm Beach, Florida 33480
        Attn: Marc Beilinson
        Telephone: (561) 835-1800
        Facsimile: (561) 835-0457
        email:  MBeilinson@BeilinsonPartners.com

        with a copy to

        Kirkland & Ellis LLP
        601 Lexington Avenue
        New York, NY 10022-4611
        Attn:   James H.M. Sprayregen
             Paul M. Basta
             Jennifer L. Marines
        Telephone:  (212) 446-4800
        Facsimile:   (212) 446-4900

email:  jsprayregen@kirkland.com
        pbasta@kirkland.com
        jmarines@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654-3406
Attn:   Anup Sathy
        Marc J. Carmel
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
email:  asathy@kirkland.com
        mcarmel@kirkland.com

If to Lehman:

Lehman ALI Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn:   Michael Lascher
        Susanne Frey
email:  michael.lascher@lamcollc.com
        susanne.frey@lehmanholdings.com

with a copy to

Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Attn:   Michael J. Sage
        Brian E. Greer
Telephone:  (212) 698-3500
Facsimile:  (212) 698-3599
email:  michael.sage@dechert.com
        brian.greer@dechert.com

Section 21.    Rule of Interpretation; Calculation of Time Period.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

Section 22.    <u>Reservation of Rights</u>.  Nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated or this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

Section 23.    <u>Publicity; Confidentiality</u>.  The Parties understand and acknowledge that, until publicly disclosed as herein contemplated, the terms of this Agreement and the exhibits hereto are confidential information, and the Parties agree to keep such information confidential and not use it for any purpose except as contemplated hereby or as reasonably necessary in the Chapter 11 Cases.

Section 24.    <u>Representation by Counsel</u>.  Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

Section 25.    <u>Fiduciary Duties</u>.

(a)    Notwithstanding  anything to the contrary herein, at any time prior to the Confirmation Date, the Company or any directors or officers of the Company, in such person's capacity as a director or officer of the Company, shall be entitled to take any action, or to refrain from taking any action, including a decision to terminate this Agreement, that such person determines in good faith, after consultation with counsel, is consistent with its or their fiduciary obligations  under applicable law (the "**Fiduciary Out**").

(b)    At the time this Agreement is entered into, the Company acknowledges and agrees that the Plan Milestones and any remedies in respect thereof set forth in this Agreement constitute the sound business judgment of the Company that comports with the fiduciary duties of the Company's officers and directors.

(c)    The Company agrees that the Fiduciary Out shall not apply, and may not be used, to annul, modify, amend, or otherwise alter any of the Plan Milestones or any of the remedies in respect thereof; provided, however, that if the Company secures a binding and firm written commitment with respect to an alternative transaction that will provide Lehman with a higher and better  recovery than the recovery proposed under the Plan (a "**Firm Alternative Transaction**"), the Company shall provide Lehman with at least ten (10) Business Days to determine whether Lehman will consent to such Firm Alternative  Transaction.  If Lehman does not consent to such Firm Alternative Transaction, the Company may only exercise the Fiduciary Out after it has obtained an order from  the Bankruptcy Court authorizing the Company to exercise the Fiduciary Out in accordance with the terms hereof.  The Company agrees that in determining whether a Firm Alternative Transaction is "higher and better,"  all factors must be considered including contingencies, conditionality, legal and financial execution risk, economics and Lehman's opinion as to whether such Firm Alternative Transaction is "higher and better."

Section 26.    <u>Indemnification</u>.    The Company hereby agrees to indemnify and hold Lehman and its officers, directors, partners, agents, employees, advisors, and successors and assigns, harmless from and against any and all claims, actions, suits, liabilities and judgments, and costs and expenses directly related thereto (including reasonable costs of defense on an as-incurred basis), arising by reason of or resulting from Lehman's execution of this Agreement and performance of its obligations hereunder, but expressly excluding any liability, cost or expense arising from or related to the fraudulent or willful misconduct of Lehman.

Section 27.    <u>Continued Banking Practices</u>.    Notwithstanding anything herein to the contrary, Lehman and its affiliates, may accept deposits from, lend money to and generally engage in any kind of banking, investment banking, trust or other business with or provide debt financing, equity capital or other services (including financial advisory services) to the Company or any affiliate of the Company or any other person, including, but not limited to, any person proposing or entering into a transaction related to or involving the Company or any affiliate thereof.

Section 28.    <u>Acknowledgement</u>.    This Agreement and the Transactions are the product of negotiations among the Parties, together with their respective representatives.    This Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.    Lehman's vote(s) will not be solicited until it has received the Disclosure Statement and any other required materials related to the Solicitation.    In addition, this Agreement does not constitute an offer to issue or sell securities to any person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

Section 29.    <u>No Waiver</u>.    The failure of any Party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity or to insist upon compliance by any other Party hereto with its obligations hereunder and any custom or practice or the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such right, power or remedy or to demand such compliance.

Section 30.    <u>Modification</u>.    This Agreement may only be modified, altered, amended, or supplemented by an agreement in writing signed by the Company and Lehman.

Section 31.    <u>Transfers</u>.    Lehman agrees that until the earlier to occur of (x) termination of this Agreement in accordance with <u>Section 6</u> and (y) the occurrence of the Plan Effective Date, it shall not sell, transfer, pledge, assign or otherwise hypothecate any of the Floating Rate Debt or any option thereon or any right or interest (voting or otherwise) therein (any such transfer, pledge, assignment, hypothecation or option being referred to as a "**Transfer**"), unless such Transfer is subject to, and the transferee thereof agrees in writing for the benefit of the Parties to be bound by all of the terms of this Agreement by executing and delivering to the Parties a joinder in the form attached hereto as Exhibit E upon no less than five (5) days written notice to the Company.    Any Transfer that is made in violation of the immediately preceding sentence shall be null and void *ab initio*, and the Company shall have the right to enforce the voiding of such transfer. In the event that any Transfer is not fully consummated for any reason,

Lehman shall remain bound by the terms of this Agreement.  After a Transfer, the Company has the right to terminate this Agreement upon one (1) day's written notice by the Company. Notwithstanding the foregoing, if Lehman notifies the Company of a potential Transfer, the Company shall advise Lehman within five business days if it will exercise its termination right with respect to such Transfer.

[Signature Page Follows]

*****

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the Parties hereto have duly executed and delivered this Agreement as of the date first above written.

By signing below, each party acknowledges its agreement to the foregoing.

LEHMAN ALI, INC.

By: _____

Name: Nancy Skanik

Title: Vice President

Date: July 17, 2010

[SIGNATURE PAGE TO PLAN SUPPORT AGREEMENT]

**EXECUTION COPY**

**INNKEEPERS USA TRUST**

By: _Marc Beilinson (signature)_

Name:  Marc Beilinson
Title:   Chief Restructuring Officer
Date:   July 17, 2010

[SIGNATURE PAGE TO PLAN SUPPORT AGREEMENT]

15818454.2

**GRAND PRIX HOLDINGS LLC**

By: _____

Name:  Marc Murphy

Title:  General Counsel, Secretary

Date:  July 17, 2010

**ON BEHALF OF ALL THE DEBTOR
ENTITIES LISTED ON ANNEX A**

By: _____

Name:  Marc Murphy

Title:  General Counsel, Secretary

Date:  July 17, 2010

**<u>Exhibit B</u>**

**(The Plan Term Sheet)**

**Term Sheet**

**Illustrative Terms of Proposed Restructuring**
**July 17, 2010**

The following are the proposed principal terms of a restructuring transaction between Lehman ALI Inc. ("**Lehman**"), as mortgage lender, and Innkeepers USA Trust ("**Innkeepers**" and, collectively with its subsidiaries, the "**Company**").[1]  The transaction (the "**Transaction**") contemplates a conversion of the Company's obligations under that certain mortgage loan agreement, dated as of June 29, 2007, among Lehman and the affiliates of the Company parties thereto (the "**Floating Rate Debt**"), collateralized by 20 of the Company's properties (the "**Floating Rate Collateral**") into all the equity of the reorganized Company (as set forth herein).  The Transaction would be effectuated through a prearranged plan of reorganization (the "**Plan**") in chapter 11 bankruptcy cases filed by Innkeepers and certain of its subsidiaries (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  This term sheet has been prepared for discussion purposes only and is non-binding, but shall serve as the basis for further negotiations regarding a definitive agreement.

The terms discussed herein constitute an integrated offer, are not divisible except as described herein, and are subject to the terms and conditions hereof.  This term sheet is provided in confidence and may be distributed only with the express written consent of Lehman and the Company, as applicable.  This term sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation governing such matters, which remain subject to discussion and negotiation to the extent not inconsistent with the specific matters set forth herein.  This term sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protections of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

Lehman's entry into any definitive transaction on the terms set forth in this term sheet, or otherwise, are subject to approval of the United States Bankruptcy Court administering the chapter 11 case of Lehman Brothers Holdings Inc.

**THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN.  ANY SUCH OFFER OR**

---

[1]    This term sheet is not being provided on behalf of SASCO 2008-C2, LLC (the "**Mezzanine Lender**") in connection with the mezzanine loan with respect to the collateral securing the Floating Rate Debt or the mezzanine loan with respect to the Anaheim property (the "**Mezzanine Debt**").  Lehman does not make any representations with respect to the Mezzanine Lender.

**SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS, IF ANY, AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**Terms:**

| **Treatment of Claims and Equity Interests Under the Plan:** | |
|---|---|
| Floating Rate Debt | Lehman will receive, in full and final satisfaction of its secured mortgage claims in respect of the Floating Rate Debt, 100% of the issued and outstanding new shares of common stock issued by Innkeepers (the "**New Equity**"), subject to dilution by the Management Equity Incentive Program (as defined below) and New Equity distributions, if any, for other Plan uses, as agreed by the parties hereto. |
| Mezzanine Debt | The Mezzanine Debt will be deemed cancelled, and the Mezzanine Lender will not retain any property or interest on account of such debt under the Plan.  The Mezzanine Lender will be deemed to vote against the Plan.  No action by the Mezzanine Lender will be required under this Term Sheet or any definitive documentation with respect to the terms set herein. |
| Fixed Rate Debt | Holders of the claims against the Company for its obligations under that certain mortgage loan agreement, dated as of June 29, 2007, among Lehman and the affiliates of the Company parties thereto (the "**Fixed Rate Debt**") collateralized by 45 of the Company's properties (the "**Fixed Rate Collateral**") will receive, in full and final satisfaction of their claims in respect of such debt, new mortgage notes secured by mortgages on the Fixed Rate Collateral either (a) in an aggregate face amount not to exceed $550 million; or (b) if such holders make an election for application of section 1111(b)(2) of the Bankruptcy Code, in the amount of the aggregate amount of such holders' Fixed Rate Debt, with a present value of the new mortgage notes not to exceed $550 million.  The terms of the new Fixed Rate Debt notes and any security interests to be granted in connection therewith are subject to approval, in form and substance, by Lehman and the Company. |
| Other Secured Debt | Holders of claims against the Company for its obligations under those certain secured mortgage loan agreements, not including the Floating Rate Debt or the Fixed Rate Debt (the "**Other Secured Debt**"), collateralized by seven of the Company's properties, not including the Floating Rate Collateral or the Fixed Rate Collateral (the "**Other Secured Debt Collateral**"), will receive, in full and final satisfaction of their claims in respect of such debt, new mortgage notes secured by liens on the respective holder's Other Secured Debt Collateral |

2

| | |
|---|---|
| | ("**Other Secured Debt New Mortgage Notes**") either (a) in an aggregate face amount not to exceed $150 million; or (b) if a holder of Other Secured Debt claims makes an election for application of section 1111(b)(2) of the Bankruptcy Code, in the amount of the aggregate amount of such holder's claims, with present value of such Other Secured Debt New Mortgage Note equaling the value of the collateral securing such holder's claims, *provided, however*, that the aggregate present value of all Other Secured Debt New Mortgage Notes issued pursuant to (a) and (b) herein shall not exceed $150 million. The terms of the Other Secured Debt New Mortgage Notes are subject to approval, in form and substance, by Lehman and the Company.<br><br>Debt allocation among the Other Secured Debt Collateral and identification of any Other Secured Debt Collateral that should be removed from the Company's portfolio shall be agreed among the parties hereto. |
| General Unsecured Claims | "**General Unsecured Claim**" shall mean any unsecured claim against any of the Debtors that is not: (a) an Administrative Claim; (b) a Priority Claim (tax or otherwise); (c) an intercompany claim; or (d) a section 510(b) claim, if any.<br><br>If a class of General Unsecured Claims votes to accept the Plan and affirmatively release Lehman and its affiliates from all claims and causes of action relating to the Company and/or the Floating Rate Debt, then holders of such General Unsecured Claims shall receive a pro rata distribution of cash in the amount of $500,000. |
| Intercompany Claims | Intercompany claims shall not be entitled to receive any distribution under the Plan on account of such claims and shall be deemed to have voted against the Plan.  Such claims will be reinstated, extinguished or cancelled as appropriate in the judgment of Lehman and the Company to effectuate the Transaction contemplated by the Plan. |
| Section 510(b) Claims | Claims subject to subordination pursuant to section 510(b) of the Bankruptcy Code shall not receive any recovery under the Plan and shall be deemed to have voted against the Plan. |
| Deficiency Claims | Unsecured deficiency claims of holders of Floating Rate Debt, Fixed Rate Debt and Other Secured Debt shall not receive any recovery under the Plan or otherwise without the consent of Lehman and the Company, and, if not receiving any recovery, shall be deemed to have voted against the Plan. |
| Administrative | Allowed administrative claims shall be paid in cash in the ordinary |

3

| | |
|---|---|
| Claims | course of business or upon the effective date of the Plan (the "**Effective Date**"), unless the holders of such Administrative Claims agree to different treatment. |
| Priority Claims | Allowed priority claims shall be paid in cash on the Effective Date; *provided*, that on the Effective Date Lehman and the Company may determine to defer priority tax claims in accordance with the Bankruptcy Code. |
| Existing Equity | On the Effective Date, all prepetition common and preferred shares of Innkeepers will be cancelled, and holders of such interests will not retain any property on account of such interests under the Plan.  To the extent Lehman and the Company determine that the Company's existing corporate structure would be the most tax efficient for Lehman and the Company on the Effective Date, the prepetition equity interests of each of Innkeepers' subsidiaries will be deemed reissued in accordance with the Company's prepetition corporate structure on terms mutually acceptable to the parties hereto.  If Lehman and the Company determine that a different structure would be more beneficial to Lehman and the Company on the Effective Date, the Plan shall provide for such structure, on terms mutually acceptable to the parties hereto. |

15798647.8

| **Means of Implementation:** | |
|---|---|
| Bankruptcy Pleadings | All material pleadings filed by the Company in connection with the Chapter 11 Cases, including all first-day motions, shall be in form and substance reasonably acceptable to Lehman. |
| DIP Financing | DIP financing to be provided in two separate facilities:<br><br>(a) a DIP facility provided in an amount equal to $50.75 million, which is necessary to complete certain Marriott property improvement plan ("**PIP**") requirements for (i) certain of those hotels collateralizing the Fixed Rate Debt; (ii) the hotel collateralizing that certain mortgage loan, dated as of October 4, 2006, by and between KPA RIMV, LLC and Capmark Bank (the "**Residence Inn in San Diego**"); and (iii) the hotel collateralizing that certain mortgage loan, dated as of September 19, 2006, by and between KPA Tysons Corner RI, LLC and Merrill Lynch Mortgage Lending, Inc. (the "**Residence Inn in Tyson's Corner**"), secured by senior, priming liens on the Fixed Rate Collateral, the Residence Inn in San Diego, and the Residence Inn in Tyson's Corner on terms acceptable to Lehman, as substantially set forth on Exhibit A (the "**Fixed Rate DIP Facility**").  On the Effective Date of the Plan, all amounts outstanding under the Fixed Rate DIP Facility shall be repaid from the Exit Funding (as defined below).<br><br>(b) a DIP facility provided by Lehman or any of its affiliates in an amount up to approximately $17.5 million, secured by senior, priming liens on the Floating Rate Collateral on terms to be agreed between the Company and Lehman as substantially set forth on Exhibit B (the "**Floating Rate DIP Facility**").  On the Effective Date of the Plan which is consistent with the terms hereof, all claims outstanding under the Floating Rate DIP Facility shall be extinguished; *provided, however*, if, and to the extent, any claim or cause of action is brought by, or on behalf of, the Company or its estates related to the Floating Rate Debt against Lehman or any of its affiliates is allowed by final order or part of a judgment of a court of competent jurisdiction (the "**Claims or Causes of Actions**"), then the claims arising under the Floating Rate DIP Facility shall be, at Lehman's election either (i) repaid on the Effective Date of the Plan in an amount equal to any allowed Claim or Cause of Action, up to the amount outstanding under the Floating Rate DIP Facility, or (ii) set off against the Claims or Causes of Action, up to the amount outstanding under the Floating Rate DIP Facility. |
| Use of Cash | In addition to providing the Floating Rate DIP Facility, Lehman will consent to the use of its cash collateral pursuant to the terms of the |

5

| | |
|---|---|
| Collateral | cash collateral order attached hereto as Exhibit C.<br><br>The Company shall not take any action, and shall not solicit, encourage or support any action by a third party, seeking to amend, modify or extend the Plan Milestones (as defined below) (the foregoing provision is hereinafter referred to as the "**Milestones Covenant**").<br><br>The Company's use of Lehman's cash collateral will terminate immediately upon the receipt of notice of a Termination Event (as defined below). |
| Exit Funding | Innkeepers will secure additional funding of no less than $75 million, plus such additional amounts in form and substance as may be determined by the parties hereto ("**Exit Funding**").  Prior to any Exit Funding, the reorganized Company shall deliver a comprehensive PIP and cycle renovation budget, which budget shall be (a) prepared with the assistance of, and validated by, a third party expert and (b) acceptable in all respects to the parties hereto (the "**Budget**"). Such Budget shall be updated annually or more frequently as may be requested by any party hereto. |
| New Equity | The Plan shall provide that the issuance of the New Equity and any subsequent transfer of New Equity by Lehman prior to the Effective Date will be exempt from (a) securities laws in accordance with section 1145 of the Bankruptcy Code and (b) transfer taxes in accordance with section 1146 of the Bankruptcy Code. |
| Conditions Precedent to Lehman's Obligations Under PSA | The Transaction will become binding on Lehman when Lehman and the Company execute a plan support agreement (the "**PSA**") that incorporates the Transaction as set forth herein, including:<br><br>▪ Receipt by Lehman of a Plan term sheet incorporating the terms set forth herein and otherwise in form and substance acceptable to Lehman;<br><br>▪ Agreement reached with Marriott in the form attached hereto as Exhibit D;<br><br>▪ Innkeepers and each of its wholly owned subsidiaries, including each obligor under the Floating Rate Debt, shall be a signatory to the PSA; and<br><br>▪ Bankruptcy Court approval in the chapter 11 bankruptcy proceedings of Lehman Brothers Holdings Inc. |

6

| | |
|---|---|
| Termination Events Under PSA and Use of Cash Collateral | Upon the occurrence of any of the following events (each, a "**Termination Event**"), the PSA and the use of Lehman's cash collateral shall automatically terminate on the first calendar day immediately following one (1) business day after the date of such Termination Event, unless (a) Lehman, in its sole discretion, provides the Company with a written waiver of any such Termination Event within one (1) business day from the date of such Termination Event or (b) Lehman and the Company, in their respective sole discretion, provide the other party with a written waiver of Termination Events R and S within one (1) business day from the date of such Termination Event: |

<div style="margin-left: 2em;">

A.    Failure to meet any of the following milestones (the "**Plan Milestones**"):

    (i)    Motion to assume the PSA filed on the petition date;

    (ii)    Order entered authorizing the assumption of the PSA no later than 45 days after the petition date;

    (iii)    Orders entered on a final (and not interim) basis authorizing the Fixed Rate DIP Facility, Floating Rate DIP Facility, the use of Lehman's cash collateral and the use of the cash collateral securing the Fixed Rate Debt consistent with the terms hereof no later than 45 days after the petition date;

    (iv)    Disclosure statement and Plan consistent with the terms hereof filed no later than 45 days after the petition date;

    (v)    Disclosure statement consistent with the terms hereof approved by the Bankruptcy Court no later than 120 days after the petition date;

    (vi)    Lehman and the Company shall have reached mutual agreement no later than 120 days after the petition date on the terms of a sale process upon the occurrence of Termination Event A(vii) or A(viii) below;

    (vii)    Order confirming a Plan consistent with the terms hereof entered no later than 240 days after the petition date; and

    (viii)    Effective Date of the Plan no later than 270 days after the petition date.

B.    Lehman has not executed definitive agreements with respect to the sale of 50% of the New Equity for a

</div>

7

|  | purchase price of at least $107.5 million (the "**New Equity Sale Transaction**") by 45 days after the petition date; |
|  | C.     Lehman has not consummated the New Equity Sale Transaction by 270 days after the petition date; |
|  | D.     The entry by the Bankruptcy Court of an interim order authorizing the use of Lehman's cash collateral in form and substance not acceptable to Lehman; |
|  | E.     The entry of any order of the Bankruptcy Court granting relief from the exercise of the automatic stay (i) to permit any exercise of remedies by the lenders or special servicer under the Fixed Rate Debt, Other Secured Debt or Mezzanine Debt other than limited relief solely to permit the delivery of default notices under the terms of the Fixed Rate Debt, Other Secured Debt or Mezzanine Debt and (ii) to permit termination of any franchise agreement with Marriott or any other hotel brand; |
|  | F.     The filing by the Company of any motion or other request for relief seeking to (i) dismiss any of the Chapter 11 Cases, (ii) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (iii) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; |
|  | G.     (i) The filing by the Company of any motion or other request for relief seeking an extension of the Plan Milestones or any alteration of the remedies upon termination set forth herein without the express written consent of Lehman in its sole discretion; (ii) the filing by the Company of any pleading supporting any motion from any other party to obtain such extension or alteration; (iii) the failure of the Company to oppose any motion from any other party to obtain such extension before the objection deadline of such motion; or (iv) the violation by the Company of the Milestones Covenant; |
|  | H.     The entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases or |

8

(iv) making a finding of fraud, dishonesty or misconduct by any officer or director of the Company, regarding or relating to the Company;

I.    The withdrawal, amendment or modification by the Company of, or the filing by the Company of a pleading seeking to amend or modify, the Plan or PSA, which withdrawal, amendment, modification or pleading is materially inconsistent with the terms hereof or the Plan or is materially adverse to Lehman, in each case in a manner not reasonably acceptable to Lehman, or if the Company files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with the terms hereof or the Plan (in each case with such amendments and modifications as have been effected in accordance with the terms hereof) and such motion or pleading has not been withdrawn within three (3) business days after Lehman provides written notice to the Company;

J.    The filing of any motion to approve a disclosure statement or Plan by the Company that incorporates a Pro Forma Capital Structure or any other terms inconsistent with the terms and conditions set forth herein;

K.    The granting by the Bankruptcy Court of relief that is inconsistent with the terms hereof or the Plan in any material respect (in each case with such amendments and modifications as have been effected in accordance with the terms hereof);

L.    The issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling, determination or order making illegal or otherwise restricting, preventing or enjoining the consummation of a material portion of the Transaction, including an order denying confirmation of the Plan and such ruling, determination or order has not been vacated or reversed within ten (10) business days of issuance;

M.    The occurrence and continuation of a default under the Fixed Rate DIP Facility, provided that a cure of such default before the expiration of the notice period shall be a cure of such default hereunder;

N.    The occurrence and continuation of a default under the Floating Rate DIP Facility, including those set forth on

9

|  |  |  |
|---|---|---|
|  |  | Exhibit B, provided that a cure of such default before the expiration of the notice period shall be a cure of such default hereunder; |
|  | O. | The occurrence and continuation of a default in connection with the Company's use of Lehman's cash collateral, provided that a cure of such default before the expiration of the notice period shall be a cure of such default hereunder; and |
|  | P. | The occurrence after execution of the PSA of (i) a change that has a material adverse effect on the use, value or condition of the Company, its assets or the legal or financial status or business operations of the Company or (ii) a material disruption or material adverse change in the financial, real estate, banking or capital markets; |
|  | Q. | Lehman has determined, in its sole discretion, after completion of its tax due diligence, that the Transaction cannot be structured in a manner acceptable to Lehman, which determination shall be made no later than 45 days after the petition date; |
|  | R. | The material breach by any Party of any of their undertakings, representations, warranties or covenants set forth in the PSA; and |
|  | S. | All parties agree in writing to terminate the PSA. |

15798647.8

| | |
|---|---|
| Remedies Upon Termination | Upon the occurrence of any of Termination Events A through S, Lehman may terminate the PSA and use of cash collateral.<br><br>As long as the PSA has not otherwise been terminated, (a) upon the occurrence of Termination Event A(vii) or A(viii); (b) if a trustee is appointed for the Chapter 11 Cases of all of those debtors obligated under the Floating Rate Debt, Fixed Rate Debt, Mezzanine Debt, and Other Secured Debt; or (c) if the Company files a motion to dismiss all of the Chapter 11 Cases for those debtors obligated under the Floating Rate Debt, Fixed Rate Debt, Mezzanine Debt, and Other Secured Debt, the Company shall, immediately upon the occurrence of such Termination Event, elect one of the following remedies, *provided*, *however*, that if the Company fails to make such election within one day after the occurrence of the applicable Termination Event, Lehman shall have the right to elect either option:<br><br>    (a)    The Company will be deemed to have consented to the modification of the automatic stay to permit Lehman to exercise any and all remedies with respect to the Floating Rate Collateral, the automatic stay shall be so modified and no further court approval shall be required; or<br><br>    (b)    The Company will sell the Floating Rate Collateral pursuant to section 363 of the Bankruptcy Code, subject to the following conditions, which shall be incorporated into any order approving the PSA: (i) the sale procedures shall be agreed upon no later than 120 days after the petition date; (ii) Lehman shall have the right to credit bid the Floating Rate Debt; (iii) if sale proceeds are not paid to Lehman within 60 days of the Termination Event, title to the Floating Rate Collateral shall be conveyed to Lehman free and clear of all liens, claims and encumbrances; (iv) the 60-day period shall not be extended and the Company waives its right to seek any extension of such period. |
| Bankruptcy Court Approval of PSA | The Company shall, on or immediately after the commencement of the Chapter 11 Cases, file a motion seeking authorization to assume the PSA.  The order approving the PSA shall include provisions that the Company (i) shall not seek an extension of the Plan Milestones or any alteration of the remedies upon termination set forth herein without the express written consent of Lehman in its sole discretion, (ii) shall not support any motion from any other party to obtain such extension or alteration; and (iii) will oppose any motion from any |

11

| | |
|---|---|
| | other party to obtain such extension or alteration by the objection deadline of such motion. |
| Pro Forma Capital Structure | Following the consummation of the Transaction, the reorganized Company will have, after repayment of the Fixed Rate DIP Facility, (a) funds sufficient to perform Marriott capital expenditures and brand standard work and (b) cash on hand sufficient to operate the business of the Company, and such amounts in (a) and (b) above shall be acceptable to Lehman and the Company and be capitalized as follows:<br><br>Fixed Rate Debt:  present value less than or equal to $550 million<br><br>Other Secured Debt:  present value less than or equal to $150 million<br><br>Exit Funding:   At least $75 million, plus such additional amounts in form and substance as may be determined by the parties hereto.<br><br>Except as set forth above, on the Effective Date, the Company shall not have any debts or liens encumbering the Company's assets, except for permitted liens agreed to by Lehman and the Company. |
| Governance | Prior to the Effective Date, Lehman will determine the requisite number of directors, all of whom will be nominated by Lehman, and voting requirements shall be in form and substance acceptable to Lehman. |
| Management Equity Incentive Program | The Plan shall provide for a management equity incentive program (the "**Management Equity Incentive Program**") in form and substance acceptable to Lehman and the Company providing for a reserve of up to 3% of the New Equity to be allocated to management under the Management Equity Incentive Program as approved by the board of directors of the reorganized Company. |
| REIT Status | Lehman and the Company shall, after the Effective Date, determine whether to maintain Innkeepers' status as a real estate investment trust. |
| Property Manager | Prior to the Effective Date of the Plan, Lehman and the Company shall designate a manager for the reorganized  Company's properties. If Island Hospitality Management, Inc. ("**Island**") is not selected as the manager, the Company will use its reasonable best efforts to effectuate an orderly transition to the replacement manager. |
| Releases | The Plan shall include a full discharge and release of liability by the Company, other than a release of the obligations set forth herein, in |

12

| | |
|---|---|
| | favor of (a) the Company and each of its subsidiaries, (b) Lehman, and (c) each of their respective principals, employees, affiliates, subsidiaries, members, shareholders, agents, officers, directors, and professionals from: (i) any and all claims and causes of action arising prior to the Effective Date and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction. |
| Professional Fees | The Company shall pay the professional fees and expenses incurred by Lehman in connection with the Transaction. |

15798647.8

**<u>Exhibit C</u>**

**(DIP Term Sheet)**

**Summary of Indicative Terms and Conditions
Proposed $17,498,095.52 Senior Secured Super-Priority
Debtor-in-Possession Credit Facility (this "Term Sheet")**

*This Term Sheet is <u>not</u> a commitment to provide the financing described below. This Term Sheet is not meant to be, and should not be construed as, a commitment by DIP Lender (defined below) or any of its affiliates to extend credit or enter into efforts in order to extend credit. Moreover, it does not attempt to describe all terms and conditions that would pertain to the DIP Facility (defined below), and its terms do not suggest the specific phrasing of documentation clauses.*

The proposed terms and conditions summarized herein represent the conditions pursuant to which the DIP Lender proposes to enter into a $17,498,095.52 Senior Secured Super-Priority Debtor-in-Possession Credit Facility (the "***DIP Facility***") with the Borrower (defined below).

Reference is made to those certain mortgage loans in the original principal amount of $250,000,000 (the "***Existing Loan***") made by Lehman ALI Inc. to the Borrower (as defined below) and the Released Borrowers (as defined below) pursuant to a certain Loan Agreement dated as of June 29, 2007, among the Borrower, the Released Borrowers and Lehman ALI Inc. (as amended, the "***Existing Loan Agreement***"). The terms, covenants, conditions and provisions which are applicable as of the date of this Term Sheet to the Existing Loan are set forth in the Existing Loan Agreement and the other loan documents entered into in connection therewith. The collateral for the Existing Loan is referred to herein as the "***Pre-Petition Collateral***." As of the date of this Term Sheet, Borrower (as defined below) is a party to the Existing Loan Agreement.

| | |
|---|---|
| **Borrower:** | Collectively, the borrowers set forth on the List of Borrowers attached hereto, which borrowers (individually and collectively, as the context may require, the "***Borrower***") shall be jointly and severally liable for the obligations under the DIP Facility (as defined below). |
| **Released Borrowers:** | Collectively, the borrowers set forth on the List of Released Borrowers attached hereto, which borrowers (collectively, the "***Released Borrowers***") were previously released from their obligations under the Existing Loan Agreement in accordance with the terms and conditions of the Existing Loan Agreement. |
| **DIP Facility:** | After entry of the Final Order, a term facility of up to $17,498,095.52 allocated to 20 properties (the "***Lehman Properties***") securing the Existing Loan (the "***DIP Facility***") shall be extended to the Borrower pursuant to the terms and provisions of a DIP loan agreement (the "***DIP*** |

*Loan Agreement*"). The loan funded by the DIP Lender under the DIP Facility is referred to herein as the "***DIP Loan.***"

**Closing Date:**

The date of the effectiveness of the DIP Facility and the funding by the DIP Lender of the first advance under the DIP Facility to the Borrower.

**DIP Lender:**

Solar Finance Inc.

**Carve-Out:**

There shall be no carve-out of any nature whatsoever for professional fees or expenses of the Borrower or any estate professionals. Since the DIP Facility is intended to solely provide funds for the Marriott PIP Work, the Other Franchise PIP Work and the Cycle Renovations, the professional fees and expenses incurred by the Borrower and other estate professionals shall be dealt with in connection with the cash collateral order(s) entered by the Bankruptcy Court.

**Fees:**

A Closing Fee of 0.5% of the amount committed in connection with the DIP Facility shall be paid by the Borrower to the DIP Lender on the closing date of the DIP Facility and shall be fully earned and non-refundable on such date.

The Borrower shall not incur or pay any success fee, transaction fee or financing fee of any kind or character in connection with or in respect of obtaining the issuance and/or funding of the DIP Facility (except for the Closing Fee and Commitment Fee).

A Commitment Fee equal to 1.0% of the amount committed in connection with the DIP Facility shall be paid by the Borrower to the DIP Lender on the closing date of the DIP Facility and shall be fully earned and non-refundable on such date.

The cash collateral order(s) approved by the Bankruptcy Court shall provide that the Closing Fee and the Commitment Fee shall be paid immediately upon the approval of the DIP Facility by the Bankruptcy Court and the closing of the DIP Facility.

**Maturity Date:**

360 days from the Closing Date.

**Termination Date:**

The earliest to occur of: (a) acceleration by the DIP Lender of the obligations under the DIP Loan due to the occurrence

and continuation of an Event of Default with respect to the DIP Loan (i.e., which Event of Default has not otherwise been cured or waived in writing by the DIP Lender); (b) the acceleration of the obligations under any other debtor-in-possession financing provided to the Debtors due to the occurrence and continuation of an event of default under such financings; (c) the effective date of any plan in the bankruptcy proceeding that provides for payment in full in cash of all obligations owing under the DIP Facility or is otherwise acceptable to the DIP Lender; (d) the date that is the closing date of any sale of all or substantially all of any Borrower's assets that constitute collateral for the DIP Facility; (e) the entry of an order by the Bankruptcy Court granting relief from the automatic stay permitting foreclosure of any assets of any Borrower constituting collateral with respect to the DIP Facility in excess of $1,000,000 in the aggregate (each, a "**_Release from Stay_**"); or (f) the entry of an order of dismissal or conversion of the Chapter 11 Cases with respect to all of the Borrowers with respect to the DIP Facility.

| | |
|---|---|
| **Non-Default Interest Rate and Payment Terms:** | Interest on the DIP Loan shall be paid monthly in arrears, accruing at a per annum floating rate equal to the sum of the 30-day LIBOR (subject to a floor of 2.0%) (LIBOR being defined and determined by DIP Lender in a manner as is customary for facilities similar to the DIP Facility) plus the applicable Spread (as defined below) (the "**_Non-Default Interest Rate_**"). All interest shall be computed on the basis of a 360-day year for the actual number of days elapsed. "**_Spread_**" means 5.00%. |
| **Default Interest Rate:** | Effective immediately upon the occurrence and applying during the continuance of any Event of Default (after giving effect to any applicable grace and cure periods with respect thereto), unless and until such Event of Default is waived in writing by the DIP Lender, interest shall accrue on the DIP Loan at a rate that is 3% per annum in excess of the applicable Non-Default Interest Rate. |
| **Loan Payments:** | All unpaid obligations, including, without limitation, principal and interest on the DIP Facility and any fees and expenses incurred thereon, shall be due and payable in full in cash on the earlier to occur of (i) the Maturity Date and (ii) the Termination Date. |

**Mandatory Prepayments:** Upon the receipt by (or on behalf of) any Borrower of insurance proceeds or a condemnation award in excess of $25,000 following a casualty or condemnation event with respect to any assets of such Borrower constituting collateral for the DIP Facility (subject to the use thereof for restoration as is permitted in the DIP Loan Agreement), 100% of any net cash proceeds from such insurance shall be paid to the DIP Lender on the date that such net cash proceeds are received by or on behalf of such Borrower or such subsidiary in the following order of priority: *first*, to accrued and unpaid interest under the DIP Facility, *second*, to all other amounts then due to DIP Lender under the DIP Facility, and *third*, to outstanding principal under the DIP Facility until the DIP Facility is paid in full.

**Use of Proceeds:** Proceeds of the DIP Facility shall be used solely for (1) the Marriott PIP Work in accordance with the PIP Budget, (2) the Other Franchise PIP Work in accordance with the PIP Budget and (3) the Cycle Renovations in accordance with the Cycle Renovations Budget and shall include the following payments: (a) amounts to pay the financing fees owed to the DIP Lender in accordance with the DIP Facility, (b) amounts up to a maximum principal amount of $5,448,771.01 to fund post-petition Marriott PIP Work in accordance with the PIP Budget, (c) amounts up to a maximum principal amount of $7,949,324.51 to fund post-petition Other Franchise PIP Work in accordance with the PIP Budget, and (d) amounts up to a maximum principal amount of $4,100,000.00 to fund post-petition Cycle Renovations in accordance with the Cycle Renovations Budget.

**Cash Management:** The Borrower shall use a segregated cash management system that segregates proceeds of the DIP Facility from cash generated by the Borrower without commingling cash collateral from any other affiliates and such cash management system must be acceptable to the DIP Lender. Additionally, (i) all funds advanced under the DIP Facility shall be held in a segregated disbursement account controlled by the DIP Lender (the "***Controlled Disbursement Account***") and (ii) disbursements from the Controlled Disbursement Account for the Marriott PIP Work, the Other Franchise PIP Work and the Cycle Renovations shall be made in accordance with the disbursement provisions of the Existing Loan Agreement with regard to the disbursements from the Required Capital Improvements Account (as defined in the Existing Loan

Agreement).  On the Closing Date, the DIP Lender shall advance $5,448,771.01 to fund the post-petition Marriott PIP Work in accordance with the PIP Budget, which funds shall be held in the Controlled Disbursement Account.  The DIP Lender shall make advances to fund (i) the post-petition Other Franchise PIP Work in accordance with the PIP Budget and (ii) the post-petition Cycle Renovations in accordance with the Cycle Renovations Budget provided that the following conditions with respect to each advance for the Other Franchise PIP Work and Cycle Renovations, respectively, under the DIP Facility have been satisfied: (a) no Event of Default shall have occurred, (b) all previous advances made by the DIP Lender with respect to the Other Franchise PIP Work or the Cycle Renovations, as applicable, shall have been fully disbursed to Borrower and Borrower shall have fully expended such amounts in accordance with the PIP Budget or the Cycle Renovations Budget, respectively, (c) Borrower shall have submitted a written request to the DIP Lender for such advance at least thirty (30) days prior to the date on which Borrower requests that such advance be funded to the Controlled Disbursement Account, which request shall set forth in reasonable detail the Other Franchise PIP Work or Cycle Renovations, as applicable, to be paid in accordance with the PIP Budget or the Cycle Renovations Budget, respectively, (d) the amount of the advance requested by Borrower pursuant to the Other Franchise PIP Budget or the Cycle Renovations Budget, as applicable, shall not exceed the remaining unfunded commitment by the DIP Lender under the DIP Facility with respect to the Other Franchise Work or the Cycle Renovations, respectively and (e) Borrower shall have otherwise satisfied all conditions necessary for funds to be disbursed from the Controlled Disbursement Account pursuant to the DIP Facility.

**Priority Claim:**    Amounts owed by the Borrower to the DIP Lender pursuant to the DIP Facility, including all accrued interest, fees, costs and expenses, shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a super-priority administrative claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code.

**Collateral Security:**    Without any limitation whatsoever, the DIP Facility, including accrued interest, principal, costs and expenses, shall be secured on a super-priority basis in accordance

with sections 364(c)(2) and (d) of the Bankruptcy Code by first priority, senior secured and priming liens on and security interests in (i) all of the Borrower's real property (including the improvements thereon and all furniture, fixtures and equipment used in connection therewith) and the proceeds thereof that secure the Existing Loan, subject only to prepetition liens and other permitted liens to be agreed in the DIP Loan Agreement (the "*Permitted Liens*"), (ii) the Controlled Disbursement Account, the amounts on deposit from time to time therein and the proceeds thereof, and (iii) all chapter 5 causes of action that relate to the Lehman Properties.

**Lien Validation and Perfection:**

All liens authorized and granted pursuant to the DIP Facility shall be deemed effective and perfected as of the Petition Date, and no further notice or act will be required to effect such perfection.

**DIP Facility Documentation:**

The DIP Facility shall be subject to the negotiation, execution and delivery of a definitive DIP Loan Agreement, an account control agreement relating to the Controlled Disbursement Account and related loan documents and other supporting instruments and agreements (collectively, the "*DIP Facility Documentation*") embodying the terms set forth herein mutually acceptable to the Borrower and DIP Lender. Entering into mortgages and other security documents and filings (and obtaining policies of mortgagee title insurance reasonably acceptable to the DIP Lender) shall not be a condition precedent to the Closing Date; provided that, following the occurrence of the Closing Date, the DIP Lender (at the sole cost and expense of Borrower) may require that some or all of the Borrowers enter into mortgages and other security documents and filings (and execute and deliver customary affidavits to the applicable title companies in order to permit the issuance of policies of mortgagee title insurance and customary endorsements thereto reasonably acceptable to the DIP Lender) which the DIP Lender deems reasonably necessary for the continued perfection of the DIP Lender's security interests under the DIP Facility. Notwithstanding the foregoing, the DIP Lender may record and/or file the Final Order in the land records and/or in such other places as may be determined by DIP Lender (although the same shall not be a condition precedent to the Closing Date, all costs and expenses incurred by the DIP Lender in connection with such

recordation and/or filing of the Final Order shall be borne exclusively by the Borrower).

**Fees and Expenses:**

Borrower will pay (i) all documented fees and out-of-pocket expenses of one counsel and financial advisor for the DIP Lender relating to the DIP Facility and the administration and interpretation of the DIP Facility, (ii) all documented out-of-pocket due-diligence expenses of the DIP Lender in connection with the DIP Facility, including but not limited to environmental and tax due diligence, duplication expenses, consultation, travel and attendance at court hearings, and inspections of the Lehman Properties in connection with disbursements from the Controlled Disbursement Account and (iii) other documented out-of-pocket fees and expenses of the DIP Lender in connection with the DIP Facility, in each case, whether or not the DIP Facility is consummated (other than as a result of the DIP Lender failure or refusal to consummate the DIP Facility on the terms set forth herein).

**Audits and Appraisals:**

The Borrower shall allow the DIP Lender (through its officers, senior employees, or agents and advisors) from time to time at the Borrower's expense to periodically inspect and audit the books, records and account statements of the Borrower in order to confirm the Borrower's compliance with the PIP Budget and the Cycle Renovations Budget and the terms and provisions of the DIP Facility Documentation (including, without limitation, in order to verify that funds are being used in accordance with the PIP Budget and the Cycle Renovations Budget); provided that, to the extent that the Termination Date shall not have occurred and there shall exist no Event of Default (or event which would constitute an Event of Default or cause the Termination Date to occur with the giving of notice or lapse of time), any such inspections and audits shall (x) be conducted only if the DIP Lender deems it reasonably necessary, and (y) occur during normal business hours and upon reasonable notice to the Borrower.

**Conditions Precedent:**

The closing of the DIP Facility shall be subject to the DIP Facility Documentation and the Final Order each being acceptable to the DIP Lender.

The closing of the DIP Facility shall also be subject to the condition that no Termination Event or Event of Default shall have occurred and shall be continuing and such other conditions precedent customary and appropriate for

financings of this type, including, but not limited to, (a) satisfaction of all conditions to be set forth in the DIP Facility Documentation, (b) delivery of (i) the PIP Budget and the Cycle Renovations Budget in form and substance satisfactory to the DIP Lender (after consultation with its advisors), each of which shall include the items set forth in the "*Use of Proceeds*" section of the Term Sheet and shall be acceptable to the applicable franchisors, (ii) the Adequate Assurance Agreement (including with respect to the timeline and performance milestones for completion of the Marriott PIP Work) in form and substance satisfactory to the DIP Lender after consultant with its advisors (it being understood and agreed that the draft Adequate Assurances Agreement provided to the DIP Lender on July 14, 2010 is satisfactory to the DIP Lender), (iii) a thirteen (13)-week cash flow projection and (iv) such other financial information with respect to the Borrower delivered (or required to be delivered) to Lehman ALI Inc. in its capacity as lender under the Existing Loan (collectively, the "*Required Financial Information*"), (c) delivery of updated title searches, lien searches and updated so-called "phase 1" environmental reports (and if recommended by the DIP Lender's environmental consultant or otherwise obtained at the closing of the Existing Loan, delivery of new or updated so-called "phase 2" environmental reports), which updated title searches, lien searches and updated "phase 1" (and, if applicable, updated or new "phase 2") environmental reports are, in each case, acceptable to DIP Lender, (d) entry of a Final Order approving the DIP Facility, its senior, first priority, priming liens, super-priority status and all liens securing the DIP Facility and containing such other orders and findings as DIP Lender may reasonably request which Final Order shall not have been modified or amended without approval of the same, and shall not have been reversed or stayed pending appeal, in form and substance satisfactory to the same, (e) the payment of all fees and expenses in accordance with the caption "Fees and Expenses" above, (f) there shall have occurred no material adverse change in the applicable Borrower(s) financial condition, results of operations or properties (which for the avoidance of doubt shall mean all of the Borrowers and properties applicable to the DIP Facility) constituting collateral under the DIP Facility (other than the commencement of the Chapter 11 Case or otherwise in connection therewith) since the date of this Term Sheet that in the reasonable judgment of the DIP

Lender have or would reasonably be expected to have a material adverse effect on the rights and remedies of the DIP Lender or on the ability of the Borrower to perform its respective obligations to them, (g) the representations and warranties contained in the DIP Facility Documentation shall be true and correct in all material respects (except to the extent that any such representations and warranties relate to an earlier date, in which case they shall be true and correct as of such earlier date), (h) the DIP Lender shall have received bankruptcy court approval in the bankruptcy case of Lehman Commercial Paper Inc. to enter into the DIP Facility and (i) the DIP Lender shall have received the approval of the Official Committee of Unsecured Creditors in the bankruptcy case of Lehman Commercial Paper Inc. to enter into the DIP Facility (which approval the DIP Lender will seek to obtain as soon as practicable).

**Affirmative and Negative Covenants:**

Affirmative and negative covenants similar to the type contained in the Existing Loan Agreement (and the other loan documents entered into in connection therewith) to the extent such covenants are customarily included in debtor-in-possession financing agreements, including, but not limited to, (a) delivery to the DIP Lender, on a weekly basis, of a rolling 13 week cash flow projections (together with a comparison of actual payments to budgeted line items for the prior weekly period) of the debtors under the Chapter 11 Case, (b) restrictions on sales of goods and services out of the ordinary course of business (including that all sales, including sales of any hotel properties, shall be on an arm's-length basis to bona fide third-party purchasers and shall be acceptable to the DIP Lender), (c) delivery of the Required Financial Information, (d) use of proceeds solely in accordance with the PIP Budget and the Cycle Renovations Budget, (e) performance and completion by the Borrower of the Marriott PIP Work and the Other Franchise PIP Work in accordance with the PIP Budget and the Adequate Assurance Agreement (including the timeline for the Marriott PIP Work set forth therein) and the performance and completion by the Borrower of the Cycle Renovations in accordance with the Cycle Renovations Budget, (f) unless such action has otherwise been approved by the DIP Lender, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify or terminate a franchise agreement or enter into a new franchise agreement upon any hotel that constitutes collateral for the DIP Facility, (g) unless such action has

otherwise been approved by the DIP Lender, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify or enter into a new PIP with respect to any hotel that constitutes collateral for the DIP Facility, (h) unless such action has otherwise been approved by the DIP Lender, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify or enter into a new Cycle Renovation with respect to any hotel that constitutes collateral for the DIP Facility, (i) unless such action has otherwise been approved by the DIP Lender, no Borrower shall (or shall attempt or seek Bankruptcy Court approval to) modify, terminate or replace the Adequate Assurance Agreement (provided that the Adequate Assurance Agreement may be extended for a period not to exceed 60 days without such approval by the DIP Lender provided that the Adequate Assurance Agreement is not otherwise modified in connection with such extension) and (j) Borrower shall use commercially reasonable efforts to deliver to the DIP Lender so-called "comfort letters" in form and substance reasonably acceptable to the DIP Lender from franchisors (which "comfort letters" shall provide, among other things, that such franchisors will recognize the performance by DIP Lender of the obligations of the Borrower thereunder, including completion of the Marriott PIP Work, the Other Franchise PIP Work and the Cycle Renovations, and that such franchisors will otherwise accept the cure by DIP Lender of defaults by the Borrower thereunder).

**Representations and Warranties:**

The documentation for the DIP Facility shall contain representations and warranties similar to the type contained in the Existing Loan Agreements, but modified to include those customary in the context of the proposed DIP Facility.

**Remedies:**

Upon the Termination Date or the occurrence of an Event of Default, the DIP Lender shall have customary remedies, including, without limitation, (i) the right to realize on all Collateral securing the DIP Facility and the right to exercise any remedy available under the DIP Facility and applicable law (including, without limitation, the right (but not the obligation) to complete the Marriott PIP Work, the Other Franchise PIP Work and the Cycle Renovations and to apply any of the proceeds of the DIP Facility on account thereof) and (ii) any remedies (but not the termination or related events themselves) set forth in any cash collateral order entered by the Bankruptcy Court in the event that

there is an event of default under such cash collateral order, without the necessity of obtaining any further relief or order from the Bankruptcy Court. Automatic Section 362 relief from the stay in favor of the DIP Lender shall be embodied in any order approving the DIP Facility; provided, that DIP Lender shall provide the Borrower with 5 days prior notice of its intent to lift the stay, with a copy of such notice to counsel for the Committee.

**Right to Credit Bid:**

Upon entry of a Final Order approving the DIP Facility, the DIP Lender shall have the right to credit-bid the amount of claims of the DIP Facility during a sale of all or substantially all assets of the Borrowers and their debtor affiliates in the chapter 11 cases (collectively, the "*Debtors*") which assets constitute collateral for the DIP Facility, including without limitation, a sale occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

**Events of Default:**

Events of Default limited to the following:

- The Chapter 11 Case shall be converted to cases under Chapter 7 of the Bankruptcy Code or be dismissed.

- Filing or support of a proposed plan of reorganization by any Borrower or any affiliate of the Borrower that does not provide for the payment in full and in cash of such Borrower's obligations outstanding under the DIP Facility on the effective date of such plan of reorganization, unless otherwise consented to by the DIP Lender.

- Entry of a final order confirming a plan of reorganization that does not require repayment in full in cash of the DIP Facility as of the effective date of the plan, unless otherwise consented to by the DIP Lender.

- Appointment of a trustee under Section 1104 of the Bankruptcy Code.

- Other than at the request of the DIP Lender, the appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code.

- Entry of a final order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility.

- Any attempt by any Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair the DIP Lender's claims or collateral security under the DIP Facility (including the filing of any motion by any Borrower to (i) obtain financing from any person or entity other than the DIP Lender (x) under Section 364(d) of the Bankruptcy Code, (y) under Section 364(c) of the Bankruptcy Code or (z) with respect to the existence of any charge, in each case which is or which is claimed to be senior to or pari passu with the super-priority of the claims or charges of the DIP Lender (in each of cases (x), (y) and (z), other than with respect to financing used, in whole or part, to repay in full the DIP Loan) or (ii) except for the Permitted Liens, grant or suffer to exist any other lien or charge upon or affecting the collateral for the DIP Loan), or to subject the DIP Lender's collateral under the DIP Facility to any surcharge pursuant to Section 506(c) of the Bankruptcy Code.

- Marriott or the other applicable franchisor terminates the franchise agreement (or otherwise has the right to so terminate such franchise agreement and has taken affirmative steps in such regard (including but not limited to proper delivery of notice of intent to terminate)) upon any hotel owned by any Borrower constituting collateral with respect to the DIP Facility.

- Any Borrower supports a request of any party in interest to surcharge collateral of the Pre-Petition Collateral or Post-Petition Collateral that constitutes collateral with respect to the DIP Facility, for any expense.

- Expenditure of any DIP Loan proceeds in a manner or upon a property or project for which it had not been approved; provided that, with respect to any expenditure in violation of the foregoing which was inadvertent and does not exceed $25,000, the Borrower shall have the right to cure the same (but on not more

than one occasion per calendar month) within five (5) business days following any such expenditure.

- Any Borrower shall apply for an order substituting any assets for all or any portion of the Post-Petition Collateral that constitutes collateral with respect to the DIP Facility, except as provided in the instruments evidencing and governing the Existing Loan Agreements and DIP Facility.

- Failure to make all payments under the DIP Facility when due.

- Failure to pay any undisputed, material post-petition taxes or indebtedness.

- Any Cycle Renovations Variance beyond the Cycle Renovations Budget with respect to any property.

  "**Cycle Renovations Variance**" means costs and expenses for completing specific Cycle Renovations at the Lehman Properties owned by Grand Prix Bulfinch LLC and KPA/GP Louisville (HI) LLC as of any date of determination, which costs and expenses exceed the line item for such Cycle Renovations set forth in the Cycle Renovations Budget for such hotel property as of such date (either on an actual spend or on a projected basis).

- Any Variance with respect to any hotel property constituting collateral for the DIP Facility; provided that, any such Variance that does not exceed 10% on a line-item basis shall not constitute an Event of Default hereunder so long as (a) with respect to the PIP Property Group that includes such hotel property, the Borrower has not, in the aggregate, spent more (and is not, in the aggregate, projected to spend more) in respect of completing the Marriott PIP Work and/or the Other Franchise PIP Work with respect to all hotel properties in such PIP Property Group than the amount, in the aggregate, budgeted therefor in the PIP Budgets for such hotel properties and (b) such Variance is fully compensated for by a combination of (i) applying the remaining unallocated portion of the contingency line item set forth in the PIP Budget for such hotel property (but in no event to exceed an amount thereof equal to the Maximum Contingency Amount), (ii) reallocating

any unused portion of the PIP Budget for any of the other hotel properties in such hotel property's PIP Property Group for which the Marriott PIP Work and/or the Other Franchise PIP Work has been fully completed and accepted by the applicable franchisor (i.e., not subject to "punch-list" items) in accordance with the applicable franchise agreement and the Adequate Assurance Agreement and approved by the DIP Lender pursuant to the terms and conditions of the DIP Facility and for which complete and final invoices have been submitted by the applicable contractors and fully paid, and (iii) identified and documented savings from budgeted amounts to complete the Marriott PIP Work and/or the Other Franchise PIP Work for any hotel property in such hotel property's PIP Property Group.

"**Maximum Contingency Amount**" means, with respect to any hotel property as of any date of determination, the percentage of the Marriott PIP Work or Other Franchise PIP Work, as applicable, with respect to such hotel property which has been completed as of such date <u>multiplied</u> by the remaining unallocated portion of the contingency line item set forth in the PIP Budget for such hotel property.

"**PIP Property Group**" means, with respect to any hotel property, such hotel property together with one or more other hotel properties (but in no event to exceed 3 such hotel properties in the aggregate) with respect to which the Borrower is then-engaged in Marriott PIP Work and/or Other Franchise PIP Work or have completed Marriott PIP Work and/or Other Franchise PIP Work and which have been designated by the Borrower and reasonably approved by the DIP Lender as a "PIP Property Group".

"**Variance**" means costs and expenses for completing specific Marriott PIP Work or Other Franchise PIP Work, as applicable at any hotel property as of any date of determination, which costs and expenses exceed the line item for such Marriott PIP Work or Other Franchise PIP Work, as applicable set forth in the PIP Budget for such hotel property as of such date (either on an actual spend or on a projected basis).

- Any breach of any covenant of the DIP Facility beyond any applicable grace periods.

- In the event any of the DIP Facility Documentation giving rise to any effective lien or security interest in any collateral for the DIP Loan (including, without limitation, the account control agreement relating to the Controlled Disbursement Account) shall cease to create a valid and perfected lien on and security interest in the collateral purported to be covered thereby.

- Any representation or warranty in the DIP Facility was incorrect or misleading in any material respect when made.

- Any sale of the Lehman Properties without the DIP Lender's consent.

- Any default under any other debtor-in-possession financings.

- Any other events of default as are usual and customary for financings of this kind, and consistent with the events of default contained in the Existing Loan Agreement (as modified to take account of the current financial condition of the Borrower).

| | |
|---|---|
| **Governing Law:** | New York |
| **Chapter 11 Cases:** | Venue for the chapter 11 Cases shall be in the Southern District of New York. |
| **Miscellaneous:** | Release and Waiver by any Borrower of any claims against the DIP Lender under the DIP Facility under Section 510 of the Bankruptcy Code. |
| | Waiver by any Borrower of any rights to assert claims arising under applicable law against the DIP Lender (or related to the DIP Facility). |
| | DIP Lender shall at all times act pursuant to the DIP Loan Agreement. |
| **Indemnification:** | The Borrower shall indemnify and hold the DIP Lender and its respective officers, directors, employees and agents (including all of their professionals) (each an "***Indemnified Party***") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all reasonable fees and disbursements of attorneys and other professionals) to which any |

Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with the DIP Facility, the DIP Facility Documentation, any *"Obligation"* under the DIP Loan Agreement or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

**Other Definitions:**

*"Adequate Assurance Agreement"* means that certain agreement (or, if more than one, those certain agreements, collectively) between the Borrower and Marriott providing for the forbearance of the exercise of remedies by the applicable franchisor under its franchise agreement in respect of the Marriott PIP Work, including a timeline and performance milestones for completion of the Marriott PIP Work and certain other matters as more fully set forth therein.

*"Bankruptcy Code"* means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended.

*"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York.

*"Chapter 11 Case"* means, collectively, the cases filed by the Borrower under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

*"Committee"* means any official committee of the unsecured creditors appointed pursuant Section 1102 of the Bankruptcy Code in Borrower's bankruptcy case.

*"Cycle Renovations"* means the construction, labor and materials necessary to renovate the Lehman Properties owned by Grand Prix Bulfinch LLC and KPA/GP Louisville (HI) LLC, which renovation plans are in scope, form and substance reasonably acceptable to the DIP Lender.

*"Cycle Renovations Budget"* means the budget setting forth the projected expenditures for funding the Cycle Renovations, in form and substance reasonably acceptable to the DIP Lender (after consultant with its advisors).

"*Final Order*" means a final order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, provides (in addition to the rights and benefits afforded to the lenders under the so-called "comfort letters" obtained in connection with the origination of the Existing Loan) that the applicable franchisors shall recognize the performance by the DIP Lender of the obligations of the Borrower under the applicable PIPs (including the completion of the Marriott PIP Work, the Other Franchise PIP Work and Cycle Renovations and that such franchisors will otherwise accept the cure by the DIP Lender of defaults of the Borrower thereunder), is in recordable form, provides that it cannot be vacated, dismissed or converted unless the DIP Facility and all amounts due and owing thereunder have been fully paid, which order is not stayed.

"*Marriott PIP Work*" means the construction, labor and materials necessary to satisfy Marriott that each of the requirements of each of the PIPs has been satisfied, as identified and reasonably approved by the DIP Lender.

"*Other Franchise PIP Work*" means the construction, labor and materials necessary to satisfy each applicable franchisor (other than Marriott) that each of the requirements of each of the PIPs has been satisfied, as identified and reasonably approved by the DIP Lender.

"*Petition Date*" means the date of filing of the Chapter 11 Case.

"*PIP*" means the Property Improvement Plans included within and a made a part of the Franchise Agreements covering certain of the hotel properties owned by the Borrower, which Property Improvement Plans shall have been approved by Marriott or any other applicable franchisor, and shall have been received and reasonably approved by the DIP Lender, unless such Property Improvement Plans have been previously approved by the DIP Lender in accordance with the terms and conditions of the Existing Loan Agreement.

"*PIP Budget*" means, collectively, (i) the existing PIP budget prepared by Borrower and approved by the DIP Lender, which PIP budget is attached and made a part of the Existing Loan Agreement, as adjusted to account for funds previously disbursed to Borrower for the Marriott

PIP Work and the Other Franchise PIP Work in accordance with the terms and conditions of the Existing Loan Agreement and (ii) the budget setting forth the projected expenditures for funding the Mod 14 work at the Lehman Properties owned by Grand Prix Ontario LLC, Grand Prix Troy (SE) LLC, Grand Prix Troy (Central) LLC and Grand Prix Harrisburg LLC, in form and substance reasonably acceptable to the DIP Lender (after consultation with its advisors).

**<u>Exhibit D</u>**

**(AIC Term Sheet)**

Confidential

## TERM SHEET
## (Lehman/AIC)

### July 19, 2010

*This term sheet ("<u>Term Sheet</u>") is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 for the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.*

**THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF INNKEEPERS USA TRUST OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS, IF ANY, AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

| | |
|---|---|
| Seller: | Lehman ALI Inc. ("<u>Lehman</u>"). |
| Acquirer: | Apollo Investment Corporation ("<u>AIC</u>"). |
| | AIC may not assign any or all of its rights or delegate any or all of its obligations under this Term Sheet without the express written consent of Lehman (which consent may be withheld in Lehman's sole discretion). |
| Description of Transaction: | Following the confirmation by the Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") of the prearranged plan (the "<u>Plan</u>") of reorganization of Innkeepers USA Trust ("<u>Innkeepers</u>" or the "<u>Company</u>") as described in the term sheet, dated as of July 17, 2010, by and between Lehman and the Company, and attached hereto as <u>Annex A</u> (the "<u>Lehman-Innkeepers Term Sheet</u>") and prior to the effective date of the Plan (the "<u>Effective Date</u>"), Lehman and AIC will enter into an agreement (the "<u>Stock Purchase Agreement</u>") whereby Lehman will agree to sell to AIC and AIC will agree to purchase from Lehman the right to receive 50% of the equity in the Company, subject to dilution as set forth in the Lehman-Innkeepers Term Sheet, that Lehman receives in connection with consummation of the Plan (such 50%, the "<u>Transferred Equity</u>") in exchange for cash in an amount equal to $107.5 million (the "<u>Sale Proceeds</u>") payable upon the closing of the transactions contemplated by the Stock Purchase Agreement. In the event the transfer tax exception under § 1146(a) of the Bankruptcy Code is determined by the Bankruptcy Court to be inapplicable, AIC and Lehman will |

cooperate to structure the sale of the Transferred Equity in a manner that will not incur transfer taxes; <u>provided</u>, <u>however</u>, that in the event such taxes are incurred as a result of the sale, AIC shall be responsible for payment of such taxes in addition to the Sale Proceeds.

| | |
|---|---|
| Distribution of Innkeepers Equity: | After giving effect to the sale of Transferred Equity described above, the equity in the reorganized Company (the "<u>New Equity</u>") will be held as follows: |

- 50% by Lehman; and

- 50% by AIC;

- Subject to *pro rata* dilution of 3%, which shall be available for distribution to the Company's management under the Plan pursuant to a Management Equity Incentive Program on the terms provided in the Lehman-Innkeepers Term Sheet.

| | |
|---|---|
| Conditions to Execution of Stock Purchase Agreement: | The execution of the Stock Purchase Agreement and the consummation of a transaction on the terms described herein will be subject to the satisfaction or waiver by Lehman or AIC, as applicable, (in each case in such party's sole discretion) of the following conditions: |

- approval of the Bankruptcy Court of a plan support agreement executed by Lehman and the Company as contemplated by the Lehman-Innkeepers Term Sheet;

- receipt by AIC and Lehman of all necessary final internal approvals to consummate the transaction (which may be withheld (for any reason or no reason) in their sole discretion) by September 2, 2010, including, without limitation, final approval by AIC's Investment Committee and final approval of the UCC and the United States Bankruptcy Court administering the Chapter 11 case of LBHI by such date; and

- the negotiation, execution and delivery of definitive documents reflecting the terms set forth in this Term Sheet and containing other terms and conditions mutually acceptable to

2

AIC and Lehman, including, but not limited to, terms customary for transactions of this type.

Conditions to Closing:

The consummation of a transaction on the terms described herein will be subject to the satisfaction or waiver by Lehman or AIC, as applicable, (in each case in such party's sole discretion) of customary closing conditions including, without limitation, the following:

- the consummation of the proposed restructuring transaction between Lehman and Innkeepers on the terms and as contemplated by the Lehman-Innkeepers Term Sheet;

- the reorganized Company will have the *pro forma* capitalization structure contemplated by the Lehman-Innkeepers Term Sheet; and

- completion of third party and regulatory notices and receipt of all necessary and material consents and waivers.

So long as the Letter Agreement has not been terminated, during the pendency of Innkeepers' chapter 11 cases, Lehman shall not object, directly or indirectly, to (a) Innkeepers' performance of the primary obligations underlying the Required Capital Improvements Guaranty, dated as of June 29, 2007 (the "Guaranty") so long as such obligations are exclusively limited to the non-immediate property improvement plan ("PIP") obligations in the properties which constitute the Fixed Rate Collateral (as such term is defined in the Lehman-Innkeepers Term Sheet) (the "Fixed Rate Pool") and such obligations are paid solely with funds available under the Fixed Rate DIP Facility (as such term is defined in the Lehman-Innkeepers Term Sheet) or cash collateral generated from the Fixed Rate Pool, and (b) the settlement or termination of the Guaranty so long as such settlement or termination occurs at least 45 days after the date Innkeepers commences its chapter 11 cases (the "Petition Date").

So long as the Letter Agreement has not been terminated and AIC is at least a 25% owner of reorganized Innkeepers, subject to dilution as provided in the Lehman-Innkeepers Term Sheet, Lehman and AIC shall authorize reorganized Innkeepers to agree that any (a) non-immediate PIP obligations in the Fixed Rate Pool described in Schedule XI to the related loan agreement that were not satisfied before or during the chapter

3

11 cases and (b) discretionary capital expenditures as set forth in <u>Annex B</u> attached hereto will be funded from the proceeds of the Exit Funding (as such term is defined in the Lehman-Innkeepers Term Sheet) or excess cash flow after payment of all property level expenses, FF&E reserves, debt obligations, corporate G&A, and working capital holdbacks as reasonably determined by reorganized Innkeepers.

Termination Events:    Upon the occurrence of any of the following events (each, a "<u>Termination Event</u>"), the Letter Agreement, dated as of July 17, 2010, by and between Lehman and AIC (the "<u>Letter Agreement</u>") and any Stock Purchase Agreement shall be terminable by either Lehman or AIC, and shall terminate upon five (5) business days' written notice of such Termination Event by the terminating party to the other party:

- upon the occurrence of any Termination Event described in the Lehman-Innkeepers Term Sheet;

- upon the waiver, modification or amendment of any material term, condition or provision of the Lehman-Innkeepers Term Sheet, or the definitive documents (including the Plan) implementing the same, in a manner not acceptable to Lehman or AIC;

- any material extension of the period of time to achieve the Plan Milestones set forth in the Lehman-Innkeepers Terms Sheet;

- if AIC seeks but does not obtain the approval of its Investment Committee within 45 days after the Petition Date;

- if Lehman seeks but does not obtain the approval of the UCC or the United States Bankruptcy Court administering the Chapter 11 case of LBHI within 45 days after the Petition Date; or

- upon the occurrence of any event that would make the fulfillment of any conditions set forth under "Conditions to Closing" or "Conditions to Execution of the Stock Purchase Agreement" of this Term Sheet impossible by April 15, 2011.

4

| Governance: | Notwithstanding the foregoing, the Letter Agreement and any Stock Purchase Agreement shall be terminable by either Lehman or AIC (for any reason or no reason in such party's sole discretion) at any time prior to September 2, 2010. The board of directors of the Company will initially consist of 7 members: 2 members nominated by Lehman, 2 members nominated by AIC and 3 members to be mutually agreed. |
|---|---|

A super-majority vote of 66 2/3% will be required for material transactions, including, among others, a merger or consolidation, equity issuances, debt issuances in excess of $10 million in the aggregate, sale or disposal of a property and such other events as determined by Lehman, AIC and the Company.

Lehman and AIC shall agree on a future date by which the Company shall engage an investment banker to market and sell the Company; provided, that such date shall not be later than three years after the Effective Date unless otherwise agreed by Lehman and AIC.

Other usual and customary terms, subject to mutual agreement between Lehman and AIC.

| Shareholders Agreement: | The Plan shall provide that, on the Effective Date, Lehman, AIC and all other holders of New Equity to be issued pursuant to the Plan shall enter into a shareholders agreement that provides, among other things, for restrictions on the transfer of the New Equity and customary protections, including, but not limited to, tag-along/drag-along rights, all on terms to be mutually agreed between Lehman and AIC. |
|---|---|
| REIT Status: | Lehman and AIC shall, prior to the Effective Date, determine whether to maintain Innkeepers' status as a real estate investment trust. |
| Property Manager: | Prior to the Effective Date, Lehman and AIC shall designate a manager for the Company's properties. |
| Professional Fees: | The Company shall reimburse AIC for fees and expenses of one counsel; provided that the transactions contemplated by the Stock Purchase Agreement are consummated. |
| Governing Law: | This Term Sheet and all agreements entered into pursuant thereto shall be governed by New York law with jurisdiction in the courts in New York. |

5

**<u>Annex A</u>**

**(Proposed Order)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :        08-13555 (JMP)
                                          :
                    Debtors.              :        (Jointly Administered)
                                          :
-----------------------------------------------------------------x
```

**ORDER PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE
GRANTING AUTHORITY TO LCPI TO (I) CONSENT TO ITS
NON-DEBTOR AFFILIATE LEHMAN ALI, INC.'S (A) ENTRY INTO
PLAN SUPPORT AGREEMENT RELATED TO RESTUCTURING OF
INNKEEPERS USA TRUST AND (B) CONSUMMATION OF THE
TRANSACTIONS SET FORTH IN THE PLAN TERM SHEET AND
(II) PROVIDE FUNDS TO SOLAR FINANCE INC., A NON-DEBTOR
AFFILIATE, TO PROVIDE DEBTOR-IN-POSSESSION FINANCING**

Upon the motion, dated July 27, 2010 (the "Motion"), of Lehman

Commercial Paper Inc. ("LCPI"), as debtor in possession (together with its affiliated

debtors in the above-referenced chapter 11 cases, the "Debtors"), for an order pursuant to

section 363 of title 11 of the United States Code (the "Bankruptcy Code") authorizing

LCPI to (I) consent to Lehman ALI, Inc.'s ("ALI"), a non-Debtor affiliate of LCPI, (A)

entry into a plan support agreement related to the proposed restructuring of Innkeepers

USA Trust (together with its affiliates, "Innkeepers") and (B) consummation of the

transactions set forth in the plan term sheet attached thereto and (II) provide funds to

Solar Finance Inc., its non-Debtor affiliate for the purposes of extending debtor in

possession financing to Innkeepers (the "DIP Facility"), all as more fully described in the

Motion (the "Transaction"); and the Court having jurisdiction to consider the Motion and

the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the

Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New

York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.);

and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28

U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided

in accordance with the procedures set forth in the second amended order entered June 17,

2010 governing case management and administrative procedures [Docket No. 9635]; and

the Court having found and determined that the relief sought in the Motion is in the best

interests of LCPI, its estate and creditors, and all parties in interest and that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that LCPI is authorized and empowered to consent to ALI's

entry into the Plan Support Agreement and consummation of the transactions

contemplated thereby; and it is further

ORDERED that ALI is authorized and empowered to execute, deliver,

implement, and perform any and all obligations, instruments, documents and papers, and

to take any and all corporate and other actions that may be necessary or appropriate to

enter into the Plan Support Agreement, the Plan Term Sheet, and all other related

documents; and it is further

ORDERED that ALI is authorized and empowered to execute, deliver,

implement, and perform any and all obligations, instruments, documents and papers, and

to take any and all corporate and other actions that may be necessary or appropriate to

consummate the transactions set forth in the Plan Support Agreement, Plan Term Sheet

and all other related agreements, which include the conversion of debt to equity (the

"New Equity") and the sale of 50% of the New Equity for a price not less than $107.5

million; and it is further

ORDERED that LCPI is authorized and empowered to loan up to

approximately $17.5 million to LCPI's non-Debtor affiliate Solar Finance Inc. for the

purposes of Solar extending the DIP Facility; and it is further

ORDERED that no further Court approval shall be required in connection

with any modification of the terms and conditions of the Transaction so long as (a) the

Transaction includes a conversion of debt to New Equity and the sale of 50% of the New

Equity for a price not less than $107.5 million, (b) the amount advanced by LCPI for the

purposes of Solar extending the DIP Facility not exceeding $17.5 million, and (c) the

Debtors have obtained the approval of the Official Committee of Unsecured Creditors to

such modifications; and it is further

ORDERED that the automatic stay in LCPI's chapter 11 case is modified

to the extent necessary to permit Innkeepers, ALI, and LCPI to take any or all of the

actions permitted by the terms and conditions of the Plan Support Agreement, Plan Term

Sheet, DIP Facility and all related agreements; and it is further

ORDERED that this Order shall not be deemed to modify or amend any

terms and conditions of the Plan Support Agreement, Plan Term Sheet, DIP Facility and

all related documents; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed

good and sufficient notice of such Motion; and it is further

ORDERED that nothing contained in the Motion or this Order shall be deemed to be a waiver or the relinquishment of any rights, claims, interests, obligations, benefits, or remedies of LCPI, or any of the Debtors or their non-debtor affiliates, that any of the Debtors or non-debtor affiliates may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including against each other or third parties.  It is further ordered that the parties are authorized to execute such further documentation necessary to reflect this reservation of rights; and it is further

ORDERED that Debtors are authorized to comply with each provision of the Plan Support Agreement; and it further

ORDERED that this Court shall retain jurisdiction over this order, but that the Bankruptcy Court presiding over the chapter 11 cases of Innkeepers and not this Court shall have exclusive jurisdiction with respect to any matter under or arising out of or in connection with the Plan Support Agreement or the Transaction (as defined in the Plan Support Agreement) contemplated therein.

Dated: August __, 2010
       New York, New York

_____
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE