**Hearing Date and Time: August 18, 2010 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline:  August 11, 2010 at 4:00 p.m. (Prevailing Eastern Time)**

Weil, Gotshal & Manges LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------------x

### NOTICE OF DEBTORS' MOTION PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE FOR AN ORDER (i) ALLOWING LCPI TO ACQUIRE CERTAIN LOANS THROUGH A JOINT VENTURE AND (ii) AUTHORIZING LCPI AND LBHI TO PROVIDE GAP FUNDING THROUGH A TERM LOAN, REVOLVER, AND PREFERRED EQUITY INVESTMENT

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, including Lehman Commercial Paper Inc. ("LCPI") in the above-referenced chapter 11 cases (together, the "Debtors") for an order allowing LCPI to acquire certain loans through a joint venture and authorizing LCPI and LBHI to provide funding to the Sun and Moon project through a term loan, revolver, and preferred equity investment, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **August 18, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Alfredo R. Pérez, Esq. and Maurice Horwitz, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; and (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases, so as to be so filed and received by no later than **August 11, 2010 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: July 27, 2010
      Houston, Texas

/s/ Alfredo R. Pérez
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

Weil, Gotshal & Manges LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO SECTION 363**
**OF THE BANKRUPTCY CODE FOR AN ORDER (i) ALLOWING LCPI**
**TO ACQUIRE CERTAIN LOANS THROUGH A JOINT VENTURE AND (ii)**
**AUTHORIZING LCPI AND LBHI TO PROVIDE GAP FUNDING**
**THROUGH A TERM LOAN, REVOLVER, AND PREFERRED EQUITY INVESTMENT**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, including Lehman Commercial Paper Inc. ("LCPI"), as debtors and

debtors in possession (together, the "Debtors"), file this Motion and respectfully represent:

**Preliminary Statement**

        1.      On January 14, 2010, this Court entered an order [Docket No. 6665] (the

"Bankhaus Order") approving a transaction (the "Bankhaus Agreement") between LBHI, LCPI,

and Lehman ALI Inc., on the one hand (together, the "Lehman Parties"), and Dr. Michael C.

Frege in his capacity as Insolvency Administrator (*Insolvenzverwalter*) (the "LBB InsAdmin") of

Lehman Brothers Bankhaus AG (In Insolvenz) ("Bankhaus"), on the other hand, pursuant to which the Lehman Parties were authorized to purchase, *inter alia*, Bankhaus's interest in certain loans where Bankhaus is the lender of record.  (A copy of the Bankhaus Agreement is attached hereto as "Exhibit A.")  Included among these loans were two commercial and residential real estate loans described as "M-Loans" (Bankhaus Agreement § 2.b(1)(iii)) that comprise the senior debt in a project known as "Sun and Moon," in which LBHI owns an 8.9% equity interest, and LBREP III Europe S.à r.l. SICAR ("LBREP"), a Luxembourg investment company, owns an 86.1% equity interest.  It was contemplated under the Bankhaus Agreement that LCPI, as the participant with respect to the "M-Loans," would purchase Bankhaus's right, title and interest therein, and that such loans would be assigned to an entity "to be determined,"[1] as LCPI has contemplated that the ultimate transferee of such loans would be a joint venture entity in which LCPI and LBREP were shareholders (the "JV Transferee").

2.      Located in the center of Marseille, France, the Sun and Moon project consists of 634 residential units (mostly 2 and 4 bedroom apartments) totaling approximately 529,132 square feet (the "Sun" portfolio)[2] and 197 commercial units split into 14 different blocks and totaling approximately 549,594 square feet (the "Moon" portfolio).  The Debtors believe that maximizing the value of the Sun and Moon project depends upon the refurbishment of Sun and Moon's underlying assets, which due to neglect, are now in a state of disrepair that is not aligned with the Sun and Moon project's overall business plan.  Such refurbishment would enhance the retail areas of the Sun and Moon project, and therefore enhance the renting of commercial units

---

[1]      Because the Debtors were still in the process of negotiating the terms of this joint venture, the transferee of the M-Loans was identified as "TBD" on Schedule 4 of the Bankhaus Agreement.

[2]      The Sun portfolio also contains 40 office units.

and sale of residential units, thereby maximizing the return on both the M-Loans to be purchased by the JV Transferee, and on LBHI's original equity investment.

3.    The Debtors have concluded, therefore, in their sound business judgment, that their investment in the Sun and Moon project would be maximized if additional funding could be provided to the project in the form of both debt, from LCPI, and a preferred equity investment from both LBHI and LBREP (the "Gap Funding").[3]  If the Gap Funding is not provided, LCPI ultimately may be required to liquidate the underlying assets prematurely and in a distressed state.  Such a distressed sale would result in diminished returns to LCPI on its investment in the M-Loans, and no returns on LBHI's original 8.9% equity investment.

4.    LBHI and LCPI began negotiating with LBREP on the terms of the Gap Funding at approximately the same time that LCPI was negotiating its purchase of the M-Loans from Bankhaus.  The terms of the Gap Funding included, among other things, the purchase of the M-Loans by both LCPI and LBREP through the JV Transferee.  Since that time, LCPI and LBREP have agreed to the acquisition of the M-Loans from Bankhaus into one or more joint ventures (collectively, "Acquisition Co."), which entity or entities will be the JV Transferee, to be owned 37.5% by LCPI and 62.5% by LBREP.  Because such an acquisition structure was not specifically approved by the Bankhaus Order, LCPI now seeks approval of its purchase of the M-Loans, alongside LBREP, through Acquisition Co.

---

[3]    LBHI has an approximately 17.6% indirect interest in LBREP held through certain indirect subsidiaries.  A capital call is expected to be made to LBREP's limited partners on account of the Gap Funding, and ultimately to LBREPP III LP Holdings, L.P., a indirect, wholly owned subsidiary of LBHI that has an indirect interest in LBREP. As is customary when LBHI determines to fund certain capital calls for private equity investments, LBHI will fund LBREPP III LP Holdings, L.P for its portion of the capital call and execute an intercompany note to evidence the funding, pursuant to the Final Order Pursuant To Sections 105(a), 345(b), 363(b), 363(c) And 364(a) of The Bankruptcy Code And Bankruptcy Rules 6003 And 6004 (A) Authorizing Debtors To (i) Continue To Use Existing Cash Management System, As Modified, (ii) Honor Certain Prepetition Obligations Related To The Use Of The Cash Management System, And (iii) Maintain Existing Bank Accounts And Business Forms And (B) Extending The Debtors' Time To Comply With Section 345(b) Of The Bankruptcy Code, entered on November 16, 2008 [Docket No. 1416] (the "Cash Management Order").  Future funding, for additional amounts committed to the project by LBREP, may require additional capital calls that LBHI would ultimately fund through intercompany loans to LBREPP III LP Holdings, L.P pursuant to the Cash Management Order.

5.    A purchase of the M-Loans through a joint venture with LBREP will facilitate the overall restructuring of the Sun and Moon project and thus unlock substantial value for the benefit of both LCPI and LBHI.  In return for allowing LBREP to participate in the joint venture, LBREP has agreed to the terms of a preferred equity investment in the Sun and Moon project that will allow LCPI and LBHI to share the burden of the Gap Funding with LBREP.  In addition, LBHI will have the opportunity to increase its share in the equity of the restructured Sun and Moon project in a preferred status.  With LBHI now holding a greater equity stake, this new equity structure will also inure to LCPI's benefit in the event that further restructuring is needed in the future.

6.    LCPI and LBHI have concluded that the purchase of the M-Loans through Acquisition Co. is in the best interests of their respective estates because it allows LCPI and LBHI to increase the value of their respective investments in the Sun and Moon project while also sharing with LBREP in providing the Gap Funding that is necessary for the project to meet its business plan.  If LCPI purchased the M-Loans alone, it would not have the benefit of the additional funding from LBREP, and the Sun and Moon project would not receive sufficient Gap Funding to meet its current business plan.  As more fully described below, both LBHI and LCPI have determined that provision of the Gap Funding would provide both LBHI and LCPI with a greater return on their respective investments even under distressed conditions.  Given both the prospective substantial increase in, and the durability of their respective returns under stressful conditions, as well as the potential loss to both investments if the Sun and Moon assets were sold prematurely, both LCPI and LBHI have concluded that it is in the best interests of their respective estates and creditors to provide the Gap Funding described below.  Accordingly, by this Motion, LCPI and LBHI seek authority to extend the Gap Funding necessary to meet the

business plan on the Sun and Moon projects and thereby maximize the value of their respective

investments for the benefit of their estates and creditors.

### Background

7.     On September 15, 2008, and periodically thereafter (as applicable, the

"Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court

voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are

being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and

manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

8.     On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

9.     On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA is administering LBI's estate.

10.     On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner"), and by order dated January

20, 2009 [Docket No. 2583], the Court approved the U.S. Trustee's appointment of the

Examiner.

11.     On January 14, 2010, the Court entered an Order Pursuant To Sections

105 And 363 of The Bankruptcy Code And Federal Rules of Bankruptcy Procedure 9019

Authorizing And Approving of A Settlement Agreement With The Insolvency Administrator of

Lehman Brothers Bankhaus AG (In Insolvenz) [Docket No. 6665].

### Jurisdiction

12.    This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b).

### Lehman's Business

13.    Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman had been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.

14.    Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases is

contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications,

filed on September 15, 2008 [Docket No. 2].

### Relief Requested

15.    By this Motion, pursuant to section 363 of the Bankruptcy Code, LBHI

and LCPI seek entry of an order, substantially in the form attached hereto as "Exhibit C,"

authorizing LCPI to purchase the M-Loans through Acquisition Co., and authorizing LBHI and

LCPI to provide the Gap Funding in the form of the LCPI Loans (defined below) and Preferred

Equity Investment (defined below).

### The Original Acquisition

16.    The Sun and Moon portfolio was acquired in March 2008 by LBREP III

Sun & Moon S.à r.l. ("LBREP Sun & Moon"), a Luxembourg limited liability joint venture

comprised of an 86.1% (€95.9 million) equity investment from LBREP, an 8.9% (€9.9million) equity investment from LBHI, and a 5% (€5.6 million) equity investment from Atemi SAS, in both Commerces de la République SAS ("Retail Co.") and Résidences de la République SAS ("Resi Co."), (together, the "Original Borrowers").  A €211.4 million financing package was arranged at closing, comprised of an acquisition facility and a capital expenditure facility granted to Resi Co. ("Loan R2") and of an acquisition facility and a capital expenditure facility granted to Retail Co. ("Loan r" and, together with Loan R2, the "M-Loans"), with Bankhaus and KBC Bank ("KBC") acting as co-lenders, and the overall lending obligation split 88.2% and 11.8% respectively between Bankhaus and KBC.  In addition, the loan documentation required the Original Borrowers to enter into an interest rate swap (the "LBSF Swap") with Lehman Brothers Special Financing Inc. ("LBSF"), which the Original Borrowers intend to restructure, potentially resulting in consensual termination.  At termination, to the extent that there is a termination payment due to LBSF (the "LBSF Termination Payment"), it will be paid.

17.     The original structure of Sun and Moon is illustrated below:



## LCPI's Purchase of Loan R2 and Loan r

18.    Pursuant to the Bankhaus Agreement, LCPI agreed (and subsequently was authorized by the Bankhaus Order) to purchase the outstanding balance of Bankhaus's 88.2% interest in the M-Loans.  The purchase of Bankhaus's interest in the M-Loans will take place via Acquisition Co., which will be owned 37.5% by LCPI and 62.5% by LBREP.  (LBREP itself is an 86.1% equity owner of the borrowers' parent, LBREP Sun & Moon.)  The salient terms of the acquisition structure for the M-Loans are as follows.[4]

| | |
|---|---|
| *Acquisition Co* | Currently 100% owned by LBREP.  LCPI will buy a 37.5% stake in Acquisition Co. immediately before the acquisition of the Sun & Moon debt by Acquisition Co., for 37.5% of the purchase price of the M-Loans. |
| *Proposed ownership of Acquisition Co* | 62.5% by LBREP and 37.5% by LCPI; |
| *Acquisition price* | As agreed in the Bankhaus Agreement and approved by the Bankhaus Order. |
| *Transaction costs* | LBREP and LCPI will share all reasonable costs directly related to the structuring and documentation of the acquisition *pro rata* to their relative percentages in Acquisition Co. |
| *Administration Fees* | LBREP will manage the administration of Acquisition Co. for a fee of €17,500 (split between LBREP 62.5% and LCPI37.5%). |
| *Acquisition Facility* | Drawn principal balance acquired from Bankhaus (the purchase price for which will be funded 62.5% LBREP and 37.5% LCPI through capital contributions to Acquisition Co.). |
| *Capex Facility* | Any drawdowns under the M-Loans other than the Acquisition Facility. |

---

[4]    This summary is intended to be used for information purposes only.  This summary is qualified in its entirety by the provisions of Acquisition Co.'s governing documentation and the Bankhaus Agreement and shall not, in any way, affect the meaning or interpretation thereof.

| | |
|---|---|
| ***Funding of the Capex Facility*** | The Capex Facility shall be funded by Acquisition Co. using the proceeds from the Revolver (defined below) entered into by Acquisition Co. and funded by LCPI.  In case LCPI fails to fund the Revolver, Acquisition Co.'s partners, LBREP and LCPI, shall fund a capital contribution to Acquisition Co. *pro rata* to their equity investment.  In case a partner fails to fund its capital contribution to Acquisition Co., the non-defaulting partner will have the right to fund the capital contribution of such defaulting partner.  That additional capital contribution ("Default Contribution") will yield a 15% annual return (fully compounded) in preference to all monies due to the defaulted party. |
| ***Acquisition Co. Waterfall*** | All monies received by Acquisition Co. will flow to each shareholder in a timely manner according to the priority of payments (the "Acquisition Co. Waterfall") set forth below with no netting of commitments: |

(a)    in or towards any essential operating costs of Acquisition Co., including the Agency Fee (defined below);

(b)    in or towards any unpaid costs and expenses due and owing by Acquisition Co. to LCPI under the LCPI Loans (defined below);

(c)    in or towards payment of interest, fees or commissions due but unpaid to LCPI in connection with the LCPI Loans;

(d)    in or towards repayment of any outstanding balance on the LCPI Loans;

(e)    in or towards payment of interest due on any Default Contribution;

(f)    in or towards repayment of any outstanding balance of Default Contributions;

remainder to be split between the shareholders of Acquisition Co., *pro rata* to ownership.

All inflows and outflows from to the Original Borrowers will be pooled in the Acquisition Co. for the purposes of the Acquisition Co. Waterfall.

| | |
|---|---|
| ***Governance*** | Governance of Acquisition Co. will be based off a final business plan to be approved by both shareholders prior to closing.

Approval of both shareholders will be required for, among other things, funding approvals; enforcement of security on event of default; syndication, sale or further leveraging of the debt (subject to (i) exceptions for the sale or transfer to affiliates and in connection with LCPI's emergence from chapter 11 and (ii) the right of first refusal to the other party). |

Any amendment to the business plan which results in an increase in costs or decrease in sales (calculated on a block by block basis) of greater than 5% will require unanimous consent of the shareholders.  Smaller changes to the business plan will require LBREP consent only.

**Agency**                    LCPI will have the right to appoint the agent for the M-Loans.

**Shareholder events**        In the event of an outright sale by one of the shareholders of a stake in Acquisition Co. directly or indirectly to a third party, the other shareholder shall have the right of first refusal on the same terms and conditions (subject to exceptions for the sale or transfer to an affiliate and in connection with LCPI's emergence from chapter 11).

**Sale of KBC's Share**       If KBC offers to sell its approximately 12% participation in the M-Loans to LBREP or LCPI or any of their affiliates, LBREP and LCPI will procure that Acquisition Co. is given the opportunity to buy such 12% participation.  LCPI and LBREP will then have the right to fund such acquisition (62.5% LBREP, 37.5% LCPI).

## The Gap Funding

19.    The Sun and Moon units are currently in a state of disrepair and have been for a number of years.  At the time of the original acquisition, the Sun and Moon business plan was to vacate the premises, refurbish the residential and commercial units, sell the residential units immediately and lease the commercial units, with the aim of ultimately selling the entire project as a portfolio.  This remains the current business plan.  However, this plan results in a total funding gap to complete the project of €102.4million (the "<u>Funding Gap</u>").[5]  Thus, to meet the Sun and Moon business plan, LBHI and LCPI have determined that it is in the best interests of their respective estates to provide the Gap Funding in the following manner:

---

[5]    Given that the interest paid on the original loan facility combined with residential sales will pay down a portion of the senior debt ahead of some of the capital expenditures, the actual funding required on a net basis is likely to be significantly less than €102.4m

## A.    Further Funding of the M-Loans

20.    Although the M-Loans, which will be 88.8% owned by LCPI and LBREP through Acquisition Co., are in default of a number of covenants relating to, *inter alia*, the requisite loan to value ratio of the project, non-payment of interest to Bankhaus, failure to top up interest reserves and defaulted interest rate hedging, LCPI and LBREP are willing, upon Acquisition Co.'s purchase of the debt, to work with KBC to put in place appropriate waivers to allow the Original Borrowers to continue to draw on the existing debt facility.[6]  This will mean that a portion of the Funding Gap will be satisfied by capital expenditure draws from the facility under the terms prescribed in the original facility agreement.  KBC, as a minority lender, has indicated a willingness to continue participating in the project on the same terms as the original loan documents.

21.    The salient terms of the M-Loans are as follows:[7]

| | |
|---|---|
| *Loan operation* | The M-Loans will become fully operational as documented and governed by their documentation, as amended from time to time.<br><br>Acquisition Co. will waive all historical defaults under the respective loan documentation and will respect the waivers entered into by Bankhaus and those to be agreed upon. |
| *Loan Agent and Security Agent* | The agency role will be transferred in accordance with the provisions of the M-Loans (*i.e.*, through a decision of the majority of lenders), it being specified that Acquisition Co. will request the appointment of a party chosen by LCPI.  LCPI's choice shall meet KBC's reasonable satisfaction, if required.  LCPI, on behalf of Acquisition Co., shall retain the sole right to replace the agent. |

---

[6]    LCPI is authorized to provide these waivers pursuant to the Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a) Establishing Procedures to (i) Restructure, (ii) Make New or Additional Debt or Equity Investments in, and/or (iii) Enter into Settlements and Compromises in Connection with Existing Real Estate Investments entered on November 23, 2009 [Docket No. 5912].

[7]    This summary is intended to be used for information purposes only.  This summary is qualified in its entirety by the provisions of M-Loans' governing documents and shall not, in any way, affect the meaning or interpretation thereof.

*Agency Fee*          25 basis points per annum, payable monthly on 88.2% of the outstanding balances of the M-Loans.  In addition, a fee on KBC's share may be agreed to.

*Interest*          Interest will be payable by the Original Borrowers to Acquisition Co. on the M-Loans at 2.5% fixed rate plus a margin of 1.7%.

## B.    The LCPI Loans

22.    Acquisition Co. will require two loans from LCPI (the "LCPI Loans") in order both to continue funding the M-Loans, and in order to provide the Original Borrowers with funds to satisfy the LBSF Termination Payment.  To fund payment of the LBSF Termination Payment, Acquisition Co. will provide a loan (the "Hedging Loan")[8] to the Original Borrowers, earning a 7.5% annual coupon and an arrangement fee of 25 basis points, and funded by a term loan of up to €8 million from LCPI (the "Term Loan").  In addition to the Term Loan, LCPI will lend money to Acquisition Co. through a revolving loan facility of up to €17.5 million (the "Revolver") to fund draw downs for capital expenditures as prescribed in the original loan documents.  While the total drawing on the Revolver is capped at €47.4 million, the outstanding balance on the Revolver cannot exceed €17.5 million

23.    LCPI will extend the LCPI Loans to Acquisition Co. on a senior basis – *i.e.*, any monies received by Acquisition Co. will first be used to repay the LCPI Loans *pro rata* – and will charge a 7.5% coupon, and a 25 basis point arrangement fee.  Furthermore, the LCPI Loans will rank *pari passu* with each other.  LCPI has determined that providing the LCPI Loans on these terms will provide it with a good return on a risk adjusted basis.

24.    The salient terms of the Term Loan and Revolver are as follows.[9]

---

[8]    LCPI will attempt to agree with KBC that the Hedging Loan will be *pari passu* to the M-Loans; however, for underwriting purposes, LCPI has assumed that this loan is subordinated to the M-Loans.

[9]    This summary is intended to be used for information purposes only.  This summary is qualified in its entirety by the provisions of Term Loan's and Revolver's governing documents and shall not, in any way, affect the meaning or interpretation thereof.

## Term Loan

| | |
|---|---|
| ***Initial Loan Amount*** | The minimum of the cost of terminating the hedging in place with LBSF, or €8.0 million. |
| ***Borrower*** | Acquisition Co. |
| ***Lender*** | LCPI |
| ***Drawings*** | Acquisition Co.'s funding(s) in respect of the Hedging Loan. |
| ***Term*** | March 3, 2012. |
| ***Cash sweep*** | Immediate 100% cash sweep of all cash available at the level of Acquisition Co., until all fees, interest and principal is repaid. |
| ***Coupon*** | 7.5% annual paid cash to the extent possible (through cash sweep mechanism) or otherwise compounded. |
| ***Interest Payment Dates*** | Monthly. |
| ***Arrangement Fee*** | 25 bps (payable upfront). |
| ***Security & guarantee:*** | LBREP will grant a third party pledge over its investment (shares, securities, intercompany loan etc.) in Acquisition Co.  Acquisition Co. will grant (i) a pledge over all its bank accounts; and (ii) a pledge over its receivables under its participation in the M-Loans. |
| ***Accounts*** | All monies received by Acquisition Co. will flow to a pledged account to which LCPI will have joint signing rights up until the loans are repaid in full and there are no more future commitments. |
| ***Netting*** | Monies received by Acquisition Co. will flow to the pledged account with no netting of commitments.  Netting will be allowed if LCPI fails to fund required drawings. |
| ***Change of control*** | Any change of control or ownership (excluding transfers to affiliates) of Acquisition Co. will lead to a mandatory repayment of the Term Loan. |

## Revolver

| | |
|---|---|
| ***Initial Loan Amount*** | €0. |
| ***Capped Level*** | At any one time no more than €17,500,000. |

| | |
|---|---|
| ***Aggregate Capped Level*** | Over the term of the loan the drawings on the Revolver cannot exceed €47,428,000. |
| ***Drawings*** | Acquisition Co.'s funding(s) in respect of Capex Facility, up to the Aggregate Capped Level, provided the outstanding balance never exceeds the Capped Level. |
| ***Term*** | March 3, 2012, a one year extension is available subject to (i) no events of default, and (i) an equivalent extension being obtained on the M-Loans. |
| ***Cash sweep*** | Immediate 100% cash sweep of all cash available at the level of the Acquisition Co., until all fees, interest and principal is repaid. |
| ***Coupon*** | 7.5% annual paid cash to the extent possible (through cash sweep mechanism) or otherwise compounded. |
| ***Interest Payment Dates*** | Monthly. |
| ***Arrangement Fee*** | 25 bps (payable upfront and calculated on the Capped Level). |
| ***Commitment Fee:*** | 15 bps per annum.  Payable monthly on the Undrawn Commitment (defined below). |
| ***Undrawn Commitment*** | Minimum of the Capped Level and the remaining Aggregate Capped Level, less any outstanding balance at the beginning of the interest period. |
| ***Security & guarantee:*** | LBREP will grant a third party pledge over its investment (shares, securities, interco loan etc.) in Acquisition Co.  Acquisition Co. will grant (i) a pledge over all its bank accounts; and (ii) a pledge over its receivables under its participation in the M-Loans. |
| ***Accounts*** | Same as under the Term Loan. |
| ***Allocation of proceeds to LCPI*** | Proceeds will be allocated to LCPI as follows:  any monies paid towards (i) unpaid costs and expenses; (ii) interest, fees or commissions due but unpaid; and (iii) repayment of any outstanding balance on the LCPI Loans; due and owing by Acquisition Co. to LCPI are to be split *pro rata* to the total due and owing by Acquistion Co. on the Revolver and Term Loan. |
| ***Netting*** | All monies received by Acquisition Co. are to flow to the pledged account with no netting of commitments.  Netting will be allowed if LCPI fails to fund required drawings in relation to the Revolver. |

***Change of control***          Any change of control or ownership (excluding transfers to
affiliates) of Acquisition Co. will lead to a mandatory repayment
of the Revolver.

## C.       The Preferred Equity Investment

25.       The remainder of the Funding Gap will be satisfied in the form of €40.6
million in preferred equity, split 62.5% LBREP and 37.5% LBHI, with a 25% accruing return,
that will be senior in return and principal to all of the original equity already invested (€111.4
million) in LBREP Sun & Moon, and will be subject to an exit fee (the "Preferred Equity
Investment").[10]

26.       With the Gap Funding in place, the new funding structure of the Sun and
Moon project will appear as illustrated below:



---

[10]       Atemi will have the right to fund 5% of the preferred equity investment, in which case the amount of
preferred equity funded by LBHI and LBREP would be reduced *pro rata*.

### The Acquisition Structure And Gap Funding of Sun & Moon
### Represents An Appropriate Exercise of The Debtors' Business Judgment

27.    Ample authority exists for approval of the proposed acquisition structure

and Gap Funding.  Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee,

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  While section 363 of the Bankruptcy Code does

not set forth a standard for determining when it is appropriate for a court to authorize the sale,

disposition or other use of a debtor's assets, courts in the Second Circuit and others, in applying

this section, have required that it be based upon the sound business judgment of the debtor.  *See*

*In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section

363(b) application must find from the evidence presented a good business reason to grant such

application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063,

1071 (2d Cir. 1983) (same).

28.    Both LBHI and LCPI have determined, in their sound business judgment,

that the Gap Funding is a necessary measure for the Sun and Moon project to meet its current

business plan and provide a maximum return on both Debtors' respective investments in the

project.  The success of the commercial project depends on the rejuvenation of the area and

buildings along rue de la République in central Marseilles through the capital expenditure

program contemplated by the Sun and Moon business plan.  Similarly, refurbishment of the

residential portions of the Sun and Moon project will not only increase the sale of residential

units, but will also further repair and upgrade the façade of the buildings occupied by

commercial tenants, providing a more attractive (and in some cases, safer) environment for

retailers.  The capital improvements on both the residential and commercial portions of the

project will be carried out simultaneously and will complement each other, resulting is a total

refurbishment of this major arterial road that links the Vieux Port to a new business and

commercial area in Marseilles, Joliette, that is part of a major public / private redevelopment

project known as Euroméditerranée.

29.    By providing the Gap Funding, LBHI and LCPI will not only make it

possible for the Sun and Moon project to meet its business plan, but also position themselves

well along the payment waterfall to benefit from the project's expected profits.  Failure to

provide the Gap Funding, on the other hand, will substantially impair the ability of both LBHI

and LCPI to realize an economic benefit from their investments in Sun and Moon.  Although

LCPI would still realize a profit from its purchase of the M-Loans from Bankhaus due to the

discount provided by the Bankhaus Agreement, the return on LCPI's investment will be

significantly lower if the Sun and Moon project does not meet its business plan.  LBHI would

fare even worse; if the Gap Funding is not provided, it is likely that LBHI will realize a loss on

its original equity investment.

30.    Although LBHI and LCPI are confident in the likely success of the Sun

and Moon business plan, each Debtor has considered how its investment in the project would

fare in certain "stress case scenarios" that take into account simultaneous delay in the completion

and exit of the project; delay in residential and commercial capital expenditures, sales and

leasing; declines in both residential sales and the estimated rental value of commercial units; and

increase in the required capital expenditures for both residential and commercial units.  Under

each of these stress case scenarios, LCPI has determined that it would still generate a higher

profit from its investment in the Sun and Moon project than it would absent its funding of the

LCPI Loans, and LBHI has determined that it would still protect its investment under certain

scenarios, and would realize only a modest loss in the worst case scenario.  Thus, overall, both

LBHI and LCPI have determined, in their business judgment, that further funding of the Sun and Moon project is necessary not only to protect their previous investments in the project, but also to ensure that the value of these assets is maximized.

31.    The purchase of the M-Loans through Acquisition Co. benefits LCPI and LBHI for several reasons. First, this structure allows LBHI to restructure its investment in the Sun and Moon project with LBREP in return for allowing LBREP to participate in the acquisition of the M-Loans for the purchase price agreed upon in the Bankhaus Agreement (and approved by the Bankhaus Order). This in turn will bring value back to the equity, which will be restructured to allow LBHI to increase its 8.9% of original equity with a 37.5% in preferred equity. At the same time, LBHI's and LBREP's combined preferred equity investment will provide additional capital expenditure funding that in turn reduces the funding that LCPI would need to provide so that the Sun and Moon project receives the full amount of the Gap Funding.

32.    Accordingly, for all the foregoing reasons, both LBHI and LCPI have concluded, in their sound business judgment, that acquisition of the M-Loans through Acquisition Co. and further funding of the Sun and Moon project through the Gap Funding in the best interests of their respective estates and creditors, and should be approved.

## Notice

33.    No trustee has been appointed in these chapter 11 cases. The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) the attorneys for the

Original Borrowers; (vii) the attorneys for LBREP; (viii) the attorneys for Atemi; (ix) the

attorneys for KBC; (x) the attorneys for the LBB InsAdmin; and (xi) all parties who have

requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice

need be provided.

      34.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

      WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  July 27, 2010
      Houston, Texas

      /s/ Alfredo R. Pérez          
      Alfredo R. Pérez

      WEIL, GOTSHAL & MANGES LLP
      700 Louisiana, Suite 1600
      Houston, Texas 77002
      Telephone: (713) 546-5000
      Facsimile: (713) 224-9511

      Attorneys for Debtors
      and Debtors in Possession