# EXHIBIT A

# BANKHAUS AGREEMENT

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement"), dated as of December 15, 2009 (the "Execution Date"), is made by and among (1) Lehman Brothers Holdings Inc., a Delaware corporation ("LBHI"), (2) Lehman ALI, Inc., a Delaware corporation ("ALI"), (3) Lehman Commercial Paper Inc., a New York corporation ("LCPI") (LBHI, ALI and LCPI are each referred to herein as a "Lehman Party" and collectively as the "Lehman Parties"), and (4) Dr. Michael C. Frege in his capacity as Insolvency Administrator (*Insolvenzverwalter*) over the assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins. (the "LBB InsAdmin") (LBHI, ALI, LCPI, and the LBB InsAdmin are each referred to herein as a "Party" and collectively as the "Parties"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Schedule 1 attached hereto and made a part hereof.

# RECITALS

WHEREAS, LBHI, ALI and Lehman Brothers Bankhaus Aktiengesellschaft i. Ins. ("Bankhaus") entered into a Master Participation Agreement, dated November 10, 1999, pursuant to which various loans originated by LBHI or ALI were participated to Bankhaus (as heretofore amended and together with all confirmations executed pursuant thereto, the "Master Participation Agreement"); and

WHEREAS, the Lehman Parties (or certain of them) and Bankhaus also entered into various other oral and written master participation agreements and participation agreements pursuant to which various loans in respect of which a Lehman Party was the lender of record were participated to Bankhaus and pursuant to which various loans in respect of which Bankhaus was the lender of record were participated to a Lehman Party (together with the Master Participation Agreement, and as heretofore amended, the "Participation Agreements"); and

WHEREAS, LBHI entered into that certain Security & Collateral Agreement, dated August 15, 2002 (the "Security & Collateral Agreement"); and

WHEREAS, LBHI entered into that certain Guarantee, dated as of November 21, 2002 (the "Guarantee"); and

WHEREAS, the members of the Executive Committee of the Board of Directors of LBHI adopted certain resolutions pursuant to that certain Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated June 9, 2005 (the "Parent Resolution"; and together with the Security & Collateral Agreement and Guarantee, the "LBHI Agreements"), which superseded and replaced in its entirety that certain Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., dated November 14, 1994; and

WHEREAS, on September 15, 2008 and on various dates thereafter, LBHI and certain of its subsidiaries, including LCPI, filed voluntary cases under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), which cases are being jointly administered under Case Number 08-13555 (the "Lehman Bankruptcy Case"); and

WHEREAS, ALI, a non-debtor, is directly owned by LBHI; and

WHEREAS, on April 29, 2009, the LBB InsAdmin filed a Verified Petition Under Chapter 15 of the Bankruptcy Code for Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C. § 1521 in the Bankruptcy Court, bearing Case Number 09-12704; and

WHEREAS, on May 22, 2009, the Bankruptcy Court entered an Order Granting Recognition of Foreign Representative and Foreign Main Proceeding and For Additional Relief Under 11 U.S.C. § 1521; and

WHEREAS, the Lehman Parties, on the one hand, and the LBB InsAdmin, on the other hand, have negotiated a resolution of certain claims or potential claims between them arising out of or relating to the Participation Agreements and the LBHI Agreements, and the interests of the Parties therein, and intend, by the terms of this Agreement, to memorialize that resolution.

NOW, THEREFORE, in consideration of the recitals stated above, the agreements, promises and warranties set forth below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    ***Incorporation of Recitals***.  The above Recitals are hereby incorporated into and made a part of this Agreement.

2.    ***Settlement***.

a.    ***Transfer of Bankhaus Assets.***  Subject to the terms and conditions of this Agreement including, without limitation, the satisfaction (or waiver by the Party entitled to waive the same pursuant to the terms of this Agreement) of each of the Closing Conditions, at the applicable Closing the LBB InsAdmin shall do each of the following:

i.    at the election of the Lehman Parties, either (1) terminate, relinquish and quitclaim to each of the respective entities identified as a "<u>Lender</u>" on <u>Schedule 2</u> attached hereto and made a part hereof (each such entity referred to herein as a "<u>Category 1 Holder</u>" with respect to the indicated Category 1 Loan) or (2) assign, transfer, convey and deliver to each of the respective entities identified as a Transferee on <u>Schedule 2</u> attached hereto and made a part hereof (each such entity being referred to herein as a "<u>Category 1 Loan Transferee</u>" with respect to the indicated Category 1 Loan), all participations interests, if any (collectively, the "<u>Category 1 Loan BH Interests</u>"), created by and under the Participation Agreements or otherwise with respect to each of the loans, debts, obligations, facilities, notes, or portions thereof, more particularly described on <u>Schedule 2</u> attached hereto and made a part hereof (collectively, the "<u>Category 1 Loans</u>"); provided, that the election to assign, transfer, convey and deliver under (2) above applies only to the loans listed on <u>Schedule 9</u> attached hereto; provided, further, that if a Category 1 Loan BH Interest has been terminated pursuant to the provisions of this Agreement on the Initial Closing Date and, at the time of such termination, a Lehman Party or

Affiliate thereof is not the sole record and beneficial owner of the whole loan of which the related Category 1 Loan is a part, then such termination shall be null and void and of no force or effect and the Parties shall effectuate an assignment and transfer of such Category 1 Loan BH Interest under clause (2) above and otherwise in the manner provided herein;

ii.  (A) assign, transfer, convey and deliver to each of the respective entities identified as a "Transferee" on Schedule 3 attached hereto and made a part hereof (each such entity being referred to herein as a "Category 2 Loan Transferee" with respect to the indicated Category 2 Loan) each of the respective loans, debts, obligations, facilities, notes, or portions thereof, more particularly described on Schedule 3 attached hereto and made a part hereof (such loans, debts, obligations, facilities, notes, or portions thereof, being collectively referred to as the "Category 2 Loans" and all right, title and interest of Bankhaus therein being collectively referred to as the "Category 2 Loan BH Interests"), except that in the case of the Facility Participation Loans, such Loans are transferred subject to the rights, if any, of the Facility Participation Participants, (B) in each instance where Bankhaus is identified on Schedule 3 attached hereto as being an "Agent" (where Bankhaus is an administrative, collateral, syndication, facility, security or other agent under any Category 2 Loan), cause Bankhaus to resign as such agent and appoint, or effectuate the appointment of, the applicable Category 2 Loan Transferee, or any other Person designated by the Lehman Parties who can serve in that capacity under the applicable Loan Documents, as successor agent in accordance with the terms and provisions of the applicable Loan Documents (such resignation and appointment being referred to as a "Category 2 Loan Agency Substitution"), and (C) execute and deliver such other instruments, endorsements, allonges, certificates, assignments, and other documents as may be necessary in order to assign, transfer and convey to, and fully vest in, the applicable Category 2 Loan Transferees all right, title and interest in, to and under the Category 2 Loans and any and all applicable Loan Documents (collectively, the "Ancillary Category 2 Loan Documents");

iii.  (A) assign, transfer, convey and deliver to each of the respective entities identified as a "Transferee" on Schedule 4 attached hereto and made a part hereof (each such entity being referred to as a "Category 4 Loan Transferee" with respect to the indicated Category 4 Loan) each of the respective loans, debts, obligations, facilities, notes, or portions thereof, more particularly described on Schedule 4 attached hereto and made a part hereof (such loans, debts, obligations, facilities, notes, or portions thereof, being collectively referred to as the "Category 4 Loans" and all right, title and interest of Bankhaus therein being collectively referred to as the "Category 4 Loan BH Interests"), (B) in each instance where Bankhaus is identified on Schedule 4 attached hereto as being an "Agent" (where Bankhaus is an administrative, collateral, syndication, facility, security or other agent under any Category 4 Loan), cause Bankhaus to resign as such

C:\DOCUMENTS AND SETTINGS\KRASNOW\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\NKFVGR0G\US_ACTIVE_BANKHAUS SETTLEMENT AGREEMENT - REDACTED VERSION - EXHIBIT A TO MOTION_43259365_1 (3).DOC

3                          *Final execution document 14/12/2009*

agent and appoint, or effectuate the appointment of, the applicable Category 4 Loan Transferee, or any other Person designated by the Lehman Parties who can serve in that capacity under the applicable Loan Documents, as successor agent in accordance with the terms and provisions of the applicable Loan Documents (such resignation and appointment being referred to as a "Category 4 Loan Agency Substitution"), (C) execute and deliver such other instruments, endorsements, allonges, certificates, assignments, and other documents as may be necessary in order to assign, transfer and convey to, and fully vest in, the applicable Category 4 Loan Transferees all right, title and interest in, to and under the Category 4 Loans and any and all applicable Loan Documents (collectively, the "Ancillary Category 4 Loan Documents"), and (D) deliver to the applicable Category 4 Loan Transferee indicated on Schedule 4 hereto as the Category 4 Loan Transferee with respect to the R-Loan, the original promissory note evidencing the R-Loan and described as "[Name of Borrower] Senior Floating Note due April 30, 2012" (the "R-Note"), the Parties acknowledging and agreeing that it shall be a condition precedent to the closing of the acquisition of the R-Loan by the applicable Category 4 Loan Transferee that the original of the R-Note be delivered to the applicable Category 4 Loan Transferee at the applicable Closing;

iv.    assign, transfer and convey, and/or otherwise relinquish, to each of the applicable Category 1 Holders, all right, title and interest of Bankhaus in and to the Category 1 Loan Cash held by, on behalf of or for the benefit of such Category 1 Loan Holders thereof as of the Initial Closing Date (the aggregate amount of such Category 1 Loan Cash being referred to as the "Category 1 Loan Cash Amount");

v.    deliver or cause to be delivered to each of the applicable Category 2 Loan Transferees, as indicated on Schedule 3 attached hereto, seventy percent (70%) of the Category 2 Loan Cash held by, on behalf of or for the benefit of the LBB InsAdmin or Bankhaus as of the applicable Closing Date of the relevant Category 2 Loan (the aggregate amount of seventy percent (70%) of Category 2 Loan Cash being referred to as the "Category 2 Loan Cash Amount"); provided, however that the Category 2 Loan Cash may be retained by the LBB InsAdmin and Bankhaus if, and to the extent that, an amount equal to the Category 2 Loan Cash Amount is deducted from the applicable Purchase Price for purposes of calculating the applicable Net Payment Amount; and

vi.    assign, transfer, convey and quitclaim to LCPI all participation interests of Bankhaus, if any, in and to those loans more particularly described on Schedule 6 attached hereto and made a part hereof (the "Schedule 6 Loans") and all rights of Bankhaus arising under any participation agreements creating or granting any such participation interests to Bankhaus and to any participation agreement pursuant to which Bankhaus

may have further participated its participation interests in the Schedule 6 Loans; provided, that the foregoing assignment shall be automatically effectuated upon and at the Initial Closing without any further instrument or deed being delivered by the LBB InsAdmin to LCPI; provided, further, that the LBB InsAdmin shall, at LCPI's request, provide such assignments and instruments as may be reasonably requested by LCPI to evidence or further assure the foregoing assignment.

The Category 1 Loan BH Interests, the Category 2 Loan BH Interests, the Category 4 Loan BH Interests and all other interests, cash and other assets to be terminated and relinquished or assigned, transferred, conveyed and/or delivered by the LBB InsAdmin to any Lehman Party, Category 1 Loan Transferee, Category 2 Loan Transferee, Category 4 Loan Transferee or Category 1 Loan Holder, pursuant to the provisions of this <u>Section 2.a.</u> or any other provision of this Agreement being collectively referred to herein as the "<u>Bankhaus Assets</u>."

      b.    *Purchase Price.* (1) In consideration for the acquisition of the Bankhaus Assets and the other benefits to be derived by the Lehman Parties under this Agreement and the Ancillary Documents, at the Initial Closing (or, with respect to that portion of the Purchase Price attributable to any Deferred Purchased Assets, at the applicable Subsequent Closing), the Lehman Parties shall pay to the LBB InsAdmin an aggregate purchase price (the "<u>Purchase Price</u>") equal to the sum of (i) an aggregate amount equal to sixty percent (60%) of the Applicable Value as of the Initial Closing Date of each Category 1 Loan, (ii) an aggregate amount equal to eighty percent (80%) of the Applicable Value as of the applicable Closing Date of each Category 4 Loan (excluding the M-Loans), (iii) an aggregate amount equal to fifty-three percent (53%) of the outstanding principal balance of the M-Loans as of the applicable Closing Date (provided, that for purposes of calculating the Purchase Price attributable to the M-Loans, the principal balance of the M-Loans shall not be increased or include any amounts which have been funded, directly or indirectly, by any Lehman Party or an Affiliate thereof at any time on or after September 15, 2008); (iv) an aggregate amount equal to seventy percent (70%) of the Category 1 Loan Cash Amount; and (v) $23.4 million in respect of all of the Category 2 Loan BH Interests and seventy percent (70%) of the Category 2 Loan Cash (such amount being apportioned to each Category 2 Loan as reflected on <u>Schedule 3</u> hereto). For purposes of clarity, the Category 2 Loan Cash reflected on <u>Schedule 3</u> constitutes one hundred percent (100%) of the Category 2 Loan Cash attributable to each Category 2 Loan as of the applicable date indicated on <u>Schedule 3</u>. Notwithstanding the foregoing or anything to the contrary contained herein, if any Deferred Purchased Assets are not purchased at the Initial Closing, the Purchase Price payable at the Initial Closing shall be reduced by an amount equal to that portion of the Purchase Price which is attributable to such Deferred Purchased Assets (as reflected on <u>Schedule 3</u> and <u>Schedule 4</u> hereof), and the Purchase Price payable for each such Deferred Purchased Asset at the applicable Subsequent Closing shall be the Purchase Price for such Deferred Purchased Asset as reflected on <u>Schedule 3</u> or <u>Schedule 4</u> hereof. For informational purposes only, a sample calculation of the Purchase Price is attached hereto as <u>Schedule 8</u> which results in a Net Payment Amount (as defined in Section 2.c. below) of (x) $1,388,900,000.00 if all Bankhaus Assets are purchased at the Initial Closing and (y) $1,278,200,000.00 if all Bankhaus Assets other than those Category 2 Loans and Category 4 Loans more particularly described on <u>Schedule 11</u> are purchased at the Initial Closing.

(2)     Notwithstanding any provision to the contrary set forth in this Agreement, for purposes of determination of the Purchase Price payable by the Lehman Parties to the LBB InsAdmin on the Initial Closing Date, calculations shall be made based upon outstanding principal balances and Applicable Values reflected in the Schedules attached to this Agreement. Not later than sixty (60) calendar days after the Initial Closing Date, the Purchase Price shall be recalculated based upon such information updated as of the close of business on the Business Day immediately preceding the Initial Closing Date, and payment shall be made to the Party or Parties entitled thereto by the other Party or Parties of the net amount of any overpayment or underpayment, as applicable, made on the Initial Closing Date. For the purpose of recalculating the Purchase Price, the Lehman Parties shall revise Schedule 2, Schedule 3 and Schedule 4 to reflect changes to the outstanding principal balances and Applicable Values resulting from payment receipts since the applicable date of each such Schedules attached to this Agreement and such revised Schedules shall be the basis for the recalculation of the Purchase Price.

The Parties agree that the allocated Purchase Price with respect to each Category 2 Loan is fixed and shall not change based upon any changes in principal balances, values or the Category 2 Loan Cash Amount.

With respect to any Deferred Purchased Assets which are Category 2 Loans and which are being transferred pursuant to the terms of this Agreement on a Subsequent Closing Date, the Lehman Parties shall revise <u>Schedule 3</u> with respect to such Deferred Purchased Assets to reflect the specific portion of the Category 2 Loan Cash Amount attributable to each such Deferred Purchased Asset as of such Subsequent Closing Date.

With respect to any Deferred Purchased Assets which are Category 4 Loans and which are being transferred pursuant to the terms of this Agreement on a Subsequent Closing Date, the Lehman Parties shall revise Schedule 4 with respect to such Deferred Purchased Assets to reflect changes to the outstanding principal balances and Applicable Values resulting from payment receipts since the applicable date of Schedule 4 attached to this Agreement and such revised Schedule 4 shall be the basis for the calculation of the Purchase Price allocated to and payable with respect to any such Deferred Purchased Assets.

The revised Schedules shall be delivered to the LBB InsAdmin for verification and approval whereupon such Schedules shall replace, in their entireties, the corresponding Schedules attached to this Agreement as of the Execution Date. The Parties will cooperate in good faith to resolve any disputes with respect to such revised Schedules as soon as possible and proceed to the applicable Closing. To the extent that the Parties are unable to resolve such disputes within thirty (30) days following the date on which such revised Schedules were delivered to the LBB InsAdmin, then the Parties agree that such dispute shall be resolved by the Bankruptcy Court upon and following the filing of an appropriate motion with respect thereto with the Bankruptcy Court.

c.     *Payment of Net Payment Amount.* At the Initial Closing (or, with respect to any Deferred Purchased Assets, at the applicable Subsequent Closing), the Lehman Parties, collectively and being jointly and severally liable, shall, subject to the provisions of Section 2.b.(2) hereof, pay, or cause to be paid, to the LBB InsAdmin an amount (the "<u>Net Payment Amount</u>") equal to the applicable Purchase Price as determined pursuant to the provisions of <u>Section 2.b.</u> hereof <u>less and except</u> the Category 2 Loan Cash Amount; provided that, if any

Deferred Purchased Assets are not purchased at the Initial Closing, the Category 2 Loan Cash Amount deducted from the applicable Purchase Price at the Initial Closing shall exclude any Category 2 Loan Cash attributable to the Deferred Purchased Assets (as reflected on Schedule 3 hereto); provided, further, that the Net Payment Amount due and payable at any Subsequent Closing shall be equal to the Purchase Price, as determined pursuant to the provisions of Section 2.b. hereof, for the Deferred Purchased Assets being acquired at such Subsequent Closing, less and except that portion of the Category 2 Loan Cash Amount attributable to such Deferred Purchased Assets (as reflected on Schedule 3 hereto). Notwithstanding anything to the contrary contained in this Agreement or in any Ancillary Document, the aggregate portion of the Category 2 Loan Cash Amount which is attributable to the Repaid Category 2 Loans (such aggregate amount being equal to the Category 2 Loan Cash Amount less any portion thereof attributable to the Category 2 Loans and being referred to as the "Repaid Category 2 Loans Cash Amount") shall be deducted from that portion of the Purchase Price which is payable at the Initial Closing by LCPI. The applicable Net Payment Amount shall be paid in immediately available funds in accordance with the wire transfer instructions set forth on Schedule 5 attached hereto and made a part hereof. The payment of the applicable Net Payment Amount shall be made without deductions, and the Lehman Parties shall not be permitted to off-set against the applicable Net Payment Amount any other claim, whether by set-off, recoupment, retention or any other theory, that any of the Lehman Parties may have against Bankhaus or the LBB InsAdmin. The applicable Purchase Price shall be apportioned among the Lehman Parties so that each Lehman Party shall pay, at the applicable Closing, an amount equal to that portion of the applicable Purchase Price which is attributable to the Bankhaus Assets being acquired by or for the benefit of such Lehman Party at such Closing and, for purposes of calculating the applicable Net Payment Amount due and payable by such Lehman Party, each Lehman Party shall be entitled to deduct from the applicable Purchase Price payable by such Lehman Party an amount equal to that portion of the Category 2 Loan Cash Amount derived from or otherwise attributable to Category 2 Loans being acquired by such Lehman Party at such Closing (as reflected on Schedule 3 attached hereto) and, in addition, LCPI shall also be entitled to deduct an amount equal to the Repaid Category 2 Loans Cash Amount at the Initial Closing. Provided that all Closing Conditions have been fully satisfied or waived by the applicable Parties and a Lehman Party refuses or otherwise fails to close by failing to pay any portion of the Net Payment Amount that is due and payable on such Closing Date (such Closing Date being referred to as the "Failed Closing Date"), then upon consummation of the applicable Closing at a subsequent date (such subsequent date being referred to as the "Actual Closing Date"), the Lehman Parties shall pay to the LBB InsAdmin, in addition to the Net Payment Amount due and payable on the Actual Closing Date, interest on such Net Payment Amount for the period commencing on the Failed Closing Date and ending on the Actual Closing Date at an annual rate equal to the Default Rate.

At Closing, the Lehman Parties shall be entitled to retain the Category 1 Loan Cash free and clear of any interest of Bankhaus or the LBB InsAdmin. The Category 1 Loan Cash and seventy percent (70%) of the Category 2 Loan Cash shall be delivered to, retained by or otherwise credited to the Lehman Parties as provided herein without deductions, and the LBB InsAdmin shall not be permitted to off-set against any payment to be made or otherwise credited to the Lehman Parties hereunder any other claim, whether by set-off, recoupment, retention or any other theory, that the LBB InsAdmin or Bankhaus may have against any Lehman Party. Except to the extent the same is credited against the applicable Purchase Price due and payable to

the LBB InsAdmin as provided herein, the LBB InsAdmin and Bankhaus shall not be permitted to retain the portion of the Category 2 Loan Cash to be delivered to the Lehman Parties or any portion thereof due to any right of retention or similar right that either such party might have.

    d.    *Debt Service Payments.*

    i.    The Lehman Parties hereby represent and warrant that all Debt Service Payments made to, or for the benefit of, the Lehman Parties on account of the Category 1 Loans from and including September 15, 2008 through the Execution Date shall constitute Category 1 Loan Cash at the Initial Closing.

    ii.    The LBB InsAdmin hereby represents and warrants that all Debt Service Payments made to, or for the benefit of, the LBB InsAdmin on account of the Category 2 Loans and the Repaid Category 2 Loans from and including November 13, 2008 through the Execution Date shall constitute Category 2 Loan Cash at the applicable Closing.

    iii.    The Parties hereby agree that (i) all Debt Service Payments made to, or for the benefit of, the Lehman Parties on account of the Category 1 Loans from the Execution Date through the Initial Closing Date shall be segregated and shall constitute Category 1 Loan Cash at the Initial Closing, (ii) all interest payments made on account of the M-Loans that have become, or may become, due and payable prior to the applicable Closing Date, regardless of when such payments are actually made (the "M-Interest Payments"), shall be segregated, and the LBB InsAdmin shall be entitled to retain and receive all M-Interest Payments in their entirety, and the Lehman Parties shall promptly transfer to the LBB InsAdmin any M-Interest Payments upon receipt, and if there are any outstanding M-Interest Payments following the Closing of the M-Loans, the Lehman Parties shall use reasonable efforts to claim such outstanding M-Interest Payments from the borrower after the applicable Closing Date and any payments made by the borrower on account of the M-Loans after the applicable Closing Date shall be applied in accordance with the terms and conditions of the Loan Documents relating to the M-Loans, (iii) all Debt Service Payments made to, or for the benefit of, the LBB InsAdmin on account of the Category 2 Loans and the Repaid Category 2 Loans from the Execution Date through the applicable Closing Date shall be segregated and shall constitute Category 2 Loan Cash at the applicable Closing, and (iv) the respective Category 1 Loan Holders and/or Category 1 Loan Transferees, Category 2 Loan Transferees and Category 4 Loan Transferees shall be entitled to any and all Debt Service Payments made on account of any Category 1 Loan, Category 2 Loan or Category 4 Loan (excluding any M-Interest Payments), respectively, on and after the applicable Closing Date, without regard to whether or not such Debt Service Payments are in respect of payments that became due and payable prior to such last day of the calendar month immediately preceding the

Closing Date. Nothing in this Section 2.d.iii. shall affect the rights of the LBB InsAdmin under Section 2.d.iv. hereof.

iv.    (1) With respect to the Category 1 Loans, the Lehman Parties hereby represent and warrant that, since May 1, 2009 and except as set forth on Schedule 7 attached hereto and made a part hereof and except to the extent the same has been consented to or approved in writing by the LBB InsAdmin on behalf of Bankhaus, the Lehman Parties have not (1) affirmatively agreed to defer or postpone, to a date following the Initial Closing Date, any scheduled Debt Service Payments that are otherwise required to be made pursuant to the terms of the applicable Loan Documents on or prior to the Initial Closing Date, or (2) sought to delay or postpone, to a date following the Initial Closing Date, any prepayments of any Debt Service Payments with respect to which the applicable borrower(s) have given written notice to any of the Lehman Parties would be made on or prior to the Initial Closing Date.

(2) With respect to the Category 1 Loans, the Lehman Parties shall not, without the consent of the LBB InsAdmin, affirmatively agree or consent to any delay or postponement of any scheduled Debt Service Payments that are required to be made, pursuant to the applicable Loan Documents, or any prepayments with respect to which the applicable borrower(s) have given written notice to any of the Lehman Parties would be made, in either case, on or prior to the Initial Closing Date.

(3) For purposes of the representation and covenant set forth in clauses (1) and (2) above, respectively, the Lehman Parties shall not be deemed to have affirmatively agreed or consented to any postponement or deferral of any Debt Service Payments or prepayments due to a lack of action; provided, that the Lehman Parties shall continue to invoice or cause to be invoiced the borrower(s) in respect of the Category 1 Loans in a manner that is consistent with past practices. Notwithstanding anything to the contrary contained in this Agreement or in any other Ancillary Document, if any Lehman Party breaches the representation or covenant set forth in clauses (1) or (2) above with respect to any Debt Service Payment (a "Deferred Debt Service Payment") and the applicable borrower(s) makes a payment to such Lehman Party in respect of the Deferred Debt Service Payment within eighteen months following the Initial Closing Date, then such Lehman Party shall pay to the LBB InsAdmin an amount equal to (x) ten percent (10%) of that portion of the Deferred Debt Service Payment which is a principal payment, and (y) seventy percent (70%) of that portion of the Deferred Debt Service Payment which is not a principal payment, in each case, to the extent that such payment was paid to such Lehman Party within such eighteen-month period. The payment(s) to be made by the applicable Lehman Party under this clause (3) shall be the sole and exclusive remedy of the LBB InsAdmin for any breach of the

representation or covenant contained in clauses (1) and (2) above, respectively.

(4)  If any Lehman Party receives a request from a borrower under any Category 1 Loan for the postponement, deferral or prepayment of any Debt Service Payment, such Lehman Party shall give prompt written notice of such written request to the LBB InsAdmin.

    e.    *Participation Agreements.*  Except as provided for in <u>Section 12</u>, to the extent that the participation interests that were granted under or pursuant to the terms of any of the Participation Agreements are terminated at the Initial Closing pursuant to the terms of this Agreement and/or any of the Ancillary Documents, the Parties agree that from and after the Initial Closing at which such terminations are effectuated, the Parties shall have no further rights or obligations under the applicable Participation Agreements with respect to such terminated participation interests; provided that there shall be no termination, modification or impairment of any rights or obligations of any parties under any applicable Participation Agreement granting, creating, relating to or governing participation interests which are not expressly terminated pursuant to the terms of this Agreement and/or any of the Ancillary Documents.  To the extent that any such participation interests are assigned at the Initial Closing, rather than terminated, pursuant to the terms of this Agreement and/or any of the Ancillary Documents, the Parties agree that nothing contained herein or in the Ancillary Documents shall effect a termination, modification or impairment of any rights or obligations of any parties under any applicable Participation Agreement granting, creating, relating to or governing such participation interests.

    3.    ***LBB InsAdmin Representations and Warranties***.  In order to induce the Lehman Parties to enter into and perform their obligations under this Agreement and the Ancillary Documents to which they are parties, the LBB InsAdmin hereby represents, warrants and acknowledges as follows:

    a.    *Authority.*  The Bankhaus creditors committee (*Gläubigerausschuss*) ("<u>Bankhaus Creditors Committee</u>") and the Bankhaus creditors assembly (*Gläubigerversammlung*) ("<u>Bankhaus Creditors Assembly</u>") have each approved the execution and delivery of, and the performance of the obligations of the LBB InsAdmin under, this Agreement and the Ancillary Documents by the LBB InsAdmin and the transactions contemplated herein and in the Ancillary Documents (collectively, the "<u>Initial Bankhaus Creditors' Approval</u>").  Further approval of the Bankhaus Creditors Committee of the final version of this Agreement and the Ancillary Documents will be required to be obtained by the LBB InsAdmin (the "<u>Additional Committee Approval</u>" and together with the Initial Bankhaus Creditors' Approval, the "<u>Bankhaus Creditors' Approval</u>").  Subject only to the Additional Committee Approval, (i) the LBB InsAdmin has the power and authority to execute, deliver and perform its obligations under this Agreement and the Ancillary Documents to which it is a party, and to consummate the transactions contemplated hereby, on behalf of the insolvency estate of Bankhaus, and (ii) the execution, delivery and performance by the LBB InsAdmin of this Agreement and each of the Ancillary Documents to which the LBB InsAdmin is a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary action on the part of the LBB

C:\DOCUMENTS AND SETTINGS\KRASNOW\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\NKFVGR0G\US_ACTIVE_BANKHAUS SETTLEMENT AGREEMENT - REDACTED VERSION - EXHIBIT A TO MOTION_43259365_1 (3).DOC

10

*Final execution document 14/12/2009*

InsAdmin and no other proceedings on the part of the LBB InsAdmin are necessary to authorize and approve this Agreement or any of the Ancillary Documents or any of the transactions contemplated thereby.

b. *Validity.* Subject only to the Additional Committee Approval, (i) this Agreement has been duly executed and delivered by the LBB InsAdmin and constitutes the legal, valid and binding agreement of the LBB InsAdmin, enforceable against the LBB InsAdmin in accordance with its terms, and (ii) upon execution and delivery of the Ancillary Documents to be executed by the LBB InsAdmin, all such Ancillary Documents will have been duly executed and delivered by the LBB InsAdmin and will constitute the legal, valid and binding agreement of the LBB InsAdmin in accordance with their respective terms.

c. *Authorization of Governmental Authorities and Creditors.* No action by (including any authorization, consent or approval), in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by the LBB InsAdmin of this Agreement or any of the Ancillary Documents other than the Additional Committee Approval.

d. *No Reliance.* The LBB InsAdmin (i) is a sophisticated party with respect to the matters that are the subject of this Agreement and the Ancillary Documents, (ii) has adequate information concerning the matters that are the subject of this Agreement and the Ancillary Documents, and (iii) has independently and without reliance upon any of the Lehman Parties or any of their Affiliates or any officer, employee, agent or representative thereof, and based on such information as the LBB InsAdmin has deemed appropriate, made his own analysis and decision to enter into this Agreement and the Ancillary Documents to which he is a party, except that the LBB InsAdmin has relied upon the Lehman Parties' express representations, warranties and covenants in this Agreement and the Ancillary Documents.

e. *Title; No Transfer of Claims.* The LBB InsAdmin has not, since November 13, 2008 (the date of opening of the insolvency proceedings of Bankhaus), assigned, transferred or conveyed to any other Person, in whole or in part, including for security, any of the Category 2 Loans, Category 4 Loans or Category 1 Loan Participations or any other Bankhaus Assets, or any right, title or interest therein or under any claims or causes of action that are the subject of this Agreement or any of the Ancillary Documents.

f. *No Fulfillment Rejection Claims.* The LBB InsAdmin has no actual knowledge of any Fulfillment Rejection Claim which was raised in writing vis-à-vis the LBB InsAdmin between November 13, 2008 and the Execution Date in relation to those Category 2 Loans or Category 4 Loans with an outstanding funding commitment as set forth on Schedule 12 attached hereto and made a part hereof, unless the raising of such Fulfillment Rejection Claim is identified on Schedule 12.

4.    *Status of Title; Repurchase of Bankhaus Assets*.

a.    Except as expressly provided in this Agreement or in the Ancillary Documents, the LBB InsAdmin makes no representations or warranties as to Bankhaus' rights to the Bankhaus Assets whatsoever including, without limitation, representations concerning the absence of third party rights therein or that Bankhaus has actually funded the participations being terminated or assigned pursuant to this Agreement.

b.    Notwithstanding the foregoing, it is the intention of the Parties that Bankhaus is assigning, transferring and conveying to the respective Transferees, and the Lehman Parties are relying upon Bankhaus having, good and valid title to and being the sole owner of the Category 2 Loans and the Category 4 Loans and to all participation interests assigned to Bankhaus by any of the Lehman Parties with respect to the Category 1 Loans ("Category 1 Loan Participations"), free and clear of any lien, claim or interest of any other Person other than any interest of the Lehman Parties (any such lien, claim, interest or other defect or condition that would cause the state of title to deviate from the foregoing being referred to as a "Title Defect" with such term to exclude (w) any participations in the Facility Participation Loans to the Facility Participation Participants; (x) any lien, claim or interest that either (i) existed when a Lehman Party assigned, transferred and conveyed such Category 1 Loan Participation to Bankhaus; (ii) was created by or on behalf of any Lehman Party; (iii) has actually been known to a Lehman Party since September 15, 2008; (iv) first arose or was created after the applicable Closing; (y) liens, claims, interests, conditions or other defects of a Category 1 Loan Participation terminated, relinquished and quitclaimed under this Agreement; and (z) liens, claims, interests, conditions or other defects that do not affect the ownership of Bankhaus in or the title of Bankhaus to the respective Bankhaus Assets).  Notwithstanding the foregoing, the Parties agree that the inability of the LBB InsAdmin and/or Bankhaus to deliver documentation and/or originals of promissory notes, guarantees, letters of credits or any other instruments respecting the Category 2 Loans, the Category 4 Loans or any other Bankhaus Asset shall in no event constitute a Title Defect within the meaning of this Agreement (except to the extent provided in Section 8.b.viii hereof) and such inability shall be dealt with in Section 8.b.viii.

c.    In the event that the applicable Transferee determines that any Category 1 Loan Participation, Category 2 Loan or Category 4 Loan is subject to a Title Defect, the applicable Transferee may deliver to the LBB InsAdmin notice of such Title Defect, accompanied by evidence of such Title Defect reasonably acceptable to the LBB InsAdmin.  Provided that such evidence is reasonably acceptable to the LBB InsAdmin, and provided further that the LBB InsAdmin receives such notice no later than eighteen months after the applicable Closing Date, the LBB InsAdmin shall refund to the applicable Transferee, not later than ninety days after receipt of such notice and evidence of the Title Defect, (i) the applicable Purchase Price with respect to the applicable Bankhaus Asset, less (ii) any principal payments received by the applicable Transferee, less (iii) thirty percent

(30%) of any Category 1 Loan Cash or seventy percent (70%) of any Category 2 Loan Cash (if any) attributable to such Bankhaus Asset, plus (iv) an amount, which may be a negative number, equal to (x) interest on the applicable Purchase Price (less any principal payments received by the applicable Transferee) from the applicable Closing Date until the date of repayment at a rate equal to the interest rate received by the LBB InsAdmin on the Repurchase Reserve, minus (y) the amount of any interest payments received by the applicable Transferee since the applicable Closing Date, plus (v) all reasonable costs and expenses incurred in connection with the reconveyance of the applicable Bankhaus Asset to the LBB InsAdmin (collectively, the "Repurchase Price"), and the applicable Transferee shall reconvey such Bankhaus Asset to the LBB InsAdmin (pursuant to such assignments and other documents consistent with the assignments and other documents executed and delivered in connection with the conveyance of such Bankhaus Asset pursuant to this Agreement and without any recourse to the applicable Transferee) simultaneously therewith; provided, that if the Bankhaus Asset to be reconveyed is a Category 2 Loan or Category 4 Loan and consent from any borrower, agent or other third party is required to be obtained in connection with the reconveyance of such Bankhaus Asset to the LBB InsAdmin or there are other conditions to such reconveyance which are required to be satisfied or complied with, then (x) the LBB InsAdmin shall cooperate and use its commercially reasonable efforts to obtain such consent and/or cause any such other conditions to be satisfied or complied with so that the applicable Bankhaus Asset can be reconveyed to the LBB InsAdmin or to a transferee (to be designated by the LBB InsAdmin) which qualifies as a holder of the applicable Bankhaus Asset under the applicable Loan Documents, and (y) if for any reason, such consent cannot be obtained or such conditions cannot be satisfied or complied with despite the LBB InsAdmin's commercially reasonable efforts to obtain such consent and satisfy and comply with such conditions, the Parties agree that they shall reasonably negotiate a mutually acceptable agreement pursuant to which such Bankhaus Asset shall be held by the applicable Lehman Party as agent for and otherwise for the benefit of the LBB InsAdmin such that the LBB InsAdmin shall be the beneficial owner of all of the rights and benefits relating to such Bankhaus Asset and shall be the obligor with respect to all of the liabilities and obligations relating to such Bankhaus Asset (such agreement being referred to as a "Beneficiary Agreement") (in which case, the Repurchase Price shall be paid to the applicable Lehman Party upon execution and delivery of any such Beneficiary Agreement). Payment of the applicable Repurchase Price shall be made by the LBB InsAdmin to the applicable Lehman Party or Transferee without deductions, and the LBB InsAdmin shall not be permitted to off-set against the applicable Repurchase Price any other claim, whether by set-off, recoupment, retention or any other theory, that the LBB InsAdmin may have against any of the Lehman Parties or Transferees. The payment of the Repurchase Price shall be made at the time of reconveyance of the relevant Bankhaus Asset to the LBB InsAdmin or, if applicable, upon execution and delivery of a Beneficiary Agreement.

d.  Unless the LBB InsAdmin fails, refuses or is otherwise unable to comply with its repurchase obligations under this Section 4, the repurchase obligations of the LBB

InsAdmin under this <u>Section 4</u> shall be the sole and exclusive remedy of the Lehman Parties in respect of the existence of any Title Defect.

e.   The LBB InsAdmin shall hold in reserve (the "<u>Repurchase Reserve</u>") a portion of the Purchase Price paid to the LBB InsAdmin on the Initial Closing Date in an amount equal to the Repurchase Reserve Amount until the Repurchase Reserve Termination Date, to provide for the payment by the LBB InsAdmin of any Repurchase Price that may be payable under this <u>Section 4</u>; provided, that, if there is any pending notice of Title Defect (accompanied with evidence of such Title Defect reasonably acceptable to the LBB InsAdmin) ("<u>Pending Notice</u>") on the Repurchase Reserve Termination Date, then the LBB InsAdmin shall continue to hold funds in the Repurchase Reserve in an amount equal to the Repurchase Price for the Bankhaus Asset(s) identified in such Pending Notice until such Pending Notice has either been (i) withdrawn, in the sole and absolute discretion of the Lehman Parties, (ii) resolved by the payment to the applicable Transferee of the Repurchase Price for the Bankhaus Asset(s) indicated in such Pending Notice in accordance with the provisions of this <u>Section 4</u>, or (iii) resolved by the Bankruptcy Court upon and following the filing with the Bankruptcy Court of an appropriate motion with respect thereto. The funds in the Repurchase Reserve shall be held in a segregated interest-bearing account located at Deutsche Bank AG (which is subject to the terms and conditions set forth in the letter attached as <u>Schedule 15</u> hereto and made a part hereof) or another financial institution reasonably acceptable to the Lehman Parties.

f.   In the event that a third party (the "<u>Title Claimant</u>") claims that it has a lien, claim, interest or other right in any Category 1 Loan Participation, Category 2 Loan or Category 4 Loan which would constitute a Title Defect and the Title Claimant provides evidence of such Title Defect reasonably acceptable to the LBB InsAdmin, the LBB InsAdmin may deliver to the applicable Transferee notice of such Title Defect, accompanied by evidence of such Title Defect. Provided that (i) such evidence is reasonably acceptable to such Transferee, (ii) the LBB InsAdmin can provide reasonable evidence that the repurchase of the relevant Bankhaus Asset would enable the LBB InsAdmin to avoid or mitigate any damage claims of the Title Claimant against Bankhaus and/or the LBB InsAdmin, and (iii) the applicable Transferee receives notice of such Title Defect no later than eighteen months after the applicable Closing Date, the repurchase mechanism set forth in <u>Section 4.c.</u> shall apply *mutatis mutandis*.

5.   ***Lehman Representations and Warranties***.  In order to induce the LBB InsAdmin to enter into and perform his obligations under this Agreement and the Ancillary Documents to which he is a party, each of the Lehman Parties hereby represents, warrants and acknowledges as follows:

a.   *Authority*.  Subject only to the Lehman Court Approval, (i) such Lehman Party has the power and authority to execute, deliver and perform its obligations under this Agreement and the Ancillary Document to which it is a party, and (ii) the execution, delivery and performance by such Lehman Party of this Agreement and each of the Ancillary Documents to which such Lehman Party is a party and

the consummation of the transactions contemplated thereby have been duly authorized by all necessary action on the part of such Lehman Party and no other proceedings on the part of such Lehman Party are necessary to authorize and approve this Agreement or any of the Ancillary Documents or any of the transactions contemplated thereby.

b.    *Validity.*  Subject only to the Lehman Court Approval, (i) this Agreement has been duly executed and delivered by such Lehman Party and constitutes the legal, valid and binding agreement of such Lehman Party, enforceable against such Lehman Party in accordance with its terms, and (ii) upon execution and delivery of the Ancillary Documents to be executed by such Lehman Party, all such Ancillary Documents will have been duly executed and delivered by such Lehman Party and will constitute the legal, valid and binding agreement of such Lehman Party.

c.    *Authorization of Governmental Authorities.*  No action by (including any authorization, consent or approval), in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by such Lehman Party of this Agreement or any of the Ancillary Documents, other than the Lehman Court Approval.

d.    *Title; No Transfer of Claims.*  The Lehman Parties have good and valid title to and have not assigned, transferred or conveyed to any other Person, in whole or in part, including for security, any of their respective right, title or interest in, to or under any claims or causes of action that are the subject of this Agreement or any of the Ancillary Documents.

e.    *No Reliance.*  Such Lehman Party (i) is a sophisticated party with respect to the matters that are the subject of this Agreement and the Ancillary Documents, (ii) has adequate information concerning the matters that are the subject of this Agreement and the Ancillary Documents, and (iii) has independently and without reliance upon the LBB InsAdmin or Bankhaus, and based on such information as such Lehman Party has deemed appropriate, made its own analysis and decision to enter into this Agreement and the Ancillary Documents to which it is a party, except that such Lehman Party has relied upon the LBB InsAdmin's express representations, warranties and covenants in this Agreement and the Ancillary Documents.

f.    Without in any way or manner waiving the rights of the Lehman Parties under Section 4, other than as disclosed on Schedule 10 of this Agreement and after due inquiry, the Lehman Parties have no actual knowledge of any Title Defects affecting any of the Category 1 Loan Participations, Category 2 Loans or Category 4 Loans.

6.    *Approval of the Agreement and Ancillary Documents.*

a.    *Lehman Court Approval.* The Lehman Parties will file with the Bankruptcy Court, within ten Business Days after the Execution Date, a motion seeking entry of an order (the "Lehman Court Order") in form and substance reasonably acceptable to each of the Parties: (i) approving, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and applicable provisions of the Bankruptcy Code, the terms of this Agreement; and (ii) authorizing LBHI and LCPI to take all necessary corporate actions to complete the transactions contemplated by this Agreement and the Ancillary Documents. The Lehman Parties shall seek the issuance and entry of the Lehman Court Order and shall inform the LBB InsAdmin of the progress of the Bankruptcy Court procedures relating to the issuance and entry of the Lehman Court Order, including progress toward resolution of any objections to the Agreement or any of the Ancillary Documents.

b.    *Bankhaus Creditors' Approval.* The LBB InsAdmin obtained the Initial Bankhaus Creditors' Approval for the execution, delivery and performance of his obligations under this Agreement and the Ancillary Documents pursuant to the German Insolvency Code (*Insolvenzordnung*) on or about October 20, 2009. The LBB InsAdmin shall use all reasonable efforts to obtain the Additional Committee Approval as promptly as possible after the Execution Date. The LBB InsAdmin shall inform the Lehman Parties of the progress of such approval procedure.

7.    *Closing.* Subject to the terms of Section 9 and provided that all Closing Conditions have otherwise been satisfied (or waived by the applicable Parties as provided herein), the closing of the acquisition of the Bankhaus Assets by the Lehman Parties and the other transactions contemplated under this Agreement (the "Initial Closing") shall occur at a mutually convenient time agreed upon by the Parties but no later than ten Business Days following the later of (i) the date on which the Lehman Court Approval has been obtained and (ii) the date on which the Additional Committee Approval has been obtained (such tenth Business Day following the later of the dates described in clauses (i) and (ii) being referred to as the "Outside Initial Closing Date"); provided, however, that with respect to any Deferred Purchased Assets, the closing of the acquisition of each such Deferred Purchased Asset by the applicable Lehman Party and the other transactions contemplated under this Agreement as they relate to such Deferred Purchased Asset (each, a "Subsequent Closing") shall occur on the applicable Subsequent Closing Date. Each Closing shall be held at the offices of Sonnenschein Nath & Rosenthal LLP, 1221 Avenue of the Americas, New York, New York, or such other place, date and time as is mutually agreed upon by the Parties and in accordance with the terms of this Agreement (with respect to the Initial Closing, the "Initial Closing Date" and with respect to any Subsequent Closing, no later than the Outside Subsequent Closing Date), time being of the essence, and shall be subject to the satisfaction of the following conditions (collectively, the "Closing Conditions"):

a.    *No Stay or Other Legal Prohibition.* There shall not be in effect any Legal Requirement or Governmental Order that would render the Parties unable to consummate or perform the transactions contemplated herein or make such transactions illegal or prohibit, restrict or delay such consummation or performance, and there shall not be in effect any injunction or other order issued

by a court of competent jurisdiction restraining or prohibiting the consummation and performance of the transactions contemplated herein.

b. *Bankhaus Creditors' Approval.* The Bankhaus Creditors Committee and the Bankhaus Creditors Assembly shall have authorized and approved the execution and delivery of, and the performance of the obligations of the LBB InsAdmin under, this Agreement and the Ancillary Documents by the LBB InsAdmin and the transactions contemplated herein and in the Ancillary Documents, and the LBB InsAdmin shall have provided the Lehman Parties with a copy of relevant portions of the minutes of the meeting(s) at which the Bankhaus Creditors' Approval was obtained reflecting the approval of this Agreement and the Ancillary Documents, which approval be in full force and effect as of the applicable Closing Date.

c. *Lehman Court Approval.* The Lehman Court Order shall have been issued and entered by the Bankruptcy Court and shall have become a Final Order (referred to herein as "<u>Lehman Court Approval</u>") and shall be in full force and effect as of the Closing Date.

d. *Lehman Closing Conditions.* Unless waived in writing by each of the Lehman Parties in their sole and absolute discretion, the obligation of the Lehman Parties to consummate the Initial Closing and each Subsequent Closing shall be expressly conditioned upon and subject to the satisfaction each of the following conditions (the "<u>Lehman Closing Conditions</u>") at or prior to the applicable Closing:

   i. each of the representations and warranties of the LBB InsAdmin contained in this Agreement and in the Ancillary Documents shall be true and correct in all materials respects as of the applicable Closing Date with the same force and effect as if made on and as of the applicable Closing Date;

   ii. the LBB InsAdmin shall have performed and complied in all material respects with all agreements, obligations and covenants contained in this Agreement that are required to be performed or complied with by the LBB InsAdmin at or prior to the applicable Closing;

   iii. the LBB InsAdmin shall have executed and delivered, or caused to have been executed and delivered, to the Lehman Parties all of the Bankhaus Closing Deliveries required to be executed and delivered with respect to the applicable Closing;

   iv. (1) with respect to the Initial Closing, no Material Event(s) shall have occurred after the Execution Date and on or prior to the Initial Closing Date which causes the aggregate market value of all Bankhaus Assets as of the Initial Closing Date to have decreased by more than twenty-five percent (25%) from the aggregate value of all Bankhaus Assets on the Execution Date (reflected as the "Applicable Value" or "Value" on <u>Schedule 2</u>, <u>Schedule 3</u> and <u>Schedule 4</u> hereto) (any such decrease resulting from one or more Material Events being referred to herein as a

"Material Value Change"); provided, that any change in the market value of any Bankhaus Asset resulting from the occurrence of an event other than a Material Event (including the making of any principal payments in respect of any of the Loans) shall be disregarded for purposes of determining whether a Material Value Change has occurred;

(2)  if the Lehman Parties claim that a Material Value Change has occurred, they shall provide documentation to the LBB InsAdmin that enables the LBB InsAdmin to evaluate and determine the alleged decrease in value (the Parties hereby agreeing that updated market values for the Bankhaus Assets shall constitute sufficient documentation for such purpose);

(3)  if a Material Value Change shall have occurred, the Parties shall negotiate, in good faith, an adjustment in the Purchase Price to reflect the Material Value Change and if they are unable to agree upon such adjustment within ten days following the commencement of such negotiations or if the Parties disagree about whether or not a Material Value Change has occurred or the extent thereof, the Parties shall retain a Third Party Appraiser (whose fees shall be paid by the Lehman Parties and the LBB InsAdmin on a fifty-fifty basis) to determine the aggregate value of the Bankhaus Assets as of the Initial Closing Date (which aggregate value shall be determined using the same assumptions used by the Parties in the determination of the Applicable Values as of the Execution Date) for purposes of determining the extent (if any) of a Material Value Change and which determination shall be conclusive and binding on the Parties for purposes of calculating an adjustment to the Purchase Price reflecting such Material Value Change. To the extent that the Parties are unable to mutually agree upon a Third Party Appraiser, then the Parties agree that such dispute shall be resolved by the Bankruptcy Court upon and following the filing of an appropriate motion with respect thereto with the Bankruptcy Court;

(4)  notwithstanding the foregoing provisions of this Section 7.d.iv., the Parties acknowledge that the "Applicable Value" or "Value" of each of the Bankhaus Assets as set forth on Schedule 2, Schedule 3 and Schedule 4 is an estimate and that the actual value of each of the Bankhaus Assets may differ materially from such estimate and that, except as provided in this Section 7.d.iv. and in Section 7.e.iv., if the value of any Bankhaus Asset differs materially from the aforementioned estimate of the Parties, no Party shall have any recourse against the Released Parties (as defined in the Mutual Release Agreement) based upon any such difference between the actual value and estimated value of such Bankhaus Asset;

(5)  notwithstanding the foregoing provisions of this Section 7.d.iv., the LBB InsAdmin shall have the right, at its election, to terminate this Agreement by written notice to the Lehman Parties if the Lehman Parties claim that a Material Value Change has occurred and the Third Party

Appraiser or the Bankruptcy Court agrees that a Material Value Change has occurred. Upon such termination, all Parties shall be automatically relieved of any further obligations hereunder (except for any obligations which are stated to survive the termination of this Agreement) and Section 11.d shall apply; and

v.   No Title Defects have been identified with respect to any of the Bankhaus Assets; provided, that if any Title Defects have been identified with respect to any Bankhaus Asset, the Lehman Parties may elect, in their sole and absolute discretion, to include or exclude such Bankhaus Asset from the applicable Closing and, in either case, shall proceed to Closing with respect to all other Bankhaus Assets (other than any Deferred Purchased Assets). Any such Bankhaus Asset which the Lehman Parties elect to exclude from the applicable Closing shall be deleted from all applicable Schedules hereto and the Schedules shall be updated to reflect such deletion.   The Lehman Parties shall promptly notify the LBB InsAdmin in writing if they determine that any Category 1 Loan Participation, Category 2 Loan or Category 4 Loan is subject to a Title Defect, accompanied by evidence of such Title Defect reasonably acceptable to the LBB InsAdmin. The Parties will cooperate in good faith to resolve, as soon as possible, any dispute arising under or with respect to any matters described in this Section 7.d.v. To the extent that the Parties are unable to resolve such dispute, then the Parties agree that such dispute shall be resolved by the Bankruptcy Court upon and following the filing of an appropriate motion with respect thereto with the Bankruptcy Court. The LBB InsAdmin may also elect to exclude a Bankhaus Asset from the applicable Closing if (i) a Title Claimant provides evidence of a Title Defect of such Bankhaus Asset reasonably acceptable to the LBB InsAdmin and the Lehman Parties and (ii) the LBB InsAdmin can provide reasonable evidence that the exclusion of the relevant Bankhaus Asset would enable the LBB InsAdmin to avoid or mitigate any damage claims of the Title Claimant against Bankhaus and/or the LBB InsAdmin.

e.   *LBB InsAdmin Closing Conditions.*  Unless waived in writing by the LBB InsAdmin in its sole and absolute discretion, the obligation of the LBB InsAdmin to consummate the Initial Closing and each Subsequent Closing shall be expressly conditioned upon and subject to the satisfaction each of the following conditions (the "LBB InsAdmin Closing Conditions") at or prior to the applicable Closing:

i.   each of the representations and warranties of the Lehman Parties contained in this Agreement and in the Ancillary Documents shall be true and correct in all materials respects as of the applicable Closing Date with the same force and effect as if made on and as of the applicable Closing Date;

ii.   the Lehman Parties shall have performed and complied in all material respects with all agreements, obligations and covenants contained in this Agreement that are required to be performed or complied by the Lehman Parties at or prior to the applicable Closing;

iii.   the Lehman Parties shall have executed and delivered, or caused to have been executed and delivered, to the LBB InsAdmin all of the Lehman Closing Deliveries required to be executed and delivered with respect to the applicable Closing; and

iv.   with respect to the Initial Closing, no Material Event(s) shall have occurred after the Execution Date and on or prior to the Initial Closing Date which causes the aggregate market value of all Bankhaus Assets as of the Initial Closing Date to have increased by more than twenty-five (25%) from the aggregate value of all Bankhaus Assets on the Execution Date (reflected as the "Applicable Value" or "Value" on Schedule 2, Schedule 3 and Schedule 4 hereto) (any such increase resulting from one or more Material Events also being referred to herein as a "Material Value Change"); provided, that any change in the market value of any Bankhaus Asset resulting from the occurrence of an event other than a Material Event shall be disregarded for purposes of determining whether a Material Value Change has occurred; provided, that if the LBB InsAdmin claims that a Material Value Change has occurred, he shall provide documentation to the Lehman Parties that enables the Lehman Parties to evaluate and determine the alleged increase in value (the Parties hereby agreeing that updated market values for the Bankhaus Assets shall constitute sufficient documentation for such purpose); provided, further, that if the LBB InsAdmin claims that such an increase has occurred, sub-paragraphs (3) and (4) of Section 7.d.iv. shall apply *mutatis mutandis*.

8.    ***Closing Deliveries***.

a.    *Lehman Closing Deliveries*.  At the applicable Closing, and provided that all of the Closing Conditions have been satisfied (or waived as provided herein), the Lehman Parties shall pay or cause to be paid the applicable Net Payment Amount to the LBB InsAdmin in immediately available funds in accordance with the wire transfer instructions set forth on Schedule 5 hereto, and shall execute and deliver, or cause to be executed and delivered, each of the following documents and other items (collectively, the "Lehman Closing Deliveries"):

i.    a closing certificate, substantially in the form attached hereto as Exhibit A-1 attached hereto and made a part hereof, duly executed by each of the Lehman Parties and certifying the accuracy of the representations and warranties made by the Lehman Parties hereunder, and confirming that each of the Lehman Closing Conditions have been satisfied or have otherwise been waived by the Lehman Parties;

ii.   the Category 1 Loan Participation Termination Agreement with respect to those Category 1 Loan BH Interests that the Parties have agreed to be terminated, relinquished and quitclaimed (collectively, the "Terminated Category 1 Interests"), duly executed by the Category 1 Loan Holders;

iii.  the Category 1 Assignment and Assumption Agreements with respect to those Category 1 Loan BH Interests listed on Schedule 9 that the Parties

have agreed to be assigned (collectively, the "Assigned Category 1 Interests"), each duly executed by the Category 1 Loan Transferees;

iv.    intentionally omitted;

v.    with respect to each Category 2 Loan and Category 4 Loan, the Non-Category 1 Assignment and Assumption Agreements, duly executed by the applicable Category 2 Loan Transferees and Category 4 Loan Transferees parties thereto, pursuant to which such transferees shall assume the obligations of Bankhaus under the applicable Loan Documents relating to the Category 2 Loans and Category 4 Loans;

vi.    a mutual release agreement with respect to the Loans, the Schedule 6 Loans and the Category 3 Loans, substantially in the form of Exhibit B attached hereto and made a part hereof (the "Mutual Release Agreement"), duly executed by each of the Lehman Parties;

vii.    a certified copy of the Lehman Court Approval; and

viii.    all other documents, instruments, certificates and agreements required to be delivered by or on behalf of any of the Lehman Parties under this Agreement or any of the Ancillary Documents and any other documents or deliveries reasonably requested by the LBB InsAdmin in order to effectuate the transactions contemplated herein.

   b.    *Bankhaus Closing Deliveries.*  At the applicable Closing, and provided that all of the Closing Conditions have been satisfied (or waived as provided herein), the LBB InsAdmin shall execute and/or deliver, or cause to be executed and/or delivered, each of the following documents and other items (collectively, the "Bankhaus Closing Deliveries"):

i.    a closing certificate, substantially in the form attached hereto as Exhibit A-2 attached hereto and made a part hereof, duly executed by LBB InsAdmin and certifying the accuracy of the representations and warranties made by the LBB InsAdmin hereunder, and confirming that the LBB InsAdmin Closing Conditions have been satisfied or have otherwise been waived by the LBB InsAdmin;

ii.    a termination agreement, substantially in the form of Exhibit C attached hereto and made a part hereof, duly executed by the LBB InsAdmin, pursuant to which the Terminated Category 1 Interests are terminated, relinquished and quitclaimed and all right, title and interest of the LBB InsAdmin in and to the Category 1 Loan Cash held by, on behalf of or for the benefit of the Category 1 Loan Holders as of the Initial Closing Date is assigned, transferred and conveyed to the applicable Category 1 Loan Holders and/or otherwise relinquished by the LBB InsAdmin (the "Category 1 Loan Participation Termination Agreement");

iii.    with respect to each Assigned Category 1 Interest, an assignment and assumption agreement pursuant to which the LBB InsAdmin assigns to the applicable Category 1 Loan Transferee all of the Assigned Category 1 Interests, substantially in the form of <u>Exhibit D-1</u> attached hereto and made a part hereof (collectively, the "<u>Category 1 Assignment and Assumption Agreements</u>");

iv.    with respect to each Category 2 Loan and each Category 4 Loan, (i) an assignment and assumption agreement pursuant to which the LBB InsAdmin assigns to the applicable Category 2 Loan Transferee or Category 4 Loan Transferee all of the applicable Category 2 Loan BH Interests and Category 4 Loan BH Interests, respectively, substantially in the form of <u>Exhibit D-2</u> attached hereto and made a part hereof, as the same may be modified to conform to any requirements set forth in the applicable Loan Documents relating to the transfer and assignment of a lender's interests thereunder and any other applicable local law requirements (collectively, the "<u>Non-Category 1 Assignment and Assumption Agreements</u>"), together with any consents which may be required from any borrowers or other parties under any of the Loan Documents, and (ii) all other Ancillary Category 2 Loan Documents and Ancillary Category 4 Loan Documents, each duly executed by the LBB InsAdmin in favor of the applicable Category 2 Loan Transferees and Category 4 Loan Transferees;

v.    with respect to those Category 2 Loans and Category 4 Loans where Bankhaus is identified as being an "Agent" (where Bankhaus is an administrative, collateral, syndication, facility, security or other agent under any Category 2 Loan or any Category 4 Loan) on <u>Schedule 3</u> and <u>Schedule 4</u>, respectively, assignments and/or resignation and appointment instruments in such forms as may be required, contemplated or specified under and otherwise conforming to the terms of the applicable Loan Documents in order to effectuate a Category 2 Loan Agency Substitution and a Category 4 Loan Agency Substitution with respect to each such Loan;

vi.    the Mutual Release Agreement, duly executed by the LBB InsAdmin;

vii.    a termination and release agreement in favor of LBHI with respect to the LBHI Agreements (the "<u>LBHI Release Agreement</u>"), substantially in the form of <u>Exhibit F</u> attached hereto, duly executed by the LBB InsAdmin;

viii.    the original R-Note, originals of other promissory notes, guarantees and letters of credit listed on <u>Schedule 14</u> (collectively, the "<u>Essential Original Loan Documents</u>"), and, to the extent within the possession, custody or control of the LBB InsAdmin or Bankhaus, all other Loan Documents respecting the Category 2 Loans and Category 4 Loans (it being understood that the LBB InsAdmin shall be entitled to keep copies of such originals as required by law); provided, that, if any Essential Original

Loan Document has been lost or misplaced and cannot be located and delivered to the applicable Transferee at the applicable Closing, then the LBB InsAdmin shall execute and deliver to the applicable Transferee, in lieu of delivering such Essential Original Loan Document, a lost note affidavit or other document or instrument as may be requested by the Lehman Parties to replace such lost or misplaced Essential Original Loan Document and to cure or eliminate any limitation or impediment to the full enforcement of the rights and remedies of, and/or the realization of the benefits inuring to, the holder of such Essential Original Loan Document created by or resulting from the failure of the LBB InsAdmin to deliver the Essential Original Loan Document to the applicable Transferee (each, a "Substitute Document"), but only to the extent that providing such Substitute Document does not entail significant expense or contravene any applicable laws or regulations, in particular with respect of the purposes of the insolvency proceedings; provided, further, that if the LBB InsAdmin fails or is otherwise unable to deliver an Essential Original Loan Document or any Substitute Document in lieu thereof, then the Lehman Parties shall not be required to purchase the applicable Category 2 Loan or Category 4 Loan and such Loan shall be treated as if a Title Defect exists with respect to such Loan and shall be subject to exclusion from this Agreement at the election of the Lehman Parties and such exclusion shall be the sole and exclusive remedy of the Lehman Parties in respect of such failure or inability;

ix.   all Escrow Funds held by the LBB InsAdmin under any of the Category 2 Loans or Category 4 Loans, which Escrow Funds shall be delivered to the applicable Category 2 Loan Transferees and Category 4 Loan Transferees in accordance with wire transfer instructions provided to the LBB InsAdmin at or prior to the applicable Closing;

x.    to the extent within the possession, custody or control of the LBB InsAdmin or Bankhaus, copies of all Loan Files relating to any of the Loans;

xi.   good and valid title to any collateral (including, without limitation, any cash or cash equivalents, equity interests, securities, real or personal property but excluding any cash collateral held in connection with the M-Loans if such cash collateral consists of accumulated interest payments which are to be retained or received by the LBB InsAdmin in accordance with Section 2.d.) or the Proceeds thereof that the LBB InsAdmin holds in respect of any of the Bankhaus Assets (for the avoidance of doubt, this Section 8.b.xi. does not apply to cash collateral provided under the Security & Collateral Agreement, which shall remain with the LBB InsAdmin);

xii.  copies of relevant sections or portions of the minutes of the meetings at which the Initial Bankhaus Creditors' Approval and the Additional Committee Approval were obtained; and

xiii.  all other documents, instruments, certificates and agreements required to be delivered by or on behalf of the LBB InsAdmin under this Agreement or any of the Ancillary Documents and any other documents or deliveries reasonably requested by the Lehman Parties in order to effectuate the transactions contemplated herein.

9.  **_Deferred Purchased Assets._**  The Parties acknowledge that, to the extent various foreign law requirements, required consents or approvals from third parties or other circumstances outside the control of the Parties would render any assignment of the applicable Bankhaus Assets ineffective, void or voidable or otherwise impossible as of the Initial Closing Date, the consummation of the transfer and assignment of some or all of those Category 2 Loans and Category 4 Loans more particularly described on Schedule 11 attached hereto and made a part hereof may need to occur on a date subsequent to the Initial Closing Date to be mutually agreed upon by the Parties but within ten Business Days following the satisfaction of all Closing Conditions applicable to any such transfer and assignment (those Category 2 Loans and/or Category 4 Loans which are not assigned and transferred on the Initial Closing Date being referred to collectively as the "Deferred Purchased Assets," and each date on which the consummation of the transfer and assignment of any Deferred Purchased Asset occurs being referred to as a "Subsequent Closing Date"); provided, however, that no Subsequent Closing Date shall be later than July 31, 2010 (the "Outside Subsequent Closing Date") provided that all Closing Conditions applicable to any Subsequent Closing shall have been fully satisfied or otherwise waived as provided in this Agreement.  Notwithstanding anything to the contrary contained herein or in any of the Ancillary Documents, provided that the Closing Conditions have been satisfied or waived with respect to the transfer and assignment of all Category 1 Loan BH Interests, then the Initial Closing shall proceed with respect to all Bankhaus Assets other than the Deferred Purchased Assets as provided in this Agreement, subject to the following:  (i) those Ancillary Documents related solely to the transfer and assignment of the Deferred Purchased Assets shall not be executed and delivered at the Initial Closing but shall be executed and delivered at the applicable Subsequent Closing, (ii) the Ancillary Documents executed and delivered at the Initial Closing (including the Mutual Release Agreement and the LBHI Release Agreement) shall be modified, as necessary, to exclude therefrom any reference to or inclusion of the Deferred Purchased Assets; provided, however, that similar Ancillary Documents shall be executed and delivered in connection with each Subsequent Closing with respect to, and referencing and including, the Deferred Purchased Assets being transferred and assigned at such Subsequent Closing, (iii) the Purchase Price payable on the Initial Closing Date shall be adjusted to exclude any portion thereof attributable to the Deferred Purchased Assets, and (iv) the Net Payment Amount payable on the Initial Closing Date shall be adjusted to exclude, in the calculation thereof, any portion of the Category 2 Loan Cash Amount attributable to the Deferred Purchased Assets.  All Closing Conditions shall be applicable to the closing of the transfer and assignment of any Deferred Purchased Assets as if such closing had occurred on the Initial Closing Date, and the Parties shall execute and deliver the Ancillary Documents respecting any such Deferred Purchased Asset on the applicable Subsequent Closing Date for such Deferred Purchased Asset and shall otherwise comply with the terms and provisions of this Agreement in connection with the consummation of such closing as if the same had occurred on the Initial Closing Date; provided, however, that the applicable Purchase Price for each Deferred Purchased Asset shall be determined on and as of the Subsequent Closing Date applicable to such Deferred Purchased Asset.  Notwithstanding anything to the contrary contained herein, if the closing of

any Deferred Purchased Assets has not occurred prior to the Outside Subsequent Closing Date, then the Parties shall have no further obligations with respect to any such Deferred Purchased Assets and this Agreement shall be of no further force or effect with respect to the acquisition of the same by the Lehman Parties.

10.    ***Pre-Closing Covenants***.

a.    *Conduct of the LBB InsAdmin Prior to the Closing.*  From the Execution Date to the earlier of (i) the applicable Closing Date, and (ii) the termination of this Agreement in accordance with the terms hereof, except as may be consented to in writing by the Lehman Parties or as otherwise expressly provided herein or as Bankhaus has otherwise agreed in the Loan Documents or in any Participation Agreement to which any Person other than the Parties is a party (and a copy of which has been provided to the Lehman Parties prior to the Execution Date),

(A) to the extent permitted by law, the LBB InsAdmin shall not, without the consent of the Lehman Parties:

i.    sell, assign, transfer or otherwise dispose of any of the Bankhaus Assets (including, without limitation, the Category 2 Loan Cash which shall continue to be segregated from any other assets of Bankhaus until the applicable Closing Date) or any interest therein, whether in whole or in part;

ii.    make any change in accounting methods, principles or practices relating to any of the Bankhaus Assets;

iii.    amend, modify, terminate or subordinate any Loan Document;

iv.    encumber any of the Bankhaus Assets;

v.    waive, modify, alter, cancel, accept a discounted payoff of, or subordinate any Bankhaus Asset in any respect, or foreclose or otherwise proceed against the collateral for, accept a deed in lieu of foreclosure of, or compromise or settle any claims with respect to, any of the Bankhaus Assets, or rescind, and the related collateral shall not be released from, the lien, encumbrance or security interest of, nor shall the borrower, guarantor, mortgagor or pledgor be released from its obligations under, any of the Loan Documents, in whole or in part, nor shall any instrument be executed that would effect any such waiver, modification, alteration, cancellation discounted payoff, subordination, foreclosure, deed in lieu of foreclosure, compromise or settlement, rescission or release, except as required by law or by the related Loan Documents;

vi.    take any action which would cause any of the representations or warranties of the LBB InsAdmin contained in this Agreement or any of the Ancillary Documents to be untrue in any material respect;

vii.    take any action which would materially affect any of the rights of any of the Lehman Parties in, to or under the Bankhaus Assets following the consummation of the applicable Closing; or

viii.    agree to take any action that would effectuate or result in any of the foregoing items i. through vii. above.

and (B) the LBB InsAdmin shall deliver to the Lehman Parties copies of any notices or other correspondence (including any default notices) delivered to or received from the applicable borrowers and other obligors under the Loan Documents.

The LBB InsAdmin shall not be obligated to fund under any of the Loans (but shall promptly notify the Lehman Parties of the receipt by it of any funding request) or accept any instructions from the Lehman Parties in respect of the Bankhaus Assets and, for the avoidance of doubt, may (but is not obligated to) take any measure which the LBB InsAdmin deems necessary to maintain the value of and safeguard the Bankhaus Assets, provided that (i) the LBB InsAdmin shall notify the Lehman Parties within a reasonable time of taking any such measure, and (ii) any such measure shall not contravene the provisions of Section 10.a.(A) above.

b.    *Conduct of the Lehman Parties Prior to Closing.*  From the Execution Date to the earlier of (i) the applicable Closing Date, and (ii) the termination of this Agreement in accordance with the terms hereof, except as may be consented to in writing by the LBB InsAdmin or as otherwise expressly provided herein, the Lehman Parties shall not take any action which would cause any of the representations or warranties of the Lehman Parties contained in this Agreement or any of the Ancillary Documents to be untrue in any material respect.

c.    *[Intentionally Omitted]*

d.    *Notices of Material Events.*  Each Party will give prompt notice to the other Parties of any fact, to the knowledge of such Party, that would, if it were true on the applicable Closing Date, constitute a breach of such Party's representations, warranties or covenants under this Agreement or any of the Ancillary Documents. Each Party to this Agreement will give prompt written notice to the other Parties of any material development affecting the ability of such Party to consummate the transactions contemplated by this Agreement and the Ancillary Documents. No disclosure by any Party pursuant to this Section 10.d. shall be deemed to prevent or cure any misrepresentation, breach of warranty or breach of covenant.

e.    *Approvals.*  None of the Parties shall take any action which would cause the Lehman Court Approval or the Bankhaus Creditors' Approval to be modified, vacated or stayed or otherwise to not remain in full force and effect.

11.    *Termination.*

　　a.    *Automatic Termination.*  This Agreement shall automatically terminate and be of no further force or effect and the Parties hereto shall be automatically relieved of any further obligations hereunder (except for any obligations which are stated to survive the termination of this Agreement) if and on any date on which the Bankruptcy Court denies the motion seeking issuance of the Lehman Court Order with prejudice or on February 26, 2010 if the Lehman Court Approval and the Additional Committee Approval have not been obtained on or prior to such date.  If the Bankruptcy Court conditions any approval of the motion upon the making of any modification to this Agreement, the Parties shall discuss such conditions in good faith.  If the Parties cannot agree upon the necessary modification to this Agreement within thirty days after the relevant order of the Bankruptcy Court, this Agreement shall automatically terminate and be of no further force or effect and the Parties hereto shall be automatically relieved of any further obligations hereunder (except for any obligations which are stated to survive the termination of this Agreement).

　　b.    *Lehman Parties' Right to Terminate.*  The Lehman Parties shall have the right, at their election, to terminate this Agreement by written notice to the LBB InsAdmin if there is a breach, in any material respect, of the representations, warranties and/or covenants of the LBB InsAdmin hereunder, taken as a whole, and the LBB InsAdmin shall fail to cure such breach within fifteen days following written notice of such breach from the Lehman Parties;  provided, that nothing herein shall in any way affect or impair the Lehman Parties' rights to require that all Closing Conditions be satisfied in connection with any Closing.  Upon such termination, all Parties shall be automatically relieved of any further obligations hereunder (except for any obligations which are stated to survive the termination of this Agreement).  The foregoing termination right is not intended to be and shall not be an exclusive remedy for the Lehman Parties resulting from a breach by the LBB InsAdmin as described above, but the Lehman Parties shall further be entitled to all rights and remedies available in equity or at law.

　　c.    *LBB InsAdmin's Right to Terminate.*  The LBB InsAdmin shall have the right, at its election, to terminate this Agreement by written notice to the Lehman Parties if there is a breach, in any material respect, of the representations, warranties and/or covenants of the Lehman Parties hereunder, taken as a whole, and the Lehman Parties shall fail to cure such breach within fifteen days following written notice of such breach from the LBB InsAdmin; provided, that nothing herein shall in any way affect or impair the LBB InsAdmin's right to require that all Closing Conditions be satisfied in connection with any Closing.  Upon such termination, all Parties shall be automatically relieved of any further obligations hereunder (except for any obligations which are stated to survive the termination of this Agreement).  The foregoing termination right is not intended to be and shall not be an exclusive remedy for the LBB InsAdmin resulting from a breach by the Lehman Parties as described above, but the LBB InsAdmin shall further be entitled to all rights and remedies available in equity or at law.

　　d.    *Effect of Termination.*  In the event that this Agreement is terminated in accordance with its terms by any Party, then neither this Agreement, nor any motion or other pleading filed in the Lehman Bankruptcy Case with respect to the approval of this Agreement or the transactions contemplated hereby, shall have any res judicata or collateral estoppel effect or be of any force or effect, each of the Parties' respective interests, rights, remedies and defenses shall be restored without prejudice as if this Agreement had never been executed.  Except as

expressly provided herein or in any of the Ancillary Documents (and then only upon the consummation of the Initial Closing and, with respect to any Deferred Purchased Assets, each applicable Subsequent Closing), this Agreement and all communications and negotiations among the Parties with respect hereto or any of the transactions contemplated hereunder are without waiver of or prejudice to the Parties rights and remedies and the Parties hereby reserve all claims, defenses and positions that they may have with respect to each other.

12.   ***Agreement Regarding Claims.***  The Parties hereby confirm, acknowledge and agree as follows:

a.   the loans, debts, obligations, facilities notes or portions thereof, set forth on Schedule 13 attached hereto and made a part hereof (collectively, the "Category 3 Loans") were participated pursuant to LMA-style participation agreements and, as a result, neither Bankhaus nor the LBB InsAdmin has any ownership interest in any of the Category 3 Loans but the nature of the relationship between Bankhaus (and/or the LBB InsAdmin) and the Lehman Parties who are record owners of the Category 3 Loans is that of creditor and debtor;

b.   the Lehman Parties hereby represent that they have no knowledge that the nature of the relationship between Bankhaus (and/or the LBB InsAdmin) and the Lehman Parties who are record owners of the Category 3 Loan is other than that of creditor and debtor;

c.   the LBB InsAdmin hereby represents that he has no knowledge that the nature of the relationship between LCPI and Bankhaus (and/or the LBB InsAdmin) with respect to the Category 4 Loans is other than that of creditor and debtor. For the avoidance of doubt, the Parties acknowledge and agree that nothing in this Agreement shall in any way or manner imply or constitute an election or deemed election by the LBB InsAdmin (by his act or omission) of the fulfillment of any Participation Agreement in respect of the Category 4 Loans within the meaning of Section 103 of the German Insolvency Code;

d.   the Lehman Court Order shall provide that the LBB InsAdmin has an allowed and accepted non-priority unsecured claim in the amount of $1,015,500,000.00 against LCPI on account of and arising from the Category 3 Loans after deduction of all claims which LCPI holds against Bankhaus and/or the LBB InsAdmin on account of and arising from the Category 2 Loans and the Category 4 Loans (collectively, the "Bankhaus Net Cat 3 Claim");

e.   except as hereinafter provided, the Lehman Court Order shall provide that the LBB InsAdmin has an allowed and accepted non-priority unsecured claim as a creditor against LBHI on account of any and all claims arising under the Security & Collateral Agreement relating to the Category 3 Loans and relating to the O.T.A. Senior Loan in an aggregate amount equal to $1,380,900,000.00 less the amount of any distributions that are received by the LBB InsAdmin in respect of the Bankhaus Net Cat 3 Claim (the "Security & Collateral Agreement Claim"); provided, however, that the Lehman Parties reserve the right to seek a reduction or disallowance of the Security & Collateral Agreement Claim in the event that LCPI is substantively consolidated with LBHI; and provided, further, that the LBB InsAdmin reserves all rights, claims, defenses and objections related thereto, including but not limited to the right to oppose substantive consolidation and the right to oppose reduction or disallowance of the Security & Collateral Agreement Claim in the event of substantive consolidation of LCPI and LBHI; provided, further, that under no circumstances shall the LBB InsAdmin be entitled to

collect or receive, collectively, from both LCPI and LBHI or from any entity resulting from the substantive consolidation of LCPI and LBHI an amount in excess of the amount of $1,380,900,000.00 on account of and arising from the Bankhaus Net Cat 3 Claim and the Security & Collateral Agreement Claim;

f.   neither Bankhaus nor the LBB InsAdmin has any further claims against the Lehman Parties on account of or arising from the Category 3 Loans except as provided in Section 12.d. and Section 12.e.  For the avoidance of doubt, in the event the Lehman Parties seek reduction or disallowance of the Security & Collateral Agreement Claim as described in Section 12.e., the LBB InsAdmin shall retain the right to assert all claims arising under the LBHI Agreements which pertain to the Category 3 Loans and LBHI shall retain the right to assert any and all defenses, objections and challenges to such claims;

g.   except as provided in Section 4 hereof, the Lehman Parties have no further claims against Bankhaus and/or the LBB InsAdmin  and the LBB InsAdmin has no further claims against the Lehman Parties on account of or arising from the Category 2 Loans or the Category 4 Loans if and to the extent they have been assigned, transferred, coveyed and delivered under this Agreement and have not been repurchased under Section 4.c;

h.   for the avoidance of doubt, on the Initial Closing Date, all participation interests, if any, created to or for the benefit of Bankhaus by and under the Participation Agreements or otherwise with respect to each of the Category 3 Loans shall be automatically terminated, relinquished and quitclaimed without any further instrument being delivered by the LBB InsAdmin; provided, that the LBB InsAdmin shall, at the Lehman Parties' request, provide such further instruments and further assurances as may be reasonably requested by the Lehman Parties to evidence or further assure the foregoing termination;

i.   this Agreement does not resolve any disputes between the Lehman Parties and the LBB InsAdmin respecting loans other than the Loans, the Category 3 Loans and the Schedule 6 Loans (the "Other Loans") and nothing contained herein shall in any way or manner impair the Parties' respective claims and other rights and remedies with respect to any Other Loans; and

j.   the LBB InsAdmin hereby represents that he has not, since November 13, 2008, conveyed, transferred or assigned any claims that Bankhaus and/or the LBB InsAdmin may have arising from the Category 3 Loans to any third party and further agrees that he shall not convey, transfer or assign the Bankhaus Net Cat 3 Claim to any third party without the prior written consent of the Lehman Parties, which consent shall not be required if the LBB InsAdmin has provided to the Lehman Parties at least 10 days prior written notice of any such conveyance together with a copy of any conveyance instrument which clearly designates the Bankhaus Net Cat 3 Claim as a non-priority unsecured claim.

k.   For the avoidance of doubt, except as otherwise provided in this Section 12, the Bankhaus Net Cat 3 Claim and the Security & Collateral Agreement Claim shall be treated in a like manner to that of other general unsecured claims against LBHI and LCPI and receive treatment and distribution on account of such claims equal to that of other general unsecured claims against LBHI and LCPI, and shall not be subject to further defenses, whether by way of set off, recoupment, counterclaim or otherwise, or any claim under Section 510 of the

Bankruptcy Code or otherwise which would have the effect of subordinating the Bankhaus Net Cat 3 Claim or the Security & Collateral Agreement Claim to the claims of other general unsecured claims.

13.    *Indemnification*.

a.    *Bankhaus Indemnification.*  If the Initial Closing occurs, the LBB InsAdmin shall indemnify each Lehman Party (which, for purposes of this Section 13.a. shall include their respective officers, directors, advisors, attorneys and Affiliates) against and in respect of any and all Losses that are paid, suffered or incurred by any such Lehman Party as a result of the breach of an express representation or warranty made by the LBB InsAdmin hereunder.  Any claims by a Lehman Party for indemnification under this Section 13.a. must be made in writing.  The obligation of the LBB InsAdmin to indemnify the Lehman Parties as provided in this Section 13.a. constitutes the sole remedy of the Lehman Parties under this Agreement if a Closing occurs (but only with respect to the Bankhaus Assets that have been terminated or transferred and assigned in connection with such Closing and not with respect to any Bankhaus Assets which have not yet been terminated or transferred and assigned hereunder) with respect to the breach of an express representation or warranty by the LBB InsAdmin hereunder.  Nothing contained in this Section 13.a. shall in any way affect or impair the Lehman Parties' rights to require that all Closing Conditions be satisfied in connection with any Closing.

b.    *Lehman Parties' Indemnification.*  If the Initial Closing occurs, the Lehman Parties, each individually and not jointly and severally, shall indemnify the LBB InsAdmin against and in respect of any and all Losses that are paid, suffered or incurred by the LBB InsAdmin as a result of the breach of an express representation or warranty made by the Lehman Parties hereunder.  In addition, each Transferee with respect to the Assigned Category 1 Loan Interests, the Category 2 Loans and the Category 4 Loans shall indemnify and hold the LBB InsAdmin harmless from any claims made against the LBB InsAdmin by any Person (including, without limitation, any borrower, guarantor or other obligor under the applicable Loan Documents) and arising from acts, omissions or events that occur after the applicable Closing Date (including, without limitation, any such claim arising from such Transferee's failure to comply with the obligations assumed by such Transferee under the applicable Category 1 Assignment and Assumption Agreement or Non-Category 1 Assignment and Assumption Agreement) with respect to any Assigned Category 1 Loan Interest, Category 2 Loan or Category 4 Loan assigned to such Transferee, excluding, however, any claims arising from any acts or omissions of the LBB InsAdmin; provided, that the applicable Transferee shall have the right to participate in, and at its election, to assume the defense of, any action or proceeding relating to any such claims for which the LBB InsAdmin is seeking to be indemnified hereunder with counsel reasonably satisfactory to the LBB InsAdmin. Any claims by the LBB InsAdmin for indemnification under this Section 13.b. must be made in writing.  The obligation of the Lehman Parties to indemnify the LBB InsAdmin as provided in the first sentence of this Section 13.b. constitutes the sole remedy of the LBB InsAdmin under this Agreement if a Closing occurs (but only with respect to the Bankhaus Assets that have been terminated or transferred and assigned in connection with such Closing and not with respect to any Bankhaus Assets which have not yet been terminated or transferred and assigned hereunder) with respect to any breach of an express representation or warranty by the Lehman Parties hereunder.  Nothing contained in

this Section 13.b. shall in any way affect or impair the LBB InsAdmin's right to require that all Closing Conditions be satisfied in connection with any Closing.

14.    **LBHI Agreements.**

**a.    Except as provided in Section 12.e., the Parties acknowledge and agree that neither any reference herein or in any of the Ancillary Documents to any of the LBHI Agreements nor the execution and delivery of the LBHI Release Agreement shall in any way or manner imply or constitute an admission or concession on the part of LBHI or any of the other Lehman Parties that LBHI or any Affiliate thereof has or may have any liability or obligation under any of the LBHI Agreements and LBHI hereby reserves all of its rights, claims, defenses and objections with respect thereto.**

b.    For the avoidance of doubt, any cash collateral provided by the Lehman Parties to Bankhaus under the Security & Collateral Agreement shall remain with the LBB InsAdmin, and the LBB InsAdmin and Bankhaus shall under no circumstance be required to repay such cash collateral. The Lehman Parties expressly waive all of their rights with respect to such cash collateral including, but not limited to, all rights pursuant to the doctrines of set-off, recoupment, retention or any other legal or equitable theory.

15.    *Survival.*  The representations, warranties, covenants and agreements made by the Parties in this Agreement shall survive the Initial Closing and each Subsequent Closing.

16.    *Venue and Choice of Law.*

a.    *Venue.*  To the maximum extent permissible by law, the Parties expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement or any of the Ancillary Documents and any Party bringing such action or proceeding shall bring such action or proceeding in the Bankruptcy Court. Each of the Parties agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by law. If the Bankruptcy Court refuses or abstains from exercising jurisdiction over the enforcement of this Agreement or any of the Ancillary Documents and/or any actions or proceedings arising hereunder or thereunder, then the Parties agree that venue shall be in any court in the State of New York having proper jurisdiction. Nothing in this Agreement shall affect any right that any Party may otherwise have to bring any action or proceeding to enforce the Loans or any of the Loan Documents or otherwise relating to the Loans against any borrower or other obligor thereunder or the collateral securing such Loans in the court of any jurisdiction. Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the Ancillary Documents with the Bankruptcy Court or with any other state or federal court located within the County of New York in the State of New York; and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each Party irrevocably consents to service of process in the manner provided for notices in Section 17 hereof. Nothing

in this Agreement will affect the right, or requirement, of any Party to this Agreement to serve process in any other manner permitted or required by law.

      b.    *Choice of Law.*  This Agreement and all claims and disputes arising out of or in connection with this Agreement, shall be governed by and construed in accordance with the laws of the State of New York, without regard to choice of law principles to the extent such principles would apply a law other than that of the State of New York.

      17.    **Notices**.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next Business Day, (c) three days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one Business Day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent:

      To any Lehman Party at:

      c/o Lehman Brothers Holdings Inc.
      1271 Avenue of the Americas, 39th Floor
      New York, New York 10020
      U.S.A.
      Attn: Joelle Halperin
      Facsimile: (646) 834-0874

      With a copy (which shall not constitute notice) to:

      Weil, Gotshal & Manges LLP
      767 Fifth Avenue
      New York, New York 10153
      U.S.A.
      Attn: W. Michael Bond, Esq.
      Facsimile: (212) 310-8007

      To LBB InsAdmin at:

Lehman Brothers Bankhaus AG i. Ins.

c/o CMS Hasche Sigle

Barckhausstraße 12-16

60325 Frankfurt a.M.

Germany

Attn: Dr. Michael Frege

Facsimile: 00-49-69-717-01-40410

With a copy (which shall not constitute notice) to:

Sonnenschein Nath & Rosenthal LLP

1221 Avenue of the Americas

New York, New York, 10020

U.S.A.

Attn: Walter G. Van Dorn, Jr.

Facsimile: (212) 768-6800

or to such other address as may have been furnished by a party to each of the other parties by notice given in accordance with the requirements set forth above.

18.    ***Closing Expenses***.  Except as otherwise expressly provided in <u>Section 13</u> hereof, the fees and expenses incurred by each Party (including the fees of any attorneys, accountants, investment bankers, financial advisors or any other professionals engaged by such Party) in connection with this Agreement and the transactions contemplated hereby, whether or not the transactions contemplated hereby are consummated, will be paid by such Party.  Notwithstanding the foregoing or anything to the contrary contained herein, all transfer taxes, notary fees and similar charges associated with or arising in connection with the transfer and assignment of the Bankhaus Assets as contemplated in this Agreement and/or the execution, delivery, recording or filing of any of the Ancillary Document, shall be paid one-half by the Lehman Parties and one-half by the LBB InsAdmin.

19.    ***Specific Performance***.  Without limiting or waiving any rights or remedies under this Agreement now existing or hereafter arising at law, in equity or by statute, each Party acknowledges that there is no adequate remedy at law for a breach of the covenants and obligations of the Parties under this Agreement and each Party agrees that, except as otherwise expressly provided in this Agreement, the other Parties shall be entitled to specific performance of this Agreement as a remedy to any such breach, and each Party hereby waives any legal or equitable defense to the granting thereof, including, without limitation, the requirement of posting a bond.

20.    ***Further Assurances***.  From time to time after any Closing, without further consideration, the LBB InsAdmin will execute and deliver, or cause to be executed and delivered, such documents to the Lehman Parties, and take such actions as the Lehman Parties may reasonably request to consummate the transactions contemplated herein and to assure that the benefits of this Agreement and the Ancillary Documents are realized by the Lehman Parties.

21. **No Admission of Liability**. Each Party acknowledges that this Agreement effects a settlement of potential claims and counterclaims that are denied and contested, and that nothing contained herein shall be construed as an admission of liability or wrongdoing. The Parties have entered into this Agreement solely for the purpose of avoiding costly litigation.

22. **Entire Agreement**. This Agreement, together with the Ancillary Documents, constitutes the entire and only agreement of the Parties concerning the subject matter hereof. This Agreement supersedes and replaces any and all prior or contemporaneous verbal or written agreements between the Parties (including that certain Summary of Lehman/Bankhaus Issues – Proposed Deal Points, dated August 27, 2009), except as otherwise expressly provided herein. The Parties acknowledge that this Agreement is not being executed in reliance on any verbal or written agreement, promise or representation not contained herein or in the Ancillary Documents.

23. **No Oral Modifications**. This Agreement may not be modified or amended orally. This Agreement only may be modified or amended by a writing signed by a duly authorized representative of each Party hereto. Any waiver of compliance with any term or provision of this Agreement on the part of any Lehman Party must be provided in a writing signed by the LBB InsAdmin. Any waiver of compliance with any term or provision of this Agreement on the part of the LBB InsAdmin must be provided in a writing signed by any Lehman Party. No waiver of any breach of any term or provision of this Agreement shall be construed as a waiver of any subsequent breach.

24. **Construction**. This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

25. **Binding Effect; Successor and Assigns**. Except as expressly stated otherwise in Section 29 of this Agreement, any declaration or statement of the LBB InsAdmin shall only be made in his capacity and function as Insolvency Administrator over the assets of Bankhaus, and shall in no circumstance be construed as being a declaration or statement of the LBB InsAdmin on his own and personal behalf. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns and it is the Parties' understanding that, by virtue of German statutory law, this Agreement, its implementation and the exercise of rights granted under it will be binding upon the insolvency estate of Bankhaus; provided, however, that no Party may assign its rights or obligations under this Agreement without the written consent of the other Party, which consent shall not be unreasonably withheld or delayed, and any assignment not in accordance with the terms hereof shall be null and void *ab initio*.

26. **Counterparts**. This Agreement may be executed in counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement. The signatures of all of the Parties need not appear on the same counterpart.

27. **Headings; Schedules and Exhibits**. The headings utilized in this Agreement are designed for the sole purpose of facilitating ready reference to the subject matter of this Agreement. Said headings shall be disregarded when resolving any dispute concerning the