# AMENDMENT TO THE
## MASTER AGREEMENT DATED AS OF FEBRUARY 14, 2000
## AND TERMINATION OF THE
## INTEREST RATE AND CURRENCY EXCHANGE AGREEMENT
## DATED AS OF MAY 20, 1992

Amendment and Termination Agreement ("Amendment") dated as of September 26, 2003, among Lehman Brothers Special Financing Inc ("LBSF"), Lehman Brothers Holdings Inc., as Credit Support Provider ("Credit Support Provider"), Western Farm Credit Bank ("Western") and the Farm Credit Bank of Wichita ("Wichita").

WHEREAS, Western will merge with and into Wichita effective October 1, 2003 (the "Effective Date"), with the continuing institution being known as U.S. AgBank, FCB ("AgBank"); and

WHEREAS, Western and LBSF are parties to that certain 1992 ISDA Master Agreement dated as of February 14, 2000, including the Credit Support Annex (the "Western Agreement" attached hereto as Annex B), and Wichita and LBSF are parties to that certain 1987 Interest Rate and Currency Exchange Agreement dated as of May 20, 1992 (the "Wichita Agreement"); and

WHEREAS, as a result of the merger of Western with and into Wichita, AgBank will assume all of the rights, liabilities, duties and obligations of Western under the Western Agreement and of Wichita under the Wichita Agreement as of the Effective Date; and

WHEREAS, Wichita and LBSF desire to amend certain of the terms and provisions of the Wichita Agreement so that as of the Effective Date all Transactions under the Wichita Agreement will be governed by the terms and provisions of the Western Agreement; and

WHEREAS, AgBank and LBSF desire to terminate the Wichita Agreement as of the Effective Date by this Amendment;

NOW, THEREFORE, the parties hereto agree as follows:

1.    **Amendment of the Western Agreement and Termination of the Wichita Agreement.** As of the Effective Date, (i) all Transactions governed by the Wichita Agreement, including those the Confirmations for which are attached as Annex A hereto, shall be governed by the Western Agreement, in addition to the Transactions currently outstanding and subject to the Western Agreement; (ii) each Confirmation forming part of, or stated to be governed by or subject to the Wichita Agreement shall thereafter constitute a Confirmation which supplements, forms a part of and is subject to the Western Agreement; and (iii) the Wichita Agreement shall terminate and be of no further force and effect. As of the Effective Date, all references in the Western Agreement to Western shall be deemed to be references to AgBank.

2.      **Guaranty of LBSF Transactions with Western and Wichita.**  Credit Support Provider agrees that all LBSF Transactions subject to its guaranty under the Wichita Agreement will be subject to its guaranty of Transactions under the Western Agreement.

3.      **Representations.**  Each party represents to the other party that:-

(a)      *Status.*  It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

(b)      *Powers.*  It has the power to execute and deliver this Amendment and to perform its obligations under this Amendment and has taken all necessary action to authorize such execution, delivery and performance;

(c)      *No Violation or Conflict.*  Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(d)      *Consents.*  All governmental and other consents that are required to have been obtained by it with respect to this Amendment have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(e)      *Obligations Binding.*  Its obligations under this Amendment constitute its legal, valid and binding obligations, enforceable in accordance with its respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

4.      **Miscellaneous.**

(a)      *Definitions.*  Capitalized terms used in this Amendment and not otherwise defined herein shall have the meanings specified for such terms in the Western Agreement.

(b)      *Entire Agreement.*  This Amendment constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings (except as otherwise provided herein) with respect thereto.

(c)    *Counterparts*. This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if signatures thereto and hereto were upon the same instrument.

(d)    *Headings*. The headings used in this Amendment are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Amendment.

(e)    *Governing Law*. This Amendment shall be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

5.    **Notices and Account Information**

(a)    For purposes of Part 4(a) of the Schedule , the addresses for notices or communications to Party A and Party B are amended and restated in their entirety as set forth below:

Address for notices or communications to Party A:-

Address:       Lehman Brothers Special Financing Inc.
               c/o Lehman Brothers Inc.
               Transaction Management
               745 Seventh Avenue, 28th Floor
               New York, New York 10019

Attention:  Documentation Manager

Phone.: 212.526.7187

Facsimile:  212.526.7672

For all purposes.

Address for notices or communications to Party B:-

Address:       U.S. AgBank, FCB
               245 North Waco
               Wichita, Kansas  67202

Attn:  Craig A. Olsen, Vice President and Treasurer

Facsimile:  316.266.5770

Telephone:  316.266.5196

(b)    For purposes of Part 5(d) of the Schedule, the payment account information for Party B is amended and restated in its entirety as set forth below:

> If to Party B:  Federal Reserve Bank of Kansas City
> ABA:  101104562
> Credit:  Farm Credit Bank of Wichita

(c)    For purposes of Paragraph 13(g)(i)(3) of the Credit Support Annex, Paragraph 13(g)(i)(3) and the paragraph following relating to Party B are amended and restated in their entirety as set forth below:

> Posted Collateral may be held in the following jurisdictions:  Illinois and New York and any State that has adopted *Revised Article 8. Investment Securities of the Uniform Commercial Code,* adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws.

> Initially, the **Custodian** for Party B is:  Northern Trust Company of Chicago.

(d)    For purposes of Paragraph 13(k) of the Credit Support Annex, the addresses for demands and notices for Party A and Party B are amended and restated in their entirety as set forth below:

> Party A:    Address:    None Specified.
>
> Party B:    Address:    U.S. AgBank, FCB
>                              245 North Waco
>                              P.O. Box 2940
>                              Wichita, Kansas  67201-2940
>
>                    Attn:  James W. Shanahan
>
>                    Facsimile:  316.266.5770
>
>                    Telephone:  316.266.5186

(e)    For purposes of Paragraph 13(l) of the Credit Support Annex, the addresses for transfers for Party A and Party B are amended and restated in their entirety as set forth below:

> Party A:  Instructions for:

> (i)  Cash USD, credit Chase Manhattan Bank NY, ABA # 021-000-021, A/C # 066143543, Lehman Brothers Special Financing Inc., Ref: Collateral.

(ii)  Securities or obligations issued or guaranteed by the government of the United States of America or any of its agencies or instrumentalities, credit Chase NYC/LBRDC, ABA #021000021, Attention: Derivative Margin Group, Lehman Brothers, 745 Seventh Avenue, 16th Floor, New York, NY 10019.

(iii)  Mortgage-backed securities paid or delivered through a U.S. Federal Reserve Bank, credit Chase NYC/LBRDC, ABA #021000021, Attention: Derivative Margin Group, Lehman Brothers, 745 Seventh Avenue, 16th Floor, New York, NY 10019."

Party B:        FED WIREABLE
                Northern Trust Company of Chicago
                ABA # 0710-0015-2
                NORTHERN CHGO/CUST/FARM CREDIT BANK OF
                WICHITA
                #23618-A


         IN WITNESS WHEREOF, the parties have caused this Amendment to be executed and delivered by their respective authorized officers as of the date appearing in the first paragraph above.


LEHMAN BROTHERS SPECIAL FINANCING INC.


By: _____
Name:      ZDENKA S. GRISWOLD
Title:      Authorized Signatory
            LEHMAN BROTHERS
            SPECIAL FINANCING INC.

LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:      VP

WESTERN FARM CREDIT BANK

By:
Name:
Title:                              Craig A. Olsen
                                    Vice President -  Treasurer

FARM CREDIT BANK OF WICHITA

By:
Name:
Title:                              Craig A.  Olsen
                                    Vice President - Treasurer

# ANNEX B

Western Agreement dated as of February 14, 2000

(Multicurrency—Cross Border)



# ISDA®
### International Swap Dealers Association, Inc.

# MASTER AGREEMENT

### dated as of **February 14, 2000**

**Lehman Brothers Special Financing Inc.**                    **Western Farm Credit Bank**

.................................................................... and ...........................................................................

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

**1.      Interpretation**

(a)      *Definitions.*  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.      Obligations**

(a)      *General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)   promptly notify the other party ("Y") of such requirement;

        (2)   pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)   promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)   if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)   the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)   the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii)  *Liability*. If:—

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)  *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.    Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)  *Basic Representations.*

(i)  *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)  *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)  *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)  *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)  *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)     *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)     *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)     *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.     **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)     *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

   (i)     any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

   (ii)    any other documents specified in the Schedule or any Confirmation; and

   (iii)   upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)     *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)     *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

**ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

  (i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

  (ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

  (iii)    *Credit Support Default.*

    (1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

    (2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

    (3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

  (iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

  (v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

  (vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)   *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

        (1)   to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)   to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)   *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)   *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)   *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)   *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

6.      **Early Termination**

(a)      *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)      *Right to Terminate Following Termination Event.*

(i)      *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)      *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)      *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)      *Right to Terminate.* If:—

(1)      a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)      an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)     *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)     *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)     *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)   *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) · *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)   *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)  *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties.* If there are two Affected Parties:—

(A)  if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)  if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

## 7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Contractual Currency

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

9.  **Miscellaneous**

(a)  *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)  *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)  *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)  *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)  *Counterparts and Confirmations.*

(i)  This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)  The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)  *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)  *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.  **Offices; Multibranch Parties**

(a)  If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)  Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)  If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.  **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12.    Notices

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)   if sent by telex, on the date the recipient's answerback is received;

(iii)  if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13.    Governing Law and Jurisdiction

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

14.    **Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**Lehman Brothers Special Financing Inc.**                    **Western Farm Credit Bank**
.......................................................                    .......................................................
(Name of Party)                                            (Name of Party)

By: _Florence D. Nolan_                          By: _Russell H. Booth_
Name:                                                      Name:   Russell H. Booth
Title:     FLORENCE D. NOLAN                   Title:   Treasury Manager
Date:      VICE PRESIDENT                         Date:   February 22, 2000
           Feb. 28, 2000

- 18

                                                                        **ISDA® 1992**

## SCHEDULE

#### to the

### MASTER AGREEMENT

dated as of February 14, 2000,

between LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Party A"), whose obligations are guaranteed by LEHMAN BROTHERS HOLDINGS, INC., a Delaware corporation, and WESTERN FARM CREDIT BANK, an instrumentality of the United States ("Party B").

Part 1.  **Termination Provisions**.

(a)       "*Specified Entity*" means in relation to Party A for the purpose of:—

Section 5(a)(v), None.

Section 5(a)(vi), None.

Section 5(a)(vii), None.

Section 5(b)(iv), None.

and in relation to Party B for the purpose of:—

Section 5(a)(v), None.

Section 5(a)(vi), None.

Section 5(a)(vii), None.

Section 5(b)(iv), None.

(b)       "*Specified Transaction*" will have the meaning specified in Section 14 of this Agreement.

(c)       Notwithstanding the provisions of Section 14, the "*Default Rate*" shall be at a rate equal to the USD-Federal Funds-H.15 Floating Rate Option plus 2%.

(d)       Section 5(a)(i) is modified by adding the following language after the semicolon at the end thereof:—

*provided, however*, that in the event a payment is received after the Scheduled Payment Date but prior to the end of the three Local Business Day cure period designated above, the party owing such payment shall be required to pay interest on such amount to the other party for the period from, and including, the Scheduled Payment Date to, but excluding, the date of actual payment at the rate equal to the USD-Federal Funds-H.15 Floating Rate Option for such day(s);

(e)   Section 5(a)(ii) is modified by adding the following language after the semicolon at the end thereof:—

*provided, however*, that no Event of Default or Potential Event of Default will exist with respect to a party failing to provide documents as required under Section 4(a)(ii) if such documents were received by the fifth Local Business Day following notice of nonreceipt by the party to whom the documents were to be delivered; and *provided further*, that if the requested documents are not delivered by the fifth Local Business Day following such notice, notice of a breach of agreement under this Section 5(a)(ii) shall be deemed to have been given as of such day;

(f)   Section 5(a)(iii) is modified by adding the following language at the end thereof:—

*provided, however*, that a Credit Support Default shall not occur if such Credit Support Provider consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer (A) the resulting, surviving or transferee entity assumes all the obligations of such Credit Support Provider under such Credit Support Document by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement and (B) such event does not constitute an event described in Section 5(a)(viii); and *provided further*, that the foregoing shall not affect the application of Section 5(b)(iv);

(g)   For the purpose of Section 5(a)(vi):—

(i)   The "*Cross Default*" provisions of Section 5(a)(vi) will apply to Party A and Party B.

"*Specified Indebtedness*" will have the meaning specified in Section 14 of this Agreement.

"*Threshold Amount*" means US $40,000,000 (or the US Dollar equivalent of any obligations stated in any other currency, currency unit or combination).

(ii)   Section 5(a)(vi) is amended by adding the following language after the semicolon at the end thereof:—

*provided, however,* that notwithstanding the foregoing, a default, event of default or other similar condition or event shall not occur under either (1) or (2) above if (i) the event or condition referred to in (1) or the failure to pay referred to in (2) is a failure to pay caused by an error or omission of an administrative or operational nature, and (ii) funds were available to such party to enable it to make the relevant payment when due, and *provided further,* that the relevant payment is made within three (3) Local Business Days of receipt of written notice of failure to pay;

(h)   For the purpose of Section 5(b)(ii):—

    (i)   The following shall be inserted in Section 5(b)(ii)(1) after the word "amount" and before the word "in" and in Section 5(b)(ii)(2) after the words "from which an amount" and before the word "is":—

    (other than an additional amount paid by reason of an increase in the rate of tax from other than a zero rate)

    (ii)   The following shall be inserted before the words "there is a substantial likelihood that":—

    in the written opinion of independent legal counsel of recognized standing

    (iii)   The phrase "5(a)(i), " shall be inserted after the words "interest under Section 2(e)," and before the words "6(d)(ii) or 6(e)) or".

    (iv)   The parenthetical in the last line thereof shall be deleted and replaced with "(other than by reason of Section 2(d)(i)(4)(A), (B), (C) or (D))."

(i)   The provisions of Section 5(b)(iii) relating to *Tax Event Upon Merger* will not apply to either party.

(j)   For the purpose of Section 5(b)(iv):—

    (i)   The "*Credit Event Upon Merger*" provisions of Section 5(b)(iv) will apply to Party A and Party B.

    (ii)   Section 5(b)(iv) is amended to read as follows:—

    (iv) *Credit Event Upon Merger*. "Credit Event Upon Merger" means that a Designated Event (as defined below) occurs with respect to a party, its Credit Support Provider, if any, or any applicable Specified Entity of such party (in any case, "X") and such Designated Event does not constitute Merger Without Assumption (Section 5(a)(viii)) but that, in the reasonable opinion of the other

party, the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X (which in either case will be the Affected Party) after taking account of any applicable Credit Support Document is materially weaker than that of X immediately prior to the most recent Transaction after taking account of any applicable Credit Support Document.  For purposes hereof, a Designated Event with respect to X means that, after the Trade Date of the most recent Transaction:—

(1)  X consolidates, amalgamates or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the Trade Date of that Transaction) to, or receives all or substantially all the assets or obligations of, another entity;

(2)  any person or entity acquires directly or indirectly the beneficial ownership of equity securities having the power to elect a majority of the board of directors of X; or

(3)  X enters into any agreement providing for any of the foregoing.

(k)   The "*Additional Termination Event*" provision of Section 5(b)(v) will apply with respect to the following Additional Termination Event(s):—

None.

(l)   The "*Automatic Early Termination*" provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(m)   Section 6(b)(iv) is amended by deleting the period at the end thereof and adding the following:—

; *provided, however,* that the non-Affected Party ("Y") in the case of a Credit Event Upon Merger may not designate an Early Termination Date unless:—

(1)  Y has given at least 15 days' written notice to the Affected Party ("X") of Y's intent to designate an Early Termination Date; and

(2)  During such 15-day period, Y in good faith negotiates with X with the view toward agreeing upon a mutually satisfactory alternative to Y's designation of such Early Termination Date.  Such mutually satisfactory alternative may include, without limitation, the execution and delivery by X to Y of one or more acceptable Credit Support Documents, the pledging of acceptable collateral, the

furnishing of acceptable letters of credit, and/or the furnishing of satisfactory opinions of counsel for X.

(n)   For the purpose of Section 6(e):—

    (i)   Market Quotation will apply, unless otherwise specified in the Confirmation.

    (ii)   The Second Method will apply.

    (iii)   Section 6(e) is amended by deleting the last sentence in the first paragraph relating to Set-off.

(o)   *"Termination Currency"* means United States Dollars.

(p)   *"Bankruptcy"* has the meaning specified in Section 5(a).

Part 2.   **Representations.**

(a)   **Tax Representations.**

    *Payer Representations.*  For the purpose of Section 3(e) of this Agreement, each party represents to the other party:—

    It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 5(a)(i), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement.

(b)   **Other Representations.**  The following shall be an additional representation of the parties under Section 3 of this Agreement:—

    (g)   *Financial Statements.*  The latest publicly available financial statements of, in the case of Party A, the Credit Support Provider for Party A and its consolidated subsidiaries, and, in the case of Party B, Party B, fairly and accurately present (i) in the case of Party A, the consolidated financial condition on the date(s) thereof and the consolidated results of the operations of the Credit Support Provider for Party A and its consolidated

subsidiaries, and (ii) in the case of Party B, its combined financial condition on the date(s) thereof and the combined results of its operations, for the period(s) therein specified in accordance with accounting principles generally accepted in the country in which it is organized in each case consistently applied (except as otherwise noted therein) and, since the date of the most recent financial statement made publicly available or furnished pursuant to Section 4(a) of this Agreement (including Part 3 of the Schedule), there has been no material adverse change in such condition or results of operations.

(h)     *Financial Institution*.  Each of Party A and Party B is a "financial institution" within the meaning ascribed to that term in 12 U.S.C. § 4402(9).

(i)     *Eligible Swap Participant*.  Party A is an "eligible swap participant" within the meaning ascribed to that term in 17 C.F.R.§ 35.1(b)(2)(vi).  Party B is an "eligible swap participant" within the meaning ascribed to that term in 17 C.F.R. § 35.1(b)(2)(viii).

(j)     *Bankruptcy Code*.  Party A is subject to the U.S. Bankruptcy Code pursuant to 11 U.S.C. § 109.

Part 3.  **Agreement to Deliver Documents.**

Section 4(a) of this Agreement is amended by deleting the following in the first sentence thereof:—

, in certain cases under subparagraph (iii) below,

Section 4(a)(iii) of this Agreement is amended to read as follows—

(iii) any forms, documents or certificates that may be required or reasonably requested in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax, or with such deduction or withholding at a reduced rate, with any such forms, documents, or certificates to be accurate and completed in a manner reasonably satisfactory to such other party, and to be executed and to be delivered with any required certification to such other party (or to such government or taxing authority as such other party reasonably directs), promptly upon the earlier of (A) reasonable demand by such other party and (B) learning that any such forms, documents or certificates are required;

For the purpose of Section 4(a)(i) of this Agreement, each party agrees to deliver the following documents, as applicable:—

(a)      Tax forms, documents or certificates to be delivered are as follows:—

         None.

For the purpose of Section 4(a)(ii) of this Agreement, each party agrees to deliver the following documents, as applicable:—

(b)      Other documents to be delivered are:—

    (i)      During the period the parties are obligated to one another under this Agreement, as soon as available and in any event within 120 days (or as soon as practicable after becoming publicly available) after the end of each fiscal year, (A) Party A shall provide a copy of the publicly available annual report of the Credit Support Provider for Party A containing consolidated financial statements for the Credit Support Provider for Party A, and (B) Party B shall provide a copy of the publicly available annual report of Party B containing combined financial statements for Party B, for such year certified by independent public accountants.

    (ii)     During the period the parties are obligated to one another under this Agreement, as soon as available and in any event within 60 days (or as soon as practicable after becoming publicly available) after the end of each fiscal quarter, (A) Party A shall provide a copy of the unaudited consolidated financial statements of the Credit Support Provider for Party A, and (B) Party B shall provide a copy of its unaudited combined financial statements, for such quarter prepared on a basis consistent with that of the annual financial statements of the party (and in the case of Party A, the Credit Support Provider for Party A).

    (iii)    Each party shall deliver, on or prior to the execution of this Agreement, in form and substance satisfactory to the receiving party, (A) certified resolutions of the party approving the transactions contemplated by this Agreement; (B) a certificate or other document signed by a duly authorized officer or official of the party certifying the names, titles, true signatures and authority of the officers or officials of such party signing this Agreement and any other documents delivered or to be delivered pursuant to this Agreement; (C) an opinion of counsel substantially in the form attached hereto as Exhibit II or IIA, as appropriate; and (D) any other document to be provided by the party pursuant to any Confirmation.

    (iv)     As a condition precedent to Party B's obligations under this Agreement, Party A shall deliver, in form and substance satisfactory to Party B: (A) the executed Credit Support Document; (B) a certificate or other

document signed by a duly authorized officer of the Credit Support
Provider for Party A with respect to the Credit Support Document for
Party A, certifying the names, titles, true signatures and authority of the
officers signing the Credit Support Document and any other documents
delivered or to be delivered by the Credit Support Provider for Party A
pursuant to the Credit Support Document; and (C) an opinion of counsel
for the Credit Support Provider for Party A substantially in the form
attached hereto as Exhibit III (which opinion may be incorporated into the
opinion of counsel required to be delivered by Party A pursuant to Item
(b)(iii)(C) above).

The documents delivered pursuant to (i), (ii), (iii)(A), (iii)(B), and (iv)(B) above
shall be covered by the Section 3(d) Representation.

Part 4. **Miscellaneous.**

(a)    *Addresses for Notices*.  For the purpose of Section 12(a) of this Agreement:—

Address for notices or communications to Party A:—

Address:        Lehman Brothers Special Financing Inc.
                3 World Financial Center
                200 Vesey Street, 8th Floor
                New York, NY  10285

Attention:      Documentation Manager

Facsimile No.: (212) 526-6127

Telephone No.: (212) 526-1875

Address for notices or communications to Party B:—

Address:        Western Farm Credit Bank
                3636 American River Drive
                Sacramento, CA  95864-5966

Attention:      Russell Booth, Treasury Manager

Facsimile No.: (916) 485-6188

Telephone No.: (916) 485-6115

H:\cs\cl32622\m020\lehman\cldlbwes.92                    8

With a copy to:  General Counsel

(b)     ***Process Agent.***  For the purpose of Section 13(c) of this Agreement:—

Process Agent for Party A shall be its legal officer at its address for notices or, in his or her absence, any other senior officer of Party A at such address.

Process Agent for Party B shall be its legal officer at its address for notices or, in his or her absence, any other senior officer of Party B at such address.

For purposes of this Part 4(b), a "senior officer" shall be any officer of such party with a title of vice president or higher.

(c)     ***Offices.***  The provisions of Section 10(a) will apply to this Agreement.

(d)     ***Multibranch Party.***  For the purpose of Section 10(c) of this Agreement:—

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)     ***Calculation Agent.***  Unless otherwise designated by a Confirmation for a particular Transaction, the "Calculation Agent" shall be Party A; *provided, however*, that for purposes of Sections 7.4(c) and (d) of the 1991 ISDA Definitions (the "1991 Definitions"), published by the International Swaps and Derivatives Association, Inc. ("ISDA"), the selection of "Reference Banks" and "Reference Dealers" shall be agreed to by both parties; and *provided further*, that if Party A is a Defaulting Party, the Calculation Agent shall be Party B (or any designated third party agreed to by the parties) until such time as Party A is no longer a Defaulting Party.

(f)     ***Credit Support Document.***

"Credit Support Document" for Party A means the Guarantee of Lehman Brothers Holdings, Inc., the Credit Support Provider for Party A hereunder, substantially in the form attached to this Agreement as Exhibit IV.  If an obligation of Party A under this Agreement is fully performed by Lehman Brothers Holdings, Inc. such obligation will be deemed to have been fully performed by Party A.

(g)     ***Credit Support Provider.***

Credit Support Provider means in relation to Party A, Lehman Brothers Holdings, Inc.

Credit Support Provider means in relation to Party B, None.

(h)     *Governing Law.*  This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to the choice of law doctrine.

(i)     *Netting of Payments.*  Subparagraph (ii) of Section 2(c) will not apply.

Part 5.  **Other Provisions.**

(a)     *ISDA Definitions.*  Except as otherwise defined in this Schedule or a Confirmation, this Agreement and each Transaction are subject to the 1991 Definitions, and will be governed in all relevant respects by the provisions set forth in the 1991 Definitions, without regard to any amendments to the 1991 Definitions subsequent to the date hereof. The provisions of the 1991 Definitions are incorporated by reference in, and shall be deemed a part of, this Agreement and each Confirmation, as if set forth in full in this Agreement and each such Confirmation.  In the event of any inconsistency between the provisions of this Schedule and the 1991 Definitions, this Schedule will prevail.  In the event of any inconsistency between the provisions of a Confirmation for a particular Transaction and this Schedule, such Confirmation will prevail for purposes of the relevant Transaction.

(b)     *Rate Protection Transactions.*  Notwithstanding the terms of Sections 5 and 6 of this Agreement, if at any time and so long as one of the parties to this Agreement ("X") shall have satisfied in full all its payment obligations under Section 2(a)(i) of this Agreement and shall at the time have no future payment obligations, whether absolute or contingent, under such Section, then unless the other party ("Y") is required pursuant to appropriate proceedings to return to X or otherwise returns to X upon demand of X any portion of any such payment, (a) the occurrence of an event described in Section 5(a) of this Agreement with respect to X or any Specified Entity or Credit Support Provider of X shall not constitute an Event of Default or Potential Event of Default with respect to X as the Defaulting Party and (b) Y shall be entitled to designate an Early Termination Date pursuant to Section 6 of this Agreement only as a result of the occurrence of a Termination Event set forth in either Section 5(b)(i) or 5(b)(ii) of this Agreement with respect to Y as the Affected Party; *provided, however,* that notwithstanding subclause (a) hereof, in the event of (A) the Bankruptcy of X or any of its Specified Entities designated in Part 1(a) with respect to the application of Section 5(a)(vii) or its Credit Support Provider or (B) default by X or any of its Specified Entities designated in Part 1(a) with respect to the application of Section 5(a)(vi) or its Credit Support Provider in the payment to Y or any of its Specified Entities or its Credit Support Provider of (x) any amount of Specified Indebtedness owing by X or such Specified Entity or Credit Support Provider to Y or any of its Specified Entities or Credit Support Provider, (y) any amount owing by X or any of its Specified Entities or Credit Support Provider to Y or any of its Specified Entities or Credit Support Provider in connection with any Specified Transaction, or (z) any amount owing by X to Y under this Agreement pursuant to Section 2(d)(i)(4) or pursuant to Section 6(e) in connection with a Termination Event (in any case after the

lapse of any applicable grace period) then such defaults shall for all purposes of this
Agreement be treated as Termination Events with respect to X, and X hereby expressly
authorizes Y, to the extent possible and permitted by applicable law, and without notice
or other action, to set off the amount payable to X pursuant to Section 6 in connection
with early termination on the ground of such Termination Event against any and all
amounts owing by X or any of its Specified Entities or Credit Support Provider to Y or
any of its Specified Entities or Credit Support Provider at the time under any agreement
relating to such Specified Indebtedness or Specified Transaction or otherwise.

(For purposes of the foregoing, a party's Specified Entity(ies) shall be each entity
identified as such in Part 1(a) of this Schedule.)

(c)     *Confirmations*. A Confirmation shall be substantially in the form attached hereto as
        Exhibit I. Each party agrees to promptly request the correction of any errors in the
        Confirmation received from the other party. Each party further agrees that it will use its
        best efforts to promptly execute and provide to the other party any such Confirmation that
        accurately reflects the terms of the Transaction to which it relates.

(d)     *Payment Accounts*. Unless otherwise specified in the Confirmation for a particular
        Transaction, all payments under this Agreement shall be made to the following accounts:-

        If to Party A:-          Chase Manhattan Bank NY
                                 ABA No: 021-000-021
                                 Acct. No. 066143543 Lehman Brothers Special Financing Inc.

        If to Party B:-          Federal Reserve Bank of San Francisco
                                 WEST FRM CR BK SAC
                                 ABA #: 1211-4263-0

(e)     *No Set-Off*. All amounts payable under this Agreement by a party shall be paid without
        any set-off or counterclaim (except as contemplated by this Agreement, including Part
        5(b) of this Schedule).

(f)     *Specified Entity(ies) and Credit Support Provider*. All representations, covenants and
        agreements, including without limitation those relating to tax matters, made by a party in
        this Agreement to or for the benefit of the other party shall also be deemed made to or for
        the benefit of the Specified Entities and Credit Support Provider of the other party. If a
        party and a Specified Entity(ies) or Credit Support Provider of the party is each a
        Defaulting Party or an Affected Party, the party and Specified Entity(ies) or Credit
        Support Provider shall nevertheless be deemed a single Defaulting Party or Affected
        Party.

(g)    ***Deduction or Withholding for Tax***. Section 2(d)(i)(4) shall be amended to read as follows:-

if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that:-

(A)    it would not be required to be paid but for the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d);

(B)    it would not be required to be paid but for Y's consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another party;

(C)    Y determines it will receive credit for the Indemnifiable Tax in computing its tax liability with respect to the amounts payable under this Agreement; or

(D)    it would not be required to be paid but for the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(h)    ***Transfer***. Notwithstanding the provisions of Section 7, in the case of a rate cap, rate floor, rate collar or other rate protection transaction designated in a related Confirmation, each party (in either case, "X") may freely transfer any interest or obligation in or under this Agreement, *provided* that all payments to be made by such party under Section 2(a)(i) of this Agreement through the Termination Date have been paid with respect to that rate protection transaction; and *provided further*, that such transfer will not give rise to a Termination Event or an Event of Default and that if any Tax is imposed which would not have been imposed but for such transfer, then (i) Section 5(b)(ii) of this Agreement shall not apply; and (ii) the other party ("Y") shall (A) promptly notify the transferee of X, (B) pay to the relevant authorities the full amount of such Tax promptly upon the earlier of determining that such Tax has been imposed or receiving notice of such imposition, and (C) not be obligated to pay any additional amounts to the transferee of X pursuant to Section 2(d)(i)(4).

(i)    ***Limitation on Waiver of Sovereign Immunity***. It is understood and agreed that, notwithstanding Section 13(d) of this Agreement or any other documentation relating to

this Agreement, nothing therein shall operate as a waiver of, or impose any limitation on, the right of Party B with respect to itself and its revenues and assets, to claim immunity from punitive damages on the grounds of sovereign immunity.

(j)   *Severability.* Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall be as to such jurisdiction ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction; *provided, however*, that nothing in this provision shall adversely affect the fundamental benefits of each party under this Agreement.

(k)   *Recording of Telephone Conversations.* Each of Party A and Party B (i) consents to the recording of the telephone conversations of its trading and marketing personnel in connection with this Agreement and any potential Transaction and (ii) agrees to obtain the prior consent of such personnel, if required by law. Party A and Party B agree that the recording of any conversation regarding a Transaction under this Agreement or any dealer interpretation, whether written or oral, of a Transaction based on such a recording shall not be treated as "sufficient evidence" of a contract between Party A and Party B under Section 5-701 of New York's general obligation law unless all of the material terms of such Transaction are expressly stated, including, at a minimum, those required to (i) calculate the cash flows payable by the parties, (ii) establish the dates of payment, (iii) establish the form of additional credit support, if any, and (iv) describe any option held by a party, if any.

(l)   *Change of Account.* Section 2(b) of this Agreement shall be amended by adding the following before the period at the end of such section:-

  ; *provided* that such new account shall be in the same legal and tax jurisdiction as the original account

(m)   *Expenses.* Section 11 of this Agreement shall be revised by inserting after the word "against", in the first line, the words "all allocated costs of in-house counsel and," and by inserting after the words "Credit Support Document" in line 3, the following:-

  (including, without limitation, any such costs and expenses incurred in connection with a work-out or otherwise, as a result of the occurrence of an Event of Default whether or not an Early Termination Date has occurred or been deemed to have occurred)

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**Lehman Brothers Special Financing Inc.**     **Western Farm Credit Bank**

By: *Florence D. Nolan*                    By: *Russell H. Booth*

Name:                                       Name:    Russell H. Booth
Title:    FLORENCE D. NOLAN                 Title:   Treasury Manager
Date:     VICE PRESIDENT                    Date:    February 22, 2000
          Feb. 28, 2000

## EXHIBIT I

## CONFIRMATION

### Dated as of [Trade Date]

[Counterparty]
[Address]

SUBJECT:    Transaction between [Counterparty][, whose obligations are guaranteed by
[Credit Support Provider],] and [Farm Credit Bank]

Dear Sirs:

The purpose of this letter agreement is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date listed below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the ISDA Agreement specified below, and supersedes and replaces any previously executed Confirmation of this Transaction.

1.  The definitions and provisions contained in the 1991 ISDA Definitions (the "1991 Definitions"), as published by the International Swap Dealers Association, Inc. ("ISDA"), are incorporated into this Confirmation. The parties agree that this transaction is a Transaction under the Master Agreement (Multicurrency—Cross Border) of the parties dated as of [Date]. The Master Agreement is comprised of the printed form of such agreement as published by ISDA, as supplemented and modified by a Schedule (as so supplemented and modified, the "ISDA Agreement"). In the event of any inconsistency between the 1991 Definitions, the ISDA Agreement, and this Confirmation, this Confirmation will govern.

   This Confirmation constitutes a binding agreement between you and us and will supplement, form a part of, and be subject to the ISDA Agreement described above.

2.  The terms of the particular Transaction to which this Confirmation relates are as follows:

   Party A:  [Counterparty]

   Party B:  [Farm Credit Bank]

   Type of Transaction: [Interest Rate Swap /Rate Protection/ Cap/Collar/Floor] Transaction

[Counterparty]
[Dated as of [Trade Date]]
Page 2


Notional Amount:


Trade Date:


Effective Date:


Termination Date:      [, subject to adjustment in accordance with the [Following/Modified
Following/Preceding] Business Day Convention for purposes of making payment of the
Fixed Amount or Floating Amount due on such date, but not subject to adjustment for
purposes of determining the Fixed Amount or Floating Amount due for the final Calculation
Period.]


Fixed Amounts:

    Fixed Rate Payer:  [Party A/Party B]

    [Fixed Rate Payer Currency Amount:]

    Fixed Rate Payer Payment Dates:  [Dates][, subject to adjustment in accordance with the
    [Following/Modified Following/Preceding] Business Day Convention [with no
    adjustment to Period End Dates.] [, not subject to adjustment.]  [Modified Following is
    the automatic fallback Business Day Convention.]

    Fixed Amount:

    Fixed Rate:  [ ]% per annum

    Fixed Rate Day Count Fraction:

Floating Amounts:

    Floating Rate Payer:  [Party B/Party A]

    [Floating Rate Payer Currency Amount:]

    Floating Rate Payer Payment Dates:  [Dates][, subject to adjustment in accordance with
    the [Following/ Preceding] Business Day Convention [with no adjustment to Period End
    Dates.] [, not subject to adjustment.]  [Modified Following is the automatic fallback
    Business Day Convention.]

[Counterparty]
[Dated as of [Trade Date]]
Page 3

[Floating Rate for initial [Calculation] [Compounding] Period:  [  ]% per annum]

Floating Rate Option:

Designated Maturity:

Spread:  [Plus/Minus __% per annum] [None]

Floating Rate Day Count Fraction:

Reset Dates:  [Dates][, subject to adjustment in accordance with the [Following/Modified Following/ Preceding] Business Day Convention.]  [Automatic fallback is the Business Day Convention applicable to Payment Dates.]

[Rate Cut-off Dates:]

[Method of Averaging:  [Unweighted/Weighted] Average Rate]

Compounding:  [Applicable/Inapplicable]

[Compounding Dates:  only if Compounding applies]

[Cap Rate: _____%]

[Floor Rate: _____%]

[Initial Exchange:]

[Initial Exchange Date:]

[Fixed Rate Payer Initial Exchange Amount:]

[Floating Rate Payer Initial Exchange Amount:]

[Final Exchange:]

[Final Exchange Date:]

[Fixed Rate Payer Final Exchange Amount:]

[Counterparty]
[Dated as of [Trade Date]]
Page 4

      [Floating Rate Payer Final Exchange Amount:]

Business Days [for first currency]:

[Business Days for second currency:]

[Default Rate [for first currency]:  if other than as set forth in the Schedule]

[Default Rate [for second currency]:  if other than as set forth in the Schedule]

Other Provisions:

[3. Party A agrees to provide upon or prior to the execution of [the ISDA Agreement] [this
Confirmation] the following Credit Support Document and any other documents required to
be delivered in accordance with such Credit Support Document:  The Guarantee of the Credit
Support Provider for Party A, substantially in the form of Exhibit IV to the Schedule.]

[4. The parties agree to deliver upon or prior to the execution of [the ISDA Agreement] [this
Confirmation] the following documents:  Resolutions of the parties approving the
Transactions contemplated hereby, opinions of counsel for both parties and the Credit
Support Provider for Party A, substantially in the form of Exhibits II, IIA and III to the
Schedule, as appropriate, and certificates of incumbency and authority for both parties and
the Credit Support Provider for Party A.]

5.  Account Details:

    Payments to Fixed Rate Payer:

      Account for payments [in first currency]:

      [Account for payments in second currency:]

    Payments to Floating Rate Payer:

      Account for payments [in first currency]:

      [Account for payments in second currency:]

6.  Time for Payments:  2:00 p.m. (New York City time), subject to the provisions of Part 1(d)
of the Schedule

[Counterparty]
[Dated as of [Trade Date]]
Page 5


[7.  Termination Currency:]

[8.  Calculation Agent:  Party A, subject to the provisions of Part 4(e) of the Schedule]

[9.  Reference Banks or Reference Dealers:]

[10.    Reference Market-makers:]

[11.    Foreign Exchange Agent:]

[12.    Alternative Method for Calculating Early Termination Payments: ]

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the
copy of this Confirmation enclosed for that purpose and returning it to us.

                                        [Farm Credit Bank]



                                        By:_____
                                        Name:_____
                                        Title:_____
                                        Date:_____


Accepted and confirmed as
of the date first written:

[Party A]



By:_____
Name:_____
Title:_____
Date:_____

## EXHIBIT II

### [FORM OF OPINION OF COUNSEL]

[Date]

[Party A] [Party B]
[Address]

Dear Sirs:

This opinion is furnished to you pursuant to Part 3 Item (b)(iii) of the Schedule to the Master Agreement dated as of [Effective Date] (the "Agreement") between [Party A] [Party B] ("Counterparty") and you. Terms defined in the Agreement and used but not defined herein have the meanings given to them in the Agreement.

We have acted as counsel to Counterparty in connection with the preparation, execution and delivery of the Agreement. In this connection, we have examined the Agreement, the confirmation dated _____ (the "Confirmation") and such other documents as we have deemed necessary or appropriate for the opinions expressed herein. In such examination, we have assumed the genuineness of all signatures on original documents, the conformity to original documents of all copies submitted to us and the due execution and delivery where such due execution and delivery are prerequisites to the effectiveness thereof.

Based on the foregoing and upon such investigations as we have deemed necessary, we are of the opinion that, so far as the laws of the [for the non-Farm Credit Counterparty, State of New York and, if Counterparty's domicile is other than New York, other State or Country of domicile] [for the Farm Credit Counterparty, United States and State of such Counterparty's domicile] [if neither Counterparty's counsel is admitted in New York, address need for opinion on New York law] applicable therein are concerned:

(a) Counterparty is duly organized and validly existing and has the power and authority to execute and deliver the Agreement and the Confirmation, [and (specify any other documentation that is required to be delivered by the Agreement or the Confirmation,)] and to perform its obligations under the Agreement and the Confirmation with respect to the transaction provided for in the Confirmation and has taken all necessary action to authorize such execution, delivery and performance of such obligations. The Agreement and the Confirmation have been duly executed and delivered by Counterparty.

(b) Counterparty's execution and delivery of the Agreement and the Confirmation [and (specify any other documentation that is required to be delivered by the Agreement or the Confirmation,)] and the performance of its obligations under the Agreement and the

[Party A] [Party B]
[Date]
Page 2

Confirmation with respect to the transaction provided for in the Confirmation do not violate or conflict with (i) any provision of its charter, bylaws or comparable constituent documents or (ii) any law, rule or regulation applicable to it, any order or judgment of any court or agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting Counterparty or any of its assets, the violation of or conflict with which (in the case of the items listed in this clause (ii)) would have a material adverse effect on Counterparty or its ability to perform its obligations under the Agreement and the Confirmation.

(c) All consents, authorizations and approvals (including, without limitation, exchange control approvals) required for the execution and delivery by Counterparty of the Agreement and the Confirmation [and (specify any other documentation that is required to be delivered by the Agreement or the Confirmation,)] and the performance of its obligations under the Agreement and the Confirmation with respect to the transaction provided for in the Confirmation have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority or regulatory body is required for such execution, delivery or performance.

(d) [Assuming that the Agreement was governed by and construed in accordance with [for Farm Credit and national bank counsel only -- federal law and, in the absence of controlling provisions thereof, by] the laws of and the judicial decisions in [the State of] [insert State or Country where such Counterparty is domiciled][1/] the Agreement is a legal, valid and binding obligation of Counterparty, enforceable against Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency, conservatorship, receivership and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

[(e) Under [For Farm Credit and national bank counsel only -- federal law and, in the absence of controlling provisions thereof,] the laws of and the judicial decisions in the [State of] [insert State or Country where Counterparty is domiciled], the governing law provision of the Agreement would be enforced in accordance with its terms, and the substantive law of the State of New York would be applied to the construction and enforcement of the Agreement if an action for the same were pursued in a [state or] federal court in the [State of] [insert State or Country where Counterparty is domiciled]. [2/]

---

[1/]    Omit bracketed portion for Counterparty domiciled in New York.

[2/]    Omit this paragraph for Counterparty domiciled in New York.

[Party A] [Party B]
[Date]
Page 3


    We are members of the [insert State or Country where Counterparty domiciled] Bar and we do not purport to be experts on, or to express any opinion on matters herein concerning, any law other than the law of the [State of] [insert State or Country where Counterparty domiciled] [and the federal law of the United States].

                Very truly yours,

## EXHIBIT II-A

[date]

## [FORM OF OPINION OF COUNSEL]

«counterparty»
«cp_street»
«cp_city», «cp_state» «cp_zip»


Attention: Treasurer

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Party A"), and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor"), and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "Master Agreement") dated as of «as_of_date» between Party A and «Counterparty» ("Party B") and the guarantee of Guarantor (the "Guarantee") delivered in connection with the Master Agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of the Master Agreement and the Guarantee, certificates and statements of public officials and officers of Party A and Guarantor and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1. Each of Party A and Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

2. The execution, delivery and performance of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, are within its corporate power, have been duly authorized by all corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3. Each of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, has been duly executed and delivered and constitutes a legal, valid and binding obligation, enforceable against it in accordance with its terms.

4. To the best of my knowledge no consent, authorization, license or approval of or registration or declaration with, any U.S. federal or New York State governmental authority is required in connection with the execution, delivery and performance of the Master Agreement, in the case of Party A, or the Guarantee, in the case of Guarantor.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.    My opinion in paragraph 3 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.    I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York, the federal laws of the United States of America and the General Corporation Law of the State of Delaware.

C.    My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.    This letter is rendered to you in connection with the Master Agreement and the Guarantee and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman Brothers Holdings Inc., except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Party A or Guarantor, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Master Agreement or the Guarantee.

E.    I have assumed with your permission (i) the genuineness of all signatures by each party other than Party A or Guarantor, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Master Agreement by each party other than Party A.

Very truly yours,

## EXHIBIT III

[OPINION OF COUNSEL FOR CREDIT SUPPORT PROVIDER —
INCORPORATED IN EXHIBIT II-A]

EXHIBIT IV

[FORM OF GUARANTEE]

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and ("Party B") have entered into a Master Agreement dated as of _____, (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)  Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)  Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)  Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability of the Agreement against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which are waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)  The Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)  Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)  Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement. Guarantor

irrevocably submits to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in the city of New York.

Guarantor shall be subrogated to all rights of Party B against Party A in respect of any amounts paid by Guarantor pursuant to the provision of this Guarantee; provided however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Party A under the Agreement, shall have been paid in full and are not as a matter of law subject to the possibility of being rescinded pursuant to any bankruptcy or insolvency proceeding or reorganization involving Party A or the Guarantor.

In the event that Guarantor is required by any applicable law, rule or regulation to make any deduction or withholding for or on account of any Tax (as defined in Section 14 of the Agreement, except that the reference therein to the "Agreement" shall be deemed to mean the "guarantee" for purposes of this Guarantee) from any payment to be made under this Guarantee, Guarantor shall be subject to the provisions of Section 2(d) of the Agreement to the same extent as "X" (as defined therein); provided, however, that if any Tax is imposed which would not have been imposed but for payment made under this Guarantee then (1) Section 5(b)(ii) of the Agreement shall not apply; (2) the Guarantor shall pay such additional amounts as are necessary to insure that the net amount actually received by Party B (free and clear of such Taxes whether assessed against the Guarantor or Party B) will equal the full amount Party B would have received had such Taxes not been imposed; and (3) Party B shall not be obligated to pay additional amounts pursuant to Section 2(d)(4) of the Agreement.

Guarantor makes the same representations to and agreements with Party B as those made by Party A pursuant to Section 3 and 4 of the Agreement, as amended by the Schedule, at the times set forth therein, except that references therein to the "the party" will be deemed to be references to " the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee." Section 13 of the Agreement is incorporated by reference in this Guarantee except that references therein to "the Agreement" will be deemed to be references to "the Guarantee"

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Treasurer, at 200 Vesey Street, 24th Floor, New York, New York 10285 USA (Facsimile No. (212) 526-1467) with a copy to Lehman Brothers Special Financing Inc., Attention: Documentation Manager at 3 World Financial Center, 8th Floor, New York, New York 10285-0800 (Facsimile No. (212) 526-6127).

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

Name:

Title:

Date:

**(Bilateral Form)**                     **(ISDA Agreements Subject to New York Law Only)**



International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

**Master Agreement**

dated as of **February 14, 2000**

between

**Lehman Brothers Special Financing Inc.**     and     **Western Farm Credit Bank**

("Party A")                                           ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

**Paragraph 1. Interpretation**

(a)      *Definitions and Inconsistency.* Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)      *Secured Party and Pledgor.* All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2. Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)      *Delivery Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

> (i) the Credit Support Amount

> exceeds

> (ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)      *Return Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

> (i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

> exceeds

> (ii) the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)      *Conditions Precedent.* Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

> (i)  no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

> (ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)      *Transfer Timing.* Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)      *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

**ISDA® 1994**

(d)    *Substitutions.*

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

## Paragraph 5. Dispute Resolution

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

ISDA® 1994

**Paragraph 6. Holding and Using Posted Collateral**

(a)     *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)     *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)     *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)     *Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

**ISDA® 1994**

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a)    *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

ISDA® 1994

(b)      *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)      *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)      *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

ISDA® 1994

**Paragraph 10. Expenses**

(a)      *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)      *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)      *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)      *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)      *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)      *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)      *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)      *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)      *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**ISDA® 1994**

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

  (x) the amount of that Cash on that day; multiplied by

  (y) the Interest Rate in effect for that day; divided by

  (z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

ISDA® 1994

"*Minimum Transfer Amount*" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"*Notification Time*" has the meaning specified in Paragraph 13.

"*Obligations*" means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

"*Other Eligible Support*" means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

"*Other Posted Support*" means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

"*Pledgor*" means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

"*Posted Collateral*" means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

"*Posted Credit Support*" means Posted Collateral and Other Posted Support.

"*Recalculation Date*" means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however*, that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

"*Resolution Time*" has the meaning specified in Paragraph 13.

"*Return Amount*" has the meaning specified in Paragraph 3(b).

"*Secured Party*" means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

"*Specified Condition*" means, with respect to a party, any event specified as such for that party in Paragraph 13.

"*Substitute Credit Support*" has the meaning specified in Paragraph 4(d)(i).

"*Substitution Date*" has the meaning specified in Paragraph 4(d)(ii).

"*Threshold*" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"*Transfer*" means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

> (i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

> (ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

> (iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

> (iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

**ISDA® 1994**

**"*Valuation Agent*"** has the meaning specified in Paragraph 13.

**"*Valuation Date*"** means each date specified in or otherwise determined pursuant to Paragraph 13.

**"*Valuation Percentage*"** means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

**"*Valuation Time*"** has the meaning specified in Paragraph 13.

**"*Value*"** means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

    (i) Eligible Collateral or Posted Collateral that is:

        (A) Cash, the amount thereof; and

        (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

    (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

    (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

ISDA® 1994

# CREDIT SUPPORT ANNEX

**Paragraph 13. Elections and Variables**

(a)        *Security Interest for "Obligations".*  The term *"Obligations"* as used in this Annex includes the following additional obligations:

With respect to Party A:  None.

With respect to Party B:  None.

(b)        *Credit Support Obligations.*

(i) *Delivery Amount, Return Amount and Credit Support Amount.*

(A)  *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

(B)  *"Return Amount"* has the meaning specified in Paragraph 3(b).

(C)  *"Credit Support Amount"* has the meaning specified in Paragraph 3.

(ii) *Eligible Collateral.*  The following items will qualify as *"Eligible Collateral"* for the party specified:

|  |  | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (A) | Cash | [x] | [x] | 100% |
| (B) | Negotiable debt obligations issued by the U.S. Treasury Department having a remaining term to maturity of not more than one year | [ ] | [x] | 98% |
| (C) | Negotiable debt obligations issued by the U.S. Treasury Department having a remaining term to maturity of more than one year but not more than ten years | [ ] | [x] | 96% |
| (D) | Negotiable debt obligations issued by the U.S. Treasury Department having a remaining term to maturity of more than ten years | [ ] | [x] | 95% |

| | | | | |
|---|---|---|---|---|
| (E) | Federal Home Loan Mortgage Corporation ("FHLMC") single-class mortgage participation certificates ("FHLMC Certificates") in book-entry form backed by single-family residential mortgage loans, the full and timely payment of interest at the applicable certificate rate and the ultimate collection of principal of which are guaranteed by the FHLMC (excluding Real Estate Mortgage Investment Conduits ("REMICs") or other multi-class pass-through certificates and securities paying interest only ("IOs") or principal only ("POs")) | [ ] | [x] | 95% |
| (F) | Federal National Mortgage Association ("FNMA") single-class mortgage pass-through certificates ("FNMA Certificates") in book-entry form backed by single-family residential mortgage loans, the full and timely payment of interest at the applicable certificate rate and the ultimate collection of principal of which are guaranteed by FNMA (excluding REMICs or other multi-class pass-through certificates and IOs or POs) | [ ] | [x] | 95% |
| (G) | Government National Mortgage Association ("GNMA") single-class fully modified pass-through certificates ("GNMA Certificates") in global registered form backed by single-family residential mortgage loans, the full and timely payment of principal and interest of which is guaranteed by GNMA (excluding REMICs or other multi-class pass-through certificates and IOs or POs) | [ ] | [x] | 95% |

During the pendency of any suit, action, proceeding or lien referenced in Paragraph 11(c) (other than a suit, action, proceeding or lien resulting from the exercise of the Secured Party's rights under Paragraph 6(c)), the Posted Credit Support affected thereby shall not constitute Eligible Collateral. Pledgor shall be obligated, in such event, to Transfer to the Secured Party substitute Eligible Credit Support for such Posted Credit Support in order to satisfy its obligation under Paragraph 3 and the Secured Party shall be obligated to simultaneously return to the Pledgor all affected Posted Credit Support; *provided*, that such substitute Eligible Credit Support shall have a Value as of the date of Transfer equal to or greater than the Value such Posted Credit Support would have had (as determined by the Secured Party) if no such suit, action, proceeding or lien was pending.

(iii) *Other Eligible Support.* The following items will qualify as *"Other Eligible Support"* for the party specified:

|  |  | Party A | Party B |
|---|---|---|---|
| (A) | NONE | [x] | [x] |
| (B) | NONE | [x] | [x] |

(iv) *Thresholds.*

(A)     *"Independent Amount"* means with respect to Party A: $ None.
         *"Independent Amount"* means with respect to Party B: $ None.

(B)     *"Threshold"* means with respect to Party A: the amount set forth below under the caption "Threshold" opposite the rating classification assigned to the Long Term Debt Rating of the Credit Support Provider of Party A as of the applicable Valuation Date; *provided, however,* that if an Event of Default has occurred and is continuing with respect to Party A, Party A's Threshold shall be $0.

*"Threshold"* means with respect to Party B: the amount set forth below under the caption "Threshold" opposite the rating classification that is (1) assigned to the Long Term Debt Rating the Farm Credit System or (2) if Party B shall receive its own rating, assigned to the Long Term Debt Rating of Party B, as of the applicable Valuation Date; *provided, however,* that if an Event of Default or Designated Event has occurred and is continuing with respect to Party B, Party B's Threshold shall be $0. As used herein, a "Designated Event" shall mean that Party B is no longer a Federally chartered instrumentality of the United States operating under the authority of the Farm Credit Act and that Party B has not obtained a Long Term Debt Rating.

Lehman Brothers Special Financing - Western Farm Credit Bank     13

| S&P Long Term Debt Rating | Moody's Long Term Debt Rating | Threshold |
|---|---|---|
| AAA | Aaa | $25,000,000 |
| AA or above | Aa2 or above | $20,000,000 |
| A or above | A2 or above | $15,000,000 |
| A- | A3 | $5,000,000 |
| Below A- or suspended, withdrawn or unrated | Below A3 or suspended, withdrawn or unrated | $0 |

In the event of a split rating classification by Moody's and S&P, the split rating classification opposite the lower of the two ratings shall apply for purposes of the Threshold.

As used herein:

"Long Term Debt Rating" means the lower of the rating assigned by either S&P or Moody's to the long term, unsecured and unsubordinated indebtedness or deposit obligations of a party.

"S&P" means Standard & Poor's Ratings Services (a division of The McGraw-Hill Companies, Inc.) (or any successor thereto).

"Moody's" means Moody's Investors Service, Inc. (or any successor thereto).

(C)   *"Minimum Transfer Amount"* means with respect to Party A: $100,000; *provided, however*, that if an Event of Default has occurred and is continuing with respect to Party A, the Minimum Transfer Amount with respect to Party A shall be $0.

*"Minimum Transfer Amount"* means with respect to Party B: $100,000; *provided, however*, that if an Event of Default has occurred and is continuing with respect to Party B, the Minimum Transfer Amount with respect to Party B shall be $0.

(D)   *Rounding.* The Delivery Amount and the Return Amount will be rounded up and down to the nearest integral multiple of $10,000, respectively.

(c)   *Valuation and Timing.*

(i)   *"Valuation Agent"* means, Party A, unless there has occurred and is continuing any Event of Default, Potential Event of Default or Termination Event with respect to Party A, in which case Party B or an independent third party designated by Party B having expertise in the valuation of securities and swap transactions shall be the Valuation Agent; *provided, however*, that where Party B is also a Defaulting Party and each of Party A and Party B is an Affected Party, both

parties promptly shall jointly designate an independent third party having expertise in the valuation of securities and swap transactions as the Valuation Agent.

Upon request, Party A agrees to provide Party B with a monthly report displaying the mid-market estimate of each party's Exposure ("Exposure Report"). Party B may consider the Exposure Report when determining whether Party B should make a demand as Valuation Agent pursuant to Paragraph 3, 5, or 6(d).

(ii) *"Valuation Date"* means the last Local Business Day of each month, and any other Local Business Day which a party specifies, pursuant to any notice to the other party, as a "Valuation Date."

(iii) *"Valuation Time"* means:

[x]     the close of business in the city of the Valuation Agent on the Local Business Day before the Valuation Date or date of calculation, as applicable;

[ ]     the close of business on the Local Business Day before the Valuation Date or date of calculation, as applicable;

*provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv) *"Notification Time"* means no later than 1:00 p.m., New York time, on a Local Business Day.

(d)     *Conditions Precedent and Secured Party's Rights and Remedies.* The following Termination Event(s) will be a *"Specified Condition"* for each party (that party being the Affected Party if the Termination Event occurs with respect to that party) for the purposes of the Paragraphs specified below:

|  | Paragraph 4(a) | Paragraphs 6(c), 8(a) and 8(b) |
|---|---|---|
| Illegality | [ ] | [x] |
| Tax Event | [ ] | [x] |
| Tax Event Upon Merger | [ ] | [ ] |
| Credit Event Upon Merger | [x] | [x] |

(e)     *Substitution.*

(i) *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

(ii) *Consent.* If specified here as applicable, then the Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d): Inapplicable; *provided, however,* at any time as there has occurred and is continuing an Event of Default, a Potential Event of Default or a Specified Condition as to the Pledgor or an Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, Applicable. Any reasonable cost incurred by the

Secured Party in connection with a substitution of Posted Collateral shall be paid by the Pledgor within 2 Local Business Days of the Secured Party's incurring such costs and demand on Pledgor for reimbursement.

(f)     *Dispute Resolution.*

(i)  *"Resolution Time"* means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5.

(ii)  *Value.*  For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support will be calculated as follows:  with respect to any Eligible Collateral (other than cash), the sum of (I) (x) the arithmetic average of the bid prices quoted on such date by two or more principal market makers for such Eligible Collateral chosen by the Disputing Party, or (y) if no quotations are available from a principal market maker for such date, the arithmetic average of the bid prices for such date, next preceding such date, on which such quotations were available, in each case, multiplied by the applicable Valuation Percentage, plus (II) the accrued interest on such Eligible Collateral (except to the extent Transferred to a party pursuant to any applicable provision of this Agreement or included in the applicable price referred to in (I) of this clause as of such date).

(iii)  *Alternative.*  The provisions of Paragraph 5 will apply, as modified below, except to the following extent:  pending resolution of a dispute, Transfer of the undisputed Value of Eligible Credit Support or Posted Credit Support involved in the relevant demand will be due as provided in Paragraph 5 if the demand is made at or before the Notification Time but will be due on the second Local Business Day after the demand if the demand is made after the Notification Time.

Paragraph 5(i)(B) shall be modified by adding after "Reference Market-makers" in the second line thereof:

(as selected by the Disputing Party and the other party)

(g)     *Holding and Using Posted Collateral.*

(i)  *Eligibility to Hold Posted Collateral; Custodians.*  Party A and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1)  Party A is not a Defaulting Party and no Specified Condition has occurred and is continuing with respect to Party A.

(2) Party A shall hold Posted Collateral only through a Custodian at any times as Party A shall fail to maintain a Long Term Debt Rating of at least A- by S&P and A3 by Moody's.  The Custodian shall be or have an account with a (i) Bank (as defined in the Federal Deposit Insurance Act) with a Long Term Debt Rating of at least A- by S&P and A3 by Moody's and assets of at least $1,000,000,000 or (ii) Federal Reserve Bank.  The Custodian shall have delivered a letter to Party B, in form and substance satisfactory to Party B, in which such Custodian agrees (i) to waive or acknowledge its waiver of, with respect to any account in which it will hold Eligible Credit Support, any general lien and

any right of set-off against such Eligible Credit Support with respect to any obligation of Party A, Party B or any third person, and (ii) to hold all Eligible Credit Support in a segregated and identifiable account.  Party A, to the extent that it holds Posted Collateral other than Cash, and the Custodian, which shall hold Posted Collateral in a manner and pursuant to an agreement reasonably satisfactory to Party A and Party B, shall also be an "Eligible Securities Intermediary" (as defined below).  Any Transfer of Posted Collateral to such Eligible Securities Intermediary and such agreement shall be sufficient to create (a) in favor of the Pledgor, a security entitlement to such Posted Collateral pursuant to Section 8-501 of the Uniform Commercial Code as in effect in the State of New York (the "UCC") and (b) in favor of the Secured Party, a perfected security interest in such securities pursuant to Sections 9-115(a) and 8-106(d)(2) of the UCC.  As used herein, "Eligible Securities Intermediary" means a person that is a securities intermediary as defined in Section 8-102 of the UCC.

(3) Posted Collateral may be held only in the following jurisdictions:  New York.

Initially, the **Custodian** for Party A is:  Not Applicable.

Party B and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1) Party B is not a Defaulting Party and no Specified Condition has occurred and is continuing with respect to Party B.

(2) The Custodian shall be or have an account with a (i) Bank (as defined in the Federal Deposit Insurance Act) with a Long Term Debt Rating of at least A- by S&P and A3 by Moody's and assets of at least $1,000,000,000 or (ii) Federal Reserve Bank.  The Custodian shall have delivered a letter to Party A, in form and substance satisfactory to Party A, in which such Custodian agrees (i) to waive or acknowledge its waiver of, with respect to any account in which it will hold Eligible Credit Support, any general lien and any right of set-off against such Eligible Credit Support with respect to any obligation of Party A, Party B or any third person, and (ii) to hold all Eligible Credit Support in a segregated and identifiable account.  The Custodian shall also be an "Eligible Securities Intermediary" which shall hold Posted Collateral in a manner and pursuant to an agreement reasonably satisfactory to Party A and Party B as set out in Paragraph 13(g)(i)(2) above.

(3) Posted Collateral may be held only in the following jurisdictions:  New York and California and any State that has adopted Revised Article 8. Investment Securities of the Uniform Commercial Code, adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws.

Initially, the **Custodian** for Party B is the Federal Reserve Bank of San Francisco.

(ii) *Use of Posted Collateral*.  The provisions of Paragraph 6(c) will not apply.

(h)     *Distributions and Interest Amount.*

(i) *Interest Rate.* The *"Interest Rate"* will be:  USD-Federal Funds-H.15.

(ii) *Transfer of Interest Amount.* The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b), unless otherwise specified here.

(iii) *Alternative to Interest Amount.* The provisions of Paragraph 6(d)(ii) will apply, unless otherwise specified here:  Not Applicable.

(i)     *Additional Representation(s).*

Party B represents to the other party (which representation(s) shall be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

the necessary action to authorize referred to in Section 3(a)(ii) of this Agreement includes all authorizations required under the Farm Credit Act of 1971 as amended and under any agreement, writ, decree or order entered into with the Pledgor's supervisory authorities; and at all times during the term of this Agreement, the Pledgor will continuously include and maintain as part of its official records this Agreement, any Credit Support Document to which it is a party and all other exhibits, supplements and attachments hereto and documents incorporated by reference herein, including all Confirmations, and evidence of all necessary authorizations.

(j)     *Other Eligible Support and Other Posted Support.*

(i) *"Value"* with respect to Other Eligible Support and Other Posted Support means:  None.

(ii) *"Transfer"* with respect to Other Eligible Support and Other Posted Support means:  None.

(k)     *Demands and Notices.*

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, unless otherwise specified here:

            Party A:      Address:      Lehman Brothers Special Financing Inc.
                                        3 World Financial Center
                                        200 Vesey Street, 8th Floor
                                        New York, NY  10285

                          Attention:  Documentation Manager

                          Facsimile No.:  (212) 526-6127

                          Telephone No.:  (212) 526-1875

Party B:          Address:          Western Farm Credit Bank
                                    3636 American River Drive
                                    Sacramento, CA  95864-5995

                  Attention:  Russell Booth

                  Facsimile No.:  (916) 485-6188

                  Telephone No.:  (916) 485-6115

(l)      *Addresses for Transfers.*

         Party A:          Instructions for:

Treasury Securities:      GNMA Securities:            Other Agency Securities:
Chase NYC/Lehman          LEHM                        Chase NYC/LMBS
ABA 021-000-021           Attn:  Derivatives Margin [5-1626]   ABA 021-000-021
                                                      Attn:  Derivatives Margin [5-1626]

         Party B:          Instructions for Book-entry Securities:
                           Federal Reserve Bank of San Francisco
                           ABA 1211-4263-0
                           Westfarm Cr Bank Sac 1030

                  Other address for Transfers:  To be specified in the notice.

(m)      *Other Provisions.*

         (1)      This Credit Support Annex is a security agreement under the New York Uniform
Commercial Code.

         (2)      Paragraph 8(d).  Paragraph 8(d) is amended to read as follows:

                  (d)      *Final Returns.*  When no amounts are or thereafter may become payable by the
         Pledgor with respect to any Obligations under any existing Transactions; or, at any given
         time there are no outstanding Transactions under this Agreement and no amounts are
         payable by the Pledgor (in both cases, except any potential liability under Section 2(d) of
         this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support
         and the Interest Amount, if any.

         (3)      *Certain Distributions Received.*  If a Secured Party receives or is deemed to receive
Distributions on a day that is not a Local Business Day, or after the close of business on a Local
Business Day, it will Transfer the Distributions to the Pledgor on the second following Local
Business Day, subject to Paragraph 4(a), but only to the extent contemplated in Paragraph 6(d)(i)
in connection with Distributions received or deemed received on a Local Business Day.

**IN WITNESS WHEREOF** the parties have executed this Credit Support Annex on the respective dates specified below with effect from the date specified on the first page of this Credit Support Annex.

LEHMAN BROTHERS SPECIAL      WESTERN FARM CREDIT BANK
    FINANCING INC.

By: _Florence D Nolan_      By: _Russell H. Booth_
  Name:                  Name:  Russell H. Booth
  Title:   FLORENCE D. NOLAN    Title:  Treasury Manager
  Date:     VICE PRESIDENT      Date:  February 22, 2000
          Feb. 28, 2000