WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
David W. Wiltenburg

Attorneys for James W. Giddens, Esq.,
as Trustee for the SIPA Liquidation of
the Business of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

---------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **SIPA Case No.** |
| | : | |
| **LEHMAN BROTHERS INC.**, | : | **08-01420 (JMP)** |
| | : | |
| Debtor. | : | |

---------------------------------------------------------------x

## NOTICE OF JOINT MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)(1) OF THE BANKRUPTCY CODE AND RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AUTHORIZING LEHMAN BROTHERS HOLDINGS INC. AND JAMES W. GIDDENS, AS TRUSTEE FOR THE SIPA LIQUIDATION OF THE BUSINESS OF LEHMAN BROTHERS INC. TO ENTER INTO (I) COST SHARING AGREEMENT AND (II) TRANSFER AGREEMENT

PLEASE TAKE NOTICE that a hearing to consider the annexed Motion (the "Motion") of Lehman Brothers Holdings Inc. ("LBHI"), its affiliated debtors in the above-referenced chapter 11 cases (together, the "Debtors"), and James W. Giddens, Trustee for the SIPA Liquidation of Lehman Brothers Inc. (the "SIPA Trustee"), for authorization, pursuant to sections 105(a) and 363(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to enter into (i) a cost sharing agreement, and (ii) a transfer agreement with Citibank, N.A. ("Citibank"), all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **August 18, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn:  Richard P. Krasnow, Esq., attorney for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:  Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; (v) Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, New York 10004, Attn:  David W. Wiltenburg Esq., attorneys for the SIPA Trustee; (vi) Citibank, N.A., 390 Greenwich Street, 4th Floor, New York, New York 10013, Attn:  Ronald M. Rudolph; and (vii) any person or entity with a particularized interest in the Motion, so as to be so filed and received by no later than **August 11, 2010 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: July 28, 2010
New York, New York


/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

/s/ David W. Wiltenburg
David W. Wiltenburg

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens, Esq.,
as Trustee for the SIPA Liquidation of
the Business of Lehman Brothers Inc.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
David W. Wiltenburg

Attorneys for James W. Giddens, Esq.,
as Trustee for the SIPA Liquidation of
the Business of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
:
In re                                                    :     Chapter 11 Case No.
                                                         :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,             :     08-13555 (JMP)
                                                         :
                                    Debtors.             :     **(Jointly Administered)**
                                                         :
------------------------------------------------------------x
:
In re                                                    :     SIPA Case No.
                                                         :
**LEHMAN BROTHERS INC.,**                                :     08-01420 (JMP)
                                                         :
                                    Debtor.              :
------------------------------------------------------------x

**JOINT MOTION PURSUANT TO SECTIONS 105(a)**
**AND 363(b)(1) OF THE BANKRUPTCY CODE AND RULE 9019**
**OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AUTHORIZING**
**LEHMAN BROTHERS HOLDINGS INC. AND JAMES W. GIDDENS, AS TRUSTEE**
**FOR THE SIPA LIQUIDATION OF THE BUSINESS OF LEHMAN BROTHERS INC.**
**TO ENTER INTO (I) COST SHARING AGREEMENT AND (II) TRANSFER AGREEMENT**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI"), its affiliated debtors in the above-

referenced chapter 11 cases, as debtor in possession (together, the "Debtors" and, collectively

with their non-debtor affiliates, "Lehman"), and James W. Giddens, as Trustee (the "SIPA

Trustee") for the liquidation of the assets of Lehman Brothers Inc. ("LBI"), under the Securities Investor Protection Act of 1970, as amended ("SIPA") respectfully represent:

## **Preliminary Statement**

1.      LBHI, one of its subsidiaries, Lehman Pass Through Securities Inc. ("LPTSI," together with LBHI, the "LBHI Entities," and collectively with the SIPA Trustee, the "Sellers"), and LBI currently hold not less than approximately 1,600 residual interests (the "Lehman Residuals") in certain real estate mortgage investment conduits ("REMICs"). LBHI and the SIPA Trustee are seeking the Court's authorization to enter into a transfer agreement (the "Transfer Agreement") between the Sellers and Citibank, N.A. ("Citi") with respect to the Lehman Residuals effective as of March 31, 2010 (the "Effective Date").

2.      The Transfer Agreement is in the best interests of the estates of LBHI and LBI because every day that the Sellers continue to hold the Lehman Residuals, they incur federal, state, and local income taxes on the Lehman Residuals even though the Sellers do not receive any economic returns from these assets. Specifically, the Lehman Group (as defined below, solely for the purposes of this Motion) expects that it will incur aggregate federal, state, and local income tax liabilities of between $119 million and $283 million from the Lehman Residuals from the Effective Date through 2014 if the Transfer Agreement is not approved. *See* Declaration of Layne J. Albert, dated July 28, 2010 ("Albert Decl.") ¶ 17, attached hereto as Exhibit A. The Transfer Agreement provides for LBHI to make a $24 million payment to Citi as consideration for Citi's agreement to assume the income tax liabilities associated with the Lehman Residuals, which will relieve the Lehman Group of the $119 million to $283 million in income tax liabilities that are expected to accrue with respect to these assets.

3. In addition, LBHI and the SIPA Trustee are seeking authority to enter into an inter-estate agreement, dated as of July 27, 2010 (the "Cost Sharing Agreement"), pursuant to which the Sellers have agreed to a mechanism for allocating responsibility between LBHI and LBI for the $24 million payment to Citi. Based on current estimates, approximately 70% of the $24 million will be allocated to LBI's estate with the remaining 30% divided between the LBHI Entities.

## Background

4. Commencing on September 15, 2008 (the "Commencement Date") and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. On September 17, 2008, the United States Trustee for the Southern District of New York appointed the statutory committee of unsecured creditors in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

6. On September 19, 2008, a proceeding was commenced under SIPA with respect to LBI (the "SIPA Proceeding"). The SIPA Trustee was appointed on that date to administer LBI's estate under SIPA.

## Jurisdiction

7. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## The Tax Burden From the Lehman Residuals

### I. Lehman's Consolidated Tax Group

8. Prior to the Commencement Date, and during the course of the Chapter 11 Cases with respect to LBHI, and the SIPA Proceeding with respect to LBI, LBHI has filed consolidated federal income tax returns on behalf of itself and most of its domestic subsidiaries, including LBI and LPTSI (the "Lehman Group"). Although LBI was subject to separate regulatory requirements as a broker-dealer that were not applicable to other LBHI affiliates and is currently the subject of the separately administered SIPA Proceeding under a separate statutory scheme, it has remained a member of the Lehman Group for federal income tax purposes and will continue to be a member of the Lehman Group so long as LBHI (i) is the common parent of the Lehman Group, and (ii) directly or indirectly owns at least 80% of the total voting power and value of LBI's equity. All members of the Lehman Group are severally liable for the group's federal income taxes, whether or not such taxes are related to their individual operations.

9. Because LBHI, LBI, and all other members of the Lehman Group are each severally liable for the federal income tax liabilities incurred as a result of owning the Lehman Residuals, the Transfer Agreement will relieve each of these entities from liability for such federal income taxes attributable to ownership of the Lehman Residuals for periods following the Effective Date.

## II.    Real Estate Mortgage Investment Conduit Securities

10.    Prior to the Commencement Date, the LBHI Entities and LBI held certain residual interests ("Residual Interests") in REMICs.  REMICs are pools of real estate mortgages that meet certain requirements under Title 26 of the United States Code, as amended (the "Tax Code").  Pursuant to the Tax Code, ownership interests in REMICs are limited to one or more classes of regular interests ("Regular Interests") and a single class of Residual Interests.  The Regular Interests are treated for federal income tax purposes as debt instruments.  Regular Interest holders typically receive all of the cash distributions (net of certain expenses payable by the REMIC) from a REMIC's underlying assets.  Residual Interests are treated like equity interests for federal income tax purposes.  Residual Interest holders typically do not receive any cash distributions from the REMIC's underlying assets, but are required to recognize income or loss from the REMIC for federal income tax purposes.  More specifically, the Tax Code requires Residual Interest holders to recognize income or loss, as the case may be, when the interest income accrued on the REMIC's underlying mortgages differs from the deductions accrued for the interest due to the holders of the Regular Interests in the REMIC and other expenses of the REMIC.

11.    The amount of taxable income that Residual Interest holders may recognize is known as "Excess Inclusion Income" and is determined by a formula provided by the Tax Code.  Excess Inclusion Income cannot be mitigated by the Residual Interest holders' net operating losses or other income tax deductions, although the tax on such income can be offset by certain tax credits.  These rules are intended to ensure that holders of Residual Interests pay income taxes with respect to the Excess Inclusion Income.

12. The losses that a Residual Interest holder may recognize are sometimes referred to as "Phantom Losses" because the holder of the Residual Interests is entitled to claim losses from the REMIC for tax purposes, even though the holder does not incur actual economic losses.

13. Holders of Residual Interests generally recognize Excess Inclusion Income in the early years of the REMIC and Phantom Losses in the later years. Although Phantom Losses are equal to Excess Inclusion Income over the life of the REMIC, the fact that the Excess Inclusion Income is generally recognized in earlier years can be detrimental to the holders of Residual Interests unless the holders have a sufficient amount of tax credits available from other sources to offset any tax liability related to the Excess Inclusion Income. Residual Interest holders, however, can benefit from Phantom Losses in later years to the extent that the Phantom Losses can be used to reduce such holders' non-REMIC taxable income.

14. Accordingly, Residual Interests can be burdensome to a taxpayer for two reasons. First, if the taxpayer is unable to offset the Excess Inclusion Income with tax credits, the taxpayer will be liable for income taxes even though the taxpayer has not actually received any income and does not receive any distributions from its Residual Interests. Second, if the taxpayer is unable to utilize the Phantom Losses in later years because it has no taxable income to reduce, it will have spent years incurring tax liabilities without any corresponding economic income and without any potential to benefit from the Phantom Losses. As described below, each of these factors applies to the Lehman Group and will independently burden the Lehman Group if it continues to hold the Lehman Residuals.

## III.    The Lehman Group's Residual Interests

15.    Prior to the Commencement Date, LBI and other subsidiaries of LBHI were in the business of securitizing residential real estate mortgages.  As part of that process, these subsidiaries formed a number of REMICs and, in many cases, a Lehman entity retained the Residual Interests after the Regular Interests in the REMIC were sold to third-party investors.  In certain situations, the Lehman Group also acquired additional Residual Interests from third parties.  Acquiring Residual Interests was profitable at that time because of the combination of three factors:  (i) the Lehman Group received payments from the transferors as consideration for assuming the future income tax liabilities associated with such Residual Interests (these payments are generally referred to as inducement payments); (ii) the Lehman Group's specific tax attributes (primarily tax credits) allowed it to absorb the income tax liabilities from the Residual Interests without being required to satisfy these liabilities entirely with cash; and (iii) the Lehman Group expected that its future income from other non-REMIC sources could be offset by Phantom Losses.  *See* Albert Decl. ¶¶ 9-10.

16.    The number of Lehman Residuals that produced Excess Inclusion Income each year from 2006 through 2008 ranged from approximately 350 to 500.  It can be very difficult to predict, for a particular year, which Lehman Residuals will produce Excess Inclusion Income since there is generally a significant amount of variability from one year to the next.  Accordingly, while certain of the Lehman Residuals are expected to continue to produce Excess Inclusion Income for a number of years, the Lehman Group is unable to precisely predict the total number or the identity of the particular Lehman Residuals that will produce Excess Inclusion Income during a given year.  *See* Albert Decl. ¶ 12.

17. While at the time the Lehman Group acquired the Lehman Residuals its domestic and international operations entitled it to certain federal income tax credits that could be used to offset the federal income tax liability resulting from the Excess Inclusion Income, its expected post-Commencement Date tax profile and attributes (i.e., its income and losses and available deductions and tax credits) will likely prevent it from fully mitigating the ongoing tax burden of the Lehman Residuals.

18. As noted above, LBHI will make the $24 million payment to Citi in consideration of Citi's acquiring the Lehman Residuals (the "Inducement Payment") and thus relieving the Lehman Group of the tax liabilities associated with the Lehman Residuals. In order to evaluate the reasonableness of that payment, the Lehman Group has estimated that if it continues to hold the Lehman Residuals beyond the Effective Date, it will incur an aggregate of between $119 million and $283 million in federal, state, and local income tax liabilities between the Effective Date and 2014 arising from ownership of the Lehman Residuals. Albert Decl. ¶ 17. In estimating the range of $119 million to $283 million of tax liability, the Lehman Group made the following assumptions with respect to a number of variables including the expected amount of Excess Inclusion Income, the time period during which such income might be produced, and the amount of tax credits that might be available to the Lehman Group:

- Historically, the Excess Inclusion Income generated from the Lehman Residuals averaged approximately $398 million per year between 2003 and 2008, and was at least $199 million in 2009. Based on this historical data and other available information, LBHI has estimated that the Lehman Residuals will generate Excess Inclusion Income of approximately $150 million from March 31, 2010 through December 31, 2010 and $200 million per year through 2014.[1] Albert Decl. ¶ 13; *see also* Declaration of T. Joelle Berlat, dated as of July 28, 2010 (the "Berlat Decl.") ¶¶ 8 & 10, attached hereto as Exhibit E (estimating Excess Inclusion Income of $150 million to $265 million from the Effective Date through the end of 2010).

---

[1] The Excess Inclusion Income for 2009 could potentially be more than $199 million, but LBHI has not yet received all information related to the Excess Inclusion Income for 2009. Albert Decl. ¶ 13; Berlat Decl. ¶ 8.

- Although the Lehman Residuals could generate Excess Inclusion Income for more than five years into the future, the Lehman Group has limited its analysis to the period from the Effective Date through 2014.  Limiting the analysis to this period provides the Lehman Group with a reasonable projection of its income tax liability.  Albert Decl. ¶ 15.

- The Excess Inclusion Income estimate of $150 million for the post-Effective Date portion of 2010 and $200 million per year thereafter results in a total of $950 million of Excess Inclusion Income during the period from the Effective Date through 2014.  Based on this $950 million of Excess Inclusion Income, the Lehman Group expects to incur a total of approximately $356 million in federal, state, and local income tax liability during this period before taking into account any available tax credits.[2]  Albert Decl. ¶ 16; *see also* Berlat Decl. ¶ 10 (estimating tax liabilities prior to reduction by available tax credits of $56 million to $99 million for the period from the Effective Date through the end of 2010).

- Based on the Lehman Group's current and projected domestic and international tax profile and attributes, and its utilization of general business credits in prior years, the Lehman Group expects to have a total of at least $73 million and at most $237 million in available tax credits in the period from the Effective Date through 2014 to offset the $356 million projected tax liability.  Accordingly, the total $356 million of expected income tax liabilities will likely be reduced to a range of $119 million to $283 million depending on the amount of available tax credits.  Albert Decl. ¶ 17.

19.     Not only will the Lehman Group incur significant income tax liabilities if it continues to hold the Lehman Residuals, but the Lehman Group's post-Commencement Date tax profile and attributes prevent it from generating sufficient taxable income from other sources in the future to take advantage of Phantom Losses.  The potential to offset future taxable income with Phantom Losses, therefore, no longer has value for the Lehman Group.  *See* Albert Decl. ¶ 19.

20.     It is these burdens that the Lehman Group proposes to eliminate by the payment to Citi of $24 million, a sum that pales in comparison to the $119 million to $283

---

[2]     This $356 million figure is comprised of $332.5 million of federal taxes (the $950 million of Excess Inclusion Income taxed at the 35% corporate rate) plus $23.75 million of state and local taxes (the $950 million of Excess Inclusion Income taxed at approximately 2.5%).  Albert Decl. ¶ 16.

million of aggregate income tax liability for the period from the Effective Date through 2014 that will be eliminated as a direct result of the proposed transaction.

## IV.   The Transfer Agreement with Citi

21.   Beginning in November of 2009, representatives of LBHI and the SIPA Trustee had extensive discussions regarding the potential income tax liabilities associated with the Lehman Residuals and possible ways to mitigate such liabilities.  These discussions focused on the possible alternatives for disposing of the Lehman Residuals in a manner that complied with relevant provisions of the Tax Code and other relevant laws.[3]  Representatives of LBHI and the SIPA Trustee ultimately agreed that disposing of the Lehman Residuals was potentially in the best interests of the Lehman Group.  *See* Declaration of Jeffry Ciongoli, dated as of July 28, 2010 ("Ciongoli Decl.") ¶ 7, attached hereto as Exhibit B.

22.   After deciding that the Lehman Residuals should be disposed of, representatives of LBHI investigated the secondary market to determine prevailing market terms for the sale of Residual Interests including lot size, pricing, and potential purchasers.  Based on this review, representatives of LBHI determined appropriate pricing for the Lehman Residuals and identified three potential transferees, including Citi, with whom the Lehman Group discussed the terms of a possible transfer.  Ciongoli Decl. ¶¶ 8-10.

23.   After engaging in this process, the Lehman Group determined that it was in its best interests to convey the Lehman Residuals to Citi, subject to documentation, the consent of the SIPA Trustee, and Court approval.  Ciongoli Decl. ¶¶ 11-12 .  LBHI and the SIPA Trustee each entered into separate letters of intent with Citi, the LBHI LOI (as defined below) on March 31, 2010 and the LBI LOI (as defined below) on May 17, 2010.  Ciongoli Decl. ¶ 12.

---

[3]    Other relevant laws include the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and the Securities Act of 1933, as amended (the "1933 Act").

24.     This decision to convey the Lehman Residuals to Citi was based on a number of factors.  Specifically, Citi was an eligible transferee under applicable provisions of the Tax Code, ERISA and the 1933 Act, was willing to take the entire portfolio of the Lehman Residuals in a single lot, and was willing and able to expeditiously consummate a transfer.  The fact that Citi will assume the entire portfolio of Lehman Residuals is an attractive feature of the Transaction because, due to economies of scale, the Lehman Group is likely able to pay a lower inducement fee by selling the Lehman Residuals in one lot than if it sold the Lehman Residuals in smaller lots to several purchasers.  *See* Ciongoli Decl. ¶ 12; Declaration of Paul Edwards, dated July 28, 2010 ("Edwards Decl.") ¶ 7, attached hereto as Exhibit C.[4]

25.     Citi is also an attractive transferee because it is a large participant in the secondary market for Residual Interests and has relationships with many of the trustees of the related REMICs.  This experience with REMICs allowed Citi to complete its evaluation of the Lehman Residuals in a very short period of time and decreased the likelihood that there would be problems with completing the transfer process with the trustees of the related REMICs.  In addition, Citi agreed to pay the Transaction Costs (as defined below) and agreed, after substantial arm's length negotiations, to the Inducement Payment.  *See* Ciongoli Decl. ¶ 12.

26.     Based on the following factors, the Lehman Group determined that the Inducement Payment is a reasonable price for Citi's assumption of the Lehman Residuals and the associated income tax liabilities:

▪     It is market practice for a transferor of Residual Interests to make a payment to the transferee for assuming the associated income tax liabilities.  *See* Ciongoli Decl. ¶ 13; Edwards Decl. ¶ 11.  In fact, the Lehman Group received similar payments when it

---

[4]     Mr. Edwards is a partner of Structured Capital Solutions, LLC ("SCS").  As set forth in the Edwards Declaration, SCS was engaged to assist LBHI with its evaluation of the market for Residual Interests and the reasonableness of the Inducement Payment (as defined below).

acquired Residual Interests from third parties prior to the Commencement Date. *See* Ciongoli Decl. ¶ 13.

▪ A reasonable "nuisance" fee that a market participant would charge merely for assuming the administrative burdens associated with holding the Lehman Residuals would likely be between $20 million and $36 million. *See* Edwards Decl. ¶ 15. Given that a market participant would likely charge more than this minimum range of $20 million to $36 million for assuming at least 1,600 Lehman Residuals, which include hundreds of Lehman Residuals that produced Excess Inclusion Income between 2006 and 2009 and which may continue to produce Excess Inclusion Income in the future, the Inducement Payment of $24 million is fair and reasonable. *See* Edwards Decl. ¶¶ 16-17.

▪ The Inducement Payment is reasonable considering that the Lehman Group is relieving itself of liabilities that have been estimated to be between $119 million and $283 million through 2014. Even considering the present value of those tax liabilities of between approximately $113 million and $269 million, the income tax liabilities are far in excess of the Inducement Payment.[5] *See* Ciongoli Decl. ¶¶ 13-14.

27. According to the terms of the Transfer Agreement, Citi, as the owner of the Lehman Residuals, will bear the obligation to pay all taxes associated with ownership of the Lehman Residuals accruing on or after the Effective Date, the date the parties agreed to all material terms of the Transfer Agreement, as reflected in the March 31, 2010 letter of intent between LBHI and Citi (the "LBHI LOI"), a copy of which is attached hereto as Exhibit E.[6] *See* Transfer Agreement §2(a). Thus, the Lehman Group will be relieved of the income tax liabilities associated with the Lehman Residuals for the periods following the Effective Date.

**Relief Requested**

28. LBHI and the SIPA Trustee seek Court approval, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, of their entry into the Transfer Agreement, as of

---

[5] To calculate these present values, the Lehman Group evaluated the post-Effective Date tax liabilities through 2014 and assumed the discount was based on a reasonable interest rate (the five year swap rate, which is currently approximately 2.06%). *See* Ciongoli Decl. ¶ 13.

[6] Although the SIPA Trustee entered into a letter of intent (the "LBI LOI") on May 17, 2010, the material substantive terms of the LBI LOI are consistent with the terms of the LBHI LOI. A copy of the LBI LOI is attached hereto as Exhibit F.

the Effective Date – the date that all material terms were agreed upon, as reflected in the LBHI

LOI – and that such approval be effective as of such date for all purposes including, but not

limited to, federal, state, and local income tax purposes.[7]  Pursuant to the Transfer Agreement,

Citi will take title to the Lehman Residuals as of the Effective Date.  A copy of the Transfer

Agreement is attached hereto as Exhibit G.

29.    In order to reach an accurate and equitable determination of beneficial

ownership of the Lehman Residuals between LBHI and LBI, which will determine their

respective responsibilities for the Inducement Payment, LBHI and the SIPA Trustee seek

authorization, pursuant to Rule 9019 of the Bankruptcy Rules, to enter into the Cost Sharing

Agreement and to consummate the transactions described therein.  A copy of the Cost Sharing

Agreement is attached hereto as Exhibit H.

## I.    Terms of the Proposed Transactions

30.    The LBHI Entities and the SIPA Trustee entered into the Transfer

Agreement with Citi after extensive, arm's-length negotiations.  *See* Ciongoli Decl. ¶ 12.  The

salient terms and provisions of the Transfer Agreement are as follows:[8]

- ▪ ***Sale of the Lehman Residuals.***  The Sellers will transfer all right, title and interest in
1,600 to 1,900 Lehman Residuals,[9] and LBHI will transfer the Inducement Payment to

---

[7]      At least one other bankruptcy court case has approved a retroactive effective date with respect to the sale of
Residual Interests. *See In re Delta Financial Corp., et al.*, Case No. 07-11880 (CSS) (Bankr. D. Del. Oct. 1, 2008)
(approving a retroactive effective date for all purposes including federal, state and local income taxes for a similar
transfer of Residual Interests) [Docket No. 567].

[8]      This summary of the Transfer Agreement is qualified in its entirety by the terms and provisions of the
Transfer Agreement.  To the extent there are any inconsistencies between the description of the Transfer Agreement
contained herein and the terms and conditions of the Transfer Agreement, the terms and conditions of the Transfer
Agreement shall control.  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed
to such terms in the Transfer Agreement.

[9]      While the Lehman Group believes that there are approximately 1,600 Lehman Residuals, and, as described
herein, has concluded that that the Inducement Payment is reasonable in relation to the transfer of 1,600 Lehman
Residuals, Citi has agreed to acquire up to 300 additional Lehman Residuals if such Lehman Residuals are identified
prior to the Settlement Date (as defined in the Transfer Agreement) without an increase in the amount of the
Inducement Payment.  Accordingly, if the Lehman Group identifies additional Lehman Residuals and transfers them

Citi. Upon receipt of the Inducement Payment, Citi will accept all incidents of ownership of the transferred Lehman Residuals, effective as of March 31, 2010 for all purposes including, but not limited to, federal, state, and local income tax purposes.

If, despite the commercially reasonable efforts of the Sellers and Citi, the transfer of certain of the Lehman Residuals cannot be effected because of a legal impediment that cannot be cured or waived, Citi will provide LBHI with a refund of that portion of the Inducement Payment that is attributable to the returned Lehman Residuals. LBHI will pay such refund or a portion of such refund to LBI in accordance with, and to the extent required by, the Cost Sharing Agreement, as applicable.

- **Transaction Costs.** Citi agrees to pay the ordinary, necessary and reasonable out-of-pocket costs and expenses (including fees payable to trustees and custodians), incurred in connection with the consummation of the transactions set forth in the Transfer Agreement following submission of appropriate and customary documentation of such costs and expenses, exclusive of the cost of the Sellers' professional advisors (the "Transaction Costs").

- **Transaction Documents.** Citi will prepare, execute, and deliver to the Sellers any Transfer Documents (as defined in the Transfer Agreement) necessary to consummate or confirm the transactions set forth in the Transfer Agreement.

31.     In order to establish a process for ascertaining the incidents of ownership of the Lehman Residuals, and thereby determine each Seller's respective share of the Inducement Payment, LBHI and the SIPA Trustee entered into the Cost Sharing Agreement. The salient terms of the Cost Sharing Agreement are as follows:[10]

- **Determination of Ownership.** LBHI and the SIPA Trustee will independently undertake a review to determine the ownership by the LBHI Entities, on the one hand, or LBI, on the other hand, of the transferred Lehman Residuals. Determinations will be based on all available evidence, including transaction documents, brokerage statements for an account in which a transferred Lehman Residual is held, records of ownership of a transferred Lehman Residual from Lehman or LBI legacy trading systems, and documents produced by the trustee of a REMIC in which a transferred Lehman Residual is an interest. The

---

to Citi pursuant to the Transfer Agreement, the transaction will be even more beneficial to LBHI's and LBI's respective estates.

[10]     This summary of the Cost Sharing Agreement is qualified in its entirety by the terms and provisions of the Cost Sharing Agreement. To the extent there are any inconsistencies between the description of the Cost Sharing Agreement contained herein and the terms and conditions of the Cost Sharing Agreement, the terms and conditions of the Cost Sharing Agreement shall control. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Cost Sharing Agreement.

SIPA Trustee and LBHI will each prepare their own schedule identifying each transferred Lehman Residual and the identity of its owner.

LBHI and the SIPA Trustee have ninety days to complete this process after which they are required to reconcile any differences in the ownership of any transferred Lehman Residual.

- ■ ***Inclusion of Lehman Residuals in the Transfer Agreement.*** To the extent that the sum of (i) the number of Lehman Residuals listed on Exhibit A to the Transfer Agreement, which is comprised of a schedule of all of the Lehman Residuals identified to date, and (ii) the total number of additional Lehman Residuals that the Sellers identify prior to the fifth business day before the Settlement Date exceeds 1,900 Residual Interests, 1,900 Residual Interests will be transferred to Citi, and LBHI and the SIPA Trustee agree that they will use their reasonable best efforts, acting in good faith and reasonably, to agree as to which of such identified additional residual interests are currently producing the most Excess Inclusion Income and shall include such Lehman Residuals among those that are to be sold to Citi (such residual interests, the "<u>Agreed Additional Residual Interests</u>").

  If the number equal to (i) 1900, minus (ii) the number of Lehman Residuals identified in Exhibit A to the Transfer Agreement, minus (iii) the number of Agreed Additional Residual Interests, is greater than zero, then the Sellers shall randomly select from among any identified additional Lehman Residuals that are not Agreed Additional Residual Interests those that are to be sold to Citi.

- ■ ***Payment of the LBI Amount.*** The SIPA Trustee agrees to pay LBHI an amount (the "<u>LBI Amount</u>") equal to (i) the LBI Share (as defined below), multiplied by (ii) $24 million. To the extent that the LBI Share is not finally resolved between the LBHI and the SIPA Trustee by the Payment Date (as defined in the Cost Sharing Agreement), the SIPA Trustee will make a payment to LBHI on the Payment Date based upon its good faith estimate of the LBI Amount and any remaining amounts due in respect of the LBI Amount will be paid by the SIPA Trustee when the LBI Share is finally resolved.

- ■ ***LBI Share.*** "LBI Share" means the quotient obtained from dividing (i) the number of transferred Lehman Residuals owned by LBI as determined pursuant to the Cost Sharing Agreement, by (ii) the total number of transferred Lehman Residuals; provided, that where the SIPA Trustee and LBHI cannot agree on the ownership of any transferred Lehman Residuals or there is no evidence of ownership of any transferred Lehman Residual, the LBI Share will equal the quotient obtained from dividing (i) the number of transferred Lehman Residuals owned by LBI as agreed by LBHI and the SIPA Trustee by (ii) the number of all transferred Lehman Residuals where LBHI and the SIPA Trustee have agreed on the ownership of such transferred Lehman Residual.

## II.    The Sale of the Lehman Residuals to Citi is an Appropriate Exercise of LBHI's and the SIPA Trustee's Business Judgment

32.    Ample authority exists under section 363 of the Bankruptcy Code for approval of the conveyance to Citi of the Lehman Residuals pursuant to the Transfer Agreement.

33.    Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts in the Second Circuit and others, in applying this section have required that this determination be based upon the sound business judgment of the debtor. *See In re Chateaugay Corp.*, 973 F.2d 141, 144-45 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same).  Bankruptcy Rule 6004(f)(1) permits private sales by a debtor, FED. R. BANKR. P. 6004(f)(1), and courts often allow a chapter 11 debtor to sell assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code.[11]

34.    The decision by LBHI and the SIPA Trustee to enter into the Transfer Agreement represents an appropriate exercise of their sound business judgment and is in the best interests of LBHI, LBI, their respective estates and creditors, and all other parties in interest.  As such, the relief requested in this Motion should be granted.

---

[11]    *See, e.g., In re Lehman Brothers Holdings Inc.*, Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 18, 2008); *In re Loral Space & Commc'ns Ltd.*, Ch. 11 Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Sep. 30, 2005); *In re Int'l Wire Group, Inc.*, Ch. 11 Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. June 10, 2004); *Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.)*, 233 B.R. 619 (D.P.R. 1999) (upholding bankruptcy court's approval of private sale conducted by chapter 11 debtor); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving private sale of chapter 11 debtor's assets where standards of section 363(b) were met).

35.     As demonstrated above, based upon reasonable estimates of Excess Inclusion Income from the Lehman Residuals and the amount of available tax credits, the Lehman Group is expected to incur federal, state, and local income tax liabilities from the Effective Date through 2014 in the range of $119 million to $283 million.  The Transfer Agreement relieves the Lehman Group of these potential income tax liabilities as of the Effective Date in exchange for a single payment of $24 million.

36.     As further demonstrated above, even if the Lehman Group would not incur any income tax liability as a result of continuing to hold the Lehman Residuals, such continuing ownership would not benefit the Lehman Group in any way, as the Lehman Group is unlikely to be in a position to utilize the Phantom Losses from the Lehman Residuals in the future. Accordingly, the Lehman Residuals are no longer valuable assets of LBHI's or LBI's respective estates.

37.     LBHI and the SIPA Trustee have determined that it is in the best interests of their respective estates to transfer additional Lehman Residuals that are not currently producing Excess Inclusion Income because there is a not insubstantial risk that certain of them could produce Excess Inclusion Income, and the related income tax liability, in the future.  *See* Albert Decl. ¶ 14.

38.     Lastly, it is standard industry practice for a transferor of Residual Interests to make a payment to a transferee in consideration of the transferee's bearing of all income tax liabilities associated with the transferred Residual Interests.  *See* Ciongoli Decl. ¶ 9; Edwards Decl. ¶ 11.  Such payments are also consistent with the Lehman Group's past practice when, prior to the commencement of the Chapter 11 Case and the SIPA Proceeding, the Sellers acquired Residual Interests from third parties.  *See* Albert Decl. ¶ 10; Ciongoli Decl. ¶ 13.

39.     For the reasons set forth above and in the attached declarations, entry into the Transfer Agreement is an appropriate exercise of LBHI's and the SIPA Trustee's respective business judgment and should be approved.

III.    **The Terms of the Cost Sharing Agreement are Fair and Equitable, Fall Within the Range of Reasonableness, and Are in the Best Interests of LBHI's and LBI's Respective Estates**

40.     As set forth in greater detail below, because the ownership of some of the Lehman Residuals is subject to uncertainty, the Sellers are engaged in a process to determine the beneficial ownership of each Lehman Residual as between the LBHI Entities and LBI.  This process will be governed by the Cost Sharing Agreement.  Based on their preliminary review, the Sellers currently estimate that the LBHI Entities hold approximately 30% of the Lehman Residuals and LBI holds approximately 70% of the Lehman Residuals.[12]

41.     Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."[13]  Fed. R. Bankr. P. 9019(a).  In ruling on a motion pursuant to rule 9019(a), a court must find that the proposed settlement is fair and equitable and is in the best interests of the estate or estates.  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira (In re 47-49 Charles St., Inc.)*, 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994).

42.     The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court.  *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  It is

---

[12]     These estimates remain subject to revision and are not binding on any party for any reason.

[13]     Section 1107 of the Bankruptcy Code provides that a debtor in possession shall have all the rights and powers and shall perform all the functions and duties of a trustee serving in a chapter 11 case.  *See* 11 U.S.C. § 1107(a).

the responsibility of a court to examine a settlement and determine whether it "falls below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997). Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

43. While a court must "evaluate … all … factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court does not need to conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699 F.2d at 608, nor does the court need to conduct a full independent investigation. *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991).

44. Although a court should not give the debtor in possession's opinion conclusive effect, the court may give weight to the informed judgment of the trustee or debtor in possession that a compromise is fair and equitable. *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness…. If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other"). Moreover, "the bankruptcy judge does not have to decide the numerous questions of law and fact…. The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness." *Nellis*, 165 B.R. at 123 (internal citations omitted).

45. Entry into the Cost Sharing Agreement is in the best interests of LBHI, LBI, and their respective estates and creditors. As discussed above, the benefit to the Sellers of

disposing of the Lehman Residuals as of the Effective Date is evidenced by the fact that the Lehman Group will be relieved of approximately $119 million to $283 million in federal, state and local income tax liabilities in exchange for the Inducement Payment.  Given the benefits that will accrue to each of their respective estates, entry into the Transfer Agreement is in the best interests of LBHI's and LBI's respective estates so long as the Sellers agree on an equitable mechanism for allocating financial responsibility for the Inducement Payment between LBHI and LBI.

46.     Although LBHI appears to be the beneficial owner of a minority of the Lehman Residuals, as parent of the Lehman Group it is severally liable for the income tax liabilities for the entire Lehman Group and, as such, has agreed to pay, in the first instance, the entire Inducement Payment to Citi.  So that LBHI and the other Sellers do not bear more than their proportionate share of the Inducement Payment, the LBHI Entities and LBI have entered into the Cost Sharing Agreement, which will allow LBHI to recover the portion of the Inducement Payment that is attributable to the transferred Lehman Residuals beneficially owned by LBI as of the Effective Date.  In addition, following the determination of LPTSI's share of the transferred Lehman Residuals, LBHI will record an intercompany payable on LPTSI's books and records and a corresponding receivable on its own books and records indicating LPTSI's liability to LBHI of its proportionate share of the Inducement Payment.  While LPTSI's current ability to reimburse LBHI for its share of the Inducement Payment is uncertain, LBHI will be relieved of the majority of its several liability for the Lehman Group's tax liability arising from the Excess Inclusion Income generated by the Residual Interests, commencing as of the Effective Date, but, based solely on the SIPA Trustee's reimbursement obligations, will ultimately only be responsible for a fraction of the Inducement Payment.  *See* Albert Decl. ¶ 20.

47.     While the Sellers have been working diligently to review their business records to establish the beneficial ownership of each of the Lehman Residuals, that process has been prolonged due to the need to obtain documents from third-party trustees or servicers and, in some instances, the lack of custodial records.  Rather than delay their entry into the Transfer Agreement until the review process is complete, and after careful consideration and negotiation, the Sellers have settled on the mechanisms set forth in the Cost Sharing Agreement as the most efficient, cost-effective, and equitable manner to establish beneficial ownership of the transferred Lehman Residuals and allocate financial responsibility for the Inducement Payment.  Accordingly, LBHI and the SIPA Trustee respectfully request that their entry into the Cost Sharing Agreement be approved.

## IV.     Relief Under Bankruptcy Rule 6004(h)

48.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6004(h).  Waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h) will allow LBHI and the SIPA Trustee to finalize the transactions set forth in the Transfer Agreement in a timely manner and will provide each of their respective estates with certainty regarding their disposal of the Lehman Residuals.  LBHI and the SIPA Trustee respectfully request that any order approving the relief requesting herein be effective immediately by waiving the 14-day stay.

## Notice

49.     No trustee has been appointed in LBHI's chapter 11 case.  LBHI and the SIPA Trustee have served notice of this Motion in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [Docket No. 9635] on:  (i) the U.S. Trustee; (ii) the

attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the

Internal Revenue Service; (v) the United States Attorney for the Southern District of New York;

and (vi) all parties who have requested notice in these chapter 11 cases.  The SIPA Trustee has

provided notice of this Motion in accordance with the amended order entered in the SIPA

Proceeding implementing certain notice and case management procedures and other related relief

[LBI Docket No. 3466].  LBHI and the SIPA Trustee submit that no other or further notice need

be provided.

50.     No previous request for the relief sought herein has been made by LBHI

or the SIPA Trustee to this or any other court.

WHEREFORE the LBHI and the SIPA Trustee respectfully request that the Court

enter an order approving the relief requested herein and granting such other and further relief as

is just.


Dated: July 28, 2010
       New York, New York


/s/ Richard P. Krasnow                          /s/ David W. Wiltenburg
Richard P. Krasnow                              David W. Wiltenburg

WEIL, GOTSHAL & MANGES LLP                      HUGHES HUBBARD & REED LLP
767 Fifth Avenue                                One Battery Park Plaza
New York, New York 10153                        New York, New York 10004
Telephone: (212) 310-8000                       Telephone: (212) 837-6000
Facsimile: (212) 310-8007                       Facsimile: (212) 422-4726

Attorneys for Debtors                           Attorneys for James W. Giddens, Esq.,
and Debtors in Possession                       as Trustee for the SIPA Liquidation of
                                                the Business of Lehman Brothers Inc.