Rachel C. Strickland                                    Hearing Date: August 18, 2010 at 10:00 a.m.
Jennifer J. Hardy
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

Counsel for Appaloosa Investment L.P. I

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re                                          :    Chapter 11
                                               :
Lehman Brothers Holdings Inc., et al.,         :    Case No. 08-13555 (JMP)
                                               :
                    Debtors.                   :    Jointly Administered
-------------------------------------------------------x

**APPALOOSA INVESTMENT L.P. I'S LIMITED OBJECTION TO
THE MOTION OF LEHMAN COMMERCIAL PAPER INC.
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE FOR
AUTHORITY TO (I) CONSENT TO ITS NON-DEBTOR AFFILIATE
LEHMAN ALI INC. (A) ENTRY INTO PLAN SUPPORT
AGREEMENT RELATED TO THE RESTRUCTURING OF
INNKEEPERS USA TRUST; AND (B) CONSUMMATION OF THE
TRANSACTIONS SET FORTH IN THE PLAN TERM SHEET; AND
(II) PROVIDE FUNDS TO SOLAR FINANCE INC., A NON-DEBTOR
AFFILIATE, TO PROVIDE DEBTOR-IN-POSSESSION FINANCING**

Appaloosa Investment L.P. I ("**Appaloosa**"),[1] a creditor and party in interest in

the case of Lehman Commercial Paper Inc. ("**LCPI**," together with its affiliates, "**Lehman**"),

objects to certain requested relief in the *Motion of Lehman Commercial Paper Inc. Pursuant to*

*Section 363 of the Bankruptcy Code for Authority to (I) Consent to its Non-Debtor Affiliate*

*Lehman ALI Inc. (A) Entry Into Plan Support Agreement Related to the Restructuring of*

*Innkeepers USA Trust; and (B) Consummation of the Transactions Set Forth in the Plan Term*

*Sheet; and (II) Provide Funds to Solar Finance Inc., a Non-Debtor Affiliate, to Provide Debtor-*

---

[1] Appaloosa is a party in interest in the chapter 11 cases of Innkeepers USA Trust and its affiliated debtors.

*In-Possession Financing* [Docket No. 10465] (the "**Motion**").  As grounds, Appaloosa respectfully states as follows:

## INTRODUCTION

1. Along with relatively uncontroversial requests for relief, by its Motion, LCPI seeks authority from this Court to add to its portfolio of speculative distressed investments and to sell an asset it does not own, may never own and cannot yet value — all without assessing the risks of its proposed venture, marketing the contingent assets in question or subjecting its sale to higher or better offers.  To make matters worse, the Motion asks this Court to pre-judge and rule on central issues in the cases of Innkeepers USA Trust, et al.,[2] that will likely be the subject of a contested confirmation hearing before another Judge in this District.

2. The Innkeepers Cases were filed on July 19, 2010 (the "**Innkeepers Petition Date**") and no plan of reorganization has been filed in those cases.  A week after the Innkeepers Debtors filed for chapter 11, on July 27, 2010, LCPI filed the Motion seeking three things:

   - permission for a non-debtor affiliate of Lehman ("**ALI**") to enter into a plan support agreement (the "**PSA**") with the Innkeepers Debtors;

   - permission to consummate transactions consistent with a plan term sheet, including the sale of 50% of the equity of reorganized Innkeepers for a price not less than $107.5 million; and

   - authority to fund a debtor-in-possession credit facility to a subset of the Innkeepers Debtors.

3. The parallel motion to approve the PSA in the Innkeepers Cases is scheduled to be heard on September 1, 2010.  Notably, neither this Court nor the Innkeepers Court is being afforded a complete picture of the various transactions they are being asked to approve and this

---

[2] This case is pending under Case No. 10-13800 (SCC) (the "**Innkeepers Cases**," and the debtors in such cases, "**Innkeepers**" or the "**Innkeepers Debtors**").

Court has not been fully apprised of the impact its ruling would have in the Innkeepers Cases. The submissions in the two cases are different, and much remains to be disclosed and determined in both.[3] In short, the Motion is putting the cart well before the horse.

4.  Because Lehman's request for approval of both the PSA and the sale of its future potential plan distributions has been submitted in the very beginning stages of the Innkeepers Cases, Lehman has not submitted, and indeed is unable to submit, the required evidence for the approval, pursuant to section 363 of title 11 of the United States Code (the "**Bankruptcy Code**"), of either the PSA or a sale of equity to Apollo Investment Corporation ("**Apollo**"). Specifically, as the valuation of the equity of a reorganized debtor is properly determined after the presentation of detailed evidence by experts at the hearing with respect to confirmation of a plan, and such value is determined by the court hearing such case, this Court should not be asked to rule on any aspect of the value of the reorganized Innkeepers Debtors.

5.  Perhaps more troubling, other than remarks made for a recent news article,[4] Lehman has also failed to justify its decision to affirmatively negotiate for non-public equity in yet another troubled real estate company. Why would Lehman negotiate now to receive stock of speculative value for its stake in the Floating Rate Mortgage (as defined below) and agree, up front, to waive repayment of the proposed Lehman DIP? Assuming this question can be answered in a satisfactory manner (Appaloosa submits it cannot), it is still unclear why Lehman

---

[3] In addition to the material factual and legal questions that remain unanswered (such as the valuation of the Innkeepers' enterprise), each of the transactions that are the subject of the Motion remain subject to definitive documentation. Although the Lehman debtors inexplicably rushed to seek this Court's approval to sell stock to Apollo, their sale agreement with Apollo is not contemplated to be completed until September 2, 2010.

[4] See Wei, Lingling, Lehman Makes Its Next Property Gamble, WALL ST. J., Aug. 4, 2010, at C6 (attached hereto as Exhibit A).

would seek this Court's authority to sell half of its proposed distribution in the Innkeepers Cases today without subjecting such asset to a market test of its value.

6.  Instead of waiting until valuation testimony regarding the equity value of the reorganized Innkeepers Debtors is presented to the Innkeepers Court, instead of waiting for a plan of reorganization for the Innkeepers Debtors to be filed (let alone confirmed), instead of determining whether buyers other than Apollo would be interested in purchasing any equity that ALI may receive in the Innkeepers Cases, ALI is seeking to bind itself to sell half of its contemplated plan distributions to Apollo today.  The Motion fails to explain why Lehman feels compelled to enter into an agreement with the Innkeepers Debtors or Apollo at this early stage of the Innkeepers Cases, or why it cannot wait to determine whether there are any other buyers that would pay a higher price for its proposed plan distribution.  Nothing has been finalized, nothing has been exposed to the market and, given that Lehman is the sole secured lender for certain of the Innkeepers Debtors and the proposed DIP lender who has conditionally consented to the Innkeepers Debtors' use of cash collateral, nothing would be lost by proceeding in a more measured and traditional manner.  Lehman has not demonstrated any adequate business purpose for its entry into the PSA or the premature sale of equity it does not own.  Accordingly, the Motion should be denied in part without prejudice to Lehman's right to come back to this Court if and when it receives some form of plan consideration in the Innkeepers Cases.

## BACKGROUND

7.  In order to understand the relief requested in the Motion and its implications, it is essential to understand some of the background and dynamics of the nascent Innkeepers Cases. As set forth above, the Innkeepers Cases were filed on July 19, 2010, and are currently pending before the Honorable Shelley C. Chapman in the United States Bankruptcy Court for the Southern District of New York.  The Innkeepers Debtors own and operate a portfolio of 72

- 4 -

upscale and mid-priced extended-stay and select-service hotels located in 20 states across the United States.  See *Amended Declaration of Dennis Craven, Chief Financial Officer of Innkeepers USA Trust, In Support of First-Day Pleadings* [Docket No. 33] (the "**Innkeepers Declaration**") ¶ 6.  ALI is a secured lender to 20 of the 72 Innkeepers Debtors.  Innkeepers Declaration ¶ 27.

8.      As of the Innkeepers Petition Date, the Innkeepers Debtors had incurred approximately $1.29 billion of secured debt, consisting of (a) a securitized mortgage loan in the face amount of $825 million (the "**Fixed Rate Mortgage**"), collateralized by 45 of the Innkeepers Debtors' hotel properties and serviced by Midland Loan Services, Inc., (b) a floating rate senior mortgage loan in the face amount of $250 million (the "**Floating Rate Mortgage**") for which ALI is the sole lender, collateralized by 20 hotel properties, plus a junior mezzanine loan in the face amount of $118 million secured by the same 20 hotels, and (c) seven additional secured mortgage loans (the "**Individual Mortgages**") ranging in amounts from approximately $24 to $48 million, each secured by individual properties, with one additional mezzanine loan related to one of the Individual Mortgages.  See Innkeepers Declaration ¶¶ 8, 25-37.  Each of the Floating Rate Mortgage, Fixed Rate Mortgage, and each Individual Mortgage is secured by distinct hotel properties, and such mortgages are the liabilities of distinct debtors, such that the borrowers under the Floating Rate Mortgage, the Fixed Rate Mortgage and the Individual Mortgages do not overlap.  See Innkeepers Declaration ¶¶ 24-37.  In 2007, Apollo acquired the membership interests of debtor Grand Prix Holdings LLC, the direct or indirect parent of all of the Innkeepers Debtors.  See Innkeepers Declaration ¶¶ 8, 23.

9.      On the Innkeepers Petition Date, the Innkeepers Debtors moved for approval of two separate debtor-in-possession financing facilities, consisting of (a) an approximately $50.75

million facility provided by an affiliate of Five Mile Capital Partners LLC, which will be secured by the 45 properties securing the Fixed Rate Mortgages and two of the Individual Mortgages, and (b) an approximately $17.5 million term facility funded by an affiliate of Lehman, secured by the properties securing the Floating Rate Mortgages (the "**Lehman DIP**"). See *Debtors' Motion for the Entry of an Order Authorizing the Debtors to Obtain Postpetition Financing from Five Mile Capital Partners on a Priming Basis Pursuant to Sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) of the Bankruptcy Code* [Docket No. 24] pp. 5-10; Motion ¶ 29.

10. The Innkeepers Debtors filed a motion to obtain the Innkeepers Court's approval to enter into the PSA with Lehman. That motion is not scheduled to be heard until September 1, 2010. The only two proposed parties to the PSA are the Innkeepers Debtors and ALI. The PSA and its attached term sheet (the "**Plan Term Sheet**")[5] outline the terms of a proposed restructuring, which includes the distribution of 100% of the new equity of reorganized Innkeepers (the "**New Equity**") to ALI in full and final satisfaction of the Floating Rate Mortgage and the reduction of the Fixed Rate Mortgage and the Individual Mortgages. See Motion ¶ 24. The PSA prohibits both Lehman and the Innkeepers Debtors from negotiating, supporting, or engaging in any discussions relating to any alternate chapter 11 plan or other transaction with respect to the Innkeepers Debtors and further provides that, upon the Effective Date of a plan, all claims outstanding under the Lehman DIP shall be extinguished. See Motion Ex. A § 5(c) and Plan Term Sheet p. 5. Because it is so unusual and not subject to an obvious explanation it bears repeating; Lehman is the only creditor of the Innkeepers Debtors that has agreed to the terms of the PSA.

---

[5] The Plan Term Sheet is attached as Exhibit B to the PSA, which in turn is attached to the Motion as Exhibit A.

11.     On or prior to the Innkeepers Petition Date, Lehman entered into a letter agreement and term sheet with Apollo, the current equity holder of the Innkeepers Debtors, to sell to Apollo, for a price of $107.5 million, half of the New Equity that Lehman may receive. See Motion ¶ 31.  The term sheet accompanying the letter further provides that Lehman shall not object to the settlement or termination of Apollo's guaranty of certain of the Innkeepers Debtors' obligations (the "**Apollo Guarantee**").  See Motion Ex. D p. 3.  Next week, Lehman seeks this Court's advance authorization to enter into the PSA and all of the transactions contemplated therein (whatever they may end up to be once the plan and ancillary documents in the Innkeepers Cases are documented, litigated and/or amended), including the agreement to sell New Equity to Apollo.  See Motion ¶ 4.

## ARGUMENT

### A. Entry Into the PSA Does Not Satisfy the Requirements of Section 363(b).

12.     Lehman has not explained why it seeks to enter into the PSA.  Pursuant to section 363 of the Bankruptcy Code, the reasonable basis for this business decision must be presented to the court.  See In re Metaldyne Corp., 409 B.R. 661, 667 (Bankr. S.D.N.Y. 2007); In re 1031 Tax Group, LLC, 2007 WL 2085384, at * 5 (Bankr. S.D.N.Y. July 17, 2007); see also In re Enron Corp., 335 B.R. 22, 27-28 (S.D.N.Y. 2005) ("For a court to approve an application under section 363(b), it must 'expressly find from the evidence presented before [it] at the hearing a good business reason to grant such application.'") (quoting Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)).  In the Motion, Lehman simply states that ALI determined that the transaction in the PSA "will provide [ALI] with a better recovery than it would likely obtain by restructuring its debt in a 'free fall' bankruptcy." See Motion ¶ 36.  This statement, without additional support, does not satisfy the Lehman's burden.

13.     Lehman is the only creditor that has entered into the PSA. Creditors representing more than $1 billion of Innkeepers' $1.29 billion property-level secured debt are not party to the PSA. Without the support of such creditors the Innkeepers Debtors have not "locked-up" the necessary votes to consummate a comprehensive restructuring. Therefore, by entering into the PSA, other than limiting itself, the only other parties Lehman is attempting to bind are the Innkeepers Debtors, who are already beholden to them. The other parties in interest, who present a more substantial challenge to the success of the Innkeepers Cases, are not bound and not a party to the PSA. Lehman has not presented any justification for contractually restricting itself from negotiating with the other parties in interest, which restriction could result in leaving Lehman on the sidelines while other parties negotiate and formulate a restructuring for the Innkeepers Debtors.

14.     In addition, Lehman is seeking, through the PSA, to enter into another potentially risky investment in a distressed real estate firm. This action, not justified by Lehman, may also be in violation of the care that debtors must take when making investments of estate assets. Section 345 of the Bankruptcy Code states that "[a] trustee in a case under this title may make such deposit or investment of the money of the estate for which such trustee serves as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345.[6] Lehman has not demonstrated that its "loan and own"

---

[6]     While the requirements of section 345 of the Bankruptcy Code can be waived by a bankruptcy court for cause, though Lehman has not received a section 345 waiver from this Court, and such section is generally referred to in the context of liquid assets of a debtor, such as cash and cash equivalents, the situation is analogous to Lehman's request at issue here. See *Final Order Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 (a) Authorizing Debtors to (i) Continue to Use Existing Cash Management System, as Modified, (ii) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (iii) Maintain Existing Bank Accounts and Business Forms and (b) Extending the Debtors' Time to Comply With Section 345(b) of the Bankruptcy Code* [Docket No. 1416] p. 8 (granting brief extension of compliance with section 345(b) requirements, but not permanently waiving requirements). Lehman has affirmatively negotiated to receive a risky asset in

strategy will either "yield the maximum net return" for Lehman, or provide for a safe investment as required by section 345 of the Bankruptcy Code. As shown by Congress's inclusion of section 345 in the Bankruptcy Code, which imposes duties on debtors that are not imposed on solvent corporations, debtors in possession are not permitted to gamble with their stakeholders' recoveries. To the contrary, as a fiduciary, a debtor in possession is obligated to "protect and conserve the debtor's property for the benefit of creditors." See In re Marvel Entertainment Group, Inc., 140 F.3d 463, 474 (3d Cir. 1998) (citing In re Ionosphere Clubs, Inc., 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990)).

15.     Without the PSA, Lehman still has significant leverage with the 20 Innkeepers Debtors that are borrowers under its senior secured facility and its DIP facility. Lehman's worthy goal of protecting its downside can be achieved without binding itself prematurely to any plan, let alone a plan that requires Lehman to roll the dice on the future of commercial real estate.

        i.     The Terms of the Proposed Plan Are
    Imprudent and Not Supported by Business Judgment.

16.     Under the PSA, Lehman has negotiated to receive equity in full and final satisfaction of its debt. The PSA also provides that, upon consummation of the yet undrafted plan, the Lehman DIP will be forgiven in its entirety. Lehman gives no business justification in the Motion for why it should settle for, let alone actively seek, these terms at the very beginning of the Innkeepers Cases, without first determining whether it can obtain greater and more certain recoveries for Lehman's creditors.

---

return for its prepetition and postpetition investments in Innkeepers, rather than taking into account the safety of its investment and seeking a more secure return. Lehman *could* receive cash, but is instead opting for the New Equity without seeking to justify its actions.

- 9 -

17.  It should not become ordinary course for any debtor-in-possession to repeatedly put itself in the position of "wait[ing] until liquidity and the market come back."[7] In the Innkeepers Cases, instead of using the strength of its existing position in the capital structure to liquidate a troubled investment, Lehman has decided to double down and continue to carry risk on its books in the form of equity in reorganized Innkeepers. Neither this Court nor Lehman's creditors have been presented with any justification as to why they should bear this risk or whether equity in reorganized Innkeepers will be a sound investment for Lehman.[8]

18.  In sum, the Motion utterly fails to demonstrate the "soundness" of Lehman's business judgment in entering into the PSA and Lehman has made no attempt, as required by section 363 of the Bankruptcy Code, to provide this Court or its creditors with some basis for its decision. Given the current record, this Court should not authorize Lehman to enter into the PSA.

### B. The Sale of the New Equity Does Not Satisfy the Provisions of Section 363(b) of the Bankruptcy Code.

19.  Even if Lehman can demonstrate that the transaction contemplated by the PSA could be favorable to its estate and creditors, there is no basis for Lehman to seek approval for

---

[7] See fn. 4 supra (quote of Bryan P. Marsal, chief executive officer and chief restructuring officer of Lehman).

[8] Although Appaloosa is optimistic that the steps taken in the Innkeepers Cases will rehabilitate the Innkeepers Debtors and preserve the value of those estates, there are indications that certain assets of Innkeepers may continue to decline in value. In fact, in the last week, one of the hotels that secures the Floating Rate Mortgage, for which Lehman is the lender, became the subject of a motion to lift the automatic stay to complete a "de-identification" action by Marriott International, Inc. ("**Marriott**") due to defaults in such property's compliance with its franchise agreement with Marriott. See *Marriott International, Inc.'s Motion for Limited Modification of the Automatic Stay to Complete De-Identification of a Single Hotel in Accordance With the Prepetition Termination of the Franchise Agreement Which is Effective on August 30, 2010* [Docket No. 131] ¶¶ 16-17. If Marriott is successful in lifting the automatic stay to continue the "de-identification" process, the property will no longer be authorized to use the "Marriott" brand, which will likely result in a significant decline in the value of such collateral. See Innkeepers Declaration ¶ 53 (noting that the loss of a franchise agreement "would have an immediate and material adverse effect on the underlying value of the hotel due to the loss of associated name recognition, marketing support, brand loyalty, and centralized reservation systems provided . . .").

- 10 -

ALI to become bound now to sell New Equity it may receive in the future.  Section 363(b) of the Bankruptcy Code provides, in pertinent part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  A court may not authorize a debtor's use, sale or lease of property outside the ordinary course of business under section 363(b) of the Bankruptcy Code unless the debtor demonstrates a "good business reason" for the proposed transaction.  See In re Iridium Operating LLC, 478 F.3d 452, 466 (2d Cir. 2007); Lionel Corp., 722 F.2d at 1071; In re General Motors Corp., 407 B.R. 463, 491 (Bankr. S.D.N.Y. 2009); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); Polvay v. B.O. Acquisitions, Inc. (In re Betty Owens Schools, Inc.), 1997 WL 188127, at * 4 (S.D.N.Y. Apr. 17, 1997).  Section 363(b) of the Bankruptcy Code does not grant bankruptcy courts carte blanche to approve any application by a debtor to use or sell property out of the ordinary course of business.  See Lionel, 722 F.2d at 1069.

20. Importantly, the Lionel Court, in reversing a 363 sale due to the lack of an evidentiary basis, noted that a judge determining an application under section 363(b) of the Bankruptcy Code must "expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." Lionel, 722 F.2d at 1071.  The Lionel Court listed certain relevant factors for a court to consider in determining a 363 application, which list has often been distilled by subsequent courts into four salient factors.  Satisfaction of the "good business reason" standard requires a demonstration that (a) a sound business purpose exists for the sale, (b) there were adequate sales procedures, including proper exposure to the market and fair and reasonable notice to parties in interest, (c) the purchaser has acted in good faith, and (d) the sale price is fair and reasonable.  See, e.g., In re General Motors Corp., 407 B.R. at 493-94; In re Premier Concrete, LLC, 2010 WL 1780046, at * 2 (Bankr. D.N.M. May 4, 2010); In re

Exaeris Inc., 380 B.R. 741, 744 (Bankr. D. Del. 2008); In re Summit Global Logistics, Inc., 2008 WL 819934, at *9 (Bankr. D.N.J. March 26, 2008); In re Castre, Inc., 312 B.R. 426, 428 (Bankr. D. Colo. 2004); In re Gulf States Steel, Inc. of Alabama, 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002); In re Betty Owens Schools, Inc., 1997 WL 188127, at * 4.

21.  This Court should not bless Lehman's sale of the New Equity to Apollo because Lehman has not met its burden of proof with respect to the relevant factors for a sale under section 363(b) of the Bankruptcy Code, namely that (a) a sound business purpose exists for the sale, (b) there were adequate sales procedures, (c) Apollo has acted in good faith, or (d) the sale price is fair and reasonable.

> i.  There Has Been No Showing of a Sound Business Purpose for the Sale of the New Equity.

22.  Lehman has not marketed its contingent interest in the New Equity. Lehman's agreement with Apollo (which will be documented after the hearing on this Motion) will not be subject to higher and better offers. Lehman has failed to articulate on what basis it believes that Apollo would offer the highest price for the New Equity. Further, and as more fully discussed below, Lehman has not valued its contingent interest in the New Equity or the value of its agreement to facilitate and consent to the release of the Apollo Guaranty. Absent evidence that a sound business purpose exists to become bound to these transactions now, this Court should not authorize Lehman's sale of the New Equity or agreement to acquiesce to a release of the Apollo Guaranty.

> ii.  There Has Been No Showing of Adequate Sales Procedures.

23.  Even if it were appropriate to sell a contingent interest in another debtor's equity at this time, such equity should be marketed to establish the highest and best price for the asset. Here, the proposed sale of half of the New Equity was negotiated at a time when only a handful

of parties were apprised of the impending filing of the Innkeepers Cases. Apollo may have been the only party with sufficient knowledge of the PSA in a position to bargain for the purchase of the New Equity at the time it entered into an agreement with Lehman. Without adequate sales procedures in place which allow multiple parties the ability to bid for some or all of the New Equity, a sale of the New Equity should not be approved pursuant to section 363(b) of the Bankruptcy Code.[9]

24.   Public auctions serve as the best indication that a debtor is receiving maximum value for its assets. See In re Gulf Coast Oil Corp., 404 B.R. 407, 424 (Bankr. S.D. Tex. 2009) ("The principal justification for § 363(b) sales is that aggressive marketing in an active market assures that the estate will receive maximum benefit. Established public auction markets provide the best assurance of full value at any given time."); see also In re Landscape Properties, Inc., 100 B.R. 445, 447 (Bankr. E.D. Ark. 1988) ("There is a strong policy favoring competitive bidding . . . in bankruptcy proceedings."). Nevertheless, Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") expressly authorizes a debtor to sell its assets via a private sale pursuant to section 363(b) of the Bankruptcy Code. See Fed. R. Bankr. P. 6004(f) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

25.   However, a sale of assets accomplished through a private sale does not obviate the debtor's need to market the assets in a way that ensures that the debtor receives the maximum price for its estate. See, e.g., In re International Wire Group, Inc., et al., Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. June 10, 2004) (approving private sale where the debtors asserted they

---

[9]   Under certain circumstances, Appaloosa itself may be interested in bidding on the New Equity. Given the status of the Innkeepers Cases, however, it is premature to assess what, if anything, Lehman will have to sell and what it will be worth.

had performed extensive marketing efforts and fully explored potential sale options); In re Summit Global Logistics, Inc., 2008 WL 819934, at *11 (Bankr. D.N.J. March 26, 2008) (private sale approved where debtor marketed assets extensively, but a scheduled auction did not take place due to lack of competing bids); In re Exaeris Inc., 380 B.R. at 745 (sale not approved where debtor sent bid procedures to only four parties and made no effort to speak with any of the four regarding the proposed sale); In re Premier Concrete, LLC, 2010 WL 1780046, at *3 (sale not approved because the debtor's assets were not adequately exposed to the marketplace when the debtor spoke to a single buyer); In re Condere Corp., 228 B.R. 615, 623, 629 (Bankr. S.D. Miss. 1998) (authorizing private sale where debtor had been on the market for 10 years, with other potential bidders performing diligence both pre- and postpetition, but did not receive any competing bids).[10]

26.     Here, Lehman has not provided this Court or its creditors with any justification for the timing of the sale or its lack of marketing efforts of the New Equity. It has not asserted any basis for this Court to conclude that an auction, or even a private sale after actively seeking competing bids, would not result in a higher value for these estates particularly once Lehman's distribution in the Innkeepers Cases is certain.[11] Moreover, if in fact equity in the reorganized Innkeepers Debtors proves to be the highest and best form of recovery it can obtain in the Innkeepers Cases and the value that Lehman has suggested turns out to be correct, Lehman has

---

[10]  Occasionally courts approve private sales of assets which were not marketed to third parties, but only after evidence that marketing such assets would not increase the sale price. WBQ P'ship v. Commonwealth of Virginia Dep't of Medical Assistance Svcs. (In re WBQ P'ship), 189 B.R. 97, 104 (Bankr. E.D. Va. 1995) (approving private sale of nursing home's tangible assets where governmental regulations cap the Medicaid reimbursement amount for such assets, making it unlikely for any bidder to offer a higher price); In re Loral Space & Communications Ltd., et al., Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Sep. 30, 2005) (approving sale of minority interest in a corporation to the majority interest holder because there was no market for such equity, and the majority interest holder would be the only interested buyer).

[11]  Lehman has not presented any evidence to suggest that Apollo is unlikely to be a bidder later.

not and cannot demonstrate why it shouldn't sell all of the New Equity (at the appropriate time), rather than retaining in excess of $100 million of estate assets in risky securities. This too must be established and tested through appropriate sale procedures if and when the assets are obtained by ALI. As of now, however, Lehman has not met its burden, and this Court should not approve Lehman's sale of the New Equity to Apollo.

        iii.    There Has Been No Showing That Apollo
              Has Acted in Good Faith With Respect to the Proposed Sale.

27. By its Motion, Lehman seeks a finding from this Court that Apollo is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code. Absent a showing, this cannot be presumed, particularly where Apollo, the out-of-the money equity holder of the Innkeepers Debtors, is seeking, through its agreement with Lehman, to protect itself from exposure to its guaranty of certain obligations of the Innkeepers Debtors. The Second Circuit held that a purchaser's good faith "is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made." Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380 (2d Cir. 1997). Other courts have employed a similar understanding of the "good faith" requirement in the section 363(b) context. See In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998) ("The affirmative focus is the probity of the purchaser's conduct during the course of the sales proceeding."). While no evidence of Apollo's conduct in the sale process has been presented before this Court, making a good faith finding may be difficult given what few facts are known.

        iv.    There Has Been No Showing That the
              Sale Price for the New Equity is Fair and Equitable.

28. In order for a sale pursuant to section 363(b) of the Bankruptcy Code to be approved, a debtor must demonstrate that the sale price is fair and equitable. Lehman has made no such showing, and has presented no evidence with respect to the sale price of the New Equity

- 15 -

and release.  Further, as set forth above, the sale to Apollo is not subject to higher and better offers for the New Equity.  For the lack of evidence regarding the adequacy of sale price alone, the entry into an agreement to sell the New Equity to Apollo should not be approved.  See In re the SCO Group, Inc., 2009 WL 2425755, at *4 (Bankr. D. Del. Aug. 5, 2009) (denying proposed sale of assets under section 363(b) in part because "the Debtors offered no evidence of the fairness of the price"); In re Exaeris Inc., 380 B.R. at 745 (establishing the fairness of a sale price "would require information on the value of the assets being sold"); In re WDH Howell, Inc., 298 B.R. 527, 534 n.12 (D.N.J. 2003) (courts approve sales under section 363 upon evidence in the record regarding, inter alia, fairness of sale price).  A court cannot approve a sale under section 363(b) of the Bankruptcy Code if the debtor fails to submit any evidence as to the fairness of the purchase price received.  Compare In re General Motors Corp., 407 B.R. at 494 (sale price's fairness established by, among other things, a fairness opinion from reputable advisors), with In re Exaeris Inc., 380 B.R. at 745 (debtor unable to demonstrate fairness of purchase price where no evidence of assets' value submitted other than debtor's financial distress), and In re Premier Concrete, LLC, 2010 WL 1780046, at *3 (denying a proposed sale under section 363(b) of the Bankruptcy Code where debtor undertook no valuation of assets and instead sold to first offeror).

      C. It is Inappropriate to Ask This Court to Bless
Half of a Comprehensive Restructuring In Another Bankruptcy Case.

29.     Even if Lehman were to present evidence on sale price, this Court should not be put in a position to determine whether the sale price (or even a floor price) for the New Equity is favorable.  Instead, such determinations should be reserved for the Innkeepers Court in the context of confirmation of any chapter 11 plan that is proposed.  As this Court knows, the valuation of equity in a reorganized debtor is a highly complex determination that is typically made after a plan confirmation hearing, which includes expert valuation testimony, often from

- 16 -

competing valuation experts, takes into account the entire structure of the reorganized debtors, and often uses such valuation techniques as comparable company analyses, precedent transaction analyses, and the present value of the expected future cash flow to be generated by the reorganized debtors. Lehman has not, nor should it, attempt to present evidence to this Court that the value of the New Equity under its agreement with Apollo is fair and equitable. Those arguments and that evidence should be presented to and ruled upon by the Innkeepers Court.

30.     Judicial comity and efficiency mandates that this Court should defer any finding on the adequacy of the sale price of the New Equity until the value of the reorganized Innkeepers Debtors is determined by the Innkeepers Court, the proper court to make such determination. See Wash. Mut. Bank v. Law Office of Robert Jay Gumenick, 561 F. Supp. 2d 410, 412 (S.D.N.Y. 2008) (while staying a claim pending a ruling, the district court noted that "this Court should not attempt to predict the outcome of the Bankruptcy Proceedings and then issue a ruling in this proceeding on the basis of that prediction."). Only after such determination is made by the Innkeepers Court should this Court determine whether the sale price of the New Equity is the highest and best that can be achieved.

31.     Were this Court to approve the sale of the New Equity to Apollo now, the floor price could undoubtedly be used in the Innkeepers Cases as probative evidence of the enterprise value of reorganized Innkeepers. This is not an appropriate use of the courts, and it is unnecessary to put this Court in an untenable position vis-à-vis the Innkeepers Court. To make matters worse, as of now, neither this Court nor the Innkeepers Court have been afforded the full picture. A few examples of these "disconnects" are set forth below:[12]

---

[12]    Lehman's agreement with Apollo was only filed in the Innkeepers Cases after the special servicer for the Fixed Rate Mortgage filed a motion to compel discovery pursuant to Rule 2004 of the Bankruptcy Rules.

| INNKEEPERS DISCLOSURE | LEHMAN DISCLOSURE |
|---|---|
| Lehman's sale of half of its proposed equity distribution to Apollo is a separate transaction that does not implicate the Innkeepers Debtors or their proposed chapter 11 plan. Innkeepers Declaration ¶ 13.<br><br>"No [Innkeepers] Debtor is party to the Sale Agreement [with Apollo]. Accordingly, because the Sale Agreement is an agreement between [Apollo] and Lehman that contemplates a transaction solely between those two parties that will occur, if at all, only after the [Innkeepers] Debtors propose, confirm and consummate a chapter 11 plan, the Sale Agreement is not before this Court and has no bearing on any plan of reorganization that the Debtors may propose." *Response of Apollo Investment Corporation to the Motion of Midland Loan Services Inc., Special Servicer for the Fixed Rate Trustee for an Order Pursuant to Fed. R. Bankr. P. 7034 and 9006, Modifying Certain Discovery Response Deadlines for the Debtors and Establishing a Deposition Schedule in Connection With the September 1, 2010 Hearing* [Docket No. 100] ¶ 8. | Lehman's term sheet with Apollo indicates that Lehman's sale of the New Equity is contemplated to be exempt from transfer taxes pursuant to section 1146 of the Bankruptcy Code, which would require that the New Equity be transferred to Apollo <u>under</u> a plan. Motion, Ex. D p. 1.<br><br>"The Plan shall provide that the issuance of the New Equity and any subsequent transfer of New Equity by Lehman prior to the Effective Date will be exempt from (a) securities laws in accordance with section 1145 of the Bankruptcy Code and (b) transfer taxes in accordance with section 1146 of the Bankruptcy Code." Plan Term Sheet p. 6 |
| The Plan Term Sheet, which has been presented to the Innkeepers Court, provides that Lehman will determine the number and identity of the directors of reorganized Innkeepers. Plan Term Sheet p. 12. | The Lehman term sheet with Apollo states that the board shall consist of seven members, two of which are nominated by Apollo, two by Lehman, and three to be mutually agreed upon. Motion, Ex. D p. 5. |
| The Plan Term Sheet notes that if Lehman and Innkeepers determine that a different corporate structure would be beneficial to Lehman and Innkeepers, then the plan shall provide for an alternate corporate structure on terms mutually acceptable to Lehman and Innkeepers. Plan Term Sheet p. 4. | The Lehman term sheet with Apollo states that prior to the effective date of a plan, Lehman and Apollo shall determine whether to maintain Innkeepers' status as a real estate investment trust. Motion, Ex. D p. 5. |
| No disclosure of a potential sale of reorganized Innkeepers. | The Lehman term sheet with Apollo states that Lehman and Apollo shall agree on a future date by which reorganized Innkeepers shall engage an investment bank to market and sell |

- 18 -

| INNKEEPERS DISCLOSURE | LEHMAN DISCLOSURE |
|---|---|
|  | reorganized Innkeepers; provided that such date shall be no later than three years after the effective date of the Innkeepers plan, unless otherwise agreed by Lehman and Apollo. Motion, Ex. D p. 5. |
| The pleadings filed by the Innkeepers Debtors do not reference the Apollo Guaranty, much less Lehman's agreement with respect to it. | The Lehman term sheet with Apollo provides that Lehman and Apollo will authorize reorganized Innkeepers to perform obligations which Apollo has guaranteed, and that prior to reorganization, Lehman will not object to any settlement or termination of the Apollo Guaranty.  Motion, Ex. D p. 5. |
| No disclosure of Innkeepers' contemplated reimbursement of Apollo's attorney fees in Innkeepers pleadings. | The Lehman term sheet with Apollo provides that Innkeepers shall reimburse Apollo for the fees and expenses of one counsel if the transactions contemplated by Lehman's term sheet with Apollo are consummated.  Motion, Ex. D p. 5. |

While not dispositive, this mismatched disclosure highlights the need for critical review of the Debtors' requested relief.  There is plenty of time for the relief sought in the Motion to be analyzed, supported and approved by this Court, if appropriate.  Other than authorizing the Lehman DIP to be made, there is no need for the Court to consider, let alone approve, the other relief requested in the Motion at this time.

## **CONCLUSION**

The Motion should not be sustained with respect to Lehman's entry into the PSA or the sale of 50% of the New Equity to Apollo.  Lehman has not made the required evidentiary showings under section 363 of the Bankruptcy Code to permit this Court to approve the relief requested.  For the foregoing reasons, Appaloosa respectfully requests that this Court deny Lehman's request for authorization to (a) sell the New Equity and (b) enter into the PSA.

Dated: New York, New York
       August 11, 2010

>                    WILLKIE FARR & GALLAGHER LLP
>                    Counsel for Appaloosa Investment L.P. I
>
>                    By: /s/ Rachel C. Strickland
>                         Rachel C. Strickland
>                         Jennifer J. Hardy
>
>                    787 Seventh Avenue
>                    New York, New York  10019
>                    (212) 728-8000