UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13555 (JMP)<br><br>(Jointly Administered) |

DECLARATION OF MICHAEL J. BOWE IN RESPONSE TO
OCH-ZIFF CAPITAL MANAGEMENT GROUP LLC'S OBJECTIONS
TO DEBTORS' SUBPOENA *DUCES TECUM* DATED APRIL 12, 2010

Michael J. Bowe declares:

1. I am a partner in the law firm of Kasowitz, Benson, Torres & Friedman LLP ("KBT&F" or the "Firm"), which maintains its principal offices at 1633 Broadway, New York, New York 10019. The Firm is special counsel to Lehman Brothers Holdings, Inc. ("Lehman") and its affiliated debtors (collectively, the "Debtors"). I submit this declaration in support of Debtors' Response to Och-Ziff Capital Management Group LLC's Objections to Debtors' Subpoena *Duces Tecum* dated April 12, 2010.

A. **Background**

2. On November 4, 2009, Debtors moved for authority pursuant to Bankruptcy Rule 2004 to issue subpoenas to compel the production of documents and appearances for examinations. (Docket No. 5710.) The Debtors specifically moved for authority to subpoena persons and entities possessing:

> information relevant to the acts, conduct, property and liabilities of the Debtors and other matters relating to the administration of the Debtors' estates, including, but not limited to, the Debtors' former employees, lenders, investors, creditors and counterparties to transactions with Debtors, in order to obtain all information in their possession, custody or control that is relevant to the Debtors or Debtors' business. . . .

*Id.* Finding it in "the best interests of the Debtors, their creditors and all parties," the Court granted Debtors' motion on November 23, 2009. (*See* Order Granting the Debtors' Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities ("November 23rd Order"), Docket No. 5910.)

3.  The Debtors then applied for authorization to retain Kasowitz, Benson, Torres & Friedman LLP ("KBT&F") as special counsel. (*See* KBT&F's Retention Application, Docket No. 6595.) The Debtors sought to retain KBT&F to investigate and, "if authorized by the Debtors," prosecute "certain litigation against third parties . . . regarding pre-petition claims including . . . claims for interference with, and damage to, the Debtors' business." (*Id.* at 2.) On January 28, 2010, the Court granted the Debtors' Retention Application. (Docket No. 6808.)

### B. The Investigation

4.  As the financial crisis of 2008 deepened, Lehman became aware of false rumors circulating in the financial markets concerning Lehman's financial status, its counterparty risk, and its ability to continue operating as a going concern. Believing these rumors to be the product of unscrupulous market participants spreading the lies in order to profit from short and short equivalent positions in Lehman Securities[1], Lehman's in-house counsel initiated an investigation into the rumors for the purpose of possibly bringing them to the attention of the Securities & Exchange Commission ("SEC").

5.  One such rumor involved Lehman's effort to strengthen its financial condition during the financial turmoil of 2008 by reducing its gross and net leverage. In June of that year, false rumors circulated concerning the legitimacy of Lehman's de-leveraging effort, inaccurately claiming that Lehman had improperly spun the debt off its balance sheet into two hedge funds

---

[1] The term "Lehman Securities" as used herein has the same meaning as set forth in the Rule 2004 Subpoena issued to Och-Ziff on April 12, 2010 (the "Subpoena"), a true and correct copy of which is attached hereto as Ex. A.

2

created and controlled by Lehman. (In reality, Lehman did no such thing, and the hedge funds at issue were unrelated to Lehman, but run by *former* Lehman employees.) Through the privileged investigation Lehman determined that Och-Ziff likely disseminated and/or was the recipient of this rumor. KBT&F subsequently undertook its own investigation seeking additional information and corroboration of Lehman's internal investigation. This second privileged investigation uncovered additional information and evidence corroborating what Lehman previously had learned. As a result of this second investigation, we identified a short list of 2004 targets.

6. The false rumors circulating about Lehman carried potentially devastating consequences. Beyond artificially driving down the price of Lehman stock, such rumors could have the effect of increasing the perceived risk to counterparties in transacting business with Lehman, discouraging counterparties from dealing with Lehman and increasing its costs of doing business. A July 15, 2008 SEC emergency order banning the naked short selling of certain securities, including Lehman stock, gives the following example regarding Bear Stearns, whose experience parallels that of Lehman:

> The events preceding the sale of The Bear Stearns Companies Inc. are illustrative of the market impact of rumors. During the week of March 10, 2008, rumors spread about liquidity problems at Bear Stearns, which eroded investor confidence in the firm. As Bear Stearns' price fell, its counterparties became concerned, and a crisis of confidence occurred late in the week. In particular, counterparties to Bear Stearns were unwilling to make secured funding available to Bear Stearns on customary terms. In light of the potentially systemic consequences of a failure of Bear Stearns, the Federal Reserve took emergency action.

(Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking Temporary Action to Respond to Market Developments ("July 15 Emergency Order"), a true and correct copy of which is attached hereto as Ex. B.)

3

7. In the July 15 Emergency Order, the SEC explained the reasons for its emergency ban on naked short selling as follows:

> In recent days . . . false rumors have continued to threaten significant market disruption. For example, press reports have described rumors regarding the unwillingness of key counterparties to deal with certain financial institutions. There also have been rumors that financial institutions are facing liquidity problems.
>
> As the result of these developments, the Commission has concluded that there now exists a substantial threat of sudden and excessive fluctuations of securities prices generally and disruption in the functioning of the securities markets that could threaten fair and orderly markets.

(*Id.*) Thus, in the SEC's view, materially false rumors were circulating in the marketplace with potentially devastating consequences not only to the targets of those rumors – such as Lehman – but to the financial system as a whole.

8. On July 15, 2008, the Wall Street Journal reported that the SEC subpoenaed "more than 50 hedge-fund advisers as part of its investigation into whether individuals spread false rumors to manipulate shares of two Wall Street firms." A true and correct copy of the July 15, 2008 WSJ Article is attached hereto as Ex. C. According to the article, "[t]he subpoenas . . . are seeking trading and communications data related to short-selling and options trading in Bear Stearns Cos. or Lehman Brothers Holdings Inc." (*Id.*)

9. On September 19, 2008, the SEC announced in a press release that it planned to undertake:

> [A] sweeping expansion of its ongoing investigation into possible market manipulation in the securities of certain financial institutions. The expanded investigation will include obtaining statements under oath from market participants.
>
> Hedge fund managers, broker-dealers, and institutional investors with significant trading activity in financial issuers or positions in

4

> credit default swaps will be required, under oath, to disclose those
> positions to the Commission and provide certain other information.

A true and correct copy of the September 19, 2008 SEC press release is attached hereto as Ex. D.

10.     On September 25, 2008, the Wall Street Journal reported that the SEC had "ordered more than two dozen hedge funds to turn over trading information as it ramps up its investigation into whether traders were spreading rumors to manipulate shares." According to the article:

> The order, dated Sept. 22, identifies six financial institutions the SEC believes may have been subject to such manipulation. The order is akin to a subpoena and requires information to be handed over with a sworn statement attesting to its accuracy. It seeks a wide range of trading data and email communications over a period of three weeks involving American International Group Inc., Goldman Sachs Group Inc., Lehman Brothers Holdings Inc., Morgan Stanley, Washington Mutual Inc. and Merrill Lynch & Co., according to the order, which has been viewed by The Wall Street Journal.

A true and correct copy of the September 25, 2008 WSJ Article is attached hereto Ex. E.

### C.     The Subpoena

11.     In the course of its investigation, KBT&F, on behalf of the Debtors and in accordance with this Court's order, served Rule 2004 subpoenas *duces tecum* upon six entities, including Och-Ziff. The Och-Ziff Subpoena seeks: (1) documents concerning Lehman; (2) documents concerning any disciplinary actions involving Och-Ziff employees involving Lehman or Lehman Securities; and (3) documents sufficient to show Och-Ziff's management and organizational structure. (*Id.*)

12.     The scope of the Subpoena is limited to documents created during the year 2008. This period is narrowly drawn to capture evidence of the planning and execution of short-and-distort schemes intended to exploit Lehman's vulnerability during the financial crisis. It also is

intended to capture the realization of profits from any wrongful conduct towards Lehman and any regulatory or internal investigations or punishment of wrongdoing involving Lehman immediately following the filing of the bankruptcy petition.

### D. The "Meet and Confer" Conferences

13. After being served with the Subpoena, on or about April 9, 2010, counsel for Och-Ziff, Kenneth Bressler, and KBT&F attorney, Jennifer S. Recine, had a preliminary telephone conference concerning Och-Ziff's compliance. During the call, Och-Ziff's counsel demanded to know the basis for the Subpoena. Ms. Recine noted that the specific material that formed the basis for the subpoena was privileged and, in turn, asked Mr. Bressler for a proposal regarding a timetable for Och-Ziff's production. Ms. Recine also inquired whether there were any documents that Och-Ziff could turn over easily and quickly, such as any production Och-Ziff may have made to the SEC or other regulatory agency concerning Lehman. Mr. Bressler stated that he did not know, but would find out. The call ended inconclusively with a promise to speak again.

14. Ms. Recine and Mr. Bressler held another call on or about April 28, 2010. During this call, Mr. Bressler again demanded to know basis for the Subpoena, and contested its scope. Ms. Recine once again informed him that the specific basis for the Subpoena is privileged, but that the Debtors were willing to consider reasonable proposals for limiting the scope of the Subpoena. At that juncture, Ms. Recine also informed Mr. Bressler that other targets of the Debtors' subpoenas had agreed to initially produce responsive documents that had previously been produced to regulatory agencies. When Ms. Recine inquired again about whether Och-Ziff had made a similar production, Mr. Bressler either still did not know or refused to disclose whether such a production was made. Similarly, in response to general complaints that any production of documents would be burdensome, Ms. Recine asked if Mr. Bressler knew the

scope of responsive documents. Mr. Bressler replied that he did not know any specifics, but believed that it would be burdensome. Ms. Recine asked that Mr. Bressler clarify the extent of documents at issue and make a reasoned proposal to modify the scope.

15. Then, on or about May 10, 2010, while at the offices of Och-Ziff's counsel for an unrelated matter, Ms. Recine and I met with Mr. Bressler concerning the Subpoena. During that meeting, I informed Mr. Bressler that although the specific details concerning why Och-Ziff was targeted were privileged, it was thought to be the source or conduit for at least one rumor about the company in 2008 and further that as a prime broker for Lehman it may have been the target of efforts to move business at a critical point for Lehman. In response to Och-Ziff's complaint that complying with the Subpoena would be burdensome, I proposed the following compromise for an initial search and production: (1) Och-Ziff would produce all proprietary trading records involving Lehman Securities for the year 2008; (2) Och-Ziff also would produce organization charts setting forth Och-Ziff's organizational and management structure for that year; (3) Och-Ziff would then inform the Debtors of the identities of both Och-Ziff employees that had business relationships with Lehman and the Och-Ziff employees who worked at trading desks that were responsible for the proprietary trading of Lehman securities; and (4) upon receipt of that information, the Debtors would provide Och-Ziff with specific search terms to be used to search electronically stored information over which the identified employees were custodians. Mr. Bressler stated that he would speak with his client regarding the Debtors' proposal.

16. On or about May 26, 2010, Ms. Recine and I conferred once more with Mr. Bressler by telephone regarding Och-Ziff's compliance with the Subpoena. At that time, I again informed Och-Ziff of the basis for the Subpoena, and repeated the Debtors' offer of compromise. Mr. Bressler refused the offer, stating in a conclusory fashion that Och-Ziff is not a proper target.

During the call, Och-Ziff's counsel did not raise any concerns regarding the breadth of the Subpoena. Also, importantly, Mr. Bressler never confirmed or denied that his client was the subject of regulatory subpoenas concerning market manipulation in 2008.

### E. Och-Ziff's Harassing "Discovery"

17. On June 2, 2010, Och-Ziff served the Debtors with a notice of deposition seeking to depose a "representative" of Lehman pursuant to Fed. R. Civ. P. 30(b)(6) "to testify concerning the representation made by" Debtors' counsel at the May 26, 2010 meet-and-confer "that Och-Ziff (including any of its related or affiliated entities, or its employees) was a 'source of information' about Lehman, thereby justifying Rule 2004 discovery of Och-Ziff." A true and correct copy of Och-Ziff's Notice of Deposition is attached hereto as Ex. F. The Debtors objected to the Notice of Deposition in its entirety. A true and correct copy of the Debtors' objection is attached hereto as Ex. G. Then, on June 25, 2010, Och-Ziff served its purported "First Set of Interrogatories and Document Requests Directed to Debtors," which seeks, among other things, the identity of "each person who identified Och-Ziff as a 'source of information'" as purportedly represented by the Debtors' counsel during the May 26, 2010 "meet-and-confer" telephone conference. A true and correct copy of Och-Ziff's Interrogatories and Document Requests is attached hereto as Ex. H. The Debtors also objected to this discovery. A true and correct copy of Debtors' objection is attached hereto as Ex. I.

Dated: August 11, 2010
      New York, New York

                                              Michael J. Bowe, Esq.