Hearing Date and Time: August 18, 2010 at 10:00 a.m.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway,
New York, NY 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
Marc E. Kasowitz (mkasowitz@kasowitz.com)
Daniel R. Benson (dbenson@kasowitz.com)
Michael J. Bowe (mbowe@kasowitz.com)
Robert M. Novick (rnovick@kasowitz.com)

Special Counsel for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

In re                            :   Chapter 11

                             :   Case No. 08-13555 (JMP)

LEHMAN BROTHERS HOLDINGS INC., *et al.*, :

                             :   Jointly Administered

               Debtors.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' RESPONSE TO OCH-ZIFF CAPITAL MANAGEMENT GROUP LLC'S OBJECTIONS TO DEBTORS' SUBPOENA *DUCES TECUM* DATED APRIL 12, 2010

Lehman Brothers Holdings, Inc. ("Lehman") and its affiliated debtors (collectively, the "Debtors") submit this memorandum of law, and the accompanying declaration of Michael J. Bowe ("Bowe Decl."), in response to Och-Ziff Capital Management Group LLC's ("Och-Ziff") Responses and Objections to Debtor's Subpoena Duces Tecum Dated April 12, 2010 (the "Objections").

## PRELIMINARY STATEMENT

1.     As it struggled to survive the financial turmoil of 2008, Lehman was beset by false rumors circulated by short sellers intent on reaping profits from the resulting damage to the

investment bank's stock price and reputation.  The results of a privileged investigation

undertaken for the purpose of determining the source of these rumors so that they could be

reported to the Securities & Exchange Commission ("SEC") indicate that Och-Ziff, one of the

world's largest hedge funds, was involved with, or has information that pertains to, the "short-

and-distort" efforts.  Och-Ziff has already begun aggressively stonewalling to attempt to prevent

this information from seeing the light of day by interposing frivolous and dilatory objections to

the Debtors' Rule 2004 Subpoena.

2.      On January 28, 2010, the Court approved the Debtor's retention of Kasowitz,

Benson, Torres & Friedman, LLP ("KBT&F") for the purpose of investigating "third parties who

may have . . . taken actions or made statements that interfered with, and damaged, the Debtor's

business."  In the course of the investigation, the Debtors served a subpoena (the "Subpoena") on

Och-Ziff seeking documents concerning Lehman for the year 2008, pursuant to this Court's

Order permitting the Debtors to conduct Bankruptcy Rule 2004 discovery.  The Och-Ziff

Subpoena is one of six subpoenas issued in furtherance of the investigation.  Och-Ziff is the only

target to file an objection, wrongfully refusing to produce even a single document.  As set forth

below, Och-Ziff's objections are baseless, and the giant hedge fund should be compelled to

comply with the Subpoena and produce documents immediately.  Appallingly, while resisting

any and all discovery, Och-Ziff has served offensive discovery upon Lehman – without the

benefit of a Rule 2004 order or another procedural basis – attempting to learn what Lehman has

thus far discovered about Och-Ziff's possible wrongdoing.

3.      Bankruptcy Rule 2004 provides wide latitude in the discovery of claims and other

assets belonging to a debtor.  Indeed, Courts have long recognized that discovery under this Rule

is far broader than that allowed by the Federal Rules of Civil Procedure.  Here, the Debtors'

Subpoena, which seeks discovery of evidence concerning the rumor mongering of 2008 from Och-Ziff, falls squarely within the scope of the orders already granted by this Court permitting the Debtors to obtain Rule 2004 discovery and permitting them to retain special counsel to investigate possible claims against third parties.

4.    Critically, Och-Ziff does not deny that it has information concerning Lehman Brothers or otherwise relevant to the Debtors' investigation.  Instead, it simply contends that "Lehman has not identified any cognizable claim . . . that it is seeking to enforce," and, thus, there cannot be good cause to take discovery from Och-Ziff.  This argument is without merit, as Lehman is plainly seeking to enforce claims against "third parties who may have . . . taken actions or made statements that interfered with, and damaged, the Debtor's business."  Indeed, contrary to Och-Ziff's assertion Debtors disclosed the basis of the Subpoena, and in no way suggested that they were "just exploring" Och-Ziff because it was a "major player" in the hedge fund world.  Instead, counsel for Debtors explained that its privileged investigation revealed that (1) Och-Ziff was either a possible source of, or a conduit for, at least one specific rumor circulated in 2008 concerning Lehman Brothers and (2) it was a prime broker for Lehman Brothers during the relevant period and thus may have been the target of efforts by competitors or short sellers urging Och-Ziff to withdraw business from the Lehman Brothers at its most vulnerable point.  In light of the fact that this Court has already authorized the Debtors to issue 2004 discovery and further ordered that the Debtors may retain KBT&F to investigate "third parties who may have . . . taken actions or made statements that interfered with, and damaged, the Debtors' business," their explanation for selecting Och-Ziff was more than sufficient to demonstrate good cause.

5.        Once a party establishes that it has good cause to issue a 2004 subpoena, the party

opposing it bears the burden of proving that the oppression of complying with the subpoena

outweighs the benefit of discovery, and Och-Ziff cannot remotely meet this burden. It offers no

*credible* evidence of oppression, relying instead on unsupported exaggerations and distortions.

For example, Och-Ziff purports to calculate the number of responsive documents by measuring

the number of its e-mails mentioning Lehman during the dramatic time of its collapse,

September 1– 19, 2008. Due to the extraordinary circumstances surrounding Lehman's fall, the

number of Och-Ziff e-mails concerning Lehman during this period would vastly exceed the

number of e-mails concerning Lehman created during any other 19-day period in 2008. Yet,

Och-Ziff misleadingly extrapolates the number of responsive e-mails from the extraordinary

September 1– 19, 2008 period to the entirety of 2008, arriving at a grossly inflated number of

responsive documents. Och-Ziff then uses this intentionally exaggerated figure to "calculate"

the burden of a privilege review and the cost of producing electronically-stored information.

This bogus "evidence" should be afforded no weight, leaving Och Ziff with no credible basis for

claiming that compliance with the Subpoena would be oppressive.

6.        Moreover, even assuming, *arguendo*, that compliance would be burdensome to

Och-Ziff, that burden is easily outweighed by the benefit of permitting the Debtors to discover

evidence of possible claims. As one of the world's largest hedge funds, Och-Ziff has the

resources to comply with the Subpoena. In contrast, the denial of the Debtors' discovery may

ultimately deprive Lehman's estate and good faith creditors of a remedy for wrongdoing directed

at Lehman at a time when it was at its most vulnerable, and it may leave wrongdoers unjustly

enriched by their wrongful conduct. Indeed, the fact that this suspected wrongdoing was

4

undertaken against an investment bank when it was most fragile, and the harm from its eventual

collapse had a broad societal impact, further militates in favor of disclosure.

7.      Och-Ziff's objection does not even mention that the Debtors offered to narrow the

scope of the Subpoena in a manner that would permit the Debtors to obtain necessary discovery

with a minimal burden on Och-Ziff.  During meet-and-confer conferences, the Debtors proposed

that Och-Ziff's initial production be limited to:  (i) records of its proprietary trading in Lehman

Securities, which will disclose whether Och-Ziff was shorting Lehman Securities at the time of

the rumor mongering;  (ii) organization charts and information identifying Och-Ziff employees

who had business relationships with Lehman and those who worked on trading desks responsible

for trading of Lehman securities, to permit the Debtors to identify custodians with potentially

material evidence while narrowing the scope of Och-Ziff employees whose information would

be searched.  The Debtors then would provide search terms to Och-Ziff for the purpose of

searching the electronically stored information of the relevant custodians.

8.      Och-Ziff's failure to agree to this or any proposal, steadfastly refusing to produce

any documents.  Clearly, Och-Ziff is not concerned about alleged burdens but about frustrating

the Debtors' efforts to learn of Och-Ziff's role in potentially very serious wrongdoing.

## FACTS

### A.    Background

9.      On November 4, 2009, Debtors moved for authority pursuant to Bankruptcy Rule

2004 to issue subpoenas to compel the production of documents and appearances for

examinations.  (Docket No. 5710.)  The Debtors specifically moved for authority to subpoena

persons and entities possessing:

information relevant to the acts, conduct, property and liabilities of
the Debtors and other matters relating to the administration of the
Debtors' estates, including, but not limited to, the Debtors' former
employees, lenders, investors, creditors and counterparties to
transactions with Debtors, in order to obtain all information in their
possession, custody or control that is relevant to the Debtors or
Debtors' business. . . .

*Id.* Finding it in "the best interests of the Debtors, their creditors and all parties," the Court

granted Debtors' motion on November 23, 2009. (*See* Order Granting the Debtors' Authority to

Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons

and Entities ("November 23rd Order"), Docket No. 5910.)

10.    The Debtors then applied for authorization to retain KBT&F as special counsel.

(*See* KBT&F's Retention Application, Docket No. 6595.) The Debtors sought to retain KBT&F

to investigate and, "if authorized by the Debtors," prosecute "certain litigation against third

parties . . . regarding pre-petition claims including . . . claims for interference with, and damage

to, the Debtors' business." (*Id.* at 2.) On January 28, 2010, the Court granted the Debtors'

Retention Application. (Docket No. 6808.)

**B.**    **The Investigation**

11.    As the financial crisis of 2008 deepened, Lehman became aware of false rumors

circulating in the financial markets concerning Lehman's financial status, its counterparty risk,

and its ability to continue operating as a going concern. (Bowe Decl. ¶ 4.) Believing these

rumors to be the product of unscrupulous market participants spreading lies in order to profit

from short and short equivalent positions in Lehman Securities,[1] Lehman's in-house counsel

---

[1] The term "Lehman Securities" as used herein has the same definition as set forth in the Rule 2004 Subpoena issued
to Och-Ziff on April 12, 2010 (the "Subpoena"), which is attached as Exhibit A to the Bowe Decl.

initiated an investigation into the rumors for the purpose of possibly bringing them to the

attention of the Securities & Exchange Commission ("SEC"). (*Id.*)

12.     One such rumor involved Lehman's effort to strengthen its financial condition

during the financial turmoil of 2008 by reducing its gross and net leverage. (*Id.* ¶ 5.) In June of

that year, false rumors circulated concerning the legitimacy of Lehman's de-leveraging effort,

inaccurately claiming that Lehman had improperly spun the debt off its balance sheet into two

hedge funds created and controlled by Lehman. (*Id.*) (In reality, Lehman did no such thing, and

the hedge funds at issue were unrelated to Lehman, but run by *former* Lehman employees.) (*Id.*)

Through the privileged investigation, Lehman determined that Och-Ziff likely disseminated

and/or was the recipient of this rumor. (*Id.*) KBT&F subsequently undertook its own

investigation seeking additional information and corroboration of Lehman's internal

investigation. (*Id.*) This second privileged investigation uncovered additional information and

evidence corroborating what Lehman previously had learned. (*Id.*) As a result of this second

investigation, KBT&F  identified a short list of 2004 targets. (*Id.*)

13.     The false rumors circulating about Lehman carried potentially devastating

consequences.  Beyond artificially driving down the price of Lehman stock, such rumors could

have the effect of increasing the perceived risk to counterparties in transacting business with

Lehman, discouraging counterparties from dealing with Lehman and increasing its costs of doing

business.  A July 15, 2008 SEC emergency order banning the naked short selling of certain

securities, including Lehman stock, gives the following example regarding Bear Stearns, whose

experience parallels that of Lehman:

> The events preceding the sale of The Bear Stearns Companies Inc.
> are illustrative of the market impact of rumors.  During the week of

> March 10, 2008, rumors spread about liquidity problems at Bear
> Stearns, which eroded investor confidence in the firm.  As Bear
> Stearns' price fell, its counterparties became concerned, and a
> crisis of confidence occurred late in the week.  In particular,
> counterparties to Bear Stearns were unwilling to make secured
> funding available to Bear Stearns on customary terms.  In light of
> the potentially systemic consequences of a failure of Bear Stearns,
> the Federal Reserve took emergency action.[2]

(Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking

Temporary Action to Respond to Market Developments ("July 15 Emergency Order"), Bowe

Decl., Ex. B.)

14.    In the July 15 Emergency Order, the SEC explained the reasons for its emergency

ban on naked short selling as follows:

> In recent days . . . false rumors have continued to threaten
> significant market disruption.  For example, press reports have
> described rumors regarding the unwillingness of key counterparties
> to deal with certain financial institutions.  There also have been
> rumors that financial institutions are facing liquidity problems.
>
> As the result of these developments, the Commission has
> concluded that there now exists a substantial threat of sudden and
> excessive fluctuations of securities prices generally and disruption
> in the functioning of the securities markets that could threaten fair
> and orderly markets.

(*Id.*)  Thus, in the SEC's view, materially false rumors were circulating in the marketplace with

potentially devastating consequences not only to the targets of those rumors -- such as Lehman --

but to the financial system as a whole.

15.    Also, on July 15, 2008, the Wall Street Journal reported that the SEC subpoenaed

"more than 50 hedge-fund advisers as part of its investigation into whether individuals spread

---

[2]    Of course, Lehman failed before political consensus was reached for a widespread rescue of the financial industry, and the systemic consequences of the failure of Lehman were not averted.

false rumors to manipulate shares of two Wall Street firms." (*See* Bowe Decl., Ex. C.)

According to the article, "[t]he subpoenas . . . are seeking trading and communications data

related to short-selling and options trading in Bear Stearns Cos. or Lehman Brothers Holdings

Inc." (*Id.*) Since the identities of those subpoenaed were not disclosed, the Debtors do not know

whether Och-Ziff was one of the hedge funds subpoenaed by the SEC.

16.    On September 19, 2008, the SEC announced in a press release that it planned to

undertake:

> [A] sweeping expansion of its ongoing investigation into possible
> market manipulation in the securities of certain financial
> institutions. The expanded investigation will include obtaining
> statements under oath from market participants.
>
> Hedge fund managers, broker-dealers, and institutional investors
> with significant trading activity in financial issuers or positions in
> credit default swaps will be required, under oath, to disclose those
> positions to the Commission and provide certain other information.

(Bowe Decl., Ex. D.)[3] Again, at present, the Debtors do not know whether Och-Ziff was

required to disclose its positions in Lehman securities to the SEC.

17.    On September 25, 2008, the Wall Street Journal reported that the SEC had

"ordered more than two dozen hedge funds to turn over trading information as it ramps up its

investigation into whether traders were spreading rumors to manipulate shares." According to

the article:

> The order, dated Sept. 22, identifies six financial institutions the
> SEC believes may have been subject to such manipulation. The
> order is akin to a subpoena and requires information to be handed
> over with a sworn statement attesting to its accuracy. It seeks a

---

[3]    Also on September 19th – too late for Lehman – the SEC, in conjunction with the U.K. Financial Services
Authority – banned the short selling of 799 financial companies. (*See* press release, Bowe Decl., Ex. D.)

> wide range of trading data and email communications over a
> period of three weeks involving American International Group
> Inc., Goldman Sachs Group Inc., <u>Lehman Brothers Holdings Inc.</u>,
> Morgan Stanley, Washington Mutual Inc. and Merrill Lynch &
> Co., according to the order, which has been viewed by The Wall
> Street Journal.

(*See* Bowe Decl., Ex. E (emphasis added).)  Again, at present, the Debtors do not know whether

Och-Ziff was asked to produce documents and sworn statements to the SEC pursuant to the

order.

### C.    The Subpoena

18.    In the course of its investigation, KBT&F, on behalf of the Debtors and in

accordance with this Court's order, served Rule 2004 subpoenas *duces tecum* upon six entities,

including Och-Ziff.  (A copy of the Och-Ziff Subpoena is attached as Ex. A to the Bowe Decl.)

The Och-Ziff Subpoena in essence seeks: (1) documents concerning Lehman; (2) documents

concerning any disciplinary actions involving Och-Ziff employees involving Lehman or Lehman

securities; and (3) documents sufficient to show Och-Ziff's management and organizational

structure.  (*Id.*).

19.    The scope of the Subpoena is limited to documents created during the year 2008 –

that is, documents created seven and half months prior to the filing of Lehman's bankruptcy

petition and documents created in the three-and-a-half months after the filing.  This period is

narrowly drawn to capture evidence of the planning and execution of short-and-distort schemes

intended to exploit Lehman's vulnerability during the financial crisis.  It also is intended to

capture the realization of profits from any wrongful conduct towards Lehman and any regulatory

or internal investigations or punishment of wrongdoing involving Lehman immediately

following the filing of the bankruptcy petition.

### D.    The "Meet and Confer" Conferences

20.    After being served with the Subpoena, Och-Ziff refused to produce any responsive documents. On or about April 9, 2010, counsel for the Debtors held a preliminary telephone conference with counsel for Och-Ziff regarding its compliance. (Bowe Decl. ¶ 13.) During the call, Och-Ziff's counsel demanded to know the basis for the Subpoena. (*Id.*) The Debtors' counsel noted that the specific material that formed the basis for the subpoena was privileged and, in turn, asked Och-Ziff's lawyer for a proposal regarding a timetable for Och-Ziff's production. (*Id.*) The Debtors' counsel also inquired whether there are any documents that Och-Ziff could turn over easily and quickly, such as any production Och-Ziff may have made to the SEC or other regulatory agency concerning Lehman. (*Id.*) Counsel for Och-Ziff stated that he did not know, but would find out. (*Id.*) The call ended inconclusively with a promise to speak again. (*Id.*)

21.    Attorneys for the Debtors and Och-Ziff held another call on or about April 28, 2010. (Bowe Decl. ¶ 14.) During this call, counsel for Och-Ziff again demanded to know the basis for the Subpoena and contested its scope. (*Id.*) The Debtors' counsel once again informed him that the specific basis for the Subpoena is privileged, but that the Debtors were willing to consider reasonable proposals for limiting the scope of the Subpoena. (*Id.*) At that juncture, counsel for the Debtors also informed counsel for Och-Ziff that other targets of the Debtors' subpoenas had agreed to initially produce responsive documents that had previously been produced to regulatory agencies. (*Id.*) When counsel for Debtors again inquired about whether Och-Ziff had made a similar production, counsel for Och-Ziff either still did not know or refused to disclose whether such a production was made. (*Id.*) Similarly, in response to general complaints that any production of documents would be burdensome, counsel for the Debtors

11

asked if counsel for Och-Ziff knew the scope of responsive documents. (*Id.*) Och-Ziff's counsel replied that he did not know any specifics, but believed that it would be burdensome. (*Id.*) Counsel for Debtors asked that counsel for Och-Ziff clarify the extent of documents at issue and make a reasoned proposal to modify the scope. (*Id.*)

22.    Then, on or about May 10, 2010, while at the offices of Och-Ziff's counsel for an unrelated matter, the Debtors' counsel met with an attorney representing Och-Ziff concerning the Subpoena. (Bowe Decl. ¶ 15.) During that meeting, counsel for the Debtors informed Och-Ziff's attorney that although the specific details concerning why Och-Ziff was targeted were privileged, it was thought to be the source or conduit for one rumor about the company in 2008 and further that as a prime broker for Lehman it may have been the target of efforts to move its business at a critical point for Lehman. (*Id.*) In response to Och-Ziff's complaint that the complying with the Subpoena would be burdensome, the Debtors' counsel proposed the following compromise for an initial search and production: (1) Och-Ziff would produce all proprietary trading records involving Lehman securities for the year 2008; (2) Och-Ziff also would produce organization charts setting forth Och-Ziff's organizational and management structure for that year; (3) Och-Ziff would then inform the Debtors of the identities of both Och-Ziff employees that had business relationships with Lehman and the Och-Ziff employees who worked at trading desks that were responsible for the proprietary trading of Lehman securities; and (4) upon receipt of that information, the Debtors' would provide Och-Ziff with specific search terms to be used to search electronically stored information over which the identified employees were custodians. (*Id.*) Och-Ziff's counsel stated that he would speak with his client regarding the Debtors' proposal. (*Id.*)

23.     On or about May 26, 2010, counsel for the Debtors and Och-Ziff conferred once more by telephone regarding Och-Ziff's compliance with the Subpoena. (Bowe Decl. ¶ 16.) The Debtors' counsel again informed Och-Ziff of the basis for the Subpoena, and he repeated the Debtors' offer of compromise. (*Id.*) Och-Ziff's counsel refused the Debtors' offer, stating in a conclusory fashion that Och-Ziff is not a proper target. (*Id.*) During the call, Och-Ziff's counsel did not raise any concerns regarding the breadth of the Subpoena. (*Id.*) To date, Och-Ziff has remained steadfast in its refusal to produce documents.

### E.     Och-Ziff's Objections

24.     Failing to produce a single document, Och-Ziff, on May 13, 2010, served the Debtors with the Objections. The Objections broadly object to all of the Subpoena's document requests. While Och-Ziff's memorandum of law (the "Och-Ziff Mem.") and its supporting declaration address solely its claims that the subpoena is overly broad, unduly burdensome, and issued without "good cause," its scattershot Objections assert such nonsense as "Och-Ziff had nothing to gain from Lehman's bankruptcy" (Och-Ziff. Mem. at 2), KBT&F's authority to investigate possible causes of action arising pre-petition does not allow it to examine evidence created post petition (*Id.* at 3), and compliance with the Subpoena "would require Och-Ziff to breach [unidentified] restrictions of confidentiality placed upon it, and seeks confidential and proprietary information and trade secrets."[4] (*Id.* at 7.) As discussed below, Och-Ziff's objections are unavailing in their entirety and should be rejected.

---

[4] Obviously, this objection can be resolved through a confidentiality stipulation when the producing party is acting in good faith.

F.    **Och-Ziff's Specious "Evidence" of Undue Burden**

25.    In its Objections and supporting papers, Och-Ziff complains that compliance with the Subpoena would be oppressive. However, as the seventh largest hedge fund in the world, it has access to ample resources to do so. Och-Ziff boasts on its website:

> We are one of the largest alternative asset managers in the world, with approximately $25.6 billion of assets under management for approximately 600 investor relationships as of June 1, 2010. We have a strong investment track record spanning more than 16 years, which we believe makes us one of the longest standing alternative asset managers in the world. . . We offer a truly global investment platform with over 125 investment professionals in our offices in New York, London, Hong Kong, Mumbai and Beijing. This presence gives us the knowledge, access and ability to identify and source attractive investment opportunities across the globe."

Och-Ziff website: http://www.ozcap.com/aboutOchZiff/index.html (last visited June 8, 2010). Thus, Och-Ziff clearly has the resources to comply with the Subpoena, as it no doubt complies with others in the course of its business.

26.    Nevertheless, to demonstrate this asserted "oppression," Och-Ziff proffers the declaration (the "Frank Declaration" or "Frank Decl.") of Joel Martin Frank ("Frank") (Docket No. 9382), which purports to calculate – but which in reality misrepresents – Och-Ziff's "burden" in complying with the Subpoena. Frank inflates the number of documents that Och-Ziff will be required to produce by extrapolating from the number of Och-Ziff e-mails concerning Lehman created during the period *September 1 through September 19, 2008*. (Frank Decl. ¶ 6.) This period encompassed the critical two weeks prior to Lehman's September 15, 2008 bankruptcy filing and the four days that followed and time when Lehman's fate hung in the balance while the eyes of the world were upon it. As the result of the keen interest in, and the

14

possible catastrophic consequences of, Lehman's failure, this period likely would contain an unusually high number of Och-Ziff e-mails regarding Lehman – most likely, it contains the *highest* number of e-mails regarding Lehman for any such period during 2008.

27.    In order to inflate the number of potentially responsive documents, Frank assumes that the quantity of e-mails generated during this remarkable period – most likely a significantly-higher-than-normal "outlier" – reflects an *average* 19-day period for e-mails regarding Lehman at during the year 2008. (*See* Frank Decl. ¶ 6.)  Frank then misleadingly extrapolates the number of e-mails concerning Lehman from the extraordinary September 1-through-September 19, 2008 period to the whole of 2008, arriving at an intentionally and grossly exaggerated number of responsive documents. (*See Id.*)

28.    Not content to simply "cook" the quantity of documents responsive to the Subpoena, Frank also misrepresents the amount of time and expense that it will take to review those documents for privilege.  As part of his analysis, Frank initially identifies responsive documents by having a consultant run *searches* of e-mails for the terms "Lehman" and "LEH," Lehman's former stock symbol.  (Frank Decl. ¶ 6.)  Frank then assumes that each responsive document will have to be *individually* reviewed for privilege.  (*Id.* at ¶ 7.)  However, given that Frank postulates that responsive documents will be initially selected by electronic searches, those documents can also be electronically searched for the names of lawyers and law firms to identify potentially privileged documents.  This will greatly reduce the number of documents to be searched for privilege issues.  Moreover, the proposed confidentiality stipulation forwarded by the Debtors' counsel to Och-Ziff contains a reasonable claw-back provision, so that privileged documents that are inadvertently produced may be returned.

29.     In his declaration, Frank also purports to address technology costs associated with producing documents responsive to the Subpoena. (*See* Frank Decl., ¶¶ 9-10.) However, although he freely opines on technology issues, Frank, as the Chief Financial Officer of Och-Ziff, makes no claims to *any* expertise in the technology associated with the identification and production of documents and information in litigation. For example, discussing the quantity of responsive documents, Frank states: "[d]ue to this volume, a service provider will have to host this data on their servers" (*Id.*, ¶ 9) – an assessment that Frank is wholly unqualified to make. This lack of expertise in litigation technology renders Frank's opinions wholly irrelevant.

30.     Indeed, due to his lack of knowledge, Frank's assertions in his declaration regarding litigation-technology issues clearly are derived from unattributed hearsay. For example, Frank states: "I am told that it has been reasonably estimated that approximately 265 gigabytes of data would be involved." (Frank Decl. ¶ 9.) Frank clearly has no direct knowledge of the substance of this purported fact. Indeed, he cannot say that the estimate that he asks the Court to accept is "reasonable." He can only say that he "has been told" that it is reasonable – presumably by Och-Ziff's self-serving lawyers. Frank's statements concerning technology costs clearly have been fabricated out of whole cloth by Och-Ziff for the purpose of exaggerating its burden in responding to the Subpoena.

31.     Perhaps even more egregious than the assertions in the Frank Declaration are its omissions. Frank's declaration fails to even mention the Debtors' offer to limit the scope of the Subpoena. Clearly, it would not be unduly costly for Och-Ziff to produce its records of trades in Lehman securities during 2008 as the Debtors have offered. Nor would it be burdensome for Och-Ziff to identify the persons at Och-Ziff with business dealings with Lehman. The Debtors' offer to then provide specific search terms to be conducted of documents and electronically

stored information maintained by those Och-Ziff employees would allow the Debtors to obtain the information that they need at minimum cost to Och-Ziff.[5]

### G.    Och-Ziff's Harassing "Discovery"

32.    To disrupt the Debtors' investigation and exacerbate the result of its own failure to comply, Och-Ziff has served purported "discovery" on the Debtors concerning the Subpoena. On June 2, 2010, Och-Ziff served the Debtors with a notice of deposition seeking to depose a "representative" of Lehman pursuant to Fed. R. Civ. P. 30(b)(6) "to testify concerning the representation made by" Debtors' counsel at the May 26, 2010 meet-and-confer "that Och-Ziff (including any of its related or affiliated entities, or its employees) was a 'source of information' about Lehman, thereby justifying Rule 2004 discovery of Och-Ziff."  (Bowe Decl., Ex. F.)  The Debtors objected to this subpoena in its entirety.  *(See id.,* Ex. G.)  Then, on June 25, 2010, Och-Ziff served its purported "First Set of Interrogatories and Document Requests Directed to Debtors," which seeks, among other things, the identity of "each person who identified Och-Ziff as a 'source of information'" as purportedly represented by the Debtors' counsel during the May 26, 2010 "meet-and-confer" telephone conference  *(See id.,* Ex. H.)  The Debtors also objected to this discovery.  *(See* Bowe Decl., Ex. I.)  Thus, instead of complying with the Debtors' valid Subpoena or participating in their reasonable efforts to compromise and limit its scope, Och-Ziff is engaging in harassing and bad faith discovery of the Debtors' privileged information in an effort to damage the Debtors' investigation and extort the withdrawal of the Subpoena.

---

[5]    Frank's declaration also does not mention whether Och-Ziff already gathered documents pursuant to requests by regulatory agencies, a question directed to counsel for Och-Ziff on at least two occasions.  If it has done so, then the purported burden on Och-Ziff in producing responsive documents would be further reduced.  Indeed, any failure to mention Och-Ziff's compliance with SEC requests related to the short selling of Lehman securities in the Frank Declaration would be a clear indication of Och-Ziff's bad faith.

**ARGUMENT**

I    **The Scope of the Debtors' Subpoena is Valid Under the
Bankruptcy Laws and Och-Ziff's Compliance Should be Compelled**

33.    The scope of the Debtors' Subpoena is proper under the Bankruptcy Rules.

Courts repeatedly have stressed the broad scope of examinations permitted under Rule 2004. *See*

*In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (stating

that the scope of an examination under Rule 2004 is broader than the scope of examination

provided for under the Federal Rules of Civil Procedure and has fewer procedural safeguards); *In*

*re Dinubilo*, 177 B.R. 932, 939 (E.D. Cal. 1993) ("The range of discoverable subject matter in a

Rule 2004 examination is 'unfettered and broad.'") (citation omitted); *In re Vantage Petroleum*

*Corp.*, 34 B.R. 650, 651 (Bankr. E.D.N.Y. 1983) ("[It has been well-established that the scope of

a[] [Rule 2004] investigation is broad."). Indeed, the metaphor that courts repeatedly have

invoked in distinguishing examinations under Rule 2004 from discovery in adversary

proceedings is that Rule 2004 discovery can justifiably be a "fishing expedition." *See In re*

*Drexel Burnham Lambert Group*, 123 B.R. at 711-712 ("It can be legitimately compared to a

fishing expedition" and "It can net the dolphins as well as the tuna."); *In re Vantage Petroleum*

*Corp.*, 34 Bankr. at 651 ("The exploration can be in the nature of a fishing expedition.")

(citations omitted); *In re Foerst*, 93 F. 190, 191 (S.D.N.Y. 1899) ("The examination for this

purpose is of necessity to a considerable extent a fishing examination."); *In re Dinubilo,* 177

B.R. at 939 ("[Rule 2004] is often termed a 'quick fishing expedition.'")

34.    The Rule is "debtor-centric and allows considerable leeway for all manner of so-

called fishing expeditions provided that there is a reasonable nexus to the debtor and the

administration of the debtor's case." *In re Hilsen*, 2008 Bankr. LEXIS 2123, at *1-2 (Bankr.

S.D.N.Y. July 25, 2008) (Peck, J.) (recognizing the importance of the liberal nature of Rule 2004

discovery, but denying such discovery under the particular circumstances of this case where

individual sought information that was personal in nature ten years after the bankruptcy case had

been closed). "In general, a large latitude of inquiry should be allowed in the examination of

persons closely connected with the bankrupt in business dealings, or otherwise, for the purpose

of discovering assets and unearthing frauds, upon any reasonable surmise that they have assets of

the debtor." *In re Foerst*, 93 F. 190, 191 (S.D.N.Y. 1899) (permitting discovery); *see also In re

Recoton Corp.*, 307 B.R. 751, 756 (Bankr. S.D.N.Y. 2004) (overruling objections to 2004

discovery and finding that the discovery sought was consistent with the Rule's purpose of

allowing discovery "necessary to determine whether claims beneficial to estates exist and

whether to pursue such claims").

35.    Here, a "reasonable nexus" and "close[] connection" between the discovery

sought and the Debtors' estates clearly exists. As set forth above, during 2008, Lehman was the

victim of numerous false rumors aimed at undermining its reputation during a time of great

financial peril. A Lehman investigation identified Och-Ziff, which has admitted that it was a

significant counterparty with Lehman,[6] as the possible source of at least one of these rumors.[7] If

true, any causes of action against Och-Ziff for rumor mongering now belong to the Debtors'

estates, and, therefore, Rule 2004 permits broad discovery from Och-Ziff into those claims.

---

[6]    Specifically, Och-Ziff stated that Lehman was one of its significant prime brokers, a substantial counter-party in various transactions, a co-lead underwriter of Och-Ziff's initial public offering, an advisor on funds that were in invested in funds managed by Och-Ziff, provided research coverage for Och-Ziff's trading desks, and lent Och-Ziff approximately $250 million in loans. (*See* Och-Ziff Mem. at 2 and Frank Decl., ¶ 3.) Och-Ziff emphasized that its relationship with Lehman was on-going, as it continues to make monthly payments to Lehman. (*Id.*)

[7]    Och-Ziff's assertion that the Debtors have no basis for the Subpoena, because Och-Ziff "had nothing to gain from Lehman's bankruptcy" (Och-Ziff Mem. at 2) is specious. If Och-Ziff circulated false rumors concerning Lehman while holding short positions in its stock, the hedge fund's motivation would have been to realize profit on its short position. Its goal would have been to profit on the resultant decline in Lehman's stock, and the fact that Och-Ziff had nothing to gain from the ultimate bankruptcy of Lehman is irrelevant.

## II.    The Debtors had Good Cause to Issue the Subpoena to Och-Ziff

36.    Contrary to Och-Ziff's disingenuous contention that the Debtors "cannot articulate any reasonable basis for believing that Och-Ziff engaged in activity that would give rise to a compensable claim," the Debtors clearly had good cause to subpoena Och-Ziff. "[G]ood cause is shown if the [Rule 2004] examination is necessary to establish the claim of the party seeking the examination, or if denial of such request would cause the examiner undue hardship or injustice." *In re Metiom, Inc.,* 318 B.R. 263, 268, 270-271 (S.D.N.Y. 2004) (procedurally and substantively affirming bankruptcy court's finding that good cause existed for taking the requested Rule 2004 discovery based on the mere implication that examiner would suffer undue hardship if it could not obtain the discovery); *see also In re Dinubilo,* 177 B.R. 932, 943 (E.D. Cal. 1993) (finding good cause where examiner's attorneys simply asserted that the subjects of the Rule 2004 examination possessed information relevant to the contested issue).

37.    Here, the Debtors can easily demonstrate good cause.  The enforcement of the Subpoena is necessary to permit the Debtors to obtain evidence necessary to allow them to determine whether they have claims against Och-Ziff or others arising from the rumor mongering by short sellers preceding the Debtors' bankruptcy.  The Debtor's Subpoena (as well as their narrower offer of compromise) captures, among other things, Och-Ziff's short positions in Lehman stock, its trading strategies involving Lehman securities, its communications – both internal and external – concerning Lehman's financial condition and counterparty risk, and any disciplinary actions or investigations undertaken regarding the trading of Lehman securities.  All

such evidence could be material to establishing causes of action against Och-Ziff or others arising from the rumor mongering of 2008.[8]

38.     Good cause also exists because denying the Debtors discovery from Och-Ziff would cause them undue hardship in investigating potential claims against that giant hedge fund. Short and distort schemes such as the one that Och-Ziff may have been participated in are both civilly and criminally actionable. Accordingly, the wrongdoer has a strong incentive to hide its actions and disguise the fact that it is the source of a false rumor. Moreover, the wrongdoer itself may be the only substantial source of evidence that it participated in the short and distort scheme and initiated the rumor. To deny the Debtors discovery from Och-Ziff would be to severely diminish the Debtors' ability to develop claims against the hedge fund, resulting in substantial hardship. Therefore, the Debtors have "good cause" to seek discovery from Och-Ziff.

### III.    Och-Ziff has Failed to Demonstrate that the Subpoena is Oppressive

39.     Och-Ziff's assertion that the burden of producing the requested documents outweighs any benefit to Debtors is clearly wrong. While Debtors' bear the initial burden of establishing good cause, Och-Ziff bears the "the ultimate burden" of persuading the Court that the Subpoena is oppressive and must be quashed. *See In re Wilcher*, 56 B.R. 428, 435 (Bankr. N.D. Ill. 1985) (citation omitted) (citing *Freeman v. Seligson*, 405 F.2d 1326, 1336 (D.C. Cir. 1968)). Here, Och-Ziff cannot demonstrate that the purported "burden" of compliance with the

---

[8]     Och-Ziff's argument that KBT&F improperly exceeded the scope of its authority by serving a subpoena seeking documents created after the filing of the bankruptcy petition is nonsense. (*See* Och-Ziff Mem. at 3.) In its January 28, 2010 order, the Court granted the Debtors the authority to retain KBT&F "on the terms set forth in the [Debtors'] Application." (Docket No. 6808.) That application sought the "authority to retain KBT&F as special counsel to represent the Debtors with respect to the investigation and, if authorized by the Debtors, the possible prosecution of certain litigation against third parties . . . regarding pre-petition claims . . . ." (Application, ¶ 1, Docket No. 6596.) Nothing in that application or the Court's order granting it limits KBT&F from discovering evidence created after the filing of the petition that is material to its investigation of pre-petition claims. Thus, Och-Ziff's wholly unsupported claim that by seeking documents created during 2008 – including the three-and-a-half months following the filing of the petition – KBT&F exceeded the scope of its authority is absurd.

Subpoena outweighs the benefit to the Debtors of discovering evidence in support of possible

claims against the massive hedge fund.

40.     Och-Ziff's sole evidence of the burden of compliance is set forth in the Frank

Declaration, which is not credible in its entirety.  As set forth in greater detail above, in his

declaration, Frank:

- drastically overestimates the number of documents responsive to the Subpoena by taking the number of responsive e-mails from the extraordinary period of Lehman's demise (September 1-19, 2008) and extrapolating that number to apply to the whole of 2008;

- misleadingly overestimates the time and costs of a privilege review by overestimating the number of responsive documents and ignoring both that the documents can be electronically searched for the names of counsel and law firms and that the Debtors are willing to agree to a confidentiality agreement with a claw-back provision to further protect privileged documents;

- opines on technology issues associated with the production of electronic documents when he has no expertise in litigation technology or the costs associated with it and his opinions are based on unattributed hearsay;

- wholly ignores the Debtors' offer to limit the scope of the Subpoena that would have reduced the hedge fund's costs while ensuring that material documents are produced.

These flaws are fatal to the credibility of the Frank Declaration, and it should be afforded no

weight whatsoever.[9]

41.     Indeed, even assuming, *arguendo*, that the some or all of the fabrications in the

Frank Declaration are true – and they are not – the balance of equities favors permitting the

Debtors to undertake discovery of Och-Ziff.  As one of the world's largest hedge funds, Och-Ziff

---

[9]     Och-Ziff's contention that compliance with the Subpoena would require the hedge fund "to breach [unidentified] restrictions of confidentiality placed upon it, and seeks confidential and proprietary information and trade secrets" (Och-Ziff Mem. at 7) is equally specious. Och-Ziff never raised the possibility of a confidentiality stipulation, and the Debtors have agreed to enter into confidentiality stipulations with other targets of 2004 subpoenas and would certainly do the same with Och-Ziff.  Thus, confidentiality issues to not present a bar to Och-Ziff's compliance with the Subpoena.

clearly has the resources to easily comply with the Debtors' Subpoena. If Och-Ziff was involved in spreading false rumors concerning Lehman in 2008, the vast majority of the evidence of Och-Ziff's wrongdoing would most likely be in its own possession. To deprive the Debtors of the Rule 2004 discovery sought from Och-Ziff based on the giant hedge fund's spurious plea of poverty would be to severely hinder the Debtors' ability to discover potential claims against a party that may have sought to wrongfully exploit and profit from Lehman's weakness during 2008's financial turmoil. The resultant harm to the Debtors could deprive their estates of valid claims, deny them redress for their damages, and allow a potential wrongdoer to retain the profits from its malfeasance.

42.    Finally, as set forth above, Och-Ziff's papers fail to even mention the Debtors' offer to limit the scope of the Subpoena in a manner that would allow the Debtors to gather reasonable evidence in furtherance of their investigation while imposing minimal burden on Och-Ziff. Rather than taking the drastic approach of quashing a subpoena in its entirety, courts often, in their discretion, limit the scope of subpoenas they find to be overly broad. *See, e.g., In re Texaco, Inc.*, 79 B.R. 551, 556 (Bankr. S.D.N.Y. 1987) (limiting the scope of Rule 2004 discovery rather than finding examiner's requested discovery unduly burdensome); *Sec. Investor Prot. Corp. v. Cont'l Capital Inv. Servs. (In re Cont'l Capital Inv. Servs.)*, 2009 Bankr. LEXIS 1450, 13-14 (Bankr. N.D. Ohio Mar. 6, 2009) (same); *In re Drexel Burnham Lambert Group*, 123 B.R. 702, 711-712 (Bankr. S.D.N.Y. 1991) ("the net [of the fishing expedition], in the discretion of the Court, can be carefully stitched to limit its catch."); *In re Merrill*, 2010 Bankr. LEXIS 770, at *5-7 (Bankr. W.D. Tex. Mar. 15, 2010) (quashing the portion of the Rule 2004 discovery request that was duplicative and other portions that were unreasonable, but allowing discovery on the parts that were "not ridiculously burdensome or duplicative" or "would lead to

the discovery of relevant information."). Thus, to the extent that the Court finds any part of the Subpoena to be overly broad, the Debtors request that the Court modify its scope by adopting the Debtors' proposed compromise.

## CONCLUSION

Based on the foregoing, Och-Ziff should be ordered to immediately comply with the Subpoena, or, in the alternative, if the Court finds the scope of the Subpoena to be overly broad, then Och-Ziff should be ordered to: (1) produce records of its proprietary trading in Lehman's securities; (2) produce organization charts and information identifying Och-Ziff employees who had business relationships with Lehman and those who worked on trading desks that were responsible for the proprietary trading of Lehman securities so that the Debtors can identify custodians possessing potentially material evidence; and (3) negotiate search terms with the Debtors for the purpose of searching and producing evidence in the possession of those custodians.

Dated: August 11, 2010
        New York, New York

                          KASOWITZ, BENSON, TORRES
                          & FRIEDMAN LLP

                          By: /s/ Robert N. Novick
                              Marc E. Kasowitz (mkasowitz@kasowitz.com)
                              Daniel R. Benson (dbenson@kasowitz.com)
                              Michael J. Bowe (mbowe@kasowitz.com)
                              Robert N. Novick (rnovick@kasowitz.com)

                          1633 Broadway
                          New York, New York 10019
                          Tel.: (212) 506-1700
                          Fax: (212) 506-1800

                          Special Counsel for Debtors and
                          Debtors in Possession