Hearing Date and Time: August 18, 2010 at 10:00 a.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
                                          :
In re                                     :   Chapter 11
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :   Case No. 08-13555 (JMP)
                                          :
                Debtors.                  :   (Jointly Administered)
                                          :
-------------------------------------------------------------------x
```

**LEHMAN COMMERCIAL PAPER INC.'S REPLY TO OBJECTION OF
APPALOOSA INVESTMENT L.P. I'S LIMITED OBJECTION TO THE
MOTION OF LEHMAN COMMERCIAL PAPER INC. PURSUANT TO SECTION 363
OF THE BANKRUPTCY CODE FOR AUTHORITY TO (I) CONSENT TO ITS NON-
DEBTOR AFFILIATE LEHMAN ALI INC. (A) ENTRY INTO PLAN SUPPORT
AGREEMENT RELATED TO THE RESTRUCTURING OF INNKEEPERS USA TRUST;
AND (B) CONSUMMATION OF THE TRANSACTIONS SET FORTH IN THE
PLAN TERM SHEET; AND (II) PROVIDE FUNDS TO SOLAR FINANCE INC., A
<u>NON-DEBTOR AFFILIATE, TO PROVIDE DEBTOR-IN-POSSESSION FINANCING</u>**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Commercial Paper Inc. ("<u>LCPI</u>") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "<u>Debtors</u>") file this reply to the objection (the "<u>Objection</u>") interposed by Appaloosa Investment L.P. I ("<u>Appaloosa</u>") to LCPI's motion, dated July 27, 2010, for authority to (i) consent to its non-Debtor affiliate Lehman ALI Inc. (a) entry into plan support agreement related to the restructuring of Innkeepers USA Trust; and (b) consummation of the transactions set forth in the

US_ACTIVE:\43473296\09\58399.0008

plan term sheet; and (ii) provide funds to Solar Finance Inc., a non-Debtor affiliate, to provide debtor-in-possession financing (the "<u>Motion</u>")[1] and respectfully represents:

### Preliminary Statement

1. The relief requested in the Motion is neither extreme nor unconventional. LCPI holds the economic interest in a defaulted Mortgage Loan with Innkeepers, currently a debtor in its own chapter 11 cases. In the Motion, LCPI seeks authority for its non-Debtor affiliate ALI to enter into certain inter-dependant, delineated transactions. LCPI, in its business judgment, believes the consummation of these transactions will enable LCPI to maximize its recovery on the Mortgage Loan. LCPI is not, as alleged in the Objection, seeking authority to make a new real estate investment; rather, LCPI is trying to restructure an existing loan that is currently in default, in order to maximize the recovery for its creditors.[2]

2. The Debtors' have substantial real estate holdings that must actively be managed. In fact, this Court has approved three separate real estate protocols which would authorize the relief requested in the Motion but for the size of LCPI's investment in Innkeepers.[3]

3. Nonetheless, Appaloosa, in what appears to be an attempt to further its interests <u>in the Innkeepers chapter 11 cases</u>, has characterized the relief requested in the Motion as "unconventional" and "risky," and seeks to substitute its own self-interested "business judgment" for that of the Debtors. Indeed, while LCPI has been unable to confirm the extent of

---

[1] Any term used but not defined herein shall have the meaning ascribed to such term in the Motion.

[2] As LCPI holds the economic interest in the Mortgage Loan and is the party requesting relief from this Court, for convenience, in this Reply, "LCPI" will be used to refer to both LCPI and ALI.

[3] Docket Nos. 5187, 5272 and 5912.

Appaloosa's claim, if any, against LCPI,[4] Appaloosa discloses on the first page of the Objection that it is a "party in interest" in the Innkeepers chapter 11 cases, and, later in the Objection, that "Appaloosa itself may be interested in bidding on the [Innkeepers'] New Equity." See Objection fn. 1, fn. 9.  Appaloosa's intentions are further evidenced by the fact that it is the sole creditor of LCPI to object to the Motion, although it has not filed a single other objection or responsive pleading in these chapter 11 cases.  One can question whether the Objection was filed to advance Appaloosa's interest as an alleged creditor of LCPI.

            4.    Appaloosa also asserts that the sale of 50% of the New Equity to Apollo (or third party) for a purchase price of not less that $107.5 million should not be approved. Appaloosa fails to comprehend that this is not a stand-alone sale, but rather is one aspect of a series of inter-dependent transactions which, when taken as a whole, will result in the restructuring of the Mortgage Loan and of Innkeepers' balance sheet.  There is no equity to sell now and there will be no equity to sell in the future unless Innkeepers is restructured, its plan is consummated and the New Equity is issued.  The sale of 50% of the New Equity (when issued) is an integral part of the restructuring from LCPI's perspective as it enables LCPI to mitigate its risk by liquidating, for a significant sum, 50% of the New Equity.  Lehman, its advisors and the Creditors' Committee, including both their legal and financial advisors, all believe that the sale price provides adequate consideration and does not subject LCPI to the risk that a bidder will not be available on higher and better terms at a later date.  Appaloosa's request for a "contested"

---

[4] Appaloosa asserts that it is a creditor of LCPI through its ownership of a portion of the Bankhaus claim. The only Transfer Notice on the docket with respect to the Bankhaus claim, however, shows Deutsche Bank AG, not Appaloosa, as the transferee. See Transfer Notice [Docket No. 10202]. In fact, the Fifth Amended Verified Statement of Willkie Farr & Gallagher LLP Pursuant to Bankruptcy Rule 2019 [Docket No. 2273] does not list Appaloosa as a client.

valuation of the "New Equity" is a poorly disguised effort to manipulate the Innkeepers case for its own benefit regardless of whether such outcome would have a detrimental effect on LCPI.

5.  While there was no formal process as the Debtors disclosed in the publicly-filed Motion, the agreement with Apollo is terminable by either party until September 1, 2010. The Debtors have fielded several inquiries regarding the sale of portions of the New Equity, and to the extent the Debtors receive a higher and better offer, they can terminate the agreement with Apollo prior to September 1, 2010.[5]

6.  Finally, approval of the Motion does not usurp any authority from the Innkeepers court. The Motion seeks authority for LCPI to enter into certain delineated transactions and, in no way, binds the Innkeepers debtors. In fact, at the Innkeepers "first day" hearing, the Innkeepers court was apprised of the interrelationship between Innkeepers and the Debtors, and recognized that the Debtors would have to seek relief from this Court prior to corresponding relief being granted in the Innkeepers chapter 11 cases. See Transcript of Hearing, 20-24, July 20, 2010 (attached as Exhibit 1).

**Entry into the Plan Support Agreement
Is in LCPI's Business Judgment and Satisfies the Requirements of Section 363(b)**

7.  As set forth in the Motion, LCPI has determined that good business reasons exist for its entry into the Plan Support Agreement. See In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."). The Mortgage Loan is secured by 20 of the approximately 72 hotel properties in the Innkeepers' portfolio, while the remaining

---

[5] LCPI can always sell the Mortgage Loan, at any time if it determined in its business judgment that it would maximize recovery for its creditors. At that point, Innkeepers could elect to terminate the Plan Support Agreement.

hotel properties serve as collateral for certain of Innkeepers' other debt obligations. As a result of the bifurcation of Innkeepers' collateral, all of Innkeepers' creditors have adverse interests, and a "free fall" and/ or protracted bankruptcy proceeding would likely lead to a severe decrease in value. LCPI's entry into the Plan Support Agreement seeks to prevent this outcome, and, in doing so, maximize recovery for LCPI by exchanging the Mortgage Loan for 100% of the New Equity in a de-levered Innkeepers and the ability to monetize half of the equity for at least $107.5 million. At the same time, if the restructuring does not work, the Plan Support Agreement provides LCPI with a hedge, by enabling LCPI, generally, to foreclose on its collateral or cause it to be sold within a finite time period. In this way, entry into the Plan Support Agreement is beneficial to LCPI both by providing LCPI with maximum recovery on the Mortgage Loan if the contemplated restructuring is consummated and by providing LCPI with the ability to realize on its collateral if the restructuring is delayed or does not proceed. Either scenario is a better result for LCPI than attempting to protect its interests during a "free fall" Innkeepers' chapter 11 case.

8. The Plan Support Agreement is not, as Appaloosa asserts, a "risky investment in a distressed real estate firm." Objection ¶ 14. The Mortgage Loan is currently in default and has to be restructured. The Plan Support Agreement, provides, in LCPI's business judgment, the quickest and safest means by which LCPI can maximize its recovery on the Mortgage Loan. Appaloosa should not be allowed to substitute its self-interested "business judgment" for that of the Debtors.[6]

---

[6] Appaloosa further argues that entry into the Plan Support Agreement may be a violation of section 345 of the Bankruptcy Code. This argument is not supported by the facts or the law, or any good-faith extension thereof, and Appaloosa is unable to cite to a single supporting case. Like much of the rest of the Objection, this is a thinly-veiled attempt by Appaloosa to obfuscate where neither the law nor the facts support its position.

**The Sale of 50% of the New Equity Satisfies**
**The Standard for Approval Under Section 363(b) of the Bankruptcy Code**

9. As set forth in the Motion, a transaction outside of the ordinary course of business must be based upon the sound business judgment of the debtor. Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); accord In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In Re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986). Furthermore, if a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). Here, it is without question that a valid business justification exists to support the restructuring of the Mortgage Loan including the monetization of 50% of the equity received for an upfront payment of at least $107.5 million, as doing so allows LCPI to mitigate the risk of receiving 100% of the equity in restructured Innkeepers.[7]

10. Appaloosa cites to asset sales in In re Lionel Corp.[8] and In re General Motors Corp.[9] as support for its argument that the sale to Apollo (or another third party) does not

---

[7] Appaloosa speaks out of both sides of its mouth in arguing that the Plan Support Agreement represents a "potentially risky investment," and, at the same time, objecting the LCPI's attempt to mitigate any risk by monetizing 50% of the New Equity. This provides further evidence that Appaloosa's interest is not in increasing the value of the LCPI estate, but rather in preventing the consensual restructuring of Innkeepers as contemplated by the Plan Support Agreement.

[8] 722 F.2d 1063 (2d Cir. 1983).

[9] 407 B.R. 463 (Bankr. S.D.N.Y. 2009).

meet the standards for approval. While both of those cases apply the "good business reason" standard articulated above, the facts in those cases are inapposite to those presented here. In both Lionel and General Motors, the court was asked to approve a sale of all or substantially all of the debtors' assets. The Motion, on the other hand, seeks authority to enter into a set of inter-dependant coordinated transactions which includes the sale of 50% of the New Equity to Apollo (or a third party) for a purchase price of not less than $107.5 million. This far cry from the sale of substantially all of the assets of a debtor, as $107.5 million represents less than one-percent of the value of LCPI's estate and several tenths of one-percent of the value of the Debtors' estates. See Disclosure Statement Exhibit 2C.[10] The Lionel court itself recognized that "the proportionate value of the assets to the estate as a whole" is a "salient factor" in determining whether to approve a transaction under section 363(b). See Lionel, 722 F.2d at 1071.

11. Additionally, the sale meets the "good business reason" standard for approval, which is the law in this Circuit. As set forth above, the sale will enable LCPI to receive both significant cash and equity as consideration for the Mortgage Loan, thereby mitigating its risk. The sale to Apollo (or a third party) is not a stand-alone transaction, it is for LCPI, only one aspect of the comprehensive restructuring of Innkeepers and the Mortgage Loan, the sum of which provides the maximum recovery to LCPI.[11]

12. Furthermore, contrary to what Appaloosa claims, Lehman is not able to hold an auction for the New Equity, as Lehman does not currently hold the New Equity (or any

---

[10] *The Debtors' Disclosure Statement for Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors pursuant to Section 1125 of the Bankruptcy Code*, filed April 14, 2010 [Docket No. 8332].

[11] Although Appaloosa didn't object to LCPI providing funds for the DIP Facility, it is important to note that the DIP Facility is also a critical component of the comprehensive restructuring which cannot be "cherry-picked" out of the transaction. The DIP Facility is in the best interests of LCPI because the funds will be used to protect and improve the value of LCPI's collateral currently securing the Mortgage Loan. If the restructuring is not consummated, the DIP Facility will be repaid in full.

equity for that matter), and will only receive it upon confirmation of the Innkeepers' chapter 11 plan. The New Equity in the reorganized Innkeepers is more valuable than any consideration LCPI would receive on account of the Mortgage Loan in a "free fall" Innkeepers bankruptcy.

13. Additionally, a formal auction for the New Equity at this stage would be detrimental to both LCPI and to the Innkeepers' case. LCPI currently has a buyer willing to purchase 50% of the New Equity for a significant cash payment. There is no assurance at this time that a transaction that provided LCPI with similar or better value could be structured following the Innkeepers' plan process. As such, LCPI determined, in its business judgment, the transaction as currently structured, was beneficial to its estate because it provided more certainty of execution and was more likely to maximize LCPI's recovery. A formal auction would also disrupt the Innkeepers' case. The $107.5 purchase price is not a determination of value of reorganized Innkeepers, but rather a negotiated deal between Lehman and Apollo. During the Innkeepers' plan process, the court will, if contested, need to make findings as to the value of Innkeepers' assets.

14. Prior to LCPI's entry into the AIC Agreement, Lehman formally marketed the Mortgage Loan. During this marketing process, Lehman received expressions of interest from approximately 10 parties, and signed non-disclosure agreements with approximately five of these parties, which allowed such parties access to a data-room. The Mortgage Loan, however, was in default, and it was evident that Innkeepers would likely have to seek chapter 11 protection. As a result, Lehman was unable to find a purchaser for the Mortgage Loan for adequate consideration.

15. Moreover, up to September 1, 2010, Lehman can terminate the transaction with Apollo for any reason, including if another party presents Lehman with a higher and better

offer for the Mortgage Loan or the consideration received on account thereof. By filing the Motion, Lehman has announced its intention to sell 50% of the consideration received, and has clearly stated that the AIC Agreement is terminable until September 1, 2010. Lehman has, in fact, received inquires from other entities as to purchasing a portion of the New Equity; none of these inquiries, however, have resulted in a formal offer. <u>Indeed, Appaloosa itself contacted Lehman regarding purchasing a portion of the New Equity. Lehman encouraged Appaloosa to submit its best offer in writing and promptly negotiate a transaction, which Appaloosa failed to do.</u>

## The Court Is Not Usurping Authority
## From the Innkeepers Bankruptcy Court

16. LCPI is not asking this court to usurp any authority from the Innkeepers court. Instead, LCPI recognizes the interrelationship between its chapter 11 proceeding and the Innkeepers' case, and is attempting to enable both cases to proceed as efficiently and quickly as possible.

17. Appaloosa cites to <u>Wash. Mut. Bank. v. Law Office of Robert Jay Gumenick</u>[12] as support for its argument that this Court should defer any determinations until the value of Innkeepers has been determined by the Innkeepers court. The issues in <u>Gumenick</u> have virtually nothing in common with those presented here, and it appears this case was cited merely for the convenience of a "punchy" quote. In <u>Gumenick</u>, Washington Mutual filed both claims in a bankruptcy proceeding and a diversity action in the District Court for compensatory damages against Gumenick stemming from the same events. To avoid a double recovery to Washington Mutual, the District Court stayed the diversity action.

---

[12] 561 F. Supp. 2d 410, 412 (S.D.N.Y. 2008).

18. Here, LCPI and Innkeepers are faced with the situation of parallel chapter 11 proceedings, an issue with which this Court is well versed. In order for LCPI to act in the Innkeepers chapter 11 cases, it must seek relief from this Court. All parties in interest are benefited, and efficiency is, in fact, promoted by this Court granting the relief in the Motion and allowing Lehman to act in its best interests in the Innkeepers' chapter 11 cases. Lehman has positioned itself to realize, what it believes in its business judgment, is its maximum recovery on the Mortgage Loan. Prohibiting Lehman from asserting its interests in the Innkeepers' cases would place Lehman at a severe disadvantage vis-à-vis the other creditor constituencies.

19. Finally, the Objection asserts that neither this Court nor the Innkeepers court have been afforded the full picture of the restructuring transaction. This could not be farther from the truth. Each document referenced in the Motion was attached to the Motion in order to provide the "full picture" to this Court and to all parties in interest and all the Innkeepers' documents were similarly referenced.

## Conclusion

20. The Motion requests authority for LCPI to maximize its recovery on the Mortgage Loan by entering into a Plan Support Agreement and related transactions in the Innkeepers' chapter 11 cases. These inter-dependant transactions will enable an efficient comprehensive restructuring of Innkeepers, which, if consummated will provide LCPI with 50% of the New Equity and, at least, $107.5 million in cash. If the transactions are not consummated, LCPI's entry into the Plan Support Agreement further protects LCPI by allowing LCPI to realize on its collateral after a finite period of time by foreclosure or sale. LCPI believes, in its business judgment, this in the best interests of its estate and creditors. For these reasons, LCPI requests

that the Court grant the Motion and overrule the Appaloosa Objection and any objections that are filed hereafter.

Dated:    August 16, 2010
             Houston, Texas

<u>/s/ Alfredo R. Pérez</u>
Alfredo R. Pérez

Weil, Gotshal & Manges LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5040
Facsimile: (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

# **Exhibit 1**

**(Transcript)**

US_ACTIVE:\43473296\09\58399.0008

Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 10-13800-SCC

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  INNKEEPERS USA TRUST, et al.,

9

10           Debtors.

11

12 - - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            July 20, 2010

19            11:11 AM

20

21 B E F O R E:

22 HON. SHELLEY C. CHAPMAN

23 U.S. BANKRUPTCY JUDGE

24

25

1            With that platform, with the hotels now secured in our
2   enterprise, we needed to fund these PIPs.  And so we have
3   entered into two DIP agreements, what we're calling the PIP
4   DIPs, and so you'll be hearing about the PIP DIPs later on, not
5   today.  But we filed two motions yesterday.  One is to complete
6   the PIPs as they relate to the fixed pool, and one -- the fixed
7   pool and two of the other Marriott hotels.  So it would be the
8   fixed pool and then it would be Tysons and San Diego -- San
9   Diego.
10           So that's the first DIP that we filed.  It's
11  approximately fifty million dollars.  It's being provided by
12  affiliates of Five Mile Capital.  Five Mile Capital is the
13  certificate holder in the REMIC where these loans reside.  The
14  second is a DIP provided by Lehman for approximately eighteen
15  million dollars.  And that's intended to cover PIPs and other
16  cycles of renovations with respect to the floating pool only.
17           Both of those motions were filed yesterday.  And they
18  require that the DIPs be funded within sixty days.  And so
19  we'll be working with Your Honor and Your Honor's staff to
20  schedule hearings to approve both of those DIP facilities.
21           THE COURT:  And this comes into play in various other
22  aspects.  You're also going to have to get approval from Judge
23  Peck, I assume.
24           MR. SATHY:  Absolutely, Your Honor.  Absolutely.
25           And that comes to my last key document, the plan

1  support agreement.  As I said, Your Honor, this is the
2  cornerstone of our restructuring.  Pursuant to the agreement,
3  Lehman has agreed to convert their fixed debt into equity.  We
4  believe this has a tremendous benefit to the overall
5  restructuring.  It provides an equity cushion for the entire
6  enterprise.  It allows for cash flow that would otherwise go to
7  pay fixed debt to now be available for the entire enterprise,
8  both in terms of improvements and in terms of servicing debt on
9  other pools.
10             And we think it creates the right structure for our
11 other secured creditors.  The rest of our secured pools are
12 CMBS trusts.  And we believe that having debt would be
13 beneficial, or more beneficial for CMBS servicers and trusts.
14 And so what we've tried to do is create a platform for all of
15 the debt capacity that this reorganized enterprise can sustain,
16 to be given to pools of secured creditors for CMBS servicers.
17             Getting a secured creditor to convert into equity is
18 not easy.  Getting a Chapter 11 debtor who is a secured
19 creditor to convert is even harder.  And so as Your Honor
20 noted, Lehman's obligations under our PSA, as well as to fund
21 the --
22             THE COURT:  DIP --
23             MR. SATHY:  -- DIP --
24             THE COURT:  -- right.
25             MR. SATHY:  -- are subject to approval by Judge Peck.

Page 22

```
 1  We understand, and Lehman is here and they'll be able to speak
 2  that they will be filing their pleadings in the near future,
 3  within a few days, we hope, with an expectation that their
 4  approval, Judge Peck's approval, would be sought before we come
 5  back to you and seek approval of the DIPs as well as the
 6  assumption of the plan support agreement.
 7            THE COURT:  So both DIPs?  That has to happen before
 8  both DIPs, not just the floating pool DIP?
 9            MR. SATHY:  Correct.  We would -- we envision both
10  DIPs happening at the same time.
11            THE COURT:  Okay.
12            MR. SATHY:  The Lehman DIP will need to happen after
13  Judge Peck approves -- assuming he does --
14            THE COURT:  Right.
15            MR. SATHY:  -- Lehman's authority to --
16            THE COURT:  Okay.
17            MR. SATHY:  -- enter into that.
18            THE COURT:  And there's an outside date for August
19  27th for that approval.
20            MR. SATHY:  Yes.
21            THE COURT:  Is that correct?
22            MR. SATHY:  That's correct.  We believe that that is
23  consistent with their omnibus schedule.  And our hope is that
24  they will be able to get in front of Judge Peck at the next
25  omnibus date.
```

Page 23

```
 1              THE COURT:  Okay.
 2              MR. SATHY:  Your Honor, there is -- there was one
 3   point that I do want to raise with respect to the plan support
 4   agreement.  And Midland makes some issue with the relationship
 5   between Lehman and Apollo, with respect to their agreement.
 6   The agreement with the company and Lehman is that Lehman will
 7   be converting a hundred percent of its debt into equity.
 8   That's our plan support agreement.  Lehman has reached an
 9   agreement with Apollo that allows for Lehman to sell fifty
10   percent of the equity, should this transaction be approved --
11              THE COURT:  To --
12              MR. SATHY:  -- for a fixed price.  And that was
13   Lehman's decision.  Our agreement with Lehman does not require
14   that Apollo receive anything.  Our agreement with Lehman is
15   that they find a purchaser for half of the equity, presumably
16   for the business reasons that they believe is important for
17   them and their estates, and presumably the way that they will
18   present that request to Judge Peck.  It's a termination event
19   under our plan support agreement, if that agreement -- if their
20   agreement -- if they're not able to find a purchaser.  So in
21   some ways they are related.  But our agreement is not that --
22              THE COURT:  And that's the sentence that was added to
23   the new affidavit that I got, correct?
24              MR. SATHY:  That's right, Your Honor.  And I do -- and
25   I should correct that point.  This is, frankly, a mea culpa on
```

Page 24

```
 1  us.  We had had that disclosure in probably twenty or thirty
 2  versions of the affidavit that we were working on.  We know
 3  that's important disclosure, obviously.  In a draft of an
 4  affidavit that we sent to Midland last week, it included that
 5  disclosure.  And they will agree that on July 14th we sent them
 6  an affidavit that includes that disclosure.  And we met with
 7  them the very next day and told them about it, obviously.
 8          So this is not one of these issues that people are
 9  trying to hide.  And I hope that this case does not become "I
10  gotchas".  But that is disclosure that we thought was
11  important --
12          THE COURT:  Okay.
13          MR. SATHY:  -- and it needed to be made.
14          THE COURT:  Fair enough.
15          MR. SATHY:  Your Honor, before I conclude, just a
16  general sense of our next steps.  Obviously, we want to operate
17  the business seamlessly, with our guests not being aware of the
18  Chapter 11 filing or not being affected by it.  We want to
19  build more consensus around our restructuring plan.  And we
20  intend to do so.  And we intend, in the next forty-five days,
21  to reach a resolution on definitive documents with respect to
22  our DIPs, with respect to the plan, and ultimately, assuming
23  that things move forward with Lehman in their court, that we'd
24  be filing our plan within the next forty-five days.
25          The PSA provides for a relatively aggressive time
```