BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350
Jonathan D. Schiller
Hamish P. M. Hume
Jack G. Stern

Attorneys for Barclays Capital Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                                        Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>                                        Debtor. | Case No. 08-01420 (JMP) |

**BARCLAYS CAPITAL INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS**
**MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DANIEL MCISAAC**
**RELATING TO ETDS**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

August 16, 2010

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................3

I.      MR. MCISAAC'S AREAS OF EXPERTISE HAVE NO RELEVANCE TO
        THE ISSUES UPON WHICH HE OPINES IN HIS EXPERT REPORT. ........................3

II.     MR. MCISAAC'S OPINIONS IGNORE AND CONTRADICT THE
        FUNDAMENTAL STRUCTURE OF THE SALE TRANSACTION. ...........................5

III.    MOVANTS' OPPOSITION FURTHER HIGHLIGHTS THE INCONSISTENCY
        BETWEEN MR. MCISAAC'S EXPERT REPORT AND HIS DEPOSITION
        TESTIMONY ..................................................................................................8

IV.     MOVANTS CANNOT JUSTIFY MR. MCISAAC'S FAILURE TO CONSIDER
        ALL RELEVANT FACTS, NOR HIS RELIANCE ON ASSUMPTIONS THAT
        ARE CONTRARY TO UNDISPUTED RECORD FACTS. ........................................10

        A.      Movants Misconstrue the Law Governing When An Expert's Testimony
                Should Be Excluded For Failure To Consider All Relevant Facts or For
                Relying On Assumptions Contrary to Fact. ...............................................10

        B.      Mr. McIsaac Failed To Consider Several Critical Facts ...........................12

CONCLUSION ......................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Amoriganos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) .......................................................................................10

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) .............................................................................................8, 10

*Davidov v. Louisville Ladder Group, LLC*,
    No. 02 Civ. 6652, 2005 WL 486734 (S.D.N.Y. 2005) ......................................8, 18

*Delehanty v. KLI, Inc.*,
    663 F. Supp. 2d 127 (E.D.N.Y. 2009).........................................................................9

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ...................................................................................................8

*Heller v. Shaw Indus., Inc.*,
    167 F.3d 146 (3d Cir. 1999) .....................................................................................10

*Highland Capital Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005)........................................................................8

*Li v. Aponte*,
    No. 05 Civ. 6237, 2009 WL 1285928 (S.D.N.Y. May 5, 2009)................................10, 11, 18

*United States v. Downing*,
    753 F.2d 1224 (3d Cir. 1985) .....................................................................................8

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
    571 F.3d 206 (2d Cir. 2009) ....................................................................................11

<u>Other Authorities</u>

Federal Rules of Evidence 702 .................................................................................8

Barclays Capital Inc. ("Barclays"), by and through its undersigned counsel, respectfully submits this Reply Memorandum in further support of its motion (the "Motion") for the entry of an order, pursuant to Federal Rule of Evidence 702, excluding the expert testimony of Daniel McIsaac relating to exchange-traded derivatives ("ETDs").

## INTRODUCTION

1.      Barclays seeks the exclusion of the expert testimony offered by Daniel McIsaac on issues related to ETDs because Mr. McIsaac:  (a) lacked the expertise needed to offer a reliable opinion concerning the risk associated with the ETD component of the September 2008 Sale Transaction (the "Sale Transaction"), (b) reached conclusions directly contradictory to the contract governing the Sale Transaction and the basic concept and structure of the Transaction, (c) offered deposition testimony that flatly contradicted the most fundamental conclusion he reached in his expert report, (d) based his opinions on unfounded assumptions that were contrary to well-established fact, and (e) lacked an awareness of the most basic circumstances surrounding the Sale Transaction.  Movants' opposition brief fails to provide an adequate response to any of these bases for excluding Mr. McIsaac's testimony.

2.      Movants cannot and do not dispute that Mr. McIsaac's experience and expertise are clearly in the field of conducting customer segregation calculations applicable to broker-dealers, as well as in managing regulatory and compliance issues pertaining to customer protection.  These areas have no relevance to the opinions Mr. McIsaac proffers in his ETD report.  He was, after all, hired to be the Trustee's expert on 15c3 calculations – his report on the ETD issues was an afterthought.  *See* McIsaac Dep. Tr. at 8:11-19.  Movants' own characterization of Mr. McIsaac's report emphasizes the very areas in which Mr. McIsaac himself *admits* he has *no* expertise – namely, "risk trading," "risk management," and "risk

assessment" associated with ETDs.  *Compare* Memorandum of Movants in Opposition to the Motion in Limine of Barclays Capital Inc. for an Order Excluding the Expert Testimony of Daniel McIsaac Relating to Exchange Traded Derivatives ("ETDs") and ETD Margin ("Opp'n Br.") at ¶ 8 (Mr. McIsaac's report consists of "a systematic and granular analysis of the *risk* that Barclays assumed in acquiring LBI's exchange traded derivatives and derivatives clearing business") *with* McIsaac Dep. Tr. at 23:14 (admission that Mr. McIsaac is "not a risk man"); *id.* at 24:9-10 (admission that Mr. McIsaac is not an expert on "risk trading); *id.* at 96:22-97:10 (Mr. McIsaac is not a "quant" on "risk management" or "risk assessment"; rather, he has only a "general knowledge of risk").

3.      Mr. McIsaac opines that, if margin were part of the deal, he would expect it to be expressly listed as a Purchased Asset.  McIsaac Report at ¶¶ 15-19, 55.  Mr. McIsaac's opinion is based on nothing more than his own subjective drafting preferences, and ignores the fundamental structure of this deal, which is made plain by the fact that the APA defines the Purchased Assets as "*all* of the assets" in LBI's business *except those expressly excluded*.  Because Mr. McIsaac's opinion contradicts the contract governing the Sale Transaction, his opinion is irrelevant and unreliable, and should be excluded.

4.      Movants also have no answer to the fact that, in his deposition, Mr. McIsaac directly contradicted the central conclusion of his expert report—that it would have been irrational for a seller in Lehman's position to agree to transfer the ETD Margin to Barclays without receiving "dollar for dollar compensation" for such a transfer.  Movants try to recharacterize Mr. McIsaac's expert report to harmonize it with his deposition, but they cannot: Mr. McIsaac wrote in his report that "a rational seller would not include margin in the deal, unless it was being compensated dollar for dollar."  McIsaac Report at ¶ 55.  In deposition, he

admitted that the seller could "make a rational decision to transfer the accounts with no compensation, if that's what they wanted, based on facts and circumstances at that point in time if that's what they negotiated." McIsaac Dep. Tr. at 198:15-20.

5.      Movants contend that Mr. McIsaac considered the facts relevant to his opinion on ETD margin, and did not rely on faulty assumptions in place of the actual record facts.  That is false.  For example, Mr. McIsaac had "no idea" how much time the parties had to negotiate the APA – for all he knew, it could have been a month.  *See* McIsaac Dep. Tr. at 62:3-17; *id.* at 63:22-64:4; 63:8-15.  Mr. McIsaac assumed, contrary to fact, that Barclays had (and took) "whatever time it needed" to assess the risks associated with this transaction.  *Id.* at 215:23-216:3.  And Mr. McIsaac did not even consider the availability – or lack thereof – of other potential buyers for Lehman's assets, and instead assumed (again, contrary to fact) that there were other alternatives to the deal with Barclays.  *See* McIsaac Dep. Tr. at 98:18-99:4, 100:12-101:13.

6.      Movants contend that Mr. McIsaac's failure to consider the relevant circumstances surrounding the September 2008 Sale Transaction should not disqualify him because such a failure goes only to the weight of his testimony, rather than its admissibility.  That is not correct.  Where an expert's testimony contradicts the plain meaning of a contract and the undisputed facts, and when he admittedly failed to consider all relevant facts, his testimony can and should be excluded.

## **ARGUMENT**

## I.      **MR. MCISAAC'S AREAS OF EXPERTISE HAVE NO RELEVANCE TO THE ISSUES UPON WHICH HE OPINES IN HIS EXPERT REPORT.**

7.      Mr. McIsaac's expert report, coupled with his deposition testimony, make clear that his area of expertise is in the field of conducting customer segregation calculations

applicable to broker-dealers and in managing regulatory and compliance issues.  In short, he is

an expert in 15c3 calculations, and that is why the Trustee hired him.  He is *not* an expert in

ETDs.

8.      Movants argue that Mr. McIsaac has had some prior involvement in acquisitions

of exchange-traded derivatives businesses.  Opp'n Br. at ¶¶ 19-20.  But Mr. McIsaac admits that

his role was limited to analyzing the impact a transaction would have on "the firm's reputation . .

. and how it would impact the firm's capital position," as well as "financial statement disclosure

and understanding that, and in general, the terms – general understanding of the business."

McIsaac Dep. Tr. at 24:16-23.  He admits he is "*not* a risk man", *id.* at 23:14, and *not* an expert

on "risk trading," "risk management," or "risk assessment".  *Id.* at 24:9-10; 96:22-97:10.

Moreover, he did not "determine the value [at] risk for a firm", *id.* at 97:2-3, and "would have

other people that were responsible" for evaluating an ETD business "from a risk standpoint or a

value at risk standpoint.  *Id.* at 23:23-24:3.

9.      Nevertheless, Mr. McIsaac's report purports to assess the risk associated with the

Barclays acquisition of Lehman's ETD business.  Indeed, Movants admit that his report consists

of "a systematic and granular analysis of the risk that Barclays assumed in acquiring LBI's

exchange traded derivatives and derivatives clearing business."  Opp'n Br. at ¶ 8.  Because Mr.

McIsaac's opinions constitute a risk assessment, and because a "risk assessment" requires an

expertise that Mr. McIsaac admits he *does not have*, the opinions he provides in his ETD expert

report – that Barclays "assumed no market risk" on certain positions, could "mitigate" any

market risk or operational risk it assumed, assumed "minimal" or "remote" credit risk, and

assumed only "negligible" risk in acquiring Lehman's clearing business – should be excluded.

## II.    MR. MCISAAC'S OPINIONS IGNORE AND CONTRADICT THE FUNDAMENTAL STRUCTURE OF THE SALE TRANSACTION.

10.    The APA provides that Barclays was acquiring the "Purchased Assets," which the APA defines as "(i) *all* of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter." BCI Ex. 5 [Clarification Letter] at § 1(a) [attached hereto as Exhibit A]; BCI Ex. 1 [APA] at § 2.1 [attached hereto as Exhibit B].[1]  The APA defines the "Business" as "the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant." BCI Ex. 1 [APA] at p. 2.  The ETD Margin was an LBI asset used in LBI's "capital markets" business, "trading and advisory" business, and its business as a "futures commission merchant."  It is not listed in the definition of "Excluded Assets."  Thus, based on the plain language of the APA, ETD Margin is included within the definition of "Purchased Assets" irrespective of whether it was specifically referenced in the APA.

11.    Mr. McIsaac does not dispute the fact that ETD Margin was an asset used in the Business, as defined in the APA.  Instead, he seeks to substitute his "experience in the securities industry" for the actual language of the APA.  He concludes that, "[i]f margin were to be included in such a transaction, [he] would expect it to be separately negotiated and accounted for as part of the net asset value of the business."  McIsaac Report at ¶¶ 15-19.  Indeed, Mr.

---

[1] For the Court's convenience, these and all documents cited herein but not appended to Barclays' Motion to Exclude the Expert Testimony of Daniel McIsaac Relating to Exchange Traded Derivatives ("ETDs") and ETD Margin are included in the appendix filed herewith.

McIsaac admitted in his deposition that his conclusion was based on his own personal

expectation of how an agreement of this type would generally be structured and documented,

irrespective of the *actual* agreement that was executed in this case:

> I would always include what you're buying, not necessarily
> exclude what you're not buying. I think to make something really
> understandable, you would say include this, include that.

McIsaac Dep. Tr. at 209:10-14.

12.    This testimony regarding what Mr. McIsaac would "always include" directly

contradicts the plain text of the APA – which was clearly not written in the way that Mr.

McIsaac would have written it.  Because his testimony contradicts the APA, Mr. McIsaac's

testimony should be excluded as legally irrelevant.

13.    Moreover, Mr. McIsaac's testimony also contradicts the plain text of the contracts

that *do expressly provide* that Barclays was acquiring the ETD Margin – a fact that Mr. McIsaac

refused to accept even when confronted with the operative documents.  For example, when

confronted with the Transfer and Assumption Agreement, which expressly provides for the

transfer of "*all margin deposits*" to Barclays, Mr. McIsaac conceded that this agreement

appeared to provide for the transfer of ETD Margin to Barclays. McIsaac Dep. Tr. at 174:11-17,

but concluded that because this was not the "binding sale agreement," it was irrelevant unless the

same transfer was also provided for "in another agreement." *Id.* at 173:20-174:4.[2]  When shown

the Trustee's testimony concerning the Collateral Account Agreement, which *expressly states*

---

[2] Mr. McIsaac had a similar reaction when shown email correspondence between the OCC, the Trustee, and
Barclays in which the OCC sought to confirm its understanding "that all cash and securities collateral are intended
to be transferred to Barclays."  McIsaac Dep. Tr. at 237:23-238:3.  Mr. McIsaac was again content to ignore this
evidence and maintain his singular focus on how he would have drafted the APA, noting that "[w]hatever the
agreement was regarding those assets that are being transferred and what payment had to be made for them or not be
made for them would I expect to be part of an agreement."  *Id.* at 239:3-7.

that "LBI has assigned to Barclays all rights and securities, cash, and other property defined as collateral pledged by LBI to the Options Clearing Corporation and held for OCC's benefit at JPMorgan Chase", *id.* at 220:16-20, Mr. McIsaac could only say that he wasn't "sure of what assets" were being referenced, and speculated that it "might have been the cash that was payable to the customers." *Id.* at 221:3-10. When confronted with the Clarification Letter, which expressly defines the Purchased Assets to include "any property that may be held to secure obligations under such [exchange-traded] derivatives," Mr. McIsaac explained that this parenthetical must have been referring to something other than ETD Margin; the only reason he could give for that view was that if *he* was drafting this provision, he would have worded it differently and made specific reference to property "posted" by LBI. McIsaac Dep. Tr. at 225:6-13.

14.    In short, regardless of what various contemporaneous agreements provided, and regardless of the actual structure of the APA, Mr. McIsaac's opinion assumes a transaction in which each and every asset being purchased was listed expressly in the APA. This assumption contradicts the plain text of the APA, which clearly provides that Barclays was acquiring "*all* of the assets" used in the Business, "including" certain specific assets that were listed specifically – with the word "including" defined as "including without limitation." BCI Ex. 1 [APA] at § 1.2(a). Mr. McIsaac's opinion likewise contradicts the trial testimony of Harvey Miller, lead counsel for Lehman, who explained that the Sale Transaction "provided for Barclays to acquire all assets used in connection with that business, except for those which were explicitly excluded" and stated that "Barclays was buying the North American capital markets business, whatever it was." Apr. 28, 2010 Official Tr. at 94:6-14, 107:8-14 (Miller) [attached hereto as Exhibit C].

15.    Because it contradicts the governing contracts and the extrinisic evidence showing that ETD Margin was to be transferred to Barclays, Mr. McIsaac's testimony will not "assist the trier of fact to understand the evidence or to determine a fact in issue," and should be excluded. Fed. R. Evid. 702.  An expert's disregard for the actual facts of a case warrants the exclusion of his resulting opinions.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143-47 (1997) (approving of exclusion where expert's analysis on the cause of plaintiff's cancer was based on different factual circumstances regarding nature and extent of exposure than existed in plaintiff's case); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591-92 (1993) (stating that expert testimony must be "sufficiently tied to the facts of the case that it will aid the [court] in resolving a factual dispute") (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)); *Davidov v. Louisville Ladder Group, LLC*, No. 02 Civ. 6652, 2005 WL 486734, at *2 (S.D.N.Y. 2005) ("an expert's opinion which is not based on the evidence in the case is little more than speculation").[3]

## III.    MOVANTS' OPPOSITION FURTHER HIGHLIGHTS THE INCONSISTENCY BETWEEN MR. MCISAAC'S EXPERT REPORT AND HIS DEPOSITION TESTIMONY.

16.    Mr. McIsaac abandoned one of his central opinions at deposition.  In his expert report, Mr. McIsaac states that "a rational seller would not include margin in the deal, unless it was being compensated ***dollar for dollar***."  McIsaac Report at ¶ 55 (emphasis added).  As Movants acknowledge, however, Mr. McIsaac testified in deposition that dollar for dollar compensation would only be "the starting expectation of a rational seller," but that it "may be

---

[3] Moreover, to the extent Mr. McIsaac is attempting to instruct the Court on how to read the contract, he is opining on the law and that opinion is inadmissible for that independent reason:  "To the extent [an expert] discusses governing law, the discussion is inadmissible because '[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.'"  *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005).

negotiated up or down based on the specific circumstances." Opp'n Br. at 12. Specifically, Mr.

McIsaac agreed that "[y]ou may decide I'll take 50 cents on the dollar, I may take 25 cents on the

dollar," and that the seller could even "make a rational decision to transfer the accounts with no

compensation, if that's what they wanted, based on facts and circumstances at that point in time

if that's what they negotiated." McIsaac Dep. Tr. at 198:15-20. The inconsistency of these two

positions – the one being that dollar for dollar compensation would be the **only** rational decision,

and the other being that zero compensation could likewise be rational – renders Mr. McIsaac's

testimony illogical and unreliable.

17.     Mr. McIsaac's about-face in deposition reflects his failure to study the facts of the

case before proffering his original opinion. Once confronted with the massive uncertainty and

risk that Barclays faced, *see generally* McIsaac Dep. Tr. at 47:10-62:2, with the fact that this

transaction was negotiated under emergency circumstances, *id.* at 103:18-105:5, with the fact

that LBI was facing multiple threats from the relevant exchanges to liquidate LBI's ETD

accounts altogether (some of which were acted upon, causing $1.6 billion in losses to the LBI

estate), *id.* at 107:21-108:13, and with the fact that the intent was for Barclays to acquire the

entire Business, less only those assets which were specifically excluded, *id.* at 106:11-107:20,

Mr. McIsaac abandoned his core opinion (*id.* at 115:13-120:13; 193:17-194:11; 197:9-198:25).

His testimony should therefore be excluded as unreliable. *See, e.g., Delehanty v. KLI, Inc.*, 663

F. Supp. 2d 127, 133 (E.D.N.Y. 2009) (finding proffered testimony unreliable where expert

failed to research the basic facts of the case, then changed his testimony when confronted with

facts that contradicted his opinion).

IV.    **MOVANTS CANNOT JUSTIFY MR. MCISAAC'S FAILURE TO CONSIDER ALL RELEVANT FACTS, NOR HIS RELIANCE ON ASSUMPTIONS THAT ARE CONTRARY TO UNDISPUTED RECORD FACTS.**

    A.    **Movants Misconstrue the Law Governing When An Expert's Testimony Should Be Excluded For Failure To Consider All Relevant Facts or For Relying On Assumptions Contrary to Fact.**

18.    As set forth in Barclays' Motion, an expert opinion must be excluded as unreliable when the expert forms it "without even endeavoring to obtain and consider all the available and relevant information." *See, e.g., Li v. Aponte,* No. 05 Civ. 6237, 2009 WL 1285928, at *7 (S.D.N.Y. May 5, 2009). Rather than dispute this well-established principle, Movants cite the uncontroversial proposition that in considering motions to exclude, courts focus more on "principles and methodology" than on the substance of an expert's opinions. Opp'n Br. at ¶¶ 9-10. This argument misses the point, for the basis for Barclays' Motion is not its disagreement with the substance of Mr. McIsaac's opinions, but rather his failure to consider the relevant facts in reaching those opinions, which is grounds for disqualification. "[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Amoriganos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 257 (2d Cir. 2002) (citing *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 155 (3d Cir. 1999)). The Supreme Court has expressly stated that examining the fit between an expert's analysis and the actual facts of the case is part of the gatekeeping function of the courts. *Daubert,* 509 U.S. at 591-92 (stating that expert testimony must be "sufficiently tied to the facts of the case that it will aid the [court] in resolving a factual dispute").

19.    Movants cite two cases in support of their claim that an expert's alleged failure to review all facts and circumstances "go to the weight of the expert's opinion and not to its admissibility." Opp'n Br. at 5-6. The cases show the opposite. In the first case, the court admitted the expert testimony at issue specifically because it found that the expert *had* developed

a sufficient familiarity with the record facts to form a reliable opinion. *See Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (admitting expert testimony that was "based on witness statements, [the expert's] inspections of the bulkhead structure from 2001 to 2002, drawings and photographs of the bulkhead, reports and videotapes prepared by the Defendants, and approximately thirty years of engineering experience with marine structures"). Likewise, in the second case the court admitted expert testimony over an objection that the expert had failed to "review all the appropriate evidence," not because that was not a basis for exclusion, but because the expert had in fact reviewed the material facts and circumstances of the case. *See Feldman v. Van Gorp*, No. 03 Civ. 8135 (WHP), 2008 WL 5429871, at *3 (S.D.N.Y. Dec. 19, 2008).

20.    In contrast, expert testimony should be excluded when the supposed expert failed to consider the relevant facts. Thus, in *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91-92 (2d Cir. 2000), the Court of Appeals affirmed exclusion of expert testimony where the expert had failed to examine the boat involved in an accident, did not interview certain witnesses, and was unaware of the layout of the boat and the location of the passengers at time of accident. In *Aponte*, 2009 WL 1285928, at *7 this Court excluded testimony of an expert who relied on oral medical history from plaintiff and did not examine written medical records when testifying on the cause of plaintiff's herniated disc.

21.    Thus, as the court made clear in *Aponte* – a case on which Movants themselves rely in their motion to exclude Professor Pfleiderer – if an expert forms his opinion "without even endeavoring to obtain and consider all the available and relevant information," that opinion must be excluded as unreliable. *Aponte*, 2009 WL 1285928, at *7.

22.      Movants attempt to distinguish *Aponte* on the grounds that Mr. McIsaac's failure to consider the available and relevant information was not as "egregious" as that of the expert in *Aponte*, because Mr. McIsaac purportedly reviewed "numerous documents and extensive deposition testimony" that he deemed relevant to his opinion.  Opp'n Br. at 6-7, n.3.  As shown below, however, this contention simply cannot be squared with the admissions Mr. McIsaac made during his deposition.

**B.      Mr. McIsaac Failed To Consider Several Critical Facts**

23.      Mr. McIsaac, by his own admission, failed to consider the actual circumstances under which the Sale Transaction was negotiated and closed when forming his opinions. McIsaac Dep. Tr. at 62:3-17, 66:5-23, 215:23-216:3.  He treats what was an unprecedented transaction – undertaken with virtually no time for due diligence and no competing bidders in the midst of a chaotic market in which LBI was facing multiple threats from the relevant exchanges to liquidate LBI's ETD accounts altogether (some of which were acted upon, causing $1.6 billion in losses to the LBI estate) – as though it were no different from a small, garden-variety sale of a discrete number of derivative positions during normal times in a competitive environment.  *Id.* While Barclays disputes his conclusions even for such garden-variety transactions (an issue the Court need not reach), it is Mr. McIsaac's failure to consider the effect of the actual circumstances of the Sale Transaction that renders his testimony inadmissible under Rule 702.  If he did not understand what the circumstances of the transaction actually were, Mr. McIsaac had no reliable basis for concluding that "a rational seller would not include margin in the deal, unless it was being compensated dollar for dollar," McIsaac Report at ¶ 55, and that "[t]he circumstances of the transaction between Lehman and Barclays do not change [his] opinions in this matter".  McIsaac Report at ¶ 20.

12

24.     Movants contend that Mr. McIsaac *did* in fact consider the facts discussed in
Barclays' Motion.  Opp'n Br. at ¶¶ 11-13.  This contention is based on self-serving
characterizations of Mr. McIsaac's "methodology" that are directly refuted by his own
deposition testimony.

25.     For example, while Movants contend that Mr. McIsaac "fully considered the
timing of the Sale Transaction" in arriving at his opinions and believed it to be a "special
circumstance[] in which the transaction occurred," Mr. McIsaac admitted in deposition that he
had "no idea" about the time frame in which the parties negotiated the APA:

> Q.  Do you know how much time Barclays and Lehman had to negotiate the terms
> of this transaction before they entered into the APA?
>
> A.  No, I do not.
>
> Q.  Would it surprise you to hear that it was less than 24 hours?
>
> A.  It would – wouldn't surprise me or not surprise me.  Lehman was in financial
> difficulty at that time and there were reports in the papers that a lot of people were
> looking at Lehman from time to time.  So I have no idea when Barclays started to
> look at it and determined what they wanted to do.

McIsaac Dep. Tr. at 62:3-17.  Mr. McIsaac simply "did not give much thought" to this, and even
questioned "what that has to do with what we're talking about."  *Id.* at 63:22-64:4; 63:8-15.
Indeed, when pressed, Mr. McIsaac admitted that he could not say whether the APA was
negotiated in a matter of days, weeks, or even a full month:

> Q.  Did you ask [Deloitte] any of the circumstances under which the deal was
> negotiated?
>
> A.  No, I did not.
>
> Q.  Did you ask anyone what the circumstances were of the deal at the time it was
> negotiated?
>
> A.  I think I understand what was going on in the environment at that time.  I
> don't think I had to ask specifically what was happening in the environment at
> that time.  It was a rough, you know, a difficult time and I don't know if Barclays
> had one day or five days or how long they were reviewing the transaction.
>
> Q.  You don't know if it was ten days?

A.  I don't know if it was ten days.

Q.  And you don't know if it was a month that Barclays had to review the transaction?

A.  That's right.

*Id.* at 66:5-23.

26.     Rather than form an accurate understanding of the time constraints involved in the

Sale Transaction, a factor that fundamentally affected the nature of the parties' negotiations,[4] Mr.

McIsaac simply assumed (incorrectly) that Barclays had (and took) "whatever time it needed" to

analyze and negotiate this deal.  According to Mr.  McIsaac:

- "The Fed could have continued to provide liquidity while they were looking for another purchaser.  That has happened before.  If they stepped in the shoes once before, I assume things could have been done, still been done in that fashion."  McIsaac Dep. Tr. at 100:20-101:2.

- The Sale Hearing transcript "says the business has been known worldwide, so I don't know why it had to close – I don't know what happened that made it have to close within a week's period. . . .  If I looked at the financial statements that were not filed but prepared, it looked like they had adequate capital for the broker-dealer."  *Id.* at 102:17-25.

- "How much [Barclays was] getting and what they were willing to pay for it they had to make an assessment, and I assume they took whatever time it needed to take to do that assessment."  *Id.* at 215:23-216:3.

27.     These assumptions were plainly contrary to fact.  As the Court was told on

September 19 by the SIPC representatives, the transaction needed to close "as soon as possible."

---

[4] The time constraints on the parties to this transaction are critical to a proper understanding of why the parties would not have been able to craft an agreement in the manner that Mr. McIsaac would traditionally "expect." Neither Barclays nor Lehman had time to work out the values of the ETDs or Margin.  This created substantial risk for Barclays since the ETD positions consisted of liabilities as well as assets and could have carried (and ultimately did carry) substantial net negative value.  The parties agreed to a deal despite that uncertainty, in order to close the larger transaction in time to keep the Business alive.  Mr. McIsaac's failure to appreciate the special circumstances that forced the parties to work at such an unprecedented pace in the face of these uncertainties renders his opinions concerning what would have been rational under "the circumstances" inherently unreliable.

BCI Ex. 49 [Sept. 19, 2008 Hrg. Tr.] at 73:14-21 [attached hereto as Exhibit D]. And as Harvey

Miller explained:

> Expedition, Your Honor, is mandatory. Events move with the
> velocity that almost defies comprehension. In this kind of world,
> form cannot be exalted over substance. The substance of this
> transaction is to continue a business for the benefit of the general
> economy, the employees whose lives are at stake and to fit a small
> piece into the jigsaw puzzle of maintaining a stable economy. We
> cannot take the risk of rejecting this transaction because of
> ambiguities, the lack of a piece of paper to support every element
> of the assets to be transferred, the lack of definition as to particular
> items. We have to think and we have to act in the same manner
> that the decisions were made by the government and others over
> the past week to expend billions and billions of dollars to shore up
> the economy.

*Id.* at 60:17-61:5. As this Court was also told, "[i]f the transaction does not close today or over

this weekend, Your Honor, Mr. McDade would testify that the effect on the broker-dealers

business and on Lehman Holdings would be devastating." *Id.* at 102:6-9. And "Mr. Ridings

would also testify that the sale of LBI must be immediately consummated or there will be little

or nothing to sell." *Id.* at 143:17-19. These disclosures led this Court to conclude not only that it

was a "preposterous notion" that delaying the approval might result in "another better

transaction," but also that a decision to delay the approval would be "reckless" and would carry

"truly disastrous" consequences. *Id.* at 249:2-250:18.

28.    Mr. McIsaac's deposition testimony also makes clear that, in reaching his

conclusions, he made no effort to investigate whether there were other potential buyers of the

Lehman assets:

> Q. When you described the circumstances of the transaction between Lehman
> and Barclays on page 7 of your report, did you consider among those
> circumstances the options that Lehman had to the deal with Barclays?
>
> A. The options that Lehman had? I guess Lehman could have decided to sell or
> not to sell.
>
> Q. Could they have decided to sell to a different entity?

A.  I'm sure they could have.

McIsaac Dep. Tr. at 98:18-99:4.

29.     Had Mr. McIsaac so much as read the Sale Hearing transcript in this case before

reaching his conclusions, he would have seen that even the Court had determined that an

immediate sale to Barclays was the only viable alternative to a potentially "disastrous"

liquidation.  BCI Ex. 49 [Sept. 19, 2008 Hrg. Tr.] at 248:25-249:3, 250:13-18; *see also id.* at

249:3-11 (the Court:  "[F]or a transaction like this to happen, only Barclays can do it").)  Indeed,

even when confronted with this fact in deposition, Mr. McIsaac was unwilling to accept it, and

insisted that another potential buyer could have been waiting in the wings:

> Q.  You testified a moment ago that you were sure Lehman could have sold the
> assets to a different buyer.  Does this [the Sale Hearing Transcript] refresh your
> recollection at all on the circumstances that Lehman was facing at the time?
>
> A.  This says they have no buyers.  It's Chapter 11.  The Fed was providing them
> with liquidity earlier in the week before Barclays stepped into the shoes.  The Fed
> could have continued to provide liquidity while they were looking for another
> purchaser.  That has happened before.  If they stepped in the shoes once before, I
> assume things could have been done, still been done in that fashion.
>
> Q.  Do you agree that the court is being told at the September 19th Sale Hearing
> that it is almost academic for Lehman to find another potential buyer at that point?
>
> A.  That's what it looks like here, yes, but I –
>
> Q.  And if you –
>
> A.  Excuse me.  But it also says they weren't marketing the firm in the first
> paragraph on that page.  So maybe if they did, they might have been able to find
> other buyers.

McIsaac Dep. Tr. at 98:18-99:4; 100:12-101:13.

30.     In short, once again, rather than investigate and opine on the relevant facts, Mr.

McIsaac elected to make assumptions contrary to those facts, and to rely on those assumptions

instead in reaching his conclusions regarding the rationality of entering into a transaction

involving the ETD Margin.[5]  This demonstrates the unreliability of Mr. McIsaac's purported

expert opinions, and a further basis for the exclusion of his testimony.

31.    Mr. McIsaac also chose to make assumptions – rather than investigate and rely on

facts – when opining on the amount of diligence and the level of certainty the parties would have

required regarding the values of the subject assets before entering into a deal of this magnitude.

As the parties stressed to this Court on September 19, in the distressed circumstances that existed

in September of 2008, asset values were falling precipitously, and there was no time to "wait for

ordered reports, appraisals, physical inventories, [or] a review of each and every document

relating to the transaction."  BCI Ex. 49 [Sept. 19, 2008 Hrg. Tr.] at 59:11-25.  Nevertheless, Mr.

McIsaac's "opinion assumes that [Barclays] would know the value of what they were

purchasing.  I would assume most people wouldn't buy something that they didn't know what

they were buying."  McIsaac Dep. Tr. at 214: 2-5.  Similarly, Mr. McIsaac could not "fathom

why anybody would buy anything without knowing what they were buying," *id.* at 215:15-16,

and did not "believe a purchaser would enter into an agreement to purchase something without

assessing what the value is that they were purchasing".  *Id.* at 216:24-217:4.

32.    Again, Mr. McIsaac's assumptions reflect a fundamental misunderstanding of the

circumstances in which this deal was negotiated, and of the fact that the parties were necessarily

entering into this deal on an "extraordinarily fast schedule" and in a non-traditional manner –

indeed, in a manner that was "unheard of but imperative."  BCI Ex. 49 [Sept. 19, 2008 Hrg. Tr.]

---

[5] Movants do not contest or explain Mr. McIsaac's failure to consider the unavailability of other potential buyers for Lehman's assets in reaching his conclusions, and instead emphasize the fact that Mr. McIsaac proffered this testimony in response to a hypothetical question – a fact that has no bearing on the importance of Mr. McIsaac's admission.  The crucial fact – and the one Movants do not even try to rebut – is that Mr. McIsaac plainly did not even bother to investigate Lehman's alternatives to the Barclays transaction before forming his expert opinion on what would have been a rational decision on Lehman's part.

at 247:20-23, 250:11-12.  That Mr. McIsaac failed to investigate, and indeed could not even

"fathom" the circumstances that existed in September of 2008, and assumed an entirely different

set of circumstances in forming his opinions, renders his opinions unreliable and excludable.

33.    In sum, Mr. McIsaac's approach in this case runs afoul of two distinct principles

that guide courts when evaluating the admissibility of expert testimony under Rule 702.  First,

Mr. McIsaac formed his opinions "without even endeavoring to obtain and consider all the

available and relevant information."  *Aponte,* 2009 WL 1285928, at *7.  And second, Mr.

McIsaac's opinions are "not based on the evidence in this case" and are therefore "little more

than speculation."  *Davidov,* 2005 WL 486734, at *2.  For both of these reasons, Mr. McIsaac's

expert testimony should be excluded.

## CONCLUSION

For the foregoing reasons, Barclays respectfully requests that the Court enter an Order

excluding the proffered expert testimony of Mr. McIsaac.


Dated:        New York, New York
              August 16, 2010

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP


By:  /s/ Jonathan D. Schiller
Jonathan D. Schiller
Hamish P.M. Hume
Jack G. Stern
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350

Attorneys for Barclays Capital Inc.