# Exhibit A

## BARCLAYS CAPITAL INC.

As of September 20, 2008

> BCI Exhibit No.
>
> **5**

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

      Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Original Agreement") as amended by the First Amendment thereto dated as of September 19, 2008 (the "First Amendment" and, the Original Agreement as so amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Original Agreement. This letter agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects, and is binding on the parties hereto upon its execution and delivery. All references herein to the Original Agreement are to the conformed copy attached hereto of the hand marked Original Agreement.

      1.    Purchased Assets; Excluded Assets.

      (a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter. Purchased Assets shall include:

      (i)    the items set forth in clauses (b), (c) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets" in the Original Agreement;

      (ii)    with respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in the Original Agreement, instead of the items referred to in such clauses, (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A previously delivered by Seller and accepted by Purchaser, (B) such securities and other assets held in LBI's "clearance boxes" as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser (provided, however, that Purchaser in its discretion may

1

elect within 60 days after the Closing to return any such securities to LBI); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and (C) exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short-term agreements;

(iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; and

(iv)    all prime brokerage business and accounts and repurchase agreement operations and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business); and

(v)    any rights or interests Seller may have with respect to any escrow or other account established in connection with the Global Research Analyst Settlement entered by the U.S. District Court on October 31, 2003 (the "Research Settlement"), or funds otherwise set aside for the procurement of independent research pursuant to the Research Settlement, but only to the extent that Purchaser is required to make payments in accordance with the Research Settlement as a result of its acquisition of LBI's investment banking and research operations.

(b)    For the avoidance of doubt, the "Business" includes LBI's commodities business, government securities trading operations and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller except as otherwise specified herein or in the Agreement).

(c)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a), (c) through (j), and (l) through (q) of the definition of "Excluded Assets" in the Original Agreement and the other assets identified in this Letter as Excluded Assets  Except as otherwise specified in the definition of "Purchased Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall not include any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business.  The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, over-the-counter derivatives, TBA mortgage notes and similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement, and until any securities pledged as collateral under Seller clearing arrangements with JP Morgan Chase & Co. or its Affiliates (other than those referred to in Section 1(a)(ii) of the Letter).  Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities.  Included in clause (h) of the definition of "Excluded Assets" in the Original Agreement are life insurance policies owned by Seller and its Subsidiaries.  For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets).  The

2

reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller.  Clause (h) of the definition of Excluded Assets in the Original Agreement is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

(d)    Sections 3 and 4 of the First Amendment are hereby deleted in their entirety and shall be of no effect *ab initio*.  LBI hereby instructs Purchaser to pay at the Closing $250 million of the Cash Amount to the Depository Trust Clearance Corporation ("DTC") for deposit as collateral against LBI's obligations to DTC (including its affiliated clearing organizations).  Such collateral account shall be maintained in accordance with the agreement among LBI, Purchaser and DTC entered into in connection with the Closing.

(e)    Seller hereby represents and warrants to Purchaser that LB I Group Inc. has and had as of the date on which LB I Group Inc. transferred to LBI the equity of Townsend Analytics, Ltd., LB I Group Inc. no indebtedness.

2.    <u>IMD Business</u>.  For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business).  As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business.  The private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") is a Purchased Asset and the Purchased Assets shall include the assets of the Seller used exclusively in the PIM Business.  The forgivable notes issued by PIM employees to Seller or its Affiliates shall be an Excluded Asset.  Excluded Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    <u>Assumed and Excluded Liabilities</u>.  Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser and arising after the Closing in connection with the Business.  Clause (d) of the definition of "Assumed Liabilities" in the Original Agreement is understood as though it read as follows:  "accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business (other than accounts payable arising out of or in connection with any Excluded Contract), including, for the avoidance of doubt, to the extent arising after such date (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable)."  Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities." For the avoidance of doubt, any Liabilities of Seller or its Subsidiaries under the $15.8 billion tri-party repurchase facility dated on or about September 18, 2008 funded by JP Morgan Chase shall be "Excluded Liabilities."

4.    <u>Consideration</u>.  The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission

3

and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain holdback amounts relating to the real estate being transferred pursuant to the Agreement as provided by Section 12.2 of the Agreement).

        5.     License.  All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement.  The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries).  The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

        6.     Subordinated Notes of LBI.  The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

        7.     Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

        8.     Transfer of Customer Accounts.  All customer accounts of LBI (other than customer who are Affiliates of LBI) shall be transferred to Purchaser.  In connection therewith, Purchaser shall receive (i) for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business and (ii) to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value.  Liabilities arising under Seller's arrangements with DTC and its affiliated clearing organizations shall be Excluded Liabilities.

        9.     Deletion of Purchase Price Adjustment Provisions.  Section 3.3 of the Original Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.

        10.     Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract and except as provided in Section 8.  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

        11.     Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations

4

between or among any Seller and any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    Barclays Repurchase Agreement. Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008 repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "Barclays Repurchase Agreement") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Purchaser shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void *ab initio* in all respects.

14.    Risk of Loss of Artwork. During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

15.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces.  Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below.  In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the

6

party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of LW-LLP Inc. will be fully repaid and extinguished.

19.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    <u>Definition of Excluded Contract.</u>  As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    <u>PIM Business Leases.</u>

(a)  Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases").  At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

(b)  Notwithstanding the foregoing or anything to the contrary contained in Section 22(a) or any other provision of the Agreement, with respect to the PIM Lease for the premises located at 399 Park Avenue, New York, New York (the "New York Property"), the underlying lease shall not be subject to assignment to Purchaser and the Purchaser shall only have the option to require that Seller sublease to Purchaser or its Affiliates the sixth floor of the New York Property (or a portion of the sixth floor) (the "NY Sublease Premises"), and Seller agrees to sublease the NY Sublease Premises, subject to the parties' compliance with the terms of the underlying lease including, without limitation, any notice or consent requirements set forth therein.  If Purchaser elects to sublease the NY Sublease Premises as provided herein, all of the terms and conditions set forth in this letter agreement applicable to the SF Property shall also apply to the sublease of the NY Sublease Premises.

23.    <u>No Overseas Assets.</u>  Although LBI has been part of a global business and Purchaser remains interested in potentially acquiring other portions thereof and obtaining the services of the employees thereof, all assets and rights of the Lehman companies that would otherwise be Purchased Assets (other than Seller, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) that cannot be sold pursuant to Section 2.1 of the Original Agreement as a result of being subject to governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time or until such assets and rights can be so sold.  Except with respect to Purchased Intellectual Property, no assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall each use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit

8

Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

The representations and warranties of the parties contained in this Letter and in the Agreement shall not survive the Closing. This Letter shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This Letter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

Sincerely,

BARCLAYS CAPITAL INC.

By: _Ricardo A Green_

Name:

Title:

Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____

Name:

Title:


LEHMAN BROTHERS INC.


By: _____

Name:

Title:


LB 745 LLC


By: _____

Name:

Title:

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: Steven Berkenfeld
Title: Vice President

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LB 745 LLC

By: _____
Name:
Title:

*[SIGNATURE PAGE TO CLARIFICATION LETTER]*

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.

By: _____
Name:   Anson B. Frelinghuysen
Title:   as Counsel for James W. Giddens,
         Trustee for the SIPA Liquidation
         of Lehman Brothers Inc.

LB 745 LLC


By: _____
Name:
Title:


*[SIGNATURE PAGE TO CLARIFICATION LETTER]*

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC

By: _Ufel Ufan___
Name: _Mark Marrucci_
Title: _President_


[SIGNATURE PAGE TO CLARIFICATION LETTER]

# Schedule 1(a) – Excluded Real Estate Assets

**New York**
1301 Avenue of the Americas - 7th Floor
1271 Avenue of the Americas
399 Park Avenue
605 Third Avenue
85 Tenth Avenue

**New Jersey**
Jersey City - 101 Hudson St.
Livingston - 2 Peachtree Hill Road (Co-location)
Florham Park - 230 Park Avenue
Hoboken - 111 River Street (Sublease)

**Branches**
Atlanta - 3414 Peachtree Road
Calgary - 150 Sixth Avenue, Suite 3370 - PetroCanada
Columbia - Little Patuxent Parkway (NB)
Dallas - 200 Crescent Court
Dallas - 325 N. St. Paul Street (former Crossroads)
Greenwich - 8 Sound Shore Drive
Houston - 600 Travis Street
Los Angeles - 10880 Wilshire Blvd.
Menlo Park - 3000 Sand Hill Road
Miami - 1111 Brickell Avenue - Barclay's Financial Center
Newport Beach - 680 Newport Center Dr, Suite150
Palm Beach - 450 Royal Palm Way (License agreement for 1,704 on 6th floor)
Philadelphia - 1735 Market Street - Mellon Bank Center
San Francisco - 555 California Street
Tampa - 401 East Jackson Street, 24th flr (NB)
Wilmington - 1000 West Street - Brandywine Building (LBB)

**South America Branches**
Mexico City - Av. Paseo de la Reforma 265 Col. Cuauhtemoc

## Schedule 1(b) - Included Real Estate Assets

| City | St | Location | Landlord Legal Entity | Lease Expiration | Space Footage Total | Space Footage Acquisition | LB | Seats Total | Seats Acquisition | LB | Occupancy Total | Occupancy Acquisition | LB | CRE Assets Total | CRE Assets Acquisition | LB | EI Assets Total | EI Assets Acquisition | LB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Boston | MA | 125 High Street | Lehman Brothers Holdings Inc. | | | | | | | | | | | | | | | | |
| Chicago | IL | 190 South LaSalle Street | Lehman Brothers Holdings Inc. | | | | | | | | | | | | | | | | |

SCHEDULE 1(C)

PIM LEASES

| | City | State | Address | Tenant | Landlord |
|---|---|---|---|---|---|
| 1. | Atlanta | GA | 3414 Peachtree Road, NE | Lehman Brothers Inc. | Monarch Centre Associates, LLC |
| 2. | Dallas | TX | 200 Crescent Court | Lehman Brothers Inc. | Crescent TC Investors LP |
| 3. | Greenwich | CT | 8 Sound Shore Drive | Lehman Brothers Holdings Inc. | 8 Sound Shore Associates, LLC |
| 4. | Miami | FL | 1111 Brickell Avenue | Lehman Brothers Inc. | 1111 Brickell Office, LLC |
| 5. | Newport Beach | CA | 680 Newport Center Drive | Lehman Brothers Holdings Inc. | The Irving Company |
| 6. | Palm Beach | FL | 450 Royal Palm Way | Lehman Brothers Inc. | Palm Beach Centre 1, LLC |
| 7. | Philadelphia | PA | 1735 Market Street | Lehman Brothers Inc. | Nine Penn Center Associates, LP |
| 8. | New York | NY | 399 Park Avenue | Lehman Brothers Inc. | Boston Properties LP |

# Exhibit B

**EXECUTION COPY**

ASSET PURCHASE AGREEMENT

AMONG

LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS INC.

LB 745 LLC

AND

BARCLAYS CAPITAL INC.

———————————

Dated as of September 16, 2008



EXHIBIT

1 31 04 MS

BCI Exhibit No.

1

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| Article I | DEFINITIONS | 1 |
| 1.1 | Certain Definitions | 1 |
| 1.2 | Other Definitional and Interpretive Matters | 10 |
| Article II | PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES | 11 |
| 2.1 | Purchase and Sale of Assets | 11 |
| 2.2 | Excluded Assets. | 11 |
| 2.3 | Assumption of Liabilities | 11 |
| 2.4 | Excluded Liabilities | 12 |
| 2.5 | Cure Amounts | 13 |
| 2.6 | Further Conveyances and Assumptions | 13 |
| 2.7 | Bulk Sales Laws | 14 |
| Article III | CONSIDERATION | 14 |
| 3.1 | Consideration | 14 |
| 3.2 | Payment of Cash Amount | 14 |
| 3.3 | Adjustment to Cash Amount | 14 |
| Article IV | CLOSING AND TERMINATION | 15 |
| 4.1 | Closing Date | 15 |
| 4.2 | Deliveries by Seller | 15 |
| 4.3 | Deliveries by Purchaser | 15 |
| 4.4 | Termination of Agreement | 16 |
| 4.5 | Procedure Upon Termination | 16 |
| 4.6 | Effect of Termination | 16 |
| Article V | REPRESENTATIONS AND WARRANTIES OF SELLER | 17 |
| 5.1 | Organization and Good Standing | 17 |
| 5.2 | Authorization of Agreement | 18 |
| 5.3 | Conflicts; Consents of Third Parties | 18 |
| 5.4 | Title to Purchased Assets | 19 |
| 5.5 | Compliance with Laws; Permits | 19 |
| 5.6 | No Other Representations or Warranties; Schedules | 20 |

i

**TABLE OF CONTENTS**
(continued)

Page

Article VI      REPRESENTATIONS AND WARRANTIES OF PURCHASER ........ 20

6.1      Organization and Good Standing ................................................ 20

6.2      Authorization of Agreement ...................................................... 20

6.3      Conflicts; Consents of Third Parties ......................................... 21

6.4      Financial Capability .................................................................. 21

6.5      Condition of the Business ......................................................... 21

Article VII      BANKRUPTCY COURT MATTERS ........................................ 22

7.1      [Reserved] ................................................................................. 22

7.2      Bankruptcy Court Filings .......................................................... 22

Article VIII      COVENANTS ............................................................................. 22

8.1      Access to Information ............................................................... 23

8.2      Conduct of the Business Pending the Closing ......................... 23

8.3      Consents .................................................................................... 25

8.4      Regulatory Approvals. .............................................................. 26

8.5      Further Assurances .................................................................... 27

8.6      Confidentiality .......................................................................... 27

8.7      Preservation of Records ............................................................ 28

8.8      Publicity .................................................................................... 28

8.9      Trademark License .................................................................... 28

8.10      Use of Purchased Intellectual Property .................................... 29

8.11      Deferred Transfers .................................................................... 30

8.12      Release of Guarantees ............................................................... 32

8.13      Transition Services .................................................................... 32

8.14      Subleases ................................................................................... 32

8.15      Landlord Notice ........................................................................ 33

8.16      Artwork ..................................................................................... 33

Article IX      EMPLOYEES AND EMPLOYEE BENEFITS ....................... 33

9.1      Employee Benefits .................................................................... 33

Article X      CONDITIONS TO CLOSING .................................................. 35

ii

**TABLE OF CONTENTS**
**(continued)**

**Page**

10.1  Conditions Precedent to Obligations of Purchaser ................................. 35

10.2  Conditions Precedent to Obligations of Seller......................................... 36

10.3  Conditions Precedent to Obligations of Purchaser and Seller ................ 36

10.4  Frustration of Closing Conditions............................................................. 37

Article XI  [RESERVED] .................................................................................... 37

Article XII  TAXES............................................................................................ 37

12.1  Transfer Taxes ......................................................................................... 37

12.2  Prorations ................................................................................................ 37

12.3  Purchase Price Allocation ....................................................................... 37

12.4  Adjustment to Purchase Price ................................................................. 37

Article XIII  MISCELLANEOUS ....................................................................... 38

13.1  Expenses .................................................................................................. 38

13.2  Injunctive Relief....................................................................................... 38

13.3  Submission to Jurisdiction; Consent to Service of Process .................... 38

13.4  Waiver of Right to Trial by Jury............................................................... 39

13.5  Entire Agreement; Amendments and Waivers ........................................ 39

13.6  Governing Law ........................................................................................ 39

13.7  Notices ..................................................................................................... 39

13.8  Severability .............................................................................................. 41

13.9  Binding Effect; Assignment..................................................................... 41

13.10  Non-Recourse. ....................................................................................... 41

13.11  Counterparts. ......................................................................................... 41

13.12  Scope of Purchased Assets.................................................................... 41

<u>ASSET PURCHASE AGREEMENT</u>

ASSET PURCHASE AGREEMENT, dated as of September 16, 2008 (this "<u>Agreement</u>"), among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation ("<u>LBHI</u>"), **LEHMAN BROTHERS INC.**, a Delaware corporation ("<u>LBI</u>" and, together with LBHI, the "<u>Seller</u>"), **LB 745 LLC**, a Delaware limited liability company ("<u>745</u>"), and **BARCLAYS CAPITAL INC.**, a Connecticut corporation ("<u>Purchaser</u>").

W I T N E S S E T H:

WHEREAS, LBHI is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "<u>Bankruptcy Code</u>"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York (Manhattan) (the "<u>Bankruptcy Court</u>") (Case No. [08-13555]) (the "<u>Bankruptcy Case</u>");

WHEREAS, the Seller and its Subsidiaries presently conduct the Business;

WHEREAS, Seller and 745 desire to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller and 745, pursuant to Sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein; and

WHEREAS, an Affiliate of Purchaser has agreed to provide to LBHI a debtor-in-possession facility (the "<u>DIP Facility</u>") and has agreed to provide to LBI certain other financing;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

ARTICLE I

DEFINITIONS

1.1    <u>Certain Definitions</u>.

For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms

1

i

"controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Breakup Fee and Competing Bid Order" means an order of the Bankruptcy Court in the form attached as Exhibit A hereto.

"Business" means the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease or other agreement.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to or necessary for the conduct of the Business and the Purchased Assets in each case whether or not in electronic form.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" shall mean the following assets, properties, interests and rights of Seller and its Subsidiaries:

(a)      the shares of capital stock, limited liability company membership, general and limited partnership, and other equity interests, of Seller and its Subsidiaries (other than (i) the capital stock of Townsend Analytics and (ii) the capital stock or other equity interests of any other Subsidiary that Seller and Purchaser may agree prior to the entry of the Sale Order shall be a Purchased Asset);

(b)      all cash, cash equivalents, bank deposits or similar cash items of LBI and its Subsidiaries (the "Retained Cash") other than $1.3 billion in cash, cash equivalents, bank deposits or similar cash items;

i

(c)     all intercompany receivables;

(d)     the Excluded Contracts, including any accounts receivable to the extent arising out of any Excluded Contract;

(e)     any Intellectual Property Rights that do not constitute Purchased Intellectual Property;

(f)     any (i) confidential personnel and medical records pertaining to any Excluded Employee; (ii) other books and records that LBI is required by Law to retain, including, but not limited to, books and records required to be retained by Rules 17a-3 and 17a-4 of the Exchange Act with respect to the Purchased Assets or that LBHI reasonably determines are necessary to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets; and (iv) minute books, stock ledgers and stock certificates of Subsidiaries..

(g)     any claim, right or interest of LBHI or any of its Subsidiaries in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(h)     all insurance policies or rights to proceeds thereof relating to the assets, properties, business or operations of Seller or any of its Subsidiaries other than customer account insurance supplemental to SIPC coverage included in the Business;

(i)     any rights, claims or causes of action of Seller or any of its Subsidiaries against third parties relating to assets, properties, business or operations of Seller or any of its Subsidiaries (other than those primarily related to Purchased Assets) arising out of events occurring on or prior to the Closing Date;

(j)     commercial real estate investments (including commercial loans, equity investments in such commercial real estate and other commercial real estate assets and all Archstone debt and equity positions), private equity investments and hedge fund investments;

(k)     50% of each position in residential real estate mortgage securities;

(l)     assets related to the soliciting, placing, clearing and executing of buy and sell orders for derivatives contracts by Lehman Brothers Derivative Products Inc. and all activities related or ancillary thereto;

(m)     all artwork owned by Seller and its Subsidiaries;

i

(n)      all assets primarily related to the IMD Business and derivatives contracts;

(o)      any assets set aside, segregated, or otherwise specifically identified as being held for the purpose of satisfying Excluded Liabilities referred to in Section 2.4(e);

(p)      all real property leases of Seller and its Subsidiaries, and all rights and obligations appurtenant thereto, as set forth on Schedule 1.1(a), other than the Transferred Real Property Leases; and

(q)      Lehman Commercial Paper, Inc. and any assets thereof.

"Excluded Contracts" means all of the Contracts of Seller and its Subsidiaries, other than the Purchased Contracts.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or used by Seller and its Subsidiaries in the conduct of the Business, including all desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory, judicial or administrative, body thereof, or political subdivision thereof, whether foreign, federal, state, national, supranational or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private) or any self-regulatory organization, including, but not limited to, the Financial Industry Regulatory Authority.

"Hardware" means any and all computer and computer-related hardware, networks and peripherals, including, but not limited to, information and communication systems, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"IMD Business" means the investment management business of Seller and its Subsidiaries.

"Intellectual Property Rights"  means, collectively, all intellectual property and other similar proprietary rights in any jurisdiction, whether owned or held for use

4

i

under license, whether registered or unregistered, including without limitation such rights in and to: (i) patents and applications therefor, including continuations, divisionals, continuations-in-part, reissues, continuing patent applications, reexaminations, and extensions thereof, any counterparts claiming priority therefrom and patents issuing thereon (collectively, "Patents") and inventions, invention disclosures, discoveries and improvements, whether or not patentable, (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, slogans, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof and all common law rights thereto (collectively, "Marks"), (iii) copyrights and registrations and applications therefor and renewals and extensions thereof, and works of authorship, databases and mask work rights, and all moral rights (collectively, "Copyrights"), (iv) all Software, Technology, trade secrets and market and other data, and rights to limit the use or disclosure of any of the foregoing by any Person, and (v) all claims, causes of action and defenses relating to the enforcement of any of the foregoing.

"Intellectual Property Licenses" means (i) any grant to a third Person of any license, immunity, a covenant not to sue or otherwise any right to use or exploit, any of the Purchased Intellectual Property owned by Seller or any of its Subsidiaries, and (ii) any grant to Seller or its Subsidiaries of a license, immunity, a covenant not to sue or otherwise any right to use or exploit any Purchased Intellectual Property which is not owned by Seller or any of the Subsidiaries.

"Knowledge of Seller" means the knowledge after due inquiry, as of the date of this Agreement, of the senior officers and directors of Seller and its Subsidiaries.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation (including rules of any self-regulatory organization).

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings or investigations by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

i

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through September 14, 2008 consistent with past practice.

"Permits" means any approvals, authorizations, consents, licenses, permits, registrations or certificates of a Governmental Body.

"Permitted Exceptions" means all (i) defects, exceptions, restrictions, easements, rights of way and encumbrances of record, (ii) statutory liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; (v) title of a lessor under a capital or operating lease; (vi) Liens arising under the DIP Facility; and (vii) the terms and provisions of the ground lease and related documents affecting the property located at 745 Seventh Avenue, New York, NY (the "745 Seventh Ground Lease").

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Purchased Assets" means all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets), including:

(a)    the Retained Cash;

(b)    all deposits (including customer deposits, security deposits for rent, electricity, telephone or otherwise and required capital deposits) and prepaid charges and expenses of Seller and its Subsidiaries associated with the Business, other than any deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(c)    the Transferred Real Property Leases, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(d)    government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion (collectively, "Long Positions");

(e)    50% of each position in the residential real estate mortgage securities;

(f)    the Furniture and Equipment;

6

i

(g)      the Purchased Intellectual Property and all income, royalties, damages and payments due or payable at the Closing or thereafter relating to the Purchased Intellectual Property (including damages and payments for past or future infringements or misappropriations thereof), the right to sue and recover damages for past or future infringements or misappropriations thereof and the right to fully and entirely stand in the place of Seller in all matters related thereto;

(h)      the Purchased Contracts;

(i)      all Documents that are used in, held for use in or intended to be used in, or that arise in connection with, or are necessary to carry on or are related to the operation of the Business, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), account agreements, books and records required to be maintained in connection with the Business under applicable Law, compliance manuals, supervisory policies and procedures, customer lists, supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (d) above, but excluding (i) personnel files for Excluded Employees of Seller or its Subsidiaries who are not Transferred Employees, (ii) such files as may be required under applicable Law regarding privacy, (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) any Documents primarily related to any Excluded Assets;

(j)      all Permits used by Seller in the Business to the extent assignable under applicable Law;

(k)      all supplies owned by Seller and used in connection with the Business;

(l)      all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees, contractors and agents of Seller or its Subsidiaries or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(m)      rights to "Lehman" indices and analytics that support the indices and all other indices and analytics used in the Business;

(n)      general trading tools supporting the Business;

(o)      the stock of  Townsend Analytics and the stock, equity interests or assets of any other Subsidiary of LBI that the Seller and Purchaser may mutually agree on prior of the entry of the Sale Order and of which a notice has been provided to any statutory committee;

i

(p)    the equity interests or assets (at the election of Purchaser in its sole discretion prior to the entry of the Sale Order) of Eagle Energy Management LLC;

(q)    all past and present goodwill and other intangible assets associated with or symbolized by the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(r)    Mercantile Exchange license agreements with respect to 335 South LaSalle Street, Chicago, IL and 400 South LaSalle Street, Chicago, IL; and

(s)    any insurance proceeds from the occurrence after the date hereof and prior to Closing, of any casualty or event loss with respect to any Transferred Real Property Leases or any properties subject thereto.

"Purchased Contracts" means all Contracts designated as Purchased Contracts pursuant to Section 2.5.

"Purchased Intellectual Property" means the Purchased Marks and all other Intellectual Property Rights, Software and Technology throughout the world that are used in, related to, or otherwise necessary for the Business, including all Intellectual Property Rights embodied in or arising from the Purchased Assets.

"Purchased Marks" means the Mark "LEHMAN" and "LEHMAN BROTHERS" throughout the world, all other Marks throughout the world containing or incorporating the name "LEHMAN," the Internet domain name www.lehman.com, all other Internet domain names containing or incorporating any Purchased Marks, and any other Mark throughout the world that is used in, related to, or otherwise necessary for the Business; in each case, together with all of the goodwill associated therewith and all registrations and applications for the foregoing and all common law rights thereto.

"Sale Motion" means the motion or motions of Seller, in form and substance reasonably acceptable to Purchaser and Seller, seeking approval and entry of the Breakup Fee and Competing Bid Order and Sale Order.

"Sale Order" shall be an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Purchased Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens (other than Liens created by Purchaser and Permitted Exceptions) and claims, such Liens and claims to attach to the Purchase Price; (ii) Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall

i

retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 13.3 hereof; and (v) this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller or any chapter 7 or chapter 11 trustee of Seller.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies and application programming interfaces, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all software-related specifications documentation including user manuals and other training documentation related to any of the foregoing.

"Subsidiary" means any Person of which a majority of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by Seller.

"Tax Authority" means any state or local government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, business and marketing information, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, non-public or confidential information, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

9

i

"Transferred Real Property Leases" means the leases listed on Schedule 1.1(b) attached hereto and any rights and obligations appurtenant thereto.

1.2    Other Definitional and Interpretive Matters

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one schedule shall be deemed to have been disclosed on each other schedule.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

i

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing (as defined below), Purchaser shall purchase, acquire and accept from the Seller and 745, and Seller and 745 shall sell, transfer, assign, convey and deliver (or cause to be sold, transferred, assigned, conveyed and delivered) to Purchaser, all of Seller's and its applicable Subsidiaries' right, title and interest in, to and under the Purchased Assets free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code.

2.2     Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller (directly and indirectly) shall retain all right, title and interest to, in and under the Excluded Assets.

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the following  Liabilities of Seller and its Subsidiaries (collectively, the "Assumed Liabilities"):

(a)      all Liabilities of Seller incurred, after the Closing, in connection with the Business;

(b)      all Liabilities of Seller under the Purchased Contracts arising after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code;

(c)      all Liabilities assumed under Article IX;

(d)      accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business other than any accounts payable arising out of one in connection with any Excluded Contract (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable);

(e)      all Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement;

(f)      all other Liabilities to the extent related to the Business, the Purchased Assets or the Transferred Employees arising after the Closing;

11

i

(g)    all Liabilities under Transferred Real Property Leases from the date of Closing forward;

(h)    all Liabilities relating to amounts required to be paid by Purchaser hereunder; and

(i)    all short positions and "repos" relating to any securities or interests of the types included in the definition of "Long Positions" with a book value as of the date hereof of approximately $69 billion (collectively, "Short Positions" and, together with the Long Positions, "Positions").

2.4    Excluded Liabilities.  Notwithstanding anything herein to the contrary, Purchaser will not assume or be liable for any Excluded Liabilities.  "Excluded Liabilities" shall mean all Liabilities of Seller and its Subsidiaries to the extent they do not arise out of the Business and the following Liabilities:

(a)    all Liabilities arising out of Excluded Assets, including Contracts that are not Purchased Contracts;

(b)    except as otherwise provided in Article XII, all Liabilities for Taxes of Seller for any Tax periods (or portions thereof) ending on or before the Closing Date;

(c)    except as otherwise provided in this Agreement and other than any cure amounts that Purchaser is required to pay pursuant to Section 2.5, Liabilities incurred in the Ordinary Course of Business existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Case (the "Compromised Liabilities");

(d)    except as expressly assumed pursuant to Article IX hereof, any Liabilities relating to the employment, potential employment or termination of employment of any Person relating to or arising out of any period prior to the Closing, including without limitation any Liability under or relating to any employee benefit plan, program, agreement or arrangement, including in respect of equity compensation plans and tax-qualified or not tax-qualified pension or saving plans as to which the parties agree there shall be no transfer to or assumption of Liabilities by the Purchaser;

(e)    all Liabilities relating to amounts required to be paid by Seller, hereunder, including upon any breach;

(f)    all Liabilities under Excluded Real Property Leases and Transferred Real Property Leases other than Liabilities under Transferred Real Property Leases from the date of Closing forward; and

(g)    all intercompany payables.

12

i

    2.5    <u>Cure Amounts</u>. For a period of 60 days after the Closing, the Purchaser shall have the right upon notice to Seller to designate any contract related to the assets purchased from the Seller by Purchaser or its Affiliates (the "<u>Related Contracts</u>") as either (1) a Purchased Contract or (2) a Contract not designated as a Purchase Contract (a "<u>Rejected Contract</u>").  Until a Related Contract is so designated, Buyer shall be obligated to pay or cause to be paid ordinary course amounts due under such contracts in accordance with the terms thereof.  If a Related Contract is designated as a Purchased Contract, such Purchased Contract shall be assigned to the Purchaser and upon such assignment Purchaser shall be obligated to pay or cause to be paid the cure amount in respect of such Purchased Contract.  If a Related Contract is designated as a Rejected Contract, Purchaser shall have no further obligations in respect thereof.  In the event of any dispute relating to such cure amount, Purchaser shall escrow such funds in a manner satisfactory to the court. This Section will not apply to real property leases.

    2.6    <u>Further Conveyances and Assumptions</u>.

    (a)    From time to time following the Closing, Seller shall, or shall cause its Affiliates to, make available to Purchaser such data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

    (b)    From time to time following the Closing, without further consideration, Seller and Purchaser shall, and shall cause their respective Affiliates to, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, all such further conveyances, deeds, assignments, notices, assumptions, releases, acquaintances, powers of attorney and assurances (including any notarization, authentication, legalization and consularization of the signatures of Seller's and its Subsidiaries' representatives), and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents, and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

    (c)    If any third-party consent is required for the assignment of any Intellectual Property Licenses to Purchaser and such consent cannot be obtained, then, to the extent permitted by Applicable Law, Seller shall sublicense whatever rights they are permitted to sublicense under the respective Intellectual Property Licenses, provided such sublicense is at no cost to Seller.  If, however, Seller is permitted to sublicense only at a one time, fixed payment or an ongoing fee, Seller shall notify Purchaser thereof and, only if Purchaser agreed in writing to be responsible to such payment or fee, as applicable, Seller shall sublicense whatever rights it is permitted to sublicense under the respective Intellectual Property Licenses, subject to the payment or fee being paid by Purchaser.

13

i

2.7    Bulk Sales Laws.  Purchaser hereby waives compliance by Seller and its Subsidiaries with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

ARTICLE III

CONSIDERATION

3.1    Consideration.  The aggregate consideration for the Purchased Assets shall be (a) the Cash Amount and (b) the assumption of the Assumed Liabilities by Purchaser. The "Cash Amount" shall equal an amount in cash equal to the sum of (i) $250 million, (ii) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Lehman headquarters at 745 Seventh Avenue in New York City less a reasonable market commission that would be paid assuming a sale of such property as of the Closing, (iii) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Cranford New Jersey Data Center less a reasonable market commission that would be paid assuming a sale of such property as of the Closing, and (iv) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Piscataway New Jersey Data Center less a reasonable market commission that would be paid assuming a sale of such property as of the Closing.  For illustrative purposes only, the parties note that as of the date hereof they expect that the Cash Amount will be approximately $1.7 billion (less the aforementioned assumed commissions).

3.2    Payment of Cash Amount.  On the Closing Date, Purchaser shall pay the Cash Amount to Seller, which shall be paid by wire transfer of immediately available funds into an account designated by Seller.

3.3    Adjustment to Cash Amount.  Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof). Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss.  If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (a) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (b) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant to this Section 3.3).  For purposes of this Section 3.3, the time value of money shall be disregarded and no interest shall be deemed earned.

i

## ARTICLE IV

## CLOSING AND TERMINATION

4.1     <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in <u>Sections 10.1</u>, <u>10.2</u> and <u>10.3</u> hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> hereof (the "<u>Closing</u>") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York 10153 (or at such other place as the parties may designate in writing) at 10 a.m (New York time) on the day of, or at Purchaser's election the Business Day following, the satisfaction or waiver of the conditions set forth in <u>Article X</u> (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto.  The date on which the Closing shall be held is referred to in this Agreement as the "<u>Closing Date</u>."  Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the Closing Date.

4.2     <u>Deliveries by Seller</u>.  At the Closing, Seller shall deliver to Purchaser:

(a)     a duly executed, reasonably customary bill of sale in the form of <u>Exhibit A</u> hereto;

(b)     duly executed, reasonably customary assignment and assumption agreements (including, with respect to the 745 Seventh ground lease, all assignments that were entered into in connection with Seller's acquisition of such lease) and duly executed assignments of the U.S. and Canadian trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. and Canadian trademark office, and general assignments of all other Purchased Intellectual Property;

(c)     a certificate, duly executed by Seller, that Seller is not a "foreign person" within the meaning of Section 1445 of the Code;

(d)     duly executed Seller Sublease and Purchaser Subleases; and

(e)     all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser or as Purchaser may reasonably request, including such instruments of conveyance and transfer in form and substance comparable to the instruments of conveyance and transfer exchanged in connection with Seller's acquisition of the 745 Seventh Ground Lease.

15

i

4.3     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Seller:

(a)     the Purchase Price, in immediately available funds, as set forth in Section 3.2 hereof;

(b)     a duly executed, reasonably customary assignment and assumption agreement; and

(c)     duly executed Purchaser Subleases and Seller Sublease.

4.4     Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)     by Purchaser or Seller, if the Closing shall not have occurred by the close of business on September 24, 2008 (the "Termination Date");

(b)     by mutual written consent of Seller and Purchaser;

(c)     by Seller or Purchaser if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence);

(d)     by Purchaser upon the entry of an order by the Bankruptcy Court authorizing a Competing Transaction; or

(e)     by Purchaser if the Breakup Fee and Competing Bid Order is not approved by the Bankruptcy Court in the form attached hereto as Exhibit A.

4.5     Procedure Upon Termination.  In the event of termination and abandonment by Purchaser or Seller, or both, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Seller.  If this Agreement is terminated as provided herein each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6     Effect of Termination.

(a)     In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Seller; provided, however, that the obligations of the parties set

16

i

forth in <u>Sections 4.6 and 8.6</u> and <u>Article XIII</u> hereof shall survive any such termination and shall be enforceable hereunder.

(b) Nothing in this <u>Section 4.6</u> shall relieve Purchaser or Seller of any liability for a material breach of this Agreement prior to the date of termination, The damages recoverable by the non-breaching party shall include all attorneys' fees reasonably incurred by such party in connection with the transactions contemplated hereby.

(c) The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this <u>Section 4.6</u> shall relieve Purchaser or Seller of their obligations under the Confidentiality Agreement; <u>provided</u>, that upon the termination of this Agreement, the non-solicitation obligations of Purchaser and its Affiliates under the Confidentiality Agreement shall be of no further force and effect; <u>provided</u> further that upon the Closing, the non-solicitation obligation of Purchaser and its Affiliates under the Confidentiality Agreement with respect to non-U.S. employees of the broker-dealer and investment banking business shall be of no further force and effect.

(d) In the event that Purchaser terminates this Agreement pursuant to <u>Section 4.4(d)</u>, Sellers shall pay to Purchaser (i) the Break-Up Fee promptly upon such termination and (ii) the Expense Reimbursement as provided in the Breakup Fee and Competing Bid Order.

(e) In the event that Purchaser or Seller terminates this Agreement pursuant to <u>Section 4.4(a)</u> and at any time after the date of this Agreement and prior to such termination a bona fide proposal for a Competing Transaction shall have been publicly disclosed or otherwise communicated to the Sellers and shall not have been irrevocably withdrawn, then if a Qualified Bid shall be consummated within twelve months after such termination Sellers shall pay to Purchaser (i) the Break-Up Fee and (ii) the Expense Reimbursement as provided in the Breakup Fee and Competing Bid Order on the date of such consummation.

(f) The parties hereto acknowledge that the agreements contained in this <u>Section 4.6</u> are an integral part of the transactions contemplated by this Agreement. The Sellers shall be jointly and severally liable for any amount due to Purchaser pursuant to this <u>Section 4.6</u>. In the event that the Sellers shall fail to pay any amounts due pursuant to this <u>Section 4.6</u>, the Sellers shall reimburse Purchaser for all reasonable costs and expenses actually incurred or accrued by Purchaser (including reasonable fees and expenses of counsel) in connection with the collection under and enforcement of this <u>Section 4.6</u>.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF SELLER

17

i

Seller hereby represents and warrants to Purchaser that:

     5.1    <u>Organization and Good Standing</u>.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Seller is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not have a material adverse effect.

     5.2    <u>Authorization of Agreement</u>.  Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for), Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the transactions contemplated by this Agreement (the "<u>Seller Documents</u>"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller.  This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by Seller which is a party thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Sale Order, and, with respect to Seller's obligations under <u>Section 4.4</u>, the entry of the Breakup Fee and Competing Bid Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller or, as the case may be, its Subsidiary in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

     5.3    <u>Conflicts; Consents of Third Parties</u>.

     (a)    None of the execution and delivery by Seller of this Agreement or by Seller and its Subsidiaries of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller and its Subsidiaries with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Seller or any Subsidiary; (ii) subject

18

i

to entry of the Sale Order, any Order of any Governmental Body applicable to Seller or any of the properties or assets of Seller as of the date hereof; other than, in the case of clause (ii), such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller or any Subsidiary in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by Seller or any Subsidiary with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller or any Subsidiary of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Sale Order, (iii) the entry of the Breakup Fee and Competing Bid Order with respect to Seller's obligations under Section 4.6, (iv) filings of applications and notices with, and receipt of consents, authorizations, approvals, exemptions or non-objections from, the Securities and Exchange Commission (the "SEC"), foreign and state securities authorities, the Financial Industry Regulatory Authority ("FINRA"), the Commodity Futures Trading Commission ("CFTC"), National Futures Association ("NFA") applicable securities, commodities and futures exchanges, the Financial Services Authority ("FSA") and other industry self-regulatory organizations ("SRO"), (v) the filing of any other required applications, filings or notices with the Board of Governors of the Federal Reserve System (the "Federal Reserve"), any foreign, federal or state banking, other regulatory, self-regulatory or enforcement authorities or any courts, administrative agencies or commissions or other governmental authorities or instrumentalities, and (vi) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not have a material adverse effect.

5.4     Title to Purchased Assets.  Other than the real property subject to the Transferred Real Property Leases, intellectual property licensed to Seller and the personal property subject to personal property leases, Seller owns (directly or indirectly) each of the Purchased Assets, and Purchaser will be vested with good and exclusive title to such Purchased Assets, free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.  The Purchased Assets, together with all of Seller's agreements hereunder and under the Seller Documents, constitute all of the necessary assets and services used by Seller and its Affiliates to operate the Business as it is currently operated.

5.5     Compliance with Laws; Permits.

(a)     Seller and its Subsidiaries, and their respective personnel, are in compliance with all Laws applicable to their respective operations or assets or the Business, except where the failure to be in compliance would not have a material adverse effect.  Neither Seller nor any of its Subsidiaries has received any written notice of or been charged with the violation of any Laws applicable to their respective operations or

i

assets or the Business, except where such violation would not have a material adverse effect.

(b)    Seller and its Subsidiaries currently have all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not have a material adverse effect. Neither Seller nor any of its Subsidiaries is in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party required for the operation of the Business as presently conducted, except where such default or violation would not be material.

5.6    No Other Representations or Warranties; Schedules. Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), neither Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, its Subsidiaries, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective officers, directors, employees, agents or representatives. Except for the representations and warranties contained in Article V hereof (as modified by the Schedules hereto), Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business. The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a material adverse effect.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1    Organization and Good Standing. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

20

i

6.2    Authorization of Agreement. Purchaser has full corporate power and
authority to execute and deliver this Agreement and each other agreement, document,
instrument or certificate contemplated by this Agreement or to be executed by Purchaser
in connection with the consummation of the transactions contemplated hereby and
thereby (the "Purchaser Documents"), and to consummate the transactions contemplated
hereby and thereby. The execution, delivery and performance by Purchaser of this
Agreement and each Purchaser Document have been duly authorized by all necessary
corporate action on behalf of Purchaser. This Agreement has been, and each Purchaser
Document will be at or prior to the Closing, duly executed and delivered by Purchaser
and (assuming the due authorization, execution and delivery by the other parties hereto
and thereto) this Agreement constitutes, and each Purchaser Document when so executed
and delivered will constitute, the legal, valid and binding obligations of Purchaser,
enforceable against Purchaser in accordance with their respective terms, subject to
applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting
creditors' rights and remedies generally, and subject, as to enforceability, to general
principles of equity, including principles of commercial reasonableness, good faith and
fair dealing (regardless of whether enforcement is sought in a proceeding at law or in
equity).

6.3    Conflicts; Consents of Third Parties.

(a)    None of the execution and delivery by Purchaser of this Agreement
or the Purchaser Documents, the consummation of the transactions contemplated hereby
or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof
will conflict with, or result in any violation of or default (with or without notice or lapse
of time, or both) under, or give rise to a right of termination or cancellation under any
provision of (i) the certificate of incorporation and by-laws of Purchaser, (ii) any
Contract or Permit to which Purchaser is a party or by which Purchaser or its properties
or assets are bound, (iii) any Order of any Governmental Body applicable to Purchaser or
by which any of the properties or assets of Purchaser are bound or (iv) any applicable
Law.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or
declaration or filing with, or notification to, any Person or Governmental Body is
required on the part of Purchaser in connection with the execution and delivery of this
Agreement or the Purchaser Documents, the compliance by Purchaser with any of the
provisions hereof or thereof, the consummation of the transactions contemplated hereby
or thereby or the taking by Purchaser of any other action contemplated hereby or thereby,
or for Purchaser to conduct the Business, except for compliance with the regulatory
regimes referred to in Section 5.3(b) or as would not have a material adverse effect.

6.4    Financial Capability. Purchaser (i) has, and at the Closing will have,
sufficient internal funds) available to pay the Cash Amount and any expenses incurred by
Purchaser in connection with the transactions contemplated by this Agreement, (ii) has,
and at the Closing will have, the resources and capabilities (financial or otherwise) to

21

i

perform its obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

      6.5    <u>Condition of the Business</u>.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in <u>Article V</u> hereof (as modified by the Schedules hereto as supplemented or amended), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis.  Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Seller set forth in <u>Article V</u> hereof (as modified by the Schedules hereto as supplemented or amended).  Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller or any of its Subsidiaries, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of Seller, any of its Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Business and the transactions contemplated hereby.  Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied on the results of its own independent investigation.

ARTICLE VII

BANKRUPTCY COURT MATTERS

      7.1    [Reserved]

      7.2    <u>Bankruptcy Court Filings</u>.  As promptly as practicable following the execution of this Agreement, Seller shall file with the Bankruptcy Court the Sale Motion seeking entry of the Sale Order and the Breakup Fee and Competing Bid Order.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Breakup Fee and Competing Bid Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Purchaser shall

22

i

not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Assets hereunder.  In the event the entry of the Sale Order or the Breakup Fee and Competing Bid Order shall be appealed, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal.

## ARTICLE VIII

## COVENANTS

8.1    <u>Access to Information</u>.  Seller agrees that, until the earlier of the Closing and termination of this Agreement, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. Seller shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Seller and its Subsidiaries to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Seller and its representatives and shall use their reasonable efforts to minimize any disruption to the Business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller or any of its Subsidiaries to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Seller or any of its Subsidiaries is bound.

8.2    <u>Conduct of the Business Pending the Closing</u>.  In order to attempt to preserve the going concern value of the Business, Purchaser shall have the right to be on-site and shall coordinate and consult with representatives of Seller regarding the business, operations and management of the Business   In addition, until the earlier of the Closing and termination of this Agreement, except (1) as required by applicable Law, (2) as otherwise expressly contemplated by this Agreement, or (3) with the prior written consent of Purchaser:

(a)    Seller shall, and shall use its best efforts to cause its Subsidiaries whose equity or assets constitute Purchased Assets to:

(i)    conduct the Business only in the Ordinary Course of Business (recognizing its current distressed state); and

(ii)    use its commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B)

23

i

preserve the present relationships with customers and suppliers of the Business and Seller's Subsidiaries (recognizing that Seller reserves the right to cause any of its Subsidiaries, other than a Subsidiary the equity or assets of which constitutes a Purchased Asset, to commence a proceeding under the Bankruptcy Code or other applicable state or foreign law); and

(b)     Seller shall not, and shall not permit its Subsidiaries whose equity or assets constitute Purchased Assets to, solely as it relates to the Business:

(i)     other than in the Ordinary Course of Business, (A) materially increase the annual level of compensation of any director or executive officer of Seller, (B) increase the annual level of compensation payable or to become payable by Seller or any of its Subsidiaries to any such director or executive officer, (C) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any such director or executive officer, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which Seller or any of its Subsidiaries is a party or involving any such director or executive officer, except, in each case, as required by applicable Law from time to time in effect or by any existing employee benefit plans;

(ii)     make or rescind any material election relating to Taxes, settle or compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or except as may be required by applicable Law or GAAP, make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recent tax returns;

(iii)     subject any of the Purchased Assets to any Lien, except for Permitted Exceptions;

(iv)     cancel or compromise any material debt or claim or waive or release any material right of Seller or any of its Subsidiaries that constitutes a Purchased Asset except in the Ordinary Course of Business;

(v)     [Reserved];

(vi)     enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(vii)     other than (A) in the Ordinary Course of Business or (B) secured borrowings from the Federal Reserve Bank under the Primary Dealer Facility, incur any indebtedness for borrowed money, issue any debt securities,

24

i

assume, guarantee, endorse or otherwise become responsible for the obligations of any other individual, corporation or other entity, or make any loan or advance or capital contribution to, or investment in, any person, in any case that would be related to the Business or constitute an Assumed Liability;

(viii)    set any record date or payment date for the payment of any dividends on its capital stock or make, declare or pay any dividend, or make any other distribution on, or directly or indirectly redeem, purchase or otherwise acquire, any shares of its capital stock or any securities or obligations convertible (whether currently convertible or convertible only after the passage of time or the occurrence of certain events) into or exchangeable for any shares of its capital stock;

(ix)    sell, transfer, pledge, lease, license, mortgage, encumber or otherwise dispose of any of Purchased Assets (including pursuant to securitizations) to any individual, corporation or other entity or cancel, release or assign any material amount of indebtedness related to the Business to any such person or any claims held by any such person, other than any such transactions as are in the Ordinary Course of Business;

(x)    transfer ownership, or grant any license or other rights, to any person or entity of or in respect of any Purchased Intellectual Property, other than grants of non-exclusive licenses pursuant to license agreements entered into in the Ordinary Course of Business;

(xi)    in connection with the Business, make any investment in, or any acquisition of, any business entity or division, by merger, consolidation, asset purchase or other business combination, or by contributions to capital; or make any property transfers or purchases of any property or assets, in or from any other individual, corporation, joint venture or other entity;

(xii)    in connection with the Business, conduct its operations or take actions related to trading or credit extension in any manner other than in the Ordinary Course of Business;

(xiii)    change in any material respect the policies, practices and procedures governing operations of the Business;

(xiv)    amend or otherwise modify, except in the Ordinary Course of Business, or knowingly violate in any material respect the terms of, any Purchased Contract, or (ii) except as may be required by applicable Law, create or renew any agreement or contract or other binding obligation related to the Business containing (A) any material restriction on the ability of Purchaser to conduct the Business as it is presently being conducted or (B) any material

25

i

restriction on the ability of Purchaser to engage in any type of activity or business after the Closing;

(xv)     abandon, cancel, let lapse, fail to renew, fail to continue to prosecute, protect, or defend, or dispose of, any Purchased Intellectual Property;

(xvi)    commence or settle any claim, action or proceeding related to the Business, other than settlements resulting solely in the payment of monetary damages in amounts not in excess of $500,000 in the aggregate; or

(xvii)   agree to do anything prohibited by this Section 8.2.

8.3     Consents.  Seller shall use (and shall cause each of its Subsidiaries to use) its commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in Section 5.3(b) hereof; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.

8.4     Regulatory Approvals.

(a)     If necessary, Purchaser and Seller shall (a) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or subsidiaries, as applicable, or Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within 1 Business Day after the date of this Agreement, (b) comply at the earliest practicable date with any request under such Laws for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries or subsidiaries, as applicable, from any other Governmental Body in respect of such filings or such transactions, and (c) cooperate with each other in connection with any such filing and in connection with resolving any investigation or other inquiry of any Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction. Each such party shall use best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable law in connection with the transactions contemplated by this Agreement.  Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction.  No party hereto shall independently participate in any formal meeting with any Governmental Body (other than Purchaser solely with respect to a Governmental Body in the United Kingdom) in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.  Subject to applicable law, the parties hereto will consult and cooperate with

26

i

one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws.  Seller and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this <u>Section 8.4</u> as "outside counsel only."  Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Purchaser, as the case may be).

(b)     Each of Purchaser and Seller shall use its best efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "<u>Antitrust Laws</u>").  In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement is in violation of any Antitrust Law, each of Purchaser and Seller shall cooperate and use its best efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Seller decide that litigation is not in their respective best interests.

8.5     <u>Further Assurances</u>.

(a)     Each of Seller and Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

i

(b)    In the event that, for any reason including a determination by a court of competent jurisdiction that any sale, transfer, assignment, conveyance or delivery contemplated by this Agreement is ineffective or invalid to vest or confirm such title, any conveyance, assignment, assumption, allocation or other action is necessary or appropriate to vest in or confirm to Purchaser full title to any of the Purchased Assets vested in Purchaser pursuant to Section 2.1, or to cause Purchaser to assume any Liabilities allocated to Purchaser pursuant to Section 2.3, then Seller shall, and shall cause its Subsidiaries to, execute and deliver all such instruments and take all such actions necessary in order to convey, assign or allocate such Purchased Assets or Liabilities to Purchaser.

8.6    Confidentiality.

(a)    Purchaser acknowledges that the Confidential Information provided to it in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby, is subject to the terms of the confidentiality agreement between Purchaser and Seller dated September 11, 2008 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets; provided, however, that Purchaser acknowledges that any and all other Confidential Information provided to it by Seller or its representatives concerning Seller and its Subsidiaries shall, other than Purchased Assets, remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. For purposes of this Section 8.6, "Confidential Information" shall mean any confidential information with respect to, including, methods of operation, customers, customer lists, products, prices, fees, costs, Technology, inventions, Trade Secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.

(b)    From and after the Closing, Seller shall, and shall cause its Subsidiaries to, use the same efforts to maintain the confidentiality of any proprietary or confidential information regarding the Purchased Intellectual Property as Seller and/or its Subsidiaries used to maintain the confidentiality of such information prior to the Closing.

8.7    Preservation of Records. Seller and Purchaser agree that each of them shall preserve and keep the records held by it or their Affiliates relating to the Business for a period of seven (7) years from the Closing Date (or such longer period as may be required by applicable Law) and shall make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Seller or Purchaser wishes to destroy such records before or after that time (and such

28

i

proposed destruction is not in violation of applicable Law), such party shall first give
ninety (90) days prior written notice to the other and such other party shall have the right
at its option and expense, upon prior written notice given to such party within such ninety
(90) day period, to take possession of the records within one hundred and eighty (180)
days after the date of such notice.

8.8    Publicity.  Neither Seller nor Purchaser shall issue any press release or
public announcement concerning this Agreement or the transactions contemplated hereby
without obtaining the prior written approval of the other party hereto, which approval will
not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or
Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court
with respect to filings to be made with the Bankruptcy Court in connection with this
Agreement or by the applicable rules of any stock exchange on which Purchaser or Seller
lists securities, provided that the party intending to make such release shall use its best
efforts consistent with such applicable Law or Bankruptcy Court requirement to consult
with the other party with respect to the text thereof.

8.9    Trademark License.

(a)    From and after the closing Purchaser hereby grants Seller a
perpetual, worldwide, nonexclusive, full paid, royalty-free license under the trademarks
"LEHMAN" and "LEHMAN BROTHERS," including any logos containing such names
(collectively, the "Licensed Marks") for any of its existing uses or in connection with the
IMD Business and the unwinding of any of its other operations including use in corporate
or other entity names. The foregoing license as it relates to the IMD Business shall be
assignable by Seller without the need for further consent to a purchaser of all or
substantially all of the equity interests in or assets of the IMD Business. Seller shall have the
right to sublicense the foregoing license to any of its Subsidiaries and an assignee in
connection with a sale of all or substantially all of the IMD Business shall have a right to
sublicense such right to any of its Affiliates in connection with the conduct of that
business, provided that any such sublicense shall terminate on the date when Seller's or
its assignee's license terminates. In the remainder of this provision, the licensee or
sublicense (Seller or Seller's assignee or their sublicensees) shall be referred to as
"Licensee." Each Licensee acknowledges Purchaser's ownership of the Licensed Marks
and the validity of the Licensed Marks and shall not register any confusingly similar
mark in any jurisdiction. All goodwill arising from use of the Licensed Marks shall inure
to Purchaser's benefit. Each Licensee shall use each Licensed Mark in connection with
any markings or other notices as required by law. Purchaser shall have the right to
supervise and control  the use of the Licensed Marks by each Licensee, including by
reviewing specimens of use of the Licensed Marks, with respect to the nature and quality
of the products and services designed, performed, distributed, sold or otherwise
commercialized by such Licensee and the materials used to promote such products and
services for the purpose of protecting and maintaining the validity of the Licensed Marks
and the goodwill associated with the Licensed Marks.  Each Licensee shall at all times
use the Licensed Marks only in connection with goods and services of quality at least as

29

i

high as that offered by Seller and its Affiliates under such marks immediately prior to the Closing. Any use of the Licensed Marks in connection with the IMD Business shall include a disclaimer in a form reasonably acceptable to Purchaser indicating that the IMD Business is not affiliated with Seller. Seller or its assignee shall be responsible for each Licensee's compliance with the terms of this Section 8.9 and shall be liable to Purchaser for any non-compliance by any such Licensee with any such terms.

(b)    Purchaser hereby grants to Seller a perpetual, irrevocable, worldwide, nonexclusive, fully-paid, royalty-free license under all non-Mark Purchased Intellectual Property used in or covering any business of the Seller andor its Affiliates other than the Business in the fields of investment management, investment research, portfolio management and other fields of the IMD Business as well as the unwinding of any of Seller's other operations, solely for use in connection with such business outside of the Business. The foregoing license as it relates to the IMD Business shall be assignable without the requirement of further consent by Seller in connection with a sale of all or substantially all of the assets of the IMD Business and may be sublicensed to any entity conducting the IMD Business and any successor of the IMD Business and any contractor providing services to such business or successor. The foregoing license shall be under Purchased Intellectual Property acquired by Purchaser hereunder that was previously owned by Seller or its Affiliates as well as Purchased Intellectual Property owned by third parties as to which Purchaser shall have after Closing has the right to grant a sublicense without requirement of additional consent or payment of additional consideration.

8.10    Use of Purchased Intellectual Property.  Except as permitted under subsection 8.9 above, after the Closing Date, neither the Seller nor any of its Subsidiaries will, directly or indirectly, in any jurisdiction: (i) exploit or make use of, or authorize any third party to exploit or make use of, any of the Purchased Intellectual Property, or any Marks confusingly similar to the Purchased Marks; (ii) attempt to register the Purchased Marks or any mark confusingly similar thereto; or (iii) challenge or otherwise contest the Purchaser's efforts to register, or enforce its trademark registrations for and trademark rights in, the Purchased Marks or its rights in other Purchased Intellectual Property.

8.11    Deferred Transfers.

30

i

(a)     If and to the extent that the allocation to and vesting in Purchaser of any Purchased Assets pursuant to <u>Section 2.1</u> or otherwise would be a violation of applicable Law or require any Consent or the approval of any Governmental Body or the fulfillment of any condition that cannot be fulfilled by the Purchaser prior to the Closing then, unless the Parties shall otherwise agree, the allocation to and vesting in Purchaser of such Purchased Asset shall, without any further action by any Party, be automatically deferred and any allocation or vesting of such Purchased Asset pursuant to <u>Section 2.1</u> or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such Consents or approvals of Governmental Bodies are obtained, and such conditions are fulfilled.  Any such Purchased Asset shall be deemed a "<u>Deferred Transfer Purchased Asset</u>."

(b)     If and to the extent that the allocation to Purchaser of, and Purchaser's becoming responsible for, any Assumed Liabilities pursuant to <u>Section 2.3</u> or otherwise would be a violation of applicable Law or require any Consent or approval of any Governmental Body or the fulfillment of any condition that cannot be fulfilled by Seller prior to the Closing, then, unless the Parties shall otherwise agree, the allocation to Purchaser of, and Purchaser's becoming responsible for, such Assumed Liability shall, without any further action by any Party, be automatically deferred and any allocation or responsibility for such Assumed Liability pursuant to <u>Section 2.3</u> or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such Consents or approvals of Governmental Bodies are obtained, and such conditions are fulfilled.  Any such Assumed Liability shall be deemed a "<u>Deferred Transfer Assumed Liability</u>."

(c)     With respect to any Deferred Transfer Purchased Asset or any Deferred Transfer Assumed Liability, insofar as it is reasonably possible, (i) Seller shall, and shall cause any applicable Subsidiary to, following the Closing, hold such Deferred Transfer Purchased Asset for the use and benefit of Purchaser and its Subsidiaries (at the expense of Purchaser) and (ii) Purchaser shall, or shall cause its applicable Subsidiary to, pay or reimburse Seller for all amounts paid or incurred in connection with the retention of such Deferred Transfer Assumed Liability.  In addition, Seller shall, and shall cause any applicable Subsidiary to, insofar as reasonably possible and to the extent permitted by applicable Law, hold and treat such Deferred Transfer Purchased Asset in the Ordinary Course of Business in accordance with past practice and take such other actions as may be reasonably requested by Purchaser in order to place Purchaser, insofar as permissible under applicable Law and reasonably possible, in the same position as if such Deferred Transfer Purchased Asset had been transferred to and vested in Purchaser or an applicable Subsidiary at the Closing and so that, to the extent possible, all the benefits and burdens relating to such Deferred Transfer Purchased Asset, including possession, use, risk of loss, potential for gain, and dominion, control and command over such Deferred Transfer Purchased Asset, are to inure from and after the Closing to Purchaser or its applicable Subsidiary entitled to the receipt of such Deferred Transfer Purchased Asset.

31

i

(d)      If and when the Consents, approvals of Governmental Bodies and/or conditions, the absence or non-satisfaction of which caused the deferral or transfer of any Deferred Transfer Purchased Asset or Deferred Transfer Assumed Liability pursuant to Section 8.12(a), are obtained or satisfied, the transfer, allocation or novation of the applicable Deferred Transfer Purchased Asset or Deferred Transfer Assumed Liability shall be effected in accordance with and subject to the terms of this Agreement.

(e)      Seller shall not be obligated, in connection with the foregoing, to expend any money unless the necessary funds are advanced, assumed or agreed in advance to be reimbursed by Purchaser, other than reasonable attorney's fees and recording or similar fees, all of which shall be promptly reimbursed by Purchaser.

(f)      For a period of nine months after the Closing Date, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, to the extent Excluded Employees occupied real property subject to a Transferred Real Property Lease prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such real property to the same extent and for the same purposes as such real property was occupied and used by such Excluded Employees prior to the Closing, without charge or consideration.

(g)      For a period of nine months after the Closing Date, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises,  after the Closing, to the extent Transferred Employees occupied real property is not subject to a Transferred Real Property Lease prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use such real property to the same extent and for the same purposes as such real property was occupied and used by such Transferred Employees prior to the Closing, without charge or consideration.

8.12    Release of Guarantees.  Purchaser shall deliver to the respective beneficiaries of any and all guarantees relating to or arising under any Purchased Contracts, Transferred Real Property Leases or Assumed Liabilities ("Seller Guarantees") such replacement guarantees from Purchaser and its Affiliates, letters of credit, collateral, or other credit support, as shall be required pursuant and in accordance with any Purchased Contract, Transferred Real Property Leases or Assumed Liability.  In the event that the respective beneficiaries under any of the Seller Guarantees do not agree to release (the "Guarantee Release") Seller and its Subsidiaries from any and all liability arising thereunder after theClosing, prior to the Closing, then Purchaser shall cause to be delivered to Seller, as beneficiary, at the Closing an indemnification agreement and guarantee, dated and effective as of the Closing Date and in form and substance reasonably satisfactory to Seller and from a creditworthy obligor as shall be satisfactory to Seller (collectively, "Backstop Documents"), pursuant to which Seller and its Affiliates shall, from and after the Closing, be indemnified, reimbursed and held harmless from any and all liabilities, losses, claims, costs and expenses under or arising out of the

i

relevant Seller Guarantee. From and after the Closing, Purchaser shall not permit any Contract to which a Seller Guarantee relates to be renewed, extended, amended or modified unless the Purchaser obtains and delivers to Seller the related Guarantee Release duly executed by the beneficiaries of the related Seller Guarantee.

8.13    Transition Services. The Purchaser and Seller shall use commercially reasonable efforts to enter into a Transition Services Agreement in a form reasonably acceptable to Seller and Purchaser in order for each of Seller and Purchaser to continue to receive the services provided between LBI and LBHI on the Closing Date.

8.14    Subleases.

(a)    For the leased premises located in 555 California Street, San Francisco, CA, Seller shall sublet to Purchaser pursuant to a sublease agreement (the "Seller Sublease"), reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, a portion of the demised premises in such location subject to the terms of the applicable lease and obtaining the landlord's consent to the Sublease or Bankruptcy Court approval. Purchaser shall bear its portion of the occupancy cost for such location based on the relative square footage sublet. Seller and Purchaser shall enter into the Seller Sublease at Closing to memorialize the provisions of this Section.

(b)    For the leased premises located in 125 High Street, Boston, MA, 190 S. LaSalle Street, Chicago, IL and 10250 Constellation Boulevard, Los Angeles, CA Seller shall assume such leases in connection with Seller's bankruptcy proceedings and assign such leases to Purchaser. Purchaser shall then sublet to Seller or a designee of Seller, in either event with credit reasonably acceptable to Purchaser, pursuant to three separate subleases (each, a "Purchaser Sublease", collectively the "Purchaser Sublease"), reasonably acceptable to both Purchaser and Seller and subject in all cases to the terms of the underlying lease, a portion of the demised premises in such locations shall be subject to obtaining the landlord's consent to each Sublease or Bankruptcy Court approval. Seller shall bear its portion of the occupancy cost for each such location based on the relative square footage sublet. Seller and Purchaser shall enter into each Sublease at Closing to memorialize the provisions of this Section.

8.15    Landlord Notice. Seller shall give notice, on the date hereof , to Rock-Forty-Ninth LLC in accordance with the terms of the 745 Seventh Ground Lease, regarding the transactions contemplated hereunder and shall provide Rock-Forty-Ninth LLC with the appropriate bankruptcy filings in order to provide adequate notice thereof under applicable Law.

8.16    Artwork. Purchaser shall have the right to possess, for a period of one-year after the closing, all of the artwork at the Seller's headquarters located at 745 Seventh Avenue, New York, New York. At any time during such period, Purchaser shall have the option to purchase any or all of the artwork for a price equal to its appraised value (as

i

determined by an independent, recognized appraiser). To the extent Purchaser does not exercise such option on any or all of the artwork by the first anniversary of the Closing, the Purchaser shall return such artwork to the Seller.

ARTICLE IX

EMPLOYEES AND EMPLOYEE BENEFITS

9.1    <u>Employee Benefits.</u>

(a)    Effective as of the Closing Date, Purchaser shall, or shall cause one of Purchaser's Subsidiaries to, continue to employ (where employment continues or is transferred to Purchaser or a Subsidiary of Purchaser automatically by operation of Law), or offer employment to (where employment does not continue or transfer automatically by operation of Law), each Offeree.  For purposes of this Agreement, the term "<u>Offeree</u>" means each active employee employed primarily in connection with the Business at the Closing, other than such employees who are identified by Purchaser to Seller prior to Closing, such identified persons shall not include any person who is in the targeted population referred to in <u>Section 10.1(b)</u>.  Each Offeree who accepts Purchaser's or one of its subsidiaries' offer of employment, together with each person whose employment transfers to Purchaser or a subsidiary of Purchaser automatically by operation of law, shall be referred to herein as a "<u>Transferred Employee</u>."  Each Person who is not a Transferred Employee shall be referred to herein as an "<u>Excluded Employee</u>".  An Offeree who performs work at his then applicable place of employment on the first Business Day immediately following the Closing shall be deemed for all purposes of this Agreement to have accepted Purchaser's or one of its subsidiaries' offer of employment and shall be deemed to be a Transferred Employee for all purposes of this Agreement.

(b)    Without limiting any additional rights that each Transferred Employee may have, Purchaser shall, or shall cause its Subsidiaries, for a period commencing at the Closing and ending on December 31, 2008, to provide to each Transferred Employee whose employment is terminated during such period by the Purchaser by reason of a "reduction in force" or a "job elimination" (as those terms are customarily applied in good faith, consistent with past practice) severance payments and benefits at levels that are no less favorable than such levels as the Transferred Employee would have been entitled to receive pursuant to the provisions of the Seller's severance plans or agreements covering such Transferred Employee as in effect immediately prior to the Closing.  Nothing contained in this <u>Section 9.1</u> or elsewhere in the Agreement shall be construed to prevent, from and after the Closing, the termination of employment of any individual Transferred Employee or any change in the employee benefits available to any Transferred Employee.

34

i

(c)     On or after the Closing, Purchaser shall, or shall cause its
Subsidiaries to, pay each Transferred Employee an annual bonus ("08 Annual Bonuses"),
in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100
percent of the bonus pool amounts accrued in respect of amounts payable for incentive
compensation (but not base salary) and reflected on the financial schedule delivered to
Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and
Purchaser (the "Accrued 08 FY Liability"). Such 08 Annual Bonuses shall be awarded
on or before March 15, 2009 in such forms and proportions as are consistent with
Purchaser's customary practices, so that the aggregate amount awarded shall equal the
Accrued 08 FY Liability. Any amounts that would have been allocated in respect of any
Transferred Employee who voluntarily terminates employment before such award is
made shall instead be allocated among the remaining Transferred Employees (who
include, for this purpose, those Transferred Employees who are terminated without cause
by Purchaser or its affiliates prior to the time the awards are made) (collectively, the
"Remaining Transferred Employees"). However, the Accrued 08 FY Liability shall be
reduced if, prior to the time such awards are made, both (x) 10% of the Transferred
Employees have voluntarily terminated their employment with the Purchaser and (y) such
terminated Transferred Employees would have been expected to receive at least 10% of
the 08 Annual Bonuses had no such Transferred Employee's employment in fact
terminated. In that case, Purchaser may adjust the Accrued 08 FY Liability
proportionately from its initial level, in the same proportion as the reduction in
Transferred Employees below 90% of the initial number of Transferred Employees
compared to 90% of the initial number of Transferred Employees, in a good faith and
reasonably equitable manner to account for the Transferred Employees to whom 08
Annual Bonuses will not be payable, and thereby to reduce the aggregate 08 Annual
Bonuses. Any such reduction shall take into account the length of service, seniority
within the Business and contribution of the Remaining Transferred Employees, relative to
the allocation of the Accrued 08 FY Liability, in accordance with the principles
enumerated herein.

ARTICLE X

CONDITIONS TO CLOSING

10.1     Conditions Precedent to Obligations of Purchaser. The obligation of
Purchaser to consummate the transactions contemplated by this Agreement is subject to
the fulfillment, on or prior to the Closing Date, of each of the following conditions (any
or all of which may be waived by Purchaser in whole or in part to the extent permitted by
applicable Law):

(a)     Seller shall have performed and complied in all material respects
with all obligations and agreements required in this Agreement to be performed or
complied with by it prior to the Closing Date, and Purchaser shall have received a
certificate signed by an authorized officer of Seller, dated the Closing Date, to the
forgoing effect;

35

i

(b)    at least 70% of the U.S. and Canadian Persons identified by Seller and reasonably accepted by Purchaser, acting in good faith, not later than two Business Days after the date hereof as the targeted population are actively employed in the Business immediately prior to the Closing and as to whom management of Seller has made a good faith assessment that they will continue in employment with the Business as of the Closing Date;

(c)    the Bankruptcy Court shall have entered a final order permitting Seller to sell the premises at 745 Seventh Avenue, New York, New York to Purchaser;

(d)    the mortgage in favor of the Seller's Affiliate with respect to the premises at 745 Seventh Avenue, New York, New York shall have been fully repaid and extinguished;

(e)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(f)    Purchaser shall have obtained confirmation from the SEC and CFTC that Purchaser will be eligible, following the Closing, to compute its net capital under Appendix E to SEC Rule 15c3-1 and adjusted net capital in accordance with the provisions of CFTC Rule 1.17(c)(6);

(g)    Purchaser shall have obtained from the SEC confirmation reasonably satisfactory to Purchaser regarding (i) the transition period during which Purchaser will be permitted to come into compliance with the consolidated holding company supervisory framework applicable to ultimate holding companies that have a principal regulator under SEC Rule 15c3-1e and g, and (ii) the scope of the deference to be extended by the SEC to the Federal Reserve and/or the home country consolidated supervisor of Purchaser's ultimate parent company in connection with the SEC's administration of the framework described in clause (i) of this subsection 10.1(g); and

(h)    the Sellers headquarters building at 745 Seventh Avenue, New York, New York shall be substantially habitable.

10.2    Conditions Precedent to Obligations of Seller.    The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

36

i

(b)    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3.

10.3    Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)    the Bankruptcy Court shall have entered the Breakup Fee and Competing Bid Order, in form and substance reasonably acceptable to Seller and Purchaser;

(c)    the Bankruptcy Court shall have entered the Sale Order and any stay period applicable to the Sale Order shall have expired or shall have been waived by the Bankruptcy Court;

(d)    LBI shall have commenced a case under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court; and

(e)    Purchaser shall have obtained regulatory approval under the HSR Act and all other material regulatory, self-regulatory, exchange, clearing organization and governmental approvals, authorizations, waivers and/or licenses required to conduct the transferred Business following the Closing substantially in the manner as it was conducted immediately prior to the Closing and, after giving effect to the Closing (subject to such exceptions as shall not, in the aggregate, be material).

10.4    Frustration of Closing Conditions.  Neither Seller nor Purchaser may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

ARTICLE XI

[RESERVED]

ARTICLE XII

TAXES

12.1    Transfer Taxes.  Purchaser shall be responsible for (and shall indemnify and hold harmless Seller and its directors, officers, employees, Affiliates, agents,

37

i

successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("Transfer Taxes"). Seller shall, however, seek to include in the Sales Order a provision that provides that the transfer of the Purchased Assets shall be free and clear of any stamp or similar taxes under Bankruptcy Code Section 1146(c). Seller and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

12.2    Prorations. Seller and Purchaser shall enter into customary prorations for the Purchased Assets as of the Closing.

12.3    Purchase Price Allocation. Seller and Purchaser shall allocate the purchase price (including the Assumed Liabilities) among the Purchased Assets as specified in Schedule 12.3 and, in accordance with such allocation, Purchaser shall prepare and deliver to Seller copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement"). Purchaser shall prepare and deliver to Seller from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any) consistent with the agreed upon allocation. The purchase price for the Purchased Assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Purchaser to Seller, and all income Tax Returns and reports filed by Purchaser and Seller shall be prepared consistently with such allocation.

12.4    Adjustment to Purchase Price. The parties agree that any payment made under this Article XII shall be treated by such parties as an adjustment to the Purchase Price.

ARTICLE XIII

MISCELLANEOUS

13.1    Expenses. Except as otherwise provided in this Agreement, each of Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

13.2    Injunctive Relief. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in

i

this Agreement.  The rights set forth in this Section 13.2 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

13.3    Submission to Jurisdiction; Consent to Service of Process.

(a)    Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 13.7 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.7.

13.4    Waiver of Right to Trial by Jury.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.5    Entire Agreement; Amendments and Waivers.  This Agreement (including the schedules and exhibits hereto), the transition services agreements, the Dip Facility, the Interim Support and Cooperation Agreement, Master Repurchase Agreement and the Confidentiality Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this

39

i

Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

13.6  <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

13.7  <u>Notices</u>. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, NY 10019
Facsimile: (646) 758-4226
Attention: Steven Berkenfeld, Esq.

40

i

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Facsimile: (212) 310-8007
Attention:      Thomas Roberts
                Michael Lubowitz

and a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Facsimile:  (212) 455-2502
Attention:      John Finley
                Andrew Keller

If to Purchaser, to:

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Facsimile: (212) 412-7519
Attention:      Jonathan Hughes, Esq.

With a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Facsimile: (212) 225-3999
Attention:      Victor I. Lewkow
                David Leinwand
                Duane McLaughlin

and

Sullivan & Cromwell LLP
125 Broad St.
New York, NY 10004
Facsimile: (212) 558-3580
Attention:      Mitchell S. Eitel
                Jay Clayton

41

i

13.8    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.9    Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void, provided that Purchaser shall be entitled to assign its rights and obligations in whole or in part to its Affiliates or to designate its rights to acquire any assets hereunder to its Affiliates.  No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

13.10    Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, partner or equityholder of Seller shall have any liability for any obligations or liabilities of Seller under this Agreement or the Seller Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

13.11    Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

13.12    Scope of Purchased Assets.  This Agreement is not intended to convey and does not convey assets and liabilities from the non-U.S. and non-Canadian operations of Seller.

[signature page follows]

42

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
    Name: *Steven Berkonfeld*
    Title: *Vice President*

LEHMAN BROTHERS INC.

By: _____
    Name: *Steven Berkonfeld*
    Title: *Managing Executive*

LB 745 LLC

By: _____
    Name:
    Title:

BARCLAYS CAPITAL INC.

By: _____
    Name: *Gerard LaRoca*
    Title: *Chief Executive Officer*

Exhibit C

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)
- - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.
            Debtors.
- - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS INC.
            Debtor.
- - - - - - - - - - - - - - - - - - - -x
            United States Bankruptcy Court
            One Bowling Green
            New York, New York

            April 28, 2010
            9:33 AM

B E F O R E:
HON. JAMES M. PECK
U.S. BANKRUPTCY JUDGE

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

1  there some variety of cash that you were excluding from your
2  representation?
3  A.  Yeah, there was margin cash associated with the customer's
4  account, and they were taking the customer's account.  They
5  were taking the whole account.  So if there was collateral cash
6  in that account, that cash would go with the customer's
7  account.
8  Q.  So you weren't discussing customer property here, you were
9  talking about Lehman's own proprietary property?
10  A.  Well, I may -- your use of the word "customer cash" --
11  collateral, margin payments.  I'm not sure how you would
12  characterize that as whether it's Lehman cash or customer cash.
13  But as a general proposition, with the accounts being
14  transferred, everything relating to those accounts was being
15  transferred.
16  Q.  So you certainly were not including customer cash when you
17  said "no cash is being transferred to Barclays"?
18  A.  That's correct.
19  Q.  You understood the customers deposited cash with Lehman.
20  And with the customer accounts, the cash that belonged to them
21  would also go?
22  A.  That's correct.
23  Q.  Lehman, on the other hand, had its own cash which it used
24  for a variety of purposes, did it not?
25  A.  It had some cash, yes.

90

1  Q.  Including, for example, the cash that was restricted in
2  the 15c3 account, correct?
3  A.  That's correct.  That was not available for use at any --
4  under any circumstances.
5  Q.  And you represented to the Court that there was not any
6  cash that was being transferred to Barclays, correct?
7  A.  In the context of our last two minutes, yes.
8  Q.  And of course, that was of concern to you on the Sunday
9  night or the early Monday morning when you learned that
10  Barclays wanted not only 769 million in government securities
11  but in addition, one billion dollars of restricted cash in the
12  customer reserve account, correct?
13  A.  I think I testified to that.
14  Q.  And that's what led to a heated argument, in which you
15  took the position that a representation had been made to the
16  Court that no cash was being transferred to Barclays, and you
17  therefore insisted that that one billion dollars in cash not be
18  transferred to Barclays from the restricted customer accounts?
19  A.  That was one aspect or one branch of the debate, if you
20  want to call it that.  The other thing that that account was a
21  protected account and should not have been transferred.  We
22  also, I might add, gave an admonition to Barclays that the
23  likelihood of the SEC ever releasing that account was slim to
24  none.
25  Q.  You mentioned in your last answer, I believe -- or the

91

1  previous answer -- margins, sir.  And you personally did not
2  have any discussions with anyone at Barclays about Lehman's
3  margin.  Isn't that right, sir?
4  A.  That's correct.
5  Q.  And by Lehman's margin, you understand Lehman's cash, cash
6  equivalents and government securities that Lehman posted as
7  collateral with clearing corporations?
8  A.  Correct.
9  Q.  And indeed, you are not aware of anyone at your firm, the
10  Weil Gotshal law firm, who had any discussions with anyone at
11  Barclays concerning the question of Lehman's margins?
12  A.  As far as I'm aware, that's correct.
13  Q.  Thank you, sir.
14      MR. MAGUIRE:  No further questions.
15      THE COURT:  Mr. Schiller?
16      MR. SCHILLER:  Thank you, Your Honor.
17  CROSS-EXAMINATION
18  BY MR. SCHILLER:
19  Q.  Jonathan Schiller from Barclays, Mr. Miller.
20  A.  Good afternoon.
21      MR. SCHILLER:  I have a book, Your Honor, that I would
22  like to distribute, with the Court's permission.
23      THE COURT:  That's fine.
24      THE WITNESS:  Am I finished with this one?  Mr.
25  Schiller, do I need this one anymore?

92

1      MR. SCHILLER:  Would you just, please, leave it up
2  there?  I may make reference to it.  Thank you.
3      (Pause)
4  Q.  I would like to begin, Mr. Miller, with tab 2 of the book
5  that I provided you, which would be the hearing transcript from
6  the September 19th hearing, which you described extensively
7  this morning.  I would like to go back to what you advised
8  Judge Peck at page 60, lines 19 through 23, where you advised
9  the Court that, "The substance of this transaction is to
10  continue a business for the benefit of the general economy, the
11  employees, whose lives are at stake, and to fit a small piece
12  into the jigsaw puzzle of maintaining a stable economy."  Do
13  you see that, sir?
14  A.  Yes, I do.
15  Q.  Were those benefits that you set forth there for the Court
16  realized?
17  A.  I would say, in part.  The problem that I'm having is the
18  stable economy.  I have very fixed views about that, which I
19  don't think I should express, Your Honor.
20      THE COURT:  There's no need to express those views
21  here.
22  A.  But I would say generally, the transaction did accomplish
23  that in terms of the employees, in terms of the customers of
24  LBI.  I think it was of enormous benefit to the nation and to
25  the city.  And it accomplished what I think we set out to

93

1  accomplish. We saved a business that on Monday the 22nd, if
2  the transaction had not closed, would have been catastrophic,
3  with 10,000 people out of work, pandemonium, values lost, an
4  empty building in a real estate market that was crumbling. So
5  I am very proud of what happened.
6  Q.  And the business that you saved, I believe you've always
7  characterized that in terms of the sale transaction as the
8  purchase of the North American business. Is that right?
9  A.  North American capital markets business.
10  Q.  And that business was sold, through the asset purchase
11  agreement. And that provided for Barclays to acquire all
12  assets used in connection with that business, except for those
13  which were explicitly excluded, correct?
14  A.  That's correct.
15  Q.  And when you proffered Mr. McDade's testimony to the Court
16  on the 19th, Mr. Miller, at page 98, lines 19 through 22, you
17  brought to the attention of Judge Peck that "McDade would
18  testify that the asset purchase agreement provides for the sale
19  of the North American broker-dealer business of LBI, which
20  includes banking and capital market business, in addition to
21  numerous other divisions," which you've just referenced again?
22  A.  Yes, sir.
23  Q.  Through that tumultuous week of September 15th through the
24  22nd, which you've described dramatically this morning again,
25  you never had what you would call an accurate Lehman balance

94

1  sheet. Is that correct?
2  A.  That's a fair statement.
3  Q.  And because there was no accurate Lehman balance sheet in
4  that chaotic period, there was significant uncertainty over the
5  value of Lehman's assets and liabilities that were being
6  transferred?
7  A.  There was volatility in the values. There was a high
8  level of risk in the transaction, I think particularly from
9  Barclays' perspective. And that was one of the major elements
10  in this volatility about this transaction during the week and
11  concern about the decline in the values.
12  Q.  And this uncertainty in values was one of the reasons that
13  the discussions ensued over valuation, that you've described
14  generally, correct?
15      MR. GAFFEY:  Objection.
16      THE COURT:  What's the objection?
17      MR. GAFFEY:  Mr. Miller testified he wasn't involved
18  in those discussions.
19      THE COURT:  Let me think about this. Objection is
20  sustained.
21  Q.  You observed discussions, did you not, discussions you
22  were in and out of, where there was debate over the value of
23  the assets being transferred?
24  A.  As I testified, I was in a number of conference rooms. I
25  wouldn't call it a debate. There were discussions between the

95

1  Lehman team and the Barclays team, as to the appropriate marks
2  or marks to market of various securities. As I said before, it
3  was a very long, laborious process. When you go CUSIP number
4  by CUSIP number, it could take a long time.
5  Q.  Was it your impression that they were trying together to
6  get to appropriate marks for that period in the week?
7  A.  That was my impression.
8  Q.  Is it your testimony before the Court, Mr. Miller, that
9  this was not a balance sheet deal?
10  A.  It was not a balance sheet deal, from my perspective, at
11  any time, nor from Mr. McDade's perspective.
12  Q.  Why is that?
13  A.  Because nobody really had a firm fix on the assets. This
14  was a distressed sale, when you got down to it, in an
15  extremely -- I mean, I've been at this for fifty years, and
16  I've never been in a situation like this. And what Mr. McDade
17  and his team were out to do, was to get the best deal they
18  could, the best deal that would preserve the employment
19  opportunities and the best deal to protect the customers of the
20  brokerage firm.
21  Q.  In this environment, the APA that was presented to the
22  Court contained no representations or warranties regarding the
23  values of all of the assets and liabilities being acquired by
24  Barclays, correct?
25  A.  That is correct.

96

1  Q.  And the APA did not provide for a "true-up" regarding the
2  values of all of the assets and liabilities that were being
3  acquired, did it?
4  A.  There was no provision for a true-up, and in the context
5  of what we were doing, having a true-up would have been, I
6  think, virtually impossible. And then if you had a true-up --
7  and let's assume that Lehman had a true-up, where would Lehman
8  get the assets to true up? I do recall that the Cleary
9  Gottlieb folks said there is no -- there will be no true-up,
10  and that's why I think there are no representations or
11  warranties.
12  Q.  And in light of that impossibility that you've just
13  described --
14  A.  Almost.
15  Q.  -- Mr. Miller, you did not tell the Court on the 19th or
16  on the 17th, or represent to the Court, that this deal was
17  going to be in balance or roughly equivalent or a wash,
18  correct?
19  A.  I did not -- I never used those expressions.
20  Q.  Nor did you proffer through the testimony of Mr. McDade or
21  Barry Ridings that these assets and liabilities in this
22  transaction would be roughly equivalent or in balance or a
23  wash. Isn't that correct, sir?
24      MR. GAFFEY:  Objection.
25  A.  Well, I think --

97

1    A.  Not that I recall.
2    Q.  Let me ask you to turn to tab 4 of the book that I
3    provided you, please.
4         MR. SCHILLER:  Exhibit 419, for the record, Your
5    Honor.
6    A.  Yes.
7    Q.  And that is a letter to the examiner's team dated March
8    24, 2010.
9    A.  That's what it is.
10   Q.  And in the course of this letter to the examiner's team,
11   your partner Richard Davis writes that -- at paragraph 4, "In
12   response to your question as to why there wasn't a protection
13   of the balance between assets and liabilities, the assets were
14   going up, and while in some deals there might be a post-closing
15   true-up, no such provision was in this agreement"?
16   A.  I think the paragraph says the assets were going down, not
17   up.  I read the paragraph, yes.
18   Q.  Yes.  And it's accurate?
19   A.  I believe it's accurate.
20   Q.  And it's accurate in terms of your understanding of the
21   transaction, not what Mr. Roberts may have said to the
22   examiner?
23   A.  That's correct.
24   Q.  May I ask you to turn to the next page, please.  And you
25   see a paragraph there.  May I ask you to read it to yourself?

102

1    A.  Yes, I have.
2    Q.  Is it also correct, Mr. Miller, that while maintaining a
3    balance between the assets and the liabilities, as is written
4    here, might have been desirable, everyone understood that the
5    agreement did not require there to be such a balance?  Do you
6    agree with that?
7         MR. GAFFEY:  Objection, Your Honor.  The witness is
8    not competent to testify to what everybody understood.
9         THE COURT:  Well, I think that's true, although this
10   is cross examination.  Although I think that Mr. Miller is not
11   hostile to either side here, he's just here as a source of
12   impartial information, as far as I can tell.
13   To the extent that it talks about what everybody knew
14   or everybody understood, it's probably a question that cannot
15   be answered --
16        MR. SCHILLER:  Let me rephrase it, Your Honor.
17        THE COURT:  -- but that's the language that's in the
18   letter.
19        MR. SCHILLER:  Yes.  Let me rephrase it.
20   Q.  Maintaining -- is it correct, Mr. Miller, that maintaining
21   a balance between the assets and the liabilities might have
22   been desirable among the parties, but you, and in your
23   discussions reflected with Mr. McDade and Mr. Ridings,
24   understood that the agreement did not require that there be
25   such a balance?

103

1    A.  The understanding and what Mr. McDade told me in the long
2    hours of preparing him -- prepping him for his examination,
3    that this was not a balance sheet transaction.
4    Q.  Thank you.  Let me turn to the subject of gain and day-one
5    gain, which has been presented to the Court already in this
6    trial.  And let me ask you to turn to the -- actually I don't
7    need to burden you with the transcript, I don't think.  Do you
8    recall that Barclays made a public announcement on or about
9    September 17, 2008, that it expected to have a multibillion
10   dollar gain -- accounting gain on day one of the acquisition,
11   that was two days before the sale hearing?
12        THE WITNESS:  Do I get a right to object, Your Honor?
13        THE COURT:  Regrettably as a witness, you don't.  But
14   I think --
15        MR. SCHILLER:  I'm happy to rephrase.
16        THE COURT:  -- I think Mr. Miller doesn't like that
17   question.
18        MR. SCHILLER:  So I gather.
19   Q.  If Barclays announced on September 17th, two days before
20   the hearing, publically, in an analysts call, and reported in
21   the press that it anticipated to have a multibillion dollar
22   accounting gain if the sale were approved, would that be
23   inconsistent with your understanding of the sale you presented
24   to Judge Peck?
25   A.  Not inconsistent with my understanding.  We live in an era

104

1    of financial engineering.  And an accounting gain, which is
2    not, at least in my terms, in real money, would not have made
3    any difference.
4    Q.  Would you also agree with me, it's not uncommon for
5    someone to buy assets in a bankruptcy process and make money on
6    that purchase?
7    A.  In my experience, people who come to the bankruptcy court
8    to buy assets do not do it as eleemosynary institutions.
9    Q.  Are --
10   A.  They do it --
11   Q.  -- I'm sorry.
12   A.  -- in the hope that they're going to make money and that
13   it's going to be in some way accretive to them.
14   Q.  And if they hope and announce that it may be accretive to
15   them, are they required to file such statements -- public
16   statements in the court, in your experience?
17   A.  I don't know whether you're asking for a legal opinion or
18   just general advice.  If your question is premised upon some
19   fiduciary duty, I would have to explore that and research it.
20   I don't think I'm really qualified to answer that question.
21   Q.  If a purchase made, as Barclays, I represent to you, that
22   they did in a public announcement on the 17th of anticipated
23   accounting gain in this proceeding, would you have brought it
24   to the Court's attention on the 19th?
25   A.  I'm not quite sure I would have.  I don't -- an accounting

105

**Page 106**

```
 1   game really did not go to the substance of the transaction and
 2   I assume if they made a public announcement it was in the
 3   public domain.
 4   Q.   Thank you.  Now I may have covered this once before but I
 5   would like to cover the subject again, if it's not duplicative.
 6   And that is, that the APA provided to the Court had no
 7   contractual limitations on the value of the purchased assets
 8   that were being acquired by Barclays in the sale.
 9   A.   That's correct.
10   Q.   Indeed the purchased assets were being acquired by
11   Barclays in the sale irrespective of what their values may have
12   been that week, correct?
13   A.   Technically, yes.
14   Q.   And because of that technicality in the contract there was
15   no valuation cap contractually for specific assets in the
16   transaction, correct?
17   A.   That is correct.
18   Q.   Indeed, between Lehman and Barclays, in their purchase
19   agreement, there was no valuation cap for all of the purchased
20   assets, correct?
21   A.   In the agreement, that's correct.
22   Q.   Is it fair to say that on September 19th, before this
23   Court when Lori Fife spoke, you, Mr. Miller, did not understand
24   the 47.4 billion dollars that she mentioned in terms of those
25   long position to be a valuation cap on the purchased assets
```

**Page 107**

```
 1   under the purchase agreement, correct?
 2   A.   It was just given for guidance as to the potential
 3   dimensions of the transaction.
 4   Q.   And that guidance was given as to the long positions, the
 5   hard assets which had been seventy billion on Tuesday and now
 6   we're in freefall and you had a number 47.4, correct?
 7   A.   That's correct.
 8   Q.   I think it's important to review with the Court the fact
 9   that the purchase agreement, which your firm and other lawyers
10   worked hard on with their clients, provided no valuation for
11   many of the purchased assets that were identified in the APA,
12   correct?
13   A.   Barclays was buying the North American capital markets
14   business, whatever it was.
15   Q.   And I hate to take up too much of your time and burden you
16   with this contract, but it is important in terms of what's been
17   said to this Court before you took the stand.
18        If I could have you turn back to the APA, which is again
19   tab 3 and look at pages 6 through 8 with me, Mr. Miller,
20   briefly?
21   A.   Yes, sir.
22   Q.   The APA doesn't provide valuations for many of the
23   nineteen categories of purchased assets that you see identified
24   there under the definition and through pages 6 and 8.
25   A.   Yes, sir.
```

**Page 108**

```
 1   Q.   It does provide a valuation of approximately seventy
 2   billion for long positions and approximately a valuation of
 3   1.34 retained cash.  But it has no estimated valuations at all
 4   for any of the other seventeen categories of purchased assets.
 5   Do you see that and agree with that?
 6   A.   I do.
 7   Q.   Was Barclays entitled to each of those assets listed there
 8   as clarified in the clarification letter, specifically
 9   identified irrespective of whether there was a valuation
10   provided for it?
11   A.   Pursuant to the approved APA, yes.
12   Q.   And was Barclays entitled to any of these assets,
13   irrespective of any value that Barclays might ascribe to them
14   under its accounting on its balance sheet once it acquired the
15   business?
16   A.   Under the APA as approved, yes.  At least that's my
17   opinion.
18   Q.   And subsection q, Mr. Miller, within that definition of
19   purchased assets --
20   A.   Q?
21   Q.   Yes, sir.  On page 8.  There's a reference there to
22   intangible assets.
23   A.   Yes, sir.
24   Q.   And the agreement provides that "Intangible assets
25   associated with or symbolized by the business, including
```

**Page 109**

```
 1   customer and supplier lists" are to transfer on the sale.  Do
 2   you see that?
 3   A.   Yes.
 4   Q.   Now was Barclay to acquire those intangible assets not
 5   matter what value Barclays might attribute to those assets on
 6   its balance sheet?
 7   A.   As you've pointed out, there's no valuation caps in the
 8   asset purchase agreement or the clarification letter.
 9   Q.   And some of these assets that are discussed there may be
10   of value to Barclays in ongoing business on Monday but not to
11   Lehman, correct?
12   A.   If the transaction did not close it would have no value.
13   Q.   Indeed, the same is true for all the purchased assets --
14   A.   My recollection --
15   Q.   -- listed in the APA.  I'm sorry, go ahead.
16   A.   My recollection is that there was a problem with the
17   intellectual property and some of the intellectual property
18   belonged to another entity.
19   Q.   All right.
20   A.   And that was brought to the attention of the Court.
21   Q.   Thank you.  In terms of those elements of the purchased
22   assets for which there was no value, there were a number of
23   them, as I've taken you through, seventeen categories.  Seats
24   on the New York Stock Exchange, for example, weren't valued in
25   this deal were they?
```

# Exhibit D

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


        Debtors.


- - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            September 19, 2008

            4:36 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

BCI Exhibit No.
49

59

1    open access to the Primary Dealer Credit Facility at the

2    Federal Bank to support the banking industry, to commit the

3    federal government to what might be hundreds of billions of

4    dollars to save Fannie Mae and Freddie Mac and to have the

5    government advance eighty-five billion dollars to save AIG.

6    And now, Your Honor, within the space of maybe a few days for

7    the government to adopt a variation of the Resolution Trust

8    Company or the Reconstruction Finance Corporation to save the

9    economy and the welfare of the people who are dependent upon a

10   stable economy.

11          The tragedy of Lehman, Your Honor, is part and parcel

12   of the design to preserve and stabilize financial markets.

13   Access to federal funding to maintain the business of Lehman

14   Brothers incorporated the need to put Lehman Brothers Holdings

15   Inc. into Chapter 11 as part of a plan to move that sensitive

16   business of LBI to a qualified buyer as soon as possible.  A

17   buyer who meets the qualifications necessary to operate such a

18   business -- which is a universe, I might add, Your Honor, that

19   is only limited to a few possible candidates.  In making those

20   decisions that the government or parties involved wait for

21   ordered reports, appraisals, physical inventories, a review of

22   each and every document relating to the transaction, I think,

23   Your Honor, the answer is no.  They had to do what was

24   necessary to protect the greater good and not to lose the

25   forest for the trees.

73

1    the effective administration of that estate of the trustee and

2    have less to do, essentially, Monday morning.  And we stand

3    back from the proceeding at first but we have committed all of

4    the energy and all of the resources of SIPC to enable the SIPC

5    trustee to get his work done, to enable Barclays to step in,

6    take over the accounts that they are willing to take over and

7    then to deal with the other transactions in the ordinary course

8    of business as necessary.

9           THE COURT:  Let me ask you a question about the

10   timing imperative as it relates to the undertakings of your

11   client.  You mentioned a 6 p.m. cutoff date, I think, on

12   Tuesday.

13          MR. CAPUTO:  Yeah.

14          THE COURT:  In order for this transaction to be

15   optimally closed from the perspective of SIPC, when should it

16   close?  Does it need to close this weekend before the markets

17   open on Monday?

18          MR. CAPUTO:  The sale transaction?

19          THE COURT:  Yes.

20          MR. CAPUTO:  As soon as possible it needs to close.

21   The sooner the better.  That's going to provide certainty to

22   parties and counterparties so that they can take the actions

23   that they deem necessary to protect their clients but it also

24   provides certainty to the hundreds of thousands of customers.

25   And that provides comfort to the markets and I think comfort on

247

1   Honor?

2           THE COURT: Yes, you may.

3           MR. BIENENSTOCK:  I just want to point out that,

4   number one, we all understand the importance of the

5   transaction.  And it's very easy for a party sponsoring it to

6   say, and I won't do it unless you give me something illegal, so

7   give it to me, Judge.  I'd like to point Your Honor to some

8   evidence Your Honor admitted, the contract.  Nowhere in that

9   contract does it say they need an order that's free and clear

10  of successor liability from creditors of non-debtor

11  subsidiaries.  Nowhere.  This is just overreaching and gambling

12  that Your Honor feels this is so important that you'll do

13  something illegal so they'll close tonight.  Thanks.

14          THE COURT:  It's my job to do what the law permits in

15  the exercise of my discretion.  This week, more than any other

16  week since I was appointed to the bench, I have felt the

17  awesome power of this job.  And it's now Saturday morning.

18  I've given a lot of thought the objections.  I reviewed each

19  one that I could get.  They were flying in this afternoon one

20  after another.  And I categorized them in my mind and

21  considered carefully whether it was permissible for me as a

22  judge in this district to approve a transaction this momentous

23  on such an extraordinarily fast schedule.  And I gave

24  consideration to the due process considerations that have been

25  articulated in objections both orally and in writing.  And I

248

1    have concluded that this is really not a question of due

2    process being denied.  This is a question of due process being

3    pursued in good faith by all parties to the transaction, even

4    the objectors.  It is a testament to the importance of this

5    transaction that this courtroom is still packed.  I have no

6    idea what's going on in the overflow rooms.  This is not an

7    ordinary Chapter 11 case.

8            This is not simply approving the transaction because

9    Mr. Miller is putting pressure on me to do so.  This is not

10   approving the transaction because I know it's the best

11   available transaction.  I have to approve this transaction

12   because it's the only available transaction.

13           I believe that one of the remarkable aspects of our

14   Bankruptcy Code, as it has evolved, is its remarkable

15   flexibility to different circumstances.  The lawyers who are

16   appearing before me this evening are truly among the best and

17   the brightest in the field.  And some have participated in the

18   evolution of bankruptcy as a field, nationally and

19   internationally.  We must close this deal this weekend not

20   because the markets demand it, although that's certainly a part

21   of it.  Lehman Brothers became a victim.  In effect, the only

22   true icon to fall in the tsunami that has befallen the credit

23   markets.  And it saddens me.  I feel that I have a

24   responsibility to all the creditors, to all of the employees,

25   to all of the customers and to all of you.  Arguments have been

249

1    made this evening by objectors, some questioning whether or not

2    if I were to delay approval another better transaction might be

3    realized or discovered. And that's a preposterous notion. As

4    I said on Wednesday, it's very apparent to me that for a

5    transaction of this sort to happen, only Barclays can do it.

6    Only Barclays has the support of the regulators. Only Barclays

7    is prepared to close. Only Barclays can deliver the customer

8    accounts to safe harbors. And the customer property, which is

9    the principal concern of the SIPC trustee, a case which is also

10    pending before me now, will be best protected by virtue of

11    approving the sale.

12            The objectors, and I'm not putting them all in the

13    same basket, principally, Mr. Golden and Mr. Rosner's clients,

14    argue passionately that I should not be unduly influenced by

15    the arguments made by the debtors that the markets will, in

16    fact, tank if this deal is not approved and that more time

17    should be afforded to searching for an alternative. I am

18    persuaded that to do so would be reckless. I believe that the

19    debtors have acted in the utmost of good faith in trying to

20    make the best out of a terrible situation. The comments made

21    by the SIPC trustee so many hours ago in reference to the

22    cooperation, the unusual cooperation that has characterized the

23    commencement of the SIPC proceeding and the coordination of

24    that proceeding with this bankruptcy case demonstrate not just

25    that New York lawyers and consultants can be good citizens but

250

1    that we all recognize that we're engaged in something here

2    that's very special.  This is the most momentous bankruptcy

3    hearing I've ever sat through either as a lawyer or as a judge.

4    And I'm guessing I'm not alone in that sense.

5           One could be a theoretical bankruptcy jurist and say

6    transactions such as this should always be subject to more time

7    so that parties can better assess the consequences of the

8    transactions.  Bankruptcy Rule 6003 which was enacted recently

9    was designed among other things to slow down activities in the

10   first twenty days of big bankruptcy cases.  This is Friday.

11   This case was filed on Monday.  What we're doing is unheard of

12   but imperative.

13          I am completely satisfied that I am fulfilling my

14   duty as a United States bankruptcy judge in approving this

15   transaction and in finding that there is no better or

16   alternative transaction for these assets, that the consequences

17   of not approving a transaction could prove to be truly

18   disastrous.  And those adverse consequences are meaningful to

19   me as I exercise this discretion.  The harm to the debtor, its

20   estates, the customers, creditors, generally, the national

21   economy and the global economy could prove to be incalculable.

22          Moreover, it's not just about avoiding harm.

23   Approving the transaction secures whether for ninety days or

24   for a lifelong career employment for 9,000 employees at Lehman,

25   and holds together an operation the value of which is really

VERITEXT REPORTING COMPANY

212-267-6868                                                    516-608-2400