BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
Jonathan D. Schiller
Hamish P. M. Hume
Jack G. Stern

Attorneys for Barclays Capital Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                                                    Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>                                                    Debtor. | Case No. 08-01420 (JMP) |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION *IN LIMINE*
OF BARCLAYS CAPITAL INC. FOR AN ORDER EXCLUDING
THE EXPERT TESTIMONY OF DANIEL MCISAAC REGARDING
LBI'S OBLIGATIONS UNDER SEC RULES 15c3-1, 15c3-3 AND/OR
THE SECURITIES INVESTOR PROTECTION ACT**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

August 16, 2010

**TABLE OF CONTENTS**

ARGUMENT ..................................................................................................................... 1

I.     Movants' Opposition Fails To Identify Any Independent Analysis Performed By Mr. McIsaac On LBI's Reserve Calculation Or The Amounts Needed To Fund LBI's Reserve Account .................................................................................. 1

II.     Mr. McIsaac Improperly Opines On Interpretations Of Law. ............................ 4

III.     Mr. McIsaac Opines On Matters Outside The Scope Of His Expertise. ............ 6

IV.     September 19, 2008 Is Not The Proper Date For Consideration Of The Adequacy Of LBI's Reserve Account .................................................................................. 9

CONCLUSION .................................................................................................................. 11

# TABLE OF AUTHORITIES

**Cases**

*Am. Home Assur. Co. v. Merck & Co.*,
  462 F. Supp. 2d 435 (S.D.N.Y. 2006) ................................................................................. 2

*In re Adler, Coleman Clearing Corp.*,
  247 B.R. 51 (Bankr. S.D.N.Y. 1999) ................................................................................... 5

*In re MJK Clearing, Inc.*,
  286 B.R. 109 (Bankr. D. Minn. 2002) ............................................................................... 10

*Marx & Co. v. Diners' Club, Inc.*,
  550 F.2d 505 (2d Cir. 1977) ................................................................................................ 5

*Mishkin v. Peat, Marwick, Mitchell & Co.*,
  744 F. Supp. 531 (S.D.N.Y. 1990) ...................................................................................... 6

*Monsanto Co. v. David*,
  516 F.3d 1009 (8th Cir. 2008) ............................................................................................. 2

*Music Sales Corp. v. Morris*,
  73 F. Supp. 2d 364 (S.D.N.Y. 1999) ................................................................................... 5

*NutraSweet Co. v. X-L Eng'g Co.*,
  227 F.3d 776 (7th Cir. 2000) ............................................................................................... 2

*Robbins v. Moore Medical Corp.*,
  894 F. Supp. 661 (S.D.N.Y. 1995) ...................................................................................... 6

*Southwire Co. v. J.P. Morgan Chase & Co.*,
  528 F. Supp. 2d 908 (W.D. Wis. 2007) ............................................................................... 2

*United States v. Duncan*,
  42 F.3d 97 (2d Cir. 1994) .................................................................................................... 5

**Other Authorities**

15 U.S.C. § 78lll(4) ................................................................................................................ 11

17 C.F.R. § 15c3-3(e)(3) ..................................................................................................... 1, 10

Barclays Capital Inc. ("Barclays"), by and through its undersigned counsel, submits this reply memorandum in further support of its motion for an order, pursuant to Federal Rule of Evidence 702, excluding the McIsaac Report[1] and any expert testimony by Mr. Daniel McIsaac concerning the following topics: (1) interpretation of SEC Rules 15c3-1 or 15c3-3; (2) interpretations of LBI's obligations under SIPA after filing for SIPA protection on September 19, 2008, including what constitutes "customer property" under SIPA; (3) LBI's ability on or around September 19, 2008 to accurately calculate the amount of cash and qualified securities required to be maintained pursuant to SEC Rule 15c3-3; (4) selective so-called "errors" in LBI's calculations under SEC Rule 15c3-3 as of September 19, 2008; and (5) any purported understatement of LBI's overall calculation under SEC Rule 15c3-3 or any shortfall in LBI's overall reserve account of cash and qualified securities held pursuant to SEC Rule 15c3-3 on September 19, 2008.

## ARGUMENT

I. **Movants' Opposition Fails To Identify Any Independent Analysis Performed By Mr. McIsaac On LBI's Reserve Calculation Or The Amounts Needed To Fund LBI's Reserve Account.**

1. Movants acknowledge that Mr. McIsaac "relied on the Trustee's financial advisors to provide him with information about the customer accounts[2] that were the subject of" LBI's reserve calculation. Movants' Opp. at ¶ 7. What Movants fail to acknowledge, however,

---

[1] The "McIsaac Report" consists of those three documents identified in Barclays' opening memorandum in support of this motion. See Motion *In Limine* of Barclays Capital Inc. for an Order Excluding the Expert Testimony of Daniel McIsaac Regarding LBI's Obligations Under SEC Rules 15c3-1, 15c3-3 and/or the Securities Investors Protection Act ("Opening Br.") at 1, n.1.

[2] "Customer accounts" of course, only constitute one aspect of a firm's reserve calculation. See 17 C.F.R. § 240.15c3-3. To the extent that Deloitte & Touche only provided Mr. McIsaac with customer account information, his analysis therefore is fundamentally flawed in that it is not based on the actual requirements of Rule 15c3-3.

1

is that Barclays does not also have access to the information that is the subject of LBI's reserve calculation.

2.      Although Movants are correct that experts frequently rely on material assembled by the party that retained them or by a third party, the usual regime is that all material relevant to the subject matter of the expert's report has been the subject of discovery. Indeed, this is the case in all of the precedent cited by Movants. *See, e.g., Monsanto Co. v. David*, 516 F.3d 1009, 1015 (8th Cir. 2008) (expert permissibly relied on "seed analysis" performed by plaintiff Monsanto that used seeds which were obtained from (and therefore in the control of) defendant farmer); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789-90 (7th Cir. 2000) (permitting expert to testify regarding data gathered by "G&M's hydrologist," but where "G&M's supervising hydrologist" also testified (*id.* at 783) and presumably had been subject to pre-trial discovery under the Federal Rules); *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 934 (W.D. Wis. 2007) (analysis of antitrust plaintiffs' records relating to purchases of copper, documents which would have been discoverable by all parties in litigation regarding purported manipulation of the copper market); *Am. Home Assur. Co. v. Merck & Co.*, 462 F. Supp. 2d 435, 448 (S.D.N.Y. 2006) (one expert's reliance on a previous expert's report was permissible where the expert reviewed all the materials underlying the first expert's report and reached the same conclusion).

3.      In contrast to this precedent, the Trustee here has invoked privilege to avoid discovery of any of its advisors' financial analyses of LBI's books and records at the time of the SIPA filing, yet has then purported to provide expert opinion using a selection of such allegedly privileged materials to argue that LBI did not have sufficient funds in its reserve account as of September 19, 2008. Accordingly, the Trustee's selection of only certain materials for analysis

2

by its expert from a larger body of materials as to which the Trustee has otherwise claimed privilege renders Mr. McIsaac's opinion unreliable because it cannot be subjected to proper scrutiny.

4. Movants disingenuously argue that because they did not invoke privilege as to *Mr. McIsaac's* testimony and documents, the fact that they invoked privilege to avoid any meaningful discovery of related information *from Deloitte & Touche* regarding its analysis of LBI's books and records should not matter. Movants' Opp. at 6, n.2. This argument is flatly wrong.

5. Barclays' primary criticism of Mr. McIsaac's analysis has always been that Mr. McIsaac did not attempt to do a full analysis of LBI'S September 19 reserve calculation, but instead applied only selected (and, with one minor exception, *upward*) "adjustments" to the reserve calculation.[3] Mr. McIsaac defends himself by claiming that he cannot do a full analysis of the accuracy of LBI's reserve calculations because he purportedly does not have access to LBI's systems or personnel. McIsaac Rebuttal at ¶¶ 29-33.

6. Yet there is substantial evidence that, in fact, through a "Transition Services Agreement," the Trustee and Deloitte & Touche have had full access to LBI's systems and full access to the former LBI employees with the most knowledge of LBI's reserve calculations. Martini Dep. Tr. at 55:25-56:23, 142:19-143:17. In many instances, this access to former LBI

---

[3] A particularly telling instance of Mr. McIsaac's tunnel vision with respect to upwards adjustments is his insistence that an adjustment needed to be made on September 19, 2008 to account for the transfer of $507 million in margin held at the OCC even though that margin was not to be transferred out of LBI's accounts until after Closing. At his deposition, Mr. McIsaac theorized (despite lacking any experience in SIPA liquidations) that this pre-filing adjustment would need to be made for post-filing events because LBI had contractually agreed to transfer those funds by September 19. McIsaac Dep. Tr. at 312:10-314:14. Using this logic, however, Mr. McIsaac also should have made a pre-filing adjustment for the anticipated transfers of tens of thousands of customer accounts to Barclays at Closing — thereby massively reducing any customer reserve requirement and rendering Mr. McIsaac's one-sided analysis meaningless. Movants' assertion that Barclays "does not identify a single reason" why Mr. McIsaac's failure to conduct a recalculation instead of selected "adjustments" is critical to any conclusion regarding the adequacy of LBI's reserve account, *see* Movants' Opp. at ¶ 15, is insincere at best.

3

data and information is exclusive and unavailable to Barclays. *Id.* at 45:21-46:17. The Trustee has never denied that it has exclusive access to systems and personnel that are unavailable to Barclays. Moreover, it appears that Deloitte & Touche has been working with that data for close to two years to resolve the issues that may have made it difficult for LBI to conduct a thorough calculation post-SIPA filing. *Id.* at 80:18-81:10.

7.  Without access to data that would show *all potential adjustments* to LBI's reserve calculation, including in particular Deloitte & Touche's analysis of the general ledger and its reconciliation of breaks, Barclays cannot meaningfully analyze the accuracy of Mr. McIsaac's ultimate conclusion that there was a shortfall in LBI's reserve account. And even more to the point, without Mr. McIsaac having been given access to all such data (rather than just that data that Movants selectively opted to share with Mr. McIsaac), *Mr. McIsaac* could not meaningfully or reliably analyze the accuracy of the Trustee's conclusion of such a shortfall. Movants simply cannot use the privilege both as a sword and a shield to make bold assertions regarding the accuracy of LBI's reserve calculations without allowing full and open examination of the records underlying those calculations. For this reason, Mr. McIsaac's testimony, based as it is on an incomplete review of all relevant facts, is not susceptible to effective and complete cross-examination due to Barclays' lack of access to all relevant facts, and should therefore be excluded.

## II. Mr. McIsaac Improperly Opines On Interpretations Of Law.

8.  Mr. McIsaac opines directly and repeatedly on the meaning of Rule 15c3-3. McIsaac Affidavit at ¶¶ 6-22 ("Industry Regulations for the Safeguarding of Customer Property"); *id.* at ¶ 24 (items that must be included in a 15c3-3 reserve calculation); *id.* at ¶¶ 39-40 ("LBIE's insolvency filing in the United Kingdom was a "material change in its condition" and caused LBIE to no longer be a "good control location"); *id.* at ¶ 45 (assets held at the OCC

4

that were to be transferred to Barclays at the time of Closing should not, as a matter of law, have been included in a pre-Closing calculation of the Rule 15c3-3 reserve requirement).

9. Movants respond to Barclays' argument that Mr. McIsaac should be precluded from opining on what is or is not required of an operating broker-dealer under SEC Rules 15c3-1 and 15c3-3 by asserting the irrelevant fact that Mr. McIsaac is a CPA and has "thirty years of experience" with broker-dealers dealing with Rule 15c3-3 compliance. Movants' Opp. at ¶¶ 11, 17. But Mr. McIsaac's lay experience with a legal regime is of no import where, as here, his proposed testimony is to interpret that regime — a matter left solely to the Court.

10. It is black-letter law that "the testimony of an expert on matters of domestic law is inadmissible *for any purpose*." *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 381 (S.D.N.Y. 1999) (emphasis added); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 512 (2d Cir. 1977) (noting it is the responsibility of the Court to circumscribe the expert witness's testimony to ensure that the witness does not "usurp the function of the judge"); *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("[T]he use of expert testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.") (internal quotation marks omitted).

11. In an effort to evade this binding precedent, Movants cite to cases in which a court purportedly found expert testimony regarding SEC regulations to be admissible. Movants' Opp. at ¶¶ 18-19. In fact, however, in none of these cases was the admissibility of the expert's testimony opining on the regulatory obligations *actually challenged or analyzed.*

12. First, Movants cite *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 66, n.10, 68-70 (Bankr. S.D.N.Y. 1999), for the proposition that expert testimony "regarding a broker-dealer's obligations under Rule 15c3-1" is admissible. *In re Adler* does not analyze the

5

admissibility of such testimony, however.[4] Instead, the court there refers to a separate opinion not cited by Movants relating to the admissibility of certain aspects of the expert's proposed testimony. *See* 247 B.R. at 63, n.4 (citing *In re Adler, Coleman Clearing Corp.*, No. 97/8423A, 1998 WL 160039 (Bankr. S.D.N.Y. Apr. 3, 1998)). In other words, the Court was never asked to consider whether it was appropriate for an expert to opine on the content or meaning of the SEC's net capital rule. *See generally In re Adler*, 1998 WL 160039.

13.    Similarly, *Robbins v. Moore Medical Corp.*, 894 F. Supp. 661, 670-71 (S.D.N.Y. 1995), did *not* hold that expert testimony regarding "a firm's obligations under SEC regulations" was admissible, Movants' Opp. at ¶19; indeed, the court there performed no analysis of admissibility at all. Moreover, the expert opinion relied upon by the Court in granting summary judgment was that the defendant was "in compliance *with GAAP*." 894 F. Supp. at 671 n.8 (emphasis added). Because the SEC has adopted GAAP requirements in its own regulations that may make expert testimony about *GAAP* relevant and admissible, that does not, however, mean that an accountant generally can opine on SEC regulations *unrelated to GAAP*.

### III.    Mr. McIsaac Opines On Matters Outside the Scope Of His Expertise.

14.    Movants respond to Barclays' argument that Mr. McIsaac should be precluded from opining on what is or is not required of a broker-dealer that has filed for SIPA liquidation by claiming that they do not purport to call Mr. McIsaac as an expert on SIPA. Movants' Opp. at ¶¶ 20-21. That response would be sufficient if it were true, but the fact is that it is not.

15.    Mr. McIsaac's expert report makes it perfectly clear that Movants have proffered Mr. McIsaac to opine on LBI's obligations under SIPA, including:

---

[4] The same is true in the case of *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531 (S.D.N.Y. 1990), also cited by Movants.

6

- Whether there currently is a shortfall in "customer property" under SIPA. *See, e.g.,* McIsaac Affidavit at ¶¶ 49, 60; McIsaac Rebuttal at ¶ 7.

- What constitutes "customer property" post-filing and discussion of "applicable rules" after SIPA filing. McIsaac Rebuttal at ¶13 (conclusions regarding undifferentiated post-filing "customer property" and "applicable rules" without distinction between SEC Rule 15c3-3 and SIPA).

- That transfer of OCC margin as a result of post-liquidation events (the Closing of the Sale Transaction) requires adjustment to pre-filing reserve calculations under Rule 15c3-3. McIsaac Affidavit at ¶ 45; McIsaac Rebuttal at ¶¶ 24-25.

16.  This testimony should be excluded not only because it is testimony on issues of law, but also because, in sharp contrast to Mr. McIsaac's experience with broker-dealers in the ordinary course of business, Mr. McIsaac has never had experience with a broker-dealer in liquidation, McIsaac Dep. Tr. at 273:23-274:1, and can therefore do no more than speculate as to proper post-filing procedures and obligations.

17.  Nor can Movants salvage Mr. McIsaac's testimony regarding LBI's ability to conduct proper Reserve Calculations on or around September 19, 2008. As demonstrated in Barclays' opening brief, Mr. McIsaac's own admissions demonstrate his lack of experience and expertise in LBI's systems, a fact that precludes him from offering reliable expert testimony on these systems and the impact that any problems with these systems may have had on Lehman's ability to conduct an accurate reserve calculation on September 19, 2008. Movants claim that Mr. McIsaac's testimony "does not concern LBI's *ability* to conduct a reserve calculation, but rather addresses the *accuracy* of the reserve calculation that LBI actually completed as of September 19, 2008," and should be permitted on that basis. Movants' Opp. at ¶ 21 (emphasis in original). Movants' claim is belied by the fact that there is a section in Mr. McIsaac's report entitled "LBI's Systems for Computing its Reserve Requirements," in which Mr. McIsaac discusses "technical difficulties" faced by LBI during its last week of operations, and apparent

7

"lack of access to certain electronic systems." McIsaac Report at ¶¶ 23-26; *id.* at ¶¶ 28-29; McIsaac Rebuttal at ¶ 9; *see also* Movants' Opp. at ¶ 21 (conceding that Mr. McIsaac's report at least *discusses* "issues concerning LBI's ability to perform the September 19 calculation").

18.  Movants claim that this portion of Mr. McIsaac's expert report was intended merely to present context and, for that reason, it should be permitted. Movants' Opp. at ¶ 21. Yet Mr. McIsaac's report leaves no question as to the purpose for which his opinions in this regard were being offered — to support Mr. McIsaac's conclusion that there were inaccuracies in Lehman's calculations. *See, e.g.*, McIsaac Report at ¶ 28 (discussing "technical difficulties" and "general ledger and stock record breaks" that led to "various issues surrounding the information provided by the various systems and used for the Reserve Formula"); *id.* at ¶ 29 (noting that the reserve computation was "further hampered by the lack of access to certain electronic systems"); *id.* at ¶ 29 (concluding that the access problems involving the Chase system caused an "[i]nability to monitor these accounts" that "would have impeded LBI's ability to keep up-to-date records and to process settlements of both customer and firm transactions on a timely and automated basis"); *id.* at ¶ 30 (concluding that "an unusually large amount of breaks" in the system "likely contributed to some of the errors in LBI's reserve calculations as of September 19").

19.  Given Mr. McIsaac's admitted lack of familiarity with the systems on which he opines, he is clearly unqualified to speak to purported systems issues, their materiality, or their severity, and is certainly not qualified to draw any reliable inferences concerning the impact such issues may have had on Lehman's ability to conduct accurate calculations. Thus, Mr. McIsaac's testimony, to the extent it addresses issues that purportedly affected Lehman's ability to conduct accurate calculations, must be excluded as beyond the scope of his area of expertise.

IV. **September 19, 2008 is Not the Proper Date For Consideration of the Adequacy of LBI's Reserve Account.**[5]

20. Finally, Movants have failed to justify Mr. McIsaac's use of September 19, 2008 as the relevant "computation date" for assessing the sufficiency of assets held in LBI's reserve account as of that date. As noted in Barclays' opening brief, there is a critical difference under the applicable rules between the reserve calculation conducted on a particular day and the amount required to be held in a reserve account on that day. Thus, as a matter of law, a reserve calculation conducted as of Friday, September 19, 2008, does not determine the amount required to be held in the reserve account on that day; what it does determine is the amount required to be deposited in the reserve account two business days later.

21. By contrast, what determines the sufficiency of the assets held in a reserve account on a particular day is the reserve calculation that was performed at least two business days *prior* to the day in question. That is why Barclays contends that the September 19 reserve calculation is an inappropriate indicator of the sufficiency of LBI's reserve account on September 19. And that is why Barclays maintains that only the September 17 reserve calculation could be relevant under the facts of this *particular* case.

22. Apart from choosing to ignore the governing law altogether, claiming that it just does not "make any sense," Movants' Opp. at ¶ 22, Movants' only response is to misconstrue that law. For example, Movants incorrectly cite SEC Rule 15c3-3(e)(3) for the proposition that "there was a *deficiency* in LBI's Customer Reserve Accounts on September 19." Movants' Opp. at ¶ 24 (emphasis added). The cited regulation in fact makes clear that although a broker-dealer is required to conduct *computations* at each week's end, it is not required to make any related

---

[5] Notably, the fact that Movants argue vehemently that SIPA requires consideration of a reserve calculation on September 19, 2008 demonstrates that Mr. McIsaac's interpretations of LBI's post-filing conduct is based at least in part on his non-expert interpretation of the SIPA regime.

9

*deposits* in the account until one hour after the opening of business on the *second following business day*. *See* 17 C.F.R. § 15c3-3(e)(3) ("Computations necessary to determine the amount required to be deposited as specified in paragraph (e)(1) of this section shall be made weekly, as of the close of the last business day of the week, and the deposit so computed shall be made no later than 1 hour after the opening of banking business on the second following business day"). Accordingly, there is no "deficit" in a broker-dealer's reserve accounts based on a Friday computation unless and until the broker-dealer fails to deposit the funds after opening for business two business days later. LBI never opened for business after September 19, and therefore was never in violation of SEC Rule 15c3-3 based on any failure to make deposits arising from a September 19 reserve calculation.

23.    Thus, as a matter of law, Mr. McIsaac uses an improper (and irrelevant) reserve calculation to justify his conclusion that there was a "deficit" in LBI's reserve account on September 19, 2008. His opinion should therefore be excluded.

24.    The decision in *In re MJK Clearing, Inc.*, 286 B.R. 109 (Bankr. D. Minn. 2002) does not assist Movants. In addition to being non-binding precedent from another jurisdiction, the *MJK* decision did not address the issue presented by this motion. In *MJK*, the broker dealer had not conducted either computations or deposits for more than two weeks prior to filing for SIPA protection, and accordingly, was not in compliance with Rule 15c3-3. 286 B.R. at 131.[6] The *MJK* Court's holding that the SIPA trustee should look to other assets of the broker-dealer to make up any deficiency in the account says nothing about whether or not there was, in fact, a deficiency in LBI's account here.

---

[6] Although the SEC had temporarily suspended the "computation" requirements of 15c3-3 in response to the September 11, 2001 terrorist attacks, it had not similarly suspended the "deposit" requirements of that regulation. *Id.*

10

25.   Moreover, the *MJK* decision does not in fact conduct an analysis of the propriety of using a calculation as of the filing date to determine the proper level of deposits in a reserve account, but merely assumes that to be the case. 286 B.R. at 131. Under SIPA, the term "customer property" includes assets as of the filing date that "*would have been set aside* or held for the benefit of customers under applicable laws, rules, and regulations." *See* 15 U.S.C. § 78lll(4). It does not state that "customer property" includes money that did *not* have to be set aside as of the filing date, as was the case here. Thus, *MJK* does not support Movants' assertions regarding the relevance of Mr. McIsaac's testimony

## CONCLUSION

For the foregoing reasons, as well as those set forth in its opening memorandum, Barclays respectfully requests that the Court enter an Order excluding the proffered expert testimony of Mr. McIsaac.

Dated:   New York, New York
         August 16, 2010

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Jonathan D. Schiller
Jonathan D. Schiller
Hamish P.M. Hume
Jack G. Stern
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Attorneys for Barclays Capital Inc.

11