**Hearing Date: TBD**
**Objection Deadline: TBD**

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------- x
                                                            :
In re:                                                      :        Chapter 11 Case No.
                                                            :
LEHMAN BROTHERS HOLDINGS INC., et al.,                      :        08-13555 (JMP)
                                                            :
                    Debtors.                                :        (Jointly Administered)
                                                            :
----------------------------------------------------------- x
```

**FIFTH APPLICATION OF MILBANK, TWEED, HADLEY & McCLOY LLP,
COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR
INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES
RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
FEBRUARY 1, 2010 THROUGH AND INCLUDING MAY 31, 2010**

| | |
|---|---|
| Name of Applicant: | Milbank, Tweed, Hadley & McCloy LLP |
| Authorized to Provide Professional Services to: | Official Committee of Unsecured Creditors |
| Date of Retention: | November 18, 2008 (effective as of September 17, 2008) |
| Period for which compensation and reimbursement is sought: | February 1, 2010 – May 31, 2010 |

Amount of Compensation
requested:                          $19,450,342.75

Amount of Expense
Reimbursement requested:            $851,804.27

This is an: __X__ interim _____ final application.

This is the fifth interim fee application filed by Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP in these
cases.

**FIFTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(FEBRUARY 1, 2010 – MAY 31, 2010)**

| Name | Position; Experience | Hourly Rate | Total Hours | Total Compensation |
|---|---|---|---|---|
| Paul Aronzon | Financial Restructuring Partner for 20 years; admitted in 1979. | $1,050 | 67.70 | $71,085.00 |
| Dennis Dunne | Financial Restructuring Partner for 11 years; admitted in 1991. | $1,050 | 551.20 | $578,760.00 |
| Scott Edelman | Litigation Partner for 14 years; admitted in 1989. | $1,050 | 7.50 | $7,875.00 |
| Trayton Davis | Alternative Investments Partner for 21 years, admitted in 1981. | $1,025 | 11.80 | $12,095.00 |
| Jay Grushkin | Alternative Investments Partner for 21 years, admitted in 1982. | $1,025 | 22.60 | $23,165.00 |
| Michael Hirschfeld | Litigation Partner for 28 years; admitted in 1974. | $1,025 | 155.90 | $159,797.50 |
| Marcelo Mottesi | Global Securities Partner for 11 years; admitted in 1995. | $1,025 | 144.40 | $148,010.00 |
| Andrew Tomback | Litigation Partner for 13 years; admitted in 1987. | $1,025 | 478.70 | $490,667.50 |
| Elizabeth Besio Hardin | Global Finance Partner for 13 years; admitted in 1996. | $975 | 21.60 | $21,060.00 |
| Thomas Janson | Global Corporate Partner for 7 years; admitted in 1982. | $950 | 4.30 | $4,085.00 |
| Dale Ponikvar | Tax Partner for 20 years; admitted in 1981. | $950 | 286.90 | $272,555.00 |
| Nicholas James Angel | Financial Restructuring Partner for 2 years; admitted in 1986. | $950 | 37.20 | $35,340.00 |
| Peter Benudiz | Global Corporate Partner for 17 years; admitted in 1987. | $950<br>$475* | 197.80<br>25.70 | $187,910.00<br>$12,207.50 |
| David Cohen | Litigation Partner for 8 years; admitted in 1994. | $950<br>$475* | 564.20<br>29.40 | $535,990.00<br>$13,965.00 |
| Robert Finkel | Global Corporate Partner for 14 years; admitted in 1988. | $925 | 8.10 | $7,492.50 |
| David Lamb | Global Corporate Partner for 20 years; admitted in 1992. | $925<br>$462.5* | 116.00<br>9.50 | $107,300.00<br>$4,393.75 |

| | | | | |
|---|---|---|---|---|
| Eric Moser | Global Finance Partner for 11 years; admitted in 1991. | $925 | 261.40 | $241,795.00 |
| Andrew Walker | Tax Partner for 7 years; admitted in 1995. | $925 | 42.10 | $38,942.50 |
| Paul Wessel | Tax Partner for 14 years; admitted in 1988. | $925 | 25.50 | $23,587.50 |
| Wilbur Foster | Financial Restructuring Partner for 19 years; admitted in 1982. | $925 | 655.10 | $605,967.50 |
| Winthrop Brown | Global Finance Partner for 27 years; admitted in 1975. | $900 | 30.70 | $27,630.00 |
| Catherine Marsh | Global Project Finance Partner for 5 years; admitted in 1995. | $900 | 20.40 | $18,360.00 |
| David Wolfson | Global Corporate Partner for 6 years; admitted in 1994. | $875 | 44.10 | $38,587.50 |
| Brett Goldblatt | Global Corporate Partner for 5 years; admitted in 1998. | $875 | 26.20 | $22,925.00 |
| James Warbey | Global Finance Partner for 5 years; admitted in 1996. | $875 | 313.30 | $274,137.50 |
| Debra Alligood White | Global Corporate Partner for 4 years; admitted in 1993. | $850 | 2.00 | $1,700.00 |
| Russell Kestenbaum | Tax Partner for 3 years; admitted in 1999. | $825 | 145.40 | $119,955.00 |
| Paul Denaro | Global Securities Partner for 2 years; admitted in 2000. | $800 | 301.80 | $241,440.00 |
| Robert Liubicic | Litigation Partner for 4 months; admitted in 1999. | $750 | 263.50 | $197,625.00 |
| Evan Fleck | Financial Restructuring Partner for 4 months; admitted in 2002. | $750 $375* | 1,053.80 44.00 | $790,350.00 $16,500.00 |
| Risa Rosenberg | Financial Restructuring Of Counsel for 8 years; admitted in 1984. | $850 | 184.30 | $156,655.00 |
| Dennis O'Donnell | Financial Restructuring Of Counsel for 3 years; admitted in 1992. | $810 | 1,013.70 | $821,097.00 |
| Richard Rosberger | Litigation Of Counsel for 3 years; admitted in 1994. | $750 | 343.40 | $257,550.00 |
| David Sieradzki | Litigation Associate for 15 years; admitted in 1996. | $720 | 5.90 | $4,248.00 |
| Andrew Beirne | Litigation Associate for 14 years; admitted in 1996. | $695 | 98.80 | $68,666.00 |

| Lisa Brabant | Real Estate Associate for 12 years; admitted in 1999. | $695 | 33.60 | $23,352.00 |
|---|---|---|---|---|
| Stephen Tudway | Litigation Associate for 12 years; admitted in 1998. | $695 | 84.40 | $58,658.00 |
| Drew Batkin | Tax Associate for 8 years; admitted in 2003. | $695 | 394.40 | $274,108.00 |
| Aaron Renenger | Litigation Associate for 8 years; admitted in 2002. | $695 | 439.60 | $305,522.00 |
| Steven Szanzer | Financial Restructuring Associate for 10 years; admitted in 2001. | $695 | 318.50 | $221,357.50 |
| Lena Mandel | Senior Attorney; admitted in 1991. | $685 | 383.60 | $262,766.00 |
| Adrian Azer | Litigation Associate for 7 years; admitted in 2003. | $675 $337.5* | 759.00 15.50 | $512,325.00 $5,231.25 |
| Irene Bogdashevsky | Financial Restructuring Associate for 7 years; admitted in 2004. | $675 | 61.00 | $41,175.00 |
| James Bulger | Financial Restructuring Associate for 7 years; admitted in 2004. | $675 | 44.60 | $30,105.00 |
| Neda Matar | Global Finance Associate for 7 years; admitted in 2004. | $675 | 270.60 | $182,655.00 |
| Erika Kuver-Del Duca | Real Estate Associate for 7 years; admitted in 2004. | $675 | 21.40 | $14,445.00 |
| Brian Stern | Global Corporate Associate for 7 years; admitted in 2003. | $675 | 12.90 | $8,707.50 |
| Kevin Brown | Tax Associate for 6 years; admitted in 2008. | $650 | 3.00 | $1,950.00 |
| Daniel De Souza | Litigation Associate for 6 years; admitted in 2005. | $650 | 305.10 | $198,315.00 |
| Peter Devonshire | Global Finance Associate for 6 years; admitted in 2007. | $650 | 30.50 | $19,825.00 |
| Melissa Gambol | Global Securities Associate for 6 years; admitted in 2007. | $650 | 42.90 | $27,885.00 |
| Grace Gilligan | Litigation Associate for 6 years; admitted in 2005. | $650 | 169.70 | $110,305.00 |
| Aisha Greene | Global Leveraged Finance Associate for 6 years; admitted in 2005. | $650 | 146.90 | $95,485.00 |

| | | | | |
|---|---|---|---|---|
| Peter Newman | Financial Restructuring Associate for 6 years; admitted in 2005. | $650 | 37.30 | $24,245.00 |
| Scott Rozic | Global Securities Associate for 6 years; admitted in 2004. | $650 | 173.50 | $112,775.00 |
| Maximilian Schneider | Global Leveraged Finance Associate for 6 years; admitted in 2005. | $650 | 39.40 | $25,610.00 |
| Tamieka Spencer Bruce | Litigation Associate for 6 years; admitted in 2008. | $650 | 27.70 | $18,005.00 |
| Melanie Westover | Litigation Associate for 6 years; admitted in 2005. | $650 | 16.00 | 10,400.00 |
| Temitope Adesanya | Global Project Finance Associate for 5 years; admitted in 2006. | $625 | 78.10 | $48,812.50 |
| Douglas Barnes | Global Corporate Associate for 5 years; admitted in 2006. | $625 | 26.10 | $16,312.50 |
| Ana Bast | Global Securities Associate for 5 years; admitted in 2006. | $625 | 17.00 | $10,625.00 |
| Karen Bhatia | Global Securities Associate for 5 years; admitted in 2007. | $625 | 119.00 | $74,375.00 |
| John White | Litigation Associate for 5 years; admitted in 2006. | $625 | 569.60 | $356,000.00 |
| Simon Williams | Global Finance Associate for 5 years; admitted in 2008. | $625 | 139.30 | $87,062.50 |
| Nicholas Bassett | Litigation Associate for 4 years; admitted in 2007. | $600 $300* | 393.80 9.00 | $236,280.00 $2,700.00 |
| Victoria Boid | Global Finance Associate for 4 years; admitted in 2007. | $600 | 67.40 | $40,440.00 |
| Jonathan Brown | Global Finance Associate for 4 years; admitted in 2007. | $600 | 5.00 | $3,000.00 |
| Melissa Ann Clark | Global Corporate Associate for 4 years; admitted in 2006. | $600 | 97.10 | $58,260.00 |
| Rachel Fink | Global Corporate Associate for 4 years; admitted in 2007. | $600 | 41.10 | $24,660.00 |
| James Harris | Financial Restructuring Associate for 4 years; admitted in 2008. | $600 | 257.50 | $154,500.00 |
| Emma Hogwood | Litigation Associate for 4 years; admitted in 2006. | $600 | 71.50 | $42,900.00 |

| | | | | |
|---|---|---|---|---|
| Aluyah Imoisili | Litigation Associate for 4 years; admitted in 2006. | $600 | 48.10 | $28,860.00 |
| Grace Lim | Global Corporate Associate for 4 years; admitted in 2005. | $600 | 4.70 | $2,820.00 |
| Mary Santanello | Alternative Investments Associate for 4 years; admitted in 2007. | $600 $300 | 37.80 1.00 | $22,680.00 $300.00 |
| Jeremy Sussman | Financial Restructuring Associate for 4 years; admitted in 2007. | $600 | 209.90 | $125,940.00 |
| Wendy Williams | Global Securities Associate for 4 years; admitted in 2007. | $600 | 335.20 | $201,120.00 |
| Yeping Zhou | Global Securities Associate for 4 years; admitted in 2007. | $600 | 17.80 | $10,680.00 |
| Husam Badawi | Global Securities Associate for 3 years; admitted in 2008. | $575 | 110.10 | $63,307.50 |
| Constance Beverley | Litigation Associate for 3 years; admitted in 2008. | $575 | 382.80 | $220,110.00 |
| Brianne Copp | Litigation Associate for 3 years; admitted in 2008. | $575 | 13.40 | $7,705.00 |
| Emin Guseynov | Global Leveraged Finance Associate for 3 years; admitted in 2008. | $575 | 2.70 | $1,552.50 |
| Tarnetta Jones | Global Leveraged Finance Associate for 3 years; admitted in 2008. | $575 | 65.10 | $37,432.50 |
| Sofia Khan | Litigation Associate for 3 years; admitted in 2008. | $575 | 41.70 | $23,977.50 |
| Bria La Salle Mertens | Financial Restructuring Associate for 3 years; admitted in 2008. | $575 | 21.80 | $12,535.00 |
| Michael Lee | Global Securities Associate for 3 years; admitted in 2008. | $575 | 256.20 | $147,315.00 |
| Nicole Leyton | Tax Associate for 3 years; admitted in 2008. | $575 | 41.90 | $24,092.50 |
| Michael Lynch | Global Corporate Associate for 3 years; admitted in 2007. | $575 | 455.30 | $261,797.50 |
| Gregory Papeika | Financial Restructuring Associate for 3 years; admitted in 2008. | $575 | 309.30 | $177,847.50 |

| | | | | |
|---|---|---|---|---|
| Charles Rubio | Financial Restructuring Associate for 3 years; admitted in 2008. | $575 | 176.30 | $101,372.50 |
| Andrew Sullivan | Global Securities Associate for 3 years; admitted in 2008. | $575 | 130.10 | $74,807.50 |
| Laurice Thrasher | Global Leveraged Finance Associate for 3 years; admitted in 2008. | $575 | 23.00 | $13,225.00 |
| Andrew Young | Financial Restructuring Associate for 3 years; admitted in 2006. | $575 | 199.70 | $114,827.50 |
| Jeeseon Ahn | Global Alternative Investments Associate for 2 years; admitted in 2009. | $525 | 11.60 | $6,090.00 |
| Sonja Andersen | Global Transportation and Space Finance Associate for 2 years; admitted in 2009. | $525 | 223.30 | $117,232.50 |
| Michael Applebaum | Tax Associate for 2 years; admitted in 2009. | $525 | 7.70 | $4,042.50 |
| Kurt Avarell | Tax Associate for 2 years; admitted in 2009. | $525 | 102.90 | $54,022.50 |
| Adam Bagley | Global Corporate Associate for 2 years; admitted in 2009. | $525 | 13.90 | $7,297.50 |
| Jennifer Beaudry | Global Securities Associate for 2 years; admitted in 2009. | $525 | 197.50 | $103,687.50 |
| Adlin Castro | Global Securities Associate for 2 years; admitted in 2009. | $525 | 138.90 | $72,922.50 |
| Ateesh Chanda | Litigation Associate for 2 years; admitted in 2009. | $525 | 248.40 | $130,410.00 |
| Wayne Ren Chang | Litigation Associate for 2 years; admitted in 2009. | $525 | 21.80 | $11,445.00 |
| Alecia Chen | Alternative Investments Associate for 2 years; admitted in 2009. | $525 | 17.00 | $8,925.00 |
| Michael Clarke | Global Finance Associate for 2 years; admitted in 2009. | $525 | 71.60 | $37,590.00 |
| Andrea Conis | Financial Restructuring Associate for Associate for 2 years; admitted in 2009. | $525 | 697.20 | $366,030.00 |

| | | | | |
|---|---|---|---|---|
| Julie Constantinides | Global Corporate Associate for 2 years; admitted in 2009. | $525 | 29.80 | $15,645.00 |
| Erin Culbertson | Litigation Associate for 2 years; admitted in 2009. | $525 | 419.80 | $220,395.00 |
| Rachel Dobson | Litigation Associate for 2 years; admitted in 2009. | $525 | 489.30 | $256,882.50 |
| Nicole Fidler | Litigation Associate for 2 years; admitted in 2009. | $525 | 29.10 | $15,277.50 |
| Melissa Galicia | Global Transportation and Space Finance Associate for 2 years; admitted in 2009. | $525 | 273.30 | $143,482.50 |
| Derek Gluckman | Global Transportation and Space Finance Associate for 2 years; admitted in 2009. | $525 | 236.00 | $123,900.00 |
| Joanna L. Grossman | Tax Associate for 2 years; admitted in 2009. | $525 | 6.50 | $3,412.50 |
| Christopher Hower | Litigation Associate for 2 years; admitted in 2009. | $525 | 82.00 | $43,050.00 |
| Jared Joyce-Schleimer | Financial Restructuring Associate for 2 years; admitted in 2009. | $525 | 485.10 | $254,677.50 |
| Benjamin Keller | Real Estate Associate for 2 years; admitted in 2009. | $525 | 6.90 | $3,622.50 |
| Alexander Klein | Global Leveraged Finance Associate for 2 years; admitted in 2009. | $525 | 21.00 | $11,025.00 |
| Marianna Kosharovsky | Global Securities Associate for 2 years; admitted in 2009. | $525 | 264.80 | $139,020.00 |
| Kristen Lam | Global Transportation and Space Finance Associate for 2 years; admitted in 2009. | $525 | 102.80 | $53,970.00 |
| Brian Lee | Global Finance Associate for 2 years; admitted in 2009. | $525 | 38.40 | $20,160.00 |
| Roger Lee | Financial Restructuring Associate for 2 years; admitted in 2009. | $525 | 19.50 | $10,237.50 |
| Ulric Lewen | Global Securities Associate for 2 years; admitted in 2009. | $525 | 130.90 | $68,722.50 |

| Abbey Mansfield | Global Leveraged Finance Associate for 2 years; admitted in 2009. | $525 | 126.70 | $66,517.50 |
|---|---|---|---|---|
| Jan Nishizawa | Global Corporate Associate for 2 years; admitted in 2009. | $525<br>$262.5* | 63.50<br>11.90 | $33,337.50<br>$3,123.75 |
| Tanja L. Olano | Global Corporate Associate for 2 years; admitted in 2009. | $525 | 51.60 | $27,090.00 |
| Brendan Riley | Litigation Associate for 2 years; admitted in 2009. | $525 | 340.40 | $178,710.00 |
| Joanne Robertson | Global Finance Associate for 2 years; admitted in 2009. | $525 | 306.30 | $160,807.50 |
| Stephen Rose | Global Securities Associate for 2 years; admitted in 2009. | $525 | 139.40 | $73,185.00 |
| Matthew Squires | Global Securities Associate for 2 years; admitted in 2009. | $525 | 43.90 | $23,047.50 |
| Jeremy Steckel | Global Securities Associate for 2 years; admitted in 2009. | $525 | 368.40 | $193,410.00 |
| Stephanie Swanson | Global Securities Associate for 2 years; admitted in 2009. | $525 | 251.30 | $131,932.50 |
| Brittany Akins | Litigation Associate for 8 months; admitted in 2010. | $450 | 807.00 | $363,150.00 |
| Jon Babtie | Global Corporate Associate for 8 months; admitted in 2010. | $450 | 13.20 | $5,940.00 |
| Thallen Brassel | TAx Associate for 8 months; admitted in 2010. | $450 | 109.70 | $49,365.00 |
| Deana Brown | Financial Restructuring Associate for 8 months; admitted in 2010. | $450<br>$225* | 13.70<br>16.40 | $6,165.00<br>$3,690.00 |
| John Calabrese | Litigation Associate for 8 months; admitted in 2010. | $450 | 119.40 | $53,730.00 |
| Ginni Chen | Litigation Associate for 8 months; admitted in 2010. | $450 | 119.40 | $53,730.00 |
| Philippe Danielides | Global Transportation and Space Finance Associate for 8 months; admitted in 2010. | $450 | 22.30 | $10,035.00 |
| Victoria Farren | Alternative Investments Associate for 8 months; admitted in 2010. | $450 | 44.90 | $20,205.00 |

| | | | | |
|---|---|---|---|---|
| Julia Fish | Alternative Investments Associate for 8 months; admitted in 2010. | $450 | 85.40 | $38,430.00 |
| Bradley Friedman | Financial Restructuring Associate for 8 months; admitted in 2010. | $450 | 597.10 | $268,695.00 |
| Vina Ha | Litigation Associate for 8 months; admitted in 2010. | $450 | 49.00 | $22,050.00 |
| Elena Hassan | Global Corporate Associate for 8 months; admitted in 2010. | $450 | 9.50 | $4,275.00 |
| Jacob Jou | Litigation Associate for 8 months; admitted in 2010. | $450 | 20.20 | $9,090.00 |
| Matthew Kanter | Financial Restructuring Associate for 8 months; admitted in 2010. | $450 | 628.50 | $282,825.00 |
| Andrea Kelly | Litigation Associate for 8 months; admitted in 2010. | $450 | 90.40 | $40,680.00 |
| Ethan Lee | Litigation Associate for 8 months; admitted in 2010. | $450 | 220.10 | $99,045.00 |
| Kevin Lee | Global Corporate Associate for 8 months; admitted in 2010. | $450 | 5.30 | $2,385.00 |
| Kathryn Lenahan | Financial Restructuring Associate for 8 months; admitted in 2010. | $450 | 40.10 | $18,045.00 |
| Denise Linton | Litigation Associate for 8 months; admitted in 2010. | $450 | 474.60 | $213,570.00 |
| Tiara Lipps | Real Estate Associate for 8 months; admitted in 2010. | $450 | 6.20 | $2,790.00 |
| Alastair Macdonald | Global Transportation and Space Finance Associate for 8 months; admitted in 2010. | $450 | 14.70 | $6,615.00 |
| James Marshall | Global Securities Associate for 8 months; admitted in 2010. | $450 | 288.60 | $129,870.00 |
| Richard Mo | Global Securities Associate for 8 months; admitted in 2010. | $450 | 116.50 | $52,425.00 |
| Andrew Morton | Financial Restructuring Associate for 8 months; admitted in 2010. | $450 | 50.30 | $22,635.00 |

| | | | | |
|---|---|---|---|---|
| Vanessa Ortblad | Global Project Finance Associate for 8 months; admitted in 2010. | $450 | 12.20 | $5,490.00 |
| Jonathan Ostrzega | Financial Restructuring Associate for 8 months; admitted in 2010. | $450 | 241.40 | $108,630.00 |
| Amaldo Rego, Jr. | Global Securities Associate for 8 months; admitted in 2010. | $450 | 280.60 | $126,270.00 |
| James Reilly | Litigation Associate for 8 months; admitted in 2010. | $450 | 76.80 | $34,560.00 |
| Katherine Rhodes | Litigation Associate for 8 months; admitted in 2010. | $450 | 12.50 | $5,625.00 |
| Joanne Ricciardiello | Global Transportation and Space Finance Associate for 8 months; admitted in 2010. | $450 | 41.10 | $18,495.00 |
| Paul Riley | Litigation Associate for 8 months; admitted in 2010. | $450 | 210.20 | $94,590.00 |
| Iiya Ross | Global Securities Associate for 8 months; admitted in 2010. | $450 | 176.00 | $79,200.00 |
| Neema Saran | Litigation Associate for 8 months; admitted in 2010. | $450 | 94.90 | $42,705.00 |
| Megha Shah | Global Securities Associate for 8 months; admitted in 2010. | $450 | 159.00 | $71,550.00 |
| Nehal Siddiqui | Global Corporate Associate for 8 months; admitted in 2010. | $450 | 27.50 | $12,375.00 |
| Sunila Sreepada | Litigation Associate for 8 months; admitted in 2010. | $450 | 42.30 | $19,035.00 |
| Drew Stewart | Litigation Associate for 8 months; admitted in 2010. | $450 | 40.40 | $18,180.00 |
| Brian Sturm | Financial Restructuring Associate for 8 months; admitted in 2010. | $450 | 10.40 | $4,680.00 |
| Matthew Telford Vidal | Global Securities Associate for 8 months; admitted in 2010. | $450 | 134.50 | $60,525.00 |
| Shujun Tian | Global Securities Associate for 8 months; admitted in 2010. | $450 | 177.70 | $79,965.00 |

| | | | | |
|---|---|---|---|---|
| Jonathan Walder | Litigation Associate for 8 months; admitted in 2010. | $450 | 108.60 | $48,870.00 |
| Pong-Jeh Wang | Global Securities Associate for 8 months; admitted in 2010. | $450 | 102.90 | $46,305.00 |
| Eric Weiss | Litigation Associate for 8 months; admitted in 2010. | $450 | 96.40 | $43,380.00 |
| Jeremy Wells | Global Securities Associate for 8 months; admitted in 2010. | $450 | 705.20 | $317,340.00 |
| Brian Youn | Litigation Associate for 8 months; admitted in 2010. | $450 | 12.70 | $5,715.00 |
| Zen Zhang | Global Corporate Associate for 8 months; admitted in 2010. | $450 | 38.10 | $17,145.00 |
| Jenny Zhou | Litigation Associate for 8 months; admitted in 2010. | $450 | 407.90 | $183,555.00 |
| Samuel Giorgi | Financial Restructuring International Attorney. | $450 | 3.00 | $1,350.00 |
| Abayomi A. Ayandipo | Case Manager | $250 | 175.40 | $43,850.00 |
| Monica Alston | Case Manager | $250 | 372.50 | $93,125.00 |
| Oscar Castrillon | Case Manager | $250 | 29.70 | $7,425.00 |
| Jennifer Russo | Case Manager | $250 | 42.80 | $10,700.00 |
| Angel Anderson | Case Manager | $215 | 342.90 | $73,723.50 |
| Rena Ceron | Case Manager | $215 | 247.30 | $53,169.50 |
| Richard Cosentino | Legal Assistant | $275 | 329.00 | $90,475.00 |
| Randy Hooks | Legal Assistant | $275 | 262.40 | $72,160.00 |
| Kim Strosser | Legal Assistant | $275 | 166.00 | $45,650.00 |
| Charles Sheehan | Legal Assistant | $265 | 104.80 | $27,772.00 |
| Mayuko Ichihara | Legal Assistant | $240 | 2.20 | $528.00 |
| Dakota Blake | Legal Assistant | $215 | 25.30 | $5,439.50 |
| Paul Butters | Legal Assistant | $185 | 103.10 | $19,073.50 |
| Peter J. Delfausse | Legal Assistant | $185 | 29.10 | $5,383.50 |
| Charmaine Thomas | Legal Assistant | $185 | 183.00 | $33,855.00 |
| Toi K. Carrion | Legal Assistant | $175 | 41.50 | $7,262.50 |
| Kyle Martin | Legal Assistant | $175 | 638.10 | $111,667.50 |
| Jason Hsu | Legal Assistant | $165 | 293.50 | $48,427.50 |
| Sarah P. Steele | Legal Assistant | $165 | 41.50 | $6,847.50 |
| Jacqueline Brewster | Managing Attorney Clerk | $175 | 62.00 | $10,850.00 |

| | | | | |
|---|---|---|---|---|
| Matthew Ottenstein | Librarian | $205 | 12.30 | $2,521.50 |
| Robin Traylor | Librarian | $205 | 37.80 | $7,749.00 |
| Barbara Peck | Librarian | $190 | 2.00 | $380.00 |
| Janelle S. Blanchard | Litigation Support Specialist | $285 | 6.00 | $1,710.00 |
| Marcin Grabysz | Litigation Support Specialist | $285 | 102.20 | $29,127.00 |
| Shaun M. De Suze | Litigation Support Specialist | $275 | 15.50 | $4,262.50 |
| Joseph S. Klock | Litigation Support Specialist | $275 | 20.80 | $5,720.00 |
| Rhodely Vallon | Litigation Support Specialist | $275 | 376.80 | $103,620.00 |
| Theartis Everett | Litigation Support Specialist | $255 | 97.40 | $24,837.00 |
| Juan Rojas | Litigation Support Specialist | $240 | 21.70 | $5,208.00 |
| Gabrielle Zsebi | Librarian | $210 | 3.70 | $777.00 |
| Maria Smilen | File Clerk | $115 | 7.20 | $828.00 |
| | | | | |
| **Total** | | **$577.45 (blended rate)[1]** | **33,683.10 hours** | **$19,450,342.75** |

---

[1]    The blended rate <u>excluding</u> paraprofessionals is $627.27 per hour.

*    In accordance with the Fee Committee Guidelines, Milbank has billed non-working travel time at 50% of normal rates.

FIFTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & MᶜCLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(FEBRUARY 1, 2010 – MAY 31, 2010)

| ACTIVITY | HOURS | FEES |
|---|---|---|
| General Case Administration | 528.70 | $357,353.50 |
| General Case Strategy Meetings | 20.00 | 16,289.00 |
| Project Monitoring/Court Calendar & Docket Maintenance | 642.70 | 189,977.50 |
| Hearings and Court Communications | 313.00 | 172,150.00 |
| Non-Working Travel | 197.70 | 92,048.75 |
| Interested Party Communications/Website/Lehman Team Hotline | 314.70 | 179,799.00 |
| Communications with Debtors | 67.40 | 52,640.00 |
| Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee | 1,090.70 | 755,533.00 |
| Secured Creditors Issues/Meetings/Communications | .80 | 768.00 |
| LBI/SIPC Coordination and Issues | 322.30 | 189,047.00 |
| Cash Management | 5.30 | 3,642.00 |
| Insurance Issues | 8.80 | 5,911.50 |
| Employee/ERISA/Benefits/Pension Issues | 44.50 | 22,512.50 |
| Tax Issues | 890.30 | 625,551.00 |
| Corporate Governance | .90 | 580.50 |
| Other General Business Operation Issues | 87.50 | 63,816.00 |
| Intercompany Issues | 940.90 | 612,724.50 |
| Real Estate Matters | 1,191.60 | 891,533.00 |
| Private Equity | 117.10 | 86,986.50 |
| Derivatives/SWAP Agreement Issues (Including Derivatives- Related Adversary Proceedings, Alternative Dispute Resolution, and Claims Reconciliation and Litigation) | 5,291.30 | 3,442,935.50 |
| Loans/Investments | 363.50 | 189,654.50 |
| Domestic Bank and Related Regulatory Issues | 89.50 | 61,631.00 |

| | | |
|---|---|---|
| International Insolvency Issues | 562.10 | 341,642.00 |
| Schedules/Statement of Financial Affairs | 2.80 | 1,762.50 |
| Non-Derivative Automatic Stay/Safe Harbor Issues | 169.70 | 85,701.50 |
| Miscellaneous Asset Sales/363 Issues | 142.80 | 83,663.50 |
| Non-Derivative Executory Contracts/365 Issues | 52.30 | 27,762.00 |
| DIP Financing | 5.20 | 1,366.00 |
| Exit Financing | 2.80 | 2,030.00 |
| Plan of Reorganization/Plan Confirmation/Plan Implementation | 2,357.00 | 1,591,053.00 |
| Disclosure Statement/Solicitation/Voting | 131.20 | 98,166.50 |
| Non-Derivative Claims Reconciliation, Estimation, Litigation, and Alternative Dispute Resolution and Bar Date Issues | 9,170.10 | 4,768,848.50 |
| Other Bankruptcy Motions and Matters | 948.60 | 572,286.00 |
| Non-Derivative Adversary Proceedings Preparation and Litigation | 4,876.10 | 2,545,337.00 |
| Non-Bankruptcy Litigation | 33.90 | 11,558.50 |
| 2004 Issues | 104.00 | 74,302.50 |
| Appeals | .80 | 420.00 |
| US Trustee Related Issues | 2.50 | 1,132.50 |
| Examiner Issues | 876.80 | 527,097.50 |
| Proprietary Retention/Billing/Fee Applications | 1,561.10 | 627,311.00 |
| Retention Issue/Fees Applications: Ordinary Course Professionals | 58.10 | 32,291.50 |
| Retention Issue/Fees Applications: Other Professionals | 96.00 | 43,526.50 |
| | | |
| **Total** | **33,683.10** | **$19,450,342.75** |

**FIFTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(FEBRUARY 1, 2010 – MAY 31, 2010)**

| DISBURSEMENTS | AMOUNT |
|---|---|
| Airfreight | 2,538.80 |
| Binding | 257.50 |
| Cab Fares/Local Travel | 42,612.97 |
| Computer Database Research | 544,240.60 |
| Court Search | 12,710.79 |
| Court/Clerical Services | 213.84 |
| Fees | 30,974.20 |
| Global Filings | 12,300.00 |
| Mail | 129.36 |
| Meals | 32,260.55 |
| Messenger | 1,076.57 |
| Misc | 176.01 |
| Outside Reproduction | 5,007.51 |
| Photocopies | 102,392.35 |
| Telephone/Telecopy | 27,421.31 |
| Travel | 37,491.91 |
| **TOTAL DISBURSEMENTS** | **$851,804.27** |

Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 Case No. |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : | 08-13555 (JMP) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

----------------------------------------------------------- x

**FIFTH APPLICATION OF MILBANK, TWEED, HADLEY & McCLOY LLP,**
**COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR**
**INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES**
**RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM**
**FEBRUARY 1, 2010 THROUGH AND INCLUDING MAY 31, 2010**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), counsel to the Official

Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc.

("LBHI"), Lehman Brothers Structured Finance ("LBSF"), Lehman Brothers Commercial Paper,

Inc. ("LCPI") and their affiliated debtors and debtors in possession in the above-captioned cases

(collectively, the "Debtors"), hereby submits its application (the "Application"), pursuant to

sections 330 and 331 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

(as amended, the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and

amended April 21, 1995 (together, the "Local Guidelines"), the United States Trustee Guidelines

for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, effective January 30, 1996 (the "U.S. Trustee Guidelines"), the Third

Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy

Rule 2016(a) Establishing Procedures for Interim Monthly Compensation And Reimbursement

Of Expenses of Professionals, dated June 25, 2009 (the "Interim Compensation Order"), and the

guidelines (the "Fee Committee Guidelines") contained in the Fee Committee Report Regarding

Fee Committee Processes and Efforts to Resolve Outstanding Issues Related to the Third Interim

Fee Applications of Retained Professionals, dated April 9, 2010 (the "Fee Committee Report"),

for the allowance of interim compensation for professional services rendered from February 1,

2010 through and including May 31, 2010 (the "Fifth Interim Compensation Period"), and for

reimbursement of expenses incurred in connection with such services, and in support thereof

respectfully represents as follows:

I.

**INTRODUCTION**

A.      **Background**

      1.      Bankruptcy Filing.  On September 15, 2008, and periodically thereafter

(the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the

"Chapter 11 Cases").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.

The Debtors are authorized to operate their businesses and manage their properties as debtors in

possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

2

2.    <u>Creditors' Committee</u>.  On September 17, 2008, the Office of the United

States Trustee for the Southern District of New York (the "<u>United States Trustee</u>") appointed

the Committee in the Chapter 11 Cases.

3.    <u>SIPA Trustee</u>.  On September 19, 2008, a proceeding ("<u>SIPA</u>

<u>Proceeding</u>") was commenced under the Securities Investor Protection Act of 1970 ("<u>SIPA</u>")

with respect to Lehman Brothers Inc. ("<u>LBI</u>"), a wholly owned subsidiary of LBHI and a

registered broker-dealer.  James W. Giddens, Esq. is the trustee appointed under SIPA (the

"<u>SIPA Trustee</u>") and is administering LBI's estate.

4.    <u>Examiner</u>.  The United States Bankruptcy Court for the Southern District

of New York (the "<u>Court</u>") approved the appointment of Anton R. Valukas as examiner (the

"<u>Examiner</u>") in the Chapter 11 Cases in the Order Approving the Appointment of Examiner

dated January 20, 2009.  In accordance with his appointment, the Examiner issued his report

(the "<u>Examiner's Report</u>") on February 8, 2010, which was filed under seal and later unsealed

on March 11, 2010.

5.    <u>Fee Committee</u>.  On May 26, 2009, the Court appointed a fee committee

(the "<u>Fee Committee</u>") and approved a fee protocol (the "<u>Fee Protocol</u>") in the Chapter 11

Cases.

6.    <u>Debtors' Plan and Disclosure Statement</u>.  On March 15, 2010, the

Debtors filed their Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated

Debtors [Docket No. 7572].  Subsequently, on April 14, 2010, the Debtors filed their Disclosure

Statement for Joint Chapter 11 Plan of Lehman Brothers Holding Inc. and its Affiliated Debtors

Pursuant to Section 1125 of the Bankruptcy Code (the "<u>Debtors' Disclosure Statement</u>")

3

[Docket No. 8332], along with their revised Chapter 11 Plan (the "Debtors' Plan") [Docket No. 8330].

       7.     <u>Jurisdiction</u>.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code.  Pursuant to the Local Guidelines, a certification regarding compliance with the Local Guidelines is attached hereto as Exhibit "<u>A</u>."

**B.**      **<u>Retention of Milbank and Billing History</u>**

       8.     <u>Authorization for Milbank's Retention</u>.  On November 5, 2008, pursuant to the Interim Order Under 11 U.S.C. § 1103 And Fed. R. Bankr. P. 2014 And 5002 Authorizing The Retention And Employment Of Milbank, Tweed, Hadley & M$^c$Cloy LLP, As Counsel For The Official Committee Of Unsecured Creditors Effective As Of September 17, 2008 (the "<u>Retention Order</u>"), the Court authorized Milbank's retention as counsel for the Committee in these cases.  The Retention Order, which became a final order on November 21, 2008, authorized Milbank to receive compensation pursuant to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Guidelines, the U.S. Trustee Guidelines, and the local rules and orders of this Court.  Among other things, the Retention Order provides that Milbank's hourly rates are subject to periodic firm-wide adjustments in the ordinary course of Milbank's business.

       9.     <u>First Interim Fee Application</u>.  On April 10, 2009, Milbank filed its First Application Of Milbank, Tweed, Hadley & M$^c$Cloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

4

Rendered And For Reimbursement Of Expenses During Period From September 17, 2008

Through And Including January 31, 2009 (the "First Interim Fee Application"). In the First

Interim Fee Application, Milbank requested (i) allowance of compensation for professional

services rendered during the period from September 17, 2008 through and including January 31,

2009 (the "First Interim Compensation Period") in the total amount of $12,123,376.00,[1] and (ii)

reimbursement of its actual and necessary expenses incurred during the First Interim

Compensation Period in the amount of $668,388.72. Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $10,397,943.56 during the First Interim

Compensation Period. On August 5, 2009, the Court approved the First Interim Fee

Application, subject to a ten percent holdback pursuant to the recommendation of the Fee

Committee. On September 10, 2009, the Court approved the release of the remaining holdback,

subject to a $69,990.04 deduction, at the recommendation of the Fee Committee.[2]

        10.     Second Interim Fee Application. On August 14, 2009, Milbank filed its

Second Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From February 1, 2009 Through

And Including May 31, 2009 (the "Second Interim Fee Application"). In the Second Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from February 1, 2009 through and including May 31, 2009 (the

---

[1]     Milbank voluntarily reduced the fees it sought to have allowed for the First Interim Compensation Period by $129,111.00. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[2]     Milbank reserves the right to seek, at a later date, the allowance of all or a portion of such fees.

"Second Interim Compensation Period") in the total amount of $16,829,521.00,[3] and (ii)

reimbursement of its actual and necessary expenses incurred during the Second Interim

Compensation Period in the amount of $1,019,754.61.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $14,582,737.21 during the Second Interim

Compensation Period.  On September 25, 2009, the Court approved the Second Interim Fee

Application, subject to a ten percent holdback pursuant to the recommendation of the Fee

Committee.  On December 23, 2009, the Court released the ten percent holdback, subject to a

$311,734.82 deduction, at the recommendation of the Fee Committee.[4]

   11. <u>Third Interim Fee Application</u>.  On December 14, 2009, Milbank filed its

Third Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From June 1, 2009 Through

And Including September 30, 2009 (the "<u>Third Interim Fee Application</u>").  In the Third Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from June 1, 2009 through and including September 30, 2009 (the

"<u>Third Interim Compensation Period</u>") in the total amount of $10,881,540.00,[5] and (ii)

reimbursement of its actual and necessary expenses incurred during the Second Interim

Compensation Period in the amount of $583,803.10.  Pursuant to the Interim Compensation

---

[3] Milbank voluntarily reduced the fees it sought to have allowed for the Second Interim Compensation Period by $154,700.25, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[4] Milbank reserves the right to seek, at a later date, the allowance of all or a portion of such fees.

[5] Milbank voluntarily reduced the fees it sought to have allowed for the Third Interim Compensation Period by $419,548.50, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

Order, Milbank received payment in the amount of $7,480,652.96 during the Third Interim

Compensation Period.  On April 9, 2010, the Court approved the Third Interim Fee Application,

subject to a $292,555.40 deduction, at the recommendation of the Fee Committee.[6]

          12.    <u>Fourth Interim Fee Application</u>.  On April 16, 2010, Milbank filed its

Fourth Application Of Milbank, Tweed, Hadley & M[c]Cloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From October 1, 2009 Through

And Including January 31, 2010 (the "<u>Fourth Interim Fee Application</u>").  In the Fourth Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from October 1, 2009 through and including January 31, 2010 (the

"<u>Fourth Interim Compensation Period</u>") in the total amount of $13,595,778.50,[7] and (ii)

reimbursement of its actual and necessary expenses incurred during the Fourth Interim

Compensation Period in the amount of $451,410.54.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $11,341,325.19 during the Fourth Interim

Compensation Period.  The Fourth Interim Fee Application is scheduled for hearing on August

25, 2010, at which time the Court will be required to address certain recommended reductions

proposed by the Fee Committee.[8]

---

[6]     Milbank reserved, and continues to reserve, the right to seek, at a later time, the allowance of all or a portion of such fees.

[7]     Milbank voluntarily reduced the fees it sought to have allowed for the Fourth Interim Compensation Period by $111,446.50, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[8]     Milbank reserves, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

13.    <u>Application</u>.  Milbank makes this fifth interim application for approval and allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code.

14.    In accordance with the Interim Compensation Order, Milbank submitted monthly fee statements to the Debtors seeking interim compensation and reimbursement of expenses.  During the Fifth Interim Compensation Period, Milbank submitted the following fee statements:

a.    On June 2, 2010, pursuant to the Interim Compensation Order, Milbank served its seventeenth fee statement for the period from February 1, 2010 through and including February 28, 2010 (the "<u>Seventeenth Fee Statement</u>").  The Seventeenth Fee Statement sought (i) an allowance of $4,269,508.00 as compensation for services rendered and (ii) the reimbursement of $197,136.91 in expenses.  As of the date hereof, Milbank has received a total of $3,612,743.31, which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred pursuant to the Seventeenth Fee Statement.

b.    On July 9, 2010, pursuant to the Interim Compensation Order, Milbank served its eighteenth fee statement for the period from March 1, 2010 through and including March 31, 2010 (the "<u>Eighteenth Fee Statement</u>").  The Eighteenth Fee Statement sought (i) an allowance of $5,450,207.00 as compensation for services rendered and (ii) the reimbursement of $262,768.45 in expenses.  As of the date hereof, Milbank has received a total of $4,622,934.05, which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred pursuant to the Eighteenth Fee Statement.

c.    On August 11, 2010, pursuant to the Interim Compensation Order, Milbank filed and served its nineteenth fee statement for the period from April 1, 2010 through and including April 30, 2010 (the "<u>Nineteenth Fee Statement</u>").  The Nineteenth Fee Statement sought (i) an allowance of $4,907,292.00 as compensation for services rendered and (ii) the reimbursement of $212,883.48 in expenses.

d.    On August 13, 2010, pursuant to the Interim Compensation Order, Milbank filed and served its twentieth fee statement for the period from May 1, 2010 through and including May 31, 2010 (the "<u>Twentieth Fee Statement</u>") and, together with the Seventeenth Fee Statement, Eighteenth Fee Statement and Nineteenth Fee Statement, the "<u>Fee Statements</u>").  The Twentieth Fee Statement sought (i) an allowance of $ 4,823,335.75 as compensation for services rendered and (ii) the reimbursement of $194,781.68 in expenses.

8

15.     Milbank has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases.  No promises have been received by Milbank or any member thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

## II.

## APPLICATION

16.     By this Application, Milbank is seeking allowance of (a) compensation for professional services rendered by Milbank, as counsel for the Committee, during the Fifth Interim Compensation Period and (b) reimbursement of expenses incurred by Milbank in connection with such services during the Fifth Interim Compensation Period.

17.     In this Application, Milbank seeks approval of $19,450,342.75[9] for legal services rendered on behalf of the Committee during the Fifth Interim Compensation Period and $851,804.27[10] for reimbursement of expenses incurred in connection with the rendering of such services, for a total award of $20,302,147.02.

18.     Pursuant to the Interim Compensation Order, Milbank has already received payment of $8,235,677.36 during the Fifth Interim Compensation Period.  Milbank will seek a total payment of $12,066,469.66 pursuant to this Application, which amount represents the portion of Milbank's fees for legal services rendered and expenses incurred

---

[9]     The compensation sought by this Application reflects a voluntary reduction of approximately $199,247.00, including, but not limited to, certain fee issues identified by the Fee Committee.  However, Milbank reserves the right to seek allowance of all or a portion of such fees at a future date.

[10]     This amount reflects a reduction of certain expenses as per the Fee Committee Guidelines.  Milbank reserves the right to seek, at a later date, reimbursement for the total amount of expenses incurred in connection with its representation of the Committee.

during the Fifth Interim Compensation Period not previously paid to Milbank pursuant to the

Interim Compensation Order.[11]

19.      The fees sought by this Application reflect an aggregate of 33,683.10

hours of attorney and paraprofessional time spent and recorded in performing services for the

Committee during the Fifth Interim Compensation Period, at a blended average hourly rate of

$577.45 for both professionals and paraprofessionals.  The blended hourly rate for professionals

only is $627.27.

20.      Milbank rendered to the Committee all services for which compensation

is sought solely in connection with these cases, in furtherance of the duties and functions of the

Committee.

21.      Milbank maintains computerized records of the time expended in the

rendering of the professional services required by the Committee.  These records are maintained

in the ordinary course of Milbank's practice.  For the convenience of the Court and parties in

interest, a billing summary for the Fifth Interim Compensation Period is attached as part of the

cover sheet, setting forth the name of each attorney and paraprofessional for whose work on

these cases compensation is sought, each attorney's year of bar admission, the aggregate of the

time expended by each such attorney or paraprofessional, the hourly billing rate for each such

attorney or paraprofessional at Milbank's current billing rates, and an indication of the

individual amounts requested as part of the total amount of compensation requested.  In

addition, set forth in the billing summary is additional information indicating whether each

---

[11]      As is customary, in connection with the preparation of this Application, Milbank has reviewed the fees and
expenses set forth in its Fee Statements.  Based on this review, the amount requested herein on account
of fees and expenses incurred by Milbank during the Fifth Interim Compensation Period is $867,570.52
less than the sum of fees and expenses set forth in the Fee Statements.  Accordingly, upon approval of the
relief requested herein, Milbank will reduce its request for payment from the Debtors by such amount.

attorney is a partner, counsel or associate, the number of years each attorney has held such position, and each attorney's area of concentration.  The compensation requested by Milbank is based on the customary compensation charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

22.    Attached hereto as Exhibit "B" are time entry records broken down in tenths of an hour by project category, based on the U.S. Trustee Guidelines, setting forth a detailed description of services performed by each attorney and paraprofessional on behalf of the Committee.[12]

23.    Milbank also maintains computerized records of all expenses incurred in connection with the performance of professional services.  A summary of the amounts and categories of expenses for which reimbursement is sought, as well as a breakdown of expenses by project category and detailed descriptions of these expenses, are attached hereto as Exhibit "C."

### III.

### SUMMARY OF PROFESSIONAL SERVICES RENDERED

24.    To provide an orderly summary of the services rendered on behalf of the Committee by Milbank, and in accordance with the U.S. Trustee Guidelines, the Fee Committee adopted the following billing categories in connection with these cases:

| | |
|---|---|
| 00100 | General Case Administration |
| 00200 | General Case Strategy Meetings |
| 00300 | Project Monitoring/Court Calendar & Docket Maintenance |
| 00400 | Hearings and Court Communications |
| 00500 | Non-Working Travel |
| 00600 | Interested Parties Communications |

---

[12]    Due to the volume of the time and expense records, and consistent with the Interim Compensation Order, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the members of the Fee Committee.

| | |
|---|---|
| 00700 | Communications with Debtors |
| 00800 | Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee |
| 00900 | Secured Creditors Issues/Meetings/Communications |
| 01000 | Equity Holders/Motions/Hearings/Communications |
| 01100 | LBI/SIPC Coordination and Issues |
| 01200 | Cash Management |
| 01300 | Insurance Issues |
| 01400 | Employee/ERISA/Benefits/Pension Issues |
| 01800 | Tax Issues |
| 01900 | Corporate Governance |
| 02000 | Other General Business Operation Issues |
| 02100 | Intercompany Issues |
| 02200 | Data Preservation/Migration |
| 02300 | Real Estate Matters |
| 02400 | Private Equity |
| 02500 | Derivatives/SWAP Agreement Issues |
| 02600 | Loans/Investments |
| 02700 | Domestic Bank and Related Regulatory Issues |
| 02800 | International Insolvency Issues |
| 02900 | Schedules/Statement of Financial Affairs |
| 03000 | Non-Derivative Automatic Stay/Safe Harbor Issues |
| 03100 | Miscellaneous Asset Sales/363 Issues |
| 03200 | Non-Derivative Executory Contracts/365 Issues |
| 03300 | DIP Financing |
| 03400 | Exit Financing |
| 03500 | Plan of Reorganization/Plan Confirmation/Plan Implementation |
| 03600 | Disclosure Statement/Solicitation/Voting |
| 03700 | Non-Derivative Claims Reconciliation, Estimation, Litigation, and Alternative Dispute Resolution and Bar Date Issues |
| 03800 | Other Bankruptcy Motions and Matters |
| 03900 | Non-Derivative Adversary Proceedings Preparation and Litigation |
| 04000 | Non-Bankruptcy Litigation |
| 04100 | 2004 Issues |
| 04200 | Appeals |
| 04300 | US Trustee Related Issues |
| 04400 | SEC/DOJ Issues |
| 04500 | Examiner Issues |
| 04600 | Firm's Own Billing/Fee Applications |
| 04700 | Firm's Own Retention Issues |
| 04800 | Third Party Retention/Fee Application/Other Issues |

25.     The following summary is intended only to highlight key services

rendered by Milbank in certain project billing categories where Milbank has expended a

considerable number of hours on behalf of the Committee, and is not meant to be a detailed

description of all of the work performed.  Detailed descriptions of the day-to-day services

provided by Milbank and the time expended performing such services in each project billing

category are fully set forth in Exhibit "B" hereto.  Such detailed descriptions demonstrate that

Milbank was heavily involved in the performance of services for the Committee on a daily

basis, including night and weekend work, often under extreme time constraints, to meet the

needs of the Committee in these cases.  The sheer magnitude of matters in these Chapter 11

Cases has required and continues to require substantial and continuing efforts on the part of the

Committee and its professional advisors, including Milbank, to address the many complex

issues and problems that are presented by these extraordinary and complex cases.

A.    **General Case Administration**

26.    During the Fifth Interim Compensation Period, Milbank continued to

maintain, and undertake action in accordance with, an elaborate protocol developed earlier in

these cases for the organization and delegation of the substantial number of tasks engendered by

Lehman's chapter 11 process.  The protocol is designed to ensure that the Committee is kept

apprised of all aspects of the Chapter 11 Cases.  The protocol also guarantees that all matters are

being addressed, without duplication of effort.  Due to the highly complicated nature of the

Debtors' cases, these tasks require the knowledge, expertise, and input of a whole range of

Milbank timekeepers, from paralegals to senior partners, all of whom have become intimately

familiar with the issues and the parties in the Chapter 11 Cases.

27.    Additionally, Milbank has established a system whereby substantive

court filings are reviewed to provide the Committee with a comprehensive summary and

analysis of each material pleading filed in the Chapter 11 Cases.  Milbank's efforts in setting up

13

efficient and comprehensive methods of administering the Committee's needs ensure that the

Committee has the information necessary to effectively carry out its fiduciary responsibilities to

the unsecured creditors of each of the Debtors.

**B.**     **Unsecured Creditors' Issues/Meetings/Communications/Creditors' Committee**

28.     During the Fifth Interim Compensation Period, the Committee held

weekly telephonic meetings and monthly in-person meetings in advance of in-person meetings

with the Debtors.  In addition, the Committee also began holding a separate weekly telephonic

meeting devoted to plan of reorganization issues.  Prior to each Committee meeting, Milbank

prepared and distributed memoranda, presentations, and other materials for the Committee

members' consideration.  During the Committee meetings, Milbank discussed with Committee

members and their counsel all significant matters arising during the Fifth Interim Compensation

Period, and in particular, the Debtors' Plan, and assisted the Committee in formulating positions

with respect to such issues.

29.     Through Committee meetings and conference calls, and numerous other

communications with members of the Committee, Milbank has assisted the Committee in

(i) fulfilling its obligations to unsecured creditors of each of the Debtors' estates, and

(ii) making informed decisions regarding the numerous issues that have arisen in these cases.

**C.**     **Project Monitoring/Court Calendar & Docket Maintenance**

30.     During the Fifth Interim Compensation Period, Milbank continued to

maintain internal filing, record-keeping, docket-monitoring, and calendaring systems to

organize and track (i) pleadings filed in the Chapter 11 Cases, SIPA Proceeding, and related

adversary proceedings; (ii) ongoing projects; and (iii) upcoming deadlines.  On a real-time

basis, Milbank downloaded, consolidated, and organized pleadings to ensure efficient access.

Milbank also monitored the dockets and summarized and circulated substantive pleadings to the

Milbank team.  These summaries enabled Milbank to stay abreast of ongoing developments in

these cases, facilitated the assignment of projects, and helped ensure that deadlines were not

missed.

   31. Additionally, Milbank maintained a comprehensive calendar of active

matters in these cases.  This calendar ensured that Milbank could effectively monitor and update

the status of all pending matters, a resource that proved beneficial in responding to inquiries and

discussing these matters with the Committee and other parties in interest.  Milbank also

maintained and circulated to the Committee, on a weekly basis, a calendar of upcoming

motions, hearing dates, and other important deadlines.

**D.**  **Hearings and Court Communications**

   32. During the Fifth Interim Compensation Period, Milbank prepared for and

appeared at each of the hearings conducted before this Court, including, among others,

(i) numerous regularly scheduled omnibus hearings; (ii) special hearings and case conferences;

(iii) hearings in the SIPA Proceeding; and (iv) hearings in a wide variety of adversary

proceedings arising out of the Chapter 11 Cases and the SIPA Proceeding.  In advance of each

hearing, Milbank would confer internally to address the issues presented by each motion or

other pleading and coordinate a response thereto.  To that end, among other things, Milbank

reviewed and analyzed documents, including correspondence and pleadings, conducted factual

and legal research, and met with numerous parties to work toward the consensual resolution of

any objections raised by the Committee or other parties in interest.  Following each hearing,

Milbank promptly advised the Committee of pertinent Court rulings and developments.

E.        **Interested Party Communications/Website/Lehman Team Hotline**

33.        In accordance with the Stipulation and Agreed Order Between the

Debtors and the Official Committee of Unsecured Creditors Regarding Creditor Access to

Information Pursuant to 11 U.S.C §§ 105(a), 1102(b)(3) and 1103(c) [Docket No. 498], which

the Court approved on October 1, 2008 (the "Creditor Information Protocol"), Milbank, on

behalf of the Committee, continued to populate and maintain a public website (the "Committee

Website").  The Committee Website contains a significant amount of content produced by

Milbank, which is updated frequently and designed to provide information to creditors,

including, among other things, (i) general information concerning the Debtors' Chapter 11

Cases, including adversary proceedings, chapter 15 cases, and the SIPA Proceeding; (ii)

highlights of significant events; (iii) a case calendar; and (iv) answers to frequently asked

questions, available in several foreign languages.  The Committee Website also acts as a critical

pathway for the dissemination of information between Milbank and the Debtors' creditors.  For

example, the Committee Website permits creditors to register to receive monthly reports and to

submit inquiries directly to Milbank, as to which Milbank works in collaboration with the

Debtors' counsel (as required by the Creditor Information Protocol) to provide responses.

34.        During the Fifth Interim Compensation Period, Milbank continued to

expend substantial time maintaining the Committee Website.  In addition, hundreds of creditors

contacted Milbank via the Committee Website and telephonically with questions concerning the

Chapter 11 Cases, and, more specifically, inquiries concerning substantive consolidation and

other plan structure issues.  In accordance with the Creditor Information Protocol, Milbank

reviewed and responded to all such creditor inquiries.

35.     During the Fifth Interim Compensation Period, Milbank continued to spend considerable time working with each of the *ad hoc* groups that formed during the Chapter 11 Cases to advance the objectives of various creditor constituencies, to assist such groups' understanding of the issues in the Chapter 11 Cases, and negotiate resolutions of disputed issues.  Milbank also continued, at the Court's direction, to act as an information "liaison" between the Debtors, these *ad hoc* groups, and other creditors on a frequent basis.

### F.    Communications with Debtors

36.     During the Fifth Interim Compensation Period, Milbank continued its frequent communication and exchange of correspondence with Debtors' counsel regarding, among numerous other issues, case administration, responses to pleadings, issues related to the Debtors' Plan, negotiations with the persons or entities (the "Foreign Administrators") managing the affairs of the numerous proceedings (the "Foreign Proceedings") initiated by or against Lehman-related entities in countries outside of the U.S., or jurisdictions where Lehman entities may have assets and/or liabilities (the "Foreign Affiliates"), substantive consolidation, claims based on purported guarantees issued by LBHI of its affiliates' obligations (the "Guarantee Claims"), and public disclosures in connection with the Debtors' Plan, including Debtors' March 29, 2010 8-K filing and the Debtors' Disclosure Statement.  Milbank also worked with the Debtors to finalize the documentation of and obtain bankruptcy court approval for the Debtors' to enter into agreements with Lenders Asset Management Corporation ("LAMCO"), the alternative dispute resolution process to resolve objections to proofs of claim, and upcoming hearings.  Further, Milbank prepared for and attended in-person meetings with the Committee members, the Debtors, and their respective professionals to, among other things,

discuss the ongoing administration of and long term strategy for the Chapter 11 Cases, and in

particular, the Debtors' Plan.

**G.     LBI/SIPC Coordination and Issues**

37.     During the Fifth Interim Compensation Period, in addition to reviewing

and analyzing various motions filed in the SIPA Proceeding, Milbank spent considerable time

analyzing the issues raised by the SIPA Trustee's motion for an order approving the SIPA

Trustee's proposed allocation of property of the LBI estate (the "SIPA Allocation Motion"),

reviewing related discovery, conferring with the Committee's financial advisors, FTI

Consulting Inc. ("FTI") and Houlihan, Lokey, Howard & Zukin ("Houlihan"), and preparing a

response to the SIPA Allocation Motion.  After numerous discussions and negotiations with the

SIPA Trustee and his advisors, the Committee ultimately reached a consensual resolution of

certain of the issues raised by the SIPA Allocation Motion, which the Court approved on March

2, 2010 [Docket No. 2743].

38.     Additionally, Milbank spent considerable time reviewing and analyzing

objections to the SIPA Trustee's determinations of claims filed against LBI and how these

determinations would impact the LBI estate and, ultimately, potential creditor recoveries

therefrom.  In that connection, Milbank closely monitored and analyzed the responses filed by

Fifth Third Structured Large Cap Plus Fund and Providence Equity Partners so as to advise the

Committee on the Court's treatment of the SIPA Trustee's claim determinations.

39.     Finally, Milbank examined various intercompany issues, stemming from

claims filed against the Debtors by the SIPA Trustee and claims filed by the Debtors against the

LBI estate.  In connection therewith, Milbank continued to consult with the Committee's

financial advisors and with the Debtors on matters such as the enforceability of certain

subordination agreements entered into by LBI and the value of the Lehman ALI, Inc. payment-in-kind note.

### H.   Employee/ERISA/Benefits/Pension Issues

40.     During the Fifth Interim Compensation Period, Milbank devoted substantial time to researching and analyzing issues with respect to the Federal Worker Adjustment Retraining and Notification Act ("WARN") and similar laws.  These laws require employers to give employees advance notice of termination of their employment in certain circumstances.  Milbank, accordingly, drafted an analysis that both summarized the relevant laws and also noted the variations and differences between state law and federal law on that matter.  The analysis also evaluated the Debtors' exposure to claims by their former employees by reason of insufficient notice of the termination of their employment.

### I.   Tax Issues

41.     During the Fifth Interim Compensation Period, Milbank devoted substantial time to analyzing and evaluating federal, state, local, and international tax issues relating to the Debtors' estates.  A subcommittee (the "Tax Subcommittee") convened, as necessary, to address the myriad tax issues arising in the Chapter 11 Cases.  In addition to attending meetings of the Tax Subcommittee, Milbank participated in the Committee's weekly telephonic meetings to (i) inform the Committee of significant tax matters (e.g., the structure of the Debtors' Plan, the status and substance of the Debtors' planned private letter ruling request from the Internal Revenue Service ("IRS")); (ii) obtain Committee input as to certain tax matters (e.g., the sale of Real Estate Mortgage Investment Conduits ("REMICs") held by Lehman Pass Through Securities Inc. and LBI, the approval of the Debtors' settlements with the IRS and Department of Justice); and (iii) ascertain information that may be relevant to the tax

analysis (e.g., recovery projections, ongoing activities that may give rise to tax, substantive consolidation discussions, business and derivative settlements).

42.     Milbank also conducted weekly conferences with the Debtors' in-house tax department and the Debtors' tax litigation counsel, Bingham McCutchen LLP ("Bingham"), to discuss (i) the Debtors' ongoing business activities; (ii) the Debtors' tax compliance activities and preparedness; (iii) discussions and negotiations with the IRS and Department of Justice; (iv) discussions with LBI's tax counsel; (v) strategies for obtaining a ruling from the IRS regarding the tax consequences the Debtors' Plan; and (vi) any miscellaneous matters that arose that were materially related to the Debtors' tax positions.

43.     Additionally, Milbank  reviewed, researched, and analyzed (i) tax issues related to the disposition of certain assets; (ii) tax issues involving Aurora Bank FSB, f/k/a Lehman Brothers Bank FSB ("Aurora") and Woodlands Commercial Bank ("Woodlands Bank" and, together with Aurora, the "Banks"); (iii) tax consequences of Lehman Pass Through Securities Inc. and LBI holding and disposing of REMIC residual interests; (iv) the Debtors' federal, state, local, and international tax exposures and potential refund claims; (v) transactions subject to the ongoing IRS audit of the Debtors' estates, including foreign tax credit claims; (vi) activities of certain creditors relating to the motions and orders to restrict trading of equity and debt claims of the Debtors; (vii) tax allocation issues among Debtors, non-debtor entities, and LBI; (viii) the Debtors' use of net operating losses, including the effect new legislation will have on the Debtors' alternative minimum tax position; (ix) the effect of state and local tax laws and the potential impact of tax provisions in proposed legislation on the Debtors' estates; and (x) structural issues related to the Debtors' Plan.  In connection with the above-mentioned IRS audit, Milbank met with the Debtors' in-house tax department and Bingham, prepared

memoranda for the Tax Subcommittee and the Committee explaining the transactions at issue

and the tax exposure associated with the IRS audit, and developed, together with the Debtors, a

collective negotiating strategy to settle the significant issues that had arisen on audit.  The

parties have reached a settlement on several of the above-described issues.  Milbank reviewed

and analyzed the proposed settlements among the IRS, Department of Justice, and the Debtors,

some of which were approved by the Court and others which remain subject to bankruptcy court

approval.  Furthermore, Milbank, on the Committee's behalf, intervened in the Debtors' suit for

a tax refund relating to its 1999 and 2000 tax years and undertook activities associated with

preparing to represent the Committee's interests in that litigation.

44.     Additionally, Milbank researched, prepared legal memoranda, and

corresponded with the Debtors regarding (i) the potential exposure for significant tax liabilities

related to the ownership of REMIC residual interests; (ii) the priority of various tax claims

against the Debtors; (iii) tax allocation rules related to the Debtors' right to contribution by

subsidiaries; (iv) the status of a controlled foreign corporation when placed in receivership; and

(v) potential withholding tax claims against the Debtors for pre- and post petition dates.

**J.      Other General Business Operation Issues**

45.     During the Fifth Interim Compensation Period, Milbank continued

reviewing and analyzing the myriad issues in connection with a potential business plan for the

Debtors, including the Debtors' proposal to form an asset management company.  Milbank

worked in tandem with the Committee's financial advisors to (i) identify issues related to the

formation, structure, and function of such an asset management company and (ii) craft solutions

to the problems engendered by such issues, which were subsequently discussed and negotiated

with the Debtors and their professionals.  Such discussions culminated in the formation and

documentation of LAMCO, for which the Debtors sought bankruptcy court approval (the

"LAMCO Motion") [Docket No. 7579].  Milbank filed a statement in support of the LAMCO

Motion, [Docket No. 8017], and also assisted the Debtors in resolving certain objections

interposed with respect to the LAMCO Motion.  On April 15, 2010, the Court approved the

LAMCO Motion, thereby establishing LAMCO LLC to manage the Debtors' assets.

**K.**     **Intercompany Issues**

46.     During the Fifth Interim Compensation Period, Milbank expended

considerable time investigating matters related to intercompany obligations.  Most significantly,

Milbank devoted substantial resources to an analysis of the treatment of Lehman Brothers

Treasury Co. B.V. ("LBT") intercompany claims under the Debtors' Plan and their potential

impact on creditor recoveries.  Milbank also undertook extensive research regarding the

treatment of certain other intercompany claims under the Debtors' Plan, and the theories to

enforce or object to such claims.

**L.**     **Real Estate Matters**

47.     As reflected in the First Interim Fee Application, due to the size,

complexity and potential for exposure of the Debtors' real estate portfolio, the Committee

established a subcommittee (the "Real Estate Subcommittee") to evaluate issues relating to the

Debtors' extensive real estate portfolio.  During the Fifth Interim Compensation Period, the

Real Estate Subcommittee continued to hold regular meetings to address and make

recommendations to the Committee with regard to issues related to the Debtors' real estate

holdings in discrete assets (e.g., Excalibur, Intrawest, SunCal, Palmdale, Archstone, 200 Fifth

Avenue, 340 Madison Avenue, Canyon Ranch, King Edward Hotel and Heritage Fields) and

work with the Debtors under previously approved protocols to attempt to maximize the value of the Debtors' real estate assets.

48.    The Debtors' real estate portfolio includes commercial, residential and corporate interests in which the Debtors hold both debt and equity positions, often in the form of joint ventures to develop large commercial projects. Milbank continued to work closely with the Committee's financial advisors to assess whether the Debtors should continue to meet various funding obligations, and also reviewed and commented on the terms of the Debtors' proposed restructurings of their debt facilities. In connection therewith, Milbank continued to review the Debtors' rights, obligations and exposures relative to joint venture partners, borrowers, senior secured lenders, unsecured creditors and other third parties in order to further analyze the potential consequences of the proposed restructurings or failures to fund capital calls. Milbank also continued to participate in the consensual resolution of several outstanding real estate related motions.

49.    **Fenway**.    In connection with the Real Estate Subcommittee's and the Committee's consideration thereof, Milbank spent considerable time reviewing and analyzing the Fenway structure, which involved a complex commercial paper program, and the Debtors' proposed Fenway settlement. In the Fenway structure, LCPI and Fenway Capital, LLC ("Fenway") had entered into a repurchase agreement whereby LCPI transferred to Fenway interests in certain real property, including interests in the certain term loans to various affiliates of SCC Acquisitions, Inc., who are subject to their own bankruptcy proceeding in California (collectively, the "SunCal Debtors"). Fenway used these assets to secure obligations under certain variable funding notes which were in turn used to secure obligations under three commercial paper notes. In analyzing the settlement transaction, Milbank assessed the impact

23

that the unwinding of the Fenway structure would have on the pending SunCal Debtors'
bankruptcy cases.  Milbank also worked with the Debtors in formulating the proposed
settlement.  Due to concerns that Lehman's prepetition relationships with Fenway may have
involved certain improprieties, Milbank conducted additional due diligence and worked with the
Debtors to further revise the terms of the Fenway settlement.  With the settlement appropriately
tailored and the benefits of the Debtors' estates clearly established, the Committee supported the
transaction [Docket No. 8220], which was approved by the Court on May 13, 2010.

**M.    Private Equity**

50.    As reflected in the First Interim Fee Application, the Committee
established a subcommittee (the "Private Equity Subcommittee") to monitor and evaluate
developments with respect to the Debtors' private equity assets.  During the Fifth Interim
Compensation Period, the Private Equity Subcommittee continued to hold regular meetings to
address and make recommendations to the full Committee with regard to specific issues
surrounding the Debtors' portfolio of private equity assets and formulate protocols with the
Debtors to maximize the value of such portfolios.  Milbank worked closely with the Debtors,
the Debtors' professionals, and the Committee's financial advisors in connection with the sale
of several investments that were part of Lehman's private equity portfolio, including Silver
Lake and Varel.

51.    Furthermore, Milbank has been involved in the restructuring of several
investments in the private equity portfolio.  For example, in connection with the Kingfisher
structure, Milbank reviewed and considered a transaction that resulted in a substitution of the
collateral manager so that the Debtors could have the opportunity to restructure and better

manage the assets of the Kingfisher structure.  Milbank has also been involved in restructuring transactions of underlying investments in the Kingfisher structure.

52.     Milbank also worked with the Committee's financial advisors to identify and analyze potential avoidance actions arising in connection with the private equity portfolio. In connection therewith, Milbank attended various meetings and teleconferences with the Committee's financial advisors and the Debtors' professionals to discuss individual transactions and the estates' overall financial situation in the months leading to the bankruptcy filing.

53.     Finally, the Committee and its advisors continued to work closely with the Debtors to review and evaluate the entire private equity portfolio, as recently reunderwritten, to continue to map out a process for ascertaining which of these assets should be sold in the near term and which should be held.

**N.** **Derivatives Issues**

54.     As reflected in the First Interim Fee Application, the Committee established a subcommittee (the "<u>Derivatives Subcommittee</u>") to evaluate issues and develop value maximizing strategies relating to the Debtors' valuable derivatives portfolio.  During the Fifth Interim Compensation Period, Milbank continued to conduct regular (at least weekly) meetings with the Derivatives Subcommittee to address and, where appropriate, make recommendations to the Committee in respect of specific issues concerning the Debtors' portfolio of derivatives positions.

55.     **Derivatives ADR**.  On September 17, 2009, this Court entered an order approving the Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and General Order M-143 for Authorization to Implement Alternative Dispute Resolution Procedures for Affirmative Claims of Debtors Under Derivative Contracts (the "<u>Derivatives ADR Order</u>"),

pursuant to which the Committee, the Debtors and derivatives counterparties mediate disputes

arising from the closing out of the Debtors' "in-the-money" derivatives portfolio.  During the

Fifth Interim Compensation Period, Milbank continued to work closely with the Debtors to

review and respond to the counterparty notices filed under the Derivatives ADR Order, and to

evaluate settlement proposals under the alternative dispute resolution process.  During the

subsequent period, Milbank participated actively in mediations.

      56.     **Derivatives Litigation**.  Milbank also continued to address issues related

to, and provided recommendations on, derivatives matters, including the highly complex

derivatives-related adversary proceedings commenced by the Debtors to recover the Debtors'

"in-the-money" positions in various derivatives transactions.  To that end, Milbank devoted

substantial resources to analyzing derivatives contracts and other related transaction documents,

monitoring and participating actively in the derivatives-related adversary proceedings,

communicating with the Debtors' counsel and the Committee's financial advisors, and

developing and evaluating strategies to monetize complicated derivatives transactions for the

benefit of unsecured creditors of each of the Debtors' estates.  In that connection, Milbank

expended considerable time summarizing such analyses and recommendations in numerous

memoranda to the Committee.  Milbank also conducted extensive research on issues relating to

the appeals of the Court's determination of the contested matters involving Metavante

Corporation and BNY Corporate Trustee Services Limited.

      57.     Considerable attention was paid to certain adversary proceedings, each of

which raises novel issues of law.  In preparation for the representation of the Committee in

certain of the derivatives-related adversary proceedings in which the Committee has intervened,

Milbank researched complex legal issues related to, among other things, the treatment of

derivative contracts in bankruptcy.  Such research and analysis has been essential to the

development of strategies to recover amounts due to the Debtors in disputed derivatives

transactions for the benefit of unsecured creditors of each of the Debtors' estates.

**O.    Loans/Investments**

58.    As reflected in the First Interim Fee Application, the Committee

established a subcommittee (the "Loan Book Subcommittee") to review and analyze matters

related to the Debtors' loan book.  During the Fifth Interim Compensation Period, the Loan

Book Subcommittee continued to analyze, among numerous other matters related to the

Debtors' loan book, (i) issues concerning the Debtors' motions, dated November 14, 2008 and

December 15, 2009, to assume or reject trade confirmations to purchase or sell interests in

loans; (ii) activity regarding the Debtors' funded and unfunded loan commitments; and (iii)

restructurings and other transactions regarding the Debtors' interests in loans.   Milbank

continued to work with the Committee's financial advisors to analyze and present the legal and

financial implications of the Debtors' loan book transactions to the Loan Book Subcommittee in

order to facilitate its recommendations and responsive courses of action to the full Committee.

To that end, the Loan Book Subcommittee convened meetings to discuss and formulate

recommendations regarding all outstanding loan book matters.

59.    **Transactions.**  During the Fifth Interim Compensation Period, Milbank

reviewed, among other transactions, several special purpose securitization vehicles established

by the Debtors to issue certain notes, including (i) a collateralized loan obligation with Spruce

CCS Ltd. as the issuer; (ii) a collateralized loan obligation with Verano CCS Ltd. as the issuer;

and (iii) a statutory trust named the Restructured Asset Securities with Enhanced Returns Series

with 2007-7-MM Trust as the issuer.  Milbank reviewed and analyzed the governing documents

of these structures to determine the requirements for selling the underlying collateral.  The

Committee's advisors continued to analyze the management of these underlying loans, and the

potential to sell such assets, taking into account possible violations of the governing documents

regarding the loans.

60.    Milbank also worked with the Committee's financial advisors to review

and advise the Committee with respect to, among other transactions, (i) the prepayment by the

Debtors of notes issued by certain securitization trusts involving Metropolitan Life Insurance

Company; (ii) the liquidation of certain corporate loan assets of LCPI securing financing

provided to the Debtors; (iii) the transactions involved in the FairPoint Communications

restructuring and the Debtors' debt interests therein; and (iv) the recapitalization of certain non-

Debtor affiliates, including a Brazilian entity which was provided financing by certain Debtors

for the acquisition of loan portfolios.

61.    **Loan Commitments and Restructurings**.  During the Fifth Interim

Compensation Period, Milbank continued to monitor the Debtors' compliance with the

reporting requirements and internal protocols contemplated by Court-approved procedures to

execute transactions involving unfunded commitments and loan restructurings, and summarized

for the Committee the Debtors' disclosures regarding monthly loan activity.  Milbank also

conducted research and drafted a memorandum for the Loan Book Subcommittee on the

Debtors' potential liability and defenses with respect to their failure to fund loan commitments,

and reviewed and analyzed relevant proofs of claim of borrowers asserting damages for such

alleged failures to fund.  In addition, Milbank and the Committee's financial advisors presented

to the Loan Book Subcommittee analyses of segments of the Debtors' loan portfolio, focusing

on significant funded commitments, and discussed recommendations and strategized with the

subcommittee members regarding buy and sell options with respect to such commitments.

**P.**    **Domestic Bank and Related Regulatory Issues**

62.    During the Fifth Interim Compensation Period, Milbank continued to

expend considerable time in connection with the Banks, which are overseen by the Office of

Thrift Supervision (the "<u>OTS</u>") and the Federal Deposit Insurance Company (the "<u>FDIC</u>,"

together with the OTS, the "<u>Regulators</u>").  The Debtors' and Committee's professionals have

sought throughout the Chapter 11 Cases to improve the capital levels at each of the Banks to

satisfy regulatory requirements, avoid potential seizures and liquidations by the Regulators, and

facilitate the resumption of depository functions at the Banks to preserve and maximize value.

Accordingly, Milbank continued to work closely with the Debtors and their professionals in

attempting to structure solutions to the various issues confronting the Banks, including

communicating with the Regulators to discuss the Banks' alternatives and to negotiate a

mutually acceptable solution to the Banks' regulatory issues.

63.    Milbank worked closely with the Committee's financial advisors to

analyze and present the legal and financial implications of transactions involving the Banks to a

subcommittee (the "<u>Bank Regulatory Subcommittee</u>") established to review such matters.

During the Fifth Interim Compensation Period, the Bank Regulatory Subcommittee held

meetings to review restructuring measures and other developments related to the Banks, discuss

responsive courses of action and formulate recommendations regarding Bank matters that were

presented to the full Committee for further consideration.

64.    Milbank has taken, and continues to take, measures to ensure that the

Banks are being properly managed to maximize their value for the Debtors' estates and

creditors.  To that end, during the Fifth Interim Compensation Period, Milbank spent

considerable time, among other things, (i) analyzing the claims of the Regulators against LBHI

with respect to its obligations owed to the Banks; (ii) researching precedent cases involving

thrifts and defenses to claims brought by regulators regarding capital maintenance commitments

of holdings companies under section 365(o) of the Bankruptcy Code; (iii) monitoring issues

regarding the proposed settlement agreement with the Regulators to resolve disputes arising out

of a certain master forward agreement between LBHI and Aurora; and (iv) discussing with the

Committee's financial advisors and the Debtors' advisors restructuring strategies for the Banks

and approaches to resolving disputes with their Regulators.

**Q.**      **International Insolvency Matters**

65.      During the Fifth Interim Compensation Period, Milbank continued to

monitor and analyze issues regarding the Foreign Proceedings, including, without limitation, the

proceedings pending in (i) the United Kingdom ("UK"); (ii) Hong Kong; (iii) Japan;

(iv) France; (v) the Netherlands; (vi) Switzerland; (vii) Germany; (viii) Australia;

(ix) Singapore; (x) Korea; (xi) the Philippines; (xii) China; (xiii) Cayman Islands;

(xiv) Luxembourg; (xv) Taiwan; and (xvi) Bermuda.

66.      **Analysis of Foreign Proceedings, Claims and Discussions.**  During the

Fifth Interim Compensation Period, Milbank attorneys and paraprofessionals across various

jurisdictions collaborated with each other, Debtors' counsel, and the Foreign Administrators

regarding the status of and major issues arising in the Foreign Proceedings.  Milbank analyzed

and summarized reports published by the Foreign Administrators and other publicly available

information.  Based on such analyses, Milbank provided regular updates to the Committee

regarding the Foreign Proceedings.

67.     Milbank also continued to monitor compliance with and developments regarding that certain Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "Protocol"), approved by the Court on June 17, 2009.  In connection therewith, Milbank reported to the Committee on the developments at the meetings of the Protocol signatories held in London in February 2010, Hong Kong in April 2010 and London again in May 2010, in which Milbank participated.  At the Protocol meetings, other forums and through correspondence, Milbank engaged with certain Foreign Administrators to understand their concerns regarding the Debtors' Plan and other issues in the Chapter 11 Cases.  Milbank also analyzed and engaged in discussions with the Debtors and others to facilitate the resolution of issues among the Debtors and the Foreign Administrators.  Further, Milbank corresponded with the Foreign Administrators and reviewed their counterproposals to the Debtors' Plan and potential resolutions of contested issues.  In connection with each of the foregoing, Milbank regularly updated the Committee on the progress of negotiations with the Foreign Administrators.

68.     In addition, during the Fifth Interim Compensation Period, Milbank, among other things, continued to (i) review the Guarantee Claims filed by and against the Debtors and the Foreign Affiliates; (ii) research potential bases under applicable law for disallowing claims of Foreign Affiliates against the Debtors; and (iii) analyze relevant setoff, equitable subordination and avoidance laws in applicable jurisdictions and the potential for disallowance of the Debtors' claims in the Foreign Proceedings.

69.     **Australia Issues.**  Foreign Affiliate Lehman Brothers Australia Ltd. ("Lehman Australia") commenced a voluntary administration on September 26, 2008.  In May 2009, Lehman Australia's largest creditor, Foreign Affiliate Lehman Brothers Asia Holdings

31

Ltd. ("LBAHL"), proposed a deed of company arrangement (the "DOCA") – a statutory mechanism under Australia law whereby a company may enter into a compromise arrangement with its creditors – as a plan to resolve Lehman Australia's debts and creditors' claims. The proposed DOCA was rejected by an Australian Federal Court (the "Australian Federal Court"), which decision was upheld by the High Court of Australia (the "Australian High Court") in March 2010. As a result, the Lehman Australia estate was converted to a liquidation proceeding.

70.    During the Fifth Interim Compensation period, Milbank monitored Lehman Australia's Foreign Proceeding and analyzed various issues, including, among others, (i) the Australian Federal Court and Australian High Court's decisions regarding the DOCA and the potential impact on Lehman Australia, LBAHL and LBHI, which is also a creditor of Lehman Australia; (ii) litigation surrounding an issuance of notes in Australia by certain LBHI affiliates known as the Dante Program and issues regarding the priority of payment of the note obligations; and (iii) the potential settlement of claims by and against Lehman Australia and the potential outcome of the Lehman Australia liquidation proceedings. In connection therewith, Milbank reviewed publicly available information regarding the Lehman Australia Foreign Proceeding, including reports from the official liquidators of the Lehman Australia estate, PPB, and regularly corresponded with PPB to address issues in the proceedings. In connection therewith, Milbank drafted and discussed with the Committee a memorandum summarizing the key issues in the Lehman Australia Foreign Proceeding.

71.    **Asia Issues.**  In September 2008, petitions were submitted by representatives of certain of the Debtors' affiliates in Hong Kong (collectively, the "HK

32

Debtors")[13] for the winding up of the HK Debtors pursuant to section 179(1) of the Hong Kong Companies Ordinance.  During the Fifth Interim Compensation Period, Milbank monitored the Hong Kong liquidation proceedings, reviewed relevant publicly available information, and prepared a memorandum summarizing the status of and major issues arising in the proceedings. Milbank conducted research regarding the HK Debtors and jurisdiction-specific laws and their impact on the Debtors' interests.  Additionally, Milbank prepared for and attended meetings with the liquidators of the HK Debtors, KPMG, during the Protocol meeting in Hong Kong in April 2010, and engaged in discussions with KPMG, regarding, among other things, the Debtors' Plan and intercompany claims and issues.

72.     Milbank also continued to monitor and review issues arising in the Civil Rehabilitation Proceedings for the Foreign Affiliates in Tokyo (collectively, the "Japan Debtors"), including the pending appeal of creditors to Tokyo High Court regarding the Tokyo District Court's approval of civil rehabilitation plans for certain Japan Debtors seeking reduced distributions to LBHI and/or its affiliates.

73.     **UK Issues.**  Lehman Brothers International Europe ("LBIE"), the Debtors' principal trading company in the UK, along with several other British subsidiaries and affiliates of the Debtors, were placed into insolvency administration in the UK (the "UK Administration"), and the English High Court appointed PricewaterhouseCoopers ("PwC"), as joint administrators.  During the Fifth Interim Compensation Period, Milbank continued to monitor the UK Administration, and major developments therein, and to provide English law advice in relation to various swaps and derivatives transactions to which Lehman entities are a

---

[13]     The HK Debtors include:  (i) LBAHL; (ii) Lehman Brothers Asia Limited; (iii) Lehman Brothers Futures Asia Limited; (iv) Lehman Brothers Securities Asia Limited; (v) LBQ Hong Kong Funding Limited; (vi) Lehman Brothers Nominees (H.K. Limited); (vii) Lehman Brothers Asia Capital Company; and (viii) Lehman Brothers Commercial Corporation Asia Limited.

party.  This involved numerous internal telephone conversations, email communication and

memoranda, as well as email communication and conversations with the Committee's financial

advisors and the Debtors' advisors.

74.    In particular, Milbank performed extensive legal research into the

provisions and practical mechanics of the administration process under English law.  Milbank

regularly communicated with UK-based representatives of FTI and had regular conversations

with members of the London office of Weil, Gotshal & Manges LLP regarding the status of the

UK Administration.  In addition, Milbank monitored and provided updates and analyses to the

Committee on various issues in connection with the UK Administration, including the

upcoming RASCALs hearing and the LBIE Client Money Appeal, which was heard by the

Court of Appeal of England and Wales from June 21-24, 2010.

75.    In addition, Milbank reviewed, summarized and analyzed the Third

Progress Report (the "Report"), dated April 14, 2010, prepared by PwC, that provided an

account of the steps that had been taken in the UK Administration, and communicated to the

Committee regarding the Report and its principal findings.  In that connection, Milbank, with

the help of FTI, analyzed the most recent data regarding the potential quantum of claims against

LBIE, the realization process of LBIE's assets and the size of potential distributions to LBHI

and other Debtors holding intercompany claims against LBIE.

76.    **German Bank Issues.**  Lehman Brothers Bankhaus AG ("Bankhaus") is

a wholly owned subsidiary of LBHI that was put into an insolvency proceeding by the Frankfurt

Local Court (*Amtsgericht*) on November 13, 2008.  On April 29, 2009, Bankhaus filed with this

Court a petition for recognition of a foreign main proceeding under chapter 15 of the

Bankruptcy Code.  During the Fifth Interim Compensation Period, Milbank analyzed numerous

issues relating to Bankhaus, including working with the Debtors and Houlihan to review the terms of the settlement agreement with Bankhaus and legal issues in connection therewith.  In addition, Milbank, among other things, (i) reviewed proofs of claim filed by and against Bankhaus, including claims filed by Bundesverband deutscher Banken regarding obligations under a guarantee and indemnity letter from LBHI and assessed the merits of such claims pursuant to German law; (ii) researched the treatment under German law of intercompany claims that could affect the recovery of the Debtors; and (iii) drafted a memorandum for the Committee regarding the potential setoff of claims by Bankhaus pursuant to the laws governing German insolvency proceedings.

**R.    Non-Derivative Automatic Stay/Safe Harbor Issues**

77.    During the Fifth Interim Compensation Period, Milbank reviewed numerous motions filed by parties in interest seeking to lift the automatic stay to enforce various contractual agreements or otherwise exercise rights against the Debtors' estates.

78.    **SunCal Debtors' Relief From Stay Motion**.  In connection therewith, Milbank reviewed and analyzed the Motion of the SunCal Debtors for an Order Determining that the Automatic Stay Does Not Apply; Or, in the Alternative, Granting Relief from the Stay (the "SunCal Debtors' Motion") [Docket No. 8539] and Milbank filed with the Court, on behalf of the Committee, a Statement in Connection with the SunCal Debtors' Motion (the "Statement in Connection") [Docket No. 8940].  The Statement in Connection concurred with the Debtors' view that the SunCal Debtors' Motion should be denied.  Milbank asserted that the burdens imposed on LCPI in terms of the time, financial resources and attention necessary to defend itself against the SunCal Debtors' meritless equitable subordination claims in California far

outweighed any potential harm to the SunCal Debtors and threatened material detriment to the interests of LCPI's and LBHI's creditors.

79.    **Debtors' Motion to Allow Delivery of Notices of Acceleration**.  During the Fifth Interim Compensation Period, Milbank continued to participate in the negotiations of an agreed form of order granting Merrill Lynch International ("Merrill") certain limited relief from the automatic stay to deliver notices of acceleration (the "Notices") for certain notes issued by LBT and purportedly guaranteed by LBHI (the "LBT Notes").  The Debtors also filed a motion and proposed order which sought to modify the automatic stay to permit all holders of the LBT Notes (the "Holders") to deliver Notices to LBHI in order to accelerate the Holders' claims against LBT in LBT's insolvency proceeding in the Netherlands (the "Motion to Allow Acceleration Notices") [Docket No. 8753].

80.    Milbank played a central role in negotiating an agreed form of order and filed, on behalf of the Committee, a Statement in Connection with the Debtors' Motion to Allow Acceleration Notices (the "Statement") [Docket No. 9525].  The Statement noted that the Debtors' Motion to Allow Acceleration Notices proposed a reasonable solution to one of the administrative challenges resulting from inconsistencies between Dutch and American laws and that the relief requested by the Debtors should avoid substantial administrative costs to LBHI's estate, while permitting Holders of the LBT Notes to pursue their claims.  Milbank also ensured that the Committee's rights were reserved with respect to (i) whether delivery of Notices to LBHI with respect to the LBT Notes violated the automatic stay in effect in LBHI's chapter 11 case; (ii) the validity and enforceability of the LBHI guarantee; and (iii) how claims against LBHI on account of the LBT Notes and/or the LBHI guarantee were to be calculated.

**S.**     <u>**Miscellaneous Asset Sales/363 Issues**</u>

81.     During the Fifth Interim Compensation Period, the Committee and its

professionals continued their work in connection with the Debtors' asset sale transactions

including ongoing work related to the sale of the Lehman's broker-dealer business to Barclays

Capital Inc. ("<u>Barclays</u>").

82.     **<u>Omnium</u>**.  Milbank continued to play an active role in the Debtors'

efforts to retain a data processing and workflow automation consultant on a permanent basis,

following the expiration of the Transition Services Agreement put in place following the sale of

Lehman's broker-dealer business to Barclays.  During the Fifth Interim Compensation Period,

the Court approved the retention of Omnium LLC (formerly Citadel Solutions LLC,

"<u>Omnium</u>") on a final basis on March 25, 2010.  Milbank spent considerable time reviewing

and analyzing the terms of the final agreement with Omnium, working in close communication

with Debtors' counsel.  Additionally, Milbank worked closely with the Committee's financial

advisors in reaffirming the adequacy of the Transition Services Agreement with respect to its

final form.

83.     **<u>Libro</u>**.  Milbank also reviewed and analyzed the potential sale of the

Debtors' interests in non-debtor affiliate Lehman Libro Securitizadora de Creditos Financeiros

("<u>Libro</u>"), a Brazilian entity.  Milbank continued to expend time in connection with the sale of

all issued and outstanding shares and certain promissory notes issued by Libro.  In that

connection, Milbank worked closely with Debtors' counsel in reviewing and commenting on

drafts of a proposal submitted by an interested party, culminating in the execution of a term

sheet with negotiations of a final agreement ongoing.

**T.**    **Non-Derivative Executory Contracts/365 Issues**

84.    During the Fifth Interim Compensation Period, Milbank reviewed and

analyzed pleadings filed with respect to the Debtors' executory contracts, including motions by

certain of the Debtors' counterparties seeking to compel the respective Debtor to assume or

reject a particular executory contract.  Such review and analysis included legal research

regarding the relief sought by such pleadings, analysis of the Debtors' rights and obligations

under the applicable executory contracts, consultation with the Committee's financial advisors

regarding the financial implications of the proposed treatment of the subject contracts,

correspondence with the Debtors' legal and financial advisors regarding the financial context

and implications of the proposed courses of action, and assessment of the potential impact on

the Debtors' estates.  Based upon such review and analysis, Milbank prepared memoranda for

the Committee summarizing such pleadings, applicable legal issues, corresponding financial

considerations, and the potential impact on the Debtors' estates and unsecured creditor

recoveries.

**U.**    **Plan of Reorganization/Plan Confirmation/Plan Implementation**

85.    As the Debtors' exclusive period for filing a plan of reorganization

expired and they filed the Debtors' Plan, Milbank, together with the Committee's financial

advisors, intensified its long-pending review of the myriad issues involved with the plan of

reorganization.  Such analysis included the review of bankruptcy, corporate governance,

pension, tax and structural issues, and the preparation and review of recovery scenarios.  In

connection therewith, Milbank, along with the Committee's financial advisors, regularly met

with the Debtors and their advisors to discuss the proposed treatment of a variety of plan-related

issues, including the preservation of net operating losses, substantive consolidation,

38

intercompany claims and guarantee claims reconciliation, corporate governance, and plan currency.

86.    Additionally, Milbank continued its work on a comprehensive analysis of substantive consolidation and the factors generally considered by courts when analyzing substantive consolidation.   In preparing such analyses, Milbank conducted in-depth research on all reported cases discussing the doctrine of substantive consolidation and also undertook extensive factual investigation on the issue, including document review and employee and creditor interviews.  In connection therewith, Milbank, together with the Committee's financial advisors, also continued its analysis of the potential applicability of the principles articulated in such cases to the facts and circumstances of the Chapter 11 Cases.  Milbank also researched and drafted several comprehensive memoranda on substantive consolidation and its implications on the Debtors' estates, and made numerous presentations to the Committee with respect to the foregoing.

87.    Finally, Milbank and Houlihan analyzed different scenarios that would serve to settle the issues of substantive consolidation and had numerous meetings with the Debtors and certain creditor groups with respect thereto.  Specifically, the Committee individually met with the LBT Noteholder Group, the LBT Ad Hoc Group, The Baupost Group, the LBSF Ad Hoc Consortium of Claimholders and the LBSF Alliance to discuss each of their positions on substantive consolidation.  Additionally, the Committee convened telephonically with the Ad Hoc Group of Lehman Brothers Creditors to discuss their proposed objection to the Debtors' Plan seeking authorization to conduct discovery on substantive consolidation, which was later filed on June 29, 2010 [Docket No. 9905].

V.    <u>**Claims Analysis**</u>

88.    <u>**Claims Database**</u>.  Milbank continued, during the Fifth Interim

Compensation Period, to expand and refine the database of the Debtors' debt offering

documents ("<u>Database</u>") that was created and developed during the First Interim Compensation

Period.  Milbank continued to use the Database to develop and present summary forensic capital

structure information to the Committee and its advisors, as well as to answer individual queries

from the Committee and the public about specific Lehman debt instruments.  The Database is

used by Milbank and the Committee's financial advisors on a regular basis to determine and

analyze the Debtors' and certain foreign subsidiaries' capital structures, review certain proofs of

claim, establish a basis upon which to determine and validate claim amounts, and analyze

substantive consolidation, intercompany, preference and other potential issues.  Milbank

continued to review and analyze the debt securities and guarantees of LBHI and its affiliates in

order to expand the Database with respect to LBT and to address issues related to Lehman

securities raised by the Committee.  Having access to the Database has proved invaluable to the

Committee and its advisors, including with respect to the matters related to the claims

reconciliation process and the Debtors' Plan.

89.    <u>**Capital Structure Issues**</u>.  Milbank drafted a number of memoranda for

the Committee on certain current and anticipated disputed topics relating to the Debtors' capital

structure, including (i) an analysis of LBHI's guarantee of LBT debt; (ii) a comparison of the

treatment of LBHI subordinated notes under the governing documents as versus under the

Debtors' Plan; (iii) an analysis of the nature of certain intercompany claims in the context of

substantive consolidation arguments; (iv) an analysis of the various early redemption valuation

methods upon an event of default for LBHI structured notes and the LBT Notes; (v) an

overview of Lehman Brothers Securities N.V.'s formation, operations, issuances and financial information; (vi) an analysis of assumption of obligations provisions whereby LBHI may assume LBT's obligations; and (vii) an analysis of the effect of allowing the Holders to accelerate payment under the LBT Notes.

90.     **Bar Date.**  During the Fifth Interim Compensation Period, Milbank reviewed and analyzed numerous motions filed by claimants seeking permission to file proofs of claim after the deadline to file proofs of claim against the Debtors.  In connection therewith, Milbank did extensive research regarding excusable neglect, the standard for late-filed proofs of claim, and related legal and factual issues.  Milbank drafted and filed a joinder to the Debtors' objection to the several motions filed by parties seeking, *inter alia*, to have their late filed proofs of claim be deemed as timely filed [Docket No. 7544], and took similar positions on the record at the hearings on other similar motions.  On May 20, 2010, this Court issued a memorandum decision denying the motions to file late proofs of claim [Docket No. 9150].

W.     **Other Bankruptcy Motions and Matters**

91.     During the Fifth Interim Compensation Period, Milbank devoted substantial time to researching and evaluating potential claims on behalf of the Debtors' estates, including voidable transfer claims.  Pursuant to section 546(a) of the Bankruptcy Code, the deadline for bringing avoidance actions is two years after the entry of the order for relief, which in this case is September 15, 2010.  Due to this time limitation, Milbank conducted considerable diligence in connection with potential avoidance actions.  In particular, Milbank began working with the Debtors, the Debtors' counsel and professionals, the Committee's financial advisors, the Committee's conflicts counsel, the SIPA Trustee and the SIPA Trustee's advisors, among other things, to (i) identify and analyze categories of pre- and post-petition transfers potentially

subject to avoidance and recovery; (ii) analyze the prepetition financial condition of the Debtors to determine whether the Debtors were insolvent and/or undercapitalized during any period for purposes of pursuing preference and constructive fraudulent transfer claims; (iii) investigate and analyze in greater depth particular transfers identified as potential avoidance targets; (iv) analyze potential legal issues that might arise in connection with the pursuit of any avoidance actions; and (v) develop potential litigation strategies.

92.    Milbank analyzed various categories of potentially voidable transfers based on information provided by the Debtors' professionals and contained the Examiner's Report, including payments to insiders and vendors, and transfers made in connection with the treasury and trading activities of the Debtors. Milbank met and corresponded extensively with the Committee's financial advisors, and counsel and financial advisors to the Debtors and the SIPA Trustee to discuss various types of prepetition transfers made by the Debtors, the prepetition financial condition of the Debtors, various issues relating to the joint pursuit of avoidance actions by the Debtors and the SIPA Trustee and strategies and mechanics of sending demand letters and tolling agreements to and/or filing complaints against transferees. Milbank also began looking into particular transfers in which potential recoveries for the estates appeared to be substantial, and developing potential theories of recovery for such transfers. Through these analyses and discussions, Milbank began working with the Debtors to determine which transfers might create viable causes of action under avoidance and other theories and which transfers could be eliminated from further consideration.

93.    Milbank also began assessing the financial condition of the Debtors prior to the Petition Date for purposes of preference and constructive fraudulent transfer causes of action. Milbank engaged in discussions and correspondence with the Debtors' counsel

regarding the Debtors' prepetition financial condition and the Debtors' concerns regarding the

collateral effects that a finding of insolvency or undercapitalization might have on potential

claims against the estate.  Milbank worked extensively with the Committee's financial advisors

in developing work plans to coordinate with the Debtors' professionals in assessing the

Debtors' financial condition and to potentially perform an independent assessment.

## X.    Non-Derivative Adversary Proceedings Preparation and Litigation

94.    During the Fifth Interim Compensation Period, Milbank did research and

prepared memoranda regarding the claims and issues raised by a wide range of pending lawsuits

and potential settlements impacting the Debtors' estates.  Milbank also held teleconferences and

meetings, both internally and with the Debtors and their professionals, with regard to the

foregoing and provided regular updates to the Committee.

95.    More specifically, with the exception of cases in which the Committee's

interests are represented by the Committee's conflicts counsel, Milbank monitored

developments in (i) all pending adversary proceedings commenced in this Court; (ii) lawsuits

commenced prepetition against the Debtors and pre- and post-petition against non-Debtor

affiliates, officers, directors, and related parties; (iii) litigation raising issues similar to those

raised or to be raised in the Chapter 11 Cases; and (iv) contested matters in the Chapter 11

Cases.  When appropriate and directed by the Committee, Milbank intervened in such matters

on the Committee's behalf.  In connection with the monitored proceedings, Milbank reviewed

and analyzed proposed settlement agreements and advised the Committee regarding the same.

## Y.    2004 Issues

96.    In connection with certain findings contained in the Examiner's Report,

Milbank conducted research and filed a motion for authorization, pursuant to Rule 2004 of the

Bankruptcy Rules, to issue subpoenas for the production of documents and oral examination of representatives from Ernst & Young LLP and its affiliates (collectively, "E&Y") involved in performing auditing and other services for Lehman prior to the Petition Date (the "E&Y Rule 2004 Motion").  Specifically, the Committee sought information related to E&Y's role in Lehman's prepetition use of an accounting method known as "Repo 105" to purportedly move assets off Lehman's balance sheets.  In connection therewith, Milbank also drafted discovery requests and a motion pursuant to Rule 30(b)(6) to ensure the Committee's access to oral examinations and documents in connection with the relief sought.

## Z.    **Examiner Issues**

97.    During the Fifth Interim Compensation Period, Milbank continued to communicate and coordinate with the Examiner in connection with the Examiner's investigation mandate and also reviewed and analyzed the Examiner's Report.  In connection with the filing of the Examiner's Report, and prior to its unsealing, Milbank analyzed and developed a response to the Examiner's Motion to Establish Procedures to Unseal the Examiner's Report.  Once the Examiner's Report was unsealed, Milbank conducted a thorough review of the report and its exhibits and drafted for the Committee a summary and analysis of the report, including its impact on potential claims of the estates.  Along with its review of the claims and causes of action identified in the Examiner's Report, Milbank also researched and analyzed various legal issues, such as the ability to access materials underlying the Examiner's investigation and the evidentiary weight of the Examiner's findings in subsequent proceedings.

## AA.    **Firm's Own Billing/Fee Applications**

98.    During the Fifth Interim Compensation Period, Milbank reviewed the Fee Statements for, among other purposes, compliance with the Interim Compensation Order, the

44

Local Guidelines and the Fee Committee Guidelines.  Milbank also prepared and served its Fee Statements and its Fourth Interim Fee Application on all parties as required by the Interim Compensation Order.

99.    In connection with the appointment of the Fee Committee, during the Fifth Interim Compensation Period, Milbank reviewed and analyzed matters related to the Fee Protocol, and regularly corresponded with the members of the Fee Committee and the other professionals retained in the Chapter 11 Cases regarding such matters.  In addition to continuing to attend regular meetings of the Fee Subcommittee, Milbank continued to work cooperatively with the Fee Committee to settle certain outstanding issues identified in the Fee Committee reports pertaining to the retained professionals' third and fourth interim fee applications.  Such cooperative efforts led to, among other things, the adoption of a revised protocol for the review of fee statements and fee applications by the Fee Committee, as reflected in the April 9, 2010 Fee Committee Report.

**BB.**    **Third Party Retention/Fee Application/Other Issues**

100.    During the Fifth Interim Compensation Period, Milbank reviewed the retention applications of Dechert, LLP; Sutherland, Asbill & Brennan, LLP; Jones Day, LLP; Deloitte, LLP, and others, as certain of these professionals originally retained as ordinary course professionals pursuant to the Court's Order Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code Authorizing the Debtors to Employ Professionals Utilized in the Ordinary Course of Business, dated November 5, 2008 (the "OCP Order") [Docket No. 1394], exceeded the $1 million cap on fees during the pendency of the Chapter 11 Cases established in the OCP Order.

101.    Milbank also reviewed the monthly fee statements received from other

professionals pursuant to the Interim Compensation Order.  Finally, Milbank assisted in the

filing and service of the fourth interim fee applications of other Committee professionals.

## IV.

### ALLOWANCE OF COMPENSATION

102.    The professional services rendered by Milbank have required a high

degree of professional competence and expertise to address, with skill and dispatch, the

numerous issues requiring evaluation and action by the Committee.  The services rendered to

the Committee were performed efficiently, effectively and economically, and that the results

obtained to date have benefited not only the members of the Committee, but also the unsecured

creditors of each of the Debtors' estates.

103.    The allowance of interim compensation for services rendered and

reimbursement of expenses in bankruptcy cases is expressly provided for in section 331 of the

Bankruptcy Code:

> Any professional person . . . may apply to the court not more than once
> every 120 days after an order for relief in a case under this title, or more
> often if the court permits, for such compensation for services rendered . . .
> as is provided under section 330 of this title.

11 U.S.C. § 331.

104.    With respect to the level of compensation, section 330(a)(1)(A) of the

Bankruptcy Code provides, in pertinent part, that the Court may award to a professional person,

"reasonable compensation for actual, necessary services rendered."  Section 330(a)(3), in turn,

provides that:

> In determining the amount of reasonable compensation to be awarded to
> . . . [a] professional person, the court shall consider the nature, the extent,
> and the value of such services, taking into account all relevant factors,
> including –

(A)    the time spent on such services;

(B)    the rates charged for such services;

(C)    whether the services were necessary to the administration of, or beneficial at the time which the service was rendered toward the completion of, a case under this title;

(D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E)    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and expertise in the bankruptcy field; and

(F)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

105.    The congressional policy expressed above provides for adequate compensation in order to continue to attract qualified and competent professionals to bankruptcy cases. In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 850 (3d Cir. 1994) ("Congress rather clearly intended to provide sufficient economic incentive to lure competent bankruptcy specialists to practice in the bankruptcy courts.") (citation and internal quotation marks omitted); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 18 (Bankr. S.D.N.Y. 1991) ("Congress' objective on requiring that the market, not the Court, establish attorneys' rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists.").

106.    In assessing the "reasonableness" of the fees requested, courts have looked to a number of factors, including those first enumerated by the Fifth Circuit in In re First Colonial Corp. of America, 544 F.2d 1291, 1298-99 (5th Cir. 1977), and thereafter adopted by

most courts.[14]  See In re Nine Assocs., Inc., 76 B.R. 943, 945 (S.D.N.Y. 1987) (adopting First Colonial/Johnson analysis); In re Cuisine Magazine, Inc., 61 B.R. 210, 212-13 (Bankr. S.D.N.Y 1986) (same); see generally 3 Collier on Bankruptcy ¶ 330.04[3] (Lawrence P. King et al., eds., 15th rev. ed. 2009) (enumerating First Colonial and Johnson as the "leading cases to be considered in determining a reasonable allowance of compensation").  Milbank respectfully submits that the consideration of these so-called Johnson factors should result in this Court's allowance of the full compensation requested.

(A)     The Time and Labor Required.  The Debtors' cases are among the largest, most complex and active bankruptcy cases ever filed.  Accordingly, the professional services rendered by Milbank on behalf of the Committee have required the continuous expenditure of substantial time and effort, under time pressures which sometimes required the performance of services late into the evening and, on a number of occasions, over weekends and holidays.  The services rendered required a high degree of professional competence and expertise in order to be administered with skill and dispatch.

(B)     The Novelty and Difficulty of Questions.  Novel and complex issues have arisen in the course of these chapter 11 cases, and it can be anticipated that other such issues will be encountered.  In these cases, as in many others in which the firm is involved, Milbank's effective advocacy and creative approach to problem solving have helped clarify and resolve difficult issues and will continue to prove beneficial.

(C)     The Skill Requisite to Perform the Legal Services Properly.  Milbank believes that its recognized expertise in the area of financial restructuring, its ability to draw from highly experienced professionals in other areas of its practice such as securities, structured products, asset divestiture, litigation, and regulatory law and its practical approach to the resolution of issues help maximize the distributions to the unsecured creditors of each of the Debtors.

(D)     The Preclusion of Other Employment by Applicant Due to Acceptance of the Case.  Due to the size of Milbank's financial restructuring department and the firm as a whole, Milbank's representation of the Committee has not precluded the

---

[14]     The factors embraced by the Fifth Circuit in First Colonial were first adopted by the Fifth Circuit's decision in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), except that First Colonial also included the "spirit of economy" as a factor expressly rejected by Congress in enacting section 330 of the Bankruptcy Code.  Stroock & Stroock & Lavan v. Hillsborough Holdings Corp. (In re Hillsborough Holdings Corp.), 127 F.3d 1398, 1403 (11th Cir. 1997).  A majority of the First Colonial factors are now codified in section 330(a)(3). 3 Collier on Bankruptcy ¶ 330.04[3].

acceptance of new clients. However, the number of matters needing attention on a continuous basis has required numerous Milbank attorneys, across multiple practice groups, to commit significant portions of their time to these cases.

(E)    The Customary Fee. The compensation sought herein is based upon Milbank's normal hourly rates for services of this kind. Milbank respectfully submits that the compensation sought herein is not unusual given the magnitude and complexity of these cases and the time dedicated to the representation of the Committee. Such compensation is commensurate with fees Milbank has been awarded in other cases, as well as with fees charged by other attorneys of comparable experience.

(F)    Whether the Fee is Fixed or Contingent. Milbank charges customary hourly rates, as adjusted annually, for the time expended by its attorneys and paraprofessionals in representing the Committee, and Milbank's fee is not outcome dependent.

(G)    Time Limitations Imposed by Client or Other Circumstances. As stated above, Milbank has been required to attend to various issues as they have arisen in these cases. Often, Milbank has had to perform these services under significant time constraints requiring attorneys and paraprofessionals assigned to these cases to work evenings and on weekends.

(H)    The Amount Involved and Results Obtained. The Committee represents the interests of unsecured creditors of each of the Debtors that, in the aggregate, hold unsecured claims estimated to be valued in the hundreds of billions of dollars, in what has been widely described as the largest chapter 11 case ever filed. The Committee's participation, with Milbank's counsel and guidance, has greatly contributed to the efficient administration and prospects for reorganization of these cases.

(I)    The Experience, Reputation and Ability of the Attorneys. Milbank has a sophisticated and nationally recognized corporate reorganization and financial restructuring practice, and Milbank attorneys involved in this representation have played a major role in numerous complex restructurings including, for example, the chapter 11 cases of Lyondell Chemical Company, Nortel Networks Inc., Capmark Financial Group Inc., Hayes Lemmerz International, Inc., DBSD North America, Inc., Refco, Inc., Enron Corp., TOUSA, Inc., Vicorp, Interstate Bakeries Corp., Winn-Dixie Stores, Inc., Fruit of the Loom Inc., Adelphia Communications Corp., Maxxim Medical Group, Inc., RCN Corp., US Airways Group, Inc., Global Crossing Ltd., Fleming Companies, Inc., Dairy Mart Convenience Stores, Inc., Lernout & Hauspie Speech Products N.V., Teligent, Inc., World Access, Inc., ORBCOMM Global, L.P., ICO Global Communications Inc., Safety-Kleen Corp., HomePlace Stores, Inc., Hvide Marine, Inc., Sun TV and Appliances, Inc., Seven-Up/RC Bottling Company of Southern California, Inc., and Ames Department Stores, Inc. Milbank's experience enables it to perform the services described herein competently and expeditiously.

(J)    The "Undesirability" of the Case.  These cases are not undesirable but, as already indicated, have required a significant commitment of time from many of Milbank's attorneys.

(K)    Nature and Length of Professional Relationship.  Milbank was selected as the Committee's counsel shortly after the Committee's formation, on September 17, 2008, and was retained nunc pro tunc to that date pursuant to an order of the Court dated November 21, 2008.  Milbank has been rendering services continuously to the Committee since the Committee was formed, and Milbank has rendered such services in a necessary and appropriate manner.

107.    The total time spent by Milbank attorneys and paraprofessionals during the Fifth Interim Compensation Period was 33,683.10 hours and has a fair market value of $19,450,342.75.  As shown by this Application and supporting exhibits, Milbank's services were rendered economically and without unnecessary duplication of efforts.  In addition, the work involved, and thus the time expended, was carefully assigned in consideration of the experience and expertise required for each particular task.

**V.**

**EXPENSES**

108.    Milbank has incurred a total of $851,804.27 in expenses in connection with representing the Committee during the Fifth Interim Compensation Period.  Milbank records all expenses incurred in connection with the performance of professional services.  A schedule of expenses by project billing category, as well as a summary of these expenses and detailed descriptions of these expenses, is annexed hereto as Exhibit "C."

109.    In connection with the reimbursement of expenses, Milbank's policy is to charge its clients in all areas of practice for expenses, other than fixed and routine overhead expenses, incurred in connection with representing its clients.  The expenses charged to Milbank's clients include, among other things, telephone and telecopy toll and other charges, mail and express mail charges, special or hand delivery charges, photocopying charges, out-of-

town travel expenses, local transportation expenses, expenses for working meals, computerized research and transcription costs.

110.    Milbank charges the Committee for these expenses at rates consistent with those charged to Milbank's other bankruptcy clients, which rates are equal to or less than the rates charged by Milbank to its non-bankruptcy clients.  Milbank seeks reimbursement from the Debtors at the following rates for the following expenses:  (i) ten cents ($0.10) per page for photocopying; (ii) fifty cents ($0.50) for color copies; (iii) no charge for incoming facsimiles; (iv) toll charges only for outgoing facsimiles; and (v) an average of nineteen cents ($0.19) per minute for long distance.  Specifically, with respect to phone charges over $100.00, such charges were accrued in connection with conference calls in which the Committee, the Debtors and/or other parties in interest participated.

111.    In accordance with section 330 of the Bankruptcy Code, the Local Guidelines and the U.S. Trustee Guidelines, Milbank seeks reimbursement only for the actual cost of such expenses to Milbank.[15]  Additionally, Milbank has further limited and defined its expenses in accordance with the Fee Committee Guidelines.

112.    In providing or obtaining from third parties services which are reimbursable by clients, Milbank does not include in such reimbursable amount any costs of investment, equipment or capital outlay.

113.    Milbank regularly charges its non-bankruptcy clients for ordinary business hourly fees and expenses for secretarial, library, word processing and other staff

---

[15]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted cost of such expenses.

services because such items are not included in the firm's overhead for the purpose of setting the billing rates.

114.    Attorneys at Milbank have not incurred expenses for luxury accommodations or deluxe meals.  The Application does not seek reimbursement of air travel expenses in excess of coach fares.  Throughout the Fifth Interim Compensation Period, Milbank has been keenly aware of cost considerations and has tried to minimize the expenses charged to the Debtors' estates.

## VI.

## NOTICE

115.    Notice of this Application has been given to (a) the Debtors, (b) counsel for the Debtors, (c) the United States Trustee, and (d) the members of the Fee Committee.

## VII.

## CONCLUSION

WHEREFORE, Milbank respectfully requests the Court to enter an order conforming to the amounts set forth in Fee Schedule A(1) attached hereto as Exhibit "D" (i) allowing Milbank (a) interim compensation for professional services rendered as counsel for the Committee during the Fifth Interim Compensation Period in the amount of $19,450,342.75 and (b) reimbursement of expenses incurred in connection with rendering such services in the aggregate amount of $851,804.27, for a total award of $20,302,147.02; (ii) authorizing and directing the Debtors to pay to Milbank $12,066,469.66, which is an amount equal to the difference between (a) this $20,302,147.02 award and (b) $8,235,677.36, the total of all amounts that the Debtors have previously paid to Milbank pursuant to the Interim Compensation Order

for services rendered and expenses incurred during the Fifth Interim Compensation Period; and

(iii) granting such further relief as is just.

Dated: New York, New York
       August 16, 2010

**MILBANK, TWEED, HADLEY & MᶜCLOY LLP**

By:  /s/  Dennis F. Dunne
Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

# EXHIBIT A

**Certification**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                    :
In re:                         :          Chapter 11 Case No.
                                      :
LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u>,   :          08-13555 (JMP)
                                      :
                Debtors.           :          (Jointly Administered)
                                      :
------------------------------------------------------------ x

**CERTIFICATION UNDER GUIDELINES FOR FEES AND DISBURSEMENTS
FOR PROFESSIONALS IN RESPECT OF FIFTH APPLICATION OF MILBANK,
TWEED, HADLEY & M<sup>C</sup>CLOY LLP, COUNSEL TO
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
<u>FEBRUARY 1, 2010 THROUGH AND INCLUDING MAY 31, 2010</u>**

Pursuant to the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and

amended April 21, 1995 (together, the "<u>Local Guidelines</u>"), and the United States Trustee

Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, adopted on January 30, 1996 (the "<u>U.S. Trustee Guidelines</u>" and,

together with the Local Guidelines, the "<u>Guidelines</u>"), the undersigned, a member of the firm

Milbank, Tweed, Hadley & M<sup>C</sup>Cloy LLP ("<u>Milbank</u>"), counsel to the Official Committee of

Unsecured Creditors (the "<u>Committee</u>") of Lehman Brothers Holdings Inc., Lehman Brothers

Structured Finance, Lehman Brothers Commercial Paper, Inc. and their affiliated debtors in

possession in the above-captioned cases (collectively, the "<u>Debtors</u>"), hereby certifies with

respect to Milbank's fifth application for allowance of compensation for services rendered and

for reimbursement of expenses, dated August 16, 2010 (the "<u>Application</u>"), for the period of

February 1, 2010 through and including May 31, 2010 (the "Fifth Interim Compensation Period") as follows:

    1.    I am the professional designated by Milbank in respect of compliance with the Guidelines.

    2.    I make this certification in support of the Application, for interim compensation and reimbursement of expenses for the Fifth Interim Compensation Period, in accordance with the Local Guidelines.

    3.    In respect of section B.1 of the Local Guidelines, I certify that:

    a.    I have read the Application.

    b.    To the best of my knowledge, information and belief formed after reasonable inquiry, the fees and disbursements sought fall within the Guidelines.

    c.    Except to the extent that fees or disbursements are prohibited by the Guidelines, the fees and disbursements sought are billed at rates in accordance with practices customarily employed by Milbank and generally accepted by Milbank's clients.

    d.    In providing a reimbursable service, Milbank does not make a profit on that service, whether the service is performed by Milbank in-house or through a third party.[1]

    4.    In respect of section B.2 of the Local Guidelines, I certify that Milbank has provided statements of Milbank's fees and disbursements previously accrued, by filing and serving monthly statements in accordance with the Interim Compensation Order (as defined in the Application), except that completing reasonable and necessary internal accounting and review procedures have at times precluded filing fee statements within the time periods established in the Interim Compensation Order.

---

[1] The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted cost of such expenses.

5.    In respect of section B.3 of the Local Guidelines, I certify that copies of the Application are being provided to (a) the Court, (b) the Debtors, (c) counsel for the Debtors, (d) the Office of the United States Trustee, and (e) the members of the Fee Committee.

6.    I certify that the Application for interim compensation and reimbursement of expenses for the Fifth Interim Compensation Period has been prepared in accordance with the Fee Committee Guidelines (as defined in the Application).

Dated:        New York, New York
              August 16, 2010

By:    /s/ Dennis F. Dunne
        Dennis F. Dunne

# **EXHIBIT B**

**Time Entry Records**[1]

---

[1]     Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the members of the Fee Committee.

# __EXHIBIT C__

**Expenses**[1]

---

[1] Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; (v) the members of the Fee Committee.

# **EXHIBIT D**

**Fee Schedule A(1)**

CASE NO.:  08-13555 (JMP) (Jointly Administered)

CASE NAME:  IN RE LEHMAN BROTHERS HOLDINGS INC., et al.

| FIRST INTERIM FEE PERIOD SEPTEMBER 17, 2008 – JANUARY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 4/10/09 Docket No. 3337 | $12,132,376.00 | $12,062,428.50 | $1,213,237.60 | $1,143,247.54 | $668,388.72 | $668,346.18 |

| SECOND INTERIM FEE PERIOD FEBRUARY 1, 2009 – MAY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 8/14/09 Docket No. 4821 | $16,829,521.00 | $16,233,210.42 | $1,682,952.10 | $1,371,217.28 | $1,019,754.61 | $1,006,175.08 |

| THIRD INTERIM FEE PERIOD JUNE 1, 2009 – SEPTEMBER 30, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & | 12/14/09 | $10,881,540.00 | $10,689,053.40 | $1,088,154.00 | $795,598.60 | $583,803.10 | $483,734.30 |

FEE SCHEDULE A(1)

| McCloy LLP | Docket No. 6203 | | | | | | |
|---|---|---|---|---|---|---|---|

| FOURTH INTERIM FEE PERIOD OCTOBER 1, 2009 – JANUARY 31, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 4/16/10 Docket No. 8432 | $13,595,778.50 | [ ][1] | $1,359,577.85 | $6,211,791.04 | $451,410.54 | [ ] |

| FIFTH INTERIM FEE PERIOD FEBRUARY 1, 2010 – MAY 31, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 8/16/10 Docket No. [    ] | $19,450,342.75[2] | [ ] | $1,945,034.28 | $11,674,570.75 | $851,804.27 | [ ] |

---

[1]     This amount will be determined at a hearing to be held on August 25, 2010.

[2]     The amount requested on account of fees and expenses incurred by Milbank during the Fifth Interim Compensation Period was $867,570.52 less than the sum of fees and expenses set forth in the Fee Statements served during the Fifth Interim Compensation Period.

FEE SCHEDULE A(1)