BOIES, SCHILLER & FLEXNER LLP

575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350
Jonathan D. Schiller
Hamish P. M. Hume
Jack G. Stern

Attorneys for Barclays Capital Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>    Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>    Debtor. | Case No. 08-01420 (JMP) |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION *IN LIMINE* OF BARCLAYS CAPITAL INC. FOR AN ORDER EXCLUDING THE EXPERT TESTIMONY OF JOSEPH SCHWABA, MARK E. SLATTERY, PROFESSOR MARK E. ZMIJEWSKI, HARRISON J. GOLDIN, JOHN J. SCHNEIDER, AND JOHN P. GARVEY**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

August 16, 2010

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

I.    THE COURT SHOULD HOLD THAT MOVANTS ARE LEGALLY BARRED
      FROM INTRODUCING EXPERT TESTIMONY AS TO THE VALUE OF THE
      REPO COLLATERAL. ................................................................................. 6

      A.    Movants Agreed to a Purchase Agreement That Provided No Limitation On
            The Value Of The Repo Collateral Barclays Was Entitled To Receive, And
            Made No Provision For A Post-Closing Audit And True-Up. ................................... 6

      B.    The December 2008 Settlement And Release Bar Any Claim Relating To The
            Repo Collateral. ................................................................................. 10

II.   THE TESTIMONY OF MOVANTS' VALUATION EXPERTS IS NOT
      SUFFICIENTLY RELIABLE TO SATISFY THE ADMISSIBILITY
      STANDARDS UNDER *DAUBERT*. ................................................................ 16

      A.    Movants Illogically Opine That The Repo Collateral Was Worth $5 Billion
            More Than Barclays Reported On Its Acquisition Balance Sheet, But Refuse
            To State That The Acquisition Balance Sheet Was Misstated. ................................... 19

      B.    Movants' Experts Rely Upon Illogical And Unsupported Manipulations Of
            The "Valuation Date" In Order To Inflate The Value Of The Securities
            Transferred To Barclays. ................................................................................. 22

            1.    Movants' Experts Seek To Inflate The Value Of The Barclays' Claim That
                  Was Settled In The December 2008 Settlement By Looking At The September
                  19 Value Of The Assets Received In That Settlement. ........................................ 22

            2.    Movants' Experts Improperly And Unreasonably Value The Securities
                  Actually Delivered To Barclays As If The Closing Date Were September 19,
                  Rather Than Using The Actual Closing Date Of September 22. ............................ 27

      C.    Movants' Experts Use Improper Technical Manipulations And Inappropriate
            Data In Order To Achieve Biased Valuations Driven By A Litigation Goal. ............. 30

            1.    Professor Zmijewski Uses Untested And Unreliable Custodial Values And
                  Inherently Flawed Data To Inflate The Value Of The JPM Settlement
                  Securities and the Equity Securities Transferred To Barclays. ........................... 30

            2.    Mr. Schwaba Uses Obviously Inapposite Non-Arm's Length Trades In Order
                  To Inflate His Valuation Of Certain Municipal Securities. ............................... 33

            3.    Mr. Slattery Concocts Artificially Narrow "Distressed" Market Spreads In
                  Order To Inflate The Valuation Of The Securities He Measures. ........................ 35

D.      Movants' Experts Use *Ex Post* Events And Valuations To Re-Value Securities
        As Of September 22. ............................................................................................. 35

E.      Movants Fail To Recognize The Importance Of The Distinction Between
        Repo Custodians Who Mark Securities At Their "Mid" Price And Barclays,
        Who Is Required To Mark Securities At The Lower "Bid" Price. ........................... 42

F.      Movants And Their Experts Accuse Barclays Of Deliberately Manipulating
        Their Valuations To Reach A Target Number Of $45.5 Billion – An
        Accusation That Contradicts The Record Evidence. ................................................ 44

# TABLE OF AUTHORITIES

## Cases

*Am. Totalisator Co. v. Fair Grounds Corp.*,
No. 91-500, 1992 U.S. Dist. LEXIS 17795 (E.D. La. Nov. 17, 1992)................................... 10

*Amorgianos v. Amtrak*,
303 F.3d 256 (2d Cir. 2002)....................................................................................... 27, 42

*Biosyntec, Inc. v. Baxter Healthcare Corp.*,
746 F. Supp. 5 (D. Ore. 1990)........................................................................................ 14

*Davidov v. Louisville Ladder Group, LLC*,
No. 02 Civ. 6652, 2005 WL 486734 (S.D.N.Y. Mar. 1, 2005)................................................5

*EEOC, v. Morgan Stanley & Co.*,
324 F. Supp. 2d 451 (S.D.N.Y., 2004) ...............................................................................5

*Elswick v. Nichols*,
144 F.Supp.2d 758 (E.D. Ky. 2001)................................................................................. 21

*Giles v. Rhodes*,
No. 94 CV 6385, 2000 WL 1425046 (S.D.N.Y. Sept. 27, 2000) .......................................... 10

*Housing Works, Inc. v. Turner*,
362 F.Supp.2d 434 (S.D.N.Y.2005) ................................................................................. 21

*In re N. Broadway Funding Corp.*,
34 B.R. 620 (Bankr. E.D.N.Y. 1983) ............................................................................... 10

*Lans v. Gateway 2000, Inc.*,
110 F. Supp. 2d 1 (D.D.C. 2000) .................................................................................... 10

*Li v. Aponte*,
No. 05 Civ. 6237, 2009 WL 1285928 (S.D.N.Y. May 5, 2009).......................................... 42

*Lippe v. Bairnco Corp.*,
99 Fed. Appx. 274 (2d Cir. 2004) .....................................................................................5

*Louisville Bedding Co. v. Pillowtex Corp.*,
455 F.3d 1377 (Fed. Cir. 2006)....................................................................................... 10

*Marria v. Broaddus*,
200 F. Supp. 2d 280 (S.D.N.Y. 2002) .............................................................................. 42

*Miller v. JetBlue Airways Corp.*,
2009 WL 2514155 (N.Y. Sup. Ct. Aug. 17, 2009) ............................................................ 14

*Perelman v. Snowbird Ski Shop, Inc.*,
    215 A.D.2d 809, 626 N.Y.S.2d 304 (3d Dep't 1995)............................................................ 14

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
    2004 U.S. Dist. LEXIS 2676 (S.D.N.Y. Feb. 20, 2004).......................................................... 5

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)................................................................................................ 16

*Waldorf v. Borough of Kenilworth*,
    878 F. Supp. 686 (D.N.J. 1995) .......................................................................................... 10

**<u>Other Authorities</u>**

Fed. R. Civ. P. 60(c)(1)............................................................................................................ 11

Barclays[1] hereby submits its reply in further support of its Motion *in Limine* for an Order Excluding the Expert Testimony of John P. Garvey, Mark E. Slattery, Joseph Schwaba, John J. Schneider, John J. Olvany, Harrison J. Goldin, and Professor Mark E. Zmijewski filed on April 20, 2010.

Through a letter dated August 9, 2010, Movants have decided not to rely upon the proffered expert testimony of Harrison Goldin, and therefore Barclays' motion as to Mr. Goldin is moot.

## PRELIMINARY STATEMENT

1.      Movants began their Rule 60(b) investigation by showing the Court the acquisition gain of over $4 billion recorded by Barclays on its February 2009 acquisition balance sheet and claiming this gain was the result of an undisclosed $5 billion discount that was secretly agreed to by a small group of Barclays and Lehman negotiators.[2]  Movants claimed that this $5 billion discount was delivered through the Fed Replacement Transaction, in which Barclays advanced $45 billion of cash to Lehman and, in exchange, was supposed to receive over $49 billion in Repo Collateral.[3]

---

[1] To the extent not otherwise defined herein, capitalized terms are defined as set forth in Barclays' Motion *in Limine* for an Order Excluding the Expert Testimony of John P. Garvey, Mark E. Slattery, Joseph Schwaba, John J. Schneider, John J. Olvany, Harrison J. Goldin, and Professor Mark E. Zmijewski dated April 20, 2010 ("Barclays' Motion to Exclude").  For the Court's convenience, all documents cited herein but not appended to Barclays' Motion to Exclude or to Movants' Memorandum In Opposition to the Motion *in Limine* of Barclays for an Order Excluding the Expert Testimony of John P. Garvey, Mark E. Slattery, Joseph Schwaba, John J. Schneider, John J. Olvany, Harrison J. Goldin, and Professor Mark E. Zmijewski dated July 16, 2010 ("Movants' Opp. Br. to Barclays' Motion to Exclude"), are included in the appendix filed herewith.

[2] BCI Ex. 380 [LBHI Reply Brief on R. 2004 Motion] at 2, 17 and n. 7; LBHI Rule 60 Br. at ¶¶ 1-2, 5 [attached as Ex. A].

[3] The details of this Fed Replacement Transaction were clearly described to the Court by New York Fed Associate General Counsel Shari Leventhal in her declaration filed in support of the Trustee's December 5, 2008 motion to approve the Settlement Agreement between Barclays, the Trustee, and JPMorgan Chase ("JPMorgan").  *See* BCI Ex. 30 [Leventhal Decl.] at ¶¶ 10-17.

2.      In discovery, however, Movants learned that Barclays' acquisition gain did *not* come from the Repo Collateral.  In discovery, Movants learned that Barclays had marked the assets in the Repo Collateral, including all assets received in the December 2008 settlement with JPMorgan and the LBI Trustee, at amounts that totaled $45.5 billion — barely more than the $45 billion that Barclays advanced to Lehman on September 18 in connection with the repo transaction.[4]

3.      The fact that Barclays had valued the Repo Collateral at only $45.5 billion was flatly inconsistent with Movants' theory that the Barclays acquisition gain resulted from an "undisclosed" $5 billion discount delivered through the Repo Collateral.[5]  Therefore, in an effort to keep their claim alive, Movants advanced a new theory:  that Barclays' acquisition gain was actually $5 billion *more* than Barclays reported on its February 2009 publicly-filed acquisition balance sheet ("Acquisition Balance Sheet"), and that Barclays improperly hid part of its gain by *deliberately understating* the value of the Repo Collateral.  Despite the vast amount of discovery that Movants have been afforded, both of Barclays and of its auditor PricewaterhouseCoopers ("PwC"), Movants have not found a single shred of evidence to support this new theory:  not a single email or memo or snippet of deposition testimony suggests that Barclays *deliberately understated* the value of *any* assets it received.  To the contrary, discovery has shown that the valuation work underlying Barclays' Acquisition Balance Sheet was Barclays' best effort to accurately value these assets, that Barclays' valuation work was thoroughly audited and found to be reasonable by PwC, and that the results of this work were publicly filed with the SEC and the U. K. Financial Services Authority ("FSA").  A huge portion of the assets in the Repo Collateral

---

[4]  *See* BCI Ex. 357 [Romain Decl.] at ¶20; Movants' Opp. Brief to Barclays' Motion to Exclude at ¶10.

[5]  To be clear, even if the Repo Collateral were worth the amount of its Lehman marks (*i.e.*, in excess of $49 billion), the plain text of the Purchase Agreement agreed to and supported by Movants for months would still have entitled Barclays to keep all of that Repo Collateral as a Purchased Asset.

were illiquid assets — assets that did not have a reliable daily transaction price, but which required the use of modeling, third-party data, and independent judgment to determine a fair market value. Barclays' employees involved in the valuations have expressly confirmed under oath that there was no effort to understate the value of the assets, but rather that the directive given to them (and that they gave to their staffs) was simply to accurately determine the fair market value of the assets as of the acquisition date.[6] The valuations were established by experienced and highly-qualified valuation professionals in Barclays' Independent Valuation Group, none of whom were involved in negotiating the Sale Transaction, using the best available data and methods, and their professional judgment.[7] As reflected in contemporaneous memos by PwC auditors, PwC reviewed and analyzed all aspects of the methods Barclays used to value each category of assets — including the specific "bid-offer" adjustments Barclays used to determine the appropriate "bid" price at which Barclays was required to book each asset.[8] After an extensive audit (the adequacy of which Movants have not challenged), PwC found that each of the methodologies now criticized by Movants was "reasonable" and found the valuations arrived at by Barclays to be reasonable. *Id.*[9]

4.      Thus, to support their new theory, Movants have had to turn to hired experts: Movants seek to introduce the testimony of six different experts who make *ex post* criticisms of Barclays' valuation methods and strive mightily to show that the securities transferred to Barclays in the Repo Collateral were actually worth approximately $5 billion more than the

---

[6] *See generally* Landreman Dep. Tr. at 195:24-203:11; Washtell Dep. Tr. at 217:6-224:20; Teague Dep. Tr. at 278:25-301:6.

[7] *See* Landreman Dep. Tr. at 88:25-90:2; Washtell Dep. Tr. at 44:22-45:4; Teague Dep. Tr. at 285:20-286:3.

[8] Movants' Trial Exhibit 333 [Feb. 2, 2009 R. MacGoey to L. Gunn, *et al.*] at pp. 2-4.

[9] PwC also examined the valuation date used for both the initial inventory that Barclays received in September 2008 and the inventory it received as part of the December 2008 Settlement with JPM and found the valuation dates used by Barclays to be reasonable and appropriate. M. 333 [Feb. 2, 2009 R. MacGoey to L. Gunn, *et al.*] at pp. 2-4.

amounts booked by Barclays on its Acquisition Balance Sheet — exactly the amount needed to fit Movants' theory. These experts are not willing to state that PwC failed to conduct a competent audit; nor are they willing to state that Barclays materially understated the value of the assets reflected on its Acquisition Balance Sheet. Instead, while admitting, as they must, that valuing illiquid securities such as those in the Repo Collateral requires "subjective" judgments,[10] these experts simply assert that the assets in the Repo Collateral acquired by Barclays were worth more than Barclays thought they were worth — because their subjective valuation judgments are allegedly better than Barclays' judgments and PwC's judgments.

5.     The Court should exclude this expert testimony for two independent reasons. *First*, Movants are legally barred from trying to "re-value" the securities in the Repo Collateral. The Purchase Agreement and the Sale Order that Movants supported at the time of the Sale, and successfully defended on appeal for months, provides that Barclays acquired all assets in the Repo Collateral, without any limitation based on the value of those assets. Moreover, in December 2008, at the request of the SIPC Trustee for LBI, this Court approved a settlement that transferred approximately $5 billion of additional Repo Collateral to Barclays and that contains a broad *release* of any and all future claims relating to the Repo Collateral. The attempt by Movants to use experts to artificially inflate the value of the Repo Collateral in order to force Barclays to return portions of that Collateral (or the equivalent value) is a *direct breach of that release*. The release applies not only to the SIPC Trustee for LBI who signed the release, but also to LBHI and the Committee: their claims to the Repo Collateral are purely derivative of the claims held by LBI and hence, are barred by the release. This renders Movants' proposed expert testimony irrelevant and therefore, inadmissible under *Daubert*. *See, e.g.*, *EEOC v. Morgan*

---

[10]   Indeed, huge portions of the Repo Collateral were illiquid mortgage assets or structured financial products that Barclays consistently believed were worth far less than the "marks" given by Lehman and the custodian banks.

*Stanley & Co.*, 324 F. Supp. 2d 451, 464 (S.D.N.Y., 2004) (excluding testimony because the expert's "proposed testimony and opinions are irrelevant to the present case").

6.      *Second*, even if there were no legal bar to Movants' underlying claims, the testimony of their valuation experts would still have to be excluded because it is the product of unreliable methods.  It is well-established that where an expert's testimony is illogical, self-contradictory, or contrary to established facts, it should be excluded.[11]  All of Movants' experts run afoul of these standards.  At best, they offer a series of "cherry-picked" subjective judgments on a number of technical valuation issues that they claim support a higher valuation for the assets transferred to Barclays.  They fail to provide any guidance as to the margin of error in their own valuations; consequently, there is no basis for determining whether the valuations differences they purport to identify are statistically significant or simply reflect the normal range of differences in valuing complex financial instruments.[12]  They do not provide a reliable basis on which the Court could find that the assets *were actually worth* more than the values Barclays ascribed to them on its Acquisition Balance Sheet, let alone that Barclays believed that to be the case.  Thus, at most, they simply attempt to provide an alternative valuation showing that the assets *might*, under *their* subjective view, have been worth more than the values Barclays booked in good faith on its audited financial statements.  This Court should reject the invitation to turn

---

[11]   *See generally Davidov v. Louisville Ladder Group, LLC*, No. 02 Civ. 6652, 2005 WL 486734, at *2 (S.D.N.Y. Mar. 1, 2005) (excluding expert testimony that was inconsistent with the facts of the case), *aff'd,* 169 Fed. Appx. 661 (2d Cir. Mar. 10, 2006); *Point Prods. A.G. v. Sony Music Entm't, Inc.*, No. 93 Civ. 4001, 2004 U.S. Dist. LEXIS 2676, at *24 (S.D.N.Y. Feb. 20, 2004) (excluding expert testimony that contained "gaping omissions of real world events that were highly material"); *Lippe v. Bairnco Corp.*, 99 Fed. Appx. 274, 279 (2d Cir. 2004) (affirming exclusion of expert where "among the indicia of unreliability were [the expert's] inability to explain a number of variables and assumptions used in his analysis, such as price/earnings multipliers, income projections, and which companies were comparable to those being valued").

[12]   *See* Excerpt of Volume II of March 11, 2010 Examiner's Report (pp. 210-215) (describing Examiner's efforts to test many of Lehman's marks.  While finding large differences, the Examiner could not conclude that Lehman's marks were unreasonable given the inherent subjectivity and variability of the process of valuing such assets) [attached as Exhibit J].

this case into a war of competing valuations of illiquid assets, and should exclude the testimony
of Movants' valuation experts.

### I.  THE COURT SHOULD HOLD THAT MOVANTS ARE LEGALLY BARRED FROM INTRODUCING EXPERT TESTIMONY AS TO THE VALUE OF THE REPO COLLATERAL.

7.       There are two independent bases upon which the Court should hold that Movants'
expert testimony regarding the value of the Repo Collateral is legally irrelevant and should be
excluded:  the first is the Purchase Agreement itself, and the second is the release in the Court-
approved settlement from December 2008.

### A.  Movants Agreed to a Purchase Agreement That Provided No Limitation On The Value Of The Repo Collateral Barclays Was Entitled To Receive, And Made No Provision For A Post-Closing Audit And True-Up.

8.       The Purchase Agreement plainly provides that Barclays was entitled to receive all
assets in the Repo Collateral as Purchased Assets and contains no "valuation cap" or other
valuation limit on Barclays' right to receive these securities.  *See* BCI Ex. 1 [APA] at pp. 6-8
(defining Purchased Assets as "all assets … used in connection with the Business" and all
"collateralized short term agreements," and providing no total valuation for all Purchased
Assets); *id.* at § 2.1 (providing that Barclays was entitled to acquire the Purchased Assets under
the terms set forth in the APA, which contained no valuation limitation); BCI Ex. 5 [Clarification
Letter] at §§ 1(a)(ii)(A), 13 (providing that Barclays was entitled to receive "all securities and
other assets" in the Repo Collateral without any limitation based on valuations).

9.       Movants accuse Barclays of being "presumptuous" in making this contractual
argument, which they claim is "moot" because the Court refused to rule on Barclays' contractual
arguments before the evidentiary hearing.  Movants' Opp. Br. to Barclays' Motion to Exclude at
¶ 3.  The argument is neither presumptuous nor moot:  the Court has not made a decision one
way or another regarding the need to have expert testimony to debate the value of the

6

approximately 12,000 CUSIPs transferred to Barclays in the Sale Transaction.  Moreover, since

the Court has now heard Movants' fact case, it is in a better position to assess whether it needs

such expert testimony.

        10.      As the evidentiary hearing held thus far has amply demonstrated, at the time of

the closing of the Sale, Movants were given lists of the securities being transferred to Barclays.[13]

Those lists showed that at Lehman's marks the aggregate value of  the Repo Collateral was over

$49.9 billion,[14] and the aggregate value of  the Clearance Box Assets at Lehman's marks was

over $1.9 billion.[15]  The evidentiary hearing has also demonstrated that Movants knew that

Barclays believed the marks on these assets were stale and overstated.  As Harvey Miller

testified, it was a "persistent theme" throughout the Sale Transaction that Barclays thought the

Lehman marks were "aggressive."[16]  Likewise, the trial testimony of both Saul Burian (from the

Committee's financial adviser Houlihan Lokey) and Lehman Managing Director Jim Seery

confirms that Barclays said at the time that it believed the securities were worth substantially less

than Lehman's marks indicated.[17]  If Movants had wanted to challenge Barclays' view that the

assets were worth far less than Lehman's marks suggested, then they could and should have done

so at the time of the Sale, not more than a year later.

---

[13]  *See* May 4, 2010 Official Tr. at 24:14-25:1 (Seery) [attached as Exhibit F]; May 6, 2010 Official Tr. at 136:1-138:22 (Burian) [attached as Exhibit G]; M. 381 [Sept. 21, 2008 11:34 am email from B. Kelly to A. McComiskey *et al.*]; June 25, 2010 Official Tr. at 64:2-67:25, 77:5-9 (Despins) [attached as Exhibit I]; M. 707 [Sept. 28, 2008 6:15 am email from B. Greer to L. Despins, *et al.*] ("We're looking at them.  Sched. A appears consistent with that which we had last sunday night at weil") [sic].

[14]  BCI Ex. 736 [Sept. 20, 2008 1:26 pm email from R. Miller to R. Messineo, *et al.*]; BCI Ex. 740 [Sept. 21, 2008 12:46 pm email from D. Murgio to B. Kelly, *et al.*]

[15]  BCI Ex. 737 [Email chain including Sept. 21, 2008 6:11 am email from P. Tonucci to R. Miller, *et al.*]; BCI Ex. 738 [Email chain including Sept. 21, 2008 8:12 am from R. Miller to A. Keller, *et al.*].

[16]  April 28, 2010 Official Tr. at112:4-9 (Miller) [attached as Exhibit C]; Miller Dep. Tr. at 34:15-15 [attached as Exhibit N].

[17]  May 4, 2010 Official Tr. at 33:11-34:7, 130:20-131:6 (Seery) [attached as Exhibit F]; May 7, 2010 Official Tr. at 91:24-92:21, 96:11-97:4 (Burian) [attached as Exhibit H].

11.    Indeed, documents produced by the Committee during the evidentiary hearing revealed that, at the time of the Sale, the Committee's financial advisers carefully reviewed *and* valued the securities being transferred to Barclays, and concluded that they *might* be worth more than the values Barclays was estimating at the time of the Sale (while acknowledging that large portions of the assets were difficult to value).[18]  Yet instead of seeking a modification to the Sale Order or the Purchase Agreement that would allow the Committee to perform an independent audit and valuation, and that would seek to impose a limitation on the value of what Barclays was entitled to receive — subject to some defined procedure for determining that value — the Committee (and other Movants) chose to remain silent and to accept the considerable uncertainty over those asset values.  As they reported in one of their memos, "[d]epending on how they [Barclays] do liquidating the book, they will make or lose money."  BCI Ex. 811 [Sept. 22, 2008 9:34 am email from S. Burian to M. Fazio, *et al*].

12.    Thus, the Sale closed under circumstances in which the value of the securities was acknowledged to be extremely uncertain, and all parties accepted that uncertainty and supported the Sale as the best alternative to what would have been a disastrous liquidation.  There was no provision in either the Purchase Agreement or the Sale Order allowing the Estate or creditors to hire a set of hand-picked experts to perform an independent valuation of the assets, and then to claw back any assets that these experts assert were above a certain threshold (just as there was no such provision allowing Barclays to demand more assets if the values turned out to be less than estimated).  Despite the obvious uncertainty over asset values, none of Movants asked for any

---

[18]    BCI Ex. 812 [Email chain including Sept. 28, 2008 5:04 am email from L. Despins to B. Geer, *et al*.] ("They should be 'audited' now because if there is an issue with them we need to speak up now before the trail gets cold!"); BCI Ex. 812 [Sept. 28, 2008 6:15 am email from B. Geer to L. Despins, *et al*.] ("Schedule A appears consistent with that which he had last sunday [sic] night at weil [sic]…Those that we have looked at seem to suggest that they're worth more than implied by the negotiated mark in the deal…"); BCI Ex. 813a [Oct. 10, 2008 2:11 pm email from C. Bell to L. Despins, *et al*.] ("We are still looking at the remaining balance of $14.4 on Schedule A, but it is clear that there shouldn't be a $5 billion haircut necessary here.").

such provision.  To the contrary, as Harvey Miller testified, the Purchase Agreement provided

for Barclays to acquire the assets "irrespective of what their values may have been."  April 28,

2010 Official Tr. at 106:10-13 (Miller) [attached as Ex. C]; *see also* Miller Dep. Tr. at 51:3-6

[attached as Ex. N].

13.    Movants are now asking this Court to modify both the Sale Order and the

Purchase Agreement so as to nullify Barclays' right to receive the Purchased Assets "irrespective

of what their values may have been."  Barclays has already laid out the numerous legal bars to

such relief.  *See* Barclays' Opp. Br. to Movants' Rule 60 Motion (filed Jan. 29, 2010) at ¶¶ 442-

521 [attached as Ex. B].  The Court now has ample evidence to hold that one or more of those

legal bars applies.

14.    Even if the Court wishes to refrain from ruling on any of these legal bars, it can

certainly make the narrower ruling that there is no legal theory that allows Movants to modify

the Sale Order and the Purchase Agreement simply because their experts say the Repo Collateral

was worth more than Barclays believed it was worth.  A *post hoc* difference of opinion over the

value of positions in some 12,000 different securities, many of which were complex, extremely

hard to value, and highly illiquid, is not a basis for relief under Rule 60(b).  The testimony

Movants' experts seek to give could not support a finding of "mistake" or "new evidence" or

"fraud."  Instead, the proposed testimony of these experts is merely an effort by Movants, using

lists of CUSIPs that they had at the time of Closing, to show that it is possible to concoct

methods, assumptions, and judgments that suggest that the Repo Collateral was worth more than

the amounts ascribed to those assets by Barclays on its audited, publicly-filed financial

statements.  As a matter of law, that cannot provide a factual basis for rewriting the Purchase

Agreement and the Sale Order.  *See*, *e.g.*, *Louisville Bedding Co. v. Pillowtex Corp.*, 455 F.3d

1377, 1380-81 (Fed. Cir. 2006) (rejecting request to nullify "a bargained-for provision in the settlement agreement"); *In re N. Broadway Funding Corp.*, 34 B.R. 620, 622 (Bankr. E.D.N.Y. 1983) (court would not void its order simply because "subsequent developments indicate that the bargain is more beneficial to one side than to the other").

15.     No relief is appropriate where, as here, the "factual basis" upon which the agreement was reached has not changed, and the only possible change is, allegedly "the applicants' knowledge of relevant facts." *In re N. Broadway,* 34 B.R. at 622; *Lans v. Gateway 2000, Inc.*, 110 F. Supp. 2d 1, 5 (D.D.C. 2000) (rejecting Rule 60(b) challenge and upholding agreement where request for relief was premised solely on a new understanding of the effect of a specific provision in the contract); *Waldorf v. Borough of Kenilworth*, 878 F. Supp. 686, 694 (D.N.J. 1995) (rejecting Rule 60(b) challenge and upholding agreement where request for relief was "based only upon evidential rethinking and other morning-after quarterbacking by successive trial counsel"); *Am. Totalisator Co. v. Fair Grounds Corp.*, No. 91-500, 1992 U.S. Dist. LEXIS 17795, at *3-4 (E.D. La. Nov. 17, 1992) (rejecting Rule 60(b) challenge and upholding agreement where request for relief was premised on a new interpretation of contractual terms).

16.     The Court should hold that Movants' expert testimony that attempts to re-value the Repo Collateral is legally irrelevant, and should therefore be excluded from evidence. *See Giles v. Rhodes*, No. 94 CV 6385, 2000 WL 1425046, at *4 (S.D.N.Y. Sept. 27, 2000) ("An irrelevant expert report, like any irrelevant testimony, is not admissible.").

**B.     The December 2008 Settlement And Release Bar Any Claim Relating To The Repo Collateral.**

17.     In December 2008, the SIPC Trustee asked this Court to approve a Settlement Agreement that would transfer approximately $5 billion of additional Repo Collateral to

Barclays, based upon the Trustee's representation that Barclays was entitled to $49.7 billion in Repo Collateral.[19]  Movants have not filed a Rule 60(b) challenge against this Court's December 22, 2008 Order approving that Settlement Agreement and Release, and the time for doing so has passed.  *See* Fed. R. Civ. P. 60(c)(1).

18.    In support of his motion seeking approval for the December Settlement, the Trustee submitted an affidavit from New York Fed Associate General Counsel Shari Leventhal, who explained that Barclays was entitled to a total of $49.7 billion in Repo Collateral, that Barclays was still owed $7 billion of undelivered Repo Collateral, and that LBI was "unjustly enriched" because it held both the cash Barclays had advanced in the Fed Replacement Transaction, and a significant portion of the collateral that was supposed to be transferred to Barclays in exchange for that cash.  BCI Ex. 30 [Leventhal Decl.] at ¶ 10-17.  The Trustee asked the Court to approve the Settlement Agreement because the Clarification Letter provided for Barclays to receive all of the Repo Collateral as Purchased Assets and therefore, the Court had in essence already approved the transfer of these assets:  "*what this settlement really accomplishes is completing the very transaction contemplated in the purchase agreement as approved by this Court.*"  BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 23:21-24.  The Trustee further explained:

> And Barclays was to receive securities valued at over forty-nine billion dollars to cancel the loan.  Under the purchase agreement approved by Your Honor, that party became a significant part of what Barclays obtained under the agreement, the agreement that this Court approved and that allowed tens of thousands of customer accounts to be transferred.

*Id.* at 19:13-19.

19.    The Settlement Agreement the Trustee asked the Court to approve contained a broad mutual release between Barclays and the LBI Trustee (as well as JPMorgan as clearing

---

[19]  BCI Ex. 29 [Trustee's Motion for Entry of Order Approving Settlement Agreement] at ¶¶ 10, 12.

bank, who sat in the middle of the dispute). BCI Ex. 9 [Dec. 5, 2008 Settlement Agreement].

That release provided as follows:

> [T]he Trustee, on behalf of LBI and the LBI estate, hereby does and shall be deemed to forever release, waive and discharge each of JPMorgan and BarCap …. from and in respect of *all Claims, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, relating to the Subject Funds, the Replacement Transaction or the Delivered Securities.*"

*Id.* at ¶ 4(d) (emphasis added).[20]

20.     The Committee objected to the approval of the Settlement Agreement, but the

Trustee explained why the Court should overrule the Committee's objection, as follows:

> The one remaining objection, as I understand it, is the objection of the committee in the Chapter [11] case. And their objection, as I understand it, is primarily that they seek extensive information about some background facts leading up to the transaction. ***The information that they seek we think really has nothing to do with this aspect of the purchase agreement itself and it's just using this motion as a vehicle either to reopen the Court's approval of the purchase agreement or to investigate unrelated claims and transactions. We think it's too late to do the former*** and with respect to the latter, nothing in the motion or the proposed order forecloses any investigation or claims that might be made about anything else.

BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 24:15-25:3 (emphasis added).

21.     The Court agreed with the Trustee: it overruled all objections and approved the

Settlement Agreement, thereby approving the Release quoted above. BCI Ex. 39 [Dec. 22, 2008

Order Approving Settlement Agreement] at p. 2 (ordering "that the settlement agreement (the

'Settlement Agreement') is authorized and approved…."); *id.* (ordering "that all objections to the

---

[20] The "Replacement Transaction" was defined as the "reverse repurchase transaction with LBI in which BarCap would fund $45 billion to LBI for the Fed Portfolio," BCI Ex. 9 [Settlement Agreement] at ¶ A; the "Subject Funds" were defined as the "$7 billion [that] was transferred by LBI to an account at JPMorgan early on the morning of September 19, 2008 as a result of the fact that not all of the Fed Portfolio securities were delivered to BarCap under the Replacement Transaction," *Id.* at ¶ D; and the Delivered Securities were defined as "the securities listed on Schedule A to the Clarification Letter." *Id.* at ¶ E.

Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all

reservations of rights included therein, are overruled on the merits"). Thus, this Court has

approved a Release that protects Barclays from "*all Claims, whether known or unknown,*

*foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or*

*fixed, currently existing or hereafter arising, in law, equity or otherwise, relating to . . . the*

*Subject Funds, the Replacement Transaction or the Delivered Securities.*"  BCI Ex. 9

[Settlement Agreement] at ¶ 4(d). The Replacement Transaction is, of course, the transaction in

which Barclays received the Repo Collateral that Movants now claim should be transferred back

to them, based upon the valuation opinions of experts hired during this litigation while the

Delivered Securities and the Subject Funds are the collateral Barclays received in connection

with that transaction and the funds to which Barclays was entitled as a result of that settlement,

respectively. The Release clearly bars such claims and thereby renders the valuation opinions

that are intended to support such claims legally irrelevant.

       22.     While the Release was signed solely by the SIPC Trustee for LBI, it bars any

claim that LBHI or the Committee might wish to make that relates to the Repo Collateral. The

Repo Collateral was held by LBI not by LBHI or the Committee. *See* BCI Ex. 30 [Leventhal

Decl.] at ¶ 12 ("LBI was to provide Barclays with approximately $49.7 billion in securities in

return for the $45 billion in cash funded by Barclays."); BCI Ex. 9 [Dec. 5, 2008 Settlement

Agreement] at ¶ E ("When BarCap and LBI agreed to engage in the Replacement Transaction, it

was BarCap's and LBI's intention that the securities in the Fed Portfolio would be included in

'Purchased Assets'. . . ."). Thus, any claims to the Repo Collateral by either LBHI or the

Committee are *derivative* of claims made by the LBI Trustee. The law is well-established that a

party whose claims are derivative of another party with direct claims is barred by a release

signed by the party with the direct claims.[21]   Thus, since the claims of LBHI and the Committee

to the Repo Collateral are purely derivative of those held by the LBI Trustee, and since the LBI

Trustee has signed a broad Release of all claims relating to the Repo Collateral, LBHI and the

Committee are likewise barred by that Release.

23.     The Order approving the Settlement and Release provided that it would not "bind,

be collateral estoppel or otherwise prejudice any *other* matter in this case."  BCI Ex. 39 [Dec. 22,

2008 Order Approving Settlement Agreement] at p. 2 (emphasis added).  But that proviso did not

and could not nullify the Release.  It merely provided that "other matters" will not be prejudiced

by the Release:  in other words, possible claims relating to the Clearance Box Assets, the 15c3-3

assets, or any other Purchased Assets or Assumed Liabilities were not prejudiced and not subject

to collateral estoppel.  But the Release itself obviously stands:  it would make no sense for a

provision stating "no collateral estoppel" to be interpreted to mean "the Release approved by this

Order is meaningless, and may be overcome by a showing that the Repo Collateral was worth

more than a certain amount."  *No one* at the December 22 hearing argued that the Release should

be subject to nullification if certain facts or valuations could be proven; *no one* argued that the

Purchase Agreement's provisions relating to the Repo Collateral could be modified or nullified;

*no one* argued that the Settlement and Release were just temporary measures, all subject to a

specific valuation cap that would be enforced through subsequent discovery.  Instead, the parties

---

[21] *See, e.g. Perelman v. Snowbird Ski Shop, Inc.*, 215 A.D.2d 809, 626 N.Y.S.2d 304 (3d Dep't 1995) (injured plaintiff and her husband who alleged derivative claim were properly dismissed based upon plaintiff's executed release); *Miller v. JetBlue Airways Corp.*, No. 102398/2009, 2009 WL 2514155 at *2 (N.Y. Sup. Ct. Aug. 17, 2009) (derivative claims barred where holder of claim executed release); *Biosyntec, Inc. v. Baxter Healthcare Corp.*, 746 F. Supp. 5, 11 (D. Ore. 1990) (same).

simply stated that rights were reserved as to "*other* matters" — meaning matters "*other* than" issues relating to the Repo Collateral, which were being settled and released in full.[22]

24.    The Court-approved Settlement and Release from December 22, 2008 makes Movants' attempt to re-value the Repo Collateral legally irrelevant.  The fact that Movants' experts assert that, under their subjective view of valuations, the Repo Collateral was worth close to the amount indicated by custodial marks that were circulated to all Movants at the time of the Sale (*i.e.*, approximately $49.9 billion), rather than the approximately $45.5 billion amount booked by Barclays, does not provide a basis for upsetting a Court Order from almost two years ago, and that has never been the subject of a Rule 60(b) challenge.  That is especially so because the factual predicate for the Court Order approving the December Settlement was the assertion by Shari Leventhal of the New York Fed, adopted by the LBI Trustee, that Barclays *was entitled* to Repo Collateral of $49.7 billion.

25.    Thus, the December Release bars all claims by all Movants relating to the Repo Collateral, and Movants' valuation experts should therefore be excluded.  This Court should not devote a week or more to hear expert testimony that relates solely to claims that have already been released.

---

[22]    *See* BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 20:6-21 (the settlement "doesn't affect anything else in the purchase agreement or anything else that happened in the time preceding LBI's filing under SIPA. It doesn't determine any issues of interpretation, possible reformation under anything else under any other provisions of the purchase agreement and clarification letter."), 25:9-13 (the settlement "really doesn't affect the rights as to other matters of other parties."); BCI Ex. 39 [Dec. 22, 2008 Order Approving Settlement Agreement] at p. 2 (stating that "nothing in this Order shall bind, be collateral estoppel or otherwise prejudice any other matter in this case"); BCI Ex. 9 [Dec. 5, 2008 Settlement Agreement] at ¶ 4(d) (releasing Barclays from "all Claims . . . relating to the Subject Funds, the Replacement Transaction or the Delivered Securities.").

## II.  THE TESTIMONY OF MOVANTS' VALUATION EXPERTS IS NOT SUFFICIENTLY RELIABLE TO SATISFY THE ADMISSIBILITY STANDARDS UNDER *DAUBERT*.

26.     Even if the Court concludes that expert testimony valuing the Repo Collateral is legally relevant, it should exclude Movants' valuation experts because their testimony is not based on reliable methods or principles.  *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).   Unlike the Barclays valuation personnel and the PwC auditors who respectively prepared and audited, in the ordinary course of business, a detailed and thorough valuation of the assets Barclays received in the Sale, Movants' experts have prepared a litigation-driven analysis intended to justify Movants' claim that there was a $5 billion discount hidden in the Repo transaction.  As shown in Barclays' opening brief, Movants' effort to support that theory has led their experts to adopt methods that are unreliable, illogical, and contrary to the evidence.

27.     There are at least five fundamental flaws that render the testimony of Movants' valuation experts unreliable and excludable under *Daubert*.  First, Movants' experts illogically conclude that the assets in the Repo Collateral were worth $5 billion more than Barclays recorded on its Acquisition Balance Sheet, yet they refuse to state that the numbers on the Acquisition Balance Sheet were materially understated.  In other words, they do not and will not dispute that the Acquisition Balance Sheet was accurate in all material respects, but nevertheless ask the Court to treat Barclays as receiving assets with an aggregate value much higher than is reflected on that Acquisition Balance Sheet.[23]  That is so illogical as to render the testimony inadmissible.

---

[23]  Both John Garvey and Professor Zmijewski engage in this illogical doublespeak.  *Compare* Garvey Report at p. 7 (heading) ("The Acquisition Balance Sheet is not Representative of the Values Barclays Received in the Acquisition and had a Claim on as of September 19, 2008") *with* Garvey Dep. Tr. at 5:25-6:23 ("…Q. Is it your opinion, Mr. Garvey, that Barclays materially misstated the value of the assets on this SEC filing?...A. I didn't undertake to study that opinion.") (objection omitted), 98:20-99:19; *compare* Zmijewski Report at ¶ 28 ("I calculate the effect of Barclays using December 22, 2008 closing prices to value the JPM Inventory instead of the time of the Sale Transaction.  My analyses document that Barclays' undervaluation is at least $1.657 billion.")

28.    Second, Movants' experts "second guess" and manipulate Barclays' (and PwC's) reasoned judgment as to the appropriate valuation dates for the assets in order to inflate the value of the assets received by Barclays: they argue that Barclays should have used September 19 as the date on which to measure the value of assets received on September 22 and that Barclays also should have used September 19 securities prices to measure the acquisition date value of a disputed receivable, settled in cash and securities that were identified and agreed as part of the December Settlement and received on December 22.  Through these two judgmental (and, in the opinion of Barclays and PwC, inappropriate and unsupported) "valuation date" adjustments, Movants' experts inflate the value of what Barclays received by more than $2 billion. More than $1.7 billion of this difference reflects Movants' effort to treat Barclays as having received securities on September 19, whose identity and value was not determined until this Court approved the December 22, 2008 Settlement.[24]  Any methodology that attempts to treat Barclays as receiving value that it never actually received cannot be reliable, and should be grounds for exclusion.

29.    Third, Movants' experts systematically manipulate technical calculations and misuse data in a biased and improper way in order to generate higher valuations.

---

*with* Zmijewski Dep. Tr. at 284:20-285:2 ("Q. Is it your testimony that you believe that Barclays materially understated the assets on its opening balance sheet with respect to the Lehman transaction?  A. I haven't thought about that issue.  I wasn't asked to think about it, so I haven't even thought about it.");  *compare* Barclays Motion To Exclude, at ¶¶ 6, 12-13 *with* Movants' Opp. Br. to Barclays' Motion to Exclude at ¶ 64.

[24]  This valuation date manipulation pervades all of the expert reports, but is advanced most aggressively by John Garvey and Professor Zmijewski.  *See generally* Garvey Report at p. 20 (heading) ("Barclays' use of valuation dates after September 22, 2008 is not supported by the accounting literature and results in understated values for certain securities in the Acquisition Balance Sheet.");  Zmijewski Report at ¶¶ 29-30 ("I understand that Barclays has taken the position that the appropriate date to value the JPMorgan Inventory (Annex A) is December 22, 2008… Movants have taken the position that September 19, 2008 is the appropriate date to value these securities for the purpose of this matter.");  Schwaba Report at ¶ 8 ("Barclays' valuations are further flawed by their inappropriate use of September 22, 2008 as the valuation date.");  Olvany Report at ¶¶ 12, 18, 26-27; July 15, 2010 Olvany Decl. ¶ 19; Slattery Report at ¶¶ 54-62.

30.    Fourth, Movants' experts use events that occurred *weeks after* the date of the

Closing, which increased the value of some of the acquired securities as of a *later date*, and

impute that increased value back to September 22.[25]  This is an improper methodology and

grounds for exclusion.

31.    Fifth, Movants' experts attempt to buttress their revisionary calculations by citing

the marks received from BoNY and JPMorgan, but fail to recognize the fact that repo custodians

such as BoNY and JPMorgan provide pricing information for any given security at the "mid"

point between the "bid" and "ask" prices for that security, whereas Barclays, in assessing the

market value of a security,  is *required* under the accounting rules to mark its assets at a "*bid*"

price (which reflects the "exit" price at which Barclays can reasonably expect to be able to sell

the security).  Comparing custodian values (based on mid prices) with realizable value (based on

bid or exit prices, as Barclays is required to do) is improperly mixing apples and oranges.  For

illiquid assets, the difference between a "mid" price and a "bid" price can be significant — in

some instances more than 10%.  Thus, on a portfolio worth more than $40 billion containing

substantial amounts of illiquid securities, the adjustment from mid to bid will be in the billions of

dollars.  Movants' experts attempt to avoid this reality:  they make some bid/ask adjustments, but

invariably they find a way to manipulate the data so as to reduce the size of the bid/ask spread

below what Barclays believed was reasonable, to a number that suits Movants' litigation needs.

32.    Finally, Movants appear to be improperly using their experts to support an

accusation against Barclays which is unsupported by — indeed contradicted by — the record

evidence.  Movants accuse Barclays of being "biased" and of somehow manipulating their

---

[25]  The two clearest examples of this involve the reports of John Olvany and his valuation of the Giants Stadium auction rate securities, and Mark Slattery and his valuation of Lehman's privately structured financial product "Pine," an illiquid collateralized loan obligation that was created solely for repo financings.  Olvany Report ¶¶ 12, 18, 26-27; July 15, 2010 Olvany Decl. ¶ 19; Slattery Report at p. 30, Appendix II (relying on Pine CCS, Ltd. Trustee Report – Measurement Date 10/06/2008).

valuations to produce a $45.5 billion valuation, so as to "mirror" what they call the "undisclosed

liquidation analysis" they allege Barclays and Lehman arrived at on September 19. *See, e.g.*,

Movants' Opp. Br. to Barclays' Motion to Exclude at ¶¶ 41-44.[26]    That allegation is untrue,

implausible, and flatly inconsistent with the documentary and testimonial evidence in the record.

For such a scheme to have existed would have required a conspiracy involving the active

participation of more than a dozen Barclays executives *and the team of PwC auditors assigned to

oversee the preparation of the Acquisition Balance Sheet*.    Although Movants have taken

extensive discovery of both Barclays and PwC, they cannot cite a single email, document, or line

of deposition or trial testimony evidencing such a massive conspiracy or any manipulative effort

at all.    To the contrary, both the documentary and testimonial evidence shows nothing other than

a good faith effort to value the assets received as of the date of the acquisition, conducted in the

ordinary course of business and under the supervision of Barclays' independent auditors, for the

purpose of accurately reporting to investors and regulators the financial details of the transaction.

*See generally* April 30, 2010 Official Tr. at 49:6-15, 71:4-24 (Clackson); Washtell Dep. Tr. at

219:11-224:20; Landreman Dep. Tr. at 197:7-203:11; Teague Dep. Tr. at 278:25-283:17; Jan. 13,

2010 Romain Dep. Tr. at 158:8-159:10.

### A.    Movants Illogically Opine That The Repo Collateral Was Worth $5 Billion More Than Barclays Reported On Its Acquisition Balance Sheet, But Refuse To State That The Acquisition Balance Sheet Was Misstated.

33.    In its opening brief, Barclays argued that Movants' experts should be excluded

because they advance a self-contradictory and illogical proposition:  *i.e.*, they simultaneously

---

[26] This so-called "undisclosed liquidation value analysis" was nothing of the kind.  The trial record demonstrates that the analysis to which Movants cite (a) was not an attempt to estimate fire sale liquidation values, (b) was simply an application of percentage haircuts to the Fed portfolio, which was different from the collateral actually transferred to Barclays, and (c) produced a number *lower* than $45.5 billion.  *See* May 3, 2010 Official Tr. at 143:20-144:3 , 146:25-147:10, 152:13-23, 158:10-19 (Seery) [attached as Ex. E]; May 4, 2010 Official Tr. at 22:14-23:3 (Seery) [attached as Ex. F]; *see also* Kirk Dep. Tr. at 92:3-96:16 [attached as Ex. M].

opine that the securities received by Barclays in the Sale Transaction were worth $5 billion more than the amount booked on Barclays' Acquisition Balance Sheet, while refusing to state an opinion on whether the values on the Acquisition Balance Sheet were accurate or were understated.  *See* Barclays' Motion To Exclude, at ¶¶ 6, 12-13.[27]  In response, Movants simply reiterate their illogical position:  they claim that "[t]here is no aspect, element or cause of action set forth in the Rule 60 Motions or the Adversary Complaints that requires Movants to demonstrate that Barclays filed materially false and misleading financial statements with its regulators and the SEC," but in the very next sentence they state that, "[a]ll that is relevant here is whether the values that Barclays has chosen to ascribe to the securities it acquired in the Sale Transaction *accurately reflect the fair market value of those securities at the relevant point in time*."  Movants' Opp. Br. to Barclays' Motion to Exclude at ¶ 64.  But "the values that Barclays has chosen to ascribe to the securities it acquired in the Sale Transaction" are the values set forth on the Acquisition Balance Sheet.  Either those values are accurate in all material respects (as Barclays believed and PwC's audit confirmed), or they are not.  Movants cannot have it both ways:  if Barclays' Acquisition Balance Sheet was accurate in all material respects, then it is necessarily the case that the values on that Acquisition Balance Sheet "*accurately reflect the fair market value of those securities at the relevant point in time*."  Thus, to the extent the accuracy of Barclay's valuations is an issue in this litigation (and as explained in Section I, above, it should not be), that issue necessarily is an attack on the accuracy of Barclays' Acquisition Balance Sheet and also PwC's auditing of that Acquisition Balance Sheet.

---

[27]  John Garvey admitted that he did not have an opinion on whether the Acquisition Balance Sheet understated the values of the securities Barclays received by *any* amount (irrespective of materiality).  *See* Garvey Dep. Tr. at 5:25-6:23, 98:20-99:19.  When asked whether he had the opinion that Barclays had materially understated the value of the assets it acquired on its opening acquisition balance sheet, Professor Zmijewski admitted that "I haven't thought about that issue. I wasn't asked to think about it, so I haven't ever thought about it."  Zmijewski Dep. Tr. at 284:20-285:2.

34.     Movants do not want to admit this because they want to use this Court to claw back assets from Barclays without having to make the far-fetched finding that Barclays' materially misstated its publicly-filed financial statements, which were audited and approved by PwC.  But Movants have not explained how that could be the case.  If they believe the valuation date or other methodology is different for purposes of this Rule 60(b) proceeding than it is for standard accounting purposes, they have not explained why or how that could be the case.[28]  If they believe that a $5 billion understatement of value is not a "material" amount to the Acquisition Balance Sheet, they have not explained how that could be the case.

35.     The bottom line is that Movants and their experts are not willing to ask this Court to make the audacious (and wholly unsupported) finding that Barclays materially misstated the values on its Acquisition Balance Sheet.  The Court should therefore reject any effort by Movants to have the Court accomplish the same thing through the disguised route of re-valuing the securities by adopting the purpose-driven methods of Movants' experts.  If Movants are unwilling to challenge PwC's conclusion that the Acquisition Balance Sheet was fairly stated in all material respects, then there can be no basis for doing so — directly or indirectly.  On this ground alone, the Court should exclude all of Movants' valuation experts for providing illogical and self-contradictory testimony.  *Hous. Works, Inc. v. Turner*, 362 F.Supp.2d 434, 447-48 (S.D.N.Y.2005) (excluding illogical expert report that failed to address facts that would, by common sense, dictate different conclusions from those reached by the expert); *Elswick v. Nichols*, 144 F.Supp.2d 758, 768 (E.D. Ky. 2001) (excluding expert testimony as unreliable, because it was inconsistent and without concrete support).

---

[28]  Movants claim that the "relevant point in time" is "12:01 a.m. on September 22, 2008, the Closing Date."  As explained below, it is far from clear that is the relevant point in time for either accounting purposes or any assessment of value in this litigation.

**B.    Movants' Experts Rely Upon Illogical And Unsupported Manipulations Of The "Valuation Date" In Order To Inflate The Value Of The Securities Transferred To Barclays.**

36.    More than $2 billion of the $5 billion difference between the parties' valuations of the Repo Collateral comes down to a disagreement about valuation dates.  There are two distinct disagreements:  (a) whether to use the value of the securities that Barclays received on December 22, 2008, in settlement of its claim involving JPMorgan with respect to undelivered securities, as the best measure of the value of Barclays' claim on September 22, or whether instead to use the allegedly higher value of those undelivered securities as of September 19 — calculated by Movants' experts by making judgmental adjustments to the custodial values as of September 17, which is the date of the available JPMorgan values for these assets — this disagreement accounts for approximately *$1.7 billion* of the difference between Movants and Barclays; and  (b) whether closing prices on September 22 or closing prices on September 19 provide the best available indicator of the September 22 value of the Schedule A securities that Barclays acquired effective September 22 pursuant to the Purchase Agreement — this disagreement accounts for *at least* $300 million of the difference between Movants and Barclays.

1.    <u>Movants' Experts Seek To Inflate The Value Of The Barclays' Claim That Was Settled In The December 2008 Settlement By Looking At The September 19 Value Of The Assets Received In That Settlement.</u>

37.    Nearly $1.7 billion of the $5 billion difference between the parties' respective valuations relates to the divergent methods used by Barclays and by Movants' experts to value the litigation-clouded claim that Barclays held as of the Closing as a result of the $7 billion shortfall in the Repo Collateral that was actually delivered to Barclays at the Close.  *See* BCI Ex. 30 [Leventhal Decl.] ¶¶ 14-17.

38.    As explained above, the resulting legal claim for $7 billion was settled with JPMorgan and the LBI Trustee on December 22, 2008, for $1.25 billion in cash and securities

that were worth approximately $3.75 billion on the date of the settlement. Movants do not contend that these securities were worth more than $3.75 billion as of December 22, the date that Barclays acquired them. Instead, they claim that Barclays should have booked these securities based upon what Movants' experts contend was their value as of September 19 — more than three months *before* the population of securities included in the December settlement had even been identified.

39.    The accounting standards that apply to Barclays (International Financial Reporting Standards — "IFRS") required Barclays to measure the assets it received in the Sale Transaction at their fair value as of the closing date. The fair value of an asset is, by definition, the amount a third party would be willing to pay for that asset, taking into account all available facts and circumstances at that time — including, in the case of a legal claim, the risk and uncertainty of litigation. Although there is no market for such claims, it is highly unlikely that any potential purchaser, on the morning of September 22, 2008, after discounting for risk and uncertainty, would have been willing to pay $7 billion or anything close to that amount to acquire an untested claim for $7 billion against either JPMorgan or the LBI Trustee. Rather than simply guessing at the value of this claim or booking the claim at zero because its value as of the Closing was essentially unknowable, Barclays made the judgment that the best available proxy for the value of that claim as of the time of Closing was the value *actually received* in the December settlement for that claim, consisting of approximately $5 billion worth of cash and securities. That determination was examined and approved at the time by PwC. BCI Ex. 870 [Dec. 23, 2008 7:27 pm email from R. MacGoey to S. Teague, *et al.*] ("In addition, the JPM portfolio now has to be priced at the receipt date in December . . . ."). As a result, Barclays' Acquisition Balance Sheet reflects a valuation of approximately $5 billion for that legal claim —

$1.25 billion for the cash and approximately $3.75 billion for the securities received in the settlement.

40.      At the December 22 Settlement Hearing, the Court asked to be told "the value of what is being transferred to Barclays today."  BCI Ex. 50 [December 22, 2008 Hearing Tr.] at 44:17-19.  In doing so, the Court was asking what the value of the securities was as of the date of the settlement; the Court clearly was *not* asking the value of those securities as of September 22 or September 19.  In response to the Court's statement that it would be "prepared to learn it through an in camera submission," Barclays gave the Court an estimate off the record based on a valuation estimate as of ***that time*** — no one asked for Barclays to say what the value of the securities were back in September 2008 (nor would Barclays have been in a position to give such an estimate, since that would have had no relevance to the settlement).  *See* BCI Ex. 50 [December 22, 2008 Hearing Tr.] at 43:19-45:4.  After conferring, Barclays agreed to provide an off-the-record estimate of the value of the securities being transferred *as of the date of settlement* — not as of September 22.  *Id.*

41.      By contrast, Movants' experts Professor Zmijewski and Mr. Garvey contend that Barclays should have booked on its Acquisition Balance Sheet an amount equal to the *September 19* value of the cash and securities Barclays ultimately received in the December settlement.  Thus, they contend that Barclays' $7 billion claim was worth not what a willing purchaser would have paid for that claim at the time of Closing, but what a willing purchaser would have paid at Closing for the cash and securities that Barclays ultimately received in settlement in December (even though neither the amount of cash that Barclays would receive nor the particular securities that Barclays would receive were known on September 19).

24

42.     This approach leads to absurd results, with the value of the claim at Closing

varying radically depending on the assets used to pay a settlement months later.  To illustrate,

under Movants' experts' valuation approach: (a) if on December 22, Barclays had received a

settlement in the form of $5 billion in cash, then the value of the claim at Closing would be $5

billion as of September 19, (b) if on December 22, Barclays had received a settlement in the

form of securities with a value of $5 billion on December 22, but which had been worth, say, $10

billion on September 19, then the value of the claim as of Closing would be $10 billion (*more*

than the $7 billion cash amount Barclays was claiming, thus augmenting rather than discounting

the claim for litigation risk), and (c) if on December 22, Barclays had received a settlement in the

form of securities with a value of $5 billion on December 22, but which had doubled in value

between September 19 and December 22, then the value of the claim at Closing would be $2.5

billion.[29]  These three scenarios demonstrate that the valuation approach of Movants' experts is

illogical and arbitrary and should be rejected.  Between September 19 and December 22, 2008,

Barclays neither benefited from nor was harmed by any movements in the value of the securities

used to "pay" the settlement amount in December 2008; the only relevant issue to Barclays was

what those securities were worth at the time the settlement became effective.  Under Movants'

illogical approach, the value of *the claim at the time of Closing* depends entirely on the historical

value of the securities ultimately selected to satisfy Barclays' claim.

43.     There is a further problem with Movants' experts' valuation of the securities

received in the December settlement.  In valuing those securities, Movants' experts simply adopt

---

[29] Indeed, the valuation approach advocated by Movants' experts makes the amount of Barclays' alleged
understatement of values depend on (1) which specific securities JPM delivered on December 22, and (2) how the
values of those securities changed between September 19 and December 22.  Nonsensically, even if everyone agreed
that what Barclays received on December 22 was worth exactly $5 billion as of that date, the method adopted by
Movants' experts would lead to wildly different estimates of Barclays' alleged undervaluation (or overvaluation)
depending on what particular assets comprised the $5 billion.

wholesale JPMorgan custodial values for those securities *as of September 17*, some five days

prior to Closing.  Given the tumultuous events of that week, valuations as of September 17

cannot be simply assumed to provide reliable information about valuations at Closing, no matter

how they are adjusted.[30]  Moreover, JPMorgan itself stated that "we caution against using those

[September 17] values as reliable indicators of realizable value."  BCI Ex. 443 [Oct. 31, 2008

3:28 pm email from H. Novikoff to J. Giddens *et al.*].  Thus, the values Movants rely on as the

starting point for their alternative valuation are for the *wrong day* and cannot be reliably adjusted

to the correct day (whether that day is September 19 or September 22), and even the persons who

provided the values are unwilling to vouch for their reliability.  Nor can Movants' experts vouch

for their reliability, since they have not even examined how the marks were prepared or

otherwise attempted independently to validate these values.  *See* Barclays' Opening Br. at ¶¶ 60-

61; *infra* at ¶ 51.

44.    In sum, the valuation methodology used by Professor Zmijewski and Mr. Garvey

to determine the value of Barclays' "$7 billion claim," which was satisfied through the

December 2008 Settlement, should be excluded as illogical and unreliable.  It produces absurd

results that ignore the actual value of the settlement reached in December 2008, which was a

package of cash and securities with a total value of $5 billion — *a figure that none of Movants'*

*experts dispute*.  The Court should not ignore the undisputed value of what Barclays *actually*

*received* in favor of a faulty methodology that could produce numbers vastly higher or lower

than the true value of the claim, and that is based upon JPMorgan custodial values for the

securities at issue as of September 17 — which are unreliable because they were five days stale

---

[30] Movants' expert Professor Zmijewski purports to adjust the JPM marks (which he does not establish are a reliable starting point) for changes in market conditions between September 17 and September 19.  However, his method of adjustment is unscientific and employs data that demonstrably did not reflect changes in market conditions between September 17 and September 19.

by the date of the Closing and which even JPMorgan, who provided the values, cautioned were

unreliable.  Such an extreme and obvious attempt to inflate the value of the assets received by

Barclays cannot pass muster under the *Daubert* standard.  *See Amorgianos v. Amtrak*, 303 F.3d

256, 267 (2d Cir. 2002) (expert testimony should be excluded where a methodological "flaw is

large enough that the expert lacks 'good grounds' for his or her conclusions") (internal quotation

marks omitted).

> 2.   <u>Movants' Experts Improperly And Unreasonably Value The Securities
> Actually Delivered To Barclays As If The Closing Date Were September
> 19, Rather Than Using The Actual Closing Date Of September 22.</u>

45.     Barclays did not acquire full ownership rights over any of the securities

transferred to it until the Sale Transaction closed, which was the morning of Monday, September

22.  Faced with the task of determining what those securities were worth when acquired,

Barclays' valuation professionals, subject to the close scrutiny of PwC's audit team, determined

appropriate valuations for the assets actually in hand at the Closing as of September 22.

46.     The decision to use September 22 as the valuation date came about as the result of

discussions with PwC.  Initially, under a misimpression that title had passed on September 19,

2008 (because most of the securities had been pledged to Barclays as of that date as a result of

the Fed Replacement Transaction), Barclays' valuation personnel preliminarily attempted to

value the Repo Collateral as of that date.  M. 333 [Feb. 2, 2009 R. MacGoey to L. Gunn, *et al.*]

at p. 1.  PwC pointed out that this approach was incorrect, and would, if employed, result in an

overestimate of the value of the collateral.  Among other things, PwC explained that there was

downward pressure on markets over the weekend from the close of markets on Friday,

September 19, to the open of markets on Monday, September 22 — in part as a result of the

SIPC liquidation filing of LBI on the afternoon of September 19.  This analysis was summarized

by PwC auditor Robert MacGoey in a December 23, 2008 email:

> The acquisition was effective prior to open of business in the UK on 9/22. The majority of the securities had been received prior to that date and were legally owned and controlled by BarCap as of open of business 9/22. Closing price 9/19 was used as the indicative price for opening 9/22. However, given the turmoil in the markets there was further downward pressure on prices on the weekend (9/20, 9/21) and therefore *we suggested* that this maybe something that you would want to capture.  [PwC audit partner] Jon Holloway spoke with [the head of Barclays' Price Testing Group] Marcus [Morton] and *our understanding was that you were going to use the 9/22 closing-mid prices* in the basis that you can't get intra-day numbers and the S&P opening is a poor proxy for much of what BarCap purchased.  *We believe this is a reasonable approach . . . .*

BCI Ex. 870 [Dec. 23, 2008 7:27 pm email from R. MacGoey to S. Teague, *et al.*] (emphasis added).

47.    Thus, at PwC's suggestion, in valuing the securities received in the Sale Transaction, Barclays' personnel used closing prices from September 22, 2008.  The reason PwC recommended and Barclays used closing prices from September 22, as opposed to prices from some other time on September 22, is that closing prices are generally the only prices that are available looking backward (even a few days)[31]:  for most securities, vendors and third-party pricing sources maintain and report closing prices, and do not store and provide opening or intra-day prices for any given day.[32]

48.    Movants' experts Professor Zmijewski and Mr. Garvey do not dispute that closing prices are the right starting point for valuing the assets in question.  But in their judgment, closing prices from September 19, 2008, represent a better proxy for the value of the securities transferred to Barclays at the time of Closing than closing prices from September 22.  *See* Garvey Report at ¶¶ 60-63; Zmijewski Report at ¶¶ 29-31.  They contend that the use of

---

[31] Thus, for example, the securities prices reported in daily newspapers, which come from these vendors, typically are closing prices.

[32] Indeed, there is no accounting standard that requires securities to be valued as of a *specific time of day*, as opposed to a specific date in general.  The goal for Barclays was to value the securities as of the Closing Date, which was September 22.

September 22 closing prices produces values that are too low because the prices of most securities were generally down on September 22 (from the September 19 close), and that the Estate should not be required to bear the risk of intra-day price movements on September 22. Zmijewski Decl. at ¶ 21; Garvey Decl. at ¶¶ 37-38.  The approach of Professor Zmijewski and Mr. Garvey ignores what PwC identified as the "downward pressure on prices on the weekend" between market close on September 19 and the Closing on the morning of September 22; it fails to ascribe any portion of the market decline reflected in the difference between September 19 and September 22 closing prices to that pre-Closing period; and, to the extent market prices declined the 56 hours after the close on September 19, it indisputably results in an inflated valuation of the assets Barclays received on September 22).

49.     Significantly, Movants' expert Mr. Garvey now admits that the proper valuation date is the *date of the Closing*, which is indisputably September 22, 2008; he also admits that there is nothing in any applicable accounting rule or standard that requires a valuation as of 12:01 a.m. on September 22.  *See* Garvey Decl. at ¶ 35 ("The accounting rules regarding the determination of measurement date are not as precise as the terms outlined in the APA; there is no reference in the accounting standards to the time of measurement, only the date … the accounting rules for determining the measurement date are not as precise and involve a degree of judgment based on the facts and circumstances.")  By making these admissions, Mr. Garvey is contradicting his earlier opinion that the accounting rules *required* use of the September 19 closing prices.  Garvey Report at ¶¶ 60-61.  Moreover, Mr. Garvey's admissions show that, at most, this dispute represents a judgment call as to how best to estimate the value of the securities transferred to Barclays as of the Closing — whether to use values based on prices as of the close of markets on September 19 (ignoring subsequent downward movements in prices before the

29

open of business on September 22), or whether to use values based on prices as of the close of

markets on September 22, using the only reliable prices actually available on the Closing Date

(which Movants' experts allege incorporate intraday movements in value during the course of

the Closing Date, even while they simultaneously admit the accounting rules do not require

valuation as of any specific time on the Closing Date).

> **C.    Movants' Experts Use Improper Technical Manipulations And Inappropriate Data In Order To Achieve Biased Valuations Driven By A Litigation Goal.**

50.    Movants' experts rely on improper technical manipulations and biased selection

of data to inflate their estimates of the value of the securities delivered to Barclays.  This can be

seen, for example, in Professor Zmijewski's calculation of lower mid-to-bid adjustments for

equities and his reliance on custodial values that even JPMorgan cautioned against relying on, in

Mr. Schwaba's use of prices from regulator-mandated repurchases of auction rate securities

(ARS) at par, which have no relevance to the ARS valuations at issue in this dispute, and in Mr.

Slattery's concoction of a novel, unscientific methodology designed to produce small

"distressed" market spreads and therefore increase the valuation of certain securities.

> 1.    Professor Zmijewski Uses Untested And Unreliable Custodial Values And Inherently Flawed Data To Inflate The Value Of The JPM Settlement Securities and the Equity Securities Transferred To Barclays.

51.    With respect to Professor Zmijewski's re-calculation of the value of Barclays'

claim involving JPMorgan and the undelivered assets, in addition to the conceptual illogic of

measuring the value of the securities delivered in December as of September 19 — instead of

attempting to measure the value of Barclays claim (which is all that Barclays had on September

22) (*see supra* Section II(B)(1)) — Professor Zmijewski's measurement of the value of those

securities as of September 22 is unreliable because, among other reasons described in Barclays'

opening brief, the starting point of his calculation is unreliable.  Professor Zmijewski assumes

that the September 17 custodial value listed in JPMorgan documents for the securities ultimately

delivered pursuant to the December 22 settlement accurately reflect the market value of those

securities as of that date, without any understanding of how JPMorgan (or unnamed third parties,

which are the apparent source of the numbers) calculated such "collateral" value or what exactly

the "collateral" value is supposed to reflect, and despite JPMorgan's explicit warning that "***we***

***caution against using those values as reliable indicators of realizable value***."  BCI Ex. 443

[Oct. 31, 2008, 3:28 p.m. email from H. Novikoff to J. Giddens *et al.*] (emphasis added).  Indeed,

JPMorgan, in contrast to what it refers to as "collateral value," offers an estimate of "market

value" as of November that is approximately *half* the "collateral value" that Professor Zmijewski

uses in his calculation.  Professor Zmijewski in no way corrects this problem in his declaration

submitted with Movants' opposition to this motion.  Instead of responding with information

explaining the nature or confirming the reliability of the "collateral" value he uses, Professor

Zmijewski simply asserts "that Barclays' interpretation of these emails is unsupported."

Zmijewski Decl. at ¶ 54.  However, JPMorgan's explicit warnings (twice) against using the

September 17 values "as reliable indicators of realizable value" (which is exactly what Professor

Zmijewski does) does not require any "interpretation."  Professor Zmijewski simply chooses to

ignore this explicit warning and use these "collateral" values as indicators of market value

without understanding the nature or sources of those values.  This makes his calculation

inherently unreliable on its face.

52.    With respect to Professor Zmijewski's re-calculation of the value of the equities

delivered on September 22, in addition to his use of the September 19 values (discussed above),

he uses demonstrably flawed data to calculate a mid-bid liquidity adjustment.  Professor

Zmijewski admits that his data set had erroneous observations that he had to exclude, such as

negative bid-ask spreads (which make no sense).  He dismisses this by excluding from his

calculations such negative spreads, which he says the Bloomberg Help Desk told him were the

result of "data error."  Zmijewski Decl. at ¶ 23 n.80.  But that does not cure the larger problem

with this data.  The Bloomberg data on which Professor Zmijewski relies are not "live"

actionable bid and ask quotes; rather, they are historically-reported end-of-day bid and ask

quotes (which may or may not have been actionable simultaneously).  This makes the data on

which Professor Zmijewski relies inherently unreliable for the purpose of estimating true bid-ask

spreads.  Barclays chose to observe and capture "live" bid and ask quotes (from a later date

because, understandably, these data had not been captured on either September 19 or September

22) and extrapolated back to September 22 using these more reliable and accurate "live" spreads.

53.    Professor Zmijewski's adjustment to bid artificially inflates the resulting estimate

of fair value of the equities Barclays received, which is the result Movants seek to establish.  For

example, suppose there were a true, actionable bid-ask spread of $9-$10 as of 3:30 p.m. on a

given day, that the market moves upwards at the end of the trading day, and in response, at 3:55

p.m. one trader increases his or her bid to $9.50, while other traders leave their bids at $9 and

their asks at $10.  A vendor tracking end-of-day bids and offers would capture the $9.50 bid and

the $10 ask and would report in its historical data a $9.50 bid and a $10 ask.  From these data,

Mr. Zmijewski would compute a spread of $.50, whereas the true actionable spread available in

the marketplace was really $1.

54.    Professor Zmijewski attempts to buttress his use of historical Bloomberg data to

calculate spreads by pointing to Barclays' own use of Bloomberg-reported-data and suggesting

that Barclays is being inconsistent with respect to Bloomberg data.  This is a false contradiction,

as the use of Bloomberg data by Barclays referenced by Professor Zmijewski is *not* using

historical, non-live, non-actionable bid and ask quotes to calculate spreads for equities (which is what Professor Zmijewski does), but rather simply using Bloomberg as a provider of *price data* or in a situation where bids can be matched with asks, which is quite different.  Therefore, Professor Zmijewski misses the point and in no way cures the unreliability of the data he uses.

        2.      <u>Mr. Schwaba Uses Obviously Inapposite Non-Arm's Length Trades In Order To Inflate His Valuation Of Certain Municipal Securities.</u>

      55.      As shown in Barclays opening brief, Mr. Schwaba has no experience evaluating or trading auction rate securities (which were among the municipal securities he re-valued for the Movants[33]) and had no involvement in that market for ARS in or around September 2008.  Barclays' Motion to Exclude at ¶ 40.  This lack of experience with ARS was clearly evident in his deposition.  *See id.*  Although Mr. Schwaba admitted in deposition that his research had shown him that the market for auction rate securities was essentially frozen in September 2008, he simply ignores this critically-important fact when he re-values the auction rate securities that Barclays acquired from Lehman.  As the President of the Securities Industry and Finance Marketing Association explained in a February 2009 letter to the Secretary of the Treasury, the frozen market for ARS meant that these securities became essentially impossible to sell because the market for them had virtually disappeared:  "[A]s the credit crisis spread into other markets, demand for ARS halted, resulting in 'failed' auctions and leaving investors unable to sell their ARS.  Today, most ARS auctions continue to fail and many thousands of investors are holding securities which offer no liquidity and cannot be sold."  Letter from T. Timothy Ryan, Jr., President and CEO Securities Industry and Financial Markets Association, to the Hon.

---

[33] In his recent declaration, Mr. Schwaba draws a distinction between the nine municipal ARS he re-valued (discussed here) and the 10 municipal variable rate demand obligations (VRDO) he re-valued.  While there are technical differences between ARS and VRDO, their interest rate adjustment mechanisms are economically similar and the markets for both types of securities were severely impacted and essentially non-functioning in September 2008.

Timothy Geithner, Secretary, U.S. Department of Treasury, Feb. 6, 2009 at p. 2 [attached as

Exhibit K].  Responding to regulatory or legal pressure, or to maintain relationships with

customers, some brokers and others who had sold ARS to their customers repurchased them at

par.  *See, e.g., id.* at p. 3; Randall Smith, UBS to Pay $81 Million in Auction-Rate Case, Wall

Street Journal Online, Aug. 5, 2010 at p. 1 ("The entire $330 billion market for auction-rate

securities froze in February 2008, when Wall Street dealers pulled back from auctions held

weekly and monthly to set their interest rates"; "Investors have filed more than 650 claims to

recover auction-rate losses or damages"; "Regulatory settlements eventually required major

brokerages to buy back more than $60 billion from investors") [attached as Exhibit L].  In

pointing to the relatively small number of ARS transactions for which he can find prices on

September 19, 2008, and which he uses as "comparables," Mr. Schwaba fails to acknowledge or

even recognize that most or all of these "trades" may have been non-arm's length repurchases

from retail customers; as such, they are in no way relevant or informative as to what Barclays

could have realized in the marketplace for the ARS it acquired from Lehman.  Even though using

such non-arm's length trades "at par" introduced a clear upward bias in his valuations, Mr.

Schwaba made no effort to screen out transactions in which broker-dealers bought back ARS

from their own customers for regulatory, legal, or relationship reasons.  Instead, he blithely

values these ARS at par as if they were trading in vibrant and liquid markets, when, in reality,

investors were hardly able to sell them at any price.  This failure to recognize this central market

reality biases his results upward and renders his opinions concerning the value of these securities

unreliable.

3.    Mr. Slattery Concocts Artificially Narrow "Distressed" Market Spreads In
Order To Inflate The Valuation Of The Securities He Measures.

56.    Despite Mr. Slattery's belated and inadequate efforts to find support for his novel

method for estimating an appropriate bid-ask spread under the market conditions prevailing in

September 2008 — a period during which Mr. Slattery was not actively involved in the market

— the fact remains that, as explained in Barclays' opening brief, for purposes of this litigation he

and one of his support staffers concocted a methodology never used, validated, or endorsed by

any academic or industry source to minimize the applicable bid-ask spread and thereby inflate

the value of these securities.  Barclays' Motion to Exclude at ¶¶ 27-32.  In his new declaration,

Mr. Slattery claims to have found some measure of academic support for his methodology.  But

neither of the articles he now cites say anything whatsoever that supports the use of the vaguely

sourced, outdated trader estimates that he relies on as a basis from which to extrapolate a bid-ask

adjustment for use in valuing securities in the unprecedented market conditions prevailing in

September 2008.  Mr. Slattery's novel methodology produces a higher valuation, as it was

evidently designed to do, but is unscientific, untested, and unreliable.[34]

D.    **Movants' Experts Use *Ex Post* Events And Valuations To Re-Value
Securities As Of September 22.**

57.    Movants' experts accuse Barclays of considering information from after the

Closing Date to value certain securities, which they initially asserted is always and everywhere

wrong.  In fact, it is required under relevant accounting standards to use information arising after

the valuation date if that information is evidence of or reflects circumstances that existed as of

the valuation date.  For instance, where there is little information about the value of a security

---

[34] And Mr. Slattery still offers no support for his assertion — for which he admitted he had no support at deposition
— that Barclays valued the non-Agency RMBS securities on which he opines using "fire sale prices."  Mr. Slattery
now contends that the testimony of Sean Teague establishes that Barclays valued these assets using internal sale
prices.  Slattery Decl. at ¶ 26.  But Mr. Slattery begs the question by simply assuming that internal sale equates to
fire sale.  Neither Barclays' independent valuation team — nor the PwC audit team — agreed.

that is illiquid, and hence has no observable transaction price on the valuation date, it is entirely

appropriate to consider a sale of that security that occurs shortly after the valuation date.  For

example, suppose there had been no reported trades in security X on the several days before and

including September 22, but there was a true arm's-length sale of that security on September 23,

under circumstances like these; it is appropriate to take into account a reported sales price for

that security on September 23 — if there had been no intervening events (a newly announced

dividend, new information about the underlying business, etc.) likely to have materially affected

the value of the security between September 22 and the observed trade on September 23.[35]  BCI

Ex. 873 [IASB Expert Advisory Panel, "Measuring and disclosing the fair value of financial

instruments in markets that are no longer active," Oct. 2008] at ¶¶ 37-39.  Thus, following this

established principle, for a small population of highly illiquid securities, Barclays used sales

transaction data observed between September 22 and 30 to help assess the value of those

securities as of September 22.  Washtell Dep. Tr. at 104:21-105:7, 217:11-218:9.  This was done

because, in Barclays' business judgment, doing so improved the accuracy of its valuations of

these highly illiquid assets for which reliable prices were not otherwise readily available.

Contrary to the assertions of Movants' experts, this was appropriate and fully consistent with

relevant valuation principles and accounting standards.

       58.     By contrast, even while they criticize Barclays for allegedly using *ex post*

information to value certain securities, Movants' experts have attempted to re-value certain of

the largest and most illiquid securities Barclays acquired by reference to *new factual*

---

[35] Arguably, it might be appropriate to at least consider the information from a trade on September 23 even if there had been an intervening event, provided that the impact of that event could be quantified.  For example, a price on September 23 that had been affected by a dividend payment could be adjusted to reflect a with-dividend price estimate for September 22.

*developments* that affected the value of those securities *many weeks after* the valuation date.

Zmijewski admits this in stating:

> [I]t is a fact that if, in real time, one is measuring the value of an
> asset at a specific point in time, only information that is available
> as of that point in time can be used to make that assessment
> because no other information exists. It is only when one is valuing
> an asset as of some previous point in time that one even has the
> opportunity to use *ex post* information; that is, information that
> became available after the valuation date. Thus, if one is
> attempting to measure the value that could have been assessed in
> real time, then it is inappropriate to use information that became
> available after the valuation date unless and only unless such *ex
> post* information is identical to the information that would have
> been available as of the valuation date. In other words, using
> hindsight information is appropriate if, and only if, that
> information is shown to reflect the facts and circumstances that
> existed as of the point in time the asset is to be valued.

Zmijewski Decl. at ¶ 14.

59.     Two glaring examples of this are Mr. Slattery's attempt to re-value Barclays'

interest in a highly complex structured finance product named "Pine CCS" ("Pine"), a

collateralized loan obligation ("CLO") which Lehman had packaged shortly before its

bankruptcy but apparently had been unable to sell, and Mr. Olvany's attempt to re-value the

Giants Stadium Bonds, which were auction-rate securities that had failed at auction earlier in

2008.  There was no market for either of these financial products in September 2008 — no one

was buying and selling these securities or anything similar at the time; both carried tremendous

risk; and both were therefore exceptionally difficult to value.  Indeed, Mr. Olvany admitted at his

deposition that he did not know whether Barclays could have sold the Giants bonds for the value

he assigned to them, and that he had no opinion as to what a willing buyer would have paid for

them:

> Q.    Is it your testimony that no bid and offer adjustment should
> have been made to the . . . Giants securities?

A.   Yes.

. . .

Q.   Did you look into whether or not Lehman had had difficulty selling its positions in the Giants Stadium bonds leading up to the Barclays transaction?

A.   No.

. . .

Q.   So I'm trying to understand whether in your opinion at 12:01 on September 22, Barclays could have sold the four Giants Stadium bonds for $408,325,000.

A.   I'm not -- that's not my opinion, that they could -- that Barclays could have sold it at 12:01 for that price.

Q.   Do you have an opinion on that?

A.   On --

Q.   One way or the other, whether they could --

A.   What's the question?

Q.   On whether or not Barclays could have sold the four Giants Stadium bonds at 12:01 a.m., September 22, for $408,325,000.

A.   I don't have an opinion on that.

Q.   You have no opinion.  Do you have an opinion on what a willing buyer would have paid for these four Giants Stadium securities at 12:01 a.m. on September 22?

A.   No, I do not.

Olvany Dep. Tr. at 89:18-21, 90:8-12, 94:11-95:12 (objections omitted).

60.    Based on events occurring *after* September 22, 2008, Movants' experts claim that the values Barclays assigned to these two securities were too low:  they claim Barclays undervalued Pine by $388.7 million and undervalued the Giants Stadium Bonds by $349.3 million.  However, these claims are based on a flawed and unreliable methodology that inflates

(by over $730 million) the valuation of these assets based on later-occurring events that do not reflect the facts, circumstances, and uncertainties as of the valuation date.

61.    For example, Movants' expert Mr. Slattery purports to value Barclays' interest in Pine by relying on developments that occurred several weeks after the valuation date, and that changed the perceived risks associated with this security.  Pine was a vehicle created by Lehman solely for use in repo financings.  Teague Dep. Tr. 215:22-216:11.  This special purpose entity owns a participation interest in a series of leveraged loans to fifty-five different borrowers of varying credit risks.  The participation interest is held through a Participation Agreement with a bankrupt Lehman affiliate named LCPI, which is the actual holder of the underlying leveraged loan agreements with the various borrowers.  At the time that Barclays acquired its interest in Pine, there were funded loans outstanding (*i.e.*, drawn down by borrowers and not yet repaid to LCPI) of approximately $697 million; the Pine entity itself held another $367 million in cash or similar investments; and there were additional unfunded commitments under the leveraged loans of $1.14 billion (*i.e.*, that was the additional amount the borrowers could borrow under the loans held by LCPI).  *See* BCI Ex. 607 [Dec. 12, 2008 J. Yang Front Office Memo on Pine Valuation] at Appendix B; Slattery Report at ¶ 56.  As a result of the Sale Transaction, Barclays received the senior "Class A-1" interest in Pine (there were junior interests held by various Lehman affiliates).  Slattery Report at n.27.

62.    In assessing the value of Barclays' interest in Pine, Barclays took into account the following risks:  (1) the underlying *credit risk*, which reflects the risk that the borrowers would fail to repay the amounts they had already borrowed (the $697 million) or the amounts they may borrow in the future; (2) the *participation risk*, which reflects the risk that even if the borrowers repaid LCPI (the nominal lender), because LCPI was in bankruptcy, it might not pass on the

amounts owed to the Pine CLO under the Participation Agreement; and (3) the *potential funding risk*, which reflected the risk that the borrowers might draw down on their loans for additional amounts. BCI Ex. 607 [Dec. 12, 2008 J. Yang Front Office Memo on Pine Valuation] at App. B. Movants' expert Mr. Slattery criticizes Barclays for improperly assuming there was a funding risk: according to Mr. Slattery, Barclays "failed to recognize" that the Pine Indenture makes clear that the Class A-1 holders do not have any obligation to fund future draw downs by the borrowers. Slattery Report at ¶ 57. But Mr. Slattery completely misunderstands the nature of the funding risk Barclays was assessing: at the time that Barclays acquired its interest in Pine, there was a risk that the $367 million in cash investments already held in the Pine vehicle could be drawn down by borrowers.[36] That risk was not eliminated until October 20, 2008, when the Indenture Trustee for the Pine CLO issued a Notice of Default, which terminated Pine's obligation to make the $367 million available for additional funding demands by the borrowers. Notice of Default [attached as Ex. P]; Indenture §§ 5.1, 6.2 [attached as Ex. O].

63.     Thus, the Notice of Default on October 20, 2008 increased the value of Pine. That information, however, was not relevant to valuing Pine as of September 22, 2008. Accordingly, it is improper for Mr. Slattery to rely upon this *ex post* information to increase the value of Pine as of September 22, 2008. *See generally* Slattery Report at ¶¶ 57-60.

64.     Similarly, Movants' expert Mr. Olvany purports to determine the value of certain auction rate securities (Giants Stadium bonds) as of the Closing Date through the use of developments that occurred after the Closing Date. These Giant Stadium bonds had *failed* at auction earlier in 2008, and there had been no successful auctions of these bonds since that

---

[36]  There was also at least some risk that Barclays would have to provide additional funding to satisfy future draw down demands by the borrowers either because the borrowers would need those funds to stay in business and hence be able to pay off future debts, or because a court might restructure the underlying leveraged loan agreements. Teague Dep. Tr. at 224:11-226:7, 294:24-295:7, 296:6-297:8; BCI Ex. 607 [Dec. 12, 2008 J. Yang Front Office Memo on Pine Valuation] at App. B.

failure.  *See* Olvany Dep. Tr. at 119:22-121:8; Teague Dep. Tr. at 62:12-63:9.  Since investors

normally can liquidate (*i.e.,* convert to cash) an auction rate security only through a functioning

auction process, the absence of a viable auction for these Giants Stadium bonds obviously casts

significant doubt on their value.  Teague Dep. Tr. at 62:12-63:9, 65:15-66:23.  It is for this

reason that BoNY, as repo custodian, marked the Giants Stadium bonds *well below par.*  Lacking

any reliable information that could support a different valuation, Barclays adopted the BoNY

marks for these securities.  Mr. Olvany, by contrast, speculates that the securities should have

been valued *at par*, based on the following facts that had not yet occurred or were not known as

of September 22:  (a) "Following Lehman's bankruptcy filing, Goldman Sachs was appointed as

broker-dealer for the Giants Stadium Bonds" (which did not occur until November 14, 2008), *see*

Olvany Report ¶ 12 and note 7; (b) "as the holder, Barclays had a number of attractive

alternatives at *subsequent rate settings*," Olvany Report at ¶ 18; (c) "It is plausible that market

conditions for ARS [auction rate securities] *could be expected* to change, and that other potential

buyers *would be willing* to bid for the Giants Stadium Bonds", Olvany Report at ¶ 26 (emphasis

added); and (d) "The designation of Goldman Sachs as broker dealer [in November 2008]

permitted the holder of Giants Stadium Bonds to maintain the same procedures each period on

determining the coupon rate and redemption of the securities.  It *could be reasonably expected*

that Goldman Sachs would be appointed as the broker dealer."  Olvany July 15, 2010

Declaration, at ¶ 19 (emphasis added).

65.    The use of new developments that occurred after the relevant valuation date, and

that could not have impacted the value of the security on the valuation date, is an unreliable

methodology for assessing value as of the valuation date.  For this reason, the Court should

exclude Mr. Slattery's testimony on Pine and Mr. Olvany's testimony on the Giants Stadium

Bonds. *See Marria v. Broaddus*, 200 F. Supp. 2d 280, 289 (S.D.N.Y. 2002) (expert testimony

based on unreliable methodology is inadmissible).

> ### E.    Movants Fail To Recognize The Importance Of The Distinction Between Repo Custodians Who Mark Securities At Their "Mid" Price And Barclays, Who Is Required To Mark Securities At The Lower "Bid" Price.

66.    Movants claim that Barclays "summarily rejects" the valuations provided by

BoNY and JPMorgan, both of whom acted as "repo custodians" in the Fed Replacement

transaction.  Movants' Opp. Br. to Barclays' Motion to Exclude at ¶ 36.  Movants hired one

expert, John Schneider, whose sole purpose is to opine that repo custodians like BoNY and

JPMorgan generally provide reliable marks.  Schneider Report at ¶¶ 9-12.[37]  But despite their

extensive reliance upon the repo custodians, Mr. Schneider and Movants never acknowledge one

major qualification to the use of marks from repo custodians, which applies no matter how

accurate those marks might otherwise be:  the repo custodian marks to a "mid" price, which is

defined as the mid-point between a buyer's "bid" price and a seller's "ask" price.[38]  By contrast,

Barclays, when calculating fair value, is required by the accounting rules to mark its securities at

---

[37] Movants claim that Mr. Schneider should be permitted to testify that BoNY and JPMorgan are qualified to value all types of collateral and that, therefore, Professor Pfleiderer — and the Barclays valuation professionals and the PwC auditors — were unreasonable in disagreeing with the valuations assigned by those custodian banks with respect to certain of the esoteric, illiquid, and difficult-to-value collateral received by Barclays in connection with the Fed Replacement Repo Transaction.  Setting to one side the fact that Movants' own experts readily disregard BoNY valuations when they consider them to be too low, it remains undisputed that Mr. Schneider has not analyzed the particular valuations in dispute at all, but rather intends to offer only general testimony that such clearing banks are competent to value collateral.  That does little to answer the question of whether they accurately valued this collateral, particularly given such red flags as JPMorgan's caution that its valuations — one of the very valuations that Mr. Schneider says is reliable — should not be considered reliable indicators of realizable value.  Mr. Schneider's proposed testimony therefore does not fit the facts of this case and should be excluded.  *See, e.g., Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002), *Li v. Aponte*, No. 05 Civ. 6237, 2009 WL 1285928, at *6 (S.D.N.Y. May 5, 2009).

[38] *See* BCI Ex. 823 [February 2010 ECB Monthly Bulletin] at p. 69 ("To ensure that both parties are protected against a default by their counterparty, the collateral value and the cash value of the repo should be close to each other. If the collateral value is lower, the cash lender incurs losses if the borrower defaults. If it is higher, the borrower incurs losses if the lender defaults. For that reason, *the collateral is valued at the "dirty" (i.e. including the interest accrued) mid-market price*. However, the market for the collateral asset may not be fully liquid, so there is a risk of the asset being sold for less than the mid-price. This is the main reason for the application of initial margins or haircuts.")

a "bid" price — *i.e.*, the price at which Barclays could actually expect to sell the security on the date in question (sometimes also referred to as an "exit price").[39]

67.     Thus, even if the marks from BoNY and JPMorgan were otherwise reliable for what they were, Barclays would still have to adjust those marks from their "mid" price levels to the "bid" price levels at which Barclays is required to book its securities.  For illiquid securities that are not trading in significant volumes each day, the difference between a "mid" price and a "bid" price is significant — in some cases well in excess of 10%.  Even for securities that typically trade in relatively liquid markets, if the market is volatile and trading becomes thin — which were the conditions that held in many markets in September 2008 — it would not be unusual for the bid/ask spread to be as high as 3 to 5 percent or higher.   For a portfolio of over $40 billion in securities, the "mid-to-bid adjustment" could easily be in the billions of dollars. Thus, a custodian's overall value for such a portfolio *would be expected to be* billions of dollars higher than a broker-dealer's valuation of the same portfolio.

68.     Movants never acknowledge this.  They pretend that the repo custodians provide rock solid pricing information, and that only a "biased" methodology by Barclays could arrive at lower values.  *See e.g.*, Movants' Opp. Br. to Barclays' Motion to Exclude at ¶¶ 34-36.  Yet even Movants' own experts implicitly acknowledge the need to adjust to bid prices; they just believe the adjustments should be smaller than those developed by Barclays, using the best available data and methods in Barclays' business judgment.  Zmijewski Decl. at ¶¶ 28, 37-44.   Indeed, for most assets, Movants' experts do not use a fundamentally different method for determining bid-ask spreads; they just selectively choose from the data in a way that allows them to calculate a smaller adjustment to bid prices (and hence higher indicated values).

---

[39]  *See generally* BCI Ex. 872 [International Accounting Standard 39 (Financial Instruments: Recognition and Measurement)] at ¶ 9 (p. A873) and AG 72 (p. A927); BCI Ex. 873 [IASB Expert Advisory Panel, "Measuring and disclosing the fair value of financial instruments in markets that are no longer active," Oct. 2008] at ¶ 99 (b).

**F.      Movants And Their Experts Accuse Barclays Of Deliberately Manipulating Their Valuations To Reach A Target Number Of $45.5 Billion – An Accusation That Contradicts The Record Evidence.**

69.      Movants repeatedly accuse Barclays of being "biased" because Barclays calculated bid-ask adjustments that Movants' experts consider too large.  Movants even go so far as to suggest that Barclays *deliberately targeted* a $45.5 billion valuation number for the Repo Collateral — and then, presumably, reverse-engineered all of its bid-offer adjustments to reach that number.  But Movants have failed to uncover a single piece of evidence that could support the incredible theory that Barclays *intentionally* marked the assets it received at $5 billion *less* than their fair market value.  To the contrary, the unrebutted testimony at trial directly contradicts this assertion.  Barclays' Chief Financial Officer, Patrick Clackson, testified that senior management at Barclays would have loved nothing more than to have Barclays record the largest negative goodwill number possible — thereby increasing Barclays' gain, and providing greater protection against future losses and write downs in the middle of the financial crisis. April 30, 2010 Hearing Tr. at 30:21-31:3, 31:20-34:2, 70:15-71:24 (Clackson) [attached as Ex. D].  However, as Mr. Clackson also explained, the Barclays' finance department did not have flexibility under the accounting rules to do that:  they were required to book the assets they received at values that they responsibly believed were the "fair values" (at bid prices) for those assets.  *Id.*  Movants have not cited to *any* evidence that supports their claim that Barclays abandoned its responsibilities under the accounting rules and intentionally wrote the assets down *below* their fair value.[40]

---

[40]  There is a numerical coincidence between the $45.5 billion estimated by some witnesses as the value of the Repo Collateral during the Sale negotiations and the $45.5 billion ultimately calculated by the Barclays valuation team months after the Closing.  But far from being evidence of a *widespread conspiracy* to fix the numbers below fair market value, that coincidence simply reinforces the fact that both the Barclays and the Lehman executives involved in looking at the Repo Collateral were correct in being skeptical of its value.  Of course, had it not been for the fact that Barclays received only $5 billion of value in the December settlement instead of $7 billion, Barclays would have had more than $45.5 billion attributable to the Repo Collateral.  But the fact is that Barclays compromised its

70.     Further unrebutted testimony has been given by the individuals at Barclays who were principally responsible for determining the values at which to book the securities acquired from Lehman.  These individuals work in the "Independent Valuation Group" of the Barclays Finance Department.  They each testified unequivocally that their sole goal in valuing the assets acquired from Lehman was to determine the fair market value of the assets in question as of September 22, as required by the accounting rules — nothing more, and nothing less.  Teague Dep. Tr. at 279:8-282:8; Washtell Dep. Tr. at 220:12-223:19; Landreman Dep. Tr. at 197:7-201:13.  Movants have cited to no evidence that contradicts that sworn testimony.

71.     Finally, the re-calculation of bid-offer spreads by Movants' experts fails to recognize that Barclays determined its bid-offer adjustments during a time when there was no litigation, when the financial markets were still in crisis, and when many markets for the financial products in question were still completely frozen.  Movants' experts likewise fail to recognize that Barclays' calculations were scrutinized by and ultimately found to be reasonable by their independent auditor, PwC.  By contrast, Movants' experts have reverse-engineered their bid-offer calculations to satisfy a litigation goal — *i.e.*, attempting to prove the existence of a "secret $5 billion discount" in the Repo Collateral.

72.     The Court should not entertain testimony from six different experts whose proposed testimony contradicts unrebutted testimony from the hearing, and the unrebutted documents produced by PwC, all of which show that the values on the Acquisition Balance Sheet reflect Barclays' best judgment as to the fair value of the assets acquired as of the Closing Date — not some deliberate attempt to hide a secret gain.

---

claim in the December Settlement and valued all of the assets it received at their fair values, for a grand total of $45.5 billion.  Movants should not be permitted to take this numerical coincidence and insinuate the existence of a widespread fraud.

Dated:  New York, New York
        August 16, 2010

                                                    Respectfully submitted,

                                                    BOIES, SCHILLER & FLEXNER LLP

                                                    By: /s/  Jonathan D. Schiller

Jonathan D. Schiller
Hamish P.M. Hume
Jack G. Stern
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350

Attorneys for Barclays Capital Inc.