# BCI Ex. 1

EXECUTION COPY

ASSET PURCHASE AGREEMENT

AMONG

LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS INC.

LB 745 LLC

AND

BARCLAYS CAPITAL INC.

———————

Dated as of September 16, 2008



EXHIBIT

1 31 04 MS

BCI Exhibit No.
1

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| Article I | DEFINITIONS | 1 |
| 1.1 | Certain Definitions | 1 |
| 1.2 | Other Definitional and Interpretive Matters | 10 |
| Article II | PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES | 11 |
| 2.1 | Purchase and Sale of Assets | 11 |
| 2.2 | Excluded Assets. | 11 |
| 2.3 | Assumption of Liabilities | 11 |
| 2.4 | Excluded Liabilities | 12 |
| 2.5 | Cure Amounts | 13 |
| 2.6 | Further Conveyances and Assumptions | 13 |
| 2.7 | Bulk Sales Laws | 14 |
| Article III | CONSIDERATION | 14 |
| 3.1 | Consideration | 14 |
| 3.2 | Payment of Cash Amount | 14 |
| 3.3 | Adjustment to Cash Amount | 14 |
| Article IV | CLOSING AND TERMINATION | 15 |
| 4.1 | Closing Date | 15 |
| 4.2 | Deliveries by Seller | 15 |
| 4.3 | Deliveries by Purchaser | 15 |
| 4.4 | Termination of Agreement | 16 |
| 4.5 | Procedure Upon Termination | 16 |
| 4.6 | Effect of Termination | 16 |
| Article V | REPRESENTATIONS AND WARRANTIES OF SELLER | 17 |
| 5.1 | Organization and Good Standing | 17 |
| 5.2 | Authorization of Agreement | 18 |
| 5.3 | Conflicts; Consents of Third Parties | 18 |
| 5.4 | Title to Purchased Assets | 19 |
| 5.5 | Compliance with Laws; Permits | 19 |
| 5.6 | No Other Representations or Warranties; Schedules | 20 |

i

**TABLE OF CONTENTS**
**(continued)**

| Article VI | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 20 |
| 6.1 | Organization and Good Standing | 20 |
| 6.2 | Authorization of Agreement | 20 |
| 6.3 | Conflicts; Consents of Third Parties | 21 |
| 6.4 | Financial Capability | 21 |
| 6.5 | Condition of the Business | 21 |
| Article VII | BANKRUPTCY COURT MATTERS | 22 |
| 7.1 | [Reserved] | 22 |
| 7.2 | Bankruptcy Court Filings | 22 |
| Article VIII | COVENANTS | 22 |
| 8.1 | Access to Information | 23 |
| 8.2 | Conduct of the Business Pending the Closing | 23 |
| 8.3 | Consents | 25 |
| 8.4 | Regulatory Approvals. | 26 |
| 8.5 | Further Assurances | 27 |
| 8.6 | Confidentiality | 27 |
| 8.7 | Preservation of Records | 28 |
| 8.8 | Publicity | 28 |
| 8.9 | Trademark License | 28 |
| 8.10 | Use of Purchased Intellectual Property | 29 |
| 8.11 | Deferred Transfers | 30 |
| 8.12 | Release of Guarantees | 32 |
| 8.13 | Transition Services | 32 |
| 8.14 | Subleases | 32 |
| 8.15 | Landlord Notice | 33 |
| 8.16 | Artwork | 33 |
| Article IX | EMPLOYEES AND EMPLOYEE BENEFITS | 33 |
| 9.1 | Employee Benefits | 33 |
| Article X | CONDITIONS TO CLOSING | 35 |

**TABLE OF CONTENTS**
**(continued)**

Page

| | | |
|---|---|---|
| 10.1 | Conditions Precedent to Obligations of Purchaser | 35 |
| 10.2 | Conditions Precedent to Obligations of Seller | 36 |
| 10.3 | Conditions Precedent to Obligations of Purchaser and Seller | 36 |
| 10.4 | Frustration of Closing Conditions | 37 |
| Article XI | [RESERVED] | 37 |
| Article XII | TAXES | 37 |
| 12.1 | Transfer Taxes | 37 |
| 12.2 | Prorations | 37 |
| 12.3 | Purchase Price Allocation | 37 |
| 12.4 | Adjustment to Purchase Price | 37 |
| Article XIII | MISCELLANEOUS | 38 |
| 13.1 | Expenses | 38 |
| 13.2 | Injunctive Relief | 38 |
| 13.3 | Submission to Jurisdiction; Consent to Service of Process | 38 |
| 13.4 | Waiver of Right to Trial by Jury | 39 |
| 13.5 | Entire Agreement; Amendments and Waivers | 39 |
| 13.6 | Governing Law | 39 |
| 13.7 | Notices | 39 |
| 13.8 | Severability | 41 |
| 13.9 | Binding Effect; Assignment | 41 |
| 13.10 | Non-Recourse. | 41 |
| 13.11 | Counterparts. | 41 |
| 13.12 | Scope of Purchased Assets | 41 |

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of September 16, 2008 (this "Agreement"), among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation ("LBHI"), **LEHMAN BROTHERS INC.**, a Delaware corporation ("LBI" and, together with LBHI, the "Seller"), **LB 745 LLC**, a Delaware limited liability company ("745"), and **BARCLAYS CAPITAL INC.**, a Connecticut corporation ("Purchaser").

## W I T N E S S E T H:

WHEREAS, LBHI is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York (Manhattan) (the "Bankruptcy Court") (Case No. [08-13555]) (the "Bankruptcy Case");

WHEREAS, the Seller and its Subsidiaries presently conduct the Business;

WHEREAS, Seller and 745 desire to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller and 745, pursuant to Sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein; and

WHEREAS, an Affiliate of Purchaser has agreed to provide to LBHI a debtor-in-possession facility (the "DIP Facility") and has agreed to provide to LBI certain other financing;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms

"controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Breakup Fee and Competing Bid Order" means an order of the Bankruptcy Court in the form attached as Exhibit A hereto.

"Business" means the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease or other agreement.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to or necessary for the conduct of the Business and the Purchased Assets in each case whether or not in electronic form.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" shall mean the following assets, properties, interests and rights of Seller and its Subsidiaries:

(a) the shares of capital stock, limited liability company membership, general and limited partnership, and other equity interests, of Seller and its Subsidiaries (other than (i) the capital stock of Townsend Analytics and (ii) the capital stock or other equity interests of any other Subsidiary that Seller and Purchaser may agree prior to the entry of the Sale Order shall be a Purchased Asset);

(b) all cash, cash equivalents, bank deposits or similar cash items of LBI and its Subsidiaries (the "Retained Cash") other than $1.3 billion in cash, cash equivalents, bank deposits or similar cash items;

(c)     all intercompany receivables;

(d)     the Excluded Contracts, including any accounts receivable to the extent arising out of any Excluded Contract;

(e)     any Intellectual Property Rights that do not constitute Purchased Intellectual Property;

(f)     any (i) confidential personnel and medical records pertaining to any Excluded Employee; (ii) other books and records that LBI is required by Law to retain, including, but not limited to, books and records required to be retained by Rules 17a-3 and 17a-4 of the Exchange Act with respect to the Purchased Assets or that LBHI reasonably determines are necessary to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets; and (iv) minute books, stock ledgers and stock certificates of Subsidiaries..

(g)     any claim, right or interest of LBHI or any of its Subsidiaries in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(h)     all insurance policies or rights to proceeds thereof relating to the assets, properties, business or operations of Seller or any of its Subsidiaries other than customer account insurance supplemental to SIPC coverage included in the Business;

(i)     any rights, claims or causes of action of Seller or any of its Subsidiaries against third parties relating to assets, properties, business or operations of Seller or any of its Subsidiaries (other than those primarily related to Purchased Assets) arising out of events occurring on or prior to the Closing Date;

(j)     commercial real estate investments (including commercial loans, equity investments in such commercial real estate and other commercial real estate assets and all Archstone debt and equity positions), private equity investments and hedge fund investments;

(k)     50% of each position in residential real estate mortgage securities;

(l)     assets related to the soliciting, placing, clearing and executing of buy and sell orders for derivatives contracts by Lehman Brothers Derivative Products Inc. and all activities related or ancillary thereto;

(m)     all artwork owned by Seller and its Subsidiaries;

(n)     all assets primarily related to the IMD Business and derivatives contracts;

(o)     any assets set aside, segregated, or otherwise specifically identified as being held for the purpose of satisfying Excluded Liabilities referred to in <u>Section 2.4(e)</u>;

(p)     all real property leases of Seller and its Subsidiaries, and all rights and obligations appurtenant thereto, as set forth on Schedule 1.1(a), other than the Transferred Real Property Leases; and

(q)     Lehman Commercial Paper, Inc. and any assets thereof.

"<u>Excluded Contracts</u>" means all of the Contracts of Seller and its Subsidiaries, other than the Purchased Contracts.

"<u>Furniture and Equipment</u>" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or used by Seller and its Subsidiaries in the conduct of the Business, including all desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"<u>GAAP</u>" means generally accepted accounting principles in the United States as of the date hereof.

"<u>Governmental Body</u>" means any government or governmental or regulatory, judicial or administrative, body thereof, or political subdivision thereof, whether foreign, federal, state, national, supranational or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private) or any self-regulatory organization, including, but not limited to, the Financial Industry Regulatory Authority.

"<u>Hardware</u>" means any and all computer and computer-related hardware, networks and peripherals, including, but not limited to, information and communication systems, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"<u>HSR Act</u>" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"<u>IMD Business</u>" means the investment management business of Seller and its Subsidiaries.

"<u>Intellectual Property Rights</u>" means, collectively, all intellectual property and other similar proprietary rights in any jurisdiction, whether owned or held for use

4

under license, whether registered or unregistered, including without limitation such rights in and to: (i) patents and applications therefor, including continuations, divisionals, continuations-in-part, reissues, continuing patent applications, reexaminations, and extensions thereof, any counterparts claiming priority therefrom and patents issuing thereon (collectively, "Patents") and inventions, invention disclosures, discoveries and improvements, whether or not patentable, (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, slogans, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof and all common law rights thereto (collectively, "Marks"), (iii) copyrights and registrations and applications therefor and renewals and extensions thereof, and works of authorship, databases and mask work rights, and all moral rights (collectively, "Copyrights"), (iv) all Software, Technology, trade secrets and market and other data, and rights to limit the use or disclosure of any of the foregoing by any Person, and (v) all claims, causes of action and defenses relating to the enforcement of any of the foregoing.

"Intellectual Property Licenses" means (i) any grant to a third Person of any license, immunity, a covenant not to sue or otherwise any right to use or exploit, any of the Purchased Intellectual Property owned by Seller or any of its Subsidiaries, and (ii) any grant to Seller or its Subsidiaries of a license, immunity, a covenant not to sue or otherwise any right to use or exploit any Purchased Intellectual Property which is not owned by Seller or any of the Subsidiaries.

"Knowledge of Seller" means the knowledge after due inquiry, as of the date of this Agreement, of the senior officers and directors of Seller and its Subsidiaries.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation (including rules of any self-regulatory organization).

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings or investigations by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through September 14, 2008 consistent with past practice.

"Permits" means any approvals, authorizations, consents, licenses, permits, registrations or certificates of a Governmental Body.

"Permitted Exceptions" means all (i) defects, exceptions, restrictions, easements, rights of way and encumbrances of record, (ii) statutory liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; (v) title of a lessor under a capital or operating lease; (vi) Liens arising under the DIP Facility; and (vii) the terms and provisions of the ground lease and related documents affecting the property located at 745 Seventh Avenue, New York, NY (the "745 Seventh Ground Lease").

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Purchased Assets" means all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets), including;

      (a)    the Retained Cash;

      (b)    all deposits (including customer deposits, security deposits for rent, electricity, telephone or otherwise and required capital deposits) and prepaid charges and expenses of Seller and its Subsidiaries associated with the Business, other than any deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

      (c)    the Transferred Real Property Leases, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

      (d)    government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion (collectively, "Long Positions");

      (e)    50% of each position in the residential real estate mortgage securities;

      (f)    the Furniture and Equipment;

(g)     the Purchased Intellectual Property and all income, royalties, damages and payments due or payable at the Closing or thereafter relating to the Purchased Intellectual Property (including damages and payments for past or future infringements or misappropriations thereof), the right to sue and recover damages for past or future infringements or misappropriations thereof and the right to fully and entirely stand in the place of Seller in all matters related thereto;

(h)     the Purchased Contracts;

(i)     all Documents that are used in, held for use in or intended to be used in, or that arise in connection with, or are necessary to carry on or are related to the operation of the Business, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), account agreements, books and records required to be maintained in connection with the Business under applicable Law, compliance manuals, supervisory policies and procedures, customer lists, supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (d) above, but excluding (i) personnel files for Excluded Employees of Seller or its Subsidiaries who are not Transferred Employees, (ii) such files as may be required under applicable Law regarding privacy, (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) any Documents primarily related to any Excluded Assets;

(j)     all Permits used by Seller in the Business to the extent assignable under applicable Law;

(k)     all supplies owned by Seller and used in connection with the Business;

(l)     all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees, contractors and agents of Seller or its Subsidiaries or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(m)     rights to "Lehman" indices and analytics that support the indices and all other indices and analytics used in the Business;

(n)     general trading tools supporting the Business;

(o)     the stock of  Townsend Analytics and the stock, equity interests or assets of any other Subsidiary of LBI that the Seller and Purchaser may mutually agree on prior of the entry of the Sale Order and of which a notice has been provided to any statutory committee;

(p)      the equity interests or assets (at the election of Purchaser in its sole discretion prior to the entry of the Sale Order) of Eagle Energy Management LLC;

(q)      all past and present goodwill and other intangible assets associated with or symbolized by the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(r)      Mercantile Exchange license agreements with respect to 335 South LaSalle Street, Chicago, IL and 400 South LaSalle Street, Chicago, IL; and

(s)      any insurance proceeds from the occurrence after the date hereof and prior to Closing, of any casualty or event loss with respect to any Transferred Real Property Leases or any properties subject thereto.

"Purchased Contracts" means all Contracts designated as Purchased Contracts pursuant to Section 2.5.

"Purchased Intellectual Property" means the Purchased Marks and all other Intellectual Property Rights, Software and Technology throughout the world that are used in, related to, or otherwise necessary for the Business, including all Intellectual Property Rights embodied in or arising from the Purchased Assets.

"Purchased Marks" means the Mark "LEHMAN" and "LEHMAN BROTHERS" throughout the world, all other Marks throughout the world containing or incorporating the name "LEHMAN," the Internet domain name www.lehman.com, all other Internet domain names containing or incorporating any Purchased Marks, and any other Mark throughout the world that is used in, related to, or otherwise necessary for the Business; in each case, together with all of the goodwill associated therewith and all registrations and applications for the foregoing and all common law rights thereto.

"Sale Motion" means the motion or motions of Seller, in form and substance reasonably acceptable to Purchaser and Seller, seeking approval and entry of the Breakup Fee and Competing Bid Order and Sale Order.

"Sale Order" shall be an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the transactions contemplated hereby.  Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Purchased Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens (other than Liens created by Purchaser and Permitted Exceptions) and claims, such Liens and claims to attach to the Purchase Price; (ii) Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall

retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 13.3 hereof; and (v) this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller or any chapter 7 or chapter 11 trustee of Seller.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies and application programming interfaces, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all software-related specifications documentation including user manuals and other training documentation related to any of the foregoing.

"Subsidiary" means any Person of which a majority of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by Seller.

"Tax Authority" means any state or local government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, business and marketing information, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, non-public or confidential information, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

"Transferred Real Property Leases" means the leases listed on Schedule 1.1(b) attached hereto and any rights and obligations appurtenant thereto.

1.2    Other Definitional and Interpretive Matters

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one schedule shall be deemed to have been disclosed on each other schedule.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     <u>Purchase and Sale of Assets</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing (as defined below), Purchaser shall purchase, acquire and accept from the Seller and 745, and Seller and 745 shall sell, transfer, assign, convey and deliver (or cause to be sold, transferred, assigned, conveyed and delivered) to Purchaser, all of Seller's and its applicable Subsidiaries' right, title and interest in, to and under the Purchased Assets free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code.

2.2     <u>Excluded Assets</u>.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller (directly and indirectly) shall retain all right, title and interest to, in and under the Excluded Assets.

2.3     <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the following  Liabilities of Seller and its Subsidiaries (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all Liabilities of Seller incurred, after the Closing, in connection with the Business;

(b)     all Liabilities of Seller under the Purchased Contracts arising after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code;

(c)     all Liabilities assumed under <u>Article IX</u>;

(d)     accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business other than any accounts payable arising out of one in connection with any Excluded Contract (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable);

(e)     all Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement;

(f)     all other Liabilities to the extent related to the Business, the Purchased Assets or the Transferred Employees arising after the Closing;

(g)     all Liabilities under Transferred Real Property Leases from the date of Closing forward;

(h)     all Liabilities relating to amounts required to be paid by Purchaser hereunder; and

(i)     all short positions and "repos" relating to any securities or interests of the types included in the definition of "Long Positions" with a book value as of the date hereof of approximately $69 billion (collectively, "Short Positions" and, together with the Long Positions, "Positions").

2.4     Excluded Liabilities.  Notwithstanding anything herein to the contrary, Purchaser will not assume or be liable for any Excluded Liabilities.  "Excluded Liabilities" shall mean all Liabilities of Seller and its Subsidiaries to the extent they do not arise out of the Business and the following Liabilities:

(a)     all Liabilities arising out of Excluded Assets, including Contracts that are not Purchased Contracts;

(b)     except as otherwise provided in Article XII, all Liabilities for Taxes of Seller for any Tax periods (or portions thereof) ending on or before the Closing Date;

(c)     except as otherwise provided in this Agreement and other than any cure amounts that Purchaser is required to pay pursuant to Section 2.5, Liabilities incurred in the Ordinary Course of Business existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Case (the "Compromised Liabilities");

(d)     except as expressly assumed pursuant to Article IX hereof, any Liabilities relating to the employment, potential employment or termination of employment of any Person relating to or arising out of any period prior to the Closing, including without limitation any Liability under or relating to any employee benefit plan, program, agreement or arrangement, including in respect of equity compensation plans and tax-qualified or not tax-qualified pension or saving plans as to which the parties agree there shall be no transfer to or assumption of Liabilities by the Purchaser;

(e)     all Liabilities relating to amounts required to be paid by Seller, hereunder, including upon any breach;

(f)     all Liabilities under Excluded Real Property Leases and Transferred Real Property Leases other than Liabilities under Transferred Real Property Leases from the date of Closing forward; and

(g)     all intercompany payables.

2.5    <u>Cure Amounts</u>. For a period of 60 days after the Closing, the Purchaser shall have the right upon notice to Seller to designate any contract related to the assets purchased from the Seller by Purchaser or its Affiliates (the "<u>Related Contracts</u>") as either (1) a Purchased Contract or (2) a Contract not designated as a Purchase Contract (a "<u>Rejected Contract</u>").  Until a Related Contract is so designated, Buyer shall be obligated to pay or cause to be paid ordinary course amounts due under such contracts in accordance with the terms thereof.  If a Related Contract is designated as a Purchased Contract, such Purchased Contract shall be assigned to the Purchaser and upon such assignment Purchaser shall be obligated to pay or cause to be paid the cure amount in respect of such Purchased Contract.  If a Related Contract is designated as a Rejected Contract, Purchaser shall have no further obligations in respect thereof.  In the event of any dispute relating to such cure amount, Purchaser shall escrow such funds in a manner satisfactory to the court. This Section will not apply to real property leases.

2.6    <u>Further Conveyances and Assumptions</u>.

(a)    From time to time following the Closing, Seller shall, or shall cause its Affiliates to, make available to Purchaser such data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)    From time to time following the Closing, without further consideration, Seller and Purchaser shall, and shall cause their respective Affiliates to, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, all such further conveyances, deeds, assignments, notices, assumptions, releases, acquaintances, powers of attorney and assurances (including any notarization, authentication, legalization and consularization of the signatures of Seller's and its Subsidiaries' representatives), and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents, and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

(c)    If any third-party consent is required for the assignment of any Intellectual Property Licenses to Purchaser and such consent cannot be obtained, then, to the extent permitted by Applicable Law, Seller shall sublicense whatever rights they are permitted to sublicense under the respective Intellectual Property Licenses, provided such sublicense is at no cost to Seller.  If, however, Seller is permitted to sublicense only at a one time, fixed payment or an ongoing fee, Seller shall notify Purchaser thereof and, only if Purchaser agreed in writing to be responsible to such payment or fee, as applicable, Seller shall sublicense whatever rights it is permitted to sublicense under the respective Intellectual Property Licenses, subject to the payment or fee being paid by Purchaser.

2.7     Bulk Sales Laws.  Purchaser hereby waives compliance by Seller and its Subsidiaries with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

ARTICLE III

CONSIDERATION

3.1     Consideration.  The aggregate consideration for the Purchased Assets shall be (a) the Cash Amount and (b) the assumption of the Assumed Liabilities by Purchaser. The "Cash Amount" shall equal an amount in cash equal to the sum of (i) $250 million, (ii) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Lehman headquarters at 745 Seventh Avenue in New York City less a reasonable market commission that would be paid assuming a sale of such property as of the Closing, (iii) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Cranford New Jersey Data Center less a reasonable market commission that would be paid assuming a sale of such property as of the Closing, and (iv) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Piscataway New Jersey Data Center less a reasonable market commission that would be paid assuming a sale of such property as of the Closing.  For illustrative purposes only, the parties note that as of the date hereof they expect that the Cash Amount will be approximately $1.7 billion (less the aforementioned assumed commissions).

3.2     Payment of Cash Amount.  On the Closing Date, Purchaser shall pay the Cash Amount to Seller, which shall be paid by wire transfer of immediately available funds into an account designated by Seller.

3.3     Adjustment to Cash Amount.  Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof). Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss.  If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (a) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (b) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant to this Section 3.3).  For purposes of this Section 3.3, the time value of money shall be disregarded and no interest shall be deemed earned.

## ARTICLE IV

## CLOSING AND TERMINATION

4.1     Closing Date.  Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York 10153 (or at such other place as the parties may designate in writing) at 10 a.m (New York time) on the day of, or at Purchaser's election the Business Day following, the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the Closing Date.

4.2     Deliveries by Seller.  At the Closing, Seller shall deliver to Purchaser:

(a)     a duly executed, reasonably customary bill of sale in the form of Exhibit A hereto;

(b)     duly executed, reasonably customary assignment and assumption agreements (including, with respect to the 745 Seventh ground lease, all assignments that were entered into in connection with Seller's acquisition of such lease) and duly executed assignments of the U.S. and Canadian trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. and Canadian trademark office, and general assignments of all other Purchased Intellectual Property;

(c)     a certificate, duly executed by Seller, that Seller is not a "foreign person" within the meaning of Section 1445 of the Code;

(d)     duly executed Seller Sublease and Purchaser Subleases; and

(e)     all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser or as Purchaser may reasonably request, including such instruments of conveyance and transfer in form and substance comparable to the instruments of conveyance and transfer exchanged in connection with Seller's acquisition of the 745 Seventh Ground Lease.

4.3     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Seller:

(a)     the Purchase Price, in immediately available funds, as set forth in Section 3.2 hereof;

(b)     a duly executed, reasonably customary assignment and assumption agreement; and

(c)     duly executed Purchaser Subleases and Seller Sublease.

4.4     Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)     by Purchaser or Seller, if the Closing shall not have occurred by the close of business on September 24, 2008 (the "Termination Date");

(b)     by mutual written consent of Seller and Purchaser;

(c)     by Seller or Purchaser if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence);

(d)     by Purchaser upon the entry of an order by the Bankruptcy Court authorizing a Competing Transaction; or

(e)     by Purchaser if the Breakup Fee and Competing Bid Order is not approved by the Bankruptcy Court in the form attached hereto as Exhibit A.

4.5     Procedure Upon Termination.  In the event of termination and abandonment by Purchaser or Seller, or both, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Seller.  If this Agreement is terminated as provided herein each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6     Effect of Termination.

(a)     In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Seller; provided, however, that the obligations of the parties set

forth in Sections 4.6 and 8.6 and Article XIII hereof shall survive any such termination and shall be enforceable hereunder.

(b)  Nothing in this Section 4.6 shall relieve Purchaser or Seller of any liability for a material breach of this Agreement prior to the date of termination, The damages recoverable by the non-breaching party shall include all attorneys' fees reasonably incurred by such party in connection with the transactions contemplated hereby.

(c)  The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 4.6 shall relieve Purchaser or Seller of their obligations under the Confidentiality Agreement; provided, that upon the termination of this Agreement, the non-solicitation obligations of Purchaser and its Affiliates under the Confidentiality Agreement shall be of no further force and effect; provided further that upon the Closing, the non-solicitation obligation of Purchaser and its Affiliates under the Confidentiality Agreement with respect to non-U.S. employees of the broker-dealer and investment banking business shall be of no further force and effect.

(d)  In the event that Purchaser terminates this Agreement pursuant to Section 4.4(d), Sellers shall pay to Purchaser (i) the Break-Up Fee promptly upon such termination and (ii) the Expense Reimbursement as provided in the Breakup Fee and Competing Bid Order.

(e)  In the event that Purchaser or Seller terminates this Agreement pursuant to Section 4.4(a) and at any time after the date of this Agreement and prior to such termination a bona fide proposal for a Competing Transaction shall have been publicly disclosed or otherwise communicated to the Sellers and shall not have been irrevocably withdrawn, then if a Qualified Bid shall be consummated within twelve months after such termination Sellers shall pay to Purchaser (i) the Break-Up Fee and (ii) the Expense Reimbursement as provided in the Breakup Fee and Competing Bid Order on the date of such consummation.

(f)  The parties hereto acknowledge that the agreements contained in this Section 4.6 are an integral part of the transactions contemplated by this Agreement. The Sellers shall be jointly and severally liable for any amount due to Purchaser pursuant to this Section 4.6.  In the event that the Sellers shall fail to pay any amounts due pursuant to this Section 4.6, the Sellers shall reimburse Purchaser for all reasonable costs and expenses actually incurred or accrued by Purchaser (including reasonable fees and expenses of counsel) in connection with the collection under and enforcement of this Section 4.6.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that:

5.1     <u>Organization and Good Standing</u>.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Seller is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not have a material adverse effect.

5.2     <u>Authorization of Agreement</u>.  Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for), Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the transactions contemplated by this Agreement (the "<u>Seller Documents</u>"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller.  This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by Seller which is (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Sale Order, and, with respect to Seller's obligations under <u>Section 4.4</u>, the entry of the Breakup Fee and Competing Bid Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller or, as the case may be, its Subsidiary in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3     <u>Conflicts; Consents of Third Parties</u>.

(a)     None of the execution and delivery by Seller of this Agreement or by Seller and its Subsidiaries of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller and its Subsidiaries with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Seller or any Subsidiary; (ii) subject

to entry of the Sale Order, any Order of any Governmental Body applicable to Seller or any of the properties or assets of Seller as of the date hereof; other than, in the case of clause (ii), such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller or any Subsidiary in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by Seller or any Subsidiary with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller or any Subsidiary of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Sale Order, (iii) the entry of the Breakup Fee and Competing Bid Order with respect to Seller's obligations under Section 4.6, (iv) filings of applications and notices with, and receipt of consents, authorizations, approvals, exemptions or non-objections from, the Securities and Exchange Commission (the "SEC"), foreign and state securities authorities, the Financial Industry Regulatory Authority ("FINRA"), the Commodity Futures Trading Commission ("CFTC"), National Futures Association ("NFA") applicable securities, commodities and futures exchanges, the Financial Services Authority ("FSA") and other industry self-regulatory organizations ("SRO"), (v) the filing of any other required applications, filings or notices with the Board of Governors of the Federal Reserve System (the "Federal Reserve"), any foreign, federal or state banking, other regulatory, self-regulatory or enforcement authorities or any courts, administrative agencies or commissions or other governmental authorities or instrumentalities, and (vi) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not have a material adverse effect.

5.4     Title to Purchased Assets.  Other than the real property subject to the Transferred Real Property Leases, intellectual property licensed to Seller and the personal property subject to personal property leases, Seller owns (directly or indirectly) each of the Purchased Assets, and Purchaser will be vested with good and exclusive title to such Purchased Assets, free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.  The Purchased Assets, together with all of Seller's agreements hereunder and under the Seller Documents, constitute all of the necessary assets and services used by Seller and its Affiliates to operate the Business as it is currently operated.

5.5     Compliance with Laws; Permits.

(a)     Seller and its Subsidiaries, and their respective personnel, are in compliance with all Laws applicable to their respective operations or assets or the Business, except where the failure to be in compliance would not have a material adverse effect.  Neither Seller nor any of its Subsidiaries has received any written notice of or been charged with the violation of any Laws applicable to their respective operations or

assets or the Business, except where such violation would not have a material adverse effect.

        (b)     Seller and its Subsidiaries currently have all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not have a material adverse effect. Neither Seller nor any of its Subsidiaries is in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party required for the operation of the Business as presently conducted, except where such default or violation would not be material.

       5.6    <u>No Other Representations or Warranties; Schedules</u>. Except for the representations and warranties contained in this <u>Article V</u> (as modified by the Schedules hereto), neither Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, its Subsidiaries, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective officers, directors, employees, agents or representatives. Except for the representations and warranties contained in <u>Article V</u> hereof (as modified by the Schedules hereto), Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business. The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a material adverse effect.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

       6.1    <u>Organization and Good Standing</u>. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2     <u>Authorization of Agreement</u>.  Purchaser has full corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Purchaser Documents</u>"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary corporate action on behalf of Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     <u>Conflicts; Consents of Third Parties</u>.

(a)     None of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws of Purchaser, (ii)  any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound,  (iii) any Order of any Governmental Body applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (iv) any applicable Law.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, or for Purchaser to conduct the Business, except for compliance with the regulatory regimes referred to in <u>Section 5.3(b)</u> or as would not have a material adverse effect.

6.4     <u>Financial Capability</u>.  Purchaser (i) has, and at the Closing will have, sufficient internal funds) available to pay the Cash Amount and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, (ii) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to

perform its obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

      6.5   <u>Condition of the Business</u>.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in <u>Article V</u> hereof (as modified by the Schedules hereto as supplemented or amended), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis.  Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Seller set forth in <u>Article V</u> hereof (as modified by the Schedules hereto as supplemented or amended).  Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller or any of its Subsidiaries, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of Seller, any of its Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Business and the transactions contemplated hereby.  Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied on the results of its own independent investigation.

ARTICLE VII

BANKRUPTCY COURT MATTERS

      7.1   [Reserved]

      7.2   <u>Bankruptcy Court Filings</u>.  As promptly as practicable following the execution of this Agreement, Seller shall file with the Bankruptcy Court the Sale Motion seeking entry of the Sale Order and the Breakup Fee and Competing Bid Order.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Breakup Fee and Competing Bid Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Purchaser shall

not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Assets hereunder. In the event the entry of the Sale Order or the Breakup Fee and Competing Bid Order shall be appealed, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal.

## ARTICLE VIII

## COVENANTS

8.1 <u>Access to Information</u>. Seller agrees that, until the earlier of the Closing and termination of this Agreement, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. Seller shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Seller and its Subsidiaries to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Seller and its representatives and shall use their reasonable efforts to minimize any disruption to the Business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller or any of its Subsidiaries to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Seller or any of its Subsidiaries is bound.

8.2 <u>Conduct of the Business Pending the Closing</u>. In order to attempt to preserve the going concern value of the Business, Purchaser shall have the right to be on-site and shall coordinate and consult with representatives of Seller regarding the business, operations and management of the Business. In addition, until the earlier of the Closing and termination of this Agreement, except (1) as required by applicable Law, (2) as otherwise expressly contemplated by this Agreement, or (3) with the prior written consent of Purchaser:

(a) Seller shall, and shall use its best efforts to cause its Subsidiaries whose equity or assets constitute Purchased Assets to:

(i) conduct the Business only in the Ordinary Course of Business (recognizing its current distressed state); and

(ii) use its commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B)

preserve the present relationships with customers and suppliers of the Business and Seller's Subsidiaries (recognizing that Seller reserves the right to cause any of its Subsidiaries, other than a Subsidiary the equity or assets of which constitutes a Purchased Asset, to commence a proceeding under the Bankruptcy Code or other applicable state or foreign law); and

(b)     Seller shall not, and shall not permit its Subsidiaries whose equity or assets constitute Purchased Assets to, solely as it relates to the Business:

(i)     other than in the Ordinary Course of Business, (A) materially increase the annual level of compensation of any director or executive officer of Seller, (B) increase the annual level of compensation payable or to become payable by Seller or any of its Subsidiaries to any such director or executive officer, (C) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any such director or executive officer, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which Seller or any of its Subsidiaries is a party or involving any such director or executive officer, except, in each case, as required by applicable Law from time to time in effect or by any existing employee benefit plans;

(ii)     make or rescind any material election relating to Taxes, settle or compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or except as may be required by applicable Law or GAAP, make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recent tax returns;

(iii)     subject any of the Purchased Assets to any Lien, except for Permitted Exceptions;

(iv)     cancel or compromise any material debt or claim or waive or release any material right of Seller or any of its Subsidiaries that constitutes a Purchased Asset except in the Ordinary Course of Business;

(v)     [Reserved];

(vi)     enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(vii)     other than (A) in the Ordinary Course of Business or (B) secured borrowings from the Federal Reserve Bank under the Primary Dealer Facility, incur any indebtedness for borrowed money, issue any debt securities,

assume, guarantee, endorse or otherwise become responsible for the obligations of any other individual, corporation or other entity, or make any loan or advance or capital contribution to, or investment in, any person, in any case that would be related to the Business or constitute an Assumed Liability;

(viii)   set any record date or payment date for the payment of any dividends on its capital stock or make, declare or pay any dividend, or make any other distribution on, or directly or indirectly redeem, purchase or otherwise acquire, any shares of its capital stock or any securities or obligations convertible (whether currently convertible or convertible only after the passage of time or the occurrence of certain events) into or exchangeable for any shares of its capital stock;

(ix)   sell, transfer, pledge, lease, license, mortgage, encumber or otherwise dispose of any of Purchased Assets (including pursuant to securitizations) to any individual, corporation or other entity or cancel, release or assign any material amount of indebtedness related to the Business to any such person or any claims held by any such person, other than any such transactions as are in the Ordinary Course of Business;

(x)   transfer ownership, or grant any license or other rights, to any person or entity of or in respect of any Purchased Intellectual Property, other than grants of non-exclusive licenses pursuant to license agreements entered into in the Ordinary Course of Business;

(xi)   in connection with the Business, make any investment in, or any acquisition of, any business entity or division, by merger, consolidation, asset purchase or other business combination, or by contributions to capital; or make any property transfers or purchases of any property or assets, in or from any other individual, corporation, joint venture or other entity;

(xii)   in connection with the Business, conduct its operations or take actions related to trading or credit extension in any manner other than in the Ordinary Course of Business;

(xiii)   change in any material respect the policies, practices and procedures governing operations of the Business;

(xiv)   amend or otherwise modify, except in the Ordinary Course of Business, or knowingly violate in any material respect the terms of, any Purchased Contract, or (ii) except as may be required by applicable Law, create or renew any agreement or contract or other binding obligation related to the Business containing (A) any material restriction on the ability of Purchaser to conduct the Business as it is presently being conducted or (B) any material

restriction on the ability of Purchaser to engage in any type of activity or business after the Closing;

(xv)    abandon, cancel, let lapse, fail to renew, fail to continue to prosecute, protect, or defend, or dispose of, any Purchased Intellectual Property;

(xvi)    commence or settle any claim, action or proceeding related to the Business, other than settlements resulting solely in the payment of monetary damages in amounts not in excess of $500,000 in the aggregate; or

(xvii)    agree to do anything prohibited by this Section 8.2.

8.3    Consents.  Seller shall use (and shall cause each of its Subsidiaries to use) its commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in Section 5.3(b) hereof; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.

8.4    Regulatory Approvals.

(a)    If necessary, Purchaser and Seller shall (a) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or subsidiaries, as applicable, or Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within 1 Business Day after the date of this Agreement, (b) comply at the earliest practicable date with any request under such Laws for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries or subsidiaries, as applicable, from any other Governmental Body in respect of such filings or such transactions, and (c) cooperate with each other in connection with any such filing and in connection with resolving any investigation or other inquiry of any Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction. Each such party shall use best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable law in connection with the transactions contemplated by this Agreement.  Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction.  No party hereto shall independently participate in any formal meeting with any Governmental Body (other than Purchaser solely with respect to a Governmental Body in the United Kingdom) in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.  Subject to applicable law, the parties hereto will consult and cooperate with

one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws.  Seller and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only."  Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Purchaser, as the case may be).

(b)     Each of Purchaser and Seller shall use its best efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws").  In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement is in violation of any Antitrust Law, each of Purchaser and Seller shall cooperate and use its best efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Seller decide that litigation is not in their respective best interests.

8.5     Further Assurances.

(a)     Each of Seller and Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

(b)     In the event that, for any reason including a determination by a court of competent jurisdiction that any sale, transfer, assignment, conveyance or delivery contemplated by this Agreement is ineffective or invalid to vest or confirm such title, any conveyance, assignment, assumption, allocation or other action is necessary or appropriate to vest in or confirm to Purchaser full title to any of the Purchased Assets vested in Purchaser pursuant to <u>Section 2.1</u>, or to cause Purchaser to assume any Liabilities allocated to Purchaser pursuant to <u>Section 2.3</u>, then Seller shall, and shall cause its Subsidiaries to, execute and deliver all such instruments and take all such actions necessary in order to convey, assign or allocate such Purchased Assets or Liabilities to Purchaser.

8.6     <u>Confidentiality</u>.

(a)     Purchaser acknowledges that the Confidential Information provided to it in connection with this Agreement, including under <u>Section 8.1</u>,  and the consummation of the transactions contemplated hereby, is subject to the terms of the confidentiality agreement between Purchaser and Seller dated September 11, 2008 (the "<u>Confidentiality Agreement</u>"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets; <u>provided</u>, <u>however</u>, that Purchaser acknowledges that any and all other Confidential Information provided to it by Seller or its representatives concerning Seller and its Subsidiaries shall, other than Purchased Assets, remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.  For purposes of this <u>Section 8.6</u>, "<u>Confidential Information</u>" shall mean any confidential information with respect to, including, methods of operation, customers, customer lists, products, prices, fees, costs, Technology, inventions, Trade Secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.

(b)     From and after the Closing, Seller shall, and shall cause its Subsidiaries to, use the same efforts to maintain the confidentiality of any proprietary or confidential information regarding the Purchased Intellectual Property as Seller and/or its Subsidiaries used to maintain the confidentiality of such information prior to the Closing.

8.7     <u>Preservation of Records</u>.  Seller and Purchaser agree that each of them shall preserve and keep the records held by it or their Affiliates relating to the Business for a period of seven (7) years from the Closing Date (or such longer period as may be required by applicable Law) and shall make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Seller or Purchaser wishes to destroy such records before or after that time (and such

proposed destruction is not in violation of applicable Law), such party shall first give ninety (90) days prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice.

8.8     Publicity.  Neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Seller lists securities, provided that the party intending to make such release shall use its best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

8.9     Trademark License.

(a)     From and after the closing Purchaser hereby grants Seller a perpetual, worldwide, nonexclusive, full paid, royalty-free license under the trademarks "LEHMAN" and "LEHMAN BROTHERS," including any logos containing such names (collectively, the "Licensed Marks") for any of its existing uses or in connection with the IMD Business and the unwinding of any of its other operations including use in corporate or other entity names. The foregoing license as it relates to the IMD Business shall be assignable by Seller without the need for further consent to a purchaser of all or substantially all of the equity interests in or assets of the IMD Business. Seller shall have the right to sublicense the foregoing license to any of its Subsidiaries and an assignee in connection with a sale of all or substantially all of the IMD Business shall have a right to sublicense such right to any of its Affiliates in connection with the conduct of that business, provided that any such sublicense shall terminate on the date when Seller's or its assignee's license terminates. In the remainder of this provision, the licensee or sublicense (Seller or Seller's assignee or their sublicensees) shall be referred to as "Licensee." Each Licensee acknowledges Purchaser's ownership of the Licensed Marks and the validity of the Licensed Marks and shall not register any confusingly similar mark in any jurisdiction. All goodwill arising from use of the Licensed Marks shall inure to Purchaser's benefit. Each Licensee shall use each Licensed Mark in connection with any markings or other notices as required by law. Purchaser shall have the right to supervise and control  the use of the Licensed Marks by each Licensee, including by reviewing specimens of use of the Licensed Marks, with respect to the nature and quality of the products and services designed, performed, distributed, sold or otherwise commercialized by such Licensee and the materials used to promote such products and services for the purpose of protecting and maintaining the validity of the Licensed Marks and the goodwill associated with the Licensed Marks.  Each Licensee shall at all times use the Licensed Marks only in connection with goods and services of quality at least as

29

high as that offered by Seller and its Affiliates under such marks immediately prior to the Closing. Any use of the Licensed Marks in connection with the IMD Business shall include a disclaimer in a form reasonably acceptable to Purchaser indicating that the IMD Business is not affiliated with Seller. Seller or its assignee shall be responsible for each Licensee's compliance with the terms of this Section 8.9 and shall be liable to Purchaser for any non-compliance by any such Licensee with any such terms.

(b)     Purchaser hereby grants to Seller a perpetual, irrevocable, worldwide, nonexclusive, fully-paid, royalty-free license under all non-Mark Purchased Intellectual Property used in or covering any business of the Seller andor its Affiliates other than the Business in the fields of investment management, investment research, portfolio management and other fields of the IMD Business as well as the unwinding of any of Seller's other operations, solely for use in connection with such business outside of the Business. The foregoing license as it relates to the IMD Business shall be assignable without the requirement of further consent by Seller in connection with a sale of all or substantially all of the assets of the IMD Business and may be sublicensed to any entity conducting the IMD Business and any successor of the IMD Business and any contractor providing services to such business or successor. The foregoing license shall be under Purchased Intellectual Property acquired by Purchaser hereunder that was previously owned by Seller or its Affiliates as well as Purchased Intellectual Property owned by third parties as to which Purchaser shall have after Closing has the right to grant a sublicense without requirement of additional consent or payment of additional consideration.

8.10    Use of Purchased Intellectual Property.  Except as permitted under subsection 8.9 above, after the Closing Date, neither the Seller nor any of its Subsidiaries will, directly or indirectly, in any jurisdiction: (i) exploit or make use of, or authorize any third party to exploit or make use of, any of the Purchased Intellectual Property, or any Marks confusingly similar to the Purchased Marks; (ii) attempt to register the Purchased Marks or any mark confusingly similar thereto; or (iii) challenge or otherwise contest the Purchaser's efforts to register, or enforce its trademark registrations for and trademark rights in, the Purchased Marks or its rights in other Purchased Intellectual Property.

8.11    Deferred Transfers.

(a)     If and to the extent that the allocation to and vesting in Purchaser of any Purchased Assets pursuant to <u>Section 2.1</u> or otherwise would be a violation of applicable Law or require any Consent or the approval of any Governmental Body or the fulfillment of any condition that cannot be fulfilled by the Purchaser prior to the Closing then, unless the Parties shall otherwise agree, the allocation to and vesting in Purchaser of such Purchased Asset shall, without any further action by any Party, be automatically deferred and any allocation or vesting of such Purchased Asset pursuant to <u>Section 2.1</u> or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such Consents or approvals of Governmental Bodies are obtained, and such conditions are fulfilled.  Any such Purchased Asset shall be deemed a "<u>Deferred Transfer Purchased Asset</u>."

(b)     If and to the extent that the allocation to Purchaser of, and Purchaser's becoming responsible for, any Assumed Liabilities pursuant to <u>Section 2.3</u> or otherwise would be a violation of applicable Law or require any Consent or approval of any Governmental Body or the fulfillment of any condition that cannot be fulfilled by Seller prior to the Closing, then, unless the Parties shall otherwise agree, the allocation to Purchaser of, and Purchaser's becoming responsible for, such Assumed Liability shall, without any further action by any Party, be automatically deferred and any allocation or responsibility for such Assumed Liability pursuant to <u>Section 2.3</u> or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such Consents or approvals of Governmental Bodies are obtained, and such conditions are fulfilled.  Any such Assumed Liability shall be deemed a "<u>Deferred Transfer Assumed Liability</u>."

(c)     With respect to any Deferred Transfer Purchased Asset or any Deferred Transfer Assumed Liability, insofar as it is reasonably possible, (i) Seller shall, and shall cause any applicable Subsidiary to, following the Closing, hold such Deferred Transfer Purchased Asset for the use and benefit of Purchaser and its Subsidiaries (at the expense of Purchaser) and (ii) Purchaser shall, or shall cause its applicable Subsidiary to, pay or reimburse Seller for all amounts paid or incurred in connection with the retention of such Deferred Transfer Assumed Liability.  In addition, Seller shall, and shall cause any applicable Subsidiary to, insofar as reasonably possible and to the extent permitted by applicable Law, hold and treat such Deferred Transfer Purchased Asset in the Ordinary Course of Business in accordance with past practice and take such other actions as may be reasonably requested by Purchaser in order to place Purchaser, insofar as permissible under applicable Law and reasonably possible, in the same position as if such Deferred Transfer Purchased Asset had been transferred to and vested in Purchaser or an applicable Subsidiary at the Closing and so that, to the extent possible, all the benefits and burdens relating to such Deferred Transfer Purchased Asset, including possession, use, risk of loss, potential for gain, and dominion, control and command over such Deferred Transfer Purchased Asset, are to inure from and after the Closing to Purchaser or its applicable Subsidiary entitled to the receipt of such Deferred Transfer Purchased Asset.

(d)     If and when the Consents, approvals of Governmental Bodies and/or conditions, the absence or non-satisfaction of which caused the deferral or transfer of any Deferred Transfer Purchased Asset or Deferred Transfer Assumed Liability pursuant to Section 8.12(a), are obtained or satisfied, the transfer, allocation or novation of the applicable Deferred Transfer Purchased Asset or Deferred Transfer Assumed Liability shall be effected in accordance with and subject to the terms of this Agreement.

(e)     Seller shall not be obligated, in connection with the foregoing, to expend any money unless the necessary funds are advanced, assumed or agreed in advance to be reimbursed by Purchaser, other than reasonable attorney's fees and recording or similar fees, all of which shall be promptly reimbursed by Purchaser.

(f)     For a period of nine months after the Closing Date, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, to the extent Excluded Employees occupied real property subject to a Transferred Real Property Lease prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such real property to the same extent and for the same purposes as such real property was occupied and used by such Excluded Employees prior to the Closing, without charge or consideration.

(g)     For a period of nine months after the Closing Date, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, after the Closing, to the extent Transferred Employees occupied real property is not subject to a Transferred Real Property Lease prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use such real property to the same extent and for the same purposes as such real property was occupied and used by such Transferred Employees prior to the Closing, without charge or consideration.

8.12    Release of Guarantees.  Purchaser shall deliver to the respective beneficiaries of any and all guarantees relating to or arising under any Purchased Contracts, Transferred Real Property Leases or Assumed Liabilities ("Seller Guarantees") such replacement guarantees from Purchaser and its Affiliates, letters of credit, collateral, or other credit support, as shall be required pursuant and in accordance with any Purchased Contract, Transferred Real Property Leases or Assumed Liability.  In the event that the respective beneficiaries under any of the Seller Guarantees do not agree to release (the "Guarantee Release") Seller and its Subsidiaries from any and all liability arising thereunder after theClosing, prior to the Closing, then Purchaser shall cause to be delivered to Seller, as beneficiary, at the Closing an indemnification agreement and guarantee, dated and effective as of the Closing Date and in form and substance reasonably satisfactory to Seller and from a creditworthy obligor as shall be satisfactory to Seller (collectively, "Backstop Documents"), pursuant to which Seller and its Affiliates shall, from and after the Closing, be indemnified, reimbursed and held harmless from any and all liabilities, losses, claims, costs and expenses under or arising out of the

relevant Seller Guarantee. From and after the Closing, Purchaser shall not permit any Contract to which a Seller Guarantee relates to be renewed, extended, amended or modified unless the Purchaser obtains and delivers to Seller the related Guarantee Release duly executed by the beneficiaries of the related Seller Guarantee.

8.13  Transition Services. The Purchaser and Seller shall use commercially reasonable efforts to enter into a Transition Services Agreement in a form reasonably acceptable to Seller and Purchaser in order for each of Seller and Purchaser to continue to receive the services provided between LBI and LBHI on the Closing Date.

8.14  Subleases.

(a)  For the leased premises located in 555 California Street, San Francisco, CA, Seller shall sublet to Purchaser pursuant to a sublease agreement (the "Seller Sublease"), reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, a portion of the demised premises in such location subject to the terms of the applicable lease and obtaining the landlord's consent to the Sublease or Bankruptcy Court approval. Purchaser shall bear its portion of the occupancy cost for such location based on the relative square footage sublet. Seller and Purchaser shall enter into the Seller Sublease at Closing to memorialize the provisions of this Section.

(b)  For the leased premises located in 125 High Street, Boston, MA, 190 S. LaSalle Street, Chicago, IL and 10250 Constellation Boulevard, Los Angeles, CA Seller shall assume such leases in connection with Seller's bankruptcy proceedings and assign such leases to Purchaser. Purchaser shall then sublet to Seller or a designee of Seller, in either event with credit reasonably acceptable to Purchaser, pursuant to three separate subleases (each, a "Purchaser Sublease", collectively the "Purchaser Sublease"), reasonably acceptable to both Purchaser and Seller and subject in all cases to the terms of the underlying lease, a portion of the demised premises in such locations shall be subject to obtaining the landlord's consent to each Sublease or Bankruptcy Court approval. Seller shall bear its portion of the occupancy cost for each such location based on the relative square footage sublet. Seller and Purchaser shall enter into each Sublease at Closing to memorialize the provisions of this Section.

8.15  Landlord Notice. Seller shall give notice, on the date hereof , to Rock-Forty-Ninth LLC in accordance with the terms of the 745 Seventh Ground Lease, regarding the transactions contemplated hereunder and shall provide Rock-Forty-Ninth LLC with the appropriate bankruptcy filings in order to provide adequate notice thereof under applicable Law.

8.16  Artwork. Purchaser shall have the right to possess, for a period of one-year after the closing, all of the artwork at the Seller's headquarters located at 745 Seventh Avenue, New York, New York. At any time during such period, Purchaser shall have the option to purchase any or all of the artwork for a price equal to its appraised value (as

determined by an independent, recognized appraiser). To the extent Purchaser does not exercise such option on any or all of the artwork by the first anniversary of the Closing, the Purchaser shall return such artwork to the Seller.

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

9.1     Employee Benefits.

(a)     Effective as of the Closing Date, Purchaser shall, or shall cause one of Purchaser's Subsidiaries to, continue to employ (where employment continues or is transferred to Purchaser or a Subsidiary of Purchaser automatically by operation of Law), or offer employment to (where employment does not continue or transfer automatically by operation of Law), each Offeree.  For purposes of this Agreement, the term "Offeree" means each active employee employed primarily in connection with the Business at the Closing, other than such employees who are identified by Purchaser to Seller prior to Closing, such identified persons shall not include any person who is in the targeted population referred to in Section 10.1(b).  Each Offeree who accepts Purchaser's or one of its subsidiaries' offer of employment, together with each person whose employment transfers to Purchaser or a subsidiary of Purchaser automatically by operation of law, shall be referred to herein as a "Transferred Employee."  Each Person who is not a Transferred Employee shall be referred to herein as an "Excluded Employee".  An Offeree who performs work at his then applicable place of employment on the first Business Day immediately following the Closing shall be deemed for all purposes of this Agreement to have accepted Purchaser's or one of its subsidiaries' offer of employment and shall be deemed to be a Transferred Employee for all purposes of this Agreement.

(b)     Without limiting any additional rights that each Transferred Employee may have, Purchaser shall, or shall cause its Subsidiaries, for a period commencing at the Closing and ending on December 31, 2008, to provide to each Transferred Employee whose employment is terminated during such period by the Purchaser by reason of a "reduction in force" or a "job elimination" (as those terms are customarily applied in good faith, consistent with past practice) severance payments and benefits at levels that are no less favorable than such levels as the Transferred Employee would have been entitled to receive pursuant to the provisions of the Seller's severance plans or agreements covering such Transferred Employee as in effect immediately prior to the Closing.  Nothing contained in this Section 9.1 or elsewhere in the Agreement shall be construed to prevent, from and after the Closing, the termination of employment of any individual Transferred Employee or any change in the employee benefits available to any Transferred Employee.

i

(c)     On or after the Closing, Purchaser shall, or shall cause its Subsidiaries to, pay each Transferred Employee an annual bonus ("08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the "Accrued 08 FY Liability").  Such 08 Annual Bonuses shall be awarded on or before March 15, 2009 in such forms and proportions as are consistent with Purchaser's customary practices, so that the aggregate amount awarded shall equal the Accrued 08 FY Liability.  Any amounts that would have been allocated in respect of any Transferred Employee who voluntarily terminates employment before such award is made shall instead be allocated among the remaining Transferred Employees (who include, for this purpose, those Transferred Employees who are terminated without cause by Purchaser or its affiliates prior to the time the awards are made) (collectively, the "Remaining Transferred Employees").  However, the Accrued 08 FY Liability shall be reduced if, prior to the time such awards are made, both (x) 10% of the Transferred Employees have voluntarily terminated their employment with the Purchaser and (y) such terminated Transferred Employees would have been expected to receive at least 10% of the 08 Annual Bonuses had no such Transferred Employee's employment in fact terminated.  In that case, Purchaser may adjust the Accrued 08 FY Liability proportionately from its initial level, in the same proportion as the reduction in Transferred Employees below 90% of the initial number of Transferred Employees compared to 90% of the initial number of Transferred Employees, in a good faith and reasonably equitable manner to account for the Transferred Employees to whom 08 Annual Bonuses will not be payable, and thereby to reduce the aggregate 08 Annual Bonuses.  Any such reduction shall take into account the length of service, seniority within the Business and contribution of the Remaining Transferred Employees, relative to the allocation of the Accrued 08 FY Liability, in accordance with the principles enumerated herein.

ARTICLE X

CONDITIONS TO CLOSING

10.1     Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect;

(b)     at least 70% of the U.S. and Canadian Persons identified by Seller and reasonably accepted by Purchaser, acting in good faith, not later than two Business Days after the date hereof as the targeted population are actively employed in the Business immediately prior to the Closing and as to whom management of Seller has made a good faith assessment that they will continue in employment with the Business as of the Closing Date;

(c)     the Bankruptcy Court shall have entered a final order permitting Seller to sell the premises at 745 Seventh Avenue, New York, New York to Purchaser;

(d)     the mortgage in favor of the Seller's Affiliate with respect to the premises at 745 Seventh Avenue, New York, New York shall have been fully repaid and extinguished;

(e)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(f)     Purchaser shall have obtained confirmation from the SEC and CFTC that Purchaser will be eligible, following the Closing, to compute its net capital under Appendix E to SEC Rule 15c3-1 and adjusted net capital in accordance with the provisions of CFTC Rule 1.17(c)(6);

(g)     Purchaser shall have obtained from the SEC confirmation reasonably satisfactory to Purchaser regarding (i) the transition period during which Purchaser will be permitted to come into compliance with the consolidated holding company supervisory framework applicable to ultimate holding companies that have a principal regulator under SEC Rule 15c3-1e and g, and (ii) the scope of the deference to be extended by the SEC to the Federal Reserve and/or the home country consolidated supervisor of Purchaser's ultimate parent company in connection with the SEC's administration of the framework described in clause (i) of this subsection 10.1(g); and

(h)     the Sellers headquarters building at 745 Seventh Avenue, New York, New York shall be substantially habitable.

10.2    Conditions Precedent to Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(b)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in <u>Section 4.3</u>.

10.3     <u>Conditions Precedent to Obligations of Purchaser and Seller</u>.  The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)     the Bankruptcy Court shall have entered the Breakup Fee and Competing Bid Order, in form and substance reasonably acceptable to Seller and Purchaser;

(c)     the Bankruptcy Court shall have entered the Sale Order and any stay period applicable to the Sale Order shall have expired or shall have been waived by the Bankruptcy Court;

(d)     LBI shall have commenced a case under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court; and

(e)     Purchaser shall have obtained regulatory approval under the HSR Act and all other material regulatory, self-regulatory, exchange, clearing organization and governmental approvals, authorizations, waivers and/or licenses required to conduct the transferred Business following the Closing substantially in the manner as it was conducted immediately prior to the Closing and, after giving effect to the Closing (subject to such exceptions as shall not, in the aggregate, be material).

10.4     <u>Frustration of Closing Conditions</u>.  Neither Seller nor Purchaser may rely on the failure of any condition set forth in <u>Section 10.1</u>, <u>10.2</u> or <u>10.3</u>, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

ARTICLE XI

[RESERVED]

ARTICLE XII

TAXES

12.1     <u>Transfer Taxes</u>.  Purchaser shall be responsible for (and shall indemnify and hold harmless Seller and its directors, officers, employees, Affiliates, agents,

successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("Transfer Taxes"). Seller shall, however, seek to include in the Sales Order a provision that provides that the transfer of the Purchased Assets shall be free and clear of any stamp or similar taxes under Bankruptcy Code Section 1146(c). Seller and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

12.2    Prorations. Seller and Purchaser shall enter into customary prorations for the Purchased Assets as of the Closing.

12.3    Purchase Price Allocation. Seller and Purchaser shall allocate the purchase price (including the Assumed Liabilities) among the Purchased Assets as specified in Schedule 12.3 and, in accordance with such allocation, Purchaser shall prepare and deliver to Seller copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement"). Purchaser shall prepare and deliver to Seller from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any) consistent with the agreed upon allocation. The purchase price for the Purchased Assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Purchaser to Seller, and all income Tax Returns and reports filed by Purchaser and Seller shall be prepared consistently with such allocation.

12.4    Adjustment to Purchase Price. The parties agree that any payment made under this Article XII shall be treated by such parties as an adjustment to the Purchase Price.

## ARTICLE XIII

## MISCELLANEOUS

13.1    Expenses. Except as otherwise provided in this Agreement, each of Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

13.2    Injunctive Relief. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in

this Agreement. The rights set forth in this Section 13.2 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

13.3    Submission to Jurisdiction; Consent to Service of Process.

(a)    Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 13.7 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.7.

13.4    Waiver of Right to Trial by Jury. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.5    Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto), the transition services agreements, the Dip Facility, the Interim Support and Cooperation Agreement, Master Repurchase Agreement and the Confidentiality Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this

Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

13.6    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

13.7    <u>Notices</u>. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, NY 10019
Facsimile: (646) 758-4226
Attention: Steven Berkenfeld, Esq.

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Facsimile: (212) 310-8007
Attention:      Thomas Roberts
                Michael Lubowitz

and a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Facsimile:  (212) 455-2502
Attention:      John Finley
                Andrew Keller

If to Purchaser, to:

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Facsimile: (212) 412-7519
Attention:      Jonathan Hughes, Esq.

With a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Facsimile: (212) 225-3999
Attention:      Victor I. Lewkow
                David Leinwand
                Duane McLaughlin

and

Sullivan & Cromwell LLP
125 Broad St.
New York, NY 10004
Facsimile: (212) 558-3580
Attention:      Mitchell S. Eitel
                Jay Clayton

13.8    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.9    Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void, provided that Purchaser shall be entitled to assign its rights and obligations in whole or in part to its Affiliates or to designate its rights to acquire any assets hereunder to its Affiliates.  No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

13.10    Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, partner or equityholder of Seller shall have any liability for any obligations or liabilities of Seller under this Agreement or the Seller Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

13.11    Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

13.12    Scope of Purchased Assets.  This Agreement is not intended to convey and does not convey assets and liabilities from the non-U.S. and non-Canadian operations of Seller.

[*signature page follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: Steven Berkenfeld
Title: Vice President

LEHMAN BROTHERS INC.

By: _____
Name: Steven Berkenfeld
Title: Managing Director

LB 745 LLC

By: _____
Name:
Title:

BARCLAYS CAPITAL INC.

By: _____
Name: Gerard LaRocca
Title: Chief Executive Officer

# BCI Ex. 5

# BARCLAYS CAPITAL INC.

As of September 20, 2008

BCI Exhibit No.

5

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Original Agreement") as amended by the First Amendment thereto dated as of September 19, 2008 (the "First Amendment" and, the Original Agreement as so amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Original Agreement. This letter agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects, and is binding on the parties hereto upon its execution and delivery. All references herein to the Original Agreement are to the conformed copy attached hereto of the hand marked Original Agreement.

    1.    Purchased Assets; Excluded Assets.

    (a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter. Purchased Assets shall include:

    (i)    the items set forth in clauses (b), (c) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets" in the Original Agreement;

    (ii)    with respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in the Original Agreement, instead of the items referred to in such clauses, (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A previously delivered by Seller and accepted by Purchaser, (B) such securities and other assets held in LBI's "clearance boxes" as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser (provided, however, that Purchaser in its discretion may

1

elect within 60 days after the Closing to return any such securities to LBI); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and (C) exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short-term agreements;

        (iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; and

        (iv)    all prime brokerage business and accounts and repurchase agreement operations and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business); and

        (v)    any rights or interests Seller may have with respect to any escrow or other account established in connection with the Global Research Analyst Settlement entered by the U.S. District Court on October 31, 2003 (the "Research Settlement"), or funds otherwise set aside for the procurement of independent research pursuant to the Research Settlement, but only to the extent that Purchaser is required to make payments in accordance with the Research Settlement as a result of its acquisition of LBI's investment banking and research operations.

        (b)    For the avoidance of doubt, the "Business" includes LBI's commodities business, government securities trading operations and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller except as otherwise specified herein or in the Agreement).

        (c)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a), (c) through (j), and (l) through (q) of the definition of "Excluded Assets" in the Original Agreement and the other assets identified in this Letter as Excluded Assets  Except as otherwise specified in the definition of "Purchased Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall not include any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business.  The following shall also be Excluded Assets:  All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, over-the-counter derivatives, TBA mortgage notes and similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement, and until any securities pledged as collateral under Seller clearing arrangements with JP Morgan Chase & Co. or its Affiliates (other than those referred to in Section 1(a)(ii) of the Letter).  Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities.  Included in clause (h) of the definition of "Excluded Assets" in the Original Agreement are life insurance policies owned by Seller and its Subsidiaries.  For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets).  The

2

reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Clause (h) of the definition of Excluded Assets in the Original Agreement is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

(d)     Sections 3 and 4 of the First Amendment are hereby deleted in their entirety and shall be of no effect *ab initio*. LBI hereby instructs Purchaser to pay at the Closing $250 million of the Cash Amount to the Depository Trust Clearance Corporation ("DTC") for deposit as collateral against LBI's obligations to DTC (including its affiliated clearing organizations). Such collateral account shall be maintained in accordance with the agreement among LBI, Purchaser and DTC entered into in connection with the Closing.

(e)     Seller hereby represents and warrants to Purchaser that LB I Group Inc. has and had as of the date on which LB I Group Inc. transferred to LBI the equity of Townsend Analytics, Ltd., LB I Group Inc. no indebtedness.

2.      IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business. The private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") is a Purchased Asset and the Purchased Assets shall include the assets of the Seller used exclusively in the PIM Business. The forgivable notes issued by PIM employees to Seller or its Affiliates shall be an Excluded Asset. Excluded Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.      Assumed and Excluded Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser and arising after the Closing in connection with the Business. Clause (d) of the definition of "Assumed Liabilities" in the Original Agreement is understood as though it read as follows: "accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business (other than accounts payable arising out of or in connection with any Excluded Contract), including, for the avoidance of doubt, to the extent arising after such date (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable)." Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities." For the avoidance of doubt, any Liabilities of Seller or its Subsidiaries under the $15.8 billion tri-party repurchase facility dated on or about September 18, 2008 funded by JP Morgan Chase shall be "Excluded Liabilities."

4.      Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission

and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain holdback amounts relating to the real estate being transferred pursuant to the Agreement as provided by Section 12.2 of the Agreement).

     5.   <u>License</u>. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

     6.   <u>Subordinated Notes of LBI</u>. The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

     7.   <u>Breakup Fee</u>. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

     8.   <u>Transfer of Customer Accounts</u>. All customer accounts of LBI (other than customer who are Affiliates of LBI) shall be transferred to Purchaser. In connection therewith, Purchaser shall receive (i) for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business and (ii) to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value. Liabilities arising under Seller's arrangements with DTC and its affiliated clearing organizations shall be Excluded Liabilities.

     9.   <u>Deletion of Purchase Price Adjustment Provisions</u>. Section 3.3 of the Original Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.

     10.   <u>Payables, Deposits and Receivables</u>. No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract and except as provided in Section 8. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

     11.   <u>Intercompany Obligations</u>. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations

4

between or among any Seller and any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    Barclays Repurchase Agreement. Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008 repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "Barclays Repurchase Agreement") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Purchaser shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void *ab initio* in all respects.

14.    Risk of Loss of Artwork. During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

15.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

5

(b)     With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces.  Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below.  In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the

6

party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)     If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.     Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.     745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of LW-LLP Inc. will be fully repaid and extinguished.

19.     Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.     Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Definition of Excluded Contract.  As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases.

(a)  Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases").  At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

(b)  Notwithstanding the foregoing or anything to the contrary contained in Section 22(a) or any other provision of the Agreement, with respect to the PIM Lease for the premises located at 399 Park Avenue, New York, New York (the "New York Property"), the underlying lease shall not be subject to assignment to Purchaser and the Purchaser shall only have the option to require that Seller sublease to Purchaser or its Affiliates the sixth floor of the New York Property (or a portion of the sixth floor) (the "NY Sublease Premises"), and Seller agrees to sublease the NY Sublease Premises, subject to the parties' compliance with the terms of the underlying lease including, without limitation, any notice or consent requirements set forth therein.  If Purchaser elects to sublease the NY Sublease Premises as provided herein, all of the terms and conditions set forth in this letter agreement applicable to the SF Property shall also apply to the sublease of the NY Sublease Premises.

23.    No Overseas Assets.  Although LBI has been part of a global business and Purchaser remains interested in potentially acquiring other portions thereof and obtaining the services of the employees thereof, all assets and rights of the Lehman companies that would otherwise be Purchased Assets (other than Seller, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) that cannot be sold pursuant to Section 2.1 of the Original Agreement as a result of being subject to governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time or until such assets and rights can be so sold.  Except with respect to Purchased Intellectual Property, no assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall each use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit

Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

The representations and warranties of the parties contained in this Letter and in the Agreement shall not survive the Closing. This Letter shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This Letter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

Sincerely,

BARCLAYS CAPITAL INC.

By: _Gerard A Brun_
Name: Gerard S LaRocca
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: Steven Berkenfeld
Title: Vice President

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LB 745 LLC

By: _____
Name:
Title:

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.

By: _____
Name:  Anson B. Frelinghuysen
Title:  as Counsel for James W. Giddens,
        Trustee for the SIPA Liquidation
        of Lehman Brothers Inc.

LB 745 LLC


By: _____
Name:
Title:

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC

By: _Wal Wan_____
Name: Mark Mariucci
Title: President


[SIGNATURE PAGE TO CLARIFICATION LETTER]

# Schedule 1(a) - Excluded Real Estate Assets

**New York**
1301 Avenue of the Americas - 7th Floor
1271 Avenue of the Americas
399 Park Avenue
605 Third Avenue
85 Tenth Avenue

**New Jersey**
Jersey City - 101 Hudson St.
Livingston - 2 Peachtree Hill Road (Co-location)
Florham Park - 230 Park Avenue
Hoboken - 111 River Street (Sublease)

**Branches**
Atlanta - 3414 Peachtree Road
Calgary - 150 Sixth Avenue, Suite 3370 - PetroCanada
Columbia - Little Patuxent Parkway (NB)
Dallas - 200 Crescent Court
Dallas - 325 N. St. Paul Street (former Crossroads)
Greenwich - 8 Sound Shore Drive
Houston - 600 Travis Street
Los Angeles - 10880 Wilshire Blvd.
Menlo Park - 3000 Sand Hill Road
Miami - 1111 Brickell Avenue - Barclay's Financial Center
Newport Beach - 680 Newport Center Dr, Suite150
Palm Beach - 450 Royal Palm Way (License agreement for 1,704 on 6th floor)
Philadelphia - 1735 Market Street - Mellon Bank Center
San Francisco - 555 California Street
Tampa - 401 East Jackson Street, 24th flr (NB)
Wilmington - 1000 West Street - Brandywine Building (LBB)

**South America Branches**
Mexico City - Av. Paseo de la Reforma 265 Col. Cuauhtemoc

# Schedule 1(b) - Included Real Estate Assets

| City | St | Location | Landlord Legal Entity | Lease Legal Entity | Lease Expiration | Square Footage | | | Stores | | | Occupancy | | | CRE Assets | | | IT Assets | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total | Acquisition | LB | Total | Acquisition | LB | Total | Acquisition | LB | Total | Acquisition | LB | Total | Acquisition | LB |

## SCHEDULE 1(C)

### PIM LEASES

| | City | State | Address | Tenant | Landlord |
|---|---|---|---|---|---|
| 1. | | | | | Monarch Centre Associates, |
| 2. | Atlanta | GA | 3414 Peachtree Road, NE | Lehman Brothers Inc. | LLC |
| 3. | Dallas | TX | 200 Crescent Court | Lehman Brothers Inc. | Crescent TC Investors LP |
| 4. | Greenwich | CT | 8 Sound Shore Drive | Lehman Brothers Holdings Inc. | 8 Sound Shore Associates, LLC |
| 5. | Miami | FL | 1111 Brickell Avenue | Lehman Brothers Inc. | 1111 Brickell Office, LLC |
| 6. | Newport Beach | CA | 680 Newport Center Drive | Lehman Brothers Holdings Inc. | The Irving Company |
| 7. | Palm Beach | FL | 450 Royal Palm Way | Lehman Brothers Inc. | Palm Beach Centre 1, LLC |
| 8. | Philadelphia | PA | 1735 Market Street | Lehman Brothers Inc. | Nine Penn Center Associates, LP |
| | New York | NY | 399 Park Avenue | Lehman Brothers Inc. | Boston Properties LP |

## SETTLEMENT AGREEMENT

AGREEMENT dated as of December 5, 2008 among JPMORGAN CHASE BANK, N.A. ("JPMorgan"), BARCLAYS CAPITAL INC. ("BarCap"), and JAMES W. GIDDENS, AS TRUSTEE ("Trustee") IN THE SECURITIES INVESTOR PROTECTION ACT ("SIPA") LIQUIDATION OF LEHMAN BROTHERS INC. ("LBI") (JPMorgan, BarCap and Trustee each a "Party" and collectively the "Parties").

### Background

A.    BarCap was asked by the Federal Reserve Bank of New York (the "Fed") and agreed to purchase a group of securities that had, as of the evening of September 17, 2008, been pledged by LBI to the Fed (the "Fed Portfolio") by entering into a reverse repurchase transaction with LBI in which BarCap would fund $45 billion to LBI for the Fed Portfolio (such reverse repurchase transaction, the "Replacement Transaction").

B.    On September 18, 2008, much of the Fed Portfolio was transferred to BarCap by LBI through JPMorgan, as clearing bank, against payment of $45 billion by BarCap to LBI, but the Fedwire and Depository Trust Company ("DTC") services closed for the day before the Replacement Transaction could be completed.

C.    The securities required to complete the Replacement Transaction were not delivered to BarCap before the commencement of LBI's SIPA liquidation (the "SIPA Proceeding") on September 19, 2008. JPMorgan asserts that a portion of the undelivered Fed Portfolio securities is currently in certain LBI accounts against which JPMorgan asserts it has liens (such Fed Portfolio securities as listed on Annex A hereto, the "Settlement Consideration Fed Portfolio Securities"), while the remaining portion of the undelivered Fed Portfolio securities were liquidated by JPMorgan and, thus, are no longer available for delivery.

D.    JPMorgan and BarCap agree that $7 billion was transferred by LBI to an account at JPMorgan early on the morning of September 19, 2008 as a result of the fact that not all of the Fed Portfolio securities were delivered to BarCap under the Replacement Transaction (the "Subject Funds"). Thereafter, the Subject Funds were moved by JPMorgan into what JPMorgan asserts is an LBI account. This resulted in BarCap no longer having the benefit of either the Subject Funds or the securities required to complete the Replacement Transaction. BarCap asserts that the Subject Funds were moved from the account at JPMorgan without its prior knowledge or consent, that BarCap is the owner of the Subject Funds and that BarCap is entitled to $7 billion in cash or securities of equivalent value. JPMorgan asserts that it properly moved the Subject Funds and properly applied the Subject Funds in reduction of advances JPMorgan asserts it made to LBI under a clearance agreement (including without limitation any advance made by JPMorgan to LBI to fund the payment of the Subject Funds) (all such actual outstanding advances, the "Advances").

E.    When BarCap and LBI agreed to engage in the Replacement Transaction, it was BarCap's and LBI's intention that the securities in the Fed Portfolio would be included in "Purchased Assets" as defined in the Asset Purchase Agreement dated as of September 16, 2008,

BCI Exhibit No.

9

as amended (the "Asset Purchase Agreement"), which Asset Purchase Agreement was authorized and approved by an order of the court (the "Bankruptcy Court") presiding over LBI's SIPA liquidation case on September 20, 2008. Because LBI had failed to finish delivering to BarCap the securities that had been part of the Fed Portfolio, the inclusion of such undelivered securities as "Purchased Assets" under the Asset Purchase Agreement was not possible. Consequently, the securities listed on Schedule A to the Clarification Letter dated as of September 20, 2008 (the "Clarification Letter"), which was entered into in connection with the Asset Purchase Agreement and filed with the bankruptcy court presiding over the bankruptcy cases of Lehman Brothers Holdings Inc. and certain of its affiliates on September 22, 2008, include only the securities that actually had then been delivered by LBI to BarCap on September 18, 2008 (the "Delivered Securities") and do not include the portion of the Fed Portfolio securities that had not been delivered by that time.

F.    JPMorgan, BarCap and Trustee desire to provide for the resolution of their disputes on the terms and conditions set forth below.

**THEREFORE, IT IS AGREED:**

Terms and Conditions

1.    Transfers to BarCap. At the Effective Time (as defined below), JPMorgan shall transfer to BarCap, from securities and cash that were in the LBI clearance account with JPMorgan on the close of business on September 19, 2008 (but in any event excluding any securities and cash in customer or segregated accounts or accounts bearing the name of a customer on the close of business on September 19, 2008), and proceeds of such securities (collectively, the "Specified Property Pool"):

(a)    $1.25 billion in immediately available funds by wire transfer to BarCap in accordance with the following wire instructions (the "Cash Wire Instructions"):

ABA # 021000018
BK OF NYC
Account Number: GLA111569
Name: BZW
Ref: Barclays Capital, Attn John Rodefeld

(b)    $14,942,677.88 in immediately available funds by wire transfer to BarCap in accordance with the Cash Wire Instructions (representing principal and interest payments, and any other distributions, on the Delivered Securities attributable to the period on and after September 18, 2008 which were received in LBI and/or JPMorgan accounts and not heretofore paid to BarCap), plus interest accrued thereon from the time of receipt to the time of payment at the effective fed funds rate from time to time during such period, and

(c)    (x)(A) The Settlement Consideration Fed Portfolio Securities to BarCap in accordance with the Securities Wire Instructions at the end of this Section 3(c), together with (B) all principal and interest payments and any other distributions on the Settlement Consideration Fed Portfolio Securities (including, without limitation, the proceeds at

2

maturity of any securities) attributable to the period on and after September 18, 2008, and (y) $7,103,500 in immediately available funds by wire transfer to BarCap in accordance with the Cash Wire Instructions (representing the proceeds of certain Fed Portfolio securities that initially were understood to be among the Settlement Consideration Fed Portfolio Securities but in fact have been liquidated by JPMorgan), plus, in the case of each of (x)(B) and (y), interest accrued thereon from the time of receipt to the time of payment at the effective fed funds rate from time to time during such period (such funds, interest and securities described in clauses (a), (b) and (c) collectively, the "Settlement Consideration"). The Securities Wire Instructions are:

> Fed Eligible Securities Wire Instructions
> ABA # 021000018
> BK OF NYC/BARCLAYS
>
> DTC Eligible Securities Wire Instructions
> DTC 7256

As between JPMorgan and the Trustee only, the cash amounts paid to BarCap pursuant to this Section 1 shall, to the extent that JPMorgan has a valid and first priority perfected lien (not subject to avoidance) against the LBI cash included in the Specified Property Pool (which matter is not addressed by this Settlement Agreement), be deemed to have been paid only from such cash against which JPMorgan has such a valid and first priority lien (not subject to avoidance).

2.     Trustee Consent and Acknowledgement.    Trustee consents and agrees to the transfer of the Settlement Consideration in accordance with Section 1 above. As of the Effective Time, Trustee acknowledges and agrees that (a) the Subject Funds were applied to reduce (dollar-for-dollar) the Advances, (b) the Settlement Consideration was not and shall not be applied to reduce the Advances, and (c) Trustee shall not assert that the Subject Funds should not have been applied to reduce the Advances or that the Settlement Consideration should be applied to reduce the Advances. JPMorgan shall not, prior to, on or after the Effective Time, assert against the Trustee or LBI any right to any replacement collateral in respect of the Settlement Consideration.

3.     Rights in Property.    (a) Upon the receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, (i) JPMorgan and Trustee shall be deemed to have released, waived and discharged all of their right, title and interest in and to the Settlement Consideration, and (ii) subject to the remaining provisions of this Section 3, BarCap shall be deemed to have accepted the Settlement Consideration in full release, waiver and discharge of any right, title and interest it may have to the Subject Securities, together with the proceeds of the Subject Securities (including without limitation all principal and interest payments and any other distributions on the Subject Securities (including, without limitation, the proceeds at maturity of any Subject Securities)) received on and after September 19, 2008, in each case other than the Settlement Consideration. For purposes of this Section 3, "Subject Securities" shall mean the securities identified on a CUSIP number by CUSIP number basis in the listings provided to BarCap by JPMorgan on October 23, 2008 (the "Subject Securities List"), which securities JPMorgan represents to each of BarCap and the Trustee were all of the securities in what JPMorgan has described to BarCap as LBI's clearance account with

3

JPMorgan (the "Clearance Account") at the close of business on September 19, 2008. For purposes of entering into this Settlement Agreement, each of BarCap and the Trustee has relied on JPMorgan's representations (A) as to the identification of the Subject Securities in the Subject Securities List, and (B) that JPMorgan has a prior perfected security interest with respect to (I) the Subject Securities (including the Settlement Consideration Fed Portfolio Securities) or, in the case of Subject Securities that have been liquidated, the proceeds thereof, in each case subject to any rights that BarCap may have therein, and (II) the Settlement Consideration other than the Settlement Consideration Fed Portfolio Securities. Each of JPMorgan and BarCap represent to the other and to the Trustee that (aa) as of the date of this Settlement Agreement and subject to possible exceptions as notified by the Trustee to JPMorgan and BarCap prior to the date hereof, it is not aware, and (bb) prior to such notification it was not aware, that any of the Subject Securities are property of, or held by or on behalf of LBI or a transferee broker for the benefit of, or to secure any obligation of, any customer or former customer of LBI, the account of which has been, is to be or may in the future be transferred to BarCap.

(b)     Notwithstanding the provisions of Section 3(a)(ii) hereof, for the avoidance of doubt, BarCap shall not be deemed to have released, waived or discharged any interest it may have in the Subject Securities (or the proceeds thereof) to the extent any of the Subject Securities consist of (i) property of, or held by or on behalf of LBI or a transferee broker for the benefit of or to secure any obligation of, any customer or former customer of LBI, the account of which has been, is to be or may in the future be transferred to BarCap, (ii) securities or balances held in any reserve or segregated account maintained at any time by or on behalf of LBI in accordance with Rule 15c3-3 under the Securities Exchange Act of 1934, (iii) securities or other assets held in any lien-free account at DTC or any other depository, clearing organization or clearing bank (including, without limitation, JPMorgan), (iv) securities or other assets posted or held-in respect of listed or exchange-traded contracts, including margin or collateral held by or for the benefit of any exchange, depository, clearing firm, clearing organization or other facility, and (v) securities and other assets as to which JPMorgan did not, at the close of business on September 19, 2008, have a prior perfected security interest, including in each case of clauses (i) through (v) above, the proceeds thereof. Nothing in the immediately preceding sentence shall be construed to imply that any right, title or interest which has not been released, waived or discharged by BarCap with respect to any property described therein is prior to or free of any right, title or interest of JPMorgan with respect to such property. Nothing in this Settlement Agreement shall release, waive or discharge, (i) any claim that BarCap or its affiliates may have against LBI in the SIPA Proceeding, or against LBHI and its affiliates in their respective bankruptcy cases (in each case other than claims related to the failure to deliver the complete Fed Portfolio as part of the Replacement Transaction, which is being settled by delivery and payment of the Settlement Consideration as specifically set forth in this Settlement Agreement, and otherwise other than as set forth in Section 4(c) hereof), including, without limitation, BarCap (to extent it has allowed claims) being entitled to share as a creditor in such cases in any proceeds of any recoveries that those estates may have related to the Subject Securities or the proceeds thereof or any claims of those estates against any party, including, without limitation, JPMorgan except as specifically set forth in Section 4(c) hereof, or (ii) any claim that the Trustee or LBI may have against any person (except as set forth in Sections 2, 3(a)(i) and 4(d) hereof). Moreover, nothing contained in this Section 3 shall be deemed to restrict BarCap from performing any services on behalf of the Trustee, LBI or any customers or counterparties of LBI pursuant to the Transition Services Agreement entered into in connection with the Asset Purchase Agreement or otherwise. For the

avoidance of doubt, the release set forth in Section 3(a)(ii) hereof shall not apply to any claim relating to securities (other than the Subject Securities) that are fungible with the Subject Securities.

4. Releases. (a) Upon the receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, (1) this Settlement Agreement shall be deemed to supersede Sections 2 and 4 of the Services and Settlement Agreement dated as of September 22, 2008 (the "Services Agreement") in their entirety (other than Schedule A thereto), (ii) such Sections of the Services Agreement shall have no further force or effect, and (iii) except as so superseded hereby, the Services Agreement shall be deemed to be in full force and effect.

(b) Upon the receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, BarCap shall promptly cause the lawsuit identified on Schedule A to the Services Agreement (the "Lawsuit") to be dismissed with prejudice against all of the defendants therein (the "Defendants"). Upon the receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, BarCap further covenants to cause the plaintiff not to re-institute or seek to prosecute in any forum any claims or causes of action based in whole or part on any act, omission, transaction or other occurrence described in or related to the matters described in the complaint in the Lawsuit (the "Lawsuit Claims") and shall indemnify and hold harmless each of the Defendants and their respective current and former officers, directors, employees, subsidiaries, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives from and in respect of any and all claims, causes of action, liabilities, costs, fees or expenses (including reasonable attorneys' fees) that they may suffer or incur as a result of any failure by BarCap to cause the dismissal of the Lawsuit or any threat or prosecution of any of the Lawsuit Claims by BarCap or any of its affiliates. The Parties agree to keep confidential all information contained in Schedule A to the Services Agreement, subject to any requirements of law mandating disclosure.

(c) Upon the receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, each of JPMorgan and BarCap (in each case, on its own behalf and on behalf of each of its affiliates) hereby does and shall be deemed to forever release, waive and discharge each other, the Trustee, LBI and the LBI estate, their respective property and their respective current and former officers, directors, employees, subsidiaries, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives (collectively, "Representatives") from and in respect of all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, interests, remedies and liabilities (other than the right to enforce the obligations of the Parties set forth in this Agreement) (collectively, "Claims"), whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, relating to the Subject Funds, the Replacement Transaction or the Delivered Securities. Nothing in this Settlement Agreement shall release, waive or discharge any claims that JPMorgan or its affiliates may have against LBI in the SIPA Proceeding, or against LBHI and its affiliates in their respective bankruptcy cases, in each case with respect to the Advances remaining outstanding after giving effect to this Settlement Agreement and other transactions unrelated to the Subject Funds, the Replacement

Transaction and the Delivered Securities.

(d)     Upon the receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, the Trustee, on behalf of LBI and the LBI estate, hereby does and shall be deemed to forever release, waive and discharge each of JPMorgan and BarCap, their respective property and their respective current and former Representatives (for the avoidance of doubt, in (and only in) such current or former Representatives' respective capacities as such) from and in respect of all Claims, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, relating to the Subject Funds, the Replacement Transaction or the Delivered Securities.

(e)     Upon receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, each of JPMorgan and BarCap (in each case, on its own behalf and on behalf of each of its affiliates) hereby does and shall be deemed to forever release, waive and discharge each other and their respective property and their respective current and former Representatives from and in respect of all Claims, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, relating to any alleged agreement of BarCap to enter into one or more triparty or other repurchase transactions involving LBI.

(f)     From September 22, 2008 until the earlier of the date on which (i) the Authorizing Order (as defined below) becomes final and no longer subject to further appeal or review and (ii) the Settlement Agreement terminates, each Party agrees to toll any applicable statute of limitations in respect of any claim against it by any other Party that would be released by Section 4(c), (d) or (e) if such sections become and remain effective.

5.     Entire Agreement.  This Settlement Agreement and the Services Agreement (to the extent it is effective and not expressly superseded hereby) constitute the entire contract among the Parties relative to the subject matter hereof.  This Settlement Agreement supersedes any previous agreements or understandings among the Parties, express or implied, with respect to the subject matter hereof, except the Services Agreement (to the extent it is effective and not expressly superseded hereby).  No supplement, modification, or amendment of this Settlement Agreement, or waiver of rights hereunder or thereunder, shall be binding unless executed in writing by the Party affected thereby.  Nothing in this Settlement Agreement, expressed or implied, is intended to confer upon any person or entity other than the Parties hereto any rights, remedies, obligations or liabilities under or by reason of this Settlement Agreement.  In the event that this Settlement Agreement and the Services Agreement (to the extent it is effective and not expressly superseded hereby) shall be construed to conflict in any way, the terms of this Settlement Agreement shall control.

6.     No Admissions.  Nothing in this Settlement Agreement or any negotiations or proceedings in connection herewith shall be claimed to be evidence of an admission by any Party or its affiliates of any liability, violation of law or wrongdoing whatsoever, or the truth or untruth, or merit or lack of merit, of any claim or defense of any Party.  Neither this Settlement Agreement, nor any negotiations or proceedings in connection herewith, may be used in any

proceeding against any Party or its affiliates for any purpose except with respect to the validity, effectuation and enforcement of this Settlement Agreement. Nothing contained herein shall be deemed (a) an admission by BarCap that any of the provisions of the Services Agreement are currently effective, (b) an admission by JPMorgan or Trustee that any of the provisions of the Services Agreement are not effective, (c) an admission by any Party of any assertions made herein by any other Party or (d) without limitation of Sections 2, 3(a)(i) and 4(d) hereof, an admission by the Trustee as to any matter.

7. Counterparts; Signatures. This Amendment may be executed in one or more counterparts, all of which taken together shall constitute one instrument. This Agreement may be executed and delivered manually, by facsimile transmission or by email transmission.

8. Effective Time. (a) Except for Sections 8(b) through (e) below, the last sentence of Section 4(b) above and Sections 4(f) and 6 above (and in relation thereto, Sections 9 and 11 and the first sentence of Section 10), this Settlement Agreement shall not become effective until (the "Effective Time") the later to occur of (i) the entry of an order that has not been stayed (the "Authorizing Order") authorizing the execution, delivery and performance of this Settlement Agreement by Trustee by the Bankruptcy Court (or other court of competent jurisdiction) and (ii) the execution and delivery of this Agreement by the Trustee.

(b) In the event that the Bankruptcy Court declines to enter the Authorizing Order (or a court enters an order precluding the entry of an order that would qualify as the Authorizing Order), this Settlement Agreement shall terminate and be of no further force or effect.

(c) Effective upon the execution and delivery of this Settlement Agreement by JPMorgan and BarCap (even if not yet executed and delivered by Trustee) and for so long as this Settlement Agreement shall not have been terminated, each of them shall (i) reasonably cooperate with Trustee to obtain as soon as reasonably practicable the entry and finality of the Authorizing Order, provided that this clause shall not be interpreted to require JPMorgan or BarCap to agree to any change in the provisions of this Settlement Agreement, and (ii) not take any action inconsistent with this Settlement Agreement, including without limitation commencing any litigation based on claims or causes of action to be released under Sections 4(c), (d) or (e) above.

(d) This Settlement Agreement shall automatically terminate and be of no force and effect if (i) the Effective Time has not occurred by December 23, 2008 or (ii) the Authorizing Order is stayed or vacated after the Effective Time but before the transfer of the Settlement Consideration to BarCap in accordance with Section 1 above.

(e) If this Settlement Agreement terminates in accordance with Section 8(d) above, each provision contained in this Settlement Agreement shall be of no further force and effect from and after such date of termination and each of the releases granted by the Parties in Sections 3 and 4 shall be void *ab initio; provided*, however, that the last sentence of Section 4(b) above and Sections 4(f) and 6 above (and in relation thereto, Sections 9 and 11 and the first sentence of Section 10) shall survive any termination of this Settlement Agreement and nothing in Section 8(d) above or this Section 8(e) shall relieve the Parties' obligations under the last sentence of Section 4(b) above and Sections 4(f) and 6 above (and in relation thereto, Sections 9

and 11 and the first sentence of Section 10).

9.    Governing Law; Jurisdiction.  THIS SETTLEMENT AGREEMENT SHALL BE
GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS
OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICT OF
LAWS PRINCIPLES THEREOF.  Each of JPMorgan and BarCap hereby irrevocably and
unconditionally submits, for itself and its property, to the exclusive jurisdiction of the New York
state court located in the Borough of Manhattan, City of New York, the United States District for
the Southern District of New York or the United States Bankruptcy Court for the Southern
District of New York as applicable (the "New York Court"), and any appellate court from any
such court, in any proceeding arising out of or relating to this Settlement Agreement, or for
recognition or enforcement of any judgment resulting from any such proceeding, and each of
JPMorgan and BarCap hereby irrevocably and unconditionally agrees that all claims in respect of
any such suit, action or proceeding may be heard and determined in the New York Court.  The
Trustee hereby irrevocably and unconditionally submits, for itself and its property, to the
exclusive jurisdiction of the United States Bankruptcy Court for the Southern District of New
York (the "Bankruptcy Court"), and any appellate court from such court, in any proceeding
arising out of or relating to this Settlement Agreement that is brought against the Trustee, or for
recognition or enforcement of any judgment resulting from any such proceeding against the
Trustee, and each Party hereby irrevocably and unconditionally agrees that the Bankruptcy Court
shall have exclusive jurisdiction of any action, suit or proceeding by or against the Trustee
arising out of or relating to this Settlement Agreement.  Each Party hereby irrevocably and
unconditionally waives, to the full extent it may legally and effectively do so, (i) any objection
which it may now or hereafter have to the laying of venue of any proceeding arising out of or
relating to the Settlement Agreement in the applicable New York Court or Bankruptcy Court
specified above, (ii) the defense of an inconvenient forum to the maintenance of such proceeding
in any such court, and (iii) the right to object, with respect to such proceeding, that such court
does not have jurisdiction over such Party.  Each Party irrevocably consents to service of process
in any manner permitted by law.

10.    Binding Effect.  This Settlement Agreement shall bind, and be for the benefit of,
the Parties hereto and their respective successors and assigns.  All persons and entities released
pursuant to Sections 4(c), (d) and (e) of this Settlement Agreement are intended beneficiaries of
such release.

11.    Non-Severability.  Each of the provisions of this Settlement Agreement has been
agreed upon in consideration of each other provision of this Settlement Agreement.  No Party
would have entered into this Settlement Agreement unless each of the provisions hereof was
valid, binding and enforceable against each other Party.  If any provision of this Settlement
Agreement is determined not to be valid, binding and enforceable against each Party, this
Settlement Agreement shall be terminated and the Parties restored to their respective positions
existing immediately before entry into this Settlement Agreement.

IN WITNESS WHEREOF the Parties have executed this Settlement Agreement as of
the date first set forth above.

[Remainder of page intentionally left blank]

8

JPMORGAN CHASE BANK, N.A.


By_____


BARCLAYS CAPITAL INC.


By_____



JAMES W. GIDDENS, AS TRUSTEE IN THE SECURITIES INVESTOR PROTECTION ACT LIQUIDATION OF LEHMAN BROTHERS INC., ON BEHALF OF HIMSELF AND LEHMAN BROTHERS INC.

By _James W. Giddens_



Signature Page to Settlement Agreement dated as of December 5, 2008

JPMORGAN CHASE BANK, N.A.

By

BARCLAYS CAPITAL INC.

By

JAMES W. GIDDENS, AS TRUSTEE IN THE SECURITIES INVESTOR PROTECTION ACT
LIQUIDATION OF LEHMAN BROTHERS INC., ON BEHALF OF HIMSELF AND
LEHMAN BROTHERS INC.

By

Signature Page to Settlement Agreement dated as of December 5, 2008

JPMORGAN CHASE BANK, N.A.


By_____


BARCLAYS CAPITAL INC.

By _____
    Name:    Richard T. Ricci
    Title:   Chief Operating Officer,
             Investment Banking &
             Investment Management


JAMES W. GIDDENS, AS TRUSTEE IN THE SECURITIES INVESTOR PROTECTION ACT
LIQUIDATION OF LEHMAN BROTHERS INC., ON BEHALF OF HIMSELF AND
LEHMAN BROTHERS INC.


By_____


Signature Page to Agreement Regarding Settlement Agreement dated as of December 5, 2008

ANNEX A

<u>TO BE FILED UNDER SEAL</u>

# BCI Ex. 29

James B. Kobak, Jr.
David W. Wiltenburg
Stephen Luger
Christopher K. Kiplok
Jeffrey S. Margolin
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) SIPA |
| Debtor. | |

**MOTION UNDER 11 U.S.C. §§ 105 AND 363 AND FED. R. BANKR. P.**
**9019(a) FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT**

James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of the

business of Lehman Brothers Inc. ("Debtor" or "LBI"), by and through his undersigned counsel,

hereby files this motion (the "Motion") pursuant to sections 105(a) and 363 of title 11 of the

United States Code, 11 U.S.C §§ 101-1330 (as amended, the "Bankruptcy Code") and Rule

9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for approval of

a settlement and compromise among the Trustee, Barclays Capital Inc. ("Barclays") and

JPMorgan Chase Bank, N.A. ("JPMorgan") and as set forth in the settlement agreement, dated

BCI Exhibit No.

**29**

December 5, 2008, attached hereto as Exhibit "1" (the "Settlement Agreement")[1] pursuant to

which the Trustee, Barclays and JPMorgan have agreed to settle and compromise certain claims

arising from transactions related to (i) the Replacement Transaction and (ii) the Purchase

Agreement, as defined below. In support of the Motion, the Trustee respectfully represents as

follows:

## I.   JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 28 U.S.C. 1334. This is a core

proceeding pursuant to 28 U.S.C. § 157. Venue is proper pursuant to 28 U.S.C. §§ 1408 and

1409. The statutory predicates for the relief sought herein are sections 105(a) and 363 of the

Bankruptcy Code.

## II.   BACKGROUND

2.      Commencing on September 15, 2008 and periodically thereafter, Lehman

Brothers Holdings Inc. ("LBHI") and certain of its subsidiaries (collectively, the "Chapter 11

Debtors") commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of the

Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes only

and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

Procedure.

3.      On September 16, 2008, certain of the Chapter 11 Debtors, LBI, and

Barclays entered into an Asset Purchase Agreement (as amended and clarified from time to time,

the "Purchase Agreement").

---

[1]     The Settlement Agreement attached hereto does not include a copy of Annex A, as to which Barclays,
        JPMorgan and the Trustee have filed a motion seeking permission to file under seal.

4.    On September 19, 2008 (the "Filing Date"), the Honorable Gerard E.
Lynch, Judge of the United States District Court for the Southern District of New York, entered
the Order Commencing Liquidation (the "LBI Liquidation Order") pursuant to the provisions of
the Securities Investor Protection Act ("SIPA") in the case captioned Securities Investor
Protection Corporation v. Lehman Brothers Inc., Case No. 08-CIV-8119 (GEL).

5.    The LBI Liquidation Order: (i) appointed the Trustee for the liquidation of
the business of the Debtor pursuant to SIPA section 78eee(b)(3); (ii) appointed counsel to the
Trustee pursuant to section 78eee(b)(3); and (iii) removed this case to this Court pursuant to
section 78eee(b)(1).

6.    On September 20, 2008, the Court entered an order approving the
Purchase Agreement and the various transactions contemplated therein. (Chapter 11 Cases
Docket No. 258.) On September 20, 2008, the Court entered a concurrent Order Approving, and
Incorporating by Reference for the Purposes of this Proceeding, an Order Authorizing the Sale of
Purchased Assets and other Relief in the Lehman Brothers, Holdings Inc. Chapter 11 Proceeding
(Docket No. 3) thereby authorizing the Trustee to consummate the sale transaction on behalf of
LBI pursuant to the Purchase Agreement.

7.    The Settlement Agreement is designed to achieve the intended economic
outcome of certain transactions that were carried out under emergency conditions during the
days preceding and following the commencement of this SIPA proceeding. Under the leadership
of the Federal Reserve Bank of New York ("New York Fed"), the Securities and Exchange
Commission ("SEC") and the Secretary of the Treasury, the parties sought first to rescue
Lehman, and, when this proved impossible, to create circumstances that would permit an orderly
transfer of LBI customer accounts and an orderly liquidation of its business. The following

3

factual summary, which includes discussion of events occurring prior to the Trustee's appointment, is based upon the Declarations of Shari D. Leventhal ("Leventhal Decl."), Gerard LaRocca ("La Rocca Decl.") and Jeffrey M. Moore ("Moore Decl.") in Support of Trustee's Motion for Entry of an Order Approving a Settlement Agreement, submitted herewith.

A.    **The Replacement Transaction.**

8.    During the week of September 15, 2008, following the chapter 11 filing of LBHI, LBI continued to operate. As described by the New York Fed, this was a "carefully thought out decision" designed to "facilitate an orderly wind-down" of LBI, and was supported by New York Fed financing of LBI's payroll and operations. (Leventhal Decl. ¶6.) This financing was on a fully secured basis, supported by LBI collateral. By September 17, the New York Fed had funded to LBI $46.22 billion in cash and Treasury securities against $50.62 billion in collateral. (Leventhal Decl. ¶9.)

9.    On September 17, 2008, Barclays agreed to replace the New York Fed in funding LBI – that is, to "step into the shoes of the Fed." (See LaRocca Decl. ¶ 4; Leventhal Decl. ¶7.) The parties understood this to mean that Barclays would provide funding through a reverse repurchase transaction using essentially the same securities that had been pledged by LBI to the New York Fed (the "Fed Portfolio"). (LaRocca Decl. ¶¶ 4-5.)

10.    The form of transaction selected by Barclays to effectuate the substitute funding for LBI was a reverse repurchase transaction between Barclays and LBI, entered into on September 18, 2008 (the "Replacement Transaction"). (Leventhal Decl. ¶12.) Pursuant to the Replacement Transaction, LBI was to provide Barclays with $49.7 billion in securities in exchange for $45 billion in cash. (Id.) This ratio was consistent with the ratio of cash to securities used in the earlier repurchase agreement between LBI and the New York Fed on September 17, 2008. (Id.)

4

11.     On September 18, 2008, Barclays initiated the process of transferring $45 billion to fund LBI overnight. A series of funds transfers were made using the Fedwire Funds Service, which is operated by the New York Fed. By early evening of that date, the entire sum of $45 billion had been transferred by Barclays to LBI. (Leventhal Decl. ¶11; LaRocca Decl. ¶ 6.)

12.     Notwithstanding that both Depository Trust and Clearing Corporation ("DTCC") and the Fedwire Securities Service remained open for hours past their normal closing times on September 18 in an effort to complete the delivery of the Fed Portfolio to Barclays, operational issues interfered with the ability to transfer all of the securities. When DTCC closed at 11 PM on September 18th, Barclays had received $42.7 billion of the approximately $49.7 billion in securities it was expecting under the terms of the Replacement Transaction. (Leventhal Decl. ¶14.)

13.     LBI therefore agreed, either late on the night of September 18th or early in the morning of September 19, 2008, to transfer $7 billion in cash (the "Subject Funds") to Barclays at an account at JPMorgan. (Leventhal Decl. ¶15).   The expectation at that time was that, the next day, LBI would transfer the remaining securities originally due under the Replacement Transaction, and Barclays would transfer the Subject Funds to LBI. (Leventhal Decl. ¶ 15; see LaRocca Decl. ¶ 7.)

14.     The transfer of the remaining securities was discussed on Friday September 19 and into the weekend, but did not occur. (LaRocca Decl. ¶9.) On September 19, SIPC commenced this proceeding and the Court approved the Purchase Agreement. The parties then entered into the Clarification Letter to the Purchase Agreement (the "Clarification Letter"), dated September 20, 2008. (LaRocca Decl. ¶10.) The closing pursuant to the Purchase

Agreement occurred early on Monday, September 22, 2008. (LaRocca Decl. ¶ 8; Leventhal Decl. ¶19.)

15. In the meantime, JPMorgan caused the Subject Funds to be transferred to an LBI account at JPMorgan. (Leventhal Decl. ¶ 16.)

16. The Clarification Letter provided that the Replacement Transaction was terminated, and that the securities that had actually been delivered were "deemed to constitute part of the Purchased Assets" under the Purchase Agreement. Accordingly, LBI would have no further obligation to "repurchase" those securities under the repo and Barclays would not be obligated to deliver such securities back to LBI. (LaRocca Decl. ¶ 10.)

17. Barclays asserts that, at the time the Clarification Letter was finalized, Barclays believed that the $7 billion in cash was in its account at JPMorgan (LaRocca Decl. ¶ 11), and did not learn until Tuesday, September 23 (well after finalizing the Clarification Letter), that the Subject Funds were not in Barclays' account at JPMorgan. (Id. ¶ 12.)

18. As set forth in the accompanying affidavits, it is asserted that these events left Barclays without the full consideration it had contracted for under the Replacement Transaction and the Purchase Agreement. Barclays had neither the $7 billion nor its equivalent value in securities that were originally to have been delivered pursuant to the Replacement Transaction. (LaRocca Decl. ¶ 13; Leventhal Decl. ¶ 17.)

19. The LBI Estate faces claims related to its retention of both the remainder of the Fed Portfolio and the Subject Funds. The proposed settlement would convey to Barclays cash and securities having a lesser value, due to "market events" since September 17. (Moore Decl. ¶¶ 4-5.) The cash portion of the settlement consideration (leaving out distributions received since September 19) is the sum of $1.25 billion and $7.1 million, which is $5.743

billion less than the amount that might be claimed. The securities portion of the settlement consideration, although difficult to value with precision, is today worth "substantially less" than $5.743 billion. (Moore Decl. ¶ 6.) The difference creates a settlement discount for the LBI Estate.

**B.**     <u>The Settlement Agreement</u>.

    20.     The principal terms of the proposed Settlement Agreement are as follows:[2]

    (a) Barclays will receive (i) (x) the undelivered Fed Portfolio securities that have not been liquidated by JPMorgan (the "Settlement Securities"), together with (y) all principal and interest payments and any other distributions on the Settlement Consideration Fed Portfolio Securities (including, without limitation, the proceeds at maturity of any securities) attributable to the period on and after September 18, 2008, and (ii) $7,103,500 (representing the proceeds of certain Fed Portfolio Securities that initially were understood to be among the Settlement Consideration Fed Portfolio Securities but in fact have been liquidated by JPMorgan), plus, in the case of each of (i)(y) and (ii), interest accrued thereon from the time of receipt to the time of payment at the effective fed funds rate from time to time during such period.

    (b) To partially account for the undelivered Fed Portfolio Securities that will not be delivered to Barclays as part of the Settlement Securities (because they have been liquidated by JP Morgan) and the decline in value of the Settlement Securities since September 19, 2008, Barclays is to receive $1.25 billion in cash.

    (c) Barclays will receive $14,942,677.88 (representing principal and interest payments, and any other distributions, on the Delivered Securities attributable to the period on and after September 18, 2008 which were received in LBI and/or JPMorgan accounts and not heretofore paid to Barclays), plus interest accrued thereon from the time of receipt to the time of payment at the effective fed funds rate from time to time during such period (together with the payments described in paragraph (b), the "Settlement Payment").

---

2.   This summary is qualified in its entirety by reference to the Settlement Agreement, annexed hereto as Exhibit 1. In the event of any discrepancy between the Settlement Agreement and any description thereof contained in this Motion, the Settlement Agreement controls.

(d) The Settlement Securities and Settlement Payment will be remitted to Barclays from LBI accounts at JPMorgan. To facilitate the settlement, JPMorgan has agreed to release all liens on the Settlement Securities and Settlement Payment.

(e) The $7 billion of cash in LBI's account (referred to in paragraph 15 above) is acknowledged to have been applied against LBI's clearance advance obligations to JPMorgan, and the Settlement Securities, Settlement Payment and other amounts described in paragraphs 20(a) through (d) are not applied to such obligations.

(f) The parties will execute mutual limited releases.

### III.    RELIEF REQUESTED

21.    The Trustee has determined that protracted litigation over the foregoing events, with its attendant costs and risks, would not be in the best interest of the LBI Estate. By this Motion, the Trustee requests approval of the Settlement Agreement pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a).

### A.    Basis For Relief

22.    Under section 363(b) of the Bankruptcy Code, a debtor in possession or trustee may "use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor. See Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983). Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) of the Bankruptcy Code grants bankruptcy courts authority to

employ equitable principles in carrying out the Bankruptcy Code's provisions. See Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994).

23. Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Bankruptcy Rule 9019(a) "empowers the Bankruptcy Court to approve compromises and settlements if they are in the best interests of the estate." Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). Accordingly, the Court is authorized to approve the settlement, on the terms set forth in the Settlement Agreement.

24. In determining whether to approve a proposed settlement pursuant to Bankruptcy Rule 9019(a), a court must find that the proposed settlement is fair and equitable, reasonable, and in the best interests of the debtor's estate. Protective Comm. for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson, 390 U.S. 414, 424 (1968); In re Ionosphere Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994). A decision to approve a particular compromise or settlement is within the sound discretion of the bankruptcy court. In re Drexel Burnham, 134 B.R. at 505. It is appropriate for the court to consider the opinions of the trustee or debtor in possession that a settlement is fair and reasonable. Nellis v. Shugrue, 165 B.R. 115, 122 (S.D.N.Y. 1994). In addition, the bankruptcy court should exercise its discretion "in light of the general public policy favoring settlements." In re Hibbard Brown & Co., 217 B.R. 31 (Bankr. S.D.N.Y. 1998); see also Shugrue, 165 B.R. at 123 ("the general rule [is] that settlements are favored and, in fact, encouraged by the approval process outlined above").

25.     In determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather, should "canvas the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983); In re Purofied Down Prods., 150 B.R. 519, 522 (S.D.N.Y. 1993) (in making the determination of reasonableness, the court need not conduct a "mini-trial" on the merits). "All that [the proponent of the settlement] must do is establish [that] it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly [the settlement] might be considerably less (or more) than were the case fought to the bitter end." Florida Trailer & Equip. Co. v. Deal, 284 F.2d 567, 573 (5th Cir. 1960) (citation omitted).

## B.      The Settlement Falls Within the Range of Reasonableness

26.     In the instant case, both as an exercise of his business judgment for purposes of Section 363, and as a weighing of the reasonableness factors for purposes of Rule 9019, the Trustee has concluded that the Settlement Agreement should be approved.

27.     First, litigation based on LBI's retention of both the Subject Funds and the Fed Portfolio would be expensive and protracted, and would divert significant resources and attention of the Trustee, his counsel and staff.

28.     Second, the Estate is facing significant risk in the form of a claim in the amount of not less than $7 billion,. If such a claim were brought, it can be anticipated that a right to pre-judgment interest would also be claimed. Even at a relatively modest 6% rate (the CPLR currently specifies 9%), approximately $35 million per month of interest might be claimed to accrue while the issue remains unresolved. The settlement would avoid these risks in return for settlement consideration in an amount substantially less than the potential exposure.

60416369_1 (4).DOC

29.    Finally, the Settlement Agreement is the product of arm's length

negotiations between the Trustee, Barclays, and JPMorgan, with the assistance of the New York

Fed and the Securities Investor Protection Corporation.

30.    Accordingly, the Trustee submits that the settlement and compromise

embodied in the Settlement Agreement is appropriate in light of the relevant factors, is fair and

equitable, and should be approved.

31.    The Trustee's agreement to the settlement is based on the facts as set forth

in the accompanying affidavits of knowledgeable representatives of Barclays and the New York

Fed, and upon the Trustee's own review.  The Trustee believes that the explanations set forth in

the affidavits are reasonable and consistent with the facts known to him.  As such, the proposed

settlement avoids a large claim and the expense and distraction of litigation and produces a

benefit to the LBI estate because the settlement consideration consists largely of securities which

have declined in value.

32.    In consenting to this settlement, the Trustee does not take any position on

any issue related to the Purchase Agreement or Clarification Letter or to the events and actions

by various parties that preceded them that is not specifically covered by the Settlement

Agreement.  The Trustee will be investigating and reporting to the Court and creditors under

§78-fff(d) of SIPA on many of these issues and the impact they and the Purchase Agreement and

Clarification Letter have had on the wind-down of LBI and transfer of customer accounts. .

### IV.    NOTICE

33.    The Trustee will provide notice of the Motion pursuant to the Court's

Order to Show Cause. The Trustee submits that no other or further notice need be given.

## V.    NO PRIOR REQUEST

34.    No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Trustee respectfully requests that the Court approve the Settlement Agreement and grant such additional and further relief as the Court deems just and appropriate.

Dated:    New York, New York
          December 5, 2008

          HUGHES HUBBARD & REED LLP

          By: /s/ James B. Kobak, Jr.
              James B. Kobak, Jr.
              David W. Wiltenburg
              Stephen Luger
              Christopher K. Kiplok
              Jeffrey S. Margolin
              One Battery Park Plaza
              New York, New York 10004
              Telephone: (212) 837-6000
              Facsimile: (212) 422-4726
              Email: kobak@hugheshubbard.com

          Attorneys for James W. Giddens, Trustee for the SIPA Liquidation of Lehman Brothers Inc.

60416369_1 (4).DOC

# BCI Ex. 30

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION                  :
CORPORATION,                                     :
                                                 :
                    Plaintiff,                   :
                                                 :
              v.                                 :
                                                 :
LEHMAN BROTHERS INC.,                            :
                                                 :
                    Debtor.                      :
                                                 :
-------------------------------------------------------------X

### DECLARATION OF SHARI D. LEVENTHAL
### IN SUPPORT OF TRUSTEE'S MOTION
### FOR ENTRY OF AN ORDER
### APPROVING A SETTLEMENT AGREEMENT

Pursuant to 28 U.S.C. § 1746, SHARI D. LEVENTHAL declares as

follows:

1.       I am Assistant General Counsel and Senior Vice President at the

Federal Reserve Bank of New York ("New York Fed"). In that capacity, except where

stated otherwise, I have personal knowledge of the matters set forth in this declaration. I

submit this declaration in support of the Motion for Entry of An Order Approving a

Settlement Agreement filed by James W. Giddens as Trustee for the Securities Investor

Protection Act ("SIPA") liquidation of the business of Lehman Brothers Inc. ("LBI").

<u>Background</u>

2.       On Friday evening, September 12, 2008, an historic meeting began

at the New York Fed's head office in downtown Manhattan. Participating in this meeting

were the senior management of the New York Fed, the Chairman of the Securities and

Exchange Commission, the Secretary of the Treasury, and the most senior leadership of

BCI Exhibit No.

**30**

the major global financial firms. The goal of the meeting was to find a way to rescue Lehman Brothers, which was on the verge of insolvency. All of the participants recognized the impact that a Lehman bankruptcy filing could have on an already fragile financial system.

3.     The effort to save Lehman was directed toward an acquisition of the firm and it naturally focused on possible suitors. By Saturday, September 13th, two institutions had expressed interest in acquiring Lehman, Bank of America and Barclays Capital. By mid-day Saturday, Bank of America had found another bride, which left Barclays Capital as the one viable party. By Sunday, September 14th, the major global financial firms agreed to facilitate an acquisition by financing some of the transaction. All were hopeful that Lehman would be saved.

4.     For Lehman to continue as a viable entity pending closing of the deal, it was necessary for the purchaser to guarantee all of Lehman's short-term obligations. This guarantee was vital to stave off the effects of a panic that would likely result from the markets' reaction to Lehman's condition. By mid-day on Sunday, September 14th, however, it became apparent that a number of technical legal issues arising under the laws of the United Kingdom presented a barrier that would become insurmountable.

5.     By Sunday evening it became certain that an acquisition of Lehman by Barclays was not possible. Lehman's Board of Directors, therefore, made the decision that Lehman Brothers Holdings International ("Lehman Holdings") would commence a voluntary Chapter 11 case on September 15th.

6. LBI, the broker-dealer subsidiary of Lehman Holdings, did not commence a Chapter 11 case on September 15th. This represented a carefully thought out decision that would enable LBI to continue to operate so as to facilitate an orderly wind down of its trading positions. To keep LBI operating, however, its operations and payroll had to be funded. The New York Fed agreed to finance LBI overnight. JPMorgan Chase Bank, N.A. ("JPMC"), as LBI's clearing bank, agreed to provide certain intra-day funding.

7. On Tuesday, September 16th, Barclays returned with an offer to purchase certain assets, and assume certain liabilities, of LBI. Recognizing that Barclays' offer provided an opportunity for an orderly transfer of thousands of customer accounts, as well as the possibility of preserving the jobs of thousands of LBI employees, the New York Fed decided to support the transaction. However, we also explained to Barclays that the New York Fed's commitment to provide overnight funding for LBI was based on the assumption that we were facilitating an orderly wind down of the business. If Barclays wanted the New York Fed to continue funding LBI so as to facilitate an orderly transition (instead of an orderly wind down), and thus assist with the implementation of Barclays' purchase-and-assumption agreement, then Barclays needed to take out the New York Fed's exposure to LBI prior to the closing of its transaction. Barclays and the New York Fed entered an agreement on the morning of September 17th to the effect that Barclays would take over the New York Fed's place in providing Lehman overnight funding.

8. On the night of September 17th, the New York Fed was funding Lehman through various lending programs: the Primary Dealer Credit Facility

("PDCF"), the Term Securities Lending Facility ("TSLF"), and Open Market Operations ("OMO"). The PDCF is a financing facility, where the New York Fed funds dealers using the repurchase agreement ("repo") form. Open Market Operations are, by contrast, transactions done by the New York Fed to implement monetary policy directives of the Federal Open Market Committee. These OMO transactions are also done in the form of repos. The TSLF is not a cash lending facility. Rather, through the TSLF, the New York Fed lends U.S. Treasury securities against other forms of collateral.

9. Overnight on September 17th, the New York Fed had the following exposures to LBI:

   a. $20.43 billion in cash against $23.866 billion in collateral through the PDCF;

   b. $7.0 billion in cash against $7.159 billion in collateral through OMO; and

   c. $18.79 billion in treasury securities against $19.596 billion in other collateral through the TSLF.

In total, the New York Fed had funded LBI $46.22 billion in cash and Treasury securities against $50.62 billion in collateral.

10. On the morning of September 18th, in accordance with the terms of the applicable repurchase agreements, the New York Fed's PDCF and OMO positions with LBI were unwound. As a result of Barclays' agreement to take out the New York Fed's exposures to LBI, the TSLF contract with LBI was terminated. The New York Fed was paid cash, and the Treasury securities borrowed by Lehman were delivered back. The securities that the New York Fed had held overnight on September 17th were

returned to LBI through its account at JPMC. JPMC then funded LBI intra-day on September 18th.

11.     Beginning in the afternoon of September 18th, Barclays initiated the process of transferring $45 billion in cash to LBI to fund LBI overnight. A series of funds transfers were made using the Fedwire Funds Service, which is operated by the Federal Reserve Banks. By early evening, the entire sum of $45 billion in cash had been transferred by Barclays to LBI.

12.     Pursuant to the repurchase agreement between Barclays and LBI (the "September 18[th] Repo"), which was the form selected by Barclays to fund LBI overnight, LBI was to provide Barclays with approximately $49.7 billion in securities in return for the $45 billion in cash funded by Barclays. This ratio was consistent with the ratio of cash to securities used in the New York Fed's repurchase agreement with LBI on the night of September 17th.

13.     As the Court knows, the events of the week of September 15th as they related to Lehman Holdings and LBI were unprecedented in nature, and they unfolded at an unprecedented speed, in turbulent markets. The effect of these events was to push the operational components of the financial system nearly to their limits. It is not surprising, therefore, that the intended transfer of $49.7 billion in securities from LBI to Barclays on the night of September 18th came with a hitch.

14.     Notwithstanding that both Depository Trust Company ("DTC") and the Fedwire Securities Service remained open for several hours past their normal closing times in an effort to complete this transaction, operational issues interfered with

the ability to transfer all of the intended securities to Barclays. When, at 11 PM, DTC had to close, Barclays had received approximately $42.7 billion of the approximately $49.7 billion in securities it was expecting under the terms of the September 18th Repo.

15.    LBI, therefore, agreed, either late on the night of September 18th, or early in the morning of September 19th, to transfer $7 billion in cash (the "Subject Funds") to Barclays at an account at JPMC. The expectation at that time was that, the next day, LBI would transfer the remaining securities originally due under the September 18th Repo, and Barclays would transfer the Subject Funds to LBI. The transfer of securities, however, did not occur prior to the entry by the United States District Court for the Southern District of New York on September 19, 2008 of the Order Commencing Liquidation ("LBI Liquidation Order") pursuant to the provisions of SIPA in the case captioned Securities Investor Protection Corporation v. Lehman Brothers Inc., Case No. 08-CIV-8119 (GEL).

16.    I have been informed by JPMC that, after the Subject Funds were transferred by LBI to an account at JPMC, as described above, JPMC caused the Subject Funds to be transferred to an LBI account at JPMC.

17.    As a result of the operational issues that arose on the night of September 18th, and JPMC's transfer of the Subject Funds to an LBI account at JPMC, LBI was unjustly enriched. LBI had both Barclays' cash (the $45 billion transferred on September 18th), and approximately $7 billion in securities that had been intended to be transferred to Barclays.

## The Settlement Agreement

18.    Barclays' purchase of LBI's assets and its assumption of certain liabilities pursuant to an Asset Purchase Agreement was approved by the Court in the early hours of September 20th.

19.    Only after the purchase transaction closed on Monday, September 22nd, did Barclays learn that the Subject Funds it believed were in its account at JPMC had been transferred to LBI's account. This is crucial to understanding paragraph 13 of the September 20th letter from Barclays to Lehman Holdings that sought to clarify the intention of the parties with respect to certain provisions of the Asset Purchase Agreement (the "Clarification Letter"). Some of the provisions of the Clarification Letter were discussed during conference calls in which I participated on Sunday, September 21st. During those calls, Barclays' representatives made statements that clearly reflected their belief that the Subject Funds were in Barclays' account at JPMC.

20.    Because Barclays believed that the $7 billion was in its account, it agreed in the Clarification letter that:

> all securities and other assets held by Purchaser under the
> September 18, 2008 repurchase arrangement . . . shall be
> deemed to constitute part of the Purchased Assets . . . .
> Seller and Purchaser shall be deemed to have no further
> obligations to each other under the [September 18[th] Repo]
> (including, without limitation, any payment or delivery
> obligations), and . . . the [September 18[th] Repo] shall
> terminate.

21.    When Barclays learned for the first time, on or about September 23rd, that it had neither all of the securities intended to be transferred under the September 18th Repo, nor the Subject Funds, Barclays came to the New York Fed.

Barclays sought the New York Fed's assistance in facilitating negotiations with JPMC regarding JPMC's movement of the Subject Funds. The proposed settlement agreement is the result of those negotiations.

22.    The proposed settlement agreement provides that Barclays will receive the securities that remain from the pool of LBI securities previously held by the New York Fed under its repo with LBI on the night of September 17th and that were intended to have been transferred to Barclays under the September 18th Repo. These securities are identified in Annex A to the Settlement Agreement as the "Settlement Consideration Fed Portfolio Securities". I have been told that some of the securities that the New York Fed held on the night of September 17th have since been liquidated by JPMC. To make up for the shortfall resulting from those liquidations, and the decline in the value of the remaining securities since September 19th, the proposed settlement provides that Barclays is to receive $1.25 billion in cash. In addition, approximately $7.1 million of cash would also be provided to Barclays in the proposed settlement, representing proceeds of certain Settlement Consideration Fed Portfolio Securities that were inadvertently liquidated by JPMC after the parties reached agreement on the terms of the proposed settlement.

23.    The securities and cash that Barclays will receive under the proposed Settlement will come from LBI accounts at JPMC. JPMC has a lien on these accounts, and, consequently, on the relevant cash and securities which Barclays will receive. JPMC has agreed to release its liens on the above-mentioned cash and securities to facilitate this settlement.

24.     The proposed settlement is, in the New York Fed's opinion, a fair one. It addresses the unjust enrichment to the LBI estate caused by the operational failures on September 18th and 19th, and restores the parties, and the LBI estate, to the positions they would have been in had the September 18th Repo been executed as originally planned. It is also, in the New York Fed's opinion, consistent with the intent of the Clarification Letter.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on:

_____

Shari D. Leventhal

# BCI Ex. 39

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS INC.,<br><br>              Debtor. | Case No. 08-01420 (JMP) SIPA |

## ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN TRUSTEE, BARCLAYS CAPITAL INC. AND JPMORGAN CHASE BANK, N.A.

Upon consideration of James W. Giddens' (the "Trustee"), as trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI" or "Debtor"), Motion under 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement (the "Motion"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that due and proper notice of the Motion and the relief requested therein having been given in accordance with the Order to Show Cause and Notice Fixing Hearing Date to Consider Trustee's Motion under 11 U.S.C. §§ 105 and 363 and Fed. R. of Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement, and no other or further notice need be given; and the relief requested in the Motion being in the best interests of LBI, its estate, customers and creditors; and the Court having reviewed the Motion; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that the settlement is fair and reasonable, and after due deliberation and sufficient cause appearing therefor, it is

**ORDERED** that the Motion is granted in all respects; and it is further

BCI Exhibit No.
**39**

ORDERED that the settlement agreement (the "Settlement Agreement")[1] is authorized and approved pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and sections 105(a) and 363 of the Bankruptcy Code; and it is further

ORDERED that the Trustee is authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary to consummate the Settlement Agreement and perform any and all obligations contemplated therein; and it is further

ORDERED that nothing in this Order shall bind, be collateral estoppel or otherwise prejudice any other matter in this case, the Chapter 11 Cases or any related case with respect to the facts alleged in the Motion or in the accompanying Moore Declaration, Leventhal Declaration, or LaRocca Declaration, other than the approval of the Settlement Agreement and the authorization for the Trustee to take such action and execute the Settlement Agreement and such documents as may be necessary or appropriate to effectuate the Settlement Agreement and transfer of the Settlement Securities and Settlement Payment to Barclays; and it is further

ORDERED that except as provided in section 9 of the Settlement Agreement, the Court shall retain jurisdiction to (i) enforce and implement the terms and provisions of the Settlement Agreement and resolve disputes thereunder and (ii) implement and enforce the provisions of this Order; and it is further

ORDERED that all objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits; and it is further

---

[1] Terms not otherwise defined herein shall have the meaning ascribed in the Settlement Agreement.

**ORDERED** that nothing in this Order shall be interpreted as a finding or determination that any of the parties who filed objections to the Trustee's Motion are parties in interest or have standing to participate in discovery or otherwise in this SIPA proceeding; and it is further

**ORDERED** that the failure to specifically include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Trustee's implementation of the transactions contemplated in the Settlement Agreement be approved in its entirety; and it is further

**ORDERED** that the stay of this Order provided by the Bankruptcy Rules (including Bankruptcy Rule 6004) whether for ten (10) days or otherwise shall not be applicable to this Order, and this Order shall be effective and enforceable immediately upon entry.

Dated:   New York, New York
         December 22, 2008

                                         */s/ James M. Peck*
                                         Honorable James M. Peck
                                         United States Bankruptcy Judge

# BCI Ex. 50

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555 (JMP)

   08-01420 (JMP)(SIPA)

- - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.

  Debtors.

- - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

  Debtor.

- - - - - - - - - - - - - - - - - -x

   United States Bankruptcy Court

   One Bowling Green

   New York, New York


   December 22, 2008

   10:14 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

BCI Exhibit No.

50

1

2     I.    UNCONTESTED MATTERS:

3     HEARING re Debtors' Motion for Entry of Order Pursuant to

4     Sections 105 and 363 of the Bankruptcy Code and Federal Rules

5     of Bankruptcy Procedure 2002, 6004, and 9019 (i) Authorizing

6     Lehman Brothers Holdings Inc. to Enter into a Settlement

7     Agreement with Certain French Affiliates Relating to

8     Intercompany Claims, (ii) Authorizing Lehman Brothers Holdings

9     Inc. to Vote Its Shares in French Affiliate to Approve Sale of

10    Substantially All of the Assets of and Voluntary Dissolution of

11    Such Affiliate and (iii) Granting Certain Related Relief

12

13    HEARING re LBHI's Motion, Pursuant to Sections 105(a) and 365

14    of the Bankruptcy Code, for Authorization to Assume

15    Administrative Services Agreement with Aetna

16

17    HEARING re LBHI's Motion, Pursuant to Sections 105(a) and 365

18    of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, for

19    Authorization to Reject Prescription Drug Program Master

20    Agreement with Medco

21

22    II.   CONTESTED MATTERS:

23    HEARING re Motion for Relief from Stay Motion of OMX Timber

24    Finance Investments II, L.L.C. For Limited Relief from the

25    Automatic Stay

1

2      HEARING re Debtors' Motion for an Order Pursuant to Section 365

3      of the Bankruptcy Code Approving the Assumption or Rejection of

4      Open Trade Confirmations

5

6      HEARING re Debtors Motion to (A) Establish Sales Procedures;

7      (B) Approve a Seller Termination Fee and a Reimbursement

8      Amount; and (C) Approve the Sale of the Purchased Assets and

9      the Assumption and Assignment of Contracts Relating to the

10     Purchased Assets

11

12     SECURITIES INVESTOR PROTECTION CORPORATION PROCEEDINGS:

13     III. CONTESTED MATTERS:

14     HEARING re Trustee's Motion under 11 U.S.C. 105 and 363 and

15     Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving

16     Settlement Agreement

17

18

19

20

21

22

23

24

25     Transcribed by:  Lisa Bar-Leib

```
 1
 2    A P P E A R A N C E S :
 3    WEIL, GOTSHAL & MANGES LLP
 4         Attorneys for Debtors
 5         767 Fifth Avenue
 6         New York, NY 10153
 7
 8    BY:  HARVEY R. MILLER
 9         LORI R. FIFE, ESQ.
10         JACQUELINE MARCUS, ESQ.
11         GARRETT AVERY FAIL, ESQ.
12
13    HUGHES HUBBARD & REED LLP
14         Attorneys for James W. Giddens, SIPC Trustee
15         One Battery Park Plaza
16         New York, NY 10004
17
18    BY:  JAMES B. KOBAK, JR.
19         DAVID W. WILTENBURG, ESQ.
20
21
22
23
24
25
```

1

2    SECURITIES INVESTOR PROTECTION CORPORATION

3        Attorneys for SIPC

4        805 15th Street, N.W.

5        Suite 800

6        Washington, DC 20005

7

8    BY:  KENNETH J. CAPUTO, ESQ.

9

10   MILBANK, TWEED, HADLEY & MCCLOY LLP

11       Attorneys for the Official Committee of Unsecured

12        Creditors

13       One Chase Manhattan Plaza

14       New York, NY 10005

15

16   BY:  DENNIS F. DUNNE, ESQ.

17       EVAN R. FLECK, ESQ.

18

19

20

21

22

23

24

25

1

2    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

3        Special Counsel for Creditors' Committee

4        51 Madison Avenue

5        22nd Floor

6        New York, NY 10010

7

8   BY:  JAMES C. TECCE, ESQ.

9        SUSHEEL KIRPALANI, ESQ.

10

11   CLEARY GOTTLIEB STEEN & HAMILTON LLP

12        Attorneys for Barclays Capital Inc.; Goldman Sachs Credit

13        Partners L.P. and GS European Performance Fund Limited;

14        Wachovia Bank, N.A.; Evergreen Investment Management

15        Company, LLC

16        One Liberty Plaza

17        New York, NY 10006

18

19   BY:  LINDSEE P. GRANFIELD, ESQ.

20        LISA M. SCHWEITZER, ESQ.

21        THOMAS J. MOLONEY, ESQ.

22        LUKE A. BAREFOOT, ESQ.

23

24

25

1

2   UNITED STATES DEPARTMENT OF JUSTICE

3       Office of the United States Trustee

4       33 Whitehall Street

5       Suite 2100

6       New York, NY 10004

7

8   BY:  ANDREW D. VELEZ-RIVERA, ESQ.

9

10  BINGHAM MCCUTCHEN LLP

11      Attorneys for Harbinger Capital Partners Special

12       Situations Fund, L.P. and Harbinger Capital Master

13       Fund I, Ltd.; Deutsche Bank AG; Halbis Distressed

14       Opportunity Master Fund Limited

15      399 Park Avenue

16      New York, NY 10022

17

18  BY:  MARK W. DEVENO, ESQ.

19       STEVEN WILAMOWSKY, ESQ.

20

21

22

23

24

25

1

2    BLANK ROME LLP

3        Attorneys for Iconix Brand Group, Inc.; Capital Automotive

4        L.P.; Delaware River Port Authority; BANCA ITALEASE,

5        S.p.A.; ITALEASE FINANCE, S.p.A.; New Jersey Housing and

6        Mortgage Financing Agency; Thomas Reuters

7        The Chrysler Building

8        405 Lexington Avenue

9        New York, NY 10174

10

11   BY:  EDWARD J. LOBELLO, ESQ.

12

13   BOIES, SCHILLER & FLEXNER LLP

14       Attorneys for Barclays Capital Inc.

15       575 Lexington Avenue

16       7th Floor

17       New York, NY 10022

18

19   BY:  JOHNATHAN D. SCHILLER, ESQ.

20

21

22

23

24

25

DAY PITNEY LLP

    Attorneys for Oracle USA, Inc.

    7 Times Square

    New York, NY 10036


BY: AMISH R. DOSHI, ESQ.


DRINKER BIDDLE & REATH LLP

    Attorneys for Allianz Global Advisors, AG

    500 Campus Drive

    Florham Park, NJ 07932


BY: ROBERT K. MALONE, ESQ.


FEDERAL RESERVE BANK OF NEW YORK

    Assistant General Counsel and Senior Vice President

    33 Liberty Street

    New York, NY 10045


BY: SHARI D. LEVENTHAL, ESQ.

HANLY CONROY BIERSTEIN SHERIDAN FISHER HAYES LLP

    Attorneys for Ben Gamoran

    112 Madison Avenue

    New York, NY 10016


BY: THOMAS I. SHERIDAN, III


KLEIN, DENATALE, GOLDNER, COOPER, ROSENLIEB & KIMBALL, LLP

    Attorneys for Superior Pipelines, Inc.

    4550 California Avenue

    Second Floor

    Bakersfield, CA 93309


BY: T. SCOTT BELDEN, ESQ.

    (TELEPHONICALLY)


KLESTADT & WINTERS, LLP

    Attorneys for OMX Timber Finance Investments II, LLC

    292 Madison Avenue

    17th Floor

    New York, NY 10017


BY: JOHN E. JURELLER, JR.

LINKLATERS LLP

    Attorneys for Joint Administrators of the Lehman European

     Group Administration Companies

    1345 Avenue of the Americas

    New York, NY 10105


BY:  MARY K. WARREN, ESQ.

    MARTIN FLICS, ESQ.


MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

    Attorneys for the SunGard Creditors

    990 Steward Avenue

    Suite 300

    Garden City, NY 11530


BY:  JIL MAZER-MARINO, ESQ.


PAUL, HASTINGS, JANOFSKY & WALKER LLP

    75 East 55th Street

    New York, NY 10022


BY:  THOMAS L. KENT, ESQ.

1

2    PENSION BENEFIT GUARANTY CORPORATION

3          Office of the Chief Counsel

4          1200 K Street, NW

5          Washington, DC 20005

6

7    BY:  STEPHANIE THOMAS, ESQ.

8

9    PROSKAUER ROSE LLP

10          Attorneys for NBSH Acquisition LLC

11          1585 Broadway

12          New York, NY 10036

13

14    BY:  JAMES P. GERKIS, ESQ.

15          JEFFREY LEVITAN, ESQ.

16

17

18

19

20

21

22

23

24

25

1
2   RICHARDS KIBBE & ORBE LLP
3        Attorneys for DK Acquisition Partners, L.P., Farallon
4        entities, Goldman Sachs Credit Partners, L.P., Greywolf
5        entities, Halcyon Structured Asset Management European
6        CLO 2007-1 B.V., Longacre entities, Morgan Stanley Bank
7        International Limited, Morgan Stanley Senior Funding,
8        Inc. Rowayton Loan Funding Company, Royal Bank of
9        Scotland, PLC, P. Schoenfeld Asset Management LLC
10       One World Financial Center
11       New York, NY 10281
12
13  BY:  MICHAEL  FRIEDMAN, ESQ.
14
15  SEWARD & KISSEL LLP
16       Attorneys for Global Thematic Opportunities Fund LP;
17        Panton Master Fund, L.P.; CFIP Master Fund, Ltd.; Cura
18        Fixed Income Arbitrage Master Fund, Ltd.; and Turnberry
19        Leveraged Credit Master Fund, L.P.
20       One Battery Park Plaza
21       New York, NY 10004
22
23  BY:  JUSTIN L. SHEARER, ESQ.
24
25

1

2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3        Attorneys for BlackRock Financial Management, Inc.; H/2

4         Credit Partners Master Fund Ltd.; Region Marche; JA Solar

5        Holdings Co., Ltd.

6        Four Times Square

7        New York, NY 10036

8

9    BY:  ANDREW M. THAU, ESQ.

10

11   STEMPEL BENNETT CLAMAN & HOCHBERG, P.C.

12       Attorneys for SLG 220 News Owner LLC

13       675 Third Avenue

14       31st Floor

15       New York, NY 10017

16

17   BY:  JAMES E. SCHWARTZ, ESQ.

18

19

20

21

22

23

24

25

STEPTOE & JOHNSON LLP

    Attorneys for Korea Investment & Securities Co. and

    True Friend Forth Specialty Co.

    2121 Avenue of the Stars

    Suite 2800

    Los Angeles, CA 90067

BY:  KATHERINE C. PIPER, ESQ.

    (TELEPHONICALLY)

STEVENS & LEE PC

    Attorneys for Royal Bank America

    485 Madison Avenue

    20th Floor

    New York, NY 10022

BY:  ALEC P. OSTROW, ESQ.

SUSMAN GODFREY LLP

    Attorneys for Susman Godfrey

    1000 Louisiana

    Suite 5100

    Houston, TX 77002


BY:  CHARLES R. ESKRIDGE III, ESQ.


THOMPSON & KNIGHT LLP

    Attorneys for Crossmark Investment Company L.P.

    919 Third Avenue

    39th Floor

    New York, NY 10022


BY:  IRA L. HERMAN, ESQ.


WACHTELL, LIPTON, ROSEN & KATZ

    Attorneys for JPMorgan Chase Bank, N.A.

    51 West 52nd Street

    New York, NY 10019


BY:  HAROLD S. NOVIKOFF, ESQ.

1

2    WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

3         Attorneys for Hartford

4         3 Gannett Drive

5         White Plains, NY 10604

6

7    BY:  MARK G. LEDWIN, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             P R O C E E D I N G S

2         THE COURT: Please be seated. Mr. Miller, you look

3 even taller in person.

4         MR. MILLER: Thank you, Your Honor. Must be the

5 weather. Must be the weather. Good morning, Your Honor.

6         THE COURT: Good morning.

7         MR. MILLER: With Your Honor's permission, may we

8 take the SIPA proceeding, item number 9 (sic) on the agenda,

9 first?

10         THE COURT: Sure.

11         MR. MILLER: Mr. Kobak?

12         MR. KOBAK: Thank you, Your Honor, and good morning,

13 Your Honor. It's James B. Kobak, Jr. of the firm Hughes

14 Hubbard & Reed representing -- on behalf of the trustee, Mr.

15 Giddens, in the SIPA proceeding. Before you today, Your Honor,

16 is a motion seeking approval for a settlement agreement between

17 Barclays and JPMorgan and the trustee for a transaction that,

18 in effect, completes a significant part of the purchase

19 agreement approved by this Court.

20         This settlement involves a transaction sponsored by

21 the Federal Reserve Board of New York to try to accomplish a

22 wind down of LBI's business and an orderly transfer of accounts

23 as explained in the declaration of Ms. Leventhal of the Fed.

24 Although it has a large monetary value, it actually only has a

25 positive impact on LBI's estate because of the declining value

1  of securities being transferred against an obligation of seven

2  billion dollars or more.

3        The facts are set forth in uncontroverted affidavits

4  or declarations, principally, Ms. Leventhal's of the Fed as

5  well as Mr. LaRocca's of Barclays. And I'll only briefly

6  summarize here.

7        THE COURT: I've read the declarations.

8        MR. KOBAK: All right.

9        THE COURT: But you may wish to advert to particular

10  sections of them for emphasis or for the benefit of the record.

11        MR. KOBAK: Sure, Your Honor. Well, let me just

12  explain. At the time of the purchase agreement, Barclays had

13  loaned LBI forty-five billion dollars. And Barclays was to

14  receive securities valued at over forty-nine billion dollars to

15  cancel the loan. Under the purchase agreement approved by Your

16  Honor, that party became a significant part of what Barclays

17  obtained under the agreement, the agreement that this Court

18  approved and that allowed tens of thousands of customer

19  accounts to be transferred. For various operational reasons,

20  the great bulk of securities was transferred on the evening of

21  the 18th but approximately seven billion dollars as then valued

22  could not be. Cash was supposed to be transferred as a

23  temporary substitute but as described by Ms. Leventhal and Mr.

24  LaRocca, the circumstances did not allow that and the SIPA

25  proceeding intervened. The cash ended up at JPMorgan to which

1    LBI had and still has very substantial indebtedness.  Barclays

2    never received the securities which it was supposed to receive

3    which everyone expected it to receive and which the Court's

4    order entitled it to receive.  Neither did it receive the cash

5    substitute.

6           In essence, the settlement before Your Honor today

7    completes this part of the transaction by transferring

8    securities and to the extent they had already been liquidated

9    or already declined in value, some additional cash from

10   JPMorgan.  I want to make it clear that the settlement doesn't

11   affect anything else in the purchase agreement or anything else

12   that happened in the time preceding LBI's filing under SIPA.

13   It doesn't determine any issues of interpretation, possible

14   reformation under anything else under any other provisions of

15   the purchase agreement and clarification letter.  The trustee,

16   for example, may well have disputes with Barclays and others

17   over other provisions and other aspects of the agreement.  We

18   tried to make that clear in paragraph 32 of our application

19   where we said that the trustee is not taking a position on or

20   conceding anything else and that there is much, as Your Honor

21   knows, that we intend to investigate on his behalf.

22          We have a clarifying amendment, which at the end of

23   remarks, if Your Honor permits, I'll hand up to Your Honor,

24   that spells out this point even more clearly for the avoidance

25   of doubt.

1          THE COURT:  When you say clarifying amendment, is

2     that of the order?

3          MR. KOBAK:  Of the order.  I'm sorry, Your Honor.

4          THE COURT:  Okay.

5          MR. KOBAK:  And I think that satisfies or may satisfy

6     the objections of Royal Bank and anyone else who, even though

7     they haven't filed a paper has expressed any reservations other

8     than the creditors' committee --

9          THE COURT:  Has that language been shared --

10          MR. KOBAK:  -- and the Chapter 11 --

11          THE COURT:  Has that language been shared --

12          MR. KOBAK:  Yes, it has.  Yes, it has, Your Honor.

13          THE COURT:  Okay.

14          MR. KOBAK:  I want to note that this Court

15     specifically reserved a 40 to compel delivery of purchased

16     assets to Barclays and otherwise to implement and enforce the

17     terms of the purchase agreement under paragraph 20 of the

18     Court's order approving the sale.  That order is incorporated

19     in the SIPA proceeding through the separate order that Your

20     Honor also entered in our case on September 19th.  If the

21     trustee refused to implement this settlement, he or JPMorgan or

22     both could well be required to transfer a full seven billion

23     dollars of cash or property plus possibly substantial interest

24     to Barclays whereas, as Mr. Moore of the Fed states in his

25     uncontroverted declaration, the value of the securities

1     involved is substantially less than the value attributed to

2     them for settlement purposes.

3           I also note that every security that will be

4     transferred had already been pledged by LBI by September 19th

5     and was contemplated to be transferred in the purchase

6     agreement.  So no creditor can really claim that this changes

7     anything.  And, indeed, we learned over the weekend that the

8     CUSIP claim -- or in which Royal Bank of America is interested

9     in fact isn't included in the schedule of securities that's

10     going over as part of this agreement.

11           I want to make clear that the trustee undertook a

12     very careful consideration of this settlement and the factual

13     bases that are set forth in their affidavits by Ms. Leventhal

14     and Mr. LaRocca.  The trustee and his lawyers and accountants

15     met several times with representatives of other parties and

16     with the Fed to ask questions and make sure we understood the

17     facts and the circumstances.  Mr. Caputo, on behalf of SIPC,

18     who's in court today and I believe would like to make a few

19     remarks when I'm done, participated in or oversaw a good deal

20     of that activity.

21           Barclays and their attorneys, particularly,

22     frequently remind us, and I'll advert to this in a minute that

23     this matter has considerable urgency because of the market risk

24     involved with the securities that are being transferred, and as

25     they remind us, we first met with them back in October which is

1   more than five weeks before we filed this motion.  But despite

2   the importuning of the parties, we insisted on asking questions

3   and looking at the facts and circumstances, a process that took

4   until early December.  We also insisted that attorneys for Mr.

5   Miller and other attorneys for LBHI and Alvarez & Marsal be

6   informed of the settlement terms and have opportunities for

7   meetings and to obtain information all of which has occurred.

8   We provided information to LBIE informally and to Linklaters

9   which was acting as its counsel.

10          The trustee thinks that this settlement clearly falls

11  within the range of reasonableness and meets the standards for

12  approval under Bankruptcy Rule 9019.  It's far above the low

13  point of reasonableness.  As noted, we feel that there's a good

14  possibility that the Court could order this transfer or even a

15  more costly one by the estate under paragraph 20 of the order

16  approving the sale.  The estate could be diminished by a full

17  seven billion dollars and perhaps considerable interest.  And

18  on top of all that, the estate would have to bear the

19  considerable expense and disruption of potentially a major

20  litigation.

21          And again, I just want to make it clear that what

22  this settlement really accomplishes is completing the very

23  transaction contemplated in the purchase agreement as approved

24  by this Court.  And as Ms. Leventhal and the Fed note, this is

25  also a transaction that bears with it a considerable amount of

1    public interest.

2            There is urgency here because of the market risk

3    involved with the securities. From the trustee's point of

4    view, it's urgent because if the agreement is not approved by

5    the Court and signed by the trustee, it could be terminated by

6    the other parties as early as tomorrow and that would have all

7    the adverse consequences that I've outlined.

8            Only two sets of papers purporting to be objections

9    to the settlement have been -- to the motion have been filed.

10   And as I said, I think that we have been able to resolve one of

11   them with some language which I'll have to hand up to Your

12   Honor in a minute. We've also provided, as I indicated,

13   information that I think resolved any concerns that LBIE may

14   have had.

15           The one remaining objection, as I understand it, is

16   the objection of the committee in the Chapter 11 case. And

17   their objection, as I understand it, is primarily that they

18   seek extensive information about some background facts leading

19   up to the transaction. The information that they seek we think

20   really has nothing to do with this aspect of the purchase

21   agreement itself and it's just using this motion as a vehicle

22   either to reopen the Court's approval of the purchase agreement

23   or to investigate unrelated claims and transactions. We think

24   it's too late to do the former and with respect to the latter,

25   nothing in the motion or the proposed order forecloses any

1    investigation or claims that might be made about anything else.

2    And as I've said, the trustee himself intends to investigate

3    some of these matters himself.

4         I also want to make clear for the record that we do

5    not believe that the creditors' committee should be considered

6    a party in interest or to have any special status in the SIPA

7    proceeding where, among other things, SIPA already plays

8    substantial oversight roles.

9         And as I mentioned, I do have a blackline which I'll

10   be happy to hand up to Your Honor if Your Honor wishes to see

11   it which does have some clarifying language making clear that

12   this really doesn't affect the rights as to other matters of

13   other parties.

14        THE COURT:  Thank you.  This hearing was noticed as

15   an evidentiary hearing.  Do you assert that the declarations in

16   support of this motion constitute the evidentiary record on the

17   basis of which relief should be afforded?

18        MR. KOBAK:  We do, Your Honor.

19        THE COURT:  Is there anyone who has requested an

20   opportunity to examine or cross-examine further the witnesses

21   whose declarations have been offered?

22        MR. KOBAK:  Not as far as I'm aware, Your Honor.

23        THE COURT:  Let me ask openly in court right now if

24   there's anyone who wishes to examine any of the declarants.

25   Hearing no response, I'll deem that to be a no.  And I will

1 accept the declarations of each of the witnesses, notably the

2 declaration of Shari Leventhal which provides considerable

3 detail concerning the circumstances of this transaction.

4 Let me ask you a question before hearing from counsel

5 for Royal Bank and the committee who appear to be the only

6 objectors at this point. Both objections, as I read them,

7 assert a somewhat common theme. Royal Bank, and I probably

8 distort their position by characterizing it simply, say we

9 shouldn't be bound by somebody else's settlement. The

10 creditors' committee, and I make the same comment about not

11 attempting to characterize their remarks by this shorthand, we

12 need some more time to investigate further the circumstances of

13 this extraordinarily complex transaction that was approved in

14 such a hurry. And we're concerned that if it's approved now,

15 we may not have access to all the facts with which to assess

16 the reasonableness of the trustee's business judgment in saying

17 yes to this now. Is that a fair characterization?

18 MR. KOBAK: I think it's a -- I mean, I'll let them

19 speak for yourself (sic), Your Honor, but I think that's a fair

20 characterization.

21 THE COURT: Okay. That said, one of the questions I

22 have is this. Assuming that I approve this and we later

23 discover that despite the utmost good faith on the part of

24 everybody involved and the reasonable skill and insight of

25 those involved, that another mistake is uncovered. I'm not

1    calling this a mistake as much as something -- it's a seven

2    billion dollar item which, even in this case, is not a rounding

3    error. And let's just say that there's a recognition upon

4    further diligence that there's a need for further adjustment.

5    How can that be affected if this settlement is approved today?

6              MR. KOBAK: Well, Your Honor, first of all, I know

7    mistakes can happen but I don't think that's going to happen.

8    I don't even think Royal Bank of America's security is involved

9    in the securities that are going over. So I think that's

10   basically a nonissue. Again, this is all securities that were

11   supposed to go over on September 19th. So, in essence, it's a

12   transaction that's already been approved. Now, it certainly

13   doesn't take away any rights that people have as -- in our

14   proceeding anyway, as of September 19th. Our universe is kind

15   of fixed as of that date.

16             THE COURT: Okay.

17             MR. KOBAK: May I hand up the blackline, Your Honor?

18             THE COURT: Do you want me to read it now --

19             MR. KOBAK: Well, I guess --

20             THE COURT: -- or you want me to just have it.

21             MR. KOBAK: I think Your Honor should have it. I

22   don't know if the other parties will refer to it.

23             THE COURT: Certainly you may approach and hand it

24   up.

25             MR. KOBAK: Thank you, Your Honor.

1        THE COURT:  Thank you.

2        MR. KOBAK:  And, Your Honor, I believe Mr. Caputo of

3    SIPC would like to say a few words in support of the motion.

4    And it may be that some of the other parties would also like to

5    be heard.

6        THE COURT:  All right.  Well, given the fact that

7    we're dealing with those who support the motion first, why

8    don't we just hear from those.  And then we'll hear from the

9    objectors.  And then we can try to wrap this up.

10       MR. KOBAK:  Right.  Thank you, Your Honor.

11       MR. CAPUTO:  Good morning, Your Honor.

12       THE COURT:  Mr. Caputo, good morning.

13       MR. CAPUTO:  Kenneth Caputo on behalf of the

14   Securities Investor Protection Corporation.  Your Honor, SIPC

15   has reviewed the trustee's motion and the settlement agreement.

16   As Mr. Kobak stated, we've met with and engaged in numerous

17   comprehensive discussions with various parties among others,

18   the trustee, the parties to the settlement agreement, the New

19   York Fed, representatives of the LBHI and the Securities and

20   Exchange Commission.  We've discussed the facts and

21   circumstances leading to the dispute between the parties, the

22   content and parameters of the settlement agreement and the

23   present motion seeking its approval.

24       SIPC has reviewed the matter in accordance with its

25   oversight role in the SIPA liquidation proceeding of LBI and,

1  specifically, pursuant to SIPA Section 78EEE(d) which makes

2  SIPC a party by right to all matters within the liquidation

3  proceeding.

4     We've also reviewed the settlement agreement and the

5  motion in light of the guidelines set forth under Bankruptcy

6  Rule 9019 and the six factors considered by courts in the

7  Second Circuit under 9019 as set forth in such cases as In re

8  WorldCom and In re Ashford Hotels.  In that regard, Your Honor,

9  SIPC has considered first that absent approval of the

10  settlement agreement, the parties would likely engage in

11  complex, expensive and potentially lengthy litigation that

12  would burden the estate.

13     Second, the probability of success on the merits for

14  either party is not clear.  But what is clear is that if

15  litigation were to ensue, both parties would vigorously defend

16  their positions which lends support to the conclusion that the

17  exchange of the consideration contemplated by the settlement

18  agreement may reasonably be determined to be due and owing

19  under and after such litigation.

20     Third, the parties have agreed to exchange mutual

21  general releases making settlement agreement a fair resolution

22  of outstanding claims between the parties.

23     Fourth, creditors generally support the motion.  That

24  includes two of the largest creditors of the estate of LBI, of

25  course, the parties.  LBHI has not objected.  And SIPC, which

1  stands to be one of the largest creditors in the estate, is

2  standing in support.

3      Fifth, the settlement agreement represents a fair and

4  beneficial outcome for the estate especially given what Mr.

5  Kobak alluded to a couple of times which is the market risk of

6  the securities in Annex A.

7      Finally, Your Honor, and sixth, the settlement

8  agreement is the product clearly of significant arm's length

9  negotiation between the parties.  So all of the factors the

10  Courts have considered in approving settlement agreements in

11  this circuit have been met, we believe.

12      Very simply, Your Honor, based upon the foregoing, we

13  determined and we believe that resolution of the issues as set

14  forth under the settlement agreement and in the motion is in

15  the best interest of the estate of LBI, its creditors and

16  interested parties.  And we respectfully recommend that the

17  Court approve the motion.

18      THE COURT:  Mr. Caputo, thank you for those remarks.

19  Let me just ask you if you can endeavor to describe what this

20  litigation would look like that's being settled.  One of the

21  things that is, frankly, not clear to me from the papers I have

22  reviewed at least to this point is precisely what is being

23  settled in terms of the claims and defenses that are before the

24  Court in the settlement agreement.  And based upon the

25  presentation that has been made, this appears to be the

1  reasonably contemplated completion of the transaction that was

2  before the Court on September 19th.

3         MR. CAPUTO:  Right.

4         THE COURT:  To that extent, it would seem that there

5  wouldn't be much to be arguing about.  What is the estate

6  giving up, if anything, in achieving this settlement other than

7  avoided cost?

8         MR. CAPUTO:  We giving certainty to the estate

9  because it would undoubtedly be the case that if the settlement

10 agreement were not approved that a claim would be made against

11 the estate for far more, at least the seven billion if not

12 costs contemplated in relation thereto.  So the estate gains by

13 the settlement is a certainty of what was contemplated in the

14 APA and in the paragraph 20 of the order that was entered

15 approving the sale on 9/19 and then thereafter 'cause, I

16 believe, 9/20, 1, 2, 3, etcetera.

17        So what litigation would entail would be a recitation

18 of and a delving into all of the facts and circumstances that

19 were in existence on the 18th and the 19th leading up to the

20 APA.  That would be detailed, voluminous.  It would be lengthy.

21 So if I'm answering the question correctly, I think what you're

22 getting here is a certainty for the estate of what would

23 undoubtedly be a very large claim against the estate.  And the

24 certainty is that the assets contemplated to be distributed and

25 delivered, even as of 9/19, would indeed now be delivered and

1   both JPMorgan Chase, of course, and Barclays will walk away

2   from any of those claims they would have against the estate and

3   that's a significant benefit.

4            THE COURT:  Okay.  Thank you.  Is there anyone else

5   who wishes to speak in support of this proposed settlement?

6            MR. MILLER:  If Your Honor please, Harvey Miller, on

7   behalf of the Chapter 11 debtors.  I don't rise, Your Honor, in

8   the context of support but rather no objection.  This is a

9   compromise and settlement, Your Honor, in which the Chapter 11

10  debtors have a very significant interest.  Just to give Your

11  Honor some background, LBI, the SIPC debtor, has substantial

12  collateral which was posted with JPMorgan Chase.  In connection

13  with the resolution of claims that JPMorgan Chase may have

14  against the LBI estate, the Chapter 11 debtors and, in

15  particular, Your Honor, LBHI likewise posted a considerable

16  amount of collateral security consisting of cash and

17  securities.  As the claim of the bank against LBI is processed

18  and settled, Your Honor, and that collateral is used to settle

19  that claim, if that collateral is insufficient then JPMorgan

20  Chase will look to the collateral that LBHI has posted.  So

21  there was a very significant interest in this transaction, Your

22  Honor.  And we spent a considerable amount of time with the

23  SIPC trustee, with the staff, with the former Lehman people in

24  going through the facts relating to this transaction.  And it's

25  very significant, Your Honor, because in addition to the

1   transfer of the securities which are alluded to as having a

2   value, at some point in time, of 5.7 billion dollars in round

3   figures. The assertion in the declarations is that those

4   securities are now worth substantially less than 5.7 billion

5   dollars. But to make up what is facially the seven billion

6   dollars, an additional one billion 250 million dollars of cash

7   is going over to Barclays if you approve the settlement. And

8   that was very significant, Your Honor, to the Chapter 11

9   debtors and Mr. Marsal. And I can't tell you, Your Honor, how

10   much time we have spent on this with the cooperation of Mr.

11   Giddens as the trustee.

12         There are still facts, Your Honor, that have to be

13   determined. So when Mr. Kobak refers to the facts stated in

14   declarations as being uncontradicted, we understand the spirit

15   of the settlement, Your Honor. We understand what was to be

16   contemplated and to be performed under the asset purchase

17   agreement. And this is within the spirit of that agreement.

18         However, Your Honor, we were very concerned that

19   something would occur in this compromise and settlement which

20   would preclude future discovery, future determination, that

21   perhaps some assets were transferred to Barclays that may not

22   have been transferred to Barclays (sic) and, as Your Honor

23   knows, this is tripartheid settlement and there may be some

24   relationships with JPMorgan Chase in which LBHI and the related

25   Chapter 11 debtors may have some claims, or they may not have

1  some claims. But we were very concerned, Your Honor, in the

2  shortness of time between the filing of this motion and the

3  time to do some discovery and, as I said, Your Honor, a lot of

4  discovery, informal discovery, was done, Your Honor, the

5  considerations were raised with Mr. Giddens as the trustee,

6  raised with Mr. Novikoff as the attorney for JPMorgan Chase.

7  And as I understand it, even though Mr. Kobak refers to the

8  facts alleged in the declarations as being uncontradicted, all

9  rights are reserved by all parties as I understand the order.

10  And there is nothing in this that presents collateral estoppel

11  with a binding effect in any future proceedings. So when Your

12  Honor mentioned in the future, there is still a great deal of

13  work being done by the unsecured creditors' committee in

14  looking to the transfer of assets from all of the Chapter 11

15  debtors and LBI to Barclays.

16      So I don't think, Your Honor, as I understand the

17  order, that that kind of discovery, the assertion of claims in

18  the future, if there are any claims, are precluded by the

19  approval of this compromise and settlement. And it's on that

20  basis, Your Honor, that the Chapter 11 debtors do not object to

21  this compromise and settlement.

22      THE COURT: Fine. Thank you very much.

23      MR. MILLER: Thank you.

24      THE COURT: And I'd like others who are parties to

25  the settlement to confirm that what you've just said is their

1  understanding as well.  If it's not, I want to know what

2  differences may exist.

3       MR. SCHILLER:  Jonathan Schiller for Barclays

4  Capital.  That is our understanding and we confirm what Mr.

5  Miller has brought before Your Honor.

6       We have some other points but I believe the reserved

7  ones should be heard first --

8       THE COURT:  Okay.

9       MR. SCHILLER:  -- with Your Honor's permission.

10      MS. LEVENTHAL:  Good morning, Your Honor.  Shari

11  Leventhal for the Federal Reserve Bank of New York.  The

12  salient facts of how this settlement came to be are set forth

13  in my declaration.  And as has been stated a number of times

14  are not being contested here today.  Of course, if you have any

15  questions, Your Honor, I'm prepared to address those.  But if

16  not, I would like to note again that the Federal Reserve Bank

17  of New York believes that the interest of fairness dictate that

18  this settlement should be approved.  And I'd like to highlight

19  a few of the reasons why.

20      Barclays stepped in as the only party willing and

21  able to purchase LBI's assets.  Your Honor acknowledged that in

22  approving the asset purchase agreement.  Part of that ability

23  included the ability to step into the Fed's shoes and fund

24  LBI's payroll and operations.  And Barclays did this on the

25  night of September 18th.  The plan was for Barclays and LBI to

1 execute or reverse repo transactions whereby Barclays would

2 fund LBI to the tune of seven billion dollars. And -- I'm

3 sorry, to the tune of forty-five billion dollars and received

4 49.7 billion dollars in securities. Because of the operational

5 difficulties that I highlighted in my declaration, that reverse

6 repo transaction changed. And, in fact, Barclays paid thirty-

7 nine billion dollars and received 42.7 billion dollars in

8 securities. The seven billion dollar differential went into an

9 account at JPMorgan Chase for Barclays but somehow it ended up

10 in LBI's account and didn't remain in Barclays' account. Those

11 funds were Barclays' on the night of September 18th, the early

12 morning of September 19th. And as the Court noted, this was

13 the transaction that was contemplated in the asset purchase

14 agreement.

15 As Mr. Kobak noted, the estate could face a claim

16 here in excess of seven billion dollars. By our calculations,

17 I believe the interest on seven billion dollars is something in

18 the range of around thirty-five million dollars a month. So if

19 this settlement is not approved, we're talking about a sizeable

20 cash claim against the estate. And, in fact, what the estate

21 gains here is it has 5.7 billion dollars in cash remaining in

22 the estate in exchange for giving up securities that have a

23 value that's been noted both in the declarations and here today

24 as being far less than that.

25 Seven billion dollars is a lot of money at any time.

1  But it's particularly so in the current economic climate.  The

2  parties with the Federal Reserve's assistance have been working

3  diligently to reach a resolution of this matter.  And while the

4  delay in bringing this matter to the Court may seem to negate a

5  sense of urgency, as Mr. Kobak and Mr. Caputo noted, there is a

6  continuing and substantial market risk that the securities are

7  going to decline.  And it's important, therefore, that the

8  settlement be approved as expeditiously as possible.  As the

9  host country supervisor for Barclays, we believe it's important

10  that Barclays get its money.  In conversations with the FSA,

11  the home country regulator, they believe the same.  And,

12  therefore, we ask Your Honor that the settlement be approved as

13  soon as possible.  Thank you.

14        THE COURT:  Thank you.

15        MR. NOVIKOFF:  Good morning, Your Honor.  Harold

16  Novikoff, Wachtell, Lipton, Rosen & Katz on behalf of JPMorgan

17  --

18        THE COURT:  Good morning.

19        MR. NOVIKOFF:  -- Chase Bank, N.A.  Good morning,

20  Your Honor.  We are a party to and support the settlement

21  that's currently before the Court.  As has been noted, this is

22  essentially designed to achieve what was intended by the

23  parties to occur during the period on September 18th and 19th

24  to complete a delivery of securities that was intended at that

25  time which, largely due to operational issues, simply did not

1  occur.

2       JPMorgan's interest in this matter are largely

3  aligned with those of LBI and, indirectly, with the LBHI estate

4  in that all of us have an interest in maximizing the value of

5  the collateral pool that is held by JPMorgan to cover the

6  obligations owing to it by LBI, particularly, those arising

7  from the clearance advances pre-petition. These securities, if

8  they are not delivered to Barclays Capital, remain in that

9  collateral pool and would essentially have to be liquidated in

10  order to achieve a payment and realize their value. In looking

11  at it, we believe that, from JPMorgan's economic perspective,

12  which, as I noted, is aligned with those of the two estates, we

13  feel it is far better at this point to deliver those

14  securities, the entire settlement consideration here to

15  Barclays Capital, than to retain those derived value from them

16  but run a risk of -- a serious risk of a claim which could

17  result in seven billion plus of real value going to Barclays

18  Capital.

19       With respect to the timing, Your Honor, we believe

20  that any further delay here is potentially harmful. As I

21  noted, these securities right now are shown as property of LBI

22  in which JPMorgan holds a security interest. These securities

23  are not like fine wine. They do not improve over time in an

24  adverse market. Particularly, many of these are mortgage-

25  backed securities and they have been going down in value while

1  we've been putting the settlement into place. We would like to

2  know now, I'm sure Barclays would like to know now, whether

3  this transaction will be allowed to go forward. These

4  securities were set aside at some time in October to allow this

5  transaction to happen. The reality is, is the value during

6  that period of time, is the reality is the value of the

7  securities have gone down and we've got a market which, as Your

8  Honor knows, is quite volatile. And there can be further drops

9  in value. We want this to go forward now. We do not believe

10  it should be held up by any tangential issues where, at this

11  point, parties want to find additional information about the

12  overall sales transaction.

13      We confirm Your Honor's understanding that what is

14  being done here is we are approving a settlement agreement.

15  There will not be any collateral estoppel or other similar

16  effects. As to the facts laid out in the declarations or

17  otherwise in the order or the motion, we are approving a

18  transaction. People would remain free to pursue claims if they

19  feel that there is something in the overall sales transaction

20  which gives rise to a claim.

21      Essentially, what we're doing here at this point,

22  Your Honor, is allowing a portfolio of securities and proceeds

23  of sales of securities that previously have been set aside at

24  this point to move. Nobody's going to lose the record of what

25  moved or how it got there.

1          I would have more, Your Honor, to say about the Royal

2     Bank objection although I understand that objection is going to

3     be withdrawn and would reserve time if, in fact, my

4     understanding is incorrect.

5          THE COURT:  Fine.

6          MR. NOVIKOFF:  Thank you, Your Honor.

7          THE COURT:  Thank you, Mr. Novikoff.

8          MR. SCHILLER:  Your Honor, briefly, Jonathan Schiller

9     again on behalf of Barclays.  The order that the trustee has

10    put before you and which we've reviewed and to which Mr. Miller

11    referred preserves rights, as Mr. Novikoff just explained.

12    What will be final, Your Honor, is your approval of the

13    settlement agreement and the intended transfer of the

14    settlement securities and the settlement payment to Barclays.

15    Your Honor has heard from both the Fed and JPMorgan about the

16    risk of these securities in the marketplace.  We have put

17    before you through Gerard LaRocca, chief administrative officer

18    of Barclays -- and Mr. LaRocca is here this morning, Your

19    Honor.

20         THE COURT:  Good morning, Mr. LaRocca.

21         MR. SCHILLER:  In support of the motion to shorten

22    time, I just want to draw the Court's attention to the second

23    paragraph of Mr. LaRocca's declaration there where he said

24    insofar as a settlement agreement contemplates the transfer to

25    Barclays of those securities that remain from the Fed portfolio

1  that were originally intended to be transferred to Barclays

2  pursuant to the transaction described in the declarations that

3  accompany the motion before you, Barclays has been exposed and

4  continues to be exposed to continued market risk associated

5  with these securities at a time when the markets have been

6  experiencing and considerable risk.

7  　　　We regard the creditor committee objection, Your

8  Honor, as not germane to your decision whether to accept this

9  motion and approve the settlement.  They want to exhume

10  information related back to the sale.  That is not pertinent

11  and does not bear upon the question before you today.  Thank

12  you, Judge.

13  　　　THE COURT:  Mr. Schiller, before you --

14  　　　MR. SCHILLER:  Yes.

15  　　　THE COURT:  -- sit down, you may not be the right

16  person to answer this question and Mr. LaRocca might be.  And I

17  just want you to know that before we close the record as to

18  this aspect of this morning's agenda, I would like greater

19  clarity than I currently have on a valuation question.  And

20  this is not just addressed to you.  It's addressed to anybody

21  who can answer it.  I believe, if I'm understanding the

22  transaction correctly, that the working premise of it is that

23  the 1.25 billion dollars in cash consideration, which is going

24  to Barclays, upon approval, along with the securities that have

25  been identified, is intended to compensate Barclays for the

1    diminution in value over time of those securities such that

2    Barclays is receiving the same seven billion dollars in value,

3    assuming it's approved today and consummated tomorrow, that it

4    would have received if the transaction had been consummated as

5    contemplated in September.  Am I right in understanding that?

6    That's a premise that I have.  I just want to confirm it.  And

7    then assuming that's correct, I want to know what the current

8    value of the transaction is.

9              MR. SCHILLER:  It's a bit different than that, Judge.

10   The cash component is designed to address the liquidation of

11   certain securities from the Federal portfolio that occurred.

12   And it makes up for that portion of the securities.

13             THE COURT:  As of what date?

14             MR. SCHILLER:  As of the date --

15             THE COURT:  I mean, recog --

16             MR. SCHILLER:  -- the settlement agreement was

17   entered.  The liquidation occurred after the 19th and the

18   values were established at the time the parties agreed in their

19   settlement.

20             THE COURT:  I'm still not clear on this.  And I know

21   a lot of people have spent a lot of time on it.  I'm just

22   trying to understand the basic math that is supposed to equal

23   seven billion.  It's 1.25 billion in cash plus a basket of

24   securities equals seven billion, is that right?

25             MR. SCHILLER:  That is, as Mr. Miller said, that's

1    the facial value. All the parties before you believe that the

2    current value of those securities is below that. And that's

3    why it would be a benefit to the estate to resolve it on this

4    basis.

5              THE COURT: Understood. And I take it that while

6    everybody represents, and I accept the representations, that

7    this is a net benefit to the estate, no one is prepared on

8    today's record to quantify what that benefit is.

9              MR. SCHILLER: Well, the evidence before you, Judge,

10   submitted by the Fed by Mr. Moore is that the Federal

11   securities, and I quote, "would be substantially less than the

12   50.62 billion". And that in paragraph 6 of his affidavit, he

13   relates that the subject of the motion is going to be

14   substantially less than the difference. And he does the math

15   there. The precise value today of the securities in the Fed

16   portfolio, I can't make a representation other than agreeing

17   with Mr. Moore that the values have declined and are

18   substantially below the seven billion dollar value.

19             THE COURT: Okay. All that I was really trying to

20   get a sense of -- and it may be that the parties involved in

21   this would prefer not to sharpen their pencils on this and

22   prefer the record to speak for itself that it's substantially

23   less and allow me to use my own powers of interpretation to

24   assume that means a lot of money. But I don't know what we're

25   talking about in terms of the order of magnitude. It may be

1   that I don't need to know that.  But missing from the equation

2   of determining that this is a 9019 settlement that warrants

3   approval is the quantification of what that benefit actually

4   is.  It may be that parties would prefer that that not be part

5   of the public record.  I'd like to know it.  And I'd be

6   prepared to learn it through an in camera submission.

7           MR. SCHILLER:  Very well, Your Honor.  I would just

8   add to that that the trustee, of course, with Deloitte, has

9   looked at this as has Mr. Moore to make their representation to

10  you.  It doesn't offer the precision of the value that you're

11  asking but it is testimony as to that number being less than

12  the full value of the settlement.

13          THE COURT:  I understand.  I simply trying to get

14  some sense.  In a universe in which we're talking about seven

15  billion dollars which is quite a lot of money --

16          MR. SCHILLER:  Yes, sir.

17          THE COURT:  -- I'm trying to understand what, in

18  fact, is the value of what is being transferred to Barclays

19  today.

20          MR. SCHILLER:  If I may just take one minute, because

21  it's an important question, confer with my client and Mr.

22  LaRocca and see if there's something that we can throw a light

23  on publicly at this point in time for you.

24          THE COURT:  That would be helpful.

25      (Pause)

1          MR. SCHILLER:  Your Honor, we are prepared to proffer

2   through Mr. LaRocca off the record in camera the value of the

3   securities that Barclays assigned on the night of the 19th.

4          THE COURT:  Fine.  Thank you.  Is there anyone else

5   who wishes to speak in support of the proposed settlement?  All

6   right.  Let's hear from anyone who wishes to speak against it.

7          MR. KIRPALANI:  Good morning, Your Honor.  Susheel

8   Kirpalani from Quinn Emanuel on behalf of the official

9   committee of unsecured creditors of the Chapter 11 debtors.

10         THE COURT:  Good morning.

11         MR. KIRPALANI:  Your Honor, first of all, I want to

12  thank you for letting me be heard at least to outline what our

13  position is.  I appreciate the offer to include in the proposed

14  form of order language and all the representations that this

15  would not be collateral estoppel.  But I did want to explain to

16  the Court, and I won't take up too much of Your Honor's time,

17  exactly why did the committee feel it so necessary to appear on

18  this particular settlement if, in fact, all rights are reserved

19  and if, in fact, there's not supposed to be any collateral

20  damage -- or, hopefully not damage but collateral estoppel.

21         Your Honor, I think the issues -- Your Honor knows

22  better than I -- from the Friday night when you approved the

23  sale going forward were thereafter spun into a whole variety of

24  additional discussions and negotiations into Saturday and

25  Sunday.  And we did submit the declaration of Mr. Saul Burian

1    from Houlihan Lokey who was intimately involved in those

2    negotiations. The sale order itself made the creditors'

3    committee a party, if you will, to the transaction in the sense

4    that it couldn't be changed without the creditors' committee's

5    consent, even an immaterial change.

6            The transaction, Your Honor, did change. It changed

7    and you heard about the changes. Your Honor yourself probably

8    sees the numbers in the affidavit and went back and looked at

9    your transcript and said that wasn't exactly the numbers that I

10   remember being told on the Friday. At least that's the

11   learning process I've gone through. And so, the question that

12   we had when this has come before the Court in an emergency

13   basis order to show cause three months after the transaction is

14   these new numbers. If they're not footing with the numbers

15   that were told to the creditors' committee during the weekend,

16   why is that? And what are the right numbers? Because as of

17   that late Sunday night, early Monday morning, our financial

18   advisors were told that, look, this is the transaction that has

19   to close. These are the numbers -- they're actually given a

20   manila folder, which I photocopied here, that has all of the

21   numbers that Mr. Burian outlined in his declaration. And it's

22   for these reasons we need to go forward. Don't worry. There

23   will be a reconciliation post-closing.

24           And so, here we are, three months hence and we assume

25   that parties are busy, there's a lot of other things that need

1    to happen in the estate and we're not faulting anybody for

2    that.  But then when we see three declarations submitted by

3    various parties to some settlement agreement that, although I

4    say it's tangential, it was part and parcel of the transaction,

5    Your Honor.  I mean, I'm not going to use a microscope and say

6    that this is something separate than the sale transaction.

7    When we see declarations that have different numbers, different

8    understandings than what people were told, we agree with the

9    Court's comments that these aren't rounding errors.  These are

10   billions of dollars.  And Your Honor mentioned that seven

11   billion dollars is a lot of money.  I would posit that five

12   billion dollars is also a lot of money.  And one of the major

13   changes from that weekend was the securities or the assets that

14   were being transferred to Barclays would need to be trued up

15   that the value from Ms. Fife's comments on that Friday up until

16   Sunday had gotten even worse than the 47.4 and that they have

17   actually decreased now to forty-four or forty-five billion

18   dollars.  And Mr. Burian goes through that in his declaration.

19        And so, our request was simply that in addition to

20   the language that Your Honor sees in the court order that by

21   mid-January, at least, there be a final reconciliation of this

22   mess of transactions.  There are a lot of smart people who

23   worked on it.  But not everything -- in fact, close to nothing

24   has come to light.  And while we understand that the creditors'

25   committee sits in the Chapter 11 case and this is the SIPA

1    proceeding, we thought someone should bring it to the Court's

2    attention that Your Honor, I can tell from your questions, are

3    asking, how do I know what the values are or who ascribed the

4    value, as of what date, these are all the same types of

5    questions that we've been asking.  And we thought it's

6    important to bring it to the Court's attention because,

7    frankly, at the end of the day, Your Honor lowers the gavel and

8    says this is a fair deal or not a fair deal.  But without the

9    right information or without understanding how numbers kept

10   changing, I think it gives us a little bit of pause, Your

11   Honor.  And if what everybody in this courtroom is telling me

12   is we want to get on with the agenda and you've made your

13   point, all rights are reserved, all I would say is if the

14   parties could agree to provide us with the information rather

15   than force us to go through the hoops of filing a Rule 2004

16   against three different entities, yeah, that would be, I think,

17   the most efficient way to proceed.

18        It's not that the information doesn't exist.  The

19   declarants are relying on something when they're making

20   statements about assumed liabilities and asset values of

21   particular dates.  When people market to market securities, we

22   want to make sure they didn't stick their finger in the air and

23   say, hmm, five billion dollars additional assets, please,

24   Lehman Brothers.  And that's our concern.  If everything turns

25   out that it was a frenzied time but that, in fact, was the

1  market to market value as of that weekend and the transaction

2  was permitted to close and had to close to save the various

3  jobs that we're very happy that they did save, then that would

4  be fine.  But there are major discrepancies between what we

5  were told that weekend and what's being put forth here today.

6  Now, I understand none of that is part of the factual record

7  which is comforting.  When we filed our objection, that was not

8  the case but I think that's now been made very clear.  And what

9  we have asked is, and we asked them on Friday, could we please

10  get some final reconciliation of the numbers and Houlihan Lokey

11  will work with Deloitte and work with Barclays.  And the

12  problem we face, which, I think, Your Honor has heard in other

13  contexts is the critical people on Lehman Brothers' side don't

14  work at Lehman Brothers anymore.  And so, it's difficult that

15  they were the ones who were assisting in the consummation of

16  the transaction.  They're not there anymore when the questions

17  are to be asked.  And we just want to get the final answer,

18  Your Honor.  That's really all we want.

19       THE COURT:  When you asked the question on Friday

20  about getting together and trying to work cooperatively to get

21  to the bottom of all this, was there a response?

22       MR. KIRPALANI:  Their response was we'll give you the

23  language in the order and that's it.  This morning, the parties

24  did tell me that they would be happy to look at the list, it's

25  five items, look at the list that Houlihan helped me put

1  together and we can talk about it sometime in mid-January.  You

2  know, I guess, that's where we are.  They said they don't think

3  it's appropriate for the Court to have to order them to comply

4  and I said you're just causing us to file a motion to do that.

5  It's hard to argue that the information shouldn't be made

6  available.  But, I guess, that's probably where we are.  We'd

7  have to file something if they don't give us the information.

8          THE COURT:  All right.  I'll just make the general

9  comment.  It's not a ruling and I'm not ordering anybody to do

10  anything because there's nothing before me that leads to the

11  entry of an order at least at this point other than an order

12  with respect to the settlement agreement itself.

13          It's obviously in the best interest of orderly case

14  administration that information be shared as promptly as it can

15  be consistent with the other conflicting obligations that the

16  financial advisors and lawyers have in this massive case with

17  enormously complicated issues.

18          Nonetheless, I consider it to be important for us to

19  get to what I'll call closure with respect to the basics of the

20  transaction that was approved by order entered September 20th.

21  And this motion with respect to the settlement agreement is a

22  reasonable platform on which to address some of these issues

23  because while this is not fairly to be characterized as a

24  cleanup item, it's a very significant matter.  It does draw all

25  of our attention back to what happened in September.  And I

think it important that there be reasonably prompt resolution

of outstanding questions that the committee may have on the

subject.  I would hope that it's not necessary for the

committee to have to file 2004 requests in order to get the

information that it seeks which seems to be reasonable and

consistent with its mandate.

As it relates to the issue of standing that has been

alluded to during the course of this hearing and in your own

remarks at the outset, by making this comment, I am not making

any judgment as to the standing of the creditors' committee

appointed in the LBHI case to participate actively and directly

in the LBI case.  But it is apparent to me that the transaction

that was approved on September 20th was approved by means of

two orders, one entered in the LBHI case and one entered in the

LBI case.  It is reasonable for the creditors' committee which

represents substantial creditor interest in LBHI to have access

to information so that it can fulfill its functions in the LBHI

case.

Additionally, it appears to me reasonable for the

LBHI committee not just in the context of what's before me now

but in other settings to be a party in interest for purposes of

major transactions affecting the LBI case.

This does not constitute a ruling with respect to

standing.  I do, however, note that these cases operate off the

same agenda, very frequently have overlapping agenda items and

1    regardless of their actual procedural status as stand alone

2    cases are in many material respects linked.

3          To the extent that there is a reasonable standing

4    objection made at some point in the future by the LBI trustee,

5    I'm prepared to consider it on its merits. But to the extent

6    that the parties can work cooperatively, I consider that to be

7    desirable and something to be pursued in good faith.

8          MR. KIRPALANI: Thank you, Your Honor. I appreciate

9    your remark.

10         THE COURT: Whatever happened with Royal Bank? Mr.

11   Ostrow, do you wish to make your way to the front of the room?

12         MR. OSTROW: Thank you, Your Honor. Good morning,

13   Your Honor. Alec Ostrow from Stevens & Lee on behalf of Royal

14   Bank America.

15         THE COURT: Good morning.

16         MR. OSTROW: Your Honor, Royal Bank America objected

17   to this settlement on four grounds. One is that it didn't want

18   to be bound and, in particular, drew attention to particular

19   language in the order that said anyone who objects is deemed to

20   consent. We objected to that.

21         We were also concerned that our particular property,

22   collateral that was posted with Lehman Brothers Special

23   Financing somehow made its way to Lehman Brothers Inc. and

24   somehow made its way to Barclays might be affected in this

25   particular transaction. And we didn't know whether it was or

1    it wasn't.  And to the extent that it was and we had interest

2    in it, we wanted those interests protected.

3         The other aspect to which we objected was that we

4    just didn't see the basis for the compromise.  Over the weekend

5    I received a proposed revised order from counsel for the

6    trustee.  And this morning, I had an opportunity to speak with

7    counsel for Barclays and counsel for JPMorgan Chase.  And based

8    on the discussions that I've had with that counsel and the

9    things that were agreed to among counsel, I'm prepared to

10   withdraw the objection.

11        And let me tell you what the things are.  I haven't

12   seen the precise order that was handed up to Your Honor and I

13   would like to see a copy of it.  But the deemed consent

14   language that I had objected to is to be stricken and the

15   limitation on the binding effect language that was inserted

16   over the weekend is to be retained.

17        There is to be a representation by Barclays that

18   Royal Bank's posted collateral, as we've described it in our

19   papers, is not involved in this transaction at all.  That upon

20   the signing of appropriate confidentiality agreements we would

21   be able to get complete access to the Schedules A and B to the

22   asset purchase agreement and to Annex A to the settlement

23   agreement.  And that Barclays and JPMorgan Chase will provide

24   to Royal Bank on a confidential basis information as to their

25   banks -- to the extent that their banks acquired or disposed of

1    Royal Bank's posted collateral. With respect to JPMorgan

2    Chase, that will take place after the first of the year. And

3    David advised me that they can only trace me CUSIP numbers and

4    that's acceptable to me. If that's acceptable to the other

5    parties, then I'm prepared to withdraw the objection.

6         THE COURT: It sounds like it's a conditional

7    withdrawal. Is there agreement that those conditions have been

8    met?

9         MS. GRANFIELD: Lindsee Granfield, Cleary Gottlieb

10   Steen & Hamilton LLP on behalf of Barclays Capital, Your Honor.

11   I think Mr. Ostrow's recitation is correct. One little

12   clarification or amendment may just simply be that obviously we

13   were checking as to -- again, and something similar. He said

14   with respect to JPMorgan, we can check on CUSIP number with

15   respect to the CUSIP number that he has put in his objection

16   and any securities that may be on different schedules. It is

17   represented that that CUSIP number does not appear on Annex A

18   to the settlement agreement. To the extent that it were to

19   appear on schedules related to the clarification letter, we'll

20   check whether that amount and that CUSIP is still at Barclays.

21   That's what we agreed we would do and we will do that.

22        Obviously, if -- the CUSIP is the same, just as a

23   clarification, doesn't mean that that's Royal Bank's posted

24   collateral. That's a different question. But we will check

25   and get that answer at least for Mr. Ostrow.

1          THE COURT: Thank you.

2          MR. NOVIKOFF: Your Honor, on behalf of JPMorgan, we

3     confirm. I do want to clarify that what JPMorgan will do is

4     determine from its records whether it believes that this CUSIP

5     number was involved in a transfer of the amounts that were --

6     of the securities that were delivered to Barclays Capital on

7     September 18th or whether it was a CUSIP that was contained in

8     the clearance accounts on September 19th. I understand, if I

9     understand the complaint properly, the security was originally

10    posted as collateral in January of 2006. We are not going to

11    be checking for some period of two and a half or two and three-

12    quarter years on the security. But we will -- what we will

13    endeavor to find out -- if that CUSIP was there during that

14    period. Obviously, Your Honor, there is no assurance that that

15    CUSIP on September 19th, if it was present, is in any way the

16    same security that was posted in January of 2006.

17         THE COURT: Mr. Ostrow, does all of that satisfy you

18    to the point of confirming that your objection is withdrawn?

19         MR. OSTROW: Yes, Your Honor. It does.

20         THE COURT: Thank you. The objection is deemed

21    withdrawn.

22         MR. MILLER: Your Honor, please, Harvey Miller again.

23    Your Honor, I just want to respond to something that Mr.

24    Kirpalani said in connection with this particular transaction.

25    We had two situations, Your Honor, the sale that you approved

1   by the order of September 19th and this particular transaction.

2   I don't want Your Honor to believe that this was not part of

3   discussions that occurred over the weekend of the 19th, the

4   20th, the 21st into early that Monday morning.

5          THE COURT:  I think Mr. Kirpalani confirmed that, in

6   fact, it was discussed over that weekend and Mr. Burian was

7   part of those discussions.

8          MR. MILLER:  The problem is, Your Honor, that at 3 or

9   4:00 in the morning, Mr. Burian had left.  And the Houlihan

10  Lokey people had left.  And the Fed was present through

11  telephone, Your Honor.  JPMorgan was present.  Barclays was

12  present.  The representatives of LBHI were present.  And in

13  those transactions, Your Honor, this seven billion dollars was

14  an issue of extended discussion.  And Your Honor has to

15  remember that this goes back to what was a reverse repo that

16  was done on the evening of the 18th.  And normally, when that

17  repo comes off in the morning, cash is exchanged, securities

18  are released and so on.  The 19th occurred; the securities were

19  not there to deliver to Barclays in connection with that

20  reverse repo.  It was converted into purchased assets.

21         That's what happened, Your Honor.  And at the

22  closing -- and this, Your Honor -- there were very few people

23  awake.  They were lying on the floors and all over the place.

24  And we were talking -- and as Senator Dirksen said, we were

25  talking about real money.  And it was very clear, Your Honor,

1    that Barclays was to either get seven billion dollars in cash

2    or to get the securities that were to be released.

3            At that point in time, Your Honor, there was an

4    election by Barclays, so to speak, that it would take the seven

5    billion dollars in cash.  It was under the impression that

6    there was seven billion dollars in cash in a bank account at

7    JPMorgan Chase.  It turned out after the closing, Your Honor,

8    that that bank account did not exist.  So what has been

9    happening over this period of time is the parties have been

10   trying to resolve that difference.  And while it's facially

11   seven billion dollars, the representations that have been made

12   all the way through these discussions, Your Honor, that that

13   5.7 billion dollar securities has eroded in value to a

14   substantial sum that nobody wants to release publicly.  But

15   it's our understanding, on behalf of the Chapter 11 debtors,

16   Your Honor, that it is significantly less than 5.7 billion

17   dollars.

18           So what is really happening here, Your Honor, is the

19   LBI estate is getting credit for seven billion dollars being

20   paid to Barclays which reduces the claim that Barclays would

21   have against that estate.  That preserves value for the LBHI

22   estate because the collateral that has been posted by LBHI will

23   not be eroded to the extent of a full seven billion dollars.

24   So there is real value here, Your Honor, to the LBHI estate.

25   And that's the reason why we don't object to this.

1    And I would point out, Your Honor, the seven billion

2  dollars is different than the APA.  That seven billion dollars

3  was a separate discussion.  And there's no question in my mind,

4  Your Honor, that Barclays thought it had seven billion dollars

5  in cash in a bank account.  It wasn't there.  And that's what's

6  being resolved today, Your Honor.  Thank you.

7    THE COURT:  Thank you.  Is there anyone else who

8  wishes to make any comments in connection with the proposed

9  settlement agreement between the SIPA trustee, Barclays Capital

10  and JPMorgan Chase Bank?  I'll deem the record closed for

11  purposes of both evidence and argument and I will approve the

12  settlement based upon the record and the representations that

13  have been made including the comments confirming that the

14  settlement is not intended to have collateral estoppel impact

15  that would preclude the further examination of the

16  circumstances surrounding the original sales transaction

17  between the estates and Barclays Capital approved by order

18  entered September 20.

19    I accept the representations that have been made by

20  the various parties concerning the benefit to the estate

21  associated with this 9019 settlement notwithstanding the fact

22  that the record is murky with respect to the quantification of

23  the actual benefit.  References have been made to the avoidance

24  of the burden and expense of litigation but also to the fact

25  that the notional amount applicable to the settlement

1    represents a significant but unquantified saving with respect

2    to the amount that would be paid if we were counting out seven

3    billion dollars in actual cash.  That difference apparently is

4    the current market value of the basket of securities that has

5    been referenced during the course of today's hearing.

6         For reasons stated earlier during the course of the

7    hearing, I am interested in learning what that delta is to the

8    extent that it's possible to estimate what the actual benefit

9    is in dollars recognizing that it is just that, an estimate,

10   and not a precise calculation.  But I do accept the statements

11   that have been made by counsel for all parties and that no one

12   has objected to that this settlement represents a significant

13   benefit to the estate and is the right thing to do,

14   particularly, since Barclays had every reason to expect that

15   this value would be part of its agreement with the New York

16   Fed.

17        I was particularly impressed the declarations

18   submitted in support of this motion of Shari D. Leventhal and

19   her remarks made amplifying on the language of that declaration

20   during the course of this morning's hearing.  Without going

21   into specifics, in effect, what the New York Fed is saying,

22   this was what the parties contemplated when Barclays stepped

23   into the shoes of the New York Fed at a time when this case was

24   going through its most difficult early days.

25        Based upon the declarations that have been supported

1     -- that have been submitted in support of the proposed

2     settlement agreement and the various statements that have been

3     made by interested counsel, I approve the settlement.  I'm

4     prepared to enter the order in the form that it has been

5     modified to take into account some of the concerns of Royal

6     Bank whose objection has been withdrawn.  And I incorporate

7     into that order by reference the statements that have been made

8     on the record indicating that this is without prejudice to

9     further investigation by the creditors' committee.

10          MR. KOBAK:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MS. GRANFIELD:  Your Honor, could I approach with a

13    hard copy of that revised order and a diskette with the order

14    on it?

15          THE COURT:  That will be fine.

16          MS. GRANFIELD:  Thank you.

17          THE COURT:  Thank you.

18       (Pause)

19          THE COURT:  We seem to be --

20          MR. OSTROW:  Your Honor, may I be excused from the

21    remainder of the hearing?

22          THE COURT:  We seem to be clearing the courtroom.  So

23    let's take a moment to do that.  And this may be a reasonable

24    time to take a break anyway.  Let me just ask people to stop

25    for a moment while I'm commenting.  We're going to clear the

1  courtroom but there's just a statement I wanted to make.  I

2  would like to have the chambers conference, if that's what it's

3  going to be, now in reference to the representations as to

4  value.  So if anybody is leaving who's needed for that, you can

5  certainly appear with your coats on but let's use this time to

6  go into the conference room across from my chambers' entrance

7  which is right outside in the hall.  And during the course of

8  that chambers conference, I would like to also have an

9  administrative discussion with counsel for the debtor about a

10  matter that involves a possible emergency hearing that has been

11  requested by a litigant that does not appear on today's agenda.

12  So let's meet across the hall in five minutes and let's plan on

13  a total break of fifteen minutes.

14        MR. MILLER:  Thank you, Your Honor.

15        THE COURT:  We're adjourned.

16     (Recess from 11:25 a.m. until 11:58 a.m.)

17        THE COURT:  Be seated, please.

18        MS. FIFE:  Good morning, Your Honor, if it still is

19  morning.

20        THE COURT:  Just barely morning.

21        MS. FIFE:  Yeah, that's right.  Lori Fife from Weil

22  Gotshal & Manges on behalf of the debtors.  The first thing on

23  the calendar for the LBHI case is an uncontested matter, the

24  debtors' motion authorizing entry into a settlement agreement

25  with certain of its French affiliates.  The motion seeks

1  approval of the settlement and also seeks authority for LBHI to

2  vote in its capacity as shareholder of BLB, which is one of the

3  French affiliates for the sale of the business to Nomura.  And

4  also for the voluntary dissolution of BLB, both of which are

5  predicated upon the approval of this settlement.

6       There were no responses received.  And I can go into

7  the terms of the settlement in more detail if you'd like.

8  Otherwise --

9       THE COURT:  It's probably not necessary.  I have

10  looked at it.

11       MS. FIFE:  Okay.

12       THE COURT:  And I think it's fine.  I'll approve it.

13       MS. FIFE:  Thank you.  The second motion on the

14  calendar is LBHI's motion for authorization to assume

15  administrative services agreement with Aetna.  Aetna is our

16  administrator of what is now self-funded medical and health

17  plan.  We are in the process of entering into a new agreement

18  with Aetna to have Aetna become the insurer.  But we still need

19  the administrative services of Aetna.  So we have entered into

20  this amended agreement.

21       There were no responses received so I'd ask the Court

22  to approve the motion.

23       THE COURT:  That motion is approved.

24       MS. FIFE:  Thank you, Your Honor.  The third thing on

25  the calendar is LBHI's motion for authorization to reject the

1  prescription drug program master agreement with Medco.  This is

2  the pharmaceutical plan that LBHI and its subsidiaries had.  As

3  I just mentioned, we're entering into a new agreement with

4  Aetna so we no longer need this prescription plan.  We'd ask

5  that the motion for rejection be approved.

6          THE COURT:  That is granted.

7          MS. FIFE:  The fourth item on the calendar, Your

8  Honor, is a motion to amend orders authorizing the sale of

9  aircraft.  You may recall that earlier you approved the sale of

10  the Gulf Stream G-4 and the Falcon 50.  Neither of those

11  transactions were consummated mostly because of the decline in

12  the market for airplanes.  In addition, the Falcon 50 had some

13  issues with inspection on the aircraft.  We continued to market

14  those two aircrafts and were unsuccessful.  However, the

15  original purchasers came back and offered to buy those two

16  planes as long as we were able to consummate the sale prior to

17  December 24th which was the reason we needed to shorten notice

18  for this motion.

19          We believe that this transaction continues to

20  represent the highest and best price for the aircraft and seek

21  the modification.  The purchase price for the G-4 went from

22  24,892,000 to 23,400,000 which is a reduction of 1,492,000.

23  And the Falcon 50, which was originally sold for 6,200,000 has

24  been reduced to 5,900,000 which is a reduction of 300,000.

25          There were no responses that were filed and the

1  creditors' committee has reviewed the transaction and supports

2  it as well.  So we'd ask that you approve the amended orders.

3        THE COURT:  I will approve the amended order although

4  when I first saw all the paperwork surrounding these retrades

5  of transactions that have only recently been approved, it all

6  got my attention.  And I know that a tremendous amount of work

7  had been invested in the original transactions which were

8  presented by your colleague on two separate hearing occasions.

9  And understand that the market for a pre-owned aircraft appears

10  to be in steep descent and, as a consequent, the business

11  judgment that's being exercised here seems appropriate although

12  it's somewhat painful, I might add, to have to revisit these

13  transactions as recently as a month after approval and that

14  these deals are not simply being closed by responsible

15  purchasers as agreed.  But I fully recognize that liquidated

16  damages are what they are and that business is what it is.

17        And so, I approve these with some regret.

18        MS. FIFE:  We have regret as well, Your Honor, but

19  this is the highest and best offer we have.

20        THE COURT:  Understood.  And if it weren't the

21  highest and best offer for these assets, I wouldn't be

22  approving it.

23        MS. FIFE:  Thank you, Your Honor.  The next matter on

24  the calendar is a contested matter, a motion of OMX Timber

25  Finance Investments LLC.  And I'll let --

1          MR. MILLER:  Your Honor, just before -- I think we

2     resolved the other matter --

3          MS. FIFE:  Oh.

4          THE COURT:  Wonderful.

5          MR. MILLER:  -- without the necessity for a hearing.

6          THE COURT:  So there's no need to schedule an

7     emergency.

8          MR. MILLER:  Correct, Your Honor.

9          THE COURT:  Fine.

10          MR. MILLER:  Your Honor, may I be excused?

11          THE COURT:  You may.  Have a good holiday, Mr.

12     Miller.

13          MR. MILLER:  Happy holidays to you, Your Honor.

14          MR. FLECK:  Good afternoon, Your Honor.  Evan Fleck

15     of Milbank Tweed Hadley & McCloy on behalf of the official

16     committee of unsecured creditors.  As Ms. Fife mentioned, this

17     is the motion of OMX Timber Finance for limited relief from the

18     stay.  The committee filed an objection on Friday evening and

19     the debtors filed a joinder yesterday.

20          The parties have met this morning and I'm pleased to

21     report that there is a resolution of the motion.  The parties

22     intend to submit an order to the Court for entry later on this

23     afternoon.  By way of preview, if I may, Your Honor, just

24     mention the contours of the agreement that's been reached.

25          The parties have agreed for limited relief from the

1 stay solely for the purpose of OMX to submit demand notices

2 with respect to the guaranty. That would apply to OMX and also

3 with respect to the indenture trustee for one of the underlying

4 notes on a going forward basis. All parties would reserve all

5 rights with respect to those notices including to argue that

6 the automatic stay applies and that cause does not exist to

7 lift the automatic stay with respect to those notices.

8       THE COURT: Let me make sure I understand what you've

9 just said. Are you saying that notices will be given as

10 requested in the motion but that the giving of the notice is

11 without prejudice to the argument that it violates the

12 automatic stay?

13       MR. FLECK: Yes, Your Honor. That is the agreement

14 of the parties in order to allow the parties to continue to

15 discuss the matter and return to the court at a later date, if

16 appropriate, in connection with either a hearing on a motion or

17 in connection with claims reconciliation process. That is the

18 agreement of the parties if it's satisfactory to the Court.

19       THE COURT: I'll simply say that it's a pretty

20 unusual agreement.

21       MR. DEVENO: Your Honor, Mark Deveno of Bingham

22 McCutchen on behalf of Wells Fargo. Your Honor, Wells Fargo is

23 the indenture trustee on certain notes issued by OMX and in

24 that capacity receives a pledge of the guaranty. I'll ask Mr.

25 Fleck to confirm my understanding but just to clarify it, I

1  think, slightly, I don't believe there will be a reservation of

2  whether there has been a violation of the automatic stay for

3  purpose of sanctions or otherwise but I believe the committee's

4  objection was based on a premise that a claim does not

5  currently exist because a demand has to be given. During the

6  claims process, all rights of the parties will be reserved for

7  the committee to argue that that demand, although we've

8  permitted it today, should not have been given in which case at

9  least for a claims resolution process, we'll treat it as though

10 the demand, in fact, hadn't been given and the parties' rights

11 with respect to the various claims that OMX or the indenture

12 trustee might assert would be based on that outcome.

13       THE COURT: I'm completely befuddled by this. And

14 it's probably -- it's not because of anything you've said. But

15 you can reach any agreement you wish that resolves this.

16 That's fine. I'm all in favor of consensual resolution. But

17 the motion practice that has been teed up for today calls for a

18 very difficult decision to be made absent such an agreement.

19 And that difficult decision effectively deals with the balance

20 of harms standard in the Sonnax case. And you should know,

21 both sides, that I've spent some considerable time in

22 preparation for today's hearing thinking about this very issue.

23 I don't know when it is that you came up with the structure

24 that you're now describing. And I'm glad that you did if it

25 satisfies this dispute at least for today. But in terms of

1   courtesy to the bench, if this is something that was known
2   earlier than five minutes ago, it would have been very helpful
3   to me to have known it earlier. And I say that because I
4   dedicated very significant amounts of time to this particular
5   dispute over the weekend. In doing so, I might add, I was
6   looking forward to hearing whatever arguments were going to be
7   made today because I consider this to be an extremely close
8   question. Furthermore, it is still not clear to me whether or
9   not a claim currently exists on the part of OMX Timber Finance
10  Investments II, LLC or whether or not that claim is only
11  triggered upon the giving of the notice which, ordinarily,
12  would be barred by the automatic stay. The stipulation you
13  describe is one that so finesses the issue that it seems to me
14  that it creates more trouble than it solves.

15          And so while I am almost always anxious to approve
16  stipulations, unless I'm misunderstanding something, all you
17  have done is kick the can down the road. You've done nothing
18  about fixing the problem.

19          MR. DEVENO: Again, Mark Deveno on behalf of the
20  indenture trustee, Your Honor. And we certainly -- I can't
21  stress enough -- appreciate the Court's time and energy put
22  into the issue. And it is, in fact, an issue that has been
23  resolved this morning. So we certainly apologize for the
24  inconvenience to the Court.

25          THE COURT: No, no. No. I'm not looking for an

1    apology.  I'm looking for a better understanding as to the

2    stipulation that has been reached.  Is this a matter which has

3    been resolved to the point that the stay relief before the

4    Court is now moot?  Or is this something which simply defers

5    consideration to another date under a different guise by virtue

6    of reserved rights?  And I don't understand, and it's probably

7    just because I'm hearing this for the first time, how you can

8    reserve rights with respect to the giving of notice by

9    stipulation which is being so ordered?  Because if it's being

10   given in a so ordered stipulation, it would appear that stay

11   relief has been, in fact, given for purposes of giving that

12   notice.  And if there are rights which are triggered by virtue

13   of that, I don't know how those rights are effectively

14   reserved.

15        So I think you need to do -- all of you need to do a

16   better job explaining what this consists of as a matter of law

17   because I'm not getting it.

18        MR. DEVENO:  Excuse me, Your Honor.

19     (Pause)

20        MR. DEVENO:  Apologize, Your Honor.

21        THE COURT:  We're going to defer this matter.  This

22   is not going to continue.  We're going to go to the next matter

23   on the agenda.  The parties to this stipulation can spend some

24   time in the hall or conference room conferring so that I can

25   have better clarity on the answer to the question just posed.

1          MR. DEVENO:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MS. MARCUS:  Good afternoon, Your Honor.  Jacqueline

4    Marcus, Weil Gotshal & Manges on behalf of LBHI and LCPI.  Your

5    Honor, number 6 on the agenda is the continued hearing with

6    respect to the debtors' motion for assumption or rejection of

7    open trades.  When we were last here on December 16th, we

8    postponed eight objections representing eighteen parties to

9    today's hearing.  As we knew it would, today's hearing came

10   upon us very quickly.  Nevertheless, I'm pleased to report that

11   we have reached and signed agreements with ten parties.  And

12   for Your Honor's benefit, I'll name them.  They are Bank of

13   America Securities, BDF Limited, Millenium Management, DK

14   Acquisition, Longacre Capital Partners and Longacre Master

15   Fund, Morgan Stanley Senior Funding, Inc., the Royal Bank of

16   Scotland, UFAA, the Bank of Nova Scotia and BlackRock Financial

17   Management.

18          With respect to the yet unresolved objections that

19   were on the calendar for today, all of the parties have agreed

20   to adjourn those matters to January 14th.  So those are AIB

21   International, Putnam, Tennenbaum, Deutsche Bank, Field Point,

22   Bank of America, N.A., Morgan Stanley International Limited and

23   P. Schoenfeld Asset Management.

24          In addition to the agreements, Your Honor, and the

25   adjournments, there are a few corrections and clarifications to

1  the December 16th order that we had been requested to make.

2  And we have consulted with the parties that have made those

3  requests and they are all in agreement with the proposed terms.

4  But for Your Honor's benefit, I'll just run through them.

5        First, there were a series of trades with funds

6  affiliated with Hartford Insurance that were inadvertently

7  included on Exhibit A to the December 16th order.  Those trades

8  were actually supposed to be part of the second trades motion

9  which will also be heard on January 14th.  The debtors and the

10  counterparties have agreed to treat those trades as if they had

11  not been assumed on December 16th and as if they had been

12  listed on Exhibit A to the second trades motion.  Accordingly,

13  any objection to the assumption of such trades will be filed by

14  January 9th in accordance with the second trades motion.

15        Second, there was an assumed trade with Avenue

16  Investments which was included on Exhibit A to the December

17  16th order.  Subsequent to the hearing last week, Avenue

18  Investments contacted us and told us that they had not received

19  notice of the debtors' intent with respect to this trade until

20  December 14th.  Cognizant of Your Honor's ruling at the last

21  hearing, we agreed to deem the Avenue trade deleted from the

22  December 16th order and to provide Avenue with a period of time

23  to object to the assumption of the trade.  The debtors and

24  Avenue have agreed that Avenue will have until January 2 to

25  file an objection and that the matter will be heard on January

1   14th as well.

2           The third one, Your Honor, is with respect to the

3   objection of P. Schoenfeld Asset Management. While that's one

4   that's expected to be heard on January 14th, there was a trade

5   with P. Schoenfeld where there was a dispute as to who the

6   correct counterparty is. The debtors believe that the correct

7   counterparty was an affiliate of Credit Suisse and P.

8   Schoenfeld believes that they are the true party in interest.

9   So, although that was included on Exhibit A, the debtors and P.

10  Schoenfeld have agreed to give P. Schoenfeld the opportunity to

11  argue that they are indeed the correct party in interest. And

12  the proposed order would deal with that as well.

13          THE COURT: Does that happen on the 14th?

14          MS. MARCUS: Yes.

15          THE COURT: The 14th is shaping up to be a pretty

16  long day.

17          MS. MARCUS: Hopefully, we'll get a number of them

18  out of the way before the 14th. But we're not sure yet.

19          THE COURT: I agree. Hopefully.

20          MS. MARCUS: Finally, Your Honor, in the December

21  16th order, although we indicated on the record that the R3

22  objection would be heard on January 14th, when we submitted the

23  proposed order, we inadvertently failed to include R3 on the

24  list for January 14th. So the proposed order that we're

25  submitting later this afternoon will also make that correction.

1          In addition, R3 has a similar situation to P.

2     Schoenfeld in which there is a trade that we believe is with

3     Credit Suisse but R3 believes they are the correct

4     counterparty.  So the proposed order also gives relief to R3

5     with respect to that.  And we have agreed just this morning on

6     proposed language with R3.

7          I think that covers all the issues.  And we'd like to

8     submit a proposed order later this afternoon.

9          THE COURT:  That's fine.  Let me ask one question

10    unrelated to the comments you've just made but it does relate

11    to the hearing on January 14th.  Last week, Mr. Brozman, on

12    behalf of various clients that he represented, made a number of

13    arguments.  I don't know if he's present today and I'm not

14    inviting him up unless he feels the need to speak.  But he did

15    raise the question as to whether the hearing on the 14th would

16    be an evidentiary hearing in connection with the matters that

17    concerned him and his clients.  Has any progress been made, and

18    the answer could be no, in working out the parameters of the

19    hearing as it relates at least to his clients?  And also, as it

20    relates to the others that you've mentioned, are we talking

21    about evidentiary hearings or argument?

22         MS. MARCUS:  Mr. Brozman's clients were on the other

23    motion, the derivatives motion.

24         THE COURT:  Yes.

25         MS. MARCUS:  So I can't --

1          THE COURT:  Oh, am I on the wrong -- oh, the open

2     trades --

3          MS. MARCUS:  That's the derivatives motion.

4          THE COURT:  I'm in the wrong one?  I apologize

5     completely.

6          MS. MARCUS:  That's okay.  But --

7          THE COURT:  I confused you, too.

8          MS. MARCUS:  But with respect to -- no, you didn't

9     confuse me.  With respect to the parties that are objecting

10    here, there is -- Mr. Friedman -- I don't know if he's here.

11    But there's one party that has served the debtors with a

12    discovery request.  But in light of the fact that we've now

13    settled, I think, nine of the eleven objections and hope to

14    settle the remaining two, I think the expectation is that if we

15    proceed to litigate with one or both of those clients that the

16    14th probably would not be an evidentiary hearing because they

17    will not have gotten their discovery by then.

18         THE COURT:  Okay.  There's someone standing up.

19         MS. MARCUS:  There he is.

20         THE COURT:  I should have kept my mouth shut.  I

21    obviously opened a can of worms.

22         MS. MARCUS:  Hopefully not.

23         MR. FRIEDMAN:  Good morning, Your Honor.  Michael

24    Friedman on behalf of P. Schoenfeld and a number of other

25    clients that some of which have settled today and a number of

1    which have been adjourned to the 14th.

2         Your Honor, I believe that the response deadline for

3    the discovery that we have served is actually on the 14th as of

4    now.  I think that we would work with the debtors to continue

5    the discovery process.  We're also working to try to resolve

6    these matters.  So I believe that it would be difficult to go

7    forward on an evidentiary basis on the 14th given where we are

8    with our discovery requests.  So there may be some preliminary

9    argument or perhaps we would set another date for an

10   evidentiary hearing.

11        THE COURT:  All right.  I'm going to assume then that

12   the hearing on the open trades matter will not be an

13   evidentiary hearing on the 14th at least as it relates to your

14   clients.  And I'm hopeful that we can avoid an evidentiary

15   hearing as to any of the others as well.  But if there is going

16   to be a need for an evidentiary hearing, I just need reasonable

17   notice in advance for purposes of allocating appropriate time

18   and resources.

19        MR. FRIEDMAN:  Your Honor, I would propose that we

20   decide over the next several days whether we're far close

21   enough that we'll settle or whether we're far enough that we

22   think that we will need an evidentiary hearing and then maybe

23   we'd set a schedule for that.

24        THE COURT:  That's fine.  Thank you.

25        MS. MARCUS:  Thank you, Your Honor.  We'll submit an

1   order this afternoon.

2          THE COURT:  That's fine.

3          MS. MARCUS:  May I be excused?

4          THE COURT:  Yes.

5          MS. MARCUS:  Thank you.

6          MS. FIFE:  Pretty soon I'm going to be the only one

7   left.

8          THE COURT:  They're bailing on you.

9          MS. FIFE:  Let me just suggest the question that you

10  asked about the derivatives motion, Your Honor.  We do

11  anticipate that there will be some evidence needed for the

12  hearing unless we're able to resolve all of the derivative

13  objections.  So we will coordinate with your clerk and --

14         THE COURT:  And is that in connection with only

15  certain parties who have objected?  Or is there a sense that

16  the entire matter to the extent that there are open issues will

17  involve the need for evidence presented by the debtor?

18         MS. FIFE:  I believe that most of the general issues

19  are legal issues so probably will not require evidence.  But

20  there may be evidence required with respect to individual

21  derivative contracts.

22         THE COURT:  Okay.

23         MS. FIFE:  So the next item on the agenda is the

24  consideration of the debtors' motion to sell their interest in

25  the investment -- Lehman Brothers investment management

1  division to NBSH Acquisition LLC.

2  　　　As I'm sure Your Honor will recall, on October 16th,

3  the Court conducted a hearing to consider the bidding

4  procedures for the sale of the IMD division. At that hearing,

5  we heard testimony of Barry Ridings, the cochairman of the

6  restructuring group at Lazard Freres, who stated that the IMD

7  division was a valuable but highly sensitive collection of

8  assets whose value is greatly dependent upon its ability to

9  assure its clients and customers of its financial and

10  operational integrity.  And he further stated that Lehman's

11  current instability affected IMD's ability to maintain its

12  clients, customers and employees where it would face material

13  disruption of value.

14  　　　We also heard about the debtors' pre-petition

15  marketing efforts and post-petition marketing efforts and

16  negotiations with Bain and Hellman & Friedman which led to the

17  execution of a stalking horse purchase agreement.

18  　　　At the conclusion of the hearing on October 16th, the

19  Court approved the bidding procedures and had found that they

20  were reasonable and appropriate and represented the best method

21  for maximizing the value of the assets being sold.  In

22  accordance with those bidding procedures, the debtors conducted

23  an auction on December 3rd and, after consultation with the

24  creditors' committee, selected the bid submitted by NBSH

25  Acquisition LLC.  NBSH Acquisition LLC, Your Honor, is an

1    acquisition vehicle formed by and controlled by certain members

2    of senior management of the IMD division.

3          A copy of the purchase agreement dated December 1st

4    and an amendment to such purchase agreement dated December 19th

5    were filed with the Court. I'll just briefly describe the

6    terms of the new agreement. The key assets being transferred

7    are the Neuberger Berman business, the fixed income business,

8    parts of the hedge fund of funds and single manager businesses,

9    the private funds investment group of the private equity

10   business and certain assets related to the Asian and European

11   asset management businesses.

12         The liabilities that are being assumed by NBSH

13   Acquisition or its subsidiaries including substantially all of

14   the liabilities incurred on or prior to the closing and also

15   liabilities under contracts assigned to the company or any

16   subsidiaries. They're also assuming some unfunded commitments

17   of LBHI and its affiliates in certain partnerships.

18         The consideration for the transaction is as follows.

19   LBHI, on behalf of the sellers, will receive ninety-three

20   percent of the preferred units and forty-nine percent of the

21   common units. Management will receive seven percent of the

22   preferred units and fifty-one percent of the common units.

23   Management's consideration vests over time and requires a

24   management to be employed in order to receive that

25   consideration.

1         The preferred units have an aggregate liquidation

2 preference of 875 million dollars. And subject to approval

3 today, the transaction is expected to close the first quarter

4 of 2009.

5         The agreement includes customary termination rights

6 which really boil down to closing of the transaction has to

7 occur prior to June 30th, 2009 and the sale order needs to be

8 entered prior to January 31st, 2009. There's no other party

9 consents or client consents required.

10         The board of the new company following this

11 consummation will consist of seven managers, two managers

12 appointed by LBHI, four managers appointed by management, two

13 of which must be independent, and George Walker, the current

14 global head of investment management for Lehman Brothers. If

15 dividends aren't paid on the preferred, then the preferred

16 holders have the right to nominate additional directors.

17         The structure of this transaction is intended to

18 permit the distribution of the preferred units and the common

19 units that LBHI and its subsidiaries receive to creditors of

20 LBHI and creditors of the subsidiaries pursuant to a plan of

21 reorganization. So, during the Chapter 11 case, LBHI and its

22 subsidiaries will hold the preferred stock and common units and

23 then will ultimately distribute it out to its creditors.

24         Your Honor, in the courtroom today is Mr. Ridings.

25 With the Court's permission, I would offer to proffer his

1    testimony regarding the debtors' participation in the diligence

2    and auction process and also why the debtors determined that

3    this bid was the best and highest bid.

4         THE COURT:  Is there any objection to the offer of a

5    proffer of Mr. Ridings' direct testimony?  There's no objection

6    so you can proceed by means of a proffer.

7         MS. FIFE:  Thank you, Your Honor.  Mr. Ridings'

8    educational and professional background and Lazard's

9    involvement in the sale process are also set forth in the

10   record on October 16th so I'm not going to repeat them here.

11        If Mr. Ridings was called to testify in support of

12   this sale motion, his direct testimony would be as follows:

13   Mr. Ridings would testify that after the bid procedures were

14   approved, Lazard began a comprehensive marketing process.

15   Lazard contacted eighty parties consisting of forty-three

16   potential strategic and thirty-seven potential financial

17   buyers.  Thirty-nine of the potential buyers requested an

18   initial diligence package which included an NDA bid procedures

19   letter, bid procedures order and a copy of the stalking horse

20   purchase agreement.  Ten parties signed NDAs and were given

21   access to a data room and also the ability to meet with

22   management.  Several groups had diligence meetings with

23   management.  Fifteen Lazard professionals were involved in this

24   process including nine managing directors who assisted in

25   soliciting potential buyers.  Mr. Ridings would testify,

1  however, that a total of three qualified bids were received in

2  accordance with the bid procedures order:  the stalking horse

3  bid, the bid NBSH Acquisition LLC and a bid by Crossmark

4  Investment Company L.P.

5          Mr. Ridings worked very closely with Alvarez and

6  Marsal and with the professionals of the creditors' committee

7  to review the bids.  He would testify that Lazard assessed a

8  deteriorating value of the stalking horse due to the declines

9  in the S&P 500 and related purchase price adjustments and the

10  uncertainties surrounding the stalking horse obligation to

11  close a transaction given various significant closing

12  conditions.

13          Mr. Ridings would also testify that Lazard spent

14  significant time and resources negotiating the terms of the

15  management bid on behalf of the estate.  Lazard participated in

16  a series of meetings and calls in the weeks leading up to the

17  December 3rd auction including over the Thanksgiving holiday.

18  Lazard held discussions with the management team and with

19  portfolio managers.  Mr. Ridings would testify that the

20  debtors' estate and management team negotiated at arm's length

21  and in good faith.  The management team was represented by

22  separate counsel.

23          The purchase agreement represents the result of a

24  competitive purchasing process and extensive negotiation.  Mr.

25  Ridings would testify that the cross-market bid was only for

1    the private equity funds managed by Lehman Brothers Private

2    Equity Fund Management LP. The consideration for the bid was

3    sixty million dollars in cash and 105 million in assumed

4    contingent liabilities. He would testify that neither the

5    stalking horse nor the management team would agree to separate

6    out these assets from their bid. Mr. Ridings would testify

7    that Crossmark proposed an alternative bid at the auction.

8    After several hours of discussion, however, that bid was deemed

9    not competitive by virtue of being extremely difficult to

10   structurally implement. And also Mr. Ridings would testify

11   that the value of the stalking horse bid and the management bid

12   were higher and better than the Crossmark bid.

13        Mr. Ridings would testify that the debtors estimated

14   the stalking horse bid to be worth approximately 745 million

15   dollars to the estate. This assumed that the stalking horse

16   actually closed the transaction. The purchase by its

17   adjustments to that offer were primarily, as I said, the S&P

18   adjustment and also an adjustment that lowered the price of the

19   bid in proportion to the run rate revenue which had declined

20   given the market conditions.

21        Additionally, the stalking horse had the ability to

22   withdraw its bid under a number of circumstances. Mr. Ridings

23   would testify that at the auction the estate determined the

24   management there to be worth at least 922 million dollars to

25   the estate and, therefore, at least 176 million higher than the

1  stalking horse bid.  Accordingly, the management bid was

2  determined to be the starting bid even after taking account of

3  the breakup fee and expense reimbursement that would have to be

4  paid by the estate in the event we took another bid.

5      The valuation that Lazard did was determined by

6  utilizing current projected normalized EBITDA of 152 million

7  dollars assuming operational restructuring and a normalized 8.6

8  times multiple.  The estate receives 814 million dollars face

9  value preferred equity plus forty-nine percent of the implied

10  common equity value equal to 212 million dollars less the

11  breakup fee of fifty-two million dollars and expense

12  reimbursement of thirteen million.  Plus, the management bid

13  provides the estate with the upside in the form of the retained

14  forty-nine percent equity interest.  The stalking horse bid

15  would have meant selling the entire IMD business at valuations

16  which were extremely low given the market conditions.

17      At the auction date alone, the value of the S&P had

18  fallen twenty-nine percent since the stalking horse bid was

19  signed, and forty-six percent off the peak in October 2008.

20  Current value of the S&P 500 is the lowest it's been since the

21  dot.com bubble in 2002.

22      An index of comparable investment management

23  companies were looked at by Lazard and compared the trading

24  values.  Current trading values are at their lowest level in

25  the last ten years.  This compares to the last twelve month

1    average valuation of 8.6 times a five year average valuation of

2    11.2 times, and a ten-year average valuation of 10.5.

3         Additionally, since 2002, comparable investment

4    management companies have been sold at an average purchase

5    price of 13.6 last twelve months EBITDA in change of control

6    transactions. So it was determined that the stalking horse bid

7    was at the lowest possible, and management bid was higher.

8         During the auction the stalking horse, Bain and

9    Hellman & Friedman were given the opportunity of overbid. We

10   met with them and they determined that not to provide an

11   additional bid, Your Honor.

12        Mr. Ridings would also testify that the management

13   bid was also deemed to be better in qualitative terms,

14   including the certainty of price and consummation in the market

15   of an unprecedented volatility. There's no downward purchase

16   price adjustment in the management bid, and there are only

17   customary closing conditions. There are no walk away rights in

18   the management deal versus walk away rights in the stalking

19   horse bid.

20        And, importantly, the management bid does not require

21   additional bankruptcy filings, whereas the stalking horse bid

22   would have required LBHI to have filed numerous subsidiaries.

23   Such filings would have further unnerved the client base and

24   led to significant withdrawals as well as portfolio manager

25   defections.

1          Based on the advice provided by Lazard and after

2     consultation with the creditors' committee, the debtors

3     determined in their business judgment to accept the bid of NBSH

4     Acquisition and to move forward to consummate the transaction

5     subject to the Court's approval.

6          This would be the conclusion of Mr. Ridings'

7     testimony.

8          THE COURT:  Does anyone wish to examine Mr. Ridings

9     in connection with the offer of proof just completed by

10    counsel?  Evidently not, I accept the proffer.

11         MS. FIFE:  Thank you, Your Honor.  Your Honor, the

12    debtors filed a revised proposed order to reflect the terms of

13    the new agreement and a selection of NBSH LLC as the successful

14    bidder.  We have copies available for parties that have not

15    seen them.  Since the filing of the proposed order we have

16    received certain comments and suggestions for corrections, and

17    we've made those as well.  And we have a further blackline

18    reflecting those changes.

19         There were seven limited objections filed and one

20    objection to the proposed sale.  As I said, we had discussions

21    with other parties, including Barclays and the creditors'

22    committee, and have resolved those.

23         As noted in the reply filed by the debtors, none of

24    the objections dispute the proposed sale in the reasonable

25    exercise of the debtors' business judgment, or that it's in the

1   best interest of the debtors and their creditors to consummate

2   the sale. However, four of the eight objections relate to

3   executory contracts and unexpired leases. And the time for

4   assuming and rejecting those contracts and leases. The

5   objections point out that the debtors do not provide

6   counterparties to those contracts with notice of assumption and

7   cure amounts. A proposed order that we filed, however, does

8   take this into account and provides that the debtors will file

9   with the Court and provide notice of assumption, assignment and

10   cure amounts to counterparties, to all purchase contracts,

11   transfer the real property leases or sublease real property

12   leases. And that counterparties will have fifteen days notice

13   and an opportunity to object to the proposed assumption and the

14   cure amounts before the debtors assume and assign any of those

15   contracts.

16         The debtors believe that with this revision we should

17   resolve the objections filed by SunGard Creditors, Oracle USA,

18   Thomson Reuters PLC and 605 Third Avenue PLLC, although my

19   understanding is that attorneys for some of these parties are

20   here and would like to be heard, Your Honor.

21         THE COURT: Well, we'll find out what they think

22   about whether or not what you just said satisfies them.

23         MS. FIFE: Right. I also just want to point out for

24   one of the parties, in particular, but it applies to everyone,

25   that the rights of all contract counterparties to reject to the

1  assumability or assignability of their contracts with the

2  debtors is also reserved such that if a party believes that its

3  contract cannot be assigned, that they can make that argument

4  after we have provided them with notice.

5         The objections filed by Benjamin Gamaron, Crossmark

6  and 220 News Owners LLC I have grouped because, in essence,

7  these creditors are creditors of nondebtor subsidiary that --

8  as to which the Court really has no jurisdiction.  As we

9  discussed on October 16th, this sale includes the sale of

10  property of the estate and also the property of nondebtor

11  subsidiaries.  These parties have claims against nondebtor

12  subsidiaries.  Benjamin Gamaron has brought a lawsuit.

13  Crossmark has a claim against some of the funds for an earn-

14  out.  And 220 News Owner has a guaranty from Neuberger Berman

15  Holdings LLC, also a nondebtor.

16         As creditors of nondebtors they really have no

17  standing here and have no rights to object to the sale.

18  However, if the entities as to which these parties have claims

19  are sold in a stock sale, then the parties will continue to

20  have a claim against the purchaser.  If those entities, as to

21  which they have a claim, are sold in asset sales, then those

22  parties will have claims against the proceeds of this sale.

23  And what we intend to do, Your Honor, is higher an independent

24  party to allocate the proceeds in each of the debtors or

25  companies or their subsidiaries that are being sold, so that we

1   will properly identify the amount of the value that was sold to

2   the buyer.  And we will distribute the consideration in

3   accordance with that valuation and allocation.  And the

4   agreement also provides that while the allocation will be of

5   the preferred stock and the common stock, LBHI will have the

6   right to replace that with cash, so as to satisfy any claims of

7   creditors, if necessary.  So we believe that that deals with

8   those objections.

9           Finally, the PBGC objected to the proposed sale on

10  two grounds.  The first is that we asked the Court to waive the

11  ten-day stay.  We have modified the order to put in the ten-day

12  stay because the reality is that this transaction will not

13  close for several months as we're seeking consents of the

14  customers.  PBGC also objected to the extent that the debtor

15  sought to transfer nondebtor control group members to NBSH LLC

16  free and clear of their joint and several ERISA liabilities

17  arising out of Title 4 of ERISA.  We have had discussions with

18  the PBGC and as a result we have revised the order to make it

19  clear that we are not transferring nondebtor control group

20  members free and clear of their joint and several ERISA

21  liabilities.  Nothing in the proposed order is intended to

22  prejudice the PBGC rights with respect to control group members

23  or as a general unsecured creditor against LBHI's estate.

24  They're permitted to share in the proceeds of any sale to the

25  extent they have a valid claim.

1    With the changes made to the proposed order and the

2  representations that I have just made, I believe that the

3  PBGC's objection has been resolved.

4    And, Your Honor, I have a blackline order that

5  demonstrates those revisions, which I hope resolves the PBGC's,

6  if I can it up to you.

7    THE COURT:  That's fine, you may approach.  Thank

8  you.

9    MS. FIFE:  With that, Your Honor, the debtors believe

10  that entry of the sale order at this time is appropriate and in

11  the best interest of the debtors, the creditors and all

12  parties-in-interest.  Unless Your Honor has any other

13  questions, I would ask that the objections be denied and the

14  sale approved.

15    THE COURT:  I'm prepared to hear from counsel for the

16  various objectors who either confirm that their objections have

17  been taken care of by the various adjustments that you've made

18  to the order, or the comments that you've made on the record.

19  Or will continue to press their objections to the extent that

20  they're not satisfied.

21    I do have one question, which is just for my own

22  curiosity.  During the hearing that took place on October 16th,

23  we spent quite a lot of time discussing the procedures

24  applicable to the transfer of customer's accounts.  To what

25  extent, if at all, did the procedures that had been adopted by

1   the stalking horse impact the decision of the debtor, through

2   Mr. Ridings and otherwise, to choose as between the competing

3   bids. And to what extent does NBSH Acquisition get a benefit

4   of any sort as a result of the continuity of operations

5   associated with -- in effect having the very same investment

6   managers continuing to do what they do under, what I assume,

7   will be the same trade dress for the most part, but simply with

8   a different equity split?

9         MS. FIFE: Well, first of all, Your Honor, as I

10   briefly mentioned, the Bain and Hellman & Friedman bid required

11   that we put many, many entities into Chapter 11, which we

12   viewed as extremely detrimental. We had hoped that following

13   the hearing, we could provide sufficient information to Bain

14   and Hellman & Friedman to get them comfortable so that a

15   Chapter 11 case, with respect to a lot of the subsidiaries,

16   would be unnecessary, but we were unsuccessful in doing that.

17   They insisted that we file quite a number of subsidiaries which

18   we believed would have resulted in a drastic loss of value,

19   very, very significant.

20         With respect to the actual consent process, we are

21   required to go through the same consent process. However, Bain

22   and Hellman had -- because Bain and Hellman had insisted on

23   filing these other Chapter 11 cases, it would have been

24   necessary for us to put in the letters that we sent to each of

25   the customers and in the proxy statement and the letters that

1  went out to the shareholders the possibility or probability

2  that their entities may end up in Chapter 11. And that, in and

3  of itself, management viewed as extremely detrimental to their

4  client base and to the ongoing viability of the company. So we

5  thought that there would be a significant deterioration in

6  value. With management continuing, the letters that we're

7  writing to our clients and to the stockholders of the mutual

8  funds are much better phrased and termed and will give the

9  customers comfort that the managers, whom they had invested

10 money with, are continuing. And, in particular, the portfolio

11 managers themselves are now part of the equity team. And I

12 think that gives -- we believe that it gives a lot of comfort

13 to the customers and will help maintain the client base.

14         THE COURT: Am I correct in concluding from your

15 comments, that at least as of this moment, customers have not

16 been solicited for their consents on behalf of the stalking

17 horse bidder, so there is no conflict in the solicitation

18 process?

19         MS. FIFE: That's correct, Your Honor. We really ran

20 into some issues over the disclosure that would be necessary.

21 And we've determined that we could not -- we actually couldn't

22 get it out prior to the auction. So there is not going to be

23 any conflicting.

24         THE COURT: So the issue that occupied so much of our

25 time and attention on October 16th turned out to be moot?

1        MS. FIFE:  That's correct, Your Honor.

2        THE COURT:  Okay.  Let's hear from the parties who

3   are either satisfied or dissatisfied with the consequences of

4   your adjustments.

5        MR. DOSHI:  Good afternoon, Your Honor.  Amish Doshi

6   with the firm of Day Pitney on behalf of Oracle USA Inc.  I

7   think for the most part, the additional representations by

8   counsel satisfy Oracle.  However, there are two points that I

9   wanted to just clarify.  With respect to the first, that any

10  executory contracts or unexpired leases, notwithstanding

11  anything either in the order or the unit purchase agreement,

12  are subject to the notice procedures outlined in paragraph 12,

13  I believe, of the order because there's language in different

14  parts of the order that might be deemed contradictory to

15  paragraph 11.  So if we can have that representation that

16  notwithstanding anything in the order or the unit purchase

17  agreement, any assumption and assignment of executory contracts

18  or unexpired leases with -- I only care about Oracle, but with

19  respect to any counterparties, will be subject to the notice

20  provisions outlined in Paragraph 11.

21        And, secondly, that the same applies to -- there was

22  a bid notice that was filed on December 9th identified NBSH as

23  the successful bidder.  And in that bid agreement, there were

24  certain references to the transfer of intellectual property

25  rights.  So I just want clarification that similarly any

1     intellectual property rights that where Oracle is a

2     counterparty are not being transferred and are subject to the

3     same notice provisions with an opportunity for Oracle to file

4     any additional pleadings upon receiving notice and all of its

5     rights are reserved with respect to those items as well.

6           THE COURT: I think it's probably best to just

7     comment one at a time. Is that a satisfactory arrangement from

8     the debtor's perspective, because it was a lot more specific

9     than what heard during your presentation?

10          MS. FIFE: That's correct, Your Honor. What we

11     propose to do is give parties to contracts with a debtor

12     fifteen days notice prior to the assumption and assignment of

13     that contract. But to the extent that we are seeking to

14     transfer contracts and leases of nondebtors that are not

15     subject to the jurisdiction of this bankruptcy court, we will

16     comply with whatever the requirements are in that particular

17     contract or lease. I don't see what else we can do.

18          THE COURT: Okay. I don't want to convert this into

19     a negotiating session in open court over the form of the order,

20     but there is a legal issue that has just been articulated that

21     applies across a number of objections. And so, rather than

22     make Oracle the one party who's in the middle of this one, why

23     don't we just move on, Oracle can make further comments with

24     respect to what was just stated at the end. But I have a

25     strong strength that issues as it relates to the nondebtor

1  counterparty part will be presented across the board here, to

2  the extent that there are affected parties.

3         MR. DOSHI:  Thank you.

4         MR. KENT:  Good afternoon, Your Honor.  Tom Kent from

5  Paul Hastings on behalf of 605 Third Avenue.  Our client is a

6  landlord with a lease to the nondebtor.  And I understand by

7  the representations made by counsel here there is no intention

8  to put this nondebtor into bankruptcy.  So we're here simply as

9  a nondebtor and as creditor to the nondebtor.  And our concern,

10  Your Honor, is --

11         THE COURT:  Ordinarily, that would be enough for me

12  to say you're excused.

13         MR. KENT:  But, Your Honor, I have tremendous

14  concerns that the form of the order that is being proposed to

15  be entered is inappropriate and potentially is binding on my

16  client.  And I'm here simply to raise my point.

17         Your Honor, on Friday afternoon, the debtor submitted

18  some changes to the form of the agreement.  And that

19  agreement -- and those changes have been set forth in our

20  papers that we filed a day later on Sunday afternoon, basically

21  sets forth the possibility that the debtor, could, in fact,

22  exclude assets or exclude liabilities of nondebtors.  And as

23  set forth in our papers, Your Honor, what we can find as a

24  landlord is that our asset is excluded from the shares of this

25  nondebtor that potentially is being sold.  That's certainly

1  listed on the scheduled of shares of nondebtors that are to be

2  sold.  But notwithstanding that the shares are going to be

3  sold, I believe that the changes that the debtor proposed on

4  Friday would allow assets of these nondebtors to be excluded

5  from the sale.  So we may end up somewhere, I don't know where

6  we would end up, what entity we would end up, but stripped away

7  from the assets of the nondebtor that are there now.

8         THE COURT:  Who's your client's tenant here?

9         MR. KENT:  I'm sorry?

10        THE COURT:  Who's the tenant?

11        MR. KENT:  Neuberger Berman LLC, which is a second

12  tier Neuberger Berman entity.

13        THE COURT:  And there's no dispute that Neuberger

14  Berman LLC is a nondebtor?

15        MR. KENT:  That's correct.

16        THE COURT:  And there's no dispute that Neuberger

17  Berman LLC is not on account of this transaction, at least,

18  likely to become a debtor any time soon.

19        MR. KENT:  Well, that's the representation that

20  counsel made this morning.

21        THE COURT:  What then is before me to decide as a

22  bankruptcy judge as it relates to your objection?  Your

23  counterparty is a nondebtor; you represent a nondebtor.

24  Ordinarily, somebody in your position would be talking in state

25  court not in federal court.

1          MR. KENT:  That's correct, Your Honor.  However, the

2     definition of assets that's included in the sale include the

3     assets of nondebtors.  There are potential transactions that

4     Your Honor is being asked to approve as part of this

5     transaction that affects nondebtors.

6          THE COURT:  Bankruptcy affects all kinds of

7     nondebtors all the time, that's not unusual.  I might add that

8     the papers that you filed on Sunday, which I read, were

9     untimely.  No special permission was asked to file papers on a

10    Sunday afternoon.  There's no provision for filing papers of

11    the sort that you filed, within hours of a commencement of a 10

12    a.m. hearing on Monday.  And, frankly, I don't understand why

13    you did it.

14         MR. KENT:  Your Honor, this was solely in response to

15    the amendment that was filed by the debtor Friday evening after

16    6:00.

17         THE COURT:  You didn't think it would be sufficient

18    for you to be able to stand up and make whatever arguments

19    you're now making, but instead to do something that's not

20    authorized by the rules or the case management order?

21         MR. KENT:  Your Honor, we tried to reply as quickly

22    as we could to --

23         THE COURT:  There's no question that you replied

24    quickly.  You replied in a manner that was prejudicial to me.

25    I ended up having to read a tremendous amount of material over

1  the weekend. I thought whether or not I should read yours or

2  delete it from my computer. I read it. But I don't think it's

3  good practice.

4        MR. KENT: Your Honor, I apologize if the papers were

5  improper.

6        THE COURT: No. What I'm saying this is in part to

7  you and in part it relates to orderly case management. This is

8  a very large and important case, and there are a lot of people

9  who are interested in it. But that doesn't mean that everybody

10 has the license to file papers willy-nilly. You did and you

11 shouldn't in the future.

12       MR. KENT: Accepted, Your Honor.

13       THE COURT: Now, let's get to the merits. Just

14 because there may be some consequences as between a nondebtor

15 and a nondebtor to the approval of a transaction doesn't to me

16 amount to an objection that cognizable as a matter of

17 bankruptcy law. In what respect do I have jurisdiction to even

18 deal with what you're complaining about?

19       MR. KENT: Your Honor, the issue is whether in

20 fact -- first of all, we don't know whether this is going to

21 occur or not, or whether there will be any transactions

22 affecting my client or not, these are all potentially set forth

23 in the amendment that was filed by the debtor Friday evening.

24 However, the form of the order that Your Honor's being asked to

25 enter has findings with respect to whether this was a

1    fraudulent conveyance, whether fair consideration was being

2    received, whether parties have had an opportunity to review the

3    transaction, all of which, Your Honor, I don't think should be

4    binding on any potential subsequent action that my client may

5    have in state court, any rights that my client may currently

6    have that potentially they may raise in state court, and that

7    there should be nothing in this order that should be binding

8    upon parties that are really not before you.

9           THE COURT:  Well, it's kind of definitional, isn't

10    it?  If you represent a nondebtor and your counterparty tenant

11    is a nondebtor, a bankruptcy court order should not be, at

12    least directly affecting anything that involves that

13    relationship.  There may be indirect consequences of all sorts

14    that arise out of bankruptcy court orders that affect

15    nondebtors and other, but there's not much I can do about that.

16    And I don't know what you're asking for other than a

17    clarification from the debtor that there's no intention in the

18    order that affects the relief being sought today that directly

19    impacts a transaction between your client, a nondebtor, and

20    your tenant, a nondebtor.

21           MR. KENT:  Your Honor, what I'm asking for is a

22    specific provision in this order that there's nothing in this

23    order that would be binding upon my client if, in fact, there

24    are any claims that my client may have against the nondebtor's

25    assets that are being sold pursuant to this transaction.  That

1  to the extent that this -- in terms of Neuberger Berman LLC is

2  a fraudulent transfer, that if certain assets of Neuberger

3  Berman LLC are being transferred as part of this sale, if

4  that's a fraudulent conveyance, my client should have the right

5  to allege and bring those causes of action. There should be

6  nothing in the order.

7  THE COURT: Your client has whatever rights your

8  client has. And you're not going to get anything from me to

9  either improve or clarify those rights. If you're able to get

10  such language or understandings from debtors' counsel, you're

11  certainly free to have that conversation. This is not a

12  bankruptcy issue as far as I'm concerned. You've already

13  confirmed multiple times in this colloquy that you represent a

14  nondebtor and that your counterparty is a nondebtor. And you

15  really don't belong here.

16  I refuse to grant your client any relief based upon

17  the papers you've submitted or the argument you just made. If

18  you wish to get clarification from the debtor you're free to do

19  that.

20  MR. KENT: Thanks, Your Honor.

21  MS. MAZER-MARINO: Good afternoon, Your Honor. Jill

22  Mazer-Marino, Mayer Suozzi English & Klein for the SunGard

23  creditors. I'm happy to report that our objection is resolved

24  by the debtors' representation on the record that the rights of

25  SunGard with respect to its contract, that is all of its rights

1    and claims with respect to its contracts, are reserved. And we

2    would have the opportunity to assert those rights and claims

3    through the end of the fifteen-day window period. And I thank

4    debtor for their cooperation.

5              THE COURT: Fine, thank you.

6              MR. SCHWARTZ: Your Honor, good afternoon. James

7    Schwartz, Stempel Bennett Claman Hochberg for SLG 220 News

8    Owner LLC.

9              My position is very similar to that of Mr. Kent's.

10   The only reason -- I am a nondebtor guarantor of my client's

11   lease. The only concern that we had was that the order that

12   Your Honor was going to enter here could somehow prejudice our

13   state law rights, whatever they may be. But I think you've

14   clarified that already and I'm not going to press the point any

15   further.

16             THE COURT: Fine.

17             MR. SCHWARTZ: Thank you.

18             MR. LOBELLO: Good afternoon, Your Honor. Edward

19   LoBello, Blank Rome for Thompson Reuters.

20             Your Honor, we have filed a limited objection and

21   reservation of rights. I'd like to confirm for the record what

22   Weil Gotshal indicated, that based upon the proposed order

23   that's before you and the debtor's representations in its

24   omnibus reply, and also before the Court, that our papers are

25   simply a reservation of rights to reserve our rights

1       accordingly and before our limited objected.

2               THE COURT:  Fine, thank you.

3               MR. HERMAN:  Good afternoon, Your Honor.  Ira Herman

4       from Thompson & Knight for the Crossmark entities.

5               Your Honor, we've had colloquy with the Weil Gotshal

6       attorneys and representative of the debtors.  I've been

7       authorized to stand down at this time as a result of

8       discussions.

9               THE COURT:  Fine.

10              MR. SHERIDAN:  Good afternoon, Tom Sheridan from

11      Hanley Conroy on behalf of Benjamin Gamoran.

12              And as my colleagues -- based on the representations

13      that have been made and the rulings that Your Honor indicated

14      on the record, we withdraw that objection.

15              THE COURT:  Thank you.  Is there anyone else who

16      wishes to be heard on this point?

17              MS. THOMAS:  Good afternoon, Your Honor.  Stephanie

18      Thomas on behalf of the Pension Benefit Guaranty Corporation.

19      Based on the changes to the sale order the representations in

20      the omnibus objection and made here today, we also withdraw our

21      objection to the sale order.

22              THE COURT:  Thank you.  Now let me ask Oracle if

23      Oracle wishes to say anything more, or if you're now satisfied.

24              MR. KENT:  I'm satisfied with --

25              THE COURT:  You may not be, I don't know.

1        MR. KENT:  I'm satisfied with respect to the

2    contracts with the debtor and the notice and the reservation of

3    rights.  However, I'm a little troubled by the statement made

4    with respect to nondebtor entities and any contracts that the

5    debtors herein are seeking to assume and assign contracts that

6    nondebtors may have with Oracle.

7        THE COURT:  That can't happen.

8        MR. KENT:  And that's exactly the point.  If that's

9    the representation, then I think we're fine.  Thank you.

10       THE COURT:  It's just a basic principle of bankruptcy

11    law.  I can't do it.

12       MR. KENT:  Thank you.

13       MS. FIFE:  Just very quickly, Your Honor, about the

14    same thing.  We're not seeking to assume and assign any

15    contracts with nondebtors because it's not appropriate and you

16    don't have jurisdiction over that.

17       If we choose to assign a contract, as I said before,

18    we'll comply with whatever requirements are in that particular

19    contract.  And right now we have no present intention to file

20    any other companies.  So I just want you to understand that.

21       THE COURT:  Okay.

22       MS. FIFE:  Thank you.

23       THE COURT:  Is there anything more?

24       Based upon the record that has been presented, the

25    argument of counsel, the withdrawal of various objections or

1   the overruling of objections, I am satisfied that the debtor

2   has demonstrated cause for approval of the sale of its

3   investment management division, which is being sold to NBSH

4   Acquisition, the highest bidder at a duly noticed auction which

5   was conducted in accordance with the Court approved bidding

6   procedures.  The transaction, as represented, represents the

7   highest and best value for the assets that are being sold, and

8   represents what appears to the Court to be a creative means to

9   preserve the potential for the debtor to realize higher value

10   in the future at a time when market conditions may be

11   materially more favorable than they are today.

12        Under the circumstances I'm prepared to enter the

13   order in the form that it has been submitted, with a proviso

14   that to the extent that there are parties that have expressed

15   concerns, reservations and objections with regard to the form

16   of the order, that they at least be afforded an opportunity to

17   review the order as it has been revised.  And to the extent

18   there are some language adjustments that may make the order a

19   more comforting document than it is today, and are not

20   objectionable to the debtor, that the debtor at least give some

21   consideration to those comments.  With that, the transaction's

22   approved.

23        MS. FIFE:  Thank you, Your Honor.  And we will

24   provide copies of the order to everybody.

25        And, in addition, Your Honor, we have orders and

1    disks for the uncontested matters, which we'll take care of

2    shortly.  One of them needs to get entered today, if possible.

3              THE COURT:  We'll try to enter all the orders today.

4              MS. FIFE:  Thank you, Your Honor.  I appreciate it.

5              THE COURT:  Now, in terms of the agenda, we had one

6    deferred matter, OMX.

7              MR. FLECK:  Your Honor, Evan Fleck of Milbank Tweed

8    on behalf of the committee.  Unfortunately, in light of the

9    other matters the Court has been dealing with, we hadn't all

10   had an opportunity to discuss whether a consensual resolution

11   is appropriate even among the parties.  We would request, if

12   the Court pleases, to have a brief recess so that we can all

13   confer.

14             THE COURT:  Here's my suggestion.  It's now after 1

15   p.m. and this is an omnibus day, not an omnibus morning, so we

16   can certainly return at 2:30, which would give everybody

17   hopefully time to get some lunch and to perhaps also confer.

18   This is a matter which is somewhat parochial in that it

19   involves particular parties.  And so unless there are people

20   who are very interested in knowing the outcome, no one else

21   needs to come back, but all are welcome.

22             So we're adjourned until 2:30.

23        (Recess from 1:08 p.m. until 3:01 p.m.)

24             THE COURT:  Please be seated.  First of all, let me

25   apologize for the delay, I was dealing with an emergency that

1    was unexpected.  What's going on?

2           MR. JURELLER:  Good afternoon, Your Honor.  John

3    Jureller from Klestadt & Winters on behalf of OMX Timber

4    Finance Investment II LLC, I'll just refer to as OMX Timber, if

5    you don't mind.

6           I do apologize early on for the confusion, parties

7    did think up they came up with a good resolution --

8           THE COURT:  It may be, I just don't understand it.

9           MR. JURELLER:  I think at this point, after

10   discussing it further, that we're just going to proceed forward

11   with the motion.

12          THE COURT:  Okay.  So the result of what I said is

13   that instead of having a settlement you have a bloodbath.

14          MR. JURELLER:  Well, we'll see if that's the case or

15   not.  I think, basically, again, we've reached the agreement

16   five minutes before you got back on the bench the second time,

17   so that's why there was no prior notice to you about the

18   proposed stipulation.  But we had an understanding that was

19   merely a claims issue whether or not this was deemed a valid

20   claim or not a valid claim, and that's why we were going to

21   push it off until the claims process.  But I think after

22   discussing it we're willing to go forward at this time and

23   argue the relief from stay motion.

24          THE COURT:  Well, I think it's uncharacteristic for

25   the Court to be in the spot of unsettling something that's

1   already been settled. Is everybody comfortable that the right

2   procedure for this aspect of the case right now is to have it

3   head now? Because I'm certainly prepared to hear it.

4           MR. FLECK: Your Honor, Evan Fleck of Milbank on

5   behalf of the committee.

6           We are, Your Honor, prepared to go forward. We also

7   thought that a settlement, albeit a temporary settlement, was

8   acceptable to -- as Your Honor said, it did push the can down

9   the road a little bit. But we've also said we were comfortable

10  going forward, I think the debtors are comfortable going

11  forward at this point. And it's OMX's motion. And I think

12  based upon the relief that they seek, it's appropriate and

13  we're certainly comfortable doing that on behalf of the

14  committee.

15          THE COURT: Fine, let's go forward then.

16          MR. JURELLER: As I said, Your Honor, John Jureller

17  from Klestadt & Winters on behalf of OMX Timber. Also present

18  is Mark Deveno, who represents Wells Fargo, who is the

19  indentured trustee. This note was securitized.

20          I could go through the details, the facts, if you'd

21  like, but they were set forth in the papers. Essentially, this

22  is a motion for relief from the automatic stay under 362(d) for

23  the limited purpose of issuing a demand notice to Lehman

24  Brothers Holdings pursuant to the terms of the guarantee. This

25  motion does not seek to deem the claim allowed, this motion

1   does not seek to compel payment. Basically, the motion is to

2   reserve rights of OMX Timer under the guarantee and pursuant to

3   its terms.

4          THE COURT: Let me ask you a question.

5          MR. JURELLER: Sure.

6          THE COURT: As a matter of law, if hypothetically, I

7   don't grant your motion, do you have a claim?

8          MR. JURELLER: I believe that we do, Your Honor. And

9   as part of the presentation I was going to set forth that. But

10  if the Court were to look to In re Texaco, which was cited by

11  the committee as joined by the debtor, as well as the other

12  case that was cited, essentially what the Court stated, and

13  I'll actually read it, because I think it's very instructive

14  here, and really kind of shows the precautionary nature of this

15  motion. We believe that we need to make this motion in order

16  to comply with the terms. However, at the end of the day if

17  the relief is not granted, I believe that the claim is still in

18  place.

19          In Texaco, what they stated was "the debtor should

20  not be permitted to use the automatic stay and argue that a

21  formal notice of acceleration is a condition proceeded to the

22  noteholder's right to claim the higher interest rate."

23          Essentially in that case, what they said was that you

24  couldn't not lift the automatic stay but then hold the claimant

25  to that in not being able to assert the claim themselves. So

1     that's what we sort of see as this case here. And I think it's

2     actually dead-on with the In re Texaco matter.

3              As I go forward I'll differentiate those two cases.

4     But I think actually the cases cited by the committee actually

5     support the motion rather than go against the motion.

6              Essentially, Your Honor, it's admitted that

7     submission cause exists for this limited modification of the

8     automatic stay. Of all the Sonnax factors I believe the

9     balancing of the harm factor is really the only one that

10    applies here.

11             THE COURT: That's the one I'm most concerned with.

12             MR. JURELLER: Sure. Under the terms of the

13    contract, OMX Timber must serve a demand notice within sixty

14    days of the interest payment default, which is the trigger

15    event for this particular motion. There was an interest

16    payment default on October 29, 2008 which was post-petition.

17    Arguably, in order to comply with the terms OMX Timber will

18    have to serve this demand notice by December 27th of this year

19    in order to comply with its terms. Again, taking into

20    consideration the fact that the relief is not granted we

21    believe we still have a claim.

22             It's our position that there's no harm to the debtors

23    in this case because we're not seeking to compel payment, we're

24    not seeking to deem the claim allowed, that process will happen

25    down the road. Basically, all we're trying to do is preserve

1    the rights that were contracted for in the both, the

2    installment note and the guarantee itself.

3         The committee as joined by the debtor essentially

4    attempts to cloud the issues here.  Generally speaking, they

5    have I think four arguments that are set forth in the papers.

6    The first argument is the demand notice creates an obligation

7    in and of itself, and without it there is no claim.  However,

8    the obligation is a pre-petition obligation that became ripe as

9    a result of the default, not of the debtor, not as a result of

10   the bankruptcy of the debtor, but as a result of the default of

11   the counterparty under the installment note.  This is

12   essentially a timing issue.  The parties contracted to

13   basically a statute of limitations within their installment

14   note and within their guarantee.

15        The second argument that's set forth by the committee

16   is the argument that the automatic stay was not contemplated by

17   the guarantee.  And I think they really spent a lot of time on

18   that saying that these are sophisticated parties, that they

19   should have contemplated this bankruptcy and automatic stay.

20   And, therefore, because the bankruptcy was filed, the guarantee

21   is automatically terminated.  Now, I don't think that basically

22   has any basis in law or in fact.  In fact, what I think the

23   debtor is attempting to do and what the committee is attempting

24   to do here is to use the automatic stay as a sword rather than

25   a shield.  And essentially --

1    THE COURT:  I think you can make that

2  characterization if you like.  But I think what I'm reading

3  into their papers is that sophisticated parties are able to

4  rather easily avoid the problem by not providing for a notice

5  period and in sophisticated business transactions bankruptcy

6  planning is a natural part of what business lawyers think about

7  and pay attention to.  And since bankruptcy planning appears

8  not to have been part of the thinking in connection with this

9  transaction, you should, in affect, be stuck with the

10  consequences.  That's my reading of what they've said.

11    MR. JURELLER:  Well, on the opposite side of that, if

12  they were sophisticated parties and bankruptcy was

13  contemplated, then they could have easily put into the

14  agreement that upon the filing of a bankruptcy of the

15  guarantor, the guarantee is being terminated.  And that wasn't

16  in the agreement either.

17    THE COURT:  Do you happen to have any knowledge or

18  information as you stand here as to the reason for the various

19  notice periods that were set forth here and why notice wasn't

20  waived, and what the purpose notice was to serve in the

21  transaction?

22    MR. JURELLER:  I do not, Your Honor.  Maybe Mr.

23  Deveno on behalf of the trust could shed some light on that.

24    THE COURT:  If he can, that's fine.  I'm just

25  interested in knowing why this transaction was structured so

1    awkwardly.

2         MR. JURELLER:  I really don't know, to tell you the

3    truth.  I mean, it was a transaction that was put together five

4    years ago.  Whether or not anybody ever thought that Lehman

5    Brothers would ever file bankruptcy or Wachovia, which is

6    another of the guarantors, would ever file bankruptcy, it

7    probably never crossed their mind, to tell you the truth.  But

8    I'm just speculating, I do not know the actual reason for that.

9    And I will defer counsel, if he does know, although I'm not

10   sure that he does.

11        The third argument that the committee has set forth

12   is that a balancing of the harms actually weighs in favor of

13   the debtor.  And the sole reason that they set forth for that

14   argument is that allowing this claim to go forward will

15   increase the claims pool.  However, in and of itself,

16   increasing the claims pool should not be deemed a reason or a

17   factor for not allowing this claim to go forward or allowing

18   this contractual right to be provided for.

19        And, lastly, the debtor has cited what it deems the

20   regular case law, which is two cases.  In re Texaco which we've

21   just discussed, and In re Metro Square.  In both cases, the

22   claimants were attempting to better the position solely based

23   upon the bankruptcy filing of the debtor.  And that's not the

24   case here.  In fact, OMX Timber is not seeking to better its

25   position at all, it's seeking merely to reserve its substantive

1  right that it contracted for in its guarantee and in the

2  installment note.  In re Texaco, just to go into not all the

3  details, but just very briefly, sought to accelerate the note

4  to avoid a reduction of the interest rate.  Post-petition the

5  interest rate was going to be reduced from thirteen percent

6  down to seven percent.  The Court had previously permitted a

7  modification of the stay to allow the noteholders to serve a

8  notice of default upon the debtor to preserve their rights.

9  What the Court did not do, though, was to give them that next

10  step to try to better their position and allow for the higher

11  interest rate.  However, what the Court did say is that they

12  could file the claim for the higher interest rate and that

13  would be  a claims objection issue.

14      In re Metro Square the claimant sought to accelerate,

15  to assert a claim against the nondebtor guarantors.  The Court

16  allowed the claimants to file a claim in the full amount.  Just

17  not to use the ipso facto clause to accelerate the debtor to go

18  after the guarantors.  And what the emphasis of that decision

19  was, actually, was that the Court found that the guarantors

20  were vital to the bankruptcy itself because they were the

21  principals of the debtor and that they were going to be

22  providing funding for the reorganization of the debtor.  That

23  was really the basis behind the decision, it had nothing to do

24  with the notice -- whether or not the notice -- the stay could

25  be lifted before the notice.

1  As I said, OMX is not seeking to better its position,

2  it's merely seeking to maintain its substantive rights that it

3  contracted for.

4  THE COURT: Let me ask you this.

5  MR. JURELLER: Sure.

6  THE COURT: Since I think everyone recognizes that

7  what we're most focused on for purposes of stay relief is the

8  balance of harms. What harm does OMX suffer if this motion is

9  denied, since you earlier stated that this is not a critical

10  element in your ability to press your claim?

11  MR. JURELLER: Well, I think that the harm, Your

12  Honor, is that this is a contractual provision for filing the

13  demand notice within sixty days. And the harm is that down the

14  road, although we believe the case law supports the filing of

15  the proof of claim, whether or not the stay is lifted, that it

16  could raise questions as to the proof of claim that will be

17  filed. And this is one instance where a demand notice needs to

18  be served, this is the interest payment default. There will be

19  other defaults that will be coming in down the road. There's

20  an interest and principal payment default, which is based upon

21  the other defaults. There are other defaults that could happen

22  within six months, as interest payments are paid every six

23  months. So the harm to OMX Timber is that this could create an

24  issue down the road that they were not permitted to follow the

25  contract obligation and could raise a question as to a claim

1    which, obviously, is very substantial, 817,500,000 dollar

2    claim, not including accrued interest at this point. So that's

3    the harm at this point.

4          On the other side, the harm to the debtor, we don't

5    see a harm to the debtor, to tell you the truth. It's going to

6    be a claim against the estate. We're not fighting over the

7    claim right now, we're not deeming it allowed, we're not asking

8    for payment. It's going to be a claim in the regular course of

9    the claims process, just as other people had filed a claim

10   against the estate. This is just a contractual obligation that

11   we need to meet in order to get there, to not have questions

12   down the road.

13         THE COURT: Well, it seems to me that you're arguing

14   about harm which is, in affect, equal on both sides of the

15   scale, because either giving your argument it due, your client

16   suffers the harm of being exposed to a defense to the claim or

17   the debtor suffers the harm of losing a defense to the claim.

18   As you say, isn't it in affect the same issue being put on a

19   scale equally? Because you're talking about not your right to

20   payment which you assert continues regardless of the outcome,

21   you're talking about posturing for purposes of claims

22   litigation at some future date in the case.

23         MR. JURELLER: Our argument is that notwithstanding

24   the motion today, that the OMX Timber will have the right to

25   file its proof of claim. And that this is a precautionary

1    motion.  There's more of a harm to OMX Timber if it is

2    deemed -- because down the road there could be a question as to

3    whether or not they met a contractual obligation, which the

4    debtor does not have.  The debtors' only argument at this point

5    is whether the claim is for the amount that it's being filed

6    as.

7             THE COURT:  Okay.  The position you're now advancing

8    is somewhat different from the position which was set forth in

9    your papers, I think.

10            MR. JURELLER:  In which way, Your Honor?

11            THE COURT:  Paragraph 12 argues "cause exists to lift

12   the automatic stay because it is necessary for OMX Timber to

13   preserve its right to collect under the guarantee.  In order to

14   hold" -- I skipped a sentence.  "In order to hold LBHI liable

15   on the guarantee OMX Timber II must issue a demand notice by

16   December 27, 2008."  Is it your position, and I don't mean to

17   put you in a position where you're arguing something against

18   something you may have to argue later if I were to deny the

19   rely you seek, but in terms of the balance of the harm

20   equation, is it your position that you may be unable to assert

21   your claim at all if this relief is not granted?

22            MR. JURELLER:  That's not our position.  Our position

23   is a precautionary motion.  Our position based upon the case

24   law is that we feel comfortable with the argument that we'll be

25   able to file the claim notwithstanding the decision on the

1   motion.

2           THE COURT:  You'll be filing the claim knowing that

3   it will almost immediately fetch a claim objection that there

4   was a failure on your part to fulfill conditions precedent.

5           MR. JURELLER:  Again, I think this is more --

6           THE COURT:  Is that right?

7           MR. JURELLER:  I'm not backtracking on what I'm

8   saying.  I'm saying this is the motion why we want to file it,

9   why we want to serve the demand notice, because we want to meet

10  those contractual obligations.  But if we were to, again, not

11  be successful on the motion, we believe we may still have

12  rights.  But, again, the word is may still have rights to file

13  the claim.  But certainly there will be arguments out there by

14  the committee or by the debtor that they -- that the claim was

15  not filed properly because we did not meet the contractual

16  obligations, notwithstanding, the In re Texaco case law.

17          So its almost a two-partner.  We want to file the

18  notice to meet our contractual obligations, so we avoid that

19  issue down the road.  Because if we do that, there's not going

20  to be an issue as to whether we met our contractual

21  obligations.  However, if the list stay is not granted, we'll

22  be filing our proof of claim.  Now we will be subject to a

23  fight because there may be a question down the road as to

24  whether or not we had the ability to file a proof of claim,

25  notwithstanding the fact that we didn't serve the demand

1    notice.  So I think it's a two-part --

2         THE COURT:  What is the purpose served by the filing

3    of the demand notice?  Transactionally why is it a necessary

4    prerequisite.

5         MR. JURELLER:  I'm going to let Mr. Deveno address

6    that a little bit, but there's other people that are -- other

7    parties that are involved with respect to this transaction.  My

8    understanding of it, and not being privy to the drafting of the

9    whole agreement but reading it, is that OMX Timber needs to

10   file its demand notice within sixty days of the interest rate

11   default.  Then there's a next step where if Lehman Brothers

12   does not make payment, I believe then OMX can now go back after

13   the principal, which is Boise II, we refer to it is.  But in

14   order to get that next step there has to be a proper demand

15   made on Lehman Brothers.  So it's almost like a tiered-type

16   demand that has to be done here.  That's my understanding of

17   it.  And I'll let Mr. Deveno speak a little bit to that.

18        THE COURT:  Okay.  I'll wait to hear more then.

19        MR. JURELLER:  Thank you, Your Honor.

20        THE COURT:  Thank you.  Why don't I hear more from

21   that side of the table, unless you have comments for the

22   committee now.

23        MR. FLECK:  If I may, Your Honor, on behalf of the

24   committee -- Mr. Deveno, I'm not sure if he's going to be

25   speaking as a witness here, he's counsel to the bond trustee,

1   not the movant here.

2           THE COURT:  I understand.  I think he's simply

3   standing up to answer a question that --   .

4           MR. FLECK:  Very well.

5           THE COURT:  -- was pending moments ago.  You're not

6   here to argue but to tell me more about why notice is a

7   required feature of this transaction.

8           MR. DEVENO:  Correct.  Good afternoon, Your Honor.

9   Just for the record, Mark Deveno, Bingham McCutchen on behalf

10  of Wells Fargo as indentured trustee.  In our case, I suppose,

11  we are not a movant or actually a joinder in the motion.  But I

12  think in part because as Mr. Jureller indicated, I think we

13  generally view the motion as protective or somewhat surprised

14  by the objection.  I can walk the Court through a little bit of

15  our thought process on that.  But let me start with -- you

16  always asked a couple of questions of Mr. Jureller related to

17  whether the claim existed without the notice, and related to

18  the intent of the notice and demand provisions.

19          Is there a particular place you'd like me to start,

20  Your Honor, perhaps at one of those questions before --

21          THE COURT:  My focus on this if you know is what

22  purpose is served by the notice provision within the structure

23  of this transaction?  My most naive question is why would

24  anybody put such a provision in a transaction like this?  And

25  if it was being put into the transaction, why wasn't there some

1    provision made for what happens in the event that one important

2    party happens to be in bankruptcy.  Because even if the Lehman

3    bankruptcy was not contemplated it certainly was the kid of

4    risk that parties do think about in situations like this.

5         MR. DEVENO:  Sure.  It's a fair question.  And I have

6    to confess, Your Honor, I can't speak from personal knowledge

7    of the issue, I can only speak from a review of the documents

8    having become indentured trustee counsel in the last -- I'm not

9    sure how long it is, let's say few months.  But there -- I

10   think something that may not have come out in the presentation

11   and the materials filed with the Court is the complexity of the

12   overall scope of the transaction, and the fact that there are

13   any number of parties, call it four or five different types of

14   constituents that are all -- you know, have moving parts with

15   sales of assets running one way, installment notes running

16   another, a Lehman credit support to one party and a guarantee

17   to another.  And it's a fairly complex transaction, Your Honor.

18   I think the relevant concept of notice and demand relate to the

19   fact that there are so many parties involved in this complex

20   structure.  And just as a for instance, and it even goes to the

21   point of harm, Your Honor, and harm to OMX, is the relevant

22   installment note that's attached to the motion is the

23   installment note provided by Boise Land to OMX guaranteed by

24   Lehman, that's what the guarantee relates to.  That installment

25   note actually has a provision that it cannot be accelerated

1    absent the -- you know, absent making demand on the guarantee.

2    And I think the parties came up with a complex arrangement that

3    reflected the order in which things should happen.  I suspect

4    that's part of the reason for the demand and the notice-type

5    structure.  And it is a guess on my part based on the

6    documents.  But it does go to harm, Your Honor, in the sense

7    that we have a third party out there, a nondebtor unrelated to

8    Lehman whose rights -- you know, OMX is somewhat prejudiced

9    against if they have to sit on their hands during the

10   bankruptcy case and not provide the relevant demand.

11          THE COURT:  Sorry, how are they prejudiced?

12          MR. DEVENO:  In the sense that they are prevented

13   under the relevant terms of the contract, the installment note

14   that was attached to the motion, has a provision that provides

15   that OMX cannot pursue its rights to accelerate against Boise

16   Land and pursue its rights against Boise Land, this nondebtor,

17   until it's made the demand on Lehman.  It's a complex

18   transaction.

19          THE COURT:  Okay.  I hear you.  But isn't that just

20   another example of a complex transaction in which the parties

21   failed to contemplate this eventuality?

22          MR. DEVENO:  Actually, I don't know that that's the

23   case, Your Honor.

24          THE COURT:  Was it contemplated?

25          MR. DEVENO:  I think in a manner of speaking it is.

1  One of the interesting things here -- and if I can approach, I

2  actually have a copy of the perspectus that went with the

3  indenture which --

4           THE COURT:  I don't really want to see that now.

5           MR. DEVENO:  And which happens to be underwritten by

6  Lehman and talk about what happens in the even of a Lehman

7  bankruptcy.

8           THE COURT:  I'd be happy to take it, I'm not going to

9  look at it while you're arguing, I'll just hear what you have

10  to say.

11           MR. DEVENO:  Sure.  It's a very short bit of language

12  I was hoping to read to the Court, if there's no objection.

13           THE COURT:  Is this a surprise to the Lehman camp?

14           MR. FLECK:  Yes, Your Honor, we don't have a copy of

15  this document.

16           THE COURT:  I'm not going to look at it if they don't

17  have a copy.

18           MR. DEVENO:  Okay.  I suspect then, Your Honor, you

19  don't want me to read language into the record at this moment

20  as to --

21           THE COURT:  No.  I'm interested in knowing whether or

22  not bankruptcy was, in fact, a contemplated aspect of the

23  structuring of the transaction.  That was a question, and if

24  you can answer that it's fine.

25           MR. DEVENO:  Sure.  Sure.  Then rather than handing

1   it up, let me just give it a little color.  Again, remembering

2   this is a complex transaction, various components, including

3   the indenture, as part of the transaction, the indenture was

4   underwritten by Lehman.  And one particular provision of the

5   prospectus relates to the insolvency or financial distress

6   of -- I should pause for a moment just to highlight that

7   there's really two different sets of OMX transactions.  One

8   that involved Wachovia, one that involved Lehman.  They're two

9   separate transactions structured the same, so if you hear me

10  read Wachovia, that's the explanation for it.

11          The section was titled "the insolvency or financial

12  distress of Wachovia or Lehman Brothers could reduce the

13  likelihood of repayment of the applicable offered notes."  And

14  if I go on to read it it says "the only practical remedy

15  available to the indentured trustee upon a default under an

16  installment note is a demand for payment on the applicable

17  guarantee.  The insolvency of Lehman Brothers or any of its

18  subsidiaries or certain financial distress with respect to

19  Lehman Brothers or any of its subsidiaries, could limit Lehman

20  Brothers' ability to perform under the term of the Leman

21  Brothers guarantee.  Such inability to pay under the Lehman

22  Brothers guarantee would reduce the likelihood of repayment of

23  the Class A2 installment note.  And consequently reduce the

24  likelihood of repayment under the Class A2 notes."

25          I think all focused on inability to pay, not a

1   concept that the guarantee, itself, somehow became ineffective

2   at the time that a bankruptcy was filed.  And nowhere in that

3   prospectus to my knowledge, Your Honor, is some indication that

4   Lehman Brothers' view was that the guarantee would be coming

5   affective.

6          THE COURT:  It seems to me that it's a risk factor

7   that wasn't fully flushed out.

8          MR. DEVENO:  Well, if I could.  You know, one thing

9   that struck me interesting watching the argument -- and, again,

10  we didn't join the motion because I think we view this as

11  somewhat perfunctory in the sense that --

12         THE COURT:  It's not.  Let me assure you this is not

13  perfunctory.

14         MR. DEVENO:  I understand, Your Honor.  But part of

15  the rationale on that was if the stay motion is I guess denied

16  today, I suspect what OMX will do is not necessarily file it's

17  full proof of claim, I suspect that may shape up over time.  I

18  think if I were in OMX's position I would probably file a proof

19  of claim which attaches the relevant guarantee demand form.  I

20  might later amend it when I have another guarantee demand or

21  otherwise.  But if I look at the technical read of the

22  document, the provision that the -- of the guarantee, I'm

23  sorry.  The provision that the committee focuses, Your Honor,

24  or focuses on, Your Honor, is one sentence that really

25  basically requires that the guarantee demand be made within a

1 certain time. And they try to argue that this means that, you

2 know, with sophisticated parties, aware of automatic stays,

3 they must have known that you couldn't give a demand during a

4 bankruptcy so the guarantee must have been ineffective during a

5 bankruptcy. I think I contend, Your Honor, that all that OMX

6 needs to do is file a proof of claim attaching that guarantee

7 demand. And the argue would run as follows: The only

8 technical requirement of the document is that the guarantee

9 demand be delivered, just to their point that there's no --

10 that these are sophisticated parties. There's no provision of

11 the guarantee that says the guarantee becomes ineffective, it

12 only requires that the guarantee demand be delivered. And I

13 think it would be delivered by the proof of claim. I suspect

14 that proof of claim would later be amended for the next demand,

15 etcetera. I think that OMX could meet its obligations pretty

16 easily. And perhaps that's what the parties considered when

17 they structured this.

18          THE COURT: Well, if that's true then there's no

19 harm.

20          MR. DEVENO: Well --

21          THE COURT: If you're right there's no harm.

22          MR. DEVENO: Yeah. I mean, I think that's a fair

23 interpretation. The harm, of course, is the fact that the

24 objection was brought. And the fact that we're apparently

25 facing an argument that that proof of claim, or otherwise,

1    might be ineffective to serve this demand notice.  And I think

2    that's probably why OMX has brought this kind of protective

3    pleading, just to make sure that they don't get tripped up on a

4    technicality.

5            THE COURT:  Okay.  Well, the underlying theme that

6    concerns me, and either you can comment on or others can, is

7    whether this is the motion that you describe as perfunctory and

8    I tell you is not, or whether or not this is an effort to cure

9    a structural defect in the underlying documents, or whether or

10   not this is a means to elevate the position of OMX as claimant?

11   I can't tell yet, based upon the arguments that have been made

12   and the papers that I have reviewed.  Whether the filing of

13   this notice is an express condition precedent to the right to

14   payment or whether it is a mere ministerial act.  And I'm not

15   asking you to respond to that, I'm just telling you and the

16   others in the room, that's a question I still have.

17           MR. DEVENO:  Okay.  Again, I think it's -- I suppose

18   I will respond, I have the podium for a moment longer.  I think

19   in our view, Your Honor, that it is a mere ministerial act in

20   the fact that, again, if you focus on the relevant language

21   being focused solely on a timing issue, a timing of when demand

22   is made, and the fact that that demand could presumably be

23   included within a proof of claim, yes, one could argue that

24   means no harm, just file the proof of claim.  But I think it's

25   also evidence that this could be viewed as just a ministerial

1    act, so what harm is caused to anybody by permitting the relief

2    from stay to more formally serve the demand.

3             THE COURT:  Let me assume something with you for a

4    moment.

5             MR. DEVENO:  Sure.

6             THE COURT:  Assume for a moment that Lehman Brothers

7    is not in bankruptcy and you're not before a bankruptcy judge.

8    Assume that there is a failure due to oversight or neglect in

9    giving the notice that you're now seeking to give before

10   December 27th.  Under applicable non-bankruptcy law, does the

11   failure to provide that notice affect the ability of parties

12   who are in a position to pursue a Lehman guarantee to do so?

13            MR. DEVENO:  I suspect contractually the answer is

14   yes, Your Honor.

15            THE COURT:  So then it's not a mere ministerial act.

16   It goes to the substantive rights of the parties.

17            MR. DEVENO:  Well, does it go to the substantive

18   rights of the parties that they have a claim, they need to

19   preserve their claim by providing the demand.

20            THE COURT:  Is it a condition precedent to the claim,

21   or is it a preservation of a right to a claim?

22            MR. DEVENO:  I would argue it's a preservation of the

23   existing claim.

24            THE COURT:  Why?  What do you mean by claim

25   preservation, does that involve moth balls, how do you do that?

1           MR. DEVENO:  Well, certainly, Your Honor --

2           THE COURT:  I truly don't understand the term, what

3   do you mean by -- what do you mean by claim preservation?

4           MR. DEVENO:  Certainly, Your Honor, Lehman signed the

5   applicable guarantee.  And at all times absent to bankruptcy,

6   anyway, as the debtors argue, intended to performance upon

7   receiving a demand.  I don't think that fact has changed.  And

8   that demand, as I say, can be provided through a proof of

9   claim, it can be provided through this automatic stay request.

10  And I think that would -- I suppose maybe that results in the

11  same thing as a contingent claim, Your Honor, I struggle to

12  sort of articulate it in the terms you've asked, but certainly

13  there's an existing guarantee.  It seems to be a ministerial

14  act given that it could just be included with a proof of claim,

15  the relevant demand, and it would protect that claim.

16          THE COURT:  Okay, thank you.

17          MR. DEVENO:  Thank you, Your Honor.  Obviously,

18  reserving, Your Honor, to respond after everyone has had a

19  chance to speak.

20          MR. FLECK:  Good afternoon, Your Honor.  For the

21  record, once again, Evan Fleck of Milbank Tweed on behalf of

22  the committee.

23          Your Honor, it doesn't surprise the committee that

24  the OMX trustee believes that this is a ministerial act, the

25  serving a notice of demand with respect to the guarantee.  In

1    fact, we understand from debtor's counsel that the OMX trustee

2    has, in fact, served the demand on the debtors in connection

3    with its documents. And that's a separate issue and that's the

4    reason why I rose to speak before Mr. Deveno spoke, and that

5    will be taken up separately, Your Honor. But we do recognize

6    that the trustee believes that this is a ministerial act. The

7    committee was pleased, actually, that OMX recognizes that

8    relief from this Court is required in order to serve a demand

9    with respect to the guarantee.

10            THE COURT: Let me just stop you for one second. Are

11   you saying that a demand has already been served?

12            MR. FLECK: Yes, Your Honor. We understand --

13            THE COURT: When did that happen, what does it

14   consist of, is it a stay violation, and does it moot the

15   current motion?

16            MR. FLECK: Your Honor, we don't believe it moots the

17   current motion. We learned about it this morning from the

18   debtors. The debtors' counsel received a copy of the demand

19   notice from the OMX trustee in connection with their documents.

20   I understand that there's a pledge of the underlying note in

21   connection with financing -- the OMX, indentured trustees'

22   financing. They have certain rights, apparently with a similar

23   structure to make a demand. And they've sent a demand notice

24   to the debtors. I don't believe a copy of it is in the

25   courtroom today. And as I said, Your Honor, we recognize that

1   it hasn't been brought before the Court, although it is

2   relevant, we believe, to the issue that's before us because it

3   deals with the same structure of making a demand against the

4   debtors which we think is a real request for relief from the

5   automatic stay that certainly is not limited.  It's not a

6   limited relief from the stay, it's asking, actually, for quite

7   a significant subsequent relief from this Court, which we

8   believe is to create a one -- an approximately one billion

9   dollar claim against the estates.  That's the reason -- I'm not

10  sure if that addresses Your Honor's question with respect to

11  that.

12          THE COURT:  Well, you've addressed it certainly in

13  part.  I was trying to understand whether or not that notice,

14  which has already been delivered is, in fact, the same notice

15  that would be delivered if this motion for stay relief were

16  granted.  Is it a different notice or the same notice?

17          MR. DEVENO:  I can speak to that.

18          THE COURT:  Let me just find out the answer to that

19  question and we'll go back to the committee after that.

20          MR. DEVENO:  Again, Mark Deveno for the record, Your

21  Honor.  And forgive me, I should have covered this fact as

22  opposed to having it presented in this way.  A demand notice

23  has been -- in theory has been provided by the indentured

24  trustee.  It is -- forgive me for using the word in theory,

25  I'll come back to explaining it.  It's in theory that the

1   relevant demand here, what happens under the documents is the

2   indentured trustee receives a pledge of the guarantee and the

3   installment note. It receives certain rights to enforce those

4   obligations. Again, the first of the various potential demands

5   was provided, although it was provided with a remarkably

6   cautious cover letter of -- and I'm pointing out that we've

7   attached the relevant guarantee demand form, but making

8   abundantly clear that there is no actual immediate demand or

9   otherwise being made. And, again, we'll reserve for another

10  time as to the impact of that. But I think that the cover

11  letter may in and of itself -- I hate to suggest this on the

12  record, but I think the cover letter in and of itself may raise

13  some question as to whether it was a proper and formal service

14  of the demands since that it's important to us, as indentured

15  trustee, to see OMX be able to deliver as its requested.

16          THE COURT: I'm confused. Is the demand that is the

17  subject of the pending motion the same demand that was

18  cautiously delivered to the debtor or is it a different demand?

19          MR. DEVENO: It's the same -- it's the same first

20  demand. What OMX has to do is deliver two demands. A demand

21  in respect of a missed interest payment, followed by a demand

22  in respect of misprinciple and interest. The demand that has

23  been delivered is a demand in respect of the missed interest

24  payment.

25          THE COURT: And is that not the same demand which is

1  the subject of the pending motion?

2          MR. DEVENO:  It is a demand that's subject of the

3  pending motion, Your Honor.

4          THE COURT:  So when the trustee, however cautiously,

5  delivered this demand, what was counsel and what was the

6  trustee thinking in terms of the relationship between the

7  pending motion and the action that either didn't require stay

8  relief or may expose the trustee to a claim for a stay

9  violation?

10          MR. DEVENO:  Obviously, Your Honor, we'll reserve on

11  that and the issues will play out.  But I will say that it was

12  our view and our impression of where the current motion was, we

13  were -- frankly, we were somewhat surprised when the Friday

14  objection came in.

15          THE COURT:  So when was the demand delivered?

16          MR. DEVENO:  The demand, I believe, was delivered --

17  I don't know if I have it at my fingertips, Your Honor, but I

18  believe it was delivered Thursday of last week.

19          THE COURT:  Mr. Jureller seems to want to speak, too.

20  I think we should -- this is for a relatively contained matter.

21  This is already showing signs of kind of disagreeable disorder.

22  So I think we need to have one person speaking at a time.

23          MR. JURELLER:  Your Honor, John Jureller.  I was just

24  going to address that question.  The demand that was served was

25  a demand that was served by the indentured trustee.  The

1   motion, itself, that was filed was filed by OMX, itself. Two

2   separate entities from my understanding. So, although, they're

3   similar in that the demands are made to the same party under

4   the same note, the demand that we sought under the motion came

5   from or was hopefully to come from OMX, not from the indentured

6   trustee.

7         THE COURT: Who has standing to bring this matter

8   before me? Is this an indentured trustee issue, is this an OMX

9   issue? And if one has delivered the demand does that moot out

10   the request of the other?

11         MR. JURELLER: My understanding was that possibly

12   both parties, because it was -- the note was pledge to the

13   indentured trustee as part of the securitization, that both

14   parties possibly had the right to further a demand. The

15   noteholder is still OMX Timber Finance Investment II LLC.

16   However, it's been pledged, so, therefore, the trustee arguably

17   has standing as well to make a demand for a default under the

18   note.

19         THE COURT: Well, use the term disorderly to describe

20   the argument. But it seems to me that transactionally this is

21   more than disorderly. Ordinarily, one would think that only

22   one party would have the standing to make demands, otherwise

23   there could be conflict. But we don't need to address that

24   right now. I think I've heard enough on that score.

25         MR. FLECK: Your Honor, once again, Evan Fleck.

1    At least with respect to the demand, that is the

2 subject of OMX's motion, the committee is pleased that OMX,

3 based upon its papers, acknowledges that relief from this Court

4 is required in order for it to serve its demand. And to be

5 clear, Your Honor, the demand -- the guarantee which was

6 attached to the motion states "that it is a demand for payment

7 of all principle outstanding under the installment note, and

8 accrued and unpaid interest payment is due and has not been

9 made by the obligor. And payment of such amount is demanded of

10 the guarantor." That's what the note says, that OMX seeks to

11 send to the debtor. And we agree with OMX that unless this

12 Court finds that there's cause under the Sonnax factors, they

13 cannot transmit that demand to the debtor.

14    In response to Your Honor's question, whether OMX has

15 a claim absent the ability to transmit the demand, the

16 committee believes that there would be no claim without the

17 relief from this Court, and then ultimately sending the demand

18 notice based upon the language of the guarantee. Which states

19 "guarantor shall have no liability to beneficiary for any

20 guaranteed obligations for which a demand is not delivered to

21 guarantor within the notice period set forth in the guarantee."

22    As has been commented upon in the argument up to this

23 point, this is and was a tremendously sophisticated

24 transaction. There are several memoranda that were generated

25 internally at Lehman describing the transaction with flow

1    charts that run from page to page.  The parties were advised by

2    counsel who clearly understood -- hopefully understood the

3    transactions they were entering into.  And, in fact, did

4    contemplate bankruptcy.  Bankruptcy planning is part of these

5    documents.  In fact, the guarantee specifically talks about

6    bankruptcy and the effect of bankruptcy.  In paragraph 2 at the

7    end it speaks to bankruptcy of the obligor, it doesn't speak to

8    bankruptcy of LBHI.  But there's no allegation that the

9    documents are unclear.  And so it's fair to read from these

10   documents that the parties either did or should have made

11   certain consideration for bankruptcy but drew the documents up

12   as they decided if it was appropriate for the transaction.  And

13   none of us here in the room today were present, I don't think

14   any of us needed to have been present because the documents are

15   unambiguous.  But suffice it to say from the Committee's

16   perspective, presumably, this was the benefit -- this was the

17   benefit of the bargain that was struck.  And by their motion,

18   OMX is seeking to change that bargain.  And is seeking to

19   change the terms.  So that a notice is not required in order to

20   breath life into the guarantee.

21           And, again, looking at the plain language of the

22   guarantee in paragraph 2 it speaks to a number of circumstances

23   where no notice is required.  It lays it out quite explicitly

24   in paragraph 2 of the guarantee.  But the beginning of that

25   paragraph starts "except as set forth in paragraph 3 below."

1    And paragraph 3 goes through in painstaking detail what OMX

2    must do and when and to whom in order to serve its demand with

3    respect to the guarantee.  And it's repeated five times in the

4    document.  And we think that that's not an accident, Your

5    Honor.

6          Again, sophisticated parties drew up a document that

7    they believed was appropriate for the transaction.  And we

8    think that the motion that's before the Court today is, in

9    fact, extraordinary.  It's asking this Court to rewrite the

10   document, to write around the automatic stay.

11         THE COURT:  But it's really not doing that, Mr.

12   Fleck.  The motion is asking for the right to do what the

13   document expressly provides.  It's not asking it to be

14   rewritten, it's asking that the automatic stay be lifted so

15   that what the parties contemplated could take place.  I'm not

16   arguing with you, I'm just letting you know that I don't like

17   that argument, particularly.

18         MR. FLECK:  Very well, Your Honor.

19         With respect to the balancing of the harms, we think

20   that is -- we agree with OMX that that is the relevant Sonnax

21   factor.  There's only that possibly could help their argument

22   out of the twelve.  And we think that's it.  But when OMX's

23   counsel said that when you look at -- really, the balancing is

24   with respect to the claim and they would lose out if they don't

25   get a claim, and then there's a claim against LBHI.  And, okay,

1  it's a large claim, but just merely adding a claim to the

2  claims pool is not harm to the estate.  We disagree, we think

3  it is.  And it's quite a significant claim.

4          But, in addition, we are cautious and recognize that

5  we should make an argument about floodgates very carefully and

6  only in appropriate circumstances.  But, Your Honor, we do

7  believe in this circumstance there are plenty of disappointed

8  parties who, but for the automatic stay would seek certain

9  remedies from this Court.  And by permitting what OMX is

10 seeking from this Court, the committee is quite concerned about

11 other parties coming forward seeking similar relief.

12         In the context of the balancing of the harms, we

13 think that's quite relevant and certainly weighs against

14 granting the relief under these circumstances.  We understand

15 the committee is cognizant of the fact that the result might be

16 painful economically to CMX.  We cited some cases in our

17 objection reports.  The Second Circuit has recognized that in

18 bankruptcy certainly parties are disappointed by the results

19 economically.  And we think that's the result here that's

20 appropriate.

21         The committee did not pursue this objection lightly

22 but recognized it's in the interest of the unsecured creditors

23 of these estates to allow only those claims that are

24 appropriate.  And legally, where there's a legal right to have

25 claimed to be asserted against the estate to proceed.  And on

1   its face, based upon the clear documents, the committee is

2   confident that his claim -- that OMX does not have a claim to

3   assert against these estates as a result of the automatic stay.

4           And for that reason, Your Honor, we request that the

5   motion be denied. And I'd be happy to respond to any questions

6   from the Court.

7           THE COURT: It's your position on behalf of the

8   committee that a denial of this motion would mean that OMX is

9   deprived of the ability to pursue its 800 plus million dollar

10  claim against the Lehman estate, is that the direct consequence

11  of your argument?

12          MR. FLECK: Your Honor, I should be more clear. The

13  specific relief that we're seeking here is that a claim under

14  the guarantee not be pursued because we feel like the automatic

15  stay prevents OMX from pursuing a claim under the guarantee and

16  stay relief is not appropriate because cause does not exist.

17          If OMX, as it seems that they intend, would like to

18  file a proof of claim in the case and pursue that, there's a

19  process for that and we believe will be dealt with in due

20  course. But we believe -- we think that the guarantee is

21  written so that they lose their right to a claim if they don't

22  take the action that needs to be taken within this period of

23  time.

24          THE COURT: What's your position if they don't

25  prevail today but they've done everything that they can

1   possibly do to give notice.  In fact, Lehman has noticed.

2   Lehman knows that these parties are asserting rights under this

3   guarantee.  They've given notice directly perhaps as a stay

4   violation through the indentured trustee, and they've given,

5   certainly, notice of their intention to give notice through

6   this motion.  Is it your position that that does nothing in

7   terms of their ability to perfect their claim, because they've

8   done everything that they can do under the circumstances,

9   including even possibly something that isn't allowed as a

10  matter of law?

11          MR. FLECK:  Well, Your Honor, if OMX was able to make

12  an argument that cause exists to lift the stay then we think

13  that they would have a right to assert a claim under the

14  guarantee.  We don't think cause exists and what naturally

15  flows from that is that they do not -- they cannot pursue a

16  claim with respect to the guarantee, with respect to notice.

17          THE COURT:  It sounds like forfeiture to me.  It

18  sounds as if they're unable to get the relief that they seek,

19  your position would be they lose all rights.  Is that your

20  position?

21          MR. FLECK:  Well, they certainly have the right to

22  pursue a proof of claim.  They have a right to file a proof of

23  claim and have that claim adjudicated through a process.  We

24  don't think that the -- we think that at its core, the issue is

25  that the document was written in a way that's unfortunate and

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

1  shouldn't be rewritten to fix the problem.  Obviously,

2  sophisticated parties now and in hindsight, OMX would

3  presumably write a guarantee that doesn't require any action

4  and that if automatically there would be an acceleration, a

5  garden variety guarantee would so provide.  So we all know what

6  everyone was trying to do here and they didn't get it done.

7      There's a significant harm to the estate as a result

8  of curing what certainly was intended to result here.  And we

9  don't believe that the Court should cure that problem for OMX.

10  To be sure, yes, the natural result of what flows from that is

11  it may be that OMX is without a claim.  When the process runs

12  through its natural course, they file a proof of claim and

13  there's an objection, there's an adjudication of that claim.

14  And as Your Honor recognized, there's a condition precedent

15  to -- perhaps a condition precedent to their right to recovery.

16  And that could be adjudicated at a later time.

17      But, yes, the simple answer is that it may be that

18  they are without a claim here.

19      THE COURT:  Okay, thank you.  Mr. Fail, do you have

20  anything to say?

21      MR. FAIL:  Thank you, Your Honor.  Garrett Fail, Weil

22  Gotshal & Manges for the debtors.

23      The debtors filed a joinder in support of the

24  committee's arguments.  And I restate that, again, for the

25  record.  I would simply add, not that I think Your Honor has

1    accepted any of counsel's representations or anything that

2    counsel for movant or someone who's joining movant may have

3    read into the record as evidence. These are facts that were

4    not -- you know, still aren't apparently known to all parties

5    in the courtroom today. And so, certainly, the debtors would

6    reserve all rights to challenge any allegations of facts that

7    were made by movant's counsel.

8           THE COURT: Okay. Anything more?

9           MR. WILAMOWSKY: Your Honor, if I may just respond to

10   some of the points that -- for the record, I'm sorry, Steven

11   Wilamowsky, Bingham McCutchen LLP on behalf of the indentured

12   trustee.

13          I just wanted to be able to respond to a couple of

14   the points of the committee counsel. First thing is that both

15   said it and they said it in their pleadings is that well, if

16   OMX wanted to have the benefit of being able to have its

17   guarantee claim even in a bankruptcy it should have drafted

18   around it. In fact, they used the word draft around in the

19   pleading that says well, I'm sure there are many other

20   disappointed parties that could have -- that are in hindsight

21   sorry that they didn't draft around the automatic stay. Your

22   Honor, you're not supposed to be able to draft around the

23   automatic stay. There are a legion of cases that show --

24   render unenforceable attempts to end-run the automatic stay.

25   So it's pretty good indication if there is such an easy way to

1   have end-run the automatic stay in a way that nobody would

2   argue with and that everybody agrees is common. It's probably

3   a good hint that the purposes of the automatic stay are not

4   being offended because otherwise courts wouldn't enforce it,

5   courts don't allow you to end-run the automatic stay.

6        So, if anything, we think that cuts in favor of the

7   motion because what it demonstrates is that it underscores that

8   no automatic stay policy, no bankruptcy policy is being

9   violated by the request. And the reason why the bankruptcy

10  policy is not being violated by the request is because it is

11  also well settled that the automatic stay is not intended to

12  affect the substantive -- to impair the substantive rights of

13  the nondebtor parties. It's intended to be a breathing spell.

14  It's supposed to freeze everything in its tracks. And it's not

15  supposed to render a party's -- impair a party's substantive

16  claim that they can later assert in the bankruptcy through the

17  process. And where there is a risk that that substantive claim

18  is not going to be preserved for the purposes of having it

19  available to be adjudicated through the claims process, then

20  that we submit is reason why the motion should be granted.

21        I use an analogy in terms of the prejudice to the

22  debtors in terms of what comes up on a 9006(b) cases all the

23  time, where parties want to come in and file a late claim, and

24  where the debtor asserts that the prejudice is well then

25  there's going to be a claim against me, and if you deny the

1   motion there won't be a claim.  Courts routinely have said no,

2   that's not a prejudice.  You've got to show -- you've got to

3   make some kind of argument that's -- you know, sometimes the

4   court will accept a floodgates argument, sometimes the Court

5   will accept an argument based on the settled expectations of

6   the parties, because there's already been a disclosure

7   statement and a plan that's gone out.  But the fact that

8   there's going to be a claim that's going to be added to the

9   pot, that's not a cognizable harm in the context of this kind

10  of a process.  Because it is not the goal of the Bankruptcy

11  Code to impair parties' substantive claims.  The goal of the

12  bankruptcy code is to deal with those claims as they exist

13  under state law.  Take the state law claims and then divide the

14  pot equally or in accordance with Bankruptcy Code priorities.

15          So for that reason, again, Your Honor, we would

16  submit that any prejudice based on the fact that this happens

17  to be a large claim is -- there isn't an even balance as Your

18  Honor suggested.  Well, isn't it even because we're going to

19  have a claim and they're going to avoid the claim?  No, because

20  if we've got a state law claim then we're entitled to be

21  asserted that claim under the Bankruptcy Code.  And if I didn't

22  have the automatic stay somehow we're not going to be able to

23  assert that, then that is a harm that is inuring to the

24  detriment of the parties on this side of the table.  But it's

25  not, I would submit, a cognizable harm the other way to the

1    parties on that table.

2           Finally, Your Honor, I would just want to -- Your

3    Honor spoke about the question of whether the demand is

4    ministerial or it's a precondition to the right of payment.

5    And I think that everything that I've been arguing here is

6    let's assume that it's a precondition to a right of payment.  I

7    think that Your Honor can safely for the purposes of granting

8    the motion -- if Your Honor were inclined to grant the motion,

9    Your Honor can do that even by assuming that it is a

10   precondition to a right of payment.

11          But that's exactly the point.  The point is that it

12   would be a precondition to a right of payment.  And by not

13   allowing the OMX to exercise that precondition OMX is being

14   prejudiced.  Nobody's arguing that this is literally a brand

15   new claim.  They talk about it creating a claim, but if it was

16   creating a claim, literally, then there wouldn't be a stay

17   issue at all.  It would be -- nobody's arguing it's a post-

18   petition claim.  Obviously, they would have a right to assert a

19   post-petition claim.  Everybody's agreeing that his is a pre-

20   petition claim that's arising under pre-petition contract.

21   What the demand does, it ripens the claim, it matures, it

22   becomes payable, something happens to the claim.  But it can't

23   be a brand new claim that's being created, the claim has to

24   preexist the bankruptcy, otherwise we could be saying okay,

25   we've got a post-petition claim when nobody's asserting that

1  we've got a new post-petition claim. So it's a claim that

2  exists. And it's a claim that already exists -- I think that's

3  the point when Your Honor asks what does it mean to preserve a

4  claim? I think that what it means to preserve a claim is if

5  the claim never existed before then that's a brand new claim.

6  But if the claim did exist and we've got to take steps to make

7  sure that it doesn't go away, that's what I would submit is

8  called preserving a claim.

9       Thank you, Your Honor.

10      THE COURT: Does the principal obligor continue to

11  exist? The obligor on the note?

12      MR. WILAMOWSKY: Yes.

13      THE COURT: And is that obligor and obligor that has

14  a credit strength to make payments under the note?

15      MR. WILAMOWSKY: I don't think it's structured that

16  way.

17      MR. JURELLER: It's my understand that it's more of a

18  -- the way that it was structured it was more of a shell type

19  company, but it does not have the capital strength to make

20  payments under the note. It's my understanding but I don't

21  speak for that.

22      MR. WILAMOWSKY: I think, Your Honor -- I think we

23  have Congress to blame for this whole big mess. Because I

24  think somehow they created the tax advantage status for Timber

25  related access, I guess somebody from the Timber lobby maybe --

1    THE COURT:  So why don't you blame them not Congress.

2    MR. WILAMOWSKY:  So how it ended up is that I think

3  this was a vehicle where -- if, Your Honor, we consider it it's

4  very strange, because essentially in order to go against the

5  primary obligor you've got to show that you've made a demand

6  against the guarantor.  I mean, that's highly unusual and I

7  think it's just reflective of the priorities in terms of what

8  was expected out of the transaction, that you'd be able to go

9  to Lehman and assert that claim.

10    THE COURT:  Well, again, assuming that Lehman is not

11  part of this equation, just for purposes of my understanding

12  how this transaction was contemplated initially, was there a

13  ready source of identified cash flow from the borrower in the

14  structure to make the designated payments of principle and

15  interest, under the 2020 loan?  Because I understand the

16  original installments were to go out to the year 2020.

17    MR. DEVENO:  Your Honor, Mark Deveno of Bingham.

18    Oddly enough, the answer is -- oddly enough in the

19  transaction, the answer is yes.  In that credit source was

20  itself Lehman, Boise itself has claims against Lehman.  Again,

21  blame the Timber lobby.

22    MR. WILAMOWSKY:  Oh, okay.  It was a Lehman entity

23  that -- when the whole Lehman enterprise collapsed so,

24  therefore, that naturally created a claim against the

25  guarantee, against LBHI.

1          THE COURT:  Yes.  But my question was whether if you

2     assume away for a moment the Lehman guarantee and you were

3     simply looking simplistically at a borrower that presumably had

4     cash flow that matched the obligations at the time that this

5     transaction was set up, is there such a borrower and is it

6     generating cash flow?

7          MR. WILAMOWSKY:  I think the answer is that there is

8     such a borrower, but it's source of cash -- of payment was a

9     different Lehman entity.  And, therefore, it doesn't have any

10    source of cash flow.

11         THE COURT:  Okay.  So that source is dried up.

12         MR. WILAMOWSKY:  Right.

13         THE COURT:  All right, thank you.

14         MR. WILAMOWSKY:  Thank you, Your Honor.

15         THE COURT:  I'm not going to decide this today.  But

16    what I am going to do is to provide that when I do decide it it

17    will relate back to today.

18         This means that the moving party, OMX, has at least

19    done what it needed to do timely to get stay relief that speaks

20    as of a date prior to the notional deadline of December 27.

21         The reason I'm not deciding it today is that I don't

22    have enough information yet.  I've asked any number of

23    questions and the answers are not anything other than lawyers,

24    and that's fine, telling me to the best of their ability what

25    they think the facts are.  But as Mr. Fail has pointed out in

1   his comments on behalf of the debtor, the debtor reserves all

2   of its rights to the actual facts and what the evidence would

3   show if we had an evidentiary hearing, which today is not.

4        I think there is a need for an evidentiary hearing in

5   this instance. And there are a number of questions that I

6   have. The first general question is to understand the

7   structure more fully than I do now. Why it was set up the way

8   it was set up, the purposes to be served by the various notice

9   provisions, and a better understanding based upon the

10   underlying transaction documents as to why notice within a

11   certain period of time is deemed to be an important condition

12   to the obligations of Lehman as guarantor.

13        Everybody recognizes that balancing the harms

14   represents the fundamental question here. And I'm getting

15   mixed messages from the parties as to just what kind of harm

16   that is. I'd like to know more from the moving party OMX, as

17   to the actual harm to be encountered by virtue of a denial of

18   the requested relief. I'm particularly troubled by the fact

19   that the indentured trustee appears to have, at least at some

20   level, mooted the motion by delivering under whatever kind of

21   cover letter was carefully created by counsel, what appears to

22   be a demand notice covering the very same subject matters of

23   the pending motion. Assuming there is efficacy to that demand,

24   and I don't know if there is or there isn't, this is a motion I

25   could easily deny. To the extent that there's no efficacy the

1  notice may be a nullity, or may be liability creating.

2         I want to know a lot more than I know right now as to

3  why that notice was sent and what color of law was cited in the

4  cover letter that gave the trustee the authority to send it in

5  the first instance on Thursday.

6         In terms of the harm to the debtor I think that Mr.

7  Wilamowsky's argument was quite persuasive in suggesting that

8  there is no harm, it's just a claim, one of many.  And that the

9  business of bankruptcy is not to erect artificial barriers to

10 keep legitimate claims outside the bankruptcy court.

11        I'd like to know more from the debtor in particular

12 as to what harm is associated with permitting this claim to be

13 asserted now.  While it's not a matter for an evidentiary

14 hearing, I think it's worth noting that my curiosity has at

15 least been aroused by the role reversal associated with the

16 current controversy.  The principal party opposing this motion

17 for stay relief is not the debtor, it's the creditors'

18 committee.  The debtor joined in the position articulated by

19 the committee, but is hardly carrying the laboring law on this

20 one.  I'd like to know more about the debtor's position.  I

21 understand that the creditors' committee is a watchdog, but

22 this watchdog is doing more than I think is appropriate in this

23 instance.  This is a situation in which the debtor should be

24 asserting positions on behalf of the estate.  For some reason

25 it's in a joinder role, I want to know why.  Is there anyone at

1   the debtor who has evaluated this, who has considered whether

2   or not there is actual merit to the harm argument being made by

3   the creditors' committee.  I heard the argument, but I'm not

4   particularly persuaded that there is cognizable harm to the

5   estate, unless this is a situation in which a claim that would

6   not otherwise exist is, in effect, being activated by the

7   demand notice.

8           For that reason, I'd like some supplemental briefing

9   in addition to a further evidentiary hearing.  Are there really

10  only two cases that deal with this subject matter.  Or by

11  analogy are there other situations in which courts have

12  permitted notices to be given, not necessarily in the context

13  of a guarantee, but in other settings.  Or in which other

14  action has been permitted in order to give a claimant the

15  ability to pursue claims in bankruptcy by satisfying non-

16  bankruptcy conditions precedent.

17          I suggest that the parties meet and confer regarding

18  a schedule for both, the evidentiary hearing and supplement

19  briefing, consistent with these remarks.

20          Meanwhile, the automatic stay will continue in affect

21  because I'm not ruling.  But when I do rule, as I will

22  eventually, it will be as of today's date, nunc pro tunc.

23          Any questions?  We're adjourned.

24      (Whereupon these proceedings were concluded at 4:13 p.m.)

25

I N D E X

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Trustee's motion seeking approval for settlement agreement between Barclays, JPMorgan Chase Bank and the SIPA trustee approved. subject to comments and clarifications made on the record and to modifications made to form of order and without prejudice to further investigation by creditors' committee | 59 | 2 |
| Debtors' motion authorizing entry into settlement agreement with certain of its French affiliates approved | 61 | 12 |
| LBHI's motion for authorization to assume administrative services agreement with Aetna approved | 61 | 23 |
| LBHI's motion for authorization to reject prescription drug program master agreement with Medco approved | 62 | 6 |

I N D E X, cont'd

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Motion to amend orders authorizing sale of aircraft granted | 63 | 17 |
| Debtors' motion to approve sale of purchased assets and assumption and assignment of contracts relating to purchased assets approved | 102 | 21 |

1

2                    C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6        **Lisa Bar-Leib**  Digitally signed by Lisa Bar-Leib
                           DN: cn=Lisa Bar-Leib, c=US
                           Reason: I am the author of this
7                          document
                           Date: 2008.12.24 14:15:45 -05'00'

8        LISA BAR-LEIB

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:   December 24, 2008

16

17

18

19

20

21

22

23

24

25