# Exhibit A

Hearing Date and Time:  October 15, 2009 at 2:00 p.m.
Objection Deadline:  October 9, 2009 at 4:00 p.m.

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:   (212) 326-3939
Facsimile:   (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
William J. Hine

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 |
| Debtors. | (Jointly Administered) |

**DEBTOR'S MOTION FOR AN ORDER, PURSUANT TO FED. R. CIV. P. 60**
**AND FED. R. BANKR. P. 9024, MODIFYING THE SEPTEMBER 20, 2008**
**SALE ORDER AND GRANTING OTHER RELIEF**

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

NY1-4215277v1

## PRELIMINARY STATEMENT[1]

1.      This motion arises from the sale to Barclays of Lehman assets under
circumstances that were difficult and unprecedented.  LBHI does not question the procedures
followed by the Court or the need for expedition given the difficult economic circumstances in
which Lehman found itself a year ago.  The Court acted appropriately based on the facts
disclosed to it at the time, but the exigent circumstances surrounding the sale led to inappropriate
consequences effected by mistake, inadvertence and/or misrepresentation.  Discovery, taken
pursuant to the Court's Rule 2004 Order issued on LBHI's motion on June 25, 2009, has now
revealed that (i) material components of the transaction were not disclosed to the Court before
and at the Sale Hearing; and (ii) the transaction that purported to close on September 22, 2008
differed materially from the transaction explained to and approved by the Court at the Sale
Hearing.  Throughout the week, information conveyed to the Court suggested that Barclays was
effectively paying fair value for the assets it was acquiring.  Indeed, when Barclays' purported
assumption of liabilities as an integral part of the transaction was factored into the mix, all
information conveyed to the Court indicated that Barclays was providing significant value to the
Debtors' estates.  The information upon which the Court was asked to rely was wrong.

2.      The fact is that the deal was actually structured to give Barclays an immediate and
enormous windfall profit.  Certain Lehman executives agreed to give Barclays an undisclosed
$5 billion discount off the book value of securities transferred to Barclays, and later agreed to

---

[1]    The facts set out in this motion were developed by LBHI independently and through discovery which
LBHI, LBI, the Creditors Committee and the Examiner have conducted pursuant to the Court's order entered
June 25, 2009 authorizing discovery under Bankruptcy Rule 2004.  The documents and testimony cited are annexed
in an Appendix to this motion (submitted to the Court in five volumes).  References to that record are annotated
herein as "A.___."  Owing to the strictures of a Confidentiality Stipulation and Order upon which Barclays insisted
before it would produce any information, the publicly-filed version of this Motion has been heavily redacted, which
reflects Barclays excessive application of "Highly Confidential" and "Confidential" designations to testimony and
documents.  It is LBHI's intention to engage in further discussions with Barclays to have many, if not most, of those
designations removed or, alternatively, to ask the Court to do so in the interests of transparency.

give billions more in so-called "additional value" that Barclays demanded, but the Court never

approved. This immediate windfall to Barclays (i) was not disclosed to the boards of LBHI or

LBI, (ii) was not revealed in the agreement the Court was asked to approve, and (iii) was never

disclosed to the Court until now.

3.    To right the wrong that resulted, it is not necessary for the Court to undo the sale.

Rather, the Court needs only to require Barclays to return to the Sellers' estates the value it took

in excess of what the Sellers were entitled to convey based on the record before the Court. That

will require modification of the Sale Order, including the elimination of the reference to the so-

called "Clarification Letter." Never submitted to the Court for approval, the Clarification Letter

purported to significantly alter the Asset Purchase Agreement.

4.    The tumultuous circumstances that led to the Sale Transaction also cannot explain

away the manipulation of the numbers or the fact that everyone other than a few "negotiators"

was kept in the dark about material aspects of the transaction. Whether these executives acted

under mistake or inadvertence, or actually knew what they were doing, the result is the same: an

undisclosed, unwarranted and inequitable loss to the Sellers' estates of many billions of dollars,

and a huge financial windfall to Barclays.

5.    Evidence discovered since the Sale Transaction demonstrates that the sale was,

from the beginning, based on an undisclosed distortion of the book value of the securities to be

transferred to Barclays. The Asset Purchase Agreement submitted to the Court expressly stated

that those securities had a "book value" of approximately $70 billion as of September 16, 2008.

The actual book value was $5 billion higher. From September 16, 2008, when the Asset

Purchase Agreement was signed, through September 22, 2008, when the deal closed, and

notwithstanding the changes to the deal during that week, this $5 billion discount remained

4

buried within the transaction. To make matters worse, as the size of the pool of securities available for sale to Barclays diminished during the week, the notional amount of discount always remained at $5 billion. Thus, the percentage of the discount against the assets transferred grew much, much larger.

6.      By Friday, September 19th, when the Sale Hearing commenced, individuals negotiating the Sale Transaction had essentially abandoned the original structure set forth in the Asset Purchase Agreement and had, without any meaningful disclosure, decided instead to deliver securities to Barclays by simply terminating a certain executory repurchase agreement entered into between LBI and Barclays on September 18, 2008 (the "Repurchase Agreement"). It was never mentioned in any agreement or other document put before the Court that termination of the Repurchase Agreement had become the facility to transfer the securities to Barclays at a discounted price. To the contrary, the Repurchase Agreement was described to the Court only as a means of providing temporary funding so LBI could operate until the filing of its planned liquidation proceeding at the end of the week.

7.      Pursuant to the Repurchase Agreement, Barclays transferred $45 billion in cash to LBI on September 18th in exchange for approximately $50 billion of securities, subject to LBI's right and obligation to repurchase those same securities from Barclays at a later date for $45 billion. By mid-week, certain Lehman and Barclays executives decided that, rather than mark down the value of the securities on Lehman's books to fit the undisclosed discount (their original plan), the better way to deliver the discount to Barclay's would be to terminate the executory Repurchase Agreement, leaving all $50 billion of the securities in Barclays' hands. Changing the deal in this way orchestrated an exchange of $50 billion in securities for a payment

5

# Exhibit B

Hearing date: March 25, 2010

Objections Date for Movants' Rule 60
Motions: January 29, 2010

Objections Date for Motion by Barclays Capital Inc.
to Enforce the Sale Order and Secure Delivery of All
Undelivered Assets: March 4, 2010

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) |

**MEMORANDUM OF BARCLAYS CAPITAL INC. IN OPPOSITION TO THE RULE 60
MOTIONS AND IN SUPPORT OF MOTION OF BARCLAYS CAPITAL INC. TO
ENFORCE THE SALE ORDER AND SECURE DELIVERY OF ALL UNDELIVERED
ASSETS**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

As of January 29, 2010
[Corrected Version March 4, 2010]

II.   **THE MOVANTS ARE BARRED AS A MATTER OF LAW FROM SEEKING TO
REWRITE A CONTRACT AND A SALE ORDER THEY AGREED TO OVER A
YEAR AGO AND THAT THE LEHMAN MOVANTS SUCCESSFULLY
DEFENDED ON APPEAL.**

442.   The Debtor and the Committee make no effort to adopt the Trustee's strained

contractual arguments — effectively admitting agreement with Barclays' interpretation of the

plain text of the Purchase Agreement. Instead, they adopt a different tactic for avoiding the

terms of the Purchase Agreement they approved: they simply ask the Court to rewrite it.[172]

Invoking Rule 60(b) and a series of inapplicable Bankruptcy Code provisions, they claim there

were "mistakes" and "unauthorized transfers" that the Court must now rectify by imposing a

completely different deal from what is set forth in the Purchase Agreement. Their claims are

demonstrably false on the facts, as demonstrated in the Statement of Facts. There was no "secret

discount" — the fact that Barclays was unwilling to accept Lehman's stale marks was known by

Weil Gotshal, Lazard, Alvarez & Marsal, and the Committee. There were no "secret" or

"unauthorized" transfers of "additional assets."

443.   The Debtor's own respected attorneys and financial advisors do not support the

Rule 60 Motions. Harvey Miller, who argued to this Court for approval of the Sale, has testified

that the transaction reflected in the Clarification Letter "did not change the deal that was

presented to the Court," and that his firm concluded, after a discussion before closing, that "it

wasn't necessary" to seek additional approval from this Court. BCI Ex. 87 [Miller Dep. Tr.] at

48:24-49:15. Mr. Miller has reviewed the Rule 60(b) motions and the documents on which

Movants rely, and testified that he stands by his presentation to the Court, and still has "no

---

[172]   The Trustee joins this effort to nullify the contract — essentially telling the Court that if it does not agree with
the Trustee's interpretation, then the Court must rewrite the contract. *See* Trustee Br. at ¶¶ 80-88.

reason to doubt" the good faith of the Lehman executives who supplied him information about the transaction. *Id.* at 33:2-24, 46:22-49:15, 56:4-9, 103:5-11.

444.     Similarly, LBHI's financial advisor, Barry Ridings of Lazard, who has also seen the Rule 60 Motions, believes that the Lehman officers acted in good faith, that his testimony to the Court in support of the Sale was "accurate" and "appropriate," and that the consequences of non-approval would have been "catastrophic." BCI Ex. 92 [Ridings Dep. Tr.] at 11:12-23, 27:23-28:3. The Debtor's other outside law firm, Simpson Thacher agrees that, based on everything it knows, the transaction was the result of a "good faith, arms-length" negotiation process, and it knows of no disconnect between what the parties' believed and what the contract reflects. BCI Ex. 74 [Keller Dep. Tr.] at 24:3-16, 62:10-63:11.

445.     Indeed, even the CEO and Chief Restructuring Officer of the Debtor — Bryan Marsal — admitted that he has no basis for alleging that any Lehman executives breached their fiduciary duty. After authorizing his "special counsel" to file an Adversary Complaint on November 16, 2009, alleging that Barclays "aided and abetted" the breach of fiduciary duties by Lehman executives, and after his special counsel identified nine different former Lehman executives that the Debtor alleges breached their fiduciary duties to Lehman,[173] Mr. Marsal testified as follows:

Q.     Do you have any reason to believe that any of the Lehman executives involved in negotiating the Barclays deal breached their fiduciary duty to Lehman?

A.     I don't have any evidence. I don't have any facts one way or the other.

BCI Ex. 84 [Marsal Dep. Tr.] at 76:9-16.

446.     In addition to being factually baseless, the Rule 60 Motions are barred as a matter of law. The Court can and should resolve this matter without the need for an evidentiary

---

[173] BCI Ex. 46 [LBHI's Responses to Barclays' Second Set of Interrogatories] at p. 2.

hearing.  Based upon facts that cannot be genuinely disputed, the Movants are legally barred

from seeking the extraordinary relief they seek.  Their arguments boil down to a series of

assertions that *directly challenge the plain text of the written Purchase Agreement and Sale

Order* that (a) the Lehman Movants helped draft, (b) the Lehman Movants executed (in the case

of the Purchase Agreement) and asked the Court to issue (in the case of the Sale Order), (c) the

Committee consented to, (d) none of the Movants sought to stay or modify under Rule 59, (e)

none of the Movants sought to appeal, (f) all of the Movants treated as an approved transaction

for almost a full year (even while the Trustee failed to honor certain provisions), and (g) the

Lehman Movants successfully defended on appeal.

     447.   The mandate rule and the long-established doctrines of judicial estoppel, equitable

estoppel, and waiver prevent Movants from asking this Court to rewrite the Sale Order and the

Purchase Agreement.  Indeed, we are not aware of any case in which a Court granted a request

by a party to rewrite an agreement that party drafted and executed, successfully asked the Court

to approve, and then successfully defended on appeal.  Quite the contrary, "even if the [debtor]

and creditors' committee did not know what the contracts they approved actually said, they are

still bound by the language of those contracts.  Bankruptcy is drastic and expensive enough

without allowing the debtor and court to approve a contract and later void it on the grounds that

they would not have approved if they had bothered to understand it." *Terry Oilfield Supply Co.

v. American Sec. Bank*, 195 B.R. 66, 73 (S.D. Tex. 1996).

     448.   Strong public policy reasons further compel the rejection of Movants' claims.

Granting the relief requested by the Movants would set a terrible precedent that would

discourage potential acquirors in the future from making bids to acquire assets from sellers in

bankruptcy.  The disincentive would be especially severe in contexts where such acquirors are

needed most — *i.e.*, when there is a need for an emergency transaction that will serve the broader

public interest, but where the crisis situation creates massive uncertainty and risk for the buyer.

> **A.    Well Established Legal Doctrines Enforce The Finality Of Judgments And Preclude A Party From Later Attacking A Judgment That It Supported Or Failed To Challenge.**

>> 1.    The Mandate Rule Bars Claims That Were Explicitly Or Implicitly Decided By The District Court, Or Were "Includable" In The Appeal.

449.    The mandate rule bars Movants' Rule 60 Motions because the District Court

affirmed the Sale Order, and the appeal to the Second Circuit was dismissed.  As a matter of law,

this affirmance barred all future challenges to the Sale Order that were either explicitly or

implicitly raised in the actual appeal, or that *could have been raised* on appeal but were not.  This

result is underscored by the fact that the Debtor and the Trustee argued strongly in favor of

affirmance, and the Committee chose not to appeal, even though the appellants raised several of

the same arguments that Movants are making now.

450.    The mandate rule is jurisdictional.  *See Fine v. Bellefonte Underwriters Ins. Co.*,

758 F.2d 50, 52 (2d Cir. 1985).  This means the burden is on the Movants to demonstrate their

ability to bring their claims notwithstanding the District Court's affirmance of the Sale Order.

>> a.    Matters Expressly Or Implicitly Decided Are Barred.

451.    The mandate rule requires compliance by lower courts "with the dictates of the

superior court and forecloses relitigation of issues expressly or *impliedly* decided by the appellate

court."[174]  *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (emphasis in original)

(citations omitted); *see also Rodriguez v. Mitchell*, No. 96-2534, 1997 WL 311801, at *1-2 (2d

Cir. June 4, 1997) (denying Rule 60(b) motions because appellate decision put the issue beyond

---

[174] The mandate rule applies to both factual and legal determinations. *United States v. Jones*, 294 Fed. Appx. 624, 628 (2d Cir. 2008) (where party could have challenged findings of fact and law on prior appeal, law of the case precludes reconsideration of those findings).

the authority of the lower court).  "In other words, the trial court is barred from reconsidering or

modifying any of its prior decisions that have been ruled on by the court of appeals."  *Burrell v.*

*United States*, 467 F.3d 160, 165 (2d Cir. 2006).[175]

<div align="center">

b.    <u>Issues That Could Have Been Raised Are Barred.</u>

</div>

452.    In addition to applying to issues that actually were litigated and decided during

the prior appeal, the mandate rule forecloses issues that *could have been raised* but were not.

*United States v. Vidal*, 136 Fed. Appx. 438, 439-40 (2d Cir. 2005); *United States v. Ben Zvi*, 25

Fed. Appx. 34, 36 (2d Cir. 2001); *United States v. Stanley*, 54 F.3d 103, 107 (2d Cir. 1995).

Thus, a lower court is without power to alter the mandate of a superior court "on the basis of

matters included *or includable*" in the prior appeal.  *Seese v. Volkswagenwerk, A.G.*, 679 F.2d

336, 337 (3d Cir. 1982) (emphasis added).  If certain evidence and arguments were available to a

party prior to the appellate court's decision, the lower court is not permitted to deviate from the

appellate court's mandate based upon that evidence and argument.  *Id.  Accord, Fine,* 758 F.2d at

52; *Fogel v. Chestnut*, 668 F.2d 100, 109 (2d Cir. 1981) ("It would be absurd that a party who

has chosen not to argue a point on a first appeal should stand better as regards the law of the case

than one who had argued and lost."); WRIGHT & MILLER, 18B FEDERAL PRACTICE & PROCEDURE

§ 4478.3 (2d. ed. 2002) (district court may not reconsider its own rulings made before appeal and

not raised on appeal).

---

[175]  *See also United States v. Minicone*, 994 F.2d 86, 89 (2d Cir. 1993) ("where issues have been explicitly or
implicitly decided on appeal, the district court is obliged, on remand, to follow the decision of the appellate court");
*In re Ivan F. Boesky Securities Litig.*, 957 F.2d 65, 69 (2d Cir. 1992) (the lower court's actions "should not be
inconsistent with either the express terms or the spirit of the mandate").

<div align="center">

203

</div>

c.    The Mandate Rule Applies With Special
Force Where A Party Changes A Position It
Had Successfully Advocated.

453.    A party successful on an appeal "cannot change its mind and take unilateral

action in a trial court to modify the mandate of [a superior] court." *Litman v. Massachusetts*

*Mut. Life Ins. Co.*, 825 F.2d 1506, 1515 (11th Cir. 1987); *see Am. Home Assur. Co. v. Am.*

*Fidelity*, 261 F. Supp. 734, 735 (S.D.N.Y. 1966) ("Whether we regard it 'law of the case' or

'estoppel,' plaintiffs are barred by the former action from now attacking the arbitration procedure

they previously sought enforced."). Allowing the successful party to seek to modify a judgment

would lead to uncertainty and invite abuse. It would be contrary to the strong policy favoring

finality of judgments, a policy that is inviolable, such that "[e]ven at the joint request of the

litigants, the [lower] court 'may not deviate from the mandate of an appellate court.'" *Litman*,

825 F.2d at 1516 (quoting *ATSA of California, Inc. v. Continental Ins. Co.*, 754 F.2d 1394, 1396

(9th Cir. 1985)).

454.    Thus, Movants may not now raise any issues that were decided expressly or

impliedly by the District Court, or which they could have raised during the prior appeal,

particularly with respect to issues on which they previously advocated a contrary position.

d.    The Debtor And The Trustee Argued Successfully On Appeal
That Barclays Acted In Good Faith And That The Clarification
Letter Properly Disclosed The Purchased Assets.

455.    As shown above in Fact Section I(4), in response to the Bay Harbor appeal, the

Debtor and the Trustee argued strongly for affirmance of the Sale Order. The Committee could

have joined Bay Harbor, or filed an appeal of its own on any issue, but it opted to remain silent.

456.    The Debtor opposed the Bay Harbor appeal by arguing that the APA — *including*

*the Clarification Letter and its schedules* — fully disclosed each of the assets that would be

transferred to Barclays. BCI Ex. 33 [LBHI Brief in Opposition to Bay Harbour Appeal] at p. 16.

204

The Trustee joined in the Debtor's appellate argument and hence endorsed this argument.  BCI

Ex. 34 [Trustee Brief in Opposition to Bay Harbour Appeal] at p. 4 n.1.

457.   The Debtor and the Trustee also argued that Barclays was a good faith purchaser

and that the Sale was an arm's-length transaction.  *Id.* at pp. 16-27.  To show that Barclays was a

good faith purchaser, they explicitly relied on the Clarification Letter.  *Id.* at pp. 21-22 ("the

Clarification Letter made it abundantly clear that [any allegedly misappropriated funds], if they

existed, were not sold to Barclays.").

458.   The District Court agreed with the Debtor and the Trustee and affirmed the Sale

Order.  The District Court expressly affirmed the "bankruptcy court's determination of Barclays'

good faith status."  BCI Ex. 41 [March 13, 2009 Opinion and Order] at p. 17.  As unstayed sale

orders are moot if the purchaser acted in good faith, Bay Harbor's appeal was dismissed in its

entirety.  *Id.* at pp. 18-19.  In the alternative, the District Court affirmed on the merits, because

"Judge Peck correctly determined that Appellants had sufficient notice and opportunity to be

heard," *id.* at p. 19 n.7, thus agreeing with the Debtor and the Trustee that there was adequate

disclosure of the terms of the deal.

459.   The judgment of the District Court issued as a mandate, and Movants are now

barred from making claims that were either explicitly or implicitly raised in the appeal (including

the findings that Barclays acted in good faith and that the Clarification Letter was part of the

final Court-approved deal and adequately identified the Purchased Assets), or that *could have*

*been raised* on appeal but were not (such as the lack of a valuation cap or a "wash" requirement).

460.   Thus, the Movants are absolutely barred by the mandate rule from arguing that the

Clarification Letter was not approved by the Sale Order.  The Trustee and the Debtor signed the

Clarification Letter, and the Committee reviewed it and approved it.  They all knew that it was

drafted and revised over the weekend following the Sale Hearing. They all knew its contents

long before the time expired for filing an appeal. They all knew that the Sale Order expressly

included the Clarification Letter in its definition of the Purchase Agreement. BCI Ex. 16 [Sale

Order] at p. 1.

> 2.    Judicial Estoppel Bars The Movants From Adopting
>        Positions Contrary To Those They Successfully
>        Advocated To This Court Or The District Court.

461.    In addition to being barred by the mandate rule, Movants' claims fail under the

related doctrine of judicial estoppel. The Debtor and the Trustee themselves procured the Sale

Order and the Closing of the transaction. The Debtor moved for approval of the Sale and warned

of dire consequences if it was not immediately approved, even though the documentation was

still incomplete at the time of the hearing. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 59:11-

61:13, 92:19-94:20, 98:10-12, 102:3-103:7, 146:4-14, 243:1-10. The Trustee joined in the

Debtor's arguments, *id.* at 74:16-75:17, and the Committee, which was given the ability to object

to the final terms of the Purchase Agreement, BCI Ex. 16 [Sale Order] at ¶ 25, reviewed the final

documentation and gave its consent to the Closing of the transaction. BCI Ex. 87 [Miller Dep.

Tr.] at 29:19-25, 101:13-102:5; BCI Ex. 96 [Seery Dep. Tr.] at 148:3-149:8, 156:15-25. It is

now too late for Movants to change their minds.

462.    Judicial estoppel "prevents a party from prevailing in one phase of a case on an

argument and then relying on a contrary position to prevail in another phase." *New Hampshire v.

Maine*, 532 U.S. 742, 749 (2001) (citation omitted). The doctrine applies to a party's assertions

of fact and law. *Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1044 (9th Cir. 2004). It

safeguards the integrity of the judicial process by avoiding unfair results and protecting the court

from chameleonic litigants who seek to prevail in different phases of a case on opposite theories. *Id.*[176]

463.   The doctrine is particularly important in bankruptcy cases and works to prevent a party from "thwart[ing] a bankruptcy order which has been 'conceived and fostered through its participation.'" *In re J.F. Hink & Son*, 815 F.2d 1314, 1318 (9th Cir. 1987) (citations omitted); *see also Rosenshein v. Kleban*, 918 F. Supp. 98, 104 (S.D.N.Y. 1996). "Judicial estoppel is invoked where (1) a party's later position is 'clearly inconsistent' with its earlier position, and (2) the party has succeeded in persuading a court to accept its earlier position." *Sewell v. The 1199 Nat'l Benefit Fund for Health & Human Servs.*, 187 Fed. Appx. 36, 40 (2d Cir. 2006).[177]

464.   The Debtor and the Trustee successfully advocated for entry of the Sale Order by this Court and for affirmance of the order by the District Court, successfully resisting objections that are akin to the arguments they now raise in their Rule 60 Motions. The Debtor and the Trustee fought off objections that Barclays was underpaying for the assets, that the Court was not aware of all assets being transferred to Barclays, and that the transaction should not be approved because the terms of the Sale were not yet finalized. BCI Ex. 33 [LBHI Brief in Opposition to Bay Harbour Appeal] at pp. 9, 16-27; BCI Ex. 34 [Trustee Brief in Opposition to Bay Harbour Appeal] at p. 9.

---

[176] Despite some earlier authority requiring a "separate proceeding," the Supreme Court's decision in *New Hampshire*, which was reaffirmed in *Zedner v. United States*, 547 U.S. 489, 505-06 (2006), makes clear that for judicial estoppel to apply, the earlier, inconsistent position need be made only in an earlier "phase" of the same litigation. *See also, e.g., Sewell v. The 1199 Nat'l Benefit Fund for Health & Human Servs.*, 187 Fed. Appx. 36, 40-41 (2d Cir. 2006) (judicial estoppel invoked because position on appeal conflicted with position on motion for reconsideration in the district court); *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 77 (S.D.N.Y. 2009); *In re Adelphia Comm. Corp.*, 367 B.R. 84, 92-93 (S.D.N.Y. 2007); *In re Initial Public Offering Sec. Litig.*, 383 F. Supp. 2d 566, 581 (S.D.N.Y. 2005); *Lomascolo v. Otto Oldsmobile-Cadillac, Inc.*, 253 F. Supp. 2d 354, 360-61 (N.D.N.Y. 2003).

[177] Although a factor, detrimental reliance of the party seeking estoppel is not necessary because the judicial estoppel doctrine is concerned with protecting the integrity of the judicial system rather than the litigants. *See In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999).

465.    The Debtor and the Trustee successfully advocated to this Court that the Purchase
Agreement, including the Clarification Letter, should be approved by the Court, that Barclays
was a good faith purchaser, and that the Sale Order was in the best interests of the Debtor and its
creditors. BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 75:5-10, 147:1-5. The Court adopted these
arguments, overruled the various objections, and entered the Sale Order, thus locking the
Movants into these positions for judicial estoppel purposes. *See In re Bradlees Stores, Inc.*, No.
00-16033, 2001 WL 1112308, at *11 (S.D.N.Y. Sept. 20, 2001) (bankruptcy court's approval of
settlement agreement constitutes approval of party's assertions that settlement agreement is fair,
reasonable and in the best interest of the estate and creditors); *Reynolds v. C.I.R.*, 861 F.2d 469,
473 (6th Cir. 1988) (a bankruptcy court's approval of an agreement constitutes "judicial
acceptance" for purposes of judicial estoppel).

466.    Before the District Court, the Debtor and the Trustee again successfully advocated
in favor of the Sale Order and the validity of the Purchase Agreement, including the Clarification
Letter. *See* Fact Section I(3), *supra.* Citing the Clarification Letter and the specific asset
schedules referenced therein, they successfully resisted Bay Harbour's arguments that the Sale
Hearing was held without "actual notice of material terms," and that "there was no real
indication of what was being sold and for what nor transparency" into the sales process. BCI Ex.
27 [Bay Harbour Appeal Brief] at pp. 3-4. LBHI and LBI also convinced the District Court to
reject Bay Harbour's primary contention — that Barclays was not a good faith purchaser. BCI
Ex. 33 [LBHI Brief in Opposition to Bay Harbour Appeal] at pp. 14, 16-27.

467.    The judicial estoppel doctrine also applies to the Committee, which acquiesced by
silence and by signing off on the final terms of the transaction documents, including the
Clarification Letter. *See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414,

419 (3d Cir. 1988) (applying judicial estoppel to bar debtor's suit against bank because suit was

"clearly contrary" to debtor's prior silence and treatment of bank's claim as undisputed in

Chapter 11 proceedings); *Negron v. Weiss*, No. 06-cv-1288, 2006 WL 2792769, *3 (E.D.N.Y.

Sept. 27, 2006) (same); *Griggs v. Marion Hosp. Corp.*, Civ. No. 2004-CV-4241, 2005 WL

1802249, *2 (S.D. Ill. July 28, 2005) (judicial estoppel barred former debtor's discrimination

claim, in light of debtor's silence and failure to list claim as an asset in bankruptcy proceedings);

*MDFC Loan Corp. v. First Shopping Center Partnership*, Civ. No. 93C4481, 1996 WL 99909,

*8 (N.D. Ill. March 1, 1996) (judicial estoppel bars the taking of a position that is "clearly

inconsistent" with a "prior position, whether explicit or implied through silence"). *See also*

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir.

2003) (following *Oneida*). The Committee fully participated in the all-weekend meetings at

Weil Gotshal where drafts of the agreements were circulated and discussed, and the Committee

received a "line by line" review of each asset "being transferred and how it was being

transferred."[178] Even though the Committee was fully aware of the "$5 billion secret discount" it

now alleges and its attorneys (Milbank Tweed) complained about to Weil Gotshal prior to

closing,[179] the Committee freely opted to "sign off" and thus by silence represented to the Court

that the transaction was ready for closing without the need for further authorization.

468.    Shortly after the Closing, and well within the appeal period, the Committee

attended a presentation by Alvarez & Marsal (the Debtor's restructuring advisor and

administrator), and reviewed a document from Alvarez listing the assets purchased by Barclays

and expressly stating that Barclays "*negotiated a $5.0 billion reduction*" from "*Lehman 'stale'*

---

[178] BCI Ex. 96 [Seery Dep. Tr.] at 124:14-125:8, 155:4-156:25 (the Committee "signed off" on the Clarification
Letter after a "line by line" review prior to closing); BCI Ex. 87 [Miller Dep. Tr.] at 28:11-30:5, 100:24-102:5
(Committee representatives told him, "If you guys are satisfied with it, we're satisfied").

[179] BCI Ex. 88 [O'Donnell Dep. Tr.] at 140:23-141:25, 157:4-24, 164:25-165:6.

*marks*" on the Repo Collateral. BCI Ex. 131 [Oct. 8, 2008 Report by Alvarez & Marsal to

Creditors' Committee] at p. 29; *see also* BCI Ex. 67 [Fogarty Dep. Tr.] at 112:10-121:23

(discussing how this very issue was raised by the Committee during the meeting). Yet, even

after receiving and plainly comprehending all of that information, the Committee did not appeal

and did not support Bay Harbour's appeal. And despite having this same information, the

Lehman Movants affirmatively opposed the appeal. Judicial estoppel prohibits all of the

Movants from changing course now. *Oneida Motor Freight, Inc.*, 848 F.2d 414; *Negron*, 2006

WL 2792769.

> 3.    Equitable Estoppel Bars Movants From Now
>        Taking Positions Inconsistent With Their Prior
>        Conduct On Which Barclays Reasonably Relied.

469.    Equitable estoppel and waiver are doctrines related to, but broader than, the

above-described doctrines of judicial estoppel and the mandate rule. To the extent, if any, that

judicial estoppel and the mandate rule are deemed not to bar Movants' Rule 60 Motions,

equitable estoppel and waiver should be applied, because Movants were undisputedly aware of

the plain terms of the Purchase Agreement which includes the Clarification Letter, and Barclays

reasonably relied upon Movants' express statements and conduct demonstrating their acceptance

of the very terms of the transaction now being challenged.

470.    "The doctrine of equitable estoppel is properly invoked where the enforcement of

the rights of one party would work an injustice upon the other party due to the latter's justifiable

reliance upon the former's words or conduct." *Kosakow v. New Rochelle Radiology Assocs.*, 274

F.3d 706, 725 (2d Cir. 2001). Equitable estoppel applies where: (1) a party makes a

misstatement of fact or engages in other conduct (including silence) with reason to believe that

the other party will rely upon it; (2) the other party reasonably relies upon it; and (3) the other

210

party suffers prejudice as a result. *Id.* at 725-26. Equitable estoppel applies even if the party that induced reliance acted without any intent to deceive. *Id.* at 726.

471. Bankruptcy courts frequently apply equitable estoppel because finality in bankruptcy proceedings is "particularly important." *In re Lawrence*, 293 F.3d 615, 621 (2d Cir. 2002). Thus, for example, the Second Circuit applied equitable estoppel to prevent a trustee from seeking to recover insurance premiums paid by a debtor pursuant to a contract the debtor had assumed on the ground that they exceeded limits imposed by state law. *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999-1000 (2d Cir. 1995). "Based on equitable principles, once a party accepts the proceeds and benefits of a contract, that party is estopped from renouncing the burdens the contract places upon him." *Id.* "The notion that a party in bankruptcy can be permitted to thwart a bankruptcy order which has been conceived and fostered through its participation has been vigorously rejected." *Id.* at 1000 (quoting *J.F. Hink*, 815 F.2d at 1318).[180]

472. Silence alone can give rise to equitable estoppel. Courts apply equitable estoppel when a party has an opportunity to object to a bankruptcy order, fails to do so, and then challenges the order on the basis of information of which it was previously aware. For example, in *In re Varat Enterprises, Inc.*, 81 F.3d 1310 (4th Cir. 1996), the court applied equitable estoppel to prevent a creditor from challenging a confirmed plan because the creditor failed to raise any objection at the time the bankruptcy court approved the plan. The court applied equitable estoppel because the creditor knew the critical facts, did not object, and the other

---

[180] *Accord, e.g., In re Teligent, Inc.*, 326 B.R. 219, 226-27 (S.D.N.Y. 2005) (equitable estoppel prevented Trustee from challenging an assumption order because no one objected to the order, the order was not appealed, and others had "reasonably relied on the Assumption Order, and changed their positions."); *In re Home & Hearth Plano Pkwy., L.P.*, 320 B.R. 596, 609 (Bankr. N.D. Tex. 2004) (debtor estopped from recovering surplus proceeds generated from the sale of his home because he had previously stipulated that he had no equity in the home); *Seidle v. GATX Leasing Corp.*, 45 B.R. 327, 330 (S.D. Fla. 1984) (Trustee equitably estopped from recovering preferential transfers because of the debtor's "execution of a stipulation which was predicated on their validity and by its representations to the bankruptcy court in seeking approval for that stipulation."); *In re Vick*, 75 B.R. 248, 249 (Bankr. E.D. Va. 1987) (Trustee equitably estopped from recovering accidental double payments because the creditors relied on the Trustee's representations that the payments were properly due).

parties involved "had a right to assume it could rely on [the creditor's] conduct." *Id.* at 1318-

19.[181]

        4.      Waiver Bars Movants From Making Claims
                Inconsistent With Their Prior Conduct When
                That Conduct Was Inconsistent With An Intent
                <u>To Bring The Current Claims.</u>

473.    Waiver is the intentional relinquishment of a known right. *United States v.*

*Quinones*, 511 F.3d 289, 321 n. 21 (2d Cir. 2007). Though waiver and estoppel are related and

sometimes used interchangeably, there are differences in application:

> Waiver . . . focuses on intent. If an individual intentionally relinquishes a
> known right, either expressly or by conduct inconsistent with an intent to
> enforce that right, he has waived it. Estoppel, on the other hand, focuses
> on the effects of the conduct of the obligee. It arises when a party's
> conduct misleads another into believing that a right will not be enforced
> and causes the other party to act to his detriment in reliance upon this
> belief.

*J.H. Cohn & Co. v. Am. Appraisal Assoc.*, 628 F.2d 994, 1000 (7th Cir. 1980).

474.    Bankruptcy courts apply waiver to bar a party from challenging a sale order when

it could have asserted its objection at the time of the sale hearing, yet chose not to do so. *In re*

*Garfinkle*, 672 F.2d 1340, 1347 (11th Cir. 1982) (waiver and equitable estoppel prevented buyer

from challenging the validity of the sale based upon the existence of leases on the property,

because the buyer knew of the leases but made no objection at the time the court approved the

sale, and the "Trustee would not have entered into the Contract with appellants if they had made

their objections known beforehand"); *accord Byrd v. Hoffman*, 417 B.R. 320, 330 (D. Md. 2008)

(a "party in interest waive[s] its objection . . . when it fail[s] to raise the objection prior to or at

---

[181] *Accord, e.g., In re Colarusso*, 280 B.R. 548, 560 (Bankr. D. Mass. 2002) (defendant's failure to object during sale proceedings "induced the other parties to the transaction to reasonably rely on the finality of the proceedings and thus precludes her from claiming any right to the property"); *In re Newport Offshore, Ltd.*, 86 B.R. 325, 326 (Bankr. D.R.I. 1988) (equitable estoppel barred the Army's Rule 60 challenge to a prior bankruptcy order, because it had failed to object to the order and had instead chosen "to sit back, knowing that its silence and inaction would be interpreted as" approval).

the [] hearing, despite the party's ability to raise the objection at the hearing"); *In re New River Shipyard, Inc.*, 355 B.R. 894, 910-12 (Bankr. S.D. Fla. 2006) (creditor barred by waiver and estoppel from bringing a challenge to a confirmation plan where the party was aware of its basis for the objection at the time of the order, yet did not object); *In re Kjeldahl*, 52 B.R. 916, 921 (D. Minn. 1985) (waiver implied from failure to object to sale).

**B.    The Foregoing Doctrines Bar Movants' Claims And There Is No "New Evidence" To Justify Any Exception.**

475.    Each of Movants' claims rely on assertions that Movants are barred from making by the legal doctrines discussed above in Section II(A).  Moreover, none of these allegations is based upon "new evidence" that could allow for an exception to these bars.

1.    The Movants Are Barred From Claiming That The Clarification Letter Was "Unauthorized" Because It Was Finalized After The Court Issued The Sale Order.

476.    At the Sale Hearing, a creditor objected that the Court should not approve a sale that was governed by "a contract that's not complete" and "a contract that's not final."  BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 173:7-9, 173:22-23.  Given the extraordinary circumstances of this Sale, none of the Movants believed this was a basis for asking the Court to withhold approval.

477.    Movants were all at the Weil Gotshal offices during the weekend prior to Closing. At Weil Gotshal, the Movants, their lawyers, and their financial advisors reviewed draft after draft of the Clarification Letter and other transaction documents.  At the end of the lengthy weekend meetings, the Debtor and the Trustee signed the pertinent documents, including the Clarification Letter, and the Committee consented to them.  *See* Fact Section H, *supra*.  No Movant suggested that the Clarification Letter was unauthorized or that further Court approval was necessary or appropriate.  BCI Ex. 74 [Keller Dep. Tr.] at 35:22-36:15.  In fact, the Weil

Gotshal team met shortly before the Closing for the specific purpose of considering this issue, and *they concluded that no further court approval was needed.* BCI Ex. 87 [Miller Dep. Tr.] at 48:19-49:15.

478.    As of the Closing, and therefore long before the deadline for filing an appeal of the Sale Order, the Movants all knew that the Clarification Letter had been revised and finalized after the Court issued the Sale Order. All Movants are charged with knowledge of the contents of the documents. Thus, the Movants were all in a position to appeal the Sale Order based upon the argument that the Court could not have approved a sale governed by a contract that was not yet finalized. They did not do so.

479.    To the contrary, as discussed above, the Lehman Movants affirmatively argued on appeal that the Clarification Letter *was* an authorized part of the Purchase Agreement governing the approved Sale. In response to Bay Harbour's argument that the "material terms" of the deal had not been sufficiently disclosed, the Debtor and the Trustee successfully pointed to the Clarification Letter and the schedules referenced therein, which disclosed "[a]ll relevant facts regarding the Sale." BCI Ex. 33 [LBHI Brief in Opposition to Bay Harbour Appeal] at pp. 12, 16, 21-23.

480.    In defending the Sale Order, the Lehman Movants thus relied on the fact that the Clarification Letter was both (1) a valid and integral part of the approved Purchase Agreement, and (2) a document that adequately disclosed the assets that were to be transferred to Barclays. The Committee did not take issue with any of this. The District Court at least implicitly accepted these arguments, holding that there was adequate disclosure of the assets in the deal. BCI Ex. 41 [March 13, 2009 Opinion and Order] at pp. 16-17, 19 n.7. The mandate rule, judicial estoppel, equitable estoppel, and waiver therefore prohibit the Movants from flip-flopping by asserting

214

now that the Clarification Letter was unauthorized, simply because it was drafted and executed

after the Court issued the Sale Order.

>    2.    The Movants Are Barred From Claiming That Barclays
>          Should Not Be Entitled To All Of The Repo Collateral.

481.    Prior to the Closing, and even prior to that, each of the Movants was well aware

that Barclays was acquiring all of the Repo Collateral as part of the Purchased Assets. This fact

was set forth explicitly in the Clarification Letter. BCI Ex. 5 [Clarification Letter] at

§§ 1(a)(ii)(A), 13. This fact was shown plainly on Weil Gotshal's post-closing chart

summarizing the assets to be transferred. BCI Ex. 325 [September 29, 2008 11:40 am email

from W. Gordon to W. Gordon with attachment] at AM002290-92. It was likewise discussed in

emails and other documents sent to each of the Movants. *See, e.g.*, BCI Ex. 320 [Sept. 27, 2008

12:53 pm email from G. West to J. McCarthy, *et al.*, with attachments]; BCI Ex. 329 [Sept. 29,

2008 11:40 pm email from W. Gordon to M. Korycki, *et al.* with attachments] at p. 4. And Weil

Gotshal and other Lehman representatives communicated and acknowledged this to the

Committee and internally. *See generally* BCI Ex. 58 [Burian Dep. Tr.] at 92:13-93:11

(acknowledging that he understood that "all the repo collateral would be treated as a purchased

asset"); BCI Ex. 87 [Miller Dep. Tr.] at 39:5-41:7; BCI Ex. 301 [Sept. 24, 2008 7:53 pm email

from M. Stewart to E. Bailey, *et al.*] (Weil Gotshal explained that "there are no settle-up

payments to be made" on the Repo Collateral); BCI Ex. 74 [Keller Dep. Tr.] at 72:8-73:5.

482.    Months later, after "very careful consideration" of the Repo Collateral issue, the

Trustee told the Court that, "[u]nder the purchase agreement approved by Your Honor," Barclays

"was to receive securities valued at over forty-nine billion dollars to cancel the [$45 billion]

loan." BCI Ex. 50 [Dec. 22, 2008 Hearing Tr.] at 19:13-15. The Trustee executed the December

Settlement, which explicitly states that "[w]hen BarCap and LBI agreed to engage in the

Replacement Transaction, it was BarCap's and LBI's intention that the securities in the Fed

Portfolio would be included in 'Purchased Assets' as defined in the Asset Purchase Agreement

dated as of September 16, 2008, as amended[.]" BCI Ex. 9 [Dec. 5, 2008 Settlement Agreement]

at ¶ E. The Trustee agreed in the settlement to release Barclays from "all Claims . . . relating to

the Subject Funds [the $7 billion withheld by JPMorgan], the Replacement Transaction [the

Barclays-LBI repo agreement] or the Delivered Securities [the securities listed in Schedule A of

the Clarification Letter]." *Id.* at ¶ 4(d).

483.    Nevertheless, Movants now complain that the fact that all of the Repo Collateral

would be among the Purchased Assets transferred to Barclays was not disclosed to the Court.

LBHI Br. at ¶ 95 ("The Repurchase Agreement between LBI and Barclays was described to the

Court only as a means to continue short term financing so LBI could get through the week, not as

a mechanism by which assets would be transferred to Barclays."); Committee Br. at ¶ 49

("Although this drastic change in concept existed in drafts of the Clarification Letter created

before the September 19 hearing, it was not disclosed to the Court.").

484.    Given the extensive factual record (summarized above) establishing the

knowledge and understanding of all of the Movants at the time of the transaction, the time for

Movants to complain about the Repo Collateral being a Purchased Asset was in September 2008,

not a year later.

485.    Similarly, Movants assert that the transfer of the Repo Collateral resulted in an

"undisclosed" $5 billion "discount" to Barclays, because Barclays paid $45 billion for collateral

with an alleged "value" of $50 billion. LBHI Br. at ¶¶ 97-99; Committee Br. at ¶¶ 45-48. But it

is undisputed that Weil Gotshal and the Committee had documents in their files before the

Closing showing that the Repo Collateral carried "marks" from Lehman or the custodian banks

showing a purported value of over $49 billion. *See* BCI Ex. 312 [Sept. 25, 2008 10:07 pm email

from D. Murgio to R. Moore, *et al.*, with attachments]; *see also* BCI Ex. 255 [Sept. 21, 2008

11:34 am email from B. Kelly to A. McComiskey, *et al.*, with attachment]; BCI Ex. 88

[O'Donnell Dep. Tr.] at 86:17-87:6; *see also* BCI Ex. 58 [Burian Dep. Tr.] at 254:21-255:8;

Committee Br. at ¶ 22. The Movants are therefore legally barred from basing their claim upon

the same kinds of documents in Barclays files — showing a value of the Repo Collateral in

excess of $49 billion based upon "marks" from custodian banks or Lehman that no one believed

were reliable, and which were in fact not reliable. *Compare* LBHI Br. at ¶¶ 92-93 *with* BCI Ex

349 [Malloy Decl.] at ¶¶ 2-4; *see also generally* BCI Ex. 341 [Pfleiderer Report] at ¶¶ 17-64.

486.    There was "extensive discussion" over the Closing weekend as to what the

appropriate marks should be. BCI Ex. 87 [Miller Dep. Tr.] at 53:19-54:4. Immediately after the

Closing, Alvarez & Marsal made a presentation to the Committee in which it explained that the

Repo Collateral involved "Book value per Lehman 'stale' marks; negotiated a $5 billion

reduction." BCI Ex. 131 [Oct. 8, 2008 Report by Alvarez & Marsal to Creditors' Committee] at

p. 28. The combined 30(b)(6) representative for both LBHI and Alvarez & Marsal, Mr. Philip

Kruse, admitted in deposition that this October 2008 presentation discussed the *same $5 billion

discount* raised in the Debtor's Rule 60 Motion. After being asked about both the Debtor's Rule

60 Motion and the October 2008 Alvarez presentation, he testified as follows:

Q.    And you recall there being a discount talked about in that motion?

A.    Yes.

Q.    Is that the same discount that's referred to on page 28 [of the October Alvarez &
       Marsal Report], the $5 billion reduction?

A.    I believe it applies to the same pool of securities.

Q.    Is it different in any way?

> A.    Well, no.  Again, because it applies to the same group of securities, the repo collateral, I think it is the same concept being communicated.

BCI Ex. 81 [Kruse Dep. Tr.] at 142:21-143:13 (objections omitted).  Mr. Kruse went on to state that while the Rule 60 Motion might characterize this alleged "discount" differently, "I think it's the same concept at play, if that's your question." *Id.* at 143:21-144:6.

487.    The Committee's outside counsel, Milbank Tweed, likewise admitted to knowing about and discussing "an approximate $5 billion discrepancy" in October 2008, and was not able to explain how, if at all, that was different from the alleged "new evidence" of an "undisclosed $5 billion discount" described in their Rule 60 brief.  *See* BCI Ex. 88 [O'Donnell Dep. Tr.] at 139:7-143:10.  On behalf of the Committee, Milbank Tweed raised concerns about this "$5 billion mismatch" issue with Weil Gotshal *even before Closing*, and on into October.  *Id.* at 157:4-24, 164:25-165:6.  The Committee was "very annoyed" and claimed this $5 billion was not a "fair reduction in value."  BCI Ex. 67 [Fogarty Dep. Tr.] at 116:19-119:8.  Yet the Committee chose not to object, not to return to the Court, and not to seek any appeal.

488.    Thus, the Movants cannot truthfully claim there was anything secret about what they call a "$5 billion discount."  They knew about it at the time.  Movants were fully aware before Closing that Barclays would be getting Repo Collateral initially marked at close to $50 billion.  If they had any issue with that, they should have declined to close, moved this Court for Rule 59(e) relief, or filed an appeal.[182]

489.    Movants also claim that the LBI estate is entitled to a portion of the Repo Collateral under 11 U.S.C. § 559, which requires the reversion of any "excess collateral" when a repo is "liquidated."  Movants assert that this provision was triggered by an inadvertent

---

[182]  The record clearly establishes that Alvarez & Marsal (and hence the Debtor) had all of the information about the so-called "$5 billion" "negotiated reduction" from "stale marks" before September 30, 2008, and therefore before the deadline for seeking Rule 59(e) relief.  BCI Ex. 144 [Notes of Alvarez & Marsal]; BCI Ex. 67 [Fogarty Dep. Tr.] at 116:19-119:8.

termination notice automatically generated by Barclays prior to the Closing. LBHI Br. at ¶¶ 8,

136; Committee Br. at ¶¶ 66-67. But the Clarification Letter provides unambiguously that

Barclays was entitled to receive "all securities and other assets" in the Repo Collateral, and that

the inadvertent "notice of termination" for the repo agreement was deemed to be "*void ab initio.*"

BCI Ex. 5 [Clarification Letter] at § 13. All of these provisions were evident on the face of the

Clarification Letter and Movants were admittedly aware of them; therefore, they could have been

the basis for an appeal or motion for reconsideration. Instead of seeking reconsideration or

appeal, however, the Debtor and the Trustee relied on the Clarification Letter in defending the

Sale Order on appeal, and the Committee remained silent. And then three months later, after

stressing to this Court the importance of the transfer of the Repo Collateral to Barclays, the

Trustee even *released* Barclays in writing from any claims relating to the Repo Collateral.

490.    Accordingly, all of Movants' contentions about the Repo Collateral are barred by

the mandate rule, judicial estoppel, equitable estoppel, and waiver. These claims are not based

on any "new evidence" or "mistake" and should be dismissed.

3.    The Movants Are Barred From Claiming That Barclays Was
Not Entitled To Receive The Clearance Box Assets, $769
Million of Rule 15c3-3 Or Equivalent Assets, And The
Exchange-Traded Derivatives And Associated Collateral.

491.    The Clarification Letter plainly provides that Barclays was entitled to receive the

Clearance Box Assets, the ETDs and Margin, and the $769 million in Rule 15c3-3 assets (or

assets of substantially the same nature and value). BCI Ex. 5 [Clarification Letter] at §§ 1(a)(ii),

8. The provisions providing for these assets were discussed, debated, and understood as a result

of the weekend meeting at Weil Gotshal, which was attended by all Movants and their legal and

financial advisors. *See, e.g.*, BCI Ex. 58 [Burian Dep. Tr.] at 210:8-211:6, 263:19-265:11,

305:17-308:8, 315:17-316:21; BCI Ex. 87 [Miller Dep. Tr.] at 42:24-25 ("there was a lot of

discussion about clearance box assets"); BCI Ex. 74 [Keller Dep. Tr.] at 74:14-79:17, 82:10-20;

BCI Ex. 67 [Fogarty Dep. Tr.] at 128:3-14.

492.    The Movants cannot possibly claim that there is any "new evidence" that can

justify their argument that what they characterize as "additional assets" were improperly

transferred to Barclays.  As of the Closing (and indeed, before the Closing), the Movants knew

that these assets were being transferred to Barclays.  If any Movant had deemed the inclusion of

any of these assets to be improper, problematic, or unauthorized for any reason, they could and

should have raised that at the time — either by refusing to agree to the Clarification Letter,

stopping the Closing, filing for Rule 59(e) relief, or filing an appeal.  Instead, they did the

opposite:  they agreed to the Clarification Letter; they closed the transaction; they chose not to

object or return to the Court; and the Lehman Movants defended the Clarification Letter on

appeal.  The mandate rule, judicial estoppel, equitable estoppel, and waiver prohibit Movants

from making any assertion now that these were "additional assets" improperly transferred under

the Clarification Letter.

    4.    The Movants Are Barred From Claiming That The
        Purchase Agreement Or Sale Order Is Subject To
        Valuation Caps Not Set Forth In Either Document.

493.    The APA provides no representations or warranties as to the values of any of the

Purchased Assets or Assumed Liabilities.  BCI Ex. 1 [APA].  It also does not provide for any

specific accounting result, or for any "true-up" to ensure that only a specifically defined balance

sheet is transferred.  *Id.*  The only provision that was even remotely akin to a "true-up" was

really only a limited adjustment to the "Cash Amount" owed under the APA that was based

solely on possible future profits from the sale of financial inventory — and that provision was

removed from the APA, as the Court was told at the Sale Hearing.  BCI Ex. 1 [APA] at § 3.3;

BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 47:7-10; BCI Ex. 5 [Clarification Letter] at § 9. All

this was obviously known to the Movants at the time of the Sale.

494.    Similarly, the Movants all knew at the time of the Sale that the Clarification

Letter provides no valuation estimates for the Repo Collateral, the Clearance Box Assets, or the

ETDs and Margin. BCI Ex. 5 [Clarification Letter] at § 1(a)(ii). The only assets for which it

provides values are the appraised value of the real estate and the $769 million of Rule 15c3-3

assets or their equivalent. *Id.* at §§ 4, 8(ii).

495.    Likewise, the Movants knew that the Sale Order made no reference to any

valuations of any of the Purchased Assets, and made no findings as to any valuations or

appraisals. BCI Ex. 16 [Sale Order].

496.    All of this was plainly evident at the time of the Sale. Moreover, there can be no

genuine dispute that there was significant uncertainty about asset values throughout the week of

the Sale. *See, e.g.* BCI Ex. 85 [McDade Dep. Tr.] at 27:21-28:8; BCI Ex. 92 [Ridings Dep. Tr.]

at 18:5-17. This was especially true for the types of illiquid assets contained within the Repo

Collateral and the Clearance Box Assets. As the Committee has admitted in its brief and in

deposition, it knew the Repo Collateral had been "marked" with a value of over $49 billion, but

was thought to be worth much less — meaning, its value was *uncertain*. *See* Committee Br. at

¶¶ 22, 25; BCI Ex. 58 [Burian Dep. Tr.] at 254:21-255:8. Similarly, the Trustee and his financial

advisor both admitted in deposition that despite having over a year to attempt to value the Repo

Collateral, they have been unable to do so. *See* BCI Ex. 80 [Kobak Dep. Tr.] at 156:6-157:6,

158:6-18, 161:11-20; BCI Ex. 72 [Karp Dep. Tr.] at 68:3-70:4, 87:17-88:10. As explained

above, it was even more difficult, from Barclays' perspective, to make any form of estimate as to

the possible value — or potential exposure to liability and losses — associated with the ETD

accounts being acquired.  *See* Fact Section H(6), *supra*.

497.    In light of the foregoing, there is no merit to Movants' contention that the deal

was either subject to an absolute valuation cap, or required to be a "wash."  *See generally* LBHI

Br. at ¶¶ 33-35, 48-49; Trustee Br. at ¶¶ 99-101; Committee Br. at ¶ 75.  They rely upon a

statement made by Weil Gotshal partner Lori Fife at the Sale Hearing, in which she was

explaining the "major changes" to the transaction, and in so doing described the dramatic drop in

the estimated value of one category of financial assets described in the APA.  BCI Ex. 49 [Sept.

19, 2008 Hearing Tr.] at 47:1-4, 54:18.  But the testimony of Weil Gotshal's 30(b)(6)

representative, Harvey Miller, proves that Weil Gotshal did not intend Ms. Fife's statement to be

interpreted in the manner now asserted by the Movants:  he testified that the Sale was "a deal to

buy the business, not a balance sheet deal," that there was no "true-up," and that the purchased

assets were purchased "irrespective of their values."  BCI Ex. 87 [Miller Dep. Tr.] at 57:12-17,

50:14-51:6.  Likewise, the Debtor's other law firm, Simpson Thacher, testified that they had

never heard or understood that there was any kind of valuation cap on the assets being

transferred, and never even heard the $47.4 billion figure mentioned.  BCI Ex. 74 [Keller Dep.

Tr.] at 105:11-107:19.  Similarly, Barry Ridings, testifying as the 30(b)(6) representative for

Debtor's financial advisor Lazard, testified that he also did not know how the $47.4 billion

number was determined.  BCI Ex. 92 [Ridings Dep. Tr.] at 61:18-20.  Like Mr. Miller, he also

testified that the Sale involved the purchase of "a business," that he "didn't know with certainty

what the number was of the assets conveyed," and that "[t]hey were getting these assets.  Once

they owned it, it was their risk."  *Id.* at 63:21-64:21.

498. The Trustee's representative admitted in deposition that the Trustee and his advisors never discussed the $47.4 billion alleged valuation cap with anyone — they never asked anyone what assets comprised that estimate, they never asked anyone whether that was the final value for any specific subset of assets, and they never were told that there was such a valuation cap. The Trustee also could not explain which assets were within the cap, and which ones were not. BCI Ex. 80 [Kobak Dep. Tr.] at 96:24-97:19, 101:20-24, 102:23-103:3, 126:10-19.

499. The Committee's attorneys, Milbank Tweed, who were at Weil Gotshal for the weekend, received estimated values of the repo securities well in excess of $47.4 billion (*i.e.*, in excess of *$49 billion*). Yet they *never* suggested contractual provisions to assure that the transaction would be a wash or balanced transaction. BCI Ex. 88 [O'Donnell Dep. Tr.] at 32:15-23, 33:10-16, 34:4-9.

500. Finally, as explained above, both Miller and Ridings both rejected the notion that the deal was presented to the Court as a "wash." BCI Ex. 87 [Miller Dep. Tr.] at 60:12-21; BCI Ex. 92 [Ridings Dep. Tr.] at 17:5-10.

501. There is therefore no basis for asserting "new evidence" that could justify asking the Court to ask to modify the Sale Order so as to impose either a "valuation cap" or a "wash" requirement. Both the lead lawyer and the lead financial advisor for the Debtor have testified that neither requirement was understood to be part of the deal. That is also plainly evident on the face of the Purchase Agreement and the Sale Order. If any of the Movants had believed that, contrary to the understanding of Mr. Miller and Mr. Ridings, the Purchase Agreement *should have been* subject to a valuation cap or to a "wash" requirement, then they could have requested such a provision (which Barclays would have rejected), or they could have asked the Court not to approve the Sale (the Court heard such objections and rejected them), or they could have sought

reconsideration, or filed an appeal. They did none of those things. They are therefore barred by

the mandate rule, judicial estoppel, equitable estoppel, and the doctrine of waiver from asking

the Court now to do what they were unwilling to ask it to do in September of 2008.

> 5.    The Movants Are Barred From Claiming
>       That Barclays Acted In Bad Faith.

502.   As discussed above, the Debtor and the Trustee expressly argued to the District

Court that "the record demonstrates that Barclays acted in good faith." BCI Ex. 33 [LBHI Brief

in Opposition to Bay Harbour Appeal] at p. 18; BCI Ex. 34 [Trustee Brief in Opposition to Bay

Harbour Appeal] at pp. 4 n.1, 17. The Committee did not argue otherwise. The District Court

reviewed the evidence and explicitly held that Barclays was a good faith purchaser of the

Lehman assets, just as the Debtor and the Trustee had argued. BCI Ex. 41 [March 13, 2009

Opinion and Order] at p. 17.

503.   Now, however, the Debtor and the Trustee contend that Barclays acted in bad

faith — they suggest as much in their Rule 60 Motions, and they specifically allege in their

Adversary Complaints that Barclays aided and abetted a fiduciary breach.[183] They claim that

Barclays corrupted certain Lehman executives with employment offers, thus "aiding and

abetting" alleged breaches of fiduciary duty by such officers. Movants persist in making this

allegation even though the Debtor's CEO, Bryan Marsal, admits he has no evidence and no basis

for believing that any former Lehman officer breached a fiduciary duty *at all*. BCI Ex. 84

[Marsal Dep. Tr.] at 75:4-76:16.

504.   Under the mandate rule, the Lehman Movants may not now change their position

and allege bad faith by Barclays. The Committee is likewise bound by the District Court's clear

---

[183]  *See* LBHI Complaint. Adv. Proc. No. 09-01731 (JMP), Doc. No. 1, at Count I; Trustee Complaint, Adv. Proc.
No. 09-01732 (JMP), Doc. No. 1, at Count XIII. The Committee's Complaint does not contain an aiding and
abetting fiduciary breach claim. Committee Complaint, Adv. Proc. No. 09-01733 (JMP), Doc. No. 1.

holding that Barclays acted in good faith. *In re W.T. Grant Co.*, 20 B.R. 186, 190 (S.D.N.Y. 1982) (interested parties that do not join an appeal of a bankruptcy court order are nonetheless bound by the final outcome of the case); *In re Marlar*, 288 B.R. 823, 826-27 (Bankr. W.D. Ark. 2003) (where bankruptcy court order is affirmed on appeal, mandate rule bars all related claims even by creditors who were not party to the appeal).

505. There is no "new evidence" of bad faith that could justify revisiting this express holding of the District Court. The very suggestion of "bad faith" is that Barclays allegedly "aided and abetted" a fiduciary breach by Lehman executives. But LBHI CEO Marsal admits he has *no evidence* of a fiduciary breach by anyone at Lehman. BCI Ex. 84 [Marsal Dep. Tr.] at 75:4-76:16. In any event, the "new evidence" exception to the mandate rule is extremely narrow: it allows judicial action inconsistent with a mandate if, but only if, there is "significant new evidence not earlier obtainable with due diligence." *United States v. Wallace*, 573 F.3d 82, 89 (1st Cir. 2009); *United States v. Salerno*, 932 F.2d 117, 121 (2d Cir. 1991). In view of the strong policy favoring finality of judgments, the exception is narrowly construed and rarely used, and the new evidence must be "substantial, even conclusive, before it is appropriate to reopen a judgment." *Suel v. Sec'y of Health & Human Servs.*, 192 F.3d 981, 986 (Fed. Cir. 1999).[184] Therefore, even new evidence that a lower court believes supports its disagreement with a mandate may not be sufficiently conclusive or substantial to permit reconsideration of an issue by the lower court. *United States v. Tenzer*, 213 F.3d 34, 39-40 (2d Cir. 2000) (district court correctly found that it was bound to follow a prior appellate decision even though the district court believed new evidence supported disagreement with the decision).

---

[184] *See also United States v. Rivera-Martinez*, 931 F.2d 148, 150-52 (1st Cir. 1991); WRIGHT & MILLER, 18B FEDERAL PRACTICE & PROCEDURE § 4478.3 (evidence must be outside the record and significant).

506.   When the Lehman Movants asked this Court to approve the Sale and to find that Barclays acted in good faith, and then asked the District Court to affirm the Sale Order and the good faith finding, they were fully aware of the facts upon which they now base their allegations of bad faith.  The fact that Barclays was offering employment to Lehman executives had been disclosed to the LBHI and LBI boards, and the boards were told this meant that "interested Firm employees were involved in the transaction negotiations on behalf of the Firm."  BCI Ex. 104 [Minutes of the Sept. 16, 2008 LBHI/LBI Board Meeting] at p. 3.  By the time Movants filed their appeal briefs, they had had months to ponder the transaction and conduct additional due diligence, yet they remained satisfied that the Clarification Letter was a valid part of the deal and that "[a]ll relevant facts regarding the Sale were disclosed to the Bankruptcy Court."  Even though they were well aware that many of the Lehman executives working on the deal had transferred to Barclays, they continued to assert that Barclays was a "good faith purchaser."

507.   Accordingly, the District Court's mandate bars any claim of Movants based on an alleged lack of good faith by Barclays.  Such claims are further barred by judicial estoppel (because the Lehman Movants successfully argued that Barclays acted in good faith), by equitable estoppel (because Barclays reasonably relied on Movants' failure to raise these claims), and by waiver (because Movants' conduct, including the Committee's decision not to oppose the Sale and not to appeal, was inconsistent with an intent to later claim bad faith).

508.   If Movants' attorneys believed any of the positions they took in this Court or on the appeal were inaccurate, they had an ethical obligation to inform the courts immediately.  *See* N.Y. Rules of Prof'l Conduct R. 3.3(a)(1) (2009) ("A lawyer shall not knowingly make a false statement of fact or law to a tribunal or *fail to correct a false statement of material fact or law previously made to the tribunal . . . .*") (emphasis added).  They did not do so.

226

6.      The Lehman Movants Are Bound By The Knowledge Of
        The Lehman Officers Who Negotiated The Transaction.

509.      As discussed above at Fact Sections (H) and (J), Movants' claims are based

entirely on facts that were well known to their eminent attorneys and financial advisors who

worked on this transaction.[185]  There is absolutely no truth to LBHI's allegation that only a

"limited set [of] Lehman employees" were "informed about the specifics of the proposed

transactions." LBHI Br. at ¶ 160.  But even if this were true, *all* persons who allegedly breached

fiduciary duties were managerial level LBHI and LBI officers,[186] and *all* of their knowledge (as

well as the knowledge of the numerous Lehman officers who undisputedly performed their

duties faithfully, including Lehman's head negotiator Bart McDade), is imputed to their

companies.

510.      "Knowledge and actions of a corporation's employees and agents are generally

imputed to the corporation where the acts are performed on behalf of the corporation and are

within the scope of their authority." *UCAR Int'l, Inc. v. Union Carbide Corp.*, No. 00-cv-1338,

2004 WL 137073, at *13 (S.D.N.Y. Jan. 26, 2004); *see also CompuDyne Corp. v. Shane*, 453 F.

Supp. 2d 807, 824 (S.D.N.Y. 2006).  The company is bound even if the officers' knowledge is

"never actually communicated to it." *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784

(1985) (*citing* RESTATEMENT (2D) OF AGENCY § 272).

---

[185] The only claim made by Movants that might arguably not be barred by the mandate rule and the other above-mentioned doctrines is the claim that the compensation and cure estimates were "inflated." This claim lacks merit for the reasons shown in Section III, *infra*.

[186] For example, at the time of the Sale Transaction: Mr. McDade was the President and Chief Operating Officer of LBHI; Mr. Lowitt was the Chief Financial Officer, Co-Chief Administrative Officer, Controller, and Executive Vice President of LBHI; Mr. Kelly was the Global Financial Controller of Lehman; Mr. Tonucci was the Global Treasurer of Lehman; and Mr. Reilly was a Managing Director and Capital Markets and Investment Banking Chief Financial Officer of Lehman. BCI Ex. 148 [Spreadsheet of Lehman and Barclays Titles]; BCI Ex. 85 [McDade Dep. Tr.] at 7:11-20; BCI Ex. 102 [SEC Form 3 of Herbert McDade III]; BCI Ex. 83 [Lowitt Dep. Tr.] at 9:21-10:4, 11:17-19, 14:9-10; BCI Ex. 10 [First Day Aff. of Ian T. Lowitt]; BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 11:2-9; BCI Ex. 98 [Tonucci Dep. Tr.] at 7:19-8:12; BCI Ex. 371 [Sept. 17, 2008 5:57 pm email from M. Kelly to J. Walker, *et al.* with attachment].

511.   Movants may contend that the knowledge of the Lehman officers should not be imputed because Barclays had offered them jobs and thus they were compromised (even though LBHI's CEO admits he has no evidence and no basis for believing any Lehman officer breached his duties to the company). BCI Ex. 84 [Marsal Dep. Tr.] at 75:4-76:16. To be sure, there is an exception to the imputation rule called the "adverse interest" exception, but that exception is inapplicable in this case. "New York courts have cautioned that this exception is a narrow one and that the guilty manager 'must have totally abandoned' his corporation's interests for it to apply." *In re CBI Holding Co.*, 529 F.3d 432, 448 (2d Cir. 2008). *"It cannot be invoked merely because [the officer] has a conflict of interest or because he is not acting primarily for his principal." Center*, 66 N.Y.2d at 785 (emphasis added) (citing Restatement (2d) of Agency § 282(1)). The RESTATEMENT provides:

> P appoints A to negotiate for the purchase of Blackacre, agreeing to pay him a commission of 10 per cent if he succeeds in persuading the owner to sell it and if A finds no defects in the title of record or otherwise. In investigating the title, A discovers an unrecorded equitable interest owned by T and, *believing that the transaction will not be consummated if he reveals this equity to P,* conceals his knowledge from P, who buys Blackacre upon A's favorable report. *P is affected by A's knowledge.*

RESTATEMENT (2D) OF AGENCY § 282(1), illustration 4 (emphasis added).

512.   Thus, *even if* the LBHI and LBI officers with the "true" knowledge of the deal had a conflict of interest, and *even if* they intentionally failed to disclose material facts to LBHI and LBI because they feared the transaction with Barclays would not be consummated if they revealed such facts, LBHI and LBI are nonetheless charged with knowledge of everything their negotiators knew. It is not alleged, and it could not credibly be alleged, that any, let alone all, of the Lehman employees who negotiated the deal with Barclays "totally abandoned" LBHI's and LBI's interests. *See generally*, BCI Ex. 365 [Lowitt Decl.] at ¶ 9; BCI Ex. 369 [Tonucci Decl.] at ¶ 9; BCI Ex. 362 [Kelly Decl.] at ¶ 10; BCI Ex. 366 [McGee Decl.] at ¶ 11. As explained

above, Harvey Miller, Barry Ridings, and Bryan Marsal have all testified that they have no basis

to believe any of the former Lehman executives acted in bad faith. BCI Ex. 87 [Miller Dep. Tr.]

at 47:5-15, 60:2-7; BCI Ex. 92 [Ridings Dep. Tr.] at 49:22-50:20; BCI Ex. 84 [Marsal Dep. Tr.]

at 75:4-76:16.

513.    Moreover, Lehman's lead negotiator, Bart McDade, is not even accused of

breaching any fiduciary duties. BCI Ex. 46 [LBHI's Responses to Barclays' Second Set of

Interrogatories] at p. 2. Nor is James Seery, who along with Weil Gotshal's Harvey Miller

reviewed for the Committee on a "line by line" basis each asset that Lehman would be

transferring to Barclays. BCI Ex. 96 [Seery Dep. Tr.] at 125:5-8, 152:13-16. As there is no

allegation that Mr. McDade and Mr. Seery were unaware of the pertinent facts of the transaction,

their imputed knowledge is fatal to the allegations that material facts were withheld.

514.    At most, the Rule 60 Motions rely upon an unspecified innuendo that, because

some of the former Lehman executives involved in the deal expected to work for Barclays, they

*may* have acted improperly. This falls far short of satisfying the narrow adverse interest

exception. *See, e.g., Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 152

(S.D.N.Y. 2009) (imputing knowledge and rejecting company's claim that individuals with

relevant knowledge were "rogue employees"); *Center*, 66 N.Y.2d at 783 (conclusory allegations

of serious conflicts and fraud insufficient "as a matter of law to negate imputed knowledge").

515.    The Lehman Movants successfully argued for the Sale Order, and the Committee

agreed to allow it to proceed. The Debtor and the Trustee benefited from the Sale. They avoided

the potentially catastrophic liquidation of LBI, which would have triggered massive losses — as

they themselves emphasized to this Court and to the District Court on appeal. *See generally* BCI

Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 93:3-94:20, 98:10-13 (Sale to Barclays is a good match

229

economically and "it saves the jobs of thousands of employees and avoids losses that could total

in the hundreds of billions of dollars"); *id.* at 142:23-144:24 ("the sale of LBI must be

immediately consummated or there will be little or nothing to sell"); BCI Ex. 33 [LBHI Brief in

Opposition to Bay Harbour Appeal] at pp. 18-20, 24-25; *see also* BCI Ex. 342 [Saunders Report]

at ¶¶ 25-100 (detailing how the consequences of a failure of the transaction to close "would have

been devastating to LBI's estate, LBHI's estate, employees, customers, counterparties, and, to

some extent, the entire financial system"). By supporting the Sale, the Trustee also helped

protect the interests of tens of thousands of customers. BCI Ex. 42 [Trustee's First Interim

Report] at ¶ 20 (the transfer of PIM customers to Barclays was "instrumental in protecting

customers and preserving customer value in uncertain times.").

516.    Instead of opposing the Sale, refusing to sign the Purchase Agreement, refusing to

close, filing a Rule 59(e) motion, or appealing, the Movants agreed to and supported the Sale:

they stood by while Barclays *paid out over $46.5 billion in cash*, hired thousands of former

Lehman employees, assumed contracts and liabilities, assumed the great risk of a further market

turndown or even meltdown, and made substantial changes to its corporate structure in reliance

upon the validity of the Sale. Yet now that the markets have stabilized and Movants have reaped

the dramatic benefits of the Sale, they want to re-trade the deal to deprive Barclays of assets

promised under the Purchase Agreement. The mandate rule, judicial estoppel, equitable estoppel

and waiver are designed to prevent exactly this type of manipulation.

**C.    The Relief Requested By Movants Contradicts Public Policy.**

517.    The relief Movants seek contradicts not only the law but also public policy.

There is a well-established policy of upholding the finality of sale orders issued by bankruptcy

courts, so as to encourage potential acquirers to make bids on assets in bankruptcy. *In re Chung*

*King, Inc.*, 753 F.2d 547, 549 (7th Cir. 1985) (finality policy necessary to encourage serious

bidders); *In re Lawrence*, 293 F.3d 615, 621 (2d Cir. 2002) (finality policy "particularly important" in bankruptcy).

518.    That public policy applies with special force in this case. As the Court was told repeatedly when it was asked to approve this Sale, there were enormous public interests at stake. The worldwide financial markets were in crisis. The Lehman bankruptcy represented the largest bankruptcy filing in history and was a shock to the financial system. The SIPC liquidation of LBI was full of unknowns, and there was tremendous concern about the impact of initiating a SIPC liquidation that would prevent tens of thousands of customers from accessing their accounts. There also were concerns about the potential impact of the loss of employment for thousands of Lehman employees. For these and related reasons, Weil Gotshal told the Court that despite all of the uncertainties involved, including obvious uncertainties as to asset values, immediate approval of the Barclays Sale was necessary to "assist in the stabilization of the financial markets." *See* BCI Ex. 11 [Sale Motion] at ¶ 12. Mr. Miller further explained in open court that a failure to approve the Sale would be "detrimental to the national interest." *See* BCI Ex. 49 [Sept. 19, 2008 Hearing Tr.] at 61:9-13.

519.    If Movants have their way, the next time the "national interest" requires a sale out of bankruptcy in the middle of a crisis (and the current crisis itself is far from over), the potential buyers will all stay far away. The Movants seek a result that will impose upon Barclays a deal that was never proposed, that it never agreed to, and that it never would have agreed to — a deal that would cause Barclays to suffer a loss in the billions of dollars. While Barclays knew it was taking a risk in the transaction, it did not agree to take the risk that the deal would be overturned and the contract rewritten more than a year after the Closing.

231

520.    The Trustee has himself openly acknowledged the public policy importance of not

re-trading this transaction.  As recently as December 2009, in asking the Court to approve the

settlement of his dispute with Barclays over the Trustee's failure to transfer approximately $1.3

billion of customer property, the Trustee's representative urged the Court to consider the

following policy points:

> . . . I think if people had gone to Barclays and said oh, Barclays wants to take the
> accounts but, by the way, maybe we can only transfer eighty percent of the
> property that goes with those accounts or ninety percent or seventy-five percent at
> least right away, I very much doubt that Barclays would have participated in any
> transaction like that. *And the next time some liquidation like this happened, God
> forbid that it happens, but it happened once it could happen again, I think any
> potential transferee would have real cold feet* if they didn't know that there would
> be a complete transfer of property to go along with the accounts that they were
> going to have to administer for those customers.

BCI Ex. 51 [Dec. 10, 2009 Hearing Tr.] at 33:17-34:3 (emphasis added).

## III.    MOVANTS' REQUESTS FOR RULE 60 RELIEF FAIL AS A MATTER OF LAW AND ON THE FACTS OF THE CASE.

### A.    Rule 60(b) Motions Are Generally Disfavored, And Are Especially Disfavored In Attacks On Bankruptcy Sale Orders.

521.    Rule 60(b) motions seek "extraordinary relief," require a showing of "exceptional

circumstances," and are "generally not favored." *United States v. Int'l Bhd. of Teamsters*, 247

F.3d 370, 391 (2d Cir. 2001); *In re Enron Corp.*, 352 B.R. 363, 369 (Bankr. S.D.N.Y. 2006).

Because the finality of bankruptcy sales is necessary to encourage serious bidders, a bankruptcy

court's discretion under Rule 60(b) to vacate a sale order is "very limited." *Chung King*, 753

F.2d at 550 (to overturn a confirmed sale, a court must find "a fundamental defect which would

shock the conscience"); *accord, In re General Insecticide Co.*, 403 F.2d 629, 630-31 (2d Cir.

1968) (Rule 60 standard stricter in bankruptcy cases, given the importance of ensuring the

finality of judicial sale orders); *In re Frankel*, 191 B.R. 564, 572 (Bankr. S.D.N.Y. 1995) (only

"fundamental errors or compelling equities" allow for Rule 60(b) relief).

# Exhibit C

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)
- - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.
            Debtors.
- - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS INC.
            Debtor.
- - - - - - - - - - - - - - - - - - - -x
            United States Bankruptcy Court
            One Bowling Green
            New York, New York

            April 28, 2010
            9:33 AM

B E F O R E:
HON. JAMES M. PECK
U.S. BANKRUPTCY JUDGE

1    A.  Not that I recall.
2    Q.  Let me ask you to turn to tab 4 of the book that I
3    provided you, please.
4        MR. SCHILLER:  Exhibit 419, for the record, Your
5    Honor.
6    A.  Yes.
7    Q.  And that is a letter to the examiner's team dated March
8    24, 2010.
9    A.  That's what it is.
10   Q.  And in the course of this letter to the examiner's team,
11   your partner Richard Davis writes that -- at paragraph 4, "In
12   response to your question as to why there wasn't a protection
13   of the balance between assets and liabilities, the assets were
14   going up, and while in some deals there might be a post-closing
15   true-up, no such provision was in this agreement"?
16   A.  I think the paragraph says the assets were going down, not
17   up.  I read the paragraph, yes.
18   Q.  Yes.  And it's accurate?
19   A.  I believe it's accurate.
20   Q.  And it's accurate in terms of your understanding of the
21   transaction, not what Mr. Roberts may have said to the
22   examiner?
23   A.  That's correct.
24   Q.  May I ask you to turn to the next page, please.  And you
25   see a paragraph there.  May I ask you to read it to yourself?
                                                            102

1    A.  The understanding and what Mr. McDade told me in the long
2    hours of preparing him -- prepping him for his examination,
3    that this was not a balance sheet transaction.
4    Q.  Thank you.  Let me turn to the subject of gain and day-one
5    gain, which has been presented to the Court already in this
6    trial.  And let me ask you to turn to the -- actually I don't
7    need to burden you with the transcript, I don't think.  Do you
8    recall that Barclays made a public announcement on or about
9    September 17, 2008, that it expected to have a multibillion
10   dollar gain -- accounting gain on day one of the acquisition,
11   that was two days before the sale hearing?
12       THE WITNESS:  Do I get a right to object, Your Honor?
13       THE COURT:  Regrettably as a witness, you don't.  But
14   I think --
15       MR. SCHILLER:  I'm happy to rephrase.
16       THE COURT:  -- I think Mr. Miller doesn't like that
17   question.
18       MR. SCHILLER:  So I gather.
19   Q.  If Barclays announced on September 17th, two days before
20   the hearing, publically, in an analysts call, and reported in
21   the press that it anticipated to have a multibillion dollar
22   accounting gain if the sale were approved, would that be
23   inconsistent with your understanding of the sale you presented
24   to Judge Peck?
25   A.  Not inconsistent with my understanding.  We live in an era
                                                            104

1    A.  Yes, I have.
2    Q.  Is it also correct, Mr. Miller, that while maintaining a
3    balance between the assets and the liabilities, as is written
4    here, might have been desirable, everyone understood that the
5    agreement did not require there to be such a balance?  Do you
6    agree with that?
7        MR. GAFFEY:  Objection, Your Honor.  The witness is
8    not competent to testify to what everybody understood.
9        THE COURT:  Well, I think that's true, although this
10   is cross examination.  Although I think that Mr. Miller is not
11   hostile to either side here, he's just here as a source of
12   impartial information, as far as I can tell.
13       To the extent that it talks about what everybody knew
14   or everybody understood, it's probably a question that cannot
15   be answered --
16       MR. SCHILLER:  Let me rephrase it, Your Honor.
17       THE COURT:  -- but that's the language that's in the
18   letter.
19       MR. SCHILLER:  Yes.  Let me rephrase it.
20   Q.  Maintaining -- is it correct, Mr. Miller, that maintaining
21   a balance between the assets and the liabilities might have
22   been desirable among the parties, but you, and in your
23   discussions reflected with Mr. McDade and Mr. Ridings,
24   understood that the agreement did not require that there be
25   such a balance?
                                                            103

1    of financial engineering.  And an accounting gain, which is
2    not, at least in my terms, in real money, would not have made
3    any difference.
4    Q.  Would you also agree with me, it's not uncommon for
5    someone to buy assets in a bankruptcy process and make money on
6    that purchase?
7    A.  In my experience, people who come to the bankruptcy court
8    to buy assets do not do it as eleemosynary institutions.
9    Q.  Are --
10   A.  They do it --
11   Q.  -- I'm sorry.
12   A.  -- in the hope that they're going to make money and that
13   it's going to be in some way accretive to them.
14   Q.  And if they hope and announce that it may be accretive to
15   them, are they required to file such statements -- public
16   statements in the court, in your experience?
17   A.  I don't know whether you're asking for a legal opinion or
18   just general advice.  If your question is premised upon some
19   fiduciary duty, I would have to explore that and research it.
20   I don't think I'm really qualified to answer that question.
21   Q.  If a purchase made, as Barclays, I represent to you, that
22   they did in a public announcement on the 17th of anticipated
23   accounting game in this proceeding, would you have brought it
24   to the Court's attention on the 19th?
25   A.  I'm not quite sure I would have.  I don't -- an accounting
                                                            105

1  game really did not go to the substance of the transaction and
2  I assume if they made a public announcement it was in the
3  public domain.
4  Q.  Thank you.  Now I may have covered this once before but I
5  would like to cover the subject again, if it's not duplicative.
6  And that is, that the APA provided to the Court had no
7  contractual limitations on the value of the purchased assets
8  that were being acquired by Barclays in the sale.
9  A.  That's correct.
10  Q.  Indeed the purchased assets were being acquired by
11  Barclays in the sale irrespective of what their values may have
12  been that week, correct?
13  A.  Technically, yes.
14  Q.  And because of that technicality in the contract there was
15  no valuation cap contractually for specific assets in the
16  transaction, correct?
17  A.  That is correct.
18  Q.  Indeed, between Lehman and Barclays, in their purchase
19  agreement, there was no valuation cap for all of the purchased
20  assets, correct?
21  A.  In the agreement, that's correct.
22  Q.  Is it fair to say that on September 19th, before this
23  Court when Lori Fife spoke, you, Mr. Miller, did not understand
24  the 47.4 billion dollars that she mentioned in terms of those
25  long position to be a valuation cap on the purchased assets

106

1  under the purchase agreement, correct?
2  A.  It was just given for guidance as to the potential
3  dimensions of the transaction.
4  Q.  And that guidance was given as to the long positions, the
5  hard assets which had been seventy billion on Tuesday and now
6  we're in freefall and you had a number 47.4, correct?
7  A.  That's correct.
8  Q.  I think it's important to review with the Court the fact
9  that the purchase agreement, which your firm and other lawyers
10  worked hard on with their clients, provided no valuation for
11  many of the purchased assets that were identified in the APA,
12  correct?
13  A.  Barclays was buying the North American capital markets
14  business, whatever it was.
15  Q.  And I hate to take up too much of your time and burden you
16  with this contract, but it is important in terms of what's been
17  said to this Court before you took the stand.
18      If I could have you turn back to the APA, which is again
19  tab 3 and look at pages 6 through 8 with me, Mr. Miller,
20  briefly?
21  A.  Yes, sir.
22  Q.  The APA doesn't provide valuations for many of the
23  nineteen categories of purchased assets that you see identified
24  there under the definition and through pages 6 and 8.
25  A.  Yes, sir.

107

1  Q.  It does provide a valuation of approximately seventy
2  billion for long positions and approximately a valuation of
3  1.34 retained cash.  But it has no estimated valuations at all
4  for any of the other seventeen categories of purchased assets.
5  Do you see that and agree with that?
6  A.  I do.
7  Q.  Was Barclays entitled to each of those assets listed there
8  as clarified in the clarification letter, specifically
9  identified irrespective of whether there was a valuation
10  provided for it?
11  A.  Pursuant to the approved APA, yes.
12  Q.  And was Barclays entitled to any of these assets,
13  irrespective of any value that Barclays might ascribe to them
14  under its accounting on its balance sheet once it acquired the
15  business?
16  A.  Under the APA as approved, yes.  At least that's my
17  opinion.
18  Q.  And subsection q, Mr. Miller, within that definition of
19  purchased assets --
20  A.  Q?
21  Q.  Yes, sir.  On page 8.  There's a reference there to
22  intangible assets.
23  A.  Yes, sir.
24  Q.  And the agreement provides that "Intangible assets
25  associated with or symbolized by the business, including

108

1  customer and supplier lists" are to transfer on the sale.  Do
2  you see that?
3  A.  Yes.
4  Q.  Now was Barclay to acquire those intangible assets not
5  matter what value Barclays might attribute to those assets on
6  its balance sheet?
7  A.  As you've pointed out, there's no valuation caps in the
8  asset purchase agreement or the clarification letter.
9  Q.  And some of these assets that are discussed there may be
10  of value to Barclays in ongoing business on Monday but not to
11  Lehman, correct?
12  A.  If the transaction did not close it would have no value.
13  Q.  Indeed, the same is true for all the purchased assets --
14  A.  My recollection --
15  Q.  -- listed in the APA.  I'm sorry, go ahead.
16  A.  My recollection is that there was a problem with the
17  intellectual property and some of the intellectual property
18  belonged to another entity.
19  Q.  All right.
20  A.  And that was brought to the attention of the Court.
21  Q.  Thank you.  In terms of those elements of the purchased
22  assets for which there was no value, there were a number of
23  them, as I've taken you through, seventeen categories.  Seats
24  on the New York Stock Exchange, for example, weren't valued in
25  this deal were they?

109

A. No.
Q. They'd be of value Monday morning, because you got this deal done, to Barclays when the markets opened but they meant nothing to Lehman, correct?
A. You have to go back to the concept of the deal. The concept of the deal was the sale of a business, an ongoing business.
Q. It's been brought up before Judge Peck, Mr. Miller, that this process that you observed, of the parties discussing valuation, trying to get to a correct valuation, was not presented to Judge Peck adequately on the 19th. To the extent that is alleged by these movants, do you agree with it?
A. No.
Q. May I address your attention, again, to the transcript of the 19th. And I'd ask you to turn --
A. What's the number?
(Pause)
Q. It's tab 2 in the binder I placed before you.
A. Okay.
Q. And I draw your attention to page -- before I do that, let's make sure I provided you with enough pages. Page 109.
A. I don't have 109.
Q. If you would turn to --
A. It's on the screen.
Q. Okay. Well, let's look at it on the screen. That's fine.

110

And in particular, questions put to Mr. McDade beginning at line 5. He is asked:
"Q. Well, in the absence of a closing balance sheet having been prepared, can you please describe for the Court how it is that the debtor determined that fair value was being realized for the sale of these assets?
"A. For the assets?
"Q. Yes.
"A. The individual assets on the balance sheet, the trading inventory, was bottoms up. Meaning, individual line item detail processed through all of our individual risk businesses in coordination with a normal finance professionals who are incorporated into the valuation process.
"Q. Did the debtors have any form of valuations of any of the assets that are being transferred?
"A. Sorry?
"Q. Does Lehman have any valuations, internal valuations of any of the assets being transferred?
"A. Absolutely. There are many complex security models involved, many different models we used to evaluate those securities.
"Q. And is it your testimony that a valuation was conducted within Lehman for all the assets being transferred to Barclays, when was that conducted?
"A. Portfolio moved during the week."

111

At the top of page 110.
"A. But that was conducted all last evening, all through and up to the arrangement -- the agreement today."
Q. Does that testimony by Mr. McDade conveying to the Court the process which you described briefly today?
A. There was a process of trying to establish the appropriate evaluation for the securities that were going to be transferred based on the mark-to-market basis. There was a general theme that Lehman's marks were aggressive.
Q. Let me turn to the questions of comp and cure, if I will, those assumed liabilities that you've been asked about. It's your testimony that those figures on comp and cure that were presented this morning were very contingent, is that right?
A. Yes. They were contingent figures. It was an estimate of exposure.
Q. And these were rough estimates that were inherently uncertain and made in good faith to the Court, were they not?
A. I would adopt the words good faith. I can't tell you they were rough, you'd have to go to the person who calculated them.
Q. And the Court was told these were estimates of potential exposures, correct?
A. It was subject to variables in terms of which contracts, if any, were going to be assumed and there were many, many, many contracts, whether there were defaults that had to be cured, and that goes to the executory contracts and the

112

unexpired leases.
In terms of compensation we were talking about, approximately 10,000 employees, what would Barclays -- if the transaction closed, how many of those employees, ultimately, would be retained by Barclays which would diminish the exposure.
Q. And the Court was told, through the APA, what Barclays might have to pay depending on how it conducted its business upon closing rather than actual amount that Barclays would pay, correct?
A. It was, as we just discussed, it was an estimate. It was an exposure amount.
Q. And the 1.5 billion, with respect to what are called cure payments, that was a maximum exposure, correct?
A. It was an estimate that was to take into account the -- if all of the contracts or substantially all the contracts were going to be assumed, what might have been required to cure any defaults under those contracts.
Q. You've described how chaotic it was that week, haven't you?
A. Yeah.
Q. And you've described the situation in Lehman itself upon your arrival there, in terms of the people, their operations and their systems being down; do you remember that?
A. Yes, I do.

113

**Page 114**

1  Q. Was there -- and you described the melting iceberg which

2  you dramatically reviewed with the Court that important evening

3  of September 19th. It's 2010 now but that ice cube was melting

4  in September of 2008, wasn't it?

5  A. I would say with some speed.

6  Q. Was there time for an integration analysis for Barclays

7  and Lehman as in an ordinary merger, to sit down and see how

8  these business could be merged?

9  A. This was not an ordinary transaction in any sense of the

10  word.

11  Q. Was there any time --

12  A. Can I finish?

13  Q. I'm sorry; yes, sir.

14  A. This was, as I said before, the most hectic, difficult

15  transaction I've ever been involved in, different from any

16  financial crisis, maybe 10,000 more difficult than the Refco

17  case in terms of a transaction.

18      In the context that this was not peculiar to Lehman, we

19  were in an economy which was going through the floor and that's

20  why the federal government was actively involved.

21  Q. And there was precious little time to do a synergistic

22  review of what contracts would be assumed, if those contracts

23  could even be identified and located, correct?

24  A. I believe that to be correct.

25  Q. There was no way to know what the number for cure would be

**Page 115**

1  in the amount of time available to negotiate the sale that

2  week.

3  A. My recollection is, there were thousands of contracts that

4  had to be reviewed. We want to set up a process that would not

5  be a tremendous burden on the court, where parties would, in

6  effect, negotiate whether the contract should be assumed,

7  cured, defaults waved, etcetera, and there was a process that

8  was being set up, almost like an EDR process.

9  Q. No one knew what contracts would be assumed?

10  A. On the 19th and over the weekend certainly not.

11  Q. And no one knew, on the 19th or over the weekend, whether

12  Barclays would get a bargain from the vendor on any of those

13  contracts?

14  A. That's correct.

15  Q. So there was, it's fair to say, a wide range of what

16  Barclays would choose to do and expend between some number and

17  1.5 billion, correct?

18  A. Could be.

19  Q. Okay. You were not concerned, I think you've indicated

20  already, with what Barclays ultimate accounting treatment for

21  cure payments would be, is that right?

22  A. I didn't have any major concern about that. The -- how

23  you treat things for accounting purpose always mystified me.

24  Q. In fact, you generally considered Barclays' accounting

25  irrelevant to what you were doing with your colleagues that

**Page 116**

1  week?

2  A. I don't think accounting for negative good will was a

3  particularly important thing.

4  Q. And with respect to the two billion dollar estimate of

5  exposure for both bonus and severance, which you addressed

6  briefly, that number could be known with precision either

7  because it wasn't known how many employees would accept at

8  Barclays or how many would terminate and for those accepted how

9  long they'd be there.

10  A. I think I testified to that.

11  Q. You were asked earlier about discussion of whether to take

12  the clarification letter back to court on the evening before

13  the closing was completed, Sunday night, do you remember that?

14  Subject earlier in the --

15  A. Over the weekend there was a discussion about that.

16  Q. Yes, over the weekend.

17  A. Yes.

18  Q. Now in April of 2010 our economy is a different place then

19  it was, as you described the economy in the circumstances of

20  Lehman in September 2008, correct?

21  A. Is the economy different now?

22  Q. Yes.

23  A. Then it was back in September of 2008?

24  Q. It's much improved, isn't it?

25  A. I guess you can say so. I think the president might say

**Page 117**

1  so.

2  Q. On April 9th, movants said to this Court that it was an

3  egregious mistake for Weil Gotshal and other lawyers involved

4  in Lehman, not to bring the clarification letter back to the

5  Court.

6      MR. GAFFEY: Misquotes the papers, Your Honor

7      MR. SCHILLER: "Egregious mistake" is in the

8  transcript, Judge.

9      MR. GAFFEY: Those two words are in it but not as Mr.

10  Schiller just read it, Your Honor

11      THE COURT: Right. It's a misleading question then.

12  Why don't you rephrase it?

13  Q. If my friend referred to the decision not to bring the

14  clarification letter back as a mistake what is your view of

15  that?

16  A. The issues was whether there was any material change in

17  the basic transaction which had been presented to the Court.

18  And after discussion a number of people including, I think, the

19  creditors' committee representatives who where there the

20  conclusion was there was no material change that required going

21  back to the Court.

22      In fact, as late as, I think, two months after the closing

23  in a meeting with the attorneys for the creditors' committee

24  the question was raised again and the issue, which was

25  discussed, I think his name Matthew Barr, a partner of Milbank,

# Exhibit D

1

```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)
- - - - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.
               Debtors.
- - - - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS INC.
               Debtor.
- - - - - - - - - - - - - - - - - - - - - -x
               United States Bankruptcy Court
               One Bowling Green
               New York, New York

               April 30, 2010
               9:40 AM

B E F O R E:
HON. JAMES M. PECK
U.S. BANKRUPTCY JUDGE
```

**Page 26**

1   agreed that title and interest in the purchased assets would
2   transfer as of 12:01 a.m. the day of the closing?
3   A. I'm not sure I can remember that detail.
4   Q. If you could turn to Movants' Exhibit 1, please, and in
5   particular, to page 15. If you take a look at the paragraph
6   titled 4.1 Closing Date. Do you see that? And the last
7   sentence. It says, "Unless otherwise agreed by the parties in
8   writing, the closing shall be deemed effective and all right,
9   title, and interest of seller to be acquired by purchaser
10   hereunder shall be considered to have passed to purchaser as of
11   12:01 a.m. time on the closing date." You see that?
12   A. Yes, I can see that.
13   Q. And you are aware of no agreement by the parties in
14   writing to the contrary, sir, are you?
15   A. I've got no recollection of such agreement.
16   Q. Okay. With respect to the assets that had been acquired,
17   the financial assets --
18     MR. TAMBE: And if we could go back to 579, please.
19   Q. Please, Mr. Clackson, feel free to go back to 579 which
20   was the acquisition balance sheet we were looking at. Putting
21   aside the JPM component, the cash of seven billion, the other
22   inventory that is talked about there -- there was substantial
23   amount about inventory that had come over Thursday night,
24   correct, as part of Barclays taking over the Fed repo, correct?
25   A. I think, as I said earlier, I wasn't in New York. I think

**Page 27**

1   it did come in dribs and drabs through the week. I don't know
2   exactly how much came when.
3   Q. Well, you knew that you had a substantial -- so you had
4   substantial possessions in Barclays' books by the Friday the
5   19th, correct?
6   A. I knew that we were taking on all these long positions.
7   Physically, what had been delivered and when that was
8   physically delivered, I don't know. But I knew we were exposed
9   to now, as I said, a transaction where we just were taking on
10   long positions, yes.
11   Q. And you were aware with respect to the long equity
12   positions which were approximately eight billion dollars of
13   long equity positions, correct?
14   A. Yes. Specifically, I was very aware of that.
15   Q. And in fact, the markets, with respect to those eight
16   billion dollars of long equity positions moved significantly in
17   Barclays' favor on Friday the 19th, correct?
18   A. Yes, the equity market rallied significantly on Friday,
19   you're right.
20   Q. If you could turn to M-230, please. Movants' 230.
21     MR. TAMBE: And if you could just blow up that e-mail,
22   please. Actually, the entire text, really.
23   Q. This is an e-mail chain. That's you at the top of the e-
24   mail chain corresponding with Lee Guy. Do you see that?
25   A. Yes, I can see that.

**Page 28**

1   Q. And then further down, there are other e-mails between Lee
2   and you. Do you see that?
3   A. Yes.
4   Q. And he makes a reference at the bottom of the page to the
5   eight billion dollars long equity position. Do you see that?
6   A. Yes, I can see that.
7   Q. Okay. Now, you respond to him in your e-mail where you
8   say trade date is Monday, completion 7 a.m.
9   A. Yes, that's correct.
10   Q. All right. And that was your anticipation as of Sunday
11   the 21st as to when the actual documents would be signed --
12   A. Yeah.
13   Q. -- the paper closing, correct? And Lee Guy writes back
14   to you and says "I thought valuations were agreed for an earlier
15   date." Do you see that?
16   A. Yes, that's correct.
17   Q. Okay. And then you respond by saying, "Yep, so we made a
18   load." Do you see that?
19   A. Yes, I can see that.
20   Q. So you don't disagree with Mr. Guy that valuations were
21   agreed for an earlier date, do you?
22   A. It's -- no, I don't disagree. It's a kind of strange e-
23   mail in that way because -- yeah, I don't disagree, but you're
24   right.
25   Q. You have no reason to doubt that you sent this e-mail, do

**Page 29**

1   you, sir?
2   A. No, no, I don't. No, I don't. It's my e-mail.
3   Q. Okay. All right. And you go on to say, "Yep, so we made
4   a load." Do you see that?
5   A. Yes, I can see that.
6   Q. And you're referring to the load that Barclays made on the
7   long equity positions?
8   A. Yes, sir, because the equity market rallied and because I
9   knew we had a long equity eight billion position, I thought we
10   made money on those equities moving up in market value on the
11   Friday.
12   Q. Okay. How big was that load?
13   A. I've got no recollection. I think because we hadn't
14   booked all the equities and we had the high level information
15   that we had eight billion equities, we knew the S&P had
16   rallied. And therefore, we said we should have made some money
17   because the S&P had rallied. I don't know if we have a detail
18   of how much that was. I can't recall any specific numbers.
19   Q. 200 million?
20   A. As I said, I can't recall.
21   Q. 400 million?
22   A. As I said, I've got no recollection.
23   Q. All right. Let's go back to 579, please. By the way, on
24   Friday the 19th, you didn't get an e-mail saying we've lost a
25   bundle on the nonequity positions, did you, sir?

**Page 30**

1    A.  No, I don't --
2    Q.  No such e-mail, sir.
3    A.  -- I can't remember such an e-mail, no.
4    Q.  So going back to 579, we had talked about the net assets,
5    and then we talked about the negative goodwill number on that
6    acquisition balance sheet of 2.98.
7    A.  Yes, that's correct.
8    Q.  In the board presentation that had been made earlier in
9    the week to Barclays' board, the board had been told the
10   expected negative goodwill from the transaction would be three
11   billion.  Do you remember that?
12   A.  Yes, I think that was the number.
13   Q.  So this is coming in a little shy of that negative
14   goodwill?
15   A.  Yes.
16   Q.  And in part, that negative goodwill is at 2.98 because
17   you've got a 2.83 billion dollar negative adjustment on the
18   financial assets, correct?  That's the math.
19   A.  Yeah.  The math, the 2.98 reflects everything above it in
20   the balance sheet.
21   Q.  Okay.  How did that go down -- how did that 2.98 number go
22   down with your boss, Rich Ricci.
23   A.  I can't remember.  As I said, we had lots of acquisition
24   balance sheets.  And some showed higher negative goodwill, some
25   showed lower.  I think, generally, we wanted a number as high

**Page 31**

1    as possible.  So it was lower, probably went down badly; when
2    it was higher, it went down well.  That was generally the
3    reaction.
4    Q.  And if we turn to Movants' 580, we can see one of his
5    reactions to this number.  And if you can turn to the second
6    page of that exhibit, you'll see that last e-mail --
7    A.  Sorry, exhibit --
8    Q.  M-580.  And you can compare to what you have on the
9    screen, just to make sure you have the right document.  Are you
10   there, sir?
11   A.  Yes.
12   Q.  Okay.  So if you look at the second page of Exhibit 580,
13   that last e-mail is the e-mail that was the cover e-mail on the
14   acquisition balance sheet, 579, that we were looking at,
15   correct?
16   A.  Yes.  It appears to be the same.
17   Q.  So this is an e-mail chain that starts off with that
18   message, and there's a series of back and forths.
19   A.  Yes.
20   Q.  And in corresponding with Mr. Ricci with respect to that
21   balance sheet, you say in the next e-mail up in the chain, "So
22   some things we have to keep working on to squeeze out what we
23   can, but looks more like 3 to 3.5 rather than 4 plus.  Basic
24   issue is outside repo, not enough assets."  Do you see that?
25   A.  Yes, I can see that.

**Page 32**

1    Q.  And in part, the valuation of the repo assets is being
2    driven by what Mr. King is doing, in terms of his valuation
3    exercise, correct?
4    A.  Yes.  So he's going to fair value the assets.
5    Q.  And go on the first page of 580.  There's discussions
6    about other points, but the third e-mail from the top is from
7    Mr. Rich Ricci to you.
8    A.  Yeah.
9    Q.  And he says, "Need to get to four or no write-down
10   capacity."  Got a typo in his e-mail, but it's write-down
11   capacity.
12   A.  That's correct.
13   Q.  And you understand that as a reference to write-down
14   capacity.
15   A.  Yeah.  I think what I said in my deposition is the same
16   thing.  Precisely what he meant, you should ask Mr. Ricci
17   exactly what he meant by that.
18   Q.  You had no idea what he meant by that?
19   A.  I think, as I said before, he was trying to get to as
20   large a number as possible.
21   Q.  What's he trying to write-down?
22   A.  But in terms of exactly what he's talking about, yeah, I
23   can't recall exactly, and you should talk to Mr. Ricci.
24   Q.  I'm sure we will.  What did you do in response to that
25   statement or observation from Mr. Ricci, "Need to get to four

**Page 33**

1    or no write-down capacity"?  Well, if you didn't understand
2    what he meant, you probably didn't know what to do, right?
3    A.  Yeah -- no.  I mean, as I said, we were looking at
4    everything, and yes, we obviously wanted as large a number as
5    possible.
6    Q.  Let's go to Movants' 229, please.  Are you there, sir?
7    A.  Yes.
8    Q.  And that's another iteration of the acquisition balance
9    sheet, this one dated the 24th of September.
10   A.  That's correct, yes.
11   Q.  The day after Mr. Ricci stating need to get to four or no
12   write-down capacity, right?
13   A.  Was that on Tuesday?  Yes --
14   Q.  Take a look.  It's Exhibit 580.
15   A.  Yes.
16   Q.  And if you look at the negative goodwill number on
17   Movants' 229, there you have Mr. Ricci's number:  4.47 negative
18   goodwill.  Do you see that?
19   A.  I don't think it's Mr. Ricci's number, but I can see we
20   have a higher negative goodwill number.  I mean, as I said, and
21   you can see from the footnotes here, there's huge confusion as
22   we were trying to work out what we had.  People were doing the
23   work to try to work out what the different pieces were, and I
24   think you can see on this balance sheet, there were a
25   significant number of items which have moved on the balance

1  sheet. I haven't done a map, but as we went through time,
2  stuff was changing.
3      Q.  Well, I took a look to see, kind of, what had changed over
4  the course of that day.  And if you look at this acquisition
5  balance sheet, Movants' 229, take a look at the valuation
6  adjustment.  That's Mr. King's number, correct?
7      A.  Sorry, I can't --
8      Q.  It may be a little bit better on the screen.
9      A.  Sorry, it's very vague on my monitor.
10         MR. TAMBE:  Do we have a native version of this?
11  Could you pull that up, please?
12         With your permission, Your Honor.  We're asking to
13  pull up the Excel version of this document.
14         THE COURT:  All right.
15         MR. TAMBE:  It might be easier to read.
16         THE COURT:  That leads to a question in my mind, and
17  this is really a question in general application.  I noticed it
18  in reference to Exhibit 45N which is Exhibit 45 in native form
19  How are these electronic documents separately in evidence?  Is
20  it simply part of the record that you have referred to them and
21  that they've been used in questioning?  Or do I have physical
22  versions of them to refer to if I need to?
23         MR. TAMBE:  If you don't already have physical
24  versions of these, you will have a CD with the Excel files on
25  them --

34

1         THE COURT:  All right.
2         MR. TAMBE:  -- with the metadata.
3         THE COURT:  Fine, thank you.
4         MR. TAMBE:  Thank you, Your Honor.
5         Do we have that on Excel?  Maybe we don't.
6      Q.  Are you having trouble making out that writing, sir, the
7  valuation, BoNY Thursday close, and below that, valuation
8  adjustment, 1.38?
9      A.  Yes, it looks like 1.38.  That's what it looks like.
10      Q.  So the day before, two days before, it was 2.83 --
11      A.  Your question was is that Stephen King's adjustment.
12      Q.  Yeah.
13      A.  I was just trying to -- yeah, this doesn't say here that
14  it's Stephen King's adjustment.  So I don't know why that
15  number changed and I don't know what -- I don't know this is
16  Stephen's latest adjustment or not.
17      Q.  Well, other than Mr. King, are you aware of any other
18  trader at this point in time who is providing valuation
19  adjustment inputs on the acquisition balance sheets, sir?
20      A.  I wasn't aware.  I'm just saying that it doesn't say here
21  that this is Mr. Stephen King's adjustment.
22      Q.  Okay.  So either Mr. King or someone else changed the
23  valuation adjustment of 2.83 down to 1.38, and that is the main
24  driver that pushes the negative goodwill number over 4.47, do
25  you see that?

35

1      A.  Yes, I'm -- as you said, there were many versions of this
2  document, and I know as well as the traders who were doing the
3  marking exercise, we also had people like people working in the
4  control group who were also trying to do a bottom-up booking
5  the trades exercise.  So I don't know, is what I'm saying, if
6  this is Stephen King's number or coming from somewhere else
7  like the product control group.
8      Q.  Well, on the 24th of September, sir, you are aware that
9  the PCG group was just getting its process underway, correct?
10  It took them months to get that done.
11      A.  Yeah.  It took them a long, long time.  I don't know
12  this -- but all I'm saying is I just don't know the source of
13  that number.
14      Q.  So you're guessing.  You're guessing it might have been
15  PCG.
16      A.  Or I'd be guessing it was Stephen King.
17      Q.  But at this point in time in September 2008, you're not
18  aware of anyone other than Stephen King who has been providing
19  input on the valuation adjustments on these acquisition balance
20  sheets, correct?
21      A.  I think all I'm saying is I don't know where that came
22  from.  I -- Gary Romain would have a better idea, I think, than
23  I would about precisely where that came from.
24      Q.  And knowing Gary, as you do, and having him as your head
25  of technical accounting, Gary wouldn't just make up that

36

1  number, correct?  He wouldn't put that number in there unless
2  someone gave it to him --
3      A.  I think Gary --
4      Q.  -- a trader gave it to him.
5      A.  -- Gary would have some source where he got that number
6  from, yes.
7      Q.  Can we next go to M-668?  And this is another cover e-mail
8  with another acquisition summary balance sheet -- or,
9  acquisition balance sheet attached to it.  Do you see that?
10      A.  Yes, I can see this.  This looks like it's a week or so
11  later.
12      Q.  Yeah, we're into early October, now.
13      A.  Yes, right.
14      Q.  And there's a cover e-mail at the bottom of that e-mail.
15  This is from you to James Walker and others, do you see that?
16      A.  Yes.
17      Q.  And the subject line reads, "Need the latest on
18  acquisition balance sheet ASAP."  And you continue to say "and
19  all areas where we may have upside.  Looks like we will need a
20  current JP offer is one billion cash and six billion
21  securities, which Stephen values at 4.3 billion."  Do you see
22  that?
23      A.  Yes, I can see that.
24      Q.  Right.  And so this is a reference to the conversion of
25  the seven billion dollars of cash into something different from

37

**Page 66**

1  Q. It was important, was it not, to alert the members of the
2  audit committee to any conditions or contingencies associated
3  with this provisional balance sheet?
4  A. Yes, that's correct.
5  Q. And it specifically notes "all of the amounts presented
6  above are subject to finalization". Do you see that?
7  A. Yes, I can.
8  Q. And then it says, specifically, "in particular, the
9  following are of note". Do you see that, sir?
10  A. Yes, I can see that.
11  Q. Now, I invite your attention to note 2. You will see that
12  note says "the release of this deposit is subject to SEC
13  approval".
14  A. Yes, I can see that.
15  Q. And that specifically refers to an item that is the third
16  asset listed at the top of the page under financial assets,
17  specifically, cash deposit, 15 C3. See that, sir?
18  A. Yes, I can see that.
19  Q. And that was your best understanding at the time of this
20  report to the audit committee, approximately a month after the
21  closing of the transaction; isn't that correct?
22  A. Yes, it's correct.
23  Q. And this is the report that was made to Barclays' audit
24  committee on or about that date.
25  A. Yes, that's correct.

**Page 67**

1  Q. Thank you, sir.
2  MR. MAGUIRE: No further questions.
3  THE COURT: Thank you. No questions from the
4  committee? We'll take a morning break before getting to Mr.
5  Schiller's questioning, and we'll resume at about 11:10.
6  (Recess from 10:59 a.m. until 11:14 a.m.)
7  THE COURT: Be seated, please.
8  And you may proceed, Mr. Schiller.
9  MR. SCHILLER: Thank you. Good morning, Your Honor.
10  CROSS-EXAMINATION
11  BY MR. SCHILLER:
12  Q. Good morning, Mr. Clackson.
13  MR. SCHILLER: May we distribute the thin books,
14  please? I apologize. We should have done that right now. My
15  mistake.
16  (Pause)
17  THE COURT: Thank you.
18  THE WITNESS: Thank you.
19  (Pause)
20  Q. Good morning --
21  A. Good morning.
22  Q. -- Mr. Clackson. How are you?
23  A. Good, thank you.
24  Q. In your examination earlier this morning, you were shown
25  an e-mail and asked about the success Barclays had on Friday of

**Page 68**

1  that week, the 13th through the 22nd, in terms of the equity
2  markets turning and some gains being anticipated. Do you
3  remember that?
4  A. Yes, I remember that.
5  Q. And you had an e-mail about making a load, or something
6  like that. Do you recall that?
7  A. Yes, I recall that.
8  Q. Would you compare for the Court that aspect of the private
9  equity issue you were reviewing in the e-mail, with the early
10  morning call that you participated in, which you testified
11  yesterday with respect to being incredibly frightened about a
12  possible huge loss based on what your people were seeing in the
13  assets that were coming over Thursday night and Friday through
14  this repo?
15  A. Yeah. So as I said, the call when I was working up in the
16  middle of the night when I realized we were paying out forty-
17  five billion dollars in cash and we were getting some assets,
18  some of which we'd never seen before and we didn't know the
19  value of them, and at that point we were terrified because we
20  thought we could have a huge shortfall, as I said yesterday I
21  think. So rather than realize an accounting gain, we could
22  realize a huge accounting loss, substantially.
23  There's a huge amount of ups and downs in that period, as
24  probably I think the trail shows, that we were terrified. We
25  heard some good news, we felt a bit better, then we heard some

**Page 69**

1  bad news. There were quite significant mood swings over that,
2  you know, twenty-four/forty-eight hour period.
3  Q. And as a result of the bad news in the morning, what did
4  your colleagues do here in New York with Lehman?
5  A. So my understanding is that they got some of the Lehman
6  people together to try and make sure they could and -- because
7  a lot of the assets we thought originally in the deal we were
8  acquiring had been encumbered. So other people who'd
9  securitize them had taken those assets away, so they were no
10  longer being able to deliver. We were trying to find, in terms
11  of the business we were buying, whether there were other
12  unencumbered assets in that business, and trying to identify
13  those unencumbered assets, to make sure that it was clear than
14  that we understood all the assets which were covered in the
15  deal of the business we were acquiring.
16  Q. And there were some securities your colleagues told you
17  they were having trouble valuing, is that correct?
18  A. There are a number of different cases where people were
19  having trouble valuing securities. Some were because, as we've
20  talked about, we did that extensive exercise earlier in the
21  week on the Monday when we went through all the securities. We
22  had new securities coming from the Fed. And it wasn't one or
23  two or three; it was, my understanding, lists of thousands of
24  securities.
25  And as I think I said earlier today or yesterday, some of

1  these were own label Lehman securities, so they were one-off
2  securities which had been manufactured by Lehman to get funding
3  and placed in the Fed. And in terms of those securities, to
4  value them you couldn't just go and find a price or see where
5  are they trading in the market. You had to do fundamental
6  analysis to try and find out what was underlying the security
7  and what value, if any, that had.
8      Q.  Do you recall being told the magnitude of the issue in
9  terms of whether it was billions of dollars of concern over
10 values that Friday morning?
11     A.  I can't recall any specific numbers, but my recollection
12 was the level of anxiety we had, as I said, was in the
13 billions. So it was more than wiping out any accounting gain
14 we thought we made.
15     Q.  You testified earlier this morning on the subject of
16 negative goodwill, that you wanted as large a negative goodwill
17 number on your acquisition balance sheet as you could achieve.
18     A.  Yes, that's correct.
19     Q.  And why is that?
20     A.  I suppose we wanted to realize the largest accounting gain
21 we could for our financials and because it helped our capital
22 position. And as I said earlier on, capital was an extremely
23 scarce commodity. If we had a larger accounting gain, the
24 accounting gain goes into the capital calculation.
25     Q.  And did you maintain the view of wanting as large a

70

1  negative goodwill number through the filing of your balance
2  sheet in February of 2009?
3      A.  Yes, that's correct.
4      Q.  With respect to the valuation of assets, is it correct
5  that the higher the valuation of the financial assets the
6  higher the negative goodwill will be on your accounting balance
7  sheet?
8      A.  Yes. Yes, that's correct, but I suppose I should say the
9  thing I said before. We don't have a choice about the value of
10 the financial assets. The accounting rules are you have to
11 value them at the fair value; so the fair market value. A
12 higher value would give you a higher goodwill, but that doesn't
13 mean we could just choose a higher value. The accounting rules
14 are pretty strict, and we went through a pretty extensive
15 process, as has been discussed earlier, to make sure we got to
16 the fair value.
17     Q.  And the fair values that you got to, were those audited,
18 sir?
19     A.  Yes. In our accounts we had a detailed disclosure of our
20 acquisition balance sheet and of the values of all the assets,
21 breaking down to get the gain. And there was extensive work
22 done by our auditors going through the valuation of those
23 assets to make sure that we were reflecting an appropriate fair
24 value.
25     Q.  Mr. Clackson, let's turn to the subject of cure on which

71

1  you were examined both yesterday and then again this morning.
2  This Court has been told by Movants that it was Barclays' plan
3  to pay in the range of 200 million for assumed contracts, not
4  1.5 billion but 200 million for the assumed contracts, and that
5  Barclays knew this on the 16th of September. Is that accurate?
6      A.  As I think I said earlier, we hadn't done our detailed
7  work at that point in time, so we didn't know what we were
8  going to spend. And what we knew were the estimates we had
9  received from Lehman, and I think the original estimate which I
10 remember was for 2.25 billion I think is what we knew the 16th
11 of September.
12     MR. SCHILLER:  Would you put on the screen the April
13 9th transcript, at page 34, lines 24 through 34.2, please? On
14 page 33, I'm sorry, at lines 12 through 25.
15     Q.  You see it says, line 12:  "Now, with respect to the
16 assumed liabilities, Barclays planned on them. They insisted
17 on a discount and they planned, and the liability numbers being
18 inflated"? Do you see that?
19     A.  Yes, I can see.
20     MR. SCHILLER:  And now go down to line 24.
21     Q.  "Now, what that indicates, it was Barclays' plan to pay in
22 the range of 200 million for assumed contracts --"
23     MR. SCHILLER:  Over to the next page.
24     Q.  "-- not 1.5 billion as the Court had been told, and that
25 they, Barclays, knew this on the 16th."

72

1      Is that accurate, sir?
2      A.  No. As I've said, I don't think that is accurate, because
3  I don't think on the 16th we knew what we were going to spend.
4      Q.  When you were informed of the 1.5 billion number on --
5  later on Friday the 19th, which you've testified about earlier,
6  did you have any understanding as to how Lehman derived that
7  number that it presented to the Court?
8      A.  No, sir. I didn't have any understanding of how Lehman
9  derived the original number of 2.25 billion or the subsequent
10 number of the 1.5 billion.
11     Q.  And I believe your testimony is that, over the weekend,
12 information started coming in?
13     A.  Yes. That was my understanding.
14     Q.  And the mission critical element of that, when did that
15 come in, do you know, those contracts that were needed to begin
16 the business on Monday, and continue it Saturday and Sunday
17 actually?
18     A.  So my understanding is that there was a list of mission
19 critical contracts which, as I said this morning, I understood
20 had been pulled together by Lehman, because they understood the
21 business and understood what you needed to keep the lights
22 running, the computers working, et cetera. So they provided
23 that list. And I think, as I said earlier, I thought the value
24 of that list of day one mission critical contracts was about
25 200 million dollars.

73

# Exhibit E

1

```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)
- - - - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.
             Debtors.
- - - - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS INC.
             Debtor.
- - - - - - - - - - - - - - - - - - - - - -x
                   United States Bankruptcy Court
                   One Bowling Green
                   New York, New York

                   May 3, 2010
                   9:04 AM

B E F O R E:
HON. JAMES M. PECK
U.S. BANKRUPTCY JUDGE
```

## 138

1   important. I'm being asked about modeling, was I familiar with
2   how Lehman modeled illiquid securities. The answer is yes.
3   You're asking me now -- you're trying to take this and say on
4   that date was I sure that they were up to date. For my own
5   securities that I was responsible for, that I signed Sarbanes
6   Oxley for, I was comfortable. But in that market it was still
7   difficult to be very accurate, particularly with respect to
8   illiquid securities.
9       And I think the testimony I gave earlier is identical to
10  what I gave here. You've just taken I think part of it out of
11  context, and there should be other places in the deposition
12  where the very question you asked me I was asked and I answered
13  in the very same way.
14  Q.  And as a general proposition in its dealings with Barclays
15  on -- in the week of September 15th, it was Lehman's position
16  that the marks on the Fed collateral were accurate marks,
17  correct?
18  A.  Yes.
19  Q.  And that the value of the securities was consistent with
20  the marks on the securities, correct?
21  A.  That was our position, yes.
22  Q.  Okay. And the result of that would be that the -- there
23  would be a difference between the marks on the securities and
24  the amount that had been advanced under the REPO financing
25  transaction, correct?

## 139

1  A.  That's correct.
2  Q.  And that difference was approximately five billion
3  dollars, wasn't it, sir?
4  A.  That's correct.
5  Q.  All right. Taking you to Friday morning, we started to
6  mention some of the discussions with Barclays. Is it fair to
7  say that there were some issues that had arisen with respect to
8  the transaction by Friday morning that, perhaps, called the
9  transaction into question?
10  A.  That is fair to say. Yes.
11  Q.  And were you involved in discussions with Barclays
12  concerning those issues?
13  A.  I was.
14  Q.  And did the issues involve, among other things, a
15  difference of opinion, with respect to the value of the
16  collateral that Barclays had received when it stepped into the
17  shoes of the Fed under the REPO transaction?
18  A.  They did. What happened was on Thursday night, Barclays
19  began to take in the REPO. And during that night, they were
20  purchasing around 50 billion dollars, face amount roughly, of
21  assets in -- marked on Lehman's books. And they were advancing
22  around 45 billion dollars of cash.
23       Their team in London called and checked certain items that
24  were getting delivered to them by JPMorgan. Some of those
25  items they questioned the value of, and one of them in

## 140

1  particular, they called me. And that led to some concern about
2  the value of that asset, because it didn't -- it wasn't an
3  asset that was marked, to my knowledge, at any regular
4  interval.
5       In addition, on Friday morning, when they looked at what
6  they had, there were a number of other assets in the REPO that
7  they had questions about the marks. And so they challenged
8  Lehman's marks with respect to those assets.
9  Q.  And were they, as part -- oh, I'm sorry. Were you
10  finished?
11  A.  Yes, I am.
12  Q.  I thought I cut you off, sorry. Were they threatening not
13  to close on the transaction as a result of these issues?
14  A.  They were, yes.
15  Q.  And were you involved in various discussions with Barclays
16  concerning the issues that they were raising?
17  A.  I was, yes.
18  Q.  Who from Lehman other than yourself were involved in those
19  discussions?
20  A.  Alex Kirk.
21  Q.  Anyone else?
22  A.  Bart McDade.
23  Q.  Anyone besides the three of you?
24  A.  I believe Mark Shapiro, as well.
25  Q.  And who from Barclays do you recall being involved?

## 141

1  A.  Mike Keegan, Rich Ricci.
2  Q.  Any others from Barclays that you recall being involved?
3  A.  I believe, at least briefly, Mr. Diamond.
4  Q.  And at some point on Friday morning, did you assemble a
5  group of Lehman traders and give them an assignment?
6  A.  I did, yes.
7  Q.  And do you recall the approximate time at which you did
8  that?
9  A.  No, I don't.
10  Q.  Was it -- can you approximate it at all, whether it was
11  first thing in the morning, mid-morning, late morning?
12  A.  The time runs completely together, because I don't believe
13  we went home on Thursday night. The calls that I got from
14  London with respect to some of the assets that were trying to
15  get put into the REPO were middle of the night calls. We
16  scrambled to try to figure out what those assets were.
17      By early Friday morning, I had met with Mr. Kirk and
18  discussed some of the issues that Barclays had, particularly
19  Mike Keegan. I believe, at that point, the hearing may not yet
20  have even been moved. And we knew we had to prepare Mr.
21  Ridings for testimony.
22      So I met with Mr. Ridings, had other conversations
23  involved with their dispute with respect to -- Barclays'
24  dispute with respect to the amount or value of certain of the
25  assets. And then in connection with preparing Mr. Ridings and

1    thinking about the value dispute, I called together a bunch of
2    traders, so I don't have a real accurate reflection of the time
3    as it all ran together.
4    Q. And was the -- did you, in fact, call them together as
5    part of the process of gathering information for Mr. Ridings'
6    testimony?
7    A. Yes, that was the primary purpose.
8    Q. Okay. Where did this -- the meeting of the traders take
9    place?
10    A. I believe it was on the third floor at Lehman Brothers in
11    one of the conference rooms.
12    Q. And do you have any recollection about how the meeting was
13    set up? Was it set up in advance, was it a spur of the moment
14    kind of a thing?
15    A. It was very much spur of the moment. I sat down with Mr.
16    Ridings. I don't recall whether there was someone from Weil
17    Gotschal there or not to review Mr. Ridings' testimony and
18    review the changes to the deal, to discuss the securities, as
19    well as the other assets that were being transferred.
20        I then quickly assembled a number of traders to review
21    categories of positions. I don't recall how many traders, but
22    it was at least ten or fifteen, probably more like twenty, and
23    was doing it with one of the guys who ran hedge fund sales.
24    Q. And you mentioned the meeting that you had with Mr.
25    Ridings. Did Mr. Ridings give you some indication at that

                                                        142

1    analysis that goes along with a disclosure statement. We
2    really tried to look at, you know, what the securities were
3    worth versus what our marks were.
4    Q. And so it's your testimony that the work that you were
5    doing was not intended to come up with a liquidation bid for
6    the collateral?
7    A. No, it was a liquidation bid. It was to sell the assets,
8    you know, over a relatively swift period of time. I didn't set
9    up parameters and say we're putting it on the auction block
10    tomorrow, but to sell securities over a couple of days to see
11    what you could get out of them in the context of the business.
12    Q. And that was the instructions that you gave, in fact, to
13    the traders were to -- well, withdrawn.
14        Have you -- we're going to get into the specifics of the
15    meeting in a moment. But in describing the meeting that you
16    had with Mr. Ridings, have you fully described the impetus for
17    the meeting that you assembled of the Lehman traders?
18    A. I'm not quite sure what your question is.
19    Q. Well, you talked about Mr. Ridings and his need to
20    testify. And after the -- after you had the meeting with Mr.
21    Ridings, you went and called this meeting of traders, correct?
22    A. Yes.
23    Q. And what I was trying to ask you, not very artfully, was
24    whether there were other meetings in which you had participated
25    that also contributed to your decision to call this meeting of

                                                        144

1    meeting about what information he thought he needed for
2    purposes of the hearing?
3    A. I don't recollect a specific discussion. This was an area
4    of law that I'm generally familiar with. And so I was prepared
5    to work with Mr. Ridings to help him get the information he
6    needed for his testimony.
7    Q. And did you have some understanding then based upon your
8    familiarity about the kind of information that Mr. Ridings
9    needed, even though he didn't tell you?
10    A. Yes, I did.
11    Q. And what was your --
12    A. Well, I don't -- excuse me. I don't know that he didn't
13    tell me. I just don't have a specific recollection of the
14    discussion.
15    Q. What was your understanding of the kind of information
16    that Mr. Ridings needed for purposes of his testimony?
17    A. I think he was going to testify that the sale was fair and
18    reasonable. And in order to do that, he had to consider what
19    the alternative sales of Lehman Brothers would look like.
20    Q. And did that include a liquidation value of the assets
21    under consideration?
22    A. It included a sale of all of the securities and all of the
23    other assets and what they would have looked like. We didn't
24    do a liquidation value in the term, the way the term is
25    normally used in bankruptcy court, where you have a liquidation

                                                        143

1    the traders.
2    A. No. It was coming out of my meeting with Barry.
3    Q. Okay. So the meeting with Barry was the, I think you said
4    was the primary impetus of --
5    A. Yes.
6    Q. -- the calling of the meeting of the traders?
7    A. Yes.
8    Q. Okay. And you mentioned Mr. Ricci of Barclays. Was he
9    present at Lehman's facility on the morning of the 19th?
10    A. He was at the facility, he wasn't at that meeting.
11    Q. And had you met with him earlier in the morning prior to
12    calling the meeting of the traders?
13    A. I don't think I met with Mr. Ricci that -- before that
14    meeting, and I was only in one meeting with Mr. Ricci around
15    that time.
16    Q. All right. How about Mr. Keegan, was he -- did you meet
17    with him shortly in advance of calling the meeting --
18    A. No.
19    Q. -- of the traders?
20    A. No. This was a meeting with our financial advisor, our
21    expert, just Lehman people. And there was nobody from
22    Barclays. This was on the third floor. The people from
23    Barclays were on the 31st floor. This was on the trading
24    floors, bringing guys in and telling them what we want them to
25    do. And it wasn't a formal meeting as we're sitting here in

                                                        145

**Page 146**

1  this court. It was guys standing up and saying this is what we
2  need and we need it fast.
3  Q.  And was it you who did the selection of the traders that
4  you assembled for purposes of this task?
5  A.  I don't believe I actually picked the individual traders.
6  I think that was Peter Hornick.
7  Q.  I'm sorry?
8  A.  Peter Hornick.
9  Q.  Peter Hornick picked the traders.  And did Mr. Hornick
10  notify the traders that the meeting was going to occur?
11  A.  Literally ran around the floor and grabbed guys off their
12  desk and said, come with me.
13  Q.  And is it fair to say that the purpose of the gathering of
14  the traders was to have the traders provide values for certain
15  assets?
16  A.  It was, yes.
17  Q.  And were those assets the assets that constituted the REPO
18  collateral?
19  A.  They really weren't, because I didn't have the full deck
20  of what was in the REPO collateral.  They were categories of
21  assets that were in the Fed collateral.  So they went from
22  things like agency debentures, to pass through certificates, to
23  CMO equity even.  So all kinds of different securities that
24  otherwise would have made their way into the Fed REPO.
25  Q.  So was the base that you were working with then the --

**Page 147**

1  what you understood to be the Fed collateral, the Fed REPO
2  collateral?
3  A.  Didn't hand out a sheet to anybody.  We simply asked them
4  to look at those categories of assets that we believed were
5  involved in the trade and get a sense of where the market had
6  moved and how they would do if they were trying to sell those
7  assets, whether they -- if the market was very liquid, they
8  could sell it this afternoon, if it wasn't so liquid, it could
9  take a couple days.  But to move both the type of asset and the
10  size position that they had through the market.
11  Q.  And did you give the traders a specific assignment?
12  A.  That was the assignment I gave them.
13  Q.  Okay.  And it was you that gave them the instruction,
14  correct, not anybody else?
15  A.  That's correct.
16  Q.  You personally gave the instruction to the traders?
17  A.  I'm sure Peter amplified it, but I gave it in at least the
18  first instance.
19  Q.  And it's true, is it not, that the assignment that you
20  gave to the traders was to determine what the appropriate
21  liquidation bid would be with respect to the collateral?
22  A.  To their various securities.  But liquidation bid the way
23  you're using it, is just selling the securities over a short
24  period of time.  You're not looking to sell them all to one
25  buyer, you'll get killed.  In the context of your market and

**Page 148**

1  the securities that you trade, how much of a hit to your mark,
2  how much of an adjustment to your marks would you realize if
3  you had to sell it in the market during that week.
4  Q.  And the term liquidation bid with respect to the
5  collateral was, in fact, part of the instructions that you gave
6  to the Lehman traders; was it not, sir?
7  A.  I don't really know.
8  Q.  All right.  Let me --
9  A.  I may well have used that term.  I don't know.
10  Q.  Okay.  Let me direct your attention, if I could, to page
11  257 of your deposition.  And there's kind of a long question
12  and answer there.  Why don't you take a moment to review the
13  question that starts on line 12 of page 257 and the answer that
14  runs over to the end of page 258.
15  A.  Just so I'm in the right place, your question is, "So
16  what's the next thing that you folks do, that you do
17  personally?"
18  Q.  That's correct, sir, thank you.
19  (Pause)
20  A.  Okay.
21  Q.  And without -- I don't want to take the -- burden the
22  court reporter by reading the entire answer into the record,
23  but it is true, is it not, sir, that you were, in this answer,
24  describing the meeting that you had with the traders and the
25  instructions that you gave to them?

**Page 149**

1  A.  That's correct.
2  Q.  And your instructions included to figure out what would be
3  the appropriate liquidation bid with respect to this
4  collateral, correct?
5  A.  Again, the term here, I'm not quoting from myself, you
6  know, a year-and-a-half ago.  I'm perfectly fine with that bid,
7  and you seemed to be focused -- that term, you seem to be
8  focused on it.  I'll stand by this testimony.
9  Q.  You're not quibbling with the fact that you used --
10  A.  Not at all.
11  Q.  -- the word liquidation bid in your instructions to the
12  traders, are you, sir?
13  A.  I'm quibbling -- I'm not quibbling with the fact that I
14  used the term liquidation bid in my testimony.  I said I may
15  well have used it in my instruction to the trader.  It doesn't
16  have a significance that I'm aware of that would change
17  anyone's view from the more detailed description that I give
18  below.
19  Q.  And you also instructed the traders that the value that
20  you wanted or the values that you wanted them to come up with
21  would be the values that would be attainable if 50 billion
22  dollars of securities hit the market in rapid succession,
23  correct?
24  A.  That's what I was looking for.  I didn't tell them what
25  the gross positions were.  They knew what their own positions

1  were. So each trader knows what his market can bear and what
2  he can handle, and that's what we asked them to determine.
3  They didn't -- each trader didn't have 50 billion dollars in
4  securities. From those categories of assets, the aggregate is
5  50 billion. Some of them were just a couple hundred million or
6  50 million, some of them were multiple billion.
7  Q. So, sir, is it your testimony as you sit here today then,
8  that your description of the assignment to the traders did not
9  include a hypothesis or a parameter that you wanted them to
10  come up with the values that would be -- that what would happen
11  if 50 billion dollars of securities hit the market in rapid
12  succession? Is that your testimony?
13  A. I don't recall telling them about 50 billion dollars.
14  Each trader was told to look at their own positions and look to
15  how those positions would move.
16  Q. And is it your --
17  A. And I'm not sure that would make a difference, but that's
18  what I recollect telling them.
19  Q. Okay. So is it your testimony now then, sir, that the
20  traders were not advised that the collateral that was at issue
21  was the 50 billion dollars of the Fed REPO collateral?
22  A. I think that's similar to my testimony before, yes.
23  Q. So you're -- you deny that that's what the traders were
24  told?
25  A. I don't recollect telling anybody, and there would have

150

1  been no need to tell them about the aggregate. Barry certainly
2  knew about the aggregate. But each trader had to figure out
3  their own positions and knew what they were.
4  Q. Well, let me direct your attention, if I could, to page
5  259 of your transcript, sir.
6  A. Uh-huh.
7  Q. And in particular, to line 5. And there's a question --
8  well, first of all, there's a reference to thirty different
9  people on line 4. Do you see that?
10  A. Yes.
11  Q. Does that refresh your recollection about the number of
12  traders that were involved in the exercise that we're
13  discussing?
14  A. I don't think that -- I don't know that they were all
15  senior traders. There were at least that many people in the
16  room.
17  Q. Okay. And --
18  A. Now I said at least. That might be a little bit of a
19  hyperbole. It was more than fifteen for sure.
20  Q. Okay. So you don't know if it was -- thirty may have been
21  a hyperbole. Is that what you're saying now?
22  A. Yes, I don't know for sure.
23  Q. Okay. So directing your attention, sir, to the question
24  that begins on line 5.
25  "Q. Was there -- did you speak to all thirty or did you

151

1  have a point of contact?
2  "A. Got the senior traders all in a room and said, here's
3  what we need, here's the category of assets that you're
4  responsible for, we're going to come back and circulate, and
5  come back to each of you, and we need a view as to where, what
6  kind of discount you would be forced to take if you were to
7  liquidate these assets in a relatively short period of time."
8  Is that -- that was your testimony, was it not, sir?
9  A. Yes, it was.
10  Q. And is that consistent with the instruction that you gave
11  to the traders?
12  A. Yes, it was.
13  Q. And you told the traders that you wanted a liquidation bid
14  for the assets, correct?
15  A. Again, we can replow this term again. I don't know if I
16  used the term liquidation bid. In our parlance, on Wall
17  Street, when you sell something, you're liquidating it. So how
18  much would it take to liquidate that position, to sell that
19  position.
20  Again, in bankruptcy, liquidation sometimes has a
21  different connotation. For example, a Chapter 7 proceeding or
22  a TIPIC proceeding, we're telling them to -- on their desk, go
23  out and liquidate securities.
24  Q. So your -- is it your testimony then that the liquidation
25  bids that you were seeking were coextensive with the market

152

1  value of the assets? Is that your testimony, sir?
2  A. The liquidation bids I was receiving was coextensive with
3  the market values of those assets, yes.
4  Q. Let me direct --
5  A. We asked them -- yes. We asked them to sell the assets in
6  the market. What would it take to sell your position, to
7  liquidate your position in the context of the market? If you
8  could do it in an hour, do it in an hour. If it takes two
9  days, couple of days. Come back to us and tell us how you
10  would liquidate those positions over that period of time. It
11  does not connote a bid wanted in comp, which is a term of art
12  where a dealer goes out and says I have five billion, everybody
13  come in with your best bid.
14  It connotes selling them within the context of the market.
15  And undersianding the markets at that time, they were very
16  distressed market. So I think the market value and the
17  liquidation value were probably pretty darn close using your
18  terms.
19  Q. So just so that I understand your testimony here. Your
20  testimony is essentially that any disposition of the assets
21  would have reflected a liquidation bid? Is that your
22  testimony, sir?
23  A. Any disposition of the assets? I think it really depends.
24  If you're -- my term liquidation bid is selling your assets.
25  If you're -- if you want to bid to get out of everything in

153

1  large size, if I want to sell a million treasuries even in that
2  week, that probably wouldn't have been very difficult.  If I
3  wanted to sell eleven billion of them, that might have been a
4  little more difficult.
5  Q.  Well, sir, let me direct your attention, if I could, to
6  pay 263 of your -- of the transcript, and in particular, to the
7  question that begins on line 6.  Are you with me?
8  A.  Yes.
9  Q.  Question:
10     "Q.  And to the best of your recollection, what
11  exactly were the words that you said?  I understand
12  the time?
13     "A.  I have no specific recollection of the
14  words.  I can tell you what generally was requested,
15  which is what I already said.
16     "Q.  Okay.
17     "A.  Which was, we went you to provide us with a
18  view as to the liquidation bid for these assets.  If
19  you had to sell the full size in a short period of
20  time, what kind of discount would you need to give the
21  buyers in order to move that assets."
22  Q.  "That full size:"
23  Q.  "To move that full size," I'm sorry.
24  A.  Yes.
25  Q.  And that was the instruction that you gave them?

154

1  with the traders, at which you gave the traders the
2  instructions to come up with the liquidation bid; was it not,
3  sir?
4  A.  That's correct.
5  Q.  And the instructions -- and the people you were meeting
6  with were not bankruptcy lawyers, correct?
7  A.  Not to my knowledge.
8  Q.  Okay.  But what you were asking them for was the kind of
9  information that you knew that Mr. Ridings might be required to
10  present to the Court, to contrast the deal that was on the
11  table to liquidation values?  You knew that; did you not, sir?
12  A.  I did, yes.
13  Q.  And you gave instructions to the traders that were
14  consistent with developing the kind of information that you
15  knew that Mr. Ridings might need for purposes of his testimony,
16  correct?
17  A.  It was in the context of what he might need.  What you
18  have to remember is that we didn't put together a liquidation
19  analysis, as I said earlier, that you'd see in a plan of
20  reorganization.  We're trying to figure out, with the
21  organization in place, how could they sell these securities and
22  what would be the level they got.  And also, the context that
23  we're going through, this discussion that we're having now,
24  exceeds the time of this meeting by ten times.
25  Q.  Well, let me ask you this, sir.  When you met with the

156

1  A.  That was as close as I could remember.  I think I said I
2  didn't recollect the exact words.
3  Q.  And it's your testimony, as you sit here today, that in
4  asking the traders to develop a liquidation bid for the full
5  size of the assets in a short period of time, you are asking
6  them to basically give you market value.  Is that your
7  testimony, sir?
8  A.  No.  I said the full size of their positions.  All right.
9  Not -- and each asset could be different.
10  Q.  Well --
11  A.  Then if a -- there was a very small size in a particular
12  asset, it would move very easily.  If it was a large size, and
13  it would depend on the asset class, it could be much more
14  difficult.
15  Q.  And you mentioned several times Mr. Ridings and the
16  testimony that he was about to give.  And you're trained as a
17  bankruptcy lawyer; are you not, sir?
18  A.  I am, yes.
19  Q.  And you understood that one of the things that Mr. Ridings
20  might be required to do, in defending the sale transaction, is
21  to testify that the asset values that were being achieved
22  through the sale, were better than what would be achieved in a
23  liquidation, correct?
24  A.  The entire sale of Lehman Brothers, that's correct.
25  Q.  And that was the context for the meeting that you called

155

1  Barclays' lawyers over the last couple days, did you talk about
2  the term liquidation bid?
3  A.  Certainly did.
4  Q.  And was that one of the issues in your deposition that you
5  focused on in the preparation sessions that you had with them
6  over the last couple of days?
7  A.  I told them very much what I just told you.
8  Q.  Okay.  And it's true, is it not, that the impetus for your
9  meeting with the traders, was a desire to have from the
10  traders, the kind of information that Mr. Ridings would need
11  for purposes of his testimony?  That's the -- that was the
12  purpose, correct?
13  A.  That's correct.
14  Q.  And you gave them -- it's fair to assume, is it not, that
15  you gave them traders instructions that were consistent with
16  developing that information, right?
17  A.  That's correct.
18  Q.  The traders would not have known without you telling them
19  would they, sir, what kind of information Mr. Ridings was
20  likely to need for purposes of his testimony, correct?
21  A.  I don't believe we gave them the context of what Mr.
22  Ridings was doing or anything to do with what might be needed
23  in court.  We just asked them for those values to help prepare
24  Barry, yes.
25  Q.  I understand that, sir.  But you gave the traders -- you

157

1  told -- whatever you told the traders was intended to give you
2  information that you could then give to Mr. Ridings for
3  purposes of his testimony, correct?
4  A.  That's right.
5  Q.  And what you knew about his testimony was that he might be
6  in a position where he needed to compare and contrast the price
7  that was being paid pursuant to the deal to liquidation prices,
8  correct?
9  A.  I did, yes.
10  Q.  Okay.  And so, when you instructed the traders, you gave
11  them instructions that were consistent with that potential data
12  need, correct?
13  A.  It's a little bit different, because I didn't have a
14  context to just do a complete liquidation as you'd think of a
15  Chapter 7 liquidation, which is a normal bankruptcy context.
16  All I had was the traders and what their marks were versus what
17  they could sell in -- over some period of time.  If you shut
18  the doors and you had Gordon Brothers come in and sell the
19  securities, I had no way to estimate what that value would be.
20  Q.  Well, you had their marks, correct?
21  A.  I had their marks, yes.
22  Q.  And you understood that the marks were intended to reflect
23  market prices, correct?
24  A.  I testified before, generally, that's the case.  We were
25  in a week that no one that I've ever experienced -- certainly a
                                                          158

1  week that I've never experienced in the securities market, and
2  I don't think anyone else had.  And it wasn't just the markets.
3  It was the challenges of the organization.  So there were
4  concerns about those marks.
5  Q.  Well, we'll talk about those concerns in a moment.  But
6  for present purposes, you knew that while there might be debate
7  about the marks, the marks were intended to reflect the prices
8  that the assets were worth if they were sold in the market to a
9  willing buyer and by a willing seller, correct?
10  A.  That's correct.
11  Q.  That was the entire -- that's the entire purpose behind
12  marking to market, correct?
13  A.  I don't think that's the entire purpose, but that is a
14  purpose, yes.
15  Q.  Well, it's the measure of value that is intended to be
16  used in marking to market; is it not, sir?
17  A.  That's correct.
18  Q.  And the -- and there were a set of marks that were in
19  existence at the time that you called this meeting, right?
20  A.  Yes.
21  Q.  And what you were intending to do was to come up with some
22  alternative values that represented what, at your least your
23  deposition testimony indicated, would be a liquidation bid if
24  you were to sell the full size of the position in relatively
25  short order, correct?
                                                          159

1  A.  That's correct.  And that happens, by the way, all the
2  time in the securities business.  You can have a security
3  marked at ninety-five and go to sell it in the market, and it
4  looks like it's ninety-five, but today you can only get ninety.
5  Q.  And by the way, sir, did anyone at Barclays tell you that
6  it was their intention to sell the full 50 billion dollars'
7  worth of -- or whatever billion dollars' worth of assets,
8  constituted the collateral very quickly and all at once?
9  A.  No.  Barclays had nothing to do with this discussion.
10  Q.  Okay.  So Barclays did not tell you that they intended --
11  A.  No.
12  Q.  -- to do some sort of a quick liquidation, a fast
13  liquidation of these assets, correct?
14  A.  They did not, no.
15  Q.  And you knew at the time that you were undertaking this
16  effort with your traders that Barclays would do that,
17  correct?
18  A.  I didn't know exactly what Barclays would do.  I assumed
19  that the only reason they were buying these securities was to
20  use them in the business.  Otherwise, they would have been just
21  as well off and perhaps better off if they had never advanced
22  45 billion dollars against these securities and use that money
23  to capitalize the business.
24  Q.  Well, let me direct your attention, sir, to page 266 of
25  your deposition and, in particular, to the question starting at
                                                          160

1  line 10.  Are you there?
2  A.  Yes, I am.
3  Q.  Question:
4     "Q.  Did anybody at Barclays say that they
5  intended to sell the securities very quickly, very
6  soon, and all at once?
7     "A.  Not that I recall.
8     "Q.  And do you know one way or another whether
9  that's what Barclays actually did with the securities?
10     "A.  I don't know.  Actually, I do know.
11     "Q.  And?
12     "A.  They wouldn't do that."
13     That was your testimony, correct?
14  A.  That's correct.
15  Q.  And you understood, on the morning of Friday, September
16  19th of 2008, that Barclays would not be going out into the
17  market and selling these securities en masse, all at once, very
18  quickly, correct?
19  A.  They could have lost money.  They advanced 45 billion
20  dollars against them.  They would have been insane.  They were
21  -- they had no hedge.  Nobody would have done that, to just
22  sell them the next day.  You'd lose money.
23  Q.  And so, you knew that they wouldn't do that, correct?
24  A.  Yes.
25  Q.  It was not their --
                                                          161

# Exhibit F

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 08-13555-jmp
- - - - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS HOLDING, INC., et al.,

        Debtors.

- - - - - - - - - - - - - - - - - - - - - -x

            U.S. Bankruptcy Court
            One Bowling Green
            New York, New York

            May 4, 2010
            9:35 AM

B E F O R E:
HON. JAMES M. PECK
U.S. BANKRUPTCY JUDGE

**Page 18**

1  bring up a modeling team, and model hundreds of securities.
2  Q.  That was very -- it was very busy that morning.
3  A.  It was crazy.
4  Q.  It was very hectic that morning.
5  A.  Indeed.
6  Q.  Had you slept the night before?
7  A.  I don't believe I did.
8  Q.  Did you leave the meeting with Mr. Keegan and perhaps Mr.
9  Ricci?
10  A.  The meetings moved in and out of different rooms.  And so
11  there wasn't one big meeting.  It was a very fluid situation.
12  So initially, when I went up to meet Mr. Keegan, he complained
13  about Archstone, Spruce, Pine, Verano, mentioned the RACERS.
14  would run back to my desk and get some underlying data out --
15  admittedly, some of it was dated on my desk because I was just
16  pulling it off, and this was before many people were at the
17  office -- to walk through with him some of the underlying
18  assets that were in those vehicles and to discuss with him why
19  we thought the values were different than what he thought they
20  were.  But it was a very fluid situation, and I left a number
21  of times.
22  Q.  You mentioned yesterday that you had other
23  responsibilities that morning, and you went on to talk about
24  your assisting Mr. Ridings to prepare for appearing before His
25  Honor later that day.  Before I ask you about that, were you

**Page 19**

1  aware of any resolution with Mr. Keegan that morning, before
2  you went to work with Mr. Ridings, about his concern that the
3  marks were too high and that Barclays was not getting the value
4  that they required for the forty-five billion dollars they'd
5  paid the day before to Lehman?
6  A.  I don't believe that there had been a resolution by that
7  point.  Again, the time sequence is very hard for me to
8  determine at this point, but my recollection was that with Mr.
9  Ridings there, we started thinking about preparing for his
10  testimony just to make sure he had a fluid understanding -- or,
11  fluent understanding, excuse me, of the business and could
12  articulate it.  And then we went about the exercise we talked
13  about yesterday, determining where we could actually sell these
14  assets versus our current marks.  And that meeting, I believe,
15  took place before there was any resolution.  I had left the
16  floor before there was any agreement.  So coming into the
17  Riding -- meeting with Mr. Ridings and subsequent to that,
18  there wasn't complete agreement with Barclays that we would
19  even have a deal.
20  Q.  So when you went to speak with Mr. Ridings about his
21  testimony before His Honor later that day, you were not aware
22  of satisfaction on the part of Mr. Keegan and his colleagues.
23  You had no certainty that the deal would close.
24  A.  I didn't have certainty that the deal would close.  I
25  believe by the time that I actually came down with Mr. Ridings

**Page 20**

1  we had had a general agreement on the terms, and that was the
2  conversation I had with Mr. Burian by phone that are -- some of
3  which is reflected in the notes that were shown to me
4  yesterday.  So I apologize, but the sequence of events is very
5  difficult, but I believe the meetings with Mr. Keegan and Mr.
6  Ricci in the morning, trying to push them into getting the deal
7  done, nervous that -- we were nervous that they might not
8  close, they appeared very nervous to us that they were going to
9  lose money on this deal, meeting with Mr. Ridings, subsequent
10  meeting with Mr. Kirk and Mr. McDade and the rest of the team
11  a call with Mr. Burian as things were changing, and then
12  transportation down here on the subway with Mr. Ridings.
13  Q.  All right --
14  A.  That's probably more than you asked for, sorry about that.
15  Q.  -- let me try to go to a part of that stream, and I
16  understand how, years later, that hectic period flows together,
17  as you testified before His Honor yesterday.
18       Before you spoke with Mr. Ridings, was there time to
19  prepare what you describe as a Chapter 7 liquidation analysis
20  of the sale, of the assets that had come over in the repo the
21  night before?
22  A.  No, and in fact, we didn't try to do that.  We weren't
23  going through a confirmation hearing.  We were going through a
24  very expedited sale hearing.  And so what we tried to do, as I
25  testified yesterday, was to arm Mr. Ridings with some factual

**Page 21**

1  data to augment his experience, which was what our traders
2  thought they could do in a fast period of time to sell and
3  liquidate those securities.  So it wasn't a traditional
4  liquidation analysis, and there certainly wouldn't have been
5  anything that we could have attached to a disclosure statement
6  that would have been the normal standards of this court.
7  Q.  Let me show you Mr. Ridings' testimony about a liquidation
8  sale of Lehman's assets and ask you whether that is similar or
9  different than the liquidation sale analysis that you did and
10  testified about yesterday in preparation for Ridings'
11  testimony.
12       (Video testimony begins)
13  "Q.  If there were no sale approved to Barclays on September
14  9th (sic), did you have a view whether there would be the risk
15  of enormous loss to Lehman?
16  "A.  That is my view, and more so if this transaction didn't
17  happen, I think the repercussions in the financial market would
18  have been catastrophic to a number of other financial
19  institutions.  So the reverberation of a Lehman liquidation
20  would have had a major negative impact on the U.S. capital
21  markets.
22  "Q.  You had past experience with Drexel Burnham and the
23  failure of that investment bank, is that correct?
24  "A.  Unfortunately, yes.  I was a managing director at Drexel
25  when it also went bankrupt.

1    "Q. And did your experience there help inform the views that
2    you held on September 19th as you just described?
3    "A. Yes.
4    "Q. Was it possible to calculate potential losses to Lehman of
5    a liquidation, as of September 19th, with any certainty?
6    "A. I don't think you could have done it with certainty
7    because you would have been making assumptions. But in a
8    financial meltdown of this magnitude, the prices of securities
9    would have dropped by enormous amounts.
10    "Q. And it was your view on September 9th (sic) that a sale to
11    Barclays was superior to any liquidation value?
12    "A. Yes."
13    (Video testimony begins)
14    Q. What Mr. Ridings refers to as a financial meltdown, is
15    that the analysis you undertook?
16    A. No, we didn't go through that. I think -- what you have
17    to -- and again, I don't think I expressed it well enough
18    yesterday, but perhaps it's hard to express. We were trying to
19    come up with best estimates. In these kinds of markets, the
20    analysis that we were doing very, very quickly was how much
21    could you get if you sold your positions in the market over the
22    next couple of days. It assumed that those traders were at
23    their desks, at work, getting paid, selling the positions into
24    the market. We didn't ask them to assume that there was
25    financial Armageddon, meltdown, whatever the terms Mr. Ridings

22

1    the attendant erosion of values." Was that wholesaling dumping
2    the liquidation analysis that you undertook?
3    A. No, it was not. As I explained, it was a fast, quick
4    liquidation of those securities. If they could do it in a day,
5    that would be great. If it took a couple days, that was fine,
6    too. We wanted to know how they could get out of the
7    securities in the best way possible over that short period of
8    time.
9    Q. Let me return to another period Friday concerning the
10    spreadsheet, the prices and the lists of the repo securities
11    that were available to you and to Barclays. And let me ask you
12    to turn to tab 8, Your Honor, of the small book that's in front
13    of you.
14        MR. SCHILLER:  To explain to the Court, that tab 8 is
15    an excerpt from Exhibit 739, Judge, which is this spreadsheet.
16    And rather than put that in the book, I've taken from it a
17    couple of pages to put before Your Honor.
18    Q. Let me first ask you, Mr. Seery, can you identify for His
19    Honor Barclays' Exhibit 739? And you can reference the binder
20    which you have, along with the tab 8 excerpts.
21    A. This document looks very similar to the run of the repo
22    securities that we had on Sunday night at Weil Gotshal, that
23    the committee had, that we had, that Barclays had, as the
24    securities that Barclays received. Obviously, I can't tell
25    with certainty whether these were actually the securities they

24

1    has used throughout his deposition. We didn't seek that out,
2    nor did we provide that kind of information to him. I don't
3    know that you could have.
4    Q.    Let me direct your attention and the Court's to the
5    proffer that was -- of Mr. Ridings' testimony that was offered
6    to Your Honor on September 19th from Mr. Miller, and that's
7    page 141, lines 8 through 10 of the hearing transcript
8        MR. WERDER:  Can we have the question, Your Honor, so
9    we can put it in context as to what this witness is going to be
10    asked about that proffer?
11        THE COURT:  Well, I'm not going to require that any
12    more than I required context for the showing of the Mr. Barry
13    Ridings video excerpt. I trust that there will be a question
14    following a reference to his proffer. It's really more of the
15    same.
16        MR. SCHILLER:  It is a bit more of the same, but a bit
17    different, too; with Your Honor's permission.
18    Q. At lines 8 through 10, Mr. Ridings' testimony was
19    proffered that, "As a result of the experiences at Drexel, he
20    understood the consequences of failure of a major investment
21    bank and the costs in dislocation that occur." And at page
22    146, lines 7 through 10, Mr. Ridings' proffer continued:
23    "Absent the sale to Barclays, counterparties will be required
24    to liquidate their collateral positions which may entail a
25    wholesale dumping of the collateral into the marketplace with

23

1    received, because there's a lot of securities on this list.
2    Q. Do you recall who prepared this spreadsheet?
3    A. My recollection is this was done out of treasury, which
4    was Paolo Tonucci's responsibility.
5    Q. And did you specifically see this spreadsheet on Sunday?
6    A. Did I specifically see it?
7    Q. Yes.
8    A. Yes, I did. I had a copy of it. My recollection,
9    however, is that it was on larger paper, like, legal size so I
10    could read it.
11        MR. SCHILLER:  I offer 739 into evidence, Your Honor.
12        THE COURT:  Is there any objection?
13        MR. GAFFEY:  No objection, Your Honor.
14        THE COURT:  It's admitted.
15    (Spreadsheet Showing Repo Securities was hereby received into
16    evidence as Barclays' Exhibit 739, as of this date.)
17    Q. Now, were the repo positions set forth in Exhibit 739, to
18    your knowledge, reviewed by Lehman and Barclays on Friday?
19    A. They were certainly reviewed by Lehman. Barclays had
20    them; I believe they reviewed them as well.
21    Q. Do you know when they were available to the parties,
22    generally?
23    A. I don't recall when they were avail -- you said Friday? I
24    don't recall exactly when they were available Friday. The
25    documents that we saw Friday morning were much less settled

25

```
 1   than these.  It was more fluid and they were sheets coming in
 2   by the minute.  So I don't recall.  Early Friday morning, this
 3   document was not assembled in this fashion.
 4   Q.  Did Mr. Kirk, at any point Friday, to your knowledge, as
 5   for an analysis of that spreadsheet?
 6   A.  I don't recollect Mr. Kirk doing a separate analysis of
 7   the spreadsheet other than in my discussions with him just
 8   around the -- around the value.  But I don't recollect him
 9   going and getting a separate analysis of this spreadsheet.
10   Q.  In terms of discussions around the value, were there
11   discussions between Barclays and Lehman Friday about the values
12   set forth in that spreadsheet?
13   A.  There were numerous discussions, as the ones I described
14   from the morning, they -- we had disputes around specific
15   positions and the values overall of where they were marked.
16   There wasn't, to my knowledge or my own experience, a line-by-
17   line debate about each of these securities.
18   Q.  You said earlier that you weren't aware when you went off
19   to work with Mr. Ridings of any resolution of the values of
20   these securities as between Barclays and Lehman.  Did there
21   come a time when Mr. Kirk or anyone else informed you of a
22   resolution on Friday?
23   A.  Yes.  I don't recall if it was before we left for the
24   hearing or as we left for the hearing.  But when I was on the
25   phone with Mr. Burian, there were still some loose items,
                                                              26
```

```
 1   before we left for the hearing, but we were pretty close by
 2   that point.
 3   Q.  If I ask you to turn to the third page of tab 8 where it
 4   refers to collateral and market value on a schedule --
 5   A.  Yes.
 6   Q.  Is that a summary of the schedule there?
 7   A.  I believe that's a summary of all of the collateral with
 8   market values marked.
 9   Q.  And was this the approximate values of the securities set
10   forth in the schedule that was presented that day?
11   A.  Yes, I believe I previously testified that my recollection
12   was right around fifty billion dollars, and obviously, this
13   number's right around fifty billion dollars.
14   Q.  And what did Mr. Kirk advise you was the resolution of the
15   negotiations between Barclays and Lehman that day over the
16   current market value or the negotiated market value of those
17   securities in this sale transaction?
18   A.  Ultimately, I believe they reached an agreement.  I wasn't
19   part of the reaching of that agreement, but ultimately, they
20   reached the agreement, around forty-five billion dollars.
21   Q.  Yesterday, I believe you said you weren't clear as to when
22   he informed you of that forty-five billion resolution.  Is that
23   right?
24   A.  That's correct.  As I think I mentioned, I certainly knew
25   it by the time we were in the hearing, and I believe I had
                                                              27
```

```
 1   knowledge of it when I was on the phone with Mr. Burian, or at
 2   least that we were close to that resolution, but while I was on
 3   the phone with Mr. Burian, things were still changing.  So it
 4   couldn't have been completely settled at that point.
 5   Q.  Let me ask --
 6   A.  And so I think it was right around that time.
 7   Q.  Let me ask you to turn to tab 7 in your binder which is
 8   Barclays' Exhibit 679, Your Honor.  And this is an e-mail at
 9   the top from Alex Kirk to you, Mr. Seery, at the very top.
10   Last time is 5:55.  These e-mails begin earlier than that,
11   earlier in the 5 o'clock hour.  But I want to address your
12   attention to the two top exchanges between you and Mr. Seery
13   (sic).  Do you see those?
14   A.  Me and Mr. Kirk, yes.
15   Q.  You and Mr. Kirk.  And you write to Mr. Kirk, Mr. Seery,
16   on this chain of what's going on.  Does that refer to what's
17   going on in court?
18   A.  Yes, it does.  I had my BlackBerry in court.
19   Q.  You had your BlackBerry in court and you wrote this e-mail
20   to Mr. Kirk, "What is the value of the collateral the Barclays
21   posted to the DTC today?"  Do you see that?
22   A.  Yes.
23   Q.  Would you please explain to Judge Peck what that refers
24   to, that posting to the DTC?
25   A.  Yes, first, I would like to point out that while the court
                                                              28
```

```
 1   was in session, I would turn my BlackBerry off so it wouldn't
 2   interfere with the trans -- the telephone.  That -- we were
 3   trying to figure out exactly what the agreement on the value
 4   was to get a reminder of that value of the collateral that
 5   Barclays actually received.  So when I posted to the DTC,
 6   that's their collateral; they've now purchased it as part of
 7   the repo.  And Alex responds to me that I believe the value is
 8   45.5.  I don't know what the marked value is.  So I think the
 9   marked value would be the forty-nine and change that you just
10   showed me.
11   Q.  And what did you understand he meant by the 45.5 value?
12   A.  That's the current market value as opposed to where the
13   marks are.
14   Q.  And is that a market value agreed by the parties?
15   A.  It would have had to have been.  There's no other way to
16   come up with that number because we didn't, as I'd said, remark
17   the entire book.
18       MR. SCHILLER:  May we have Exhibit 650 at page 70 up
19   on the screen.
20   Q.  Yesterday, you were asked about your hand-written number
21   there, 45.5, do you see that?
22   A.  I do, yes.
23   Q.  And you couldn't recall when you wrote it.  Remember that?
24   A.  That's correct.
25   Q.  You mentioned that it wasn't the same as the total, there,
                                                              29
```

| | |
|---|---|
| 1 if the haircut were applied to the Lehman market values. You | 1 quite friendly with Brad. |
| 2 said it was a different number, as much as a billion dollars | 2 Q. In the course of -- you say you had a call with them. |
| 3 different, although you didn't describe that as a significant | 3 Where were you when you placed or they placed the call? |
| 4 amount. Do you remember that? | 4 A. The call on the 30 -- I'm sorry, the call on Friday -- |
| 5 A. I believe it -- 50.6 minus the 6.04. | 5 Q. The 19th, yes. |
| 6 Q. After looking at Exhibit 679, is it possible that you | 6 A. -- I was on the thirty-first floor at Lehman Brothers in |
| 7 hand-wrote that number based on what Mr. Kirk wrote to you? | 7 Mr. Kirk's office; however, he was not in that office. |
| 8 MR. GAFFEY: Objection, Your Honor. Calls for | 8 Q. And who was on the line with you? |
| 9 speculation. | 9 A. On the line with me, I don't recollect everyone that was |
| 10 THE COURT: I sustain the objection simply because | 10 in the room. There was, I believe, a junior -- or, mid-level |
| 11 most anything is possible. And -- | 11 analyst or associate that -- I'm getting that wrong, or senior |
| 12 MR. SCHILLER: Fine, Your Honor. Let me withdraw that | 12 vice president, probably, now -- from Lehman, Brendan Hayes |
| 13 question -- | 13 who'd been working with me on the transaction. I don't recall |
| 14 THE COURT: Right. | 14 who else was in the room, but there were a number of other |
| 15 MR. SCHILLER: -- and ask a different question. | 15 people in Alex's office with me. And then on the line were Mr. |
| 16 Q. Does the review of your e-mails with Mr. Kirk refresh your | 16 Burian, Mr. Fazio, I don't recall if Mr. Geer was on the line. |
| 17 recollection as to whether your hand-written note resulted from | 17 I believe he was. And I believe either Mr. Despins or Mr. |
| 18 any communication with Mr. Kirk that day? | 18 Dunnee were on the line. |
| 19 A. Unfortunately -- or fortunately, it doesn't matter -- it | 19 Q. Did you discuss the repo? |
| 20 really doesn't. I just don't know when I wrote the 45.5. | 20 A. We -- |
| 21 Obviously, the numbers are the same, and the 1.9 is the same as | 21 Q. Did you discuss Barclays' views of the repo assets that it |
| 22 the DTC amount that was referenced and I've referenced before. | 22 had received? |
| 23 But I just don't know when I wrote that on that page. | 23 A. We discussed -- we tried -- what I tried to do was lay out |
| 24 Q. Fair enough. Thank you. Now, you've mentioned Mr. Burian | 24 the entire transaction and how it had evolved. As I mentioned |
| 25 a couple of times in summing up events Friday before court. On | 25 earlier, the transaction had changed. The value of the |
| 30 | 32 |

| | |
|---|---|
| 1 September 19th, Mr. Seery, on behalf of Lehman Brothers, did | 1 securities had dropped significantly over that week. The |
| 2 you keep Mr. Burian and his colleagues up to date on the status | 2 actual securities that were going to be delivered had changed |
| 3 of the sale negotiations prior to the hearing before His Honor? | 3 quite a bit, and we were walking through the structure of the |
| 4 A. I did. I'd started my conversations with the committee | 4 transaction. And certainly, those who know Mr. Burian know |
| 5 before that; because of my personal and professional | 5 that he was asking questions. |
| 6 experiences, I'm friendly with most of the ladies and gentlemen | 6 Q. Did you discuss with them, on that call, in substance, the |
| 7 from Milbank, as well as from Houlihan Lokey, some of whom are | 7 transfer of repo securities to Barclays the night before, and |
| 8 very good friends of mine, and it was my responsibility, as it | 8 Barclays reactions to that, as you've testified you learned of |
| 9 evolved, to keep them informed of the negotiations on the | 9 early Friday morning. |
| 10 transaction. So I had conversations with Mr. Burian, Mr. Brad | 10 A. I believe I did, yes. |
| 11 Geer, one of their other associates, I believe Mr. Fazio as | 11 Q. Do you recall what you said to the committee about the |
| 12 well, during that week. A number of phone calls with Mr. Geer | 12 transfer of repo assets and Barclays' concerns upon receiving |
| 13 and Mr. Fazio, and then a long phone call on Friday describing | 13 them? |
| 14 the transaction and the resolution we were trying to reach with | 14 A. I believe I generally explained to Mr. Burian the |
| 15 Barclays that morning. | 15 substance of the transaction, laid out how the long positions |
| 16 Q. You mentioned some familiarity with Mr. Burian and Mr. | 16 had changed, that Barclays had actually received different |
| 17 Geer and Mr. Fazio, as well? | 17 securities, that they had concerns about the value, that the |
| 18 A. Mr. Fazio only from this transaction. | 18 face amount of the securities that we had marked was about |
| 19 Q. And how did you know Mr. Burian and Mr. Geer, other than | 19 fifty billion and that they thought that it was worth a lot |
| 20 from this transaction? | 20 lower number. I explained that they had advanced forty-five |
| 21 A. Mr. Burian had been, I'm sure the Court's aware, a | 21 billion dollars against that, and there was a five billion |
| 22 bankruptcy lawyer and partner at Kramer Levin for a long time, | 22 dollar difference between the amount they advanced and the |
| 23 so professional experiences, we'd worked together a number of | 23 marked amount of those securities, and that the transaction |
| 24 times. Mr. Geer was at Houlihan Lokey and did a lot of work | 24 would close and Barclays would take the securities versus the |
| 25 for me. At Lehman Brothers, we hired him a lot and became | 25 forty-five billion dollars they advanced and the five billion |
| 31 | 33 |

**Page 34**

1  dollars they believed -- Barclays believed wasn't there because
2  the securities were worth less than the marked value, and that
3  there was, you know, some legitimate dispute about that that we
4  pushed back. I didn't concede, again, that they were worth
5  less than fifty billion dollars, but certainly told him that
6  our own traders had taken a look at these values, and there was
7  question.
8  Q. Do you recall whether Mr. Burian questioned you about this
9  five billion dollar difference that you say you told him would
10 go to Barclays if there were a gain?
11 A. We certainly discussed the five billion dollar difference,
12 and we certainly discussed the potential value of those
13 securities and the risk. It was -- the risk was to Barclays if
14 they weren't worth forty-five billion dollars, that was
15 Barclays' problem. If they were worth more than forty-five
16 billion dollars, there was no upside to the estate.
17 Q. Did Mr. Burian question you in the course of this call, or
18 did Mr. Despins, if he was on it, or the others you named, Mr.
19 Geer, question you about why there was a five billion dollar
20 difference as you were describing it to them?
21 A. The questioning I recall was not from Mr. Despins or Mr.
22 Geer. Mr. Geer's involvement, I just don't specifically
23 recall. But Mr. Fazio and Mr. Geer -- I'm sorry, Mr. Burian
24 certainly questioned me about the transaction and the
25 difference at that point. Yes.

**Page 35**

1  Q. So Mr. Fazio and Mr. Burian, as best you can recall for
2  Judge Peck, questioned you on Friday on the telephone about a
3  five billion dollar difference that you had described between
4  what Barclays had paid Lehman the day before, the forty-five
5  billion, and what the collateral, in exchange, was worth.
6  A. Yes, they did. Mr. -- you know, again, this was not --
7  this was very fluid conversation. During the conversation,
8  certain aspects of the transaction changed, even while we were
9  on that call. So at one point, I laid out what the longs were,
10 that is the long positions that Barclays took, the 50.6 versus
11 the 45; I also laid out the short positions that they were
12 going to take, and those would have been the hedge against that
13 long. As we were on the phone, Mr. Kirk came in and told me
14 that the shorts were gone, that we'd been closed out or they
15 couldn't be delivered from JPMorgan, and so I had to explain to
16 Mr. Burian that that had changed. The long position stayed the
17 same but the short position had changed.
18 Q. During the call, Mr. Kirk came in and told you that the
19 short positions were gone, and you shared that with Mr. Burian.
20 Is that your testimony?
21 A. Yes, it is.
22 Q. And in terms of this five billion dollar difference, did
23 you describe for Mr. Burian and Mr. Fazio the process of
24 negotiation that had gone on that day between Barclays and
25 Lehman?

**Page 36**

1  A. I don't recall the specific words or the discussion in
2  terms of the give and take with Mr. Keegan. I do recall
3  explaining to him that the traders had told us that there could
4  be questions about or value and in that market, they were
5  probably legitimate questions.
6  Q. Let me ask you to turn to tab 11 in your book. Before you
7  do that, I just want you to know that I'm going to show you
8  notes. I know they're not your notes, but I want to ask you
9  whether you said things to Mr. Burian and others in the course
10 of this call that may be reflected in those notes. And they're
11 at tab 11, Barclays' Exhibit 143A, Your Honor.
12     UNIDENTIFIED SPEAKER: Your Honor, objection.
13     THE COURT: What's the basis for the objection?
14     UNIDENTIFIED SPEAKER: The only possible basis for
15 doing this would be to use the notes as a basis for refreshing
16 his recollection, and he hasn't laid a proper foundation at
17 this point for refreshing recollection with the notes, nor is
18 he refreshing recollection in a way that's permitted by the
19 rules.
20     THE COURT: Well, I'm not sure that's what's going on
21 here. We can debate whether or not this is permissible use of
22 these notes. But what I glean from the introduction made by
23 Mr. Schiller is that he's attempting to validate that these are
24 notes taken at a time that the witness spoke with Mr. Burian,
25 thereby, in effect, validating the notes or demonstrating their

**Page 37**

1  source. I think he can use the document, and I'm going to
2  overrule the objection. It doesn't mean that the document
3  comes in through the witness, nor do I accept, necessarily, as
4  true that the notes have accurately reflected what was said.
5  But I think it's permissible examination; I'm going to overrule
6  you.
7  Q. Mr. Seery, have you reviewed these notes?
8  A. I have seen them before, yes.
9      MR. SCHILLER: 143A, Your Honor, is an enlarged,
10 colored version of the notes at 143 so they may appear more
11 legible to us.
12 Q. In that call with Mr. Burian and the committee, at the
13 risk of being repetitive, I'm going to explain to the committee
14 that there was a five billion dollar difference to Lehman
15 between the marked value of the assets in the Fed repo and the
16 amount advanced in the Fed repo to purchase those assets.
17 A. Well, I did, but looking at page 1 from that conversation
18 that day, I don't think those notes would have -- are
19 reflective of that conversation. I certainly wouldn't have
20 been discussing with Mr. Burian the number of employees or the
21 IMV division at that point. That was --
22 Q. Let me address your attention to --
23 A. -- well beyond that.
24 Q. I'm sorry. Let me address your attention to the third and
25 the fourth page of the notes --

**Page 126**

1 A. I don't think they could have valued this portfolio, no.
2 Q. Okay. Then you were asked some questions -- you could put
3 that aside, sir. I want to direct your attention to tabs 12 to
4 14 of Mr. Schiller's book.
5 A. Yes.
6 Q. And you were asked some questions about those documents
7 and the first thing I want to ask you is whether in the -- we
8 talked about yesterday we talked about your preparation
9 sessions on Sunday and Monday.
10 A. Yes.
11 Q. Did you see these -- any of these documents in your
12 preparation session on Sunday and Monday?
13 A. I believe I saw some of them. I don't know that I saw all
14 of them.
15 Q. Can you tell me which ones you saw?
16 A. I may have seen this first part, excuse me, of 12. I'm
17 pretty sure I saw the second part of 12 which is -- I guess
18 that Milbank 13437 and 8. I believe I saw 13. I don't know if
19 I saw 14 and I -- I don't know if I saw the cahoots or just
20 heard the cahoots and seeing it wasn't pleasant.
21 Q. And so in addition to seeing these documents in your
22 preparation session, did you discuss them with Barclays counsel
23 and how they might be used for purposes of your testimony?
24 A. A little bit, yes, but frankly I was surprised the way Mr.
25 Schiller actually used them.

**Page 127**

1 Q. Let me -- I won't ask you why you were surprised, but let
2 me --
3 A. If you would like I will tell you.
4 Q. No, that's okay. I don't -- I think we can keep that a
5 secret for now.
6    Tab 12, Exhibit 813-A, Barclays Exhibit 813-A. Let me --
7 I want to direct your attention to the page that -- the part of
8 the document that begins with 13437. And in particular --
9 A. Yes.
10 Q. And that's a document that you think you saw in your
11 preparation session on Sunday or Monday; is that correct?
12 A. I think I did, yes.
13 Q. All right. And let's look at the second page of that
14 document which is part of the exhibit, the one that has 438 as
15 the last three numbers.
16 A. Yes.
17 Q. And I want to ask you, sir, in the second full paragraph
18 on that page, there's a statement there that says "We were told
19 that some of the mark shown in schedule A were out of date."
20 Do you see that?
21 A. I do, yes.
22 Q. First of all, were you involved in the entirety of the
23 session between Lehman and the committee that's being described
24 in that paragraph?
25 A. I think I was involved in virtually all of it, the

**Page 128**

1 entirely. You phrase it in a way that would indicate that if
2 they left the room, I followed them and if they went to another
3 room, I followed them, no. There were rooms as I believe I
4 testified, there were a number of conference rooms where folks
5 popped in and out of and even my discussions with the committee
6 took place in at least two conference rooms and sometimes in
7 the hallway. So for the vast majority, I believe I was but
8 there may have been other discussions.
9 Q. All right. All right. Well just let me just lay a little
10 more context for the paragraph then if I could. I think you
11 testified in response to Mr. Schiller's question -- one of Mr.
12 Schiller's questions that you don't think that a few hours
13 passed, correct?
14 A. Yes.
15 Q. Okay. And then -- but regardless of how much time passed,
16 this note refers to Lehman came and got us and sat us down to
17 try to show us how things added up and do you associate that
18 phrase, that sentence fragment with a particular meeting that
19 was held with the committee?
20 A. No, these aren't my statements.
21 Q. No, I know. I am just -- I am trying to ask you, sir,
22 whether when whoever wrote these notes said Lehman came and got
23 us and sat us down to try to show us how things added up,
24 whether -- I mean is that what happened?
25 A. Not exactly, no.

**Page 129**

1 Q. Okay. Was there in response to some set of questions that
2 the committee had raised, a point in time where Lehman came and
3 got the committee, brought them to another room and provided
4 them with some information?
5 A. The first part of that sentence again just doesn't do
6 justice to the actual setting. After the big meeting broke up,
7 the committee came across -- immediately came to me and we
8 began these discussions. They had the document. They had
9 taken a look. It was consistent with my previous conversation
10 with Mr. Burian. We talked about that difference. They looked
11 at the document and started going through specific numbers on
12 the document.
13    I can't look at this document and take a particular
14 security and tell you whether that's a good value or a bad
15 value. I couldn't have done it on Sunday night. That's --
16 those discussions continued several times in different rooms.
17 So the idea that a few hours passed, it seems like the way it's
18 written, they were hidden in some room. Then we came and
19 summoned them and brought them in for their little audience and
20 sent them out, is not at all the way this happened.
21 Q. Well regardless of what -- how much time passed, who was
22 in what room, was there, in fact, in response to questions
23 raised by the committee some presentation that was made to them
24 that attempted to show us how things -- show them how things
25 added up?

1    A.  There was a hearty given and take on those numbers, yes.
2    There wasn't a presentation the way you've described it.
3    Q.  Okay.
4    A.  And the reason I focused previously on whether we went and
5    got them is because that's how you asked the question.
6    Q.  Okay.  And were you the person that -- I mean I know you
7    were involved in the meeting, you testified to that already,
8    but were you the person who was attempting to explain to them
9    how things added up or was that somebody else?
10    A.  That was me, yes.  I had help.
11    Q.  And who helped you?
12    A.  I believe Paolo was with me at the time, Paolo Tonucci.
13    Q.  Anyone else?
14    A.  I don't recollect anyone else.  I think I testified that
15    Klein and Miller came in at some point and Klein went through
16    an analysis of it.
17    Q.  Okay.
18    A.  But Burian and Despins know me and they wanted to talk to
19    me.
20    Q.  And in explaining the situation to them, did you tell them
21    that some of the marks that were shown on schedule A were out
22    of date?
23    A.  Again, I don't recall using the term out of date.  And
24    it's written in quotes.  So I don't recollect that being a term
25    that I used at all.  They were wrong.  They might have been

130

1    described as stale versus the market.  I just don't recall the
2    specific terms we used.  But the challenge was that Barclays
3    viewed it was lower.  We viewed it as higher but we did
4    understand their query with respect to a challenge to the marks
5    that we had and there might have been some legitimacy to some
6    of that.
7    Q.  All right.  I understand that part of it, sir.  I just
8    want to focus on the phrase out of date -- the marks -- some of
9    the marks being out of date.
10    A.  Uh-huh.
11    Q.  And the only question I have is whether it's a situation
12    where you just don't remember one way or another whether you
13    said that or whether to the best of your recollection you
14    didn't say that.
15    A.  I don't think I said it.  I don't remember one way or the
16    other but I may have.  I just don't know.  This is a document
17    written by someone who I have no idea who wrote it.  Don't know
18    where it came from.  Don't know why it's in quotes.  I doubt
19    they were in the meeting.
20    Q.  Okay.  And then at the end of that paragraph, there's this
21    discussion here about the parties agreeing to the five billion
22    dollar discount, and the phrase that's on the page there is
23    "the appropriate mark to market adjustment for the securities."
24    Do you see that, sir?
25    A.  I do, yes.

131

1    Q.  And is that -- without focusing on the specific language,
2    is that statement consistent -- is that summary consistent with
3    the information that you and your colleagues provided to the
4    committee on Sunday night?
5    A.  I think it's consistent, the five billion difference
6    between the amount they advanced and the face amount of those
7    securities is consistent.  And if the connotation of that is
8    that we adjusted it as part of that negotiation to get closer
9    to that current market, then that connotation would be correct.
10    Q.  And, sir, the phrase that is written on the exhibit refers
11    to the adjustment being described as the appropriate mark to
12    market adjustment for the securities, do you see that?
13    A.  I see it, yes.
14    Q.  And my question is do you recall one way or another about
15    whether that was, in fact, the way that it was described?
16    A.  I don't recall one way or the other as being the way
17    I described it, no.
18    Q.  Okay.
19    A.  As I said, it's --
20    Q.  Very good.  At any point in time during this session or
21    this set of sessions on Sunday night, did you tell the
22    committee about the liquidation analysis -- the liquidation bid
23    analysis that you had had performed on Friday morning?
24    A.  I believe there's reference in one of the myriad of
25    document that I have been shown over the last couple of days

132

1    that some of your clients wrote that actually references the
2    discussion of the traders.  So my supposition is that I did
3    have some discussion there.  I don't have a specific
4    recollection of that, other than we looked at the marks that we
5    had, that our traders checked them, there's definitely some
6    issue.  Barclays thinks they're a lot lower but Barclays is
7    negotiating.  This is the number we came up with.
8    Q.  And when you refer to the document, the notes from the
9    committee, is that -- are you doing anything other than
10    reporting what that document says at this point in time, sir?
11    A.  No.
12    Q.  Just -- it doesn't -- it hasn't created in your mind a
13    present recollection.  It's rather a document that would be,
14    since you're a lawyer, past recollection recorded; is that
15    correct, sir?
16    A.  Well you test my evidence knowledge.  I think the -- what
17    it does -- it doesn't recollect for me or bring back, refresh
18    specific words that I used but that would be part of the
19    discussion.  I do recall having the discussion with them about
20    the values.
21    Q.  Well --
22    A.  This was the central issue that we were discussing.  There
23    wasn't much reason to be hanging out there in the middle of the
24    night if this was straight up forty-five billion for forty-five
25    billion.  There was a difference between where they were marked

133

# Exhibit G

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)
- - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.
               Debtors.
- - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS INC.
               Debtor.
- - - - - - - - - - - - - - - - - - - -x
               United States Bankruptcy Court
               One Bowling Green
               New York, New York

               May 6, 2010
               9:33 AM

B E F O R E:
HON. JAMES M. PECK
U.S. BANKRUPTCY JUDGE

**134**

1  My view was, I didn't think the Court cared how Barclays
2  got what it got, you know, whether it was directly, indirectly,
3  but that what it got was important.  That was a distinction I
4  made in my head.  But my understanding of the clarification
5  letter was to confirm that.  And by the way, there were
6  substantive changes that were described on the record that were
7  never papered over.  And it was also my understanding that the
8  clarification letter was intended to do that as well, which was
9  to document, you know, the number of changes that were
10  described in court.
11  Q.  Okay.  I understand that -- appreciate describing all of
12  your efforts during the weekend, but I just want to fix it in
13  time a little bit more clearly so we can go a little slower on
14  a couple of meetings that we want to talk about.  On Saturday,
15  how late did you and your team stay at Weil Gotshal?
16  A.  We were doing nothing.  I think -- at some point, I think,
17  three in the morning, two in the morning, four in the --
18  somewhere between two and four, I don't know exactly.  It
19  was -- there was -- they weren't ready for us.  It made no
20  sense to stay.
21  Q.  What did you expect would happen when you returned on
22  Sunday?
23  A.  I expected that there would be -- you know, we figured out
24  what we got.  Here's a, you know, schedule that's going to be
25  attached to a purchase agreement and what they're getting.

**135**

1  We're going to make you comfortable as to what assets are being
2  transferred.  I expected there would be a clarification letter
3  that was -- you know, had a list of issues that were -- that
4  would be described to us, and that if there were any open
5  issues, hopefully they were relatively narrow.  And they would
6  tell us what the bid and ask was, or what the issues were.  It
7  would be like every other significant transaction where there's
8  some -- at some point at least, there's order to the chaos, and
9  we would be treated like a committee should be, which is, as a
10  necessary evil, you know, to an appropriate functioning of a
11  bankruptcy case.
12  Q.  I resent that, Mr. Burian.
13  A.  Sorry?
14  Q.  I resent that.  What did in fact happen on Sunday morning.
15  A.  I started to describe the fact that I hung around for a
16  long time and ate starchy foods.  Sat down in that larger
17  meeting.  Was briefed by Milbank about what a 15c3 account was
18  because there was reference in the clarification letter, and I
19  honestly didn't even know what it was.  Walked through the
20  letter with Milbank, spent some time doing that.  The team had
21  a quick conversation with Jim Seery that we really had to get
22  the list of assets.  And as you know, we did get a draft,
23  preliminary, old list of assets there.
24  Q.  Let me stop you there, because I want to put it up on the
25  screen.  Can you take a look in your binder --

**136**

1          MR. KIRPALANI:  And if we can put it up.  It's
2  Movants' Trial Exhibit 381.
3  Q.  This is an e-mail from -- I think from someone at Weil
4  Gotshal to an associate at Milbank, 11:30 --
5  A.  It's actually from Milbank.
6  Q.  Oh, I'm sorry.  It's from Milbank to Houlihan, is that
7  right?
8  A.  Correct.
9  Q.  Okay.  11:34 a.m.  And the subject line is "BarCap".  And
10  then if you turn the page to page 2, there's a summary page.
11          MR. KIRPALANI:  Could you just blow that up?
12  Q.  And then you don't have to turn to this on the screen, but
13  there seems to be a ream of paper behind that, it's double-
14  sided in these binders, which looks like backup to that
15  schedule.  Is this the schedule that you were finally given on
16  Sunday?
17  A.  I personally was not given this schedule.  This was
18  e-mailed to us from Milbank, having been given it by Weil
19  Gotshal, of a list of assets that at some point in time was the
20  list that would be distributed to Barclays.  The numbers were
21  marks as of some date between Monday and Friday.
22  Q.  Okay.  And did Houlihan do anything with this schedule on
23  Sunday after it had gotten it around 11:30 in the morning?
24  A.  Well, Brad Geer buttonholed Jim Seery and said hey, we
25  just got this through Milbank.  It says 49.9 -- it's 50 billion

**137**

1  dollars.  You had told the judge 47.4, you know, of that -- if
2  this is supposed to be the repo stuff, that was only supposed
3  to be 45.5 billion.  You know, what's going on?  And he was
4  told, you know, whatever schedule you're looking at, it is what
5  it is.  I can't tell you when the marks were.  I'm not even
6  sure these are the assets that are going.  We're still trying
7  to reconcile the books.  You know, look, when we know, you'll
8  know.
9  Q.  So --
10  A.  And Mr. Geer -- again, I think I'm here not only for
11  myself but for Houlihan -- is that right?
12  Q.  You can speak about your knowledge if you're the senior
13  most person --
14  A.  To my knowledge --
15  Q.  -- at Houlihan.
16  A.  So, to my knowledge, the focus on that conversation was
17  more the issue with respect to the integrity, is this the
18  corpus of assets -- I'm sorry.  The focus was more on things
19  have dropped in value and all the sorts of problems; less of an
20  emphasis on is it the corpus of assets.  Remember, we were a
21  different side of the house.  We're sitting in the rooms all
22  day, Sunday, at this time, knowing that huge disputes about
23  assets not showing up, and therefore the two of us put that one
24  together.
25  Q.  And did you ask anyone back at your office to try and

1  start diligence in this schedule?
2  A. Well, here we are, it's sometime -- I mean, it's 11:30,
3  12:00 in the afternoon on Sunday. The largest asset purchase
4  agreement in bankruptcy ever is about to close. We don't know
5  what assets are going. We're told they've dropped tremendously
6  in value. So we did -- we didn't know if this was the assets,
7  but under instructions to do the best we can, we basically sent
8  out an APB and pulled in associates and analysts, and while I
9  know it sounds crazy, but we basically split this list up and
10 said to our associates and analysts go find out what we can
11 know about the value of these assets, you know, go CUSIP by
12 CUSIP. I mean, look at this list. Go CUSIP by CUSIP and just
13 find as many Bloomberg machines as you can. If you have to go
14 to Yahoo Finance, just plug it in and get the quotes. And try
15 to find someone to do an Excel spreadsheet to compare how the
16 quotes add up to these numbers. Maybe we could back in to when
17 this was marked as of, maybe we can get a feel for what things
18 dropped in value. Maybe we could actually get ahead of the
19 curve for a change and not be behind the curve. Now, to be
20 honest, I didn't know how complicated this was when I said all
21 this stuff, sent the associates to work, but the goal was what
22 can we fathom from these documents.
23 Q. And did you ultimately get any feedback from your team?
24 A. Again, I was doing a lot of other things at the time, but
25 the team did get feedback which was then related to me in

138

1  summary fashion.
2  Q. And what did they relate to you?
3  A. Well, what was related to me is, as we would have
4  expected, a lot of these assets were the cherry-picked, most
5  liquid, broker/dealer assets that would be used in the ordinary
6  course of business. These were the assets that a large portion
7  of them -- like, if you look at the schedule, the twenty-eight
8  and a half billion called Fed collateral, a lot of that were
9  agencies, government securities, which in fact, given enough
10 time, you can find quotes for.
11     There was a large portion of assets for which we had no
12 idea -- I mean, in retrospect, you know, there are numbers here
13 and CUSIP numbers we couldn't find anything about. I mean,
14 virtually -- for instance, one of them turns out to be a senior
15 note in the Pine structure vehicle which I now know too much
16 about, but at that point in time Pine to me was a tree. You
17 know, there was no knowledge. And that in fact if you grouped
18 them into different areas I believe the groupings were agencies
19 and federal securities like T-bills, and you grouped them in
20 corporate so we can get quick quotes on.
21     Net, net, net, it looked like one category went down
22 roughly 300 million in value. If you look at the three days
23 from Wednesday to Friday, for the other category it had gone up
24 400 million in value. So net, net, net, of the assets that we
25 could value, it wasn't perfect, not exact, done by essentially

139

1  kids doing the best they could in a very limited time, it
2  looked like the assets had gone up 100 million bucks.
3     No firm conclusion as to what date these were marked as
4  of. It appeared that the marks didn't correlate to any
5  specific date which, by the way, didn't surprise us, in light
6  of the -- you know, the description in the document was hey,
7  here's a list that was pulled together. It may or may not be
8  accurate, you know, we're not sure what date it's through.
9  Q. So at that time even though you were diligencing (sic)
10 this list, just so that the record's clear, you weren't sure
11 that this in fact is the list of securities that's going over?
12 A. I was neither sure that it was the list of the securities
13 nor did I have any real idea of what the true value was because
14 a large portion of the securities were impossible to find
15 quotes on --
16 Q. Okay.
17 A. -- through our limited systems.
18 Q. Okay. You mentioned a few minutes ago the 15c3 lesson
19 that you got. And I think you also mentioned that that wasn't
20 the only meeting you attended or that wasn't the only
21 negotiation that you had some role in. Did there come a time
22 when you had a role in the negotiation over the 15c3 issue?
23 A. Yeah. I mean, time is passing, it's getting later. I
24 found out this information somewhere between 11:30 at night and
25 1 o'clock in the morning, you know, the idea that what we

140

1  couldn't value was -- may have been worth more. I'm getting a
2  little more agitated as time goes on. I mean, things are
3  moving on and I'm, like, stomping around trying to find someone
4  to talk to me.
5     And I passed by a group of people standing by, I don't
6  know, the secretary's station outside of one of the conference
7  rooms, 25b or c -- c or d, on the Weil Gotshal conference
8  floor. And Harvey Miller was there, Tom Roberts was there.
9  And I basically picked up a conversation about we really got to
10 solve the regulatory capital issue, 15c3 issue.
11     I'm not exactly shy. I sort of poke into the middle and
12 say, "Hey, what's going on there?" And they go, "Oh, Barclays
13 is giving us a big headache. They're threatening to close.
14 You know, they're concerned about the amount of transactions,
15 and we're going to have to compromise on this issue." And I
16 was, like, yeah, I don't want to give -- when you say
17 participate or negotiate, we're not, like, sitting in chairs,
18 you know, "What do you think?". We are literally standing by a
19 printer where I happened to walk by.
20     And I say, "Well, what's the issue?" And they say this
21 and that. And I say, "Wait a minute, Milbank had told me about
22 this. It doesn't make any sense to me. I mean, a deposit's a
23 deposit. Cash is cash. What's the ambiguity? You can't let
24 Barclays just push you around." Hey, in my role as the
25 committee I'm supposed to give the debtor backbone in dealing

141

# Exhibit H

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)
- - - - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.
                Debtors.
- - - - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS INC.
                Debtor.
- - - - - - - - - - - - - - - - - - - - - -x
                United States Bankruptcy Court
                One Bowling Green
                New York, New York

                May 7, 2010
                9:17 AM

B E F O R E:
HON. JAMES M. PECK
U.S. BANKRUPTCY JUDGE

1  Q.  -- did you ever give any description of how you
2  interpreted Ms. Fife's representation to the Court, other than
3  the deposition testimony that I've shown you?
4  A.  I believe yesterday in my testimony I described at length
5  my understanding at the time that Ms. Fife's description was
6  consistent with, both her quick review prior to the judge
7  taking the bench, and my conversations with Mr. Seery and I
8  think Mr. Shapiro was on the phone at the same time.  And which
9  we went through the before and after checklist of what had
10 changed in the transaction.
11 Q.  At the time of the sale hearing, and Ms. Fife spoke to the
12 Court, did you have at that point, on September 19th, an
13 estimate of what the value of the fed repo securities were?
14 A.  Only in the context of an estimate of the total assets
15 being transferred to Barclays.  So not specifically these
16 assets are worth X, this is worth Y.  I think -- I don't -- did
17 I have an estimate at the time?  Yeah, yeah.  I think in the
18 notes -- in fact, in my notes before I had forty-five plus 1.9.
19 So, yeah, it was basically somewhere around forty-five billion
20 dollars.
21     I think as I told you, I believe that on Friday Mr. Seery
22 did tell me about the hammers, the box assets, the clearance
23 box.  And, therefore, the only conclusion one could have
24 reached is that the repo assets had deteriorated in value to
25 around forty-five.
                                                              86

1  Q.  When did you have this conversation with Mr. Seery?
2  A.  As I testified yesterday there were a number of
3  conversations, one long one, one shorter one.
4  Q.  When did you have the conversation with Mr. Seery, in
5  which he told you according to your testimony about the nails
6  and --
7  A.  Hammers.  We would have to go back to my notes as to
8  whether it was the first conversation, the second conversation.
9  It was that Friday morning, early afternoon, before the
10 hearing.
11 Q.  And when did you first come to the conclusion that as part
12 of this transaction Barclays was acquiring clearance box assets
13 worth an estimated 1.9 billion dollars?
14 A.  I never came to that conclusion, it's what I was
15 represented and trusted to be verified later.
16 Q.  That's what you were told?
17 A.  Correct.
18 Q.  And did you believe it?
19 A.  Yes.
20 Q.  Did you have any reason to disbelieve?
21 A.  Now, I do.
22 Q.  When did you first have any reason to disbelieve the
23 assertion that Barclays was getting 1.9 billion dollars in
24 clearance box assets?
25 A.  When did I first have a reason to disbelieve?  When the
                                                              87

1  deal closed --
2  Q.  Sir, the question's when?
3  A.  I'm trying my best to recollect.  I had no reason to
4  disbelieve in particular the valuation of the clearance box
5  assets, other than in the context of trying to verify the total
6  amount of assets.  I, frankly, didn't worry that much about the
7  clearance box assets, I didn't disbelieve that.  At the time I
8  was more focused on the repo transaction assets.  And I don't
9  know.
10 Q.  I'm not asking what you worried about, sir, okay.  What
11 I'm asking you is when was the first time, if ever, you had any
12 reason to disbelieve the assertion that you say was made to
13 you, that Barclays was getting 1.9 billion dollars in clearance
14 box assets?
15 A.  With respect to those particular assets, I do not recall.
16 Q.  Approximately when?
17 A.  With respect to those particular assets, I do not recall.
18 Q.  Do you recall whether it was in 2008?
19 A.  With respect to those particular assets, I do not recall.
20 Q.  Do you recall whether it was in the first half of 2009?
21 A.  With respect to those particular assets, I do not recall.
22 Q.  Let me go back to the Milbank/Houlihan document, dated
23 October 10, 2008.  And go to the second page, second paragraph
24 This is Barclays' Exhibit 18 -- 813-B.  And the first paragraph
25 talks about an asset difference of five or six billion dollars
                                                              88

1  that you had, or Houlihan or the committee had raised with
2  Lehman and Weil Gotshal the night of the close of the
3  transaction.  And we've talked about that.  And then it goes on
4  to say, "A few hours after we raised the issue Lehman came in
5  and got us and sat down to try to show us how things added up.
6  We were told that some of the marks shown on Schedule A, were
7  'out of date' and that the parties, Lehman and Barclays, had
8  agreed to a five billion dollar discount, as the appropriate
9  mark-to-market adjustment for the securities."  Do you see
10 that?
11 A.  I do.
12 Q.  First, were you present when Lehman came in, got you and
13 sat you down to try to show you how things added up?
14 A.  Mr. Geer is referring to my description of the Michael
15 Klein meeting, which I explained earlier how that happened.  So
16 if you're asking me was there a meeting which Lehman came and
17 got us and sat us down, no, there was no such meeting.
18 Q.  Well, sir, you say Mr. Geer was referring to.  To
19 begin with this is something that was written by, both Mr. Geer
20 and by Milbank, and not by you, correct?
21 A.  I do not believe that this paragraph was written by
22 Milbank, sir.  It's an internal summary preparing Milbank to
23 push Weil harder to get information in giving a Layman's quick
24 explanation of what -- of Mr. Geer's recollection of what
25 happened.
                                                              89

1    Q.  Did you ever have any discussions with Mr. Geer or with
2    Milbank about who wrote what portions of this document?
3    A.  I did.
4    Q.  And when did you do that?
5    A.  It must have been when the discovery binders showed up on
6    my desk.
7    Q.  What discovery binders?
8    A.  The Houlihan e-mails.  We got a subpoena or something, we
9    were told to produce e-mails.  At my direction a paralegal
10   produced e-mails.  There were discussions about parameters and
11   searches, and we spent a lot of time on this.  And at some
12   point all sorts of things got dumped on my desk.
13   Q.  And this would have been after discovery had started in
14   this proceeding, correct?
15   A.  Yes.
16   Q.  Okay.  And who told you what portions of this were written
17   by Milbank, and what portions were written by Mr. Geer, or
18   Houlihan?
19   A.  I don't remember if it was clearly discussed explicitly or
20   it just very, very clear from the context since we were there
21   having these conversations and Milbank wasn't.  So -- but it
22   would have only come from a conversation between me and Mr.
23   Geer.  Or, again, it's pretty clear from the context that this
24   is not Milbank.
25   Q.  Sir, everybody can read the document for themselves.  I'm

90

1    simply asking you what you were told.  And did anybody ever
2    tell you what portions of this document were written by Milbank
3    and what portions of the document were written by people from
4    Houlihan?
5    A.  I don't specifically recall why the foundation for my
6    belief that these paragraphs describing that evening were by
7    Brad Geer.
8    Q.  Is that a no to my question?
9    A.  It's an I don't know.  It's I don't specifically recall
10   how I know this or believe it to be true.
11   Q.  Now, there's no reference in here to Barclays telling you
12   anything, correct?
13   A.  That is correct.
14   Q.  Now, in the second sentence here it says, "We were told
15   that some of the marks shown on Schedule A were out of date.
16   And that the parties, Lehman and Barclays, had agreed to a five
17   billion dollar discount."  Do you see that?
18   A.  Well, let's read the rest of it.
19   Q.  I did, before.  "As appropriate" --
20   A.  "As the appropriate mark-to-market adjustment for the
21   securities."
22   Q.  And --
23   A.  That is a --
24   Q.  Was Houlihan and the committee told on Sunday night that
25   Lehman and Barclays had agreed to a five billion dollar

91

1    discount as the appropriate mark-to-market adjustment for the
2    securities, that Barclays was acquiring?  That's yes, no, or I
3    don't know.
4    A.  It depends on how you define the word discount.  So it's a
5    yes, with an explanation.
6    Q.  Well, first of all, were Houlihan or the committee told
7    that Lehman and Barclays had agreed to a five billion dollar
8    discount, using the word discount?
9    A.  No.
10   Q.  Was Houlihan and the committee told that Lehman and
11   Barclays had agreed to a five billion dollar reduction as the
12   appropriate mark-to-market adjustment for the securities that
13   Barclays was acquiring?
14   A.  Yes.  We were told that market values had dropped, and the
15   appropriate mark-to-market valuation of the securities being
16   transferred, not including the clearance box, but including the
17   resis was forty-four to forty-five billion was being rounded up
18   to forty-five billion.  Which -- and this is math we were
19   competent in doing, we understood was five billion less than
20   the fifty billion on the page that we had received Sunday
21   afternoon.
22   Q.  Let me be sure I've got your testimony.  You testified
23   that you were not told that Lehman and Barclays had agreed to a
24   five billion dollar discount, using the word discount as the
25   appropriate mark-to-market adjustment for the securities

92

1    Barclays was acquiring, correct?
2    A.  Correct.
3    Q.  My question now is were you told that Lehman and Barclays
4    had agreed to a five billion dollar reduction as the
5    appropriate mark-to-market adjustment for the securities?
6    A.  We're having a problem, Mr. Boies, because in common usage
7    when I think of discount, you go to a store you buy a shirt,
8    it's a very nice shirt, it's worth twenty bucks.  You get it
9    for eighteen dollars, hey, I got a discount.
10   Q.  Do you understand the question, sir?
11   A.  No.  Because I'm trying for you to please be more
12   particular as to what you mean by discount or reduction.
13   Q.  I didn't use the word discount in my last question.  I
14   said reduction.  Do you understand what reduction means?
15   A.  I'm trying to define it with particularity, but you're not
16   letting me.
17   Q.  Let me try to define reduction as the lowering of the
18   amount, the reducing of the amount.
19   A.  As compared to what, sir?
20   Q.  As compared to a prior amount.  Okay.  And I'm asking you
21   were you told on Sunday night that Lehman and Barclays had
22   agreed to reduce, bring down, lower, the mark by about five
23   billion dollars?
24   A.  As compared to what?  Which mark are you referring to?
25   Q.  As it compared to what it had been?

93

1    A.  At what date?
2    Q.  Well, let me ask you that question, sir.
3    A.  Well, that's exactly what I've been saying, sir.
4    Q.  No.
5    A.  Yes.  It's exactly what I've been saying.  Which is --
6    Q.  Mr. Burian, what question are you answering?
7    A.  I'm answering your question as to whether or not I was
8    told there was a reduction in the value of the securities as of
9    a mark of a date that you have not defined.  And I am telling
10    you exactly -- you have it exactly right, Mr. Boies.
11    Q.  And my question to you --
12    A.  I'm answering the question.
13    Q.  No, I don't think you are, sir.  And with respect --
14    A.  I finally got a question I could answer, now you don't
15    want the answer.  I finally got the question right.
16    Q.  Sir --
17    A.  And now I want to answer it
18    Q.  Have you finished?
19    A.  I want to answer the question first.
20    Q.  Okay.  Tell me the question you're answering?
21    A.  Whether or not I was told that there was a five billion
22    dollar reduction in the value of the securities as of a mark of
23    a date that you're not sure of.
24    Q.  Okay, now the answer to that question --
25    A.  That one I can answer.

94

1    Q.  The answer to that question begins yes, no, or I don't
2    know?
3    A.  Yes.
4    Q.  Okay.  Now, when were you told that?
5    A.  By Mr. Klein in the meeting early Monday morning.
6    Q.  Okay.  Now, we will agree that if you're talking about a
7    reduction or lowering, as you just said, there is a prior
8    amount and then a subsequent amount, correct?
9    A.  Correct.
10    Q.  And the subsequent amount is lower than the prior amount,
11    correct?
12    A.  You said if?
13    Q.  I said it is.  That's what you were told.  You were
14    told --
15    A.  Correct.  Correct.
16    Q.  Okay.  So that you had one value and then you had a second
17    lower value, correct?
18    A.  Correct.
19    Q.  And the first higher value was for, you were told, an
20    earlier point in time, correct?
21    A.  Correct.
22    Q.  And the second lower value was for a later point in time,
23    you were told, correct?
24    A.  Correct.
25    Q.  And the difference between the higher value and the lower

95

1    value was about five billion dollars, you were told, correct?
2    A.  Correct.
3    Q.  And you were told that the difference between the higher
4    value and the lower value of about five billion dollars was a
5    difference that Lehman and Barclays had agreed to, correct,
6    sir?
7    A.  It wasn't expressed that way.  Not exactly right.  Close,
8    but not exactly right.
9    Q.  Well, when --
10    A.  It wasn't --
11    Q.  It's written here, sir, that Lehman and Barclays had
12    agreed to a five billion dollar discount as the appropriate
13    mark-to-market adjustment for the securities, and you say, you
14    don't like discount, you don't know what reduction means, but
15    you know what lowering means.  And it's lowered down.  It's
16    clear that whatever had happened it was something that Lehman
17    and Barclays had agreed to, correct?
18    A.  Barclays and Lehman had agreed the fair market value of
19    the assets on that date was forty-five billion.  My
20    recollection is not that they agreed on an amount to the
21    discount.  It happened to be that because at one point in time
22    it was embarked at fifty billion and now it was forty-four to
23    forty-five billion, rounded up to forty-five, you are pointing
24    out the difference.  But you're implying in your questions that
25    I know what they negotiated a discount.  And that is not my

96

1    testimony, and not what I believe was told, and not what I
2    believed at the time.  So we can go back and forth on words,
3    but I stay very, very clear what I was told and what I
4    believed.
5    Q.  I'm focusing right now on what you were told.  And
6    assuming that we changed the word discount to some word that
7    you're more comfortable with that means generically the same
8    thing.  Are you saying that this statement in the Milbank
9    Houlihan document is right or wrong?
10    A.  As long as we understand discount not to be a discount to
11    value, but a reduction from a previous higher number, at some
12    indeterminate time, then the answer is of course it's right.
13    Q.  Okay.  Now, let me focus on the indeterminate time.  It is
14    your testimony that you were told that there was a fifty
15    billion dollar number, and rounded forty-five billion dollar
16    number.  And the fifty billion dollar number was from an
17    earlier point in time -- an indeterminate point of time, but
18    outdated, correct?
19    A.  Both, the number and the corpus of securities, were
20    outdated, correct.
21    Q.  Let me focus on that.  How much of the reduction from
22    fifty billion dollars to forty-five billion dollars, as you
23    understood it, was a result of the value changing, not the
24    result of securities being taken out, but of the value
25    changing?

97

VERITEXT REPORTING COMPANY

1   A.  I didn't know.  I did not know at the time.
2   Q.  Did you try to find out?
3   A.  Later we tried to find out.  At the time, no.
4   Q.  Okay.  And by later -- when you say later we tried to find
5   out, when do you mean later?
6   A.  The whole process of seeking reconciliation, of exactly
7   what went at what marks at what values.
8   Q.  Let me ask you this.  When was the first time that you
9   ever asked Barclays how much of the reduction that you say was
10  made from fifty to forty-five billion dollars was due to a
11  change in valuation?
12  A.  I never specifically asked Barclays to parse the
13  difference between the premark and the postmark in categories
14  of securities that did not show up as compared to market
15  deterioration.  We figured we could figure that one out on our
16  own when we got the full list of assets and their marks of what
17  was actually transferred.
18  Q.  Just to be clear, what you're saying is the reduction in
19  value, from fifty billion to forty-five billion, was as you
20  understood it, in part do to some securities no longer being
21  there, and in part due to a deterioration of prices, correct?
22  A.  Correct.  Mr. Klein said market value of what we're
23  getting --
24  Q.  I'm not asking you what Mr. Klein said, I'm asking what
25  your understanding was?
98

1   A.  My understanding was it could very well have been a
2   combination of both of those but without any firm knowledge of
3   whether it was the former, latter, or both.
4   Q.  Did you believe that it was in part due to some of the
5   fifty billion dollar assets no longer being there, and in part
6   due to a deterioration in the value of the assets that
7   remained?
8   A.  At the time I suspected as much.
9   Q.  And at the time, before the closing, did you ever make any
10  effort to find out how much of the difference was attributable
11  to assets disappearing and how much was attributable to the
12  prices of the assets that remained declining?
13  A.  Yes.
14  Q.  And did you ask somebody that?
15  A.  We did.
16  Q.  Who did you ask?
17  A.  As I testified yesterday, Mr. Fazio, he immediately jumped
18  in after I clarified the resi issue.  He said wait a minute I
19  want to talk about the what went down, government securities,
20  which is the first half of understanding what portion would be
21  market decline, what portion would be assets not showing up.
22  And as I testified yesterday, it was Mr. Miller cut him off and
23  said you got your explanation and ended the meeting.
24  Q.  And did you ever -- prior to this proceeding, did you ever
25  complain to the Court that Mr. Miller was cutting you off and
99

1   not giving you information that you thought was important?
2   A.  Just so I understand the question, Mr. Boies --
3   Q.  The question is yes, no, I don't --
4   A.  Are you asking me whether I came running into Judge Peck
5   and asked him whether or not Mr. Miller was being informative
6   or nice to me?
7   Q.  No, I didn't ask that at all, sir.  My question was
8   whether at anytime prior to this proceeding you ever complained
9   to the Court that Mr. Miller was cutting you off and not giving
10  you information that you thought was important?  That's my
11  question.  And I'd like you to begin with yes, no, I don't
12  know.
13  A.  I never came to Court to complain that Mr. Miller had cut
14  off a conversation about the closing.
15  Q.  Did you ever come to Court to complain to the Court or to
16  tell the Court that Mr. Miller was not permitting you to get
17  information that you thought was important?
18  A.  I --
19  Q.  Again, a yes, no, or I don't know.
20  A.  Yes, with an explanation, Mr. Boies.  The explanation
21  is --
22  Q.  Wait, wait, wait a minute.  I want to be sure I got the
23  question.
24  A.  Whether I ran to Court --
25  Q.  Did you ever come to Court to complain to the Court, or to
100

1   tell the Court Mr. Miller was not permitting you to get
2   information that you thought was important?  And your answer is
3   yes with an explanation, is that correct?
4   A.  Correct.  To the extent you view Mr. Miller as
5   representing a Lehman estate, and to the extent that we came in
6   December to complain very loudly that we were not getting
7   information we need to do our reconciliation, that would be a
8   reflection on Mr. Miller.
9   Q.  And the first time you did that was in December, is that
10  your testimony?
11  A.  The first time we came to Court was in December, yes, sir.
12  Q.  Let me go to the next paragraph.  Where it says, "Lehman
13  wasn't able to provide detail as to which securities on
14  Schedule A led to the five billion dollar adjustment."  You see
15  that?
16  A.  I do, sir.
17  Q.  And is adjustment a term that you're comfortable using in
18  connection with what happened?
19  A.  Yes, I am.
20  Q.  Okay.
21  A.  It's an adjustment to reflect market value at the time.
22  Q.  Okay.  And -- and let me try to use the word adjustment.
23  And you will agree that the five billion dollar adjustment was
24  a five billion dollar downward adjustment, correct?
25  A.  With all the qualifications we've been talking about, yes.
101

# Exhibit I

- 1 -

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC., et al.

9           Debtors.

10  - - - - - - - - - - - - - - - - - - - -x

11  In the Matter of:

12

13  LEHMAN BROTHERS INC.

14          Debtor.

15  - - - - - - - - - - - - - - - - - - - -x

16          United States Bankruptcy Court

17          One Bowling Green

18          New York, New York

19

20          June 25, 2010

21          9:32 AM

22

23  B E F O R E:

24  HON. JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

- 62 -

1  discussions, either within Milbank Tweed or with other
2  committee professionals, concerning the fact that it was in the
3  committee's interest that the appeal be denied because this
4  transaction was the only viable alternative and it was better
5  than having no transaction at all?  Do you recall that?
6  A.  No.
7  Q.  Did you have any discussions with anyone prior to the time
8  that you left Milbank Tweed concerning what the results were of
9  the audit that you had said you planned to do and, in fact, was
10  being done?
11  A.  Conversations before -- I'm repeating your question in my
12  mind.  Conversations before leaving regarding the results of
13  Houlihan's review or audit of the book?
14  A.  Yes.
15  Q.  Well, I'm sure I would have told people at the firm about
16  it.  And actually, I remember sending an e-mail the date I was
17  told not to work on this anymore.  And I'm pretty sure I sent
18  it to Crayton Bell saying just be careful you follow up on this
19  because Houlihan has raised these issues.  But other than that,
20  I have no specific recollection because I'm not sure that the
21  audit was completed, if you will.  I mean, I'm not sure we had
22  the final picture from Houlihan.
23  Q.  Well, let me try to set the stage.  On September 25th, you
24  write Lori Fife--
25  A.  Yes.

- 63 -

1  Q.  -- trying to get the schedules because you want to do an
2  audit, correct?
3  A.  Yes.
4  Q.  And on September 28th, you get the schedules, correct?
5  A.  I think that I said that we got them by then but I may
6  have gotten them one day earlier.  But, yeah, essentially, yes.
7  Q.  In any event, by September 28th, you had the schedules --
8  A.  Correct.
9  Q.  -- and the audit was underway, correct?
10  A.  Audit review -- yes.
11  Q.  Well, I'm using the word "audit" because that's the word
12  you used.
13  A.  Yes.
14  Q.  Now, what were the results of that audit three weeks later
15  while you were still working on this matter?
16  A.  I don't think we had results other than Houlihan repeating
17  the same thing which is that they had concerns about the marks
18  and that there seemed to be a gap of billions of dollars.  But
19  I -- but more than that, I don't recall.
20  Q.  Now, Houlihan's view was that there seemed to be several
21  billions of dollars' discrepancy before they even began their
22  audit, correct, sir?
23  A.  I don't recall whether it's -- it's possible that it was
24  before they actually -- no -- the answer is I don't know.  I
25  don't know whether that was their view.  We can look at the

- 64 -

1  e-mails if you want but --
2  Q.  Let's look at Movants' Trial Exhibit 707 in the book that
3  counsel for the committee gave you.
4     (Pause)
5  A.  Okay.  One second.  I'm here.
6  Q.  Now this --
7     MR. GAFFEY:  Your Honor, sorry.  Can I have the tab
8  number, please?
9     MR. BOIES:  Oh, I'm sorry.  Well, it doesn't have a
10  tab number.  It's -- they number it by exhibit numbers.
11  Q.  Now, this is an e-mail from Brad Geer to you and a variety
12  of other people, correct, dated September 28th, 2008 early in
13  the morning?
14  A.  Yes, yes.
15  Q.  6:15 a.m.?  And this does suggest that your clarification
16  was correct, that you had actually gotten the schedules before
17  September 28th because the e-mail at 6:15 a.m. says that you
18  have the schedules and you're looking at them.  And it says,
19  "Schedule A appears consistent with that which we had last
20  Sunday night at Weil."  You see that?
21  A.  Yeah, I see that.
22  Q.  And was that accurate, sir?
23  A.  I don't know.  Other than the fact that he's making the
24  statement, I don't know if it's accurate or not.
25  Q.  You don't have any reason to dispute that statement, do

- 65 -

1  you?
2  A.  The statement here?  No.
3  Q.  And when you talk about the schedule that appears
4  consistent with that which you had last Sunday night at Weil,
5  you're talking about the schedule that lists the securities in
6  the Fed repo, so-called, that were transferred to Barclays,
7  correct?
8  A.  But this is not me.  This is from Brad Geer.  You said
9  "when you talk about".  I didn't author that e-mail.
10  Q.  But you understood it when you got it, didn't you, sir?
11  A.  Yes, yes.  I understood it.  But --
12  Q.  And you understood that it related to the schedule of
13  securities that were the Fed repo, correct?
14  A.  I don't know about Fed repo but their book of securities
15  that were transferred as part of the transaction.  I was just
16  merely correcting your statement that said "you said".
17  Q.  Yeah, but what do you think was being transferred back in
18  September when you were the lead partner for Milbank Tweed?
19  What did you think that book of securities was?
20  A.  And what do you mean, what did I think it was?  Did I know the
21  exact nature of each security or what's your question?
22  Q.  My question, sir, is that you knew perfectly well at the
23  end of September of 2008 that what had been transferred to
24  Barclays was the Fed repo securities that were listed on a
25  schedule that had been given to the committee representatives

17 (Pages 62 - 65)

- 66 -

1 prior to closing at Weil Gotshal, correct, sir?

2 A.  I don't know that for a fact.

3 Q.  You don't?

4 A.  No.  You're asking me would I recall of two years ago?  I

5 don't know if that was my understanding or not.  I see the e-

6 mail.  I have no reason to dispute it.  So I'm not trying to

7 evade the question.  But personally, I don't recall -- I

8 remember distinctly a book of securities being transferred.

9 Whether they were repo securities or not, sitting here today, I

10 don't have a recollection of that.

11 Q.  Do you recall a Fed repo that, during the week prior to

12 closing, that Barclays had stepped into the shoes of the Fed?

13 A.  I remember discussions about that, yes, generally.

14 Q.  I'm not talking about remembering discussions about that

15 generally.  I'm talking about whether, sitting here right now,

16 you remember that that week Barclays stepped into the shoes of

17 the Fed with respect to a repo financing?

18 A.  I think that's correct.  I'm not a hundred percent sure

19 but I think that's correct.

20 Q.  What?

21 A.  I'm not a hundred percent sure but I think that's correct.

22 Q.  And sitting here right now, do you recall that the

23 clarification letter provided that those repo securities were

24 going to be transferred to Barclays?

25 A.  I don't know that.  I would have to look at the repo --

- 67 -

1 the clarification letter.

2 Q.  You just don't remember that one way or another sitting

3 here?

4 A.  That's correct.

5 Q.  Sitting here right now, do you remember one way or another

6 what Schedule A refers to?

7 A.  I think it's the schedule of securities being transferred.

8 Q.  The schedule of securities being transferred from Lehman

9 to Barclays as part of the transaction?

10 A.  Yes.

11 Q.  And that list of securities was furnished to committee

12 representatives prior to closing at Weil Gotshal, correct?

13 A.  There was a list of securities provided to committee

14 counsel or to committee advisors prior to closing.  Whether

15 it's identical to the one that's attached to the final executed

16 clarification letter, I don't know.

17 Q.  Did you ever try to find out?

18 A.  No.  That was Houlihan's job to look into this.

19 Q.  Well, if it was Houlihan's job, Houlihan then reports to

20 you that the Schedule A that was given to -- attached to the

21 clarification letter was consistent with what you'd been given

22 at Weil, correct?

23 A.  It says "appears to be consistent", correct.

24 Q.  And you don't have any reason to doubt that?

25 A.  No.  I said that a few minutes ago.

- 68 -

1 Q.  All right.  And the e-mail goes on to say, "So the issue

2 is if they were really only worth the amount that was agreed to

3 between Lehman and Barclays or if they were worth more."  Do

4 you see that?

5 A.  I see that.

6 Q.  And as of September 28th, 2008, did you believe that

7 that's what the issue was?

8 A.  I understand that that's -- I understood that that's the

9 issue that Houlihan had, yes.

10 Q.  My question to you is whether you, as the lead partner

11 representing the committee, whether you believed that that was

12 the issue.

13 A.  As I said before, I -- on issues of securities, valuation

14 of securities, I rely a hundred percent on Houlihan and so I

15 have no independent view of what the value of these securities

16 are or should be or -- et cetera.  So if they're telling me

17 that's the issue then I understand that that's the issue that's

18 outstanding.

19 Q.  Okay.  Now they talk about the valuation of these

20 securities that are being transferred to Barclays as having

21 been agreed to between Lehman and Barclays.  Do you see that?

22 A.  Just one second.  I see the sentence that says "worth the

23 amount that was agreed to between Lehman and Barclays or if

24 they were worth more".  Yeah, I see that.

25 Q.  And in September of 2008, was it your understanding that

- 69 -

1 the securities transferred to Barclays had been valued based on

2 an agreement between Lehman's and Barclays?

3 A.  Other than my knowledge from this e-mail?  No.  You

4 mean -- I see that that's what they told me but I have no

5 independent knowledge of that point.

6 Q.  And were they the people who you would rely on for making

7 this determination?

8 A.  Yes.

9 Q.  Okay.  Then, sir, I take it you would not have any

10 disagreement with their statement.  Is that fair?

11 A.  I'm not in a position to disagree with them on that issue,

12 no.

13 Q.  Okay.  Now, did you see anything wrong or inappropriate

14 about Lehman and Barclays agreeing as to what the securities

15 being transferred to Barclays were worth?

16 A.  You're asking me what my frame of mind was then?

17 Q.  Yes, sir.

18 A.  I don't recall whether I had a reaction to that or not.

19 Q.  Other than looking at this e-mail, do you recall anything

20 at all about how the values of the securities transferred to

21 Barclays were arrived at?

22    (Pause)

23 A.  Yes.  Well, there were discussions between us and Houlihan

24 about this all along.  Maybe I'm not answering your question

25 precisely.  But he said -- other than this e-mail?  Yes.  There

18 (Pages 66 - 69)

- 70 -

1 were numerous conversations with Houlihan about this issue.
2 Q.  And in those conversations that Houlihan conveyed to
3 you -- how the valuations of the securities transferred to
4 Barclays had been arrived at?
5     (Pause)
6 A.  I'm trying to recall.  I know they were upset about the
7 valuation.  But how it had been arrived at, I am not -- I don't
8 recall.
9 Q.  You knew the weekend of the closing that there were
10 certain securities being transferred to Barclays, correct?
11 A.  Yes.
12 Q.  And you knew that those securities had been valued,
13 correct?
14 A.  We knew that there was a mark associated with these
15 securities, yes.
16 Q.  A mark as to their valuation, correct?
17 A.  Correct, yes.
18 Q.  And you knew that Houlihan was very agitated and unhappy
19 about that mark or valuation, correct?
20 A.  I don't know if it's only about the mark but it's about
21 the lack of information about the securities themselves and --
22 et cetera.  But I'll subsume in what you're raising here, yes.
23 Q.  Let me just follow up on that.  As you understood it the
24 weekend of the closing, did Houlihan have any concern that the
25 marks or valuation on the securities being transferred to

- 71 -

1 Barclays were too low?
2 A.  I think they had concerns about the fact that these marks
3 didn't add up to a number that had been given in court
4 regarding the value of the assets being transferred.
5 Q.  When you say they didn't add up --
6 A.  Didn't add up to the value that had been described to the
7 Court regarding what was being transferred.
8 Q.  I'm just trying to clarify.  There was an amount described
9 to the Court as to the total value of the assets being
10 transferred, correct?
11 A.  That's my understanding, yes.
12 Q.  Now my question is, when you say that Houlihan believed
13 that the marks on those assets didn't add up to that number, do
14 you mean that it added up to a smaller number or a larger
15 number?
16 A.  Well, I think that the securities were worth more than the
17 amount that was reflected -- or how shall I -- let me rephrase
18 that.  They reviewed the schedules.  They did some spot
19 checking of the securities.  There were marks associated with
20 these securities.  And they said, wait a minute.  That does not
21 correspond -- these are -- I remember Fazio saying vividly
22 something like these -- some of them are government securities,
23 should be a hundred cents on the dollar.  They're being pegged
24 at a lower amount.  What's going on?
25 Q.  Well, when did Mr. Fazio say that?

- 72 -

1 A.  I think shortly after the closing.
2 Q.  After the closing?
3 A.  Yes, when we got the schedule.
4 Q.  Well, you've actually gotten schedules prior to the
5 closing, correct, at Weil Gotshal?
6 A.  Well, when we got the final schedules, I should say.
7 Q.  I want to separate in time.
8 A.  Okay.
9 Q.  Before the closing and after closing.  Prior to closing,
10 were you aware of any concerns that Houlihan had concerning the
11 marks, the valuations placed on the securities to be
12 transferred to Barclays?
13 A.  Yes.  They had questions about the marks.  They had
14 questions about the securities that were being transferred in
15 general.
16 Q.  Prior to the closing, had anyone from Houlihan conveyed to
17 you that they believed that the marks or valuations placed on
18 securities to be transferred to Barclays, or any of them, were
19 lower than the actual market value of those securities?
20 A.  I don't think they did.  I don't recall them saying that
21 before the closing.
22 Q.  When was the first time they said that after the closing?
23 A.  I can't pinpoint precisely but it would be in --
24 certainly, it wouldn't be before the Friday when we got the
25 schedules because we only got the schedules on Friday.  So it

- 73 -

1 would be sometime between that Friday and that e-mail of
2 September 28th.
3 Q.  So you got the schedules on the Friday following the
4 closing, is that correct?
5 A.  That's what my e-mail seems to reflect, yes.
6 Q.  Okay.  And that would have been September 26th, correct?
7 A.  I take your word.  I'm not sure, yeah.
8 Q.  And shortly thereafter, Houlihan informed you that the
9 difference between what they thought the value, actual value of
10 those securities were and the value that had been placed on
11 them in the transaction could be several billions of dollars,
12 correct?
13 A.  They told us that, yeah, that there was an issue of
14 several billions of dollars, yes.
15 Q.  And neither at that time nor at any other time prior to
16 the time that you left, did any representative of the
17 committee, insofar as you were aware, ever tell either the
18 Court or Barclays about that several billion dollar difference,
19 correct?
20 A.  Certainly not the Court.  As to Barclays, I think my
21 conversation with counsel for Barclays speaks for itself.  But
22 I didn't use the word billions of dollars but we -- I remember
23 giving her heads up that Houlihan was looking at this issue and
24 that they just didn't add up or something along those lines.
25 But I --

19 (Pages 70 - 73)

- 74 -

1  Q.  Now you remember saying it didn't add up?

2  A.  No.  I said something along those lines.  And that's how I

3  would describe my prior conversation.  I don't remember exactly

4  what sentence I used.  I remember that I gave her a heads-up

5  that this issue was percolating.  And I didn't use the word

6  "percolating" last time either.  I'm just giving you the sense

7  of the conversation.

8  Q.  Yes.  And last time what you said was that you had given

9  her a heads-up that the committee was looking at the marks.

10  A.  Yes.

11  Q.  And I asked you whether you remembered anything else in

12  words or in substance and you told me you didn't.

13  A.  Not precisely, that's correct.

14  Q.  And I asked -- you did say that.  And then I said

15  generally do you?  And you said you didn't generally either.

16  Do you recall that?

17  A.  Okay.

18  Q.  Okay.  So are you now saying that you remember telling her

19  that the numbers, the marks didn't add up?

20  A.  I didn't use the words "add up".  I said the committee is

21  looking into the issue of valuation of the marks.

22  Q.  Okay.

23  A.  I didn't use the word "billions".  I don't recall using

24  the word "billions".  But something along the lines of the

25  committee is investigating this issue.

- 75 -

1  Q.  And the -- and when you say investigating this issue, is

2  the issue of the marks?

3  A.  Correct.

4  Q.  So at any point, did you or, insofar as you were aware,

5  any representative of the committee, at any time prior to the

6  time you left ever tell or communicate to anyone at Barclays

7  that the committee believed that the difference between what

8  was transferred and the marks placed on those transferred had a

9  difference between x and y several billion dollars?

10  A.  I can only speak to what I said -- what indicated and

11  other than the general conversation I had with counsel for

12  Barclays, I did not communicate what you're talking about.

13  Q.  Insofar as you are aware -- I understand I can only ask

14  you about your knowledge.

15  A.  Correct.

16  Q.  But insofar as you are aware, did anyone else ever --

17  A.  Not to my knowledge.

18  Q.  Okay.

19      (Pause)

20  Q.  Let me turn next to Movants' Exhibit 381 which is in your

21  book.  You have that?  When you have it, let me know.

22  A.  Yeah.  One second.  Almost there.  Yeah, I'm here.

23  Q.  And this is an e-mail with an attachment that purports to

24  provide on Sunday, September 21st, at 11:34 a.m. the Schedule A

25  information, correct?

- 76 -

1  A.  Correct.

2  Q.  And this is sent by Brian Kelly of Milbank, correct?

3  A.  That appears to be the case, yes.

4  Q.  And who is Mr. Kelly?

5  A.  I think he was an associate in the corporate group at the

6  time.

7  Q.  Do you know how Mr. Kelly got this?

8  A.  I have no idea.

9  Q.  Now, it is sent to Ann Kaminski, the -- right?

10  A.  That's what the e-mail indicates, yes.

11  Q.  Do you know who she is?

12  A.  I think she's an associate at Houlihan Lokey but I'm not a

13  hundred percent sure.  I think so.

14  Q.  And it's copied to Michael Fazio?

15  A.  Yes.

16  Q.  And he's also at Houlihan, correct?

17  A.  He's a partner at Houlihan, yes.

18  Q.  And do you know why Mr. Kelly is sending them to these two

19  people at Houlihan?

20  A.  No.  I don't know why he was sending them.

21  Q.  Well, you know he was sending it so that they would check

22  it, correct, sir?

23  A.  I don't know what was his intent but I -- it makes sense

24  that they would be looking at that, yes.

25  Q.  And did Houlihan, in fact, make any attempt to check this

- 77 -

1  prior to closing, the Schedule A?

2  A.  The schedule that he received at 11:30 on the morning of

3  the closing?

4  Q.  Yes.

5  A.  I remember them -- I don't recognize the names of the

6  securities or anything like that.  But I remember them looking

7  at a list like this in our conference room at Weil.

8  Q.  Prior to the closing?

9  A.  Yes.

10  Q.  And did they do any spot checks?

11  A.  I'm sure they did but I don't know that precisely.  And

12  spot checks -- what does spot check mean?

13  Q.  What does spot check mean?

14  A.  Well, I understand what -- what do you mean by spot check?

15  I'm sure they looked at some of these securities.  More than

16  that, I can't --

17  Q.  You remember using the term "spot check" earlier in your

18  testimony?

19  A.  Maybe I have, yeah.

20  Q.  What did you mean by "spot check", sir?

21  A.  I don't know.  They were looking at the security -- I saw

22  them in a conference room going through this book and looking

23  at some of these securities -- that I can't tell you more than

24  that.

25  Q.  What do you think they were doing when they were going

LEHMAN BROTHERS HOLDINGS INC., et al.

- 78 -

1 through this book?

2 A.  They were trying to see if they can find data points on

3 these securities to see, for example, if you had any security

4 which is a U.S. Treasury due in 2020, how much is that worth.

5 I mean, I'm making this up.  I don't know if they're in there

6 or not but that's what they were doing, I assume.

7 Q.  Sure.  What they're doing is they're taking this and

8 they're trying to test, as best they can in a short period of

9 time, whether valuations are really reasonable valuations,

10 correct, sir?

11 A.  That must be part of what they're doing.  I --

12 Q.  All right.  Now did they ever give you any report as to

13 what the results of that attempt were?

14 A.  They didn't give us a report but I remember them saying

15 that they were government securities that were off, meaning

16 that the marks seemed to be off compared to what that

17 government security would fetch in the open market.

18 Q.  And they told you this in this conference room at Weil?

19 A.  Yes.  I am not clear about that.  I think so.

20 Q.  And this was prior to closing, correct?

21 A.  I think so.  Not a hundred percent sure but I think so.

22 Q.  Okay.  Now when Houlihan told you that they had discovered

23 prior to closing that some of the marks that were used to value

24 the securities transferred to Barclays looked to be off, did

25 you raise that with Weil Gotshal?

- 79 -

1 A.  That's an issue that was raised not only with Weil Gotshal

2 but with Lehman generally.  That's what led to these sidebar

3 discussions.

4 Q.  And when -- well, let me just ask.  Did you personally

5 raise it?

6 A.  No.  I -- Houlihan raised it with Lehman folks.  And Weil

7 Gotshal was there and I was there as well.

8 Q.  But you were personally present when Houlihan raised,

9 prior to closing, with the Lehman people and the Weil Gotshal

10 people that Houlihan believed that some of the marks were, as

11 you described it, off?

12 A.  Yeah.  Again, I -- I'm not sure they had reached a

13 conclusion about that but I think they did raise that issue

14 with the Lehman folks, yes.

15 Q.  And with the Weil Gotshal folks?

16 A.  Weil Gotshal was present.  I believe they were present in

17 some of these discussions.

18 Q.  And what did the Lehman folks and the Weil Gotshal folks

19 say in response to Houlihan's objections?

20 A.  I'm trying to recall precisely.  I think that, but I'm not

21 a hundred percent sure, I think they said something along the

22 lines that the marks that Lehman was using were stale and

23 that's why the new marks were used.

24 Q.  I thought that you said that Houlihan had gone through and

25 looked at some government securities that should have marked at

- 80 -

1 par, saw they were marked lower than that and raised that

2 concern.  Am I correct about that?

3 A.  I think that that -- that did take place, yes.

4 Q.  Okay.  Now that wouldn't have anything to do with whether

5 marks were stale or not, correct?

6 A.  I don't know it.  I didn't tell you that.  I think the

7 focus of the discussion was on Lehman explaining that the marks

8 they had in their book were stale and that's why they were

9 using other marks.

10 Q.  Was anyone in this discussion that you say took place --

11 was anybody from Barclays there?

12 A.  Not that I recall.

13 Q.  Did anyone from Lehman or Weil Gotshal give you any

14 explanation as to why, as you say was the case, government

15 securities being transferred to Barclays were marked for

16 valuation purposes below what Houlihan thought they should be

17 marked at?

18 A.  I don't remember a response to that.

19 Q.  Did you consider that to be a significant enough issue

20 that you would want to raise that with the Court?

21 A.  Not until I have the full story.

22 Q.  The full story?

23 A.  Yes.

24 Q.  So you didn't think it was enough to raise with the Court

25 the fact that you had discovered that government securities

- 81 -

1 were being transferred to Barclays at a price that was below

2 their value and that neither Lehman nor Weil Gotshal had any

3 explanation for that, is that correct?

4 A.  No.  I think I would say that they gave an explanation to

5 Houlihan.  And I believe that Houlihan, without doing due

6 diligence or, rather, having the ability to actually test

7 everything, left the -- was left with the impression that

8 everything was okay.  And -- but they needed to be audited and

9 that's what they did after the closing.

10 Q.  How long does it take to audit the market price of a

11 government security?

12     MR. KIRPALANI:  Objection, Your Honor.  No foundation.

13 A.  I don't know.  You would have to ask Houlihan.

14     THE COURT:  Sorry.  One second.  There's an objection.

15 What's the objection?

16     MR. KIRPALANI:  Your Honor, there's no foundation this

17 witness has that understanding of how long it takes to value

18 securities in the marketplace.

19     THE COURT:  That's a fair objection.  Do you want to

20 rephrase it or do you want to establish your foundation for it?

21     MR. BOIES:  I will, Your Honor.

22 BY MR. BOIES:

23 Q.  Mr. Despins, do you have any understanding as to how long

24 it takes to get a reliable value for government securities --

25 U.S. government securities, in the marketplace?

21 (Pages 78 - 81)

# Exhibit J

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                 :

In re                               :      Chapter 11 Case No.
                                   :

LEHMAN BROTHERS HOLDINGS INC.,    :      08-13555 (JMP)
*et al.*,                              :
                                   :      (Jointly Administered)

                 Debtors.        :
------------------------------------------------------- x


### REPORT OF
### ANTON R. VALUKAS, EXAMINER


                             Jenner & Block LLP
                             353 N. Clark Street
                             Chicago, IL 60654-3456
                             312-222-9350

                             919 Third Avenue
                             37th Floor
                             New York, NY 10022-3908
                             212-891-1600

March 11, 2010                    *Counsel to the Examiner*


### VOLUME 2 OF 9

**Section III.A.2: Valuation**

**Section III.A.3: Survival**

### (1) Scope of Examination

To address the tasks in the Examiner's Order, the Examiner evaluated the reasonableness of Lehman's mark-to-market valuations in two distinct but related different contexts. The Examiner considered the reasonableness of Lehman's mark-to-market valuations for two reasons. First, in connection with the Examiner's analysis as to whether LBHI or any LBHI Affiliates were insolvent, the Examiner considered whether there was sufficient evidence that Lehman's valuations for a particular asset class were unreasonable such that the court could adjust, or even disregard, such valuations in determining the solvency of these debtors. Second, where there was sufficient evidence to demonstrate that valuations were unreasonable, the Examiner considered whether such valuations were the product of actions of a Lehman officer that would support a colorable claim of breach of fiduciary duty.

The Examiner's inquiry into the reasonableness of Lehman's valuation focused on Lehman's U.S. assets. The Examiner determined that, in light of the composition of the LBHI Affiliates' assets, the relative inaccessibility of information regarding the valuation and price testing of Lehman's non-U.S. assets and the time and expense necessary to obtain and analyze such information, an assessment of Lehman's non-U.S. assets was not a prudent use of resources. Accordingly, unless otherwise noted, any reference to an asset class or a particular Lehman business unit in this Section is to U.S. assets or a Lehman U.S. business unit.

The Examiner analyzed Lehman's valuation of the following asset categories: commercial real estate ("CRE"), residential whole loans ("RWLs"), residential mortgage-backed securities ("RMBS"), collateralized debt obligations ("CDOs"), derivatives, corporate debt and corporate equity. The Examiner selected these asset categories due to the relative size of each asset class and the risk of a valuation error in light of deteriorating market conditions. Given that the primary purpose of the valuation was to support the solvency analysis, the Examiner focused the valuation analysis on the second and third fiscal quarters of 2008,[727] except with respect to Lehman's valuations of its Archstone positions, which are addressed beginning with the Archstone acquisition in October 2007.

Across all asset classes, the asset values Lehman reported were those determined by its business desk, subject to revision pursuant to a price testing process performed by its Product Control Group.[728] Even within a single asset class, the valuation methodologies employed by the business desk differed, and the Product Control

---

[727] LBHI's market capitalization was approximately $28.1 billion as of the end of its first fiscal quarter on February 29, 2008. *See* LBHI Form 10-Q (filed April 9, 2008), at p. 6. The Examiner focused on the dates May 31, 2008, and August 31, 2008, because these were the last days of Lehman's second and third quarters, respectively. While Lehman did not file a quarterly report for the third quarter of 2008, the business desks did value their positions and the Product Control Group performed price testing for this period. In light of the primary purpose of the valuation analysis, the Examiner determined that it was not a prudent use of resources to examine the reasonableness of Lehman's valuations (other than Archstone) prior to the second quarter of 2008. With respect to Archstone, given the substantial analyst and media focus on this transaction and the nature of Lehman's participation, the Examiner determined it would be prudent to begin the valuation analysis with the Archstone acquisition in the fourth quarter of 2007 to provide appropriate context in which to consider the reasonableness of Lehman's valuations during later periods.

[728] Lehman, Price Verification Policy: Global Capital Markets 2008 [Draft], at p. 4 [LBHI_SEC07940_2965994].

Group's price testing served as a standardized check on the valuation process.   For this

reason, the investigation focused on the role played by the Product Control Group and

the methods employed in the price testing process.

### (2)  Summary of Applicable Legal Standards

The standard for determining the fair value of an asset pursuant to SFAS 157 is

closely aligned with the standard courts have applied in determining the value of a

debtor's assets for purposes of a solvency determination.[729]   The Bankruptcy Code

defines "insolvent" in relevant part as the "financial condition such that the sum of the

entity's debts is greater than all of such entity's property, at a fair valuation[.]"[730]  When

assessing the fair value of a debtor's assets, courts consider "the fair market price of the

debtor's assets that could be obtained if sold in a prudent manner within a reasonable

period of time to pay the debtor's debts."[731]  In this manner, both the SFAS 157 standard

for mark-to-market valuation and the courts' solvency analysis are predicated on the

price that could be obtained for the asset in the marketplace as of the applicable

measurement date.

Given that "valuation is, to a great extent, a subjective exercise,"[732] courts have

assessed the reasonableness of a debtor's valuation or projection of future cash flows in

---

[729] *See* Appendix 1, Legal Issues, Section VII.A, for a discussion of the applicable valuation standards under SFAS 157 and for a solvency determination under the Bankruptcy Code.
[730] 11 U.S.C. § 101(32)(A) (definition applicable to entities other than a partnership or municipality).
[731] *In re Roblin Industries, Inc.*, 78 F.3d 30, 35 (2d Cir. 1996).
[732] *In re Iridium Operating LLC*, 373 B.R. 283, 348 (Bankr. S.D.N.Y. 2007).

light of information available at the time the valuation was undertaken. As the Third Circuit has explained with respect to the analysis of a debtor's cash flow projections, "far from 'hindsight' or 'post-hoc' analysis, a court looks at the circumstances as they appeared to the debtor and determines whether the debtor's belief that a future event would occur was reasonable. The less reasonable a debtor's belief, the more a court is justified in reducing the assets (or raising liabilities) to reflect the debtor's true financial condition at the time of the alleged transfers."[733] Accordingly, the Examiner has considered the reasonableness of Lehman's asset values in light of contemporaneous information available to Lehman and with the understanding that valuation of illiquid assets requires the application of considerable judgment.

With respect to the fiduciary duty analysis, a corporate fiduciary would have breached such duty if the fiduciary caused Lehman to improperly value an asset intentionally or with "conscious recklessness — *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence."[734] In order for there to be a colorable claim, the facts need to support a finding that the corporate fiduciary had the necessary scienter.

---

[733] *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc.*, 92 F.3d 139, 157 (3d Cir. 1996).

[734] *See, e.g., Desimone v. Barrows*, 924 A.2d 908, 934-35 & n.89 (Del. Ch. 2007). *See* Appendix 1, Legal Issues, Section II, for a discussion regarding the legal standards for breach of fiduciary duty. *See also South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009).

### (3)  Summary of Findings and Conclusions

The Examiner finds insufficient evidence to support a finding that Lehman's valuations of its RWL, RMBS, CDO or derivative positions were unreasonable during the second and third quarters of 2008.  Although the Examiner identifies, and discusses below, certain problematic issues related to the price testing of these asset classes, these problems either did not impact the ultimate asset values determined or the resulting valuation errors were immaterial.

Because an assessment of the reasonableness of Lehman's asset values for corporate debt and corporate equity would require an expensive and time consuming asset-by-asset analysis, the Examiner determined that such an assessment was not a prudent use of resources.  The Examiner considered Lehman's valuations of the largest corporate debt and corporate equity positions and identified issues that may warrant further review by parties in interest.

With respect to commercial real estate, the Examiner finds insufficient evidence to conclude that Lehman's valuations of its Commercial portfolio were unreasonable as of the second and third quarters of 2008.  The Examiner determines that there is sufficient evidence to conclude that certain of the Principal Transactions Group ("PTG") real estate assets were not reasonably valued during these quarters.  Furthermore, the Examiner finds sufficient evidence to support a finding that Lehman's valuations of its

Archstone bridge equity investment were unreasonable as of the first, second and third quarters of 2008.[735]

The Examiner did not find sufficient evidence to support a colorable claim for breach of fiduciary duty in connection with any of Lehman's valuations. In particular, in the third quarter of 2008 there is evidence that certain executives felt pressure to not take all of the write-downs on real estate positions that they determined were appropriate; there is some evidence that the pressure actually resulted in unreasonable marks. But, as the evidence is in conflict, the Examiner determines that there is insufficient evidence to support a colorable claim that Lehman's senior management imposed arbitrary limits on write-downs of real estate positions during that quarter.

### b) Overview of Valuation of Lehman's Commercial Real Estate Portfolio

This Section addresses Lehman's valuation of its CRE portfolio, principally during the second and third quarters of 2008,[736] and provides an overview of Lehman's CRE portfolio and Lehman's valuation process across the CRE portfolio. In order to put Lehman's valuation process and decisions in context, this overview summarizes the

---

[735] This analysis also pertains to the permanent equity (*i.e.*, general partner interest) which was valued at $246 million at closing. *See* Lehman, Archstone Monthly Exposure as of July 2008 revised.xls [LBEX-BARFID 0013113].

[736] As is the case with each of the other asset classes that were the focus of the investigation as to Lehman's valuation of assets, the Examiner determined that it would not be a prudent use of resources to conduct an investigation of Lehman's valuation of its non-U.S. CRE assets. With the exception of LCPI, which owned certain European debt and Coeur Defense positions (located in Paris, France), the LBHI Affiliates did not directly own material CRE positions in respect of real estate located outside of the U.S. *See* Section III.B.3.c.3.a of this Report, which discusses the Examiner's finding that LCPI was either insolvent or borderline solvent during the period beginning September 2007.

# Exhibit K



**SIFMA**®

Securities Industry and
Financial Markets Association

February 6, 2009

The Honorable Timothy Geithner
Secretary
Department of the Treasury
1500 Pennsylvania Avenue NW
Washington, DC 20220

Dear Secretary Geithner:

The Securities Industry and Financial Markets Association (SIFMA)[1] applauds the bold steps the Treasury Department has taken to put our financial markets back on track. We understand the severity of the credit crisis is such that there are many competing demands, but we respectfully urge you to consider taking action to help restore liquidity and functioning in the municipal and auction securities markets. Historically, state and local governments have looked to the municipal bond market to help fund roads, public school construction and improvements to public infrastructure, among other projects. Auction rate securities had been an attractive source of funding for state and local governments, student loan financing authorities, and closed-end funds since 1984.

As you know, beginning in 2008, as the credit markets tightened, investor demand for investment options supported by monoline insurers and third-party credit enhancers halted. Because of the critical role insurers and third-party credit enhancers play in the municipal bond and auction rate securities markets, demand for these securities declined sharply. The resulting lack of liquidity in these markets has made it difficult for state and local issuers to meet the financing needs of their communities, threatened the viability of small regional broker-dealer firms, and left individual investors holding onto illiquid securities. We wish to work with you to stabilize these critical markets at this difficult time in our economy.

## I.    Municipal Issuers

The municipal bond market is experiencing a significantly low level of liquidity. State and local issuers are facing a critical need for reliable long-term credit enhancement, making it difficult to bring issues to market. The municipal securities market is also facing a serious dislocation between supply and demand. Municipalities are finding that even full faith and credit general obligation bonds cannot find investors. In some instances, due to the lack of availability of liquidity facilities for short-term money market fund eligible debt, cities and states have been forced to replace their variable rate municipal securities with more expensive, long-term, fixed-rate debt. This change in the supply of municipal bonds drives up rates on long-term munis, hurting municipal bond issuers

---

[1] SIFMA brings together the shared interests of more than 650 securities firms, banks, and asset managers. SIFMA's mission is to promote policies and practices that work to expand and perfect markets, foster the development of new products and services, and create efficiencies for member firms, while preserving and enhancing the public's trust and confidence in the markets and the industry. SIFMA works to represent its members' interests locally and globally. It has offices in New York, Washington, D.C., and London. Its associated firm, the Asia Securities Industry and Financial Markets Association, is based in Hong Kong. More information may be found on our website: http://www.sifma.org.

and raising costs for taxpayers. In other cases, municipal issuers have simply been unable to find buyers in the short- and long-term markets for their debt issues. Examples of state and local issuers who have recently faced difficulties in the municipal market include:

- The Port Authority of New York and New Jersey failed to receive any bids on its $300 million auction of taxable three year notes in December.
- The Michigan Municipal Bond Authority abandoned plans to issue $200 million in revenue bonds to help fund the state's clean water revolving fund, opting instead to issue $150 million in shorter-term notes. This was the first time in the program's ten-year history that the state will issue notes instead of bonds.
- The Commonwealth of Pennsylvania limited a $600 million competitive general obligation sale due to market conditions. Pennsylvania tends to sell debt twice a year, but may be forced to borrow more frequently in smaller quantities.
- The State of California also reduced a $523 million bond issuance by half and has had difficulty renewing liquidity facilities and maintaining the long-term ratings necessary to ensure its short-term debt is eligible to be purchased by money market funds.

As these examples illustrate, the deteriorating conditions in the credit markets generally have spread into the municipal market, severely limiting the capital available to build roads, bridges, schools and other necessary infrastructure. We are forwarding the following options to federal policymakers in hopes of restoring liquidity, adequately addressing the need for reliable long-term credit enhancement, and resolving the serious dislocation between supply and demand in the municipal bond market.

- Develop a federal liquidity facility to write or guarantee letters of credit and standby bond purchase agreements for state and local governmental issuers of debt.
- Develop a federally-supported monoline insurer or reinsurer.
- Modify restrictions on pension fund investments in in-state tax-exempt bonds.
- Appoint a contact at the Treasury Department to monitor the economic functioning of the municipal securities market.

## II.    Regional Broker-Dealers

Historically, auction rate securities, which include auction rate bonds (ARBs) and auction rate preferred securities (ARPS), have provided an attractive cost of financing for state and local governments, student loan financing authorities and closed-end mutual funds. ARS were considered highly-rated investments because they are backed by state and local governments' taxing authority, revenues from student loan financing authorities, 501c3s, and the assets of closed-end mutual funds, making them attractive to retail and institutional investors. But as the credit crisis spread into other markets, demand for ARS halted, resulting in "failed" auctions and leaving investors unable to sell their ARS. Today most ARS auctions continue to fail and many thousands of investors are holding securities which offer no liquidity and cannot be sold. As a result, many state and local issuers, including state student loan financing authorities, have faced steep increases in their cost of capital. Some state and local government ARS issuers have been able to refund or restructure their outstanding ARS, but others have not, resulting in difficulty for state and local issuers to meet the financing needs of their communities.

The failed auctions have also threatened the viability of small and regional broker-dealer firms. These small and regional firms are often a source of necessary financing for projects in their local communities. Some broker-dealers have purchased the auction rate securities from their clients, but this often just transfers illiquidity problems to the dealers who are facing their own liquidity and balance sheet issues. Other broker-dealers are facing capital limitations as a result of the continuing credit crunch. If these firms are required to reimburse investors for the auction rate securities, many would be forced to go out of business, resulting in lost jobs and revenues in some of our already struggling communities.

It is essential that we restore liquidity in the auction rate securities market to help state and local issuers, retail and institutional investors and small and regional firms. We respectfully request you consider:

- Using authority under the Troubled Asset Relief Program (TARP) to purchase auction rate securities.
- Developing a federal liquidity facility to write standby letters of credit for ARPS.
- Developing a temporary federal government guarantee program for ARPS, similar to the Treasury's Temporary Guarantee Program for Money Market Funds.
- Developing a lending facility to repurchase auction rate securities.

We look forward to working with the administration, the Congress and the municipal securities community, as we all work to return to a vibrant and healthy municipal securities market and restore liquidity to the auction rate securities market. Please do not hesitate to call Scott DeFife, Senior Managing Director, Government Affairs, at 202.962.7330 with any questions or if we can be of assistance in this area.

Sincerely,

T. Timothy Ryan, Jr.
President and CEO

# Exhibit L

Go on campus now
at WSJ.unigo.com

WSJ ON CAMPUS
THE WALL STREET JOURNAL.

unigo

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers,
use the Order Reprints tool at the bottom of any article or visit www.djreprints.com.

See a sample reprint in PDF format.        Order a reprint of this article now

## THE WALL STREET JOURNAL
WSJ.com

LAW  |  AUGUST 5, 2010

# UBS to Pay $81 Million in Auction-Rate Case

By RANDALL SMITH

UBS AG has been ordered to pay 10 times the amount a Maryland marketer of cellphones originally invested in auction-rate securities, in another sign of the reckoning still dogging Wall Street for its role in investor losses during the meltdown.



'Money is like oxygen,' said Daniel Neal, above, CEO of Kajeet, which won an award from UBS.

Brendan Hoffman for The Wall Street Journal

UBS was ordered to reimburse Kajeet Inc., which markets cellphones for kids, $80.8 million for damage to its business when Kajeet's cash was frozen in auction-rate securities in early 2008. Kajeet had invested only $8 million in the securities through UBS, according to people familiar with the case.

A spokeswoman for Switzerland-based UBS said, "We strongly disagree with the arbitration panel's decision." She said UBS plans to file a motion to overturn it: "We believe the outcome is unwarranted under both the facts and the law."

The award, disclosed late Tuesday, is an unusual example of how Wall Street's bills for the market meltdown are still growing more than three years after the crisis first struck in mid-2007.

Investors have filed more than 650 claims to recover auction-rate losses or damages through the end of June, according to the Financial Industry Regulatory Authority.

The entire $330 billion market for auction-rate securities froze in February 2008, when Wall Street dealers pulled back from auctions held weekly and monthly to set their interest rates. UBS had more than $35 billion in such auction-rate investments held by 40,000 customers who suddenly couldn't get access to their money, the Securities and Exchange Commission said in a 2008 complaint. Regulatory settlements eventually required major brokerages to buy back more than $60 billion from investors.

Investors have had relative success in recovering money for their losses, in part because Wall Street firms represented such investments as safe. Such securities offered rates that were higher than money-market funds, but lower than long-term debt. Regulators later charged that UBS and other firms misled investors to believe they "were equivalent to cash or money market funds," as the SEC put it in its 2008 complaint against UBS.

UBS to Pay $81 Million in Auction-Rate Case - WSJ.com#printMode

Page 2 of 2



**Deep Freeze**
How much customers of some Wall Street firms had tied up in auction-rate securities when the market froze in February 2008.

| | |
|---|---|
| Citigroup | $45 billion |
| UBS | 35 |
| Wachovia | 14 |
| Bank of America | 10 |

Source: Securities and Exchange Commission

As part of the settlement by UBS and other brokerages in 2008, a special arbitration procedure was set up for their customers. It allows investors whose funds were frozen to claim "recovery of consequential damages" based on lack of access to their funds. Under the procedure, the firms were barred from contesting liability for claims based on the contention that brokers misrepresented how easy it would be to resell the assets.

"This case sends a shot across the bow for Wall Street firms that if they violate securities laws, they can be held liable for consequential damages," said investors' lawyer Jacob Zamansky.

In the arbitration, Kajeet argued that with the markets frozen, the lack of access to its $8 million caused a "domino effect," people familiar with the case said. But UBS responded that while Kajeet did run into subsequent financial difficulty, it wasn't entirely related to its inability to access its cash.

Without access to its funds, Bethesda, Md.-based Kajeet had to cut its 60-member work force in half and lost a key distribution deal with a well-known national retail chain, stunting its growth, the same people said. Kajeet currently has 15 employees.

Founded in 2003, Kajeet raised more than $64 million in venture-capital financing before borrowing $10 million in January 2008. It ultimately sold $4 million in auction-rate securities in May 2008 at a 10% loss, which was later made up by UBS. Kajeet sold its remaining $4 million in January 2009 under a regulator-mandated UBS buyback plan.

"Any company that had its war chest in auction-rate securities was potentially going to suffer catastrophic consequences," said Greg Lawrence, a partner of Conti Fenn & Lawrence LLC in Baltimore, which represented Kajeet in the arbitration case. "Liquidity crises can kill companies."

"Money is like oxygen," said Daniel Neal, Kajeet's CEO. Merely recovering the original investment, he said, would be like being told, "I want to take all the oxygen out of your office and I'll give it back in a week." The arbitration award, which represented 73% of the $110 million the company claimed, "will make sure that we'll be healthy" in the future.

Other investors have had similar success in auction-rate cases. Geneva chip maker STMicroelectronics NV won a $406 million arbitration award against Credit Suisse Group in February 2009 over its purchase of $415 million in auction-rate securities.

The former Credit Suisse brokers who dealt with STMicro, Eric Butler and Julian Tzolov, were charged with criminal fraud in federal court in Brooklyn. Mr. Butler was convicted in a jury trial in August 2009. Mr. Tzolov testified against him after pleading guilty a month earlier.

**Write to** Randall Smith at randall.smith@wsj.com

Copyright 2009 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com

# Exhibit M

Page 1

1          HIGHLY CONFIDENTIAL - A. KIRK

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                    Debtors.

10

     ----------------------x

11

12        * * * HIGHLY CONFIDENTIAL * * *

13          DEPOSITION OF ALEX KIRK

14            New York, New York

15            August 31, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24545

Page 90

HIGHLY CONFIDENTIAL - A. KIRK

1     A.   As a matter of fact, my answer
2 indicates what I did was I redirected them to
3 people I thought could be helpful.
4     Q.   Okay.
5     A.   That's what I thought my
6 responsibility would be.
7     Q.   Okay.
8     A.   Try to put point them in a direction.
9     Q.   Beg your pardon.
10     And with respect to the third
11 question, you say, "The third question is
12 definitely for Cogs," C-O-G-S. Is that a
13 reference to Mr. Coghlan?
14     A.   John Coghlan, yes.
15     Q.   John Coghlan, okay. And why was it a
16 question for John Coghlan?
17     A.   Because he was head of repo financing
18 at the firm.
19     Q.   Do you know if Mr. Coghlan ever did
20 address the third question?
21     A.   No idea.
22     Q.   Now, when you were in the Friday
23 meeting and the topic of the repo was being
24 discussed -- withdrawn.

Page 91

HIGHLY CONFIDENTIAL - A. KIRK

1     This is sent, this e-mail comes to you
2 on Thursday?
3     A.   Yes.
4     Q.   At roughly 6:40 in the morning. Note
5 that that's Greenwich mean time shown there.
6     A.   Yeah.
7     Q.   The next morning you're in a meeting
8 where the repo is being discussed. Did that
9 trigger any recollection in your mind about, you
10 know, an e-mail discussion the prior day about
11 using the repo as a means of making the block
12 discount happen?
13     A.   No, I, you know, I get 500 e-mails a
14 day, and during this period of time we were
15 getting probably twice that. So ...
16     Q.   And when you saw a reference --
17     A.   I was answering all of them, so, you
18 know, or as many of them as I could.
19     Q.   And also to the mysterious number that
20 we finally identified.
21     A.   Yes, and then there's the mysterious
22 number.
23     Q.   Now, the --
24     A.   I don't think the company's in

Page 92

HIGHLY CONFIDENTIAL - A. KIRK

1 business anymore.
2     Q.   Was there a reference to the -- any
3 discussion in the Friday meeting of a discount?
4     A.   No, not that I recall.
5     Q.   Okay. So I'll summarize it just to
6 frame my next question so you're not married to
7 how I do this. But as I understand it, the
8 meetings happened, you identified the JPM
9 problem, the recommendation is made to transfer
10 what's in the repo, and there's some issues
11 about how to value what's in there; is that a
12 fair summary?
13     A.   Yes.
14     Q.   Okay. And the general sense of the
15 meeting from both sides of the table is, okay,
16 let's go to it and try and figure this out, we
17 have until about 4 o'clock to see if we can
18 solve this, yes?
19     A.   Yes.
20     Q.   And Barclays says if we can't reach a
21 resolution of that by about 4 o'clock, we may
22 have to terminate the repo, correct?
23     A.   Correct.
24     Q.   And McDade has said if that comes to

Page 93

HIGHLY CONFIDENTIAL - A. KIRK

1 be, you know, you have to do what you have to
2 do?
3     A.   Those are your rights.
4     Q.   And you don't know if the repo was in
5 fact ever terminated by Barclays?
6     A.   I don't know that.
7     Q.   Okay. So now what happens? Does the
8 meeting end or is there further discussion?
9     A.   I recall the meeting ending at that
10 time.
11     Q.   And what did you do next?
12     A.   I went back to my office. I called
13 the various senior executives I was going to
14 meet with and told them that we should be
15 getting a new schedule at some point of assets
16 that we would have to -- they should ignore that
17 schedule of assets and we would be getting a new
18 schedule of assets at some point to try to put
19 some values on.
20     Q.   When you say "ignore that schedule of
21 assets," again, for clarity of record, are you
22 talking about Exhibit 19, the original financial
23 schedule?
24     A.   I'm sorry, no, I'm talking about the

Page 94

HIGHLY CONFIDENTIAL - A. KIRK

1 list of hundred assets that was delivered to the
2 desk early that morning.
3     Q.   Got it. As part of the fire sale
4 liquidation?
5     A.   Correct.
6     Q.   And you told them they would be
7 getting a new list of assets. Who is it you're
8 having these communications with?
9     A.   I certainly called Mike Gelband and I
10 would have called some subset, although I don't
11 recall who I spoke to specifically or who Mike
12 spoke to, but I would have called either
13 Kaushik, Charlie, Eric and Gerry.
14     Q.   Eric is Eric Felder?
15     A.   Yes.
16     Q.   And Gerry is Gerald Donini?
17     A.   Yes.
18     Q.   And who is Charlie? Is that Charlie
19 Spero?
20     A.   Spero, uh-huh.
21     Q.   And did do you this on a conference
22 call? Call them separately? In a meeting?
23     A.   Probably called them separately.
24     Q.   And what happened after that?

Page 95

HIGHLY CONFIDENTIAL - A. KIRK

1     A.   We waited for a deliverable schedule
2 from finance.
3     Q.   Did you get one?
4     A.   Got one at sometime within the hour.
5     Q.   And from whom within finance did you
6 receive that?
7     A.   I don't remember who it was.
8     Q.   Who within finance was in charge of
9 that piece?
10     A.   It would have been some combination --
11 well, no, most likely it would have been Paolo,
12 working with accounting.
13     Q.   And Paolo or somebody at his direction
14 delivers a schedule. To whom is it delivered?
15     A.   I don't recall, but I'm sure it was
16 instructed to be delivered directly to the
17 people on this list that I mentioned before and
18 myself and Mike.
19     Q.   And what happened with the list?
20     A.   We asked the senior managers to try to
21 value the list given the market conditions that
22 day, and generally the response was the markets
23 are too volatile, there's too many line items,
24 it's not possible to get this done in any

Page 96

HIGHLY CONFIDENTIAL - A. KIRK

1 pinpoint fashion in this timeframe, but we'll
2 try.
3     Q.   And at some point was there -- did
4 they solve that problem? Did they produce
5 valuations?
6     A.   The only valuations we got was that --
7 I don't know what they communicated to Barry
8 Ridings or the people working on that specific
9 testimony.
10     Q.   Uh-huh.
11     A.   But I got the word back generally that
12 many of these positions were so illiquid that,
13 you know, that if we were to try to sell them,
14 given our circumstances, you know, the bids
15 might be down 20 percent.
16     Q.   Was there any discussion about looking
17 at the valuations that Bank of New York had
18 given to what was in the repo?
19     A.   We didn't have access to Bank of New
20 York's valuations, I don't believe.
21     Q.   Did you talk to anyone who was
22 familiar with how repurchase -- more familiar
23 than you with how repurchase agreements worked
24 to see if the collateral agent applied

Page 97

HIGHLY CONFIDENTIAL - A. KIRK

1 valuations to what was held as collateral?
2     A.   I don't recall having that specific
3 conversation.
4     Q.   Do you know if anyone did have that
5 discussion, that conversation with Barclays?
6     A.   They might have.
7     Q.   Without regard to the particular
8 detail or even the number --
9     A.   Yeah.
10     Q.   -- you had a sense of whether by, you
11 know, at some point on that Friday a value was
12 put on the collateral within the repo?
13     A.   We at Lehman determined that the
14 out -- the volatility of those outcomes we
15 couldn't put a number that was specific on it.
16 It was, given how illiquid many of the assets
17 were, some of the assets you could value, but
18 the markets were tremendously volatile all week.
19     We had had, you know, been getting
20 closed out of -- just the prior day we got
21 closed out of a repo, a futures position on the
22 CME that had excess margin of, you know, $1.6
23 billion.
24     As far as we could tell, the markets

Page 98

HIGHLY CONFIDENTIAL - A. KIRK

1  hadn't moved that much.  Many of them were in
2  Treasury and government bond futures, but the
3  CME called us to inform us they had closed us
4  out of the position and we had lost all the
5  money in excess margin.  So it was becoming very
6  hard to value even what were deemed to be liquid
7  securities.
8      Q.   Just so we're clear here, the closing
9  out of the position by the Chicago Merc doesn't
10 bear on the collateral that's within the repo;
11 that's a separate event, correct?
12     A.   That is a separate event, but it
13 was -- it was demonstrative of the volatility
14 and the issues we were wrestling with.
15     Q.   And the question that I would like to
16 put is, did Lehman come to some number, did it
17 come to a value, a valuation of the collateral
18 that was within the Barclays Repurchase
19 Agreement?
20     A.   We couldn't come up with a specific
21 value.  We didn't have time.  We knew we
22 didn't -- we tried, but we couldn't, and we knew
23 the risk was that Barclays would close out of
24 the repo and take all that collateral, so they

Page 99

HIGHLY CONFIDENTIAL - A. KIRK

1  owned it, that we would end up with no excess
2  from that collateral, and that from the very
3  high-level work that the senior risk managers
4  did, which we were relying upon, that we could
5  be well out of the money, it was likely that we
6  could be well -- we would be well out of the
7  money in that below the haircut, which I
8  believe, understood to be somewhere between 5
9  and 10 percent.
10     Q.   When you referred to a moment ago to
11 one of the risks was that we would not end up
12 with -- we would end up with no excess, what did
13 you mean by that?
14     A.   Meaning that if Barclays closed us out
15 of the repo, our experience had been, not just
16 in that period of time but other cases, but
17 certainly in that week, that their liquidation
18 of that collateral would eat through more than
19 the haircut they had and that they would not get
20 back a hundred cents on the dollar.  So we,
21 Lehman, would not receive any proceeds back from
22 the liquidation of that collateral.
23     Q.   What was your understanding of what
24 would happen if there was excess collateral?

Page 100

HIGHLY CONFIDENTIAL - A. KIRK

1  Who would keep that?
2      A.   If there was excess collateral, Lehman
3  would keep that value.
4      Q.   Was that discussed at the Friday
5  meeting, that if there was excess collateral, it
6  would say with Lehman?
7      A.   There was not a discussion of closing
8  out the repo and the mechanics of it.
9      Q.   So did there come a point on Friday
10 where Lehman communicated to Barclays either --
11 where it communicated a value of the repo or it
12 said it couldn't?  What happens next vis-a-vis
13 talking to Barclays?
14     A.   In terms of talking to Barclays, the
15 next meeting was at some point, call it 3
16 o'clock in the afternoon, and they were
17 indicating that the -- their view of the value
18 of the repo securities was far below the stated
19 value and below their loan value and that Lehman
20 should attempt to find other unencumbered
21 assets, should continue to attempt to find other
22 unencumbered assets or the transaction may not
23 take place.
24     Q.   Now, is this response from Barclays

Page 101

HIGHLY CONFIDENTIAL - A. KIRK

1  after the Friday meeting has ended?  I want to
2  get a sense of the timeline within Friday of
3  when Barclays does this.
4      A.   This is like 3 o'clock in the
5  afternoon.
6      Q.   Does Barclays tell you, does Barclays
7  tell Lehman how much difference has to be made
8  up?
9      A.   No.
10     Q.   Is your answer that you don't remember
11 or that you remember that they didn't?
12     A.   I remember they didn't.
13     Q.   So what happens now?
14     A.   We said we'll continue to look.  And
15 Ian and I had a conversation with McDade
16 offline, just he and I.  I said, I don't have
17 any basis or enough information to argue with
18 them about their point of view, about the value
19 of collateral, and that the high-level work
20 we've been doing leads me to believe that they
21 have a reason to be nervous about this.
22     Q.   And what was --
23          (Mr. Kelley confers with the witness.)
24     A.   Barclays.

26 (Pages 98 to 101)

# Exhibit N

Page 1

1                         H. MILLER

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4       ----------------------x

5    In Re:

6                               Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                  Debtors.

10

        ----------------------x

11

12

13

14     VIDEOTAPED DEPOSITION OF HARVEY R. MILLER

15              New York, New York

16              January 7, 2010

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 26535

Page 34

1           H. MILLER
2  what?
3      A.   References to the value of the assets,
4  the assumption of liabilities, all the
5  liabilities.
6      Q.   Did you have an understanding one way
7  or the other as to whether there were any
8  reliable estimates of the actual value of the
9  assets or liabilities that were involved here?
10     A.   I don't quite know what you mean by
11 "reliable."  As I said, the -- it was fluid.
12 The markets were in terrible shape.  There was a
13 persistent theme that -- and this was a theme
14 that predated this transaction -- that Lehman
15 was always aggressive on its marks.
16         So, from my perspective, and I think
17 my team's perspective, Lehman and Barclays were
18 trying to work that out in this room that had
19 this huge computer printouts and stuff that went
20 on for hours and hours and hours.
21     Q.   Were you, and by "you" I mean Weil
22 Gotshal, not you necessarily you personally, but
23 were you, in the context of Weil Gotshal, aware
24 that both Barclays and Lehman had a variety of
25 estimates of values of these assets?

Page 35

1           H. MILLER
2      A.   Yes.
3      Q.   And that those estimates varied
4  widely?
5      A.   "Widely" is a relative term, but I
6  mean, we -- I think we started Monday or Tuesday
7  with estimates of potentially 70 odd billion
8  dollars in assets and $64 billion in
9  liabilities.  By Wednesday evening, or sometime
10 around that time, it had gone down to 45 billion
11 in assets, and I don't remember the figure on
12 the liabilities, but 42, 43, something like
13 that.
14     Q.   In terms of the assets.
15         Now, when you refer to the assets,
16 what assets are you referring to there?
17     A.   I can't -- I really can't itemize
18 them, but those were the figures that I heard.
19     Q.   Were you aware of assets that were
20 referred to as the repo assets?
21     A.   There were the outstanding -- there
22 was an outstanding repo with the Fed.
23     Q.   And that outstanding repo with the
24 Fed, there were certain assets that were the
25 collateral for the loan from the Fed, correct?

Page 36

1           H. MILLER
2      A.   Well, as I said, when we had the
3  meeting with the Federal Reserve Bank on Sunday,
4  the 14th, in the course of those discussions,
5  when the Fed and the S.E.C. and the Treasury
6  Department insisted -- maybe "insisted" is too
7  strong a word -- that Lehman file a bankruptcy
8  petition and the discussions about the effect
9  that it would have on customers of LBI, which
10 had the biggest presence, the Fed said that they
11 would keep the PDCF window open for four days,
12 about four or five days, provided that LBI
13 complied with the collateral requirements.
14         So there wasn't one repo; there was a
15 repo on Monday and I guess there was a repo on
16 Tuesday.  It was like an overnight loan.  And I
17 can't recall the figure on Monday, but it was
18 maybe close to $90 billion.
19     Q.   And that Monday, which Monday is that?
20     A.   That's the 15th.
21     Q.   That's the 15th.
22         By the end of that week, there was
23 still a repo outstanding with the Fed, correct?
24     A.   There was a repo outstanding, but the
25 character of it had changed in terms of who was

Page 37

1           H. MILLER
2  the lender, let me call it.  I think starting on
3  Tuesday there was pressure on Barclays to step
4  into the process.  If I recall correctly, I
5  think Barclays made a first loan on Tuesday, may
6  have been around $7 billion, then there was a
7  $15.8 billion loan, and then the Fed I think put
8  a lot of pressure on Barclays to take over the
9  Fed's position.  And that repo, I think it was
10 45 billion.
11     Q.   And Barclays did take over the Fed's
12 position?
13     A.   My -- my understanding was Barclays
14 stepped into the shoes of the Fed.
15     Q.   And at that point there were certain
16 assets, and you said about $45 billion, that
17 were collateral that was backing up that loan
18 that had first been made by the Fed and then --
19     A.   Should have been more than 45 billion.
20 Generally, you need an excess, some
21 loan-to-value kind of a concept.  My own
22 impression is the Fed was getting very nervous
23 about the deterioration in the value of the
24 collateral and certainly did not want to end up
25 as an undersecured creditor.

Page 46

H. MILLER

1 Barclays since Barclays was buying the business,
2 correct?
3     A.    Correct.
4     Q.    So they had at least a potential
5 conflict of interest since they were both doing
6 marks and they were going to end up at the
7 buyer, correct?
8     A.    You could say that, but I'm not sure,
9 I don't know -- well, certainly Mr. McDade was
10 here most of the time, and Mr. McDade had taken
11 the position that he would not agree to being
12 employed by Barclays. In fact, he said to me he
13 was here to -- he was going to be the
14 independent officer in connection with this
15 transaction and would not even consider any
16 discussions about employment by Barclays.
17     I don't remember whether Alex Kirk,
18 who was involved in some of this, actually was
19 employed by Barclays at any point in time, but
20 there was that issue, yes.
21     Q.    Do you believe that the information
22 that you were getting from Barclays was
23 information that you could rely on in making
24 representations to the Court?

Page 47

H. MILLER

1     A.    Barclays or from Lehman?
2     Q.    I'm sorry.
3     A.    Okay.
4     Q.    Did you believe that the information
5 that you were receiving from Lehman was
6 information that you could rely on in making
7 your representations to the Court?
8     A.    I assumed that the people at Lehman
9 were operating in good faith and I had no reason
10 to doubt them.
11     Q.    Have you ever had any reason to doubt
12 it based on anything that you have come across
13 since September of 2008?
14     A.    No.
15     MR. GAFFEY: Objection to the form.
16     Q.    Have you ever had any reason to doubt
17 the good faith of Mr. McDade?
18     A.    No, I've never had any reason to doubt
19 the good faith of Mr. McDade.
20     Q.    Let me --
21     MR. GAFFEY: Mr. Boies, could I
22 interrupt you? When you get to a convenient
23 point for a break, if we could take ten
24 minutes.

Page 48

H. MILLER

1     MR. BOISE: Sure. We can break now.
2 Absolutely.
3     THE VIDEOGRAPHER: The time is now
4 10:42 A.M. We're now off the record.
5     (Recess.)
6     THE VIDEOGRAPHER: This is the start
7 of tape number 2. The time is now 11:03
8 A.M. We're now back on the record.
9 BY MR. BOISE:
10     Q.    Mr. Miller --
11     A.    I remembered Michael's last name.
12 It's Eisenband from FTI.
13     Q.    Thank you.
14     Mr. Miller, I've handed you a copy of
15 Exhibit 25. Is this the Clarification Letter
16 that we had talked about?
17     A.    Yes.
18     Q.    And did this Clarification Letter
19 represent, in substance, the deal that the Court
20 had approved Friday night or early Saturday
21 morning?
22     A.    In my view, yes.
23     Q.    And is that why you and Weil Gotshal
24 concluded that it was not necessary to take this

Page 49

H. MILLER

1 specific letter back to the Court for further
2 approval?
3     A.    Yes. I was reminded, as a 30(b)(6)
4 witness, I did not recall that there was
5 actually a discussion about going back to Court
6 in connection with the Clarification Letter.
7 That occurred sometime during either Sunday
8 evening or Monday morning, in which there was a
9 discussion and the conclusion of that discussion
10 was it wasn't necessary.
11     Q.    And the reason it wasn't necessary was
12 what?
13     A.    It did not change the deal that was
14 presented to the Court.
15     Q.    Let me ask you to look at the first
16 page, and at the bottom half it talks about what
17 the purchased assets are. Do you see that?
18     A.    Yes.
19     Q.    And subparagraph 1(A)(ii) lists
20 certain additional purchased assets, correct?
21     A.    Yes.
22     Q.    And (A) is, or are, the securities
23 that we referred to as the so-called repo
24 securities, correct?

Page 50

```
1                H. MILLER
2       A.   They would be in that, in that
3    characterization.
4       Q.   And Category (B) are the securities
5    and other assets held in LBI's clearance boxes,
6    correct?
7       A.   That's what it says.
8       Q.   And Category (C) are the
9    exchange-traded derivatives and any property
10   that may be held to secure obligations under
11   such derivatives and collateralized short-term
12   agreements, correct?
13      A.   That's what it says.
14      Q.   And as you understood it, were all of
15   those assets included as purchased assets that
16   Barclays was acquiring?
17      A.   Correct.
18      Q.   Now, in this agreement there are no
19   values specified for any of the assets that are
20   being transferred or the liabilities that are
21   being assumed, correct?
22      A.   I believe that's correct.
23      Q.   Why is that?
24      A.   It was a purchase of the business and
25   the assets that went with that business, to the
```

Page 51

```
1                H. MILLER
2    extent not excluded.
3       Q.   And those -- and those assets that
4    were being purchased were being purchased
5    irrespective of what their value was, correct?
6       A.   Essentially, yes.
7       Q.   Now, let me ask you to look at Exhibit
8    506.
9         MR. POLKES:  Which is 506?  I'm sorry.
10        MR. BOISE:  It's coming.
11        (Exhibit 506, a document bearing Bates
12   Nos. WGM-LEHMAN-E 0006125 through 127 with
13   attachment, marked for identification, as of
14   this date.)
15      Q.   Exhibit 506 is an e-mail chain dated
16   September 20, 2008, correct?
17      A.   That's what it says.
18      Q.   And this was an e-mail chain that Weil
19   Gotshal had as of September 20, 2008, correct?
20      A.   It appears, yes.  Yes, the answer is
21   yes.
22      Q.   And this represented an estimate of
23   the value of the so-called repo assets, correct;
24   that is, the Barclays collateral that was
25   collateralizing the repo loan?
```

Page 52

```
1                H. MILLER
2         MR. GAFFEY:  Object to form.
3         MR. POLKES:  Are you referring to the
4    first page that's a chart that's attached to
5    the exhibit that says "Market Value" at the
6    top?
7         MR. BOISE:  Yes.
8       A.   That's what it appears to be.
9       Q.   And that shows the market value of the
10   so-called repo assets at $49.9 billion, correct?
11      A.   In round figures, yes.
12      Q.   Now, were you aware of the fact that
13   there were other estimates of the value of the
14   repo assets other than this $49.9 billion
15   estimate?
16      A.   I was aware that the values were
17   fluctuating all the time.
18      Q.   Let me, let me ask you to look at
19   Exhibit 510.
20        (Exhibit 510, a document bearing Bates
21   Nos. WGM-LEHMAN-E 00021381 and 21409, marked
22   for identification, as of this date.)
23      A.   Yes, sir.
24      Q.   Exhibit 510 is, or purports to be, an
25   excerpt from a report to Unsecured Creditors
```

Page 53

```
1                H. MILLER
2    Committee of Lehman Brothers Holdings dated
3    October 8, 2008.
4         Have you ever seen this exhibit
5    before?
6       A.   I don't have a present recollection
7    other than in connection with this deposition.
8       Q.   This was a document that Weil Gotshal
9    had, correct?
10      A.   Yeah.
11      Q.   Now, on the second page of the exhibit
12   when it talks about the assets purchased by
13   Barclays, it refers to the assets, the repo
14   assets, as 4.31 billion and says that there had
15   been a negotiated 5 billion reduction from what
16   are referred to as Lehman "stale" marks, do you
17   see that?
18      A.   I see that.
19      Q.   Were you aware that there was, during
20   the time leading up to the closing of the
21   transaction, a negotiation between Lehman and
22   Barclays as to what the appropriate marks should
23   be?
24      A.   I was aware that there were
25   discussions between Lehman and Barclays as to
```

# Exhibit O

EXECUTION VERSION

INDENTURE

By and among

PINE CCS, LTD.,
as the Issuer,

PINE CCS, CORP.,
as the Co-Issuer,

and

U.S. BANK NATIONAL ASSOCIATION,
as the Trustee

Dated as of May 28, 2008

for U.S. federal income tax purposes as a result of such deposit and satisfaction and discharge of this Indenture.

Notwithstanding the requirements in subclauses (a) and (b) above, if a liquidation in full of the Collateral has occurred pursuant to Section 5.5, and the proceeds of such liquidation have been paid pursuant to the terms of this Indenture, then, subject to the other requirements of this Article IV, this Indenture shall be discharged and shall cease to be of further effect.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee and, if applicable, the Holders, as the case may be, under Sections 2.5, 2.6, 2.7(l), 4.2, 5.4(d), 5.9, 5.18, 6.1, 6.3, 6.4, 6.6, 6.7, 7.1, 7.4 and 7.5 hereof shall survive the satisfaction and discharge of this Indenture.

Section 4.2    Application of Trust Money.  All monies deposited with the Trustee pursuant to Section 4.1 shall be held in trust and applied by it in accordance with the provisions of the Securities and this Indenture, including the Priority of Payments, to the payment of the interest on and principal of the Notes and either directly or through any Paying Agent, as the Trustee may determine, to the Person entitled thereto of interest and principal for whose payment such money has been deposited with the Trustee; provided, that such money need not be segregated from other funds except to the extent required herein or required by law.

Section 4.3    Repayment of Monies Held by Paying Agent.  In connection with the satisfaction and discharge of this Indenture with respect to the Securities, all monies then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.5 hereof and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such monies.

ARTICLE V
REMEDIES

Section 5.1.    Events of Default.  "Event of Default," wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    a default in the payment of any interest in respect of the Class A-1 Notes, any interest in respect of the Class A-2 Notes, the Class A-2 Commitment Fee, or, if there are no Class A Notes Outstanding, a default in the payment of any interest in respect of the Class B Notes or the Class B Commitment Fee, when the same becomes due and payable, which default continues for a period of five or more Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, any Paying Agent or the Securities Registrar, such default continues for a period of five or more Business Days after the Trustee receives written notice of or has actual knowledge of such administrative error or omission);

(b)    a default in the payment of principal of any Class A Note or Class B Note, when the same becomes due and payable, at its Stated Maturity or on any Redemption Date; provided, that if such failure results solely from an administrative error or omission by the Trustee, such default continues for a period of five or more Business Days after the Trustee receives written notice or has actual knowledge of such administrative error or omission;

(c)      the failure on any Payment Date to disburse amounts available in the Payment Account in excess of $1,000, which failure continues for a period of ten or more Business Days (provided, if such failure results solely from an administrative error or omission by the Trustee, such default continues for a period of ten or more Business Days after the Trustee receives written notice of or has actual knowledge of such administrative error or omission);

(d)      the failure on any Measurement Date to maintain an Aggregate Principal Amount of all Underlying Assets, Eligible Investments and Cash at least equal to 100% of the Aggregate Outstanding Amount of the Class A Notes (calculated, in the case of the Class A-2 Notes, using the aggregate amount of the Class A-2 Commitments (whether funded or unfunded)) at such time;

(e)      any of the Issuer, the Co-Issuer or the Collateral becomes an investment company required to be registered under the Investment Company Act;

(f)      a default in any material respect in the performance, or material breach, of any other covenant, representation, warranty or other agreement of the Issuer or the Co-Issuer under this Indenture (it being understood that a failure of any Portfolio Criteria shall not be a default or breach) or in any certificate or writing delivered by the Issuer or the Co-Issuer pursuant to this Indenture, or any representation or warranty of the Issuer or the Co-Issuer made in this Indenture or in any certificate or writing delivered by the Issuer or the Co-Issuer pursuant hereto that proves to be incorrect in any material respect when made, and the continuation of such default, breach or failure for a period of 30 or more days after notice thereof shall have been given to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least a Majority in Aggregate Outstanding Amount of the Controlling Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default;"

(g)      the entry of a decree or order by a court having competent jurisdiction adjudging either of the Co-Issuers as bankrupt or insolvent or granting an order for relief or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of either of the Co-Issuers under the Bankruptcy Code, the bankruptcy or insolvency laws of the Cayman Islands or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of its or either of their property, or ordering the winding up or liquidation of its or either of their affairs; or an involuntary case or Proceeding shall be commenced against either of the Co-Issuers seeking any of the foregoing and such case or Proceeding shall continue in effect for a period of 60 consecutive days;

(h)      the institution by either of the Co-Issuers of Proceedings to be adjudicated as bankrupt or insolvent, or the consent by either of them to the institution of bankruptcy or insolvency Proceedings against either of them or the passing of a resolution for either of them to be voluntarily wound up, or the filing by either of the Co-Issuers of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code, the bankruptcy and insolvency laws of the Cayman Islands or any other applicable law, or the consent by either of them to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of its or either of their property, or the making by it of an assignment for the benefit of creditors, or the admission by either of them in writing of its inability to pay its or either of their debts generally as they become due, or the taking of any action by either of the Co-Issuers in furtherance of any such action; or

(i)      one or more final judgments being rendered against the Issuer or the Co-Issuer which exceed, in the aggregate, $10,000,000 (after excluding any portion of the judgment that is payable by a party other than the Issuer or Co-Issuer pursuant to an insurance policy or other agreement) and

which remain unstayed, undischarged and unsatisfied for 30 or more days after such judgment(s) becomes non-appealable, unless adequate funds have been reserved or set aside for the payment thereof.

Upon the occurrence of or receipt of written notice or actual knowledge of the occurrence of an Event of Default, each of (i) the Co-Issuers and (ii) the Trustee shall notify each other, and the Trustee on behalf of the Co-Issuers shall notify promptly the Holders, each Paying Agent, the Depositary and each of the Rating Agencies in writing.

      Section 5.2     Acceleration of Maturity; Rescission and Annulment. (a) If an Event of Default occurs and is continuing (other than an Event of Default specified in Section 5.1(g) or 5.1(h)), (i) the Holders of not less than a Majority of the Controlling Class or (ii) the Trustee at the written direction of such Holders, by notice to the Issuer and, in the case of notice by such Holders of not less than a majority of the Controlling Class, the Trustee (which shall provide notice to the Holders of all of the Outstanding Class A Notes and Outstanding Class B Notes), may declare the principal of and accrued and unpaid interest on all of the Notes, together with all amounts due hereunder to be immediately due and payable.  If an Event of Default specified in Section 5.1(g) or (h) occurs, all unpaid principal, together with all accrued and unpaid interest thereon, of all the Notes, and other amounts payable hereunder, shall automatically become due and payable without any declaration or other act on the part of the Trustee or any Holder of Notes.

      (b)     At any time after such a declaration of acceleration of the Maturity Date has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this ARTICLE V, a Majority of the Controlling Class, by written notice to the Co-Issuers and the Trustee, may rescind and annul such declaration and its consequences if:

      (i)     the Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay, and shall pay:

      (A)     all overdue installments of interest on and principal of the Notes (other than principal that has become due solely as a result of such acceleration);

      (B)     to the extent that payment of such interest is lawful, interest upon any Defaulted Interest on the applicable Classes of Class A Notes, interest upon any Class B Deferred Interest and Defaulted Interest on the applicable Classes of Class B Notes and interest upon any Defaulted Commitment Fees, in each case at the applicable Note Interest Rates;

      (C)     all accrued and unpaid taxes, government fees and charges and Administrative Expenses and other sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel; and

      (D)     [Reserved]; and

      (ii)     the Trustee has determined that all Events of Default, other than the non-payment of the interest on or principal of Class A Notes or Class B Notes that have become due solely by such acceleration, have been cured or waived as provided in Section 5.14, and a Majority of the Controlling Class by written notice to the Trustee has agreed with such determination.

(d)    For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Event of Default described in Section 5.1(e), 5.1(g), 5.1(h) or 5.1(i), or any Default described in Section 5.1(f), unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default or Default is received by the Trustee at the Corporate Trust Office, and such notice references the Securities generally, the Issuer, the Co-Issuer, the Collateral or this Indenture. For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or a Default, such reference shall be construed to refer only to such an Event of Default or Default of which the Trustee is deemed to have notice as described in this Section 6.1.

(e)    Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this ARTICLE VI.

(f)    The Trustee shall be permitted to act in accordance with any proxy granted to a third party by a Holder of record in connection with any action under the Securities or the Operative Agreements or any vote on or consent to any waiver, amendment, modification or other actions (including, without limitation, any Act of Holders) with respect to the Securities or the Operative Agreements to the extent of the Securities held by such Holder upon receipt of instructions from such third party accompanied by evidence of such proxy in a form reasonably satisfactory to the Trustee. Any reference to a vote by a Holder hereunder shall not be deemed to require a Holder to vote all its interests in the Securities consistently, but rather a Holder may vote such proportion of its Securities (or not vote such proportion) as it may determine. In such instance, a Holder shall inform the Trustee the proportion of the Securities in the vote assigned thereto.

Section 6.2    Notice of Default. Promptly (and in no event later than two Business Days) after the occurrence of any Default known to the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall transmit by mail to each of the Rating Agencies, for so long as any Class A Notes or Class B Notes are Outstanding and rated by such Rating Agency, to the Trustee and to all Holders of Notes, as their names and addresses appear on the Securities Register and, upon written request therefor in the form of Exhibit I attached hereto certifying that it is a Holder of a beneficial interest in any Global Security, to such Holder (or its designee), notice of all Defaults hereunder actually known to a Trust Officer of the Trustee, unless such Default shall have been cured or waived.

Section 6.3    Certain Rights of Trustee. Except as otherwise provided in Section 6.1:

(a)    the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or document, including, without limitation, the Payment Date Report, reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    any request or direction of the Issuer or the Co-Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)    whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate or (ii) be required to determine the value of any Collateral or

# Exhibit P

U.S. Bank National Association
214 North Tryon Street, 26th Floor
Charlotte, North Carolina 28202

October 20, 2008

To the Addressees Identified
On Attached Schedule I

Re:    NOTICE OF EVENT OF DEFAULT

We refer to that certain Indenture, dated as of May 28, 2008 (the "Indenture"), among Pine CCS, Ltd. (the "Issuer"), Pine CCS, Corp. as co-issuer, and U.S. Bank National Association, as trustee (the "Trustee"). Capitalized terms used herein and not defined herein shall have the meanings ascribed to such terms in the Indenture.

Pursuant to Sections 5.1 and 6.2 of the Indenture, we hereby notify you of an occurrence of an Event of Default pursuant to Section 5.1(d) of the Indenture, which requires that on any Measurement Date, the Aggregate Principal Amount of all Underlying Assets, Eligible Investments and Cash equal at least 100% of the Aggregate Outstanding Amount of the Class A Notes at such time. As of October 6, 2008 the Aggregate Principal Amount of all Underlying Assets, Eligible Investments and Cash was less than 100% of the Aggregate Outstanding Amount of the Class A Notes.

Copies of the Indenture are available by writing or calling the Trustee at:

U.S. Bank National Association
214 North Tryon Street, 26th Floor
Charlotte, North Carolina 28202
Attention: Brand Hosford
Telephone: 704-335-4600

Please contact Brand Hosford at 704-335-4600 with any questions.

Very truly yours,

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:

Name:  Brand Hosford
Title:    Vice President

## Schedule 1

Class A Noteholders

Class B Noteholders

Subordinated Noteholders

Pine CCS, Ltd.
c/o Maples Finance Limited
P.O. Box 1093
Boundary Hall, Cricket Square
Grand Cayman KY1-1102
Cayman Islands
Attention: The Directors

Pine CCS, Corp.
850 Library Avenue, Suite 204
Newark, Delaware 19711

Grant Thornton
Herbert Street
Dublin 2, Ireland

The Depository Trust Company

Moody's Investors Service, Inc.
7 World Trade Center at 250 Greenwich Street
New York, New York 10007
Attention: CBO/CLO Monitoring

Standard & Poor's Ratings Services
55 Water Street, 42nd Floor
New York, New York 10041-0003
Attention: Structured Finance Ratings