UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                              :

| | |
|---|---|
| In re | :    **Chapter 11 Case No.** |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | :    **08-13555 (JMP)** |
| | : |
| Debtors. | :    **(Jointly Administered)** |
| | : |

----------------------------------------------------------------x

## ORDER TO SHOW CAUSE AND NOTICE FIXING HEARING DATE TO CONSIDER MOTION OF LEHMAN BROTHERS HOLDINGS INC. PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE FOR ENFORCEMENT OF THE AUTOMATIC STAY WITH RESPECT TO UK PENSION PROCEEDINGS

Upon the motion, dated August 17, 2010 (the "Motion"),[1] of Lehman Brothers

Holdings Inc. ("LBHI" and together with its affiliated debtors in the above-referenced chapter 11

cases, the "Debtors"), pursuant to section 362 of title 11 of the United States Code (the

"Bankruptcy Code"), for enforcement of the automatic stay with respect to the UK Pension

Proceedings, all as more fully described in the Motion; and upon the Declaration of Shai Y.

Waisman Pursuant to Local Bankruptcy Rule 9077-1(a) (the "Declaration") attesting to the

necessity for relief by Order to Show Cause; and it appearing that no notice of this Order to

Show Cause need be given, except as provided herein; and after due deliberation and sufficient

cause appearing therefor, it is hereby

        ORDERED that a hearing (the "Hearing") to consider the Motion shall be held

before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States

Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green,

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

New York, New York 10004 (the "Bankruptcy Court"), on **September 1, 2010 at 2:00 p.m. (Prevailing Eastern Time)**, or as soon thereafter as counsel may be heard; and it is further

ORDERED that notice of the Hearing shall be given by sending a copy of this Order to Show Cause, the Motion, and the proposed order on the Motion, via e-mail, fax, or overnight mail, on or before **August 17, 2010, at 11:00 p.m. (prevailing Eastern Time)**, on (i) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"); (ii) the attorneys for the official committee of unsecured creditors appointed in these cases (the "Creditors' Committee"); (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) counsel to the Trustees of the Lehman Brothers Pension Scheme and the Board of the Pension Protection Fund; (vii) the Pensions Regulator; and (vi) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and it is further

ORDERED that objections and responses, if any, to the Motion must be in writing, shall conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Bankruptcy Court), by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format, and shall be served in accordance with General Order M-242, upon (i) the Chambers of the Honorable James M. Peck, One Bowling Green, New York, New York

10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New

York 10153, Attn:  Shai Y. Waisman, Esq., attorneys for the Debtors; (iii) the U.S. Trustee, 33

Whitehall Street, 21st Floor, New York, New York 10004, Attn:  Andy Velez-Rivera, Esq., Paul

Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin Esq., and Tracy Hope Davis, Esq.; (iv)

Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York

10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys

for the Creditors' Committee; (v) counsel to the Trustees of the Lehman Brothers Pension

Scheme and the Board of the Pension Protection Fund; and (vi) the Pensions Regulator, so as to

be so filed and received no later than **August 30, 2010 at 4:00 p.m. (prevailing Eastern Time)**

(the "Objection Deadline"); and it is further

ORDERED that pursuant to Local Rule 9014-2(a), the Hearing may be an

evidentiary hearing.

Dated: August  ___, 2010
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                             :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------------x

**MOTION OF LEHMAN BROTHERS HOLDINGS INC.**
**PURSUANT TO SECTION 362 OF THE BANKRUPTCY**
**CODE FOR ENFORCEMENT OF THE AUTOMATIC**
**STAY WITH RESPECT TO THE UK PENSION PROCEEDINGS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI" and together with its affiliated debtors in

the above-referenced chapter 11 cases, as debtors and debtors in possession, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), files this motion (the "Motion") and

respectfully represents:

**Preliminary Statement**

        1.      By this Motion, LBHI seeks to enforce the automatic stay extant pursuant

to section 362 of title 11 of the United States Code (the "Bankruptcy Code") as to certain

administrative proceedings (the "UK Pension Proceedings"), which are not carved out by section

362(b)(4) of the Bankruptcy Code, and enjoin the United Kingdom ("UK") Pensions Regulator ("TPR"), the trustees (the "Trustees") of the Lehman Brothers Pension Scheme (the "Pension Scheme"), and the Board of the Pension Protection Fund (the "PPF Board" and, together with the Trustees, the "Claimants") from attempting to liquidate or enforce remedies on the Claimants' prepetition claims in violation of the automatic stay.  The Claimants filed proofs of claim against LBHI and submitted to the jurisdiction of the United States Bankruptcy Court for the Southern District of New York (the "Court").  TPR's and the Claimants' violations of the automatic stay should not be countenanced, and its actions should be deemed void ab initio.  TPR and the Claimants should also be subject to sanctions if they participate in the UK Pension Proceedings in any manner that affects LBHI's assets, estates, or the administration of its chapter 11 case.

2.      LBHI's estate is comprised of property of the estate "wherever located and by whomever held" under section 541(a) of the Bankruptcy Code and, as such, is within the exclusive jurisdiction of this Court.  The UK Pension Proceedings affect the assets of LBHI's estate.  The decision of the United States Bankruptcy Court for the District of Delaware in In re Nortel Networks Corp., 426 B.R. 84 (Bankr. D. Del. 2010), attached hereto as Exhibit A, provided TPR with notice that it was required to request relief from the automatic stay in order to commence the UK Pension Proceedings against any U.S. debtor, and the Nortel decision provided the Claimants with notice that they would violating the automatic stay by participating in the UK Pension Proceedings.  Further, the Nortel decision provided notice that the UK Pension Proceedings are not subject to the exception to the automatic stay in section 362(b)(4) of Bankruptcy Code.  Nevertheless, rather than seeking relief from the automatic stay, TPR commenced the UK Pension Proceedings by issuing a warning notice (the "Warning Notice") to LBHI and certain of its non-Debtor affiliates (together, the "Targets").  On August 5, 2010, a

magistrate judge for the United States District Court for the District of Delaware issued a Report

and Recommendation, attached hereto as Exhibit B, recommending that the bankruptcy court's

decision be affirmed substantially for the reasons set forth therein.  Trustee of Nortel Networks

U.K. Pension Plan v. Nortel Networks Inc., Case No. 10-00230-JJF-MPT (D. Del. Aug. 5, 2010)

[Docket No. 49]  ("Nortel II").

        3.     In order to protect its rights, assets, estate, and creditors, LBHI has

participated in the UK Pension Proceedings to date.  On August 9, 2010, LBHI submitted written

representations (the "LBHI Representations") to a panel appointed by TPR (the "Determinations

Panel").  Other parties, including the Trustees, and a U.S. attorney for the Claimants, despite

notice from Nortel that doing so would violate the automatic stay, have also submitted written

representations (the "Trustee Representations") and a witness statement (the "Lipkin

Statement"), respectively, to the Determinations Panel.  "Skeleton arguments" are due from each

side on August 31, 2010, and an oral hearing before the Determinations Panel has been

scheduled for September 8-9, 2010.

### Background

        4.     Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under the Bankruptcy Code.  The Debtors' chapter 11 cases have been

consolidated for procedural purposes only and are being jointly administered pursuant to Rule

1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors

are authorized to operate their businesses and manage their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

6.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

7.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner. On March 11, 2010, the Examiner filed its report with the Court (the "Examiner's Report") [Docket No. 7531].

8.      On March 15, 2010, the Debtors filed their joint chapter 11 plan pursuant to section 1121 of the Bankruptcy Code [Docket No. 7572].  On April 14, 2010, the Debtors filed their revised joint chapter 11 plan [Docket No. 8330] and disclosure statement for their revised joint chapter 11 plan pursuant to section 1125 of the Bankruptcy Code [Docket No. 8332].

### Jurisdiction

9.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Lehman's Business

10.     Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been

a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

11.     Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

### The Pension Scheme

12.     TPR has commenced the UK Pension Proceedings against LBHI and certain of its non-Debtor affiliates (i.e., the Targets) based on a purported funding shortfall in the Pension Scheme.  According to TPR, the Pension Scheme has approximately 2,760 members, with assets of approximately £219 million as of October 31, 2008, and an estimated deficit of £148 million as of January 1, 2007.  Lehman Brothers Limited ("LBL"), the principal employing entity for Lehman's UK businesses, is the principal employer under the Pension Scheme.  As of the Commencement Date, LBL employed most of the Pension Scheme's members, with a de minimis number of employees employed at Lehman Brothers Bankhaus Aktiengesellschaft ("LBBA"), Lehman Brothers International Services Inc. ("LBIS"), and Tal Europe LLC.

13.     According to TPR, LBL funded the Pension Scheme through scheduled contributions and annual special contributions, and LBL charged any surplus or deficit in the Pension Scheme to itself or proportionately to the other Lehman entities to whom LBL had seconded employees.  According to TPR, LBL seconded 28.1% of its employees to Lehman Brothers International (Europe) (In Administration) ("LBIE"), 13.1% to Lehman Brothers Europe Limited (In Administration) ("LBEL"), and 1.9% to LBHI.  According to TPR, LBL did

not second 49% of its employees, but LBL recharged that 49% to the other Lehman entities to

which it supplied employees: 55% to LBIE, 41% to LBEL, and 4% to Lehman Brothers Asset

Management (Europe) Limited ("LBAM").[2]  Therefore, TPR asserts that LBL passed on any

surplus or deficit in the Pension Scheme to these other Lehman entities (i.e., the Targets).  TPR

believes that it is "reasonable" for the Targets to provide financial support for the current funding

shortfall in the Pension Scheme because, inter alia, the deficit would have been recharged

eventually to the Targets if the insolvency of the Lehman entities had not intervened.

### The Claims Against LBHI

14.     On September 18, 2009, and September 22, 2009, the Claimants filed two

joint proofs of claim against LBHI (the "Claims"), as contingent and unliquidated claims in

undetermined amounts.[3]  The Claimants assert that Claims arise from a certain guarantee, dated

as of June 27, 2008 (the "Pension Guarantee"), made by LBHI in favor of the Trustees, as to

obligations by LBL and/or any other participating employer of the Pension Scheme (together

with LBL, the "Employers") for payment of debts which arise or may arise pursuant to section

75 of the UK Pensions Act of 1995 (as amended, the "Pensions Act").  The Claimants also assert

that the Claims against LBHI arise under the Unanimous Written Consent of the Executive

Committee of the Board of Directors of LBHI, dated June 9, 2005, pursuant to which LBHI

resolved to fully guarantee the payment of all liabilities, obligations, and commitments of certain

---

[2] LBIE, LBEL, LBAM, and certain other Lehman UK entities, along with LBHI, are the Targets.

[3] The Claims against LBHI have been assigned numbers 16613 and 32541 by LBHI's claims and noticing agent, and the Claims appear to be substantially identical except for the inclusion of additional exhibits with the Claim numbered 32541.  The Claimants have also filed proofs of claim against other Debtor entities.

of its affiliates[4] (the "Consent Guarantee" and together with the Pension Guarantee, the

"Guarantees").

15.    In the Claims, the Claimants assert that under the Pension Guarantee,

"LBHI became obligated to pay, among other things, certain obligations of the Employers to the

[Pension] Scheme, if such obligations have not been paid when they became due, together with

accrued interest, charges and expenses, including reasonable attorneys' fees, and interest and

expenses accrued or incurred subsequent to the commencement of any bankruptcy or insolvency

proceeding with respect to any Employer, whether or not such interest or expense is allowed as a

claim in such proceeding."  Specifically, in the Claims, the Claimants assert various contingent

and unliquidated claims in undetermined amounts against LBHI on account of LBHI's purported

obligations to TPR and on behalf of certain of its affiliates.

16.    The Claimants assert that when LBL entered UK administration

proceedings on the Commencement Date, a payment obligation from LBL to the Pension

Scheme was triggered, which, after the issuance of a notice and passage of a certain period of

time, became a binding unconditional obligation on LBL.  The Claimants assert that under the

Pension Guarantee, LBHI guaranteed this obligation of LBL's to the Pension Scheme.  The

Claimants make substantially the same assertions as to the Pension Guarantee for LBIS, except

that LBIS's payment obligation was triggered on October 13, 2008, when it ceased to employ

any active member covered by the Pension Scheme.  As of the filing date of the Claims, the

Pension Scheme was in the process of determining the amount of the claims against LBL and

LBIS.

---

[4] These affiliates (the "Guaranteed Subsidiaries") include, without limitation, LBBA, Lehman Brothers Special
Financing Inc. ("LBSF"), Lehman Brothers Commercial Corporation ("LBCC"), and Lehman Brothers OTC
Derivatives Inc. ("LBOTC").  LBSF, LBCC, and LBOTC are Debtors in these chapter 11 cases.

17.     The Claimants also assert that the Trustees applied to the PPF Board on

July 1, 2009, to assume LBBA's responsibilities to the Pension Scheme based on the Trustees'

view that LBBA was unlikely to continue as a going concern.  This application triggered a

payment obligation on LBBA, which was contingent on a notice being issued and becoming

binding.  The Claimants assert that that under both of the Guarantees, LBHI guaranteed this

obligation of LBBA's to the Pension Scheme.  As of the filing date of the Claims, the amount of

claim against LBBA had not been determined.

18.     The Claimants further assert that under the Guarantees and as an

obligation to TPR, LBHI is obligated to pay any amounts that become due and payable in the

event that the Employers are unable to meet their obligations to the Pension Scheme as a result

of the Pension Scheme winding up.

## The UK Pensions Proceedings

19.     On June 1, 2010, TPR served LBHI with the Warning Notice,[5] dated May

24, 2010, based on (i) LBL's purported status as a "service company" under the Pensions Act

and (ii) the Targets' purported status as persons who are connected with or an associate of LBL.

The Warning Notice specifies purported facts and circumstances, the determination sought, and

the grounds for and evidence in support of the application for a financial support direction

("FSD").  In the Warning Notice issued to LBHI and the other Targets, TPR indicates that it is

"reasonable" to impose the requirements of an FSD on the Targets or any one of them.

20.     TPR has referred its determination to the Determinations Panel, which will

determine whether the FSD should be issued.  The recipients of the Warning Notice have an

---

[5] The Targets were served by TPR on different dates, but LBHI was served via its attorneys, Weil, Gotshal &
Manges LLP, on June 1, 2010.

opportunity to make written representations to the Determinations Panel and to request an oral

hearing before the Determinations Panel.[6]  If the Determinations Panel decides that an FSD

should be issued, the FSD would require the recipient to provide specified financial support to

the Scheme.  If the recipient does not comply with an FSD, TPR may issue a "contribution

notice" ("CN") directing the recipient to pay the sum specified in the CN.  The Claimants could

then attempt to enforce payment of such sum against LBHI pursuant to a CN issued against

LBHI and/or the Guaranteed Subsidiaries (based on the Consent Guarantee).  Here, TPR

considers that it is "reasonable in the circumstances of this case as set out in this Warning Notice

for FSDs to be issued as against the Targets."  Attached to the 91-page Warning Notice

(including appendices) are exhibits numbering over 2000 pages.

      21.     The Warning Notice stated that the Targets and the Pension Protection

Fund (the "PPF" and, together with the Targets, the "Directly Affected Parties") had just about

three (3) weeks to respond to the 91-page Warning Notice – until 5 p.m. London time on June

21, 2010.  If no written representations were received by that date, the Determinations Panel

could make its decision based only on the information contained in the Warning Notice.

      22.     In a letter to TPR, dated June 4, 2010, LBHI requested an extension of

three (3) months to compile the LBHI Representations, reflecting a revised deadline of August

31, 2010, based on the length of time it has taken TPR to issue the Warning Notice (over twenty

(20) months since LBHI filed its chapter 11 petition) and the disproportionately short period of

---

[6] On August 9, 2010, LBHI submitted the LBHI Representations to the Determinations Panel so as to fully protect
its rights, assets, estate, and creditors.  An oral hearing before the Determinations Panel has been scheduled for
September 8-9, 2010.  LBHI's submission of the LBHI Representations to the Determinations Panel does not estop
LBHI from asserting that the automatic stay has been violated nor may the automatic stay be waived in any event.
See, e.g., In re Enron Corp., 300 B.R. 201, 212-13 ("It is well settled that, since the purpose of the automatic stay is
to protect creditors as well as the debtor, the debtor may not waive the stay.") (citations omitted).  LBHI notes that it
has apprised the Creditors' Committee of the UK Pension Proceedings and sought input from the Creditors'
Committee on the contents of the LBHI Representations.

time the Directly Affected Parties were being given to review, analyze, and respond to the

Warning Notice and its accompanying exhibits.  In an email to LBHI's attorneys, dated June 7,

2010, TPR refused to extend the June 21, 2010, deadline for the LBHI Representations based on

its need for a determination to be made within the "relevant time" (i.e., before September 15,

2010, two (2) years after the Commencement Date).

   23.  LBHI and TPR thereafter exchanged numerous letters and emails, in

which LBHI requested an extension of time to submit the LBHI Representations to the

Determinations Panel but did not waive or otherwise address the automatic stay.[7]  Ultimately, in

a "letter before action," dated June 25, 2010, LBHI informed TPR that it would initiate "judicial

review" proceedings in the UK Administrative Court regarding TPR's refusal to extend LBHI's

deadline for making the LBHI Representations to the Determinations Panel unless TPR extended

such deadline by June 28, 2010.  TPR did not extend LBHI's deadline, and on June 29, 2010, to

avoid any prejudice, LBHI submitted a claim for a judicial review of TPR's decision to refuse to

provide the requested extension.  On July 1, 2010, TPR and LBHI entered into a consent order

under which LBHI's deadline to submit the LBHI Representations to the Determinations Panel

was extended to at least August 6, 2010, and the claim for judicial review was withdrawn.  Since

that time, the deadline for LBHI to submit the LBHI Representations to the Determinations Panel

was extended to August 9, 2010.

---

[7] In a letter to LBHI's attorneys, dated June 8, 2010, TPR conditioned LBHI's request for an extension of time to submit the LBHI Representations to the Determinations Panel as follows:  "In order that we can properly consider this request, please confirm that LBHI intends to file representations in this matter and that LBHI does not intend to seek to argue that the stay pursuant to section 362 of the US Bankruptcy Code applies to this action."  Letter from Marcus Laughton, Case Lawyer, the Pensions Regulator, to Weil, Gotshal & Manges, attorneys for LBHI (June 8, 2010) (on file with Weil, Gotshal & Manges LLP).  Thus, by requesting that LBHI waive any automatic stay argument, TPR impliedly conceded that the automatic stay applies to the UK Pension Proceedings.

24.    In all correspondence with TPR, LBHI has reserved its rights with respect to the automatic stay.  LBHI contends that the issuance of the Warning Notice and any and all further UK Pension Proceedings, as to LBHI, are void <u>ab</u> <u>initio</u> as a violation of the automatic stay.  However, as a measure of protection, LBHI submitted the LBHI Representations to the Determinations Panel on August 9, 2010, to fully protect the rights, assets, estate, and creditors of LBHI.  <u>See</u> <u>supra</u> n. 6.  Nonetheless, LBHI requests that the Court enforce the automatic stay as to the UK Pension Proceedings and enjoin TPR and the Claimants from attempting to liquidate or enforce remedies on the Claims in violation of the automatic stay.

25.    Prior to filing this Motion, LBHI contacted the U.S. attorneys for the Claimants and TPR in an effort to negotiate a consensual stipulation regarding the relief requested herein and provided them with a draft of a proposed stipulation.  No consensual resolution has been reached as of the filing of this Motion.

## Relief Requested

26.    LBHI requests that the Court enforce the automatic stay as to the UK Pension Proceedings and enjoin TPR and the Claimants from attempting to liquidate or enforce remedies on the Claims.  LBHI seeks to confirm that TPR and the Claimants are subject to sanctions if they participate in the UK Pension Proceedings in any manner that affects LBHI's assets, estates, or the administration of its chapter 11 case.

## Basis for Relief

**A.    The Court Should Enforce the Automatic
Stay with Respect to the UK Pension Proceedings**

27.    Pursuant to section 362(a)(1) of the Bankruptcy Code, a chapter 11 petition operates as a stay of "the commencement or continuation, including the issuance or

employment of process, of a judicial, administrative, or other action or proceeding against the

debtor that was or could have been commenced before the commencement of the case under this

title, or to recover a claim against the debtor that arose before the commencement of the case

under this title." See, e.g., In re U.S. Lines, Inc., 197 F.3d 631, 640 (2d Cir. 1999) ("As the

legislative history of the automatic stay provision reveals, the scope of section 362(a)(1) is broad,

staying all proceedings . . .") (quoting FAA v. Gull Air, Inc., 890 F.2d 1255, 1262 (1st Cir.

1989)) (internal quotation marks omitted).  Additionally, pursuant to section 362(a)(6) of the

Bankruptcy Code, a chapter 11 petition operates as a stay of "any act to collect, assess, or

recover a claim against the debtor that arose before the commencement of the case under this

title." See, e.g., In re Solutia Inc., 379 B.R. 473, 485 n.8 (Bankr. S.D.N.Y. 2007) (finding that,

as used in section 362(a)(6) of the Bankruptcy Code, "assess . . . can mean to simply determine

the size or value of something").

      28.    In this case, TPR has issued a Warning Notice to the Targets, including

LBHI, indicating that a panel of the TPR will determine whether to issue FSDs to the Targets in

respect of the Pension Scheme.  The Warning Notice initiates the UK Pension Proceedings,

which may ultimately culminate in a CN being issued against LBHI and/or the other Targets.

The UK Pension Proceedings are plainly a violation of the automatic stay.

      29.    It is beyond doubt that the Claims constitute prepetition claims.  Because

the Guarantees were executed prior to the Commencement Date, the claims, if any, thereon arose

prior to the Commencement Date and are prepetition claims against LBHI's estate.  See, e.g., In

re Stucker, 153 B.R. 219, 222 (Bankr. N.D. Ill. 1993) (holding that a debtor's prepetition

guarantee "gave rise to a contingent claim as defined in 11 U.S.C. § 101(5) and buttressed by 11

U.S.C. § 101(10)(A). . . . The contingent claim arises from the moment of the execution of the

guarantee.") (citations omitted); In re Transp. Sys. Intern., Inc., 110 B.R. 888, 894 (D. Minn.

1990) ("[A] claim is considered to arise, for bankruptcy purposes, at 'the time when acts giving

rise to the alleged liability were performed.'") (quoting In re Johns-Manville Corp., 57 B.R. 680,

690 (Bankr. S.D.N.Y. 1986)).  The Claimants must proceed through the appropriate channels

(i.e., the claims allowance and disallowance process in this Court) to liquidate and recover the

Claims against LBHI.

**B.      The Nortel Decision Gave TPR and the Claimants Notice
           that the UK Pension Proceedings Violate the Automatic Stay**

30.      The Nortel decision provided TPR with notice that it was required to

request relief from the automatic stay in order to commence the UK Pension Proceedings against

any U.S. debtor, and the Nortel decision provided the Claimants with notice that they would

violating the automatic stay by participating in the UK Pension Proceedings as to any U.S.

debtor.  In Nortel, TPR issued a Warning Notice to Nortel Networks Inc. ("NNI") and Nortel

Networks (CALA) Inc. ("NN CALA"), debtors under chapter 11 of the Bankruptcy Code, (along

with certain non-U.S. Nortel entities) based on the "financial insufficiency" of a Nortel UK

affiliate to fully fund the Nortel UK pension plan.  See Nortel, 426 B.R. at 90.  The Nortel court

enforced the automatic stay, finding that the Nortel UK pension proceedings (the "Nortel

Pension Proceedings") were subject to the automatic stay because they could have been

commenced prior to the commencement of the chapter 11 cases.  See id. at 90-91.

31.      Likewise, "[p]roceedings to recover a claim which arose prior to the filing

of the petition in bankruptcy are also subject to the automatic stay in bankruptcy."  In re

Grynberg, 143 B.R. 574, 576 (D. Colo. 1990).  Here, as in Nortel, TPR has violated the

automatic stay by commencing the postpetition UK Pension Proceedings in order to liquidate

and recover prepetition claims against LBHI:  "Post-petition attempts to assess, impose and/or liquidate a debt against a Chapter 11 debtor outside of the bankruptcy court go to the very essence of the Chapter 11 claims process, and are the very reason why there in an automatic stay."  Nortel, 426 B.R. at 91 (citing Maritime Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1207 (3d Cir. 1991)).

32.    Indeed, without relief from the stay, judicial actions and proceedings against the debtor are void ab initio.  Maritime, 959 F.2d at 1206 (citation omitted).  "Holding that judicial acts and proceedings in violation of the automatic stay are void ab initio is consistent with the stay's function of 'enabl[ing] the bankruptcy court to decide whether it will exercise its power under section 502(b) of the Bankruptcy Code to establish the validity and amount of claims against the debtor or allow another court to do so, thereby preventing a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.'"  Id. at 1207 (quoting Hunt v. Bankers Trust Co., 799 F.2d 1060, 1069 (5th Cir. 1986)) (internal citation and quotation marks omitted).

33.    Here, over twenty (20) months after LBHI filed its chapter 11 case, TPR, for the benefit of the Claimants, commenced the entirely separate UK Pension Proceedings in order to establish and recover prepetition claims against LBHI.  Because TPR did not request relief from the automatic stay from the Court before commencing the UK Pension Proceedings, consistent with the Nortel decision, the acts as to the UK Pension Proceedings, including the service of the Warning Notice, should be determined to be void ab initio as to LBHI.  Similarly, the Trustee Representations and the Lipkin Statement should be determined to be void as to LBHI because they were submitted to the Determinations Panel without first requesting from this Court relief from the automatic stay or this Court granting such relief.

34.    As in Nortel, the Claimants have submitted to the jurisdiction of this Court by filing the Claims.  See Langenkamp v. Culp, 498 U.S. 42, 44, 111 S. Ct. 330 (1990) (filing a claim against a bankruptcy estate subjects the claimant to the bankruptcy court's equitable jurisdiction) (citations omitted).  The Claims themselves, which seek recovery from LBHI on account of the Guarantees, demonstrate the Claimants' intention to participate in the claims allowance and disallowance process in this Court.  Nevertheless, without requesting that the Court lift the automatic stay, TPR commenced uncoordinated parallel proceedings in another jurisdiction to accomplish the same ends against LBHI.  The Warning Notice states the following:

> [T]he acceptance by LBHI of being responsible and liable for the Scheme's pension deficiency is clearly acknowledged in the guarantee given by it to the Trustees of the Scheme on 27 June 2008, covering (inter alia) outstanding sums due under a schedule of contributions adopted in respect of the Schemes and amounts due under the [Pensions Act].  Accordingly the position of LBHI was clear prior to the various insolvencies.

Thus, TPR purports to conclusively determine LBHI's liability under the Pension Guarantee, usurping this Court's proper role under the claims allowance and disallowance process.

35.    Furthermore, as the Nortel court stated, "[T]he trustee and the PPF are clearly subject to this Court's jurisdiction.  They've filed proofs of claim for their pending pre-petition claim.  This is a claim which the Court, not easily but, certainly, capably, can decide at the appropriate time."  Tr. of Feb. 26, 2010 Hr'g at 183: 10-14.  Likewise, this Court, which has jurisdiction over the Claims, can capably decide them at the appropriate time.  See Nortel, 426 B.R. at 92 ("[T]he Claimants can obtain complete monetary relief in this Court at the appropriate time."

36.    Significantly, the Warning Notice reveals TPR's true motivation in commencing the UK Pension Proceedings:  "[T]he level of recovery under the [Pension] Guarantee is uncertain, and an FSD is therefore sought against [LBHI]."[8]  Because TPR is concerned about LBL's "level of recovery" on account of the Pension Guarantee under LBHI's plan of reorganization, TPR now seeks to liquidate and recover prepetition claims against LBHI through different means in a different forum.  The automatic stay is designed to prevent precisely these sorts of efforts.  See, e.g., S.E.C. v. Brennan, 230 F.3d 65, 70 (2d Cir. 2000) ("The automatic stay provision is intended 'to allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.'") (quoting U. S. Lines, 197 F.3d at 640 (2d Cir. 1999) (internal quotation marks and citation omitted)).

37.    Additionally, the Nortel court determined that section 362(b)(4) of the Bankruptcy Code, whereby an exercise of a governmental unit's police or regulatory power exempts it from the automatic stay, does not apply to the Nortel Pension Proceedings.  As the Nortel court found, neither of the Claimants is a governmental unit.  See Nortel, 426 B.R. at 91, 93 (finding that the claimants[9] are organizations merely acting in a governmental capacity and, thus, not covered by the section 362(b)(4) exception, which is limited to true governmental entities); see also Nortel II, Case No. 10-00230-JJF-MPT, at 10 ("The Bankruptcy Court was correct in its determination that the police powers exception should be interpreted narrowly with

---

[8] A footnote following the word "uncertain" reads as follows:  "The current version of the joint plan of reorganization proposed by LBHI and other Lehman companies in Chapter 11 proceedings caps the amount of allowed guarantee claims against LBHI.  Under the Plan, LBHI guarantee claims relating to LBL's obligations are placed in their own class (Class 7H) and are capped at $2.4 billion."

[9] Like in this case, the claimants in Nortel were the PPF Board and the trustees of Nortel's pension scheme.

regard to foreign entities."). The <u>Nortel</u> court also concluded that TPR was the *forum* through which these non-governmental units sought protection of their beneficiaries' *private property* rights, which did not entail any greater entitlement to the section 362(b)(4) exception. <u>See</u> <u>id</u>. at 92-93 (citation omitted, emphasis added).

38.     Although the <u>Nortel</u> court held that the Claimants did not pass the threshold test of being governmental units, the <u>Nortel</u> court still applied the two objective tests used to determine if the section 362(b)(4) exception is applicable: the "pecuniary purpose" test and the "public policy" test. The <u>Nortel</u> court held that the Nortel Pension Proceedings did not pass either test and therefore did not qualify for the section 362(b)(4) exception. <u>Id</u>. at 91-94. According to the <u>Nortel</u> court,

> What we have here are creditors who have filed claims in this Court and who are seeking to litigate those claims clear of the Court's jurisdiction and the automatic stay. Their effort to do so is inimical to the Debtors' efforts and those of non-U.S. debtors in a highly complex liquidation to assemble the assets, reduce them to money, allocate those assets among numerous entities in many countries and then distribute the assets. The Claimants' pecuniary interest does not warrant the extraordinary standing above all others they seek. The Claimants who implore this Court to give comity to the U.K. Proceedings are themselves ignoring comity. They as much as say, "give the proceedings of our choice the respect we are unwilling to show to other proceedings in which many debtors and creditors are working tirelessly to formulate a coherent, equitable plan."
> . . .
> Here, TPR seeks not to protect the "safety or welfare" of the public in the U.K., but rather to obtain financial support for the benefit of private parties – the members of the [Nortel UK] Pension Plan, represented by the Trustee – and if that fails, to assert and liquidate a claim to the property of the Debtors, on the Trustee's behalf. Any sum paid as a result of the U.K. Proceedings would not go to benefit the public, but would be used to reduce the debt owed by [Nortel UK] to the Trustee. The Trustee, as intended beneficiary, and PPF, filed the proofs of claim to recover from the Debtors the same financial support that is the subject of the U.K. Proceedings.

<u>Id.</u> at 93; <u>see</u> <u>also</u> <u>Nortel II</u>, Case No. 10-00230-JJF-MPT, at 11 ("[T]he Bankruptcy Court did

not abuse its discretion in rejecting [the Claimants'] comity argument.").

       39.    The proceedings in the instant case are identical to those in <u>Nortel</u>.  Thus,

LBHI urges the Court to follow <u>Nortel</u> and <u>Nortel II</u> and decline to apply the section 362(b)(4)

exception to the UK Pension Proceedings.  Assuming <u>arguendo</u> that this Court declines to follow

<u>Nortel</u> and <u>Nortel II</u> and finds the UK Pension Proceedings subject to the section 362(b)(4)

exception, such exception only permits the *entry* of a money judgment.  <u>See</u> <u>Brennan</u>, 230 F.3d

at 71 ("It is well established that the governmental unit exception of § 362(b)(4) permits the

*entry* of a money judgment against a debtor so long as the proceeding in which such a judgment

is entered is one to enforce the governmental unit's police or regulatory power.") (citations

omitted, emphasis in original).  The enforcement of any such money judgment is unquestionably

a violation of the automatic stay, <u>see</u> <u>id.</u> ("*[A]nything beyond the mere entry of a money

judgment against a debtor is prohibited by the automatic stay.*") (citations omitted, emphasis

added in <u>Brennan</u>),[10] and, to the extent the Claims are liquidated in the UK Pension Proceedings

based on the section 362(b)(4) exception, LBHI urges the Court to enjoin TPR and the Claimants

from attempting to enforce remedies on the Claims in violation of the automatic stay.

**C.**    **The Claimants Should Be Subject to Sanctions If**
        **They Participate in the UK Pension Proceedings as to LBHI**

---

[10] LBHI does not suggest that any outcome of the UK Pension Proceedings represents a "money judgment." However, to the extent such proceedings result in an enforceable debt against LBHI, any enforcement without separate application to this Court constitutes a <u>per</u> <u>se</u> violation of the automatic stay.  <u>See</u> <u>id.</u> at 71-72 ("[T]he collection of [a money] judgment *after entry* . . . is not authorized . . . and requires a separate application to the bankruptcy court.") (citation and internal quotation marks omitted, emphasis added in <u>Brennan</u>).  Furthermore, any determinations made in the UK Pension Proceedings are without prejudice to LBHI's right to object to the Claims, and any distribution on account of the Claims will be made solely pursuant to LBHI's plan of reorganization or an order of this Court.

40.　　In the order enforcing the automatic stay, the <u>Nortel</u> court ordered that the Nortel Pension Proceedings were void as to the Debtors and "to the extent that either of the U.K. Pension Trustee or the PPF participate in the U.K. Pension Proceeding, as to any Debors [sic] such participation will be in violation of the automatic stay and subject the participating persons or entities to sanctions under Section 362." <u>In re Nortel Networks Corp.</u>, 2010 Bankr. LEXIS 669, at \*37 (Bankr. D. Del. Mar. 9, 2010).  In light of the <u>Nortel</u> order and opinion, the onus was clearly on TPR and the Claimants to seek relief from the automatic stay in order to commence or participate in the UK Pension Proceedings.  Therefore, TPR and the Claimants should be subject to sanctions if they participate in the UK Pension Proceedings in any manner that affects LBHI's assets, estates, or the administration of its chapter 11 case.

### <u>Notice</u>

41.　　No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [Docket No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) counsel to the Trustees of the Lehman Brothers Pension Scheme and the Board of the Pension Protection Fund; (vii) the Pensions Regulator; and (viii) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

42.　　No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE LBHI respectfully requests that the Court grant the relief requested herein and such other and further relief as is just.

Dated: August 17, 2010
      New York, New York

                                          /s/ Shai Y. Waisman
                                          Shai Y. Waisman

                                          WEIL, GOTSHAL & MANGES LLP
                                          767 Fifth Avenue
                                          New York, New York 10153
                                          Telephone: (212) 310-8000
                                          Facsimile: (212) 310-8007

                                          Attorneys for Debtors
                                          and Debtors in Possession

**Exhibit A**

**Nortel Bankruptcy Court Opinion**

**84**                    **426 BANKRUPTCY REPORTER**

Agreement. Thus, the Initial Fee provision is not ambiguous as to when the Initial Fee was earned; rather, the Initial Fee was paid in consideration for Defendant's promise to perform the duties specified in the Agreement.

3. *Whether Plaintiff's Complaint States A Claim Upon Which Relief Can Be Granted*

**[17, 18]** Because the Initial Fee provision is unambiguous, and the Agreement contains an integration clause,[2] the Court will not consider Exhibit 1 or any other parol evidence in assessing the sufficiency of the Complaint. *See Yocca v. Pittsburgh Steelers Sports, Inc.,* 578 Pa. 479, 854 A.2d 425, 436 (2004)("Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract.") As a matter of law under the Initial Fee provision, Defendant is not obligated to return any portion of the Initial Fee, regardless of whether the Agreement's purpose was frustrated. Accordingly, Plaintiff fails to sufficiently state a claim for breach of contract, declaratory relief, or dissolution of the Agreement and restitution, and the Court will dismiss the Complaint in its entirety.

**V.  Conclusion**

For the reasons discussed, Defendant's Motion To Strike Exhibits 1 and 2 To Plaintiff's Complaint will be denied. Plaintiff's Complaint shall be amended to include a corrected version of Exhibit 2, the Exclusive Sealed Bid Agreement entered into between the parties. Defendant's Mo-

tion To Dismiss Plaintiff's Complaint will be granted.

An appropriate Order will be entered.

***ORDER***

At Wilmington, this *26* day of March 2010, for the reasons set forth in the Memorandum Opinion issued this date;

NOW THEREFORE, IT IS HEREBY ORDERED that:

1.  Defendant NRC Realty Advisors, LLC's Motion To Strike Exhibits 1 and 2 To Plaintiff's Complaint (D.I.14) is ***DENIED.***

2.  Exhibit 2 to Plaintiff's Complaint is deemed amended to include a full and correct copy of the Exclusive Sealed Bid Agreement, which is attached to Defendant's Brief In Support Of Motion To Dismiss Plaintiff's Complaint And Motion To Strike Exhibits 1 And 2 To Plaintiff's Complaint (D.I.15, Ex. A).

3.  Defendant NRC Realty Advisors, LLC's Motion To Dismiss Plaintiff's Complaint (D.I.13) is ***GRANTED.***



**In re NORTEL NETWORKS CORPORATION, et al.,
Debtors.**

**No. 09–10138(KG).**

United States Bankruptcy Court,
D. Delaware.

March 9, 2010.

**Background:** Chapter 11 debtors moved for order enforcing automatic stay with

---

**2.** The Agreement's integration clause provides, in relevant part, that "[t]his Agreement represents the entire agreement of the parties in regard to the subject matter hereof; all prior agreements, understandings and representations, if any, are merged herein and superseded hereby." (D.I. 14, Ex. A, Section IX ¶ 5.)

## IN RE NORTEL NETWORKS CORPORATION                    85
### Cite as 426 B.R. 84 (Bkrtcy.D.Del. 2010)

respect to foreign pension fund protection proceedings.

**Holdings:** The Bankruptcy Court, Kevin Gross, J., held that:

(1) foreign pension fund protection proceedings were subject to automatic stay;

(2) foreign pension fund protection proceedings did not satisfy pecuniary purpose test for applicability of police and regulatory power exception to automatic stay; and

(3) foreign pension fund protection proceedings did not pass public policy test for applicability of police and regulatory power exception to automatic stay.

Motion granted.

**1. Bankruptcy** ⟷2394.1

Any acts to "assess" a claim that arose before debtor's bankruptcy case commenced are barred by the automatic stay. 11 U.S.C.A. § 362(a)(1).

**2. Bankruptcy** ⟷2402(2.20)

Foreign pension fund protection proceedings were subject to automatic stay arising in Chapter 11 debtors' cases where foreign proceedings, which were based on "financial insufficiency" of related foreign debtor to fully fund its foreign pension plan as of date preceding debtors' petition filings, could have been commenced prior to filing of those cases, and were subject of proofs of claim filed against Chapter 11 debtors. 11 U.S.C.A. § 362(a)(1), (a)(6).

**3. Bankruptcy** ⟷2059

Claimants submitted to bankruptcy court's jurisdiction by filing proofs of claim against Chapter 11 debtors.

**4. Bankruptcy** ⟷2394.1

Postpetition attempts to assess, impose, and/or liquidate a debt against a Chapter 11 debtor outside of the bankrupt-

cy court go to the essence of the Chapter 11 claims process, and are the very reason why there is an automatic stay. 11 U.S.C.A. § 362(a)(1).

**5. Bankruptcy** ⟷2402(2.20)

Neither trustee for foreign pension plan nor board for foreign pension protection fund qualified as "governmental unit," as defined by Bankruptcy Code, for purposes of determining whether police and regulatory power exception to automatic stay applied with respect to trustee or board since trustee was private party and board, which exercised trustee's rights and powers during assessment period in foreign pension fund protection proceedings, stood in trustee's shoes. 11 U.S.C.A. §§ 101(27), 362(b)(4).

See publication Words and Phrases for other judicial constructions and definitions.

**6. Bankruptcy** ⟷2402(1)

Police and regulatory power exception to automatic stay is to be narrowly construed. 11 U.S.C.A. § 362(b)(4).

**7. Bankruptcy** ⟷2402(2.20)

Foreign pension fund protection proceedings, the stated purpose of which was to address alleged financial shortfall in private pension plan through after-the-fact determination of which entities should be financially responsible for funding pension shortfall, did not qualify as matter of public safety or welfare, despite importance of matter to pension plan's private trustee, and thus did not pass pecuniary purpose test for applicability of police and regulatory power exception to automatic stay. 11 U.S.C.A. § 362(b)(4).

**8. Bankruptcy** ⟷2402(1)

Under the pecuniary purpose test used to determine whether police and regulatory power exception to automatic stay applies, the issue is whether the govern-

mental action or proceeding relates primarily to the protection of the government's pecuniary or financial interest in the debtor's property, as opposed to a matter of public safety or welfare. 11 U.S.C.A. § 362(b)(4).

**9. Bankruptcy ⊜2402(1)**

Under public policy test used to determine whether police and regulatory power exception to automatic stay applies, issue is whether the governmental action is taken in furtherance of a matter of public policy, or instead is intended primarily to adjudicate private rights. 11 U.S.C.A. § 362(b)(4).

**10. Bankruptcy ⊜2402(2.20)**

Foreign pension fund protection proceedings did not pass public policy test for applicability of police and regulatory power exception to automatic stay, given that foreign pensions regulator did not seek to protect public safety or welfare, but to obtain financial support for benefit of private parties consisting of members of pension plan, and any recovery obtained would be used to reduce debt owed by foreign debtor to pension plan trustee. 11 U.S.C.A. § 362(b)(4).

---

*MEMORANDUM OPINION*[1]

KEVIN GROSS, Bankruptcy Judge.

The Court conducted an evidentiary hearing on February 26, 2010, on Debt-

ors'[2] Motion for Entry of an Order Enforcing the Automatic Stay Against Certain Claimants With Respect to the U.K. Pension Proceedings (D.I. 2441) (the "Motion"). The Court was faced with an impending deadline of March 1, 2010 (the next business day), by which Debtors would have to take substantial action in the absence of the relief Debtors were seeking in the Motion. The Court granted the Motion based upon an oral ruling and entered an Order (D.I. 2576) with the understanding that it would issue a written opinion given the significance of the issues. Time does not permit the detailed opinion which the matter warrants but the Court will address the issues sufficiently to provide a reviewing court, if any, with the substance of the Court's findings and its rationale for granting the Motion and thereby enforcing the automatic stay.

**A.    *The Motion***

The Debtors seek an order pursuant to sections 362(a)(1) and (a)(6) of the Bankruptcy Code, enforcing the automatic stay against two parties, Nortel Networks UK Pension Trust Limited (the "Trustee") and The Board of the Pension Protection Fund (the "PPF") (collectively, the "Claimants"), with respect to certain U.K. Administrative Proceedings (the "U.K. Proceedings") initiated by the U.K. Pensions Regulator ("TPR"). The U.K. Proceedings relate to

---

**1.** This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

**2.** The Debtors in these Chapter 11 cases, which are jointly administered, are: Nortel

Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

Nortel Networks Corporation ("NNI") and Nortel Networks (CALA) Inc. ("NN CALA"). The U.K. Proceedings will determine whether to issue a financial support direction ("FSD") against NNI, NN CALA, and the non-U.S. Nortel Entities that are identified by TPR as targets of the U.K. Proceedings. The result may be to impose financial responsibility of as much as $3.1 billion on the targets for the statutory liability of Nortel Networks UK Limited ("NNUK") to the Trustee under section 75 of the U.K. Pensions Act 1995. The Motion seeks to enforce the stay against the Claimants, who previously filed proofs of claim and thereby submitted the U.K. Pension Claim to the Court.

### B. *Relevant Background*

On January 14, 2009 (the "Petition Date"), the Debtors (except for NN CALA, which filed on July 14, 2009) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Also on the Petition Date, the Debtors' ultimate corporate parent, Nortel Networks Corporation ("NNC"), NNI's direct corporate parent, Nortel Networks Limited ("NNL") (together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors") filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").

On January 14, 2009, the Canadian Court entered an order recognizing these Chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

In addition, on January 14, 2009, after the filing by the U.S. Nortel Entities, the High Court of Justice in England placed nineteen of Nortel's European affiliates, including NNUK (collectively, the "EMEA Debtors") into administration. On June 8, 2009, NNUK filed petitions in this Court for recognition of the English insolvency proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code. The need for coordination in the proceedings caused the Court to enter an order on June 26, 2009, recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code.

On June 9, 2009, to resolve, on an interim basis, certain allocation and post-petition cross-affiliate claims issues, pending the final allocation of the proceeds of the planned sales of their businesses, the Canadian Debtors, the U.S. Debtors, and the EMEA Debtors, including NNUK (by the Joint Administrators), entered into an Interim Funding and Settlement Agreement (the "IFSA"). The Court approved the IFSA on June 29, 2009. Pursuant to section 12 of the IFSA, the parties agreed that the proceeds of any sale of their material assets (less taxes and costs) would be held in escrow until the parties either reached a consensual allocation of the proceeds, or:

> "in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol . . . applicable to the Sale Proceeds . . . which Protocol shall provide binding procedures for the allocation of Sales Proceeds. . . ."

On September 30, 2009, NNUK, on behalf of itself, the Joint Administrators, and the other EMEA Debtors, filed proofs of claim against NNI and the other U.S. Debtors "in respect of any heretofore unknown, unliquidated, or unmatured claim

or claims ... against Nortel Networks Inc. or its affiliated debtors in these cases".

### The U.K. Pension Claim

NNUK is the employer under the Nortel Networks U.K. Pension Plan (the "NNUK Pension Plan"), a defined benefit occupational final salary pension scheme. (Declaration of Richard Hitchcock, dated February 18, 2010 (the "Hitchcock Dec.") ¶ 5.4.) On both November 21, 2006 and December 21, 2007, NNL executed guarantees regarding the NNUK Pension Plan. No U.S. Nortel Entity provided any guarantee with respect to the NNUK Pension Plan.

The PPF is a U.K. statutory body established under the U.K. Pensions Act 2004 (the "U.K. Pensions Act"). NNUK's commencement of proceedings in the U.K. led to the NNUK Pension Plan entering a PPF "assessment period" pursuant to the U.K. Pensions Act. (See Hitchcock Dec. ¶ 5.5; Exhibit A to the Declaration of John Ray, dated February 18, 2010). ("Ray Dec.") An "assessment period" means that the PPF is working with the Trustee to determine the NNUK Pension Plan's funding position. To the best of the Debtors' understanding, the NNUK Pension Plan remains in an "assessment period."

On or about September 30, 2009, and January 25, 2010, the Trustee and the PPF jointly filed proofs of claim against the U.S. Nortel Entities. The U.K. Pension Claim is based on allegations that (i) the NNUK Pension Plan is under-funded by an estimated amount alternatively stated to be £2.1 billion or $3.1 billion; and (ii) TPR may seek to require certain of the Debtors, as well as certain non-U.S. Nortel entities, to provide financial support for the NNUK Pension Plan.

According to the U.K. Pension Claim, by the time it was filed, TPR had concluded that grounds existed to issue certain warning notices ("Warning Notices") and to seek a FSD against certain members of the Nortel Group worldwide, including NNI and NN CALA, as companies allegedly "connected with or associates of" NNUK, with respect to the allegation that NNUK was "insufficiently resourced" on June 30, 2008, a date selected by TPR. (See Exhibit A to Ray Dec.) The U.K. Pension Claim also states that the indebtedness or liability of the relevant U.S. Nortel Entities arose no later than June 30, 2008, a date well prior to the Petition Date. In addition, the U.K. Pension Claim asserts that if a FSD is issued against any of the U.S. Nortel Entities, such entity could then be instructed under the U.K. Pensions Act to procure financial support for the NNUK Pension Plan, either alone or with other members of the Nortel Group. The U.K. Pension Claim further asserts that if a U.S. Nortel Entity receives a FSD, but fails to put or keep in place financial support for the NNUK Pension Plan approved by TPR, then TPR could also exercise its power to impose on that U.S. Nortel Entity a liability to pay a specific amount, which could be all or some portion of the deficit in the NNUK Pension Plan. (See Exhibit A to Ray Dec.)

### The U.K. Pensions Act

Under the U.K. Pensions Act, TPR has, in relation to a pension plan, a stated pecuniary purpose: to protect the plan benefits of members and to reduce the risk that compensation would be required from the PPF. (Hitchcock Dec. ¶ 41.) Under the U.K. Pensions Act, the PPF imposes a levy like a private insurance premium on eligible pension plans as one of the ways of funding such compensation.

In furtherance of that pecuniary purpose, TPR may conduct an administrative process whereby it may issue, through TPR's Determinations Panel (the "Determinations Panel"), a FSD under section 43

of the U.K. Pensions Act, if it believes that the employer funding the pension plan (the "Employer") is either (a) a service company, or (b) "insufficiently resourced." (*See* Hitchcock Dec. ¶¶ 37–38, 50 & Schedule 2.)

A FSD, which is preceded by a "Warning Notice," is a direction, issued to certain persons following a decision of the Determinations Panel to issue it, to secure financial support for a pension plan. A FSD may only be issued against a person who is either the Employer, or is "connected and/or associated with" the employer (the "Non–Employers"). The FSD specifies a certain time period during which the financial support is to be put in place, and directs that this support is to continue for as long as the pension plan is in existence. A FSD may only be issued if the Determinations Panel believes that it is reasonable to do so. (*See* Hitchcock Dec. ¶¶ 37.3–37.4, 50 & Schedule 2.)

In deciding whether it is reasonable to issue a FSD against a Non–Employer, the Determinations Panel must consider such matters as it considers relevant, including: (a) the relationship between the Non–Employer and the Employer, including whether the Non–Employer controlled the Employer; (b) the value of any benefits received directly or indirectly by the Non–Employer from the Employer; (c) any connection or involvement of the Non–Employer with the pension plan; and (d) the financial circumstances of the Non–Employer. (Hitchcock Dec. ¶¶ 37.4, 50.)

In addition to its ability to issue a FSD, where the target has not complied with the FSD, and TPR believes that it is reasonable to do so, it is authorized to issue a CN. (Hitchcock Dec. ¶ 43.) A CN states that the persons to whom it is issued are under a liability to pay to the trustee of the pension plan the sum specified therein. The CN may be for all or part of the amount by which the pension plan is un-

der-funded. This amount is treated as a debt due to the trustee of the pension plan. (U.K. Pensions Act, s. 49(3).) While TPR can exercise such powers as the trustee of the pension plan to recover the debt under the CN, during the assessment period (which the NNUK Pension Plan has been in since it entered administration proceedings), only the PPF may exercise the trustee's rights and powers. (Hitchcock Dec. ¶¶ 5.5, 46 & Schedule 2.)

If a party to whom a FSD or CN is issued disputes that issuance, it may make a reference to the TPR Tribunal (the "Tribunal") within 28 days from the date of the issuance. The Tribunal will decide the appropriate action, if any, to take, including possibly revoking, confirming, or varying the FSD or CN. After receiving the Tribunal's decision, the party may, with permission of the Tribunal or the U.K. Court of Appeal, appeal to the Court of Appeal on a point of law arising from a decision of the Tribunal. (U.K. Pensions Act, s. 103; Hitchcock Dec. ¶¶ 54–58.)

### FSD Warning Notice Addressed to NNI and NN CALA

By letters dated January 13, 2010 and addressed to NNI and NN CALA (along with certain non-U.S. Nortel entities), TPR issued a Warning Notice initiating an administrative proceeding regarding the alleged shortfall in the funding of the NNUK Pension Plan; the other U.S. Nortel Entities were not referred to in the Warning Notice. The Warning Notice provides, in summary, that TPR believes it is reasonable to issue a FSD against the addressees (the "Targets") and references certain documents and witness statements as support for this determination, some of which were provided by NNUK, and others of which are publicly available information. It further provides, *inter alia*, that (i) the "relevant time" on which to measure the NNUK Pension Plan's funding position

for the purpose of deciding whether to issue a FSD is June 30, 2008; and (ii) TPR believes it is reasonable to issue a FSD against the Targets, including NNI and NN CALA, for various reasons including TPR's analysis of certain benefits conveyed among affiliates. The Warning Notice also reviews TPR's conclusion that benefits provided by certain affiliates to certain other affiliates provides a basis for issuing a FSD. (Ray Dec. ¶ 10.)

TPR indicated that the Targets, as well as the U.K. Trustee and PPF, should respond in writing to the Warning Notice by midday on March 1, 2010, and that the Determinations Panel will consider all responses. (Ray Dec. ¶ 12.) [3]

### *Canadian Debtors' Motion to Stay U.K. Proceedings*

On February 17, 2010, the Monitor filed an application with the Canadian Court seeking to stay the U.K. Proceedings on the ground that they violate the stay imposed by the Initial Order issued by the Canadian Court. That application was heard on February 25, 2010. The Canadian Court issued the stay on February 26, 2010.

### *JURISDICTION AND VENUE*

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue over the Debtors' Chapter 11 cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory bases for the relief requested herein are sections 362(a)(1) and (a)(6) of the Bankruptcy Code and Rule 9014 of the Federal Rules of Bankruptcy Procedure.

**3.** The Claimants indicated the Determinations Panel may have been amenable to an extension of the March 1 response date. However,

### *DISCUSSION*

**[1, 2]** 11 U.S.C. § 362(a)(1), provides, in part, that a "judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title," is stayed. *Constitution Bank v. Tubbs,* 68 F.3d 685, 691 (3d Cir.1995) ("[t]he automatic stay is of broad scope, directing that 'all judicial actions against a debtor seeking recovery on a claim that were or could have been brought before commencement of a bankruptcy case, are automatically stayed' ") (citation omitted); *In re Spansion, Inc.,* 418 B.R. 84, 92 (Bankr.D.Del. 2009) ("the automatic stay applies . . . because the claims asserted . . . 'could have been brought' and were, in fact, brought, prepetition"). Any acts to "assess" a claim that arose before the case commenced are similarly barred by the automatic stay. *See, e.g., Glenshaw Glass Co. v. Ontario Grape Growers' Mktg. Bd.,* 67 F.3d 470, 477 (3d Cir.1995).

Here, TPR has issued a Warning Notice to NNI and NN CALA, as well as to a number of non-U.S. Nortel entities, triggering the U.K. Proceedings, on the basis of what is described in the NNUK Pension Claim as the "financial insufficiency" of NNUK to fully fund the NNUK Pension Plan as of June 30, 2008, six months before NNI filed its Chapter 11 petition, and over a year before the filing of NN CALA's Chapter 11 petition. Accordingly, the FSD proceeding, and any future proceedings by TPR or the Determinations Panel, could have been commenced prior to the filing of these Chapter 11 cases, and are

the Determinations Panel was statutorily required to rule by June 28, 2010, thus maintaining the time pressure on Debtors.

IN RE NORTEL NETWORKS CORPORATION          **91**
Cite as 426 B.R. 84 (Bkrtcy.D.Del. 2010)

subject to the automatic stay. *See* 11 U.S.C. §§ 362(a)(1), (a)(6); *see also ACandS, Inc. v. Travelers Cas. and Surety Co.,* 435 F.3d 252, 260 (3d Cir.2006); *Constitution Bank v. Tubbs,* 68 F.3d 685, 693 (3d Cir.1995).

**[3, 4]** Moreover, the Claimants have submitted to this Court's jurisdiction by filing proofs of claim against the Debtors, including NNI and NN CALA, and the subject of the U.K. Pension Claim is the very subject of the U.K. Proceedings. *See Langenkamp v. Culp,* 498 U.S. 42, 44, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) (filing a claim against a bankruptcy estate subjects the claimant to the bankruptcy court's equitable jurisdiction). Post-petition attempts to assess, impose and/or liquidate a debt against a Chapter 11 debtor outside of the bankruptcy court go to the essence of the Chapter 11 claims process, and are the very reason why there is an automatic stay. *See, e.g., Maritime Elec. Co. v. United Jersey Bank,* 959 F.2d 1194, 1207 (3d Cir.1991).

### The Police Power Exception to the Automatic Stay Does Not Apply

**[5]** An exercise of a governmental unit's police or regulator power exempts them from the automatic stay pursuant to Section 362(b)(4) of the Bankruptcy Code.[4] Here, neither of the Claimants is a "governmental unit," as defined in Section 101(27) of the Bankruptcy Code. The Trustee is a private party, and the PPF, while defined as "a statutory body" in paragraph 1.4 of the U.K. Pension Claim, during an assessment period exercises the rights and powers of the Trustee. PPF thus stands in the shoes of the Trustee, a private party. (*See* Exhibit A to the Ray Dec.; Hitchcock Dec. ¶ 22, 46.)

**[6]** The police power exception is to be "narrowly construed," as reflected in the standards courts apply in determining whether or not a governmental unit's action or proposed action constitutes an exercise of its police power. There are two objective tests upon which courts rely in considering if the Section 362(b)(4) exception is applicable.

**[7, 8]** First, under the "pecuniary purpose" test, the issue is whether the governmental action or proceeding relates primarily to the protection of the government's pecuniary or financial interest in the debtor's property, as opposed to a matter of public safety or welfare. *See, e.g., Missouri v. U.S. Bankr. Court,* 647 F.2d 768, 776 (8th Cir.1981) (denying Section 362(b)(4) defense where plaintiff sought to enforce state grain laws that "primarily relate to the protection of the pecuniary interest in the debtors' property and not to matters of public safety and health"); *In re Fairchild Corp.,* 2009 WL 4546581, at *4, 2009 Bankr.LEXIS 3815, at *15 (Bankr.D.Del. Dec. 1, 2009) (concluding that agency's action sought solely to promote its pecuniary interest in being reimbursed for expenditures, and thus did not qualify as an exercise of police or regulatory power).

The U.K. Proceedings do not pass the "pecuniary purpose" test. The stated purpose of the U.K. Proceedings is to address

---

**4.** Section 362(b)(4) provides, in pertinent part: "The filing of a petition under section 301, 302, or 303 of this title, . . . does not operate as a stay: (4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit

. . . to enforce such governmental unit's . . . police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's . . . police or regulatory power."

an alleged financial shortfall in a private pension plan, first by determining whether the Targets should provide financial support to the Trustee, and, then potentially by imposing and fixing a claim against NNI and NN CALA through a CN. This is purely an issue of determining which, if any, entities, on an after-the-fact basis, should be financially responsible for funding a pension shortfall. It is clearly a pecuniary matter, and, notwithstanding the importance of the financial matter to the private Trustee, under the case law does not qualify as a matter of public safety or welfare. *See, e.g., Brock v. Morysville Body Works*, 829 F.2d 383 (3rd Cir.1987) (holding that an order to abate violations of health and safety standards was enforceable by the Secretary of Labor under section 362(b)(4)'s exception to the automatic stay); *Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267 (3rd Cir.1983) (police power exception applicable to allow a state court to issue an injunction ordering debtor to clean up environmental hazards); *see also In re James (James v. Draper)*, 940 F.2d 46 (3rd Cir.1991) (civil forfeiture proceeding for alleged proceeds of drug sales falls within the police power exception to the automatic stay).

Further illustrative of the appropriate application of the police—regulatory exception and, by contrast, its inapplicability here, are several cases. First, in *Safety–Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d 846 (4th Cir.2001), the appeals court affirmed the ruling that the automatic stay did not bar action by South Carolina's Department of Health and Environmental Control to close a commercial hazardous waste site. The court based its ruling on the finding that the primary purpose of South Carolina's statute was to deter pollution, a health and safety concern.

Next, the Claimants rely heavily on Equal Employment Opportunity Commis-

sion ("EEOC") cases to argue that a pecuniary purpose does not extinguish the automatic stay exception. *EEOC v. McLean Trucking Company*, 834 F.2d 398 (4th Cir. 1987) is an example of a case in which the court found that the governmental exception applied even though the suit at issue included a pecuniary benefit, back pay. The court of appeals rejected the bankruptcy court's finding that because the debtor was in liquidation, the subject litigation was merely an action to recover back wages, an adjudication of private rights. *Id.* at 400. *McLean* and similar equal employment cases emphasize the significance of eliminating discrimination through injunctive relief and the imposition of penalties—deterrents—and, coincidentally, private causes of action. Here, the Claimants can obtain complete monetary relief in this Court at the appropriate time.

Finally, a recent decision of the Bankruptcy Court from the Eastern District of Virginia discusses the issue posed here clearly and concisely. In *In re Qimonda AG*, 425 B.R. 256, 2010 WL 595654 (Bankr. E.D.Va.2010), the debtor was seeking a Section 362 stay of an International Trade Commission ("ITC") proceeding in which debtor was accused of patent infringement. The matter was ready for trial. The bankruptcy court precisely stated the issues as follows:

Is the action pending before the ITC the continuation of an action **by** the ITC? Is the action an enforcement of the ITC's police and regulatory power?

*Id.* at 258. The court answered "no" to both questions because the action was being prosecuted before, not by, the ITC. *Id.* at 260. As the *Qimonda* court explained,

The reality is that the ITC and its administrative law judges are the forum before whom the action was brought by [the claimants] . . . and who are seeking

the protection of their property rights. The proceeding is adversarial and subject to the adjudicative provisions of the Administrative Procedure Act, 5 U.S.C. §§ 551, et seq. The administrative law judge makes an initial determination which contains findings of fact and conclusions of law with respect to the issues in controversy.

* * *

Rather than being the governmental unit that is enforcing the patents, the ITC is the forum before which private litigants are enforcing their patents. Similarly, the TPR is the forum for the dispute in the UK Proceedings, in which private parties are seeking to protect their property rights.

The bankruptcy court also analyzed the legislative history of Section 362(b)(4) and concluded that the exception was explicitly limited to true governmental entities, "not to organizations acting in a governmental capacity." *Id.* at 259. The Claimants are such organizations acting in a governmental capacity.

What we have here are creditors who have filed claims in this Court and who are seeking to litigate those claims clear of the Court's jurisdiction and the automatic stay. Their effort to do so is inimical to the Debtors' effort and those of non-U.S. debtors in a highly complex liquidation to assemble the assets, reduce them to money, allocate those assets among numerous entities in many countries and then distribute the assets. The Claimants' pecuniary interest does not warrant the extraordinary standing above all others they seek. The Claimants who implore this Court to give comity to the U.K. Proceedings are themselves ignoring comity. They as much as say, "give the proceedings of our choice the respect we are unwilling to show to other proceedings in which many debtors and creditors are working tirelessly to formulate a coherent, equitable plan."

[9, 10] The U.K. Proceedings also fail the "public policy test." The issue under this test is whether the governmental action is taken in furtherance of a matter of public policy, or instead is intended primarily to adjudicate private rights. *See, e.g., Fairchild Corp.,* 2009 WL 4546581, at *4, 2009 Bankr.LEXIS 3815, at *15 (action akin to private action to collect money damages does not qualify as an exercise of police power under section 362(b)(4)); *Spansion,* 418 B.R. at 95 (administrative patent proceeding against debtors, prosecuted on behalf of the public by staff attorney of the U.S. International Trade Commission, was primarily an adjudication of private rights, only incidentally serving a public interest, and thus was not an exercise of police or regulatory power exempt from automatic stay).

Here, TPR seeks not to protect the "safety or welfare" of the public in the U.K., but rather to obtain financial support for the benefit of private parties—the members of the NNUK Pension Plan, represented by the Trustee—and if that fails, to assert and liquidate a claim to the property of the Debtors, on the Trustee's behalf. Any sum paid as a result of the U.K. Proceedings would not go to benefit the public, but would be used to reduce the debt owed by NNUK to the Trustee. The Trustee as intended beneficiary, and PPF, filed the proofs of claim to recover from the Debtors the same financial support that is the subject of the U.K. Proceedings.

The provisions of the U.K. Pensions Act establish that the purpose of the FSD and CN proceedings is to vindicate the rights of private parties, that a FSD is a demand that financial support be provided for the benefit of a private pension plan (s. 43(3)); that in the event of non-compliance with the FSD, TPR can issue a CN requiring

**94**                    **426 BANKRUPTCY REPORTER**

the payment of a specified sum that is "to be treated as a debt due from the person to the trustees or managers of the scheme" (s. 49(2), (3)); and that this debt can be enforced either directly by the trustees or by TPR on behalf of the trustees of the scheme (s. 49(4)) (emphasis supplied). (*See* Hitchcock Dec. ¶¶ 41, 46.)

The U.K. Pension Claim also shows that the focus of the U.K. Proceedings is to procure a pecuniary benefit, for a private party—the Trustee. The Claim recites the process under the U.K. Pensions Act, and that, if necessary, the TPR will attempt to impose and liquidate an enforceable debt, to be enforced by or on behalf of the Trustee, for an amount to be paid to the Trustee. (*See* Exhibit A to Ray Dec.)

### *"Sea Containers" Decision*

The Claimants argue that the decision in *In re Sea Containers Ltd.,* 2008 WL 4296562, 2008 Bankr.LEXIS 2363 (Bankr. D.Del. Sept. 19, 2008) supports their defense to the Motion. In *Sea Containers,* the Determinations Panel issued a FSD against a single debtor, on the grounds that: (i) the U.S. debtor against which the FSD was sought was a U.K. chartered company which, together with its subsidiary, the plan sponsor, operated primarily out of the U.K.; (ii) the debtor had a clear control relationship with the employer-affiliate; (iii) the debtor had substantial assets in the U.K.; and (iv) the Determinations Panel held a hearing on the FSD request, without a motion by the U.S. debtor to invoke or to lift the protections of the automatic stay, and at which one of the two U.S. creditors' committees encouraged the Panel to issue a FSD so that the plan trustee could rely on it to pursue their claims in the Chapter 11 proceedings.

Following the issuance of the FSD, a settlement was entered into among the debtors, affiliates, one of the creditors' committees and the pension trustee, and was approved by TPR, granting the trus-

tee an allowed claim in the bankruptcy case. The matter never reached the CN stage. The case came before the court on a motion under Bankruptcy Rule 9019 for approval of the settlement.

The court approved the settlement. In so doing, it overruled a number of objections by the second creditors' committee, one of which was that the FSD proceeding had violated the automatic stay. In this regard, the court did not treat the FSD as determinative but only ruled that the FSD "should not be ignored as invalid," because it "provide[d] guidance as to the . . . pertinent considerations in valuing the Schemes' claims." *Id.,* 2008 WL 4296562 at *9, 2008 Bankr.LEXIS 2363 at **26–27. The court also relied on the fact that the Determinations Panel, as one would expect, did not view itself as being constrained by the automatic stay, not surprising given that the U.S. debtor had not sought an order of the bankruptcy court enforcing the stay in connection with the proceeding.

In short, the court's ruling that the FSD proceeding did not violate the automatic stay was issued in an entirely different procedural context—a Rule 9019 motion by the debtor to approve a settlement with TPR, where the debtor had not sought to invalidate the FSD—and on entirely different facts. Furthermore, the facts reveal that the objecting creditors' committee never sought to enforce the automatic stay or formally objected to the proceedings in the U.K. Unlike in *Sea Containers,* the Debtors and the creditors' representatives here object to the U.K. Proceedings, and dispute TPR's right to proceed against the Debtors in the absence of relief from the automatic stay. Further, in contrast to *Sea Containers,* which involved only a FSD proceeding, here TPR is attempting to secure financial support for the benefit of the Plan Trustee through a FSD proceeding and, if necessary, a CN proceed-

ing, which creates an enforceable debt. Also, the Trustee has already submitted to the jurisdiction of the Court for determination and liquidation of contingent and unliquidated claims for the very same financial support TPR seeks to obtain for them in the U.K. Proceedings. And here, unlike in *Sea Containers*, the Warning Notice makes plain that TPR is asserting a contingent claim, whereas in *Sea Containers*, integral to the court's ruling that there was no stay violation was its determination that there was no assertion of a claim. *Id.,* 2008 WL 4296562 at *9, 2008 Bankr.LEXIS 2363 at *26. Accordingly, *Sea Containers* is confined to its facts and is not controlling.

### Prejudice

An overriding issue in these cases—as well as in the related insolvency proceedings in Canada and the U.K.—is the allocation of the billions of dollars in proceeds of the post-petition asset sales. This allocation will determine the amounts available for distribution to the creditors located in the various jurisdictions, in part based on the factual issue of the respective contributions of the various Nortel entities to the value of the assets sold. (Ray Dec. ¶ 14.)

In recognition of this fundamental question, the U.S. Debtors, the Canadian Debtors, and the EMEA Debtors (including NNUK) entered into the IFSA, pursuant to which they agreed, *inter alia,* (a) that all such sales proceeds will be held in escrow until the parties either agree on a consensual allocation, or, in the absence of such an agreement, obtain a binding determination on the allocation pursuant to an agreed upon allocation protocol; and (b) that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process. (IFSA §§ 12(b)-(c), Exhibit B to the Schweitzer Dec.)

In accordance with the IFSA, the parties have engaged in extensive negotiations regarding the terms of the allocation protocol. The purpose of the protocol (called the "Protocol For Resolving Disputes Concerning Allocation of Sale Proceeds") is to ensure a fair allocation, to be determined (absent a consensual agreement) in a single cross-jurisdictional forum. (Ray Dec. ¶ 16.)

The Court is satisfied that the Claimants seek to litigate, in the context of an administrative proceeding before a U.K. administrative body whose sole focus is the financial protection of U.K. pension plan members and an insurance vehicle, the question of whether NNUK's contributions to the "global" Nortel business received inadequate financial recognition pre-filing so that now it is "reasonable" to impose financial responsibility on its affiliates. That issue overlaps heavily with the issues in the allocation dispute. The question of whether and to what extent affiliates of NNUK should be responsible for NNUK's obligations is part and parcel of the entire cross-affiliate benefit and contribution issue and the allocation process. (Ray Dec. ¶ 14.)

Indeed, the resolution of the issues Claimants seek to litigate in the U.K. Proceedings may involve consideration of the same factors—including Nortel's transfer pricing arrangements, Nortel's Master Research and Development Agreement, the value of certain research and development, ownership rights to Nortel's intellectual property, and individual corporate assets and revenues—as those that may be significant to the allocation process. (Ray Dec. ¶ 17.)

The Nortel debtors in Canada, the U.S., and the U.K. have agreed that these issues must be resolved, on a global basis, in a single cross-jurisdictional forum. They should not be decided, even in part, by an administrative body in a single jurisdiction with a single constituency.

**96**                    **426 BANKRUPTCY REPORTER**

Moreover, the very premise for the U.K. Proceedings is that NNUK does not have the resources to fund the NNUK Pension Plan, and one of the key elements in determining the "reasonableness" of imposing a FSD and a CN against a Non–Employer under the U.K. Pensions Act is the financial condition of the Non–Employer. (U.K. Pensions Acts. 42(5); s. 47(3); *see* Hitchcock Dec. ¶¶ 37, 44.) Until the allocation procedure is completed, however, the financial condition of the Employer, NNUK, and the Non–Employers, including the Debtors, cannot be determined. (Ray Dec. ¶ 19.)

### CONCLUSION

The Court finds that the automatic stay applies to the efforts of the Trustees and the PPF to "grab" at Debtors' assets when there is already a procedure in place for the allocation of the multi-national Debtors' assets. The U.K. Proceedings are premature and prejudice the ultimate literally global resolution of these bankruptcy cases. An order has already issued.



**In re MERVYN'S HOLDINGS, LLC, et al., Debtors.**

**Mervyn's LLC, Plaintiff,**

**v.**

**Lubert–Adler Group IV, LLC, et al., Defendants.**

**Bankruptcy No. 08–11586 (KG).**
**Adversary No. 08–51402 (KG).**

United States Bankruptcy Court, D. Delaware.

March 12, 2010.

**Background:** Unsecured creditors' committee filed complaint to avoid alleged fraudulent transferees and to hold defendants liable thereon. Financial institution that had been named as defendant moved to dismiss, and committee moved for leave to file amended pleading.

**Holdings:** The Bankruptcy Court, Kevin Gross, J., held that:

(1) allegations in complaint filed by unsecured creditors' committee, seeking to avoid series of transactions by which company divested itself of one of its department store chains by means of sale to newly created entity that subsequently filed for Chapter 11 relief, did not set forth sufficient facts showing that financial institution that became involved in these transactions following initial transfer had knowledge of entire sales process, as required for unsecured creditors' committee to collapse transactions, and

(2) committee's motion for leave to amend would be denied as futile.

Motion to dismiss granted; motion to amend denied.

**1. Bankruptcy ⇨2162**

Purpose of Federal Rule of Civil Procedure governing amended pleadings is to permit liberal amendment to facilitate determination of claims on merits and to prevent litigation from becoming technical exercise in fine points of pleading. Fed. Rules Civ.Proc.Rule 15, 28 U.S.C.A.

**2. Bankruptcy ⇨2162**

Despite federal policy of liberally granting leave to amend, court should deny motion for leave to amend pleading where amendment would be futile. Fed. Rules Civ.Proc.Rule 15, 28 U.S.C.A.

**3. Bankruptcy ⇨2162**

Amendment of complaint would be "futile," if the complaint, as amended,

## **Exhibit B**

**Nortel II District Court Report and Recommendation**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | : |  |
|  | : | Chapter 11 |
| NORTEL NETWORKS INC., et al., | : |  |
|  | : |  |
| Debtors. | : | Case No. 09-10138-KG |
| _____ | : |  |
|  | : |  |
| TRUSTEE OF NORTEL NETWORKS | : |  |
| U. K. PENSION PLAN AND BOARD OF | : |  |
| THE PENSION PROTECTION FUND, | : |  |
|  | : |  |
| Appellant, | : |  |
|  | : |  |
| v. | : | C. A. No. 10-230-JJF-MPT |
|  | : |  |
| NORTEL NETWORKS INC., et al., and | : |  |
| the COMMITTEE OF UNSECURED | : |  |
| CREDITORS, | : |  |
|  | : |  |
| Appellees. | : |  |

## REPORT AND RECOMMENDATION

## I. INTRODUCTION

Presently before the court is an appeal filed by Trustee of Nortel Networks UK

Pension Plan (the "Trustee") and the Board of Pension Protection Fund, (the "PPF")

(collectively "Appellants"), from the United States Bankruptcy Court, District of Delaware

("Bankruptcy Court") February 26, 2010 order enforcing the automatic stay against

certain claimants with respect to the U.K. pension proceedings[1] ("Automatic Stay

Order") and its March 9, 2010 memorandum opinion denying Appellants' motion

seeking relief from the automatic stay (the "Opinion").[2] For the reasons that follow, the

_____

[1] Bankr. D.I. 2576.
[2] *In re Nortel Networks Corp.*, 426 B.R. 84 (Bankr. D. Del. 2010).

court recommends the orders of the Bankruptcy Court be affirmed.

## II. BACKGROUND

### The Nortel Networks U.K. Pension Plan

This action arises in connection with the Nortel Networks U.K. Pension Plan (the "Plan"), which is a defined benefit pension plan established and governed by U.K. law, wherein employees of Nortel Networks UK Limited ("NNUK") become entitled to pension benefits on their final salary, with the employer agreeing to meet the balance of the costs providing such pension benefits after taking into account the employees' own contributions.[3] NNUK is the employer under the Nortel Networks U.K. Pension Plan. The Trustee is the trustee of the Plan, and owes a fiduciary duty to the members of the Plan, which requires that the Trustee act in the best interest of the members and take steps to ensure that the assets of the Plan are sufficient to meet the members' pension entitlements.[4]

### The U.K. Pension Legislative and Regulatory Framework

Appellant Trustee is a private party responsible for administering the Plan and providing benefits to Plan members, who are former employees of NNUK.[5] Appellant PPF was established under the U.K. Pensions Act 2004 (the "2004 Act"). PPF is a statutory fund established to provide compensation to members of eligible U.K. occupational pension plans where the employer has suffered a qualifying insolvency event and where the plan's assets are insufficient to cover a specified level of

---

[3] Davies Dec. ¶ 8.
[4] Hamm Dec. ¶ 44.
[5] Hitchcock Dec. ¶ 16.

compensation.[6]  Funding for the "safety net" administered by the PPF is derived

principally from a mandatory levy assessed on all eligible plans.  Also part of the 2004

Act was the creation of The Pensions Regulator ("TPR"), which is the governmental

agency charged with the responsibility of regulating the operations and administration of

occupational pension plans in the U.K.[7]

**Financial Support Directions**

One of TPR's powers is its ability to issue a Financial Support Direction ("FSD")

to an entity associated with an employer in a underfunded pension plan ("Related

Entity").[8]  An FSD requires the Related Entity to submit a proposal to TPR for its

approval explaining how it intends to provide financial support to eliminate the plan's

funding deficit and ensure that such support remains in place while the plan is in

existence.[9]  An FSD may be issued if certain requirements are met, including (1) the

plan employer is "insufficiently resourced"; (2) the Related Entity is an associate of, or is

connected with, the employer; and (3) issuance of an FSD against the Related Entity is

reasonable in the circumstances.[10]

The decision to issue an FSD is made by the Determinations Panel ("DP"), which

is an independent committee established by TPR consisting of persons with legal,

business and/or pension knowledge and expertise.[11]  In deciding whether it is

reasonable to issue a FSD against a Related Entity, the Determinations Panel must

---

[6]  Favier Dec. ¶¶ 4-6.
[7]  Hitchcock Dec. ¶ 29-30.
[8]  Ham Dec. ¶¶ 7, 30.
[9]  Hitchcock Dec. ¶ 37.2.
[10]  *See* § 43 of the 2004 Act, Ham Dec. Ex. A.
[11]  Ham Dec. ¶¶ 18, 28, 40; Hitchcock Dec. ¶¶ 49, 51-52.

3

consider all relevant matters, including: (1) the relationship between the Non-Employer and the Employer, including whether the Non-Employer controlled the Employer; (2) the value of any benefits received directly or indirectly by the Non-Employer; (3) any connection or involvement of the Non-Employer with the pension plan; and (4) the financial circumstances of the Non-Employer.[12]

If the entity has not complied with the FSD, the DP can also issue a non-compliance contribution notice ("CN") so long as TPR believes that it is reasonable to do so.[13] A CN states that the persons to whom it is issued are under a liability to pay to the trustees of the pension plan the sum specified therein. The CN may be for all or part of the amount by which the pension plan is under-funded. This amount is treated as a debt due to the trustees of the pension plan.[14] While TPR can exercise such powers as the trustee of the pension plan to recover the debt under the CN, during the assessment period, only the PPF may exercise the trustee's rights and powers.[15]

If a party to whom a FSD or CN is issued disputes that issuance, it may make a reference to the TPR Tribunal (the "Tribunal") within 28 days from the date of the issuance. The Tribunal will decide the appropriate action, if any, to take, including possibly revoking, confirming, or varying the FSD or CN. After receiving the Tribunal's decision, the party may, with permission of the Tribunal or the U.K. Court of Appeal, appeal on a point of law arising from a decision of the Tribunal.[16]

### Chapter 11 Filings

---

[12] Hitchcock Dec. ¶ 37.4.
[13] Hitchcock Dec. ¶ 43.
[14] *See* § 49(3) of the 2004 Act.
[15] Hitchcock Dec. ¶¶ 5.5, 46, & Schedule 2.
[16] *See* § 103 of the 2004 Act; Hitchcock Dec. ¶¶ 54-58.

4

On January 14, 2009 (the "Petition Date"), the debtors in the above-captioned case (the "Debtors")[17] (other than Nortel Networks (CALA) Inc. ("NN CALA") which filed on July 14, 2009) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and the Canadian Debtors filed a similar application in Canada.[18]  Also on January 14, 2009, nineteen of the Debtor's European affiliates, including NNUK (collectively, the "EMEA Debtors") were placed into administration by the High Court of Justice of England and Wales.[19]

On September 30, 2009, Appellants jointly filed Proofs of Claim ("Proofs of Claim") against the Debtors based on allegations that:  (1) the NNUK Pension Plan was underfunded by an amount stated to be £2.1 billion or $3.1 billion; and (2) TPR had concluded that NNUK was "insufficiently resourced" on June 30, 2008, and that grounds therefore existed to issue a Warning Notice ("Warning Notice"), instituting the U.K Administrative Proceedings (the "Proceedings") to seek the issuance of an FSD against certain affiliates of NNUK, including Nortel Networks Inc. ("NNI") and NN CALA, to cover the underfunding.[20]

According to the U.K. Pension Claim, by the time it was filed, TPR had concluded that grounds existed to issue certain Warning Notices and to seek a FSD against certain

---

[17]   The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc, (3546), Architel Systems (U.S.) Coproration (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11epiqsystems.com/nortel.
[18]   D.I. 39 at 4-5.
[19]   *Id.* at 5.
[20]   Hitchcock Dec. ¶¶ 22, 46.

5

members of the Nortel Group worldwide, including NNI and NN CALA, as companies allegedly "connected with or associates of" NNUK, with respect to the allegations that NNUK was "insufficiently resourced" on June 30, 2008, a date selected by TPR.[21]

On January 11, 2010, TPR issued a Warning Notice against 29 Nortel entities, including two of the Debtors:  NNI and NN CALA.[22]  The Warning Notice provides that TPR believes it to be reasonable to issue an FSD against the these entities ("Targets"), which requires them to provide financial support for the NNUK Pensions Plan in an amount as large as $3.1 billion.

### Debtors' Motion to Enforce the Stay Against the Trustee and PPF

On February 17, 2010, the Canadian Debtors filed an application with the Ontario Superior Court of Justice (the "Canadian Court") seeking to stay the Proceedings on the ground that they violate the stay imposed by the Initial Order issued by the Canadian Court.  That application was heard on February 25, 2010.  The Canadian Court issued the stay on February 26, 2010.

On February 18, 2010, the Debtors filed a motion (the "Stay Motion") pursuant to Sections 362(a)(1) and (a)(6) of the Bankruptcy Code to enforce the automatic stay against Appellants with respect to their participation in the Proceedings as against NNI and NN CALA.  Appellants filed an objection to the Stay Motion on February 24, 2010 (the "Objection").  On February 26, 2010, a hearing occurred before the Bankruptcy Court, after which the Bankruptcy Court granted the Stay Motion and issued the Automatic Stay Order, and subsequently issued the Opinion.

---

[21]  *See* Ray Dec. Ex. A.
[22]  Davies Dec. ¶ 25.

6

In the Opinion, the Bankruptcy Court held that:  (1) Appellants had submitted to the jurisdiction of the Court by filing the Proofs of Claim, the subject of which was the "very subject" of the Proceedings; (2) Appellants' participation against the Debtors in such Proceedings is subject to the automatic stay under Section 362(a) of the Bankruptcy Code; and (3) under the applicable "pecuniary purpose" and "public policy" tests, and controlling case law, the police power exception to the automatic stay does not apply, because the Proceedings do not involve a matter of public health, safety or welfare, but are intended to "address an alleged financial shortfall in a private pension plan," and "to obtain financial support for the benefit of private parties."

**Parties' Contentions**

Appellants contend that the Bankruptcy Court erred in concluding that the Proceedings were not commenced by a foreign governmental agency.  Specifically, Appellants argue that the Proceedings were an exercise of the agency's regulatory/police power within the meaning of the exception to the automatic stay contained in section 362(b)(4) of the Bankruptcy Code.  Appellants also point out that the Bankruptcy Court erred in concluding that the prejudice the Debtors might suffer as a result of the Proceedings did not provide a basis for the conclusion that the automatic stay applies to the Appellants and bar them from participating therein with respect to the Debtors.

In response, the Debtors contend that the Bankruptcy Court correctly found that allowing Appellants to participate in the Proceedings would violate the automatic stay, and the Proceedings do not constitute the exercise of the "police power" that would except them from the stay.

7

## II. STANDARD OF REVIEW

The court has jurisdiction to hear an appeal from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a).  In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions.[23]  With mixed questions of law and fact, the court must accept the Bankruptcy Court's finding of "historical or narrative facts unless clearly erroneous, but exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts."[24]  The appellate responsibilities of the court are further understood by the jurisdiction exercised by the Third Circuit, which reviews the Bankruptcy Court decision on *de novo* basis in the first instance.[25]

In cases regarding the denial of relief from the automatic stay and denial of reconsideration, the Bankruptcy Court's decisions are reviewed under the abuse of discretion standard.[26]  An abuse of discretion exists when judicial action "'rests upon a clearly erroneous finding of fact, and errant conclusion of law or an improper application of law to fact.'"[27]  A court abuses its discretion when it bases a decision upon an

---

[23] *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999).
[24] *Mellon Bank., N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citing *Universal Mineral, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101-02 (3d Cir. 1981)) (internal quotations omitted).
[25] *In re Telegroup*, 281 F.3d 133, 136 (3d Cir. 2002).
[26] *Baldino v. Wilson*, 116 F.3d 87, 89 (3d Cir. 1997) (automatic stay); *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 673 (3d Cir. 1999) (reconsideration).
[27] *NLRB v. Frazier*, 966 F.2d 812, 815 (3d Cir. 1992) (quoting *International Union, UAW v. Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir. 1987)); *In re FRG*, 115 B.R. 72, 73 (E.D. Pa. 1990) (holding that an abuse of discretion exists whenever a judicial action is "arbitrary, fanciful, or unreasonable, or when improper standards, criteria, or procedures are used") (internal quotations omitted).

erroneous legal conclusion, which itself is reviewed *de novo*.[28]  A court's decision should

not be overturned based upon an abuse of discretion "unless there is a definite and firm

conviction that the court below committed a clear error of judgment in the conclusion it

reached upon a weighing of the relevant facts."[29]  Thus, a decision should not be

overturned under the abuse of discretion standard, unless "no reasonable person would

adopt the [lower] court's view."[30]

## III.  DISCUSSION

### A.  Interpretation of Section 362(b)(4)

Reviewing the decision of the Bankruptcy Court in light of the parties' arguments

and the applicable standard of review, the court concludes that the Bankruptcy Court

did not err in its decision to deny Appellants relief from the automatic stay.  The

Bankruptcy Court thoroughly analyzed the law governing the automatic stay exception

of Section 362(b)(4) of the Bankruptcy Code, and in the court's view, correctly

concluded that:  (1) the police power exception is to be narrowly construed; (2) the

Proceedings do not pass the pecuniary purpose or public policy test which would

exempt them from the stay; and (3) the Bankruptcy Court did not impermissibly base its

decision on the issue of prejudice.

### B.  Interpretation of regulatory power

Appellants contend that the Bankruptcy Court erred by interpreting the regulatory

power exception to the automatic stay in too narrow a manner.  In support, they point to

---

[28] *Hanover Potato Prods. v. Shalala*, 989 F.2d 123, 127 (3d Cir. 1993) (holding that the use of an improper legal standard or procedure gives rise to an automatic abuse of discretion "which is merely another way of saying that our review becomes plenary").
[29] *Id.*
[30] *Id.* (alteration in original).

the Third Circuit's decision in *Penn Terra Ltd. v. Pa. Dep't of Envtl. Res.,* which requires

that the regulatory power exception be construed broadly.[31]  While it is true that the

Third Circuit holds that the regulatory power exception requires a broad interpretation,

this discussion was not in the context of the police powers with regard to foreign

entities.  As Debtors correctly point out, the regulatory exception should be construed

broadly "in the context of federal-state preemption."[32]  The Third Circuit states,

> [W]e find that the exception to the automatic stay provision
> . . . should itself be construed broadly, and no unnatural
> efforts be made to limit its scope.  The police power of the
> several States embodies the main bulwark of protection by
> which they carry out their responsibilities to the *People*; its
> abrogation is therefore a serious matter.  Congress should
> not be assumed, therefore, to have been miserly in its refund
> of that power to the *States.*[33]

The Bankruptcy Court was correct in its determination that the police powers exception

should be interpreted narrowly with regard to foreign entities.

Appellants further assert that a broad interpretation of the regulatory exception

should be applied to a foreign power, allowing the Proceedings to be exempted from the

automatic stay, citing *Gen. Elec. Co. v. Deutz AG.*[34]  There the Third Circuit states, "[i]n

parallel litigation, the issue of comity is an important and omnipresent factor.  Although it

is a consideration in federal and state litigation, it assumes even more significance in

international proceedings."[35]  While comity is an important consideration, it is also used

---

[31]  733 F.2d 267, 273 (3d Cir. 1984).
[32]  D.I 42 at 5 (emphasis in original).
[33]  *Penn Terra Ltd.,* 733 F.2d at 273 (emphasis added).
[34]  270 F.3d 144 (3d Cir. 2001).
[35]  *Id.* at 160.  The Third Circuit goes on to define comity.  "The Supreme Court has described comity as
'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of
another nation, having due regard both to international duty and convenience, and to the rights of its own
citizens or of other persons who are under the protection of its laws.'" *Id.*  (quoting *Hilton v. Guyot,* 159

at the discretion of the Bankruptcy Court. Comity, in the legal sense, is neither a matter

of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the

other.[36] Because the Third Circuit has not decided a case involving comity superceding

an automatic stay, the Bankruptcy Court did not abuse its discretion in rejecting

Appellants' comity argument.[37]

Appellants next claim that the Bankruptcy Court's determination that TPR's

issuance of FSDs in the Proceedings did not constitute an exercise of its regulatory

powers within the meaning of Section 362(b)(4) was erroneous.[38] In support, they point

to the Bankruptcy Court's decision In re Sea Containers Ltd. In that case, the

Bankruptcy Court held that "the mere issuance of the FSDs did not violate the automatic

stay" because TPR is "a statutorily created entity endeavoring to exercise its regulatory

power."[39]

Appellants once again rely on a broad interpretation of the regulatory power

exception, thus allowing the Proceedings to be exempted from the automatic stay. As

previously stated, this court agrees with the Bankruptcy Court findings that,

> An exercise of a governmental unit's police or regulator
> power exempts them from the automatic stay pursuant to
> Section 362(b)(4) of the Bankruptcy Code. Here, neither of
> the Claimants is a "governmental unit," as defined in Section
> 101(27) of the Bankruptcy Code. The Trustee is a private

---

U.S. 113, 164 (1895)).

[36] *Hilton,*159 U.S. at 163-64.

[37] The three cases cited by Appellants were *Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods, N.V.*, 310 F.3d 118, 129 (3d Cir. 2002), *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 160 (3d Cir. 2001), and *Compagnie des Braxuites de Guinea v. Ins. Co. of N. Am.*, 651 F.2d 877 (3d Cir. 1981) *affd*, 456 U.S. 694 (1982). *General Electric* and *Compagnie des Bauxites* are not bankruptcy cases, and *Stonington* involved conflicts of law resulting from the debtor's decision to file bankruptcy in two jurisdictions.

[38] D.I. 39 at 13.

[39] No. 06-11156 (KJC), 2008 WL 4296562, at *9 (Bankr. D. Del. Sept. 19, 2008).

> party, and the PPF, while defined as "a statutory body" in
> paragraph 1.4 of the U.K. Pension Claim, during an
> assessment period exercises the rights and powers of the
> Trustee.  PPF thus stands in the shoes of the Trustee, a
> private party.[40]

In addition, the Bankruptcy Court points out that *Sea Containers* is distinguished

from the case at issue because:  (1) *Sea Containers* involved a motion to approve a

settlement based on Bankruptcy Rule 9019, and a different set of facts; (2) there was no

objection to the FSD preceding in *Sea Containers*; (3) there was no move to enforce the

automatic stay; (4) neither the *Sea Containers* debtors nor the creditors who later

objected to the FSD proceedings moved to enforce the automatic stay; (5) the trustees

in *Sea Containers* did not file a proof of claim in the debtors' Chapter 11 proceedings

until after the FSD proceeding took place and therefore was not subject to the

jurisdiction of the bankruptcy court, and; (6) here, TPR is asserting a contingent claim,

whereas in *Sea Containers*, integral to the court's ruling that there was no stay violation

was its determination that there was no assertion of a claim.  In sum, the court agrees

with and adopts the rationale and conclusions of the Bankruptcy Court.

### C.  Pecuniary Purpose Test

The Bankruptcy Court correctly identified and analyzed the two tests that are

used to consider whether a Section 362(b)(4) exception applies.  First is the pecuniary

purpose test, which determines if "the governmental action or proceeding relates

primarily to the protection of the government's pecuniary or financial interest in the

debtor's property, as opposed to a matter of public safety or welfare."[41]  The Bankruptcy

---

[40] *In re Nortel Networks Corp.*, 426 B.R. at 91.
[41] *Id.*

Court found that the purpose of the U.K. Proceedings is to

> [A]ddress an alleged financial shortfall in a private pension
> plan, first by determining whether the Targets should provide
> financial support to the Trustee, and, then potentially by
> imposing and fixing a claim against NNI and NN CALA
> through a CN. This is purely an issue of determining which, if
> any, entities, on an after-the-fact basis, should be financially
> responsible for funding a pension shortfall. It is clearly a
> pecuniary matter, and, notwithstanding the importance of the
> financial matter to the private Trustee, under the case law
> does not qualify as a matter of public safety or welfare.[42]

Appellants maintain that TPR is acting in furtherance of its statutory objective,

which includes ensuring that pension plans in the U.K. are properly funded and

maintained by their sponsors and remedying the moral hazard created by employers

who seek to evade their pension obligations and pass off the burden or their liabilities to

the PPF.  The Bankruptcy Court disagreed with this characterization, and found that

TPR is a forum for disputes in U.K. proceedings, where private parties are seeking to

protect their property rights.  This court agrees with that characterization and finds that

the requirements of the pecuniary purpose test have not been met.  The Proceedings

do not address whether there has been a violation of law or public safety, but instead

only seek to determine whether and how much the parties should contribute to the

Pension Plan.[43]

Appellants further suggest that the Proceedings should be viewed in a similar

light to that of the Equal Employment Opportunity Commission ("EEOC") since the

EEOC is not barred by an automatic stay despite the fact that private individuals may

---

[42] *Id.* at 91-92.
[43] Hitchcock Dec. ¶ 39, A-2.

receive a pecuniary benefit as a result of its findings.  This argument is baseless, as the

Bankruptcy Court points out that in *EEOC v. McLean Trucking Co.,* the Fourth Circuit

"rejected the bankruptcy court's finding that because the debtor was in liquidation, the

subject litigation was merely an action to recover back wages, an adjudication of private

rights."[44]  To summarize, this court agrees that Appellants have not demonstrated that

the Proceedings meets the pecuniary policy exception to the automatic stay.

### D. Public Policy Test

The Bankruptcy Court correctly found that the Proceedings also failed to meet

the public policy test exception for the automatic stay.  Under this test, the issue is

"whether the governmental action is taken in furtherance of a matter of public policy, or

instead is intended primarily to adjudicate private rights."[45]  Appellants argument that the

Proceeding was initiated and controlled by a governmental agency is unpersuasive.  As

the Bankruptcy Court points out,

> Here, TPR seeks not to protect the "safety or welfare" of the
> public in the U.K., but rather to obtain financial support for
> the benefit of private parties-the members of the NNUK
> Pension Plan, represented by the Trustee-and if that fails, to
> assert and liquidate a claim to the property of the Debtors,
> on the Trustee's behalf.  Any sum paid as a result of the U.K.
> Proceedings would not go to benefit the public, but would be
> used to reduce the debt owed by NNUK to the Trustee.  The
> Trustee as intended beneficiary, and PPF, filed the proofs of
> claim to recover from the Debtors the same financial support
> that is the subject of the U.K. Proceedings.

Because TPR is acting on behalf of the members of the NNUK, who are private parties,

----

[44] *In re Nortel Networks Corp.*, 426 B.R. at 92 (citing *EEOC v. McLean Trucking Co.*, 834 F.2d 398, 400 (4th Cir. 1987)).
[45] *Id.* at 93 (citing *In re Fairchild Corp.*, No. 09-10899 CSS, 2009 WL 4546581, at *4 (Bankr. D. Del. Dec. 1, 2009).

the U.K. Proceedings do not pass the public policy test.

**E. Prejudice**

Appellants' final argument is that the Bankruptcy Court "placed significant emphasis" on the issue of prejudice in determining whether to enforce the automatic stay, and thus committed a reversible error.  This court does not agree.  While the Bankruptcy Court did discuss the issue of prejudice, it did not include it in its decision to enforce the stay.  The Bankruptcy Court properly based its decision on the pecuniary and public policy tests.  Prejudice was discussed after the decision to enforce the stay was made in response to Appellants argument in their Objection to Debtor's Motion for Stay.  Because of this, it was proper for the Bankruptcy Court to discuss this issue after a decision was reached.

**ORDER AND RECOMMENDED DISPOSITION**

For the reasons contained herein, I recommend that:

(1) The April 30, 2010 decision of the Bankruptcy Court be AFFIRMED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D.Del.LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.[46]  The objections and response to those objections are limited to ten (10) pages each.

The parties are directed to the court's standing Order in Non-Pro Se Matters for Objections Filed under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is

---

[46] FED. R. CIV. P. 72(b).

available on the court's website, www.ded.uscourts.gov.


Dated: August 5, 2010                    _____/s/ Mary Pat Thynge_____
                                         UNITED STATES MAGISTRATE JUDGE

## **Exhibit C**

## **Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
:
In re                                        :        Chapter 11 Case No.
                                             :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,     :        08-13555 (JMP)
                                             :
                        Debtors.             :        (Jointly Administered)
                                             :
----------------------------------------------------------------x

## ORDER ENFORCING THE AUTOMATIC STAY
## WITH RESPECT TO UK PENSION PROCEEDINGS

Upon the motion, dated August 17, 2010 (the "Motion"),[1] of Lehman Brothers

Holdings Inc. ("LBHI" and together with its affiliated debtors in the above-referenced chapter 11

cases, as debtors and debtors in possession, the "Debtors"), pursuant to section 362 of title 11 of

the United States Code (the "Bankruptcy Code"), for enforcement of the automatic stay with

respect to the UK Pension Proceedings, all as more fully described in the Motion; and the Court

having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C.

§§ 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the

District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.);

and consideration of the Motion and the relief requested therein being a core proceeding pursuant

to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Motion having been provided, and it appearing that

no other or further notice need be provided; and the relief requested in the Motion being in the

best interests of LBHI and its estate and creditors; and the Court having reviewed the Motion and

having heard the statements in support of the relief requested therein at a hearing before the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth

in the Motion and in the record of the Hearing establish just cause for the relief granted herein;

and upon all of the proceedings had before the Court and after due deliberation and sufficient

cause appearing therefore, it is

ORDERED that the Motion is GRANTED; and it is further

ORDERED that by virtue of their filing proofs of claim in this Court, the Trustees

and the PPF Board have submitted to the jurisdiction of this Court; and it is further

ORDERED that the automatic stay imposed by section 362 of the Bankruptcy

Code is enforced as to the UK Pension Proceedings, and TPR and the Claimants are enjoined

from proceeding with such action or attempting to liquidate or enforce remedies on the Claims;

and it is further

ORDERED that the Claimants are subject to sanctions if they participate in the

UK Pension Proceedings in any manner that affects LBHI's assets, estates, or the administration

of its chapter 11 case; and it is further

ORDERED that any distribution on account of the Claims will be made solely

pursuant to any plan of reorganization that is confirmed and becomes effective in these chapter

11 cases or an order of this Court; and it is further

ORDERED that notwithstanding any provision in the Federal Rules of

Bankruptcy Procedure to the contrary, (i) the terms of this Order shall be immediately effective

and enforceable upon its entry, (ii) LBHI is not subject to any stay in the implementation,

enforcement, or realization of the relief granted in this Order, and (iii) the Debtors may, in their

discretion and without further delay, take any action and perform any act authorized under this

Order; and it is further

ORDERED that this Court retains exclusive jurisdiction with respect to any and

all matters arising from or related to the implementation or enforcement of this Order.

Dated: September ___, 2010
         New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE