EXECUTION VERSION

INDENTURE

By and among

SPRUCE CCS, LTD.,
as the Issuer,

SPRUCE CCS, CORP.,
as the Co-Issuer,

and

U.S. BANK NATIONAL ASSOCIATION,
as the Trustee

Dated as of April 28, 2008

# TABLE OF CONTENTS

**Page**

### ARTICLE I
### DEFINITIONS

Section 1.1    Definitions.................................................................................... 2

Section 1.2    Assumptions as to Underlying Assets............................................... 52

Section 1.3    Rules of Construction ................................................................... 53

### ARTICLE II
### THE SECURITIES

Section 2.1    Forms Generally........................................................................... 54

Section 2.2    Forms of Securities and Certificate of Authentication ...................... 54

Section 2.3    Authorized Amount; Note Interest Rate; Stated Maturity; Denominations......... 55

Section 2.4    Execution, Authentication, Delivery and Dating............................... 56

Section 2.5    Registration, Registration of Transfer and Exchange ........................ 57

Section 2.6    Mutilated, Destroyed, Lost or Stolen Securities. .............................. 77

Section 2.7    Payment of Principal and Interest .................................................. 77

Section 2.8    Persons Deemed Owners .............................................................. 80

Section 2.9    Cancellation ............................................................................... 80

Section 2.10   Global Securities; Temporary Securities ........................................ 81

Section 2.11   Additional Issuance of Securities.................................................. 82

Section 2.12   Tax Purposes .............................................................................. 84

Section 2.13   No Gross Up ............................................................................... 84

Section 2.14   Securities Beneficially Owned by Persons not either QIB/QPs or both
               Accredited Investors and QPs.......................................................... 84

### ARTICLE III
### CONDITIONS PRECEDENT; CERTAIN PROVISIONS
### RELATING TO COLLATERAL

Section 3.1    General Provisions ....................................................................... 85

**TABLE OF CONTENTS**
(continued)

**Page**

Section 3.2    Security for the Senior Notes and Mezzanine Notes ........................................... 88

Section 3.3    Additional Securities – General Provisions ........................................................ 89

Section 3.4    Delivery of Underlying Assets and Eligible Investments .................................... 89

Section 3.5    Purchase and Delivery of Underlying Assets and Other Actions During the
Ramp-Up Period; Ramp-Up Effective Date Legal Opinion ................................ 91

Section 3.6    Representations Regarding Collateral ................................................................. 93

Section 3.7    [Reserved] ........................................................................................................ 94

ARTICLE IV
SATISFACTION AND DISCHARGE

Section 4.1    Satisfaction and Discharge of Indenture ............................................................ 94

Section 4.2    Application of Trust Money ............................................................................... 96

Section 4.3    Repayment of Monies Held by Paying Agent ..................................................... 96

ARTICLE V
REMEDIES

Section 5.1    Events of Default .............................................................................................. 96

Section 5.2    Acceleration of Maturity; Rescission and Annulment ......................................... 97

Section 5.3    Collection of Indebtedness and Suits for Enforcement by Trustee ...................... 99

Section 5.4    Remedies .......................................................................................................... 100

Section 5.5    Optional Preservation of Collateral .................................................................... 102

Section 5.6    Trustee May Enforce Claims Without Possession of Securities ......................... 103

Section 5.7    Application of Money Collected ........................................................................ 104

Section 5.8    Limitation on Suits ........................................................................................... 104

Section 5.9    Unconditional Rights of Senior Noteholders and Mezzanine Noteholders
to Receive Payments ......................................................................................... 104

Section 5.10   Restoration of Rights and Remedies .................................................................. 104

Section 5.11   Rights and Remedies Cumulative ...................................................................... 105

# TABLE OF CONTENTS
(continued)

**Page**

Section 5.12    Delay or Omission Not Waiver ................................................. 105

Section 5.13    Control by Holders of Senior Notes or Mezzanine Notes ................................. 105

Section 5.14    Waiver of Past Defaults ....................................................... 105

Section 5.15    Undertaking for Costs ........................................................ 106

Section 5.16    Waiver of Stay or Extension Laws ............................................. 106

Section 5.17    Sale of Collateral ........................................................... 106

Section 5.18    Action on the Senior Notes and Mezzanine Notes ............................. 107

ARTICLE VI
THE TRUSTEE

Section 6.1     Certain Duties and Responsibilities ........................................... 107

Section 6.2     Notice of Default ............................................................ 109

Section 6.3     Certain Rights of Trustee .................................................... 109

Section 6.4     Not Responsible for Recitals or Issuance of Securities ...................... 110

Section 6.5     May Hold Securities ......................................................... 111

Section 6.6     Money Held in Trust ......................................................... 111

Section 6.7     Compensation and Reimbursement ......................................... 111

Section 6.8     Corporate Trustee Required; Eligibility ...................................... 112

Section 6.9     Resignation and Removal; Appointment of Successor ...................... 112

Section 6.10    Acceptance of Appointment by Successor ................................. 114

Section 6.11    Merger, Conversion, Consolidation or Succession to Business
                of Trustee ................................................................... 114

Section 6.12    Co-Trustees and Separate Trustee ......................................... 114

Section 6.13    Certain Duties of Trustee Related to Delayed Payment of Proceeds ......... 115

Section 6.14    Representations and Warranties of the Trustee ............................. 115

# TABLE OF CONTENTS
(continued)

**Page**

Section 6.15    Authenticating Agents ........................................................................ 116

Section 6.16    Fiduciary for Holders of Senior Notes and Mezzanine Notes Only; Agent
for Other Secured Parties ................................................................... 117

ARTICLE VII
COVENANTS

Section 7.1    Payments on Securities ....................................................................... 117

Section 7.2    Compliance with Laws ........................................................................ 117

Section 7.3    Maintenance of Books and Records ..................................................... 117

Section 7.4    Maintenance of Office or Agency ........................................................ 117

Section 7.5    Money for Payments to Be Held in Trust ............................................. 118

Section 7.6    Existence of Co-Issuers ...................................................................... 119

Section 7.7    Protection of Collateral ....................................................................... 120

Section 7.8    Opinions as to Collateral ..................................................................... 121

Section 7.9    Performance of Obligations ................................................................. 121

Section 7.10    Negative Covenants .......................................................................... 122

Section 7.11    Co-Issuers May Consolidate, Etc., Only on Certain Terms ................ 125

Section 7.12    Successor Substituted ....................................................................... 128

Section 7.13    No Other Business ............................................................................ 128

Section 7.14    Compliance with Collateral Administration Agreement and Administrative
Agency Agreement ........................................................................... 128

Section 7.15    Confirmation of Rating ...................................................................... 129

Section 7.16    Reporting .......................................................................................... 129

Section 7.17    Calculation Agent ............................................................................. 129

Section 7.18    Certain Tax Matters ......................................................................... 130

# TABLE OF CONTENTS
(continued)

**Page**

### ARTICLE VIII
### SUPPLEMENTAL INDENTURES

Section 8.1    Supplemental Indentures Without Consent of Holders ..................................... 131

Section 8.2    Supplemental Indentures with Consent of Holders ........................................... 134

Section 8.3    Execution of Supplemental Indentures ............................................................. 137

Section 8.4    Effect of Supplemental Indentures .................................................................... 137

Section 8.5    Transfer of Non-Consenting Noteholders' Securities in Connection with
Pricing Amendment ......................................................................................... 137

### ARTICLE IX
### REDEMPTION OF NOTES

Section 9.1    General ............................................................................................................. 138

Section 9.2    Tax Redemption ............................................................................................... 138

Section 9.3    Redemption by Liquidation .............................................................................. 138

Section 9.4    Redemption by Refinancing ............................................................................. 138

Section 9.5    Redemption Procedures .................................................................................... 140

Section 9.6    Notice of Redemption by the Co-Issuers; Withdrawal of Notice ...................... 142

Section 9.7    Securities Payable on Redemption Date ........................................................... 143

Section 9.8    Payment of Principal to Satisfy Coverage Tests or Remedy a Ratings
Confirmation Failure ........................................................................................ 144

Section 9.9    Special Redemption .......................................................................................... 144

Section 9.10   Redemption of the Subordinated Notes following a Redemption of the
Senior Notes and Mezzanine Notes .................................................................. 144

### ARTICLE X
### ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1   Collection of Money; General Account Requirements ...................................... 146

Section 10.2   Collection Account ........................................................................................... 147

Section 10.3   Additional Issuer Accounts .............................................................................. 149

# TABLE OF CONTENTS
(continued)

**Page**

Section 10.4    Additional Matters Regarding Issuer Accounts ................................................. 151

Section 10.5    Reports by Trustee ......................................................................................... 152

Section 10.6    Accountings ................................................................................................... 152

Section 10.7    Release of Collateral ..................................................................................... 157

Section 10.8    Reports by Independent Accountants .............................................................. 157

Section 10.9    Additional Reports ......................................................................................... 158

Section 10.10   Notices to the Holders .................................................................................. 158

## ARTICLE XI
## APPLICATION OF MONIES

Section 11.1    Disbursements of Monies from Payment Account ........................................... 159

Section 11.2    Allocation of Funds to Satisfy Coverage Tests ............................................... 161

## ARTICLE XII
## SALE OF UNDERLYING ASSETS

Section 12.1    Sale of Underlying Assets and Eligible Investments ....................................... 162

Section 12.2    [Reserved] ..................................................................................................... 162

Section 12.3    [Reserved] ..................................................................................................... 162

Section 12.4    [Reserved] ..................................................................................................... 163

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1    Form of Documents Delivered to Trustee ....................................................... 163

Section 13.2    Acts of Holders ............................................................................................. 163

Section 13.3    Notices ......................................................................................................... 164

Section 13.4    Notices to Holders; Waiver ............................................................................ 165

Section 13.5    Subordinated Noteholders To Direct Remedies and Rights Related to
                Underlying Assets ......................................................................................... 166

Section 13.6    Effect of Headings and Table of Contents ...................................................... 166

# TABLE OF CONTENTS
### (continued)

Section 13.7    Successors and Assigns.................................................................... 166

Section 13.8    Severability .............................................................................. 166

Section 13.9    Benefits of Indenture.................................................................... 166

Section 13.10  GOVERNING LAW .................................................................... 167

Section 13.11  SUBMISSION TO JURISDICTION ................................................. 167

Section 13.12  Counterparts ............................................................................. 167

Section 13.13  WAIVER OF JURY TRIAL........................................................... 167

Section 13.14  Liability of Co-Issuers ................................................................. 167

Section 13.15  De-Listing of the Notes................................................................ 168

### ARTICLE XIV
### ASSIGNMENT OF ADMINISTRATIVE AGREEMENT
### AND  COLLATERAL ADMINISTRATION AGREEMENT 168

Section 14.1    Assignment of Administrative Agency Agreement........................................ 168

Section 14.2    Assignment of Collateral Administration Agreement ..................................... 170

| | |
|---|---|
| Exhibit A-1 | Form of Rule 144A Global Senior Note |
| Exhibit A-2 | Form of Regulation S Global Senior Note |
| Exhibit A-3 | Form of Certificated Senior Note |
| Exhibit B-1 | Form of Rule 144A Global Mezzanine Note |
| Exhibit B-2 | Form of Regulation S Global Mezzanine Note |
| Exhibit B-3 | Form of Certificated Mezzanine Note |
| Exhibit C-1 | Form of Certificated U.S. Subordinated Note |
| Exhibit C-2 | Form of Regulation S Global Subordinated Note |
| Exhibit D-1 | Form of Regulation S Global Senior Note Transferee Certificate |
| Exhibit D-2 | Form of Regulation S Global Mezzanine Note Transferee Certificate |
| Exhibit E-1 | Form of Transferee Certificate for Transfers of Interest in Regulation S Global Senior Note to Person Taking Delivery in the Form of an Interest in Rule 144A Global Senior Note or a Certificated Senior Note |
| Exhibit E-2 | Form of Transferee Certificate for Transfers of Interest in Regulation S Global Mezzanine Note to Person Taking Delivery in the Form of an Interest in Rule 144A Global Mezzanine Note or a Certificated Mezzanine Note |
| Exhibit F-1 | Form of Investor Representation Letter for Senior Notes |
| Exhibit F-2 | Form of Investor Representation Letter for Mezzanine Notes |
| Exhibit G-1 | Form of Transferee Certificate for Transfer and Exchange of Certificated Senior Notes |
| Exhibit G-2 | Form of Transferee Certificate for Transfer and Exchange of Certificated Mezzanine Notes |
| Exhibit H | Form of Subordinated Note Transferee Certificate |
| Exhibit I | Form of Note Owner Certificate |
| Exhibit J | Form of Opinion of Allen & Overy LLP |
| Exhibit K | Form of Opinion of Maples and Calder |
| Exhibit L | Form of Opinion of Allen & Overy LLP |
| Exhibit M | Form of Opinion of Alston & Bird LLP |
| Exhibit N | Form of Certificate to Trustee |
| | |
| Schedule A | Moody's Industry Category List |
| Schedule B | Determination of LIBOR Formula |
| Schedule C | Standard & Poor's Industry Classification Groups |
| Schedule D | Diversity Score Table |
| Schedule E | Standard & Poor's Recovery Rate Tables |
| Schedule F | Moody's Recovery Rate Table |

INDENTURE, dated as of April 28, 2008, by and among SPRUCE CCS, LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands, as the issuer (the "Issuer"), SPRUCE CCS, CORP., a corporation organized under the laws of the State of Delaware, as the co-issuer (the "Co-Issuer," and together with the Issuer, the "Co-Issuers"), and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as Trustee (as defined herein).

## PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Co-Issued Notes issuable by the Co-Issuers and the Subordinated Notes issuable by the Issuer as provided in this Indenture. All covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Secured Parties and the Trustee. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with the terms of this Indenture have been done.

## GRANTING CLAUSE

The Issuer hereby Grants to the Trustee, for the benefit and security of the Secured Parties, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, all loans, securities, financial assets, investment property, instruments, general intangibles, payment intangibles, accounts, including, without limitation, deposit accounts, money, documents, agreements, investments and all other property and assets of any type or nature in which the Issuer has an interest (excluding any money, securities, financial assets, investment property or other property and assets credited thereto and the Excepted Property) (collectively, the "Collateral"), including, without limitation:

(a)     the Underlying Assets (which, for the avoidance of doubt, may include Bonds, Loans and Participations, including the Participations evidenced by the Master Participation Agreement) listed as of the Closing Date in the Schedule of Underlying Assets, including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto and all payments made or to be made thereon or with respect thereto, and all Underlying Assets which are delivered or credited to the Trustee, or for which a Security Entitlement is delivered or credited to the Trustee or which are credited to one or more of the Issuer Accounts on or after the Closing Date, including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto and all payments made or to be made thereon or with respect thereto;

(b)     any Equity Securities acquired or received by the Issuer in connection with the Underlying Assets;

(c)     the Master Participation Agreement, the LBHI Guarantee, the Collateral Administration Agreement, the Administration Agreement, the Administrative Agency Agreement and the Issuer's rights thereunder;

(d)     the Issuer Accounts and all monies, securities, financial assets, investment property, instruments, general intangibles, payment intangibles, documents, agreements, loans and investments and other property and assets now or hereafter on deposit therein or credited thereto (including Eligible Investments), and all dividends, distributions and other payments thereon or with respect thereto; and

(e)        all Proceeds of any of the foregoing.

Such Grants are made, however, in trust, to secure the Secured Obligations equally and ratably without prejudice, priority or distinction between the Secured Obligations by reason of difference in time of issuance or incurrence or otherwise, except as expressly provided in this Indenture (including Section 2.7 and ARTICLE XI), and to secure (i) the payment of all amounts due on the Secured Obligations in accordance with their terms and (ii) compliance with the provisions of this Indenture and each related document, all as provided herein and therein.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein, for the benefit of the Secured Parties.  Upon the occurrence of any Event of Default hereunder, and in addition to any other rights available under this Indenture or any other Instruments included in the Collateral subject to Section 6.16 hereof, for the benefit and security of the Secured Parties or otherwise available at law or in equity but subject to the terms hereof, the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law and the terms of this Indenture, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public and private sale.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof, and agrees to perform the duties herein in accordance with the provisions hereof such that the interests of the Secured Parties may be adequately and effectively protected.

The Issuer hereby authorizes Allen & Overy LLP to file, on behalf of the Trustee, a Record or Records (as such term is defined in the UCC of the District of Columbia), including, without limitation, financing or continuation statements, and amendments thereto, in all jurisdictions and with all filing offices as the Issuer may determine, in its sole discretion, are necessary or advisable to perfect the security interests granted to the Trustee in connection herewith.  Such financing statements may describe the collateral in the same manner as described in any security agreement or pledge agreement entered into by the parties in connection herewith or may contain an indication or description of collateral that describes such property in any other manner as the Issuer may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interests in the Collateral granted to the Trustee in connection herewith, including, describing such property as "all assets" or "all personal property."

## ARTICLE I
## DEFINITIONS

Section 1.1    <u>Definitions</u>.  Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms.  Whenever any reference is made to an amount the determination or calculation of which can be made by applying the provisions of Section 1.2, the provisions of Section 1.2 shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of determination or calculation is expressly specified in the particular provision.

"<u>Account</u>":  The meaning specified in Section 9-102(a)(2) of the UCC.

"Accountants' Certificate":  A certificate of a firm of Independent certified public accountants of national reputation appointed by the Issuer pursuant to Section 10.8(b).

"Accredited Investor":  An "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act.

"Act":  The meaning specified in Section 13.2(b).

"Administration Agreement":  The Administration Agreement, dated as of the Closing Date, between the Issuer and the Administrator, relating to the administration of the Issuer, as the same may be amended or otherwise modified from time to time in accordance with its terms.

"Administrative Agency Agreement":  The Administrative Agency Agreement, dated as of the Closing Date, between the Issuer and the Administrative Agent, as the same may be amended or otherwise modified from time to time in accordance with its terms.

"Administrative Agent":  Lehman Brothers Inc., in its capacity as Administrative Agent under the Administrative Agency Agreement and its permitted successors and assigns in such capacity.

"Administrative Expenses":  Amounts (including fees, expenses and indemnities) due or accrued and payable by the Issuer or the Co-Issuer to (i) the Trustee pursuant hereto; (ii) the Collateral Administrator under the Collateral Administration Agreement; (iii) each of the Rating Agencies for annual surveillance fees and other fees and expenses in connection with any rating of the Senior Notes or Mezzanine Notes or any credit estimates, including, without limitation, the initial application for annual renewal fees of credit estimates with respect to the Underlying Assets and any fee or expense of the Rating Agencies in connection with the preparation, review and execution of any amendment or other modification to any of the Operative Agreements; (iv) the Independent accountants, advisors, agents and counsel of the Issuer and/or the Co-Issuer for fees (including retainers) and expenses (including the fees and expenses of any independent advisor retained to value or approve the Issuer's acquisition of Underlying Assets); (v) any other Person in respect of any governmental fee (including all filing, registration and annual return fees payable to the Cayman Islands government and registered office fees), charge or tax (other than withholding taxes); (vi) the Administrative Agent under the Administrative Agency Agreement; and (vii) any other Person in respect of any other fees or expenses (including in respect of any indemnity obligations) permitted under this Indenture (including any monies owed to the Administrator under the Administration Agreement) and the documents delivered pursuant to or in connection with this Indenture and the Securities, including, without limitation, any fees or expenses incurred by such other Persons in connection with any amendment or other modification to this Indenture or such other documents.

"Administrator":  Maples Finance Limited, a licensed trust company incorporated in the Cayman Islands, and its successors and assigns in such capacity.

"Affiliate" or "Affiliated":  With respect to a Person, (a) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (b) any other Person who is a director, officer or employee (i) of such Person, (ii) of any subsidiary or parent company of such Person or (iii) of any Person described in clause (a) above; provided, that neither the Administrator nor any special purpose entity for which it acts as share trustee or administrator shall be deemed to be an affiliate of the Issuer solely because the Administrator or any of its affiliates serves as administrator or share trustee for the Issuer; provided, further, that the term Affiliate shall not include any Affiliate relationship which may exist solely as a result of direct or indirect ownership of, or control by, a common Person, including any subsidiary of such Person, whose principal business activity is acquiring,

holding and selling investments (including controlling interests) in otherwise unrelated companies that are not integrated with one another and whose financial condition and creditworthiness are independent of the other companies in which such Person acquires, holds or sells investments.  For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote more than 50% of the securities having ordinary voting power for the election of directors of any such Person or (y) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise. With respect to the Administrator, the term "Affiliate" or "Affiliated" shall exclude the Issuer and any other special purpose vehicle to which the Administrator is or will be providing administrative services.

"Agent Members":  Members of, or participants in, the Depositary.

"Aggregate Excess Spread":  As of any date of determination, the amount obtained by multiplying:

(a)    the amount (not less than zero) equal to LIBOR applicable to the Senior Notes during the applicable Interest Period in which such date of determination occurs minus 0.25%; by

(b)    the amount (not less than zero) equal to (i) the Aggregate Principal Amount of all Floating Rate Underlying Assets (other than Defaulted Obligations, Partial PIK Securities and any Deferred Interest Asset to the extent of any non-Cash interest and the unfunded portion of any Delayed Draw Loan or any Revolving Credit Facility), as of such date of determination minus (ii) the Required Ramp-Up Effective Date Amount.

"Aggregate Industry Equivalent Unit Score":  As defined in the definition of the "Diversity Score" herein.

"Aggregate Outstanding Amount":  As of any date of determination, when used with respect to any Class or Classes of Securities, the aggregate principal amount of such Class or Classes of Securities, as applicable, Outstanding on such date; provided, that (A) the Aggregate Outstanding Amount of the Mezzanine Notes shall include all Mezzanine Deferred Interest except to the extent otherwise provided herein.

"Aggregate Principal Amount":  When used with respect to any or all of the Underlying Assets, Eligible Investments or Cash on any date of determination, the aggregate of the Principal Balances of such Underlying Assets and the Balances of such Eligible Investments or Cash, as the case may be, on such date of determination.

"Applicable Recovery Percentage":  With respect to any Underlying Asset, the lower of (A) the Moody's Recovery Rate (for the category of assets of which such Underlying Asset is an example) for such Underlying Asset and (B) the Standard & Poor's Recovery Rate (for the category of assets of which such Underlying Asset is an example) for such Underlying Asset and the rating corresponding to the rating on the Controlling Class.

"Assigned Moody's Rating": The monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

"Assumed Reinvestment Rate":  As of any date of determination, LIBOR determined as of the most recent LIBOR Determination Date minus 1.00% per annum.

"Authenticating Agent":  With respect to the Securities or a Class of the Securities, the Person designated by the Trustee to authenticate such Securities or such Class on behalf of the Trustee pursuant to Section 6.15 hereof.

"Authorized Officer":  With respect to the Issuer, the Co-Issuer or the Administrative Agent, any Officer or any other Person who is authorized to act for the Issuer, the Co-Issuer, as applicable, in matters relating to, and binding upon, the Issuer the Co-Issuer, as applicable.  With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer.  Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"Average Par Amount":  As defined in the definition of "Diversity Score" herein.

"Balance":  With respect to the Cash or Eligible Investments on deposit in, or otherwise credited to, any Issuer Account as of any date of determination, the aggregate of (i) the current balance of Cash, demand deposits, time deposits, certificates of deposit and federal funds; (ii) the principal amount of interest-bearing corporate and government securities, money market accounts and repurchase obligations; and (iii) the purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper on deposit in, or otherwise credited to, such Issuer Account on such date.

"Bank":  U.S. Bank National Association, a national banking association, in its individual capacity.

"Bankruptcy Code":  The U.S. bankruptcy code, as set forth in Title 11 of the United States Code, as amended.

"Benefit Plan Investor":  As such term is defined in Section 3(42) of ERISA.

"Board of Directors":  With respect to the Issuer, the directors of the Issuer duly appointed by the shareholders of the Issuer or otherwise duly appointed from time to time and with respect to the Co-Issuer, the directors of the Co-Issuer duly appointed by the stockholders of the Co-Issuer; provided that, with respect to each of the Issuer and the Co-Issuer, there shall at all times be one director who is not Affiliated with the Manager.

"Board Resolution":  With respect to the Issuer, a resolution of the Board of Directors of the Issuer and with respect to the Co-Issuer, a resolution of the Board of Directors of the Co-Issuer.

"Bond":  A U.S. dollar denominated debt security (that is not a Loan) issued by a corporation, limited liability company, partnership or trust.

"Bridge Security":  Any Underlying Asset that is a debt obligation incurred in connection with an actual or proposed merger, acquisition, consolidation, sale of all or substantially all of the assets of a person or entity, restructuring (other than a bankruptcy or similar restructuring) or similar transaction, which debt obligation by its terms is required to be repaid within one year of the incurrence thereof with proceeds from additional borrowings or other refinancings (other than any additional borrowing or refinancing if one or more financial institutions will have provided the issuer of such debt obligation with a binding written commitment to provide the same); provided that the issuer, obligor, or guarantor of such debt obligation has a public or private rating from Standard & Poor's.

"Business Day": Any day on which commercial banks and foreign exchange markets settle payments in each of New York City, New York, Charlotte, North Carolina and any other city in which the designated Corporate Trust Office of the Trustee may from time to time be located (provided that (a) in the case of the final payment of principal of any Senior Note, the place of presentation of such Senior Note, (b) in the case of the final distribution on any Subordinated Notes, the place of presentation of such Subordinated Notes and (c) in the case of any payment being made from or through the Cayman Islands, the Cayman Islands). Solely for purposes of the definition of "Payment Date" set forth in this Section 1.1, if and for so long as any Class of Securities is listed on the Irish Stock Exchange, "Business Day" shall also be required to be a day on which commercial banks and foreign exchange markets settle payments in Dublin, Ireland.

"Caa Obligation": As of any Measurement Date, any Underlying Asset (other than a Defaulted Obligation, Deferred Interest Asset or Current Pay Obligation) for which the Moody's Default Probability Rating is below "B3."

"CCC Obligation": As of any Measurement Date, any Underlying Asset (other than a Defaulted Obligation) for which the Standard & Poor's Rating is below "B-."

"Calculation Agent": The meaning specified in Section 7.17 .

"Cash": Such coin or currency of the U.S. as at the time shall be legal tender for payment of all public and private debts.

"Certificate of Authentication": The Trustee's or Authenticating Agent's certificate of authentication on any Security.

"Certificated Notes": The meaning set forth in Section 2.2(a)(iii).

"Certificated Security": The meaning specified in Section 8-102(a)(4) of the UCC.

"Certificated Mezzanine Notes": The meaning set forth in Section 2.2(a)(iii).

"Certificated Senior Notes": The meaning set forth in Section 2.2(a)(iii).

"Certificated U.S. Subordinated Note": The meaning set forth in Section 2.2(a)(iii).

"Chattel Paper": "Tangible Chattel Paper" and "Electronic Chattel Paper," as those terms are defined in the UCC.

"Class": Each of the Senior Notes, the Mezzanine Notes and the Subordinated Notes, including any additional Senior Notes, Mezzanine Notes or Subordinated Notes of such Class issued in connection with an additional issuance pursuant to Section 2.11.

"Clearing Agency": An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Corporation": The meaning specified in Section 8-102(5) of the UCC.

"Clearstream": Clearstream Banking, société anonyme, a corporation organized under the laws of the Grand Duchy of Luxembourg.

"Clearstream Security":  A "security" (as defined in Section 8-102(a)(15) of the UCC) that (i) is a debt or equity security and (ii) is capable of being transferred to the account of a custodian at Clearstream.

"Closing Date":  April 28, 2008.

"Closing Date Expense Reserve Account":  The account designated the "Closing Date Expense Reserve Account" and established in the name of the Trustee for the benefit of the Secured Parties pursuant to Section 10.3(b).

"Co-Issued Notes":  The Senior Notes.

"Co-Issuer":  Spruce CCS, Corp., a corporation incorporated under the laws of the State of Delaware, unless and until a successor Person shall have become the Co-Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Co-Issuer" shall mean such successor Person.

"Co-Issuers":  Collectively, the Issuer and the Co-Issuer.

"Code":  The United States Internal Revenue Code of 1986, as amended.

"Collateral":  As defined in the Granting Clause hereof.

"Collateral Administration Agreement":  The Collateral Administration Agreement, dated as of the Closing Date, by and among the Issuer, the Administrative Agent and the Collateral Administrator, as the same may be amended or otherwise modified from time to time in accordance with its terms.

"Collateral Administrator":  The Bank in its capacity as Collateral Administrator under the Collateral Administration Agreement and its permitted successors and assigns in such capacity.

"Collection Account":  The account designated the "Collection Account" comprised of two sub-accounts designated the "Interest Collection Account" and the "Principal Collection Account" and established in the name of the Trustee for the benefit of the Secured Parties pursuant to Section 10.2(b).

"Company Announcements Office":  The Company Announcements Office of the Irish Stock Exchange.

"Controlling Class":  The Senior Notes so long as any Senior Notes are outstanding and, thereafter, the Mezzanine Notes so long as any Mezzanine Notes are outstanding and, thereafter, the Subordinated Notes.  Voting in respect of any matters involving this Indenture, including amendments to the provisions hereof, declaring any default or an acceleration hereunder, waivers of any of the provisions hereof, or any demands, authorizations, directions, requests or notices, shall be based upon the Aggregate Outstanding Amount of such Controlling Class.

"Corporate Family Rating":  With respect to any Underlying Asset or any obligor on any Underlying Asset as of any date of determination, the corporate family rating of such Underlying Asset or such obligor, as the case may be, as of such date, if any, as published from time to time by Moody's.

"Corporate Trust Office":  The designated corporate trust office of the Trustee, currently located at 214 North Tryon Street, 26th Floor, Charlotte, North Carolina, 28202, Attention: CDO Trust

Services – Spruce CCS, or such other address as the Trustee may designate from time to time by notice to the Holders and the Issuer or the designated corporate trust office of any successor Trustee.

"Cov-Lite Loan":  A Loan that (i) does not contain any financial covenants or (ii) requires the borrower to comply with an Incurrence Covenant, but no Maintenance Covenants.

"Coverage Tests":  The Senior Note Interest Ratio Coverage Test and the Senior Note Overcollateralization Ratio Test.

"Current Market Value":  With respect to any Underlying Asset as of any Determination Date:

(i)      the value of such Underlying Asset as of such date determined by the Administrative Agent or its affiliates using (A) the LSTA/LPC Mark-to-Market Pricing Service, (B) Mark-it Partners/LoanX, Inc., (C) Interactive Data Corporation, (D) NASD Trade Reporting and Compliance Engine (TRACE) or (E) such other Independent nationally recognized pricing service selected by the Administrative Agent or its affiliates subject to Rating Agency Confirmation;

(ii)      if the value cannot be determined in the manner described in clause (i) above, the value determined using the average of the bid side prices for such Underlying Asset as of such date obtained by the Administrative Agent or its affiliates from three Independent nationally recognized dealers (or, in the event that, notwithstanding the Administrative Agent's or its affiliates' reasonable efforts, there are only two Independent nationally recognized dealers from which a bid side price can be obtained, the lower of the bid side prices from such dealers); and

(iii)      if the value cannot be determined in the manner described in clause (i) or (ii) above, an amount equal to the Principal Balance of the Underlying Asset as of such date multiplied by the Applicable Recovery Percentage with respect to such Underlying Asset; provided that, if the Current Market Value cannot be determined in the manner described in clause (i) or (ii) above for more than 30 days immediately following any date such market value is determined pursuant to this clause (iii), then the Current Market Value of such Underlying Asset shall automatically be deemed to be zero following such 30-day period until the market value can be determined in the manner described in clause (i) or (ii) above as of any date of determination;

provided, that the Current Market Value of a Current Pay Obligation shall be the lesser of its par value and the value determined in the manner described in clause (i) or (ii) above.

"Current Market Value Percentage":  Means, with respect to any Underlying Asset as of any Determination Date, the amount (expressed as a percentage) equal to the Current Market Value of such Underlying Asset on such date divided by the Principal Balance of such Underlying Asset on such date.

"Current Pay Obligation":  Any Underlying Asset that would otherwise be a Defaulted Obligation but as to which (i) no default has occurred and is continuing with respect to the payment of interest and any contractual principal (if any) and the most recent interest and contractual principal payment due (if any) was paid in cash; (ii) if the issuer of such Underlying Asset is subject to a bankruptcy proceeding and if the related bankruptcy court has authorized any payments due and payable on such Underlying Asset, all interest payments and scheduled distributions of principal authorized by such bankruptcy court have been paid by such issuer of such Underlying Asset; and (iii) if such Underlying Asset is a PIK Security no interest on such Underlying Asset remains deferred in accordance with the terms thereof; provided that such Underlying Asset has a Current Market Value at least equal to

80% of its Principal Balance; provided, further, that Current Pay Obligations shall be deemed to have a Standard & Poor's issuer rating of "CCC-" pending receipt from Standard & Poor's of a credit estimate or other rating and that, to the extent the Aggregate Principal Amount of Current Pay Obligations exceeds 5% of the Aggregate Principal Amount of all Underlying Assets at any time, Current Pay Obligations having an Aggregate Principal Amount equal to the amount of such excess over 5% shall be deemed to constitute Defaulted Obligations.

"Current Portfolio":  As of any date of determination, the Aggregate Principal Amount of Underlying Assets, Principal Proceeds held as Cash and Eligible Investments purchased with Principal Proceeds existing immediately prior to the maturation, sale or other disposition of an Underlying Asset or immediately prior to the acquisition of an Underlying Asset, as the case may be.

"Custodial Account":  The account designated the "Custodial Account" and established in the name of the Trustee for the benefit of the Secured Parties pursuant to Section 10.3(c).

"Custodian":  The meaning specified in Section 3.4(a).

"Deep Discount Obligation":  (i) If the Underlying Asset is rated "B3" and on credit watch with negative implications or "Caa1" or lower by Moody's or "CCC+" or lower by Standard & Poor's, until the Current Market Value of such Underlying Asset as of any date of determination equals or exceeds 90% of its Principal Balance for a period of at least 30 Business Days following the purchase of such Underlying Asset, any Underlying Asset acquired by the Issuer for a purchase price less than 85% of its Principal Balance (in the case of Loans) or 80% of its Principal Balance (in the case of any Underlying Asset that is not a Loan); and (ii) if the Underlying Asset is rated "B3" (and not on credit watch with negative implications) or higher by Moody's and "B-" or higher by Standard & Poor's, until the Current Market Value of such Underlying Asset as of any date of determination equals or exceeds 90% of its Principal Balance (in the case of Loans) and 85% of its Principal Balance (in the case of High-Yield Bonds and Structured Finance Securities) for a period of at least 30 Business Days following the purchase of such Underlying Asset, any Underlying Asset acquired by the Issuer for a purchase price less than 80% of its Principal Balance (in the case of Loans) or 75% of its Principal Balance (in the case of any Underlying Asset that is not a Loan).  For the purpose of calculating the Current Market Value Percentage on any day, the Current Market Value Percentage on any day that is not a Business Day shall be deemed to be the Current Market Value Percentage on the immediately preceding Business Day.

"Default":  Any Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Defaulted Interest":  Any interest due and payable in respect of any Senior Note and any interest (other than Mezzanine Deferred Interest) due and payable in respect of any Mezzanine Note that is not punctually paid or duly provided for on the applicable Payment Date (subject to any grace periods) or at Stated Maturity and remains unpaid and, to the extent not duplicative in any context in which the term "Defaulted Interest" is used, any interest on such amounts; provided that, for so long as any Senior Notes are Outstanding, any interest payable in respect of the Mezzanine Notes that is not punctually paid or duly provided for on the applicable Payment Date shall become Mezzanine Deferred Interest rather than Defaulted Interest.

"Defaulted Obligation":  Any Underlying Asset or any other debt obligation included in the pool of assets owned by the Issuer:

(i)     as to which there has occurred and is continuing a default with respect to the payment of interest or principal (including, without limitation, a default in the

payment of interest payments in respect of Partial PIK Securities required to be paid in cash pursuant to the applicable Underlying Instruments); <u>provided</u> that such default shall have not been cured (without regard to any waiver thereof or any applicable grace or notice period); <u>provided, further</u>, that any such default may continue for a period of up to the lesser of (a) length of any applicable grace period or waiver set forth for the Underlying Asset and (b) five Business Days from the date of such default if the Administrative Agent has certified to the Trustee in writing that the payment failure was not due to credit-related reasons and <u>provided, further</u>, for the avoidance of doubt, that a PIK Security shall not constitute a Defaulted Obligation if it is current in the payment of principal;

(ii)     that is a Defaulted Participation Obligation;

(iii)    [Reserved];

(iv)    that is a Selling Institution Defaulted Participation;

(v)     [Reserved];

(vi)    as to which any bankruptcy, insolvency or receivership proceeding has been initiated in connection with the issuer thereof, or as to which there has been proposed or effected any distressed exchange or other distressed debt restructuring where the issuer of such Underlying Asset has offered the debt holders a new security or package of securities that either (x) amounts to a diminished financial obligation or (y) has the purpose of helping the issuer avoid default; <u>provided</u> that any Underlying Asset received in a distressed exchange or other distressed debt restructuring will not be treated as a Defaulted Obligation if it otherwise satisfies the definition of Underlying Asset; and <u>provided, further</u>, that neither a Current Pay Obligation nor a DIP Loan (with respect to the bankruptcy, insolvency, receivership proceeding, distressed exchange or other debt restructuring with respect to which such DIP Loan was received) shall constitute a Defaulted Obligation under this <u>clause (vi)</u>;

(vii)   that has a Standard & Poor's Rating of "D" or "SD" or a Moody's Rating of "LD" or "D" or such rating was withdrawn or has been subsequently withdrawn and has not been reinstated as of the date of determination (in each case excluding Current Pay Obligations other than DIP Loans);

(viii)  [Reserved];

(ix)    that is <u>pari</u> <u>passu</u> with or subordinated to other indebtedness for borrowed money owing by the issuer thereof, to the extent that (x) the Issuer or the Trustee has received written notice or has actual knowledge that a payment default of the type described in <u>clause (i)</u> above has occurred with respect to such other indebtedness or (y) Standard & Poor's Rating on such other indebtedness is "CC," "D" or "SD" or with respect to which the Standard & Poor's Rating of "CC," "D" or "SD" has been subsequently withdrawn by Standard & Poor's and has not been reinstated as of the date of determination (in each case excluding Current Pay Obligations other than DIP Loans); or.

(x)    with respect to which the Administrative Agent has received written notice or has actual knowledge that a default has occurred under the Underlying Instruments and any applicable grace period has expired such that the holders of such Underlying Asset may accelerate the repayment of such Underlying Asset but only until such default is cured or waived in the manner provided in the Underlying Instruments.

"Defaulted Participation Obligation":  Any Underlying Asset that is a participation interest in a loan or other debt obligation that would, if such loan or other debt obligation were an Underlying Asset, constitute a "Defaulted Obligation" (other than under clause (ii) of such definition) or with respect to which the Selling Institution has a Standard & Poor's Rating of "D" or "SD" or a Moody's Rating of "LD" or "D" or had such rating before it was withdrawn.

"Deferred Interest Asset":  A PIK Security (other than a Partial PIK Security) that has deferred payments of interest or other amounts in Cash and that has not reduced such deferred interest (or other amount) balance to zero and that (a) in the case of an asset that has a Moody's Rating of "Ba1" or below that pays interest no more frequently than quarterly, has deferred interest for the lesser of (i) a period of six months or more and (ii) one payment period, and (b) in the case of an asset that has a Moody's Rating of "Baa3" or higher, has deferred interest for the lesser of (i) a period of 12 months or more and (ii) two payment periods.

"Delayed-Draw Loan":  A loan with respect to which the Issuer may be obligated to make or otherwise fund future term-loan advances to a borrower; provided, that once such loan (or portion thereof) has been funded, such loan (or portion thereof) shall cease to constitute a Delayed-Draw Loan.

"Deposit":  Any Cash deposited with the Trustee by the Issuer on or before the Closing Date for inclusion as Collateral and deposited by the Trustee in the Collection Account on the Closing Date.

"Deposit Account":  The meaning specified in Section 9-102(29) of the UCC.

"Depositary":  With respect to the Securities in a global form, The Depository Trust Company, its nominees, and their respective successors and assigns.

"Depositary Participant":  A broker, dealer, bank or other financial institution or other Person for whom from time to time the Depositary effects book-entry transfers and pledges of notes deposited with the Depositary.

"Determination Date":  The last day of each Due Period; provided that all determinations to be made on or as of the Determination Date shall be made as of the close of business on such date.

"DIP Loan":  A Loan (i) obtained or incurred after the entry of an order of relief in a case pending under Chapter 11 of the Bankruptcy Code, (ii) to a debtor in possession as described in Section 1107 of the Bankruptcy Code or a trustee (if appointment of such trustee has been ordered pursuant to Section 1104 of the Bankruptcy Code), (iii) on which the related obligor is required to pay interest and/or principal on a current basis, (iv) approved by a Final Order or Interim Order of the bankruptcy court so long as such Loan is (A) fully secured by a lien on the debtor's otherwise unencumbered assets pursuant to Section 364(c)(2) of the Bankruptcy Code, (B) fully secured by a lien of equal or senior priority on property of the debtor estate that is otherwise subject to a lien pursuant to Section 364(d) of the Bankruptcy Code or (C) is secured by a junior lien on the debtor's encumbered assets (so long as such

Loan is fully secured based on the most recent current valuation or appraisal report, if any, of the debtor) and (v) that has been rated by Moody's or has a credit estimate by Moody's and has been rated by Standard & Poor's or has a credit estimate by Standard & Poor's.

"Disposition Proceeds":  Any proceeds received with respect to sales of Underlying Assets, Eligible Investments or Equity Securities, in each case, net of reasonable out-of-pocket expenses and disposition costs in connection with such sales.

"Distribution":  Any payment of principal or interest or any dividend, premium or fee payment made on, or any other distribution in respect of, a security or obligation.

"Diversity Score":  A single number that indicates Underlying Asset concentration in terms of both issuer and industry concentration.  The Diversity Score for the Underlying Assets (other than Underlying Assets that are collateralized loan obligations backed primarily by high-yield Loans) is calculated by summing each of the Industry Diversity Scores, which are calculated as follows:

(i)    An "Average Par Amount" is calculated by summing the Issuer Par Amounts and dividing such amount by the sum of the number of issuers of Underlying Assets (other than the issuers of Defaulted Obligations); provided, that all Affiliated issuers will be considered one issuer.

(ii)    An "Issuer Par Amount" is calculated for each issuer of Underlying Assets (other than the issuers of Defaulted Obligations) by summing the par amounts of all Underlying Assets in the Collateral issued by that issuer; provided that in calculating the Issuer Par Amount for each issuer, Affiliated issuers will be considered to be a single issuer to the extent provided in the definition of "Average Par Amount."

(iii)    An "Equivalent Unit Score" is calculated for each issuer (other than the issuers of Defaulted Obligations) as the lesser of (A) one and (B) the Issuer Par Amount for such issuer divided by the Average Par Amount.

(iv)    An "Aggregate Industry Equivalent Unit Score" is then calculated for each of the Moody's Industry Categories listed on Schedule A hereto, by summing the Equivalent Unit Scores for each issuer (other than the issuers of Defaulted Obligations) in each such Moody's Industry Category.

(v)    An "Industry Diversity Score" is then established by reference to the Diversity Score Table shown in Schedule D for the related Aggregate Industry Equivalent Unit Score; provided that if any Aggregate Industry Equivalent Unit Score falls between any two such scores then the applicable Industry Diversity Score will be the lower of the two Industry Diversity Scores in the Diversity Score Table.

For purposes of calculating the Diversity Score, (i) all Affiliates of an obligor shall be treated as a single obligor together with such obligor, except as otherwise specified by Moody's on a case by case basis and (ii) any Underlying Asset that is an obligation issued in connection with a collateralized loan obligation transaction shall be disregarded.

"Dollar" or "$":  A dollar or other equivalent unit in such coin or currency of the U.S. as at the time shall be legal tender for all debts, public and private.

"Due Date":  Each date on which a Distribution is due on a Pledged Underlying Asset.

"Due Period":  With respect to any Payment Date, the period commencing immediately following the fifth Business Day prior to the preceding Payment Date (or on the Closing Date, in the case of the Due Period relating to the first Payment Date) and ending on (and including) the fifth Business Day prior to such Payment Date (or, in the case of the Due Period that is applicable to the Payment Date relating to the Stated Maturity of any Senior Note or Mezzanine Note or the Maturity of all Senior Notes or Mezzanine Notes, ending on such Payment Date).

"Effective Spread":  With respect to any Floating Rate Underlying Asset (other than Defaulted Obligations), the current per annum rate at which it pays interest in excess of LIBOR or, if such Floating Rate Underlying Asset bears interest based on a floating rate index other than LIBOR, the Effective Spread shall be the then-current base rate applicable to such Floating Rate Underlying Asset plus the rate at which such Floating Rate Underlying Asset pays interest in excess of such base rate minus three-month LIBOR; provided, that with respect to any unfunded commitment of any Revolving Credit Facility or Delayed-Draw Loan, the Effective Spread will be the current per annum rate at which such Loan pays or would pay interest on the funded portion of the Issuer's commitment reducing that rate by LIBOR; and provided, further, that the Effective Spread for any Revolving Credit Facility or Delayed-Draw Loan for which an amount is deposited to the Variable Funding Account in respect of the unfunded portion of such loan shall be the sum of (i) any commitment fee paid in respect of such Revolving Credit Facility or Delayed-Draw Loan during the related Due Period expressed as a per annum rate, multiplied by a ratio with a numerator equal to the unfunded amount and a denominator equal to the Principal Balance of such Delayed-Draw Loan or Revolving Credit Facility and (ii) the per annum rate payable in respect of any funded amount in excess of the per annum rate implied by the current three-month LIBOR multiplied by a ratio with a numerator equal to the funded amount and a denominator equal to Principal Balance of such Delayed-Draw Loan or Revolving Credit Facility.

"Elected Subordinated Notes":  The meaning specified in Section 13.2(e).

"Electing Subordinated Noteholder":  The meaning specified in Section 13.2(e).

"Eligible Investment":  Any  Dollar denominated investment that, at the time it, or evidence of it, is delivered to the Trustee or the Custodian in accordance with Section 3.4 hereof, is one or more of the following obligations or securities including, without limitation, investments for which the Trustee or an Affiliate of the Trustee is the obligor or depository institution or otherwise provides services:

(i)    Cash;

(ii)    direct Registered debt obligations of, and Registered obligations the timely payment of principal of and interest on which is fully and expressly guaranteed by, the U.S. or any full faith and credit agency or instrumentality thereof;

(iii)    demand and time deposits in, certificates of deposit of, bankers' acceptances payable within 183 days of issuance issued by, or federal funds sold by any U.S. federal or state depository institution or trust company, the commercial paper and/or debt obligations of which (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or contractual commitment providing for such investment have a long-term credit rating of "Aa2" by Moody's and "AA" by Standard & Poor's, in the case of long-term debt obligations, or "P-1" by Moody's and "A-1+" by Standard & Poor's (or "A-1" in the case of time deposits of U.S. Bank National Association for so long as U.S. Bank National Association is Trustee), in the case of commercial paper and short-term obligations; provided, that, in the case of commercial paper

and short-term debt obligations with a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of "Aa2" by Moody's and "AA" by Standard & Poor's;

(iv)    unleveraged repurchase obligations with respect to (a) any security described in clause (ii) above or (b) any other security issued or guaranteed by an agency or instrumentality of the U.S. (in each case without regard to the stated maturity of such security), in either case entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (iii) above or entered into with a corporation (acting as principal) whose long-term credit rating is "Aa2" by Moody's and "AA" by Standard & Poor's and whose short-term credit rating is "P-1" by Moody's and "A-1+" by Standard & Poor's at the time of such investment; provided, that if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of "Aa2" by Moody's and "AA" by Standard & Poor's;

(v)    Registered debt securities (other than mortgage-backed securities) bearing interest or sold at a discount issued by any corporation incorporated under the laws of the U.S. or any state thereof and which has a long-term credit rating of "Aaa" by Moody's and "AAA" by Standard & Poor's at the time of such investment or contractual commitment providing for such investment; provided that if such security has a maturity of shorter than 91 days or less, the issuer thereof must also have at the time of such investment a short-term credit rating of "A-1+" by Standard & Poor's;

(vi)    commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance having at the time of such investment a credit rating of "P-1" by Moody's and "A-1+" by Standard & Poor's; provided, that if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of "Aa2" by Moody's and "AA" by Standard & Poor's;

(vii)    Reinvestment Agreements (so long as payments under any such Reinvestment Agreement are not subject to withholding taxes) issued by any bank (if treated as a deposit by such bank) or Reinvestment Agreements issued in registered form (for purposes of the Code) after July 18, 1984 by any insurance company or other corporation or entity organized under the laws of the U.S. or any state thereof that has a short term credit rating of "P-1" by Moody's and "A-1+" by Standard & Poor's; provided, that if such security has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of "Aa2" by Moody's and "AA" by Standard & Poor's; and, provided, further, that the Issuer may invest in Reinvestment Agreements only if (x) Rating Agency Confirmation is received from Standard & Poor's with regard to such investment and (y) upon the liquidation thereof or otherwise the Issuer shall receive no less than the par value of such investment;

(viii)    securities issued by any offshore money market fund or similar investment vehicle having at all times a long-term credit rating of "AAA," "AAAm" or "AAAm-G" by Standard & Poor's and a short-term credit rating of "P-1" by Moody's; provided, that (x) if such investment has a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of "Aaa"/"MR1+" by Moody's and (y) no amount earned by the Issuer with respect to such investment will be subject to withholding tax unless "gross-up" payments are required to be made to the Issuer that cover the full amount of any such withholding taxes; and

(ix)    any other new category of investment; provided that (i) Moody's has published guidance that such category satisfies as an eligible investment in CDO transactions (as so certified to the Trustee by the Administrative Agent) and (ii) a Rating Agency Confirmation has been received from Standard & Poor's with respect to such investment;

and, in each case, with a Stated Maturity (giving effect to any applicable grace period) no later than the Business Day immediately preceding the Payment Date next following the Due Period in which the date of investment occurs, that matures or rolls no later than the Business Day immediately preceding the Payment Date next following the Due Period in which the date of investment occurs; provided, that Eligible Investments shall not include (a) any interest-only security or mortgage-backed security, any security purchased at a price in excess of 100% of the par value thereof or any security whose repayment is subject to substantial non-credit-related risk as determined in the sole judgment of the Administrative Agent, (b) any security whose rating assigned by Standard & Poor's includes the subscript "p," "q," "f," "pi," "r" or "t," (c) any security that is subject to an Offer or (d) any other security that is an asset the payments on which are subject to withholding tax if owned by the Issuer unless the issuer or obligor or other Person (and guarantor, if any) is required to make "gross-up" payments that cover the full amount of any such withholding taxes; provided, further, that an investment of the type set forth in clauses (iii), (iv), (vi) and (vii) having a short-term rating of "A-1" from Standard & Poor's or a long-term rating of "A+" from Standard & Poor's shall constitute an Eligible Investment if such investment has a maturity no later than the earlier of (A) 60 days after the date of acquisition thereof or (B) the next Payment Date.

"Entitlement Holder":  The meaning specified in Section 8-102(a)(7) of the UCC.

"Entitlement Order":  The meaning specified in Section 10.4(c).

"Equity Security":  Any equity security that is not eligible for purchase on its own by the Issuer as an Underlying Asset.

"Equivalent Unit Score":  As defined in the definition of "Diversity Score" herein.

"ERISA":  The United States Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder from time to time.

"EU Paying Agent":  The meaning specified in Section 2.7(f).

"Euroclear":  Euroclear Bank S.A./N.V., as operator of the Euroclear System.

"Euroclear Security":  A "security" (as defined in Section 8-102(a)(15) of the UCC) that (i) is a debt or equity security and (ii) is capable of being transferred to the account of a custodian at Euroclear.

"Event of Default":  The meaning specified in Section 5.1.

"Excel Default Model Input File"  An electronic spreadsheet file in Microsoft Excel format to be provided to Standard & Poor's (along with the models and assumptions necessary to run such model), which file shall include the Balance of Cash and Eligible Investments in each Account and the following information (to the extent such information is not confidential) with respect to each Underlying Asset:  (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP or other applicable identification number associated with such Underlying Asset, (c) the par value of such Underlying Asset, (d) the type of issue (including, by way of example, whether such Underlying Asset is a bond, loan or asset-backed security), using such abbreviations as may

be selected by the Trustee, (e) a description of the index or other applicable benchmark upon which the interest payable on such Underlying Asset is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR), (f) the coupon (in the case of an Underlying Asset which bears interest at a fixed rate) or the spread over the applicable index (in the case of an Underlying Asset which bears interest at a floating rate), (g) the Standard & Poor's Industry Classification Group for such Underlying Asset, (h) the stated maturity date of such Underlying Asset, (i) the Standard & Poor's Rating of such Underlying Asset or the issuer thereof, as applicable, (j) the priority category assigned by Standard & Poor's to such Underlying Asset, if available, (k) with respect to each Underlying Asset for which a Standard & Poor's Recovery Rate has not been determined by Standard & Poor's, whether or not such Underlying Asset is a Cov-Lite Loan and (l) such other information as the Trustee may determine to include in such file.

"Excepted Property": Each of (i) the accounts established and maintained by the Issuer in the Cayman Islands for the deposit, respectively, of the paid up share capital of the Issuer Ordinary Shares and the fee paid to the Issuer for issuing the Securities and any other amounts on deposit therein, and (ii) the proceeds of the $100 capital contributed to the Co-Issuer by the owners of the equity of the Co-Issuer in accordance with the Co-Issuer's certificate of incorporation.

"Exchange Act": The United States Securities Exchange Act of 1934, as amended.

"Existing Notes": The meaning specified in Section 9.4.

"Final Order": An order, judgment, decree or ruling the operation or effect of which has not been stayed, reversed or amended and as to which order, judgment, decree or ruling (or any revision, modification or amendment thereof) the time to appeal or to seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

"Financial Asset": The meaning specified in Section 8-102(a)(9) of the UCC.

"Fixed Rate Underlying Assets": Underlying Assets that bear interest at a fixed rate, including Underlying Assets whose fixed interest rate increases periodically over the life of such Underlying Assets.

"Floating Rate Underlying Assets": Underlying Assets that bear interest at floating rates.

"General Intangibles": The meaning specified in Section 9-102(a)(42) of the UCC.

"Global Securities": Collectively, the Regulation S Global Securities and the Rule 144A Global Securities.

"Global Securities Legend": The legend set forth on any Global Security as provided for herein.

"Government Security": A security (other than a security issued by the Government National Mortgage Association) issued or guaranteed by the U.S. representing a full faith and credit obligation of the U.S. or issued or guaranteed by an agency or instrumentality of the U.S., and, with respect to each of the foregoing, that is maintained in book-entry form on the records of a Federal Reserve Bank.

"Grant":  To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create or grant a security interest in and right of setoff against, deposit, set over or confirm.  A Grant of the Collateral, or of any other Instrument, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including the immediate continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of the Collateral, and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"High-Yield Bond":  A publicly issued or privately placed debt security of a corporation or other entity that is organized under the laws of any Moody's Group Country or Tax Advantaged Jurisdiction (or any state or political subdivision thereof) which debt security is not a Loan and is able to be granted to the Trustee pursuant to the terms hereof, and when so granted: (i) does not provide for payments that are in a currency other than Dollars or that is convertible at the option of the related obligor into a currency other than Dollars; (ii) is not a Defaulted Obligation; (iii) is not the subject of an offer to acquire, exchange, or tender for cash or other consideration by the related obligor or any other Person; (iv) is eligible to be sold, assigned, or participated to, and by, the Issuer; (v) the terms of which have been fully negotiated prior to the contemplated date of the Issuer's commitment to acquire it; (vi) is not an obligation that provides for its conversion into an equity security at the option of the related obligor or any other Person; (vii) is property of a type that is subject to Article 8 or 9 of the Uniform Commercial Code, as amended and in effect from time to time in the State of New York; (viii) does not provide for payments that shall be subject to U.S. withholding tax or foreign withholding tax unless, in each case, the related obligor is required to make "gross-up" payments that cover the full amount of any withholding tax on an after-tax basis; (ix) does not provide for "in-kind" interest payments or capitalization of interest payments at the option of the related obligor; (x) has a Moody's Rating and a Standard & Poor's Rating, and (a) its Standard & Poor's Rating is at least "CCC" and (b) it or the related obligor must have a Moody's Rating of at least "Caa2"; (xi) does not provide for future advances or payments to be made to the related issuer or other obligor; (xii) was not incurred in connection with a merger, acquisition, consolidation, sale of all or substantially all of the assets of a Person or entity or a similar transaction, and is not, by its terms, required to be repaid within one year of its incurrence with proceeds from additional borrowings or a refinancing; and (xiii) is not a bond issued (or guaranteed) by, or a loan (or any participation interest therein) the obligor of which is a Sovereign Issuer, the Standard & Poor's foreign currency rating of which is less than "AA" or the Moody's long term U.S. dollar foreign currency rating of which is less than "Aa2."

"Holder":  A Senior Noteholder, a Mezzanine Noteholder and/or a Subordinated Noteholder, as the context may require.

"Incurrence Covenant":  A covenant by the borrower of a Loan to comply with one or more financial covenants only upon the occurrence of certain actions of the borrower including, but not limited to, a debt issuance, dividend payment, share purchase, merger, acquisition or divestiture.

"Indenture":  This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"Independent":  As to any Person, any other Person (including a firm of accountants or lawyers or an investment bank and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, (ii) is not connected with such Person as an officer, employee, promoter, underwriter, voting

trustee, partner, director or Person performing similar functions and (iii) is not Affiliated with a Person who fails to satisfy the criteria set forth in the foregoing clause (i) and (ii). "Independent" when used with respect to (x) any accountant may include an accountant who audits the books of any Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants and (y) any nationally recognized dealer shall mean any such nationally recognized dealer who satisfies the criteria set forth above.

Whenever any Independent Person's opinion or certificate is to be furnished to the Trustee, such opinion or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning hereof.

"Indorsement": The meaning specified in Section 8-102(a)(11) of the UCC.

"Industry Diversity Score": As defined in the definition of "Diversity Score" herein.

"Instruments": The meaning specified in Section 9-102(a)(47) of the UCC.

"Interest Collection Account": The sub-account of the Collection Account designated the "Interest Collection Account" and established in the name of the Trustee for the benefit of the Secured Parties pursuant to Section 10.2(b).

"Interest Period": With respect to any Senior Note or Mezzanine Note and any Payment Date, the period from and including the preceding Payment Date (or the Closing Date in the case of the first Payment Date) to but excluding such Payment Date (or, in the case of the interest payment to be made on the Maturity of any Senior Note or Mezzanine Note, to but excluding the Maturity of such Senior Note or Mezzanine Note).

"Interest Proceeds": With respect to any Payment Date, the following amounts (without duplication), to the extent received during the related Due Period (provided, that any such amounts that were due during the related Due Period but were received after the end of such Due Period will be included among the "Interest Proceeds" for such Payment Date so long as they are received on or prior to the second Business Day prior to such Payment Date):

(a)     all payments of interest and dividends received in Cash (including cash payments of accreted interest on any PIK Security which are not included in Principal Proceeds) during the related Due Period on the Underlying Assets and Eligible Investments owned by the Issuer (other than interest accrued on Underlying Assets prior to the date of acquisition thereof by the Issuer and purchased with Principal Proceeds);

(b)     Disposition Proceeds constituting payments of accrued interest received in Cash by the Issuer during the related Due Period on any Underlying Assets sold by the Issuer (other than interest accrued on Underlying Assets prior to the date of acquisition thereof by the Issuer and purchased with Principal Proceeds);

(c)     all payments of principal received in Cash by the Issuer during the related Due Period on Eligible Investments to the extent that such Eligible Investments were acquired with Interest Proceeds;

(d)     [Reserved];

(e) [Reserved];

(f) all amendment and waiver fees, all late payment fees (including compensation for delayed settlement on trades), all call protection fees and all other fees and commissions received (other than syndication, facility or other up-front fees) in cash by the Issuer during the related Due Period in connection with the Underlying Assets and Eligible Investments (unless the Administrative Agent notifies the Trustee in writing (delivered on or before the applicable Determination Date) that the Administrative Agent, in its sole discretion, has determined that such payments are attributable to credit-related causes or are to be treated as Principal Proceeds);

(g) any amounts to be transferred from the Interest Reserve Account to the Payment Account on such Payment Date in accordance with Section 10.3(i) hereof;

(h) with respect to the Payment Date immediately following any additional issuance of Securities pursuant to Section 2.11, the portion of the net proceeds of such issuance that are designated as Interest Proceeds in respect of such Payment Date, at the discretion of the Administrative Agent (except to the extent such net proceeds are subsequently designated as Principal Proceeds at the discretion of the Administrative Agent); and

(i) any funds on deposit in the Closing Date Expense Reserve Account;

provided, that payments of interest, fees and other amounts that would otherwise constitute Interest Proceeds in respect of any Defaulted Obligation or Deferred Interest Asset (the "Recharacterized Interest Proceeds") shall be included in Principal Proceeds until the earlier to occur of (x) the date on which such Defaulted Obligation or Deferred Interest Asset no longer constitutes a Defaulted Obligation or Deferred Interest Asset and (y) in the case of a Defaulted Obligation, the date on which the aggregate amount of payments received with respect to such Defaulted Obligation equal at least the par amount thereof; and thereafter, for a Defaulted Obligation, amounts received as principal thereon shall constitute Interest Proceeds, or for a Deferred Interest Asset, Principal Proceeds up to an amount equal to the total amount of the related Recharacterized Interest Proceeds, shall be treated as Interest Proceeds.

"Interest Reserve Account":  The account designated the "Interest Reserve Account" and established in the name of the Trustee for the benefit of the Secured Parties pursuant to Section 10.3(i).

"Interest Shortfall":  Shall be deemed to occur on any Payment Date occurring on or prior to the Payment Date occuring in July, 2009 if the amount of Interest Proceeds that is available to be applied on such Payment Date in accordance with Section 11.1(a) (excluding any amounts to be transferred from the Interest Reserve Account to the Payment Account on such Payment Date in accordance with Section 10.3(i)) is less than the aggregate amount referred to in paragraphs (i) through (iv) of Section 11.1(a) that is payable by, or on behalf of, the Issuer on such Payment Date.

"Interest Shortfall Amount":  With respect to any Payment Date occurring on or prior to the Payment Date occuring in July, 2009, the difference between (i) the aggregate amount referred to in paragraphs (i) through (iv) of Section 11.1(a) that is payable by, or on behalf of, the Issuer on such Payment Date and (ii) the amount of Interest Proceeds that is available to be applied on such Payment Date in accordance with Section 11.1(a) (excluding any amounts to be transferred from the Interest Reserve Account to the Payment Account on such Payment Date in accordance with Section 10.3(i)).

"Interim Order":  An order, judgment, decree or ruling entered after notice and a hearing conducted in accordance with Bankruptcy Rule 4001(c) granting interim authorization, the operation or effect of which has not been stayed, reversed or amended.

"Interim Payment Date":  July 15, 2008.

"Investment Company Act":  The United States Investment Company Act of 1940, as amended.

"Irish Listing Agent":  The listing agent maintained by or on behalf of the Co-Issuers for the listing of any Class of Securities on the Irish Stock Exchange.

"Issuer":  Spruce CCS, Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands, unless and until a successor Person shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor Person.

"Issuer Accounts":  The Closing Date Expense Reserve Account, the Collection Account, the Custodial Account, the Payment Account, the Variable Funding Account and the Interest Reserve Account.

"Issuer Charter":  The Memorandum of Association and Articles of Association of the Issuer, as adopted on April 15, 2008, as the same may be further amended, supplemented or otherwise modified from time to time.

"Issuer Order" and "Issuer Request":  A written order or request (which may be in the form of a standing order or request) dated and signed in the name of the Issuer by an Authorized Officer of the Issuer or by an Authorized Officer of the Co-Issuer where permitted pursuant to this Indenture, as the context may require or permit.  Nothwithstanding anythingto the contrary contained or implied herein, the Administrative Agent shall have the authority to, and may, execute and deliver any Issuer Order or Issuer Request on behalf of the Issuer.

"Issuer Ordinary Shares":  50,000 (fifty thousand) ordinary shares in the capital of the Issuer having a par value of $1.00 per share, 250 of which have been issued by the Issuer and are outstanding at the date hereof.

"Issuer Par Amount":  As defined in the definition of "Diversity Score" herein.

"LBHI Guarantee":  The Guarantee of Lehman Brothers Holdings Inc., dated as of the Closing Date, relating to the the Obligations (as defined therein) of Lehman Brothers Bankhaus AG and Lehman Commercial Paper Inc., as the same may be amended or otherwise modified from time to time in accordance with its terms.

"LIBOR":  The meaning set forth in Schedule B attached hereto.

"LIBOR Determination Date":  The meaning set forth in Schedule B attached hereto.

"Loan":  Any (i) loan made by a bank or other financial institution to an obligor incorporated or organized under the laws of the U.S. (or any state thereof), Canada, the United Kingdom, a Tax Advantaged Jurisdiction or a Moody's Group Country or (ii) Participation in a loan described in clause (i) of this definition.

"Maintenance Covenant":  A covenant by the borrower of a Loan to comply with one or more financial covenants during each reporting period, whether or not it has taken any specified action.

"Majority": With respect to the Senior Notes or Mezzanine Notes or any Class thereof or the Subordinated Notes, the Holders of more than 50% of the Aggregate Outstanding Amount of such Senior Notes or Mezzanine Notes of such Class or such Subordinated Notes.

"Manager": Lehman Brothers Inc.

"Master Participation Agreement": The Master Participation Agreement, dated as of the Closing Date, by and among the Issuer, as Purchaser, and Lehman Brothers Bankhaus AG and Lehman Brothers Commercial Paper Inc., as Sellers, as the same may be amended or otherwise modified from time to time in accordance with its terms; provided that any such amendment or modification shall be subject to Rating Agency Confirmation from Standard & Poor's.

"maturity": With respect to any Underlying Asset, the date on which such obligation shall be deemed to mature (or its maturity date) shall be the earlier of (x) the Stated Maturity of such obligation or (y) if the Issuer has a right to require the issuer or obligor of such Underlying Asset to purchase, redeem or retire such Underlying Asset (at or above par) on any one or more dates prior to its Stated Maturity (a "put right"), the maturity date shall be the date specified in such certification.

"Maturity": With respect to any Security, the date on which the unpaid principal of such Security becomes due and payable as therein or herein provided, whether on the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

"Maximum Investment Amount": On the Closing Date and any Measurement Date prior to the Ramp-Up Effective Date, an amount equal to $2,028,149,779, and, on and after the Ramp-Up Effective Date, an amount equal to the sum of (without duplication): (i) the Aggregate Principal Amount of the Underlying Assets; (ii) the aggregate amount of any Principal Proceeds invested in Eligible Investments; and (iii) any remaining uninvested proceeds from the issuance of the Securities on such Measurement Date.

"Measurement Date": Any of the following: (i) the Ramp-Up Effective Date, (ii) each date on or after the Ramp-Up Effective Date on which an acquisition relating to an additional issuance of Securities pursuant to Section 2.11 or disposition by the Issuer of any Underlying Asset occurs, (iii) any date on or after the Ramp-Up Effective Date on which an Underlying Asset becomes a Defaulted Obligation, (iv) each Determination Date on or after the Ramp-Up Effective Date and (v) with reasonable notice to the Trustee any other Business Day on or after the Ramp-Up Effective Date that either Rating Agency, requests be a "Measurement Date;" provided that, if any such date would otherwise fall on a day that is not a Business Day, the relevant Measurement Date will be the first following day that is a Business Day.

"Mezzanine Deferred Interest": The meaning specified in Section 2.7(b).

"Mezzanine Note Initial Purchaser": Lehman Brothers Inc.

"Mezzanine Note Interest Rate": The interest rate for the Mezzanine Notes specified in Section 2.3.

"Mezzanine Note Purchase Agreement": The Purchase Agreement dated April 28, 2008, between the Issuer and the Mezzanine Note Initial Purchaser.

"Mezzanine Note Redemption Price": When used with respect to any Mezzanine Note in an Optional Redemption, an amount equal to the sum (without duplication) of: (a) the Aggregate

Outstanding Amount of such Mezzanine Note to be redeemed (including Mezzanine Deferred Interest, if any) as of the Redemption Date, plus (b) accrued and unpaid interest thereon (including Defaulted Interest and interest on Defaulted Interest, if any) to the Redemption Date.

"Mezzanine Noteholder":  With respect to any Mezzanine Note, the Person in whose name such Mezzaniner Note is registered in the Securities Register.

"Mezzanine Notes":  The floating rate notes having the applicable Note Interest Rate and Stated Maturity as set forth in Section 2.3, including any such additional Mezzanine Notes issued pursuant to Section 2.11.

"Money":  The meaning specified in Section 1-201(24) of the UCC.

"Monthly Report":  The monthly report provided to the Trustee pursuant to Section 10.6(a), summarizing the account transactions with respect to the Collateral.

"Moody's":  Moody's Investors Service, Inc. and any successor or successors thereto.

"Moody's Default Probability Rating": With respect to any Loan or Bond, as of any date of determination, is the rating determined in accordance with the following, in the following order of priority:

(a)    with respect to any Moody's Senior Secured Loan:

(i)    if the Loan's obligor has a Corporate Family Rating from Moody's, such Corporate Family Rating; and

(ii)    if the preceding clause does not apply, the Moody's Obligation Rating of such Loan; and

(b)    with respect to a Moody's Non Senior Secured Loan or a Bond:

(i)    if the Obligor has a senior unsecured obligation with an Assigned Moody's Rating, such rating; and

(ii)    if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating of the Loan or Bond, as applicable; and

(c)    with respect to a collateralized loan obligation, the Moody's Obligation Rating thereof; and

(d)    with respect to a DIP Loan, the rating that is one rating subcategory below the Moody's Obligation Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade; provided that with respect to Structured Finance Securities such rating or ratings will be adjusted down two subcategories (if on watch for downgrade) or up two subcategories (if on watch for upgrade); and provided, further, that the requirement for such rating or ratings to be adjusted will not apply if (a) there has been an announcement by Moody's with respect to such Loan or Bond that the placement of

such Loan or Bond on watch was in connection with an acquisition, corporate merger, reorganization or other similar transaction and (b) the issuer of such Bond or Loan is required to redeem such Bond or Loan at par upon the completion of such transaction.

"Moody's Equivalent Senior Unsecured Rating": With respect to any Loan or Bond and the obligor thereof as of any date of determination, is the rating determined in accordance with the following, in the following order of priority:

(a)    if the obligor has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

(b)    if the preceding clause does not apply, the Moody's "Issuer Rating" for the obligor;

(c)    if the preceding clauses do not apply, but the obligor has a subordinated obligation with an Assigned Moody's Rating, then

(i)    if such Assigned Moody's Rating is at least "B3" (and, if rated "B3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than such Assigned Moody's Rating, or

(ii)    if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be such Assigned Moody's Rating;

(d)    if the preceding clauses do not apply, but the obligor has a senior secured obligation with an Assigned Moody's Rating, then:

(i)    if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating, or

(ii)    if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(e)    if the preceding clauses do not apply, but such obligor has a Corporate Family Rating, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such Corporate Family Rating;

(f)    if the preceding clauses do not apply, but the obligor has a senior unsecured obligation (other than a bank loan) with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(i)    one rating subcategory below the Moody's equivalent of such Standard & Poor's rating if it is "BBB–" or higher,

(ii)    two rating subcategories below the Moody's equivalent of such Standard & Poor's rating if it is "BB+" or lower; or

(iii)     so long as the aggregate of the Principal Balances of Underlying Assets having an Assigned Moody's Rating pursuant to this clause (f)(iii), clause (g)(iii) and clause (h)(iii) below, in the aggregate, does not exceed 10.0% of the Maximum Investment Amount, (x) "B3" (unless such Underlying Asset is an interest in a Loan originated as part of a facility with an aggregate face amount at the time of origination of less than U.S.$150,000,000) until the Issuer or the Administrative Agent obtains an estimated rating from Moody's if (A) the Issuer or the Administrative Agent on its behalf applies for an estimated rating from Moody's within ten (10) Business Days of the date of the commitment to purchase the Loan or Bond and (B) all the Coverage Tests are satisfied; provided, that if Moody's issues an estimated rating lower than "B3" pursuant to this clause (f)(iii)(x) at least three times within a twelve-month period or a cumulative total of five times, the Issuer may not utilize this clause (f)(iii)(x) and (y) if such Underlying Asset is an interest in a Loan originated as part of a facility with an aggregate face amount at the time of origination of less than U.S.$150,000,000, "Caa1" until the Issuer or the Administrative Agent obtains an estimated rating from Moody's; provided that, with respect to any Underlying Asset for which an estimated rating from Moody's has been received, the Administrative Agent shall request that Moody's confirm such estimated rating on an annual basis;

(g)     if the preceding clauses do not apply, but the obligor has a subordinated obligation (other than a bank loan) with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(i)     one rating subcategory below the Moody's equivalent of such Standard & Poor's rating if it is "BBB–" or higher;

(ii)     two rating subcategories below the Moody's equivalent of such Standard & Poor's rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (c) above; or

(iii)     so long as the aggregate of the Principal Balances of Underlying Assets having an Assigned Moody's Rating pursuant to this clause (g)(iii), clause (f)(iii) above and clause (h)(iii) below, in the aggregate, does not exceed 10.0% of the Maximum Investment Amount, (x) "B3" (unless such Underlying Asset is an interest in a Loan originated as part of a facility with an aggregate face amount at the time of origination of less than U.S.$150,000,000) until the Issuer obtains an estimated rating from Moody's if (A) the Issuer or the Administrative Agent on its behalf applies for an estimated rating from Moody's within ten (10) Business Days of the date of the commitment to purchase the Loan or Bond and (B) all the Coverage Tests are satisfied; provided that, if Moody's issues an estimated rating lower than "B3" pursuant to this clause (g)(iii)(x) at least three times within a twelve-month period or a cumulative total of five times, the Issuer may not utilize this clause (g)(iii)(x) and (y) if such Underlying Asset is an interest in a Loan originated as part of a facility with an aggregate face amount at the time of origination of less than U.S.$150,000,000, "Caa1" until the Issuer or the Administrative Agent obtains an estimated rating from Moody's; provided that, with respect to any Underlying Asset for which an estimated rating from Moody's has been received, the Administrative Agent shall request that Moody's confirm such estimated rating on an annual basis;

(h)     if the preceding clauses do not apply, but the obligor has a senior secured obligation with a monitored public rating from Standard & Poor's (without any postscripts,

asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(i)       one rating subcategory below the Moody's equivalent of such Standard & Poor's rating if it is "BBB–" or higher;

(ii)       two rating subcategories below the Moody's equivalent of such Standard & Poor's rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (d) above; or

(iii)       so long as the aggregate of the Principal Balances of Underlying Assets having an Assigned Moody's Rating pursuant to this clause (h)(iii), clause (f)(iii) and clause (g)(iii) above, in the aggregate does not exceed 10.0% of the Maximum Investment Amount, (x) "B3" (unless such Underlying Asset is an interest in a Loan originated as part of a facility with an aggregate face amount at the time of origination of less than U.S.$150,000,000) until the Issuer obtains an estimated rating from Moody's if (A) the Issuer or the Administrative Agent on its behalf applies for an estimated rating from Moody's within ten (10) Business Days of the date of the commitment to purchase the Loan or Bond and (B) all the Coverage Tests are satisfied; provided that, if Moody's issues an estimated rating lower than "B3" pursuant to this clause (h)(iii)(x) at least three times within a twelve-month period or a cumulative total of five times, the Issuer may not utilize this clause (h)(iii)(x) and (y) if such Underlying Asset is an interest in a Loan originated as part of a facility with an aggregate face amount at the time of origination of less than U.S.$150,000,000, "Caa1" until the Issuer or the Administrative Agent obtains an estimated rating from Moody's; provided that, with respect to any Underlying Asset for which an estimated rating from Moody's has been received, the Administrative Agent shall request that Moody's confirm such estimated rating on an annual basis;

(i)       if the preceding clauses do not apply and each of the following clauses (i) through (viii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa1":

(i)       neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings,

(ii)       no debt securities or obligations of the obligor are in default,

(iii)       neither the obligor nor any of its Affiliates has defaulted on any debt during the preceding two years,

(iv)       the obligor has been in existence for the preceding five years,

(v)       the obligor is current on any cumulative dividends,

(vi)       the fixed-charge ratio for the obligor exceeds 125% for each of the preceding two fiscal years and for the most recent quarter,

(vii)       the obligor had a net profit before tax in the past fiscal year and the most recent quarter, and

(viii)    the annual financial statements of such obligor are unqualified and certified by a firm of Independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer;

(j)    if the preceding clauses do not apply but each of the following clauses (i) and (ii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa3":

(i)    neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings; and

(ii)    no debt security or obligation of such obligor has been in default during the past two years; and

(k)    if the preceding clauses do not apply and a debt security or obligation of the obligor has been in default during the past two years, the Moody's Equivalent Senior Unsecured Rating will be "Ca."

Notwithstanding the foregoing, the Aggregate Principal Amount of the Underlying Assets that may be given a Moody's Equivalent Senior Unsecured Rating based on a rating by Standard & Poor's in the manner provided in clauses (f), (g) and (h) above may not exceed 10% of the Maximum Investment Amount as of any date of determination.

"Moody's Group Countries":    The Moody's Group I Countries, Moody's Group II Countries, Moody's Group III Countries and Moody's Group IV Countries, collectively, and each one individually being a "Moody's Group Country," and, within each group, with respect to any particular country, so long as such country has a long-term foreign currency rating of at least "AA" by Standard & Poor's and "Aa2" by Moody's as of the applicable date of determination.

"Moody's Group I Countries":    The "Moody's Group I Countries," as determined from time to time by Moody's, which as of the date hereof are Australia, the Netherlands and New Zealand.

"Moody's Group II Countries":    The "Moody's Group II Countries," as determined from time to time by Moody's, which as of the date hereof are Germany, Ireland, Sweden and Switzerland.

"Moody's Group III Countries":    The "Moody's Group III Countries," as determined from time to time by Moody's, which as of the date hereof are Austria, Belgium, Denmark, Finland, France, Iceland, Liechtenstein, Luxembourg, Norway and Spain.

"Moody's Group IV Countries":    The "Moody's Group IV Countries" as determined from time to time by Moody's, which as of the date hereof are Greece, Italy and Portugal.

"Moody's Industry Category":    Any of the industry categories set forth in Schedule A hereto, including any such modifications that may be made thereto or such additional categories that may be subsequently established by Moody's and provided by or on behalf of the Issuer to the Trustee.

"Moody's Non Senior Secured Loan": means any Loan that is not a Moody's Senior Secured Loan.

"Moody's Obligation Rating": With respect to any Loan or Bond as of any date of determination, is the rating determined in accordance with the following, in the following order of priority:

(a)      any Underlying Asset (other than a Moody's Non Senior Secured Loan, a Bond or a DIP Loan):

(i)      if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii)      if the preceding clause does not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating; and

(b)      with respect to a Moody's Non Senior Secured Loan or a Bond:

(i)      if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii)      if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating; and

(c)      with respect to a DIP Loan or collateralized loan obligation, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Obligation Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade; provided that with respect to Structured Finance Securities such rating or ratings will be adjusted down two subcategories (if on watch for downgrade) or up two subcategories (if on watch for upgrade); and provided, further, that the requirement for such rating or ratings to be adjusted will not apply if (a) there has been an announcement by Moody's with respect to such Loan or Bond that the placement of such Loan or Bond on watch was in connection with an acquisition, corporate merger, reorganization or other similar transaction and (b) the issuer of such Bond or Loan is required to redeem such Bond or Loan at par upon the completion of such transaction.

"Moody's Rating":  With respect to any Underlying Asset, the Moody's Default Probability Rating thereof; provided, that with respect to the Underlying Assets generally, if at any time Moody's or any successor to it ceases to provide rating services, references to rating categories of Moody's in this Indenture shall be deemed instead to be references to the equivalent categories of any other nationally recognized investment rating agency selected by the Administrative Agent as of the most recent date on which such other rating agency and Moody's published ratings for the type of security in respect of which such alternative rating agency is used.

"Moody's Rating Downgrade":  The withdrawal by Moody's of its rating on the Senior Notes or the reduction by Moody's of its ratings below the initial ratings as in effect on the Closing Date ( disregarding any withdrawal or reduction if subsequent thereto Moody's has upgraded any such reduced or withdrawn rating to at least the initial ratings); provided, that if a Majority of the Controlling Class elects in writing to waive a Moody's Rating Downgrade, such Moody's Rating Downgrade shall be deemed to no longer exist (and, for all purposes of this Agreement, shall cease to have any effect) until the earlier of (i) revocation of such waiver by a Majority of the Controlling Class and (ii) a further downgrade or withdrawal of the rating of any Class of Senior Notes that, notwithstanding such waiver, would constitute a Moody's Rating Downgrade.

"Moody's Rating Factor":  With respect to any Underlying Asset (except Structured Finance Securities), is the number set forth in the table below opposite the Moody's Rating of such Underlying Asset unless a rating factor has been obtained through a private rating:

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| "Aaa" | 1 | "Ba1" | 940 |
| "Aa1" | 10 | "Ba2" | 1350 |
| "Aa2" | 20 | "Ba3" | 1766 |
| "Aa3" | 40 | "B1" | 2220 |
| "A1" | 70 | "B2" | 2720 |
| "A2" | 120 | "B3" | 3490 |
| "A3" | 180 | "Caa1" | 4770 |
| "Baa1" | 260 | "Caa2" | 6500 |
| "Baa2" | 360 | "Caa3" | 8070 |
| "Baa3" | 610 | "Ca" or lower | 10000 |

"Moody's Recovery Rate":  With respect to any Underlying Asset, the recovery rate determined in accordance with the following tables:

**Table I:**

| Moody's Priority Category | Moody's Recovery Rate |
|---|---|
| Unsecured DIP Loans and any Underlying Assets not covered above or below | As determined by Moody's on a case-by-case basis. |

For High-Yield Bonds, Moody's Senior Secured Loans and Moody's Non Senior Secured Loans, the relevant Moody's Recovery Rate is the rate determined pursuant to the table below based on the number of rating subcategories difference between the High-Yield Bond's or Loan's Moody's Obligation Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Obligation Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

**Table II:**

| Number of Moody's Ratings Subcategories Difference Between the Moody's Obligation Rating and the Moody's Default Probability Rating | Moody's Senior Secured Loans | Moody's Non Senior Secured Loans | High-Yield Bonds |
|---|---|---|---|
| +2 or more | 60% | 45% | 40% |
| +1 | 50% | 42% | 35% |
| 0 | 45% | 40% | 30% |
| -1 | 40% | 30% | 15% |
| -2 | 30% | 15% | 10% |
| -3 or less | 20% | 10% | 2% |

If no Moody's Recovery Rate has been specifically assigned with respect to a Loan pursuant to the above tables and the Loan is a DIP Loan, the relevant Moody's Recovery Rate is 50%.

**Table III**:

The Moody's Recovery Rate for a Structured Finance Security will be the applicable rate set forth below based on the appropriate sector as categorized by Moody's:

**Diversified Securities** primarily include (1) Automobile Securities; (2) Car Rental Receivable Securities; (3) Credit Card Securities; (4) Student Loan Securities:

| Initial Rating of Structured Finance Security | | | | | | |
|---|---|---|---|---|---|---|
| % of Underlying Capital Structure | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 70% | 60% | 50% | 40% |
| ≤70% >10% | 75% | 70% | 60% | 50% | 40% | 30% |
| ≤10% | 70% | 65% | 55% | 45% | 35% | 25% |

**Residential Securities** primarily include (1) Home Equity Loan Securities; (2) Manufactured Housing Securities; (3) Residential A Mortgage Securities; (4) Residential B/C Mortgage Securities:

| **Initial Rating of Structured Finance Security** | | | | | | |
|---|---|---|---|---|---|---|
| **% of Underlying Capital Structure** | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| ≤70% >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| ≤10% >5% | 65% | 55% | 45% | 40% | 30% | 20% |
| ≤5% >2% | 55% | 45% | 40% | 35% | 25% | 15% |
| ≤2% | 45% | 35% | 30% | 25% | 15% | 10% |

**Undiversified Securities** primarily include (1) CMBS Conduit; (2) CMBS Credit Tenant Lease; (3) CMBS Large Loan; (4) those ABS Sectors not included in Diversified Securities:

| **Initial Rating of Structured Finance Security** | | | | | | |
|---|---|---|---|---|---|---|
| **% of Underlying Capital Structure** | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| ≤70% >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| ≤10% >5% | 65% | 55% | 45% | 35% | 25% | 15% |
| ≤5% >2% | 55% | 45% | 35% | 30% | 20% | 10% |
| ≤2% | 45% | 35% | 25% | 20% | 10% | 5% |

**Collateralized Debt Obligations** include (1) High-diversity CDOs (Diversity Score in excess of 20); (2) Low-Diversity CDOs (Diversity Score of 20 or less).

**High Diversity Collateralized Debt Obligations**:

| **Initial Rating of Structured Finance Security** | | | | | | |
|---|---|---|---|---|---|---|
| **% of Underlying Capital Structure** | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| ≤70% >10% | 75% | 70% | 60% | 50% | 40% | 25% |
| ≤10% >5% | 65% | 55% | 50% | 40% | 30% | 20% |
| ≤5% >2% | 55% | 45% | 40% | 35% | 25% | 10% |
| ≤2% | 45% | 35% | 30% | 25% | 10% | 5% |

**Low Diversity Collateralized Debt Obligation**s:

| | **Initial Rating of Structured Finance Security** | | | | | |
|---|---|---|---|---|---|---|
| **% of Underlying Capital Structure** | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| >70% | 80% | 75% | 60% | 50% | 45% | 30% |
| ≤70% >10% | 70% | 60% | 55% | 45% | 35% | 25% |
| ≤10% >5% | 60% | 50% | 45% | 35% | 25% | 15% |
| ≤5% >2% | 50% | 40% | 35% | 30% | 20% | 10% |
| ≤2% | 30% | 25% | 20% | 15% | 7% | 4% |

Notwithstanding the foregoing, the Moody's Recovery Rates set forth in the table above may be adjusted on a case-by-case basis upon receipt of Rating Agency Confirmation from Moody's.

"Moody's Senior Secured Loan":  (a) (i) A Senior Secured Loan, (ii) a Senior Secured Floating Rate Note or (iii) a Second Lien Loan; provided, that such Senior Secured Floating Rate Note or such Second Lien Loan, in each case, will only constitute a "Moody's Senior Secured Loan" if it has an Assigned Moody's Rating that is not lower than the Corporate Family Rating of the related obligor and (b) such Loan is not:  (i) a DIP Loan, (ii) a Loan for which the security interest or lien (or the validity or effectiveness thereof) in substantially all of its collateral attaches, becomes effective, or otherwise "springs" into existence after the origination thereof, or (iii) a type of Loan that Moody's has identified as having unusual terms and with respect to which its Moody's Recovery Rate has been or is to be determined on a case-by-case basis.

"Net Collateral Interest Proceeds":  With respect to any Measurement Date, the sum (without duplication) of:

(i)        the interest payments received or, in the determination of the Administrative Agent, scheduled to be received in Cash on the Underlying Assets during the Due Period in which such Measurement Date occurs (determined (a) assuming that LIBOR (or such other rate index applicable to the relevant Underlying Asset pursuant to the related Underlying Instruments) remains constant at its current rate on the relevant Underlying Asset for the remainder of such Due Period, (b) excluding interest accrued on Underlying Assets prior to the date of acquisition thereof by the Issuer and purchased with Principal Proceeds, (c) excluding amounts payable in respect of Defaulted Obligations (but including Current Pay Obligations) or Deferred Interest Assets, (d) excluding the amount of any payments due on the Underlying Assets in such Due Period that the Administrative Agent in its commercially reasonable judgment (which judgment shall not be called into question based on subsequent events) does not expect to be paid (in each case, regardless of whether the Due Date for any such interest payment has yet occurred) and (e) including Disposition Proceeds received during such Due Period that constitute Interest Proceeds); plus

(ii)        the interest payments received or scheduled to be received in Cash on any Eligible Investments held in the Issuer Accounts during the Due Period in which such Measurement Date occurs; plus

(iii)    the Aggregate Principal Amount of Eligible Investments that were purchased with Interest Proceeds as of such Measurement Date; <u>plus</u>

(iv)    [Reserved];

(v)    any fees actually received by the Issuer during the Due Period in which such Measurement Date occurs that constitute Interest Proceeds; <u>plus</u>

(vi)    [Reserved];

(vii)    amounts designated as Interest Proceeds pursuant to <u>clause (g)</u> of the definition of "Interest Proceeds" and on deposit in the Interest Collection Account as of such Measurement Date; <u>minus</u>

(viii)    amounts payable pursuant to <u>subclauses (i) through (iii)</u> of Section 11.1(a) on the immediately following Payment Date.

"<u>Net Collateral Principal Balance</u>":  On any Measurement Date, without duplication, an amount equal to:

(i)    the Aggregate Principal Amount of the Underlying Assets, including the funded and unfunded balance on all Revolving Credit Facilities and Delayed-Draw Loans (excluding any Underlying Asset that is (a) a Defaulted Obligation or (b) a Current Pay Obligation); <u>plus</u>

(ii)    the Balance of all cash and Eligible Investments constituting or purchased with Principal Proceeds on such Measurement Date excluding the Balance of all cash and Eligible Investments in the Closing Date Expense Reserve Account and the Variable Funding Account; <u>plus</u>

(iii)    with respect to each Defaulted Obligation, the Principal Balance thereof; <u>minus</u>

(iv)    solely for purposes of the Coverage Tests, with respect to each Deferred Interest Asset, the greater of (x) the Principal Balance of such Deferred Interest Asset as of such date multiplied by the amount equal to $(1 - $ the Applicable Recovery Percentage as of such date) and (y) the Principal Balance of such Deferred Interest Asset as of such date multiplied by the amount equal to $(1 - $ the Current Market Value Percentage thereof as of the most recent Determination Date); <u>plus</u>

(v)    solely for purposes of the Coverage Tests, with respect to each Current Pay Obligation, an amount equal to 95% of the Current Market Value of such Current Pay Obligation as of such date; <u>minus</u>

(vi)    solely for purposes of the Coverage Tests, with respect to each Deep Discount Obligation, the Principal Balance of such Deep Discount Obligation as of such date multiplied by the amount equal to $(1 - $ its purchase price expressed as a percentage of the par amount of such Underlying Asset on the date of purchase);

<u>provided</u>, that, with respect to any amounts included in Net Collateral Principal Balance in respect of Defaulted Obligations (determined in accordance with clause (iii) above), Deferred Interest Assets (determined in accordance with clauses (i) and (iv) above) or Deep Discount

Obligations (determined in accordance with clauses (i) and (vi) above), if an amount would also be included in Net Collateral Principal Balance with respect to such asset in any other clause above, such asset shall not be double counted for purposes of calculating the Net Collateral Principal Balance, but rather the treatment, either as a Defaulted Obligation, Deferred Interest Asset or Deep Discount Obligation, as applicable, that results in the lowest Net Collateral Principal Balance shall be used.

For purposes of clarification, in determining the "Net Collateral Principal Balance," Equity Securities and any Underlying Asset in which the Trustee does not hold a first priority, perfected security interest will be deemed to have a Principal Balance of zero.

"Non-Consenting Noteholder":  The meaning specified in Section 8.5.

"Non-Consenting Notes":  The meaning specified in Section 8.5.

"Non-Permitted Holder":  The meaning specified in Section 2.14(b).

"Note Interest Rate":  With respect to any Class of Senior Notes, Mezzanine Notes and Subordinated Notes, the annual rate at which interest accrues on such Class of Senior Notes, Mezzanine Notes and Subordinated Notes, as specified in Section 2.3 and in such Senior Notes, Mezzanine Notes and Subordinated Notes.

"Noteholder":  With respect to any Senior Note or Mezzanine Note, the Person in whose name such Senior Note is registered in the Securities Register.

"Note Owner Certificate":  A certificate to be signed by the beneficial owner of an interest in a Security, in the form attached hereto as Exhibit I

"Notice of Default":  The meaning specified in Section 5.1(f).

"Offer":  With respect to any security or debt obligation, any offer by the issuer of such security or borrower with respect to such debt obligation or by any other Person made to all of the holders of such security or debt obligation to purchase or otherwise acquire such security or debt obligation (other than pursuant to any redemption in accordance with the terms of any related Reference Instrument or for the purpose of registering the security or debt obligation) or to exchange such security or debt obligation for any other security, debt obligation, Cash or other property.

"Officer":  With respect to the Issuer, the Co-Issuer or any other corporation, the Chairman of the Board of Directors, any Director, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity; with respect to any partnership, any general partner thereof; with respect to any bank or trust company acting as trustee of an express trust or as custodian, any Trust Officer; and with respect to any other legal entity, any Persons holding an equivalent position.

"Officer's Certificate":  With respect to any Person, a certificate signed by an Authorized Officer of such Person.

"Operative Agreements":  This Indenture, the Administrative Agency Agreement and the Collateral Administration Agreement.

"Opinion of Counsel":  A written opinion addressed to the Trustee and each of the Rating Agencies, in form and substance reasonably satisfactory to the Trustee and each of the Rating Agencies, of an attorney at law, who is reasonably experienced and knowledgeable in the subject matter of the opinion in question and admitted to practice (or a law firm with one or more partners admitted to practice) in a state of the U.S. or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands) the laws of which state or other jurisdiction govern the subject matter in respect of which the opinion is being solicited (provided, that if the State of Delaware has such jurisdiction, such attorney may be admitted to practice in any state of the U.S. or the District of Columbia), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer and which attorney shall be reasonably satisfactory to the Trustee.  Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to the Trustee and each of the Rating Agencies or shall state that the Trustee and each of the Rating Agencies shall be entitled to rely thereon.  In addition, an Opinion of Counsel may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion or representations by the Issuer, the Co-Issuer or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer or such other Person, unless such Authorized Officer of the Issuer or the Co-Issuer or such counsel knows that the certificate or representations with respect to such matters are erroneous.

"Optional Redemption":  The meaning specified in Section 9.4.

"Outstanding":  With respect to the Senior Notes or a particular Class of the Senior Notes, the Mezzanine Notes or a particular Class of the Mezzanine Notes, or the Subordinated Notes, as of any date of determination, all of the Senior Notes, all of such Class of Senior Notes, all of the Mezzanine Notes, all of such Class of Mezzanine Notes, or all of the Subordinated Notes, as applicable, theretofore authenticated and delivered under this Indenture, except:

(i)       Securities theretofore cancelled by the Securities Registrar or delivered to the Securities Registrar for cancellation;

(ii)      Securities or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent or deposited with the Trustee in trust for the Holders of such Securities; provided, that, if such Securities or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture and provision therefor reasonably satisfactory to the Trustee has been made;

(iii)     Securities in exchange for, or in lieu of which, other Securities have been issued and authenticated and delivered pursuant to this Indenture unless proof reasonably satisfactory to the Trustee or the Share Registrar is presented that any such original Securities are held by a Holder in due course; and

(iv)      Securities alleged to have been mutilated, destroyed, lost or stolen for which replacement Securities have been issued as provided in Section 2.6 of this Indenture;

provided, that, in determining whether the Holders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder as of any date of determination, Securities owned by the Issuer or the Co-Issuer or any Affiliate of the Issuer or the Co-Issuer shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand,

authorization, direction, notice, consent or waiver, only Securities that a Trust Officer of the Trustee actually knows to be so owned shall be so disregarded.

"Partial PIK Security":  A security with respect to which under the related Underlying Instruments (i) a portion of the interest due thereon is required to be paid in cash on each payment date therefor and is not permitted to be deferred or capitalized (which portion shall at least equal LIBOR or the applicable index with respect to which interest on such security is calculated and (ii) the issuer thereof or obligor thereon may defer or capitalize the remaining portion of the interest due thereon.

"Participations":  Interests in loans (as defined in clause (i) of the definition of "Loan") acquired indirectly by way of participation.

"Paying Agent":  Any Person authorized by the Co-Issuers (or, with respect to the Mezzanine Notes and the Subordinated Notes, the Issuer) to pay the principal of or interest on any Senior Notes on behalf of the Co-Issuers (or, with respect to the Mezzanine Notes and the Subordinated Notes, the Issuer), as specified in Section 7.4.

"Payment Account":  The account designated the "Payment Account" and established in the name of the Trustee for the benefit of the Secured Parties pursuant to Section 10.3(a).

"Payment Date":  The 15th day of each January, April, July and October of each year, commencing in October, 2008, or if any such date is not a Business Day, the immediately following Business Day; provided, that the last Payment Date in respect of any Security shall be the Stated Maturity, Subordinated Note Redemption Date or Redemption Date, as applicable.

"Payment Date Report":  The meaning specified in Section 10.6(b).

"Payment Default":  The meaning specified in Section 5.14(a).

"Payment Intangible":  The meaning specified in Section 9-102(a)(61) of the UCC.

"Person":  An individual, corporation (including a business trust), partnership, limited partnership, limited liability partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), bank, unincorporated association or government or any agency or political subdivision thereof or any other entity of similar nature.

"PIK Security":  A security (including a Partial PIK Security) that permits deferral and/or capitalization of interest (in whole or in part) or other periodic distribution otherwise due without resulting in a default by the terms of its Underlying Instruments.  Except as otherwise provided, each Underlying Asset constituting a PIK Security will be considered for purposes of the Portfolio Criteria as having a Principal Balance which excludes any deferred or capitalized interest thereon.

"Plan":  Any of the following:  (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) subject to Title I of ERISA, (b) a "plan" described in Section 4975(e)(1) of the Code (including, without limitation, an individual retirement account or Keogh plan) subject to Section 4975 of the Code, (c) an entity whose underlying assets include "plan assets" by reason of an employee benefit plan's or other plan's investment in such entity or (d) a governmental plan or other plan subject to applicable law that is substantively similar or of similar effect to Section 406 of ERISA or Section 4975 of the Code.

"Pledged Underlying Assets":  On any date of determination, the Underlying Assets identified on the Schedule of Underlying Assets and any Underlying Assets and Equity Securities acquired by the Issuer subsequent to the Closing Date and required to be Granted to the Trustee hereunder, in each case to the extent owned by the Issuer as of such determination date, and the Eligible Investments owned by the Issuer as of such determination date that are required to be Granted to the Trustee hereunder.

"Portfolio Criteria":  The Coverage Tests.

"Pricing Amendment":  The meaning specified in Section 8.5.

"Pricing Amendment Mandatory Transfer":  The meaning specified in Section 8.5.

"Principal Balance":  With respect to any Underlying Asset on any date of determination, the outstanding principal amount of such Underlying Asset on such date; provided, that the Principal Balance of:

(a)    a Revolving Credit Facility shall equal the sum of (x) the outstanding amount of such Revolving Credit Facility funded by the Issuer and (y) the unfunded portion of such facility which the Issuer would be obligated to fund if the obligor thereunder draws upon such facility;

(b)    a Delayed-Draw Loan shall equal the sum of (x) the outstanding amount of such Delayed-Draw Loan funded by the Issuer and (y) the unfunded portion of such loan which the Issuer would be obligated to fund if the obligor thereunder draws upon such loan;

(c)    a Deferred Interest Asset or PIK Security shall exclude any deferred or capitalized interest thereon;

(d)    any Underlying Asset in which the Trustee does not hold a valid, first priority, perfected security interest in the manner provided in Section 3.4 shall be deemed to be zero;

(e)    any Defaulted Obligation will be the lesser of (1) the Current Market Value of such Defaulted Obligation as of such date and (2) the outstanding principal amount of such Defaulted Obligation multiplied by the Applicable Recovery Percentage as of such date; provided, however, if such Defaulted Obligation has been held by the Issuer for a period in excess of 3 years, the Principal Balance of such Defaulted Obligation shall be deemed to be zero;

(f)    any Equity Security shall be deemed to be zero; and

(g)    any Zero Coupon Bond will be the accreted value thereof, as determined by the Administrative Agent.

"Principal Collection Account":  The sub-account of the Collection Account designated the "Principal Collection Account" and established in the name of the Trustee for the benefit of the Secured Parties pursuant to Section 10.2(b).

"Principal Payments":  For any Payment Date, an amount equal to the sum of any payments of principal (including optional or mandatory redemptions or prepayments) received on the Pledged Underlying Assets during the related Due Period, including payments of principal received in respect of Offers and recoveries (net of all costs) on Defaulted Obligations.

"Principal Proceeds":  With respect to any Payment Date, the following amounts (without duplication and excluding the Excepted Property and any proceeds thereof), to the extent received during the related Due Period:

(a)    the net proceeds received by the Issuer from the issuance and sale of the Securities on the Closing Date (excluding any amounts to be deposited into the Interest Reserve Account on the Closing Date pursuant to Section 10.3(i)) and the issuance of additional Securities on any subsequent date pursuant to Section 2.11 (except to the extent that such net proceeds are applied to purchase additional Underlying Assets pursuant to Section 2.11(e) and/or designated as "Interest Proceeds" in the manner described in clause (g) of the definition thereof);

(b)    all payments of principal (including Unscheduled Principal Payments) received in Cash by the Issuer during the related Due Period on the Underlying Assets (including PIK Securities up to the original principal amount thereof) and Eligible Investments other than amounts that constitute "Interest Proceeds" pursuant to clause (c) of the definition thereof;

(c)    all Disposition Proceeds received by the Issuer during the related Due Period, including, without limitation, amounts received in respect of original issue or market discount and all call, redemption and prepayment premiums received in Cash by the Issuer during the related Due Period on the Underlying Assets and Eligible Investments (which shall exclude accrued interest defined as "Interest Proceeds" pursuant to clause (b) of the definition thereof);

(d)    [Reserved];

(e)    interest accrued on Underlying Assets prior to the date of acquisition thereof by the Issuer and purchased with Principal Proceeds (whether received by the Issuer in the form of an actual interest payment or as part of the Disposition Proceeds of the related Underlying Asset) that is received by the Issuer during the related Due Period;

(f)    all amounts on deposit in the Principal Collection Account that have been transferred from the Variable Funding Account for application as Principal Proceeds during the related Due Period, as described in Section 10.3(d);

(g)    all other amounts received by the Issuer in Cash in exchange for Equity Securities received by the Issuer in respect of a Defaulted Obligation during the related Due Period; and

(h)    all other amounts received by the Issuer during the related Due Period which are not included in the definition of "Interest Proceeds."

"Priority of Payments":  The meaning specified in Section 11.1.

"Proceeding":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Proceeds":  (i) Any property (including but not limited to Cash and securities) received as a Distribution on all or any portion of the Collateral, (ii) any property (including but not limited to Cash and securities) received in connection with the sale, liquidation, exchange or other disposition of all or any portion of the Collateral and (iii) all proceeds (as such term is defined in Section 9-102(64) of the UCC) of all or any portion of the Collateral.

"Proposed Portfolio":  The portfolio (measured by Principal Balance) of Underlying Assets and Principal Proceeds, held as Cash and Eligible Investments purchased with Principal Proceeds that would result from the maturation, proposed sale or other disposition of an Underlying Asset or a proposed purchase of an Underlying Asset, as the case may be.

"Protected Purchaser":  The meaning specified in Section 8-303 of the UCC.

"Purchase Agreements":  Collectively, the Senior Note Purchase Agreement, the Mezzanine Note Purchase Agreement and the Subordinated Note Purchase Agreement.

"QIB" or "Qualified Institutional Buyer":  A "qualified institutional buyer" as defined in Rule 144A.

"QIB/QP":  Any Person that, at the time of its acquisition, purported acquisition or proposed acquisition of Securities, is both a QIB and a QP.

"QP" or "Qualified Purchaser":  Any of (i) a "qualified purchaser" within the meaning of Section 3(c)(7) of the Investment Company Act, (ii) a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act or (ii) a company beneficially owned exclusively by one or more "qualified purchasers" and/or "knowledgeable employees" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act.

"Ramp-Up Effective Date":  The earlier to occur of (i) the date designated as such by the the Administrative Agent,acting on behalf of the Issuer, subject to satisfaction of the following conditions in the manner provided in Section 3.5(c):  (x) the Aggregate Principal Amount of the Underlying Assets and the Eligible Investments constituting Principal Proceeds (including the amount of any prepayment on any Underlying Asset which has not yet been reinvested in other Underlying Assets) is not less than the Required Ramp-Up Effective Date Amount and (y) the Portfolio Criteria (other than the Interest Coverage Ratio Test) are satisfied, and (ii) April 28, 2008.

"Ramp-Up Period":  The period from and including the Closing Date to and including the Ramp-Up Effective Date.

"Ramp-Up Test Date":  The meaning specified in Section 3.5(b).

"Rating Agencies":  Moody's and any successor or successors thereto and Standard & Poor's and any successor or successors thereto, or, with respect to Underlying Assets generally, if at any time Moody's or any such successor or Standard & Poor's or any such successor ceases to provide rating services generally, any other nationally recognized investment rating agency selected by the Issuer and reasonably satisfactory to a Majority of the Controlling Class.  In the event that at any time the Rating Agencies do not include Moody's or Standard & Poor's, references to rating categories of Moody's or Standard & Poor's in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and Moody's or Standard & Poor's published ratings for the type of security in respect of which such alternative rating agency is used provided, that so long as Standard & Poor's is a "Rating Agency," Rating Agency Confirmation from Standard & Poor's shall be required in order to refer to equivalent categories of any successor Rating Agency whose published ratings for the type of security is required.  References to Rating Agencies with respect to a Class of Senior Notes or Mezzanine Notes shall apply only to Rating Agencies that assigned a rating (public or confidential) to such Class of Senior Notes or Mezzanine Notes on the Closing Date.

"Rating Agency Confirmation":  For any action contemplated by or on behalf of the Issuer, receipt by each of the Trustee and the Issuer of prior written confirmation from each of the Rating Agencies (or, if any particular Rating Agency is specified, such Rating Agency) that the then-current rating assigned by such Rating Agency to any of the Senior Notes or the Mezzanine Notes will not be reduced, withdrawn or qualified as a result of the taking of such action.

"Ratings Confirmation Failure":  The meaning specified in Section 7.15.

"Record Date":  The date on which the Holders entitled to receive a payment of interest on or principal of the Securities, on the succeeding Payment Date or Redemption Date are determined, which date with respect to any Payment Date or Redemption Date shall be the 7th day (whether or not a Business Day) prior to such Payment Date or Redemption Date.

"Redemption Advance Rate":  The meaning specified with respect to any applicable Underlying Assets and time period in the table under Section 9.5(b).

"Redemption by Liquidation": The meaning specified in Section 9.3.

"Redemption by Refinancing": The meaning specified in Section 9.4

"Redemption Date":  With respect to the Senior Notes, any Payment Date or Interim Payment Date specified for a redemption of Senior Notes pursuant to ARTICLE IX, and with respect to the Mezzanine Notes, any Payment Date or Interim Payment Date specified for a redemption of Mezzanine Notes pursuant to ARTICLE IX.

"Redemption Date Statement":  The meaning specified in Section 10.6(d).

"Redemption Price":  With respect to the Senior Notes, the Senior Note Redemption Price, with respect to the Mezzanine Notes, the Mezzanine Note Redemption Price and with respect to the Subordinated Notes, the Subordinated Note Redemption Price.

"Reference Banks":  The meaning specified in Schedule B attached hereto.

"Reference Instrument":  The indenture, credit agreement or other agreement pursuant to which a security or debt obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such security or debt obligation or of which the holders of such security or debt obligation are the beneficiaries.

"Refinancing":  The meaning specified in Section 9.4(a).

"Refinancing Proceeds":  The meaning specified in Section 9.4(a).

"Registered":  A debt obligation that is issued after July 18, 1984 and that is in registered form within the meaning of Section 881(c)(2)(B)(i) of the Code and the regulations of the U.S. Department of the Treasury promulgated thereunder.

"Registration Required Obligation":  Debt obligation issued on or after January 1, 1983 other than an obligation that (1) is issued by a natural person, (2) is not of a type offered to the public, (3) has a maturity (at issue) of not more than one year, or (4) is described in Section 163(f)(2)(B) of the Code and the regulations of the U.S. Department of the Treasury promulgated thereunder.

"Regulation D":  Regulation D under the Securities Act.

"Regulation S":  Regulation S under the Securities Act.

"Regulation S Global Securities":  The Regulation S Global Senior Notes, the Regulation S Global Mezzanine Notes or the Regulation S Global Subordinated Notes, as the context may require.

"Regulation S Global Mezzanine Notes":  One or more permanent global notes evidencing the Mezzanine Notes offered and sold to Persons that are both non-U.S. Persons and non-U.S. Residents in offshore transactions pursuant to Regulation S and issued in definitive, fully registered form without interest coupons with the "Global Securities Legend" and the "Regulation S Legend" added to the form of the Mezzanine Notes as set forth in the applicable Exhibit attached hereto.

"Regulation S Global Senior Notes":  One or more permanent global notes evidencing the Senior Notes offered and sold to Persons that are both non-U.S. Persons and non-U.S. Residents in offshore transactions pursuant to Regulation S and issued in definitive, fully registered form without interest coupons with the "Global Securities Legend" and the "Regulation S Legend" added to the form of the Senior Notes as set forth in the applicable Exhibit attached hereto.

"Regulation S Global Subordinated Notes":  One or more permanent global notes evidencing the Subordinated Notes offered and sold to Persons that are both non-U.S. Persons and non-U.S. Residents in offshore transactions pursuant to Regulation S and issued in definitive, fully registered form without interest coupons with the "Global Securities Legend" and the "Regulation S Legend" added to the form of the Subordinated Notes as set forth in the applicable Exhibit attached hereto.

"Regulation S Legend":  The legend set forth on any Regulation S Global Security as provided in the applicable Exhibit attached hereto.

"Reinvestment Agreement":  A guaranteed reinvestment agreement from a bank, insurance company or other corporation or entity; provided, that such agreement provides that it is terminable by the purchaser, without penalty, in the event that the rating assigned to such agreement by Moody's or Standard & Poor's is at any time lower than the rating required pursuant to the terms of this Indenture to be assigned to such agreement in order to permit the purchase thereof.  The Issuer shall provide written notice to Standard & Poor's in the event that any Reinvestment Agreement is terminated.

"Replacement Notes" The meaning specified in Section 9.4(a).

"Required Ramp-Up Effective Date Amount": $2,028,149,779.

"Revolving Credit Facility":  Means: (a) a senior secured or senior unsecured loan facility, which provides a borrower with a line of credit against which one or more borrowings may be made up to the stated principal amount of such facility and which provides that such borrowed amount may be repaid and re-borrowed from time to time or (b) a loan with respect to which the Issuer is obligated to make or otherwise fund future term loan advances to a borrower.

"Rule 144A":  Rule 144A under the Securities Act.

"Rule 144A Global Mezzanine Notes":  One or more permanent global notes evidencing the Mezzanine Notes offered and sold in accordance with Rule 144A and issued in definitive, fully registered form without interest coupons with the "Global Securities Legend" and the "Rule 144A Legend" added to the form of the Mezzanine Notes as set forth in the applicable Exhibit attached hereto.

"Rule 144A Global Securities":  The Rule 144A Global Senior Notes and/or the Rule 144A Global Mezzanine Notes, as the context may require.

"Rule 144A Global Senior Notes":  One or more permanent global notes evidencing the Senior Notes offered and sold in accordance with Rule 144A and issued in definitive, fully registered form without interest coupons with the "Global Securities Legend" and the "Rule 144A Legend" added to the form of the Senior Notes as set forth in the applicable Exhibit attached hereto.

"Rule 144A Legend":  The legend set forth on any Rule 144A Global Senior Note as provided in the applicable Exhibit attached hereto.

"Schedule of Underlying Assets":  The list of Underlying Assets provided by the Issuer to the Trustee on the Closing Date setting forth the Underlying Assets acquired by the Issuer and in which a security interest is Granted to the Trustee as of the Closing Date.

"Scheduled Distribution":  With respect to any Pledged Underlying Asset for each Due Date, the Distribution scheduled on such Due Date, determined in accordance with the assumptions specified in Section 1.2 hereof.

"SEC":  The United States Securities and Exchange Commission.

"Second Lien Loan":  A Loan that:

(i) is not (and by its terms is not permitted to become) subordinate in right of payment to any other debt for borrowed money incurred by the obligor of the Loan, other than a Senior Secured Loan;

(ii) is secured by a valid and perfected security interest or lien on specified collateral securing the obligor's obligations under the Loan, which security interest or lien is not subordinate to the security interest or lien securing any other debt for borrowed money other than a Senior Secured Loan on such specified collateral; and

(iii) with respect to clauses (i) and (ii) above, such right of payment, security interest or lien may be subordinate to customary permitted liens, such as, but not limited to, tax liens.

"Secured Obligations":  Collectively, all of the indebtedness, liabilities and obligations owed from time to time by the Issuer to any of the Secured Parties whether for principal, interest, fees, costs, expenses or otherwise (including all amounts which would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code and the operation of Sections 502(b) and 506(b) thereof or any analogous provisions of any similar laws).

"Secured Parties":  The Trustee, individually and in its capacity as trustee hereunder, the Holders of the Senior Notes and the Holders of the Mezzanine Notes.

"Securities":  The Senior Notes, the Mezzanine Notes and/or the Subordinated Notes, as the context may require.

"Securities Account":  The meaning specified in Section 8-501 of the UCC.

"<u>Securities Account Control Agreement</u>":  The Securities Account Control Agreement, dated as of the Closing Date, between the Issuer and the Bank, as the Trustee and Securities Intermediary, as the same may be amended or otherwise modified from time to time in accordance with its terms.

"<u>Securities Act</u>":  The U.S. Securities Act of 1933, as amended.

"<u>Securities Intermediary</u>":  The meaning specified in Section 3.4(a).

"<u>Securities Register</u>":  The register maintained by the Trustee or any Securities Registrar with respect to the Securities pursuant to Section 2.5.

"<u>Securities Registrar</u>":  The meaning specified in Section 2.5(a).

"<u>Security Certificate</u>":  A certificate representing a security.

"<u>Security Entitlement</u>":  The meaning specified in Section 8-102(a)(17) of the UCC.

"<u>Selling Institution</u>":  Any institution from which a Participation is acquired by the Issuer.

"<u>Selling Institution Defaulted Participation</u>":  A participation interest in a loan or other debt obligation (other than a Defaulted Participation Obligation) with respect to which the Selling Institution has defaulted in any material respect in the performance of any of its payment obligations under the related participation agreement.

"<u>Senior Note Interest Rate</u>":  The interest rate for the Senior Notes specified in Section 2.3.

"<u>Senior Note Coverage Tests</u>":  The Senior Note Overcollateralization Ratio Test and the Senior Note Interest Coverage Ratio Test.

"<u>Senior Note Interest Coverage Ratio</u>":  As of any Measurement Date, the ratio obtained by dividing:

(i)     the Net Collateral Interest Proceeds as of such Measurement Date; by

(ii)    the sum of (a) scheduled interest on the Senior Notes and (b) Defaulted Interest, if any, in respect of the Senior Notes and accrued interest on such Defaulted Interest.

For purposes of calculating the Senior Note Interest Coverage Ratio, the expected interest income on Floating Rate Underlying Assets (other than Defaulted Obligations) and floating rate Eligible Investments and the expected interest payable on the Senior Notes shall be calculated assuming the current interest rates applicable thereto on the related Measurement Date remain unchanged.

"<u>Senior Note Interest Coverage Ratio Test</u>":  For so long as the Senior Notes remain outstanding, the test will be satisfied on any Measurement Date subsequent to the second Payment Date if the Senior Note Interest Coverage Ratio is equal to or greater than 120.0%.  The principal amount of the Senior Notes to be redeemed in accordance with Section 11.1 on any Payment Date for which the Senior Note Interest Coverage Ratio Test is not met on the related Determination Date shall be the minimum amount that, if it had been paid in reduction of the principal amount of the Senior Notes on the

immediately preceding Payment Date, would have caused the Senior Note Interest Coverage Ratio Test to be met for the current Determination Date.

"Senior Note Overcollateralization Ratio":  With respect to any Measurement Date, the number (expressed as a percentage) calculated by dividing the Net Collateral Principal Balance by the sum of the Aggregate Outstanding Amount of the Senior Notes, in each case as of such Measurement Date.

"Senior Note Overcollateralization Ratio Test":  For so long as the Senior Notes remain outstanding, a test that shall be met on any Measurement Date if the Senior Note Overcollateralization Ratio as of such Measurement Date is equal to or greater than 126.7%.  The principal amount of the Senior Notes to be redeemed on any Payment Date for which the Senior Note Overcollateralization Ratio Test is not met on the related Determination Date shall be the minimum amount that, if it is paid in reduction of the principal amount of the Senior Notes would cause the Senior Note Overcollateralization Ratio Test to be met for the current Determination Date (calculating the amount of Interest Proceeds to be diverted pursuant to Section 11.1 by assuming Interest Proceeds so diverted reduce the denominator of the Senior Note Overcollateralization Ratio with no impact on the numerator, and then calculating the amount of Principal Proceeds to be diverted pursuant to Section 11.1 by assuming Principal Proceeds so diverted reduce both the numerator and the denominator of the Senior Note Overcollateralization Ratio).

"Senior Note Initial Purchaser":  Lehman Brothers Inc.

"Senior Note Purchase Agreement":  The Purchase Agreement dated April 28, 2008, between the Co-Issuers and the Senior Note Initial Purchaser.

"Senior Note Redemption Price":  When used with respect to any Senior Note in an Optional Redemption, an amount equal to the sum (without duplication) of:  (a) the Aggregate Outstanding Amount of such Senior Note to be redeemed as of the Redemption Date, plus (b) accrued and unpaid interest thereon (including Defaulted Interest and interest on Defaulted Interest, if any) to the Redemption Date.

"Senior Noteholder":  With respect to any Senior Note, the Person in whose name such Senior Note is registered in the Securities Register.

"Senior Notes":  The floating rate notes having the applicable Note Interest Rate and Stated Maturity as set forth in Section 2.3, including any such additional Senior Notes issued pursuant to Section 2.11.

"Senior Secured Floating Rate Note":  Any Dollar-denominated senior secured note issued pursuant to an indenture or equivalent document by a corporation, partnership or other person that (i) has a stated coupon that bears a floating rate of interest and (ii) is secured by a first priority perfected security interest or lien to or on specified collateral securing the issuer's obligations under the note, which security interest or lien is not subordinate to the security interest or lien securing any other indebtedness for borrowed money.

"Senior Secured Loan":  A Loan that:

(i) is not (and by its terms is not permitted to become) subordinate in right of payment to any other indebtedness for borrowed money incurred by the obligor of such Loan;

(ii) is secured by a valid first priority perfected security interest or lien to or on specified collateral securing the obligor's obligations under the Loan, which security interest or lien is not subordinate to the security interest or lien securing any other debt for borrowed money; and

(iii) with respect to clauses (i) and (ii) above, such right of payment, security interest or lien may be subordinate to customary permitted liens, such as, but not limited to, tax liens.

"Senior Unsecured Loan":  Any unsecured Loan that is not subordinated to any other unsecured indebtedness of the borrower.

"Special Redemption":  The meaning specified in Section 9.9.

"Special Redemption Price":  With respect to a Special Redemption of the Senior Notes and the Mezzanine Notes pursuant to Section 9.9, the lesser of (i) the Aggregate Outstanding Amount of the Senior Notes, or a portion thereof, and, if applicable, the Aggregate Outstanding Amount of the Mezzanine Notes, or a portion thereof, in each case on the Interim Payment Date (before giving effect to any payment of principal on such date), together with any interest accrued thereon, that would equal the amount of all funds on deposit in the Principal Collection Account on such date (before giving effect to any withdrawals on such date) and (ii) the Aggregate Outstanding Amount of the Senior Notes and the Aggregate Outstanding Amount of the Mezzanine Notes on the Interim Payment Date (before giving effect to any payment of principal on such date), together with any interest accrued thereon.

"Standard & Poor's":  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor or successors thereto.

"Standard & Poor's CRR" means, with respect to any Underlying Asset, a corporate recovery rate assigned by Standard & Poor's to such Underlying Asset.

"Standard & Poor's CRR Recovery Rate" means, with respect to any Underlying Asset to which Standard & Poor's has assigned a Standard & Poor's CRR, the recovery rate determined in accordance with the definition of Standard & Poor's Recovery Rate.

"Standard & Poor's Group A1 Countries":  The "Standard & Poor's Group A1 Countries," as determined from time to time by Standard & Poor's, which as of the date hereof are the United Kingdom, Ireland, Finland, Denmark, The Netherlands, South Africa, Australia and New Zealand.

"Standard & Poor's Group A2 Countries":  The "Standard & Poor's Group A2 Countries," as determined from time to time by Standard & Poor's, which as of the date hereof are Belgium, Germany, Austria, Spain, Portugal, Luxembourg, Switzerland, Sweden, Norway, Hong Kong, and Singapore.

"Standard & Poor's Group B Countries":  The "Standard & Poor's Group B Countries," as determined from time to time by Standard & Poor's, which as of the date hereof are France, Italy, Greece, Japan, South Korea, and Taiwan.

"Standard & Poor's Group Countries":  Collectively, the Standard & Poor's Group A1 Countries, the Standard & Poor's Group A2 Countries and the Standard & Poor's Group B Countries.

"Standard & Poor's Industry Classification Group":  Any of the industry categories established by Standard & Poor's and set forth in Schedule C hereto, including any such modifications that may be made thereto or such additional categories that may be subsequently established by Standard & Poor's and provided by the Issuer or Standard & Poor's to the Trustee.

"Standard & Poor's Rating":  With respect to any Underlying Asset, the rating of Standard & Poor's determined as follows:

(i)    if there is a public Standard & Poor's long-term issuer credit rating of the issuer or of a guarantor of such Underlying Asset that unconditionally and irrevocably guarantees in writing the timely payment of principal and interest on such Underlying Asset (which form of guarantee shall comply with Standard & Poor's then current criteria for guarantees), then the Standard & Poor's Rating shall be such long-term issuer credit rating of the issuer or guarantor, as applicable;

(ii)    if there is no issuer credit rating of the issuer of such Underlying Asset or any guarantor who unconditionally and irrevocably guarantees such Underlying Asset and if no other security or obligation of the issuer is rated by Standard & Poor's or Moody's, then the Issuer or the Administrative Agent on behalf of the Issuer, shall notify Standard & Poor's that it intends to apply for a corporate credit estimate prior to or immediately upon the acquisition of such Underlying Asset which notification shall be sent to Credit_estimates@sandp.com   The Administrative Agent shall provide Standard & Poor's with all information available to the Administrative Agent with respect thereto that Standard & Poor's may reasonably request within 30 days of the acquisition of such Underlying Asset (including, all relevant information as specified in Standard & Poor's "Credit Estimate Information Requirements" dated June 2007), which shall be its Standard & Poor's Rating; provided, that, pending receipt from Standard & Poor's of such corporate credit estimate, the Standard & Poor's Rating of such Underlying Asset shall be the corporate credit estimate that in the Administrative Agent's commercially reasonable judgment believes will be provided by Standard & Poor's (the "Issuer Rating"), which Issuer Rating shall be valid until Standard & Poor's assigns a rating, if the Administrative Agent has provided all required information set forth above within 30 days of the acquisition of such Underlying Asset, otherwise such Issuer Rating shall be valid for no more than 90 days following the purchase thereof after which the Standard & Poor's Rating shall be "CCC-" until Standard & Poor's has provided a corporate credit estimate; provided, further, that the Administrative Agent may request that such Underlying Asset continue to be carried at the Issuer Rating beyond such 90-day period, however, Standard & Poor's is not obligated to grant such request; provided, further still, that so long as the Issuer owns such Underlying Asset, the Issuer must re-apply for such corporate credit estimate upon each anniversary of the date such corporate credit estimate was assigned in the manner and within the timeframe provided above;

(iii)    [Reserved];

(iv)    if there is no issuer credit rating of the issuer or any guarantor who unconditionally and irrevocably guarantees such Underlying Asset but such Underlying Asset is rated by Standard & Poor's, then the Standard & Poor's Rating of such Underlying Asset shall be determined as follows:  (a) if such Underlying Asset is a senior secured obligation of the issuer, then the Standard & Poor's Rating of such Underlying Asset shall be one subcategory below such rating; (b) if such Underlying Asset is a senior unsecured obligation of the issuer, then the Standard & Poor's Rating of such Underlying Asset shall equal such rating; and (c) if such Underlying Asset is a subordinated obligation of the issuer, then the Standard & Poor's Rating of such Underlying Asset shall be one subcategory above such rating;

(v)    if there is no issuer credit rating of the issuer of such Underlying Asset or any guarantor who unconditionally and irrevocably guarantees such Underlying Asset and such Underlying Asset is not rated by Standard & Poor's, but any other security or obligation of the issuer is rated by Standard & Poor's and the neither the Issuer nor the Administrative Agent

obtains a Standard & Poor's Rating for such Underlying Asset pursuant to <u>clause (ii)</u> above, then the Standard & Poor's Rating of such Underlying Asset shall be determined as follows: (a) if there is a rating on a senior secured obligation of the issuer, then the Standard & Poor's Rating of such Underlying Asset shall be one subcategory below such rating; (b) if clause (a) does not apply but there is a rating on a senior unsecured obligation of the issuer, then the Standard & Poor's Rating of such Underlying Asset shall equal such rating; and (c) if clauses (a) and (b) do not apply but there is a rating on a subordinated obligation of the issuer, then the Standard & Poor's Rating of such Underlying Asset shall be one subcategory above such rating;

(vi)    if there is no issuer credit rating of the issuer of such Underlying Asset or any guarantor who unconditionally and irrevocably guarantees such Underlying Asset and such Underlying Asset is not rated by Standard & Poor's, and no other security or obligation of the issuer is rated by Standard & Poor's and the Issuer does not obtain a Standard & Poor's Rating for such Underlying Asset pursuant to <u>clause (ii)</u> above, then if (1) neither the issuer nor any of its Affiliates is subject to reorganization or bankruptcy proceedings and (2) no debt security or obligation of the issuer has been in default during the past two years and all debt securities or obligations of the issuer are current and, in the commercially reasonable judgment of the Administrative Agent, will remain current with respect to their contractual payments, the Standard & Poor's Rating of such Underlying Asset shall be "CCC-" unless the Issuer or the Administrative Agent on behalf of the Issuer determines the Standard & Poor's Rating for such Underlying Asset in the manner described in <u>clause (viii)</u> below;

(vii)    if there is no issuer credit rating of the issuer of such Underlying Asset or any guarantor who unconditionally and irrevocably guarantees such Underlying Asset and such Underlying Asset is not rated by Standard & Poor's, and no other security or obligation of the issuer is rated by Standard & Poor's and neither the Issuer nor the Administrative Agent obtains a Standard & Poor's Rating for such Underlying Asset pursuant to <u>clause (ii)</u> above, then if a debt security or obligation of the issuer has been in default during the past two years, the Standard & Poor's Rating of such Underlying Asset shall be "D" unless the Issuer or the Administrative Agent on behalf of the Issuer determines the Standard & Poor's Rating for such Underlying Asset in the manner described in <u>clause (viii)</u> below;

(viii)    if there is no issuer credit rating published by Standard & Poor's for such issuer or any guarantor who unconditionally and irrevocably guarantees such Underlying Asset and such Underlying Asset is not rated by Standard & Poor's, and no other security or obligation of the issuer is rated by Standard & Poor's and neither the Issuer nor the Administrative Agent obtains a Standard & Poor's Rating for such Underlying Asset pursuant to <u>clause (ii)</u> above, then the Standard & Poor's Rating of such Underlying Asset may be determined using any of the methods provided below:

(a)    if such Underlying Asset is publicly rated by Moody's, then the Standard & Poor's Rating of such Underlying Asset shall be (A) one subcategory below the Standard & Poor's equivalent of the public rating assigned by Moody's if such Underlying Asset is rated "Baa3" or higher by Moody's and (B) two subcategories below the Standard & Poor's equivalent of the public rating assigned by Moody's if such Underlying Asset is rated "Ba1" or lower by Moody's; <u>provided</u>, that the Aggregate Principal Amount of Underlying Assets (including unfunded commitments) that may be deemed to have a Standard & Poor's Rating based on a rating assigned by Moody's as provided in this <u>subclause (a)</u> may not exceed 10.0% of the Maximum Investment Amount; or

(b)      if such Underlying Asset is not rated by Moody's but a security with the same ranking (a "<u>parallel security</u>") is rated by Moody's then the Standard & Poor's Rating of such parallel security shall be determined in accordance with the methodology set forth in <u>subclause (a)</u> above; and

(ix)      with respect to any Underlying Asset that is a DIP Loan, the Standard & Poor's Rating of such Underlying Asset shall be (a) the rating assigned thereto by Standard & Poor's either publicly or privately available to the Issuer or (b) if such DIP Loan does not have a rating assigned thereto by Standard & Poor's, then the Issuer or the Administrative Agent on behalf of the Issuer shall apply to Standard & Poor's for a corporate credit estimate; <u>provided</u>, that pending receipt from Standard & Poor's of such estimate, the Standard & Poor's Rating of such Underlying Asset shall be the credit estimate that the Administrative Agent reasonably believes will be provided by Standard & Poor's, for no more than 90 days following the purchase thereof after which the Standard & Poor's Rating shall be "CCC-".

Notwithstanding the foregoing, (x) if the Standard & Poor's rating or ratings used to determine the Standard & Poor's Rating above are on watch for downgrade or upgrade by Standard & Poor's, the Standard & Poor's Rating shall be determined by adjusting such Standard & Poor's rating or ratings down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade) and (y) if any issuer credit rating of an Underlying Asset by Standard & Poor's is private or confidential, the appropriate consents must have been received from the respective obligor and provided to Standard & Poor's prior to using such rating to determine the Standard & Poor's Rating.

"<u>Standard & Poor's Recovery Rate</u>":   As of any date of determination, in making calculations with respect to any Class of Notes, the recovery rate with respect to any Underlying Asset shall be the percentage for such Underlying Asset set forth in (x) the applicable table set forth in <u>Schedule E</u> attached hereto, (y) the row in such table opposite the Standard & Poor's CRR of such Underlying Asset and (z) the column in such table below the original Standard & Poor's Rating of the respective Class of Notes; <u>provided</u>, <u>however</u>, that (i) with respect to a DIP Loan, the Standard & Poor's Recovery Rate shall be the recovery rate assigned by Standard & Poor's and (ii) the Issuer or the Administrative Agent may request the assignment of a recovery rate from Standard & Poor's with respect to any Underlying Asset, any such assignment by Standard & Poor's to be in writing (electronic or otherwise).

"<u>Stated Maturity</u>":   Unless earlier redeemed in accordance with the Priority of Payments or as a result of an Optional Redemption or a Tax Redemption, the Senior Notes and the Mezzanine Notes are scheduled to be redeemed on the Payment Date occurring in October 2017.

"<u>Structured Finance Security</u>":   Any trust certificate, collateralized debt obligation or other structured finance security (other than a mortgage backed security, an asset backed security that is backed by mortgage backed securities, a market value collateralized bond or debt obligation, an enhanced equipment trust certificate or a non-credit risk obligation) (i) for which the underlying assets consist primarily of loans or corporate bonds, (ii) the payments on which are not subject to withholding tax if owned by the Issuer (or, if subject to withholding tax, the Issuer is entitled to a "gross-up" payment that covers the full amount of such withholding tax), (iii) unless Rating Agency Confirmation is received, that does not pay unrated or contingent interest or principal, (iv) that is rated by each Rating Agency or has a rating factor and (v) with respect to which a recovery rate assigned by each Rating Agency exists and (vi) the pool of assets underlying which is not managed by the Issuer or any of its affiliates.

"<u>Subordinated Note Initial Purchaser</u>":  Lehman Brothers Inc.

"Subordinated Note Purchase Agreement":  The Subordinated Note Purchase Agreement dated April 28, 2008, between the Co-Issuers and the Subordinated Note Initial Purchaser.

"Subordinated Note Redemption Date":  The date on which the Subordinated Notes mature or are redeemed (whether such redemption occurs on a Redemption Date, the Stated Maturity or any other date).

"Subordinated Note Redemption Price":  When used with respect to any Subordinated Note to be redeemed pursuant to ARTICLE IX, the price equal to each Subordinated Note's *pro rata* allocation of any amounts available to be distributed to the Subordinated Notes on the Subordinated Note Redemption Date in accordance with the Priority of Payments on the Subordinated Note Redemption Date (or any preceding Payment Date if not previously distributed to the Subordinated Noteholders).

"Subordinated Noteholder":  With respect to any Subordinated Note, the Person in whose name such Subordinated Note is registered in the Securities Register.

"Subordinated Notes":  The Subordinated Notes having the Stated Maturity as set forth in Section 2.3, including any additional Subordinated Notes issued pursuant to Section 2.11.

"Subordination Note Distribution Cap":  With respect to each Interest Period and the related Payment Date, the product of: (a) the Aggregate Outstanding Amount of the Subordinated Notes (determined as of the first day of such Interest Period), (b) 5%; and (c)(x) the number of the days elapsed during such Interest Period (computed on the basis of a 360-day year and twelve 30-day months including any adjustment to the number of days in an Interest Period as a result of the related Payment Date and/or the preceding Payment Date being moved from a day that is not a Business Day to the immediately succeeding Business Day) divided by (y) 360.

"Supermajority":  With respect to all of the Securities or any Class of Securities, the Holders of at least 66 ⅔% of the Aggregate Outstanding Amount of all of the Securities or of such Class of Securities, as the case may be.

"Tax Advantaged Jurisdiction":  Each of the Cayman Islands, Bermuda, Netherlands Antilles, the Channel Islands and the Bahamas. The Issuer may designate any other country as a Tax Advantaged Jurisdiction so long as a Rating Agency Confirmation is obtained with respect thereto.

"Tax Event":  An event that will occur upon a change in or the adoption of any U.S. or non-U.S. tax statute or treaty, or any change in or the issuance of any regulation (whether final, temporary or proposed), ruling, procedure or any formal interpretation of any of the foregoing by a related governmental entity, which change, adoption or issuance results or will result in (i) any portion of any payment due from any obligor under any Underlying Asset becoming properly subject to the imposition of U.S. or foreign withholding tax, which withholding tax is not compensated for by a "gross-up" provision under the terms of such Underlying Asset (other than commitment and similar fees associated with Revolving Loans and Delayed-Draw Loans and fees in respect of prefunded letters of credit) or (ii) any jurisdiction's properly imposing net income, profits or similar tax on the Issuer; provided, that (A) the total amount of the tax or taxes imposed on the Issuer as described in clause (ii) of this definition, (B) the total amount withheld from payments to the Issuer which is not compensated for by a "gross-up" provision as described in clauses (i) and (ii) of this definition and (C) the total amount of any tax "gross-up" payments that are required to be made by the Issuer as described in clause (iii) of this definition are determined to be in excess of 5% of the aggregate interest due and payable on the Underlying Assets during the Due Period.

"<u>Tax Redemption</u>":  The meaning specified in Section 9.2.

"<u>Total Redemption Amount</u>":  The meaning specified in Section 9.5(b)(i).

"<u>Transfer Agent</u>":  The Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Securities, and initially, U.S. Bank National Association.

"<u>Treasury Regulations</u>":  The rules and regulations promulgated by the U.S. Department of Treasury under the Code as now or hereafter in effect, and any successor provision thereto.

"<u>Trust Officer</u>":  When used with respect to the Trustee, any officer within the CDO Trust Services group of the Corporate Trust Office (or any successor group of the Trustee) including any vice president, assistant vice president or officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred at the CDO Services Group of the Corporate Trust Office because of his knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Indenture.

"<u>Trustee</u>":  U.S. Bank National Association, a national banking association, in its capacity as trustee, unless a successor Person shall have become the Trustee pursuant to the applicable provisions of this Indenture, and thereafter "Trustee" shall mean such successor Person.

"<u>Trustee Fee</u>":  The fee payable to the Trustee on each Payment Date in accordance with Sections 6.7(a)(i) and 11.1, in an amount specified in a fee letter between the Lehman Brothers Inc. and the Trustee.

"<u>UCC</u>":  The Uniform Commercial Code as in effect in the State of New York or as otherwise specified herein, as amended from time to time.

"<u>Uncertificated Security</u>":  The meaning specified in Section 8-102(a)(18) of the UCC.

"<u>Underlying Asset</u>":  Any asset that, as of the date of its acquisition by the Issuer (or, if applicable, the date that a binding commitment with respect to the acquisition of such asset is entered into):

    (a)    is

        (i)    a Loan;

        (ii)    a Senior Secured Floating Rate Note; or

        (iii)    a High-Yield Bond;

    (b)    is Dollar-denominated and is not convertible into, or payable in, any other currency;

    (c)    is (i) an asset with a Moody's Rating (and such Moody's Rating is not a rating only with respect to principal, without Rating Agency Confirmation from Moody's) and a Standard & Poor's Rating (and such Standard & Poor's Rating does not include the subscript "p," "q," "f," "pi," "r" or "t") or (ii) is guaranteed as to the timely payment of principal and interest by the government of the U.S.

or any agency or instrumentality thereof (<u>provided</u>, that the long-term debt of such agency or instrumentality is rated "Aaa" by Moody's and "AAA" by Standard & Poor's);

(d)      is not a Defaulted Obligation or a Deferred Interest Asset;

(e)      is eligible under the instrument or agreement pursuant to which it was issued or created to be purchased by the Issuer and does not by its terms prohibit a pledge to the Trustee;

(f)      is not issued by a sovereign, or by a corporate issuer located in a country, that on the date on  which it is acquired by the Issuer imposes foreign exchange controls that effectively limit the availability or use of Dollars to make when due the scheduled payments of principal thereof and interest thereon;

(g)      [Reserved];

(h)      is not the subject of an Offer of exchange, or tender by its issuer, for Cash, securities or any other type of consideration other than an exchange offer in which a security that is not registered under the Securities Act is exchanged for a security that has substantially identical terms (except for transfer restrictions) but is registered under the Securities Act or a security that would otherwise qualify for purchase under the Portfolio Criteria described herein;

(i)      is not an asset with an interest rate which steps down solely as a function of time;

(j)      did not make interest payments solely in kind on its payment date immediately preceding the date of purchase and with respect to which there is no deferred interest outstanding;

(k)      is either (i) Registered or (ii) not a Registration Required Obligation;

(l)      is any of (1) an asset issued by an entity classified as a corporation for U.S. federal income tax purposes, (2) an asset which is not treated for U.S. federal income tax purposes as equity in an entity classified as either a partnership or a trust (unless all the assets of such trust are Underlying Assets) or (3) an asset with respect to which the Issuer has received an opinion from Allen & Overy LLP (or other nationally recognized law firm with substantial expertise in such matters) to the effect that the ownership of such asset will not subject the Issuer to net income tax or cause the Issuer to be treated as engaged in a trade or business within the U.S. for U.S. federal income tax purposes;

(m)      is an asset the payments on which are not subject to withholding tax (other than withholding taxes, if any, with respect to commitment and similar fees associated with Underlying Assets constituting Revolving Credit Facilities or Delayed-Draw Loans) if such asset is owned by the Issuer unless "gross-up" payments are required to be made to the Issuer that cover the full amount of any such withholding taxes;

(n)      is an asset that does not require any commitment from the Issuer to provide further funds to the obligor thereon under the agreement or other instrument

pursuant to which such Underlying Asset was created, other than a Revolving Credit Facility or a Delayed-Draw Loan or fees, expenses or other reimbursement or indemnification obligations;

(o)     is not a lease;

(p)     is an obligation or security of an entity organized in the U.S., Canada, the United Kingdom, Mexico, a Moody's Group Country or any Tax Advantaged Jurisdiction (or, in each case, any state, territory, possession or political subdivision thereof); provided that for any obligation or security of any entity organized in the United Kingdom, Canada or any Tax Advantaged Jurisdiction to constitute an "Underlying Asset," such country must have a long-term foreign currency rating of at least "Aa2" by Moody's as of the applicable date of determination;

(q)     provides for payment of a fixed principal amount, together with interest thereon, in Cash no later than its Stated Maturity;

(r)     is not an Equity Security or convertible into an Equity Security at the option of the issuer thereof or any other person other than the Issuer; and

(s)     is not Margin Stock (within the meaning of Regulation U issued by the Federal Reserve Board).

For the avoidance of doubt Underlying Assets may include Current Pay Obligations. In addition, an obligation which is exchanged for, or results from an amendment, modification or waiver of the terms of, an Underlying Asset pursuant to an Offer shall be deemed to be an Underlying Asset delivered for purposes hereof as of the date of such exchange, amendment, modification or waiver.

"Underlying Instruments":   The indenture, credit agreement, assignment agreement, participation agreement, pooling and servicing agreement, trust agreement, instrument or other agreement pursuant to which an Underlying Asset has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Underlying Asset, or of which the holders of such Underlying Asset are the beneficiaries, and any Instrument evidencing or constituting such Underlying Asset (in the case of any Underlying Asset evidenced by or in the form of an Instrument).

"Unscheduled Principal Payments":   All Principal Payments received as a result of prepayments, redemptions, exchange offers, tender offers or other unscheduled payments with respect to an Underlying Asset; provided, that the term "Unscheduled Principal Payments" shall also include any amounts transferred from the Variable Funding Account to the Principal Collection Account for treatment as Unscheduled Principal Payments upon the termination or reduction of the Issuer's funding commitment with respect to a Delayed-Draw Loan or a Revolving Credit Facility.

"U.S.":  The United States of America.

"U.S. Person":  The meaning specified under Regulation S.

"U.S. Resident":  A "U.S. resident" within the meaning of the Investment Company Act.

"Variable Funding Account":  The account designated the "Variable Funding Account" and established in the name of the Issuer in favor of the Trustee for the benefit of the Secured Parties pursuant to Section 10.3(d).

"Weighted Average Coupon":  As of any Measurement Date, will equal a fraction (expressed as a percentage) obtained by (i) *multiplying* the Principal Balance of each one of the Fixed Rate Underlying Assets (other than Defaulted Obligations and Deferred Interest Assets) held by the Issuer as of such Measurement Date by the current per annum rate at which it bears interest, (ii) *summing* the amounts determined pursuant to clause (i) and (iii) *dividing* the sum determined pursuant to clause (ii) by the Aggregate Principal Amount of all Fixed Rate Underlying Assets (other than Defaulted Obligations and Deferred Interest Assets) held by the Issuer as of such Measurement Date.

"Weighted Average Rating":  The number obtained by (a) multiplying the Principal Balance of each Underlying Asset (excluding Defaulted Obligations and Current Pay Obligations) by its Moody's Rating Factor on any Measurement Date; (b) summing the products obtained in clause (a) for all Underlying Assets; (c) dividing the sum obtained in clause (b) by the Aggregate Principal Amount on such Measurement Date of all Underlying Assets (excluding Defaulted Obligations and Current Pay Obligations); and (d) rounding the result to the nearest whole number.

"Weighted Average Recovery Rate": As applicable, the Weighted Average Recovery Rate (Moody's) or the Weighted Average Recovery Rate (Standard & Poor's).

"Weighted Average Recovery Rate (Moody's)": As of any Measurement Date, the number obtained by (i) adding the products obtained by multiplying the Principal Balance of each Underlying Asset by the applicable recovery rate for Moody's for the indicated priority category, (ii) dividing such sum by the Aggregate Principal Amount of all such Underlying Assets and (iii) rounding up to the first decimal place.

"Weighted Average Recovery Rate (Standard & Poor's)": As of any Measurement Date, the number obtained by (i) adding the products obtained by multiplying the Principal Balance of each Underlying Asset by the applicable recovery rate for Standard & Poor's for the indicated priority category, (ii) dividing such sum by the Aggregate Principal Amount of all such Underlying Assets and (iii) rounding up to the first decimal place.

"Weighted Average Spread":  As of any Measurement Date will be the fraction (expressed as a percentage) obtained by (i) multiplying the Principal Balance of each one of the Floating Rate Underlying Assets (other than Defaulted Obligations and Deferred Interest Assets) that is held by the Issuer as of such Measurement Date, by its Effective Spread, (ii) summing (a) the amounts determined pursuant to clause (i) and (b) the Aggregate Excess Spread and (iii) dividing the sum determined pursuant to clause (ii) by the Aggregate Principal Amount of all Underlying Assets held by the Issuer as of such Measurement Date.

"Zero Coupon Bond":  An Underlying Asset that, based on its terms at the time of determination, does not make periodic payments of interest.

Section 1.2     Assumptions as to Underlying Assets.     (a) In connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Underlying Assets or any payments on any other assets included in the Collateral, and with respect to the income that can be earned on Scheduled Distributions on such assets and on any other amounts that may be received for deposit in the Collection Account, the provisions set forth in this Section 1.2 shall be applied.

(b)　　All calculations with respect to Scheduled Distributions on the Pledged Underlying Assets shall be made on the basis of information as to the terms of each such Pledged Underlying Asset, and upon report of payments, if any, received thereon, that are furnished by or on behalf of the issuer of or borrower with respect to such Pledged Underlying Asset and, to the extent they are not manifestly in error, such information or report may be conclusively relied upon in making such calculations.

For each Due Period, the Scheduled Distribution on any Pledged Underlying Asset shall be the minimum amount, including coupon payments, accrued interest, scheduled Principal Payments, if any, by way of sinking fund payments which are assumed to be on a *pro rata* basis or other scheduled amortization of principal, return of principal, and redemption premium, if any, assuming that any index applicable to any payments on a Pledged Underlying Asset, that is subject to change is not changed, that, if paid as scheduled, will be available in the Collection Account at the end of the Due Period, net of withholding or similar taxes to be withheld from such payments (but taking into account gross-up payments in respect of such taxes). Notwithstanding the foregoing, for each Due Period, the Scheduled Distribution shall be zero on (i) any Underlying Asset that is a Defaulted Obligation (other than (1) Current Pay Obligations and (2) Defaulted Obligations that qualify as Current Pay Obligations but are in excess of the maximum permitted in the definition of "Current Pay Obligations"; provided that amounts scheduled to be received in respect of Defaulted Obligations described in this clause (2) shall only be included to the extent that the aggregate amount of principal, interest, fees and other amounts previously received by the Issuer with respect to such Defaulted Obligations exceeds 100% of the par amount of such Defaulted Obligations) and (ii) any Deferred Interest Asset.

(c)　　Subject to the preceding sentence, each Scheduled Distribution receivable with respect to a Pledged Underlying Asset shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Interest Collection Account or the Principal Collection Account, as applicable, and, except as otherwise specified, to earn interest at the Assumed Reinvestment Rate. All such funds shall be assumed to continue to earn interest at the Assumed Reinvestment Rate until the date on which they are required to be available in the Collection Account for application, in accordance with the terms hereof, to payments of principal of or interest on the Securities or other amounts payable pursuant to this Indenture.

(d)　　Unless otherwise specified, test calculations that evaluate to a percentage will be rounded to the nearest one-hundredth, and test calculations that evaluate to a number or decimal will be rounded to the nearest one hundredth.

(e)　　Unless otherwise specified, all calculations required to be made and all reports which are to be prepared pursuant to this Indenture with respect to the Underlying Assets shall be made on the basis of the date on which the Issuer makes a commitment to acquire or to sell an asset, as applicable (the "trade date") and not the settlement date.

Section 1.3　　Rules of Construction. All references in this instrument to designated "Articles," "Sections," "subsections" and other subdivisions are to the designated Articles, Sections, subsections and other subdivisions of this instrument as originally executed. The words "herein," "hereof," "hereunder," and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section, subsection or other subdivision. The term "including" shall mean "including without limitation."

ARTICLE II
THE SECURITIES

Section 2.1    Forms Generally.    The Securities, including the Certificates of Authentication, shall be in substantially the forms required by this ARTICLE II, with such appropriate insertions and variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may be consistent herewith, determined by the Authorized Officers of the Co-Issuers (or, in the case of the Subordinated Notes, the Issuer) as evidenced by their execution of such Securities.

Section 2.2    Forms of Securities and Certificate of Authentication.    (a) The forms of the Securities, including the Certificate of Authentication, shall be as set forth as Exhibits A-1, A-2, A-3, B-1, B-2, B-3, C-1 and C-2 hereto, as applicable.

(i)    Senior Notes and Mezzanine Notes offered and sold to Persons that are both (x) QIBs in reliance on Rule 144A and (y) Qualified Purchasers shall be issued initially in the form of Rule 144A Global Securities, which shall be deposited with the Trustee, as custodian for and registered in the name of the Depositary or a nominee of the Depositary, duly executed by the Co-Issuers and authenticated by the Trustee as hereinafter provided.  The aggregate principal amount of the Rule 144A Global Securities of a Class may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depositary or its nominee, as the case may be, as hereinafter provided.

(ii)    Senior Notes, Mezzanine Notes and Subordinated Notes offered and sold to Persons that are both non-U.S. Persons and non-U.S. Residents in offshore transactions in reliance on Regulation S shall be issued in the form of Regulation S Global Securities, which shall be deposited with the Trustee, as custodian for and registered in the name of the Depositary or a nominee of such Depositary for the respective accounts of Euroclear and Clearstream, duly executed by the Co-Issuers and authenticated by the Trustee as provided herein.  The aggregate principal amount of the Regulation S Global Securities of a Class may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depositary or its nominee, as the case may be, as hereinafter provided.

(iii)    Senior Notes and Mezzanine Notes offered to Qualified Purchasers that are Accredited Investors in reliance on Section 4(2) under the Securities Act (that are not QIBs acquiring Senior Notes or Mezzanine Notes, as applicable, in accordance with Rule 144A) and Subordinated Notes offered to Qualified Purchasers that are either (x) Accredited Investors in reliance on Section 4(2) under the Securities Act or (y) QIBs in reliance on Rule 144A, in each case, shall be issued and held in the form of one or more certificated securities in definitive, fully registered form without interest coupons executed by the Issuer and authenticated by the Trustee and issued, in the form of and with the applicable legends set forth in, with respect to the Senior Notes, Exhibit A-3, hereto (the "Certificated Senior Notes"), with respect to the Mezzanine Notes, Exhibit B-3, hereto (the "Certificated Mezzanine Notes") or, with respect to the Subordinated Notes, Exhibit C-1, hereto (the "Certificated U.S. Subordinated Notes" and, together with the Certificated Senior Notes and Certificated Mezzanine Notes, the "Certificated Notes").

(iv)    Subordinated Notes offered to Persons that are neither U.S. Persons or U.S. Residents taking delivery of the Subordinated Notes in offshore transactions in reliance on Regulation S shall be issued in definitive, fully registered form without interest coupons, executed by the Issuer and authenticated by the Trustee and issued, in the form of, and with the

applicable legends set forth in, <u>Exhibit C-2</u> attached hereto (the "<u>Regulation S Global Subordinated Notes</u>").

(b)     This Section 2.2(b) shall apply only to Global Securities deposited with or on behalf of the Depositary.

The Co-Issuers (or, in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer) shall execute and the Trustee shall, in accordance with this Section 2.2(b), authenticate and deliver initially one or more Global Securities evidencing the Senior Notes, the Mezzanine Notes or the Regulation S Global Subordinated Notes that shall be (i) registered in the name of the Depositary for such Global Security or Global Securities or the nominee of such Depositary and (ii) delivered by the Trustee to such Depositary or pursuant to such Depositary's instructions or held by the Trustee, as custodian for the Depositary.

Agent Members shall have no rights under this Indenture with respect to any interest in a Global Security held on their behalf by the Depositary or under the Global Security, and the Depositary may be treated by the Co-Issuers, the Trustee and any agent of the Co-Issuers or the Trustee as the absolute owner of such Global Security for all purposes whatsoever (except to the extent otherwise provided herein).  Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee or any agent of the Co-Issuers or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Security.

(c)     Except as provided in Section 2.10 hereof, owners of beneficial interests in Global Securities will not be entitled to receive physical delivery of certificated notes.

Section 2.3     <u>Authorized   Amount;   Note   Interest   Rate;   Stated   Maturity; Denominations</u>.  (a) Subject to the provisions set forth below and in Section 2.11, the aggregate principal amount of Securities that may be authenticated and delivered under this Indenture is limited to $1,874,420,000, except for (i) Securities authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Securities, as applicable, pursuant to Section 2.5, 2.6 or 8.4 of this Indenture, (ii) Securities issued pursuant to supplemental indentures in accordance with Article VIII, (iii) Mezzanine Deferred Interest and (iv) additional issuances of Securities pursuant to Section 2.11.

(b)     The Securities shall be divided into two classes having designations, original principal amounts, Note Interest Rates and Stated Maturities as follows:

| Designation | Original Principal Amount | Note Interest Rate[1] | Stated Maturity[2] |
|---|---|---|---|
| Senior Notes | $1,462,050,000 | LIBOR + 1.90% | October 15, 2017 |
| Mezzanine Notes | $243,670,000 | LIBOR + 3.50% | October 15, 2017 |
| Subordinated Notes | $168,700,000 | N/A | October 15, 2017 |

_____

(1)  LIBOR refers to LIBOR for the applicable Interest Period calculated in the manner described in <u>Schedule B</u>.

(2)  If such date is not a Business Day, the Stated Maturity of the Notes shall be the immediately following Business Day.

(c)    Beneficial interests in (i) the Senior Notes shall be issuable in minimum denominations of $250,000 and integral multiples of $1,000 in excess thereof, (ii) the Mezzanine Notes shall be issuable in minimum denominations of $250,000 and integral multiples of $1,000 in excess thereof and (iii) the Subordinated Notes shall be issuable in minimum denominations of $250,000 and integral multiples of $1,000 thereof; provided, that (x) any Security or beneficial interest therein may fail to be in such required minimum denomination or integral multiple of $1,000 after issuance due to the repayment of the principal amount thereof pursuant to Section 11.1 and (y) any Mezzanine Note may fail to be in an integral multiple of $1,000 on any Payment Date due to the addition to the principal amount thereof of Mezzanine Deferred Interest.  Transfers of Securities or beneficial interests therein shall be made only in denominations that meet the minimum denomination requirements set forth above, and any remaining principal amount of the transferor's interest in the Securities shall either equal zero or meet such required minimum denominations.

Section 2.4    Execution, Authentication, Delivery and Dating.  The Securities shall be executed on behalf of the Issuer and the Co-Issuer (or, in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer) by one of its respective Authorized Officers.  The signature of such Authorized Officer on the Securities may be manual or facsimile (including in counterparts).

(a)    Securities bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer or the Co-Issuer, as applicable, shall bind the Issuer or the Co-Issuer, as applicable, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Securities or did not hold such offices at the date of issuance of such Securities.

(b)    At any time and from time to time after the execution and delivery of this Indenture, the Co-Issuers may deliver Senior Notes executed by the Co-Issuers, and the Issuer may deliver Mezzanine Notes and Subordinated Notes executed by the Issuer, to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Securities as provided in this Indenture and not otherwise.

(c)    Each Security authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date.  All other Securities that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

(d)    Securities issued upon transfer, exchange or replacement of other Securities shall be issued in authorized denominations reflecting the original Aggregate Outstanding Amount of the Securities so transferred, exchanged or replaced, but shall represent only the current Aggregate Outstanding Amount of the Securities so transferred, exchanged or replaced.  In the event that any Security is divided into more than one Security in accordance with this ARTICLE II, the original principal amount of such Security shall be proportionately divided among the Securities delivered in exchange therefor and shall be deemed to be the original Aggregate Outstanding Amount of such subsequently issued Securities.

(e)    No Security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Security a Certificate of Authentication, substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, and such certificate upon any Security shall be conclusive evidence, and the only evidence, that such Security has been duly authenticated and delivered hereunder.

Section 2.5 <u>Registration, Registration of Transfer and Exchange</u>. (a) The Issuer shall cause to be kept the Securities Register in which, subject to such reasonable regulations as it may prescribe, the Issuer shall provide for the registration of Securities and the registration of transfers of Securities. The Trustee is hereby initially appointed as agent of the Issuer to act as "<u>Securities Registrar</u>" for the purpose of registering and recording in the Securities Register the Securities and transfers of such Securities as herein provided. Upon any resignation or removal of the Securities Registrar, the Issuer shall promptly appoint a successor.

(i) If a Person other than the Trustee is appointed by the Issuer as Securities Registrar, the Issuer will give the Trustee prompt written notice of the appointment of a Securities Registrar and of the location, and any change in the location, of the Securities Registrar, and the Trustee shall have the right to inspect the Securities Register at all reasonable times and to obtain copies thereof and the Trustee shall have the right to rely upon a certificate executed on behalf of the Securities Registrar by an Officer thereof as to the names and addresses of the Holders of the Securities and the principal amounts and numbers of such Securities.

(ii) Subject to this Section 2.5, upon surrender for registration of transfer of any Securities at the office or agency of the Co-Issuers (or with respect to the Subordinated Notes, the Issuer) to be maintained as provided in Section 7.4, the surrendered Securities shall be returned to the Issuer marked "canceled" or retained by the Trustee in accordance with its standard retention policy and the Co-Issuers or in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer shall execute, and the Trustee or the Authenticating Agent, as the case may be, shall authenticate and deliver in the name of the designated transferee or transferees, one or more new Securities of any authorized denomination and of a like Aggregate Outstanding Amount.

(iii) The Issuer or the Administrative Agent will notify the Trustee in writing of any Security beneficially owned by or pledged to the Issuer, the Co-Issuer or the Administrative Agent or any of their respective Affiliates promptly upon actual knowledge by the Issuer or in the case of the Administrative Agent, an officer of the acquisition thereof or the creation of such pledge.

(iv) At the option of the Holder thereof, Securities may be exchanged for Securities of like terms, in any authorized denominations and of like Aggregate Outstanding Amount, upon surrender of the Securities to be exchanged at such office or agency. Whenever any Security is surrendered for exchange, the Co-Issuers (or, in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer) shall execute and the Trustee or the Authenticating Agent, as the case may be, shall authenticate and deliver the Securities that the Holder making the exchange is entitled to receive.

(v) All Securities issued and authenticated upon any registration of transfer or exchange of Securities shall be the valid obligations of the Co-Issuers, (or, in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer) evidencing the same debt, and entitled to the same benefits under this Indenture, as the Securities surrendered upon such registration of transfer or exchange.

(vi) A Security and the rights to payments evidenced thereby may be assigned or otherwise transferred in whole or in part pursuant to the terms of this Section 2.5 only by the registration of such assignment and transfer of such Security on the Securities Register (and each Security shall so expressly provide). Any assignment or transfer of all or part of such Security shall be registered on the Securities Register only upon presentment or surrender for

registration of transfer or exchange of the Security, as the case may be, duly endorsed, or accompanied by a written instrument of transfer in form satisfactory to, and as may be required by, the Securities Registrar and the Co-Issuers, duly executed by the Holder thereof or his attorney duly authorized in writing.

(vii)    No service charge shall be made to a Holder for any exchange of Securities, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any exchange of Securities.

(viii)    The Co-Issuers (or, with respect to the Mezzanine Notes and the Subordinated Notes, the Issuer) shall not be required (i) to issue, register the transfer of or exchange any Securities during a period beginning at the opening of business 15 days before any selection of Securities to be redeemed and ending at the close of business on the day of the first publication in the Company Announcements Office of the relevant notice of redemption or, if there is no publication, the mailing of the relevant notice of redemption, or (ii) to register the transfer of or exchange any Security so selected for redemption.

(ix)    No Security may be sold or transferred (including by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act and is exempt under applicable state securities laws.

(b)    For so long as any of the Securities are Outstanding, the Issuer shall not permit the transfer of any Issuer Ordinary Shares and the Co-Issuer shall not transfer any shares of the Co-Issuer to U.S. Persons or U.S. Residents, and shall not permit the transfer of any such shares to any Person other than a Person which is a resident of the Cayman Islands if (i) such transfer is disadvantageous in any material respect to the Holders of the Securities, (ii) the Issuer fails to give written notice of such transfer to the Trustee, the Holders of the Securities and each of the Rating Agencies at least 10 Business Days prior to such transfer, or (iii) on or prior to the 15th Business Day following such notice the Trustee shall have received written notice from a Majority of the Controlling Class objecting to such transfer.

(c)    *Tax Transfer Restrictions*.

(i)    Each Holder or beneficial owner agrees that it will not (A) acquire, sell, transfer, assign, pledge or otherwise dispose of any of its Subordinated Notes (or any interest therein that is described in Treasury Regulations Section 1.7704-1(a)(2)(i)(B)) on or through (x) a United States national, regional or local securities exchange, (y) a foreign securities exchange or (z) an interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers (including, without limitation, the National Association of Securities Dealers Automated Quotation System) ((x), (y) and (z), collectively, an "Exchange") or (B) cause any of its Subordinated Notes or any interest therein to be marketed on or through an Exchange.

(ii)    Each Holder or beneficial owner agrees that it will not enter into any financial instrument payments on which, or the value of which, is determined in whole or in part by reference to the Subordinated Notes, or the Issuer (including the amount of Issuer distributions or interest on the Subordinated Notes, the value of the Issuer's assets, or the result of the Issuer's operations), or any contract that otherwise is described in Treasury Regulations Section 1.7704-1(a)(2)(i)(B), without the consent of the holders of a majority of the Subordinated Notes.

(iii)    If any Holder or beneficial owner is a partnership, grantor trust or S corporation, less than 50% of the value of any person's interest in such partnership, grantor trust

or S corporation is attributable to such Holder's or beneficial owner's interest in the Issuer, or the Securities Registrar otherwise determines that transfer to such partnership, grantor trust, or S Corporation will not cause the Issuer to be unable to rely on the "private placement" safe harbor of Treasury Regulation Section 1.7704‑1(h).

(iv)     Each Holder or beneficial owner agrees to be bound by the restrictions and conditions set forth in the Indenture and acknowledge and agree that it may not directly or indirectly assign, participate, pledge, hypothecate, rehypothecate, exchange or otherwise dispose of or transfer in any manner (each a "Transfer") its interest in the Subordinated Notes unless: (A) the transferee signs a transfer certificate and (B) such Transfer does not violate this Section 2.5 of the Indenture.  Any purported Transfer that does not satisfy the above mentioned conditions shall be null, void and of no effect.

(v)     Each Holder or beneficial owner agrees that the Securities Registrar shall monitor all transfers of Subordinated Notes so that the aggregate number of Subordinated Noteholders is limited to 90 or fewer Subordinated Noteholders. In monitoring such transfers, the Securities Registrar shall rely solely and exclusively (without any duty to make further inquiry, including without any duty to inquire whether a Subordinated Noteholder holds for the account of one or more other persons) on (i)  information provided to it by Lehman Brothers Inc. on the Closing Date with respect to the number of Subordinated Noteholders on the Closing Date and (ii) any transfer certificates received by the Securities Registrar subsequent to the Closing Date pursuant to the terms of the Indenture.

(vi)     Any transfer that would cause the Issuer to be unable to rely on the "private placement" safe harbor of Treasury Regulations Section 1.7704-1(h) will be void and of no force or effect unless the Issuer has received an opinion of Allen & Overy LLP or other nationally recognized U.S. tax counsel experienced in such matters that notwithstanding such transfer the Issuer will be treated as a partnership and not as an entity taxable as a corporation for U.S. federal income tax purposes.

(vii)     Each Holder or beneficial owner understands that the representations, warranties and covenants contained in this paragraph (c) are intended to permit the Issuer to rely, if necessary, on the "private placement" safe harbor from classification as a publicly traded partnership in U.S. Treasury Regulations Section 1.7704-1(h).

(d)     Upon final payment due on the Maturity of a Security, the Holder thereof shall present and surrender such Security at the office designated by the Trustee in Section 7.4 or at an office designated by the Issuer outside the U.S. if then required by applicable law) in the case of a definitive Security issued in exchange for a beneficial interest in a Regulation S Global Security pursuant to Section 2.10) on or prior to such Maturity; provided that if there is delivered to the Co-Issuers (or, in the case of a Mezzanine Note or a Subordinated Note, the Issuer) and the Trustee such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate, then, in the absence of notice to the Co-Issuers or the Trustee that the applicable Security has been acquired by a Protected Purchaser, such final payment shall be made without presentation or surrender.

(e)     Notwithstanding any provision to the contrary herein, so long as a Global Security remains Outstanding and is held by or on behalf of the Depositary, transfers of a Global Security or any interest therein, in whole or in part, shall only be made in accordance with Section 2.2(b), Section 2.3(c) and this Section 2.5(e), and so long as a Certificated Senior Note or a Certificated Mezzanine Note

remains Outstanding, transfers of a Certificated Senior Note or a Certificated Mezzanine Note, in whole or in part, shall only be made in accordance with Section 2.3(c) and this Section 2.5(e).

(i)     <u>Transfers of Global Securities Generally</u>.  Subject to <u>clauses (ii)</u>, <u>(iii)</u>, <u>(iv)</u>, <u>(v)</u>, <u>(vii)</u>, <u>(viii)</u>, <u>(ix)</u>, <u>(x)</u>, <u>(xi)</u>, <u>(xii)</u>, <u>(xiii)</u>, <u>(xiv)</u> and <u>(xv)</u> of this Section 2.5(e), transfers of a Global Security shall be limited to transfers of such Global Security in whole, but not in part, to nominees of the Depositary or to a successor of the Depositary or such successor's nominee.

(ii)     <u>Rule 144A Global Senior Note to Regulation S Global Senior Note</u>.  If a Holder of a beneficial interest in a Rule 144A Global Senior Note representing the Senior Notes and deposited with the Depositary wishes at any time to exchange its interest in such Rule 144A Global Senior Note for an interest in the corresponding Regulation S Global Senior Note, or to transfer its interest in such Rule 144A Global Senior Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Regulation S Global Senior Note, such Holder, provided such Holder or, in the case of a transfer to another Person, such Person is not a U.S. Person or a U.S. Resident, may, subject to the immediately succeeding sentence and the rules and procedures of the Depositary, exchange or transfer or cause the exchange or transfer of such interest for an equivalent beneficial interest in the Regulation S Global Senior Note. Upon receipt by the Trustee, as Securities Registrar, of (A) instructions given in accordance with the Depositary's procedures from an Agent Member directing the Trustee to cause to be credited a beneficial interest in the Regulation S Global Senior Note in an amount equal to the beneficial interest in the Rule 144A Global Senior Note to be exchanged or transferred, but not less than the minimum denomination applicable to Senior Notes held through Regulation S Global Senior Notes, (B) a written order given in accordance with the Depositary's procedures containing information regarding the participant account of the Depositary and, in the case of a transfer or exchange pursuant to and in accordance with Regulation S, the Euroclear and Clearstream account to be credited with such increase and (C) a certificate in the form of <u>Exhibit D-1</u> attached hereto given by the Holder of such beneficial interest (in the case of an exchange) or the transferee of such beneficial interest (in the case of a transfer) stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Securities, including in accordance with Regulation S, the Trustee, as Securities Registrar, shall approve the instructions at the Depositary to reduce the principal amount of the Rule 144A Global Senior Note and to increase the principal amount of the Regulation S Global Senior Note by the aggregate principal amount of the beneficial interest in the Rule 144A Global Senior Note to be exchanged or transferred, and to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Regulation S Global Senior Note equal to the reduction in the principal amount of the Rule 144A Global Senior Note.

(iii)     <u>Rule 144A Global Senior Note to Certificated Senior Notes</u>.  If a Holder of a beneficial interest in Rule 144A Global Senior Notes deposited with the Depositary wishes at any time to transfer all or a portion of its interest in such Rule 144A Global Senior Notes to any Person taking delivery in the form of Senior Notes represented by Certificated Senior Notes, or to exchange its beneficial interest in Rule 144A Global Senior Notes deposited with the Depositary for Senior Notes represented by Certificated Senior Notes, such Holder may, subject to the rules and procedures of the Depositary transfer or cause the transfer of such interest (or exchange such interest, as the case may be) for an equivalent Aggregate Outstanding Amount of Certificated Senior Notes as provided below.  Such transfer (or exchange) will (A) only be made in accordance with the applicable procedures of the Depository, (B) upon receipt by the Trustee, as Transfer Agent, of a transfer certificate in the form of <u>Exhibit G-1</u> hereto delivered by the proposed transferee of such Senior Notes (or such Holder, in the case of an exchange) and (C) only be made if either (x) the transferor or the transferee has certified that the transfer is being

made pursuant to Rule 144 or (y) the transferor or the transferee has provided an opinion of nationally recognized counsel to each of the Trustee and the Co-Issuers that such transfer may be made pursuant to an exemption from registration under the Securities Act. If such conditions are satisfied, the Trustee, as Transfer Agent, shall notify the Securities Registrar to record the transfer (or exchange, as the case may be) in the Securities Register in accordance with Section 2.5(a) and, upon execution by the Co-Issuers, deliver one or more Certificated Senior Notes in the amounts designated by the transferee (or such Holder, in the case of an exchange), the Aggregate Outstanding Amount of such Senior Notes being equal to Aggregate Outstanding Amount of Rule 144A Global Senior Notes being transferred or exchanged, and in the authorized minimum denominations and integral multiples specified in Section 2.3, and shall record the decrease in the Aggregate Outstanding Amount of Rule 144A Global Senior Notes issued in the name of the Depositary. The Securities Registrar shall not register any purported transfer or exchange in violation of the foregoing requirements and the Transfer Agent shall not deliver such Certificated Senior Notes.

(iv)    <u>Regulation S Global Senior Note to Rule 144A Global Senior Note</u>. If a Holder of a beneficial interest in a Regulation S Global Senior Note representing the Senior Notes and deposited with the Depositary wishes at any time to exchange its interest in such Regulation S Global Senior Note for an interest in a corresponding Rule 144A Global Senior Note or to transfer its interest in such Regulation S Global Senior Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Rule 144A Global Senior Note, such Holder may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear and Clearstream or the Depositary, as the case may be, cause the exchange or transfer of such interest for an equivalent beneficial interest in the Rule 144A Global Senior Note. To the extent that the Trustee, as Securities Registrar, has received (A) instructions from Euroclear and Clearstream or the Depositary, as the case may be, directing the Trustee, as Securities Registrar, to cause to be credited a beneficial interest in the Rule 144A Global Senior Note equal to the beneficial interest in the Regulation S Global Senior Note to be exchanged or transferred but not less than the minimum denomination applicable to Senior Notes held through Rule 144A Global Senior Notes, such instructions to contain information regarding the participant account with the Depositary to be credited with such increase, and (B) a certificate in the form of <u>Exhibit E-1</u> attached hereto given by the Holder of such beneficial interest (in the case of an exchange) or by the transferee of such beneficial interest stating that the Person acquiring such interest in the Rule 144A Global Senior Note, or the Holder in the case of an exchange, is a QIB/QP and is obtaining such beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the U.S. or any other relevant jurisdiction, then Euroclear or Clearstream or the Trustee, as Securities Registrar, as the case may be, shall approve the instructions at the Depositary to reduce the Rule 144A Global Senior Note by the aggregate principal amount of the beneficial interest in the Regulation S Global Senior Note to be transferred or exchanged, and the Trustee, as Securities Registrar, shall approve the instructions at the Depositary, concurrently with such reduction, to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Rule 144A Global Senior Note equal to the reduction in the principal amount of the Regulation S Global Senior Note.

(v)    <u>Transfers of an Interest in Regulation S Global Senior Notes to Persons Taking Delivery in the Form of Certificated Senior Notes</u>. If a Holder of a beneficial interest in Regulation S Global Senior Notes deposited with the Depositary wishes at any time to transfer all or a portion of its interest in such Regulation S Global Senior Notes to any Person taking delivery in the form of Senior Notes represented by Certificated Senior Notes, or to exchange its beneficial interest in Regulation S Global Senior Notes deposited with the Depositary for Senior Notes represented by Certificated Senior Notes, such Holder may, subject to the rules and procedures of

the Depositary and Euroclear or Clearstream, as the case may be, transfer or cause the transfer of such interest (or exchange such interest, as the case may be) for an equivalent Aggregate Outstanding Amount of Certificated Senior Notes as provided below.   Upon receipt by the Trustee, as Transfer Agent, of (A) a written order containing information regarding the Euroclear or Clearstream account to be decreased by the amount of the beneficial interest being transferred and (B) a transfer certificate in the form of <u>Exhibit G-1</u> hereto, including representations that the transferee is both an Accredited Investor and a Qualified Purchaser (provided, that in the case of any such transfer, either (x) the transferor or the transferee has certified that the transfer is being made pursuant to Rule 144 under the Securities Act or (y) the transferor or the transferee has provided an opinion of nationally recognized counsel to each of the Trustee and the Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act), delivered by the proposed transferee of such Senior Notes (or such Holder, in the case of an exchange), the Trustee, as Transfer Agent, shall notify the Securities Registrar to record the transfer (or exchange, as the case may be) in the Securities Register in accordance with Section 2.5(a) and, upon execution by the Issuer, deliver one or more Certificated Senior Notes in the amounts designated by the transferee (or such Holder, in the case of an exchange), the Aggregate Outstanding Amount of such Senior Notes being equal to Aggregate Outstanding Amount of Regulation S Global Senior Notes being transferred or exchanged, and in the authorized minimum denominations and integral multiples specified in Section 2.3, and shall record the decrease in the Aggregate Outstanding Amount of Regulation S Global Senior Notes issued in the name of the Depositary.   The Securities Registrar shall not register any purported transfer or exchange in violation of the foregoing requirements and the Transfer Agent shall not deliver such Certificated Senior Notes.

(vi)    <u>Transfers of Certificated Senior Notes to Persons Taking Delivery of Certificated Senior Notes</u>.  If a Holder of Certificated Senior Notes wishes at any time to transfer such Senior Notes to any Person taking delivery in the form of Certificated Senior Notes, such Holder may transfer or cause the transfer of such Senior Notes for an equivalent Aggregate Outstanding Amount of Certificated Senior Notes as provided in this Section 2.5(d)(vi).   Upon receipt by the Trustee, as Transfer Agent, of (A) such Holder's Senior Note certificate representing such Certificated Senior Notes properly endorsed for assignment to the transferee and (B) a transfer certificate in the form of <u>Exhibit G-1</u> attached hereto, including representations that the transferee is both an Accredited Investor and a Qualified Purchaser (provided, that in the case of any such transfer, either (x) the transferor or the transferee has certified that the transfer is being made pursuant to Rule 144 under the Securities Act or (y) the transferor or the transferee has provided an opinion of nationally recognized counsel to each of the Trustee and the Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act), delivered by the proposed transferee of the Certificated Senior Notes, the Trustee, as Transfer Agent, shall cancel such surrendered Senior Note certificate in accordance with Section 2.9, notify the Securities Registrar to record the transfer in the Securities Register in accordance with Section 2.5(a) and, upon execution by the Issuer, deliver one or more Senior Note certificates representing Certificated Senior Notes in the Aggregate Outstanding Amount of Certificated Senior Notes transferred by the transferor, and in the minimum denominations and integral multiples specified in Section 2.3.   The Securities Registrar shall not register any purported transfer in violation of the foregoing requirements and the Transfer Agent shall not deliver such Certificated Senior Notes.

(vii)    <u>Transfers of Certificated Senior Notes to Persons Taking Delivery in the Form of an Interest in Regulation S Global Senior Notes</u>. If a Holder of Certificated Senior Notes wishes at any time to transfer such Senior Notes to any Person taking delivery in the form of an interest in Regulation S Global Senior Notes, such Holder may, subject to the rules and

procedures of the Depositary and Euroclear or Clearstream, as the case may be, transfer or cause the transfer of such Certificated Senior Notes for an equivalent interest in Regulation S Global Senior Notes deposited with the Depositary as provided in this Section 2.5(d)(vii).  Upon receipt by the Trustee, as Transfer Agent, of (A) such Holder's Senior Note certificate representing such Certificated Senior Notes properly endorsed for assignment to the transferee, (B) instructions given in accordance with the Depositary's procedures directing the Trustee to instruct the Depositary to cause to be credited a beneficial interest in Regulation S Global Senior Notes in an amount equal to the interest in the Certificated Senior Notes to be transferred, (C) a written order given in accordance with the Depositary's procedures containing information regarding the participant account of the Depositary and the Euroclear or Clearstream accounts to be credited with such increase and (D) a transfer certificate in the form of Exhibit D-1 attached hereto (including representations that the transfer is being made to, or the exchange is being made by, a person that is neither a U.S. Person nor a U.S. Resident, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is neither a U.S. Person nor a U.S. Resident, in an offshore transaction in accordance with Regulation S) delivered by the proposed transferee of the Certificated Senior Notes, the Trustee, as Transfer Agent, shall cancel such surrendered Senior Note certificate in accordance with Section 2.9, and, if applicable, a new Certificated Senior Note certificate for the amount of Certificated Senior Notes not being transferred by the Holder.  Upon such transfer, the Trustee, as Transfer Agent, shall notify the Securities Registrar to record the transfer in the Securities Register in accordance with Section 2.5(a).

(viii)    Transfers of Certificated Senior Notes to Persons Taking Delivery in the Form of an Interest in Rule 144A Global Senior Notes.  If a Holder of Certificated Senior Notes wishes at any time to transfer such Senior Notes to any Person taking delivery in the form of an interest in Rule 144A Global Senior Notes, such Holder may, subject to the rules and procedures of the Depositary transfer or cause the transfer of such Certificated Senior Notes for an equivalent interest in Rule 144A Global Senior Notes deposited with the Depositary as provided in this Section 2.5(d)(vii).  Upon receipt by the Trustee, as Transfer Agent, of (A) such Holder's Senior Note certificate representing such Certificated Senior Notes properly endorsed for assignment to the transferee, (B) instructions given in accordance with the Depositary's procedures directing the Trustee to instruct the Depositary to cause to be credited a beneficial interest in Rule 144A Global Senior Notes in an amount equal to the interest in the Certificated Senior Notes to be transferred, (C) a written order given in accordance with the Depositary's procedures containing information regarding the participant account of the Depositary, and (D) a transfer certificate in the form of Exhibit E-1 attached hereto, to the effect that, among other things, the transfer or exchange is to a person that is both a Qualified Institutional Buyer and a Qualified Purchaser, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is both a Qualified Institutional Buyer and a Qualified Purchaser, delivered by the proposed transferee of the Certificated Senior Notes, the Trustee, as Transfer Agent, shall cancel such surrendered Senior Note certificate in accordance with Section 2.9, and, if applicable, a new Certificated Senior Note certificate for the amount of Certificated Senior Notes not being transferred by the Holder.  Upon such transfer, the Trustee, as Transfer Agent, shall notify the Securities Registrar to record the transfer in the Securities Register in accordance with Section 2.5(a).

(ix)    Rule 144A Global Mezzanine Note to Regulation S Global Mezzanine Note.  If a Holder of a beneficial interest in a Rule 144A Global Mezzanine Note representing the Mezzanine Notes and deposited with the Depositary wishes at any time to exchange its interest in such Rule 144A Global Mezzanine Note for an interest in the corresponding Regulation S Global Mezzanine Note, or to transfer its interest in such Rule 144A Global Mezzanine Note to a Person

who wishes to take delivery thereof in the form of an interest in the corresponding Regulation S Global Mezzanine Note, such Holder, provided such Holder or, in the case of a transfer to another Person, such Person is not a U.S. Person or a U.S. Resident, may, subject to the immediately succeeding sentence and the rules and procedures of the Depositary, exchange or transfer or cause the exchange or transfer of such interest for an equivalent beneficial interest in the Regulation S Global Mezzanine Note.  Upon receipt by the Trustee, as Securities Registrar, of (A) instructions given in accordance with the Depositary's procedures from an Agent Member directing the Trustee to cause to be credited a beneficial interest in the Regulation S Global Mezzanine Note in an amount equal to the beneficial interest in the Rule 144A Global Mezzanine Note to be exchanged or transferred, but not less than the minimum denomination applicable to Mezzanine Notes held through Regulation S Global Mezzanine Notes, (B) a written order given in accordance with the Depositary's procedures containing information regarding the participant account of the Depositary and, in the case of a transfer or exchange pursuant to and in accordance with Regulation S, the Euroclear and Clearstream account to be credited with such increase and (C) a certificate in the form of Exhibit D-2 attached hereto given by the Holder of such beneficial interest (in the case of an exchange) or the transferee of such beneficial interest (in the case of a transfer) stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Securities, including in accordance with Regulation S, the Trustee, as Securities Registrar, shall approve the instructions at the Depositary to reduce the principal amount of the Rule 144A Global Mezzanine Note and to increase the principal amount of the Regulation S Global Mezzanine Note by the aggregate principal amount of the beneficial interest in the Rule 144A Global Mezzanine Note to be exchanged or transferred, and to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Regulation S Global Mezzanine Note equal to the reduction in the principal amount of the Rule 144A Global Mezzanine Note.

          (x)        <u>Rule 144A Global Mezzanine Note to Certificated Mezzanine Notes</u>.  If a Holder of a beneficial interest in Rule 144A Global Mezzanine Notes deposited with the Depositary wishes at any time to transfer all or a portion of its interest in such Rule 144A Global Mezzanine Notes to any Person taking delivery in the form of Mezzanine Notes represented by Certificated Mezzanine Notes, or to exchange its beneficial interest in Rule 144A Global Mezzanine Notes deposited with the Depositary for Mezzanine Notes represented by Certificated Mezzanine Notes, such Holder may, subject to the rules and procedures of the Depositary transfer or cause the transfer of such interest (or exchange such interest, as the case may be) for an equivalent Aggregate Outstanding Amount of Certificated Mezzanine Notes as provided below. Such transfer (or exchange) will (A) only be made in accordance with the applicable procedures of the Depository, (B) upon receipt by the Trustee, as Transfer Agent, of a transfer certificate in the form of Exhibit G-2 hereto delivered by the proposed transferee of such Mezzanine Notes (or such Holder, in the case of an exchange) and (C) only be made if either (x) the transferor or the transferee has certified that the transfer is being made pursuant to Rule 144 or (y) the transferor or the transferee has provided an opinion of nationally recognized counsel to each of the Trustee and the Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act.  If such conditions are satisfied, the Trustee, as Transfer Agent, shall notify the Securities Registrar to record the transfer (or exchange, as the case may be) in the Securities Register in accordance with Section 2.5(a) and, upon execution by the Issuer, deliver one or more Certificated Mezzanine Notes in the amounts designated by the transferee (or such Holder, in the case of an exchange), the Aggregate Outstanding Amount of such Mezzanine Notes being equal to Aggregate Outstanding Amount of Rule 144A Global Mezzanine Notes being transferred or exchanged, and in the authorized minimum denominations and integral multiples specified in Section 2.3, and shall record the decrease in the Aggregate Outstanding Amount of Rule 144A Global Mezzanine Notes issued in the name of the Depositary.  The Securities Registrar shall not

register any purported transfer or exchange in violation of the foregoing requirements and the Transfer Agent shall not deliver such Certificated Mezzanine Notes.

(xi)      Regulation S Global Mezzanine Note to Rule 144A Global Mezzanine Note.  If a Holder of a beneficial interest in a Regulation S Global Mezzanine Note representing the Mezzanine Notes and deposited with the Depositary wishes at any time to exchange its interest in such Regulation S Global Mezzanine Note for an interest in a corresponding Rule 144A Global Mezzanine Note or to transfer its interest in such Regulation S Global Mezzanine Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Rule 144A Global Mezzanine Note, such Holder may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear and Clearstream or the Depositary, as the case may be, cause the exchange or transfer of such interest for an equivalent beneficial interest in the Rule 144A Global Mezzanine Note.  To the extent that the Trustee, as Securities Registrar, has received (A) instructions from Euroclear and Clearstream or the Depositary, as the case may be, directing the Trustee, as Securities Registrar, to cause to be credited a beneficial interest in the Rule 144A Global Mezzanine Note equal to the beneficial interest in the Regulation S Global Mezzanine Note to be exchanged or transferred but not less than the minimum denomination applicable to Mezzanine Notes held through Rule 144A Global Mezzanine Notes, such instructions to contain information regarding the participant account with the Depositary to be credited with such increase, and (B) a certificate in the form of Exhibit E-2 attached hereto given by the Holder of such beneficial interest (in the case of an exchange) or by the transferee of such beneficial interest stating that the Person acquiring such interest in the Rule 144A Global Mezzanine Note, or the Holder in the case of an exchange, is a QIB/QP and is obtaining such beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the U.S. or any other relevant jurisdiction, then Euroclear or Clearstream or the Trustee, as Securities Registrar, as the case may be, shall approve the instructions at the Depositary to reduce the Rule 144A Global Mezzanine Note by the aggregate principal amount of the beneficial interest in the Regulation S Global Mezzanine Note to be transferred or exchanged, and the Trustee, as Securities Registrar, shall approve the instructions at the Depositary, concurrently with such reduction, to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Rule 144A Global Mezzanine Note equal to the reduction in the principal amount of the Regulation S Global Mezzanine Note.

(xii)      Transfers of an Interest in Regulation S Global Mezzanine Notes to Persons Taking Delivery in the Form of Certificated Mezzanine Notes.  If a Holder of a beneficial interest in Regulation S Global Mezzanine Notes deposited with the Depositary wishes at any time to transfer all or a portion of its interest in such Regulation S Global Mezzanine Notes to any Person taking delivery in the form of Mezzanine Notes represented by Certificated Mezzanine Notes, or to exchange its beneficial interest in Regulation S Global Mezzanine Notes deposited with the Depositary for Mezzanine Notes represented by Certificated Mezzanine Notes, such Holder may, subject to the rules and procedures of the Depositary and Euroclear or Clearstream, as the case may be, transfer or cause the transfer of such interest (or exchange such interest, as the case may be) for an equivalent Aggregate Outstanding Amount of Certificated Mezzanine Notes as provided below.  Upon receipt by the Trustee, as Transfer Agent, of (A) a written order containing information regarding the Euroclear or Clearstream account to be decreased by the amount of the beneficial interest being transferred and (B) a transfer certificate in the form of Exhibit G-2 hereto, including representations that the transferee is both an Accredited Investor and a Qualified Purchaser (provided, that in the case of any such transfer, either (x) the transferor or the transferee has certified that the transfer is being made pursuant to Rule 144 under the Securities Act or (y) the transferor or the transferee has provided an opinion of nationally

recognized counsel to each of the Trustee and the Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act), delivered by the proposed transferee of such Mezzanine Notes (or such Holder, in the case of an exchange), the Trustee, as Transfer Agent, shall notify the Securities Registrar to record the transfer (or exchange, as the case may be) in the Securities Register in accordance with Section 2.5(a) and, upon execution by the Issuer, deliver one or more Certificated Mezzanine Notes in the amounts designated by the transferee (or such Holder, in the case of an exchange), the Aggregate Outstanding Amount of such Mezzanine Notes being equal to Aggregate Outstanding Amount of Regulation S Global Mezzanine Notes being transferred or exchanged, and in the authorized minimum denominations and integral multiples specified in Section 2.3, and shall record the decrease in the Aggregate Outstanding Amount of Regulation S Global Mezzanine Notes issued in the name of the Depositary.   The Securities Registrar shall not register any purported transfer or exchange in violation of the foregoing requirements and the Transfer Agent shall not deliver such Certificated Mezzanine Notes.

(xiii)    Transfers of Certificated Mezzanine Notes to Persons Taking Delivery of Certificated Mezzanine Notes.  If a Holder of Certificated Mezzanine Notes wishes at any time to transfer such Mezzanine Notes to any Person taking delivery in the form of Certificated Mezzanine Notes, such Holder may transfer or cause the transfer of such Mezzanine Notes for an equivalent Aggregate Outstanding Amount of Certificated Mezzanine Notes as provided in this Section 2.5(d)(xiii).  Upon receipt by the Trustee, as Transfer Agent, of (A) such Holder's Mezzanine Note certificate representing such Certificated Mezzanine Notes properly endorsed for assignment to the transferee and (B) a transfer certificate in the form of Exhibit G-2 attached hereto, including representations that the transferee is both an Accredited Investor and a Qualified Purchaser (provided, that in the case of any such transfer, either (x) the transferor or the transferee has certified that the transfer is being made pursuant to Rule 144 under the Securities Act or (y) the transferor or the transferee has provided an opinion of nationally recognized counsel to each of the Trustee and the Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act), delivered by the proposed transferee of the Certificated Mezzanine Notes, the Trustee, as Transfer Agent, shall cancel such surrendered Mezzanine Note certificate in accordance with Section 2.9, notify the Securities Registrar to record the transfer in the Securities Register in accordance with Section 2.5(a) and, upon execution by the Issuer, deliver one or more Mezzanine Note certificates representing Certificated Mezzanine Notes in the Aggregate Outstanding Amount of Certificated Mezzanine Notes transferred by the transferor, and in the minimum denominations and integral multiples specified in Section 2.3.   The Securities Registrar shall not register any purported transfer in violation of the foregoing requirements and the Transfer Agent shall not deliver such Certificated Mezzanine Notes.

(xiv)    Transfers of Certificated Mezzanine Notes to Persons Taking Delivery in the Form of an Interest in Regulation S Global Mezzanine Notes. If a Holder of Certificated Mezzanine Notes wishes at any time to transfer such Mezzanine Notes to any Person taking delivery in the form of an interest in Regulation S Global Mezzanine Notes, such Holder may, subject to the rules and procedures of the Depositary and Euroclear or Clearstream, as the case may be, transfer or cause the transfer of such Certificated Mezzanine Notes for an equivalent interest in Regulation S Global Mezzanine Notes deposited with the Depositary as provided in this Section 2.5(d)(xiv). Upon receipt by the Trustee, as Transfer Agent, of (A) such Holder's Mezzanine Note certificate representing such Certificated Mezzanine Notes properly endorsed for assignment to the transferee, (B) instructions given in accordance with the Depositary's procedures directing the Trustee to instruct the Depositary to cause to be credited a beneficial interest in Regulation S Global Mezzanine Notes in an amount equal to the interest in the Certificated Mezzanine Notes to be transferred, (C) a written order given in accordance with the

Depositary's procedures containing information regarding the participant account of the Depositary and the Euroclear or Clearstream accounts to be credited with such increase and (D) a transfer certificate in the form of <u>Exhibit D-2</u> attached hereto (including representations that the transfer is being made to, or the exchange is being made by, a person that is neither a U.S. Person nor a U.S. Resident, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is neither a U.S. Person nor a U.S. Resident, in an offshore transaction in accordance with Regulation S) delivered by the proposed transferee of the Certificated Mezzanine Notes, the Trustee, as Transfer Agent, shall cancel such surrendered Mezzanine Note certificate in accordance with Section 2.9, and, if applicable, a new Certificated Mezzanine Note certificate for the amount of Certificated Mezzanine Notes not being transferred by the Holder. Upon such transfer, the Trustee, as Transfer Agent, shall notify the Securities Registrar to record the transfer in the Securities Register in accordance with Section 2.5(a).

(xv)    <u>Transfers of Certificated Mezzanine Notes to Persons Taking Delivery in the Form of an Interest in Rule 144A Global Mezzanine Notes</u>. If a Holder of Certificated Mezzanine Notes wishes at any time to transfer such Mezzanine Notes to any Person taking delivery in the form of an interest in Rule 144A Global Mezzanine Notes, such Holder may, subject to the rules and procedures of the Depositary transfer or cause the transfer of such Certificated Mezzanine Notes for an equivalent interest in Rule 144A Global Mezzanine Notes deposited with the Depositary as provided in this Section 2.5(d)(xv). Upon receipt by the Trustee, as Transfer Agent, of (A) such Holder's Mezzanine Note certificate representing such Certificated Mezzanine Notes properly endorsed for assignment to the transferee, (B) instructions given in accordance with the Depositary's procedures directing the Trustee to instruct the Depositary to cause to be credited a beneficial interest in Rule 144A Global Mezzanine Notes in an amount equal to the interest in the Certificated Mezzanine Notes to be transferred, (C) a written order given in accordance with the Depositary's procedures containing information regarding the participant account of the Depositary, and (D) a transfer certificate in the form of <u>Exhibit E-2</u> attached hereto, to the effect that, among other things, the transfer or exchange is to a person that is both a Qualified Institutional Buyer and a Qualified Purchaser, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is both a Qualified Institutional Buyer and a Qualified Purchaser, delivered by the proposed transferee of the Certificated Mezzanine Notes, the Trustee, as Transfer Agent, shall cancel such surrendered Mezzanine Note certificate in accordance with Section 2.9, and, if applicable, a new Certificated Mezzanine Notes certificate for the amount of Certificated Mezzanine Notes not being transferred by the Holder. Upon such transfer, the Trustee, as Transfer Agent, shall notify the Securities Registrar to record the transfer in the Securities Register in accordance with Section 2.5(a).

(f)    So long as any Subordinated Note remains Outstanding, transfers or exchanges of the Subordinated Notes or any interest therein shall only be made in accordance with Section 2.4(d) and this Section 2.5(f).

(i)    <u>Transfers of an Interest in Regulation S Global Subordinated Notes to Persons Taking Delivery of an Interest in Regulation S Global Subordinated Notes</u>. If a Holder of a beneficial interest in Regulation S Global Subordinated Notes deposited with the Depositary wishes at any time to transfer all or a portion of its interest in such Regulation S Global Subordinated Notes to any Person that is both a non-U.S. Person and a non-U.S. Resident (as defined in Regulation S under the Securities Act) in a transaction outside of the United States in reliance on Regulation S, such Holder may, subject to the rules and procedures of the Depositary and Euroclear or Clearstream, as the case may be, transfer or cause the transfer of such interest

for an equivalent interest in Regulation S Global Subordinated Notes deposited with the Depositary. Interests in Regulation S Global Subordinated Notes may be held only through Euroclear or Clearstream and may not be held by a U.S. Person or a U.S. Resident at any time. Each transferee of Subordinated Notes represented by an interest in Regulation S Global Subordinated Notes that takes delivery in the form of an interest in Regulation S Global Subordinated Notes will be deemed to acknowledge, represent to and agree with the Issuer as to, the applicable representations and warranties described herein, including, without limitation, the representation set forth in Section 2.5(f)(vii) hereof. Transfers between Participants in the Depositary will be effected in the ordinary way in accordance with the applicable procedures of the Depositary and Euroclear or Clearstream and will be settled in immediately available funds. Transfers between participants in Euroclear and Clearstream will be effected in the ordinary way in accordance with their respective rules and operating procedures.

(ii) _Transfers of an Interest in Regulation S Global Subordinated Notes to Persons Taking Delivery in the Form of Certificated U.S. Subordinated Notes_. If a Holder of a beneficial interest in Regulation S Global Subordinated Notes deposited with the Depositary wishes at any time to transfer all or a portion of its interest in such Regulation S Global Subordinated Notes to any Person taking delivery in the form of Subordinated Notes represented by Certificated U.S. Subordinated Notes, or to exchange its beneficial interest in Regulation S Global Subordinated Notes deposited with the Depositary for Subordinated Notes represented by Certificated U.S. Subordinated Notes, such Holder may, subject to the rules and procedures of the Depositary and Euroclear or Clearstream, as the case may be, transfer or cause the transfer of such interest (or exchange such interest, as the case may be) for an equivalent number of Certificated U.S. Subordinated Notes as provided below. Upon receipt by the Trustee, as Transfer Agent, of (A) a written order containing information regarding the Euroclear or Clearstream account to be decreased by the amount of the beneficial interest being transferred and (B) a transfer certificate in the form of Exhibit H hereto (or, in the case of any initial transfer from Lehman Brothers International (Europe), the Subordinated Note Purchase Agreement) delivered by the proposed transferee of such Subordinated Notes (or such Holder, in the case of an exchange), the Trustee, as Transfer Agent, shall notify the Securities Registrar to record the transfer (or exchange, as the case may be) in the Securities Register in accordance with Section 2.5(a) and, upon execution by the Issuer, deliver one or more Certificated U.S. Subordinated Notes in the amounts designated by the transferee (or such Holder, in the case of an exchange), the Aggregate Outstanding Amount of such Subordinated Notes being equal to Aggregate Outstanding Amount of Regulation S Global Subordinated Notes being transferred or exchanged, and in the authorized minimum denominations and integral multiples specified in Section 2.3, and shall record the decrease in the Aggregate Outstanding Amount of Regulation S Global Subordinated Notes issued in the name of the Depositary. The Securities Registrar shall not register any purported transfer or exchange in violation of the foregoing requirements and the Transfer Agent shall not deliver such Certificated U.S. Subordinated Notes.

(iii) _Transfers of Certificated U.S. Subordinated Notes to Persons Taking Delivery of Certificated U.S. Subordinated Notes_. If a Holder of Certificated U.S. Subordinated Notes wishes at any time to transfer such Subordinated Notes to any Person taking delivery in the form of Certificated U.S. Subordinated Notes, such Holder may transfer or cause the transfer of such Subordinated Notes for an equivalent number of Certificated U.S. Subordinated Notes as provided in this Section 2.5(f)(iii). Upon receipt by the Trustee, as Transfer Agent, of (A) such Holder's Subordinated Note Certificate representing such Certificated U.S. Subordinated Notes properly endorsed for assignment to the transferee and (B) a transfer certificate in the form of Exhibit H attached hereto delivered by the proposed transferee of the Certificated U.S. Subordinated Notes, the Trustee, as Transfer Agent, shall cancel such surrendered Subordinated

Note Certificate in accordance with Section 2.9, notify the Securities Registrar to record the transfer in the Securities Register in accordance with Section 2.5(a) and, upon execution by the Issuer, deliver one or more Subordinated Note Certificates representing Certificated U.S. Subordinated Notes in the Aggregate Outstanding Amount of Certificated U.S. Subordinated Notes transferred by the transferor, and in the minimum denominations and integral multiples specified in Section 2.3. The Securities Registrar shall not register any purported transfer in violation of the foregoing requirements and the Transfer Agent shall not deliver such Certificated U.S. Subordinated Notes.

(iv)    Transfers of Certificated U.S. Subordinated Notes to Persons Taking Delivery in the Form of an Interest in Regulation S Global Subordinated Notes. If a Holder of Certificated U.S. Subordinated Notes wishes at any time to transfer such Subordinated Notes to any Person taking delivery in the form of an interest in Regulation S Global Subordinated Notes, such Holder may, subject to the rules and procedures of the Depositary and Euroclear or Clearstream, as the case may be, transfer or cause the transfer of such Certificated U.S. Subordinated Notes for an equivalent interest in Regulation S Global Subordinated Notes deposited with the Depositary as provided in this Section 2.5(f)(iv). Upon receipt by the Trustee, as Transfer Agent, of (A) such Holder's Subordinated Note Certificate representing such Certificated U.S. Subordinated Notes properly endorsed for assignment to the transferee, (B) instructions given in accordance with the Depositary's procedures directing the Trustee to approve the instructions at the Depositary to cause to be credited a beneficial interest in Regulation S Global Subordinated Notes in an amount equal to the interest in the Certificated U.S. Subordinated Notes to be transferred, (C) a written order given in accordance with the Depositary's procedures containing information regarding the participant account of the Depositary and the Euroclear or Clearstream accounts to be credited with such increase, and (D) a transfer certificate in the form of Exhibit H attached hereto delivered by the proposed transferee of the Certificated U.S. Subordinated Notes, the Trustee, as Transfer Agent, shall cancel such surrendered Subordinated Note Certificate in accordance with Section 2.9, and, if applicable, a new Certificated U.S. Subordinated Notes certificate for the amount of Certificated U.S. Subordinated Notes not being transferred by the Holder. Upon such transfer, the Trustee, as Transfer Agent, shall notify the Securities Registrar to record the transfer in the Securities Register in accordance with Section 2.5(a).

(v)    Exchange of Certificated U.S. Subordinated Notes. If a Holder of a Certificated U.S. Subordinated Note wishes at any time to exchange such Certificated U.S. Subordinated Note for one or more Certificated U.S. Subordinated Note representing a different amounts of Certificated U.S. Subordinated Notes, such Holder may exchange or cause the exchange of such Certificated U.S. Subordinated Note for one or more new Certificated U.S. Subordinated Notes collectively bearing the Aggregate Outstanding Amount of the Certificated U.S. Subordinated Note endorsed and surrendered for exchange as provided in this Section 2.5(f)(v). Upon receipt by the Trustee, as Transfer Agent, of (A) such Holder's Certificated U.S. Subordinated Note properly endorsed for such exchange and (B) written instructions from such Holder designating the amounts of the Certificated U.S. Subordinated Notes to be exchanged for (the Aggregate Outstanding Amount of such Subordinated Notes being equal to the Aggregate Outstanding Amount of the Certificated U.S. Subordinated Note surrendered for exchange), then the Trustee shall cancel such surrendered Certificated U.S. Subordinated Note in accordance with Section 2.9, notify the Securities Registrar to record the exchange in the Securities Register in accordance with Section 2.5(a) and upon execution by the Issuer, deliver one or more Certificated U.S. Subordinated Notes and collectively bearing the Aggregate Outstanding Amount of the Certificated U.S. Subordinated Notes endorsed for exchange, registered in the same names as the Certificated U.S. Subordinated Note surrendered by such Holder, in such amounts of the

Subordinated Notes designated by such Holder (the Aggregate Outstanding Amount of such Subordinated Notes being equal to the Aggregate Outstanding Amount of the Certificated U.S. Subordinated Note surrendered for exchange by such Holder), and in the minimum denominations and integral multiples specified in Section 2.3.

(vi)    Restrictions on U.S. Transfers.  Transfers of interests in any Regulation S Global Subordinated Note to U.S. Persons or U.S. Residents, or any transfers thereof made in the United States, shall be limited to transfers made pursuant to the provisions of Section 2.5(f)(ii).

(vii)    Deemed Representations.  Each transferee of Subordinated Notes taking delivery of an interest in Regulation S Global Subordinated Notes will be deemed to represent and warrant to the Issuer that (i) such transferee is neither a U.S. Person nor a U.S. Resident, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is neither a U.S. Person nor a U.S. Resident, in an offshore transaction in accordance with Regulation S and in accordance with the minimum denomination requirements set forth in Section 2.3 and (ii) for the duration that it holds any interest in such Subordinated Notes, either (A) it is not, and will not, be a Benefit Plan Investor, (B) it is an insurance company purchasing Subordinated Notes with assets from its general account, and it represents, warrants and covenants that at the time of acquisition and throughout its holding of the Subordinated Notes or any interest therein, (1) it is not the Manager or any other person who has discretionary authority or control, with respect to the assets of the Issuer or the Co-Issuer, or who provides investment advice for a fee (direct or indirect), with respect to the assets of the Issuer or Co-Issuer or any affiliate of such a person and would not otherwise be disregarded under 29 C.F.R. Section 2510.3-101(f) and (2) each of the accounts to which the Subordinated Notes are allocated by such insurance company investor is an insurance company general account (a) that is eligible for and meets the requirements of Department of Labor Prohibited Transaction Class Exemption 95-60 and (b) of which less than 25% of the assets are (or represent) assets of a Benefit Plan Investor or (C) it is a governmental plan or other plan subject to applicable law that is substantively similar to or of similar effect to Section 406 of ERISA or Section 4975 of the Code and it represents, warrants and covenants that at the time of the acquisition and throughout its holding of the Subordinated Notes or any interest therein, its acquisition and holding of such Subordinated Notes will not constitute or result in a violation of such applicable law and will not cause the underlying assets of the Issuer or Co-Issuer to be treated as plan assets under such applicable law.  The purchaser and transferee represents, warrants and covenants that it will not sell, pledge or otherwise transfer such Subordinated Note in violation of the foregoing.  Any purported transfer of a Subordinated Note or interest therein that does not comply with the foregoing representations shall be null and void *ab initio*.

(g)    (i)    Other Exchanges.  In the event that a Global Security is exchanged for Securities in definitive registered form without interest coupons, pursuant to Section 2.10 hereof, such Securities may be exchanged for one another only in accordance with such procedures and restrictions as are substantially consistent with the provisions above (including certification requirements intended to ensure that such transfers comply with Rule 144A or another exemption from the registration requirements of the Securities Act, or are to non-U.S. Persons and non-U.S. Residents, or otherwise comply with Regulation S, as the case may be) and as may be from time to time adopted by the Co-Issuers (or, in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer) and the Trustee.

(ii)    Transfer of Interests in the Global Securities.  Notwithstanding anything herein to the contrary, transfers of interests in a Global Security may be made (x) by book-entry transfer of beneficial interests within the relevant Clearing Agency, (y)(i) in the case of transfers of interests in a Rule 144A Global Senior Note, in accordance with Sections 2.5(e)(ii) and (iii)

hereof, and (ii) in the case of transfers of interests in a Regulation S Global Senior Note, in accordance with Sections 2.5(e)(iv) and (v), or (z)(i) in the case of transfers of interests in a Rule 144A Global Mezzanine Note, in accordance with Sections 2.5(e)(ix) and (x) hereof, and (ii) in the case of transfers of interests in a Regulation S Global Mezzanine Note, in accordance with Sections 2.5(e)(xi) and (xii); provided, that, in the case of any such transfer of interests pursuant to clause (x), (y) or (z) above, such transfer is made in accordance with subclause (iii) below.

(iii)    Restrictions on Transfers.

(A)    Transfers of interests in a Regulation S Global Senior Note to a U.S. Person or a U.S. Resident shall be made by (1) delivery of an interest in the corresponding Rule 144A Global Senior Note or (2) delivery of a Certificated Senior Note and shall be limited to transfers made pursuant to the provisions of Section 2.5(e). Transfers of interests in a Regulation S Global Mezzanine Note to a U.S. Person or a U.S. Resident shall be made by (1) delivery of an interest in the corresponding Rule 144A Global Mezzanine Note or (2) delivery of a Certificated Mezzanine Note and shall be limited to transfers made pursuant to the provisions of Section 2.5(e). Beneficial interests in a Regulation S Global Security may only be held through Euroclear and Clearstream.

(B)    Any transfer of an interest in a Security to a U.S. Person or a U.S. Resident that is not either a QIB/QP or both an Accredited Investor and a QP shall be null and void *ab initio* and shall not be given effect for any purpose hereunder, and the Trustee shall hold any funds conveyed by the intended transferee of such interest in such Security in trust for the transferor and shall promptly reconvey such funds to such Person in accordance with the written instructions thereof delivered to the Trustee at its address listed in Section 13.3.

(h)    Each Holder of a beneficial interest in a Senior Note or Mezzanine Note in the form of a Rule 144A Global Security will be deemed to have represented and agreed with the Issuer as follows (except that in a transfer of a beneficial interest in a Senior Note or Mezzanine Note in the form of a Regulation S Global Security to a transferee that takes delivery in the form of an interest in a Rule 144A Global Security, the Holder will be required to make the required representations in a transfer certificate in the form set forth as Exhibit E-1 or Exhibit E-2, as applicable):

(i)    The Holder is purchasing such Security for its own account or one or more accounts with respect to which it exercises sole investment discretion, in each case in minimum denominations of $250,000 and integral multiples of $1,000 in excess thereof, and both it and each such account (if any) and (A) is a QIB/QP, (B) is not a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis not less than $25,000,000 in securities of issuers that are not Affiliated to it, (C) is not a participant-directed employee plan, such as a 401(k) plan, or any other type of plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, unless investment decisions with respect to the plan are made solely by the fiduciary, trustee or sponsor of such plan, (D) was not formed for the purpose of investing in the Issuer or the Co-Issuer (except where each beneficial owner of the Holder is a QP) and (E) shall provide written notice to any transferee that any transferee taking delivery of such Security in the form of an interest in a Rule 144A Global Security must satisfy the foregoing qualifications.

(ii)    The Holder agrees on its own behalf and on behalf of any account for which it is holding such Security to offer, sell or otherwise transfer such Security (or a beneficial

interest therein) only (A) in the required minimum denomination, and (B)(1) in the U.S., only in the form of an interest in a Rule 144A Global Security to a QP that the Holder reasonably believes is a QIB, purchasing for its own account or one or more accounts, each of which is a QP that the Holder reasonably believes is a QIB, in accordance with Rule l44A, and none of which are (i) a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis not less than $25,000,000 in securities of issuers that are not Affiliated to it, (ii) a participant-directed employee plan, such as a 401(k) plan, or any other type of plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, unless investment decisions with respect to the plan are made solely by the fiduciary, trustee or sponsor of such plan or (iii) formed for the purpose of investing in the Issuer or the Co-Issuer (except where each beneficial owner is a QP) or (2) outside the U.S. in the form of an interest in a Regulation S Global Security to a Person that is neither a U.S. Person nor a U.S. Resident in an offshore transaction in accordance with Regulation S under the Securities Act.  The Holder understands and agrees that neither a U.S. Person nor a U.S. Resident may hold an interest in a Senior Note in the form of a Regulation S Global Security at any time.  The Holder agrees to provide notice of such transfer restrictions to any subsequent transferee.

(iii)     The Holder understands that the Issuer is entitled to force the sale of any Security (or beneficial interest therein) held by a U.S. person (as defined in Regulation S) or U.S. resident (within the meaning of the Investment Company Act) who is determined not to have been either (A) a QIB/QP or (B) both an Accredited Investor and a QP at the time of acquisition of such Security.

(iv)     The Holder understands that the Securities have not been approved or disapproved by the SEC or any other governmental authority or agency of any jurisdiction, nor has the SEC or any other governmental authority or agency passed upon the accuracy or adequacy of any offering memorandum relating to the Securities.  Any representation to the contrary is a criminal offense.

(v)     The Holder agrees that no Security (or any interest therein) may be sold, pledged or otherwise transferred in a denomination of less than $250,000 and integral multiples of $1,000 in excess thereof.

(vi)     The Holder (A) has such knowledge and experience in financial and business matters that the Holder is capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of its prospective investment in the Securities, (B) is financially able to bear such risk, (C) in making such investment is not relying on the advice or recommendations of the Manager or the Co-Issuers (or any representative of any of the foregoing), (D) has determined that an investment in the Securities is suitable and appropriate for it and (E) has had access to such financial and other information concerning the Co-Issuers and the Securities as it has deemed necessary to make its own independent decision to purchase such Securities, including the opportunity, at a reasonable time prior to its purchase of such Securities, to ask questions and receive answers concerning the Co-Issuers and the terms and conditions of the offering of the Securities.

(vii)     The Holder understands that there is no market for the Securities and that no assurance can be given as to the liquidity of any trading market for the Securities and that it is unlikely that a trading market for the Securities will develop.  It further understands that, although the Manager may from time to time make a market in the Securities, the Manager is under no obligation to do so and, following the commencement of any market-making, may discontinue

the same at any time.  Accordingly, the Holder must be prepared to hold the Securities for an indefinite period of time or until their maturity.

(viii)    The Holder agrees that no sale, pledge or other transfer of a Security (or any interest therein) may be made if such transfer would have the effect of requiring either of the Co-Issuers or all or a portion of the pool of assets owned by the Issuer to register as an investment company under the Investment Company Act.

(ix)    (I) The Holder of a Senior Note will be deemed to represent, warrant and covenant, for the duration that it holds any interest in such Senior Note, that either (A) it is not acquiring or holding such Senior Notes with the assets of a Plan or (B) its acquisition, holding and disposition of such Senior Notes, throughout the period that it holds such Senior Notes, will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental plan or other plan, a violation of any substantively similar applicable law or applicable law of similar effect), because such acquisition, holding and disposition of such Senior Notes by the Holder is and will be eligible for relief under a prohibited transaction exemption, all of the conditions of which are and will be satisfied upon its acquisition of, and throughout the term that it holds, such Senior Notes.  Each Holder of such Senior Notes will be deemed to represent, warrant and covenant that it will not sell, pledge or otherwise transfer such Senior Notes in violation of the foregoing.  Any purported transfer of a Senior Note or interest therein that does not comply with the foregoing representations shall be null and void *ab initio*.    (II) The Holder of a Mezzanine Note will be deemed to represent, warrant and covenant to the Issuer, for the duration that it holds any interest in such Security, that (A) it is not, and will not, be a Benefit Plan Investor, (B) it is an insurance company purchasing Mezzanine Notes with assets from its general account, and it represents, warrants and covenants that at the time of acquisition and throughout its holding of the Mezzanine Notes or any interest therein, (1) it is not the Manager or any other person who has discretionary authority or control, with respect to the assets of the Issuer or the Co-Issuer, or who provides investment advice for a fee (direct or indirect), with respect to the assets of the Issuer or Co-Issuer or any affiliate of such a person and would not otherwise be disregarded under 29 C.F.R. Section 2510.3-101(f) and (2) each of the accounts to which the Mezzanine Notes are allocated by such insurance company investor is an insurance company general account (a) that is eligible for and meets the requirements of Department of Labor Prohibited Transaction Class Exemption 95-60 and (b) of which less than 25% of the assets are (or represent) assets of a Benefit Plan Investor or (C) it is a governmental plan or other plan subject to applicable law that is substantively similar or of similar effect to Section 406 of ERISA or Section 4975 of the Code and it represents, warrants and covenants that at the time of the acquisition and throughout its holding of the Mezzanine Notes or any interest therein, its acquisition and holding of such Mezzanine Notes will not constitute or result in a violation of such applicable law and will not cause the underlying assets of the Issuer or Co-Issuer to be treated as plan assets under such applicable law.  The Holder of a Mezzanine Note represents, warrants and covenants that it will not sell, pledge or otherwise transfer such Mezzanine Note in violation of the foregoing.  Any purported transfer of a Mezzanine Note or interest therein that does not comply with the foregoing representations shall be null and void *ab initio*.

In addition, if the Holder is, or is acting on behalf of, a Plan, the fiduciaries of such Plan represent, warrant and covenant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in such Securities was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

(x)    The Holder agrees that (A) any sale, pledge or other transfer of a Security (or any interest therein) made in violation of the transfer restrictions contained in this Indenture, or made based upon any false or inaccurate representation made by the Holder or a transferee to the Co-Issuers, will be void and of no force or effect and (B) none of the Co-Issuers, the Trustee or the Securities Registrar has any obligation to recognize any sale, pledge or other transfer of a Security (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

(xi)    The Holder is not a member of the public in the Cayman Islands.

(xii)    The Rule 144A Global Securities will bear the applicable legends set forth in Exhibits A-1 and B-1 hereto.

(xiii)    The Holder has the power and authority to enter into each agreement required to be executed and delivered by or on behalf of the Holder in connection with its purchase of Securities and to perform its obligations thereunder and consummate the transactions contemplated thereby, and the Person signing any such documents on behalf of the Holder has been duly authorized to execute and deliver such documents and each other document required to be executed and delivered by the Holder in connection with its purchase of Securities.  Such execution, delivery and compliance by the Holder does not conflict with, or constitute a default under, any instruments governing the Holder, any applicable law, regulation or order, or any material agreement to which the Holder is a party or by which the Holder is bound.

(xiv)    If the Holder's permanent address is located in the U.S., the Holder was offered the Securities in the state of such Holder's permanent address and intends that the securities law of that state govern the Holder's subscription for the Securities.

(xv)    The Holder understands that the Issuer may require certification acceptable to it (i) to permit the Issuer to make payments to it without, or at a reduced rate of, withholding or (ii) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets.  The Holder agrees to provide any such certification that is requested by the Issuer.

(xvi)    The Holder acknowledges that the Co-Issuers, the Manager and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that, if any of the acknowledgments, representations or warranties made or deemed to have been made by it in connection with its purchase of the Securities are no longer accurate, the Holder will notify promptly the Co-Issuers and the Manager.

(i)    Each Holder of a beneficial interest in a Senior Note or a Mezzanine Note in the form of a Regulation S Global Security shall be deemed to have represented and agreed with the Issuer as set forth in clauses (ii) through (xvi) of clause (h) above (except that in a transfer of an interest in a Rule 144A Global Security to a transferee that takes delivery in the form of an interest in a Regulation S Global Security, the Holder will be required to make the required representations in a transfer certificate in the form set forth as Exhibit D-1 or Exhibit D-2, as applicable).  Each Holder of a beneficial interest in a Regulation S Global Security will also be deemed or required (as applicable) to represent, warrant and agree as follows:

(i)    The Holder is neither a U.S. Person nor a U.S. Resident purchasing for its own account or one or more accounts, each of which is neither a U.S. Person nor a U.S. Resident, and as to each of which the Holder exercises sole investment discretion, in an offshore

transaction pursuant to Regulation S and is aware that the sale of the Securities to it is being made in reliance on the exemption from registration provided by Regulation S.

(ii)    The Regulation S Global Securities will bear the applicable legends set forth in <u>Exhibits A-2</u>, <u>B-2</u> and <u>C-2</u> hereto.

(iii)    The Holder understands and agrees that before a Senior Note or Mezzanine Note in the form of an interest in a Regulation S Global Security may be offered, sold, pledged or otherwise transferred to a transferee that takes delivery in the form of a Rule 144A Global Security, the transferee shall be required to provide the Trustee with a transfer certificate in the form attached hereto as <u>Exhibit E-1</u> or <u>Exhibit E-2</u>, as applicable, to the effect that the transferee is a QIB/QP which is acquiring the interest in the Senior Note or Mezzanine Note, as applicable, in the form of a Rule 144A Global Security in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the U.S. or any other relevant jurisdiction.

(j)    <u>Certificated Notes</u>.  (i)  Each initial purchaser of a Certificated Senior Note or a Certificated Mezzanine Note will be required to execute and deliver to the Co-Issuers (or, in the case of the Mezzanine Notes, the Issuer) and the Manager a representation letter substantially in the form of <u>Exhibit F-1</u> or <u>Exhibit F-2</u>, as applicable, and, each subsequent transferee of a Senior Note or a Mezzanine Note taking delivery in the form of a Certificated Senior Note or Certificated Mezzanine Note, respectively, shall be required to deliver to the Issuer and the Trustee a certificate substantially in the form of <u>Exhibit G-1</u> or <u>Exhibit G-2</u>, as applicable, certifying, in each case, among other things, that such initial purchaser or transferee, as applicable, is (i) both an Accredited Investor and a Qualified Purchaser (provided, that in the case of any such transfer, either (x) the transferor or the transferee has certified that the transfer is being made pursuant to Rule 144 under the Securities Act or (y) the transferor or the transferee has provided an opinion of nationally recognized counsel to each of the Trustee and the Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act) and (ii) in compliance with all applicable securities laws, ERISA restrictions and tax laws in the manner described in the certificate attached hereto as <u>Exhibit G-1</u> or <u>Exhibit G-2</u>, as applicable.

(ii)    Each initial purchaser of a Subordinated Note will be required to deliver the applicable Purchase Agreement, and (other than with respect to a transfer made pursuant to and in accordance with Section 2.5(e)(i)), each subsequent transferee of a Subordinated Note shall be required to deliver to the Issuer and the Trustee a certificate substantially in the form of <u>Exhibit H</u> certifying, in each case, among other things, that such initial purchaser or transferee, as applicable, is (i) either (A) a QIB/QP, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is a QIB/QP, in accordance with Rule 144A or (B) neither a U.S. Person nor a U.S. Resident, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, none of which is a U.S. Person nor a U.S. Resident, in an offshore transaction in accordance with Regulation S, and in each case for investment purposes and not with a view to the distribution thereof and (ii) in compliance with all applicable securities laws, ERISA restrictions and tax laws in the manner described in the certificate attached hereto as <u>Exhibit H</u>, as applicable.

(k)    Any transfer of the Securities in violation of the foregoing restrictions will be void *ab initio* and will be disregarded by the Trustee (acting in reliance upon the certificates and instruments provided to it pursuant to the terms hereof). Notwithstanding a request made to remove the Rule 144A Legend or Regulation S Legend from any of the Securities, such Securities shall bear the applicable legend, and the applicable legend shall not be removed unless there is delivered to the Co-

Issuers (or, in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer) and the Trustee such satisfactory evidence, which may include an Opinion of Counsel satisfactory to the Co-Issuers (or, in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer), as may be reasonably required by the Co-Issuers or the Issuer, as applicable, to the effect that neither the applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A or Regulation S, as applicable, and the Investment Company Act.  Upon provision of such satisfactory evidence, the Trustee or the Authenticating Agent, as the case may be, at the direction of the Co-Issuers shall authenticate and deliver such Securities that do not bear such legend.

(l)     Any purported transfer of a Security not in accordance with this Section 2.5 shall be null and void *ab initio*, shall be disregarded by the Trustee and shall not be given effect for any purpose hereunder.

(m)     Nothing in this Section 2.5 shall be construed to limit any contractual restrictions on transfers of Securities or interests therein that may apply to any Person.

(n)     Notwithstanding anything contained in this Indenture to the contrary, and to the maximum extent permitted under applicable law, neither the Trustee nor the Securities Registrar (nor any other Transfer Agent) shall be responsible or liable for compliance with applicable federal or state securities law (including, without limitation, the Securities Act, Rule 144A or Regulation S promulgated thereunder), the Investment Company Act, ERISA or the Code (or any applicable regulations thereunder); provided, that if a specified transfer certificate or Opinion of Counsel is required by the express terms of this Section 2.5 to be delivered to the Trustee or Securities Registrar prior to registration of transfer of a Security, the Trustee and/or Securities Registrar, as applicable, shall be under a duty to receive such certificate or Opinion of Counsel and to examine the same to determine whether it conforms on its face to the requirements hereof (and the Trustee or Securities Registrar, as the case may be, shall notify promptly the party delivering the same if it determines that such certificate or Opinion of Counsel does not so conform).

(o)     For so long as one or more Global Securities are Outstanding:

(i)     the Trustee and its directors, Officers, employees and agents may deal with the Depositary for all purposes (including the making of distributions on, and the giving of notices with respect to, the Global Securities);

(ii)     unless otherwise provided herein, the rights of beneficial owners shall be exercised only through the Depositary and shall be limited to those established by law and agreements between such beneficial owners and the Depositary;

(iii)     for purposes of determining the identity of and principal amount of Global Securities beneficially owned by beneficial owners, the records of the Depositary shall be conclusive evidence of such identity and principal amount and the Trustee may conclusively rely on such records when acting hereunder;

(iv)     the Depositary will make book-entry transfers among the Depositary Participants and will receive and transmit distributions of principal of, interest on the Global Securities to such Depositary Participants; and

(v)     the Depositary Participants shall have no rights under this Indenture under or with respect to any of the Global Securities held on their behalf by the Depositary, and

the Depositary may be treated by the Trustee and its agents, employees, Officers and directors as the absolute owner of the Global Securities for all purposes whatsoever.

Section 2.6    Mutilated, Destroyed, Lost or Stolen Securities.    If (i) any mutilated Security is surrendered to a Transfer Agent, or if there shall be delivered to the Co-Issuers (or, in the case of a Mezzanine Note or a Subordinated Note, the Issuer), the Trustee and the relevant Transfer Agent evidence to their reasonable satisfaction of the destruction, loss or theft of any Security, and (ii) there is delivered to the Co-Issuers (or, in the case of a Mezzanine Note or a Subordinated Note, the Issuer), the Trustee and such Transfer Agent such security or indemnity as may be required by them to save each of them and any agent of any of them harmless, then, in the absence of notice to the Co-Issuers (or, in the case of a Mezzanine Note or a Subordinated Note, the Issuer), the Trustee or such Transfer Agent that such Security has been acquired by a Protected Purchaser, the Co-Issuers (or, in the case of a Mezzanine Note or a Subordinated Note, the Issuer) shall execute and, upon Issuer Request, the Trustee or the Authenticating Agent, as the case may be, shall authenticate and deliver, in lieu of any such mutilated, destroyed, lost or stolen Security, a new Security of the same tenor and principal amount and bearing an identifying number not contemporaneously outstanding.

If, after delivery of such new Security, a Protected Purchaser of the predecessor Security presents for payment, transfer or exchange such predecessor Security, the Co-Issuers (or, in the case of a Mezzanine Note or a Subordinated Note, the Issuer), the Transfer Agent and the Trustee shall be entitled to recover such new Security from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer, the Co-Issuer, the Trustee (or any Authenticating Agent) and the Transfer Agent in connection therewith.

In case any such mutilated, destroyed, lost or stolen Security has become due and payable, the Co-Issuers (or, in the case of a Mezzanine Note or a Subordinated Note, the Issuer) in their discretion may, instead of issuing a new Security, pay such Security without requiring surrender thereof except that any mutilated Security shall be surrendered.

Upon the issuance of any new Security under this Section 2.6, the Co-Issuers (or, in the case of a Mezzanine Note or a Subordinated Note, the Issuer), the Trustee or a Transfer Agent may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Security issued pursuant to this Section 2.6 in lieu of any mutilated, destroyed, lost or stolen Security shall constitute an original additional contractual obligation of the Co-Issuers (or, in the case of a Mezzanine Note or a Subordinated Note, the Issuer), and such new Security shall be entitled, subject to the second paragraph of this Section 2.6, to all the benefits of this Indenture equally and proportionately with any and all other Securities duly issued hereunder.

The provisions of this Section 2.6 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

Section 2.7    Payment of Principal and Interest.    (a)  Each Class of Senior Notes and Mezzanine Notes shall accrue interest during each Interest Period at the applicable Note Interest Rate specified in Section 2.3 on the Aggregate Outstanding Amount of such Class (determined in each case, as of the first day of each Interest Period and after giving effect to any payment of principal occurring on such day) from the Closing Date and will be payable in arrears on each Payment Date commencing in

October, 2008 and on Maturity, and will be computed in the manner set forth in Section 2.7(j); provided that if a Special Redemption occurs with respect to the Senior Notes or the Mezzanine Notes, interest shall accrue on each Class of Senior Notes and Mezzanine Notes so redeemed at their respective Note Interest Rate specified in Section 2.3 for the first Interest Period (i) during the period from and including the Closing Date to but excluding the Interim Payment Date, on the Aggregate Outstanding Amount of such Class as of the Closing Date and (ii) during the period from and including the Interim Payment Date to but excluding the first Payment Date, on the Aggregate Outstanding Amount of such Class as of the Interim Payment Date (after giving effect to the payment of principal on such date). The Subordinated Notes shall not accrue interest at a stated rate and shall be entitled to distribution of Interest Proceeds solely to the extent provided in the Priority of Payments. Any payment of interest with regard to any Class of Securities shall be made on a *pro rata* basis among the Securities of such Class. Any payment of principal with respect to any Class of Securities shall be made on a *pro rata* basis among the Securities of such Class, according to the respective unpaid principal amounts thereof outstanding immediately prior to such payment. Interest on the Senior Notes and the Mezzanine Notes shall be due and payable on each Payment Date (commencing in October, 2008) immediately following the related Interest Period and on Maturity.

(b)    So long as any Senior Notes are Outstanding, any interest that has accrued and is due on the Mezzanine Notes on any Payment Date but that remains unpaid on such Payment Date because funds are insufficient for such purpose in accordance with the Priority of Payments (including to the extent that funds are required to be applied to satisfy the Coverage Tests on such Payment Date) will not be considered Defaulted Interest but will, instead, be deferred for payment on subsequent Payment Dates (such interest, including as of any date interest accrued as provided in the next sentence on such interest not paid on prior Payment Dates, "Mezzanine Deferred Interest") shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Payment Date on which funds are permitted to be used for payment of such interest in accordance with the Priority of Payments and, in any event, on the Stated Maturity thereof. Mezzanine Deferred Interest accrued to any Payment Date shall bear interest at the Mezzanine Note Interest Rate and shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.

(c)    [Reserved].

(d)    [Reserved].

(e)    The principal of each Senior Note and Mezzanine Note shall be due and payable on the Stated Maturity thereof unless the unpaid principal of such Senior Note or Mezzanine Note, as applicable, becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise; provided, that on each Payment Date, principal of each Class of Senior Notes and Mezzanine Notes shall be paid only to the extent of available funds for such purpose in accordance with the Priority of Payments pursuant to Section 11.1.

(f)    Interest and principal due on any Payment Date on the Senior Notes and the Mezzanine Notes and distributions due on any Payment Date on the Subordinated Notes, if applicable, (including any Redemption Price paid on the applicable Redemption Date) shall be payable by the Trustee, by Dollar check drawn on a bank in the U.S. or by wire transfer in immediately available funds. For so long as any Securities are listed on the Irish Stock Exchange and the rules of such exchange shall so require, the Co-Issuers will have a paying agent (the "EU Paying Agent") for the Securities that are so listed in Ireland and payments on such Securities may be effected through such EU Paying Agent. In the event that the EU Paying Agent is replaced at any time during such period, notice of the appointment of any replacement will be given to the Irish Listing Agent for delivery to the Company Announcements Office. In the case of a check, such check shall be mailed to the Person entitled thereto at his address as it

appears on the Securities Register and, in the case of a wire transfer, such wire transfer shall be sent in accordance with written instructions provided by such Person. Upon final payment due on the Maturity of a Security, the Holder thereof shall present and surrender such Security at the Corporate Trust Office of the Trustee or at the office of any Paying Agent (outside of the U.S. if then required by applicable law in the case of a definitive Security issued in exchange for a beneficial interest in the Global Security) on or prior to such Maturity; provided, that if there is delivered to the Co-Issuers (or, in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer), the Trustee and the Paying Agent such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate, then, in the absence of notice to the Co-Issuers or the Trustee that the applicable Security has been acquired by a Protected Purchaser, such final payment shall be made without presentation or surrender. In the case where any final payment of principal and interest is to be made on any Senior Note or Mezzanine Note or final distribution is to be made on any Subordinated Note (other than on the Stated Maturity thereof) the Co-Issuers or, upon Issuer Request, the Trustee, in the name and at the expense of the Co-Issuers or the Issuer, as applicable, shall, not more than 30 nor less than ten days prior to the date on which such payment is to be made, mail to the Persons entitled thereto at their addresses appearing on the Securities Register, a notice which shall state the date on which such payment will be made, the amount of such payment per $1,000 initial principal amount of Securities and shall specify the place where such Securities may be presented and surrendered for such payment.

(g)     Subject to the provisions of Sections 2.7(a) through (e) hereof, the Holders of Senior Notes and the Mezzanine Notes as of the Record Date in respect of a Payment Date shall be entitled to the interest accrued and payable in accordance with the Priority of Payments and principal payable in accordance with the Priority of Payments on such Payment Date. All such payments that are mailed or wired and returned to the Corporate Trust Office of the Trustee or at the office of any Paying Agent shall be held for payment as herein provided at the office or agency of the Co-Issuers to be maintained as provided in Section 7.4.

(h)     Interest on any Senior Note and Mezzanine Note that is payable and is punctually paid or duly provided for on any Payment Date shall be paid to the Person in whose name that Senior Note (or one or more predecessor Senior Notes) or Mezzanine Note (or one or more predecessor Mezzanine Notes), is registered at the close of business on the Record Date for such interest.

(i)     Payments of principal to Holders of Senior Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Senior Notes of such Class registered in the name of each such Holder on such Record Date bears to the Aggregate Outstanding Amount of all Senior Notes of such Class on such Record Date. Payments of principal to Holders of Mezzanine Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Mezzanine Notes of such Class registered in the name of each such Holder on such Record Date bears to the Aggregate Outstanding Amount of all Mezzanine Notes of such Class on such Record Date.

(j)     Interest accrued with respect to the Senior Notes and the Mezzanine Notes (including interest on any Mezzanine Deferred Interest and Defaulted Interest, as applicable, in respect thereof) shall be computed on the basis of a 360-day year and the actual number of days elapsed in the applicable Interest Period (including any adjustment to the number of days in an Interest Period as a result of the related Payment Date and/or the preceding Payment Date being moved from a day that is not a Business Day to the immediately succeeding Business Day).

(k)     All reductions in the principal amount of a Senior Note or a Mezzanine Note (or one or more predecessor Senior Notes or Mezzanine Notes) effected by payments of installments of principal made on any Payment Date, Redemption Date or any other date shall be binding upon all future Holders of such Senior Note or Mezzanine Note and of any Senior Note or Mezzanine Note, as

applicable, issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Senior Note or Mezzanine Note.

(l)    The Senior Notes and the obligations of the Issuer and Co-Issuer thereunder and the Mezzanine Notes and the obligations of the Issuer thereunder shall be limited recourse debt obligations of the Issuer, and the Co-Issued Notes shall be non-recourse debt obligations of the Co-Issuer, secured, in each case, solely by, and payable only from the proceeds of, a pledge of the Collateral by the Issuer to the Trustee pursuant to this Indenture for the benefit of the Holders of the Senior Notes and the Mezzanine Notes in accordance with the terms of this Indenture.  The obligations of the Issuer under the Subordinated Notes are non-recourse obligations of the Issuer, payable solely from the Collateral and following the realization of the Collateral.  No recourse shall be had for the payment of any amount owing in respect of the Securities against any officer, director, employee, stockholder, shareholder or incorporator of the Co-Issuers or any successors or assigns thereof for any amounts payable under the Securities or this Indenture.  It is understood that the foregoing provisions of this Section 2.7(l) shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement that is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Securities or secured by this Indenture, and the same shall continue until paid or discharged.  It is further understood that the foregoing provisions of this Section 2.7(l) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any action or suit or in the exercise of any other remedy under the Securities or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person.  In the event that the proceeds of the realization of the Collateral are insufficient to satisfy all claims hereunder, such claims shall be limited to the proceeds of the realization of the Collateral and once such proceeds have been exhausted in accordance with the terms hereof, no debt shall be owed by the Co-Issuers for any further sum and all claims hereunder shall be extinguished and shall not thereafter revive.

(m)    Subject to the foregoing provisions of this Section 2.7, each Senior Note and Mezzanine Note delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Senior Note or Mezzanine Note, as applicable, shall carry the rights of unpaid interest and principal that were carried by such other Senior Note or Mezzanine Note.

(n)    If the Senior Notes and the Mezzanine Notes have become or been declared due and payable following an Event of Default and such acceleration of Maturity and its consequences have not been rescinded and annulled and the provisions of Section 5.5 are not applicable, then payments of principal of and interest on such Senior Notes and Mezzanine Notes shall be made in accordance with Section 11.1.

Section 2.8    Persons Deemed Owners.  The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat the Person in whose name any Security is registered as the owner of such Security on the Securities Register on the applicable Record Date for the purpose of receiving payments on such Security and on any other date for all other purposes whatsoever (whether or not such payment is overdue), and neither the Co-Issuers (or, in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer) nor the Trustee nor any agent of the Co-Issuers or the Trustee shall be affected by notice to the contrary; provided, that the Depositary, or its nominee, shall be deemed the owner of the Global Securities, and owners of beneficial interests in Global Securities will not be considered the owners of any Securities for the purpose of receiving notices.

Section 2.9    Cancellation.  All Securities surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee and shall be promptly cancelled by it.  No Securities shall be

authenticated in lieu of or in exchange for any Securities cancelled as provided in this Section 2.9, except as expressly permitted by this Indenture. All cancelled Securities held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Co-Issuers (or, in the case of the Subordinated Notes, the Issue) shall direct by an Issuer Order that they be returned to the Issuer.

Section 2.10    Global Securities; Temporary Securities.    (a) A Global Security deposited with the Depositary pursuant to Section 2.2 shall be transferred to the beneficial owners thereof only if such transfer complies with Section 2.5 of this Indenture and either (i) the Depositary notifies the Co-Issuers (or with respect to Regulation S Global Subordinated Notes, the Issuer) that the Depositary is unwilling or unable to discharge properly its responsibilities as Depositary with respect to the Global Securities or if at any time such Depositary ceases to be a Clearing Agency and a successor clearing agency is not appointed by the Co-Issuers within 90 days of such notice, or (ii) as a result of any amendment to or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which become effective on or after the Closing Date, the Issuer or any Paying Agent becomes aware that it is or will be required to make any deduction or withholding from any payment in respect of the Securities which would not be required if the Securities were in definitive form.

(b)    Any Global Security that is transferable to the beneficial owners thereof pursuant to this Section 2.10 shall be surrendered by the Depositary to the Trustee's to be so transferred, in whole or from time to time in part, without charge, and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Security, an equal aggregate principal amount of Securities of authorized denominations. Any portion of a Rule 144A Global Security or a Regulation S Global Security transferred pursuant to this Section 2.10 shall be executed, authenticated and delivered in denominations of $250,000 and any integral multiple of $1,000 in excess thereof, registered in such names as the Depositary shall direct in writing. Any Security delivered by the Trustee or its agent in exchange for an interest in a Rule 144A Global Security shall, except as otherwise provided by Section 2.5(k), bear the Rule 144A Legend set forth in the applicable Exhibit to this Indenture. Any Security delivered in exchange for an interest in a Regulation S Global Security shall, except as otherwise provided by Section 2.5(k), bear the Regulation S Legend set forth in the applicable Exhibit to this Indenture.

(c)    Subject to the provisions of Section 2.10(c), the registered Holder of a Global Security may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Securities.

(d)    Upon receipt of notice from the Depositary of the occurrence of either of the events specified in Section 2.10(a), the Issuer shall use its best efforts to make arrangements with the Depositary for the exchange of interests in the Global Securities for individual definitive Securities and cause the requested individual definitive Securities to be executed and delivered to the Securities Registrar in sufficient quantities and authenticated by or on behalf of the Trustee for delivery to Holders.

(e)    Pending the preparation of definitive certificates for such Class of Securities pursuant to this Section 2.10, the Co-Issuers (or with respect to Mezzanine Notes and Regulation S Global Subordinated Notes, the Issuer) may execute, and upon Issuer Order the Trustee shall authenticate and deliver, temporary certificates for such Class of Securities that are printed, lithographed, typewritten, mimeographed or otherwise reproduced, in any authorized denomination, substantially of the tenor of the definitive certificates in lieu of which they are issued and with such appropriate insertions, omissions,

substitutions and other variations as the Officers executing such temporary certificates may determine, as conclusively evidenced by their execution of such certificates.

(f)     If temporary certificates for a Class of Securities are issued as provided above, the Co-Issuers (or with respect to Mezzanine Notes and Regulation S Global Subordinated Notes, the Issuer) will cause such Securities to be prepared without unreasonable delay.  The definitive certificates shall be printed, lithographed or engraved, or provided by any combination thereof, or in any other manner permitted by the rules and regulations of any applicable securities exchange, all as determined by the Officers executing such definitive certificates.   After the preparation of definitive certificates, the temporary certificates shall be exchangeable for definitive certificates upon surrender of the temporary certificates at the office or agency maintained by the Co-Issuers (or with respect to Mezzanine Notes and Regulation S Global Subordinated Notes, the Issuer) for such purpose, without charge to the Holder. Upon surrender for cancellation of any one or more temporary certificates, the Co-Issuers (or with respect to Mezzanine Notes and Regulation S Global Subordinated Notes, the Issuer) shall execute, and the Trustee shall authenticate and deliver, in exchange therefor the same aggregate principal amount of definitive certificates of authorized denominations.  Until so exchanged, the temporary certificates shall in all respects be entitled to the same benefits under this Indenture as definitive certificates.

(g)     Persons exchanging interests in a Global Security for individual definitive Securities will be required to provide to the Trustee, through the Depositary, (i) written instructions and other information required by the Issuer and the Trustee to complete, execute and deliver such individual definitive Securities, (ii) in the case of an exchange of an interest in a Rule 144A Global Security, such certification as to QIB/QP status as the Issuer shall require, and (iii) in the case of an exchange of an interest in a Regulation S Global Security, such certification as to non-U.S. Person and non-U.S. Resident status as the Issuer shall require.  In all cases, individual definitive Securities delivered in exchange for any Global Security or beneficial interests therein will be registered in the names, and issued in any approved denominations, requested by the Depositary.

Section 2.11     Additional Issuance of Securities.  (a) At the direction of a Majority of the Senior Notes, the Issuer may issue and sell additional Senior Notes and use the proceeds in the manner specified in Section 2.11(e) below at any time prior to the Stated Maturity if the following conditions are satisfied:  (i) the Senior Notes issued must be *pro rata* in right of payment and priority with the previously issued Senior Notes; (ii) the Stated Maturity of such Senior Notes is not prior to the Stated Maturity of the previously issued Senior Notes; (iii) each other term of such additional Senior Notes (other than the issue price thereof) is no more favorable to the Holders thereof than the corresponding terms of the previously issued Senior Notes; (iv) the additional Senior Notes must be issued at par; (v) each existing Holder of Senior Notes shall have been notified in writing 30 days prior to such issuance and shall have been afforded the opportunity to purchase additional Senior Notes in an amount equal to the percentage of the aggregate amount of Senior Notes held by such Holder immediately prior to such issuance; (vi) an opinion of counsel shall be delivered to the Trustee to the effect that (a) the Issuer will not be required, as a result of such additional issuance, to be registered as an investment company under the Investment Company Act, (b) such additional issuance will not result in the Issuer becoming subject to U.S. federal income taxation with respect to its net income, (c) such additional issuance would not prevent the Senior Notes previously issued from being characterized as debt for U.S. federal income tax purposes and (d) the additional and existing Senior Notes will be treated as debt for U.S. federal income tax purposes; (vii) such additional issuance is in accordance with all applicable laws; and (viii) receipt by the Co-Issuers of Rating Agency Confirmations with respect to such additional issuance and application of the proceeds thereof in accordance with Section 2.11(e) from each Rating Agency rating the previously issued Senior Notes that are outstanding at such time. In addition, following the issuance of any additional Senior Notes, the Underlying Assets (including any additional Underlying Assets purchased

from proceeds from such additional issuance in accordance with Section 2.11(e)) must be in compliance with the Coverage Tests.

(b)       At the direction of a Majority of the Mezzanine Notes, the Issuer may issue and sell additional Mezzanine Notes and use the proceeds in the manner specified in Section 2.11(e) below at any time prior to the Stated Maturity if the following conditions are satisfied:  (i) the Mezzanine Notes issued must be *pro rata* in right of payment and priority with the previously issued Mezzanine Notes; (ii) the Stated Maturity of such Mezzanine Notes is not prior to the Stated Maturity of the previously issued Mezzanine Notes; (iii) each other term of such additional Mezzanine Notes (other than the issue price thereof) is no more favorable to the Holders thereof than the corresponding terms of the previously issued Mezzanine Notes; (iv) the additional Mezzanine Notes must be issued at par; (v) each existing Holder of Mezzanine Notes shall have been notified in writing 30 days prior to such issuance and shall have been afforded the opportunity to purchase additional Mezzanine Notes in an amount equal to the percentage of the aggregate amount of Mezzanine Notes held by such Holder immediately prior to such issuance; (vi) an opinion of counsel shall be delivered to the Trustee to the effect that (a) the Issuer will not be required, as a result of such additional issuance, to be registered as an investment company under the Investment Company Act, (b) such additional issuance will not result in the Issuer becoming subject to U.S. federal income taxation with respect to its net income and (c) such additional issuance would not prevent the Senior Notes and Mezzanine Notes previously issued from being characterized as debt for U.S. federal income tax purposes; (vii) such additional issuance is in accordance with all applicable laws; and (viii) receipt by the Issuer of Rating Agency Confirmations with respect to such additional issuance and application of the proceeds thereof in accordance with Section 2.11(e) from each Rating Agency rating the previously issued Senior Notes and Mezzanine Notes that are outstanding at such time. In addition, following the issuance of any additional Mezzanine Notes, the Underlying Assets (including any additional Underlying Assets purchased from proceeds from such additional issuance in accordance with Section 2.11(e)) must be in compliance with the Coverage Tests.

(c)       At the direction of a Majority of the Subordinated Notes, the Issuer may issue and sell additional Subordinated Notes and use the proceeds in the manner specified in Section 2.11(e) below at any time prior to the Stated Maturity if the following conditions are satisfied:  (i) the Subordinated Notes issued must be *pro rata* in right of payment and priority with the previously issued Subordinated Notes; (ii) the Stated Maturity of such Subordinated Notes is not prior to the Stated Maturity of the previously issued Subordinated Notes; (iii) each other term of such additional Subordinated Notes (other than the issue price thereof) is no more favorable to the Holders thereof than the corresponding terms of the previously issued Subordinated Notes; (iv) the additional Subordinated Notes must be issued at par; (v) each existing Holder of Subordinated Notes shall have been notified in writing 30 days prior to such issuance and shall have been afforded the opportunity to purchase additional Subordinated Notes in an amount equal to the percentage of the aggregate amount of Subordinated Notes held by such Holder immediately prior to such issuance; (vi) an opinion of counsel shall be delivered to the Trustee to the effect that (a) the Issuer will not be required, as a result of such additional issuance, to be registered as an investment company under the Investment Company Act, (b) such additional issuance will not result in the Issuer becoming subject to U.S. federal income taxation with respect to its net income and (c) such additional issuance would not prevent the Senior Notes and Mezzanine Notes previously issued from being characterized as debt for U.S. federal income tax purposes; (vii) such additional issuance is in accordance with all applicable laws; and (viii) receipt by the Co-Issuers of Rating Agency Confirmations with respect to such additional issuance and application of the proceeds thereof in accordance with Section 2.11(e) from each Rating Agency rating the previously issued Senior Notes and Mezzanine Notes that are outstanding at such time. In addition, following the issuance of any additional Subordinated Notes, the Underlying Assets (including any additional Underlying Assets purchased from proceeds from such additional issuance in accordance with Section 2.11(e)) must be in compliance with the Coverage Tests.

(d)    Any additional Securities issued pursuant to this Section 2.11 shall be subject to the terms of this Indenture as if such Securities had been issued on the date hereof and shall be subject to the requirements of Section 3.3 and if such additional Securities are to be rated by Standard & Poor's, the terms of such additional Securities (including application of such proceeds as Interest Proceeds pursuant to clause (h) of the definition thereof) shall be subject to rating review by Standard & Poor's.

(e)    The net proceeds of the Securities issued in connection with any additional issuance pursuant to this Section 2.11 shall be (i) applied to purchase or invest in additional Underlying Assets, and/or (ii) deposited into the Interest Collection Account for application as Interest Proceeds in accordance with the Priority of Payments on the immediately following Payment Date, in each case, at the discretion of the Administrative Agent (except to the extent that any such net proceeds designated as Interest Proceeds may subsequently be designated as Principal Proceeds at the discretion of the Administrative Agent). The Issuer, at the direction of the Administrative Agent, shall promptly deliver or cause to be delivered to the Trustee and each Rating Agency an amended Schedule of Underlying Assets reflecting the purchase of additional Underlying Assets as contemplated hereunder.  The delivery of such amended schedule shall be a deemed certification that the additional Underlying Assets meet the requirements set forth in the definition of Underlying Assets.

Section 2.12    Tax Purposes.  The Co-Issuers and each Holder of a Senior Note and each Holder of a beneficial interest in a Senior Note, by acceptance of its Senior Note, or its interest in a Senior Note, shall be deemed to have agreed to treat, and shall treat, such Senior Note as unconditional debt of the Issuer for U.S. income tax purposes.  The Issuer and each Holder of a Mezzanine Note and each Holder of a beneficial interest in a Mezzanine Note, by acceptance of its Mezzanine Note, or its interest in a Mezzanine Note, shall be deemed to have agreed to treat, and shall treat, such Mezzanine Note as unconditional debt of the Issuer for U.S. income tax purposes.  The Issuer and each Holder and beneficial owner of a Subordinated Note, by acceptance of its Subordinated Note, or its interest in a Subordinated Note, shall be deemed to have agreed to treat, and shall treat, such Subordinated Note as equity of the Issuer for U.S. income tax purposes.

Section 2.13    No Gross Up.  The Issuer shall not be obligated to pay any additional amounts to the Holders of beneficial interests in the Securities as a result of any withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges.

Section 2.14    Securities Beneficially Owned by Persons not either QIB/QPs or both Accredited Investors and QPs.  (a) Notwithstanding anything to the contrary elsewhere in this Indenture, any purported transfer of a beneficial interest in any Security to a Person that is either a U.S. Person or a U.S. Resident and is not either a QIB/QP or an Accredited Investor and a QP shall be null and void *ab initio* and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee shall have notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(b)    If any Person that is either a U.S. Person or a U.S. Resident that is not either a QIB/QP or an Accredited Investor and a QP at the time it acquires a Security or a beneficial interest therein shall become the beneficial owner of any Security (any such person, a "Non-Permitted Holder"), the Issuer shall, promptly after discovery that such Person is a Non-Permitted Holder by the Issuer, the Co-Issuer or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery), send notice to such Non-Permitted Holder demanding that such Non-Permitted Holder transfer its interest to a Person that is not a Non-Permitted Holder within 30 days of the date of such notice.  If such Non-Permitted Holder fails to transfer its Security or interest therein, the Issuer shall have the right, without further notice to the Non-Permitted Holder, to sell such Security or interest in such Security to a purchaser selected by the Issuer that is not a Non-Permitted Holder on such terms as the Issuer may choose.  The Issuer, or the Trustee may select the purchaser by soliciting one or more bids

from one or more brokers or other market professionals that regularly deal in securities similar to the Securities and selling such Security to the highest such bidder.  However, the Issuer or the Trustee may select a purchaser by any other means determined by it in its sole discretion.  The Holder of each Security, the Non-Permitted Holder and each other Person in the chain of title from the Holder to the Non-Permitted Holder, by its acceptance of an interest in the Securities, agrees to cooperate with the Issuer and the Trustee to effect such transfers.  The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted Holder.  The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and neither the Issuer nor the Trustee shall be liable to any Person having an interest in the Securities sold as a result of any such sale or the exercise of such discretion.  No payments will be made on the interest in a Security from the date notice of the sale requirement is sent to the date on which the interest is sold.  The Co-Issuers (or, in the case of a Mezzanine Note, the Issuer) shall also be entitled not to honor the transfer of an interest in a Security (i) in the form of a Rule 144A Global Security to a transferee that the Co-Issuers (or, in the case of a Mezzanine Note, the Issuer) believe(s) is a U.S. person or a U.S. resident that is not a QIB/QP at the time of acquisition of such interest or (ii) in the form of a Certificated Senior Note or Certificated Mezzanine Note to a transferee that the Co-Issuers (or, in the case of a Mezzanine Note, the Issuer) believe(s) is a U.S. person or a U.S. resident that is not both an Accredited Investor and QP at the time of acquisition of such interest.  The Issuer shall also be entitled not to honor the transfer of an interest in a Subordinated Note in the form of a Certificated U.S. Subordinated Note to a transferee that the Issuer believes is a U.S. Person or a U.S. Resident that is not a QIB/QP at the time of acquisition of such interest.  In connection therewith, the Issuer shall also be entitled to require any Holder of a Security in the form of an interest in a Rule 144A Global Security or a Certificated Note to certify, upon request by the Issuer, whether such Holder is a U.S. Person or a U.S. Resident and whether such Holder was either a QIB/QP or an Accredited Investor and a QP at the time of acquisition of such interest.  The Issuer shall be entitled to assume that any Holder of a Security in the form of an interest in a Rule 144A Global Security or any Holder of either a Senior Note, Mezzanine Note or a Subordinated Note in the form of a Certificated Note that does not promptly respond to such request is a U.S. Person or a U.S. Resident and was not either a QIB/QP or both an Accredited Investor and a QP at the time of acquisition of such interest.  Each Holder of an interest in a Rule 144A Global Security shall be deemed to acknowledge and agree to the Issuer's entitlement to require any sale in connection with the circumstances described in this Section 2.14 pursuant to Section 2.5(h).  Each Holder of a Certificated Note shall be required to acknowledge and agree to the Issuer's entitlement to require any sale in connection with the circumstances described in this Section 2.14, if such Holder is an initial purchaser of such Security, or the transfer certificate to be delivered pursuant to Section 2.5(d) if such Holder is a transferee of such Security.

ARTICLE III
CONDITIONS PRECEDENT; CERTAIN PROVISIONS
RELATING TO COLLATERAL

Section 3.1    General Provisions.  The Securities to be issued on the Closing Date shall be executed by the Co-Issuers (or, with respect to the Subordinated Notes, the Issuer)) and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon Issuer Request, upon compliance with Section 3.2 and upon receipt by the Trustee of the following:

(a)    an Officer's Certificate of the Issuer (A) evidencing the authorization by Board Resolution of the execution and delivery of, among other documents, this Indenture, the Administration Agreement, the Collateral Administration Agreement, the Administrative Agency Agreement, the Master Participation Agreement and the Purchase Agreements and the execution, authentication and delivery of the Securities and specifying the Stated Maturity, the principal amount and Note Interest Rate of each

Class of Senior Notes and Mezzanine Notes to be authenticated and delivered; and (B) certifying that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(b)    an Officer's Certificate of the Co-Issuer (A) evidencing the authorization by Board Resolution of the execution and delivery of this Indenture and the execution, authentication and delivery of the Co-Issued Notes and specifying the Stated Maturity, the principal amount and Note Interest Rate of the Co-Issued Notes to be authenticated and delivered; and (B) certifying that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(c)    either (A) a certificate of the Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel to the effect that the Trustee is entitled to rely thereon and that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Senior Notes, Mezzanine Notes and the Subordinated Notes or (B) an Opinion of Counsel of the Issuer to the effect that the Trustee is entitled to rely thereon and that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Senior Notes, Mezzanine Notes and Subordinated Notes except as may have been given for the purposes of the foregoing; provided that the opinion of Allen & Overy LLP attached as Exhibit J hereto and Maples and Calder attached as Exhibit K hereto in respect of such matters shall satisfy this clause (i)(B);

(d)    either (A) a certificate of the Co-Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel to the effect that the Trustee is entitled to rely thereon and that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Co-Issued Notes, or (B) an Opinion of Counsel of the Co-Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Co-Issued Notes except as may have been given for the purposes of the foregoing; provided, that the opinion of Allen & Overy LLP attached as Exhibit J hereto in respect of such matters shall satisfy this clause (ii)(B);

(e)    an opinion of Allen & Overy LLP, counsel to the Co-Issuers, dated the Closing Date, substantially in the form of Exhibit J;

(f)    an opinion of Maples and Calder, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit K;

(g)    an opinion of Allen & Overy LLP, counsel to the Issuer, dated the Closing Date, on security interest-related matters substantially in the form of Exhibit L;

(h)    an opinion of Allen & Overy LLP, special tax counsel to the Issuer, dated the Closing Date, in form and substance satisfactory to the Issuer and the Manager;

(i)    an opinion of Alston & Bird LLP, counsel to the Trustee, dated the Closing Date, substantially in the form of Exhibit M;

(j)     an Officer's Certificate stating that the Issuer is not in Default under this Indenture and that the issuance of the Securities will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the Issuer Charter, any indenture or other agreement or instrument to which the Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer is a party or by which it may be bound or to which it may be subject; and that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Securities have been complied with;

(k)     an Officer's Certificate stating that the Co-Issuer is not in Default under this Indenture and that the issuance of the Co-Issued Notes applied for will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the Certificate of Incorporation or By-laws of the Co-Issuer, any indenture or other agreement or instrument to which the Co-Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Co-Issuer is a party or by which it may be bound or to which it may be subject; and that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Co-Issued Notes applied for have been complied with;

(l)     an Accountants' Certificate satisfactory to the Issuer (i) confirming the information with respect to each Underlying Asset set forth on the Schedule of Underlying Assets, (ii) confirming that the Senior Note Overcollateralization Ratio Test is met as of the Closing Date and (iii) specifying the procedures undertaken by them to review data and computations relating to the Underlying Assets;

(m)     true and correct copies of letters signed by each of the Rating Agencies confirming that the Senior Notes have been rated "A2" by Moody's and "A" by Standard & Poor's and that the Mezzanine Notes have been rated "B1" by Moody's and "B+" by Standard & Poor's;

(n)     an executed copy of the Collateral Administration Agreement;

(o)     an executed copy of the Administrative Agency Agreement;

(p)     an executed copy of the Securities Account Control Agreement;

(q)     an executed copy of the Administration Agreement;

(r)     a certificate from the Governor in Cabinet of the Cayman Islands stating that the Issuer will be exempt from certain Cayman Islands taxes; provided that such certificate shall be deliverable within five Business Days of the Closing Date;

(s)     copies of the UCC-1 Financing Statements relating to the Collateral filed in the District of Columbia no later than ten Business Day following the Closing Date;

(t)     written confirmation from either the Administrative Agent or the Issuer that, immediately after giving effect to the issuance of the Securities on the Closing Date, the Variable Funding Account will have credited to it an amount equal to the aggregate amount of the unfunded commitments under all Underlying Assets that are Delayed-Draw Loans or Revolving Credit Facilities; and

(u)     such other documents as the Trustee may reasonably require; provided, that nothing in this clause shall imply or impose a duty on the Trustee to require such other documents.

Section 3.2    Security for the Senior Notes and Mezzanine Notes.    The Co-Issued Notes to be issued on the Closing Date may be executed by the Co-Issuers or, with respect to the Mezzanine Notes and the Subordinated Notes, the Issuer and delivered to the Trustee for authentication, and thereupon the same shall be authenticated and delivered to the Issuer by the Trustee upon Issuer Order and upon delivery by the Issuer to the Trustee, and receipt by the Trustee, of the following:

(a)    Grant of Underlying Assets.    Fully executed copies of this Indenture and copies of any other instrument or document, fully executed (as applicable), which the Issuer determined to be necessary to consummate and perfect the Grants set forth in the Granting Clauses of this Indenture of perfected security interests that are of first priority, free of any adverse claim or the legal equivalent thereof in favor of the Trustee on behalf of the Secured Parties in all of the Issuer's right, title and interest in and to the Collateral on the Closing Date, including compliance with the provisions of Section 3.4.

(b)    Certificate of the Issuer.    A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, in the case of each Underlying Asset and any Deposit on the Closing Date and immediately prior to the delivery thereof on the Closing Date:

(i)    the Issuer has good and marketable title to the Underlying Asset and Deposit free and clear of any liens, claims, encumbrances or defects of any nature whatsoever, except for those which are being released on the Closing Date and except for those encumbrances arising from due bills, if any, with respect to interest, or a portion thereof, accrued on such Underlying Asset prior to the Closing Date and owed by the Issuer to the seller of such Underlying Asset;

(ii)    the Issuer has acquired its ownership in such Underlying Asset and Deposit in good faith without notice of any adverse claim, except as described in clause (i) above;

(iii)    the Issuer has not assigned, pledged or otherwise encumbered any interest in such Underlying Asset and Deposit (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(iv)    the Issuer has full right to Grant a security interest in and assign and pledge such Underlying Asset and Deposit to the Trustee;

(v)    such Underlying Asset satisfies the applicable requirements set forth in the definition of "Underlying Asset" herein;

(vi)    the information set forth with respect to such Underlying Asset in the Schedule of Underlying Assets is true, accurate and complete; and

(vii)    upon Grant by the Issuer, the Trustee has a perfected security interest on behalf of the Secured Parties in the Pledged Underlying Assets that is of first priority, free of any adverse claim or the legal equivalent thereof, as applicable.

(c)    Issuer Accounts.    Evidence of the establishment of the Issuer Accounts.

(d)    Issuer Order.    An Issuer Order or Issuer Request directing the Trustee to authenticate the Senior Notes and an Issuer Order or Issuer Request executed by the Co-Issuer directing the Trustee to authenticate the Co-Issued Notes, in both cases in the amounts and registered in the names set forth therein.

Section 3.3        Additional Securities – General Provisions.    Additional Securities may be executed by the Co-Issuers (in the case of the Co-Issued Notes) or the Issuer (in the case of Mezzanine Notes and Subordinated Notes) and delivered to the Trustee for authentication and thereupon authenticated and delivered by the Trustee upon Issuer Request, upon compliance with Section 3.2 and upon receipt by the Trustee of the following:

(a)        the Officer's Certificates of the Co-Issuers (or in the case of such additional issuance of Mezzanine Notes or Subordinated Notes, the Issuer) substantially described in Section 3.1(a), (b), (c), (d), (i) and (j), respectively, with respect to such additional issuance; and

(b)        Rating Agency Confirmation from Moody's and Standard & Poor's with respect to such additional issuance and with respect to the existing Senior Notes and Mezzanine Notes, and in the event that the Issuer has requested that such additional Senior Notes or Mezzanine Notes, as applicable, be rated by, true and correct copies of letters signed by each applicable Rating Agency confirming such ratings.

Section 3.4        Delivery of Underlying Assets and Eligible Investments.    Underlying Assets and Eligible Investments relating to, or made from funds from, the Issuer Accounts, shall be transferred in accordance with the following:

(a)        The Trustee shall appoint a custodian (in such capacity, the "Custodian") to act as a securities intermediary (in such additional capacity, the "Securities Intermediary") with respect to the Issuer Accounts and to hold all Certificated Securities and Instruments that are in physical form and that cannot be held in a Securities Account at the office of the Custodian in the States of North Carolina, Wisconsin or New York.    Initially, such Custodian and Securities Intermediary shall be the Bank.    Any successor Custodian or Securities Intermediary shall be a state or national bank or trust company or banking association or corporation which is not an Affiliate of the Co-Issuers and has a combined capital and surplus of at least U.S.$250,000,000 and a long-term debt rating of at least "Baa1" by Moody's and "BBB+" by Standard & Poor's.

(b)        Each time that the Issuer, or the Administrative Agent on behalf of the Issuer, shall direct or cause the acquisition of any Underlying Asset or Eligible Investment, the Issuer, or the Administrative Agent on behalf of the Issuer, shall, if such Underlying Asset or Eligible Investment has not already been transferred in accordance with Section 3.4(c), cause the transfer of such Underlying Asset or Eligible Investment to the Securities Intermediary in the manner described in Section 3.4(c) to be held in an Issuer Account for the benefit of the Trustee.    Notwithstanding the foregoing, the Issuer, or the Administrative Agent on behalf of the Issuer, may cause any Underlying Asset or Eligible Investment to be transferred to the Securities Intermediary for the benefit of the Trustee or to the Trustee by such other method, or take any other appropriate action, for which an Opinion of Counsel specifies will result in a valid, perfected, first priority security interest in favor of the Trustee in each Underlying Asset and Eligible Investment.    The security interest of the Trustee in the funds or other property utilized in connection with such acquisition shall, immediately and without further action on the part of the Trustee, be released.    The security interest of the Trustee shall come into existence and continue in the Underlying Asset or Eligible Investment so acquired, including all rights of the Issuer in and to any contracts related to and proceeds of such Underlying Asset or Eligible Investment.    The Issuer, or the Administrative Agent on behalf of the Issuer, also shall take any and all other actions necessary to create in favor of the Trustee, a valid, perfected, first priority security interest in each Underlying Asset and Eligible Investment Granted to the Trustee under laws and regulations (including Articles 8 and 9 of any applicable UCC) in effect from time to time, including, without limitation, by authorizing and filing a financing statement under the UCC in the District of Columbia and in any other appropriate jurisdiction.

(c)      Except as provided in Section 3.4(b), in the case of any Underlying Asset or Eligible Investment to be transferred to the Securities Intermediary for the benefit of the Trustee, the Issuer shall deliver, or cause to be delivered, such Underlying Asset or Eligible Investment as follows (provided, that in the case of any Underlying Asset that is an Uncertificated Security or Certificated Security held by a Clearing Corporation other than the Depositary, Clearstream or Euroclear, the Issuer shall have delivered an Opinion of Counsel at the expense of the Issuer to the Trustee stating the necessary events upon the occurrence of which the security interest of the Trustee in such Underlying Asset will be a perfected security interest (and a first priority perfected security interest with respect to all of the Collateral), and the Issuer shall, further, within thirty (30) days after the date of such acquisition, deliver to the Trustee a certificate stating that the necessary events set forth in such Opinion of Counsel have taken place):

(i)      in the case of an Instrument or a Certificated Security which cannot be held in a Securities Account, by (w) delivering such Instrument or Certificated Security to the Securities Intermediary endorsed to the Securities Intermediary or endorsed in blank, in each case by an effective Indorsement, or registered in the name of the Securities Intermediary (unless such Instrument or Certificated Security is in bearer form in which case delivery alone shall suffice), (x) causing the Securities Intermediary to maintain continuous possession of such Instrument or Certificated Security, (y) causing the Securities Intermediary to credit such Instrument or Certificated Security to an Issuer Account and (z) causing the Securities Intermediary to continuously identify such Instrument or Certificated Security on its books and records as being credited to such Issuer Account;

(ii)      in the case of an Uncertificated Security, by (w) causing the Securities Intermediary to become the registered owner of such Uncertificated Security, (x) causing such registration to remain effective, (y) causing the Securities Intermediary to credit such Uncertificated Security to an Issuer Account and (z) causing the Securities Intermediary to continuously identify such Uncertificated Security on its books and records as being credited to such Issuer Account; and

(iii)      in the case of any Securities Entitlement, by (x) causing the Securities Intermediary to become the Entitlement Holder of such Securities Entitlement, (y) causing the Securities Intermediary to credit such Securities Entitlement to an Issuer Account and (z) causing the Securities Intermediary to continuously identify such Securities Entitlement on its books and records as being credited to such Issuer Account;

(d)      The Issuer (or the Administrative Agent on its behalf) shall deliver all Underlying Assets or Eligible Investments acquired by the Issuer to the Securities Intermediary for the benefit of the Trustee and shall take such other action as may be reasonably requested to create in favor of the Trustee a valid, perfected, first priority security interest in each Underlying Asset or Eligible Investment Granted in accordance with this Indenture under applicable laws and regulations (including Articles 8 and 9 of the applicable UCC and federal regulations governing transfers of interests in securities issued by the U.S. or any agency or instrumentality thereof in effect at the time of such Grant).

(e)      The Issuer shall cause a UCC financing statement describing the Collateral by use of the words "all personal property" and naming the Issuer as debtor and the Trustee as secured party to be filed by or on behalf of the Issuer in the District of Columbia, within ten (10) Business Days of the Closing Date.  The Issuer shall take all actions necessary to maintain the effectiveness of such financing statement and shall notify the Trustee in writing thirty (30) days prior to any change in the Issuer's name, identity, corporate structure, jurisdiction of incorporation or jurisdiction of its chief executive office.  The Issuer hereby authorizes the Trustee to file any other financing statement, amendment, assignment or

continuation statement that the Trustee shall have been advised pursuant to Section 7.7 or otherwise is necessary or advisable in connection with the security interest granted hereunder, including financing statements describing the Collateral as "all personal property;" provided, that the Trustee shall not be deemed to assume the obligations of the Issuer under this Section 3.4(e) pursuant to this provision. The Issuer shall not authorize the filing of any financing statements naming it as debtor other than financing statements in favor of the Trustee.

(f)     In addition to those steps specified in Sections 3.4(b) through (e) above, the Issuer shall take all steps necessary or advisable under the laws of the Cayman Islands to protect the security interest of the Trustee including the registration of this Indenture in the register of mortgages and charges of the Issuer at the Issuer's registered office in the Cayman Islands.

(g)     Without limitation of the foregoing, with respect to Bonds, Loans and Participations delivered to the Trustee or the Custodian (or any other custodian or the Securities Intermediary acting on its behalf) pursuant to the provisions of this Indenture, the Administrative Agent, pursuant to the terms of the Administrative Agency Agreement, shall have the responsibility of examining the underlying credit agreements and other underlying documents and nothing herein shall be construed to impose or imply any duty or obligation on the part of the Trustee or the Custodian (or any other custodian or the Securities Intermediary acting on its behalf) to examine any underlying credit agreement, loan agreement, participation agreement, indenture, trust agreement or similar instrument that may be applicable to any Bond, Loan or Participation in order to determine (or otherwise to determine under applicable law) whether sufficient actions have been taken and documents delivered (including, without limitation, any requisite obligor or agent bank consents, notices or filings) in order to properly assign, transfer, or otherwise convey title to such Bonds, Loans or Participations to the Issuer. In connection with the delivery of any Bond, Loan or Participation, the Issuer (or the Administrative Agent on its behalf) shall send to the Trustee a trade ticket or transmittal letter (in form and content mutually acceptable to them), which shall, at a minimum (in addition to other appropriate information with regard to the subject Bond, Loan or Participation as may be mutually agreed upon by the Trustee and the Administrative Agent), specify the purchase price for, and principal amount of, such Bond, Loan or Participation. In addition, the Issuer (or the Administrative Agent on its behalf) shall provide to the Trustee such other information as the Trustee may reasonably request in connection with the purchase and delivery of such Bond, Loan or Participation. Each of the Trustee, any custodian acting on its behalf and the Bank acting as Custodian shall be entitled to assume the genuineness, validity and enforceability of each such note, certificate, instrument and agreement delivered to it in connection with the delivery of a Bond, Loan or Participation, and to assume that each is what it purports on its face to be, and to assume the genuineness and due authority of all signatures appearing thereon.

Section 3.5     Purchase and Delivery of Underlying Assets and Other Actions During the Ramp-Up Period; Ramp-Up Effective Date Legal Opinion.

(a)     Investment of Deposit. As of the Closing Date, the Issuer has purchased or entered into commitments to purchase an Aggregate Principal Amount of Underlying Assets equal to at least 100% of the Maximum Investment Amount. The Issuer shall use all commercially reasonable efforts to invest the Deposit and any reinvestment income thereon in Underlying Assets (meeting the requirements set forth in the definition thereof) during the Ramp-Up Period.

(b)     Interim Targets. The Issuer agrees to use all commercially reasonable efforts to purchase Underlying Assets from the Closing Date to the Ramp-Up Effective Date in such a manner as to satisfy the criteria set forth below on each date set forth below and either date on which the Aggregate Principal Amount of Underlying Assets specified below has been purchased (such date other than the

Closing Date, the "Ramp-Up Test Date") and to notify each Rating Agency promptly in the event any of such criteria are not satisfied.

| Days Following the Closing Date | Minimum Aggregate Principal Amount | Maximum Weighted Average Rating | Minimum Weighted Average Spread | Minimum Diversity Score | Minimum Weighted Average Recovery Rate |
|---|---|---|---|---|---|
| 0 | $2,028,149,779 | 2440 | 2.92% | 22 | 39.1% |

(c)    Declaration of Ramp-Up Effective Date.  On or after the date on which each of the conditions to the occurrence of the Ramp-Up Effective Date set forth in clause (i) of the definition thereof are satisfied, the Administrative Agent, acting on behalf of the Issuer, may declare the Ramp-Up Effective Date to have occurred by written notice to the Trustee, the Manager and each Rating Agency (which, in the case of Standard & Poor's, shall be sent via e-mail to CDOEffectiveDatePortfolios@standardandpoors.com) on the date specified in such notice, subject to the delivery of all schedules, certificates, opinions and documents required to be delivered on or prior to such date pursuant to Sections 3.5(e) and (f); provided, that if the Issuer has not declared the Ramp-Up Effective Date to have occurred prior to the date set forth in clause (ii) of the definition thereof, the Ramp-Up Effective Date shall occur on such date.

(d)    In connection with the occurrence of the Ramp-Up Effective Date pursuant to Section 3.5(c), the Issuer will prepare the Monthly Report as of the Ramp-Up Effective Date and deliver it to the Trustee, the Manager, and each Rating Agency.

(e)    Accountants' Certificate.  The Issuer shall cause to be delivered to the Trustee and each of the Rating Agencies as promptly as possible on or after the Ramp-Up Effective Date an Accountants' Certificate substantially in the form of the certificate delivered on the Closing Date pursuant to Section 3.1(l) confirming the information with respect to each Underlying Asset as of the Ramp-Up Effective Date, purchased by or on behalf of the Issuer and the information provided by the Issuer with respect to every other asset included in the Collateral, by reference to such sources as shall be specified therein, (ii) confirming that the Coverage Tests are met as of the Ramp-Up Effective Date and (iii) specifying the procedures undertaken by them to review data and computations relating to such information.

(f)    Rating Agency Letter.  There shall have been delivered to the Trustee Rating Agency Confirmation dated on or after the Ramp-Up Effective Date pursuant to Section 7.15; provided, that Rating Agency Confirmation from Moody's will not be required if the Issuer, at the direction of the Administrative Agent, certifies to the Trustee that the Ramp-Up Effective Date has been designated by the Issuer pursuant to clause (i) of the definition thereof and Moody's shall have received the Accountants' Certificate pursuant to Section 3.5(e).

(g)    Excel Default Model Input File and Schedule of Underlying Assets.  The Issuer shall cause to be delivered to Standard & Poor's, as promptly as possible on or after the Ramp-Up Effective Date, the Excel Default Model Input File and a computer file containing an amended Schedule of Underlying Assets, in each case determined as of the Ramp-Up Effective Date (with a copy of such amended Schedule of Underlying Assets to be delivered to Moody's), which schedule shall include, with respect to each Underlying Asset, the name and country of domicile of the obligor, the CUSIP number, loan identification number or similar identifying information (to the extent available), the Standard &

Poor's Rating, the Standard & Poor's Priority Category, the Standard & Poor's Industry Classification Group and the Aggregate Principal Amount of each Underlying Asset.

(h)    Notwithstanding the foregoing, the parties hereto agree that the requirements set forth in sub-sections 3.5(c) through (g) shall not apply to the extent that the Ramp-Up Effective Date falls on the Closing Date and the condition set forth in Section 3.1(m) has been satisfied as of the Closing Date; provided, however, that the Issuer (or the Administrative Agent on its behalf) shall remit to the Rating Agencies a copy of the Accountants' Certificate described in Section 3.1(l) pursuant to this Section 3.5(h).

Section 3.6    Representations Regarding Collateral.  The Issuer, as of the date hereof (and, as of the date of each purchase of an Underlying Asset, only with respect to such Underlying Asset), represents and warrants to the following:

(a)    This Indenture creates a valid and continuing security interest (as defined in the applicable UCC) in the Underlying Assets and other items constituting the Collateral in favor of the Trustee for the benefit of the Secured Parties which security interest is prior to all other liens, and is enforceable as such as against creditors of and purchasers from the Issuer.

(b)    The Issuer owns and has good and marketable title to the Underlying Assets free and clear of any liens, claims, encumbrances or defects of any nature whatsoever except for those that are being released on the Closing Date or on the date of purchase by the Issuer, as applicable.

(c)    The Collateral is comprised of the following types of collateral:  (i) any of the types of collateral covered by Article 8 of the applicable UCC and (ii) any Instruments, Chattel Paper, Accounts, Security Entitlements and General Intangibles, in each case under the applicable UCC.

(d)    Each of the Issuer Accounts, and all sub-accounts thereof, constitute Securities Accounts or Deposit Accounts.

(e)    Items of Collateral meeting the definition of "securities entitlements" under the applicable UCC constitute Securities Entitlements.

(f)    All of the Underlying Assets and Eligible Investments that constitute Security Entitlements have been and will have been credited to one of the Issuer Accounts.  The Securities Intermediary for each of the Issuer Accounts has agreed that New York is the applicable jurisdiction and to treat all assets credited to the Issuer Accounts as Financial Assets under the applicable UCC.

(g)    Other than the security interest granted to the Trustee pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Collateral (except for any such pledge or security interest that has been terminated or released on or prior to the Closing Date).  The Issuer has not authorized the filing of, and is not aware of, any financing statements against the Issuer that include a description of collateral covering the Collateral other than any financing statement relating to the security interest granted to the Trustee hereunder or that has been terminated. The Issuer is not aware of any judgment or tax lien filings against it.

(h)    The Issuer has caused or will have caused, within ten days, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interests in the Collateral granted to the Trustee hereunder which constitutes Chattel Paper, Instruments, Accounts or General Intangibles under the applicable UCC, if any.

(i)      The Trustee or the Securities Intermediary has in its possession all transfer documents customarily relied upon to evidence the purchase of such Underlying Assets.

(j)      The Issuer has not delivered an authoritative copy of any Chattel Paper that constitutes or evidences the Collateral to any Person other than the Trustee.

(k)      The authoritative copy of any Chattel Paper that constitutes or evidences the Collateral has been communicated to the Trustee and has no marks or notations indicating that it has been pledged, assigned or otherwise conveyed to any Person other than the Trustee.

(l)      The Issuer has received or shall receive all consents and approvals required by the terms of the underlying loan agreement, indenture or other underlying documentation relating to the purchase of the Collateral by the Issuer and the Grant by the Issuer to the Trustee of its interest and rights in the Collateral hereunder.

(m)      The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the Securities Intermediary has agreed to comply with all instructions originated by the Trustee relating to the Issuer Accounts without further consent by the Issuer.

(n)      None of the Issuer Accounts is in the name of any Person other than the Issuer or the Trustee. The Issuer has not consented to the Securities Intermediary of any of the Issuer Accounts to comply with entitlement orders or instructions of any Person other than the Trustee.

(o)      Notwithstanding any other provision of this Indenture or any other related transaction document, the representations in this Section 3.6 shall be continuing, and remain in full force and effect, until such time as all obligations under this Indenture and the Senior Notes have been finally and fully paid and performed.

(p)      Each of the Issuer and the Trustee (i) shall not, without obtaining Rating Agency Confirmation, waive any of the representations in this Section 3.6; (ii) shall provide each of the Rating Agencies with prompt written notice of any breach of the representations contained in this Section 3.6 upon becoming aware thereof, and (iii) shall not, without obtaining Rating Agency Confirmation (as determined after any adjustment or withdrawal of the ratings following notice of such breach) waive a breach of any of the representations in this Section 3.6.

Section 3.7      [Reserved].

ARTICLE IV
SATISFACTION AND DISCHARGE

Section 4.1      Satisfaction and Discharge of Indenture. This Indenture shall cease to be of further effect with respect to the Securities except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen Securities, (iii) rights of Holders to receive payments of principal thereof and interest thereon as provided herein, (iv) the rights, obligations and immunities of the Trustee hereunder, and (v) the rights of Holders as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them, and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

(a)      either

(i)    all Senior Notes and Mezzanine Notes theretofore authenticated and delivered (other than (A) Senior Notes or Mezzanine Notes which have been mutilated, destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.6 and (B) Senior Notes or Mezzanine Notes for whose payment money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer); or

(ii)    all Senior Notes and Mezzanine Notes not theretofore delivered to the Trustee for cancellation (A) have become due and payable, (B) will become due and payable at their Stated Maturity within one year or (C) are to be called for redemption (together with any Subordinated Notes Outstanding) within one year pursuant to ARTICLE IX under an arrangement reasonably satisfactory to the Trustee and there has been given notice of redemption by the Issuer and the Co-Issuer pursuant to Section 9.6 and, in the case of subclause (A), (B) or (C) the Issuer or the Co-Issuer has irrevocably deposited or caused to be deposited with the Trustee in an account which account shall be maintained for the benefit of the Holders of the Securities, in trust for such purpose, Cash or non-callable direct obligations of the U.S.; provided, that (x) the obligations are Eligible Investments, in an amount sufficient, as verified by a firm of Independent certified public accountants of national reputation, to pay and discharge the entire indebtedness on such Senior Notes not theretofore delivered to the Trustee for cancellation, for principal and interest (in the case of Senior Notes which have become due and payable), or to the Stated Maturity or the Redemption Date, as the case may be, and shall have Granted to the Trustee a valid perfected security interest in such Eligible Investment that is of first priority, free of any adverse claim or legal equivalent thereof, as applicable, and shall have furnished an Opinion of Counsel with respect thereto and (y) the obligations constitute all of the Eligible Investments owned by the Issuer, the Issuer owns no Underlying Assets and all such obligations mature no later than the date on which the Senior Notes are to be redeemed; provided, further, that this subsection (ii) shall not apply if an election to act in accordance with the provisions of Section 5.5(a) shall have been made and not rescinded;

(b)    the Co-Issuers have paid or caused to be paid all other sums payable hereunder, this Indenture, the Administrative Agency Agreement, the Collateral Administration Agreement and the Administration Agreement, in each case, to the extent of available funds in accordance with the Priority of Payments, by the Co-Issuers; and

(c)    the Co-Issuers have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent relating to the satisfaction and discharge of this Indenture have been complied with and the conditions of clauses (a), (b) and (c) have been met as to the Senior Notes and the Mezzanine Notes;

provided that in the case of (a)(ii) above, the Issuer has delivered to the Trustee an Opinion of Counsel of Independent U.S. tax counsel to the effect that a change in or clarification of U.S. federal income tax law (or binding interpretation thereof by a court or the Internal Revenue Service upon which all taxpayers may generally rely) has occurred such that the Holders of Senior Notes and Mezzanine Notes would recognize no income, gain or loss for U.S. federal income tax purposes as a result of such deposit and satisfaction and discharge of this Indenture.

Notwithstanding the requirements in subclauses (a) and (b) above, if a liquidation in full of the Collateral has occurred pursuant to Section 5.5, and the proceeds of such liquidation have been paid pursuant to the terms of this Indenture, then, subject to the other requirements of this Article IV, this Indenture shall be discharged and shall cease to be of further effect.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee and, if applicable, the Holders, as the case may be, under Sections 2.5, 2.6, 2.7(l), 4.2, 5.4(d), 5.9, 5.18, 6.1, 6.3, 6.4, 6.6, 6.7, 7.1, 7.4 and 7.5 hereof shall survive the satisfaction and discharge of this Indenture.

Section 4.2    Application of Trust Money.    All monies deposited with the Trustee pursuant to Section 4.1 shall be held in trust and applied by it in accordance with the provisions of the Securities and this Indenture, including the Priority of Payments, to the payment of the interest on and principal of the Senior Notes and the Mezzanine Notes and either directly or through any Paying Agent, as the Trustee may determine, to the Person entitled thereto of interest and principal for whose payment such money has been deposited with the Trustee; provided, that such money need not be segregated from other funds except to the extent required herein or required by law.

Section 4.3    Repayment of Monies Held by Paying Agent.    In connection with the satisfaction and discharge of this Indenture with respect to the Securities, all monies then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.5 hereof and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such monies.

ARTICLE V
REMEDIES

Section 5.1    Events of Default.    "Event of Default," wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    a default in the payment of any interest on any Senior Note or Mezzanine Note, when the same becomes due and payable, which default continues for a period of five or more Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, any Paying Agent or the Securities Registrar, such default continues for a period of five or more Business Days after the Trustee receives written notice of or has actual knowledge of such administrative error or omission);

(b)    a default in the payment of principal of any Senior Note or Mezzanine Note, when the same becomes due and payable, at its Stated Maturity or on any Redemption Date; provided, that if such failure results solely from an administrative error or omission by the Trustee, such default continues for a period of five or more Business Days after the Trustee receives written notice or has actual knowledge of such administrative error or omission;

(c)    the failure on any Payment Date to disburse amounts available in the Payment Account in excess of $1,000, which failure continues for a period of ten or more Business Days (provided, if such failure results solely from an administrative error or omission by the Trustee, such default continues for a period of ten or more Business Days after the Trustee receives written notice of or has actual knowledge of such administrative error or omission);

(d)    the failure on any Measurement Date to maintain an Aggregate Principal Amount of all Underlying Assets, Eligible Investments and Cash at least equal to 100% of the Aggregate Outstanding Amount of the Senior Notes at such time;

(e)    any of the Issuer, the Co-Issuer or the Collateral becomes an investment company required to be registered under the Investment Company Act;

(f)    a default in any material respect in the performance, or material breach, of any other covenant, representation, warranty or other agreement of the Issuer or the Co-Issuer under this Indenture (it being understood that a failure of any Portfolio Criteria shall not be a default or breach) or in any certificate or writing delivered by the Issuer or the Co-Issuer pursuant to this Indenture, or any representation or warranty of the Issuer or the Co-Issuer made in this Indenture or in any certificate or writing delivered by the Issuer or the Co-Issuer pursuant hereto that proves to be incorrect in any material respect when made, and the continuation of such default, breach or failure for a period of 30 or more days after notice thereof shall have been given to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least a Majority in Aggregate Outstanding Amount of the Controlling Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default;"

(g)    the entry of a decree or order by a court having competent jurisdiction adjudging either of the Co-Issuers as bankrupt or insolvent or granting an order for relief or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of either of the Co-Issuers under the Bankruptcy Code, the bankruptcy or insolvency laws of the Cayman Islands or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of its or either of their property, or ordering the winding up or liquidation of its or either of their affairs; or an involuntary case or Proceeding shall be commenced against either of the Co-Issuers seeking any of the foregoing and such case or Proceeding shall continue in effect for a period of 60 consecutive days;

(h)    the institution by either of the Co-Issuers of Proceedings to be adjudicated as bankrupt or insolvent, or the consent by either of them to the institution of bankruptcy or insolvency Proceedings against either of them or the passing of a resolution for either of them to be voluntarily wound up, or the filing by either of the Co-Issuers of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code, the bankruptcy and insolvency laws of the Cayman Islands or any other applicable law, or the consent by either of them to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of its or either of their property, or the making by it of an assignment for the benefit of creditors, or the admission by either of them in writing of its inability to pay its or either of their debts generally as they become due, or the taking of any action by either of the Co-Issuers in furtherance of any such action; or

(i)    one or more final judgments being rendered against the Issuer or the Co-Issuer which exceed, in the aggregate, $10,000,000 (after excluding any portion of the judgment that is payable by a party other than the Issuer or Co-Issuer pursuant to an insurance policy or other agreement) and which remain unstayed, undischarged and unsatisfied for 30 or more days after such judgment(s) becomes non-appealable, unless adequate funds have been reserved or set aside for the payment thereof.

Upon the occurrence or receipt of written notice or actual knowledge of the occurrence of an Event of Default, each of (i) the Co-Issuers and (ii) the Trustee shall notify each other, and the Trustee on behalf of the Co-Issuers shall notify promptly the Holders, each Paying Agent, the Depositary and each of the Rating Agencies in writing.

Section 5.2    Acceleration of Maturity; Rescission and Annulment.  (a) If an Event of Default occurs and is continuing (other than an Event of Default specified in Section 5.1(g) or 5.1(h)), (i) the Holders of not less than a Majority of the Controlling Class or (ii) the Trustee at the written direction

of such Holders, by notice to the Issuer and, in the case of notice by such Holders of not less than a majority of the Controlling Class, the Trustee (which shall provide notice to the Holders of all of the Outstanding Senior Notes and Outstanding Mezzanine Notes), may declare the principal of and accrued and unpaid interest on all of the Senior Notes and Mezzanine Notes, together with all amounts due hereunder to be immediately due and payable.  If an Event of Default specified in Section 5.1(g) or (h) occurs, all unpaid principal, together with all accrued and unpaid interest thereon, of all the Senior Notes and Mezzanine Notes, and other amounts payable hereunder, shall automatically become due and payable without any declaration or other act on the part of the Trustee or any Holder of Senior Notes or any Holder of Mezzanine Notes.

(b)    At any time after such a declaration of acceleration of Maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this ARTICLE V, a Majority of the Controlling Class, by written notice to the Co-Issuers and the Trustee, may rescind and annul such declaration and its consequences if:

(i)    the Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay, and shall pay:

(A)    all overdue installments of interest on and principal of the Senior Notes and Mezzanine Notes (other than principal that has become due solely as a result of such acceleration);

(B)    to the extent that payment of such interest is lawful, interest upon any Defaulted Interest on the applicable Classes of Senior Notes and interest upon any Mezzanine Deferred Interest and Defaulted Interest on the applicable Classes of Mezzanine Notes, in each case at the applicable Note Interest Rates;

(C)    all accrued and unpaid taxes, government fees and charges and Administrative Expenses and other sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel; and

(D)    [Reserved]; and

(ii)    the Trustee has determined that all Events of Default, other than the non-payment of the interest on or principal of Senior Notes or Mezzanine Notes that have become due solely by such acceleration, have been cured or waived as provided in Section 5.14, and a Majority of the Controlling Class by written notice to the Trustee has agreed with such determination.

At any time after such a declaration of acceleration of Maturity has been made as provided in Section 5.2(a) and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this ARTICLE V, the Trustee shall rescind and annul such declaration and its consequences if the Trustee is required to preserve the Collateral in accordance with the provisions of Section 5.5 with respect to the Event of Default that gave rise to such declaration; provided, that if such preservation of the Collateral is rescinded pursuant to Section 5.5, the Senior Notes and/or the Mezzanine Notes may be accelerated pursuant to Section 5.2(a), notwithstanding any previous rescission and annulment of a declaration of acceleration pursuant to this paragraph.

No such rescission shall affect any subsequent Default or impair any right consequent thereon.

Section 5.3        Collection of Indebtedness and Suits for Enforcement by Trustee.  The Co-Issuers (or, in the case of Mezzanine Notes, the Issuer) covenant(s) that if a Default shall occur in respect of the payment of any principal of any Senior Note or Mezzanine Note, or the payment of interest on any Senior Note or Mezzanine Note, the Co-Issuers (or, in the case of Mezzanine Notes, the Issuer) will, upon demand of the Trustee or any affected Holder of Senior Notes or any affected Holder of Mezzanine Notes, as applicable, pay to the Trustee, for the benefit of the Holder of such Note, the whole amount then due and payable on such Senior Note or Mezzanine Note, as applicable, for principal and interest, with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest, at the applicable Note Interest Rate and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and such Holder of Senior Notes or Holder of Mezzanine Notes, as applicable, and their respective agents and counsel.

If the Co-Issuers (or, in the case of Mezzanine Notes, the Issuer) fail(s) to pay such amounts forthwith upon such demand, the Trustee, in its own name and as Trustee of an express trust, may after written notice to the Holders of the Senior Notes or the Holders of the Mezzanine Notes, as applicable, and shall upon the written direction of a Majority of the Controlling Class (subject to the terms hereof, including Section 6.3(e)) institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Co-Issuers (or, in the case of Mezzanine Notes, the Issuer) or any other obligor upon the Senior Notes or the Mezzanine Notes and collect the monies adjudged or decreed to be payable in the manner provided by law out of the Collateral.

If an Event of Default occurs and is continuing, the Trustee may in its discretion after written notice to the Holders of the Senior Notes and the Holders of the Mezzanine Notes and shall upon the written direction of a Majority of the Controlling Class (subject to the terms hereof, including Section 6.3(e)) proceed to protect and enforce its rights and the rights of the Secured Parties by such appropriate Proceedings, in its own name as Trustee of an express trust, as the Trustee shall deem most effectual (if no direction by a Majority of the Controlling Class is received by the Trustee) or as the Trustee may be directed by a Majority of the Controlling Class, to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

In case there shall be pending Proceedings relative to the Issuer or the Co-Issuer or any other obligor upon the Senior Notes or the Mezzanine Notes under the Bankruptcy Code, the bankruptcy or insolvency laws of the Cayman Islands or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Senior Notes or the Mezzanine Notes, or the creditors or property of the Issuer, the Co-Issuer or such other obligor, the Trustee, regardless of whether the principal of any Senior Notes or Mezzanine Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of this Section 5.3, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(a)        to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of each of the Senior Notes and the Mezzanine Notes and to file such other papers or documents and take such other action (including sitting on a committee of creditors) as may be

necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee) and of the Holders of Senior Notes and Mezzanine Notes allowed in any Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Senior Notes or the Mezzanine Notes or to the creditors or property of the Issuer, the Co-Issuer or such other obligor;

(b)        unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Senior Notes and the Mezzanine Notes in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or a Person performing similar functions in comparable Proceedings; and

(c)        to collect and receive any monies or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Holders of Senior Notes and Mezzanine Notes and of the Trustee on their behalf; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Holders of Senior Notes and Mezzanine Notes to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Holders of Senior Notes and/or Mezzanine Notes, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of its gross negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Senior Notes or the Mezzanine Notes or the rights of any Holder thereof or to authorize the Trustee to vote in respect of the claim of any Holder in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

In any Proceedings brought by the Trustee on behalf of the Holders of Senior Notes and/or Mezzanine Notes (and any such Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party), the Trustee shall be held to represent all the Holders of Senior Notes and/or Mezzanine Notes, as applicable.

Section 5.4        Remedies.

(a)        If an Event of Default shall have occurred and be continuing, and the Senior Notes and/or the Mezzanine Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may (and shall, upon written direction by a Majority of the Controlling Class, subject to the terms hereof including Section 6.3(e)), to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i)        institute Proceedings for the collection of all amounts then payable on the Senior Notes and/or the Mezzanine Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral monies adjudged due;

(ii)        sell all or a portion of the Collateral or rights of interest therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17 hereof;

(iii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iv)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Secured Parties hereunder; and

(v)    to the extent not inconsistent with clauses (i) through (iv), exercise any other rights and remedies that may be available at law or in equity;

provided, that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.4 unless either of the conditions specified in Section 5.5(a) is met or the preservation of the Collateral by the Trustee is prohibited by applicable law.

The Trustee may, but need not, obtain and rely upon an opinion or advice of an Independent investment banking firm of national reputation as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 and as to the sufficiency of the Proceeds and other amounts receivable with respect to the Collateral to make the required payments of principal and interest on any Class of Senior Notes and/or Mezzanine Notes, which opinion or advice shall be conclusive evidence as to such feasibility or sufficiency.

(b)    If an Event of Default as described in Section 5.1(f) hereof shall have occurred and be continuing, the Trustee may, and at the written request of the Holders of not less than a Majority of the Controlling Class shall (subject to the terms hereof, including Section 6.3(e)), institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under Section 5.1(f), and enforce any equitable decree or order arising from such Proceeding.

(c)    Upon any sale, whether made under the power of sale hereby given or by virtue of judicial proceedings, any of the Trustee, the Administrator, the Paying Agent, the Collateral Administrator or the Holders may bid for and purchase the Collateral and any Equity Securities owned by the Issuer or any part thereof and, upon compliance with the terms of sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability; and any purchaser at any such sale may, in paying the purchase money, turn in any of the Senior Notes (or Mezzanine Notes if it is the Controlling Class) in lieu of Cash equal to the amount which shall, upon distribution of the net proceeds of such sale, be payable on such Senior Notes or Mezzanine Notes so turned in by such Holder (taking into account the Class of such Senior Notes or Mezzanine Notes and the Priority of Payments). Said Senior Notes or Mezzanine Notes, in case the amounts so payable thereon shall be less than the amount due thereon, shall be returned to the Holders thereof after proper notation has been made thereon to show partial payment.

Upon any sale, whether made under the power of sale hereby given or by virtue of judicial proceedings, the receipt of the Trustee, or of the officer making a sale under judicial proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for its or their purchase money, and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such sale, whether under any power of sale hereby given or by virtue of judicial proceedings, shall bind the Co-Issuers, the Trustee and the Secured Parties, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

(d)    Notwithstanding any other provision of this Indenture, none of the Trustee (in its own capacity or on behalf of any Holder of Securities), the Administrator, the Paying Agent, the Collateral Administrator, the Holders or any other Secured Party shall, prior to the date that is one year and one day (or, if longer, the applicable preference period) after the final payments to the Holders of the Securities, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands or U.S. federal or state bankruptcy or similar laws or any similar laws of any other jurisdiction).  Nothing in this Section 5.4 shall preclude, or be deemed to stop, the Trustee (i) from taking any action prior to the expiration of the aforementioned one year and one day (or longer) period in (A) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency proceeding filed or commenced by a Person other than the Trustee, or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

Section 5.5    Optional Preservation of Collateral.  (a) If an Event of Default shall have occurred and be continuing and an acceleration has been declared, the Trustee shall retain the Collateral intact, collect and cause the collection of the proceeds in respect thereof and make and apply all payments and deposits and maintain all accounts hereunder and release funds and make deposits thereto in accordance with the Priority of Payments set forth in ARTICLE XI and the provisions of ARTICLE X unless:

(i)    the Trustee determines in accordance with Section 5.5(c) (and, at its option and to the extent it may deem necessary, after consultation with an accounting firm, investment bank or other financial advisor, in any case, of a nationally recognized standing (but which may be an affiliate of the Trustee), and which may include the conclusive reliance on a report, certificate or opinion therefrom), that the anticipated net proceeds of a sale or liquidation of the Collateral (after deducting the reasonable expenses of such sale or liquidation including reasonable expenses of the Trustee incurred in connection therewith) would be sufficient to pay in full the amounts then due and unpaid on the Outstanding Senior Notes and Outstanding Mezzanine Notes (including any Defaulted Interest and any Mezzanine Deferred Interest) and all amounts due and payable in accordance with the Priority of Payments prior to such payments on such Senior Notes and Mezzanine Notes (including all Administrative Expenses); or

(ii)    the Holders of at least a Supermajority of the Aggregate Outstanding Amount of the Senior Notes so long as the Senior Notes are Outstanding and, thereafter, the Holders of at least a Supermajority of the Aggregate Outstanding Amount of the Mezzanine Notes, subject to the terms and conditions set forth below, direct the sale or liquidation of the Collateral.

Notwithstanding the foregoing, the Trustee will release any item of Collateral in connection with (i) the payment in full or redemption of such item of Collateral and (ii) the exchange, tender or sale of any item of Collateral pursuant to an Offer for an amount in Cash at least equal to its outstanding Principal Balance.

The Trustee shall give written notice of its determination not to retain the Collateral to the Issuer with a copy to the Co-Issuer.  So long as such Event of Default is continuing, any such determination may be made at any time when the conditions specified in clause (i) or (ii) above exist.  The net proceeds of a sale or liquidation of the Collateral shall be applied in accordance with Section 11.1.

(b)    Nothing contained in Section 5.5(a) shall be construed to require the Trustee to sell the Collateral if the conditions set forth in Section 5.5(a) are not satisfied.  Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Collateral (i) if prohibited by applicable law, (ii) if the Trustee is directed to liquidate the Collateral pursuant to Section 5.5(a)(ii) or (iii) with respect to any particular Underlying Asset, if the Administrative Agent, on behalf of the Issuer, or the Trustee receives an offer for a payoff, tender, exchange or other similar offer with respect to such Underlying Asset and the Administrative Agent, on behalf of the Issuer, determines, using commercially reasonable judgment, that the acceptance of such offer would be in the best interests of the Secured Parties.

(c)    In determining whether the condition specified in Section 5.5(a)(i) is satisfied, the Trustee, in consultation with the Issuer, shall obtain bid prices with respect to each security and debt obligation contained in the Collateral from two nationally recognized dealers (or in the event that there is only one national recognized dealer, then the Trustee shall obtain a bid price from that nationally recognized dealer or, if there are no nationally recognized dealers, the Trustee shall obtain quotes from a pricing service), selected and specified to the Trustee by the Issuer in writing, at the time making a market in such securities and debt obligations and the Trustee shall compute the anticipated proceeds of sale or liquidation on the basis of the lowest of such bid prices for each security and debt obligation.  In connection with any of the foregoing, the Trustee shall be entitled to retain and rely upon such advisors as it may deem necessary to solicit bids, make such determination and execute such sale or liquidation (including consultation with an accounting firm, investment bank or other financial advisor, in any case, of nationally recognized standing and the conclusive reliance on a report, certificate or opinion therefrom), the expense of which shall be paid pursuant to Section 6.7.  In addition, in determining issues relating to whether the condition specified in Section 5.5(a)(i) is satisfied and issues relating to the offer and sale of each security and debt obligation, the Trustee may retain and rely on an opinion of an Independent investment banking firm of national reputation.

(d)    The Trustee shall promptly deliver to the Holders of the Senior Notes and the Mezzanine Notes a report stating the results of any determination required pursuant to Section 5.5(a)(i).  The Trustee shall make the determinations required by Section 5.5(a)(i) within 30 days after an Event of Default and at the written request of a Majority of the Controlling Class at any time during which the Trustee retains the Collateral pursuant to Section 5.5(a)(i).  In the case of each calculation made by the Trustee pursuant to Section 5.5(a)(i), the Trustee shall obtain a letter of a firm of Independent certified public accountants of national reputation confirming (to the extent they are able and willing to do so) the accuracy of the computations of the Trustee and certifying their conformity to the requirements of this Indenture (provided that in so doing such accountants shall not be required to confirm or verify accuracy or conformity of underlying bid prices or values) at the Issuer's expense.

(e)    Collateral may not be sold or liquidated pursuant to Section 5.5(a)(i) after the last date on which such sale or liquidation is permitted under Section 5.5(a)(i) with respect to a determination made pursuant thereto (such last permitted date being determined based upon the anticipated proceeds of such sale or liquidation, as described in Section 5.5(a)(i)), unless a new determination is made in accordance with such Section 5.5(a)(i) and the Collateral are sold or liquidated prior to the last sale date permitted in accordance with such new determination.

Section 5.6    Trustee May Enforce Claims Without Possession of Securities.    All rights of action and claims under this Indenture, the Senior Notes or the Mezzanine Notes may be prosecuted and enforced by the Trustee without the possession of any of the Senior Notes or the Mezzanine Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as Trustee of an express trust, and any recovery of judgment, subject to the payment of the reasonable expenses, disbursements in compensation of the

Trustee, each predecessor Trustee and its agents and attorneys in counsel, shall be applied as set forth in Section 5.7 hereof.

Section 5.7    <u>Application of Money Collected</u>.    The application of any money collected by the Trustee pursuant to this ARTICLE V and any money that may then be held or thereafter received by the Trustee hereunder shall be applied subject to, and in accordance with, Section 11.1.

Section 5.8    <u>Limitation on Suits</u>.    No Holder of any Senior Note or Mezzanine Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or Trustee, or for any other remedy hereunder, unless:

(a)    such Holder has previously given written notice to the Trustee of a continuing Event of Default;

(b)    except as otherwise provided in Section 5.9, the Holders of at least 25% of the Aggregate Outstanding Amount of the Controlling Class shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as the Trustee hereunder;

(c)    such Holder or Holders have offered to the Trustee indemnity satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(e)    no direction inconsistent with such written request has been given to the Trustee during such 30-day period by a Majority of the Controlling Class;

it being understood and intended that no one or more Holders of Senior Notes or Mezzanine Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Senior Notes or Mezzanine Notes, respectively, or to obtain or to seek to obtain priority or preference over any other Holders of the Senior Notes or Mezzanine Notes, respectively, or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Senior Notes or Mezzanine Notes, respectively.    In addition, any action taken by any one or more Holders of Senior Notes or Mezzanine Notes shall be subject to the restrictions of Section 5.4(d).

Section 5.9    <u>Unconditional Rights of Senior Noteholders and Mezzanine Noteholders to Receive Payments</u>.    Notwithstanding any other provision in this Indenture (other than Section 5.4(d)), the Holder of any Senior Note and the Holder of any Mezzanine Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Senior Note or Mezzanine Note, as the case may be, in accordance with the Priority of Payments.    Holders of Senior Notes or Holders of Mezzanine Notes, as the case may be, shall have the right to institute Proceedings for the enforcement of any such payment, which right shall be subject to the provisions of Section 5.8 and shall not be impaired without the consent of such Holders.

Section 5.10    <u>Restoration of Rights and Remedies</u>.    If the Trustee or any Holder of Senior Notes or Mezzanine Notes has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder of Senior Notes or Mezzanine Notes, then and in every such case the Co-Issuers, the Trustee and the Holder of such Senior Notes or Mezzanine Notes, as the case may be, shall, subject to any determination in such Proceeding, be restored severally and

respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Holder of such Senior Notes or Mezzanine Notes shall continue as though no such Proceeding had been instituted.

Section 5.11    Rights and Remedies Cumulative.  No right or remedy herein conferred upon or reserved to the Trustee or to the Holder of Senior Notes or Mezzanine Notes is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.12    Delay or Omission Not Waiver.  No delay or omission of the Trustee or of any Holder of Senior Notes or Mezzanine Notes to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this ARTICLE V or by law to the Trustee or to the Holders of Senior Notes or Mezzanine Notes may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders of Senior Notes or Mezzanine Notes, as applicable.

Section 5.13    Control by Holders of Senior Notes or Holders of Mezzanine Notes.  A Majority of the Controlling Class shall have the right to cause the institution of and direct in writing the time, method and place of conducting any Proceeding for any remedy available to the Trustee or exercising any trust, right, remedy or power conferred on the Trustee; provided, that:

(a)    such direction shall not be in conflict with any rule of law or with this Indenture;

(b)    the Trustee may take any other action deemed proper by it that is not inconsistent with such direction; provided, that, subject to Section 6.1, it need not take any action that it determines might involve it in liability;

(c)    the Trustee shall have been provided with indemnity satisfactory to it; and

(d)    any direction to the Trustee to undertake a sale of the Collateral shall be by the Holders of Senior Notes representing the percentage of the Aggregate Outstanding Amount of such Senior Notes specified in Section 5.4 or 5.5, as applicable, so long as any Senior Notes are Outstanding and, thereafter, any direction to the Trustee to undertake a sale of the Collateral shall be by the Holders of Mezzanine Notes representing the percentage of the Aggregate Outstanding Amount of such Mezzanine Notes specified in Section 5.4 or 5.5.

Section 5.14    Waiver of Past Defaults.  Prior to the time a judgment or decree for payment of the money due has been obtained by the Trustee as provided in this ARTICLE V, a Majority of the Controlling Class may waive any past Default on behalf of the Holders of all the Senior Notes and Mezzanine Notes and its consequences, except a Default:

(a)    constituting a default in the payment of the principal of any Senior Note or Mezzanine Note or in the payment of interest (including Defaulted Interest) on the Senior Notes, or after the Senior Notes have been paid in full, on the Mezzanine Notes (including Mezzanine Deferred Interest, if applicable) (in each case, except any such default consisting of non-payment of amounts that have become due and payable solely by virtue of an acceleration that has been rescinded or defaults that have

subsequently been remedied by the payment of principal and/or interest) (any such default being referred to herein as a "Payment Default");

(b)      in respect of a covenant or provision hereof that under Section 8.2 cannot be modified or amended without the consent of the Holder of each Outstanding Senior Note and/or the Holder of each Outstanding Mezzanine Note materially adversely affected thereby; or

(c)      an Event of Default described in Section 5.1(g) or (h).

In the case of any such waiver, the Co-Issuers, the Trustee and the Holders of the Senior Notes and the Mezzanine Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.  The Trustee shall promptly give notice of any such waiver to the Issuer and to each of the Rating Agencies.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

Section 5.15      Undertaking for Costs.  All parties to this Indenture agree, and each Holder of any Senior Note or Mezzanine Note by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.15 shall not apply to any suit instituted by the Trustee, to any suit instituted by any Holder of Senior Notes or Mezzanine Notes, or group of Holders of Senior Notes and/or Mezzanine Notes, holding in the aggregate more than 10% of the Aggregate Outstanding Amount of the Controlling Class, or to any suit instituted by any Holder of Senior Notes or Mezzanine Notes for the enforcement of the payment of the principal of or interest on any Senior Note or Mezzanine Note on or after the Stated Maturity expressed in such Senior Note or Mezzanine Note (or, in the case of redemption, on or after the applicable Redemption Date).

Section 5.16      Waiver of Stay or Extension Laws.  The Co-Issuers covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants, the performance of or any remedies under this Indenture; and the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.17      Sale of Collateral.  (a) The power to effect any sale of any portion of the Collateral pursuant to Sections 5.4 and 5.5 shall not be exhausted by any one or more sales as to any portion of such Collateral remaining unsold, but shall continue unimpaired (subject to Section 5.5(e) in the case of sales pursuant to Section 5.5) until the entire Collateral shall have been sold or all amounts secured by the Collateral shall have been paid.  The Trustee may and shall, upon direction of the Majority of the Controlling Class, from time to time postpone any sale by public announcement made at the time and place of such sale.  The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any sale; provided that the Trustee shall be authorized to deduct the reasonable costs,

charges and expenses incurred by it in connection with such sale from the proceeds thereof notwithstanding the provisions of Section 6.7 hereof.

(b)     The Trustee may bid for and acquire any portion of the Collateral in connection with a public sale thereof.  The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)     If any portion of the Collateral consists of securities or debt obligations issued without registration under the Securities Act, the Trustee may seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained, with the consent of a Majority of the Controlling Class, seek a no-action position from the SEC or any other relevant federal or state regulatory authorities, regarding the legality of a public or private sale of such securities or debt obligations.

(d)     The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Collateral in connection with a sale thereof.  In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Collateral in connection with a sale thereof, and to take all action and to execute any instruments (whether in its name or in the name of the Issuer) necessary to effect such sale. No purchaser or transferee at such a sale shall be bound to ascertain the Trustee's authority to inquire into the satisfaction of any conditions precedent or see to the application of any monies.

Section 5.18     Action on the Senior Notes and Mezzanine Notes.  The Trustee's right to seek and recover judgment on the Senior Notes, the Mezzanine Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Holders of the Senior Notes or the Mezzanine Notes shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the other assets of the Issuer.

ARTICLE VI
THE TRUSTEE

Section 6.1     Certain Duties and Responsibilities.  (a) Except during the continuance of an Event of Default known to the Trustee:

(i)     the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; provided, that in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they substantially conform on their face to the requirements of this Indenture and shall notify promptly the party delivering the same if such certificate or opinion does not conform.  If a corrected form shall not have been delivered to the Trustee within 15 days after such notice from the Trustee, the Trustee shall so notify the Holders of Securities.

(b)       In case an Event of Default actually known to a Trust Officer of the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from a Majority of the Controlling Class (or, as permitted under this Indenture, by the Issuer, including, without limitation, pursuant to Sections 7.9 and 10.7 hereof), exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)       No provision of this Indenture shall be construed to relieve the Trustee from liability for its own grossly negligent action, its own grossly negligent failure to act, or its own willful misconduct, except that:

(i)       this subsection shall not be construed to limit the effect of Section 6.1(a);

(ii)       the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it shall be proven that the Trustee was grossly negligent in ascertaining the pertinent facts;

(iii)       the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Co-Issuers and/or a Majority (or such larger percentage as may be required by the terms hereof) of the Controlling Class or any other required Classes relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture; and

(iv)       no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it unless such risk or liability relates to its ordinary services under this Indenture, including the giving of notices to the holders under ARTICLE V.

(d)       For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Event of Default described in Section 5.1(e), 5.1(g), 5.1(h) or 5.1(i), or any Default described in Section 5.1(f), unless a Trust Officer assigned to or working in the Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default or Default is received by the Trustee at the Corporate Trust Office, and such notice references the Securities generally, the Issuer, the Co-Issuer, the Collateral or this Indenture.  For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or a Default, such reference shall be construed to refer only to such an Event of Default or Default of which the Trustee is deemed to have notice as described in this Section 6.1.

(e)       Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this ARTICLE VI.

(f)       The Trustee shall be permitted to act in accordance with any proxy granted to a third party by a Holder of record in connection with any action under the Securities or the Operative Agreements or any vote on or consent to any waiver, amendment, modification or other actions (including, without limitation, any Act of Holders) with respect to the Securities or the Operative Agreements to the extent of the Securities held by such Holder upon receipt of instructions from such

third party accompanied by evidence of such proxy in a form reasonably satisfactory to the Trustee. Any reference to a vote by a Holder hereunder shall not be deemed to require a Holder to vote all its interests in the Securities consistently, but rather a Holder may vote such proportion of its Securities (or not vote such proportion) as it may determine. In such instance, a Holder shall inform the Trustee the proportion of the Securities in the vote assigned thereto.

Section 6.2    Notice of Default. Promptly (and in no event later than two Business Days) after the occurrence of any Default known to the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall transmit by mail to each of the Rating Agencies, for so long as any Senior Notes or Mezzanine Notes are Outstanding and rated by such Rating Agency, to the Trustee and to all Holders of Senior Notes and Mezzanine Notes, as their names and addresses appear on the Securities Register and, upon written request therefor in the form of Exhibit I attached hereto certifying that it is a Holder of a beneficial interest in any Global Security, to such Holder (or its designee), notice of all Defaults hereunder actually known to a Trust Officer of the Trustee, unless such Default shall have been cured or waived.

Section 6.3    Certain Rights of Trustee. Except as otherwise provided in Section 6.1:

(a)    the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or document, including, without limitation, the Payment Date Report, reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    any request or direction of the Issuer or the Co-Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)    whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate or (ii) be required to determine the value of any Collateral or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other persons qualified to provide the information required to make such determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)    as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)    the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders pursuant to this Indenture (or other Person authorized or permitted to direct it hereunder) , unless such Holders shall have provided to the Trustee security or indemnity reasonably satisfactory to it against all costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f)    the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or documents, but the Trustee, in its discretion, may and, upon the written direction of a Majority of the Controlling Class, shall (subject to Section 6.3(e)) make such further

inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and the Trustee shall be entitled to receive copies of the books and records of the Administrative Agent relating to the Securities and the Collateral, and on reasonable prior notice to the Co-Issuers, to examine the books and records relating to the Securities and the Collateral and the premises of the Co-Issuers personally or by agent or attorney during the Co-Issuers' normal business hours; provided that the Trustee shall, and shall cause its agents to, hold in confidence all such information, except (i) to the extent disclosure may be required by law or any governmental or regulatory authority over the Issuer, the Administrative Agent or the Trustee and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder; provided further, that the Trustee may disclose on a confidential basis any such information to its agents, attorneys and auditors in connection with the performance of its obligations hereunder;

(g)      the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys; provided that the Trustee shall not be responsible for any misconduct or negligence on the part of any agent appointed and supervised, or attorney appointed, with due care by it hereunder;

(h)      the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably and, after the occurrence and the continuance of an Event of Default subject to Section 6.1(b) hereof,  prudently believes to be authorized or within its rights or powers hereunder;

(i)      the permissive rights of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty;

(j)      the Trustee shall not be responsible for the accuracy of the books and records of, or for any acts or omissions of, the Depositary, any Transfer Agent (other than the Bank acting in that capacity), Securities Intermediary (other than the Bank acting in such capacity), Clearstream, Euroclear, any Calculation Agent (other than the Trustee itself acting in that capacity) or any Paying Agent (other than the Bank acting in that capacity);

(k)      in making or disposing of any investment permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or such Affiliate is acting as a subagent of the Trustee or for any third Person or dealing as principal for its own account.  If otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments hereunder;

(l)      in the event that the Bank is also acting in the capacity of Paying Agent, Transfer Agent, Custodian, Calculation Agent or Securities Intermediary hereunder, the rights, protections, immunities and indemnities afforded to the Trustee pursuant to this ARTICLE VI shall also be afforded to the Bank acting in such capacities; and

(m)      nothing herein shall be construed to impose an obligation on the part of the Trustee to recalculate, verify or evaluate (other than to confirm that it complies on its face with the requirements hereof) any report, certificate or information received from the Issuer (unless and except to the extent otherwise explicitly set forth herein).

Section 6.4      Not Responsible for Recitals or Issuance of Securities.   The recitals contained herein and in the Securities, other than the Certificate of Authentication thereon with respect to the Trustee, shall be taken as the statements of the Co-Issuers and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), of

the Collateral or the Securities.  The Trustee shall not be accountable for the use or application by the Co-Issuers of the Securities or of the Proceeds thereof or any money paid to the Co-Issuers pursuant to the provisions hereof.

Section 6.5    <u>May Hold Securities</u>.  The Trustee, any Paying Agent, any Securities Registrar or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Co-Issuers or any of their Affiliates, with the same rights it would have if it were not Trustee, Paying Agent, any Securities Registrar or such other agent.

Section 6.6    <u>Money Held in Trust</u>.  Money held by the Trustee hereunder shall be held in trust to the extent required herein.  The Trustee shall be under no liability for interest on any money received by it hereunder except that to the extent of income or other gain on investments is actually received by the Trustee on Eligible Investments, it shall be held in accordance with this Indenture.

Section 6.7    <u>Compensation and Reimbursement</u>.  (a) The Issuer agrees:

(i)    to pay the Trustee on each Payment Date (in accordance with the Priority of Payments) reasonable compensation as set forth in the fee letter dated April 28, 2008, for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a Trustee of an express trust);

(ii)    except as otherwise expressly provided herein, to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture or in the enforcement of any provision hereof (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Sections 5.4, 5.5, 5.17, 6.3 or 10.6 except any such expense, disbursement or advance as may be attributable to its gross negligence, willful misconduct or bad faith) and expenses related to the maintenance and administration of the Collateral; <u>provided</u>, <u>further</u>, that the securities transaction charges referred to above shall, in the case of certain Eligible Investments specified by the Administrative Agent, be waived in the event that any amounts are received by the Trustee during a Due Period from a financial institution in consideration of purchasing such Eligible Investments;

(iii)    to indemnify the Trustee (both in its individual capacity and as Trustee) and its officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without gross negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder; and

(iv)    to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees and expenses) for any collection action taken pursuant to Section 6.13 hereof.

(b)    The Issuer may remit payment for such fees and expenses to the Trustee or, in the absence thereof, the Trustee may from time to time deduct payment of its fees and expenses hereunder from moneys on deposit in the Payment Account for the Securities pursuant to Sections 11.1 or 10.2(f).

(c)     The Trustee hereby agrees not to cause the filing of a petition in bankruptcy against either of the Co-Issuers for the non-payment to the Trustee of any amounts provided by this Section 6.7 until at least one year and one day (or, if longer, the applicable preference period) after the payment in full of all of the Securities issued under this Indenture.

(d)     The amounts payable to the Trustee on any Payment Date pursuant to Section 6.7(a), or which may be deducted by the Trustee pursuant to Section 6.7(b) in any Due Period shall not exceed the amounts available for such purpose pursuant to the Priority of Payments, and the Trustee shall have a lien (which ranks senior to that of the Holders of the Securities in the case of payments pursuant to Sections 11.1(a)(ii) and (iii)) upon all property and funds held or collected as part of the Collateral to secure payment of amounts payable to the Trustee under this Section 6.7 not to exceed such amount with respect to any Payment Date; provided that the Trustee shall not institute any Proceeding for the enforcement of such lien except in connection with an action pursuant to Section 5.3 hereof for the enforcement of the lien of this Indenture for the benefit of the Secured Parties; provided, further, that the Trustee may only enforce such a lien in conjunction with the enforcement of the rights of the Holders of the Securities in the manner set forth in Sections 5.4 and Section 5.5 hereof.  For the avoidance of doubt, any amount payable to the Trustee pursuant to Section 6.7(a) and not paid on any Payment Date pursuant to this paragraph shall remain outstanding and shall be payable on the next Payment Date in accordance with the Priority of Payments.

The fees payable to the Trustee shall be computed on the basis of the actual number of days elapsed in the applicable calculation period divided by 360, and fees applicable to periods shorter or longer than a calendar quarterly period shall be prorated based on the number of days within such period. The Trustee shall apply amounts pursuant to Section 6.7 and Section 11.1 only to the extent that the payment thereof is in compliance with the Priority of Payments and the failure to pay such amounts to the Trustee will not, by itself, constitute an Event of Default.  Subject to Section 6.9, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder.  No direction by a Majority of the Controlling Class shall affect the right of the Trustee to collect amounts owed to it under this Indenture.

If, on any date when a fee shall be payable to the Trustee pursuant to this Indenture, insufficient funds are available for the payment thereof, any portion of a fee not so paid shall be deferred and payable, together with compensatory interest thereon (at a rate not to exceed the federal funds rate), on such later date on which a fee shall be payable and sufficient funds are available therefor.

Section 6.8     Corporate Trustee Required; Eligibility.     There shall at all times be a Trustee hereunder which shall be a corporation or national association organized and doing business under the laws of the U.S. or of any state thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $200,000,000 and a rating assigned by Moody's of at least "Baa2" (and not on credit watch for downgrade) and a rating assigned by Standard & Poor's of at least "BBB" and having an office within the U.S.  If such corporation or national association publishes reports of condition at least annually, then for the purposes of this Section 6.8, the combined capital and surplus of such corporation or national association shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.8, it shall resign immediately in the manner and with the effect hereinafter specified in this ARTICLE VI.

Section 6.9     Resignation and Removal; Appointment of Successor.     (a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this ARTICLE VI shall become effective until the acceptance of appointment by the successor Trustee under Section 6.10.  The indemnification in favor of the Trustee in Section 6.7 hereof shall survive any

resignation or removal (to the extent of any indemnified liabilities, costs, expenses and other amounts arising or incurred prior to, or arising out of actions or omissions occurring prior to, such resignation or removal).

(b)    The Trustee may resign at any time by giving 60 days' prior written notice thereof to the Co-Issuers, the Holders, and each of the Rating Agencies.

(c)    The Trustee may be removed at any time upon 60 days' prior written notice by Act of a majority of the Senior Notes and Mezzanine Notes voting together as a single class, or may be removed at any time when an Event of Default shall have occurred and be continuing, by Act of a Majority of the Controlling Class, by notice delivered to the Trustee, the Co-Issuers and the Rating Agencies.

(d)    If at any time:

(i)    the Trustee shall cease to be eligible under Section 6.8 and shall fail to resign after written request therefor by the Co-Issuers or by any Holder; or

(ii)    the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation;

then, in any such case (subject to Section 6.9(a)), (A) the Co-Issuers, by Issuer Order, may remove the Trustee, or (B) subject to Section 5.15, any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)    Upon (i) receiving any notice of resignation of the Trustee, (ii) any determination that the Trustee be removed, or (iii) any vacancy in the position of Trustee, then the Co-Issuers shall promptly appoint a successor Trustee or Trustees by written instrument, in duplicate, executed by an Authorized Officer of the Issuer or Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor Trustee or Trustees; provided that such successor Trustee shall be appointed only upon the written consent of a Majority of the Controlling Class. If the Co-Issuers shall fail to appoint a successor Trustee within 30 days after such notice of resignation, determination of removal or the occurrence of a vacancy, a successor Trustee may be appointed by Act of a Majority of the Controlling Class. If no successor Trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 60 days after the giving of such notice of resignation, determination of removal or the occurrence of a vacancy, then the Trustee to be replaced, or any Holder, on behalf of itself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee. Notwithstanding the foregoing, at any time that an Event of Default shall have occurred and be continuing, a Majority of the Controlling Class shall have in lieu of the Co-Issuers the Co-Issuers' rights to appoint a successor Trustee, such rights to be exercised by notice delivered to the Issuer and the retiring Trustee. Any successor Trustee shall, forthwith upon its acceptance of such appointment in accordance with Section 6.10, become the successor Trustee and supersede any retiring Trustee.

(f)    The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first-class mail, postage prepaid, to each of the Rating Agencies, and the Holders as their names and addresses appear in the Securities Register. Each notice shall include the name of the successor Trustee and the

address of its Corporate Trust Office.  If the Co-Issuers fail to mail any such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

Section 6.10    Acceptance of Appointment by Successor.    Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Co-Issuers, the Rating Agencies and the retiring Trustee an instrument accepting such appointment and confirming its eligibility pursuant to Section 6.8 hereof.  Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all of the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Co-Issuers or a Majority of the Controlling Class or the successor Trustee, such retiring Trustee shall, upon payment of its charges then unpaid, execute and deliver an instrument transferring to such successor Trustee all of the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder, subject nevertheless to its lien, if any, provided for in Section 6.7(d).  Upon request of any such successor Trustee, the Co-Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

Section 6.11    Merger, Conversion, Consolidation or Succession to Business of Trustee.  Any corporation or entity into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee (which for purposes of this Section 6.11 shall be deemed to be the Trustee) shall be a party, or any corporation or entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder (and of the Bank in any and all other capacities in which it may be acting in respect hereof, including, without limitation, as Custodian, Collateral Administrator, Securities Intermediary, Securities Registrar and Paying Agent), provided that such corporation shall be otherwise qualified and eligible under this ARTICLE VI and provided further that the Trustee shall give notice thereof to the Issuer, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any of the Securities have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Securities so authenticated with the same effect as if such successor Trustee had itself authenticated such Securities.

Section 6.12    Co-Trustees and Separate Trustee.    At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee shall have power to appoint a co-trustee which meets the requirements of Section 6.8, with the power to file such proofs of claim and take such other actions pursuant to Section 5.4 and to make such claims and enforce such rights of action on behalf of the Holders of the Securities as such Holders themselves may have the right to do, subject to the other provisions of this Section 6.12.  The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee.

Should any written instrument from the Co-Issuers be required by any co-trustee so appointed to more fully confirm to such co-trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Co-Issuers.  The Co-Issuers agree to pay for any reasonable fees and expenses in connection with such appointment to the extent that funds are available for such purpose on any Payment Date pursuant to Section 11.1(a)(viii) or (b)(vi).

Every co-trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(i)    the Securities shall be authenticated and delivered by, and all rights, powers, duties and obligations hereunder in respect of the custody of securities, Cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by, the Trustee (or the Controlling Class Trustee, as the case may be);

(ii)    the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee jointly in the case of the appointment of a co-trustee;

(iii)    the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.12, and in case an Event of Default has occurred and is continuing, the Trustee shall have the power to accept the resignation of, or remove, any such co-trustee without the concurrence of the Co-Issuers.  A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.12;

(iv)    no co-trustee hereunder shall be personally liable by reason of any act or omission of the Trustee hereunder;

(v)    the Trustee shall not be liable by reason of any act or omission of a co-trustee; and

(vi)    except in the case of conflicts between Classes, any Act of Holders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

Section 6.13    Certain Duties of Trustee Related to Delayed Payment of Proceeds.  In the event that in any month the Trustee shall not have received a payment with respect to any Pledged Underlying Asset on its Due Date, (a) the Trustee shall notify promptly the Issuer in writing and (b) unless within three Business Days (or the end of the applicable grace period for such payment, if longer) after such notice such payment shall have been received by the Trustee, the Trustee shall request the issuer of such Pledged Underlying Asset, the trustee under the related Reference Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request.  In the event that such payment is not made within such time period, the Trustee, subject to the provisions of clause (iv) of Section 6.1(c), shall take such action as the Holders of a Majority of the Subordinated Notes shall reasonably direct in writing.  In no event shall the Trustee be required to advance its own funds.  In the event that the Issuer or the Holders of a Majority of the Subordinated Notes requests a release of a Pledged Underlying Asset in connection with any such action, such release shall be subject to Section 10.7 and ARTICLE XII of this Indenture, as the case may be.  Notwithstanding any other provision hereof, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Underlying Asset received after the Due Date thereof to the extent the Issuer previously made provisions for such payment reasonably satisfactory to the Trustee in accordance with this Section 6.13 and such payment shall not be deemed part of the Collateral.

Section 6.14    Representations and Warranties of the Trustee.  Each of the Trustee, each successor Trustee and each Co-Trustee represents and warrants that:  (a) (i) in the case of the Trustee, the Trustee is a national banking association, duly incorporated and validly existing under the laws of the United States, and (ii) in the case of any successor Trustee or Co-Trustee, such successor Trustee or Co-Trustee is duly formed and validly existing in accordance with its respective organizational documents, and in each case, has the power and authority to execute, deliver and perform its obligations under this

Indenture, and is duly eligible and qualified to act as Trustee under this Indenture; (b) this Indenture has been duly authorized, executed and delivered by the Trustee and constitutes the valid and binding obligation of the Trustee, enforceable against it in accordance with its terms except (i) as limited by bankruptcy, fraudulent conveyance, fraudulent transfer, insolvency, reorganization, liquidation, receivership, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general equitable principles, regardless of whether considered in a proceeding in equity or at law, and (ii) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought; and (c) neither the execution or delivery by the Trustee of this Indenture nor performance by the Trustee of its obligations under this Indenture requires the consent or approval of, the giving notice to or the registration or filing with, any governmental authority or agency under any existing law of the U.S. governing the banking or trust powers of the Trustee; (d) there is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Trustee, threatened that, if determined adversely to the Trustee, would have a material adverse effect upon the performance by the Trustee of its duties under, or on the validity or enforceability of, this Indenture; and (e) the Trustee is not in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Trustee or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Indenture or the performance by the Trustee of its duties hereunder.

Section 6.15    Authenticating Agents.   Upon the request of the Co-Issuers (or, in the case of the Subordinated Notes, the Issuer), the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Securities in connection with issuances, transfers and exchanges under Sections 2.4, 2.5 and 2.6, as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by those Sections to authenticate such Securities. For all purposes of this Indenture, the authentication of Securities by an Authenticating Agent pursuant to this Section 6.15 shall be deemed to be the authentication of Securities by the Trustee.

Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any paper or any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Co-Issuers. The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Co-Issuers. Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Co-Issuers if the resigning or terminated Authenticating Agent was originally appointed at the request of the Issuer or Co-Issuer.

The Trustee agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto and the Trustee shall be entitled to be reimbursed for such payments, subject to Section 6.7. The provisions of Sections 2.9, 6.4 and 6.5 shall be applicable to any Authenticating Agent.

Section 6.16    Fiduciary for Holders of Senior Notes and Mezzanine Notes Only; Agent for Other Secured Parties.  With respect to the security interests created hereunder, the pledge of any item of Collateral to the Trustee is to the Trustee as representative of the Holders of the Senior Notes and the Mezzanine Notes and agent for each of the other Secured Parties; in furtherance of the foregoing, the possession by the Trustee of any item of Collateral or other assets of the Issuer, the endorsement to or registration of any item of Collateral or other assets of the Issuer and the control by the Trustee (including control over Financial Assets held in the Issuer Accounts) are all undertaken by the Trustee in its capacity as representative of such Holders and agent for each of the other Secured Parties.  The Trustee shall have no fiduciary duties to the other Secured Parties.  The foregoing shall not limit any of the express obligations of the Trustee hereunder.

ARTICLE VII
COVENANTS

Section 7.1    Payments on Securities.    The Co-Issuers (or, in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer)  will duly and punctually pay the interest on and principal of the Securities in accordance with the terms thereof and this Indenture.  Amounts properly withheld under the Code by any Person from a payment to any Holder of Securities of interest and/or principal shall be considered as having been paid by the Co-Issuers to such Holder for all purposes of this Indenture.  The Trustee hereby provides notice to each Holder that the failure of such Holder to provide the Trustee with appropriate tax certifications may result in amounts being withheld from payment to such Holder under this Indenture (provided, that amounts withheld pursuant to applicable tax laws shall be considered as having been paid by the Co-Issuers as provided in the preceding sentence).

Section 7.2    Compliance with Laws.    The Co-Issuers will comply in all material respects with applicable laws, rules, regulations, writs, judgments, injunctions, decrees, awards and orders with respect to them, their business and their properties.

Section 7.3    Maintenance of Books and Records.    The Co-Issuers shall maintain and implement administrative and operating procedures reasonably necessary in the performance of their obligations hereunder and the Issuer shall keep and maintain at all times, or cause to be kept and maintained at all times in its registered office in the Cayman Islands, all documents, books, records, accounts and other information as are required under the laws of the Cayman Islands.

Section 7.4    Maintenance of Office or Agency.    The Co-Issuers (or in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer) hereby appoint the Trustee at its Corporate Trust Office as a Paying Agent for the payment of principal and interest on the Securities, as a location where Securities may be surrendered for registration of transfer or exchange and as a location where notices in respect of the Notes or this Indenture may be delivered.

The Co-Issuers hereby appoint Corporation Service Company, with an office on the date hereof at 1133 Avenue of the Americas, Suite 3100, New York, New York 10036, as their agent to receive on behalf of the Co-Issuer or Issuer, as applicable, notices and demands in respect of the Securities or this Indenture.  The Co-Issuers hereby appoint Grant Thornton in Dublin, Ireland as (i) the Co-Issuers' agent where notices and demands to or upon the Co-Issuer or the Issuer, as applicable, in respect of the Securities or this Indenture may be served and (ii) the EU Paying Agent for the payment of principal of and interest on such Senior Notes and Mezzanine Notes and distributions on the Subordinated Notes.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; provided, that the Co-

Issuers will maintain in the Borough of Manhattan, the City of New York, an office or agency where notices and demands to or upon the Co-Issuers in respect of the Co-Issued Notes (or, in respect of the Mezzanine Notes and the Subordinated Notes, the Issuer) and this Indenture may be served and subject to any laws or regulations applicable thereto; provided, further, that no Paying Agent shall be appointed in a jurisdiction which subjects payments on the Senior Notes or the Mezzanine Notes to withholding tax; provided, further, that so long as any Class of Securities is listed on the Irish Stock Exchange and such stock exchange shall so require, the Co-Issuers shall maintain a Paying Agent in Ireland.  In the event that the EU Paying Agent is replaced at any time during such period, notice of the appointment of any replacement will be given to the Irish Listing Agent for delivery to the Company Announcements Office of the Irish Stock Exchange.  The Co-Issuers shall at all times maintain a Securities Register.  The Co-Issuers shall give prompt written notice to the Trustee, each of the Rating Agencies and the Holders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers shall fail to maintain any such required office or agency in the Borough of Manhattan, the City of New York, or shall fail to furnish the Trustee with the address thereof, presentations and surrenders may be made (subject to the limitations described in the preceding paragraph) at and notices and demands may be served on the Co-Issuers (or, in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer) and Securities may be presented and surrendered for payment to the appropriate Paying Agent at its main office, and the Co-Issuers hereby appoint the same as their agent to receive such respective presentations and surrenders.

Section 7.5    Money for Payments to Be Held in Trust.  All payments of amounts due and payable with respect to any Securities that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Co-Issuers (or, with respect to the Mezzanine Notes and the Subordinated Notes, the Issuer).

When the Co-Issuers shall have a Paying Agent that is not also the Securities Registrar, they shall furnish, or cause the Securities Registrar to furnish, no later than the fifth calendar day after each Record Date a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and of the certificate numbers of individual Securities held by each such Holder.

Whenever the Co-Issuers shall have a Paying Agent other than the Trustee, they shall, on or before the Business Day next preceding each Payment Date or Redemption Date, as the case may be, direct the Trustee to deposit on such Payment Date with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for such purpose in the Payment Account), such sum to be held in trust for the benefit of the Persons entitled thereto and (unless such Paying Agent is the Trustee) the Co-Issuers shall notify promptly the Trustee of such Paying Agent's action or failure so to act.  Any moneys deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Senior Notes and the Mezzanine Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Trustee for application in accordance with ARTICLE X.

The initial Paying Agents shall be as set forth in Section 7.4.  Any additional or successor Paying Agents shall be appointed by Issuer Order with written notice thereof to the Trustee; provided, that such additional or successor Paying Agent must either (i) have a rating of at least "Aa2" or its equivalent by Moody's and at least "AA" by Standard & Poor's, (ii) agree not to hold any funds pursuant to this Indenture overnight, or (iii) be an entity the appointment of which as Paying Agent will not, at that time, result in a downgrade, withdrawal or qualification of the ratings on the Senior Notes or the Mezzanine Notes.  The Co-Issuers shall not appoint any Paying Agent (other than an initial Paying

Agent) that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities. The Co-Issuers (or, in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer) shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee (and if the Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 7.5, that such Paying Agent will:

> (A)     allocate all sums received for payment to the Holders of Securities for which it acts as Paying Agent on each Payment Date and Redemption Date among such Holders in the proportion specified in the applicable report or statement in accordance herewith, in each case to the extent permitted by applicable law;

> (B)     hold all sums held by it for the payment of amounts due with respect to the Securities in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

> (C)     if such Paying Agent is not the Trustee, immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Securities if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment; and

> (D)     if such Paying Agent is not the Trustee, at any time during the continuance of any Event of Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Co-Issuers (or, in respect of the Mezzanine Notes and the Subordinated Notes, the Issuer) may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Co-Issuers or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such sum.

> Any money deposited with a Paying Agent and not previously returned that remains unclaimed for 60 days shall be returned to the Trustee. Except as otherwise required by applicable law, any money deposited with the Trustee or any Paying Agent in trust for the payment of the principal of or interest on any Security and remaining unclaimed for two years after such principal or interest has become due and payable shall be paid to the Issuer on Issuer Request; and the Holder of such Security shall thereafter, as an unsecured general creditor, look only to the Issuer, and all liability of the Trustee or such Paying Agent with respect to such trust money (but only to the extent of the amounts so paid to the Issuer) shall thereupon cease. The Trustee or such Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Co-Issuers, any reasonable means of notification of such release of payment, including, but not limited to, mailing notice of such release to Holders whose Securities have been called but have not been surrendered for redemption or whose right to or interest in monies due and payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each such Holder.

> Section 7.6     Existence of Co-Issuers.    (a) Each of the Issuer and the Co-Issuer shall, to the maximum extent permitted by applicable law, take all reasonable steps to maintain its identity as a separate legal entity from that of its stockholders. Each of the Issuer and the Co-Issuer shall keep its

principal place of business at the address specified in Section 13.3.  Each of the Issuer and the Co-Issuer shall keep separate books and records and will not commingle its respective funds with those of any other Person.  The Issuer and the Co-Issuer shall, to the maximum extent permitted by applicable law, keep in full force and effect their rights and franchises as a company incorporated under the laws of the Cayman Islands and a corporation incorporated under the laws of the State of Delaware, respectively, shall comply with the provisions of their respective organizational documents, and shall obtain and preserve their qualification to do business as foreign corporations in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Securities or any of the Collateral; provided, that, subject to Cayman Islands law, the Issuer shall be entitled to change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction reasonably selected by the Issuer and approved by the Holder of the Issuer Ordinary Shares so long as (i) the Issuer determines that such change would not subject the Issuer to taxation on a net income basis and is not disadvantageous in any material respect to the Issuer or Holders of Senior Notes, Mezzanine Notes or Subordinated Notes, (ii) written notice of such change shall have been given by the Co-Issuers to the Trustee, the Holders, and each of the Rating Agencies at least 30 Business Days prior to such change of jurisdiction, (iii) on or prior to the 15th Business Day following such notice, the Trustee shall not have received written notice from a Majority of the Controlling Class objecting to such change and (iv) Rating Agency Confirmation from Standard & Poor's shall have been obtained.

(b)    The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including holding regular board of directors' and stockholders', or other similar, meetings) are followed.  Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding.  Without limiting the foregoing, (i) the Issuer shall not have any subsidiaries (other than any subsidiaries necessitated by a change of jurisdiction pursuant to Section 7.6), (ii) the Co-Issuer shall not have any subsidiaries and (iii) the Issuer and the Co-Issuer shall not (A) have any employees (other than their respective officers and directors), (B) engage in any transaction with any shareholder that would constitute a conflict of interest (provided, that the Administration Agreement, the Collateral Administration Agreement, the Administrative Agency Agreement and this Indenture shall not be deemed to be such a transaction that would constitute a conflict of interest) or (C) pay dividends other than in accordance with the provisions of this Indenture.

Section 7.7    Protection of Collateral.  The Issuer shall execute and deliver from time to time all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be reasonably necessary or advisable or reasonably desirable to secure the rights and remedies of the Secured Parties hereunder and to:

(i)    Grant more effectively all or any portion of the Collateral;

(ii)    maintain or preserve the lien (and the priority thereof) of this Indenture the purposes hereof;

(iii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture;

(iv)    enforce any of the Pledged Underlying Assets or other instruments or property included in the Collateral;

(v)     preserve and defend title to the Collateral and the rights therein of the Trustee and the Secured Parties in the Collateral against the claims of all Persons and parties; or

(vi)     cause the Issuer to pay (solely from the Collateral in accordance with the Priority of Payments) any and all taxes levied or assessed upon all or any part of the Collateral and use its reasonable commercial efforts to minimize taxes and any other costs arising in connection with its activities.

(b)     The Issuer hereby designates the Trustee its agent and attorney-in-fact to file on behalf of the Issuer or either of the Co-Issuers any Financing Statement, continuation statement or other instrument required pursuant to this Section 7.7.  Such designation shall not impose upon the Trustee, or release or diminish, the Issuer's obligations under this Section 7.7.  Without limiting any of the foregoing, the Issuer expressly agrees that it shall take on a timely basis all actions that may be necessary to continue and maintain the effectiveness and perfection of the security interest granted hereunder in the Collateral under and in compliance with the requirements of the revised version of Article 9 of the Uniform Commercial Code as in effect from time to time in New York ("Revised UCC Article 9").

(c)     The Trustee shall not (i) except in accordance with Section 10.7(a), (b) or (c), as applicable, remove or permit the removal of any portion of the Collateral that is evidenced by a Certificated Security or an Instrument in physical form (A) from the jurisdiction in which it was held at the date the most recent opinions delivered pursuant to Section 7.8 (or from the jurisdiction in which it was held at the Closing Date, if no Opinion of Counsel has yet been delivered pursuant to Section 7.8) or (B) from the possession of the Person who held it on such date or (ii) cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (A) located in a different jurisdiction from the jurisdiction in which such ownership or pledge was recorded at such date or (B) other than the Person on whose books such ownership or pledge was recorded at such date, unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

(d)     The Issuer shall (i) pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any Collateral and (ii) if required to prevent the withholding or imposition of U.S. income tax, deliver or cause to be delivered for as long as the Issuer is treated as an entity disregarded from its owner, a United States Internal Revenue Service Form W-9 if such owner is a U.S. person (or successor applicable form), to each issuer, counterparty or paying agent with respect to (as applicable) an item included in the Collateral owned by the Issuer at the time such item is included in the Collateral and thereafter prior to the expiration or obsolescence of such form, and such other forms as may be appropriate, if the Issuer is treated as a partnership or otherwise not as an entity disregarded from its owner.

Section 7.8     Opinions as to Collateral.  On or before the Payment Date in October of each calendar year, commencing in 2009, the Issuer shall furnish to the Trustee an Opinion of Counsel stating that, in the opinion of such counsel, as of the date of such opinion, the lien and security interest created by this Indenture with respect to the Collateral remains in effect and that no further action (other than as specified in such opinion) needs to be taken (under then current law) to ensure the continued effectiveness and perfection of such lien over the next year.

Section 7.9     Performance of Obligations.  (a) If an Event of Default or a Default shall have occurred, the Co-Issuers shall not take any action, and shall use their best efforts not to permit any action to be taken by others, that would release any Person from any of such Person's covenants or

obligations under any Reference Instrument, except in the case of certain actions taken with respect to any Defaulted Obligation in accordance with the provisions hereof and as otherwise required hereby

(b)      The Co-Issuers may contract with other Persons for the performance of actions and obligations to be performed by the Co-Issuers hereunder by such Persons and the performance of the actions and other obligations with respect to the Collateral.  Notwithstanding any such arrangement, the Co-Issuers shall remain primarily liable with respect thereto.   In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Co-Issuers; and the Co-Issuers will punctually perform, and use their best efforts to cause such other Person to perform, all of their obligations and agreements contained in such other agreement.

(c)      The Co-Issuers agree to comply in all material respects with all requirements applicable to them set forth in any Opinion of Counsel obtained pursuant to any provision of this Indenture including satisfaction of any event identified in any Opinion of Counsel as a prerequisite for the obtaining or maintaining by the Trustee of a perfected security interest in any Pledged Underlying Asset or other Collateral that is of first priority, free of any adverse claim or the legal equivalent thereof, as applicable.

Section 7.10      Negative Covenants.  (a) The Issuer will not:

(i)      sell, transfer, assign, participate, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (by security interest, lien (statutory or otherwise), preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever or otherwise) (or permit such to occur or suffer such to exist), any part of the Collateral, except as expressly permitted by this Indenture;

(ii)      claim any credit on, or make any deduction from, the principal, interest or other amounts payable in respect of the Securities (other than amounts withheld in accordance with the Code or any applicable laws of the Cayman Islands) or assert any claim against any present or future Holder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(iii)      (A) incur or assume or guarantee any indebtedness or any contingent obligations, other than the Securities, this Indenture and the other agreements and transactions expressly contemplated hereby and thereby or (B) issue any additional securities (including ordinary shares (other than those in issue on the date hereof)) other than the Subordinated Notes except pursuant to Section 2.11;

(iv)      (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Securities, except as may be expressly permitted hereby, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (including any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever or otherwise, other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof, any interest therein or the Proceeds thereof, or (C) take any action that would cause the lien of this Indenture not to constitute a valid perfected security interest in the Collateral that is of first priority, free of any adverse claim or the legal equivalent thereof, as applicable, except as may be expressly permitted hereby (or in connection with a disposition of Collateral required hereby);

(v)       make or incur any capital expenditures, except as reasonably required to perform its functions in accordance with the terms of this Indenture;

(vi)      become liable in any way, whether directly or by assignment or as a guarantor or other surety, for the obligations of the lessee under any lease, hire any employees or pay any dividends to the stockholders of the Issuer Ordinary Shares;

(vii)     enter into any transaction with any Affiliate or any Holder of a Senior Note, a Mezzanine Note or a Subordinated Note other than (A) the transactions contemplated by, the Collateral Administration Agreement, the Administrative Agency Agreement, and the Purchase Agreements, (B) the transactions relating to the offering and sale of the Securities or (C) transactions on terms no less favorable than those obtainable in an arm's-length transaction with a wholly unaffiliated Person;

(viii)    maintain any bank accounts other than the Issuer Accounts and the Issuer's bank account in the Cayman Islands;

(ix)      (A) change its name without first delivering to the Trustee and the Rating Agencies notice thereof and an Opinion of Counsel that such name change will not adversely affect the Trustee's lien or the interest hereunder of the Secured Parties or the Trustee or (B) conduct business under an assumed name;

(x)       have any subsidiaries other than any subsidiaries necessitated by a change of jurisdiction pursuant to Section 7.6, in which case the Issuer shall provide notice thereof to Standard & Poor's;

(xi)      permit the transfer of any of its ordinary shares to a U.S. Person or a U.S. Resident;

(xii)     establish a branch, agency, office or place of business in the U.S., or take any action or engage in any activity (directly or through an agent) which would subject it to U.S. federal, state or local income tax;

(xiii)    fail to pay any tax, assessment, charge or fee with respect to the Collateral, or fail to defend any action, if such failure to pay or defend may adversely affect the priority or enforceability of the lien over the Collateral created by this Indenture;

(xiv)    issue and sell additional Subordinated Notes other than in accordance with Section 2.11;

(xv)     commingle its assets with those of any other entity;

(xvi)    conduct its business in any name other than its own;

(xvii)   fail to correct any known misunderstanding regarding its identity separate from any other entity;

(xviii)  amend the Collateral Administration Agreement, the Administrative Agency Agreement or the Purchase Agreements except as permitted by the terms thereof and of this Indenture;

(xix)    except for any agreements involving the ownership or purchase and sale of any Underlying Asset having customary purchase or sale terms and documented with customary trading documentation, enter into any agreements unless such agreements contain "non-petition" and "limited recourse" provisions;

(xx)    amend its constitutional documents unless Rating Agency Confirmation from Standard & Poor's shall have been received; or

(xxi)    amend limited-recourse and non-petition provisions in this Indenture or other transaction documents to which it is a party.

(b)    The Co-Issuer will not:

(i)    claim any credit on, or make any deduction from, the principal or interest payable in respect of the Senior Notes (other than amounts withheld in accordance with the Code or any applicable laws of the Cayman Islands) or assert any claim against any present or future Holder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(ii)    conduct its business in any name other than its own;

(iii)    fail to correct any known misunderstanding regarding its identity separate from that of any other entity;

(iv)    (A) incur, assume or guarantee or become directly or indirectly liable with respect to any indebtedness or any contingent obligations (including swap agreements, cap agreements, reimbursement obligations, repurchase obligations or the like), other than pursuant to the Senior Notes, this Indenture and the other agreements and transactions expressly contemplated hereby and thereby, (B) issue any additional securities (except pursuant to Section 2.11) or (C) issue any additional shares of stock;

(v)    (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Senior Notes, except as may be expressly permitted hereby, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (including any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever or otherwise, other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof, any interest therein or the Proceeds thereof except as permitted hereby, or (C) take any action that would cause the lien of this Indenture not to constitute a valid first priority perfected security interest in the Collateral, except as may be expressly permitted hereby (or in connection with a disposition of Collateral required hereby;

(vi)    make or incur any capital expenditures;

(vii)    become liable in any way, whether directly or by assignment or as a guarantor or other surety, for the obligations of the lessee under any lease, hire any employees or pay any dividends to its stockholders;

(viii)    enter into any transaction with any Affiliate or any Holder of a Senior Note other than the transactions relating to the offering and sale of the Senior Notes;

(ix)     maintain any bank accounts;

(x)     commingle its assets with those of any other entity;

(xi)     change its name without first delivering to the Trustee notice thereof and an Opinion of Counsel that such name change will not adversely affect the Trustee's lien or the interests hereunder of the Secured Parties or the Trustee;

(xii)     have any subsidiaries; or

(xiii)     permit the transfer of any of its shares of capital stock to a U.S. Person or a U.S. Resident.

(c)     Neither the Issuer nor the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral, or enter into or engage in any business with respect to any part of the Collateral except as expressly permitted or required by this Indenture.

(d)     [Reserved].

Section 7.11    Co-Issuers May Consolidate, Etc., Only on Certain Terms.  The Issuer shall not consolidate or merge with or into any other Person or convey or transfer its properties and assets substantially as an entirety to any Person, unless permitted by Cayman Islands law and unless:

(i)     the Issuer shall be the surviving corporation, or the Person (if other than the Issuer) formed by such consolidation or into which the Issuer is merged or to which the properties and assets of the Issuer are transferred shall be a company incorporated and existing under the laws of the Cayman Islands or such other jurisdiction approved by a Majority of the Controlling Class; provided that no such approval shall be required in connection with any such transaction undertaken solely to effect a change in the jurisdiction of incorporation pursuant to Section 7.6, and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee and each Senior Noteholder and Mezzanine Noteholder, the due and punctual payment of the principal of and interest on all Senior Notes and Mezzanine Notes and the performance of every covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein;

(ii)     each of the Rating Agencies shall have been notified in writing of such consolidation or merger and the Trustee shall have received Rating Agency Confirmation with respect to the consummation of such transaction;

(iii)     if the Issuer is not the surviving corporation, the Person formed by such consolidation or into which the Issuer is merged or to which the properties and assets of the Issuer are transferred substantially as an entirety shall have agreed with the Trustee (A) to observe the same legal requirements for the recognition of such formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Issuer with respect to its Affiliates and (B) not to consolidate or merge with or into any other Person or convey or transfer the Collateral or its assets substantially as an entirety to any other Person except in accordance with the provisions of this Section 7.11;

(iv)     if the Issuer is not the surviving corporation, the Person formed by such consolidation or into which the Issuer is merged or to which the properties and assets of the Issuer are transferred substantially as an entirety shall have delivered to the Trustee and each of the

Rating Agencies an Officer's Certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in clause (i) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is valid, legal and binding on such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law); that, immediately following the event which causes such Person to become the successor to the Issuer, (A) such Person has good and marketable title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Collateral, (B) the Trustee continues to have a valid perfected security interest in the Collateral that is of first priority, free of any adverse claim or the legal equivalent thereof, as applicable, (C) such Person will not be considered as engaged in a U.S. trade or business for U.S. federal income tax purposes and (D) such other matters as the Trustee or any Holder may reasonably require;

(v)    immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(vi)    the Issuer shall have notified each of the Rating Agencies of such consolidation, merger, conveyance or transfer and shall have delivered to the Trustee for transmission to each Holder an Officer's Certificate and an Opinion of Counsel each stating that (A) such consolidation, merger, conveyance or transfer does not result in the Co-Issuers being subject to U.S. federal income tax on a net income tax basis or cause the Issuer to be subject to income tax on a net income basis in the jurisdiction of its incorporation that it previously was not subject to and (B) such supplemental indenture comply with this ARTICLE VII and that all conditions precedent in this ARTICLE VII provided for relating to such transaction have been complied with;

(vii)    after giving effect to such transaction, neither of the Co-Issuers will be required to register as an investment company under the Investment Company Act; and

(viii)    after giving effect to such transaction, neither the outstanding Issuer Ordinary Shares nor the outstanding shares of the Co-Issuer will be beneficially owned by any U.S. Person or U.S. Resident.

(b)    The Co-Issuer shall not consolidate or merge with or into any other Person or convey or transfer its properties and assets substantially as an entirety to any Person unless:

(i)    the Co-Issuer shall be the surviving corporation, or the Person (if other than the Co-Issuer) formed by such consolidation or into which the Co-Issuer is merged or to which the properties and assets of the Co-Issuer are transferred shall be a limited purpose corporation organized and existing under the laws of the State of Delaware or such other jurisdiction approved by a Majority of the Controlling Class, and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, the due and punctual payment of the principal of and interest on all Senior Notes and the performance of every covenant of this Indenture on the part of the Co-Issuer to be performed or observed, all as provided herein;

(ii)    each of the Rating Agencies shall have been notified of such consolidation or merger and the Trustee shall have received Rating Agency Confirmation with respect to the consummation of such transaction;

(iii)    if the Co-Issuer is not the surviving corporation, the Person formed by such consolidation or into which the Co-Issuer is merged or to which the properties and assets of the Co-Issuer are transferred substantially as an entirety shall have agreed with the Trustee (A) to observe the same legal requirements for the recognition of such formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Co-Issuer with respect to its Affiliates and (B) not to consolidate or merge with or into any other Person or convey or transfer its assets substantially as an entirety to any other Person except in accordance with the provisions of this Section 7.11;

(iv)    if the Co-Issuer is not the surviving corporation, the Person formed by such consolidation or into which the Co-Issuer is merged or to which the properties and assets of the Co-Issuer are transferred substantially as an entirety shall have delivered to the Trustee and each of the Rating Agencies an Officer's Certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in clause (i) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is valid, legal and binding on such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law); that such Person would not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the U.S. for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis and such other matters as the Trustee or any Holder may reasonably require;

(v)    immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(vi)    the Co-Issuer shall have notified each of the Rating Agencies of such consolidation, merger, conveyance or transfer and shall have delivered to the Trustee for transmission to each Holder of a Senior Note an Officer's Certificate and an Opinion of Counsel each stating that (A) such consolidation, merger, conveyance or transfer does not result in the Co-Issuers being subject to U.S. federal income tax on a net income tax basis or cause the Issuer to be subject to income tax on a net income basis in the jurisdiction of its incorporation that it previously was not subject to and (B) such supplemental indenture comply with this ARTICLE VII and that all conditions precedent in this ARTICLE VII provided for relating to such transaction have been complied with;

(vii)    after giving effect to such transaction, neither of the Co-Issuers will be required to register as an investment company under the Investment Company Act; and

(viii)    after giving effect to such transaction, the outstanding shares of the Issuer and the Co-Issuer will not be beneficially owned within the meaning of the Investment Company Act by any U.S. Resident.

Section 7.12    <u>Successor Substituted</u>.    Upon any consolidation or merger, or conveyance or transfer of the properties and assets of the Issuer or the Co-Issuer substantially as an entirety, in accordance with Section 7.11, the Person formed by or surviving such consolidation or merger (if other than the Issuer or the Co-Issuer), or, the Person to which such consolidation, merger, conveyance or transfer is made, shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer or the Co-Issuer, as the case may be, under this Indenture with the same effect as if such Person had been named as the Issuer or the Co-Issuer, as the case may be, herein.  In the event of any such consolidation, merger, conveyance or transfer, the Person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this ARTICLE VII may be dissolved, wound up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Securities and from its obligations under this Indenture.

Section 7.13    <u>No Other Business</u>.    The Issuer shall not engage in any business or activity other than, as applicable, (i) issuing and selling the Securities pursuant to this Indenture, (ii) entering into, and performing its obligations under, this Indenture, the Collateral Administration Agreement, , the Administrative Agency Agreement,the Purchase Agreements, the Master Participation Agreement and the Administration Agreement, (iii) acquiring, owning, holding, selling, pledging and contracting for the management of and otherwise dealing with Underlying Assets and other Collateral in connection therewith in the manner permitted hereby (including, without limitation, entering into amendments, forbearances and waivers with respect to the Underlying Assets), (iv) entering into certain pre-closing warehousing arrangements and the agreements relating thereto and (v) undertaking such other activities which are necessary, required or advisable to accomplish the foregoing; <u>provided</u>, that the Issuer shall be permitted to enter into any additional agreements other than agreements not expressly prohibited by Section 7.10(a) and to enter into any amendment, modification, or waiver of existing agreements or such additional agreements, in each case without Rating Agency Confirmation or the consent of the Holders unless otherwise provided in a Transaction Document or this Indenture, except that any amendment, modification or waiver of this Indenture shall be subject to the applicable conditions set forth in Article VIII.  The Co-Issuer shall not engage in any business or activity other than issuing and selling the Co-Issued Notes pursuant to this Indenture and entering into the other transaction documents to which it is a party contemplated hereby and such other activities which are necessary, required or advisable to accomplish the foregoing.

Section 7.14    <u>Compliance with Collateral Administration Agreement and Administrative Agency Agreement</u>.    (a) The Issuer agrees to perform or cause the Collateral Administrator or other specified Person to perform on the Issuer's behalf, all actions required to be performed by it, and to refrain from performing, any actions prohibited under the Collateral Administration Agreement.  The Issuer also agrees to take all actions as may be necessary to ensure that all of the Issuer's representations and warranties made pursuant to the Collateral Administration Agreement are true and correct as of the date thereof and continue to be true and correct for so long as any Securities are Outstanding.  The Issuer further agrees not to authorize or otherwise permit the Collateral Administrator to act in contravention of the representations, warranties and agreements of the Collateral Administrator under the Collateral Administration Agreement.

(b)    The Issuer agrees to perform or cause the Administrative Agent or other specified Person to perform on the Issuer's behalf, all actions required to be performed by it, and to refrain from performing, any actions prohibited under the Administrative Agency Agreement.  The Issuer also agrees to take all actions as may be necessary to ensure that all of the Issuer's representations and warranties made pursuant to the Administrative Agency Agreement are true and correct as of the date thereof and continue to be true and correct for so long as any Securities are Outstanding. The Issuer further agrees not to authorize or otherwise permit the Administrative Agent to act in contravention of the

representations, warranties and agreements of the Administrative Agent under the Administrative Agency Agreement.

Section 7.15    Confirmation of Rating.  The Co-Issuers shall request, within 10 days after the Ramp-Up Effective Date, that each of the Rating Agencies confirm the original ratings assigned to each Class of Co-Issued Notes on the Closing Date; provided, that Rating Agency Confirmation from Moody's will not be required if the Ramp-Up Effective Date has been designated by the Issuer pursuant to clause (i) of the definition thereof and Moody's has received the Accountants' Certificate required to be delivered pursuant to Section 10.8(b).  In the event that either (i) any rating assigned to any Class of the Senior Notes or Mezzanine Notes as of the Closing Date has not been confirmed (or deemed confirmed) by the applicable Rating Agency by the Determination Date preceding the first Payment Date or (ii) by the Determination Date preceding the first Payment Date, the Co-Issuers fail to deliver to Moody's the Accountant's Certificate pursuant to Section 3.5(e) confirming that clauses (i)(x) and (i)(y) of the definition of "Ramp-Up Effective Date" have been met, in each case as evidenced by a certificate to the Trustee (such event, a "Ratings Confirmation Failure"), then Interest Proceeds and, to the extent Interest Proceeds are insufficient for such purpose, Principal Proceeds will be applied in accordance with the Priority of Payments to pay first, principal of the Senior Notes, and second, principal to the Mezzanine Notes (including Mezzanine Deferred Interest, if any), until such original ratings are confirmed or the principal of such Senior Notes and Mezzanine Notes are paid in full. In addition, if and for so long as any Class of Securities is listed on the Irish Stock Exchange and the rules of such exchange so require, the Issuer will give notice to the Irish Listing Agent for delivery to the Company Announcements Office in the event that a Ratings Confirmation Failure occurs. Notwithstanding the foregoing, the parties hereto agree that the requirements set forth in this Section 7.15 shall not apply to the extent that the Ramp-Up Effective Date falls on the Closing Date and, for the purposes of this Indenture (including, without limitation, Sections 11.1(a)(vi) hereof and 11.1(b)(iii)), a Rating Confirmation Failure shall be deemed not to have occurred or be continuing so long as the condition set forth in Section 3.1(m) has been satisfied as of the Closing Date.

Section 7.16    Reporting.  At any time when the Co-Issuers are not subject to Section 13.1 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder of, or a Holder of a beneficial interest in, a Security, the Co-Issuers shall promptly furnish or cause to be furnished the information specified in Section (d)(4) of Rule 144A under the Securities Act (or any successor provision thereto) to such Holder or beneficial owner, to a prospective purchaser of such Security designated by such Holder or beneficial owner, to another designee of such Holder or beneficial owner or to the Trustee for delivery to such Holder or beneficial owner or a prospective purchaser designated by such Holder or beneficial owner or such other designee of such Holder or beneficial owner, as the case may be, in order to permit compliance by such Holder or beneficial owner with Rule 144A in connection with the resale of such Security by such Holder or beneficial owner.

Section 7.17    Calculation Agent.  The Co-Issuers hereby agree that for so long as any of the Senior Notes or Mezzanine Notes remain Outstanding there will at all times be a calculation agent appointed to calculate LIBOR in respect of each Interest Period in accordance with the terms of Schedule B hereto (the "Calculation Agent").  The Calculation Agent appointed by the Co-Issuers must be a bank which does not control, is not controlled by and is not under common control with, the Co-Issuers or any of their respective Affiliates.  The Calculation Agent may be removed by the Co-Issuers at any time.  If the Calculation Agent is unable or unwilling to act as such or is removed by the Co-Issuers, or if the Calculation Agent fails to determine any of the information required to be communicated, as described in Section 7.17(b), in respect of any Interest Period, the Co-Issuers will promptly appoint another bank meeting the qualifications set forth above to act as Calculation Agent.  The Calculation Agent may not resign its duties without a successor having been duly appointed.  The Co-Issuers have initially appointed

the Trustee as Calculation Agent for purposes of determining LIBOR for each Interest Period. For so long as any of the Securities are listed on the Irish Stock Exchange and the rules of such exchange so require, the Issuer will publish notice of the appointment, termination or change in the office of such Calculation Agent to the Company Announcements Office.

(a)    The Calculation Agent shall be required to agree that, as soon as practicable after 11:00 a.m., London time, on each LIBOR Determination Date (as defined in Schedule B hereto), but in no event later than 11:00 a.m., New York City time, on the Business Day immediately following such LIBOR Determination Date, the Calculation Agent will calculate the interest rate applicable to each Class of Senior Notes and Mezzanine Notes for the following Interest Period, and will as soon as practicable but in no event later than 11:00 a.m., New York City time, on the day following such LIBOR Determination Date, communicate such rates, and the amount of interest payable per $1,000 of principal amount on the next Payment Date (rounded to the nearest cent, with half a cent being rounded upwards), in respect of each Class of Senior Notes and Mezzanine Notes, to the Co-Issuers, the Trustee, Euroclear, Clearstream, the Manager, the Depositary and each Paying Agent. For so long as any of the Securities are listed on the Irish Stock Exchange and the rules of the Irish Stock Exchange so require, such information will be given to the Irish Listing Agent for delivery to the Company Announcements Office as soon as practicable, but in no event later than the fourth Business Day following such LIBOR Determination Date.

(b)    The Calculation Agent shall be required to specify to the Co-Issuers the quotations upon which each Note Interest Rate is based, and in any event the Calculation Agent shall notify the Co-Issuers before 5:00 p.m. (New York City time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining each of the Note Interest Rates and the amount of interest payable in respect of each Class of Senior Notes and Mezzanine Notes for the related Interest Period or (ii) it has not determined and is not in the process of determining each of the Note Interest Rates and the amount of interest payable in respect of each Class of Senior Notes and Mezzanine Notes for the related Interest Period, together with its reasons therefor.

Section 7.18    Certain Tax Matters.

(a)    Tax Classification. It is intended that the Issuer will be classified either as a partnership (if there is more than one Holder of the Subordinated Notes) or a disregarded entity (if there is only a single Holder of the Subordinated Notes) for U.S. federal income tax purposes and otherwise not as an association or publicly traded partnership taxable as a corporation for U.S. federal income tax purposes. To that end, since it is contemplated that there shall only be a single Holder of the Subordinated Notes, the Issuer shall file (or caused to be filed), effective as of the date of the issuance of the Notes, an election with the U.S. Internal Revenue Service to be classified as disregarded as an entity separate from its owner for U.S. federal income tax purposes, in the time and manner as set forth under Treasury regulations Section 301.7701-3(c) and shall take (or cause to be taken) all actions that are necessary to ensure such election is valid and remains valid at all times. The sole Subordinated Noteholder on behalf of the Issuer is hereby authorized to prepare, file and execute the election in accordance with Treasury regulation Section 301.7701-3(c)(2). The Issuer shall not, nor shall the Issuer permit any Person to, take any action or make any election that would result in the Issuer being classified as an association or publicly traded partnership taxable as a corporation without the unanimous consent of all Holders.

(b)    Treatment of Notes for U.S. Tax Purposes. The Issuer and each Holder of a Senior Note and Mezzanine Note, by acceptance of such Senior Note or Mezzanine Note, as the case may be, or its interest in a Senior Note or Mezzanine Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Senior Note or Mezzanine Note as debt for U.S. federal income tax purposes. The Issuer and each Holder of a Subordinated Note, by acceptance of such Subordinated Note, or its

interest in a Subordinated Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Subordinated Note as equity of the Issuer for U.S. federal income tax purposes.

(c)     U.S. Tax Forms.    Each Holder and any beneficial owner of Senior Notes, Mezzanine Notes or Subordinated Notes (if the Subordinated Notes are held by more than one person) shall timely furnish the Issuer or its agents with any U.S. federal income tax form or certification (such as IRS Form W-8BEN, W-8IMY, W-9 or W-8ECI, or any successors to such IRS forms) that the Issuer or its agents may reasonably request and shall update or replace such form or certification in accordance with its terms or its subsequent amendments.  The Holder or beneficial owner understands that the Issuer may require certification acceptable to it (a) to permit the Issuer to make payments to it without, or at a reduced rate of, withholding or (b) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets.  Each Holder or beneficial owner agrees to provide any such certification that is requested by the Issuer.

(d)     Notwithstanding anything herein to contrary or any contrary agreement or understanding, the Co-Issuers, the Trustee and the Holders and beneficial owners of the Securities (and each of their respective employees, representatives or other agents and the Rating Agencies) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the Co-Issuers and the offering, ownership and disposition of the Securities contemplated by this Indenture and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such tax treatment and tax structure.  However, any such information relating to such tax treatment or tax structure is required to be kept confidential to the extent reasonably necessary to comply with any applicable federal or state securities laws.  For this purpose, the tax treatment of a transaction is the purported or claimed U.S. federal income tax treatment of the transaction, and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of the transaction.  The tax treatment or tax structure of a transaction shall not include, and the Co-Issuers, the Trustee and the Holders and beneficial owners of the Securities (and each of their respective employees, representatives or other agents) shall not disclose pursuant to this clause (d): the name of, or other information identifying, the Issuer, the Co-Issuer, the Initial Purchaser or any investor or future investor in the Securities (or, in any case, any affiliate thereof).

ARTICLE VIII
SUPPLEMENTAL INDENTURES

Section 8.1     Supplemental Indentures Without Consent of Holders.  (a) Without the consent of the Senior Noteholders, the Mezzanine Noteholders or the Subordinated Noteholders, the Co-Issuers and the Trustee, at any time and from time to time, may (and, at the direction of the Holders of at least a Majority of the Subordinated Notes, the Holders of at least a Majority of the Mezzanine Notes and the Holders of at least a Majority of the Senior Notes, shall) enter into one or more indentures supplemental hereto, in form reasonably satisfactory to the Trustee for any of the following purposes:

(i)     to evidence the succession of another Person to the Issuer or the Co-Issuer, and the assumption by any such successor Person of the covenants of the Issuer or the Co-Issuer contained herein and in the Securities;

(ii)     to add to the covenants of the Co-Issuers or the Trustee for the benefit of the Holders of the Senior Notes, or to surrender any right or power herein conferred upon the Co-Issuers;

(iii)     to convey, transfer, assign, mortgage or pledge any additional property to or with the Trustee, or add to the conditions, limitations or restrictions on the authorized amount,

terms and purposes of the issue, authentication and delivery of the Senior Notes or the Mezzanine Notes;

(iv)    to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Section 6.9, 6.10 or 6.12 hereof;

(v)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to correct, amplify or otherwise improve any pledge, assignment or conveyance to the Trustee of any property subject or required to be subject to the lien of this Indenture (including any and all actions necessary or desirable as a result of changes in law or regulations), or to cause any additional property to be subject to the lien of this Indenture;

(vi)    to cure any ambiguity or manifest error or correct or supplement any provisions herein which may be defective or inconsistent with any other provision or make any modification that is of a formal, minor or technical nature;

(vii)    to take any action necessary or advisable to prevent the Issuer or the Trustee from becoming subject to withholding or other taxes, fees or assessments or to prevent the Issuer from being treated as engaged in the U.S. trade or business or otherwise being subject to U.S. federal, state or local income tax on a net income basis;

(viii)    to enter into any additional agreements not expressly prohibited by this Indenture as well as any amendment, modification or waiver if the Issuer determines that such amendment, modification or waiver would not, upon or after becoming effective, materially adversely affect the rights or interests of Holders of any Class of Senior Notes, the Holders of any Class of Mezzanine Notes or the Holders of the Subordinated Notes;

(ix)    to evidence and provide for any additional issuance of Securities pursuant to Section 2.11 and Section 3.3;

(x)    to modify the restrictions on and procedures for resales and other transfers of the Securities to reflect any changes in applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(xi)    to accommodate the settlement of the Senior Notes, the Mezzanine Notes and the Subordinated Notes in book-entry form through the facilities of the Depositary or otherwise;

(xii)    [Reserved];

(xiii)    [Reserved];

(xiv)    to authorize the appointment of any listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Securities required or advisable in connection with the listing of any Class of Securities on the Irish Stock Exchange or any other stock exchange, to amend this Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, Transfer Agent, Paying Agent or additional

registrar for any Class of Securities in connection therewith or to make any appropriate changes for the Notes to be de-listed from the Irish Stock Exchange, if, in the sole judgment of the Issuer, the maintenance of the listing of any Class of Notes on the Irish Stock Exchange is unduly onerous or burdensome;

(xv)    to amend the name of the Issuer and/or the Co-Issuer;

(xvi)    to avoid either of the Co-Issuers or the Collateral being required to register as an investment company under the Investment Company Act;

(xvii)    [Reserved];

(xviii)    to provide for the issuance of Replacement Notes (provided, that a Majority of the Holders of the Subordinated Notes has consented to the related Redemption by Refinancing);

(xix)    to modify the terms hereof in order that it may be consistent with the requirements of the Rating Agencies, including to address any change in the rating methodology employed by either Rating Agency;

(xx)    to facilitate the issuance of participation notes, combination notes, composite securities, and other similar securities;

(xxi)    to modify any provision to facilitate an exchange of one obligation for another obligation of the same obligation(s) that has substantially identical terms except transfer restrictions, including to effect any serial designation relating to the exchange;

(xxii)    to make such other changes as the Co-Issuers deem appropriate and that do not materially and adversely affect the interests of any holder of the Senior Notes, any holder of the Mezzanine Notes or any holder of the Subordinated Notes as evidenced by an opinion of counsel delivered to the Trustee (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion);

(xxiii)    [Reserved]; or

(xxiv)    in order to reflect any changes after the Closing Date in the published criteria of the Rating Agencies with respect to CDO transactions.

(b)    The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise, except to the extent required by law.

(c)    Not later than seven Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.1, the Trustee, at the expense of the Co-Issuers, shall, for so long as any Class of Senior Notes and/or Mezzanine Notes are Outstanding and rated by the Rating Agencies, mail to each of the Rating Agencies, a copy of such proposed supplemental indenture. No proposed supplemental indenture contemplated by this Section 8.1 may be executed without obtaining Rating Agency Confirmation with respect to such supplemental indenture; provided, that the Rating

Agency Confirmation from Moody's shall not be required for supplemental indentures contemplated by clauses (iii), (iv), (v), (vi), (vii), (xi), (xii), (xiv), (xv) and (xvi) of this Section 8.1 and no Rating Agency Confirmation shall be required for any supplemental indenture contemplated by this Section 8.1 if such Rating Agency Confirmation shall have been waived or otherwise not requested or required by the holders of at least a Majority of the Subordinated Notes, the holders of at least a Majority of the Mezzanine Notes and the holders of at least a Majority of the Senior Notes.

(d)    Promptly after the execution by the Co-Issuers and the Trustee of any supplemental indenture pursuant to this Section 8.1, the Trustee, at the expense of the Co-Issuers, shall mail or otherwise deliver to the Holders of the Securities, and, so long as the Senior Notes or the Mezzanine Notes are Outstanding and rated by the Rating Agencies, each of the Rating Agencies a copy thereof.  Any failure of the Trustee to deliver or mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

(e)    Not later than seven Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.1, the Trustee, at the expense of the Co-Issuers, shall mail to the Holders and the Administrative Agent a copy of any proposed supplemental indenture and written notice reciting in substance the following provisions:

(i)    unless within seven Business Days after such mailing the Trustee shall have received written notice from a Majority of a Class of Securities that such Holders reasonably consider their interests to be materially adversely affected by the proposed supplemental indenture, the Trustee may rely on written advice of counsel as to whether or not the Holders of any Senior Notes, Mezzanine Notes or Subordinated Notes would be materially adversely affected by any supplemental indenture and any such determination shall be conclusive upon the Holders of all Senior Notes, Mezzanine Notes or Subordinated Notes, whether theretofore or thereafter authenticated and delivered; and

(ii)    the Trustee shall not be liable for any such determination made in good faith and in reliance upon an Opinion of Counsel delivered to the Trustee as described in this Section 8.1 or Section 8.3 hereof.

provided that the clauses (i) and (ii) of this Section 8.1(e) shall not apply if the Trustee is acting under this Section 8.1 at the direction of the Holders of at least a Majority of the Subordinated Notes, the Holders of at least a Majority of the Mezzanine Notes and the Holders of at least a Majority of the Senior Notes.

(f)    Notwithstanding anything in this ARTICLE VIII to the contrary, the terms of this Indenture may be amended in any respect by the Co-Issuers and the Trustee, with the consent of a Majority (or, if so required under Section 8.2, all) of the Subordinated Notes, but without the consent of any Senior Noteholder or any Mezzanine Noteholder, in connection with and effective upon the satisfaction a Refinancing pursuant to Section 9.4.

Section 8.2    Supplemental Indentures with Consent of Holders.  With the consent of the Holders of not less than a Majority of each Class of Securities materially adversely affected thereby, the Trustee and the Co-Issuers may enter into a supplemental indenture to add provisions to, or change in any manner or eliminate any provisions of, this Indenture or modify in any manner the rights of the Holders of the Senior Notes or the Mezzanine Notes; provided, that each Holder of a Security that has not objected to any proposed supplemental indenture in writing to the Issuer and the Trustee by the date that is thirty (30) days after the date on which notice of any such proposed supplemental indenture is sent to such Holder will be deemed to have consented to such supplemental indenture.  The Trustee may rely on the written advice of counsel or a certificate of the Issuer as to whether or not any Class of Securities

would be materially adversely affected by such change.  Such determination shall be conclusive and binding on all present and future Holders of the Securities.

Notwithstanding the foregoing, the Trustee and the Co-Issuers may not enter into any supplemental indenture without the written consent of the Holders of each Outstanding Senior Note or Mezzanine Note materially adversely affected thereby (except as provided in the preceding paragraph with respect to deemed Senior Noteholder and Mezzanine Noteholder consent) and the Issuer may not enter into any such supplemental indenture without the consent of the Holders of each Outstanding Security materially adversely affected thereby if such supplemental indenture:

(a)        changes the Stated Maturity of or the due date of any installment of interest on any Senior Note or any Mezzanine Note or the date on which any payment or any final distribution on the Subordinated Notes is payable, reduces the principal amount of any Senior Note or Mezzanine Note or the rate of interest thereon, or the rate at which interest accrues or the manner in which deferred interest accrues, or the redemption price with respect thereto, or changes the earliest date on which any Senior Note or Mezzanine Note may be redeemed, changes the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on the Senior Notes or the Mezzanine Notes or to the making of payments or any final distribution on the Subordinated Notes or change any place where, or the coin or currency in which, any Senior Note or Mezzanine Note or the principal thereof or interest thereon is payable or where the making of payments or any final distribution on the Subordinated Notes is payable, or impairs the right to institute suit for the enforcement of any such payment on any Senior Note or Mezzanine Note on or after the Stated Maturity thereof (or, in the case of redemption, on or after the applicable Redemption Date);

(b)        (1) reduces the percentage of the Aggregate Outstanding Amount of Holders of Senior Notes whose consent is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain defaults thereunder or their consequences, (2) reduces the percentage of the Aggregate Outstanding Amount of Holders of Mezzanine Notes whose consent is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain defaults thereunder or their consequences or (3) reduces the percentage of the Aggregate Outstanding Amount of Holders of Subordinated Notes whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with the provisions of this Indenture of which such waiver is permitted by the Holders of the Subordinated Notes or any other action under this Indenture that requires the consent of the Holders of the Subordinated Notes;

(c)        impairs or adversely affects in a material way the Collateral except as otherwise permitted in this Indenture;

(d)        permits the creation of any lien ranking prior to or an a parity with the lien of this Indenture with respect to any part of the Collateral or terminates the lien of this Indenture on any property at any time subject hereto or deprives the Holder of any Senior Note or Mezzanine Note of the security afforded by the lien of this Indenture;

(e)        reduces the percentage of the Aggregate Outstanding Amount of Holders of Senior Notes or the Aggregate Outstanding Amount of Holders of Mezzanine Notes whose consent is required to (i) request that the Trustee preserve the Collateral, (ii) rescind the Trustee's election to preserve the Collateral pursuant to Section 5.5 or (iii) sell or liquidate the Collateral pursuant to Section 5.4 or 5.5;

(f)    modifies any of the provisions of this Section 8.2, except to increase the percentage of Outstanding Senior Notes, Mezzanine Notes or Subordinated Notes the consent of the Holders of which is required for any such action or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Senior Note, Mezzanine Note or Subordinated Note materially adversely affected thereby;

(g)    modifies the Priority of Payments or modifies the definition of the term "Outstanding";

(h)    modifies any of the provisions of this Indenture in such a manner as to affect the calculation, on any Payment Date, of the amount of any payment of interest on or principal of any Senior Note or Mezzanine Note or the amount of any payment or any Payment Date or any final distribution on the Subordinated Notes on the Subordinated Note Redemption Date, or to affect the right of the Holders of Senior Notes and the Mezzanine Notes to the benefit of any provisions for the redemption of such Senior Notes and Mezzanine Notes contained in ARTICLE IX or to affect the rights of the holders of the Subordinated Notes to the benefit of any provisions for redemption of the Subordinated Notes contained in ARTICLE IX, or to affect the rights of the Secured Parties to the benefit of any provisions for the redemption of such Senior Notes and Mezzanine Notes contained in ARTICLE IX;

(i)    amends any provision of this Indenture or any other agreement entered into by the Issuer with respect to the transactions contemplated hereby relating to the institution of proceedings for the Issuer or the Co-Issuer to be adjudicated as bankrupt or insolvent, or the consent of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency proceedings against it, or the filing with respect to the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization, arrangement, moratorium or liquidation proceedings, or other proceedings under the Bankruptcy Code or any similar laws, or the consent of the Issuer or the Co-Issuer to the filing of any such petition or the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or the Co-Issuer or any substantial part of its property, respectively;

(j)    amends any provision of this Indenture or any other agreement entered into by the Issuer with respect to the transactions contemplated hereby that provides that the obligations of the Issuer or the Co-Issuer, as the case may be, are limited recourse and non-recourse obligations of the Issuer or the Co-Issuer, respectively, payable solely from the Collateral, in accordance with the terms of this Indenture; or

(k)    at the time of the execution of such supplemental indenture, causes the Issuer to become subject to withholding or other taxes, fees or assessments or causes the Issuer to be treated as engaged in a U.S. trade or business or otherwise be subject to U.S. federal, state or local income tax on a net income basis.

Not later than five Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall, for so long as the Senior Notes or Mezzanine Notes are Outstanding and rated by the Rating Agencies, mail to each of the Rating Agencies and the Holders, a copy of any proposed supplemental indenture. No such proposed supplemental indenture may be executed without obtaining Rating Agency Confirmation with respect to such supplemental indenture; provided that the Trustee may, with the consent of the Holders of 100% of the Aggregate Outstanding Amount of Senior Notes and/or the Holders of 100% of the Aggregate Outstanding Amount of Mezzanine Notes whose then current rating would be reduced, withdrawn or qualified as a result of such supplemental indenture, enter into any such supplemental indenture without obtaining such Rating Agency Confirmation and notwithstanding any such reduction, withdrawal or qualification. In connection with any proposed supplemental indenture that would require the consent of

any Holder of Securities pursuant to the terms of this Indenture, each Holder of a Security that has not objected to any proposed supplemental indenture in writing to the Issuer and the Trustee by the date that is thirty (30) days after the date on which notice of such proposed supplemental indenture is sent to such Holder will be deemed to have consented to such supplemental indenture.

It shall not be necessary for any Act of Senior Noteholders, Mezzanine Noteholders or Subordinated Noteholders under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

Promptly after the execution by the Co-Issuers and the Trustee of any supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall mail to the Holders of the Securities, the Trustee and, so long as the Senior Notes or Mezzanine Notes are Outstanding and rated by the Rating Agencies, each of the Rating Agencies a copy thereof. Any failure of the Trustee to publish or mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Section 8.3    Execution of Supplemental Indentures. In executing or accepting the additional trusts created by any supplemental indenture permitted by this ARTICLE VIII or the modifications thereby, the Trustee shall be entitled to receive, and (subject to Sections 6.1 and 6.3 hereof) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution and delivery of such supplemental indenture is in compliance with this Indenture and that all conditions precedent thereto have been satisfied. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 8.4    Effect of Supplemental Indentures. Upon the execution of any supplemental indenture under this ARTICLE VIII, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Senior Notes theretofore and thereafter authenticated and delivered hereunder, every Holder of Mezzanine Notes theretofore and thereafter authenticated and delivered hereunder and every Holder of Subordinated Notes shall be bound thereby.

Section 8.5    Transfer of Non-Consenting Noteholders' Securities in Connection with Pricing Amendment. If on or after the Payment Date occurring in October, 2008, an amendment of the provisions of this Indenture relating to interest on the Senior Notes and/or the Mezzanine Notes (a "Pricing Amendment") is proposed and one or more Senior Noteholders and/or Mezzanine Noteholders whose consent is required to effect such Pricing Amendment, pursuant to this ARTICLE VIII, do not provide their consent thereto within fifteen Business Days after the request therefor is mailed to such Holder(s) (each such Holder, a "Non-Consenting Noteholder"), then the Co-Issuers and the Trustee may cause such Non-Consenting Noteholder's Senior Note(s) or Mezzanine Note(s), as applicable, (the "Non-Consenting Notes") to be transferred to a Person that (i) is eligible to acquire such Non-Consenting Notes in accordance with the terms of this Indenture, (ii) is willing to consent to such Pricing Amendment and (iii) agrees to purchase such Non-Consenting Notes at a price equal to the par amount thereof plus all accrued and unpaid interest thereon (such transfer, a "Pricing Amendment Mandatory Transfer"); provided, that in order to effect a Pricing Amendment Mandatory Transfer, (a) a Majority of the Subordinated Notes must consent thereto, (b) the Trustee and Standard & Poor's shall have received an opinion of counsel to the effect that the Pricing Amendment will not result in a deemed exchange of the Senior Notes or Mezzanine Notes, as applicable, for purposes of Section 1001 of the Code for the Senior Noteholder(s) or Mezzanine Noteholder(s), as applicable, who have consented to such Pricing Amendment and (c) the Issuer shall have received a Rating Agency Confirmation from Standard & Poor's with respect to the Senior Notes and/or Mezzanine Notes that are subject of such Pricing Amendment. Any expenses associated with effecting any Pricing Amendment Mandatory Transfer will be payable as

Administrative Expenses of the Co-Issuers pursuant to the Priority of Payments, <u>provided</u>, that such Administrative Expenses may be payable wholly or in part out of Principal Proceeds at the direction of the Issuer, rather than first out of Interest Proceeds. In obtaining Rating Agency Confirmation with respect to the Senior Notes and/or the Mezzanine Notes that are the subject of such Pricing Amendment, the Co-Issuers will be required to comply with the methodology employed by the Rating Agencies at the time such confirmation and such ratings are being sought, even if such methodology has been revised since the Closing Date.

ARTICLE IX
REDEMPTION OF NOTES

Section 9.1    <u>General</u>.  Subject to the satisfaction of certain conditions described in this ARTICLE IX, on any Payment Date, a Majority of the Subordinated Notes shall have the right to require the Co-Issuers to redeem the Senior Notes and/or the Issuer to redeem the Mezzanine Notes pursuant to (i) a Redemption by Liquidation, (ii) a Redemption by Refinancing or (iii) a Tax Redemption. In connection with any such redemption, the Issuer may not direct the Trustee to sell (and the Trustee shall not be required to release) any Underlying Asset, unless, as determined pursuant to the procedures set forth in Section 9.5, there will be sufficient Disposition Proceeds after giving effect to actual or anticipated receipt of any Refinancing Proceeds in the manner described in Section 9.4, if any, and all available funds held in the Issuer Accounts to pay the Total Redemption Amount.  Notwithstanding anything in this ARTICLE IX to the contrary, payments of the applicable Redemption Price shall only be made in accordance with the Priority of Payments.

Section 9.2    <u>Tax Redemption</u>.  On any Payment Date on or after the occurrence of a Tax Event (such redemption, a "<u>Tax Redemption</u>"), the Co-Issuers (or, in the case of the Mezzanine Notes and the Subordinated Notes, the Issuer) shall redeem the Securities, in whole but not in part, on any subsequent Payment Date if so directed in writing by the Holders of a Majority of the Subordinated Notes outstanding.  Any such redemption will be made sequentially among the Securities, subject to the conditions set forth in Section 9.5 and the Priority of Payments.  The funds available for a redemption of the Securities made in connection with a Tax Event shall include all Principal Proceeds, Interest Proceeds, Disposition Proceeds, Refinancing Proceeds and all other available funds in the Issuer Accounts.  Each Class of the Securities shall be redeemed at the applicable Redemption Price in accordance with the Priority of Payments.

Section 9.3    <u>Redemption by Liquidation</u>.  On any Payment Date, the Majority of Subordinated Notes shall have the right to require the Co-Issuers to redeem the Senior Notes, in whole but not in part, and, simultaneously, the Issuer to redeem the Mezzanine Notes, in whole but not in part, from Disposition Proceeds and all other available funds in the Issuer Accounts (such redemption, a "<u>Redemption by Liquidation</u>"), in accordance with, and subject to the conditions set forth in, the redemption procedures set forth in Section 9.5.

Section 9.4    <u>Redemption by Refinancing</u>.  (a) In addition to (or in lieu of) a sale of Underlying Assets and/or Eligible Investments in the manner provided in Section 9.3, on and after the Payment Date occurring in October, 2008, any Outstanding Senior Notes as a Class, in whole but not in part, or any Outstanding Mezzanine Notes as a Class, in whole but not in part, (such Class(es), the "<u>Existing Notes</u>") may be redeemed from Refinancing Proceeds if a Majority of the Subordinated Notes direct the Co-Issuers (or, in the case of the Mezzanine Notes, the Issuer) to redeem any Existing Notes by obtaining a loan or an issuance of replacement securities (which may, but need not, be effected by an issuance of additional Senior Notes and Mezzanine Notes, as applicable, ("<u>Replacement Notes</u>" and such redemption, a "<u>Redemption by Refinancing</u>" and, together with a Redemption by Liquidation, an "<u>Optional Redemption</u>") under this Indenture as amended in connection therewith), the terms of which loan or

issuance will be negotiated by the Administrative Agent on behalf of the Issuer, from one or more financial institutions or purchasers (a refinancing provided pursuant to such loan or issuance, a "Refinancing"); provided that the terms of such Refinancing and any financial institutions acting as lenders thereunder or purchasers thereof must be acceptable to the Administrative Agent and such Refinancing must otherwise satisfy the conditions described below.  Any expenses associated with effecting any Redemption by Refinancing shall be payable as administrative expenses of the Co-Issuers pursuant to the Priority of Payments; and provided, further, that such administrative expenses may be payable wholly or in part either out of Principal Proceeds or Interest Proceeds, at the direction of the Administrative Agent.  Any Optional Redemption of the Senior Notes or the Mezzanine Notes shall be made at the applicable Redemption Price.

> (i)     Prior to executing any Refinancing, the Co-Issuers shall obtain a ratings letter from each of the Rating Agencies evidencing the fact that the ratings assigned to each Replacement Note are at least as high as the ratings assigned to the Existing Notes of the corresponding Class (if the Replacement Notes are in the same proportions to each other as to principal amounts as the Existing Notes are to each other and if the Replacement Notes are rated).

> (ii)    The Issuer shall obtain a Refinancing only if (x) the Cash proceeds from the Refinancing (the "Refinancing Proceeds"), all Disposition Proceeds from the sale of Underlying Assets and Eligible Investments in accordance with the procedures set forth in Section 9.5, and all other available funds in the Issuer Accounts will be at least sufficient to redeem simultaneously the Classes of Existing Notes subject to the Redemption by Refinancing, in whole but not in part, and to pay the administrative and other fees and expenses incurred in connection with such Refinancing, (y) the Disposition Proceeds, Refinancing Proceeds and other available funds are used (to the extent necessary) to effect such redemption and (z) the agreements relating to the Refinancing contain limited recourse and non-petition provisions equivalent (*mutatis mutandis*) to those contained in Section 5.4(d).

The Subordinated Noteholders will not have any cause of action against any of the Co-Issuers or the Trustee for any failure to obtain a Refinancing.

> (b)     In the event that a Refinancing is obtained meeting the criteria specified above and in a manner acceptable to the requisite Subordinated Noteholders, the Co-Issuers and the Trustee, as directed by the Subordinated Noteholders, shall amend this Indenture to the extent necessary to reflect the terms of the Refinancing (which amendments may include (1) Stated Maturities for Replacement Notes later than the Stated Maturities of the Existing Notes, (2) changes in related Note Interest Rate, (3) changes to the provisions for the issuance of additional Senior Notes and Mezzanine Notes, including under Section 2.11, (4) specifying a date before which no Optional Redemption subsequent to such Refinancing may occur and (5) any other amendments to the existing terms of this Indenture as may be negotiated by the Issuer with the providers of the Refinancing), and no further consent for such amendments shall be required from the Subordinated Noteholders or the Holders of Existing Notes.  Any such Refinancing will be subject to receipt by the Co-Issuers (or, in the case of the Mezzanine Notes, the Issuer) of a rating from each Rating Agency with respect to the Replacement Notes at least as high as the rating of the corresponding Class of Note being redeemed and a Rating Agency Confirmation (with respect to each Class of rated Note not being so redeemed) with respect to such issuance of Replacement Notes.  The Trustee shall not be obligated to enter into any amendments that, in its view, adversely affects its duties, obligations, liabilities or protections hereunder, and the Trustee shall be entitled (but not obligated) to require the Issuer to provide to it an Opinion of Counsel to the effect that such amendment meets the criteria specified above and is permitted under this Indenture without the consent of the Senior Noteholders or the Mezzanine Noteholders (except that such counsel shall have no obligation to opine as to the sufficiency of the Refinancing Proceeds, or the sufficiency of the Accountants' Certificate required

pursuant to Section 3.1(l)).  Any expenses associated with effecting any Redemption by Refinancing will be payable as Administrative Expenses of the Co-Issuers pursuant to the Priority of Payments; provided, that such Administrative Expenses may be payable wholly or in part out of Principal Proceeds at the direction of the Administrative Agent, rather than first out of Interest Proceeds and, only if Interest Proceeds are insufficient therefor, then, out of Principal Proceeds. In obtaining ratings for any Replacement Notes, the Co-Issuers will be required to comply with the methodology employed by the Rating Agencies at the time such ratings are being sought, even if such methodology has been revised since the Closing Date.

Section 9.5    Redemption Procedures.  (a) Holders of Subordinated Notes wishing to direct an Optional Redemption or a Tax Redemption must provide written notice to the Trustee and the Administrative Agent at least 20 days prior to the scheduled Redemption Date (unless each of the Trustee and the Administrative Agent shall agree to a shorter notice period) of such Redemption Date, the applicable Record Date, the principal amount of Senior Notes and/or Mezzanine Notes to be redeemed on such Redemption Date and the Redemption Price of such Senior Notes and/or Mezzanine Notes in accordance with Section 9.3.  The Administrative Agent, with the consent of a Majority of Subordinated Notes, wishing to direct a Redemption by Liquidation must provide notice to the Trustee at least 10 days prior to the scheduled Redemption Date (unless the Trustee agrees to a shorter notice period).  The Trustee shall forward notice of such Optional Redemption or Tax Redemption to each of the Issuer and the Rating Agencies at least 5 days prior to the scheduled Redemption Date and direct the Issuer to redeem, whereupon the Issuer shall be obligated to redeem, the applicable Securities, subject to satisfaction of the applicable conditions set forth in Section 9.5(c).  In addition, if and for so long as any Securities are listed on the Irish Stock Exchange, the Trustee will give notice of any redemption of such Securities and the applicable Redemption Date to the Irish Listing Agent for delivery to the Company Announcements Office of the Irish Stock Exchange, not less than 10 days prior to such scheduled Redemption Date.  The Issuer expects that DTC or its nominee, upon receipt of any notice of Optional Redemption or Tax Redemption, will provide prompt notice of such Optional Redemption or Tax Redemption to its participants who own a beneficial interest in a Global Security in accordance with its customary procedures.  The Issuer also expects that any such participants in DTC will provide prompt notice of such Optional Redemption or Tax Redemption to owners of a beneficial interest in a Global Security through such participants in accordance with the customary procedures of such participants.

Senior Notes and Mezzanine Notes to be redeemed, other than interests in Global Securities, must be surrendered at the office of the Paying Agent appointed for such Senior Notes or Mezzanine Notes, as applicable, in order to receive the applicable Redemption Price unless the Holder provides an undertaking to surrender such Senior Note or Mezzanine Note, as applicable, thereafter.

(b)    The Senior Notes and/or the Mezzanine Notes shall not be redeemed pursuant to an Optional Redemption or Tax Redemption unless either:

(i)    at least five Business Days before the scheduled Redemption Date, the Administrative Agent shall have furnished to the Trustee evidence (which may be an officer's certificate) in form reasonably satisfactory to the Trustee, that the Issuer, at the direction of the Administrative Agent, has entered into a binding agreement or agreements (including a confirmation of sale) with a financial institution or institutions (i) whose short-term unsecured debt obligations have a credit rating of "P-1" from Moody's and at least "A-1" from Standard & Poor's or (ii) who has received a guarantee from a financial institution or institutions with the ratings specified in clause (i) above (or any other entity that has the benefit of a credit facility, a warehouse agreement, a liquidity facility or a similar arrangement with a financial or other institution or entity that satisfies such criteria in the case of a special purpose vehicle that is purchasing part of the portfolio) to purchase, not later than the Business Day immediately

preceding the scheduled Redemption Date, in immediately available funds, all or part of the Underlying Assets at a purchase price at least equal to an amount sufficient, together with, (A) the sum of (x) the proceeds from the Underlying Assets and Eligible Investments maturing on or prior to the scheduled Redemption Date and (y) without duplication, any Cash and Refinancing Proceeds to be applied to such redemption and (B) without duplication, the aggregate amount of the expected proceeds from the sale of the Underlying Assets and Eligible Investments not later than the Business Day immediately preceding the scheduled Redemption Date with respect to which the Administrative Agent on behalf of the Issuer has provided the certification to the Trustee described in clause (ii) below, (1) to pay all administrative and other fees and expenses (including in respect of any indemnity obligations) payable under the Priority of Payments (including the fees and expenses incurred by the Trustee and the Collateral Administrator) and (2) to redeem such Senior Notes and/or Mezzanine Notes in whole but not in part on the scheduled Redemption Date at the applicable Redemption Price (the aggregate amount required to make all such payments and to effect such redemption, the "Total Redemption Amount"); or

(ii)    at least eight Business Days prior to the scheduled Redemption Date and prior to selling any Underlying Assets and/or Eligible Investments, the Administrative Agent shall have certified to the Trustee and to each of the Rating Agencies that the expected proceeds from such sale (calculated as provided in the immediately following paragraph) together with any Refinancing Proceeds and any other amounts available to be used for such Optional Redemption or Tax Redemption will be delivered to the Trustee not later than the Business Day immediately preceding the scheduled Redemption Date, in immediately available funds, and will equal or exceed the Total Redemption Amount.

For purposes of determining the expected proceeds from a sale for purposes of clause (ii) above, the expected proceeds shall be deemed to be (1) the Current Market Value of the Underlying Assets if such Underlying Assets are to be sold on the Business Day of the certification or (2) the percentage of the Current Market Value of the Underlying Assets set forth in the applicable column of the table below based upon the period of time between the certification and the expected date of sale.

| Type of Collateral[1] | Redemption Advance Rates (Number of Business Days Between Certification by the Issuer to the Trustee and Sale of Collateral) | | |
| --- | --- | --- | --- |
| | Same day | Two Business Days | Three to Five Business Days |
| 1.    Loans (other than Loans with a Current Market Value of less than 90% of the Principal Balance thereof) | 100% | 93% | 92% |
| 2.    Underlying Assets (other than Loans) rated "B3" or higher (other than Underlying Assets with a Current Market Value of less than 90% of the Principal Balance thereof) | 100% | 89% | 85% |
| 3.    Loans with a Current Market Value of less than 90% of the Principal Balance thereof | 100% | 80% | 73% |
| 4.    Underlying Assets (other than Loans) rated "Caa1" or lower and Underlying Assets (other than Loans) rated "B3" or higher with a Current Market Value of less than 90% of the Principal Balance thereof | 100% | 75% | 65% |

---

[1]    For purposes of determining the Principal Balance of the Underlying Assets in the table above (A) the principal balance of each Underlying Asset that is a Deferred Interest Asset will be equal to the lesser of (x) the Principal Balance of such Underlying Asset multiplied by the Applicable Recovery Percentage and (y) the Current Market Value thereof and (B) the portion of the Principal Balance of each Underlying Asset which is payable after the Stated Maturity will be included solely to the extent of such amount multiplied by the Applicable Recovery Percentage.

(c)    The Administrative Agent shall set the Redemption Date (which shall be a Payment Date) and the Record Date with respect to such Redemption Date and give notice thereof to the Trustee pursuant to Section 9.5(a).  Installments of interest and principal due on or prior to a Redemption Date which shall not have been paid or duly provided for shall be payable to the Holders of the Senior Notes and/or the Holders of the Mezzanine Notes, as applicable, as of the relevant Record Dates.  Upon receipt of the direction of the Holders of a Majority of Subordinated Notes with respect to an Optional Redemption pursuant to Section 9.3 or a Tax Redemption, the Co-Issuers (or, in the case of the Mezzanine Notes, the Issuer) shall deliver an Issuer Order to the Trustee directing the Trustee to make the payment to the Paying Agent of the applicable Redemption Price of the Senior Notes and/or the Mezzanine Notes to be redeemed from available funds in the Issuer Accounts in accordance with the Priority of Payments.  The Issuer shall deposit, or cause to be deposited, the funds required for an Optional Redemption or a Tax Redemption in the Payment Account on or before the Business Day prior to the Redemption Date.

Section 9.6    Notice of Redemption by the Co-Issuers; Withdrawal of Notice.    (a) Notice of redemption pursuant to Section 9.1 or 9.9 (of which the Trustee has received timely written notice) of any Senior Notes and/or Mezzanine Notes shall be given by the Trustee on behalf of and at the expense of the Co-Issuers (or, in the case of the Mezzanine Notes, the Issuer) by first-class mail, postage prepaid, mailed not less than five days prior to the applicable Redemption Date or Maturity to each Rating Agency and each Holder of Senior Notes and/or Holder of Mezzanine Notes to be redeemed pursuant to this ARTICLE IX, at such Holder's address in the Securities Register.

All notices of redemption shall state:

(i)     the applicable Redemption Date and Record Date with respect thereto (which shall be a date after the date on which such notice is deemed to be given pursuant to Section 13.4);

(ii)    the Redemption Price for the Optional Redemption of each Senior Note and/or Mezzanine Note Outstanding, as applicable;

(iii)   that each Senior Note and/or Mezzanine Note Outstanding is being paid in full and that interest on such Senior Notes and/or Mezzanine Notes shall cease to accrue on the date specified in the notice; provided, that this statement shall not be included in any notice of redemption pursuant to Section 9.9;

(iv)    the place or places where such Senior Notes and/or Mezzanine Notes are to be redeemed or are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Issuer to be maintained as provided in Section 7.4; and

(v)     the latest possible date upon which such notice of redemption may be withdrawn.

Any notice of redemption of the Senior Notes and/or Mezzanine Notes may be withdrawn by the Co-Issuers (or, in the case of the Mezzanine Notes, the Issuer) on or prior to the fourth Business Day prior to the scheduled Redemption Date by written notice to the Trustee. Notice of any such withdrawal shall be given by the Trustee to each Holder of Senior Notes and Mezzanine Notes, as applicable, to be redeemed at such Holder's address appearing in the Securities Register by overnight courier, or if the address provided in the Securities Register is insufficient for such purpose, by first-class mail, sent not later than the second Business Day prior to the scheduled Redemption Date. In addition, if and for so long as any Senior Notes or Mezzanine Notes for which a notice of redemption was withdrawn are listed on the Irish Stock Exchange, the Trustee will send notice of any withdrawal of such notice to the Irish Listing Agent for delivery to the Company Announcements Office not less than the second Business Day prior to such Redemption Date.

(b)     Any failure to give notice of redemption, or any defect therein, to any Holder of a Senior Note selected for redemption shall not impair or affect the validity of the redemption of any other Senior Notes. Any failure to give notice of redemption, or any defect therein, to any Holder of a Mezzanine Note selected for redemption shall not impair or affect the validity of the redemption of any other Mezzanine Notes.

Section 9.7    Securities Payable on Redemption Date.    (a) Notice of redemption having been given and not withdrawn as aforesaid, the Securities so to be redeemed shall, on the applicable Redemption Date, become due and payable in whole but not in part at the Redemption Price therein specified, and from and after the Redemption Date (unless a default is made in the payment of the Redemption Price) such Securities (or the portion thereof to be redeemed) shall, if applicable, cease to bear interest. Upon final payment on a Security to be redeemed in connection with a Redemption, the Holder shall present and surrender such Security at the place specified in the notice of redemption on or prior to such Redemption Date; provided, that if there is delivered to the Co-Issuers (or, in the case of a Mezzanine Note or a Subordinated Note, the Issuer) and the Trustee such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such Security, then, in the absence of notice to the Co-Issuers (or, in the case of a Mezzanine Note or a Subordinated Note, the Issuer) or the Trustee that the applicable Security has been acquired by a Protected Purchaser, such final payment shall be made without presentation or surrender.

(b)    If any Senior Note or Mezzanine Note called for Redemption shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Note Interest Rate for each successive Interest Period at all times that such Senior Note or Mezzanine Note, as applicable, remains Outstanding.

Section 9.8    <u>Payment of Principal to Satisfy Coverage Tests or Remedy a Ratings Confirmation Failure</u>.  If any Coverage Test is not met as of any Determination Date of which any Senior Notes are Outstanding, the principal of the Senior Notes shall be repaid on the immediately following Payment Date in the manner and to the extent provided in Section 11.1.  If a Ratings Confirmation Failure occurs and continues to exist with respect to any Senior Notes and/or Mezzanine Notes as of any Determination Date, the principal of the Senior Notes and/or Mezzanine Notes shall be repaid on the immediately following Payment Date in the manner and to the extent provided in Section 11.1.

Section 9.9    <u>Special Redemption</u>.  On the Interim Payment Date, the Co-Issuers shall, if so directed in writing by the Holders of a Majority of the Subordinated Notes and provided that the funds on deposit in the Principal Collection Account on such date is equal to or greater than US$100,000,000 (before giving effect to any withdrawals from such account on such date), redeem (such redemption, a "**Special Redemption**") the Senior Notes, in whole or in part, and, after the Senior Notes are paid in full, the Mezzanine Notes, in whole or in part, at a redemption price equal to the Special Redemption Price.  For the avoidance of doubt, the Aggregate Outstanding Amount of Senior Notes and/or Mezzanine Notes to be redeemed on the Interim Payment Date pursuant to this Section 9.9 shall be a *pro rata* share of the principal portion of the Special Redemption Price.

Section 9.10    <u>Redemption of the Subordinated Notes following a Redemption of the Senior Notes and Mezzanine Notes</u>.  (a) On any Payment Date occurring on or after the Payment Date on which all of the Senior Notes and the Mezzanine Notes are redeemed in full and payment of, or establishment of, a reasonable reserve (as determined by the Administrative Agent in its sole discretion) for all other amounts payable under the Priority of Payments, the Subordinated Notes will be redeemed (in whole but not in part) by the Issuer in accordance with Section 9.5, upon receipt of written notice directing such redemption from (x) a Majority of the Subordinated Notes or (y) the Administrative Agent, with the consent of a Majority of the Subordinated Notes, shall have the right to require the Issuer to redeem the Subordinated Notes, in whole but not in part, from Disposition Proceeds and all other available funds in the Issuer Accounts (such redemption, a "Subordinated Note Redemption"); provided that with respect to a redemption in accordance with clause (y) above, such consent of the holders of a Majority of Subordinated Notes will be deemed to have been received if such Holders have not objected in writing to such redemption within 15 days after the date on which notice of such redemption was sent to the holders of the Subordinated Notes.  Notwithstanding anything in this ARTICLE IX to the contrary, payments of the applicable Redemption Price shall only be made in accordance with the Priority of Payments.

(b)    Holders of Subordinated Notes wishing to direct a Subordinated Note Redemption must provide written notice to the Trustee and the Administrative Agent at least 19 days prior to the scheduled Redemption Date (unless each of the Trustee and the Administrative Agent shall agree to a shorter notice period).  The Administrative Agent, with the consent of a Majority of Subordinated Notes, wishing to direct a Subordinated Note Redemption must provide notice to the Trustee at least 19 days prior to the scheduled Redemption Date (unless the Trustee agrees to a shorter notice period).  The Trustee shall forward notice of such Subordinated Note Redemption to the Issuer at least five days prior to the scheduled Redemption Date and direct the Issuer to redeem the applicable Subordinated Notes.  In addition, if and for so long as the Subordinated Notes are listed on the Irish Stock Exchange, the Trustee will give notice of any redemption thereof to the Irish Listing Agent for delivery to the Company Announcements Office of the Irish Stock Exchange, not less than three days prior to such

scheduled Redemption Date.  The Issuer expects that DTC or its nominee, upon receipt of any notice of Subordinated Note Redemption, will provide prompt notice of such Subordinated Note Redemption to its participants who own a beneficial interest in a Regulation S Global Subordinated Note in accordance with its customary procedures.  The Issuer also expects that any such participants in DTC will provide prompt notice of such Subordinated Note Redemption to owners of a beneficial interest in a Regulation S Global Subordinated Note through such participants in accordance with the customary procedures of such participants.

(c)    Subordinated Notes to be redeemed in whole, other than interests in a Regulation S Global Subordinated Note, must be surrendered at the office of the Paying Agent appointed for the Subordinated Notes in order to receive the Subordinated Note Redemption Price unless the Holder provides an undertaking to surrender such Subordinated Note thereafter.

(d)    Following receipt of such notice, the Administrative Agent shall direct the Trustee in writing to sell the Underlying Assets, and the Trustee shall sell such Underlying Assets in the manner directed in writing by the Administrative Agent and release such Underlying Assets pursuant to Section 10.7.

(e)    Upon receipt of the direction of a Majority of the Subordinated Notes directing the redemption of the Subordinated Notes in accordance with this Section 9.10, the Issuer shall deliver an Issuer Order to the Trustee directing the Trustee to make the payment to the Paying Agent of the Subordinated Note Redemption Price of all of the Subordinated Notes from available funds in the Issuer Accounts in accordance with the Priority of Payments.  The Issuer shall deposit, or cause to be deposited, the funds required for a redemption in the Payment Account on or before the Business Day prior to the Redemption Date.

(f)    Notice of redemption pursuant to this Section 9.10 or the Maturity of the Subordinated Notes shall be given by the Trustee on behalf of and at the expense of the Issuer by first-class mail, postage prepaid, mailed not less than five days prior to the applicable Redemption Date or Maturity to each Holder of Subordinated Notes to be redeemed pursuant to this ARTICLE IX, at such Holder's address in the Securities Register.

All notices of redemption shall state:

(i)    the applicable Redemption Date and Record Date with respect thereto (which shall be a date after the date on which such notice is deemed to be given pursuant to Section 13.4);

(ii)    the Subordinated Note Redemption Price;

(iii)    the place or places where the Subordinated Notes are to be redeemed or are to be surrendered for payment of the Subordinated Note Redemption Price, which shall be the office or agency of the Issuer to be maintained as provided in Section 7.4; and

(iv)    the latest possible date upon which such notice of redemption may be withdrawn.

(g)    Any notice of redemption of the Subordinated Notes may be withdrawn on or prior to the fourth Business Day prior to the Scheduled Redemption Date by the Holders of a Majority of the Subordinated Notes for any reason; provided, that if the Senior Notes or the Mezzanine Notes are not redeemed in full on the scheduled Redemption Date, no such redemption of the Subordinated Notes may

occur and such notice of redemption shall be deemed to have been automatically withdrawn. Notice of any such withdrawal shall be given by the Trustee to each Holder of Subordinated Notes to be redeemed at such Holder's address appearing in the Securities Register by overnight courier, or if the address provided in the Securities Register is insufficient for such purpose, by first-class mail, sent not later than the second Business Day prior to the scheduled Redemption Date. In addition, if and for so long as the Subordinated Notes is listed on the Irish Stock Exchange, the Trustee will send notice of any withdrawal of such notice to the Irish Listing Agent for delivery to the Company Announcements Office not less than the second Business Day prior to such Redemption Date.

Any failure to give notice of redemption, or any defect therein, to any Holder of a Subordinated Note shall not impair or affect the validity of the redemption of any other Subordinated Notes.

ARTICLE X
ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1    Collection of Money; General Account Requirements.  (a) Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Underlying Assets, in accordance with the terms and conditions of such Pledged Underlying Assets.  The Trustee shall segregate and hold all such Money and property received by it in trust pursuant to the Granting Clauses, for the Holders of the Senior Notes and the Mezzanine Notes.

(b)    Each of the parties hereto hereby agrees that (i) each Issuer Account shall be deemed to be a Securities Account (ii) except as otherwise expressly provided herein, the Trustee will be exclusively entitled to exercise the rights that comprise each Financial Asset held in each Issuer Account, and (iii) the Trustee shall be permitted to establish any number of sub-accounts deemed necessary by the Trustee for convenience in administering each Issuer Account.  Each of the parties hereto hereby agrees to cause the Securities Intermediary to agree with the parties hereto that (x) the Cash and other property is to be treated as a Financial Asset under Article 8 of the UCC and (y) the "securities intermediary's jurisdiction" (within the meaning of Section 8-110 of the UCC) for that purpose will be the State of New York; provided, however, that any Loan or Participation that constitutes a General Intangible shall be delivered to the Trustee as provided in Section 3.4(d), and the Securities Intermediary shall not be required to credit to any Securities Account any Loan or Participation that constitutes a General Intangible or to treat as a financial asset any Loan or Participation that constitutes a General Intangible. In no event may any Financial Asset held in any Issuer Account in the form of a registered security or registered instrument (or instrument payable to order) be registered in the name of, payable to the order of, or specially endorsed to, the Issuer unless such Financial Asset has also been endorsed in blank or to the Securities Intermediary that holds such Financial Asset in such Issuer Account.

(c)    Each Issuer Account shall be established (a) with a federal or state chartered depository institution with a short-term rating of at least "A-1" by Standard & Poor's (or a long-term rating of at least "A+" by Standard & Poor's if such institution has no short-term rating) and if such institution's short-term rating falls below "A-1" by Standard & Poor's (or its long-term rating falls below "A+" by Standard & Poor's if such institution has no short-term rating), the assets held in such Account shall be transferred within 60 calendar days to another institution that has a short-term rating of at least "A-1" by Standard & Poor's (or which has a long-term rating of at least "A+" by Standard & Poor's if such institution has no short-term rating) or (b) in segregated trust accounts with the corporate trust department of a federal or state-chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations, Section 9.10(b).

(d)      The Trustee (as directed in writing by the Administrative Agent, which may be in the form of a standing instruction) shall invest or cause the investment of all funds received into or retained in the Issuer Accounts (other than the Payment Account and the Variable Funding Account, which shall be invested in accordance with Section 10.4) in Eligible Investments (unless otherwise required under this Indenture and except when such funds shall be required to be disbursed under this Indenture) maturing on or before the next Payment Date.  Absent such direction by the Administrative Agent, the Trustee shall invest such funds in Eligible Investment of the type described in clause (iii) of the definition thereof, and the Trustee shall not be liable for investment losses on investments made in accordance with the terms hereof.

Section 10.2      Collection Account.  (a) On or prior to the Closing Date, the Trustee shall establish at the Custodian a segregated trust account (which may be a sub-account of the Custodial Account) designated as the "Collection Account" and maintained in the name of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal.  The Trustee shall from time to time deposit  (i) any portion of the Deposit deposited with the Trustee by the Issuer on or after the Closing Date that constitutes Principal Proceeds, (ii) all Principal Proceeds of any Underlying Assets (unless simultaneously reinvested in Underlying Assets), (iii) the deposits of Principal Proceeds required pursuant to Section 10.7(d)(ii) and (iv) any other amounts that constitute Principal Proceeds into a sub-account of the Collection Account designated the "Principal Collection Account."  The Trustee shall from time to time deposit all Interest Proceeds on the Underlying Assets and Eligible Investments into a sub-account of the Collection Account designated as the "Interest Collection Account."  Funds on deposit in the Collection Account shall not be commingled with any other Money.

(b)      All Distributions, any deposit required pursuant to Section 10.2(b) and any net proceeds from the sale or other disposition of an Underlying Asset or Equity Security received by the Trustee shall be immediately deposited into the Collection Account subject to Section 10.2(b).  Subject to Sections  10.2(c) and 10.2(d), all amounts deposited in the Collection Account, together with any securities in which funds included in such property are or will be invested or reinvested during the term of this Indenture, and any income or other gain realized from such investments, shall be held by the Trustee in the Collection Account as part of the Collateral subject to disbursement and withdrawal as provided in this Section 10.2.  The Trustee, within one Business Day after receipt of any Distribution or other proceeds of any Underlying Asset or Equity Security which are not Cash, shall so notify the Issuer, and, except as otherwise provided in Section 12.1, the Issuer shall, within five Business Days of receipt of such notice from the Trustee, sell such Distribution or other proceeds for Cash in an arm's-length transaction to a Person which is not an Affiliate of the Issuer and deposit the proceeds thereof in the Collection Account for investment pursuant to this Section 10.2; provided, that the Issuer need not sell such Distributions or other proceeds if it delivers an Officer's Certificate to the Trustee certifying that such Distributions and other proceeds constitute Underlying Assets or Eligible Investments.

(c)      If, prior to the occurrence of an Event of Default, the Issuer shall not have given any investment directions pursuant to Section 10.4(a), the Trustee shall seek instructions from the Administrative Agent within three Business Days after transfer of such funds to the Collection Account. If the Trustee does not thereupon receive written instructions from the Administrative Agent within five Business Days after transfer of such funds to a Collection Account, it shall invest and reinvest the funds held in such Collection Account, as fully as practicable, but only in one or more Eligible Investments and, for so long as the Bank is Trustee, in the commercial paper and/or debt obligations of the Bank (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or contractual commitment providing for such investment have a long-term credit rating of "Aa2" by Moody's and "AA" by Standard & Poor's, which shall be deemed to be an Eligible Investment (such investment, until changed as

hereinafter provided, the "Standby Directed Investment"), until investment instruction as provided in the preceding sentence is received; provided that if the Trustee receives a standing written instruction from the Administrative Agent expressly stating that it is changing the "Standby Directed Investment" under this Section 10.2(b), such Standby Directed Investment may be changed from time to time as so directed by the Administrative Agent to another Eligible Investment of the type described in clause (iii) of the definition thereof maturing no later than the Business Day immediately preceding the next Payment Date. After the occurrence of an Event of Default, the Trustee shall invest and reinvest such amounts as fully as practicable in Eligible Investments at the direction of the Issuer maturing not later than the earlier of (i) 30 days after the date of such investment and (ii) the Business Day immediately preceding the next Payment Date.  If the Trustee does not receive such direction from the Administrative Agent, the Trustee shall invest and reinvest such amounts as fully as practicable in Eligible Investments of the type described in clause (iii) of the definition thereof.   All interest and other income from such investments shall be deposited in the Collection Account, any gain realized from such investments shall be credited to the Collection Account, and any loss resulting from such investments shall be charged to the Collection Account.  The Trustee shall not in any way be held liable by reason of any insufficiency of the Collection Account resulting from any loss relating to any such investment, except with respect to investments in obligations of the Bank or any Affiliate thereof.

(d)     The Trustee shall, on behalf of the Co-Issuers, transfer all funds on deposit in the Principal Collection Account to the Payment Account on the Business Day prior to the Interim Payment Date to redeem the Senior Notes and/or the Mezzanine Notes in accordance with Section 9.9.

(e)     On or prior to the Business Day immediately preceding each Payment Date, the Trustee shall transfer to the Payment Account for application pursuant to Section 11.1 and in accordance with the calculations and the instruction contained in the Payment Date Report prepared by the Issuer pursuant to Section 10.6(b), any amounts held in the Collection Account as of the related Determination Date; provided, that, to the extent that Principal Proceeds in the Collection Account as of such date are in excess of the amounts required to be applied pursuant to the Priority of Payments on the next Payment Date as shown in the Payment Date Report with respect to such Payment Date, the Issuer may direct the Trustee to retain such excess amounts in the Collection Account and not to transfer such excess amounts to the Payment Account.

(f)     The Trustee shall, at the direction of the Administrative Agent, apply Interest Proceeds on dates other than Payment Dates to the payment of accrued and unpaid Administrative Expenses other than amounts constituting fees, up to an amount of $400,000 per calendar year minus the amounts paid for such expenses (excluding any fees paid to the accountants in connection with their annual review as contemplated in Section 10.8(b)) during such calander year (or, with respect to any date during the first three Due Periods, the amount paid for such expenses (excluding any fees paid to the accountants in connection with their annual review as contemplated in Section 10.8(b)) during the period from the Closing Date to such date), to the extent sufficient Interest Proceeds have theretofore been received to cover such payments; provided, however, that the Trustee shall be entitled (but not required), without liability on its part, to refrain from making any such payment of an Administrative Expense which it has been requested or directed to make (on any day other than a Payment Date) if in the reasonable determination of the Trustee the payment of such amount would leave insufficient funds available to pay in full each of the items described in Sections 11.1(a)(ii) or 11.1(a)(iii) or that would in its reasonable judgment result in payments being made that are inconsistent with or contrary to the Priority of Payments.

Section 10.3     Additional Issuer Accounts.

(a)     Payment Account.  On or prior to the Closing Date, the Trustee shall establish at the Custodian a segregated trust account designated as the "Payment Account" and maintained in the name of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal.  Any and all funds at any time on deposit in, or otherwise to the credit of, the Payment Account shall be maintained in trust by the Trustee for the benefit of the Secured Parties.  The funds in the Payment Account shall not be invested.  On or prior to the Business Day preceding each Payment Date, the Trustee shall deposit to the Payment Account (i) as of such date all funds held in the Collection Account as of the related Determination Date and (ii) as of such Payment Date the funds required to be transferred from the Interest Reserve Account to the Payment Account on such date in accordance with Section 10.3(i).  The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay the amounts specified in the Priority of Payments.

(b)     Closing Date Expense Reserve Account.  On or prior to the Closing Date, the Trustee shall establish at the Custodian a segregated trust account designated as the "Closing Date Expense Reserve Account" and maintained in the name of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal.  Any and all funds at any time on deposit in, or otherwise to the credit of, the Closing Date Expense Reserve Account shall be maintained in trust by the Trustee for the benefit of the Secured Parties.  Except as provided below, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Closing Date Expense Reserve Account shall be to pay (on any day other than a Payment Date) any additional fees and expenses of the Co-Issuers incurred in connection with the offering and sale of the Securities that were not paid on the Closing Date.  Following an initial deposit of funds to the Closing Date Expense Reserve Account on the Closing Date, no further amounts shall be deposited into the Closing Date Expense Reserve Account.  On the Business Day preceding the Payment Date occurring in October, 2008, the Trustee shall withdraw any funds remaining on deposit in the Closing Date Expense Reserve Account on such date for deposit to the Interest Collection Account for application as Interest Proceeds pursuant to Section 11.1(a) on such Payment Date and thereafter the Closing Date Expense Reserve Account shall terminate.

(c)     Custodial Account.  On or prior to the Closing Date, the Trustee shall establish at the Custodian a segregated trust account designated as the "Custodial Account" and maintained in the name of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal.  Underlying Assets and Eligible Investments acquired by the Issuer shall be deposited or otherwise credited to the Custodial Account to the extent provided in this Indenture.  Any and all Underlying Assets at any time on deposit in, or otherwise to the credit of, the Custodial Account shall be maintained in trust by the Trustee for the benefit of the Secured Parties.  The only permitted withdrawals from the Custodial Account shall be in the manner provided in this Indenture.

(d)     Variable Funding Account.  On or prior to the Closing Date, the Trustee shall establish at the Custodian a segregated trust account designated as the "Variable Funding Account" and maintained in the name of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal.  The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Variable Funding Account shall be pursuant to this Section 10.3(d).  Amounts in the Variable Funding Account will be invested in overnight funds that are Eligible Investments at the direction of the Issuer or the Administrative Agent, on the Issuer's behalf, and earnings from all such Eligible Investments will be deposited in the Interest Collection Account as Interest Proceeds.  Funds shall be deposited in the Variable Funding Account and withdrawn therefrom in accordance with the following:

149

(i)       Funds shall be deposited into the Variable Funding Account as follows:

(A)       Upon the earlier of the purchase or the initial funding of any Underlying Asset that is a Revolving Credit Facility or Delayed-Draw Loan, funds from the Principal Collection Account shall be deposited at the direction of the Issuer into the Variable Funding Account.  Upon any such purchase, the funds required to be deposited into the Variable Funding Account shall be treated as part of the purchase price for the related Underlying Asset;

(B)       In accordance with an Issuer Order, all Distributions in respect of principal payable under any Revolving Credit Facility or Delayed-Draw Loan received by the Trustee shall be deposited within two Business Days into the Variable Funding Account, but only up to the amount of the undrawn commitment under any such Underlying Asset;

(ii)       Funds may be withdrawn from the Variable Funding Account as follows:

(A)       upon any draws requested by a borrower under a Revolving Credit Facility or any advance made to, or on behalf of, a borrower under any Delayed-Draw Loan, the Administrative Agent may direct the Trustee and, upon receipt of such direction, the Trustee shall withdraw from the Variable Funding Account the amount so directed and shall satisfy the Issuer's obligation or a portion thereof with such funds, provided, that any withdrawals from the Variable Funding Account pursuant to this paragraph (A) shall be made only if the borrower requested such draw or advance in Dollars;

(B)       if the Issuer sells or otherwise disposes of a Revolving Credit Facility or a Delayed-Draw Loan pursuant to Article XII, the Administrative Agent shall, by delivery of an Issuer Order executed by an Authorized Officer of the Administrative Agent, direct the Trustee and, upon receipt of such Issuer Order, the Trustee shall withdraw from the Variable Funding Account the amount on deposit in the Variable Funding Account related to such Revolving Credit Facility or Delayed Draw-Loan and deposit such amount into the Principal Collection Account; or

(C)       if, as determined by the Administrative Agent, amounts in the Variable Funding Account are greater than the undrawn commitments of the Revolving Credit Facilities and Delayed-Draw Loans (due to the asset maturing, terminating or being reduced) on any Business Day, the Administrative Agent may, by delivery of an Issuer Order executed by an Authorized Officer of the Administrative Agent, direct the Trustee and, upon receipt of such Issuer Order, the Trustee shall withdraw from the Variable Funding Account the amount directed in such Issuer Order and deposit such amount into the Principal Collection Account.

(iii)       Funds on deposit in, or otherwise to the credit of, any sub-account of the Variable Funding Account may be pledged for the benefit of the obligor under Revolving Credit Facilities or Delayed-Draw Loans to secure the Issuer's obligations in respect of such Revolving Credit Facilities or Delayed-Draw Loans related to such sub-account.

(e)       [Reserved].

(f)       [Reserved].

(g)    [Reserved].

(h)    [Reserved].

(i)    Interest Reserve Account.  On or prior to the Closing Date, the Trustee shall establish at the Custodian a segregated trust account designated as the "Interest Reserve Account" and maintained in the name of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal.  The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Interest Reserve Account shall be pursuant to this Section 10.3(i).  On the Closing Date, the Trustee shall deposit into the Interest Reserve Account an amount equal to U.S.$20,000,000 from the net proceeds received by the Issuer on such date from the initial issuance of the Senior Notes, the Mezzanine Notes and the Subordinated Notes. If, on any Payment Date occurring on or prior to the Payment Date occurring in July, 2009, an Interest Shortfall with respect to such Payment Date occurs, the Trustee shall transfer an amount equal to the lesser of (i) the Interest Shortfall Amount for such Payment Date and (ii) the funds on deposit in the Interest Reserve Account on such Payment Date, to the Payment Account to be applied as part of Interest Proceeds on such Payment Date in accordance with the priority of payments set forth in Section 11.1(a) hereof. On the Payment Date falling in October, 2009, the Trustee shall transfer all remaining amounts on deposit in the Interest Reserve Account to the Payment Account to be applied as part of Interest Proceeds on such Payment Date in accordance with the priority of payments set forth in Section 11.1(a) hereof, and thereafter the Interest Reserve Account shall terminate.

(j)    [Reserved].

Section 10.4    Additional Matters Regarding Issuer Accounts.  (a) Funds on deposit in or otherwise to the credit of each sub-account of the Variable Funding Account shall be invested by the Trustee as directed by the Administrative Agent in overnight funds that are Eligible Investments selected by the Issuer.  All interest and other income from such investments shall be deposited in the applicable Issuer Account or such other account, any gain realized from such investments shall be credited to the applicable Issuer Account or such other account, and any loss resulting from such investments shall be charged to the applicable Issuer Account or such other account.  The Custodian, acting on behalf of the Trustee, agrees to notify promptly each of the Issuer and the Trustee if it becomes aware that any Issuer Account or any funds on deposit therein, or otherwise to the credit of such account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.  The Co-Issuers shall not have any legal, equitable or beneficial interest in the Issuer Accounts or such other accounts other than in accordance with the Priority of Payments.

(b)    At all times, the Issuer Accounts shall remain at an institution with a combined capital and surplus in excess of $200,000,000; provided, that such institution shall have a rating assigned by Moody's of no less than "Baa2" and a rating assigned by Standard & Poor's of no less than "BBB"; provided, further, that if such institution is rated "Baa2" by Moody's, such institution shall not be on credit watch for possible downgrade by Moody's.

(c)    Notwithstanding anything else contained herein, the Trustee agrees that with respect to each of the Issuer Accounts, the Trustee will enter into a securities account control agreement (substantially in the form of the Securities Account Control Agreement) with the financial institution at which such Issuer Account may be established (which shall initially be the Bank) and shall require such financial institution to agree with respect to each such account that it will (i) comply with orders directing the transfer or redemption of any Financial Assets credited to such Issuer Accounts ("Entitlement Orders") relating to such Issuer Account issued by the Trustee without further consent by the Issuer; (ii) credit all Underlying Assets or Eligible Investments to the applicable Issuer Account; (iii) treat each item

of property credited to such Issuer Account as a Financial Asset; (iv) not enter into any agreement with any other Person relating to any Issuer Account pursuant to which agreement it has agreed to comply with Entitlement Orders made by such Person; (v) not accept for credit to any Issuer Account any Underlying Asset or Eligible Investment which is registered in the name of, or payable to the order of, or specially indorsed to, any Person other than the Securities Intermediary unless it has been indorsed to the Securities Intermediary or is indorsed in blank; and (vi) waive any security interest and right of set-off unrelated to its fees for such Issuer Account; provided, however, that any such securities intermediary (a) shall not be required to credit to any Securities Account or treat as a Financial Asset any item or property in the nature of a General Intangible, and (b) shall be entitled to retain its rights of set-off and lien for recoupment of any overdraft incurred for the benefit of the Issuer, including those resulting from deposit items returned without collection because of insufficient funds, assumed settlement or similar provisional credits.

Section 10.5    Reports by Trustee.  The Trustee shall supply in a timely fashion to the Issuer, the Collateral Administrator, the Administrative Agent and each Rating Agency any information regularly maintained by the Trustee that any of them may from time to time request with respect to the Pledged Underlying Assets or any Issuer Account reasonably needed to complete the Payment Date Report or to provide any other information reasonably available to the Trustee by reason of its acting as Trustee hereunder and required to be provided by Section 10.6 or to permit the Administrative Agent to perform its obligations under the Administrative Agency Agreement and the Collateral Administrator to perform its obligations under the Collateral Administration Agreement.  Unless otherwise prohibited by law, the Trustee shall forward the Administrative Agent and to any Holder of a Security shown on the Securities Register, upon request therefor, copies of notices and other writings received by it from the issuer of any Underlying Asset or from any Clearing Agency with respect to any Underlying Asset advising the holders of such security of any rights that the holders might have with respect thereto (including, notices of calls and redemptions of securities) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer.

Section 10.6    Accountings.

(a)    Monthly Report.  Not later than the 3rd Business Day after the 12th day of each calendar month excluding any calendar month in which a Payment Date falls, commencing in June, 2008, the Issuer shall or shall compile or cause to be compiled and make available to each Rating Agency, the Manager, the Trustee and, upon written request therefor in substantially the form attached hereto as Exhibit I, any beneficial owner of an interest in a Security, a monthly report (the "Monthly Report").  The Monthly Report shall contain the following information and instructions with respect to the Collateral, determined as of the 5th Business Day prior to the 12th day of such calendar month:

(1)    the Aggregate Principal Amount of all Underlying Assets;

(2)    the Balance of all Eligible Investments and Cash in each Issuer Account (including each sub-account thereof);

(3)    the nature, source and amount of any proceeds in the Collection Account, including Interest Proceeds, Principal Proceeds and Disposition Proceeds, received since the date of determination of the last Monthly Report;

(4)    the principal balance, annual interest rate, Maturity, issuer, Moody's Rating (other than estimated ratings), Standard & Poor's Rating (other than estimated ratings assigned pursuant to clause (ii) of the definition of Standard & Poor's Rating and any private or confidential ratings from Standard & Poor's), any private or derived rating by Moody's and Standard & Poor's

industry and industry code of each Underlying Asset and Eligible Investment purchased with funds from the Collection Account;

(5)    the identity of any Underlying Assets that were released for sale or other disposition (indicating whether such Underlying Asset is a Defaulted Obligation or Equity Security) or Granted to the Trustee since the date of determination of the last Monthly Report, together with the sale price of each such Underlying Asset released for sale;

(6)    the identity of (a) each Underlying Asset that became a Defaulted Obligation since the date of determination of the last Monthly Report and (b) to the extent not covered by subclause (a), each Underlying Asset then held by the Issuer that is a Defaulted Obligation;

(7)    the Aggregate Principal Amount of all Defaulted Obligations then outstanding and since the date of the last Monthly Report, and the Current Market Value of each Defaulted Obligation;

(8)    each Underlying Asset with a Standard & Poor's Rating of "CCC+" or below or a Moody's Rating of "Caa1" or below;

(9)    the identity of each Underlying Asset that is a Cov-Lite Loan and the Principal Balance of each such Underlying Asset;

(10)    a calculation in reasonable detail necessary to determine compliance with the Coverage Tests, the levels required for each such test and whether such compliance was met pursuant to this Indenture;

(11)    the funded and unfunded principal balance of each Underlying Asset;

(12)    [Reserved];

(13)    the breach of any covenant, representation or warranty by any party to any Operative Agreement since the last report as to which the Issuer has been notified in writing;

(14)    the termination or change of any party to any Operative Agreement as to which the Issuer has been notified in writing;

(15)    the amendment or waiver of any Operative Agreement as to which the Issuer has been notified in writing;

(16)    [Reserved];

(17)    [Reserved];

(18)    [Reserved];

(19)    [Reserved];

(20)    [Reserved];

(21)    the identity and Current Market Value of each Underlying Asset that is a Current Pay Obligation;

(22)    the identity of each Underlying Asset that is a Deep Discount Obligation;

(23)    [Reserved];

(24)    [Reserved];

(25)    [Reserved];

(26)    [Reserved]; and

(27)    [Reserved].

Standard & Poor's shall be notified of any amendments to this Agreement, the Administrative Agency Agreement and the Collateral Administration Agreement.

(b)    Payment Date Accountings.  The Issuer shall compile an accounting ("Payment Date Report"), determined as of each Determination Date, and make available such Payment Date Report to the Trustee, the Collateral Administrator, each Rating Agency, the Manager, and, upon written request to the Trustee therefor in substantially the form attached hereto as Exhibit I, any Holder of a Security or beneficial owner of an interest in a Security, on or prior to the related Payment Date.  The Payment Date Report shall contain the following information determined as of the related Determination Date or as otherwise specified below:

(1)    (A) the Aggregate Outstanding Amount of the Senior Notes as of the immediately preceding Payment Date after giving effect to any payment of principal on such Payment Date (including as a percentage of the original Aggregate Outstanding Amount of the Senior Notes after giving effect to such payment), (B) the amount of principal payments to be made on the Senior Notes on the related Payment Date, (C) the Aggregate Outstanding Amount of the Senior Notes after giving effect to any payment of principal on the related Payment Date (including as a percentage of the original Aggregate Outstanding Amount of the Senior Notes after giving effect to such payment), (D) the Aggregate Outstanding Amount of the Mezzanine Notes as of the immediately preceding Payment Date after giving effect to any payment of principal on such Payment Date (including as a percentage of the original Aggregate Outstanding Amount of the Mezzanine Notes after giving effect to such payment), (E) the amount of principal payments to be made on the Mezzanine Notes on the related Payment Date, (F) the Aggregate Outstanding Amount of the Mezzanine Notes after giving effect to any payment of principal on the related Payment Date (including as a percentage of the original Aggregate Outstanding Amount of the Mezzanine Notes after giving effect to such payment) and (G) the amount of any Mezzanine Deferred Interest on the related Payment Date;

(2)    (A) the interest payable on the Senior Notes on the related Payment Date, including any Defaulted Interest thereon and (B) the interest payable on the Mezzanine Notes on the related Payment Date, including any Defaulted Interest thereon;

(3)    the Administrative Expenses payable on the related Payment Date;

(4)    for the Collection Account:

(A)    the Balance on deposit in the Collection Account on such Determination Date;

(B)     the Balance on deposit in the Collection Account allocable to each of the Interest Collection Account and the Principal Collection Account on such Determination Date;

(C)     the amounts payable from each of the Interest Collection Account and the Principal Collection Account pursuant to Sections 11.1(a) and (b) on the related Payment Date; and

(D)     the Balance remaining in each of the Interest Collection Account and the Principal Collection Account and the Collection Account in the aggregate immediately after all payments and deposits to be made on the related Payment Date;

(5)     the Balance on deposit in the Variable Funding Account on such Determination Date;

(6)     the Balance on deposit in the Closing Date Expense Reserve Account on such Determination Date (but only to and including the Determination Date preceding the date on which the Closing Date Expense Reserve Account is terminated pursuant to Section 10.3(b));

(7)     the Balance on deposit in the Interest Reserve Account on such Determination Date (but only to and including the Determination Date preceding the date on which the Interest Reserve Account is terminated pursuant to Section 10.3(i));

(8)     the Senior Note Interest Rate and the Mezzanine Note Interest Rate for the Interest Period preceding the next Payment Date;

(9)     without duplication, the information required under Section 10.6(a) for such Determination Date; and

(10)     the amounts expected to be distributed to the Holders of the Subordinated Notes.

Each Payment Date Report shall constitute instructions to the Trustee to withdraw on the related Payment Date from the Payment Account and pay or transfer amounts set forth in such report in the manner specified, and in accordance with the priorities established in, Sections 11.1(a) and (b).

The Payment Date Report shall state that it is for informational purposes only; that certain information included in the report is estimated, approximated or projected; and that the report is provided without any representations or warranties as to accuracy or completeness and none of the Issuer, the Co-Issuer, the Collateral Administrator or the Trustee shall have any liability for or arising out of the use of such estimates, approximations or projections.

The Issuer and the Bank (in any capacity) may satisfy any obligation to deliver a report set forth in Section 10.6(a) or this Section 10.6(b), notwithstanding anything herein to the contrary, by making such information, reports and other materials available electronically through the Bank's password protected website; provided, that nothing herein shall obligate the Trustee to incorporate a password protection or other such security feature on its Corporate Trust website or to otherwise maintain such website page.  In addition, in the event the Trustee has incorporated and continues at all times to maintain such a password protection feature, the Trustee may post, on terms acceptable to it and the Manager, this Indenture, any amendments or supplements thereto and other such information and reports on a password protected portion of its Corporate Trust website.  Upon the written request of any Holder

or other Person entitled thereto, the Trustee shall mail the reports required by Section 10.6(a) or this Section 10.6(b)of such Holder or Person.

(c)      Annual Notice to Holders of Interests in Rule 144A Global Securities.  On or prior to the Payment Date occurring in July of each year (but not more than ten Business Days prior to such Payment Date), commencing in 2009, the Trustee shall deliver a notice to each Agent Member holding a beneficial interest in, and any beneficial owner who has delivered a request to the Trustee substantially in the form of Exhibit I with respect to, an interest in a Rule 144A Global Security notifying such Holder that (i) if such Holder is a Holder of an interest in such Rule 144A Global Security, such Holder is required to be a QIB/QP, (ii) such Holder's interest in such Security may only be transferred to a transferee taking delivery of such interest in the form of an interest in a Rule 144A Global Security that is a QIB/QP, (iii) the Issuer is entitled to require any Holder of an interest in such Security to certify, upon request by the Issuer, whether such Holder is a U.S. Person or a U.S. Resident and whether such Holder was a QIB/QP at the time of acquisition of such interest, (iv) the Issuer is entitled to assume that any Holder of an interest in such Security that does not respond to such request is a U.S. Person or a U.S. Resident and was not a QIB/QP at the time of acquisition of such interest and (v) the Issuer may require any Holder of an interest in such Security that is a U.S. Person or a U.S. Resident that is determined not to have been a QIB/QP at the time of acquisition of such interest to transfer such interest pursuant to Section 2.14.  To the extent that such notice is sent to the Holder of a Global Security, the Trustee shall request that such Holder send the notice to the beneficial owners of such Global Security.

(d)      Redemption Date Instructions.  Not less than four Business Days after receiving an Issuer Request requesting information regarding a redemption of the Senior Notes or Mezzanine Notes as of a proposed Redemption Date set forth in such Issuer Request, the Trustee shall provide the necessary information (to the extent it is available to the Trustee) to the Issuer and the Issuer shall compute, or cause to be computed, the following information and provide such information in a statement (the "Redemption Date Statement") delivered to the Trustee:

(i)      the Aggregate Outstanding Amount of the Senior Notes to be redeemed as of such Redemption Date and the Aggregate Outstanding Amount of the Mezzanine Notes to be redeemed as of such Redemption Date;

(ii)      the amount of accrued interest due on such Senior Notes and the amount of accrued interest due on such Mezzanine Notes ; and

(iii)      the amount in the Collection Account available for application to the redemption of such Senior Notes and Mezzanine Notes.

(e)      Following the initial delivery to Standard & Poor's of the Excel Default Model Input File and Schedule of Underlying Assets pursuant to Section 3.5(g), on the same date that each Monthly Report is delivered thereafter pursuant to Section 10.6(a), the Issuer shall deliver or cause to be delivered via e-mail to Standard & Poor's an updated Excel Default Model Input File and, with respect to each Underlying Asset, the name of each obligor thereon, the CUSIP number thereof (if applicable) and the Standard & Poor's Priority Category thereof, and electronic file containing an amended Schedule of Underlying Assets prepared as of the date of such Monthly Report; provided, that with respect to any month in which a Payment Date occurs, the updated Excel Default Model Input File and amended Schedule of Underlying Assets shall be prepared as of the related Determination Date and delivered one Business Day prior to such Payment Date.

(f)      If the Trustee shall not have received any accounting provided for in this Section 10.6 on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee

shall use reasonable efforts to cause such accounting to be made by the applicable Payment Date or Redemption Date.  To the extent that the Trustee is required to provide any information or reports pursuant to this Section 10.6 as a result of the failure of the Issuer to provide such information or reports, the Trustee shall be entitled to retain a firm of Independent certified public accountants of national reputation in connection therewith and the reasonable costs incurred by the Trustee for such Independent certified public accountants shall be reimbursed pursuant to Section 6.7.

Section 10.7    Release of Collateral.  (a) If the Issuer and the Trustee shall be obligated to dispose of any Underlying Asset pursuant to ARTICLE XII hereof, or if the sale of an Underlying Asset is required to be effected in conjunction with a redemption pursuant to ARTICLE IX hereof, the Trustee shall deliver such Underlying Asset, if in physical form, duly endorsed to the broker or purchaser designated in writing by the holders of a Majority of the Subordinated Notes or against receipt of the sales price therefor, in either case, as set forth in such designation; provided that the Trustee may deliver such Underlying Asset in physical form for examination in accordance with street delivery custom.

(b)    The Issuer may, by Issuer Order delivered to the Trustee at least one Business Day prior to the date set for redemption or payment in full of any Underlying Asset or other item of Collateral and certifying that such Underlying Asset or other item of Collateral is being redeemed or paid in full, direct the Trustee, or at the Trustee's instructions, the Custodian, to deliver such Underlying Asset or other asset, if in physical form, duly endorsed, to cause it to be presented, or otherwise appropriately deliver or present such security or debt obligation, to the appropriate paying agent therefor or other Person responsible for payment thereon on or before the date set for redemption or payment, in each case against receipt of the redemption price or payment in full thereof.

(c)    The Issuer may, by Issuer Order delivered to the Trustee at least one Business Day prior to the date set for an exchange, tender or sale of any Underlying Asset and certifying that such Underlying Asset is subject to an Offer and setting forth in reasonable detail the procedure for response to such Offer, direct the Trustee or, at the Trustee's instructions, the Custodian, to deliver such Underlying Asset, if in physical form, duly endorsed, or, if such Underlying Asset is a security for which a Security Entitlement has been created in an Issuer Account, to cause it to be delivered, or otherwise appropriately deliver or present such security or debt obligation, in accordance with such Issuer Order, in each case against receipt of payment therefor.

(d)    The Trustee shall deposit all distributions on (i) the Underlying Assets, any proceeds received from the disposition of Underlying Assets to the extent that such distributions, proceeds or amounts constitute Interest Proceeds, to the Interest Collection Account and (ii) the Underlying Assets and any proceeds received from the disposition of any Underlying Assets, to the extent that such distributions or proceeds constitute Principal Proceeds (unless simultaneously reinvested in Eligible Investments to the Principal Collection Account).

(e)    The Trustee shall, upon receipt of an Issuer Order at such time as there are no Securities Outstanding and all obligations of the Co-Issuers hereunder have been satisfied, release the Collateral from the lien of this Indenture.

(f)    [Reserved].

Section 10.8    Reports by Independent Accountants.  (a)  At the Closing Date, the Issuer shall appoint a firm of Independent certified public accountants of national reputation for purposes of preparing and delivering the reports or certificates of such accountants required by this Indenture. Upon any resignation by such firm, the Issuer shall promptly appoint by Issuer Order delivered to the Trustee and each of the Rating Agencies a successor thereto that shall also be a firm of Independent

certified public accountants of nationally recognized reputation.  If the Issuer shall fail to appoint a successor to a resigned firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall notify promptly the Trustee and the Rating Agencies of such failure in writing.  If the Issuer shall not have appointed a successor within ten days thereafter, the Manager shall promptly appoint a successor firm of Independent certified public accountants of nationally recognized reputation.  The fees of such Independent certified public accountants and its successor shall be payable by the Issuer.

(b)    On or before the Business Day immediately preceding the Payment Date occurring in July of each year, commencing in 2009, the Issuer shall cause to be delivered to the Trustee and each of the Rating Agencies a statement from a firm of Independent certified public accountants of national reputation indicating (i) that such firm has reviewed the Payment Date Reports and Redemption Date Statements, if any, received since the last review and applicable information from the Trustee, (ii) that the calculations within those Payment Date Reports and Redemption Date Statements, if any, have been performed in accordance with the applicable provisions of this Indenture, and (iii) the Aggregate Principal Amount of the Underlying Assets as of the immediately preceding Payment Date; provided, that in the event of a conflict between such firm of Independent certified public accountants and the Issuer with respect to any matter in this Section 10.8(b), the determination by such firm of Independent certified public accountants shall be conclusive.

(c)    Any statement delivered to the Trustee pursuant to Section 10.8(b) shall be delivered by the Trustee to any beneficial owner of an interest in a Security upon written request therefor in the form of Exhibit I.

Section 10.9    Additional Reports.    In addition to the information and reports specifically required to be provided to each of the Rating Agencies pursuant to the terms of this Indenture, the Issuer shall provide, or cause to be provided to, each of the Rating Agencies, the Trustee and any Holder of a Security with such additional information as any of them may from time to time reasonably request and the Issuer shall reasonably determine may be obtained and provided without unreasonable burden or expense.  Such a request from a Holder of Securities may be submitted directly to the Trustee and then such request shall be forwarded to the Issuer for processing.  Such request from a Holder of a beneficial interest in the Securities shall be submitted to the Trustee by delivery of a written request in the form of Exhibit H hereto.  If the rating by either Rating Agency of any Class of Senior Notes or Mezzanine Notes has been changed or withdrawn or reinstated, the Issuer shall notify promptly each of the Trustee and, if and for so long as such Class of Senior Notes or Mezzanine Notes, as the case may be, is listed on the Irish Stock Exchange, the Irish Listing Agent.

Section 10.10    Notices to the Holders.    Each Monthly Report and each Payment Date Report sent to any Holder or beneficial owner of a Rule 144A Global Security shall contain, or be accompanied by, the following notice:

The Securities may be beneficially owned only by Persons that (a)(i) are not U.S. Persons (within the meaning of Regulation S under the United States Securities Act of 1933, as amended) or U.S. Residents (within the meaning of the Investment Company Act), (ii) are both (x) qualified purchasers (for purposes of Section 3(c)(7) of the United States Investment Company Act of 1940, as amended), and (y) qualified institutional buyers within the meaning of Rule 144A under the Securities Act or (iii) are both (x) qualified purchasers (for purposes of Section 3(c)(7) of the United States Investment Company Act of 1940, as amended), and (y) accredited investors as defined in Rule 501(a) of Regulation D under the Securities Act and (b) can make the representations set forth in Section 2.5(h) or (i), as applicable, of this Indenture and the legends of the applicable

Securities. Beneficial ownership interest in the Rule 144A Global Securities may be transferred only to a Person that meets the qualifications set forth in clause (a)(ii) of the preceding sentence and that can make the representations referred to in clause (b) of the preceding sentence. The Issuer has the right to compel any beneficial owner of an interest in Rule 144A Global Securities that does not meet the qualifications set forth in such clauses to sell its interest in such Securities, or may sell such interest on behalf of such owner, pursuant to Section 2.14of this Indenture.

ARTICLE XI
APPLICATION OF MONIES

Section 11.1    Disbursements of Monies from Payment Account. Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section 11.1 and Section 10.2(f), the Trustee shall disburse amounts transferred to the Payment Account from the Issuer Accounts pursuant to ARTICLE X in accordance with the following priorities (collectively, the "Priority of Payments"):

(a)    On each Payment Date, Interest Proceeds received during the related Due Period (or due during such Due Period and received after the end of such Due Period, but before such Payment Date), together with any amounts withdrawn from the Interest Reserve Account and deposited into the Payment Account for such Payment Date pursuant to Section 10.3(i), will be distributed in the following order of priority:

(i)    to the payment of taxes and registration and filing fees, if any, of the Co-Issuers;

(ii)    to the payment or reimbursement of the fees due and payable to the following parties in the following order: *first*, to the Trustee pursuant to this Indenture, *second*, to the Collateral Administrator pursuant to the Collateral Administration Agreement and, *third*, to the Administrative Agent pursuant to the Administrative Agency Agreement;

(iii)    to the payment or reimbursement of the accrued and unpaid Administrative Expenses of the Co-Issuers (other than fees payable pursuant to clause (ii) above, but including indemnities) (to the extent not already paid pursuant to Section 10.2(f)) in the order set forth in the definition thereof (including any amounts payable by the Issuer to the Trustee pursuant to the terms hereof and, to the Collateral Administrator pursuant to the Collateral Administration Agreement), in an amount up to $400,000 per calendar year minus the amounts paid for such expenses pursuant to Section 10.2(f) and this subclause (iii) (excluding any fees paid to the accountants appointed pursuant to Section 10.8(b) in connection with their annual review as contemplated by Section 10.8(b)) during such calendar year (or, in the case of the three Payment Dates immediately following the Closing Date, minus the amounts paid for such expenses pursuant to Section 10.2(f) and this subclause (iii) (excluding any fees paid to the accountants in connection with their annual review as contemplated in Section 10.8(b)) over the period from the Closing Date to and including the Due Period immediately preceding such Payment Date);

(iv)    to the payment of accrued and unpaid interest on the Senior Notes (including Defaulted Interest on the Senior Notes, if any);

(v)    if either Senior Note Coverage Test is not satisfied as of the related Determination Date and the Senior Notes remain outstanding, to the payment of principal of the

Senior Notes, in either case to the extent necessary to cause such Senior Note Coverage Test to be satisfied as of such Determination Date or until the principal of the Senior Notes has been paid in full;

(vi)    if a Ratings Confirmation Failure occurs and continues to exist with respect to any Class of the Senior Notes or Mezzanine Notes as of the related Determination Date, *first*, to the payment of principal of the Senior Notes, and *second*, to the payment of principal of the Mezzanine Notes, until the original rating on each such Class of Senior Notes or Mezzanine Notes is reinstated or the principal of each such Class of Senior Notes or Mezzanine Notes is paid in full;

(vii)    to the payment of accrued and unpaid interest on the Mezzanine Notes (including (A) accrued and unpaid interest on Mezzanine Deferred Interest, if any, but excluding any such Mezzanine Deferred Interest, and (B) after the Senior Notes are paid in full, Defaulted Interest on the Mezzanine Notes, if any);

(viii)    to the payment of Mezzanine Deferred Interest, if any, until paid in full;

(ix)    any Interest Proceeds remaining on such Payment Date after application thereof in accordance with clause (i) through (viii) of this Section 11.1(a), *first*, to the Holders of the Subordinated Notes, in an amount up to the Subordination Note Distribution Cap for such Payment Date, *second*, to the payment of principal of the Senior Notes, until the Senior Notes have been paid in full, and *third*, to the payment of principal of the Mezzanine Notes, until the Mezzanine Notes have been paid in full;

(x)    to the payment or reimbursement of the accrued and unpaid Administrative Expenses (including indemnities) payable under clause (iii) above, in the order set forth in this Indenture but only to the extent not paid under Section 10.2(f) and clause (iii) above on such Payment Date, in each case, whether as a result of the maximum amount set forth in such clauses or otherwise; and

(xi)    all remaining Interest Proceeds shall be distributed to the Holders of the Subordinated Notes as a payment thereon or as a final distribution in redemption thereof, as applicable.

(b)    On each Payment Date, Principal Proceeds received during the related Due Period (other than Principal Proceeds that are on deposit in, or otherwise to the credit of (or required to be on deposit in, or otherwise to the credit of), the Variable Funding Account) will be distributed in the following order of priority:

(i)    to the payment of the amounts specified in subclauses (i) through (iv) of clause (a) above in the same order or priority prescribed by clause (a) and, in each case, only to the extent not paid in full after the application of Interest Proceeds provided for thereunder;

(ii)    if either of the Senior Note Coverage Tests is not satisfied on the related Determination Date and the Senior Notes remain outstanding after giving effect to the payment of the amounts specified in subclause (v) of clause (a) above, to the payment of such amounts, in each case, to the extent necessary for such Senior Note Coverage Tests to be satisfied as of such Determination Date or until the principal of the Senior Notes has been paid in full;

(iii)    to the payment of the amounts specified in subclause (vi) of clause (a) above in connection with a Ratings Confirmation Failure (and in the same manner and order of priority) but only to the extent the ratings on the Senior Notes or Mezzanine Notes, as applicable, have not been confirmed after the application of Interest Proceeds as specified in such subclause (vi) of clause (a) above;

(iv)    to the payment of the accrued and unpaid interest on the Mezzanine Notes (including accrued and unpaid interest on Mezzanine Deferred Interest, if any, but excluding any such Mezzanine Deferred Interest and Defaulted Interest on the Mezzanine Notes, if any), but only to the extent that the Coverage Tests would be satisfied on a pro forma basis after giving effect to any such payment;

(v)    (A) if the Senior Notes are to be redeemed on such Payment Date in connection with a Tax Redemption or an Optional Redemption, to the payment of the Total Redemption Amount, including the Redemption Price (without duplication of any payments received by any Senior Noteholder under clause (a) above or under subclauses (i) through (iii) of this clause (b)) to the payment of principal of the Senior Notes until the Senior Notes have been paid in full, (B) if the Mezzanine Notes are to be redeemed on such Payment Date in connection with a Tax Redemption or an Optional Redemption, to the payment of the Total Redemption Amount, including the Redemption Price (without duplication of any payments received by any Mezzanine Noteholder under clause (a) above or under subclauses (i) through (iv) of this clause (b)) to the payment of principal of the Mezzanine Notes until the Mezzanine Notes have been paid in full, and (C) on any Payment Date on or after the Senior Notes and the Mezzanine Notes have been paid in full, if the Subordinated Notes are to be redeemed on such Payment Date in connection with a Tax Redemption or an Optional Redemption of the Subordinated Notes in whole (but not in part) pursuant to Section 9.10, the remaining funds after payment of, or establishment of a reasonable reserve (as determined by the Trustee and the Administrative Agent) for, payment of all amounts payable prior to the Subordinated Notes in accordance with the Priority of Payments to the holders of the Subordinated Notes in redemption thereof;

(vi)    to the payment of principal of the Senior Notes until paid in full;

(vii)    to the payment of Mezzanine Deferred Interest, if any, until paid in full;

(viii)    to the payment of principal of the Mezzanine Notes until paid in full;

(ix)    *first*, payable to the Trustee, the Collateral Administrator and the Administrative Agent in the same order of priority prescribed by subclause (ii) of clause (a) (including indemnities) to the extent not paid under such clause and, *second*, to the payment of any fees and expenses of the Co-Issuers, to the extent not paid pursuant to subclauses (iii) or (x) of clause (a) in the same order of priority prescribed by clause (a);

(x)    all remaining Principal Proceeds, to the holders of the Subordinated Notes as a payment thereon or as a final distribution in redemption thereof, as applicable.

Section 11.2    Allocation of Funds to Satisfy Coverage Tests.    Any calculation to determine the allocation of Interest Proceeds and/or Principal Proceeds to repay the principal of the Senior Notes to the extent necessary to satisfy any Coverage Test will be performed on a pro forma basis, giving effect to principal reductions in both the numerator and denominator of the Senior Note Overcollateralization Ratio.

## ARTICLE XII
## SALE OF UNDERLYING ASSETS

Section 12.1    <u>Sale of Underlying Assets and Eligible Investments</u>.    (a) Except as otherwise provided in ARTICLE IX and Sections 12.1(d) and (e), the Issuer shall not sell or otherwise dispose of any Underlying Asset; <u>provided</u> that, subject to satisfaction of all of the applicable conditions in Section 10.7, and if (A) no Event of Default has occurred and is continuing and (B) on or prior to the trade date for such sale or disposition, the holders of a Majority of the Subordinated Notes have certified to the Trustee and the Issuer in a certificate substantially in the form of <u>Exhibit N</u> hereto (or in such other form as may be acceptable to the Trustee from time to time), that each of the conditions applicable to such sale set forth in this ARTICLE XII has been satisfied, the holders of a Majority of the Subordinated Notes may direct the Issuer and the Trustee in writing to sell or otherwise dispose of, whereupon the Issuer and Trustee shall sell or otherwise dispose of the following in a sale or disposition arranged by the Administrative Agent at the direction of the Majority of the Subordinated Noteholders in the manner directed by the holders of a Majority of the Subordinated Notes in writing;

(i)    any Defaulted Obligation at any time;

(ii)    any Equity Security at any time; and

(iii)    any Underlying Asset (that is not a Defaulted Obligation or an Equity Security) at any time, but only if the Disposition Proceeds from the sale or other disposition of such Underlying Asset would be greater than or equal to the Aggregate Principal Amount of such Underlying Asset at such time as determined by the Administrative Agent or by the majority of Subordinated Noteholders.

(b)    [Reserved].

(c)    The Issuer shall sell each Equity Security received in exchange for a Defaulted Obligation as soon as commercially practicable, but in any event shall use commercially reasonable efforts to sell such Equity Security within three years after the related Underlying Asset became a Defaulted Obligation (or within one year of such later date as such Equity Security may first be sold in accordance with its terms).

(d)    In the event of an Optional Redemption or a Tax Redemption pursuant to Section 9.3 or 9.4, respectively, the Issuer hereby directs the Trustee to sell, and the Trustee shall sell in a manner directed by the majority of Subordinated Noteholders, any Underlying Asset without regard to the limitations set forth in <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u> of this Section 12.1; provided that any sale of Underlying Assets in connection with an Optional Redemption or a Tax Redemption shall be subject to the applicable conditions set forth in Section 9.5.

(e)    Notwithstanding <u>clauses (a)</u> through <u>(d)</u> of this Section 12.1, within 60 days of the Stated Maturity, the Issuer shall sell, and shall cause the Trustee to sell in a manner directed by the majority of Subordinated Noteholders, all Underlying Assets to the extent necessary such that no Underlying Assets shall be held by the Issuer on or after Stated Maturity.  The settlement dates for any such sales of Underlying Assets shall be no later the Business Day immediately preceding the Stated Maturity.

Section 12.2    <u>[Reserved]</u>.

Section 12.3    <u>[Reserved]</u>.

Section 12.4    [Reserved].

ARTICLE XIII
MISCELLANEOUS

Section 13.1    Form of Documents Delivered to Trustee.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate of an Authorized Officer of the Issuer or the Co-Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate of an Authorized Officer of the Issuer or the Co-Issuer may be based, insofar as it relates to factual matters, upon a certificate of, or representations by, the Issuer, the Co-Issuer or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer or such other Person, unless such Authorized Officer of the Issuer or the Co-Issuer or such counsel knows that the certificate or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is provided that the absence of the occurrence and continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of the Issuer or the Co-Issuer, then notwithstanding that the satisfaction of such condition is a condition precedent to the Issuer's or the Co-Issuer's rights to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default or Event of Default as provided in Section 6.1(d).

Section 13.2    Acts of Holders. (a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders of Senior Notes, Mezzanine Notes or Subordinated Notes may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Senior Noteholders, Mezzanine Noteholders or Holders of Subordinated Notes in person or by an agent duly appointed in writing, and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Issuer.  Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Senior Noteholders, Mezzanine Noteholders or Holders of Subordinated Notes signing such instrument or instruments.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this Section 13.2.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)    The principal amount and registered numbers of Securities held by any Person, and the date of his holding the same, shall be proved by the Securities Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Senior Notes, Mezzanine Notes or Subordinated Notes shall bind the Holder (and any transferee thereof) of such Senior Note, Mezzanine Note or Subordinated Note and of every Senior Note, Mezzanine Note or Subordinated Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee, or the Co-Issuers in reliance thereon, whether or not notation of such action is made upon such Senior Note, Mezzanine Note or Subordinated Note.

(e)    If required by applicable banking laws, a Holder of Subordinated Notes that is subject to the Bank Holding Company Act of 1956, as amended, may upon written notice to the Trustee, elect to forfeit the voting or consent rights specified in such notice of all or any portion of Subordinated Notes, as applicable, owned by such Holder (the "Electing Subordinated Noteholder"). With respect to any matter as to which Holders of Subordinated Notes may vote or consent and as to which any Electing Subordinated Noteholder has forfeited the right to consent in respect of any Subordinated Notes owned by it (the "Elected Subordinated Notes"), such Elected Subordinated Notes shall not be included in determining whether such matter has been approved, consented to or adopted. Any such election may be rescinded in whole or in part at any time if such Electing Subordinated Noteholder determines that such rescission is consistent with applicable banking laws and notifies the Trustee of same.

Section 13.3    Notices.    Except as otherwise expressly provided herein, any request, demand, authorization, direction, notice, consent, waiver or Act of Holders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with any of the parties indicated below shall be deemed effective for every purpose hereunder (i) if in writing and delivered by hand or by overnight courier service, on the date on which it is delivered; (ii) if sent by facsimile or electronic mail (if available), on the date that the facsimile or electronic mail message is received in legible form (as evidenced by the sender's record of an e-mail to the recipient in which the recipient acknowledged receipt of such facsimile or electronic mail message ); and (iii) if sent by mail, on the date on which the mail is delivered; in each case, unless the date of delivery or receipt, as applicable, is after the close of business on a Business Day or not on a Business Day, in which case the communication shall be deemed given and effective on the first following day that is a Business Day. Any such notice or other communication shall be delivered to the applicable recipient at the following address:

(a)    to the Trustee at U.S. Bank National Association, 214 North Tryon Street, 26th Floor, Charlotte, North Carolina, 28202, Attention: CDO Trust Services – Spruce CCS, facsimile no.: (704) 335-4678, or at any other address previously furnished in writing by the Trustee to the Co-Issuers, the Senior Noteholders, the Mezzanine Noteholders and the Holders of the Subordinated Notes;

(b)    to the Issuer at Spruce CCS, Ltd., c/o Maples Finance Limited, P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman KY1-1102, Cayman Islands, Attention: The Directors, telephone no.: (345) 945-7099, facsimile no.: (345) 945-7100, or at any other address previously furnished in writing by the Issuer to the Trustee;

(c)    to the Administrator at c/o Maples Finance Limited, P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman KY1-1102, Cayman Islands, Attention: The Directors, telephone no.: (345) 945-7099, facsimile no.: (345) 945-7100, or at any other address previously furnished in writing by the Issuer to the Trustee;

(d)      to the Co-Issuer at Spruce CCS, Corp., 850 Library Avenue, Suite 204, Newark, Delaware 19711, or at any other address previously furnished in writing by the Co-Issuer to the Trustee;

(e)      to Moody's, at Moody's Investors Service, Inc., 7 World Trade Center at 250 Greenwich Street, New York, New York 10007, Attention: CBO/CLO Monitoring, Regarding: Spruce CCS, Ltd. telephone no. (212) 553-4808, electronic mail: cdomonitoring@moodys.com, facsimile no.: (212) 553-4170, or at any other address previously furnished in writing by Moody's to the Trustee; provided, that delivery of any notice or other communication to Moody's shall be sent by electronic mail to the extent reasonably possible;

(f)      to Standard & Poor's, at Standard & Poor's Ratings Services, 55 Water Street, 42nd Floor, New York, New York 10041-0003, Attention: Structured Finance Ratings, Asset-Backed Securities CBO/CLO Surveillance, Regarding: Spruce CCS, Ltd., telephone no.: (212) 438-2506, electronic mail: cdo_surveillance@sandp.com and notification of all Monthly Reports shall be sent to Standard & Poor's electronically at cdo_surveillance@sandp.com; facsimile no.: (212) 438-2664, and notice of the Ramp-Up Effective Date (and any request for Rating Agency Confirmation with respect thereto) shall be sent to Standard & Poor's electronically at CDOEffectiveDatePortfolios@standardandpoors.com, or at any other address previously furnished in writing by Standard & Poor's to the Trustee;

(g)      to the EU Paying Agent, at Grant Thornton, Herbert Street, Dublin 2, Ireland, telephone no.: 353-0-1-436-6400, facsimile no.: 353-0-1-436-6521, or at any other address previously furnished in writing by the EU Paying Agent to the Trustee; and

(h)      to the Manager, at 745 Seventh Avenue, New York, NY, 10019, Attention: CDO Group re: Spruce CCS, facsimile no.: 646-758-2197. or at any other address previously furnished in writing by the Manager to the Trustee; and

(i)      to the Administrative Agent, at 745 Seventh Avenue, New York, NY, 10019, Attention: Collateralized Debt Obligations Group, telephone no.: 212-526-5569, or at any other address previously furnished by the Administrative Agent to the Trustee.

Section 13.4    Notices to Holders; Waiver.    Except as otherwise expressly provided herein, where this Indenture provides for notice to Holders of Securities of any event,

(a)      such notice shall be sufficiently given to Holders of Securities if in writing and mailed, first-class postage prepaid, to each Holder of a Security affected by such event, at the address of such Holder as it appears in the Securities Register, not earlier than the earliest date and not later than the latest date, prescribed for the giving of such notice; and

(b)      such notice shall be in the English language.

Such notices will be deemed to have been given on the date of such mailing.

The Trustee will deliver (i) to the Holders of the Senior Notes any information or notice requested to be so delivered by at least 25% of the Holders of any Class of Senior Notes and (ii) to the Holders of the Mezzanine Notes any information or notice requested to be so delivered by at least 25% of the Holders of any Class of Mezzanine Notes.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder of a Security shall affect the sufficiency of such notice with respect to other Holders of

Securities.  In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail, then such notification to Holders of Securities shall be made with the approval of the Trustee shall constitute a sufficient notification to such Holders for every purpose hereunder.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Holders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

If and for so long as any Class of Securities is listed on the Irish Stock Exchange and the rules of such exchange so require, notices to the Holders thereof shall also be given to the Irish Listing Agent for delivery to the Company Announcements Office.

Section 13.5    Subordinated Noteholders To Direct Remedies and Rights Related to Underlying Assets.  Notwithstanding anything to the contrary contemplated by this Indenture, the Holders of a Majority of the Subordinated Notes shall have the right to direct the Issuer and the Trustee as to any determination of the exercise of, and any exercise of, any rights associated with the Issuer's ownership or other interest in any of the Underlying Assets, including but not limited to (to the extent applicable to such Underlying Asset): (A) negotiating on behalf of the Issuer with the obligors thereunder or other parties with interests therein; (B) exercising voting and other rights related to (1) the bankruptcy or insolvency of any obligor or other party related thereto or (2) the consensual or non-judicial restructuring of the debt or equity of any obligor or other party related thereto; (C) to the extent permitted, participating in committees (official or otherwise) or other groups formed by creditors of any obligor or other party related thereto; and (D) on behalf of the Issuer, approving any amendment or other modification of the agreements or contractual terms governing such Underlying Asset.  In each case, the Issuer and the Trustee shall be obligated, and authorized, to follow the directions of Holders of a Majority of the Subordinated Notes without regard to the interest of the Senior Noteholders, the Mezzanine Noteholders or any other Secured Party hereunder and notice shall be provided to Standard & Poor's of any action taken pursuant to this Section 13.5.  For purposes of this Section 13.5, if the Underlying Asset is a Participation, then Underlying Asset shall include the underlying loan related to such Participation.

Section 13.6    Effect of Headings and Table of Contents.  The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 13.7    Successors and Assigns.  All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

Section 13.8    Severability.  In case any provision in this Indenture or in the Securities shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 13.9    Benefits of Indenture.  Nothing in this Indenture or in the Securities, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Holders any benefit or any legal or equitable right, remedy or claim under this Indenture; provided, that the Holders of the Subordinated Notes shall be express third party beneficiaries of this Indenture, subject in each case to the application of funds in accordance with the Priority of Payments; provided, further, that prior to the date which is one year and one day (or, if longer, the applicable preference period) after the payment in full of all Notes, none of such Persons, the Paying

Agent, the Administrator or the Collateral Administrator shall be entitled to institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under federal or state bankruptcy or similar laws in its capacity as a third party beneficiary under this Indenture.

        Section 13.10   <u>GOVERNING LAW</u>.   THIS INDENTURE AND EACH SECURITY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

        Section 13.11   <u>SUBMISSION TO JURISDICTION</u>.   THE CO-ISSUERS AND THE TRUSTEE HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE SECURITIES OR THIS INDENTURE, AND THE CO-ISSUERS AND THE TRUSTEE HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH FEDERAL OR NEW YORK STATE COURT.   THE CO-ISSUERS AND THE TRUSTEE HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THAT THEY MAY LEGALLY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING. THE CO-ISSUERS AND THE TRUSTEE EACH IRREVOCABLY CONSENT TO THE SERVICE OF ANY AND ALL PROCESS IN ANY ACTION OR PROCEEDING BY THE MAILING OR DELIVERY OF COPIES OF SUCH PROCESS TO IT AT THE OFFICE OF THE CO-ISSUER'S AGENT SET FORTH IN SECTION 7.4.   THE CO-ISSUERS AND THE TRUSTEE AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

        Section 13.12   <u>Counterparts</u>.   This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

        Section 13.13   <u>WAIVER OF JURY TRIAL</u>.   THE TRUSTEE, THE NOTEHOLDERS AND THE CO-ISSUERS HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS INDENTURE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE PARTIES HERETO.   EACH OF THE CO-ISSUERS, THE TRUSTEE AND THE NOTEHOLDERS ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR SUCH PARTIES ENTERING INTO THIS INDENTURE.

        Section 13.14   <u>Liability of Co-Issuers</u>.   Notwithstanding any other terms of this Indenture, the Senior Notes, the Mezzanine Notes or any other agreement entered into between, *inter alia*, the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other under this Indenture, the Senior Notes, the Mezzanine Notes, any such agreement or otherwise and, without prejudice to the generality of the foregoing, neither of the Co-Issuers shall be entitled to take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Senior Notes, the Mezzanine Notes, any such agreement or otherwise against the other of the Co-Issuers.   In particular, neither of the Co-Issuers shall be entitled to petition or take any other steps for the winding up or

bankruptcy of the other of the Co-Issuers or shall have any claim in respect of any assets of the other of the Co-Issuers.

Section 13.15    De-Listing of the Notes.    If, in the sole judgment of the Issuer, the maintenance of the listing of any Class of Notes on the Irish Stock Exchange is unduly onerous or burdensome to the Issuer or the Noteholders, the Issuer shall cause the Notes to be de-listed from the Irish Stock Exchange and, if the Issuer so directs, cause the Notes to be listed on an exchange other than the Irish Stock Exchange, as identified by the Issuer.

ARTICLE XIV
ASSIGNMENT OF ADMINISTRATIVE AGREEMENT AND
COLLATERAL ADMINISTRATION AGREEMENT

Section 14.1    Assignment of Administrative Agency Agreement.    (a) The Issuer, in furtherance of the covenants of this Indenture and as security for the Secured Obligations and the performance and observance of the provisions hereof, hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Secured Parties, all of the Issuer's estate, right, title and interest in, to and under the Administrative Agency Agreement, including (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Administrative Agent thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; provided, that the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Administrative Agency Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture, including as set forth in Section 14.1(f)), which license shall be and is hereby deemed to be automatically revoked upon the occurrence of an Event of Default hereunder until such time, if any, as such Event of Default is cured or waived.  Following an Event of Default, the Trustee shall take such action with respect to the Issuer's rights under the Administrative Agency Agreement as it shall be directed to take by a Majority of the Controlling Class.

(b)    The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Administrative Agency Agreement, nor shall any of the obligations contained in the Administrative Agency Agreement be imposed on the Trustee.

(c)    Upon the retirement of the Senior Notes and the Mezzanine Notes, and the release of the Collateral from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Secured Parties shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Administrative Agency Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

(d)    The Issuer represents that the Issuer has not executed any other assignment of the Administrative Agency Agreement.

(e)    The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer will, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may specify.

(f)      The Issuer hereby agrees, and hereby undertakes to obtain the agreement and consent of the Administrative Agent in the Administrative Agency Agreement to the following:

(i)      The Administrative Agent consents to the provisions of this assignment and agrees to perform any provisions of this Indenture applicable to it subject to the terms of the Administrative Agency Agreement.

(ii)      The Administrative Agent acknowledges that the Issuer is assigning all of its right, title and interest in, to and under the Administrative Agency Agreement to the Trustee for the benefit of the Secured Parties, and the Administrative Agent agrees that all of the representations, covenants and agreements made by it in the Administrative Agency Agreement are also for the benefit of the Trustee on behalf of the Secured Parties.

(iii)      Neither the Issuer nor the Administrative Agent will enter into any agreement amending, modifying or terminating the Administrative Agency Agreement other than in respect of an amendment or modification of the type that may be made to this Indenture without consent of Holders of Securities, or selecting or consenting to a successor Administrative Agent without notifying each of the Rating Agencies and without prior Rating Agency Confirmation with respect to such amendment, modification or termination and without complying with the applicable provisions of the Administrative Agency Agreement.  Neither the Issuer nor the Administrative Agent will enter into any agreement amending, modifying or terminating the Administrative Agency Agreement in respect of an amendment or modification of the type that may not be made to this Indenture without consent of the Holders of Securities without obtaining the consent of the requisite percentage of each Class of Senior Notes, Mezzanine Notes and Subordinated Notes that would be required of an amendment or modification of such type if it were made to this Indenture.

(iv)      Except as otherwise set forth herein and therein, the Administrative Agent shall continue to serve in such capacity under the Administrative Agency Agreement notwithstanding that it shall not have received amounts due it under such agreement because sufficient funds were not then available hereunder to pay such amounts in accordance with the Priority of Payments.  The Administrative Agent agrees not to cause the filing of a petition in bankruptcy against the Issuer for the non-payment of the fees and expenses payable to it under the Administrative Agency Agreement or other amounts payable by the Issuer to it hereunder or under the Administrative Agency Agreement prior to the date which is one year and one day (or, if longer, the applicable preference period) after the payment in full of all Securities issued under this Indenture.   Nothing in this Section 14.1(f) shall preclude, or be deemed to stop, the Administrative Agent (i) from taking any action prior to the expiration of the aforementioned one year and one day (or longer) period in (A) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency proceeding filed or commenced by a Person other than the Administrative Agent, or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

(v)      The Administrative Agent shall irrevocably (A) submit to the non-exclusive jurisdiction of any federal or New York state court sitting in the Borough of Manhattan in The City of New York in any action or Proceeding arising out of or relating to the Securities or this Indenture, (B) agree that all claims in respect of such action or Proceeding may be heard and determined in such federal or New York state court, (C) waive, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or Proceeding, (D) consent to the service of any and all process in any action or Proceeding by the mailing or

delivery of copies of such process to it at the office of the Administrative Agent set forth in Section 11.1 of the Administrative Agency Agreement and (E) agrees that a final judgment in any such action or Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law, in each case pursuant to the Administrative Agency Agreement.

Section 14.2    <u>Assignment of Collateral Administration Agreement</u>.  (a) The Issuer, in furtherance of the covenants of this Indenture and as security for the Secured Obligations and the performance and observance of the provisions hereof, hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Secured Parties, all of the Issuer's estate, right, title and interest in, to and under the Collateral Administration Agreement, including (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Collateral Administrator thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; <u>provided</u>, that the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Collateral Administration Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture, including as set forth in Section 14.2(f)), which license shall be and is hereby deemed to be automatically revoked upon the occurrence of an Event of Default hereunder until such time, if any, as such Event of Default is cured or waived.  Following an Event of Default, the Trustee shall take such action with respect to the Issuer's rights under the Collateral Administration Agreement as it shall be directed to take by a Majority of the Controlling Class.

(b)    The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Collateral Administration Agreement, nor shall any of the obligations contained in the Collateral Administration Agreement be imposed on the Trustee.

(c)    Upon the retirement of the Senior Notes and the Mezzanine Notes, and the release of the Collateral from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Secured Parties shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Collateral Administration Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

(d)    The Issuer represents that the Issuer has not executed any other assignment of the Collateral Administration Agreement.

(e)    The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer will, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may specify.

(f)    The Issuer hereby agrees, and hereby undertakes to obtain the agreement and consent of the Collateral Administrator in the Collateral Administration Agreement to the following:

(i)    The Collateral Administrator consents to the provisions of this assignment and agrees to perform any provisions of this Indenture applicable to it subject to the terms of the Collateral Administration Agreement.

(ii)     The Collateral Administrator acknowledges that the Issuer is assigning all of its right, title and interest in, to and under the Collateral Administration Agreement to the Trustee for the benefit of the Secured Parties, and the Collateral Administrator agrees that all of the representations, covenants and agreements made by it in the Collateral Administration Agreement are also for the benefit of the Trustee on behalf of the Secured Parties.

(iii)     Neither the Issuer nor the Collateral Administrator will enter into any agreement amending, modifying or terminating the Collateral Administration Agreement other than in respect of an amendment or modification of the type that may be made to this Indenture without consent of Holders of Securities, or selecting or consenting to a successor collateral administrator without notifying each of the Rating Agencies and without prior Rating Agency Confirmation with respect to such amendment, modification or termination and without complying with the applicable provisions of the Collateral Administration Agreement.  Neither the Issuer nor the Collateral Administrator will enter into any agreement amending, modifying or terminating the Collateral Administration Agreement in respect of an amendment or modification of the type that may not be made to this Indenture without consent of the Holders of Securities without obtaining the consent of the requisite percentage of each Class of Senior Notes, Mezzanine Notes and Subordinated Notes that would be required of an amendment or modification of such type if it were made to this Indenture.

(iv)     Except as otherwise set forth herein and therein, the Collateral Administrator shall continue to serve in such capacity under the Collateral Administration Agreement notwithstanding that it shall not have received amounts due it under such agreement because sufficient funds were not then available hereunder to pay such amounts in accordance with the Priority of Payments.  The Collateral Administrator agrees not to cause the filing of a petition in bankruptcy against the Issuer for the non-payment of the fees and expenses payable to it under the Collateral Administration Agreement or other amounts payable by the Issuer to it hereunder or under the Collateral Administration Agreement prior to the date which is one year and one day (or, if longer, the applicable preference period) after the payment in full of all Securities issued under this Indenture.  Nothing in this Section 14.2(f) shall preclude, or be deemed to stop, the Collateral Administrator (i) from taking any action prior to the expiration of the aforementioned one year and one day (or longer) period in (A) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency proceeding filed or commenced by a Person other than the Collateral Administrator, or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

(v)     The Collateral Administrator shall irrevocably (A) submit to the non-exclusive jurisdiction of any federal or New York state court sitting in the Borough of Manhattan in The City of New York in any action or Proceeding arising out of or relating to the Securities or this Indenture, (B) agree that all claims in respect of such action or Proceeding may be heard and determined in such federal or New York state court, (C) waive, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of such action or Proceeding, (D) consent to the service of any and all process in any action or Proceeding by the mailing or delivery of copies of such process to it at the office of the Collateral Administrator set forth in Section 11.1 of the Collateral Administration Agreement and (E) agrees that a final judgment in any such action or Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law, in each case pursuant to the Collateral Administration Agreement.

*[Remainder of page intentionally left blank. Signature page follows.]*

IN WITNESS WHEREOF, we have set our hands as of the date first written above.

Executed as a Deed by:

SPRUCE CCS, LTD.,
as the Issuer

By: _____
    Name:    **Chris Marett**
    Title:    Director

In the presence of:

Witness: _____
    Name:    **Sheredan Bodden**
    Title: ADMINISTRATIVE ASSISTANT

SPRUCE CCS, CORP., as the Co-Issuer

By: _____
    Name:
    Title:

U.S. BANK NATIONAL ASSOCIATION,
as the Trustee

By: _____
    Name:
    Title

IN WITNESS WHEREOF, we have set our hands as of the date first written above.

Executed as a Deed by:

SPRUCE CCS, LTD.,
as the Issuer

By:_____

    Name:

    Title:

In the presence of:

Witness:_____

    Name:

    Title:

SPRUCE CCS, CORP., as the Co-Issuer

By:_____

    Name:    Donald J. Puglisi

    Title:    President

U.S. BANK NATIONAL ASSOCIATION,
as the Trustee

By:_____

    Name:

    Title

IN WITNESS WHEREOF, we have set our hands as of the date first written above.

Executed as a Deed by:

SPRUCE CCS, LTD.,
as the Issuer

By:_____
    Name:
    Title:

In the presence of:

Witness:_____
        Name:
        Title:

SPRUCE CCS, CORP., as the Co-Issuer

By:_____
    Name:
    Title:

U.S. BANK NATIONAL ASSOCIATION,
as the Trustee

By:_____
    Name:
    Title    Scott D. DeRoss
            Vice President

## SCHEDULE E

STANDARD & POOR'S RECOVERY RATE TABLES

**Table I (if the Underlying Asset has a Standard & Poor's CRR)**:

| Recovery Rates For Assets With Corporate Recovery Ratings | | | | | | |
|---|---|---|---|---|---|---|
| Rating of Class of Senior Notes or Mezzanine Notes** Asset recovery rating | AAA | AA | A | BBB | BB | B and CCC |
| 1+ | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 | 92% | 94% | 96% | 98% | 100% | 100% |
| 2 | 78% | 81% | 84% | 87% | 90% | 90% |
| 3 | 58% | 61% | 64% | 67% | 70% | 70% |
| 4 | 38% | 41% | 44% | 47% | 50% | 50% |
| 5 | 16% | 20% | 24% | 27% | 30% | 30% |
| 6 | 6% | 7% | 8% | 9% | 10% | 10% |

** As of the Closing Date.

**Table II (if the Underlying Asset is a Senior Unsecured Loan and has no Standard & Poor's CRR, but other senior secured corporate debt of the same obligor has a Standard & Poor's CRR)**

| U.S. Recovery Rates of Corporate Senior Unsecured Debt If Senior Secured Debt Has A Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| Rating of Class of Senior Notes or Mezzanine Notes** Senior secured recovery ratings | AAA | AA | A | BBB | BB | B and CCC |
| 1+ | 53% | 55% | 57% | 59% | 61% | 61% |
| 1 | 48% | 50% | 52% | 54% | 56% | 56% |
| 2 | 43% | 45% | 47% | 49% | 51% | 51% |
| 3 | 39% | 41% | 43% | 45% | 47% | 47% |
| 4 | 22% | 24% | 26% | 28% | 30% | 30% |
| 5 | 8% | 10% | 12% | 14% | 15% | 15% |
| 6 | 4% | 4% | 4% | 4% | 4% | 4% |

** As of the Closing Date.

**Table III (if the Underlying Asset is a subordinated obligation and has no Standard & Poor's CRR, but other senior secured corporate debt of the same obligor has a Standard & Poor's CRR)**

| U.S. Recovery Rates of Corporate Subordinated Debt If Senior Secured Debt Has A Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| Rating of Class of Senior Notes or Mezzanine Notes** | AAA | AA | A | BBB | BB | B and CCC |
| Senior secured recovery ratings | | | | | | |
| 1+ | 25% | 25% | 25% | 25% | 25% | 25% |
| 1 | 22% | 22% | 22% | 22% | 22% | 22% |
| 2 | 20% | 20% | 20% | 20% | 20% | 20% |
| 3 | 20% | 20% | 20% | 20% | 20% | 20% |
| 4 | 10% | 10% | 10% | 10% | 10% | 10% |
| 5 | 5% | 5% | 5% | 5% | 5% | 5% |
| 6 | 2% | 2% | 2% | 2% | 2% | 2% |

** As of the Closing Date.

**Table IV (if none of Table I, Table II or Table III is applicable)**

| Standard & Poor's U.S. Tiered Corporate Recovery Rates (for Underlying Assets that do not have a Standard & Poor's CRR)* | | | | | | |
|---|---|---|---|---|---|---|
| Rating of Class of Senior Notes or Mezzanine Notes ** | AAA | AA | A | BBB | BB | B and CCC |
| **U.S. loan recovery rates** | | | | | | |
| Senior Secured Loans+ | 56% | 60% | 64% | 67% | 70% | 70% |
| Cov-Lite Loans | 51% | 54% | 57% | 60% | 63% | 63% |
| Senior Unsecured Loans and Second Lien Loans*++ | 40% | 42% | 44% | 46% | 48% | 48% |
| Subordinated loans | 22% | 22% | 22% | 22% | 22% | 22% |
| **U.S. bond recovery rates** | | | | | | |
| Senior Secured Notes | 48% | 49% | 50% | 51% | 52% | 52% |
| Unsecured bonds | 38% | 41% | 42% | 44% | 45% | 45% |
| Subordinated bonds | 19% | 19% | 19% | 19% | 19% | 19% |

*The Aggregate Principal Amount of all Second Lien Loans without a CRR (excluding any Defaulted Obligations) that, in the aggregate, represent up to 15% of the Maximum Investment Amount will have the Standard & Poor's Recovery Rate specified for Second Lien Loans in the table above. The Aggregate Principal Amount of all Second Lien Loans without a CRR (excluding any Defaulted Obligations) in excess of 15% of the Maximum Investment Amount will have the Standard & Poor's Recovery Rate specified for Subordinated Loans in the table above.

**As of the Closing Date.

+ Solely for the purpose of determining the Standard & Poor's Recovery Rate for such Loan, no Loan shall constitute a "Senior Secured Loan" if such Loan does not have a Standard & Poor's CRR or a Standard & Poor's Recovery Rate assigned as part of a credit estimate, unless such Loan, in the Issuer's commercially reasonable judgment (with such determination being made in good faith by the

Issuer at the time of such Loan's purchase and based upon information reasonably available to the Issuer at such time and without any requirement of additional investigation beyond the Issuer's customary credit review procedures), is secured by specified collateral that has a value not less than an amount equal to the sum of (i) the Aggregate Principal Amount of all Loans senior or *pari passu* to such Loans and (ii) the outstanding Principal Balance of such Loan, which value may be derived from, among other things, the enterprise value of the issuer of such Loan (<u>provided</u>, that the terms of this proviso may be amended or revised at any time by a written agreement of the Issuer and the Trustee (without the consent of any holder of any Senior Note or Mezzanine Note), subject to Rating Agency Confirmation from Standard & Poor's, in order to conform to Standard & Poor's then-current criteria for such Loans).

++ Solely for the purpose of determining the Standard & Poor's Recovery Rate for any Loan, no Loan shall constitute a "Second Lien Loan" if such Loan does not have a Standard & Poor's CRR or a Standard & Poor's Recovery Rate assigned as part of a credit estimate, unless such Loan, in the Issuer's commercially reasonable judgment (with such determination being made in good faith by the Issuer at the time of such Loan's purchase and based upon information reasonably available to the Issuer at such time and without any requirement of additional investigation beyond the Issuer's customary credit review procedures), is secured by specified collateral that has a value not less than an amount equal to the sum of (i) the Aggregate Principal Amount of all Loans senior or *pari passu* to such Loan and (ii) the outstanding Principal Balance of such Loan, which value may be derived from, among other things, the enterprise value of the issuer of such Loan (<u>provided</u>, that the terms of this footnote may be amended or revised at any time by a written agreement of the Issuer and the Trustee (without the consent of any holder of any Senior Note or Mezzanine Note), subject to Rating Agency Confirmation from Standard & Poor's, in order to conform to Standard & Poor's then-current criteria for such Loans).

<u>Standard & Poor's Recovery Rates for Structured Finance Securities</u>

**Table V (if the Structured Finance Security is the senior-most tranche of securities issued by the issuer of or obligor on such Structured Finance Security)**

| Standard & Poor's Rating of Underlying Asset at the Date of Issuance | Recovery Rate by Standard & Poor's Rating of Class of Senior Notes and Mezzanine Notes on the Applicable Measurement Date | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 80% | 85% | 90% | 90% | 90% | 90% | 90% |
| AA | 70% | 75% | 85% | 90% | 90% | 90% | 90% |
| A | 60% | 65% | 75% | 85% | 90% | 90% | 90% |
| BBB | 50% | 55% | 65% | 75% | 85% | 85% | 85% |
| BB* | | | | | | | |
| B* | | | | | | | |
| CCC* | | | | | | | |

_____
*   As assigned by Standard & Poor's on a case-by-case basis.

**Table VI (if the Structured Finance Security is not the Senior-most tranche of securities issued by the issuer of or obligor on such Structured Finance Security)**

| Standard & Poor's Rating of Underlying Asset at the Date of Issuance | Recovery Rate by Standard & Poor's Rating of Class of Senior Notes and Mezzanine Notes on the Applicable Measurement Date | | | | | | |
|---|---|---|---|---|---|---|---|
|  | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 65% | 75% | 80% | 85% | 85% | 85% | 85% |
| AA | 55% | 65% | 75% | 80% | 80% | 80% | 80% |
| A | 40% | 45% | 55% | 65% | 80% | 80% | 80% |
| BBB | 30% | 35% | 40% | 45% | 50% | 60% | 70% |
| BB | 10% | 10% | 10% | 25% | 35% | 40% | 50% |
| B | 3% | 5% | 5% | 10% | 10% | 20% | 25% |
| CCC | 0% | 0% | 0% | 0% | 3% | 5% | 5% |

**Table VII**

| Emerging Market Recoveries | | | | | | |
|---|---|---|---|---|---|---|
|  | AAA | AA | A | BBB | BB | B and CCC |
|  |  |  |  |  |  |  |
| Sovereign Debt | 37% | 38% | 40% | 47% | 49% | 50% |
| Corporate Debt | 22% | 24% | 32% | 33% | 35% | 37% |
|  |  |  |  |  |  |  |

**Table VIII (Standard & Poor's Group A1 Countries)**

| Europe and Asia Recovery Rates of Senior Unsecured Debt If Senior Secured Debt Has A Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| Rating of Class of Senior Notes or Mezzanine Notes** | AAA | AA | A | BBB | BB | B and CCC |
| Senior secured recovery ratings |  |  |  |  |  |  |
| 1+ | 65% | 68% | 71% | 73% | 76% | 76% |
| 1 | 57% | 60% | 63% | 65% | 68% | 68% |
| 2 | 50% | 53% | 55% | 57% | 59% | 59% |
| 3 | 42% | 45% | 47% | 49% | 51% | 51% |
| 4 | 18% | 18% | 18% | 18% | 18% | 18% |
| 5 | 8% | 8% | 8% | 8% | 8% | 8% |
| 6 | 4% | 4% | 4% | 4% | 4% | 4% |

---

** As of the Closing Date.

**Table IX (Standard & Poor's Group A2 Countries)**

| Europe and Asia Recovery Rates of Senior Unsecured Debt If Senior Secured Debt Has A Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| Rating of Class of Senior Notes or Mezzanine Notes** | AAA | AA | A | BBB | BB | B and CCC |
| Senior secured recovery ratings | | | | | | |
| 1+ | 53% | 55% | 57% | 59% | 61% | 61% |
| 1 | 48% | 50% | 52% | 54% | 56% | 56% |
| 2 | 43% | 45% | 47% | 49% | 51% | 51% |
| 3 | 39% | 41% | 43% | 45% | 47% | 47% |
| 4 | 18% | 18% | 18% | 18% | 18% | 18% |
| 5 | 8% | 8% | 8% | 8% | 8% | 8% |
| 6 | 4% | 4% | 4% | 4% | 4% | 4% |

** As of the Closing Date.

**Table X (Standard & Poor's Group B Countries)**

| Europe and Asia Recovery Rates of Senior Unsecured Debt If Senior Secured Debt Has A Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| Rating of Class of Senior Notes or Mezzanine Notes** | AAA | AA | A | BBB | BB | B and CCC |
| Senior secured recovery ratings | | | | | | |
| 1+ | 45% | 46% | 48% | 49% | 51% | 51% |
| 1 | 41% | 43% | 44% | 46% | 47% | 48% |
| 2 | 37% | 39% | 41% | 42% | 44% | 44% |
| 3 | 33% | 36% | 37% | 39% | 40% | 41% |
| 4 | 16% | 16% | 16% | 16% | 16% | 16% |
| 5 | 6% | 6% | 6% | 6% | 6% | 6% |
| 6 | 3% | 3% | 3% | 3% | 3% | 3% |

** As of the Closing Date.

**Table XI (Standard & Poor's Group A1 Countries)**

| Europe and Asia Recovery Rates of Subordinated Debt If Senior Secured Debt Has A Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| Rating of Class of Senior Notes or Mezzanine Notes** | AAA | AA | A | BBB | BB | B and CCC |
| Senior secured recovery ratings | | | | | | |
| 1+ | 22% | 22% | 22% | 22% | 22% | 22% |
| 1 | 20% | 20% | 20% | 20% | 20% | 20% |
| 2 | 18% | 18% | 18% | 18% | 18% | 18% |
| 3 | 18% | 18% | 18% | 18% | 18% | 18% |
| 4 | 9% | 9% | 9% | 9% | 9% | 9% |
| 5 | 4% | 4% | 4% | 4% | 4% | 4% |
| 6 | 2% | 2% | 2% | 2% | 2% | 2% |

** As of the Closing Date.

**Table XII (Standard & Poor's Group A2 Countries)**

| Europe and Asia Recovery Rates of Subordinated Debt If Senior Secured Debt Has A Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| Rating of Class of Senior Notes or Mezzanine Notes** | AAA | AA | A | BBB | BB | B and CCC |
| Senior secured recovery ratings | | | | | | |
| 1+ | 22% | 22% | 22% | 22% | 22% | 22% |
| 1 | 20% | 20% | 20% | 20% | 20% | 20% |
| 2 | 18% | 18% | 18% | 18% | 18% | 18% |
| 3 | 18% | 18% | 18% | 18% | 18% | 18% |
| 4 | 9% | 9% | 9% | 9% | 9% | 9% |
| 5 | 4% | 4% | 4% | 4% | 4% | 4% |
| 6 | 2% | 2% | 2% | 2% | 2% | 2% |

** As of the Closing Date.

**Table XIII (Standard & Poor's Group B Countries)**

| Europe and Asia Recovery Rates of Subordinated Debt If Senior Secured Debt Has A Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| Rating of Class of Senior Notes or Mezzanine Notes** | AAA | AA | A | BBB | BB | B and CCC |
| Senior secured recovery ratings | | | | | | |
| 1+ | 20% | 20% | 20% | 20% | 20% | 20% |
| 1 | 17% | 17% | 17% | 17% | 17% | 17% |
| 2 | 15% | 15% | 15% | 15% | 15% | 15% |
| 3 | 15% | 15% | 15% | 15% | 15% | 15% |
| 4 | 8% | 8% | 8% | 8% | 8% | 8% |
| 5 | 3% | 3% | 3% | 3% | 3% | 3% |
| 6 | 1% | 1% | 1% | 1% | 1% | 1% |

_____
** As of the Closing Date.

**Table XIV (Standard & Poor's Group Countries)**

| Europe and Asia Tiered Corporate Recovery Rates (By Asset Class and Standard & Poor's Group Countries) | | | | | | |
|---|---|---|---|---|---|---|
| Rating of Class of Senior Notes or Mezzanine Notes** | AAA | AA | A | BBB | BB | B and CCC |
| **Senior secured loans** | | | | | | |
| Group A1 | 68% | 73% | 78% | 81% | 85% | 85% |
| Group A2 | 56% | 60% | 64% | 67% | 70% | 70% |
| Group B | 48% | 51% | 55% | 57% | 60% | 60% |
| **Senior secured Cov-Lite Loans** | | | | | | |
| Group A1 | 61% | 66% | 70% | 73% | 77% | 77% |
| Group A2 | 50% | 54% | 58% | 60% | 63% | 63% |
| Group B | 43% | 46% | 49% | 52% | 54% | 54% |
| **Mezzanine/second-lien/senior unsecured loans** | | | | | | |
| Group A1 | 45% | 47% | 50% | 52% | 54% | 54% |
| Group A2 | 40% | 42% | 44% | 46% | 48% | 48% |
| Group B | 35% | 37% | 39% | 40% | 42% | 42% |
| **Subordinated loans** | | | | | | |
| Group A1 | 20% | 20% | 20% | 20% | 20% | 20% |
| Group A2 | 20% | 20% | 20% | 20% | 20% | 20% |
| Group B | 17% | 17% | 17% | 17% | 17% | 17% |
| **Senior secured bonds** | | | | | | |
| Group A1 | 60% | 61% | 62% | 63% | 64% | 64% |
| Group A2 | 48% | 49% | 50% | 51% | 52% | 52% |
| Group B | 43% | 44% | 45% | 46% | 47% | 47% |
| **Senior unsecured bonds** | | | | | | |
| Group A1 | 40% | 42% | 44% | 46% | 48% | 48% |
| Group A2 | 38% | 41% | 42% | 44% | 45% | 45% |
| Group B | 32% | 35% | 36% | 38% | 39% | 40% |
| **Subordinated bonds** | | | | | | |
| Group A1 | 18% | 18% | 18% | 18% | 18% | 18% |
| Group A2 | 18% | 18% | 18% | 18% | 18% | 18% |
| Group B | 15% | 15% | 15% | 15% | 15% | 15% |

_____
** As of the Closing Date.

In all recovery rate tables above, Senior Note and Mezzanine Note rating categories below "AAA" include rating subcategories (for example, the "AA" column also applies to Senior Notes and Mezzanine Notes rated "AA+" and "AA-"). Notwithstanding the foregoing, the Standard & Poor's Recovery Rates set forth in the table above may be adjusted on a case-by-case basis upon receipt of Rating Agency Confirmation from Standard & Poor's.

## **SCHEDULE F**

MOODY'S RECOVERY RATE TABLE FOR STRUCTURED FINANCE SECURITIES

The Moody's Recovery Rate for a Structured Finance Security will be the applicable rate set forth below based on the appropriate sector as categorized by Moody's:

**Diversified Securities** primarily include (1) Automobile Securities; (2) Car Rental Receivable Securities; (3) Credit Card Securities; (4) Student Loan Securities:

| **Initial Rating of Structured Finance Security** | | | | | | |
|---|---|---|---|---|---|---|
| **% of Underlying Capital Structure** | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| >70% | 85% | 80% | 70% | 60% | 50% | 40% |
| ≤70% >10% | 75% | 70% | 60% | 50% | 40% | 30% |
| ≤10% | 70% | 65% | 55% | 45% | 35% | 25% |

**Residential Securities** primarily include (1) Home Equity Loan Securities; (2) Manufactured Housing Securities; (3) Residential A Mortgage Securities; (4) Residential B/C Mortgage Securities:

| **Initial Rating of Structured Finance Security** | | | | | | |
|---|---|---|---|---|---|---|
| **% of Underlying Capital Structure** | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| ≤70% >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| ≤10% >5% | 65% | 55% | 45% | 40% | 30% | 20% |
| ≤5% >2% | 55% | 45% | 40% | 35% | 25% | 15% |
| ≤2% | 45% | 35% | 30% | 25% | 15% | 10% |

**Undiversified Securities** primarily include (1) CMBS Conduit; (2) CMBS Credit Tenant Lease; (3) CMBS Large Loan; (4) those ABS Sectors not included in Diversified Securities:

| Initial Rating of Structured Finance Security | | | | | | |
|---|---|---|---|---|---|---|
| % of Underlying Capital Structure | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| ≤70% >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| ≤10% >5% | 65% | 55% | 45% | 35% | 25% | 15% |
| ≤5% >2% | 55% | 45% | 35% | 30% | 20% | 10% |
| ≤2% | 45% | 35% | 25% | 20% | 10% | 5% |

**Collateralized Debt Obligations** include (1) High-diversity CDOs (Diversity Score in excess of 20); (2) Low-Diversity CDOs (Diversity Score of 20 or less).

**High Diversity Collateralized Debt Obligations**:

| Initial Rating of Structured Finance Security | | | | | | |
|---|---|---|---|---|---|---|
| % of Underlying Capital Structure | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| ≤70% >10% | 75% | 70% | 60% | 50% | 40% | 25% |
| ≤10% >5% | 65% | 55% | 50% | 40% | 30% | 20% |
| ≤5% >2% | 55% | 45% | 40% | 35% | 25% | 10% |
| ≤2% | 45% | 35% | 30% | 25% | 10% | 5% |

**Low Diversity Collateralized Debt Obligations**:

| Initial Rating of Structured Finance Security | | | | | | |
|---|---|---|---|---|---|---|
| % of Underlying Capital Structure | Aaa | Aa | A | Baa | Ba | B |
| >70% | 80% | 75% | 60% | 50% | 45% | 30% |
| ≤70% >10% | 70% | 60% | 55% | 45% | 35% | 25% |
| ≤10% >5% | 60% | 50% | 45% | 35% | 25% | 15% |
| ≤5% >2% | 50% | 40% | 35% | 30% | 20% | 10% |
| ≤2% | 30% | 25% | 20% | 15% | 7% | 4% |

Notwithstanding the foregoing, the Moody's Recovery Rates set forth in the tables above may be adjusted on a case-by-case basis upon receipt of Rating Agency Confirmation from Moody's.