Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555 (JMP)

5   Case No. 08-01420 (JMP) (SIPA)

6   - - - - - - - - - - - - - - - - - - - - - - - -x

7   In the Matter of:

8   LEHMAN BROTHERS HOLDINGS INC., et al.,

9          Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - -x

11  In the Matter of:

12  LEHMAN BROTHERS INC.,

13          Debtor.

14  - - - - - - - - - - - - - - - - - - - - - - - -x

15

16              U.S. Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              August 18, 2010

21              10:01 AM

22

23  B E F O R E:

24  HON. JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2    HEARING re LBHI's Motion for (i) Approval of Surrender

3    Agreement in Connection With Surrender of Real Property Lease

4    and (ii) Authorization to Abandon Certain Personal Property

5    [Docket No. 10517]

6

7    HEARING re Debtors' Motion for an Order (i) Allowing LCPI to

8    Acquire Certain Loans through a Joint Venture and (ii)

9    Authorizing LCPI and LBHI to Provide Gap Funding through a Term

10   Loan, Revolver, and Preferred Equity Investment [Docket No.

11   10467]

12

13   HEARING re Motion of Lehman Brothers Holdings Inc. and Lehman

14   Commercial Paper Inc. to Amend the Racers Transaction Documents

15   [Docket No. 10464]

16

17   HEARING re Motion of Lehman Brothers Holdings Inc. and Lehman

18   Commercial Paper Inc. for Authorization to Guarantee Payment of

19   the Fees and Related Charges of Lazard Freres & Co. LLC [Docket

20   No. 10466]

21

22   HEARING re Motion of the Chapter 11 Trustee of the SunCal

23   Master Debtors for Relief from the Automatic Stay [Docket No.

24   9642]

25

Page 3

1

2   HEARING re Motion of Lehman Commercial Paper Inc. for Authority

3   to (i) Consent to its Non-Debtor Affiliate Lehman ALI Inc. (a)

4   Entry into Plan Support Agreement Related to the Restructuring

5   of Innkeepers USA Trust; and (b) Consummation of the

6   Transactions Set Forth in the Plan Term Sheet; and (ii) Provide

7   Funds to Solar Finance Inc., a Non-Debtor Affiliate, to Provide

8   Debtor-in-Possession Financing [Docket No. 10465]

9

10  HEARING re Motion of Debtors and Debtors in Possession for

11  Entry of an Order to Consolidate Certain Proceedings and

12  Establish Related Procedures [Case No. 08-13555; Docket No.

13  8614; Adv. Case No. 10-03228, Docket No. 2; Adv. Case No.

14  10-03229, Docket No. 2]

15

16  HEARING re Och-Ziff Capital Management's Objection to Debtors'

17  Subpoena Duces Tecum [Docket No. 9382]

18

19  PRE-TRIAL CONFERENCE re Lehman Brothers Holdings Inc. v. USA

20  [Case No. 10-03211]

21

22

23

24  Transcribed By:  Clara Rubin

25

Page 4

1

2    A P P E A R A N C E S:

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for the Debtors and Debtors-in-Possession

5         700 Louisiana

6         Suite 1600

7         Houston, TX 77002

8

9    BY:   ALFREDO R. PEREZ, ESQ.

10

11   WEIL, GOTSHAL & MANGES LLP

12        Attorneys for the Debtors and Debtors-in-Possession

13        767 Fifth Avenue

14        New York, NY 10153

15

16   BY:   DAMON P. MEYER, ESQ.

17         AMANDA M. HENDY, ESQ.

18

19   KING & SPALDING

20        Attorneys for Lehman Commercial Paper Inc.

21        1185 Avenue of the Americas

22        New York, NY 10036

23

24   BY:   ARTHUR J. STEINBERG, ESQ.

25

Page 5

1

2   BINGHAM MCCUTCHEN LLP

3        Special Counsel to the Debtors

4        1919 M Street NW

5        Suite 200

6        Washington, DC 20036

7

8   BY:   KIARA RANKIN, ESQ.

9

10

11   BINGHAM MCCUTCHEN LLP

12        Special Counsel to the Debtors

13        2020 K Street, NW

14        Washington, DC 20006

15

16   BY:   RAJ MADAN, ESQ.

17

18

19   JONES DAY

20        Special Counsel to the Debtors

21        222 East 41st Street

22        New York, NY 10017

23

24   BY:   JAYANT W. TAMBE, ESQ.

25

Page 6

```
 1

 2    KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

 3         Special Counsel for the Debtors and Debtors-in-Possession

 4         1633 Broadway

 5         New York, NY 10019

 6

 7    BY:   JENNIFER S. RECINE, ESQ.

 8          ROBERT M. NOVICK, ESQ.

 9          GARY W. DUNN, ESQ.

10

11    BLANK ROME LLP

12         Attorneys for Thomson Reuters PLC and Thomson Reuters

13          Corporation

14         The Chrysler Building

15         405 Lexington Avenue

16         New York, NY 10174

17

18    BY:   KENNETH L. BRESSLER, ESQ.

19

20    CHAPMAN AND CUTLER LLP

21         Attorneys for U.S. Bank National Association, as Trustee

22         330 Madison Avenue, 34th Floor

23         New York, NY 10017

24

25    BY:   CRAIG M. PRICE, ESQ.
```

Page 7

1

2    CHAPMAN AND CUTLER LLP

3         Attorneys for U.S. Bank National Association, as Trustee

4         111 West Monroe Street

5         Chicago, IL 60603

6

7    BY:   FRANKLIN H. TOP III, ESQ. (TELEPHONICALLY)

8         JAMES HEISER, ESQ. (TELEPHONICALLY)

9

10

11   HUGHES HUBBARD & REED LLP

12        Attorneys for James W. Giddens, Trustee for the SIPA

13         Liquidation of Lehman Brothers Inc.

14        One Battery Park Plaza

15        New York, NY 10004

16

17   BY:   JEFFREY S. MARGOLIN, ESQ.

18        DANIEL S. LUBELL, ESQ.

19

20

21

22

23

24

25

Page 8

1

2   MILBANK, TWEED, HADLEY & MCCLOY LLP

3        Attorneys for the Official Committee of Unsecured

4         Creditors

5        One Chase Manhattan Plaza

6        New York, NY 10005

7

8   BY:   EVAN R. FLECK, ESQ.

9        DENNIS C. O'DONNELL, ESQ.

10        ANDREW E. TOMBACK, ESQ.

11        KATE LENAHAN, ESQ.

12

13

14   MILBANK, TWEED, HADLEY & MCCLOY LLP

15        Attorneys for the Official Committee of Unsecured

16         Creditors

17        International Square Building

18        1850 K Street, NW

19        Washington, DC 20006

20

21   BY:   DAVID S. COHEN, ESQ.

22

23

24

25

Page 9

1

2    SHEARMAN & STERLING LLP

3         Attorneys for Nomura Global Financial Products

4         599 Lexington Avenue

5         New York, NY 10022

6

7    BY:   SOLOMON J. NOH, ESQ.

8

9

10   SILLS CUMMIS & GROSS, P.C.

11        Attorneys for Alfred H. Siegel, Chapter 11 Trustee

12        One Riverfront Plaza

13        Newark, NJ 07102

14

15   BY:   BORIS I. MANKOVETSKIY, ESQ.

16

17

18   WEILAND, GOLDEN, SMILEY, WANG EKVALL & STROK, LLP

19        Attorneys for the SunCal Trustee

20        650 Town Center Drive

21        Suite 950

22        Costa Mesa, CA 92626

23

24   BY:   EVAN D. SMILEY, ESQ.

25

Page 10

1

2    WHITE & CASE LLP

3         Attorneys for the Official Committee of Unsecured

4         Creditors

5         1155 Avenue of the Americas

6         New York, NY 10036

7

8    BY:   J. CHRISTOPHER SHORE, ESQ.

9

10

11   WILLKIE FARR & GALLAGHER LLP

12        Attorneys for Appaloosa Investment L.P.

13        787 Seventh Avenue

14        New York, NY 10019

15

16   BY:   RACHEL C. STRICKLAND, ESQ.

17

18

19   U.S. DEPARTMENT OF JUSTICE

20        Office of the United States Trustee

21        33 Whitehall Street

22        21st Floor

23        New York, NY 10004

24

25   BY:   ANDREW D. VELEZ-RIVERA, ESQ.

Page 11

1

2    U.S. DEPARTMENT OF JUSTICE

3         U.S. Attorney's Office

4         86 Chambers Street

5         3rd Floor

6         New York, NY 10007

7

8    BY:   JOSEPH N. CORDARO, AUSA

9

10   DAY PITNEY LLP

11        Attorneys for Creditor, Fidelity National Title Insurance

12         Co.

13        One Audubon Street

14        New Haven, CT 06511

15

16   BY:   JOSHUA W. COHEN, ESQ. (TELEPHONICALLY)

17

18   KILPATRICK STOCKTON LLP

19        Attorneys for Trimont

20        1100 Peachtree Street

21        Suite 2800

22        Atlanta, GA, 30309

23

24   BY:   MARK A. FINK, ESQ. (TELEPHONICALLY)

25

Page 12

1

2    KIRKLAND & ELLIS LLP

3         Attorneys for PWC Bermuda

4         300 North LaSalle

5         Chicago, IL 60654

6

7    BY:   JAMES H.M. SPRAYREGEN, ESQ., P.C. (TELEPHONICALLY)

8

9    MILLER STARR REGALIA P.C.

10        Attorneys for Creditor, Fidelity National Title Insurance

11        1331 N. California Boulevard

12        Fifth Floor

13        Walnut Creek, CA 94596

14

15   BY:   AMY MATTHEW, ESQ. (TELEPHONICALLY)

16        TARA CASTRO NARAYANAN, ESQ. (TELEPHONICALLY)

17

18   STUTMAN TREISTER & GLATT

19        Attorneys for Interested Party, Elliott Management

20        1901 Avenue of the Stars

21        12th Floor

22        Los Angeles, CA 90067

23

24   BY:   JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

25        WHITMAN L. HOLT, ESQ. (TELEPHONICALLY)

Page 13

1

2   STUTMAN TREISTER & GLATT

3          Attorneys for Creditor, Perry Capital

4          1901 Avenue of the Stars

5          12th Floor

6          Los Angeles, CA 90067

7

8   BY:   MARINA FINEMAN, ESQ. (TELEPHONICALLY)

9

10

11  FARALLON CAPITAL MANAGEMENT

12         Creditor

13  BY:   ANATOLY BUSHLER (TELEPHONICALLY)

14

15

16  KING STREET CAPITAL MANAGEMENT, LLC

17         Creditor

18  BY:   MITCHELL SOCKETT (TELEPHONICALLY)

19

20

21  OAKTREE CAPITAL MANAGEMENT

22         Creditor

23  BY:   MAHESH BALAKRISHNAN (TELEPHONICALLY)

24

25

Page 14

1   ALSO APPEARING:

2   WILLIAM KUNTZ, III, Pro Se

3         Objector

4         India Street

5         Nantucket Island, MA 02554

6

7

8   LAZARD FRERES

9   BY:   BRANDON AEBERSOLD

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2         THE COURT:  Be seated, please.  Good morning.

3         Mr. Perez --

4         MR. PEREZ:  Good morning, Your Honor.

5         THE COURT:  -- let's proceed.

6         MR. PEREZ:  Alfredo Perez on behalf of the debtors.

7    Your Honor, since we filed the notice of agenda, two of the

8    matters are now fully consensual.  And with the Court's

9    permission, if we could take those two matters first, SunCal

10   and RACERS, and then we'll go to the rest of the docket.

11        THE COURT:  Sure, that'd be fine.

12        MR. PEREZ:  Mr. Steinberg is going to present the

13   SunCal matter, Your Honor.

14        MR. STEINBERG:  Good morning, Your Honor.  Arthur

15   Steinberg from King & Spalding, on behalf of the debtor, LCPI,

16   Lehman Commercial Paper Inc.

17        Your Honor, this comes up in the context of a motion

18   filed by the SunCal trustee to lift the stay to sell property

19   which debtor LCPI had free and clear of liens, and to commence

20   a lawsuit against LCPI.  The debtor responded to that motion

21   and basically said that it was -- should be opposed on

22   technical grounds but also, as a practical matter, that the

23   parties had come very close to negotiating a term sheet.  There

24   was an ambiguity raised and we would be better off focusing our

25   efforts to try to complete, then clear up, the ambiguity in the

Page 16

1    term sheet.  Your Honor had instructed the parties to see if we

2    could focus on that endeavor over the next thirty-five days.

3    Last night, we agreed to a term sheet, which has to go through

4    some internal approvals, but a term sheet which stayed fairly

5    close to the original term sheet and addressed the ambiguities.

6           There is a four-person steering committee of first

7    lien lenders, of which LCPI is the agent for the first lien

8    lenders.  Two of the four members of the steering committee

9    have already signed off on the term sheet, both in economics

10   and in language.  The third has signed off on in economics but

11   hasn't seen the last term sheet; we expect that to happen

12   forthcoming.  The fourth is LCPI, the person who was obviously

13   doing the negotiation, is recommending it, but it has to go

14   through the internal channels at the debtor and, as well, we

15   need to be able to explain it to the creditors' committee and

16   as to the merits of the, what I will call, tweaks to the term

17   sheet, but they are tweaks they need to be able to go through.

18          I think we'd like to be able to carry this to the

19   September 22nd calendar.  Hopefully by that point in time we

20   will have gone through the internal approvals, we will have a

21   motion pending for Your Honor to actually approve the term

22   sheet, and we will have -- assure everybody who needs to look

23   at it that this is the appropriate way of going forward; if

24   not, then we will have to deal with that on September 22nd.

25          So that, I think, is the agenda today.  Counsel for

Page 17

1   the SunCal trustee is in court, Mr. Smiley, and I finished my

2   presentation.  Unless Your Honor has any questions -- I'm not

3   sure if he has anything he would like to add.

4            THE COURT:  Let's find out.

5            Is there anything that the SunCal trustee would like

6   to add?

7            MR. STEINBERG:  I think Mr. Smiley's indicated that

8   I --

9            THE COURT:  Mr. Smiley is -- and indicating that he

10  has no interest in speaking on the record.  I can see him

11  standing toward the back of the courtroom.

12           MR. STEINBERG:  Thank you, Your Honor.

13           MR. COHEN:  Your Honor, if I may.  This is Joshua

14  Cohen from Day Pitney, on behalf of Fidelity National Title

15  Insurance Company, on the telephone.  I was wondering if I

16  could just make a brief statement on the record?

17           THE COURT:  That's fine.  What's your interest in

18  what's just been said, however?

19           MR. COHEN:  Your Honor, Fidelity issued certain title

20  insurance policies covering deeds of trust on the SunCal

21  projects and was the -- one of the main objectors to the

22  original settlement as proposed.  We were given a brief update

23  on Monday as to, sort of, the status of the negotiations, but

24  do want to make sure that we're given an adequate opportunity

25  to review the term sheet that it sounds like was approved

LBal, et al, LB1

Page 18

1   subject to the committee approvals last night, in order to

2   ensure that we don't have similar issues that need to be vetted

3   or addressed in conjunction with the new term sheet going

4   forward.

5           THE COURT:  I hear what you've said.  I'm not sure

6   there's anything I can say or do to comfort you.  If Mr.

7   Steinberg wishes to do that, that's fine.

8           MR. STEINBERG:  Your Honor, we did have a conversation

9   with Fidelity, because obviously we would like to minimize any

10  objections.  I think they had filed the objection when the

11  SunCal trustee moved to approve it in California.  We're aware

12  of the objection; we would like to obviate it.  So we will keep

13  them in the loop, and we will probably be in a position to

14  share the term sheet with them before the end of this week.

15          THE COURT:  Is it possible for you to at least

16  indicate on this record what this term sheet means for the

17  California proceedings?

18          MR. STEINBERG:  Yes, Your Honor.  That by virtue of

19  the term sheet, the pending stalking horse bidder, which I

20  think was presented to Your Honor before, is going to be

21  withdrawn; that at a minimum at this point in time, that the

22  first lien lenders will make a credit bid which is in excess of

23  that first lien lenders' and we will find a broker that we --

24  that the SunCal trustee and the first lien lenders feel

25  comfortable with to try to market that stalking horse bid.

Page 19

```
 1          The issue that I think related to Fidelity was are

 2     there liens in the California properties senior to that of the

 3     first lien lenders, specifically mechanic's liens and, if there

 4     are, has Fidelity given title insurance to the first lien

 5     lenders with respect to those mechanic's liens.  They're

 6     concerned about how to work through the senior -- the potential

 7     senior mechanic's lien issue and what their responsibility

 8     might be, and that's why I think counsel has raised to be

 9     wanting to be plugged in earlier rather than later.

10          But the ultimate result will be that some portion of

11     the cash collateral that is there now will be set aside to the

12     SunCal trustee for administration of its case.  And some

13     portion of the potential proceeds relating to a sale will be

14     set aside for the SunCal unsecured creditors, very similar to

15     what had been presented into the original term sheet.

16          Ultimately we're going to be asking Your Honor and the

17     California Bankruptcy Court to approve a settlement agreement,

18     and the actual sale process will be embedded in a plan of

19     reorganization to be presented in the SunCal bankruptcy case.

20     And we have agreed in this term sheet to the parameters of what

21     that plan will say as it impacts the first lien lenders and the

22     sale of the property.  So that is the essence of the term

23     sheet.

24          THE COURT:  Okay, fine.  Thank you.  Has the judge in

25     California been advised of these developments?
```

Lehman, et al; LB1

Page 20

```
1              MR. SMILEY:  No, not yet, Your Honor, but we will --

2    we're going to notice that as soon as possible.

3              THE COURT:  Fine.  Thank you very much.

4              MR. STEINBERG:  Thank you, Judge.

5              MR. COHEN:  Thank you, Your Honor.

6              MR. STEINBERG:  I think that is the only thing I have.

7    If I may be excused.

8              THE COURT:  Anyone who's involved in this matter can

9    be excused, or stay if you wish.

10             MR. PEREZ:  Your Honor, next I'd like to move to

11   docket number 10464, which is the so-called RACERS motion, Your

12   Honor.  Your Honor, RACERS is a securitization trust that was

13   set up by Lehman in August of 2007.  It currently holds -- it's

14   item number 3 on the agenda, Your Honor.  It currently holds

15   about 500 -- more than 500 positions, including loans, equity

16   positions, a lot in real estate but also commercial loans.

17             The goal of this motion, Your Honor, is twofold:  one,

18   to take out the assets, the underlying assets, from the

19   structure so that LCPI will be in a position to administer

20   those assets, not have to go through the structure to maximize

21   value when they dispose of the assets or deal with the assets;

22   the second goal of the motion is to make sure that everybody's

23   rights are preserved, that, by taking out the asset, the pot

24   will be bigger but that people's rights to the case or the

25   assets will be preserved.  So we don't want to put anybody in a
```

Page 21

1   worse position.  We certainly don't want to put anybody in a

2   better position.

3          And in connection with this motion, we have dealt

4   extensively with the SIPA trustee; with Barclays, which claims

5   an interest in a part of this; with the LBSF creditors, there

6   are two total return swaps that are part of this structure that

7   U.S. Bank, the current trustee, has filed five proofs of claim,

8   each for five billion dollars.  Obviously we have preserved the

9   rights of LBHI and, frankly, any other party.  From the time

10  that we filed the proposed form of order which we thought

11  accomplished that, we've had numerous comments from the various

12  parties.  The order has been significantly amended.  There was

13  in fact a tweak last night that hasn't been filed on the

14  record.  And I do have a copy of -- it's really fairly minor,

15  but basically it says that both pre- and post-petition rights

16  are preserved.  I think it said all rights were preserved, but

17  we spelled out pre- and post-petition rights.  And then the

18  rights of all parties-in-interest, including -- and then the

19  long list of parties that were there.  So two minor changes

20  just basically to clarify that we're preserving everybody's

21  rights.

22          We did receive an objection from U.S. Bank, which was

23  the trustee.  That -- we were able to resolve that objection,

24  and basically we did three things, and that was in the form of

25  order that was filed yesterday, which was we agreed that they

Page 22

1    would be released with respect to any obligations going

2    forward; we agreed that they would be released with respect to

3    anything that happened as a result of this transaction, so that

4    the fact of the transaction and the motion would not create any

5    liability for them; we also agreed that they would not be bound

6    by the tolling agreement that exists with respect to all of the

7    various parties, the debtors plus the SIPA trustee.  And it was

8    already in there, but we also agreed to pay their reasonable

9    fees and expenses, both that have accrued plus the ones that

10   they'll incur in connection with this motion.

11         I think, with those changes late last night, they

12   withdrew their objection.  So at this point, Your Honor, the

13   objection -- the motion, I'm sorry, is fully consensual.  I do

14   have Mr. Fitts here, who I'm prepared to proffer, to the extent

15   the Court has any questions.

16         THE COURT:  In your presentation, you didn't reference

17   the ad hoc committee of Lehman creditors that filed a

18   reservation-of-rights limited objection.  Did their issues go

19   away as well?

20         MR. PEREZ:  Well, Your Honor, I don't think that their

21   issue goes away.  I did not interpret that as an objection.  I

22   really did interpret it as a reservation of rights.  We did put

23   in language at their request.  I think they raised really an

24   issue that transcends this motion.  They filed a similar

25   position with respect to the Sun and Moon matter.

Page 23

1          THE COURT:  Right.

2          MR. PEREZ:  And I think that, on behalf of the

3    debtors, Your Honor, I think -- from day one, you know, we have

4    an independent fiduciary, and we've been working.  We fully

5    recognize that they're independent estates, and we are working

6    to preserve value in each of the estates.

7          Now, you know, there may not be a hundred people each

8    representing all of the various interests, but I do think that

9    that's something that is at the very -- you know, everybody

10   keeps in mind when they're negotiating these deals.  And, you

11   know, Mr. Fitts is well aware -- I mean, he's the primary

12   person; he's well aware of the fact that there are competing

13   interests among the various estates and that there are going to

14   be different distributions among the various estates.

15         So, Your Honor, this is a very complicated

16   transaction.  You know, Lehman appears -- a Lehman entity --

17   LCPI, LBSF, LBHI appear in a bunch of -- they're in a bunch of

18   places in the transaction.  So there are definitely competing

19   interests, and our goal is to preserve those interests to make

20   sure that they are all adequately represented, and to maximize

21   the value of the underlying assets.  Some day, either those

22   matters will be resolved consensually, or the Court's going to

23   have to resolve it themselves.  But I think that you got to

24   take the first two steps, which is maximize the value and

25   preserve the rights, before you can get to the ultimate

Page 24

1    distribution.

2           THE COURT:  Okay.  I want to be clear that U.S. Bank,

3    as trustee, is satisfied with this arrangement, particularly in

4    light of certain aspects of the objection raised concerning the

5    qualification of a Lehman entity to step into its shoes and

6    replace them, and the issues that surround the interest of LBI

7    and the LBI trustee, which raise some questions noted in their

8    objection.  First I'd like to just have it confirmed on the

9    record that U.S. Bank is satisfied with the arrangements that

10   have been just described and with the form of order.  And I'd

11   also like to be assured that U.S. Bank is satisfied that it can

12   safely step aside here.

13          MR. PEREZ:  Your Honor, counsel for U.S. Bank.

14          MR. PRICE:  Craig Price from Chapman & Cutler, for

15   U.S. Bank.

16          We are.  We've reviewed the order.  We talked to our

17   client about this quite a bit, and they are satisfied.

18          THE COURT:  Fine.  Thank you.

19          I'd also like to clarify on the record that counsel

20   for the ad hoc committee is standing down with respect to its

21   reservation of rights.

22          MR. SHORE:  With respect to the language that was

23   added to the proposed form of order, we are, Your Honor.

24          It's Chris Shore from White & Case, for the --

25          THE COURT:  Thank you, Mr. Shore.

1          Okay.  This does now seem to be fully consensual.

2          MR. PEREZ:  I thought it was, but I've been wrong

3     before.

4          THE COURT:  All right.

5          MR. PEREZ:  I don't know whether Mr. Lubell --

6          THE COURT:  I would like to hear from counsel for the

7     SIPA trustee, both because there is a statement in support and

8     because there is also, if I read the papers correctly, a claim

9     that the LBI estate may have as to assets within the RACERS

10    trust and also a general statement by Lehman that that claim is

11    of no particular concern to Lehman.  So those positions have

12    been staked out in the paperwork, but I'd like to be assured

13    that counsel for the SIPA trustee is satisfied with the order.

14         MR. LUBELL:  Good morning, Your Honor.  Dan Lubell of

15    Hughes Hubbard, for the SIPA trustee.

16         After we received the RACERS motion, we did have

17    discussions with the debtors to ensure that the proposed order

18    reflects what Mr. Perez described as the intent of the order,

19    if that is amending and terminating the RACER transaction

20    documents and deeming LCPI as the owner of the underlying

21    assets, that no parties' rights were being affected to the

22    proceeds of those underlying assets.

23         We also worked with the debtors to ensure that the

24    relief granted does not change the standard of care or the

25    duties of loyalty that existed with respect to those underlying

Page 26

1    assets in the RACER transaction documents.  And on that basis

2    and the changes that were made, the trustee does support the

3    entry of the revised proposed order.  And we would also note

4    that the Court retains jurisdiction should the implementation

5    or interpretation of that order fail to protect parties' rights

6    in interest with respect to the proceeds of the underlying

7    assets.

8              THE COURT:  All right.  Thank you.

9              MR. O'DONNELL:  Your Honor?  If I may, Your Honor,

10   Dennis O'Donnell, Milbank, Tweed, Hadley & McCloy, on behalf of

11   the committee.

12             Just rising because we also filed a statement in

13   support to make clear that we looked very closely at this

14   motion as well, are acutely aware of the conflicts issues

15   raised in the ad hoc committee's response, and believe that the

16   objective here is primarily operational, that all these other

17   issues, as evidenced in the order as finally submitted, are

18   issues that will be preserved for another day and are

19   adequately so preserved.

20             THE COURT:  All right.  The motion is granted.

21             MR. PEREZ:  Thank you, Your Honor.  The next matter is

22   a motion to -- it's the first matter on the agenda, motion to

23   surrender a leased premise, and Ms. Hendy's going to be

24   handling that, Your Honor.

25             THE COURT:  Okay.

Page 27

1           MR. LUBELL:  Your Honor, may I be excused?

2           THE COURT:  Yes.

3           MR. LUBELL:  Thank you.

4           MS. HENDY:  Good morning, Your Honor.  Amanda Hendy on

5    behalf of the debtors.  As Mr. Perez said, the next item on the

6    agenda is LBHI's motion for approval of a surrender agreement

7    and for authorization to abandon certain personal property,

8    filed at docket 10517.

9           Your Honor, LBHI leases a portion of a building

10   located at 85 Tenth Avenue here in New York City.  The lease

11   expires on December 31st, 2013.  And LBHI has an outstanding

12   obligation under the lease of over 12.4 million dollars.

13   Because the debtors have no business purpose for the office

14   space at 85 Tenth, LBHI negotiated and entered into a surrender

15   agreement with the landlord.  Pursuant to that surrender

16   agreement, the lease will expire by no later than December

17   31st, 2010 -- that's three years early -- and in exchange, LBHI

18   will pay to the landlord a fee in the amount of 3.5 million

19   dollars.  LBHI will also abandon any interest it may have in

20   certain miscellaneous property and equipment remaining at

21   85 Tenth Avenue.

22           LBHI estimates that by entering into the surrender

23   agreement it will reduce its obligations under the lease by at

24   least eight million dollars, possibly more depending on the

25   exact date of surrender.  Your Honor, the ultimate surrender of

Page 28

1   the lease and the surrender date depend on the landlord's

2   ability to attract a new tenant to 85 Tenth and to secure a

3   deal with that tenant.

4          The only response we received to the motion was by Mr.

5   Kuntz.  In his response, which he styled as an objection, Mr.

6   Kuntz provides some general information about the building at

7   85 Tenth Avenue.  He also stated that the debtors should

8   provide more information.  In response to Mr. Kuntz, it should

9   be noted that the debtors do not own the building at 85 Tenth

10  Avenue but merely lease a portion of the building.

11         The motion sets forth detailed information regarding

12  the proposed transactions, including the business

13  justifications in support of LBHI's decision to enter into the

14  surrender agreement, and the fully executed surrender agreement

15  is attached to the motion.

16         I'm not sure if Mr. Kuntz has anything to say today on

17  this, but we request that his response be overruled and, unless

18  Your Honor has any questions, that the Court enter the order

19  granting the motion.

20         THE COURT:  I'll hear from Mr. Kuntz, if he wishes to

21  speak.  I see him in the gallery.  My only question is one that

22  I probably shouldn't even be asking, because it goes to the

23  business nature of the transaction, and it's really whether or

24  not any effort was made to find a replacement tenant for the

25  premises prior to the decision to surrender and, in effect, pay

Page 29

1    what amounts to a hundred-cent dollar exit fee to the landlord.

2    So I'm interested in knowing efforts to, in effect, make a

3    better deal by obtaining a replacement tenant.  And I'm also

4    interested in knowing what, if any, role Barclays has in all of

5    this, since Barclays was using the space.

6           MS. HENDY:  Right.  Your Honor, that does go to the

7    business decision behind this.  And the lease does allow for

8    LBHI to seek a subtenant.  But the only problem there is that

9    there's only three years remaining on the lease, and this

10   building, I guess, is equipped for certain data services, which

11   is what Barclays was using the space for and how the space had

12   been used pre-petition.  And the debtors believe it would be

13   almost impossible to find a replacement tenant for that short

14   of a period at a space like this.

15          THE COURT:  But my question is whether there was any

16   effort made to obtain such replacement tenant and, to the

17   extent you know it, if you could share that.

18          MS. HENDY:  I'm not aware if -- I'm not sure if

19   they -- if LBHI actually did seek a replacement tenant.

20          THE COURT:  Is there anyone in court who knows the

21   answer to that question?

22          MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

23   Tweed.

24          Based on our separate diligence here, we were led to

25   believe that there was a nine-month effort here to seek a

Page 30

1   replacement tenant.

2           THE COURT:  I'm sorry, I couldn't hear you.

3           MR. O'DONNELL:  There was a nine-month effort here to

4   seek a replacement tenant, and no tenant could be found --

5           THE COURT:  All right.

6           MR. O'DONNELL:  -- basically because of the issues

7   highlighted by Ms. Hendy.

8           THE COURT:  All right.  Thank you.

9           Mr. Kuntz, do you wish to say anything at this point?

10          MR. KUNTZ:  Yes, Your Honor.  If I believe correctly,

11  I think the debtor filed a declaration from somebody from the

12  management team, but --

13          THE COURT:  It's a declaration of William Gordon.

14          MR. KUNTZ:  Right.  Is he here?

15          MS. HENDY:  No.

16          MR. KUNTZ:  Could we adjourn to put him on the stand?

17          THE COURT:  For what purpose?

18          MR. KUNTZ:  I would like to ask him some questions.

19  To me it's quite absurd that Lehman provided a detailed list of

20  gold-plated golf tees that they gave away.  Here's a 50,000

21  square foot space, probably loaded with all sorts of computer

22  equipment that nobody ow -- 'We don't know,' 'We don't have a

23  list.'  And every lawyer in this room has probably a cell phone

24  with a camera, and I'd like to find out if they visited the

25  premises and if there's a picture and an inventory.  One used

Page 31

1    Cisco router on eBay is 10,000 dollars, used.

2            Now, if the Court knows that there's half a million

3    dollars' worth of equipment the debtor's going to walk away

4    from, that's fine.  The Court would be making an informed

5    decision.  But I keep hearing of this de minimis stuff, and to

6    me de minimis is not a 10,000 dollar router.  De minimis is a

7    used copy of the newspaper they hand out on the subway as you

8    walk to the courthouse.

9            You know, the rent on this, seventy-dollars per square

10   foot -- I know and I'm aware that the New York State Internet

11   Security Department is right now looking for a lease.  And to

12   me, I think the Court needs more information before this is

13   just rubber-stamped.  I mean, it's unbelievable to me that they

14   have no picture of the space that Barclays is handing over.

15   You know, I mean, it's just a simple inventory.

16           THE COURT:  I don't understand your objection.

17           MR. KUNTZ:  They had an inventory of the gold-plated

18   golf tees they provided.

19           THE COURT:  Is your concern, Mr. Kuntz, that --

20           MR. KUNTZ:  I think it's a windfall for the landlord.

21           THE COURT:  I'm sorry, I'm in the middle of saying

22   something to you.  Is your concern, Mr. Kuntz, in respect of

23   the property which is being left behind in the space, or is

24   your concern with respect to the reasonableness of the 3.5

25   million dollar surrender payment and the business judgment of

LBHI, et al; LB1

Page 32

1    the debtor in walking away from this liability?

2             MR. KUNTZ:  Both.

3             THE COURT:  Okay, well, I don't understand your

4    interest in either of those points.

5             MR. KUNTZ:  My interest is as a creditor.  Like I

6    said, we have a declaration that it's de minimis, nobody knows,

7    'We think it's worthless.'  A ten thousan -- one router is

8    worth 10,000 dollars, used.  Now, if this building -- this

9    floor, this Internet hub, or whatever you want to call it --

10            THE COURT:  It's a data center.

11            MR. KUNTZ:  -- data center, if it's full of equipment,

12   and the debtor wants to abandon it.  And if the Court is aware

13   that it's going to be abandoning two-, three-, four-, five

14   million dollars' worth of equipment, the Court is then making

15   an informed decision.  But just to say it's de minimis when

16   nobody's provided inventory, nobody has a picture -- the

17   gentleman who made the declaration, I'm sure, has a digital

18   camera available to him.  You know.  I owned a 50,000 square

19   foot building out in Ohio; I'm aware of how much space is in

20   there.  And even de minimis assets have value in this city.

21            THE COURT:  Okay --

22            MR. KUNTZ:  Thank you, Your Honor.

23            THE COURT:  Let me find out if Mr. Gordon is available

24   today.  Frankly --

25            MS. HENDY:  Well, Your Honor --

Page 33

 1          THE COURT:  -- I think it's extraordinary that there

 2    would be a contested matter with the declarant not in court.

 3          MS. HENDY:  Your Honor, in response to Mr. Kuntz,

 4    prior to filing the motion, Barclays had not yet vacated the

 5    premises; since filing the motion, they have.  And the debtors

 6    have visited the site and confirmed that it is clean and that

 7    the only remaining fixtures in the building are some desk

 8    furniture and some cubicles, some HVAC filters and some

 9    remaining boxes of cable.

10          THE COURT:  All right, but where is Mr. Gordon?

11          MS. HENDY:  We can reach out to him and see if he's --

12          THE COURT:  Excuse me?

13          MS. HENDY:  We can reach out to him if you'd like

14    to --

15          THE COURT:  I think you should reach out for Mr.

16    Gordon.  What we have is a contested matter with, in effect, a

17    request for the declarant to be available for questioning.  And

18    I think it's good practice, whenever there is a contested

19    matter, for the declarant to be present in court to avoid this

20    kind of problem.

21          Let's adjourn this to a later time today.  Assuming

22    that Mr. Gordon can be available before the close of the Monday

23    agenda, we'll recall it; otherwise, he can be available this

24    afternoon.  I know Mr. Kuntz travels from various locations but

25    Nantucket in particular, and so, since he's here, let's see if

Page 34

1    we conveniently accommodate his request to have a witness.

2         MS. HENDY:   Okay.   Thank you, Your Honor.

3         MR. PEREZ:   Your Honor, the next matter on the agenda

4    is the Sun and Moon matter, which is docket number 2.   Your

5    Honor, Sun and Moon is a real estate development in Marseilles,

6    France.   It has both a commercial piece and a residential

7    piece.   The debt portion of this loan, of the financing of this

8    project, is held by Bankhaus.   Pursuant to the Bankhaus motion,

9    LCPI was given the opportunity to purchase this loan, and it

10   didn't occur at the time that most of the closings have

11   occurred, and it's going to be purchased by a joint venture.

12   Currently, LBHI owns a part of the preferred equity in the

13   structure that will own the building.   So the -- LBHI will be

14   a -- will put in preferred equity.   And in addition, LCPI will

15   put in some loans.

16        Your Honor, the -- in essence, what we're seeking to

17   do is two things by this motion:   One is to go ahead and

18   purchase the Bankhaus loan and, secondly, to provide what's

19   called the gap funding, in order to be able to build out the

20   property.   The -- LCPI and LBHI are both going to be

21   contributing monies.   LCPI will be providing an eight million

22   dollar hedge loan.   In addition, LCPI will be providing the

23   revolver, up to seventeen and a half million.   And that money,

24   because the project is going to be staged, it will -- in

25   essence it will be providing forty-seven and a half million,

Page 35

1   but at no time can it exceed seventeen and a half million.  And

2   then LBHI will be funding the preferred equity basically on a

3   thirty-seven and a half/sixty-two and a half, with LBREP.

4   LBREP is in turn seventeen percent owned by LBHI.  So to the

5   extent that there's a capital call, they will do that.

6        Your Honor, we have -- there have been -- there was an

7   objection filed by Mr. Kuntz, which we're going to address.

8   And then there has been a -- there was a reservation of rights

9   that was filed, again, by the ad hoc committee.  In response to

10  that, we put in a more fulsome reservation of rights and then

11  in addition, at their request, we included in the order a

12  provision that LCPI and LBHI will attempt to harmonize their

13  positions in the capital structure so we don't find ourselves

14  in a position where one debtor would be in a position to

15  foreclose on another debtor, and then we're going to be working

16  on that.

17       Mr. Fitts is in the courtroom, and I have a --

18       THE COURT:  Let me ask you about what you've just said

19  about harmonizing those positions.  That's something to happen

20  in the future?  That is not -- that hasn't yet been fully

21  developed?

22       MR. PEREZ:  Correct, Your Honor.  The -- this is a

23  very complicated structure.

24       THE COURT:  I looked at some of the diagrams in

25  your --

Page 36

1          MR. PEREZ:  And I have a little bit --

2          THE COURT:  -- in your motion papers.

3          MR. PEREZ:  I have a little bit -- if I may approach,

4     Your Honor?

5          THE COURT:  Sure.

6        (Pause)

7          MR. PEREZ:  Your Honor, it's a very complicated

8     structure, and there are various Lehman entities at the --

9     at -- in connection with the structure.  There's also

10    significant tax and regulatory implications of who holds what.

11    But currently the only Lehman entity that has the right to

12    purchase the Bankhaus loan is LCPI.  So we have to -- and

13    that's pursuant to the court order that we did.

14          Now, at some point our goal is going to be to

15    rationalize the new money that's going in, so that everybody

16    will be in a position so that the interest, in essence, will be

17    fully aligned.  You know, we actually believe that the

18    interests are currently aligned, because I think that, you

19    know, based on the work that's being done, the goal is not only

20    to get a full recovery, but to get a recovery for the old

21    equity as well.  And under various stress scenarios that we've

22    alluded to in the motion and that Mr. Fitts is prepared to

23    proffer, they still think that they would even get a small

24    return on the old equity.

25          So it is something that is going to happen in the

LBHI, et al, LB1

Page 37

1    future, but it's something that we're working on in order to be

2    able to address the concern.  And we've created a full

3    reservation of rights to the extent that people aren't

4    satisfied with the way we handle it in the future.

5              THE COURT:  All right.  And what's the timing

6    imperative to resolve this prior to the time that the

7    rationalization of the respective interests has occurred?

8              MR. PEREZ:  Your Honor, there is -- there are --

9    there's a need, from the standpoint of the -- to move forward

10   with the projects.  I think LBREP has been, in essence, pushing

11   us to move forward with this project.  And frankly, Your Honor,

12   Bankhaus was approved, I think, at the beginning of the year.

13   And literally we have been working -- or the real estate folks

14   have been working since that time to come up with a structure

15   that allows us to move forward.  So there is significant need

16   to do that.

17             Secondly, Your Honor, we do have an outstanding loan

18   out there that we do need to restructure.  I mean, KBC still

19   holds twelve percent of the Bankhaus loan, which is in default,

20   and we don't want to be foreclosed out.  So by stepping into

21   the shoes of Bankhaus, we will hold eighty-eight percent of

22   that loan and we'll be able to restructure that loan.  So

23   that's probably the biggest primary driving factor of why we

24   need to do it currently.

25             THE COURT:  All right.  Now, do you have a declarant

L Bar, et al, LB1

Page 38

```
 1   for this one?

 2          MR. PEREZ:  I do, Your Honor.  I have a short proffer

 3   for Mr. Fitts, who's in the courtroom.

 4          THE COURT:  Is there any objection to proceeding by

 5   means of a proffer?

 6          MR. KUNTZ:  I'd like to call him to the stand, Your

 7   Honor.

 8          THE COURT:  Well, does that mean that you object to

 9   the proffer?

10          MR. KUNTZ:  Well, I'm going to ask to call him to the

11   stand anyway, but let's hear the proffer.

12          MR. PEREZ:  Your Honor, this is the proffer of Mr.

13   Jeff Fitts, managing director at Alvarez & Marsal.  Mr. Fitts

14   has more than nineteen years' experience in assisting insolvent

15   and troubled companies; focus on operation and financial

16   restructuring.  Prior to joining A&M, he was a managing

17   director at GE Commercial Finance, and prior to that he was in

18   the workout division of Citicorp.

19          Mr. Fitts was assigned to the Lehman debtor in

20   September of 2008.  He currently serves as co-head of the real

21   estate group, which includes all of the various debtors.  Mr.

22   Fitts' primary responsibility includes the day-to-day

23   management and oversight of the real estate portfolio,

24   including all the finance and related activities.

25          As co-head of the real estate group, Mr. Fitts
```

Page 39

1    oversees a number of the employees, including Jim Blackmore,

2    Kathryn Webster and Paul Coles (ph.), who have been actively

3    involved -- who are in Europe and have been actively involved

4    in the Sun and Moon transaction.  Mr. Fitts is also a member of

5    the real estate group's investment committee, which is charged

6    with approving the various decisions.

7            Mr. Fitts would testify that on January 14, 2010 the

8    Court entered the Bankhaus order which authorized LCPI to

9    purchase, among other things, Bankhaus interest in loans where

10   Bankhaus was the lender of record.  These included the

11   so-called M loans, which comprise the senior debt in a mixed

12   commercial and residential project known as Sun and Moon.  LBHI

13   owns an 8.9 percent equity interest in Sun and Moon through a

14   joint venture with LBREP, which owns the other 86 percent of

15   the equity.

16           Mr. Fitts would testify that at the time that the

17   Bankhaus agreement was executed and approved, it was

18   contemplated that LCPI would purchase Bankhaus' right, title

19   and interest in the M loans and would assign the M loans to an

20   entity to be determined.  He would further testify that it was

21   contemplated that the ultimate transfer of such loan would be a

22   joint venture between LCPI and LBREP as shareholders.

23           Since that time, both LCPI and LBREP have agreed to

24   the acquisition of the M loans from Bankhaus, through an

25   AcquisitionCo (ph.) which will be owned thirty-seven percent by

Page 40

1    Bankhaus and sixty-two percent by LBREP and will be funded in

2    those proportions.  Mr. Fitts would testify that the purchase

3    of the M loans through a joint venture will facilitate the

4    overall restructuring of the Sun and Moon project and unlock

5    the substantial value for the benefit of both debtors.

6         Mr. Fitts would testify that the Sun and Moon units

7    are currently in a state of disrepair, have been for several

8    years.  When LBREP and LBHI made their initial investment, the

9    business plan was to vacate the premises and refurbish the

10   residential and commercial units and sell the residential units

11   immediately and lease the commercial units, with the aim of

12   ultimately selling the entire project as a portfolio.  Mr.

13   Fitts would testify that this remains a business plan, and the

14   plan results in a total funding gap of approximately 102

15   million euros.

16        Mr. Fitts would testify that the funding gap may be

17   satisfied by funding the M loans, which are currently in

18   default, and that accordingly LCPI and LBREP are willing, upon

19   the AcquisitionCo's purchase of the debt from Bankhaus, to work

20   with KBC in order to place the appropriate waivers in place to

21   allow the continued funding of the M loans.  Mr. Fitts would

22   further testify that, to maximize the LCPI and LBHI's

23   respective investments in Sun and Moon, it's in the best

24   interest of the estate to provide additional financing,

25   so-called gap financing, in both the form of debt and equity

Page 41

1    for the project.  In that connection, the portion of the gap

2    funding would consist of a euro term loan, which could be used

3    to make a termination payment on an interest rate swap.  This

4    is the hedging loan.  In addition, there would be a 17.5

5    million dollar revolver which could be drawn down for capital

6    expenditures, as described in the original loan documents.  Mr.

7    Fitts would testify that, while the total drawings on the

8    revolver is capped at 47.4 million, the outstanding balance of

9    the revolver can never exceed 17.5 million.

10          Mr. Fitts would testify that any monies coming to

11   AcquisitionCo on a senior basis would be used to pay down these

12   loans initially.  In addition, there would be a preferred

13   equity investment of 40.6 million dollars, which would be split

14   62.5 percent by LBREP and 37.5 percent by LBHI, with a 25

15   percent accruing return which would come out ahead of any of

16   the existing equity and would fund the additional funding gap.

17   Mr. Fitts would testify that the funding gap amounts are

18   necessary for Sun and Moon to meet its current business plan

19   and to provide a maximum return for both LBHI and LCPI's

20   investment.  The success of this project depends on the

21   rejuvenation of the areas around the Rue de la Republique in

22   Central Marseilles, and the capital expenditure program is

23   intended to have that effect.

24          Mr. Fitts would testify that the refurbishment of the

25   residential portion of the Sun and Moon project would not only

Page 42

```
 1   increase the sale of the residential units but will also repair

 2   and upgrade the facade of the buildings that will be used

 3   primarily by commercial tenants, providing a more attractive

 4   environment for the retailers.  Mr. Fitts would testify that

 5   the capital improvements on both the residential and commercial

 6   portions of the project will be carried out simultaneously and

 7   will complement each other, resulting in a total refurbishment

 8   of this major area.

 9          Mr. Fitts would testify that the funding gap needs to

10   be provided in order for Sun and Moon to meet its business plan

11   and be in a position to allow the returns that have been

12   anticipated.  As co-head of the real estate group, he has

13   concluded, in his judgment, that providing this is in the best

14   interests of each of the debtors' respective estates.  This --

15   and he would testify that this was reached after extensive

16   consultations and analysis that were prepared by Mr. Blakemore,

17   Ms. Webster and Mr. Coles, each which have been involved

18   directly in negotiating the terms of these agreements.

19          THE COURT:  Who are all those people?

20          MR. PEREZ:  Your Honor, these are the three senior

21   real estate people for Lehman in Europe --

22          THE COURT:  Okay.

23          MR. PEREZ:  -- who -- they report to Mr. Fitts.

24   They're basically his employees in Europe.

25          While Mr. Fitts believes in the likely success in the
```

Page 43

1    Sun and Moon business plan, he notes that the real estate group

2    considered how an investment would fare under stress scenarios

3    and take into account both a delay in the completion of the --

4    and exit from the project, and a delay in the ability to expend

5    the capital expenditures, a delay in sales and leasing, and a

6    decline in both residential sales and estimated rental returns,

7    and an increase in the required capital expenditures.

8            Mr. Fitts would testify that in the stress scenarios

9    that demonstrate that LCPI would still likely generate a profit

10   from its investment, LBHI would still be in a position to

11   protect its investment under a stress scenario and only in the

12   worst case would they not be able to recover the original

13   investment.

14           Mr. Fitts has testified that overall in his business

15   judgment that the further funding of the Sun and Moon project

16   is not only necessary to protect the debtors' previous

17   investments in the projects but also to ensure that the value

18   of these assets is maximized.

19           THE COURT:  Okay, recognizing that Mr. Kuntz has

20   already requested the opportunity to cross-examine and that Mr.

21   Fitts is in the courtroom, is there any objection to my

22   receiving the proffer as direct testimony?

23       (No response)

24           THE COURT:  There's no object and I accept it as

25   direct testimony.

Page 44

1          Is there anyone else who wishes to examine Mr. Fitts

2     when he's called to the witness stand?

3          (No response)

4          THE COURT:  Probably not.

5          Mr. Kuntz, let met just ask you if you can estimate,

6     because we have a lot of people in the courtroom --

7          MR. KUNTZ:  Five minutes, Your Honor.

8          THE COURT:  Okay.  Let's call Mr. Fitts.

9          Mr. Fitts, please raise your right hand.

10         (Witness duly sworn)

11         THE COURT:  Be seated, please.

12         Before you begin, Mr. Kuntz, I just want to be clear

13    about something.  In the ordinary course of the management of a

14    calendar as complicated and as lengthy as we have on our

15    omnibus hearing days, we rarely have unannounced evidentiary

16    hearings.  Indeed there is a Local Rule that governs the

17    conduct of evidentiary hearings.  I'm not waiving that Local

18    Rule in this instance, but I'm advising you, since you're pro

19    se, that in the future if you are going to need an evidentiary

20    hearing to prosecute an objection, there should be advance

21    notice of the fact that there's going to be an evidentiary

22    hearing.  That's both --

23         MR. KUNTZ:  I'll try and make it --

24         THE COURT:  -- a matter of convenience to the Court

25    and a matter of convenience to the many people who are here

1    observing but also here for other reasons.

2          MR. KUNTZ:  I understand, Your Honor.  Thank you.

3    CROSS-EXAMINATION

4    BY MR. KUNTZ:

5    Q.   Could you explain how this property got in such bad shape?

6    A.   I entered the estate in September 2008.  How it got to

7    that stage I couldn't give you a history on.

8    Q.   So it just happened?  It just --

9    A.   No, I know it didn't happen.  You asked could I explain

10   how it got to this state, and the answer is I was -- showed up

11   in September 2008 and this property was in its current state at

12   that time.

13   Q.   Do you have any reports or information as to how it got to

14   this condition?

15   A.   Not that I can recall.  I mean, I've seen a lot of

16   information on this property.  Going through the history of how

17   it got to that state wasn't particularly time well spent for

18   me.  I was dealing with the here and now.

19   Q.   Can you give us the actual address in Marseilles?

20   A.   No, I sure cannot.

21   Q.   Can you -- have you done any inquiry into the economic

22   conditions in Marseilles or south of France?

23   A.   Absolutely part of our underwriting was to review the

24   economic conditions of the local area and the project itself.

25   Q.   Can you give us the general vacancy rates for these kinds

LBar, et al, LB1

Page 46

1    of buildings in Marseilles?

2    A.   No, I cannot.

3    Q.   Can you tell us how much the debtor would lose if they

4    abandoned their interest in the property?

5    A.   The debtors' equity interest, which I think was in the

6    motion, the total equity in it was 111 million euros, I

7    believe.  The debtor LBHI's equity interest was, off the top of

8    my head, 8.9 million euros.  And then obviously LBREP has quite

9    a large equity investment, and the estate has an interest in

10   LBREP itself.

11           MR. KUNTZ:  Thank you, Your Honor.

12           THE COURT:  Okay.  Before you sit down, Mr. Kuntz, I

13   have a question for you.  For you.

14           MR. KUNTZ:  Thank you, Your Honor.

15           THE COURT:  The agenda shows you listed as an

16   objector, but there's no docket reference to the objection that

17   you filed.  And I haven't seen your written objection,

18   because --

19           MR. KUNTZ:  On the Sun and Moon?

20           THE COURT:  On Sun and Moon.

21           MR. KUNTZ:  I don't have it with me, but I believe the

22   TBD, to --

23           THE COURT:  I just want to make sure that you in fact

24   have done all that you need to do to be prosecuting an

25   objection.  I haven't seen the papers.  I saw your papers on

In Bar, et al, LBI

Page 47

1   the other -- on 85 Tenth Avenue, but not on this.

2          MR. KUNTZ:  I can't answer Your Honor right now, but

3   I'm pretty sure it was filed.  I think that was filed --

4          THE COURT:  Well, apparently Mr. Perez has a copy, so

5   that's a good start.

6          MR. PEREZ:  The only thing it doesn't have attached

7   is -- he attached a flight itinerary, because -- to suggest

8   that the Court take a field trip to the property.  And there

9   are, like, Expedia or something --

10          MR. KUNTZ:  Air France.

11          MR. PEREZ:  -- Air France tickets for six people.  But

12   that's not attached to this, Your Honor.

13          THE COURT:  Mr. Kuntz, that's a very generous

14   suggestion.

15          MR. KUNTZ:  I actu -- if I recall, Your Honor, I

16   believe I mailed that last week and it was docketed on the

17   16th.

18          THE COURT:  Fine.  I just didn't see it on the docket

19   when I was preparing for today's hearing.

20          MR. KUNTZ:  But it just -- if I can make my brief

21   argument and then --

22          THE COURT:  All right.

23          MR. KUNTZ:  Or maybe the ad hoc committee wishes to

24   ask questions, I'm not sure.

25          THE COURT:  Well, you're standing --

LBI, et al, LBI

Page 48

1          MR. KUNTZ:  Well, Your Honor basically approved

2    warehousing an empty building in Stamford, Connecticut.  This

3    property is seven time zones away, in a foreign country well-

4    known for its labor strife, its construction strife, its

5    Communist labor leagues, and a city not well-received in

6    American investments, if you -- my observations, if you will.

7    And it seems to me, before the Court approves a hundred million

8    dollar maybe-it'll-work kind of situation, that the Court

9    consider adjourning the matter to Marseilles and seeing what's

10   really there.  I mean, the witness doesn't even know the

11   address of the property that the Court's supposed to approve a

12   hundred million dollar investment in.  Thank you.

13          THE COURT:  Okay.

14          Mr. Shore is moving forward.

15          MR. SHORE:  I have no questions for the witness,

16   though, so --

17          THE COURT:  Well, before we excuse Mr. Fitts, let me

18   just ask Mr. Fitts a question about the business plan itself

19   and how the business plan was developed.

20          I'd like to know more about the process pursuant to

21   which you and those working with you developed a business plan

22   for the repositioning of the property, together with any

23   consultants from outside of your group that you consulted and

24   developed in the business plan in coming up with assumptions

25   you deem reasonable.

Page 49

1           THE WITNESS:  When this property was purchased by

2    LBREP and LBHI, there was obviously a business plan in place at

3    that time.  That business plan still exists.  So the -- in

4    summary, of selling the residential portions block by block, as

5    they are rehab, and obviously leasing up the retail, as it is

6    rehabbed as well, that same business plan from, I believe, 2007

7    still exists in concept.  The focus that we had is obviously,

8    given the downturn that began in September 2008, whether or not

9    that plan was still feasible and that the structure that was

10   financing it was still appropriate.  So everything that was

11   done was to that end.

12          The team that was in place, Mr. Blakemore, who ran

13   Lehman's European operation, and the two people that worked for

14   him, had previously significant experience with this project.

15   The individual from LBREP, who, again, are still there and had

16   done the deal originally, and Atame (ph.), who is the third-

17   party asset manager for this project and also a small equity

18   holder, has also been involved since the beginning.

19          So from a continuity standpoint, what happened was

20   this project stalled because of the Lehman bankruptcy and the

21   financing issues that came about because of that.  The

22   underlying business plan hasn't changed and was obviously

23   refreshed to understand what's going on with today's market.

24   But, in effect, it was just a confirmation that it was still

25   appropriate today as it was then.  Does that answer your

Page 50

1    question?

2         THE COURT:  It does, except for the involvement of any

3    independent third parties in testing the reasonableness of the

4    business plan.

5         THE WITNESS:  Off the top of my head, I couldn't tell

6    you who -- whether there were independent third parties in

7    this.  Again, as between the debtors' professionals, the LBREP

8    professionals and the Atame professionals, all of whom are

9    very, very experienced in the real estate development and

10   finance area, third-party -- I don't know off the top of my

11   head.  I believe there was a new appraisal that was done as

12   part of this process; I want to say that was ninety days ago.

13   But, again, for us it was confirmatory.  But I couldn't give

14   you off the top of my head a litany of outside third parties.

15   Frankly, there are enough people involved in this process.

16   Having outside third parties wasn't deemed something that we

17   thought was necessary.

18        THE COURT:  Mr. Fitts, I take it that it is your

19   judgment, as the individual charged with this asset, that it

20   makes sense to invest additional monies into this project as

21   opposed to simply allowing the equity that Lehman has in it to

22   be lost?

23        THE WITNESS:  It's absolutely my business judgment to

24   invest the additional monies.  This is, as was stated in the

25   proffer, a property that is in a state of disrepair.  So if you

Page 51

1    look at the alternative, which is find a way to sell out what

2    is there, you effectively have emptied out a project and would

3    be trying to sell it or liquidate it in exactly the worst time.

4    Completing the business development with this new investment

5    versus the alternatives is a far better outcome than a sale in

6    the short term.

7              THE COURT:  All right.  Thank you.  You're excused.

8         (Witness excused)

9              THE WITNESS:  Thank you.

10             THE COURT:  And, Mr. Shore, it's now your turn.

11             MR. SHORE:  Thank you, Your Honor.  Chris Shore from

12   White & Case, on behalf of the ad hoc group.

13             We're supportive of the deal, but I have two issues to

14   present to the Court, and I'll try to be brief.  The motion was

15   filed on July 27th, seeking to have the debtors -- and the part

16   we were focusing on was the new investment on a debt and equity

17   gap funding.

18             We're obviously focused on LBHI issues, and the

19   question in our mind arose, 'Why is LBHI putting in equity

20   behind LCPI?'  To clarify the record, I believe Mr. Perez said

21   it was a forty million dollar loan.  It's a forty million euro

22   loan -- or forty million euro investment that's going behind

23   that.

24             We immediately called debtors' counsel and set up

25   calls and, based on those calls, it's not clear that counsel or

Page 52

1    the professionals were looking at it on an estate-by-estate

2    basis and spotted that issue about why it's getting put in

3    behind.  And that led to the reservation of rights.  They

4    wanted to proceed now, but the idea was that they'll try to

5    harmonize that, because it's not clear from the documentation

6    that LBHI has to put in equity behind LCPI and we want to avoid

7    a situation that, if it all goes south, that LCPI's in a

8    position of controlling not only the pre-petition equity

9    investment of LBHI but also the post-petition preferred equity

10   investment.

11         That raises two issues in our mind.  First of all,

12   it's difficult to do this on an ad hoc basis where we're

13   looking through a pleading and trying to figure out where these

14   issues are arising.  And I think there probably needs to be

15   better disclosure going forward as to who's deciding and what

16   the respective rights of the estates are.  I mean, this is a

17   big equity investment for a debtor to be making, and we can't

18   spot all the issues.  And above all, the Court's being asked to

19   decide on a debtor-by-debtor basis in approving an LBHI equity

20   investment, approving an LCPI debt investment here.  And I

21   think those issues need to be in the foreground.

22         We're happy with the reservation of rights, but there

23   is the whole host of interdebtor issues that are being reserved

24   on.  We had the RACERS motion today that we're reserving on,

25   and it begs the question as to when we're going to resolve

1    that.  People keep saying it's reserved for another day, but we

2    don't have any visibility as to when the debtors intend to do

3    that.

4          With respect to, just, asset ownership issues, which

5    estate owns which assets, we think the disputes are in the tens

6    of billions.  Talking about interdebtor issues, I think that's

7    probably a twelve-figure number.

8          Again, we've said that we need to have a process.  To

9    date, there hasn't been any engagement on that.  But there

10   really needs to be something done, because in order to

11   construct a plan to inform creditors as to what their

12   distributions are going to be, and to have an informed voting

13   body here, there really needs to be something going on.  The

14   ball is in the debtors' court, with the help from the UCC, as

15   to coming up with a plan for that other day, and we expect

16   they're going to engage on that at some point.

17         Unless you have any questions, I have nothing further.

18         THE COURT:  No, I don't.

19         MR. SHORE:  Thank you.

20         MR. O'DONNELL:  Your Honor, Dennis O'Donnell of

21   Milbank, on behalf of the official committee again.

22         Three things, Your Honor.  One, in terms of your

23   question about independent third-party review of this

24   transaction, the committee, as has always been the case with

25   respect to significant transactions, spent a substantial amount

Page 54

1    of time reviewing this transaction; it's probably a six-month

2    process for us in terms of looking at several iterations of the

3    proposed transaction, in terms of structural issues in

4    particular.  I mean, we were not -- if anyone thinks that we

5    weren't looking at how things were arranged here in terms of

6    LBHI versus LCPI, that is not the case.  In fact, there were

7    earlier iterations of this transaction that had different

8    arrangements, and we worked through it and came out where we

9    came out.  We agree that there are still issues that need to be

10   addressed, and the notion of trying to harmonize interests

11   makes a great deal of sense, and we'll work with the debtors in

12   that context.

13          In terms of independent valuation of the situation,

14   our financial advisor FTI was heavily involved in looking at

15   this, did use its own European resources to confirm that the

16   economic conditions in Marseilles make this an investment worth

17   making, and you should add that to your considerations.

18          And finally in terms of Mr. Shore's comments, we, as I

19   said previously, are very aware of the intradebtor issues here.

20   They do need to be resolved, but we believe they'll be resolved

21   as part of an ongoing plan process that the Court is aware of

22   and do not need to be addressed further today.

23          THE COURT:  All right.

24          MR. PEREZ:  Two points, Your Honor.  It is forty

25   million euros, but LBHI's percentage is thirty-five percent.

Page 55

 1   So it's about fourteen, fifteen million dollars -- euros, I'm

 2   sorry.

 3          Second, Your Honor, we are aware of Mr. Shore's

 4   issues, and I think we're working toward, you know, coming up

 5   with a process to resolve those issues; I just don't think

 6   we're in a position to do that today.  I think right now our

 7   goal, frankly, not different from what we did with RACERS:

 8   maximize the dollars that we're talking about and make sure

 9   that everybody's rights are preserved.  And I may sound like a

10   broken record, but one of these days I'll have a proposal.

11          THE COURT:  I'm sure you will.

12          I'm approving the transaction.  It's a very

13   complicated transaction.  And the chart is probably more

14   indicative of the kinds of real estate investment structures

15   that were current in 2005 to 2007 than they are indicative of

16   anything that a rational person would put on a piece of paper

17   today.

18          The unbundling and unpacking of these transactions

19   seems to have become Mr. Perez's principal work in this case,

20   and I don't envy his task.  The RACERS transaction, which

21   preceded the current motion, is but one example of a number of

22   similar transactions that need to be rationalized, to use the

23   term that has been described during the argument today, in

24   order to move forward in maximizing value for the estate and

25   its creditors.

Page 56

```
 1              Mr. Kuntz is the only objector to this transaction,

 2    and I think it's notable that the creditors' committee which

 3    has a subcommittee focused on real estate assets, and the ad

 4    hoc committee that has the resources to retain its own

 5    professionals, both support the business judgment that

 6    underlies the investment in this dilapidated real estate

 7    project in Marseilles.

 8              As was the case with the piece of property in

 9    Connecticut that originally motivated Mr. Kuntz to take an

10    active role in connection with real estate matters in this

11    bankruptcy case, the portfolio of real estate that Lehman

12    invested in is a given.  The question becomes how best to

13    reposition those assets and improve the overall realization for

14    creditors with respect to investments that have already been

15    made.

16              I'm not going to second-guess the judgment that has

17    been made by Mr. Fitts and those who work with him; nor am I

18    going to second-guess the judgment of the creditors' committee

19    that has reviewed this transaction.  I'm approving it.  I'm

20    overruling Mr. Kuntz's objection but would note that, given the

21    location of the property in Marseilles, and given the

22    statements that have been made regarding the property's

23    condition, it is not readily apparent, without close

24    investigation, that this is the kind of investment that one

25    would ordinarily choose to make.  I accept it, however, as the
```

Page 57

1    debtors' business judgment and I approve it.

2            MR. PEREZ:  Thank you, Your Honor.  I believe those

3    are the matters that Mr. Fitts was here on.  May he be excused?

4            THE COURT:  Mr. Fitts, you may be excused.

5            MR. PEREZ:  Your Honor, the next matter on the agenda

6    is the motion to provide Lazard an indemnity with respect to

7    their retention in connection with the Innkeepers case.

8            THE COURT:  Okay.

9            MR. PEREZ:  Your Honor, in connection with the

10   Innkeepers case, Lehman ALI, who is the holder of the loan, has

11   retained Lazard to be their financial advisor.  Their monthly

12   fee is 150,000 dollars.  Their fee, if the matter is

13   restructured, is a million-five.  The reason why the motion is

14   being filed in this court is because LBHI has agreed to

15   backstop Lehman ALI in the event that Innkeepers, in their

16   case, doesn't pay the amounts owed as well as provide an

17   indemnity.

18           In addition, Your Honor, because LCPI has the economic

19   interest in the Innkeepers loan, they've agreed to, in essence,

20   indemnify LBHI to the extent that LBHI's called upon to do it.

21   So it'll be coming out of the LCPI estate.

22           There have been -- there were two changes that were

23   made to the order as filed; one change reflected an adjustment

24   in the monthly amount in the event that it goes past ten

25   months, and that was done at the request of the committee.  The

Page 58

1    other change was to make clear that LCPI had the authority to

2    reimburse LBHI, to the extent that it was called upon to do it.

3           We did file a declaration by Mr. Lascher, who is the

4    principal.  And he's here in the courtroom in connection with

5    the Innkeepers motion and we have a proffer for him.  But in

6    connection with that, he's here; he did file a declaration in

7    support of that motion.  We did receive one objection from Mr.

8    Kuntz.  But that's the sum and substance of the motion, Your

9    Honor.

10          THE COURT:  Okay.

11          Mr. Kuntz, what's your position?

12          MR. KUNTZ:  I think, as everybody in the court knows,

13   Lazard is one of the major financial institutions of this

14   country.  And from what I understand, they manage a hundred

15   billion dollars in assets.  I don't think it's the business of

16   the debtor, or any of the debtors, to guarantee Lazard fees in

17   another case where they're engaged as a professional.  It just,

18   to me, is ludicrous.  If Lazard is not willing to run the risk

19   of nonpayment after being engaged as a professional in the

20   Innkeepers case, then they can get out of the kitchen, so to

21   speak.  There's any number of other professional firms that

22   would be more than happy to take up Innkeepers and add that to

23   their, you know, whatever you'd call it, CV of cases that

24   they've done, and run the risk of nonpayment.  It just -- to

25   me, it's just racking up more professional fees in this case.

Page 59

```
 1              I mean, just the other day, Mr. Miller sat here for

 2    two hours with Mr. Feinberg (ph.); 4- or 5,000 dollars in fees

 3    that they're going to be looking to be paid to merely backstop

 4    the claims procedure.  It just -- the clock's running and

 5    running and running, and every big-name firm comes -- I mean,

 6    Your Honor has approved almost a thousand applications for

 7    attorneys out of this district to be engaged in this case.

 8    Now, maybe a thousand's a little high, but it seems to me that,

 9    if Lazard wants to take the engagement of Innkeepers, they can

10    look to Innkeepers to be paid, period.

11              THE COURT:  Okay.  I understand your position.

12              MR. KUNTZ:  And I look forward to Appaloosa's

13    presentation.

14              MR. PEREZ:  Your Honor, just -- I just want to make

15    sure the record is correct.  Innkeepers, I believe, has their

16    own financial advisor, Molis.  Lazard is being retained on

17    behalf of Lehman, who is a lender to Innkeepers.  And

18    Innkeepers, as part of the plan support agreement, has agreed

19    to reimburse Lazard.  So what we're really looking at here is a

20    client reimbursing its own professional to the extent that the

21    borrower doesn't pay.

22              THE COURT:  I understand.

23              Is there anyone here on behalf of Lazard?

24              MR. PEREZ:  Mr. Aebersold is here, Your Honor.

25              THE COURT:  Is there anything that Lazard wishes to
```

Page 60

```
 1    say or contribute to this contested matter?

 2          There's no obligation to say anything, but do you wish

 3    to say anything as to why it is reasonable and appropriate for

 4    Lazard to be requesting this kind of belt-and-suspenders

 5    financial support for the engagement in the Innkeepers matter?

 6          MR. AEBERSOLD:  Yes, Your Honor.

 7          This is Brandon Aebersold from Lazard.

 8          The way that our engagement --

 9          THE COURT:  Why don't you come all the way forward.

10    (Pause)

11          MR. AEBERSOLD:  Hi, Your Honor.  It's Brandon

12    Aebersold with Lazard.  I worked with Lehman Brothers,

13    representing them as a lender in the Innkeepers case.

14          The reason that this is necessary in this instance is

15    our engagement letter, which is actually signed by Dechert,

16    who's an advisor to Lehman as the lender -- the company,

17    Innkeepers, is a party to that engagement, but they're only

18    obligated to pay our fees in the event that a transaction is

19    consummated.

20          As such, Lehman ALI is also a party to that engagement

21    letter.  However, the creditworthiness of Lehman ALI, without

22    having enough information to make that judgment, we felt that

23    it was necessary that, in the event that that transaction's not

24    consummated with Innkeepers, and if the creditworthiness of

25    Lehman ALI were not of substance that we'd feel comfortable, we
```

Page 61

```
 1   would need a backstop to those fees from LBHI in this

 2   proceeding.

 3          So there is a risk in this matter that, to the extent

 4   the transaction is not consummated with the company in the

 5   Innkeepers matter, that they would not be obligated to pay our

 6   fees.

 7          THE COURT:  Now, there are monthly fees and then there

 8   is a so-called success fee when a transaction is consummated,

 9   correct?

10          MR. AEBERSOLD:  That is correct, Your Honor.

11          THE COURT:  You're not talking about a guarantee of

12   the transaction fee; you're talking about a guarantee of the

13   monthly fee?

14          MR. AEBERSOLD:  No, Your Honor.  It's actually -- it

15   is essentially a guarantee of the overall fee, which includes

16   the monthly fees and the restructuring fees.  A percentage of

17   those monthly fees credit against the transaction fee.  So, in

18   essence, the arrangement -- and there's three parties to our

19   engagement letter; the first is the company, which is

20   Innkeepers, who has agreed to pay our fees in the event a

21   transaction is consummated with them.  In the event that that

22   is not the case or Innkeepers does not fulfill those

23   obligations, Lehman ALI would be the party that would pay those

24   fees.  However, in the event that neither the company nor

25   Lehman ALI pays Lazard's fees, this motion is for LBHI to be
```

Page 62

1    allowed to make those payments.

2         THE COURT:  Okay, well, here's what I'm just trying to

3    understand.  Assuming no transaction is consummated in the

4    context of the Innkeepers bankruptcy case, does Lehman ALI or

5    LBHI, under this arrangement, end up obligated to pay your fees

6    notwithstanding the fact that a transaction didn't become a

7    consummated transaction, or is it only an undertaking to cover

8    any monthly fees that haven't yet been paid in accordance with

9    the engagement letter?

10        MR. AEBERSOLD:  In the event our fees are not paid

11   pursuant to the engagement letter, either the company or Lehman

12   ALI, for whatever reason -- LBHI would be obligated to make

13   those payments.  There's a nuance here with respect to when the

14   company, Innkeepers, is obligated to pay our fees, and I think

15   that that may be a nuance I'll describe here is that it is a

16   transaction that is consummated amicably with the company;

17   however there could be a number of permutations of how this

18   loan is actually restructured at the end of the day.  And in

19   the event, for example, a transaction is done away from the

20   company, they are no longer obligated to pay our fee under our

21   engagement letter.

22        The reason it makes sense from our perspective to have

23   this backstop is we don't want an incentive to do a deal with

24   the company in order so that they would pay our fees if there

25   wasn't a creditworthy party to be able to pay that fee in the

1    event we did another transaction, because our intent obviously

2    is to maximize to Lehman as the lender here.

3            THE COURT:  Okay, I think I understand that.

4            MR. PEREZ:  Your Honor, just if I may.  I think there

5    are two reasons really for the backstop; number one is LCPI

6    actually owns the economics of this.  Lehman ALI is the lender

7    of record, but LCPI owns the economics.  But the second

8    situation is, Your Honor, there could be circumstances where,

9    pursuant to the engagement letter, the company would not be

10   obliga -- I mean, I'm sorry, Innkeepers would not be obligated

11   to pay.  But in our business judgment we determined to do

12   another transaction which would result in the -- in a

13   transaction fee being owed that wouldn't be owed by Innkeepers,

14   because they did a transaction away from Innkeepers, Your

15   Honor.  Those are the two circumstances.

16           THE COURT:  But a transaction fee would not be owed in

17   any event unless a transaction of some sort --

18           MR. PEREZ:  Exactly.

19           THE COURT:  -- is consummated, correct?

20           MR. PEREZ:  Correct.

21           MR. AEBERSOLD:  That is correct, Your Honor.

22           MR. STEINBERG:  That's correct.

23           THE COURT:  All right.

24           Is there anyone else who wishes to be heard on this?

25       (No response)

Page 64

1          THE COURT:  Having been better informed as to the

2    Lazard position and as to the circumstances for payment as a

3    result of the colloquy, I overrule the objection of Mr. Kuntz,

4    although I recognize his position that firms such as Lazard

5    might be more willing to assume risks than they actually are.

6          The engagement letter is relatively standard for

7    financial advisory and investment banking type services in

8    Chapter 11 cases.  What makes this highly unusual, however, is

9    that we're talking about investment banking services that are

10   being rendered in a bankruptcy case which is currently pending

11   down the hall from this courtroom, the Innkeepers case; Lazard

12   is an advisor to Lehman, retained in this case; they are acting

13   as an advisor to a nondebtor, Lehman ALI, in connection with

14   the other parallel bankruptcy case which is pending before

15   Judge Chapman; and they are seeking what amounts to backstop

16   fee protection, in connection with their services in that other

17   case, from the debtors here, Lehman Brothers Holdings and

18   Lehman Commercial Paper.

19          The objection of Mr. Kuntz goes to, in effect, the

20   business risk judgment of Lazard as an advisor and doesn't go

21   to the question of whether or not it is in the best interests

22   of the Lehman estate to have appropriate representation in the

23   Innkeepers case in connection with the secured claims that are

24   being protected there.  Under the circumstances, I overrule Mr.

25   Kuntz's objection and grant the motion to support the fees and

Page 65

1   related charges of Lazard.

2            MR. PEREZ:  Thank you, Your Honor.  Your Honor, I've

3   just been informed that Mr. Gordon is sick and at the doctor's,

4   so we will need to adjourn the hearing until the next available

5   date --

6            THE COURT:  Okay.

7            MR. PEREZ:  -- when he's available.

8            THE COURT:  We'll adjourn it to the next omnibus

9   hearing, unless Mr. Kuntz wishes to reconsider his objection

10  after he has had a chance to review information that might be

11  provided to him concerning the present contents that have been

12  left in these premises.

13           MR. PEREZ:  We'll try to do that.  We'll try to get

14  him some pictures.  And -- I was going to say that I didn't

15  know whether this building was actually on Tenth Avenue or

16  Eleventh Avenue, but I didn't have a chance to do that.

17           Your Honor, the last matter before the Court that I'm

18  handling is --

19           MR. KUNTZ:  May I be heard on that, Your Honor?

20           THE COURT:  On what?

21           MR. KUNTZ:  Lois Weiss, who's a real estate columnist

22  for the New York Post, put a small blurb in her column about

23  this.  I believe she asked for access to the building, which

24  was refused.  I think it would be very helpful for the debtor

25  to basically -- I mean, I'll even buy them a digital camera, if

Page 66

```
1    they're short on money, to, like, just have some pictures.
2    Let's see if there's equipment in there, if it's really broom-
3    clean empty.
4         THE COURT:  There's really nothing more to discuss on
5    this.  What I --
6         MR. KUNTZ:  Thank you, Your Honor.
7         THE COURT:  What I've said is that either there's
8    going to be an evidentiary hearing at the next omnibus hearing
9    or, if you and the representatives of the debtor are able to
10   share information that satisfies you, perhaps you'll withdraw
11   your objection.  That's all.  That's all I said.  Nothing more
12   to say on it.
13        Let's proceed with the next matter.
14        MR. PEREZ:  Your Honor, the next matter on the agenda
15   is the Innkeepers motion, and that's a motion to approve a plan
16   support agreement.  Your Honor, Lehman currently holds a 220
17   million dollar defaulted mortgage loan with Innkeepers' it's
18   secured by twenty of the hotel properties -- twenty of the
19   seventy-two hotel properties that Innkeepers has.  Innkeepers,
20   as the Court is aware, is a case pending in front of Judge
21   Chapman.  There is a motion filed in that case, which will be
22   heard, I think, either August 31st or September 1st, to approve
23   the assumption of the plan support agreement that we're seeking
24   to approve here first before we go to that Court.
25        The -- in essence, what LCPI has is a defaulted loan,
```

Page 67

1    and they've negotiated with their borrower, and they've

2    negotiated a restructuring with their borrower, and that

3    restructuring has, you know, basically three fundamental

4    components:  The first one is that we're going to convert our

5    debt to equity; the next one is that we're going to make --

6    that we're going to monetize at least half of that for no less

7    than 107 million dollars; and the third one is that we're going

8    to use approximately 17 million -- 17-1/2 million dollars to

9    fund a post-petition DIP loan, which is intended to fund the

10   property improvement plans and to fund other capital

11   expenditures on the 20 hotels that we have a lien on, and some

12   of that money is required to be put in by the franchisors,

13   Marriott, in connection with their -- with the flagging of the

14   hotels as Marriott.

15        You know, the debtor has twenty-three of these PIPs

16   with respect to hotels; some of them involve hotels that we

17   have a lien on.  So this money is intended -- there's a

18   separate fifty million dollar loan -- DIP loan to do those

19   improvements on the other hotels.

20        Your Honor, this motion is a motion that would be

21   covered by our real estate protocols, and in our papers we

22   indicated there have been three real estate protocols.  There

23   actually have been in fact four, four, real estate protocols; I

24   forgot the one that was signed on June 17th.

25        But for the fact that this exceeded the amounts in the

Page 68

1    protocols, this is exactly what you would anticipate.  The

2    steps that we have taken and what we have done is precisely

3    what a responsible lender would do in order to collect on their

4    loan, and we're doing it in two different ways.

5         The transactions are really interdependent, because

6    you have a conversion of the debt to equity to delever the

7    company, while at the same time monetizing a substantial

8    portion, and getting a big cash payment to boot.

9         Your Honor, there have been -- there's been one

10   objection and, you know, I'm sure the Court has reviewed that

11   objection and our response.  We believe, in our business

12   judgment, that this is the appropriate way to restructure the

13   loan and, frankly, would request that the Court enter it.  We

14   have Mr. Lascher available here; he's the person who put in the

15   declaration.  I have a short proffer for him, if appropriate,

16   as to the debtors' business judgment with respect to why we did

17   this.

18        But, Your Honor, this is not extraordinary; this is

19   not something, in my mind, the least bit unusual to do.  We're

20   actively managing and working through our assets.  In RACERS

21   alone, there's over 500 positions.  You know, we have to be

22   able to move forward.  I think this is a way to move forward.

23        Another comment, Your Honor, which I believe is -- is

24   that somehow this Court is being asked to prejudge what's going

25   on in the Innkeepers case.  I don't think that could be further

Page 69

1   from the truth.  We attached kind of the relevant portions of

2   the transcript.  I think Judge Chapman is fully aware that all

3   these matters are going to be brought to you beforehand.  You

4   know, we know what happens when courts don't coordinate as a

5   result of other cases that the Court's been aware of.  We're

6   asking -- we're simply asking permission to go to the next

7   step.  And all of those other steps are going to happen there.

8        If we get 100 percent of the equity, if we can sell it

9   for not less than 107 million dollars, and if our loan doesn't

10  exceed 17-1/2 million dollars, we have authority.  If one of

11  those things changes, obviously we need to come back.  But at

12  least as it relates to the issues that are going to be

13  initially before Judge Chapman, what we're seeking is authority

14  to go forward so we don't have the issue of, kind of, the

15  dueling debtors.  We want to avoid that.  It just doesn't make

16  any sense, Your Honor.

17       THE COURT:  What position do you take as to the

18  standing of Appaloosa to object as a party-in-interest to this

19  transaction?  There are some suggestions in your reply papers

20  that standing is suspect, but I don't think you come out in so

21  many words as --

22       MR. PEREZ:  Well, Your Honor --

23       THE COURT:  -- to say they don't have standing.

24       MR. PEREZ:  Well, Your Honor, I'll tell you exactly

25  what happened.  We got the papers, and first thing I did was I

Page 70

1    asked to see whether a proof of claim had been filed.  There

2    was no proof of claim filed.  So I sent Ms. Strickland an

3    e-mail saying 'Look, I haven't seen a proof of claim,' and she

4    indicated that she -- that they had bought a piece of the

5    Bankhaus position and that she was on vacation, so we couldn't

6    speak.  So I said 'Okay, fine.'  I went on the docket to look

7    for the -- to see who had bought the Bankhaus position, and

8    there is a transfer to Deutsche Bank, which I think was filed

9    on July 15th.

10        Now, it's very possible, and probably likely, that

11   Deutsche Bank didn't hold that.  So they could be one of the

12   people who purchased it.  I have no independent knowledge of

13   that.  It's not on the docket.

14        THE COURT:  Okay.

15        MR. PEREZ:  As I said, Mr. Lascher is here.  I have a

16   short proffer with the business judgment --

17        THE COURT:  Well, maybe just to do this in the right

18   order, we should deal with the proffer and then deal with the

19   objections and any parties who support the motion.

20        MR. PEREZ:  Okay, Your Honor, thank you.  If called to

21   testify, Michael Lascher would indicate that he has worked at

22   Lehman since 2004, specializing in commercial real estate,

23   finance and capital markets.  While at Lehman, he originated,

24   structured and closed complex loan transactions for

25   securitization and syndications, and assisted in the marketing

Page 71

1    of whole loans, B notes, mezzanine loans to secondary market

2    participants.

3            Prior to joining Lehman, he practiced for five years

4    in the real estate group of Cadwalader.  He has a bachelor's

5    degree from the University of Pennsylvania, and JD from Cardozo

6    Law School.

7            Mr. Lascher is currently an employee of Lamco and is

8    responsible for the oversight of Lehman's hospitality

9    investments.  And, Your Honor, the other co-head of the real

10   estate group is Ms. Nancy Shanik, who is here also in the

11   courtroom.  She's the A&M managing director responsible for

12   that, co-head with Mr. Fitts who oversees the other things.  So

13   just so the Court recognize her.

14           In his capacity, he's either actively involved or

15   overseeing the Lehman employees who have been actively involved

16   in finalizing the terms of the transaction described in the

17   motion, because LCPI has the economic interest in the mortgage

18   loan.  And I don't want to take up the Court's time, but

19   because of the MetLife transaction, LCPI actually has the

20   economic interest.  I don't know whether that's an issue, but I

21   don't think it is.  Nobody's raised it, but it's really --

22   we'll refer to LCPI instead of LCPI and ALI.

23           Mr. Lascher would testify that, beginning in April of

24   2010, Innkeepers and LCPI and engaged in numerous negotiations

25   to outline a potential restructuring of Innkeepers that would

Page 72

1   maximize LCPI's return on the mortgage loan, and that in

2   connection with these discussions the debtors have worked

3   closely with their legal and financial advisors to determine

4   which alternatives the debtors should pursue, including, among

5   others, seeking to foreclose on the collateral securing the

6   mortgage loan, seeking the appointment of one or more

7   receivers, or seeking relief to the extent that the debtors had

8   filed bankruptcy.

9           Mr. Lascher would testify that, in considering these

10  alternatives, the debtors' analysis included economic and

11  noneconomic factors, including the expected recovery, the cost

12  to pursue each of the alternatives, the timing of the potential

13  recoveries, and the likelihood of being able to achieve value

14  through each alternative.  Additionally, he would testify that

15  the debtors considered the potential impact on the hotel

16  properties serving as collateral and the hotel franchise

17  agreement that support the value.  After extensive negotiations

18  with Innkeepers and their legal and financial advisors, the

19  Court determined that the transactions described in the motion

20  are the best alternative to maximize recovery on the mortgage

21  loan.

22          Mr. Lascher would testify that on July 19 Innkeepers

23  filed for bankruptcy, and he would also testify that the

24  balance of the mortgage loan on the petition date was 220.2

25  million dollars, plus late fees and other charges pursuant to

Page 73

1    the documents, and that the loan is secured by approx -- by

2    twenty of the seventy-two hotels, going by Innkeepers and its

3    affiliates.

4            Mr. Lascher would testify that LCPI and Innkeepers

5    agreed to the terms of the restructuring embodied in the plan

6    term sheet, and that the restructuring contemplates the

7    debtors' agreement to convert a hundred percent of their debt

8    to equity, subject to dilution for management incentive, and a

9    provision of a debtor-in-possession financing to address

10   certain property improvement plans, work and certain other

11   necessary capital expenditures for the hotels that secure the

12   mortgage loan.

13           Mr. Lascher would further testify that LCPI's

14   willingness to enter into the plan support agreement is

15   conditioned on its ability to mitigate its risk by being able

16   to monetize a portion of the equity it receives in the Chapter

17   11 case, and that to that end, LCPI entered into a separate

18   agreement with Apollo to sell 50 percent of the equity, when

19   issued, for a price of 107.5 million dollars.  Mr. Lascher

20   would testify that this amount is considered by both the

21   debtors, their financial advisors, to be adequate

22   consideration.

23           Mr. Lascher would further testify that although the

24   agreement with Apollo can be terminated by either Apollo or

25   LCPI under certain circumstances, the debtor further negotiated

Page 74

```
1    a provision in the plan that provides that if the debtors are

2    unable to find a buyer for 50 percent of the equity they

3    received, for at least a 107.5 million dollars, they can

4    terminate the plan support agreement.

5           Mr. Lascher would further testify that a formal

6    auction at this stage would be both detrimental to both LCPI,

7    as LCPI currently has a purchaser for a hundred percent of the

8    equity for a significant cash payment, and there is no

9    assurance at this time that a transaction that provided LCPI

10   such similar value or better value could be structured,

11   following Innkeepers' plan process.

12          Mr. Lascher would testify that prior to LCPI's entry

13   into the agreement with Apollo, Lehman, through its financial

14   advisor, formally marketed the loans, and during this marketing

15   process, Lehman received expressions of interest from

16   approximately ten parties; signed confidentiality agreements

17   with five of these parties, which were allowed access to a data

18   room.

19          Mr. Lascher would testify that because of the mortgage

20   loan that was in default, and it was evident that Innkeepers

21   would likely seek Chapter 11 protection, Lehman was unable to

22   find a purchaser for the mortgage loan for adequate

23   consideration.  Mr. Lascher would testify that Lehman has

24   received inquiries from other entities about purchasing the

25   mortgage loan -- about purchasing the equity received in
```

Page 75

1   exchange for the mortgage loan, but that none of the inquiries

2   has resulted in a formal offer.

3          Mr. Lascher would further testify that Appaloosa

4   itself contacted Lehman regarding the purchase of the equity

5   received on account of the mortgage loan, however, Appaloosa

6   did not submit a written offer, despite the request to do so.

7          Mr. Lascher would testify that prior to September 1st,

8   they can walk away from this transaction -- from the sale of

9   the equity, and that LCPI can always sell the mortgage loan, if

10  it determines that it can maximize value by doing that, at

11  which time, Innkeepers could terminate the plan support

12  agreement.

13         Additionally, Mr. Lascher would testify that the term

14  sheet and the plan support agreement provide that if this

15  direction is not finalized within the period set forth in the

16  plan support agreement, approximately 240 days, at Innkeepers'

17  option, either the collateral can be sold to a third party,

18  transferred to LCPI or allowed to fore -- LCIP will be allowed

19  to foreclose on the collateral.

20         Mr. Lascher would testify that the plan term sheet and

21  the plan support agreement is a result of extensive good-faith

22  negotiations between LCPI and Innkeepers, and their respective

23  counsels and financial advisors, and he believes that the

24  transaction set forth in the plan term sheet will maximize

25  LCPI's recovery.  He would also testify that the provision of

Page 76

1    up to seventeen and a half million dollars to Solar, an LCPI

2    affiliate, so that they can extend the DIP loan, is a necessary

3    part of the transaction and it benefits LCPI by improving the

4    value of the collateral currently securing the mortgage loan.

5    Mr. Lascher would testify that the provision of the funds to

6    Solar is in the best interest of the LCPI estate.

7           Mr. Lascher would testify that in connection with

8    obtaining the records and internal approvals at Lehman, as is

9    customary, he and his team discussed the situation and proposed

10   transaction with the real estate investment committee.  And the

11   transaction was approved by the real estate investment

12   committee, by Bryan Marsal and by the board of directors.

13          Mr. Lascher would testify that he has concluded in his

14   considered opinion that LCPI's entry into the plan support

15   agreement, which contemplates the conversion of the mortgage

16   loan to a hundred percent of the equity, the provision of

17   seventeen million dollars of the DIP -- seventeen and a half

18   million dollars of the DIP loan, and the sale of fifty percent

19   of the equity for not less than 107 million, is in the best

20   interests of the estate, and additionally, that entry into the

21   plan support agreement mitigates Lehman's -- LCPI's risks by

22   allowing them to exercise remedies, to the extent that the plan

23   cannot be consummated or is otherwise deferred.

24          And that's the conclusion of his testimony, Your

25   Honor.

L Bar, et al; LB1

Page 77

1          THE COURT:  Is there any objection to the receipt of

2   that proffer?  I can't tell if that's an objection or if it's a

3   reservation of rights.

4          MS. STRICKLAND:  Your Honor, at this time, it's a

5   reservation of rights.  But I would like to actually reserve

6   only for about fifteen minutes until the end.  There was no

7   declaration filed by Mr. Lascher in connection with this

8   matter.  The only declaration that was filed was in connection

9   with the Lazard matter.  And so under 9014-2, this is not set

10  up to be evidentiary.

11         There are things that are included in the proffer that

12  are nowhere within the submissions that Lehman has made thus

13  far as to -- to give a specific example, the --

14         THE COURT:  All I want to know is whether I can accept

15  the proffer.  I understand the reservation.

16         MS. STRICKLAND:  If you would reserve on that, Your

17  Honor, until the end of this matter.  I may very well object to

18  it, yes.

19         THE COURT:  Object in what respect?  Are you going to

20  call a witness?

21         MS. STRICKLAND:  I would have had the opportunity, had

22  I been apprised of the fact that this was going to be

23  evidentiary, under Rule 9014 --

24         THE COURT:  This is simply evidentiary as to the

25  debtors' business judgment in the Lehman case.  It has no

Page 78

1    evidentiary impact, as far as I'm concerned, in the case that

2    you're concerned with.  And I have some fundamental questions

3    as to why you're here.

4                MS. STRICKLAND:  Certainly, Your Honor.

5                THE COURT:  And we're going to get to that when we get

6    to your objection.  Right now, I accept your reservation of

7    rights, but I'm also accepting the proffer.

8                MS. STRICKLAND:  Okay, Your Honor.

9                MR. PEREZ:  Your Honor, I have nothing further.

10               THE COURT:  Okay.  I think I should hear from those

11   who support the motion first.

12               MR. O'DONNELL:  Your Honor, Dennis O'Donnell; Milbank,

13   Tweed, Haley & McCloy on behalf of the official committee.  At

14   the risk of sounding like a broken record, myself, Your Honor,

15   this is yet another situation where the committee was heavily

16   involved in the debtors' consideration of the proposed course

17   of action here and the relief being sought in the motion.

18               We have been fully apprised and involved in the

19   discussions for the past several months, and believe that under

20   all the circumstances, the relief being sought makes sense.  It

21   is somewhat unusual.  I'm not sure if it's quite -- not as

22   unusual as Mr. Perez suggests.  But we believe that what is

23   really being presented or what is presented that is here, is a

24   package deal.  I mean, the sale, in particular, which I think

25   is the issue most in contention, is part of an overall deal,

Page 79

```
 1   but cannot be considered separate from it.

 2           And the committee and its advisors looked at the terms

 3   of the proposed sale to Lazard and concur on the debtors'

 4   judgment that the sale price, even in the absence of an auction

 5   process, is reasonable.

 6           THE COURT:  You said Lazard.  Do you mean Apollo?

 7           MR. O'DONNELL:  Apollo.  My apologies, Your Honor.

 8           We believe that the sale price is reasonable.  I mean,

 9   we believe that an auction -- that the sale can go forward here

10   without an auction at this point, because there is nothing to

11   sell at this point.  Until events play out in the Innkeepers

12   case and Judge Chapman does whatever she's going to do in that

13   case, there is nothing for the debtors to sell here.  And an

14   auction would make no sense.

15           And finally, Your Honor, in terms of potential impact

16   on that case, we really believe that the cart is being put

17   before the horse here.  Whatever -- all the debtors are seeking

18   here is authority to go to Judge Chapman and participate in

19   that process.  Judge Chapman will decide whatever she decides

20   in the Innkeepers case.  What's before Your Honor today is

21   simply whether the debtors' decision to enter into the plan

22   support agreement, which includes the proposed sale to Apollo,

23   entails a sound exercise of their business judgment.  And the

24   committee believes that it does.

25           THE COURT:  All right.  Are there any others who
```

                                                              Page 80

1    support this?

2         I'll hear the objection from Appaloosa.  But before we

3    get to the merits, I'd like to talk about your standing.  Why

4    are you here and what gives you a right to be here?

5         MS. STRICKLAND:  Your Honor, just because I neglected

6    to do so earlier, Rachel Strickland of Willkie Farr &

7    Gallagher, on behalf of Appaloosa Investment.

8         Appaloosa purchased a significant portion of the

9    Bankhaus claim from Deutsche Bank on July 17th.  July 17th is

10   important because it's a date that is prior to the time that

11   Appaloosa was even cognizant of the fact that Innkeepers would

12   be filing for Chapter 11.  That claim was not acquired for

13   purposes of having a strategic position to implicate

14   Innkeepers.

15        I am here today as a result of the fact that they are

16   a substantial creditor of Lehman Commercial Paper, not in our

17   capacity as an interested party in Innkeepers, which we are.

18   And we have fully disclosed from the absolute outset, both to

19   the Lehman counsel when we were speaking to them and in our

20   initial objection, we definitely wear two hats.  And I will not

21   be confusing those hats today.  We may very well have a beef

22   down the hall but that's not for today and that's not for Your

23   Honor.

24        THE COURT:  Yes, but your motivation here is not

25   really as a creditor of Lehman Commercial Paper.  Your

Page 81

```
 1    motivation here is as an active participant in a case down the

 2    hall before Judge Chapman and that's why you're here.  You

 3    really can't credibly say that you're here as a creditor even

 4    though you have creditor standing.

 5         MS. STRICKLAND:  I can absolutely credibly say, Your

 6    Honor, that we are here as a creditor of Lehman Commercial

 7    Paper.

 8         THE COURT:  I understand that you're here as a

 9    creditor of Lehman Commercial Paper, but your motivation is as

10    a party-in-interest in the Innkeepers' case.  That's clear to

11    me, and you can't deny that.

12         MS. STRICKLAND:  I can deny that, Your Honor.  There

13    are multiple --

14         THE COURT:  You can't credibly deny that.

15         MS. STRICKLAND:  I can --

16         THE COURT:  Based upon the papers you filed you can't

17    credibly deny that.  This is all about Apollo.  Apollo is all

18    over your papers.  Your papers are all about the Innkeepers

19    case.  I'm going to give you an opportunity to say whatever you

20    want to say, but understand that you're arguing from a somewhat

21    difficult position.

22         MS. STRICKLAND:  I appreciate that, Your Honor.  Our

23    objection is simple.  We don't believe that the debtors have

24    met their burden.  Neither the motion nor the reply nor the

25    proffer that was just put in answers a few simple things that
```

Page 82

1    are required for any debtor moving under 363.  They don't say

2    why the plan support agreement protects their collateral or

3    protects this estate against the investment it already has, nor

4    do they say that about the sale to Apollo.  They have never

5    included in any presentation to this Court or in any pleading

6    why 107.5 million dollars is the right number.

7            Starting with the plan support agreement.  They have

8    given a generic explanation.  Their explanation is that they

9    need to protect their current investment and they need to avoid

10   a, quote, "freefall bankruptcy" in Innkeepers.  There's no

11   evidence of any freefall bankruptcy risk in Innkeepers.

12   Innkeepers filed on July 19th.  It is operating solely with

13   cash collateral.  And there's not even a hearing in that case

14   on a DIP until September.  There is no freefall filing.

15   There's nothing in the plan support agreement or in the sale to

16   Apollo, which all parties have said is outside of the

17   Innkeepers case entirely, that implicates or protects against

18   any kind of freefall.  If those agreements were to disappear

19   today it wouldn't create a freefall.

20           The debtors' own papers in this case say that what

21   they need to do to protect their collateral is make sure that

22   the property improvements can be made and that those Marriot

23   flags stay up.  We agree.  But those property improvements are

24   dealt with by the DIP, and the DIP has no provisions that cross

25   over into the PSA or the Apollo sale.  And the Marriot

Page 83

```
 1   forbearance agreement, that protects Lehman's collateral and

 2   keeps those flags, is conditioned only upon the DIP.

 3          We're not objecting to the DIP.  We think that that is

 4   a sound exercise of business judgment, particularly because in

 5   effect it's a rollup; that 17.5 million came out of the

 6   original reserves and is going back in.  We think that is

 7   important to protect Lehman Commercial Paper's interest in the

 8   Innkeepers case.  But it has nothing to do with the plan

 9   support agreement or the sale to Apollo.  The PSA doesn't

10   accomplish that goal.  It only binds one creditor of Innkeepers

11   in any of the cases, not just the twenty that Lehman is

12   implicated by.  One.  Lehman.  No other creditor of the other

13   seventy-two debtors is bound by the PSA.

14          Why is Lehman locking itself up?  There is already in

15   the Innkeepers case massive amounts of turmoil over what will

16   be valuation disputes before Judge Chapman.  There is going to

17   be a deposition of a Lehman representative tomorrow.  An

18   examiner motion has been filed in that case.  The PSA is not a

19   device to expedite a recovery for Lehman in the Innkeepers

20   case.  The PSA doesn't hasten Innkeepers' exit.  It doesn't

21   lock other parties up and get everybody's ducks in a row to

22   facilitate a fast process.  It only locks up Lehman.  So why is

23   that good for Lehman?  Nothing is going to happen to Lehman and

24   Lehman's interests if the PSA doesn't get done and if the sale

25   to Apollo doesn't get done.
```

1          And that turns to the next component, the sale to

2   Apollo.  The debtors have said five statements repeatedly in

3   their papers.  The first one is that selling the stock now

4   mitigates the risk inherent in taking an equity position in

5   another debtor.  The second is that they believe the price is

6   fair.  Third, that they have not marketed the stock because

7   they can't market something they don't have.  Four, they're

8   concerned if they wait they're going to lose their bird in the

9   hand which is Apollo.  And five, that they're free to accept

10  another offer until September 1.

11         These five assertions, all of which were made without

12  any support, don't satisfy Lionel and the rest of the case law.

13  Judge Gerber recently referred to what is a routine showing

14  required of the debtor moving under 363 and not just in cases

15  where the sale of substantially all of the assets are

16  occurring.

17         And all of these cases repeat the same factors which I

18  know Your Honor is aware of.  But there are four themes that

19  come across loud and clear in every case:  sound business

20  purpose, adequate sales procedures, that the buyer is a good-

21  faith purchaser, and that the sale price is fair and

22  reasonable.

23         Of these points, the motion and their reply either

24  acknowledge that the factors have not been met at all -- sale

25  procedures, et cetera -- or are completely silent.  The motion

Page 85

```
1     is silent as to how anyone arrived at 107.5 million dollars.

2     The motion acknowledges this asset hasn't been marketed.  The

3     debtors have never discussed or given a probable range of the

4     value of the equity or the implications in the value of the

5     release being contemplated for Apollo.

6            The motion and the reply state repeatedly, and I heard

7     it again this morning, that the debtors seek the authority to

8     sell the equity for at least 107.5 million.  That's not

9     consistent with the documentation.  Paragraph 1 of the letter

10    agreement with Apollo is entitled "Binding Nature Definitive

11    Agreement".

12           If approved by Your Honor, this offer that is before

13    you today will not just be a floor on the value, it will also

14    be a ceiling.  The debtors have said that they're concerned

15    that they're going to lose the opportunity to sell the equity

16    if they wait.  This is just speculation.  The party that they

17    have on the other end of this sale is the equity holder of

18    Innkeepers that has guaranteed Innkeepers' obligation.  On the

19    other side of the pure speculation supported by nothing is the

20    common sense proposition that Apollo, who has more of an

21    interest in the Innkeepers cases than anyone else, is probably

22    going to be there at the end of the day when they're seeking to

23    sell that equity, if in fact they have equity at that point.

24           There's no evidence that Apollo is going anywhere or

25    that there's any time pressure on this.  We're not suggesting
```

Page 86

1    that there may not be a time when they come to you and make the

2    case they're required to make under 363 and that Your Honor

3    should, solely looking at Lehman as Your Honor must do, say

4    this is a great deal for Lehman, I should approve it.  But

5    today is not that day.

6           Lehman's arguments contradict themselves.  On the one

7    hand, Lehman defends its lack of marketing by saying 'How can

8    we market what we don't have?'  You're moving to sell what you

9    don't have today.  They said 'You know, if we marketed this and

10   we had an auction, that could really hurt the Innkeepers

11   cases.'  I'm not sure why.  But they're putting a price tag on

12   it today, and there's no concern that that's going to hurt the

13   Innkeepers cases.  And again, just wearing my Lehman hat, which

14   I get that Your Honor doesn't buy but I do in fact have one on

15   my head --

16           THE COURT:  I don't see it yet.

17           MS. STRICKLAND:  Okay.

18           THE COURT:  I mean, I hear what you're saying, but one

19   of the questions I'm going to want you to answer that you

20   haven't answered, because I didn't ask it yet, I want a full

21   disclosure of your interest in the Innkeepers case.  I want to

22   know what Appaloosa has in the case, what its objectives are in

23   the case, what its motives are in the case, because I believe

24   Appaloosa sent you here because of that case, not because of

25   this case.

Page 87

1          MS. STRICKLAND:  Appaloosa has a substantial interest

2     in the Innkeepers case, particularly on the fixed side, which

3     is not the Lehman twenty hotel.  It's the forty-five silo that

4     under the plan support agreement would be sufficiently -- would

5     be significantly haircut.  Lehman -- I'm sorry, Appaloosa has

6     significant problems with the plan support agreement and

7     absolutely supports the opposition to the plan that Lehman and

8     Apollo and Innkeepers are proposing.  No doubt about it.

9          THE COURT:  So you're going to be standing up in Judge

10    Chapman's court opposing the plan that the plan support

11    agreement is designed to foster?

12         MS. STRICKLAND:  Correct.

13         THE COURT:  Okay.

14         MS. STRICKLAND:  However, Appaloosa's investment in

15    Lehman Commercial Paper, which is a substantial investment, was

16    purchased before the link between Innkeepers and Lehman

17    Commercial Paper was on the radar.  There was no Innkeepers

18    filing on the horizon at the time -- at least to parties like

19    my client who were outside of the negotiation circle which has

20    been going on for some time.  This is a substantial claim.

21    This wasn't a claim that was purchased to -- and allowed me to

22    tell you with a straight face we have standing.  This was an

23    investment in Lehman Commercial Paper.

24         And here today, their objection is look, maybe in

25    Lehman Commercial Paper they're getting an amazing deal and

Page 88

1    maybe the equity that they would be getting is worth way more

2    than the way it's currently valued and that would be terrific

3    for their Lehman position.  And if that's the case then Lehman

4    can make the case why its deal is great for its estate and in

5    their Lehman capacity they would support that.

6         As evidence of that I'll point to the super underlying

7    text in the reply.  I did have a conversation with counsel for

8    Lehman Commercial Paper to say, look, have you marketed this

9    equity you're selling to Apollo?  I will tell you right now, we

10   are going to be opposing that.  But if this deal went through

11   we very well might be interested.  No one other than the

12   existing equity holder of Innkeepers has had any opportunity to

13   diligence anything or look at anything.  And when we told them

14   affirmatively and up front what our role and our viewpoint was

15   in the other case, the conversation that we had was, 'I'm not

16   really sure how we could agree to sell it to you if you're

17   going to be fighting us down the hall.'  And I understood that,

18   and that's the reason there's no formal offer.

19        So again, you know, this is a lar -- Appaloosa is a

20   large hedge fund.  They obviously have a lot of different

21   positions, which we're being perfectly candid about, but at the

22   same time, if they're able to make an excellent investment on

23   the Lehman side, yeah, they would be interested in it.  I fully

24   expect that if there were a marketing process here and there

25   was an opportunity for more than one party to be inside the

Page 89

1    tent they would show up and they would participate in that.

2    And so they can underline that sentence all they want; I agree

3    with it.  There's not a shifting motive because they wear more

4    than one hat.  There's not necessarily a lack of motivation

5    that is Lehman-oriented because they also have a motivation

6    that's Innkeepers motivated.  They do have that motivation; I

7    would be lying if I told you they didn't.  But they have one

8    here as well.

9         There's been no process, as I just alluded to.  Even

10   the private sale cases which we've cited in our objection make

11   clear that where a debtor comes to a judge under 363 they say I

12   am selling it to Party X and not opening it up to a process

13   because I did that process already.  I have pre-marketed this.

14   We tried.  We heard just a moment ago they've been trying

15   something for nine months.  Now it's time for them to fish or

16   cut bait.  There's been none of that here.  The conversations

17   that I had when looking into Appaloosa's own interest was 'Have

18   you talked to anybody?  How do you know what this is worth

19   unless there's been any sort of process?'

20        They are not saying this is a melting ice cube.  The

21   melting ice cube and the real emergency in terms of protecting

22   Lehman's collateral is keep those flags up, we agree, and make

23   sure that the property improvements can be done.  Entirely

24   encapsulated in the 17.5 million dollar DIP facility which, as

25   I mentioned, is a rollup and not necessarily a use of new

Page 90

1    capital.

2         They have said that they're going to -- by

3    prearranging half of the equity sale to Apollo, they're going

4    to mitigate their risk of receiving equity.  I have no idea

5    what it means to mitigate a risk that you've created yourself.

6    Lehman actively negotiated to receive equity.  If it only

7    wanted half, maybe -- and I wasn't in that tent -- it should

8    have negotiated to receive half.  Maybe it should have

9    negotiated to receive cash or new debt or something else.  It

10   is now saying, 'Well, gee, we've got a risk' -- their word --

11   'and now we need to mitigate the risk.'  They negotiated to

12   receive equity.  There is nothing in the record before you that

13   supports their business judgment in doing that.

14        Now, they've also said, which I thought was a little

15   bit cute, that this offer can be topped until September 1st.

16   There's no party other than Apollo, the only entity that

17   already has all of the information on these assets because it's

18   the current equity holder, that has been afforded any

19   opportunity to diligence it.  And if notice of the ability to

20   top an offer is putting a sentence in a reply, I'm fairly

21   certain it's not and that more notice would be required if that

22   were going to actively be something that they were going to be

23   deeming subject to higher and better offers.

24        And they're right, it is more complicated by the fact

25   that they don't even have the equity yet and that the hearing

Page 91

1   to approve the assumption of a plan support agreement, when it

2   would just confuse things since they're talking about filing

3   the plan in two weeks, hasn't even happened.  So it is hard to

4   market something they don't have.  I agree with the phrase

5   "cart before the horse", I just think it applies to this.

6          There's no rush here.  The documentation for the

7   entire transaction isn't done.  For whatever reason, fully

8   intending to come before Your Honor today and seek approval of

9   it, the written agreement between Lehman and Apollo says that

10  they're not going to fully document their sale until September

11  2nd, one day after the Innkeepers' court hears what it's

12  hearing and several weeks after Your Honor is being asked to

13  approve it.  Everything is a term sheet.  The Innkeepers' plan

14  isn't done.  The sale documents aren't done.  There are lots

15  and lots of details that have yet to be worked out.  I'm just

16  not sure why they're here today.

17         The motion and the form of proposed order, of course,

18  take this all into account.  The revised order that was

19  submitted, on page 3, the second full paragraph, asks Your

20  Honor for authority to enter into any transaction contemplated

21  by the term sheets, including amendments that'll be made

22  without notice to Your Honor and parties-in-interest.  It's a

23  blank check.

24         They are talking in the reply about how this is sort

25  of a de minimis asset and I think they were talking about

Page 92

1    percentages of one percent or under one percent to the estate.

2    But if you look at their motion that they filed the first time,

3    they said that this is one of the most significant sources of

4    recovery that the Lehman Commercial Paper estate has.  And if

5    half of the equity is reasonable to sell for 107.5 million then

6    the full equity is 200 million.  They've got already over a

7    quarter of a billion dollars invested in this.  It's not

8    immaterial.

9         I understand that they're in a very unique position.

10   They have a lot of distressed real estate assets in a very

11   tough market and they have a strong desire to make lemonade out

12   of lemons.  But they have legal standards as a Chapter 11

13   debtor; they're obligated to protect and conserve the debtors'

14   property.  And the 345 analogy, which we made and think is an

15   effective analogy, is something that other courts have picked

16   up on in a 363 context.

17        There's a case that we cited in our papers, In re

18   Bakalis, 220 B.R. 525, that when analyzing a 363 motion the

19   Court said that -- it was a context of a bid in an auction

20   where the debtor sought to take the lower bid because it had

21   fewer contingencies, and in that case the Court said that in

22   citing 345 that a trustee has to also seek to avoid undue risk

23   where dealing with money of the estate, and refers to trust

24   provisions and says a trustee who has a duty to preserve the

25   estate must use caution that may be greater than that of a

LBar, et al; LB1

Page 93

1    prudent man who's dealing with his own property.

2           My client is a hedge fund.  Lehman Commercial Paper is

3    not.  So although there seems to be a lot of playing the

4    market, here that may very well be a prudent course of action

5    but it hasn't been demonstrated.  There's no evidence, and Your

6    Honor, under Lionel, needs evidence that supports the business

7    judgment on all of the factors that we see in all of these

8    cases.

9           I am not asking Your Honor to block a plan in the

10   Innkeepers case.  I am not asking Your Honor to substitute

11   Appaloosa's business judgment for Lehman's.  If we have

12   concerns, and we do, we will take them down the hall.  But

13   before Your Honor we do not believe that you have a sufficient

14   record.

15          If you conclude that 107.5 is an appropriate price for

16   fifty percent of the reorganized Innkeepers' equity -- not just

17   a floor but also a ceiling -- Your Honor is ruling that that

18   price is reasonable for fifty percent of another debtor's

19   equity.  It's hard for me to understand how that isn't

20   something that someone is later going to say to Judge Chapman

21   this is at least probative.  And we don't think that that is an

22   appropriate use of the courts.  Common sense dictates that that

23   is something that is very likely to happen.

24          We support Lehman's DIP.  We support the preservation

25   of the collateral.  We do not think that the plan support

LB1, et al., LB1

Page 94

1   agreement has had an adequate showing, and we certainly do not

2   think that the sale to Apollo at a specific price now has had

3   any sufficient showing as to the reasonableness of the price,

4   the need for the timing, and why all of these things have to go

5   before all of these things are determined.  Once Lehman knows

6   what it's going to get -- and it can pursue and support lots of

7   things, but if something new crops up two weeks from now that's

8   a more interesting opportunity, Lehman can't avail itself of

9   it, and it's the only party that will be prohibited from doing

10  so.

11         So we do have an interest down the hall, we're going

12  to be speaking to that, but we very much have an interest here.

13  And if they come back and they make their showing under 363 as

14  to why what they're asking you to do is reasonable and why it's

15  good for Lehman, Appaloosa will be thrilled on the return on

16  its investment in this case as a result.

17         Unless Your Honor has other questions, that's all I

18  have.

19         THE COURT:  Not right now.

20         MS. STRICKLAND:  Thank you, Your Honor.

21         MR. PEREZ:  Your Honor, Alfredo Perez.  While counsel

22  says that they're not trying to substitute their business

23  judgment, they are in fact trying to substitute their business

24  judgment, Your Honor.  And you know, they make reference to

25  Lyondell (sic) repeatedly.  Well, Lyondell (sic), the reason in

Page 95

1    Lyondell (sic) was because --

2          THE COURT:  Lionel.

3          MR. PEREZ:  Lion -- oh, God, Lionel, thank you for

4    doing that.  The only articulated reason in Lionel was because

5    the creditors' committee wanted to settle.  That was the only

6    articulated reason.  Yet I think counsel has articulated five

7    reasons why we want to do the transactions:  One, we want to

8    monetize the equity that we're receiving.  Two, we do think

9    it's a fair price; we've said it.  Three, we don't know what

10   the process is going to be like; we can't sell something that

11   we don't have.  Four, it is a bird in hand and we don't know

12   what's going to happen in the future.  Five, it is a

13   substantial price.

14         And Your Honor, we can sell it to anybody before

15   September 1st and at any time we're free to sell our mortgage

16   loan.  So if somebody wants to come and pay us for our mortgage

17   loan there's nothing that prevents us from selling the mortgage

18   loan.  Innkeepers would then have to -- would have the right to

19   walk away from the PSA, but there's nothing that prevents us

20   from selling it.

21         Your Honor, we do believe that this is an effort, that

22   restructuring it, that doing the DIP loan, and that being able

23   to monetize our recovery are -- is protecting our collateral.

24   I mean, we're doing this -- I mean, this is what people want

25   you to do.  They want you to have a plan.  They want you to

Page 96

1    monetize collateral.  They want you to be in a situation.  And

2    the fact that they say, well, we're the only creditor that's

3    done anything, okay, so we're the only creditor that's done

4    anything.

5           And again, I didn't know what Appaloosa's interest was

6    in the Innkeepers case; I suspected that they were a holder of

7    some of the CMBS paper.  But the interests of Lehman and the

8    interests of the holders of the CMBS papers are going to be

9    diametrically opposed.  I mean, there's no question about that.

10   It's a zero-sum game.  To the extent they get a dollar more our

11   estate gets a dollar less.  Zero-sum game.  So we should keep

12   that in mind.

13          Your Honor, we do think we have met our burden under

14   Lionel.  We have articulated reasons why we want to do this.

15   This is not -- you know, we've presented a package which we

16   think in our interests maximizes the recovery for our estate.

17   They may not like it.  They may think that if we wait we may

18   get more.  It's our business judgment that that's not the case.

19   I think it's supported by the committee.  And we did try to

20   market what we had and we couldn't market what we had.

21          Thank you, Your Honor.

22          THE COURT:  Before you sit down --

23          MR. PEREZ:  Yes, sir.

24          THE COURT:  One of the things about this particular

25   argument that distinguishes it from other items on today's

Page 97

```
1     calendar is that it's my impression that the timing of this

2     motion is driven not by Lehman's true needs but by the needs of

3     others in the Innkeepers case and in particular the needs of

4     Apollo.  I'm saying that's my impression.

5           I know that there's a hearing which is scheduled on

6     September 1 before Judge Chapman.  I know, because I've looked

7     at it, that that's likely to be a big deal hearing where

8     there's a motion that has been brought by Dewey & LeBoeuf for

9     appointment of an examiner, that the focus of the examiner

10    motion is the role of Apollo, and that there's a big fight

11    brewing in that case.

12          Ms. Strickland has tried to make her appearance here

13    appear, to the best of her ability, to be that of a Lehman

14    creditor, but I believe that transparently she is here and

15    she's being paid to be here not because of Appaloosa's claim in

16    this case but because of Appaloosa's interests in the

17    Innkeepers case.  That makes good sense to me because if she

18    can head this off at this pass that's one advantage for

19    Appaloosa in the next case.

20          That having been said, what's the consequence to

21    Lehman?  And I recognize that Lehman ALI is involved in this

22    too and I'd like to hear from Lehman ALI's counsel, to the

23    extent that Lehman ALI's counsel is prepared to speak to why

24    this is a good deal for Lehman ALI.  What's the consequence if

25    this isn't approved today?
```

Page 98

1          MR. PEREZ:  Well, Your Honor --

2          THE COURT:  What's the consequence if this is deferred

3   until after the hearings that are scheduled to take place in a

4   few weeks?  Is the cart before the horse?  And is Lehman doing

5   the bidding of others here?

6          MR. PEREZ:  Your Honor, I don't believe so.  I do not

7   believe that it's doing the bidding of others at all.  Your

8   Honor, the motion -- this filed on July 19th.  At the first-day

9   hearings it was discussed with Judge Chapman that Lehman would

10  be filing a motion to approve the plan support agreement which

11  would then be heard, and then the motion to approve the -- to

12  assume the plan support agreement in the Innkeepers case

13  would be heard after this Court had an opportunity to rule on

14  it.

15          Your Honor, Apollo is represented by Paul Weiss.

16  Innkeepers is represented by Mr. Basta.  They've been

17  functioning, based on what my involvement is -- have been

18  relatively independently.  Your Honor, this is not something --

19  we've put this on full notice.  This is not something that

20  we're doing kind of on a hurry up basis.  And I don't believe

21  we're doing anybody's bidding.  I do think that our ability to

22  credibly stand in front of Judge Chapman and support the

23  assumption of the plan support agreement will inure to our

24  benefit.

25          And I don't think that this is done -- and I do

Page 99

1    believe, Your Honor, that waiting to support this is going to

2    cast a doubt.  I frankly believe, unfortunately, that if we

3    wait it's almost tantamount to not having had it approved

4    because at that point we'll be in a situation where we'll have,

5    you know, courts that are going to need the approval, one who

6    will need the approval of the other.  Judge Chapman is going to

7    have to decide whether she approves the assumption, whether she

8    appoints an examiner, all of the things that she's going to

9    have to do.  And all we want to be able to do is be there to

10   say to the extent that the Court approves this we can go

11   forward.  And that's really all we're asking.  And it's

12   actually the horse.  I mean, we're -- this is the horse, it's

13   not the cart, Your Honor.

14          THE COURT:  Okay.  Well, enough imagery on that, but

15   it's clear that approval of the plan support agreement here is

16   simply one of the puzzle pieces that isn't even the most

17   important puzzle piece because the plan support agreement is

18   tied to what happens before Judge Chapman later.

19          MR. PEREZ:  What happens before Judge Chapman, whether

20   the plan -- whether the plan support agreement is assumed, what

21   happens before Judge Chapman when she determines value of the

22   assets, and what happens before Judge Chapman when there is a

23   hearing on confirmation.

24          THE COURT:  What I'd like to hear some more about are

25   the flexibilities available to Lehman Commercial Paper,

Page 100

1    assuming this is approved.  Ms. Strickland argues strenuously

2    that the 363 standards are not met here, in part because for

3    all practical purposes Lehman is locking into a transaction

4    that's a black box, it's blind, because we can't really tell

5    what this asset would be worth in a free market environment,

6    one in which, say, Appaloosa or others like Appaloosa might be

7    a bidder, or there's an opportunity down the road in an

8    unlocked up bankruptcy case for valuation to be tested in what

9    may be an improving market for hotel properties.  I'm putting

10   those words out as my own words.  Those aren't words that she

11   said, but that's the concept.

12        And I don't have a 363 problem if Lehman has

13   flexibility, but if Lehman is in fact boxed by this trustee I

14   might.  And to the extent that she has raised record questions

15   as to the adequacy of the record to support this, we may need

16   to further develop that record.

17        MR. PEREZ:  Right, Your Honor.  And I believe that the

18   two pieces of evidence which are in the record are that between

19   now and September 1st we can totally walk the deal with Apollo,

20   and that at any time we can always sell our mortgage loan to

21   the extent that there's a higher bidder for it.  So --

22        THE COURT:  But you have -- to what extent has this

23   transaction determined equity value in respect of a plan of

24   reorganization that hasn't yet been filed with respect to a

25   confirmation hearing that hasn't yet been scheduled?

Page 101

1          MR. PEREZ:  Your Honor, I don't think it's determined

2     it at all.  I don't think it's determined it at all.  What we

3     have done is we have a -- assets that are currently owned by

4     Innkeepers.  We are getting 100 percent of the equity, assuming

5     all of these other things fall into place.  And we're -- today

6     we're trying to mitigate the risk of that 100 percent by a cash

7     payment of 107 million dollars.  You know, our outstandings are

8     220.  So we're mitigating by a cash payment of 107 million

9     dollars.  Depending on what the capital structure looks like,

10    depending on a whole host of other things, the Court's going to

11    have to make a determination of value.

12          And Your Honor, I mean, this is really a situation

13    where we are asking permission ahead of time because we don't

14    want to find ourselves in the problem that we found ourselves

15    in some other cases.  I mean, Judge Chapman is going to be free

16    to say I'm not going to approve the plan support agreement.

17    Judge Chapman is going to be free to say, you know, we're not

18    going to impair the CMBS creditors, to the extent that you need

19    to be impaired in order to do it.

20          Now, the black box comment, I also don't believe is

21    accurate.  There are three pieces in here that I think are

22    significantly determined that can't move unless we come back to

23    you.  And that is 100 percent of the equity, and we have to be

24    able to monetize half of that for 107 with Apollo or a greater

25    amount if somebody comes along and gives us more, and funding

Page 102

1    no more than 17.5 million.  And you can't -- you can't look at

2    the funding separately from all of the other things, Your

3    Honor.  And it's not really a black box.  Yes, there is going

4    to be a process that's going to be run, but we've staked

5    three -- you know, this is a chair that has three legs.  If you

6    knock out any one of those three legs we're back in front of

7    you, Your Honor.

8           So I don't believe that -- and with respect to the

9    marketing process, I mean, they did go out and market our loan.

10   Okay?  This is not something that -- we marketed the loan to

11   see what we could get for the mortgage loan of Innkeepers.  And

12   there was nothing that was satisfactory.  So we entered into

13   these discussions and we did this.

14          So I really do not believe, Your Honor, that this

15   Court is in any way determining what Judge Chapman is going to

16   do or not do, but she's going to be able to do what she does,

17   recognizing that we're not going to have to come back here for

18   the Court, you know, to then go back and forth between the

19   judges.

20          THE COURT:  Okay.  Are you satisfied at this point

21   that the declaration that you read into the record of Michael

22   Lascher is all the evidence that you need to support your

23   motion for today?

24          MR. PEREZ:  Your Honor, unless the Court has any

25   questions, I think I am.  I mean, we -- I think we've

Page 103

1    established what we need to establish in order to prove the

2    business justification for doing the transaction which is a

3    holistic transaction, it's not just the ultimate sale.

4              THE COURT:  Okay.  Is there anyone else who wishes to

5    speak in support of the motion?

6         (No response)

7              THE COURT:  I invited counsel for Lehman ALI to speak

8    to the motion.  I don't know if there's a desire to speak to it

9    or not.

10             MR. SAGE:  Your Honor, Michael Sage from Dechert, on

11   behalf of Lehman ALI.  I would just like to reiterate a few

12   points made by Mr. Perez, just a few.

13             Your Honor asked the question about whether this was

14   driven by Apollo.  And I think it's a good question.  The

15   answer is:  absolutely not.  Any situation in which a creditor

16   has an agreement with a debtor and it's a pre-negotiated deal,

17   it behooves that creditor to work out a pre-negotiated assumed

18   deal in the case.

19             And therefore, regardless of what Apollo wanted, it

20   was in Lehman's interest to have a plan support agreement, a

21   process, and a pathway through Chapter 11.  And that's what was

22   going on in this case.  That Apollo wanted what it wanted is

23   immaterial to that point, meaning that we felt that in the

24   Innkeepers bankruptcy it would be our interest to have a

25   roadmap to success and to a good result.  That's why we are

LBH, et al; LB1

Page 104

```
1    here before the Court today, as Mr. Perez said, to have pre-

2    approval at certain levels.  And that's why down the hall we

3    have hopefully a plan support agreement that will be approved

4    in that case.

5          It was stated earlier by Ms. Strickland that, you

6    know, without this deal we would not have -- that there's no

7    evidence or there's no inclination or there's no suggestion

8    that we would have a freefall in that case.  I think that's

9    almost ridiculous because in fact if we didn't have a

10   pre-negotiated deal with the company we don't know what would

11   happen in that case.  We have no idea whatsoever.

12         In fact, Midland and other creditors in that case find

13   themselves without a pre-negotiated deal, find themselves in

14   exactly the position that we don't want to be in.  We want to

15   be in a position of having a negotiated transaction, a roadmap,

16   a path toward success for Lehman in that case.  That's why we

17   are here and that's why we'll be there.  All right?  It's an

18   effort to try to make sense of the case and try to mitigate the

19   risk.  So just in response to what she said about, you know,

20   there's no suggestion that it would be a freefall there as to

21   us, I think it would be a freefall there as to us without a

22   plan support agreement.

23         Now, would we try to negotiate, try to make something

24   better of it, try to deal with that fact if it's not approved

25   there?  Of course we will.  That's what we'll do.  But this is
```

Page 105

1    an attempt to avoid that risk.  She also said --

2         THE COURT:  How am I -- excuse me, Mr. Sage.  How am I

3    to determine the reasonableness of the monetary value that has

4    been ascribed to Lehman's fifty percent share of the equity

5    that will come out of the plan assuming it's confirmed?

6         MR. SAGE:  Well, before I address that squarely, I

7    want to point out --

8         THE COURT:  It may be tough to address squarely.

9         MR. SAGE:  Well, I think that Lehman has made -- I'm

10   going to come back to it in one second --

11        THE COURT:  Okay.

12        MR. SAGE:  -- if I can.  I just want to say before I

13   answer it squarely, or as best I can, is that the point that

14   Mr. Perez made about being able to sell the loan is critical

15   because, you know, it's not the case that Lehman is locked in

16   forever or past September 1st, assuming we get past the out

17   period, to transfer the equity when received to Apollo.  That's

18   just not the case.

19        If Lehman sells the note to a third party, Appaloosa

20   or anyone else in the world, the plan support -- the agreement

21   with Apollo goes away, the plan support agreement goes away at

22   the debtors' option.  The debtor can choose to do a deal with

23   who -- who we sell to.  But it's critical, I think, that from

24   the Lehman perspective that we can always monetize or always

25   get out of the case, the Innkeepers case, by selling the loan.

Page 106

1    That's some -- you can't just gloss over that.  I would

2    understand -- if that wasn't the case I would understand the

3    objection a lot more.

4          With respect to how Lehman got there, Lehman got

5    there, you know, by taking into account the process -- the

6    attempt to sell the loan by using their experience in these

7    areas, by conferring with their financial advisor, and by

8    negotiating what they thought was the best price with a willing

9    buyer, Apollo.

10          It was -- you know, there wasn't -- it's correct,

11   there wasn't a formal auction process.  I don't -- I submit

12   there doesn't need to be, given the overall facts of this case.

13   But they did -- it wasn't just a number they picked out of the

14   air either.  It was a number that was based on all of the facts

15   and the experience of Mr. Lascher who's in the court today, to

16   make a determination that it was a reasonable price.

17          The other thing I'll say is that, you know, it's easy

18   to say, well, why not just have an auction in ten months or

19   whenever you're going to get the asset?  Who knows what's going

20   to be in the world in ten months?  If indeed the Apollo deal

21   sticks and if indeed they don't sell the note, if indeed they

22   find themselves holding the equity in ten -- in eight months,

23   six months, whatever the period is, you know, we don't know

24   what's going to be.  It might be that the world looks a lot

25   different then, that it looks like a great price.  It may look

Page 107

1   like a not great price.  But that's the nature of making a

2   business judgment six months, eight months out; you take a

3   chance.

4        And you know, there is -- that's a business -- I

5   submit that's something that Lehman has the right to do in its

6   business judgment and it made what it considers to be the wise

7   move.  Time will tell as to whether -- and time might not tell

8   that because if it looks to Lehman that there's either

9   execution risk, there's price risk or there's some other good

10  reason to sell the loan in three months they can do that too.

11  So they're not so locked in.  They have options.

12       You know, as to whether this is probative to what

13  happens down the hall, I think that's -- it's a big statement

14  to make.  You know, this is negotiated price.  Judge Chapman

15  will run her case as she runs her case.  If she takes notice of

16  what happens here that's her call.  But she can take notice of

17  a lot of things and make a determination as to value, and I

18  don't think she will feel boxed, she shouldn't feel boxed.  I'm

19  going to say on the record that she should not feel boxed or

20  limited by whatever happens here.

21       This, as Mr. Perez has correctly said, gives Lehman

22  the ability to take certain steps as long as certain minimums

23  are met.  It's not -- it doesn't drive the outcome or the

24  result.  And we're not looking to -- we'll not be in that

25  courtroom down the hall ever saying 'Well, based on Judge

Page 108

1    Peck's decision today you have to -- this means the value is

2    X.'  That's not going to ever happen.  That's not the goal.

3    Thank you, Your Honor.

4         THE COURT:  Thank you, Mr. Sage.

5         MR. PEREZ:  Your Honor, just one thing.  Attached as

6    Exhibit B was our plan term sheet.  And the plan term sheet on

7    page 7, 8, and 9 have the various termination events associated

8    with the plan support agreement.  I think those termination

9    events, you know, set milestones in that case which give --

10   give us tremendous flexibility.  You know, we've been focusing

11   only --

12        THE COURT:  Could you put those on the record now?

13        MR. PEREZ:  Yes, Your Honor.  Would you like a copy of

14   the Exhibit B?

15        THE COURT:  No, I just want you to put them on the

16   record now.

17        MR. PEREZ:  Okay.  All right.  Well, in Exhibit B to

18   the motion, the plan term sheet, and the -- Lehman could

19   terminate the plan term sheet for the failure to meet any of

20   the milestones which would be:

21        There's no order authorizing assumption of the PSA

22   later than forty-five days after the petition date;

23        There is no order authorizing the DIP facility, for

24   both the fixed rate DIP and the floating DIP, within forty-five

25   days after the petition date;

Page 109

1              The plan and disclosure statement, consistent with the

2       terms of the plan -- of the term sheet are not filed within

3       forty-five dates of the petition date;

4              The disclosure statement is not approved within 120

5       days of the petition date;

6              Lehman and the company haven't reached mutual

7       agreement with respect to the sales process, because it's

8       anticipated that there would be a sales process down the road

9       within 120 days;

10             An order confirming the plan is not approved within

11      240 days of the petition date;

12             The effective date of the plan is not -- goes

13      effective within 270 days of the petition date.

14             And so those are the milestones.

15             And in addition to that, Lehman has not executed a

16      definitive agreement with respect to the sale of fifty percent

17      of the equity for at least 107.5 million dollars by forty-five

18      days of the petition date.  And obviously that's not to Apollo,

19      it's just 107.5 million;

20             Lehman has not consummated the new equity sale by 270

21      days after the petition date;

22             The Court does not enter an interim order on the use

23      of cash collateral in form and substance satisfactory to

24      Lehman;

25             The Court grants an order of relief to the automatic

Page 110

1    stay with respect to the other assets in the case;

2          The filing of the company of a motion to dismiss the

3    Chapter 11 cases or to convert the Chapter 11 cases;

4          The filing of the company of a motion that requests

5    relief and extension of the plan milestones or any alteration

6    of the remedies;

7          And upon the entry of an order converting the case to

8    a Chapter 7 or appointing a trustee;

9          The withdrawal amendment modification of the company

10   or the filing of the company of a pleading seeking to amend or

11   modify the plan or the PSA that's not satisfactory to Lehman;

12         The filing of a motion to approve disclosure statement

13   that contains pro forma capital structure that is not

14   consistent with the terms of the term sheet;

15         The granting of bankruptcy court relief inconsistent

16   with the terms of the plan in material respects;

17         The issuance by governmental authority or other

18   regulatory authority of competent jurisdiction of a ruling that

19   make it illegal or denies the ability to enter into the

20   transaction;

21         The existence of an event of default under the DIP;

22         The occurrence of an event of default under Lehman's

23   use of cash collateral;

24         After the execution of the PSA, a change in material

25   adverse effect on the use, value, or condition of the company,

LBHI, et al, LB1

Page 111

1    its assets or legal or financial status or business operations

2    of the company or a material disruption or a material adverse

3    change in the financial, real estate, banking or capital

4    markets;

5          Lehman determines, in its sole discretion, after

6    completion of tax due diligence that the transaction cannot be

7    structured in a way acceptable to Lehman.  If it doesn't do

8    that within forty-five days a material breach of anybody of any

9    of the undertakings under the PSA.

10          And what we really haven't highlighted is that if the

11   Court grants it and then -- and it's assumed under Judge

12   Chapman's order, then if the plan isn't confirmed within 240

13   days, at that time Innkeepers has agreed to work with Lehman in

14   order to realize on its collateral.  So the collateral will

15   either be sold, Lehman will be able to foreclose, or the assets

16   will be conveyed to Lehman.  So to the extent that the process

17   continues for, you know, eight months and nothing happens, we

18   will have certainly -- we will be able to realize on our

19   collateral at that time.

20          So Your Honor, first we had the marketing process

21   ahead of time which didn't bear fruit.  Now we've entered into

22   the agreement.  I think there are significant protections for

23   the debtor on the agreement going forward.  Hopefully we'll be

24   able reorganize and get 107 million dollars, have fifty percent

25   of the equity and be able to sell that equity in the time frame

Page 112

1    of the plan.  But if that doesn't happen then we're set up to

2    realize on our collateral.

3            THE COURT:  Okay, thank you.

4            MR. PEREZ:  Your Honor, I would just -- I don't know

5    if we need to move the exhibit into evidence.  It's attached as

6    one of the --

7            THE COURT:  There's no need to.  It's part of the

8    record.  I wanted it read because I wanted the transcript to

9    include the various outs that relate to the plan support

10   agreement.  This is a highly unusual motion, largely because

11   even though it is a motion that reflects the business judgment

12   of Lehman Commercial Paper, it fundamentally relates to the

13   role of Lehman Commercial Paper and its nondebtor affiliate,

14   Lehman ALI in another bankruptcy case, and the document which

15   I'm being asked to approve has much greater significance in

16   that case than it has in this case.  We could argue about the

17   relative importance of 107.5 million dollar transaction in the

18   context of the billions that we deal with in the context of the

19   Lehman bankruptcy case, but it's clearly a significant amount

20   of money regardless of percentages that might be applied.

21           I am satisfied, based upon the argument of counsel,

22   the declaration of Mr. Lascher, the presentation made by Mr.

23   Sage on behalf of Lehman ALI, the support for this transaction

24   by counsel for the creditors' committee, and the abundant

25   number of outs just described by Mr. Perez, that this is not

LBH, et al; LB1

Page 113

1    only a transaction which is reasonable in the business judgment

2    of Lehman Commercial Paper but is one that is so highly

3    contingent that it is difficult to apply the case law standards

4    that have been cited by Ms. Strickland in her opposition to

5    this motion.  This is a 363 transaction; of that there is no

6    doubt.  But it is not a sale of substantially all of the assets

7    of Lehman Commercial Paper, nor does it come close to that.

8    Indeed, it is barely a sale at all.  It is, instead, approval

9    of an agreement which is highly contingent and subject,

10   ultimately, to the judgment of my colleague, Judge Chapman, as

11   well as to the vagaries of the Innkeepers bankruptcy case

12   itself, the future course of which is unpredictable.

13          Whether or not this is the best deal that could have

14   been arrived at in the context of what amounts to a pre-

15   negotiated filing of a bankruptcy case that includes elements

16   that I don't know about and frankly -- I have enough on my own

17   docket -- I don't choose to know about unless I need to, this

18   is a transaction that I accept represents a reasonable collar

19   around the recoveries for Lehman in respect of its loans made

20   in the Innkeepers bankruptcy.  Whether or not that turns out to

21   be a 107.5 million dollar outcome or some other outcome, I

22   don't know, the fact that Lehman retains the ability to

23   transfer in its sole discretion the mortgage loans that are at

24   issue here is a source of additional comfort to the Court.

25          And with all respect to the argument that has been

Page 114

1   made by Appaloosa and the standing issue that we were dancing

2   around during the course of that argument, it is manifestly

3   clear to the Court that Appaloosa's motivation in being here is

4   not in its capacity as a creditor of Lehman Commercial Paper

5   but is in its capacity as a significant party-in-interest in

6   the Innkeepers case.  Its unabashed desire is to defeat the

7   plan support agreement either in this court or next door.  And

8   it will have that opportunity another day.

9        The motion is approved.

10       MR. PEREZ:  Thank you, Your Honor.  I believe the rest

11  of the matters are being handled by Jones Day -- or, actually,

12  I'm not sure they're all Jones Day.  The next matter is the --

13  oh, we reported on the SunCal matter, so the next matter --

14       THE COURT:  Oh, one thing.  One thing before we go to

15  the next matter.  It's twenty-five to 1, or actually, twenty to

16  1 based upon that clock.  And I've been sitting here and

17  everybody else has been patiently watching since about 10, and

18  for some of you, it's been since before 10.  I need to know

19  whether or not the next matters to be heard are going to be

20  time-consuming.  If they're going to be time-consuming, we

21  should take a lunch break.  If not, hopefully we can just

22  dispose of them.

23       MR. TAMBE:  Good morning, Your Honor.  Jay Tambe from

24  Jones Day here to address item number 7 on the docket.  We

25  think it will be relatively short; should be no more than five

Page 115

```
1    to ten minutes.

2              THE COURT:  Okay, Mr. Bartner (ph.) nodded in assent

3    to that, at least as to his piece of it.

4              And anybody who wants to be excused can be excused.

5              MR. PEREZ:  And then, Your Honor, the matter 8, it's

6    about fifteen minutes.  And that's -- Kasowitz is handling that

7    matter 8.

8              THE COURT:  Okay, the Och-Ziff matter, we will handle

9    after lunch.  And it's really more of a litigation matter,

10   anyway.

11             UNIDENTIFIED SPEAKER:  Your Honor, may we be excused?

12             THE COURT:  Yes.  Everybody who wants to be excused

13   may be excused.  And Och-Ziff will be at 2 o'clock.

14             MR. TAMBE:  Good morning, Your Honor.  Jay Tambe from

15   Jones Day on behalf of the debtors LBHI and LBSF with respect

16   to item number 7 on this morning's docket.  This is a motion to

17   consolidate, and it's a motion to consolidate two adversary

18   proceedings with an objection, with a claim objection.  Since

19   the time this motion was filed, there have been some

20   developments, and I will apprise the Court of those

21   developments and briefly touch upon the reasons why we believe

22   consolidation is proper here.

23             When we originally filed the motion, we had filed an

24   adversary complaint against Nomura International.  We'd filed

25   an adversary complaint against Nomura Securities, and we had
```

Page 116

1    filed a claim objection with respect to Nomura GFP -- Global

2    Financial Products.

3           Nomura International and Nomura Securities consented

4    to consolidation for pre-trial purposes.  All the parties

5    reserved their rights to argue and present to the Court at

6    another time whether consolidation is proper for evidentiary

7    hearing and trial purposes.  And what we would propose with

8    respect to GFP is a similar consolidation order which is

9    consolidation for pre-trial purposes and leave for another day

10   and reserve all of our respective rights as to whether there

11   should be any consolidation of the evidentiary hearing.

12          Briefly, there are any number of common issues that

13   cut across all three of these matters.  They all relate to

14   terminated derivatives transactions.  So in each case, there's

15   a master agreement; in each case, that master agreement had an

16   automatic termination provision.  So the filing of bankruptcy

17   by LBHI triggered the automatic termination of the master

18   agreement with respect to each of these Nomura entities.  Prior

19   to the bankruptcy filing, each of these Nomura entities had

20   calculated their exposure to Lehman.  Each of them have

21   calculated a substantial exposure in Lehman's favor.  Following

22   bankruptcy, each of these Nomura entities submitted claims

23   forms and calculations of amounts owing upon termination which

24   were hundreds of millions of dollars the other way.  The total

25   swing in valuation from pre-bankruptcy to post-bankruptcy is in

LBH, et al; LBI

Page 117

1    excess of a billion dollars.

2         We have laid out in the complaints, in the claim

3    objection, as well as in the consolidation motion the

4    similarities we see in the approach taken by all three of the

5    Nomura entities to how they have calculated termination values,

6    how they have gone about a blind bid ask spreads, we believe

7    those are common issues of law, common issues of fact that cut

8    across all three matters.  That alone, I think, is enough to

9    support consolidation.

10        While we've been waiting to present this motion to

11   Your Honor, we have gone ahead and started on parallel tracks,

12   for now, with similar discovery schedules, similar protective

13   orders, similar expert discovery stipulations.  Clearly,

14   consolidation would alleviate the burden of having to run on

15   parallel tracks.  We could have one protective order; we could

16   have one discovery schedule; we could have one set of

17   deposition notices.  And when we get to it, we would have one

18   set of dispositive motions that each side may wish to make.

19   And rulings entered by this Court would apply equally to all

20   three matters.

21        By no means are we suggesting that all issues are

22   common.  We recognize that there are unique issues that pertain

23   to some of these master agreements, but that's not a reason to

24   deny consolidation.  We certainly respect the uniqueness of any

25   factual legal arguments one of the Nomura entities may plan to

Page 118

1   make.  We'd certainly preserve for that in any order that was

2   entered and any application we made to Your Honor.

3        We think consolidation is proper.  The standards of

4   consolidation are met, here.  Frankly, we're puzzled why, given

5   that we are already on parallel tracks on discovery -- we have

6   entered into discovery schedules with each of the Nomura

7   entities that are exactly the same; same amount of time fact

8   discovery, same amount of time for depositions, expert

9   discovery -- why Nomura GFP persists in objecting to

10  consolidation.  And it's consolidation purely for pre-trial

11  purposes.

12       We would ask that the objection be denied and

13  consolidation ordered.

14       THE COURT:  Okay.

15       MR. NOH:  Your Honor, for the record, Solomon Noh from

16  Shearman & Sterling on behalf of Nomura Global Financial

17  Products.  We refer to the entity as NGFP.  Your Honor, at the

18  outset, I just want to remark to the Court, we're obviously

19  aware of the extraordinary burden -- administrative burden on

20  this Court as a result of all these extraordinary cases, and we

21  will endeavor to do our very best to make this an efficient

22  process.  In fact, as Mr. Tambe has mentioned, we've gone so

23  far in making this an efficient process that we're quite unsure

24  exactly what we're doing here.  Is -- the reason for the

25  adjournment to the consolidation hearing was that NGFP has been

Page 119

1    in constant discussions, settlement discussions with Lehman,

2    and to -- in an effort to promote good will, we have kept on

3    adjourning the hearing.

4            In the meantime, as Mr. --

5            THE COURT:  When you say settlement discussions, do

6    you mean discussions that go to the merits of this dispute or

7    discussions that go to whether or not we can avoid dealing with

8    the procedural question that's presently before me?

9            MR. NOH:  It goes to the merits of the dispute, Your

10   Honor.

11           THE COURT:  Good.

12           MR. NOH:  In the process, while the consolidation

13   hearing has been adjourned, we've progressed substantially with

14   the claims objection.  As Mr. Tambe mentioned, we've entered

15   into a consensual form of litigation schedule which is

16   substantially identical to the one that's been entered with

17   respect to the adversary proceedings.  Moreover, today, I

18   understand that there's anticipated to be delivered to the

19   Court a consensual form of protective orders.  So with those

20   two elements, we're quite unsure what it means to consolidate

21   for pre-trial purposes only to the adversary proceedings that

22   also are pre-trial purposes-only consolidated.  And what

23   concerns us, as well as our client, is we don't know what that

24   means.  There is an element of unknown that nobody can really

25   articulate to us that we're afraid that this consolidation

Page 120

1   order is going to cover.

2          Now, Mr. Tambe had briefly mentioned, yesterday, while

3   we were discussing today that, okay, what would happen if

4   Lehman were to be forced to provide a deponent.  Would NGFP

5   also be -- have the right to force Lehman to provide the same

6   deponent?  We can stipulate on the record that that's not going

7   to be the case, and we will make every effort to make that an

8   efficient process in that Lehman will only be required to do

9   that only once.  Now, if Lehman is able to articulate any other

10  reason why there needs to be a technical consolidation order in

11  what substantially, in our minds, has already been procedurally

12  consolidated for procedural purposes, pre-trial purposes, then

13  we're, of course, willing to listen because like I said in the

14  beginning, we're very cognizant of the extraordinary

15  administrative burden to the Court as a result of these Chapter

16  11 cases.

17         We're certainly willing to listen and work out an

18  arrangement that will work for everyone, but what we are afraid

19  of is that, for whatever reason, as a result of the pre-trial

20  consolidation, there will be some type of preclusive effect

21  down the line on the merits of the consolidation of the trial

22  that will bind us as a result of the order.

23         Now, going to the substance of whether consolidation

24  here is merited, as we indicated in our papers -- and I'll be

25  very brief about this because I know Your Honor has thoroughly

Page 121

1   read those pleadings -- we have experienced, Mr. Bartner and I,

2   that these three entities, these three Nomura Global affiliates

3   are very different institutions.  One is based in the U.K.,

4   which is Nomura International.  One is based in Tokyo, which is

5   Nomura Securities Co., Limited, and Nomura Global Financial

6   Products, Inc., which is the subject of the hearing, today, is

7   based here in New York.  And they engage in different

8   businesses.  NGFP engages in the business of entering into

9   interest rate swaps whereas Nomura International is

10  substantially involved in credit default swaps.  And those two

11  types of transactions, they're -- are extremely different, and

12  any kind of trial that we conduct will involve different

13  elements to present to the Court.  In fact, given how different

14  those types of transactions are, I think the consolidation will

15  actually obfuscate, as opposed to clarify any issues.  And

16  that's the kind of concern that we have with respect to a

17  consolidation hearing.

18          I won't go much further, unless Your Honor has any

19  questions.  But in summary, we think the balance, here, leans

20  towards the concern regarding potential prejudice and the

21  confusion as a result of the consolidation of the proceedings

22  as opposed to any conceivable judicial economy that may result

23  from what Mr. Tambe is suggesting because that type of

24  arrangement for judicial economy purposes has already been

25  entered into as a result of the ongoing discussions and the

Page 122

1    claims objection process.

2           THE COURT:  All right, thank you.

3           MR. TAMBE:  Just briefly, Your Honor.  I think the

4    benefit of having a consolidation order for pre-trial purposes

5    actually gives you some more procedural certainty as to exactly

6    what it is that we're doing.  It's fine to have ad hoc

7    cooperation and coordinated proceedings, but I think we'd all

8    be on much surer footing as to exactly what's been

9    consolidated, what rulings are common, what issues are we

10   dealing with on a pre-trial basis, on a common basis.  There's

11   rules for consolidation; the reason why they're rules for

12   consolidation and not for loose coordination is so that

13   everyone has certainty.  And we respectfully would request that

14   the order be entered.

15          THE COURT:  I sort of wish this had been settled along

16   with some other things that were settled this morning.

17          It's actually a nuanced question, and having read the

18   papers and having also presided over earlier pre-trials during

19   the adversary docket, I'm generally familiar with the fact that

20   Lehman takes the position that there are common issues of fact

21   having to do with the calculation of termination claims

22   associated with the swaps, regardless of whether we're dealing

23   with credit default swaps or interest rate swaps, and that

24   Nomura Global Financial Products takes the position that it is

25   in engaged in what is fundamentally a different business from

Page 123

1    the other Nomura entities that are the subject of this proposed

2    consolidation.

3            The fact that the parties have been able to work

4    cooperatively together without a consolidation order actually

5    tends to make the entire matter seem more theoretical than real

6    as a dispute.  And the fact that there has been cooperation

7    leading to coordinated discovery, coordinated stipulations

8    relating to privilege and the like all indicates that this is

9    probably much ado about nothing, especially considering that

10   people have been here for hours to get to this point.

11           But this needs to be decided.  I believe that

12   regardless of whether I issue a consolidation order for

13   purposes of pre-trial proceedings in this case, that I have the

14   reserved discretion to order separate trials, should I

15   determine at the conclusion of discovery that it is more

16   efficient, in light of the expert testimony and evidence for

17   the issues relating to Nomura Global Financial Products to be

18   conducted in a separate trial.  In that sense, whether or not I

19   issue consolidation, there is still the ability, after parties

20   have more further -- more fully developed the record, to, in

21   effect, undo the consolidation for purposes of what happens at

22   trial.

23           Because I don't yet have enough information to

24   determine whether this can be most efficiently handled as a

25   consolidated proceeding or as a proceeding with Nomura Global

LBH, et al, LB1

Page 124

1    Financial Products in a separate trial, I'm going to issue an

2    order of consolidation that includes within it, in effect, a

3    statement just as I've said it from the bench, which is, I

4    reserve the right following the conclusion of discovery and

5    pre-trial procedures to order a separate trial for Nomura

6    Global Financial Products, should it be shown in the future

7    that it would be more efficient to the dispute resolution

8    process for a separate hearing to be held.  And I'd simply ask

9    that the consolidation order include that express statement.

10           MR. TAMBE:  Your Honor, we do have a form of

11   consolidation order that we'd agreed upon for pre-trial

12   purposes reserving specifically the right to decide another day

13   whether there would be consolidation for trial purposes.  We

14   could submit an agreed upon form given direction from the

15   Court.

16           THE COURT:  That'd be fine.

17           MR. TAMBE:  Thank you.

18           THE COURT:  Okay.

19           MR. TAMBE:  We'll do so this afternoon.

20           THE COURT:  Then we can all go to lunch.

21           MR. TAMBE:  Thank you.

22           THE COURT:  We're adjourned until 2.

23       (Recess from 12:53 p.m. until 2:04 p.m.)

24           THE COURT:  Be seated, please.

25           I suppose some of you waited all morning for this.  We

Page 125

1      start with Och-Ziff.

2              MR. BRESSLER:  Good afternoon, Your Honor.  Ken

3      Bressler, Blank Rome, for Och-Ziff.

4              MS. RECINE:  Jennifer Recine and Rob Novick from KB --

5      Kasowitz, Benson, Torres & Friedman on behalf of the debtors.

6              THE COURT:  Okay.

7              MR. BRESSLER:  Your Honor, in April 2010, the debtors

8      served a very broad subpoena upon Och-Ziff seeking all records

9      relating to Lehman for all of 2008.  We had several

10     conversations, I did, with various counsel over at the Kasowitz

11     firm in an attempt to narrow it unsuccessfully.  And what we

12     were trying to find out is what are you looking for and why.

13     And what we finally found out in response to our objection is

14     that Lehman thinks that we may have received and may have

15     received some rumors relating to Lehman having offloaded debt

16     to hedge funds that it controlled.

17             Now, it turns out that the rumor was started by

18     someone at Lehman.  Whether it's a rumor or story, I just

19     don't -- I'm not going to say.  And it was reported in an

20     online newsletter called "Naked Capitalism".  Now, Lehman

21     doesn't say that we actually started it.  They don't say that

22     Och-Ziff actually ever saw it or passed it on.  Och-Ziff, of

23     course, did see it because Och-Ziff monitors what's going on

24     out there.  But let me make it very clear.  This, according to

25     counsel for Lehman, was part of a short and distort scheme.  In

Page 126

1    order to have a short and distort scheme, you have to be short.

2    Och-Ziff was long Lehman going into June.  Och-Ziff bought 276

3    million dollars worth of common and preferred shares in June as

4    part of a secondary offering.  Och-Ziff was long in Lehman

5    throughout June and at the end of June.  Okay?  Och-Ziff, as

6    far as we can tell, we knew about this, heard about the rumor,

7    never did pass it on, never did anything.

8         Now, the SEC has looked into all the hedge funds and

9    have asked for documents from everybody, and Och-Ziff turned

10   over documents.  And this is two years ago.  Since then,

11   nothing because there is nothing.  Yet, we're being asked in

12   the original subpoena to give everything that would cost 3.3

13   million dollars to produce.

14        We're willing to work with them.  And now that counsel

15   for Lehman has identified a particular rumor that they're

16   interested in, we've offered to give them documents during June

17   that refers to the rumor.  They've turned it down.  And they

18   said they want everything from March until the date that Lehman

19   filed relating to -- they'll give us search words -- search

20   terms to search for.

21        We think that we're giving a very tailored offer that

22   would be reasonable for which, while we don't think they've

23   established good cause, would be not so much of a burden that

24   we would contest it.  And we ask the Court to just fashion a

25   compromise whereby we'll produce documents that refer to this

Page 127

1    rumor in June that Lehman has identified -- it's the only thing

2    they've identified through their investigation as our even

3    having likely seen or likely disseminated -- and we'd be happy

4    to turn over those documents.

5            Anything else, Your Honor, I think is not justified

6    and would be an undue and unwarranted expense not only to the

7    estate but, of course, to a non-party, Och-Ziff.  Thank you.

8            MS. RECINE:  That was an interesting presentation,

9    largely because the first that we ever heard in terms of a

10   willingness to produce even a single document was yesterday

11   afternoon.  At that point, we were offered ten days.

12           This morning, we came back.  Our compromise offer has

13   always been, from the very beginning, let's start with whether

14   or not you were in short or short-equivalent positions during

15   the relevant time period; turn over your trading records

16   subject to confidentiality -- appropriate confidentiality

17   provisions, and we'll go from there.

18           We also simultaneously asked repeatedly of Och-Ziff,

19   which they did not confirm until this morning, whether or not

20   they were a subject of the SEC investigation into market

21   participants manipulating the stocks so that they could profit

22   from their short positions.  This is not a lark on our part.

23   It turns out that Och-Ziff was the target of such SEC

24   investigations.  As a result, we feel that that buttresses our

25   position, which is that our investigation showed that they were

LBHI, et al, LB1

Page 128

1    involved in at least one rumor.  That rumor does relate to

2    something that was ultimately published in a news report, but

3    that doesn't mean that's the extent of the rumor.  That means

4    it may have made its way into the public domain through Och-

5    Ziff personally, or it may have made its way through Och-Ziff

6    because they were the recipient of that rumor from someone

7    else.  It was never the case that -- it was never the case that

8    we believed, at least at the outset, that Och-Ziff was

9    necessarily the entity that was engaging in short and distort

10   practices.  We believed they were an entity that would have

11   information about those who were.  Of course, their complete

12   unwillingness to cooperate with us in finding a way to get the

13   information that we need has raised red flags for us, and

14   particularly, their unwillingness to share with us, despite

15   repeated requests, the fact that they were, in fact, the target

16   of an SEC subpoena.

17        At this juncture, we think the fact that they have

18   already produced these documents to the SEC, those documents

19   have probably already been reviewed for privilege, they're

20   probably in an electronic format militates against any argument

21   that there's a significant burden here for Och-Ziff.  At this

22   point, as a starting place, they can certainly turn those

23   documents over to us, and if, in fact, as they suggest, they

24   not only engaged in no inappropriate behavior but also have no

25   information about any inappropriate conduct, well, then we'll

Page 129

1    leave it there.  But we don't believe that that's the case.

2          THE COURT:  Just ask a question or two.  I looked at

3    all the paperwork that this dispute has generated, including

4    the papers that were filed as recently as yesterday.  And it

5    appears that this argument is being converted into a bid and

6    ask for what will be ultimately produced.  There's a

7    willingness on the part of Lehman through special counsel to

8    limit the requests, and there's a willingness on the part of

9    Och-Ziff in responding to the subpoena to turn over something

10   based upon, at least, what was said today, although Och-Ziff

11   has been characterized in the papers filed as stonewalling from

12   the very beginning.

13         Why shouldn't I simply ask the parties to do what they

14   should have done at the very outset which is to reach a

15   reasonable agreement and then proceed?

16         MS. RECINE:  We're happy to do that, and we've been

17   willing to discuss this all along.  Until yesterday, the answer

18   that we have received from Och-Ziff's counsel is that they

19   would produce no documents.  As of yesterday, there was an

20   offer of ten days.  As of today, it seems that it's expanded by

21   a few weeks.  We don't think that our time period is

22   unreasonable.  We also don't think our methodology is

23   unreasonable.  We are willing to do this in a number of

24   different ways in order to alleviate the burden.  We also

25   asked, during the process during which we were meeting and

Page 130

1   conferring, about what the specific burden was.  We also

2   received no answer about that until we saw the papers.  We

3   think that the discussion of burden shouldn't be credited

4   because it also does not take into account the fact that Och-

5   Ziff did, in fact, make a production to the SEC.  If they're

6   willing to start with that production, I think that we can

7   reach a reasonable agreement at this point.

8        THE COURT:  Was there -- I'll ask this just of Och-

9   Ziff's counsel because I have no idea what the answer is.  I

10  don't know very much about the SEC investigation.  What was the

11  subject matter in the documents that were turned over?  Were

12  they documents within the scope of what's currently being

13  requested?

14       MR. BRESSLER:  Not -- most of them were not, Your

15  Honor, firstly, but second, I would like to address Your

16  Honor's comment that the estate has claimed they were

17  stonewalling.  We asked and asked.

18       THE COURT:  Well, that's what the papers say.

19       MR. BRESSLER:  They do.  But I just want it to be

20  clear that we kept on asking why, and what are you looking for,

21  and all they kept on saying is give us all of this.  We don't

22  have to tell you.  The exact quote is, "That's litigation.

23  It's not how it works.  We don't have to tell you anything."

24  Now we're in a situation where we've gotten something, finally,

25  from them where they said here is what we're looking at.  We're

Page 131

1    looking at a specific rumor; that's what our investigation has

2    shown.  Now that they have that investigation, that rumor,

3    fine.  We'll respond to it.  And the fact that we said the

4    17th, the day it came out, this morning, Ms. Recine said, well,

5    we would like some stuff before that, too.  So we'll give it to

6    them, relating to this rumor.  But anything else is uncalled

7    for.  And it's not just a fishing expedition; it's harassing.

8    It goes beyond that.

9            Insofar as the SEC investigation, everything will have

10   to be re-reviewed.  Firstly, a lot of the doc -- the, one, it

11   covers a period in September.

12           THE COURT:  What was the SEC investigating?

13           MR. BRESSLER:  They were investigating all hedge funds

14   relating to policies for short-selling, for trading, records

15   relating to Lehman and others, and for policies -- I mean, all

16   documents mentioning Lehman, Merrill Lynch, Morgan Stanley,

17   Goldman Sachs, WaMu, and AIG.  They had a blunderbust (sic)

18   request to all hedge funds, all major hedge funds, not

19   investigating Och-Ziff, as counsel would have this Court

20   believe, and it's gone nowhere because there is nothing.

21           All these documents will have to be reviewed.  They

22   had to be produced in very fast order, they weren't necessarily

23   reviewed for privilege.  Many of them contained information

24   that is not just related to Lehman.

25           But again, most importantly, they've told us what they

Page 132

1    want, what their investigation showed.  And we'll give it to

2    them, Your Honor.  We'll give them what they need for what they

3    say we, quote, "likely were involved in".  And I don't

4    understand why they need anything else.

5            THE COURT:  What's the response to that?

6            MS. RECINE:  The response to that is two-fold.  One is

7    that while there is one rumor in particular that our

8    investigation showed that Och-Ziff may have been involved with,

9    our perception is that during this entire period there was an

10   extreme amount of market noise with respect to Lehman.  That's

11   what this investigation is about.  Because we know that Och-

12   Ziff was involved with one rumor, we have reason to believe

13   that they could have been involved with a number of the rumors

14   that were very much affecting the marketplace during a

15   relatively tight period of time.  We're not talking about an

16   extensive period of time.  I think it's disingenuous for Och-

17   Ziff to say, okay, well, we may have had something to do with

18   this one rumor, so we'll give you that information, but we're

19   not going to give you anything else during this time period.

20   We're willing to work with them in order to make this a

21   reasonable search.  We're willing to limit custodians; we're

22   willing to limit search terms.

23           And the other really important piece here, that I

24   think that Och-Ziff would like to gloss over but I think needs

25   to be addressed is that Och-Ziff had extensive business

Page 133

1    relationships with Lehman.  One of the other things that Lehman

2    believes was happening during this period and one of the things

3    that Lehman's investigation showed and that our internal

4    investigation also corroborated was that entities and firms

5    with business relationships with Lehman during this period were

6    being wooed away.  Other market participants and other firms

7    were coming to them and if they had a prime brokerage

8    relationship, for example, with Lehman, that competitor would

9    come to the firm, for example, Och-Ziff, and say, okay, look,

10   Lehman's falling apart.  There are all these things that are

11   going on with it.  These are the following issues that it has.

12   We think that you should leave Lehman Brothers and bring your

13   business to us.  All of those things -- all of those things are

14   things we need to look into in order to understand what

15   happened during this period and to understand whether there is

16   a claim that ought to be pursued.  Och-Ziff admits that it had

17   extensive business relationships with Lehman; it admits that it

18   had a prime brokerage relationship with Lehman.  And it doesn't

19   contest the fact that it may have received information and may

20   have been the subject of efforts to win its business away from

21   Lehman Brothers.

22             THE COURT:  Okay.

23             MR. BRESSLER:  May I briefly respond?

24             THE COURT:  Very.  Very briefly.

25             MR. BRESSLER:  Thank you, Your Honor.  Counsel says

Page 134

1    that we say we may have been involved in this rumor.  We were

2    not.  We saw it.  That's it.  And now, if they believe they

3    should be entitled to look into other rumors because they think

4    we're involved with this, well, let them see that we're not

5    involved in this.  Then they're whole basis for looking into

6    something else falls by the wayside.

7            Insofar as the prime brokerage, I have no idea what

8    Congress will claim there could be if one company says come do

9    business with us.  That's not -- it's just not a claim, number

10   one.  Number two, of course Och-Ziff and others pulled, at some

11   point, some prime brokerage accounts.  We have 220 million

12   dollars left with Lehman in the prime brokerage account.

13           So I think they're on some type of I don't even know

14   what.  I don't know what they're looking for.  They just keep

15   on throwing different things at us to make it harder.

16           THE COURT:  It's called a fishing expedition.  That's

17   what happens in 2004.

18           MR. BRESSLER:  I understand.  I think it's a little

19   beyond and we're willing to be reasonable.  And I think they'll

20   see how -- that Och-Ziff did nothing wrong in connection with

21   this rumor, and they'll have no reason to proceed any further.

22           THE COURT:  Okay, well, disputes of this sort are the

23   very disputes that judges, wherever they sit, dislike the most.

24   This is just a garden-variety discovery dispute that's arising

25   without even litigation in the context of a 2004 order and

Page 135

1   subpoena that, candidly, never should've gotten to this point.

2   The fact that counsel had to be at the tail end of an omnibus

3   hearing, literally for hours, wasting their time, maybe is

4   punishment enough for you.

5           The parties have filed declarations, supplemental

6   briefs, everybody trying to show how reasonable they're being.

7   Obviously, nobody's being that reasonable.

8           The notion that this is a three-plus million dollar

9   job is a complete distortion and not credible.  I am not going

10  to grant the discovery request in full, but I am inclined to be

11  very liberal under the ambit of Rule 2004 in giving the debtor

12  a fairly wide berth in terms of exploring whatever questions

13  they have regarding the role of Och-Ziff.  It is premature to

14  argue the merits of a subpoena by, in effect, assuming that the

15  answer is there's nothing here for anybody to discover.  The

16  only way to know if there's anything to discover is to actually

17  produce the requested documents.

18          I'm going to direct the parties to meet and confer

19  today and to report to me by 5 o'clock today what progress you

20  have made, and I expect there to be progress.  If you would

21  like, for convenience, to use the conference room across from

22  my chambers, you're free to do that.  If you want to go to

23  somebody's office and be more comfortable and get coffee,

24  that's fine, too.  But I expect a telephone call to chambers no

25  later than 5 p.m.  And depending on the results of that call,

Page 136

1    we'll either have a further conference on the record, or we'll

2    discover what next will happen.  But there will be discovery;

3    it's just a question of the scope and the burden.  I'm sure you

4    can work it out.  You're both experienced on both sides.

5              MR. BRESSLER:  Thank you.

6         (Pause)

7              THE COURT:  Lehman v. USA.

8              MR. MADAN:  Good afternoon, Your Honor.  Raj Madan,

9    Bingham McCutcheon for the debtors.

10             MR. CORDARO:  Good afternoon, Your Honor.  Joseph

11   Cordaro, Assistant United States Attorney on behalf of the

12   United States.

13             MR. COHEN:  David Cohen, Milbank, Tweed, Hadley &

14   McCloy here on behalf of the official committee for unsecured

15   creditors.

16             MR. TOMBACK:  Andrew Tomback, Milbank, on behalf of

17   the committee for unsecured creditors, Your Honor.

18             MS. RANKIN:  Kiara Rankin on behalf of LBHI.

19             THE COURT:  Okay.  This is just a pre-trial.  I see

20   from the docket that the government has filed a motion relating

21   to the reference because of the tax issues involved here.  It

22   appears to have been filed as recently as yesterday.

23             You don't all have to stand; you can try to make

24   yourselves comfortable.

25             This isn't an opportunity to talk about that.  I've

Page 137

1    taken a quick look at the papers that were filed just to see

2    what they're about, and I don't know whether that was expected

3    or unexpected on the part of the government, and it certainly

4    looks to me as if somebody's going to be responding to that or

5    agreeing to it, one or the other.  But how does that affect

6    today's pre-trial?

7              MR. MADAN:  May I, Your Honor?

8              THE COURT:  Sure.

9              MR. MADAN:  First of all, the government's motion to

10   withdraw the reference was expected.  We have been in

11   discussions with the government for some time about this issue.

12   It's -- directly answering your question, and then I'm going to

13   come back to what I think our position is going to be, I don't

14   think it should affect the pre-trial conference in setting a

15   schedule for discovery.  I think we should proceed with the

16   setting of discovery, and here's why.

17             While you're right, we've only had a short time to

18   review the papers, and we're still formulating a definitive

19   position, directionally, where we're headed is to consent to

20   withdraw the reference, which may seem a little bit

21   inconsistent with my earlier comment.  But the reason for that,

22   Your Honor, is we are inclined to oppose the motion to withdraw

23   the reference for purposes of discovery.  By that I mean, we

24   think it would be more efficient for the parties to conduct

25   discovery in this court.  And the reason for that is that the

Page 138

1    primary discovery is third party discovery that will be

2    conducted from LBIE, and I think this Court is familiar with

3    the complexities of dealing with Lehman's former affiliate in

4    the U.K., the U.K. broker-dealer LBIE.  And we think this

5    Court, Your Honor, is in a better position to help resolve any

6    issues we have with LBIE to the extent a dispute arises.

7            We are already in informal discussions and have been

8    for a few months, now, with the administrator there at PwC in

9    attempting to obtain documents.  Not unexpectedly, that process

10   is taking a while.  There's bureaucracy and there's a fair

11   amount of back and forth.  But there are certain issues that

12   have arisen, for example, data privacy questions, questions

13   about how long this data goes back, which leads me to believe

14   that at some point, there may need to be some involvement by

15   this Court with obtaining information.  And it's our

16   perspective, the debtors' perspective, which I think is shared

17   by the creditors' committee, that some efficiency would be

18   gained given your experience with dealing with affiliates

19   generally in this multinational bankruptcy process, but in

20   particular, with respect to LBIE and, frankly, from what I've

21   seen on the docket, certain U.K. discovery issues to the extent

22   letters rogatory need to be issued under the Hague Convention.

23           So in summary, I think we're willing to consent to the

24   withdraw of reference, but what we're inclined to do is ask the

25   federal district court to leave the case in bankruptcy court

Page 139

1    for discovery purposes for the reasons I just mentioned.

2          THE COURT:  What does everybody else think of that

3    idea?

4          MR. CORDARO:  Good afternoon, Your Honor.  Joseph

5    Cordaro for the United States.  At this point, Your Honor, the

6    government's view of the efficiencies is actually that if the

7    district court withdraws the reference, then it makes most

8    sense for the case that the district court would supervise

9    discovery.  And it's my impression that, typically, that's what

10   happens, although the government is aware of some cases where

11   the district court has allowed the -- has withdrawn the

12   reference and allowed the case to remain with the bankruptcy

13   court for discovery.  That has happened in the past.

14         THE COURT:  I think that's actually the most typical

15   model.

16         MR. CORDARO:  But Your Honor, as Mr. Madan referred to

17   in the end of his comments, actually, that's going to be a

18   question for the district judge to decide, and I think that's

19   an argument that we can have before him at that time.

20         THE COURT:  Or her.

21         MR. CORDARO:  Or her -- actually, the case has --

22         THE COURT:  Has it been assigned?

23         MR. CORDARO:  No, the case has been assigned; it's

24   been assigned to Judge Berman.  But insofar as the setting of a

25   discovery schedule goes, it is a way of getting the case --

1   getting some dates into the case at this point.  Of course, I

2   mean, there's the recognition that should the matter be

3   withdrawn, the district judge probably is going to look at this

4   anew and may modify the schedule as he pleases or not.  But I

5   do think to answer the question that Your Honor put, insofar as

6   this conference is concerned, I mean, it does make sense to

7   discuss deadlines, and we've been having discussions along

8   those lines as well as in reference to withdrawing the

9   reference.

10          THE COURT:  Okay, I'll hear from the committee.

11          MR. CORDARO:  Thank you, Your Honor.

12          MR. TOMBACK:  Your Honor, Andrew Tomback, Milbank, for

13   the committee.  It's rare that I'm in a position to agree with

14   everybody, but first of all, I certainly agree with the notion

15   that we should move forward and ask Your Honor respectfully to

16   sign the order.  I think that it would help things to get going

17   not just informally but formally.

18          And then secondly, whether the case is actually

19   formally withdrawn and then referred back to Your Honor or, I

20   guess the most well-known case to me, at least, is Keene Corp.

21   (ph.), a Judge Duffy case, where he deferred ruling on the

22   withdrawal issue and left the case in the bankruptcy court for

23   much longer than just discovery, and there's precedent --

24   Shugrue and PBGC -- precedent for the withdrawal of the case

25   and then refer back.  We fill strongly that's appropriate, not

Page 141

1    just because of what Your Honor sees, but I've had the pleasure

2    of working with LBIE in trying to obtain documents informally.

3          THE COURT:  You described that as a pleasure?

4          MR. TOMBACK:  Well, I was being facetious, Your Honor.

5    And it's tough.  And I've watched Your Honor deal with

6    discovery on a multiple issues vis-a-vis LBIE, for that matter,

7    the client here, LBHI.  I think there's a tremendous advantage

8    that Your Honor has in doing so, and I don't think that it

9    would hurt, necessarily, Judge Berman in his ability to handle

10   the case thereafter, if Your Honor does that.  So I agree, of

11   course, with the debtor, as well.

12         THE COURT:  Okay.  Here's what I think makes sense.

13   First of all, I commend the parties in recognizing that the

14   legal issues that are presented in this adversary proceeding

15   are unusual non-bankruptcy issues of first impression, as far

16   as I can tell -- but I'm not characterizing it other than to

17   say that -- and that the process of managing the case

18   cooperatively with the district court is something that I

19   believe both Judge Berman and I would welcome if the parties

20   could reach what I'll suggest is a protocol for managing

21   discovery and trial cooperatively in the context of a

22   consensual withdrawal of the reference by stipulation.

23         I hear no major pushback on the notion that there are

24   predominant non-bankruptcy issues that are at the root of this

25   dispute and that it would be most efficient, regardless of

Page 142

```
 1   mandatory withdrawal, for the district court to be the first

 2   trial court that considers the case for dispute resolution.

 3   Whether the district court or this court represents the better

 4   place to deal with pretrial and discovery issues, I'm frankly

 5   not prepared to say, and it may be that for calendaring

 6   purposes and other administrative purposes that Judge Berman

 7   would prefer to manage the discovery phase of the case unless

 8   the parties otherwise had a stipulation which he could easily

 9   agree to.  And I'm not going to prejudge that, here.  But I do

10   think that it makes sense for the parties, promptly, to

11   develop, if they haven't already started this process, a

12   schedule for the completion of discovery, dispositive motions,

13   dealing with experts to the extent experts are involved, and

14   that to the extent that there is some work that's already been

15   done on that subject, we could maybe move forward with that

16   right away.

17              MR. MADAN:  Yeah, I don't mean to interrupt, Your

18   Honor, but we did file on the docket, on Monday, an agreed

19   discovery plan which includes all the dates you just

20   identified.  If you'd like, I can approach the bench with --

21              THE COURT:  I saw the motion for withdrawal of

22   reference.  I didn't see this.  Thank you.

23              Well, if you've already done that, and if everybody's

24   already signed it and all it requires is my signature, it shall

25   be done.
```

Page 143

1          MR. MADAN:  Thank you, Your Honor.

2          THE COURT:  Now, is there more for this conference, or

3    does that really take care of it?

4          MR. MADAN:  That takes care of it from the debtors'

5    side, Your Honor.

6          MR. CORDARO:  Nothing from the government, Your Honor.

7          THE COURT:  Okay.

8          MR. TOMBACK:  Just appreciation from us, Your Honor.

9          THE COURT:  My suggestion is that I will arrange for a

10   relatively prompt entry of the order relating to the scheduling

11   and discovery plan, but it does seem to me that it would be in

12   the interest of the parties to consider together how best to

13   most efficiently manage the discovery process which has been

14   outlined in this order.  And I have no particular preference

15   one way or the other.  I think if the parties believe that

16   there are efficiencies associated with keeping the discovery

17   process within the bankruptcy court, I have, certainly, no

18   objection to that and I'd be pleased to preside with respect to

19   any matters that may come up during the discovery phase of the

20   case.  But if there's lack of consensus on that point, I'll

21   leave it to others to decide how best to handle this, including

22   Judge Berman when he hears what will turn out to be a

23   consensual -- I think it will turn out to be a consensual

24   motion of withdrawal of the reference.

25          I suspect that both he and I share the view that it

LBH, et al, LB1

Page 144

1   would be desirable, to the extent unnecessary disputes can be

2   minimized, that the parties think about what makes the most

3   sense.  There probably isn't an advocate's view of that.  There

4   probably is a better view as to how to deal with foreign

5   discovery issues.  And I have no preference.  Do whatever you

6   think is best.  And if you don't have an agreement, I'll leave

7   it to Judge Berman to decide.  All right?

8          MR. MADAN:  Thank you, Your Honor.

9          MR. CORDARO:  Thank you, Your Honor.

10          THE COURT:  We're adjourned for the day.  Thank you.

11       (Proceedings concluded by 2:36 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 145

```
 1                         I N D E X

 2

 3                      T E S T I M O N Y

 4   WITNESS              EXAM BY           PAGE      LINE

 5   Jeff Fitts           (Via proffer)      38        12

 6   Jeff Fitts           Mr. Kuntz          45         5

 7   Michael Lascher      (Via proffer)      70        20

 8

 9

10                      R U L I N G S

11   DESCRIPTION                            PAGE      LINE

12   Motion of Lehman Brothers Holdings Inc.  26       21

13   and Lehman Commercial Paper Inc. to Amend

14   the RACERS Transaction Documents, granted.

15

16   Proffer of Jeff Fitts is accepted as     43       24

17   direct testimony.

18

19   Debtors' Motion for an Order (i) Allowing  55      12

20   LCPI to Acquire Certain Loans through a

21   Joint Venture and (ii) Authorizing LCPI

22   and LBHI to Provide Gap Funding through a

23   Term Loan, Revolver, and Preferred Equity

24   Investment, approved.

25
```

Page 146

1

2                        R U L I N G S (con't.d)

3     DESCRIPTION                              PAGE      LINE

4     LBHI's Motion for (i) Approval of Surrender    65        8

5     Agreement in Connection With Surrender of

6     Real Property Lease and (ii) Authorization

7     to Abandon Certain Personal Property, adjourned

8     if there remain objections after discussion

9     between the parties.

10

11    Motion of Lehman Brothers Holdings Inc.        64        24

12    and Lehman Commercial Paper Inc. for

13    Authorization to Guarantee Payment of the

14    Fees and Related Charges of Lazard Freres

15    & Co. LLC, granted.

16

17    Proffer of Jeff Fitts is accepted as           78        7

18    direct testimony.

19

20

21

22

23

24

25

```
                                                      Page 147

 1

 2                       R U L I N G S (con't.d)

 3    DESCRIPTION                              PAGE      LINE

 4    Motion of Lehman Commercial Paper Inc.   114        9

 5    for Authority to (i) Consent to its Non-

 6    Debtor Affiliate Lehman ALI Inc. (a)

 7    Entry into Plan Support Agreement

 8    Related to the Restructuring of Innkeepers

 9    USA Trust; and (b) Consummation of the

10    Transactions Set Forth in the Plan Term

11    Sheet; and (ii) Provide Funds to Solar

12    Finance Inc., a Non-Debtor Affiliate,

13    to Provide Debtor-in-Possession

14    Financing,

15

16    Motion of Debtors and Debtors in         124        2

17    Possession for Entry of an Order to

18    Consolidate Certain Proceedings and

19    Establish Related Procedures, granted.

20

21    Discovery plan approved.                 142       25

22

23

24

25
```

1

2                         C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    _____

8    Clara Rubin

9    AAERT Certified Electronic Transcriber (CET**D-491)

10   Also transcribed by:    Sharona Shapiro (CET**D-492)

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date: August 19, 2010

18

19

20

21

22

23

24

25