Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555 (JMP)

5   - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC., et al.,

9

10          Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - -x

13

14                 U.S. Bankruptcy Court

15                 One Bowling Green

16                 New York, New York

17

18                 August 23, 2010

19                 9:32 AM

20

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25

1

2    EVIDENTIARY HEARING re 60(b) Motions.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed By:  Clara Rubin and Lisa Bar-Leib

25

Page 3

1

2    A P P E A R A N C E S:

3    JONES DAY

4            Special Counsel to the Debtors

5            222 East 41st Street

6            New York, NY 10017

7

8    BY:   ROBERT W. GAFFEY, ESQ.

9

10

11   BOIES, SCHILLER & FLEXNER LLP

12           Attorneys for Barclays

13           575 Lexington Avenue

14           7th Floor

15           New York, NY 10022

16

17   BY:   JONATHAN D. SCHILLER, ESQ.

18

19

20   BOIES, SCHILLER & FLEXNER LLP

21           Attorneys for Barclays

22           333 Main Street

23           Armonk, NY 10504

24

25   BY:   DAVID BOIES, ESQ.

Page 4

1

2    BOIES, SCHILLER & FLEXNER LLP

3         Attorneys for Barclays

4         10 North Pearl Street

5         4th Floor

6         Albany, NY 12207

7

8    BY:   TRICIA J. BLOOMER, ESQ.

9

10   HUGHES HUBBARD & REED LLP

11        Attorneys for James W. Giddens, Trustee for the SIPA

12         Liquidation of Lehman Brothers Inc.

13        One Battery Park Plaza

14        New York, NY 10004

15

16   BY:   WILLIAM R. MAGUIRE, ESQ.

17        NEIL J. OXFORD, ESQ.

18

19   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

20        Attorneys for the Official Committee of Unsecured

21         Creditors

22        51 Madison Avenue, 22nd Floor

23        New York, NY 10010

24

25   BY:   JAMES G. TECCE, ESQ.

Page 5

1

2      STUTMAN TREISTER & GLATT

3            Attorneys for Interested Party, Elliott Management

4            1901 Avenue of the Stars

5            12th Floor

6            Los Angeles, CA 90067

7

8      BY:    WHITMAN L. HOLT, ESQ. (TELEPHONICALLY)

9            REBECCA S. REVICH, ESQ. (TELEPHONICALLY)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1              P R O C E E D I N G S

2         THE COURT:  Be seated, please.  Good morning.  Welcome

3    back.

4         MR. BOIES:  Good morning, Your Honor.

5         THE COURT:  What's the plan for the day?

6         MR. BOIES:  Your Honor, we have one -- David Boies,

7    for Barclays.  We have one brief housekeeping matter, which is

8    a stipulation that admits certain exhibits which, with the

9    Court's permission, I will hand up.

10        THE COURT:  That'd be fine.

11      (Pause)

12        THE COURT:  I'll just take it.  Thank you.

13        MR. BOIES:  And then I think we are prepared to begin

14   with the -- Barclays' case.  And we have our first witness

15   here, who is Mark Shapiro.  And with the Court's permission, I

16   would call Mr. Shapiro to the stand.

17        THE COURT:  Okay.  At some point during the day, I'd

18   be interested in just a plan for the week so I have an idea

19   what to expect each day.  We don't have to do that now.

20        MR. BOIES:  Right.

21        THE COURT:  Maybe we can do that at an appropriate

22   break.

23        MR. BOIES:  Okay.  We will --

24        THE COURT:  Okay?

25        MR. BOIES:  -- Your Honor.

Page 7

```
1              THE COURT:  Thank you.

2              Mr. Shapiro?  Please raise your right hand.

3         (Witness duly sworn)

4              THE COURT:  Be seated, please.

5    DIRECT EXAMINATION

6    BY MR. BOIES:

7    Q.   Good morning, Mr. Shapiro.

8    A.   Good morning.

9    Q.   Would you begin by telling the Court a little bit about

10   your background?  You are a lawyer by training, are you not,

11   sir?

12   A.   I was trained as a lawyer.  I went to school -- law

13   school, and I practiced at Shearman & Sterling right after law

14   school from 1986 through the time I left, which was in 2002.

15   Q.   And what did you do in 2002?

16   A.   I left the firm -- left Shearman & Sterling where, as a

17   partner, I had been recruited into Lehman Brothers, who was

18   looking to start a restructuring group on the investment

19   banking side.

20   Q.   In September of 2008, were you still at Lehman?

21   A.   Yes, I was.

22   Q.   And what was your position there?

23   A.   I was head of the restructuring group within the

24   investment banking division.

25   Q.   And what is your current position?
```

Page 8

1   A.   Well, after the Lehman bankruptcy, I was offered a

2   position at Barclays, which is essentially the same position I

3   had at Lehman, which was the head of restructuring within

4   investment banking at Barclays Capital, and that's the position

5   I hold today.

6   Q.   I'd like to take you back to September of 2008, in

7   particular to September 12 of 2008, and ask you whether at that

8   time you learned that there was a serious risk that Lehman

9   would file for bankruptcy?

10  A.   September 12th was Thursday?

11  Q.   No, I think September 12th was a Friday.

12  A.   Friday.  Okay.  So I first learned about the possibility

13  that there could be a problem on Thursday late afternoon from

14  Mark Schaffer, who called me away from a meeting that I was at

15  at Kirkland & Ellis where I was negotiating a DIP facility to

16  come back to the firm to talk about what might need to happen

17  over the course of the next few days.

18  Q.   And what did you do when you returned to the firm on

19  September 11th?

20  A.   I went to Mark Schaffer's office.

21  Q.   And then what happened?

22  A.   They asked me to think about what we might have to do in

23  the event that a deal couldn't be consummated outside of court

24  with one of the bidders that was -- that were in discussions

25  with the firm at that point, and obviously said, you know, it

Page 9

1    is possible that bankruptcy might have to occur in the event we

2    can't get a deal consummated over the weekend.

3    Q.   And in response to that, what did you then do?

4    A.   I said that's going to be a disaster, and basically said

5    okay, well, let me start to think about how we might approach

6    this.  They told me I wasn't able to talk to anybody else, with

7    the limited exception of a few people within the firm, because

8    they were afraid of the confidentiality of the issue.  And, so,

9    basically I said I needed to understand the Lehman balance

10   sheet, try to understand kind of what the whole firm looked

11   like, you know, where the assets were with the liabilities,

12   just to get a sense of what might be able to be accomplished.

13   And so I started on a fact-finding mission essentially to

14   get -- gather in facts.

15   Q.   Now, you said that your initial reaction was that

16   bankruptcy would be a disaster.  Can you explain why you felt

17   that way?

18   A.   Well, we were talking about one of the largest broker-

19   dealer investment banks in the world going bankrupt and that's,

20   you know, by definition going to be a very, very difficult

21   situation for the firm.  Obviously there were inherent systemic

22   risks around it.  And so, you know, my general view was it's

23   going to be a very bad outcome if this happens.

24   Q.   And did you come up with any plan to try to deal with

25   those potentialities?

Page 10

1    A.    Well, not initially.  Initially I just started to figure

2    kind of what the firm looked like, and hoped that they would be

3    able to get to an out-of-court deal.  I really didn't believe,

4    actually, that Lehman would actually go bankrupt, because it

5    just seemed like something that was not going to be allowed to

6    happen.  But ultimately after I did that fact-finding, which

7    really started late Thursday night when I got some information

8    from some people who had -- who were in position of information

9    around the corporate chart, essentially, and understanding what

10   the whole corporate structure looked like, and then by Friday I

11   had started to think about what might have to happen and what

12   we might want to be doing in the event that this became an

13   eventuality.

14   Q.    And what did you conclude were the options?

15   A.    Well, I thought that the only -- if we were going to go

16   into bankruptcy, which I viewed, frankly, as a -- you know, try

17   to avoid it all cost, I basically told everyone, you know, 'We

18   should avoid bankruptcy at all cost.  Whatever deal you have to

19   do out of court you should do, because it's going to be better

20   than a bankruptcy.'  That being said, obviously we didn't

21   control our own destiny in many ways.

22        And so when I, you know, was really thinking about what we

23   might do, it seemed to me that the only way that the firm would

24   be able to survive as a going concern would be to potentially

25   sell it in some kind of a bankruptcy sale process.

1    Q.    And did you present the possibility of a bankruptcy sale

2    process to people within Lehman Brothers?

3    A.    Yes, I did.

4    Q.    When did you do that?

5    A.    Friday night.

6    Q.    And what was their reaction?

7    A.    Well, I explained that we could potentially sell the firm

8    in, you know, a 363 sale, it would have to be done very

9    quickly, in my view, and it would need the support of the

10   regulators, who would obviously have to be supportive of

11   whoever was buying it.  And when I showed -- or told them about

12   this idea, they said 'Well, we're talking about a bankruptcy,

13   right?'  And I said 'Yes, that's a bankruptcy.'  And they said

14   'Well, we don't want to do a bankruptcy.'  And I said 'I

15   understand.  This is a backup plan.'  And so really it didn't

16   get much traction.

17   Q.    Now, you say that if you were going to do a 363 sale, it

18   would have to be done very quickly.  Why was that?

19   A.    Because I didn't -- you know, financial -- I've been

20   involved in a number of large financial firm bankruptcies, and

21   they don't tend to last very long in terms of the going

22   concern:  People leave; it becomes very, very difficult to

23   control the situation.  And so it was my view as a twenty-plus

24   year bankruptcy professional that, you know, the only way that

25   you can get a deal done that would maintain the going-concern

08-13555-mg   Doc 11012   Filed 08/25/10   Entered 08/26/10 10:23:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 12 of 199

Page 12

 1   business would be to do something reasonably quickly.

 2   Q.   Now, you indicated that Lehman was at this time trying to

 3   avoid bankruptcy.  How were they trying to avoid bankruptcy?

 4   A.   Well, I wasn't really involved but, based on what I had

 5   learned, they were in discussions with Barclays and with Bank

 6   of America to try to effectuate some kind of a transaction.

 7   But, again, I really wasn't privy to the details of those

 8   transactions.

 9   Q.   Did there come a time when you understood that neither of

10   those transactions were going to take place?

11   A.   I guess -- well, yeah, I mean, at different points in

12   time.  I guess, on Saturday there was a lot going on down at

13   the Fed, and I was not somebody who had gone down to the Fed.

14   And a group came back from the Fed and said that Bank of

15   America had just purchased Merrill.  And so as a result, I

16   figured, okay, well, that's obviously the end of, you know,

17   Bank of America purchasing Lehman.  And so it appeared to me

18   that we were down to Barclays at that point.  And then

19   obviously there was discussions going on at the Fed, which

20   seemed like it was mostly being choreographed by the Fed, not

21   by the people at Lehman, over the weekend.  But on Sunday

22   morning, we learned -- I learned from someone who came running

23   down the hall at Lehman that morning that the Barclays deal was

24   not approved by the English regulators.

25   Q.   Now, after you learned that the Barclays deal was not

Page 13

1   going to proceed on Sunday, September 14th, what did you then

2   do?

3   A.   Well, I was in Tom Russo's office.  Tom Russo was the

4   chief legal officer and he was -- I guess I would call him the

5   consigliere to Fuld.  And so we were trying to figure out what

6   to do next.  We -- he was very close to some of the regulators

7   and organized a call to talk about what the consequences of a

8   Lehman bankruptcy might mean.  And so we ended up getting on a

9   call with, at the time, Tim Geithner, Chris Cox from the SEC,

10  some staff people.  And it was Tom Russo, myself and Dick Fuld

11  talking to them about what might happen here.

12  Q.   And when was this call?

13  A.   It was probably either late morning or around lunchtime on

14  that Sunday.

15  Q.   Okay.  And what occurred on that call?

16  A.   Dick Fuld said 'I have Mark Shapiro here.  He's our

17  restructuring professional.  He's going to talk a little bit

18  about what might happen here in the event that, you know, we

19  are forced to file for a bankruptcy.'  And then I got on and I

20  said 'I believe this is going to be Armageddon.  I think that

21  there's no precedent for this and that this is going to be a

22  disaster.'  And we got no response.  Then Dick Fuld said 'This

23  is not about Lehman anymore.  This is about the global

24  economy.'  Again, we got, really, no response back.  And

25  basically the conversation was reasonably quick and ended

Page 14

```
 1    without, I'd say, any meaningful feedback from that group.

 2    Q.   And what was the next thing that you did?

 3    A.   Well, we had a subsidiary in London, and the subsidiary in

 4    London was funded by the U.S. company LBI.  And so we needed to

 5    figure out what to do there, because they had their own board

 6    meetings going on with their own counsel, and they were dealing

 7    with the trading law and solvent issue under English law.

 8    Q.   And what did you end up doing there?

 9    A.   I ended up in contact with the internal lawyer who I knew

10    who -- he and I were having discussions, and he needed to know

11    was there still a chance that we would avoid bankruptcy,

12    because, if there wasn't, then he needed to advise that board

13    that they needed to put themselves into an administration under

14    U.K. law.

15    Q.   And what did you respond?

16    A.   Well, we held out hoping that maybe sometime between,

17    let's call it, noon and what eventually was probably around

18    4 o'clock, we would find some alternative solution to

19    bankruptcy.  When none appeared, Tom Russo and I called him

20    back and said 'It doesn't appear that there's any savior here

21    for us.  You'll have to do what you have to do.'  And so they

22    put -- they then put the U.K. company into administration.

23    Q.   And with respect to what was happening in the United

24    States, during that Sunday of September 14th, did you return to

25    your 363 sale idea at all?
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 15

1    A.    Later in the day, yes.

2    Q.    When was that?

3    A.    That was -- well, I guess -- at about 5 o'clock we had an

4    internal meeting amongst most of the senior people, maybe fifty

5    senior people that had been flown in from all over the world,

6    to talk about what was happening, and I was asked to present

7    briefly what was going to happen in the coming days.  I had the

8    corporate chart; I explained to people we were filing the

9    holding company but we were not going to file any other

10   companies in hope that we would figure something out maybe in

11   the interim.

12   Q.    And what did you do next after that?

13   A.    So when that meeting broke up, which was, I'd call it,

14   sort of morgue-like, because obviously, you know, everybody --

15   it was so uncertain as to what would happen; everyone was being

16   wiped out of much of their net worth, losing their jobs.  You

17   know, obviously a very somber meeting.  And at the end of that

18   meeting, there were a few of us who kind of hung around, and I

19   believe it was Kevin Genirs, who was the internal counsel at

20   investment banking, said to me, 'You know, Mark, you had this

21   idea about selling the firm.  Have you talked to Bart about

22   it?'

23   Q.    And what did you respond?

24   A.    I said 'No, I hadn't.'

25   Q.    And what happened after that?

Page 16

1   A.   He said 'We should go down to Bart's office and talk to

2   you' -- you know, 'You should go down to Bart's office and talk

3   to him about it.'

4   Q.   And did you do that?

5   A.   I did.

6   Q.   And what did you say to him and what did he say to you, in

7   substance?

8   A.   I knew Bart because our kids had gone to Rye Country Day

9   School together, so I knew him a little bit, and so I felt

10  comfortable going into his office.  And I said 'I have this

11  idea.  I think we can still sell the firm to a buyer, and maybe

12  Barclays wants to buy it.'  And I gave him a thirty-second

13  synopsis of what 363 was.

14  Q.   And then what did Mr. McDade do?

15  A.   He said 'Let's call Diamond.'

16  Q.   And did he call Mr. Diamond in your presence?

17  A.   Yes, he did.

18  Q.   And what did Mr. McDade say to Mr. Diamond?

19  A.   He said 'I have Mark Shapiro here.  He's a restructuring

20  person who works here at Lehman and he thinks, you know, that

21  you guys can buy us in a bankruptcy sale.  Are you interested?'

22  Q.   And did Mr. Diamond give a response at that time?

23  A.   Well, he wasn't on speakerphone, so I didn't hear the

24  response.  I only could infer the response from what Bart said.

25  But basically it sounded like he essentially said he needed to

Page 17

1    call somebody, and then Bart hung up and said 'He said he'll

2    call me' -- 'He needs to call someone.  He'll call us back in

3    fifteen minutes.'

4    Q.    And did you remain in Mr. McDade's office?

5    A.    I did.

6    Q.    And did a call come back?

7    A.    Yeah, it did.

8    Q.    And were you still in Mr. McDade's office when that call

9    came back?

10   A.    Yes, I was.

11   Q.    And as a result of that call from Mr. Diamond, what

12   happened?

13   A.    Bart reported that Diamond called back, and it was a very

14   short call, and he said 'We want to do this.'  He said 'We want

15   to do this.  Let's meet at your firm at 7 a.m. tomorrow

16   morning.  I'll have our team there; you have your team there.'

17   Q.    Now, prior to the time that Mr. McDade and Mr. Diamond

18   agreed to meet the following morning, had you retained any

19   outside bankruptcy counsel?

20   A.    Yes.

21   Q.    Who did you retain?

22   A.    I didn't retain them, but Steve Berkenfeld had retained

23   Weil Gotshal.

24   Q.    And where -- when were they retained?

25   A.    I'm not exactly sure.  I believe they were retained either

Page 18

1    Wednesday or Thursday.  I'm not positive when exactly they were

2    retained.

3    Q.    Prior to the conversation between Mr. McDade and Mr.

4    Diamond we're talking about, had you had any meetings with Weil

5    Gotshal?

6    A.    Yes.

7    Q.    When did you have meetings with Weil Gotshal?

8    A.    I had a phone call with them on Friday, very -- you know,

9    just sort of introductory.  It was with Shai Waisman and Lori

10   Fife.  And then we met on Saturday, because they had prepared

11   petitions.  And I had also instructed them on Saturday to start

12   working on a motion -- on a 363 motion on the off-chance that

13   maybe we could do something with somebody.

14   Q.    Okay.  Now, as of the time that Mr. McDade and Mr. Diamond

15   were talking Sunday night, September 14th, had Lehman retained

16   an investment banker in connection with the bankruptcy?

17   A.    When -- as of the time I spoke to Bart?

18   Q.    Yes.

19   A.    No.

20   Q.    Did there come a time when Lehman Brothers did retain an

21   investment banker?

22   A.    Yes.

23   Q.    When was that?

24   A.    Later that evening.

25   Q.    And did you play any role in that?

Page 19

```
 1    A.    Yes.

 2    Q.    What role did you play?

 3    A.    Well, we were standing right after the board had met, and

 4    that -- I guess an hour, or maybe an hour or so, after the

 5    board had met, and I said to Skip McGee who was there, 'You

 6    know, we can't be our own investment bankers in a bankruptcy,'

 7    because I don't think people fully appreciated that.  You know,

 8    very often when investment banks do their own deals, they are

 9    their own banker.

10    Q.    And what was the response?

11    A.    He said 'Oh, okay.'  And I said 'I think we should

12    bring' -- 'We need to bring somebody in to do this.'

13    Q.    And did he agree?

14    A.    He said 'Yes, we should.  What do you think?'

15    Q.    And who was brought in?

16    A.    Well, initially I suggested Art Newman at Blackstone, who

17    I knew extremely well and have a high regard for, and he had

18    played the role in other large financial institution

19    bankruptcies.  And so I called Art to see if he was free and

20    his firm, you know, could do it.

21    Q.    And did you ultimately -- did Lehman ultimately retain

22    him?

23    A.    No, we did not.

24    Q.    Why not?

25    A.    Because Lazard -- in betw -- by the time he called me
```

Page 20

```
 1    back, Skip came back to me and said, 'You know, we had brought

 2    Lazard in to work on the SpinCo transaction and they were

 3    giving a fairness opinion.  I feel like I have an obligation to

 4    them to at least offer them this opportunity.  Since we haven't

 5    paid them anything in regards to that transaction, we should

 6    give them an opportunity to earn a fee.'

 7    Q.   And what was the SpinCo transaction that you refer to?

 8    A.   That was -- the firm had put together its commercial real

 9    estate in one entity and it was going to either try to spin it

10    off to shareholders or sell it to a third party.  I was not

11    involved with it.

12    Q.   And Lazard had been the investment banker for Lehman in

13    that proposed transaction?

14    A.   There was a banker named Gary Parr, who I personally

15    didn't know, who apparently was involved in that transaction at

16    the time, yes.

17    Q.   Okay.  And he was from Lazard?

18    A.   Correct.

19    Q.   Now, did Lehman Brothers ultimately retain Lazard in

20    connection with this bankruptcy and the 363 sale?

21    A.   Yes.  So after we had this conversation, Skip and I, he

22    said 'Let's go back to my office and let's call Lazard and see

23    if they can do this.'  And so he put in a call to Gary Parr,

24    who then got Terry Savage on the phone, because Terry is

25    someone that I've known well over the years.  I explained -- we
```

1   explained to them what was going on, and they said that they

2   would be interested, they would like to do it and that -- Terry

3   said he couldn't personally deal with it that evening but that

4   he would send Barry Ridings, his partner, into our office that

5   evening, which ultimately happened.

6   Q.   So Mr. Ridings came to the Lehman offices Sunday night --

7   A.   Correct.

8   Q.   -- September 14?

9   A.   Probably around 10 o'clock, yeah.

10   Q.   And did you know Mr. Ridings before then?

11   A.   I had worked on one transaction with him years before,

12   Owens Corning, but we weren't -- I didn't know him nearly as

13   well as I knew Terry Savage.

14   Q.   And what was Mr. Ridings' position with Lazard?

15   A.   He and Terry ran their restructuring group.

16   Q.   And had he had personal experience with any financial-firm

17   bankruptcies previously to this one?

18   A.   I didn't know.  You know, I only knew Terry through Owens

19   Corning, so I didn't really exactly know what he had worked on

20   before that.

21   Q.   Did you later find that out?

22   A.   Well, in the course of those few days, we talked a little

23   bit about Drexel, because he had been -- I didn't realize he

24   had been a managing director of Drexel.  So we did chat a

25   little bit about that.  I think it was a little bit of deja-vu

Page 22

1    for him.

2    Q.    And what was the charge or assignment that was given Mr.

3    Ridings and Lazard?

4    A.    Well, as the investment bank for Lehman Brothers, this --

5    you know, the bankrupt, they were going to give whatever

6    advice -- whatever financial advice was necessary in the

7    context of whatever was going to happen next.  And obviously

8    what happened next was a potential sale, and so they became

9    intimately involved in the sale process.

10   Q.    And with respect to the potential sale, what was their

11   charge or assignment?

12   A.    Well, basically Barry said he needed to review the whole

13   transaction.  He was around the negotiations that took place,

14   basically starting on Monday.  He was there sort of side by

15   side with us for most of the negotiations.  Obviously there

16   were some that took place without him, but most -- he was

17   around in the hallway virtually the entire forty-eight hour

18   period, talking to us about different issues.  And then

19   subsequent to that, he and his team did diligence around the

20   book of securities that was purporting to be sold by

21   Barclays -- by Lehman to Barclays.  So we organized diligence

22   for him around that.

23   Q.    And when did that take place?

24   A.    I guess -- that probably started on Tuesday.  Yeah,

25   probably started on -- the diligence part started on Tuesday, I

Page 23

1    would say, or Wednesday maybe even, and went through the end of

2    the week.

3    Q.    Now, on the morning of Monday, September 15th, did Mr.

4    Ridings work at Lehman Brothers?

5    A.    He was there.  I don't recall exactly what he was doing,

6    but he was there.

7    Q.    Did he have anybody with him?

8    A.    He had one associate with him, yes.

9    Q.    And did you play any role in taking Mr. Ridings to various

10   places and people within Lehman Brothers?

11   A.    I did, and I actually delegated to one of the people who

12   works for me the task of trying to organize meetings for him

13   with different people on different desks so he could do the

14   work he needed to do.

15   Q.    And did you go with him to any of those people and desks?

16   A.    I think I may have sat through maybe one of the meetings,

17   but mostly I didn't sit through those meetings.  There were

18   other things that were going on that I was dealing with.

19   There -- I definitely remember being in one meeting.

20   Q.    Now, in addition to meeting with Lazard the morning of

21   September 15th, did you attend any meetings with other people

22   related to the sale process?

23   A.    Yeah, well, the first meeting that took place was the

24   7 a.m. meeting I referred to earlier, which was basically

25   between a number of us on the Barclays side, myself, Bart

08-13555-mg   Doc 11012   Filed 08/25/10   Entered 08/26/10 10:23:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 24 of 199

Page 24

```
 1    McDade, Skip McGee, Mark Schaffer, Weil Gotshal; and Barclays'

 2    team, which was Archie Cox, Michael Klein, who was their

 3    advisor; and a group of lawyers from Cleary.  And that was the

 4    7 a.m. meeting.

 5    Q.   And then was there a meeting after that that you

 6    participated in?

 7    A.   Well, there were many meetings after that.  We basically

 8    did a marathon negotiating session from that point all the way

 9    through about 9 to 10 o'clock Tuesday night.  I didn't leave

10    the firm through that whole period.  In fact, I didn't leave

11    the thirty-second floor through that whole period.

12    Q.   As of September 15th, the Monday, what was the basic

13    structure of the deal that was being discussed?

14    A.   The basic structure was -- we didn't know what Barclays

15    was prepared to buy.  We knew what we had to sell.  So that

16    meeting was really a -- you know, a meeting where we said, you

17    know, 'Here's how you do this.'  We laid out a path of both (a)

18    the magnitude of what they might be able to buy, which included

19    the buildings, included potentially securities, obviously

20    making an offer to the people; those kinds of categories of

21    things to buy as a business.  And obviously they were

22    interested in buying the business, not specific assets

23    necessarily.  And at the same time, we were talking about

24    timing, because obviously timing was critical.  And so we

25    had -- you know, we had some discussion around how to get this
```

Page 25

1    done if -- you know, if we were going to get it done, how to

2    get it done.

3    Q.    What was said about timing?

4    A.    We laid out -- he was asked -- sorry.  Harvey Miller, who

5    obviously was the lead lawyer for Weil Gotshal in the deal, was

6    asked by -- I think it was Archie, you know, 'How long will

7    this take to get done?'

8    Q.    And when you say the "timing was critical", what do you

9    mean by that?  Why was it critical?

10   A.    Because the firm was imploding.  There were -- if -- you

11   know, when I looked at my BlackBerry, there were messages of,

12   you know, 'It's been nice to know you.'  People were leaving

13   right and left.  There were -- I was told stories.  Again, I

14   was not -- I never left the thirty-second floor, but my

15   colleagues did, and they were saying how there were people

16   carrying boxes out of the firm.  There was obviously news all

17   over.  It was -- you know, it was one of these chaotic

18   situations in terms of the people, and it seemed to me that it

19   was unlikely that the firm was going to last very long under

20   those circumstances.

21   Q.    Now, who were the lead negotiators for Lehman in this

22   process?

23   A.    Bart McDade, our president, was the guy who really led the

24   nego -- the overall negotiations.  No decision got made without

25   basically Bart being involved in that decision.

Page 26

1    Q.    And what was your role in those negotiations?

2    A.    You know, it really depended on the matter.  You know, it

3    was -- obviously multiple things were happening at the same

4    time.  So we had contract negotiations going on, we had

5    specific deal points that were going on.  So I was trying to

6    handle principally the bankruptcy issues.  And I also felt some

7    responsibility as a bankruptcy former lawyer to make sure I

8    read the contract and understood what the deal was and made

9    sure as best I could that the business deal was being reflected

10   in the documents.  So I'd say, you know, I viewed my role as

11   one of trying to shepherd this through to get to a consummated

12   transaction.

13   Q.    And who was the lead negotiator or negotiators for

14   Barclays in the process?

15   A.    The people that I personally dealt with were Archie Cox

16   and Michael Klein on the business side, and Victor Lewkow on

17   the legal side.

18   Q.    And in the negotiations, were there disagreements between

19   the Barclays side and the Lehman side?

20   A.    Yes.

21   Q.    Can you give me some examples?

22   A.    Sure.  We disagreed on what they were going to pay for the

23   buildings.  They wanted to pay less than what we were telling

24   them we thought they should pay.  They wanted to appraise the

25   building on an unoccupied basis.  We disagree -- we had

Page 27

1    discussions about the breakup.  I -- they had asked for a much

2    higher breakup fee than I thought was appropriate under the

3    circumstances.  We had disagreements about -- or I had a very

4    long, heated argument with Michael Klein about cure and how

5    that worked.  He didn't seem to get what cure meant.  And I was

6    insisting that they take all the cure costs, and he didn't

7    really appreciate what that meant and so he was -- he got

8    angry; I think that was his response to not understanding.  And

9    so we had a number of disagreements through the night.  Those

10   all happened, by the way, in the middle of the night, you know,

11   anywhere between 1 and 4 a.m.  So people were also tired.

12   Q.   Now, with respect to the disagreement over the real estate

13   as to whether it should have been valued as an occupied -- or

14   on an occupied basis or an occupied basis, how was that

15   resolved?

16   A.   Ultimately we believed, on the Lehman side, that it should

17   be valued on a fully occupied basis, because they were getting

18   a building that was going to be filled with the people at

19   Lehman Brothers.  So, again, I was not the principal negotiator

20   who resolved that point.  I was there while it got discussed,

21   but ultimately I believe Schaffer and Archie Cox resolved it

22   where Archie agreed that it would be appraised -- there would

23   be an agreed appraisal; each side would do their own appraisal

24   and then they would come to some kind of a view on an occupied

25   basis -- fully occupied basis.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 28

1    Q.   You said there was a disagreement that you participated in

2    with respect to a breakup fee, is that correct?

3    A.   That's correct.

4    Q.   And what was that disagreement and how was it resolved?

5    A.   It was a disagreement between myself and Victor Lewkow

6    where they had said that they wanted a 250 million dollar

7    breakup fee.  I said I thought that that was too high in light

8    of the transaction and the speed of the transaction and that I

9    thought that we should focus on trying to get to a deal as

10   opposed to trying to give them the protections of a large

11   breakup fee.  And so we had a back-and-forth probably over the

12   course of about an hour on that.  And ultimately I persuaded

13   him that a hundred million dollars plus a twenty-five million

14   dollar fee reimbursement was a reasonable amount, and he

15   ultimately agreed to that.

16   Q.   From your perspective, were the negotiations between

17   Barclays and Lehman at arm's length and in good faith?

18   A.   Yes.

19   Q.   Did you see any indication that anybody on either the

20   Lehman side or the Barclays side were acting in anything other

21   than in the interests of the company that they were

22   representing?

23   A.   No, I did not.  We all did the best we could under the

24   circumstances.

25   Q.   Now, there's been some testimony in this trial that Lehman

Page 29

1    had made offers to a small group of top Lehman executives.  Was

2    that widely known at the time?

3    A.   I heard about that on Tuesday that they had offered a few

4    people, you know, sizable contracts.

5    Q.   Did you have any understanding as to why that was being

6    done?

7    A.   Yes.

8    Q.   And what was that understanding?

9    A.   Because they were buying a business that's a very

10   complicated large-scale investment bank and they needed the

11   people who were running it to run it, and the only way they

12   could get them to run it was to get those people signed up.

13   Q.   Did you see any indication that any of the people that had

14   been offered jobs by Barclays were in any way not fulfilling

15   their obligations to Lehman?

16        MR. GAFFEY:  Objection, Your Honor.  It calls for a

17   legal conclusion.  I understand he's a lawyer, but he's still

18   not competent to address the ultimate issue on that, Your

19   Honor.

20        THE COURT:  I'll sustain the objection for the reasons

21   stated, and perhaps also for another reason, which is he's

22   being asked to surmise state-of-mind issues rather than

23   objective behavioral issues, and it's so general a question

24   it's tough to answer.

25        Objection sustained, but you're certainly free to

08-13555-mg   Doc 11012   Filed 08/25/10   Entered 08/26/10 10:23:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 30 of 199

Page 30

1    rephrase it any way you wish.

2            MR. BOIES:  Thank --

3            MR. GAFFEY:  Your Honor, just --

4            I beg your pardon.

5            -- just while there's a brief break.  I have a hearing

6    issue.  Could I ask that the microphone be pulled a little

7    closer to the witness?  I'm having a hard time hearing Mr.

8    Shapiro.

9            THE WITNESS:  Is this better?

10           THE COURT:  Mr. Shapiro --

11           MR. GAFFEY:  Thank you.

12           THE COURT:  -- please speak into the microphone.  And

13   I'll note that there's a jackhammer outside as well.

14           MR. GAFFEY:  And I changed the batteries in my hearing

15   aid, but it's not helping, Your Honor.

16           THE WITNESS:  I'll do my best, Your Honor.

17   BY MR. BOIES:

18   Q.   Mr. Shapiro, at any time in the negotiations, did you see

19   any indication that any of the Lehman employees were taking any

20   actions that were not, in your view, in Lehman's best interest?

21           MR. GAFFEY:  Same objection, Your Honor.

22           THE COURT:  Well, did he see any indication -- let me

23   just look at the question again.

24           That objection's overruled.

25           Can you repeat the question?

Page 31

1   Q.   At any time in the negotiations, did you see any

2   indication that any of the Lehman employees were taking any

3   actions that were not, in your view, in Lehman's best interest?

4   A.   No.

5   Q.   Now, you indicated that you ultimately joined Barclays; am

6   I right about that?

7   A.   That's correct.

8   Q.   When did you decide to join Barclays?

9   A.   I think it was about two weeks into October.

10   Q.   Let me turn to the subject of the APA.  And when did

11   you -- well, let me back up.  Were you -- did you participate

12   in the drafting of the APA?

13   A.   The physical drafting?  I didn't actually type any words

14   or -- but I did look at it; I did mark it up from time to time,

15   depending on the section that we were dealing with, yes.

16   Q.   That is, you participated not in the typing of it but in

17   the negotiations that led to it, is that what you're --

18   A.   Yeah, there was a room on the thirty-second floor filled

19   with lawyers from both Cleary, Sullivan & Cromwell, and Weil,

20   and those lawyers were working on obviously what was ultimately

21   the APA.  And we were all waiting around for the first draft

22   and, when the first draft came, we all started reading it and

23   giving them input on whatever we knew to be, you know, on

24   agreement on specific points.

25   Q.   And did you ultimately read the entire APA at some point?

Page 32

1    A.    Multiple times.  In fact, the last -- I don't know if the

2    last time, but one of the times it was the middle of the night;

3    it was probably about 5 a.m. when whatever draft came out.  And

4    we were all very tired.  And I remember then Steve Berkenfeld

5    showed up and I said 'I'm glad you're here because I'm getting

6    pretty tired and I'm glad to have another set of eyes looking

7    at this.'

8    Q.    Now, did the APA, as filed with this Court, in your view

9    accurately disclose the basic economic structure of the sale as

10   you understood it?

11   A.    Yes, it did.

12   Q.    And what was the basic economic structure of the sale, as

13   you understood it?

14   A.    Well, Barclays was buying the North American business of

15   Lehman.  It was not buying anything outside of North America;

16   they chose not to, even though they were offered that

17   opportunity.  Obviously it would have been more complicated

18   because they were also in their own bankruptcy proceeding.  So

19   it was limited to the North American businesses.  Those

20   businesses included fixed income, equities, investment banking;

21   I think, ultimately the personal wealth business as well.  And

22   so they were buying that business as a going concern,

23   effectively, with -- you know, making offers to all the

24   employees, and then buying the buildings to house the people

25   that they were making offers to, obviously:  the building in

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 33

1    New York, the building -- the data centers in New Jersey.  And

2    they were buying other assets that were being used in the

3    operation of the business, which obviously included the

4    securities that ultimately are in -- you know, are part of this

5    dispute.

6    Q.   Were there certain assets that were specifically excluded

7    from the purchase?

8    A.   Yes, there were.

9    Q.   Except for the assets that were specifically excluded from

10   the purchase, was Barclays acquiring all of the assets used in

11   the business?

12   A.   That was the intent, yes.

13   Q.   And was that intent, as you understood it, expressed in

14   the APA?

15   A.   Yes, it was.

16   Q.   Now, did the APA provide for an appraised value for all

17   the purchased assets?

18   A.   No.

19   Q.   Why not?

20   A.   It was very chaotic, as you can imagine, trying to figure

21   out how to sell a multibillion dollar investment bank in a, you

22   know, very short period of time and identifying what exactly we

23   had to sell.  So it was a difficult exercise to actually figure

24   out what it is that we actually could convey to Barclays.

25   Q.   What was the consideration set forth in the APA, as you

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 34

1   understood it?

2   A.   I'd have to -- is there a copy of the APA in here?   I'd

3   have to look at it specifically.

4   Q.   It's, I think, behind your Tab 2.   It's BCI Exhibit number

5   1.

6   A.   (Pause).   So I'm looking at Section 3.1, which is the

7   consideration section, and what it says is the aggregate

8   consideration shall be the cash amount, which is equal to 250

9   million dollars, the assumption of assumed liabilities.   And

10  then you had also the appraised value of the building in New

11  York City as well as the data centers in New Jersey.   And we

12  said -- again, this was really illustrative at the time, but we

13  said that we expected that the total cash amount, which

14  included all the things I just described, would be

15  approximately 1.7 billion dollars, and that was based on a

16  rough 1 billion dollar expected appraisal of the building in

17  New York City.

18  Q.   Now, in addition to the 1.7 billion dollars of expected

19  cash, there was, you said, certain assumed liabilities, is that

20  correct?

21  A.   That's correct.

22  Q.   And was there an appraised value for those assumed

23  liabilities?

24  A.   No.

25  Q.   Why not?

Page 35

1    A.    There were, I guess, a couple reasons; one is there was

2    no -- again, no way to ascertain what that could exactly be.

3    We didn't have precise numbers to work with at the time.

4    Things were moving very quickly.  We were trying to get to a

5    contract.  So we categorized things in the normal way that you

6    do it in an asset purchase agreement of this nature.  But there

7    wasn't a specif -- we didn't have specific numbers necessarily

8    associated with everything we put in the contract.

9    Q.    Were the assumed liabilities defined expressly in the APA?

10   A.    Yes, they were.

11   Q.    And why was that?

12   A.    If you give me a minute, I'll try to find them.  (Pause).

13   Section 2.3, it's titled "Assumption of Liabilities"; that's

14   the section that dealt with the assumed liabilities, and that

15   of course was subject to the excluded liabilities.

16   Q.    And as you understood it, was Barclays assuming only the

17   liabilities that were expressly identified in the APA?

18   A.    That's correct.  In a normal bankruptcy deal, buyers do

19   not want to take on liabilities, obviously, that are not

20   specifically enumerated.  And this would -- you know, this was,

21   I would call it, the standard operating procedure for what --

22   you know, what an asset purchase agreement would be like in a

23   bankruptcy sale -- in a 363 sale.

24   Q.    Did the APA provide for a balance sheet deal?

25   A.    No, it did not.

1   Q.   Why not?

2   A.   Well, we didn't have a good balance sheet to work from to

3   begin with, and that was not the nature of what we were trying

4   to negotiate.

5   Q.   Did the APA provide representations or warranties as to

6   asset values?

7   A.   No, it did not.

8   Q.   Why not?

9   A.   We wouldn't give -- we wouldn't have given them that.

10   Q.   Did the APA have a true-up provision?

11   A.   It had a provision that gave some limited sharing to the

12   Lehman -- to Lehman in the event that Barclays was going -- was

13   making money on certain securities that it was purchasing.  I'd

14   have to find it.

15   Q.   Was that true-up provision ultimately taken out?

16   A.   Yeah.  It's -- it was Section 3.3 in the asset purchase

17   agreement, called "Adjustment to Cash Amount", and that was

18   subsequently removed under the clarification letter.

19   Q.   You mentioned that there was uncertainty about the

20   securities that Lehman had.  Can you explain why that was?

21   A.   Well, we were dealing with a moving -- I mean, you're

22   dealing with a trading operation, so, by definition, things are

23   changing all the time.  And we didn't have a good snapshot of

24   exactly what it was that we could sell to them.  We knew that,

25   as a result of the bankruptcy, particularly on Monday and

1    Tuesday, we were getting -- the firm was getting blown out of

2    positions.  I was told that people were, you know, terminating

3    trades, people were grabbing collateral.  You know, there were

4    things that, you know, we didn't have knowledge of that were

5    just happening as we were dealing with the deal.  And so I was

6    afraid, truthfully, that Barclays would not close because we

7    were not able to convey to them what we originally said we were

8    going to be conveying to them, and I wanted to be as careful as

9    we could to get to a deal that was actually a deal that we

10   could close on and not one that they would walk from.

11   Q.   When you say that Lehman was being blown out of positions,

12   can you explain what you mean by that?

13   A.   Well, you know, on every trade there are counterparties,

14   and obviously bankruptcy of a holding company often would be an

15   event of default under the relevant documentation, whether it's

16   a swap or whether it's a -- some other kind of financial

17   transaction.  And so people were closing out trades right and

18   left, as I was told by people on the trading side with Lehman.

19   And so people were having a very hard time getting a handle on

20   ultimately what we could convey to Barclays is a pool of

21   securities.

22   Q.   And when you were closed out of trades -- when Lehman was

23   closed out of trades, what was the consequence of that to

24   Lehman?

25   A.   I guess it would depend -- I don't really have specific

Page 38

1    knowledge of any specific trades that I could tell you about.

2    Q.   Were you familiar with what happened at the CME?

3    A.   I think I heard about it, but I didn't have any direct

4    participation in it.

5    Q.   Okay.  Let me ask you to direct your attention to the APA

6    where it talks about the value of various assets or the

7    reference value of various assets.  And if you look at the long

8    positions and the seventy billion dollar -- can you do that?

9    A.   You're talking about the definition of purchased assets, I

10   think?

11   Q.   Yes.

12   A.   Yes, purchased assets.

13   Q.   Now, at the time that the APA was being negotiated, did

14   you understand that there was a difference or buffer between

15   the value of the trading assets being transferred and the value

16   of the associated trading liabilities that were being assumed?

17   A.   Yes, there was a difference.

18   Q.   And what was the amount of the buffer, as you understood

19   it from the APA?

20   A.   It's somewhere around a billion to a billion and a half;

21   in that neighborhood.

22   Q.   And that was the difference there between the seventy

23   billion dollars and the sixty-nine billion dollars, is that

24   correct?

25   A.   That's correct.

Page 39

1   Q.   Now, in addition to that --

2   A.   The -- you know, we obviously said approximately seventy

3   billion dollars, because we didn't have the exact number.  We

4   were all working off of, as I said, again, a moving target.

5   And so we used "approximately".  But my recollection was, in my

6   mind, it was around seventy; again, something around sixty-

7   nine.

8   Q.   And in addition to that difference, was there a portion of

9   the buffer that was made up by what was referred to as retained

10  cash?

11  A.   Well, there were other things in the contract that

12  Barclays was entitled to receive under the asset purchase

13  agreement.

14  Q.   And was one of those retained cash?

15  A.   Yes.  They were entitled to receive 1.3 billion dollars of

16  cash.

17  Q.   And did the APA make clear that the retained cash was in

18  addition to the approximately seventy billion dollars that is

19  referred to here?

20  A.   Yeah.  It's a separate item in Section A.  It's

21  specifically enumerated as "the retained cash", which is

22  defined somewhere as 1.3 billion.

23  Q.   Now, in addition, you say Lehman was transferring to

24  Barclays a number of other assets.  Can you give me some

25  examples of those other assets?

Page 40

1   A.   Well, all the assets that are described in the purchased

2   assets section, going from A through S.

3   Q.   And --

4   A.   And the obviously that got changed through the

5   clarification letter on Friday and through the weekend, I

6   guess.

7   Q.   And did you understand that there were certain assets that

8   were being transferred to Barclays that might have value --

9   substantial value to Barclays but did not have significant

10   value to Lehman Brothers?

11   A.   Yes.

12   Q.   And why was that?

13   A.   Because Barclays was now going to buy it as a going

14   concern.  So things like intellectual property, indices,

15   trading tools -- you know, all of those things were things that

16   were valuable to a business like Lehman Brothers as an

17   operating business.  In a liquidating firm, none of those

18   things would have had value other than, you know, what I'll

19   call either scrap value, or maybe you could sell it to someone

20   for cents on the dollar.

21   Q.   Now, was Barclays also acquiring residential real estate

22   mortgage securities?

23   A.   Yes, they -- we called them resis (ph.), yes.

24   Q.   Resis.  And was the resis in addition to the so-called

25   seventy billion dollar number?

08-13555-mg   Doc 11012   Filed 08/25/10   Entered 08/26/10 10:23:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 41 of 199

Page 41

1    A.   Yes.  Subclause (e) sets out the fact that we agreed that

2    they would be -- have -- they would have the right to purchase

3    fifty percent of each position in the residential real estate

4    mortgage pool.

5    Q.   Now, did you have an estimate of what the total difference

6    or buffer was if you took into account the trading assets and

7    trading liabilities together with the retained cash and the

8    residential real estate mortgage securities?

9    A.   Did I have a view at that time --

10   Q.   Yeah.

11   A.   -- or do I have a view now?

12   Q.   At that time.

13   A.   You know what --

14   Q.   Did you try to make an estimate?

15   A.   -- to be honest, we really didn't focus on that; at least

16   I didn't really focus on that at the time.  That really wasn't

17   all that relevant to me what their, you know, subsequent,

18   quote, "buffer" was.  It was really about what was the deal;

19   are we documenting it to the best of our abilities, accurately;

20   and are we going to get the deal closed, consistent with the

21   timing constraints we were under.

22   Q.   And why did you think the amount of the buffer or

23   difference between the asset and liability numbers was not

24   relevant to what you were doing?

25   A.   Because we did the best deal we could do under the

Page 42

1   circumstances, you know, and that was -- you know, my goal was

2   to do the best we could do and to try to get it consummated.

3   Q.   Now, do you know where the seventy billion dollar number

4   that's in the APA came from?

5   A.   It came from the trading side of the firm at some point; I

6   don't recall specifically exactly when or from whom.

7   Q.   Did you know whether it came from the accounting system,

8   from the book value, from --

9   A.   Well, it came from the finance group, and things were

10  moving around quite a bit, as you can imagine.  So that -- and

11  that's why it says "approximately", because, you know, it was

12  not a precise number.

13  Q.   Now, there's a reference to this as having a book value of

14  approximately seventy billion dollars; do you see that?

15  A.   Yes, I do.

16  Q.   Where did the book value description come from?

17  A.   I don't recall exactly where it came from, but I think the

18  intent was to reflect what we believed were the market value of

19  the securities at the time from Lehman's perspective -- or from

20  Barclays' and Lehman's perspective.

21        MR. GAFFEY:  Move to strike everything after "I don't

22  remember exactly where it came from," Your Honor.

23  Nonresponsive.

24        THE COURT:  I'm not going to strike it.  He said what

25  he believed, and that's probably based upon something in his

Page 43

1   brain.  So I'm going to accept it as his testimony.  What

2   weight is to be given we'll determine later.

3   Q.   Did you have, yourself, any personal knowledge about the

4   exact source of the seventy billion dollar number?

5   A.   No.

6   Q.   Did you understand that there was an effort to resolve

7   what you referred to as the uncertainty caused by the market

8   movement during that week -- during --

9   A.   Sorry, I'm not sure I understand your question.

10  Q.   You mentioned that there was uncertainty as to the values

11  because of the market movements during the week.  Do you recall

12  that generally?

13  A.   It was not just market movements.  It was a combination of

14  the market moving -- obviously no one -- you know, that week

15  was obviously one of the most volatile weeks in the history of

16  the financial world.  So, you know, ascertaining values was not

17  going to be easy, number one.  Number two is, as I said before,

18  we were getting blown out of position, so we didn't know

19  exactly what we would be left with when the dust settled.  So I

20  think -- hopefully that answers your question.

21  Q.   And was there an attempt to resolve those kind of issues

22  during the week, that is, to figure out what was going to be

23  left and what the values were going to be?

24  A.   Yeah.  Obviously no one wanted to get to a point where we

25  were obligated to convey, you know, a group of securities to

Page 44

1    Barclays that we couldn't convey.  Things were changing through

2    the week.  The traders were obviously monitoring everything

3    that was going on, and there was definitely Barclays people and

4    Lehman people continuing to work throughout that week on, you

5    know, reviewing the securities that were to be conveyed.

6    Q.    Let me turn to the subject that you mentioned before,

7    which were cure payments.  And you said you'd had a

8    disagreement with Mr. Klein about cure payments; do you recall

9    that?

10   A.    Yeah.

11   Q.    As you understood it, did the APA make clear that Barclays

12   would pay cure payments only for contracts that it chose to

13   assume within sixty days after the closing?

14   A.    That's correct.

15   Q.    And was that necessarily an uncertain amount?

16   A.    By definition, it's an uncertain amount because cure

17   payments are payments you make only to the extent that you

18   assume and assign a contract, and obviously we didn't know

19   exactly what Barclays was going to be assuming.  My presumption

20   going into it was that they were going to need most of the

21   contracts to run the business.  Obviously it was a very, very

22   large business.  And Barclays did not have a substantial

23   business in the U.S. at that point in time.  And so my general

24   presumption was that they were going to need to cause most of

25   the contracts to be assumed and assigned over to them.

Page 45

1    Q.   Was there any limitation in the APA as to which contracts,

2    if any, Barclays had to assume?

3    A.   Not that I remember.

4    Q.   Was which contracts Barclays assumed left to Barclays'

5    sole discretion, as you understood it?

6    A.   Yes.  And I personally negotiated that part of the

7    contract and essentially said to them 'You're going to need

8    some time to figure this out.  We'll give you sixty days.  I

9    want you to pick up all the cure costs; we don't want the

10   estate to be having to do that.  I also want you to pick up all

11   the costs associated with what happened post-filing.  So to the

12   extent that sixty day goes (sic) by or even more time goes by

13   and you haven't assumed or rejected the' -- 'caused us to

14   assume or reject the contract, you need to pick that up as a

15   post-petition admin claim,' to which they ultimately agreed.

16   Q.   Now, were you present at the September 19th hearing before

17   the Court?

18   A.   Yes.  I was sitting over in that windowsill right over

19   there (pointing).

20   Q.   And do you recall that the Court was told that the cure

21   amounts had a potential exposure of 1.5 billion dollars?

22   A.   Yes, I do.

23   Q.   And did you have an understanding of what "potential

24   exposure" meant there?

25   A.   Yeah.  I think it's reasonably common parlance within a

Page 46

1    bankruptcy 363 sale to understand that if a buyer is being

2    given the opportunity to select which contracts it will take,

3    and it has agreed to pick up the cure costs, that it's a --

4    it's an amount that's not clear, but it could be as much as a

5    specific number.  And that, by the way, was an estimated

6    number, and it was a number that we had gotten -- you know, we

7    had gotten to very, very quickly.

8    Q.    And did that estimated number of what the maximum exposure

9    could be change over time?

10   A.    Not in my mind it didn't, but I know that I have -- I

11   subsequently saw references to a higher number, but I didn't

12   know where that came from.

13   Q.    Let me turn now to the question of compensation and what

14   Barclays assumed with respect to compensation for transferred

15   employees.

16   A.    Okay.

17   Q.    What did the APA provide, as you understood it, that

18   Barclays had an obligation to assume in terms of compensation

19   for transferred employees?

20   A.    If you give me one second, I'll just look at the agreement

21   again; unless someone has a specific section.  I don't know if

22   you have a specific section to refer me to.

23        (Pause)

24   Q.    I might suggest 9.1(b) --

25   A.    Yeah.

1   Q.   -- and 9.1(c).

2   A.   Yeah, that's what I'm looking -- so I'm looking at Section

3   9.1.  And essentially the intent was that Barclays would offer

4   all of Lehman's North American employees employment.  They

5   would have ninety days to decide whether those people were

6   going to be essentially permanently -- you know, made a

7   permanent offer; they would have to pay severance to those who

8   they didn't, and they would have to compensate those who did,

9   consistent with -- in paragraph (c), consistent with what the

10   expectation would be -- was at the time for 2008 annual

11   bonuses.  And they agreed to a two billion dollar total number

12   for 2008 compensation, which was intended, in my mind, to

13   include the severance that was covered by this and the bonuses

14   that was covered by this.

15   Q.   And what was that amount?

16   A.   Two billion.

17   Q.   And was that two billion dollars an estimated number?

18   A.   You know, I was given that number by Bart McDade.  I don't

19   know exactly how it was derived at the time.

20   Q.   Now, there's been some testimony in court about whether or

21   not Barclays expected to book an accounting gain on the

22   acquisition of the Lehman assets.  At the time that you were

23   negotiating the APA and the deal thereafter, did you have an

24   understanding one way or the other as to whether Barclays would

25   or would not expect to book an accounting gain on the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 48

```
 1    transaction?

 2    A.   I had no understanding of whatever Barclays' accounting

 3    was whatsoever.

 4    Q.   As far as you were concerned in terms of what you were

 5    doing on behalf of Lehman, was that relevant to what you were

 6    doing?

 7    A.   No, it wouldn't have been relevant to what I was doing at

 8    the time, no.

 9    Q.   Why not?

10    A.   How Barclays accounted for the transaction was not of any

11    import to either the asset purchase agreement or the

12    transaction commercially.

13    Q.   As you understood it at the time that you were

14    participating on behalf of Lehman and negotiating this

15    transaction, was Barclays undertaking a substantial risk in the

16    acquisition?

17    A.   I would say yes.  At the time, absolutely.

18    Q.   Why is that?

19    A.   Because we were in the -- one of the most uncertain weeks

20    in the history of the financial industry.  They were buying a

21    bank that was going through a bankruptcy; it wasn't clear

22    exactly how it was all going to come out.  And financial

23    acquisitions generally have not worked out terribly well for

24    most buyers.  So I would say they were assuming a fair amount

25    of risk, yeah.
```

Page 49

1    Q.    Did there ultimately come a time when a sales motion was

2    prepared and submitted to the Court?

3    A.    Yes.

4    Q.    What was your role in the preparation of the sale motion?

5    A.    I reviewed it with Weil Gotshal, gave them my comments,

6    and then we filed it.

7    Q.    In your book, there should be a Tab 15 that has BCI

8    Exhibit number 11.

9    A.    Yep, I have it.

10   Q.    And is this the document that you're referring to?

11   A.    This is the motion, correct.

12   Q.    And this was, as I understand your testimony, drafted by

13   Weil Gotshal, but you participated in it and gave comments?

14   A.    Yes, I did.

15   Q.    Let me take you through some of these statements in here,

16   and I want to ask you about them.  First, at the time the sale

17   motion was submitted to the Court, did you believe that what

18   was stated in the sale motion was true and accurate and fair?

19   A.    Yes.

20   Q.    And do you still today believe that what is stated in the

21   sale motion was true and fair and accurate at the time it was

22   made?

23   A.    Yes, although I haven't re-read it word for word.  I've,

24   you know, glanced at it in preparing for this, but -- so I

25   would say yes, it's consistent with what we had filed,

Page 50

1    obviously, at the time; it reflects the accuracy of the

2    information that we believed existed at the time, yes.

3    Q.   Let me ask you to look at paragraph 6 of the sale motion,

4    which says "The sale of the Purchased Assets" -- and this is

5    the sale of the purchased assets to Barclays, is that correct?

6    A.   That's correct.

7    Q.   It says "The sale of the Purchased Assets is critical to

8    the stabilization of value each day that the Purchased Assets

9    are subject to the vagaries and vicissitudes of the

10   marketplaces, and the impact of bankruptcy diminishes the value

11   of such assets.  Time is of the essence."  Do you see that?

12   A.   Yes, I do.

13   Q.   And did you believe that that was accurate at the time?

14   A.   Yes.

15   Q.   Why was that?

16   A.   Because the firm was -- you know, I think Harvey Miller

17   characterized it best as a melting ice cube.  It was a melting

18   ice cube.  People were looking for other jobs.  People were not

19   doing -- you know, necessarily doing all the jobs that they had

20   to do; people were -- it was a state of flux.  And it was clear

21   to me that, you know, every day that passed, we were running

22   the risk that, you know, the firm -- you know, we wouldn't be

23   able to accomplish the sale and that the firm would end up

24   getting liquidated and that the overall value of the firm would

25   be diminished.

1   Q.   Let me ask you to look at the second sentence of paragraph

2   8 where it says "The Proposed Sale will maximize the value of

3   the Purchased Assets and avoid rapid erosion of their value."

4   Do you see that?

5   A.   I do.

6   Q.   And did you believe that was accurate at the time?

7   A.   Yes, I did.

8   Q.   And do you believe that is still accurate today?

9   A.   Yes, I do.

10   Q.   Why is that?

11   A.   We had no other buyer.  We had one buyer.  No one else was

12   showing up.  It was a very, very difficult week, as I

13   previously described.  Values were in flux in a negative way.

14   And it wasn't clear whether any of the other broker-dealers

15   would survive as well.  And so at that point in time, the

16   sale -- you know, selling the firm as a going concern was going

17   to be the -- you know, create the most value we could create

18   under the circumstances.

19   Q.   Let me ask you to look at the last sentence at paragraph

20   10, which says "The Sale will relieve LBHI of exposure based

21   upon its guarantees of many of LBI's obligations."  Do you see

22   that?

23   A.   I'm sorry, where are you looking at?

24   Q.   The last --

25   A.   Paragraph 10?

Page 52

1    Q.   The last sentence of paragraph 10.

2    A.   "The Sale will relieve LBHI of exposure based upon its

3    guarantees of many of LBI's obligations."

4    Q.   And did you believe that was true at the time it was

5    written?

6    A.   Yeah, I believed that there were many transactions, trades

7    and other things that LBI had entered into as the broker-dealer

8    that LBHI had been required to guarantee as the parent.  And

9    so, effectively, I guess that sentence was really talking about

10   the fact that LBHI, to the extent that things were being taken

11   over or assumed, would be relieved from its obligations.

12   Q.   Let me ask you to look at paragraph 17, which deals with

13   breakup fee, and in particular the second sentence of paragraph

14   17 --

15   A.   I see it.

16   Q.   -- where it says "The Proposed Sale is unique because of

17   the fragile and highly vulnerable nature of the Purchased

18   Assets."  Do you see that?

19   A.   Yes, I do.

20   Q.   And did you believe that was true at the time?

21   A.   Yes, I did.

22   Q.   And do you believe that's still true?

23   A.   Yes, I do.

24   Q.   Why is that?

25   A.   Lehman Brothers was the largest broker-dealer to go

Page 53

 1   bankrupt in the history of the world.  And so you had a

 2   situation of a financial firm that, you know, requires the

 3   confidence of the market, which it lost, obviously.  And at

 4   that point, the employees were potentially scattering to the

 5   winds and the assets were in a state of flux, and people were

 6   taking action against those assets.  And the sooner we could

 7   stabilize the situation, you know, in my mind and in the mind

 8   of others, the greater value we were going to create --

 9   greatest value we were going to create and greatest

10   stabilization we would create.

11   Q.   Let me ask you to look at paragraph 11, and the next to

12   last sentence where it is said that "It is urgent to sell the

13   Purchased Assets now or face material disruption of their

14   value."

15   A.   Um-hum.

16   Q.   You see that?

17   A.   Yes.

18   Q.   Can you explain why that was true?

19   A.   Well, for the same reasons:  The absence of a sale would

20   have led to, you know, a near-term liquidation, whatever you

21   want to call that, which would have consequently ended up where

22   assets would have been disposed of piecemeal and potentially

23   under, you know, much more -- even at much more adverse

24   circumstances.  And so there was obviously an urgency at that

25   point to sell these assets and sell the business.  And really

Page 54

1    we were selling the business, not just assets.  No one looked

2    at this as just a pure asset sale.  This was sale of Lehman

3    Brothers' North American businesses.

4    Q.    And I think you said they were selling all of the assets

5    related to those businesses, except those that were

6    specifically excluded, is that correct?

7    A.    That's correct.

8    Q.    Let me ask you to look at paragraph 14 of the sale motion,

9    and in particular, like, the third bullet.  It says "Purchase

10   Price and assumed liabilities", do you see that?

11   A.    I do.

12   Q.    And it talks about future liabilities under assigned

13   contracts and leases; do you see that?

14   A.    Yes, I do.

15   Q.    And was part of the consideration that Barclays was giving

16   their assumption of these future liabilities of running the

17   business?

18   A.    Yeah, to the extent that they were going to have contracts

19   assumed and assigned over to them by the debtor, yes, they

20   would have been relieving the debtor of those obligations.

21   Q.    Now, let me ask you to look at paragraph 28, and this

22   talks about cure amounts and it talks about contracts that may

23   be assumed; do you see that?

24   A.    Yes, I do.

25   Q.    And it talks about two categories of contracts:  the

1    closing date contracts, and the designated contracts.

2    A.    Yes, I see that.

3    Q.    And the first category, the closing date contracts, is

4    comprised of those contracts that the purchaser requires be

5    assumed and assigned on the closing date; do you see that?

6    A.    I do.

7    Q.    And the purchaser there is Barclays, correct?

8    A.    Correct.

9    Q.    And why did Barclays require that certain contracts be

10   assumed and assigned on the closing date?

11   A.    I'm not really privy to why they thought that, but I

12   believe that there were certain contracts that were ultimately

13   more important to them in terms of making sure that they had

14   those contracts in hand when they closed.

15   Q.    Were these the so-called mission critical contracts?

16   A.    I've heard that term before.  Yeah.

17   Q.    And then the remaining contracts are the ones that they

18   have the sixty days to decide whether to assume, is that right?

19   A.    Yeah, there were -- when we -- you know, when we started

20   this, there were potentially thousands of contracts.  I really

21   had no idea how many contracts were -- you know, Lehman

22   Brothers as a firm and the U.S. was a party to.  And so we just

23   tried to put together a structure that would give them ample

24   time to figure out what they were going to take, and make them

25   pay for whatever they were going to take post-petition; so

Page 56

1   they -- while they were taking their time doing it, they had to

2   pick up those costs and, if they took a contract, they had to

3   pay the cure costs.  That was the basic structure, which is

4   consistent with what most of the deals I've worked on in my

5   career have required.

6   Q.   Now, you attended, you said, the September 19th hearing?

7   A.   Yes, I did.

8   Q.   And I want to ask you some questions about that.  Did you

9   believe, as you sat there, that the Court was being given a

10  fair description of the status of the negotiations and the

11  deal?

12  A.   Yes, I did.

13  Q.   And let me direct your attention to a portion of where Mr.

14  Miller says -- this is BCI Exhibit 49A --

15  A.   I'm sorry, what tab should I be looking at?

16  Q.   Tab 3, I believe, has this.  And it is at page 43, line 14

17  of this transcript that is Exhibit 49A.

18  A.   Okay.

19  Q.   And --

20  A.   Yeah, I see it.

21  Q.   And at line 14, Mr. Miller says, "In any event, Your

22  Honor, as we described last Wednesday, there are a lot of

23  moving parts to this transaction, and they've been moving with

24  great velocity over the last days since Wednesday.  And as a

25  consequence, Your Honor, there has" -- "had to be some major

Page 57

1   changes in the transaction, and unfortunately they were not" --

2   "weren't finalized until about half an hour ago."

3        And did you participate in those changes that had occurred

4   in the days since Wednesday?

5   A.   This is now on Friday, I believe, right?

6   Q.   Yes.

7   A.   Okay, so I was in Bart McDade's office immediately before

8   the hearing -- before leaving for the hearing.  I probably left

9   his office somewhere between 3 and 4 o'clock, from what I

10  remember.  And there were changes that were being discussed in

11  his office that -- and we were talking about them.  Truthfully,

12  really he was dealing with them with Alex Kirk for the most

13  part, because they had to do with the securities and I really

14  wasn't the -- you know, the principal person around that set of

15  issues.  And so I heard some of what was going on.  Then I left

16  to take the train down to come down to the courthouse.  And

17  then the next thing I heard was the testimony -- or the

18  presentation that was being given by Mr. Miller.

19  Q.   Did you believe, at the time, that the transaction that

20  the Court was being asked to approve was the best transaction

21  that was available to Lehman?

22  A.   Yeah, it was the best available to us under the

23  circumstances, yes.

24  Q.   And why was that?

25  A.   Because we had no other transaction to do -- or to compare

Page 58

1    it to, or any alternative other than not to have a transaction.

2    Q.   And did you believe, based on the negotiations that had

3    occurred, that the consideration that Barclays was paying

4    constituted reasonably equivalent value or fair value for the

5    purchased assets?

6    A.   It would be viewed by me as the best we could do under the

7    circumstances.  How you characterize it exactly I'm not sure,

8    but it was the best we could on an arm's-length basis, you

9    know, in a forty-eight hour negotiation.

10   Q.   As you understood it, was the deal that Barclays and

11   Lehman negotiated a deal where Barclays acquired the assets

12   free and clear of any liens or liabilities?

13   A.   Absolutely.

14   Q.   And why was that important?

15   A.   Because that's the way you do a bankruptcy deal:  You

16   acquire assets free and clear of liens, claims and

17   encumbrances.  And if you don't do it that way, you run the

18   risk that you're going to find problems later.

19   Q.   And as you understood it, was Barclays' assumption of

20   liabilities limited to those expressly set forth in the

21   purchase agreement?

22   A.   Yes, they were.

23   Q.   And, again, why was that?

24   A.   For the same purpose I just enumerated:  that buyers do

25   not take on liabilities in a bankruptcy sale unless they're

Page 59

1   expressly laid out in the contract.

2   Q.   Did you believe, at the time that this deal was being

3   negotiated, that Barclays would have done the deal if it had

4   believed it would be subject to post-closing litigation,

5   challenging the valuations of any of the assets?

6        MR. GAFFEY:  Objection.  Foundation.

7        THE COURT:  What's the foundation objection?

8        MR. GAFFEY:  No foundation that he has any idea what

9   Barclays' intent or thoughts or desires were, Your Honor.  He's

10  being asked what Barclays thought.

11       THE COURT:  Sustained.

12  Q.   In the course of your negotiations -- in your

13  participation in the negotiation with Barclays, did you form a

14  view from what Barclays said -- not trying to read their mind

15  but from what Barclays said and did, as to what their

16  understanding of the deal was?

17  A.   Did I understand what Barclays' understanding of the deal

18  was?

19  Q.   Yes.

20  A.   I would -- I don't think I had anything other than the

21  asset purchase agreement to go by.

22  Q.   And as you understood the asset purchase agreement, did

23  the asset purchase agreement permit anyone, creditors'

24  committee or anyone else, to challenge any of the valuations

25  after the deal had been approved by the Court?

Page 60

1    A.    Not to the best of my knowledge, no.

2           MR. BOIES:  Your Honor, if this would be a convenient

3    time to take the morning break, I would like to just sort of

4    review where I am.  I'm about done, and I wanted to see whether

5    there are any questions that I have.

6           THE COURT:  Fine.  Let's take a fifteen minute break,

7    resuming at 11:05.

8           MR. BOIES:  Thank you, Your Honor.

9       (Recess from 10:51 a.m. until 11:09 a.m.)

10          THE COURT:  Be seated, please.

11          MR. BOIES:  Your Honor, I have no more questions.

12          MR. GAFFEY:  May I proceed, Your Honor?

13          THE COURT:  Yes.  Do I get a book, or --

14          MR. GAFFEY:  Yes, you do, Your Honor; two.

15          Robert Gaffey for -- Jones Day, for the -- from Jones

16   Day, for the debtor, for the record, Your Honor.

17          Your Honor, I have two books, and one I -- I want to

18   explain; I have one for the witness that's related to Mr.

19   Shapiro.  We're also going to -- for this phase, we've

20   collected in what's just called "Witness Binder" a set of

21   documents that come up time and time again.  So I've said to

22   Mr. Boies, regardless of what he takes back and forth, he may

23   want to keep that one handy, and I'll say that to Your Honor as

24   well.  This witness binder is sort of a core set of documents.

25   So there are two.

Page 61

1          THE COURT:  Okay, that's fine.

2          MR. GAFFEY:  And if I can hand those up?

3          THE COURT:  Absolutely.  Thank you.

4      (Pause)

5  CROSS-EXAMINATION

6  BY MR. GAFFEY:

7  Q.  Mr. Shapiro, we haven't met.  My name is Bob Gaffey.  I'm

8  from Jones Day.  We represent the debtor.

9          Now, Mr. Boies asked you a bit about your background, sir,

10 as a restructuring lawyer.  I just wanted to follow up a bit on

11 that.  In your time at Shearman & Sterling, was your practice

12 concentrated in the restructuring and bankruptcy area?

13 A.  Yes, it was.

14 Q.  And among the things that you did in your practice before

15 Lehman Brothers was deal with such things as motions for

16 approval of 363 sales, correct?

17 A.  Yeah, I worked for debtors sometimes; I worked for

18 creditors other times; I worked for buyers sometimes.  So I did

19 all of those different things.

20 Q.  And one of the things that you understood from your time

21 at Shearman & Sterling and your other involvement in

22 restructuring practices is that one key issue with regard to

23 363 sales is disclosure of the facts to the Court that is being

24 asked to approve the sale, correct?

25 A.  Of course.

Page 62

1    Q.   And several times in response to Mr. Boies' questions, you

2    mentioned that there was no alternative or only one buyer, or

3    Lehman was doing the best that it could here.  Do you recall

4    generally those answers?

5    A.   Yes, I do.

6    Q.   And you don't mean to suggest with those answers that the

7    fact that there's only one buyer would in any way diminish or

8    dilute the disclosure obligations the parties had to the Court

9    with respect to the 363 sale we're talking about, would you,

10   sir?

11   A.   No, I do not.

12   Q.   You understood at the time that you were working in

13   connection with the 363 sale here that disclosure was a

14   critical element of the process that needed to be followed in

15   order to obtain approval?

16   A.   Like every case, disclosure is required to the Court so

17   that the Court has a full appreciation for what the transaction

18   is before it signs the order approving it.  Absolutely.

19   Q.   All right.  And you spoke a bit toward the end of your

20   testimony about the finality of 363 sales, that is, that the

21   buyer obtains property free and clear of liens and

22   encumbrances; do you recall that?

23   A.   Yes, I do.

24   Q.   All right.  And one of the elements needed to get that

25   favor of finality, that freedom from liens and encumbrances, is

Page 63

1    to ensure that full disclosure is made of the facts and

2    circumstances surrounding the transaction, yes?

3            MR. BOIES:  Objection.  Legal conclusion, Your Honor.

4            MR. GAFFEY:  I think he opened the door, Your Honor.

5            THE COURT:  That's -- excuse me?

6            MR. GAFFEY:  I think Mr. Boies opened the door to that

7    with some of his questions on direct to Mr. Shapiro.

8            THE COURT:  Well, it -- that's possible.  I think that

9    it's true that it does call for a legal conclusion.  And it's

10   conceivable that this witness is in a good position to answer a

11   question like that given his background and the position that

12   he held at Lehman Brothers, but I'll sustain the objection.

13   And you can try to ask the question a different way.

14           MR. GAFFEY:  I'll rephrase it, Your Honor.

15   Q.   In connection with your work on this transaction, the

16   review of the APA, your conversations with Mr. McDade, your

17   negotiations with Mr. Lewkow, it was your view at the time,

18   sir, that if the ultimate goal here included finality, freedom

19   of liens and encumbrances for Barclays, that one price to be

20   paid for that finality was full and complete disclosure to the

21   Court?

22   A.   I wouldn't characterize it that way.  I would say that in

23   every deal -- this deal is no different other than the fact

24   that we were obviously going very, very fast, which happens

25   sometimes, and this deal was obviously -- involved a very large

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 64

 1   company in a very difficult time, you know, in our economic

 2   crisis.  That being said, I look at the totality of what was

 3   done, which was a combination of the disclosures that were made

 4   orally to the Court both on Wednesday and on Friday, the papers

 5   that were filed with the Court, the papers that were filed

 6   after the court hearing, including the clarification letter.

 7   So when I look at, you know, how do you get to a final order,

 8   all of the things that are required to ultimately inform the

 9   Court, and other constituencies as well, all of which I believe

10   were all done consistent with the law and consistent with our

11   obligations as the debtor, you know, created a final order, in

12   my mind.

13   Q.   Now, the clarification letter that you just mentioned,

14   sir, the fact of the matter is you had nothing to do with the

15   drafting of the clarification letter, correct?

16   A.   Absolutely correct.

17   Q.   The fact of the matter is you were out of town over the

18   weekend when the clarification (sic) was finalized, is that

19   correct?

20   A.   That's correct.  I knew about the clarification letter on

21   Friday, because there was some discussion that the deal was

22   going to need to be changed and that the parties were going to

23   evidence that through a letter, that was not ready yet, that

24   would have to be worked on either, you know, through the

25   balance of Friday evening or potentially later.  And then I

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 65

1    left after the hearing on Friday.

2    Q.   And you learned about the fact -- the existence even of a

3    draft clarification letter, sitting in this court at the sale

4    hearing, correct?

5    A.   Correct.  I might have heard about -- I don't think it was

6    called a clarification letter, but I might have heard that they

7    were working on a document.  But I don't recall it being called

8    a clarification letter in Bart's office Friday afternoon.  Then

9    I heard about the clarification letter for the first time in

10   court, correct.

11   Q.   And you were not involved in its drafting, correct?

12   A.   No, I was not.

13   Q.   And its contents in any way, correct?

14   A.   No.  Not in a --

15   Q.   The decision --

16   A.   Not in a direct way, no.

17   Q.   Okay.  And you were not involved, were you, sir, with any

18   decision as to whether to file that clarification letter at a

19   point before or after the Court issued its sale order, were

20   you?

21   A.   No.  As you indicated, I -- the court hearing ended at

22   about 1 a.m., as Your Honor may recall; it was a late night.

23   And I then took the car home and then took a nap for about

24   fifteen minutes, and then went to the airport and caught a

25   flight to California.

Page 66

```
 1    Q.   And the question that I think I asked is you were not

 2    involved, sir, in any decision as to whether the clarification

 3    letter should be brought to the Court before or after the sale

 4    hearing was --

 5    A.    No.  As you said, I was not involved in the clarification

 6    letter at all.

 7    Q.    All right.  Now, one of the -- on your direct testimony,

 8    sir, you described yourself as being involved in shepherding

 9    this through.  Do you recall that?

10    A.    Yes, I do.

11    Q.    Okay.  There was a time when you applied different

12    descriptions to your work on the transaction, including being a

13    quarterback of the transaction, is that correct?

14    A.    Yeah, I mean, I would call all of those kinds of things,

15    you know, general descriptions of what someone's doing who is

16    helping to get a transaction completed.

17    Q.    You have described to others as having been an architect

18    of the sale process, is that right?

19    A.    I think I may have called myself an architect in that I

20    had the original idea for it.

21    Q.    Have you described yourself to others, sir, as the

22    architect of the deal and the lead person on the deal for

23    Lehman?

24    A.    I might have at some point, yeah.

25    Q.    And have you described yourself as at the epicenter of the
```

08-13555-mg    Doc 11012    Filed 08/25/10    Entered 08/26/10 10:23:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 67 of 199

Page 67

1    deal, trying to steer it to a soft landing at Barclays?

2    A.    I'm sorry, say that again.

3    Q.    At the epicenter of the deal --

4    A.    The epicenter?

5    Q.    -- trying to steer it to a soft landing at Barclays.

6    A.    Trying to steer it to -- I might have, yeah.

7    Q.    And have you said to other people that you were thrust

8    into having to lead the bankruptcy filing and the sale to

9    Barclays?

10    A.    Sounds very dramatic, but I probably might have said that.

11    Q.    You think you might have said that?  And one of the things

12    that you -- despite being a shepherd or a quarterback or an

13    architect or the leader, your role essentially, sir, was

14    reviewing the asset purchase agreement at the -- in the

15    beginning of the week, yes?

16    A.    No.

17    Q.    You were not privy, for example, sir, to the work of the

18    people assessing the value of the securities being transferred,

19    isn't that right?

20    A.    We each had different roles as the transaction sort of

21    took on a life.  So I would say that at the very beginning we

22    were trying to construct a transaction structure, if you want

23    to call it that, in putting the whole thing together.  I was,

24    I'd say, critical to that mission.  And then as we got further

25    into it, different pieces needed to come together in order to

Page 68

1    fill that out and to put meat on the bones.  And, so, obviously

2    other -- you know, one person could not possibly, under the

3    circumstances, taken on all of that.  So we had different

4    people in charge of different parts of that overall process.

5    Q.    And with regard to the part of that overall process that

6    was assessing the identity and value of the securities to be

7    transferred, that was not one of the pieces that you worked on,

8    isn't that right?

9    A.    Corre -- well, I worked only on helping other people

10   identify, like Barry Ridings, understanding what we were trying

11   to accomplish and getting him the diligence.  But I was not

12   personally involved in selecting securities or negotiating

13   which securities were in or were out, correct.

14   Q.    And you were not involved in any internal valuations of

15   the securities?  You were not privy to a good chunk of what was

16   happening on that front, other than the fact that Bart had

17   people working on it, isn't that right?

18   A.    Bart had people working on it.  I would hear conversations

19   from Jim Seery, who would give me an update on what was

20   generally going on, you know, depending on the day, of course,

21   or the hour.  But I was not personally involved in valuing

22   securities, no.  That's not the nature of my expertise.

23   Q.    That was the work of people like Martin Kelly, is that

24   correct?

25   A.    No, I would say that was the work of Bart and people on

Page 69

1   the trading side.  Really I'd say he was looking to different

2   desks, people who ran different desks around each different

3   type of security.  Martin Kelly, based on the limited exposure

4   I had to him, was almost like an information guy; he, like --

5   he would get stuff for people.  But he didn't -- I don't know

6   if he -- I don't think he has the expertise to be valuing

7   securities.

8   Q.   Neither do you, right?

9   A.   Nor do I.

10  Q.   Okay.  So, you understood that Seery, Kelly and Lowitt

11  were among those focusing on pulling together information about

12  the securities pool and giving it to Bart, the lead negotiator,

13  Barton McDade?

14  A.   Yeah.  Obviously, Bart was getting the information.  He

15  was, obviously, getting it from multiple sources depending on

16  the nature of the security.  There were different traders that

17  were in charge of different desks some of whom I met in the

18  course of those few days and some of whom I didn't.  And

19  ultimately all that information flowed to Bart.

20  Q.   Okay.  And one of the places that information flowed to

21  was into a schedule that was put together of the assets to be

22  transferred and the liabilities to be assumed in the deal, is

23  that right?

24  A.   There was a schedule that we created, if -- I think I know

25  what you're referring to but if you want to show it to me that

Page 70

1    might be easier.

2    Q.   Well, do you recall a schedule that was created by one of

3    your analysts, John Grenier?

4    A.   Yeah.  That sche --

5    Q.   John Grenier was there with a laptop?

6    A.   John Grenier was a second week first year analyst who had

7    barely, you know, gotten his feet on the ground and was asked

8    to, basically, be a scribe which he actually tried his best at

9    in a difficult circumstance for a young kid.  And he was asked

10   to put -- take, effectively, a bunch of information and put it

11   onto his computer.

12   Q.   Okay.  Now, if you would take a look, sir, in the book

13   marked Shapiro Witness Binder, I've left you two, just put

14   aside for the one that just says Witness Binder and in front of

15   you the one that has your name on it.  And if you would turn in

16   that binder, sir, to what's marked as Exhibit M-2.  Let me know

17   when you're there.

18   A.   Yeah.

19   Q.   Is that the schedule that we've been talking about?

20   A.   Yeah.  This was the one that Berkenfeld initialed.

21   Obviously, this schedule had many iterations of it before this

22   initialed one.

23   Q.   And you were not in the middle of drafting that piece of

24   paper?

25   A.   I looked -- I was looking at the schedule on and off

08-13555-mg   Doc 11012   Filed 08/25/10   Entered 08/26/10 10:23:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 71 of 199

Page 71

1   depending on, you know, the hour, truthfully.  Because,

2   basically, people in my team were working in this, George Mack

3   and John Grenier, so, they were coming to me showing me it and

4   then we lost control of it at some point during the middle of

5   the night.

6   Q.   Would it be fair, sir, to use the words, "you were not in

7   the middle of drafting that piece of paper" to describe your

8   role?

9   A.   Yeah.  I think that's fair.

10  Q.   Okay.  The scribe who originally generated was not the

11  person responsible for signing.  It was signed by a senior

12  executive at Lehman, yes?

13  A.   The scribe was merely an inputter.

14  Q.   And did you come to understand that this document marked

15  as M-2 served as the form of guidance for the transaction?

16  A.   The origin of that document was that there was -- there

17  was actually a balance sheet of some sort that I don't

18  personally remember seeing but I had remembered being told that

19  there was a balance sheet, and what we were trying to do was

20  figure out, at the time, what we could sell to Barclays, so the

21  initial draft of that schedule, what came to be that schedule

22  was really just a list of what assets were on the balance sheet

23  that could potentially be sold to Barclays.  That iterated and

24  got morphed into ultimately the schedule you're looking at.

25  Q.   And the schedule we're looking at is the one signed by

Page 72

1    Mr. Berkenfeld or initialed by Mr. Berkenfeld?

2    A.    Correct.

3    Q.    And the question I asked was if you had come at that point

4    to understand that this document served as some form of

5    guidance for the transaction?

6    A.    Yeah.  It served as a basis to try to identify which

7    specific pools of assets were being included in the deal.

8    Q.    And one of the people we've talked about is Martin Kelly

9    who had a collection role for -- had a role in collecting the

10   data, gathering it together, and supplying it to Bart McDade

11   the lead negotiator, is that right?

12   A.    As far as I know.  You know, I don't know exactly what

13   Martin did that whole weekend but --

14   Q.    Well, one of the things you don't know that Martin -- you

15   never had a conversation with Kelly about valuing the

16   securities on any basis other than Lehman's marks, is that

17   right?

18   A.    I never had any conversation with Kelly about valuation

19   that I recall.

20   Q.    So, one of the -- your understanding, sir, was that the

21   values that were reflected on this exhibit, M-2, came from

22   Lehman's book value, isn't that right?

23   A.    I don't know exactly where that came from.  That came from

24   someone who provided them to the people who put this data in.

25   I don't know exactly ultimately how it came to be that these

Page 73

1    particular numbers were agreed to.

2    Q.    Did you ask anybody at the time?

3    A.    Not that I recall but it's going on two years now.

4    Q.    And when you reviewed the APA, draft after draft of the

5    APA, did you look at it to see if there was a description on

6    the basis of the valuation of securities that were being

7    transferred?

8    A.    Probably in reviewing the section on purchase assets I

9    looked at the section that said approximately seven -- book

10    value of approximately seventy billion.  I do have specific

11    knowledge of remembering that I looked at that, yes.

12    Q.    And when you read that definition of book value, it was

13    your understanding that that came from how Lehman's books

14    reflected on the date the agreement was signed?

15    A.    No --

16    Q.    Value of the securities and the long position, is that

17    right?

18    A.    At the time I don't really remember exactly what I thought

19    you meant by book value to be honest.  I just remembered the

20    words we used book value, I don't know exactly where they came

21    from.  I do know, though, that in the course of the discussions

22    between the two firms, there was a disagreement as to

23    ultimately what the values of the securities were and

24    ultimately, you know, how they got to numbers I'm not exactly

25    sure.  Because as you pointed out I didn't participate in most

Page 74

1    of those discussions.

2    Q.   Now, you, sir, read every -- every draft of the asset

3    purchase agreement, is that right?

4    A.   I tried to.

5    Q.   And, in fact, you considered reading every draft of the

6    asset purchase agreement to be a pretty significant

7    responsibility of yours, isn't that right?

8    A.   I viewed myself as trying to make sure that we tried to

9    reflect the deal as best we could in the document.

10   Q.   And that was a pretty significant role, wasn't it?

11   A.   It was an important role in the context of what we were

12   trying to accomplish I guess.

13   Q.   And one of the things you would do when you were reviewing

14   every draft of the APA, was to watch out for changes in the

15   wording of the APA, correct?

16   A.   Well, obviously, if something got changed and it was

17   blacklined I'd look at it.

18   Q.   And if it was written in by hand, would you look at that

19   too?

20   A.   Well, if it was written in by hand I presume I would have

21   looked at it.

22   Q.   And one of the things you mentioned to Mr. Boies on your

23   direct testimony is that you reviewed the sale motion, is that

24   right?

25   A.   Correct.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 75

1    Q.   Do you recall that the exhibit of the asset purchase

2    agreement to the sale motion included handwritten

3    interlineations?

4    A.   I don't recall but it could be true.

5    Q.   Okay.  And in any event, you reviewed the APA multiple

6    times, yes?

7    A.   Correct.

8    Q.   And let me ask you, sir, to turn in your book to --

9    actually, it's in the other book, the one marked witness book.

10   And if you would turn, sir, to Tab 9 in that book you'll find

11   behind that what's been marked as Movant's Trial Exhibit 7 --

12   Movant's Exhibit 7 in evidence, sir.

13   A.   Okay.  Looking at an e-mail?

14   Q.   What I want you to tell us is if you've ever seen that

15   document before?

16   A.   I was shown this document in connection with preparation.

17   Q.   And prior to your preparation -- your preparation for your

18   deposition or your preparation for your testimony today?

19   A.   I believe my preparation for my testimony today.

20   Q.   Okay.  And prior to the time that you saw it as part of

21   your preparation for your testimony today, you've never seen

22   that document before, isn't that right?

23   A.   Correct.

24   Q.   And you never had any conversations with Mr. Martin Kelly

25   about anything concerning an overall -- a five billion all-in

Page 76

1   economic loss versus Lehman's marks as part of the transaction,

2   is that right?

3   A.   No, I did not.

4   Q.   And no one over spoke to you about any concept of a loss

5   versus Lehman's marks as part of the structure of the

6   transaction is that correct?

7   A.   I loss?  No, I don't remember the word loss.

8   Q.   A loss versus Lehman's marks, sir?

9   A.   A loss versus Lehman's marks, no, I don't remember that.

10  Q.   And when you reviewed the asset purchase agreement, every

11  draft of the asset purchase agreement, you -- and to compare --

12  you were doing that to compare it to the economic terms that

13  had been given to you of what the deal was, correct?

14  A.   Not just for that.

15  Q.   That was one reason, no?

16  A.   Just the changes that were being made to make sure that

17  they were reflected -- reflecting what we were negotiating,

18  kind of, real time.

19  Q.   Okay.  And in simpler terms, sir, probably my fault in the

20  question, but one of the things you were charged to do or took

21  upon yourself to do was review the asset purchase agreement to

22  make sure that it accurately documented the deal, correct?

23  A.   As best I understood it and under the circumstances,

24  correct.

25  Q.   And at the time that you were performing this work,

Page 77

1   reviewing the drafts of the asset purchase agreement to make

2   sure that it accurately reflected the deal, no one had ever

3   talked to you about an all-in economic loss versus Lehman's

4   marks, is that correct?

5   A.    Correct.

6   Q.    Now, in fact, sir, you found the asset purchase agreement

7   to be a reasonably straightforward contract, correct?

8   A.    As these things go, yeah, I think so.

9   Q.    Okay.  And you would from time to time have conversations

10  with Mr. McDade about what you viewed as key issues with regard

11  to the language of the asset purchase agreement?

12  A.    Yeah, we -- yeah, I mean, you know, I'd say that generally

13  speaking the president of a firm is not necessarily interested

14  in looking at every single word of a contract as you would

15  expect.  He did, you know, obviously, look at the contract and

16  reviewed all the key points.  We took him through them orally I

17  recall with Weil Gotshal who did, frankly, most of that, not

18  me.  And so I believe that Bart fully understood the contract.

19  Q.    Nobody from Weil Gotshal ever mentioned to you knowledge

20  or understanding of all-in economic loss versus Lehman's marks

21  being part of the structure of the transaction, is that right?

22  A.    That wouldn't have really been relevant to the drafting of

23  the contract.  What was relevant to the drafting of the

24  contract was how we were enumerating the assets that they were

25  purchasing and the liabilities that they were assuming and what

Page 78

1    they were excluding from the contract.  It wasn't about marks

2    or not.

3    Q.    So, is that a no?  Nobody from Weil Gotshal ever said that

4    to you or anything like that to you?

5    A.    I guess it's a no.

6    Q.    Okay.  Now, you mentioned to Mr. Boies that the seventy

7    billion dollar number in the definition of the long position in

8    the asset purchase agreement came from the trading side from

9    the finance group, is that right?

10   A.    That's my belief, yes.

11   Q.    You were not involved in determining that number,

12   calculating that number?

13   A.    No, I was not.

14   Q.    And would you take a look, sir, at Exhibit M-1 in your

15   book.  It's the asset purchase agreement again.  And if you

16   would turn to page 6 just so we can get that --

17   A.    We talking about the other binder now?

18   Q.    Yes, sorry about that.  And that's marked M-1 in your

19   book --

20   A.    Yeah, I have it.

21   Q.    -- the asset purchase agreement.  And let's go back to

22   page 6 to the subsection (d) at the bottom, the definition of a

23   long position.  You with me there?

24   A.    Yeah, I'm with you.

25   Q.    All right.  And you understood that that clause of the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 79

1   asset purchase agreement when you saw it to mean that the value

2   of those securities were based on Lehman's marks, is that

3   right?

4   A.   I think as I said earlier, I believe that there was some

5   agreement, not sure whether it came straight out of Lehman's

6   marks or whether it was agreed between Lehman and Barclays but

7   basically there was an agreement on what the value of those

8   securities were which we tried to evidence by saying

9   approximately seventy billion.

10  Q.   Now, you understood it to be the book value shown as of

11  the time the contract got signed at around 10:30 p.m. on

12  Tuesday, is that right?

13  A.   Yeah, the contract was signed about that time so

14  presumably it would have been an agreement that took place on

15  or before that time.

16  Q.   And you believed that the seventy billion dollars that's

17  referred to in there, at the time they were reviewing the APA,

18  you believed that the seventy billion dollars referred to there

19  was based on Lehman's book value, yes?

20  A.   Well, that's what I just said.  It was based on what

21  was -- what I believe to be at the time agreed to by the

22  parties on what book value was and that we had a seventy

23  billion dollar, approximately seventy billion dollar number

24  that was given to us to put into the contract.

25  Q.   Okay.  Would you take a look at -- in the book there, sir,

Page 80

1    is your deposition transcript and I'll ask you turn to page

2    104.

3    A.    Sure.   Sorry, what exhibit am I looking at?

4    Q.    The tab should say deposition transcript.

5    A.    Is that in a different binder?

6    Q.    Nope.   It's that one.   The Shapiro binder.   Right there.

7    A.    Yep.

8    Q.    Okay.

9    A.    Yeah.

10   Q.    And if you would, sir, turn to page 104.   And, in

11   particular, sir, I'll direct your attention to the question and

12   answer that begin at line 19 and continue through page 105 at

13   line 11.

14   A.    Um-hum.

15   Q.    I asked you this -- you were asked this question and you

16   gave this answer at your deposition.

17   A.    Um-hum.

18   Q.    Okay.

19   "Q.   Okay.   Let's go back to the seventy billion for just a

20   moment, were the value of those securities based on Lehman's

21   marks?

22   "A.   Well, this says it has a book value, so I believe it was

23   based on Lehman's as Lehman has marked them as of the time that

24   this contract got signed which meant the contract got signed at

25   10:30 p.m. around --- on Tuesday and on the night of the 16th.

Page 81

1    So, I'm presuming that on or about the close of business on the

2    16th, there was a view, and it does say approximately seventy

3    billion, so presumably there was a list that was taken that

4    they had, obviously, had different pools of security in, they

5    had the marks that Lehman had on those securities as of that

6    date, approximately, and that's presumably where this seventy

7    billion came from."

8        You see that sir?

9    A.    I do.

10   Q.    Was that testimony true when you gave it at your

11   deposition?

12   A.    Yes.

13   Q.    So, I'll ask you again, your understanding at the time

14   with regard to the description of a long position in the asset

15   purchase agreement it was based on Lehman's marks, correct?

16   A.    Correct.

17   Q.    And you didn't say anything at your deposition about any

18   agreed value with those marks.  You talked about Lehman's

19   marks, right?

20   A.    When I -- I guess when I say agreed values, Lehman,

21   obviously, had marks at the time as of, I guess, 10:30 that

22   night or probably the end of the business day that day.  They

23   were in discussions with Barclays, I knew they were I

24   discussions.  The end of the day I think that this seventy

25   billion dollars represents whatever it was that Lehman took the

08-13555-mg    Doc 11012    Filed 08/25/10    Entered 08/26/10 10:23:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 82 of 199

Page 82

1    position that its marks were at that point in time.

2    Q.    And --

3    A.    Whether that included any input from Barclays, I can't be

4    sure.  I can only tell you if we got that number.

5    Q.    In your experience dealing with 363 sales and financial

6    institutions, you've never before seen an incident where the

7    books and records of a regulated broker-dealer are kept as

8    relative conversations with an outsider, have you sir?

9    A.    I'm not party to other books and records and other things.

10   I can only say that this was a very unusual set of

11   circumstances that we were facing.

12   Q.    So, that's a yes, is that right?  You never --

13   A.    You want to restate the question?

14   Q.    -- that you never saw the books and records of a regulated

15   broker-dealer kept in a manner that took input from an

16   outsider?

17   A.    I've never seen the books and records of a broker-dealer

18   period.

19   Q.    Well, let me ask you to turn to -- on this issue of where

20   Lehman's marks came from, let me as you turn to page 105 of

21   your deposition, sir, line 16 and it's a long answer.  I'm

22   going to take you through line 25.  We can read the rest if

23   you'd like, but.

24   "Q.  Well, the seventy billion is based, as you said, on

25   Lehman's marks.  Do you know whether or not in selling the

Page 83

1   securities to Barclays whether different marks were used?

2   "A.  No, these -- again as I recall, this seventy billion was a

3   rough approximation of the aggregate book value.  You know,

4   based on Lehman's marks of the asset side of the deal, right.

5   And so I would say no there was no discount because, obviously,

6   it was a book value."

7        Do you see our portion of your --

8   A.   Yeah, I do.

9   Q.   Okay.  Was that true?

10  A.   If I said it I -- absolutely.

11  Q.   Okay.  And you were not aware at the time you were

12  reviewing the asset purchase agreement, sir, of any discount

13  given to Barclays off the amounts shown on Lehman's books.  Is

14  that correct?

15  A.   Discount to the asset side?

16  Q.   Yes.

17  A.   No, there was a difference between the asset side and the

18  liability side but there's no discount, if you want to call it

19  that, on the asset side.

20  Q.   I'm just on the asset side for the moment, sir.

21  A.   Yeah.

22  Q.   In the seventy billion dollar asset description that we've

23  been talking about, at the time you were reviewing the asset

24  purchase agreement, you had no knowledge, did you, of any

25  discount from the amount shown on Lehman's books to the seventy

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 84

1    billion shown in the asset purchase agreement?

2    A.    There was no discussion or anybody saying anything to me

3    about a discount, no.

4    Q.    And you had no discussion with anyone about there being no

5    book value available on the 16th of September the date the

6    contract was signed, correct?

7    A.    Can you ask -- repeat your question?

8    Q.    You had no knowledge, did you sir, of a book value being

9    unavailable on the 16th of September the date the agreement was

10   signed, is that right?

11   A.    No, I had no knowledge that it was unavailable, no.

12   Q.    Now, you had discussions, did you not, sir, with

13   Mr. McDade at the time, at the time the transaction was being

14   negotiated and signed, you had discussions with Mr. McDade

15   about his conception of the structure of the deal, did you not?

16   A.    I don't know if we had discussions with the conception of

17   the structure of the deal, we had discussions about what was

18   going on, we had discussions about specific points from time to

19   time, but we didn't have -- I'm not quite sure I totally

20   understand what you're asking.

21   Q.    Well, it's my fault, I think, with the question again.

22   Let me give you some testimony that Mr. McDade gave in this

23   court.  Mr. McDade in this hearing has testified:

24   "Q.    Now, on the 16th, when this agreement was signed, did you

25   consider the transaction contemplated by the asset purchase

Page 85

1  agreement to be an equivalent exchange of assets and

2  liabilities?  A wash?

3  "A.  Including all of the value of what was contemplated, yes,

4  approximately."

5        UNIDENTIFIED SPEAKER:  Do we have a transcript

6  reference, Your Honor?

7        MR. GAFFEY:  I beg your pardon, yes.  That's --

8        THE COURT:  I was waiting for that myself.

9        MR. GAFFEY:  The April 26th trial transcript, Your

10  Honor, at page 184, lines 3 to 8.

11        THE WITNESS:  I'm sorry, am I supposed to be looking

12  at that?

13        MR. GAFFEY:  Steve, can we put that up on the screen?

14  Page 184, please lines 8 to 13, 9 to -- I beg your pardon, 3 to

15  8.  All right.

16  BY MR. GAFFEY:

17  Q.  All right.  I put that on the screen, sir, and let me just

18  read it again, so it's fresh in your mind.

19  "Q.  Now, on the 16th, when this agreement was signed, did you

20  consider the transaction contemplated by the asset purchase

21  agreement to be an equivalent exchange of assets and

22  liabilities?  A wash?

23  "A.  Including all of the value of what was contemplated, yes,

24  approximately."

25  Q.  You see that testimony from Mr. McDade?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 86

1   A.   I do.

2   Q.   You have no reason to disagree with that, do you sir?

3   A.   If that's what was in his mind that's his conclusion.

4   Q.   He was the principal negotiator of the deal?

5   A.   He was the principal negotiator of the deal, correct.

6   Q.   And when you took final guidance as to what the structure

7   of the deal was during the time you were reading the asset

8   purchase agreement and all its drafts, you would be governed by

9   Mr. McDade's views, wouldn't you?

10   A.   Mr. McDade was governed by Mr. McDade's views.  He was,

11   ultimately, the one who decided whether we should sign the deal

12   or not.

13   Q.   All right.  Mr. --

14   A.   I was not a decision maker.

15   Q.   -- Mr. McDade is the final decision maker.  Are we making

16   this deal or not, yes?

17   A.   Correct.

18   Q.   And you are the restructuring expert who's looking at the

19   asset purchase agreement draft after draft, correct?

20   A.   Correct

21   Q.   And you are the asset purchase agreement -- you are the

22   restructuring expert looking at the asset purchase agreement

23   for the purpose of making sure it accurately reflects the deal

24   that the dealmakers made, correct?

25   A.   I was one of a number of people, not just me.

Page 87

1    Q.   And you spoke to Mr. McDade among others about what the

2    terms of the deal were, what the intent of the deal was, yes?

3    A.   Yes.  And I can tell you that he and I never discussed the

4    notion of a wash.

5    Q.   Okay.  Now, you were actually involved in the prep of

6    Mr. McDade for the hearings on the 17th and on the 19th, is

7    that right?

8    A.   More -- I'm just trying to remember, more on the 17th

9    which was really more about he had never been in a bankruptcy

10   court before so he was just asking me kind of general questions

11   about it.  Weil Gotshal actually did the -- whatever prep he

12   did in advance of the hearings, but he just wanted my views on

13   kind of, like, oh, what's it like to be testifying.  He'd never

14   done that before.

15   Q.   Did you ever write to anyone that you were quote "prepping

16   the CEO"?

17   A.   Yeah, I think because I was involved in talking to him

18   about getting ready for the hearing.

19   Q.   And in your work with Mr. McDade both in connection with

20   the hearings and in connection with the documenting of the

21   deal, did you talk to him about the deal being a wash an

22   equivalent exchange of assets and liabilities?

23   A.   No.  Not to the best of my recollection.  We never --there

24   was no discussion about wash, the word wash.

25   Q.   Mr. Boies asked you on direct if this was a quote/unquote

08-13555-mg    Doc 11012    Filed 08/25/10    Entered 08/26/10 10:23:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 88 of 199

Page 88

 1    "balance sheet deal".  Do you recall that?

 2    A.    I think so, yeah.

 3    Q.    Okay.  Taking a look at Mr. McDade's testimony, you think

 4    he thought it was a balance sheet deal?

 5    A.    No, I don't.

 6    Q.    But you do agree, sir, that the primary negotiator for

 7    Lehman thought it was an equivalent exchange of assets and

 8    liabilities, a wash, yes?

 9    A.    What Mr. McDade said there is what Mr. McDade said and

10    that's his view, obviously.

11    Q.    Okay.  You were present at the sale hearing when

12    Mr. McDade testified, sir, is that correct?

13    A.    Yes, I was.

14    Q.    Yes?

15    A.    Yes, I was.

16    Q.    All right.  And you did get involved to some degree with

17    preparing Mr. McDade for that testimony, correct?

18    A.    As I said, the kind of preparation, if you want to call it

19    that, was really more him wanting to understand what it was

20    like to be in a bankruptcy court and then I think on Friday,

21    I'm just trying to remember, we just talked a little bit in his

22    office about what was going to happen at the courthouse that

23    afternoon.

24    Q.    Now, Mr. Boies asked you too, sir, some questions about --

25    about the compensation agreement in the asset purchase

Page 89

1    agreement.  Do you recall that topic generally?

2    A.   Yes, I do.

3    Q.   Okay.  And you -- you did not draft the provisions

4    concerning compensation of former Lehman employees that wound

5    up in the asset purchase agreement, is that right?

6    A.   No, I was reading it.  There were two lawyers who were

7    actually working on it in the hallway of the 32nd floor.  It

8    was one -- a compensation benefits lawyer from Cleary and one

9    from Weil Gotshal and I was kind of standing, kind of hovering

10   with them because, obviously, it was a pretty important

11   provision and I wanted to make sure that people understood what

12   we were trying to accomplish and I wanted to make sure that the

13   senior executives of Lehman were properly conveying to me what

14   we needed to get into that provision.

15   Q.   Okay.  And one of the things you did at the time you were

16   reviewing every draft of the asset purchase agreement was to

17   make sure that those provision concerning compensation of

18   former Lehman employees accurately reflected the deal that was

19   made?

20   A.   To the best I could, yes.

21   Q.   Okay.  And you recall the two billion dollar number that

22   Mr. Boies asked you about in connection with the compensation

23   piece?

24   A.   Yes, I do.

25   Q.   And do you recall that two billion dollar number came from

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 90

1   the one page asset schedule we looked at before?

2   A.   Well, it didn't really come from there.   It came from

3   Bart -- I think it came from Bart and Skip McGee, Bart McDade

4   and Skip McGee.

5   Q.   Um-hum.

6   A.   So, that's where it came from.   It didn't necessarily come

7   from the schedule.   The schedule evidenced whatever it was that

8   senior executives determined to be the right number.

9   Q.   Would you take a look, sir, at the asset purchase

10  agreement, it's M-1 in our Shapiro book there, and turn to page

11  35?

12  A.   Okay.

13  Q.   You with me?   And just for context, take a quick look back

14  at page 34, see where we are. We're in Article IX, employees

15  and employee benefits.

16  A.   Yeah.

17  Q.   All right.   Now, back on page 35, sir, that section 9.1(c)

18  which Mr. Boies asked you about.

19  A.   Yes.

20  Q.   You see that?

21  A.   I do.

22  Q.   And you see that there's a reference in there to a

23  financial schedule.   It's about five lines -- you see it there?

24  A.   Yeah.

25  Q.   Four or five lines down from the top?

08-13555-mg   Doc 11012   Filed 08/25/10   Entered 08/26/10 10:23:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 91 of 199

Page 91

1   A.   Yes, I do.

2   Q.   Financial schedule delivered to purchaser on September

3   16th and initialed by an officer of each of holdings and

4   purchaser?

5   A.   Yes, I do.

6   Q.   You see that?  When you were reviewing the asset purchase

7   agreement and a redraft of it to make sure it was consistent

8   with the business terms, did you see that schedule?

9   A.   You know, I'm not sure exactly what schedule that refers

10  to.

11  Q.   Take a look, then, sir, let's keep our electronic finger

12  on that page, please, but let's also take a look at Exhibit M-2

13  in your book.  That's the schedule.

14  A.   Okay.

15  Q.   Okay.  Now, looking at M-2 in your book, sir, does that

16  refresh your recollection?  Is that the schedule referred to in

17  your --

18  A.   Now, that I'm seeing it, yeah, I think that comp number of

19  2.0 billion dollars was what they were referring to.

20  Q.   Okay.  Now, let's go back to paragraph 9.1(c) at page 35

21  of Exhibit M-1.  All right.  And it was the reference I showed

22  you to, a financial schedule.  And we've agreed now, sir, that

23  M-2 is the schedule we're talking about here, yes?

24  A.   I believe so, yeah.

25  Q.   All right.  And your understanding based on the language

Page 92

 1    of that clause is that the two billion referred to on M-2, the

 2    financial schedule, is the amount intended by paragraph 9.1(c)

 3    concerning bonuses, is that right?

 4    A.    That's right.

 5    Q.    All right.  Now, no part of that two billion, sir, in the

 6    agreement that your reviewed and reviewed included that

 7    schedule in any way to severance, is that correct?

 8    A.    I'm not sure I understand your question.

 9    Q.    Well, let me try this another way.  Go back to page 34 and

10    take a look at section 9.1(b) entitled severance.  Do you see

11    that?

12    A.    9.1(b), okay.

13    Q.    I'm sorry, it's not entitled severance, sir, but you can

14    see that it deals with the severance issue as well.

15    A.    Can I read it?

16    Q.    Absolutely.  And with this question in mind, sir, you

17    agree with me that there's no reference to M-2, the financial

18    schedule in the severance portion?

19    A.    I'll read it and I'll agree with you if I can read it.

20    Q.    Okay.

21          (Pause)

22    A.    So, to answer you, there is no reference in Section B to

23    the schedule, that's correct, there is no reference.

24    Q.    So, it's fair to say, then, sir, that the schedule amount

25    refers only to the bonus provisions in 9.1(c) in the asset

Page 93

1    purchase agreement that you reviewed and reviewed to make sure

2    it accorded with the business transactions, is that right?

3    A.   Can you repeat your question one more time?  I'm sorry, I

4    was reading --

5    Q.   It's fair to say --

6    A.   -- I was just reading paragraph (c), that's why I didn't

7    hear your question.

8    Q.   Okay.  My question, sir, is it's fair to say that the two

9    billion dollar item on the schedule that we saw before as M-2,

10   relates only to the bonus provisions in 9.1(c) and not the

11   severance provisions of 9.1(b)?

12   A.   Well, there's clearly no reference to it in 9.1(b).

13   9.1(c) also talks about, you know, what would happen if

14   employees were terminated.  And, obviously, there was a

15   provision we negotiated that would reduce the total amount in

16   the event that -- or reallocate, I should say, I guess, is the

17   better way to put it, reallocate the amount in the event that

18   certain employees were terminated.  And, so, in terms of

19   paragraph (c) it principally relates to the bonuses.

20   Q.   Okay.  And do you see -- and there's no reference to it in

21   (b), the severance.

22   A.   No, there's no reference of it.

23   Q.   And you would have looked carefully at the time reviewing

24   draft after draft to make sure that it accorded with the

25   business terms to be sure that if a schedule should be referred

Page 94

1   to in the provisions, it was referred to in provision, correct?

2   A.   I guess my answer would be that this was all done very

3   quickly.  Lawyers were drafting fast.  We were reviewing fast

4   and we did the best we could.  Was it the perfect contract?

5   Probably not.

6   Q.   It was true, sir, that you were probably one of the few

7   people around that had the ability to make sure that not only

8   was the business deal being reflected but that also you felt

9   comfortable with the legal terms of the APA.  That's true isn't

10  it?

11  A.   To the best of my abilities, yes.

12  Q.   And it's true that you viewed this as a pretty, you know,

13  significant responsibility that you had to the Lehman estate,

14  yes?

15  A.   As I told you earlier, correct.

16  Q.   And in light of the importance, the significance to that

17  responsibility and your expertise, sir, will you agree with me

18  that when you reviewed the contract even in the organized

19  chaos, that's something you did carefully to make sure in a

20  multibillion transaction taken to this court, it accurately

21  reflected the business deal?

22  A.   To the best of my ability, absolutely.

23  Q.   Now, Mr. Boies also asked you a few things about the cure

24  provisions, about what Barclays' obligations were with respect

25  to cure and I'd like to turn to that --

Page 95

1    A.    Sure.

2    Q.    -- that topic, sir.  It was -- I think you mentioned that

3    you -- well, let me first establish what you didn't do.  You

4    did not yourself gather the numbers with regard to estimating

5    the potential cure liability that Barclays would assume.  You

6    didn't put the numbers together, right?

7    A.    I asked for those numbers to be put together on the basis

8    that Archie Cox and Michael Klein, but principally Archie Cox,

9    I believe, asked me -- one or both of them, I can't remember

10   actually because we were sitting together in that negotiating

11   session, myself and Mark Schaffer and the two of them and they

12   asked me when I said to them that they had to take on the cure

13   payments the asked me how much could that be.  I said I have no

14   idea.  And, so, I said let me see if we can figure out

15   generally kind of on an estimated basis what that might be.

16   And I then went and instructed someone who worked for me,

17   George Mack, who was a senior vice president at the time to go

18   to the finance staff and try to find out as a proxy for a cure

19   amount what approximately one month the payable number would be

20   excluding compensation for the firm.

21   Q.    And I'm going to follow up on that in a minute but my

22   original question was a bit more basic, sir.  You yourself did

23   not sharpen your pencil, take out a pad, and figure out the

24   number, right?

25   A.    That's correct.

Page 96

1    Q.    Okay.  And you asked Mr. Mack who worked for you to go see

2    somebody and have them figure out the money?

3    A.    Correct.

4    Q.    And Mr. Mack also -- he went to -- it was his own wedding,

5    yes?

6    A.    Mr. Mack was getting married so he left in the middle of

7    that week.

8    Q.    Now, you wanted a fair estimate of what Barclays would

9    pay.  It was an estimate, but a fair estimate of what Barclays

10   would pay in cure amounts.

11   A.    Yeah, again, I was asked to give them a sense of what that

12   number might be, because, obviously, to the extent that we were

13   asking them to potentially take on many of the contracts they

14   wanted a sense of what is it that we could have to pay for,

15   right.  They needed to know what the total amount might be.

16   Q.    And your best estimate of a fair estimate of what Barclays

17   would pay was in the range of one and a half billion dollars,

18   correct?

19   A.    When you say "your", obviously, I got the number from

20   George.  George got the number from the finance staff after he

21   spent some time and he spent some time we didn't just, like,

22   pick a number out of the air.  He spent some time working with

23   them on what was the sort of snapshot as to what payables would

24   be for all of LBHI and LBI at any given point in time over the

25   course of the month which seemed to me to be sort of a fair

08-13555-mg    Doc 11012    Filed 08/25/10    Entered 08/26/10 10:23:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 97 of 199

Page 97

 1    proxy for what the firm -- what someone might have to pay.  And

 2    the cure cost was presumably at any given time we have some

 3    amount of accruals going on and so generally speaking it felt

 4    to me like that was a swag or a very general way to kind of get

 5    at it because there was no way for me to give them an answer

 6    within a very short period of time that was going to be very

 7    definitive.

 8    Q.   And so the task was to get a fair best estimate?

 9    A.   To get the best estimate we could under the circumstances.

10    Q.   And one of the places you saw that best estimate was the

11    sale motion that you reviewed when it was submitted to the

12    Court.

13    A.   Once we came up with the number, which was, I think, we

14    made it very clear that was an estimated number, then we used

15    that number as the potential amount up to which Barclays could

16    have to pay without any assurance that they actually would pay

17    it, all of it.

18    Q.   Now, when you reviewed the sale motion, sir, did you

19    review it to make sure that that was accurately described to

20    the Court?

21    A.   Yes, I tried to.

22    Q.   All right.  And, I think, you'll find that motion in the

23    book that Mr. Boies gave you behind Tab 15.

24    A.   Okay.

25    Q.   Hold on.  And that's BCI Exhibit 11.

08-13555-mg   Doc 11012   Filed 08/25/10   Entered 08/26/10 10:23:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 98 of 199

Page 98

1    A.   All right.  I have it.

2    Q.   And I'm going to direct your attention, sir, to page 6 of

3    the sale motion and, in particular, sir, to the bullet point

4    entitled assumption of contracts.  It's the fourth bullet point

5    down under the section entitled purchase agreement.  Are you

6    with me?

7    A.   Yes, I am.

8    Q.   All right.  And that says "The purchaser shall have the

9    right but not the obligation to take assignment of contracts

10   and leases which are designated for assumption and assignment

11   by purchaser".  And then continues, quote, "The parties

12   estimate that the cure costs associated with such assumptions

13   and assignments will be approximately 1.5 billion dollars."  Do

14   you see that, sir?

15   A.   I do.

16   Q.   And you read that at the time to be an estimate to the

17   Court of what the cure costs associated with the assumption and

18   assignments would be, isn't that right?

19   A.   I probably had a hand in drafting that specific sentence.

20   Q.   All right.  So, when you had a hand in drafting that

21   specific sentence, sir, you were careful to say everything you

22   could to the Court about what that 1.5 billion dollar item was?

23   A.   Yeah, I think to -- there's two sentences there.  One says

24   the purchaser shall have the right but not the obligation so

25   that makes it very clear to everybody that Barclays could take

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 99

1   all or it could take no contracts.  Obviously, we believed that

2   they would be taking the lion's share of the contracts because

3   they were buying an entire business that they hadn't previously

4   operated.

5        Our estimate at the time, best reasonable estimate we

6   could come up with was an amount of 1.5 billion dollars.

7   Q.   I'm going to take a small risk here, sir, and push back at

8   a bankruptcy lawyer in a bankruptcy court, but that first

9   sentence describes the mechanism that Barclays can -- might or

10  might not take contracts.  That's the purpose of that first

11  sentence, yes?  It has the right but not the obligation?

12  A.   I don't know what the purpose is.  It says what it says.

13  Q.   Well, you had a hand in drafting it thought, right?

14  A.   Yeah.

15  Q.   Okay.  When you had a hand in drafting it you wrote, "The

16  right but not the obligation to take assignment of contracts

17  and leases, right?

18  A.   Yes.  And that sentence is meant to tell the Court

19  Barclays doesn't have to take everything, right?

20  A.   Yeah.

21  Q.   Okay.

22  A.   They take whatever they choose to take.

23  Q.   And then the second separate sentence says simply, quote,

24  "The parties estimate that the cure costs associated with such

25  assumptions and assignments will be approximately 1.5 billion

Page 100

1    dollars", end quote.

2    A.    Yeah, I think that you need to -- that sentence needs to

3    be read in both the context of the first -- in connection with

4    the first sentence.  And as well there were other

5    representations made to the Court during the hearings and maybe

6    in other pleadings that that 1.5 billion dollar number could be

7    up to 1.5 billion dollars.  It was an estimate.  And it was our

8    best guesstimate, effectively, as to what Barclays might have

9    to pay in the event that it took on, you know, a substantial

10   portion of the contracts.  But there was no guarantee,

11   certainly, that anybody who's a bankruptcy practitioner and,

12   you know, there were, obviously, a lot of sophisticated

13   bankruptcy practitioners around this transaction, knew that

14   that 1.5 billion dollar number was an up to number.  It could

15   be smaller, frankly, it could have been larger.  Truth is, we

16   told Barclays this was the number but I didn't have any

17   absolute assurance -- we didn't cap it, they didn't have a

18   provision that said that they wouldn't pay more than 1.5

19   billion and after that it was Lehman's responsibility.  This

20   was open-ended as far as they were concerned.  It could have

21   been 2 billion, it could have been 300 million; the number was

22   not clear.

23   Q.    Just to help me find my way through the books there, you

24   seem fairly familiar with the record, can you remind me of

25   where we would look to find the part where the Court was told

Page 101

1   this was an up to number?

2   A.   My general recollection was that during the hearing when

3   Harvey Miller was talking about -- Harvey Miller and Lori Fife

4   were talking about things that they talked about the cure

5   costs.  I don't remember exactly their words but that's what I

6   remember.

7   Q.   All right.  And I'm not going to -- their words are their

8   words, so I'm not going to ask that --

9   A.   Yeah, in the transcript they say what they say.

10  Q.   -- but I'm asking about sources of the statement.  So,

11  there's Mr. Miller's statements in Court, yes?

12  A.   Um-hum.

13  Q.   And there's the sale motion, yes?

14  A.   Um-hum.

15  Q.   Yes?

16  A.   I'd have to go back and look at all the pleadings that

17  were filed.  I don't recall them all today.

18  Q.   Okay. Let's see the ones you can recall.  There's the sale

19  motion, you had a hand in drafting it, correct?

20  A.   Correct, correct.

21  Q.   Okay.  And there's the asset purchase agreement that was

22  submitted with the sale motion, correct?

23  A.   Correct.

24  Q.   And there are the two hearings on the 17th of September

25  and the 19th of September, correct?

Page 102

1    A.   That's right.

2    Q.   Now, prior to the issuance of the sale order, sir, are you

3    aware of any other mechanism for disclosure to the Court of any

4    qualification of that statement, "The parties estimate that the

5    cure costs associated with such assumptions and assignments

6    will be approximately 1.5 billion dollars"?

7    A.   No.  I would say all of the things you just described

8    would have been the basis for description and disclosure to the

9    Court.

10   Q.   Now, one role that --

11        MR. GAFFEY:  You can take that off the screen.

12   Thanks, Steven.

13   Q.   -- one role that cure cost estimate plays, sir, was in

14   your negotiations with Mr. Lewkow of Cleary of the breakup fee,

15   is that right?

16   A.   That's correct.

17   Q.   And the negotiation of the breakup fee was as I understand

18   it from your testimony is somewhat vociferous negotiation?

19   A.   Yeah, for a couple, you know, for an hour.

20   Q.   Okay.  And as always, the buyer wants a high fee and the

21   seller wants a low one, yes?

22   A.   The best we could do, yes.

23   Q.   Okay.  And one of the arguments that you made in

24   connection with coming up with the right number to bring to the

25   Court was that you needed to be in the range of roughly three

08-13555-mg    Doc 11012    Filed 08/25/10    Entered 08/26/10 10:23:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 103 of 199

Page 103

 1   percent of the purchase price, right?

 2   A.   Yeah, I told them that I didn't feel comfortable going

 3   above three percent.

 4   Q.   Okay.  And you understood from your experience as a

 5   bankruptcy lawyer that something in the range of two to three

 6   percent was about the range you wanted to aim at?

 7   A.   Down the fairway.

 8   Q.   Okay.  And you used the 1.5 billion dollar estimate of

 9   cure in these negotiations with Mr. Lewkow to drive your point

10   about the three percent breakup fee, correct?

11   A.   Yeah.  Mr. Lewkow -- Mr. Lewkow to the best I remember,

12   didn't seem to care much about how I was getting there.  He was

13   basically saying he wanted more.  That he wanted 250.  He might

14   have even started higher; I don't remember. But he wanted a big

15   number that I didn't think was justified and that I didn't feel

16   that we could actually defend.

17   Q.   By defend you mean get approval from the Court?

18   A.   Yeah, of course. And be able to explain to the Court how

19   we arrived at that number.  And, so, when I went back to him I

20   said, look, we have approximately 1.7 billion dollars, you

21   know, in -- call it the buildings, the data center and the

22   cash, right.  I think it was 250, 1 billion and 450.  So, that

23   was, like. 1.7 billion.  We have another approximately 1.5 of

24   estimated cure costs.  So, we have about 3.2 billion dollar

25   transaction.  Three percent, we can get to a hundred million

Page 104

1    dollars.  I feel comfortable with that.  I would recommend that

2    and I will give you twenty-five million dollars of expenses

3    since, you know, I understand you're going to be going out-of-

4    pocket on this.  That's what I would be prepared to recommend.

5    Q.   And, as you know, sir, the 125 was the number that was

6    brought to the Court as the proposed breakup fee, correct?

7    A.   That's correct.

8    Q.   And that was the number that was brought to the Court at

9    the first hearing on the 17th of September?

10   A.   That's correct.

11   Q.   And you were present at that hearing, correct?

12   A.   Correct.

13   Q.   And you heard Mr. Miller describe those numbers to the

14   Court --

15   A.   Yes.

16   Q.   -- when the Court asked about the overall value of the

17   transaction in connection with the request for approval of the

18   breakup fee, correct?

19   A.   That's correct.

20   Q.   And it was in that context that you heard Mr. Miller use

21   the 1.5 billion with regard to cure?

22   A.   I don't -- I'd have to look at Mr. Miller's transcript to

23   know exactly what he said but I can tell you that it was pretty

24   clear to me that we told the Court that this was an estimate.

25   And the word "estimate" was used multiple places either orally

Page 105

1    or in a contract or in a pleading.

2    Q.   Was it clear to you at any point in the hearing, sir, that

3    the estimate the Court was given would lead someone to

4    understand it could be 1.5, it could be 0?

5    A.   I think anybody who is an experienced bankruptcy person

6    which, obviously, Your Honor is and, obviously, the creditors'

7    committee people and the debtor, everybody who is around this

8    transaction, we're all highly competent bankruptcy

9    professionals all understood that an assumption of assignment

10   provision could lead someone to take all of the contracts.  We

11   said it was an estimate.  Had Barclays been forced to pay two

12   billion dollars that would have been the outcome, had Barclays

13   paid zero that could have been the outcome.  I think that was

14   reasonably clear to me and I think it was reasonably clear to

15   most people.

16   Q.   And it was reasonably clear to most people in the hurry up

17   chaotic circumstances where you did the best you could, right?

18   A.   Absolutely.

19   Q.   And you left it up to creditors and others to infer that

20   the number -- although it was said to be 1.5 could actually be

21   0?

22   A.   You know, I don't think we left it up to people to infer

23   things.  People had the opportunity to ask questions.  I made a

24   full presentation to the creditors' committee professionals

25   right before we came down the Court and try to give them an

Page 106

1   explanation for everything and they asked questions.  I don't

2   recall specifically whether they asked me a question about

3   that.  But certainly with the kinds of professionals that were

4   around this case, there would be no reason that people wouldn't

5   have the ability to understand that.

6   Q.   And you don't recall going through the basis of the 1.5

7   billion dollar estimate for cure in those meetings, do you?

8   A.   I don't recall.

9   Q.   And you can't testify today that you said anything about

10  the basis --

11  A.   I don't.

12  Q.   -- let me finish the question, please, sir.  You can't

13  testify today that you said anything about the basis for

14  arriving at that cure estimate in those meetings you've just

15  told us about, is that right?

16  A.   To the creditors?

17  Q    Yes.

18  A.   Not that I recall.

19  Q.   Now, you mentioned a bit before, sir, the -- well, you

20  knew, sir, that the deal changed by Friday, correct?

21  A.   Correct.

22  Q.   And you knew that one of the reasons the deal changed was

23  the composition and the value of the securities that were being

24  transferred to Barclays, correct?

25  A.   Amongst other things.  There were, obviously, other

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 107

1    changes that were occurring in terms of what they were going to

2    buy versus what they thought they were going to buy on

3    Wednesday. but I would say one of the most important changes

4    that was happening was the fact that the composition of

5    securities that we originally believed we could deliver to them

6    was no longer available.

7    Q.   And we talked about, or at least I did, composition and

8    value.   There were changes in value, yes?

9    A.   Well, by definition presumably if you change the

10   composition -- I guess it doesn't have to depend but,

11   obviously, there was a pretty drastic change in the composition

12   because of what was happening both from a market standpoint and

13   also from the fact that we literally didn't have title or

14   didn't -- couldn't say we had necessarily had title to some of

15   the things that were in the original pool because of being

16   blown out of positions and the like.   And, so, therefore, you

17   know, from my vantage point, I think, I said earlier what was

18   important to me when we started the process was to see if we

19   could create a contract that would ultimately be able to be

20   closed upon.   Actually, we weren't successful in that regard so

21   things had to change.

22   Q.   Thinks had to change in the clarification letter?

23   A.   Well, they had to change in the business deal first which

24   is then evidenced by the clarification letter.

25   Q.   And one of the changes that you under -- or amongst the

Page 108

1   changes that understood had happened by Friday was that a lot

2   of the securities, or most of the securities, were now residing

3   within a certain repurchase agreement, correct?

4   A.   Can you repeat that question?

5   Q.   Did you know about the repo at the time of the sale

6   transaction, sir?

7   A.   Yeah, well, let's talk about what the repo meant because

8   there were multiple repos.

9   Q.   Right.  You understood that Barclays would wind up taking

10  over from the Fed a certain repurchase agreement the Fed had

11  with Lehman, yes?

12  A.   Yes.

13  Q.   You were not privy to those discussions directly, correct?

14  A.   No, I heard about them from Jim Seery.

15  Q.   And you never had a conversation with anyone at Lehman as

16  to what collateral was actually in the repo, isn't that

17  correct?

18  A.   I did not.

19  Q.   And although you knew there was a repo, you didn't know

20  what securities were in it, correct?

21  A.   Correct.

22  Q.   And you were not involved directly in anything regarding

23  the repo, correct?

24  A.   Not that repo, no.

25  Q.   For example, one thing you did not know when you attended

08-13555-mg   Doc 11012   Filed 08/25/10   Entered 08/26/10 10:23:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 109 of 199

Page 109

 1   the sale hearing on the 19th was that during the afternoon of

 2   the 19th the repurchase agreement was terminated by Barclays,

 3   correct?

 4   A.   I did not know that, no.

 5   Q.   Now, in your experiences as a lawyer with Shearman &

 6   Sterling and as a restructuring expert at Lehman, you had some

 7   familiarity with the safe harbor provisions of the Code,

 8   correct?

 9   A.   Yes.

10   Q.   And one of them is Section 559 concerning terminated

11   repurchase agreements, correct?

12   A.   Best that I recall.  I haven't looked at that section in a

13   long time but --

14   Q.   Okay.  Nobody asked you to look at it at the time either,

15   right?

16   A.   No.

17   Q.   And no facts came to your attention that indicated you

18   ought to take a look at it to make sure whether the agreement

19   that was before the Court accurately reflected the deal the

20   parties were doing, correct?

21   A.   Well, as you said, I was not party to the repo discussion

22   at all so no one would have had reason to ask me.

23   Q.   And do you know when, sir, the fact of the repurchase

24   agreement was disclosed to the Court in connection with seeking

25   its approval of the sale order?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 110

1   A.    I don't know.

2   Q.    As far as you know, the first time the assets and the

3   repurchase agreement are mentioned as part of the sale

4   transaction is in the clarification, is that correct?

5   A.    I think I heard -- I think I remember Harvey Miller

6   mentioning something to it, something about it in the hearing,

7   but that's the extent of my recollection of it.

8   Q.    So, if it's not in the transcript of the hearing on the

9   19th, we'll take that over your recollection, okay?

10  A.    Yeah, obviously.

11  Q.    Okay.  Now, assuming that there's nothing by Mr. Miller

12  with regard to saying the assets we're transferring are the

13  assets in the repo.

14  A.    Yeah.

15  Q.    Do you know of any place where it was told other than the

16  clarification letter that that was so?

17  A.    Not that I have personal knowledge of, no.

18  Q.    And you at the time of the hearing, let's just put it at

19  the time you came into court so we have a pin put in it, by the

20  time you walked into court, sir, you had not seen or read or

21  drafted or heard of the clarification letter.  Is that right?

22  A.    As I said, the Friday afternoon in Bart's office there was

23  discussion about evidencing changes in the letter or in a

24  document.  I don't remember it being called a clarification

25  letter.  The first time I remember hearing of a clarification

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 111

1    letter per se was when Harvey got up during a recess and

2    started to explain all the changes that had occurred when the

3    deal was, frankly, occurring right up to the point where Bart

4    McDade arrived in court.

5    Q.   And if I heard you before correctly, sir, after the sale

6    hearing you had a family event to go to in San Francisco over

7    the weekend, right?

8    A.   That's correct.

9    Q.   So, you went home to Connecticut, took a shower, got in

10   the car, went to Kennedy, jumped on a plane, went to

11   California?

12   A.   Correct.

13   Q.   Okay.  And you don't come back until --

14   A.   Sunday.

15   Q.   Sunday night --

16   A.   Sunday afternoon, late in the afternoon.

17   Q.   Sunday afternoon.

18   A.   Late afternoon.

19   Q.   And did you -- went you got back did you review the

20   clarification letter?

21   A.   No.  When I got back -- I mean not that day.  I asked for

22   a set of documents on Monday when I got into the office and I

23   got the clarification letter and I probably took a look at it

24   but, again, as far as I was concerned we completed the deal.

25   Q.   That was my next question.  By the time you saw the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 112

1    clarification letter, the deal was already closed?

2    A.    Correct.

3    Q.    Do --

4    A.    The deal closed on early Monday morning, I think.

5    Q.    -- do you know who took up your role in reviewing draft

6    after draft of the agreements to make sure they were consistent

7    with the business terms?

8    A.    I think there were a team of people that were, obviously,

9    still around.  There was, obviously -- I didn't have a role,

10    per se, as the lawyer because I'm not a lawyer at Barclays and

11    I didn't purport to be.  I was reviewing them in a business

12    context.  Weil Gotshal, obviously, was the principal lawyer for

13    the firm outside counsel.  Inside, we had Steve Berkenfeld and

14    you had Jim Seery and other people on the business side were

15    around.

16    Q.    But you were probably one of the few people around that

17    had the ability to make sure that not only was the business

18    deal being reflected but also to be able to get comfortable

19    with the legal terms, right?

20    A.    I was one of the few people who was trained as a lawyer

21    and also on the business side of Lehman.

22    Q.    And no one asked you to take a look at this clarification

23    letter?

24    A.    I, you know, I think that I was, you know, people realized

25    that I had pretty much killed myself for five straight days and

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 113

1    I had decided that this was an important family event.  I felt

2    that the deal was pretty much done.  It seemed like it was in

3    good hands and so I left and I was pretty much out of contact

4    most of the weekend.  I think I might have had one or two e-

5    mails on Sunday before I left California but basically expected

6    that I'd get back and the deal would be closed.

7    Q.   Just so I can move onto another topic, sir, is it fair to

8    say that you had no idea what the clarification letter said

9    until after the closing?

10   A.   I -- the -- what was ultimately contained in the

11   clarification letter was described generally speaking in court

12   on Friday, but not -- I don't think every single piece of it

13   and, frankly, I was not terribly focused on the clarification

14   letter.

15   Q.   Now, we spoke a few minutes ago, sir, about the valuation

16   of the collateral in the repo and I think I've heard you say

17   you were not involved in the process of evaluating it, yes?

18   A.   No, I was not.

19   Q.   And I take it too, sir, you don't know what process was

20   applied to come to a value?

21   A.   In terms of which securities, the repo?

22   Q.   Yes.

23   A.   I don't know.

24   Q.   Do you recall a number being given to the Court at the

25   sale hearing of 45.5 billion for value of the securities to be

Page 114

1    transferred to Barclays?

2    A.   I'd have to go back and look at the transcript.  I

3    remember there were two numbers that were given.

4    Q.   I beg your pardon, sir.  I have that -- I just have that

5    wrong.  I need to withdraw that question.  I didn't mean 45.5,

6    I mean 47.4.

7    A.   Okay.  I remember two numbers.  I remember forty-seven and

8    I remember forty-five.

9    Q.   Okay.

10   A.   Roughly.

11   Q.   And did you know at the time what the constituent parts

12   were that added up to 47.4?

13   A.   No.  I think I surmised.  This was only my own -- my own

14   view at the time that the -- she had contrasted it, I believe,

15   this is Lori Fife when she presented it to the Court, with the

16   seventy billion long position.  So, I guess I had heard that

17   that was the corollary of the seventy billion that the forty-

18   seven represented the corollary of the long position.

19   Q.   And at any point in connection with what you heard about

20   that number, you never heard that that number was derived from

21   the application of liquidation values to the securities, did

22   you?

23   A.   Well, I didn't hear anything about how it was derived,

24   so --

25   Q.   Now, one other thing you did in connection with the sale

1    hearing was -- well, you understood before the sale hearing

2    that Mr. Ridings was -- might testify about liquidation values,

3    is that right?

4    A.    Yeah, he was as the investment banker and financial

5    advisor to the company I expected he would testify as to what

6    he believed the transaction represented from Lehman's

7    perspective.

8    Q.    And one of the reasons Mr. Ridings, you understood, was

9    going to testify about liquidation values was to present

10   liquidation values as a lower worse alternative to the deal

11   that was on the table for approval, isn't that right?

12   A.    Yeah.  I think as he looked at the world and as he looked

13   at the deal, he was comparing the deal that was on the table

14   from Barclays with a possible liquidation scenario and what

15   that could mean for evaluation purposes of the assets that were

16   being transferred.

17   Q.    Because the goal from a 363 side was to do better than

18   liquidation, yes?

19   A.    That was one of the goals not the only goal.  You know,

20   this transaction, obviously, had multiple goals.  One was to do

21   the best job we could from a value standpoint, the other was to

22   create -- I think you used my word soft landing, a soft landing

23   for 10,000 employees who otherwise would have been terminated.

24   And the third was to avoid a calamity for the world economy

25   through a liquidation of Lehman's.  So, I think, we all took

Page 116

```
 1    cognizance, frankly, of the fact that this was not your typical

 2    straightforward sale of a widget company.  We were dealing with

 3    a very different animal.

 4    Q.   And even in that circumstance, sir, you understood that in

 5    a 363 sale, you need to be able to tell the Court the

 6    proposed -- the proposed value was better than the seller would

 7    do in a liquidation?

 8    A.   Barry Ridings was trying to get a point of view as to

 9    whether or not he believed that or not.

10    Q.   And to you knowledge, some work was done between Lehman

11    people and Mr. Ridings to come up with liquidation values for

12    certain categories of assets?

13    A.   I don't know, per se, exactly what he came up with.  He

14    was given the opportunity to meet with different trader -- you

15    know, head traders let's call them, present scenarios under

16    which, I don't believe he actually as far as I recall asked

17    them, you know, what would have been in a fire sale liquidation

18    I think he was asked, or asking them, if I had to sell these

19    securities over the next few days kind of where would you --

20    where did you get to, what would you do?

21    Q.   And the reason Mr. Ridings needed that information, he had

22    to sell the securities over the next few days, what price would

23    you get, was in order to be equipped to testify at the sale

24    hearing to what a lower liquidation value would be as opposed

25    to the deal that was on the table, correct?
```

Page 117

1    A.    I think that was one of the reasons.  Presumably, he as

2    the advisor to the company had to let the management and the

3    board know also his view.

4    Q.    And one reason -- one aspect of Mr. Ridings was going to

5    be describe liquidation values to show what would happen if the

6    deal did not complete, correct?

7    A.    Yeah.  I would say he wanted to understand -- again, as I

8    just said if they had to sell securities pretty quickly, again,

9    I can't define what that meant but I think he was looking at,

10   you know, a reasonably short time frame on a forced sale basis,

11   you know, what would happen?

12   Q.    And just to go back to the phrase I used a moment ago,

13   sir, do you agree with me that one of the things that

14   Mr. Ridings was being prepared to do with this assessment of

15   liquidation values was so he could evaluate what would happen

16   if this transaction did not complete and what the potential

17   loss in value to the estate might be if a forced sale of these

18   securities were to take place?

19   A.    Yeah, that sounds accurate.

20   Q.    And it was for that reason liquidation values were being

21   assessed or calculated?

22   A.    By him.

23   Q.    Let me ask you, sir, to take a look -- sorry to run you

24   from book to book, the witness book that doesn't have your name

25   on it; does not have your name on it.  If you would, sir, I'm

Page 118

```
 1   going to ask you to turn to Tab 14 which is a multi page

 2   document and it is Movant's Trial Exhibit 147 in evidence.  And

 3   I'm not going to take you through the whole thing.  So, I'm

 4   going to ask you take a look at the last page.  Page number 70.

 5   A.   It's the very last page.  Okay.

 6        MR. GAFFEY:  Steve, can we have that on screen,

 7   please?

 8   A.   This is the schedule here?

 9   Q.   Yes.  Just before we get on screen, have you ever seen

10   that before?

11   A.   Only in connection with preparation for this trial.

12   Q.   Did you see it at or around -- I take it, then, you did

13   not see it at or around the time that the Court was being asked

14   to prove this one's --

15   A.   I did not.

16   Q.   And I take it, then, sir, you never had any conversations

17   with Mr. Seery about negotiations with Barclays to arrive at a

18   value of what price could you obtain if you sold the securities

19   quickly, in a hurry?

20   A.   I did not.

21   Q.   So, when you sat at the sale hearing on the 19th, sir, and

22   you heard the number 47.4 given to the Court, you had no

23   knowledge of any such activity taking place?

24   A.   I had no knowledge of that what you just described, no.

25        MR. GAFFEY:  Your Honor, may I just have one moment to
```

Page 119

1    consult with my colleagues?  I may be finished.

2         THE COURT:  Surely.

3       (Pause)

4         MR. GAFFEY:  Nothing further for Mr. Shapiro, Your

5    Honor.  Thank you for your time, sir.

6         THE WITNESS:  Thank you.

7         THE COURT:  No questions from -

8         UNIDENTIFIED SPEAKER:  No questions from me.

9         THE COURT:  Any movants, redirect?

10        MR. BOIES:  Yes, thank you, Your Honor.

11   REDIRECT EXAMINATION

12   BY MR. BOIES:

13   Q.   I'd like to begin by asking about the comp or compensation

14   issue that you asked about by counsel.

15   A.   Okay.

16   Q.   And that connection he directed your attention to the

17   witness binder that you have with your name on it.

18   A.   Okay.

19   Q.   And Movant's Exhibit 1 which is the APA and he directed

20   your attention first to paragraph 9.1(c).

21   A.   Yes.

22   Q.   And then he directed your attention to Movant's Exhibit 2

23   and said this is that schedule.  Do you recall that?

24   A.   Yes, I do.

25   Q.   Now, 9.1(c) talks about a schedule that is initialed by an

Page 120

1    officer of both parties, correct?

2    A.   Correct.

3    Q.   Is Movant's Exhibit 2 initialed by an officer of both

4    parties?

5    A.   I see -- I just see one SB initial, I don't see another

6    set of initials.

7    Q.   Are you aware of any schedule like this that was initialed

8    by an officer of both parties as provided for in the APA?

9    A.   I'm not aware, that's why I -- at the time when he asked

10   me the question before I wasn't quite sure which financial

11   schedule this referred to.

12   Q.   Now, the reference on M-2 is to comp, do you see that?

13   A.   Yes.

14   Q.   It doesn't say bonus, it doesn't say severance, it says

15   comp, is that correct?

16   A.   That's right.

17   Q.   And at the time that you were working on the APA and on

18   this transaction, did you have an understanding of what was

19   encompassed within the term comp?

20   A.   At the time my belief was that it was a combination of the

21   bonuses that they would pay and if into the extent that they

22   weren't paying someone a bonus because they were terminating

23   that person's bonus it would include severance for that person.

24   That was my recollection at the time.

25   Q.   Now, Mr. Gaffney showed you some materials that related to

08-13555-mg   Doc 11012   Filed 08/25/10   Entered 08/26/10 10:23:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 121 of 199

Page 121

1    Mr. McDade's testimony at trial.

2    A.   Yes.

3    Q.   And I'd like to direct your attention to April 26th, the

4    official transcript, page 160.

5    A.   I'm sorry, what tab should I be looking at?

6    Q.   We're going to put it on the screen.

7    A.   Okay.

8    Q.   Because I know in advance what questions I'm going to ask

9    you but I don't know what questions he's going to ask you.  And

10   if we could look at line 24 it says,

11   "Q.  The other part of that question had to do with

12   compensation, sir.

13   "A.  Right.  Barclays also assumed a two billion compensation

14   liability with respect to the combination of the employee's

15   bonus process and the severance process."

16   Q.   Do you see that?

17   A.   I do.

18   Q.   And as you testified to counsel, Mr. McDade was the lead

19   negotiator for Lehman, is that correct?

20   A.   That's correct.

21   Q.   And you agree with this statement that he makes?

22   A.   Yes, I do.

23   Q.   And let me direct your attention to what Mr. Miller said

24   at trial in the April 28th, 2010 official transcript at page

25   32, line 20.  "In connection with the compensation, that also

Page 122

1    was an estimate as to the possible exposure for Lehman

2    employees going over to Barclays who would either be terminated

3    or were entitled to bonuses.  So, it was supposed to cover both

4    severance pay and bonuses."  Do you see that?

5    A.    I do.

6    Q.    First, do you agree that compensation amount, the two

7    billion dollar amount, was an estimate?  Do you agree with

8    that?

9    A.    I guess it depends on what you mean by do I agree with or

10   was it an estimate?  In other words, that two billion dollars

11   was supposed to be the number that they paid out for bonus and

12   severance in my mind.

13   Q.    But it had been prepared by somebody other than you,

14   correct?

15   A.    Oh, yeah, absolutely.

16   Q.    And did you understand the person who prepared it was

17   trying to make an estimate value?

18   A.    Yes.  I believe that it was based on an accrual that had

19   taken place on the -- through the point of the year that we're

20   in plus -- and that was for, I think, a cash accrual plus the

21   equity portion which I think they hadn't accrued and I think

22   they made a general estimate as to the two billion being the

23   number.

24   Q.    And nobody knew at that point in time how many of the

25   Lehman employees going over to Barclays would be terminated and

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 123

1    how many would stay, correct?

2    A.    That's correct.  Although -- and I think we wanted to make

3    sure that they didn't jip us, those of us who were staying, so

4    we had this reallocation that in the event that they terminated

5    a certain number of people that they would just have to

6    reallocate that portion of it to the remaining employees.

7    Q.    And that covered, the two billion dollars, covered both

8    bonuses and severance pay as Mr.  Miller and Mr. McDade say,

9    correct?

10   A.    What they said is consistent with my understanding of the

11   deal, correct.

12   Q.    Now, you were also asked some questions about cure.  And

13   first, you were asked by counsel about this subject and you

14   said you thought the number was an up to number, do you recall

15   that?

16   A.    I did.

17   Q.    And he said, "Well, can you tell me where that might have

18   been said?"  And you said "Maybe it was said at the hearing."

19   Do you recall that?

20   A.    Yes.

21   Q.    I'd like to ask you to look at Tab 3 in the book that I

22   originally gave you.

23   A.    Okay.

24   Q.    And this is a transcript of the September 19, 2008 hearing

25   that has been marked as BCI Exhibit 49A in evidence.  You see

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 124

1    that?

2    A.    I do.

3    Q.    And I'd like you to turn to page 100 of the transcript.

4    And at the very top of the page, lines 1 through 4 --

5    A.    Yes.

6    Q.    --- it says, "Barclays is also assuming" and I believe

7    this is what -- this is Mr. Miller's statement in court,

8    "Barclays is also assuming the cure amounts relating to

9    contracts and leases that will be assumed pursuant to the asset

10   purchase agreement and that has a potential exposure, Your

11   Honor, of 1.5 billion dollars that he would testify to."  Do

12   you see that?

13   A.    I do.

14   Q.    And did you understand that when Mr. Miller was talking

15   about potential exposure, he was talking about something that

16   was not certain?

17   A.    Yes, that's what potential exposure meant.  Obviously, it

18   could be up to or even, you know, in excess of 1.5 billion.

19   Q.    Incidentally, counsel also asked you about this September

20   19th hearing where you said that you thought there'd been

21   reference to the repo.  You thought that was maybe when you

22   heard about it and he asked you whether you could remember

23   whether that was actually mentioned at the hearing or not.  Do

24   you recall that?

25   A.    Yeah.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 125

1   Q.   While you've got this transcript in front of you, let me

2   ask you to look at page 63 and lines 16 through 22 where

3   Mr. Miller says, "Barclays, Your Honor, has extended the sale

4   to enable this extraordinary transaction and hopefully to be

5   consummated.  Yesterday, as Your Honor has heard, Barclays

6   basically stepped into the shoes of the Federal Reserve in

7   connection with the primary dealer credit facility as to the

8   45.5 billion dollars Lehman borrowed last Monday and received a

9   collateral that Lehman had posted in connection therewith."

10  You see that?

11  A.   Yes, I do.

12  Q.   And does that refresh your recollection that Mr. Miller

13  did talk at the hearing about the repo facility?

14  A.   Yeah, that is a reference to that repo, correct.

15  Q.   Let me turn next to Tab 15 in the book I originally gave

16  you which is BCI Exhibit 11 and counsel asked you about

17  paragraph 14.

18  A.   Yes.

19  Q.   And the assumption of contracts.

20  A.   Yep.

21  Q.   And you remember you talked about these two sentences

22  here?

23  A.   Um-hum.

24  Q.   And do you believe that these two sentences taken together

25  are consistent with what Mr. Miller told the Court that is that

08-13555-mg    Doc 11012    Filed 08/25/10    Entered 08/26/10 10:23:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 126 of 199

Page 126

1    the cure estimate was an estimate of potential exposure?

2    A.    Yes, I do.  I mean it's clear what the intent was as far

3    as I'm concerned.

4            MR. BOIES:  May I have just a moment, Your Honor?

5            THE COURT:  Sure.

6        (Pause)

7            MR. BOIES:  I have no more questions, Your Honor.

8            THE COURT:  Any further questioning?

9            MR. GAFFEY:  None from the debtor, Your Honor.

10           THE COURT:  Well, as if on cue, it's lunchtime and

11   Mr. Shapiro is excused and we can take a lunch break.

12       (Witness excused)

13           THE COURT:  I'd just like to ask counsel for Barclays

14   what to expect this afternoon?

15           MR. BOIES:  Your Honor, this afternoon, we have two

16   video each about an hour a little bit less followed by two

17   witnesses, Mr. Ullman and Mr. Exall, both of them I think will

18   be quite short.  We are then -- tomorrow we have two witnesses,

19   Mr. Rosen and Mr. King who I think will take a day probably,

20   maybe not the entire day.  And then on Wednesday, assuming that

21   Mr. Rosen and Mr. King take the entire day, we would plan to

22   bring on Mr. Romain.  Thereafter, assuming that that is all on

23   track, on Friday we would bring Mr. Klein.  We then have

24   Mr. Lewkow and James who will probably -- the order of those

25   two will depend on exactly the point we reach them because

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 127

1    there's some witness availability issues with respect to them.

2            We have one witness, Mr. Raisler (ph.), who is out of

3    the country and we have by agreement with counsel slotted him

4    for September 7th.

5            THE COURT:  Okay. That's your lineup for now.

6            MR. BOIES:  Thank you, Your Honor.

7            MR. GAFFEY:  On the depositions, Your Honor, and we

8    can do this after lunch, I just want to -- I would ask for a

9    couple minutes to be briefly heard because of the two

10   depositions that I understand are going to be played.  I want

11   to get some guidance from Your Honor as to how you want us to

12   proceed with objections.  I'm inclined to just find a way to

13   register them with the Court and then sit quietly while the

14   depositions are played rather than jump up.  Except with

15   respect to one and that's the deposition of Ms. Leventhal to

16   which we object to it being played and I'd just like to make a

17   record of that before we begin the depositions this afternoon

18   if that's okay.

19           THE COURT:  Why don't we deal with that after lunch?

20           MR. GAFFEY:  Thank you, Your Honor.

21           THE COURT:  And I'm assuming based upon the schedule

22   that's been announced that we can conveniently start at

23   2 o'clock.

24           MR. GAFFEY:  Yes, Your Honor.

25           THE COURT:  Fine.  So, I'll see you back at 2.

Page 128

1           MR. GAFFEY:  Thank you, Your Honor.

2           THE COURT:  Thank you.

3      (Recess from 12:34 p.m. until 2:03 p.m.)

4           THE COURT:  Be seated, please.  Before we start, on

5      the subject of scheduling I have learned that my half day on

6      Wednesday the 25th has gone away as an issue.  I was supposed

7      to have a morning hearing.  That means that I have the entire

8      day on Wednesday to devote to this and can start at 9:30 or any

9      other time that's convenient for the parties, and, hopefully,

10     that additional time will make it easier to fit some of the

11     witnesses that you have identified into the schedule for this

12     week.

13          UNIDENTIFIED SPEAKER:  Thank you, Judge.

14          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

15          MR. BOIES:  Our first deposition witness this

16     afternoon is Mr. Barry Ridings, and the Court has a binder

17     which contains in it a copy at the beginning of the transcript

18     pages that are going to be played, together with the exhibits

19     that are going to be referenced, in the back for the Court's

20     reference.  And a copy of the doc is being furnished to

21     counsel.

22          THE COURT:  Okay.  Can I just ask just a very basic

23     question, which is why we're dealing with Mr. Ridings by

24     deposition as opposed to live in court, since his office in New

25     York and I would assume he's available to either cooperate or

08-13555-mg    Doc 11012    Filed 08/25/10    Entered 08/26/10 10:23:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 129 of 199

Page 129

1    be subpoenaed?

2          MR. BOIES:  He could have been, Your Honor.  We were

3    doing it this way just because it was more efficient.  If the

4    Court wished to have him in --

5          THE COURT:  No, no.  That's fine.  If there's no

6    objection to doing it by this method.

7          MR. GAFFEY:  We have an agreement, Your Honor, which I

8    may have mentioned on one of our court days in the last phase,

9    that we have agreed that deposition testimony can be used.  It

10   won't be objected to solely for the reason that a witness is

11   available otherwise.  So I think Mr. Ridings' testimony would

12   fall within the ambit of that agreement.

13         THE COURT:  That's fine.

14         MR. GAFFEY:  I don't think the Leventhal deposition

15   falls within the ambit of that.  But we don't object to

16   proceeding with Mr. Ridings by --

17         THE COURT:  We can talk about the Leventhal deposition

18   at the time that we come to the Leventhal deposition.  At the

19   moment I'm really raising the question because live testimony

20   always is more powerful than anything that's shown on video.

21   It may not be entitled to less weight simply because it's

22   video, but it's human nature to consider that if a witness has

23   not been called live who could have been called live that maybe

24   there's something about the witness that should be viewed as

25   being less vital to the case.  That, obviously, is not a

Page 130

1    conclusion I'm drawing in this instance.  I'm simply saying

2    that it raises questions in my mind as to why certain otherwise

3    available witnesses are being used in this manner.  But, having

4    said that, let's proceed and see what he has to say on his

5    video.

6           MR. GAFFEY:  Can I just, Your Honor, raise briefly the

7    issue of objections, because this does relate to Mr. Ridings.

8    With regard to most of the depositions that I understand

9    Barclays is going to play, and that's really all but two of

10   them, our objections are minimal, really.  But with respect to

11   Mr. Ridings and Ms. Leventhal, as to -- because of the nature

12   of the question we have interposed a fair number of objections.

13   Now, as I said, I don't want to interfere with Barclays'

14   presentation here by jumping up, unless Your Honor would prefer

15   that we deal with them as the questions come up.  I'm prepared

16   to do that, because I have a binder with them marked.  Or we

17   could, if I can simply say I will have objections to part of

18   this, I'd be pleased to proceed by saying I can submit them to

19   Your Honor and -- it's a bench trial.  Your Honor can rule on

20   the objections after you've heard the testimony.

21          MR. BOIES:  I think that is the most efficient way to

22   do it, Your Honor.

23          THE COURT:  Fine.

24          MR. GAFFEY:  Then I'm out of the way now, Your Honor.

25          THE COURT:  And we'll hear all the testimony,

Page 131

1    including the objectionable testimony, at once, and then we'll

2    see if we can ignore the objectionable testimony later.

3            MR. GAFFEY:  Well, I will say with respect to the

4    objections for Ridings and Leventhal, there are a lot of them,

5    but they are of a theme.  They have to do with asking for

6    opinion and relevance objections.  It's not form.  So if Your

7    Honor decides one of them, I'm either right or I'm wrong on the

8    basic approach I've taken with this.

9            THE COURT:  Fine.  Okay.  Let's proceed.

10   (Video deposition testimony played)

11           MR. BOIES:  Your Honor, for the record, the next

12   question is going to reference Deposition Exhibit 561-a.  That

13   same document has been marked as Barclays' Exhibit 140.  So

14   when you hear the reference to 561-a it's Barclays' Exhibit 140

15   that's being referred to.

16           THE COURT:  Fine.

17   (Video deposition testimony played)

18           MR. BOIES:  Your Honor, this document is Barclays'

19   Exhibit 133 as far as trial exhibits are concerned.  So the

20   reference to 377-a as a deposition exhibit is the same document

21   as Barclays' Trial Exhibit 133.

22           THE COURT:  Okay.

23   (Video deposition testimony played)

24           MR. BOIES:  Your Honor, the next testimony deals with

25   Deposition Exhibit 563-a.  For Your Honor's convenience and for

Page 132

1    the record that document has been marked as Barclays' Exhibit

2    196 in this trial.

3            (Video deposition testimony played)

4            MR. BOIES:  Your Honor, the next question will be

5    about Deposition Exhibit 20.  That document has been marked at

6    trial as Movant's Exhibit 7.

7            (Video deposition testimony played)

8            MR. BOIES:  Your Honor, the next testimony will be

9    about Exhibit 21, Deposition Exhibit 21, which has been marked

10   at trial as Movant's Trial Exhibit 28.

11           (Video deposition testimony played)

12           MR. BOIES:  Your Honor, the next testimony will

13   concern Deposition Exhibit 564A which has been marked at trial

14   as Barclays' Trial Exhibit 436.

15           (Video deposition testimony played)

16           MR. BOIES:  Your Honor, that completes the deposition

17   designations of Barry Ridings.  And we're now up to the

18   question of the Leventhal deposition.

19           THE COURT:  Well, shouldn't we deal with what

20   objections you have as to the testimony I've just heard?

21           MR. GAFFEY:  Yes, Your Honor.  I'm happy to do that

22   now.  I can do that by page -- by page and line if that makes

23   sense.  We have a marked up book.  We always have a book that

24   will show where those objections are.

25           If I can approach, Your Honor?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 133

1          THE COURT:  Sure.

2          MR. GAFFEY:  Now, Your Honor, the designations are

3   shown in here in two different colors only because there -- all

4   the designations were played, both Barclays' and ours.  I think

5   theirs are blue and ours are yellow.  What we've done is marked

6   the objections to the questions and answers that we'd asked for

7   rulings on.  And the first of those is at page 9 starting at

8   line 10.  And it continues through page 10 at line 25.  And

9   that is where Mr. Schiller asked:

10         "During the course of that period, September 15th

11   through September 19th, did you reach a view as to whether

12   there was a realistic opportunity to sell the North American

13   business to any entity other than to Barclays?"

14         And in our view, Your Honor, Mr. Ridings is a lay

15   witness.  And to call for -- and as you saw several times

16   during the deposition, to call for a lay opinion like that, we

17   believe is inappropriate.

18         We also think that his opinion as to such things as to

19   whether there was a realistic opportunity to sell to any entity

20   is also subject to a relevance objection and to a lack of

21   foundation based on the testimony that Your Honor saw.

22         THE COURT:  I'm overruling that objection.  I believe,

23   based upon my having observed Mr. Ridings both as a live

24   witness during the hearings that we've been talking about on

25   September 19th of 2008 and also my observation of him by

Page 134

1    videotape this afternoon, I conclude that given his position as

2    the retained investment banker for Lehman Brothers during this

3    period of time that he's in a position to testify in respect of

4    the question that's been asked.  What weight is to be given to

5    his opinion testimony or his fact testimony is a matter

6    ultimately for me to determine at the time of final judgment in

7    this matter.  But I'm accepting the testimony notwithstanding

8    the objection.  And the objection's overruled.

9           MR. GAFFEY:  Thank you, Your Honor.  That'll inform a

10   couple of my other objections.  If I can just make them for the

11   record and I'll assume the ruling is the same.

12          THE COURT:  That's fine.

13          MR. GAFFEY:  We have the same objection with respect

14   to page 11, line 12 through line 23; page 12, line 9, through

15   page 13, line 4.

16          Now, the next line of objections, Your Honor, begin at

17   page 24.

18          THE COURT:  Just so I can be clear.  As to all of

19   these foundation objections, they're overruled.

20          MR. GAFFEY:  Thank you, Your Honor.  And as I said,

21   those objections are consistent with the first that Your Honor

22   ruled on.  So we accept that ruling with respect to all of

23   them.

24          I'm now at page 24, line 9, through page 24, line 25.

25   And the question that Mr. Schiller put is:

1          "Does Barclays' statement on September 17th as

2     reported here by Reuters that it expected to record a multi-

3     million dollar acquisition gain on the transaction, is that

4     statement inconsistent in any way with your proffer and

5     testimony to the Court on September 19th?"

6          Our objections there, again, Your Honor, go to

7     relevance and also go to opinion and a lack of foundation in

8     this sense.  That's a question for the Court to decide.  There

9     are two pieces of record evidence.  One is whatever this

10    Reuters article says.  The other is what Mr. Ridings' proffer

11    was.  And with respect to each question formulated that way.

12    And I can identify them by page and line.  We object to the

13    introduction of that testimony because it calls for Mr. Ridings

14    to essentially invade the providence of the Court.  It borders

15    on expert testimony in that regard.

16          THE COURT:  I'm overruling those objections as well.

17    In fact, all that Mr. Ridings is being asked here is whether or

18    not, in his view as the witness who gave the testimony, there's

19    anything about the statements reported by Reuters on September

20    17th that he considers sufficient cause to change that

21    testimony.  He responded that he mostly viewed as irrelevant

22    himself because it goes to issues of accounting under U.K.

23    accounting law.  And I'll overrule those objections and take

24    the testimony for whatever it's worth which is probably not

25    very much.

Page 136

1          MR. GAFFEY:  Thank you, Your Honor.  I think this one

2    falls in a slightly different category, Your Honor.  I'm now at

3    page 40 beginning at line 23 and continuing through page 42 and

4    continuing through line 24.  And in this line of questioning,

5    Mr. Schiller is showing the witness what was marked as

6    Deposition Exhibit 20.  And I don't happen to have the trial

7    exhibit number.  That's Movants' 7, Your Honor.  Exhibit 20,

8    that's the subject of the questioning, is Movants' Exhibit 7.

9          And Mr. Schiller asked:  "Is this document and what it

10   purports consistent with your understandings of the discussion

11   between the parties that week?"  That and similar questions

12   that take a document in evidence and simply ask the witness to

13   give his opinion about it we think are objectionable and should

14   not be admitted.

15         THE COURT:  I agree with you on this one.  The

16   document has nothing to do with the witness.  And his testimony

17   doesn't add very much, to my understanding, of what the

18   document means.  And so, I'll grant you that objection.

19         MR. GAFFEY:  Thank you, Your Honor.

20         Our next objection, Your Honor, is at page 48

21   beginning at line 23 and continuing through page 50 at line 20

22   where Mr. Schiller begins with the following question:

23         "Mr. Miller also proffered as your testimony that the

24   sales agreement between Lehman and Barclays that was before the

25   Court was 'the result of good faith negotiations'.  Did you

08-13555-mg    Doc 11012    Filed 08/25/10    Entered 08/26/10 10:23:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 137 of 199

Page 137

1     believe that at the time?"

2     "A.  Yes.

3     "Q.  Based on everything that you know today, was this proffer

4     of your testimony in the Court on September 19th fair and

5     accurate?

6          The witness answers:  "I'm struggling with 'fair'.  It

7     certainly was accurate and attempted to be accurate."

8          And then the question:  "Have you become aware of

9     anything since that hearing that has led you to believe that

10    the information you received from Lehman was inaccurate in any

11    way?"

12         The proffer of Mr. Ridings' testimony was obviously

13    proffered by Mr. Miller.  It is what it is.  It's in the

14    record.  We think it's inappropriate and objectionable for the

15    witness to comment on the accuracy of his own testimony in that

16    sense both based on the record at the time and certainly based

17    on anything he has learned since.

18         THE COURT:  I'll overrule that objection.  I think

19    that most of what this proceeding is about goes to the

20    essential reliability of evidence that was presented to the

21    Court at the hearings held on the 17th and 19th through 20th of

22    September 2008.  And Mr. Ridings is in a position to at least

23    give his view as to whether or not the proffer of his own

24    testimony remains, at least in his view, accurate and reliable

25    testimony.  That doesn't mean that I'm not in a position to

Page 138

1    disagree with him based upon the evidence presented during the

2    60(b) hearings.  So I accept his own self-reflection of his

3    testimony as being relevant for his state of mind both at the

4    time that he gave the testimony and at the time of his

5    deposition but not necessarily probative on the essential

6    issues that are before the Court.

7            MR. GAFFEY:  Thank you, Your Honor.  And within that

8    line of questioning as well is, at page 49, starting at line

9    22, Mr. Schiller asked:

10           "Do you have any reason to believe that those at

11   Lehman who were dealing with Barclays that week were not acting

12   in good faith" and questions to that and continue through page

13   50 at line 20.

14           We don't believe Mr. Ridings is competent to offer an

15   opinion on the good faith of others.  The questions don't call

16   for extrinsic evidence one way or the other as to what would be

17   evidence of good faith.  They simply ask him to opine on the

18   good faith of other witnesses.

19           THE COURT:  I'm going to overrule that objection

20   pretty much for the same reason that I overruled similar

21   objections this morning that went to the testimony of Mark

22   Shapiro along the same lines.  People who were present at the

23   time dealing with these negotiations are entitled to their

24   individual perceptions as to whether or not they saw anything

25   that gave them reason to question whether or not the parties

Page 139

1   they were dealing with were acting in good faith.  That doesn't

2   go to the ultimate question of whether the parties were, in

3   fact, acting in good faith.  But it goes to the state of mind

4   of people who were present.  And I'm prepared to take that into

5   account in assessing the ultimate questions that are before the

6   Court.

7           MR. GAFFEY:  Thank you, Your Honor.  We had a couple

8   of others in there but, in light of Your Honor's rulings, I'll

9   not press them.  And --

10          THE COURT:  Fine.

11          MR. GAFFEY:  -- that's it for Mr. Ridings.  Thank you,

12  Your Honor.

13          THE COURT:  Okay.  Now, before getting to the

14  threshold question of the Leventhal deposition which, I gather,

15  is going to be an objection to whether or not I should hear it

16  at all --

17          MR. GAFFEY:  Yes, Your Honor.

18          THE COURT:  -- I'm going to suggest that we take an

19  afternoon break because it's just about 3:30.  And we'll break

20  for ten minutes.  And I look forward to the argument at just

21  about twenty to 4.

22          MR. GAFFEY:  Thank you, Your Honor.

23      (Recess from 3:27 p.m. until 3:46 p.m.)

24          THE COURT:   Be seated, please.

25          MR. GAFFEY:  Robert Gaffey, again, Your Honor.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 140

1      I rise briefly to address what we believe is the

2  impropriety of proceeding with Ms. Leventhal's testimony by

3  deposition.

4      We did, Your Honor, as I said, agree that solely on

5  the basis of the unavail -- of the availability of a witness

6  neither side would object to the introduction of deposition

7  testimony, and I should say that up front.  But Ms. Leventhal

8  falls in a different category.

9      Ms. Leventhal's deposition was not taken during the

10 discovery period, which was quite long and there was plenty of

11 time to take her, and the role of the Fed in this case was

12 never a secret to anyone.

13      Instead, out of nowhere, Barclays decided to take Ms.

14 Leventhal's deposition purely and clearly for the purpose of

15 playing it rather than bringing her to trial.  And we know that

16 because Mr. Schiller said so at the beginning of the

17 deposition.  Where he says, at page 7, lines 2 through 6 to Ms.

18 Leventhal, "And I will ask you to address the Court from time

19 to time, because Judge Peck may be viewing this deposition as

20 opposed to live testimony so that we don't interrupt your busy

21 schedule."

22      Now, Ms. Leventhal is an assistant general counsel of

23 the New York Fed.  And with all due respect to the position of

24 assistant general counsel of the New York Fed I don't think

25 that rises to the level of a sufficiently busy government

Page 141

1    official sufficiently to warrant not proceeding with live

2    testimony.  Especially, given the fact that she's clearly

3    within subpoena power, she works around the corner.

4            And given the fact that this was clearly designed to

5    be read so that Ms. Leventhal would not have to take the stand,

6    we object.

7            Now, I would agree that it would fall within the

8    agreement we've made with regard to proper discovery taken

9    during the discovery period, but not to afterthought add-ons

10   designed really I think as a strategic matter for trial.  I

11   think Ms. Leventhal should come here.  I think if the Fed

12   really does have something to add that she should testify to it

13   and be subject to a cross-examination in the court.  And for

14   that reason, we object on the grounds that this is post-

15   deadline discovery for no good reason, and does -- and she

16   should -- she's available; she should come and testify.

17           THE COURT:  But let me just understand a couple of

18   essential facts.  When was the deposition taken?  What

19   objection, if any, was made to the taking of the deposition by

20   the movants prior to the taking of the deposition?  And what,

21   if any, reservation of rights was placed on the record of the

22   deposition with regard to this issue?

23           MR. GAFFEY:  We preserved our rights in this regard,

24   Your Honor.  I don't have it to hand, but I recall that we

25   wrote to Barclays -- I think I recall it.  We wrote to Barclays

Page 142

1   and said this.  And, in any event, at the deposition my

2   partner, David Carden, said at the beginning, and this is

3   before the statement I just read, this is at page 6, lines 14

4   through 23, "Jonathan," addressing Mr. Schiller, "I'm sorry, I

5   don't mean to interrupt you, I was going to wait until the

6   opening statement.  I just want to preserve the objection that

7   Hamish is quite aware of, maybe you aren't, that this is being

8   taken after the close of discovery and there have been an

9   exchange of e-mails on that.  I just want to say that we still

10  do object to the deposition."

11          THE COURT:  What date was the deposition taken?

12          MR. GAFFEY:  The deposition was taken on April 14th,

13  2010, Your Honor.  And discovery had concluded sometime in

14  March.  This is not six months after.  But my point is there

15  just was no reason not to -- not to go ahead with the

16  deposition of Ms. Leventhal when discovery was being taken.  We

17  did reserve our rights with regard to this, and Your Honor may

18  recall that, as I said this morning, at the last session of the

19  trial when the topic of Ms. Leventhal's deposition came up I

20  rose and recorded our objection, again, at that point.  So

21  there has been all summer to accommodate Ms. Leventhal's busy

22  schedule, and, yet, she is not here.  So we would object on

23  that basis.

24          If her deposition does go forward by deposition we

25  have, as we did with Mr. Ridings, registered some objections

Page 143

1    and I think it would be useful if I can give you an idea of the

2    nature of the objections.

3         Essentially -- and again, I'm commenting on the

4    deposition as a whole, and Your Honor will see and agree with

5    me, or disagree with me, but much of the objection -- much of

6    the deposition is devoted to eliciting from Ms. Leventhal, as

7    if she were the New York Fed, what its views are on whether or

8    not Your Honor should have approved the transaction.  And

9    that's irrelevant.  The Fed's views -- I mean, whatever is to

10   be thought in the executive branch, whatever the Fed thinks

11   they had an opportunity to come and say it, and her views about

12   this now, if, indeed, she speaks for the government, are

13   irrelevant.  And I'll give you an example of the type of

14   question and answer that we're talking about.

15        This would be at page 49, starting at line 15 and

16   continuing through line 20.  Actually, let me start at line 9.

17   "Q.  You were asked a moment ago about my question to you

18   regarding whether there is a public policy interest in

19   protecting the finality of the sales, such as the sale of LBI

20   to Barclays, do you recall that?

21   "A.  Yes, I do.

22   "Q.  If I change that question to ask whether the Fed has a

23   policy interest in protecting the finality of sales, such as

24   the sale of LBI to Barclays, does that change your answer at

25   all?

Page 144

1     "A.  No."

2          And then further on, in connection with that line of

3     questioning, and now at page 50, line 4.

4     "Q.  I showed you Exhibit 1, the APA, earlier in your

5     deposition?

6     "A.  Uh-huh.

7     "Q.  The APA disclosed to the Court, didn't it, what purchased

8     assets were, correct?

9     "A.  Yes.

10    "Q.  Did the APA disclose to Judge Peck purchased assets in the

11    transaction between Lehman and Barclays?

12    "A.  Yes.

13    "Q.  And did those purchased assets in the APA to your

14    understanding include all assets used in connection with the

15    business excluding the excluded assets?"

16         Now, there are factual matters that relate to the Fed

17    here, Your Honor.  You've heard testimony about them.  These

18    are not them.  Whether the Fed has an opinion about the

19    finality of sale orders is as irrelevant I think as it gets.

20    And to ask Ms. Leventhal, although she is an attorney, for her

21    opinion as to finality or whether the Court should have

22    approved a transaction, or whether the Fed has a public policy

23    interest is not appropriate testimony.

24         I'm prepared -- I think, this is what I would go

25    through after we heard Ms. Leventhal, as I just did with Mr.

Page 145

1    Ridings in the interest of continuity, so that I'm not raising

2    these questions out of context, by the context of the

3    testimony.  But all told, this one is different.  This is not

4    just -- we made an agreement for efficiency, but to bring in a

5    public official to come in and opine on videotape as opposed to

6    coming to the court and expressing their views with all that is

7    attendant to that we think is inappropriate.  And we would ask

8    that her deposition be excluded.  And that if they want her

9    they bring her to court to testify.

10          THE COURT:  Okay.  I understand that position and I'll

11   hear from counsel for Barclays with respect to the proper use

12   of the deposition testimony.

13          I'm just going to make a comment as it relates to

14   administration of the trial as a general matter.  I suppose

15   part of the fun of going to court is surprise, but generally

16   speaking, the Court prefers not to be surprised.  And I did not

17   know before this afternoon that there was going to be an issue

18   concerning either objections to the testimony of Barry Ridings

19   or now objection to the use of the deposition of Ms. Leventhal.

20          I have no problem dealing with these issues as they

21   arise, but given the fact that we had such a long break between

22   the end of the movants' case and now the first day of evidence

23   in Barclays' case, it might have been helpful to me to have had

24   perhaps a foreshadowing before today of these issues, because I

25   could have used some of my time last week to review the

Page 146

1    designations of Mr. Ridings' testimony and have some better

2    opportunity to prepare.

3         Believe me, it's fun for me, I'm happy to be surprised

4    from time to time, but I'm just thinking that the case may go

5    more smoothly for everybody if we had fewer of them, at least

6    as they related to me.

7         MR. GAFFEY:  I'm sorry, Your Honor, for that.  I think

8    part of the disconnect here, and I will take the weight for

9    this, is we -- you may recall that when the movants concluded

10   their case we put depositions in.  We were going to come in and

11   read them, and we were talking about how to go ahead, and

12   object or not object.  And we resolved it by submitting.

13        THE COURT:  I have that notebook.

14        MR. GAFFEY:  Well -- and what we had from Barclays

15   until shortly before trial was a very long witness list.  And

16   then it got to be a shorter witness list, and then a shorter

17   witness list still.  It wasn't entirely clear.  I take Your

18   Honor's point and I apologize for that.

19        THE COURT:  And I'm not hitting it hard.  I'm just

20   saying in the future it would be great if we had just a little

21   bit more than a few minutes' notice that we're going to have an

22   issue.

23        MR. GAFFEY:  I will say this.  With regard to what I

24   think are the depositions that my friends are going to play

25   next week; Mr. Miller, Mr. Marsal, and some others, we -- in

Page 147

1    the book that I have given Your Honor today we have annotated

2    those objections that we do have.  Although -- and as I said a

3    while ago, it's really Ridings and Leventhal where we've got

4    anything of any significant amount.  For example, we have no

5    objections to playing -- hearing Mr. Miller again.  And

6    whatever objections we have to the others they are minor.

7            THE COURT:  Okay.

8            MR. BOIES:  Thank you, Your Honor.  One of the

9    thoughts that I had had prior to today, and I still think it's

10   a good idea, is that our objections or the objections to our

11   witnesses, be treated the same way that our objections to their

12   witnesses be treated, which is what we did and we submitted

13   them for the Court's consideration at the end of all the

14   evidence.  That is, rather than taking them witness by witness,

15   like we did with Mr. Ridings, what we did with theirs is they

16   put in all their designations, we put in our objections, and

17   that's submitted to the Court.  And the Court has the benefit

18   of having the entire presentation of our side to consider the

19   objections.

20           I'd actually thought that was what we were going to do

21   with our witness as well.  I thought that was the agreement.

22   But if I'm wrong about that, I'm wrong.  But I still think

23   that's a good way to approach it.  But I just submit that for

24   whatever consideration the Court wants to give it.

25           THE COURT:  Without getting into that, I think there

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 148

1     may be a distinction between the designation of dry transcripts

2     and the presentation of videotape in court, which is going on

3     the record, and the public has an opportunity to --

4              MR. BOIES:  To hear it.

5              THE COURT:  -- not only hear it --

6              MR. BOIES:  Right.

7              THE COURT:  -- but view it and react to it as if it's

8     live testimony.

9              The Leventhal objection seems to me --

10             MR. BOIES:  That's different.

11             THE COURT:  -- to be a in a different category

12    altogether.

13             MR. BOIES:  Absolutely.  Your Honor, Leventhal is

14    entirely different, and we did understand that they had that

15    objection.  That's entirely separate, and that's really what I

16    rise to address.

17             MR. GAFFEY:  Excuse me one second.  I can say, David,

18    and Your Honor, with respect to the rest of the -- we're

19    absolutely happy to do it the same way.

20             MR. BOIES:  Right.

21             MR. GAFFEY:  Have the objections, minimal as they are,

22    ruled on later.

23             MR. BOIES:  That's good.

24             MR. GAFFEY:  We don't have to take Court time.

25             THE COURT:  Fine.

Page 149

1          MR. BOIES:  I think that'd be terrific.

2          THE COURT:  Let's do that so that the same pattern of

3     cooperation and collective action to minimize unnecessary time

4     in court with regard to objections will apply, both to the

5     Barclays' designations and to the movants' designations.

6          Now, let's just deal with this question of the

7     Leventhal deposition.

8          MR. BOIES:  Sure.  Ms. Leventhal's deposition was

9     taken on April 14th.  We noticed it, we subpoenaed her.  It was

10    beyond the discovery cutoff.  We did it because the Fed repo

11    issue and the discount issue became increasingly obvious with

12    their final brief.  It was going to be important issue.  We

13    thought that there was a desirability of having her testimony.

14    We thought given her schedule, and she happens to be gone this

15    week, she'll be back I think next week, so it's not entirely

16    impossible to call her, but because of her schedule we wanted

17    to have her deposition available for the Court.  And we made

18    very clear that we were taking that deposition so that we could

19    submit it to the Court.

20          The fact that we have that desire doesn't make that

21    deposition any less admissible.  In fact, I think it makes it

22    more admissible than a normal discovery deposition.  Because

23    what it does is it gives everybody notice that what you're

24    doing is bringing on a witness that you do plan to present to

25    the Court as opposed to simply the normal discovery situation.

Page 150

1         So we have a agreement that you -- that we can play

2    depositions even when the witness is available.  The only

3    question is whether that ought to apply to Leventhal just the

4    way it is applied to all of the witnesses that the movants have

5    brought.  And we think it should.  We don't think there's any

6    reason to make a distinction.

7         THE COURT:  Okay.  Frankly, as to both the Barry

8    Ridings testimony and the Leventhal testimony, I have much the

9    same reaction, totally consistent with the remarks that I made

10   before the video of Mr. Ridings' deposition was played earlier

11   this afternoon.  And that is, while I understand the

12   stipulation of the parties to be, and there's nothing wrong

13   with it, that witnesses who are available within the subpoena

14   power of the Court and who work in New York City can still have

15   their testimony presented by video as opposed to appearing

16   live.  I consider that to be less favorable a way to present

17   their testimony than having them present in court.  There are

18   multiple reasons why I think that's so.

19        You can tell from simply looking at the Barry Ridings

20   testimony that virtually every question was objected to as to

21   form, and none of those objections really mattered.

22        Having a deposition taken with a video camera is, on

23   the one hand, both a little bit more off-putting than appearing

24   in court, but it's also much more informal.  And I'm old school

25   enough to think that there's a difference when somebody is

08-13555-mg   Doc 11012   Filed 08/25/10   Entered 08/26/10 10:23:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 151 of 199

Page 151

1    sitting on the bench with a black robe on, when the public is

2    present, when there's an opportunity for a real-time

3    examination when the testimony truly counts.  And that the

4    system was really designed for searching the truth of witnesses

5    who are appearing live, that's the preferred approach; that's

6    how the system works.

7            For that reason, I'm not real happy to have had to

8    spend the afternoon looking at Mr. Ridings' video as opposed to

9    looking at Mr. Ridings.  We ended up spending time that I think

10   was somewhat unnecessary in respect of objections, although

11   they had to be lodged, and they had to be ruled on.

12           In the case of Ms. Leventhal, we have the added

13   problem of having a threshold question, which I am asked to

14   consider now without a single piece of paper alerting me to the

15   fact that this was an issue before this afternoon.  In fact,

16   when I went out onto the bench this morning at 9:30 I did not

17   know who the first witness was.  It so happens that I remember

18   Mr. Shapiro, we were both in practice years ago, and like many

19   other witnesses in this case, I know them.  I know them because

20   I was -- before I was appointed to the bench, an active

21   practitioner in this market.  And many of the witnesses; like

22   Mr. Miller, like Mr. Ridings, like Mr. Shapiro, like Mr.

23   Burian, like Mr. Despins, and I'm not leaving anybody out, I

24   don't think, are people with whom I have had something to do

25   over the years when I was the practitioner.  I'm interested in

Page 152

1    seeing them testify live.

2           Ms. Leventhal has appeared in this court in the Lehman

3    case.  She appeared, if I recall correctly, at the hearings on

4    September 19.  She has appeared on other occasions.  She

5    provided a declaration which supported the settlement, which

6    is, on occasion, a subject of debate in these proceedings

7    relating to sixty-day.  There's no reason why she shouldn't be

8    here.

9           Now, that having been said, there's also no reason

10   why, if the parties have agreed to the use of depositions in

11   lieu of live testimony, that the deposition transcript and

12   video can't be played.

13          My ruling on this in order to be consistent is that

14   I'll see the deposition transcript played as a video without

15   prejudice to the ability of the movants, if they feel that

16   there is anything about the testimony that's incomplete,

17   whether it requires supplementation to cause Ms. Leventhal to

18   appear as a live witness next week or whenever she can appear.

19   And I'm making this statement openly to everybody.  I don't

20   want to see video when there's a witness who can be here in

21   person.  I don't like it; I prefer that you don't do it.  It

22   appears tactical and it's not going to help you.

23          So if you would like Mr. Ridings to also appear live,

24   please bring him in too.

25          I want to see both of them live.  And if Barclays

Page 153

 1   would like to reconsider whether or not it wants to play this

 2   video, you're free to do that too.

 3          So my ruling is you can have it both ways, you can

 4   play the video but I want to see the witnesses.  You're not

 5   going to have it one way.

 6          Let's proceed any way you want.  If you want to break

 7   to think about how you want to proceed we can take a five-

 8   minute break.

 9          MR. BOIES:  Your Honor, let me suggest, rather than

10   taking another break, that we proceed with Mr. Ullman, who is

11   our next live witness, who was going to follow the deposition.

12   And let us take into account Your Honor's comments, and confer

13   with the other side, and we'll try to work out something that

14   will meet with the Court's objectives.

15          THE COURT:  That's fine.  I mean, it's your case, Mr.

16   Boies, and this is obviously something that did not happen

17   casually.  In other words, I am impressed with the quality of

18   lawyering that all parties have at their disposal in this case,

19   and recognize that virtually nothing here happens by accident,

20   except perhaps something I might do, because I haven't had as

21   much time to think about some of these issues as the parties

22   have.

23          If Barclays is of the view that it can best present

24   its case through deposition testimony played through a video,

25   and if there is no objection to that, except in the case of the

Page 154

1    Leventhal deposition for reasons that have been argued, I'm not

2    going to step on the way you try your case.  But what I am

3    telling you is, I think it's backfiring.  And the fact that

4    we're spending this much time talking about it raises more

5    questions than I think you probably consider helpful for your

6    case.  So that I really wanted to see Ms. Leventhal.  And,

7    frankly, I really would have wanted to see Mr. Ridings

8    available for the kind of searching examination that every

9    other witness who had a major role in the case has had, up to

10   this point.

11          To the extent that Mr. Ridings has been given a

12   somewhat shorter opportunity to have his testimony presented by

13   means of video that hasn't served your cause as well, I think,

14   as having had him here for the soup to nuts presentation that

15   every other witness has had.

16          But let's proceed with the next witness.

17          MR. BOIES:  Very well, Your Honor.  We call Mr. Ullman

18   to the stand.

19          THE COURT:  Mr. Ullman, good afternoon.  Please raise

20   your right hand.

21       (Witness duly sworn)

22          THE COURT:  Be seated, please.

23   DIRECT EXAMINATION

24   BY MR. BOIES:

25   Q.   Good afternoon, Mr. Ullman.

Page 155

1    A.    Good afternoon.

2    Q.    Would you tell the Court what your present position is?

3    A.    I'm a managing director at Barclays Capital.

4    Q.    And prior to the close of the transaction that is at issue

5    in this case, what was your position?

6    A.    It was the managing director at Lehman Brothers

7    responsible for global clearance and custody operations.

8    Q.    And can you explain a little bit what your role was at

9    Lehman Brothers in that position?

10   A.    I was responsible for all of the clearance and settlement

11   activity of the firm's businesses, both customer and

12   proprietary activity.

13   Q.    Now, did you have any role in negotiating the sale

14   transaction that's at issue here?

15   A.    No, I did not.

16   Q.    After the closing you joined Barclays, is that correct?

17   A.    That is correct.

18   Q.    And did you, after the closing, work with the SIPA

19   trustee's lawyer to facilitate the transfer of assets from LBI

20   to Barclays pursuant to the purchase agreement?

21   A.    Yes.  I worked with Mr. Frelinghuysen on the transfer.

22   Q.    And this involved a lot of securities, a lot of value of

23   securities, correct?

24   A.    It involved a lot of securities, yes.

25   Q.    And transfer of billions of dollars of assets from LBI to

Page 156

1    Barclays, correct?

2    A.    That is correct.

3    Q.    Now, you mentioned Mr. Frelinghuysen.  During the period

4    of time we're talking about did Mr. Frelinghuysen actually have

5    an office at Barclays?

6    A.    Yes.  For the first couple of weeks Mr. Frelinghuysen had

7    an office in 70 Hudson, where our security operations was

8    located.  He was directly across the floor from my office.

9    Q.    And what is the reason why he was brought -- that is a

10   trustee's lawyer was brought to the Barclays' offices, and

11   given an office there?

12   A.    He was brought there to help facilitate the transfer of

13   securities, customer and proprietary assets.

14   Q.    Now, you draw the distinction between customer and

15   proprietary assets, did you discuss with the trustee's

16   representative, Mr. Frelinghuysen, both the transfer of

17   customer assets, and the transfer of proprietary assets?

18   A.    Yes.  During the -- with reference to a specific transfer

19   I would -- I did discuss with Mr. Frelinghuysen customer asset

20   transfers and proprietary asset transfers.

21   Q.    And did you discuss with Mr. Frelinghuysen that the

22   customer transfers would go to a different account than the

23   accounts used for the proprietary transfers?

24   A.    Yes.  The settlement instructions -- the account that

25   you're referring to would be the settlement instructions.  The

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 157

1  settlement instructions of customer assets were going to a

2  specific DTC account.  Proprietary assets were going to

3  different DTC accounts.  Yes.

4  Q.   And did you tell Mr. Frelinghuysen which accounts related

5  to proprietary assets and which accounts related to customer

6  assets?

7  A.   We would have had that discussion, you know, during the

8  course of me explaining why we were transferring -- well,

9  requesting a specific transfer.

10  Q.   Okay.  And with respect to each transfer was Mr.

11  Frelinghuysen and the trustee aware of the account to which the

12  securities were being transferred?

13  A.   The accounts would have been included in the request to

14  Mr. Frelinghuysen, and then the onward request to DTC.

15  Q.   So the request that was given would have shown whether you

16  were requesting a transfer to a customer account or a

17  proprietary account, is that correct?

18  A.   Yes.

19  Q.   Do you have a witness book up there?  I think you do.

20  We're handing them out right now, you do not.  But you do now.

21  A.   I do now.  Thank you.

22       MR. BOIES:  May I have just a moment, Your Honor?

23       (Pause)

24  Q.   Now, do you know a Mr. Blackwell?

25  A.   Yes, I do.

Page 158

1    Q.    Can you identify for the record who Mr. Blackwell is?

2    A.    Mr. Blackwell was my direct manager at Lehman Brothers.

3    Q.    And did Mr. Blackwell also talk to Mr. Frelinghuysen?

4    A.    Yes, he did.  I arranged for Mr. Blackwell to meet Mr.

5    Frelinghuysen over at 70 Hudson Street.

6    Q.    And what was the purpose of that meeting?

7    A.    The purpose was to discuss the transfer of proprietary

8    noncustomer assets.

9    Q.    And what was the result of that meeting?

10   A.    The results of that meeting were the -- that we were going

11   to be given instructions on how to transfer noncustomer assets.

12   Q.    And let me ask you to look in your binder at Tab 5.  And

13   does this document have anything to do with what you were just

14   talking about?

15   A.    Yes.  This is an e-mail that was written by Mr.

16   Frelinghuysen as a result of his meeting with Mr. Blackwell.

17   Q.    And this is from Mr. Frelinghuysen and it's to Mr.

18   Blackwell, and it shows copies to other people.  First, Mr.

19   James Giddens, do you see that?

20   A.    Yes, I do.

21   Q.    And do you know who he is?

22   A.    Yes, I do.

23   Q.    Who is he?

24   A.    He is -- works for the trustee, represents the trustee.

25   Q.    And then the next one is James Kobak, and do you know who

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 159

1    that is?

2    A.    Yes, I do.

3    Q.    Who is that?

4    A.    He also represents the trustee.

5    Q.    And Christopher Kiplok, and do you know who that is?

6    A.    Yes.

7    Q.    And who is that?

8    A.    My understanding he also represents the trustee.

9    Q.    And this exhibit has two pages, the first is the e-mail,

10   and -- which says "Please see the attached letter which will be

11   necessary before the SIPC trustee can authorize the movement of

12   the positions discussed earlier, that are due as part of the

13   LBI/Barclays transaction."  And then there's attached a form

14   letter, is that correct?

15   A.    That is correct.

16   Q.    And if you go to the form letter does this letter relate

17   to proprietary assets as opposed to customer assets?

18   A.    Yes, it does.

19   Q.    And how can you tell that?

20   A.    It makes specific references to securities that were sold

21   to Barclays Capital.  Customer assets would be transferred.  I

22   also know it was in specific response to the meeting that they

23   had, which was to talk about the transfer of proprietary

24   noncustomer assets.

25   Q.    Now let me ask you to look at Tab 6, which is Barclays'

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 160

1    Exhibit 517.  And this is a series of e-mails.  And the first

2    e-mail is an e-mail from you to Mr. Frelinghuysen, September

3    29th, 2008 at 3:21 p.m., correct?

4    A.    That is correct.

5    Q.    And this asks for the transfer of securities to a

6    particular DTC account, or accounts, correct?

7    A.    That is correct.

8    Q.    And those accounts are account number 074 and 7256,

9    correct?

10   A.    That is correct.

11   Q.    Were these accounts or either of them accounts that you

12   had previously identified to Mr. Frelinghuysen as accounts that

13   received proprietary as opposed to customer assets?

14   A.    No, they're not.

15   Q.    Which are these accounts?

16   A.    The accounts on this e-mail, 5101 and 7256 represent the

17   DTC accounts.  We were instructing the receipt of noncustomer

18   proprietary assets for Barclays.  The customer assets that we

19   would instruct on would have been DTC account 229.

20   Q.    Okay.  I may have misspoke, or you may have misheard.  Let

21   me just be sure I'm understanding.

22        What was the account or accounts to which customer assets

23   were transferred?

24   A.    Customer assets for PIM customers would go to DTC account

25   229.

1   Q.   And DTC account 5101, do you know what that is?

2   A.   Yes, I do.

3   Q.   What is that?

4   A.   That is a DTC -- Barclays/DTC account where they hold

5   equity securities.

6   Q.   Equity securities that are customer securities or

7   proprietary securities?

8   A.   Proprietary securities.

9   Q.   Proprietary securities.  And customer account 7256, is

10  that an account that holds customer securities or proprietary

11  securities?

12  A.   It's a DTC account where Barclays was receiving

13  proprietary securities.

14  Q.   And prior to this e-mail had you informed Mr.

15  Frelinghuysen that account 7256, for example, was an account

16  that received proprietary securities?

17  A.   Yes, I had that discussion with Mr. Frelinghuysen on the

18  preceding Friday.

19  Q.   Okay.  So as you understood it, when you sent this e-mail

20  to Mr. Frelinghuysen, he understood that you were requesting

21  the transfer of proprietary securities, correct?

22  A.   Yes, I --

23          MR. MAGUIRE:  Objection, Your Honor.  Asking the

24  witness to speak as to Mr. Frelinghuysen's understanding.

25          THE COURT:  Sustained.

Page 162

1    Q.    When you wrote this e-mail were you requesting Mr.

2    Frelinghuysen to transfer proprietary securities?

3    A.    Yes, I was.

4    Q.    And did you believe that you expressed that to Mr.

5    Frelinghuysen in this e-mail?

6    A.    Yes, I did.

7    Q.    Now, Mr. Frelinghuysen then writes you back, correct?

8    A.    That is correct.

9    Q.    And that's an e-mail at September 29th at 3:31 p.m.,

10   correct?

11   A.    Correct.

12   Q.    And he says "Please confirm that the attachments to the e-

13   mail below represent assets of Lehman Brothers Inc. that were

14   sold to Barclays Capital pursuant to the asset purchase

15   agreement, dated as of September 16th, 2008."  Do you see that?

16   A.    Yes, I do.

17   Q.    And the assets of Lehman Brothers are those proprietary

18   assets?

19   A.    Yes, they are.

20   Q.    And you then write back "confirmed," correct?

21   A.    Correct.

22   Q.    And were the assets then transferred?

23   A.    Yes, they were transferred.

24   Q.    And let me ask you to look next at Barclays' Exhibit 825,

25   which is behind the same tab behind that blue sheet.  And this

Page 163

1    is another copy of your September 29th, 2008 e-mail of 3:21

2    p.m., or on this one 3 p.m., twenty minutes and thirty-six

3    seconds, is that correct?

4    A.    That is correct.

5    Q.    Now let me ask you to look at Tab 7, Barclays' Exhibit

6    675.  And this is an e-mail from Mr. Frelinghuysen, correct?

7    A.    That is correct.

8    Q.    And it is to a variety of people, but you get a copy,

9    correct?

10   A.    Yes, I do.

11   Q.    And what did you understand this e-mail to convey when you

12   received it?

13   A.    This is an e-mail to DTC instructing them to deliver

14   securities from Lehman's participant account 074 to Barclays'

15   DTC account 5101.

16   Q.    And the Lehman Brother DTC account 074, was that an

17   account that held Lehman proprietary assets?

18   A.    Yes, it did.

19   Q.    And the Barclays' accounts 5101 and 7256, were those

20   Barclays' DTC accounts that held proprietary assets?

21   A.    Yes, they did.

22   Q.    So what this was authorizing was the transfer of

23   proprietary assets from a Lehman proprietary account to a

24   Barclays proprietary account or accounts, correct?

25   A.    That is correct.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 164

1    Q.   Let me ask you to look at Tab 9, this is Barclays' Exhibit

2    375.  And this is a -- again, a document from Mr. Frelinghuysen

3    to a variety of people, and you get a copy of it, is that

4    correct?

5    A.   That is correct.

6    Q.   And this is dated September 26th, 2008 at 4:13 p.m., and I

7    guess at fifty-nine seconds after, a minute.  With respect to

8    your conversations with Mr. Frelinghuysen, did Mr.

9    Frelinghuysen ever tell you that he did not believe that Lehman

10   had an obligation to transfer proprietary assets to Barclays?

11   A.   No, he did not.

12   Q.   Did you communicate with Mr. Frelinghuysen that you

13   believed that Lehman Brothers did have an obligation to

14   transfer proprietary securities to Barclays pursuant to the

15   APA?

16   A.   Yes, I did.

17   Q.   And did he ever disagree with that?

18   A.   No, he did not.

19   Q.   And did he, pursuant to your instructions, in fact

20   transfer proprietary securities to Barclays?

21   A.   Yes, he did.

22        MR. BOIES:  Your Honor, I have no more questions.

23   CROSS-EXAMINATION

24   BY MR. MAGUIRE:

25   Q.   Sir, Bill Maguire for the SIPC trustee.  It is, of course,

Page 165

1   true, is it not, sir, that the vast majority of the assets that

2   were being transferred in the days and weeks after the closing

3   were all customer assets, isn't that right?

4   A.   Yes, the majority of them were customer assets.

5   Q.   And it is true, is it not, that in the course of your work

6   in connection with the transfers of assets you had many, many,

7   many conversations with Anson Frelinghuysen?

8   A.   Yes, I had several conversations with Mr. Frelinghuysen.

9   We didn't have as many transfers as we had conversations.

10  Q.   It's true, is it not, sir, that you had, on the subject of

11  transfers, many, many, many conversations with Anson

12  Frelinghuysen?

13  A.   I had several conversations with Mr. Frelinghuysen, yes.

14  Q.   You're not quibbling about the use of the description

15  "many, many, many conversations"?

16  A.   No, I'm not.

17  Q.   And of all of those conversations there are three that you

18  believe related in some way to transfers concerning noncustomer

19  property?

20  A.   That is true.

21  Q.   The first one of those conversations was one in which you

22  testified earlier you introduced Alastair Blackwell to Mr.

23  Frelinghuysen, isn't that right?

24  A.   That is correct.

25  Q.   Until that introduction all of the conversations, and all

Page 166

1   of the transfers, and all of the work that you had done with

2   Mr. Frelinghuysen exclusively concerned transfers of customer

3   property, isn't that right?

4   A.   We had not transferred any assets at that time.

5   Q.   You were not even aware that there was any noncustomer

6   property that was to be transferred?

7   A.   I was vaguely --

8           MR. BOIES:   Can we have a time frame on that?

9   Q.   At the time of the introduction, the introduction that you

10  testified earlier where you introduced Alastair Blackwell to

11  Mr. Frelinghuysen?

12  A.   I was aware that there were noncustomer assets to be

13  transferred based on my conversations with Mr. Blackwell and

14  his request to meet Anson to discuss that.

15  Q.   And prior to that revelation from Mr. Blackwell you were

16  not aware of any noncustomer property transfers, isn't that

17  right?

18  A.   Prior to my conversations with Mr. Blackwell --

19  Q.   Yes.

20  A.   -- I might have been vaguely aware.

21  Q.   If you could turn, sir, to page 70 of your deposition

22  transcript which I believe is in the binder in front of you.

23  And you'll see there at page 70, starting at line 7, you were

24  asked -- you gave the following testimony:

25  "Q.   Okay, so your first conversation about the transfer of

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 167

1    noncustomer assets with Mr. Frelinghuysen is when you

2    introduced him to Mr. Blackwell, correct?

3    "A.   That would have been the first time I was aware, as well,

4    that we were going to be making a transfer of noncustomer

5    assets."

6    Q.   Do you see that testimony, sir?

7    A.   Yes, I do.

8    Q.   Was that true when you gave it?

9    A.   Yes, it is.

10   Q.   Does it remain true today?

11   A.   Yes, it does.

12   Q.   Now, sir, you explained to Mr. Frelinghuysen who Alastair

13   Blackwell was, did you not?

14   A.   Yes, I did.

15   Q.   And you told him that Alastair wanted to talk to him about

16   the transfer of non-PIM assets, correct?

17   A.   Noncustomer assets, that is correct.

18   Q.   Non-PIM assets, isn't that correct?

19   A.   No.  I would have used the term "noncustomer assets".

20   Q.   Would you mind, sir, please turning to page 63 of your

21   deposition.  Then starting at line 9 you'll see you gave the

22   following testimony:

23   "Q.  Tell me everything you remember about that, sir.  Did you

24   tell Anson why you were introducing him to Mr. Blackwell?

25   "A.  I -- yes, I did.  I remember explaining to Anson who

Page 168

1    Alastair was and that Alastair wanted to talk to him about the

2    transfer of these non-PIM assets.  Because I was dealing with

3    Anson on -- at that -- up until that point I was talking to

4    Anson about the PIM assets."

5    Q.   Do you see that testimony, sir?

6    A.   Yes, I do.

7    Q.   You were asked that question and you gave that answer.

8    A.   Yes, I did.

9    Q.   That testimony was true when you gave it, was it not?

10   A.   Yes, it is.

11   Q.   Now, you had been talking to Anson about the PIM assets

12   and all of the PIM assets, of course, were all customer

13   property, isn't that right?

14   A.   At that time I was talking to Anson about PIM assets.  Up

15   until that point, that is correct.

16   Q.   And that was all customer property, isn't that right?

17   A.   And that was customer securities, yes.

18   Q.   You had talked to him about some non-PIM assets, as well,

19   like prime brokerage assets, isn't that right?

20   A.   That is correct.

21   Q.   They're non-PIM assets, isn't that right?

22   A.   They are customer assets that are not PIM.

23   Q.   And there was also the matter of the PAM customers, right?

24   You'd been talking to Mr. Frelinghuysen also about the PAM

25   customers and their property, right?

Page 169

1    A.    I'm not sure exactly when I started talking to him about

2    that.

3    Q.    The PAM customers, sir, I think you testified about at

4    your deposition at page 64.  If you look just down at the

5    bottom of that page starting at line 22 you'll see you were

6    asked --

7    "Q.  Did you have any discussions with Anson relating to the

8    transfer of securities for PAM, P-A-M customers?

9    "A.  Yes, I did."

10   Q.    And the PAM customers, sir, they, again, were non-PIM

11   customers, isn't that right?

12   A.    They are non-PIM customer assets.

13   Q.    But, again, all those assets are customer assets, isn't

14   that right?

15   A.    Yes, they are.

16   Q.    Now, having introduced Mr. Blackwell to Mr. Frelinghuysen

17   on the subject of this transfer of non-PIM assets, you were

18   not, yourself, physically present for the meeting that followed

19   between Mr. Frelinghuysen and Mr. Blackwell, isn't that right?

20   A.    I wasn't present but I was very aware of what Alastair was

21   going to be speaking to Mr. Frelinghuysen about.

22   Q.    But you did not accompany him to that meeting?

23   A.    No, I didn't.  I met with Mr. Blackwell immediately after

24   the meeting.

25   Q.    And that introduction that you testified about that was

08-13555-mg    Doc 11012    Filed 08/25/10    Entered 08/26/10 10:23:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 170 of 199

Page 170

1    the first conversation that you had with Anson Frelinghuysen on

2    the subject of non-PIM transfers, isn't that right?

3    A.    Yes.  And in that context I would have referred to non-PIM

4    as proprietary assets.

5    Q.    I understand that's your position, sir.  My question is

6    that is the first conversation of the three in which you had

7    with Mr. Frelinghuysen that you believed related to the subject

8    of noncustomer assets, that is the first one, is it not?

9    A.    That is correct.

10   Q.    The second conversation that you had concerned a transfer

11   of some 269 million dollars in securities, is that right?

12   A.    That is correct.

13   Q.    And that transfer is the subject of the correspondence

14   that you were shown by your counsel in Tab 9 of your binder.

15   That is the Barclays' Exhibit 375, is that right, sir?

16   A.    Yes.

17   Q.    And that is an e-mail from Anson Frelinghuysen to various

18   people that you mentioned on direct that was dated Friday

19   September 26, 2008 at around 4:14 p.m.?

20   A.    That's correct.

21   Q.    And attached to this is a listing of assets in the amount

22   of something over 269 million dollars, is that right, sir?

23   A.    Yes.  Yes, it is.

24   Q.    And accompanying that is the authorization and transfer

25   instructions from the trustee, is that correct, sir, at the

Page 171

1    last page of the exhibit?

2    A.   Yes, it is.

3    Q.   And if we take a look at the last page of the exhibit

4    you'll see those instructions start with the words "James W.

5    Giddens, for the SIPA liquidation of Lehman Brothers, Inc., as

6    trustee for the SIPA liquidation of Lehman Brothers, Inc.,

7    authorizes the transfer of collateral referenced in the

8    enclosed spreadsheet in accordance with the wire instructions

9    below on an expedited priority basis as part of the transfer of

10   customer accounts to Barclays," do you see that, sir?

11   A.   Yes, I do.

12   Q.   Now, it was your understanding that these, in fact, were

13   not going to go to Barclays' customers.  That, in fact, this

14   entire 269 million dollars was being received and obtained by

15   Barclays, not for customers but for Barclays' own proprietary

16   account, isn't that right, sir?

17   A.   Yes, that's true.  These were going to -- these were

18   proprietary positions being delivered to Barclays.

19   Q.   Did you tell Mr. Frelinghuysen that the authorization that

20   had been provided here was mistaken and that, in fact, this was

21   not going to the customer accounts to Barclays, as set forth

22   here in the specific written authorization?

23   A.   When I spoke to Mr. Frelinghuysen about this transfer my

24   focus was on the settlement instructions and expediting the

25   delivery of those.  The settlement instructions, DTC Box 7256,

08-13555-mg   Doc 11012   Filed 08/25/10   Entered 08/26/10 10:23:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 172 of 199

Page 172

1   I had told Mr. Frelinghuysen is a proprietary box of Barclays.

2   He understood that, he didn't object when we had that

3   conversation.  And we spent the rest of that discussion talking

4   about how -- or if there was anything we could do to get DTC to

5   expedite the delivery that day.

6   Q.    You heard my question, did you not, sir?

7   A.    I think so, yes.

8   Q.    You understood my question?

9   A.    Yes.

10   Q.    Did you tell Mr. Frelinghuysen that these wire transfer

11   instructions were mistaken?

12   A.    The wire instructions are accurate.  The wire instructions

13   is to deliver from 636 to DTC Box 7256.

14   Q.    Did you tell him there was any mistake anywhere on this

15   page?

16   A.    No, I didn't.  I would not have paid particular attention

17   to some of the language above that.  My focus would have been

18   on the settlement instructions.

19   Q.    So you never said Anson, why are you saying this is going

20   to customer accounts to Barclays, when it's my understanding,

21   and maybe if I wasn't clear, let me be clear now, that it's not

22   actually going to a customer account of Barclays, it's going to

23   Barclays' own account, you didn't say that to him?

24   A.    I never pointed out why the language on this is

25   inaccurate.  But I clearly explained to him that we were

Page 173

 1   delivering noncustomer proprietary assets to Barclays.

 2   Q.   Well, you can't actually tell us, sir, that you told Anson

 3   Frelinghuysen that these assets were Lehman-owned assets that

 4   were going to Barclays' own account, you can't say that, can

 5   you, sir?

 6   A.   Could you repeat the question?

 7   Q.   You can't say that you told Anson Frelinghuysen that this

 8   transfer was of Lehman proprietary assets that were going to

 9   Barclays' own proprietary account, or its own account?

10   A.   I can tell you that Anson and I discussed, and I discussed

11   with Anson that this delivery was going to -- because these

12   were noncustomer assets going to a Barclays' DTC box.

13   Q.   Let me try again.  You can't say that you explicitly told

14   Anson Frelinghuysen that these assets were Lehman proprietary

15   assets that were going to Barclays' own account for Barclays'

16   account?

17   A.   Yes, I can.

18   Q.   Would you turn, sir, to page 77 of your transcript.

19   Starting at line 8 you'll see you gave the following testimony:

20   "Q.   Other than telling Mr. Frelinghuysen that you wanted this

21   269 million of securities to go to a different box at DTCC did

22   you tell him that these assets were Lehman-owned assets that

23   were going to Barclays for Barclays' own account?

24   "A.   I can't explicitly say I said that.  That said, I didn't

25   tell Anson where I wanted securities to go without explaining

Page 174

1    to Anson or justifying why securities were going one place

2    versus another."

3    Q.   And your answer continues.

4          MR. BOIES:  And could we for context have the

5    remainder of the answer read, Your Honor?

6          THE COURT:  What more do you wish to read?

7          MR. BOIES:  Just the remainder of the answer, just the

8    next three sentences in the answer.

9          THE COURT:  All right, let's do that.

10          MR. MAGUIRE:  Certainly.

11    Q.   For fullness:

12    "A.   That said, I didn't tell Anson where I wanted securities

13    to go without explaining to Anson or justifying why securities

14    were going one place versus another.  I had no authority to

15    move securities, only Anson had authority or the trustee had

16    authority to move securities.  So, as a matter of course, I did

17    explain to Anson in every case that we were moving securities,

18    why, and for what reason."

19    Q.   And if we continue reading the testimony for fullness,

20    sir, the following question is:

21    "Q.   I appreciate that answer, sir.  My question is a little

22    more specific than that.  Other than what you believe you would

23    have done as a matter of course can you tell me if you have a

24    specific recollection of telling Mr. Frelinghuysen that the 269

25    million of securities that you wanted him to transfer on or

Page 175

1    around the 26th of September were Lehman-owned assets that were

2    being transferred to Barclays for Barclays' own account?

3    "A.  Again, I think I answered it.  I said I can't explicitly

4    remember that I used those terms."

5            MR. BOIES:  And can we have the rest of the answer

6    read, Your Honor?  Where he then goes on to say "But, what I am

7    telling you."

8            THE COURT:  Well, I guess one of the problems in

9    reading more is that it just keeps on coming.

10           MR. BOIES:  All I'm asking is to have the com --

11           THE COURT:  Originally all you wanted was the rest of

12   the original answer --

13           MR. BOIES:  And then he read --

14           THE COURT:  -- and now we're going into the rest of

15   the continuation, which was never really a part of the original

16   question.

17           MR. BOIES:  Exactly.  All I'm asking is a complete

18   answer.

19           MR. MAGUIRE:  I'm happy to indulge --

20           THE COURT:  Please do.

21           MR. MAGUIRE:  I'm happy to indulge Mr. Boies.

22           THE COURT:  At some point -- at some point we have to

23   stop this, though.

24           MR. MAGUIRE:  We'll finish up with this, I think by

25   agreement.

Page 176

1           THE COURT:  I think I'm showing my general antipathy

2     to depositions.

3     BY MR. MAGUIRE:

4     Q.   The question:

5     "Q.  Well?

6     "A.  But what I'm telling you is that in every case that we

7     transferred or requested a transfer of assets we were required

8     by Anson to explain to him why we were transferring it, where

9     they were going, and for what reason."

10    Q.   And that is the testimony that you gave, is it not?

11    A.   That is my testimony.

12    Q.   And that is all in connection with this transfer of 269

13    million dollars, isn't that right?

14    A.   That is correct.

15    Q.   And it was with respect to that and every other transfer

16    that you were required to tell Mr. Frelinghuysen what the

17    transfer was and why it was being made, right?

18    A.   That is correct.

19    Q.   And it's with respect to that transfer that we have

20    Barclays' Exhibit 375, in which Mr. Frelinghuysen sent you the

21    instructions and authorization saying that this was being done

22    on an expedited priority basis as part of the transfer of

23    customer accounts to Barclays, correct?

24    A.   That is -- that is what that says.  But as I mentioned

25    that I did discuss with Anson and I did focus on the fact that

Page 177

1    the DTC settlement instructions were those instructions for

2    noncustomer assets.

3    Q.   And that's the second conversation that you believe you

4    had with Mr. Frelinghuysen on the subject of transferring non-

5    PIM assets, correct?

6    A.   It is -- yes, it's a conversation I had with Anson -- Mr.

7    Frelinghuysen.

8    Q.   And there is a third -- that you believe you had a third

9    conversation with Mr. Frelinghuysen that you believe you had on

10   the subject of transferring non-PIM assets, and that's a

11   follow-up conversation that you had with respect to that

12   transfer, right?

13   A.   That is correct.

14   Q.   To make sure that it had settled?

15   A.   To make sure that we had the correct settlement

16   instructions and to determine what we needed to do or what we

17   could do to effect settlement.

18   Q.   But in connection with that follow-up settlement

19   discussion you do not recall discussing the nature of those

20   securities as to whether they were customer or noncustomer?

21   A.   The nature of the conversation or -- the conversation was

22   to discuss with him how to and to ensure we were effecting the

23   delivery of noncustomer securities.  These were going to a

24   noncustomer or a Barclays' proprietary account.

25   Q.   So it's -- well, let me ask you then to turn to your

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 178

1    deposition at page 80, starting at line 7.

2    "Q.  And in this conversation with Mr. Frelinghuysen,

3    conversation number three, did you discuss the nature of those

4    securities as i.e., whether they were customer or noncustomer

5    assets?

6    "A.  I don't remember if I would have mentioned that again.

7    "Q.  Do you remember anything else about conversation number

8    three, sir?

9    "A.  No, I don't."

10   Q.   That was your testimony then, sir, was it not?

11   A.   Yes, it is.

12   Q.   And that was correct, was it not?

13   A.   Yes.

14   Q.   Now, sir, you were asked by your counsel to look at Tab

15   Number 6 in your binder, which I believe is Barclays' Exhibit

16   Number 517.

17   A.   I have it.

18   Q.   You have that before you?

19   A.   Yes, I do.

20   Q.   And that relates to another transfer, right?  That's a

21   transfer of some 160 million dollars of securities, is that

22   correct?

23   A.   That is correct.

24   Q.   And you were asked whether you had a discussion with Mr.

25   Frelinghuysen with respect to that transfer, do you recall

1    that?

2    A.    Yes, I do.

3    Q.    And you were asked specifically whether you had told Mr.

4    Frelinghuysen whether this DTC Account 7256, that's referred to

5    in the body of this, was a Barclays' corporate account in which

6    proprietary noncustomer assets were placed, do you recall that?

7    A.    Yes.

8    Q.    And you said to Mr. Boies in your direct testimony that

9    you had that conversation with Mr. Frelinghuysen the previous

10   Friday, do you recall that?

11   A.    Yes, I do.

12   Q.    Now, in fact, sir, you don't know whether you even had a

13   conversation with Mr. Frelinghuysen about this transfer, isn't

14   that true?

15   A.    About this particular transfer?

16   Q.    Yes.

17   A.    I don't know if I specifically had a conversation about --

18   about this transfer on Monday.  But on the Friday we would have

19   talked about the fact that we were going to be transferring

20   noncustomer proprietary assets.

21   Q.    So if you could turn, sir, to page 82 of your transcript,

22   starting at line 9 -- I'm sorry, at line 12.

23   "Q.  Do you recall whether or not there was a conversation

24   about the 160 million, sir?

25   "A.  I'm not positive if there was about the 160.

08-13555-mg    Doc 11012    Filed 08/25/10    Entered 08/26/10 10:23:58    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 180 of 199

Page 180

1    "Q.  Do you recall any other conversations with Mr.

2    Frelinghuysen that you have not testified to already today

3    about the transfer of noncustomer assets from Lehman to

4    Barclays?

5    "A.  No, I do not."

6    Q.   And that testimony was true, was it not, sir?

7    A.   Yes, it was.  When I spoke with Anson on Friday regarding

8    noncustomer asset transfers I would not have referenced a

9    specific market value at that point.  I would have not have

10   known exactly what we might be transferring.

11   Q.   Now, sir, you never saw the asset purchase agreement or

12   the clarification letter, isn't that right?

13   A.   That is correct.

14   Q.   And you certainly weren't involved in any negotiations

15   concerning the letter agreement or contract that Barclays had

16   with the Depository Trust Clearing Corporation?

17   A.   No, I was not.

18   Q.   And you certainly don't have any personal knowledge as to

19   what assets actually belonged to Barclays and did not belong to

20   Barclays under any of those agreements?

21   A.   No, I did not.

22   Q.   Thank you, sir.

23        MR. MAGUIRE:  I have nothing further, Your Honor.

24        THE COURT:  Any redirect?

25        MR. BOIES:  Yes, Your Honor.

Page 181

1   REDIRECT EXAMINATION

2   BY MR. BOIES:

3   Q.   Counsel showed you the portion of your deposition and

4   suggested to you that when you had -- when this conversation

5   took place with Mr. Hanson (sic) you were just talking about

6   non-PIM assets, do you recall that?

7   A.   Yes, I do.

8   Q.   And he directed your attention to page 63 at line 12, and

9   would you go there, please.  And you had said that you were

10   talking about noncustomer assets, and he was suggesting that

11   you were only talking about non-PIM assets, do you recall that?

12   A.   Yes, I do.

13   Q.   Now, I'd like to direct your attention to the question and

14   answer that's immediately before the question and answer that

15   counsel read you.  And that begins at line 12, on page 62:

16   "Q.   Tell me everything you remember about those conversations

17   that you say happened?

18   "A.   There were noncustomer assets that we were delivering away

19   for prime broker clients.  We had very detailed discussions

20   around how those, and when I refer to noncustomer I'm referring

21   to, broadly, non-PIM customer assets.  We had very detailed

22   discussions around prime broker assets and how those were to be

23   validated and effective, and also discussions with respect to

24   securities or assets that were being purchased by Barclays.  I

25   specifically, specifically recollect and remember this because

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 182

1    at one point I introduced Hanson (sic) to Alastair Blackwell

2    on, I believe it was that Wednesday, after -- I believe it was

3    that Wednesday.  I was asked -- I was introduced to Alastair to

4    Anson specifically so Alastair could have a conversation with

5    Anson regarding the transfer of these noncustomer assets."

6    Q.    Did you give that testimony also, sir?

7    A.    Yes, I did.

8    Q.    Let me ask you to also look at page 135 of your

9    deposition.  And particularly, lines 9 through 16.  And this

10   follows a discussion about a e-mail of September 25th.

11   "Q.  Was it shown to you at this time, sir, did someone print

12   it and show it to you?

13   "A.  I don't remember how it was brought to my attention.  It

14   was brought to my attention that Alastair, you know, as I had

15   mentioned, that Alastair had conversations with Anson regarding

16   the transfer of noncustomer assets.  So in that context it was

17   discussed with me or shown to me."

18   Q.    And did you give that testimony, as well, sir?

19   A.    Yes, I did.

20   Q.    Now counsel showed you Barclays' Exhibit 375, which is at

21   Tab 9 of your book.  And showed you some language about the

22   transfer of customer accounts, do you see that?

23   A.    Yes, I do.

24   Q.    Now, he also asked you to look at Barclays' Exhibit 517,

25   which is behind Tab 6.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 183

1    A.    Yes.

2    Q.    Do you see anything there about the transfer of

3    noncustomer -- I mean -- excuse me.  Do you see anything in

4    Exhibit 517 about the transfer of customer assets?

5    A.    No, I do not.

6    Q.    There's no language here about the transfer of customer

7    assets, is there, sir?

8    A.    No, there's not.

9    Q.    And this talks about the transfer of assets of Lehman

10   Brothers Inc., is that correct?

11   A.    Yes, this is specific language to transfer noncustomer

12   assets.

13   Q.    And Exhibit 514, behind Tab 5.  This is the September 25th

14   e-mail and the form letter that is attached, it is sent from

15   Mr. Frelinghuysen, specifically refers to the transfer of

16   assets of Lehman Brothers Inc.  Is that correct?

17   A.    That is correct.

18   Q.    There's no mention here of customer assets, correct?

19   A.    That is correct.

20   Q.    And just one more.  Exhibit 675, behind Tab 7.  And this,

21   again, talks about the transfer of assets pursuant to the asset

22   purchase agreement, correct?

23   A.    Yes.

24   Q.    And there's no mention here of customer assets, is there,

25   sir?

Page 184

1   A.   No, there is not.

2   Q.   And this was entirely a transfer of noncustomer assets,

3   correct?

4   A.   That is correct.

5            MR. BOIES:  Your Honor, I have no more questions.

6            MR. MAGUIRE:  David?

7            MR. BOIES:  Oh, excuse me.

8            THE COURT:  Apparently you might have one more.

9            MR. BOIES:  I might have.  Your Honor, thank you.

10            No more questions, Your Honor.

11            THE COURT:  Nothing more?  All right.

12            You're excused.  Thank you.

13        (Witness excused)

14            MR. BOIES:  Our next witness is Mr. Exall.  He will be

15   about the same length of time as the last witness.

16            THE COURT:  Covering the same general subject matter?

17            MR. BOIES:  No, a different subject matter but again,

18   it will be a relatively short one.

19            THE COURT:  We're here; let's proceed.

20            MR. BOIES:  Okay.

21            Mr. Paul Exall?  The question is will he come.

22            MR. GAFFEY:  Your Honor, one of my partners is going

23   to cover --

24            THE COURT:  He may be excused.

25        (Pause)

08-13555-mg   Doc 11012   Filed 08/25/10   Entered 08/26/10 10:23:58   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 185 of 199

Page 185

1          THE COURT:  Please raise your right hand.

2      (Witness duly sworn)

3          THE COURT:  Be seated, please.

4    DIRECT EXAMINATION

5    BY MR. BOIES:

6    Q.   Good afternoon, Mr. Exall.

7    A.   Good afternoon.

8    Q.   Could you begin by telling the Court what your present

9    position is?

10   A.   I'm a director within the human resources department of

11   Barclays Capital.  My title is head of compensation analytics

12   of Barclays Capital, Barclays Corporate and Barclays World.

13   Q.   And could you speak into the microphone so we can pick

14   that up?

15   A.   Sorry, is that better?

16   Q.   Yes, thank you.

17       And in that position, could you generally describe your

18   responsibilities?

19   A.   My responsibilities generally relate to assisting

20   management in the initiation, preparation, development,

21   agreement and eventual implementation of all and various

22   compensation strategies across those businesses.

23   Q.   Now, you are familiar with the sales transaction that

24   brings us here -- familiar generally, correct?

25   A.   Yes, I am.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 186

1   Q.   You were not involved in the sale negotiations, correct?

2   A.   No.

3   Q.   Did you come to New York at some point to do work related

4   to the sale?

5   A.   Yes, I did.

6   Q.   And when was that?

7   A.   On or around the 22nd of September, 2008.

8   Q.   And what was the purpose of your coming to New York?

9   A.   Mr. Evans (ph.) requested that I come and assist him in my

10  general responsibilities but specifically in respect of the

11  sale and tracking and monitoring and modeling various

12  commitments that Barclays were taking on as part of the

13  transaction.

14  Q.   And were you aware that Barclays had taken on certain

15  compensation or "comp" obligations under the APA?

16  A.   I had seen a copy of the APA; I saw that there were

17  articles within the version of the APA that I had seen but I

18  had no specific understanding as to what Barclays' obligations

19  were, in fact, under that APA.

20  Q.   Was it your responsibility to develop that understanding

21  or was that somebody else's job?

22  A.   It wasn't my responsibility.

23  Q.   I want to direct your attention to a conversation on -- I

24  believe there is evidence that you had a with a PWC auditor

25  whose first name is Mike and second name I have some difficulty

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 187

1    pronouncing but it starts with a G.

2    A.    I think it's Mike Guarnuccio.

3    Q.    Yes.

4    A.    Yes.

5    Q.    And meaning no disrespect to the gentleman, I'm going to

6    refer to him as "Mike".

7    A.    Right.

8    Q.    Did you have a conversation with Mike concerning the bonus

9    obligation that Barclays had under the APA?

10   A.    I recall that we had a conversation at around the time --

11   around Barclays' overall compensation plans.

12   Q.    And when would that conversation have been?

13   A.    As I said, at around the time of my arrival in New York at

14   the beginning of my work.  As I say, I can't be precise about

15   the dates.  I could not find it in my diary.

16   Q.    And at the time that you had this conversation with Mike,

17   did you have, yourself, an understanding of exactly what

18   Barclays' obligations were?

19   A.    No, I did not.

20   Q.    At the time of that conversation, if Mike understood that

21   you were telling him that Barclays was going to make a two

22   billion dollar payment for bonuses only, not other compensation

23   or severance but for bonuses only, what would your reaction be

24   to that?

25   A.    Sir, could you repeat the question, please?

Page 188

1    Q.   Yes.  If somebody told you that Mike believed that you had

2    told him that Barclays was going to pay two billion dollars for

3    bonuses only, not for other compensation aspects like severance

4    but for bonuses only, what would your reaction be to that?

5    A.   I would be surprised at that.  My immediate reaction would

6    be that he presume -- I believe he would have misinterpreted

7    the extent of my knowledge, or lack thereof, around the

8    obligations under the sale and the APA in general.  And

9    misunderstood or inferred too much from the conversation that

10   we did, in fact, have.

11   Q.   Now, after this period of time when you'd just arrived in

12   New York, did you ultimately come to understand what the two

13   billion dollar figure encompassed?

14   A.   Not -- not in terms of Barclays' obligations under the

15   APA, no.

16   Q.   Because that was not your responsibility?

17   A.   No.

18   Q.   Did PWC ultimately sign off on the accruals that Barclays

19   made in connection with the sales transaction?

20   A.   Yes, I believe I did and that they signed the audit report

21   supporting the report of accounts at Barclays PLC of which that

22   was a part.

23   Q.   And do you know, from your own personal knowledge, what

24   those accounting entries amounted to in terms of the bonus

25   amount that was being paid or accrued?

Page 189

1   A.   Not the bonus amount, no.

2   Q.   Let me ask you to turn to Tab 3 in your book.  And this is

3   Barclays' Exhibit 142A.

4   A.   Um-hum.

5   Q.   And can you identify this document?

6   A.   Yes.  This is the schedule that I was asked to prepare.

7   Q.   And who asked you to prepare this?

8   A.   Gary Romain -- Mr. Gary Romain who works in our finance

9   department.

10  Q.   And what was the purpose of this being prepared, if you

11  know?

12  A.   Gary asked me to prepare the schedule to track -- to

13  identify and track all compensation-related items in terms of

14  compensation delivered or planned to be delivered to former

15  Lehman Brothers employees in respect to their pre-acquisition

16  services.

17  Q.   And when was this prepared?

18  A.   We prepared several iterations of this throughout a period

19  of time.  I don't recall precisely when we began this process

20  but it would have been -- I believe it would have been within

21  the period after -- obviously after the sale had took place but

22  I can't -- I can't be precise, unfortunately.

23  Q.   Now, at the top, there are four columns.  And the third

24  column says "Total Dollars in Millions".  Do you see that?

25  A.   Yes, I do.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 190

1    Q.   And under that there is something that says "OBS

2    Compensation Accrual".  Do you see that?

3    A.   Yes.

4    Q.   And what does that represent?

5    A.   That represents the opening balance sheet compensation

6    accrual.

7    Q.   And this in connection with the APA, is that correct?

8    A.   I was advised to use this by Mr. Romain.

9    Q.   I'm sorry, what?

10   A.   I was advised to use this as a reference point by Mr.

11   Romain for the schedule.

12   Q.   And where it says "Source, APA"?

13   A.   That was what he informed me.

14   Q.   Okay.  So he informed you that this was -- that the APA

15   was the source of this accrual?

16   A.   Yes.

17   Q.   And the amount of this accrual was two billion dollars, is

18   that correct?

19   A.   That's what he informed me, yes.

20   Q.   And did he inform you of all of the other numbers that are

21   here?

22   A.   No.

23   Q.   Who informed you of these numbers?

24   A.   We -- as I mentioned, he requested that I track and

25   collate and aggregate up all items related to pre-employment --

Page 191

1   pre-acquisition services performed by former Lehman Brothers

2   employees.  These items came up as we -- as events unfolded and

3   I had a team of finance professionals and HR professionals that

4   supported me in generating the schedule.

5   Q.   And I want to -- I want to go through them and ask you

6   about some of these specific items.

7   A.   Okay.

8   Q.   First, where it talks about "Pre-22/9 Payroll Items", do

9   you see that?

10  A.   I do.

11  Q.   What does that relate to?

12  A.   Those were -- in substance there were two issues that --

13  that these were items that were paid for the -- to or for the

14  benefit of former Lehman Brothers employees in respect of a

15  pre-acquisition payroll -- or payroll-related item.

16  Q.   And the next item says "Replacement RSUs", do you see

17  that?

18  A.   Yes.

19  Q.   And what does that relate to?

20  A.   Those were cash awards that Barclays gave to former Lehman

21  Brothers employees to replace the lost value of bonus awards

22  that they had received earlier in 2008 from Lehman Brothers.

23  Q.   So was this included as -- is that a bonus item?

24  A.   I would categorize it as such, yes.

25  Q.   The next item says "Bonus Including Social Tax".  And what

Page 192

1    does that relate to?

2    A.    Those were all annual bonus awards made to individuals

3    that were in our compensation database as part of the 2008

4    compensation round at Barclays Capital.

5    Q.    And these are bonuses for the ex-Lehman Brother employees?

6    A.    Absolutely, former Lehman Brother employees, yes.

7    Q.    And then the next one says "IBD Grad Programs", do you see

8    that?

9    A.    I do.

10    Q.    And what does that relate to?

11    A.    Those were the annual bonuses payable to graduates that

12    were on our investment banking graduate program.  But they were

13    former Lehman Brothers graduates that we obviously took on as

14    part of the acquisition.

15    Q.    So these were also bonuses for the former Lehman Brothers

16    personnel?

17    A.    Yes.

18    Q.    And then the next two items are "Severance" and then

19    "Severance Payable in the Future", is that correct?

20    A.    Correct.

21    Q.    And all of these numbers related to the former Lehman

22    Brothers personnel, correct?

23    A.    Yes, all the items on the schedule relate to former Lehman

24    Brothers employees.

25    Q.    The next item says "Payroll Tax and Equity Compensation".

Page 193

1    And what does that relate to?

2    A.   Those are payroll taxes that we had estimated would be

3    payable on the granting of equity compensation awards to former

4    Lehman Brothers employees in respect to their pre-acquisition

5    service.   It's derived from the numbers in the equity column on

6    the schedule and of -- you know, bonus-related in the sense

7    that they're directly linked to the bonuses reflected on the

8    schedule.

9    Q.   So this was part of the cost of the bonuses, is that

10   correct?

11   A.   Yes, it was.

12   Q.   And let me just jump down near the bottom where it says

13   "Payroll Taxes on ISP Awards", you see that?

14   A.   I do.

15   Q.   And was that also a cost of the bonuses?

16   A.   Yes.

17   Q.   And then going back up to where it says "Acquisition

18   Buyout Investing Over Two Years", do you see that?

19   A.   Yes.

20   Q.   And what does that relate to?

21   A.   That related to performance bonus awards that were due and

22   payable to an individual under his contract with Lehman

23   Brothers that Barclays matched as part of the acquisition.

24   Q.   And was that, as with all of these amounts, amounts that

25   related to pre-acquisition services for the former Lehman

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 194

1   Brothers personnel?

2   A.   Yes, absolutely.

3   Q.   And you come down to a total spend of 1.951 billion

4   dollars, is that correct?

5   A.   I see that there, yes.

6   Q.   And it says "Balance left, cash basis forty-nine million

7   dollars", is that correct?

8   A.   Yes.

9           MR. BOIES:  Your Honor, I have no more questions.

10          THE COURT:  Any cross-examination?

11          MR. GAFFEY:  Your Honor, I have about an hour of

12  cross-examination for this witness.  I don't know how you want

13  to proceed.

14          THE COURT:  If you have an hour, I think we're going

15  to start tomorrow morning at 9:30 with this witness.

16          MR. GAFFEY:  Okay, Your Honor.

17          THE COURT:  And let me just ask again about what the

18  schedule for tomorrow will be after this witness.

19          MR. BOIES:  Taking Your Honor's comments to heart, I

20  think we will see if we can arrange for Ms. Leventhal to appear

21  alive as opposed to playing her deposition.  I don't know

22  whether that's going to be possible or not, but we're at least

23  going to explore that.

24          In the meantime, we're going to begin tomorrow with

25  Mr. Rosen followed by Mr. King after the completion, of course,

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 195

1    of this witness.

2           THE COURT:  Okay, fine.

3           Anything more?

4           MR. GAFFEY:  Your Honor, maybe now, maybe at some

5    point -- in our next phase, we're going to have experts.  And

6    when we can get -- and we don't need an answer now but when we

7    get an idea of when it is Barclays will be finished -- we need

8    to schedule them.  And rather than have them sit around and run

9    a clock, it looks to me as if Barclays is aiming to finish by

10   the 7th or so and then on the schedule that Your Honor gave us

11   there was the 10th, if needed, and then the 20th of September.

12          What I wanted to propose, if I could, is that it might

13   make sense to just decided now that the expert phase'll start

14   then and we can -- we can then know when these -- our experts

15   need to be here.

16          MR. BOIES:  It's starting on the 20th?

17          MR. GAFFEY:  Yes.

18          MR. BOIES:  Yeah, I think that works, Your Honor.

19          The one thing I want to take an overnight to think

20   about is the implications of the Court's views in terms of the

21   remaining depositions that we were going to play.  Because we

22   thought it would be much more efficient to do so, we had -- as

23   the movants had -- I mean movants offered a number of

24   depositions and we were planning to offer a number of

25   depositions as well.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 196

1        THE COURT:  Let me be clear.  My comments were

2   particularly focused on two witnesses who I considered to be

3   important, witnesses who are both local and who have previously

4   physically shown up in court on multiple occasions; Mr. Ridings

5   and Ms. Leventhal.  I'm not making a general statement designed

6   to either prolong or make more costly the presentation of

7   evidence that can be conveniently presented by means of

8   deposition excerpts.  There reference is, as much as anything,

9   to my personal surprise that these two witnesses were being

10  presented by means of video deposition.  And I took the

11  occasion of the objection made to the Leventhal deposition by

12  video to express a point of view, which is personal to me, but

13  by no means intended to alter trial preparation or trial

14  strategy for any party.

15        I did note, and I meant it, that because there was

16  obvious disagreement concerning the Leventhal deposition in

17  particular it appeared to be, as much as anything, a preference

18  of Barclays' not to have that witness present live which led to

19  the use of the deposition testimony which was opposed by

20  counsel for Lehman.  That may not be the case and my

21  conclusions may be completely inapposite.

22        Nonetheless, it did provide an opportunity for me to

23  say that generally speaking having sat through, as I think I

24  expressed to all counsel at the outset, weeks and weeks of

25  video deposition testimony in the context of another major

Page 197

1   trial a number of years ago, I have come to the conclusion that

2   the presentation of evidence by means of video is not optimal.

3   For any party.  And it's certainly not optimal for me.

4        And so if anybody believes the testimony of a

5   particular witness is likely to be significant to the finder of

6   fact, and that witness is alive, cooperative or within subpoena

7   power, that witness should be here.  Live.  Because I will

8   necessarily assume that any witness who is presented by means

9   of deposition is viewed by the parties as ultimately less

10  significant.

11       Now, if you tell me I'm wrong in that, I'll certainly

12  give reconsideration to all of those designations I have in my

13  chambers.  But I have concluded that every single one of those

14  designations ultimately is less important to me than anything I

15  hear here live.  If you want to disabuse me of that, you don't

16  have to do that now.  Okay?

17       MR. MAGUIRE:  Thank you, Your Honor.

18       THE COURT:  We'll see you tomorrow morning at 9:30.

19       (Proceedings concluded at 5:20 PM)

20

21

22

23

24

25

Page 198

1                          I N D E X

2

3                      T E S T I M O N Y

4    WITNESS                EXAM BY            PAGE      LINE

5    Mark Shapiro           Mr. Boies           7         7

6    Mark Shapiro           Mr. Gaffey         61         7

7    Mark Shapiro           Mr. Boies         119        13

8    Neal Ullman            Mr. Boies         154        25

9    Neal Ullman            Mr. Maguire       164        25

10   Neal Ullman            Mr. Boies         181         3

11   Paul Exall             Mr. Boies         185         6

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 199

1

2                        C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    _____

8    Clara Rubin

9    AAERT Certified Electronic Transcriber (CET**D-491)

10   Also transcribed by:    Lisa Bar-Leib (CET**D-486)

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date: August 25, 2010

18

19

20

21

22

23

24

25