Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC., et al.

9               Debtors.

10   - - - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14               Debtor.

15   - - - - - - - - - - - - - - - - - - - - - -x

16               United States Bankruptcy Court

17               One Bowling Green

18               New York, New York

19

20               August 24, 2010

21               9:34 AM

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

Page 2

1

2      CONTINUED EVIDENTIARY HEARING re (i) Motion of Debtor to Modify

3      the September 20, 2008 Sale Order and Granting Other Relief;

4      (ii) Motion of the Trustee for Relief Pursuant to the Sale

5      Orders or, Alternatively, for Certain Limited Relief Under Rule

6      60(b); (iii) the Motion of Official Committee of Unsecured

7      Creditors of Lehman Brothers Holdings Inc., Authorizing and

8      Approving (A) Sale of Purchased Assets Free and Clear of Liens

9      and Other Interests and (B) Assumption and Assignment of

10     Executory Contracts and Unexpired Leases, Dated September 20,

11     2008 (and Related SIPA Sale Order) and Joinder in Debtors' and

12     SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify

13     Sale Order; (iv) All Joinders Thereto and Related Adversary

14     Proceedings; and (v) Motion of Barclays Capital Inc. to Enforce

15     the Sale Order and Secure Delivery of All Undelivered Assets

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Lisa Bar-Leib

Page 3

1

2    A P P E A R A N C E S :

3    JONES DAY

4         Attorneys for the Movant, LBHI

5         222 East 41st Street

6         New York, NY 10017

7

8    BY:   ROBERT W. GAFFEY, ESQ.

9         WILLIAM J. HINE, ESQ.

10

11   HUGHES HUBBARD & REED LLP

12        Attorneys for Movant, James W. Giddens, SIPC Trustee

13        One Battery Park Plaza

14        New York, NY 10004

15

16   BY:   WILLIAM R. MAGUIRE, ESQ.

17        NEIL J. OXFORD, ESQ.

18

19

20

21

22

23

24

25

Page 4

1

2    QUINN EMANUEL URQUHART & SULLIVAN, LLP

3         Attorneys for the Movant, Official Committee of Unsecured

4          Creditors

5         51 Madison Avenue

6         22nd Floor

7         New York, NY 10010

8

9    BY:   JAMES C. TECCE, ESQ.

10

11   BOIES, SCHILLER & FLEXNER LLP

12        Attorneys for Barclays Capital, Inc.

13        333 Main Street

14        Armonk, NY 10504

15

16   BY:   DAVID BOIES, ESQ.

17        JONATHAN D. SCHILLER, ESQ.

18

19   BOIES, SCHILLER & FLEXNER LLP

20        Attorneys for Barclays Capital, Inc.

21        10 North Pearl Street

22        4th Floor

23        Albany, NY 10504

24

25   BY:   TRICIA J. BLOOMER, ESQ.

Page 5

1

2   STUTMAN TREISTER & GLATT LLP

3           Attorneys for Elliott Management

4           1901 Avenue of the Stars

5           12th Floor

6           Los Angeles, CA 90067

7

8   BY:    WHITMAN L. HOLT, ESQ.

9           REBECCA S. REVICH, ESQ.

10          (TELEPHONICALLY)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 6 of 265

Page 6

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Be seated, please.  Good morning.

 3            MR. BOIES:  Good morning, Your Honor.  Your Honor, we

 4    have one housekeeping matter at the beginning.  We've conferred

 5    about an issue with respect to the admissibility of certain

 6    data called GFS data.  There is going to be a witness presented

 7    by deposition by the name of Uma Krishnan who will address

 8    that.  What we have agreed is that since there will be an

 9    objection to that GFS data that we will resolve that by one of

10    two ways.  Either we will make Uma Krishnan available in court

11    live for voir dire at the time that that GFS data is offered.

12    Or, we will, in advance of offering that GFS data, allow

13    sufficient time for both sides to present letter briefs on

14    admissibility to the Court so that the Court will have an

15    opportunity before the issue is presented to have the letter

16    briefs for consideration.

17            THE COURT:  I understood everything that you said

18    except that I don't know what GFS data is nor do I understand

19    in what respect the GFS data connects to any issue in the case.

20            MR. BOIES:  We understand that, Your Honor.  And we

21    will present that at the time that it's offered although I will

22    say that, very generally, and I'm probably -- neither one of us

23    is probably the right person to actually get into the details

24    of GFS data.  But it relates to valuation.  It was a system

25    that contain valuation for securities at Lehman.  And the
```

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 7 of 265

Page 7

1    question is going to be whether the GFS data is or is not data

2    that is relevant to determining what Lehman's marks were on

3    September 12, September 15th, 16th and the like and whether it

4    is something that can be reliably considered by the Court or

5    not.

6              THE COURT:  And the witness whose deposition might be

7    offered or whose live testimony might be offered has what

8    connection to this data?

9              MR. BOIES:  She is somebody who is responsible and

10   knowledgeable, one or the other or both, with respect to the

11   data.  And she will describe that in the deposition.  And we

12   can provide further details to the Court at the time.  My point

13   today is not to try to explain all of this to the Court but

14   simply to advise the Court and record the agreement that

15   counsel has made as to how we're going to treat this issue.

16             THE COURT:  Okay.  And when is expected that this

17   issue will be ripe for presentation?

18             MR. BOIES:  I believe -- Your Honor, could I just get

19   my schedule for one second?

20             THE COURT:  Sure.

21             MR. BOIES:  I believe it's around September --

22        (Pause)

23             MR. BOIES:  September 7th, Your Honor.  Possibly

24   September 10th.  Probably September 7th.

25             THE COURT:  Okay.  I'll look forward to that.

Page 8

1          MR. BOIES:  Thank you very much, Your Honor.

2          MR. HINE:  Good morning, Your Honor.  My name is

3    William Hine from Jones Day on behalf of LBHI for the record.

4    And I'm prepared, if it please the Court, to continue with my

5    cross-examination of Mr. Exall from yesterday.

6          THE COURT:  Fine.

7          MR. HINE:  Your Honor, I placed on your bench and in

8    front of the witness a green binder of documents that I plan on

9    using in my cross-examination if that's okay.

10         THE COURT:  Okay.

11         MR. HINE:  May I proceed?

12         THE COURT:  Please.  And please speak up.

13         MR. HINE:  Okay, Your Honor.

14    CROSS-EXAMINATION

15    BY MR. HINE:

16    Q.   Good morning, Mr. Exall.

17    A.   Good morning.

18    Q.   My name is Bill Hine from Jones Day.  We've met previously

19    at your deposition, if you recall.

20    A.   I do.

21    Q.   I want to take you back to the testimony you gave

22    yesterday about a chart that you prepared concerning payments

23    that Barclays has made of various kinds to former Lehman

24    employees who have moved to Barclays.  Do you recall that

25    testimony?

Page 9

1    A.    I recall it, yes.

2    Q.    And if I could just show a copy of M107 just to make sure

3    we're all talking about the same chart.  Yesterday, you

4    testified about a chart which was marked as BCI 142A which had

5    some red coloring.  In your book is a copy of M107.  Could you

6    please just verify that we're talking about the same chart?

7    A.    Could you refer me to the copy in the binder, please,

8    that's -- I can't see it on the screen properly.

9    Q.    Okay.  It's in your binder, M107.

10   A.    M1 -- okay.  Sorry.  Sorry.  Is it the big binder or the

11   little binder?

12   Q.    Yes, the big binder.  It should be marked as M107.

13   A.    Oh.  Oh yes.  I see it.  Yes, I recognize the schedule.

14   Q.    And that schedule comes to a number of 1.951 billion in

15   total spent just like the schedule you talked about yesterday,

16   correct?

17   A.    That's correct.

18   Q.    Okay.  And as I understood your testimony yesterday,

19   Barclays' position is that this chart demonstrates that it is

20   complied with all its obligations with respect to paying former

21   Lehman employees under the APA, is that right?

22        MR. BOIES:  Objection, Your Honor.  I don't think he

23   was speaking about Barclays' position in this litigation.  He

24   was simply testifying as to what the chart was.

25        THE COURT:  The objection is sustained as it relates

Page 10

1    to a litigation position.  We're going to limit our questions

2    to the chart.

3              MR. HINE:  Okay, Your Honor.  You can take the chart

4    down.

5    Q.   Mr. Exall, you were designated as a 30(b)(6) witness in

6    this case with respect to bonus and severance payments made to

7    former Lehman employees who came over to Barclays, isn't that

8    right?

9    A.   I believe that was the categorization of my witness in

10   relation to the schedule that was prepared.

11   Q.   Okay.  And let's just take a look at your deposition

12   notice -- or your 30(b)(6) notice that relates to you.

13             MR. HINE:  Could you please put up M766?

14   Q.   And that's in your binder as well, Mr. Exall.  M766.

15   A.   766.  Bear with me.  Okay.

16   Q.   You recognize this document, Mr. Exall?

17        (Pause)

18   A.   I may have seen it.

19   Q.   Okay.  You saw this before your deposition, correct?

20   A.   I don't specifically recall it but --

21   Q.   Okay.  Any reason to doubt that this is the deposition --

22   30(b)(6) deposition notice to which Barclays was responding

23   when they designated you as their witness on bonus and

24   severance payments?

25   A.   I have no reason to doubt it, no.

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 11 of 265

Page 11

1    Q.   Okay.  And you generally reviewed this document before

2    your deposition, right?

3    A.   I don't specifically recall it but I probably did, yes.

4    Q.   Okay.  Well, you understood you were being deposed as a

5    30(b)(6) witness, correct?

6    A.   Yeah.  I recall the phrase and I recall discussion around

7    what that meant, yes.

8    Q.   Okay.  And just for clarity sake, could you please turn to

9    Schedule A of this document?

10   A.   Okay.

11   Q.   And you recognize that as the topics on which you were

12   designated as a 30(b)(6) witness, correct?

13   A.   It makes sense to me.

14   Q.   Excuse me?

15   A.   It does make sense to me, yes.

16   Q.   Okay.

17          MR. HINE:  Your Honor, we'd move this document into

18   evidence.

19          MR. BOIES:  No objection, Your Honor.

20          THE COURT:  Fine.  It's admitted.

21   (Movants' Exhibit 107, deposition notice designating Paul Exall

22   as Barclays' 30(b)(6) witness on bonus and severance payments,

23   was hereby received into evidence as of this date.)

24   Q.   Just for a point of clarity, Mr. Exall, you'll see on

25   Schedule A there's a Bates number, what we call a Bates number

Page 12

1    referring to a particular spreadsheet.  Do you see that?

2    A.    Could you highlight it for me, please?

3    Q.    About the third line down, it talks about a spreadsheet

4    produced by Barclays and numbered BCI --

5    A.    Yes.

6    Q.    -- EX000077287.  Do you see that?

7    A.    I see that.

8    Q.    And now that is not the same Bates number on the M107 that

9    we just looked at.

10   A.    Okay.

11   Q.    Correct?

12   A.    If you say so.

13   Q.    Okay.  Well, let's look at M107 again.  You'll see the

14   number in the lower right-hand corner.  It's a different

15   number.

16   A.    Yes.

17   Q.    You might want to keep your finger on the M107 tab --

18   A.    Okay.

19   Q.    -- 'cause we'll be going back to it.  I just want to

20   clarify that apparent discrepancy.  The reason the numbers are

21   different is because M107 is an updated version of an earlier

22   spreadsheet that you sent -- prepared in connection with this

23   case, right?

24   A.    That's correct.

25   Q.    And so, the earlier version was sent to the movants and

Page 13

1   that was what is referenced in the 30(b)(6) notice, right?

2   A.   I recall that there were two schedules.  And this one here

3   is the updated one, yes.

4   Q.   Okay.  So M107 is the updated version, correct?

5   A.   Yes.

6   Q.   And that's the version about which you testified at your

7   deposition, correct?

8   A.   That's correct.  I recall the other one was -- we

9   discussed that at the deposition, yeah.

10  Q.   It was superseded and M107 replaced the one that was

11  referred to --

12  A.   Yes.

13  Q.   -- in the deposition notice, is that right?

14  A.   Yes.  That's accurate.

15  Q.   Okay.

16       MR. HINE:  You can take that down, please.

17  Q.   Now, Mr. Exall, understanding that you were designated for

18  certain topics as a 30(b)(6) witness, I just want to go over a

19  little bit of your background.  You had no role whatsoever in

20  the negotiations surrounding the sale transaction between

21  Lehman and Barclays, is that right?

22  A.   I did not have any role, no.

23  Q.   Right.  Okay.  So you had no role in negotiating the

24  compensation provisions that are embodied in the asset purchase

25  agreement, correct?

Page 14

1    A.    No.

2    Q.    Okay.  You had no role in disclosures that were made to

3    the Court about compensation issues, is that right?

4    A.    No.  I was not involved.

5    Q.    Okay.  And you weren't at any of the sale hearings -- the

6    hearing on September 19th, correct?

7    A.    No.  I was not there.

8    Q.    In fact, you weren't even in New York then, right?

9    A.    That's my recollection.  I was I London, yes.

10   Q.    You came to New York sometime around the 21st or 22nd of

11   September, is that right?

12   A.    I believe I landed Sunday -- Sunday evening, yes.

13   Q.    Okay.

14   A.    The 21st.

15   Q.    So even after you came to New York, you didn't review

16   copies of the clarification letter that relates to the

17   Lehman/Barclays transaction, correct?

18   A.    That's correct.

19   Q.    Okay.  So it's safe to say you have no first-hand

20   knowledge about what exactly took place and the negotiations

21   between the parties to the sale transaction right?

22   A.    I have no first-hand knowledge of the events at the time,

23   yeah.

24   Q.    Right.  And so if you wanted to learn what had happened in

25   those negotiations, you would have to confer with someone who

Page 15

1     was actually involved, right?

2     A.    That would be correct.

3     Q.    Okay.  And you would necessarily defer to someone who was

4     involved in the negotiations if you had to develop an

5     understanding of the intent of the parties and what took place

6     in those negotiations.  Isn't that fair to say?

7     A.    It's fair to say.  If I had a question of events at the

8     time, I would have discussed those, if relevant, with people

9     involved, yes.

10    Q.    Right.  Right.  Now when you did come over to New York in

11    late September of 2008, you were asked to undertake a role in

12    tracking, monitoring and modeling how much money Barclays was

13    paying to former Lehman employees who came over to Barclays,

14    right?

15    A.    Yes.  That was my functions, yes.

16    Q.    Okay.  That's one of the reasons you were asked to come

17    over here, correct?

18    A.    That was one of the reasons, yes.

19    Q.    Okay.  And on or about September 22nd was the first time

20    you were handed a copy of the asset purchase agreement,

21    correct?

22    A.    I believe so, yes.

23    Q.    Okay.  And Mr. Romaine gave you a copy of that agreement?

24    A.    He sent me a copy of -- and I don't -- I'm not certain

25    whether it was the final version, but he sent me a copy

Page 16

1   thereof, yes.

2   Q.   He thought you would need that in connection with this

3   function you were going to perform for Barclays, right?

4   A.   That's correct.

5   Q.   Okay.  And you were also given a copy of the September

6   16th financial schedule that's referred to in the APA?

7   A.   I was given the schedule which when I asked -- sorry.  Let

8   me start that again.  I asked for the schedule referred to in

9   Article 9 of the draft that I had seen.

10  Q.   Okay.

11  A.   And I was given a schedule that was purported to be that

12  schedule referred to.

13  Q.   Okay.  So you read the asset purchase agreement and you

14  saw in Article 9 a reference to a schedule and you asked for a

15  copy?

16  A.   That's correct.

17  Q.   Okay.  And Mr. Clackson (ph.) gave you a copy of that

18  schedule?

19  A.   I believe it was Mr. Clackson, yes.

20  Q.   And Mr. Clackson represented to you that that was the

21  schedule referred to in Section 9.1(c) of the APA, isn't that

22  right?

23  A.   I don't recall exactly what he said to me about it, but I

24  had asked for a copy of that schedule and that's what I

25  received.

1    Q.   But in fact -- well -- it was represented to you -- isn't

2    it correct that that was the schedule that was referred to in

3    Section 9.1(c) of the APA, right?

4    A.   As I said, I requested a copy of the schedule referred to

5    in Article 9 and that's what I received from finance.

6    Q.   Okay.  Mr. Exall, could you turn to -- in your binder is a

7    copy of the transcript from your deposition.

8    A.   Sure.

9    Q.   And I refer you to page 38.

10   A.   Sorry.  Where --

11   Q.   Page 38.  Should be a tab marked "Deposition".

12   A.   Page 38?

13   Q.   Page 38.  And you'll see a series of questions starting

14   on -- let's go to line 2.  You'll see -- well, I'm sorry.  I

15   have to go to the prior page.  I apologize.  Page 37 on line

16   22.  Excuse me.

17   A.   Yes.

18   Q.   And you'll see we're talking about the schedule and I ask:

19        "Okay.  Who gave you that schedule?"

20   "A.   Mr. Clackson passed me the schedule."

21        Now if we continue on to the next page:

22   "Q.   What did he tell you about it?

23   "A.   He represented this as being the schedule referred to in

24   the APA."

25        Now that's the testimony that you gave under oath at your

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 18 of 265

Page 18

1    deposition, is that right?

2    A.    Yes.

3    Q.    Okay.  And that was true testimony when you gave it?

4    A.    Yes.  That's my testimony.

5    Q.    Okay.

6    A.    I would add that further on, it states that I don't recall

7    what he told me about it.

8    Q.    I understand.

9         MR. HINE:  Now can we put up Exhibit M-2, Steve?

10   Q.    If you turn in your binder to Exhibit M2, Mr. --

11   A.    M2?

12   Q.    M2, yes.

13   A.    Okay.

14   Q.    And can you confirm that that is, in fact, the copy of the

15   schedule that Mr. Clackson gave you?

16   A.    I believe that's the schedule that was passed to me, yes.

17   Q.    Okay.  And in performing this function, you were -- in

18   tracking payments to former Lehman employees, you operated

19   under the assumption that that was the schedule referred to in

20   Section 9.1(c) of the APA, right?

21   A.    No.  I didn't have a real view as to what the schedule was

22   that related to Article 9.  It was unclear to me in that the

23   draft of the APA that I was reading referred to a schedule that

24   had been initialed by two parties.  This has only been

25   initialed by one.  The -- Article 9 also referred to bonus on

Page 19

 1    several occasions.  This schedule doesn't have the word bonus

 2    on it.  I was unclear as to what the schedule actually

 3    represented.  And in fact, it was not necessary for me to

 4    understand that for the purposes of my role.

 5    Q.   I understand that's your position.  But my question is

 6    were you given any other schedules?

 7    A.    In relation to the APA?

 8    Q.   In relation to your work in tracking payments to Barclays'

 9    employees -- or Lehman employees --

10    A.   I received --

11    Q.   -- under the APA.

12    A.   On a day to day basis, I received many schedules on many

13    topics.

14    Q.   Were you given any schedules that were represented to you

15    as that -- as referred to in Section 9.1(c) of the APA?

16    A.   No.  This is the only schedule that was passed to me.

17    Q.   Okay.  Now let's look over a copy of the APA, please,

18    which is M1.  Now this is the copy of the APA that you were

19    given, Mr. Exall?

20    A.   I don't recall if this is the specific copy --

21    Q.   Okay.

22    A.   -- but I received a draft version of it, as I said.

23    Q.   Okay.  In general, you reviewed this agreement generally.

24    But is it fair to say you focused on Section 9.1 of the APA?

25    A.   It'll be fair to say I read Article 9 as you've described

Page 20

1    and, for wont of a better word, skimmed the rest.

2    Q.    Fair enough.  And the reason you read Article 9 is 'cause

3    that related to the work you were going to be doing in tracking

4    payments to former Lehman employees, right?

5    A.    No.  Mr. Romaine directed me to Article 9 to say this may

6    be something that you may be interested in.

7    Q.    Okay.  And so you -- Article 9 or the APA became kind of a

8    point of reference for you in tracking the payments to former

9    Lehman employees, right?

10   A.    No, it did not.

11   Q.    It did not?  Can you turn in your deposition to page 17.4

12   --

13   A.    17?

14   Q.    -- 17, please?

15   A.    17.

16   Q.    17 at the very bottom starting on line 25.  I ask:

17        "Okay.  And when were you passed that agreement?

18   "A.  I can't recall the exact date but it would have been

19   around the 22nd of September or shortly thereafter.

20   "Q.  Okay.  And did you need to consult that agreement to do

21   your job from then on?

22   "A.  It was a point of reference, yes."

23        That's the testimony you gave at your deposition, right?

24   A.    Okay.

25   Q.    So the APA was a point of reference for your future work,

LEHMAN BROTHERS HOLDINGS INC., et al.

1    right?

2    A.    Apologies for the previous -- but yes.  I read it.  It

3    became part of my understanding.  And it -- and from then on,

4    it did not play a major part in what I actually did.

5    Q.    Right.  But I -- and I understand you testified yesterday

6    that you didn't have a specific understanding of the exact

7    provisions of the APA as they relate to compensation, right?

8    A.    No.

9    Q.    No, you did not testify to that effect or --

10   A.    No.  I -- in reading Article 9 and referencing the

11   schedule that was passed to me, I had no clear understanding of

12   what Barclays' obligations may or may not have been under the

13   APA.

14   Q.    You didn't have a legal understanding, right?

15   A.    No legal --

16   Q.    It's fair to say you had a general familiarity with

17   Article 9, correct?

18   A.    I read the clause.

19   Q.    Okay.  So when you're doing your chart, you have to know,

20   for example, what's a bonus and what's a severance, right, in

21   order to prepare your chart, correct?

22   A.    I do know what a bonus and what a severance is.

23   Q.    Yeah, 'cause you have to know that.  You have to know the

24   cutoff dates for bonuses and severance that are set forth in

25   Article 9 in order to determine whether to put those payments

Page 22

1    on your chart, isn't that right?

2    A.   No.  Mr. Romaine and I had discussions over the time.  And

3    I came to learn that the way Barclays were accounting for the

4    transaction -- and he requested that I track all compensation

5    payments made to former Lehman Brothers employees in relation

6    to their pre-acquisition services.  And when I say

7    compensation, I mean all forms of compensation as I would

8    understand that.

9    Q.   Okay.  And you were tracking pre-acquisition services

10   because those are the ones that are discussed in Article 9 of

11   the APA, right?

12   A.   No.  I was tracking pre-acquisition services because Mr.

13   Romaine requested that I do so.

14   Q.   So it's your testimony that you really have absolutely no

15   understanding of the provisions of Article 9 in connection with

16   doing the job that you did?

17   A.   I felt that having read Article 9 and the clarity that I

18   did not take from it, I felt that it was not relevant to the

19   job that I was there to perform.  And ultimately, it became a

20   point of interest rather than something that I referred to to

21   do my job.

22   Q.   Okay.  Let's take a look at Article 9 for a minute.

23          MR. HINE:  Could you please put up Section 9.1(b),

24   Steve?

25   Q.   That's Movants' -- M1.

1   A.   M1, yeah.

2   Q.   I believe it's on page 34.  Now, Mr. Exall, when you

3   reviewed the APA or Article 9, you understood this provision to

4   be relating to the severance payments that would purport to be

5   made to former Lehman employees, correct?

6   A.   I see the words "severance payments" in this clause.

7   Q.   Okay.  And this clause provides that in the event of a

8   reduction in force or a job elimination, right, the qualified

9   transferred employees would be entitled to some form of

10  severance no less favorable than what they would have received

11  under the Lehman plan, isn't that right?

12  A.   I don't have a legal view as to what this clause means.

13  Q.   Well, you did review it, right?  That's what it says, is

14  that right?

15  A.   It doesn't quite say what you said.

16  Q.   Okay.  It relates to severance, isn't that right, Mr.

17  Exall?

18  A.   I see the words "severance payments" in the clause.

19  Q.   And you nowhere see the phrase "bonus" in this

20  subparagraph, do you?

21  A.   Sorry.  Do I see the word "bonus" in this paragraph?

22  Q.   Yeah.  Do you see the word "bonus" in subparagraph (b)?

23  A.   Excuse me.  Let me just read the whole thing.

24       (Pause)

25  A.   No.  I do not see the word "bonus".

Page 24

1    Q.    Okay.  Now let's turn to paragraph (c), subparagraph (c),

2    9.1(c), which is the next page.

3    A.    Excuse me.

4         (Pause)

5    Q.    And you'll agree with me that this paragraph relates to

6    the payment of annual bonuses, isn't that right?

7    A.    The words "annual bonuses" are shown in this clause, Yes.

8    Q.    Okay.  And you understand based on your employment in the

9    human resources field that there's a difference between

10   severance and a bonus, right, in general?

11   A.    Sorry.  Can you repeat that question?

12   Q.    Well, based on your experience in human resources, a

13   severance is a payment that's given to people who are laid off

14   or terminated so that they can transition to a new job, as a

15   general matter, isn't that true?

16   A.    As a general matter, that would be true in the general

17   sense, although I would follow on to say that oftentimes when

18   negotiating settlements with individuals, their severance

19   arrangements will most likely take some consideration of what

20   their bonus had been in the prior year --

21   Q.    Sure.

22   A.    -- and provide some compensation for that.

23   Q.    So that's the level of severance.  But the actual -- what

24   a severance is, is basically a transition payment to help

25   people move on to a new job, is that right?

Page 25

1    A.   It feels like an acceptable definition.  There is no

2    specific definition of severance --

3    Q.   I understand.

4    A.   -- other than what's embodied in each firm's practices,

5    yes.

6    Q.   I understand.  And can we go back to 9.1(b), the provision

7    on severances?  I draw your attention to the opening phrase

8    which says "Without limiting any additional rights that each

9    transferred employee may have" and then it goes on to say that

10   the purchaser shall pay severance.  Do you see that opening

11   phrase?

12   A.   I see the phrase, yes.

13   Q.   When you reviewed this document in September of 2008, you

14   understood that to mean that a severed employee would be able

15   to get a severance payment from Barclays but they could also

16   collect on any other additional rights or benefits that they

17   might be entitled to, isn't that right?

18   A.   I don't particularly have a view as to what that means.

19   Q.   You have no idea what that means?

20   A.   I'm not a lawyer.

21   Q.   Okay.

22        MR. HINE:  Let's go back to 9.1(c), Steve.

23   Q.   Now, in general, a bonus payment is -- again, based on

24   your experience as a employee in human resources for a number

25   of years, a bonus is typically a payment that's made on a

Page 26

1    periodic basis to incentivize employees to bigger and better

2    things later, isn't that right?

3    A.   I prefer to use the term personally "incentive

4    compensation".

5    Q.   Okay.

6    A.   It's compensation due and payable for services rendered

7    during a period of employment that is variable incentive in the

8    sense that -- you know, it's for -- if you do a good job, you

9    get paid; if you don't do your job --

10   Q.   Sure.

11   A.   -- you don't get paid.

12   Q.   Sure.  And, in fact, in the fourth line of this paragraph,

13   we see the phrase "incentive compensation", right?

14   A.   I see that phrase.

15   Q.   Okay.  And it says so a bonus -- in the definition of

16   bonuses, it uses the phrase "incentive compensation but not

17   base salary".  Do you see that?

18   A.   I see that.

19   Q.   And based on your view of the document in September 2008,

20   you understood that's what the bonuses were to entail,

21   correct --

22   A.   As I --

23   Q.   -- in some form?

24   A.   As I said, I do not particularly have an understanding as

25   to what Barclays' obligations are under this APA at all.

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 27 of 265

Page 27

1    Q.   I understand.  Okay.  You will agree with me also, though,

2    that nowhere in paragraph (c) -- subparagraph (c) is the word

3    "severance" used, is that right?

4    A.   Let me just take a read --

5         (Pause)

6    A.   The word "severance" does not appear in this clause.

7    Q.   And you would agree with me that severance payments don't

8    incentivize employees for future performance because, by

9    definition, they've already been laid off, correct?

10   A.   Certainly, they would not be performing functions for the

11   firm at all, yes.

12   Q.   Correct.  After they're laid off, correct?

13   A.   Yes, but it is a form of compensation for --

14   Q.   I understand.

15   A.   -- services rendered.

16   Q.   Fair enough.  Now you'll see in this provision, there's

17   also a reference to the financial statement that -- or the

18   financial schedule that we talked about earlier, right?

19   A.   I see that reference, yes.

20   Q.   Okay.  And you understood that after discussions with Mr.

21   Clackson that that was the document that we talked about

22   earlier, correct, the M2?

23   A.   I will say that I requested the schedule from Finance and

24   that's what I got.  I don't recall what Mr. Clackson

25   particularly said about it.

Page 28

1    Q.   Got it.  And you understood that that schedule had a two

2    billion dollar number for a comp, correct?

3    A.   I see the word "comp" on the schedule and an amount of two

4    billion dollars, yes.

5    Q.   Okay.  And you would agree with me that while paragraph

6    9.1(c) refers to that schedule, there's no reference to that

7    financial schedule, or any financial schedule, in 9.1(b), isn't

8    that right?  The provision dealing with severance?

9    A.   There's no reference to a financial schedule in 9.1(b), I

10   don't believe.

11   Q.   Correct.

12   A.   As I said before, I'm not sure that the schedule that was

13   passed to me is, in fact, the schedule referred to in 9.1(c).

14   Q.   That wasn't my question.  I understand that.

15   A.   I notice --

16   Q.   I understand that.  But you will agree there's no

17   financial schedule referred to in 9.1(b), correct?  And that's

18   the provision dealing with severance.

19   A.   Correct.  There's no reference to any financial schedule.

20   Q.   Okay.  Let me draw your attention to the verb used in

21   9.1(c) for a moment.  You see the opening line has the verb

22   "shall" or "shall cause"?  Do you see that?

23   A.   I do.

24   Q.   And when you reviewed this document in September of 2008,

25   you understood the word "shall" to be imposing a mandatory

1    obligation on Barclays, right?

2    A.    I have no view as to what Barclays' mandatory or otherwise

3    obligations under this contract may or may not have been.

4    Q.    So --

5    A.    I have no interpretation of this.

6    Q.    -- you have no idea what "shall" means?

7    A.    Not in a legal sense.

8    Q.    Okay, but in a general sense.

9    A.    I know what the verb means, yes.

10    Q.    Okay.  Well, it doesn't -- it suggests that something's

11    required, isn't that right?

12    A.    In English, yes.

13    Q.    You would agree with that?  Okay.  And so to the extent

14    Barclays' counsel in this case submitted papers to the Court

15    suggesting that it was not required for them to pay bonuses,

16    that would just be incorrect, right?

17    A.    I can't pass a view on counsel's arguments.  I'm not a

18    lawyer.

19    Q.    Based on your understanding, Barclays had to pay some

20    bonuses, right?

21    A.    I don't -- I do not know what this clause obligates

22    Barclays to do, but I understand that there was arrangements in

23    place to compensate former Lehman Brothers employees --

24    Q.    You operated --

25    A.    -- for pre-acquisition services.

Page 30

```
 1   Q.   Okay.  You operated on the assumption that it was

 2   mandatory for Barclays to make some compensation payments to

 3   Lehman employees, right?

 4   A.   Could you repeat the question?

 5   Q.   In doing your work in preparing your chart and monitoring

 6   and tracking payments to Lehman employees, you operated under

 7   the assumption that Barclays was obligated to make some

 8   payments to those Lehman employees, right?

 9   A.   I did not know if we were obligated or not.  The fact is

10   that we wanted to make payments and that's what we did.

11   Q.   So it was altruistic?

12   A.   I was not involved in the negotiations.  I didn't make the

13   arrange -- I didn't make the deal.

14   Q.   I haven't said --

15   A.   I don't know what our obligations were.  I understand that

16   there was a general expectation that we would pay an amount of

17   compensation --

18   Q.   So --

19   A.   -- in respect of pre-acquisition services.  But what we

20   were obligated to do, I can't testify to that.

21   Q.   So did you -- in working on this tracking of employments

22   for a period of time, you developed no understanding at all,

23   general or otherwise, that Barclays was obligated to make

24   payments to former Lehman employees?

25   A.   No.  It was not necessary for me to understand their legal
```

Page 31

1   point to do my job.

2   Q.   Okay.  You were a party to some discussions within folks

3   at Barclays, people in the finance department, about whether

4   Barclays had to pay bonus amounts to former Lehman employees,

5   right?

6   A.   I was involved in discussions with members of the finance

7   department and what they required me to do in support of their

8   role.

9   Q.   Okay.

10          MR. HINE:  Let me -- can we put up M24?

11   Q.   Look at M24, Mr. Exall.  Mr. Exall, this is --

12          MR. HINE:  Your Honor, this is a document that's

13   already in evidence.

14   Q.   Mr. Exall, this is an e-mail from Mr. Clackson to Mr.

15   Evans and Mr. Ricci dated September 17th.  Do you see that?

16   A.   I do.

17   Q.   And the title is "650 million dollar problem".  Do you see

18   that?

19   A.   Yes.

20   Q.   And when you went over to work on your new project in

21   connection with tracking payment to Lehman employees, Mr.

22   Clackson gave you a copy of this e-mail, didn't he?

23   A.   Yes, he did.

24   Q.   Okay.  And that's 'cause he thought you should be apprised

25   of what's being discussed in this e-mail, right?

Page 32

1  A.   Mr. Clackson and I go back a long way and he thought I

2  would be interested in this.

3  Q.   Right.  So you read the e-mail when he gave it to you?

4  A.   I did.

5  Q.   Okay.  So you were generally familiar with the topics

6  being discussed in this e-mail?

7  A.   I wouldn't say generally familiar.  I read the e-mail.

8  Q.   Well, you understood the e-mail when you read it, correct?

9  A.   I understood the -- I read the e-mail.  I didn't have a

10 particular understanding of the problem but, yes, I read the

11 e-mail.

12 Q.   Okay.  You were new to the project at the time and you're

13 developing an understanding of what's going on.  Is that fair

14 to say?

15 A.   That would be correct.

16 Q.   Okay.  So you'll see in the e-mail of September 17th Mr.

17 Clackson writes:  "This is a problem.  They have two billion

18 dollars in the agreement.  I was relying on you guys telling me

19 I needed 1.35 billion which gave me 650 million of goodwill

20 'cause the paragraph below says we have to pay it to them.

21 Can't use.  Archie says you have agreed to this."  Do you see

22 that?

23 A.   I do.

24 Q.   And when you read this document after Mr. Clackson gave it

25 to you, you understood that the reference to the paragraph

1    below was the citation to paragraph 9.1(c) that's contained in

2    the e-mail, right?

3    A.    I see that 9.1(c) in there, yes.

4    Q.    Well, you understood when he's talking about the paragraph

5    below, he's referring to paragraph 9.1(c), right?

6    A.    That's what he's put in the e-mail, correct.

7    Q.    Right.  There's no reference in this e-mail to paragraph

8    9.1(b) relating to severance, is there?

9    A.    Not that I can see.

10   Q.    He doesn't attach a copy of 9.1(b), does he?

11   A.    No.

12   Q.    Okay.  Now at some point in time, after receiving this e-

13   mail and doing your initial review of certain documents, you

14   yourself developed a view that -- or you developed a belief

15   that Barclays was obligated to pay two billion dollars in bonus

16   exclusive of the severance obligation, isn't that right?

17   A.    No, that's not correct.

18   Q.    Well, didn't you have a conversation with Mr. Guarnuccio

19   to that effect?

20   A.    I recall speaking to Mr. Guarnuccio at around this time,

21   yes.

22   Q.    And are you aware that your counsel or Barclays' counsel

23   has entered into a stipulation in this case and the stipulation

24   has been placed on the record that relates to your conversation

25   with Mr. Guarnuccio?

Page 34

1    A.    Yes.

2    Q.    Okay.  So --

3              MR. HINE:  Can we pull up that stipulation for a

4    minute?  From the June 25th transcript?  Page 5.

5    Q.    Now I direct your attention to lines 13 to 21.  And I'm

6    going to read to you what Mr. Gaffey entered into the record.

7    And that's the stipulation I'm talking about.  He entered into

8    the record the following statement:

9              "Barclays Capital Inc. (Barclays) and Movants stipulate

10   that if called to testify at trial, Michael Guarnuccio of

11   PricewaterhouseCoopers would testify as follows:

12             Michael Guarnuccio recalls that at some point in September

13   2008 after the Barclays/Lehman transaction closed, he spoke

14   with a Paul Exall.  And Mr. Exall stated that he believed the

15   two billion dollar estimate was for bonus payments only not for

16   severance payments."

17             Do you see that?

18   A.    I do.

19   Q.    Now I understand you gave some testimony yesterday about

20   your questioning Mr. Guarnuccio's interpretation of what you

21   told him but you don't deny, in fact, that you had a

22   conversation with Mr. Guarnuccio, right?

23   A.    Sure.  I met Mike Guarnuccio, yes.

24   Q.    You had conversations with him, right?

25   A.    I had -- I believe I had a conversation at around this

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 35

1    time and a follow-up in January.

2    Q.    Okay.  And he was from PricewaterhouseCoopers, right?

3    A.    Yes.

4    Q.    And he was auditing Barclays' books at the time or engaged

5    in some kind of audit function?

6    A.    He was engaged in the audit function, yes.

7    Q.    Okay.  And, in fact, when you did have that conversation,

8    you did express the opinion that the two billion dollar

9    estimate was for bonus only and not for severance, right?

10   A.    I don't believe we discussed Barclays' specific

11   obligations under the APA.  As I testified yesterday, I believe

12   Mr. Guarnuccio has misunderstood the extent of my knowledge at

13   this stage of the transaction.  And I think he misunderstood or

14   inferred too much from the conversation we had.

15   Q.    I understand you feel that way about his inferences, but

16   what did you -- I'm asking you about what you exactly said to

17   him --

18   A.    I --

19   Q.    -- not what your interpretation was, what your belief was

20   on the APA or your familiarity with the legal obligations of

21   the APA.  You had a conversation with Mr. Guarnuccio and you

22   said to him that for whatever reason your belief at the time

23   was that the two million (sic) dollar estimate was for bonus

24   payments only and not for severance, isn't that true?

25   A.    That was Mr. Guarnuccio's recollection.  My recollection

Page 36

1    is different.  I do not recall specifically what was said in

2    that meeting.  We may have used the terms in conversation

3    around "bonus", "bonus pool", "incentive comp", "compensation".

4    We were talking about Barclays' compensation plans in general

5    as well.  I don't believe we talked about Barclays' obligations

6    at all.

7    Q.   Did I hear you say you don't really recall what was said

8    at that conversation?

9    A.   I took no notes of the meeting.

10   Q.   So you don't have --

11   A.   -- and none was sent to me from Mr. Guarnuccio

12   Q.   You don't have a specific recollection of what you said to

13   Mr. Guarnuccio at that meeting, is that right?

14   A.   That would be correct.

15   Q.   Okay.  You don't have a specific recollection one way or

16   the other whether you said what he's claiming you said, is that

17   right?

18   A.   I have no specific recollection one way or the other, no.

19   At that point in time, as I said, I had no understanding of

20   what the APA required or obligated Barclays to do.  That would

21   have been my state of mind at the time.

22   Q.   I understand.  But you have no specific recollection one

23   way or the other whether you said that to him, correct?

24   A.   No.

25   Q.   Okay.  Now you do know that there were -- Mr.

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 37 of 265

Page 37

1    Guarnuccio --

2            MR. HINE:  You could take that down now, Steve.

3    Q.   You know that Mr. Guarnuccio participated in further

4    discussions with people in Barclays about issues like that,

5    correct?

6    A.   That's correct.

7    Q.   Okay.  And you weren't the maybe not the principal

8    participant in those discussions with him but you had some

9    involvement, right, fair to say?

10   A.   I recall further meetings in January 2009 that -- a con --

11   particularly, a conference call that I was a participant of.

12   Q.   Okay.  Well, let me just take you before we get there to

13   November of 2008.  And I'd like you to take a look at Movants'

14   Exhibit 801 in your binder.  Do you see that as a -- that is an

15   e-mail.  At the bottom, it's an e-mail between Mr. Walker from

16   Barclays to yourself.  Do you see that?

17   A.   I do.

18   Q.   And it's cc'd to Mr. Romaine?

19   A.   Yep.

20   Q.   And it relates to a PwC request?  Do you see that?  That's

21   the subject?

22   A.   Yes.

23   Q.   Okay.  And do you recall this e-mail?

24   A.   Yes.

25   Q.   Do you recall receiving this e-mail?

Page 38

1    A.    Sure.

2    Q.    Okay.  And do you recall sending the response that's above

3    it?

4    A.    Yes.

5            MR. HINE:  Your Honor, we would offer this exhibit

6    into evidence.

7            MR. BOIES:  No objection, Your Honor.

8            THE COURT:  It's admitted.

9    (Movants' Exhibit 801, e-mail thread dated November 2008

10   beginning with e-mail from James Walker to Paul Exall, was

11   hereby received into evidence as of this date.)

12   Q.    Now let's look at the initial e-mail.  Let's read it from

13   the bottom up, Mr. Exall.  Mr. Walker, from the finance

14   department, writes you and says "Gary and I" -- Gary is Gary

15   Romaine, correct?

16   A.    Correct.

17   Q.    "Gary and I just had a conversation with Mike Guarnuccio,

18   lead U.S. partner covering Barclays at PwC.  And as part of the

19   sign-off of the acquisition balance sheet, he is requesting a

20   copy of the schedule that shows the two billion dollar bonus

21   liability to Lehman folks."  Do you see that?

22   A.    I see those words, yes.

23   Q.    And it continues:  "He is referring to a 'accrued FY08

24   liability' schedule that is referenced in the asset purchase

25   agreement."  Do you see that?

1   A.   I do.

2   Q.   And then he concludes asking you:  "Is there something

3   that you have that you can share with PwC?"  Correct?

4   A.   Yes.

5   Q.   Okay.  And then you understood that inquiry to be talking

6   about bonus liability, correct?

7   A.   Those are the words James used, yes.

8   Q.   Excuse me?

9   A.   Those are the words James used.

10  Q.   Right.  There's no reference in the e-mail from Mr.

11  Walker --

12         MR. HINE:  Steve, go back to the other one.  The whole

13  e-mail, Steve.

14  Q.   There's no reference in Mr. Walker's e-mail to you about

15  severance, is there?

16  A.   That's correct.  He refers to the copy of the schedule

17  referred to in the APA.

18  Q.   Right.  And he mentions the two billion dollar bonus

19  liability, correct?

20  A.   Yes.  He's -- he uses that word.  But I would say is that

21  when you're talking between --

22  Q.   That's the phrase he used.

23  A.   That's the phrase he used.  When you're talking between

24  the nature of professional or compensation professional and the

25  finance person, for example, or anyone else in another field,

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 40 of 265

Page 40

1    these are colloquialisms that people use.

2    Q.    Sure.

3    A.    And in fact, the word "bonus" was, in fact, used in Clause

4    9.1(c).  And if James did not have a copy of this purported

5    schedule, that's the word he would have used.

6    Q.    Sure.  But he did use the word "bonus", right?

7    A.    He used the word "bonus".

8    Q.    And he did not use the word "severance", correct?

9    A.    No, he didn't.

10   Q.    And then if you continue on his line, he talks about a

11   defined term, "accrued FY08 liability".  Do you see that?

12   A.    I see that.

13   Q.    And that's a defined term from Clause 9.1(c) of the APA,

14   isn't it?

15   A.    It's in Clause 9.1(c).  I don't know what it's

16   particularly defined as, but yes.

17          MR. HINE:  Okay.  Well, let's look at 9.1(c), Steve,

18   please, which is M1.

19   Q.    And you'll see 4 at the top of that provision, there's a

20   definition of "accrued 08FY liability".  Do you see that?

21   About the sixth, seventh line down?

22   A.    I see it referenced, yes.

23   Q.    Okay.  So that's -- you understood when you received that

24   e-mail from Mr. Walker that he was referring to 9.1(c),

25   correct?

Page 41

1    A.    Sure.

2    Q.    Sure.  Okay.

3           MR. HINE:  And let's go back to the e-mail, Steve,

4    please.  M108.

5    Q.    So you understood this request when Mr. Walker sent it to

6    you, right?

7    A.    I understood he requested a copy of the schedule that's

8    purported to be represented in that clause, yes.

9    Q.    Right.  And you responded to him and said "Here's a

10   scanned copy."  Right, in the e-mail above?

11   A.    Yes.  I say "Here's a scanned copy.  You will see the two

12   billion described as comp."

13   Q.    Right.  So you're referring to the two billion that's in

14   his e-mail and you're pointing out that it's described as comp.

15   A.    That's what it says on the schedule that was passed to me

16   by Finance when I requested it, yes.

17   Q.    And if we turn to the second page of this document, you'll

18   see that you, in fact, forwarded him a copy of what we've

19   marked as Exhibit M2, the financial schedule, correct?

20   A.    That's correct.

21   Q.    Okay.  And so, at the time you sent this e-mail, November

22   2008, you were sufficiently familiar with the provisions of the

23   APA to at least know what schedule to forward him in response

24   to his query, right?

25   A.    Well, yes, in the sense that when I first read the APA, I

Page 42

1    requested from Finance a copy of the schedule --

2    Q.    Correct.

3    A.    -- which was passed to me by Finance.  And I'm effectively

4    sending the same schedule that they sent to me back to them.

5    Q.    Sure.  Sure.  Well, you're sufficiently --

6    A.    Yes.

7    Q.    -- sufficiently familiar with the paragraph 9.1(c) to know

8    that that's what he was talking about when he was asking you,

9    correct?

10   A.    It's the same question I had asked earlier, so yes.

11   Q.    Okay.  And you'll see later on up the e-mail chain

12   apparently they forward your schedule to -- they forward that

13   schedule to PwC, correct?

14   A.    That's correct.

15   Q.    Okay.  And in response to your forwarding the schedule, no

16   one said, hey, you got the wrong schedule, right?

17   A.    I don't believe so.

18   Q.    Okay.  No one said, hey, that schedule's not initialed by

19   a Barclays officer.  We shouldn't send it to PwC.  Did they?

20   A.    I can't tell -- I mean Finance responded to an ordered

21   request.

22   Q.    Okay.  But you don't recall anyone saying that and not

23   forwarding it to PwC 'cause it wasn't initialed by a Barclays

24   officer, do you?

25   A.    No.  We, in fact, did forward it to PwC.

Page 43

1    Q.    Okay.

2    A.    I do recall --

3    Q.    Do you recall --

4    A.    -- discussions at the time -- sorry -- to elaborate, I do

5    recall discussions at the time where I said, hey, this is

6    initialed by one person but this is the schedule that was

7    passed to me.  And their OC passed it on to PwC as requested.

8    Q.    Okay.  So you read the APA sufficiently to know that there

9    was a provision in there that talked about a schedule being

10   initialed by both parties, right?

11   A.    Sure.

12   Q.    Sure.  Okay.  And when you forwarded this -- when they

13   forwarded the schedule on to PwC, no one said -- provided you

14   any feedback and said, hey wait, this schedule applies to both

15   bonus and severance, did they?

16   A.    I don't recall anyone coming back to me on that either

17   from Finance or PwC.

18   Q.    Okay.  And it's fair to say that the discussions between

19   Mr. Guarnuccio and members of Barclays continued even after

20   November on this type of -- this topic, right?

21   A.    Certainly.  The accounts were only signed by PwC, I would

22   say, in and around February 2009.  And I recall being on a

23   conference call with Mr. Guarnuccio as well as some of our

24   finance people in late January 2009.

25   Q.    Okay.  So you were on a conference call on January 27th,

Page 44

1   2009 scheduled at 8 a.m. between Mr. Guarnuccio and his team

2   and yourself to discuss what may have to be paid out of two

3   billion dollars, right?

4   A.   I believe Mr. Guarnuccio had some questions of Gary

5   Romaine.  And we -- I believe a conference call had been

6   arranged to discuss those questions at that meeting prior to

7   the PwC signing off on the --

8   Q.   And you recall --

9   A.   -- which then affected --

10  Q.   You recall that conversation -- that conference call

11  taking place, right?

12  A.   Absolutely.

13  Q.   And you were on it?

14  A.   I was on it.

15  Q.   So you had sufficient understanding of the issues to be on

16  a conference call with PwC relating to this discussion,

17  correct?

18  A.   PwC had some questions that they wanted to discuss.

19  Q.   And sometime after that conference call, PwC eventually

20  signed off on how Barclays was accounting for the compensation

21  payments to Lehman employees, right?

22  A.   I believe so.  They signed our report of accounts which

23  would eventually -- as their official auditors of which the

24  acquisition accounting was a part.

25  Q.   Okay.  And that's -- you testified about that yesterday,

Page 45

1    right?  At some point, PwC -- at some point after January of

2    '09, PwC signed off on your report of accounts, correct?

3    A.   Yes.  I believe most of the queries -- or all of the

4    queries must have been resolved by then, so yes.

5    Q.   Okay.  I want to take you back to September 2008 again --

6    A.   Okay.

7    Q.   -- when you first began tracking or working on this

8    project to track the bonus payments or any kind of compensation

9    payments paid to Lehman employees.  When you first began

10   tracking the bonus payments, you used a number that was

11   considerably lower than two billion dollars, right?

12   A.   I used -- I was instructed to use in the daily updates

13   that I was preparing a reference point of 1.4 billion.

14   Q.   Correct.

15         MR. HINE:  Could we see one of those documents?

16   Q.   It's under tab M91 of your book.

17   A.   Yep.

18   Q.   And you recognize the covering e-mail as an e-mail

19   forwarding from Michael Evans to several other people on

20   September 23rd an update chart that you prepared, right?

21   A.   Yes.  I prepared that document.

22   Q.   Michael Evans is your boss, correct?

23   A.   Michael Evans was my direct line manager and the

24   recipients of the executive committee at Barclays Capital.

25   Q.   Okay.  So you -- and if we turn to the next page, we'll

1   see the report that he's forwarding.  And it's a -- entitled a

2   "Summary Report", right?

3   A.    That's correct.

4   Q.    And this is a daily -- or at that time, it was a daily

5   prepared report where you were tracking bonus payments to

6   former Lehman employees who were now working at Barclays,

7   correct?

8   A.    At that time, we were doing it twice a day, once in the

9   morning and once in the evening.  And it was to track

10  guaranteed payments or payments that had been guaranteed in

11  contracts to former Lehman Brothers employees for pre-

12  acquisition services.  It also facilitated some modeling around

13  what that would impact or how that would impact the residual

14  population in general that would not be receiving or had not

15  received at that time guaranteed contracts.

16  Q.    Okay.

17  A.    It was also any other ancillary matters that may or may

18  not be relevant that we felt the executive committee of

19  Barclays Capital may or may not need to know or may need to

20  know about it at the time.

21  Q.    Okay.  Now it's fair to say -- I think you told me at your

22  deposition  you prepared the first one of these reports?

23  A.    That's correct.  I prepared several of the first

24  iterations.  And I think some of my team came across and

25  assisted me and I reviewed each one daily.

Page 47

1   Q.   Okay.  So eventually, your team gets involved in preparing

2   these reports either a daily basis or a twice daily basis,

3   correct?

4   A.   Correct.

5   Q.   And you wanted to be ensured that these reports are

6   accurate because they're going to the executive committee at

7   Barclays, right?

8   A.   That would be advisable.

9   Q.   Right.  And it's fair to say that you reviewed these

10  reports before they went to the executive committee, correct?

11  A.   Yes, I did.

12  Q.   Okay.  Now, I just want to look at a couple of the entries

13  on this report.  And the first line, you talk about the Elite

14  8.  Do you see that?

15  A.   Yes.

16  Q.   And I think in a footnote, you highlight the fact that

17  that's a select number of very senior Lehman executives who are

18  now working at Barclays, right?

19  A.   Yes.  They were senior executives at Lehman.  I don't

20  recall specifically whether all of them actually ended up

21  working for Barclays, but yes.

22  Q.   Okay.  But --

23  A.   At that time.

24  Q.   -- they were known as a colloquial phrase, the "Elite

25  8" --

Page 48

1    A.    Yeah.

2    Q.    -- is that right?

3    A.    Although there are nine of them, strangely.

4    Q.    There are nine of them, right.  You sure you were checking

5    this for accuracy?

6    A.    I didn't come up with the name.

7    Q.    Before we get to the Elite -- I want to just focus on the

8    Elite 8 for a second and ask you about a declaration that

9    you've submitted in this case.  Do you recall preparing a

10   declaration to be submitted in this litigation?

11   A.    Not particularly.

12   Q.    Okay.  Well, let's look at BCI Exhibit 356.  It should be

13   in your binder, Mr. Exall.

14   A.    Sorry.  I found it, yes.

15   Q.    And that's a declaration that you prepared in connection

16   with this litigation, correct?

17         (Pause)

18   A.    Yes.  I've signed this.

19   Q.    That's your signature on the last page?

20   A.    It is.

21   Q.    Okay.  And this declaration is to summarize some of the --

22   for certain select senior executives of Lehman who now came

23   over to Barclays, both their 2007 compensation and their 2008

24   compensation, correct?

25   A.    Can I read the document?

Page 49

```
 1    Q.   Yeah.

 2         (Pause)

 3    A.   I've read the document.  Could you repeat the question,

 4    please.

 5    Q.   I just wanted to describe the document.  This is a summary

 6    of compensation information related to certain senior

 7    executives of Lehman.  And it lists their 2007 base salaries

 8    and bonuses and their 2008 base salaries and bonuses, is that

 9    right.

10    A.   In most cases --

11    Q.   In most cases.

12    A.   Yeah.  And I would say that the 2007 compensation would be

13    based on information that was available to us at the time from

14    the former Lehman Brothers estate.

15    Q.   Well, that was going to be my question.  You don't -- you

16    assembled this information based on a review of books and

17    records available to you at the time, right?

18    A.   Yes.  The information was passed to us as part of the

19    acquisition process.  And that would have been the source data.

20    Q.   Okay.  And you did your best to review the available data

21    and come up with the numbers in this declaration, right?

22    A.   That's correct.

23    Q.   Do you have any reason to doubt the accuracy of any of

24    these numbers?

25    A.   I don't believe so.
```

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 50 of 265

Page 50

1    Q.    Okay.

2          MR. HINE:  Your Honor, we'd like to offer this

3    document into evidence.

4          MR. BOIES:  No objection, Your Honor.

5          THE COURT:  It's admitted.

6    (BCI Exhibit 356, declaration of Mr. Exall summarizing

7    compensation information related to certain senior executives

8    of Lehman, was hereby received into evidence as of this date.)

9    Q.    And the reason I brought this document up, I just want to

10   ask you one question before we discuss your prior chart.  I see

11   in reference o some of these individuals and, in particular,

12   I'll point you to paragraph 11.  You'll see a reference to

13   something called a "special cash award".  Do you see that?

14   A.    Yes.

15   Q.    Now a special cash award, to your understanding, a special

16   cash award is not a bonus, is that right?

17   A.    This was a -- I believe, if it's the special cash awards

18   to which I'm thinking, it was retention awards --

19   Q.    Right.

20   A.    -- for certain formerly Lehman employees.

21   Q.    I just want to distinguish between bonuses for pre-

22   acquisition activities at Lehman and special cash awards were

23   for retention to ensure those people stayed on at Barclays,

24   right --

25   A.    That's correct.

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 51 of 265

Page 51

1   Q.   -- in general?  Okay.  So in your understanding, a special

2   cash award would not be considered a bonus under 9.1 of the

3   APA, right?

4   A.   Again, I don't know what 9.1 means --

5   Q.   Right.

6   A.   -- in a legal sense.  What I can tell you is that those

7   special cash awards would not have been on the schedule that I

8   prepared because they relate to -- they do not relate to pre-

9   acquisition services of former Lehman Brothers employees.  When

10  you say I don't understand them to be a bonus, again, I come

11  back to the colloquial use of the term "bonus".  If you ask a

12  finance professional or any other professional, it's not a

13  complex but they may would refer to that as a bonus.

14  Q.   I understand.  So just as -- but the main point I wanted

15  to get is that on that schedule that we talked about earlier,

16  M107, you did not include special cash awards as bonuses,

17  correct, because they were not pre-acquisition --

18  A.   They're not on that schedule.

19  Q.   -- compensation.  Correct.  Okay.  Now let's go back to

20  the schedule we were previously talking about which is M91,

21  please.  Now, I just would like to --

22        MR. HINE:  Could you blow up the top chart, Steve,

23  with the footnotes?

24  Q.   Now you'll see -- I just want to get a little groundwork

25  here on what this all means.  In the left-hand column, you are

Page 52

```
 1    -- in the upper left-hand two blocks, you are tracking

 2    guaranteed bonuses to both the Elite 8 and another group of

 3    some 383 individuals, correct?

 4    A.   At that point in time, yes.

 5    Q.   Yes.  This is as of the date of the report, right?

 6    A.   That's correct.

 7    Q.   Okay.  And GB means "guaranteed bonus"?

 8    A.   Yes.

 9    Q.   Okay.  And if I look to the column marked actual, I will

10    see at that point in time you were tracking or planning on

11    paying those 402 senior individuals a total of 862 million in

12    bonuses, right?

13    A.   That would have been the aggregate of the contracts that

14    we had -- would have at that time issued to those people, yes.

15    Q.   All right.  At that time, the aggregate you expected to

16    pay for those 402 people was 862 million dollars?

17    A.   That would be fair to say, yes.

18    Q.   And if we look to the black to the right, you'll see "One

19    Time Deferred Cash Award".  Do you see that --

20    A.   I do.

21    Q.   Yes?  And that is to encompass these special cash awards

22    that we just talked about, right?

23    A.   That's correct.

24    Q.   So they're not bonuses; they're the retention payment that

25    you just described earlier, correct?
```

1    A.    They're the retention payments, yes.

2    Q.    Right.  Okay.  And the last block on the right talks about

3    "Second Year Guaranteed Bonuses".  And that relates to certain

4    people who had guaranteed bonuses the second year after coming

5    to Barclays, right?

6    A.    That's correct.

7    Q.    Okay.  Now let's go down the left-hand column briefly.

8    After you get past these 402 people, there's 10,000 some odd

9    people who are expected to come to Barclays, correct?

10   A.    Yes.

11   Q.    And again, this is all based on your understanding at that

12   particular date, right?

13   A.    That's correct.

14   Q.    Okay.  And of that 10,000 some odd people, they weren't

15   guaranteed bonuses but there was a plan to pay them some form

16   of bonus, right?

17   A.    That's correct.

18   Q.    Okay.  And -- but of that 10,000 people, 3300 were going

19   to be laid off because they were planned redundancies, right?

20   A.    Yes.  There was -- there was a plan being put in place or

21   in place, I don't recall the exact nature of it, whereby there

22   would be redundancies across the firm as a whole.

23   Q.    Right.  And so as of the date of this report, September

24   23rd, you were -- they were planning on laying off -- Barclays

25   was planning on laying off 3300 of those 10,000 people,

Page 54

1   correct?

2   A.   That's correct.

3   Q.   And there's no bonus payment included in the next block

4   for those people there.  They're not -- Barclays isn't expected

5   to pay them a bonus, right?

6   A.   They would be eligible for severance.

7   Q.   They would get severance not a bonus, correct.

8   A.   Yes.  But as I mentioned before, oftentimes when you're

9   negotiating a settlement of severance, there will be some

10  consideration of prior year bonus and that may or may not be

11  included in the final settlement amount.

12  Q.   But you're not -- aside from that distinction, those

13  people are entitled to severance in Barclays' view but not a

14  bonus, correct?

15  A.   They would be eligible for severance in the plan

16  redundancy, yes.

17  Q.   Right.  And if we look down at Footnote 1 -- well, before

18  we get to Footnote 1, that leaves a total of about 6700 some

19  odd people.  And the plan at that point was to pay them an

20  aggregate amount of 538 million dollars in bonus, correct?

21  A.   That's not the plan.  That's just a simple mathematical

22  calculation.  You have to read this document in its entirety

23  because it required a plan at this time.  But the reference

24  point of 1.4 billion of funds was clearly insufficient to

25  deliver the kind of compensation plans that Barclays had in

Page 55

1   fact at the time.  If you turn the page to page 2, there's a

2   sensitivity analysis section which identifies that issue

3   further and suggests that we're between 270 and 370 million

4   dollars lacked on the 1.4 billion reference point.

5   Q.   Okay.  So the reference point that you're using is what's

6   entitled "Total Pool Funding of Hours".  Do you see that?

7   A.   I see that, yes.

8   Q.   And that's 1.4 billion?

9   A.   That's what it says.

10  Q.   Correct?  And that's the number you were given by Mr.

11  Evans?

12  A.   That was the reference point Mr. Evans asked me to use for

13  that chart.

14  Q.   Mr. Evans is your boss?

15  A.   Correct.

16  Q.   Okay.  And so, according to this chart, there was a pool

17  available of 1.4 billion to pay bonuses, 862 million of which

18  was going to go to the 402 most senior people.  And the balance

19  would be left to be divided up against the 6700 others,

20  correct?

21  A.   Taken in isolation, that's what it says.  Again, you have

22  to read the document to put it in full context.

23  Q.   I -- we'll get there.  And before we get there, let's talk

24  about Footnote 1.  You say in Footnote 1 that this is -- and

25  this is in relation to the residual pool of people left.  "All

Page 56

1    the moving" -- I'm sorry.  I can't read it myself.  "Still

2    moving and a net of an expected 3300 redundancies expected to

3    cost about a hundred million.  Not funded out of the 2008 bonus

4    pool."  You see that?

5    A.    Yes.

6    Q.    So the funding for the severance was coming out of a

7    separate pool from the bonus pool, right?

8    A.    I think what I'm referring to here is the 1.4 billion --

9    Q.    Right.

10        THE COURT:  -- which is described here as "Pool

11   Funding".

12   Q.    Right.  So the --

13   A.    So it's not coming out of that 1.4 billion --

14   Q.    The hundred million --

15   A.    -- that's being used for this chart.

16   Q.    Right.  The expectation, at least at the time you prepared

17   this chart was that the 3300 people would get a hundred million

18   dollars in aggregate in severance, correct?

19   A.    They would have -- that's what it says.

20   Q.    Right.  And that is separate and apart from the 1.4 that's

21   in this bonus pool for a bonus, correct.

22   A.    It's separate to this reference point, yes.

23   Q.    Right.  So this chart matched an expectation of having to

24   pay a total of 1.5 billion dollars in severance and bonus,

25   correct?  If you add the one hundred to the 1.4 billion, I get

Page 57

```
 1   to 1.5 billion dollars, right?

 2   A.   If you do the arithmetic, that's what this chart in

 3   isolation says.  However, I would say that as this document

 4   clearly identifies, at the time, we were very clear.  This went

 5   to the executive committee at Barclays Capital.  The 1.4

 6   billion reference point was going to be insufficient to the

 7   tune of 270 to 370 million dollars as modeled to deliver the

 8   kind of compensation that Barclays in fact wanted to do.

 9   Q.   Wanted to do?

10   A.   Well, was planning to do in terms of the target as

11   specified in this document.

12   Q.   Well, so you're referring further down on this page to the

13   funding pressures that you highlight that are putting pressure

14   on the original bonus pool estimate of 1.4 billion, is that

15   right?

16   A.   That's it.

17   Q.   And the rest of this memo is to highlight the executive

18   committee, the fact that we might blow the 1.4 pool, correct?

19   A.   That's what this document is intended to demonstrate.  And

20   my personal opinion was that we were going to substantiate or

21   exceed the 1.4 billion which is, in fact, what we did.

22   Q.   Okay.  Now you were told to use this 1.4 billion dollar

23   pool by your superiors, correct?

24   A.   That's correct, as a reference point.

25   Q.   Okay.  And that is on or before September 23rd, 2008 you
```

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 58 of 265

Page 58

1    were given that number, right?

2    A.    I think it was on that date.

3    Q.    Okay.

4    A.    It was for the first iteration of this document.

5    Q.    Okay.  And that's less than a week after the date when the

6    Court was told that Barclays was going to pay two billion

7    dollars in comp, correct?

8    A.    I have no knowledge of what the Court was told.

9    Q.    Okay.

10         MR. HINE:  Can we go to Exhibit M145, please?

11   Q.    It's in your binder, Mr. --

12   A.    Yes.  I'm here.

13   Q.    And this is a -- do you recognize this document, Mr.

14   Exall?  I'm sorry.  It's M145.  Do you recognize this document,

15   Mr. Exall?

16   A.    This one in my binder -- yes.  Yes.

17   Q.    Yes.

18         MR. HINE:  This document is already in evidence, Your

19   Honor.

20   Q.    This is a e-mail exchange involving you and Mr. Evans and

21   a Ms. Pamela Sinclair, correct?

22   A.    Correct.

23   Q.    Okay.  And in general, it's talking about -- it's actually

24   dated the same date as the prior exhibit, right?  September

25   23rd?

Page 59

1   A.   I see that date.

2   Q.   Right.  And we're -- and you're talking about, in general,

3   the issues you just mentioned, correct?

4   A.   In part.  The context is that the business were under

5   extreme pressure to retain individuals.  Understandably, given

6   the circumstance, we had 25,000 Lehman Brothers employees

7   across the globe looking for new jobs.  And we were under

8   pressure to retain them.  And the business was requesting our

9   assistance in that.  And I believe in this e-mail, we're

10  requesting the consideration of issuing further guaranteed

11  bonus to top talent to secure their services for the

12  foreseeable.

13  Q.   In other words, you're raising the problem associated with

14  the original expectation to pay 1.4 pool.  That's a lot more

15  businesses within Lehman -- or what used to be Lehman is now

16  Barclays.  There's a lot more businesses that want to pay

17  bonuses to lower level employees than originally expected.  Is

18  that generally correct?

19  A.   I wouldn't say it was a reference to the 1.4 billion.  I

20  don't know particularly how the 1.4 billion actually came

21  about.  What I can say is that there were tremendous pressures

22  to retain these people --

23  Q.   Right.

24  A.   -- no matter what reference point we were using.  The

25  request was to issue guarantees at a lower level.  The original

Page 60

1    intention was to issue guarantees to a select group of people,

2    150 to 200 -- if I recall -- people.  We ended up issuing

3    guaranteed bonus contracts to substantially more people than

4    that because of the retention concerns.

5    Q.    Okay.  And then when you -- and so, in addressing that

6    issue, you made some recommendations on page 2 of this

7    agreement -- of this document, right?

8    A.    Yeah.  These were hypothetical arguments or suggested

9    responses that we could discuss further and form a view on.

10   Q.    Right.  And you've titled them on page 2 "Strawman

11   Approaches"?

12   A.    That's correct.

13   Q.    That's your phrase for suggesting --

14   A.    It's probably a poor choice of words given its legal

15   connotation but it's a hypothetical set of responses for

16   discussion.

17   Q.    Okay.  And the first option is do nothing, right?

18   A.    Yes.

19   Q.    The second option says "Model and allocate specific

20   guaranteed bonus pools to individual business areas to manage

21   within the overall 1.4 billion."  Is that right?

22   A.    That's what it says.

23   Q.    And if we continue on to the second page, you're talking

24   about the disadvantages of that approach.  You write, "Spending

25   more than 1.4 is dilutive to current negative goodwill

Page 61

1    calculation."  Do you see that?

2    A.    That's what it says.

3    Q.    And diluting the negative goodwill calculation was a

4    concern of senior management at Barclays at the time, right?

5    A.    Yes.  Well, I can't speak for senior management at

6    Barclays.  I understand from the e-mail that Mr. Clackson sent

7    to me that there was a he has raised the issue around 1.35

8    billion and the 650 goodwill -- negative goodwill calculation.

9    And this is a reiteration of that understanding at the time

10   from his e-mail.  I simply rounded it to 1.4 billion.

11   Q.    Okay.  Now, Mr. Exall, I'd like to get to your chart that

12   you talked about yesterday.

13   A.    Sure.

14   Q.    Before we do, I would like to show you an excerpt from

15   Barclays' brief in this case, which I know you haven't seen,

16   but I just want to point out one sentence to you.

17   A.    Okay.

18   Q.    And that is Barclays' opposition brief at page 136.

19   A.    Sorry.  Which section of the binder is this in?

20   Q.    I don't think it's in the binder.

21   A.    Oh.

22   Q.    I just want to show you one sentence.

23   A.    Okay.

24         MR. HINE:  Steve, can you highlight the sentence in

25   the middle of the paragraph 300.  "Barclays has paid" --

Page 62

1    Q.   I just want to get your orienta -- orient you to an issue

2    that's going to come up while we talk about your chart, Mr.

3    Exall.  You'll see this is a excerpt from Barclays' brief where

4    they say:  "Barclays has paid or promised to pay for 2008

5    approximately 1.66 billion in bonuses, 265 million in severance

6    payments and approximately twenty-one million in taxes."  Do

7    you see that?

8    A.   I see that statement.

9    Q.   And if we continue on to the next page, it says, "These

10   liabilities total 1.946 billion, an amount fully consistent

11   with the two billion dollar as to the parties."  Correct?  Now,

12   the reason --

13   A.   I see that.

14   Q.   -- I point this out to you is I want to draw your

15   attention to the 1.946 billion.  You'll agree with me that

16   that's five million dollars off the number that's on your

17   chart, right, which was 1.951, correct?

18   A.   It's five million dollars difference, yes.

19   Q.   Yes.  Okay.  I just wanted to highlight that issue.  We'll

20   come back to that five million.  But I wanted to point that

21   out.

22   A.   Okay.

23   Q.   Now before we get to your chart, I'd like to look at the

24   earlier version of your chart that we mentioned earlier, which

25   is Exhibit M218.  And this is the original version of your

Page 63

1   chart that you sent -- that was sent to the movants.  And you

2   replaced this later with the version that you testified about

3   yesterday, correct?

4   A.   I see the Bates stamp.  I recognize that number from the

5   earlier testimony, yes.

6   Q.   Yes.  And you recognize --

7   A.   That was the original form of the document, yes.

8   Q.   Yes.  And this was prepared in or around, I believe you

9   testified at your deposition, in or around July of 2009 after

10  the start of this litigation, right?

11  A.   I don't recall what I testified in my deposition

12  specifically.  I do recall we were tracking these payments

13  throughout the process.  I think we produced a specific

14  document as requested.

15  Q.   Okay.  Well, let's look at page 69 of your deposition.

16  A.   Okay.

17  Q.   And we are talking about this original spreadsheet at the

18  time, which is Exhibit 280B.  And if you look -- starting at

19  line 5, the question is:

20       "Okay.  So just tell me, just to be specific here, 280B

21  was prepared at or about what date?"

22  "A.  This was, I understand, supplied to yourselves on or

23  around the middle of July 2009."

24       Is that right?

25  A.   That's what it says.

Page 64

1    Q.    So that's about the date that it was supplied in this

2    litigation, correct?

3    A.    That's correct.  I'd go on to say that the spreadsheet did

4    exist in previous forms and formats.  But I think we cleaned up

5    the presentation for the purposes of presentation.

6    Q.    I understand that.  Okay.  And when you look at this first

7    chart --

8           MR. HINE:  Back to M318, please?

9    Q.    -- you'll see that it comes to a total of 1.999 billion

10   dollars, right?

11   A.    That's correct.

12   Q.    And we've heard a lot in this case about the chaos and

13   tumult with all this period of time and how difficult it was to

14   track things.  When you did this chart many months later, did

15   you remark to anyone or did you say to anyone, holy crow, in

16   all that chaos, we came to one million dollars off of the two

17   billion dollar number that we were shooting for?

18   A.    We weren't shooting for any particular number.  We were

19   tracking payments made to former Lehman Brothers employees.

20   Q.    Okay.  Did you say to anyone, unbelievably, this chart

21   comes to less than one-tenth of a percent from that two billion

22   dollar number?  Did you say that --

23   A.    I don't believe, sir.  This schedule was still moving at

24   the time as we've seen.  The replacement schedule was updated

25   subsequent to this.  There were still severance payments that

Page 65

1   were still being ironed out.  And this was the version at the

2   time.  And it subsequently moved on.  We were aware of that and

3   I think we informed counsel of that.  Or --

4   Q.   And this is the first version that was sent to the

5   movants, right?

6   A.   Yes.

7   Q.   Okay.  Later you had to change this version because you

8   realized the severance payments listed on this chart were

9   overstated, right?

10  A.   That's correct.  There was a double count error between

11  the severance line on this schedule and the bonus line.

12  Q.   Okay.

13  A.   And as certain severance payments were, in fact, made,

14  they differed substantially from the amounts that were

15  estimated at the time for this schedule.  Consequently, I think

16  in aggregate, these numbers came down by about fifty million

17  dollars --

18  Q.   Okay.  So let's go to your --

19  A.   -- as an estimate.

20  Q.   -- schedule now that we've talked about -- we've been

21  talking about, M107.  And the total number that this schedule

22  comes to is 1.951, correct?

23  A.   Correct.

24  Q.   And that's forty-nine million dollars short of the two

25  billion dollar number, right?

Page 66

1    A.    That's forty-nine million dollars short of two billion

2    dollars.

3    Q.    Right.  And I just want to go through some of these

4    entries.  You went through them yesterday.  But I'd like to go

5    through them in a little more detail.  On the OBS, opening

6    balance sheet compensation accrual, you see a number of 2.0,

7    two billion dollars, right?

8    A.    Yes.

9    Q.    And the source of that number is the APA?

10   A.    That's what I was informed, yes.

11   Q.    And you were told that by Mr. Clackson?

12   A.    Mr. Romaine asked me to prepare that.

13   Q.    Mr. Romaine, okay.  So that's just a number you were given

14   by others.

15   A.    Yes.  And the -- yes, that's correct.

16   Q.    Okay.  And if we continue down on the next item, it says

17   "Pre" -- and so -- starting with that number, you're mapping or

18   you're tracking the payments that have been made by Barclays to

19   Lehman employees under different categories, correct?

20   A.    Different categories of compensation, correct.

21   Q.    Right.  And so let's look at the first one.  "Pre-9/22

22   payroll items".  You see that?

23   A.    Yes.

24   Q.    And that's twelve million dollars?

25   A.    That's correct.

Page 67

1    Q.   And that's comprised of two different components, right,

2    generally?

3    A.   I believe so.

4    Q.   Seven million of that is a tax, right?  It's a payment of

5    a tax for former Lehman employees that were old -- with respect

6    to former Lehman employees?

7    A.   I believe the -- my recollection at the time is that they

8    were tax payments due and payable to relevant tax authorities

9    for expatriates --

10   Q.   Right.

11   A.   -- that worked for former Lehman Brothers.  And they were

12   due and payable to those authorities.  We made those payments

13   on their behalf and for their benefit.

14   Q.   Right.  Okay.  So that's seven billion out of the twelve

15   is a tax payment, correct?

16   A.   Correct.

17   Q.   And you would agree with me that those former Lehman

18   employees didn't get that money.  That money went to a tax

19   authority, right?

20   A.   Yes, it was, but it was for their benefit.

21   Q.   Okay.  So now if we turn back to 9.1(c) --

22        (Pause)

23   Q.   -- you'll agree with me that there's no provision in here

24   discussing payments to tax authorities on behalf of the

25   termin -- transferred employees, is there?

Page 68

```
 1   A.   I'll have to reread the section.

 2   Q.   Okay.

 3        (Pause)

 4   A.   There's no reference to tax authorities.

 5   Q.   Okay.  This language contemplates payments to the

 6   transferred employees themselves, right?

 7   A.   I don't -- I can't interpret this laws.

 8   Q.   You can't tell?

 9   A.   I'm not a lawyer.

10   Q.   Fair enough.

11        MR. HINE:  Let's go back to the chart.

12   Q.   Now, out of that twelve million dollars, the remaining

13   five is a -- are payroll items, right?

14   A.   Yes.  Payroll related items.

15   Q.   So that could include base salaries as well as payroll

16   related benefits that Barclays paid on behalf of certain

17   employees -- or two certain employees.

18   A.   Yes, that's correct.  The circumstance at the time was

19   such in the chaos around these dates, there were payrolls in --

20   particularly in the U.S. or North America in general that

21   needed to be -- employees needed to be paid for the month.

22   Q.   Right.

23   A.   There was no funding available from the former Lehman

24   Brothers estate.  What Barclays did was make good on those

25   payrolls.  There were no -- I don't believe or I was -- I don't
```

Page 69

1    believe they were under any requirement to do so.  But I think

2    to keep the business running, to retain the people, was part of

3    the overall retention strategy.  We made those payments.

4    Q.   Okay.  And those are just the weekly payroll payments that

5    employees receive, right?

6    A.   That's my belief.  That's what I --

7    Q.   The base salary, not their bonus compensation, correct?

8    A.   No.  There are no bonuses generally paid before the

9    stipulated period.

10   Q.   Right.  And in general, it's their base salary, right?

11   A.   It would be their base salary, their benefits, all sorts

12   of related compensation items.

13   Q.   Right.  And if we look back at 9.1(c), you recall the

14   provision that says "but not base salary", right?

15   A.   It says those words.

16   Q.   Okay.  So that five million dollars could not possibly

17   fall under the ambit of 9.1(c), right?

18   A.   I don't know what 9.1(c) requires.  What I can tell you is

19   that that five million dollars was paid to former Lehman

20   Brothers employees for pre-acquisition services for Lehman

21   Brothers.

22   Q.   Okay.

23   A.   And that is why it is on the schedule.

24   Q.   And it's principally their base salary, right?

25   A.   Yes.

Page 70

1   Q.   Okay.  Now this five billion (sic) explains the difference

2   between Barclays' brief where they used the 1.946 number and

3   your chart which is 1.951, isn't that right?

4   A.   Mathematically, that's the case.  I don't know whether

5   that's the reason.

6   Q.   Okay.  Fair enough.  Let's move on to the next item on the

7   chart.  I think you testified yesterday about replacement RSUs.

8   Those are, in fact, Barclays' assuming a stock bonus obligation

9   that Lehman previously owed, right?

10  A.   A portion thereof, yes.  And we replaced them with cash.

11  Q.   Okay.  Now the next item is "Bonus including social tax".

12  Do you see that?

13  A.   I do.

14  Q.   So a portion of that is bonus and a portion of that is a

15  tax, right?

16  A.   Relevant taxes, yes.

17  Q.   Okay.  And you would agree with me that those tax payments

18  were paid to some tax authority not to the individual employees

19  themselves, correct?

20  A.   That would be the case.

21  Q.   Okay.  And --

22  A.   They are clearly bonus related.

23  Q.   Excuse me?

24  A.   They're clearly bonus related.

25  Q.   Sure.

Page 71

1   A.   They're related specifically to these bonuses.

2   Q.   The bonus was paid to the individuals but the tax was paid

3   to a taxing authority, correct?

4   A.   That's the norm.

5   Q.   Okay.  And at your deposition, you estimated the amount of

6   social tax embodied in that to be about fifty million dollars,

7   right?

8   A.   I recall that it's quite low given the low social taxes in

9   the U.S., yes.

10  Q.   Do you think it might be higher than that?

11  A.   No.

12  Q.   Okay.  So it's about fifty million dollars?  We can agree

13  on that?

14  A.   That's what I estimated in my deposition.  I have no

15  reason to change that.

16  Q.   Okay.  And like any -- so we don't have to go through all

17  the taxes, all the tax entries on here were paid to a tax

18  authority and not to the individual employees themselves,

19  right?

20  A.   That's correct, although I would say that any cash bonus

21  paid to any employees are subject to any withholding tax at any

22  point in time --

23  Q.   Sure.

24  A.   -- and payable to any tax authority.

25  Q.   Sure.

Page 72

1    A.   So in that sense, it's not really different.

2    Q.   I understand.  I'm  just saying the taxes were not paid to

3    the individuals themselves.  They were paid to a taxing

4    authority, correct?

5    A.   That's correct.

6    Q.   All right.  Next you have IBD drive programs which is

7    again just Barclays assuming a bonus type obligation that

8    Lehman used to owe, correct?

9    A.   Yes.

10   Q.   Okay.  Now you see two entries for severance.  The first

11   one is 238 million dollars.  You see that?

12   A.   Yes.

13   Q.   And that's with respect to two different reduction in

14   force exercises that took place at properties, right?

15   A.   Yes.

16   Q.   And that's in reference on the right as RIF and VIG are

17   two different reduction in force programs?

18   A.   Yes.  One was in Q4 2008 and one was in Q1 2009.

19   Q.   So the RIF is in the fourth quarter of '08?

20   A.   I think so.  I can't recall the specific -- I mean, RIF

21   stands for reduction in force, clearly.  VIG -- I have no idea

22   what that stands for.

23   Q.   Okay.  But VIG is in the first quarter of '09, correct?

24   A.   It's one or the other.  I'm sorry I'm --

25   Q.   One of them --

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 73 of 265

Page 73

1    A.   One of them is Q4 and one of them is Q1 2009.

2    Q.   Okay.  And if we turn back to Section 9.1(b) --

3         (Pause)

4    Q.   -- you'll agree with me that Section 9.1(b) provides for

5    the payment of severance for employees who -- for the period

6    from the closing up until December 31st, 2008, right?

7    A.   It references the date December 31st, 2008, correct.

8    Q.   So it doesn't apply to the reduction in force the

9    following year, does it?

10   A.   I don't know what this applies to.

11   Q.   Okay.

12        MR. HINE:  Let's go back to the chart, please?

13   Q.   Now, in any event, this severance payment, when that

14   severance payment is calculated, it's calculated in reference

15   to the severance program that was in place at Lehman before

16   these folks came over to Barclays, right?

17   A.   Believe so, yes.

18   Q.   Yes.  Okay.  But you have no real understanding, I think

19   you said -- or at your deposition, you have no real

20   understanding how this severance payment relates to 9.1(c) and

21   the obligations under 9.1(c) of the APA.  Is that fair to say?

22   A.   I have no understanding -- I had no understanding of what

23   9.1(c) obligates Barclays to do or not.

24   Q.   Okay.  And the same would be true of the severance

25   payment, the twenty-seven million and future severance

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 74 of 265

Page 74

1    payments, right?

2    A.   Sorry.  I don't understand your question.

3    Q.   Well, the next entry is twenty-seven million in severance

4    payments that had not been paid at the time you prepared this

5    chart, right?

6    A.   Yes.  The adjourned payroll hadn't as yet physically been

7    paid.

8    Q.   Okay.  And same question, you would not -- you have no

9    understanding of how that severance payment relates to the

10   obligations of 9.1(c) under the APA, correct?

11   A.   No.  I have no idea what --

12   Q.   Okay.

13   A.   -- had no idea what 9.1(c) obligates us to do.

14   Q.   Okay.  And if we wanted to compare these severance models

15   to Barclays' brief excerpt that we saw, I'd add up 238 and 27

16   and I would come to 265 million in total severance that

17   Barclays has paid, right?

18   A.   That total is 265, yes.

19   Q.   Right.  So your numbers agree with the excerpt from the

20   brief that we looked at.

21   A.   They appear to, yeah.

22   Q.   Yes.  Okay.  Next is an item, a tax item.  We've talked

23   about that.  That's another payment to a tax authority,

24   correct?  Nine billion?

25   A.   I believe so, yes.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 75

1    Q.    Okay.

2    A.    Or just to clarify, they may or may not have those yet

3    been paid.  It depends on the timing of the actual payments to

4    the tax authority and, in fact, the value of that tax payment -

5    -

6    Q.    Okay.

7    A.    -- is -- depends on when the equity actually vests, I

8    believe.

9    Q.    Okay.  The next items is a fifty-three million dollar

10   position buyout investing over two years.  Do you see that?

11   A.    I do.

12   Q.    And that relates to one individual trader who came from

13   Lehman to Barclays, right?

14   A.    That's correct.

15   Q.    Mr. Hoffman?

16   A.    Correct.

17   Q.    And Mr. Hoffman had a contract with Lehman.  It's a

18   performance based contract where he would make x amount of

19   dollars depending on how well he traded, right?

20   A.    That's reasonably fair to say.

21   Q.    And Barclays assumed that contract so now he does that

22   work for Barclays, right?

23   A.    Barclays issued him with a similar contract.

24   Q.    Okay.  And at the time you were preparing this chart, you

25   expected him to receive twenty million dollar tranches, one of

Page 76

1    February of 2010 and one of February of 2011, correct?

2    A.    That's correct.  In fact, he's received the one on

3    February 2010.

4    Q.    Okay.  And he was going to get the balance -- the thirteen

5    million was --

6    A.    He received that as well.

7    Q.    He's received that as well?

8    A.    Correct.

9    Q.    And was paid on February 2010, correct?

10    A.    It was delivered to him in whatever form outstanding

11    delivery parcel.  But, yes, he received value to that effect.

12    Q.    Okay.  And in connection with this assuming this contract,

13    Barclays retained the right to reduce these amounts if he

14    traded poorly, correct?

15    A.    In general, yes.

16    Q.    So if he accumulated a lot of losses in his trading,

17    Barclays could reduce those twenty million dollars payment by,

18    I believe you testified, up to ten million dollars, correct?

19    A.    That's correct.

20    Q.    So at least in part, you would agree that Barclays'

21    willingness to pay that fifty-three million dollars depended on

22    his performance after he went to Barclays, correct?

23    A.    We committed to this fifty-three million dollars

24    contractually to pay to Mr. Hoffman.  Delivery thereof was

25    contingent on -- delivery of a portion thereof was contingent

Page 77

1    on future performance.

2    Q.   So ten million dollars on two different tranches, at least

3    a substantial portion of it, is contingent on how well he

4    performs after he moves to Barclays, isn't that right?

5    A.   Those -- the twenty million tranches were subject to that

6    reduction under the contract, yes.

7    Q.   Right.  So that's --

8    A.   Well, as I've stated, he's received the first twenty.

9    He's received the thirteen.  And in fact, he's on track to

10   receive --

11   Q.   Okay.  That wasn't my question, Mr. Exall.

12   A.   I'm just giving --

13   Q.   But the question is Barclays assumed that contract.

14   Barclays' willingness to pay the fifty-three million dollars in

15   total was at least in substantial part dependant on how well he

16   traded when he went to Barclays, correct?

17   A.   The fifty-three million dollars that we had committed to

18   were subject to -- a certain portion thereof was subject to

19   future performance.

20   Q.   And it's also contingent on the fact that he has to stay

21   at Barclays till February of 2011, right?

22   A.   I can't recall the exact interpretation of the contract

23   but if that's what it says then, in general, that's probably

24   the case.

25   Q.   Well, let's --

Page 78

1   A.   For certain awards you receive in stock or something,

2   there are vesting conditions that are required.  Some of them

3   require service.  I can't recall exactly the specifics of Mr.

4   Hoffman's replacement contract.

5   Q.   Okay.  Let me direct your attention to page 135 of your

6   deposition.

7   A.   Okay.

8   Q.   I'm sorry.  It's page 136.  I apologize.

9   A.   Okay.

10  Q.   Starting at line 9, we're talking about Mr. Hoffman's

11  arrangement.  The question is:

12       "Barclays' willingness to pay that is contingent at least

13  in substantial part on how well he performs for Barclays

14  thereafter, correct?"

15  "A.   That is correct as well as Mr. Hoffman being in employment

16  with Barclays at the time."

17       Is that the testimony you gave at your deposition?

18       MR. BOIES:  Your Honor, for context, could we have the

19  next question and answer, please?

20       THE COURT:  Let's do that.

21       MR. HINE:  Sure, Your Honor.

22  Q.   The following question says:

23       "Okay.  So he has to stay an employee at Barclays at least

24  through the third payment?"

25  "A.   I don't know that for certain.  Again, I can't interpret

Page 79

1    the specific leaving clauses or termination clauses under his

2    agreement.  But in general, that's, you know, I would say, it's

3    based on future time served criteria as well as trading

4    performance."

5        That was your testimony --

6    A.   That's what I said.

7    Q.   -- at your deposition, right?

8    A.   That's what I said.

9    Q.   And that's still a true statement?

10   A.   I believe so.

11   Q.   Okay.  Let's go back -- refer back to paragraph 9.1(c)

12   once more.

13       (Pause)

14   Q.   You'll see in that paragraph, about the seventh or eighth

15   line down, Mr. Exall, it says, "Such annual bonuses shall be

16   awarded on or before March 15th, 2009."  You see that?

17   A.   That's what it says.

18   Q.   You would agree with me that the payments Mr. Hoffman

19   received were well after March 15th, 2009, is that right?

20   A.   Which payments?

21   Q.   The payments that he was to receive in February of 2010

22   and February of 2011.

23   A.   He received a contract for March 15th, 2009 and we

24   stipulated Barclays' obligations under that contract.

25   Q.   Right.  But his payments he didn't receive until February

Page 80

1    of 2010 or February of 2011, correct?

2    A.   He certainly didn't receive certain payments until that

3    time.  But it's -- again, I don't really know what this clause

4    means, but it does say "shall be awarded".

5    Q.   Yes.

6    A.   And he was given a contract with those terms inside it.

7    Q.   He didn't get the money until February of 2010, is that

8    right?

9    A.   In certain instances, yes.

10   Q.   As to the ones we were just talking about, right?

11   A.   That's correct, although I would go on to say that certain

12   individuals -- well, under normal stock programs they're

13   given -- people are given awards of stock.  They don't

14   necessarily receive the cash value before the 15th of March

15   2009.  But they may well have received the actual reward value

16   in a letter.

17   Q.   Okay.  Can we go back to your chart?  And just one point

18   of clarity.  Mr. Hoffman, in addition to this fifty-three

19   million dollar entry, he also received a bonus that falls

20   within the 1.529 number further up, correct?

21   A.   That's correct.

22   Q.   So he received both a bonus within that category of

23   payments and a separate contractual performance based contract,

24   right?

25   A.   He received an amount embodied in the 1.529 number.  And

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 81 of 265

Page 81

1    he received awards for the value of fifty-three million dollars

2    as stipulated on the schedule.

3    Q.   Okay.  And following that fifty-three number, you'll see

4    there's a payroll tax associated with his payments, is that

5    right?

6    A.   I believe so, yeah.

7    Q.   Okay.  And then the last large item is ISP awards.  Do you

8    see that?  Fifty-six million?

9    A.   Yes.

10   Q.   Now, as I understand it, those are shares of stock, the

11   stock bonuses that Barclays paid to employees to compensate

12   them for the fact that they did not receive their normal bonus

13   in March but rather received it in May, is that right?

14   A.   I wouldn't categorize it that way, no.

15   Q.   Okay.  Well, let me try to break it down.  The normal

16   practice at Barclays would be to pay stock awards in March,

17   correct?

18   A.   The normal practice for Barclays is to make awards to

19   individuals and communicate their compensation in late

20   February, make cash payments and then make stock awards related

21   to those in March having purchased the stock on an open market.

22   Q.   Okay.  And for some reason, 2009 -- those awards were paid

23   in May instead of March, right?

24   A.   I do recall there was a delay.

25   Q.   Okay.  And this is to compensate the recipients of those

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 82

1    awards for the fact that Barclays stopped appreciating the

2    value in that interim period, right?

3    A.    That's correct.  The amount of stock units that they would

4    have received in May would have been substantially lower than

5    the amount of stock units they would have received in March.

6    In March, people were told the dollar value of the awards they

7    were going to get in stock.  But they would have received a

8    substantially higher number of units in March.

9    Q.    Right.

10   A.    In May, given the sheer class depreciation, they would

11   receive substantially fewer stock units.  Consequently, this

12   award is directly related to the original value of the stock

13   awarded and it's to compensate them in part for the loss of

14   value in the sense that they would have gotten fewer stock

15   units.

16   Q.    I understand it's related to their original awards but

17   it's --

18   A.    It's directly related to the original awards.

19   Q.    -- it's payment to compensate them for the fact that

20   Barclays' normal procedures weren't followed and they were paid

21   several months later, isn't that right?

22   A.    No.  People got awards of value in March as a normal

23   course of business.

24   Q.    Right.

25   A.    They were not told the amount of stock  units they

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 83 of 265

Page 83

1    received until later.

2    Q.    Right.

3    A.    And this is to compensate them for the fact that they, in

4    May, doing a mathematical calculation based on the strike price

5    that we would have received in having hedged or purchased the

6    shares on the market, they would have received fewer shares

7    than they otherwise would have received.  It's directly related

8    to the value of the stock awards made at the time.

9    Q.    But it's due to the -- it's paid due to the fact that

10   their normal process wasn't followed that year, right?

11   A.    For various reasons, yes.

12   Q.    Right.  Okay.

13            MR. HINE:  Your Honor, I have nothing further.

14            THE COURT:  Do you have any redirect?

15            MR. BOIES:  Excuse me, Your Honor?

16            THE COURT:  Do you have any redirect?

17            MR. BOIES:  I do, Your Honor.

18            THE COURT:  About how long do you think you might be,

19   Mr. Boies?

20            MR. BOIES:  I would say certainly much less than the

21   cross.  I would say maybe thirty, forty minutes.  I think we

22   should take a break at this point.  It's ten after 11.  Let's

23   resume at twenty after 11.

24            MR. BOIES:  Thank you, Your Honor.

25         (Recess from 11:10 a.m. until 11:29 a.m.)

Page 84

```
 1              THE COURT:  Be seated, please.  Please proceed, Mr.

 2     Boies.

 3              MR. BOIES:  Thank you, Your Honor.

 4     REDIRECT EXAMINATION

 5     BY MR. BOIES:

 6     Q.   Good morning, Mr. Exall.

 7     A.   Good morning.

 8     Q.   Counsel asked you a number of questions about a

 9     conversation that you had with Mr. Guarnuccio.  And he took you

10     through the fact that you were not present even in New York

11     when the APA was signed.  Is that correct?

12     A.   I wasn't in New York till the 22nd -- or 21st of

13     September.

14     Q.   Of September?

15     A.   Yeah.  I don't know when the APA was actually signed.

16     Q.   And you spoke to Mr. Guarnuccio shortly after arriving in

17     New York in September of 2008, is that correct?

18     A.   I recall it being at or around the time.  I can't be

19     precise about the date.  I don't -- I couldn't find it in my

20     diary and I have no notes of the meeting.

21     Q.   You don't have any reason to doubt Mr. Guarnuccio's

22     statement that it was in September of 2008, correct?

23     A.   No.

24     Q.   And at the time you spoke to Mr. Guarnuccio, this was when

25     you were just beginning to examine the bonus and severance
```

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 85 of 265

Page 85

1    issues, is that correct?

2    A.    Yes.    This was at the beginning of my work associated with

3    the sale, yes.

4    Q.    Now, Mr. -- counsel gave you a copy of Movants' Exhibit 2.

5    And that's in the book that they gave you.    This is the

6    schedule that is initialed by Mr. Berkenfeld?

7    A.    Yes.

8    Q.    And is there any place on this schedule that references

9    bonus payments?

10    A.    Not that I can see.

11    Q.    There is a reference to comp, is that correct?

12    A.    Correct.

13    Q.    And you understand that to mean compensation, correct?

14    A.    That would be my interpretation of that.

15    Q.    And that shows a total for compensation of two billion

16    dollars, is that correct?

17    A.    That's what it seems to show.

18    Q.    And as you use the terms, "comp" and "compensation" as an

19    HR person, does that include severance as well as bonuses?

20    A.    Absolutely.    Compensation encompasses all forms of award

21    and compensation for services rendered including bonus,

22    severance, annual, long term incentive awards if necessary,

23    stock awards, benefits, monthly salary, all sorts of

24    compensation.

25    Q.    Now you were shown some materials from our brief in the

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 86 of 265

Page 86

1    trial record.  I'd like to show you a couple of pieces also.

2    Do you happen to know who Mr. McDade is?

3    A.    I don't know him personally but I know who he is.

4    Q.    And he was the lead negotiator for Lehman in this sales

5    transaction.  Were you aware of that?

6    A.    I have heard that.

7    Q.    Let me show you some testimony that Mr. McDade gave at

8    this trial, the official trial transcript of April 26th, 2010

9    at page 160.  And this -- in particular, I want to go to line

10   24 and the question that carries over to the next page.  And

11   I'd like you to look at this on the screen:

12   "Q.  The other part of that question had to do with

13   compensation, sir.

14   A.    Right.  Barclays also assumed a two billion dollar

15   compensation liability with respect to the combination of the

16   employees' bonus process and the severance process."

17        Do you see that?

18   A.    I do.

19   Q.    Did you come across anything in your work that was

20   inconsistent with that?

21   A.    Well, I believe so.

22   Q.    Now, going back just for a moment to Movants' Exhibit 2,

23   it's initialed up in the right-hand corner.  Do you know whose

24   initials those are?

25   A.    No, I don't.

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 87 of 265

Page 87

1  Q.  Didn't anyone ever tell you that was Mr. Berkenfeld?  Yes

2  or no?

3  A.  Not during the process.

4  Q.  Okay.

5  A.  I happened to be --

6  Q.  There's some testimony in the record that this was Mr.

7  Berkenfeld's initials.

8  A.  Okay.

9  Q.  And I ask you to assume that just for the moment.  And let

10  me show you -- and the cure and comp number totals 4.2 billion

11  dollars, correct?  4.25 billion dollars?

12  A.  That's correct.

13  Q.  Let me show from the official trial transcript, June 21st,

14  2010.  This is Mr. Marsal's testimony at lines 9 through 14 of

15  page 45:

16  "Q.  Was it your understanding in October of 2008 that the

17  assumed cure liability that is listed here and the assumed

18  severance liability that was listed here together added up to

19  4.2 billion dollars?

20  A.  That was my assumption based on the conversation with

21  Steven Berkenfeld, yes."

22      And did you find anything in your work that was

23  inconsistent with the inclusion of severance in that 4.2

24  billion dollars?

25  A.  If severance -- well, no.  No, I didn't.  If these are the

Page 88

1    references you're making then, no, I don't see anything

2    inconsistent with that.

3    Q.   Let me ask you to look at page 38 of your deposition.  And

4    you will recall that counsel asked you some questions about

5    that and directed your attention to the testimony at the top of

6    the page.  And you said in your answer, yes, you had testified

7    as he indicated at the top but there was also some testimony at

8    the bottom that you thought was relevant?

9    A.   Yes.

10   Q.   And I'd like to now give you a chance to look at that

11   portion at the bottom beginning at line 17 to 24:

12   "Q.  What did Mr. Clarkson (sic) tell you about that schedule?

13   "A.  I don't recall what he told me about it.  I asked for a

14   copy of it as part of my own reading of the relevant sections

15   of the APA."

16       And did you give that testimony also at the time?

17   A.   Yes, I did.

18   Q.   Let me ask you to look next at Movants' Exhibit 801 that

19   is in the book that counsel gave you.  And you'll recall that

20   counsel asked you about the e-mail at the bottom of the page

21   which was from James Walker to you with a copy to Gary Romaine

22   dated November 3, 2008.

23   A.   Yes.

24   Q.   Do you recall that?  And where he is requesting a copy of

25   the schedule that I think we've identified as Movants' Exhibit

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 89 of 265

Page 89

1    2.   And he says that -- or James says that there is a request

2    for a copy of the schedule that shows the two billion bonus

3    liability to Lehman folks.  Do you recall that?

4    A.   I see that there.

5    Q.   Now when you reply to that, you don't use the term

6    "bonus", correct?

7    A.   No, I didn't.

8    Q.   In fact, when you replied to that, which is the middle e-

9    mail on the same exhibit, you say "Here is a scanned copy.  You

10   will see the two billion dollars described as 'comp'."  Do you

11   see that?

12   A.   I do.

13   Q.   And why did you do that?

14   A.   I wanted to be precise about what I saw in the schedules

15   that have been given to me from Finance in relation to

16   Clause --  Article 9.  And I'm very careful, generally, to use

17   precise terms.  I realize that there is oftentimes confusion

18   when dealing with noncomp professionals.  For example, in my

19   day-to-day, I deal with finance people all the time.  They'll

20   use colloquialisms.  And in the comp world, certain things mean

21   certain things to different people.  So I try to be as precise

22   as I can when answering the question.

23   Q.   Let me ask you to look next at Movants' Exhibit 91 which

24   was another exhibit that counsel showed you.

25   A.   Yes.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 90

1   Q.   And you said in response to a couple of questions that the

2   1.4 billion dollar reference number was believed this time to

3   be insufficient.  And I'd like to give you a chance to explain

4   what you meant by that.

5   A.   The 1.4 billion dollars was given to me as a reference

6   point for the chart on the first page of this attached

7   document, summary report.  If you turn to the second page, we

8   are looking at sensitivity analysis around that number.  And

9   what we were trying to understand is with that reference point

10  and the guaranteed contracts that had been written and issued

11  to people at the time, what would the impact be on the residual

12  population that are not being guaranteed at that time.

13       Our target was to deliver in an aggregate for those people

14  without guarantees sixty-five percent of their 2007 total bonus

15  in 2008.  And the sensitivity analysis that we performed at

16  this time almost from day 1 indicated that the residual amount

17  available for those nonguaranteed people was at least 270

18  million dollars short on the model basis.  And if you adjust it

19  for people that may have received a zero bonus in 2007 and it

20  should be normalized in the normal course of events, you could

21  add another seventy-five to a hundred million dollars on top of

22  that.

23       So at this time, we were realizing that the 1.4 billion

24  dollar reference point was at least -- was anywhere between, on

25  a model basis, 270 and 370 million dollars short.

1       Now this is a bonus model only.  It excluded, as you see

2    on the front page, severances that may or may not be payable to

3    eligible employees as part of the redundancy program.

4    Q.   Now, in that connection, I'd like to ask you to look at

5    Movants' Exhibit Trial Exhibit 145, which you were also asked

6    about.  And in particular, go on to the second page and at the

7    bottom, under "Strawman Approaches", one of the strawman

8    approaches that you identified is to try to manage within the

9    overall 1.4 billion dollar number.  Do you see that?

10   A.   I see that.

11   Q.   And you were asked about that.  And there are a list of

12   risks or disadvantages to this.  And there are several.  And

13   counsel asked you about the very last one which was spending

14   more than one billion dollars is "dilutive to current negative

15   goodwill calculation".  Do you see that?

16   A.   More than 1.4 billion.

17   Q.   Yes.  And what I'd like to do is ask you about the very

18   first disadvantage of the several that are listed here, not the

19   last one, which is "contrary to original principles".  And can

20   you explain what you meant by that?

21   A.   What I meant by that was there was an original plan to

22   issue guarantee bonus contracts to the top 175 to 200 people.

23   And we were going to go beyond that estimate.  We were going to

24   issue guarantee bonus contracts to more than that given the

25   substantial pressures that we were under to retain staff and

Page 92

1    solidify the franchise.  I think if you continue on under those

2    disadvantages to the second last one, we were referencing the

3    fact that a finite pool, which is the 1.4 billion dollar

4    reference point, would mean a furtherance of substantial

5    squeeze on nonguaranteed people and lead to flat risk which is

6    what we were seeing at the time.  And I think at this time, we

7    realized that 1.4 billion dollars was just not going to be

8    sufficient if we were going to address these concerns of the

9    business.

10   Q.   Let me ask you -- incidentally, before I go on to the next

11   exhibit, in addition to the guaranteed -- the people you were

12   going to guarantee the bonuses to, was it the plan to give

13   bonuses to additional people?

14   A.   Yes.  People that were not issued guaranteed contracts

15   were eligible for compensation.

16   Q.   And from the beginning, was it intended that some amount

17   of money would be spent on bonuses for pre-acquisition services

18   for former Lehman employees who were not given guarantee

19   contracts?

20   A.   That's correct.  The original targets, rules of the road

21   for wont of a colloquialism that we use, was to try and deliver

22   an aggregate to those people an amount equivalent to sixty-five

23   percent of their 2007 bonus.

24   Q.   Okay.  Now let me go on to Movants' Trial Exhibit 107

25   which is another version of an exhibit that I had used with you

Page 93

1    during my examination yesterday.  And in this connection,

2    counsel asked you a number of questions about taxes and payment

3    of taxes to tax authorities.  Do you recall that generally?

4    A.   Yes.

5    Q.   Now, typically, if you pay a bonus to an individual, do

6    the taxing authorities require you to withhold a certain amount

7    of that bonus and pay it to the tax authorities?

8    A.   In most tax jurisdictions, that's correct.

9    Q.   And when you do that, is your belief that when you pay it

10   to the tax authorities, you're paying it on behalf of the

11   employee?

12   A.   It will be their liability to the tax amount in that

13   jurisdiction, correct.  And the employer is effectively acting

14   as a collection agent for --

15   Q.   And do you include the amount of the withholding that

16   you're paying to the tax authorities as part of what you

17   ordinarily consider to be the bonus that is being paid to the

18   individual?

19   A.   Yes.  That's the value that would be drawn to or awarded

20   to the individual, the gross number.

21            MR. BOIES:  Your Honor, I have no more questions.

22            THE COURT:  Is there anything more?

23            MR. HINE:  No questions, Your Honor.

24            THE COURT:  You're excused.  Thank you.

25            THE WITNESS:  Thank you, Your Honor.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 94

1          MR. BOIES:  Our next witness, Your Honor, is Mr.

2     Rosen.  We call Mr. Rosen to the stand.

3          THE COURT:  Please raise your right hand, sir.

4       (Witness duly sworn)

5          THE COURT:  Be seated, please.

6          MR. BOIES:  We will hand out binders and documents I'm

7     going to be using.  And we'll collect the binder that's up

8     there on the witness stand.

9     DIRECT EXAMINATION

10    BY MR. BOIES:

11    Q.   Good morning, Mr. Rosen.

12    A.   Good morning, Mr. Boies.

13         (Pause)

14    A.   Thank you.

15    Q.   You are a partner with the firm of Cleary Gottlieb,

16    correct?

17    A.   Yes, that's correct.

18    Q.   And how long have you been a partner at Cleary Gottlieb?

19    A.   Approximately twenty years.

20    Q.   And do you have a specialization in your practice?

21    A.   Yes.  I specialize in derivatives and in securities

22    regulation.

23    Q.   And how long have you specialized in derivatives?

24    A.   More than twenty-five years.  Thank you.

25    Q.   And do I understand correctly that you are the coordinator

Page 95

1  of Cleary Gottlieb's financial products and markets practice

2  group?

3  A.   Yes, that's correct.

4  Q.   Now there is a Securities Industry and Financial Markets

5  Association.  Are you familiar with that?

6  A.   Yes, I am.

7  Q.   And do you play any role with respect to that association?

8  A.   Yes.  I have been the regular outside counsel to the

9  derivatives committee and have advised and testified before

10  Congress for that trade association on a number of occasions.

11  Q.   Do you play any role with respect to the Securities

12  Industry Association?

13  A.   The Securities Industry and Financial Markets Association

14  has succeeded to the Securities Industry Association which I

15  similarly represented before.

16  Q.   And there is also a Futures Industry Association, is that

17  correct?

18  A.   That is correct.

19  Q.   And do you play any role with respect to the Futures

20  Industry Association?

21  A.   I have advised the Futures Industry Association on

22  derivatives regulation.  And I am also on the board of

23  directors of the Futures Industry Association.

24  Q.   With respect to the International Swaps and Derivatives

25  Association, do you play any role with respect to that --

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 96 of 265

Page 96

1    A.    I have --

2    Q.    -- organization?

3    A.    -- advised and on occasion testified before Congress for

4    the International Swaps and Derivatives Association and I am on

5    their regulatory advisory committee in the United States.

6    Q.    With respect to the Bond Market Association, is that an

7    association that you have any connection with?

8    A.    That is also a Securities Industry Association that was

9    superseded by the Securities Industry and Financial Markets

10   Association.  And while it existed, I similarly advised that

11   trade association.

12   Q.    I want to direct your attention to the period of September

13   of 2008.  And you were involved in the Barclays/Lehman

14   transaction, correct, sir?

15   A.    Yes, that's correct.

16   Q.    When did you become involved in that transaction?

17   A.    I became involved, my recollection is, in the beginning of

18   the week leading up to the sale hearing.

19   Q.    And who did you represent?

20   A.    I was representing Barclays.  I was not a member of the

21   deal -- original deal negotiation team.  But I was an adjunct

22   to it for the purpose initially of addressing certain

23   regulatory issues that were presented by the transaction.

24   Q.    And did those issues include issues related to the

25   derivatives business or the exchange traded derivatives

Page 97

1   business?

2   A.   It did.  And they involved -- they evolved to observe

3   quite a lot of my attention, particularly, at the time of the

4   sale hearing and over the weekend following that.

5   Q.   And were you also at some point involved in issues

6   relating to JPMorgan?

7   A.   Yes.

8   Q.   Did you have any involvement in the preparation of the

9   original APA?

10  A.   I wasn't a part of the deal team negotiating it but I had

11  been asked by my partners to prepare a set of conditions that

12  related to regulatory requirements which I'm happy to elaborate

13  if you'd like.

14  Q.   Would you just summarize your --

15  A.   Just very briefly.  Lehman Brothers operated under a

16  particular regulatory regime with the SEC which entitled it to

17  certain favorable capital treatment.  Barclays was not

18  operating under that same regime.  And so, we needed certain

19  arrangements with the SEC to agree that with the combined

20  entity, they could continue to operate at least the Lehman

21  portion of the business if not the entire business under the

22  new regime.  And since Lehman had been subject to consolidated

23  supervision by the SEC but Barclays' local consolidated

24  supervisor was the Federal Reserve, as part of the regime, it's

25  necessary for the holding company of the broker-dealer to be

Page 98

1    subject to a consolidated supervisor.  And we were seeking

2    confirmation that the SEC would permit the Fed to be the

3    consolidated supervisor.  We ultimately received assurances

4    from the SEC along those lines.

5    Q.   Now you're familiar with the so-called clarification

6    letter, correct?

7    A.   Yes, I am.

8    Q.   Did you have any involvement in the actual negotiation and

9    drafting of the clarification letter?

10   A.   Specific provisions of it, I did.

11   Q.   And could you identify those specific provisions?

12   A.   I dealt with provisions that related to assets that were

13   in the 15c3-3 account.  I had some involvement in provisions

14   that related to DTCC.  And I had some involvement in provisions

15   relating to the treatment of exchange traded derivatives and a

16   margin that was associated with those exchange traded

17   derivatives.

18   Q.   And did that include what has sometimes been referred to

19   in this trial as clearance box assets, any of those that you've

20   just identified?

21   A.   There were provisions related to the provisions that I

22   worked on that included references to the clearance box assets,

23   yes.

24   Q.   Let me turn to the exchange traded derivatives or

25   sometimes referred to in this trial as ETDs.  And let me begin

Page 99

1   by asking although you were not involved in negotiating the

2   APA, did you read it and were you familiar with its terms?

3   A.   I did come to read it and develop some familiarity with

4   particular provisions that related to the clarification letter

5   issues that I was working on, yes.

6   Q.   Let me ask you to look at Exhibit 1, which is the APA, and

7   it's at tab 2 of your book.  And in particular, let me ask you

8   to look at page 2 where the APA defines the business that is

9   being defined -- that is being acquired by Barclays.  And it

10  says that the "Business means the U.S. and Canadian investment

11  banking and capital markets businesses of Seller including the

12  fixed income and equities, cash trading brokerage, dealing,

13  trading and advisory businesses, investment banking operations

14  and LBI's business as a futures commission merchant."  Do you

15  see that?

16  A.   Yes, I do.

17  Q.   And as you understood it at the time, were exchange traded

18  derivatives a part of that business?

19  A.   Yes. They would have been a part of that business both as

20  part of the capital markets trading business of Lehman, its

21  brokerage business and as part of what is referred to at the

22  end as "LBI's business as a futures commission merchant" which

23  is a colloquial reference to being a broker in the futures

24  business which are listed exchange traded futures contracts.

25  Q.   Let me now ask you to look at page 6 of the APA where

Page 100

1   purchased assets are defined.  And in particular, I want to

2   look at the very beginning where it says "Purchased Assets

3   means all of the assets of the Seller and its subsidiaries used

4   in connection with the business."  Do you see that?

5   A.   Yes, I do.

6   Q.   And we've just defined what that business is.  And would

7   ETD margin or the margin for the exchange traded derivatives be

8   assets of the seller used in connection with the business as

9   you understood it?

10   A.   Yes.  It would have been one of the most important assets

11   associated with the business if not the most important asset

12   associated with the business.

13   Q.   Why is that?

14   A.   The reason is that exchange traded derivatives are a form

15   of executory contract.  They're a contract that create ongoing

16   future performance obligations with the possibility that

17   someone who has such a position might not fulfill their

18   obligations in the future.  You can only maintain an exchange

19   traded derivatives position through a clearinghouse in an

20   account of a participant of a clearinghouse with arrangements

21   for the deposit or other commitment of a variety of different

22   forms of security or collateral, generally referred to as

23   credit support, to ensure that if someone doesn't pay their

24   obligations under the exchange traded derivatives going forward

25   that there will be assets available to ensure that the market -

Page 101

1    - market participants in the clearing corporation doesn't incur

2    a loss.  It's to maintain the financial integrity of those

3    markets.  So you can't have a position in an exchange traded

4    derivative without having margin, a guarantied fund deposit,

5    various forms of arrangements to provide security or collateral

6    to the clearing corporation.  And the clearing broker

7    occasionally requires their customers to provide equivalent

8    levels of that kind of credit and collateral to the clearing

9    broker so that the clearing broker is covered in terms of its

10   obligations to the clearing corporation.

11   Q.   Now the APA says that purchased assets means all of the

12   assets of the seller used in connection with the business

13   excluding the excluded assets.  It then gives some examples of

14   what is included.  And I want to go through at least one of

15   those examples with you because of what you just said.  And

16   that is paragraph -- subparagraph (b) where one of the examples

17   of included assets is "all deposits".  Do you see that?

18   A.   Yes, I do.

19   Q.   And would exchange traded derivative margin, as you

20   understand it, be included in the ordinary course of the words

21   "deposits" as those are used in the industry?

22   A.   Yes, but not only the margin.  It would also be the

23   guaranty fund deposit.  And I think if you look at the

24   documents that were provided by the OCC in connection with

25   those transactions, you will see that they refer specifically

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 102 of 265

Page 102

1    to margin deposits and guaranty fund deposits.  And these types

2    of deposits are precisely -- perform precisely the same

3    function as the enumerated deposits because, again, it's a

4    question of having a contractual arrangement whether it's a

5    lease or some other obligation to pay money going forward and

6    providing some form of security or collateral to ensure that

7    the party to whom the payment is owed is protected in the event

8    that there is a default.

9    Q.   Now during the negotiations that you were aware of and

10   involved in in connection with the sale transaction, was it

11   apparent to you as to whether or not the parties were

12   specifically focusing on ETD margin as part of what was being

13   transferred to Barclays?

14   A.   Yes, from the very beginning it was clear to me.

15   Q.   And can you give me some examples of how that became clear

16   to you?

17   A.   Well, in the sale order itself leading up to the sale

18   hearing, I received, forwarded from one of my partners, an e-

19   mail from the Options Clearing Corporation which is the U.S.

20   largest clearing corporation for securities options.  And they

21   wanted to include language in the sale order to protect the

22   lien that they would have on the margin in the accounts of

23   Lehman that were being transferred to Barclays as part of the

24   APA because they were concerned that the provisions of the sale

25   order that would have relinquished the liens of third parties

Page 103

1    with respect to the purchased assets might be read to affect

2    the liens that they would have with respect to the margin and

3    other assets that they would have held in accounts transferred

4    from Lehman to Barclays as part of the transaction.

5    Q.   Now you referred to an e-mail.  Let me ask you to look at

6    tab 27 in the book that you have in front of you.

7    A.   I'm sorry, Mr. Boies.  My binder goes up to 26 -- wait, I

8    may be wrong.  Yes.  I see it.  I apologize.

9    Q.   And I would ask you -- and this is Movants' Trial Exhibit

10   508.  And I would ask you whether this is the e-mail that you

11   were referring to.

12   A.   No.  This is not the e-mail that I was referring to.

13   Q.   Okay.  This is a different e-mail --

14   A.   Yes.

15   Q.   -- which was also --

16   A.   This was sent on the Sunday.

17   Q.   Sent to you Sunday.

18   A.   Yes.

19   Q.   I'll get the right one.  Let me try tab 3 which is

20   Barclays' Exhibit 220.

21   A.   Yes.  I recognize this.

22   Q.   Is this the e-mail that you were referring to?

23   A.   Yes.  This is the e-mail.  And what is included here is a

24   forwarding of an earlier e-mail to a number of individuals

25   including at Weil because after I had seen and reviewed the

Page 104

1    language that they wanted to include which I thought was a

2    reasonable concern for them to seek to be addressed, I

3    suggested to them that they forward it on to the Lehman side.

4    Q.   And this e-mail, the second page in the e-mail that is

5    September 19th, 2008 at 11:39 p.m., it talks about the

6    collateral that is being transferred from LBI accounts at OCC

7    to Barclays' accounts at OCC.

8    A.   Yes.  Positions and collateral, yes.

9    Q.   And did anyone ever indicate to you that there was any

10   intention on Lehman's part not to transfer any of the ETD

11   margin or collateral?

12   A.   That was never communicated to me at any time.

13   Q.   And would there have been any reason for the OCC to have

14   this concern if the positions and collateral were not being

15   transferred to Barclays?

16   A.   No.  And similarly, if the transfers had been limited to

17   customer accounts and customer property, that would not have

18   been affected by the release of the lien and therefore wouldn't

19   have been a purchased asset.  So this could only have been a

20   concern of theirs with respect to the proprietary portions of

21   the assets and positions in the account.

22   Q.   Let me ask you to look at the document that is behind tab

23   8.  This is Barclays' Exhibit 233.

24   A.   Yes, sir.

25   Q.   And this is a e-mail from James McDaniel to a number of

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 105 of 265

Page 105

1    people dated September 20, 2008 at 12:45 p.m.  Do you see that?

2    A.   Yes.

3    Q.   And did you get a copy of this?

4    A.   I did get a copy of this, yes.

5    Q.   And one of the things that is said and indeed the very

6    first thing that is said is "OCC is seeking to confirm its

7    understanding that the LBI accounts and all positions, cash and

8    securities collateral that are held by OCC in respect of those

9    accounts are intended to be transferred to Barclays and that

10   Barclays is assuming all obligations with respect to those

11   accounts."  Do you see that?

12   A.   I do see that.

13   Q.   And was confirmation given to OCC that that was in fact

14   what was being done?

15   A.   I believe I confirmed that with Jim McDaniel on the

16   telephone.

17   Q.   Now --

18   A.   This was -- the implementation of this was to be

19   effectuated by a transfer and assumption agreement copies of

20   which were provided to me and I understood also the trustee for

21   the first time on Friday.

22   Q.   Now you mentioned the trustee.  Could you go through who

23   the addressees of this e-mail are to the extent that you

24   recognize them?

25   A.   There are a number of Weil Gotshal lawyers, Ronit

Page 106

1   Berkovich, Shai Waisman, Rod Miller, Hague Generis (ph.).  Also

2   included on this in addition to myself was Mr. Kobak at Hughes

3   Hubbard, Mr. Giddens at Hughes Hubbard, a fellow by the name of

4   Margolin at Hughes Hubbard.  K. Caputo at SIPC, Shelly Hirshon

5   at Proskauer and a name I don't recognize of someone at DTCC.

6   Q.   And you mentioned several representatives from Hughes

7   Hubbard.  Who was Hughes Hubbard representing here?

8   A.   My understanding is that Hughes Hubbard was representing

9   the trustee.

10  Q.   And did anyone who received this e-mail, or anyone else

11  for that matter, ever say that OCC's understanding that all

12  positions, cash and securities collateral held by OCC was being

13  transferred to Barclays?

14  A.   No.  Quite the contrary.  The actions of the participants

15  in the transaction were exactly the opposite.  I was informed

16  sometime between Friday and Saturday that the transfer and

17  assumption agreement language implementing what is described

18  here was signed by the trustee and that the OCC had that

19  signature page.  And they were looking to us also to execute

20  the transfer and assumption agreement.

21  Q.   Let me ask you to look at another e-mail.

22       (Pause)

23          MR. BOIES:  May I have just a moment, Your Honor?

24          THE COURT:  Yes.

25       (Pause)

1  Q.   Let me ask you to look at the e-mail that we looked at a

2  moment ago that's behind tab 3.  And in particular, on the

3  second page, this is the e-mail that I mentioned earlier,

4  September 19th, 2008 at 11:39 p.m. -- or a.m. where there is a

5  request to insert into the sale order some language.  Do you

6  see that?

7  A.   Yes, I do.

8  Q.   At the very bottom of the page, it says, "From and after

9  the closing date, all securities, cash, collateral and other

10 property transferred to accounts of the purchaser at OCC shall

11 be subject to all rights of OCC therein in accordance with the

12 bylaws and rules of OCC including, without limitation, the

13 security interest and setoff rights of OCC with respect

14 thereto."  Do you see that?

15 A.   Yes, I do.

16 Q.   And was that information, in fact, included in the sale

17 order?

18 A.   Yes, it was.  My understanding is it was, yes.

19 Q.   Now would this provision have had any rationale and made

20 any sense if Barclays was not getting the ETD margin?

21 A.    No, I don't believe so.  Certainly not the reference to

22 the securities, cash and collateral and other property

23 transferred to the accounts.

24 Q.   Now, let me ask you to look next at tab 6 which is the

25 transfer and assumption agreement.  And this is Barclays'

1   Exhibit number 3.  And I want to direct your attention to the

2   first paragraph of what's described as being transferred and,

3   in particular, subparagraph (a) where it says "For good and

4   valuable consideration, the receipt and sufficiency of which

5   are hereby acknowledged, Lehman hereby assigns -- hereby sells,

6   assigns, transfers and sets over to Barclays without recourse

7   or without representation or warranty other than as expressly

8   provided herein all of Lehman's rights, title, interests,

9   powers, privileges, remedies, obligations and duties in, to,

10   under and in respect of the account as of the effective date

11   including with respect to (i)the clearing fund deposit; (ii)all

12   margin deposits held by OCC with respect to the account;

13   (iii)all settlement obligations with regard to the transactions

14   and cleared contracts; and (iv)all rights and obligations in

15   respect of exercises of option contracts and assignments of

16   such exercise."  Do you see that?

17   A.   I do.

18   Q.   And did that include the ETD margin and collateral?

19   A.   That would have included the ETD margin and collateral

20   Lehman Brothers guaranty clearing -- what they call a clearing

21   fund deposit.  There are different terms of art used to refer

22   to these various forms of credit.  But yes.  And it would have

23   applied to all of their accounts which would have included

24   customer accounts, their proprietary accounts as well as the

25   margin deposits that secured obligations under those.

Page 109

1    Q.    Now let me ask you to turn to the last page of this, the

2    signature page.  And it is signed on behalf of James W. Giddens

3    as trustee for Lehman Brothers Inc.  Do you see that?

4    A.    Yes, I do.

5    Q.    And do you recognize who signed on behalf of the trustee?

6    A.    It appears to be James Kobak.

7    Q.    Now did you ever hear anything from Mr. Kobak or any

8    representative of the trustee that was inconsistent with your

9    understanding that LBI was transferring all of the exchange

10   traded derivative margin and collateral of whatever kind of

11   description?

12   A.    Not at any time.

13   Q.    Let me ask you to turn next to tab 8 in your book.  This I

14   had showed you before.  This is BCI 233.

15   A.    Yes.  I see it.

16   Q.    And this was a -- an e-mail that Mr. McDaniel sent on

17   Saturday, September 20th, correct?

18   A.    Yes.

19   Q.    And we've already gone over that.  But then if you turn to

20   tab 9, which is another e-mail from Mr. McDaniel the next day,

21   that is, Sunday, September 21, at 4:03 p.m., and this is on the

22   second page.

23   A.    Yes.

24   Q.    Paragraph number 2 says "Having heard nothing further from

25   you with respect to cash held by OCC in respect of the LBI

Page 110

1    accounts and in accordance with the terms of the transfer and

2    purchase agreement, all such cash in the accounts will be

3    transferred to Barclays assuming that the transaction closes

4    this evening.  Do you see that?

5    A.    Yes.  I do see that.

6    Q.    And this again goes to Mr. Giddens and Mr. Kobak as well

7    as people at SIPC and elsewhere, correct?

8    A.    That's correct.

9    Q.    Now, did anyone ever say in response to this e-mail, or

10   otherwise, that the cash being held by OCC in respect to the

11   ETD margin accounts that have held for Lehman was not to be

12   transferred to Barclays?

13   A.    No one indicated that the cash was not -- or any portion

14   of it or cash associated with any particular accounts or

15   account type.  There was no question raised in communications

16   to which I was a party questioning that.

17   Q.    Now let me ask you to turn to tab 10.  This is an e-mail

18   that you wrote on Saturday, September 20th, following Mr.

19   McDaniel's e-mail of September 20th at 12:45 p.m. that is BCI

20   Exhibit 233, but obviously before Mr. McDaniel's Sunday

21   September 21st e-mail.  And you write, "Jim" -- and that's

22   addressed to Mr. McDaniel, correct, sir?

23   A.    Yes.

24   Q.    -- "can you tell us more about the one billion dollars?

25   Is it excess margin?"  Do you see that?

Page 111

1    A.    Yes, I do.

2    Q.    And to whom do you send copies of this e-mail?

3    A.    I replied to everybody that was on the e-mail that I had

4    originally received from Mr. McDaniel.  So that would include

5    the lawyers from Weil Gotshal, Jim Kobak at Hughes Hubbard,

6    James Giddens and some others and Mr. Ken Caputo, I guess, of

7    SIPC.

8    Q.    Was it clear, as you understood it, from the conversations

9    and communications between all of these people that all of the

10   ETD margin, including cash margin, including any excess margin

11   that might have existed, was being transferred to Barclays?

12   A.    It was certainly my understanding.  And no one raised any

13   question as to whether or not there was or should have been a

14   distinction between margin that was required and margin that

15   was excess.

16   Q.    Now if you tried to make a distinction between margin that

17   was excess and margin that was not excess, would there have

18   been a practical way to do that?

19   A.    It would have required a fairly extensive set of

20   provisions the most important of which is you cannot tell

21   whether there is excess in relation to an exchange traded

22   derivative really until the position is liquidated because the

23   risk is the risk of the holder of the account until the

24   position has been liquidated and all obligations extinguished

25   and you can see what is left at that time.  But you can't know

Page 112

1    that what is excess at 9:00 in the morning is going to be

2    excess at 11:00 in the morning.  One could have addressed --

3    one could have negotiated provisions addressed to those issues

4    but the question was never raised.

5    Q.    Let me, in connection with what you just said, ask you to

6    look at Barclays' Exhibit 236, which is tab 14.  And as we

7    established a moment ago, you had written Mr. McDaniel.  "Can

8    you tell us more about the one billion dollars?  Is it excess

9    margin?"  And this is referring to the OCC margin that Lehman

10   Brothers had with respect to its EDT positions.  And Mr.

11   McDaniel responds to you also on September 20th at 1:15 p.m.:

12   "Based on market movements on Friday, a significant amount of

13   it may be excess.  But OCC won't know until tomorrow.  Also,

14   Friday's trades may use some of the cash."  Do you see that?

15   A.    Yes, I do.

16   Q.    And does that illustrate what you were saying a moment ago

17   that while there might have been a significant amount of

18   excess, it was very hard to tell and you couldn't tell except

19   by taking into account a variety of trades over a period of

20   time?

21   A.    Yes.  At this point -- anything at this point of time

22   would have been a projection and was subject to change very

23   quickly.  And in fact, we received some additional

24   communications which indicated just how variable it was.

25   Q.    Indeed, in that connection, let me ask you to look at tab

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 113 of 265

Page 113

1   15 which is from Mr. McDaniel to you the same day, Saturday,

2   September 20th at 3:52 p.m., just a few hours later in the

3   afternoon from the e-mail that we just looked at.  And he

4   begins "Ed, just to be clear, from OCC's perspective, these are

5   the three major open issues that we see now."  And number one

6   is "How much of the approximately one billion in cash that OCC

7   is holding as margin for LBI accounts is intended to be

8   transferred to Barclays at closing?  And how much will cash

9   margin not transferred be replaced?"  And he goes down at the

10  bottom to say, "While we have indicated that there may be some

11  release of excess margin collateral on Monday, Saturday morning

12  preliminary numbers actually showed a 5.1 million margin

13  deficit."

14  A.   Correct.

15  Q.   "So I would not look for any large release."  Do you see

16  that?

17  A.   Yes, I do.

18  Q.   And so that's going from a one billion dollar perhaps

19  excess margin to a 5.1 million dollar margin deficit.

20  A.   Yes, although he never indicated that the one billion was

21  entirely excess.  I asked the question because ordinarily the

22  profit on ETDs is manifested in cash.  So I was trying to

23  ascertain how much risk was associated with these accounts

24  going forward.  This is what we were trying to nail down.

25  Q.   At a minimum, there was no doubt that there could be

Page 114

1    significant excess margin, correct?

2    A.    There could be excess margin or the markets could open in

3    the morning and if Barclays had assumed responsibility for the

4    accounts, it could have a billion dollar margin deficit that it

5    had to make up.  There was no way to know over the weekend.

6    Q.    And either way, that was Barclays' risk and reward,

7    correct?

8    A.    Yes.  That was precisely what Barclays was assuming in

9    taking on these positions.

10   Q.    If there was a deficit, Barclays was responsible for it,

11   correct?

12   A.    Correct.

13   Q.    If there was an excess, Barclays got the benefit of it.

14   A.    That's correct.

15   Q.    Let me ask you to look next at tab 16 which is Movants'

16   Exhibit 421.

17   A.    Yes.

18   Q.    And is this an e-mail that you also got a copy of?

19   A.    Yes.  I had -- partly as a result of the exchanges that I

20   had had with Jim McDaniel and Bill Navin, who was the general

21   counsel at OCC, I had asked him if he could provide some

22   further color on the status of the accounts.  And he forwarded

23   to me and to others the information in this e-mail relating to

24   the Lehman accounts.  These appear to have been projections of

25   what they felt the cash flows would be on Monday based on the

Page 115

1   information that they then had.

2   Q.   Now we've been talking about the OCC and the ETD positions

3   that Lehman had at OCC.   There are other futures exchanges,

4   correct?

5   A.   Yes.   There are other futures clearinghouses and even

6   additional options clearinghouses in the United States and

7   outside the United States.

8   Q.   And at the time that the sales agreement was being

9   negotiated, were you aware that other futures exchanges had

10  already liquidated or auctioned off LBI's ETD positions?

11  A.   Yes.   Well, I had heard second-hand that the Chicago

12  Mercantile Exchange had done that.   And there was a perception

13  that the circumstances under which that liquidation occurred

14  dissipated very significant amounts of margins in excess of a

15  billion dollars.

16  Q.   And the OCC was also threatening to liquidate Lehman's ETD

17  accounts if the deal with Barclays did not go through, is that

18  correct?

19  A.   Yes, that's correct.   There was an e-mail from Jim

20  McDaniel to me over the weekend saying that they were very

21  extremely concerned about the positions even knowing everything

22  that they knew themselves about the positions in the margin and

23  that if this deal was not consummated, they would liquidate the

24  accounts.   And if they had done that, the accounts couldn't

25  have -- wouldn't have been transferred and likely a very

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 116

1   substantial, if not all of whatever value there was, one would

2   have to assume would have been dissipated as in the case of the

3   Chicago Mercantile Exchange.  So we wanted to avoid that at all

4   costs.

5        So when I received that e-mail from Mr. McDaniel, I

6   immediately forwarded it to Steve Harback, who was the

7   president of SIPC at the time, and asked him to reach out and

8   try to persuade OCC to give us the time that we needed to work

9   through the issues because I certainly didn't see any obstacle

10  to our executing the transfer and assumption agreement.  There

11  were just a number of brush fires that we needed to address

12  over the course of the weekend to get all of the arrangements

13  completed.

14  Q.   And for the record, let me ask you to turn to tab 9, which

15  is Barclays' Exhibit 267 -- we've already looked at in a

16  different context.  And in particular, to page 2, the e-mail

17  from Mr. McDaniel Sunday, September 21st at 4:03 p.m.,

18  paragraph 3 in which Mr. McDaniel writes:  "If the transaction

19  does not close tonight, OCC would need to immediately liquidate

20  and close out the LBI accounts and is preparing to do so.

21  These preparations are a precautionary measure that OCC does

22  not expect to have to use."  Do you see that?

23  A.   Yes, I do.  I would say that they were operating under a

24  hair trigger.

25  Q.   Yes.  And that was at 4:03 p.m.  And let me --

Page 117

1    A.    Let me just add that --

2    Q.    Yes.

3    A.    I mean, we shared their concern notwithstanding the fact

4    that we had received an indication that the preliminary numbers

5    were -- indicated that money was coming in to the account

6    because we didn't know what was going to happen Sunday night.

7    If Asia had opened and there was a report that the Lehman deal

8    that was approved by the Court on Friday had not consummated,

9    we had no idea what effect that might have on the market and

10   the market turmoil.  If the market had moved against the

11   positions that were in the accounts that could have been

12   completely eliminated even before we got to close on Monday.

13   These things -- events move very, very quickly.  And for these

14   kinds of numbers to be transmitted over a weekend, not an open

15   business cycle, suggested that in an active business cycle in

16   which the market was moving unfavorably or with great

17   volatility, these numbers could change significantly and in

18   amounts much larger than this potentially.

19        What this told us was not how favorable the market was but

20   how significant the potential level of market exposure was that

21   was associated with the positions in the accounts that Lehman

22   was transferring to Barclays.

23   Q.    And indeed, later that day on Sunday at 4:37 p.m., on the

24   first page of Exhibit 267, Mr. McDaniel in an e-mail wrote to

25   you and the trustee representatives and others that although

Page 118

1    they expected that the transaction would take place, "However,

2    OCC cannot allow the positions to remain in place if no

3    transaction is concluded tonight because OCC will then be

4    exposed to loss if the market moves against LBI's position."

5    Do you see that?

6    A.   Yes.

7    Q.   And you believed that that was, in fact, OCC's position,

8    correct?

9    A.   Yes, I did.  I had no reason to doubt that they would act

10   in that manner.

11   Q.   Now, let me turn to the clarification letter.  And in the

12   clarification letter, the clarification letter specifically

13   addresses the issue of EDT margin, correct?

14   A.   It does.

15   Q.   And let me try to find that in this volume.

16        THE COURT:  Mr. Boies, while you're in the process of

17   looking, but without seeking in any way to interfere with the

18   process of finding the document, I just wanted to inquire as to

19   approximately how long you think you're going to be with the

20   witness on direct at this point?

21        MR. BOIES:  I think probably more than half an hour

22   certainly.

23        THE COURT:  If you're going to be more than half an

24   hour, why don't we use the lunch break for you to find that

25   document?

Page 119

1          MR. BOIES:  Thank you, Your Honor.

2          THE COURT:  And we'll return at 2:00.

3          MR. BOIES:  Thank you very much, Your Honor.

4          THE COURT:  Okay.  We're adjourned till then.

5      (Recess from 12:31:39 p.m. until 2:02 p.m.)

6          THE COURT:  Please be seated.  And, Mr. Boies, please

7  continue.

8          MR. BOIES:  Thank you, Your Honor.

9  RESUME DIRECT EXAMINATION

10  BY MR. BOIES:

11  Q.   Mr. Rosen, would you turn to tab 13 of your binder, which

12  is Barclays Exhibit 5?  And this is the clarification letter,

13  correct?

14  A.   Yes.

15  Q.   And I'd like you to look at the bottom of page 1, when

16  it's talking about what the purchased assets include.  And if

17  you turn over to the top of the second page, subsection C; do

18  you see that?

19  A.   Yes.

20  Q.   And there it says that the purchased assets include,

21  quote, "exchange-traded derivatives (and any property that may

22  be held to secure obligations under such derivatives)"; do you

23  see that?

24  A.   Yes, I do.

25  Q.   Did you have any role in adding that particular language

Page 120

1    to the clarification letter?

2    A.    I did.

3    Q.    And what was that role?

4    A.    I believe I drafted that parenthetical --

5    Q.    And --

6    A.    -- "and any property that may be held to secure

7    obligations under such derivatives".

8    Q.    And did you furnish that to Weil Gotshal for Weil

9    Gotshal's consideration?

10   A.    Yes, through one of my partners who had been involved in

11   the ongoing exchanges with Weil on the negotiation of the

12   documentation.

13   Q.    And did Weil Gotshal accept that language as reflecting

14   the parties' intent?

15   A.    Yes.  Weil Gotshal took the language and included it in

16   the next draft that was circulated and which ultimately became

17   the executed version of the agreement.  They were controlling

18   the documents.  They were processing the clarification letter

19   on their computers.

20   Q.    And did anyone ever object to that language before the

21   agreement was signed?

22   A.    No.  No one objected to the language.

23   Q.    And did anyone object to that language before the

24   agreement was closed -- before the transaction closed?

25   A.    No.

Page 121

1    Q.   Did anyone object to that language after it was closed, at

2    any time in the month of September or October of 2008?

3    A.   It -- to my knowledge, no.  At some point, there -- I

4    became aware, although I wasn't a central participant in the

5    ongoing developments after the closing, that there were some

6    questions that were being raised about the clarification in

7    relation to this subject.  But no one, either leading up to the

8    execution of the documents or in the immediate aftermath of the

9    closing, to my knowledge, raised any objections.

10   Q.   And did anyone come back to court in September or October

11   of 2008 and say that there was any disagreement with this

12   language?

13   A.   Not to my knowledge, no.

14   Q.   Prior to the time that this language had been -- this

15   particular language had been added, there was other language

16   that dealt -- or at least covered exchange-traded derivatives,

17   although perhaps not as -- with the same degree of specificity

18   as this language, correct?

19   A.   Yes, that is correct.

20   Q.   Let me ask you to look at tab 17, and this Barclays

21   Exhibit 249.  And this is a draft of the clarification letter

22   as of September 20th, which is Saturday, at 11:13 p.m.,

23   correct?

24   A.   I believe so, yes.

25   Q.   And I direct your attention to subparagraph 1(d) on page 2

Page 122

1    of the letter.

2    A.   Yes.

3    Q.   And if you go to Roman (i) -- (ii) in the middle of that

4    subparagraph, it is listing assets that are not excluded, that

5    is, assets that are included as purchased assets, correct?

6    A.   Yes, although in a provision that is a -- an exception to

7    the exception.

8    Q.   Yes.  But the effect of the exception to the exception --

9    A.   Yes.

10   Q.   -- is to make what is being listed here included assets?

11   A.   Correct.

12   Q.   And it says "cash, cash equivalents, bank deposits or

13   similar cash items maintained (A) by or on behalf of LBI,

14   pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934

15   or otherwise, or by or on behalf of any clearing agency or

16   clearing organization to collateralize, guaranty, secure

17   (whether as margin, guaranty fund, deposit or in any other

18   form) the obligations of LBI or any other person in an account

19   maintained by or on behalf of LBI and for which Purchaser shall

20   become responsible as of the Closing".  You see that?

21   A.   Yes.

22   Q.   Did anyone object to that language on the grounds that it

23   included margin for exchange-traded derivatives?

24   A.   No.

25   Q.   Now, there came a time when that particular language was

Page 123

1   removed, correct?

2   A.    That is correct, yes.

3   Q.    And what was the reason why it was removed?

4   A.    Well, this language was included, I believe, in the next

5   draft, but the following draft followed two developments:  One

6   was the resolution of the DTCC accounts of Lehman Brothers, and

7   the other issue related to the disposition of certain

8   securities in the 15c3-3 account that Lehman maintained.  Those

9   issues had evolved from their treatment under this clause (ii),

10  which also happened to be broad enough to apply to exchange-

11  traded derivatives.

12       So in the next draft that we got back, the entirety of

13  this clause (ii) came out and in that draft there were other

14  provisions dealing specifically with the 15c3-3 account and

15  then, separately, provisions dealing with the resolution of the

16  DTCC accounts.

17  Q.    And it was in response to that that you proposed the

18  language that was actually finally included in the executed

19  clarification letter?

20  A.    Yes.  When I saw the language and read it, I realized that

21  taking out the entirety of clause (ii) did more than was

22  addressed by the other provisions.  So I had added the language

23  in the parenthetical back in.  And at the time, I said to

24  myself, 'Well, you know, why deal with this as an exclusion to

25  an exclusion.  We are talking about the exchange-traded

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 124

1   derivatives up above as purchased assets, so we might as well

2   just put it in directly as clearly and concisely and -- as we

3   could, and not use any language that might be regarded as

4   overly broad or dealing with other subjects.'

5   Q.   Now, you mentioned that the language in 1(d)(ii) that I

6   was directing your attention to in the Saturday, September 20th

7   11:13 p.m. draft was included in subsequent drafts.  And let me

8   ask you to look at tab 11, Barclays Exhibit 270.  This is an

9   e-mail and attached draft of the clarification letter dated

10  Sunday, September 21st at 7:54 p.m., correct?

11  A.   That's correct.

12  Q.   And that includes a draft that continues to have the same

13  language basically as the 1(d)(ii) language that we were

14  looking at, correct?

15  A.   That is correct.

16  Q.   They have corrected the typo of taking out the (A) that

17  had existed before without a (B).  But in terms of the

18  broadness of the language, including exchange-traded

19  derivatives, that still existed, correct?

20  A.   Yes, that is correct.

21  Q.   And the e-mail that is attached, from Weil Gotshal, that

22  goes to all of the relevant participants, including

23  representatives of the trustee and others, says "Attached

24  please find the most recent version of the so-called

25  clarification letter.  The portions highlighted in yellow

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 125 of 265

Page 125

1   concern the points which depend on the resolution of the

2   current discussions.  Otherwise, we reviewed the text of the

3   letter with Cleary this morning, and this draft reflects

4   Cleary's comments.  And apart from a few possible incidental

5   points where they have not yet signed off on the wording

6   changes made in response to their comments, I do not expect the

7   letter to change."  Do you see that?

8   A.   Yes.

9   Q.   And with respect to the matters that were highlighted in

10  yellow, did those relate to anything concerning the exchange-

11  traded derivatives?

12  A.   Not to my knowledge, although I should say that I did not

13  see this e-mail at the time.  This e-mail only came to my

14  attention later.

15  Q.   Now, going back to the language in the actual

16  clarification letter, tab 13, Barclays Exhibit 5, where it says

17  purchased assets included exchange-traded derivatives and any

18  property that may be held to secure obligations under such

19  derivatives, does that language -- or could that language apply

20  only to customer accounts or a customer margin?

21  A.   No.

22  Q.   Why not?

23  A.   There's no such limitation.  It's all exchange-traded

24  derivatives.  It doesn't limit the exchange-traded derivatives

25  to those in customer accounts.

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 126 of 265

Page 126

1    Q.    With respect to the e-mails that went back and forth with

2    respect to the OCC margin, or the margin held in the OCC

3    accounts by Lehman Brothers, those did not relate to customer

4    accounts, correct?

5    A.    Not merely to customer accounts, no.

6    Q.    And if this related only to customer accounts, it would

7    have been redundant, because paragraph 8 of the clarification

8    letter already dealt with that, correct?

9    A.    Yes, although the provision in 8 -- yes.  The provision in

10   (d) also.  Not (d), I'm sorry.  The provision in the first part

11   of (c) as well, "shall not include any and all property of any

12   customer whose accounts are being transferred to Purchaser as

13   part of the Business", would also have picked up potentially a

14   subset of customers as well as the provisions in Section 8.

15   Q.    Yes.  Now, you've already touched on this, but prior to

16   the sale hearing and prior to the closing, could Barclays have

17   known whether there would be an excess or a deficit with

18   respect to the exchange-traded derivative margin?

19   A.    They couldn't have known for certain.  They could have had

20   an idea what the estimate was.  But we only had that data, so

21   far as I know, from OCC and not from necessarily all of the

22   other clearinghouses.  So at least as far as I was aware, we

23   did not have a complete picture.  And as I say, because the

24   markets in the United States are affected by what happens in

25   markets that are in a time zone ahead of us, you cannot

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 127 of 265

Page 127

1    necessarily know with a high degree of confidence where you

2    will be on Monday based on where you are on Sunday.

3    Q.    Now, in the agreement, Barclays agreed to acquire all of

4    LBI's accounts at the OCC, correct?

5    A.    Correct.

6    Q.    Barclays did not agree to acquire Lehman's accounts at the

7    DTCC, correct?

8    A.    That is correct.

9    Q.    And did you have an understanding why that was so?

10   A.    My understanding was that Barclays was not comfortable

11   with the level of risk in which -- the financial loss that it

12   would be assuming if it were to assume the DTCC accounts.

13   Q.    Did Barclays acquire assets held in Lehman's accounts at

14   the DTCC?

15   A.    Certain assets, yes.  They acquired assets in the

16   clearance box accounts.

17   Q.    And do you -- and in the business that we're talking

18   about, is there made a distinction between accounts and the

19   assets held in accounts?

20   A.    There's a fundamental distinction to the operation of our

21   clearing system, because -- precisely for the reason that the

22   clearinghouses rely on the creditworthiness of their clearing

23   participants.  The clearinghouses look to the clearing

24   participants and require the clearing participants to be

25   responsible for all of the positions they carry, whether they

Page 128

1    are positions of the participant or of customers of the

2    participant.  So it is a fundamental structural element that

3    positions that may be owned by the clearing member or its

4    affiliates or its customers are all maintained in an account

5    which is carried by and in the name of the clearing participant

6    and for which the clearing participant is responsible.  But

7    that says nothing about who -- the owner of the positions in

8    the accounts that are carried by the clearing member.  If we

9    didn't have that system, then anyone who purchased securities

10   would have to be a clearing member of a clearing corporation in

11   order to have an account and own the assets in it.  And that's

12   obviously not practical.  That is precisely one of the

13   operational simplifications that the clearing system is

14   designed to address.

15   Q.   Let me ask you to look at tab 21, which is Barclays

16   Exhibit 6.  And do you recognize this document?

17   A.   This looks like the agreement that memorialized the

18   resolution of the DTCC accounts.

19   Q.   And --

20   A.   And it appears to be the executed copy.

21   Q.   At the time that the clarification letter was being

22   finalized, were you aware of this document?

23   A.   Yes.  Well, aware of this document, but the document was

24   completed very early in the morning, as was the clarification

25   agreement.  Basically we had work streams in parallel on all of

Page 129

1    the documents and, obviously, until all of the documents were

2    completed to the satisfaction of all the signatories, at which

3    point they would be delivered to the closing table, and

4    everything would be executed and delivered with effect at the

5    same closing time.

6    Q.   As you understood it, did Barclays Exhibit 6, the DTCC

7    letter agreement, affect at all the purchase by Barclays of

8    assets held in the clearance box accounts?

9    A.   No, not at all.

10   Q.   At any time when the clarification letter was being

11   negotiated, or thereafter in September or October of 2008, did

12   anyone assert that the DTC (sic) letter affected at all

13   Barclays' acquisition of assets in the Lehman clearance box

14   accounts held at the DTCC?

15   A.   Not to my knowledge during that period.  It did come to my

16   attention at some point, and I don't know precisely what the

17   time period is that the trustee objected to requested transfer

18   of the clearance box assets that were at DTCC.

19   Q.   But without remembering exactly when it was, was that --

20   would that have been after the closing of this transaction?

21   A.   A significant period after the closing, yes.

22   Q.   During the negotiations with respect to what became the

23   DTCC letter, were you on the telephone for a number of these

24   discussions?

25   A.   I was on a number of calls.  I wasn't on every call for

Page 130

1    every minute, but I was on most of the calls for most of the

2    time, yes.

3    Q.    And were you on the call when the agreement was finally

4    agreed to?

5    A.    I was on that call.

6    Q.    And in that call or in any of the other prior calls that

7    you participated in, did anyone suggest that Barclays was not

8    acquiring the Lehman assets in the DTCC clearance box accounts?

9    A.    I did not hear that in any of the conversations with DTCC.

10   It wouldn't -- it wasn't consistent with the tenor of the

11   conversations.

12   Q.    What do you mean by that?

13   A.    Well, the DTCC arrangements, as they were contemplated at

14   the time of the sale order, provided that there would be a

15   limited amount of financial protection provided to the DTCC

16   with respect to those accounts, and they consisted of 250

17   million dollars' holdback in the consideration that was going

18   to be part of the deal purchase and, in addition, I believe,

19   approximately 3 million dollars in residential mortgages that

20   were going to be set aside for the purpose of setting off any

21   shortfalls.  It became -- it emerged that Lehman did not have

22   the residential mortgages available to make available for that.

23   And then the question became would Barclays assume any

24   responsibility or financial liability for the accounts and, on

25   the other hand, what would DTCC be satisfied with.  So the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 131

1  discussion was always about liability to DTCC for the account

2  and what credit support, if any, might be made available.

3       Earlier in the day, there had been -- earlier in the

4  weekend, I should say, at some point -- I'm not very certain

5  about the distinctions between Saturday afternoon and Sunday

6  morning and afternoon.  My recollection is that DTCC had said

7  that they were looking for a fairly significant sum of money in

8  order to just not close down all of the accounts.  It was more

9  than -- I can't remember precisely what the amount was, but

10  something in the order of a billion dollars.  And that had not

11  been -- that was not acceptable to Barclays.

12       And in the process -- in the period between that call and

13  the later call, what we were waiting to hear was whether DTCC

14  was going to be willing to proceed to process the transactions

15  and then go into liquidation, relying on the 250 million

16  dollars of purchase price that was going to be withheld and

17  made available.

18       And the last phone call was in a -- was basically DTCC --

19  I think the person who was speaking for them was Larry

20  Thompson, their general counsel, indicating that they were

21  going to cease to act for the accounts after they processed

22  pending transactions, that they would take the 250 million

23  dollars and would not require additional credit support from

24  Barclays or Lehman.  That was regarded as a satisfactory

25  resolution of the DTCC situation, I'm assuming, in large part

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 132 of 265

Page 132

 1   because of their ability to look at what was pending in the

 2   clearinghouse and evaluate the risks that they were undertaking

 3   as a result of that.

 4        Sometime after that call -- I should back up and say by

 5   way of background that there was -- as I said, there were a lot

 6   of brushfires; there were a lot of issues that needed to be

 7   nailed down, and there were different work streams working on

 8   them.  The regulators were very concerned both in the

 9   outcome -- the ultimate outcome, and in any issues that may be

10   presented.  So it was requested that we open a line and a large

11   conference room at Weil, which Weil made available.  It was a

12   very large conference room.  It was probably as large or larger

13   than this room.  And they opened a line.  There were a lot of

14   people calling in at various times; various people were in it:

15   Weil Gotshal lawyers, the trustee's lawyers, the creditors'

16   committee, Barclays' lawyers.  It was an open facility.  And

17   the purpose of it was to report so that everybody could hear at

18   the same time both what the issues were, what the parties'

19   positions were and what issues were being resolved.

20        That's -- my recollection is that at some point after the

21   DTCC call, we went back into that room, and the DTCC was

22   summarized.  I believe, the person speaking, again, for DTCC --

23   but there must have been a lot of people in this room --

24   included -- or was Larry Thompson, again, the general counsel.

25   And I don't recall anybody saying that Barclays had agreed to

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 133 of 265

Page 133

1   relinquish the clearance box assets that it was otherwise to

2   acquire as part of the assets of the business.  Indeed,

3   immediately after the resolution of the DTCC issues, the

4   lawyers were modifying the clarification agreement to deal with

5   elements of the DTCC resolution.  There was added a provision

6   that said the liabilities associated with the DTCC accounts

7   were excluded liabilities under the agreement.

8       At the same time, there was a change to a provision

9   dealing with clearance box assets that clarified that Barclays

10  was getting all of the clearance box assets it had previous --

11  the previous provision had limited it simply to the DTCC 074

12  account.  And it was brought to the attention of the lawyers

13  that the clearance box assets were not only not limited to the

14  074 account at DTCC, but they were not limited to DTCC,

15  although the vast majority, I understand, were located at DTCC.

16      There was no provision in the context of those changes to

17  say that the purchased assets didn't include what was in those

18  accounts; quite to the contrary.  It was very specific change

19  made after the DTC (sic) arrangement was made to specify that

20  the clearance box assets were going to Barclays.  And at the

21  same time, there was a resolution of issues that had arisen

22  with respect to JPMorgan and certain accounts in which it

23  custodied assets of Lehman that needed to be transferred.

24  There was a provision in that agreement dealing with the

25  relinquishment of claims which specifically reserves claims

Page 134

1    with respect to customers and the lien-free accounts.

2    Q.   Let me follow up a few things in that answer.  First, I

3    think you said that the purpose of the DTC letter agreement was

4    to define what protection the DTCC had and not to relinquish

5    any rights that Barclays was getting under the APA; is that

6    correct?

7    A.   That is correct.

8    Q.   And after the DTCC letter agreement was agreed to, the APA

9    was modified to include a reference to that agreement, right?

10   A.   Yes, specifically.

11   Q.   And after the APA -- or after the DTCC letter agreement

12   was agreed to, the APA was also modified to broaden the assets

13   that were being acquired to not just the 074 account clearance

14   box assets but to all of the clearance box assets?

15   A.   Correct.

16   Q.   And would that have made any sense at all, or would there

17   have been any reason for that at all, if Barclays was giving up

18   the right to any of the clearance box assets?

19   A.   It would have made no sense, and anyone who had heard the

20   resolution of the DTC situation, if in hearing it had heard

21   that that was going to happen, would never have drafted those

22   provisions as they were drafted.

23   Q.   And you also mentioned something that related to JPMorgan

24   Chase, and in that connection let me ask you to look at tab 22

25   in your book.  And this is Barclays Exhibit 7, and this was an

Page 135

1   agreement that was executed, again, as of September 22, 2008,

2   correct?

3   A.   Yes.

4   Q.   And was this the agreement that you referred to relating

5   to the JPMorgan Chase issue?

6   A.   Yes, it is.

7   Q.   And if you look at page 2, paragraph 2, it spells out

8   there that, with respect to JPMorgan Chase, "BarCap shall have

9   no interest in the cash, securities or other property in the

10  accounts on the date hereof, other than any accounts maintained

11  for LBI's customers or any lien-free accounts at Depository

12  Trust Company," do you see that?

13  A.   Yes, I do.

14  Q.   And there was no such language included in the APA,

15  correct, or the clarification letter?

16  A.   No.  Well, let me ask you to clarify your question --

17  Q.   Yes.

18  A.   -- Mr. Boies.  This is consistent with the maintenance of

19  BarCap's interest in the lien-free accounts, which was

20  necessary to effectuate the purposes of the clarification

21  letter provisions that contemplate -- or, I should say, that

22  provided that the clearance box assets were to be transferred

23  to Barclays as part of the purchased assets of the business,

24  consistent with the original purchase agreement.

25  Q.   Yes, this is consistent with Barclays acquiring the

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 136 of 265

Page 136

 1    clearance box assets --

 2    A.   Correct.

 3    Q.   -- that we're talking about in this proceeding?

 4    A.   Yes.

 5    Q.   And it also shows that the parties knew how to draft

 6    language that said BarCap would be limited to accounts

 7    maintained --

 8    A.   I see.  Yes.

 9    Q.   -- for customers, if they wanted to?

10    A.   Yes.  This draws a distinction between accounts and

11    property in the accounts that is not drawn in the DTCC letter.

12    Q.   And not drawn in the clarification letter?

13    A.   And not drawn in the clarification letter in relation to

14    the clearance box assets, yes.

15    Q.   Now, after the closing, were you aware of documents that

16    were circulated by Weil Gotshal which were consistent with

17    Barclays acquiring the clearance box assets at the DTCC?

18    A.   I don't know that I saw them at the time, but I've come to

19    be aware that they exist.

20    Q.   Let me ask you to look at tab 23.  This is Barclays

21    Exhibit 251.  And the heading -- the first substantive e-mail

22    is from Rod Miller to Lori Fife on the subject of Schedule B.

23    And it says "This" -- and then the e-mail that goes to Mr.

24    Miller that is being forwarded says "This is the additional

25    collateral that we would deliver."

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 137

1    A.    Yes.

2    Q.    Do you see that?  And did you understand that Schedule B

3    related to assets that were going to be transferred to Barclays

4    pursuant to the APA?

5    A.    Yes.  My understanding was Schedule B was an effort to

6    itemize clearance box assets, but I'm not sure that the

7    information was available.  I'm not sure if it was completed by

8    the time of the closing.

9    Q.    And this is a -- an e-mail dated September 21st, 2008,

10   which is prior to the closing, is that correct?

11   A.    Yes, it is.

12   Q.    And then if you look at tab 24, the next tab, which is

13   Barclays Exhibit 326, and this is Re: Schedules A and B, and

14   this dated September 29, 2008; do you see that?

15   A.    Yes.

16   Q.    And this sets forth in the attachment what is referred to

17   as a division of assets and liabilities; do you see that on the

18   third page of the exhibit?

19   A.    Yes.

20   Q.    And under "Securities and Trading Operations" down at the

21   bottom, in listing the purchased assets, the item is

22   "securities and other assets held in LBI's clearance boxes as

23   of the time of the Closing, provided, however, that the

24   Purchaser", that's Barclays, "in its discretion may elect

25   within sixty days after the Closing to return any securities or

Page 138

1    assets to LBI.  Note that Schedule B to the Clarification

2    Letter sets forth the securities and other assets held in LBI's

3    clearance boxes as of June" -- "as of September 21st, 2008."

4    Do you see that?

5    A.   Yes, I do.

6    Q.   And is that consistent with your understanding?

7    A.   Yes.

8    Q.   And just for completeness, although it goes back to

9    something that we were talking about before, if you turn the

10   page, at the very top you will see that Weil Gotshal again

11   includes in purchased assets all exchange-traded derivatives

12   and any property that may be held to secure obligations under

13   such derivatives.

14   A.   I see that.

15   Q.   Let me turn now to the 15c3 issue.  First, let me begin

16   with the clarification letter, which of course is at tab 13,

17   and that's Barclays Exhibit 5.  And if you turn to paragraph 8,

18   which is on page 4, it says that "The Purchaser shall be" --

19   "shall receive", and then the second item states "to the extent

20   permitted by applicable law and as soon as practicable after

21   the Closing, 769 million of securities as held by or on behalf

22   of LBI on the date hereof, pursuant to Rule 15c3-3 of the

23   Securities Exchange Act of 1934, as amended, or securities of

24   substantially the same nature and value"; do you see that?

25   A.   I do see that.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 139

1    Q.   Now, I want to focus on the language "or securities of

2    substantially the same nature and value".  Did you have an

3    understanding from your participation in the negotiations as to

4    what the purpose of that language was?

5    A.   Yes.  That language to -- was to address the possibility

6    that if the assets weren't available from the 15c3-3 account,

7    they would be made available from outside the account.

8    Q.   Now, had Lehman represented that the assets in the 15c3

9    reserve account were in excess of what was required?

10   A.   I didn't have a direct conversation with Lehman about

11   that, but I was informed that the Barclays team was of the

12   view -- was told that this was excess to the requirements for

13   the reserve account and that the SEC had authorized the

14   withdrawal of something like a billion dollars from the 3-3

15   account.  And that was -- identifying that value was regarded

16   as extremely important because of concerns about assets and

17   values eroding over the weekend before the deal was closing, I

18   guess the -- one example being the residential mortgages that

19   were no longer -- we were informed were no longer part of the

20   deal.  And one of the things that the Lehman side was doing

21   over the weekend so the deal didn't fall apart was to find and

22   identify, for their counterparts at Barclays, areas in the

23   assets that were being purchased under the asset purchase

24   agreement that had value that may not have been specifically

25   identified previously but that were part of the transaction and

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 140 of 265

Page 140

1    had a value that might ameliorate concerns that Barclays might

2    have about the loss of assets to be delivered.

3         So there was a focus on this particular source of value

4    and clarifying, for the avoidance of any doubt, that it would

5    be part of the purchased assets.

6    Q.   Now, at the very beginning of this description, it says

7    "to the extent permitted by applicable law"; do you see that?

8    A.   Yes.

9    Q.   Now, were there drafts of this provision prior to the

10   final draft that did not have that language in it?

11   A.   I'm not sure whether or not the evolution of the

12   negotiation of this provision was manifested in interim

13   writings.  It -- there -- it may have been -- it may have been

14   the case, but what I recall is the evolution of the negotiation

15   about this.

16        And we had proposed that the 769 million dollars' worth of

17   securities would be made available as contemplated here.  There

18   was a hallway conversation with Weil's -- with representatives

19   from Weil on this subject, which led to the addition of the

20   words "to the extent permitted by applicable law".

21   Q.   Let me see if I have the chronology right.  In terms of

22   the negotiations, there was a negotiated provision that would

23   have provided the 769 million dollars, and then there was a

24   question raised and the "to the extent permitted by applicable

25   law" --

Page 141

1     A.    Yes.

2     Q.    -- was added?

3     A.    Harvey Miller said, you know, 'Can we do this?  Do we need

4     to get the SEC to approve it?'  And I said that I didn't think

5     that that was the case but, to the extent that he had such a

6     concern, that we would be happy to accommodate it by

7     conditioning the delivery of the securities by the phrase "to

8     the extent permitted under applicable law".  I think we didn't

9     share the same analysis of the legal issue, but it seemed to me

10    that we could avoid trying to battle it out and see who was

11    right and who was wrong, by using this language.

12    Q.    Now, when you added the language "to the extent permitted

13    by applicable law", why did that make it necessary to add the

14    "or securities of substantially the same nature and value"?

15    A.    Well, as soon as we -- as soon as the draft acknowledged

16    the possibility that the value was -- that the securities might

17    not be made available, because the whole purpose of this was to

18    identify this as an asset that would be available to Barclays

19    following the closing, we said, 'Well, if there are

20    restrictions by virtue of the fact that these securities are in

21    the 3-3 account, then you should provide to us securities of

22    equivalent value that are not subject to that encumbrance.'

23    Q.    And was there agreement on that?

24    A.    Yes, there was agreement on that, and the agreement is

25    reflected in this language.

Page 142

1        MR. BOIES:  Your Honor, I have no more questions.

2        THE COURT:  Cross-examine?

3        MR. MAGUIRE:  If it please the Court, Bill Maguire for

4    the SIPA trustee.  May I approach, Your Honor?

5        THE COURT:  Yes.

6    (Pause)

7        THE COURT:  Thank you.

8    (Pause)

9    CROSS-EXAMINATION

10   BY MR. MAGUIRE:

11   Q.   Now, sir, you were designated as a 30(b)(6) witness in

12   this matter, were you not?

13   A.   I was.

14   Q.   And that's on the subjects generally on which you have

15   testified here on your direct, is that correct?

16   A.   That's right.

17   Q.   In fact, you submitted a declaration, did you not, in

18   support of Barclays' position in this litigation as a 30(b)(6)

19   witness?

20   A.   I did.

21   Q.   I'd like to start, sir, by asking you about the 15c3

22   matter that you just finished discussing with Mr. Boies.  When

23   we talk about 15c3, we're of course referring to a Rule, an SEC

24   Rule, isn't that right?

25   A.   That is correct, yes.

Page 143

1    Q.    And that is colloquially known as the customer protection

2    rule, is it not?

3    A.    Yes.

4    Q.    And Lehman maintained an account for the protection of

5    customers under that Rule, isn't that right?

6    A.    Lehman did.

7    Q.    And at one point in the course of this deal, there was an

8    expectation by Barclays, was there not, that it would get the

9    entire amount of that customer protection account?

10    A.    Yes, I think that's true.

11    Q.    And, all in, that was some 1.7 billion dollars, isn't that

12    right?

13    A.    I'm not sure about the number.  I'm not disputing it.  But

14    in concept it would have been the 15c3-3 account.

15    Q.    And I believe, in the binder that Mr. Boies gave you,

16    there was an e-mail that gave a breakdown of those numbers.

17    Did you review that binder before you testified today?

18    A.    Yes.

19    Q.    And do you remember that e-mail that laid out 1 billion

20    dollars in cash and 769 million dollars in securities?

21    A.    Yes, I do remember that.

22    Q.    Now, you've described how this 15c3-3 issue evolved.  In

23    effect, there was, was there not, a heated debate in the

24    hallway at Weil Gotshal concerning the cash, the Lehman cash,

25    that was in the customer protection account?

Page 144

1    A.    I wasn't a party to a heated exchange.  There were a

2    series of conversations.  And before the conversations turned

3    to this particular language in which people were focusing on

4    the 769 million in securities, there was a discussion about the

5    1 billion dollars in cash, yes.

6    Q.    And Michael Klein and the Barclays representatives

7    maintained that Barclays was entitled to the entire account,

8    including the one billion dollars in cash that was at the Wells

9    Fargo bank account, isn't that correct?

10   A.    He may have.  I didn't hear him say that, but it wouldn't

11   have surprised me.  I think the 15c3-3 account would have been

12   regarded as an asset of the business that was being purchased.

13   And there wasn't a specific provision excluding it except for

14   the one which you were going to touch upon next.

15   Q.    The hallway conversation, just so we're clear, was at Weil

16   Gotshal at the --

17   A.    Yes, it was in the hallway, yes.

18   Q.    -- at the conference center?  And this conversation went

19   on for some period of time?

20   A.    Yes.  As I say, there were a number of conversations, but

21   yes.

22   Q.    And they involved Michael Klein?

23   A.    Michael Klein was there.

24   Q.    And Michael Klein wanted to have the one billion dollars

25   of cash for Barclays, did he not?

Page 145

1    A.    I believe he did.

2    Q.    And on the other side, Harvey Miller was representing

3    Lehman, isn't that right?

4    A.    When I was there, Harvey Miller was there in the

5    discussions, yes.

6    Q.    And when you were there, Mr. Miller was very clear, was he

7    not, that a representation had been made to the Court that no

8    Lehman cash was going to Barclays?

9    A.    I would not describe it in that way.  There was a

10   question, and this permeated some of the issues that we

11   addressed as to what was said to the Court and also how the

12   provisions on cash interplayed with the other provisions on --

13   of the purchased assets.  There was some discussion about that,

14   and the resolution of it was that Barclays would, instead of

15   providing for the billion dollars in cash, provide for the

16   securities that comprised the 769 million.

17   Q.    Let me probe a little bit into the "some discussion" on

18   that specific point.  And I'd invite you to look at the

19   testimony of Harvey Miller to this Court on April 28 at page 83

20   of the official transcript, starting at line 2.  "Number two,

21   we had made a representation to the Court that no cash was

22   going to Barclays, and there was no way we were going to let

23   that billion dollars go to Barclays."  That is the nub of the

24   hallway conversation on this point.  That is what Harvey Miller

25   made clear in the hallway of this conference center to Michael

Page 146

1    Klein and the other representatives of Barclays, isn't that

2    correct?

3    A.   I did not hear Harvey Miller -- I'm not contradicting that

4    this is what Harvey Miller testified, but I did not hear Harvey

5    Miller use those words in the hallway.  I may not have been

6    present for the entire day of the exchanges on the cash

7    component, but I didn't hear the discussion in those terms.

8    Q.   In any event, the Barclays representatives came back and

9    said that, rather than come back to the Court, or rather than

10   disagree about what had been said, they would simply give up on

11   the one billion dollars and that would be out of the deal, and

12   the 15c3 asset would simply be the 769 million of securities --

13   A.   I don't --

14   Q.   -- is that correct?

15   A.   I don't recall anybody saying 'rather than go back to the

16   Court'.  There was an issue about it.  There was concern.

17   There may have been concern about the amount.  Suffice it to

18   say that the Barclays side agreed to move on from the

19   discussion about the one billion dollars and instead focus on

20   the 769 million dollars.

21   Q.   So once you moved on from the billion dollars cash, that

22   left the 769 million and that was securities that were

23   maintained in this customer protection account?

24   A.   In the 3-3 account, right, yes.

25   Q.   And that's where Mr. Miller raised the remaining concern

Page 147

1    he had as to whether we can do this?

2    A.    Yes, that's correct.

3    Q.    And that was resolved by adding the words "to the extent

4    permitted by applicable law", isn't that right?

5    A.    That's correct.

6    Q.    His position was that you needed SEC approval here.  You

7    didn't think that was necessary.  But in any event, Weil wanted

8    limitation, and the limitation that was added here was "subject

9    to the" -- or "to the extent permitted by applicable law"?

10   A.    Right, and if applicable law limited the transfer of

11   something that was contemplated to be part of the purchased

12   assets, then other assets of equivalent value were to be

13   provided.  That was the economic substance of the negotiation.

14   Q.    Okay.

15   A.    Sorry --

16   Q.    So --

17   A.    -- I'm getting ahead of you.

18   Q.    -- let's focus on that.  You're telling us that in the

19   course of this hallway conversation, there was an agreement not

20   only that this whole transfer would be subject to applicable

21   law but also that, if for any reason the transfer of the 769

22   million was illegal or could not be done consistent with

23   applicable law, that Barclays would get a makeup from Lehman;

24   Lehman would have to get the 769 million dollars from somewhere

25   outside the customer protection account if it couldn't access

Page 148

1    it inside the customer protection account?

2    A.   Or another one of the sellers.   LBHI had access.

3    Q.   In any event, somewhere --

4    A.   Yes, some -- from some source other than the 3-3 account.

5    But as I say, we were under the impression that it was an

6    excess in any event, in which case there wouldn't have been any

7    restriction.

8    Q.   And it's your testimony that in the course of those

9    hallway conversations, Lehman agreed to this, that

10   unconditionally Barclays would get the 769 million no matter

11   what?

12   A.   From within the account or from another source, yes.

13   Q.   Let me invite you to look at Mr. Miller's testimony from

14   the April 28 trial hearing, at page 84, starting at line 3

15   through line 10:

16   "Q.  Did you or anyone that you know acting on behalf of Lehman

17   undertake or give Michael Klein or anyone at Barclays a

18   commitment that if there was a regulatory problem and the 769

19   million dollars in securities could not be transferred from

20   inside the 15c3 account, Lehman would be required to substitute

21   and provide 769 million dollars from somewhere outside that

22   account?

23   "A.  Absolutely not."

24   A.   I see that.

25   Q.   Your testimony is the exact contrary, is it not, of the

Page 149

1   testimony this Court has heard from Harvey Miller?

2   A.    My testimony is that we negotiated the language in the

3   agreement, and I think the language in the agreement speaks for

4   itself and provides that if the securities are not available in

5   the 15c3 account, they would be made available from some other

6   source.

7   Q.    Now, let's not talk about the language.  Let's first focus

8   on the hallway conversation, sir.  It's your position, is it

9   not, that in the course of this hallway conversation, Lehman

10  agreed to what Mr. Miller has testified Lehman absolutely did

11  not agree to?

12  A.    Well, what I'm saying is they agreed to the language, and

13  this is important because the agreements are reflected in the

14  words that people use, and what he agreed to was the addition

15  of the language -- I'm sorry, I don't have the clarification

16  provision in front of me -- "or securities of a similar nature

17  and value".

18  Q.    In the hallway?  In the hallway?

19  A.    Yes.

20  Q.    In the hallway, you're saying that Harvey Miller agreed to

21  add language that would unconditionally give Barclays a right

22  to 769 million dollars?

23  A.    Let me put it this way:  The language was proposed and,

24  although there is an interim step that I'm sure we're going to

25  be talking about, yes, the language came back from Weil

Page 150

1    Gotshal, including the language that we've been describing that

2    you have Mr. Miller apparently giving a different view on.

3    Q.   I'm not talking about the language that came back.  We

4    will get to the language that came back.

5    A.   Okay.

6    Q.   Now I'm talking about the hallway.  In the hallway, you're

7    saying that Harvey Miller agreed to what he specifically

8    testified here he did not agree to?

9    A.   No.  You're putting words in my mouth.  I'm saying that we

10   agreed to the formulation that if the 769 million dollars of

11   securities were limited by applicable law, that we would get --

12   or -- I'm sorry, am I entitled to have the clarification of

13   your provision just so that I can -- I may have it here.

14          THE COURT:  If counsel will permit, I think the

15   witness should have a chance to take a look at the document if

16   he wishes to.

17          MR. MAGUIRE:  By all means, Your Honor, except that my

18   question is not addressed to the document.  My question --

19          THE COURT:  I understand your question's about the

20   hallway conversation.

21          MR. MAGUIRE:  Yes.

22   A.   Yes, you're --

23          THE COURT:  And I also understand the witness is --

24   A.   I'm telling you that the --

25          THE COURT:  -- referring to the document.

Page 151

1   A.    -- that the hallway conversation is about the words that

2   were included ultimately in the contract.  Whether or not

3   there's an argument about how people construe that is a

4   different matter.  We proposed the "or" language precisely

5   because of the concerns about any limitation, and we proposed

6   the language and I can only infer that the Weil lawyers found

7   it acceptable because they controlled the documents and they

8   provided it back to us.

9   Q.   And, sir, I have no objection to your taking as much time

10  as you wish to look at any document that you want, but I would

11  ask you, before you do that, to answer this one question.

12  A.   Sure.

13  Q.   I would like you to be very clear with whether you are

14  saying, before anybody exchanged any piece of paper, just in

15  the hallway, are you testifying to this Court that Harvey

16  Miller agreed that Barclays would get 769 million dollars

17  unconditional?

18  A.   I'm -- I'm not testifying about what Harvey Miller said.

19  I'm testifying about -- and I do not remember in haec verba

20  each of the words that we exchanged, but I am saying that

21  Harvey Miller and/or one of his partners who was involved in

22  the drafting at this point agreed at our request, in light of

23  the limitation on the first part of the provision that limited

24  the removal of the 769 "to the extent permitted by applicable

25  law", to add language providing "or securities of a" -- and let

Page 152

1    me -- I have it here in front of me -- "or securities of

2    substantially the same nature and value".  Actually, we -- I

3    think we probably articulated it as "securities of equivalent

4    value".

5    Q.   Can you turn, sir, to your deposition transcript, which is

6    at the very beginning of the binder that I provided here?  If

7    you could turn, sir, to page 105, starting at line 4.  You

8    testified as follows, sir:

9    "Q.  And can you tell me what you recall being said in the

10   course of this hallway conversation?

11   "A.  Pretty much what I have just described to you:  that there

12   was a group already there when I arrived.  I guess some

13   predecessor language to this was being reviewed.  And Harvey

14   Miller, as I said, raised the question whether there might be

15   limits under applicable law, and I said that I wasn't aware of

16   any but, to the extent that they exist -- and this would

17   address your concern -- we can provide that the transfer be to

18   the extent permitted by applicable law but, if there was such a

19   constraint, that that basically -- 769 million dollars in

20   securities would come from somewhere else."

21   A.    Right.

22   "A.  And can I remember exactly what was said, whether it was a

23   grunt or a nod or a smile?  I don't remember.  But I remember

24   coming away from the conversation feeling that we had sort of

25   resolved the point."

Page 153

1    Q.    You were asked that question and --

2    A.    Yes.

3    Q.    -- you gave that answer, sir?

4    A.    That's correct, and I think it's consistent with what

5    we've been discussing here today.  I believe the agreeing to

6    that language is agreeing that the securities, if unavailable

7    from the 3-3 account, will be made available from outside the

8    account.  Now, somebody else apparently is construing that

9    language in a different way.  I think the language is quite

10   clear on its face.

11   Q.    And the manifestation of consent that you took away was

12   some grunt or nod or smile on the part of Harvey Miller or one

13   of his colleagues, is that correct?

14   A.    Yeah, it was the end of -- let's put it this way:  It was

15   the end of the conversation, and we expected imminently to see

16   language that reflected the end of the conversation.  So, yes.

17   I don't remember the words, but I -- but my expectation was

18   met, at least initially in some part, by the language that came

19   back from Weil.

20   Q.    Your deposition was not actually the first time that you

21   testified about this 15c3 asset, isn't that right, sir?  You

22   had put in a declaration on the same subject?

23   A.    There's a declaration, yeah.

24   Q.    And I believe that's in tab 3 of your binder.  And you put

25   this in, as you say, as a 30(b)(6) witness?

Page 154

1    A.   I'm sorry, I'm in the wrong binder.  Did you say tab 3?

2    Q.   Tab 3, yes, sir.

3    A.   Yes.

4    Q.   And you understood at the time that you did this

5    declaration that this was an important litigation, did you not?

6    A.   I did.

7    Q.   And you prepared with your lawyers this declaration, did

8    you not?

9    A.   Yes.

10   Q.   You also met with Barclays' lawyers, did you not?

11   A.   (Pause).

12   Q.   You met with Barclays' lawyers, did you not?

13   A.   Yes, at one point.

14   Q.   And I believe you referred to this 15c3 asset in paragraph

15   7 of your declaration.  And you refer at the bottom of page 3

16   to this extent of "to the extent permitted by applicable law";

17   see that?

18   A.   Yes.

19   Q.   You say nothing, however, about any commitment that was

20   made by anyone in any hallway conversation that Barclays would

21   get 769 million dollars, isn't that right, sir?

22   A.   Yes, this did not go to that issue.  We did not realize

23   that that was an issue.

24   Q.   And you can't tell us why you did not include that --

25   A.   I didn't realize --

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 155

1    Q.   -- in that declaration?

2    A.   -- that that was an issue at the time that we did this

3    declaration.  I did not know that anybody was making an issue

4    of what the "or nature or value" meant.

5    Q.   Despite all your meetings with Barclays' lawyers and your

6    meetings with your own lawyers --

7    A.   And how smart they are.

8    Q.   And somehow --

9    A.   Despite how smart they are.

10   Q.   -- somehow that all slipped by.

11   A.   No, we certainly weren't saying that we were going to get

12   it out of the 3-3 account, hell or high water.

13   Q.   Now, sir, you left this hallway conversation with the

14   feeling that you would somehow resolve the point, right?

15   A.   (No audible response)

16   Q.   And Weil Gotshal had undertaken to provide you with a

17   draft?

18   A.   Yes.  Right.

19   Q.   And, in fact, Weil Gotshal did provide you with a draft,

20   isn't that right?

21   A.   They did.

22   Q.   And that draft is tab 2 in your binder; that is Movants'

23   Exhibit 447, which I believe you looked at earlier with your

24   counsel.  That's the 4:36 a.m. Monday draft.  You see that?

25   A.   I see -- yeah, I see the draft on --

Page 156

1    Q.   And you got this draft expecting to see that you would get

2    this language confirming your feeling that --

3    A.   My impression, yes.

4    Q.   -- Barclays was going to get 769 million no matter what,

5    isn't that right?

6    A.   I expected to see language that described the securities

7    that they would get, if not from the 3-3 account, in terms of

8    it being of equivalent value.  That was the concept that was

9    important.

10   Q.   And then if we turn to page 5, you'll see that the

11   language that Weil Gotshal provides, at least from Barclays'

12   standpoint, doesn't work.

13   A.   Yes, "or securities of substantially the same nature".

14   Q.   What they --

15   A.   Well, it wasn't clear.  Yeah.

16   Q.   What they said was "or securities of substantially the

17   same nature".  And you recognized that that didn't work?

18   A.   Right.

19   Q.   In fact, you didn't know what that meant?

20   A.   I would say I had uncertainty about how the word "nature"

21   would -- might be construed and whether it adequately conveyed

22   the concept of equivalent value, because that at the end of the

23   day was what was important, whether the securities had

24   equivalent value.

25   Q.   You never asked Weil what it meant by that language, did

Page 157

1   you?

2   A.   No, I proffered the language "and value" and they accepted

3   it.  So I assumed that they did not intend to import a

4   description that would have resulted in the delivery of

5   securities having a different value.

6   Q.   And you thought that by adding two words, "and value",

7   this would then become a provision that clearly provided

8   Barclays with the right, no matter what, to 769 million dollars

9   that it might not otherwise get?

10  A.   I believe it entitled Barclays to 769 million dollars'

11  worth of securities; if they weren't available from the 3-3

12  account, they'd be made available elsewhere from LBI or LBHI,

13  yes.

14  Q.   And the fix was those two words, adding "and value", as

15  far as you were concerned?

16  A.   Well, the fix to the ambiguity that I thought I saw in the

17  use of the word "nature", yes.

18  Q.   And you never discussed that with Harvey Miller?  You

19  never said --

20  A.   No.

21  Q.   -- 'We're adding these two words and, as a result of these

22  words, we will get 769 million' --

23  A.   No.

24  Q.   -- 'no matter what'?

25  A.   It was paper passed back and forth, as frequently happens.

Page 158

1    Q.   And you never had any discussion with anyone at Weil

2    Gotshal as to what would happen if in fact there was a deficit

3    in the 15c3 account or a shortfall in customer property?  You

4    never had that discussion, did you?

5    A.   We -- let me back up by saying, first, we were under the

6    impression that this was an excess; secondly, we were not under

7    the impression that the purchased assets included all of the

8    assets of Lehman.  We had no idea whether or not there -- we

9    had no information that there might be, and I guess we still

10   don't know whether there will be, a shortfall in the assets

11   that are available to satisfy customer claims.  But it seemed

12   to me that, in connection with a transaction to sell the

13   business of a broker-dealer in SIPC liquidation in connection

14   with a transfer of the customer accounts, that it was not

15   inappropriate for a portion of the 3-3 account to be allocated

16   as part of the transfer of the business that was being

17   transferred, correct.

18   Q.   And you had no discussion with Harvey Miller or anyone

19   representing Lehman concerning the implications for customer

20   claims of having an absolute right for Barclays to get this 769

21   million dollars?

22   A.   There was no reason to believe that it would necessarily

23   have a direct impact.  There could have been -- there could

24   have been 3 billion dollars in other assets that could have

25   been transferred into the account to make the reduction of the

Page 159

1    769, for all I knew.

2    Q.    You had no discussions on that subject with anyone from

3    Weil or Lehman, isn't that right?

4    A.    I had no discussions other than the information that was

5    conveyed to me that the Lehman side had led the Barclays side

6    to believe that this was an excess.

7    Q.    And specifically no discussions on implications for

8    customer property claims of making this an unconditional right?

9    You had no such discussions?

10   A.    There was no need -- there was no basis for us to assume

11   that it would have an impact.

12   Q.    Were you present, sir --

13   A.    It would have been -- it would have had no more of an

14   impact than if Lehman was able to say 'Oh, we lost the three

15   billion dollars in resis that we couldn't deliver, but the good

16   news is we have found three billion in other securities that

17   are part of the purchased assets that you can' -- 'that we can

18   make available to you.'  It wouldn't necessarily have had more

19   of an impact than that.  People didn't know exactly what all

20   the securities were, what all the values were, what all the

21   liabilities would end up being.  So there's no reason for us to

22   have assumed, as you seem to be suggesting, that if we were

23   agreeing to this, we were necessarily taking money out of the

24   pockets of customers.  That was not a necessarily implication

25   of this.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 160

1   Q.   Is that a no?  You had no such discussions?

2   A.   I apologize.  Yes, that's a no.  That's a no.

3   Q.   Were you present, sir, when Harvey Miller warned Barclays

4   that its prospects of getting the 15c3 asset were slim to none?

5   A.   He did not convey that in my presence.  I'm not denying

6   that he said it.  As I said, I was not continuously in all of

7   the conversation.  I did not hear that.

8   Q.   Were you present after the closing when Alastair Blackwell

9   went to meet with the SEC concerning a release -- of trying to

10  get a release of funds --

11  A.   No.

12  Q.   -- from the 15c3-3 account?

13  A.   No, I was not.

14  Q.   Now, you had many communications with representatives of

15  the Securities and Exchange Commission in the course of your

16  work on this deal, isn't that right?

17  A.   I did.  I had a number of interactions with them on a

18  number of issues, yes.

19  Q.   You never at any stage, however, had any discussion -- you

20  never brought up or raised any issue with anyone at the SEC

21  concerning the customer protection account, isn't that correct?

22  A.   No, I did not have a conversation with the staff at the

23  SEC about the customer protection account, and I'm not sure

24  that they would have been comfortable discussing it with me.

25  But, no, I did not.

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 161 of 265

Page 161

1    Q.   Sir, I'd like to turn now to another subject, and that's

2    the subject of Lehman's margin assets, okay?  You testified on

3    direct that you were not present for the APA negotiations,

4    right?  Is that correct?

5    A.   The -- I tried to be very clear.  I was not part of the

6    negotiating team, particularly on the business terms.  But,

7    yes, I did provide some language that was included by my

8    partners in the agreement as it was ultimately --

9    Q.   You got brought in particularly in dealing with clearing

10   agencies, like the OCC and the Depository Trust Clearance

11   Corporation, right?

12   A.   Yes, although I was brought in initially in connection

13   with a request by the Federal Reserve and Barclays to enter

14   into the repurchase transaction.  But I think the premise of

15   your question is correct that I was not a negotiator of the

16   business terms of the APA.

17   Q.   You testified a little earlier about the sale order and

18   the concerns that the OCC had raised about the sale order on

19   the Friday of the hearing.  If you turn to tab 4 of your

20   binder, you'll see a document -- I believe it's similar or the

21   same as what you testified to on direct.  At the bottom of the

22   first page and over on the second page, you'll see the e-mail

23   from the OCC in which they were asking for language to be added

24   to the sale order.  You see that?

25   A.   On the bottom of page 2?

Page 162

1    Q.   Yes.

2    A.   Is that your reference?  Yes, I do see that, yes.

3    Q.   And it was your understanding, was it not, that the sale

4    order was going to provide that assets that went to Barclays

5    were going to be given to Barclays free and clear?  That was

6    the whole point of the 363 sale, right?

7    A.   That the purchased assets would be free of any lien, yes.

8    Q.   That obviously raised concerns with the OCC about any

9    assets, that were included in the sale, going to Barclays to

10   make sure that their interests and their rights were protected,

11   right?

12   A.   They wanted to make sure that, by a transfer of the assets

13   in the clearing accounts, that by the terms of the order it

14   didn't inadvertently vitiate their lien under their contractual

15   or rule-based arrangements for clearing members, yes.

16   Q.   And everybody wanted Barclays to step into the shoes of

17   Lehman, isn't that right?  DTC wanted that, did they not?

18   A.   I'm not sure at what point you're talking, and I think

19   you're asking me the hypothetical question would DTC have been

20   happy if Barclays merely assumed all of the liabilities that

21   were associated with the Lehman account.  I imagine that would

22   have been a fully satisfactory resolution for --

23   Q.   And certainly the OCC wanted Barclays to step into the

24   shoes of Lehman, right?

25   A.   Well, no, I would say that the OCC observed that the

Page 163

1    purchase agreement provided for the exchange-traded business

2    and its assets and the margin to go over to Barclays, and they

3    wanted to make sure that the process of approving that did not

4    result in those assets being released from the liens that they

5    had to ensure performance under the contracts in the accounts

6    that were being transferred.

7    Q.   And the assets that were at the OCC were assets that were

8    either -- that you understood were assets that were maintained

9    there either for Lehman itself or for Lehman's customers?

10   A.   They were Lehman assets to secure obligations under

11   contracts for which it was responsible, and those contracts

12   could have been -- as you say, could have been Lehman

13   contracts, could have been contracts of customers of Lehman.

14   Q.   And whether it was customers or proprietary, the OCC had

15   certain rights, did they not, and they wanted those to be

16   protected in the event of customer assets or propri -- whatever

17   assets being transferred to Barclays, right?

18   A.   Yes.  They didn't want the transfer to Barclays of the

19   assets that Barclays was purchasing under the order to

20   eliminate the lien that they would have.

21   Q.   And they provided language that would protect the lien

22   that they would have over any assets, whether they were

23   beneficially owned by a customer or by Lehman, whoever?

24   Whatever assets went to Barclays, OCC's rights would be

25   maintained, right?

Page 164

1    A.    Well, the lien was to be -- would be extinguished with

2    respect to purchased assets, not customer assets.  So it would

3    have been of particular concern in relation to the provisions

4    in the purchased assets and the order that provided for the

5    sale of purchased assets.

6    Q.    You were shown that asset purchase agreement by your

7    counsel -- or by counsel for Barclays, and I would like you to

8    turn to it.  It's in tab 9 of your binder.

9    A.    Yes.

10   Q.    And you'll see there, sir, at page 6, there is a

11   definition of "purchased assets" that you testified about on

12   direct.  Do you see that, sir?  Specifically under "Purchased

13   Assets", Mr. Boies read to you the words "means all of the

14   assets of Seller and its subsidiaries used in connection with

15   the Business".  You remember his reading those words?

16   A.    Yes.

17   Q.    And he left out the following words, "excluding the

18   Excluded Assets".  That's an important exception, is it not?

19   A.    If there are excluded assets, yes.

20   Q.    And did you spend some time dealing with some of those

21   exclusions?  Did you not?

22   A.    Not in the APA, but we dealt with the clarification of

23   them in relation to certain categories in the clarification

24   letter, yes.

25   Q.    Specifically with the exclusion for cash, isn't that

Page 165

```
 1    right?

 2    A.   Well, particularly in relationship to -- yes, in relation

 3    to the -- sort of, the clearing accounts and the customer

 4    property, some of which may be in the form of cash, yes.

 5    Q.   We'll come back to the exclusion for cash, but I would

 6    like to just follow up on the testimony you gave concerning

 7    Section B under Purchased Assets.  And that section, you told

 8    us, includes Lehman's margin, right?

 9    A.   Yes.

10    Q.   All of Lehman's margin, right?

11    A.   All of Lehman's -- all of the margin or other property

12    that secured the exchange-traded businesses that they were

13    getting, yes.

14    Q.   Now, you were not yourself a member of the negotiating

15    team --

16    A.   That's correct.

17    Q.   -- isn't that right?

18    A.   That is correct.

19    Q.   But it's your view that, simply reading this language, it

20    includes deposits, and that would cover margin; is that your

21    testimony, sir?

22    A.   I believe that that language would be read to include

23    margin deposits --

24    Q.   You find that --

25    A.   -- and guaranty fund deposits.
```

Page 166

1    Q.   You find that clear on its face?

2    A.   I would read the language to have that meaning, yes.

3    Q.   So reading this language, you see that it's disclosing to

4    the reader that Lehman's margin is going to Barclays?

5    A.   I would say that this supports the conclusion and the

6    inference that would be drawn from that and other provisions

7    that that was the case.

8    Q.   A reader reading Section B here would understand, in your

9    view, that in here with the deposits for the rent and the

10   electricity and the telephone is billions of dollars of Lehman

11   cash --

12   A.   Those are examples following the word "including" in a

13   document that incorporates a rule of construction that makes it

14   clear that the enumeration of examples is not to be read to

15   limit the scope of the preceding reference, in this case to all

16   deposits, including customer deposits; makes it clear that it's

17   not just a deposit of Barclays.  And candidly, if you look at

18   those categories of deposits, although they're not necessarily

19   in the same business line, they all involve the same concept:

20   money that is advanced to secure a future contingent or

21   noncontingent payment obligation.

22   Q.   And you're suggesting that this is not just clear to you

23   but it's something that should have been clear also -- or was

24   clear also to Lehman?

25   A.   It seemed to have been clear to the OCC, judging from

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 167 of 265

Page 167

1    their reaction to reviewing the document and coming up with a

2    sale order that provided specifically for the handling of

3    marg -- what they described as margin depositions and clearing

4    fund deposits.

5    Q.   And do you think --

6    A.   I don't think I'm the only person necessarily that would

7    have read that to be consistent with other provisions in the

8    agreement relating to the exchange-traded derivatives business.

9    Q.   Well, what about Barclays?  Is it your view it'd be just

10   as clear to Barclays, to your client?

11   A.   It may depend upon who the person is that you're talking

12   with and their sophistication about the subject and whether or

13   not they focused on the language, because, as you know, there

14   are certain things in the course of negotiating and documenting

15   a transaction where the lawyers' expertise prevails and in

16   other cases where, you know, the business objectives prevail.

17   And not every businessperson is as knowledgeable and -- about

18   how things are drafted and what they mean as necessarily the

19   people who draft them for them.

20   Q.   Well, how about Barclays corporate, everybody:  the

21   business, the most sophisticated executives, the negotiators

22   and their lawyers?  You think it's clear to Barclays corporate

23   as it is to you?

24   A.   You're asking me to speculate about something I don't have

25   direct knowledge of.

Page 168

1    Q.   Well, if a Barclays 30(b)(6) witness and its most senior

2    executive on this deal were to testify that the disclosure of

3    the transfer of margin in this deal was, in three words, in

4    "exchange-traded derivatives" and it was nowhere else in this

5    contract, that would suggest, would it not, sir, that that

6    witness and all of the people who assisted that witness and

7    provided information to that witness did not find it quite as

8    clear to them as you are now testifying to the Court you find

9    this provision today to be so clear to you?

10   A.   That may be.  You'd be asking me to speculate about facts

11   that I have not been a witness to.  But that could be a

12   conclusion that someone would reach.  And someone who is

13   knowledgeable, not just about canons of construction but also

14   knowledgeable the exchange-traded derivatives -- I can tell you

15   that a normal reader who is knowledgeable about that would not

16   find my construction to be stretched.

17   Q.   I take it you are not aware of the testimony that Mr. Rich

18   Ricci provided to this Court on this subject?

19   A.   No, I'm not familiar with the testimony of Mr. Ricci.

20   Q.   And you're not aware of his status as a 30(b)(6) witness

21   on the disclosures that Barclays made concerning the

22   transfer --

23   A.   I may --

24   Q.   -- of Lehman's margin?

25   A.   I may have known that.

Page 169

1    Q.   You are aware, however, that Mr. Ricci, unlike you,

2    actually was present at the negotiations?

3    A.   Correct.

4    Q.   He was in fact one of the top negotiators for Barclays?

5    A.   He may well have been one of the top negotiators.  How

6    actively he was involved in the actual drafting I don't know.

7    Q.   Now, sir, on the Saturday, you had some e-mail

8    correspondence with the OCC on the subject of Lehman's margin,

9    isn't that right?

10   A.   Yes.

11   Q.   You were provided with a number of e-mails by your

12   counsel.  And it was clear to you in the course of all of that

13   that Lehman had at least one billion dollars in cash margin at

14   the OCC, right?

15   A.   Yes.

16   Q.   You were specifically advised about that, and indeed your

17   counsel showed you an e-mail -- it's at tab 5 of your binder --

18   from the OCC.  It's a 3:52 p.m. e-mail --

19   A.   Um-hum.

20   Q.   -- from the OCC to you in which it specifically advised

21   you that there were a number of -- three, in fact, major open

22   issues as far as the OCC was concerned, and the first one was

23   how to transfer the one billion dollars in cash to Barclays,

24   right?

25   A.   I'm sorry, which provision are you referring to?

Page 170

1  Q.   If you look at paragraph numbered 1 --

2  A.   Um-hum.

3  Q.   -- how much of the approximately one billion dollars in

4  cash that the OCC is holding as margin for LBI accounts is

5  intended to be transferred to Barclays at closing, and how much

6  cash margin not transferred be replaced; do you see that?

7  A.   Yes.

8  Q.   So they were asking the question 'What was going to happen

9  this cash' --

10  A.   Um-hum.

11  Q.   -- 'Was it being transferred to Barclays or not?  And if

12  it wasn't being transferred to Barclays, how was it going to be

13  replaced?', right?

14  A.   In this e-mail, that's what he's asking, but in other

15  e-mails he says that he's assuming that it's going to Barclays

16  and he asks for instructions.  And then he says, 'Having not

17  gotten' -- 'having received none, we're transferring this to

18  Barclays', in correspondence that copies the Lehman parties.

19  Q.   And nobody from Barclays suggested to you that they had

20  any interest in replacing this one billion dollars in cash?

21  A.   No.  The contemplation was, as was provided in the

22  transfer and assumption agreement that the trustee had signed

23  and that was provided to us, that all of it was coming over,

24  without distinction as to whether it was cash or excess or

25  proprietary or had any other characteristics.  It was all

Page 171

1    coming over.  We had confirmed with the OCC that that was our

2    understanding of the deal.  We had given them some minor

3    comments, and I had conveyed to Jim McDaniel that I was focused

4    on other issues that needed to be resolved that are very

5    pressing.  And so I was not focusing on any further resolution

6    of the OCC issues at that time.

7    Q.    So it was very clear in your mind, as of 3:52 p.m. on

8    Saturday, that Barclays had no interest in replacing any of

9    this one billion dollars in cash and that Barclays' interest

10   was in having the entire one billion dollars in cash

11   transferred to Barclays?

12   A.    It was very clear to me that the deal provided for that

13   margin, whether it was in cash or not, to go over to Barclays.

14   Q.    And the third open item is how to obtain the transfer from

15   Lehman to Barclays of an additional almost billion dollars in

16   government securities that were at JPMorgan; you see that?

17   A.    Yes.

18   Q.    And you understood, sir, did you not, that all of this

19   property, this two billion dollars that were just covered, that

20   that was all Lehman proprietary property, right?

21   A.    I don't think I knew specifically how much of it was

22   Lehman proprietary, but it wouldn't shock me if it was.

23   Q.    Didn't you understand that all of the property that Lehman

24   maintained at the OCC was its own money?

25   A.    The mar -- if you're talking about the margin, yes.

Page 172

1    Q.   Exactly.  Isn't that what we're --

2    A.   And my understanding was that they margined it.  They used

3    their own money to margin the SEC accounts, yes.

4    Q.   And that's what we're talking about here --

5    A.   Yeah.

6    Q.   -- right?  This is two billion dollars in margin.

7    A.   Right, so there were questions about the cash and there

8    were questions about the securities at JPM.

9    Q.   So you understood the major open issue here was how to

10   transfer this cash from the OCC accounts to Barclays, and you

11   were also aware at the same time that --

12   A.   No, no.  No, that's not what I said.

13   Q.   Go ahead, sorry.

14   A.   That's not what this says.  The issue is that what will

15   happen if it's not being transferred.  It says how much is

16   going to be transferred at closing, and how will cash not

17   transferred be replaced.

18   Q.   Okay, so you understood that there was a billion dollars

19   in cash at the OCC, and Barclays felt that it was entitled to

20   that?

21   A.   Yes.

22   Q.   You also understood that there as a substantial amount of

23   money, about a billion dollars in cash, in the customer

24   protection account, and that Barclays felt it was entitled to

25   that?  This is of course Saturday, 3:52 p.m.  This is well

Page 173

1    before the hallway conversation that happens with Weil Gotshal,

2    before the 4:30 a.m. draft that you testified about earlier?

3    A.   If you're asking what my state of mind was, I was not

4    thinking in any way about 15c3.  But if somebody had asked me

5    an abstract question, I would have said that, subject to

6    parsing the excluded assets definition, the 3-3 account would

7    be regarded as an asset of the business that was being

8    purchased.

9    Q.   At this point in time, 3:52 p.m. on Saturday afternoon,

10   you knew that the parties had signed up an asset purchase

11   agreement, did you not?

12   A.   Correct.

13   Q.   And you knew that there were exclusions in that asset

14   purchase agreement?

15   A.   Yes.

16   Q.   You knew specifically that there was an exclusion for

17   Lehman's cash?

18   A.   There was an exclusion for, I think, certain cash, and

19   there were other provisions that seemed to me to include as

20   part -- that would include, as part of the business, assets

21   that could at some times have the form of cash, and that there

22   was a tension between the two.  And one of the purposes of the

23   clarification agreement was to effectuate the intent of the

24   party to distinguish how the cash/noncash issue was to be

25   resolved with respect to certain categories of property.

Page 174

1   Q.   You drafted a carve-out from the cash exclusion?

2   A.   I drafted a clarification that the provisions relating to

3   cash were excluded assets, did not include certain forms of

4   property, yes.

5   Q.   And that is in tab 6, Barclays Exhibit 249.  This is the

6   draft that your counsel showed you on direct, is that correct,

7   sir?

8   (Pause)

9   Q.   Well, let me walk you through it.

10  A.   Yes, this is the provision.

11  Q.   You recall seeing this on direct?  This is the 11:13 p.m.

12  e-mail that includes a draft from Cleary Gottlieb, right?

13  A.   Right.

14  Q.   And you'll see, if you turn to the second page, it has

15  "CGSH comments of September 20, 2008, 9 p.m.", right?

16  A.   Correct.

17  Q.   And if you turn, sir, to the page -- there should be a

18  little yellow Sticky on it.  If you turn to the red line that

19  follows the clean version, and you'll see -- I believe it's

20  page 2, and you'll see a section on excluded assets.  You see

21  that?

22  A.   I'm not sure I see this blacklined version.  Which tab did

23  you say it was on?

24  Q.   We're at tab 6.

25  A.   Yeah?

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 175 of 265

Page 175

1   Q.   And there should be a little yellow Sticky flag there.

2   But in any event, following the beginning of the cover e-mail,

3   there's a clean version and a redlined version.  And then on

4   the second page of the redlined version, you will see the

5   Clearly Gottlieb language that was added in this 9 p.m. draft.

6   You see that?

7   A.   I see this language, yes.

8   Q.   And the language that you added specifically noted that,

9   except as otherwise specified in the definition of purchased

10  assets -- okay, you added that, right?

11  A.   Did I personally?  No.

12  Q.   Well, Cleary Gottlieb --

13  A.   Yes.

14  Q.   -- certainly did, right?  This is a Cleary Gottlieb team

15  that was working with you?  Then it goes down to say that

16  excluded assets are not included.  If you skip over to customer

17  fees, right?  Then we have cash, cash equivalents, bank

18  deposits of similar cash items, and that's a reference to the

19  c3.  It goes on:  "maintained:  (a) by or on behalf of LBI,

20  pursuant to Rule 15c3 of the Securities Exchange Act of 1934 or

21  otherwise".  See that?

22  A.   Um-hmm.

23  Q.   Now, what that did -- that language did was say Lehman

24  cash is excluded from the deal, except for the Lehman cash in

25  the customer protection account, right?

Page 176

1   A.   Well, it did say that that would have provided that if

2   there were cash in the 3-3 account, it would have been a

3   purchased asset and not an excluded asset, yes.

4   Q.   So this is an exception to the exclusion?  And the effect

5   of it is to put Lehman cash into the deal?

6   A.   Well, I wouldn't say it's to put it into the deal.  I

7   would say it is to clarify the operation of the provisions

8   relating to the assets used in the business that are purchased

9   assets and those that were intended to be excluded.

10  Q.   And then it goes on to say "are, by or on behalf of any

11  clearing agency or clearing organization, to collateralize,

12  guaranty, secure, whether as margin, guaranty fund deposit, or

13  in any other form, the obligations of Lehman", and it goes on.

14  A.   Right.  And the purpose of this was to conform the

15  understanding to the understanding of the parties as

16  manifested, for example, in the OCC transfer and assignment and

17  assumption agreement.  That margin -- there's no particular --

18  no pre-known allocation of margin between cash and noncash

19  property.  People try to usually maintain it in the form of

20  property for economic efficiency.

21       So in terms of what's part of the deal or not, if the

22  margin is part of the deal, there's not -- there's no reason to

23  want to carve out of the margin margin that might happen to be

24  in the form of cash or might be -- might result from the

25  proceeds of positions that are in the account.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 177

1   Q.   Now, you --

2   A.   So --

3   Q.   -- testified earlier, sir, I believe, that the parties

4   were very focused on margin from the very beginning.  You

5   recall saying that to Mr. Boies?

6   A.   Yes.

7   Q.   But through the entire week, nobody had suggested this

8   language before?  This was the first time that Cleary Gottlieb

9   suggested this language --

10  A.   This --

11  Q.   -- isn't that right?

12  A.   This was an acquisition of one of the largest and most

13  complicated assets and liabilities, one of the largest and

14  complicated financial businesses in the United States, or even

15  the world, that was done under extraordinarily exigent

16  circumstances in an agreement that was uncharacteristically

17  short, because if there had been an effort made to fully

18  document this agreement as lawyers do when they have the

19  fullness of time and many months in preparation, there were

20  bound to be ambiguities, provisions that might be read in

21  conflict.  And the purpose of this, consistent with the intent

22  of selling the business, was to resolve those ambiguities which

23  came to the attention of the parties, which I think this does.

24  Q.   And this effort was the first time -- notwithstanding your

25  testimony that the parties were focused on margin from the very

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 178 of 265

Page 178

1    beginning, this was the first time that this language was

2    proposed?

3    A.   You may be correct.  I think the record will reveal

4    whether or not that's true.  This, I believe, is the first

5    draft that I was familiar with that --

6    Q.   And this --

7    A.   -- that included this language by --

8    Q.   -- this 9 p.m. draft is within a few hours of your

9    receiving that 3:52 p.m. e-mail from the OCC --

10   A.   Hang on a second.

11   Q.   -- saying that a major issue was how to the get the

12   billion dollars in Lehman cash to Barclays, correct, sir?

13   A.   I believe that the drafting of this language was done much

14   earlier in the afternoon, and I think this was disseminated

15   much later.  There were a number of other provisions.  And I

16   don't know when I saw Jim McDaniel's e-mail for the first time.

17   Q.   I won't hold you to a specific time, but we can agree that

18   as of Saturday, certainly Saturday afternoon, you were aware of

19   a substantial amount of cash that Lehman had in the customer

20   protection account, right?

21   A.   By Saturday afternoon, I'm not sure that I personally was

22   aware of --

23   Q.   Certainly by 9 p.m., Cleary Gottlieb was aware?

24   A.   Yes.

25   Q.   And by 9 p.m., Cleary Gottlieb was aware that there was a

Page 179

1   substantial amount of Lehman cash at the OCC?

2   A.   I think that's true.  That's fair.

3   Q.   And the purpose of this carve-out is to make sure that the

4   15c3 cash and the OCC cash is clearly carved out of the cash

5   exclusion, right?

6   A.   To clarify that, it was not excluded by the excluded

7   assets provisions, correct, consistent with the sale order

8   provisions that the OCC had requested and that the trustee and

9   Weil had agreed to, and consistent with the transfer and

10   assumption agreement.  This merely was a documentation of what

11   was consistent with everything that we were both doing and

12   observing the counterparts in the transaction agreeing to.  No

13   one at any point had ever suggested that this was not

14   consistent with the understanding of the parties negotiating

15   the transaction.  It may be the first time that anybody

16   surfaced language to clarify it, but it would have been a shock

17   to me, based on what I had seen, for anybody to say 'Oh, you're

18   adding something new.'  This was fully consistent with

19   everything that I had observed and what the parties had done to

20   date.

21   Q.   Well, now, we'll get to the deleting of this language and

22   we'll get to the parenthetical that you later provided and

23   appears in the final clarification letter.  But that final

24   language you testified about on direct, "property held to

25   secure" --

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 180 of 265

Page 180

1   A.   Yes.

2   Q.   -- I believe you told Mr. Boies that this language did not

3   have the same degree of specificity as that language that ended

4   up in the final.  Do you recall giving Mr. Boies that

5   testimony?

6   A.   I think specificity was one aspect of it.

7   Q.   Let me stop you just on that one aspect, because that's

8   the only one I want to ask you about.  In fact, this language

9   is very specific, is it not?

10  A.   It is.

11  Q.   This language specifically refers to cash, does it not?

12  A.   It's specific in certain regards and it's not specific in

13  others.

14  Q.   Well, let's just --

15  A.   It is not specific in that it is not specifically

16  referenced to exchange-traded derivatives, whereas the other

17  language is very specifically focused on security that is

18  pledged to secure obligations in respect of exchange-traded

19  derivatives.  So there's this -- there are elements of this --

20  it's obviously much more of an alliteration than the more

21  concise formulation, but there are respects in which they

22  differ.

23  Q.   Well, let's take a couple of those elements.  You'll agree

24  that this is more specific inasmuch as it refers to cash, cash

25  equivalents, bank deposits or similar cash items, right?

Page 181

1    A.    Yes.

2    Q.    You will agree that this is more specific in the sense

3    that it has an explicit reference to margin, right?  The word

4    "margin" --

5    A.    Margin guarantee --

6    Q.    -- appears here?

7    A.    -- for the deposit, yes.  Well, "explicit" -- again, I

8    think you could argue about how clear different words are.  I

9    would say that this is more in the style of an enumeration than

10   language which is intended to be more general.

11   Q.    This enumeration covers all of Lehman's cash margins, does

12   it not?

13   A.    Well, first of all, it wouldn't just be cash.  And as I

14   said, it goes beyond -- this would also pick up securities

15   margin, nonexchanged traded derivatives margin, if it were at,

16   for example, DTCC.  If there were assets carried in a DTCC

17   participant account for a customer that's margined, that could

18   be included in this.  So this was a very broad --

19   Q.    No, no --

20   A.    -- provision, and it carried a lot of water.

21   Q.    My question is just as to the cash margin.  This captures

22   all the cash margin, right?

23   A.    As did the other provision.

24   Q.    And it also captures all of the customer account cash,

25   right?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 182

1    A.    Yes.

2    Q.    Were you aware whether Lehman had any other cash?

3    A.    I was -- I didn't have personal knowledge of what other,

4    you know, bank accounts or sources of cash they might have.

5    Q.    This carve-out, in fact, captured all of the Lehman cash

6    of which you were aware, isn't that right?

7    A.    No, it captured all of the cash that was in a form that we

8    believed, based on the structure of the deal and the conduct of

9    the parties and the understandings that they manifested, should

10   be a part -- should be clarified as part of the purchased

11   assets.

12   Q.    Let me put it to you differently.  You were not aware of

13   any cash that Lehman had that was not captured by your carve-

14   out?

15   A.    I don't know whether there was cash that was not captured

16   or not, Counsel.

17   Q.    You're not aware whether, with this carve-out, the

18   exclusion for cash actually excluded any cash?

19   A.    This would not have excluded a bank account at a regular

20   bank that had a balance of a billion, five billion or one

21   billion or half a billion.  I had no idea whether or not there

22   were such accounts or not.  But this was not directed to such

23   accounts.  This was specifically directed to property that was

24   used to secure obligations that, as a result of the purchase

25   agreement, Barclays was going to become responsible for or that

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 183

1    were associated with positions that were going to be

2    transferred to Barclays.  That's what this language was

3    intended to --

4    Q.   Now --

5    A.   -- address.

6    Q.   -- if Lehman didn't have any other cash other than what's

7    in here, it would be much simpler, would it not, as a drafting

8    matter, simply to say all Lehman cash goes to Barclays?

9    A.   As I said, we did not look at this provision from the

10   perspective of what portion of the universe of cash that Lehman

11   did or didn't have would be captured.  This language was

12   addressed to specific issues that we thought needed to be

13   clarified in order to effectuate the purposes of the purchase

14   agreement.

15   Q.   But you'll agree with me, as a general drafting matter,

16   it's much easier to say all of Lehman's cash is going to

17   Barclays, than to say all of Lehman's cash is excluded except

18   for these two particular varieties of cash, which happen to be

19   all of Lehman's cash?

20   A.   I'm not sure the purpose of the hypothetical you're

21   presenting to me.  If you're asking whether it's easier to use

22   fewer words than more words, that can be true.

23   Q.   In any event, you did not make any inquiries, I take it,

24   or learn that in fact Lehman did not have any other cash?  That

25   fact --

Page 184

1    A.    This --

2    Q.    -- never came to your attention?

3    A.    This was not a hunt for Lehman cash in any way, shape or

4    form.  This was directed specifically to the issues that arose

5    over the weekend and that needed attention:  DTCC, the 3-3

6    account and mar -- and basically credit support for margin.

7    That's what this was focused on, not where Lehman had the cash.

8    Q.    Now, whether you were hunting or not hunting, it did not

9    come to your attention that Lehman had no other cash?

10   A.    I had no idea whether they did or did not have other cash.

11   Q.    Now, your counsel asked you about some highlighting in the

12   binder that he provided you, and I believe it is in tab 11.

13   And that's Barclays Exhibit 270.  And I believe Mr. Boies read

14   to you --

15   A.    I'm sorry --

16   Q.    It's in the --

17   A.    -- where?  What tab?

18   Q.    It's in the first binder that you have --

19   A.    Oh, my --

20   Q.    -- that Barclays gave you.

21   A.    From the direct?

22   A.    Yeah.

23   Q.    I think this is the only time I'm going to refer to it, so

24   I apologize for the confusion.

25   A.    No problem.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 185

1    Q.    But if you could turn to tab 11.  And you recall Mr. Boies

2    asked you about this cover e-mail which referred to, and I

3    quote, "Attached pleased find the most recent version of the

4    so-called clarification letter.  The portions highlighted in

5    yellow concern the points which depend on the resolution of

6    current discussions."  You see that?

7    A.    Yes.

8    Q.    Have you seen a color copy of this?

9    A.    I don't have a color copy.  If I look at the draft, I

10   might be able to tell you.  But if you have a draft that's

11   color-copied, I --

12   Q.    Do you know whether in fact the section on purchased

13   assets and excluded assets, specifically this carve-out in

14   Section D, was or was not highlighted?

15   A.    Yes, it was, and the highlighting included the provision

16   which was the subject of current discussions.  There were two:

17   there was the DTCC and 3-3.  There were no current discussions

18   outside the context of the clarification agreement, that I was

19   aware of, relating to margin in relation to exchange-traded

20   derivatives.  The only two open issues at that time, my

21   recollection is, that are covered by this language in the

22   clarification letter were 3-3 and the DTCC account.  That's my

23   recollection.

24   Q.    Okay, if you turn to page 3 -- let's see, the -- page 2 of

25   the draft that's attached to this e-mail.  And you'll see

Page 186

1    Section D there is the excluded assets that includes your

2    carve-out.

3    A.    Yeah.

4    Q.    And that does not show any highlighting.

5    A.    On this draft there's no highlighting --

6    Q.    Yeah.  Have --

7    A.    -- anywhere.

8    Q.    Have you seen a copy that includes the color that shows

9    the highlighting?

10   A.    I'm not sure whether I have.

11   Q.    But do you know whether or not that section, including

12   your carve-out, was highlighted for further discussion?

13   A.    In the draft that was transmitted, I don't -- am I an

14   addressee on this distribution?  I don't believe I am.  I don't

15   know.

16   Q.    So you --

17   A.    But it might have -- but it may very -- but it may have

18   been.  What's the question?

19   Q.    Question is do you know one way or the other?  Was it

20   highlighted for further discussion or not?

21   A.    I'm not -- I can't say for certain.  There may -- I may

22   have seen in the papers a draft of this, not attached to an

23   e-mail, in which in paragraph D there was some highlighted

24   language.  And it may have been around the excluded-assets

25   provision.

Page 187

1    Q.    Okay.

2    A.    But my memory is not sharper than that.

3    Q.    I don't need to test your memory.  I have the production;

4    I have the highlighting.

5    A.    Okay.

6    Q.    I could show it to you if necessary.

7    A.    Please.

8    Q.    The only question is to establish --

9    A.    Please.

10   Q.    -- that you don't know.

11   A.    No.  I personally.

12          THE COURT:  Mr. Maguire, would this be a convenient

13   time for an afternoon break?

14          MR. MAGUIRE:  Yes, Your Honor.

15          THE COURT:  Let's take a break till 4:00.

16       (Recess from 3:49 p.m. until 4:06 p.m.)

17          THE COURT:  Be seated, please.  Mr. Maguire, please

18   proceed.

19          MR. MAGUIRE:  Yes, Your Honor.

20   RESUME CROSS-EXAMINATION

21   BY MR. MAGUIRE:

22   Q.    Now, before the break, sir, we were talking about how

23   certain language was highlighted for further discussion.  Do

24   you recall that?

25   A.    I recall our discussing it.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 188

1    Q.    And there were a number of other matters that were going

2    on over that weekend; the most serious was the JPMorgan issue,

3    right?

4    A.    JPMorgan was one of the issues.

5    Q.    And you were very involved in that, were you not?

6    A.    I was involved.  I wouldn't say necessarily very involved,

7    but I was involved.

8    Q.    And that took up a significant portion of the weekend, did

9    it not?

10   A.    It did.  It took many hours.

11   Q.    Now, ultimately there was a discussion on the subject of

12   Lehman cash, and that is the hallway conversation that you

13   testified earlier, and that happened in the early hours of

14   Monday morning, isn't that correct?

15   A.    I can't remember where that conversation was, whether it

16   was on the far side or the near side of midnight or how late at

17   night it was.

18   Q.    And I understand that you may not have heard everything

19   that Harvey Miller said in the course of the hallway

20   conversation, but nobody in your presence said that Harvey

21   Miller was wrong or that in fact there had not been a very

22   clear representation made to the Court that no Lehman cash was

23   going to Barclays?

24   A.    I don't remember a conversation along those lines.

25   Q.    You do recall that the issue in that hallway conversation

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 189

1   was Lehman cash?

2   A.   There was a conversation about Lehman cash.  There were

3   questions about what was said and what it meant.  But I was not

4   there, as I said, for the entire conversation, and I didn't

5   hear what you had described in terms of the discussion.

6   Q.   You did understand, however, that Harvey Miller and Weil

7   Gotshal did have an objection to Lehman cash going to Barclays?

8   A.   I believe -- well, it may have been an objection.  Whether

9   it was an objection or a concern or a question, I couldn't

10  provide more specificity about.

11  Q.   Now, in the course of those hallway conversations, you did

12  not say anything to anyone about this other variety of Lehman

13  cash that you were aware of, the Lehman margin cash?

14  A.   The subject didn't come up.

15  Q.   And you did not raise it?

16  A.   I was not leading the discu -- I was only tangentially

17  involved in the part of the conversation about the cash.  I was

18  not there for the entire conversation.

19  Q.   You were asked a lot of questions on direct about what

20  people didn't tell you about Lehman's margin.  Do you recall

21  that?

22  A.   Um-hum.

23  Q.   At no point during the hallway conversations did you raise

24  an issue that Lehman cash was at the OCC and that in your

25  understanding it was supposed to go to Barclays?

Page 190

1    A.   Well, not during that conversation.  But I had forwarded

2    an e-mail to the trustee on precisely the subject of a billion

3    dollars in cash.  Nobody was trying to hide anything about the

4    cash or avoid the issue.  The trustee signed an agreement that

5    provided that all of the margin was going over to the Barclays

6    accounts, and it would have included cash.

7    Q.   You understand I'm talking to you now about the hallway

8    conversation?

9    A.   Yes, I understand that, but you're -- but the question

10   that you're asking me is whether or not a discussion about a

11   3-3 should have automatically set off an alarm about the

12   discussion about margin, and margin and the 3-3 accounts have

13   similarities and differences.

14   Q.   My only question, sir, was what you said.  And I'm going

15   to try to ask questions --

16   A.   Well, I didn't say --

17   Q.   -- but --

18   A.   I was not a participant in the discussion that preceded

19   the resolution of the 769 million dollars in securities.

20   Q.   I'm going to try to ask questions that can be answered

21   with a yes or no.

22   A.   Okay.

23   Q.   And if you need to add an explanation, I'd very much

24   appreciate, if you could try --

25   A.   Okay.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 191

1    Q.    -- to answer yes or no and then give your explanation.

2    Okay?  Is that fair?

3    A.    That's fine.

4    Q.    The trustee was not present for the hallway conversation,

5    isn't that right?

6    A.    I don't know.

7    Q.    At the hallway conversation, you were the only person who

8    was present who was an expert on derivatives, isn't that right?

9    A.    I don't know the answer to that question.

10   Q.    You were not aware of any other person who was there who

11   was an expert on derivatives?

12   A.    I didn't know most of the other lawyers who were involved

13   in the transaction, because I was not for the most part engaged

14   in the negotiation of the documents with the other side.  I was

15   dealing, for the most part, with issues relating to DTCC and

16   OCC and JPMorgan, which were not the transaction with the

17   participants.  So I did not have a familiarity with all of

18   the --

19   Q.    And you didn't --

20   A.    -- other lawyers who were involved.  Whether they had

21   someone who had expertise in that area or not was not known to

22   me.

23   Q.    You do not know whether any of those other lawyers was an

24   expert in derivatives?

25   A.    No.

Page 192

1   Q.   You did not know whether any of those other lawyers was

2   aware that the billion dollars in cash at the OCC was all

3   Lehman proprietary cash and not customer cash, isn't that

4   right?

5   A.   I didn't know what their state of knowledge was, no.

6   Q.   And you did not raise that issue?

7   A.   It -- no, I would not have raised that issue.

8   Q.   Now, sir, you -- after the hallway conversation, you went

9   back with your colleagues to the conference room that Barclays

10  had at Weil's conference center, and the undertaking was that

11  Weil Gotshal was going to get you a draft, right?

12  A.   I'm sorry, this is --

13  Q.   This is after the hallway conversation.

14  A.   After the hallway conversation, I believe that Weil was

15  handling the draft.

16  Q.   And that draft you got is the 4:36 a.m. draft in tab 2 of

17  your binder, Movants' Trial Exhibit 447.

18  A.   I'm sorry.  Tab --

19  Q.   Tab 2.

20  A.   Back to your binder?

21  Q.   Yes.  Now, if you turn, sir, to page 2 of the draft,

22  you'll see we have the excluded assets down at the bottom, that

23  last full paragraph.  And Weil Gotshal had deleted your carve-

24  out, isn't that right?

25  A.   It had deleted a large portion of one of the clauses, yes.

Page 193

1   Q.   You were asked some questions on direct about the subject

2   of whether anyone objected to your language.  In fact, Weil

3   Gotshal deleted most of your carve-out, isn't that right?

4   A.   No, the question that was asked of me was did anybody

5   object to this language in relation to the handling of margin,

6   and the answer was no.

7   Q.   Well --

8   A.   This, as we discussed earlier, relates to the 3-3 account,

9   DTC and a margin.

10  Q.   The first part, sir, relates to c3, right? This part --

11  A.   Yes, the very first part.

12  Q.   -- relates to c3?

13  A.   Yes.

14  Q.   The next part, sir, relates to margin held by or on behalf

15  of any clearing agency or clearing organization to

16  collateralize, secure -- guaranty, secure, whether as margin,

17  guaranty fund deposit or any other form.  That's not c3, sir,

18  right?  That's all margin?

19  A.   No.  The first part is c3, but the part that you just

20  described -- margin is one of the elements but not necessarily

21  limited to margin in respect of exchange-traded derivatives is

22  the point I'm trying to --

23  Q.   And Weil Gotshal deleted the whole reference --

24  A.   Deleted --

25  Q.   -- to margin?

Page 194

1    A.   They deleted the entire provision, which included language

2    which would simultaneously have applied to the clearinghouse

3    that was OCC and the clearinghouse that was DTCC, because the

4    clearing participant carries property for the account of

5    customers.  It has obligations and is required to settle

6    transactions by those customers, and it would have the ability

7    to use property of customers to settle those obligations.  So

8    it would have included more than just OCC.

9    Q.   Now, when you got this draft deleting most of your carve-

10   out, and specifically the part that concerned Lehman's margin,

11   the cash, you decided you would propose new language, isn't

12   that right?

13   A.   Yes.

14   Q.   And you did that because you were concerned that there was

15   a prospect of a dispute between Lehman and Barclays on the

16   subject of Lehman's cash margin, isn't that right?

17   A.   I deleted it because I thought that the language that was

18   deleted was overinclusive and that we needed to fill the gap

19   that was created by the overinclusive deletion.

20   Q.   If you could give me a yes or no answer and then explain

21   as much as you wish, sir.  You were concerned about a dispute

22   between Lehman and Barclays about the deletion, Weil's

23   deletion, of your carve-out?

24   A.   No.  I was concerned with completing the process of

25   documenting the understanding of the parties.  I was not

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 195 of 265

Page 195

1   focused on disputes.  I was focused on clarification.

2   Q.   You were concerned, were you not, sir, that Weil's

3   deletion of your carve-out would lead to negative inferences

4   against Barclays?

5   A.   I was of the view that the deletion of that language would

6   not -- would have resulted in a clarification language that did

7   not treat customer margin in a manner that was consistent with

8   the deal and which we were trying to clarify in these

9   provisions.

10  Q.   And you were specifically concerned about negative

11  inferences that could arise from Weil's deletion of your carve-

12  out, isn't that correct?

13  A.   Yes.  Yeah, I think that's a fair way of characterizing

14  it.

15  Q.   Specifically, in the context of dispute, in light of the

16  deletion of that language?

17  A.   Yes.  If there would have been a dispute, what was in and

18  what was not in the clarification agreement would bear on it.

19  And so we wanted language that reflected the agreement of the

20  parties.

21  Q.   You and your Barclays colleagues were concerned about what

22  might have been the subject of a dispute in light of Weil's

23  deletion of that language --

24  A.   I was not --

25  Q.   -- isn't that correct?

Page 196

1    A.    -- in any way focused at that point on a dispute.  I was

2    focused on conforming the language of the clarification

3    agreement to the terms of the agreement, which is the purpose

4    of the entire document. That's why it's called the

5    clarification agreement or letter.

6    Q.    Do you deny, sir, that you were concerned about what might

7    have been the subject of a dispute in light of Weil's deletion

8    of that language?

9    A.    I was -- no, I was concerned -- that is certainly -- yes,

10   in the sense that that is certainly a potential consequence.

11   My focus, however, on the language was in attempting to make

12   sure that we had documented and clarified the deal terms in the

13   clarification letter as to those matters that might be

14   ambiguous under the asset purchase agreement.

15   Q.    I'm going to ask you a little more about your concern.

16   That concern that you had was a collective concern, by you and

17   your Barclays colleagues.  Isn't that right?

18   A.    If you're asking me whether I discussed -- I'm not sure of

19   the answer to your question.  If you're asking me whether I

20   discussed that concern with Barclays colleagues, the answer is

21   no.

22   Q.    Certainly you and your Cleary Gottlieb colleagues

23   collectively were concerned about the kind of negative

24   inferences that would arise from Weil's deletion of this

25   language?

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 197 of 265

Page 197

1    A.    It would have been -- not -- you are right that failing to

2    clarify it could have left a gap in the terms of the deal and

3    the terms as represented this that could be exploited in a

4    litigation to argue different terms.  So yes, I was focused on

5    clarifying.  There was no discussion about am I concerned?  Are

6    you concerned?  Is he concerned?  We were focused on reflecting

7    exactly what we thought were the terms of the deal, consistent

8    with the documents that the trustee had executed and we had

9    indicated that we were going to execute.

10   Q.    And you were concerned that in a litigation over Lehman's

11   cash, negative inferences would be drawn against Barclays

12   because Weil had deleted this language.  Isn't that right, sir?

13   A.    Well, it was -- no.  In fact, it was not just about cash.

14   What I came to be concerned about, to the extent that I was

15   concerned about anything, was to make it clear -- because this

16   was, as I said, an exception to an exception.  It referred

17   primarily to cash and cash equivalents, and I wanted to make

18   sure that all of the forms of credit support that guaranteed

19   obligations under exchange-traded derivatives were covered,

20   whether or not they fell into that litany of cash or cash

21   equivalents.

22         In some cases, clearinghouses have obligations that are --

23   that are secured by the requirement that the clearing

24   participant own stock and pledge the stock.  There are a

25   variety of structures.  What I realized when I saw the deletion

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 198

1   was that we needed language to make it abundantly clear that

2   all of the credit support that was available for exchange-

3   traded derivatives was covered.  And yes, that does include

4   cash.

5        And to the extent that we hadn't clarified it, there could

6   have been an argument.  And clarifying it alleviated any

7   dispute as to whether or not it was the intent of the parties

8   to include credit support for exchange-traded derivatives in

9   whatever form.

10  Q.   So you were concerned about a litigation between Lehman

11  and Barclays on the subject of Lehman's margin?

12  A.   Mr. Maguire, I was not even contemplating the prospect of

13  a litigation --

14  Q.   Well, you were --

15  A.   -- at that time.

16  Q.   -- specifically concerned about negative inferences that

17  would arise in that litigation.  Isn't that right?

18  A.   I was concerned about accomplishing what every lawyer

19  involved in a transaction endeavors to accomplish, which is to

20  ensure that the language in the agreement as clearly as

21  possible, as unambiguously as possible, accurately documents

22  the terms of the deal.  That's what I was involved in trying to

23  accomplish.

24  Q.   Do you deny that you and your colleagues were concerned

25  about the sort of negative inferences that could arise?

Page 199

1    A.   I deny that we discussed any such concern at the time.

2    Q.   Do you deny that you were concerned about such negative

3    inferences?

4    A.   I'm -- I was concerned about addressing shortfalls in the

5    language that didn't reflect the deal which, yes, any

6    discrepancy between the terms of an agreement and the terms of

7    a deal, could give rise to a dispute.  Yes.  And my job was to

8    make sure that I as accurately as I was able to do, reflected

9    the terms of the transaction.  And so, yes, I added language, I

10   proposed language to Lehman, to reflect what I perceived to be

11   the gap in the terms in the deal and provided it.

12   Q.   So when you say "yes" you were concerned about negative

13   inferences.  Is that correct?  One more yes would cover this.

14   A.   Yes, with a caveat about what the word "concerned" means.

15   If you'll beg me that indulgence.

16   Q.   By all means.

17   A.   Thank you.

18   Q.   You did not go talk to Harvey Miller about the deletion of

19   the language with respect to margin?

20   A.   No.

21   Q.   You did not go talk to anybody at Weil?

22   A.   It never occurred to me that it would be an issue putting

23   contention.  Everything that I had seen, everything that the

24   trustee had done, every portion of the transaction transpiring

25   from just before the sale hearing until that moment in time,

Page 200

1    was entirely consistent with the notion that all of the credit

2    support that secures exchange-traded derivatives was to be

3    transferred to Barclays.  There was no event that occurred that

4    put me on notice in any way that there was any question about

5    that until well after the settlement of the -- well after the

6    transaction, when the trustee began to articulate different

7    positions on the subject of a margin.

8    Q.    And --

9    A.    But certainly at this time, I had no reason to suspect --

10    no reason to suspect -- that what I was doing was in any way

11    controversial.  So we provided the language to Lehman, and

12    consistent with my expectation, Lehman accepted the language,

13    put it into the document, and the parties executed the

14    documents.

15    Q.    Your understanding at the time, you say, is that Barclays

16    was entitled to all of Lehman's cash, cash equivalents, bank

17    deposits or similar cash items that were held at a clearing

18    agency as margin, a guaranteed deposit or any other form?

19    A.    To --

20    Q.    You thought that reflected the business deal, isn't that

21    right?

22    A.    Yes.  But you summarized some of the language, counselor,

23    but not all of the language.  Because it was "and for which

24    purchaser shall become responsible as of the closing, pursuant

25    to the requirements of such clearing organization."  We -- this

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 201 of 265

Page 201

1   was -- this language was only directed to those cash or cash

2   equivalents that were, in essence, committed to support an

3   obligation.  They are very different than cash.

4       If you have cash in a bank account -- if you have any

5   question about the difference between a bank deposit and the

6   cash that's committed to secure obligations, go to the clearing

7   organization and ask them to give it to you back.  There's a

8   fundamental difference between the two, and that's what we were

9   trying to get at here.

10  Q.   One way to deal with negative inferences would be to go

11  back to Weil and say look, we understand the business deal is

12  that Barclays is getting all of the margin.  Isn't that right?

13  A.   That's exactly what I did.  I put it in black and white in

14  a rider that is as clear as I was able to articulate it at that

15  time and under the circumstances.  And I did give it to them.

16  Q.   You --

17  A.   And if they didn't agree with it, or if there were any

18  questions about it, they would have said we're not accepting

19  this language or we wanted to change the language in the

20  following way.  There was no -- nobody suggested that that

21  language that we provided did not accurately reflect the

22  understanding of the agreement.

23  Q.   And no way did you see Weil's deletion of a large part of

24  your carve-out here, to in any way suggest that there was any

25  doubt or objection on the part of Weil?

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 202 of 265

Page 202

1   A.   No, because the deletion immediately followed the

2   resolution of two of the principal issues that are addressed in

3   that language.  That's why.

4   Q.   It immediately followed the hallway conversation

5   concerning Lehman cash.  Is that right?

6   A.   No.  The distribution of that may have.  But the drafting

7   of that language occurred well before the conversation in the

8   hallway, I believe.

9   Q.   So following --

10  A.   Again, if I have the -- if I have the timing right.  I

11  don't want to suggest that I accurately know exactly what

12  happened at each hour, because much of it is a blur in terms of

13  the sequencing of events.

14  Q.   -- so notwithstanding Weil's deletion of much of your

15  carve-out, you felt it was still absolutely clear that Barclays

16  was entitled to all of Lehman's margin?

17  A.   I didn't think that the deletion reflected any question

18  about that particular issue.  But that happens frequently in

19  negotiations.

20  Q.   And you didn't call in any of the Weil people to discuss

21  that or talk to them about that?

22  A.   At that time, I didn't think there was any reason to.  I

23  gave them the language that reflected my views about what they

24  had done.  I did, so I communicated my view of what they had

25  done.  And if your question is, did they ever communicate back

Page 203

1  to me any reaction that suggested that that wasn't the deal;

2  no, they never did.

3  Q.   And what you sent back to them instead was a new

4  parenthetical that you described on your direct?

5  A.   Yes.

6  Q.   And you sent that back to Weil because you wanted to avoid

7  becoming embroiled in extensive negotiations.  Isn't that

8  right?

9  A.   Over words, yes.  I didn't want to get involved in a

10  protracted negotiation of words.  And as a result, I formulated

11  what I thought would be the most clear and concise and brief

12  formulation of the concept that I was trying to convey, and put

13  it in the documents.  Because for every time you add a clause

14  or a word, you're inviting something -- you're inviting a

15  dispute or an argument or a negotiation.  And we were very

16  early in the morning at that point in time.  And so I wanted to

17  just make sure that if there was any issue, it wasn't about

18  wording, it was about substance.  Because that provision is as

19  clear a definition of margin and guarantee fund deposits as I

20  was able to draft under the circumstances and at the time.  I

21  thought it was abundantly clear.

22  Q.   So you did not send them back the part of this carve-out

23  that deals with margin?

24  A.   No, because it was intertwined -- that language that deals

25  with margin deals with other things as well.  And one of the

Page 204

```
 1    things that I've learned in the course of negotiation is

 2    sometimes it is best not to go back and hit your head against

 3    the same wall.  There are very frequently problems that you

 4    encounter because you don't realize how the other party is

 5    reacting to words that you intend in a particular way.  And

 6    it's better to go down -- it is better to approach the

 7    resolution of the issue by just being clear about what the

 8    issue is instead of trying to survive a fight of pride of

 9    authorship as to whether your language wins or their language

10    wins.  So this was about substance and avoiding wordsmithing.

11    Q.   So --

12    A.   It wasn't about avoiding issues.

13    Q.   -- you still sent them your language.  You just --

14    A.   I --

15    Q.   -- didn't send them the language you had proposed and

16    which they had deleted.  You sent them new language that you

17    crafted yourself, personally.  Isn't that right?

18    A.   Yes.

19    Q.   And that's the parenthetical?

20    A.   That's the parenthetical, yes.

21    Q.   And by sending them the parenthetical, you believed you

22    would avoid becoming embroiled in extensive negotiations on the

23    subject of Lehman's margin.  Isn't that right?

24    A.   Certainly over the words of it.  If there was an issue

25    about the substance of it, we would have negotiated.  I had no
```

Page 205

1   expectation that that would happen.  But I certainly felt that

2   I had done what I could to avoid arguing over words and

3   formulations.

4   Q.   Now, if you turn, sir, to tab 6 of your binder -- I'm

5   sorry, tab 7 -- you'll see a draft at 6 a.m., sent by your

6   partner, Michael Mazzuchi.  Do you see that?

7   A.   Yes, I see that.

8   Q.   And that went to Isaac Montal at DTCC and you were copied

9   on it.  Do you see that?

10  A.   Yes.

11  Q.   And this 6:03 a.m. draft, that does not include the

12  parenthetical.  Isn't that right?  If you'd turn to page 2 at

13  the very top -- page 2 of the draft, sorry.

14  A.   Yes, this draft does not include that language.

15  Q.   It says -- under item (c) it says, "Purchased assets are:

16  (c) exchange-traded derivatives and collateralized short-term

17  agreements."  No parenthetical, right?  So you had not

18  submitted it as of 6 a.m.?

19  A.   I'm not sure that I hadn't submitted it before 6 a.m.

20  Q.   It's certainly not in the 6 a.m. draft that your partner

21  circulated?

22  A.   It's not in here.

23  Q.   And the draft that your partner circulated, accepts all of

24  the Weil changes.  Isn't that right?  You'll see your carve-out

25  is now gone from excluded assets.

Page 206

1    A.   He didn't -- we -- I'm sorry, but the circumstances were

2    this -- were these, I'm sorry.  It was 6 o'clock in the

3    morning.  We were trying to finalize the DTCC agreement.  The

4    DTC had -- in connection with the finalization of the

5    agreement, their counsel had asked us to give them the current

6    version of the clarification letter.  We did not control that

7    document.  We did not control its contents.

8         What happened was, we asked for the current draft from

9    Weil.  Weil provided it to Mike Mazzuchi who immediately sent

10   it on to the other side.  We did not review it.  We did not

11   evaluate it.  Where -- you know, where this was in relation to

12   their processing of the riders I can't say.  But this was

13   merely a transmittal from us to the DTCC to reflect the current

14   status of the clarification agreement.

15   Q.   And to the trustee, right?  You sent this to the trustee

16   as well?

17   A.   It may very well have gone to the trustee.

18   Q.   And in this version that you sent to -- that your partner

19   sent out at 6 a.m., the Weil deletion of the carve-out -- does

20   this reflect --

21   A.   If this is the --

22   Q.   -- Weil's deletion --

23   A.   -- yes.

24   Q.   -- correct?

25   A.   If this is the draft, it doesn't reflect it.

LEHMAN BROTHERS HOLDINGS INC., et al.

1  Q.   Nonetheless, you were still working on new language.

2  Isn't that right?

3  A.   I'm candidly not sure I remember exactly what the sequence

4  and timing was, when it was showed to me -- when the language

5  that came back deleting the (1)(d) provisions or (1)(c)

6  provisions, whatever they were, and then when it was that I

7  drafted the language and exactly when it went back to Weil.   I

8  just don't remember exactly what time it was in that continuum

9  from Sunday night to Monday morning.

10  Q.   After you received the 4:36 a.m. draft from Weil, the one

11  that deleted your carve-out, you reviewed that carefully, did

12  you not?

13  A.   I reviewed it quickly, but yes, as carefully as I could.

14  Q.   You noted earlier that Weil had not actually deleted all

15  of your carve-out -- most of it yes, but not all of it.   And

16  one of the things that Weil left in is in this draft in (c), at

17  the bottom of the page, the first ten lines, going down four

18  lines, the sentence that begins, "Except as otherwise specified

19  in the definition of purchased assets."

20  A.   Um-hum.

21  Q.   You had added that language, right?

22  A.   As I said, I did not personally add that language, but --

23  Q.   That was in the Weil edition -- the Cleary Gottlieb --

24  A.   It may have been.

25  Q.   -- edition?

Page 208

1    A.    I'm not denying it.  I'm just -- I didn't draft it.

2    Q.    Okay.  Now, what that language means, of course, is that

3    anything that is specified as a purchased asset is

4    automatically carved out of excluded assets, right?

5    A.    I think the purpose of that was to specify that unless, in

6    the clarification letter, something was identified as a

7    purchased asset, it was to resolve a conflict between excluded

8    assets and purchased assets.

9    Q.    That's right.  So if you were to -- if anyone was to

10   identify Lehman margin as a purchased asset, then it would

11   automatically be carved out --

12   A.    Yes.

13   Q.    -- of the definitions of excluded assets?

14   A.    That's the way that provision would have operated as

15   drafted, correct.

16   Q.    And so you drafted a parenthetical that would make

17   Lehman's margin a purchased asset?

18   A.    The credit -- the property pledged -- held to support the

19   exchange-traded derivatives would have been a purchased asset.

20   Q.    And by making it a purchased asset, it was automatically

21   carved out of the definition of excluded assets?

22   A.    Yes.  Although if it had been kept in there, it would have

23   also been carved out from the definition of excluded assets.

24   So I'm not entirely sure what the significance of the

25   distinction is.  But yes.  But it seemed to us, you know, why

Page 209

1    do it as an exception to an exception?  Why don't we just put

2    it directly in the definition of purchased assets together with

3    the exchange-traded derivatives?

4    Q.    And thereby you accomplished exactly what you had been

5    trying to do with the original language that had been in the

6    Cleary Gottlieb 9 p.m. draft from Saturday?

7    A.    Yeah.  Although as I say, there are some differences, but

8    yes.

9    Q.    You submitted a declaration on this subject, did you not,

10   sir?

11   A.    I believe -- well --

12   Q.    If you'd turn to tab 3 of the binder?

13   A.    10 of your binder?

14   Q.    I'm sorry, tab 3.

15   A.    Oh, I'm sorry.

16   Q.    On the second page of that draft, you'll see paragraph 5.

17   A.    Um-hum.

18   Q.    And you say, "The draft language at issue was an attempt

19   to accurately document the business deal that had already been

20   negotiated and agreed, by clarifying, inter alia, that Barclays

21   would acquire the margin, including cash associated with the

22   exchange-traded derivatives positions carried by LBI."  Do you

23   see that?

24   A.    Yes, I do, sir.

25   Q.    Okay.  Now, if you'd turn to the end of that paragraph on

Page 210

1    page 3, you'll see the last sentence says, "Because excluded

2    assets is defined as assets 'except as otherwise specified in

3    the definition of purchased assets', clarification letter

4    (1)(c), the inclusion of margin in whatever form, for exchange-

5    traded derivatives, in the definition of purchased assets,

6    necessarily means that such margin is not encompassed within

7    the definition of excluded assets in section (1)(c) of the

8    clarification letter" --

9    A.    Yes.

10   Q.    -- "which is consistent with the discussions of the

11   lawyers from both sides."  Do you see that?

12   A.    Right.

13   Q.    Now, in fact, sir, you have no knowledge of any such

14   discussions.  Isn't that right?

15   A.    Well, I have knowledge of the discussions in the sense

16   that they manifested themselves in an agreement that was signed

17   by the participants in the discussions.

18   Q.    You're referring here to nothing other than what you

19   believe would have happened in the course of the parties

20   agreeing to sign the APA?

21   A.    I was -- as I say, I was not part of the negotiation, so I

22   can't testify as to those negotiations.  But what I am saying

23   here is that this is consistent with the APA and the original

24   sale order.  And I think it's pretty clear that the OCC read

25   the language and reached the same conclusion.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 211

1    Q.   So you're not aware of any discussions.  You're just

2    inferring that such discussions, in your belief, would have

3    happened?

4    A.   I'm -- as I infer from snow on the ground when I wake up

5    in the morning that it snowed overnight, I'm inferring that if

6    the parties reached agreements on terms specifying the scope of

7    the agreement, that they must have had discussions leading up

8    to the memorialization of those agreements.  But yes, that's

9    all that I mean by that.

10   Q.   Now, your parenthetical, I believe, is in the final

11   clarification letter.  And that's Exhibit 3, which I believe

12   you'll find in tab 8 of your binder.  And that's on page 2 of

13   the exhibit.  And at the top of the page, you'll see those are

14   the words that Mr. Boies quoted earlier, "And any property that

15   may be held to secure obligations under such derivatives."

16   A.   Yes.

17   Q.   You wrote that language by hand into the agreement, right?

18   A.   I believe that I -- somebody handed me a copy of the

19   agreement.  I took the page which the predecessor language was

20   on and I wrote in handwriting that language, and that, I

21   believe, one of my partners handed it back to the Weil lawyers

22   in the clarification negotiation room who were running the

23   documents.  Yes.

24   Q.   It was very important to you that this parenthetical

25   include Lehman's cash.  Isn't that right?

Page 212

1    A.    It was important to me that the -- to the extent that any

2    of Barclays' obligations that they were going to assume by

3    assuming the accounts in which the exchange-traded derivatives,

4    that whether or not the property that secured the obligations

5    was in the form of cash or not cash, would be included.

6    Q.    So that was a matter of critical importance, multibillion

7    dollar importance, that this include Lehman's cash.  Isn't that

8    right?

9    A.    It turns out that that's --

10   Q.    In fact, in your declaration, if you'd turn back to tab 3,

11   again, that same paragraph we were looking at, paragraph 5,

12   you'll see at the bottom of page 2, you quote the language and

13   you insert in square brackets -- after "any and all property,"

14   you insert in square brackets, "including cash," right?

15   A.    I'm just trying to get my references to -- is this a

16   discussion of the final provision or the antecedent provision.

17   Yes -- yeah, this is the predecessor position --

18   Q.    Right.

19   A.    -- to the -- yes.

20   Q.    Now, in the parenthetical that you provided to Weil, you

21   didn't include those words "including cash"?

22   A.    No.

23   Q.    You made no -- you didn't use the word "cash"?

24   A.    No.

25   Q.    You didn't use the word "cash equivalent"?

Page 213

1   A.   No.  I said "any property", which I think fairly clearly

2   encompasses any property, which would include all of those

3   things.  So I didn't think I was necessary.

4   Q.   And you gave the sheet of paper with your handwriting to

5   your partner who went to somebody at Weil and pointed out the

6   handwriting, the change that needed to be made, right?

7   A.   I'm assuming that's what happened.

8   Q.   And other than that there was -- you were not aware of any

9   discussion of what, if anything, was said to Weil, other than

10   pointing out that new language?

11   A.   No.  But I had no reason to suspect that it would be

12   controversial, because I had no reason to suspect that if the

13   concept was agreed, that support for exchange-traded

14   derivatives would be an asset that was to be transferred to

15   Barclays, it was a matter of -- it could be a matter of totally

16   random events, how the composition of that margin was as

17   between different forms of credit support.  And there was

18   nothing in the documents that suggested to me, or the

19   conversations of the parties, that anybody was focused on

20   carving out a distinction in the case of margin, between cash

21   and non-cash margin.

22        So there was no conversation, because there was -- I was

23   not operating under any impression that there needed to be --

24   that that was a subject of potential dispute.

25   Q.   And you don't know who the person at Weil was to whom your

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 214 of 265

Page 214

1     partner gave the handwritten change?

2     A.   I don't know.

3     Q.   You don't know --

4     A.   I don't --

5     Q.   -- obviously, if that person was an expert in derivatives?

6     A.   I have no idea whether or not he was.  I am certain that a

7     firm as sophisticated as Lehman, hiring lawyers as

8     sophisticated as they have, find the requisite expertise.

9     Q.   You don't know whether that person had any awareness

10    whether the property at the OCC was Lehman proprietary property

11    as opposed --

12    A.   Well --

13    Q.   -- to customer property?

14    A.   -- nobody had better access to that information than their

15    client.

16    Q.   You had no knowledge as to what was in the mind of that

17    person at Weil who received your handwritten change?

18    A.   I would have no reason to know what was in their mind,

19    what they asked for or what --

20    Q.   And you have no --

21    A.   -- they were --

22    Q.   -- idea whether they thought this handwriting change was

23    simply conforming an item with the transfer of customer

24    property?

25    A.   I can't speculate as to what was in their minds when they

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 215 of 265

Page 215

 1    received it.  I assumed that the per -- that any lawyer that

 2    received that would understand what it means.

 3    Q.    You did not circulate any e-mail or PDF or any electronic

 4    or paper circular to anybody with your --

 5    A.    No newspaper adverts --

 6    Q.    -- handwritten changes?

 7    A.    -- no.

 8    Q.    Nobody got a red-line?  There was no further draft?

 9    A.    We didn't control the documents, Mr. Maguire.  We were not

10    in a position to have done that, even if we had wanted to.  The

11    Weil Gotshal lawyers were not able to connect us up to the

12    printers.  And as a result, Weil Gotshal consistently -- or

13    Simpson Thacher, I'm not sure which actually -- but the lawyers

14    representing the Lehman side controlled the documents.  We had

15    no way to put language in a document.

16    Q.    In your testimony on direct, it sounded as though this

17    parenthetical appeared in the next draft.  I may have misheard,

18    but it sounded as though there was a suggestion --

19    A.    If there was -- if --

20    Q.    Maybe I should finish --

21    A.    -- that's --

22    Q.    -- my question.

23    A.    -- no, no.  If -- that's not accurate, and candidly, this

24    is the first time I'm seeing the draft that went out to the DTC

25    party in response to their request that it didn't include that

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 216 of 265

Page 216

1    language.  And I assume that that was just a matter of time.

2    Q.   The question I have is --

3    A.   We never rejected --

4    Q.   -- there wasn't a next draft?  Your handwritten

5    parenthetical went into what was then the execution version of

6    the clarification letter.  There was no intermediate draft.

7    Isn't that right?

8    A.   I think that -- I think that's right.  It was suggested to

9    us that it was acceptable to the other side.

10   Q.   Now, this parenthetical, it was intended to pick up all of

11   Lehman's cash margin, as you say, right?

12   A.   All of the credit support that Lehman would have provided

13   to secure obligations under their -- forgive me, but there's --

14   there are subtle differences, and I want to make sure that

15   we're clear about what I felt it encompassed.

16   Q.   You had -- you understood that this would be a very

17   significant amount of value that this parenthetical covered?

18   A.   Yes.  Yes.  Which is one of the reasons why it was

19   important to document the terms of the transaction correctly.

20   Q.   Lehman had a very significant amount of customer property

21   to margin?

22   A.   I'm sorry?

23   Q.   Lehman had a very significant amount of customer property?

24   A.   I -- these provisions applied to futures positions, listed

25   options positions, on a multiplicity of exchanges and cleared

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 217 of 265

Page 217

1    through different clearing organizations.  The only information

2    that I saw glimpses of which -- and we can talk about this --

3    provided a relatively incomplete picture, was OCC.  I did not

4    know what the entire picture was.

5    Q.    You did have an understanding that customer margins --

6    A.    I --

7    Q.    -- in the billions of dollars, Is that correct?

8    A.    -- I understood -- yes.  I understood that there was very

9    significant positions that Barclays was assuming responsibility

10   for.  And I wanted to make sure that Barclays was obtaining all

11   of the credit support for the obligations that it was assuming

12   and that it was entitled to under the APA, yes.

13   Q.    And you understood that Lehman's proprietary margin was in

14   the billions of dollars?

15   A.    I had the information that was circulated by OCC.  But I

16   would have assumed Lehman Brothers, being as significant as it

17   was, that there would be large amounts, and that those amounts

18   corresponded to the risks that were associated with the

19   positions that they were guaranteeing.  And therefore, large

20   amounts, necessarily meant very large risks.

21   Q.    Sir, if you could turn to tab 9, which is the APA, the

22   asset purchase agreement.  And if you could turn -- that's

23   Movant's Trial Exhibit 1.  And if you could turn to page 4 of

24   the contract -- actually page 3 -- you'll see that starting at

25   the bottom of page 2, and then for the next two pages, are

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 218 of 265

Page 218

1   definitions of excluded assets.  Do you see that?

2   A.   Yes.

3   Q.   And if you turn to clause (n) on page 4, you'll see at the

4   very top of that page, one of the excluded assets, right?

5   A.   Um-hum.

6   Q.   And that is one that excludes all assets primarily related

7   to the IMD business and derivatives contracts.  Do you see

8   that?

9   A.   Yes.

10   Q.   And you were aware, of course, that in this deal, the IMD

11   business was excluded from the sale?

12   A.   I'm -- that's my understanding.

13   Q.   And the investment management division, that was a

14   division that catered -- providing investment services to

15   wealthy clients for their stocks and bonds and --

16   A.   Yes.

17   Q.   -- mutual bonds?

18   A.   We may have covered this before, but there was a portion

19   of an investment management business that was transferred.

20   Whether structurally it was part of the IMD business, I have no

21   idea.  But there was a part of the business that was -- there

22   were customer accounts that were managed accounts that ended up

23   coming across to Barclays.

24   Q.   But --

25   A.   But subject to that, yes.

Page 219

1   Q.   -- the IMD piece --

2   A.   Yes.

3   Q.   -- and those clients and their stocks and bonds, that was

4   excluded from the deal --

5   A.   Um-hum.

6   Q.   -- and all assets related to the IMD business were

7   excluded from the deal, right?

8   A.   Right.

9   Q.   And this exclusion also excludes all assets primarily

10  related to derivatives contracts.  Isn't that right?

11  A.   Well, I suppose it depends upon how you parse it.  It says

12  "all assets primarily related the IMD business and derivatives

13  contracts."  So whether or not the "all assets primarily

14  related to" applies to both the IMD business and derivatives is

15  not clear.  But I agree that that's an issue for construction

16  in that provision.

17  Q.   And you will agree, sir, will you not, that margin is an

18  asset that is primarily related to derivatives contracts?

19  A.   Well, exchange-traded derivatives and OTC derivatives, for

20  each of them, it is.  But I, in the totality of the agreement,

21  don't read that reference to derivatives to contemplate

22  exchange-traded derivatives.  I read that reference to

23  derivatives to be a reference to non-exchange-traded

24  derivatives -- over-the-counter derivatives.

25  Q.   You agree, however, that margin is an asset that is

Page 220

1    primarily related to derivatives contracts?

2    A.   Yes.

3    Q.   And you agree that exchange-traded derivatives are

4    derivatives contracts?

5    A.   They are a subset of derivatives contracts.

6    Q.   And Lehman's exchange-traded derivative at the OCC, they

7    were all derivatives contracts?

8    A.   They were exchange-traded derivatives contracts.

9    Q.   And Lehman's margin at the OCC, and other exchanges --

10   A.   Um-hum.

11   Q.   -- was primarily related to those derivative contracts.

12   Isn't that right?

13   A.   Yes.  But as I say, the distinction is between over-the-

14   counter derivatives and exchange-traded derivatives.  No -- if

15   anybody felt that that reference meant that the margin for

16   exchange-traded derivatives did not go to Barclays, that would

17   have rendered bizarre the sale order provisions that OCC

18   requested and obtained, the transfer assignment and assumption

19   agreement that everybody signed.

20       The reading that you're suggesting here -- I understand

21   why you're suggesting it -- but it is just manifestly

22   inconsistent with the conduct of the parties under their plain,

23   collective interpretation of the provisions.

24   Q.   Just the facts, sir.  Lehman's margin at the OCC was

25   primarily related to the exchange-traded derivatives --

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 221 of 265

Page 221

1    A.    Yes.

2    Q.    -- at the OCC?

3    A.    Correct.

4    Q.    Right?

5    A.    Yes.

6    Q.    And same for exchange-traded derivatives at all other

7    clearings --

8    A.    Yes.

9    Q.    -- clearinghouses?  In fact, you told us earlier on

10    direct, did you not, that you can't have an exchange-traded

11    derivative without margin.  And so the two -- one is

12    necessarily primarily --

13    A.    Yes.

14    Q.    -- related to the other?

15    A.    Yes.

16    Q.    Right.  Now, I understand your position is that this

17    reference to derivatives contracts should be understood to

18    refer only to over-the-counter derivatives contracts, right?

19    A.    Yes.  I believe that was the intent of the drafters.

20    Q.    But those words "over-the-counter" --

21    A.    Are not there.

22    Q.    -- derivatives do not appear in this exclusion?

23    A.    I cannot argue with you about that.  They are not there.

24    Q.    You never made that insertion, nobody else ever made that

25    insertion, and you didn't tell anyone at Weil that they should

Page 222

1   make hat insertion, right?

2   A.   No.  This was -- this was done before I ever saw it.

3   Q.   And you never suggested to anyone at Lehman or at Weil

4   Gotshal that your understanding or that Barclays' understanding

5   was that the words "derivatives contracts" here should be

6   understood to mean only over-the-counter derivatives contracts,

7   and specifically not to include or to refer to exchange-traded

8   derivatives?

9   A.   At what time?

10  Q.   At any time.

11  A.   Well, I wasn't aware of this language until after we

12  closed the transaction.

13  Q.   Sir, I'd now like to turn -- oh, I'm sorry.  One minor

14  point.  That is -- yeah.  With respect to your communications

15  with the OCC, specifically on the subject of the transfer and

16  assumption agreement -- you remember giving some testimony on

17  that, subject?  If you turn to tab 11 of your binder, you'll

18  see Barclays' Exhibit 229.  And that's an e-mail to you from

19  Alex Rivera, who was a lawyer for the OCC.  And he was at the

20  Saturday sale hearing and he e-mailed you from that hearing.

21  Do you see that?

22  A.   Yes.

23  Q.   And he wanted you to sign or get signed the account

24  changeover and transfer and assumption agreement?

25  A.   Right.

Page 223

1  Q.   And in fact, the OCC repeatedly over the weekend, followed

2  up to try to get that agreement signed.  Isn't that right?

3  A.   Yes.

4  Q.   And if you turn to tab 13, you'll see an e-mail that you

5  sent to the OCC on Sunday morning at 3 -- Sunday afternoon at

6  3:31 p.m.  Do you see that?  And you apologize there, saying,

7  "Very sorry to keep you hanging and appreciate your and Bill's

8  cooperation."

9  A.   Yeah.

10  Q.   And so as of Sunday afternoon, Barclays had still not

11  signed the transfer and assumption agreement.  And you were

12  leaving the OCC still hanging, right?

13  A.   I wasn't leaving the -- I was leaving them hanging in the

14  sense of not finalizing the documentation which was not going

15  to be finalized in any event, except in connection with the

16  closing of the entire transaction.  It was also not an issue

17  from a documentation perspective, that we thought that was

18  controversial.

19      We had provided them with our comments.  But I was trying

20  to deal with issues that were requiring active negotiation and

21  resolution in order for the deal to close.  And my perception

22  of the situation with the transfer and assumption agreement was

23  that it was not, at the end of the day, when we turned our

24  attention to it, going to present an obstacle to signing the

25  closing.  So -- and I think I may have explained in a

Page 224

1    conversation to Jim McDaniel that we were focusing on some

2    rather difficult issues at the time.

3    Q.   And you told us on direct that even when they made the

4    ultimate threat to liquidate everything, you still weren't able

5    to get them a signed agreement?

6    A.   No, but we got them -- we communicated to them that there

7    were a lot of issues that needed to be resolved, and they

8    should hang tight.  And they agreed that they were going to

9    hang tight, but that they were going to poise themselves to act

10   very quickly, because if things were not resolved to their

11   satisfaction, they were going to act to eliminate all of the

12   risk that you're suggesting Barclays should have assumed

13   without the benefit of all the credit support that the OCC had

14   control over.

15   Q.   And ultimately, you did get them the signed agreement, and

16   that was -- that's in tab 14, where your partner has -- that's

17   Barclays' Exhibit 286.  And that's where your partner, Michael

18   Mazzuchi sends them the executed agreement, in connection with

19   the closing call which was -- which he says is starting now.

20   Do you see that?

21   A.   Are you pointing me to his e-mail -- his --

22   Q.   Yes, his e-mail.  It's at the very front of that Exhibit

23   286 in tab 14.

24   A.   Yes, I see this e-mail.

25   Q.   And that's at 7:51 a.m., almost 8:00 in the morning.  And

Page 225

1    that's when they got the signed agreement?

2    A.   Yes.

3    Q.   Now, until then, there were a number of brush fires that

4    you had to deal with, right?

5    A.   I and others, yes.

6    Q.   And in the course of doing that work -- well, let me ask

7    you, please, to turn to the first page of the agreement, the

8    transfer and assumption agreement.

9    A.   Can you please remind me what tab?

10   Q.   Same tab, tab 14.  Actually, you can turn to page 2.

11   A.   Um-hum.

12   Q.   And if you look at Section 2, it's "Representations and

13   Warranties," and look at subsection (c).  You'll see that,

14   "Barclays hereby represents:  1)" -- "Barclays hereby:

15   (i)represents and warrants that it has received such documents

16   and information as it has deemed appropriate to make its own

17   credit analysis and decision to enter into this agreement."  Do

18   you see that?

19   A.   Um-hmm.

20   Q.   And you were aware that the OCC had provided statements to

21   Barclays over the weekend, right?

22   A.   I was aware of the statement that -- the projected pays

23   and collects.  I believe that they did get some information.

24   I'm not -- I'm not certain precisely what was covered by the

25   information that they provided, how comprehensive it was.  But

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 226 of 265

Page 226

1    I do understand that they were in touch, trying to get

2    information about the accounts.

3    Q.    So you're aware that Barclays got information concerning

4    what was at the OCC?

5    A.    Um-hmm.

6    Q.    You personally were not involved in performing that credit

7    analysis that Barclays undertook?

8    A.    Yeah.  Or reviewing the documents that they were

9    reviewing.

10   Q.    Now, of course, the sale transaction did ultimately close.

11   And that billion dollars of cash that you had corresponded with

12   the OCC about, that entire one billion dollars of Lehman cash,

13   that all transferred -- the entire amount of it -- to Barclays,

14   isn't that right?

15   A.    I'm assuming it did.

16   Q.    And if you turn, sir, to tab 12, you'll see an additional

17   e-mail that you received from the OCC on Sunday at 11:05 a.m.

18   Do you see that?

19   A.    Yes.

20   Q.    And you'll see at the bottom of that, are the projected

21   settlements for the former Lehman Brothers Inc. OCC accounts.

22   Do you see that?

23   A.    Um-hmm.

24   Q.    These collect, i.e., pay from OCC to the clearing member

25   include -- and there's a list of payments that the OCC projects

Page 227

1    it will make, right?

2    A.   That's correct.

3    Q.   And you understood that these were all movements of cash,

4    right?

5    A.   Yes.

6    Q.   The second one is a firm movement of cash.  That's 300-

7    and-almost-60 million dollars that the OCC is going to pay on

8    Monday morning, right?

9    A.   Correct.

10   Q.   And if you go down second from the bottom, you'll see

11   another firm one for just over nine million?

12   A.   Correct.

13   Q.   So you understood that these were movements of cash that

14   the OCC was going to make to Barclays Monday morning?

15   A.   I understood these to be projected settlements based on

16   what the OCC knew Sunday at whatever time this was generated.

17   So if nothing in the world changed, and these were accurate

18   computations, I would have expected them to be an amount like

19   this.

20   Q.   And you understood that the payments of cash to Barclays

21   would be in the hundreds of millions of dollars?

22   A.   If they were made in these amounts, they would be in these

23   amounts.

24   Q.   And if you see, down at the bottom of this page, they

25   actually specifically say, "These settlement projections are

Page 228

1   assuming all margin collateral posted by Lehman Brothers Inc.,

2   continues to be part of the account on a going-forward basis,

3   or has been replaced with good collateral of equal value."

4   A.   Right.

5   Q.   And --

6   A.   I'm sorry.

7   Q.   -- the point of that, you understood, was that as far as

8   the OCC was concerned, they didn't care whether margin came

9   from Lehman or from Barclays, they just wanted margin.  Isn't

10  that right?

11  A.   They did want the level of margin.  But they had provided

12  for that level of margin to come from Barclays.  And if the

13  margin had been there and had been from Lehman and this had not

14  been resolved, because Lehman was in liquidation, they may very

15  well have just liquidated the accounts anyway, even if they had

16  gotten the money, if those accounts were Lehman.  What they

17  cared about was that the credit on the accounts was Barclays'.

18  And one of the reasons why they refer specifically to cash --

19  to collateral of equal value, is that usually excess cash is

20  replaced with fixed income securities of a high credit value.

21  So they're not requiring that it remain in cash.  But to the

22  extent it wasn't -- it didn't remain in cash, they wanted

23  somebody to substitute securities of equivalent value.

24  Q.   OCC wanted to be protected by collateral?

25  A.   That's exactly what they were looking for.

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 229 of 265

Page 229

1    Q.    As to whose collateral, that was a matter that was not of

2    primary concern to them?

3    A.    Well, they would want to make sure that the collateral

4    they got was unencumbered.  That's, for example, why they

5    wanted the language in the sale order.  Because if they had

6    gotten the transfer into the accounts, but had been subject to

7    an encumbrance, that would not have been acceptable to them.

8    So some of the details of the circumstances under which they

9    come into possession is important.

10   Q.    Let's not get into the details.  But let's close with one

11   question.  If -- your understanding, if Barclays had decided to

12   wire four billion dollars to the OCC, the OCC would not have

13   had any objection to that?

14   A.    As -- no.  They would welcome all infusions.

15   Q.    Now, sir, I'd like you to turn your attention to the

16   subject of the communications with the Depository Trust

17   Clearing Corporation.  You understand that DTCC was a

18   clearinghouse?

19   A.    Yes.

20   Q.    It was very concerned about its exposure to Lehman, right?

21   A.    Yes.

22   Q.    It had been offered 250 million during the week as a

23   limited guarantee, and it had rejected that as being

24   insufficient.  Isn't that right?

25   A.    Earlier in the week.  I just have to say, I came into the

Page 230

1    negotiations when the solution involving the residential

2    mortgages and the 250 million were underway.  But my

3    recollection is that initially, 250 million was not acceptable

4    to them.

5    Q.    And following that, there was an agreement to go forward

6    with additional protection, which was the billions of dollars

7    of residential --

8    A.    Residential mortgages.

9    Q.    -- mortgage securities?

10   A.    There was a portion of the residential mortgages that was

11   to be allocated as a limited recourse.

12   Q.    And then they were no longer available?

13   A.    And they were not longer available.

14   Q.    And the parties were back to square one, right?

15   A.    Yes.

16   Q.    Now, you understood that the person who was in charge of

17   dealing with DTCC was Gerard LaRocca?

18   A.    I wouldn't say that Gerard was in charge of dealing with

19   them.  There was a deal team that was responsible for the

20   business issues.  But Gerard LaRocca was very knowledgeable

21   operationally.  I think he may even have been on the board of

22   DTCC.  So he was an important resource.  But I wouldn't have

23   said Gerard LaRocca was responsible for determining the

24   resolution of the DTCC arrangements.  But he was certainly a

25   participant.

Page 231

1    Q.    If a top Barclays executive, specifically Rich Ricci,

2    testified to this Court that he personally put Gerard LaRocca

3    in charge of dealings with DTCC --

4    A.    Well, I guess the question is, what did he mean by "the

5    dealings with DTCC."

6    Q.    I'm sorry?

7    A.    The question I have is, what did he mean by "the dealings

8    with DTCC"?

9    Q.    Specifically making sure that this deal did not fall apart

10   over a problem with DTCC?

11   A.    If he said that --

12   Q.    Are you in a position to --

13   A.    No, I'm not in a posi -- I'm not in a position to -- I'm

14   not in a position to contradict either what he said or what he

15   believed or what he did.  I'm trying to figure out how I can --

16   how I can respond further without raising a potential privilege

17   issue.  It was not my -- let me just say that it was not my

18   impression that Gerard LaRocca was the ultimate decision-maker

19   as to how much risk Barclays was or was not willing to accept

20   in connection with the DTC matter.  But he was certainly an

21   integral part of the team that was focused on resolving the

22   issue.

23   Q.    But you're not in a position to contradict or overrule --

24   A.    No, I am --

25   Q.    -- Mr. Ricci as to who --

Page 232

1    A.    -- not.

2    Q.    -- he put in charge?

3    A.    I am not, and I wouldn't pretend to be.

4    Q.    Now, sir, you do agree that there were continued

5    discussions between DTCC and Barclays on Sunday night?

6    A.    Yes.  There were more than one discussion with DTCC that

7    night.

8    Q.    And you and your Barclays colleagues participated in these

9    discussions by telephone --

10   A.    Yes.

11   Q.    -- with DTCC on the --

12   A.    Yes, DTC was on --

13   Q.    -- other line?

14   A.    -- the other end of the telephone.  Yes.

15   Q.    And you did that from a room at the Weil conference

16   center?

17   A.    Yes.

18   Q.    And you walked in and out of the room as those calls were

19   going on?

20   A.    And other -- there were other -- there were other matters

21   that were being addressed in that room too.

22   Q.    And that particular room was a separate room on a floor

23   separate from and below the floor on which all the other

24   meetings were going on, concerning the clarification letter and

25   the deal, right?

Page 233

1   A.   Yes.  I think Weil made that room available to us, because

2   all of the other rooms were occupied with other work teams.

3   Q.   And you were jockeying between several rooms on the

4   different floors?

5   A.   I was jockeying between rooms -- rooms and hallways and

6   conference rooms.

7   Q.   You were present for a lot of the calls with DTCC?

8   A.   A number of them.

9   Q.   But you were not present for all the calls with DTCC?

10  A.   I would say that I was not present for every portion of

11  every call.  But for the most part, I was there.

12  Q.   You were not present for all the calls with DTCC?

13  A.   There may have been -- as to whether or not there were

14  calls earlier in the day that I was not a participant in, I

15  can't remember at this point.  But I was in a number of calls

16  with DTC that day.  It may have been all of them, but I'm not

17  sure that I was in all of them.

18  Q.   For the calls for which you were present, the Barclays

19  participants included Gerard LaRocca, right?

20  A.   Not all of them, I believe, but I think most of them.

21  Q.   Another participant was Jonathan Hughes?

22  A.   Yes.

23  Q.   Another participant was Archie Cox?

24  A.   Yes.

25  Q.   And another participant was Michael Klein?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 234

1    A.    Yes.

2    Q.    You believe it was Archie Cox who told DTCC that Barclays

3    would not provide any guarantee beyond the limited 250 million,

4    right?

5    A.    That's my recollection. I believe that's right.

6    Q.    But you don't recall the specifics of the Sunday night

7    calls?

8    A.    Well, I recall their substance.  I don't recall the

9    specifics of the conversations, the specific words of all of

10   the conversations.  I remember some of it, and some of it I

11   don't remember as clearly.

12   Q.    Well, specifically you don't recall anything else that

13   Archie Cox said in any of the calls?

14   A.    His specific words?  No.  I do recall him conveying -- I

15   don't want to say "saying", because these may not have been the

16   words that he used -- but I clearly remember him conveying that

17   Barclays was not going to assume responsibility for the

18   accounts or provide credit support beyond the 250 million

19   dollar holdback.

20       That was the purpose of the conversations to --

21   Q.    You don't recall anything else that he said?

22   A.    Not specifically.

23   Q.    Now, you don't recall anything that Jonathan Hughes said.

24   A.    There was a -- which conversation are we referring to?

25   Q.    Sunday night calls with DTCC.

Page 235

1    A.    In Sunday night calls there was toing -- there was a lot

2    of back and forth about the allocation of risk and, largely,

3    about who was in a position to evaluate it, because there was

4    information that Barclays was able to obtain.  This is not that

5    different from the OCC situation in the sense that there was a

6    lot of information they could obtain on paper, but they

7    couldn't get a complete picture, and DTC not only had

8    information about the positions they had them loaded on their

9    systems and could model them and evaluate what the risk was.

10   And, so, there was a lot of discussion about, as between the

11   two, who could put themselves in a position to evaluate it in

12   order to resolve the issue.  So there was a lot of toing and

13   froing on, sort of, those types of topics.

14   Q.    I know the hour is late, but I'm going to ask you to try

15   to adhere to our promise to each other.

16   A.    Okay.

17   Q.    I will ask you, and you will answer yes or no and then

18   give whatever explanation you need.  You don't recall anything

19   that Jonathan Hughes said in the Sunday night calls?

20   A.    I don't recall.  No, I don't recall, specifically, what he

21   said in those calls.

22   Q.    You don't recall anything that Michael Klein said?

23   A.    No.  I don't recall what Michael Klein said.

24   Q.    You do recall that Mr. LaRocca spoke?

25   A.    I -- I re -- yes, I recall that he was a participant in

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 236 of 265

Page 236

1   the discussions.  I don't remember specifically what he said.

2   Q.   In fact, there were a lot of conversations about the

3   transfer of securities, right?

4   A.   No, I don't recall a lot of conversations about transfers

5   of securities in the context of the final conversations.  There

6   were earlier conversations about how transfers would be

7   effected in respect of various customer accounts and the like

8   that -- that may have even been earlier, as the parties were

9   trying to work out what was there and what needed to be

10  transferred as part of the closing of the transaction and where

11  those securities might go to Barclays' accounts and things of

12  that nature.

13  Q.   And you weren't particularly focused on --

14  A.   The operational issues

15  Q.    -- matters that you considered to be operational.

16  A.   No, I was not focused on -- although I did -- I was -- I

17  tried to be instrumental in trying to make sure that the

18  meetings got scheduled and that the operational issues were

19  addressed, to the extent that was necessary for Gerard to do

20  whatever and what he was tasked to do by Mr. Ricci.

21  Q.   You do recall that there may have been continued

22  discussions on the operations side concerning the transaction?

23  A.   I believe there were ongoing conversations.  I believe

24  there was an operations team that was looking at issues.  I

25  don't know what they were discussing with DTCC or the full

Page 237

1    range of issues that they were looking at.

2    Q.   You were not privy to all of those discussions?

3    A.   No.

4    Q.   Those discussions involved Mr. LaRocca.

5    A.   I don't know whether he was there in all times.  There

6    were other people on his operational team, so I think he was

7    there for a large portion of them.

8    Q.   All the other people on his operational team reported to

9    him.

10   A.   Yes.

11   Q.   He was the head operations guy.

12   A.   Yes, he was the head of operations.

13   Q.   You're aware, sir, that in negotiating the clarification

14   letter that Barclays obtained a right to return clearance box

15   assets that it did not want?

16   A.   I've seen that provision.

17   Q.   In fact, if we turn to the clarification letter, which is

18   in your binder at tab 8, you'll see at the bottom of page 1

19   there's a reference to Schedule B and the clearance box, and in

20   the last three lines you'll see there's a parenthetical that

21   starts, and this follows.  Are you with me, sir?

22   A.   I'm sorry.  I'm trying to find the paragraph in my draft.

23   Q.   Very first page, bottom of the page under purchased assets

24   under Item B --

25   A.   Okay.  I'm with you.

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 238 of 265

Page 238

1    Q.   It's talking about the securities and other assets in the

2    clearance boxes, and that Barclays gets that as of the time of

3    closing, and, then, dropping down to the very end, the

4    parenthetical reads "Provided, however, that purchaser, in its

5    discretion, may elect within sixty days after the closing to

6    return any such securities to LBI".  Do you see that?

7    A.   Yes.

8    Q.   And you don't know why that was done?

9    A.   I don't have -- I don't have direct knowledge.  I could

10   speculate, but I don't have direct knowledge.

11   Q.   You were not privy to those discussions?

12   A.   No, I was not.

13   Q.   On its face you can tell this language indicates that

14   there may be assets in the clearance box that Barclays decided,

15   for whatever reason, it did not want --

16   A.   Or it might not -- or it might not want.  That there

17   might -- they might not want.

18   Q.   But you have no knowledge of what prompted this?

19   A.   No, I was not a participant in discussions leading up to

20   it.

21   Q.   And if you turn, sir, to tab 16, you'll see Movants' Trial

22   Exhibit 628.  And that's an e-mail from your partner, Michael

23   Mazzuchi, to Sheldon Hirshon, copied to you, concerning DTC.

24   You see that?

25   A.   Yes.

Page 239

1   Q.   And he says "Shelly, I'm wondering if I could send you a

2   few comments on the DTC docs, understanding that the DTC team

3   is tied up on bigger business issues at the moment".  And it

4   continues.  Now, you see that, sir?

5   A.   Um-hum.

6   Q.   And this is attached as a draft of an agreement, and the

7   time of his e-mail is 11:39 p.m.  You see that?

8   A.   Um-hmm.

9   Q.   And if you turn to the next page you'll see the asset

10  purchase agreement is identified in the very first line of the

11  body of the agreement.  "We are writing in connection with the

12  asset purchase agreement."  You see that?

13  A.   Yes.

14  Q.   And, then, if you look at the next page you'll see there's

15  a Section 2 that's called excluded assets and liabilities.  You

16  see that?

17  A.   Um-hmm.

18  Q.   And you'll see that in the body there there is

19  highlighted, or in bold, the words "purchased assets".  You see

20  that?

21  A.   Yes.  Sorry.

22  Q.   And this refers to how certain of the positions in pending

23  transactions may be excluded from purchased assets.  You see

24  that?

25  A.   Yes.

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 240 of 265

Page 240

1    Q.   And, then, down at the end of the paragraph you'll see

2    there's a reference to terms, the term 'known purchased assets'

3    is used.  You see that?

4    A.   Yes.

5    Q.   And, again, you were not involved in any discussions with

6    DTCC concerning about what assets Barclays would designate as

7    excluded assets or non-purchased assets?

8    A.   No, I wasn't in, and I didn't review this markup with Mike

9    Mazzuchi, and Mike Mazzuchi was not a participant in the

10    discussions with DTCC.  And am I -- am I correct that this is

11    before the e-mail in which he says the deal has changed?

12    Q.   I can't give you the chronology.  I'm sorry.

13    A.   Okay.

14    Q.   But the discussions about what Barclays wanted or didn't

15    want, those discussions would have been had by the operations

16    team, right?

17    A.   I'm sorry.  Could you say that again?

18    Q.   The discussions with DTC about what assets Barclays wanted

19    or didn't want, those would have been handled by the operations

20    team.

21    A.   I don't think the -- I'm not sure that the operations

22    teams would have discussed that subject with DTCC.  The

23    question about what Barclays was and wasn't buying would have

24    been held with Lehman.

25    Q.   Mr. LaRocca was the head of the operations team, right?

Page 241

1    He had a team working for him.

2    A.    Yes.

3    Q.    He had a due diligence team working for him.

4    A.    Yes.

5    Q.    He had an extensive team.  Isn't that right?

6    A.    I don't know how many people were on his team, but I'm

7    sure he had the asset -- the resources that he felt necessary.

8    Q.    And you were not privy to all of his discussions with

9    DTCC?

10    A.    No, I was not.

11    Q.    Now, for the calls on which you were present, the DTCC

12    participants who were on the phone, they included Larry

13    Thompson.  Isn't that right?

14    A.    Yes, that's correct.

15    Q.    And you said he's the general counsel?

16    A.    I believe so, yes.

17    Q.    Isaac Montal?

18    A.    Yes, he was on some of the calls.

19    Q.    Do you know his position?

20    A.    He's deputy.

21    Q.    Shelly Hirshon?

22    A.    Yes.

23    Q.    He was the --

24    A.    Outside --

25    Q.     -- outside counsel?

Page 242

1    A.   Yes.

2    Q.   And, for at least some of the calls, DTCC's chairman, Don

3    Donahue, right?

4    A.   Yes.

5    Q.   And after Barclays told DTCC that it was not going to

6    provide more than 250 million dollars Larry Thompson indicated

7    that DTCC would issue a cease to act, right?

8    A.   Not for the first time.  The -- we understood that if

9    Barclays was not going to assume the accounts and they were not

10   going to operate they were going to have to issue a cease to

11   act so that people -- shouldn't be submitting transactions,

12   because DTCC was no longer going to accept and process new, you

13   know, transactions.

14   Q.   DTC had been very consistent.  Isn't that right?  That if

15   it didn't get what it needed --

16   A.   Yes.

17   Q.    -- it would have to issue a cease to act notice.

18   A.   If -- yes, correct.

19   Q.   And you called Shari Leventhal to tell her that the whole

20   deal could fall apart over a problem with DTCC.  Isn't that

21   right?

22   A.   I told her that I felt that in order for us to get the

23   transaction concluded on the time frame that we were operating

24   under that DTCC would have to evaluate carefully the degree of

25   credit support that it was demanding.  The call to Shari

Page 243

1    Leventhal was more about DTCC's desire to replace the

2    residential mortgages with something on the order of a billion

3    plus in additional credit support than anything else.

4    Q.   You thought it would be helpful to let the fed know, and

5    you didn't want the fed finding out at the last minute, that

6    this thing was falling apart --

7    A.   Correct.

8    Q.    -- because of problems with DTCC.

9    A.   Correct.

10   Q.   So you called Shari Leventhal to tell her that if you

11   couldn't reach resolution with DTCC you might not be able to

12   close the transaction.

13   A.   Correct.

14   Q.   And there's no question that DTCC made clear to Barclays

15   that if they did not have adequate protection they would have

16   to issue a cease to act.

17   A.   They made it very clear to us that if they didn't reach a

18   satisfactory resolution that they would cease to act.

19   Q.   And that was precisely why Barclays continued to negotiate

20   with DTCC --

21   A.   But --

22   Q.    -- on Sunday night.

23   A.   The reason that Barclays continued to negotiate with DTCC

24   is that in order to complete the transaction and to consummate

25   it there were clearance box assets that had to be transferred,

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 244 of 265

Page 244

1    there were customer accounts that had to be transferred, and if

2    DTC, to coin a term that was used, shut down the pipes and

3    refused to do that, then the deal would not have been able to

4    be closed and the negotiations were about what DTCC required in

5    order for it to process the transactions that were contemplated

6    by the deal and whatever was already in their pipeline, after

7    which they would proceed to liquidate the Lehman Brothers'

8    accounts.  And what they were focused on was what their

9    exposure and liability might be in the course of that

10   liquidation.

11   Q.   A couple of quick things I think we can agree on.  Until

12   late that Sunday night there was no agreement with DTCC, right?

13   A.   I think that's correct.

14   Q.   And it's your position that very late Sunday night DTCC

15   indicated that it would go forward with the limited 250

16   million --

17   A.   Correct.

18   Q.    -- guaranty?  And you have no knowledge what prompted

19   DTCC to agree, as you say, to go forward with nothing other

20   than that limited guaranty?

21   A.   No, nothing except that they had said all along that they

22   were reviewing what was in the accounts, what transactions were

23   pending and what their risk was, so I assume that as time went

24   on they got a better and better picture of that, even though

25   not a complete picture, but, ultimately, my understanding is

Page 245

1    that they, whatever conclusion they reached was consistent with

2    what they were able to accomplish, which was to liquidate the

3    accounts without a loss and, in fact, I think, without need for

4    recourse to the 250 million dollars.  So I'm assuming that just

5    as Barclays was involved in quite a lot of deliberations on its

6    end, DTCC was involved in quite a lot of deliberations on its

7    side in terms of what its position and its risks were.

8    Q.   But that's all assumption on your part.  You have no

9    knowledge.

10   A.   I have knowledge that they said that they were looking at

11   the risk and that they were evaluating and that they had teams

12   working around the clock to try to do that.  I mean, I -- they

13   did communicate that, but did they tell me exactly what their

14   thinking was?  No.  I was not privy to their internal

15   conversations.

16   Q.   If you turn, sir, to tab 17 of your binder, that is

17   Movants' Trial Exhibit 449, and that is the DTC agreement, is

18   it not?

19   A.   Yes.

20   Q.   It's a letter agreement.  It's dated September 22, 2008.

21   It's addressed to the trustee and it's addressed to John

22   Roderfeld, Director of Operations, right?  And the first

23   paragraph defines the asset purchase agreement as the agreement

24   that's referred to, then, throughout this letter contract.  Do

25   you see that?

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 246 of 265

Page 246

1   A.   Yes.

2   Q.   And, then, if you turn to the second page, sir, you'll see

3   there's a section that begins "Winding down of accounts".  Do

4   you see that?

5   A.   Yes.

6   Q.   Now, you understood that Barclays was getting all of the

7   assets in the DTC clearance boxes, right?

8   A.   Yes.

9   Q.   And you understood that Barclays was excluding all of the

10  liabilities that were associated with those accounts?

11  A.   Yes.

12  Q.   So you understood that after the closing Lehman would be

13  left with an empty box that had no assets but all of the

14  liabilities?

15  A.   The clearance box that -- no, well, two things.  One, I

16  believe that the clearance box assets that were being purchased

17  were described in an exhibit.  Whether that was all of the

18  securities that Lehman had I had no reason for knowing.  I

19  assumed that it was -- that that was far from the case, that

20  there were lots of transactions and securities but not in the

21  clearance box that would remain free.

22  Q.   Everything in the clearance box was going to go to

23  Barclays.

24  A.   Yes, that was my understanding.

25  Q.   And what was going to be left was an empty box with all of

1    the liabilities.

2    A.   Well, what would be the liabilities in the clearance box?

3    There would be -- there would be potential liabilities in

4    processing the transactions associated with the positions and

5    the instructions that were coming in from market participants

6    who had transacted with and through Lehman Brothers.

7    Q.   This refers, in the very first sentence, to "Barclays has

8    indicated and hereby agrees that all of the accounts of LBI

9    maintained at the clearing agencies' subsidiaries, the accounts

10   constitute excluded assets within the meaning of the APA".

11   Now, you see that, sir?

12   A.   Correct.

13   Q.   Now, the APA had a term for purchased assets, did it not?

14   A.   Yes.

15   Q.   And that term was "purchased assets".

16   A.   Correct.

17   Q.   It also had a term for excluded liabilities.  Isn't that

18   right?

19   A.   Correct.

20   Q.   And that term was "excluded liabilities".

21   A.   Correct.

22   Q.   This agreement does not use either of those terms.  Isn't

23   that right?

24   A.   This agreement does not.

25   Q.   This agreement refers to excluded assets, right?

Page 248

1    A.    Correct.

2    Q.    You would agree with me that generally an asset is

3    something of positive value?

4    A.    Well, it depends on what you mean by positive value.

5    Sometimes it can be an entitlement or a right.  The ability to

6    own and control a clearing account is certainly an asset for a

7    clearing broker.  Without it the clearing broker couldn't

8    operate.  Whether or not it's an asset or a liability will

9    depend upon the facts.

10   Q.    Would you generally agree, sir, that a liability is

11   generally something of negative value?

12   A.    Yes.

13   Q.    And generally the difference between an asset and a

14   liability is a question of whether the underlying item is one

15   of positive or negative value?

16   A.    I think I -- I think I answered your question previously.

17   Q.    Now, if you turn back to the previous tab, and that is

18   Movants' Exhibit 628, you'll see that in Section 2 there the

19   term 'excluded assets and liabilities' is used.  You see that?

20   A.    Um-hmm.

21   Q.    And that's not the term that's used here in the final

22   agreement.  In the final agreement the term that is used is the

23   term 'excluded assets'.

24   A.    This is --

25   Q.    You see that?

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 249 of 265

Page 249

```
 1    A.   This is a doc -- this is a completely different agreement

 2    that contemplated a completely different arrangement.  If you

 3    look at part one it says "Barclays will acquire and assume the

 4    accounts of LBI".  This contemplated a completely different set

 5    of arrangements.  There is nothing in here that bears on the

 6    understandings of the parties with respect to the final, the

 7    resolution of the DTCC arrangements.  This was based on

 8    documentations that assumed that there would be an assumption,

 9    which was not the case.

10    Q.   And the final agreement does not use the term excluded

11    liabilities.  It uses the term excluded assets, correct?

12    A.   The final agreement says that the accounts are excluded

13    assets, and simultaneous changes in the clarification agreement

14    clarify that the liabilities associated with the accounts are

15    excluded liabilities.  There is no provision saying that the

16    assets in the account -- associated with the accounts are

17    excluded assets.  Indeed, quite to the contrary, roughly

18    contemporaneously the provision dealing with the transfer of

19    the clearance box assets was updated to make it clear that it

20    included all of the clearance box assets, whether at DTC or at

21    other clearing houses.

22    Q.   And this reference to excluded assets, that refers to,

23    that applies to all of the accounts, right?

24    A.   It -- excluded assets -- yes.  Excluded assets refers to

25    the accounts.
```

08-13555-mg    Doc 11038    Filed 08/26/10    Entered 08/27/10 15:41:12    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 250 of 265

Page 250

1    Q.    And that includes the clearance box account, right?

2    A.    Yes, I believe it would include all of the accounts.

3    Q.    And if you go to the next paragraph, sir, in tab 14,

4    Movants' Trial Exhibit 449.  This is on page 2.  It says "As

5    part of this closeout process the trustee hereby authorizes DTC

6    to accept and act upon instructions from NSCC to deliver

7    securities from the DTC LBI account".  You understand that to

8    be a reference to securities from the clearance box account,

9    correct?

10   A.    No, I -- I understand this to be a reference to the

11   ongoing authorization of DTC, as this -- these accounts were

12   going to be closed down after the pending transactions were --

13   which was the entire reason, as you pointed out earlier, we

14   were negotiating with DTC to have them process the transactions

15   necessary to consummate the transaction.  And what is in the

16   pipeline?  As soon as that was done they were going to initiate

17   a liquidation or closeout of the accounts.  In order to do

18   that, when transactions come in that require -- or they want to

19   liquidate a position that requires the delivery of a security,

20   DTC is the depository that holds the security, so that if

21   there's a transaction, the sale of a security for cash that's

22   being effectuated by NSCC, this merely authorizes DTCC to

23   deliver to NSCC what it needs in order to perform the

24   transaction when it's closing out the accounts.

25   Q.    And it was going to get those securities from an account.

Page 251

1   A.   If it was -- if the security was in a D -- if there was a

2   corresponding security in a DTCC account.

3   Q.   And if there was a corresponding security in the clearance

4   box account then DTC would go get that corresponding security

5   from the clearance box account and give it to NSCC, correct?

6   A.   If those securities were to be in the clearance box after

7   the consummation of the transaction, which they were not to be.

8   Those -- the clearance box assets would not have been part of

9   the securities that would have been delivered under these

10  arrangements.  It would have been all of the other activities,

11  securities and transactions that were worrying DTC and NSCC and

12  GSCC, because they didn't know precisely what the ramifications

13  or the end results of the liquidation process would be.

14  Q.   So --

15  A.   That's how we under -- let me put it to you this way.

16  This is how we understood this provision to operate.

17  Q.   So you understood this provision to allow DTC to deliver

18  securities, go get the corresponding securities from the

19  clearance box account and give it to NSCC only if those

20  securities were in the clearance box account, and you knew that

21  there wouldn't be any in the clearance box account, because at

22  that stage they would all have gone to Barclays.

23  A.   I'm sorry.  They're -- the -- now, because the securities

24  that would be delivered under these arrangements could have

25  absolutely nothing to do with securities in the clearance box.

Page 252

1   They could be other assets.

2   Q.   I'm talking about the ones that are in the clearance box.

3   A.   Yes, if there are --

4   Q.   NSCC needs those securities.

5   A.   Well --

6   Q.   It had the ability here to get them from DTC.  Isn't that

7   right?

8   A.   If the clearance box assets were to be sold to Barclays

9   then that would have been a null set following the processing

10  of the transaction.

11  Q.   If they weren't sold to Barclays, under this agreement

12  there were corresponding securities that NSCC needed, under

13  this agreement --

14  A.   Well, this was not an agreement about buying and selling

15  securities.  This was an agreement about the responsibility for

16  the accounts.  The provisions that deal with what Barclays is

17  and is not buying and selling was in the purchase agreement and

18  the clarification letter.

19  Q.   The --

20  A.   If you're asking me whether the volume of -- and number of

21  securities that would have been at DTC would be a larger number

22  but for the fact that the agreements contemplated that the

23  clearance box assets would be sold to Barclays, yes, but it

24  doesn't interfere with the operation or meaning of this

25  provision.

Page 253

1   Q.   So you don't read this reference in this sentence "As part

2   of the closeout process the trustee hereby authorizes DTC to

3   accept and act upon instructions from NSCC to deliver

4   securities from the DTC LBI account".  You do not read that as

5   in any way relating to the clearance box.

6   A.   As -- I do not regard it as being limited to the clearance

7   box --

8   Q.   Does it relate to the clearance box?

9   A.   It -- it would en -- yes, it would encompass accounts

10  which include the accounts that held clearance box assets.

11  Q.   So NSCC could get securities from the clearance box?

12  A.   If they were there to be had, they could.  If the parties

13  had agreed for them to be sold and for DTCC to transfer those

14  then they wouldn't.  And that was the agreement that was

15  reached by the parties, and the understanding was that DTCC was

16  not going to lay claim and deliver out clearance box assets

17  that were being sold to Barclays as part of the clarification

18  letter.

19  Q.   Now, the securities in the DTC clearance box were listed

20  on Schedule B to the clarification letter.  Isn't that right?

21  A.   That's my understanding, yes.

22  Q.   And, of course, DTCC could not have given those assets on

23  Schedule B both to NSCC and to Barclays.

24  A.   I think that's accurate, yes.

25  Q.   DTCC couldn't give the same assets to two different

Page 254

1    people.

2    A.    Right.

3    Q.    You never explained or said, told, DTCC that under

4    Barclays' view Barclays' position was that what was going to be

5    left behind was an empty clearance box over which NSCC would

6    have rights to an account with zero content.

7    A.    No, I don't think that's accurate.  We sent them a draft

8    of the clarification agreement before the DTCC agreement was

9    signed that said specifically that all clearance box assets

10   were being sold to Barclays, so I think they were -- they knew

11   and were told that that was part of the deal and they -- it was

12   never suggested that the deal would be anything else.

13   Q.    You're saying there's a matter of documentation.

14   A.    Yes.

15   Q.    They could have figured it out from the draft --

16   A.    That they requested --

17   Q.    -- that Mr. Mazzuchi sent --

18   A.    That they requested --

19   Q.    -- at 6 a.m.

20   A.    -- prior to executing the DTCC letter, yes.

21   Q.    And that was the 6 a.m. draft?

22   A.    I'm -- I'm not sure I remember exactly the time, but it

23   was a very early -- it was the draft very early in the morning,

24   yes.

25   Q.    But you never explained to them.  You never spoke to DTC

LEHMAN BROTHERS HOLDINGS INC., et al.

1    and said in a conversation, as opposed to having your partner

2    send a draft of the clarification letter, you never --

3    A.   I wasn't --

4    Q.   You never told them we're drawing this distinction that

5    you described to Mr. Boies earlier between the assets in the

6    account and the account itself, and that what DTC is going to

7    have at the end of the day is rights to access to an account

8    which we are going to empty.

9    A.    No.  I never had a conversation that explained to a

10   clearing corporation how its account structure operated, but we

11   had plenty of conversations about how this issue was resolve --

12   was going to be resolved, and those conversations did not

13   include a dependency or a condition on certain assets being

14   sold or not being sold.  The final conversation was about the

15   fact that the assets were not, the accounts were not coming to

16   Barclays, contrary to the earlier draft of the agreement that

17   you called my attention to, and that they were going to have

18   250 million dollars in credit support, and there was net -- it

19   was not part of the agreement, and, certainly, DTCC never asked

20   us for any representation or acknowledgement or an agreement to

21   forebear from Lehman selling any of the clearance box assets to

22   Barclays.  If they had intended to predicate the arrangement on

23   no assets being sold from outside of those accounts they could

24   have raised that issue and we would have faced it, but it never

25   occurred to them, probably for the same reason it never

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 256

1    occurred to us.

2    Q.   And --

3    A.   Because that's not the basis of the conversations at that

4    time.

5    Q.   That did not come up in any of the conversations to which

6    you were privy.

7    A.   It didn't come in any of the conversations, and it didn't

8    come up in the summary of the resolution of the DTC call that

9    was made in the large conference room with an open line that

10   was available to all of the members of the creditors' committee

11   and the lawyers who were around and interested to participate

12   in it.  Nobody from DTC said that the resolution of this issue

13   is based on Barclays not taking any assets from the Lehman

14   assets.

15   Q.   And, sir, can you explain for us why the parties here were

16   providing for the trustee to exercise authority over assets in

17   the Lehman account if your understanding was that those assets

18   contractually --

19   A.   Because those accounts needed --

20   Q.    -- all belonged to Barclays?

21   A.   Not every Lehman account included or was limited to assets

22   that were comprised of clearance box assets.  Those are lien

23   free accounts, specifically, and there were a -- there was a

24   significant amount of transaction clearance and settlement that

25   DTCC's various clearing organization subsidiaries would have

Page 257

1   been responsible and had to process, and to the extent that in

2   order to effectuate a clear transaction there needed to be a

3   security, and that security was in one of those accounts -- was

4   in the DTCC depository, DTCC could deliver out the security

5   that would be used to perform the transaction.

6   Q.   The answer that you've just given me to that question is

7   very different from the answer that you gave me at your

8   deposition, is it not?

9   A.   You'll have to refresh my recollection.

10  Q.   If you'd turn, please, to page 161 of your transcript.

11         THE COURT:  While we're doing that, Mr. Maguire, we're

12  about fifteen minutes past our ordinary time for stopping.  And

13  the witness has been on the stand for a good part of the day.

14  How much more time do you contemplate for your cross?  And I'm

15  going to ask Mr. Boies, if he has redirect, how much time he

16  contemplates, because I'm not going to stay late tonight.

17         MR. MAGUIRE:  Your Honor, I could probably finish up

18  in about five or ten minutes.

19         THE COURT:  Okay.  Mr. Boies?

20         MR. BOIES:  Your Honor, I will waive redirect to get

21  the witness home.

22         THE COURT:  Fair enough.  Let's proceed.  Does anybody

23  else have examination for the witness?  Any other movants?

24         MS. BLOOMER:  No, Your Honor.

25         THE COURT:  Okay.

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 258 of 265

Page 258

1    Q.   Sir, reading at line 12 at page 161 of your deposition

2    transcript.

3    "Q.   Can you explain why the parties were providing for the

4    trustee to exercise authority over assets in the Lehman account

5    if those assets contractually were understood all along to

6    belong to Barclays?"

7         And over an objection

8    "A.   But I think you're asking me to interpret what the import

9    of this is, because I don't accept your characterization of

10   what this does or what this provision does or says.

11   "Q.   So you would answer?

12   "A.   I think I would decline to answer on the grounds that I

13   think my interpretation of this provision would be privileged."

14        That was the answer that you gave at your deposition, is

15   it not, sir?

16   A.   It is the answer that I gave at my deposition.  I think

17   that what I was focusing on was I was there as a fact witness

18   and not to perform the role of interpreting the contract, and,

19   so, I was disinclined to accept your invitation to interpret

20   the provision.

21   Q.   Now, you were aware, sir, that the whole point of the

22   negotiations with DTCC was to find a way to protect DTCC.

23   Isn't that right?

24   A.   I would say that there were two objectives, as there

25   frequently are in any negotiation.  One was to find a way for

Page 259

1    Barclays and Lehman to consummate the transaction that they had

2    negotiated in a way that would leave DTCC comfortable with the

3    position that it would be in under those arrangements.

4    Q.   If your client were to testify that the whole point of the

5    negotiations with DTCC was to find a way to protect DTCC, are

6    you in a position to contradict that testimony?

7    A.   I would say it was a very important objective, but it was

8    obviously -- whatever the individual said it was also,

9    obviously, important to do it in a way that would have allowed

10   the transaction to have been consummated.  Whether that was an

11   articulated prong it's certainly implicit that the important

12   objective was both to get DTCC comfortable in a manner that was

13   consistent with the consummation of the deal.  Would Barclays

14   have done anything to do -- to accomplish that?  Obviously not.

15   They were asked to provide a billion plus in additional credit

16   support and they -- and they declined to do that.  So there

17   were some limits on what Barclays was willing to do in order to

18   satisfy DTCC.

19   Q.   Sir, Weil, Gotshal was not present for your calls with

20   DTCC.  Isn't that correct?

21   A.   Yeah, the -- my recollection is that they were not in

22   those conversations.

23   Q.   I invite you to see the testimony of Harvey Miller on this

24   subject given to this Court on April 28th, the trial transcript

25   at page 88, line 7 through 11.

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 260 of 265

Page 260

1   "Q.  Does the clarification letter reflect any conscious effort

2   on the part of you or your law firm, to conform that agreement,

3   that draft agreement or that final agreement, with Barclays'

4   separate letter agreement with the DTCC?

5   "A.  I don't believe we saw the DTC letter."

6        Now, sir, Weil, Gotshal was not present for the DTC

7   negotiations, right?

8   A.   That's correct.

9   Q.   So they were relying on Barclays for any conforming of the

10  clarification letter to the DTCC letter.  Isn't that --

11  A.   Well, I think -- I think they were relying on whoever was

12  participating in the description of the resolution of the DTCC

13  discussions in the larger -- in the larger room.

14  Q.   And you have no knowledge of what efforts were made to

15  conform the DTC letter with the clarification letter on the

16  part of Lehman?

17  A.   To conform the DTC letter to the clarification?

18  Q.   One to the other.

19  A.   Yes, there was --

20  Q.   Either way.

21  A.   There -- yes.  There were changes made to the

22  clarification letter that specified that the accounts would be

23  excluded liabilities, and there were provisions, changes to the

24  agreement.  I believe the prior draft of the clarification

25  letter had a specific reference to an 074 account.  I believe

08-13555-mg   Doc 11038   Filed 08/26/10   Entered 08/27/10 15:41:12   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 261 of 265

Page 261

1    that that was amended and superseded with a provision that

2    referred to, you know, that was not specific to either a single

3    DTC account or, necessarily, DTC.

4    Q.   You're referring to changes that were made to the

5    clarification letter, right?

6    A.   Yes.

7    Q.   You're not suggesting that Harvey Miller or anyone at Weil

8    sat down with the DTCC letter and went through it and made

9    conforming changes to the clarification letter as a result of

10   any conscious effort by them to conform those agreements?

11   A.   No, but after a discussion of the arrangement was -- after

12   the lawyers that were assembled and whoever was still on the

13   phone participated in the summary of the resolution of the DTCC

14   issues it was -- people were as open as they could be,

15   consistent with, you know, keeping their nose to the grindstone

16   to get things resolved.  So I'm -- it was certainly available

17   at the time at which it had been completed.  Nobody had to sign

18   the clarification letter if they were not satisfied with the

19   terms of the DTCC letter.  It wasn't as though we could have

20   withheld it from them and made them sign the clarification

21   agreement without having had access to it.  Whether they

22   actually asked for it and saw it, as opposed to relying on the

23   description of the resolution, I can't say.

24   Q.   You're not in a position to contradict --

25   A.   I'm not.

Page 262

1    Q.    -- Mr. Miller's testimony.

2    A.    He says he does -- he doesn't believe he saw -- they --

3    they saw the DTCC letter.  It sounds like he's not certain, and

4    I certainly don't know what he did or did not know.

5    Q.    And you have no knowledge as to what he or Weil, Gotshal

6    knew or did not?

7    A.    I do not know what -- I do not know which of the documents

8    at the closing table they picked up and read.

9    Q.    Thank you, sir.

10         MR. MAGUIRE:  I have no further questions, Your Honor.

11         THE COURT:  All right.

12         MR. BOIES:  Nothing further, Your Honor.

13         THE COURT:  Mr. Gaffey, you're coming forward.

14         MR. GAFFEY:  Just in case there's housekeeping, Your

15   Honor.  I would say, Your Honor, under the heading of your no-

16   surprises admonition yesterday, it may be a good idea for us to

17   book a little time tomorrow for some housekeeping.  I'm told

18   that I have received, while the testimony's been going on this

19   afternoon, designations of twenty-six more witnesses from

20   Barclays, several weeks after I was told I would receive all

21   designations.  They include designated testimony from Mr.

22   Diamond, Mr. Hughes and Mr. Ricci, all of whom have testified

23   before, and I would like to spend some time -- not now.  I need

24   to think about this overnight, but I think it may be more than

25   a three or four minute housekeeping discussion to determine how

Page 263

1    we're going to proceed from here on end.

2              THE COURT:  Let me ask whether or not you think that a

3    chambers conference is appropriate for this kind of discussion.

4              MR. GAFFEY:  Yes, Your Honor, I do.

5              THE COURT:  And would you like that to be before the

6    commencement of tomorrow's evidence or just sometime during the

7    day?

8              MR. GAFFEY:  It doesn't affect the testimony tomorrow,

9    and if there are witnesses scheduled, just as some point during

10   the day I would like to address it, sooner rather than later,

11   Your Honor.

12             THE COURT:  Okay.

13             MR. GAFFEY:  It doesn't have to be first thing is the

14   point.

15             THE COURT:  Okay.  We'll have a chambers conference to

16   discuss the issues that you want to talk about --

17             MR. GAFFEY:  Thank you.

18             THE COURT: -- and any other issues you want to talk

19   about --

20             MR. GAFFEY:  Thank you.

21             THE COURT:  -- sometime tomorrow.  We're adjourned

22   till 9:30.

23        (Whereupon these proceedings were concluded at 5:52 p.m.)

24

25

Page 264

1

2                          I N D E X

3

4                      T E S T I M O N Y

5

6    WITNESS                EXAM BY                  PAGE      LINE

7    Paul Exall             Mr. Hine                   8        14

8    Paul Exall             Mr. Boies                 84         4

9    Edward Rosen           Mr. Boies                 94         9

10   Edward Rosen           Mr. Maguire              142         9

11

12

13                      E X H I B I T S

14

15   NO.        DESCRIPTION                        ID.      EVID.

16   M107       deposition notice designating Paul            11

17              Exall as Barclays' 30(b)(6) witness

18              on bonus and severance payments

19   M801       E-mail thread dated November 2008             38

20              beginning with e-mail from James

21              Walker to Paul Exall

22   BCI356     Declaration of Mr. Exall summarizing          50

23              compensation information related to

24              certain senior executives of Lehman

25

Page 265

1

2                            C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        LISA BAR-LEIB

9        AAERT Certified Electronic Transcriber (CET**D-486)

10

11       Also transcribed by:    Clara Rubin (CET**D-491)

12

13       Veritext

14       200 Old Country Road

15       Suite 580

16       Mineola, NY 11501

17

18       Date:  August 26, 2010

19

20

21

22

23

24

25