Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC., et al.

9             Debtors.

10  - - - - - - - - - - - - - - - - - - - - - -x

11  In the Matter of:

12

13  LEHMAN BROTHERS INC.

14            Debtor.

15  - - - - - - - - - - - - - - - - - - - - - -x

16            United States Bankruptcy Court

17            One Bowling Green

18            New York, New York

19

20            August 25, 2010

21            9:38 AM

22

23  B E F O R E:

24  HON. JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2    CONTINUED EVIDENTIARY HEARING re (i) Motion of Debtor to Modify

3    the September 20, 2008 Sale Order and Granting Other Relief;

4    (ii) Motion of the Trustee for Relief Pursuant to the Sale

5    Orders or, Alternatively, for Certain Limited Relief Under Rule

6    60(b); (iii) the Motion of Official Committee of Unsecured

7    Creditors of Lehman Brothers Holdings Inc., Authorizing and

8    Approving (A) Sale of Purchased Assets Free and Clear of Liens

9    and Other Interests and (B) Assumption and Assignment of

10   Executory Contracts and Unexpired Leases, Dated September 20,

11   2008 (and Related SIPA Sale Order) and Joinder in Debtors' and

12   SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify

13   Sale Order; (iv) All Joinders Thereto and Related Adversary

14   Proceedings; and (v) Motion of Barclays Capital Inc. to Enforce

15   the Sale Order and Secure Delivery of All Undelivered Assets

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 3

1

2    A P P E A R A N C E S :

3    JONES DAY

4         Attorneys for the Movant, LBHI

5         222 East 41st Street

6         New York, NY 10017

7

8    BY:   ROBERT W. GAFFEY, ESQ.

9          WILLIAM J. HINE, ESQ.

10

11   HUGHES HUBBARD & REED LLP

12        Attorneys for Movant, James W. Giddens, SIPC Trustee

13        One Battery Park Plaza

14        New York, NY 10004

15

16   BY:   WILLIAM R. MAGUIRE, ESQ.

17         NEIL J. OXFORD, ESQ.

18

19

20

21

22

23

24

25

Page 4

1

2    QUINN EMANUEL URQUHART & SULLIVAN, LLP

3         Attorneys for the Movant, Official Committee of Unsecured

4          Creditors

5         51 Madison Avenue

6         22nd Floor

7         New York, NY 10010

8

9    BY:   JAMES C. TECCE, ESQ.

10

11   BOIES, SCHILLER & FLEXNER LLP

12        Attorneys for Barclays Capital, Inc.

13        333 Main Street

14        Armonk, NY 10504

15

16   BY:   DAVID BOIES, ESQ.

17        JONATHAN D. SCHILLER, ESQ.

18

19   BOIES, SCHILLER & FLEXNER LLP

20        Attorneys for Barclays Capital, Inc.

21        10 North Pearl Street

22        4th Floor

23        Albany, NY 10504

24

25   BY:   TRICIA J. BLOOMER, ESQ.

Page 5

1

2    STUTMAN TREISTER & GLATT LLP

3         Attorneys for Elliott Management

4         1901 Avenue of the Stars

5         12th Floor

6         Los Angeles, CA 90067

7

8    BY:   WHITMAN L. HOLT, ESQ.

9         REBECCA S. REVICH, ESQ.

10        (TELEPHONICALLY)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2          THE COURT:  Be seated, please.  Good morning.

3          MR. BOIES:  Good morning, Your Honor.

4          THE COURT:  Is there anything in the way of

5   housekeeping before we start?

6          MR. BOIES:  I don't think so, Your Honor.

7          THE COURT:  I gather from seeing this witness binder

8   that Stephen King is the next witness.

9          MR. BOIES:  Yes, Your Honor.  And Mr. Schiller will

10  take that witness.

11         THE COURT:  Okay.

12         MR. SCHILLER:  Good morning, Your Honor.

13         THE COURT:  Good morning.

14         MR. SCHILLER:  It's nice to be back in front of you.

15  We call Stephen King, sir.

16         THE COURT:  Mr. King, please raise your right hand.

17      (Witness duly sworn)

18         THE COURT:  Be seated, please.

19         THE WITNESS:  Thank you.

20         MR. SCHILLER:  Your Honor, we provided an exhibit book

21  to the parties and to Your Honor.  Mr. King, it's to your left,

22  I think.

23  DIRECT EXAMINATION

24  BY MR. SCHILLER:

25  Q.   Where are you presently employed, Mr. King?

Page 7

1    A.    At C12 Capital Management which is a asset and hedge fund

2    manager based in New York.

3    Q.    How long have you been there?

4    A.    Just under a year.

5    Q.    Before that, you worked for Barclays, didn't you?

6    A.    Yes, I did, since 2005.

7    Q.    Can you describe for His Honor the nature of your work at

8    Barclays?

9    A.    Yeah.  I joined in 2005 as part of the credit derivatives

10   business.  I ran a group called PMTG, Principal Mortgage

11   Trading Group, which was a proprietary trading business which

12   towards -- in 2007 going to 2008, took on responsibility for

13   helping Barclays manage a large amount of its mortgage exposure

14   that it had accumulated through a variety of different

15   businesses.  And in 2008, I facilitated with the asset

16   transaction that we're discussing today.

17   Q.    By facilitated, you're saying that you worked on the sale

18   of Lehman to Barclays?

19   A.    Yeah.  I worked on the securities as for the economic --

20   Q.    Over the weekend before bankruptcy, did you participate in

21   your team's work on that possible acquisition of the global

22   Lehman company?

23   A.    In the runup to it, yes.  We worked on certain assets.

24   Q.    And were you advised on Sunday, September 14th that that

25   transaction was not going to go forward?

1    A.    Yes, I was, yeah.

2    Q.    On Monday, did you learn that there was another

3    transaction that you were to work on?

4    A.    Yes, I did.

5    Q.    What were you asked to do on Monday, September 15th?

6    A.    I was asked to come back to the Lehman offices.  I put my

7    team on standby back at the Barclays offices.  And I was asked

8    to look at a revised schedule of asset types that could form

9    part of a smaller transaction than the one that we had been

10   looking at the week prior.

11   Q.    During that period, the 15th and the 16th, do you recall -

12   - could you describe for His Honor what the conditions were of

13   the U.S. financial markets?

14   A.    Yeah.  There was -- I mean, there was and there had been

15   for some time tremendous uncertainty.  But the bankruptcy of

16   the Lehman holding company had introduced a new level of

17   uncertainty because it was clear that certain -- although there

18   was a great deal of uncertainty as to how assets would perform,

19   how the U.S. housing market would perform, economic outlook.

20   And liquidity had been very bad for some time, in many respects

21   starting in 2007.  The bankruptcy of Lehman introduced a new

22   uncertainty about how parties would face one another in normal

23   transactions.  And so, even relatively liquid markets became

24   extremely fragmented and broken during that period.

25   Q.    You mentioned your work for Barclays generally on

Page 9

1   mortgages exposure.  What was happening to assets like

2   mortgages that week or equities and corporates as well?

3   A.   In many respects, all -- you know, we tend to use the term

4   "risk assets" to convey the sense that they are an asset type

5   which has a risk premium associated with them.  All risk assets

6   were falling in dollar price terms during that period as

7   investors sought safe havens in increasingly short-dated

8   government instruments.

9   Q.   On the 15th and the 16th, did you review the values of

10  mortgage-related assets?  Do you recall their status?

11  A.   Do I recall --

12  Q.   Generally in the market?

13  A.   Yes.  I mean -- well, yes, because we were managing our

14  own positions as well as reviewing those of Lehman's.  I mean,

15  we had sizable positions ourselves and we were attempting to

16  make decisions about what we would do with many of our own

17  assets and what we do if we were to acquire another large set

18  of assets which would be extremely difficult to liquidate just

19  given the absence of any buyers.

20  Q.   That week, the week of the 15th, was there a market for

21  subprime mortgage-backed securities or the privately structured

22  COO obligations or CDO obligations, do you recall?

23  A.   There's always a gray scale.  So at the most, the nearer

24  end of the spectrum there were some indices in subprime that

25  had become quite popular to discuss.  More recently, ABX is an

LEHMAN BROTHERS HOLDINGS INC., et al.

1    index of subprime bonds.  That index was trading.  Its market

2    was wide meaning that the gap between the bid and the offer

3    price the traders were willing to trade, it was wider than

4    normal.  But it did trade.  Cash bonds -- there were sellers of

5    cash bonds and there were distressed buyers.  But the number of

6    participants was very, very small.

7        The more private-labeled stuff you describe had been for

8    some time and was going to remain so for a very long time very

9    difficult to find parties that were willing to enter into those

10   transactions because, in many respects, if they were privately

11   structured, they may well have been structured for an

12   individual.  I mean, we came across structures like that as

13   part of the Lehman transaction, things that were structured for

14   Lehman to facilitate their financing or the position.  And that

15   was never really intended to trade in the open market.  So to

16   find a buyer who was then willing to value it or take

17   possession of it would be very difficult.  And we call that by

18   appointment in general.

19   Q.   Were you attempting early in that week to assess those

20   private label assets of Lehman in connection with the potential

21   transaction?

22   A.   Yes.  We had seen a number of them in the week prior and

23   in -- as part of the larger discussion and -- those days of the

24   15th and 16th.  They take a long time, though.  I mean, in many

25   cases, you need to obtain additional documentation to be able

Page 11

1    to understand the structure.  And it's not like you can just

2    look up on Bloomberg.

3    Q.   Were there significant volumes of these kinds of assets on

4    the Lehman balance sheet that you saw early in the week of

5    September 15th?

6    A.   Yes.  Significant in dollars in numbers of singles of

7    billions of dollars.  But in many respects, they carried a

8    significant amount of their risk within the portfolio because,

9    in many respects, and we've had first-hand experience of this

10   in our portfolio, you can have a security that you think is

11   worth a hundred million dollars or 200 million dollars and it

12   turns out to be worth nothing, just nothing, not a bit less but

13   nothing.  And that's due to the complexity.

14   Q.   Were government securities and agency securities of

15   uncertain value or changing in valuations that week?

16   A.   Yes.  And part of what the group -- my group does is --

17   and the firm still does is trade government securities and

18   agency securities.  We tend to trade predominantly agency

19   securities that are issued by Fannie and Freddie which are the

20   two most common.  But there are other agencies as well

21   including Tennessee Valley Authority, for example, which issue

22   very long-dated debentures to fund infrastructure bonds.  But

23   also what I hadn't really thought about in the lead up to that

24   but it did dawn on me is that there's a group of bonds that are

25   issued by banks, European and U.S. banks, that are generally

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 12

1    traded by agency desks, callable bank bonds.  And that

2    portfolio of agency securities was made up of those long-dated

3    agency bonds and bonds issued by U.S. and European financial

4    institutions.  Of course, those were the ones that were those

5    sort of bonds and any inflation-linked bonds or bonds that have

6    embedded derivatives in them became very much more difficult to

7    value because of their optionality or their structure.  Some of

8    those took a very, very long time for us to dispose of and were

9    very, very hard to risk manage.  Obviously, government

10   treasuries and things short-dated were a little bit easier.

11   Q.   Are you referring specifically then to Lehman assets that

12   included such bonds describing --

13   A.   Yes.

14   Q.   -- your efforts to assess their value?

15   A.   Yes.  The section that I think was described is government

16   and agency bonds that they had on their balance sheet which

17   wasn't an unusual label but it's a label that carries quite a

18   lot of different asset types in it.

19   Q.   The distress you described on Monday and Tuesday, did that

20   continue through the week of the transaction?

21   A.   It continued through the week, the year and is largely

22   still continuing in many markets.

23   Q.   You mentioned that in order to assess the value of some of

24   these projects, label mortgage-backed securities and the like,

25   you needed to have paperwork that would explain --

Page 13

1   documentation that would help you understand the nature of the

2   security.

3   A.   Right.

4   Q.   During the period of September 15,16, was Lehman able to

5   provide you with reliable and up-to-date information?

6   A.   They were able to provide some.  I mean, in many respects

7   it -- you know, some of this stuff is difficult to obtain its

8   information from -- the more structured transactions frequently

9   would have a trustee.  The trustee may have reports that we

10   would like to obtain.  It would be -- we had to go to the

11   trustee to obtain those.  We might need to obtain an offering

12   document.  It isn't necessarily the case that the trading desk

13   had ready access to that.  So it was quite a complex process.

14   We started with the most easy to evaluate and worked steadily

15   towards the more complex.

16   Q.   How up-to-date was the information that Lehman provided

17   you on Monday and Tuesday of that first week?

18   A.   Well, on the Monday when I was called back to Lehman on

19   the Monday, I think the only thing that I immediately had was

20   the snapshot balance sheet for the close of business on the

21   12th.  And they were in the process of attempting to provide us

22   the list of CUSIPs, the numbers, the labels that I used to

23   identify the securities that made up that balance sheet.  That

24   took a number of days to reconcile.  I don't think we have a

25   work on top of anything later than the 12th balance sheet.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 14

1     And --

2     Q.   So after the -- I'm sorry.

3     A.   And then we had to find out what were the types of

4     secur -- you know, what the name of the security was to go with

5     the CUSIP, what the type of security was.  There was a sort of

6     filtration and organization process that we followed through

7     those days.

8     Q.   You say you received at the beginning of the week a

9     balance sheet of September 12th's --

10    A.   That's correct.

11    Q.   -- market activity.  Did you receive thereafter that week

12    from Lehman a balance sheet of activity on the 15th or activity

13    on the 16th?

14    A.   I don't -- I really don't think so.  I think it was the

15    12th we worked on and then later on in the week that it was

16    superseded by other versions of the transaction anyway.

17    Q.   You're referring to the repo?

18    A.   Yes.

19    Q.   Did the status of the information flow from Lehman impact

20    your ability to assess the value of the assets you and your

21    team were reviewing?

22    A.   Yes.  I mean, it was -- you know, this was -- the amount

23    of information that needed to be gathered to be able to

24    adequately analyze thousands of line items of securities worth

25    billions of dollars in an uncertain marketing environment would

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 15

```
 1   be difficult.  We had found it difficult over the previous

 2   years.  You know, we had been doing this for a year and a half

 3   now analyzing our own benefits.  So even when you've got time

 4   and -- to organize yourself, it's difficult.  In that week,

 5   with an entity which was in a considerable amount of turmoil, I

 6   think it was very difficult for Lehman to be able to deliver a

 7   lot of the information that we wanted.  So we went to whatever

 8   source we could to find it.  But it took time.

 9   Q.   Did the quality of the information or the absence of it

10   impact the risk to Barclays of this transaction in your view at

11   that time?

12   A.   Yes, very much so, inasmuch as there were securities --

13   well, there were two aspects of it.  One, the balance sheet

14   itself -- I think one of the problems was that the balance

15   sheet itself was changing so very, very rapidly during those

16   first two days because securities were bring bought and sold by

17   the entity and positions were being closed out.  So the balance

18   sheet itself was changing.  So you had a constant moving

19   inventory of items that needed to be analyzed.  So that was one

20   layer of risk.

21        And then another layer of risk was the instruments

22   themselves were in distress and were, in many respects, you

23   could look at a CUSIP or a name of a security and have

24   absolutely no idea what it was.  Absolutely no idea.  And even

25   if someone said to you oh, it's a whole business securitization
```

Page 16

1    or it's a so-and-so, that's not enough to go on.  I mean, you

2    need to have information.  It takes time to analyze it.  And

3    that's --

4         So the availability of information was definitely a

5    challenge and the fact that the inventory itself was changing.

6    Q.   In terms of the inventory that you first received -- you

7    told the Court you received a September 12th balance sheet.  Is

8    that right?

9    A.   Yes.

10   Q.   And do you recall generally when you received it?

11   A.   I think the first time I saw that was on the Monday

12   afternoon/evening that I arrived at the Lehman offices.

13   Q.   Okay.  Let me ask you to turn to what I hope is tab 2 in

14   your book.

15        MR. SCHILLER:  BCI Exhibit 191, Your Honor.

16   Q.   Is this the -- let's look at the first page of this

17   document.  Who's Jasen Yang?  Could you identify him for Judge

18   Peck?

19   A.   Jasen is a structuring trader who works -- worked for me

20   and still works for me.

21   Q.   Was he working for you at that time on this transaction?

22   A.   Yes, he was.

23   Q.   And who is James Walker?

24   A.   James Walker's official title, I think, was the U.S. CFO

25   at Barclays at the time.

Page 17

1    Q.   And if you turn to the second page, you'll see at the top

2    left side "Lehman Balance Sheet by GAAP Asset Types -

3    9/12/2008".

4    A.   Yes.

5    Q.   Did you work from this balance sheet at the beginning of

6    the week with your team?

7    A.   Yes, I did.

8    Q.   Is that your handwriting on the --

9    A.   Yes, it is.  Most of it is, I think.

10   Q.   And does this balance sheet reflect the activity from

11   September 12th?

12   A.   I believe it to be a -- the close of business on the 12th

13   balance sheet as provided by Lehman.

14   Q.   Now you mentioned that you also received backup for this

15   balance sheet.  I think you referred to it as CUSIP backup.

16   A.   Right.

17   Q.   Can you turn to tab 4 in your balance sheet -- 4 in your

18   notebook?

19   A.   Sure.

20   Q.   This is a document dated Monday, September 15th to you

21   from Mr. Clement Bernard.

22   A.   Yes.

23   Q.   Who is he?

24   A.   Do you know what?  I don't remember.

25   Q.   Is he a Barclays person or a Lehman person as far as you

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 18 of 232

Page 18

1   know?

2   A.   I could probably work it out but I don't remember.

3   Q.   All right.  Below, in an e-mail to you from Michael

4   McCarvey -- can you identify him?

5   A.   No.  I don't remember.  I mean, unfortunately, there were

6   so many people involved at that time.

7   Q.   Okay.

8   A.   I don't remember these people.

9   Q.   Well, you see the subject is "LBI Balance Sheet detail".

10  A.   Yes.

11  Q.   Is this the kind of document you received -- do you think

12  you received Exhibit 909?

13  A.   Yes.  This is an example of it, yeah.

14  Q.   And it says, "Please see the attached long inventory

15  balance sheet detail for LBI as of September 12th" --

16  A.   Yes.

17  Q.   "2008."

18  A.   Yes.

19  Q.   "Please note that this includes all of LBI except the

20  equities division which should be sent very shortly."  Can you

21  describe this document to the Court in terms of what it

22  contains generally?

23  A.   Yes.

24        MR. TAMBE:  Objection, Your Honor.  Lack of

25  foundation.  He didn't prepare that document.  He can describe

Page 19

1    the content but he can't describe what basis.  He didn't

2    prepare it.

3            THE COURT:  Well, maybe we can get at it with another

4    question or two.  But I think all the question is asking is for

5    the witness to describe a document that I presume he was

6    familiar with at the time.  So I don't think there's much of a

7    problem with the question.  Why don't we at least establish

8    that he has sufficient familiarity with the nature of the

9    document to be able to describe it?

10   Q.   Do you recall whether at the beginning of the week your

11   team worked with Exhibit 909?

12   A.   I remember that they worked with 909 and -- so this and

13   other files, many other files, like it in an attempt to put a

14   full list of the instruments that would, in aggregate, make up

15   the value that was reported on the summary balance sheet as of

16   the 12th.  And I remember that that was a very complicated --

17   there were many iterations of that.  And I think even later on

18   in the week it still wasn't complete.  It wasn't just the

19   equities that were incomplete.

20   Q.   And please tell the Court what level of information this

21   provided to you and your team.  These are not every day

22   documents for the rest of us.

23   A.   Right.  So it would -- it is an -- it would come from an

24   inventory system at Lehman.  It would describe -- you can see,

25   it does describe as an example various internal classifications

Page 20

1    that Lehman has labeled.  Each line is a security, a single

2    security.  There is an amount of the security.  There is the

3    CUSIP of the security.  And there is a name of the security in

4    most cases.  The name isn't always as obvious as one might

5    think.  That's the column product name.  Even professionals

6    that deal with these securities all day every day can't read

7    that list of names necessarily and instantly tell you what

8    everything is.  Ballantyne, for example -- one row that

9    Ballantyne taxable notes A-3 B.  There's no way to say oh, I

10   know that security.  And there were amounts -- I can't remember

11   what else is on here.  And there's an attempt -- and I seem to

12   remember what we were trying to do at the time, mostly Jasen

13   and my team, were attempting to make sure that these

14   classifications -- an amount of each security would add back up

15   to the balance sheet that we were looking at as of the 12th so

16   at least we would know if we were going to do a line by line or

17   even group by group analysis of the potential value of those

18   assets that we were working with a -- the full population.

19          MR. SCHILLER:  Can we just put 191C up on the board,

20   please?  This is a cleaner typed version, Your Honor, of 191.

21   Q.   Could you point out to the Court what you mean by trying

22   to tie the backup into the balance sheet for your value

23   assessment?

24   A.   Sure.  The question that was being asked of me of -- at

25   its most colloquial level was the column that says "Net Long

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 21 of 232

Page 21

1   Inventory" -- the question that was being asked of me was,

2   Stephen, what do you think that is worth?  And to be able to

3   answer that question, I would need to know what made up each of

4   those numbers.  For example, corporate stocks and options

5   total, 8,431,000,000 et cetera.  You know, that must be made up

6   of a very substantial -- I mean, this report sort of shows just

7   quite how many line items must make up that eight and a half

8   billion dollars.  The very first thing that I wanted to do was

9   to make sure that we knew that we had a finite population of

10  instruments that made up that 8.43 billion at least as of the

11  12th.

12  Q.   So the exhibit you're looking at, 909, was a thick stack

13  of these numbers?

14  A.   Yes.  And there were many more to go with that.

15  Q.   Let me ask you to turn to BCI Exhibit 910 --

16          MR. SCHILLER:   -- which is tab 5, Your Honor, in the

17  book --

18  Q.   -- and ask you to identify this document for the Court.

19  It is a -- begins with an e-mail to you from Mr. Yang dated

20  Monday, September 15th.

21  A.   Right.

22  Q.   And the subject is "LBI Balance Sheet Detail as of

23  September 12th - Corporate Equities".

24  A.   Yes.

25  Q.   What information did this provide you and your team?

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 22 of 232

Page 22

1    A.    This was being sent to me by Lehman.  I think it was one

2    of several that were sent to me.  I tried to get these to be --

3    I think subsequently, I tried to get these to be sent directly

4    to Jasen and the team.  But this is, I think, supposed to be

5    the detail that should add up to the September 12th -- if they

6    all worked, the column -- 1, 2, 3, 4 -- across on the detail

7    behind this e-mail.  It says "long".  One would hope that the

8    sum of all of those positions should add up to the corporate

9    line item on the summary balance sheet.

10   Q.    And these positions were Lehman's marks as of September

11   12th activity?

12   A.    I believe that to be true, yes.

13   Q.    And did you use Exhibit 910 in your work that week?

14   A.    Yeah, and other ones like it.

15   Q.    Let me ask you to turn to BCI Exhibit 912 which is tab 6

16   in your book, Mr. King.  And that is another September 15th e-

17   mail sent to you.  The subject is "LBI Balance Sheet Detail as

18   of September 12th - Corporate Obligations".  Is this similar to

19   the other data we've discussed in terms of its purpose and your

20   use of it?

21   A.    Yes, it is.

22        MR. SCHILLER:  Your Honor, we move the admission of

23   BCI Exhibits 909, 910 and 912?

24        THE COURT:  Is there any objection?

25        MR. TAMBE:  No objection, Your Honor.

Page 23

1              THE COURT:  They're admitted.

2    (BCI Exhibit 909, e-mail from Clement Bernard to Stephen King

3    dated 9/15/08 re LBI balance sheet detail as of 9/12, was

4    hereby received into evidence as of this date.)

5    (BCI Exhibit 910, e-mail from Jasen Yang to Stephen King dated

6    9/15/08 re LBI balance sheet detail as of 9/12 - Corporate

7    Equities, was hereby received into evidence as of this date.)

8    (BCI Exhibit 912, e-mail from Jasen Yang to Stephen King dated

9    9/15/08 re LBI balance sheet detail as of 9/12 - Corporate

10   Obligations, was hereby received into evidence as of this

11   date.)

12   Q.   Now you mentioned a moment ago that these contained the

13   Lehman marks following the activity in the markets of September

14   12th, this data, correct?

15   A.   Yes.  I think that's right.  Of course --

16   Q.   Did you receive, as far as you can recall, updated marks

17   from Lehman after this at any time prior to the closing?

18   A.   Not as far as I recollect.  I don't think so, no.

19   Q.   Now you've testified that the market dropped dramatically

20   following the Lehman bankruptcy over the weekend.  When you

21   received the balance sheet with the September 12th marks, when

22   you received that on Monday the 15th, did you have concerns

23   whether Lehman had title to the assets referenced in the

24   balance sheet and listed in the data we've just looked at?

25   A.   Somewhat strangely, on the evening of the Monday the 15th,

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 24 of 232

Page 24

1    I actually didn't think much about it.  You know, I just was

2    asked -- and it was a pretty hectic time.  And I was asked of

3    my opinion on what the value of these assets were.  I didn't

4    actually give much consideration to the idea that we might not

5    be able to get the assets.  That did dawn on me and others over

6    the subsequent days as we were unable to get a definitive list

7    of the securities that Lehman still had in its possession.  And

8    we started to realize just quite how much the balance sheet was

9    changing.  And then late -- and then before the repo

10   transaction occurred, we realized that much of the

11   re-hypothecation process that had occurred through repo had

12   meant that Lehman, the U.S. entity, no longer had much

13   collateral that it was reporting on its accounting balance

14   sheets.  So it was going to be a difficult exercise.  But not

15   on the Monday evening.  It really happened during that night,

16   the next day.

17   Q.    Incidentally, was it Barclays' management that asked you

18   to try to value the assets on that balance sheet?

19   A.    Yes.  Yes, absolutely.

20   Q.    When you approached that task with your team at the

21   beginning of the week, were you familiar with Lehman's marking

22   policies or practices?

23   A.    No.  No.  Other than to the extent that they have some

24   similarity presumably through the various accounting standards

25   and bodies.  So it wouldn't be completely alien but I wouldn't

Page 25

1    know their own individual policies.  It would be impossible for

2    me to know that.

3    Q.   As you looked through the data that we just looked at and

4    other data that you've said that you received that was similar,

5    could you determine whether Lehman was updating its marks

6    regularly for illiquid assets of the kind you described to the

7    Court earlier?

8    A.   I'd hate to say -- I don't -- one, I don't know what the

9    last timestamp for an update would have been attributed to each

10   of the line items that made up the September 12th balance

11   sheet.  So presumably, some were updated very recently and some

12   were not updated as recently.  In practice, it always is very

13   difficult to update the valuations of securities where you

14   don't see the security trade.  You might see something similar

15   trade or you might see -- you might be just inferring it from

16   any number of other assumptions.  So I would be surprised even

17   if in normal circumstances Lehman was updating them right up to

18   the minute.  But on the other hand, they were also -- it was

19   very, very unusual times.  So I have no idea.  I would think it

20   would be a very, very difficult task for them to do.

21   Q.   Well, as a general proposition, is the marking of illiquid

22   assets done on the same schedule or a different schedule than,

23   say, corporate equities in your practice?

24        MR. TAMBE:  Objection.  Lack of foundation.

25        THE COURT:  It's sustained although I think that this

Page 26

1    witness has already demonstrated by his answers to this point

2    that he should be in a position to be able to comment without a

3    foundation question.  But as a technical matter, the objection

4    is sustained and we'll do this the hard way.

5              MR. SCHILLER:  Okay.  Judge, I think I want to move on

6    anyway to what's of interest to you.  And that is the valuation

7    process in which Mr. King was engaged which will take up

8    this --

9              THE COURT:  Does that mean you're withdrawing the

10   question?

11             MR. SCHILLER:  This will take up the illiquid asset

12   issue.  Yes, I'm withdrawing the question.

13   Q.   During the September 15, 16 period, were you aware that

14   Barclays' negotiators were negotiating with Lehman negotiators

15   concerning the possible purchase of LBI?

16   A.   Yes, I was, yes.

17   Q.   Now you've said that Barclays asked you to estimate the

18   value of the assets that were on that September 12th balance

19   sheet that was shown to you, Exhibit 191.  Can you describe for

20   the Court how you and your team went about that on Monday,

21   September 15th, and Tuesday?

22   A.   Yeah.  We tried to follow the same process that we had

23   followed the prior week and that we had followed in evaluating

24   large groups of securities that we'd seen on Barclays' own

25   balance sheet.  The first thing was to start at the very top,

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 27

1   just see what overall it look -- how much did we have of what

2   type of securities.  We were familiar -- we work in the same

3   industry so some of the classifications are familiar to me even

4   though they may be misleading in some respects.  For example,

5   it is common to call many different types of securities,

6   mortgage-backed securities that aren't necessarily mortgage-

7   backed securities.  Things like credit card receivables or

8   franchise loans or whole business securitizations can often --

9   we ourselves would often just call them those are the -- those

10  are part of the mortgage-backed securities book.

11      So we'd have some idea at the very highest level of what

12  the categories of securities were.  What I did while I was at

13  the Lehman office was try to evaluate what was likely to be

14  the -- my best estimate of what would be the realizable value

15  in a -- you know, the maximum realized value that I could

16  credibly commit to my management team that I thought I could

17  achieve in an organized and orderly or controlled way.

18  Meanwhile, I had my team back at Barclays starting to

19  accumulate all of the supporting data for that balance sheet,

20  reconcile it with the work that we had done the previous week

21  where possible, because there should be some overlap with some

22  of the work we'd done the previous week, and start the wheels

23  turning again because, obviously, we'd decommissioned our

24  efforts on Sunday, to continue to evaluate the individual line

25  items and put on a -- eventually, and it took a very long time

Page 28

1    to do -- a line by line estimate of what we thought we could

2    realize on the security.

3    Q.   When you say realize on the security, are you talking

4    about the ability to sell the security after you acquired a

5    sale that was done?  I think you said it would be done in an

6    orderly way.

7    A.   Well, sell all the -- would eventually be realized on -- I

8    mean, some of the securities, it was going to be the case that

9    they would never be sold.  There was no market for them.  But

10   they would actually just crystallize cash of a certain amount

11   over days, weeks, years.  And that was the objective for some

12   of them.

13        Others clearly could be liquidated, some more readily than

14   others.  But even the ones that were -- would have the feeling

15   of being more readily liquidated, like publicly traded

16   equities -- my group didn't trade a large amount of publicly

17   traded equities at that time.  But I can tell you that those

18   markets for individual stocks around the time of the Lehman

19   bankruptcies were extremely difficult to trade particularly

20   when you owned very significant numbers of shares.  So we had

21   to try and make an estimate of -- okay, so if we, in a very

22   sensible way, seek to monetize the value of this through hedges

23   and disposals over a period of time, how much do I think I can

24   get.  That was what I was being asked.

25   Q.   So in terms of what you could get in the market for the

1   value of these assets after you acquired them, that's what you

2   were trying to estimate and provide to management --

3   A.    Yes.

4   Q.    -- that week?

5   A.    Yes.

6   Q.    What level of confidence did you have in your assessment

7   of such market values?

8   A.    It was -- I mean, the business that I ran was a reasonable

9   sizeable trading business.  And it had the right to trade about

10  a billion dollars or so of capital.  This was fifty billion

11  dollars of securities many of which had never traded and we had

12  never seen before and that we know very little about.  So the

13  securities themselves were incredibly difficult to assess.

14       The markets were themselves very, very broken.  So it was

15  very difficult to know just quite how many people -- if my

16  management said to me, okay, Stephen, can you now own the

17  securities?  You can start to monetize the value of them

18  through disposals or hedges or whatever -- 'cause I didn't know

19  even that at that time, you know, how much I could actually do

20  anything with the risk that I was potentially going to be

21  taking on.  But, in aggregate, that meant that it was very,

22  very difficult to put an assessment on.

23       And I think that was one of the challenges that I had at

24  the time, particularly on that Monday evening where I knew that

25  my management team were negotiating a transaction.  And an

Page 30

```
 1    answer that I could not give was I don't know.  I couldn't give
 2    I don't know.  I had to give a reasonable estimate.  And trying
 3    to articulate to them but there is a lot of risk.  And that
 4    risk, by the way, wasn't being measured in hundreds of millions
 5    of dollars of uncertainty around my estimate but in billions of
 6    dollars, you know, while taking into account the fact that we
 7    had to be very sensible, that we weren't taking on risks that
 8    we really had absolutely no way to control or understand.
 9         So it was a very, very unusual and unprecedented process
10    for, I think, us to be in.
11    Q.    This was an unprecedented process for you to be in?
12    A.    For the firm, for me and unprecedented market conditions
13    as well to be doing it in.
14    Q.    How many years before September 15th had you been trading
15    in these markets?
16    A.    I started at Bankers Trust in the late nineties.  I had
17    good familiarity with these markets -- and not all of the
18    instruments that were in that fifty billion portfolio --
19    publicly traded equities were not the -- were treasuries, were
20    not -- certainly in these volumes were not our normal business.
21    But it was -- when you say so many of them, they start to take
22    on actually some of the characteristics of the much more
23    illiquid and broken securities themselves.
24    Q.    You say the market was broken.  Are you referring to the
25    illiquidity?  Are you referring to the absence of buyers?  Can
```

1    you tell the Court what you mean by the market was broken as

2    you looked at it to try to value these assets?

3    A.    I tend to -- we -- the business that I'm in does deal with

4    complex securities and we are used to trying to eliminate

5    ambiguity associated with definitions and words that are very

6    easy to use but can lead to considerable differences between

7    two parties who are seeking to negotiate something.  I don't

8    particularly know the difference between liquidity and were

9    there any buyers or sellers.  I mean, to me they're the same

10   concept.  If there are no buyers, there is no liquidity.  So

11   that's really what we're saying is that around that time and

12   for a very long time before and, as we note, for a very long

13   time following it, way into 2009, there were no buyers.  Or,

14   even -- and that term's a bad term itself.  It's not that there

15   were no buyers.  There are buyers.  But their prices that they

16   may want can be incredibly low.  They may not want anywhere

17   near as much as you own or want to sell.  And so it can be a

18   very, very -- and the time that they would want to take to do

19   their analyses and reach their decisions and get their

20   approvals was increasing and extending significantly.  And so,

21   that absence of number of parties in the market at the time in

22   all of these markets is what is really meant by the liquidity.

23        The broken aspect of it, I think, is even broader which is

24   there were parts of the market that had been of the normal

25   functionality of the market had just assumed to always being

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 32 of 232

Page 32

1   there and worked like repo that suddenly people were

2   questioning, well, what does it mean -- just what does it mean

3   to repo something?  If I bond and I repo it, will I be able to

4   get it back if the financial system falls into complete decay?

5   Because, after all, it wasn't necessarily the assumption that

6   Lehman was the last financial institution that was going to

7   default at that time.  Not by a long stretch.

8   Q.   Now you mentioned you were trying to develop some credible

9   estimates for management.

10  A.   Yes.

11  Q.   Were these subjective?

12  A.   You know, I -- it's my job to try to be as objective as

13  possible.  But it's impossible not to be subjective.  And

14  you're using all of the informa -- a person who's using all of

15  the information that is available to them to make their own

16  assessment of value -- I was, I think, very privileged to be --

17  being asked by my firm to give my opinion and that they would

18  be using that in some way in their discussions.  But it was --

19  it was subjective with as much of the subjectivity eliminated

20  as possible where we were able to find benchmarks or something

21  that we could point to to say, well, let's rely on the

22  following because that's a pretty good indicator.

23  Q.   You mentioned billions of dollars of uncertainty with

24  respect to valuation earlier.  Was part of what you and your

25  team was doing that week simply guesswork?

Page 33

1    A.    I -- we deal with uncertainty and risk every day in the

2    business.  And I hate the word "guess".  It -- you know, in

3    some ways, it feels like it sort of demeans what we do.  But on

4    the other hand, we were trying to form an expectation of a

5    value of stuff about which we didn't know very much.  So I'd

6    rather avoid the word "guess" but it was an estimate, an

7    expectation of both the value and the risk.  Don't forget we

8    were trying to estimate value and risk because we had to risk

9    manage it the moment that we took ownership of it.  Those were

10   extremely difficult things to do.

11   Q.    Was your team trying to work through the positions that

12   were reflected in the data you received on Monday and Tuesday?

13   A.    They were trying to work through them and they were trying

14   to lever -- I mean, the resource that was mobilized inside

15   Barclays to complete this process was enormous.  And my team at

16   the time was about twenty-five people or something.  I can't

17   even remember exactly how much it is.  It kept swelling around

18   this time as we sucked in more resource.  But they were

19   leveraging other experts within the business, the individuals

20   that ran the various desks at Barclays.  And I think they were

21   also talking to people at Lehman to try and gather information.

22   So that they weren't just doing it in isolation. They were

23   using as much of the resource -- to pulling as much of the

24   resource at Barclays as they could.

25   Q.    Were they having difficulty coming up with even rough

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 34

1    estimates?

2    A.    On some things it was impossible to.  On some things we'd

3    have a CUSIP and it would be called "bank note".  There's

4    nothing -- you don't do anything with a CUSIP and "bank note".

5    So, yes, that was very, very difficult.

6        Some things were easier to at least identify.  But then

7    you still had the question of right, but how difficult is it

8    going to be to realize that value.

9    Q.    Do you recall how long it took for Barclays to determine

10   the values of the various assets that it ultimately acquired?

11   A.    Well, you know, that's a -- that's an open-ended -- it's

12   an open-ended process.  The way that we approached it, the way

13   we approach similar smaller exercises to this and that we had

14   been working with with Barclays on in the previous years was to

15   form an estimate, form a better estimate, form a better

16   estimate, form a better estimate.  And just keep going until

17   it's gone.  Once it's gone then at least we can stop.

18   Q.    Were your estimates different from Lehman's estimates that

19   week?

20   A.    Yeah, I would ass -- I think -- yeah.  I would assume so,

21   yes.

22   Q.    Did it turn out that some of the assumptions you made,

23   some of the subjective estimates you made and reported to your

24   management were wrong?

25   A.    Yes.  I think we made some good and some bad estimates and

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 35 of 232

Page 35

1    assumptions.  And those were continually revised.

2    Q.   Can you give the Court an example of an assumption you

3    made that turned out to be incorrect?

4    A.   I'm trying to think of different security types and things

5    that there were at the time.

6    Q.   What about government and agency securities?

7    A.   Government and agency securities -- agency securities --

8    you know, agency securities, in particular, was remarkable.

9    And even I was prone to think of agency security markets as

10   being liquid deep markets meaning that they were adequately

11   international, the buyers and sellers of them were very large.

12   Therefore, the institutional support for the trading of that

13   product should be good.  So it ought to be straightforward.  In

14   reality, that was categorically not the case about that time

15   and in the following months, not just days.  Months and months

16   and months.  I can't remember how many billions of dollars of

17   agency securities that we picked up.  But it was of the order

18   of sort of five to ten -- five to ten -- five plus billion

19   dollars.  I forget now.  That took months to realize because

20   they were very, very long dated securities that were either

21   issued by, as I said, banks -- which I hadn't really given

22   thought to -- banks or agencies of the -- that didn't

23   necessarily have the full faith and credit of the U.S.

24   government.  They had implicit benefits of guaranty.  And so,

25   as a result, the number of participants in that market shrank

Page 36

1    enormously because of the uncertainty.

2         It was also shrinking because the repo market -- the

3    willingness of banks to lend people money to buy things like

4    agency securities was dwindling.  There was no lending.  The

5    net result was that really the liquidity of that product was

6    extremely poor.  And I remember we saw a sort of swing of about

7    300 million dollars of loss on that portfolio at one point

8    which was very significant in comparison to what I would have

9    originally estimated.  And that's even taking into account

10   interest rate hedges which were really very, very difficult to

11   manage because there was -- when people say "hedge", again,

12   that's one of those words that sound simpler than it is.

13   You're actually buying one thing and selling something that's

14   not exactly the same thing.  So it is possible that your hedge

15   doesn't work and the security goes up.  And rather than the

16   hedge going down, the hedge goes up.  And we experienced that

17   with those agency securities.

18   Q.   When you say to the Court you were trying to determine

19   what the realized value is of something like government and

20   agency securities for your management, are you talking about

21   the price at which Barclays can sell those to a willing buyer?

22   A.   Yeah.  All that would ultimately just be realized by

23   holding the security and allowing the cash flow to be

24   generated.  But --

25   Q.   But as to these, were you assuming you could sell them

Page 37

1   more quickly than it turned out?  I'm talking about the

2   government.

3   A.   With the government's -- I thought the government

4   securities would be much easier to sell than it turned out that

5   they were.  That was -- that portfolio itself took months and

6   months of -- that and some of the equities took months and

7   months and months to dispose of.

8   Q.   If you'd guessed correctly, would you have given them a

9   different value on Monday, September 15th?

10  A.   Yes, I would have.  Yeah, definitely, because I was

11  attempting to take into account -- I was attempting to take

12  into account what I thought I could obtain from either sale or

13  just allowing the securities to monetize, majority of them

14  sell, if over a period of time, using some of the risk

15  management techniques that we had come to use in smaller and

16  similar situations, we steadily ran off the book, which was the

17  intent -- would have been the intent and how much would that

18  cost me to do.  And in a situation where there's a tremendous

19  amount of price uncertainty as well as a dwindling number of

20  buyers then the overall realizable dollar value I ought to be

21  able to obtain would be less.

22  Q.   On Monday night, were you able to -- did you attempt to

23  value the mortgage-backed securities of Lehman?

24  A.   Yes.  We put our first estimates on it, yes.

25  Q.   Do you remember how your values that night compared to

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 38

1    Lehman's marks on that group of assets?

2    A.   Yeah.  I remember that I estimated -- I think there were

3    about -- I've got the balance sheet here, haven't I?  It was

4    about six and a half billion dollars of securities in that

5    category according to Lehman.  And I --

6         MR. SCHILLER:  For the Court and the witness, could we

7    put up 191C?  Point that out to the Court, please.

8    A.   Right.  So row -- 1, 2, 3, 4, 5, 6 --

9    Q.   Toward the bottom.

10   A.   The bottom -- second from the bottom, "Total Mortgage-

11   Backed Securities".  As I said, this wouldn't just be mortgage-

12   backed securities.  This would be other instruments as well.

13   Q.   You had uncertainty as to what was in that?

14   A.   I had uncertainty.  But I kind of knew what they had from

15   looking at some of it the week before.  And I estimated that

16   that would be worth, you know, at best, about half of what

17   Lehman had it marked at on the Friday evening.

18   Q.   On Monday, you thought that that value was worth about

19   half --

20   A.   Yeah.  So --

21   Q.   -- of what was listed there.

22   A.   -- about 3.25 billion dollars less.

23   Q.   Did you discuss that Monday with Lehman directly?

24   A.   I ended up doing so.  Well, the first thing I did was when

25   I was going through this list and getting some guidance back

Page 39

```
 1   from my team at Barclays was to advise my negotiators, my
 2   management of what I thought was a reasonable estimate of what
 3   could be realized on this.  And I provided that to my
 4   management.  Later on in the evening, and I can't remember what
 5   the time was, my management came back to me and said, well,
 6   they're a little incredulous at what your view of the mortgage-
 7   backed securities are.  So they --
 8   Q.   Incredulous that they were worth fifty percent of the
 9   marks?
10   A.   They're worth fifty percent.  They didn't say anything
11   about the overall amount that I view, so how -- you know, how I
12   valued the other things.  But they did comment on that.  And I
13   was sent to talk to Bart McDade which I did.  I know there were
14   other people present as well but I really can't remember.  It
15   was literally right in the center of the floor, 31st floor or
16   whatever it was, at Lehman.  And he said why do you think
17   they're so low.  And I can't remember the exact answers that I
18   gave but it was certainly along the lines of the answers that
19   I've given to you earlier.  And I said, no, I think I'm right.
20   That's -- look at the following.  Look at this; look at that;
21   look at the following issues.  I think this is the right -- I
22   own similar securities to some of these.  And I know I own them
23   at a lot less than you've got them marked.
24   Q.   Barclays' securities, you're referring to?
25   A.   Yes.  And so, they went away.  And I think later on we
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 40

1    were told that we wouldn't be taking all of the mortgage-backed

2    securities.

3    Q.   If you were right about the value of that category, what

4    was Mr. McDade's loss that night?

5    A.   On that -- if I was right --

6    Q.   Yes.

7    A.   -- then that would be 3.22 billion dollars or so.

8    Q.   Less than what they had marked it at.  And you're talking

9    about your ability to sell that in the market over time.

10   A.   Yes.

11   Q.   Now, you said you provided the Barclays negotiators with

12   your team's assessment of the market value of these assets,

13   your ability to sell them to willing buyers over time.  What

14   was their response when you presented them with your valuations

15   that week?  Let's focus on Monday, Tuesday.  Generally.

16   A.   What was my management's response?

17   Q.   Yes, to you.  What was the nature of their discussions

18   with you if you can remember them generally for the Court?

19   A.   They were very -- I mean, they were very anxious.  You

20   know, I thought this was an enormous transaction that the

21   capital that the firm would be putting at risk was very, very

22   significant.  And there were a lot of questions.  There were a

23   lot of other people involved.  They wanted to know, have you

24   talked to so-and-so, have you thought through it, how bad could

25   it be, et cetera.  Those were -- it was really a downside risk

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 41

1    discussion.  You know, how are we going to manage it, what are

2    you going to do, how should we deal with it.  There were a

3    plethora of questions.

4    Q.   Did those discussions concern whether they wanted to go

5    forward with the transaction based in part on your valuations?

6    A.   Well, I know that this would have fed into that decision

7    as to whether or not to proceed with the transaction.  I wasn't

8    directly involved in the negotiations that my management were

9    having.  But clearly, the information that I was providing to

10   them about what was happening to this portfolio are

11   difficulties in getting a clear read on exactly what was still

12   owned, what was owned was worth and how we were going to risk

13   manage this.  You know, immediately -- once we actually knew

14   that we had possession of it, how we would risk manage it.

15   Those were the things that I was highlighting to them

16   Q.   You mentioned earlier to the Court that at the very

17   beginning you weren't concerned about whether they had titled

18   these assets but you became concerned as the week went on.  Did

19   you become aware that Lehman assets were being seized?

20   A.   Well, we knew that the other -- what was interesting was

21   that we knew the other Lehman entities were bankrupt at this

22   point and that -- not all of them but many of them and that the

23   securities that they had on -- that many of their positions

24   were being closed out by counterparties.  And then I remember

25   that one time we saw a security that we thought we owned being

Page 42

1   disposed in a liquidation.  So there was -- this wasn't the

2   process that we were using.  But in many closeouts there'll be

3   an auction where the lender just asks multiple counterparties

4   to bid on a portfolio securities at a particular hour.  They

5   provide their bids and they sell them to the highest bid.

6   That's the -- I think that's fairly well understood.  Well,

7   what was funny was we saw some securities on that list -- I

8   can't remember what they were now -- but that we thought we

9   owned.  And then it started to dawn on us that what had

10  happened was that LBI had financed positions within its own

11  group so that it had lent them to LBIE, for example.  And LBIE

12  financed LBI.  And then LBIE financed them, for example, with

13  the ECB.  And then the ECB was closing out LBIE.

14  Q.   ECB is the European Central Bank?

15  A.   That's correct.  So then we realized well, actually, we

16  may not -- do we actually have all of this collateral or is

17  it -- is that whole process of financing way more complicated

18  than we thought, let alone the fact that clients of LBI are

19  themselves willingly closing out transactions directly with

20  LBI.  So the LBI balance sheet was shrinking.  Actually, they

21  may not even have some of this stuff.

22  Q.   Did that create uncertainty for Barclays?

23  A.   It created a lot of uncertainty.  And I don't really

24  remember exactly what happened during that bit because then it

25  was quickly superseded -- at least my involvement was quickly

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 43 of 232

Page 43

1    superseded by can you look at the Fed repo facilities.

2    Q.   Did those seizures increase risk for Barclays?

3    A.   Yes, because in addition then to the uncertainty about

4    what the line items were, the uncertainty about the markets

5    within which they would be traded, there's also now uncertainty

6    as to whether or not we would have the collateral.

7    Q.   I understood your reference to assets that you acquired to

8    be referenced to the APA.  So let me ask you about the asset

9    purchase agreement which was given to His Honor Wednesday of

10   that week, on the 17th.  Are you familiar generally with the

11   definition of the "purchased assets" in the APA?

12   A.   Yes.  I've seen it at various times, yes.

13   Q.   If you turn to tab 7, page 6, you'll see the definition of

14   "purchased assets".  And I direct your attention to

15   subparagraph (d) there.  The definition of long positions,

16   having a book value of approximately seventy billion.  Do you

17   see that?

18   A.   Yes.

19   Q.   Does that include mortgages?

20   A.   No.  I think that's included in (e).

21   Q.   You see the reference to the collateralized short term

22   agreements?

23   A.   Yes, I do.

24   Q.   Do you recall what those were?

25   A.   I don't really remember.  We didn't do much work on them.

Page 44

1    I remember they were separate line items.

2         MR. SCHILLER:  Let me ask you to put up the Berkenfeld

3    schedule, 106.

4    Q.   This is a document I don't think you saw at the time.  You

5    can tell the Court whether you did or didn't.  Did you see this

6    on September 15th or 16th?

7    A.   No, not at the time.

8    Q.   Let me direct your attention to the collateralized ST

9    agreements there as an asset with a value of ten billion.  Do

10   you see that?

11   A.   Yes, I do.

12   Q.   Does that refresh your recollection of what that item was?

13   A.   Yeah.  I just -- I remember it was a separate line item

14   from the ones that we were looking at.  And I can't remember

15   exactly what it was.  I think it was short duration instruments

16   of some sort.

17   Q.   Short duration instruments of some sort.  Did you try to

18   value these?  Were these important to your work?

19   A.   No.  We didn't look at those.

20   Q.   Okay.  So then that item and those ten billion were not

21   part of your valuation efforts?

22   A.   No.

23   Q.   When you say short term loans, can you illuminate that a

24   little bit?  What does that mean -- for the Court?

25   A.   No --

Page 45

1    Q.   Lehman loans, you mean?

2    A.   No.  I think they were -- I can't remember of what they

3    were.  I thought they were like bits of -- there's -- 'cause

4    it's on the other side of the balance sheet as well.  I think

5    it was -- I can't remember what it was made up of, to be honest

6    with you.  Commercial --

7    Q.   Okay.

8         MR. SCHILLER:  Let me ask you to put up 191C which

9    we've looked at before.

10   Q.   That's the balance sheet of September 12th that they

11   provided you.

12   A.   Right.

13   Q.   Does that include a value for mortgages?

14   A.   Yes, it does.

15   Q.   And that was a category that was not included in the long

16   positions, I think you just said, right?

17   A.   Correct.

18   Q.   So if you exclude the mortgages from this September 12th

19   balance sheet that was given to you by Lehman, does it show

20   that the total value of the assets on that balance sheet --

21   could you give me that number, please?  What is the total

22   value?

23   A.   So, what, the sixty-five billion minus the six and a half?

24   Q.   Yeah.

25   A.   So it would be about 58.5.

Page 46

1   Q.   And if you add to that the ten billion of the

2   collateralized short term agreements, does that show a value

3   greater or less than seventy billion?

4   A.   That leaves 58.5 plus ten is 68.5 which is less than

5   seventy.

6   Q.   So did the balance sheet of September 12th marks that was

7   given to you by Lehman in the negotiations show you that the

8   Lehman marks on the long positions were greater than seventy

9   billion dollars?

10  A.   I don't think so.  It seems to be about -- in keeping --

11  Q.   At any time, did you come to learn, in writing or in any

12  communication, that the Lehman marks on the September 12th

13  balance sheet listed in the APA's definition of long positions

14  were greater than seventy billion dollars?

15  A.   I really don't think so 'cause this was about the largest

16  number.  The sixty-five billion dollar number which included

17  the mortgages which would only be 58.5 was about the largest

18  number we saw 'cause during the week the balance sheet was

19  shrinking not growing.

20  Q.   Did you learn through a writing or any communication that

21  the Lehman marks as of September 15th or September 16th on the

22  assets listed in the APA's definition of long positions were

23  greater than seventy billion?

24  A.   I certainly didn't see the number.  But I would be very

25  surprised if it was.

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 47 of 232

Page 47

1    Q.    Now you mentioned that your valuation on the APA was

2    superseded by what happened later in the week.

3    A.    Right.

4    Q.    Would you tell Judge Peck what you're referring to?

5    A.    Well, so, on the Monday night, we were looking at this

6    balance sheet in an attempt to -- the previous week, we'd been

7    looking at the subset of the overall Lehman overall asset pool.

8    Monday we were looking at the LBI assets on the accounting

9    balance sheet.  Then we started the process of trying to

10   understand how many of the positions had been closed out or

11   what assets they may actually have.  But then on the

12   Wednesday -- and I don't think I was particularly told when I

13   started looking at the thing on the Wednesday that what we had

14   been looking at on Monday was now redundant.  But I quickly

15   learned it was.  I was asked to look at the repo collateral

16   that was being held at the Fed.  And would we -- and there, the

17   first question I was asked -- was told was that Barclays was

18   being asked to step into the Fed's shoes to lend against this

19   asset pool at approximately forty-five billion dollars.  And

20   did I look at the collateral.

21   Q.    By that time, Wednesday, September 17th, when the Fed

22   question came up, had it become clear to Barclays that Lehman

23   was not able to deliver all the trading assets in the APA?

24   A.    You know, I never really thought about it in those terms

25   because it's -- you know, the category -- as I look at it

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 48 of 232

Page 48

1    today, there are -- indeed, there are categories of assets.  So

2    some of those categories would still have existed.  But I doubt

3    there was seventy billion dollars at that point assuming some

4    of the liabilities -- as a practical matter, assuming some of

5    the liabilities were diminishing as well.  So I --

6    Q.   Let me ask you -- I'm sorry.  Let me ask you to turn to

7    tab 10 in your book.  This is an e-mail from Patrick Clackson

8    who's testified before His Honor to Rich Ricci who's testified

9    in this trial transmitting an e-mail from John Mahon.  Would

10   you identify Mr. Mahon for the Court, please?

11   A.   Yeah.  John ran a counterparty risk unit for the global

12   head of fixed income.

13   Q.   And you're copied on this.

14   A.   Right.

15   Q.   And this is dated September 17th.  You see that?

16   A.   Yes.

17   Q.   And it says in the third paragraph, "The assets we saw and

18   said we were going to buy may have been lent out.  And

19   liabilities we saw have been covered by borrowing those

20   securities."  Do you see that?

21   A.   Yeah.

22   Q.   So there was here identified for you and others a

23   potential problem that the assets in the APA may not be

24   available for delivery.

25   A.   Right.

Page 49

```
 1    Q.   And they then -- he then details some of the reasons for

 2    this.  I don't want to take the Court's time up with reading

 3    each of those.  But in the last highlighted paragraph, it

 4    says -- well, I would ask you to highlight it -- "This will

 5    make our ability to cleanly buy the assets and liabilities very

 6    difficult."

 7    A.   Right.

 8    Q.   Now do you recall whether Barclays was told by the end of

 9    the week that Lehman was unable to deliver the assets it had

10    promised to deliver under the APA?

11    A.   I don't know.

12    Q.   Did the New York Fed ask Barclays to advance forty-five

13    billion dollars in cash to replace its lending position to

14    Lehman?

15    A.   Yes.  I believe so, yes.

16    Q.   I'm sorry?

17    A.   Yes.

18    Q.   And you were asked, you said, to review the assets that

19    had been pledged to the New York Fed on Wednesday?

20    A.   Yes.

21    Q.   And did you have a list to review?

22    A.   Yes.  I had another list to review.

23    Q.   And how much time did you have to review it?

24    A.   I think about an hour.

25    Q.   Do you recall whether those securities had marks over
```

Page 50

1    forty-nine billion dollars?

2    A.   I remember it being about forty-nine to fifty billion

3    dollars, that's right.

4    Q.   Did you form a view as to whether you could sell the

5    collateral for that amount?

6    A.   In the -- well, in the hour to two hours that we had, the

7    specific question that I was asked was if we lend forty-five

8    billion dollars against this collateral, do you think we've got

9    enough collateral, Stephen.  And after as much humming and

10   hawing as I could get away with, I did say I think we're okay

11   but that it's close because many of the assets that were in

12   that -- we weren't completely blind.  It wasn't -- after all,

13   from the previous week to the beginning of this week to the

14   repo facilities, there was overlap between the asset types,

15   particularly the illiquid ones.  So we didn't have to start

16   from scratch.  Therefore, we already knew that it included some

17   of the assets that earlier in the week I had said that I would

18   value at three billion dollars or so less than Lehman were --

19   were valuing them.  And they would have been in the repo

20   facility or ones like them.

21   Q.   Did you have concerns that you wouldn't be able to cover

22   the forty-five billion dollar loan that afternoon?

23   A.   Well, yeah, that was -- so the two things to say were --

24   that I had to answer was do you think we're okay to lend forty-

25   five billion dollars.  And what sort of risk do we have?  And I

Page 51

1   had to say it is the case that if we're forced to liquidate

2   this collateral then there's going to be -- there would be a

3   substantial shortfall.  If we can do it in a controlled way

4   over a period of time then we should be okay.  But we're

5   dealing with a huge amount of uncertainty.

6   Q.   Did your team work through the CUSIPs in the Fed portfolio

7   list over the next few hours or half a day to come up with a

8   crude or rough estimate?

9   A.   They worked continually through the night over the next

10  two days to attempt to do so, yes.

11  Q.   Did they come up with a rough estimate of what was in that

12  portfolio --

13  A.   Yes.

14  Q.   -- the Fed portfolio?

15  A.   Yes.  I seem to remember so.

16  Q.   Let me ask you to turn to tab 29 in your book, Movants'

17  Exhibit 45.  This is a e-mail to Patrick Clackson from Rich

18  Ricci on the 19th of September transmitting an e-mail from

19  Jasen Yang on which you're copied.

20  A.   Correct.

21  Q.   See that?

22  A.   Yes.

23  Q.   And the attachment is a reference to portfolio size

24  values.

25  A.   Right.

1   Q.   Can you describe that to the Court what Jasen and your

2   team generated here in the hours after it received that list?

3   A.   Yes.  This was -- this is one of many such things that we

4   would have had about the time to attempt to sort of triangulate

5   some kind of value for this portfolio.  You can see that we

6   have further subdivided the categories of securities to be a

7   little bit more granular than were shown on the original

8   balance sheet.  This is a first attempt to being able to then

9   put some estimate of how much of a -- what value we would

10  attribute to each of those categories by reference to how much

11  Lehman column C of the balance sheet --

12  Q.   You're referring back, just for the Court's understanding,

13  to the September 12th balance sheet?

14  A.   Right.  So the Lehman categories are not granular enough

15  really for you to be able to do the -- that's an even cruder

16  version of this.  They've only got five categories.  Now we're

17  up to twenty categories.  Ultimately, we'd end up line item by

18  line item.  You can see therefore that there is some estimates

19  that I worked on with Jasen of what sort of reduction that we

20  would have expected to crystallize or lose if we were to

21  undertake the sort of controlled process that we -- controlled

22  risk management process that we --

23  Q.   You're talking about selling, the controlled process of

24  selling to willing buyers, is that right?

25  A.   Yeah.  As I said, mostly selling, some holding and hoping

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 53 of 232

Page 53

```
 1    they mature.
 2    Q.   Now, this morning assessment, early morning assessment on
 3    the 19th of the September, this was the Fed portfolio.  This
 4    was not what you received in the replacement repo, was it,
 5    ultimately?
 6    A.   Well, it was not -- it was not -- I mean, although it -- I
 7    think it's dat -- what date is it dated?  The 19th.  It was not
 8    what we received.  I mean, some of it was but not all of it
 9    was.
10    Q.   And was this a subjective assessment in terms of its
11    timing and how it was put together?
12    A.   Well, as I described earlier, it -- we were trying to be
13    as objective as possible but it necessarily had some
14    subjectivity.
15    Q.   Was this based on a fire sale or an orderly sale?
16    A.   It was based on -- it was not a fire sale.  It was based
17    on as orderly runoff as one can contemplate in the months
18    following the bankruptcy.  I mean, it wasn't very orderly --
19    Q.   And by runoff, are you talking about selling securities --
20    A.   To reduce.
21    Q.   -- in that kind of market?
22    A.   Yeah, to reduce.  I mean, ultimately, it was not -- it was
23    not the objective of the firm to be the long term holder of
24    50.6 billion dollars of assets as it wasn't Lehman's.  And
25    Lehman had another half of the trade with this, right?  It had
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 54

1    short positions. These were inventory.  And this is one half.

2    So ultimately, this portfolio would have to be run off.

3    Q.    By run off, you mean sold over time?

4    A.    Sold over time, sorry, yes.

5    Q.    In your experience with Barclays, was it in Barclays'

6    economic interest to do this repo in the absence of the Lehman

7    sale?

8    A.    I would have been stunned if they had.

9    Q.    I'm sorry?

10   A.    I would have been stunned if Barclays had done that.

11   Q.    Why?

12   A.    I don't think there was ec -- there was no economic

13   benefit in doing so.  If it was just the repo -- I can't

14   remember what the rate was that we would have been earning on

15   the repo.  But I doubt it was anywhere near enough to

16   compensate us for the risk that we would have been taking.  I

17   mean, after all, under normal circumstances, you're facing a

18   solvent counterparty that is able to continually post

19   additional margin to support its liabilities.  This effectively

20   would have been a limited recourse term loan.  So it would have

21   been just impractical to have done it.  Its capital

22   consumption, the risk reward -- I can't imagine that it would

23   have been done in the absence of a strategic acquisition.  But

24   I wasn't actually part of those discussions.  But I certainly

25   wouldn't have recommended that.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 55

1    Q.   Did you have a view whether there was significant risk to

2    Barclays from the repo collateral that it received?

3    A.   Well, the assessment that we were trying to make -- I

4    mean, we were sort of navigating a narrow channel between not

5    taking too much risk and risking our own institution and trying

6    to get a transaction done.  So I think it was a risky

7    investment but my advice to the firm was I think that we have

8    enough collateral to support the loan and that we can risk

9    manage the position but it is tight.

10   Q.   Were there then operational problems in the delivery of

11   the collateral after the repo had been agreed?

12   A.   Yeah.  I mean, again, this was a period of learning for

13   all.  I don't think we had quite realized that during the night

14   as the securities were passed from the Fed box to Barclays' box

15   that they would -- there was a potential for them to actually

16   be delivered to somebody else and thereby the collateral would

17   -- the collateral that was available to support this loan that

18   we were going to make would be cannibalized.

19   Q.   Was it?  Was what you received on Thursday, the 18th of

20   September, different than what you had looked at Wednesday

21   night that was on that list we just looked at?  Did you receive

22   collateral that was not in the Fed collateral?

23   A.   Well, we received about thirty billion dollars or so of

24   the -- I'm using extremely loose rough numbers from

25   recollection.  But about thirty billion dollars of the

Page 56

1    collateral that we had looked at on the Wednesday and the

2    Thursday.  And as I think everybody knows we received some cash

3    in lieu of a shortfall in the cumulative amount of securities.

4    And we received something like about ten billion dollars of

5    securities which we hadn't seen before.

6    Q.    The shortfall you're referring to is a seven billion

7    dollar shortfall?

8    A.    The seven billion dollars that was collateralized --

9    Q.    What is the ten billion dollar securities?  Could you

10   speak up and explain this to Judge Peck?

11   A.    Sure.  So on the -- the way the process works is that we

12   were supposed to receive -- operations receives a list of the

13   securities that it's expecting to receive in advance of the

14   repo.  And it uses that as a list of what it's expecting to

15   arrive.  And it goes down and it electronically puts a tick by

16   each of them and says I've got that, now I'll lend some money.

17   And I think that at the time we were planning on lending the

18   money into the evening in units of something like five or seven

19   billion dollars.  And so they'd check that they had collateral

20   and then they'd lend some money.  But what became evident at

21   some point, I know they kept the clearing system open late into

22   the night to permit this to occur.  But at some point it did

23   close.

24        What became clear was that some of the securities that

25   were on the list that Barclays was looking at expecting to

```
 1    receive could not be delivered.  But -- so then there was a

 2    decision to be made of well, do we proceed.  Now I wasn't part

 3    of all of that discussion but I do know what the outcome was of

 4    do we proceed or not.  And the decision was to proceed.  And

 5    therefore the loan had to be collateralized with something.  So

 6    about thirty billion dollars or so of the fifty billion dollars

 7    of securities that we had seen the day prior, that were on the

 8    delivery schedule, were delivered.  Then about ten billion

 9    dollars or so of securities, ten to thirteen billion dollars of

10    securities that we hadn't seen before were delivered as

11    collateral.  And seven billion dollars of cash.  And then that

12    collateralized the forty-five billion dollar loan.

13    Q.    When you said thirty billion of the fifty billion, what do

14    you mean by the fifty billion?

15    A.    Sorry.  I'm approximating the forty-nine point so billion

16    that we had analyzed on the day prior.

17    Q.    And I think you told the Court your analysis was it was

18    less than that--

19    A.    Yes.  I'm using --

20    Q.    -- towards what you realized --

21    A.    I'm using the custodial marks for that purpose.

22    Q.    I want to return to your point that there was ten billion

23    of securities that was received in this fashion that you've

24    described --

25    A.    Right.
```

1    Q.    -- that wasn't what you had studied Wednesday --

2    A.    Correct.

3    Q.    -- and talked to management about.  What was different

4    about it and what was different about its value if anything?

5    A.    Well, the biggest problem, of course, the first -- on the

6    following morning, the biggest problem was that now we have --

7    the firm had lent money.  So therefore it wasn't just a

8    hypothetical discussion.  It was for we are now at risk.  In

9    moving markets, we have thirty billion dollars of stuff that we

10   thought that we were going to get that we were planning to risk

11   manage in certain ways.  And we have ten to fifteen billion

12   dollars -- ten to thirteen billion dollars of stuff that we

13   haven't seen before.  And in the morning, we didn't even know

14   what it was.  So we had no idea.  It could have been just --

15   theoretically, I suppose, it could have been worthless.  I

16   mean, it was an incredible thing to wake up and find.

17   Q.    Well, let me ask you this.  Do you recall whether of the

18   ten billion there were corporate equities in there that you had

19   not seen before?

20   A.    Yeah.  There was -- well, I remember we were anticipating

21   taking delivery of something like a half a billion to one

22   billion dollars of corporate equities in the portfolio that we

23   looked at the day before.

24   Q.    The Fed portfolio.

25   A.    In the Fed portfolio.  But when we actually looked the

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 59 of 232

Page 59

1    following day, we had something like eight billion dollars of

2    corporate equities.

3    Q.    Did that change the risk to Barclays?

4    A.    Yeah.  Well, the extra stuff that we had been delivered

5    was a mixture of illiquid securities, of the mortgage-backed

6    type securities, some other stuff, and then this very

7    substantial equities portfolio.  Now we hadn't really

8    contemplated the idea that we would be -- I mean, eight billion

9    dollars of equities, individual equities, not index, is an

10   enormous number of equities.

11   Q.    Why was that a problem that day in that market if it was?

12   A.    Well, it was a very significant challenge because we had

13   to then contemplate -- we couldn't actually -- at that point,

14   we couldn't liquidate the repo and access the individual line

15   items.  We didn't even know what all of the individual line

16   items were or how to hedge them.  So we now had a very

17   significant long equity position in a market that was

18   experiencing a very significant bankruptcy and total

19   dislocation of capital markets.  So it was perfectly feasible

20   that, as we were experiencing, equity markets could fall ten,

21   twenty plus percent.  And that would mean that we'd lose one to

22   two billion dollars in a heartbeat.  And when we realized that,

23   that was pretty significant.  And so we -- but from my point of

24   view, I didn't really know exactly what the terms of the

25   discussion that were being had by the negotiators was so do I

Page 60

1    hedge or don't I hedge.  Do I get this collateral or am I

2    giving this collateral back?  So you had the additional

3    uncertainty of do I have this risk or not even once I'd found

4    out what I got which was a remarkable thing.

5    Q.   After you'd found what you got, apart from this equities

6    piece that you described, did you attempt to assess its fair

7    market value, what you could realize for it on sale?

8    A.   Yes.  We just did exactly the same process again that we'd

9    done in the days leading up to that.

10   Q.   And was there a significant amount of it which was quite

11   difficult to value because of its illiquidity?

12   A.   Well, as I say, it was -- I can't remember the exact

13   numbers, to be honest with you, of the ten billion -- the ten

14   to thirteen billion dollars of custodial marks, how much that

15   was made up of illiquid assets.  It was that there was a --

16   there was some more.  So it was the same -- it was exactly the

17   same processes as previously.

18   Q.   And was it subjective?

19   A.   Yes, it would have been -- well, again, as objective as we

20   could be but it had to be that we were now looking at some

21   things that we had to make some assumptions about.

22   Q.   Did you have to put prices on securities for which there

23   were no bids in the market?

24   A.   Yeah.  There were securities -- yeah.  I mean, there were

25   securities in that portfolio, one in particular, that was a

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 61 of 232

Page 61

1    single billion dollar -- 500 million dollar to one billion

2    dollar -- you know, one billion dollar.  I use one billion

3    dollar.  That was its face amount.  One billion dollar security

4    that had never traded, that was not intended to trade.  There

5    were several very substantial positions that were really not

6    intended to trade in any of the forms that they were.  There

7    were significant portfolio of, I recall, auctioned rates

8    securities, failed auctioned rate securities.  These are

9    securities that should remarket themselves on a continual

10   basis.  But the -- they were not capable of being remarketed.

11   So now they were being valued as effectively distressed long

12   dated securities.  So there really was no market for something

13   like that.  It was a very significant U.S. municipality bond

14   portfolio.  That was -- market was very distressed and closed.

15   Q.   Let me ask you to turn to tab 14 in your book.

16        MR. SCHILLER:  BCI Exhibit 290, Your Honor.

17   Q.   This is again -- this is dated Monday, September 22nd, the

18   day of closing.

19        THE COURT:  Mr. Schiller, let me just ask you this.

20        MR. SCHILLER:  Yes.

21        THE COURT:  I don't know how much longer you're going

22   to be on direct and I'm wondering at what point it might be

23   convenient for us to take a break.  If you think you're going

24   to be just a brief additional period, I'll take a break before

25   cross.

Page 62

```
 1              MR. SCHILLER:  I think we should take a brief break

 2     now.  Probably at about ten or fifteen minutes.

 3              THE COURT:  All right.  Let's take a break until

 4     11:20.

 5              MR. SCHILLER:  Thank you.

 6              THE COURT:  Okay.

 7         (Recess from 11:08 a.m. until 11:24 a.m.)

 8              THE COURT:  Be seated, please.

 9              MR. SCHILLER:  Thank you, Your Honor.  May I ask the

10     witness and Your Honor to turn to tab 13?  I went to the wrong

11     tab.  I'm glad we stopped when we did.

12     RESUME DIRECT EXAMINATION

13     BY MR. SCHILLER:

14     Q.   I was asking you at the break about what you actually

15     received in the repo and the valuation process.  Do you recall

16     that generally?

17     A.   Yes.

18     Q.   This e-mail from Mr. Tonucci -- would you identify him for

19     the Court, please, if you recall his title?

20     A.   Do you know, I can't remember -- he was in the -- he was

21     head of one of the finance departments at Lehman.

22     Q.   I can't hear you.

23     A.   Sorry, can you hear me now?  He was head of one of the

24     finance departments at Lehman; I can't remember his exact

25     title.
```

Page 63

1    Q.    Okay.  So Lehman is sending you early on Friday, the day

2    of the sale hearing, "Collateral and Inventory Held by LBI", do

3    you see that subject?

4    A.    Yes.

5    Q.    And it says, "Stephen" -- in the first paragraph -- "as we

6    discussed, the attached files show collateral that LBI owns and

7    that has been reversed in.  This is collateral that would be

8    transferred to Barclays for financing and would form the

9    majority of the assets that would be purchased."  So as of 1 in

10   the morning on Friday you did not know what you were actually

11   receiving in the replacement repo, is that right?

12   A.    That's correct.

13   Q.    Now, let me ask you to turn to tab 12, the preceding tab,

14   please.  And that is Exhibit -- BCI Exhibit 895.  And this is

15   another e-mail from Mr. Tonucci later in the day at 1 o'clock

16   in the afternoon the day of the sale hearing.  And he's

17   transmitting now to Jasen Yang "BarCap Collateral", meaning the

18   collateral in the repo replacement, is that right?

19   A.    Yes.

20   Q.    And you see the -- if you turn to the second page there's

21   a forty-nine billion dollar number there?

22   A.    Right.

23   Q.    If you turn back, he says to you, "This is using our

24   prices", referring to Lehman marks, is that right?

25   A.    Right.

Page 64

1    Q.   "Shows less than BoNY file so we may be conservative."

2    Now BoNY was a custodian, right?

3    A.   Right.

4    Q.   And did they mark the Lehman securities as they came in to

5    the Barclays accounts for the replacement repo?

6    A.   Yes.

7    Q.   And what Lehman was telling you was those BoNY marks were

8    higher than theirs?

9    A.   Yes.

10   Q.   Now, your effort, then, to value this repo, was it a

11   difficult process that day?

12   A.   Yes, because in many respects it was the same process as

13   the processes that we had been before.  So we just started

14   again --

15   Q.   Except that you'd advanced forty-five billion dollars at

16   the time.

17   A.   Except that -- as I say, in many respects it was the same

18   process because we just started again refining the analysis of

19   the securities that we'd already started work on and started

20   work on the securities that we'd not seen before.  The

21   additional challenge was that now we were really on risk, and

22   so now all of a sudden the risk assessment that we'd made the

23   day prior was no longer valid.  And that was -- that was an

24   additional concern because that, in many respects, was -- if

25   you think, you know, we're making an expectation of what we

Page 65

1    think is going to be the realized state of the world of how

2    much we think we're going to be able to monetize from this

3    portfolio, but around that we have to give some confidence to

4    management that how likely is that or how much downside risk is

5    there.  Well, in the absence of knowing the collateral, neither

6    can I form the expectation nor can I give a measure of

7    confidence.

8    Q.    Did you have any certainty Friday evening, September 19th,

9    whether the repo collateral was worth enough to cover the

10   forty-five billion dollar loan?

11   A.    No.  No, I think we'd started to make -- you know, we

12   were -- you know, senior management definitely wanted first

13   count estimates from as early on in the day and throughout the

14   course of the day.  There was no shortage of time till the

15   phone rang to say: Well, what's it worth, Stephen, and how much

16   risk do we have?  But --

17   Q.    Early in the day when that --

18   A.    During the --

19   Q.    -- process started --

20   A.    Just during the course of the day and into the evening,

21   but it was -- you know, it was, you know, never really the case

22   that you could say you knew with certainty that there was

23   enough until many -- you know, even many months later I'm not

24   sure that that was the case.

25   Q.    During the day of September 19th, did you discuss with

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 66 of 232

Page 66

1   negotiators such as Rich Ricci or Patrick Clackson or Archie

2   Cox concerns that this collateral that was coming in may not be

3   worth forty-five billion dollars?

4   Q.   Yes, because early on in the day we had -- I can't

5   remember to which of those individuals, but certainly there

6   were ongoing conversations with each of them over the course of

7   this period.  And I would have said in the morning, you know,

8   we don't even know what we've got yet, guys, so I can't tell

9   you that you're collateralized.  And during the course of the

10  day we'd have been able to start to load up the lists of

11  securities, itemize them and do the process and start to say,

12  well, we have the following.  But we knew that there were

13  problems with the Fed marks and there was no real selection

14  process going on, so we didn't know what collateral we'd taken

15  delivery of.  So it was a very challenging thing.

16  Q.   When you say "the Fed marks", are you referring to the

17  custodial --

18  A.   Sorry, the custodial --

19  Q.   -- marks by BoNY, just so the Court understands?

20  A.   Yes, yes.

21  Q.   And were there some JPMorgan custodial marks as well?

22  A.   Yes, yes.

23  Q.   Did you have concerns on Friday that you shared with your

24  negotiators that the BoNY marks were unrealistic?

25  A.   Well, the BoNY marks -- I don't remember particularly

Page 67

1    whether we focused on the BoNY marks that day or the JP marks

2    the day before, because after all JP was the custodian for the

3    Fed facility the day before so they'd been providing the daily

4    marks, and then that responsibility was switching to BoNY as

5    our custodian.  But what we would have been saying is -- so it

6    had already come to light in the days prior that there were

7    many instruments which were extremely difficult to value even

8    for a professional who was -- or a team of people who were

9    trading the securities, let alone a custodian.  I mean, the

10   custodian has the responsibility for attempting to do it but it

11   would have been a challenge to them.  Hence, why -- you know,

12   but they are, after all, providing marks to a lender who is

13   then haircutting that mark significantly to work out how much

14   they're willing to lend at.  So they had an additional buffer.

15   Q.   Did you rely on the BoNY marks in assessing the values?

16   A.   Rely is too strong a word.  I had to use them because --

17   in some way in the analysis because at a certain point in time

18   it was the only information that we had available to us.  So

19   for some of the very preliminary estimates at least we'd be

20   able to say, well, we have forty-nine billion dollars or fifty

21   billion dollars of collateral according to the custodial marks,

22   though that was all we would have had and we knew that it was

23   very likely that our assessment of what was an appropriate

24   realizable value was likely to be significantly less than the

25   BoNY marks.

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 68 of 232

Page 68

1    Q.    Did you received equity-linked notes issued by Lehman that

2    were marked by BoNY?

3    A.    Yes.

4    Q.    Were those marks reliable?

5    A.    No, they -- I seem to remember they were 200 -- they

6    were -- it was an interes -- a classic example of something

7    that was listed as -- there was a CUSIP, there was a -- we

8    didn't -- I don't even know whether we realized this on the

9    Friday, actually, it may have been sometime later that we had

10   the CUSIP.  And then next to the CUSIP it would say what the

11   instrument was.  And it was say, for example, IBM Equity, but

12   it was actually a warrant and I think it said warrant.  But

13   what wasn't clear to us, of course, was that the counterparty

14   to the warrant actually was Lehman.  So really there was no --

15   they were facing a bankrupt entity so there really was no

16   value.  And I seem to remember that we had attributed about 270

17   million dollars of value to those, but that is just from

18   recollection.

19   Q.    Were there CDOs among the assets you receive?

20   A.    Yeah.  There were a number of CDOs and CLOs, yes.  And

21   those are challenging instruments (a) because there were very

22   few participants in the CDO market; two, they're a very levered

23   instrument, meaning that they have struc -- they are -- they

24   have structural leverage embedded in the security.  You know,

25   there's collateral and then there are loans on the collateral

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 69 of 232

Page 69

1    and loans on the loans, so it's a very levered instrument.  And

2    then, three, there are derivative counterparties within those

3    securities, including Lehman.  So exactly what the behavior of

4    the security would be would be uncertain.  And we had some

5    familiarity with that because in the portfolio that we'd also

6    been managing for Barclays there were CDOs as well, so we knew

7    some of the issues.

8    Q.   By closing on Monday, did you have a high degree of

9    confidence in the value of the replacement repo assets?

10   A.   No, I had a better -- a better confidence than I had on

11   Friday morning and Saturday morning and each day, you know, we

12   chipped away at it and we built confidence of what we

13   thought -- what we thought we'd ended up owning and what it was

14   and how we were going to manage it.  After all, there's an

15   element that they're not totally -- it's not totally possible

16   to separate the valuation from the risk management decisions

17   because a very illiquid asset, for example, can have absolutely

18   no hedging or immediate actions that can be taken on it, so

19   really the only outlet is either to hold it to maturity or to

20   seek to dispose of it.

21   Q.   Now, were these subjective judgments you were making on

22   Friday?

23   A.   Yes, yeah.

24   Q.   And would you tell the Court about the back and forth?  I

25   believe you said a few minutes ago that your management was

Page 70

1    calling you through the day asking you about this process of

2    trying to determine value.

3    A.   I don't remember the specifics of it because, in many

4    respects, that entire period was -- you know, from the

5    beginning of that week into the next week was one long day.  So

6    I don't remember the specific conversations during the course

7    of the day but I know that, you know, my early assertion would

8    have been that we've taken delivery of assets, we don't know

9    what all of them are, and then during the course of the day

10   we'd have started to refine that.

11   Q.   What I was referring to was your testimony to His Honor

12   that people were calling you and saying Stephen, what do you

13   got?

14   A.   Yeah.

15   Q.   How does it look?

16   A.   Yeah.

17   Q.   Words to that effect.

18   A.   Yeah.

19   Q.   Are you -- who were those calls coming from, if you

20   remember?  Were they the 19th, the day of the sale hearing?

21   A.   That's the 19th -- that's the Friday, right?

22   Q.   Yes, Friday.

23   A.   Yeah.  That would have been that day and it would have

24   come from -- I mean, the people that I definitely would have

25   spoken to that day would have been Mike Keegan, Patrick

Page 71

1    Clackson, and I can't remember whether I spoke to Rich Ricci or

2    Archie on those days, but those were the people that would have

3    been calling me and saying what have you got?  And there may --

4    well, calling or e-mails, there may be traffic as well.

5    Q.   Let me ask you one more question on this about valuing

6    what you've got.

7    A.   Um-hmm.

8    Q.   Did you receive large positions in certain securities?

9    A.   Yes, we received some very significant positions, and I

10   can't remember all of the ones that were -- I think this one

11   was in the repo collateral not in the clearing box.  But there

12   was -- well there were several.  There was the very significant

13   Pine CLO which had a face -- I think we estimated market value

14   at about 500 million dollars face value of about -- face

15   meaning its contractual liability of about a billion dollars.

16   That was a single, private label security really designed for

17   financing purposes for Lehman so that had never been traded.

18   That was a good example of a complete private label liquid --

19   illiquid security.  At the other extreme we owned common stock

20   which was traded on an exchange for a company called Apco which

21   is an Argentinean petroleum company.  And I think we owned all

22   of the ten percent of the float of that security that was not

23   owned by a single other party.  So the amount of that security

24   that was going to trade each day was thousands of dollars --

25   tens of thousands of dollars, and we owned fifty million

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 72 of 232

Page 72

1   dollars.  So that sort of highlights something that you could

2   type it into Bloomberg and you could get up a mark and you

3   could see, oh, I own Apco, but I didn't really do much for you.

4   And selling S&P futures against it wasn't going to hedge it.

5   Q.   When you describe a security in which you own a great many

6   positions or shares, whatever the appropriate word is, have you

7   heard that referred to as a block or bulk position in a

8   security?

9   A.   I've heard -- I've certainly heard of the word block being

10  used over time, but I don't know --

11  Q.   How do you value a block position?  How did you value a

12  block position in your repo assessment, or even earlier in the

13  week, because I would like you to explain to the Court how that

14  figured into your valuation of different securities.

15  A.   Right.  I mean, and this again was an example of something

16  that changed over the course of the coming months not weeks.

17  We were still liquidating that equity portfolio in January,

18  maybe even February of 2009.  It sort of shows how long it

19  takes to sensibly dispose of a position like that.  After all,

20  we weren't, you know, intending to hold onto the positions

21  permanently.  So the -- what we had done, first of all, at a

22  very high level, was attempt to say given the number of -- I do

23  this with my traders that work for me today when they're

24  trading our own book.  We have exactly the same approach which

25  is, you know, how many day's volume, how long is it going to

Page 73

1    take you to liquidate this position, because that's an

2    assessment of the number of willing buyers, if you want to call

3    it that, or the liquidity of the instrument.

4    Q.   And when you say "liquidate", you mean sell?

5    A.   Sell, sorry, sell, you know, into a market.  And in many

6    respects you know that every time you sell something,

7    particularly in a falling market but not just in a falling

8    market, particularly in a falling market, every time you sell

9    you've eliminated the best bid.  So the next time you sell

10   you're going to a lower bid and the next time a lower bid and

11   the next time a lower bid.  So almost by construction, if you

12   dispose of something into a market where there aren't lots of

13   new participants coming into the market to replace the bids

14   that you hit the price will decline.  And we were attempting to

15   reflect that in the price that we were willing to pay.  And you

16   know, that was more on the liquid side.  On the illiquid the

17   same holds but it's an order of magnitude more complex because

18   almost nothing ever trades at the instrument you're on.

19   Q.   So this was a process by which you were valuing the assets

20   to determine a price at which you would sell them over this

21   process?

22   A.   Yes, I mean, effectively what I was attempting to do was

23   to work out what I thought over a period of time, using the

24   techniques that we'd used in other similar situations, how much

25   I could realize through the sale or restructuring or just

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 74 of 232

Page 74

1   waiting for the cash --

2   Q.   Okay.

3   A.   -- certainly with sale, and therefore how much would that

4   be worth today.

5   Q.   You use the words "price willing to pay".  You didn't pay

6   a price per asset, your consideration for this transaction was

7   not price per asset, was it?

8   A.   It wasn't price per asset, no.  I mean, I'm just saying

9   the logic that I had followed in providing my negotiators an

10  estimate of the value that we ought to attribute to the various

11  portfolios that we had analyzed over time and the risk

12  associated with them.

13  Q.   Let me turn to the subject of exchange-traded derivatives

14  briefly.  Did you try, Mr. King, with your team to value

15  Lehman's exchange-traded derivative positions the week of

16  September 15th?

17  A.   Value -- value's probably not necessarily the right word.

18  What we were trying to do was to assess -- the first thing that

19  we realized when we thought about the exchange-traded

20  derivatives position, which we hadn't really -- my team hadn't

21  really thought about much and through the course of the week

22  was that we don't know what the risk is.  We know we have this

23  line item that says "exchange-traded derivatives" but what is

24  that.  I mean, these are --

25  Q.   You didn't know the positions themselves.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 75

A.    We didn't know the positions themselves.  We didn't know

whether we were long or whether we were short.  Because after

all when -- it's a bit like the reason why the long asset

position exists, you know, it wasn't just a long asset

position, there was a liability position as well; we were just

taking the asset position.

      The same is kind of true with the exchange-traded

derivatives that there are -- that Lehman had a book of

exchange-traded derivatives and OTC derivatives,

over-the-counter derivatives.  And their risk was the amalgam

of the two.  We were just taking the -- necessarily, the

exchange-traded derivatives position.  So Lehman could not

readily tell us what their risk was of just their exchange-

traded derivatives position.

      Barclays systems weren't actually robust enough to be able

to load up all of the positions because we -- you know one of

the reasons for acquiring the business was because it had an

equities business.  We didn't have an equities business in the

same scale so we couldn't even load up the exchange-traded

derivatives position.  So we were relying on some extremely

crude estimates of the risk.

      I was much more focused on what's the risk not the value,

because ultimately if -- I didn't know whether we could be ten

billion dollars long and I'd just woken up in the morning to

find out I was -- we, the firm, I say I, I mean the firm

Page 76

```
 1    obviously -- was eight billion dollars long equities, but for
 2    all I knew the exchange-traded derivatives position could be
 3    long ten billion dollars of equities and Barclays had just
 4    taken on responsibility for it.  So I had no idea.  And so our
 5    first estimate was to try and whittle that down and understand
 6    what that risk was.  And as I say, Lehman couldn't provide it
 7    to us because they couldn't isolate the exchange-traded
 8    derivatives from the OTC positions and we couldn't run the
 9    positions so we went to the clearing houses to try to estimate
10    the change in margin as a way of approximating what the risk
11    was.
12    Q.   And the exchange-traded derivatives are offset, to some
13    degree, by the exchange-traded derivative margins --
14    A.   Well --
15    Q.   -- is that right?
16    A.   -- yeah, well, necessarily there's margin associated with
17    the exchange-traded derivatives position.  That was the first
18    thing that we looked at was -- you know, this highlights how
19    rudimentary the analysis had to be.  If the amount of margin in
20    the account is going down, the excess margin is going down and
21    the market just went down, then presumably we're long.  That
22    was about all we could manage.
23    Q.   By September 22nd, which was the closing, were you able to
24    determine whether Barclays would have a profit or loss from
25    taking on LBI's exchange-traded derivatives business?
```

Page 77

1    A.    On the Monday?

2    Q.    Yes.

3    A.    No.

4    Q.    What was the quality -- we may have just covered this, but

5    how long did it take you to determine those positions and the

6    value of those positions?

7    A.    I can't --

8    Q.    Generally.

9    A.    I can't remember the exact timeline, but it took -- we

10   managed to start to make estimates using the techniques that I

11   just described, you know, over the course of that weekend.  And

12   I know that at least we had whittled it down to sort of between

13   two billion dollars short, I think, or four billion dollars

14   long.  And I think going into the -- these are very approximate

15   numbers, by the way, but that we had -- I think early in the

16   week, maybe even by Monday morning, we'd started to assume that

17   we were three billion dollars long, which isn't a value of an

18   asset.  That just describes the amount of -- approximately of

19   the S&P the risk would behave like.  So if the market went down

20   ten percent we'd lose 300 million dollars.

21   Q.    Let me ask you to turn to tab 14 in your book.

22          MR. SCHILLER:  BCI Exhibit 290, Your Honor, which is

23   in evidence.

24   Q.    This is an e-mail from you on Monday to Liz James and

25   others.

Page 78

1    A.    Right.

2    Q.    Monday, September 22nd, do you see that?

3    A.    Yes.

4    Q.    And you're writing her and you're saying "It is clear that

5    one billion has absolutely no idea" -- "that Lehman Brothers

6    has absolutely no idea what its OCC risk position is".

7    A.    Right.

8    Q.    Was that your understanding as of September 22nd?

9    A.    Yes.

10   Q.    "We know it is between two billion short and four billion

11   long.  They do not know what had been booked to what entity.

12   We cannot see."  What's that a reference to?

13   A.    I can't remember what that was to do -- that may have been

14   to do with where the sum of it was -- I think the oth -- there

15   were -- so I'd actually forgotten about another aspect of the

16   problem, which was it wasn't just the OTC derivatives versus

17   the exchange-traded derivatives, it was whether any of the

18   exchange-traded derivatives were really associated with, for

19   example, LBIE.  So we didn't really know -- we really didn't

20   know what we had just taken on because we were only taking on

21   the exchange-traded derivatives associated with LBI.

22   Q.    And you say "We're now four days into making zero progress

23   on this with them."  Are you referring to Lehman?

24   A.    There's --

25   Q.    Or the positions?

Page 79

1  A.   I don't know actually.  It might have been just -- Lehman

2  weren't -- Lehman were not going out of their way to be

3  unhelpful, it's just that they -- you know, their systems

4  aggregated risk in a way that had not contemplated the idea

5  that they themselves would default.  So it was going to take

6  some time to cause their systems to be able to properly isolate

7  and report the risk.  And after all, the transaction itself

8  hadn't been consummated at this time.  So I -- you know, there

9  was a -- they were working hard but I think it was going to

10 take some time.

11 Q.   After the closing were you concerned that even with the

12 margin the exchange-traded derivatives could represent a

13 significant liability to Barclays?

14 A.   I wasn't part of the negotiations or discussions about the

15 purchase agreement, so I really did just try to focus on the

16 job that I had which was valuation and risk management.  And

17 the risk management aspect of the derivatives that concerned me

18 was that I really had very little idea of what the complex

19 risks were that would be embedded in that book.

20 Q.   Okay.

21 A.   After all, it may be behaving like three billion dollars,

22 roughly, but if the market moved a lot it might behave like six

23 billion dollars, and therefore that could -- you know, one

24 would assume that under normal circumstances a counterparty is

25 required to continually post incremental margin to a clearing

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 80

```
 1    house.  Well, here there would have been a finite amount of

 2    margin.  So presumably, if markets moved significantly enough,

 3    then the margin could be exhausted.  And I didn't know what

 4    that was.

 5    Q.   In terms of your testimony that you just made, let me ask

 6    you to look at your e-mail that's at tab 16.

 7         MR. SCHILLER:  Your Honor, BCI Exhibit 294.  So much

 8    for my fifteen-minute prediction.

 9    Q.   And there, Mr. King, you're writing to Rich Ricci, Mike

10    Keegan, Patrick Clackson about this subject.  "Rich, Mike,

11    Patrick", you say -- and in the third paragraph "The big and

12    difficult open issue remains the exchange-traded derivatives."

13    You notice the date of this is September 23rd, day after

14    closing.

15    A.   Right.

16    Q.   And I asked you whether you were concerned after closing

17    that this was a significant liability to Barclays.  Do you

18    recall that?

19    A.   Yes.

20    Q.   You say "We believe we have identified all of the

21    exchanges captured in this, and primarily the exposure is via

22    the OCC."

23    A.   Yeah.

24    Q.   "However, the size of the risk position is still unclear

25    as is all the operational process by which these positions
```

Page 81

1    could be closed out or transferred."  So was that a significant

2    liability from your standpoint at that point in time?

3    A.    Yeah, it was --

4    Q.    Even with all the margin?

5    A.    It was a tremend -- there was a tremendous amount of

6    uncertainty, yes.

7    Q.    Do you have an understanding, based on your experience,

8    whether if there had been no sale to Barclays these exchange-

9    traded derivative accounts at the OCC and other clearing houses

10   would have had any positive value to the Lehman estate in a

11   liquidation?

12        MR. MAGUIRE:  Objection, Your Honor.  No foundation,

13   speculation.

14        THE COURT:  I'll sustain that objection only because I

15   don't think anybody can have experience on this based upon the

16   evidence in this case so far.  But you also seem to be

17   eliciting or attempting to elicit an opinion from a lay

18   witness.  That may be permissible, but you do need to do more

19   to get to this point if you choose to do go there.

20   Q.    Let me ask you to look at Mr. McDade's testimony before

21   His Honor on April 27th, page 39, line 3, through page 40, line

22   19, Mr. King.  He's asked:

23   "Q.  Can you describe some examples of where Lehman positions

24   were wiped out or closed out during the course of the week of

25   September 15th.

Page 82

1    "A.  I would use an example of the call that we got late in the

2    week from CME with respect to the positions that we had on that

3    exchange.

4    "Q.  And what happened there?

5    "A.  Despite our asking for it not to happen our positions were

6    put into an open auction process.  We ultimately were taken out

7    of the positions and the margin associated with those

8    positions.

9    "Q.  Let me be sure I understand what you're saying, at the

10   CME, the Chicago Mercantile Exchange, you had certain positions

11   and you had certain margin on deposit as collateral?

12   "A.  That's correct.

13   "Q.  And when your positions were closed out you lost your

14   margin or collateral?

15   "A.  Correct."

16        And he goes on to say it was -- the loss was in excess of

17   a billion dollars or so.  And were you aware of that experience

18   that week on the part of Lehman?

19   A.   I was certainly aware of the exchange closing out -- the

20   exchanges closing out the -- CME closing out the commodities

21   positions.

22   Q.   But did you expect that the OCC or other clearing

23   corporations would close out Lehman's exchange-traded

24   derivative positions if there were no sale to Barclays?

25   A.   I don't think they would have had any choice to do

Page 83

1    otherwise.

2    Q.    And consistent with what Mr. McDade testified about the

3    CME, did you expect that Lehman would lose its margin or

4    collateral of the OCC or other clearing houses in the absence

5    of a sale to Barclays?

6    A.    It's certainly very possible.  As I just said, it's very

7    hard to say with certainty that it would have happened, but

8    it -- you know, there's a finite -- the margin, after all, is

9    supposed to be continually topped up and volatility was going

10   up and markets were going down.  If the position was behaving

11   like a long position there was a finite amount of collateral

12   and therefore a finite amount of margin and therefore certainly

13   in a forced liquidation it was a very sizeable position, it

14   could easily have been exhausted.

15   Q.    Are you aware of any secret agreements between Lehman and

16   Barclays during the week of September 15th through the closing

17   in connection with the sale?

18   A.    No.

19   Q.    Were there any secret agreements or understandings between

20   you and your team or Barclays and anyone at Lehman with regard

21   to the valuation of assets in the sale transaction that was

22   presented to His Honor, as far as you know?

23   A.    Certainly not.

24   Q.    After the December 2008 settlement over the seven billion

25   dollar issue, do you recall whether Barclays was asked to

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 84 of 232

Page 84

1    provide information to the creditors on some of the

2    complexities of the transaction?

3    A.    Yes.

4    Q.    Did you participate in the effort to provide the

5    creditors' committee with information about the transaction?

6    A.    I forget the exact timing, but I remember being asked to

7    attend a meeting with the creditors' committee along with a

8    number of other people from Barclays.

9    Q.    Do you recall generally whether it was in February of

10   2009?

11   A.    Yes, it would have been about then, yes.

12   Q.    And let me ask you just to look at a sign-in sheet -- it's

13   761, tab 19 -- covering that meeting.  It shows at the very

14   bottom that you attended.  Do you see that?

15   A.    Yes.

16   Q.    And there's a reference to the meeting at our law firm,

17   BSF.  And do you recall whether Brad Geer, Mr. Fazio, and Mr.

18   Burian were Houlihan Lokey committee financial advisors?

19   A.    You know, I don't remember the names of the individuals

20   that were there.

21   Q.    Did you understand that the committee's financial advisors

22   were participating?

23   A.    Yes.

24   Q.    And did you understand that the lawyers for the committee

25   were also participating?

Page 85

1    A.   Yes.

2    Q.   Did you attempt to provide helpful information to the

3    creditors' committee concerning the valuation process that you

4    had participated in and testified about here today?

5    A.   Yes, those were my instructions, yes.

6    Q.   And did you attempt to explain the details of the repo

7    transaction and the valuation issues within that, do you

8    recall?

9    A.   I remember that we discussed -- you know, I don't actually

10   remember all of the dialogue.  I remember that we discussed

11   many issues associated with the collateral, the valuation of

12   it.  I can't remember the repo transaction specifically being

13   discussed but it must have been discussed.  I remember the

14   mortgage securities being discussed.  That's what I remember.

15   Q.   Now, you were seated on one side of the room, correct?

16   A.   Yes.

17   Q.   And across the room was the committee and its counsel?

18   A.   Yes.

19   Q.   Do you remember whether anyone from the committee's side

20   of the room asked you whether there was a 47.4 billion dollar

21   valuation cap on the transaction, from your experience?

22   A.   No, I don't remember that.

23   Q.   I'm sorry?

24   A.   I don't remember them asking that, no.

25   Q.   Did -- do you recall whether they told you, at this

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 86 of 232

Page 86

1    meeting in February 2009, that they had independently valued

2    the securities on schedule A of the purchase agreement and

3    concluded that they were worth billions of dollars less than

4    the committee and the Court had been told?

5    A.    No, I don't remember them stating that.

6    Q.    Incidentally, would the possession of schedule A to the

7    purchase agreement provide the opportunity for the creditors'

8    committee to value them in September 2008 as you valued them in

9    that period?

10   A.    They could have undertaken the same process that we had.

11   Q.    Let me just ask you to look at tab 20 in your book --

12         THE COURT:  -- which is BCI Exhibit 812, Your Honor.

13   It's admitted.

14   Q.    And it makes reference to their saying -- and I know you

15   don't know all the individuals there but the Court does --

16   their representatives from the committee's counsel and from its

17   financial advisors.  And they say, "Yes, we're looking at them,

18   schedule A appears consistent with that which we had Sunday

19   night.  So the issue is they really were only worth the amount

20   that was agreed on between Lehman and Barclays or they were

21   worth more.  We can price a fairly big portion of securities

22   but there are some that we don't know on schedule A.  Those

23   that we've looked at seem to suggest that they're worth more

24   than implied by the negotiated mark on the deal which amount

25   isn't shown in any detail."  The two sides somehow said that,

Page 87

1   quote, "although the detailed schedule A amount totals to X

2   it's really worth Y in the aggregate because the marks in the

3   system are outdated which seems odd.  The difference between X

4   and Y is several billion."

5        Did anyone sitting across from you on -- in February 2009

6   in my office make these comments to you or share this

7   information with you?

8   A.   I don't recall it.  I recall a lot of their focus was

9   really on the mortgage-backed securities and understanding, you

10  know, how many of them were there.  But I don't really remember

11  them probing this, no.

12  Q.   Let me ask you to turn to the next -- to tab 21 which is

13  dated Friday, October 10th, again, from Milbank committee

14  counsel to Milbank committee counsel, transferring further

15  updates from Houlihan, the committee financial advisor.  And at

16  the third and fourth pages is a narrative in this memo -- in

17  this e-mail, and there's reference in the fourth page in the

18  fourth paragraph, "We're still looking at the remaining balance

19  of 14.4 billion in schedule A but it is clear that it shouldn't

20  be a 4 billion -- a 5 billion dollar haircut necessary here.  A

21  five billion dollar discount would imply an average mark of

22  sixty-five percent and a lot of these securities are household

23  names."  Did anyone on February of 2009 make this comment to

24  you or ask you about the subject of this paragraph?

25  A.   I don't remember them doing so.

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 88 of 232

Page 88

1    Q.   Did anyone at that meeting suggest to you that -- or tell

2    you their view, if they had it, that Lehman executives were in

3    cahoots with Barclays in connection with the valuation?

4    A.   I can't remember them making that assertion.  I don't

5    think they did, no.

6    Q.   After that meeting, did you and Jasen Yang and your team

7    make an effort to generate spreadsheets for the financial

8    advisors and the committee concerning the trading assets that

9    you had received?

10   A.   Yes, I mean, I remember the discussion at the offices

11   being a relatively, you know, cordial one in which we provided

12   them as much information as we could in response to their

13   questions.  I remember there was some follow-up that we

14   provided them.  I don't remember the specifics of it.

15   Q.   And after that meeting did you provide substantial data

16   for them, do you recall?

17   A.   What did they --

18   Q.   Concerning the trading assets that you'd received?

19   A.   Yeah, I mean -- well, the start -- well, you know, the

20   interesting thing is, of course, a lot of the information is

21   just available in the annexes anyway.  And I do remember that

22   they had asked for other stuff from us, but I can't remember

23   the specifics of it, of what they needed.

24   Q.   Would you look at tab 22 in your book?

25   A.   Sure.

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 89 of 232

Page 89

1    Q.    And do you see it says "Index of disc and materials

2    produced on March 20th in response to creditors' committee's

3    requests" that are dated there?

4    A.    Right.

5    Q.    Did you prepare this material?

6    A.    My team would have prepared it.

7            MR. SCHILLER:  And that is BCI Exhibit 762, Your

8    Honor.

9    Q.    And if you turn to the next tab 23, you'll see a letter,

10   BCI 763, from my office, my partner transmitting these

11   materials.  You see that?

12           MR. TAMBE:  Objection, Your Honor.  Foundation.  I

13   don't think he's established that there's a correlation --

14           THE COURT:  I'm sorry, I can't hear you.

15           MR. TAMBE:  I'm sorry.  Objection, Your Honor.

16   Foundation.  I don't think Mr. Schiller's established that

17   there's a connection between these two documents.

18           THE COURT:  Are you objecting to the question or

19   objecting to the use of the document?

20           MR. TAMBE:  Well, objecting to the question because it

21   lacks foundation.  He has not -- Mr. Schiller hasn't

22   established that there's a correlation between the documents

23   that are referenced in Exhibit 22 and the letter which purports

24   to transmit documents in Exhibit 23.

25           THE COURT:  Well, I would -- there are Bates numbers

Page 90

1   that are referenced in the letter.  I'll reserve on the

2   objection at the moment, waiting for the question to be

3   clarified.

4        MR. SCHILLER:  I'm going to withdraw that question --

5   Q.   -- and just ask by reference to reading this Exhibit 763,

6   do you recall whether an offer was made on behalf of Barclays

7   to meet with the committee to explain the material referenced

8   in the letter?

9   A.   After the first meeting?  I -- it may well have been the

10   case, actually, I think we made ourselves available.

11   Q.   Do you recall whether there was a single follow-up

12   question to you or Mike Keegan or your colleagues from the

13   committee about this data?

14   A.   If there was it must have been pretty limited because, you

15   know, my team can be quite efficient sometimes at responding to

16   requests that came into from the firm, but they usually keep me

17   pretty well appraised if there's anything significant that we

18   should be responding to.  After all, we're a very tight group

19   so I really don't think there was.

20   Q.   After the acquisition of LBI, did Barclays' product

21   control function work to value the assets that had been

22   acquired for the purposes of the final acquisition balance

23   sheet?

24   A.   Yes, they had to -- there was a -- an acquisition balance

25   sheet was going to form a part of the year-end financials for

Page 91

1    Barclays so that as with a valuation of all assets in the firm

2    there needed to be an independent process around it.  And that

3    took the bulk of the rest of the year.  Actually, it took

4    longer than the rest of the year because we didn't complete it

5    I think until February.

6    Q.   Were you involved to an extent in trying to value, as part

7    of that process, assets for which there was no information

8    available?

9    A.       Yes.  I mean, the process for product control is

10   independent but collaborative as well because after all they do

11   have to rely on us for information so we provided them as much

12   as we could and helped them with establishing what they felt

13   was reasonable -- reasonable marks.

14   Q.   Based on the assets that you reviewed in connection with

15   the purchase of Lehman, do you recall what Barclays paid for

16   those assets and the running of the business, the

17   consideration?

18   A.   I think I've come into contact with that, you know,

19   through the course of this process but I don't really -- you

20   know, I know it was over 250 million dollars or something

21   except for the entire -- entirety.  There was no -- I don't

22   remember there ever being a discussion about the asset pool in

23   isolation.  It was a business -- it was a business acqui --

24   well, it was the purchaser -- the purchase of the business.

25   Q.   Thank you.

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 92 of 232

Page 92

1        MR. SCHILLER:  No further questions, Your Honor.

2        MR. TAMBE:  Good morning, Your Honor.  Jay Tambe for

3   Lehman Brothers Holding, Inc.  We'll have some binders to hand

4   out to the witness and the Court.

5        THE COURT:  Okay.

6        MR. TAMBE:  May I approach, Your Honor?

7        THE COURT:  Yes.  Thank you.

8      (Pause)

9        MR. TAMBE:  Mr. King, just to keep the binders

10  straight, I've handed you two binders with green covers.  One

11  is -- one has your name on it.  The other simply says "witness

12  binder".

13        THE WITNESS:  Right.

14        MR. TAMBE:  You have those?

15        THE WITNESS:  Right.

16  CROSS-EXAMINATION

17  BY MR. TAMBE:

18  Q.    Good morning, Mr. King.  My name is Jay Tambe.  I'm one

19  of the lawyers for Lehman Brothers Holdings, Inc.  We have not

20  met before.  I want to follow-up on several areas in which you

21  provided testimony and perhaps let's start with your current

22  position.  You testified that you were with a fund, or hedge

23  fund, of sorts called C 12, is that right?

24  A.    C 12 Capital, yes.

25  Q.    And that's a management company of some type?

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 93 of 232

Page 93

1    A.    Yes.  It's a management -- asset management company.

2    Q.    And what assets does C 12 manage?

3    A.    What does it manage?

4    Q.    Yes.

5    A.    The bulk of what C 12 manages currently are assets

6    associated with a transaction called Protium, which is a

7    mixture of mortgage backed securities and also a fund of liquid

8    securities worth about 800 million dollars.

9    Q.    Roughly twelve billion or so in Protium, is that right?

10   A.    That's right.

11   Q.    And those are all assets that Protium acquired from

12   Barclays, correct?

13   A.    The credit assets are.  The liquid hedge fund, the billion

14   dollars, is not.

15   Q.    So, roughly twelve billion acquired from Barclays?

16   A.    That's correct.

17   Q.    The remainder from other sources?

18   A.    Well, that's the one billion is an actively traded

19   portfolio.  The twelve billion was acquired from Barclays.

20   Q.    And to acquire the twelve billion dollars in assets from

21   Barclays, Protium received a loan from Barclays for a little

22   over twelve million dollars, correct?

23   A.    Well, unfortunately, we're approximating the numbers.

24   The -- there was -- third party capital was raised of about 500

25   million dollars.  There was a loan of about twelve billion

Page 94

```
 1   dollars and securities of about twelve and a half billion

 2   dollars.

 3   Q.   So, just to be clear, Barclays loaned Protium about twelve

 4   billion dollars to take about twelve billion dollars worth of

 5   assets from Barclays and put them into Protium, correct?

 6   A.   It was -- it was a highly-levered vendor financed.

 7   Meaning the then seller of the assets was financing through a

 8   senior secured loan the bulk of the purchase that the newly

 9   established entity was making.  It was funded by a third party.

10   Q.   There was a lot of terminology in there.  Just to be

11   clear, Barclays loaned money to Protium to buy twelve billion

12   dollars worth of assets from Barclays, right?  That's about it?

13   A.   Again.  Barclays lent on a senior basis money to a newly

14   established entity that had limited partner capital from an

15   independent third party.  But yes, there was a loan of twelve

16   billion dollars secured on twelve and a half billion dollars of

17   assets.

18   Q.   And those are all assets that used to be Barclays assets

19   on Barclays balance sheet, correct?

20   A.   Correct, yes.

21   Q.   And those were the assets that you used to manage when you

22   were at Barclays, correct?

23   A.   About a third of them were.

24   Q.   So, about four billion of those?

25   A.   Correct.
```

Page 95

```
 1    Q.   Out of included assets that were assets purchased by

 2    Barclays as part of the Lehman transaction, correct?

 3    A.   A very small percentage.  I think three or something.  I

 4    remember looking into it once in anticipation of being asked

 5    and it was two or three or four percent.  I can't remember now.

 6    Q.   And when Protium was set up and these twelve billion

 7    dollars in assets were taken from Barclays' balance sheet and

 8    put into Protium, you left Barclays to manage those assets

 9    through C 12, correct?

10    A.   My team and I left to spawn the new asset management

11    company and we -- with the objective of rais -- of entering

12    into other transactions and raising third-party capital.  And

13    the first transaction that we did was this Protium transaction

14    that we did with Barclays where we were acquiring this twelve

15    and half billion dollar portfolio.

16    Q.   And you get paid management fees as part of managing this

17    portfolio of Barclays' assets, correct?

18    A.   Well, they're not Barclays' assets anymore.  They're owned

19    by an independent entity.  The upside of that entity, the

20    equity or partnership interest if you like, are all owned by

21    third parties and it is the entity not Barclays that pays the

22    management fees.

23    Q.   And you get paid the management fees before any interest

24    is paid on this so-called senior obligation that Barclays

25    extended to Protium to secure the purchase of these assets in
```

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 96 of 232

Page 96

1    the first place, correct?

2    A.    Well, we get some of our management fees paid senior and

3    we get all of the performance fees paid, you know, not for many

4    years actually, for -- and mostly at the back end of the

5    transaction.

6    Q.    And what you get at the front end of the transaction is

7    roughly forty million dollars a year for ten years?

8    A.    Yeah, I think it's forty-five million dollars a year is

9    the senior management fee.

10   Q.    And that's off the top, correct?

11   A.    What do you mean off the top?

12   Q.    That's before any interest is paid on the loan, correct?

13   A.    It is actually structured that way.  I mean there is a lot

14   of cash that comes off of the assets so it's not a significant

15   issue.

16   Q.    And when Barclays took those assets off Barclays' balance

17   sheet and put them into Protium, they moved those assets over

18   at the book value at which Barclays was carrying those assets,

19   correct?

20   A.    Correct.

21   Q.    And those would have been at least in part book values

22   that you had determined while you were managing some of those

23   assets over at Barclays, correct?

24   A.    Well, actually, we were very, very conscious of this at

25   the time.  As I say, only 4 billion dollars of the assets --

Page 97

1    there's 12 billion -- if I can use the 12 just to avoid the .5,

2    12 billion dollars of assets, only 4 billion dollars of those

3    assets were assets that were managed by my group.  Two billion

4    dollars of those assets were actual loan collateral that had

5    been -- and none of this stuff that was originated by us as

6    loan collateral was subject to some very strict marking

7    policies because these were very, very liquid assets.

8         Nevertheless, at the time of the transaction, we were -- I

9    left with my team, which is the reason why there has to be

10   significant fees associated with the transaction because it was

11   a large group of people that were associated with forming the

12   management company, and we were -- we were absolved of our

13   responsibilities for managing the assets or valuing the assets

14   on the part of the firm.  And an independent group that was

15   part of another group in the firm was put in place to ensure

16   that it wasn't just product control, but they're also traders

17   from another front office team that were reviewing the marks.

18   So, there was an adequate -- adequately independent transfer

19   price on the transaction.

20   Q.   So, the answer to my question was, yes with an

21   explanation.  Included in the assets were assets that you had

22   valued when you were working at Barclays, correct?

23   A.   The assets I had --

24   Q.   You can answer my question yes or you can answer yes and I

25   can ask for an explanation.

Page 98

1    A.   I think I can actually answer it no.  That the sale price

2    was not based on my marks, it was based on independent marks

3    performed by another group.

4         Yes, it is true that over the life of those assets in the

5    firm, I had had involvement in marking them.  So, necessarily,

6    there was some relationship between where we had marked them

7    and where the independent group who was responsible for

8    establishing the sale price marked them but it wasn't my price,

9    I guess, to avoid the situation where I was selling to myself.

10   Q.   And when you moved over to C 12, you moved over with

11   Mr. Yang as well, correct?  And he was with you at Barclays?

12   A.   That's correct.

13   Q.   He was part of that management team you described?

14   A.   Yes, that's correct.

15   Q.   And there was about forty of you that moved over?

16   A.   That's true.

17   Q.   All from Barclays?

18   A.   Yes.

19   Q.   Let's go through some other names.  Mike Keegan is a name

20   that's come up from time to time as to some of the documents

21   you talked about.  Who's Mr. Keegan?

22   A.   Mr. Keegan is still at Barclays and he runs -- I don't

23   actually know what he runs now.  At the time he was running one

24   of the principal trading units.

25   Q.   So, he had a position analogous to yours?  You ran a

Page 99

1    principal trading unit as well, correct?

2    A.    I was sort of -- Mike's position was senior to mine.  He'd

3    been with the firm for a very long time and at various points

4    it had been contemplated that I could have worked for Mike, so

5    I would view Mike as senior to myself.

6    Q.    So, going back to my question, he was a principal trader

7    like you were a principal trader?

8    A.    Well, it's an investment bank with risk-taking

9    capabilities.  So, that was a group -- I think it just happened

10   to have that name.  He had a number of businesses under him and

11   he was senior to me.

12   Q.    You're not denying that you were a principal trader, are

13   you, sir?

14   A.    We -- no.  We had a -- we had a principal trading business

15   that was -- had the narrow focus at the time of mortgages.

16   Mike had a very broad mandate.

17   Q.    Putting aside the breadth of humanity, you were a

18   professional trader trading mortgages that were owned by the

19   bank, he was a professional trader trading other assets owned

20   by the bank, correct?

21   A.    Yes.

22   Q.    And this principal trader formulation that we've used, is

23   it also referred to sometimes as proprietary trading?

24   A.    Yes, sometimes, yes.  But although that's one aspect of

25   the role.

Page 100

1    Q.    And also referred to sometimes in shorthand as prop

2    trading, you were a prop trader?

3    A.    Yes.  That's one facet of the business, yes.

4    Q.    And as a prop trader, you ran what is referred to within

5    institutions like Barclays you had a P&L center or a P&L desk

6    that you were responsible for, correct?

7    A.    Yes.  We actually had multiple.

8    Q.    You had multiple P&Ls?

9    A.    Um-hmm.

10   Q.    And when we talk about P&L desks, we're talking about

11   profit and loss desks, correct?

12   A.    Correct.

13   Q.    And you are supposed to buy and sell assets and earn

14   income for the bank and for yourself by doing that, correct?

15   A.    Correct.

16   Q.    And, in fact, a substantial portion of your compensation

17   is based on the P you generate and the L you would reduce or

18   eliminate for your desks, correct?

19   A.    Among other -- certainly from Mike's position and

20   increasingly for mine plus other things that as managing

21   directors in a large firm like Barclays we were asked to do.

22   There was a big advise -- internal advisory component of it as

23   well as just the direct profit associated with the trading

24   unit.

25   Q.    Well, let me guess, everything else being equal if you

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 101 of 232

Page 101

1    don't generate a profit, you're going to see it in your take-

2    home compensation that year, correct?

3    A.    That would be the -- that would be the normal situation.

4    These were very unusual times.

5    Q.    And in connection with the Lehman transaction, you wore

6    many hats but one of the hats you were still wearing was the

7    hat of the prop trader who was going to take on some of these

8    assets and manage them and trade them and dispose of them,

9    correct?

10    A.    Right.  But not under those proprietary trading books.

11    Under separate books that were associate -- there were three

12    sets of books; books associated with the acquisition assets

13    from Lehman, the books associated with the existing Barclays'

14    assets and then our propriety trading books.  They were

15    separate.  They were never comingled.

16    Q.    And the books that were separate and not comingled, the

17    book of Lehman acquired assets, again, the ones that you were

18    going to manage, you were going to manage and try and maximize

19    your profit on, correct?

20    A.    Right.  Although that oversimplifies the relationship

21    between -- my job was to maximize the value of those assets.

22    Q.    And you'd maximize the value of those assets by being able

23    to sell them or liquidate them at a price greater than the one

24    that you had ascribed to those assets when you took them on,

25    correct?

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 102 of 232

Page 102

1    A.   Well, or less than -- I mean this is why -- it's a risk

2    management process not just a valuation or disposal process.

3    There were assets that we had -- this is why it wasn't part of

4    the proprietary trading business.  I mean the sizes of the two

5    activities were very, very different.  As I described earlier,

6    our proprietary traded business maybe ran one to two billion

7    dollars in capital.  We were talking about fifty billion

8    dollars of assets.  So, they were separate and the objective

9    was to maximize, as I described earlier, maximize the

10   realizable value.  At times, we concluded that the best thing

11   for us to do was to dispose of an asset that we actually owned

12   above where were being shown bids.  Because the right risk

13   management decision actually was to dispose of it.

14   Q.   Going back to my question again and you can answer my

15   question with a yes, no, I don't know, and then give me an

16   explanation.  To go back to my question, with respect to the

17   Lehman assets that were part of one of these three buckets that

18   you were going to be managing --

19   A.   Right.

20   Q.   -- you were aiming to maximize the gain or the recovery on

21   those assets over a period of time, correct?

22   A.   Yes.

23   Q.   And one of the ways you would do that is by selling them

24   at a greater price than the one that was ascribed to those

25   assets upon acquisition, correct?

LEHMAN BROTHERS HOLDINGS INC., et al.

1    A.   Well, to maximize them I would sell them at the -- or I

2    would either hold them or sell them to maximize their value.

3    Q.   And a real simple concept here, so, one of the variables

4    in whether or not you maximize your profit is the price that

5    you've ascribed to that asset on acquisition, correct?

6    A.   If you view it that the objective is the profit relative

7    to a price that was given to the assets at the time they were

8    taken onto the balance sheet then yes.  But really the

9    underlying objective is just to maximize the value of the

10   assets, not maximize the value -- maximize the profit.

11   Q.   Is what you're saying, sir, you either try to maximize the

12   profit or minimize the loss.  Is that what you're talking

13   about?

14   A.   Maximizing the profit, if you like, would be a consequence

15   of maximizing the realizable value of the portfolio, so yes.

16   Q.   An in either event, no matter how you slice it, one of the

17   driving variables in that exercise is what price you ascribed

18   to that asset at acquisition, correct?

19   A.   Yes.  But --

20   Q.   It's where you start and then where you end up, correct?

21   A.   If the primary objective -- and I'm not even sure that's

22   the right way around.  If the primary objective seems to be

23   profit, then it's very, very important where you originally --

24   what value you originally ascribe to the assets.  If the

25   value -- if the objective is to just maximize the value, which,

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 104

1    after all, is my job, then it doesn't really matter where we

2    are on it.  It's just is this the right thing to do to either

3    hold the asset or sell the asset.  And that was the dialogue

4    that I would have with my management on a daily basis; at least

5    a weekly basis.

6    Q.    You described earlier in your testimony that when these

7    assets came onto Barclays books, you didn't acquire them an

8    asset at a time, correct?  It came over in bulk, right?

9    A.    Right.

10   Q.    In the usual course where you acquired an asset that you

11   were trading, there would be an acquisition price.  There'd be

12   a price at which you did the trading, correct?

13   A.    Right.

14   Q.    And that would be the price that you would start with,

15   correct?

16   A.    If we bought something, we'd have a price of where we

17   bought it.

18   Q.    And you didn't have that in this case, correct?  These

19   assets didn't come over with an asset by asset purchase price,

20   per unit price, correct?

21   A.    No.

22   Q.    You laid out forty-five billion dollars and you got a pool

23   of assets that were transferred over to you over a period of

24   time, correct?

25   A.    Well, one of the things that we did was to lend the forty-

Page 105

1    five billion dollars and then there was a portfolio of assets

2    that were booked, yes.

3    Q.    And those assets came over to you and came onto the

4    Barclays' books at a couple of different points in time,

5    correct?

6    A.    Multiple points, I think, yes.

7    Q.    There was a slug of assets that came over the night of the

8    18th of September into the early morning hours of the 19th,

9    right?

10   A.    Yes.

11   Q.    And those were the assets that were delivered from JPM

12   through to your custodial agent, the Bank of New York, correct?

13   A.    Yes.

14   Q.    There were still other assets that were delivered by JPM

15   much later in the year, correct?  Sometime around December of

16   2008, correct?

17   A.    Yes.

18   Q.    And putting aside those two large buckets of assets, there

19   were still some other assets that came over during the week of

20   the 22nd of September, right?

21   A.    Yes.  The clearing of those assets, yes.

22   Q.    And came over at points even after that last week of

23   September?

24   A.    Yes.

25   Q.    But putting aside those other dribs and drabs of assets,

Page 106

1    the two big pools were the initial inventory that came over the

2    night of the 18th early morning of the 19th and then the JPM

3    inventory which came over in December, correct?

4    A.    Those are the two largest units by value, I think.

5    Q.    And the initial inventory that came over Thursday night to

6    early Friday morning, included, as you said, a large position

7    of equities, correct?

8    A.    On the Friday morning, yes, that's correct.

9    Q.    Approximately, you said, eight billion dollars of equities

10   in that --

11   A.    Yeah, I remember it being about eight billion dollars,

12   yes.

13   Q.    And starting Friday, you began the risk management process

14   to hedge the risk associated with these assets, correct?

15   A.    Yes, I guess from Friday we would have started to think

16   about it.

17   Q.    So, among the various hats you were wearing starting

18   Friday morning, is you're identifying what's coming over,

19   you're risk managing it and then the ensuing days you are

20   parceling those assets off to different trading desks within

21   Barclays, correct?

22   A.    That's an oversimplification.

23   Q.    Many things in this case are.  But among the steps you

24   took and broadly speaking, the hats you were wearing included

25   those three hats, right?

1    A.   I don't think at that time we weren't really parceling

2    anything off to the trading desks.  We'd made the decision that

3    to ensure the sensible ongoing risk management of such a large

4    portfolio of assets, that we wouldn't just push them into the

5    front -- to the normal front office businesses to trade because

6    we would lose track of them.  So, we managed them on the desk

7    with some consultation of the individual desks within Barclays

8    and over time that we used those desks for some of the disposal

9    and for some of -- some of the desks acquired some of the

10   assets themselves.  But a lot of them we traded directly off

11   the desk.

12   Q.   And then the assets that were acquired by the desks,

13   you've seen reference to those transactions as internal sales

14   at Barclays, is that right?

15   A.   Well, there were two ways we did it.  One was that we

16   would sell some assets to -- there were really three ways that

17   we managed the risk.  We would manage it ourselves, in which

18   case we would face the street.

19   Q.   When you say "we", you mean --

20   A.   My group.

21   Q.   -- the principal mortgage trading group?

22   A.   PMTG.

23   Q.   Right.

24   A.   Would face the street and manage the assets direct.  Two,

25   we would seconder the assistance of a relevant expert from one

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 108

1    of the trading desks within the firm and they would advise or

2    help me manage a book that stayed within our group that they

3    were the experts so we'd help -- you know, we had to -- like,

4    the agencies was a good example of something where we really

5    had to use the agency trading desk but we didn't want to put

6    the assets in the agency trading desk.

7        And the third, and I think this was the minority of them,

8    was the best thing to do was for us to negotiate a price with

9    the relevant trading desk, sell it to the trading desk and then

10   they would -- they would manage the risk in their normal course

11   of their business.

12   Q.   So, given that answer, so, would it surprise you if

13   Barclays has taken the position in this case that thirty-seven

14   billion dollars of assets that were acquired from Lehman were

15   sold internally?

16   A.   Is that what they said?

17   Q.   Well, would it surprise you if that's the position

18   Barclays had taken?

19   A.   Thirty-seven billion sold internally?  I guess it depends

20   on what time it was sold.  I mean at one point or another some

21   of them would have been sold to -- to -- I mean they had to be

22   transferred, right, from the acquisition books to relevant

23   desks.  So, maybe that's true.

24   Q.   Maybe that's true.

25   A.   But ultimately they had to be -- the assets had to leave

Page 109

1    the firm.

2    Q.   Well, my question was a very specific one.  So, would it

3    surprise you if Barclays has taken the position in this

4    litigation that thirty-seven billion dollars of the assets that

5    were acquired were transferred and sold internally?

6    A.   I'm trying to think -- well, I guess it must be.  If they

7    say it's thirty-seven billion dollars it must be thirty-seven

8    billion dollars but I'm trying to think of what that would be

9    made at.  That maybe -- I mean it's was a large portfolio of

10   treasuries.  We did sell the treasuries to the trading desk

11   because that was at the most liquid end.  The equities were

12   traded out of the firm directly, not transferred internally.

13   So, then maybe that is that its thirty-seven billion dollars

14   was actually traded through -- thirty-seven billion dollars, I

15   suppose, could have been traded through our own flow desks.

16   Because after all, our flow desks were the ones that face

17   customers so they were an important part in maximizing the

18   realizable value.

19   Q.   So, as you think through this process and think through

20   this portfolio, it's possible that thirty-seven billion dollars

21   of these assets were processed first through internal sales at

22   Barclays and then those desks dealt with those assets, correct?

23   A.   Right.  But that may well have been instant -- you know,

24   it may well have been -- I wasn't part of preparing that

25   thirty-seven billion dollars number.  So, it may well be

Page 110

```
 1   factually correct that thirty-seven billion dollars was traded

 2   internally.  However, I don't know how much of that instantly

 3   traded out of the firm via those desks.

 4   Q.    You just don't know one way or the other?

 5   A.    No.  Because we tra -- because, you know, even we

 6   ourselves trade with our own -- or when I was at Barclays, even

 7   we ourselves traded with our own trading desks.  So, if I sold

 8   something to a desk and then they sold it to a customer, we

 9   couldn't face customers.  So, then they would have faced the

10   customer and that would have presumably been captured in this

11   internal sale construct even though it really was leaving the

12   firm.

13   Q.    And do you know one way or the other, sir, whether the

14   prices of which these assets, this thirty-seven billion dollars

15   of assets, were sold internally at Barclays?  Whether any of

16   those internal sales prices were used to account for these

17   assets for acquisition purposes?

18   A.    Some of them must have been.  But one of the reasons for

19   constructing the process in the way we did was to ensure that

20   there was as much independence, you know, put on that -- those

21   initial valuations as we could rather than just letting the

22   trading desks which it would have taken the sum of the trading

23   desk to bids on the Thursday, Friday, say of the week, it would

24   have been significantly lower, I anticipate, than the price we

25   actually paid.  And so to avoid that happening, that was why we
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 111

1    had this centralized process.

2    Q.   You're not disagreeing that at least on some instances

3    those internal sales prices where one Barclays' person is

4    selling the security to another Barclays' person, those prices

5    were used as the prices for those securities on the acquisition

6    balance sheet?

7    A.   Well, I don't know whether they used on the --

8    Q.   You don't know?

9    A.   -- on the acquisition balance sheet was -- the acquisition

10   balance sheet prices were prepared by product control

11   independent of the traders.  But some of the things that were

12   factored into that was where traders would trade the security.

13   And so, presumably, some of those were both internal transfer

14   prices as well as external sales because those were the best --

15   the best way to estimate a value for the purposes of the

16   acquisition balance sheet.

17   Q.   Well, you don't know, sir, all the things that the PCG

18   people looked at when determining what's the best way of

19   estimating the value of a security, do you, sir?

20   A.   I don't know all of them, no.

21   Q.   You do know that on certain occasions, they, in fact, used

22   internal sales prices amongst Barclays' personnel as the price

23   for the acquisition value of a particular security, correct?

24   A.   No, I don't know that -- that they used for certain

25   internal prices.  But I could well believe that out of the many

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 112

1    tools that they had available to them, to attempt to put line

2    by line valuations on thousands and thousands of line items may

3    well have been to say the so-and-so trading desk acquired or

4    sold a security at a particular price on a particular date that

5    was relevant and capable of being used in the acquisition

6    balance sheet.

7    Q.   And do you know one way or the other --

8    A.   Although I am -- to answer your question, I am surprised

9    that's the case because the acquisition balance sheet was being

10   struck as of a particular date and that was on the 22nd, I

11   think.  It had to be as of the date.  And really, many of those

12   transfers that you're alluding to would have had to have

13   happened at a much later date.  So, I don't know who they --

14   whether they were definitely used.  They could have been an

15   interesting indicator to product control but they couldn't have

16   been used in isolation.

17   Q.   Well, if they were, in fact, transactions that occurred

18   after the 22nd, that would have been after the closing date,

19   correct?

20   A.   Correct.

21   Q.   And you know that some of those transactions, in fact, did

22   take place well after the 22nd, correct?

23   A.   Correct.

24   Q.   And if I understood your prior answer, you'd be surprised

25   if, in fact, those post-September 22nd internal sales

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 113 of 232

Page 113

1    transaction prices were, in fact, used by PCG as the

2    acquisition prices for those securities, correct?

3    A.    Well, that would have had -- PCG would have had to have

4    made an independent assessment that it was appropriate to use

5    them, that's all I'm saying.  It's not just as simple as, well,

6    they had the transfer price we'll use those.  They must have

7    made an assessment.  Although, I am -- I wasn't involved in

8    that process.  After all, my job was to just maximize the --

9    minimize the risk to the firm and maximize the realizable

10   value.

11   Q.    When you say you weren't involved in that process, you

12   weren't involved in the determination process of the PCG

13   thought?

14   A.    The product control PCG, yes, that's right.

15   Q.    I'm sorry.

16   A.    Yes.

17   Q.    We should both try to avoid the abbreviations; there's a

18   lot of them.  So, PCG Product Control Group.

19   A.    Yes.  I was involved -- I was asked, obviously, they asked

20   me about my opinion on things and on securities.  So, I can't

21   say I was not involved at all but I wasn't driving that

22   process.  I wasn't responsible for that.

23   Q.    Well, let's drill down a little bit into your role in the

24   process of getting the securities onto Barclays' books and you

25   referred, I think, to that process as the on-boarding process

Page 114

1    in some of the documents I've seen.  Is that a familiar term to

2    you?

3    A.    I may have used that.  I could have used that, yes.

4         THE COURT:  Mr. Tambe, before we start drilling, I

5    think we all need a lunch break at some point and I'm sensing

6    from the number of documents in the book, although you may not

7    use them all, that your examination may be a lengthy one.  So,

8    I suggest that we take a lunch break at this point unless

9    there's a more logical time to do it in your view.

10        MR. TAMBE:  This is a logical time to take a break.

11        THE COURT:  Fine.  And if -- I realize that estimates

12   are mostly wrong, Mr. Schiller's fifteen minutes having become

13   at least fifty instead of fifteen, can you give me some

14   indication of how long you think you may be in your examination

15   of the witness?  And I'm only asking that so that we can

16   schedule the chambers conference that had been requested at the

17   close yesterday.

18        MR. TAMBE:  I do anticipate it will be the bulk of the

19   afternoon.

20        THE COURT:  Okay.  My suggestion then is that we plan

21   that chambers conference to be the event which will occur at

22   the conclusion of Mr. King's examination and that it will be

23   most convenient for that to take place right here in the

24   courtroom.  We'll simply clear the courtroom of those

25   spectators and others who are here who don't need to be part of

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 115

1    that conference and we'll do that at the end of the afternoon.

2    Does that work for everybody?  Fine.  We'll take a break till

3    2:00.

4         (Recess from 12:41 p.m. until 2:05 p.m.)

5            THE COURT:  Be seated, please.

6            MR. TAMBE:  Your Honor, may I proceed?

7            THE COURT:  Please.

8    RESUME CROSS-EXAMINATION

9    BY MR. TAMBE:

10   Q.   Mr. King, I want to draw your attention back to a short

11   bit of testimony from this morning.  And if we could just pull

12   it up on the rough so you know what I'm asking you about.

13           MR. TAMBE:  It's page 4992, the next page, please.

14   And if you could highlight lines 6 down through 16, please.

15   Q.   You were asked a couple of questions this morning and you

16   gave those answers.  I want to start with the second question,

17   whether any secret agreements or understandings between you and

18   your team or Barclays and anyone at Lehman, with regard to the

19   valuation of assets and the sale transaction that was presented

20   to His Honor, as far as you know, and you said "Certainly not."

21   There's about three things going on in that question, so I want

22   to try and unpackage it.  Certainly you're not aware of any

23   secret agreement being presented to this Court, correct?

24   Right?

25   A.   Yes.

Page 116

1    Q.    Okay.

2    A.    Sorry, yes.

3    Q.    So now let's talk about whether there was any secret

4    agreement between Barclays and Lehman.  And let's split up the

5    secret from the agreement, okay?  Is it fair to say that your

6    understanding from the beginning of that week, the week of

7    September 15th, was that Barclays was not going to purchase any

8    of the securities that it intended to purchase at Lehman's

9    values; Barclays was going to assess its own values for those

10   securities, correct?

11   A.    Well, I know that I was asked by my management team to

12   produce a valuation for those securities, yes.

13   Q.    And it was your understanding that, at least as far as the

14   negotiations were going, there were negotiations that were

15   being had between Barclays and Lehman as to what price Barclays

16   was willing to pay to purchase those securities, correct?

17   A.    I -- that I don't know.  I know that I provided my

18   management with a valuation, you know, an estimate of the

19   valuation of the securities, and I know that they were having

20   negotiations, but to what extent that valuation was discussed

21   explicitly or not I don't know.

22   Q.    Fair enough.  It wasn't your expectation that Barclays was

23   going to purchase any of the Lehman securities at Lehman's

24   valuation, was it?

25   A.    I wouldn't have expected so, no.

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 117 of 232

Page 117

1    Q.    No one on the management team told you that?

2    A.    No.

3    Q.    Okay.  And in fact you recounted a conversation that you

4    had with someone from Lehman's management team, Bart McDade,

5    correct?

6    A.    Yes.

7    Q.    And in which you said you didn't see the mortgage-backed

8    securities valued the same way that you saw -- that Lehman was

9    valuing them, correct?

10   A.    Well, that Lehman was valuing them as of Friday, yes.

11   Q.    As of Friday, right.  And you made clear to Mr. McDade

12   your disagreement with those Lehman values, correct?

13   A.    Correct.

14   Q.    By the way, other than those mortgage-backed securities,

15   do you recall discussing any other securities specifically with

16   anyone from Lehman early on in the week, and your valuation

17   views of those securities?

18   A.    Not -- no, not on the Monday.

19   Q.    Okay.  And as far as you were aware, there were at least

20   discussions then taking place between the Lehman management

21   team and the Barclays management team about what the

22   appropriate level or value would be for those securities; is

23   that fair?

24   A.    I don't know that was the case.  No, I know there was a

25   negoti -- I mean, self-evidently there was a negotiation

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 118

1    continuing between Barclays and Lehman about the acquisition of

2    the U.S. business, but I really don't know to what extent the

3    valuation of the securities was being discussed, other than I

4    was asked to talk to Bart McDade about my assumed valuation for

5    mortgage-backed securities.  But I don't actually know what

6    dialogue occurred between the two firms in relation to the

7    overall valuation of the portfolio.

8    Q.   So going, then, to the first question you were asked this

9    morning, "Are you aware of any secret agreements between Lehman

10   and Barclays during the week of September 15th through the

11   closing in connection with the sale" and you said no in answer

12   to that.  You're not aware of any agreements between Lehman and

13   Barclays about the valuation of the securities during that

14   week --

15   A.   That's --

16   Q.   -- right?

17   A.   That's correct.

18   Q.   And so, at least as far as you're concerned, they were a

19   secret to you, correct?

20   A.   I'm not sure I follow.  What's a secret to me?

21   Q.   If there was an agreement between Barclays management and

22   Lehman management about a value at which Barclays was going to

23   purchase securities from Lehman, that was an agreement not

24   shared with you, correct?

25   A.   I was not aware of any secret agreements about valuations,

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 119

```
 1    no.
 2    Q.   And you were aware all along that Barclays was not going
 3    to purchase those assets at Lehman's valuations, correct?
 4    A.   Well, I know that -- I don't know whether I knew all the
 5    way along.  I knew exactly what was being agreed by the
 6    Barclays negotiating team and the Lehman people.  But I know
 7    that my valuations were being provided to management, and I
 8    know it was resulting in things that happened during that week
 9    that certainly, as far as I could see, used my valuations.
10    Q.   And your valuations were generally lower than those of
11    Lehman?
12    A.   Well, my valuations, one, were current and, two, were
13    reflecting where we would be willing -- where I thought I
14    could -- we could realize the value of those securities.  They
15    didn't reflect Lehman's marks in the week before, you're
16    correct.
17    Q.   It's a simple math question:  Your values were lower than
18    Lehman's values?
19    A.   Well, they were from different days under different
20    conditions, yes.
21    Q.   And lower?
22    A.   My number was lower than the Lehman number, yes, as I said
23    earlier.
24    Q.   Now, your numbers that were being provided to management
25    were numbers that management, as you said, was using in various
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 120

1    events that were occurring during that week, correct?

2    A.    I assume so, yes, yes.

3    Q.    And, I think, in the morning you said you were privileged

4    as an employee of Barclays to be given this awesome

5    responsibility of valuing securities, correct?

6    A.    Well, I think it was a very privileged position to be in

7    to be -- you know, to have the -- you know, my team's opinions

8    used in the negotiations.  So, yes.

9    Q.    Privileged, and it was a responsibility that you felt,

10   right?

11   A.    Huge responsibility, yes.

12   Q.    And you wanted to be accurate when you spoke with

13   management about what it is that you were dealing with in

14   valuing these securities, correct?

15   A.    Accurate and -- accurate's a funny word.  I needed to

16   provide them simple but relevant information that they could

17   use.

18   Q.    And I trust you were describing the serious problems you

19   were having with valuing the securities.  And all the detail

20   that you described to this Court, you used the same words with

21   management, correct?

22   A.    I will have certainly used the same words or similar words

23   to describe the uncertainty in the market and the problems with

24   these particular types of securities and the information that

25   we were dealing with.  But they would have been familiar with

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 121 of 232

Page 121

1    that as well, because it's not as if the securities were

2    entirely unique.  You know, we had experienced similar issues

3    with valuations and realization ourselves.

4    Q.   And so you were being full and frank with management and

5    sharing with them your concerns about the securities as you

6    uncovered these concerns, correct?

7    A.   Well, when -- you know, on a timely basis and when quizzed

8    on it, when I thought it was relevant to escalate an issue,

9    yes.

10   Q.   And you know that there were events that occurred that

11   week which were significant events which required you to

12   provide your input as to where you were at that point in time

13   on your assessment of values, correct?

14   A.   Yes.

15   Q.   Things like a board meeting at Barclays, correct?  That

16   was a significant event that would have required input from you

17   and your time on valuation, right?

18   A.   I assume so, yes.

19   Q.   Well, you don't just assume so, you know so, right?

20   A.   No, I don't.  I mean, I assume -- I don't actually know

21   what board meetings were held or who was present or how my

22   information was used.  I assume there were board meetings.  And

23   I would assume that if it had anything to do with the

24   valuations of securities that it would probably use the

25   information that I provided or some derivative of it.  But I

Page 122

1    actually don't know what -- you know, what meetings were held.

2    Q.    Well, and you would assume, I guess, in your list of

3    assumptions that valuation was probably a topic that was

4    discussed at the board meeting?

5    A.    I don't know.

6    Q.    No idea?

7    A.    Barclays was acquiring a business that in some way

8    incorporated an asset purchase which included these securities.

9    So I would have been surprised if it didn't come up in any form

10   whatsoever.  But in what form, I don't know.

11   Q.    And to the extent the board did have discussions about

12   valuation -- this is the Barclays board -- you're not aware of

13   anyone other than you who was given a similar privileged

14   position to opine on the value of the assets that were being

15   purchased, correct?

16   A.    Well, other people within the firm may well have had

17   opinions, including Mike Keegan that you mentioned earlier and

18   other people that had looked at the collateral, had -- familiar

19   with markets.  And I would certainly have assumed that -- in

20   fact I know because I've been in meetings where Mike or others

21   were there, that they would have commented on my opinions.

22   Q.    And judging from the information, then, that was coming

23   on -- coming out into -- coming to your attention from on high

24   when members of senior management spoke --

25   A.    Right.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 123

1   Q.   -- did you hear them taking views that were contrary to

2   yours?

3   A.   I don't rem -- I mean, they were -- I don't remember

4   specifically that, but I was -- you know, we were dealing with

5   our own assets as well and our own risk positions.  And so

6   during the course of that week, it would have been the case

7   that the names that we've mentioned earlier, whether it be

8   Michael -- Mike Keegan or Rich or Patrick, would have

9   interrogated me and asked me about, you know, how confident I

10  was or what assumptions I was making or -- and I can't remember

11  how detailed they were, but it -- they would have certainly

12  been asking me sensible questions about how confident I was in

13  my results and what issues we might face in realizing that

14  value.

15  Q.   Putting aside the board meeting, you were aware, were you

16  not, that some of the valuation work that you were doing was

17  also factoring into the asset purchase agreement, correct?

18  A.   Well, I know that the assets that I was valuing were in

19  some way subject -- a subject of the asset purchase agreement,

20  yes.

21  Q.   And that asset purchase agreement and the facts

22  surrounding the asset purchase agreement were facts that were

23  then being submitted to this Court for the Court's review and

24  ultimate approval of the transaction, correct?

25  A.   Well, I never attended the court, so I don't know what was

Page 124

1    actually discussed.  But again, as with the board meeting, I

2    would -- you know, I would have assumed that in some way the

3    work that we were doing was useful output that was being used

4    somewhere.

5    Q.   If you could turn in your binder to the binder that does

6    not have your name on it.  It simply says "Witness Binder", if

7    you have that.

8    A.   Yeah, this one.

9    Q.   Okay.  And if you could turn to Movants' Trial Exhibit 16

10   in evidence.

11   A.   This is the one that just says "Witness", right?

12   Q.   That's right.

13   A.   I think I only go --

14   Q.   There should be a --

15   A.   -- I only go up to 15 --

16   Q.   There should be --

17   A.   -- I think.

18   Q.   I'm sorry.

19   A.   I think I only go up to 15.

20   Q.   It's tab 7.

21        THE COURT:  It's tab 7.

22   A.   Oh, it's tab 7.  Sorry.

23   Q.   Are you there?

24   A.   All right.  Yes.

25   Q.   And you'll see that tab 7 is a transcript of a conference

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 125

1    call that was held with senior management of Barclays the week

2    of the 15th of September.  This particular call was held on

3    Wednesday, the 17th of September 2008.  Do you see that?

4    A.    Yes.

5    Q.    Okay.  Did you listen in on that call?

6    A.    No.

7    Q.    Were you provided with a transcript of the call?

8    A.    Not knowingly, no.  No.  Don't think so.

9    Q.    If you could just keep your voice up, please.

10   A.    Yeah, sorry.  No, I don't think so.

11   Q.    And do you know whether any of the valuation work that you

12   had done featured in the call?

13   A.    I don't know whether it explicitly did.

14   Q.    Well, you were told they were to prepare analyses and

15   valuations that would be used by senior management for the

16   purposes of an analyst call?

17   A.    No.

18   Q.    If you could turn to page 2 of this exhibit M16, and the

19   third paragraph, which begins "The acquisition of the core".

20   The third sentence begins "We are acquiring".  Do you see that?

21   A.    Yes.

22   Q.    And it says "We are acquiring trading assets with a

23   current estimated value of seventy-two billion dollars and

24   trading liabilities with a current estimated value of 68

25   billion, for a cash consideration of 250 million," do you see

Page 126

1    that?

2    A.    Yes.

3    Q.    And those were not Lehman's valuations of these securities

4    that were being used in this report -- in this conference call;

5    they were valuations prepared by Barclays, correct?

6    A.    I -- well, I -- this is a statement by Barclays, but I --

7    but I don't know what was the source of the seventy-two billion

8    dollars --

9    Q.    No idea where that comes from?

10   A.    No.  It's not too dissimilar to the number that we were

11   looking at earlier, but I don't know what it -- I don't know

12   its source, no.

13   Q.    Well, would you have expected Barclays, given what you

14   knew in the first few days of that week, to be stating to the

15   investing public at large that it was acquiring assets at

16   Lehman's values as opposed to Barclays' own values?

17   A.    No, I would have -- no, I would have assumed that it was,

18   you know, numbers that John Varley would have been comfortable

19   with using.  So it was sourced to one of his people, but how

20   I -- how and what they were using, or even here what it

21   included, I'm not too sure.

22   Q.    And that's a good point, right?  I mean, John Varley is

23   the chairman of the group, correct?

24   A.    Um-hmm.

25   Q.    And he would not be using numbers in a public conference

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 127

1   call unless he had some level of confidence from his people

2   that these are numbers that he could go public with, correct?

3   A.   Presumably, yes.

4   Q.   If you'd turn over to page 3 of this transcript.  And

5   there's a question and answer at the bottom of page 3.  And the

6   person who's being asked the question and who's answering the

7   question is a Chris, and I believe that's Chris Lucas.  And

8   that's a name you're familiar with, correct?

9   A.   Yes.

10   Q.   Okay, and he is the group CFO, is that right?

11   A.   Yes.

12   Q.   Okay.  And Chris says "I should say that, out of a total

13   of 72.7, which is a net number, the vast majority of those

14   assets are quoted equity, government and agency paper, CP money

15   market instruments and derivatives, and a relatively sizable

16   cash and matched book."  Do you see that?

17   A.   Yes.

18   Q.   "There's a small amount of mortgage paper, which was

19   heavily written down and included in those numbers."  Do you

20   see that?

21   A.   Yes.

22   Q.   And presumably that's a reference to the mortgage assets

23   that you, in your valuation of the mortgage assets, had written

24   down by about fifty percent?

25   A.   Right.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 128

1    Q.   Right.  Okay.  So, again, this suggests that the numbers

2    that are being used are numbers that have been through the

3    Barclays valuation process, right?

4    A.   Well, except that it's the 17th.  So it's in the middle of

5    the week, so the valuation process was ongoing.  But -- and

6    there were things that he describes as being included in here

7    that we hadn't been -- that I don't recognize:  relatively

8    sizable cash, matched books.  So I'm not exactly sure what

9    they're referring to in the 72.7.

10   Q.   And when he refers to a small amount of mortgage paper,

11   you agree with his assessment there was a small amount of

12   mortgage paper, correct?

13   A.   Well, in that -- in some regard, whether it's my initial

14   estimated value of three billion or so, or the Lehman estimated

15   value of six billion or so, it's still less than ten percent of

16   the seventy-two billion dollars that he has on the first line.

17   Q.   So you do agree with them that, given the assets that you

18   were looking at, the mortgage assets were a small amount?

19   A.   Well, I'm just saying that sub ten percent, I suppose,

20   could be construed as a small number.

21   Q.   Okay, so you don't disagree with that sentiment that's

22   being expressed?

23   A.   I'm saying it seems -- it's a reasonable comment to make

24   for a number that's less than ten percent.

25   Q.   And consistent with what you knew, at least at that point

Page 129

1    in the week?

2    A.    I'm not sure I -- can you ask met that again?  I'm not

3    sure I understand.

4    Q.    That comment was consistent with what you knew at that

5    point in the week?  I understand your knowledge changed later

6    on, but by Wednesday the 17th, that's consistent with what your

7    understanding was of what the assets were, correct?

8    A.    Well, I -- you'll have to forgive me for not being precise

9    about the timings but, you now, at some point by the 17th, I

10   think the mortgage securities had been reduced to half -- that

11   it was half of the portfolio that we were taking.  And if they

12   were using half of the valuation, the Lehman valuation, as the

13   estimated realizable value, then that would be about 1.5

14   billion dollars.  So it would be a reasonable comment, if that

15   was what was embedded in that seventy-two billion dollars, for

16   Chris to say it's, you know, a small number.

17   Q.    And if you turn over to the next page, there's a further

18   answer from Bob Diamond, again talking about the assets, and it

19   starts at the top of the page.  And in particular, I draw your

20   attention to the first and second point that he makes.  He says

21   "First and foremost, as Chris said, we got to choose which

22   inventory came with the deal."  And that was consistent with

23   your understanding of how the assets had been identified that

24   you were valuing up until that point in the transaction,

25   correct?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 130

1  A.   I don't know how broad a statement that is but, you know,

2  as far as I could see at the time that I was looking at the

3  assets on the 17th -- I was just looking at the U.S. balance

4  sheet.  So other than the fifty percent of the mortgage assets

5  that I think had come out of that conversation following the --

6  following my conversation with Bart McDade on the Monday

7  evening, I don't know how much selection really was occurring.

8  And this discussion was quickly superseded by the repo

9  transaction in which we had absolutely no ability to do asset

10 selection.

11 Q.   Again, putting aside how the transaction changed, and I'll

12 have questions about that as well --

13 A.   Right.

14 Q.   -- just focusing on what the state of the world was on the

15 17th -- and in fact that's the state of the world that was

16 represented to this Court on the 17th, correct?  It's what you

17 knew at that point in time?

18 A.   I'm sorry, I don't mean to be difficult.  What did I know

19 at that time?

20 Q.   Okay, and here's what I'm asking:  That Barclays got to

21 choose what inventory they were buying and not buying, that was

22 the nature and scope of the deal at that point in time,

23 correct?

24 A.   I don't really know that, to be honest with you, because

25 I -- what I was looking at was the balance sheet of the U.S.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 131

1    entity.  And I -- you know, other than the mortgage assets over

2    which there had been some discussion, and at a very broad

3    level, fifty percent of the assets, there's -- I don't know of,

4    at least with the securities portfolio, there being that much

5    of a selection of what we took or what we didn't.  This may be

6    a comment to a much -- for all I know, Bob may be responding to

7    a much larger question of things that were included in that

8    discussion, or not, because, after all, that balance sheet that

9    we were looking at earlier was already a net balance sheet that

10   excluded a lot of other assets and liabilities.  So I don't

11   know how selected -- I don't know how narrow this question was.

12   Q.   Again, I guess -- I don't want to talk past each other.

13   With regards to how narrow or broad the selection was, your

14   general understanding was that there was a selection process,

15   that Barclays was selecting particular assets to acquire and

16   particular liabilities to assume, correct?

17   A.   I don't really know very much about that, to be honest.  I

18   know there was that September 12th balance sheet that I was

19   asked to provide a valuation on the assets.  I know there was

20   discussion at this time going on about buildings and another

21   liabilities and, you know, personnel costs and things.  I don't

22   know what other things -- I wasn't part of that discussion.  I

23   was just -- in relation to the securities, the long side of the

24   balance sheet.

25        So I don't really know.  But within that area, other than

Page 132

1    the fifty percent of the mortgages, I really don't remember

2    there being, you know, much discussion about a selection

3    process.  I was asked to look at the long leg of that balance

4    sheet.  And anyway, later on this day or the following day, it

5    was superseded by the discussions about the repo.

6    Q.   Okay.  So if there was selection going on, you weren't

7    involved in it?  You're not disagreeing with what Bob says; you

8    just don't know one way or the other what selection, if any,

9    had occurred?

10   A.   I could only reconcile it by it being that there was a

11   broader discussion about other assets or other liabilities that

12   I certainly wasn't part of.  But then also I never saw any

13   evidence particularly at this point.

14   Q.   Moving down to, I believe he says, the second thing, "I

15   think the second thing", and he goes on to say, "that is

16   important is we had just completed seventy-two hours of due

17   diligence on every position.  So when it came time to make the

18   decision on what came, we personally had been doing due

19   diligence and were able to establish the marks."  Do you see

20   that?

21   A.   Could you say that again?  Sorry.

22   Q.   Sure.  It's the last two sentences of that paragraph.  "I

23   think" -- and it's highlighted on the screen, if that's

24   helpful.

25   A.   Oh, sorry.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 133

1    Q.   You there?

2    A.   Yeah.

3    Q.   And it's the last part of that.  "We had personally been

4    doing due diligence and were able to establish the marks."  Do

5    you see that?

6    A.   Right.

7    Q.   And you understand that as a reference to the type of work

8    you and your team had been doing in reviewing the securities,

9    correct?

10   A.   It's reasonable to assume so, yes.

11   Q.   And you don't disagree with Mr. Diamond's description of

12   the work that you had been doing in doing due diligence and

13   being able to establish the marks, correct?

14   A.   Well, it's -- in fairness, it's a little bit more final

15   than I would have described our results.  But we were doing

16   work.  We had -- we did have seventy-two hours.  We had been

17   doing due diligence on as many positions as we could; not --

18   certainly not every.  And to say that we established the marks,

19   well, we had come up with some estimates of marks that, as I

20   said earlier, we continued to revise and refine for many days

21   and weeks following.

22   Q.   So the sentiment Mr. Diamond's expressing is a little bit

23   different than the sentiment you expressed to the Court, except

24   it's different in every way, correct?  You didn't know what

25   CUSIPs you had, you didn't know what values to ascribe to them,

Page 134

1    you didn't have the trustee reports, you didn't have the

2    offering documents; you didn't have anything.  You were

3    guessing and making subjective decisions about marks, right?

4    A.   As I said earlier, the word "guessing" sort of demeans the

5    efforts a little bit.  But there are assumptions that were

6    being made and there were estimates.  I -- there's a refinement

7    that seems to be suggested in that establi -- "were able to

8    establish marks".  I guess one could say yes, if I provided

9    Patrick or Rich with marks, however crude the assumptions may

10   have been in establishing them, then it's legitimate for both

11   to say that.  For me personally, establishing marks -- it

12   takes -- it took us a very long time to do that line by line

13   and for every security.  At a high level, maybe it's adequately

14   correct.

15   Q.   Or it's possible that your grave concerns and sentiments

16   about valuation risks were somehow not conveyed to Mr. Diamond?

17   A.   Well, I don't know what was conveyed to Mr. Diamond, but I

18   would be -- I find it hard to believe that the uncertainty

19   around those marks was not conveyed.

20   Q.   In describing the various problems you were facing, I

21   think you used as an example a couple of the schedules that you

22   had received from Lehman and talked about the problems you had

23   with even that -- you know, those extensive spreadsheets.  And

24   so let's go to one of the examples that you talked about.  So,

25   for example, if you turn to tab 4 in the -- take your time.

Page 135

1    A.    Sorry.

2    Q.    Sure.  Okay.  If you could turn to tab 4 in the binder

3    that counsel gave you.  And that was BCI Exhibit 909.

4    A.    Tab 4.

5    Q.    Do you have that, tab 4?

6    A.    I thought -- maybe I'm looking in the wrong place.  Oh, is

7    that in the other binder?

8    Q.    Yeah, in the one that your counsel gave you.  I'm sorry if

9    I wasn't clear.

10   A.    Oh, sorry.  It's a small space for a lot of binders.

11   Okay, tab 4, 909.  Go ahead.

12   Q.    And you remember discussing this on your direct, correct?

13   A.    Yes, I remember being asked to --

14   Q.    And attached to this cover e-mail that makes its way from

15   Lehman to you early the week of the 15th is a schedule, and

16   it's a schedule of securities, correct?

17   A.    Correct.

18   Q.    And you describe, for example, that very often what was

19   listed on the schedule was difficult to decipher and really

20   figure out what the security was, right?

21   A.    Yes, certainly there were cases like that.

22   Q.    And you encountered that problem and that difficulty with

23   all of the considerable resources of Barclays at your disposal,

24   correct?

25   A.    Yes.

Page 136

1   Q.   It wasn't for want of manpower?  I mean, if there was

2   someone within Barclays who could help you, you would be

3   reasonably able to get a hold of that person and say 'Help me

4   figure this out,' correct?

5   A.   I don't think that was the limitation, no.

6   Q.   You did describe other limitations:  the press of time,

7   correct?  There just, in your view, wasn't enough time to get

8   done the kind of detailed analysis you would have liked to do

9   that week, correct?

10  A.   There's always going to be a time constraint if -- whether

11  we had -- and you could see this going through the entire

12  fourth quarter.  Whether you have an hour, a day, a week or a

13  month, there's probably still more work that could be done to

14  help be certain about a position, and that was how we were able

15  to steadily improve the estimates that we were making.  On the

16  first day that we received just this, then there will have been

17  a paucity of information on certain securities that would have

18  made it difficult; for some of them, not all.

19  Q.   And when you say "paucity of information", I mean, you're

20  not just talking about paucity of information in your own

21  personal desk, your own personal group?  Paucity of information

22  available reasonably to even an institution of Barclays'

23  breadth and scope, correct?

24  A.   Yes.  I mean, it's -- and that's not a -- but that's not

25  a -- an issue that is unique to the efforts that we were doing

Page 137

1    here.  If someone said "Stephen, can you bid on a particular

2    security," I might say "Can I get the offering document?  Can I

3    get the trustee reports?  Can I get" something or other, and

4    those might take time.

5    Q.   And one of the pieces of information you had, whether

6    helpful or not, was you had Lehman's assessment of a value for

7    those securities, whether you agreed with it or not, correct?

8    A.   From the previous week, yes.

9    Q.   And in fact as the week went on and the transaction

10   changed and different schedules started being produced, you had

11   Lehman's values and sometimes you had JPMorgan's values, and

12   yet other times you had Bank of New York's values, correct?

13   A.   That's correct.

14   Q.   And sometimes you had values from all three?

15   A.   Yes, that sometimes we will have had values from all

16   three, from different times.

17   Q.   From different times.  But you had some base of

18   information, some directional information that might be helpful

19   in your analysis, right?

20   A.   I had some other people's opinions of value, yes.

21   Q.   There's a document that's not in your binder, that I want

22   to hand out to you.

23            MR. TAMBE:  May I approach, Your Honor?

24            THE COURT:  Yes.  Thank you

25            THE WITNESS:  Thank you.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 138

1        (Pause)

2    Q.   Sir, I've placed before you a rather substantial document

3    marked Movants' Trial Exhibit 716.

4          MR. TAMBE:  Your Honor, this document is not in

5    evidence.  There's been no objection lodged to it.  I'm going

6    to ask Mr. Schiller if there is any objection to our moving

7    this document in evidence.  It's a document that was submitted

8    to the Court.

9          MR. SCHILLER:  No objection, Judge.

10   (Movants' Trial Exhibit M716, e-mail referencing Schedules A

11   and B, was hereby received into evidence as of this date.)

12   Q.   Just look at the cover e-mail.  There's a reference there

13   to Schedules A and B.  Do you see that?

14   A.   Yes.

15   Q.   And if you'd take a moment to flip through.  And I'm not

16   going to ask you to read even selected readings from this

17   spreadsheet but just to familiarize yourself with the kind of

18   information that appears there.

19   A.   Yes.

20   Q.   You'll see there's a listing of CUSIPs, something called

21   par value.

22   A.   Yeah.

23   Q.   It may be helpful for you to go to the first page of the

24   spreadsheet --

25   A.   Yeah.

Page 139

1    Q.    -- that has the headings.

2    A.    Okay.

3    Q.    So that's BCI-CG 56085.  It says at the top "Schedule A".

4    Do you see that?

5    A.    Yes.

6    Q.    And it says "CUSIP".  There's a number; there's a par

7    value, correct?

8    A.    Yes.

9    Q.    And you don't understand par value to mean market value,

10   do you, sir?

11   A.    I wouldn't instantly, no.

12   Q.    Okay.  That that would be an unusual use of the word "par

13   value" --

14   A.    I think so, yes.

15   Q.    -- to suggest that was market value?  And then there's a

16   description of the security, correct?

17   A.    Yes.

18   Q.    And you can flip through a few pages, because it's a

19   spreadsheet broken off -- broken across several pages.  Tell me

20   if you see a column that has any kind of market value

21   information for any of these securities.

22   A.    I don't, no.

23   Q.    I'm sorry, what'd you say?

24   A.    "I don't know."

25   Q.    Okay.  You were asked a question this morning; you gave

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 140

1    the following answer, on page 4995 --

2         MR. TAMBE:  It's at the -- 4995.  4995.  And it's

3    going to be at the bottom of the page; carry over to 4996.

4    Q.   The question you were asked:

5    "Q.  Incidentally, would the possession of Schedule A to the

6    purchase agreement provide the opportunity for the creditors'

7    committee to value them in September 2008 as you valued them in

8    that period?

9    "A.  They could have undertaken the same process that we had."

10        Do you remember giving that answer to that question this

11   morning, sir?

12   A.   Yes.

13   Q.   Do you know whether Barclays or Lehman provided the

14   creditors' committee with all of the types of information that

15   you believed was essential to valuing these securities the way

16   you valued them during the week of September 15th?

17   A.   I don't.  I mean, they would have been able to obtain the

18   same -- I really meant that, on a CUSIP-by-CUSIP basis, they

19   could have, from this list, without a court resource, obtained

20   the same information about the securities that we did.  I don't

21   know whether they would have had access to all of the same

22   expertise or not, but they would have been able to have access

23   to the same information.  I -- at least theoretically.  I mean,

24   I'd like to think that we do a -- you know, a very good job in

25   my unit and in my firm, but they could have undertaken the same

Page 141

1    process.  I think, with this information, this would have told

2    them the list of securities that made up the portfolio.

3    Q.   And they could have then embarked on that same multi-month

4    process that it took Barclays three and a half, four and a

5    half, five months to effectively come up with acquisition

6    balance sheet prices, is that what you're saying?

7    A.   I -- yes, I guess that's right.  They could have done the

8    same process.

9    Q.   I mean, I guess what you're saying is they could have

10   deduced it from the list.

11   A.   Deduced what?

12   Q.   The values.

13   A.   Well, they could have come up with their assessment of

14   value, yes.

15   Q.   Let's go back to another document you looked at this

16   morning.  And you can put that big Schedule A, Schedule B

17   aside.  Just one question before you do.  Do you know who made

18   the decision to take prices off that schedule?

19   A.   No, I don't.

20   Q.   Did you ever see copies of those schedules with prices on

21   them?

22   A.   I will have seen -- I may well actually have seen the

23   spreadsheets that led to the production of those, which may

24   have had more information than are in those schedules.  So I

25   don't know who made the decision to include just that

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 142

1    information.

2    Q.    Well, it's not just you may have, right?  I mean, the

3    schedules you were getting from BoNY and from JPM and from

4    Lehman did have process.  You may have disagreed with the

5    prices, but they did have the prices on there, correct?

6    A.    They had their prices, yes.

7    Q.    And they had BoNY's prices and JPM's prices, correct?

8    A.    Well, no, I saw a JP -- no, because I saw J -- I don't

9    remem -- no, because we only saw JP's prices for the securities

10   that were in the Fed facility on the Wednesday -- Thursday.

11   Then we saw BoNY's for the stuff that was delivered on the

12   Thursday.  I don't remember which ones we saw Lehman prices

13   for, if any of them, up to that point.  So that means that

14   we -- what I do know is that we saw the Lehman prices for the

15   balance sheet as of the Friday the 12th.  I saw BO -- JP's

16   marks for the Fed portfolio, some of which was delivered on the

17   Wednesday.  And the I saw BoNY's marks on the Thursday.  And

18   then more importantly, we were working on our own set of

19   values.

20   Q.    And none of those values, the Wednesday JPM marks, the

21   Thursday BoNY marks, any Lehman marks, appear on Schedule A and

22   Schedule B filed with the Court, correct?

23   A.    Not as you've shown me, no.  That's correct.

24   Q.    You were asked this morning about the asset purchase

25   agreement, and that is Exhibit 1.

Page 143

```
 1              MR. TAMBE:  Is that tab 1 in the common folder?

 2    Q.   It should be tab 1 in the common binder, the witness

 3    binder, without your name on it.

 4    A.   Tab 1 in the -- tab 1 in your witness binder?

 5    Q.   Yes.

 6    A.   Okay.

 7    Q.   You were asked about the seventy billion dollar long

 8    position.  Do you remember that?

 9    A.   The -- sorry, could you repeat that?  The seventy --

10    Q.   Yeah --

11    A.   -- billion dollar long position?

12    Q.   Yeah, on page 6 of the asset purchase agreement --

13    A.   Yes.

14    Q.   -- and, in particular, under purchased assets, subsection

15    (d) in particular, Steve.

16    A.   Yes.

17    Q.   You were asked about that item, government securities,

18    commercial paper, corporate debt, corporate equity, exchange-

19    traded derivatives, "with a book value, as of the date hereof,

20    of approximately seventy billion".  Do you see that?

21    A.   Yes.

22    Q.   Having gone through the math we went through earlier,

23    that's not Lehman's book value for those assets, is it, sir?

24    A.   I -- you know, I don't know -- I don't know the source of

25    that seventy billion dollars.  I didn't contribute that.  It
```

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 144 of 232

Page 144

1   didn't seem to contradict the mats that we did earlier.

2   Q.   Well, the mats that we did earlier have the seventy

3   billion in item (d), and then you said 'Well, this doesn't

4   include the mortgage-backed securities.'  So that's another two

5   and a half billion.  That's 72.5.  And that's the number that

6   your chairman, Mr. Varley, used in the analyst call, correct,

7   the number that had been vetted by Barclays?  It was a Barclays

8   number?

9   A.   I don't know that to be -- I mean, it's -- there's a good

10  addition of two and a half to seventy to make seventy-two and a

11  half.  I can agree to that.  But whether that was the -- you

12  know, whether those are the two same numbers or the source of

13  them I don't know.

14  Q.   Well, if that was Lehman's book value for those assets,

15  that's not the price you were prepared to pay for those assets,

16  correct?

17  A.   No, it was -- I think the number that we calculated was

18  based off of the Lehman balance sheet -- the Lehman balance

19  sheet as of the 12th, excluding the mortgages, adding in the

20  short-term assets.

21  Q.   Well, that's also a bit of math that you did this morning,

22  correct?  You --

23  A.   Oh, I thought -- sorry, maybe I'm -- maybe we should go

24  back.  I thought that was the --

25  Q.   Well, let's go back to that.

Page 145

1    A.    -- question you were asking me.

2    Q.    You were asked to look at this number, and then you were

3    asked to look at the balance sheet from September 12th --

4    A.    Right.

5    Q.    -- do you remember that?

6    A.    Yes.

7    Q.    And that was tab 2 in the binder that your counsel gave

8    you.

9    A.    Right.

10   Q.    And you did a bit of math this morning around that balance

11   sheet, correct?

12   A.    Correct.

13   Q.    Right, and you took -- this was BCI Exhibit 191.  You went

14   to the clear version of that --

15        MR. TAMBE:  -- which is behind tab 2, Your Honor, of

16   the Barclays binder.

17   A.    Right.

18        MR. TAMBE:  Do you have 191C, Steve?

19   Q.    And you did some math.  You said you started with the

20   sixty-five billion that appears there.

21   A.    Yeah.

22   Q.    You said 'Well, that calculation doesn't include the

23   short-term collateralized agreements,' whatever those are.  So

24   you added ten to the sixty-five, right?

25   A.    Right.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 146

1    Q.    And then you backed out two and a half, right?

2    A.    I think we backed out six and a half, actually, didn't we?

3    We took off the entire amount of the mortgages.

4    Q.    And that's how you came up with the seventy.  You did that

5    bit of math?

6    A.    We came up with less than seventy.  We came up with sixty-

7    eight and a half.

8    Q.    This balance sheet, Exhibit 191C, you don't know how that

9    was prepared, do you, sir?

10   A.    No, other than --

11   Q.    No idea what systems it pulled information from, do you,

12   sir?

13   A.    Well, to say I have no idea is an odd comment because,

14   after all, it was supposedly the bank's balance sheet as of --

15   LBI's balance sheet as of the Friday evening.  So I have some

16   idea how banks put their balance sheets together, but I don't

17   actually know their systems or anything.  So I was given this

18   as a -- and told that this is the inventory, this is the

19   cumulative valuations according to Lehman's marks as of

20   September 12th.

21   Q.    Right.  And someone gave this to you, you said, Monday the

22   15th when you began the process of trying to figure out what it

23   is that Barclays was going to buy, right?

24   A.    Yeah, I think that's the first time I saw it, yes.

25   Q.    And you don't know whether this balance sheet was prepared

1    specifically for that purpose or not, correct?

2    A.   I don't actually, no.

3    Q.   So you don't know if there were negotiations that preceded

4    the preparation of this balance sheet, certain assets were

5    excluded, others were added, and this was prepared for purposes

6    of your analysis?  You don't know, do you, sir?

7    A.   Well, I don't know for certain, but it is -- it's LBI's

8    balance sheet by GAAP asset type as of 9/12 --

9    Q.   Well --

10   A.   -- and that was what it was represented to me as.

11   Q.   Right, you're reading off the top of this balance sheet?

12   A.   Yes.

13   Q.   You haven't spoken to the person who prepared this balance

14   sheet, right?

15   A.   Well, no, I haven't, but -- no, it -- no, I haven't spoken

16   to the person.  But it was represented to me at the time that

17   that's what this was.

18   Q.   And then if you go to the cover e-mail in Exhibit 191, the

19   second paragraph of that e-mail, this is an e-mail authored by

20   Jasen Yang, who you've told us worked with you, correct?

21   A.   Works for me, yes.

22   Q.   In fact, still does?

23   A.   Yes.

24   Q.   And he's trying to describe a reconciliation process in

25   that second paragraph, trying to tie out the numbers on that

Page 148

```
 1    9/12 document with schedules that you had been receiving from

 2    Lehman, correct?

 3    A.   Correct.

 4    Q.   And he was unable to do so, correct?

 5    A.   Correct.

 6    Q.   His e-mail to you is from the 17th of September.  Do you

 7    see that?

 8    A.   Yes.

 9    Q.   Do you know whether subsequent to the 17th of September he

10    was able to definitively tie out lists of CUSIPs with this

11    so-called balance sheet that was provided to you?

12    A.   I don't know subsequently, no.  And I don't think we ever

13    did it on the Thursday, because we switched to focus on the

14    repo.

15    Q.   Right, so whatever reconciliation effort was underway kind

16    of changed direction at that point?

17    A.   Correct.

18    Q.   Let's come to that part of the week now, the change in the

19    deal.  From your perspective and the work that you had been

20    doing, the work that you were privileged to do in assessing the

21    values of billions and billions of dollars of securities, this

22    was a sea change in the transaction, correct?

23    A.   On the -- sorry, on the Thursday?

24    Q.   On the Wednesday into Thursday, yeah.  The Fed repo.

25    A.   The repo, right.
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 149

1    Q.   It was a sea change in the transaction, from your

2    perspective, wasn't it, sir?

3    A.   I don't know whether it was a sea change.  I mean, it's --

4    it was, you know, another set of marching orders.

5    Q.   Well, I thought you told us this morning that all this

6    work you had been doing, this difficult work of analysis, was

7    sort of set to the side because now you had a different

8    agreement and a different pool of collateral --

9    A.   Right.

10   Q.   -- to value, correct?

11   A.   Right.

12   Q.   Incredibly difficult stuff to do, right?

13   A.   Right, but we'd just done that twice -- at least twice

14   before as well.  So --

15   Q.   But wasn't this a completely different set of securities,

16   sir?

17   A.   No.

18   Q.   Oh, it wasn't?

19   A.   No.  Some -- as we say, some -- I think I said it earlier

20   in my testimony that some of the securities that we'd been

21   looking at from the previous week and earlier on in that week

22   were also in the Fed facility, unsurprisingly.  After all, it

23   was financing of securities that were on LBI's balance sheet,

24   or at least financed through LBI.  So there was overlap.  And

25   we were able to build on the work on the securities that we'd

Page 150

 1   already done, and commence work on the securities that we

 2   hadn't looked at.

 3   Q.   Okay.  So some of the work you'd done before was in fact

 4   helpful to you even with the changed transaction?

 5   A.   Correct.

 6   Q.   Because, as you said, there was overlap in securities,

 7   correct?

 8   A.   Correct.

 9   Q.   Now, I think you laid some numbers out on direct in terms

10   of the overlap and helping us put some dimension around the

11   overlap.  And what's your recollection of what the overlap was?

12   A.   Well, can I just be clear?  I thought you were asking me

13   about the overlap between earlier on in the week and the work

14   on the Wednesday going into the Thursday.  The overlap I was

15   talking about earlier, and on which I gave some dimension, I

16   think was to do with the Fed facility that we thought was going

17   to be delivered and the Fed facility that was actually

18   delivered on the Friday.

19   Q.   Fair point.  So the overlap that you were talking about

20   was the overlap between the securities you were looking at

21   earlier in the week and the Fed, correct?

22   A.   No --

23   Q.   That's what you --

24   A.   No, the numbers I -- when I said there was some overlap,

25   and I gave some dimensionality to it earlier, I was describing

Page 151

1    what we thought we were going to take delivery of on the

2    Thursday and what we actually took delivery of on the Friday.

3    I only alluded to the fact that there was overlap, and I don't

4    remember how much, and that we were able to reuse some work

5    from the work that we had done earlier on in the week and even

6    the week prior.

7    Q.   So then let me go back to my question, because maybe I

8    misunderstood what you meant by "the overlap".  When the deal

9    changed to involving the Fed repo in any way -- so the Fed repo

10   showed up on the scene, which was --

11   A.   Right.

12   Q.   -- you said, Wednesday or Thursday of that week, correct,

13   was the fact that now there was going to be a Fed repo involved

14   in some way -- was that a sea change, from your perspective, in

15   terms of the work that you were doing?

16   A.   "Sea change" sounds very evocative.  We had done work on

17   trying to ascertain:  the list of securities on which we should

18   do work; a list of assets that we should do work the week

19   prior; on a list of securities that we should do work on early

20   on in the week; any revisions to that list of securities during

21   the course of the week because the balance sheet was changing;

22   and then a list of securities that was making up collateral

23   that had been posted to the Fed, that we knew about on the

24   Wednesday going into the Thursday.

25        In some respects, each -- you know, "sea change" is a bit

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 152

1    of a -- you know, it creates an image.  All we did was to say

2    All right, now we have another list of securities.  How many of

3    them do we know?  How many of them are we already in the

4    process of evaluating?  And how much new work do we need to do

5    and start the process again of providing my management and

6    estimate of another set of -- the valuation of another set of

7    assets?

8    Q.    Well, did that materially change the amount of work that

9    you were doing, the fact that there was now this new dimension?

10   A.    Well, we were working -- in what way was there a new

11   dimension?  Sorry.

12   Q.    The fact that instead of buying assets from Lehman, asset

13   lists that you had been reviewing, you were now going to get

14   these assets via the Fed repo facility, correct?

15   A.    So it was just another set of assets, of which there was

16   significant overlap between that work and the work that we'd

17   been doing earlier on in the week.

18   Q.    Okay.  And that's the point that I wanted to get to, which

19   was there was significant overlap from the Fed -- the

20   securities that were in the Fed repo and the securities that

21   you had been looking at in the earlier part of the week, right?

22   A.    Yes, and -- but I can't remember how much that was.

23   Q.    Okay.  So there's some overlap there?

24   A.    Yes.

25   Q.    And there's also overlap, then, between what's in the Fed

1   repo and what's in ultimately the Barclays repo, correct?

2   A.   Yes.

3   Q.   Okay.  And your earlier testimony was about the overlap

4   between the Fed repo and the Barclays repo, correct?

5   A.   Yes.

6   Q.   And you had dimensioned that overlap roughly, saying

7   there's roughly thirty billion in overlapping value, correct?

8   A.   I think that's right, yes.

9   Q.   And there was another seven billion that never came over.

10  So that was a placeholder of sorts, seven billion, correct?

11  A.   The -- do you mean the cash?

12  Q.   The cash.

13  A.   Right.  So there was seven billion in cash.

14  Q.   Okay, so seven billion in cash.  Thirty billion of

15  overlap?

16  A.   Yes.

17  Q.   And then you said another ten to thirteen billion that was

18  new to you, is that right?

19  A.   Right, depending on whose valuations you're using, yes.

20  Q.   And when you say it's new to you, that -- are you meaning

21  to say that those are securities that you had never seen before

22  during that week?

23  A.   I think that the bulk of them we had never seen before,

24  but some of them I think we had seen before.  The vast majority

25  of them we had just not seen before.

Page 154

1   Q.   And I also thought I heard you say that the vast majority

2   if this ten to thirteen billion slice, which was not

3   overlapping, was comprised of equities; there were a lot of

4   equity positions in there?

5   A.   That's correct.

6   Q.   And I believe you said about eight billion dollars' worth

7   of equities, correct?

8   A.   Well, I -- what I think I said was that there was -- I

9   remember there being -- in total, we ended up with an exposure

10  of about eight billion dollars to equities.  I think there

11  was -- this is excluding converts and other things that are

12  equity-like, of which one billion dollars was in the original

13  Fed facility.  So as I remember it, about seven billion dollars

14  of the ten-or-so billion dollars that came over that we hadn't

15  seen before was exchange-traded equities.

16  Q.   Now, you had some analysis done of the overlap, correct,

17  and the valuation of the overlap?  Do you remember that?

18  A.   Later on.

19  Q.   Yes.

20  A.   Much later on.  For the -- for when?

21  Q.   Well, why don't we go to the document.  It's Exhibit M777

22  in the green binder that has your name on it.

23  A.   M777.  Right.

24  Q.   And you recognize that, sir, at least as an e-mail -- at

25  the top of page 1 of M777 as an e-mail exchange between Jasen

Page 155

 1    Yang and yourself?  Do you see that?

 2    A.    Yes.

 3    Q.    And it's continuing a conversation between yourself and

 4    Mr. Yang.  And as you go further back in the e-mail chain,

 5    there are other individuals involved in that chain, but this

 6    entire chain makes its way to you.  Do you see that?

 7    A.    Yes.

 8    Q.    Okay.

 9         MR. TAMBE:  Your Honor, we offer M777 in evidence.

10         MR. SCHILLER:  No objection, Judge.

11         THE COURT:  It's admitted.

12    (Movants' Trial Exhibit M777, e-mail chain between Stephen King

13    and Jasen Yang, was hereby received into evidence as of this

14    date.)

15    Q.    And you'll see the e-mail chain begins on the last page of

16    M777 with an e-mail from the Fed to Gerry LaRocca.  You see

17    that?

18    A.    Yes.

19    Q.    Who is Mr. LaRocca?

20    A.    He's head of operations at Barclays.

21    Q.    And someone who was involved in the mechanics of the repo

22    transaction?

23    A.    Yes, I would expect, yes.

24    Q.    Now, there are some CCs shown on there:  Stephen M. Cutler

25    at JPMorgan, and Tom Baxter at FR -- at the Fed.  Do you see

Page 156

1    those two names?

2    A.   Yes.

3    Q.   Do you know who those folks are?

4    A.   No.

5    Q.   Now, this e-mail chain makes its way up to the first page

6    where Jasen is providing some analysis to you, and I want to

7    draw your attention to that analysis.  And he's doing some

8    reconciliation of overlap and values ascribed by various

9    parties, do you see that?

10   A.   Yes.

11   Q.   And what he lays out there as facts, he says "list

12   provided from Fed to Gerard matches the list we obtained on

13   Thursday 9/18".  Do you see that?

14   A.   Yes.

15   Q.   And you see that that's a reference to the list that was

16   sent by the Fed further down this e-mail chain; that matches up

17   with the list that you got -- had obtained on Thursday,

18   September 18th, correct?

19   A.   Okay.

20   Q.   So the lists match up, you see that?

21   A.   Sorry, what do you mean the list matches up?

22   Q.   You see Mr. Yang referring to the fact that the list

23   provided by the Fed as the list of Fed collateral matches up

24   with the list that you, Barclays, had obtained --

25   A.   Oh, okay.  Yes.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 157

1   Q.    -- during the week?  You see that?

2   A.    Yes, I do, yes.

3   Q.    And that's consistent with your recollection of those

4   events, correct?

5   A.    You know, I don't recollect exactly what we were trying to

6   do here, so --

7   Q.    Do you have any reason to believe that Jasen got this

8   wrong?

9   A.    No.

10  Q.    Okay.  Next bullet point, Jasen states Wednesday night,

11  "50.6 billion Chase MV", do you see that?

12  A.    Yes.

13  Q.    And you see that as a reference to market value ascribed

14  by JPMorgan Chase to this collateral, correct?

15  A.    Yes.

16  Q.    And the next bullet point down, Saturday list, "45.1

17  billion BoNY MV", do you see that?

18  A.    Yes.

19  Q.    Okay.  And you know that that is the market value ascribed

20  to the collateral by the Bank of New York, correct?

21  A.    Right.

22  Q.    Okay.  And that's not including the seven billion in cash

23  which was not valued by BoNY on Saturday the 20th of September?

24  A.    I wouldn't assume so, no.

25  Q.    So if you include the cash and the BoNY market value, the

Page 158

1    total value there is about 52.1 billion dollars, right?

2    A.   Right.

3    Q.   And then in the next bullet point, Jasen reports "About

4    thirty-two billion of collateral overlapped.  Total difference

5    in market value was less than one-tenth of one percent".  Do

6    you see that?

7    A.   Yes.

8    Q.   And you understand that as a calculation done by Mr. Yang,

9    comparing the market values of Chase and the BoNY with respect

10   to the overlapping collateral, correct?

11   A.   I'd have to try and think through what he was trying to

12   say there, but I believe it is -- that it's -- there's an

13   overlap between BoNY and Chase and that this similarity is --

14   in marks is high.

15   Q.   Do you know as you sit here, sir, what is the similarity

16   in the Barclays valuation of that thirty-two billion dollars of

17   overlapping collateral?

18   A.   Of just the thirty-two billion?

19   Q.   Just the thirty-two billion.

20   A.   I don't remember what the thirty-two billion dollars was

21   in isolation.  I don't remember exactly what the thirty-two

22   billion dollars was in isolation.  It was less than that.

23   Q.   I'm sorry, less than what?

24   A.   Less than thirty -- it would have been less than the

25   thirty-two.

LEHMAN BROTHERS HOLDINGS INC., et al.

1    Q.    Yeah, your value would have been less than thirty-two --

2    A.    Yes.

3    Q.    -- but you can't say by how much?

4    A.    I can't say by how much.

5    Q.    By billions?

6    A.    Very, very feasibly, yes.

7    Q.    Several billion?

8    A.    I -- I -- well, we were -- if the collateral -- I think we

9    ended up assuming that the collateral in aggregate was about

10    three -- what did we end up with?  If there was about forty-

11    nine billion of collateral, including the seven billion dollars

12    of cash, that was forty-two billion dollars, and I think we

13    estimated that to be worth about thirty-nine.  So it can have

14    been -- it can have been a couple of billion, but I wouldn't

15    have expected it -- but it couldn't have been more than about

16    three.  But I don't know the breakout between the thirty-two

17    and the other ten.

18    Q.    So you have thirty-two billion of overlapping collateral,

19    you have seven billion of cash, correct?

20    A.    Right.

21    Q.    And you have another ten billion of securities that you

22    had not seen before, correct?

23    A.    Ten billion also, yes, that's right.

24    Q.    And the ten billion that you're referring to, that's ten

25    billion by your calculation or by BoNY's calculation?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 160

```
 1    A.   I'm being -- I'm being so approximate that I can't --

 2    that's why I was sort of saying ten to thirteen billion dollars

 3    from recollection of things from a very long time ago.  I

 4    remember -- you know, I remember that there was -- I remember

 5    the cumulative differences between my assessed valuation of the

 6    portfolio and the -- what I -- what would have probably been

 7    the BoNY marks at the time.  The exact breakdown I can't

 8    remember exactly.  But if I was to take thirty billion dollars

 9    plus seven billion dollars of cash plus ten billion dollars

10    approximately, I would have ended up with a number of about

11    forty-seven, which I remember later on in the week was accrued

12    assessment of a first guess of what I thought the value of the

13    collateral was.  So I'm sort of backing into it, unfortunately.

14    Q.   Just looking at the data that Mr. Yang has gathered there,

15    he's got BoNY valuing all of the collateral, putting aside the

16    seven billion of cash.  So BoNY's valued the noncash part of

17    the collateral at forty-five billion, and thirty-two of that

18    overlaps with JPMorgan, right?

19    A.   Evidently, yes.

20    Q.   Right, so that leaves thirteen billion by BoNY's valuation

21    that is not overlapping, correct?

22    A.   Right.

23    Q.   Okay.  Which you value at ten?

24    A.   Well, as I say, I'm trying -- you're -- I'm trying to do

25    that from memory.  I doubt that can have been the -- I doubt
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 161

1    the full amount of the discount -- well, the full amount of the

2    difference, sorry, between the BoNY marks and my marks was

3    attributable to the collateral that we hadn't seen before.  So

4    there is an inconsistency there, but I can't remember exactly

5    when it was.  I know that what the cumulative amount needs to

6    be is about three billion dollars or so difference, assuming

7    that we're factoring in the seven billion dollars of cash, not

8    the securities that were ultimately delivered in lieu of the

9    seven billion dollars of cash.  But I don't remember the split

10   of that difference between the thirty-two billion dollars of

11   overlapping collateral and the thirteen billion dollars by BoNY

12   marks of the incremental collateral.

13   Q.   Well, are you suggesting that you had bigger price

14   differences with respect to the thirty-two billion dollar

15   collateral, or was it more of a concern on the stuff that you'd

16   never seen before?

17   A.   Well, it depends at exactly what minute you're asking me

18   that question.

19   Q.   I'm asking that question right now.

20   A.   No, well, no, I understand you're asking me the question

21   now.  But as of what moment are you directing the ques --

22   asking me to remember?

23   Q.   Everything you know right now.  Everything you know about

24   the valuation right now.  What's your sense?  Where's the

25   differential?  Is it in the thirty-two billion overlapping --

Page 162

1    A.    Right, but as of --

2    Q.    -- or is it the ten that don't overlap?

3    A.    -- but as of that morning when we didn't know what the ten

4    billion dollars was, then the risk would have been in the ten

5    billion dollars.  As we -- as you now look at it, I can do the

6    calculations based on what we knew after the work that we did

7    through Friday and Saturday and Sunday and subsequently.  And

8    this was done the 27th of September, right?  So this is

9    sometime after, by which time we all have had greater clarity

10   on what made up the portfolio we hadn't seen, the original

11   portfolio.  And I'd have been able to therefore attribute that

12   difference more accurately between the overlapping collateral

13   and the incremental collateral.

14        And therefore I think it's probably the case that there

15   was about -- and I would be doing this from memory; I would

16   suspect that it was more likely to be the case that it was two

17   billion attributable to the thirty-two billion, and one billion

18   to the ten, or thereabouts.  But I can't remember exactly -- I

19   can't remember how you get to the thirteen billion dollars.

20   But I do know the -- but you have to end up with somewhere

21   around forty-six to forty-seven, including the cash.

22   Q.    I'm sorry.  Why do we have to end up there?

23   A.    Well, from my -- from what my estimate --

24   Q.    Oh, from your perspective?

25   A.    -- of the cumulative was.  But on the morning of the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 163

1    transaction, then I had no idea of the value of the ten, and

2    through most of the morning of the Friday.

3    Q.   Are you aware, sir, that representations were made to this

4    Court about the value of the securities that were being

5    purchased by Barclays?

6    A.   When?

7    Q.   On the Friday the 19th.

8    A.   I've become aware of it.

9    Q.   And the number that was conveyed to the Court was a number

10   of 47.4 billion.  Did you provide that number?

11   A.   No.

12   Q.   Do you know who did?

13   A.   No.

14   Q.   Do you know how that number was calculated?

15   A.   No.

16   Q.   Going back to M777, you -- we talked about the seven

17   billion in cash, and your expectation -- and I say "your",

18   Barclays' expectation -- at closing on the 22nd was that there

19   was a set of securities, and then there were the seven billion

20   in cash --

21   A.   Right.

22   Q.   -- that was in an account at JPMorgan to be turned over to

23   you, correct?

24   A.   There was seven billion of cash, right.

25   Q.   And that's what you believed when the documents were

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 164

1    signed early, early the morning of the 22nd, correct?

2    A.    Well, I wasn't part of the signing or anything, so I can't

3    really comment on that.   I know that, as I've described, the

4    job that I was doing as part of this overall transaction was to

5    assess the value of securities and to determine what -- the

6    best risk management protocols that we should follow.   So from

7    my point of view, I just -- I know that in my spreadsheets and

8    in my own running totals that I had, I just had seven billion

9    of cash.

10    Q.    It wasn't just you, right?   I mean, Mr. Romain had cash in

11    those running spreadsheets as well, correct?

12    A.    I think he had cash on the spreadsheets I saw as well.

13    Q.    Right, and he's the head of technical accounting at

14    Barclays, correct?

15    A.    I think that's right.

16    Q.    At some point that changes, right?   It goes from seven

17    billion of cash receivable from JPM to some collection of

18    securities and cash --

19    A.    Some collection of securities, yes.

20    Q.    Right.   Who made the decision to take something other than

21    cash?

22    A.    I don't -- I don't know.   I wasn't part of that.   But I

23    don't know.   And these were parallel streams, so I don't know.

24    Q.    I mean, is it your understanding that that was forced upon

25    Barclays, that you were not given the option of taking cash?

Page 165

```
 1    A.   On -- by whom?

 2    Q.   By anyone.

 3    A.   By JP?

 4    Q.   JP, LBI, the Court, someone.  Did someone force you to

 5    take something else than cash?

 6    A.   I don't -- I don't know.  I don't know what was discussed

 7    or negotiated.

 8    Q.   Well, did you discuss those issues with Mike Keegan at all

 9    as to whether to take the cash or the securities?

10    A.   Did I discuss anything with Mike? On the Friday?  Maybe it

11    came up.  Maybe it came up.

12    Q.   Even after Friday.  Did you discuss with Mike 'We've got

13    this seven billion dollar item that shows up as cash on these

14    documents we're producing.  We're in discussions with JPM.

15    Should we take the cash?  Should we take securities?  Should we

16    take both'?  Did you --

17    A.   I can -- I know I def -- I -- yes, I discussed it.  I

18    don't remember what the output was or whether it was used or

19    whether anybody particularly cared about my view.  I know I'd

20    have rather had the seven billion of cash than seven, eight --

21    than four or five billion dollars of illiquid securities.

22    Q.   Well, let's see what Mike's view of that was.  Let's go to

23    the second page of Exhibit 777.  Towards the bottom of that

24    page, there's an e-mail from Mike Keegan to you and Jasen.  And

25    what Mike says to you and Jasen, third sentence down, "We
```

Page 166

1    should do":  "We should do a quick evaluation of the collateral

2    sitting in JPM to determine if it is worth more than the seven

3    billion cash and, if it is, use the Fed to reverse the Sunday

4    night deal with JPM where they were trying to take our

5    collateral on the grounds that they could not ID what it was."

6    You see that?

7    A.   Right.

8    Q.   And that was the view expressed by Mr. Keegan, to save the

9    collateral instead of the cash --

10   A.   Right.

11   Q.   -- if you determined the collateral was worth more?

12   A.   Right.

13   Q.   Ultimately, the position you took was that collateral was

14   worth less than seven billion, right?

15   A.   I know the coll -- well, I think the collateral that was

16   capable of being delivered change quite a bit over time, if I

17   remember correctly.  And the ultimate -- our assessment of the

18   value of the collateral was that it was worth less.

19   Q.   And ultimately you did decide to take both collateral and

20   some cash instead of seven billion in cash from JPM, correct?

21   A.   Yes.  Well, that was the -- that was the settlement.  I

22   suppose, yes, we agreed, yes.

23   Q.   And the cash component that you agreed to take in December

24   was 1.25 billion, correct?

25   A.   I know that number, yes.

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 167 of 232

Page 167

1    Q.    Okay.  And the securities that you agreed to take you

2    valued at much less than five billion dollars, correct?

3    A.    Yes.

4    Q.    So the total of the cash and the securities that you

5    valued for your acquisition accounting purposes was less than

6    seven billion?

7    A.    Yes.

8    Q.    And you valued those securities as of December 22nd, not

9    as of September 2008, correct?

10   A.    Yes.  I rememb -- there was a lot of discussion about it.

11   I remember that that question was at what point should they be

12   booked as an item on the balance sheet, and so which was the

13   relevant acquisition date; was it the 22nd or was it the date

14   that we took delivery of the securities, or the date of the

15   settlement.  So I think it was the date of the settlement.

16   Q.    And do you recall anyone espousing the view that it should

17   be September 22nd, 2008, before the open of the markets, when

18   the deal was signed, when the asset purchase agreement was

19   signed?

20   A.    I remember it being discussed, because we said what are

21   we -- you know, there was a practical consideration for the

22   team as to, well, what is the relevant price at which we

23   should -- that we should provide; are we looking at September

24   22nd or are we looking at the date of the settlement.

25   Q.    And ultimately, and you know this, ultimately it was

Page 168

1   valued as of December 22nd, 2008 --

2   A.   I --

3   Q.   -- the securities part of it?

4   A.   Until this moment, I had completely forgotten about it,

5   but I think that's right.

6   Q.   The equities that came over, the eight billion in

7   equities, were those part of the collateral that got

8   transferred over Thursday night into Friday?

9   A.   The eight billion of equities?

10  Q.   Yeah.

11  A.   It came over the Thursday night, that's correct.

12  Q.   That in fact made it through?

13  A.   Yes.

14  Q.   And you wake up Friday morning with eight billion in

15  equity securities sitting in your in-box?

16  A.   Yes.

17  Q.   What happened to the equity markets on the 19th, sir?

18  A.   On the 19th?

19  Q.   Yeah, the Friday.

20  A.   I can't remember -- I don't remember Friday.

21  Q.   Did they go up by as much as two, three percent?

22  A.   It could have done -- it had been going down, and then it

23  may have gone up.  They have a tendency to do that.

24  Q.   Yeah, they had gone up and down, but on Friday the 19th,

25  do you recall whether they went up or down?

Page 169

1    A.    Friday the 19th.  They may have gone up.  I don't

2    remember.

3    Q.    Ah.  You know Mr. Clackson, right?

4    A.    Yes.

5    Q.    Okay, and what's his position?

6    A.    He's the CFO of Barclays Capital.

7    Q.    Right, so let's turn to Movants' Exhibit 230, which is in

8    your binder that I gave you, the witness binder.

9    A.    Sorry, which one that one is?

10   Q.    It's the one with your name on it, with the green cover,

11   and it says "M Binder".  And M230.

12   A.    230.  And you'll recall -- you'll see that this is an

13   e-mail exchange at the top of the page between Patrick Clackson

14   and Guy Lee.  Do you see that?

15   A.    Lee Guy.

16   Q.    Lee -- I'm sorry, Lee Guy.

17   A.    That's okay.

18   Q.    And who is Mr. Lee Guy?

19   A.    He was global head of market risk.

20   Q.    And the e-mail chain begins at the bottom of the page with

21   Lee Guy, I guess, reporting on a risk position to Mr. Clackson,

22   do you see that?

23   A.    Yes.

24   Q.    And he says "Incidentally", at the bottom of the page, "we

25   seem to be long eight billion of equity.  Will bust all DVAR

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 170 of 232

Page 170

1    limits, and have to call FSA."  Do you see that?

2    A.   Yes.

3    Q.   And DVAR is a reference to daily value at risk, correct?

4    A.   Correct.

5    Q.   Okay, and those are limits in terms of what your long or

6    short exposure can be on any particular day, correct?

7    A.   Yes.

8    Q.   And then there's an e-mail exchange that goes back and

9    forth between Mr. Clackson and Lee Guy, discussing what the

10   valuations were agreed for an earlier date.  Do you see that

11   reference:  "I thought valuations were agreed for an earlier

12   date"?

13   A.   Okay.

14   Q.   And Mr. Clackson, on the top of the page, says "Yep, so we

15   made a load."  Do you see that?

16   A.   Right.

17   Q.   And you see that as a reference by Mr. Clackson to the

18   fact that there was a large profit earned by Barclays just on

19   that eight billion dollars of equities on the 19th of

20   September?

21   A.   Right.  I don't know whether we made money overall though,

22   of course.

23   Q.   You may not have made money overall.  We'll come to how

24   much money you made overall.  But you see that as a reference

25   to the fact that you made a load on the equities on Friday?

Page 171

1   A.   Yeah, I actually see it, but I -- so when is that?  Sunday

2   the 21st.  So that's the 21st.  So that's for Friday.

3   Q.   Yeah.

4   A.   I guess, if you've taken the closing price as of the

5   Thursday evening and then if you're reminding me that Friday

6   markets went up -- I know they went down again -- then there

7   would have been a gain on that portfolio as calculated using

8   the closing marks on those two days.  But it was -- it would

9   have been impossible to crystallize.

10  Q.   If you'd turn in your witness book to M200, please.

11       MR. TAMBE:  And this is Movants' Trial Exhibit 200 in

12  evidence.

13  Q.   You'll see it's an e-mail chain at the bottom from Marty

14  Malloy to you and Gerry LaRocca.  Do you see that?

15  A.   Yes.

16  Q.   And who is Mr. Malloy?

17  A.   He was -- I can't remember.  He was -- whether he was part

18  of the prime -- I think he was part of the prime brokering

19  business.

20  Q.   And he was someone who would have been involved in dealing

21  with repos and repo valuation issues --

22  A.   Yes.

23  Q.   -- from an operations perspective?

24  A.   Yes.

25  Q.   Okay.  And you see him reporting totals for the Fed

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 172

1    facility collateral?  Do you see that?

2    A.   Yes.

3    Q.   And describing collateral received for Lehman on Fed

4    facility.  And he's calculating the total amounts there, do you

5    see that?

6    A.   Right.

7    Q.   And including seven billion dollars of repo cash.

8    A.   Right.

9    Q.   The total securities and cash received is shown here at

10   52.19 billion dollars, do you see that?

11   A.   Right.

12   Q.   And he notes that that denotes an excess collateral of

13   7.19 billion dollars.  Do you see that?

14   A.   Right.

15   Q.   With a margin of fourteen percent?

16   A.   Yes.

17   Q.   And this information then gets passed along by Mr. LaRocca

18   to Mike Keegan, correct?

19   A.   Right.

20   Q.   And those are the values that were being ascribed to that

21   collateral by the Bank of New York at that point in time on

22   Friday the 19th, correct?

23   A.   That's Friday at 11 a.m., is that?

24   Q.   That's right.

25   A.   Yeah.  I remember that there are some peculiarities about

Page 173

1    some of these numbers around this morning.  They're very, very

2    volatile, because the custodian updates the equity values at

3    one time, I think, at, like, the close of business the day

4    before, but it doesn't update the bond prices until the

5    following lunchtime.  And so you get a mix and match of the

6    time stamps when you do valuations at certain times, and I

7    remember that led to some inflated numbers.  But I can't

8    remember which one this was.  I know that -- I think that's

9    what was going on with that 52.19.

10   Q.   Are you aware of any discussions that took place on Friday

11   at Barclays about relaying this 52.19 billion dollar number to

12   this Court?

13   A.   I think this was a work-in-progress number Friday morning.

14   I -- so I don't know whether it would -- I mean, I know this

15   list of securities and these valuations moved significantly

16   over hours and days.  So I have no idea whether somebody

17   decided to jump and grab the telephone and announce a number

18   that was changing itself.

19   Q.   On the securities that ultimately came over Thursday night

20   into Friday, putting aside the seven billion in cash, you have

21   testified earlier that you set about to, as you said,

22   risk-manage those assets as soon as they came onto Barclays'

23   books, correct?

24   A.   Right.

25   Q.   You were aware, were you not, that the Fed had promised

Page 174

1    Barclays that the Fed would finance those securities for a

2    period of at least thirty days?

3    A.    Right.

4    Q.    You knew that, correct?

5    A.    No, but what does -- I don't understand how that relates.

6    Q.    Well, I'm simply asking if you knew that.

7    A.    I didn't know.  It's a funding question, so I don't -- I

8    didn't know that.

9    Q.    Well --

10   A.    I mean, I may have come to know it, but it wasn't a major

11   issue, sir.

12   Q.    Seems to me that one of your concerns and one of your

13   major concerns that week was liquidity and risk and issues like

14   that, correct?

15   A.    Well --

16   Q.    Right?

17   A.    -- although we -- as I said, this is the danger of using

18   terms that mean different things in different places.  There's

19   clearly a bank-funding -- Barclays-funding-itself -- all-banks-

20   funding-themselves issue about the time that Lehman defaulted.

21   And, you know, Bank of England, ECB, Fed were in the process of

22   putting in lifelines to support banks being able to fund

23   themselves.  So that was about the liquidity for banks to

24   borrow money to fund their assets, and that had been Lehman's

25   problem that it couldn't, because it couldn't fund these

Page 175

1    assets.  Barclays had a balance sheet.  The liquidity that I

2    was talking about was in relation to the disposal of the

3    assets, not the funding of the assets.

4    Q.   Well, just hold on a second.  It wasn't a question that

5    Lehman's -- it was Lehman's problem that it can fund these

6    assets?  Those funding facilities that were made available to

7    broker-dealers and other financial institutions were not made

8    available to Lehman, right?

9    A.   Maybe -- I suppose that may be true, actually.

10   Q.   You know that to be the case, don't you?

11   A.   I hadn't really given any thought to it, to be quite

12   honest with you, up until you just mentioned it.  But I'm

13   trying to draw the distinction between the liquidity that

14   you're describing, i.e., can Barclays borrow money, and the

15   liquidity for the individual securities.  Even if I was able to

16   fund this portfolio, I still had a major risk management

17   problem in respect of the value of the portfolio.

18   Q.   And whatever risk management problems you had, a problem

19   that you did not have with respect to any of these securities

20   that you have described in the most florative (sic) terms as

21   highly illiquid, difficult to value, a problem you didn't have,

22   is you had someone willing to lend you money against those

23   securities, correct, and that being the federal government?

24   A.   That's -- it was very nice, thank you very much, but it

25   was not the primary issue that I had at that point.  If the

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 176 of 232

Page 176

1    securities -- if we had ended up fund -- and that's the thirty

2    days.  We owned many of these securities for a lot longer than

3    that.  If Barclays had had to fund these assets at a much more

4    expensive rate than the Fed was presumably -- I don't even know

5    what the Fed charged for the facility.  If we'd have been --

6    had to fund the assets for a month at a much higher cost, that

7    would have been a diminutive amount of risk relative to the

8    potential economic loss that we could have confronted if the

9    value of the portfolio had fallen, say, ten percent.  Then we'd

10   have lost five billion dollars.  That would have dwarfed the

11   financing issue for Barclays.

12   Q.   Now, you said in your answer "thank you very much".  Let's

13   go to M31 and see the thanks the government got.

14   A.   M31.  That's in the other one --

15   Q.   M31 in your witness binder.

16   A.   Okay, so -- I've got it.

17   Q.   It's a long e-mail chain.

18        UNIDENTIFIED SPEAKER:  What tab?

19        MR. TAMBE:  It is tab M31.

20   Q.   You'll see it's an e-mail chain.  I'm not going to ask you

21   about every aspect of it, but you'll see Mr. Yang is involved

22   in several parts of this discussion.

23   A.   Right.

24   Q.   Take a moment to review it.  I'm going to ask you a couple

25   questions about it.  Let me know when you're done reviewing.

Page 177

1    A.    Okay.

2    Q.    The e-mail I want to draw your attention to is the e-mail

3    on -- it should be the third page, but it's the e-mail from

4    Beatrice Montaudy to Jasen Yang and Mark Ruddick (ph.).

5    A.    Right.

6    Q.    Do you see that?

7    A.    Yes.

8    Q.    Okay.

9          MR. TAMBE:  And if you could highlight the first two

10   paragraphs of that e-mail, please.

11   Q.    And the topic is "Long Island Asset Booking".  Do you see

12   that?

13   A.    Right.

14   Q.    And Long Island is a reference to the Lehman transaction,

15   correct?

16   A.    Correct.

17   Q.    And this e-mail chain begins with discussions about the

18   tax implications for U.S. tax purposes of how the assets would

19   be booked; you see that?

20   A.    Right.

21   Q.    Okay.  And Ms. Montaudy starts her e-mail with the

22   following observation:  "The context of this question was that

23   during the asset purchase price negotiations, it was essential

24   that the valuation calculation" -- "it was essential to the

25   valuation calculation that the discount between the value of

Page 178

```
 1    the assets acquired and the purchase price", capitalized, "NOT

 2    be subject to the forty-six percent marginal U.S. tax rate

 3    applicable to BCI."  Do you see that?

 4    A.   Right.

 5    Q.   And BCI is the regulated broker-dealer entity of Barclays,

 6    correct?

 7    A.   Correct.

 8    Q.   Instead -- and the discussion goes on.  There's a

 9    discussion about allocating some of those assets to other

10    entities that would not be subject to the forty-six percent

11    marginal tax rate, correct?

12    A.   Right.

13    Q.   And it is your understanding, is it not, sir, that

14    ultimately when Barclays accounted for this transaction, the

15    gain was not reported in BCI; it was reported in other

16    entities, correct?

17    A.   I believe that to be the case, but I wasn't involved in

18    the tax discussions.

19    Q.   Was there any discussion with the Fed about how you'd be

20    accounting for this and what taxes you'd be paying on gains?

21    A.   I have no idea.

22         MR. TAMBE:  This is a good time, Your Honor, just to

23    break for the afternoon.

24         THE COURT:  I'm --

25         MR. TAMBE:  I'll move to another topic after this.
```

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 179 of 232

Page 179

1          THE COURT:  I'm pleased to take a break for fifteen

2     minutes.  But let me ask you, just for planning purposes, about

3     how much longer you expect to be on this cross.

4          MR. TAMBE:  I would say forty-five minutes at the

5     most.

6          THE COURT:  Okay.  We'll resume at 3:45.

7          (Recess from 3:31 p.m. until 3:50 p.m.)

8          THE COURT:  Be seated, please.  Please proceed.

9     RESUME CROSS-EXAMINATION

10    BY MR. TAMBE:

11    Q.   Mr. King, if we could please turn back to Movants' 31;

12    that's, I believe, the exhibit you were discussing before the

13    break.

14    A.   All right.  Yes.

15    Q.   And in the cover e-mail from Mr. Romain to several folks,

16    including Jasen Yang --

17          MR. TAMBE:  If we could just highlight that first

18    e-mail, please.

19    Q.   -- and the first paragraph notes "It's essential there is

20    a coordinated approach on how assets are brought onto Barclays'

21    balance sheet; which entities acquire which assets; how, where

22    goodwill recognized; how ring-fenced for acquisition

23    accounting, et cetera."  Do you see that?

24    A.   Yes.

25    Q.   And the various hats that you were playing -- you played a

Page 180

1    role in that coordinated approach, correct?

2    A.    Of which entities -- which coordinated approach?  The --

3    of which entities to book the assets?

4    Q.    How the assets were brought onto the balance sheet.

5    A.    And also where on the balance sheet they were brought on,

6    because ultimately we had to open books in which we were able

7    to book the assets.  So, yes.

8    Q.    So you played a role in that part of this coordinated

9    approach?

10   A.    Yes.

11   Q.    When it goes for -- when it goes to how and where negative

12   goodwill is recognized, is that something you were involved in?

13   A.    No.  It would have been the decisions that Finance were

14   making, would have influenced where the assets would have been

15   held, and that would have affected where we would have opened

16   the books and out of which entities we would have -- and out of

17   which entities we would have managed the assets; but not the

18   input decision.

19   Q.    And you recognize the reference to negative goodwill?  You

20   understand that concept, correct?

21   A.    Yes.

22   Q.    And to the extent --

23   A.    Actually, sorry, can I just clarify?  I understand that in

24   the context of this transact -- it was not something that I

25   know otherwise.

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 181 of 232

Page 181

1    Q.    And that's a fair point.  So in the context of this

2    transaction, you came to learn what negative goodwill meant?

3    A.    I've heard the expression, yes.

4    Q.    And the work that you were doing, the valuation work that

5    you were doing, had an impact on the calculation of negative

6    goodwill, correct?

7    A.    Yes.

8    Q.    To the extent you were ascribing a lower value to assets

9    than otherwise, that reduces the amount of negative goodwill?

10    A.    If the amount that we attributed to the estimated

11    realizable value of the assets went down, then the negative

12    goodwill would go down.

13    Q.    Was there any downside limit on how low a value you could

14    ascribe to an asset?

15    A.    No.  That would have been a peculiar thing to discuss.  So

16    I don't remember that.

17    Q.    I guess, at one level, if you ascribed a value of less

18    than forty-five billion to this pool of assets, Barclays would

19    have taken a loss because it had financed the purchase of those

20    assets with an outlay of forty-five billion dollars, correct?

21    A.    I'd have to think through all the other attributes of the

22    transaction, because -- I mean, although I wasn't involved in

23    it, I know it involved other things.  But at least, you know,

24    if I had told the firm -- well, what is definitely true is, if

25    I had told the firm I really think that we can realize forty-

Page 182

1    six billion dollars or forty-six and a half billion dollars or

2    forty-seven billion dollars on this collateral pool and then we

3    had only realized forty-four, then that would have been a loss

4    to the firm, relative to their expectation.

5    Q.   Did anyone discuss with you, not asset by asset but

6    collectively, that there was a downside floor collectively that

7    could be ascribed to the value of these assets at forty-five

8    billion?

9    A.   No.

10   Q.   Do you know, as you sit here, sir, what is the collective

11   value ascribed by Barclays to this pool of assets, the repo

12   assets?

13   A.   When?

14   Q.   Now.

15   A.   I don't think they exist anymore.

16   Q.   The last statement made by Barclays as to the value of the

17   assets it acquired from Lehman, what is that number, sir, if

18   you know it?

19   A.   I'm not sure, sorry.  I'm not sure.  The assets -- most of

20   the assets were liquidated --

21   Q.   We're talking -- I'm sorry.

22   A.   -- during 2007.

23   Q.   My fault.  We're talking past each other.  At some point

24   in time, after a lot of effort and lots of people working on

25   it, Barclays pronounced the assets it acquired as part of the

Page 183

1   repo collateral were worth X dollars when acquired, correct?

2   A.   Right.

3   Q.   Okay.  And I said "when acquired" because Barclays valued

4   those assets at various points in time, not just at the closing

5   of the transaction, correct?

6   A.   Right.

7   Q.   Okay.  That number -- when Barclays ascribed a number to

8   those assets, what was that number, if you know?

9   A.   If I can remember back to it -- so would this -- this

10  would have included -- I don't know whether there had been

11  revisions through 2 -- you know, I left the firm in 2009, so I

12  don't know whether there's been any revisions or anything.  But

13  in early 2009 when the acquisition balance sheet was being put

14  together, I seem to remember that the value of the assets,

15  including the clearing box assets, was, I think, about forty --

16  including the clearing box assets, must have been about forty-

17  seven billion dollars.

18  Q.   So, excluding clearance box assets, focusing on the repo

19  assets, about 45.5?

20  A.   It would have been something -- is it forty-five or forty-

21  seven?  Yeah, something like that, yes.

22  Q.   Now, the role that you played within this coordinated

23  approach of brining on the assets onto Barclays' balance

24  sheet -- if you could turn to 792, M792, in your binder.  Do

25  you -- are you there, sir?

Page 184

```
 1    A.    792, yes.

 2    Q.    Do you recognize that at the top of the e-mail chain as an

 3    e-mail written to you -- by you to Mr. Yang and others?

 4    A.    Sorry, 792?

 5    Q.    792.

 6    A.    Sorry.  Yes.

 7    Q.    It's an e-mail from you to Mr. Yang and others.  The Re:

 8    line reads "Prices and Risks", do you see that?

 9    A.    Yes.

10    Q.    You note in your e-mail --

11          MR. TAMBE:  We offer 792 in evidence, Your Honor.

12          MR. SCHILLER:  No objection, Your Honor.

13          THE COURT:  It's admitted.

14    (Movants' Exhibit M792, e-mail from Mr. King to Mr. Yang re

15    prices and risks, was hereby received into evidence as of this

16    date.)

17    Q.    You note in your e-mail to Mr. Yang, "At this point, the

18    relevant desks can have information.  Would like to avoid all

19    desks seeing overall position."  Do you see that?

20    A.    Yes.

21    Q.    Why were you concerned about the other desks seeing the

22    overall position, sir?

23    A.    I thought it -- I remember thinking through it at the

24    time.  And this is on the Saturday, so we were still in the

25    process of deciding the best way to realize the value of the
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 185

1    portfolio and risk-manage the portfolio on a go-forward basis.

2    The -- you know, if traders -- traders use information all of

3    the time in their normal job, and I thought that it was

4    appropriate that if we had a trader, which I seem to remember

5    was what this was, if we had a trader of, say, publicly traded

6    equities, it was probably better that they did not have a full

7    inventory list for the entirety of the assets being acquired by

8    Barclays.  It just seemed to me to be prudent information

9    management.

10   Q.   I'm just trying to understand that answer, because this

11   morning we talked about the fact that it was relevant to you in

12   valuing these securities to know that you had a particularly

13   large piece of a particular offering.  Are you suggesting you

14   didn't want that information to be shared by -- with other

15   traders?

16   A.   On, no, slightly different.  I don't mind a trader that I

17   was going to ask to help me in maximizing the realizable value

18   of a security, whether that be disposal or analysis, or

19   whatever it was.  I don't mind him or her knowing about all of

20   that position.  I don't even necessarily mind them knowing --

21   let's say it was convertibles.  I don't mind the convertibles

22   desk knowing all about all of the convertibles.  That's very

23   useful to me.  What I didn't think was necessarily appropriate

24   was that the convertibles desk knows that we are long, you

25   know, ten billion dollars of agency debentures.  That didn't

Page 186

1    seem to me to be a very sensible thing, because I don't know

2    how it's going to influence their behavior or whether that

3    information would find its way into the market and then

4    negatively affect my ability to trade those securities.  So I

5    was trying not to have everybody know everything.

6    Q.   And were you concerned at all that by sharing broader

7    portfolio information with the traders that they may be forced

8    to revalue positions that they already had on their books?

9    A.   I hadn't thought about it that way.  I'm not sure that

10   would have -- I'm not even sure that would have followed as a

11   necessary consequence.

12   Q.   Let's turn to Exhibit 782, M782, in your binder.

13   A.   M782?

14   Q.   782.  And you'll see the top of this document it's an

15   e-mail from you to Jonathan Hughes; there's a redaction at the

16   top.  But what you're forwarding is an e-mail exchange with a

17   number of people involved in it.  Do you see that?

18   A.   Right.

19   Q.   And there's a discussion, on that first page of the

20   exhibit, about whether or not the bookings are going to be

21   Trace reportable.

22   A.   Right.

23   Q.   Do you see that?

24   A.   Yes.

25   Q.   And what is Trace, sir?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 187

1    A.    Trace is a reporting service that shows where cash bonds

2    trade when two parties trade.

3    Q.    And so the cash bon -- and so that's publicly

4    disseminated?

5    A.    Yes.

6    Q.    And available to market participants, correct?

7    A.    Yes.    Absolutely.

8    Q.    And used by market participants, including Barclays, to

9    value similar positions on their own books, correct?

10   A.    Well, it's one of the things that product control would

11   have used as evidence for where securities should be marked.   I

12   don't actually know -- I don't believe that Trace is

13   necessarily used as accrued input for marking securities.   I

14   know we had our own firm use it as an interesting indicator,

15   but it's not the only thing that factors in.

16   Q.    Well, it's an interesting indicator because what Trace is

17   reporting is actual transactions that have occurred, correct?

18   A.    Right.    And this would have been very weird if this had

19   all been pushed through Trace.

20   Q.    Well, you didn't want it to be pushed through Trace,

21   correct?

22   A.    No, I hadn't thought about it, actually, up until this

23   point, but then when -- I remember, when we realized that there

24   was a potential for it to be reported through Trace, we

25   realized that was a really stupid thing.

Page 188

1    Q.    Okay.  And, in fact, you suppressed Trace reporting,

2    correct?

3    A.    We tried to, yeah.  I don't know whether we succeeded; I

4    think we did.  It was very important because otherwise the

5    entire Street would have known exactly what line items we had

6    acquired from Lehman, which would have made it very difficult

7    to trade on a go-forward basis, because now all of our

8    counterparties would have known exactly what we owned, which is

9    the same reason that I didn't want all traders to know all

10   information about all positions.  It would have put us -- we

11   were -- after all, we just were getting along fifty billion --

12   well, forty-six, forty-eight, forty-seven billion dollars of

13   securities.  I really didn't want the Street to know exactly

14   what we had acquired, and Trace would have been a way that they

15   would have been able to see that.

16   Q.    Well, what you acquired was a matter of public record,

17   right?  You filed the schedules with the Court as to what you

18   acquired?  There were disclosures made in court about what you

19   were --

20   A.    I guess that's true, but, I mean, there is a difference

21   between market participants, traders, the sort of people that

22   work for me sitting at their desk and look -- and running a

23   Trace report, and going to the Court and getting Schedule A,

24   sifting through it, identifying the corporate securities.  And

25   that would have been strange.  And I -- yes, I think that would

LEHMAN BROTHERS HOLDINGS INC., et al.

1   have been much harder.

2   Q.   And the other thing that Trace would have offered is the

3   price at which you transacted, which is something that the

4   court schedules didn't provide any member of the public,

5   correct?

6   A.   I guess that's true, yeah, but I don't know -- I'm not

7   even sure we would have known at this point.  And I can't

8   remember whether we discussed this.  You know, in many

9   respects, the items that we were bringing onto the balance

10  sheet, after all, were part of an overall business transaction

11  and were not -- you know, were not individual trade line items.

12  We were still estimating portfolio valuations.  Here we would

13  have now instantly jumped to reporting individual line item

14  valuations.  So there would have been a very large number of

15  sizes and individual line-item information for absolutely every

16  instrument in the portfolio, and I think that would have been a

17  very peculiar thing.

18          MR. TAMBE:  If I have not already done so, Your Honor,

19  I offer M782 in evidence.

20          MR. SCHILLER:  No objection, Your Honor.

21          THE COURT:  It's admitted.

22  (Movants' Trial Exhibit M782, e-mail from Mr. King to Jonathan

23  Hughes re Trace reporting, was hereby received into evidence as

24  of this date.)

25  Q.   Once the assets are taken on board and through the

Page 190

1    processes you talked about earlier, some of them end up with

2    different trading desks --

3    A.   Right.

4    Q.   Right.  -- as you said, to be risk-managed?  Right.  Some

5    of them remain with one of your desks?

6    A.   Yes.

7    Q.   Right.  Is it safe to assume that it's the mortgage-backed

8    securities and the more illiquid assets that stayed with your

9    desk?

10   A.   It was the -- well, there were two levels of approach.

11   The mortgage and mortgage-backed securities stayed with us.  I

12   also kept the equities and agencies' positions because they

13   were very large under -- in our books.  And then I used

14   resources from within the fixed -- within the agency trading

15   and equity trading business to help me risk-manage that

16   position and the corporate position -- the corporate bond

17   position, particularly the part that was part of the JP

18   settlement we kept within our group, the commercial mortgages,

19   the munis.  There was a 900 million dollar portfolio of munis

20   that, I think, Barclays finished realizing this year actually

21   fairly recently.

22        And so there were a handful of asset types that we kept.

23   And then the most obvious and most liquid ones we quickly, as

24   quickly as practical, moved through the relevant trading desks

25   and out into the market, and those were the agency CMOs and the

Page 191

1    treasuries, U.S. mortgage securities -- agency mortgage

2    securities and treasuries.

3    Q.   It's quite a handful.  I just want to make sure I know

4    what it is that you kept and managed through your desk.  So let

5    me just see; agencies?

6    A.   No, I'm trying to remember.  It was agencies, but not

7    agency CMOs.  It was -- and, well, I suppose I should just

8    check out what time do you mean.  Within days or within weeks?

9    Q.   Within days, initially.

10   A.   I think, within days -- within days, I think we had

11   everything.  Within weeks, we had started to work out what the

12   best -- or the optimal thing to do was with each of the asset

13   types, whether it was we'll manage them, we'll -- we will

14   manage them with support from other desks, or we will liquidate

15   them directly, or liquidate them through other desks.  Those

16   were the set of activities.  I know we didn't keep the

17   treasuries and the agency CMOs on our desk.  We decided the

18   best thing to do was to push those through our own fixed income

19   division.

20   Q.   Okay, so let me go back again, then.  Agencies other than

21   CMO agencies you kept?

22   A.   Yes.

23   Q.   You kept mortgage-backed securities?

24   A.   Yes.

25   Q.   You kept all of the munis, or some of the munis?

Page 192

1    A.    I think all of the munis.

2    Q.    Some of the corporate bonds, right?

3    A.    The corporate bonds, yes.

4    Q.    All of the corporate bonds?

5    A.    We transferred a small portfolio of the convertible bonds,

6    convertible corporate bonds, to the London desk, and I think we

7    ended up bringing them back, because they immediately got

8    themselves into trouble and lost money on them.  The corporate

9    bonds were kept, yes.

10   Q.    Did you keep the Giants Stadium auction-rate securities

11   bonds?

12   A.    Yes.

13   Q.    What bucket do you put those in?  Mortgage-backeds?

14   A.    You know, I can't remember which one it came in.  It came

15   in -- it was funny because the Giants Stadium bond was what was

16   called an auction-rate security.  And I can't remember now

17   whether the auction-rate securities were included in corporates

18   or in the mortgage-backed securities.  I think they were

19   included in the corporates.  We then viewed -- but you can see

20   that something like Giants Stadium is an extremely structured

21   bond.  So for my purposes --

22   Q.    I have a question.

23   A.    -- I moved them into mortgages.

24   Q.    So, I mean, what bucket did you put it in?

25   A.    I think they were in Lehman's corporate bucket.  I think I

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 193

1    put them in our mortgage bucket.

2    Q.    Okay.  And how about Pine?  You've talked about Pine in

3    the morning as a single CUSIP with a billion face value,

4    correct?

5    A.    Yeah.

6    Q.    Did you keep that one too?

7    A.    That was -- where did we describe that?  I had another

8    category that I included on our desk for the securities that

9    really were completely untradeable, like Pine, Giants Stadium

10   and some of the insurance Triple-X bonds.

11   Q.    And just so I understand, sort of, some of the P&L issues

12   that arise when you keep some of these assets with your desk,

13   you take them on, you onboard them, a value is ascribed to them

14   as part of the accounting process that then followed?

15   A.    Right.

16   Q.    Months later, that value is either validated or affirmed

17   or certified, but that value is confirmed as of the acquisition

18   date, correct?

19   A.    Right.

20   Q.    While all that's going on in those months that follow

21   closing, things are happening with these securities, correct?

22   A.    Correct.

23   Q.    So if you take Giants Stadium as an example, right, and

24   let's use round numbers, hypothetical numbers, you take in a

25   Giants Stadium bond and you say It's a thousand dollar bound, I

Page 194

1    value it at a hundred.

2    A.   Right.

3    Q.   For acquisition balance sheet purposes, I'm going to value

4    it at a hundred.  If three months later you write up the value

5    of that bond to a thousand --

6    A.   Right.

7    Q.   -- that is seen as a profit for your desk, correct?

8    A.   Well, again, you're oversimplifying desk.  My desk

9    consisted of desks and it consisted of books run by desks.

10   There was specific --

11   Q.   I'm not so focused on the desks here.  I'm focused on the

12   900 dollar profit in this example.

13   A.   Well, I --

14   Q.   There is a profit?

15   A.   Well, I'm -- yeah, but I'm trying to explain.  When you

16   say "my desk", right, there was -- there were what we called

17   acquisition books, and those securities were associated with

18   those books.  So it in no way -- we never transferred those

19   securities from those books into the proprietary trading books.

20   So that P&L would have been realized against books that were

21   well-associated with the Lehman transaction, and it would have

22   been -- resulted in a profit for the firm, but not quite the

23   same type of profit as, say, a profit on my trading desk.

24   Q.   So there's a profit for the firm and while the various

25   desks within the firm wakes up to a profit as a result of our

Page 195

1    example, right?

2    A.   Well, as I say, I mean, I was -- you know, we managed --

3    we were managing forty-five-plus billion dollars of assets

4    acquired from Lehman, and many billions of dollars of assets

5    from -- that had been acquired from other desks from within

6    Barclays as part of this, you know, call it workout or runoff

7    or whatever process.  That's very different from the other

8    piece of business which I ran, which was the proprietary

9    trading business.

10        There were gains and -- very substantial gains and losses

11   in those assets acquired from Lehman and that were on the

12   Barclays balance sheet.  Sometimes they were gains and

13   sometimes they were losses.  They weren't commingled in any

14   way.

15   Q.   Question's a really simple one.  Using my example, if you

16   took a thousand dollar bond, you valued it at a hundred.  And

17   later on, subsequent to acquisition, you wrote up the value of

18   that bond to a thousand.  Somewhere within the bowels of

19   Barclays, there would be a 900 dollar gain as a result of that

20   set of facts, correct?

21   A.   Yes, there would be a gain associated with those facts.

22   Q.   So now let's use some real numbers.  When the Giants

23   Stadium bonds were taken on and for acquisition balance sheet

24   purposes, you ascribed a value, you, Barclays, ascribed a

25   value, of roughly fifty-eight, fifty-nine million dollars to

Page 196

1    those bonds?

2    A.    Right.

3    Q.    Okay.  And by December 31st, you had written up the value

4    of that bond -- those bonds to 408 million dollars, correct?

5    A.    I think that's true, yes.

6    Q.    That's a 350 million dollar gain just with respect to

7    those four Giants Stadium bonds, correct?

8    A.    Well, yes, to that group of securities.

9    Q.    And when you valued those bonds for acquisition balance

10   sheet purposes, what data did you use?  At whose values did you

11   value them?  Your own?

12   A.    No, I think they were part of the auction rates.  There

13   was a group of securities that were the auction-rate securities

14   that were backed by many different collateral types; the Giants

15   Stadium bond, as they came to be known by, as well were one of

16   those sets of bonds.  There were many others as well.  Some of

17   them realized a gain.  Many of them realized a loss.  There was

18   very little that we could do with them.

19   Q.    Do you have my question in mind?  Whose value did you

20   value them at?  Your own?

21   A.    Well, I can't quite remember.  I seem to remember that

22   what we did with the auction-rate securities at the time was

23   come up with an approximate valuation that was something less

24   in aggregate than the custodial marks.  But I can't remember

25   exactly.

Page 197

```
 1   Q.   With the Giants Stadium bonds, you're kind of guessing at

 2   that, aren't you?

 3   A.   Well, I sort of vaguely remember that, but I can't

 4   remember it exactly.  I mean, it is one bond, after all.  It's

 5   a, you know -- you know, I know it seems like a very large

 6   number in isolation, but it's fifty-eight million dollars of

 7   bonds out of a fifty billion dollar portfolio.  So it was a --

 8   it is a big number, but it is fifty-eight -- it is, you know,

 9   less than one percent of the portfolio.

10   Q.   Actually, you had it marked 58 for acquisition purposes,

11   but by the end of the year you had it marked at 400 million?

12   A.   Yes, that's right.

13   Q.   Okay.  So you could call it a 58 million dollar bond; I'll

14   call it the 408 million dollar bond.

15   A.   Right, but stuff happened to that bond in between, very

16   significant stuff that we did, right?  Because, don't forget,

17   it was -- these auction-rate bonds, they had a -- they were

18   very peculiar; they had a fixing rate that needed to be reset,

19   and it wasn't for a while that we realized that we could cause

20   those bonds to be reset at a yield that was commensurate with a

21   much higher price.  And the idea behind it was -- and this

22   worked with -- this security and other things ended up being

23   worth a lot less; so, for example, the warrants that I

24   described earlier were 300 million dollars that turned out to

25   be worth zero.  So there were 300 million dollar swings in the
```

Page 198

1    other direction as well.  So I say they are big numbers in --

2    separately, but in aggregate this was part of a very large

3    problem.

4        Those auction-rate securities needed to be reset at a

5    market-clearing rate, which I remember we thought was about

6    twenty percent at the time we acquired them.  They were

7    clearing at two or three or four, or something.  And that very

8    much changed the characteristics of them as they started to

9    clear at twenty.  Ultimately, and I mentioned this in my

10   testimony earlier, that was an example of a bond that was

11   actually mostly refinanced and called by the issuer.

12   Q.   Well, you marked it up to par value well before it was

13   refinanced and repurchased at par by the issuer, right?

14   A.   Right, because it was clearing at a twenty percent yield,

15   whereas when we acquired it, it was clearing at a three percent

16   yield.

17   Q.   Right.  And it began clearing at that yield, if I

18   understand your testimony, because of steps that you took

19   subsequent to acquiring that bond --

20   A.   Right.

21   Q.   -- rights that you had as the holder of that bond,

22   correct?

23   A.   Right.  I mean, we -- there were many bonds in that

24   portfolio and we tried to maximize the value of it.

25   Q.   Let's talk about the Pine CLO, and you said this was not a

Page 199

1   traded or tradable security.  You described it in different

2   terms as an exotic security, correct?

3   A.   I guess, theoretically it's -- it's a security, so,

4   theoretically it's tradable.  But in practice it was really a

5   financing instrument.

6   Q.   It was a series of loans that had been made to Lehman --

7   by Lehman to various borrowers --

8   A.   Yes.

9   Q.   -- and those had been put into a securitization structure,

10  collateralized loan obligation, right?

11  A.   Yes.

12  Q.   Okay.  And the piece that was at issue, that was

13  transferred from Lehman to Barclays, had a face value of about

14  a billion, right?

15  A.   Yes.

16  Q.   Okay.  Single CUSIP, right?  And that bond, that Pine CLO

17  bond, came with all of the rights provided to the holder of

18  that bond under the securitization structure, correct?

19  A.   Yes.

20  Q.   Okay.  And with respect to that particular bond, BoNY, the

21  Bank of New York, valued it at 914 million?

22  A.   Yes.

23  Q.   JPMorgan valued it at 919 million, right?

24  A.   Yes.

25  Q.   And Barclays, for acquisition purposes, valued it at 428

1   million --

2   A.   Right.

3   Q.   -- right?  By the end of the year, that warrant had been

4   revalued at 781 million dollars by Barclays, correct?

5   A.   Right.

6   Q.   So looking at that CUSIP and that set of issues, that's a

7   350 million dollar gain on that single CUSIP by Barclays,

8   correct?

9   A.   Yes.  Again, actions taken -- and also I still don't

10  think, as far as I know, that they have monetized that

11  position.  But, again, it was -- you know, I don't know where

12  the custodian would have got the 900 million dollars from.  And

13  there were steps taken that changed the security after

14  acquisition.  That was a very difficult -- very, very difficult

15  position.

16  Q.   Did you call up the custodian and ask them how they valued

17  these securities?

18  A.   Did we ask them how they'd approached that one?  I don't

19  think we asked them how they approached that one.  I remember

20  most of it was that they took a maturity -- for many of the

21  securities, they had taken a -- you know, a legal final

22  maturity and an estimated yield and then discounted the coupon

23  by the estimated yield.  Of course that security wasn't like

24  that, because it was backed by collateral that itself was

25  trading at a very significant discount, and it had cash that

Page 201

1   was potentially exposed to being lent to those same corporates.

2   And so that was why it was different.  In fact, later on we

3   even thought a good idea was to sell it back to the Lehman

4   estate, and Lehman -- the Lehman estate would offer us -- would

5   not offer us anywhere near where we were saying it was worth.

6   Q.   Well, you were trying to sell it two years after the fact,

7   correct?

8   A.   No, this was -- that's -- no, six to nine month -- this

9   was in the following year, you know, when --

10  Q.   When a lot of other things had also happened?

11  A.   Sorry?

12  Q.   When a lot of other things had also happened to the

13  underlying collateral, correct?

14  A.   Well, some of the collateral had improved, actually.  I

15  mean, don't forget that what was happening during that

16  period -- I think by the time -- there was some collateral that

17  had improved.  The requirement to relend the cash that had been

18  trapped in the security had been eliminated, and we thought

19  that therefore it was a more valuable security, following the

20  efforts that we had taken, but we thought that it was a good

21  idea to maybe ask the Lehman estate if they were interested in

22  buying it back.  But they would -- were only willing to -- I

23  can't remember what they were willing to pay, but they were

24  willing to pay considerably less than we had estimated its

25  value at.

Page 202

1    Q.   The agencies, the non-CMO (sic) agencies, that are

2    somewhere in our ambit, maybe not on your desk but one of the

3    desks

4    that's --

5    A.   Right.

6    Q.   -- around you --

7    A.   Yes.

8    Q.   -- there was a liquidity discount applied to the valuation

9    of those agency securities, correct?

10   A.   By whom?

11   Q.   By PCG, by Barclays.

12   A.   There was a -- well, I mean, if the valua -- do you mean

13   the valuation adjustment, or --

14   Q.   Yes, the valuation adjustment.

15   A.   Right, I -- you know, there's a valuation adjustment; I

16   know that inclu -- incorporates, you know, bid offer provisions

17   and various other things that they had taken into account.

18   Q.   And is it your understanding -- and if you know tell me;

19   was this adjustment applied on a percentage basis across all

20   non-CMO agencies?

21   A.   I don't actually remem -- I either don't remember or don't

22   know -- I think don't know -- how product control did it.  I

23   know when I had done it originally, because the positions were

24   extremely long-dated and there was, you know -- I remember

25   talking to my agency trader who just told me 'There's

Page 203

1    absolutely no bid for this paper, Stephen; absolutely no bid.'

2    And I said, Well, there must be surely; it's almost government

3    collateral.  You know, There's no bid for it.  And so what we

4    tried to do was to estimate, you know, in one workout what the

5    best way to crystallize it was.  I think it took about nine

6    months.  It was a position that consumed a tremendous amount of

7    risk capital for the firm.  But we still attempted to risk-

8    manage it and liquidate it in a controlled fashion by fi -- and

9    the reason why we used -- there's a good example why we used

10   the trading desk:  because they had access to customers.  And

11   there was really no -- there was no liquidity in the Street for

12   these bonds.  So we sold it steadily and slowly into the

13   customer base.

14   Q.   This extended effort that you went through would not apply

15   to C -- to agency non-CMO securities that were maturing the

16   week of September 22nd, would it?

17   A.   Sorry, so would -- could you ask me again?

18   Q.   Would you have applied this kind of an involved procedure

19   not for the long-dated ones but for ones that were maturing the

20   week of the closing?

21   A.   I think the ones the week of the closing may well have --

22   well, they should have just paid.

23   Q.   And they did pay?

24   A.   Yeah, I assume that's the case.

25   Q.   And you did apply the valuation adjustment even to those?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 204

1   Were you aware of that?

2   A.   Well, maybe -- trust me, the valuation adjustments or the

3   estimates that I had used for that agency portfolio were

4   woefully inadequate, and we lost a considerable amount of money

5   on that block of securities, I mean, in hundreds of millions of

6   dollars, because I in no way had adequately contemplated the

7   illiquidity of those instruments.

8   Q.   Now, when you apply a valuation adjustment to the

9   nonagency CMOs, that affects the price you're going to apply to

10  that security, correct?  That's what the valuation adjustment

11  is:  It's an adjustment to the price?

12  A.   Well, the valuation adjustment was a peculiar concept that

13  came up as a result of needing to reconcile independent third-

14  party marks with something that was, you know, adequately close

15  to what I was estimating and my team was estimating and other

16  groups were estimating were the realizable values.  And so

17  there was an effort to seek to do that.

18       In the early days of the balance sheet where there is a

19  valuation adjustment, you can actually see that it is

20  explicitly calculated as the difference between the BoNY marks

21  and what they called the PMTG marks.  It's just a difference.

22  Now, later on that became a more involved process as the

23  appropriate independent processes were put in place to

24  determine a valuation adjustment, but at that -- early on, it

25  was as simple as that difference.

Page 205

1    Q.   I think my question was, "When you talk about valuation

2    adjustment, that's an adjustment to the price of the security,

3    correct?"

4    A.   Well, it's a -- right, but you have to define what you

5    mean by "price", and I'm saying that it was an adjustment that

6    was the result of deducting from the BoNY marks, my estimated

7    marks.  So it was calculated.

8    Q.   And when you do that with debt securities, one of the

9    impacts that has is, when you ascribe a price to a debt

10   security, there's an inverse proportionality to the interest

11   rate, the yield, for that security, correct?

12   A.   I don't really think so, because the -- you know, as far

13   as I'm concerned, my estimate of the valuation of the portfolio

14   was going to be what we were going to realize.  So it would be

15   zero yield to my estimate.  There was no way to ever

16   crystallize the BoNY marks.

17   Q.   So just so I understand it, your value is your value; you

18   didn't care if the value you ascribed to a particular agency

19   security implied a yield in the hundreds of percent per annum?

20   A.   Right --

21   Q.   It did -- it was immaterial to you?

22   A.   Well, that -- but that's not what the valuation adjustment

23   was.  The securities at my valuations or -- there's a set of

24   contractual cash flows and there's a set of loss-adjusted

25   contractual cash flows that need to be discounted in some way

Page 206

1    to come up with a price, whether that's my price or that's

2    BoNY's price.  The valuation adjustment just happens to be the

3    difference between those prices.  If I believe that my price is

4    right and I'm willing to sell at my price, I will earn zero

5    yield over where I bought the security.

6              MR. TAMBE:  If I could just consult my notes, Your

7    Honor?

8              THE COURT:  Sure.

9         (Pause)

10             MR. TAMBE:  No further questions, Your Honor.  Thank

11   you, Mr. King.

12             THE COURT:  Does anyone else have questions on the

13   movants' team?

14             MR. MAGUIRE:  No questions, Your Honor.

15             MR. TECCE:  I do, Your Honor, fifteen or twenty

16   months' worth.  Your Honor, I do have a handful of exhibits

17   that I would like to show the witness, and I have a binder, if

18   I may.  I'm sorry.  I know you have three binders already.

19   This will be your fourth.

20             THE COURT:  It's true.  I have three binders already

21   for this witness.

22             MR. TECCE:  You do.

23             THE COURT:  Now I'll have four.

24   CROSS-EXAMINATION

25   BY MR. TECCE:

Page 207

1    Q.    Good afternoon --

2            THE COURT:  Plus I have Exhibit 716.  So the crowded

3    space in the witness stand is becoming more crowded.

4            THE WITNESS:  Thank you.

5            THE COURT:  Thank you.

6    Q.    Good afternoon, Mr. King.  Mr. King, my name is James

7    Tecce.  I am an attorney that represents the official committee

8    of unsecured creditors in these cases.  I know you've had a

9    long afternoon and I will be brief here, I promise.

10           Earlier today, Mr. King, Mr. Schiller asked you if, after

11   the December 2008 settlement with JPM, you were part of an

12   effort to provide information to the creditors' committee

13   concerning the sale transaction.  Do you remember that?

14   A.    Yes, I do.

15   Q.    Okay.  And in connection with that effort, among other

16   things, you attended a meeting in February of 2009 with

17   representatives of the creditors' committee, correct?

18   A.    Yes.

19   Q.    And you also -- you or a team acting at your direction

20   assumed documents in response to requests provided by the

21   committee to Barclays, is that correct?

22   A.    Yes.

23           MR. TECCE:  Can we pull up Movants' 371, please?

24   Q.    Sir, in the binder which I've just given you, you'll see

25   M371, which is a tab.  And -- are you at the document, sir?

Page 208

```
 1    A.    Yes.

 2    Q.    Okay.  Have you ever seen this document before?

 3    A.    I don't think so.

 4    Q.    Well, this is an e-mail; it's dated Friday, December 26,

 5    2008, correct?

 6    A.    Yes.

 7    Q.    And you'll see it's from me, James Tecce.  And in the "To"

 8    line, you'll see a Lindsee Granfield.  Do you know who Lindsee

 9    Granfield is?

10    A.    I don't think so, no.

11    Q.    Okay.  Do you know who jschiller@bsfllp.com would be?

12    A.    Yes.

13    Q.    Okay.  That would be Jonathan Schiller, correct?

14    A.    Yes, that would.

15    Q.    Okay.  And there's also shirshon@proskauer.com.  Do you

16    know who Shelly Hirshon is?

17    A.    I don't think so, no.

18    Q.    So --

19    A.    Hope I haven't offended anybody in the courtroom.  I said

20    I hope I haven't offended anybody --

21    Q.    No.  Okay.

22    A.    -- that I'm supposed to know.

23    Q.    And you'll see the first sentence of this paragraph that's

24    in this e-mail is:  "Attached please find the letter setting

25    forth the Committee's current information requests relating to
```

Page 209

1    the Transaction.  These are largely the same requests we sent

2    through Hal Novikoff over last weekend, albeit with some minor

3    changes, including changes that attempt to address Barclays'

4    concerns over scope, which we discussed on Monday prior to the

5    hearing."  You see that text?

6    A.    Right, yes.

7    Q.    And then attached on the next page, you'll see an actual

8    letter, correct?

9    A.    Yes.

10   Q.    And again this is a letter sent by me to -- again you'll

11   see Ms. Granfield's name and Mr. Schiller's name, correct?

12   A.    Yes.

13   Q.    And this letter requests -- you'll see in the second

14   sentence of the first paragraph beginning "In connection

15   with" -- there's a series of defined terms, obviously, in the

16   beginning where we announce who we are in the letter.  And it

17   says, "In connection with the Committee's review of the Sale

18   Transaction, the Committee requests that each Barclays and the

19   Depository Trust Corporation are provided with the following

20   documents".  You see that language?

21   A.    Yes.

22   Q.    And then in (a) you'll see it starts "The flow of funds

23   and sources and uses memoranda".

24   A.    Right.

25   Q.    And if you turn to the next page, you'll see a larger

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 210 of 232

Page 210

 1   paragraph (b), and this says "With respect to all securities

 2   transferred to Barclays in connection with the Sale Transaction

 3   ("Transferred Securities"), three schedules of mark-to-market

 4   valuations on a security-by-security basis with supporting

 5   documentation (the "Valuations") determined or prepared on or

 6   about September 16th, 2008 (i.e., in connection with the

 7   Purchase Agreement), September 19th, 2008 (i.e., in connection

 8   with the Sale Hearing), and September 22nd, 2008 (i.e., in

 9   connection with the Closing) provided that the valuations were

10   either communicated by Barclays to LBHI, LBI or the Committee;

11   (y) considered by Barclays in preparing the valuations

12   communicated to LBHI, LBI or the Committee; or (z) determined

13   or prepared by employees of LBHI or LBI that were employed by

14   Barclays at any time after the Sale Transaction Closing.  For

15   purposes of this request, Transferred Securities includes

16   securities collateralizing liabilities that were extinguished

17   and hence were not visibly transferred."

18       I realize that's a long paragraph, sir, but before today,

19   have you ever seen that paragraph or this letter for that

20   matter?

21   A.   I don't think so.

22   Q.   Okay.  I'm sorry to make you do this, but I need you to

23   look in the notebook that Mr. Schiller gave you, for a second,

24   and specifically tab 19.  This is a document that's marked BCI

25   Exhibit 761.

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 211 of 232

Page 211

1    A.    Yes.

2    Q.    And you recall Mr. Schiller asked you this morning about

3    this document, correct?

4    A.    Yes.

5    Q.    Okay, and this was a sign-in sheet from a meeting held at

6    Boies Schiller's offices, correct?

7    A.    Yes.

8    Q.    And this is the February meeting which I asked you about

9    just a moment ago, correct?

10   A.    Yes.

11   Q.    And you see at the top of the sheet the date of this

12   meeting is 2/3/09 -- that's February 3rd, 2009 -- correct?

13   A.    Okay.

14   Q.    And you'll see on the left there's a list of participants:

15   You'll see Mr. Geer, Mr. Fazio, Mr. Burian, who identify

16   themselves as being from Houlihan Lokey.  And you'll see

17   there's even my name at the bottom of the list, correct?

18   A.    Yes.

19   Q.    And we -- I was present at the meeting.  You may or may

20   not rem -- well, do you remember that I was present at the

21   meeting, sir?

22   A.    Yes.

23   Q.    Okay.  At the February 3rd meeting, Barclays did not

24   provide documents that were responsive to the letter that I

25   just showed you, is that correct?

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 212 of 232

Page 212

1   A.   At the meeting?

2   Q.   Yes, sir.

3   A.   I think, at the meeting we -- we didn't bring anything to

4   the meeting.  I think we brought people to the meeting.  That

5   was the -- was the letter that you show -- I shouldn't have

6   closed your binder, but was the letter that you showed me the

7   initiation of the dialogue with Barclays?

8   Q.   Right, well, I'll represent to you, sir, the letter was

9   dated December 26, 2008 --

10  A.   Right.

11  Q.   -- and it was sent by me to Barclays counsel.

12  A.   Right.

13  Q.   And you may remember that this happened shortly after the

14  JPMorgan settlement in December of 2008.

15  A.   Right.

16  Q.   Do you remember that?

17  A.   Yes, because what I can remember is that -- so I don't

18  think I ever saw the letter.  I may have seen the letter, but I

19  don't ever remember -- I don't actually remember seeing it, but

20  I may have seen it; one of my team may have seen it.  What I do

21  remember is being told that the creditors' committee had a

22  number of questions, which would be consistent with your

23  letter, and that we had propo -- Barclays had propose a

24  meeting.  And that was this, I believe.

25  Q.   Okay.  Is it fair to say that, for the five-week period

Page 213

1    from December 26 to February 3rd, 2009, Barclays did not

2    provide any documents in response to the December 26 letter?

3    A.   You know, I don't actually know the answer to that.  I

4    don't think so, but I don't know the answer.

5    Q.   And this morning Mr. Schiller asked you, from and after

6    the meeting on February 3rd, if anybody from the committee or

7    its representatives contacted you directly, and you said the

8    answer to that was no, is that correct?  After the meeting.

9    A.   After that, I don't think so, no.

10   Q.   Okay.  Do you know whether committee counsel contacted

11   Barclays counsel after this meeting to request further

12   information?

13   A.   I don't know.

14   Q.   You don't know -- you don't -- okay.

15        MR. TECCE:  Can I have Movants' 372, please?

16   Q.   Sir, would you mind turning to M372 in your notebook

17   there?  And do -- are you at the document, sir?

18   A.   Yes.

19   Q.   Okay.  And do you see the document is an e-mail from me,

20   again to Ms. Granfield and Mr. Schiller?  And this particular

21   e-mail is dated Tuesday, February 10th, 2009, correct?

22   A.   Correct.

23   Q.   Right, and that would be seven days after February 3rd,

24   2009, after our meeting, correct?

25   A.   Right.

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 214 of 232

Page 214

1   Q.   Okay.  And you'll see the text of this e-mail says "Please

2   see the attached letter following up on our meeting last week.

3   Please feel free to contact me with any questions.  Thank you."

4   Right?

5   A.   Okay.

6   Q.   Okay, and if you turn the page, you'll see the actual

7   letter itself, correct?

8   A.   Yes.

9   Q.   And the letter I -- we won't have to go through the

10  categories of documents again, but I just would direct your

11  attention to this first paragraph:  "We write to follow up on

12  our February 3rd meeting and appreciate the spirit of

13  cooperation with which you made representatives of Barclays

14  Capital available to answer our questions.  As you know, the

15  creditors' committee has been working to obtain clarity and

16  understanding of the final reconciliation of the sale

17  transaction among Lehman Brothers Holdings Inc., Lehman

18  Brothers Inc. and LB 745 LLC on the one hand, and Barclays on

19  the other hand (the "Sale Transaction").  While the meeting

20  greatly assisted our efforts, there are certain documents that

21  we request Barclays provide in addition to those set forth in

22  our December 2008 letter."

23      That's what that paragraph says, correct?

24  A.   Correct.

25  Q.   And then you'll see, sir, on the next two pages there's a

Page 215

1   series of documents that are requested by this letter.  Do you

2   agree with that?

3   A.   Yes.

4   Q.   Okay.  Do you know when Barclays provided documents

5   responsive to this particular letter?

6   A.   I don't.  Actually I don't.

7   Q.   Okay.  Let's -- can I turn your attention, sir, to

8   BCI-762, which is in our binder?

9   A.   Yes.

10   Q.   It's in the back.  It's actually the last document.

11   A.   Yes.

12   Q.   This is a document Mr. Schiller showed you this morning,

13   correct?

14   A.   Yes.

15   Q.   Okay.  And this is a document that says at the top titled

16   "Index to Disk of Materials Produced on March 20th, 2009 in

17   Response to Creditors' Committee's December 26, 2008 and

18   February 10, 2009 Requests", correct?

19   A.   Correct.

20   Q.   Okay.  And you don't have any reason to believe --

21        MR. TECCE:  Well, strike that.

22   Q.   Do you have any reason to believe that Barclays did not

23   produce the documents in response to those requests on March 20

24   as that title says that it does?

25   A.   Sorry.  Are you asking if --

Page 216

1    Q.   Let me rephrase the question.  Does this document help

2    refresh your recollection of when Barclays actually did provide

3    us with documents responsive to those two letters?

4    A.   No, showing the letter earlier, it doesn't really.  I

5    mean, I can now see that evidently we did provide something,

6    but I really don't have a great deal of recollection about it,

7    to be honest with you.  It would have been processed primarily

8    by people who worked with me and for me, and wouldn't

9    necessarily have focused particularly on these responses.  But

10   I could see that we did.

11   Q.   Do you have an understanding, sir, of whether or not, from

12   and after March 20th, counsel for Barclays and counsel for the

13   committee were involved in discussions concerning the format in

14   which these documents were produced?

15   A.   No, I don't know.

16   Q.   You do not.

17   A.   I should point out that around this time my involvement --

18   for the reasons we were talking about earlier, my involvement

19   with some of these assets was actually being reduced as we were

20   undertaking the transaction that was touched on earlier.  So

21   that's why I become a little big vague as to what was delivered

22   and what wasn't after a certain point.

23   Q.   Okay.  Sir, can I have you turn to Movants' 375, please?

24   A.   Yes.

25   Q.   Do you recogni -- have you ever seen this document?

 1   A.   375, right?  Just the simp -- no, I don't think I have.

 2   Q.   This is a letter to me from the Boies Schiller firm,

 3   correct?

 4   A.   Yes, I see that.

 5   Q.   Okay.  And the text of the letter is "Following up" -- and

 6   the date of this letter is April 23rd, 2009, correct?

 7   A.   Yes.

 8   Q.   Okay.  It says, "Following up on our discussion, enclosed

 9   is a simple printout of selected material.  If this is

10   acceptable, we will print out the entire production for you in

11   this format," correct?

12   A.   Yes.

13   Q.   Okay.  Are you aware of any efforts by your team to assist

14   Boies Schiller in changing the format in which the documents

15   that were provided to the committee would be produced to the

16   committee?

17   A.   I'm not aware of it, but it is possible.  I'm not aware of

18   it.

19   Q.   Just briefly, sir, can I ask you to turn to the next

20   exhibit in your binder, which is Movants' 376.

21   A.   Yes.

22   Q.   Okay.  And this is an e-mail string, actually.  This

23   contains four e-mails between myself and Mr. Stern of the Boies

24   firm.  Do you see an e-mail from me to Mr. Stern on May 12th,

25   2009 at 2:08 -- well, actually let me back up.  Starting with

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 218 of 232

Page 218

1    the e-mail from Mr. Stern at the bottom, he says "Following up

2    on our discussion, I am told the colored sheets will be used as

3    follows:  First, a yellow sheet will be inserted to separate

4    attachments from the cover e-mail and from other attachments.

5    Many of the e-mails we will produce have multiple attachments.

6    In order to signify where one attachment ends and the other

7    starts, we will insert a yellow slip sheet.  See production

8    sample BCI-12 to 13.

9         "Second, a blue sheet will be inserted where one tab

10   within an attachment ends and another begins.  Most of the

11   attachments we are producing contain multiple tabs within a

12   single attachment.  Each tab is a different spreadsheet

13   illustrating different data.  See production example BCI-4 to

14   5.

15        "Third, a green sheet will be inserted in order to

16   separate e-mails.  See production sample BCI-10 to 11.

17        "I hope that explanation helps."

18        See that text from Mr. Stern?

19   A.   Yes.

20   Q.   Okay.  And then I -- he actually sends me another e-mail

21   on May 12th; he's following up on the e-mail which he sent on

22   April 27, saying "Just following up to see if you still want us

23   to prepare a complete hardcopy set along the lines described

24   below."

25        And then I respond to him that afternoon saying "I'll call

1    you this afternoon to discuss, but we've checked with our FAs.

2    The problem is that, even with the insert sheets, they still

3    can't read the documents as produced, because overflow pages,

4    e.g., other than the first page, don't contain the individual

5    column and row headings on each sheet.  They're left trying to

6    piece charts together, while the color-coded sheets show the

7    different charts attached to the different e-mails within the

8    charts, some of which are hundreds of pages long.  The row and

9    column legend only appears on the first few pages.  Even if

10   they were to cobble the pages together for massive charts with

11   thousands of entries, the assembled pages don't even fit on a

12   conference table."

13       And then Mr. Stern says that "We'll check with our vendor

14   to see if they have any better suggestions."

15       Mr. King, are you aware of whether or not your team, at

16   this point in time in May, had undertaken the task of changing

17   the format in response to this concern with respect to the

18   documents produced to the committee?

19   A.   I think -- it's about -- this is around April/May time

20   that my team was split into two, and we moved the team with the

21   people that I left Barclays with into a separate building and

22   separated the asset pool.  So it is actually feasible by this

23   time that I wouldn't know.  I certainly don't remember.  But I

24   might not actually know.

25   Q.   Are you aware, Mr. King, that around this time the

Page 220

1   debtors, Lehman Brothers Holdings, submitted formal

2   applications for documents in discovery from Barclays?

3   A.   I'm not, no.

4   Q.   You're not aware.  Are you aware that in the June time

5   frame the debtors actually came to this bankruptcy court and

6   requested authority to take discovery from Barclays relating to

7   the sale transaction?

8   A.   I remember that those episodes occurred.  I actually only

9   know about them secondhand, but I don't remember the timing of

10  it.

11  Q.   Okay.  Can I just direct your attention to M414 in your

12  binder, sir?  Actually, also, are you aware that the creditors'

13  committee joined in the request of the debtors for formal

14  discovery when the debtors came to this Court in June of

15  2004 -- 2009?

16  A.   Could you say that to me again, sir?

17  Q.   I'm sorry.  Are you aware that the creditors' committee

18  joined in the debtors' application to this Court for formal

19  discovery from Barclays in 2009?

20  A.   I'm not, no.

21  Q.   You're not.  Are you aware that Barclays objected to that

22  joinder, the joinder of the committee's request?

23  A.   I'm not, no.

24  Q.   Okay.  And so, sir, if I'm looking with you in M414, this

25  is a document entitled "Objection of Barclays Capital Inc. to

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 221

1    Propose Joinders in Debtors' Motion for an Order under Rule

2    2004 Authorizing Discovery of Barclays Capital Inc.".  Do you

3    see that title?

4    A.    Um-hmm.

5    Q.    And then in the first paragraph there, it says that

6    "Barclays Capital respectfully objects as follows to the

7    proposed joinders in the motion of Lehman Brothers Holdings

8    Inc. for an order, pursuant to Federal Rule of Bankruptcy

9    Procedure 2004, authorizing it to conduct certain discovery of

10   Barclays.  Those proposed joinders include:  (1) the response

11   of official committee of unsecured creditors of Lehman Brothers

12   Holdings"; you see that text there?

13   A.    Yes, I do.

14   Q.    Okay.  Can I turn your attention, sir, to page 5 of this

15   document?

16   A.    Yes.

17   Q.    And there's paragraph 10 there.

18   A.    Yes.

19   Q.    It says in this paragraph, "After meeting with the

20   committee, Barclays produced to the committee material relating

21   to the securities that Lehman had proposed transferring to

22   Barclays during negotiations and concerning securities which

23   Lehman actually did transfer to Barclays.  Barclays' March

24   20th, 2009 production to the Committee responded to the

25   December" -- "the committee's December 26, 2008 and February

Page 222

1    10, 2009 requests for documents, which largely overlapped.  The

2    production included over 16,000 pages of material, including

3    numerous schedules of securities, information concerning

4    residential mortgage securities, the closing memorandum for the

5    sale transaction, and appraisals of transferred real estate.

6    On May 28th, 2009, in response to a creditors' committee

7    request, Barclays provided the electronic Excel files for the

8    spreadsheets in the March 20, 2009 production."

9         Do you see that paragraph, sir?

10   A.   Yes.

11   Q.   Do you have any reason to dispute any of the assertions or

12   disagree with any of the assertions that are put forth in that

13   paragraph?

14   A.   I have no knowledge of that, sir.

15        MR. TECCE:  I have no further questions, Your Honor.

16   Thank you.

17        MR. SCHILLER:  Your Honor, I'm mindful of the

18   conference.  I will be very brief.

19        THE COURT:  Fine.

20   REDIRECT EXAMINATION

21   BY MR. SCHILLER:

22   Q.   You've used the word "crystallize" before Your Honor and

23   in this record.  I'm not sure what it means, I don't know if

24   the judge does, but would you tell him what you mean when you

25   say something will crystallize?

Page 223

```
 1   A.   I'm sorry, I flip backwards and forwards between words

 2   like "crystallize" and "realize".  I --

 3   Q.   Crystallize is a new one.  What does crystallize mean?

 4   A.   Crystallize is a new one.  Crystallize -- by "crystallize"

 5   what I really meant was that, in one way or another, whether it

 6   was through sale or structuring or restructuring or just

 7   maturity in some form or another, that the expected realizable

 8   value was converted into cash receipts for Barclays.

 9   Q.   So, in part, crystallize means sale?

10   A.   Certainly in the majority of cases, that will have meant

11   sale.

12   Q.   Okay.  You were shown a document dated the 19th, an e-mail

13   to you and Gerard LaRocca from Marty Malloy, concerning the

14   totals for the Fed facility collateral, and you've described

15   that to the Court as a custodial update on Friday.  Do you

16   remember that?

17   A.   Yes.

18   Q.   Is that -- does that mean that the marks on that document

19   were BoNY marks?

20   A.   I believe they were all BoNY marks, yes.

21   Q.   Could we turn, then, in the movants' book to tab M200,

22   Movants' Exhibit 200?

23            MR. SCHILLER:  Which is that document, Your Honor.

24   A.   That's the King -- that's my name witness, is it?

25   Q.   Yes, exactly.  And it's on the screen, if it's easier for
```

Page 224

1    you --

2    A.   All right.

3    Q.   -- Mr. King.  And my note says that you said you could not

4    crystallize it for that -- for the values that the BoNY marks

5    reflected.  Do you remember that?

6    A.   Yes.

7    Q.   Do you recall yourself considering the BoNY marks at the

8    time that you had --

9         MR. SCHILLER:  Let me strike that.

10   Q.   Did you look at the BoNY marks for the repo collateral

11   that you actually received?  And have you compared that to your

12   own rough estimates for the values of what you received on the

13   19th?

14   A.   As I mentioned previously, the number that was calculated

15   at an early stage to be the valuation adjustment was the

16   difference between the BoNY marks on a certain time and the

17   PMTG estimated valuations.

18   Q.   And was your evaluation of the values less than BoNY's on

19   the 19th?

20   A.   Yes.

21   Q.   Do you remember how much less it was, roughly?

22   A.   Well, what I remember is that the cumulative number wasn't

23   as big as this num -- I -- it's funny, I don't remember the

24   BoNY marks being as high as this either.  So I think this was

25   because of that time stamp problem that we had and the fact

Page 225

1    that the inventory of collateral wasn't finalized at this

2    point.  So there was a healthy amount of uncertainty at one

3    particular time.

4         What I remember is that around that time my estimate -- or

5    I think it was probably into the weekend -- my estimate was

6    that our valuations were somewhere in the region of two and a

7    half to three billion dollars less than BoNY had attributed

8    to --

9    Q.   Two and a half to three million dollars less than BoNY's?

10   A.   Two and a half to three million dollars less than BoNY.

11   Q.   Of the collateral you actually received?

12   A.   Of the collateral we received.

13   Q.   With regard to the document -- the e-mail concerning

14   Trace-reportable and the colloquy you had with my colleague

15   about that -- do you remember that?

16   A.   Yes.

17   Q.   And you mentioned that you were still estimating the

18   portfolio and you were concerned about counterparties knowing

19   what your positions would be?

20   A.   Yes.

21   Q.   And my friend asked would they know that from Schedule A.

22   You remember that question?

23   A.   Yes.

24   Q.   Do you know whether Schedule A was filed under seal by the

25   parties' agreement and the order of this Court?

Page 226

1    A.    You know, I remember -- funny, "seal" is not a word that I

2    use very often.   I do remember it being discussed in some form

3    or another, but I actually don't know whether it was or wasn't.

4    Q.    Thank you.   With regard to the Giants bonds -- you were

5    asked a little bit about that -- was Goldman Sachs appointed as

6    a sponsor for a new auction in November 2008.   Do you recall?

7    A.    Yes, I believe it was, yes.

8    Q.    Did that change the value of the Giants bonds?

9    A.    It was the appointment of the auction -- there were a

10   number of things that affected the value of the bond:   There

11   was the appointment of the agent; there was the ability to

12   reset the coupon; and there was growing speculation that the

13   sponsors of Giants might be interested in buying back the debt,

14   and so -- or refinancing the debt.   Those were the three things

15   that happened.   So it wasn't just the one.

16   Q.    My colleague also suggested to you that this Giants bond

17   had the value on December 31st at its acquisition date.   Is

18   that accurate?

19   A.    Could -- sorry, could you say that again?

20   Q.    Was the December 31st value the same as the value on its

21   acquisition date?

22   A.    I don't think so.   I think --

23   Q.    Were you able to sell those Giants bonds on September

24   22nd, the closing date --

25   A.    Well, it didn't --

08-13555-mg   Doc 11039   Filed 08/27/10   Entered 08/27/10 15:55:46   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 227 of 232

Page 227

1    Q.    -- for more than fifty to sixty million dollars?

2    A.    Well, it didn't -- I don't remember the timing on the

3    Giants bond, and it didn't trade like that.  Each -- once

4    Goldman was appointed as agent -- we owned a large number of

5    bonds, so these auction-rate bonds would -- the obligation was

6    that once a period, and they came up on different dates, the

7    securities would be available for auction and the highest

8    bidder, i.e., the person bidding at the lowest yield, would

9    secure some bonds and they would therefore be taken away from

10   us.  Literally our bonds would mature and somebody else would

11   get some bonds and, if they didn't clear, then we would just

12   end up keeping some new bonds.

13        So we never sold any.  We just reduced -- sorry --

14   increased the yield that we were demanding on the instruments

15   that we held.  And after a while, other parties started to bid

16   the bonds away from us, so our securities just matured.  That

17   was why I used that word "crystallize".  That is why it's not

18   always the case that we sold.  Sometimes things just matured.

19   Q.    But these bonds were booked in the fifty- to sixty million

20   dollar range, the Giants bonds.  Do you remember that?

21   A.    At one time, I believe that's right, yes.

22   Q.    Were you able to sell them as of September 22nd, the

23   close, at that value?

24   A.    I don't -- December 22nd.  I don't remember whether we had

25   started to see --

08-13555-mg    Doc 11039    Filed 08/27/10    Entered 08/27/10 15:55:46    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 228 of 232

Page 228

1    Q.    Okay, let me correct that question.

2    A.    Yeah.

3    Q.    Were you able to sell them on December 31st at the value

4    that they had been booked on September 22nd?

5    A.    Well, September 22nd we had had them booked at fifty

6    million or so.  I think that's right.  We would have -- we

7    would have had to have waited for an auction to occur and then

8    they would have been -- and we would have had to have waited

9    for somebody else to bid in the auction at a yield less than

10    us; then they would have matured.

11    Q.    So you would not have been able to sell them for fifty- to

12    sixty million dollars on or about September 22nd?

13    A.    I don't know -- I don't know the answer to that.  We

14    weren't trying to do that.  We were waiting for them to mature.

15    Q.    Thank you.

16          THE COURT:  Is there anything more for Mr. King?

17          MR. SCHILLER:  No further questions, Your Honor.

18          MR. TAMBE:  No further questions, Your Honor.

19          MR. TECCE:  No further questions, Your Honor.

20          THE COURT:  Mr. King, you're excused.  Thank you.

21          THE WITNESS:  Thank you.

22        THE COURT:  That concludes the evidence for the day.

23    We're going to use the courtroom for the chambers conference

24    that the parties requested yesterday.  And I'm going to ask

25    that everybody who is not an essential participant in that

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 229

1    conference leave.  Someone's going to be the ultimate -- not

2    me.  Someone's going to determine if the right people are in

3    the room who knows who the right people should be.  And we'll

4    also terminate the phone line for CourtCall, to the extent that

5    there are any people listening by phone.  And we'll take about

6    a ten-minute break to give people a chance to get organized.

7         (Whereupon these proceedings were concluded at 4:59 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 230

```
 1

 2                        I N D E X

 3

 4                     T E S T I M O N Y

 5

 6   WITNESS              EXAM BY              PAGE    LINE

 7   Stephen King         Mr. Schiller            6      23

 8   Stephen King         Mr. Tambe              92      15

 9   Stephen King         Mr. Tecce            206      23

10   Stephen King         Mr. Schiller         222      19

11

12

13                     E X H I B I T S

14

15   NO.        DESCRIPTION                    ID.    EVID.

16   BCI909     E-mail from Clement Bernard to          23

17              Stephen King dated 9/15/08 re

18              LBI balance sheet detail as of

19              9/12

20   BCI910     E-mail from Jasen Yang to               23

21              Stephen King dated 9/15/08 re

22              LBI balance sheet detail as of

23              9/12 -Corporate Equities

24

25
```

Page 231

```
 1

 2                      I N D E X,  cont'd

 3

 4                      E X H I B I T S

 5

 6    NO.        DESCRIPTION                      ID.     EVID.

 7    BCI912     E-mail from Jasen Yang to                  23

 8               Stephen King dated 9/15/08 re

 9               LBI balance sheet detail as of

10               9/12 -Corporate Obligations

11    M716       E-mail referencing Schedules              138

12               A and B

13    M777       E-mail chain between Stephen King         155

14               and Jasen Yang

15    M792       E-mail from Mr. King to Mr. Yang          184

16               re prices and risks

17    M782       E-mail from Mr. King to Jonathan          189

18               Hughes re Trace reporting

19

20

21

22

23

24

25
```

Page 232

1

2                          C E R T I F I C A T I O N

3

4     I, Lisa Bar-Leib, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6

7     _____

8     LISA BAR-LEIB

9     AAERT Certified Electronic Transcriber (CET**D-486)

10

11    Also transcribed by:    Clara Rubin (CET**D-491)

12

13    Veritext

14    200 Old Country Road

15    Suite 580

16    Mineola, NY 11501

17

18    Date:  August 27, 2010

19

20

21

22

23

24

25