# BOIES, SCHILLER & FLEXNER LLP

575 LEXINGTON AVENUE • 7th FLOOR • NEW YORK, NY 10022 • PH. 212-446-2300 • FAX 212-446-2350

August 30, 2010

The Honorable James M. Peck
United States Bankruptcy Court
for the Southern District of New York
One Bowling Green
New York, N.Y. 10004-1408

      Re:    Case No: 08-13555 (JMP); SIPA Proceeding Case No. 08-1420 (JMP)
             Admissibility of Barclays' GFS Exhibits

Dear Judge Peck:

      In connection with the above captioned cases, and as agreed between the parties on August 27, 2010, Barclays Capital, Inc. ("Barclays") submits this letter in support of the admission into evidence of Barclays Exhibit numbers 488, 493, 501, 502, 667-670, 808, 809, and 865.[1] All of these exhibits are printouts of pre-closing data from the Lehman Brothers Holding Inc. ("Lehman") Global Funding System ("GFS") computer database, except for 808, 809, and 865, which are summaries of that same data. These printouts show Lehman's own "marks," or valuations, of Lehman Brothers Inc. ("LBI") securities for each business day from September 12 through September 19, 2008.

      **I.**    **Introduction**

      In this proceeding, Movants have repeatedly told the Court that the Lehman "marks" or "book values" for the assets defined in the APA as the "Long Positions" were, as of September 16, 2008, $5 billion higher than the $70 billion approximation set forth in the APA's definition of Long Positions. LBHI Rule 60 Br. at ¶¶ 1-2, 5; LBI Rule 60 Br. at ¶ 1 n.1; Committee Rule 60 Br. at ¶¶ 1, 4, 33-39; April 9, 2010 Hearing Tr. at 13:11-24, 27:12-22, 41:5-10. But Movants have never identified any document or any data that actually shows the Lehman marks as being $5 billion higher. To the contrary, all of the documents show Lehman marks or book values for the Long Positions that are *lower* than the $70 billion in the APA. That is why Movants, having made repeated allegations about how the Lehman "marks" and "book values" were not accurately represented in the APA, are now trying to persuade the Court to exclude the evidence from the Lehman systems that show the actual Lehman "marks" or "book values." Movants do not want this Court to consider Lehman's *actual marks* that were *actually on its books* because

---

[1] For the Court's convenience, all documents cited herein are included in the appendix filed herewith.

Honorable James M. Peck
August 30, 2010
Page 2

that data directly contradicts what Movants have been repeatedly telling this Court for over a year.[2]

      Under well-established rules of evidence, the Court should admit the data and summaries Barclays has identified as exhibits. This data was extracted from the Lehman legacy systems after Movants made requests for it in discovery — requests that, it now turns out, were unnecessary, because the LBHI estate has had access to the GFS system since the Sale. After Movants brought these systems to Barclays' attention, Barclays extracted more of the data and had its expert, Professor Paul Pfleiderer, analyze it. He analyzed it for a number of purposes, including in support of his conclusion that it does not show book values for the Long Positions in excess of $70 billion. After identifying the relevant GFS data for each day during the week of September 15, 2008, Barclays expected Movants to stipulate to the admission of this evidence. They refused. Barclays made available for deposition the former Lehman (and current Barclays) employee who manages the system and who extracted the data from the system (both in response to Movants' requests and Barclays' requests). This employee, Uma Krishnan, gave sworn deposition testimony that authenticated the data, confirmed that it represents what is on the Lehman GFS system, and explained how the system works and how adjustments are made to the data. After the deposition, Barclays once again asked Movants to stipulate to the admission of the data, and Movants refused, claiming that the "adjustments" to the data were suspicious and rendered the data unreliable. *See* July 20, 2010 Letter from H. Hume to K. Carrero [attached as Exhibit L]; *see also* July 30, 2010 Letter from W. Hine to H. Hume at p. 3 [attached as exhibit M].

      Barclays is not submitting the GFS data to show that the Lehman marks were accurate. Barclays is submitting the GFS data to show what the *actual Lehman marks were* for the week of September 15, 2008 (and the preceding Friday). Ms. Krishnan's deposition testimony establishes the authenticity of the data that is submitted. Movants are not challenging the credibility of Ms. Krishnan's testimony, and therefore she should not have to be called as a live witness merely to authenticate the data (though Barclays is willing to do so if the Court believes that is necessary). Movants are instead asserting that the normal process of making "adjustments" to the GFS data makes it unreliable. That argument should be rejected because (a) it is false, since the "adjustments" were part of a normal business practice (already described to this Court) in which Lehman would update its marks within one business day of the day to which the data related (after which time no adjustments could be made or were made, with one special exception that was made directly by Alvarez & Marsal, as explained below); and (b) even if the argument had merit, it goes solely to the weight of the evidence, not to its admissibility. Movants have access to the same data that Barclays has and can make whatever argument they wish to make about it. The data should, however, come into evidence for the Court's consideration.

---

[2] Lehman's ex-President, Bart McDade, testified that if he wanted to know the difference between the valuation number estimating the value of Lehman assets and the Friday night Lehman marks of the same assets, he would look at GFS data. April 27, 2010 Official Tr. at 30:22-31:3 [attached as Exhibit P].

Honorable James M. Peck
August 30, 2010
Page 3

## II. Background

GFS was one of several computer systems in Lehman's Finance Technology Department. Krishnan Dep. Tr. at 11:8-24 [attached as Exhibit A]. GFS was "like a financial data warehouse." *Id.* at 133:19-134:2. All the financial data in the GFS "warehouse" was downloaded from Lehman's internal systems, not from third parties. *Id.* at 26:6-12. Through the GFS graphical user interface, Lehman's product and financial controllers could access the GFS data and obtain a wide variety of customized financial information, such as daily balances, P&L (profit and loss) reports, start of day reports, trade date balances, settlement date balances, balance sheet movements, and the inventory value of Lehman's long positions. *Id.* at 12:4-8, 65:4-22, 97:10-15, 131:16-22, 133:19-134:2, 143:8-144:3.

Movants' own expert, Mr. John Garvey, has testified that the GFS data is the best source for determining Lehman's marks. Garvey Dep. Tr. at 11:20-12:9, 13:10-19 [attached as Exhibit F]. *See also* Garvey Expert Report at ¶13 (defining the GFS data as the "source of Lehman's marks" containing the "most recent information from the previous trading day") [attached as Exhibit D]. Another of Movants' experts, Pr. Mark Zmijewski, makes repeated use of GFS data, and characterizes the Lehman marks in GFS as the "first contemporaneous" source of prices. Zmijewski Report at ¶¶ 30, 38-40, 59-63 [attached as Exhibit E]. Movants have listed *on their own exhibit list* and *have moved into evidence* numerous reports obtained from the GFS system. *See* M.269, M.271-273, M.275-278, M.301-306, and M.309.

The reports that Movants have moved into evidence include GFS data from September 12 and 19 (M.301, M.306 and M.309), which Movants now assail as unreliable. *See* July 30, 2010 Letter from W. Hine to H. Hume at pp. 1-2. Further, while asserting (without basis) that GFS reports that include equities (particularly relevant to this case) are not admissible because they are not the type of reports generated in the ordinary course of business, Movants nonetheless moved such a report into evidence — M.309, a GFS report for September 12 containing the same data that Barclays seeks to introduce in BCI Exs. 501, 502 and 667-670.

The Examiner also relied on GFS data as the principal source of information for Lehman's marks and valuations, and, in particular, selected the September 12, 2008 dataset after "consultation with Lehman employees, Barclays personnel and Alvarez & Marsal [Lehman's restructuring officers] professionals." Examiner's Report, Vol. 2 at 595 n. 2097, Vol. 5 at 2006-10, 2014 [attached as Exhibits B-C].

Despite Movants' frequent use of GFS data, their assertions in this case about the Lehman marks, and their repeated calls for transparency and a full airing of all relevant facts, Movants now seek to block Barclays from using the GFS data, even though it is *Lehman's own data from Lehman's own computer database*. Movants' position is baseless. The data of the Lehman Global Funding System are plainly admissible both as party opponent admissions, Fed. R. Evid. 801(d)(2), and as Lehman business records, Fed. R. Evid. 803(6).

Honorable James M. Peck
August 30, 2010
Page 4

### III. Argument

#### A. Barclays' GFS Exhibits Are Admissible As Lehman Admissions

Federal Rule of Evidence 801(d)(2) provides that a statement offered against a party is admissible if it is "the party's own statement" or "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Party opponent admissions are broadly admissible as substantive evidence without regard to personal knowledge and without the necessity of laying a foundation. *See* M. Graham, 30B Fed. Prac. & Proc. Evid. § 7015. *See also Mister v. N.E. Ill. Commuter R.R. Corp.*, 571 F.3d 696, 698-99 (7th Cir. 2009) (reversing trial court, which had excluded adverse party's investigative report on hearsay and foundation grounds); *Bjornson v. Dave Smith Motors/Frontier Leasing & Sales*, No. CV 04-0285-N-MHW, 2007 WL 2705585, at *11-12 (D. Idaho Sept. 12, 2007) (admitting as opponent admission a spreadsheet with employee sales data over personal knowledge and foundation objections); *Yanni v. City of Seattle*, No. C04-0896L, 2005 WL 1288017, at *1 n.1 (W.D. Wash. May 2, 2005) (admitting interview notes as admission).

Here, a former Lehman employee (now employed by Barclays), Uma Krishnan, has given testimony in deposition that establishes that the GFS data was entered automatically from Lehman systems or manually by Lehman employees and agents in the ordinary course of Lehman's business. Krishnan Dep. Tr. at 20:13-21:2, 26:6-12, 30:5-31:9. From 2005 until the Closing, Ms. Krishnan was responsible for ensuring that the GFS system was working properly, resolving user questions and issues, and handling "any issues with the database." *Id.* at 12:9-18. After the Barclays acquisition, Ms. Krishnan transferred to Barclays along with the rest of the Lehman team, and she continues to be responsible for GFS to this day. *Id.* at 7:2-8:25, 12:19-25, 31:10-32:3.

As Ms. Krishnan explained, GFS was set up to automatically receive pricing data from other internal Lehman systems on a daily basis, and system users had until 6:00 pm on the following business day ("T+1") to update the data and make any corrections. *Id.* at 20:13-21:2, 26:6-12, 30:5-31:9, 113:7-114:10. These T+1 corrections and adjustments are part of the normal process of updating the book. *Id.* at 165:15-166:17, 114:11-115:5. After T+1 (meaning after the end of the business day immediately after the day for which the data relates), the data is *closed* to adjustments, archived, and *not subject to change*. *Id.* If, after T+1, changes need to be made to the data, it is necessary to load the archived original data into a "special" live environment, which can be set up to allow adjustments by authorized users for a limited period of time. *Id.* at 114:11-115:8. The original pre-restoration file remains in the archive, and the changes are made to a copy of a dataset that is placed into the "special environment." *Id.* at 114:11-117:18, 204:12-205:20. The data contained in the Barclays exhibits at issue involves the week from September 12 through September 19, 2008, before Barclays acquired the Lehman assets and before Barclays had any involvement with GFS. Thus, any adjustments made during the normal T+1 process were made by Lehman.

Honorable James M. Peck
August 30, 2010
Page 5

To Ms. Krishnan's knowledge, a "special environment" has been created only on two occasions, once at the request of Lehman's administrator, Alvarez & Marsal ("A&M"), and once at the request of the LBI Trustee. *Id.* at 170:5-173:24, 196:23-197:25, 201:22-204:4. Citing inaccuracies resulting from the Lehman bankruptcy on September 15, A&M in October 2008 requested the creation of special environments for September 12 and later for September 19. *Id.* A&M thereafter made changes to the data in the September 12 special environment, but no changes were made to the September 19 data. *Id.* at 117:19-118:3, 188:9-14. Therefore, the only date that involves changes beyond the normal T+1 timeframe is September 12. Documents confirm Ms. Krishnan's testimony that A&M requested that these special environments be created, and that A&M initiated the changes made to the September 12 data in connection with its preparation of Lehman's month-end closing. Dep. Ex. 863 (October 27, 2008 email from N. Romero to DBSUSERS *et al.* re: 9/12 Global Consolidated Close – on behalf of Alvarez and Marsal) [attached as Exhibit H]; *see also* June 21, 2010 Hearing Tr. at 52:18-53:5 (Marsal) [attached as Exhibit G].

As the data for the dates from September 12-19 was entered by Lehman employees — and, in the case of any changes made to September 12 in A&M's special environment, under the auspices of the Lehman administrator — all of the reports generated from GFS data (Barclays Exs. 488, 493, 501, 502, and 667-670) are admissible as party opponent admissions under Fed. R. Evid. 801(d)(2). Ms. Krishnan testified that Barclays' summaries of the GFS data (Barclays Exs. 808, 809) match the summaries that she personally created directly from the system (Barclays Ex. 865) and are true and accurate, and thus, these exhibits are admissible as summaries of voluminous writings. Fed. R. Evid. 1006. Movants have asserted that Ms. Krishnan's summaries were prepared by manipulating the GFS system in some indeterminate way. July 30, 2010 Letter from W. Hine to H. Hume at p. 3. In fact, Ms. Krishnan clearly explained that she "went back into the system" to generate the summaries, using the same report path as for the full reports she wanted to summarize, and then used the GAAP Asset Class 1 number to group the data by that feed. Krishnan Dep. Tr. at 108:20-109:7, 123:16-23.

Apparently, Movants do not dispute that the GFS data would be admissible if it was, in fact, entered by Lehman employees and A&M. Rather, their argument is that Barclays' employees may have altered the data after the Closing, even though they have no proof that this actually happened (and it is clear that this did *not* happen).[3] The "fact that it is possible to alter data contained in a computer is plainly insufficient to establish untrustworthiness." *United States v. Bonallo*, 858 F.2d 1427, 1436 (9th Cir. 1988). The "mere fact that it is possible to alter computer data" is not a basis for exclusion. *U.S. v. Perocier*, Crim. No. 08-243, 2009 WL

---

[3] In fact, Movants are currently able to verify the authenticity of the GFS data provided by Barclays since they have access to GFS. First, Legacy Lehman employees who had access to GFS prior to the bankruptcy maintained their access to the application. Krishnan Dep. Tr. at 171:25-172:18. Second, employees of the Estate and the Trustee without direct access to the system could request GFS reports from Barclays under the Transition Services Agreement ("TSA"). *See e.g.,* M. 122 [September 22, 2008 TSA] at §3.12 (a) (providing LBHI with a continued "access to books and records acquired as part of the Purchased Assets that are related and material to the Retained LBHI Business.") [attached as Exhibit I]; s*ee also* December 23, 2009 TSA at §§2.01(f) and 3.01(addressing the Trustee's access to the Systems) [attached as Exhibit J].

6640616, at *13 (D.P.R. June. 29, 2009). *Accord, e.g., Floorgraphics, Inc. v. News Am. Marketing In-Store Services, Inc.*, 546 F. Supp. 2d 155, 169 (D.N.J. 2008); *Burnett v. Pizza Hut of Am., Inc.*, 92 F. Supp. 2d 1142, 1159 (D.Kan. 2000).

"Any question as to the accuracy of the printouts, whether resulting from incorrect data entry or the operation of the computer program, as with inaccuracies in any other type of business records, would have affected only the weight of the printouts, not their admissibility." *United States v. Catabran*, 836 F.2d 453, 458 (9th Cir. 1988). "[A]llegations that the [computer data have] been tampered with go to the weight of the evidence, not its admissibility." *United States v. Poulsen*, 2008 WL 271659, at *8 (S.D.Ohio Jan. 30, 2008).

Moreover, in this case, although the Barclays GFS exhibits for September 12 (Exs. 488 and 501) are based on data from the A&M-created special environment (because Barclays assumes that the A&M adjustments made the data more accurate), the original data, which were locked and archived as of T+1, remain available for Movants' inspection. Krishnan Dep. Tr. at 204:12-205:20. Also available are logs of each and every change to the data (including the date and time of each change and the name of the person who made the change) in the special environment. *Id.* at 21:14-25, 115:13-18. Inspection of the original data and the logs shows that the adjustments made in A&M's special environment represent only an approximately $100 million difference (out of a total portfolio marked at approximately $62.4 billion) between the marks in the original data and the A&M-adjusted data. In any event, both sides have access to the archived data and the detailed report of changes made. Movants can present such information if they wish to contend that the adjustments made in the A&M special environment were material or inappropriate — but they have not done so. Again, such issues would just go to weight, not admissibility.

## B. Barclays' GFS Exhibits Are Also Admissible As Business Records

Federal Rule of Evidence 803(6) provides a hearsay exception for any business report or record, including any "data compilation," if it was the "regular practice" of the business to make such a record, as established "by the testimony of the custodian or other qualified witness," unless there are indications of a "lack of trustworthiness." Fed. R. Evid. 803(6). The term "data compilation" includes "electronic computer storage." *Id.*, Notes of Advisory Committee (1972 Proposed Rules).

Fed. R. Evid. 803(6) was derived from the Business Records Act, former 28 U.S.C. § 1732, which was "designed to bring the realities of business and professional practice into the courtroom in usable form." *United States v. N. Y. Foreign Trade Zone Operators, Inc.*, 304 F.2d 792, 796 (2d Cir. 1962); *Korte v. N. Y., N.H. & H.R. Co.*, 191 F.2d 86, 90-91 & n.2 (2d Cir. 1951). It abrogated common law restrictions on the litigation use of data that "were considered reliable and trustworthy for major decisions in the industrial and business world." *Palmer v. Hoffman*, 318 U.S. 109, 111-12 (1943). The exception is liberally construed in favor of admissibility, *Smith v. Bear*, 237 F.2d 79, 89 (2d Cir. 1956), in line with the general principle that "regularly kept business records should be admitted and evidence of matters affecting their

Honorable James M. Peck
August 30, 2010
Page 7

credibility should go only to their weight." *United States v. Ellenbogen*, 365 F.2d 982, 988 (2d Cir. 1966).

The GFS database was consistently maintained by Lehman and, since the Closing, the Lehman data has been maintained by Barclays pursuant to the terms of the TSA, and reports extracted from the system for dates preceding the Closing should therefore be admitted as Lehman's business record. Data "stored electronically on computers and later printed out for presentation in court" is admissible where, as here, the "original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice." *United States v. Donato*, No. 96-1547, 1997 WL 196593, at *2 (2d Cir. 1997); *accord Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632-33 (2d Cir. 1994). Where "there are sufficient indicia of reliability of the data produced, and the underlying database is maintained through the ordinary course of business," a "smaller subset of data provided as evidence from the database is subject to the business records exception to the hearsay rule," even if the data is "culled from the database using a query" for litigation purposes. *Health Alliance Network, Inc. v. Continental Cas. Co.*, 245 F.R.D. 121, 129 (S.D.N.Y. 2007), *aff'd*, 294 Fed. Appx. 680 (2d Cir. 2008).

Ms. Krishnan's deposition testimony sufficiently established a foundation for admission of both the GFS reports and their summaries. To establish a foundation for admission, the proponent need not call the persons who entered the data; any witness who can provide a "reasonable basis" for the court to determine the data were "typically kept by [the business] during the ordinary course of regular business" will suffice. *V Cable, Inc. v. Budnick*, 23 Fed. Appx. 64, 66 (2d Cir. 2001); *accord AT&T Corp. v. Community Network Servs, Inc*., No. 97 Civ. 316 (BSJ), 1999 WL 1267457, at *4-5 (S.D.N.Y. Dec. 29, 1999). The foundation may even be laid "by a witness who is not an employee of the entity that owns and prepared" the data. *Saks Int'l, Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987). All that is necessary is a witness who is "familiar with the record-keeping system" and can "explain … the process by which the data contained in the databases is collected and stored." *In re Dow Corning Corp.*, 250 B.R. 298, 318 (Bankr. E.D.Mich. 2000). *See also Health Alliance*, 245 F.R.D. at 129-30 (finding adequate authentification by "an in-house lawyer, who did not participate in or supervise the department responsible for maintaining the databases, nor prepare the lists herself"). "Any person in a position to attest to the authenticity of certain records is competent to lay the foundation for the admissibility of the records; he need not have been the preparer of the record, nor must he personally attest to the accuracy of the information contained in the records." *Rosenberg v. Collins*, 624 F.2d 659, 665 (5th Cir. 1980); *accord, Hardison v. Balboa Ins. Co*., 4 Fed. Appx. 663, 669-70 (10th Cir. 2001) (foundation established by witness who "explained how data was entered and retrieved from the computer system"); *Dyno Constr. Co. v. McWane, Inc*., 198 F.3d 567, 575-76 (6th Cir. 1999) ("all that is required is that the witness be familiar with the record keeping system").

As set forth more fully above, Ms. Krishnan is familiar with the GFS system, and she has testified that the data was kept in the ordinary course of Lehman's business, with data entered into GFS on a daily basis, and with it locked in and archived at 6:00 pm on the following business day. Krishnan Dep. Tr. at 20:13-21:2, 26:6-12, 30:5-31:9, 113:11-114:10. She also

Honorable James M. Peck
August 30, 2010
Page 8

explained in detail how data was entered into and retrieved from the computer system. *Id.* at 16:21-17:19, 19:18-21:2, 28:4-31:9. She described the process she used to generate the reports that became the Barclays exhibits at issue, and she testified that the exhibits accurately reflect the data in the GFS system. *Id.* at 157:23-164:13. This is all that is required for admission of the data as a business record.

Movants complain that Ms. Krishnan did not adequately authenticate the GFS data because she allegedly had no responsibility for inputting data or generating reports, she could not identify the users, she had no responsibility for checking the accuracy of pricing adjustments, and she was unaware of the formulas built into the system. July 30, 2010 Letter from W. Hine to H. Hume at pp. 1-2. As the above cases show, however, all of this is irrelevant. Ms. Krishnan has ample familiarity with the GFS system, and her testimony is more than adequate to provide a "reasonable basis" for the court to determine the data were "typically kept by [the business] during the ordinary course of regular business." *See V Cable,* 23 Fed. Appx. at 66*; Dyno Constr.*, 198 F.3d at 576 ("That [the witness] was not involved in the preparation of the documents or that he did not know who prepared them were not matters that precluded the admission of the documents as business records.")

Movants also assert that the GFS reports "including equities" are not business records because they are not the type of reports prepared by Lehman in the ordinary course of business. The identical argument was rejected in *Health Alliance,* 245 F.R.D. at 129-30. There, the objectors claimed that data "culled from the database using a query" and printed out as an exhibit was not a business record, because the particular query was not used in the ordinary course of business and was input for the purpose of litigation. The court wrote:

> This argument … ignores the realities of modern business litigation, where many business records are kept in databases, and parties query these databases in order to provide responses to discovery requests. . . . [P]roducing limited data from a larger database is more akin to reviewing a set of documents in response to a discovery request and producing only responsive documents, than it is [to] creating a new data compilation or document for the purposes of litigation. *Where as here, there are sufficient indicia of reliability of the data produced, and the underlying database is maintained through the ordinary course of business*, this court holds that *a smaller subset of data provided as evidence from the database is subject to the business records exception to the hearsay rule*.

*Health Alliance,* 245 F.R.D. at 129 (emphasis added), *aff'd*, 294 Fed. Appx. 680 (2d Cir. 2008).

Moreover, the factual predicate of Movants' distinction between GFS reports including and not including equities — that one was used for business decisions but not the other — is both unsupported and wrong. As noted below, a number of exhibits *marked by Movants* are GFS reports *containing equities*. As a further example, Movants Exhibit 253 ("Let's get fid current and equities from aug if we have to for now") is another example of a GFS report *with equities* being generated for business purposes.

### C. Movants Have Already Moved GFS Data Into Evidence

In addition to the above reasons, Movants' objection should also be overruled because Movants themselves have already moved into evidence numerous reports based on GFS data. Movants Exs. 269, 271-273, 275-278, 301-306, and 309. This undermines Movants current professed concerns about the data's indicia of reliability (again, as to what Lehman's marks were, not whether those marks were accurate). The reports submitted by Movants include data from both sources specifically challenged by Movants: (1) September 12 data after the adjustments in the A&M special environment were made, and (2) reports that include equities.

As no changes were made in the September 19 special environment, the *only* date for which data was changed after T+1 is September 12. The September 12 data is set forth in BCI Ex. 501, which is *identical* to Movants Ex. 309, which has already been *admitted into evidence* in this proceeding by stipulation of the parties. April 30, 2010 Stipulation to Movants' Exhibits [attached as Exhibit K][4]; *see also* August 11 Letter from W. Hine to C. Green at p. 2 [attached as Exhibit N].[5]

Similarly, Movants Exhibits 269, 271-273, 276-278, and 309 include information regarding equities.

With respect to Movants' Exhibits 301, 306, and 309, Movants assert, through a footnote in the Annotated Exhibit List Robert Gaffey submitted to the Court on August 19, 2010, that these documents were "admissible for the limited purpose of showing that Lehman's book and records, including the data in its GFS system, were being updated. . . ." August 19, 2010 Letter from R. Gaffey to Judge Peck (Attachment Truncated) [attached as Exhibit O]. However, the stipulation for their admission contains no such limitation. Moreover, the purported limitation that they assert is that "they should not be admitted as evidence of the accuracy or value of Lehman's marks for those two days." Barclays is, most decidedly, *not* offering the reports and GFS data that they contain as evidence of the accuracy of Lehman's marks. Rather, Barclays is offering these reports and data simply to show what that data is in the GFS system, and the parties are free to argue about the implications of that fact.

---

[4] The April 30, 2010 stipulation, attached as Exhibit K, contains the signature of Hamish P.M. Hume on behalf of Barclays, was countersigned by the Trustee's lawyer, and submitted to the Court. Barclays has requested a signed copy of the stipulation from the Trustee but has not yet received it.

[5] Apparently, Movants plan to assert that they are "withdrawing" from this stipulation which they entered into "inadvertently." However, a stipulation is binding, unilateral withdrawal is not permitted, and a court should not allow relief from a stipulation in the absence of proof of "some extraordinary circumstance." *United States ex rel. Reilly v. New England Teamsters and Trucking Ind. Pension Fund*, 737 F.2d 1274, 1278 (2d Cir. 1984). *See also In re Sullivan Machinery Co.*, 79 B.R. 523, 525-26 (Bankr. D. Conn. 1987) (holding that, although a bankruptcy court has equitable power to prevent substantial injustice, "judicial disregard for a stipulation bargained for by the parties and recited in open court hardly fits within that concept"). Moreover, a party cannot simply withdraw an exhibit from evidence.

Honorable James M. Peck
August 30, 2010
Page 10

**IV.     Conclusion**

        Movants are well aware that Barclays' GFS exhibits are based on Lehman's own data from a database maintained in the ordinary course of Lehman's business. This data was reliable enough for Lehman to base key business decisions on it, for the examiner and Movants' own experts to cite in their reports, and for Movants to generate and move into admission their own exhibits based on this same data. They simply want to keep out Barclays' exhibits because this data, Lehman's own data, directly contradicts their positions regarding Lehman's marks of the securities portfolio acquired by Barclays. However, the exhibits are admissible both as party opponent admissions and as business records, so Movants' objections to these exhibits should be overruled and the exhibits should be admitted into evidence.

        Respectfully submitted,

        BOIES, SCHILLER & FLEXNER LLP


        By: /s/ Jonathan D. Schiller

        Jonathan D. Schiller
        Hamish P.M. Hume
        Jack G. Stern
        575 Lexington Avenue
        New York, NY 10022
        Telephone: (212) 446-2300
        Facsimile: (212) 446-2350

        Attorneys for Barclays Capital Inc.