# JONES DAY

222 EAST 41ST STREET • NEW YORK, NEW YORK 10017.6702
TELEPHONE: 212.326.3939 • FACSIMILE: 212.755.7306

Direct Number: (212) 326-7838
rgaffey@jonesday.com

JP019220
125426-600002

August 30, 2010

<u>VIA HAND DELIVERY</u>

The Honorable James M. Peck
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408
(212) 668-2870

    Re:    <u>In re Lehman Brothers Holdings, Inc., Case No. 08-13555</u>

Dear Judge Peck:

    We respectfully submit this letter brief in connection with the parties' dispute concerning the admissibility into evidence of certain so-called GFS reports. In particular, Movants object to Barclays' attempt to move into evidence BCI Exs. 488, 493, 501, 503, 667-671, 779, 808 and 858 (collectively, the "GFS Reports") as well as purported summaries of such reports (BCI Exs. 779, 808, 809 and 858 (collectively, the "Summaries")). In sum, Movants object to these exhibits because they are not business records, cannot be properly authenticated and do not bear the indicia of reliability business records would require. While they purport to be reports of pre-Sale Transaction valuation data, they are in fact reports and summaries generated only after Barclays – which since the Sale Transaction has had exclusive control of the historical database from which they are generated – changed the criteria under which such reports were generated and allowed thousands of changes to be made to the underlying data upon which they are based.

    The term "GFS" refers to Lehman's former Global Finance System or Global Funding System ("GFS"). When it was in use at Lehman, GFS was a computerized database and related tools that essentially served as a central warehouse to track the value and other pricing and market information relating to some but not all of the myriad securities and other financial assets owned or held by various Lehman entities. GFS was not the primary source of data. Data came to a centralized GFS system from many other special purpose databases and other systems, including some third party data sources.

    The GFS system is no longer maintained by Lehman and has not been maintained by Lehman since the Sale Transaction closed. Upon the Closing of the Sale Transaction on September 22, 2008, the entire GFS system was turned over to Barclays. It has remained within Barclays' exclusive ownership and control since then. Barclays purportedly has continued to maintain and operate this system in connection with its operating the North American broker-

JONES DAY

The Honorable James M. Peck
August 30, 2010
Page 2

dealer assets it acquired from Lehman but, obviously, its current uses of the system have nothing to do with what the system reflected before the Sale Transaction.

To the extent the Lehman bankruptcy estates ever need access to any information contained in the GFS system, they must get permission from Barclays to use the GFS system pursuant to the Transition Services Agreement ("TSA"), a contract signed the parties in connection with the Sale Transaction. Movants have no direct access to the system, and have had no ability to maintain the integrity of pre-Sale Transaction data since the system was turned over to Barclays. Obviously, this arrangement puts Barclays in a position to alter historical data, or change the methods by which reports from the system are generated and, as set out below, there is evidence that it has done so.

The GFS system has the capability of generating reports based on queries and search terms (the "report path") designed by the particular user in question. In connection with Movants' case and to assist their experts, the Movants requested and Barclays has provided GFS reports reflecting pricing and market information from relevant dates in September 2008. Those reports were produced through the application of the report path actually used by Lehman personnel during that time period. Barclays has made no objection to such GFS reports, and they have been admitted into evidence already.[1] As described below, however, the GFS Reports at issue *here* were all generated after the GFS system was turned over to Barclays, based on a report path designed by Barclays solely for this case and not actually used by Lehman prior to September 22, 2008. The GFS Reports in issue are not hard copies of historical documents that resided in anyone's files, email or corporate records. They were generated solely for use in this litigation, using criteria different from those used in the normal course of business and based on altered data.

Based on evidence recently developed during the deposition of Ms. Uma Krishnan, Barclays' proffered custodian of records for these documents ("Ms. Krishnan"), LBHI objects to the admission into evidence of GFS reports covering two dates, September 12 and 19, 2008 (BCI Exs. 488, 493, 501, 503, 670, 779, 808 and 858) on the grounds that (i) they do not qualify under the business records exception to the hearsay rule since they were not generated in the ordinary course of business and Barclays employees and others have made some *7,000* adjustments to the data reflected therein for *months* after the normal adjustment period had closed, (ii) the reports are not party admissions since these changes were made months after the GFS system had been turned over to Barclays' ownership and control by individuals who never were or are no longer Lehman employees, and (iii) in any event, Ms. Krishnan is not competent to authenticate these reports.[2] For similar reasons, LBHI objects to the admission of BCI Exs. 667-671, modified

---

[1] As noted, we have since come to learn that there are major discrepancies in the figures contained in three reports (M. 301, M. 306 and M. 309) that cover September 12th and 19th. For the reasons noted below, Movants propose that their use be limited as described in footnote 2.

[2] For the sake of consistency and maintaining an accurate evidentiary record, we agree that the use of three GFS reports for those two dates previously admitted into evidence (M. 301, 306 and 309) should be limited to

JONES DAY

The Honorable James M. Peck
August 30, 2010
Page 3

GFS reports recently generated by Barclays solely for this litigation using a methodology not employed in the ordinary course of Lehman's former business. Finally, the purported Summaries of the GFS Reports prepared by Barclays for purposes of this litigation also are inadmissible for these same reasons and because they were not produced until after the close of discovery and, thus, could not be tested in expert depositions.

1. Ms. Uma Krishnan, Barclays' proffered custodian of records, is not competent to authenticate the GFS Reports in question

Prior to admitting a document into evidence, the proponent of the evidence must, of course, establish its authenticity. Federal Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901. In this case, Barclays has proffered the deposition testimony of Ms. Krishnan, purportedly a custodian of records at Barclays with knowledge of Barclays' post-Closing operation and use of the GFS system, as authentication for the GFS Reports. However, Ms. Krishnan was not able at her deposition, nor is she even competent, to properly authenticate either the GFS Reports or the Summaries. (A copy of the transcript of Ms. Krishnan's deposition is attached hereto as Exhibit A.)

Ms. Krishnan testified that she and her group (both while she was at Lehman and now at Barclays) had no responsibility for inputting any data into the GFS system or generating reports from the system. (Krishnan Tr. 15:9-16:7.) Nor was she responsible for or knowledgeable about changes made to the pricing data contained in the GFS system; such adjustments apparently were made by users that she could not identify and never controlled. (*Id.* at 20:13-21:5, 42:4-11, 113:3-118:3, 172:24-173:15, 183:15-184:14, 200:16-201:18.) She did not know whether previous pricing data was preserved by the GFS system after pricing adjustments were made by these other users. (*Id.* at 21:15-23:10.) And her group has no responsibility for checking the accuracy of pricing adjustments entered by the system's actual users. (*Id.* at 42:23-43:10, 94:11-96:5.) She could not even say with any certainty whether data for all the securities transferred to Barclays under the Sale Transaction was captured in the GFS system. (*Id.* at 60:3-18, 150:3-8.)

Ms. Krishnan has only partial familiarity with the types of reports generated by the GFS system. (Krishnan Tr. 16:14-17:6, 52:20-53:13, 93:3-6, 93:18-21, 93:24-94:7, 101:15-19.) And she was unclear as to whether her group actually generated certain of the GFS Reports Barclays now offers as evidence in this case. (*Id.* at 48:25-50:6.) She has no knowledge about the formulas built into the GFS system that allow it to assign a market value to various securities.

---

(continued...)

showing that Lehman's marks were updated and changed on or around September 12th and 19th, and these three exhibits shall not be relied upon for the accuracy or value of the marks contained therein.

JONES DAY

The Honorable James M. Peck
August 30, 2010
Page 4

(*Id.* at 24:17-25:22.) Nor was she altogether clear as to what types of input flow into the GFS system from other divisions within Lehman or Barclays. (*Id.* at 25:23-26:19.) And she has no knowledge of how pricing data is entered into the settlement systems that ultimately feed into GFS. (*Id.* at 27:25-28:3.) For these reasons, she is not competent to authenticate the documents Barclays now seeks to enter into evidence, notwithstanding Barclays' assertions to the contrary.

    2.    <u>The GFS Reports do not qualify as party admissions under Fed. R. Evid. 801(d)(2) nor as business records under Fed. R. Evid. 803(6)</u>

Barclays contends that the GFS Reports and the Summaries are (i) admissions by a party-opponent under Fed. R. Evid. 801(d)(2) and (ii) business records, under the exception to the hearsay rule set forth in Fed. Re. Evid. 803(6). This is wrong on both fronts.

Admissions by a party opponent are not hearsay. Fed. R. Evid. 801(d). By definition, such admissions can only include "(A) the party's own statement, ... or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent ..., or (E) a statement by a coconspirator ..." Fed. R. Evid 803(d)(2). The GFS Reports and Summaries, all of which are documents produced for the first time after the Closing of the Sale Transaction, when the GFS system was no longer controlled by Lehman, and generated by either legacy Barclays employees or former Lehman employees (like Ms. Krishnan) who now work for Barclays, do not qualify under any of these clauses. It is axiomatic that a document must be prepared by a party to be used as an admission against that party under Fed. R. Evid. 801(d)(2). *See, e.g., Metito (Overseas) Ltd. v. General Elec. Co.*, No. 05 Civ. 9478 (GEL), 2009 WL 399221, *12 n. 9 (S.D.N.Y. Feb. 18, 2009) (document is party admission as to party who prepared it and inadmissible hearsay as to opposing party). And Fed. R. Evid. 802(d)(2)(D) does not allow the introduction of hearsay statements of former employees when there is no showing that those statements were made during the course of their prior employment. *See Wahad v. F.B.I.*, 179 F.R.D. 429, 441 n. 22 (S.D.N.Y. 1998) (court declines to apply 801(d)(2)(D) when there is no evidence that the purported admission was made by the former employee during the course of his prior employment). *See also Reich v. Waldbaum, Inc.*, 833 F. Supp. 1037, 1050 (S.D.N.Y. 1993), *rev'd in part on other grounds*, 52 F.3d 35 (2nd Cir. 1995) (court applies 801(d)(2) to current employees but not former employees).

The business records exception to the hearsay rule concerns "Records of Regularly Conducted Activity," which are defined as records of activities "made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make" such records, "unless the source of information or method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6). The indicia of reliability that underlies the business records exception is premised on the regular, continuous and predictable nature of the business processes in question. "[T]he business record exception is founded on the notion

JONES DAY

The Honorable James M. Peck
August 30, 2010
Page 5

that such documents bear a sufficient degree of reliability 'because they are created either through systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation.'" *Giannone v. Deutsche Bank Securities, Inc.*, 2005 WL 3577134, *4 (S.D.N.Y. 2005 (quoting *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 375313, *7 (S.D.N.Y. 2005)). Where, as here, those processes are altered or modified, that indicia of reliability is lost.

Indeed, even where the records in question were produced through a regular process, the linchpin of any analysis of this hearsay exception involves evaluating the trustworthiness of the process by which the documents were created. The business records exception in Fed. R. Evid. 803(6) does not apply if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6). *See Romano v. Howarth*, 998 F.2d 101, 108 (2nd Cir. 1993) (report lacked "sufficient indicia of trustworthiness" to apply Fed. R. Evid. 803(6) where declarant was also a defendant and had a "motive to fudge the truth of what really happened"); *see also Palmer v. Hoffman*, 318 U.S. 109, 113-14 (1943).

Ms. Krishnan's testimony about the provenance of the September 12th and 19th reports confirms that these documents in particular (BCI Exs. 488, 493, 501, 503, 670)[3] are neither business records under Fed. R. Evid. 803(6) nor admissions by a party opponent under Fed. R. Evid. 801(d)(2), as Barclays contends. She testified that the normal practice at both Lehman and now Barclays was and is for pricing data to flow into the GFS system at a fixed time towards the end of each trading day and thereafter to allow for a short period (typically, one day) for adjustments to be made to this data by traders and other users. (Krishnan Tr. 113:3-118:3, 21:15-25, 17:20-25.)

For September 12th and September 19th, two very important days in this case, this regular practice was completely abandoned. (*Id.* at 40:4-44:22, 113:3-118:3, 164:19-166:20, 168:16-174:10.) The period for making changes to pricing data was expanded from a few days to many months. Changes to the data were being made as late as January or February 2009. Numerous of these changes were made to the data originally entered within the normal one-day period. (*Id.* at 113:3-118:3.) Ms. Krishnan knew of no restrictions as to who could make such after-the-fact adjustments. (*Id.* at 172:7-10.) She stated that some **7,000** adjustments were made to the pricing data for September 12th alone (Krishnan Tr. 173:10-24, 175:14-176:3), and while she suggested that she knew of no adjustments made to the data for the 19th (*id.* at 188:9-14), for the reasons noted above, it is not clear that her knowledge on that score is complete or accurate. (*Id.* at 198:21-199:2 (noting "data dumps" of September 19th data), 189:19-192:4 (confessing memory loss).) Even if, as Ms. Krishnan asserted, these adjustment periods were extended at the request of Alvarez & Marsal (another proposition for which her knowledge appears incomplete

---

[3] To the extent the Summaries on which Barclays' proffered expert, Professor Pfleiderer, relies (BCI Exs. 779, 808, 809 and 865) incorporate data from these GFS Reports, such Summaries are also inadmissible for this same reason.

The Honorable James M. Peck
August 30, 2010
Page 6

(Krishnan Tr. 172:24-174:10, 197:14-18)), she also acknowledged that Barclays employees who had never worked a day at Lehman and transferred Lehman employees whose conduct is at issue in this litigation also had access to the system and may have made changes to the September 12th pricing data. (*Id.* at 200:16-201:18.)

Quite apart from the evident problem these data adjustments present in terms of reliability of the data, the fact remains that this is not and never was the normal business practice for either Lehman or Barclays. Therefore, reports generated from this data cannot fall within the business records exception to the hearsay rule. Moreover, this re-opened adjustments period took place at a time when Lehman no longer controlled the GFS system. The system was under Barclays' exclusive ownership and control during this period. Thus, these adjustments and any reports generated from this data adjusted after the fact cannot be considered admissions of any Lehman entity; if anything, they can only qualify as admissions by Barclays.

3. The "modified" GFS Reports generated by Barclays solely for this litigation are neither party admissions nor qualifying business records

Separately, the latest round of GFS reports prepared for and produced by Barclays, *i.e.*, those "including equities" for the first time (BCI Exs. 667-671), are inadmissible for the additional reason that, according to Ms. Krishnan's testimony, they are not the types of reports Lehman or Barclays ever prepared in the ordinary course of business and therefore are not business records under Fed. R. Evid. 801(d)(2). The GFS reports originally generated from the report path Movants provided reflect the ordinary course of business for Lehman, as these report paths were those used by Lehman prior to the Sale Transaction. (*See* Krishnan Dep. Ex. 859 (copy attached); Krishnan Tr. 48:9-50:17, 102:15-108:2.) Ms. Krishnan testified that to prepare Barclays' GFS reports (BCI Exs. 667-671) to "includ[e] equities" she had to change the normal report path and customize the filters used to derive these reports. (Krishnan Tr. 48:9-50:17, 102:15-108:2.) These reports were not prepared in the ordinary course of business, either at Lehman or now at Barclays. (*Id.*) The business records exception of Fed. R. Evid. 803(6) does not apply to documents prepared solely for use in litigation. *See Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2nd Cir. 1994) ("Data prepared or compiled for use in litigation are not admissible as business records") (citing *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943)).

Nor can these latest round of reports be Lehman admissions under Fed. R. Evid. 803(6) since they were admittedly produced by Barclays personnel well after Barclays assumed exclusive control over Lehman's former GFS system.[4] And they were generated at a time when Barclays was involved in potentially high-stakes litigation concerning that very same data. Lehman estate personnel played no part in the generation of these reports and Lehman had no

---

[4] On the eve of trial, when Barclays first mentioned the possibility of relying on these reports as evidence Barclays referred to them as still being "being generated." (*See* Extract from Barclays' Exhibit List, dated April 13, 2010, attached hereto as Exhibit B.)

JONES DAY

The Honorable James M. Peck
August 30, 2010
Page 7

ability to ensure their accuracy or completeness. Barclays can present no authority for the proposition that reports generated by a party after it has assumed exclusive and complete ownership and control over an opponent's former computerized records can constitute an admission by that opponent, especially when the opponent has no ability to monitor, provide input, or perform quality control over the process by which such new reports are generated. Such reports simply do not bear the indicia of reliability normally ascribed to business records created in the ordinary course. This is especially true where, as we already have seen here, Barclays has the ability to re-open, at will, the process by which data is input into this database and to allow adjustments to that data months after the fact.

4. <u>The Summaries produced by Barclays are also inadmissible hearsay</u>

For the reasons noted above, because the Summaries rely on, present and purport to summarize data from inadmissible GFS Reports, the Summaries themselves are inadmissible. Independently, Ms. Krishnan's testimony confirmed that the Summaries, produced by Barclays after the discovery cut off and now relied on by Barclays' proffered expert, Professor Pfleiderer, were prepared, not from the actual data set forth in the GFS Reports they purport to summarize, but rather by manipulating the GFS system in some indeterminate way (which Ms. Krishnan could not fully explain) to generate new data and new summaries thereof. (*See* Krishnan Tr. 119:21-129:15.) This latest round of data manipulation is something Movants will never be able to test in discovery. These Summaries (and Ms. Krishnan's explanation as to how they were derived) were first provided to Movants after Professor Pfleiderer's deposition on February 23, 2010, and therefore were not subject to cross examination before trial. For this independent reason, BCI Exs. 779, 808, 809 and 858 are inadmissible.

We are, of course, available to discuss these issues with Your Honor at the Court's convenience.

Respectfully,

*Robert W. Gaffey /ajd*

Robert W. Gaffey

Enclosures
cc: James Tecce, Esq. (Quinn Emanuel Urquhart Oliver & Hedges, LLP)
William R. Maguire, Esq. (Hughes Hubbard & Reed LLP)
David Boies, Esq. (Boies, Schiller & Flexner LLP)