**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| Debtor. | |

# INDEX TO APPENDIX TO LETTER BRIEF FOR THE ADMISSIBILITY OF BCI EXHIBITS 488, 493, 501, 502, 667-670, 808, 809, and 865

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350
Jonathan D. Schiller
Hamish P. M. Hume
Jack G. Stern

*Attorneys for Barclays Capital Inc.*

August 30, 2010

| Exhibit | Document |
|---|---|
| BCI Exhibit 488 | September 12, 2008 Global Financing System Report |
| BCI Exhibit 493 | September 19, 2008 Global Financing System Report |
| BCI Exhibit 501 | September 12, 2008 Global Financing System Report (including equities) |
| BCI Exhibit 502 | September 15, 2008 Global Financing System Report (including equities) |
| BCI Exhibit 667 | GFS report (including equities) for Sept. 16, 2008 |
| BCI Exhibit 668 | GFS report (including equities) for Sept. 17, 2008 |
| BCI Exhibit 669 | GFS report (including equities) for Sept. 18, 2008 |
| BCI Exhibit 670 | GFS report (including equities) for Sept. 19, 2008 |
| BCI Exhibit 808 | Exhibit 1 to April 23, 2010 Declaration of Paul Pfleiderer |
| BCI Exhibit 809 | Exhibit 2 to April 23, 2010 Declaration of Paul Pfleiderer |
| BCI Exhibit 865 | GFS Summary prepared by Uma Krishnan (Dep. Ex. 858) |
| M.269 | GFS - Corporate Stocks & Options |
| M.271 | GFS - Corporate Obligations & Spot |
| M.272 | GFS - Corporate Stocks |
| M.273 | GFS - Mortgages and Mortgage Backed Securities |
| M.275 | GFS - CDs & Other Money Market Instr. |
| M.276 | GFS - CDs & Other Money Market Instr. |
| M.277 | GFS - Corporate Obligations & Spot Commodities |
| M.278 | GFS - Governments & Agencies |
| M.301 | 9/12/08 GFS - Detailed Exposure Report (Cross System) |
| M.302 | 9/15/08 GFS - Detailed Exposure Report (Cross System) |
| M.303 | 9/16/08 GFS - Detailed Exposure Report (Cross System) |
| M.304 | 9/17/08 GFS - Detailed Exposure Report (Cross System) |
| M.305 | 9/18/08 GFS - Detailed Exposure Report (Cross System) |
| M.306 | 9/19/08 GFS - Detailed Exposure Report (Cross System) |
| M.309 | 9/12/08 GFS - Detailed Exposure Report |
| A | Excerpts of June 29, 2010 Deposition Transcript of Uma Krishnan |
| B | Excerpts of March 11, 2010 Examiner's Report Volume II |
| C | Excerpts of March 11, 2010 Examiner's Report Volume V |
| D | Excerpts of March 15, 2010 John P. Garvey Expert Report |
| E | Excerpts of March 15, 2010 Mark Zmijewski Expert Report |
| F | Excerpts of April 13, 2010 Deposition Transcript of John P. Garvey |
| G | Excerpts of June 21, 2010 Hearing Transcript [Bryan Marsal] |
| H | October 27, 2008 4:14pm email from N.Romero to DBUSERS, et al. re 9/12 Global Consolidated Close –on behalf of Alvarez and Marsal [Dep. Ex. 863][Attachment Truncated] |
| I | Excerpts of September 22, 2008 Transition Services Agreement [M.122] |
| J | Excerpts of December 23, 2009 Transition Services Agreement |
| K | April 30, 2010 Stipulation to Movants' Exhibits |
| L | July 20, 2010 Letter from H. Hume to K. Carrero |
| M | July 30, 2010 Letter from W. Hine to H. Hume |
| N | August 11, 2010 Letter from W. Hine to C. Green |
| O | August 19, 2010 Letter from R. Gaffey to Judge Peck [Attachment Truncated] |
| P | Excerpts of April 27, 2010 Hearing Transcript [Bart McDade] |

# BCI Exhibits 488, 493, 501, 502, 667-670, 808, 809 Provided in Native Format on CD

# BCI Exhibit 865

BCI Exhibit No. 865

## BS Detailed Exposure Summary (Cross System) - 12 Sep 2008

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
| --- | --- | --- | --- |
| 11061 | 0 | Total Mortgages & Mortgage Backed | 12-Sep-08 |
| 70500 | 37,310,795,798 | Total Governments & Agencies | 12-Sep-08 |
| 70600 | 1,014,274,049 | Total CD's and Other Mon Mkt Instr. | 12-Sep-08 |
| 70700 | 6,556,460,564 | Total Mortgages & Mortgage Backed | 12-Sep-08 |
| 70800 | 5,222,989,904 | Total Corp. Obligations & Spot | 12-Sep-08 |
| 70900 | 8,038,738,595 | Total Corporate Stocks & Options | 12-Sep-08 |
| 70950 | 4,214,376,104 | Total Derivatives & Other Contr. | 12-Sep-08 |
| 72260 | 0 | Total Governments & Agencies | 12-Sep-08 |
| 72263 | 0 | CD's & Other Money Market | 12-Sep-08 |
| 72266 | 0 | Total Mortgages & Mortgage Backed | 12-Sep-08 |
| 72270 | 0 | Total Corp. Obligations & Spot Commodities | 12-Sep-08 |
| 72280 | 0 | Total Corporate Stocks | 12-Sep-08 |
| 72290 | 0 | Total Derivatives & Other Contr. | 12-Sep-08 |
| 79999 | 0 | | 12-Sep-08 |
| 79999 | 488,575 | | 12-Sep-08 |
| 88888 | 0 | | 12-Sep-08 |



EXHIBIT
858
AC-9/29/10
depobook.com

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
|---|---|---|---|
| 11061 | 0 | Total Mortgages & Mortgage Backed | Sep 15 2008 6:00AM |
| 70500 | 37088514254 | Total Governments & Agencies | Sep 15 2008 6:00AM |
| 70600 | 969151091.7 | Total CD's and Other Mon Mkt Instr. | Sep 15 2008 6:00AM |
| 70700 | 6188261237 | Total Mortgages & Mortgage Backed | Sep 15 2008 6:00AM |
| 70800 | 4850781775 | Total Corp. Obligations & Spot. | Sep 15 2008 6:00AM |
| 70900 | 7120346434 | Total Corporate Stocks & Options | Sep 15 2008 6:00AM |
| 70950 | 4395326757 | Total Derivatives & Other Contr. | Sep 15 2008 6:00AM |
| 72260 | 0 | Total Governments & Agencies | Sep 15 2008 6:00AM |
| 72263 | 0 | CD's & Other Money Market | Sep 15 2008 6:00AM |
| 72266 | 0 | Total Mortgages & Mortgage Backed | Sep 15 2008 6:00AM |
| 72270 | 0 | Total Corp. Obligations & Spot Commodities | Sep 15 2008 6:00AM |
| 72280 | 0 | Total Corporate Stocks | Sep 15 2008 6:00AM |
| 72290 | 0 | Total Derivatives & Other Contr. | Sep 15 2008 6:00AM |
| 79999 | 0 | NULL | Sep 15 2008 6:00AM |
| 79999 | 491728.239 | | Sep 15 2008 6:00AM |
| 88888 | 0.02053 | | Sep 15 2008 6:00AM |

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
|---|---|---|---|
| 11061 | 0 | Total Mortgages & Mortgage Backed | Sep 16 2008  6:00AM |
| 70500 | 3685400423 | Total Governments & Agencies | Sep 16 2008  6:00AM |
| 70600 | 960236836.2 | Total CD's and Other Mon Mkt Instr. | Sep 16 2008  6:00AM |
| 70700 | 6079799365 | Total Mortgages & Mortgage Backed | Sep 16 2008  6:00AM |
| 70800 | 4798806162 | Total Corp. Obligations & Spot. | Sep 16 2008  6:00AM |
| 70900 | 7033963092 | Total Corporate Stocks & Options | Sep 16 2008  6:00AM |
| 70950 | 2916501345 | Total Derivatives & Other Contr. | Sep 16 2008  6:00AM |
| 72260 | 0 | Total Governments & Agencies | Sep 16 2008  6:00AM |
| 72263 | 0 | CD's & Other Money Market | Sep 16 2008  6:00AM |
| 72266 | 0 | Total Mortgages & Mortgage Backed | Sep 16 2008  6:00AM |
| 72270 | 4427577.229 | Total Corp. Obligations & Spot Commodities | Sep 16 2008  6:00AM |
| 72280 | 0 | Total Corporate Stocks | Sep 16 2008  6:00AM |
| 72290 | 0 | Total Derivatives & Other Contr. | Sep 16 2008  6:00AM |
| 79999 | 0 | NULL | Sep 16 2008  6:00AM |
| 79999 | 494037.581 | | Sep 16 2008  6:00AM |
| 88888 | 0.02053 | | Sep 16 2008  6:00AM |

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
|---|---|---|---|
| 11061 | 0.463745313 | Total Mortgages & Mortgage Backed | Sep 17 2008 6:00AM |
| 70500 | 3643935014 | Total Governments & Agencies | Sep 17 2008 6:00AM |
| 70600 | 9577992623 | Total CD's and Other Mon Mkt Instr. | Sep 17 2008 6:00AM |
| 70700 | 5965205445 | Total Mortgages & Mortgage Backed | Sep 17 2008 6:00AM |
| 70800 | 4752713471 | Total Corp. Obligations & Spot | Sep 17 2008 6:00AM |
| 70900 | 6186365445 | Total Corporate Stocks & Options | Sep 17 2008 6:00AM |
| 70950 | 2733426886 | Total Derivatives & Other Contr. | Sep 17 2008 6:00AM |
| 72260 | 0 | Total Governments & Agencies | Sep 17 2008 6:00AM |
| 72263 | 0 | CD's & Other Money Market | Sep 17 2008 6:00AM |
| 72266 | 0 | Total Mortgages & Mortgage Backed | Sep 17 2008 6:00AM |
| 72270 | 0 | Total Corp. Obligations & Spot Commodities | Sep 17 2008 6:00AM |
| 72280 | 0 | Total Corporate Stocks | Sep 17 2008 6:00AM |
| 72290 | 0 | Total Derivatives & Other Contr. | Sep 17 2008 6:00AM |
| 79999 | 0 | NULL | Sep 17 2008 6:00AM |
| 79999 | 460809.197 | | Sep 17 2008 6:00AM |
| 88888 | 0.02053 | | Sep 17 2008 6:00AM |

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
| --- | --- | --- | --- |
| NULL | 0 | NULL | |
| 11061 | 0.463304688 | Total Mortgages & Mortgage Backed | Sep 18 2008  6:00AM |
| 70500 | 3819478237 | Total Governments & Agencies | Sep 18 2008  6:00AM |
| 70600 | 9223750657.7 | Total CD's and Other Mon Mkt Instr. | Sep 18 2008  6:00AM |
| 70700 | 5909425547 | Total Mortgages & Mortgage Backed | Sep 18 2008  6:00AM |
| 70800 | 4636360689 | Total Corp. Obligations & Spot | Sep 18 2008  6:00AM |
| 70900 | 5066034879 | Total Corporate Stocks & Options | Sep 18 2008  6:00AM |
| 70950 | 2619910176 | Total Derivatives & Other Contr. | Sep 18 2008  6:00AM |
| 72260 | 0 | Total Governments & Agencies | Sep 18 2008  6:00AM |
| 72266 | 0 | Total Mortgages & Mortgage Backed | Sep 18 2008  6:00AM |
| 72270 | 0 | Total Corp. Obligations & Spot Commodities | Sep 18 2008  6:00AM |
| 72280 | 0 | Total Corporate Stocks | Sep 18 2008  6:00AM |
| 72290 | 0 | Total Derivatives & Other Contr. | Sep 18 2008  6:00AM |
| 79999 | 0 | NULL | Sep 18 2008  6:00AM |
| 79999 | 459931.27 | | Sep 18 2008  6:00AM |
| 88888 | 0.02053 | | Sep 18 2008  6:00AM |

## BS Detailed Exposure Summary (Cross System) - 19 Sep 2008

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
|---|---|---|---|
| 11061 | 0 | Total Mortgages & Mortgage Backed | 19-Sep-08 |
| 70500 | 36,081,407,429 | Total Governments & Agencies | 19-Sep-08 |
| 70600 | 918,946,726 | Total CD's and Other Mon Mkt Instr. | 19-Sep-08 |
| 70700 | 6,218,802,484 | Total Mortgages & Mortgage Backed | 19-Sep-08 |
| 70800 | 4,603,478,837 | Total Corp. Obligations & Spot. | 19-Sep-08 |
| 70900 | 5,771,988,177 | Total Corporate Stocks & Options | 19-Sep-08 |
| 70950 | 2,350,274,434 | Total Derivatives & Other Contr. | 19-Sep-08 |
| 72260 | 0 | Total Governments & Agencies | 19-Sep-08 |
| 72266 | 0 | Total Mortgages & Mortgage Backed | 19-Sep-08 |
| 72270 | 990,208 | Total Corp. Obligations & Spot Commodities | 19-Sep-08 |
| 72280 | 0 | Total Corporate Stocks | 19-Sep-08 |
| 72290 | 0 | Total Derivatives & Other Contr. | 19-Sep-08 |
| 79999 | 0 | | 19-Sep-08 |
| 79999 | 451,119 | | 19-Sep-08 |
| 88888 | 0 | | 19-Sep-08 |

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
|---|---|---|---|
| 11061 | 137382264.3 | Total Mortgages & Mortgage Backed | Sep 22 2008 6:00AM |
| 70500 | 4458748190 9 | Total Governments & Agencies | Sep 22 2008 6:00AM |
| 70600 | 2754438884 | Total CD's and Other Mon Mkt Instr. | Sep 22 2008 6:00AM |
| 70700 | 6238444616 | Total Mortgages & Mortgage Backed | Sep 22 2008 6:00AM |
| 70800 | 4576655939 | Total Corp. Obligations & Spot | Sep 22 2008 6:00AM |
| 70900 | 5698900787 | Total Corporate Stocks & Options | Sep 22 2008 6:00AM |
| 70950 | 1628049283 | Total Derivatives & Other Contr. | Sep 22 2008 6:00AM |
| 72260 | 0 | Total Governments & Agencies | Sep 22 2008 6:00AM |
| 72266 | 0 | Total Mortgages & Mortgage Backed | Sep 22 2008 6:00AM |
| 72270 | 0 | Total Corp. Obligations & Spot Commodities | Sep 22 2008 6:00AM |
| 72280 | 0 | Total Corporate Stocks | Sep 22 2008 6:00AM |
| 72290 | 0 | Total Derivatives & Other Contr. | Sep 22 2008 6:00AM |
| 79999 | 0 | NULL | Sep 22 2008 6:00AM |
| 79999 | 451205.834 | | Sep 22 2008 6:00AM |
| 88888 | 0.02053 | | Sep 22 2008 6:00AM |

Movants' Exhibits 269, 271-273, 275-278, 301-306, 309 Provided in Native Format on CD

# EXHIBIT A

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ---------------------x

5    In Re:

6                            Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

           Debtors.

10

     ----------------------x

11

12

13          DEPOSITION OF UMA KRISHNAN

14          New York, New York

15          June 29, 2010

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 31616

Page 6

Krishnan

1. Krishnan
2. Schiller & Flexner on behalf of Barclays and
3. the witness.
4. BY MS. CARRERO:
5. Q.   Ms. Krishnan, have you ever been
6. deposed before?
7. A.   No.
8. Q.   Perhaps it's best if we go over some
9. housekeeping rules that might make things
10. easier.  If you would let me finish a question
11. before you answer, and I will try to do the same
12. thing.
13. A.   Okay.
14. Q.   And wait to pose another question
15. until you have finished your response.
16.      If you feel like you need to take a
17. break at some point, I just ask that you finish
18. answering whatever pending question there is,
19. and if it's an appropriate time to break, we
20. will do so.
21.      The court reporter needs verbal
22. answers to be able to take it down on the
23. record, so I ask that you give verbal responses
24. rather than nodding your head or the like.
25. A.   Okay.

Page 7

Krishnan

1. Krishnan
2. Q.   So with that, let's begin.
3.      What is your current title,
4. responsibilities and duties at Barclays?
5. A.   I'm responsible for the GFS system at
6. this time.
7. Q.   And --
8. A.   And I manage a team of four people.
9. Q.   And what is your title?
10. A.   It's assistant vice president.
11. Q.   And do you have any other
12. responsibilities or duties other than for GFS?
13. A.   No, that's about it.
14. Q.   And what do those responsibilities and
15. duties entail?
16. A.   We interact with the users to make
17. sure that they are happy with the data that the
18. system produces, you know, on day-to-day issues.
19. With the system we assist them with any changes
20. that they want, things like that.
21. Q.   When you say the users, who are you
22. referring to?
23. A.   Barclays users.
24. Q.   And who are those Barclays users?
25. A.   Product controllers and financial

Page 8

Krishnan

1. Krishnan
2. controllers.
3. Q.   Does Barclays currently use the GFS
4. system?
5. A.   Yes, they do.
6. Q.   And when did they begin using the GFS
7. system?
8. A.   Probably somewhere in the end of
9. September 2008.  I don't remember the exact
10. date, but around that time.  After the
11. acquisition.
12. Q.   Do you know if it replaced an existing
13. system at Barclays?
14. A.   No, it was -- because they acquired a
15. lot of, you know, like the Lehman business,
16. they -- and GFS was still processing the data
17. from Lehman businesses, they decided to continue
18. to use GFS.
19. Q.   You had mentioned that you were an
20. assistant vice president.  Could you tell me of
21. what group?
22. A.   Finance Technology.
23. Q.   And when did you join Barclays?
24. A.   I joined Barclays in end of September
25. of 2008 like everybody else from Lehman, so ...

Page 9

Krishnan

1. Krishnan
2. Q.   And who do you report to within
3. Finance Technology?
4. A.   Right now I report to Daylas Fuentes.
5. Q.   And Ms. Krishnan, I see that you have
6. notes in front of you.
7.      MR. THOMAS:  Go ahead and put those
8. away.
9.      THE WITNESS:  Okay.
10. Q.   Were those prepared for purposes of
11. your testimony today?
12. A.   I wanted to, you know, recall myself
13. because it's a long time back, so I just ...
14. Q.   If we could just take one minute for a
15. second.
16.      (Pause in the proceedings.)
17. Q.   Ms. Krishnan, what did you do to
18. prepare for your deposition today?
19. A.   We were just talking about the reports
20. that we made for -- for the attorneys.
21. Q.   And did you --
22. A.   How we extracted them.
23.      MR. THOMAS:  If you're referring to
24. conversations with the attorneys, you don't
25. want to get in the substance of that because

Page 10

Krishnan

1
2   that's privileged.
3        THE WITNESS:  Okay.
4        Q.   Did you meet with your attorneys in
5   preparation for your deposition today?
6        A.   Yes, we did.
7        Q.   And did you meet with anybody else
8   other than your attorneys in preparation for
9   your deposition?
10       A.   No.  Anybody else?  No.
11       Q.   Did you speak to any former Lehman or
12  Barclays employees?
13       A.   No.
14       Q.   Did you prepare your notes yourself or
15  with the assistance of others?
16       A.   I --
17       MR. THOMAS:  Objection to form.
18       Q.   You can go ahead and answer.
19       MR. THOMAS:  If you're asking about
20  the notes, she wasn't using them to answer
21  questions.  She does not have them in front
22  of her.  They were notes of conversations
23  taken with counsel.  They're privileged.
24       MS. CARRERO:  For now, we'll accept
25  that, and if need be, we'll follow up later.

Page 11

Krishnan

1
2        Q.   Prior to your employment at Barclays,
3   what was your position at Lehman Brothers?
4        A.   I was part of a team called Run the
5   Bank.  We were responsible for infrastructure
6   and day-to-day issues with the system, user
7   queries.
8        Q.   And when you say the "system," are you
9   referring to only the GFS system?
10       A.   Yes, primarily the GFS system, but we
11  were trying to get trained in other systems in
12  Finance Technology.
13       Q.   And what other systems were you
14  getting trained in?
15       A.   G Quest and a data system calls PALS,
16  P-A-L-S.
17       Q.   And what is G Quest?
18       A.   I didn't really know that much
19  because, you know, we were just starting to get
20  trained.  It's a P&L system.
21       Q.   Was it replacing an existing system?
22       A.   No, it was a Lehman system.
23       Q.   And what is PALS?
24       A.   PALS was also a P&L system.
25       Q.   Were they P&L systems for different

Page 12

Krishnan

1
2   businesses of Lehman Brothers?
3        A.   Yes, I think so.
4        Q.   What is GFS?
5        A.   GFS stands for Global Funding System.
6   It produced daily balances and P&L reporting for
7   use -- for product controllers and financial
8   controllers.
9        Q.   And what were your day-to-day
10  responsibilities and duties with respect to GFS?
11       A.   The day-to-day responsibilities
12  included making sure that the system is running
13  fine, without any issues, answering user
14  questions, user issues, infrastructure
15  responsibilities, anything to do with the
16  database, you know, any issues with the
17  database, fix -- reaching out to the right
18  person to fix them.
19       Q.   And are those your same day-to-day
20  responsibilities for GFS in your current
21  position at Barclays as well?
22       A.   I have more responsibilities now in
23  the sense that we are responsible for changing
24  anything in the system plus maintaining the
25  system.

Page 13

Krishnan

1
2        Q.   And when you say responsible for
3   changing anything in the system, what do you
4   mean?
5        A.   Well, users want different
6   functionalities at different points in time, so
7   depending on what they want and whether it's
8   doable in the system, we make changes.
9        Q.   And who are the users that would be
10  requesting such changes?
11       A.   The users would be product controllers
12  and financial controllers.
13       Q.   And with respect to maintaining the
14  system, what does that entail?
15       A.   That we make sure they are rerun
16  batches, like automated batches, we make sure
17  that there are no failures and failures are
18  handled without affecting the numbers in the
19  system.
20       Q.   And how do you do that?
21       A.   It depends on what the problem is, so
22  depending on it could be like a data issue that
23  the system is not built to handle, we might --
24  we might face something like that, or it could
25  be a very simple problem because the database

Page 14

```
 1            Krishnan
 2  was down or something, so it could be ...
 3      Q.   And who was responsible for changing
 4  and maintaining the system while you were at
 5  Lehman?
 6      A.   We were split into two groups.  There
 7  was another group called Change the Bank or
 8  Build the Bank.  I'm not sure, I don't remember
 9  who was the manager was for that system at that
10  time.
11      Q.   And the other group perhaps called
12  Build the Bank was responsible for changing or
13  maintaining the GFS system?
14      A.   Changing.  We were responsible for
15  maintaining it.  Run the Bank was responsible
16  for maintaining.
17      Q.   And what did it entail to maintain the
18  system while you were at Lehman?
19      A.   The same things that we do now, like
20  the system issues, any batch job failures, you
21  know, and answering user questions.
22      Q.   Were user questions about the
23  technology itself?
24      A.   The use -- sometimes the users think
25  that the numbers should be some way, and if it's
```

Page 15

```
 1            Krishnan
 2  different, they just need an explanation on why
 3  the system generated that number.  So, you know,
 4  we look at the code and tell them what exactly
 5  it does.  Sometimes the users may be new and
 6  they don't know what's going on so they may ask
 7  questions.  Sometimes it could be just user
 8  training.
 9      Q.   Did you or your group have any
10  responsibility for the actual numbers input into
11  GFS?
12      A.   No, we did not have any.
13      Q.   I should say did you or your group
14  have any responsibility for the numbers input
15  while you were at Lehman?
16      A.   No, we did not have any responsibility
17  towards that.
18      Q.   Is that the same answer in your
19  current position at Barclays?
20      A.   Yes, that's correct.
21      Q.   And do you or your group have any
22  responsibility for generating any of the
23  financial reports that might come from GFS while
24  you were at Lehman?
25      A.   No.  Users had access to our -- we had
```

Page 16

```
 1            Krishnan
 2  like a graphical user interface and they would
 3  run the reports themselves.  They did not come
 4  to us for the reports.
 5      Q.   And is that the same answer in your
 6  current position at Barclays?
 7      A.   Yes, that's correct.
 8      Q.   Are you familiar with the reports that
 9  were run from GFS while you were at Lehman?
10          MR. THOMAS:  Objection to form.
11          You can answer.
12      A.   Yes.  I'm sorry, what was the question
13  again?
14      Q.   Were you familiar with the types of
15  reports that were run from GFS while you were at
16  Lehman?
17      A.   To some extent, yes, but there were a
18  lot of reports, so I -- I probably was familiar
19  with some of the reports, but there's like a
20  whole lot of reports.
21      Q.   And which reports would you have been
22  familiar with?
23      A.   All the reports were built off tables
24  in the system.  So, you know, we had a very
25  user-friendly environment in which we could go
```

Page 17

```
 1            Krishnan
 2  and click on the report to see what table it's
 3  based off.  So I don't remember any of the
 4  report names off the top of my head, but if the
 5  user sees this report, I could go and find out
 6  what it is.
 7      Q.   Would you know the report paths that
 8  used to generate any given report?
 9      A.   I'm sorry?
10      Q.   Would you be familiar with the report
11  paths that would be used to generate any given
12  report?
13      A.   Yes, I would know how the report is
14  getting generated.
15      Q.   Is that a query that you can put into
16  GFS in order to generate the report that you
17  want?
18      A.   Yes, you can put a query to generate
19  the report.
20      Q.   And is the GFS system that's used by
21  Barclays today identical to the one that was
22  used at Lehman?
23      A.   It is identical, yes, but it has a lot
24  of -- I mean, it has some changes post the
25  Barclays acquisition.
```

Page 18

Krishnan

1
2      Q.   And what would those post-acquisition
3   changes be?
4      A.   Changes because GFS had this
5   functionality to net down, so they wanted to net
6   down, meaning like it would net the longs with
7   the shorts.  So they wanted to prevent any net
8   down happening between Barclays and these Lehman
9   entities, so that was one of the main changes
10  that they made.
11     Q.   And would those changes have been made
12  only for prospective periods of time or was it a
13  retroactive change to the system?
14     A.   It -- I don't remember exactly when
15  the change was made, but it was sometime around
16  the end of September that change was made.  So
17  we split Barclays entities from the Lehman
18  entities.
19     Q.   And that split would happen for only
20  future dates?
21     A.   Yes, that's correct.
22     Q.   How many people were there in the Run
23  the Bank group at Lehman?
24     A.   Probably ten to twelve, or maybe more
25  globally.  I don't remember the exact number.

Page 19

Krishnan

1
2      Q.   And who did you report to while in
3   that group at Lehman?
4      A.   While I was at Lehman, I reported to
5   Daylas also.  Daylas Fuentes.
6      Q.   And do you know who -- Mr. Winters did
7   you say?
8      A.   Fuentes.  Daylas Fuentes.
9      Q.   Fuentes, do you know who he reported
10  to?
11     A.   She reported to Dan Marcus.
12     Q.   What systems flow into GFS?
13          MR. THOMAS:  Objection to form.
14     A.   ITS, MTS, Loan I.Q., TMS.  I might
15  miss a few because there's a whole lot of
16  systems.  That's one of the -- some of the main
17  systems.
18     Q.   Perhaps we should back up.  Could you
19  explain to me how the GFS system is set up to
20  receive feeds from other systems?
21     A.   We receive most of the feeds through
22  FTP, File Transfer Protocol, FTP.
23     Q.   And other systems feed into FTP which
24  then feeds into GFS; is that correct?
25     A.   No.  FTP is just a means of

Page 20

Krishnan

1
2   transferring files from one place to another, so
3   that's the mechanism by which the files were
4   transferred from those source systems to GFS.
5      Q.   And the systems that would transfer
6   into GFS, what type of systems are they?
7      A.   They are -- most of them are
8   settlement systems.
9      Q.   And are there different settlement
10  systems for the various different product
11  classes?
12     A.   I think so.
13     Q.   Would prices for any given security be
14  entered directly into GFS or into another system
15  that would then flow into GFS?
16     A.   It usually flows into GFS.  The only
17  way a price could be entered in GFS is by a user
18  if he were -- he or she were to make like an
19  adjustment.
20     Q.   What would be the process in order to
21  make an adjustment within GFS?
22     A.   There was a specific set of users who
23  have access to adjustments in GFS and the users
24  are trained on, you know, how to make the
25  adjustments on like what security and what

Page 21

Krishnan

1
2   account.
3      Q.   And who would those users be that
4   would have access to make adjustments?
5      A.   I don't remember the users now.
6      Q.   Within GFS, can you tell if any
7   adjustment has been made to the price of any
8   given security?
9          MR. THOMAS:  Objection to form.
10         THE WITNESS:  I'm sorry.
11         MR. THOMAS:  You can answer, if you
12  can.
13     A.   Yes, I'm sorry, I forget the question.
14     Q.   Sure.  I'll repeat that for you.
15         Within GFS, can you tell if any
16  adjustment has been made to the price of any
17  given security?
18     A.   Yes, there were a lot of adjustments
19  made.
20     Q.   Is there an indication within GFS when
21  an adjustment is made?
22     A.   We have -- we capture the adjustments
23  in a table which has like the user ID who made
24  the adjustment and what it was adjusted to the
25  security and the account.

Page 26

1              Krishnan
2    would flow into GFS from?
3        A.   There might have been other systems.
4    There was a Prime Broker system which might have
5    given prices.
6        Q.   Would there have been feeds into GFS
7    or into the settlement systems that flow into
8    GFS from third-party vendors such as Bloomberg
9    or Reuters, for instance?
10       A.   No, we did not get anything from
11   Bloomberg or Reuters or any third party.  We
12   always got prices from internal Lehman systems.
13       Q.   But would other internal Lehman
14   systems which then flowed into GFS get feeds
15   from various third-party vendors such as
16   Bloomberg and Reuters?
17       A.   I don't know.  I would think they
18   would have got it from third-party vendors, but
19   I don't know where they got their prices from.
20       Q.   And are there any other internal
21   Lehman systems other than settlement systems or
22   the Prime Broker systems that would have flowed
23   into GFS?
24       A.   Could you repeat the question?
25       Q.   Are there any other internal Lehman

Page 27

1              Krishnan
2    systems other than settlement systems or the
3    Prime Broker systems that would have flowed into
4    GFS?
5        A.   We had a product reference data
6    flowing from a system called Global Products.
7        Q.   And what is Global Products?
8        A.   That was holding information about all
9    securities.  Like, you know, a security could
10   have a currency and like a description of the
11   security and a security has various identifiers
12   like SEDOL, ISIN, so all these would be -- would
13   be sourced from Global Products.
14       Q.   Could you perhaps explain a little bit
15   more what you mean by "various identifiers"?
16       A.   A security could have a lot of
17   identifiers.  So the system called ISIN, it's --
18   I think European securities have the ISIN.  Then
19   there's a SEDOL.  It could be a CUSIP.
20       Q.   And would Global Products also include
21   any sort of pricing or valuation information
22   about any given security?
23       A.   I'm not sure if they had, but we did
24   not get the pricing information from them.
25       Q.   Do you know how pricing information

Page 28

1              Krishnan
2    was entered into the settlement systems?
3        A.   No, I do not know that.
4        Q.   Do you know how information flowed
5    into GFS?  Let me rephrase that.  We had
6    discussed earlier FTP.
7        A.   Right.
8        Q.   Is that how information flowed into
9    GFS?
10       A.   For the most part, yes.  Sometimes we
11   used to, for example, the Global Products, we
12   used to execute what is called as a remote
13   procedure call in their system to get the data
14   out.
15       Q.   Does that mean that, in order to get
16   information from Global Products, it was not an
17   automated process?
18       A.   We had different types of getting
19   information from Global Products.  One of them
20   was doing a remote procedure call.  The other --
21   there were also other ways.  We also got files
22   through FTP from Global Products.
23       Q.   When you say a remote procedure, is
24   that an automated procedure?
25       A.   Yes, it -- what it means is my system

Page 29

1              Krishnan
2    makes a call to their system through a remote
3    procedure.  That means I'm remotely sitting
4    somewhere and my system is making that call.
5    That's why it's called a remote procedure call.
6        Q.   And does that remote procedure call
7    happen every day at a set --
8        A.   Every day --
9             I'm sorry.
10       Q.   -- every day at a set time?
11       A.   Every time we see a new product that
12   we don't have we initiate a remote procedure
13   call to get the information for that product.
14       Q.   So I just want to make sure that the
15   record isn't confused here.  You initiate rather
16   than it being an automatic process by which you
17   would receive the information from Global
18   Products; is that correct?
19       A.   No, we do not do it manually.  The
20   system is coded to do that when it sees a
21   security that is not there in our system, it
22   goes to Global Products to get the information.
23       Q.   So the system is set up to
24   automatically, if it sees a product that it does
25   not have information for, to obtain that

Page 30

Krishnan

1
2    information from Global Products; is that
3    correct?
4        A.   Yes, that's correct.
5        Q.   How about any other systems that flow
6    into GFS, is that an automated process?
7        A.   Any -- most of the systems --
8    actually, all of the systems are automated
9    process through FTP.
10       Q.   And how does that automated process
11   work?
12       A.   I think the system from which we are
13   getting the feed, they would have some sort of
14   automated job set up to deliver the files to us
15   through FTP.
16       Q.   And do you know how frequently that
17   automated process occurs?
18       A.   Every night we get feeds from the
19   systems.
20       Q.   And do you know if each system feed
21   occurs at roughly the same time every night?
22       A.   No, it depends on some of the feeds
23   may come in earlier, like around 8 P.M. or 9
24   P.M.  Some of them are later, around 12 or 1
25   A.M. the next day morning.

Page 31

Krishnan

1
2        Q.   And is there a procedure that takes
3    place after the nightly feeds into GFS?
4            MR. THOMAS:  Objection to form.
5        A.   The system takes care of loading the
6    feeds and processing them.
7        Q.   Is that an automated process or does
8    it involve some sort of human input?
9        A.   No, it's an automated process.
10       Q.   Within GFS, how are the various --
11   scratch that.  Before I start handing you
12   documents, just one last question:  How long
13   were you employed by Lehman Brothers?
14       A.   I was employed in 2005 June.
15       Q.   And you worked there through September
16   2008; is that correct?
17       A.   Yes, that's correct.
18       Q.   And did you have the same position the
19   whole time you were at Lehman?
20       A.   I've been with the same group.
21       Q.   Did you have the same duties and
22   responsibilities for the roughly three years
23   while you were at Lehman?
24       A.   For the most part, yes.
25       Q.   Were you working with GFS during that

Page 32

Krishnan

1
2    whole period of time?
3        A.   Yes.
4            (Deposition Exhibit 828, Barclays'
5        Exhibit List, marked for identification, as
6        of this date.)
7        Q.   Ms. Krishnan, I'm putting before you
8    what has been marked as Deposition Exhibit 828.
9    It is a copy of Barclays' exhibit list that was
10   attached to a June 28 e-mail from Barclays'
11   counsel.
12           I'm also going to hand you what has
13   been marked as Deposition Exhibit 829.  It is a
14   copy of movants' exhibit list in this matter
15   which is attached to a June 17 e-mail from Fara
16   Tabatabai.
17           (Deposition Exhibit 829, Movants'
18       Exhibit List attached to a June 17 e-mail
19       from Fara Tabatabai, marked for
20       identification, as of this date.)
21       Q.   I'm also going to hand you what has
22   been marked as Deposition Exhibits 830 through
23   856, which are copies of various GFS reports
24   that have been produced in this matter.
25           (Deposition Exhibit 830 through 856,

Page 33

Krishnan

1
2    copies of various GFS reports, marked for
3    identification, as of this date.)
4        Q.   Deposition Exhibit 857, which is a
5    compilation of document production letters from
6    Barclays' counsel producing the various GFS
7    reports.
8            (Deposition Exhibit 857, a compilation
9        of document production letters from
10       Barclays' counsel producing the various GFS
11       reports, marked for identification, as of
12       this date.)
13       Q.   And finally, Deposition Exhibit 858,
14   which appear to be summary reports that were
15   produced to us by Barclays' counsel last evening
16   which we, you know, object to the production of
17   these documents after the close of discovery and
18   ask Barclays' counsel if there's a reason that
19   they're being produced now.
20           (Deposition Exhibit 858, Summary
21       Reports, marked for identification, as of
22       this date.)
23           MR. THOMAS:  Which document request do
24   you think it's responsive to?
25           MS. CARRERO:  These are documents that

9

Page 62

Krishnan

1
2  based on a report-by-report basis.
3      Q.    And so I guess, moving down the list,
4  the next part of the report path is report type,
5  and it says "custom."  Do you know what that
6  means?
7      A.    Custom is a report that a user has
8  built.
9      Q.    And what other types of report types
10  are there?
11      A.    There's another type called standard.
12      Q.    Are there any others?
13      A.    No, that's it.
14      Q.    And custom would be custom filters, is
15  that what it's referencing?
16      A.    Custom would be any report that is
17  built by the user to customize for their use.
18      Q.    And when you say "user," would the
19  user here be FID Product Control?
20      A.    It would be FID Product Control, yes.
21      Q.    Well, could it be anyone other than
22  FID Product Control where the report path lists
23  no other user?
24      A.    It's up to the users.  If an equity
25  product controller wants to put it in a FID

Page 63

Krishnan

1
2  Product Control, I think he had the capability
3  to do it, but this report category itself is for
4  ease of use for the users so they would probably
5  not do that.
6      Q.    If an equity product controller wanted
7  to run a report using the custom report type FID
8  Product Control, would it provide a report path
9  similar to the one that's in Deposition Exhibit
10  859?
11      A.    Yes.
12      Q.    And the Equity Product Control Group
13  might have its own custom report type; is that
14  correct?
15      A.    They would -- the equity product
16  controllers could have their own reports, but
17  they also have the capability to run any report
18  in any other report category in GFS.
19      Q.    Given that no filters are specified in
20  this e-mail Deposition Exhibit 859, would you
21  expect that report type custom already has those
22  filters saved?
23          MR. THOMAS:  Objection to form.
24      A.    Well, when a user creates a report, he
25  usually saves the filters that he wants.

Page 64

Krishnan

1
2      Q.    And if those filters were not a
3  regular report where they had been saved from
4  previous uses, what sort of information would be
5  needed -- let me rephrase that.
6          How can the information be filtered?
7  What are the options for a user in terms of
8  providing a query that might not be one that's
9  already saved on the system?
10          MR. THOMAS:  Objection to form.
11      A.    I don't understand the question.
12      Q.    Can a user request a report other than
13  a standard report or a custom report that has
14  previously been generated?
15      A.    Yes, the user has the ability to
16  create their own report if they don't like this.
17      Q.    And how does a user create his own
18  report?
19      A.    There are options in the GFS front end
20  to create a new report.
21      Q.    And --
22      A.    And they can -- I'm sorry.  They can
23  mention like which report group they want it to
24  be under, the report category, and it defaults
25  to custom if a user is creating it, and then

Page 65

Krishnan

1
2  they give the report name and they can apply
3  filters on it and they can save it.
4      Q.    And what do you mean by "GFS front
5  end"?
6      A.    That's the graphical user interface I
7  talked about earlier.  GFS has a graphical user
8  interface which helps the users build these
9  inquiries without actually writing the query
10  themselves.  So they have this friendly
11  interface which they tell, okay, this is the
12  report that I want and I want it to be under
13  this report category and these are the filters
14  that I want.
15      Q.    What are its options, user's options
16  in terms of filters that it might want?
17      A.    It depends on what the user wants.  He
18  could filter a security.  He could say that I
19  want only anything that is related to this
20  security.  He could say that I want only
21  anything related to this account or some
22  management code or some entity.
23      Q.    And would report group, for instance,
24  be one of those filters?
25      A.    Report group is the base on which you

Page 94

1           Krishnan
2 column "Short Inventory, Trade Date at MV" is
3 negative?
4     A.   I don't know what it means, but I
5 would guess that the price was negative.
6 Something has got to be negative to make the
7 market value negative.
8     Q.   Would it -- what sort of procedures
9 were in place to confirm the GFS data was
10 correct -- or, let me rephrase that.
11          If there was a concern that any data
12 within GFS may have been incorrect, what sort of
13 procedures were in place to identify any errors
14 and to fix those errors?
15     A.   Any data-related issues would be
16 detected by the users, financial controllers,
17 product controllers, who look at the report
18 every day.  They would say -- they would come to
19 us saying why this is not what I expect it to be
20 and then we would debug to, you know, we would
21 look at the code to see what it is set up to do
22 or maybe the input was incorrect or maybe there
23 was an adjustment that was incorrect report, so
24 then we find out what are the reasons behind it.
25     Q.   So you and your group would not have

Page 95

1           Krishnan
2 been responsible for analyzing the data for any
3 potential inaccuracies?
4     A.   No.
5         MR. THOMAS:  Objection to form.
6     Q.   And if any inaccuracies were the
7 consequence not of a technological issue but,
8 rather, a deliberate input, would that come to
9 your attention or would the product controllers
10 or finance take that elsewhere in order to make
11 any necessary adjustments?
12     A.   If they -- if they find something
13 wrong, they would come to us, normally, unless
14 they're able to fix it from their side.  They
15 would come to us and we would tell them like
16 this is why this has happened and, you know, as
17 I said earlier, it could be there could have
18 been a problem with the input that we got.
19     Q.   If a product controller in Finance had
20 an issue with a price input into one of the
21 settlement systems deliberately for, for
22 instance, a trader, would that come to your
23 attention or would that be fixed by Finance or
24 the front office directly?
25     A.   It would be fixed by the user who

Page 96

1           Krishnan
2 detected it.  They would probably put like an
3 adjustment, a price adjustment, to correct it.
4 We don't even have to know about it.  It just
5 goes through the system.
6     Q.   What does it mean when two rows with
7 the same value in the column headed "Real World
8 CUSIP" have two different values in the column
9 labeled "Fair Value Level"?  If you're looking
10 at 831, you can turn to column N and column BQ.
11     A.   The "Real World CUSIP" is a security
12 identifier.  And I think the "Fair Value Level"
13 is something that the users assign.
14     Q.   I'm sorry, could you repeat that?
15     A.   The "Fair Value Level" is something
16 that the users tag positions.  I'm not sure why
17 you want -- if the CUSIP is the same, why the
18 fair value levels were different.
19     Q.   I mean, do you know if it's possible
20 for one security to be assigned two different
21 fair value levels?
22     A.   I don't -- I don't know about the fair
23 value levels because I think that the fair value
24 levels is something that the user tags, and I
25 don't know, it could have been any reason why

Page 97

1           Krishnan
2 they didn't tag the other CUSIP.
3     Q.   So you don't know if, when this
4 happens, which fair value level should be
5 considered, correct?
6     A.   No, I don't know.
7     Q.   And do you know why some securities
8 have not been assigned a fair value level?
9     A.   I don't know.  Sorry.
10     Q.   If we wanted to recalculate the long
11 inventory value based on data in GFS, do you
12 know which columns would be used?
13     A.   I think it would be the, for the
14 traded market value, long market value to be the
15 traded position and the price.
16     Q.   Which columns are you looking at in --
17     A.   I'm actually looking at 836.
18     Q.   So in 836, which columns numbers would
19 be the ones used?
20         MR. STEPHENS:  I think, just for
21 clarity, you have an excerpt of 836 behind
22 the first -- what you have there.  Sorry.  I
23 believe if you turn -- you've got a second
24 sticker.  I think you're in 837, just for
25 clarity.

Page 106

Krishnan

1    know.  I get tickets like this.
2    Q.    And would the Fixed Income Department
3    Product Control -- or FID Product Control, would
4    they be ones that ordinarily would run the
5    reports?
6    A.   Yes.
7    Q.    And they would be the ones that
8    ordinarily choose if there would be a custom
9    filter; is that correct?
10   A.   Yes.
11   Q.    And you're not aware if they would use
12   a custom filter that would include the equities;
13   is that correct?
14       MR. THOMAS:  Objection to form.
15   A.   No, I don't know.
16   Q.    Do you know if you or your group are
17   the ones who ran the reports that were produced
18   in April, Deposition Exhibits 836 to 843?
19   A.    Yes, my -- either I or a person from
20   my group ran the reports.
21   Q.    And earlier you had indicated that the
22   report would have been requested through a SAM
23   ticket; is that correct?
24   A.   Yes, that's correct.

Page 107

Krishnan

1    Q.    Is that your recollection with respect
2    to these reports, that you generated them in
3    connection with a SAM ticket?
4    A.    Yes, that's what I recall.
5    Q.    And do you know who entered that
6    request?
7    A.    I don't remember who entered the
8    request.
9    Q.    Do you know when it was entered?
10   A.    I think there was a ticket sometime
11   around November of 2009 and probably later in
12   January or February.  I'm not sure.
13   Q.    And do you know if the report path
14   that you described to me is what was written on
15   that ticket to be run?
16   A.    Yes, this; all these details right
17   there.
18   Q.    And do you know who requested that
19   information, even if not the person to put in
20   the SAM ticket?
21   A.    Who --
22       MR. THOMAS:  Objection to form.
23   A.    It was a request from the attorneys.
24   Q.    And do you know if the attorneys are

Page 108

Krishnan

1    the ones who picked the report path to be run?
2    A.   I don't know who picked the path.
3    Q.    Ms. Krishnan, if I could put before
4    you what has been marked as Deposition Exhibit
5    858, and I am going to also hand you what has
6    previously been marked as Deposition Exhibit 791
7    and BCI Exhibit No. 779.
8        Turning first to Deposition Exhibit
9    858, do you recognize this document?
10   A.   Yes.
11   Q.   Did you prepare this document?
12   A.   Yes.
13   Q.    And could you describe for me what
14   this document is?
15   A.   We wanted to summarize based on the
16   GAAP asset classes because the other Excel
17   reports were really big, so these were for that
18   purpose.
19   Q.    And what sort of filter or report path
20   was used to generate the summaries by asset --
21   by GAAP asset class in Deposition Exhibit 858?
22   A.    The filter we used were the same as
23   the ones we used for this 836 and the others --
24   I mean, the ones with the including the

Page 109

Krishnan

1    equities.  And we included only the long
2    inventory market value because that's the
3    numbers that they wanted to be summarized, and
4    we included the GAAP Asset Class 1 number and
5    the name, you know, to group by that feed, those
6    feeds.
7    Q.    And you said that they wanted to
8    summarize.  Who were you referring to?
9    A.    The attorneys.
10   Q.    And is this a summary that you would
11   have prepared regularly in your position?
12       MR. THOMAS:  Objection to form.
13   A.    No, I have not prepared this
14   previously.
15   Q.    And was there a particular report path
16   that you used to generate this summary?
17   A.    It was -- it was based on the big
18   reports, the 831 or 83 -- I don't remember the
19   numbers, the equities.  It was based off that,
20   but when you group the data by just the GAAP
21   asset class and, you know, the GAAP Asset Class
22   1 Number and the name, it sums up the long
23   inventory market value.  So that's how we got a
24   summary.

Page 110

```
1              Krishnan
2      Q.   And the "Long Inventory Trade Date at
3  MV" column is a column that comes straight from
4  the GFS reports that we were discussing, is that
5  correct?
6      A.   Yes, it's the same that you see in the
7  other reports.  I don't remember the column
8  name -- I mean the column heading.
9      Q.   When did you run these reports?
10     A.   I think we ran this in April.
11     Q.   If I were to want to recreate this
12 report from the GFS reports with equities that
13 were produced in April, how would I go about
14 doing that?
15     A.   If you wanted to the same reports?
16     Q.   If I wanted to get to, for instance,
17 looking at the first page next to "Total
18 Governments & Agencies" of 37,310,795,798?
19     A.   Uh-huh.
20     Q.   If I wanted to get to that number
21 using the September 12 data, which I believe
22 we've been referring to as Deposition Exhibit
23 836, how would I do that?
24     A.   It could be a tedious process, but in
25 Excel you can -- you can just filter the ones,
```

Page 111

```
1              Krishnan
2  the GAAP Asset Class 1 Name, Total Governments &
3  Agencies.  Is that part of this report?  Should
4  be, I think.
5      Q.   I believe it is at column V.
6      A.   It's not column V.  It's column BK in
7  831.
8      Q.   If we could go to Deposition Exhibit
9  836 and that grouping through 843, because as I
10 understand it, it was those reports produced in
11 April that would be summarized within Deposition
12 Exhibit 858; is that correct?
13     A.   Yes, that's correct.  Let me see.
14 It's column BL and BM.  So you could, in Excel,
15 you could filter BM for the total government and
16 agencies and BL for the, you know, for the
17 number that's there, GAAP Asset Class 1 Number,
18 which is, I think, 70500.  I see "Total
19 Governments & Agencies" has two numbers, 70500
20 and 72260.
21        So if you filter this Excel on those
22 values and you sum that long inventory TD market
23 value, you should get this 37 billion plus that.
24 Okay, 37 billion.
25     Q.   So it would not be limited to just the
```

Page 112

```
1              Krishnan
2  GAAP asset class 70500, which is listed on 858
3  in the column corresponding to the 37 billion
4  figure?
5      A.   Actually, there are two GAAP Asset
6  Class 1 numbers which are associated with the
7  same name, Total Government & Agencies, but for
8  September 12, I can see that the 72260 has a
9  zero long inventory.
10     Q.   Okay.  And where on Deposition Exhibit
11 836, for instance, you see the word "null" under
12 "GAAP Asset Class 1 Name" in column BM, do you
13 know what that's a reference to?
14     A.   That refers to something that the
15 system is not able to map to -- it's not able to
16 put into any of the existing GAAP asset classes.
17     Q.   And would such securities in GFS be
18 captured on your summary?
19     A.   Yes, I believe so.  There is a 7999 in
20 the summary.
21     Q.   So the 488 million figure in
22 Deposition Exhibit 858 would be where that asset
23 class is characterized as null?
24     A.   Yes.
25     Q.   And if you'd look at column BH?
```

Page 113

```
1              Krishnan
2      A.   Uh-huh.
3      Q.   And that column is titled "Security
4  Subtype" and says "Adjustment" in the
5  corresponding rows to where the GAAP asset class
6  is null, what does "adjustment" mean?
7      A.   "Adjustment" means that a user might
8  have entered something to, you know, change that
9  row or maybe it's an entirely new row that the
10 user entered.
11     Q.   And can you tell when any such
12 adjustments would have been made?
13     A.   Adjustments are made in GFS every day.
14     Q.   But can you tell when these specific
15 adjustments would have been made?
16     A.   These are for 9/12, right?  So they
17 were probably made on -- they were probably --
18 they could have been made on September 15 when
19 the system was open for adjustments, but again,
20 we also set up a special environment for the
21 9/12 sometime late in October 2008 and it could
22 have been made at that time.
23     Q.   So adjustments could be made for a
24 previous day at any point after that date; is
25 that correct?
```

29

Page 114

Krishnan

1      Krishnan
2      A.   No, adjustments can be made only on
3    the day after. Say for September 12 was a
4    Friday, so it can be made only on September 15
5    till 6 P.M. But because the users thought that
6    the data was not -- maybe the input was not
7    correct or the maybe the data was not verified
8    by the users on that day, on September 15, they
9    had requested us to set up a special environment
10   for them for the September 12.
11     Q.   I think we're talking past each other
12   because my question right now is about the
13   September 12 data and the "Adjustment" comment
14   in column BH and whether that adjustment could
15   be made at any point after September 15; is that
16   correct?
17     MR. THOMAS:  Objection to form.
18     A.   I'm trying to explain that. Any
19   adjustment that was made for September 12 could
20   have been done on September 15, which is the
21   normal time that adjustments would have been
22   made for September 12, but since September 12
23   was an important date for the users and they
24   thought that the input data may not have been
25   right or maybe the users did not check the data

Page 115

1    on September 15, they had a special environment
2    set up to be able to make adjustments at a later
3    date. Normally doesn't happen.
4          So this adjustment could have come in
5    on September 15 or it could have been entered at
6    any time when we had the special environment
7    open for users to make adjustments.
8      Q.   So is there a way of telling when any
9    adjustment was made from the report that's in
10   front of you?
11     A.   No, not from this report.
12     Q.   Is there a way of telling when any
13   adjustment was made from the actual GFS data
14   itself?
15     A.   We have a table that records all the
16   adjustments, so we should be able to tell from
17   that.
18     Q.   And adjustments to September 12 data
19   is still possible even today; is that right?
20     A.   I don't think it's possible today.  I
21   think it's closed for adjustments.
22     Q.   Do you know when the period for
23   adjustments was closed?
24     A.   I think it was closed sometime --

Page 116

1      Krishnan
2      MR. THOMAS:  Objection to form.
3      A.   -- sometime in January of or February
4    of 2009, but I'm not too sure.
5      Q.   And is it your understanding that
6    adjustments were made up through the period when
7    it was closed in January or February of 2010 --
8    or, 2009?
9      MR. THOMAS:  Objection to form.
10     A.   I think so.
11     Q.   And do you know who would have made
12   those adjustments?
13     A.   I would guess that it would be the LBI
14   and LBHI users because we brought up the
15   environment for them, but I have not really
16   checked the users and which group they belong
17   to.
18     Q.   Could adjustments be made to any of
19   the data in the week from September 15 through
20   September 22 after those dates?
21     A.   For September 12, users had to have
22   completed the adjustments by September 15, 6
23   P.M.
24     Q.   I'm confused now, because your earlier
25   testimony was that for September 12 there could

Page 117

1      Krishnan
2    be adjustments all the way until the adjustment
3    period was closed a month later; is that
4    correct?
5      A.   Right, that was a special case for
6    just September 12.
7      Q.   So now what would be the case for,
8    say, September 15, when could adjustments be
9    made to data for September 15?
10     A.   Up to September 16, 6 P.M.
11     Q.   And what would the protocol be in
12   order to make any adjustments after 6 P.M. on
13   the following day?
14     A.   We can't do that.
15     Q.   The GFS data cannot be adjusted,
16   generally speaking, after the cut-off period at
17   6 P.M. the day after?
18     A.   That's correct.
19     Q.   But a special exception was made for
20   the September 12 data; is that correct?
21     A.   Yes, that's correct.
22     Q.   And was a special exception made for
23   data for any other day other than September 12?
24     A.   We had that -- the September 19 data
25   available as well for users to make adjustments,

Page 118

```
 1              Krishnan
 2  but I don't think users made adjustments for
 3  September 19.
 4      Q.  If you could turn your attention to
 5  Deposition Exhibit 791.
 6      A.  Is this the one?
 7      Q.  Yes.  And if you could turn to the
 8  Exhibit 1 -- actually, let me first ask you,
 9  have you seen this document before?
10      A.  Yes.
11      Q.  When did you see this document?
12      A.  I have seen this because we -- I think
13  the attorneys tried to match up the summaries
14  with what we had here in GFS.
15      Q.  And you're pointing to what has been
16  marked as Deposition Exhibit 858; is that
17  correct?
18      A.  Yes, 858.  Sorry.
19      Q.  And how did they try to match those
20  up?
21      A.  For 9/12, you can see here that we
22  have the long inventory market value as 37.3
23  billion.
24      Q.  And were you asked to create a summary
25  that also arrived at 37.3 billion?
```

Page 119

```
 1              Krishnan
 2      MR. THOMAS:  Objection to form.
 3      A.  No, I created a summary and we
 4  confirmed that the numbers match.
 5      Q.  And when did you do that?
 6      A.  April of 2010, I think.
 7      Q.  Did you speak with Professor
 8  Pfleiderer in that exercise?
 9      A.  No.
10      Q.  Have you ever communicated with
11  Professor Pfleiderer?
12      A.  No, I have never heard of his name
13  before.
14      Q.  Are you aware that Professor
15  Pfleiderer is an expert that's been retained by
16  Barclays in this matter?
17      A.  No, I don't know.
18      Q.  Have you ever read any expert report
19  that's been prepared by Professor Pfleiderer?
20      A.  No, I have not.
21      Q.  Have you ever read the contents of
22  Professor Pfleiderer's declaration that's part
23  of Deposition Exhibit 791?
24      A.  No, I don't recall reading this.
25      Q.  If you turn to footnote 3 of Professor
```

Page 120

```
 1              Krishnan
 2  Pfleiderer's declaration, "Strictly speaking,
 3  the asset categories correspond to the various
 4  values given in the GFS system for the 'GAAP
 5  Asset Class 1 Name' variable associated with
 6  each observation.  (The specific category names
 7  are slightly different when one observes entries
 8  for long versus short positions, but the
 9  categories are materially the same; for example,
10  'CDs & Other Money Market' versus 'Total CDs and
11  Other Money Market Instruments.'  Exhibits 1 and
12  2 to this affidavit are based only on data for
13  long positions)."  Do you see that?
14      A.  Yes.
15      Q.  Is that your understanding of how the
16  summaries in Deposition Exhibit 858 that you
17  said you prepared were prepared?
18      MR. THOMAS:  Objection to the form of
19  the question.
20      A.  I'm sorry, what was the question?
21      Q.  My question is, the statements in
22  footnote 3, is it your understanding that they
23  hold true with respect to the summaries you
24  prepared that are in Deposition Exhibit 858?
25      MR. THOMAS:  Objection to form.
```

Page 121

```
 1              Krishnan
 2      A.  I'm sorry, I don't understand why this
 3  is not --
 4      Q.  Why don't I just break it down a
 5  little bit.  Where it says, "For instance,
 6  Exhibits 1 and 2 to this affidavit are based
 7  only on data for long positions," do you see
 8  that?
 9      A.  Uh-huh.
10      Q.  Is that also the case for the
11  summaries that you prepared that we have marked
12  in this deposition as Deposition Exhibit 858?
13      A.  It has only long positions.
14      Q.  Only long positions.  Was it created
15  using a GFS report that only contained long
16  positions as opposed to the GFS reports with
17  both longs and shorts that have been produced to
18  us and that we have marked here as Deposition
19  Exhibits 836 through 843?
20      A.  I think that we did not select a short
21  inventory -- I mean, if I remember right, we did
22  not select the feed which had the "Short
23  Inventory, TD at Market Value," because this is
24  what we wanted to compare with that, that other
25  PBF exhibit.  I don't remember what the name
```

Page 122

Krishnan

1 was.
2
3    Q.    The other PBF, you mean the
4 declaration that you're looking at, Deposition
5 Exhibit 791?
6    A.    Right. Uh-huh.
7    Q.    You were comparing when you prepared
8 858; is that correct?
9    A.    No. No. We prepared this.
10    Q.    You prepared 858?
11    A.    And then we confirmed that these
12 numbers tie. These numbers are long inventory
13 positions, right? So we selected only long
14 inventory positions. So that's how we can
15 verify that what we have here is the same as
16 what we would if we generated a report in the
17 system.
18    Q.    And were you able to do the summary
19 using the actual GFS reports that were produced
20 in this matter with the GFS reports with the
21 equities, or did you need to go back into the
22 GFS system in order to run the summary?
23    A.    We went back to the GFS system to run
24 the summary, meaning we created a new report
25 which would give us a summary.

Page 123

Krishnan

1
2    Q.    And the new report was a report that
3 contained only the long positions; is that
4 correct?
5    A.    We selected only this feed, the long
6 inventory. So, you know, if we had selected the
7 short inventory, that would show up here.
8    Q.    And so you can't say with a hundred
9 percent certainty that the summary in 858 is a
10 summary of, for instance, the September 12 data
11 that's in Deposition Exhibit 836; is that
12 correct?
13        MR. THOMAS: Objection to form.
14    A.    No, I can say that because we built
15 this data off what we did here.
16    Q.    But correct me if I'm wrong, but you
17 used the reports that were generated in order to
18 prepare the summary that is Deposition Exhibit
19 858, or did you go back into the GFS system in
20 order to create the summary that is in
21 Deposition Exhibit 858?
22    A.    We went back into the system to create
23 this.
24    Q.    So my question is, did you test the
25 summary in 858 against what a summary of the

Page 124

Krishnan

1
2 actual GFS report, that is, for instance,
3 Deposition Exhibit 836, would have generated
4 using the relevant columns that we had discussed
5 before?
6        MR. THOMAS: Objection to form.
7        THE WITNESS: Can I -- can I talk to
8 you before I answer this?
9        MR. THOMAS: Does it relate to an
10 attorney-client communications?
11        THE WITNESS: I don't know.
12        MR. THOMAS: Or just confusion about
13 the question?
14        THE WITNESS: Because I just want a
15 few minutes to talk to one of you.
16        MR. THOMAS: Okay.
17        MS. CARRERO: If we can just -- just
18 get a yes/no answer and then we can take a
19 break of was a comparison done to the
20 reports, to the --
21        MR. THOMAS: If she's -- I'm not sure
22 whether it involves attorney-client
23 privilege, so I don't want to just -- if
24 you're able to answer that question without
25 getting into attorney-client privilege, you

Page 125

Krishnan

1
2 can do that. If not, if you're not sure if
3 it may involve something that we have
4 discussed, then we should take a break and
5 talk about it first.
6    Q.    I'm happy -- I just don't like to
7 leave a question pending before we take a break.
8 I'm happy to let you take a break and you can
9 answer further or clarify your answer, but in
10 terms of a yes/no as far as was any sort of
11 comparison done between a summary of the GFS
12 reports produced versus what a summary of, going
13 back into the GFS system, and what a summary of
14 that data would generate as in 858.
15    A.    I would think that this is the
16 comparison, you know, this was built off the
17 Excel, I think.
18    Q.    791 you think was built off of the
19 actual GFS reports that would be Deposition
20 Exhibits 836 to --
21    A.    That's correct.
22    Q.    -- to 843? And then your summaries
23 you went back into the GFS system and prepared;
24 is that correct?
25    A.    That's correct.

Page 130

Krishnan

2  A.   No, I don't know if they changed or
3  not.
4  Q.   And do you know in the ordinary course
5  how frequently prices for different types of
6  securities such as level 1 or level 2 or level 3
7  would have changed?
8  A.   No, I don't know based on the GAAP
9  asset class how they changed.
10  Q.   And is it your understanding that the
11  six GAAP asset classes that are listed here in
12  Exhibit 1, "Total Government and Agencies,"
13  "Total CDs and Other Market Instruments," "Total
14  Mortgages and Mortgage-Backed," "Total Corporate
15  Obligations and Spot," "Total Corporate Stocks
16  and Options," "Total Derivatives and Other
17  Contracts" are the exhaustive list of GAAP asset
18  classes?
19  A.   Yes, that's correct.
20  Q.   I'm going to hand you what has
21  previously been marked as Deposition Exhibit 19.
22  Have you seen this document before?
23  A.   No, I don't recall seeing this.
24  Q.   Do you know if this document was
25  prepared from GFS?

Page 131

Krishnan

2  MR. THOMAS:  Objection to form.
3  A.   I don't know.
4  Q.   Would you have been involved in the
5  creation of any balance sheets in your position
6  at Lehman?
7  A.   I don't know because I might -- I
8  might or my group might have run some reports
9  too and which in turn helped generating these
10  reports.  I don't know.
11  Q.   Do you know if the, on the asset side,
12  the total amounting to 10 billion for short --
13  for collateralized short-term agreements,
14  whether that would be found anywhere in GFS?
15  A.   I have no idea.
16  Q.   Would financing positions generally be
17  found in GFS?
18  A.   I'm not sure if financing positions
19  are part of this balance sheet report, but I
20  think there is another report which is called
21  Balance Sheet Movements that might have the
22  financing positions.
23  Q.   Are you familiar with box reports?
24  A.   No, I'm not.
25  Q.   And so do you know if any of the -- if

Page 132

Krishnan

2  all of the positions that would be on box
3  reports would, for instance, be within GFS?
4  A.   I don't know anything about box
5  reports.
6  Q.   I'd like to hand you what's previously
7  been mark as Deposition Exhibit 644A, which
8  corresponds to BCI Exhibit No. 486A.
9  Have you seen this document before?
10  A.   No.  I might have seen parts of it.
11  This report seems to be like -- the headers seem
12  to be like GFS header names.
13  Q.   You're looking at the fourth page of
14  the document titled "Lehman Brothers, Inc.
15  Balance Sheet by GAAP Asset Class -- GAAP Asset
16  Type, 9/12/2008"; is that correct?
17  A.   I'm actually looking at the last three
18  pages, which has sort of like an Excel report.
19  Q.   How about if you were to turn to the
20  page before that, which is the fourth page
21  titled "Lehman Brothers, Inc. Balance Sheet by
22  GAAP Asset Type, 9/12/2008," do you recognize
23  the form of the report as being generated by
24  GFS?
25  A.   I don't -- I don't know.  I don't

Page 133

Krishnan

2  recall.
3  Q.   You're not familiar with this report?
4  A.   These column names, they seem familiar
5  because there's "GAAP Asset Class 1 Name," "GAAP
6  Asset Class 2 Name."  I have seen these field
7  names in GFS, but I don't know -- I don't know.
8  I don't think there is a report in GFS that
9  gives this thing.
10  Q.   And is it your understanding that
11  there would be several steps from GFS or several
12  steps removed from GFS that would be taken in
13  order to generate the balance sheets that Lehman
14  would generate on a regular basis?
15  MR. THOMAS:  Objection to form.
16  A.   I think so, but I'm just guessing
17  because I was never involved in the process.
18  MR. THOMAS:  Hence the objection.
19  Q.   Is your understanding that GFS was the
20  subledger of Lehman Brothers or what role did it
21  play within financial reporting that Lehman
22  engaged in?
23  A.   It was not -- it was not a subledger.
24  It was more like a financial data warehouse kind
25  of which produced trade date balances and

34

Page 134

Krishnan

1             Krishnan
2 settlement date balances.
3     Q.   And do you know what systems were the
4 subledger and general ledger of Lehman Brothers?
5     A.   The general ledger was a system called
6 DBS, and I'm not really sure about the
7 subledger. It could be Posting Engine. I'm not
8 sure.
9     (Deposition Exhibit 860, a document
10     bearing Bates Nos. BCI-EX-(S)-00200951
11     through 53, with attachment, marked for
12     identification, as of this date.)
13     Q.   Ms. Krishnan, you have before you what
14 has been marked as Deposition Exhibit 860. If
15 you could turn to the last page of that
16 document, which is titled "LBI Inventory by GAAP
17 Asset Class & BPM as at 9/16/2008," and which is
18 a native version of a document produced as
19 BCI-EX-(S)-00200964. Do you see that?
20     A.   The last page, right?
21     Q.   Yes.
22     A.   Yes.
23     Q.   Do you recognize the format of this
24 report as one being generated from GFS?
25     A.   I think this is something that could

Page 135

1             Krishnan
2 have been generated from GFS, but I cannot be
3 sure unless I know this title here, "LBI
4 Inventory by GAAP Asset Class & BPM." I don't
5 know, but these columns look like they could
6 have been pulled from a GFS report.
7     Q.   But you have never seen a report
8 exactly in this format before; is that correct?
9     A.   Yes, I have not seen anything like
10 this before.
11     Q.   And in the title do you know what
12 "BPM" stands for?
13     A.   Business Process Mapping, I think.
14     Q.   And that's a reference to Lehman's
15 specific nomenclature, would that be correct?
16     A.   Yes.
17     Q.   For a specific asset types; is that
18 correct?
19     A.   I think it may be for the asset type
20 or sometimes the accounts are also split into
21 BPMs.
22     Q.   Or would it be a reference to the
23 divisions in column B?
24     A.   In this context, it seems to be the
25 division, but I don't know why they said BPM.

Page 136

1             Krishnan
2     Q.   And are you familiar with the
3 different division names that are listed in
4 column B?
5     A.   Yes, these look familiar.
6     Q.   And looking at the divisions
7 corresponding to "Total Corporate Stocks &
8 Options," for instance, what would "Principal
9 Investing" relate to?
10     A.   I don't know what it would relate to,
11 but these look familiar. The data looks
12 familiar.
13     Q.   Do you know if all of the divisions
14 that are listed in column B in this exhibit
15 would be captured within the summaries in 858 as
16 well as the reports between Deposition Exhibit
17 836 through 843?
18     A.   I would think so, but you can also
19 verify by, you know, looking up each of these in
20 the 836.
21     Q.   And would you in your role at Lehman
22 have been one to have generated a report such as
23 this one in Deposition Exhibit 860?
24     A.   I have not generated a report like
25 this before.

Page 137

1             Krishnan
2     Q.   And who would you expect would be the
3 group that would normally generate such reports?
4     A.   I would expect the users to -- I would
5 think that the users would generate reports like
6 this because they had the capability to make
7 their -- customize their own reports, and we
8 have no responsibility over what kinds of
9 reports they generate.
10     Q.   And the users would be the Product
11 Control Group and Finance?
12     A.   Project Control and Finance.
13     Q.   So that's yes, the Product Control
14 Group and the financial controllers, correct?
15     A.   Yes. And when I said we have no
16 responsibility, what I mean is if someone gives
17 us the report and tells us to look at it, we can
18 look at it, but on a daily basis, we are not
19 looking at what reports the users generate and
20 what reports they run.
21     MS. CARRERO: If we can just take five
22 minutes, I think I'm done, but I just want
23 to look over my notes really quick.
24     (Recess; Time Noted: 3:12 P.M.)
25     (Time Noted: 3:30 P.M.)

TSG Reporting - Worldwide     877-702-9580

Page 142

Krishnan

1
2  are summaries of GFS Daily Exposure Reports.
3     A.  Uh-huh.
4     Q.  Are you familiar with what a Daily
5  Exposure Report is?
6     A.  I mean, I don't know.  The name could
7  mean anything, but --
8     Q.  It doesn't mean anything to you?
9     A.  Yes.
10    Q.  Before you've seen this Deposition
11 Exhibit 791, had you heard the phrase "Daily
12 Exposure Report"?
13    A.  I might have.  I don't remember
14 anything now.
15    Q.  But sitting here today you couldn't
16 tell me one way or the other whether or not it
17 was a standard report within GFS, correct?
18    A.  See, we have a number of reports in
19 GFS.  So if you just give me a name, I wouldn't
20 be able to say if it's a GFS report or not.
21    Q.  Okay.
22    A.  But I have the ability to check if I'm
23 in front of my computer, I can check if that's a
24 GFS report or not.
25    Q.  But sitting here today in front of us,

Page 143

Krishnan

1
2  without reference to your computer, you just
3  don't know the answer to my question one way or
4  the other, correct?
5     A.  That's correct.  Because that's
6  because of my memory.  I don't remember that
7  much.
8     Q.  I understand entirely.  I'm just
9  asking you for your memory and your recollection
10 as sitting here today.  That's all.
11       Is there, to your knowledge, Ms.
12 Krishnan, a standard report in the GFS system
13 that is called a GAAP report?
14    A.  Yes, I have heard of GAAP report.
15    Q.  An that's GAAP, G, double A, P, not
16 G-A-P, correct?
17    A.  That's correct.
18    Q.  And to your knowledge, ma'am, what is
19 contained in that report?
20    A.  The name is longer than the GAAP
21 Report and it's -- I think there are GAAP
22 reports for each of the source systems that ITS,
23 MTS, TMS.  I'm not sure if Loan I.Q. has it or
24 not.  To my understanding, what it does is it
25 shows the -- it shows the start of day balances

Page 144

Krishnan

1
2  from the actual source systems in comparison to
3  what GFS has it at the end of the day.
4     Q.  I see.  And is there a GAAP report for
5  GFS only, and are the only GAAP reports you're
6  aware of reports that compare data in GFS to one
7  of the source systems you've just told me about,
8  ITS, TMS, et cetera?
9     A.  The only GAAP reports that I know of
10 are the ones that sort of do a reconciliation
11 with the ITS or the MTS or TMS.
12    Q.  You testified earlier about a version
13 of the GFS data that is set up within a special
14 environment?
15    A.  Uh-huh.
16    Q.  Do you remember that testimony?
17    A.  Yes.
18    Q.  And the data, as I understand it, is
19 from the 12th of September and the 19th of
20 September, correct?
21    A.  That's correct.
22    Q.  Is that data in the special
23 environment from the end of the day on those two
24 dates or the start of the day or some other
25 timeframe?

Page 145

Krishnan

1
2     A.  It's the end of the day of September
3  12.
4     Q.  And is that for all Lehman entities,
5  ma'am, in this special environment, or is the
6  data -- does the data relate to only certain
7  Lehman entities?
8        MR. THOMAS:  Objection to form.
9     A.  All Lehman entities that GFS has.
10    Q.  Is it your understanding, ma'am, that
11 GFS did not contain data on all Lehman entities?
12    A.  I do not know what we don't have, so I
13 don't -- I don't want to say that we had on here
14 the Lehman entities.
15    Q.  I understand that you may not know
16 conclusively whether every single last Lehman
17 entity was in there, but was it your
18 understanding that all Lehman data relating to
19 all Lehman entities was contained within GFS, or
20 do you believe it was some subset?
21        MR. THOMAS:  Objection to form.
22    A.  I would have thought that we didn't
23 have all the data.  I don't know.
24    Q.  Okay.
25    A.  I have no idea.

Page 154

Krishnan

1
2  Exhibit 837?
3      A.   Yes, I think so.
4      Q.   Can you please tell me how you would
5  go about that?
6      A.   You would filter on the "GAAP Asset
7  Class 1 Number" and the name and you would --
8  you would pick just the "Short Inventory, TD at
9  Market Value."
10     Q.   Uh-huh.
11     A.   And then you may have to, you know,
12 like do some sort of summing or pivoting in
13 Excel, I'm not very familiar with how they do it
14 in Excel, and you would get the numbers for the
15 short inventory.
16     Q.   Could you looking at Exhibit 837,
17 could you identify the particular columns that
18 you would use in order to create the short
19 inventory analog of Exhibit 858?
20     A.   I would pick the -- 836.  I would pick
21 the AB and BL and BM and probably the business
22 date -- I don't know where that is -- which is
23 BU.
24     Q.   Sticking with Exhibit 837, the column
25 BU that you just referred to includes not just

Page 155

Krishnan

1
2  the date but also the time, ma'am, you see that?
3      A.   Yeah, but I was just telling --
4      Q.   Ms. Carrero?
5      A.   -- that the time is not relevant
6  because it's based on the date I think it's some
7  formatting in Excel.
8      Q.   So there's no -- the time of 6 A.M.?
9      A.   It just --
10     Q.   -- is inaccurate?
11     A.   Yeah.
12     Q.   And separate and apart from the
13 inclusion in Deposition Exhibit 837, column BU,
14 of the 6 A.M. time, is this data reflective of
15 end of day or beginning of day prices?
16     A.   End of day.
17     Q.   And if you could turn to Exhibit 831
18 and to the last column, which is BT, again
19 headed "Business Date"?
20     A.   Uh-huh.
21     Q.   Is the answer the same to the same
22 question:  Does the data in Exhibit 831 reflect
23 the values within GFS -- and I use values
24 generally speaking, not specifically
25 monetarily -- as at the end of the business day?

Page 156

Krishnan

1
2      A.   Yes, that's correct.
3      Q.   Could you have Exhibit 19 in front of
4  you briefly, please?  That's a one-page document
5  shown to you at the end of the deposition.
6          Do you have it there?
7      A.   Uh-huh.
8      Q.   You see at the top left-hand side
9  under "Assets" --
10     A.   Uh-huh.
11     Q.   -- that there are seven entries above
12 the line that says "Total," beginning with "Gov.
13 and AG"?
14     A.   Uh-huh.
15     Q.   And going down through "Cash," do you
16 see those?
17     A.   Yes.  Yes.
18     Q.   With the exception of the cash, do you
19 agree that those six asset categories are
20 reflective of the six GAAP asset categories that
21 are held within GFS?
22          MR. THOMAS:  Objection to form.
23 Foundation.
24     A.   I -- I don't know.  The names are
25 different, so I'll go by the names.

Page 157

Krishnan

1
2      Q.   Which names are different, ma'am?
3      A.   I'm sorry?
4      Q.   Which names are different?
5      A.   The GAAP asset class names that I have
6  in the GFS summary report are different from
7  what they are here.
8      Q.   Do you think it's possible that these
9  are -- the entries, those six entries on Exhibit
10 19, are shorthand for the GAAP asset classes as
11 reflected in the GFS system?
12          MR. THOMAS:  Objection to form.
13 Foundation.  Calls for speculation.
14          You can answer or respond at least.
15     A.   I'm too tired.  I don't know what it
16 means.  I don't know.  I -- I really don't know.
17          MR. OXFORD:  Okay.  I have no further
18 questions.  I believe Mr. Thomas has some
19 for you.
20          MR. THOMAS:  I do.
21 EXAMINATION BY
22 MR. THOMAS:
23     Q.   Let me ask you to turn to Deposition
24 Exhibit 859, please, which is the e-mail chain
25 from Ms. Carrero.

40

Page 158

1                    Krishnan
2          At some point in 2009 were you asked
3     to run -- asked by Barclays' lawyers to run GFS
4     reports?
5          A.   Yes, that's correct.
6          Q.   Are the reports that you were asked to
7     run at that time described in Ms. Carrero's
8     e-mail here under "Report Group"?
9          A.   Uh-huh.  Balance sheet positions, yes.
10         Q.   So you recognize this report with the
11    description "Report Group," "Report Categories,"
12    "Report Type," "Report Name," "Custom Filter and
13    Dates," you recognize that as the report that
14    Barclays' attorneys asked you to run in 2009?
15         A.   That's correct, yes.
16         Q.   And did you in fact run that report?
17         A.   Yes, we did.
18         Q.   And did you provide it to Barclays'
19    lawyers?
20         A.   Yes.
21         Q.   And is it your understanding those
22    reports were provided to movants in this case?
23    Is it your understanding that those reports were
24    provided to LBHI in this case?
25         A.   Yes, it looks like it.  I see it in

Page 159

1                    Krishnan
2     the exhibits.
3          Q.   If I can ask you to turn -- That's
4     good point.  If I ask you to turn to the stack
5     of deposition exhibits which are 844 to 856.  I
6     know you were asked questions about this
7     previously.
8          Does this appear to be excerpts of the
9     reports that you ran consistent with the report
10    request described in Deposition Exhibit 859?
11         A.   Yes, that's correct.
12         Q.   Okay.  And looking at it up on the
13    screen, and if I could ask you to just scroll
14    down, please, so we're looking at the electronic
15    version of 844, and does this appear to be the
16    report that you ran in response to the report
17    request described in Deposition Exhibit 859?
18         A.   That's correct.
19         Q.   And did there come a time when you
20    were asked to modify the report or the filter in
21    any way?
22         A.   Yes, we were asked to modify the
23    filter so we would also include the equities in
24    this report.
25         Q.   Was that sometime in 2010?

Page 160

1                    Krishnan
2          A.   Yes.
3          Q.   And did you run such reports?
4          A.   Yes, we did.
5          Q.   And if I could ask you to look at the
6     stack of deposition exhibits that contain Depo
7     Exhibits 836 through 843, please.
8          A.   Yeah.
9          Q.   And does this appear to be extracts of
10    the reports that you were later asked to do that
11    contained equities?
12         A.   That's correct.
13         Q.   And in order to produce this report,
14    you had to modify or change the report requests
15    contained in Deposition Exhibit 859?
16         A.   Right, we had to change the filter to
17    include the LBIs and remove the exclusion that
18    it had on the equities.
19         Q.   And if I could ask you to look
20    electronically on the screen at Deposition
21    Exhibit 836?
22         A.   Uh-huh.
23         Q.   And if I could ask counsel to scroll
24    down for me, please.
25          And you're pointing at the screen.

Page 161

1                    Krishnan
2     What are you pointing to?
3          A.   "Sum Equities."
4          Q.   Okay.  And do you recognize this as a
5     report you produced in 2010 that included the
6     equities?
7          A.   That's correct.
8          Q.   And did this include all the long
9     positions in the GFS system?
10         A.   Yes, it included everything in GFS
11    with that filter, with the LBI filter.  It just
12    included everything that was in LBI.
13         Q.   Okay.  And that would be all the long
14    positions including equities?
15         A.   Yes.
16         Q.   When you produced these reports, did
17    you try to make sure you did so accurately?
18         A.   Yes, we did.
19         Q.   And you believe the reports accurately
20    reflect the data in the GFS system?
21         A.   That's correct.
22         Q.   And you were also shown Deposition
23    Exhibit 791, which is BCI Exhibit 779, and in
24    the middle of the page -- you've got it there --
25    it's a chart entitled "Summary of GFS Daily

41

Page 162

Krishnan

1    Krishnan
2  Exposure Report," do you see that?
3    A.   Yes.
4    Q.   At some point then were you asked to
5  ensure or to check whether these summary data
6  were consistent with the data in the GFS system?
7    A.   That's correct.
8    Q.   For good measure, let me go ahead and
9  mark Deposition Exhibit 808 -- excuse me. Let
10  me ask that we mark BCI Exhibit No. 808 as
11  Deposition Exhibit number 861.
12    (Deposition Exhibit 861, Summary of
13  GFS Daily Exposure Reports, September 12-19,
14  2008, marked for identification, as of this
15  date.)
16    MR. THOMAS:  Let me also ask that we
17  mark BCI Exhibit No. 809 as Deposition
18  Exhibit 862.
19    (Deposition Exhibit 862, a document
20  bearing Bates Nos. BCI-EX-00302963, with
21  attachment, marked for identification, as of
22  this date.)
23    MR. OXFORD:  Just so I'm clear, Todd,
24  are these the exhibits to Professor
25  Pfleiderer's April declaration?

Page 163

1    Krishnan
2    MR. THOMAS:  I think they are
3  free-standing exhibits, although they may be
4  the exact same.
5    MR. OXFORD:  Thank you.
6    Q.   And I'm going ask you to look at -- we
7  now have three charts in front of you,
8  Deposition Exhibit 861, Deposition Exhibit 862,
9  and Deposition Exhibit 791 --
10    A.   Okay.
11    Q.   -- titled "Summary of GFS Daily
12  Exposure Report"?
13    A.   Uh-huh.
14    Q.   And if you could take a moment to
15  confirm whether the data is essentially the same
16  in the charts.
17    A.   Yes.
18    Q.   Okay. And did you confirm that the
19  data reflected in the three deposition exhibits
20  you're looking at is accurate and accurately
21  reflects the data contained in the GFS system
22  for these dates?
23    A.   Yes, I did.
24    Q.   And as part of that effort, did you
25  create Deposition Exhibit 858?

Page 164

1    Krishnan
2    A.   Yes, that's correct.
3    Q.   And this was something you created out
4  of GFS yourself?
5    A.   Yes.
6    Q.   Did the numbers that you looked at in
7  GFS and used to create 858 match up with the
8  numbers in Deposition Exhibits 861, 862 and 791?
9    A.   Yes, they matched.
10    Q.   So do the numbers in these charts in
11  Deposition Exhibits 861, 862 and 791 accurately
12  reflect the data in the GFS system?
13    A.   Yes.
14    Q.   Are you familiar with the expression
15  "T+1"?
16    A.   Yes.
17    Q.   Would you explain what that means?
18    A.   It means trade date plus one.
19    Q.   Can you explain how that relates to
20  the Lehman GFS system as of September 2008?
21    A.   What it means is that when, for
22  September 12, the data is available the next
23  business date, which is the Monday.  "T+1"
24  actually means the trade date plus one business
25  date.  So for the 12th, the data is available

Page 165

1    Krishnan
2  for users to view on the 15th morning.
3    Q.   Let's, for example, use the date of
4  September 16. When would the data for the 16th
5  initially, initial data, come into the system?
6    MR. OXFORD:  Objection.  Form.
7    A.   Can I answer it?
8    Q.   You can answer.
9    A.   So the data would come in on the
10  evening of September 16.  It would keep coming
11  between September 16 night and September 17
12  early morning, and by September 17, say around 8
13  A.M. or 9 A.M., the system is ready with the
14  start of day numbers.
15    Q.   And are there further adjustments that
16  are made to the September 16 numbers on the
17  17th?
18    A.   Yes.
19    MR. OXFORD:  Objection.  Form.
20    A.   Yes.  The users have the capability to
21  make adjustments on September 17 for September
22  16 data.
23    Q.   Is there a cut-off time in the system
24  for such adjustments on the day after?
25    A.   Yes.  6 P.M. is the cut-off time.

42

Page 166

Krishnan

1 Users usually put in adjustments before 5:30 to
2 make sure that the adjustments go through.
3     Q.   So for data, for example, on September
4 16, when would complete data on Lehman's
5 positions be available for September 16?
6     A.   Somewhere between 6 P.M. on September
7 17 and 7 P.M., somewhere between that time you
8 would have the complete data.
9     Q.   And is that what's referred to as T+1
10 because the data isn't available until the night
11 of the next day?
12     A.   We refer to it as T+1 because even the
13 start of day data is not available till, for
14 September 16, is not available until September
15 17. So it's trade date September 16 plus one,
16 September 17.
17     Q.   And the data that flows into the GFS
18 system, that's from other Lehman systems?
19     A.   Yes.
20     Q.   And several times in your testimony
21 today you have used the term "market value," and
22 we've looked at the term "market value" as used
23 in the GFS system and the GFS reports.  Do you
24 recall that?

*(Note: line numbers 1–25 shown in margin)*

Page 167

Krishnan

1     A.   Uh-huh.  Yes.  Sorry.
2     Q.   And what is your understanding of what
3 the term "market value" means in the GFS system
4 and as you were using it?
5     A.   My understanding is that, based on the
6 end-of-day balances and the end-of-day prices,
7 the system calculates the market value, and
8 also, the system is open for users to make any
9 adjustments to the price or the quantity, to
10 modify it in any way.
11     Q.   If we see something that says "market
12 value" in the GFS system or a GFS report, is
13 that simply a calculation of whatever price is
14 there times the quantity of the position?
15     A.   Most times that's true, but sometimes
16 there is a pricing factor or a multiplier
17 involved.
18     Q.   The price that's in the GFS system?
19     A.   Uh-huh.
20     Q.   Do you know, is that -- that price is
21 being fed into the GFS system by some other
22 system, correct?
23     A.   Sorry?
24     Q.   That price is being fed, flowed into

Page 168

Krishnan

1 GFS from some other system?
2     A.   That's correct.
3     Q.   And do you know if the price that's
4 coming into GFS is exit or last price?
5     A.   I think --
6     MR. OXFORD:  Objection.  Form.
7     A.   I think it may be the last price
8 because we get the end-of-day balances.
9     Q.   So the "market value" phrase used in
10 GFS and the GFS reports, as you understand it,
11 would be the last price that you receive from
12 another source times the quantity of the
13 position held?
14     A.   Yes, that's my understanding.
15     Q.   You were asked earlier about a special
16 environment that was created for data as of
17 September 12, do you recall that?
18     A.   Yes.
19     Q.   And I think you were asked some
20 questions concerning whether you could --
21 whether the data for September 12 in the GFS
22 system could have been modified anytime after
23 September 15, and I just want to be specific.
24     What periods of time could the data in

Page 169

Krishnan

1 the GFS have been modified?
2     A.   For September 12, specifically, it
3 could have been modified on September 15, or at
4 the time that we set up the special environment,
5 after October 28 of 2008.
6     MR. THOMAS:  And let me go ahead and
7 mark another document.  We'll mark as
8 Deposition Exhibit 863.
9     (Deposition Exhibit 863, an e-mail
10 from Nadya Romero dated October 27, 2008,
11 with attachment, marked for identification,
12 as of this date.)
13     Q.   Were you personally involved in
14 helping set up this special environment for
15 September 12?
16     A.   Yes, I was.
17     Q.   And I've shown you a document that's
18 an e-mail chain and attachment entitled "9/12
19 Global Consolidated Close - on behalf of Alvarez
20 & Marsal"?
21     A.   Uh-huh.
22     Q.   You see it's sent to some group named
23 "DBS USERS"?
24     A.   That's right.

Page 170

Krishnan

1
2    Q.    Do you believe that you would have
3  been included as part of that group?
4    A.    I might have been included.
5    Q.    Do you recall this project that's
6  being described here in this e-mail chain?
7    A.    Yes, I was very much involved in this
8  project but I cannot remember exactly
9  getting this e-mail because it was way back in
10 October 2008.
11   Q.    But you were personally involved in
12 this project?
13   A.    Yes, I was.
14   Q.    And at whose request was this project
15 done?
16   A.    It -- my understanding was that it was
17 done for LBHI and LBI.
18   Q.    And at the top of this it says "on
19 behalf of Alvarez & Marsal." Did you have an
20 understanding that Alvarez & Marsal was kind of
21 running LBHI at this time?
22   A.    Yes, that's correct.
23   Q.    And in one of the recipients here, do
24 you see David Coles?
25   A.    Uh-huh.

Page 171

Krishnan

1
2    Q.    Were you aware that he was the CFO of
3  Lehman, LBHI?
4    A.    I'm not -- I'm not sure.
5    Q.    Okay. And what was your understanding
6  of why there was a special environment being set
7  up?
8    A.    My understanding was that the input
9  data that we received for September 12 might
10 have had some problems, or on September 15, the
11 users did not probably do the adjustments that
12 they were supposed to do and that's why we had
13 to set up this whole new environment so that
14 they are able to put in adjustments for
15 September 12.
16   Q.    So normally adjustments for a
17 particular day can only be made in the GFS
18 system for the next day up until a certain time?
19   A.    That's correct. Next day until 6 P.M.
20   Q.    And did you mention earlier something
21 about a 23-day period?
22   A.    GFS just holds the last 23 business
23 days of data, but users are not able to adjust
24 this.
25   Q.    So for someone at Lehman who stayed at

Page 172

Krishnan

1
2  Lehman after the closing of the Barclays deal on
3  September 22, those that had access to the GFS
4  prior to the closing, would they have continued
5  to have access afterwards?
6    A.    I believe so.
7    Q.    Was there anything, to your knowledge,
8  done that would have stopped that access?
9    A.    I don't think we did anything in GFS
10 to stop anybody's access.
11   Q.    And so on September 22 someone with
12 access at Lehman could go into GFS and look at
13 whatever values in the GFS system they wanted?
14   A.    Yes, I believe so.
15   Q.    And for 23 days, they could -- they
16 could go back 23 days in time to see any values
17 they wanted to in GFS?
18   A.    That's correct. Yes.
19   Q.    This effort, this project described in
20 this e-mail, Exhibit 863, would have been more
21 than 23 days after September 12; is that
22 correct?
23   A.    That's correct.
24   Q.    Now, was this special environment set
25 up so that Alvarez and LBHI and LBI could do

Page 173

Krishnan

1
2  whatever they wanted to do with respect to
3  September 12 data?
4        MR. OXFORD: Objection. Form.
5  Foundation.
6        MS. CARRERO: Same objection.
7        MR. DAKIS: Same objection.
8    A.    Can I answer it?
9    Q.    You can answer.
10   A.    I don't know what -- I mean, I don't
11 know what they did, but what I can say is that
12 I've seen adjustments for September 12 in the
13 special environment that was set up. So I guess
14 they did change the data after this environment
15 was set up.
16   Q.    And by "they," you're referring to
17 Lehman and Alvarez & Marsal?
18   A.    That's correct.
19   Q.    And you personally would have seen those
20 adjustments?
21   A.    Yes, I've seen those adjustments.
22   Q.    Were there many adjustments?
23   A.    I think there were about 7,000
24 adjustments.
25   Q.    Now, the data that's reflected in the

Page 186

1           Krishnan
2    the same detail was there in the SAM ticket, and
3    that's what we based the reports off and we ran
4    the reports.
5        Q.    And when you reran the reports with
6    the equities, did you have conversations about
7    the reports to be run or was it based solely on
8    SAM tickets with a different report path --
9            MR. THOMAS:  Objection to form.
10       Q.    -- satisfied?
11           MR. THOMAS:  Objection to form.
12       A.    We might have had conversations.  I
13   don't remember.
14       Q.    And your testimony about the reports
15   that were generated with the equities, which
16   were Deposition Exhibits 836 to 843, was that
17   the custom entity filter was removed; is that
18   correct?
19       A.    Yes, the custom filter was changed so
20   this LBI entity would include the equities.
21       Q.    And do you know if a report using the
22   custom filter that was used to generate the GFS
23   reports with equities was used regularly by the
24   product controllers at Lehman?
25           MR. THOMAS:  Objection to form.

Page 187

1           Krishnan
2        A.    I don't know.
3        Q.    And do you recall how it was
4    determined that the custom filter would be
5    changed?
6        A.    I don't know, but I think it is
7    because we had -- we didn't have -- I mean, the
8    report didn't have the equities and we found
9    that the reason is because the filter was
10   excluding them and we included the equities.
11       Q.    And do you know if the equities
12   balance sheets were created based off of GFS?
13           MR. THOMAS:  Objection to form.
14       A.    I don't know.
15           MS. CARRERO:  That's it.
16           MR. OXFORD:  I've got a couple
17   follow-up questions.
18           MR. DAKIS:  Me too, actually.
19           MR. OXFORD:  I don't mind who goes
20   first.
21           MR. THOMAS:  I'll go last.
22           MR. OXFORD:  Do you want to --
23           MR. DAKIS:  No, you might pick up on
24   it.
25   FURTHER EXAMINATION BY

Page 188

1           Krishnan
2    MR. OXFORD:
3        Q.    Ms. Krishnan, you told Mr. Thomas, I
4    believe, that the reports that you ran from GFS
5    that were marked as the deposition exhibits that
6    we looked at today, for the 12th they were run
7    from the special environment, correct?
8        A.    That's correct.
9        Q.    Is the same also true of the data in
10   these reports from the 19th of September?
11       A.    For the 19th, I'm not -- see, there
12   were no changes made to the 19th data, so the --
13   we might have pulled it from Production all the
14   special environment that we set up.
15       Q.    Can you explain what you mean by
16   "production" in that last answer?
17       A.    The Production is a GFS online system.
18       Q.    And for the data for the days between
19   the 12th and the 19th, that would have been
20   pulled from what you call the Production
21   environment, correct?
22       A.    No, between the 12th and the 19th, the
23   15th, 16th, 17th and 18th, they were not
24   available online at the time that we had got
25   this request, so we had to pull it from the data

Page 189

1           Krishnan
2    archive.
3        Q.    And was the 19th available online or
4    was that also needed to be pulled from the data
5    archive?
6        A.    The 19th was available online because
7    we had the special environment, but if we had
8    the 19th data from the data archive, we might
9    have pulled it from there or we might have
10   pulled it from the special environment.
11       Q.    The adjustments that you have
12   testified that were made to the GFS data between
13   the -- withdrawn.  I'll start it again.
14           You testified that certain adjustments
15   were made to the GFS data in your reports from
16   the 12th through the 19th of September, 2008?
17           MR. THOMAS:  Objection to form.
18       A.    I'm sorry?
19       Q.    Is it your testimony that adjustments
20   were only made to the September 15th data in the
21   special environment?
22       A.    The September 12th data.
23       Q.    Only September 12 data in the special
24   environment was adjusted.  The 7,000 adjustments
25   didn't relate to data from the 15th to the 19th?

48

Page 194

Krishnan

1
2    A.   I'm sorry?
3    Q.   You see above Lehman Brothers, Inc. in
4  the drop down menu from column I, there's also
5  Lehman Brothers International Europe?
6    A.   Uh-huh.
7    Q.   Can you explain to me why that is?
8    A.   I don't know.  The system goes by the
9  number, and this filter was built for the DBS
10 entity 0000, if I remember it right.
11   Q.   So if we wanted to check whether there
12 was any extraneous -- and by "extraneous," I
13 mean non-LBI data -- you would check column H,
14 the "DBS Entity"?
15   A.   Yes, I think so, but I'm still not
16 sure why the DBS entity is the same for those
17 two, you know, the number in H.
18   Q.   If I understand your last answer, you
19 don't understand why the DBS entity name for "I"
20 in column "I" includes LBIE, is that what you're
21 saying?
22   A.   I'm saying that the system goes by
23 column H, and you are having both LBIE and LBI
24 under the DBS entity 0000, and that is what we
25 filtered for and that's what we have, and I

Page 195

Krishnan

1
2  don't know why the DBS entity 0000 has two
3  different DBS entity names.
4    Q.   And you didn't check for that when you
5  were creating your report, did you?
6    A.   I based everything on this filter, and
7  this filter said probably DBS entity 0000 and
8  that's what we got.
9    Q.   Okay.  And can you just for the
10 record --
11   A.   Exhibit 859.
12   Q.   Thank you.
13      MR. OXFORD:  I don't have any further
14   questions for you, Ms. Krishnan.
15      MR. DAKIS:  Neil picked up most of
16   mine, but I just wanted to ask a couple more
17   follow-up questions.
18 FURTHER EXAMINATION BY
19 MR. DAKIS:
20   Q.   You testified earlier about a special
21 environment you created for the September 12 GFS
22 data, and you testified that Lehman Brothers
23 employees have access to that data, correct?
24   A.   That's correct.
25   Q.   Do any Barclays employees have access

Page 196

Krishnan

1
2  to that system?
3      MR. THOMAS:  Objection to form.
4    A.   I am not sure.  Any -- let me phrase
5  it any Barclays employees who were part -- who
6  were part of Lehman might have had access, but
7  any new -- any new Barclays user after the
8  actual bankruptcy wouldn't have had access.
9    Q.   Just to make sure I'm clear, if there
10 was -- let's call them a legacy employee, is
11 that okay?
12   A.   Okay.
13   Q.   If there was a legacy employee in the
14 Product Control Group, would that -- could that
15 employee have access to the September 12 GFS
16 data?
17      MR. THOMAS:  Objection to form.
18   A.   I think they might have had access.
19      MR. DAKIS:  No further questions.
20      MR. THOMAS:  A couple follow-up.
21 FURTHER EXAMINATION BY
22 MR. THOMAS:
23   Q.   Can you just describe in a little more
24 detail what you mean by "special environment"
25 just for us lawyers who don't really understand

Page 197

Krishnan

1
2  this computer stuff?
3    A.   Okay.  By "special environment," what
4  I mean is we -- the data that was saved up on
5  the evening of September 15 which was for
6  September 12 end of day, was loaded up into a
7  very similar database as the Production GFS with
8  all the functionalities that the Production GFS
9  has, and users were -- who had access to the
10 Production GFS at that time on September 12 also
11 had access to the special environment and they
12 could use the graphical user interface to modify
13 the data or run the reports for that date.
14   Q.   And it was your understanding that
15 this was done at the request of Lehman and/or
16 Alvarez & Marsal, as indicated in Deposition
17 Exhibit 863?
18   A.   Yes, that's correct.
19      MR. OXFORD:  Objection to form.
20      MS. CARRERO:  Same objection.
21      MR. DAKIS:  Same objection.
22   Q.   And was a special environment also set
23 up for September 19, 2008?
24   A.   Yes, a special environment was set up
25 for September 19.

Page 198

Krishnan

1
2     Q.    Was that done roughly in the same time
period of October/November 2008?
4     A.    It was done after -- after the
September 12th was -- I think it was done after
the -- our users were comfortable with September
12. You know, after they finished, after they
were done with the September 12, they said,
okay, we don't need September 12 anymore to be
adjusted; that's the time we brought the
September 19 online.
12     Q.    And when you refer to "users," can you
describe generally what entity you're speaking
of?
15     A.    The LBI and LBHI.
16     Q.    So you think that September 19 live
environment may have been established in roughly
the November 2008 time period?
19     A.    I would think more like February or
March of 2009.
21     Q.    And do you recall there being any data
dumps of September 19 data in the November 2008
time period for any reason?
24     A.    Yes, we might have asked for a
September 19 dump to -- end of day dump to be

Page 199

Krishnan

1
2     loaded into the special environment.
3     Q.    Do you know someone named Dipesh
Patel?
5     A.    I don't remember now.
6     Q.    After the close of the Barclays
transaction on September 22, 2008, were there
any major changes done to the GFS system?
9          MR. OXFORD:  Objection.  Form.
10          MR. DAKIS:  Same objection.
11     A.    There was one major change to split
the entities so they would not -- the Lehman
entities and Barclays entities do not, you know,
interact with each other.
15     Q.    And when was that done, approximately?
16     A.    Probably done by the end of September.
Maybe in the 24th, 25th timeframe of September.
I'm not sure.  I don't remember the dates.
19     Q.    Did that result in any change in
functionality for the users in terms of how you
log into the system and so forth?
22     A.    It did not change anything to the
functionality.
24     Q.    So, on September 23, a Lehman user
with access to GFS could log in and use GFS the

Page 200

Krishnan

1
2     way they had previously?
3     A.    Yes.
4     Q.    And in that GFS system, that would
have all -- they would be able to run whatever
reports they wanted to run, including the type
of reports that we've seen today as deposition
exhibits?
9     A.    That's correct.
10          MR. THOMAS:  Thanks.  I have nothing
further.
12          MR. DAKIS:  I have just one more
follow-up question.
14     FURTHER EXAMINATION BY
15     MR. DAKIS:
16     Q.    Mr. Thomas just asked you when you
talk about the users, you know, what entity
generally are you speaking of, and you testified
the LBI or the LBHI, correct?
20     A.    That's correct.
21     Q.    Are you including in the LBI and LBHI
employees who were with Lehman but went to
Barclays after the sale?
24          MR. THOMAS:  Objection to form.
25     A.    I don't know what is included, but

Page 201

Krishnan

1
2     what I mean by LBI and LBHI is the Alvarez &
Marsal would be LBHI and I think LBI was some
other consulting company.  I don't remember
their name now.
6     Q.    But you testified that Barclays
employees, the legacy Barclays employees would
also have access to the September 12 system, is
that correct?
10          MR. THOMAS:  Objection to form.
11     A.    The legacy Barclays employees would
have had access, yes, that's correct.
13     Q.    So they would also be users, correct?
14          MR. THOMAS:  Objection to form.
15     A.    Well, it was not set up for them.
16     Q.    But they have access to it and can use
it, correct?
18     A.    Yeah, they could have used it.
19          MR. DAKIS:  Nothing further.
20     FURTHER EXAMINATION BY
21     MR. THOMAS:
22     Q.    Could you turn back to Deposition
Exhibit 863, please.  Could you read the subject
line of the e-mail chain?
25     A.    "9/12 Global Consolidated Close - on

51

Page 202

```
1              Krishnan
2   Behalf of Alvarez & Marsal."
3       Q.   And is that consistent with your
4   recollection that this project was driven in
5   part by Alvarez & Marsal?
6       A.   Yes.
7           MS. CARRERO:  Objection.
8           MR. DAKIS:  Same objection.
9           MR. THOMAS:  Thanks.
10          THE WITNESS:  One more thing, I
11      don't -- for your question, if you look at
12      this e-mail, this probably does not include
13      any user who -- legacy employees who went to
14      Barclays.  So they wouldn't even know how to
15      access the September 12 environment.
16  BY MR. THOMAS:
17      Q.   But in any event, whoever this was
18  sent to and whoever might have theoretically had
19  access, it's your understanding that this was a
20  project driven by Lehman and Alvarez & Marsal?
21      A.   Yes.
22          MR. OXFORD:  Objection to form.
23          MS. CARRERO:  Objection to form.
24          MR. DAKIS:  Objection.
25      Q.   And there's no question that Lehman
```

Page 203

```
1              Krishnan
2   and Alvarez & Marsal were involved in this
3   project and process of making any adjustments?
4           MS. CARRERO:  Objection to form.
5           MR. DAKIS:  Objection to form.
6           MR. OXFORD:  Objection to form.
7       A.   This was initiated by Alvarez & Marsal
8   and LBI, so this environment was set up for
9   them.
10      Q.   And they remain involved in the
11  project?
12      A.   Yes, that's correct.
13          MR. DAKIS:  Objection to form.
14      Q.   And do you have an understanding of
15  why they wanted to try to get a consolidated
16  close for 9/12?
17          MR. OXFORD:  Objection.
18          MR. DAKIS:  Objection.  Form.
19          MR. OXFORD:  Foundation.
20          MR. DAKIS:  Foundation.
21          MS. CARRERO:  Same objection.
22      A.   I can answer, right?
23      Q.   Yes.
24      A.   My understanding is that they, Alvarez
25  & Marsal and LBI, thought the data might have
```

Page 204

```
1              Krishnan
2   been incorrect because of the input and users
3   not looking at the data on September 15, so they
4   wanted to have the capability to make it right.
5           MR. THOMAS:  Thanks.  I have nothing
6       further.
7           MS. CARRERO:  One follow-up.
8       Hopefully I won't prompt any additional
9       questions.
10  FURTHER EXAMINATION BY
11  MS. CARRERO:
12      Q.   Is it possible to query the GFS data
13  for September 12 absent any sort of adjustment
14  that might have taken place within the special
15  environment?
16      A.   I'm sorry?  The September 12?  What
17  are you saying?
18      Q.   Is a query of GFS data for September
19  12 --
20      A.   Uh-huh.
21      Q.   -- possible using data before any
22  purported subsequent adjustments while part of
23  the special environment?
24      A.   It may be possible to do it if we are
25  able to restore the data from the night of
```

Page 205

```
1              Krishnan
2   September 15 and load it into another
3   environment, you know, like that was the data
4   before the adjustments for these took place for
5   the 863.
6       Q.   So your understanding would be that
7   the September 12 data was potentially archived
8   as well as loaded onto the special environment
9   that you testified about?
10          MR. THOMAS:  Objection to form.
11      A.   The special environment started with
12  the end of day of September 12 data, which was
13  September 15 evening.  So on September -- on the
14  actual September 15, around 7:30 P.M. the data
15  was saved up somewhere.
16          So your question was can we get the
17  September 12 data without these -- the special
18  environment, right?  So if we go back to the
19  data save that we did on September 15 evening,
20  we'll be able to do that.
21      Q.   And have you undertaken any sort of
22  analysis of the September 12 data versus what
23  has been produced to us and based on your
24  testimony comes from the special environment?
25      A.   You mean if --
```

52

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                                                        :
In re                                                   :        Chapter 11 Case No.
                                                        :
LEHMAN BROTHERS HOLDINGS INC.,                          :        08-13555 (JMP)
*et al.*,                                               :
                                                        :        (Jointly Administered)
                              Debtors.                  :
------------------------------------------------------- x


# REPORT OF
## ANTON R. VALUKAS, EXAMINER


Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
312-222-9350

919 Third Avenue
37th Floor
New York, NY  10022-3908
212-891-1600

March 11, 2010                          *Counsel to the Examiner*


### VOLUME 2 OF 9

### Section III.A.2: Valuation

### Section III.A.3: Survival

system for financial inventory, was 33,174.[2097]   On August 31, 2008, the total number of

positions was 39,205.[2098]   As of May 31, 2008, Lehman reported that it held $47.5 billion

in corporate equity assets, approximately 56% of which were Level 1 assets.[2099]   As of

August 31, 2008, Lehman determined that the value of its corporate equity portfolio was

$43.2 billion, approximately 60% of which were Level 1 assets.[2100]

As is discussed below, the valuation of equity positions in publicly-held

companies is more straightforward than the marking and valuation of equities in

privately-held companies.   In reviewing Lehman's publicly traded corporate equities,

the Examiner has found that Lehman's marks for these positions closely tracked

publicly-quoted prices.   The Examiner has found insufficient evidence to support a

finding that Lehman's marks for these assets were unreasonable.   With respect to

Lehman's equity positions in privately-held companies, evaluating the reasonableness

of Lehman's valuations of these assets would require an investigation of the financial

circumstances and prospects of each privately-held company.   Furthermore, the

Examiner has considered what impact the valuation of these assets would have on the

---

[2097] *Id.*; Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 4 (describing function of GFS system).
These thousands of positions approximate the number of unique corporate equity positions held by
Lehman.  However, the actual number of unique positions held differed because (1) GFS reports the same
investment held by two different legal entities as two different positions, (2) multiple option positions are
grouped together into one position for GFS purposes, and (3) system users enter "Adjustments" directly
into the system that appear as a position but are more accurately described as adjustments to existing
positions.  Lehman., REC May-08 13-June-08 FINAL.xls [LBEX-LL 1104843]
[2098] Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812].
[2099] LBHI 10-Q (filed July 10, 2008) at p. 29.
[2100] Lehman, REC August 08 as of 17-September Ext Rep.xls [LBEX-LL 1104812]. Lehman did not file a
Form 10-Q statement for the third quarter of 2008 before its bankruptcy filing.

# EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
                                                            :
In re                                                       :          Chapter 11 Case No.
                                                            :
LEHMAN BROTHERS HOLDINGS INC.,                              :          08-13555 (JMP)
*et al.*,                                                   :
                                                            :          (Jointly Administered)
                                        Debtors.            :
---------------------------------------------------------- x

## REPORT OF
### ANTON R. VALUKAS, EXAMINER

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
312-222-9350

919 Third Avenue
37th Floor
New York, NY  10022-3908
212-891-1600

March 11, 2010                          *Counsel to the Examiner*

### VOLUME 5 OF 9

### Section III.B: Avoidance Actions

### Section III.C: Barclays Transaction

treasuries or corporate bonds.[7479]    Data from these systems was aggregated in the Activity, Positions and Balances ("APB") system.    APB was primarily a central repository for data relating to several Lehman trading systems and contained end-of-day activities, trades, failed trades and positions for all listed products, including listed derivatives.[7480]    The APB system differs from GFS in that the APB system accumulated all of the daily trade history from various trading systems, while GFS provided balance sheet and financing positions, typically at month-end.

The Examiner's financial advisors used GFS as their primary source for information about the LBHI Affiliate Entities' securities inventories and positions.    The GFS information accessed by the Examiner's financial advisors not only included month-end data, but also data for two mid-month dates relevant to the Examiner's investigation – September 12, 2008 (the last trading day immediately preceding the LBHI petition date) and September 19, 2008 (which was the LBI petition date and the last trading date prior to the Barclays' sale transaction).    The Examiner used the September 12, 2008 dataset to perform the securities analyses presented herein.    The Examiner selected the September 12, 2008 dataset (as opposed to the September 19, 2008 dataset) after consultation with Lehman employees, Barclays personnel and A&M professionals, all of whom shared a common concern that standard daily protocols were

---

[7479] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 2; Examiner's Interview of Rob Eby, Jan. 6, 2010, at pp. 2-6.
[7480] APB description in Lehman Live intranet.

not consistently followed during the week ending September 19, 2008 as a consequence of the atypical market conditions and the extraordinary business disruption that occurred during that week.   There was sufficient concern about the quality of the September 19, 2008 dataset to justify the selection of the September 12, 2008 dataset as the basis for the Examiner's analysis.

Because the Examiner used the September 12, 2008 dataset, it was possible that some transfers of securities from LBHI Affiliate Entities to LBI took place between September 15 and September 19, 2008.   Although several sources indicated that no securities had been transferred from LBHI Affiliate Entities to LBI following LBHI's bankruptcy (other than transfers relating to public customer transactions), the Examiner's financial advisors reviewed trading activity during the week beginning September 15 and determined that two of the LBHI Affiliate Entities, LBSF and LCPI, continued to engage in a material amount of trading with LBI during that week.[7481]   The Examiner evaluated the LBSF and LCPI trading activity which occurred during the week of September 15, and, as described below, determined that the trading activity was not improper and did not improve LBI's position vis-à-vis these LBHI Affiliate Entities.

---

[7481] The Examiner's financial advisors' review did not indicate that other LBHI Affiliates engaged in significant securities trading activity with LBI after September 12, 2008.

2007

### (ii) GFS System Assessment

The Examiner conducted several interviews to assess the capabilities and reliability of GFS. Criticisms of GFS included concerns regarding the reliability of valuation data and other data quality issues.[7482] GFS reports, however, were prepared daily and identified the financial assets each Lehman entity was holding on its respective balance sheet. The Legal Entity Controller group relied on these reports, in part, to monitor each legal entity's daily inventory positions.[7483] In addition, GFS provided the "inventory subledger" that was used as the basis for creating quarterly consolidated financial statements[7484] and was consistently referred to as the primary system used to track security inventory data.[7485]

Because the Examiner's financial advisors relied heavily on electronic data (and in particular the GFS information) to determine ownership of securities, they performed two distinct tests in order to gain sufficient confidence that GFS contained reliable information for the purpose of this analysis. The first test involved a comparison of the data reported by GFS to Lehman's 10-Q filings. The second test, which provided an additional check, compared the GFS data to Lehman's general ledger.

---

[7482] Examiner's Interview of Kristie Y. Wong, Dec. 2, 2009, at p. 4; e-mail from James Guarino, Barclays, to Akshay Bhargava, Duff & Phelps (Jan. 21, 2010).

[7483] Examiner's Interview of Kristie Y. Wong, Dec. 2, 2009, at p.4.

[7484] *Id.*

[7485] Global Funding System ("GFS") New User Training [LBEX-LL 3396270]; GFS System Description found on LehmanLive intranet.

### a. Comparison of GFS Data to Lehman's 10-Q Filings

The Examiner's financial advisors obtained a copy of the reconciliation between the general ledger and GFS data that had been prepared by Lehman employees in connection with the Lehman financial statement consolidation for the first three quarters of 2008.   This reconciliation was created for the purpose of supporting Lehman's FAS 157 Fair Value Balance Sheet footnote.   The Examiner's ability to leverage the work performed by Lehman estate employees minimized the time and expense required to vet the data.

The Examiner's financial advisors prepared a comparison of the balances on the reconciliation worksheet with the balances reported on the 10-Qs.   Only *de minimis* differences, which were determined to be immaterial relative to the overall balance sheet for those periods, were noted.

### b. Comparison of GFS Data to Lehman's General Ledger

The Examiner's financial advisors also obtained GFS data for the first quarter (quarter ended February 29, 2008) and the second quarter (quarter ended May 31, 2008) of 2008 for a sample of two LBHI Affiliates, namely LBCC and LBCS.   The Examiner's financial advisors summarized the GFS data for those periods by GAAP Asset Class.[7486] The Examiner's financial advisors then compared each of those GFS asset amounts to

---

[7486] Lehman categorized inventory in one of three "Asset Classes" based upon the apparent quality of inputs involved in determining valuation.   Lehman's Asset Classes 1, 2 and 3 corresponded to the accounting literature's "Hierarchy Levels" 1, 2 and 3.   This designation is required for reporting purposes according to the Statement of Fin. Accounting Standards No. 157, ¶ 22.

the corresponding accounts within the general ledger for each sample entity. The general ledger data was obtained using Essbase, which is a Lehman software program designed to extract general ledger data. The Examiner's financial advisors identified some differences for each entity, but determined that the differences were immaterial relative to the account balances in the general ledger. They further noted that the differences likely were attributable to closing adjustments subsequently made by Lehman personnel.

### c.   Reliability of September 12 Data

Based on the results of these sample tests (and the 10-Q filings reconciliation in particular) as well as several interviews, the Examiner's financial advisors maintained a sufficient level of confidence in the September 12, 2008 and earlier GFS data used for the purpose of this analysis.

### (iii) GFS Data Extracted by Examiner

The Examiner's financial advisors used GFS's search capabilities to extract information for each CUSIP appearing on the Securities Lists. They relied upon the GFS "Positions Group" (also referred to as the "Balance Sheet Module") reporting functions to extract that data.

The Examiner's financial advisors extracted all relevant data fields from the Balance Sheet Module. Because the Balance Sheet Module does not take into account the impact of repurchase agreements, reverse repurchase agreements, stock loans, or

### (a)  CUSIPs Not Associated With LBHI Affiliate Entities

To determine whether any securities reflected on the balance sheet inventories of LBHI Affiliate Entities might have been transferred to Barclays, the Examiner's financial advisors relied upon and used data extracted from Lehman's GFS application to trace CUSIPs to the respective balance sheets of the Lehman legal entities as of September 12, 2008, the last date for which reasonably accurate balance sheet and other financial information was available, and used that data to reduce the aggregate number of securities the Examiner's financial advisors would need to examine.

The Examiner's financial advisors reviewed the data extracted from GFS and identified (i) CUSIPs which had some association with an LBHI Affiliate Entity, and (ii) CUSIPs for which there was no data found in GFS.  The remaining CUSIPs were associated only with non-LBHI Affiliates (*i.e.*, CUSIPs that the LBHI Affiliate Entities did not reflect in their Balance Sheet inventories as of September 12, 2008). Understanding that GFS was the primary system used by Lehman to track balance sheet positions related to securities, the Examiner's financial advisors determined that this population of 9,472 CUSIPs presented a low probability that securities bearing such a CUSIP might have been owned by an LBHI Affiliate Entity at the time of the Barclays'

# EXHIBIT D

**Contains Highly Confidential Information**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:                                                    Chapter 11

LEHMAN BROTHERS HOLDINGS, INC*., et al.,*    Case No. 08-13555

          Debtors                              (Jointly Administered)

**EXPERT REPORT OF**

**JOHN P. GARVEY**

**MARCH 15, 2010**

Contains Highly Confidential Information

(d) government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion.

* * *

On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the following Liabilities of Seller and its Subsidiaries (collectively, the "Assumed Liabilities"):

* * *

(i) all short positions and "repos" relating to any securities or interests of the types included in the definition of "Long Positions" with a book value as of the date hereof of approximately $69 billion[9]

13.    Moreover, the APA used the term *book value* interchangeably with the term *Lehman (LBI's) marks*.[10]  The source of Lehman's marks is a central database system for pricing and other data called Lehman Global Funding System ("GFS").[11]  GFS tracked financial assets at their fair value marks and updated these marks on a periodic basis. GFS gathered pricing data from the trading desks each evening; therefore, GFS contained the most recent information from the previous trading day.[12]  Marks, however, were updated at various intervals, depending on the type of security, as explained by Steven Berkenfeld in his deposition:

> [N]ot all types of securities were marked every day.  We did not mark our entire book of securities on a daily basis.  We owned lots of level 3 securities, esoteric securities, and so we didn't go through a daily process of marking those.  Some of those positions would be marked on a monthly or even a quarterly basis.[13]

---

[9] Asset Purchase Agreement, September 16, 2008, page 6, and pages 11-12.

[10] Section 3.3 of the APA, "Adjustment to Cash Amount", states: "Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof)."  (APA, Section 3.3).

However this provision was removed by the Sale Hearing on September 19, 2008, Lori Fife told the court: "There was an upside sharing in the original transaction.  There was going to be a true-up twelve months later on and that has been eliminated from this transaction."  (9/19/08 Hearing Tr. 47:7-10) Further, Paragraph 9 of the Clarification Letter removed this provision from the APA.

[11] "GFS" is Lehman's Global Funding System, "a global data warehouse that provides strategic and flexible reporting capabilities related to the Firm's financial resources." (BCI-EX-(S)-00213941 and BCI-EX-(S)-00213939)  It is also sometimes referred to as Global Finance System, Global Financing System, or Global Financial System.

[12] Paolo Tonucci stated in his deposition:  "Market data is received from other systems.  GFS is just an aggregation tool, so would source data from settlement systems or from other pricing sources and apply that to the inventory positions or collateral positions. . . . It runs on an overnight basis so it should pick up all of the most current information."  (Deposition of Paolo Tonucci, August 14, 2009, 95:5 – 96:3)

[13] Deposition of Steve Berkenfeld, August 6, 2009, 299:14-21.

---

# EXHIBIT E

**Contains Highly Confidential Information**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS HOLDINGS, INC.*, et al.,*

Debtors.

Chapter 11

Case No. 08-13555

(Jointly Administered)

Expert Report of

Mark E. Zmijewski

March 15, 2010

Contains Highly Confidential Information

30.     Movants have taken the position that September 19, 2008 is the appropriate date to value these securities for the purpose of this matter.[54]  In Exhibit C-1, I present the value of the JPMorgan inventory based on certain price marks as of various dates from September 17 to December 22, 2008.  According to JPMorgan price marks on September 17, the JPM Inventory had a value of $5.994 billion (column [C] of Exhibit C-1).[55]  I do not have JPMorgan price marks for September 19, 2008.  I calculate JPMorgan values using the JPMorgan values for September 17, adjusted by the change in clean price marks in GFS from September 17 to September 19 (column [D] of Exhibit C-1).[56]  To be conservative, I adjust the calculated JPMorgan September 19 value to incorporate Barclays' liquidity adjustment, which results in a value for the JPM Inventory of $5.397 billion (column [E] of Exhibit C-1).[57]

31.     When compared with Barclays' $3.740 billion valuation of the assets in Annex A on December 22, 2008 (column [A] of Exhibit C-1), the analysis shown in Exhibit C-1 documents that Barclays' valuation for these assets is understated based on the alternative price marks.  The amount of the undervaluation is at least $1.657 billion.

---

[54] *See* footnote 11.

[55] The $5.99 billion represents the value for the securities listed in Annex A.  (JPM Inventory).  It is separate from and excludes the $1.25 billion in cash that was also transferred as part of the Settlement Agreement.  (Deposition Exhibit 205; Hearing Transcript, December 22, 2008, 42:10-12).

The JPMorgan price marks in JPM Inventory were labeled as JPMorgan price marks as of September 30, 2008. However, after comparing these marks to the JPM files that Barclays received on September 18, 2008 with September 17, 2008 JPM Price Marks in an email from Ricky Policke of Lehman to John Haley of Barclays, I find the overall difference between the two marks is $2.04 out of $5.99 billion.  I conclude that the JPMorgan price marks in JPM Inventory must be the marks as of September 17, 2008 and not September 30, 2008.

[56] For CUSIPs overlapping between BCI-EX-(S)-00213996.xls and the GFS data, with positive trade date position and positive Clean Market Price on September 17 and September 19, I obtain the JPM 9-19 value by applying the percentage change in GFS prices from the 17th to the 19th to the JPM 9-17 value.

I also obtain an average price change by Barclays asset class using these CUSIPs, weighted by the JPM 9-17 value. For CUSIPs in BCI-EX-(S)-00213996.xls but not in the GFS data sample, I calculate the JPM 9-19 value by applying the weighted average price change by asset class to the JPM 9-17 value.

[57] To adjust "JPM Calculated Custodial Price Marks 9-19-08" to "JPM Calculated Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08", I take the liquidity adjustment from the "Liquidity" tab in BCI-EX-(S)-00213996.xls. I take the liquidity adjustment under the column heading "Liq Haircut", matching against each CUSIP by the column "Sub Type" in the "Liquidity" tab. I calculate the "JPM Calculated Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08" by multiplying the liquidity adjustment by "JPM Calculated Custodial Price Marks 9-19-08".  For the Equity asset class, I take the liquidity adjustment provided in BCI-EX-00255172 (0922 Equities Bid-Offer) of 4.32% and multiply one minus this adjustment by the respective Custodial and Barclays Mid-Point Price Marks on the dates specified.

---

Contains Highly Confidential Information

JPMorgan on September 19, the total asset value is $51.821 billion and a $6.821 billion excess of the "Fair Value of All Assets Received" over $45 billion.[69]  As shown in the exhibits in this section, the Pfleiderer Report consistently presents the lowest valuation across alternative marks.

D.  ANALYSIS OF LEHMAN'S MORTGAGES ACQUIRED BY BARCLAYS

38.    In this section, I discuss the basis for the following opinion:

**Opinion 6**:  A comparison of the mortgages in the Global Funding System ("GFS") as of September 16, 2008 totaling approximately $6 billion and the schedules setting forth the positions transferred to Barclays demonstrate that Barclays actually received more than two-thirds of the value of all Lehman mortgages in GFS.[70]  The custodial valuation as of September 19, 2008 of the Lehman mortgages acquired by Barclays is $4.034 billion, which represents 67.1% of the $6.014 billion value of all Lehman mortgages in GFS as of September 16, 2008.

39.    At the request of Movants' Counsel, I analyzed the Lehman mortgages and mortgage backed securities ("Mortgages") acquired by Barclays in the Sale Transaction.  I identified a series of three emails from Clement Bernard (Lehman – FID Chief Financial Officer) to Barclays employees including Stephen King (Barclays – Managing Director and head of PMTG) and Jasen Yang (Barclays – Director of PMTG).[71]  These emails include eight Excel file attachments.

---

EX-00295934.xls is the amount subtracted from the Repo Collateral.  Based on the analysis in BCI-EX-00295934.xls, for each CUSIP, I assign a "Non-Repo Collateral" percentage as the ratio of the amount subtracted from the Repo Collateral to the Barclays 9-22 Exit Price Marks (for non-Equities as classified by Barclays) and as the ratio of the amount subtracted to the Barclays 9-22 Mid-Point Price Marks (for Equities as classified by Barclays).  I calculate the "Schedule B assets included in the above" based on the "Non-Repo Collateral" percentage by multiplying this percentage, on a CUSIP level, by the respective Custodial and Mid-Point Price Marks on the dates specified to obtain the portion of the inventory not in the Repo Collateral.  To comport with the analysis in BCI-EX-00295934.xls, I make two further adjustments for the equity CUSIPs.  For all equities, I reduce the amount in "Schedule B assets included in the above" by a liquidity haircut of 1.084%.  For 28 equity CUSIPs, the amount subtracted from the Repo Collateral equals the CUSIP's notional value; for these CUSIPs, I calculate the "Schedule B assets included in the above" by reducing the original notional by the liquidity haircut of 1.084%.

[69] I note that both these values are consistent with the contemporaneous documents presented in Exhibit E-1.

[70] *See* footnote 15 (describing the role of GFS).

[71] Clement Bernard is identified in the report of Anton R. Valukas, Examiner in re Lehman Brothers Holdings, Inc. et al, Chapter 11 Case No. 08-13555 (JMP), Volume 7, Appendix 3, Key Individuals, page 2.  Stephen King's position is identified in the Deposition of Stephen King, September 10, 2009, 8:23-9:9.  Jasen Yang's position is identified in the Deposition of Gary Romain, September 10, 2009, 139:6-14.

---

Contains Highly Confidential Information

These files were grouped by asset type and state that they are the "9/16 Inventory."[72]  One of the emails attached a file that identified assets as "Mortgages and Mortgaged Backed."[73]  As I show in the first line in Exhibit D-1, this inventory list contains 3,913 CUSIPs and has a total "long inventory" value equal to $6.014 billion.[74]  The $6.0 billion amount is the same as the amount listed for mortgages on a number of Lehman balance sheets the week of September 15.[75, 76]

40.    To analyze the mortgages acquired by Barclays, I first aggregated the valuations at CUSIP level.[77]  I then searched for CUSIPs with a positive trading position in Barclays' Initial Inventory and JPM Inventory.  I identified 1,720 of the 3,913 Lehman CUSIPs in the Barclays' Initial and JPM Inventory.  Using the GFS valuation of Net Long Inventory in the Mortgages file, the value of the CUSIPs transferred was $4.226 billion (*see* the third line of Exhibit D-1).[78] Since the number of securities for the CUSIPs acquired by Barclays may not be the same as the total number of securities in GFS, I used the BoNY September 19, 2008 valuation for securities in Schedules A and B and the JPMorgan adjusted September 19, 2008 valuation for securities in Annex A.  Using this valuation for the Mortgages, the value of the CUSIPs transferred was $4.034 billion, which is 67.1% of the total value of the Lehman Mortgages (4.034/6.014).  The Barclays Opening Balance Sheet valuation of the Mortgages it acquired from Lehman is $2.266 billion, which is 37.7% of the total value of the Lehman Mortgages (2.266/6.014).

---

[72] BCI-EX-(S)-00200952-BCI-EX-(S)-00200962 at 52 (includes 3 emails and 8 Excel files).

[73] BCI-EX-(S)-00200952-BCI-EX-(S)-00200962 at 54 and 57.

[74] To measure this value without accrued interest (i.e., "clean value,"), I include the CUSIPs with strictly positive trade date positions.  I adjust "Net Long" value to remove the impact of accrued interest by multiplying this value by a ratio of the clean price to the dirty price.  The "Net Long" field represents the sum of two data fields labeled "Gross Long Inventory TD @ MV" and "Long Intraco Netdown TD @MV."  These are identical names to the fields the Pfleiderer Report aggregates to determine Net Long Inventory Value as of 9/12/08 in Table IV of the Pfleiderer Report.

[75] In Barclays' Opposition to the Rule 60(b) Motions ("Barclays Opposition"), Barclays asserts that the value of 50% of Lehman's residential mortgage securities are estimated to be worth from $2.7 billion to $3.6 billion, notes in an associated footnote that court testimony placed the value of the entire portfolio at $6 billion, and notes in another footnote it may have received some with the Repo Collateral.  (Barclays Opposition, ¶69 and footnotes 46 and 209).

[76] Deposition Exhibit 509; Deposition Exhibit 200.

[77] In cases where real-world CUSIP was unavailable, I combined data with identical ISINs or product numbers.  For purposes of this analysis, I will use the term CUSIP to refer to any of these identifiers.

[78] Of the amount acquired, $1.91 billion appear in the Barclays Initial Inventory and $2.32 billion appear in the JPM Inventory (not shown in the exhibit).

---

Contains Highly Confidential Information

positions transferred to Barclays in the Initial Inventory, representing $32.025 billion (or 78.7%) of the Initial Inventory at Barclays Opening Balance Sheet valuation (at exit price marks).  Of these, 99.99% of the value of "emerging markets" assets, over 99% of "equity," over 97% of "rates," and over 85% of "corporate" bonds at Barclays Opening Balance Sheet valuation (at exit price marks) are represented within the Bloomberg or Capital IQ data.[95]  On September 22, 2008, prices were available for 7,159 (or 66.6%) of the CUSIPs.  The prices capture $31.963 billion (or 78.6%) of the Initial Inventory at Barclays Opening Balance Sheet valuation (at exit price marks), with 99.99% of emerging markets assets, over 98% of equity, over 97% of rates, and almost 85% of corporate bonds represented.  The Pfleiderer Report dismissed vendor prices based on the fact that less than 23% of the initial inventory at Barclays Opening Balance Sheet value was not represented.

58.      Expanding the sample by including Interactive Data collected via Bloomberg along with the data available from Bloomberg and Capital IQ, on September 19, 2008, prices were available for 7,998 (or 74.4%) of the CUSIPs, representing $35.359 billion (or 86.9%) of the Initial Inventory at Barclays Opening Balance Sheet value (at exit price marks).  Specifically, the data captures $9.291 billion (or 73.6%) and $0.792 billion (38.2%) of the Initial Inventory at Barclays Opening Balance Sheet valuation (at exit price marks) for RMBS and Principal Mortgage Trading Group, respectively.[96, 97]

### b.  Pfleiderer Report's Analysis Rejecting Lehman Price Marks is Flawed and Inadequate

59.      The first contemporaneous source of price marks rejected in the Pfleiderer Report is Lehman's own marks.  The source of these marks is GFS.  Most CUSIPs/contracts in GFS include an indicator for market/valuation classification.  According to the Pfleiderer Report, most

---

[95] "Rates" refers to treasury and agency securities traded both by Lehman's fixed income group and Barclays Capital.  (Deposition of Jasen Yang, September 4, 2009, 17:16-21; Deposition of Eric Felder, July 31, 2009, 12:22-13:5).

[96] A "Residential Mortgage Backed Security is a Mortgage Backed Securities that are backed by loans secured with residential rather than commercial property."
(http://www.duke.edu/~charvey/Classes/wpg/bfglosr.htm#residential_mortgage_backed_securities, last visited February 22, 2010).

[97] Principal Mortgage Trading Group [PMTG] is an internal trading and risk management group at Barclays.
(Deposition of Stephen King, September 10, 2009, 9:5-19, 10:18-23).

Contains Highly Confidential Information

of these assets were Level II (73%) category assets; however, approximately 21% of these assets were Level I assets (assets that can be valued based on quoted prices for the identical instruments traded in active markets).[98, 99]

60.    The Pfleiderer Report rejects using all of the Lehman price marks because of conflicting deposition testimony about whether or not Lehman updated its price marks after September 12, 2008 and an analysis of the "stickiness" of the prices (observed price changes) of the Level II and Level III assets.  While the Pfleiderer Report does not identify the conflicting testimony it relies on in rejecting Lehman's price marks, some conflicting testimony occurred at Mr. McDade's deposition.  Mr. McDade (Lehman – President) initially stated that he believed Lehman's price marks were stale on September 15, but then admitted that Mr. Kelly (Lehman – Global Financial Controller) and Mr. Lowitt (Lehman – Co-Global Chief Administrative Officer) would have better knowledge of that issue.[100, 101]  Ian Lowitt, Lehman's former Chief Financial Officer, stated in his deposition:

> The assets that were on Lehman's books were, particularly LBI, were securities, and securities are priced based on, you know, market sources, and our books and records were accurate.[102]
>
> . . .
>
> I think that it is important to reflect that the marks that we had on our books were accurate, which I believe was the case…[103]

---

[98] Pfleiderer Report, ¶32.

[99] Level II category assets are assets that can be valued based on quoted prices for similar instruments traded in active markets or prices for similar or identical instruments in markets that are not active or using model-based techniques for which all significant assumptions are observable in the market.  (Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" (September 2006, as amended 2008), at ¶22-31).

[100] Deposition of Bart McDade, September 2, 2009, 77:4-10.

[101] Bart McDade was President of Lehman Brothers, then employed by Barclays for three months to aid in the transition. (Deposition of Bart McDade, September 2, 2009, 7:18-8:12).

Martin Kelly was the Global Financial Controller for Lehman at the time of the acquisition. After the acquisition, Kelly became the Financial Controller for Barclays Capital and is now a Managing Director and Chief Financial Officer in the Americas for Barclays. (Deposition of Martin Kelly, August 18, 2009, 8:8-12:2).

Ian Lowitt was the Co-Global Chief Administrative Officer for Lehman before the acquisition, and Chief Operating Officer of Barclays Wealth Americas after the acquisition. (Deposition of Ian Lowitt, August 20, 2009, 8:18-11:7).

[102] Deposition of Ian Lowitt, August 20, 2009, 41:17-21.

Contains Highly Confidential Information

61.    As I show in Exhibit E-3, Lehman's price marks were not as "sticky" as the Pfleiderer Report claims.  Exhibits 4 and 5 of the Pfleiderer Report selected a subset of the Level II and Level III securities and show daily price marks for these securities.  While the Pfleiderer Report states, "My analysis of the prices recorded in GFS revealed significant 'stickiness' in the marks for Level II and Level III securities going forward from September 12, 2008," the Pfleiderer Report provides no scientific or statistical tests upon which to form that conclusion.[104]  In fact, Lehman continued to update many prices throughout the week.

62.    Exhibit E-3 shows the percentage of CUSIPs in the GFS system with price changes from September 12, 2008 – September 19, 2008, and the percentage of market value for CUSIPs for which a price change was observed during that period.[105]  8,468 CUSIPs in the Initial and JPM inventory exist on all days in GFS.  Throughout the week, clean market prices of 79% of the 8,468 CUSIPs changed at least once, which represents 79% of value based on Barclays Opening Balance Sheet valuation (at exit price marks).  Clean market prices of 52% of the 8,468 CUSIPs changed every day during this week, which represents 64% of the value based on Barclays Opening Balance Sheet valuation (at exit price marks).  Clean market prices of 77% of the 8,468 CUSIPs changed value at least twice during the week.  This implies that 23% of the CUSIPs changed value at most once.  The sample of CUSIPs in Pfleiderer Report Exhibit 4 and 5 includes only securities with at most one price change from September 12 to 22 of 2008, which are only 23% of the CUSIPs.

---

[103]Deposition of Ian Lowitt, August 20, 2009, 42:17-43:18.

[104] Pfleiderer Report, ¶39.

[105] A CUSIP is included if it is present in GFS on all days from September 12, 2008 to September 19, 2008.  A CUSIP is said to be present in GFS if it has a numeric or missing price on a given day.  All price change analysis in this table is based on the clean market price as given in GFS.  I calculate price changes for only those dates which have strictly positive prices.  If a CUSIP's price is missing on a given trading date, it is set to the previous day's price for the purposes of comparison.  When multiple prices are observed for a CUSIP on a given day, the price is taken to be the average of the observed prices.  If data is available from multiple source systems within the GFS, a price change observed in any of the source systems is considered a change on that day for the CUSIP.

The Total Inventory value for Barclays Opening Balance Sheet Valuation (at Exit Price Marks) is shown at $44,430 million. This value is $6 million lower than what is shown in Exhibit C-3 at $44,436 million ($46,522.9M - 2,086.5M) (Pfleiderer Report Table 2). This $6 million reflects the difference on Barclays Opening Balance Sheet at Exit Price Marks and what is provided in JPM Inventory.

---

**Contains Highly Confidential Information**

63.     The Pfleiderer Report fails to consider, much less analyze, this information in reaching the conclusion that Lehman's marks were sticky, and therefore provides insufficient foundation and insufficient and incomplete analyses to conclude that all of the information in the Lehman marks should be ignored.

### c.  Flawed and Inadequate Analysis Rejecting the JPMorgan and BoNY Price Marks

64.     The Pfleiderer Report also rejects two other contemporaneous sources of price marks: the JPMorgan price marks and the BoNY price marks.  JPMorgan was the custodian or collateral agent for the Federal Reserve Bank of New York and BoNY was the custodian or collateral agent for Barclays.[106]  The Pfleiderer Report rejects using all of the BoNY and all of the JPMorgan price marks even though these "…banks maintain procedures and pricing groups that enable them to provide this marking service quickly and with the level of accuracy required by their roles in tri-party repos, …" because these "…were not normal repurchase agreements, but instead were much larger and more complex, and a significant number of the securities … were not normally eligible to serve as collateral in commercial tri-party repos."[107]  The Pfleiderer Report also discusses the limited amount of time both BoNY and JPMorgan had to mark the assets.[108]  Lastly, the Pfleiderer Report states it has analyzed the JPMorgan and BoNY marks for many of the esoteric and illiquid securities and refers the reader to Appendix Four of that report.

65.     The Pfleiderer Report provides insufficient foundation and insufficient and incomplete analyses to conclude that all of the information in both the BoNY and JPMorgan marks should be ignored.[109]  First, JPMorgan's marks are not analyzed or even mentioned anywhere in

---

[106] *See* expert report of Joseph R. Mason, PhD. dated March 15, 2010.

[107] Pfleiderer Report, ¶41.  Further, at the Pfleiderer deposition, the deponent admits that he did not review any of the custodial agreements or the underlying policies for security valuations.  (Deposition of Paul Pfleiderer, February 23, 2010, 170:12-172:7).

[108] Pfleiderer Report, ¶42.  I make note of the testimony from Barclays personnel regarding the lack of accuracy of BoNY's price marks including remarks by Stephen King, Barclays Managing Director and Head of the Portfolio Mortgage Trading Group and Jasen Yang, Director of the Portfolio Mortgage Trading Group.  (Deposition of Stephen King, September 10, 2009, 111:16-112:9; Deposition of Jasen Yang, September 4, 2009, 31:16-32:17, 61:17-62:20).

[109] In the Pfleiderer deposition, the deponent does not recall a single CUSIP, or security, or class of securities for which the BoNY or JPMorgan price marks were inaccurate.  (Deposition of Paul Pfleiderer, February 23, 2010, 169:19-170:11).

---

# EXHIBIT F

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

10                Debtors.

      ----------------------x

11

12

13          DEPOSITION OF JOHN P. GARVEY

14              New York, New York

15              April 13, 2010

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 29651

Page 10

1        J. Garvey
2    "GFS is Lehman's Global Funding System, a global
3    data warehouse." You can read it, but -- and
4    there's a document cited there.
5        Q.    Did you discuss the GFS system with
6    anybody in preparing your report?
7        A.    I discussed it with my colleagues,
8    discussed it with counsel.
9        Q.    Other than counsel, when you say your
10   colleagues, what do you mean by that?
11       A.    Well, we had many people working on
12   this case.
13       Q.    And remind me, where are your
14   colleagues? What's the name of your firm?
15       MS. CARRERO:  Objection to form.
16       A.    What is the name of our --
17       Q.    When you say "colleagues," do you mean
18   at Chicago Partners?
19       A.    At Navigant Economics, formerly known
20   as Chicago Partners, yes.
21       Q.    Other than your colleagues there or
22   counsel, did you discuss the GFS system with
23   anybody else?
24       A.    I don't think so.
25       Q.    In other words, did you discuss it

Page 11

1        J. Garvey
2    with anyone currently employed by either of the
3    Lehman estates?
4        A.    I did not personally.
5        Q.    Do you know whether any of your
6    colleagues did?
7        A.    I don't know the answer to that. They
8    may have.
9        Q.    And do you know whether you or any of
10   your colleagues discussed it with anyone working
11   in the Transition Services Agreement? Are you
12   familiar with what that is?
13       A.    I'm familiar with what that is, yes.
14       Q.    And just the same question:  Do you
15   know whether you or any of your colleagues
16   discussed the GFS system with anyone working
17   under this TSA arrangement?
18       A.    I did not. Some of my colleagues may,
19   but I don't know any of the specifics.
20       Q.    Do you know, regardless of the
21   specifics of the conversation, did you learn
22   from your colleagues anything about how the GFS
23   system works?
24       A.    Anything about how the GFS system
25   works? I understand it. It works according to

Page 12

1        J. Garvey
2    what I have in this report. It was the central
3    database pricing system.
4        Q.    And it's your understanding that it
5    was the system that you would look to to learn
6    what Lehman's marks were on any given day?
7        MS. CARRERO:  Objection to the form of
8    the question.
9        A.    As a general premise, yes.
10       Q.    And did you understand that it -- that
11   there were different components of the GFS
12   system, a component for the Fixed Income
13   Division and a component for the Equities
14   Division, are you familiar with that?
15       A.    I don't know what you mean by
16   "component." I know there were different asset
17   classes being valued by the system.
18       Q.    Yes, the word "component" may be the
19   wrong word. Just that did you know that there
20   were different parts of the system for different
21   divisions within the company?
22       MS. CARRERO:  Objection to the form of
23   the question.
24       A.    Yes, I don't know the distinction
25   between "component" or "part." I know that

Page 13

1        J. Garvey
2    there were different asset classes.
3        Q.    Do you have any opinion, Mr. Garvey,
4    as to whether the GFS system was accurate,
5    materially accurate, as of September 12, 2008?
6        MS. CARRERO:  Objection to the form of
7    the question.
8        A.    Yes, I'm not sure what your definition
9    of "material" is.
10       Q.    I'm simply trying to ask you whether
11   it's your understanding that the GFS system was
12   the most accurate source for Lehman's marks on
13   its inventory of financial assets as of
14   September 12, 2008?
15       MS. CARRERO:  Objection.
16       A.    I didn't study the GFS system at
17   length. My opinion would be if you wanted to
18   figure out what Lehman's marks were, the GFS
19   system was the best place to find that out.
20       Q.    Let me refer you to paragraph 14, and
21   you're referring here again to the term "book
22   value"?
23       A.    Right.
24       Q.    Do you have an opinion as to whether
25   or not the term "book value" is a more

4 (Pages 10 to 13)

# EXHIBIT G

- 1 -

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC., et al.

9              Debtors.

10   - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14              Debtor.

15   - - - - - - - - - - - - - - - - - - - -x

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              June 21, 2010

21              9:31 AM

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

## LEHMAN BROTHERS HOLDINGS INC., et al.

- 50 -

1    (Pause)

2  Q.  Do you see that?

3  A.  No, I don't know.  Sorry.

4  Q.  You see the "Liability" heading, correct, in the left-hand

5  side?

6  A.  Yeah.

7  Q.  And the first thing under that is "Short Term Borrowings".

8  Do you see that?

9  A.  Yes.

10  Q.  And then it says "Financial Instruments".  Do you see

11  that?

12  A.  Yes.

13  Q.  And then it says "Total Securities" or something, "Total

14  SEC and Other Financial Instruments".  Do you see that?

15  A.  Yes.

16  Q.  Next it says "Collateralized Short Term Financing".  Do

17  you see that line?

18  A.  Yes.

19  Q.  And the next one it says "Payables".  Do you see that?

20  A.  Okay.

21  Q.  And then beneath that, do you see "Bonus Payable and Cure

22  Payments Payable"?

23  A.  Yes.

24  Q.  Okay.  And do you see that there are numbers for each of

25  those line items both as of October 31, '08, as of September

- 51 -

1  17th, '08 and then "Transaction Adjustments" and then "Balance

2  Sheet Entries".  Do you see that as you go across the page?

3  A.  Um-hmm, yes.

4  Q.  Were you aware that Alvarez & Marsal had been furnished

5  this information in September of 2008?

6  A.  I did not see this information, no.

7  Q.  Whether or not you actually saw this piece of paper, were

8  you aware that this information was -- made available for

9  Alvarez & Marsal?

10  A.  You got to answer -- you got -- again, the question you

11  asked was did I -- I have never seen before this event.  Did

12  David Coles?  My assumption is yes, he did see this on the

13  17th.  I have no reason to believe that wasn't the case.

14  Q.  Did you personally know prior to my showing you this that

15  Alvarez & Marsal had been furnished with this information in

16  September of 2008?

17  A.  I did not know in September 2008 or October 2008 or up

18  until just now.

19  Q.  Okay.

20  A.  And, by the way, counselor, I don't exactly understand the

21  17th of -- there was no accounting -- I don't know how the

22  17th -- the 17th would have just been an estimate 'cause we did

23  not have a -- an accounting cutoff period until January of

24  2009.  So I think this was an estimate.

25  Q.  You think this was a what?

- 52 -

1  A.  I think this would have been an estimate in any event.

2  There was no accounting cutoff -- the accounting stopped at the

3  12th of September.

4  Q.  Yes.  You've said that a couple of times.  And why did the

5  accounting stop as of the 12th of December -- September?

6  A.  'Cause we stopped posting entries.

7  Q.  And why was that?

8  A.  'Cause the system just came to a collapse.  The

9  interconnectivity of the worldwide system -- you had a -- you

10  had three hubs.  It stopped and went to bankruptcy.

11  Q.  Did that mean that subsequent to September 12th that the

12  marks on various assets were not being updated?

13  A.  Yes, sir.

14  Q.  You mentioned that there came a time when you began to

15  have some concerns as to whether or not the transaction was in

16  fact a wash.  Do you recall that?

17  A.  Yes.

18  Q.  When did you first have any concern about whether or not

19  the transaction with Barclays was a wash?

20  A.  The first concern would have been when the financial

21  information from the accounting system started to perk up.  I

22  recall in mid to late January there were questions about, as we

23  were able to close the books on September -- as of September

24  12th, the questions were coming up, I don't understand -- I

25  don't understand how the assets equaled the liabilities in this

- 53 -

1  context.  And then a week or two later, the quarterly results

2  came out and that caused even greater questioning on our part.

3  Q.  When you refer to September 12th, that's September 12th of

4  what year?

5  A.  2008, the date before the filing.

6  Q.  Are you saying that your first time you tried to close the

7  books for September 12th of 2008 was sometime in the first

8  quarter of 2009?

9  A.  Yes.  Yes.

10  Q.  And are you saying that the first time you had any concern

11  at all as to whether or not the Barclays transaction was a wash

12  was in the first quarter of 2009?

13  A.  It would be early 2009, yes.

14  Q.  Well, when you say early 2009, does that mean the first

15  quarter of 2009?

16  A.  January of 2009.

17  Q.  January of 2009.  When was the first time that you asked

18  anyone to investigate whether or not the Barclays transaction

19  had, in fact, been a wash?

20  A.  It was right around the time of the press release, shortly

21  before, shortly after the press release.

22  Q.  What press release?

23  A.  The quarterly press release, the February 8th Barclays'

24  press release.

25  Q.  In 2008, did you have any understanding one way or another

14 (Pages 50 - 53)

# EXHIBIT H

lose- on behalf of Alvarez and Marsal

**From:**      Romero, Nadya
**Sent:**      Mon, 27 Oct 2008 20:14:53 GMT
**To:**        DBSUSERS

**CC:**        Primiano, Vincent; Reilly, Gerard; Kelly, Martin; Tonucci, Paolo; Globerson, Daniel; Blackwell, Alastair; Wong, Kristie; david.coles@lehman.com; Chiu, Liliana; O'Connor, Matt (FIN); Tricarico, William: Finance (NYK); Ambrose, John; william.fox@lehman.com; dgibb@lehman.com; kayoko.nishimura@nomura.com; smurfin@lehman.com; Lee, Mark; Leto, Michael S.; Stewart, Marie; clifford.feibus@lehman.com

**Subject:** 9/12 Global Consolidated Close- on behalf of Alvarez and Marsal

EXHIBIT
863
KK 6/29/10
depobook.com

---

To All DBS Users, JVE approvers, PC

**Purpose:**

The global 9/12 global consolidated close process will begin on Tuesday October 28.  The 9/12 close is being coordinated with all Administrators in Europe, Asia and Americas, Barclays and Lehman personnel.  This close will be critical for the bankruptcy filings; the proper amount of diligence is expected on the part of all users.

A mid-month financial close has never been performed and issues will arise.  We have devised a task team (Marie Stewart, Dan Marcus, Rose Hauzenberg, Cliff Feibus, and Dominic Gibb) that will meet daily to discuss various issues related to the close from a technical, operational and accounting standpoint.

Please forward memorandum/PowerPoint Deck to all appropriate personnel not on e-mail distribution list.

**Special TEST environment**

A special TEST environment was developed to accept mid-month feeds from the various source systems.  These feeds are the same or similar as prior closes.  To the end user, this environment will be no different than the production environment.

**Accessing the test environment:**  A PowerPoint deck "Accessing Systems for September 12 close" has been attached that describes how to access each of the non-production environments for all applications required to be online (Quest, Pals, GFS, JVE, CIAS, DBS, Vista Essbase, etc)

<<...>>

**Questions and issues:**  If you are experiencing technical issues with accessing systems, please use the following avenues:

    A.  Send an e-mail to the following e-mail address in the directory:  ftg_ps_all_us, or call
    B.  Amit Patel, (201) 499-9656, or Daylis Fuentes, (201) 499-3207

**Financial Close Timeline:**

**Tue. Oct. 27th** – the new "TEST" environment will be available to perform typical Day +1 activities.
The "green light" to feed data from GFS/GQuest/PALS systems to DBS will be made once agreement is reached that all adjustments have been processed.

**Fri. Oct. 31st** – NPE, PE and Revenue - Friday, October 31 will be the last day for all NPE, PE, and Revenue journals.  No late entries will be accepted after Friday, October 31.

9/12 Gi                            behalf of Alvarez and Marsal

**Thur. Nov. 13th BS** – Last day for Balance Sheet entries.  No entries will be accepted after November 13, 2008.

<u>Special Note on PALS/Quest Interface with GFS</u>

Due to technical requirements, there will not be a direct Feed from Quest to MTS to DBS.  Therefore any journal entry entered into Quest for MTS will have to be replicated in DBS.  (i.e. the same journal entry must be entered into Quest and DBS)

<u>Other Items</u>

**JVE Approvers:**  Please report any JVE approver issues to your respective manager and Nadya Romero.

<u>Key contacts:</u>
BarCap Lead:  Marie Stewart, BarCap
Lehman Lead:  Cliff Feibus, Lehman
A+M Lead:  Michael Leto
Overall Technical Project Lead:  Daniel Marcus, BarCap
<u>Regional Leads:</u>
**Asia:**  Kayoko Nishimura & Simon Murfin
**UK:**  Dominic Gibb, Brian Furness
**Americas:**  Marie Stewart, Cliff Feibus, Michael Leto

# Accessing Systems for Sept 12 close

# Accessing GFS and GFS Derivatives for Sept 12 close

# Type 'GFS' in the LehmanLive Search text box and hit enter



# Accessing GFS and GFS Derivatives for Sept 12 close

## Select Production Clone Environment under the Launch GFS Applications section



# Accessing GFS and GFS Derivatives for Sept 12 close

## Click the **Start** button



# Accessing GFS and GFS Derivatives for Sept 12 close

You will be presented with the following screen.  Select **Clone** from the drop down menu



# EXHIBIT I

EX-10.5 6 a08-22764_5ex10d5.htm EX-10.5

Exhibit 10.

EXECUTION COPY

TRANSITION SERVICES AGREEMENT

dated as of September 22, 2008

between

LEHMAN BROTHERS HOLDINGS INC.

and

BARCLAYS CAPITAL INC.



MOVANTS' TRIAL EXHIBIT

122

Section 3.12.   Access to Books and Records.   (a) The BarCap Entities shall provide the LBHI Entities reasonable access to books and records acquired as part of the Purchased Assets that are related and material to the Retained LBHI Business (to the extent such books and records are in a BarCap Entity's possession at the time of requested access); and (b) the LBHI Entities shall provide the BarCap Entities reasonable access to books and records that are related and material to the Business (to the extent such books and records are in an LBHI Entity's possession at the time of requested access).

## ARTICLE 4

## COSTS AND DISBURSEMENTS; PAYMENTS

Section 4.01   Costs and Disbursements; Payments.

(a)   Any Service to be provided by any Provider hereunder shall be charged to the Recipient thereof as follows (such charges, the "Service Charges"):

(i)   until the date that is nine (9) months after the Closing Date, at a cost equal to the Provider's fully-loaded costs and expenses for providing such Service (including in such fully-loaded costs and expenses (x) an allocation for overhead costs to the extent directly related to providing the Services, (y) the amount of the actual payments made by the Provider to third-party providers for providing Services, and (z) associated overhead costs relating to the Services provided by such third-party providers) ("Provider's Cost"), but without any markup for profit margin; and

(ii)   on and after the date that is nine (9) months after the Closing Date (including during any extension of the term of this Agreement), at a cost equal to Provider's Cost plus 15% of Provider's Cost.

Service Charges shall include value-added taxes and all other taxes payable in respect of the provision of the Services other than taxes imposed on the net income of the Provider. If LBHI or BarCap (as applicable) is required, by Law or to otherwise avoid legal penalties under Law, to pay, directly or indirectly, to an Affiliate any transfer pricing markup or equivalent cost in order to deliver a Service, then such transfer pricing markup or cost shall be included in the relevant Service Charges, unless such mark-up or cost is subsequently recoverable by LBHI or BarCap (as applicable).

For the avoidance of doubt, Service Charges shall not include any amounts owed by a party (whether to third parties or Affiliates) prior to the Closing Date.

For the avoidance of doubt, Service Charges may increase or decrease, including, as a result of (i) an increase or decrease in the amount of such Services being provided to the Recipient (as compared to the amount of the Services underlying the determination of a Service Charge), (ii) an increase or decrease in the rates or charges imposed by any third-party provider that is providing goods or services used by the Provider in providing the Services (as compared to the rates or charges underlying a Service Charge), (iii) an increase or decrease in the payroll or benefits for any employees used by the Provider in providing the Services, or (iv) any increase or decrease in costs relating to any changes requested by the Recipient in the nature of the Services

10

# EXHIBIT J

EXECUTION COPY

TRANSITION SERVICES AGREEMENT

dated December 23, 2009

between

JAMES W. GIDDENS,

As Trustee for the Liquidation of the Assets of Lehman Brothers Inc.
Under the Securities Investor Protection Act

and

BARCLAYS CAPITAL INC.

contractors in the ordinary course during the Benchmark Period, <u>provided</u> that BarCap shall be responsible for such contractors' compliance with the terms of this Agreement.

(iii)    All Services shall be for the sole use and benefit of the respective Recipient, including any of such Recipient's customers or clients of the type who received the use and benefit of the equivalent services in the ordinary course during the Benchmark Period; <u>provided</u>, <u>however</u>, that the Recipient agrees that it shall not re-market or act as a service provider with respect to any of the Services hereunder to a third party.  For the avoidance of doubt, (x) information and other support provided by or on behalf of the Trustee to LBHI or any of its Subsidiaries (other than LBI) for purposes of identifying and reconciling intercompany accounts and transactions or intercompany claims and litigation between or involving LBI, on the one hand, and LBHI or any of its Subsidiaries (other than LBI), on the other hand, (y) if LBHI or any of its Subsidiaries (other than LBI) makes a request of the Trustee to provide limited amounts of Possible Non-LBI Data that the Trustee has received in the course of the migration described in <u>Section 3.02</u> that is owned by such requesting Person (and which is not commingled with information that is owned by any other Person (other than LBI) or, if so commingled, as to which the final sentence of <u>Section 9.04(a)</u> applies), the provision of such information and (z) any other use or disclosure of LBI Owned Data or information or reports derived therefrom, or (subject to the last sentence of <u>Section 3.12(a)</u>) Acquired LBI Data or information or reports derived therefrom, shall not, in any such case, be deemed to constitute re-marketing or acting as a service provider with respect to any of the Services; <u>provided</u> that BarCap shall not be required to provide any information or support (or any other Services) to third parties.

(b)    Each Service shall include, and the Service Charges reflect charges for, such maintenance, support, error correction, updates and enhancements normally and customarily provided by the relevant Provider to its Subsidiaries that receive such service (or, in the case of any LBI Service, as indicated on <u>Schedule 2</u>), unless mutually agreed otherwise by BarCap and the Trustee and included on (or added to) <u>Schedule 1</u> or <u>Schedule 2</u> hereto.  Each Service shall include all functions, responsibilities, activities and tasks, and the materials, documentation, resources, rights and licenses to be used, granted or provided by the relevant Provider that are not specifically described in this Agreement as a part of such Service, but are incidental to, and would normally be considered an inherent part of, or necessary subpart included within, such Service or are otherwise necessary for such Provider to provide, or the Recipient to receive, such Service.

(c)    Throughout the term of this Agreement, (i) each Provider and each Recipient of any Service shall cooperate with one another and use its good faith and commercially reasonable efforts to effect the efficient, timely and seamless provision and receipt of such Service and (ii) each Recipient shall use its good faith and commercially reasonable efforts to transition away and wind down its use of the Services.

(d)    This Agreement shall not assign any rights to Technology or Intellectual Property between the parties hereto (it being understood that nothing in this Agreement shall affect the parties' rights under Section 8.9 of the Purchase Agreement).

7

(e)    For the avoidance of doubt, no member of the former Lehman Brothers group other than LBI, including, the LBHI Entities, Lehman Brothers Holdings plc, Lehman Brothers Limited, LB UK RE Holdings Limited and Lehman Brothers International (Europe), shall directly (or, except to the extent expressly permitted by the final sentence of <u>Section 2.01(a)(iii)</u>, indirectly) be entitled to any Services or rights hereunder.  Furthermore, in the event that the Trustee or BarCap shall be the recipient of any services from any of the entities referred to in the preceding sentence in connection with the LBI Liquidation or the Business (respectively), or any successors or assigns to any portion of their assets or businesses, such services shall in no event be deemed to be LBI Services or BarCap Services (respectively) hereunder.

(f)    <u>Access Services</u>.

(i)    Acknowledging the Trustee's right to LBI Data, BarCap shall use diligent efforts to grant the Trustee and his Representatives access to the Systems (taking into account, among other things, the needs of all the users of the Systems), upon the terms set forth herein.  If, notwithstanding such efforts, there is a delay in granting the Trustee and his Representatives access to any of the Systems, then, pending such access if requested by the Trustee, the parties will co-operate in good faith to attempt to promptly find and implement an alternative solution mutually acceptable to both parties.  To the extent that BarCap provides the Trustee and his Representatives with access to any Mixed System, such access is provided for the sole purpose of enabling the Trustee to access and use LBI Data in order to effect, or otherwise fulfill his duties with respect to, the LBI Liquidation.  Additional Information Systems may be added to <u>Schedule 3</u> hereto from time to time upon mutual agreement of BarCap and the Trustee, and access to them shall be provided promptly thereafter, upon the terms set forth herein.

(ii)    BarCap recognizes that the Trustee needs access to LBI Data (including, in many instances, on a direct-access basis to Mixed Systems in or on which LBI Data resides).  The Trustee recognizes that, in certain instances, BarCap has regulatory, legal, operational or technical concerns regarding potential access by the Trustee to certain Mixed Systems, in light of the capabilities of such Mixed Systems and Possible Non-LBI Data in or on the Mixed Systems.  Accordingly, the Trustee's and his Representatives' access to certain Mixed Systems pursuant to this Agreement may need to be restricted in some way such as by limitation to users with certain skills, segregating the Mixed System by entity or providing access in read only form.  <u>Schedule 3</u> hereto sets forth, for each System listed thereon, the currently applicable restriction(s) on access for such System, if any.  With respect to any Information Systems added to <u>Schedule 3</u> after the Execution Date, or if further restrictions need to be put in place for a System in order to address any regulatory, legal, operational or technical concerns referred to in the second sentence of this <u>Section 2.01(f)(ii)</u>, BarCap will use commercially reasonable efforts to provide the Trustee with access to such Systems (subject, in the case of Information Systems added to <u>Schedule 3</u>, to reasonably comparable, limited restrictions), <u>provided</u> that (1) when and if requested by either party, the parties will discuss such restrictions and co-operate in good faith to promptly find and implement alternative solutions mutually acceptable to both parties, (2) before implementing any further restrictions for a System, BarCap will give reasonable advance notice to the

8

(iii) any other violation of a third party's rights; provided, however, that in each of the foregoing circumstances and in the case of Section 2.08(d)(ii) (and without limitation of the Trustee's rights or BarCap's objections or defenses as referred to in and subject to the terms of Section 9.13(b)), the applicable Provider shall so notify the Recipient in writing of the impediment and the parties shall use commercially reasonable efforts to work around the impediment promptly so as to enable the Provider (if such impediment were removed) to provide Services and otherwise perform its obligations under this Agreement in a manner that does not violate applicable Law, contractual obligations or third party rights;

(b)    no Provider shall be required hereunder to fund the Services or otherwise provide financial support, benefits or other consideration on the Recipient's behalf to third parties, or to take custody of, settle, clear or handle securities, in connection with the Services, and the obligation to perform any Service involving funds shall be subject to the Recipient having previously made such funds available to the Provider specifically for such purpose;

(c)    any obligation to provide Services or otherwise undertake activities hereunder shall be limited to the applicable Provider's use of good faith and commercially reasonable efforts, except with respect to the initial grant of access to the Systems pursuant to the first sentence of Section 2.01(f)(i), which shall be limited to BarCap's diligent efforts as set forth therein; and

(d)    no Provider shall be responsible for any failure to provide any Service hereunder to the extent arising from (i) the Recipient's operations or systems or otherwise by the acts or omissions of the Recipient or individuals acting on its behalf, (ii) a third party's failure to provide such Service, or (iii) the failure of the Recipient or its Affiliates to provide BarCap Services or LBI Services (if any), as the case may be, to such Provider.

## ARTICLE 3

### ADDITIONAL AGREEMENTS AND ARRANGEMENTS

Section 3.01.  Computer-Based Resources.  The Trustee's and his Representatives' access to BarCap's Information Systems (including, for the avoidance of doubt, Access Services) pursuant to this Agreement shall continue until March 16, 2011, provided, however, that, if prior to March 16, 2011 migration from any Information System is completed in accordance with the IT Migration Plan (as defined in Section 3.02), such that the Trustee is no longer utilizing and no longer has use for such Information System, then access to such Information System will end upon completion of such migration or as otherwise mutually agreed in writing by BarCap and the Trustee.

Section 3.02.  IT Steering Committee; IT Migration Plan.  Following the Execution Date, representatives of BarCap and the Trustee with authority in the area of Information Systems (the "IT Steering Committee") shall continue to meet from time to time at such reasonable time and place and in such manner as they may agree, to develop a plan that is reasonably satisfactory to both BarCap and the Trustee for migrating from BarCap's Information System infrastructure, as deployed as of the Closing Date, to a final Information Systems infrastructure (the "IT Migration Plan").  The parties shall use reasonable efforts to finalize and

15

# EXHIBIT K

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                            :
In re:                                      :    Chapter 11
                                            :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :    Case No. 08-13555 (JMP)
                                            :
                    Debtors.                :    (Jointly Administered)
                                            :
                                            :
                                            :
                                            :
-------------------------------------------------------x
                                            :
In re:                                      :    SIPA Proceeding
                                            :
LEHMAN BROTHERS INC.,                       :    Case No. 08-01420 (JMP)
                                            :
                    Debtor.                 :
                                            :
-------------------------------------------------------x

## STIPULATION TO ADMISSION OF MOVANTS' EXHIBITS

Barclays Capital, Inc. ("Barclays"), Lehman Brothers Holdings, Inc. ("LBHI"),

the Trustee in the Securities Investor Protection Act liquidation of Lehman Brothers Inc. (the

"Trustee"), and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings,

Inc. (the "Creditors' Committee", collectively with LBHI and the Trustee, the "Movants"),

hereby stipulate that the following movants' exhibits were admitted into evidence on April 26,

2010:

1, 2, 3, 4, 6, 9, 10, 11, 14, 16, 18, 19, 20, 22, 23, 24, 26, 27, 30, 31, 32, 33, 34, 35,

36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 50, 51, 52, 53, 54, 55, 57, 58, 59,

60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81,

82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 100, 101, 102, 103,

104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119,

120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135,

1

136, 137, 138, 139, 140, 141, 143, 144, 145, 146, 147, 148, 149, 157, 159, 160,

161, 162, 163, 164, 165, 166, 167, 169, 173, 174, 175, 176, 177, 178, 179, 180,

181, 182, 183, 184, 185, 186, 187, 189, 190, 191, 192, 193, 194, 196, 197, 198,

199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 215,

216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231,

232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 247,

248, 249, 250, 251, 252, 253, 255, 256, 257, 258, 259, 260, 261, 262, 263, 264,

265, 266, 267, 268, 269, 270, 271, 272, 273, 274, 275, 276, 277, 278, 279, 280,

281, 282, 283, 284, 285, 286, 287, 288, 289, 290, 291, 292, 293, 294, 295, 296,

297, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312,

314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 325, 326, 327, 328, 329,

330, 331, 332, 333, 334, 336, 337, 338, 339, 340, 341, 342, 343, 344, 345, 346,

347, 348, 350, 351, 352, 354, 355, 356, 357, 358, 362, 363, 365, 366, 367, 369,

371, 372, 374, 375, 376, 377, 378, 379, 380, 381, 382, 383, 384, 385, 386, 387,

388, 389, 390, 391, 392, 393, 394, 395, 396, 398, 399, 400, 401, 402, 403, 404,

405, 406, 408, 409, 410, 411, 412, 413, 414, 415, 417, 418, 419, 420, 421, 422,

423, 424, 425, 426, 427, 428, 429, 430, 435, 436, 437, 438, 439, 443, 444, 445,

446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 456, 457, 458, 459, 460, 461,

462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 472, 473, 474, 475, 476, 477,

478, 480, 481, 482, 483, 484, 485, 487, 488, 489, 490, 491, 492, 493, 494, 495,

496, 497, 498, 500, 501, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511, 512,

513, 514, 515, 516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 527, 528,

529, 530, 531, 532, 533, 534, 535, 536, 537, 538, 539, 540, 541, 542, 543, 544,

545, 546, 547, 548, 549, 550, 551, 552, 554, 556, 560, 561, 562, 563, 564, 565,

566, 567, 568, 569, 570, 571, 572, 573, 574, 575, 576, 577, 578, 579, 580, 581,

582, 583, 584, 585, 586, 587, 588, 589, 590, 591, 592, 593, 594, 595, 596, 597,

598, 599, 600, 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612, 613,

614, 615, 616, 617, 618, 619, 620, 621, 622, 623, 624, 625, 626, 627, 628, 629,

630, 631, 632, 633, 634, 635, 636, 637, 638, 639, 640, 641, 642, 644, 646, 648,

657, 659, 660, 662, 663, 664, 665, 666, 667, 668, 669, 670, 677, 678, 679, 680,

681, 682, 683, 684, 685, 686, 687, 688, 689, 690, 691, 692.


Dated: New York, New York
     April 30, 2010


BOIES SCHILLER & FLEXNER LLP

By: _____
    Jonathan D. Schiller
    Hamish M. Hume
    Jack G. Stern

575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

HUGHES HUBBARD & REED LLP


By: _____
    William R. Maguire
    Seth D. Rothman
    Neil J. Oxford

One Battery Park Plaza
New York, NY 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for James W Giddens, as Trustee
for the SIPA Liquidation of Lehman
Brothers Inc.*

JONES DAY

By: _____
    Robert W. Gaffey
    Jayant W. Tambe
    William J. Hine
222 East 41st Street
New York, NY 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

*Attorneys for Debtors and
Debtors in Possession*

QUINN EMANUEL URQUHART &
SULLIVAN LLP

By: _____
    James C. Tecce
    Erica Taggart
    Eric Kay

55 Madison Avenue
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Official Committee of
Unsecured Creditors*

# EXHIBIT L

# B O I E S ,     S C H I L L E R     &     F L E X N E R     L L P

5301 WISCONSIN AVENUE, N.W. • WASHINGTON, D.C. 20015-2015 • PH. 202.237.2727 • FAX 202.237.6131

July 20, 2010

<u>BY EMAIL</u>

Kelly Carrero, Esq.
Jones Day
222 East 41st Street
New York, NY 10017

RE:    <u>*In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555 (JMP)*</u>

Dear Kelly:

Based on the recent deposition of Uma Krishnan, we ask that Movants withdraw their objections to the admissibility of the GFS Reports (BCI Exs. 488-500, 501-502 and 667-671) and the GFS Summaries (BCI Exs. 808, 809 and 865 (a copy of which is enclosed)) and consent to the admission of these exhibits by stipulation.

Movants objected to the admissibility of the foregoing exhibits on the following grounds:  Production after discovery cut-off (BCI Ex. 488-500; 501-502; 667-671 and 808-809), lack of foundation (667-671, 808 and 809), authenticity (667-671), and hearsay (667-671, 808 and 809).

In an effort to demonstrate why these objections have no merit and should be withdrawn, we set forth below a brief recitation of facts that should not be genuinely controverted.  We are happy to discuss these or any related issues that bear upon the admissibility of these exhibits, in an effort to avoid the need for motion practice before the Court.

1.    <u>Timeliness of Production</u>

All of the GFS Summaries and Reports were timely produced, and therefore the objection for untimely production should be withdrawn.  In addition, even if there were a valid timeliness objection, exclusion under FRCP 37(c)(1) is discretionary and should only be granted if the requesting party is prejudiced and there is no substantial justification for the delay.[1]  In this case, there is no prejudice to Movants from the admission of these exhibits into evidence, and therefore there is no basis for pressing the objection.

---

[1] *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006); *Outley v. City of New York*, 837 F.2d 587, 590-91 (2d Cir. 1988); *Papyrus Technology Corp. v. New York Stock Exchange*, 257 F.R.D. 39, 45 (S.D.N.Y. 2009); *Kunstler v. City of New York*, 242 F.R.D. 261, 264-65 (S.D.N.Y. 2007).

1

BOIES,  SCHILLER  &  FLEXNER  LLP

It appears from questions asked during Ms. Krishnan's deposition that there may have been some misunderstanding on Movants' part regarding the production of GFS Reports in the fall of 2009, January 2010 and April 2010.  In order to ensure that there is no confusion, and to demonstrate that there is no basis for objecting to the timeliness of production, we set forth below the chronology of events relating to the production history:

a.  On August 7, 2009, Counsel for the Movants requested that, in response to Movants' Document Request No. 16, Barclays produce GFS Reports for each day from September 15 through September 22, 2008 using a specified "report path." *See* Dep. Ex. 859.  The report path provided by Movants included the Custom Filter "LBI Entity."

b.  In response to this request, Barclays ran the requested reports, which were then produced to the Movants on August 27, 2009 and September 10, 2009.  (These are BCI Exs. 489-494.)

c.  Subsequently, Counsel for the Movants requested a supplemental production of such reports "for each day between September 12 and September 30 for which a report has not already been produced."  This request was addressed in the October 27, 2009 Scheduling Order, which provided for the production of such reports by November 16, 2009.

d.  Using the same report path and Custom Filter that Movants had requested, Barclays ran reports for the requested additional dates and produced the resulting GFS Reports on November 11, 13, 16 and 17, 2009 as requested.  (These are BCI Exs. 488 and 495-500.)

e.  Therefore, all of the GFS Reports produced in response to Movants' document requests were timely produced.  (Together, these are BCI Exs. 488 – 500.) Indeed, some of these same reports (produced again in January) have been marked by Movants as trial exhibits. (M. 302-306.)

f.  In the course of his work, Professor Pfleiderer and/or staff at his direction analyzed the GFS data that Movants had requested (and that had been produced to Movants), and noticed that they did not include certain data regarding equities.  In response to recognizing this, in January 2009 a new report was run for September 12 *without* the Custom Filter that had been requested by Movants and that had excluded a substantial number of observations relating to equities.  This new report therefore included complete data regarding equities and it was produced to the Movants on January 23, 2010 (BCI Ex. 501).  This report was actually included on Movants' exhibit list (M.309) and admitted into evidence as of April 26, 2010 by stipulation on April 30, 2010.  Subsequently, similar reports (*i.e.* reports including equities and not using the Custom Filter requested by Movants) were run for other dates in September 2008, and were produced to the Movants on April 2, 15, 23 and 24, 2010 (BCI Exs. 502 and 667-671).  These reports were never requested by Movants, whose requests were specifically defined in terms of

2

BOIES, SCHILLER & FLEXNER LLP

the report path and Custom Filter referenced above. There is therefore no basis for objecting that these reports were produced in an untimely fashion.

g.   The *summaries* of the GFS Reports simply present the information contained in those reports: thus, since there is no valid objection to the admissibility of the reports, there is no valid objection to the admissibility of the summaries (FRE 1006). Moreover, as explained in Uma Krishnan's deposition, the summaries created at Prof. Pfleiderer's direction and provided as attachments to an explanatory affidavit executed on April 23, 2010 (BCI Exs. 780-781)[2] have been compared to summaries extracted directly from GFS by Barclays employee Uma Krishnan and her team (BCI Ex. 865) in order to confirm the accuracy of the Pfleiderer summaries. This process confirmed that the GFS summaries created from the reports (BCI Exs. 780-781, and BCI Exs. 808 and 809) and the summaries created directly from the system (BCI Ex. 865) contain the same data. None of these summaries were the subject of Movants' document requests, and they were all produced in a reasonable and timely manner. In addition, Movants have now had an opportunity to depose a knowledgeable witness concerning these summaries.

2.   Authenticity, Foundation, and Hearsay

        As you know, all of the GFS Summaries and Reports were authenticated and discussed in depth by Uma Krishnan at her June 29, 2010 deposition. There is therefore no basis for a foundation or authenticity objection to any of these Reports or Summaries.

        In particular, Ms. Krishnan's testimony at the June 29, 2010 deposition confirmed that the GFS Reports produced in this litigation between August 2009 and January 18, 2010 were all created directly by her or staff under her supervision. (Krishnan Dep. Tr. at 157:23-159:11). These reports were populated by using the report path provided by Movants and reflected in Dep. Ex. 859. (Krishnan Dep. Tr. at 159:3-18). Ms. Krishnan further testified that a different report path with a modified filter was used to run the reports in 2010 that included complete equities data. (Krishnan Dep. Tr. at 159:19-160:2). She confirmed that these reports, including equities data, correspond to M. 309 (or BCI Ex. 501) and BCI Exs. 502 and 667-771. (Krishnan Dep. Tr. at 160:5-12). Mrs. Krishnan also testified that she created the GFS summaries (BCI Ex. 865 or Dep. Ex. 858) – including equities data – directly from the system in order to verify that the data set forth in the summaries attached to Professor Pfleiderer's declaration (and produced in this litigation as BCI Exs. 808-809) was accurate. (Krishnan Dep. Tr. at 119:3-4; 162:8-164:13.)

        You have had all of the data and the summaries for months now, and you have not identified, and cannot identify, any reason for doubting the authenticity of the summaries. This is a simple matter of presenting the evidence of what is shown on the GFS system in

---

[2] These summaries correspond to BCI Exs. 808 and 809, which were subsequently added to Barclays' Exhibit List.

3

BOIES, SCHILLER & FLEXNER LLP

a practical manner. The rules allow for the use of these summaries, and we ask that you withdraw your objections now that you have had a full opportunity to review the data and to depose Ms. Krishnan.

There is also no basis for a hearsay objection to any of these GFS Reports and Summaries. The reports and summaries are Lehman data from a Lehman system, and therefore are admissible under FRE 801(d)(2) as admissions by a party opponent. They are also admissible as business records under FRE 803(6). Indeed, as detailed above, Movants included on their exhibit list duplicates of some of the reports that they continue to object to, one of which, M. 309, has been admitted into evidence. That fact confirms that Movants' objections to the admission of these exhibits lack merit, and should be withdrawn.

Finally, given the assertions made by Movants in this proceeding about the Lehman marks, and about the need for transparency and a full airing of all relevant facts, we cannot see how you can oppose admissibility of this GFS data. The Movants' own expert, John Garvey, has opined that the GFS data is the best source for determining the Lehman marks. (Garvey Dep. Tr. at 11:20-12:9; 13:10-19.)[3]

We therefore ask that Movants withdraw their objections to BCI Exs. 488-500, 501-502, 667-671, 808-809 and 865. We would like to move these exhibits into evidence by stipulation prior to the resumption of evidentiary hearings on August 23, 2010.

Please advise us at your earliest convenience whether Movants consent to the admission of the above exhibits. If you do not agree, please provide us with an explanation for the basis for your objections, and for why you disagree with the points made in this letter.

Sincerely,

Hamish Hume

Enclosure

Cc:    Counsel to the LBI Trustee (By Email)
        Counsel to the Creditors' Committee (By Email)

---

[3] In particular, Mr. Garvey defined the GFS data as "the source of Lehman's marks" containing "the most recent information from the previous trading day." *See* Expert Report of John P. Garvey at 13.

BCI Exhibit No. 865

## BS Detailed Exposure Summary (Cross System) - 12 Sep 2008

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
|---|---|---|---|
| 11061 | 0 | Total Mortgages & Mortgage Backed | 12-Sep-08 |
| 70500 | 37,310,795,798 | Total Governments & Agencies | 12-Sep-08 |
| 70600 | 1,014,274,049 | Total CD's and Other Mon Mkt Instr. | 12-Sep-08 |
| 70700 | 6,556,460,564 | Total Mortgages & Mortgage Backed | 12-Sep-08 |
| 70800 | 5,222,989,904 | Total Corp. Obligations & Spot | 12-Sep-08 |
| 70900 | 8,038,738,595 | Total Corporate Stocks & Options | 12-Sep-08 |
| 70950 | 4,214,376,104 | Total Derivatives & Other Contr. | 12-Sep-08 |
| 72260 | 0 | Total Governments & Agencies | 12-Sep-08 |
| 72263 | 0 | CD's & Other Money Market | 12-Sep-08 |
| 72266 | 0 | Total Mortgages & Mortgage Backed | 12-Sep-08 |
| 72270 | 0 | Total Corp. Obligations & Spot Commodities | 12-Sep-08 |
| 72280 | 0 | Total Corporate Stocks | 12-Sep-08 |
| 72290 | 0 | Total Derivatives & Other Contr. | 12-Sep-08 |
| 79999 | 0 | | 12-Sep-08 |
| 79999 | 488,575 | | 12-Sep-08 |
| 88888 | 0 | | 12-Sep-08 |


EXHIBIT
858
AC 9/29/10
depobook.com

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
|---|---|---|---|
| 11061 | 0 | Total Mortgages & Mortgage Backed | Sep 15 2008  6:00AM |
| 70500 | 37088514254 | Total Governments & Agencies | Sep 15 2008  6:00AM |
| 70600 | 969151091.7 | Total CD's and Other Mon Mkt Instr. | Sep 15 2008  6:00AM |
| 70700 | 6188261237 | Total Mortgages & Mortgage Backed | Sep 15 2008  6:00AM |
| 70800 | 4850781775 | Total Corp. Obligations & Spot. | Sep 15 2008  6:00AM |
| 70900 | 7120346434 | Total Corporate Stocks & Options | Sep 15 2008  6:00AM |
| 70950 | 4395326757 | Total Derivatives & Other Contr. | Sep 15 2008  6:00AM |
| 72260 | 0 | Total Governments & Agencies | Sep 15 2008  6:00AM |
| 72263 | 0 | CD's & Other Money Market | Sep 15 2008  6:00AM |
| 72266 | 0 | Total Mortgages & Mortgage Backed | Sep 15 2008  6:00AM |
| 72270 | 0 | Total Corp. Obligations & Spot Commodities | Sep 15 2008  6:00AM |
| 72280 | 0 | Total Corporate Stocks | Sep 15 2008  6:00AM |
| 72290 | 0 | Total Derivatives & Other Contr. | Sep 15 2008  6:00AM |
| 79999 | 0 | NULL | Sep 15 2008  6:00AM |
| 79999 | 491728.239 | | Sep 15 2008  6:00AM |
| 88888 | 0.02053 | | Sep 15 2008  6:00AM |

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
| --- | --- | --- | --- |
| 11061 | 0 | Total Mortgages & Mortgage Backed | Sep 16 2008 6:00AM |
| 70500 | 3685400423 7 | Total Governments & Agencies | Sep 16 2008 6:00AM |
| 70600 | 960236836.2 | Total CD's and Other Mon Mkt Instr. | Sep 16 2008 6:00AM |
| 70700 | 6079799365 | Total Mortgages & Mortgage Backed | Sep 16 2008 6:00AM |
| 70800 | 4798806162 | Total Corp. Obligations & Spot. | Sep 16 2008 6:00AM |
| 70900 | 7033963092 | Total Corporate Stocks & Options | Sep 16 2008 6:00AM |
| 70950 | 2916501345 | Total Derivatives & Other Contr. | Sep 16 2008 6:00AM |
| 72260 | 0 | Total Governments & Agencies | Sep 16 2008 6:00AM |
| 72263 | 0 | CD's & Other Money Market | Sep 16 2008 6:00AM |
| 72266 | 0 | Total Mortgages & Mortgage Backed | Sep 16 2008 6:00AM |
| 72270 | 4427577.229 | Total Corp. Obligations & Spot Commodities | Sep 16 2008 6:00AM |
| 72280 | 0 | Total Corporate Stocks | Sep 16 2008 6:00AM |
| 72290 | 0 | Total Derivatives & Other Contr. | Sep 16 2008 6:00AM |
| 79999 | 0 | NULL | Sep 16 2008 6:00AM |
| 79999 | 494037.581 | | Sep 16 2008 6:00AM |
| 88888 | 0.02053 | | Sep 16 2008 6:00AM |

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
|---|---|---|---|
| 11061 | 0.463745313 | Total Mortgages & Mortgage Backed | Sep 17 2008  6:00AM |
| 70500 | 3643935081 | Total Governments & Agencies | Sep 17 2008  6:00AM |
| 70600 | 9577799262.3 | Total CD's and Other Mon Mkt Instr. | Sep 17 2008  6:00AM |
| 70700 | 5965205445 | Total Mortgages & Mortgage Backed | Sep 17 2008  6:00AM |
| 70800 | 4752713471 | Total Corp. Obligations & Spot | Sep 17 2008  6:00AM |
| 70900 | 6186365445 | Total Corporate Stocks & Options | Sep 17 2008  6:00AM |
| 70950 | 2733426886 | Total Derivatives & Other Contr. | Sep 17 2008  6:00AM |
| 72260 | 0 | Total Governments & Agencies | Sep 17 2008  6:00AM |
| 72263 | 0 | CD's & Other Money Market | Sep 17 2008  6:00AM |
| 72266 | 0 | Total Mortgages & Mortgage Backed | Sep 17 2008  6:00AM |
| 72270 | 0 | Total Corp. Obligations & Spot Commodities | Sep 17 2008  6:00AM |
| 72280 | 0 | Total Corporate Stocks | Sep 17 2008  6:00AM |
| 72290 | 0 | Total Derivatives & Other Contr. | Sep 17 2008  6:00AM |
| 79999 | 0 | NULL | Sep 17 2008  6:00AM |
| 79999 | 460809.197 | | Sep 17 2008  6:00AM |
| 88888 | 0.02053 | | Sep 17 2008  6:00AM |

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
|---|---|---|---|
| NULL | 0 | NULL | |
| 11061 | 0.463304688 | Total Mortgages & Mortgage Backed | Sep 18 2008 6:00AM |
| 70500 | 3819478.2337 | Total Governments & Agencies | Sep 18 2008 6:00AM |
| 70600 | 9223750657 | Total CD's and Other Mon Mkt Instr. | Sep 18 2008 6:00AM |
| 70700 | 5909425547 | Total Mortgages & Mortgage Backed | Sep 18 2008 6:00AM |
| 70800 | 4636360689 | Total Corp. Obligations & Spot | Sep 18 2008 6:00AM |
| 70900 | 5066034879 | Total Corporate Stocks & Options | Sep 18 2008 6:00AM |
| 70950 | 2619910176 | Total Derivatives & Other Contr. | Sep 18 2008 6:00AM |
| 72260 | 0 | Total Governments & Agencies | Sep 18 2008 6:00AM |
| 72266 | 0 | Total Mortgages & Mortgage Backed | Sep 18 2008 6:00AM |
| 72270 | 0 | Total Corp. Obligations & Spot Commodities | Sep 18 2008 6:00AM |
| 72280 | 0 | Total Corporate Stocks | Sep 18 2008 6:00AM |
| 72290 | 0 | Total Derivatives & Other Contr. | Sep 18 2008 6:00AM |
| 79999 | 0 | NULL | Sep 18 2008 6:00AM |
| 79999 | 459931.27 | | Sep 18 2008 6:00AM |
| 88888 | 0.02053 | | Sep 18 2008 6:00AM |

## BS Detailed Exposure Summary (Cross System) - 19 Sep 2008

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
|---|---|---|---|
| 11061 | 0 | Total Mortgages & Mortgage Backed | 19-Sep-08 |
| 70500 | 36,081,407,429 | Total Governments & Agencies | 19-Sep-08 |
| 70600 | 918,946,726 | Total CD's and Other Mon Mkt. Instr. | 19-Sep-08 |
| 70700 | 6,218,802,484 | Total Mortgages & Mortgage Backed | 19-Sep-08 |
| 70800 | 4,603,478,837 | Total Corp. Obligations & Spot. | 19-Sep-08 |
| 70900 | 5,771,988,177 | Total Corporate Stocks & Options | 19-Sep-08 |
| 70950 | 2,350,274,434 | Total Derivatives & Other Contr. | 19-Sep-08 |
| 72260 | 0 | Total Governments & Agencies | 19-Sep-08 |
| 72266 | 0 | Total Mortgages & Mortgage Backed | 19-Sep-08 |
| 72270 | 990,208 | Total Corp. Obligations & Spot Commodities | 19-Sep-08 |
| 72280 | 0 | Total Corporate Stocks | 19-Sep-08 |
| 72290 | 0 | Total Derivatives & Other Contr. | 19-Sep-08 |
| 79999 | 0 | | 19-Sep-08 |
| 79999 | 451,119 | | 19-Sep-08 |
| 88888 | 0 | | 19-Sep-08 |

| GAAP Asset Class 1 | Long Inventory, TD @ MV | GAAP Asset Class 1 Name | Business Date |
|---|---|---|---|
| 11061 | 137382264.3 | Total Mortgages & Mortgage Backed | Sep 22 2008  6:00AM |
| 70500 | 44587481909 | Total Governments & Agencies | Sep 22 2008  6:00AM |
| 70600 | 2754438884 | Total CD's and Other Mon Mkt Instr. | Sep 22 2008  6:00AM |
| 70700 | 6238444616 | Total Mortgages & Mortgage Backed | Sep 22 2008  6:00AM |
| 70800 | 4576655939 | Total Corp. Obligations & Spot | Sep 22 2008  6:00AM |
| 70900 | 5698900787 | Total Corporate Stocks & Options | Sep 22 2008  6:00AM |
| 70950 | 1628049283 | Total Derivatives & Other Contr. | Sep 22 2008  6:00AM |
| 72260 | 0 | Total Governments & Agencies | Sep 22 2008  6:00AM |
| 72266 | 0 | Total Mortgages & Mortgage Backed | Sep 22 2008  6:00AM |
| 72270 | 0 | Total Corp. Obligations & Spot Commodities | Sep 22 2008  6:00AM |
| 72280 | 0 | Total Corporate Stocks | Sep 22 2008  6:00AM |
| 72290 | 0 | Total Derivatives & Other Contr. | Sep 22 2008  6:00AM |
| 79999 | 0 | NULL | Sep 22 2008  6:00AM |
| 79999 | 451205.834 | | Sep 22 2008  6:00AM |
| 88888 | 0.02053 | | Sep 22 2008  6:00AM |

# EXHIBIT M

# JONES DAY

222 EAST 41ST STREET  •  NEW YORK, NEW YORK 10017.6702
TELEPHONE: 212.326.3939  •  FACSIMILE: 212.755.7306

Direct Number:  (212) 326-3684
wjhine@jonesday.com

JP006080
125426-600002

July 30, 2010

VIA E-MAIL

Hamish Hume, Esq.
Boies, Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Re:   _In re Lehman Brothers Holdings Inc., et al., Case No. 08-3555 (JMP)_

Dear Hamish:

We write in response to your July 20, 2010 letter to Kelly Carrero concerning your request that we withdraw our objections and stipulate to the admission into evidence of certain GFS reports and related documents.  We have reviewed your position and, for the reasons summarized below, we cannot agree to such a stipulation for all the documents you propose.  We agree to withdraw our objections to the untimeliness of Barclays' production of these documents, so that is not the concern here.  The real problem is that, contrary to your assertions, the recent deposition testimony of Uma Krishnan confirmed and highlighted the fact that there are serious questions as to how some of these reports were generated and therefore whether they are admissible as trial evidence.

On a preliminary note, Ms. Krishnan was not able at her deposition, nor is she even competent, to properly authenticate all these GFS reports.  Ms. Krishnan testified that she and her group (both while she was at Lehman and now at Barclays) had no responsibility for inputting any data into the GFS system or generating reports from the system.  (Krishnan Tr. 15:9-16:7.)  Nor was she responsible for or knowledgeable about adjustments made to the pricing data contained in the GFS system, such adjustments apparently were made by users that she could not identify and never controlled.  (_Id._ at 20:13-21:5, 42:4-11, 113:3-118:3, 172:24-173:15, 183:15-184:14, 200:16-201:18.)  She did not know whether previous pricing data was preserved by the GFS system after pricing adjustments were made by these other users.  (_Id._ at 21:15-23:10.)  And her group has no responsibility for checking the accuracy of pricing adjustments entered by the system's actual users.  (_Id._ at 42:23-43:10, 94:11-96:5.)  She could not even say with any certainty whether data for all the securities transferred to Barclays under the Sale Transaction was captured within the GFS system.  (_Id._ at 60:3-18, 150:3-8.)

Ms. Krishnan has only partial familiarity with the types of reports generated by the GFS system.  (Krishnan Tr. 16:14-17:6, 52:20-53:13, 93:3-6, 93:18-21, 93:24-94:7, 101:15-19.)  And she was unclear as to whether her group generated certain of the reports Barclays now offers as evidence in this case.  (_Id._ at 48:25-50:6.)  She has no knowledge about the formulas built into

NYI-4297496v1

JONES DAY

Hamish Hume, Esq.
July 30, 2010
Page 2

the GFS system that allow it to assign a market value to various securities. (*Id.* at 24:17-25:22.)
Nor was she altogether clear as to what types of input flow into the GFS system from other
divisions within Lehman or Barclays. (*Id.* at 25:23-26:19.) And she has no knowledge of how
pricing data is entered into the settlement systems that ultimately feed into GFS. (*Id.* at 27:25-
28:3.) For these reasons, she is not competent to authenticate all the documents Barclays now
seeks to enter into evidence, notwithstanding your assertions to the contrary.

More importantly, Ms. Krishnan's testimony about the provenance of the September 12th
and 19th reports confirms that these documents in particular (BCI Exs. 488, 493, 501, 503, 670)[1]
are neither business records under FRE 803(6) nor admissions by a party opponent under FRE
801(d)(2), as you contend. She testified that the normal practice at both Lehman and now
Barclays was and is for pricing data to flow into the GFS system at a fixed time towards the end
of each trading day and thereafter to allow for a short period (typically, one day) for adjustments
to be made to this data by traders and other users. (Krishnan Tr. 113:3-118:3, 21:15-25, 17:20-
25.) This normal procedure was abandoned for the GFS reports covering September 12th and
19th. (*Id.* at 40:4-44:22, 113:3-118:3, 164:19-166:20, 168:16-174:10.) For those two important
days the period for making adjustments to pricing data was reopened for many months up until
as late as January or February of 2009, and numerous changes were made to the data originally
entered within the normal one-day period. (*Id.* at 113:3-118:3.)[2] Ms. Krishnan knew of no
restrictions as to who could make such after-the-fact adjustments. (*Id.* at 172:7-10.) She stated
that some 7,000 adjustments were made to the pricing data for September 12th alone (Krishnan
Tr. 173:10-24, 175:14-176:3), and while she suggested that she knew of no adjustments made to
the data for the 19th (*id.* at 188:9-14), for the reasons noted above, it is not clear that her
knowledge on that score is complete or accurate. (*Id.* at 198:21-199:2 (noting "data dumps" of
September 19th data), 189:19-192:4 (confessing memory loss).) Even if, as she asserts, these
adjustment periods were extended at the request of Alvarez & Marsal (another proposition for
which her knowledge appears incomplete (Krishnan Tr. 172:24-174:10, 197:14-18)), she also
acknowledged that legacy Barclays employees and transferred Lehman employees (whose
conduct is now at issue in this litigation) also had access to the system and could have made
adjustments to the September 12th pricing. (*Id.* at 200:16-201:18.) In any event, the fact remains
that this is not and never was the normal business practice for either Lehman or Barclays, and
therefore any reports generated from this data cannot fall within the business records exception
to the hearsay rule. Moreover, the fact that this re-opened adjustments period took place at a
time when Lehman no longer controlled the GFS system – it was under Barclays' exclusive
ownership and control during this period – means that these adjustments and any reports
generated from this massaged data cannot be considered admissions of any Lehman entity, if
anything they can only qualify as admissions by Barclays.

---

[1]  To the extent the summaries on which Professor Pleiderer relies (BCI Exs. 779, 808, 809 and 865)
incorporate data from these reports, such summaries are also inadmissible for this same reason.

[2]  Indeed, questions remain as to whether this data was changed even after that period. We note that on the
eve of trial, when Barclays first mentioned the possibility of relying on these reports as evidence Barclays referred to
them as still being "in creation."

JONES DAY

Hamish Hume, Esq.
July 30, 2010
Page 3

Separately, the latest round of GFS reports prepared for and produced by Barclays, *i.e.*, those "including equities" (BCI Exs. 667-671), are inadmissible for the additional reason that, according to Ms. Krishnan's own testimony, they also are not the types of reports Lehman or Barclays ever prepared in the ordinary course of business and therefore are not business records under FRE 801(d)(2). The GFS reports originally generated from the report path Movants provided reflect the ordinary course of business for Lehman, as these report paths were those used by Lehman prior to the Sale Transaction. (*See* Dep. Ex. 859; Krishnan Tr. 48:9-50:17, 102:15-108:2.) Ms. Krishnan testified that to prepare Barclays' newer GFS reports (BCI Exs. 667-671) to "include[e] equities" she had to modify the normal report path and customize the filters used to derive these reports. (Krishnan Tr. 48:9-50:17, 102:15-108:2.) These types of reports were not prepared in the ordinary course of business, either at Lehman or now at Barclays. (*Id.*)

Nor can these latest round of reports be opponent party admissions under FRE 803(6) since they were admittedly produced by Barclays personnel well after Barclays assumed exclusive control over Lehman's former GFS system. And they apparently were generated at a time when Barclays was involved in potentially high-stakes litigation concerning that very same data. Lehman estate personnel played no part in the generation of these reports and Lehman had no ability to ensure their accuracy or completeness. Barclays can present no authority for the proposition that reports generated by a party after it has assumed exclusive and complete ownership and control over an opponents' former computerized records can constitute an admission by that opponent, especially when the opponent has no ability to monitor, provide input, or perform quality control over the process by which such new reports are generated. Such reports simply do not bear the indicia of reliability normally ascribed to business records created in the ordinary course. This is especially true where, as we already have seen here, Barclays has the ability to re-open, at will, the process by which data is input into this database and to allow adjustments to that data months after the fact.

Lastly, Ms. Krishnan's testimony confirmed that the purported summaries of GFS reports produced by Barclays (after the discovery cut off) and now relied on by Professor Pfleiderer are inadmissible for wholly separate reasons. Ms. Krishnan testified that these summaries were prepared, not from the actual data set forth in the GFS reports they purport to summarize, but rather by manipulating the GFS system in some indeterminate way (which she could not fully explain) to generate new data and new summaries thereof. (*See* Krishnan Tr. 119:21-129:15.) This latest round of data manipulation is something Movants will never be able to test. These summaries (and Krishnan's explanation as to how they were derived) were provided to Movants after Professor Pfleiderer's deposition, and therefore not subject to cross examination before trial. For this independent reason, we object to the admission of BCI Exs. 779, 808, 809 and 858.

Thus, to summarize our position with respect to your request, we withdraw our timeliness objections in their entirety, and therefore can stipulate to the admission of BCI Exs. 489-492 and

NYI-4297496v1

JONES DAY

Hamish Hume, Esq.
July 30, 2010
Page 4

494-500.  Because the reports Barclays proffers concerning September 12th and 19th were not prepared in the ordinary course of business and are not party admissions, we cannot stipulate to the admissions of BCI Exs. 488, 493, 501, 503, 670, 779, 808, 809 and 858.  Because the latest round of reports prepared by Barclays were generated with customized filters/report paths and therefore also are not the type of reports generated or maintained in the ordinary course of business and also cannot be considered party admissions, we also cannot stipulate to the admission of BCI Exs. 667-671.  And finally, because Ms. Krishnan is not competent to authenticate any of these new reports, we must continue to press our objections to their admission for that independent reason.

We are, of course, available to discuss these issues with you prior to the hearings restarting on August 23rd.

Sincerely,

William J. Hine

cc:   Counsel to the Creditors' Committee (via e-mail)
      Counsel to the LBI Trustee (via e-mail)

# EXHIBIT N

# JONES DAY

222 EAST 41ST STREET • NEW YORK, NEW YORK 10017-6702
TELEPHONE: 212-326-3939 • FACSIMILE: 212-755-7306

Direct Number: (212) 326-3684
wjhine@jonesday.com

JP006080                                  August 11, 2010
125426-600002

VIA E-MAIL

Christopher M. Green, Esq.
Boies, Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Re:   *In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555 (JMP)*

Dear Chris:

We write in response to your August 6, 2010 letter addressed to Neil Oxford concerning certain documents that Barclays would like to admit into evidence at trial in this matter. I will address your queries in the order in which you raised them in your letter.

With respect to the exhibits listed in your "First" paragraph, Movants will agree to stipulate to the admission of BCI Exhibits 11a, 131a, 143a, 189a, 231a, 419, 813b, 816a, 820, 821, 852-855, 857 and 861. We can also stipulate to the admission of BCI Exhibits 824 and 825, provided you send us copies of the documents with the BCI Exhibit sticker attached (we have received no such copies to date). As for BCI Exhibit 838, we might be willing to stipulate to its admission for some limited purpose (which you may want to suggest), but not for the truth of the matters asserted therein. We cannot stipulate as to BCI Exhibit 856 because the document is incomplete and inadmissible under Fed. R. Evid. 106. We object to the admission of BCI Exhibits 858 and 860 on relevance grounds. Please note that, as you did during the first phase of the trial, we are hereby supplementing our prior objections to these two documents.

In your "Second" paragraph, you asked Movants to withdraw their earlier objections which you now claim are moot. We have reviewed these documents and can agree to withdraw our prior objections to BCI Exhibits 412, 456, 457 and 680-692. We cannot agree to the admission of BCI Exhibits 304, 305, 306, 307, 308, 310, 311, 315, 319, 322, 327 and 467 because the exhibits remain incomplete (many omitting attachments) and inadmissible under Fed. R. Evid. 106. We cannot stipulate as to BCI Exhibit 371 because, contrary to the chart attached to your letter, this is not the same document as BCI Exhibit 746. We object on lack of authentication and hearsay grounds for BCI Exhibit 526. And we object on hearsay grounds to the other PWC documents you have proffered, namely BCI Exhibits 594-608, 610-614 and 616-622. Again, we are supplementing our prior objections as to these PWC documents and BCI Exhibit 526.

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Christopher M. Green, Esq.
August 11, 2010
Page 2

In your "Third" paragraph, you asked Movants to stipulate to the admission into evidence of exhibits "as to which Movants raised objections, but that correspond to Movants' Exhibits that have since been admitted." If that were true, we fail to see any reason for cluttering the already voluminous record with duplicates of documents that are already in evidence. This likely will result in confusion and wasted effort down the road, and we see no benefit to this approach. For this reason, we see no basis for the duplicative admission of BCI Exhibits 27, 33, 34, 109, 109a, 271, 272, 370, 392, 406, 443, 444, 472, 501, 527, 583, 584, 609, 615, 724 and 725 since these documents are already in evidence under other numbers. In addition, in light of the recent testimony of Ms. Krishnan and the concerns set forth in my July 30, 2010 letter to Hamish Hume concerning our objections to the admission of certain GFS reports, we must withdraw our inclusion of BCI Exhibit 501, a GFS report from September 12, 2008 (also denominated as M.309), from the stipulation pursuant to which that exhibit previously was admitted into evidence. Perhaps this was an oversight, but BCI Exhibit 501 should have been included in your footnote 1, given that I expressly addressed the problems with this exhibit in my July 30th letter, to which you refer in that footnote.

You asked in your "Fourth" paragraph for Movants to withdraw their existing objections and to stipulate to the admission of certain other BCI exhibits. We have reviewed these documents and we cannot agree to withdraw our objections on relevance and hearsay grounds to the various news articles you proffer, namely BCI Exhibits 135, 381, 382, and 418. We also continue to object to BCI Exhibits 111, 115, 796, 797 and 798, except as agreed at the May 3rd hearing or subject to the Court's admission rulings at that hearing, when the Court allowed their use for a very limited purpose. We also will not withdraw our objection to BCI Exhibits 779, 780 and 781 for the reasons explained in my July 30 letter to Hamish Hume. (Please note, that BCI Exhibits 780 and 781 are the same documents as BCI Exhibits 808 and 809, which I discussed in that letter.)

With respect to the myriad exhibits listed in your "Fifth" paragraph, Movants agree to withdraw their objections to BCI Exhibits 40, 53, 134, 136, 309, 323, 325, 390, 391, 393-410, 414, 415, 451, 452, 458, 469, 524, 532, 569, 579, 585, 586, 588, 589, 678, 747 and 783. While we withdraw our timeliness objections to the other exhibits you list (except as to BCI Exhibit 651, which was produced after the discovery cut-off and well after Mr. Blackwell's deposition), we cannot withdraw our previously-stated, substantive objections as to BCI Exhibits 21 (relevance and hearsay), 28 (hearsay), 51 (incomplete Fed. R. Evid. 106), 108 (lack of authentication and hearsay), 113 (relevance and hearsay), 114 (relevance and hearsay), 148 (incomplete Fed. R. Evid. 106, and we now add hearsay), 301 (we now add objections as to foundation and improper lay opinion), 328 (incomplete Fed. R. Evid. 106), 349-352 (hearsay), 354-369 (hearsay), 384 (hearsay), 434 (incomplete Fed. R. Evid. 106), 453 (relevance), 521-523 (hearsay), 529 (relevance), 623-624 (we now add objections as to lack of authentication, foundation, hearsay and relevance), 628 (we now add an objection as to relevance), 629 (we now add objections as to lack of authentication, foundation, hearsay and relevance), 647 (hearsay), 648 (incomplete Fed. R. Evid. 106), 649 (hearsay), 650B (lack of authentication and hearsay, as

NYI-4300800v1

JONES DAY

Christopher M. Green, Esq.
August 11, 2010
Page 3

noted in Court on May 4th), 652 (lack of foundation), 659 (hearsay), 673 (we now add lack of authentication and hearsay), 677 (we now add hearsay), 731 (incomplete Fed. R. Evid. 106), 732-733 (lack of authentication) and 804-806 (hearsay and incomplete Fed. R. Evid. 106). As noted, we object to the admission of the PWC documents included in your list (BCI Exhibits 717-723, 726 and 727) on lack of authentication grounds. And finally, we continue to object to BCI Exhibits 808 and 809 for the reasons explained in my July 30 letter to Hamish Hume.

With respect to the expert reports and declarations you list (BCI Exhibits 339-348), we will continue to press our existing objections for the time being, until the Court has decided the pending motions concerning the admission of expert testimony. In the meantime, we suggest that the parties confer to determine the best way to preserve our respective objections for now, while agreeing to allow the admission of reports submitted by any expert the Court decides to allow to testify.

Lastly, in your "Sixth" paragraph, you have asked Movants to stipulate to the admission of exhibits Barclays has added to its exhibits list since June 25th. We will agree to stipulate to the admission of the following: BCI Exhibits 822, 827, 829, 832, 833, 835-837, 846, 862, 866-869 and 871. We cannot stipulate to the admission into evidence of BCI Exhibits 828, 840, 840a, 841, 842, 842a, 845, 845a, 848-851, 859, 863, 870, 872, 873, 876, 877 and 879-894.

Sincerely,

William J. Hine

cc:    Counsel to the Creditors' Committee (via e-mail)
       Counsel to the LBI Trustee (via e-mail)

# EXHIBIT O

# JONES DAY

222 EAST 41ST STREET • NEW YORK, NEW YORK 10017-6702
TELEPHONE: 212-326-3939 • FACSIMILE: 212-755-7306

Direct Number:  (212) 326-7838
rwgaffey@jonesday.com

JP636767
125426-600002

August 19, 2010

The Honorable James M. Peck
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004-1408

Re:   Lehman Brothers Holdings Inc., et al., Case No. 08-13555 (JMP)

Dear Judge Peck:

As the Court is aware, Movants concluded their fact case at the end of June, and Barclays is scheduled to begin presenting its case on Monday, August 23, 2010. So as not to infringe upon the Court's (and Barclays') time on Monday morning, we enclose now for the Court a copy of Movants' exhibit list, which has been updated to reflect the Movants' exhibits in evidence as of today's date. We also intend to provide the Court with a hard copy set of Movants' marked exhibits in evidence, and will have those documents ready on Monday for submission at such time as the Court deems appropriate.

Respectfully,

Robert W. Gaffey

Enc.

cc:  Bill Maguire, Esq.
     James Tecce, Esq.
     Hamish Hume, Esq.

NYI-4302109v1

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                      :

In re:                    :    Chapter 11
                      :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :    Case No. 08-13555 (JMP)
                      :

              Debtors.    :    (Jointly Administered)
                      :
                      :
                      :
                      :
------------------------------------------------------------x
                      :

In re:                    :    SIPA Proceeding
                      :

LEHMAN BROTHERS INC.,      :    Case No. 08-01420 (JMP)
                      :

              Debtor.    :
                      :
------------------------------------------------------------x

## <u>Movants' Exhibits</u>

NYI-4272529

| Movants Ex. # | Dep. Ex. # | LBHI App. # | CMTE Ex. # | TRSTE Ex. # | BCI Ex. # | Description | Bates # (if applicable) | Status |
|---|---|---|---|---|---|---|---|---|
| 291 | | | | | | 2/2/09 Memo re: RMBS Portfolio Acquired from Lehman - Bid/Offer Reserve Agency CMOs | BCI-EX-00248415 - 418 | Admitted, 4/26 |
| 292 | | | | | | Long Island - Gross Acquisition Balance Sheet (draft) with Romain's notes | BCI-EX-00248592 | Admitted, 4/26 |
| 293 | | | | | | PwC Testing - Additional Securities | BCI-EX-00249452 | Admitted, 4/26 |
| 294 | | | | | | 9/22/08 Equity Bid-Offer calculation | BCI-EX-00255172 | Admitted, 4/26 |
| 295 | | | | | | Position and Price Data | BCI-EX-00255173 | Admitted, 4/26 |
| 296 | | | | | | New LBI Firm Asset List A 12312008 FINAL | BCI-EX-00255181 | Admitted, 4/26 |
| 297 | | | | | | 9/19/08 Letter re: Transfer of Accounts from Lehman Brothers, Inc. | BCI-EX-00258394 | Admitted, 4/26 |
| 298 | | | | | | Lehman Cash Muni Price Testing 20081231 PwC.xls | BCI-EX-00258590 | Admitted, 4/26 |
| 299 | | | | | | 1/30/09 Letter re: Valuation Advisory Services on Acquired Lehman Assets | BCI-EX-00292153 - 237 | Admitted, 4/26 |
| 300 | | | | | | Sched B LehOBS 5 | BCI-EX-00295934 | Admitted, 4/26 |
| 301 | | | | | | 9/12/08 GFS - Detailed Exposure Report (Cross System) | BCI-EX-00297155 | Admitted, 4/26[†] |
| 302 | | | | | | 9/15/08 GFS - Detailed Exposure Report (Cross System) | BCI-EX-00297156 | Admitted, 4/26 |
| 303 | | | | | | 9/16/08 GFS - Detailed Exposure Report (Cross System) | BCI-EX-00297157 | Admitted, 4/26 |
| 304 | | | | | | 9/17/08 GFS - Detailed Exposure Report (Cross System) | BCI-EX-00297158 | Admitted, 4/26 |

[†] Movants take the position that exhibits 301, 306 and 309 are admissible for the limited purposes of showing that Lehman's book and records, including the data in its GFS system, were being updated and changed on both September 12th and 19th. Because of multiple authentication, hearsay and foundation issues associated with these exhibits, however, Movants contend that they should not be admitted for the truth of the information contained therein, i.e., they should not be admitted as evidence of the accuracy or value of Lehman's marks for those two days.

NYI-4272529

| Movants Ex. # | Dep. Ex. # | LBHI App. # | CMTE Ex. # | TRSTE Ex. # | BCI Ex. # | Description | Bates # (if applicable) | Status |
|---|---|---|---|---|---|---|---|---|
| 305 | | | | | | 9/18/08 GFS - Detailed Exposure Report (Cross System) | BCI-EX-00297159 | Admitted, 4/26 |
| 306 | | | | | | 9/19/08 GFS - Detailed Exposure Report (Cross System) | BCI-EX-00297160 | Admitted, 4/26[†] |
| 307 | | | | | | Pine Valuation Memo | BCI-EX-00297208 - 245 | Admitted, 4/26 |
| 308 | | | | | | Eligible Security Schedules to the Custodial Undertaking in Connection with Master Open Market Agreement (PDCF), Schedule of Eligible Securities, Bank of New York Mellon | BCI-EX-00297249 | Admitted, 4/26 |
| 309 | | | | | 501 | 9/12/08 GFS - Detailed Exposure Report | BCI-EX-00297253 | Admitted, 4/26[†] |
| 310 | | | | | | Support for Dep. Ex. 533A (produced in native format) | BCI-EX-00297320 | Admitted, 4/26 |
| 311 | | | | | | Giants Stadium Contributing Pricing Factors | BCI-EX-00297331 | Admitted, 4/26 |
| 312 | | | | | | 5/18/98 Securities Clearing Agreement between Barclays and BoNY | BCI-EX-00297333 - 351 | Admitted, 4/26 |
| 313 | | | | | | Giants Stadium - Impact.xls | BCI-EX-00297525 | Hearsay Lack of Foundation Relevance |
| 314 | | | | | | Bloomberg screenshots, Giants Stadium bonds | BCI-EX-00297526 - 541 | Admitted, 4/26 |
| 315 | | | | | | JPM ABS CDO 09.19.08.pdf | BCI-EX-00297788 - 956 | Admitted, 4/26 |
| 316 | | | | | | MS CDO Update 09.08.08.pdf | BCI-EX-00297957 - 969 | Admitted, 4/26 |

[†] Movants take the position that exhibits 301, 306 and 309 are admissible for the limited purposes of showing that Lehman's book and records, including the data in its GFS system, were being updated and changed on both September 12th and 19th. Because of multiple authentication, hearsay and foundation issues associated with these exhibits, however, Movants contend that they should not be admitted for the truth of the information contained therein, i.e., they should not be admitted as evidence of the accuracy or value of Lehman's marks for those two days.

NYI-4272529

# EXHIBIT P

1

```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)
- - - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.
               Debtors.
- - - - - - - - - - - - - - - - - - - - -x
In the Matter of:

LEHMAN BROTHERS INC.
               Debtor.
- - - - - - - - - - - - - - - - - - - - -x
               United States Bankruptcy Court
               One Bowling Green
               New York, New York

               April 27, 2010
               9:38 AM


B E F O R E:
HON. JAMES M. PECK
U.S. BANKRUPTCY JUDGE
```

**Page 30**

```
 1   witness.
 2   Q.   Mr. McDade, as a business person, would you consider the
 3   best way and the most accurate way to figure out the extent to
 4   which, if any, the valuation process came up with a number that
 5   was different than the Friday marks would be to compare the
 6   valuation process number with the Friday marks from the GFS
 7   system.
 8           MR. GAFFEY:   Your Honor, I still think it's
 9   objectionable opinion evidence.
10           THE COURT:   Well, I'd sustain the objection in that
11   the witness is being asked to opine as to the relative benefit
12   of comparing marks with a particular benchmark standard.  And I
13   think there's probably an easier way just to get at it.  And if
14   we can stay away from putting qualitative references into the
15   system that was in effect on Friday for comparison purposes and
16   just say whether or not a businessperson would compare today's
17   marks with last Friday's marks and as a result find out the
18   difference, that might be a way to get at it.  But I'm not
19   suggesting the question.
20           MR. BOIES:   Nevertheless, let me adopt the Court's
21   formulation.
22   Q.   Mr. McDade, if you, as the president of Lehman Brothers,
23   wanted to know what the difference was between the valuation
24   number estimating the value of Lehman assets and the Friday
25   night Lehman marks estimating the value of those same assets,
```

**Page 31**

```
 1   am I correct that you would compare the valuation number with
 2   the results from the GFS system?
 3   A.   Yes.
 4   Q.   Okay.  Now, am I correct that you don't recall who it was
 5   that mentioned the approximate five billion dollar difference,
 6   do you?
 7   A.   There were a lot of specific meetings over the course of
 8   Monday and Tuesday as that process of valuation was working
 9   through the different teams.  So I don't recall a specific
10   conversation with respect to it.  But I recall Mr. Kelly's
11   being part of a process to try to mark a moment early on
12   Tuesday.
13   Q.   Okay.  Now, this five billion dollar differential or
14   approximate five billion dollar differential, you would not
15   describe as a discount, correct?
16   A.   I would not describe it as a discount.  That's correct.
17   Q.   You would describe it as a change in the valuation of the
18   assets, correct?
19   A.   That's correct.
20   Q.   Now you never spoke with anyone at Barclays where this
21   five billion dollar differential was mentioned, correct?
22   A.   No, I did not.
23   Q.   And you never had any discussion with anyone at Barclays
24   about the concept of a discount, correct?
25   A.   No, I did not.
```

**Page 32**

```
 1   Q.   I'd like to now turn to a document that you were given
 2   yesterday by Lehman's counsel, Movants' Exhibit 2.  And that's
 3   in the book that you have up there, I think.  Do you have that
 4   document in front of you?
 5   A.   Yes, I do.
 6   Q.   And this is a document that has a September 16th, 2008
 7   date on it both in handwriting and in printing, correct?
 8   A.   Yes, it does.
 9   Q.   And the time printed is 11:18 a.m.?
10   A.   Yes.  I see that.
11   Q.   And who prepared this document as you understand it?
12   A.   I don't have a specific knowledge of who actually prepared
13   the document.
14   Q.   When did you first see this document?
15   A.   I saw this document as it started to be used as a guidance
16   document at some point in the process between Monday late and
17   Tuesday.
18   Q.   And am I correct that there were different versions of
19   this document or schedule that had different numbers and totals
20   on them as the negotiation process and the market changes
21   continued?
22   A.   Yes.  That would be my recollection.
23   Q.   And there would have been versions of this schedule both
24   before and after September 16th at 11:18 a.m., is that correct?
25   A.   That's correct.
```

**Page 33**

```
 1   Q.   Now, if you look at the numbers here for the assets on
 2   Movants' Exhibit 2 --
 3   A.   Yes.
 4   Q.   -- you would consider, as of the time this was prepared,
 5   to be the book value of those assets as far as Lehman was
 6   concerned, correct?
 7   A.   No.  I've described -- this would -- I would consider
 8   be the book value of the process that we went through with
 9   the different teams.
10   Q.   Can you explain what you mean by that?
11   A.   This would have been the market value after the
12   discussions with the Barclays and Lehman team.
13   Q.   And when you say it's a book value in terms of the
14   process, what do you mean by that?
15           MR. GAFFEY:   Objection, Your Honor.  I believe the
16   witness said market value.
17           THE COURT:   Well, what does the record say the witness
18   said?
19           MR. MAGUIRE:   Your Honor, the question reads at page
20   30 of the transcript starting at line 20:
21   "Q.  Can you explain what you mean by that?
22   "A.  That would have been the market value after the
23   discussions with the Barclays and Lehman team.
24   "Q.  And when you say it's a book value in terms of that
25   process, what do you mean by that?"
```