**Hearing Date and Time: September 22, 2010 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  September 15, 2010 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                        :
In re                                   :    Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    08-13555 (JMP)
                                        :
                    Debtors.            :    (Jointly Administered)
                                        :
                                        :
-----------------------------------------------------------------x
```

**NOTICE OF DEBTORS' MOTION, PURSUANT TO RULE 9019 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE AND SECTION 363 OF THE
BANKRUPTCY CODE, FOR APPROVAL OF (I) A SETTLEMENT AGREEMENT
BETWEEN THE DEBTORS AND AURORA BANK FSB REGARDING THE MASTER
FORWARD AGREEMENT AND OTHER MATTERS AND (II) CERTAIN OTHER
RELATED RELIEF, INCLUDING AUTHORIZATION OF (A) CERTAIN DEBTORS
TO MAKE CAPITAL TRANSFERS, (B) LBHI TO ENTER INTO A CAPITAL
MAINTENANCE AGREEMENT, AND (C) LBHI TO EXTEND THE DURATION
OF THE AMENDED REPURCHASE AGREEMENT AND FINANCING FACILITY**

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases, including Lehman Commercial Paper Inc., Lehman Brothers Special Financing Inc. and

Luxembourg Residential Properties Loan Finance S.a.r.l. (collectively, the "Debtors"), pursuant

to Rule 9019 of the Federal Rules of Bankruptcy Procedure and section 363 of the Bankruptcy

Code, for approval of (i) a settlement agreement between the Debtors and Aurora Bank FSB, and

(ii) certain other related relief, all as more fully described in the Motion, will be held before the

Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy

Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York,

New York 10004 (the "Bankruptcy Court"), on **September 22, 2010 at 10:00 a.m. (Prevailing**

**Eastern Time)** (the "Hearing").

   PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn: Alfredo R. Perez, Esq., Robert L. Messineo, Esq., and Sunny Singh, Esq., attorneys

for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New

York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:

Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq.,

and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan

Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and

Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these

cases; and (v) any person or entity with a particularized interest in the Motion, so as to be so filed

and received by no later than **September 15, 2010 at 4:00 p.m. (prevailing Eastern Time)** (the

"Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: September 1, 2010
       New York, New York

/s/ Alfredo R. Pérez
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

**Hearing Date and Time: September 22, 2010 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: September 15, 2010 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                  :
In re                                             :        **Chapter 11 Case No.**
                                                  :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,      :        **08-13555 (JMP)**
                                                  :
                                    Debtors.      :        **(Jointly Administered)**
                                                  :
                                                  :
------------------------------------------------------------------x

**DEBTORS' MOTION, PURSUANT TO RULE 9019 OF THE FEDERAL**
**RULES OF BANKRUPTCY PROCEDURE AND SECTION 363 OF THE**
**BANKRUPTCY CODE, FOR APPROVAL OF (I) A SETTLEMENT AGREEMENT**
**BETWEEN THE DEBTORS AND AURORA BANK FSB REGARDING THE MASTER**
**FORWARD AGREEMENT AND OTHER MATTERS AND (II) CERTAIN OTHER**
**RELATED RELIEF, INCLUDING AUTHORIZATION OF (A) CERTAIN DEBTORS**
**TO MAKE CAPITAL TRANSFERS, (B) LBHI TO ENTER INTO A CAPITAL**
**MAINTENANCE AGREEMENT, AND (C) LBHI TO EXTEND THE DURATION**
**OF THE AMENDED REPURCHASE AGREEMENT AND FINANCING FACILITY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

              Lehman Brothers Holdings Inc. ("LBHI") and certain of its affiliated debtors in

the above-referenced chapter 11 cases, including Lehman Commercial Paper Inc. ("LCPI"),

Lehman Brothers Special Financing Inc. ("LBSF") and Luxembourg Residential Properties Loan

Finance S.a.r.l. ("Luxco," together with LBHI, LCPI and LBSF, the "Debtors," and collectively

with their affiliated debtors and non-debtor affiliates, "Lehman"), file this Motion and

respectfully represent:

**Preliminary Statement**

1.        On February 4, 2009, in response to the diminished capital level of Aurora Bank FSB ("FSB"), the Office of Thrift Supervision (the "OTS") – the primary regulator for FSB[1] – issued a Prompt Corrective Action directive (the "PCA") imposing serious restrictions on FSB's operations, including limitations on FSB's sources of funding and origination of new loans.  On that same date, FSB's affiliate, Woodlands Commercial Bank ("Woodlands," and together with FSB, the "Banks"), consented to the entry of a cease and desist order issued by the Federal Deposit Insurance Corporation (the "FDIC," together with the OTS, the "Regulators"). The cease and desist order issued with respect to Woodlands similarly imposes substantial restrictions on Woodlands' operations.  Both Banks are indirect wholly-owned non-debtor subsidiaries of LBHI.[2]

2.        As a result of these regulatory actions, LBHI, as the holding company of the Banks, was faced with a choice:  not support the Banks' capital and allow the Banks to fail and litigate with the Regulators over potential claims under section 365(o) of the Bankruptcy Code (defined below) or support the Banks' capital and preserve the opportunity to recover the significant value of the Banks for the benefit of LBHI's creditors.  Pursuant to 12 U.S.C. § 1815(e), a federal banking statute that imposes cross-liability on commonly owned depository institutions, the seizure of one bank potentially creates liability on the other for the first bank's capital deficiency and would likely be followed by the seizure of the other.  Thus, it was

---

[1] In accordance with the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, the OTS will be disbanded and the bank regulatory functions of the OTS will be transferred primarily to the Office of the Comptroller of the Currency.  References herein to the OTS shall encompass the Office of the Comptroller of the Currency for periods subsequent to such transfer of regulatory jurisdiction.

[2] FSB and Woodlands are wholly owned subsidiaries of Lehman Brothers Bancorp Inc. ("Bancorp"), which is a wholly-owned non-debtor subsidiary of LBHI.

necessary for LBHI to consider the fate of both Banks together.[3]  Upon seizure of the Banks and

the related appointment of a receiver, the Banks' assets would likely be subjected to fire sale

liquidations and the opportunity to realize the value that might otherwise be derived from

LBHI's ownership of the Banks would be permanently lost.

3.      After an exhaustive review with its professionals, the Banks' management,

and the Creditors' Committee and its professionals, LBHI made the decision, with the full

support of the Creditors' Committee, to invest in the Banks to preserve the opportunity to realize

their fair value.  LBHI firmly believed (and continues to believe) that the Banks are valuable

assets of its estate and it would be a terrible waste to allow the Banks to fail.  Moreover, the

consequences to LBHI's estate of the successful assertion of a claim under section 365(o) of the

Bankruptcy Code by the Regulators would have been very adverse.  Based on their June 30,

2010 regulatory reports, the values of LBHI's equity interest in FSB and Woodlands were

reported, on a fair value accounting basis, at $677.6 million and $741.6 million, respectively, for

a combined value of $1.42 billion.  Failure to resolve the Banks' capital issues would put this

value at risk.

4.      The collective decision to preserve the value of the Banks was made with

the recognition and understanding that the preservation of the Banks would require a substantial

long-term financial commitment and would depend on LBHI's ability to deal with the Banks'

changing balance sheet and liquidity positions, as well as developments in the general economy

and policy considerations of the Regulators in an environment of unprecedented change in

---

[3] Concurrently with the filing of this Motion, the Debtors have filed a motion seeking approval of a global
settlement agreement with Woodlands that will allow Woodlands to realize on its assets in an orderly
manner over a period of approximately 18 months, after which it is expected that Woodlands would
dispose of its banking license and distribute its remaining assets to LBHI (the "Woodlands Settlement
Motion").  The Woodlands Settlement Motion is incorporated in its entirety by reference herein.

financial regulation.  Accordingly, since February 2009, LBHI has taken a series of actions, each

with the support of the Creditors' Committee, to support the Banks' capital levels, including:

- LBHI's entry into two settlement agreements with Aurora Loan Services LLC ("Aurora"), FSB's wholly-owned loan servicing subsidiary, that relinquished to Aurora approximately $94 million in excess servicing fees owed to LBHI;

- cash capital transfers to FSB of $9.838 million on February 27, 2009, $20.2 million on March 31, 2009, $50 million on June 30, 2009, and $100 million on December 28, 2009 (the last of which will be considered an advance against the cash consideration to be provided by LBHI under the Settlement (defined below));

- the transfer of mortgage servicing rights to FSB and Aurora valued at approximately $177 million (as reduced for a miscalculation of the initial value assigned to the RFC Servicing Rights (defined below))

- assistance in the termination of certain FSB loan commitments totaling $3.71 billion;

- LBHI's entry into the amended master repurchase agreement that made $450 million in financing, secured by eligible mortgage loans, available to FSB;

- LBHI's entry into a bridge financing facility with a wholly owned special purpose subsidiary of Aurora, Aurora Advance Receivables 1 LLC, that made up to $500 million in financing, secured by servicing advances, available to Aurora; and

- a $200 million cash contribution to Woodlands (and an additional $72 million capital commitment that has not been drawn upon).

In addition, on July 31, 2010, LBHI contributed to FSB $24.3 million in servicing rights related

to Federal National Mortgage Association ("Fannie Mae") sponsored loans, which will be

considered an advance of the consideration to be provided by LBHI under the Settlement. All of

these actions by LBHI in support of the Banks have been taken with the expectation that LBHI

would be able to recover its investments and realize over time the fair equity value of the Banks.

5.    Based on extensive negotiations with FSB (overseen on the part of FSB by

a committee of its independent directors) and extensive discussions with the Regulators, LBHI

has negotiated a settlement (the "Settlement") of virtually all issues between Lehman and FSB,

which will result in a substantial recapitalization of FSB and position FSB for a lifting of many

of the regulatory restrictions on its operations.  This will permit FSB to expand its business

operations and to carry out a business plan, to be approved by the OTS, intended to position FSB

so that within a period of approximately 18 months, FSB may be sold as a going concern,

allowing LBHI to realize a return on its equity in FSB.

6.       A key aspect of the Settlement is that it addresses outstanding OTS

concerns and allows for lifting of many of the restrictions under which FSB currently operates.

This change will allow FSB to more efficiently conduct its business operations, originate

mortgage loans and, subject to certain limitations, issue brokered certificates of deposit to re-

fund maturing deposits.  This will allow LBHI to sell FSB as a going concern, which LBHI

believes will provide it with the best opportunity to realize the fair value of its equity interest in

FSB.

7.       In addition, based upon extensive negotiations with Woodlands (overseen

on the part of Woodlands by a committee of its independent directors) and extensive discussions

with the Regulators, LBHI has negotiated a settlement of virtually all open issues between

Lehman and Woodlands, which will result in the infusion of additional capital into Woodlands

and position it for a lifting of substantially all the regulatory restrictions imposed on its

operations.  This will permit Woodlands to realize on its assets in an orderly manner over a

period of approximately 18 months, after which it is expected that Woodlands would dispose of

its banking license and distribute its remaining assets to LBHI.  By separate motion, the Debtors

are seeking approval of the Woodlands settlement.  The settlements are crucial to the path

forward for the Banks.  Unless the settlements are approved, all of LBHI's prior actions to

support the Banks will fall short of their intended goals.

8.       The Settlement addresses a variety of different considerations (operational, financial and regulatory) that are key to FSB's future.  In order to recover the fair value of its equity interest in FSB under the strategies being considered by LBHI and the Creditors' Committee, it was necessary for FSB to obtain approval of the Regulators for a business plan that lifts many of the regulatory restrictions imposed on FSB and allows FSB to conduct normal operations, particularly with respect to the origination of new mortgage loans. As discussions with the Regulators concerning FSB's business plan proceeded over the last several months, it became clear that the approval of the contemplated relief from regulatory restrictions could not be achieved unless (a) FSB's capital position was bolstered and (b) FSB's claims against Lehman, such as FSB's claim asserting a breach of the master forward agreement (the "MFA"), dated January 1, 2008, between LBHI and FSB (the "MFA Claim") were resolved.

9.       After extensive arm's-length negotiations, LBHI and FSB reached the Settlement, as a global settlement of substantially all of their outstanding disputes (other than a handful of contingent claims, which they have agreed to postpone for future resolution based on future developments), including the proofs of claim for $2.1 billion, plus unliquidated amounts, submitted by FSB and the OTS based upon an alleged breach of the MFA by LBHI.  To implement the Settlement, LBHI, LCPI, Luxco, LBSF and certain non-Debtor subsidiaries of LBHI have negotiated a settlement agreement (the "Settlement Agreement")[4] with FSB and

---

[4] The Settlement Agreement is attached hereto as Exhibit A in substantially final form.  The description of the Settlement Agreement contained in this Motion is summary in nature and is qualified in its entirety by the text of the Settlement Agreement.  In the event of any disparity between the description herein and the terms set forth in the Settlement Agreement, the Settlement Agreement (as finalized) shall govern.

Aurora.  The Settlement Agreement will (as further discussed below):

- result in the return by FSB of assets posted as collateral for the MFA (a portfolio of commercial loans owed to Lehman), which FSB values as of June 30, 2010 at $293.7 million;

- provide for the transfer to FSB of $577 million of cash (the "Cash Capital Transfer")[5] plus $409.3 million of other assets[6] (the "Non-Cash Asset Transfers," and, together with the Cash Capital Transfers, the "Capital Transfers");

- resolve substantially all pending intercompany accounts (through March 31, 2010) and various claims arising out of intercompany transactions (some of which are contingent) in consideration of the Capital Transfers plus, in respect of certain claims, an additional cash payment by LBHI to FSB of $14.4 million and of up to additional $10.6 million, the exact amount to be determined, after considering future events relating to contingent claims, by negotiation (such $14.4 million plus the portion of the $10.6 million agreed to in the future, the "Additional Capital Transfer");

---

[5] On December 17, 2009, the Court entered an order [Docket No. 6299] authorizing LBHI to make a cash capital contribution of up to $100 million to FSB to ensure that FSB's capital at December 31, 2009 remained in the "well capitalized" category.  FSB was concerned that its capital would fall below the level required for this categorization because of a miscalculation in the valuation of a portfolio of mortgage servicing rights previously contributed to FSB's capital by LBHI (the "RFC Servicing Rights") and the continued negative effect of fair value accounting on FSB's capital.  Pursuant to that authority, LBHI made a cash capital transfer of $100 million to FSB on December 28, 2009 (the "RFC Contribution").  The RFC Contribution will be treated as an advance against the Capital Transfers contemplated by the Settlement Agreement.  That is, the Cash Capital Transfers will be deemed to have been made in two parts: (i) the RFC Contribution, which has already been made on December 28, 2009; and (ii) the remaining $477 million in cash, which will be transferred after the Settlement Agreement becomes effective.

[6] These assets include mortgage servicing rights valued at approximately $279 million, including private mortgage servicing rights to be valued at not less than $134 million at closing of the Settlement and mortgage servicing rights with government sponsored entities valued at approximately $145 million, the transfer of which requires the approval of the appropriate government sponsored entity.  On July 15, 2010, the Court entered an order [Docket No. 10222] authorizing LBHI, with Fannie Mae approval, to contribute to the capital of FSB certain mortgage servicing rights with respect to Fannie Mae sponsored loans owned by LBHI, which were valued at approximately $24.3 million (the "Fannie Mae HRMSR Contribution").  On July 31, 2010, LBHI made the Fannie Mae HRMSR Contribution.  The Fannie Mae HRMSR Contribution will be treated as an advance against the Non-Cash Asset Transfers contemplated by the Settlement.  That is, the Non-Cash Asset Transfers will be made in two parts: (i) the Fannie Mae HRMSR Contribution, which has already been made on July 31, 2010; and (ii) the remaining Non-Cash Asset Transfers of approximately $385 million, which will be made after the Settlement Agreement becomes effective.

- expunge the MFA Claim and (with minor exceptions) all the other claims filed by FSB and the OTS against LBHI and certain of the other Debtors, including FSB's claim under its Tax Allocation Agreement (defined below) with LBHI, which will be replaced with a New Tax Allocation Agreement (as defined below) to govern certain tax matters between FSB and LBHI on a going-forward basis; and

- provide a release of the Debtors and certain other Lehman entities, as specifically identified in the Settlement Agreement, of any other known claims that have or could have been asserted by FSB and its subsidiaries arising out of events occurring through March 31, 2010 (with certain identified exceptions).

As a result of the Settlement, FSB's capital level is expected to rise substantially, reaching an estimated 20% total risk-based capital ratio. The Settlement is conditioned on the lifting of most of the regulatory restrictions on FSB's operations and FSB obtaining permission to regain access, within certain limitations, to the market for brokered certificates of deposit to fund maturing deposits. Upon completion of the Settlement Agreement, including the related lifting of certain regulatory restrictions and completion of the parallel settlement involving Woodlands, the risk of appointment of a receiver for FSB and the assertion by the Regulators of a claim under section 365(o) of the Bankruptcy Code against LBHI will have been effectively eliminated.

10.    The Settlement Agreement will position FSB to pursue a business plan for the period of 18 months following the implementation of the Settlement (the "Business Plan"), which FSB has submitted to the OTS for approval along with the Settlement Agreement. Among other things, the Business Plan provides for FSB originating and selling mortgage loans and issuing (with certain limitations) new certificates of deposit to fund existing certificates of deposit as they mature. Upon the effectiveness of the Settlement, FSB's total capital is expected to exceed $825 million. At this capital level, FSB is expected to have sufficient resources to be able, even in a worst case scenario, to maintain its capital above the "well-capitalized" level required under applicable regulations. Under its Business Plan, upon receipt of approval from

the OTS and a waiver by the FDIC, FSB is expected to issue brokered certificates of deposit

within approximately 4 weeks of consummation of the Settlement in order to refinance high

interest certificates of deposit currently outstanding.  In addition, subject to the FDIC granting

successive six-month waivers during the 18-month period following the closing of the

Settlement, FSB will issue certificates of deposit to fund the maturity of a significant percentage

of its outstanding certificates of deposit.

        11.      To ensure that the Settlement Agreement and Business Plan are approved

by the Regulators, LBHI has also agreed to enter into a capital maintenance agreement with FSB

(the "Capital Maintenance Agreement").  Pursuant to the Capital Maintenance Agreement, LBHI

will agree for the duration of LBHI's ownership of FSB that, in the event FSB's capital falls

below the 11% Tier-1 capital level or 15% total risk-based capital level, LBHI will promptly

make capital contributions to FSB sufficient to maintain FSB's capital at the 11% or 15% level,

as appropriate.  LBHI has also agreed to extend throughout the period of its ownership of FSB

the duration of the amended master repurchase agreement with FSB (the "Amended Master

Repurchase Agreement") and the financing facility with Aurora (the "Financing Facility"),

which were both approved by the Court on August 5, 2009 [Docket No. 4703], to ensure that

FSB has sufficient sources of liquidity even under a worst case scenario.

        12.      LBHI has agreed that it will seek to sell FSB within 18 months.  If after a

period of 15 months following the implementation of the Settlement, the OTS concludes that it is

unlikely that a sale of FSB will be consummated by the end of the 18 months after

implementation of the Settlement, FSB will prepare and submit to the OTS a plan for dissolution.

The plan shall provide for the purchase by LBHI (to which LBHI will agree in the Capital

Maintenance Agreement) for cash of all non-cash assets of FSB for a purchase price and on

terms and conditions detailed below.

13.     In addition to the portfolios of mortgage loan servicing rights to be

transferred by LBHI to FSB under the Settlement, LBHI also seeks authorization to contribute to

FSB a portfolio of LBHI's servicing rights of approximately 33,000 residential mortgage loans

for which the servicing is provided by third parties pursuant to appointment by LBHI (the

"Ancillary Servicing Rights").  Assuming the Settlement is consummated, in addition to the

transfers contemplated by the Settlement, LBHI is also considering contributing additional

servicing rights that do not have an aggregate value in excess of $25 million to the capital of

FSB, with the view that FSB will appoint Aurora as servicer, which will create benefits for both

FSB and LBHI.

14.     After more than 23 months of significant funds and resources invested,

LBHI has achieved a Settlement respecting FSB that will enable LBHI to begin to take steps to

seek to extract the value of its equity interest and prior investments in FSB.  In fact, after the

Settlement Agreement is consummated, FSB can concentrate on conducting on-going business in

accordance with its Business Plan, and LBHI can devote its full attention to pursuing strategies

for realizing the fair value of FSB for the benefit of LBHI's creditors, including a going concern

sale of FSB.  Without the Capital Transfers and the Capital Maintenance Agreement, the

Regulators would not approve the Settlement Agreement and the lifting of the regulatory

restrictions on FSB, which would leave FSB in an unacceptable position from both LBHI's

perspective and the Regulators' perspective.  LBHI believes that the Capital Transfers represent

an investment that, like its prior investments in FSB, LBHI should be able to recover through the

disposition of FSB.  The Settlement Agreement falls well within the range of reasonableness and

is in the best interests of the Debtors, their estates and creditors.  The Creditors' Committee

supports the relief requested by the Motion.  The Motion should be granted.

## **Background**

15.     Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries, including LCPI

and Luxco, commenced with this Court voluntary cases under chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for

procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to

operate their businesses and manage their properties as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

16.     On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

17.     On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

18.     On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January

20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

The Examiner issued a report of his investigation pursuant to section 1106 of the Bankruptcy

Code on March 11, 2010 [Docket No. 7531].

19.    On April 14, 2010, the Debtors filed a revised joint chapter 11 plan

("Plan") and disclosure statement (the "Disclosure Statement") [Docket Nos. 8330 and 8332].

### Jurisdiction

20.    This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Relief Requested

21.    Pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy

Code, the Motion seeks:

- approval of the Settlement Agreement, which is attached hereto as Exhibit A in substantially final form, between the Debtors, certain non-Debtor subsidiaries of LBHI, FSB and Aurora (collectively, the "Parties"), and authorization for the Debtors to perform their obligations thereunder;

- authorization, but not direction, for the Debtors to make the Capital Transfers and the Additional Capital Transfer, free and clear of any claims or interests therein, pursuant to the Settlement Agreement;

- authorization, but not direction, for LBHI to enter into the Capital Maintenance Agreement, which is attached hereto as Exhibit B in substantially final form;[7]

- authorization, but not direction, for LBHI to enter into the New Tax Allocation Agreement (as defined below), which is attached hereto as Exhibit C in substantially final form;

- authorization, but not direction, for LBHI to extend the terms of the Amended Repurchase Agreement and the Financing Facility for the duration of LBHI's ownership of FSB and Aurora; and

- authorization, but not direction, for LBHI to contribute the Ancillary Servicing Rights to the capital of FSB.

---

[7] The description of the Capital Maintenance Agreement contained in this Motion is summary in nature and is qualified in its entirety by the text of the Capital Maintenance Agreement.  In the event of any disparity between the description herein and the terms set forth in the Capital Maintenance Agreement, the Capital Maintenance Agreement shall govern.

To ensure that the implementation of the Business Plan and LBHI's strategy for FSB are not

delayed, LBHI requests that the Court waive the requirements of Bankruptcy Rule 6004(h) and

direct that the order granting the relief requested herein be effective immediately.[8]

## The Restrictions on FSB's Operations

22.    In response to the diminished capital level reported in FSB's December

31, 2008 Thrift Financial Report (the "TFR"), on February 4, 2009, the OTS issued the PCA

requiring FSB to (i) achieve the "adequate" capital levels required under the applicable

regulations by February 28, 2009 and (ii) to demonstrate how it would thereafter maintain those

levels, including by virtue of the support from its parent company, LBHI, which would be

available for this purpose.  The PCA directive imposes serious restrictions on FSB's operations,

including, most significantly, limitations on its sources of funding and restrictions on originating

new commercial loans or conducting new business without the approval of the OTS.  While

FSB's capital ratios exceeded the regulatory definition of "well-capitalized" as of March 31,

2009, June 30, 2009, December 31, 2009, March 31, 2010 and June 30, 2010 and was above the

"adequately capitalized" level at September 30, 2009, the PCA directive and the C&D Order

have remained in effect, pending termination by the OTS.  The capital maintenance restrictions

in the PCA and the Consent Order to Cease and Desist (the "C&D Order"), dated January 26,

2009 issued by the OTS, cause FSB to be considered only "adequately capitalized" for purposes

---

[8] To engage in the contemplated transactions, approval by the OTS of the Settlement Agreement, the Business Plan, the Capital Maintenance Agreement and the New Tax Allocation Agreement is required. FSB submitted an application for such approval on December 23, 2009, and a related application to the FDIC for approval to issue certificates of deposit on April 13, 2010.  Representatives of FSB have been in active communication with the Regulators regarding the requisite regulatory approvals for the Settlement. Based upon these communications, at the present time, LBHI and the Bank have no reason to believe that the requisite regulatory approvals will not be forthcoming.  Upon consummation of the Settlement Agreement, the regulatory restrictions on FSB will be modified as described in this Motion.  Subject to approval by the Bankruptcy Court, LBHI and the other relevant Debtors intend to consummate the transactions contemplated by the Settlement Agreement, including making the Capital Transfers, as soon as practicable after receipt of the requisite regulatory approvals.

of 12 C.F.R. § 337.6 until such restrictions are lifted by the OTS, and, therefore, FSB currently

continues to be prohibited from issuing brokered certificates of deposit absent an FDIC waiver.

## The Value of FSB

23.    LBHI believes that, if FSB can resume originating new mortgage loans

and re-fund its existing maturing deposits and exercise the callable feature of existing deposits

through the issuance of new deposits (as contemplated by the Business Plan), FSB can operate as

a profitable going concern, the value of which can inure to the benefit of LBHI, particularly

through a sale of FSB within the next 18 months.  In contrast, if FSB remains under the current

restrictions on its operations, it will likely be forced to liquidate its assets over a relatively short

term and, even worse, there is a risk that FSB will be seized and undergo a "fire sale"

liquidation, which could well wipe out LBHI's equity interest in FSB and result in a capital

deficiency that could give rise to a claim against LBHI that might have priority under sections

365(o) and 507(a)(9) of the Bankruptcy Code (or at least engender costly litigation).

24.    As of June 30, 2010, LBHI's equity interest in FSB was valued at

approximately $677.6 million, reflecting total assets of approximately $4.679 billion and total

liabilities of approximately $4.001 billion, including $3.463 billion of deposit liabilities, and a

total risk-based capital ratio of 18.60%.  FSB owns a substantial loan portfolio, which consists of

a variety of loans, principally residential and commercial mortgage loans, with an unpaid

principal balance of approximately $2.092 billion and marked value of $971.1 million at June 30,

2010.  FSB in the course of the past year has sold a substantial portion of its portfolios of small

business loans and student loans.  Between December 31, 2008 and June 30, 2010, FSB's deposit

base has been reduced by approximately $2 billion.  FSB also owns Aurora, which had

approximately 1,600 employees as of June 30, 2010 and was one of the largest mortgage

servicing companies in the nation.  As of June 30, 2010, Aurora serviced approximately $86.7

billion in principal balance of home mortgage loans, owned approximately $131.3 million in

mortgage servicing rights (at fair value) and owned $1.641 billion in servicing advances.

Finally, at June 30, 2010 FSB also held approximately $834.4 million in cash and cash

equivalents.

### The MFA Claim

25.    LBHI and FSB are parties to a Master Forward Agreement, dated January

1, 2008, pursuant to which LBHI agreed that FSB may require LBHI to purchase (subject to

certain exceptions) FSB's loans at FSB's cost.  The MFA is supplemented by a Master Netting

Agreement, dated January 1, 2008, between FSB and LBHI that permits FSB, upon LBHI's

filing for bankruptcy, to terminate, close out and set-off amounts owed by FSB to LBHI against

amounts owed to FSB by LBHI under the MFA.  On September 14, 2008, FSB gave notice that

it was exercising its rights under the MFA to require LBHI to purchase all of FSB's loans.  Since

the Commencement Date, LBHI has not performed under the MFA.  FSB has not terminated the

MFA.  In December 2008, FSB filed the MFA Claim for breach of the MFA against LBHI in the

amount of $2.192 billion as of November 30, 2008 plus unliquidated amounts.  The MFA Claim

also asserts, pursuant to sections 555, 556 and 560 of the Bankruptcy Code, that the MFA is a

safe harbored contract and is entitled to "safe harbor" protections under the Bankruptcy Code.

LBHI believes that it has defenses to the MFA Claim.

26.    LBHI's obligations under the MFA are partially secured by residential

mortgage loan servicing rights ("MSRs") owned by LBHI, including certain servicing rights

related to loans sold to Fannie Mae or other government sponsored entities (the "GSEs"), all of

which are serviced by Aurora (in the case of the loans sold to GSEs as sub-servicer pursuant to

appointment by LBHI).  In addition, on August 1, 2008, LCPI and Luxco entered into a joinder

agreement to the MFA.  Pursuant to the joinder agreement, LCPI pledged to FSB its interest in a

$201 million commercial term loan, and Luxco pledged to FSB its interest in a $300 million

commercial term loan, all to support LBHI's obligations under the MFA (collectively, the <u>MFA</u>

<u>Joinder Collateral</u>").

      27.    In February 2009, the OTS gave notice to FSB and LBHI that it may

commence an administrative proceeding (the "<u>Administrative Proceeding</u>") against LBHI and

FSB for an alleged violation of section 23A of the Federal Reserve Act, contending that LBHI's

failure to make payments of amounts owed under the MFA constitutes an unauthorized extension

of credit by FSB to an affiliate.  In September 2009, the OTS filed a proof of claim (proof of

claim number 15079) against LBHI for regulatory violations that it would assert in the

Administrative Proceeding in the amount of $2,192,000,000, plus unliquidated amounts, which is

the same amount asserted by FSB in the MFA Claim.  In September 2009, the OTS asserted a

priority claim under sections 365(o) and 507(a)(9) of the Bankruptcy Code alleging that the

MFA constituted a commitment by LBHI to maintain FSB's capital (proof of claim number

15078, together with claim number 15079, the "<u>OTS Claims</u>").

      28.    As of June 30, 2010, FSB valued the components of the MFA Claim as

follows: (i) $235.3 million on account of the MSRs ($71.1 million for the GSE-related MSRs

and $164.2 million for private MSRs); (ii) $293.7 million on account of the MFA Joinder

Collateral; and (iii) $237.3 million on account of the unsecured portion of the MFA Claim

(determined after offsetting certain intercompany payables to LBHI).

## The Settlement Agreement

      29.    To preserve and to be able to pursue its opportunity to realize the fair

value of FSB, LBHI had to consider and ensure that a settlement of the MFA Claim would, first,

not reduce FSB's capital level and, second, put FSB in a position where, from the perspective of

capital resources and regulatory restrictions, it would be able to originate new loans, fund its

operations by accessing (within certain limits) the market for brokered certificates of deposit and

otherwise resume normal business operations.  To achieve this, in addition to the resolution of

the MFA Claim, various other claims that FSB and Aurora asserted against LBHI (the "Other

Claims") also had to be resolved, including claims arising out of a Tax Allocation Agreement

discussed below and claims arising out of various transactions and relationships among FSB,

Aurora and LBHI or other Lehman companies arising before and after the Commencement Date

(including proofs of claim numbers 27299 and 29456).  After considering the alternatives, LBHI

determined in its business judgment that making the Capital Transfers and entering into the

Capital Maintenance Agreement are appropriate in order to resolve the MFA Claim and the

Other Claims and to obtain the approval of the Business Plan by the OTS (including the lifting of

the PCA) in that such actions will materially enhance LBHI's ability to realize the fair value of

LBHI's equity ownership of FSB for the benefit of LBHI's creditors.

       30.     In addition, LBHI and FSB have agreed with the OTS in the Capital

Maintenance Agreement that FSB will be sold within the period of eighteen (18) months after

the Effective Date (as defined below) of the Settlement.  If at any time after the fifteenth (15th)

month after the Effective Date the OTS concludes that it is not likely that a sale of FSB will be

consummated by the end of the 18-month sale period, FSB will submit to the OTS a plan for the

liquidation of FSB.  The plan, which will be subject to OTS approval, shall include the purchase

by LBHI (to which LBHI commits under the Capital Maintenance Agreement) of all the non-

cash assets of  FSB, the payoff of all of FSB's deposit liabilities and the disposal of FSB's bank

charter.  The purchase shall occur not later than five business days after the expiration of the 18-

month period, subject to extension in OTS's discretion under certain conditions.  The price

payable by LBHI for FSB's non-cash assets shall be the greater of: (i) the book value (based on

fair value accounting) of the assets to be purchased, and (ii) the difference between 111% of the

book value of FSB's liabilities (based on marked-to-market accounting) and FSB's cash assets.

31.     The Settlement Agreement contemplates a resolution of all material

disputes between LBHI and FSB, and is conditioned on, among other things, an acknowledgment

by the OTS that the OTS will <u>not</u> pursue the Administrative Proceeding or any other proceeding

making like allegations against LBHI or Bancorp, and will withdraw, or consent to the

expungement of, the OTS Claims.  The effectiveness of the Settlement Agreement is conditioned

upon (i) a final order of this Court approving the Settlement, (ii) approval of the Settlement by

the OTS, (iii) approval of the FDIC of the Request for Limited Waiver dated December 24, 2009

and amended on April 13, 2010 submitted by FSB, which will allow FSB to implement its

approved Business Plan and issue within limits new certificates of deposit to replace certain of

its existing certificates of deposit, (iv) the termination of the PCA; and (v) the issuance of a

mutually acceptable Modified Consent Order to Cease and Desist with respect to FSB that does

not: (1) restrict FSB's lending, investment and servicing activities and operations as long as such

activities and operations are undertaken in conformance with the OTS-approved Business Plan,

or (2) preclude or prevent FSB from accepting, renewing or rolling over or otherwise issuing

brokered certificates of deposit as long as such deposit activities are undertaken in conformance

with an OTS-approved business plan and the waiver obtained from the FDIC.  The date on which

the last of these conditions is satisfied is referred to herein as the "<u>Effective Date</u>."  On a

business day within five business days after the Effective Date, the Settlement will be

implemented by the Capital Transfers and the delivery by the Parties of mutual releases (the day

such actions take place, the "<u>Closing Date</u>").

32.    The salient terms of the Settlement Agreement are as follows:

- **Cash Capital Transfers.**  LBHI shall transfer to FSB $477 million in cash ($577 million less the $100 million RFC Contribution).[9]

- **Satisfaction of Security Interest in the MFA Joinder Collateral.**  In connection with the Capital Transfers, FSB will release its security interest in the MFA Joinder Collateral, which will be returned to LCPI and Luxco, respectively, free and clear of claims or interests of FSB.

- **Transfer of Non-Cash Assets.**  The following Non-Cash Asset Transfers shall be delivered to FSB:

  ➢ A portfolio of private MSRs (representing substantially all the private MSRs owned by LBHI for which Aurora acts as servicer), most of which are currently pledged to Aurora to secure LBHI's MFA obligations.  These MSRs were independently valued at September 30, 2009 at approximately $134 million, and will be independently valued as of the last business day of the month prior to the Closing Date (the "Valuation Date").  To the extent the independent valuation as of the Valuation Date of these MSRs is less than $134 million, LBHI shall transfer the difference to FSB in cash;

  ➢ All MSRs with GSEs currently owned by LBHI if the loans subject to such MSRs are currently being serviced by Aurora (as master servicer, servicer or sub-servicer), plus the MSRs with respect to Fannie Mae sponsored mortgage loans which were transferred to Aurora on July 31, 2010.  All of these MSRs were independently valued at October 31, 2009 at approximately $145 million.  This transfer is subject to the approval of the pertinent GSE.  To the extent the transfer is not permitted, LBHI will contractually agree to permit the income from the servicing to be retained by Aurora to the extent that Aurora continues to provide the servicing;

  ➢ LBHI's interest in a promissory note from Sonic Corp. in the commitment amount of $100 million with a fair value as of September 30, 2009 estimated by LBHI at $82 million.  This note will be independently valued as of the Valuation Date and, to the extent the fair valuation as of the Valuation Date is less than $82 million, LBHI will transfer to FSB the difference in cash;

  ➢ A portfolio of residential mortgage loans (constituting most of the residential mortgage loans owned by LBHI) with a market value estimated by LBHI as of September 30, 2009 of at least $46 million.  Any of such mortgage loans, in order

---

[9] As discussed below, LBHI shall make additional transfers of cash to FSB to the extent certain Non-Cash Asset Transfers are determined by an independent valuation to have a value as of the Effective Date less than specified amounts that LBHI in connection with the negotiation of the Settlement assured FSB it would receive.

to be transferred to FSB, are to be less than 30 days delinquent as of the Valuation Date.  Such loans will be independently valued as of the Valuation Date and, to the extent the independent valuation of the transferred loans is less than $46 million, LBHI will transfer to FSB the difference in cash; and

➢  Land owned by LBHI that is adjacent to Aurora's offices in Littleton, Colorado with a market value estimated by LBHI of at least $2.3 million.

- ▪ Tax Claim.  As described more fully below, under the Settlement Agreement, all tax accounts arising under the Tax Allocation Agreement (defined below) or otherwise (the "Tax Claim") between FSB and LBHI through December 31, 2009 will be settled.  A New Tax Allocation Agreement will be entered into to govern tax matters between LBHI and FSB.

- ▪ Settlement of Other Claims.  Except as set forth in the Settlement Agreement, all claims for which FSB or its subsidiaries filed proofs of claim against LBHI or any other Debtors will be immediately settled or settled after further discussion and agreement of the parties.  All accounts receivable which FSB or any of its subsidiaries have established against any Lehman entities (exclusive of FSB and its subsidiaries), and all accounts receivable which any Lehman entities (other than FSB and its subsidiaries) have established against FSB and its subsidiaries arising through March 31, 2009 will be settled, except in each case for accounts or claims by or against BNC Mortgage LLC (a Debtor that is a wholly owned subsidiary of FSB).  These accounts receivable have arisen out of various intercompany arrangements and operations occurring before and after the Commencement Date.  With respect to these intercompany accounts,[10] it was agreed to setoff the accounts, leaving $49.3 million owed by FSB to LBHI.  With respect to four proofs of claim asserted by FSB against LBHI[11] and one proof of claim asserted by FSB against LBSF,[12] it was agreed that $63.7 million was owed to FSB and it was further agreed that the $49.3 million intercompany account owed by FSB to LBHI would be set off against this amount, leaving $14.4 million owed by LBHI, which would be paid in cash on the Closing Date as part of the Additional Capital Transfer.[13]  With respect to certain of the

---

[10]  These are the Aurora Payables and LBHI Payables, as defined in the Settlement Agreement.

[11]  These are the (two) Settled Litigation Claims, the Settled Former LBHI Employee Claim and the portion of the Ginnie Mae Claim arising before the Commencement Date, all as defined in the Settlement Agreement.

[12]  This is referred to in the Settlement Agreement as the LBSF Claim.

[13]  The cash payment is attributable to the claims being settled other than the LBSF Claim.  The LBSF Claim is being settled for $48.4 million.  In connection with the Settlement, as between LBSF and LBHI, LBHI assigned to LBSF a like amount of the net intercompany account owed to it by FSB so that LBSF could set off such account against its settled claim amount.  LBSF will compensate LBHI for the assignment as described below.

claims which are contingent in nature,[14] FSB and LBHI have agreed to negotiate in good faith a settlement of such claims depending on the outcome of the contingency, with the further agreement that the aggregate liability which LBHI will have on all such claims is limited to $10.6 million, which amount if payable would constitute the balance of the Additional Capital Transfer.  It was agreed that, given the nature of the claims, two claims filed by FSB against LBHI would not be settled and each party reserves its right with respect to such claims.[15]

- <u>Other Matters Addressed by the Settlement Agreement</u>.  The Settlement Agreement also reflects the Parties' agreement on the relative priority of their several accounts receivable against 745 Special Assets LLC, a wholly owned subsidiary of LBHI, with LBHI agreeing to subordinate its recovery on its accounts to FSB first recovering on its accounts in the aggregate amount in which the accounts were carried by FSB on its books on March 31, 2010 after adjustments and reserves.

- <u>Mutual Releases</u>.  The Debtors and FSB on the Closing Date will exchange mutual releases of all claims between them and their affiliates, including a release by FSB of its claims against the Debtors with respect to the MFA (including FSB's security interest in the MFA Joinder Collateral and the above-referenced MSRs and all proofs of claims asserted against the Debtors with respect thereto (the "<u>Collateral Claims</u>")), any claims relating to the valuation of the RFC Servicing Rights, the Tax Claim and the Other Claims; *provided, however,* that the following claims of FSB will not be released and the parties reserve all of their rights with respect to them:  (i) the MetLife Claim; (ii) the Ginnie Mae Claim other than the portion accrued before the Commencement Date;[16] and (iii) any claims or obligations not recorded on FSB or Aurora's balance sheet as of March 31, 2010 and are not otherwise known to FSB or Aurora as of the date of the Settlement Agreement.  Similarly, LBHI's release will not apply to any claims or obligations not recorded on LBHI's balance sheet as of March 31, 2010 and are not otherwise known to Lehman as of the date of the Settlement Agreement.

---

[14]  These are the Pending Litigation Claims, the Indemnification Claims, the Former LBHI Employees Claim (other than in respect of the Settled Former LBHI Employee Claim), the Professional Fee Claim and the Mortgage Insurance Claim, all as defined in the Settlement Agreement.

[15]  These are the MetLife Claim, as defined in the Settlement Agreement (a contingent claim), and the portion of the Ginnie Mae Claim, as defined in the Settlement Agreement, concerning advances made after the Commencement Date.

[16]  The Ginnie Mae Claim is defined in the Settlement Agreement.  The Ginnie Mae Claim arises out of a series of business transactions between LBHI, FSB and third parties which occurred in part before and have continued after the Commencement Date and are expected to continue; accordingly, it is a partially contingent claim.  In the Settlement Agreement, LBHI and FSB have agreed to a payment to settle the Ginnie Mae Claim to the extent it arose before the Commencement Date and to negotiate in good faith new arrangements to replace the business arrangements that have given rise to the transactions occurring or that may occur after the Commencement Date.

- **Expungement of Proof of Claims.** Upon the effectiveness of the Settlement Agreement, including the making of the Capital Transfers and the execution of the Capital Maintenance Agreement by LBHI and Bancorp, the MFA Claim, the OTS Claims, the Tax Claim, the Collateral Claims and the Other Claims shall be deemed satisfied, released and may be expunged from the claims register upon notice to the claims agent by the Debtors.

### Extension of the Duration of the Amended
### Repurchase Agreement and the Financing Facility

33.      By order, dated August 5, 2009 [Docket No. 4703], the Court approved LBHI's entry into the Amended Master Repurchase Agreement with FSB and the Financing Facility with Aurora.[17]   Generally, the Amended Repurchase Agreement provides that, upon request of FSB, LBHI will purchase a portfolio of FSB's eligible residential mortgage loans for a purchase price of 75% of the value of the loans in exchange for FSB's agreement to repurchase those loans within four business days for the purchase price paid by LBHI plus interest at a per annum rate equal to LIBOR plus 6% on a 360-day year basis for the actual number of days between the purchase date and the repurchase date.   The aggregate outstanding purchase price may not exceed $450 million.   LBHI's advances are protected by a first priority lien on the purchased loans.

34.      Pursuant to the Financing Facility, LBHI provides access to temporary financing to Aurora, through Aurora's wholly owned special purpose entity Aurora Advance Receivables 1 LLC ("AAR1"), by issuing a revolving loan facility to Aurora in exchange for interest at LIBOR plus 5% and a first priority perfected security interest held by LBHI in Aurora's advance receivables that are sold to AAR1.   The collateral value of these advances is defined in the agreement and Aurora, through AAR1, can borrow against that value up to a

---

[17] On March 13, 2009, the Court authorized LBHI to enter into a Master Repurchase Agreement with FSB [Docket No. 3074].   The maximum purchase price under the Master Repurchase Agreement was $325 million.   The Amended Repurchase Agreement is on substantially the same terms as the Master Repurchase Agreement and includes a maximum purchase price of $450 million.

maximum loan balance of $500 million.  In addition to the first priority security interest, the

Financing Facility requires a $10 million reserve account that further safeguards LBHI's

investment.

35.    The Amended Repurchase Agreement is set to expire on December 31,

2011, but can be extended by mutual agreement of the parties.  The Financing Facility is set to

expire September 30, 2010.  As a condition to approval of the Settlement Agreement, the OTS

has required that the duration of the Amended Repurchase Agreement and the Financing Facility

be extended through the period during which LBHI owns and controls FSB.  The other terms of

both agreements, in particular those protecting LBHI's position as lender, will remain unaltered.

As of June 30, 2010, no balances were outstanding under the Amended Repurchase Agreement.

As of June 30, 2010, a balance of $87.8 million remained outstanding on the initial draw of $251

million under the Financing Facility.  FSB and Aurora, through AAR1, have made in a timely

manner all payments of interest and principal due on these facilities.  FSB's business plans for

the next eighteen months contemplates the repayment of the remaining balance of the Financing

Facility and no further use of either facility.  The continued availability of the financing provided

by the Amended Repurchase Agreement and the Financing Facility is intended to serve as a

financing source of last resort in case FSB needs access to additional liquidity beyond what

would normally be available to it, which is not expected.

### The Tax Allocation Agreement

36.    LBHI and FSB are parties to a tax allocation agreement, dated January 1,

2004 (the "Tax Allocation Agreement"), obligations under which are also being resolved by the

Settlement Agreement.  FSB is part of a consolidated federal income tax group with LBHI and

also is part of a combined group for certain state and local income tax purposes.  In general,

under the Tax Allocation Agreement, prior to the Commencement Date, FSB would make

payments to LBHI as if FSB were a separate taxpayer and LBHI would make payments to FSB to compensate it for losses or credits FSB could have used if it were a separate taxpayer.

37.    Under recent tax legislation, if FSB were a separate taxpayer, it would be permitted to carry back unused federal income tax losses for either the 2008 or 2009 tax years (but not both) for five years (increased from the previously allowed two years). FSB has approximately $889 million of federal income tax losses in 2008 and is expected to have more than $269 million of losses for 2009. For all relevant prior years, FSB had taxable income and could carry back its 2008 or 2009 losses to those years and obtain a substantial tax refund, which could amount to $400 million. Under the Tax Allocation Agreement, FSB would generally be entitled to payment from LBHI for the amount of the tax refund and FSB has asserted such amounts through a proof of claim number 27299, dated September 22, 2009 (the Tax Claim). FSB argues that such claim should receive administrative treatment. LBHI contends that any amounts that may be due to FSB under the Tax Allocation Agreement are prepetition general unsecured claims.

38.    Pursuant to the Settlement Agreement, the Parties have agreed on the amount of all accounts owed under the Tax Allocation Agreement arising for years prior to 2010. They have further agreed to (i) the offset of certain of these accounts owed to LBHI by FSB against certain of theses accounts owed to FSB by LBHI, and (ii) for the cash settlement of the remaining accounts, as well as any other possible claims of FSB against LBHI under the Tax Allocation Agreement or otherwise relating to taxes for any period prior to January 1, 2010, in consideration of the payment by LBHI to FSB of $218.9 million (which is part of, and not in addition to, the Cash Capital Transfer). The Tax Allocation Agreement will be cancelled upon effectiveness of the Settlement Agreement. With respect to FSB's inclusion in consolidated and

combined returns with LBHI for 2010 and any future years, LBHI and FSB have negotiated and

will enter into a new tax allocation agreement (the "New Tax Allocation Agreement") on

substantially the same terms as the Tax Allocation Agreement.

### Participation in the Settlement by Other Debtors

39.    In addition to LBHI, LCPI, Luxco and LBSF will participate in the

Settlement and make certain payments on account of claims filed against their estates by FSB as

explained below.  A key part of the Settlement is the compromise of the MFA Claim, relieving

LBHI of the possibility of an allowed priority claim under sections 365(o) and 507(a)(9) of the

Bankruptcy Code, without which the other parts of the Settlement would not be feasible.

Another important aspect of the Settlement is that it positions LBHI to recover on its investments

and equity in FSB through a sale of FSB, a benefit that will not flow to LCPI, Luxco or LBSF.

Accordingly, LBHI (i) has considered what each of LCPI, Luxco and LBSF will gain in the

Settlement, (ii) will fully compensate each of them for what it will give up in the Settlement, and

(iii) has determined that it is appropriate for LBHI to enter into an additional arrangement with

LCPI, Luxco and LBSF, severally, in connection with the Settlement.

40.    LCPI and Luxco are parties to the Settlement because they each pledged

their respective ownership interests in commercial term loans (i.e., the MFA Joinder Collateral)

to secure LBHI's obligations under the MFA.  In the Settlement, LCPI and Luxco will be

relieved of FSB's claim against them under the MFA and FSB's security interest against these

loans will be released.  The Settlement contemplates that, in exchange, FSB will receive as part

of the Capital Transfer assets sufficient to realize its carrying value for these loans, which is

determined on a "marked-to-market" basis.  LCPI and Luxco will each give up their ability to

defend against FSB's claim on the MFA, including any arguments that each of the pledges of the

loans constituted a preference or a fraudulent conveyance.

41.    LBHI concluded that, for LCPI and Luxco to pay the fair value of the loans and to receive in return only a release, would not fairly compensate LCPI or Luxco.  To ensure that the Settlement is appropriately beneficial to LCPI and Luxco, LBHI has separately agreed with LCPI and Luxco that LCPI and Luxco will not be responsible for funding the portion of the Capital Transfer representing the fair value of their respective portion of the MFA Joinder Collateral and, instead, will each fund 90% of such amount and LBHI will fund the balance of such portion of the Capital Transfer.  LBHI and LCPI or Luxco will agree on the value of the underlying loans on the Closing Date.  Thus, LCPI and Luxco will both further benefit from the Settlement by attaining unencumbered ownership of their respective interests in the loans at 90% of their fair value.  Because Luxco does not have available funds to cover the portion of the Cash Capital Transfer that it is to fund, LBHI will lend the funds to Luxco.  This loan will be non-recourse, will accrue interest at the rate equal to the return Luxco receives on its cash assets, such interest to be payable only at maturity, will mature upon confirmation of a chapter 11 plan for Luxco and will be secured by the underlying loan (the part of the MFA Joinder Collateral to be released to Luxco in the Settlement).

42.    LBSF is a party to the Settlement because of a claim FSB has filed against it arising out of the termination of certain swap contracts LBSF entered into with FSB.  LBHI guaranteed LBSF's obligations under such arrangements.  LBSF, LBHI and FSB have negotiated a compromise of the claim in the amount of $48.4 million payable by offset of an account payable in the same amount originally owed by FSB to LBHI and to be assigned in connection with the Settlement by LBHI to LBSF.  In the Settlement, LBSF will be relieved of all liability on the claim filed against it by FSB.

43.    LBHI and LBSF have agreed that LBSF shall pay LBHI in cash for the

$48.4 million account receivable being used by LBSF to satisfy the settled claim to the extent of

the portion of the $48.4 million that it would have paid to FSB on its claim pursuant to the terms

of a confirmed chapter 11 plan for LBSF in respect of the $48.4 million if such amount was the

allowed amount of FSB's claim against LBSF.  The balance of the settlement cost shall be borne

by LBHI in respect of its guarantee of this claim and the benefits it will enjoy, as the owner of

FSB's equity, from the Settlement.  To compensate LBHI for the timing difference between the

consummation of the Settlement and the consummation of a chapter 11 plan for LBSF, LBSF

will pay LBHI, once the cost allocation is complete, interest on the amount LBSF reimburses

LBHI at the rate LBSF earned on its cash funds during the period.

### The Settlement Agreement is Reasonable and in the
### Best Interests of the Debtors and their Estates and Creditors

44.    The Settlement Agreement and each of the transactions contemplated

thereby should be approved.  Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the

[debtor-in-possession] and after notice and a hearing, the court may approve a compromise or

settlement." Fed. R. Bankr. P. 9019(a).  This rule empowers bankruptcy courts to approve

settlements "if they are in the best interests of the estate."  *Vaughn v. Drexel Burnham Lambert

Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)* 134 B.R. 499, 505 (Bankr. S.D.N.Y.

1991).  A decision to accept or reject a compromise or settlement is within the sound discretion

of the Court.  *Id.*  The settlement need not result in the best possible outcome for the debtor, but

must not "fall beneath the lowest point in the range of reasonableness."  *Id.*

45.    Bankruptcy courts have applied the following factors in determining

whether a settlement should be approved:  (i) the probability of success in litigation, with due

consideration for the uncertainty in fact and law; (ii) the complexity and likely duration of the

litigation and any attendant expense, inconvenience, and delay; (iii) the proportion of creditors

who do not object to, or who affirmatively support, the proposed settlement; and (iv) the extent

to which the settlement is truly the product of arm's-length bargaining and not the product of

fraud or collusion. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson,* 390 U.S. 414, 424 (1968) ("There can be no informed and independent judgment as to

whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised

himself of all facts necessary for an intelligent and objective opinion of the probabilities of

ultimate success should the claim be litigated.")*; In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804

(Bankr. S.D.N.Y. 1998); *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994).

46.     While a court must "evaluate … all … factors relevant to a fair and full

assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court

need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699

F.2d at 608, or conduct a full independent investigation. *In re Drexel Burnham Lambert Group,

Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991). "[T]he bankruptcy judge does not have to

decide the numerous questions of law and fact… . The court need only canvass the settlement to

determine whether it is within the accepted range of reasonableness." *Nellis v. Shugrue*, 165

B.R. 115, 123 (S.D.N.Y. 1994) (internal citations omitted).

47.     The court may give weight to the informed judgment of the debtor that a

compromise is fair and equitable. *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522

(S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. at 802 ("Significantly, that test

does not contemplate that I substitute my judgment for the Trustee's, but only that I test his

choice for reasonableness…. If the Trustee chooses one of two reasonable choices, I must

approve that choice, even if, all things being equal, I would have selected the other.").

48.    The Settlement Agreement satisfies the standard for approval.  LBHI has invested a substantial amount of time, money, and effort in achieving a global resolution of its issues with FSB while positioning FSB to be able to carry out its Business Plan so that LBHI can extract the value of its equity interest and prior investments in FSB.  If the Settlement Agreement is not approved, all of LBHI's prior actions to preserve the value of FSB may prove futile and LBHI's ability to recover the fair value of both FSB and Woodlands for the benefit of creditors could be permanently lost.  Absent a resolution of the MFA Claim, FSB cannot resume normal business operations, including issuing new certificates of deposit, and will continue to remain subject to the risk of further regulatory action, including the possible seizure of FSB and appointment of a receiver.

49.    Allowing a failure of FSB and appointment of a receiver would not only deprive LBHI of a valuable asset, but it could also potentially expose the Debtors to guarantee claims and significant claims under section 365(o) of the Bankruptcy Code that would precipitate significant litigation and attendant costs.  Pursuant to section 365(o) of the Bankruptcy Code, if (a) there is a commitment by a debtor to maintain the capital of an insured depository institution and (b) there is a deficiency in capital, the debtor may be compelled to treat the claim as a priority claim under section 507(a)(9) of the Bankruptcy Code.  *See* 11 U.S.C. § 365(o); *Resolution Trust Corp. v. Firstcorp Inc. (In re Firstcorp Inc.*), 973 F.2d 243 (4th Cir. 1992). Although LBHI believes it has valid defenses to the section 365(o) claim asserted by the OTS, there is very limited authority as to the potential issues.  The results of litigation are never certain.  If the Regulators successfully prosecute the section 365(o) claim, it will have to be paid in full ahead of all allowed general unsecured claims against LBHI.

50.    The appointment of a receiver for FSB might also cause LBHI to lose the value of its equity and its prior investments in Woodlands pursuant to a cross-liability statute. *See* 12 U.S.C. § 1815(e)(1)(A) ("Any insured depository institution shall be liable for any loss incurred by the [FDIC]…in connection with – (i) the default of a commonly controlled insured depository institution; or (ii) any assistance provided by the [FDIC] to any commonly controlled depository institution in danger of default."). If FSB is allowed to fail, there is a possibility that deficiencies incurred by the FDIC with respect to FSB will be imposed onto Woodlands, which would thereby jeopardize Woodlands' capital levels and generate the risk of a receivership of Woodlands. The value of LBHI's equity interest in Woodlands was most recently reported at $741.6 million per the June 30, 2010 Call Report filed by Woodlands. In sum, the appointment of a receiver and failure of the Banks could cause LBHI to suffer between $1.2 billion (reasonable best case) and $3.6 billion (reasonable worst case) in losses.[18] The potential harm to all general unsecured creditors is obvious.

51.    Accordingly, although the Debtors are transferring substantial assets to resolve substantially all the claims asserted by FSB, Aurora and the OTS, including the MFA Claim and the OTS Claims, the Settlement Agreement is less costly than the loss LBHI would likely sustain if the Regulators take over both FSB and Woodlands. When the additional exposure to LBHI of the claims of the Regulators and the possible priority status of such claims against LBHI under sections 365(o) and 507(a)(9) of the Bankruptcy Code are taken into account, the benefits of the Settlement in comparison to the risk of the alternative are striking. The Settlement Agreement eliminates the risks of seizure of FSB, while also preserving, and, in

---

[18] *See* Tr. of February 17, 2009 Hr'g, at 18:3 – 9 (presentation and testimony of Bryan Marsal) (the "February 17, 2009 Hearing"). The record of the February 17, 2009 Hearing, including the presentation and testimony given by Bryan Marsal, is incorporated by reference herein.

fact, enhancing, LBHI's opportunity to recover its investments and to realize the fair value of its

equity in FSB.  Simply stated, without the Settlement Agreement, FSB's Business Plan is

unlikely to be approved and LBHI's ability to implement its strategies to recover the value of

FSB could be lost.  If FSB's Business Plan is not approved, the risks of a seizure of both FSB

and Woodlands and wide-scale litigation with the Regulators will increase dramatically.

52.     Over the last 23 months, the Debtors have carefully considered, in

consultation with the Creditors' Committee and with the advice of their professionals, the value

of LBHI's interests in FSB as well as the merits and risks associated with litigation in connection

with a possible Administrative Proceeding and section 365(o) claim.  Having comprehensively

reviewed and assessed all of these issues, including giving due consideration to the recognition

that the purpose of the Settlement Agreement is not only to minimize the cost to the Debtors to

resolve all of the substantial claims that have been asserted by FSB, Aurora and the OTS against

the Debtors, but also to put FSB in a position to obtain approval of its Business Plan so that

LBHI can extract the value of its equity interest in FSB, the Debtors believe the Settlement

Agreement is reasonable and in the best interests of their estates and creditors.  The Settlement

Agreement was negotiated extensively and at arm's-length and falls well within the range of

reasonableness.  For these reasons, the Settlement Agreement should be approved.

### The Proposed Actions to be Taken by LBHI in Support of the Settlement Agreement Including the Capital Transfers and the Capital Maintenance Agreement Represent Sound Business Judgment

53.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate."  11 U.S.C. § 363(b)(1).  When considering a transaction outside

the ordinary course of business, courts in the Second Circuit, and others, require that such

transaction be based upon the sound business judgment of the debtor. *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper* (*In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986).

54.       It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

55.       In the context of the Settlement Agreement, LBHI's decision to make the Capital Transfers and the Additional Capital Transfer and to enter into the Capital Maintenance Agreement and New Tax Allocation Agreement clearly represents a reasonable exercise of its business judgment.  All of these actions are critical and necessary components of the Settlement. Without the Capital Transfers, a resolution of the MFA Claim and the Tax Claim and the global resolution of virtually all claims of FSB against the Debtors would not have been possible and FSB will not be in a position to seek to lift the regulatory restrictions on its business so as to

recommence lending operations. Although the Capital Transfers involve a substantial

investment in FSB, LBHI believes, based upon an extensive review and evaluation of FSB's

business and assets, that the Capital Transfers, like the prior investments in FSB, should be

recovered in connection with the contemplated sale of FSB within the next 18 months.

56.     Similarly, without the Capital Maintenance Agreement, the Regulators

would not approve the Settlement Agreement and the OTS and FDIC would not allow FSB to

issue (within limits) new certificates of deposit. Given the value being transferred to FSB

pursuant to the Settlement Agreement as well as LBHI's ongoing pursuit of its strategies for

FSB, including a potential going concern sale of FSB to a third-party purchaser, LBHI does not

believe that its entry into the Capital Maintenance Agreement exposes its estate to unacceptable

risk. Finally, the New Tax Allocation Agreement is necessary to regularize the tax relationship

between LBHI and FSB, avoiding potential future issues.

57.     The extension of the terms of the Amended Master Repurchase Agreement

and the Financing Facility also represent sound business judgment. The extension of the

duration of these financing facilities was a condition to obtaining the approval of the Settlement

Agreement by the Regulators and are necessary to achieve a complete and final resolution of

FSB's situation. The Amended Master Repurchase Agreement and the Financing Facility will

ensure that FSB will have access to temporary liquidity in the event it is necessary. They assure

FSB's liquidity even upon the occurrence of a worst case scenario. As noted above, the

Amended Master Repurchase Agreement and the Financing Facility are on market terms, are

fully secured and are good investments of LBHI's cash. Moreover, FSB and Aurora (through

AAR1) have timely made all required payments of principal and interest under both facilities.

Thus, the extension of the respective durations of the Amended Master Repurchase Agreement

and Financing Facility for the period of LBHI's ownership and control of FSB and Aurora on the same terms and conditions as previously approved by the Court is in the best interests of LBHI, its estate and creditors.

### The Non-Cash Asset Transfers and Transfer of the Ancillary Servicing Rights Should be Free and Clear of Liens, Claims and Interests

58.    The Non-Cash Asset Transfers and the transfer of the Ancillary Servicing Rights to FSB (if LBHI determines to transfer the Ancillary Servicing Rights to FSB) should be free and clear of any and all liens, claims, encumbrances and other interests in accordance with section 363(f) of the Bankruptcy Code.   A debtor may sell property of its estate free and clear of any interest in such property if one of the conditions in section 363(f)(1) – (5) is satisfied.  *See* 11 U.S.C. § 365(f); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.); *Circus Time, Inc. v. Oxford Bank & Trust (In re Circus Time, Inc.*), 5 B.R. 1, 8 (Bankr. D. Me. 1979) (finding the court's power to sell property free and clear of liens has long been recognized).

59.    In the ordinary course of its business during the prepetition period, LBHI entered into various repurchase transactions with, amongst others, LCPI in an effort to obtain financing using LBHI's assets as collateral.  It may be the case that some or all of the assets that are the subject of the Non-Cash Asset Transfers or the Ancillary Servicing Rights were the subject of such transactions.  While the parties reserve all of their rights with respect to whether or not LCPI has an interest in the these assets, to the extent that is determined that LCPI does have such an interest, LCPI will have an allowed claim against LBHI for the value of such interest reflecting the nature and priority of such interest.  Thus, LCPI's interests will be

adequately protected, and the transfer of the Non-Cash Asset Transfers or of the Ancillary

Servicing Rights to FSB free and clear of all liens, claims, encumbrances and other interests,

including any by LCPI, should be permitted.

### Reservation of Rights

60.     As between the Debtors, all pre and post petition rights, claims and

defenses are preserved.

### Notice

61.     No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in the amended

order entered on June 17, 2010 governing case management and administrative procedures for

these cases [Docket No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service;

(v) the United States Attorney for the Southern District of New York; and (vi) all parties who

have requested notice in these chapter 11 cases.  The Debtors submit that no other or further

notice need be provided.

62.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated:  September 1, 2010
New York, New York

/s/ Alfredo R. Pérez
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :    08-13555 (JMP)
                                          :
                    Debtors.              :    (Jointly Administered)
                                          :
                                          :
----------------------------------------------------------------x

ORDER GRANTING DEBTORS' MOTION, PURSUANT TO RULE 9019 OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE AND SECTION 363 OF THE
BANKRUPTCY CODE, FOR APPROVAL OF (I) A SETTLEMENT AGREEMENT
BETWEEN THE DEBTORS AND AURORA BANK FSB REGARDING THE MASTER
FORWARD AGREEMENT AND OTHER MATTERS AND (II) CERTAIN OTHER
RELATED RELIEF, INCLUDING AUTHORIZATION OF (A) CERTAIN DEBTORS
TO MAKE CAPITAL TRANSFERS, (B) LBHI TO ENTER INTO A CAPITAL
MAINTENANCE AGREEMENT, AND (C) LBHI TO EXTEND THE DURATION
OF THE AMENDED REPURCHASE AGREEMENT AND FINANCING FACILITY

     Upon the motion, dated September 1, 2010 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and certain of its affiliated debtors in the above-referenced chapter 11

cases, including Lehman Commercial Paper Inc. ("LCPI"), Lehman Brothers Special Financing

Inc. ("LBSF") and Luxembourg Residential Properties Loan Finance S.a.r.l. ("Luxco," together

with LBHI, LCPI and LBSF, the "Debtors"), as debtors and debtors-in-possession, pursuant to

Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section

363 of title 11 of the United States Code (the "Bankruptcy Code"), for (i) approval of a

settlement agreement between the Debtors and Aurora Bank FSB ("FSB") regarding the MFA[1]

and other matters (the "Settlement Agreement"), (ii) authorization of a cash transfer by the

Debtors of $477 million and the transfer of non-cash assets valued at approximately $385 million

to FSB as more fully described in the Settlement Agreement (the "Capital Transfers"); (iii)

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

authorization for LBHI to make an additional cash payment to FSB of $14.4 million and of up to

an additional $10.6 million to FSB (the "Additional Capital Transfer"); (iv) authorization for

LBHI to enter into the capital maintenance agreement pursuant to which LBHI will agree to

ensure that FSB will maintain a minimum 11% Tier-1 capital level or 15% total risk-based

capital ratio for the duration of LBHI's ownership of FSB and agree to buy all FSB's non-cash

assets in certain circumstances after an eighteen month period (the "Capital Maintenance

Agreement"), and (v) authorization for LBHI to enter into a new tax allocation agreement with

FSB (the "New Tax Allocation Agreement"); (vii) authorization for LBHI to extend the

Amended Repurchase Agreement and the Financing Facility for the duration of LBHI's

ownership of FSB and Aurora, and (viii) authorization for LBHI to contribute, if LBHI

determines to do so, to the capital of FSB a portfolio of LBHI's servicing rights to approximately

33,000 residential mortgage loans for which servicing is provided by third parties pursuant to

appointment by LBHI and that do not have a value in the aggregate in excess of $25 million (the

"Ancillary Servicing Rights"), all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward,

Acting C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in

accordance with the procedures set forth in the amended order entered June 17, 2010 governing

case management and administrative procedures [Docket No. 9635] to (i) the United States

Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of

Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue

Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties

who have requested notice in these chapter 11 cases, and it appearing that no other or further

notice need be provided; and a hearing having been held to consider the relief requested in the

Motion; and the Court having found and determined that the relief sought in the Motion is in the

best interests of the Debtors, their estates and creditors, and all parties in interest and that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, the Debtors' entry into and

performance of the Settlement Agreement is approved; and it is further

ORDERED that, pursuant to section 363 of the Bankruptcy Code, the Debtors are

authorized, but not directed, to make the Capital Transfers pursuant to the Settlement

Agreement; and it is further

ORDERED that, pursuant to section 363 of the Bankruptcy Code, LBHI is

authorized, but not directed, to make the Additional Capital Transfer pursuant to the Settlement

Agreement; and it is further

ORDERED that, pursuant to section 363 of the Bankruptcy Code, LBHI is

authorized, but not directed, to enter into and perform the Capital Maintenance Agreement; and it

is further

ORDERED that, pursuant to section 363 of the Bankruptcy Code, LBHI is

authorized, but not directed, to enter into and perform the New Tax Allocation Agreement; and it

is further

ORDERED that, pursuant to section 363 of the Bankruptcy Code, LBHI is authorized, but not directed, to extend the Amended Repurchase Agreement and the Financing Facility for the duration of LBHI's ownership of FSB; and it is further

ORDERED that, pursuant to section 363 of the Bankruptcy Code, LBHI is authorized, but not directed, to transfer the Ancillary Servicing Rights to FSB; and it is further

ORDERED that the Debtors are authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary or appropriate to consummate the transactions contemplated by the Settlement Agreement, including to make all payments and to grant all releases contemplated therein or thereby; and it is further

ORDERED that the Debtors are authorized to make payments or incur obligations to one another in connection with the allocation of the costs of the Settlement Agreement as described in the Motion; and it is further

ORDERED that, upon the effectiveness of the Settlement Agreement, including making of the Capital Transfers and the Additional Capital Transfers and the execution of the Capital Maintenance Agreement by LBHI and Bancorp, all proofs of claim filed by FSB, Aurora and/or the OTS against the Debtors, including, without limitation, the MFA Claim, the Tax Claim the OTS Claims, the Collateral Claims and (except as specifically carved out pursuant to the Settlement Agreement) the Other Claims shall be deemed satisfied and released and may be expunged from the claims register upon notice to the claims agent by the Debtors; and it is further

ORDERED that, to the extent it is determined that LCPI has an interest in the Non-Cash Asset Transfers or the Ancillary Servicing Rights, LCPI's right to assert a claim for

the value of such interest reflecting the nature and priority of such interest against LBHI is preserved and shall not be prejudiced; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(h) are waived and the terms of this Order shall be immediately effective and enforceable upon its entry; it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2010
     New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT A**

## **(SETTLEMENT AGREEMENT)**

**CONFIDENTIAL SETTLEMENT COMMUNICATIONS**
**DRAFT 8-30-10**

## SETTLEMENT AGREEMENT

       This SETTLEMENT AGREEMENT (this "Agreement") is made as of this __ day of September 2010, by and among Lehman Brothers Holdings Inc., a Delaware corporation ("LBHI"), the LBHI subsidiaries listed on Schedule I hereto (the "Named LBHI Subsidiaries"), Aurora Bank FSB (f/k/a Lehman Brothers Bank, FSB), a federal savings bank and an indirect subsidiary of LBHI ("Aurora"), and Aurora Loan Services LLC, a Delaware limited liability company and a wholly-owned subsidiary of Aurora ("ALS") (all of the foregoing collectively referred to as the "Parties" or in the singular as a "Party").

       **WHEREAS**, on September 15, 2008 (the "Filing Date"), LBHI filed a petition in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") commencing a case (the "LBHI Case," and, collectively with the Chapter 11 cases of each of its affiliated entities that are currently pending before the Bankruptcy Court, the "Bankruptcy Cases") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code");

       **WHEREAS**, the Bankruptcy Cases are being jointly administered by the Bankruptcy Court;

       **WHEREAS**, prior to the commencement of the Bankruptcy Cases, LBHI and/or one or more of the Named LBHI Subsidiaries entered into certain inter-company arrangements with Aurora and/or ALS, including arrangements regarding (a) the allocation of certain tax liabilities and benefits, (b) forward purchase arrangements regarding loans, (c) excess servicing fees, (d) servicing rights incident to master servicer and subservicer arrangements related to mortgage loans, (e) arrangements and undertakings regarding a reverse mortgage loan portfolio to be acquired by Aurora from Metropolitan Life Insurance Company ("MetLife"), and, further, Aurora asserts that LBHI and/or one of more of the Named LBHI Subsidiaries had entered into arrangements regarding (f) reimbursement incident to litigation and indemnification claims, (g) reverse mortgages, (h) trademarks, and (i) indemnification/reimbursement obligations on account of various third-party claims, including, without limitation, in respect of certain LBHI employees, professionals retained by LBHI, costs and expenses incurred incident to mortgage insurance claims and the like (the arrangements referred to in the foregoing clauses (a) through (i) collectively, the "Inter-Company Arrangements");

*Tax Claim*

       **WHEREAS**, Aurora is a federal savings bank subject to supervision and regulation by the Office of Thrift Supervision (the "OTS");

       **WHEREAS**, Aurora is a member of an affiliated group of corporations (the "Affiliated Group") of which LBHI is the common parent, for federal and certain state and local tax purposes;

       **WHEREAS**, the Affiliated Group has elected to file consolidated federal tax returns pursuant to section 1501, et seq., of the Internal Revenue Code of 1986, as amended (the "Code");

**WHEREAS**, Aurora participates with other members of the Affiliated Group in the filing of consolidated federal returns (the "Federal Consolidated Returns") and in the filing of combined returns for certain states and localities for state and local tax purposes (the "State Combined Returns");

**WHEREAS,** the OTS, in concert with other federal banking agencies, has issued an Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure (the "Policy Statement") setting forth certain requirements for intercompany tax allocations in cases where banking organizations and savings and loan associations that are subsidiaries of holding companies file income tax returns as members of a consolidated group;

**WHEREAS**, Aurora and LBHI are parties to a Tax Allocation Agreement, dated as of January 1, 2004 (the "TAA");

**WHEREAS**, the TAA provides for Aurora to be included in the Federal Consolidated Returns and the State Combined Returns along with LBHI and other members of the Affiliated Group, and also allocates to Aurora certain federal, state and local tax liabilities and tax benefits to reflect the tax position Aurora would have been in had it filed its tax returns on a separate, and not consolidated or combined, basis;

**WHEREAS**, the TAA requires Aurora to pay to LBHI for each tax year an amount equal to the tax liability that Aurora would have incurred had it filed, for that year, a separate federal income tax return and separate state and local income tax returns in those states in which Aurora joined in the filing of State Combined Returns;

**WHEREAS**, the TAA further provides that "[s]hould the Bank [Aurora] incur Losses for income tax return purposes that it could utilize currently if it filed its return on a separate entity basis, it will record a current income tax benefit," in which case Aurora "will be entitled to receive a refund from LBHI in an amount no less than the amount of the income tax benefit derived from such Losses," and "[t]his refund shall be tendered to the Bank [Aurora] within a reasonable time of the date when the Bank [Aurora] would have filed its [own] return utilizing such [l]osses" and "regardless of whether the [consolidated or combined] Group is receiving a refund";

**WHEREAS,** for tax years 2003, 2004, 2005, 2006 and 2007, Aurora had taxable income which would have resulted in substantial federal and state tax liabilities for Aurora had it filed separate income tax returns for those years;

**WHEREAS,** in accordance with the TAA, Aurora made payments to LBHI and established certain accounts payable to LBHI in amounts estimated at that time to reflect the separate return tax liabilities Aurora would have incurred for 2003, 2004, 2005, 2006 and 2007 had it filed separate federal income tax returns and separate state and local returns in those states in which it participated in the State Combined Returns;

**WHEREAS,** for the 2008 tax year, Aurora incurred tax losses that would have produced a substantial separate return net operating loss ("2008 NOL") for Aurora for federal and state income tax purposes;

2

**WHEREAS**, it has been determined that the 2008 NOLs of the Affiliated Group will be carried back to the maximum extent permitted under applicable law (i.e., five years for federal income tax purposes), and that the amount that LBHI owes Aurora under the TAA will be correspondingly computed;

**WHEREAS**, for tax year 2009, Aurora has incurred a tax loss that will produce a substantial separate return net operating loss (the "2009 NOL") for Aurora for federal and state income tax purposes;

**WHEREAS**, the taxable income of Aurora for federal income tax purposes for 2003, 2004, 2005, 2006 and 2007, was sufficient to fully utilize the 2008 NOL by way of carry back, as well as for state income tax purposes for those years in any states which would permit the carry back of the 2008 NOL to those years; and, therefore, had Aurora filed separate federal and state income tax returns, Aurora would be entitled to substantial tax refunds for pre-2009 tax years;

**WHEREAS,** Aurora and LBHI do not agree, among other things, on the interpretation and application of the TAA in certain respects, including the impact of the Bankruptcy Cases upon the parties' obligations under the TAA;

**WHEREAS**, Aurora timely filed a claim against LBHI (the "Tax Claim") in the Bankruptcy Cases relative to amounts payable to Aurora under the TAA, seeking, in addition to the cancellation of all accounts payable shown as owing by Aurora to LBHI for tax payments under the TAA, a cash payment from LBHI and a contingent claim with respect to the 2009 NOL and any future tax receivable it may accrue for later years;

**WHEREAS**, the Tax Claim also includes a claim for any other amounts due or that may become due in connection with the TAA, in each case as provided for under the TAA, or as may be required by the Policy Statement, applicable law or any other applicable documents;

**WHEREAS**, the parties recognize that a final determination of the amounts owed by LBHI to Aurora under the TAA, or that Aurora owes to LBHI, as the case may be, could be subject to a number of adjustments, depending on the outcome, among other things, of pending examinations of prior taxable years by certain taxing authorities and certain book or tax adjustments relating to the correct tax liabilities, or the correct liabilities under the TAA, of Aurora and LBHI for the relevant years;

*MFA Claim*

**WHEREAS**, Aurora and LBHI are parties to that certain Master Forward Agreement (together with the Annexes thereto, the "Master Forward Agreement"), dated January 1, 2008, pursuant to which LBHI agreed to purchase from Aurora all Loans (as defined in the Master Forward Agreement), whether funded or unfunded, on either a physical delivery basis or on a "net cash settlement" basis, all consistent with the Master Netting Agreement executed by Aurora and LBHI simultaneously therewith (the "Master Netting Agreement");

**WHEREAS**, under the Master Netting Agreement, Aurora has the right to set off any obligation it has to LBHI against any LBHI obligation to Aurora (whether or not such obligations arise under the Master Netting Agreement);

3

**WHEREAS**, through a Joinder Agreement, dated August 1, 2008 (the "Joinder Agreement"), Lehman Commercial Paper, Inc. ("LCPI") and Luxembourg Residential Properties Loan Finance SARL ("Luxco") joined in the Master Forward Agreement and posted collateral to Aurora to secure LBHI's obligations under the Master Forward Agreement;

**WHEREAS**, under the Master Forward Agreement, the purchase price for the Loans, which include revolving credit facility agreements and term loan agreements governing domestic and non-U.S. consumer residential financing, commercial financing and student lending facilities, is generally equal to Aurora's acquisition price, plus any incremental costs incurred by Aurora and any additional funding of principal, less principal payments, on account of the subject Loans;

**WHEREAS**, on September 14, 2008, Aurora sent a communication to LBHI, intended to be a notice pursuant to Section 2(a) of the Master Forward Agreement designating for sale to LBHI on September 15, 2008 all of the Loans that Aurora owned as of the close of business on September 12, 2008 (the "MFA Loan Portfolio");

**WHEREAS**, LBHI did not purchase the MFA Loan Portfolio, which Aurora asserts constitutes an event of default under Section 7 of Annex B to the Master Forward Agreement, and, separately, that the commencement of the LBHI Case constitutes an event of default under Section 2.1 of the Master Netting Agreement;

**WHEREAS**, Aurora timely filed a claim against LBHI (the "MFA Claim") in the Bankruptcy Cases in respect of amounts payable to Aurora under the Master Forward Agreement and the Master Netting Agreement, indicating total delinquent obligations of LBHI thereunder of approximately $2.192 billion as of November 30, 2008;

**WHEREAS**, to secure LBHI's outstanding obligations to Aurora under the Master Forward Agreement, pursuant to Section 2 of Annex B thereto, Aurora was granted a first priority continuing security interest in, lien on and right of set-off against certain collateral, including (a) approximately $201 million outstanding principal amount of a term loan owned by LCPI and $300 million outstanding principal amount of a term loan owned by Luxo, all as more specifically described in and provided by the Joinder Agreement (such loans or any preferred equity or other collateral issued upon conversion of, or in substitution for, such bank debt and to which Aurora's security interest, lien and right of set-off may attach, the "MFA Joinder Collateral") and (b) certain mortgage servicing rights owned by LBHI (the "Pledged MSRs"), for which, in each case, Aurora had timely filed UCC-1 financing statements;

**WHEREAS**, Aurora has claimed that (a) LCPI and Luxco are required to deliver to Aurora any payments received on account of the MFA Joinder Collateral and (b) LBHI is required to deliver to Aurora all income on the Pledged MSRs;

**WHEREAS**, LBHI, LCPI and Luxco may have various defenses and voidable preference arguments that they may make with respect to the MFA Claim and to Aurora's claim to the MFA Joinder Collateral and the Pledged MSRs;

4

***RFC Servicing Rights Claims***

        **WHEREAS**, on or about March 10, 2008, LBHI purchased certain servicing and master servicing rights (the "<u>RFC Servicing Rights</u>"), all right, title and interest in which, pursuant to that certain Agreement entered into among Aurora, ALS, LBHI and Lehman Brothers Bancorp Inc. ("<u>Bancorp</u>"), dated as of February 27, 2009 (the "<u>February 2009 Agreement</u>"), LBHI assigned to Aurora, as a contribution by Bancorp to Aurora's capital, which Aurora, in turn, transferred and conveyed to ALS.  In this regard, LBHI, Bancorp, Aurora and ALS ascribed a value to the RFC Servicing Rights of approximately $88.5 million based upon independent third-party appraisals of the valuation of the RFC Servicing Rights prepared as of December 31, 2008 (the "<u>RFC Servicing Rights Valuation</u>");

        **WHEREAS**, thereafter the parties to the February 2009 Agreement realized and acknowledged that the value ascribed to the RFC Servicing Rights in the RFC Servicing Rights Valuation was overstated in that the valuation of the RFC Servicing Rights did not take into consideration certain prioritization provisions in the servicing agreements, and that the RFC Servicing Rights were worth considerably less than $88.5 million, resulting in less capital being contributed to Aurora pursuant to the February 2009 Agreement than intended by the parties thereto.  For purposes of this Agreement, the shortfall between the value of the RFC Servicing Rights asserted in the February 2009 Agreement and the actual value of the RFC Servicing Rights subsequently determined shall be referred to as the "<u>RFC Servicing Rights Shortfall Amount</u>";

        **WHEREAS**, Aurora timely filed a claim against LBHI (the "<u>Aurora SR Claim</u>") in the Bankruptcy Cases for the RFC Servicing Rights Shortfall Amount, with the Aurora SR Claim further seeking recovery on account of the foregone servicing fees that Aurora or ALS would have received on account of the RFC Servicing Rights but for the unusual restrictions imposed upon ALS' ability to receive servicing fees with respect to the mortgage loans related to the RFC Serving Rights. In this regard, ALS also timely filed a claim against LBHI (such claim, together with the Aurora SR Claim, the "<u>RFC Servicing Rights Claims</u>") in the Bankruptcy Cases on account of such foregone servicing fees;

***Excess Servicing Fees Claims***

        **WHEREAS**, prior to the commencement of the LBHI Case, the accounting departments at Aurora and ALS were directed by LBHI to deliver to LBHI all "excess servicing fees" that would otherwise have been retained by Aurora and/or ALS;

        **WHEREAS**, in a motion filed in the Bankruptcy Cases on February 11, 2009, LBHI stated that, as servicing rights owner, it calculated the excess servicing fees, in essence, by deducting from the aggregate servicing fees received by ALS pursuant to the terms of the related servicing agreements the aggregate sum of (a) the reasonable costs and expenses incurred by ALS during the preceding month in servicing loans it was appointed to service by LBHI (the "<u>Monthly Costs</u>") and (b) an amount equal to 10% of the Monthly Costs;

5

**WHEREAS**, pursuant to the February 2009 Agreement, LBHI transferred to Aurora all of LBHI's rights, title and interest in and to the excess servicing fees for the period from August 2008 to February 2009, subject to adjustment for final determination of the amount for the January and February 2009, without addressing the parties' entitlement to any excess servicing fees paid prior to August 2008;

**WHEREAS**, pursuant to a certain agreement entered into in March 2009 (the "March 2009 Agreement"), LBHI transferred to Aurora all of LBHI's right, title and interest in and to the excess servicing fees for the month of March 2009, without addressing the parties' entitlement to any excess servicing fees paid prior to August 2008;

**WHEREAS**, as the February 2009 Agreement and the March 2009 Agreement each failed to address the parties' entitlement to excess servicing fees prior to August 2008, Aurora and ALS each timely filed a claim against LBHI (together, the "Excess Servicing Fee Claims") in the Bankruptcy Cases for the amount of approximately $320.6 million in connection with all "excess servicing fees" paid to LBHI by ALS prior to August 2008;

**WHEREAS**, the Excess Servicing Fee Claims include a claim against LBHI in an unliquidated amount in connection with the float earnings related to custodial accounts and advances that were remitted by Aurora and/or ALS to LBHI in connection with (a) the servicing agreements in which ALS was the named servicer and (b) the "government-sponsored enterprise" (or "GSE") accounts for which LBHI was the named servicer and ALS was the named sub-servicer;

*Master Servicer Claims*

**WHEREAS**, ALS is the master servicer with respect to approximately 20 mortgage loan securitization trusts that were created by LBHI, for which either ALS or GMAC ResCap acts as the servicer;

**WHEREAS**, as master servicer, ALS is required, subject to certain conditions, to advance funds to the applicable securitization trusts if payments by the respective mortgagors are not received on a timely basis, and is to be subsequently reimbursed on account of such advances when the respective mortgagors make their applicable periodic mortgage payments;

**WHEREAS**, prior to the commencement of the Bankruptcy Cases, ALS had, as master servicer, made advances on account of principal and interest payments to the securitization trusts in respect of the mortgage loans held thereunder, regarding which Aurora asserts that LBHI had committed to pay ALS interest thereon for so long as such advances remained outstanding;

**WHEREAS**, Aurora and ALS each timely filed a claim against LBHI (together, the "Master Servicer Claims") in the Bankruptcy Cases for all unpaid interest owing to Aurora and/or ALS related to the advances;

*Subservicer Claims*

6

**WHEREAS**, LBHI is the named servicer and ALS is the subservicer with respect to certain whole mortgage loans and securitizations that were sold to Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") and other government-sponsored entities (collectively, with Fannie Mae and Freddie Mac, the "Agencies");

**WHEREAS**, Aurora and ALS assert that ALS, as subservicer, made various principal, interest and other advances in respect to such loans and securitization trusts at LBHI's direction (even though, in some instances, ALS was not contractually obligated to make such advances) in reliance upon a commitment made by LBHI prior to the commencement of the Bankruptcy Cases to pay ALS interest thereon for so long as such advances remained outstanding;

**WHEREAS**, as of the date hereof, LBHI has not made certain interest payments incident to the outstanding advances made by ALS, as subservicer, in respect of the applicable whole mortgage loans and securitizations;

**WHEREAS**, Aurora and ALS each timely filed a claim against LBHI (together, the "Subservicer Claims") in the Bankruptcy Cases on account of the unpaid interest owed by LBHI in respect of the advances made by ALS;

**WHEREAS**, because Fannie Mae, Freddie Mac and other applicable government-sponsored entities periodically declined to reimburse certain advances that were made by ALS on the relevant loans for various reasons, including reasons that Aurora and ALS assert were within LBHI's control, the Subservicer Claims also include a claim against LBHI on account of such unreimbursed advances;

*Trademark Claim*

**WHEREAS**, although Aurora asserts that LBHI had agreed to transfer the ownership rights to various trademarks to Aurora prior to the commencement of the Bankruptcy Cases, LBHI has not done so, and, accordingly, Aurora timely filed a claim against LBHI (the "Trademark Claim") in the Bankruptcy Cases in an unliquidated amount for the value of such trademarks;

*Litigation Claims*

**WHEREAS**, Aurora and/or ALS has been named as a defendant in the following pending lawsuits in which the plaintiffs seek the avoidance and recovery of funds that allegedly were transferred to ALS in response to repurchase claims that Aurora asserts were made by ALS on behalf of LBHI:  (a) *Lattig v. Aurora Bank FSB and Aurora Loan Services, LLC (In re First Magnus Financial Corporation)*, Adv. Pro. No. 09-ap-00957-JMM (Bankr. D. Ariz.) (the "Magnus Lawsuit") and (b) *Official Committee of Unsecured Creditors of Aegis Mortgage Corporation v. Lehman Brothers Bank, FSB, et al. (In re Aegis Mortgage Corporation)*, Adv. Pro. No. 09-51938-BLS (Bankr. D. Del.) (not yet served) (the "Aegis Lawsuit");

7

**WHEREAS**, Aurora has also been named as defendant in *Federal Home Loan Bank of Pittsburgh v. Lehman Brothers Holdings Inc., et al. (In re Lehman Brothers Holdings Inc.)*, Adv. Pro. No. 09-01393-JMP (Bankr. S.D.N.Y.) (the "FHLB Lawsuit"), in which the plaintiff claims that LBHI failed to segregate certain collateral and seeks recovery against Aurora, among others, of such collateral;

**WHEREAS**, ALS has been named as a defendant in *MidCountry Bank v. Aurora Loan Services, LLC,* Case No. 2009cv369 (in Douglas County District Court, in the State of Colorado) (the "Midcountry Lawsuit"), a lawsuit which alleges (a) breach of that certain Servicing Agreement between MidCountry Bank and ALS, dated as of July 30, 2007, and (b) negligent misrepresentation by ALS in connection with LBHI's sale of mortgage loans to MidCountry;

**WHEREAS**, each of Aurora and/or ALS may be named as defendants in other lawsuits in the future wherein plaintiffs may seek to hold Aurora and/or ALS liable for obligations of LBHI or which Aurora may assert were LBHI's obligations;

**WHEREAS**, Aurora and ALS each timely filed a contingent claim against LBHI in the Bankruptcy Cases for all amounts Aurora and/or ALS, as the case may be, is obligated to pay and all damages Aurora and/or ALS, as the case may be, otherwise suffers as a result of adverse judgments, settlements, or otherwise arising from or as a result of such lawsuits, and any future litigation that may be commenced against Aurora and/or ALS where LBHI may be the party, if any, ultimately liable (in whole or in part) to the plaintiff, including the fees and expenses of counsel and other professionals retained by Aurora and/or ALS in defense of such lawsuits; such claims as may result from such lawsuits and any future litigation shall be referred to herein, collectively, as the "Litigation Claims." For purposes of this Agreement, "Litigation Claims" shall not include or otherwise refer to any lawsuits, litigation or claims, contingent or otherwise, related to the Indemnification Claim, the MetLife Claim, the Ginnie Mae Claim, the Former LBHI Employee Claims, the Professional Fee Claim or the Mortgage Insurance Claim (each as defined below);

**WHEREAS**, the Magnus Lawsuit and the Midcountry Lawsuit have been settled by Aurora or ALS prior to the date hereof (the "Settled Lawsuits") while the Aegis Lawsuit and FHLB Lawsuit remain pending (the Litigation Claims exclusive of the Settled Lawsuits being the "Pending Litigation Claims");

### *Indemnification Claim*

**WHEREAS**, Aurora and ALS, on the one hand, and LBHI, on the other, are parties to various agreements pursuant to which (among other things) LBHI is obligated to indemnify and hold Aurora harmless from various losses, costs and damages Aurora and/or ALS may suffer, and Aurora and ALS timely filed contingent claims against LBHI in the Bankruptcy Cases for all such losses, costs and damages for which Aurora and ALS do not actually receive indemnification from LBHI pursuant to any operative agreement under which LBHI is obligated to indemnify Aurora or ALS, or pursuant to any indemnification obligation of LBHI that arises under applicable law (the "Indemnification Claim");

8

*Ginnie Mae Claim*

**WHEREAS**, prior to the commencement of the Bankruptcy Cases, LBHI had issued certain reverse mortgages that were guaranteed by the Government National Mortgage Association ("Ginnie Mae");

**WHEREAS**, given the nature of reverse mortgages, the loan balance outstanding in respect of each reverse mortgage continues to increase over time as the applicable mortgagor makes additional draws thereon (each of which is referred to as a "participation balance") and interest accretes with respect thereto;

**WHEREAS**, as the issuer, LBHI is required to fund all participation balances, and is responsible for all interest accruals on such participation balances, which interest accruals are added to the applicable participation balance;

**WHEREAS,** Aurora asserts that Aurora funded such participation balances on LBHI's behalf, with the expectation that LBHI would purchase such participation balances from Aurora;

**WHEREAS**, to date, LBHI has both not purchased the participation balances from Aurora and not funded the interest accruals on account of the participation balances, and, as a result, Aurora has funded all participation balances and interest accruals in respect of those reverse mortgages;

**WHEREAS**, Aurora timely filed a claim against LBHI (the "Ginnie Mae Claim") on account of the participation balances incident to the reverse mortgages not purchased by LBHI as intended by Aurora, which aggregated $29.9 million as of the date such claim was filed in the Bankruptcy Cases, and also sought any additional amounts thereafter funded by Aurora for participation balances or interest accruals;

*MetLife Claim*

**WHEREAS**, prior to the commencement of the Bankruptcy Cases, in reliance on the Master Forward Agreement, Aurora entered into a forward purchase agreement (the "MetLife Agreement") with MetLife obligating Aurora to purchase up to $200 million of reverse mortgage loans from MetLife;

**WHEREAS**, Aurora asserts that as a direct result of LBHI's default under the Master Forward Agreement, Aurora may have some liability on account of its obligations under the MetLife Agreement;

**WHEREAS**, Aurora timely filed a claim against LBHI (the "MetLife Claim") in the Bankruptcy Cases for all losses, costs and damages that it suffers from any and all claims and causes of action that MetLife may assert against Aurora in connection with Aurora's obligations under the MetLife Agreement, including the fees and expenses of counsel and other professionals Aurora retains to address any such claims and causes of action;

9

### *Former LBHI Employee Claim*

**WHEREAS**, although certain former employees of LBHI have asserted, or may assert, claims against Aurora on account of various payments (including guaranteed incentive bonus payments), Aurora believes that any such claims are the obligations of LBHI, and has asserted that LBHI is obligated to indemnify Aurora on account of such claims under applicable law;

**WHEREAS**, Aurora timely filed a claim against LBHI (the "Former LBHI Employee Claim") in the Bankruptcy Cases for all losses, costs and damages that Aurora may suffer, including the fees and expenses of counsel and other professionals retained by Aurora, on account of such claims;

### *Professional Fee Claim*

**WHEREAS**, certain professionals that Aurora asserts have rendered services to LBHI have asserted or may assert that Aurora is obligated to pay their unpaid fees and expenses relative to such work, and, accordingly, Aurora timely filed a claim against LBHI (the "Professional Fee Claim") in the Bankruptcy Cases on account of any payments Aurora makes to professionals for services that were rendered for LBHI's benefit;

### *Mortgage Insurance Claim*

**WHEREAS**, prior to the commencement of the Bankruptcy Cases, LBHI purchased and securitized certain mortgage loans and, in connection with the securitization process, ALS would, in some circumstances, arrange for the procurement of mortgage insurance that Aurora and/or ALS asserts was arranged on behalf of LBHI, as owner of the loans, with respect to such loans;

**WHEREAS**, certain insurers have now purported to rescind or cancel coverage on account of alleged misrepresentations made by LBHI in connection with the procurement of the mortgage insurance, and ALS has incurred significant costs seeking to maintain the insurance and in opposing such insurers' efforts to rescind or cancel insurance coverage;

**WHEREAS**, ALS timely filed a claim against LBHI (the "Mortgage Insurance Claim") in the Bankruptcy Cases for all costs Aurora incurred in connection with such insurers' efforts to rescind or cancel insurance coverage due to LBHI's alleged misrepresentations, and for any damages ALS suffers as a result of an insurer successfully rescinding or cancelling coverage due to LBHI's alleged misrepresentations, or losses ALS incurs as a result of any claims by third parties, including mortgage insurance companies and investors, regarding such mortgage insurance coverage, other than losses incurred due to servicing errors by ALS;

### *LBSF Claim*

**WHEREAS**, LBSF and Aurora entered into that certain 1992 (Multicurrency – Cross Border) ISDA Master Agreement, dated as of September 1, 1999 (together with the Schedule

10

thereto and the Confirmations entered into thereunder and made a part thereof, as amended from time to time, the "<u>ISDA Master Agreement</u>");

**WHEREAS**, LBSF and Aurora entered into various interest rate swaps governed by the ISDA Master Agreement (collectively, the "<u>LBSF Transactions</u>");

**WHEREAS**, Aurora asserts that an event of default has occurred and is continuing with respect to LBSF under Section 5(a)(vii) of the ISDA Master Agreement, and, as a consequence, asserts that LBSF is a "Defaulting Party" under and for purposes of the ISDA Master Agreement;

**WHEREAS**, as a result of LBSF's default under the ISDA Master Agreement, Aurora, by letter dated March 27, 2009, terminated the LBSF Transactions and designated March 27, 2009 as the "Early Termination Date" for purposes of the ISDA Master Agreement;

**WHEREAS**,  although a statement of calculations regarding the amount payable under Section 6(e) of the ISDA Master Agreement has not yet been agreed upon by Aurora and LBSF, Aurora asserts that it has a claim for approximately $118 million on account of the Early Termination Date designation under the ISDA Master Agreement (the "<u>LBSF Claim</u>");

### *745 LLC Claims*

**WHEREAS**, 745 Special Assets LLC is a wholly owned subsidiary of Bancorp ("<u>745 LLC</u>") with which both Aurora and LBHI have entered into various transactions;

**WHEREAS**, Aurora has recorded accounts payable and accounts receivable with 745 LLC which produce a net account receivable of Aurora against 745 LLC as of March 31, 2010 of $46.9 million (the "<u>745 LLC Net Claim</u>");

**WHEREAS**, LBHI has recorded accounts payable and accounts receivable with 745 LLC which produce a net account receivable of LBHI against 745 LLC as of March 31, 2010 of approximately $16.3 million;

**WHEREAS**, 745 LLC may not have sufficient assets to pay off all of its obligations and LBHI and Aurora disagree as to the relative priority of their claims against 745 LLC;

### *Other Inter-Company Transactions*

**WHEREAS**, in addition to the Inter-Company Arrangements, Aurora and/or ALS or other subsidiaries of Aurora have been parties to certain other inter-company transactions or arrangements with LBHI and/or certain of LBHI's subsidiaries (collectively, the "<u>Other Inter-Company Transactions,</u>"), including, without limitation, transactions related to certain restricted stock units issued by LBHI for the benefit of Aurora personnel (the "<u>RSUs</u>"); provided, however, that the "Other Inter-company Transactions" shall exclude any transactions with or involving BNC Mortgage LLC;

**WHEREAS**, LBHI asserts that as of March 31, 2010 certain amounts are due and owing to LBHI or subsidiaries of LBHI by one or more of Aurora and/or ALS or other subsidiaries of Aurora as a result of the Other Inter-Company Transactions (collectively, the "Aurora Payables"), including, without limitation, amounts accrued by Aurora as payable to LBHI for the RSUs, amounts payable on account of certain services (the "TSA Services") performed by Barclays Capital Inc. or its affiliates on behalf of LBHI for the benefit of Aurora and/or ALS and amounts payable for certain "back office" or administrative or like services performed by LBHI on behalf of Aurora, and Aurora disputes that it is obligated to make all such payments;

**WHEREAS**, Aurora asserts that as of March 31, 2010 certain amounts are due and owing by LBHI to Aurora, ALS or other subsidiaries of Aurora on account of certain Other Inter-Company Transactions (collectively, the "LBHI Payables"), including, without limitation, advances made by Aurora for LBHI's account to fund claims asserted based on breaches of representations and warranties made by or on behalf of LBHI in connection with LBHI's sale of mortgage loans, which advances LBHI disputes that it is obligated to pay Aurora for;

### *Repurchase Facility*

**WHEREAS**, Aurora, as seller, and LBHI, as buyer, entered into that certain Master Repurchase Agreement, dated as of March 16, 2009 (as amended from time to time, the "Repurchase Facility");

### *Bridge Facility*

**WHEREAS,** Aurora, through ALS, acts as a mortgage loan servicer for securitization transactions where the servicer is required to make monthly advances of principal and interest, or for maintenance and collection of the mortgage loans and related real-estate owned (collectively, the "Advances");

**WHEREAS**, on October 1, 2009, Aurora entered into a revolving bridge financing facility (the "Bridge Facility") with LBHI, as lender, secured by the Advance receivables, pursuant to which LBHI made available up to $500 million to Aurora Advance Receivables I LLC, a special purpose entity wholly-owned by ALS and established as a subsidiary of Aurora, as borrower, to finance various Advances of principal and interest and corporate and escrow payments;

### *Settlement*

**WHEREAS**, the MFA Claim, the Tax Claim, the Excess Servicing Fee Claims, the RFC Servicing Rights Claims, the Ginnie Mae Claim, the Master Servicer Claims, the Subservicer Claims, the Met Life Claim, the Trademark Claim, the Litigation Claims, the Former LBHI Employees Claim, the Professional Fee Claim, the Mortgage Insurance Claim, the LBSF Claim, the 745 LLC Net Claim, and claims by Aurora or its subsidiaries (other than BNC Mortgage LLC) against LBHI or its subsidiaries made on account of Other Inter-Company Transactions, including the LBHI Payables, as well as the claims made by LBHI or its subsidiaries (other than

12

Aurora and its subsidiaries) against Aurora or its subsidiaries (other than BNC Mortgage LLC), including the Aurora Payables, shall be referred to herein, collectively, as the "Claims"; and

WHEREAS, except as otherwise provided herein, the Parties desire to resolve and settle on the terms and conditions set forth herein the Claims and (i) such other claims of Aurora and/or ALS or their subsidiaries (other than BNC Mortgage LLC) against LBHI to the extent that any such claims are known to Aurora and/or ALS as of the date hereof and arise out of or by reason of any actions, omissions or events occurring, or circumstances existing, on or prior to March 31, 2010 and (ii) such other claims of LBHI and its subsidiaries (other than Aurora and its subsidiaries) against Aurora and/or ALS or their respective subsidiaries (other than BNC Mortgage LLC) to the extent that any such claims are known to LBHI or its subsidiaries (other than Aurora and its subsidiaries) as of the date hereof and arise out of or by reason of actions, omissions or events occurring, or circumstances existing, on or prior to March 31, 2010.

NOW, THEREFORE, in consideration of the undertakings, agreements and other consideration provided for herein, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows, subject to the required approvals of the Bankruptcy Court and the OTS and satisfaction of the other conditions set forth in Section 9 hereof:

1. **Tax Allocations/TAA**.

(a) Resolution of Tax Liabilities for the Pre-2010 Taxable Years.

(i)  In full satisfaction of all amounts owing and obligations arising under the TAA between LBHI and its subsidiaries (other than Aurora and its subsidiaries), on the one hand, and Aurora and its subsidiaries, on the other hand, for the taxable years ended before January 1, 2010 (the "Pre-2010 Taxable Years"), the following shall occur on the Closing Date (as defined in Section 9 below):  all accounts payable owing by Aurora to LBHI for payments under the TAA shall be cancelled, and LBHI shall pay Aurora $218.9 million (the "Tax Payment Amount"), which amount is included in and forms part of the Settlement provided for in Section 2(a) below.  Such cancellation and payment shall be in full and final satisfaction of all rights and obligations between the Parties (together with their subsidiaries) with respect to federal, state and local tax liabilities (including any and all liabilities under the TAA or otherwise) reported or reportable on Federal Consolidated Returns or State Combined Returns that were filed or required to be filed for Pre-2010 Taxable Years, and the TAA shall thereupon be deemed terminated in full without liability on the part of any party in connection with such termination, other than any liability for obligations arising under this Agreement (including, without limitation, those set forth in Sections 1(a)(ii) and 1(b) below).

(ii)  For the avoidance of doubt, the Parties agree that the satisfaction of rights and obligations, and the termination of the TAA, all as described in Section 1(a)(i) above, shall have the following consequences, among others:  (A) except as provided in (B), (C) and (D) of this Section 1(a)(ii), no additional payments shall be due from or to Aurora with respect to taxes (including amounts payable under the TAA) relating to Federal Consolidated Returns and State Combined Returns for Pre-2010 Taxable Years, including any such payment obligations that might otherwise arise under the TAA as a result of any adjustments from any pending or future examinations of Pre-2010 Taxable Years by any taxing authority, (B) if Aurora shall be required

13

to pay any additional amounts to a tax authority with respect to taxes that are the subject of the TAA, LBHI shall, subject to Section 6(c), reimburse Aurora for such amounts, including, without limitation, any taxes due and owing, together with any costs, expenses, penalties, fines, charges, and any reasonable attorneys' and other professional fees and expenses incurred by Aurora in connection therewith, (provided that Aurora promptly notifies LBHI of any asserted liability and gives LBHI a reasonable opportunity to defend and challenge such asserted liability, with the reasonable cooperation of Aurora), (C) any refund or credit received by Aurora or its subsidiaries of taxes reported on Federal Consolidated Returns or State Combined Returns for Pre-2010 Taxable Years that are the subject of the TAA shall be promptly remitted to LBHI, and (D) Aurora shall be required to pay, and shall be entitled to receive and retain, any deficiencies, or refunds, of taxes reported or reportable on state or local tax returns that were filed or required to be filed by Aurora on a separate basis (including with its subsidiaries) and not on a combined basis with LBHI or any of the LBHI group (other than Aurora's own subsidiaries).

(b) <u>Execution of New Tax Allocation Agreement</u>.  Aurora and LBHI have agreed upon the material terms of a new tax allocation agreement, the form of which is attached as Exhibit A(the "<u>New TAA</u>").  The New TAA is intended, among other things, to (i) be effective for the taxable year beginning January 1, 2010, and for all subsequent taxable years in which Aurora is included in the Federal Consolidated Returns or any State Combined Returns with LBHI and other members of the Affiliated Group, (ii) provide that any 2009 NOL in excess of $255,541,519 is carried forward (and such excess shall not be treated as carried back to Pre-2010 Taxable Years) for purposes of the New TAA, in recognition that the first $255,541,519 of estimated 2009 NOL was treated as carried back for purposes of computing the Tax Payment Amount with respect to the Pre-2010 Taxable Years, (iii) provide for payments from Aurora to LBHI, and remittances from LBHI to Aurora, as if Aurora (together with its subsidiaries, to the extent applicable) filed a separate tax return for federal, state and local tax purposes, such payments and remittances to be made on the same basis as provided in Section 5 of the TAA, (iv) provide that in calculating 2010 and future taxable income, Aurora's tax attributes as of January 1, 2010 will be calculated in a manner consistent with the tax accounting workpapers that support Aurora's financial statements as of December 31, 2009, based on which the Tax Payment Amount was determined (regardless of any adjustment to Pre-2010 Taxable Years by any taxing authority or Aurora that would have an effect on post-2009 taxable years); (v) provide that, upon a deconsolidation of Aurora as a result of which Aurora and its subsidiaries are no longer required or permitted to join in the Federal Consolidated Returns or any State Combined Returns, the New TAA shall terminate and no other amounts shall be payable under the New TAA with respect to Federal Consolidated Returns and State Combined Returns, except with respect to any amount due to or from Aurora as of the date of deconsolidation, and (vi) shall contain terms that, except as otherwise provided herein, are substantially the same as the terms of the TAA.  In this regard, the Approval Order shall provide that, on the Effective Date, the New TAA, will be effective and binding upon the parties for all purposes in the Bankruptcy Cases.

## 2.  **Resolution of the Settled Claims**.

(a) <u>The Settlement</u>.  In settlement and resolution of (i) all claims, obligations and liabilities of the respective Parties under each of the operative documents giving rise to the MFA Claim (such operative documents to which Aurora and/or ALS, on the one hand, and LBHI and/or certain of LBHI's subsidiaries, on the other, are parties, together with any and all related

agreements and instruments by and between Aurora and/or ALS, on the one hand, and LBHI or any of its subsidiaries, on the other, the "MFA Claim Operative Documents"), (ii) each of the Tax Claim, the Excess Servicing Fee Claims, the RFC Servicing Rights Claims, the Master Servicer Claims, the Subservicer Claims and the Trademark Claim, (iii) the obligations of Aurora represented by the accounts payable of Aurora and ALS to LBHI identified on Schedule II, which Aurora has treated as netted against LBHI's obligation under the MFA as of March 31, 2010, and (iv) any counter claims or cross-claims LBHI or its subsidiaries may have against Aurora and/or ALS arising out of the arrangements and transactions giving rise to MFA Claim, the Tax Claim, the Excess Servicing Fee Claims, the RFC Servicing Rights Claims, the Master Servicer Claims, the Subservicer Claims and the Trademark Claim (the items referred to in the foregoing clauses (i), (ii), (iii) and (iv) collectively, the "Settled Claims") and in consideration of the Parties entering into the covenants contained in Sections 1, 3 and 4, LBHI and/or one or more of the Named LBHI Subsidiaries, as applicable, shall on the Closing Date, unless otherwise agreed to in writing by the Parties, effectuate the following, all of which together constitute and are referred to herein as the "Settlement").

(A) LBHI or a Named LBHI Subsidiary (other than 745 LLC) shall pay (divided among LBHI and such Named LBHI Subsidiaries as they may determine) to Aurora cash in the amount of $577 million, less the $100 million that LBHI contributed to the capital of Aurora in December 2009, both on account of the RFC Servicing Rights Shortfall Amount and as additional capital to Aurora, pursuant to the order of the Bankruptcy Court entered on December 17, 2009 (the "December 2009 Order") granting *LBHI's Motion, Pursuant to Section 105(a) and 363 of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules, For Authorization to Make a Capital Contribution to Aurora Bank*.

(B) LBHI shall transfer to ALS all right, title and interest of LBHI in and to the private residential mortgage servicing rights (i.e., those not with a government sponsored entity) identified on Schedule A attached hereto (which include the Pledged MSRs) (collectively, the "Private Servicing Rights"), free and clear of all liens and encumbrances, except as otherwise reasonably acceptable to Aurora, and excluding from such transfer any and all liabilities resulting from or arising out of such Private Servicing Rights on or prior to the transfer date.  The Private Servicing Rights shall have a fair market value as of the Valuation Date (as defined in Section 2(b) below), as determined by an independent appraiser reasonably acceptable to each of Aurora and LBHI in a written appraisal delivered to Aurora and LBHI, of $134 million  To the extent that the Final Valuation (as defined in Section 2(b) below) of the Private Servicing Rights is less than $134 million,  LBHI shall pay to Aurora the amount of any such deficiency in immediately available funds on the Closing Date.

(C) LBHI shall transfer to Aurora all right, title and interest of LBHI in and to the portfolio of residential mortgage loans owned by LBHI on the Closing Date and identified on the schedule previously agreed to by LBHI and Aurora (collectively, the "Residential Mortgage Loans"), together with any servicing agreements relating thereto, free and clear of all liens and encumbrances, except as otherwise reasonably acceptable to Aurora; provided that each of the Residential Mortgage Loans shall be less than 30 days delinquent as of the date of transfer and shall not be subject to any restrictions by LBHI on sales or transfers by Aurora.  The Residential Mortgage Loans shall have a fair market value

15

as of the Valuation Date, as determined by an independent appraiser reasonably acceptable to each of Aurora and LBHI in a written appraisal delivered to Aurora and LBHI, of $46 million.  To the extent that the Final Valuation of such Residential Mortgage Loans is more than $46 million, Aurora shall select from among the Residential Mortgage Loans those to be transferred to Aurora having a value as so determined of $46 million, and, to the extent that the Final Valuation of such Residential Mortgage Loans is less than $46 million, LBHI shall pay to Aurora the amount of any such deficiency in immediately available funds on the Closing Date.

(D) LBHI shall transfer to Aurora all right, title and interest of LBHI in and to the Series 2006-1 Variable Funding Senior Notes, Class A-1 dated as of December 20, 2006, issued by Sonic Industries Services, Inc. and co-issuers, in the original principal amount of $100,000,000 (the "Sonic Note"), free and clear of all liens and encumbrances, except as otherwise acceptable to Aurora; provided, however, that the Sonic Note shall have a fair market value as of the Valuation Date, as determined by an independent appraiser reasonably acceptable to each of Aurora and LBHI in a written appraisal delivered to Aurora and LBHI, of not less than $82 million and provided further that, to the extent that the Final Valuation of the Sonic Note is less than $82 million, LBHI shall pay to Aurora the amount of any such deficiency in immediately available funds on the Closing Date.

(E) LBHI shall transfer to Aurora by special warranty deed all right, title and interest of LBHI in and to that certain 5.28 acre parcel of land located on the west side of Park Meadows Drive, north of 10350 Park Meadows Drive, in unincorporated Douglas County, Colorado, legally described as Lot 2A, OmniPark Filing No. 1, 3rd Amendment, according to the recorded plat thereof, Douglas County, Colorado, with such transfer of title to be free of all liens and encumbrances except as otherwise reasonably acceptable to Aurora.

(F) LBHI shall transfer to ALS all right, title and interest of LBHI in and to all residential mortgage servicing rights (including any mortgage servicing agreements under which LBHI has any such rights) with a government sponsored entity ("GSE") (either for loans directly owned by a GSE or held in a securitization sponsored by a GSE) owned by LBHI on the Closing Date but only if the loans subject to such mortgage servicing rights are currently being serviced by ALS, either as master servicer, servicer or subservicer (the "GSE Servicing Rights"), free of all liens and encumbrances except as otherwise agreed by Aurora. The Parties valued the GSE Servicing Rights owned by LBHI as of October 31, 2009 at $145 million.  ALS shall assume all obligations of LBHI under the GSE Servicing Rights (including any such mortgage servicing agreements), provided that ALS shall not assume, and LBHI shall, subject to Section 6(c), indemnify and hold Aurora and ALS harmless against, any liabilities resulting from or arising out of (1) the sale of such loans by LBHI to the applicable GSE (including, without limitation, any repurchase,  indemnification or retained loss obligations of LBHI) or (2) any such mortgage servicing agreements on or prior to the effective date of the transfer of such mortgage servicing agreements to Aurora or ALS. The transfer of the GSE Servicing Rights s by LBHI, and the acceptance and assumption thereof by ALS, shall be subject to the approval of the appropriate GSE; provided, however, that in the event that the applicable GSE, by the Closing Date, shall not have approved such transfer or shall have objected to the transfer of any such mortgage servicing rights to ALS, LBHI on the Closing Date shall transfer and assign to ALS all income attributable to or

derived from such excluded mortgage servicing rights from and after the Closing Date and continuing for so long as ALS shall continue to provide the servicing in respect thereof and, if the GSE shall after the Closing Date approve the transfer of any previously excluded mortgage servicing right, LBHI shall thereupon transfer such mortgage servicing right to ALS and the assignment of income shall terminate.

(G) LBHI shall transfer and assign to Aurora, or its designee, all right, title and interest of LBHI in and to the trademarks and other intellectual property, including domain names, identified on <u>Schedule III</u> hereto, free and clear of all liens and encumbrances, except as otherwise reasonably acceptable to Aurora.

(b) <u>Valuation</u>.  With respect to the valuation of the group of assets that, in each case, collectively constitute (i) the Private Servicing Rights, (ii) the Residential Mortgage Loans, (iii) the Sonic Note, and (iv) the GSE Servicing Rights (such group of assets, in each case, shall be referred to as the "<u>Appraised Assets</u>"), as required in Section 2(a) hereof, the Parties have heretofore agreed on the independent appraiser to be engaged to perform the valuation of each group of Appraised Assets. In this regard, each of such independent appraisers has, prior to the date hereof,  performed its preliminary appraisal of the relevant group of Appraised Assets and delivered same to Aurora and LBHI.   In connection with the closing of the Settlement, the Parties hereby agree that, upon entry of the Approval Order by the Bankruptcy Court, Aurora and LBHI shall instruct each of the independent appraisers to update its appraisal of the applicable group of Appraised Assets as of the last business day of the month prior to the Closing Date (the "<u>Valuation Date</u>"), and, in each case, to deliver its final appraisal of the applicable group of Appraised Assets to Aurora and LBHI by a date no later than 14 days after the entry of the Approval Order by the Bankruptcy Court.  The Parties hereby further agree that the final appraisal of each group of  Appraised Assets (as to each such group of Appraised Assets, the "<u>Final Valuation</u>") shall, in each case, be binding upon the Parties for purposes of the Settlement and the determination as to the amount, if any, to be paid to Aurora in immediately available funds to the extent that the Final Valuation of any such group of Appraised Assets is less than the value required in respect of such group of Appraised Assets pursuant to Section 2(a) hereof.

(c) <u>Allocation of the Settlement</u>.  The Parties agree that such portion of the Settlement transferred to Aurora and/or ALS pursuant to Section 2(a) above (other than the $100 million transferred to Aurora as capital pursuant to the December 2009 Order) shall be allocated first to Aurora in satisfaction of the Tax Payment Amount, with such portion of the balance of such Settlement as is equal to the carrying value of the MFA Claim on Aurora's balance sheet as of March 31, 2010 to be allocated to, and deemed transferred in full settlement and satisfaction of, the MFA Claim.  The remaining value of the Settlement transferred to Aurora and/or ALS pursuant to Section 2(a) above shall be in full settlement and satisfaction of the other Settled Claims, other than the Tax Claim and MFA Claim, or shall be treated as a contribution of capital by LBHI to Aurora, as determined by Aurora in its sole and absolute discretion.

(d)  <u>Termination of MFA Claims Operative Documents</u>.  On the Closing Date, each of the MFA Claim Operative Documents shall be deemed rejected and/or terminated, as applicable, and none of the Parties shall have any further claims, demands, liabilities and causes

17

of action, including, without limitation, any potential claims whatsoever, on account of, in relation to or arising under the MFA Claim Operative Documents, other than the Settlement.

(e)  Assumption of Servicing Rights; Accrued and Unpaid Servicing Fees; Excess Servicing Fees.

(i)  Upon transfer to ALS of the Private Servicing Rights and, if and to the extent transferred to ALS, the GSE Servicing Rights, and the related servicing agreements to which LBHI is a party (collectively, the "Servicing Agreements"), ALS shall satisfy all liabilities and perform all obligations that LBHI would have been required to perform after the Closing Date in connection with the Servicing Agreements in its capacity as Servicer; it being understood and agreed that LBHI shall, subject to Section 6(c),  indemnify Aurora, ALS and their respective subsidiaries from and against any and all losses, claims, fines, expenses (including, without limitation, reasonable attorneys' and other professional fees and expenses), and judgments resulting from or arising out of (1) the sale of such loans by LBHI to the applicable trust (including, without limitation, any repurchase,  indemnification or retained loss obligations of LBHI) or (2) any Servicing Agreements based on, or otherwise arising from or by reason of, any action or inaction by LBHI on or before the Closing Date and not based on, or otherwise arising from or by reason of, ALS's performance before the Closing Date of servicing thereunder as subservicer.

(ii) It is further understood and agreed that no LBHI subsidiary, other than Aurora and ALS, owns the Private Servicing Rights or GSE Servicing Rights and, in the event that it shall be discovered that any other subsidiary of LBHI owns any of the Private Servicing Rights or GSE Servicing Rights, LBHI shall cause such subsidiary to transfer such servicing rights to ALS on the same basis on which LBHI is to transfer the Private Servicing Rights or GSE Servicing Rights, as the case may be, to ALS hereunder.

(iii) Notwithstanding anything herein to the contrary and for the avoidance of doubt, the Parties hereby agree that any accrued but unpaid servicing fees owed to Aurora and/or ALS by LBHI prior to the Closing Date in accordance with the Parties' customary practices in effect prior to March 31, 2010 shall be paid to Aurora and/or ALS as and when due.

(iv) In furtherance of the settlement of the Excess Servicing Fee Claim as provided in Section 2(a), effective as of the Closing Date, each of Aurora and ALS, on the one hand, and LBHI, on the other hand, hereby release the other Party from any liability on account of any and all excess servicing fees related to the Servicing Agreements or to the commercial mortgage loan securitizations where Aurora is the named servicer (the "Commercial Securitizations").  For the avoidance of doubt, to the extent that any of the Parties have been paid, or accrued for services rendered, any excess servicing fees related to the Servicing Agreements or the Commercial Securitizations prior to the Closing Date, each of such Parties shall be entitled to retain such excess servicing fees for its own account, and all other Parties shall release and waive and cause to be released and waived, any and all claims, demands, liabilities and causes of action, both in law and in equity, that it has, had or claims to have or have had or hereafter can, may or shall have against the other with respect to such pre-Closing Date excess servicing fees.

18

(f) <u>Mutual Releases</u>.  On the Closing Date, each of LBHI, on the one hand, and Aurora on the other hand, shall execute and deliver mutual releases in the forms for Aurora and LBHI attached hereto as <u>Exhibits B</u> and <u>C</u>, respectively, whereby such Party will release and waive or cause to be released and waived on its behalf, and on behalf of its related parties identified in such form, any and all claims, demands, liabilities and causes of action, both in law and in equity, that it has, had or claims to have or have had or hereafter can, may or shall have against the other and its related parties (as identified in such form of release) from the beginning of time and arising out of actions, omissions or events occurring, or circumstances existing, on or prior to March 31, 2010, except as otherwise provided in such form of release; provided, however, that nothing in any such release shall release the Parties from their obligations under (i) this Agreement, (ii) under any agreements, instruments or related documents executed pursuant to this Agreement or otherwise in accordance with or necessary to implement the Settlement or any of the transactions or agreements provided for or contemplated herein or (iii) the other agreements between or among the Parties in effect and still to be performed at the Closing Date identified in the form of release.

(g) <u>Release of MFA Joinder Collateral and Pledged MSRs</u>.  Without limiting the generality of the release provided to be received by LBHI by Section 2(f), upon the payment of all amounts and the transfer of all property and interests provided above in this Section 2 to be paid or delivered on the Closing Date, Aurora's security interest in each of the MFA Joinder Collateral and the Pledged MSRs shall be deemed terminated and released, and Aurora shall, promptly upon the request of LBHI, execute such termination statements under the Uniform Commercial Code of any applicable jurisdiction, and take such other actions and execute such other instruments, as may be reasonably necessary to effect the termination and release of the security interests and rights granted to Aurora with respect to each of the MFA Joinder Collateral and Pledged MSRs under the Master Forward Agreement and related Joinder Agreement and the other MFA Operative Documents.

(h) <u>Capital Maintenance Agreement</u>.  In consideration of the agreements and undertakings provided for herein, LBHI shall, on the Effective Date, execute and deliver a Capital Maintenance Agreement in the form attached hereto as <u>Exhibit D</u> providing for maintenance of Aurora's Tier 1 and total risk-based capital ratios at 11% and 15%, respectively, for so long as Aurora is owned or controlled, either directly or indirectly, by LBHI or its bankruptcy estate.

(i) <u>Repurchase Facility and Bridge Facility</u>.  The Parties hereby agree that the term of each of the Repurchase Facility and the Bridge Facility shall be extended until such time as Aurora is no longer owned or controlled, either directly or indirectly, by LBHI or its bankruptcy estate.

3. **<u>Litigation Claims, Indemnification Claim, LBSF Claim, Former LBHI Employee Claim, Professional Fee Claim, Mortgage Insurance Claim, Aurora Payables and LBHI Payables</u>**.

(a) <u>Intercompany Claims</u>.

(1) <u>Aurora Payables and LBHI Payables</u>.  The Parties have discussed the Aurora Payables and the LBHI Payables as asserted and have resolved their disagreements regarding the Aurora Payables and the LBHI Payables and agreed that as of the Effective Date (i) the Aurora Payables at March 31, 2010 were in nature and amount as set forth on <u>Schedule</u> IV and there were no other Aurora Payables at such date and (ii) the LBHI Payables at March 31, 2010 were in nature and amount as set forth in <u>Schedule</u> V and there were no other LBHI Payables at such date.  Aurora acknowledges and agrees that, as of March 31, 2010, neither LBHI nor its subsidiaries was indebted to Aurora or its subsidiaries (other than BNC Mortgage LLC) for any amount that would properly be shown as an account receivable on Aurora's consolidated balance sheet in accordance with U.S. generally accepted accounting principles ("<u>GAAP</u>") except as shown on <u>Schedule</u> IV, except for amounts owed by LBHI on account of ALS's servicing of mortgage loans for LBHI and except as claims specifically referred to herein may otherwise have give rise to an account receivable.  LBHI acknowledges and agrees that, as of March 31, 2010, neither Aurora nor its subsidiaries (other than BNC Mortgage LLC) was indebted to LBHI or its subsidiaries for any amount that would properly be shown as an account receivable on the balance sheet of LBHI or such subsidiary in accordance with GAAP except as shown on <u>Schedule</u> V and except for any amounts owing to LBHI or any of its subsidiaries under the Repurchase Facility or the Bridge Facility related to servicing advances.

(2) <u>Settled Litigation Claims; Settled Former LBHI Employee Claim, LBSF Claim; Ginnie Mae Claim</u>.  The Parties have further negotiated a settlement of the Settled Litigation Claims, a Former LBHI Employee Claim as has separately been more specifically identified by Aurora to LBHI (the "<u>Settled Former LBHI Employee Claim</u>"), the LBSF Claim and, in part, the Ginnie Mae Claim to the effect that LBHI shall pay in the manner hereinafter provided $3.0 million in full satisfaction and settlement of the Settled Litigation Claims and the Settled Former LBHI Employee Claim, $48.4 million in full satisfaction and settlement of the LBSF Claim and $12.3 million in satisfaction of the portion of the Ginnie Mae Claim accrued before the Filing Date.

(3) <u>Set-offs</u>.  As of the Closing Date, the LBHI Payables shall be set-off against the Aurora Payables, leaving an net account payable by Aurora to LBHI of $49.3 million (the "<u>Net Intercompany Account</u>"), and the settlement amounts (as provided by Section 3(a)(2)) in respect of the Settled Litigation Claims, the Settled Former LBHI Employee Claim, the LBSF Claim and the portion of the Ginnie Mae Claim accrued before the Petition Date shall be set off against the Net Intercompany Account, resulting in a net amount of $14.4 million as payable by LBHI to Aurora.  LBHI shall pay such amount in immediately available funds to Aurora on the Closing Date.  The LBHI Intercompany Services Agreement, dated as of January 1, 2005, between Aurora and LBHI shall terminate and be superseded by a new agreement as provided in Section 4(b).

(4) <u>Pending Litigation Claims, the Indemnification Claims, the Former LBHI Employees Claim, the Professional Fee Claim and the Mortgage Insurance Claim</u>.  LBHI and Aurora shall continue to negotiate in good faith the amount (if any) payable or that may become payable by LBHI or its subsidiaries in respect of the Pending Litigation Claims, the Indemnification Claims, the Former LBHI Employees Claim (other than in respect of the Settled Former LBHI Employee Claim), the Professional Fee Claim and the Mortgage Insurance Claim. Aurora's aggregate recovery from LBHI and its subsidiaries on account of any or all of the

Pending Litigation Claims, the Indemnification Claims, the Former LBHI Employees Claim, the Professional Fee Claim and the Mortgage Insurance Claim (collectively) shall be limited to $10.6 million (representing $25 million less the $14.4 million payable by LBHI to Aurora as provided by Section 3(a)(3)). Aurora and ALS, on its own behalf and on behalf of its subsidiaries, each hereby releases and discharges LBHI and its subsidiaries from any liability on any or all of the Pending Litigation Claims, the Indemnification Claims, the Former LBHI Employees Claims, the Professional Fee Claim and the Mortgage Insurance Claim to the extent (if any) that the liability of LBHI or its subsidiaries thereon collectively exceeds the amount mentioned in the immediately preceding sentence and hereby waives any right or claim it may have or come to have to receive any greater amount on account of any such claims. The settlement of the Aurora Payables, the LBHI Payables, the Settled Litigation Claims, the Former LBHI Employee Claim, the LBSF Claim, the Pending Litigation Claims, the Indemnification Claims, the Professional Fee Claim and the Mortgage Insurance Claim as provided by this Section 3(a) is hereinafter referred to as the "Intercompany Settlement."

(b) <u>Unsettled Claims</u>. For the avoidance of doubt, the resolution of the claims provided for in Section 3(a) above shall not address (i) any indemnification or contribution obligations of LBHI or any of its subsidiaries to Aurora or any of its subsidiaries not yet known to Aurora and/or its subsidiaries as of the date hereof, or any indemnification or contribution obligations of Aurora or its subsidiaries to LBHI and its subsidiaries not yet known to LBHI or its subsidiaries as of the date hereof, (ii) the MetLife Claim, (iii) the Ginnie Mae Claim for advances made after the Filing Date, or (iv) any claim that Aurora, ALS or their respective current or former directors, officers and employees have under (A) any insurance policies that are or were maintained by LBHI or (B) the bylaws or certificate of incorporation of LBHI or Bancorp.

(c) <u>Transactions after March 31, 2010</u>. Nothing contained herein is intended to, or shall be applied, to relieve LBHI, the Named LBHI Subsidiaries, Aurora or ALS, or their respective subsidiaries, from any of their obligations to the other that have arisen or do arise as a result of actions, omission or events occurring, or circumstances first existing, after March 31, 2010, including accounts payable or receivable arising in the ordinary course of business.

(d) <u>Aurora's Right to Manage Claims and Disputes</u>. Nothing herein shall be construed to limit the rights of Aurora and/or ALS to manage and settle, in their reasonable discretion, any claims or disputes giving rise to any of the claims referred to in Section 3(a)(4) hereof. Upon request, Aurora shall keep LBHI reasonably informed of any litigation of any such claim.

4. **Other Inter-Company Transactions**.

In addition to the resolution of the Aurora Payables and LBHI Payables set forth in Section 3(a) above, the Parties have reached certain agreements in respect of the remaining Other Inter-Company Transactions, and, with respect thereto, the Parties shall take such actions and execute such documents as may be necessary to:

(a) release Aurora and its subsidiaries from any obligation to pay LBHI or its subsidiaries any amounts in respect of the RSUs that have or otherwise would accrue for the

period from and after March 31, 2010 or in respect of which Aurora might otherwise be responsible to LBHI in connection with the RSUs;

(b) continue the process currently in place to phase out the TSA Services that Aurora and its subsidiaries have been receiving and, in good faith, determine the appropriate source and level of services to be provided by LBHI to Aurora and its subsidiaries (directly or through third-party service providers) subsequent to the Effective Date, and the appropriate payments to be made by Aurora for such services, whereupon, the applicable Parties shall incorporate such determinations in a new intercompany services agreement with respect thereto to replace that certain LBHI Intercompany Services Agreement, between LBHI and Aurora, dated as of January 1, 2005 (the "ISA"), with a new services agreement that shall become effective as soon as practicable after the Effective Date and the ISA shall then be replaced thereby;

(c) release any right that Aurora or any of its subsidiaries may have or assert in respect of any income or interest earned from and after the Filing Date on account of the MFA Joinder Collateral;

(d) enter into (i) an amendment of that certain September 2, 2008 Assignment Agreement between Aurora and LBHI, which relates to certain agreements concerning mortgage loans that were to be assigned to LBHI, substantially in the form of Exhibit E attached hereto; (ii) such assignment agreements and other instruments as reasonably requested by LBHI relating to certain broker agreements, indemnification agreements and other settlement agreements assigned to LBHI; and (iii) such assignment agreements and other instruments as reasonably requested by Aurora relating to the commercial real estate loans identified on Schedule B hereto that were assigned by LBHI to Aurora prior to the Filing Date; it being agreed and understood that Aurora and LBHI shall continue to negotiate in good faith to agree upon, execute and deliver the agreements and instruments contemplated in this paragraph (d) as soon as reasonably practicable;

(e) ensure that payment on the accounts receivable of LBHI against 745 LLC, and payment on any right or interest that LBHI and/or any of its subsidiaries have to or in any proceeds or distributions made in respect of any assets owned or held by 745 LLC, will be subordinate to payment by 745 LLC to Aurora on the accounts receivable of Aurora against 745 LLC to the extent of the first $28.0 million of recovery by Aurora on such accounts receivable, after which LBHI shall be entitled to recover the same percentage of its accounts receivable against 745 LLC as Aurora's March 31, 2010 balance sheet amount bears to its accounts receivable against 745 LLC as the Effective Date, before any further recovery by Aurora on its accounts receivable, whereupon Aurora and LBHI shall then be entitled to recover on any unpaid amounts (if any) of their respective accounts receivable against 745 LLC or any other amount to which they are or become entitled from 745 LLC on a pro rata basis in accordance with their respective interests.

The Parties hereby acknowledge and agree that this Agreement does not, and is not intended to, resolve or settle the Ginnie Mae Claim, other than the portion thereof accrued before the Filing Date, or the MetLife Claim or the outstanding intercompany matters between Aurora or its subsidiaries, on the one hand, or the LBHI and its subsidiaries, on the other hand,

22

described in Exhibit F, and the Parties reserve the right to assert claims (subject in the case of claim against LBHI and any of its subsidiaries who are debtors in Bankruptcy Cases to the requirements of the Bankruptcy Code) and/or reach agreements to settle such matters at a later date.

      5.   **Ginnie Mae Claim**.  With respect to the Ginnie Mae Claim, the Parties hereby agree as follows:  (a) LBHI hereby acknowledges the right of Aurora to receive any and all amounts paid on account of any participation balance funded by Aurora incident to a reverse mortgage involved in the Ginnie Mae Claim, including any payments made on account of any applicable reverse mortgages or any proceeds realized from the liquidation of such reverse mortgages, and LBHI agrees and covenants to pay to Aurora any such amounts as may be received by LBHI on account thereof; (b) to the extent that LBHI has received or shall receive title to any reverse mortgage loan or real property, by deed-in-lieu or otherwise, as a result of a repurchase consummated with advances made by 745 LLC, LBHI shall immediately transfer title to such property, or the proceeds from sale of such property, to 745 LLC; and (c) each of Aurora and/or ALS, on the one hand, and LBHI, on the other, shall cooperate in good faith to take such actions and execute such documents as may be reasonably necessary to eliminate Aurora's and ALS' on-going exposure on account of the participation balances incident to the reverse mortgages involved in the Ginnie Mae Claim, which may include transferring LBHI's issuer responsibility for the reverse mortgages to a qualified third party, qualifying Aurora as an issuer of such reverse mortgages, or effectuating a repurchase of such participation balances.

      6.   **Implementing Provisions.**

      (a)   Implementing Documents.  The Parties shall cooperate in good faith to prepare, as soon as practicable after the date hereof, such documents as are required to effectuate the transfers and transactions referred to in Sections 2, 3 and 4.  The Parties shall use their best efforts to cause any direct or indirect subsidiary of a Party to enter into such transactions and to execute and deliver such instruments or other documents as shall be necessary to consummate the transactions contemplated by this Agreement (provided, however, that neither LBHI nor Bancorp shall be responsible to cause Aurora or any subsidiary of Aurora to consummate the transactions contemplated by this Agreement).

      (b)   References to LBHI Subsidiaries.  It is understood and agreed that certain companies owned directly or indirectly by LBHI are under administration or receivership or like insolvency  proceedings in non-U.S. jurisdictions or are owned by companies in such circumstances and, accordingly, are not within the control of LBHI and that all references in this Agreement to direct or indirect subsidiaries of LBHI excludes all subsidiaries in such circumstances (except insofar as tax matters concerning such subsidiaries are involved in an account arising under the TAA or New TAA), and such subsidiaries shall not be bound by any release or covenant contained herein. Unless the context otherwise requires, references herein to LBHI subsidiaries shall not refer to Aurora or its direct or indirect subsidiaries.

      (c)   Termination of Indemnities.  The obligation of LBHI to provide any indemnity hereunder for the benefit of the Bank, including the indemnity provided by clause (B) of the first sentence of Section 1(a)(i) hereof, the second sentence of Section 2(a)(F) hereof and the first sentence of Section 2(e)(1) hereof shall (except with respect to a claim for which LBHI

23

is already providing indemnification in accordance herewith) terminate and be of no further force or effect at such time as LBHI ceases to own and control, directly or indirectly, a majority of the shares of Aurora entitled to vote in the election of its directors.  With respect to LBHI's indemnification obligations hereunder, Aurora shall give LBHI prompt written notice of the assertion of any claim against which indemnification is sought hereunder and shall cooperate with LBHI in the defense of any such claim.  LBHI shall be entitled, at its election, to assume the defense of any such claim with counsel of its choice, reasonably satisfactory to Aurora, unless there are defenses or cross claims available to Aurora that are in conflict with those available to LBHI.

(d)  Further Assurances.  Each Party shall use its commercially reasonable efforts after the Closing Date to execute and deliver such instruments, certifications, reports and other documents, and to take such other actions, as may be reasonably requested by another Party in order to perfect or confirm or give effect to the transactions and releases contemplated by this Agreement.

7.  **Representations**.

(a)  Each of LBHI and the Named LBHI Subsidiaries hereby represents to Aurora and ALS as follows:

(i)  It is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, and has the corporate power and authority (subject to and after giving effect to the Required Approvals) to execute and deliver this Agreement and to perform its obligations hereunder, and it has taken all necessary action to authorize such execution, delivery and performance (subject to and after giving effect to the Required Approvals).

(ii)  This Agreement has been duly executed and delivered by it and constitutes a legal, valid and binding obligation of it enforceable in accordance with its terms, subject to the Required Approvals, as applicable, and other applicable bankruptcy, reorganization, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought is a proceeding in equity or in law).

(b)  Aurora and ALS each hereby represents to LBHI and the Named LBHI Subsidiaries as follows:

(i)  It is duly organized, validly existing and in good standing, and has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder (subject to and after giving effect to the Required Approvals, as applicable), and it has taken all necessary action to authorize such execution, delivery and performance (subject to and after giving effect to the Required Approvals).

(ii)  This Agreement entered into as of the date hereof has been duly executed and delivered by it and constitutes a legal, valid and binding obligation of it enforceable in accordance with its terms, subject to the Required Approvals, as applicable, and other applicable bankruptcy, reorganization, moratorium or similar laws

24

affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought is a proceeding in equity or in law).

8. **Governing Law**.  To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by, and interpreted in accordance with, the laws of the State of New York applicable to contracts made and to be performed in that State without reference to its conflict of laws rules.  The Parties agree that the appropriate and exclusive forum for any disputes arising out of this Agreement between Aurora, ALS and LBHI and the Named LBHI Subsidiaries shall be the Bankruptcy Court, or if such court will not hear any such suit, the United States District Court for the Southern District of New York, and, the Parties hereto irrevocably consent to the exclusive jurisdiction of such courts, and agree to comply with all requirements necessary to give such courts' jurisdiction.

9. **Required Approvals / Effective Date**.  The obligations of the Parties to effectuate the Settlement and the Intercompany Settlement and to consummate the other transactions contemplated by this Agreement are subject to (a) entry of the Approval Order (as hereinafter defined) by the Bankruptcy Court and (b) approval by the OTS of this Agreement and the performance by the Parties of their obligations hereunder (the approvals of the Bankruptcy Court and the OTS shall be referred to herein, collectively, as the "Required Approvals") and (c) the receipt of the "Operating Clearances" as defined below with respect to Aurora's future operations and (d) the receipt by LBHI of the "Regulatory Acknowledgement" as defined below.  LBHI and Aurora shall use their best efforts to obtain the Required Approvals on or before [_____], 2010, and shall give each other notice of the receipt of such approvals as soon as practicable.  The obligation of the Parties to implement the Settlement, the Intercompany Settlement and the other transactions contemplated by this Agreement is subject to the withdrawal by the OTS of the pending Prompt Corrective Action Directive respecting Aurora and the entry of a modification of the pending Consent Order to Cease and Desist respecting Aurora on terms permitting the future operation of Aurora acceptable to Aurora and LBHI and the approval of the Federal Deposit Insurance Corporation of the Request for Limited Waiver dated December 24, 2009, and amended on April 13, 2010, submitted by Aurora (the "Operating Clearance").  The obligation of LBHI and the Named LBHI Subsidiaries to implement the Settlement, the Intercompany Settlement and the other transactions contemplated by this Agreement is subject to receipt by LBHI and Bancorp of  a notice from the OTS (the "Regulatory Acknowledgement") to the effect that, based on the effectiveness of the Settlement and the Intercompany Settlement, it will not pursue the proposed administrative proceeding for a cease and desist order referenced in OTS's February 13, 2009 letter to LBHI or any other proceeding making like allegations against LBHI or Bancorp and will withdraw, or consent to the expungement of, the proofs of claim filed in the Bankruptcy Cases by the OTS.  Subject to withdrawal or expungement of all proofs claims filed by the OTS in the Bankruptcy Cases and except as otherwise provided for herein or as the Parties may otherwise agree, this Agreement shall become effective on, and only upon, the business day (the "Effective Date") next following the day on which the later of the following four events shall have occurred:  (i) entry of an order by the Bankruptcy Court approving this Agreement (the "Approval Order") and such order becoming final, and (ii) Aurora notifies LBHI that all necessary approvals of the OTS of the performance of this Agreement by the Parties have become effective, (iii) the Operating Clearance has been obtained and Aurora shall have given notice thereof to LBHI and (iv) the

Regulatory Acknowledgement has been obtained and LBHI has given notice thereof to Aurora. On a Business Day within five Business Days after the Effective Date designated by LBHI (the "Closing Date"), the Parties shall consummate the Settlement and the Intercompany Settlement by the delivery as contemplated by Sections 2 and 3 of immediately available funds, appropriate instruments of transfer and appropriate releases and shall consummate the other transactions contemplated by this Agreement.  Payment of funds shall be against delivery of releases.  To the extent a Party is not able to make a delivery required of it hereby on the Closing Date, it shall use its commercially reasonable efforts to make such delivery as soon as practicable thereafter.

10.  **Counterparts**. This Agreement may be executed and delivered by the Parties in multiple counterparts, no one of which needs be signed by all Parties, each of which shall be deemed to be an original but all which together shall constitute but one and the same agreement.  It is the intent of the Parties that the copy signed by any Party shall be fully enforceable against said Party.

11.  **Entire Agreement**.  This Agreement, together with the exhibits and schedules hereto and other documents executed in connection therewith (including, without limitation, allonges, assignments, and deeds), constitutes the entire agreement concerning the subject matter hereof, and it supersedes any prior or contemporaneous representations, statements, understandings or agreements concerning the subject matter of this Agreement, including the letter of intent dated December 1, 2009 between LBHI and Aurora.

12.  **Modifications**.  This Agreement may not be modified, amended or terminated except by written agreement executed by all of the Parties.

13. **Successors and Assigns**.  On the Effective Date, the terms of this Agreement shall be binding on and inure to the benefit of the Parties and their respective successors and assigns.

14.  **Headings**.  The headings of the sections and subsections of this Agreement are for convenience and reference only and shall not affect the construction of this Agreement.

15.  **Exhibits**.  All exhibits and schedules attached hereto are by this reference by a part of this Agreement for all purposes

16.  **Judicial Interpretation**.  Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any Party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agent prepared the same, it being agreed that all Parties have participated in the preparation of this Agreement.

*[remainder of page intentionally left blank; signature page follows]*

**IN WITNESS WHEREOF** the parties, by duly authorized persons, have executed this Agreement as of the date first written above.

AURORA BANK FSB

By: _____
      Name:
      Title:

\

AURORA LOAN SERVICES LLC.

By: _____
      Name:
      Title:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
      Name:
      Title:

LEHMAN BROTHERS BANCORP

By: _____
      Name:
      Title:

LEHMAN COMMERCIAL PAPER, INC.

By: _____
      Name:
      Title:

LUXEMBOURG RESIDENTIAL LOAN
PROPERTIES SARL

By: _____

27

Name:
Title:

and

By: _____
Name:
Title:

LEHMAN BROTHERS SPECIAL FINANCE INC.

By: _____
Name:
Title:

745 SPECIAL ASSETS LLC

By: _____
Name:
Title:

**CONFIDENTIAL SETTLEMENT COMMUNICATIONS**
**DRAFT 8-30-10**

### <u>Schedule I</u>

Lehman Brothers Bancorp

Lehman Commercial Paper Inc.

Luxembourg Residential Properties Loan Finance SARL

Lehman Brothers Special Financing Inc.

745 Special Assets LLC

**CONFIDENTIAL SETTLEMENT COMMUNICATIONS**
**DRAFT 8-30-10**

## Schedule II

[Accounts payable of Aurora netted against LBHI's obligations under MFA to be attached (see Section 2(a)(iii))]

**CONFIDENTIAL SETTLEMENT COMMUNICATIONS**
**DRAFT 8-30-10**

## Schedule III

Trademarks

Aurora

Aurora Expanded Options

Auroraconnect

Aurora Affinity

Domain Names

alsemployees.com
alservices.biz
alservices.com
alservices.info
alservices.jobs
alservices.us
alsmasterservicing.com
aurora-loan-services.biz
aurora-loan-services.net
aurora-loan-services.org
aurora-loan-services.us
auroraconduit.biz
auroraconduit.com
auroraconduit.info
auroraconduit.net
auroraconduit.org
auroraconduit.us
auroraconnect.com
auroraconnect.net
auroraconnect.org
auroralend.com
auroralend.net
auroralend.org
auroralends.com
auroralends.net
auroralends.org
auroraloanservices.biz
auroraloanservices.info
auroraloanservices.org
auroraloanservices.us
aurorawarehouse.biz
aurorawarehouse.com
aurorawarehouse.info

aurorawarehouse.net
aurorawarehouse.org
aurorawarehouse.us
aurorawholesale.biz
aurorawholesale.com
aurorawholesale.info
aurorawholesale.net
aurorawholesale.org
aurorawholesale.us
bncmortgage.com
myauroraloan.com
brokerfundingsolutions.com
auroradirect.com
auroraaffinity.com
  http://www.capitalcrossing.com/
  capitalcrossingbank.biz
  capitalcrossingbank.com
  capitalcrossingbank.net

**CONFIDENTIAL SETTLEMENT COMMUNICATIONS**
**DRAFT 8-30-10**


## Schedule IV

AURORA PAYABLES
(Accounts Payable of Aurora or subsidiaries[1] to LBHI or subsidiaries As of March 31, 2010)


|  | Amount (in millions, rounded) |
|---|---|
| RSUs (Pre-Filing Date)(ALS) | 10.9 |
| RSUs (Post-Filing Date (AB consol.) | 12.6 |
| Barcap TSA allocation to AB | 12.7 |
| Indemnification funds (collected for LBHI's account) | 19.9 |
| Intercompany services agreement (D&O ins., A&M tax services, LBHI payroll) | 6.9 |
| Other payables of AB, ALS | 6.3 |
| Campus Door payables | 0.7 |
| AB employee benefits | 3.0 |
| Reimbursable one-time charges (Riskpan, PBGC, ADP) | 3.3 |
|  | ___ |
|  | 76.3 |

---

[1]  Exclusive of BNC Mortgage LLC

**CONFIDENTIAL SETTLEMENT COMMUNICATIONS**
**DRAFT 8-30-10**

<u>**Schedule V**</u>

LBHI PAYABLES
<u>(Accounts Payable of LBHI or subsidiaries to Aurora or subsidiaries[2] As of March 31, 2010)</u>

|  | <u>Amount (in millions, rounded)</u> |
|---|---|
| Rep. and Warranty payable | 24.5 |
| TriMont payable (less subsequent payment) | <u>2.5</u> |
|  | 27.0 |

---

[2]  Exclusive of BNC Mortgage LLC

**Exhibit B**

Form of
<u>GENERAL RELEASE</u>


_____ \_\_, 2010


This GENERAL RELEASE (the "<u>Release</u>"), dated as of _____ \_\_, 2010, is made by LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("<u>LBHI</u>"), LEHMAN BROTHERS BANCORP, a Delaware corporation and wholly owned subsidiary of LBHI, LEHMAN COMMERCIAL PAPER INC., a Delaware corporation and wholly owned subsidiary of LBHI, LUXEMBOURG RESIDENTIAL LOAN PROPERTIES SARL, a Luxembourg company and indirect wholly owned subsidiary of LBHI, and LEHMAN BROTHERS SPECIAL FINANCE INC., a Delaware corporation and wholly owned subsidiary of LBHI.

RECITALS:

WHEREAS, LBHI is the sole shareholder of Lehman Brothers Bancorp, a Delaware corporation ("<u>Bancorp</u>"), which is the sole shareholder of Aurora Bank FSB, a savings bank incorporated under the laws of the United States of America ("<u>Aurora</u>"); and

WHEREAS, Aurora and, its wholly owned subsidiary Aurora Loan Services LLC, a Delaware limited liability company ("<u>ALS</u>"), LBHI, Bancorp, Lehman Commercial Paper, Inc., a Delaware corporation and wholly owned subsidiary of LBHI ("<u>LCPI</u>"), Luxembourg Residential Properties Loan Finance SARL, a Luxembourg company and indirect wholly owned subsidiary of LBHI ("<u>Luxco</u>"), and Lehman Brothers Special Finance, Inc., a Delaware corporation and wholly owned subsidiary of LBHI ("<u>LBSF</u>"), are parties to that certain Settlement Agreement, dated as of _____ \_\_, 2010 (the "<u>Settlement Agreement</u>"); and

WHEREAS, the Settlement Agreement provides for LBHI and certain LBHI subsidiaries to enter into this Release for the benefit of Aurora and the persons identified below; and

WHEREAS, capitalized terms used herein have, unless otherwise defined herein, the meanings provided by the Settlement Agreement;

NOW, THEREFORE, in consideration of the premises and agreements contained in the Settlement Agreement, and for other good and valuable consideration, the receipt

and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, LBHI, Bancorp, LCPI, Luxco and LBSF hereby agree as follows:

    1.  <u>General Release.</u> Effective as of the Closing Date, each of LBHI, Bancorp, LCPI, Luxco and LBSF, as well as LBHI on behalf of all other subsidiaries of LBHI controlled by LBHI (other than BNC Mortgage LLC), on behalf of itself and on behalf of its predecessors, successors, assigns, subrogees, agents and representatives, and the heirs, executors, administrators and assigns thereof in their capacities as such (collectively, the "<u>Releasing Parties</u>"), hereby unequivocally, irrevocably and unconditionally releases, remises, acquits, and forever discharges, waives and renounces, for the benefit of each of Aurora, ALS and each other direct or indirect subsidiary of Aurora (other than BNC Mortgage LLC), and their respective predecessors, successors and assigns (collectively, the "<u>Released Parties</u>"), as the case may be, from and of, and hereby covenants not to sue or institute or prosecute or aid in the institution or prosecution of any action or suit (at law, in equity or otherwise) against any of the Released Parties with respect to, any and all actions, suits and causes of action, at law or in equity, based on contract, tort (including, without limitation, gross negligence or intentional misconduct), statute or otherwise, debts, commissions, duties, fees, liens, commitments, contracts, agreements, promises, claims, demands, damages, losses, costs, expenses, liabilities and obligations (whether pecuniary or not, including obligations to perform or forebear from performing acts or services), of any kind or nature whatsoever, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or undetermined, which such Releasing Party has, ever had or hereafter can, shall or may have from the beginning of time against any Released Party and that has arisen or hereafter may arise out of or by reason of actions, omissions or events occurring, or circumstances existing, on or prior to March 31, 2010 (collectively, "<u>Claims</u>"), except for the Claims (including the agreements and instruments) identified on <u>Attachment A</u> hereto and any Claims arising out of or by reason of actions or omissions occurring, or circumstances existing, not known to LBHI (including the subsidiaries of LBHI) on the date hereof.  For the avoidance of doubt, it is understood and agreed that the Releasing Parties are not releasing hereunder any claims (whether now existing or hereafter arising) against the Released Parties arising under the Settlement Agreement or any agreement, instrument or document referred to in the Settlement Agreement as implementing the provisions of the Settlement Agreement (including, without limitation, the New TAA) or any claims arising out of any acts or omissions or events occurring, or circumstances first coming about, after March 31, 2010.

2.  <u>Complete Defense</u>. This Release shall constitute a complete defense to any Claim released pursuant to Section 1 above.  That any matter is released hereunder shall not be construed as an admission on the part of any Released Party of any liability with respect thereto.

3.  <u>Representations</u>. Each of LBHI, Bancorp, Luxco, LCPI and LBSF acknowledges, agrees and represents, on behalf of itself and its subsidiaries, that (i) it has not assigned any Claim or potential Claim against any of the Released Parties to any other person and (ii) it has been advised by its legal counsel with respect to, and has negotiated and agreed

upon, this General Release and hereby expressly waives any rights it has under any applicable law to maintain any Claim with respect to the matters set forth herein.

4. <u>Third-Party Beneficiaries</u>.  Each of the Released Parties shall be deemed a third-party beneficiary of this General Release and shall be entitled to enforce the provisions hereof.

5. <u>Governing Law</u>. This General Release shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware (without giving effect to the provisions, policies or principles thereof concerning conflict of laws).

IN WITNESS WHEREOF, the undersigned have signed this General Release this ___ day of _____ 2010.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
     Name:
     Title:

LEHMAN BROTHERS BANCORP

By: _____
     Name:
     Title:

LEHMAN COMMERCIAL PAPER, INC.

By: _____
     Name:
     Title:

LUXEMBOURG RESIDENTIAL LOAN
    PROPERTIES SARL

By: _____
     Name:
     Title:
and

By: _____

4

Name:
Title:

[Signature pages continue]

LEHMAN BROTHERS SPECIAL FINANCE INC.

By: _____
Name:
Title:

**Exhibit A**

[Form of Tax Allocation Agreement attached]

**ATTACHMENT A**
(to General Release)

1.  The Claims asserted in paragraphs 16 and 17 (under the heading "Ginnie Mae Reverse Mortgages") except with respect to liabilities for participation balances accrued on or before the Filing Date, or paragraph 21 (under the heading "MetLife Loans") of the proof of claim dated September 22, 2009 filed by Aurora in the Chapter 11 Cases.

2.  The Settlement Agreement, dated as of February 27, 2009, among LBHI, Bancorp, Aurora and ALS.

3.  The Agreement, dated as of March 31, 2009, among LBHI, Bancorp, Aurora and ALS (relating to excess servicing fees).

4.  The Contribution and Assignment Agreement, dated as of March 31, 2009, between LBHI, Bancorp, Aurora and ALS.

5.  Investor Services Agreement, dated as of April [__], 2010, between LBHI and ALS, which replaced the Master Servicing Agreement between Lehman Capital, a Division of Lehman Brothers Holdings, Inc., Owner, and Aurora Loan Services Inc. (n/k/a Aurora Loan Services LLB) dated as of February 1, 1999.

6.  Flow Servicing Agreement dated as of May 1, 2006, between Lehman Brothers Bank, FSB (n/k/a Aurora Bank FSB), as servicer, and Lehman Brothers Holdings, Inc., as owner, related to servicing of commercial mortgage loans, as such agreement may be amended, modified or restated from time to time.

7.  Flow Sub-Servicing Agreement dated as of December 1, 2005, between Lehman Brothers Holdings, Inc., as Owner, and Lehman Brothers Bank, FSB (n/k/a Aurora Bank FSB) and Aurora Loan Services LLC, as servicer, related to servicing of residential mortgage loans, as such agreement may be amended, modified or restated from time to time.

8.  Master Repurchase Agreement dated as of March 16, 2009, between LBHI and Aurora, as such agreement may be amended or modified from time to time.

9.  Receivables Loan Agreement and related documents dated as of October 1, 2009, between Aurora Advance Receivables I LLC, Aurora Loan Services LLC and LBHI.

**Exhibit C**

Form of
<u>GENERAL RELEASE</u>

_____ __, 2010

     This GENERAL RELEASE (the "<u>Release</u>"), dated as of _____ __, 2010, is made by AURORA BANK FSB, a savings bank incorporated under the laws of the United States of America ("<u>Aurora</u>"), and AURORA LOAN SERVICES LLC, a Delaware limited liability company and wholly owned subsidiary of Aurora.

RECITALS:

     WHEREAS, Aurora is a wholly owned t subsidiary of Lehman Brothers Bancorp, a Delaware corporation ("<u>Bancorp</u>"), which is a wholly owned subsidiary of Lehman Brothers Holdings Inc., a Delaware corporation ("<u>LBHI</u>"); and

     WHEREAS, Aurora and, its wholly owned subsidiary Aurora Loan Services LLC, a Delaware limited liability company ("<u>ALS</u>"), LBHI, Bancorp, Lehman Commercial Paper, Inc., a Delaware corporation and wholly owned subsidiary of LBHI ("<u>LCPI</u>"), Luxembourg Residential Properties Loan Finance SARL, a Luxembourg company and indirect wholly owned subsidiary of LBHI ("<u>Luxco</u>"), and Lehman Brothers Special Finance, Inc., a Delaware corporation and wholly owned subsidiary of LBHI ("<u>LBSF</u>"), are parties to that certain Settlement Agreement, dated as of _____ __, 2010 (the "<u>Settlement Agreement</u>"); and

     WHEREAS, the Settlement Agreement provides for Aurora to enter into this Release for the benefit of LBHI and the persons identified below; and

     WHEREAS, capitalized terms used herein have, unless otherwise defined herein, the meanings provided by the Settlement Agreement;

     NOW, THEREFORE, in consideration of the premises and agreements contained in the Settlement Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Aurora  hereby agrees as follows:

     1.  <u>General Release.</u> Effective as of the Closing Date, each of Aurora and ALS, for itself and for all subsidiaries of Aurora other than BNC Mortgage, LLC, and for their respective predecessors, successors, assigns, subrogees, agents and representatives, and the heirs, executors, administrators and assigns thereof in their capacities as such (collectively, the "<u>Releasing Parties</u>"), hereby unequivocally, irrevocably and unconditionally releases, remises, acquits, and forever discharges, waives and renounces, for the benefit of each of LBHI, Bancorp, LCPI, Luxco, and LBSF, and their respective

8

predecessors, successors and assigns (collectively, the "Released Parties"), as the case may be, from and of, and hereby covenants not to sue or institute or prosecute or aid in the institution or prosecution of any action or suit (at law, in equity or otherwise) against any of the Released Parties with respect to, any and all actions, suits and causes of action, at law or in equity, based on contract, tort (including, without limitation, gross negligence or intentional misconduct), statute or otherwise, debts, commissions, duties, fees, liens, commitments, contracts, agreements, promises, claims, demands, damages, losses, costs, expenses, liabilities and obligations (whether pecuniary or not, including obligations to perform or forebear from performing acts or services), of any kind or nature whatsoever, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or undetermined, which such Releasing Party has, ever had or hereafter can, shall or may have from the beginning of time against any Released Party and that has arisen or hereafter may arise out of or by reason of actions, omissions or events occurring, or circumstances existing, on or prior to March 31, 2010, including but not limited to those matters covered by the proofs of claim filed by Aurora or ALS in the cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the U.S. Code commenced by LBHI, LCPI, Luxco, LBSF and affiliated debtors in the U.S. Bankruptcy Court for the Southern District of New York (Case No. 08-13555 (JMP) (Jointly Administered) (collectively, "Claims"), except for the Claims (including the agreements and instruments) identified on Attachment A hereto and any Claims arising out of or by reason of actions or omissions occurring, or circumstances existing, not known to Aurora (including ALS and the other subsidiaries of Aurora) on the date hereof.  For the avoidance of doubt, it is understood and agreed that the Releasing Parties are not releasing hereunder any claims (whether now existing or hereafter arising) against the Released Parties arising under the Settlement Agreement or any agreement, instrument or document referred to in the Settlement Agreement as implementing the provisions of the Settlement Agreement (including, without limitation, the New TAA) or any claims arising out of any acts or omissions or events occurring, or circumstances first coming about, after March 31, 2010.

2.  Complete Defense; Expungement of Proofs of Claim.  This Release shall constitute a complete defense to any Claim released pursuant to Section 1 above.  Aurora and ALS hereby agree that the proofs of claim they have filed in the Chapter 11 Cases (other than the portion of the proofs of claim identified on Attachment A hereto) shall be expunged. Aurora and ALS shall execute such instruments or other documents as LBHI may reasonably request to reflect or confirm the expungement of such proofs of claim.  That any matter is released hereunder shall not be construed as an admission on the part of any Released Party of any liability with respect thereto.

3.  Representations.  Aurora acknowledges, agrees and represents, on behalf of itself and its subsidiaries, that (i) it has not assigned any Claim or potential Claim against any of the Released Parties to any other person and (ii) it has been advised by its legal counsel with respect to, and has negotiated and agreed upon, this General Release and hereby expressly waives any rights it has under any applicable law to maintain any Claim with respect to the matters set forth herein.

4.  <u>Third-Party Beneficiaries</u>.  Each of the Released Parties shall be deemed a third-party beneficiary of this General Release and shall be entitled to enforce the provisions hereof.

5.  <u>Governing Law</u>. This General Release shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware (without giving effect to the provisions, policies or principles thereof concerning conflict of laws).

IN WITNESS WHEREOF, the undersigned have signed this General Release this ___ day of _____ 2010.

AURORA BANK FSB

By: _____
     Name:
     Title:

AURORA LOAN SERVICES LLC

By: _____
     Name:
     Title:

**ATTACHMENT A**
(to General Release)

1.  The Claims asserted in paragraphs 16 and 17 (under the heading "Ginnie Mae Reverse Mortgages") , except with respect to liabilities for participation balances accrued on or before the Filing Date, and paragraph 21 (under the heading "MetLife Loans") of the proof of claim dated September 22, 2009 filed by Aurora in the Chapter 11 Cases.

2.  The Settlement Agreement, dated as of February 27, 2009, among LBHI, Bancorp, Aurora and ALS.

3.  The Agreement, dated as of March 31, 2009, among LBHI, Bancorp, Aurora and ALS (relating to excess servicing fees).

4.  The Contribution and Assignment Agreement, dated as of March 31, 2009, between LBHI, Bancorp, Aurora and ALS.

5.  Investor Services Agreement, dated as of April [__], 2010, between LBHI and ALS, which replaced the Master Servicing Agreement between Lehman Capital, a Division of Lehman Brothers Holdings, Inc., Owner, and Aurora Loan Services Inc. (n/k/a Aurora Loan Services LLB) dated as of February 1, 1999.

6.  Flow Servicing Agreement dated as of May 1, 2006, between Lehman Brothers Bank, FSB (n/k/a Aurora Bank FSB), as servicer, and Lehman Brothers Holdings, Inc., as owner, related to servicing of commercial mortgage loans, as such agreement may be amended, modified or restated from time to time.

7.  Flow Sub-Servicing Agreement dated as of December 1, 2005, between Lehman Brothers Holdings, Inc., as Owner, and Lehman Brothers Bank, FSB (n/k/a Aurora Bank FSB) and Aurora Loan Services LLC, as servicer, related to servicing of residential mortgage loans, as such agreement may be amended, modified or restated from time to time.

8.  Master Repurchase Agreement dated as of March 16, 2009, between LBHI and Aurora, as such agreement may be amended or modified from time to time.

9.  Receivables Loan Agreement and related documents dated as of October 1, 2009, between Aurora Advance Receivables I LLC, Aurora Loan Services LLC and LBHI.

**Exhibit D**

[Form of  Capital Maintenance Agreement to be attached]

**<u>Exhibit E</u>**

[Form of Amendment to Assignment Agreement to be attached]

**Exhibit F**

1.  The Claims asserted in paragraphs 16 and 17 (under the heading "Ginnie Mae Reverse Mortgages") except with respect to liabilities for participation balances accrued on or before the Filing Date, or paragraph 21 (under the heading "MetLife Loans") of the proof of claim dated September 22, 2009 filed by Aurora in the Chapter 11 Cases.

2.  The Settlement Agreement, dated as of February 27, 2009, among LBHI, Bancorp, Aurora and ALS.

3.  The Agreement, dated as of March 31, 2009, among LBHI, Bancorp, Aurora and ALS (relating to excess servicing fees).

4.  The Contribution and Assignment Agreement, dated as of March 31, 2009, between LBHI, Bancorp, Aurora and ALS.

5.  Investor Services Agreement, dated as of April [__], 2010, between LBHI and ALS, which replaced the Master Servicing Agreement between Lehman Capital, a Division of Lehman Brothers Holdings, Inc., Owner, and Aurora Loan Services Inc. (n/k/a Aurora Loan Services LLB) dated as of February 1, 1999.

6.  Flow Servicing Agreement dated as of May 1, 2006, between Lehman Brothers Bank, FSB (n/k/a Aurora Bank FSB), as servicer, and Lehman Brothers Holdings, Inc., as owner, related to servicing of commercial mortgage loans, as such agreement may be amended, modified or restated from time to time.

7.  Flow Sub-Servicing Agreement dated as of December 1, 2005, between Lehman Brothers Holdings, Inc., as Owner, and Lehman Brothers Bank, FSB (n/k/a Aurora Bank FSB) and Aurora Loan Services LLC, as servicer, related to servicing of residential mortgage loans, as such agreement may be amended, modified or restated from time to time.

8.  Master Repurchase Agreement dated as of March 16, 2009, between LBHI and Aurora, as such agreement may be amended or modified from time to time.

9.  Receivables Loan Agreement and related documents dated as of October 1, 2009, between Aurora Advance Receivables I LLC, Aurora Loan Services LLC and LBHI.

# **EXHIBIT B**

## **(CAPITAL MAINTENANCE AGREEMENT)**

*DRAFT, rev. April 8, 2010*

## CAPITAL MAINTENANCE AGREEMENT

THIS CAPITAL MAINTENANCE AGREEMENT ("Agreement") is entered into the _____ day of ___ ,_____ 2010 (to be effective as provided in Article IV below as of the "Effective Date"); by and among AURORA BANK, FSB (the "<u>FSB</u>"), a federal savings association with its home office in Wilmington, Delaware, LEHMAN BROTHERS BANCORP (the "<u>Parent</u>"), a Delaware corporation with its principal place of business in New York, New York, LEHMAN BROTHERS HOLDINGS, INC. (the "<u>Ultimate Parent</u>"); a Delaware corporation with its principal place of business in New York, New York, and the OFFICE OF THRIFT SUPERVISION (the "<u>OTS</u>").

## RECITALS

**WHEREAS,** the FSB is a wholly-owned subsidiary of the Parent, and an indirect wholly-owned subsidiary of the Ultimate Parent;

WHEREAS, the Ultimate Parent is a debtor in possession in a case under chapter 11 of title 11 of the U.S. Code (the "<u>Bankruptcy Code</u>") pending in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), wherein there are also pending chapter 11 cases of certain subsidiaries of Ultimate Parent, which cases of Ultimate Parent and its subsidiaries have been consolidated for administrative purposes only;

**WHEREAS**, the Ultimate Parent, Parent and the FSB have determined that it is in the best interests of the Ultimate Parent, the Parent and the FSB to ensure that the FSB is able to continue to operate, safely and soundly and in accordance with all applicable laws, regulations and regulatory requirements, as a going concern;

**WHEREAS**, in order to meet all regulatory capital requirements and carry out its business plans, the FSB may need additional capital from time to time;

**WHEREAS**, the OTS seeks to ensure that the FSB complies with all of its capital requirements and that the FSB operates in a safe and sound manner; and

**WHEREAS**, the Ultimate Parent and the Parent may realize the benefits of contributions to the equity capital of the FSB through continued ownership of the Parent's equity interest in the FSB.

**NOW, THEREFORE**, in consideration of the foregoing premises, the OTS, and other good and valuable consideration the sufficiency of which is hereby acknowledged, the OTS, and the Ultimate Parent, the Parent and the FSB, intending to be legally bound, do hereby agree as follows:

## ARTICLES

I.      **CONSTRUCTION OF AGREEMENT.**

      A.      As this Agreement applies to FSB and Parent, it shall constitute a binding and enforceable "written agreement" entered into with an agency within the meaning and for purposes of Section 8 of the Federal Deposit Insurance Act ("<u>FDIA</u>"), as amended (12 USC §1818). As this Agreement applies to the Ultimate Parent, it shall not constitute such a "written agreement" and shall not be enforceable pursuant to Section 8 of the FDIA, but shall (when effective in accordance with Article IV 5 below) constitute a binding post-petition agreement and obligation of Ultimate Parent, enforceable as a

Section 507(a)(2) claim in a proceeding under Chapter 11 of the Bankruptcy Code and as a priority claim in a Chapter 7 proceeding, should there be a conversion from Chapter 11 of the Bankruptcy Code.

        B.        This Agreement shall not be construed as a "written agreement, order, capital directive or prompt corrective action directive issued by OTS" requiring the FSB "to meet and maintain a specific capital level" for purposes of 12 C.F.R. § 565.4.

## II.      CAPITAL ASSURANCES.

        A.        Subject to the required approval referred to in Article IV, during the term of this Agreement and except as otherwise provided herein, the Ultimate Parent and Parent commit and promise to make such capital contributions as may be necessary from time to time to ensure that the FSB has sufficient "core capital" (or "Tier 1 capital") and "total risk based capital," as computed in accordance with the rules and regulations of the OTS at 12 C.F.R. Part 567 ("Capital"); so that the FSB maintains (i) a "Tier 1 (Core) capital" or leverage ratio of at least 11% and (ii) a total risk-based capital ratio of at least 15%  (hereinafter the "Minimum Capital Requirement") during the term of this Agreement.

        B.        Subject to the required approval referred to in Article IV, the Ultimate Parent and the Parent agree that if, at any time during the term of this Agreement, the FSB's Capital level falls below the Minimum Capital Requirement (a "Capital Deficiency"), then the Ultimate Parent and Parent will, within five (5) business days after any of the events referred to in 12 C.F.R. § 565.3(b)(1) or (2) occurs with respect to such Capital Deficiency, contribute additional Capital, in cash, in an amount sufficient to cause the FSB's Capital to meet the Minimum Capital Requirement; provided that such time period for compliance may be extended, or an alternate form of the capital contribution may be approved, by the appropriate Regional Director of the OTS in the sole discretion of the OTS; and further provided that, in the event the FSB is less than wholly-owned by the Parent or Ultimate Parent, then the Parent shall be entitled, upon its contribution of such additional Capital, to receive from the FSB additional shares of common stock of the FSB having a value equal to the Capital contributed by the Parent at a price per share mutually agreed upon by the Parent and the FSB so as to prevent dilution of the Parent's interest in the FSB.  The Parent and the FSB hereby agree to use reasonable efforts to promptly obtain or provide all corporate, regulatory and other approvals necessary to authorize the issuance of such common stock to Parent.

        C.        The Ultimate Parent, the Parent and FSB agree that prior to the end of the eighteenth (18th) month after the Effective Date, the Ultimate Parent, the Parent and FSB will market the FSB to one or more unaffiliated third parties, including through one or more investment banking firms, and will enter into a definitive agreement by that date to sell the FSB to an unaffiliated third party, whether by stock purchase, merger or a purchase of substantially all assets and assumption of deposit liabilities.  If by such date the FSB is not so subject to a definitive agreement of sale, the Ultimate Parent and Parent shall as soon as practicable purchase all of the FSB's assets, other than cash and cash equivalents, in exchange for cash or readily marketable securities at a price equal to the greater of (i) the book value (based on marked to market accounting) of such assets or (ii) 111% of FSB's total book liabilities (based on marked to market accounting) less the amount of the FSB's cash and cash equivalents.

        D.        OTS shall monitor the progress of the efforts to sell the FSB required by II.C.  If at any time after the fifteenth (15th) month after the Effective Date OTS determines that a sale of the FSB is not likely to occur prior to the end of the eighteenth (18th) month after the Effective Date, it may direct the FSB to file, and FSB shall file with the OTS, a plan of dissolution in accordance with 12 C.F.R. § 546.4 and Part 460 of the OTS' Application Processing Handbook, detailing the FSB's plans to, inter alia, (i) as soon as practicable, sell all of its assets, other than cash and cash equivalents, to the Parent or

Ultimate Parent at a price, payable in cash, equal to the greater of  (A) the book value (based on marked to market accounting) of such assets or (B) 111% of FSB's total book liabilities (based on marked to market accounting) less the amount of FSB's cash and cash equivalents, (ii) pay off its deposit liabilities, (iii) terminate its federal deposit insurance, and (iv) return its charter to the OTS.  Upon approval of such plan of dissolution by the OTS, the FSB shall, and the Ultimate Parent and Parent shall cause the FSB to, promptly comply with the plan.


### III.    TERM AND TERMINATION OF AGREEMENT.

A.    The term of this Agreement shall commence on the Effective Date (as defined below) and shall terminate upon the first to occur of (i) the earlier of (A) the time when the Parent no longer has control as herein defined of the FSB or (B) the time following Ultimate Parent's purchase of all of the FSB's assets, when FSB has no deposit liabilities (ii) upon the conversion of the FSB to another form of depository institution charter other than a "savings association" within the meaning of Section 2(4) of the Home Owners Loan Act, as amended (the "HOLA"), or (iii) with the written consent of the parties hereto.  For purposes of this Agreement, "control" shall have the meaning set forth at Section 10(a)(2) of the HOLA (12 USC § 1467a(a)(2)), and 12 C.F.R. § 574.4.  Without limiting the generality of the foregoing, for the avoidance of doubt, the Parent shall be deemed to control the FSB if the OTS may presume that the Parent controls the FSB pursuant to 12 C.F.R. § 574.4(b), unless the OTS shall have accepted a rebuttal of control submission made by the Parent using the standards set forth in 12 C.F.R. § 574.4(e) to establish an absence of such control.

B.    During the term of this Agreement, without obtaining the prior written approval or non-objection of the OTS, the Parent may not transfer or dispose of voting stock or other securities of the FSB if such transaction would cause the Parent to no longer control the FSB and, consequently, result in the termination of this Agreement.

IV.    **REQUIRED APPROVALS.**  Each of the Ultimate Parent, Parent and the FSB represent to each other and to OTS that it has obtained all corporate approvals necessary for it to enter into and perform this Agreement.  The obligations of the parties hereto to effectuate this Agreement are subject to the approval by the Bankruptcy Court of the performance by Ultimate Parent of this Agreement in connection with the approval by the Bankruptcy Court of the performance by the Ultimate Parent and its subsidiaries that are debtors in possession in chapter 11 cases of the settlement and related transactions between the FSB and its subsidiaries and the Ultimate Parent and its subsidiaries contemplated by the application of FSB to the OTS submitted in accordance with 12 C.F.R. § 563.22 on December 24, 2009 (the "Settlement") and approved by the OTS, of which Settlement this Agreement is a part.  Ultimate Parent, Parent and the FSB shall each use their reasonable best efforts to obtain Bankruptcy Court approval of the Settlement, including this Agreement, and the consummation of the transactions contemplated by the Settlement.  This Agreement shall become effective on the day the Bankruptcy Court Order approving the Agreement and Settlement becomes final and nonappealable ("Effective Date").  On the day the Bankruptcy Court Order approving the Agreement and Settlement becomes final and nonappealable, LBHI's counsel shall so certify in a letter to the Parent, FSB and OTS, which shall be transmitted via electronic and overnight mail.

V.    **MODIFICATION OR AMENDMENT OF AGREEMENT.**  This Agreement may be modified or amended only by the mutual written consent of the Ultimate Parent, Parent and the FSB and with the prior written approval or non-objection of the OTS.

VI.    **ASSIGNABILITY OF AGREEMENT.**  This Agreement shall not be assigned without the written consent of the Ultimate Parent, the Parent and the FSB and the prior written approval or non-objection of the OTS.

VII.    **SUCCESSORS IN INTEREST; THIRD PARTY BENEFICIARIES.**  This Agreement shall remain in full force and effect against any successors in interest to the Parent and shall inure to the benefit of: (i) the Federal Deposit Insurance Corporation, in the event that it is appointed as conservator or receiver for FSB and (ii)  any regulatory successor of the OTS.  This Agreement is not intended to, and nothing in this Agreement shall create or be deemed to create, any third party beneficiary rights in any person or entity.

VIII.    **NOTICES.**  All notices or other communications required hereunder shall be in writing and shall be made by facsimile transmission, with a copy sent via overnight courier to the following persons. addressed as follows:

|  |  |
|---|---|
| if to the Ultimate Parent, to: | Lehman Brothers Holdings, Inc.<br>1270 Avenue of the America<br>New York, New York  10019<br>Facsimile:  (212)<br>Attn: Corporate Secretary<br><br>with a copy to:<br><br>Attn.:  Douglas Lambert<br>Facsimile:  (646) 285-9320 |
| if to the Parent, to | Lehman Brothers Bancorp<br>1270 Avenue of the Americas<br>New York, New York  10019<br>Facsimile:  (212)<br>Attn: Corporate Secretary |
| if to the FSB, to: | Aurora Bank, FSB<br>1270 Avenue of the Americas<br>New York, New York  10019<br>Facsimile:  (   )<br>Attn:  Chief Executive Officer |
| if to the OTS, to: | Office of Thrift Supervision<br>Department of the Treasury<br>Harborside Financial Center, Plaza 5<br>Jersey City, New Jersey 073_1<br>Facsimile:  (201) 413-7543<br>Attn:  Michael Finn, Regional Director |

Such notice or communication shall be deemed to have been given or made as of the date that the notice or communication was sent via facsimile transmission.

IX.    **COMMITMENT TO THE OTS.**  As of the Effective Date, the undertakings of the Ultimate Parent and the Parent in this Capital Maintenance Agreement constitute a commitment by the Ultimate Parent and the Parent to the OTS (and any regulatory successors to the OTS) that the Ultimate Parent and Parent will maintain the Capital of the FSB as provided in this Agreement.

X.    **ENTIRE AGREEMENT.**  This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof, and all prior agreements, arrangements, and negotiations between the parties, whether oral or written, with respect to this Agreement are deemed to be merged herein.

XI.    **GOVERNING LAW; CONSENT TO JURISDICTION.**  To the extent that Federal law does not control, this Agreement shall be governed, construed and controlled by the laws of the State of New York without reference to conflicts of laws principles thereof that would otherwise result in the application of the laws of another jurisdiction.  Each party, without limiting any party's right to appeal any order of the Bankruptcy Court, irrevocably and unconditionally submits, until such time as a transfer of ownership and control of the FSB shall have become effective either pursuant to an approved Plan of Reorganization for Ultimate Parent or otherwise or, if no such transfer shall have occurred, until the Chapter 11 case of Ultimate Parent has been closed. to the exclusive jurisdiction of the Bankruptcy Court to enforce the terms of this Agreement against Parent or Ultimate Parent.

XII.    **SEVERABILITY.**  If any portion of this Agreement shall be held by a court of competent jurisdiction to be invalid or inoperative, then, so far as is reasonable and possible, the remainder of this Agreement shall be considered valid and operative, and effect will be given to the intent manifested by the portion held invalid or inoperative.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** the parties have executed this Agreement.

**Lehman Brothers Holdings, Inc.**

By: _____
Name:
Title:

**Lehman Brothers Bancorp**

By: _____
Name:
Title:

**Aurora Bank, FSB**

By: _____
Name:
Title:

**Office of Thrift Supervision**

By: _____
Name:  Michael E. Finn
Title:   Northeast Regional Director

**<u>EXHIBIT C</u>**

**(NEW TAX ALLOCATION AGREEMENT)**

# TAX ALLOCATION AGREEMENT

This Tax Allocation Agreement (the "Agreement") is made as of the Effective Date, as defined below, by and between Lehman Brothers Holdings Inc., a Delaware corporation ("LBHI"), and Aurora Bank FSB, a federal savings bank and its operating subsidiaries (the "Bank") (the foregoing collectively referred to as the "Parties" or in the singular as a "Party").

WHEREAS, LBHI is the parent corporation of an affiliated group of corporations (the "Group") within the meaning of §1504(a) of the Internal Revenue Code of 1986, as amended (including the regulations promulgated thereunder, the "Code"), and such Group includes the Bank;

WHEREAS, LBHI has commenced a case under chaper 11 of title 11 of the U.S. Code in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, LBHI and the Bank have been operating under a Tax Allocation Agreement, effective as of January 1, 2004 (the "Prior TAA"), which provides for the allocation of the Bank's federal, state and local tax liabilities and benefits between the Parties;

WHEREAS, LBHI and the Bank entered into a Settlement Agreement, which provides for the settlement of claims relating to certain inter-company arrangements (including the Prior TAA) between the Bank, on the one hand, and LBHI and various other LBHI subsidiaries, on the other hand;

WHEREAS, among other things, the Settlement Agreement resolves and settles all claims and obligations of the Parties relating to amounts owed and obligations arising under the Prior TAA for the taxable years ended before January 1, 2010 (the "Pre-2010 Taxable Years");

WHEREAS, at the time this Agreement is being executed and delivered the Settlement Agreement shall have become effective;

WHEREAS, in accordance with the Settlement Agreement, the Prior TAA is being terminated as of the Effective Date of this Agreement; and

WHEREAS, the Parties have agreed in the Settlement Agreement to enter into a new tax allocation agreement containing terms and conditions substantially the same as those provided herein;

NOW THEREFORE, in consideration of the covenants and agreements hereinafter set forth, the Parties agree as follows:

## Section 1 -

### Effective Date and Scope of
### Tax Allocation Agreement

**1.01**    **Effective Date.**  This Agreement is effective as of January 1, 2010.

**1.02**    **Scope**.  This Agreement applies to the allocation of federal, state and local tax liabilities and benefits for the taxable year beginning January 1, 2010, and for all subsequent taxable years in which the Bank is included in the consolidated U.S. federal income tax returns or in any state or local combined returns with LBHI and other members of the Group.

## Section 2 -

### Agreement to File
### Consolidated Federal Income Tax Returns and Pay Tax

**2.01**    **Agreement to File**.  The Parties hereby agree that the Bank will continue to be included in the Group's consolidated U.S. federal income tax return, so long as the Bank is a member of the Group, except (if applicable) in the event that the Bank were electively deconsolidated pursuant to Treas. Reg. § 1.597-4(g).

**2.02**    **Elections.**  All elections that are available to the Group or any of its members under the Code, relating to the filing of consolidated federal income tax returns, shall be made by LBHI at its sole discretion in determining the LBHI Group's tax liability.

**2.03**    **Payment of Tax**.  LBHI will remit the Group's federal income tax liability to the appropriate government agency, including estimated taxes, on behalf of the Group.

## Section 3 -

### Agreement to File
### State and Local Income Tax Returns As Appropriate

**3.01**    **Filing State and Local Income Tax Returns.**  The Parties hereby agree that the LBHI shall determine the methodology and format for the filing of state and local income tax returns by the Bank, including the inclusion of the Bank in combined, affiliated or consolidated returns where appropriate.  Such determination shall be made by the LBHI Corporate Tax Department in accordance with the applicable statutes and rules of each particular jurisdiction.

**3.02**    **Elections.**  As relates to any state or local combined, affiliated or consolidated income tax returns, all elections that are available to the filing group or any of its members shall be made by LBHI at its sole discretion in determining the filing group's tax liability.

2

## Section 4 -

### Allocation of Tax Liability

**4.01**    **Federal Income Tax Liability or Benefit**.  The current federal income tax liability or benefit of the Bank will be computed by multiplying the Bank's separate entity taxable income or loss by 35% (or the applicable federal statutory income tax rate).  LBHI's Corporate Tax Department will be responsible for the calculation of, as well as making all decisions impacting, the federal consolidated income tax return of the Group.

**4.02**    **Unutilized Federal Income Tax Loss or Benefit**.  Should the Bank have an income tax loss or benefit that could not be utilized either currently or in a carryback year on a separate entity basis, but which is utilized in whole or part in a current or prior consolidated return, the Bank's tax liability or benefit will be adjusted accordingly.

**4.03**    **Consolidated Federal Alternative Minimum Tax ("AMT") Liability**.  The Bank's tax liability will be adjusted to reflect, if applicable, its AMT liability on a separate entity basis.  The Bank, if it has a liability for an AMT, will be entitled to an AMT credit when, and if, such credit is recognized on the Group's consolidated income tax return.

**4.04**    **State and Local Income/Franchise Tax Liability or Benefit.**  The state and local income/franchise tax liability or benefit of the Bank will be computed based on the Bank's separate entity taxable income multiplied by the applicable jurisdiction's respective allocation factors and tax rates.  A state and local income/franchise tax liability based on an alternative tax method will be allocated to the Bank to the extent it has an alternative liability on a separate entity basis.  It is the intent of the Parties hereto that the concepts and methods defined in this Agreement for allocation of federal income taxes be applied in a similar manner to tax liability assessed by state and local taxing jurisdictions where there is combined tax liability between the Parties.

**4.05**    **2009 Net Operating Losses.**  Any net operating loss of the Bank for the 2009 taxable year (the "2009 NOL") shall be treated, for federal income tax purposes, as having been carried back to pre-2009 taxable years to the extent of $255,541,519.  Any amount of the 2009 NOL in excess of $255,541,519 shall be carried forward in calculating the Bank's federal income tax liability (or refunds) for 2010 and future years for all purposes of this Agreement.  The portion of the Bank's 2009 net operating losses treated as allocable to a state or locality in which the Bank joined in filing combined returns with LBHI or other members of the LBHI Group for 2009 shall also be carried forward in calculating the Bank's tax liability (or refunds) for that state or locality for 2010 and future years for all purposes of this Agreement, but only to the extent such 2009 net operating losses allocable to that state or locality were not carried back to pre-2009 taxable years in calculating refunds for that state or locality that were included in the Tax Payment Amount (as defined in the Settlement Agreement).  The net operating losses for 2009 treated as carried forward for federal, state and local tax purposes under the preceding two sentences, as well as net operating losses arising in 2010 and subsequent years, shall not be carried back to pre-2009 years for purposes of this Agreement, regardless of any election that LBHI may have as a result of any change in law or otherwise.

**4.06**   <u>**Other 2009 Tax Carry Forwards**</u>. This section shall apply if the Bank is determined to have tax benefits, other than the 2009 NOLs, including without limitation any tax credits, that could be carried forward for federal, state or local tax purposes if the Bank were filing its tax returns on a separate entity basis ("Other 2009 Carry Forwards"). In that event, the Other 2009 Carry Forwards shall be available to be used by the Bank in calculating its federal, state or local tax liabilities for 2010 and future years for all purposes of this Agreement, but only to the extent such amounts were not used in calculating the Tax Payment Amount (as defined in the Settlement Agreement).

<u>**Section 5 -**</u>

**Deferred Taxes**

**5.01**   <u>**Amount of Deferred Taxes**</u>. Deferred taxes, reflected either as an asset or liability, shall be computed by the Bank on a separate entity basis.

**5.02**   <u>**No Payment for Deferred Taxes**</u>. The Bank will not tender or accept payment relative to its separately computed deferred tax liabilities/benefits.

<u>**Section 6 -**</u>

**Refund and Payment**

**6.01**   <u>**Payment of Tax**</u>. Payments of tax by the Bank to LBHI shall equal the amount which the Bank has recorded as its current income/franchise tax liability on a separate entity basis. Estimated tax payments shall be made to LBHI by the Bank at the same time at which the Bank would have been required to tender such amount to the appropriate tax authority had it filed as a separate entity.

**6.02**   <u>**Income Tax Benefit**</u>. LBHI will pay the Bank for separate company net operating losses, capital loss carryovers, charitable contributions, Section 1231 gains and losses, general business credits, and other tax benefits (collectively, "Losses") generated by it, that are used in the consolidated return of the Group to the extent those Losses may be utilized by the Bank on a separate return basis as follows: Should the Bank incur Losses for income tax return purposes that it could utilize currently if it filed its return on a separate entity basis, it will record a current income tax benefit. Within a reasonable time (not to exceed thirty (30) days) of the date when the Bank would have filed its return utilizing such Losses, if it had been on a separate entity filing basis, it will be entitled to receive a refund from LBHI in an amount no less than the amount of the income tax benefit derived from such Losses. This refund shall be tendered to the Bank regardless of whether the Group is receiving a refund.

<u>**Section 7 -**</u>

**Recomputations and Adjustments**

**7.01**   <u>**IRS or Other Taxing Authority's Adjustment of Group Tax Liability**</u>. If any item of income, loss, expense, or a credit for Taxable Year 2010, or for any

subsequent taxable year for which this Agreement is in effect, is changed or adjusted by the Internal Revenue Service ("IRS") or other taxing authority, and such change or adjustment is part of a final determination, then the Parties hereby agree that the calculation of the separate tax of the Bank shall be recomputed so as to reflect such revision.  Appropriate payments will be tendered by or to the Bank, if required as a result of such recomputation.  The Bank will be charged or credited with interest and/or penalties resulting from such adjustments and recomputations.

**7.02**    **Other Recomputations.**  If there is any change of or adjustment to any item relating to the computation of payments under this Agreement of a type not provided for in Section 7.01 above (such as a recomputation of amounts due hereunder to reflect a carryback of an item of loss or credit, or a correction of any erroneous calculation previously made hereunder), then the Bank shall make or receive such payments as may be necessary and appropriate to reflect the intent of this Agreement.

**7.03**    **Pre-2010 Taxable Years.**  No recomputation or adjustment shall be made under this Agreement based on any change or adjustment of items in Pre-2010 Taxable Years, whether such changes or adjustments are made by federal or state tax authorities or otherwise.  Provided, that if federal, state or local tax authorities disallow net operating losses or other tax benefits claimed by the Bank in 2010 or a subsequent year and require such items to be taken instead in 2009, any increase in the amount of the 2009 NOL or the Other 2009 Tax Carry Forwards resulting from such change or adjustment shall be carried forward from 2009 and used in calculating the tax liability (or refunds) of the Bank for 2010 and later years.

## Section 8 -

### Miscellaneous Provisions

**8.01**    **Foreign Tax Liabilities.**  It is the intent of the Parties hereto that the concepts and methods defined herein for allocation of federal, state and local income taxes also be applied in a similar manner to any tax liability assessed by foreign taxing jurisdictions where there is a combined tax liability between the Parties.

**8.02**    **Basis of Certain Computations.**  In calculating the Bank's taxable income for purposes of this Agreement for 2010 and any future taxable year, the Bank's tax attributes as of January 1, 2010 will be calculated in a manner consistent with the tax accounting workpapers that support the Bank's financial statements as of December 31, 2009 (regardless of any adjustment to Pre-2010 Taxable Years by any taxing authority or the Bank that would have an effect on post-2009 taxable years).

**8.03**    **Successors and Assigns.**  This Agreement shall bind and inure to the benefit of the respective successors and assigns of the Parties hereto, but no assignment shall relieve any party's obligations hereunder without the written consent of the other party, which shall not be unreasonably withheld.

**8.04**    **Entire Understanding; Amendment.**  This Agreement contains the entire understanding of the Parties hereto with respect to the subject matter contained herein. This Agreement may not be amended without the written consent of each of the Parties hereto.  The Parties recognize and acknowledge their intention to enter into additional agreements from time to time with respect to the allocation of taxes not covered by this Agreement.

**8.05**    **Governing Law; Exclusive Jurisdiction**.  The validity, interpretation, and performance of this Agreement shall be controlled and construed under the laws of the State of Delaware.  The parties agree that, without limiting any party's right to appeal to final decision, the appropriate and exclusive forum for any disputes between the parties arising out of this Agreement shall be the Bankruptcy Court, or, if such court will not hear any such suit, the United States District Court for the Southern District of New York, and, the parties hereto irrevocably consent to the exclusive jurisdiction of such courts, and agree to comply with all requirements necessary to give such courts jurisdiction.

**8.06**    **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**8.07**    **Termination.**  Upon deconsolidation of the Bank from the Group for federal income tax purposes, this Agreement shall terminate and no further amounts shall be payable under this Agreement, except for amounts owing to the Bank or LBHI for the periods through the date of deconsolidation; provided, however, that, if the Bank continues to file on a combined, affiliated or consolidated basis with LBHI for state or local income/franchise tax purposes, this Agreement shall continue to apply in respect of such taxes.

**8.08**    **Compliance with Interagency Policy Statement.**  The Parties intend that this Agreement shall be construed and applied in a manner that complies with the provisions of the Interagency Policy Statement on Income Tax Allocation In a Holding

[The rest of this page intentionally left blank]

6

Company Structure,  63 Fed. Reg. 64757, November 23, 1998, part II, Interagency Policy Statement.

      IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date indicated below, to be effective as of the Effective Date provided above.

LEHMAN BROTHERS HOLDINGS INC.


By:_____        _____
     Name:                                                              Date
     Title:



AURORA BANK FSB


By:_____        _____
     Name:                                                              Date
     Title: