KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77027
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

*Counsel for the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                          :
In re                                     :      **Chapter 11 Case No.**
                                          :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :      **08-13555 (JMP)**
                                          :
                          **Debtors.**     :      **(Jointly Administered)**
                                          :
-------------------------------------------------------------------x

### MOTION OF LEHMAN COMMERCIAL PAPER INC. PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR APPROVAL OF THAT CERTAIN AMENDED AND RESTATED COMPROMISE BY AND AMONG LEHMAN COMMERCIAL PAPER INC., ALFRED H. SIEGEL, AS CHAPTER 11 TRUSTEE FOR THE SUNCAL DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN THE SUNCAL BANKRUPTCY CASES

TO THE HONORABLE JAMES M. PECK, UNITED STATES BANKRUPTCY JUDGE:

Lehman Commercial Paper Inc. ("LCPI," together with its affiliated debtors in the

above-referenced chapter 11 cases, the "Debtors," and, collectively with their non-debtor

affiliates, "Lehman"), files this Motion pursuant to Section 105 of Title 11 of the United States

Code ("Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and respectfully represents:

## Preliminary Statement

1.      By this Motion, LCPI seeks approval of a settlement pursuant to the terms set forth in an amended and restated term sheet (the "Amended Term Sheet") by and among (a) LCPI, on its own behalf and as agent for the First Lien Lenders (as defined below), (b) Alfred H. Siegel (the "SunCal Trustee"), the chapter 11 trustee of the estates of LBREP/L-SunCal Master I, LLC (the "SunCal Parent"), and LBREP/L-SunCal McAllister Ranch, LLC, LBREP/L-SunCal McSweeny Farms, LLC, and LBREP/L-SunCal Summerwind Ranch, LLC (collectively, the "SunCal Subsidiaries," and together with the SunCal Parent, the "SunCal Debtors"), which are being jointly administered under case no. 08-15588 (the "SunCal Bankruptcy Cases") in the United States Bankruptcy Court for the Central District of California ("SunCal Court"), and (c) the official committee of unsecured creditors in the SunCal Bankruptcy Cases (the "SunCal Committee").  The Amended Term Sheet is acknowledged and agreed as to certain provisions by one or more First Lien Lenders, and by LCPI, in its capacity as a Second Lien Lender (as herein defined) and a Third Lien Lender (as herein defined).  A copy of the Amended Term Sheet is attached hereto as Exhibit A.[1]

2.      By way of brief background, in 2006 and 2007, the SunCal Parent entered into certain credit agreements with LCPI, as agent, pursuant to which the SunCal Parent borrowed approximately $395 million.  The SunCal Subsidiaries guaranteed the SunCal Parent's obligations under such credit agreements.  On or about September 10, 2008, involuntary chapter

---

[1] The SunCal Trustee has filed (or will soon file) in the SunCal Bankruptcy Cases a motion similar to this Motion seeking approval of the Amended Term Sheet (the "SunCal Approval Motion").

11 cases were filed against the SunCal Debtors.  On or about October 9, 2009, the SunCal

Trustee filed a motion in the SunCal Bankruptcy Cases (the "Original Settlement Motion")

seeking the approval of a settlement pursuant to the terms of that certain original term sheet by

and among LCPI, the SunCal Trustee, and the SunCal Committee (the "Original Term Sheet").

Following the filing of the Original Settlement Motion, a dispute arose between LCPI, on the one

hand, and the SunCal Trustee and the SunCal Committee, on the other hand, regarding the

interpretation of a provision in the Original Term Sheet.  The parties were initially unable to

resolve their differences.

3.    On June 17, 2010, the SunCal Trustee filed a motion for relief from the

automatic stay in these bankruptcy cases (the "SunCal Stay Relief Motion") [Docket No. 9642]

seeking, among other things, stay relief to sell the real property of the SunCal Debtors (the

"Properties") free and clear of LCPI and the other First Lien Lenders' asserted liens and to deny

LCPI's credit bid rights.  The SunCal Trustee also sought permission to commence a complex

litigation against LCPI. At an initial hearing on the SunCal Stay Relief Motion held on July 14,

2010, this Court continued the hearing until August 18, 2010 and suggested to the parties that

they focus their attention on resolving their differences and reaching a settlement, as opposed to

planning for expensive and protracted litigation against each other.  As suggested by this Court,

the parties resumed negotiations, and as a result of the renewed discussions, LCPI, the SunCal

Trustee, and the SunCal Committee have now resolved their differences regarding the

interpretation of the Original Term Sheet and have executed the Amended Term Sheet. At a

status conference held on August 18, 2010, LCPI reported to this Court that it was seeking

internal approval to sign the Amended Term Sheet and would shortly thereafter be filing this

Motion for approval thereof.

NYC_IMANAGE-1195023.3

4.      LCPI believes that the Amended Term Sheet is a fair and reasonable compromise, and that its approval is in the best interests of LCPI's bankruptcy estate.  The Amended Term Sheet resolves all of the disputes between LCPI on its own behalf and as agent for the First Lien Lenders, on the one hand, and the bankruptcy estates of the SunCal Debtors, on the other hand. In particular, the Amended Term Sheet resolves all pending litigation between the parties, all disputes between the parties related to the SunCal Trustee's use of LCPI's and the other First Lien Lenders' cash collateral, and provides for a consensual process for the sale of the Properties (which are subject to the lien of LCPI, as agent for the First Lien Lenders).  Approval of the Amended Term Sheet will save LCPI's bankruptcy estate significant administrative expense, will eliminate the risk associated with litigation, and will substantially preserve LCPI's secured claims in the SunCal Bankruptcy Cases for the benefit of LCPI's bankruptcy estate and creditors.  Moreover, as set forth below, the Amended Term Sheet puts into place an acceptable structure relating to the disposition of the Properties (i.e., the First Lien Lenders' collateral), which will help ensure that the Properties are liquidated in a timely, efficient and beneficial manner (thereby allowing LCPI's share of the proceeds to be available to its bankruptcy estate much faster than in the absence of a settlement).

5.      Under the Amended Term Sheet, the Properties will be sold through a plan of reorganization, subject to LCPI's right to credit bid as provided in the Amended Term Sheet. Pursuant to the Amended Term Sheet, the SunCal Trustee and the SunCal Committee have agreed, among other things, that (a) the First Lien Lenders will have an allowed secured claim in the SunCal Bankruptcy Cases equal to the proceeds realized by them from the sale of the Properties plus certain cash proceeds to be remitted to the First Lien Lenders by the SunCal Trustee (after each amount is adjusted to account for certain "carve outs" and/or obligations, as

4

set forth in greater detail below), (b) the First Lien Lenders will have an allowed general
unsecured claim in the SunCal Bankruptcy Cases in the amount of their deficiency claims, and
(c) the SunCal Trustee, the SunCal Committee and the SunCal Debtors' estates will provide
broad releases to the First Lien Lenders, LCPI, and their respective officers, directors,
employees, agents and attorneys.[2]

6.     In return, under the Amended Term Sheet, LCPI on its own behalf and as
agent for the First Lien Lenders, has agreed that certain of the First Lien Lenders' cash collateral
will be "carved out" for the benefit of the administration of the SunCal Debtors' estates, and that
certain other cash collateral held by the SunCal Debtors may be used to preserve the Properties
until sale. In addition, the First Lien Lenders have agreed to share with the unsecured, non-lender
creditors in the SunCal Bankruptcy Cases a portion of the proceeds from the sale of the
Properties and certain litigation recoveries.

7.     Specifically, upon the entry of orders granting this Motion and the SunCal
Approval Motion, the SunCal Debtors' estates will receive $5.5 million in cash.  Of this sum,
$3.5 million will be available for use by the SunCal Trustee to administer the SunCal Debtors'
cases and to pursue the SunCal Debtors estates' claims against other third parties.  The remaining
$2.0 million will be used by the SunCal Trustee to maintain and preserve the Properties' pending
sale (with any unused residual amount to be transferred to the First Lien Lenders after the sale of
the Properties has closed).  Also, through the SunCal Debtors' plan of reorganization
contemplated under the Amended Term Sheet, the proceeds of any other recoveries by the

---

[2] The releases specifically do not include a release of LBREP Lakeside SC Master I LLC ("LBREP Lakeside"), SCC
Acquisitions, Inc. ("SCC Inc."), SCC Acquisitions, LLC ("SCC LLC"), or SCC Ranch Ventures LLC ("SCC
Ranch" and together with SCC Inc. and SCC LLC, "SCC"), or any claims related to the acts of the owners of any of
the SunCal Debtors including any transfers of funds to any of the owners by any of the SunCal Debtors.

SunCal Trustee (excluding proceeds from the sale of the Properties and the Yucaipa Funds (as herein described)) will be split 50/50 between (a) the First Lien Lenders on account of their unsecured deficiency claims, and (b) the SunCal Debtors' estates for distribution to the SunCal Debtors' unsecured non-lender creditors.[3] Finally, the SunCal Debtors' estates will also be entitled to 3.5% of any net recovery from the sale of the Properties to a third party, whether through the plan or subsequently by LCPI (after a credit bid). The Amended Term Sheet recognizes that there could be mechanics liens encumbering the Property that are senior to the lien of the First Lien Lenders. To the extent title insurance is not available to cover such claims, these senior mechanics liens, if any, will either be paid from the proceeds of a third party sale of the Properties, or in the event of an LCPI credit bid, will remain a lien on the Properties. In essence, the 3.5% recovery for the SunCal Debtors estate comes out of the sale proceeds otherwise payable to the First Lien Lenders.  LCPI believes that the concessions made by it under the Amended Term Sheet are reasonable in view of the benefits derived therefrom.

### **Relief Requested**

8.    By this Motion, LCPI seeks entry of an order pursuant to Section 105 of the Bankruptcy Code and Bankruptcy Rule 9019 approving the Amended Term Sheet and authorizing LCPI's entry into and consummation of the settlement and the transactions contemplated therein.

---

[3] Other than the First Lien Lenders, there are other lender creditors (Second Lien Creditors and the Third Lien Creditors) in the SunCal Bankruptcy Cases which have agreed, pursuant to intercreditor agreements, to turnover their distributions in the SunCal Bankruptcy Cases to the First Lien Lenders, until the First Lien Lenders claims are paid in full. The 50/50 split referenced above reflects the enforcement of the intercreditor agreements to effectuate the contemplated sharing arrangement.

6

## Background

9.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), Lehman Brothers Holdings Inc. ("LBHI") and certain of its subsidiaries filed with this Court voluntary petitions under Chapter 11 of the Bankruptcy Code.  On October 5, 2008, LCPI commenced its voluntary case under the Bankruptcy Code. The Debtors' Chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.      On September 17, 2008, the United States Trustee for the Southern District of New York ( "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code ( "Creditors' Committee").

11.      On April 14, 2010, the Debtors filed a revised joint chapter 11 plan and disclosure statement [Docket Nos. 8330 and 8332].

## Lehman's Business

12.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

13.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these Chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications

filed on September 15, 2008 [Docket No. 2].

## Jurisdiction

14.     This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## The History of the SunCal Debt

15.     The SunCal Parent is a holding company established to fund the real estate

development projects owned by each of its operating subsidiaries (i.e., the SunCal Subsidiaries).

Approximately ninety percent (90%) of the SunCal Parent is owned by LBREP Lakeside, which

is an affiliate of Lehman Bros. Real Estate Partners, LP ("LBREP").[4]  The remaining equity

interests in the SunCal Parent are owned by SCC Ranch, which is an affiliate of SCC Inc. d/b/a

SunCal Companies.  LBREP Lakeside is the managing member of the SunCal Parent.

16.     The SunCal Parent's primary asset, other than cash, is its interests in the

SunCal Subsidiaries.  The SunCal Parent is the sole equity member of the SunCal Subsidiaries,

each of which, in turn, owns a real estate development project bearing a similar name (the

Properties).  The SunCal Parent also has cash in accounts with a current aggregate balance of

over $13 million, which funds were formerly held in a "Development Account" and/or

"Operating Accounts" established under the LCPI loan documents.

17.     The SunCal Parent, as borrower, entered into three Lien Credit

Agreements with LCPI (collectively, the "Lien Credit Agreements").  Pursuant to the First and

Second Lien Credit Agreements, which were entered into on or around January 19, 2006, the

---

[4] Both LCPI and LBREP are affiliates of LBHI.

SunCal Parent borrowed a total of $320 million (collectively, the "January 2006 Loans") as follows: (1) a revolving credit facility of $75 million and term loan facility of $160 million under the First Lien Credit Agreement entered into with certain lenders party thereto (collectively, the "First Lien Lenders"); and (2) an $85 million term loan facility under the Second Lien Credit Agreement entered into with certain lenders party thereto (collectively, the "Second Lien Lenders").  The SunCal Parent's obligations under the First and Second Lien Credit Agreements were guaranteed by the SunCal Subsidiaries, and these  guaranties were secured by first and second liens against the Properties.  LCPI was a lender under the January 2006 Loans, and acted as the sole administrative agent, and Lehman Brothers, Inc. ("LBI"), served as the advisor, sole lead arranger and syndication agent.  Later, Gramercy Warehouse Funding I, LLC, replaced LCPI as the administrative agent under the Second Lien Credit Agreement.  As of the date of this Motion, LCPI (a) holds approximately thirty percent (30%) of the debt outstanding under the First Lien Credit Agreement in its capacity as a First Lien Lender, and (b) holds approximately fifteen percent (15%) of the debt outstanding under the Second Lien Credit Agreement in its capacity as a Second Lien Lender.

18.    As part of the 2006 Loans, among other things, certain loans made by affiliates of the Debtors were repaid, and a shareholder of the SunCal Parent, who was an affiliate of the Debtors, received a significant dividend.

19.    On February 6, 2007, a Third Lien Credit Agreement was entered into by the SunCal Parent and certain lenders party thereto (collectively, the "Third Lien Lenders" and together with the First Lien Lenders and the Second Lien Lenders, the "Lien Lenders"), which provided for an additional $75 million term loan (the "February 2007 Loan," and together with the January 2006 Loans, the "Loans").  The February 2007 Loan was also guaranteed by the

9

SunCal Subsidiaries and secured by third priority liens against the Properties.  Just as with the

January 2006 Loans, LCPI was a lender and served as the administrative agent, and LBI served

as advisor, sole arranger and syndication agent.  Square Mile Structured Debt (One), LLC, and

Square Mile Structured Debt (Two), LLC, collectively, replaced LCPI as the administrative

agent under the Third Lien Credit Agreements.  As of the date of this Motion, LCPI holds

approximately sixty-five percent (65%) of the debt outstanding under the Third Lien Credit

Agreement in its capacity as a Third Lien Lender.

       20.     Under certain intercreditor agreements, the Second Lien Lenders and the

Third Lien Lenders agreed and confirmed that their liens and right to payment from the SunCal

Debtors were subordinated in favor of the First Lien Lenders.

### SunCal Bankruptcy

       21.     On or about September 10 and 11, 2008, involuntary petitions under

Chapter 11 of the Bankruptcy Code were filed against the SunCal Debtors.  On or about October

29, 2008, the SunCal Court entered an order approving Alfred H. Siegel's appointment as the

chapter 11 trustee for the SunCal Debtors, and on October 30, 2008, orders for relief were

entered in the SunCal Bankruptcy Cases.

       22.     At the time of the filing of the SunCal Bankruptcy Cases, numerous events

of default existed under the First, Second and Third Lien Credit Agreements.  LCPI, as

administrative agent for the First Lien Lenders, has asserted a first priority lien against the

Properties and the SunCal Parent's cash for the full amount of the Loans extended to the SunCal

Parent under the First Lien Credit Agreement (and guaranteed by the SunCal Subsidiaries).

Likewise, the Second and Third Lien Lenders have also asserted liens against the Properties and

the SunCal Parent's cash for the full amount of their respective Loans. Based on appraisals

NYC_IMANAGE-1195023.3

received by LCPI and offers received by the SunCal Trustee, it is believed that the value of the Properties is substantially less than the amount of the First Lien Lenders debt.

## LCPI Stay Relief Motion

23.    On or about October 2, 2008, LCPI, in its capacity as agent to the First Lien Lenders, filed four motions for automatic stay relief (the "LCPI Stay Relief Motions"), seeking, *inter alia*, to foreclose on the First Lien Lenders' liens in the Properties and cash held by the SunCal Debtors.  The LCPI Stay Relief Motions were originally scheduled for hearing on October 28, 2008, but the SunCal Court continued the hearing to November 20, 2008 to allow the SunCal Trustee an opportunity to analyze the motions and prepare a response thereto.  Both the SunCal Trustee and the SunCal Committee opposed the LCPI Stay Relief Motions, in part, because both parties allegedly disputed the amount and validity of LCPI's liens.[5]

24.    In an effort to facilitate an amicable settlement among the parties, the evidentiary hearing on the LCPI Stay Relief Motions was continued by agreement of the parties on multiple occasions.  Currently, LCPI and the SunCal Trustee are parties to a stipulation, pursuant to which they agreed to take the evidentiary hearing related to the LCPI Stay Relief Motions off the calendar, and further agreed to suspend the related deadlines and discovery, subject to the parties' rights to re-notice and/or reinstate the same.  Absent a settlement, LCPI will have no other option but to re-notice the evidentiary hearing and pursue expensive and protracted litigation in order to obtain the stay relief necessary to foreclose on its interests in the Properties and the SunCal Parent's cash.

## SunCal Cash Collateral Disputes

---

[5] The arguments and claims of the SunCal Trustee and SunCal Committee regarding the amount and validity of LCPI's liens are set forth in greater detail herein.

NYC_IMANAGE-1195023.3

25.    Although LCPI and the SunCal Trustee were able to ultimately agree upon the use of the First Lien Lenders' cash collateral during the early stages of the SunCal Bankruptcy Cases, the parties were unable to reach an agreement regarding the use of cash collateral beyond November 30, 2009 (due to the breakdown in negotiations related to the Original Term Sheet, as set forth in greater detail below).  Accordingly, the SunCal Trustee filed motions in the SunCal Bankruptcy Cases for the use of cash collateral through December 31, 2009, March 31, 2010, and June, 30, 2010.  LCPI filed a limited objection to each motion, and each motion was granted over LCPI's limited objection.  On May 27, 2010, the SunCal Trustee filed a Motion for Order Authorizing Use of Cash Collateral Through September 30, 2010 in the SunCal Bankruptcy Cases.  LCPI filed an opposition to the motion.  On June 17, 2010, the SunCal Court heard and granted the motion over LCPI's opposition.  On June 25, 2010, the SunCal Court entered an *Order Granting Motion for Order Authorizing Use of Cash Collateral Through September 30, 2010* (the "Cash Collateral Order").  On July 9, 2010, LCPI filed a notice of appeal of the Cash Collateral Order ( "Appeal").  In light of the Amended Term Sheet, LCPI and the SunCal Trustee are in the process of memorializing a stipulation staying the Appeal pending the outcome of this Motion and the SunCal Approval Motion, which, if granted, will result in the dismissal of the Appeal.

## Original Term Sheet and Settlement Motion

26.    On or about October 9, 2009, after months of negotiations, the SunCal Trustee filed the Original Settlement Motion in the SunCal Bankruptcy Cases seeking the approval of the Original Term Sheet.  The Original Settlement Motion was, for various reasons, opposed by multiple third parties.

27.     Thereafter, the SunCal Trustee raised what he saw as an ambiguity in the Original Term Sheet, the interpretation of which resulted in a dispute between the settling parties.  Specifically, the Original Term Sheet required that the SunCal Trustee settle and obtain a release of any mechanic's and similar liens determined to be senior to the liens of LCPI ("Senior Liens") using LCPI's title insurance and $1.5 million of cash collateral set aside for that purpose.  The title insurance company, Fidelity National Title Insurance Company, objected to the Original Compromise Motion.  The SunCal Trustee became concerned that there was a possibility that he might not be able to discharge all of the Senior Liens which he asserted could have negative ramifications to the SunCal estates under the Original Term Sheet.

28.     LCPI, the SunCal Trustee, and the SunCal Committee attempted to resolve the dispute regarding the interpretation of the Original Term Sheet, and the hearing on the Original Settlement Motion was continued on multiple occasions.  Ultimately, on January 25, 2010, the SunCal Trustee filed a notice of withdrawal of the Original Settlement Motion in the SunCal Bankruptcy Cases.  After being unable to engage the SunCal Trustee to resolve their differences, by letter dated March 30, 2010, LCPI notified the SunCal Trustee of its termination of the proposed settlement embodied in the Original Term Sheet and reserved all of its rights related thereto.

**SunCal Stay Relief Motion**

29.     Following the break down in negotiations among the parties, the SunCal Trustee began pursuing a strategy aimed at selling the Properties free and clear of liens, including the liens of the First Lien Lenders, and pursuing the SunCal Debtors' purported claims against LCPI and the other First Lien Lenders.  To that end, on or about June 17, 2010, the SunCal Trustee filed the SunCal Stay Relief Motion in these cases, seeking, among other things,

13

stay relief to sell the Properties free and clear of LCPI's asserted liens and to deny LCPI's credit

bid rights.  The SunCal Trustee also sought permission to assert affirmative claims against LCPI.

LCPI filed an opposition to the SunCal Stay Relief Motion.  The SunCal Stay Relief Motion was

initially heard on July 14, 2010 and continued by this Court to August 18, 2010. The parties

engaged in further settlement discussions following the hearing and were able to resolve their

disputes concerning the Original Term Sheet.

### SunCal Claims Against LCPI

30.    In the SunCal Stay Relief Motion and in the responses of the SunCal

Trustee and the SunCal Committee to the LCPI Stay Relief Motions, the SunCal Trustee and the

SunCal Committee have repeatedly alleged that the SunCal Debtors' estates have numerous

claims against LCPI.  Among others, the SunCal Trustee and the SunCal Committee have stated

that they believe that the SunCal Debtors' have claims against LCPI to: (1) equitably subordinate

the claims of LCPI and cause the liens securing LCPI's claims to be transferred to the SunCal

Debtors' estates; (2) avoid the security interests held by LCPI against the Properties as fraudulent

transfers and preserve those security interests for the benefit of the SunCal Debtors' estates; and

(3) recover damages against LCPI for lender liability (the "SunCal Estate Claims").[6]

31.    LCPI disputes each of the SunCal Estate Claims and believes it has valid

defenses to each claim.  However, it is clear that litigating these claims would be expensive and

subject to the vagaries and risk of litigation, and until such litigation is resolved, there will be a

stalemate spanning two different bankruptcy courts as to how to deal with the Properties.

---

[6]   The SunCal Trustee has filed proofs of claim in the LCPI bankruptcy case asserting these claims.

## The Amended Term Sheet

32.     In an effort to globally resolve the numerous disputes among LCPI, the SunCal Trustee and the SunCal Committee, including, without limitation, disputes and claims arising from or relating to the LCPI Stay Relief Motions, the SunCal Stay Relief Motion, the Appeal and related cash collateral disputes, and the SunCal Estate Claims, and to avoid protracted, costly and uncertain litigation, LCPI believes it is in the best interests of its estate to enter into the Amended Term Sheet.  The salient terms of the Amended Term Sheet are summarized as follows:[7]

| | |
|---|---|
| **Allowance of LCPI Claim** | Upon the Settlement Effective Date,[8] the claim of the First Lien Lenders, for which LCPI serves as the administrative agent, will be allowed in each of the SunCal Bankruptcy Cases in the aggregate amount of $230,006,233.98, plus accrued and unpaid interest through the Petition Date and legal fees.  (*See* Ex. 1 at ¶ B.)  The First Lien Lenders' claim will be allowed as a secured claim in the amount of the aggregate final credit or third-party bid for the Properties as discussed below, plus any cash collateral received by the First Lien Lenders on the Settlement Effective Date, plus the amount of the Yucaipa Funds (as defined below) received by the First Lien Lenders, less any cash paid by the First Lien Lenders pursuant to paragraph H of the Amended Term Sheet.  The remaining amount of the First Lien Lenders' claim will be deemed an allowed general unsecured claim against each of the SunCal Debtors. (*See* Ex. 1 at ¶¶ B, F, H.) |
| **Distributions on Settlement Effective Date** | (a)  <u>Distribution of the Development Account Funds.</u>  The SunCal Trustee will retain $5.5 million from the funds originally held in the Development Account ( "<u>Development Account Funds</u>").  Of |

---

[7] This summary (the "<u>Summary</u>") of the Amended Term Sheet is qualified in its entirety by the terms and conditions of the Amended Term Sheet.  The Summary contained in this Motion is intended to be used for information purposes only and shall not in any way affect the meaning or interpretation of the Amended Term Sheet.

[8] As noted, the Amended Term Sheet contemplates that it will be approved by both this Court and the SunCal Court. The Settlement Effective Date is the date that the last of the compromise orders becomes a "Final Order" (as defined in the Amended Term Sheet). Unless there is a stay, the parties intend to close the settlement after the bankruptcy courts have approved the Amended Term Sheet and notwithstanding any appeals filed with respect to such approval orders.

15

this amount: (a) $3.5 million ( "Administrative Funds") will be available for the administrative expenses of the SunCal Debtors' estates and for potential distribution to non-lender general unsecured creditors; and (b) $2.0 million ( "Remaining Development Funds") will be retained to pay the operating expenses of the Properties pursuant to an approved budget. The balance of the Development Account Funds, after the sale of the Properties, will be transferred to the First Lien Lenders. (*See* Ex. 1 at ¶ C.1.) If the Remaining Development Funds are not sufficient, the First Lien Lenders have agreed, subject to certain conditions and limitations, to a further use of their cash collateral to preserve the Properties.

(b) Allocation of the Yucaipa Funds. The funds currently on deposit with the Yucaipa Valley Water District and paid to the SunCal Trustee pursuant to that certain Settlement Agreement and Release Agreement ( "Yucaipa Settlement Agreement") between the SunCal Trustee and Oak Valley Partners, L.P. ( "Yucaipa Funds"), will be split 50/50 between the SunCal Trustee and the First Lien Lenders.[9] As to the SunCal Trustee's 50% portion of the Yucaipa Funds ( "Trustee's YFP"), such funds will be transferred or otherwise retained by the SunCal Trustee free and clear of liens, claims, interests, and encumbrances. The Trustee's YFP will constitute additional Administrative Funds and shall be immediately available for use in the administration of the SunCal Debtors' cases. (*See* Ex. 1 at ¶ C.2.)

| **Sale of Properties Under the Plan** | The Properties will be sold pursuant to a plan of reorganization in the SunCal Bankruptcy Cases in accordance with bidding procedures to be developed by the parties in consultation with a broker of their choosing ( "Approved Broker") and approved by the SunCal Court. (*See* Ex. 1 at ¶ E.) The First Lien Lenders will be entitled to credit bid for the Properties. The initial credit bid by the First Lien Lenders will be in the aggregate amount of at least $45 million ( "Aggregate Minimum Credit Bid Amount") and the First Lien Lenders' credit bid will not exceed the maximum credit bid amount established by the parties prior to the Settlement Effective Date ( "Aggregate Maximum Credit Bid Amount"). The Aggregate Maximum Credit Bid Amount and the Aggregate |

---

[9]     On August 13, 2010, the SunCal Trustee filed a motion to approve the Yucaipa Settlement Agreement, which will be heard on September 30, 2010. If the Yucaipa Settlement Agreement is approved, the SunCal Trustee expects to receive approximately $434,000, of which 50% will be paid over to LCPI pursuant to the Amended Term Sheet.

Minimum Credit Bid Amount will be allocated among the Properties by the parties in consultation with the Approved Broker prior to the Settlement Effective Date.  Properties sold to the First Lien Lenders by way of credit bid will be sold subject to any Senior Liens .  Properties sold to a third party will be sold free and clear of any liens, claims, encumbrances, or interests (other than certain permitted liens, claims, encumbrances or interests), with all other liens, claims, encumbrances, or interests (including the lien of the First Lien Lenders) to attach to the sale proceeds.  (*See* Ex. 1 at ¶¶ E, F.)

**Resolution of Senior Liens**

The SunCal Trustee will reasonably cooperate with the First Lien Lenders in their efforts to determine whether any liens are superior to the liens of the First Lien Lenders against the Properties and to determine the amount of such superior liens.  However, the SunCal Trustee will not be obligated to take any action that would cause the SunCal Trustee or the SunCal Debtors' bankruptcy estates to incur material cost or liability.  (*See* Ex. 1 at ¶ J.)

**Distributions Pursuant to the Plan**

(a)  <u>Distributions of Other Recoveries.</u>  The plan will provide that all proceeds recovered from sources other than the sale of the Properties or the Yucaipa Funds (<u>e.g.</u>, from litigation against other third parties) ("<u>Other Recoveries</u>"), subject to the payment of administrative and priority unsecured claims, will be split 50/50 between the First Lien Lenders, on the one hand, and the holders of allowed claims against the SunCal Debtors other than the First, Second and Third Lien Lenders (collectively, the "<u>Trade Creditors</u>") (on an administratively consolidated pro rata basis), on the other hand, until the Trade Creditors are paid in full (the "<u>50/50 Distribution Scheme</u>").  If, under the Amended and Restated Intercreditor Agreement among the First, Second and Third Lien Lenders (the "<u>Intercreditor Agreement</u>"), Other Recoveries paid to the Second and Third Lien Lenders must be paid to the First Lien Lenders, then the Other Recoveries will be split 50/50 between the First Lien Lenders and the Trade Creditors.  If, on the other hand, the Intercreditor Agreement does not require that the Second and Third Lien Lenders pay Other Recoveries to the First Lien Lenders, then the allowed unsecured claims of the First Lien Lenders, and, to the extent necessary, the allowed unsecured claims of LCPI, as a Second Lien Lender and as a Third Lien Lender, will be assigned to the SunCal Debtors' bankruptcy estates on behalf of the Trade Creditors to provide the Trade Creditors with the equivalent of what they would have received under the 50/50 Distribution Scheme.  (*See* Ex. 1 at ¶ Q.)

17

(b) <u>SunCal Trustee's Participation in Recovery.</u>  The SunCal Trustee will be entitled to recover the lesser of (i) the amount necessary to pay the allowed claims of the Trade Creditors, and (ii) 3.5% of the Proceeds (defined below) from the sale of the Properties to a third party through the plan or, if the First Lien Lenders acquire the Properties through the plan by way of a credit bid, then from the Proceeds from the subsequent disposition of the Properties by the First Lien Lenders (the "<u>Trustee's Participation</u>").  "<u>Proceeds</u>" means all cash or other proceeds from the disposition of each Property, less (i) customary and reasonable costs and expenses of sale, and (ii) the cash or other property used to satisfy any Senior Liens not otherwise satisfied under the plan or under the First Lien Lenders' title insurance policy.  The SunCal Trustee will be entitled to the Trustee's Participation only upon actual receipt of Proceeds by the First Lien Lenders.  (*See* Ex. 1 at ¶ R.)

| | |
|---|---|
| **Trustee Loss Collateral** | On the Settlement Effective Date, LCPI on behalf of the First Lien Lenders will deliver to the SunCal Trustee cash or irrevocable letters of credit acceptable to the SunCal Trustee in the aggregate amount of $500,000 (the "<u>Trustee Loss Collateral</u>").  The Trustee Loss Collateral will be used to cover proven losses that occur during the period from the Settlement Effective Date to the date of transfer of title to the Properties (the "<u>Trustee Maintenance Period</u>") based on claims of simple negligence or strict liability in connection with the ownership, operation, maintenance and management of the Properties, to the extent such losses are not covered by insurance and subject to a formula set forth in section G of the Amended Term Sheet.  Upon a termination event or the effective date of the plan, the SunCal Trustee will deliver any remaining Trustee Loss Collateral to LCPI.  (*See* Ex. 1 at ¶ G.) |
| **Releases** | As of the Settlement Effective Date, (a) the SunCal Debtors' estates through the SunCal Trustee will be deemed to have released the First Lien Lenders and LCPI (in its individual capacity and in its capacity as administrative agent for the First Lien Lenders), and, except with respect to those entities specifically carved-out below, their respective affiliated parties, officers, directors, employees, agents and attorneys, and (b) LCPI (in its individual capacity as a First Lien Lender and in its capacity as administrative agent for the First Lien Lenders but not in any other capacity) and the First Lien Lenders will be deemed to have released the SunCal Debtors' estates and the SunCal Trustee and the SunCal Trustee's agents and attorneys, in each case for and |

18

from all claims (as defined in Section 101(5) of the Bankruptcy Code and including any claims that could be brought by or against the SunCal Trustee pursuant to the Bankruptcy Code) other than the rights and benefits granted and preserved under the Amended Term Sheet including without limitation the allowed claims set forth in the Amended Term Sheet and the rights to receive distributions based on those allowed claims.  Notwithstanding the foregoing and for the avoidance of doubt, the releases to be given by the SunCal Trustee will not include claims and causes of action against any third parties other than the First Lien Lenders and LCPI and their respective affiliated parties, officers, directors, employees, agents and attorneys acting in their capacities as lenders, agents, loan administrators or advisors thereto, and such releases specifically do *not* include a release of LBREP Lakeside, SCC Inc., SCC LLC, or SCC Ranch or any claims related to the acts of the owners of any of the SunCal Debtors including any transfers of funds to any of the owners by any of the SunCal Debtors.  If the Settlement Effective Date does not occur for any reason, the foregoing releases will be of no force or effect.

**Termination Event**    If a final order confirming the plan is not in effect by February 28, 2011 (or such later date as may be agreed upon by LCPI, the SunCal Trustee, and the SunCal Committee), then: (a) the First Lien Lenders will be granted relief from the automatic stay to immediately foreclose on the Properties, and the SunCal Trustee (and any party claiming by or through any of the SunCal Debtors) shall be prohibited from interfering with such foreclosure; (b) the SunCal Trustee will retain the Administrative Funds and the Trustee's YFP free from the secured claims of the Lien Lenders; (c) the First Lien Lenders will retain the balance of the Development Account Funds and its share of the Yucaipa Funds; and (d) the SunCal Trustee will immediately pay over to the First Lien Lenders the unused portion of the Remaining Development Funds, and the Trustee Loss Collateral free of all claims and interests.  (*See* Ex. 1 at ¶ T.)

## The Settlement Meets the Legal Standard
## Established Under Bankruptcy Rule 9019 and Is in the Best Interests of LCPI's Estates

33.    The proposed settlement is in the best interests of LCPI's estates and should be approved under Bankruptcy Rule 9019, which provides, in part, that "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or

19

settlement." FED. R. BANKR. P. 9019(a).  This rule empowers bankruptcy courts to approve settlements "if they are in the best interests of the estate."  Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.) 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); Fisher v. Pereira (In re 47-49 Charles St., Inc.), 209 B.R. 618, 620 (S.D.N.Y. 1997); In re Ionosphere Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994).  A decision to accept or reject a compromise or settlement is within the sound discretion of the Court.  Drexel Burnham Lambert Group, 134 B.R. at 505; see also 9 Collier on Bankruptcy ¶ 9019.02 (15th ed. rev. 2001).  The settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness." Drexel Burnham Lambert Group, 134 B.R. at 505.  See also Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983); In re Spielfogel, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).  Indeed, courts have long considered compromises to be "a normal part of the process of reorganization." TMT Trailer Ferry, 390 U.S. at 424 (quoting Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130 (1939).

34.    The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court.  Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994).  Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements." In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).  However, the analysis must focus on the question of whether a particular compromise is "fair and equitable, and in the best interest of the estate."  In re Best Products, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).

NYC_IMANAGE-1195023.3

35.    While a court must "evaluate … all … factors relevant to a fair and full assessment of the wisdom of the proposed compromise," Anderson, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, W.T. Grant Co., 699 F.2d at 608, or conduct a full independent investigation.  Drexel Burnham Lambert Group, 134 B.R. at 496.  "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact….  The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness." Nellis, 165 B.R. at 123 (internal citations omitted).

36.    The court may give weight to the "informed judgments of the … debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise." Drexel Burnham Lambert Group, 134 B.R. at 505 (internal citations omitted); see also In re Purofied Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993); accord In re Ashford Hotels Ltd., 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness….  If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other.") (internal citations omitted).

37.    LCPI, in its business judgment, has determined that the Amended Term Sheet (and the settlement embodied therein) provides the best framework for globally resolving the numerous disputes by and among LCPI, the SunCal Trustee and the SunCal Committee, including, without limitation, disputes and claims arising from or relating to the LCPI Stay Relief Motions, the SunCal Stay Relief Motion, the Appeal and related cash collateral disputes, and the SunCal Estate Claims.

21

38.     As discussed above, the SunCal Trustee has alleged that the SunCal Debtors' estates have claims to equitably subordinate LCPI's secured claims, avoid LCPI's liens, and to recover damages against LCPI for lender liability (i.e., the SunCal Estate Claims).  The SunCal Estate Claims are resolved by the Amended Term Sheet by and through the release of such claims by the SunCal Debtors' estates, as well as the grant of an allowed secured claim to LCPI, as agent for the First Lien Lenders, in an amount equal to the successful bid for the Properties, plus any cash collateral received by the First Lien Lenders on the Settlement Effective Date, plus the amount of the Yucaipa Funds received by the First Lien Lenders.

39.     In exchange for the release of the SunCal Estate Claims, the grant of the allowed secured claim (including the right to credit bid such claim), and the other benefits received by LCPI and the First Lien Lenders under the Amended Term Sheet, LCPI, as agent for the First Lien Lenders, has agreed to "carve out" certain amounts of its collateral and transfer that collateral to the SunCal Trustee for the benefit of the SunCal Debtors' estates (i.e., the Administrative Funds, the Trustee's YFP, amounts payable under the 50/50 Distribution Scheme and the Trustee's Participation).  Additionally, LCPI, as agent for the First Lien Lenders, has agreed to allow the SunCal Trustee to use certain additional cash collateral to maintain the Properties prior to their disposition (i.e., the Remaining Development Funds) and has agreed to post the Trustee's Loss Collateral.

40.     While LCPI believes that it has valid defenses to each of the SunCal Estate Claims, in order to successfully defend the SunCal Estate Claims, LCPI would be required to engage in expensive and protracted litigation with the SunCal Trustee and the SunCal Committee.  Additionally, absent the settlement set forth in the Amended Term Sheet, LCPI and the other First Lien Lenders would not be able to recover their collateral (i.e., the Properties and

22

cash) or the proceeds of their collateral in the foreseeable future (if at all).  Absent the settlement, if LCPI wishes to obtain the Properties, LCPI will be required to pursue the LCPI Stay Relief Motions in the SunCal Bankruptcy Cases and convince the SunCal Court that lifting the automatic stay is appropriate.  Again, this litigation would likely be expensive and protracted, and would come with many of the same aforementioned uncertainties.  By contrast, the Amended Term Sheet not only provides a framework for LCPI and the other First Lien Lenders to obtain the benefit of their collateral through an imminent plan sale of the Properties, it also preserves LCPI's credit bidding rights and gives LCPI significant input with respect to the conduct of the sale of the Properties.  In short, the Amended Term Sheet provides a framework that will facilitate the sale of the Properties in the near future (with a substantial portion of the sale proceeds to be paid to LCPI ) in a manner that has a material, direct and tangible benefit to LCPI's estate.

41.    Based on the foregoing, the Amended Term Sheet is reasonable and in the best interests of LCPI and its estate and creditors, and, as a result, the Court should authorize and approve LCPI's entry into the Amended Term Sheet and its performance of its obligations thereunder.

## Notice

42.    No trustee has been appointed in these chapter 11 cases.  LCPI has served notice of this Motion in accordance with the procedures set forth in the amended order entered on June 17, 2010 governing case management and administrative procedures [Docket No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) counsel to the SunCal Trustee; (vii) counsel to the SunCal

Committee; and (viii) all parties who have requested notice in these chapter 11 cases.  LCPI

submits that no other or further notice need be provided.

43.       No previous request for the relief sought herein has been made by LCPI to

this Court.

WHEREFORE LCPI respectfully request that the Court grant the relief requested

herein and such other and further relief as it deems just and proper.

Dated:  September 2, 2010
       New York, New York

/s/ Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77027
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg

*Counsel for the Debtors and Debtors-in-Possession*

24

## Exhibit A

Amended Term Sheet

See attached.

NYC_IMANAGE-1195023.3

<u>BINDING AMENDED AND RESTATED TERM SHEET AMONG
LCPI AS ADMINISTRATIVE AGENT FOR THE 1st LIEN LENDERS, LCPI AS THE 2ND
LIEN LENDER, LCPI AS THE 3RD LIEN LENDER, THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, AND THE CHAPTER 11 TRUSTEE</u>

This Binding Amended And Restated Term Sheet dated as of August 18, 2010 (this "<u>Term Sheet</u>") is by and among ALFRED H. SIEGEL, solely in his capacity as the chapter 11 trustee (the "<u>Trustee</u>") of the administratively-consolidated estates of LBREP/L-SunCal Master I LLC ("<u>Parent Debtor</u>"), LBREP/L-SunCal McAllister Ranch LLC ("<u>McAllister Ranch</u>"), LBREP/L-SunCal McSweeny Farms LLC ("<u>McSweeny Farms</u>"), and LBREP/L-SunCal Summerwind Ranch LLC ("<u>Summerwind Ranch</u>"; with McAllister Ranch, McSweeny Farms and Summerwind Ranch being referred to collectively as the "<u>Subsidiary Debtors</u>," and together with the Parent Debtor, as the "<u>Debtors</u>") in their respective bankruptcy cases (the "<u>SunCal Bankruptcy Cases</u>") now pending in the United States Bankruptcy Court for the Central District of California (the "<u>California Bankruptcy Court</u>"); THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS of the Debtors (the "<u>Creditors' Committee</u>"); LEHMAN COMMERCIAL PAPER INC. ("<u>LCPI</u>"), in its capacity as administrative agent for the first-position secured lenders of the Debtors (the "<u>1st Lien Lenders</u>"); and is acknowledged and agreed as to certain provisions by one or more 1st Lien Lenders; by LCPI in its capacity as a second-position secured lender of the Debtors ("<u>LCPI 2nd Lien Lender</u>"); and by LCPI in its capacity as a third-position secured lender of the Debtors ("<u>LCPI 3rd Lien Lender</u>"), in order to reach interim agreement with respect to the distribution of certain funds, to establish certain parameters for a chapter 11 plan of reorganization for the Debtors and otherwise to establish the terms for globally resolving all disputes between the parties to this Term Sheet. Notwithstanding any references to the contrary contained herein, each and every reference in this Term Sheet to "Trustee" shall mean and refer to ALFRED H. SIEGEL solely and exclusively in his capacity as the chapter 11 trustee of the administratively-consolidated estates of the Debtors, and in no other capacity, and in no event whatsoever shall ALFRED H. SIEGEL have any personal liability of any kind, nature or amount as a result of this Term Sheet, including, without limitation, any performance, failure of performance, breach, default or other circumstance arising from or related to this Term Sheet, the implementation thereof, or the transactions contemplated herein.

That certain Binding Term Sheet Among LCPI As Administrative Agent For The 1st Lien Lenders, The Official Committee Of Unsecured Creditors, And The Chapter 11 Trustee, dated September 23, 2009 (the "<u>Original Term Sheet</u>"), is hereby superseded, amended, restated and replaced in its entirety by the terms hereof, and the Original Term Sheet is and shall be null and void and of no further binding force or effect.

## <u>DEAL TERMS</u>

### <u>The Amended Compromise Motion</u>

A.    1.    The Trustee will seek approval of this compromise by filing an amended motion (the "<u>Amended Compromise Motion</u>") under Federal Bankruptcy Rule 9019 within ten (10) calendar days of the Trustee's actual receipt of a copy of this Term Sheet fully executed by all non-Trustee parties hereto. The Trustee shall file the Amended Compromise Motion in all of the SunCal Bankruptcy Cases and LCPI shall

concurrently file the Amended Compromise Motion in the LCPI bankruptcy case (the "<u>LCPI Bankruptcy Case</u>", and together with the SunCal Bankruptcy Cases, the "<u>Bankruptcy Cases</u>") pending in the United States Bankruptcy Court for the Southern District of New York (the "<u>New York Bankruptcy Court</u>", and together with the California Bankruptcy Court, the "<u>Bankruptcy Courts</u>") to obtain approval of this Term Sheet.    The orders approving the Amended Compromise Motions (the "<u>Compromise Orders</u>") must be obtained, entered in the respective Bankruptcy Courts and become "Final Orders" (as defined in paragraph A(2) below),  by no later than November 1, 2010, unless this date is extended by mutual agreement of the Trustee, LCPI and the Creditors' Committee.  If the Compromise Orders have not become Final Orders on or before November 30, 2010, this Term Sheet, and the terms and provisions hereof and thereof shall become null and void and of no further force and effect, in which case the parties hereto shall have no further obligations hereunder or to each other with respect to the subject matter hereof.  Immediately upon the last of the Compromise Orders becoming a Final Order, this Term Sheet shall be binding on LCPI, the Trustee, the Creditors' Committee and each other party hereto (such date being referred to herein as the "<u>Settlement Effective Date</u>").  All parties hereto acknowledge that all other parties hereto intend to and will rely on the binding nature of this Term Sheet as of the Settlement Effective Date in moving forward with the Bankruptcy Cases.  The terms of this Term Sheet will be incorporated into one or more plans of reorganization to be filed by the Trustee (the "<u>Plan</u>") in consultation with, or jointly with, the Creditors' Committee in the California Bankruptcy Court with respect to the SunCal Bankruptcy Cases.    The Trustee and the Creditors' Committee shall work together in good faith with LCPI to ensure that the Plan is consistent with this Term Sheet.   If LCPI believes that the Plan filed does not materially conform to this Term Sheet, then LCPI shall have the right to object to the Plan solely with respect to the alleged material nonconformity with the Term Sheet, and the Trustee and the Committee agree that the Plan shall be modified, consistent with any ruling of the Bankruptcy Courts to make it conform materially with the Term Sheet.  The Plan shall be subject to LCPI's reasonable consent prior to filing, provided such consent shall not be withheld if the Plan is in a form and substance materially consistent with the Term Sheet.

2.    "Final Order" means an order or judgment of either of the Bankruptcy Courts entered on the Bankruptcy Court's docket where either: (a) the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending, or (b) if such an appeal or petition has been timely filed, there is no stay pending appeal or other injunction or court order in place which prohibits the enforcement of the Term Sheet.

3. Subject to the Settlement Effective Date, the Trustee and the Creditors' Committee shall stipulate to LCPI being granted immediate relief from the automatic stay for the sole and only purpose of allowing LCPI in its capacity as administrative agent for the 1st Lien Lenders to record a new notice of default on behalf of the 1st Lien Lenders with respect to the Parent Debtor and Subsidiary Debtors so as to allow LCPI to re-commence the period within which a foreclosure sale may be conducted

with respect to such first position lien. This stipulation shall not include relief from stay for any other or further foreclosure or enforcement actions such as, but not limited to, recording of a notice of sale or the holding of a trustee's sale.

## Allowance of Claim of LCPI; Claims Filed by 2nd and 3rd Lien Lenders

B.      Upon the Settlement Effective Date, the claim of the 1st Lien Lenders in the aggregate amount of $230,006,233.98 plus accrued and unpaid interest calculated through September 10, 2008 (the "Petition Date"), and accrued and unpaid legal fees shall be allowed in each of the SunCal Bankruptcy Cases; provided, however, the 1st Lien Lenders' allowed secured claims against the Subsidiary Debtors shall be in the amount of the 1st Lien Lenders' final credit bid under 11 U.S.C. Section 1123(a)(5)(d) pursuant to the Plan, as set forth in and adjusted in accordance with paragraphs E and F below (or, in the case of one or more successful bids by any third-party purchasers at the related sales pursuant to the Plan, the aggregate amount of such successful third-party bids), plus any amounts received by the 1st Lien Lenders as described in paragraph D below, and minus any amounts paid by the 1st Lien Lenders as described in paragraph H below. Any amount not deemed a portion of the 1st Lien Lenders' allowed secured claim shall be deemed an allowed unsecured claim against all of the Debtors as further described in paragraph F below. Proofs of claim have been filed in the Bankruptcy Cases by second position lenders (the "2nd Lien Lenders") and third position lenders (the "3rd Lien Lenders", with the 1st Lien Lenders, the 2nd Lien Lenders and the 3rd Lien Lenders being referred to collectively as the "Lenders"). The Lenders have alleged that their loans to the Parent Debtor are guaranteed by each of the Subsidiary Debtors. This Term Sheet is not intended to affect the rights, if any, of (a) the 2nd Lien Lenders other than LCPI 2nd Lien Lender, (b) the 3rd Lien Lenders other than LCPI 3rd Lien Lender, or (c) any other Person (as defined in the First Lien Credit Agreement dated January 19, 2006 (as amended) among LCPI, Parent Debtor, the 1st Lien Lenders, and certain other parties (the "First Lien Credit Agreement"), except to the extent that a Person is a party hereto, with such Person's rights being affected to the extent expressly provided herein).

## Distributions Upon Settlement Effective Date

C.      1.  On the Settlement Effective Date, the Trustee will retain $3.5 million from those certain Parent Debtor funds previously held by First Bank & Trust and subsequently transferred to the Trustee for the benefit of the Debtors' estates, which funds are currently subject to the liens and rights of the 1st Lien Lenders (the "Development Account Funds"), for use by the Trustee in administration of the SunCal Bankruptcy Cases. The $3.5 million of the Development Account Funds retained by the Trustee pursuant to this Term Sheet for use by the Trustee in administration of the SunCal Bankruptcy Cases shall hereinafter be referred to as the "Administrative Funds". The Administrative Funds shall be immediately available to the Trustee to pay administrative claims owing in the SunCal Bankruptcy Cases. In addition, upon the effective date of the Plan, any portion of the Administrative Funds not used to pay administrative claims as provided in the previous sentence or used or reserved to pay post-confirmation fees and costs of professionals of the Debtors' estates and/or

quarterly fees payable to the Office of the United States Trustee and court costs shall be available to make distributions to non-Lender creditors in respect of unsecured claims. In addition to the $3.5 million in Administrative Funds, the Trustee shall also retain $2.0 million of the Development Account Funds (the "Remaining Development Funds"), which Remaining Development Funds may be used by the Trustee solely to fund the ongoing current expenses of maintaining the real property owned by McAllister Ranch, McSweeny Farms, and Summerwind Ranch (together, the "Properties") pursuant to cash collateral orders of the California Bankruptcy Court in a manner consistent with the budget attached as Exhibit "A" hereto (the "Approved Budget"), subject to the budget variances allowed pursuant to Paragraph G below, or otherwise for uses for which the Trustee obtains the 1st Lien Lenders' consent (not to be unreasonably withheld) or which are approved by the California Bankruptcy Court after notice to the 1st Lien Lenders. The Approved Budget shall include quarterly fees payable to the Office of the United States Trustee and court costs. Any unused Remaining Development Funds will be transferred to the 1st Lien Lenders within five business days of the date that the Debtors no longer hold title to the Properties.

2.   The funds currently on deposit with the Yucaipa Valley Water District and to be paid to the Trustee pursuant to that certain Settlement and Release Agreement (the "Yucaipa Settlement") between the Trustee and Oak Valley Partners, L.P. (the "Yucaipa Funds"), shall be split 50/50 between the 1st Lien Lenders and the Trustee. The Trustee's 50% portion of the Yucaipa Funds shall be referred to herein as the "Trustee's YFP"; and the 1st Lien Lenders' 50% portion of the Yucaipa funds shall be referred to herein as the "1st Lien Lenders' YFP." Following the entry of an order approving the Yucaipa Settlement by the California Bankruptcy Court (the "Yucaipa Settlement Order") and the Trustee's receipt of the Yucaipa Funds, the Yucaipa Funds shall be segregated by the Trustee from other funds in his possession relating to the Debtors and held by the Trustee, subject to the asserted liens, claims, interests and encumbrances of the 1st Lien Lenders. On the Settlement Effective Date, (a) the 1stLien Lenders' YFP shall be paid to the 1st Lien Lenders free and clear of any claims or interests of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors, and (b) the asserted liens, claims, interests and encumbrances of the 1st Lien Lenders in the Trustee's YFP shall be avoided and preserved for the benefit of the Detbors' bankruptcy estates pursuant to 11 U.S.C. §§ 544 and 551, and the the Trustee's YFP shall immediately be available for use by the Trustee in the administration of the SunCal Bankruptcy Cases. The Trustee's YFP shall constitute additional funds of the Trustee and shall be treated as additional Administrative Funds (as Administrative Funds is defined in paragraph C).

Notwithstanding the foregoing, (a) if the Yucaipa Settlement is approved by the California Bankruptcy Court and the Trustee receives possession of the Yucaipa Funds but the Settlment Effective Date does not occur by the deadline set forth in paragraph A(1) above , then the Yucaipa Funds shall be segregated by the Trustee subject to the asserted liens, claims, interests and encumbrances of the 1st Lien Lenders, which liens, claims, interests and encumbrances may be challenged by the Trustee in accordance with applicable law and procedure and shall not be distributed or used without further order of the California Bankruptcy Court obtained on proper

notice and hearing, and (b) if the Yucaipa Settlement is not approved by the California Bankruptcy Court, the respective rights of the parties to the Term Sheet to all the funds currently held by the Yucaipa Valley Water District shall be preserved. Notwithstanding the foregoing, nothing herein shall be deemed an admission regarding the existence or validity of any lien or right asserted by the 1st Lien Lenders in the funds currently held by the Yucaipa Valley Water District.

D.   Upon the Settlement Effective Date, the Trustee shall immediately transfer to the 1st Lien Lenders, free and clear of any claims or interests of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors, (a) all Development Account Funds less the aggregate $5.5 million in Administrative Funds and Remaining Development Funds to be retained by the Trustee pursuant to paragraph C above and (b) the 1st Lien Lenders' YFP (all of the funds to be transferred to the 1st Lien Lenders hereafter referred to as the "1st Lien Lenders Retained Settlement Funds").

### Sale Of Properties Under The Plan

E.   The 1st Lien Lenders acting collectively in concert shall be the initial bidder with respect to each of the Properties and, subject to paragraph F below, shall credit-bid their allowed secured claims with respect to each Property in accordance with the bidding procedures set forth in paragraphs F and P below, as such bidding procedures may be further drafted and agreed upon by the parties hereto in consultation with a real property broker acceptable to each of the parties hereto (the "Approved Broker") and otherwise approved by the California Bankruptcy Court to the extent required (together, the "Bidding Procedures"). Properties for which the 1st Lien Lenders are determined to be the winning bidders pursuant to, in accordance with, and as more particularly described in the Bidding Procedures (the "Winning Bidders"), and which are purchased by the 1st Lien Lenders by way of credit bid, shall be transferred to the 1st Lien Lenders subject to (i) the lien of the 1st Lien Lenders, (ii) Senior Liens (hereinafter defined), and (iii) liens, claims, encumbrances or interests that satisfy clause (b), (c) and/or (d) of the definition of "Permitted Exceptions" set forth in the First Lien Credit Agreement (items described in this clause (iii), "Permitted Liens") Properties for which one or more third parties are determined to be the Winning Bidders shall be sold under the Plan pursuant to 11 U.S.C. Section 1123(a)(5)(d) free and clear of liens, claims, encumbrances or interests other than Permitted Liens.

F.   The initial credit bids by the 1st Lien Lenders shall be in an aggregate amount which shall be at least equal to $45 million (the "Aggregate Minimum Credit Bid Amount") and shall not exceed a maximum amount (the "Aggregate Maximum Credit Bid Amount"), with such Maximum Credit Bid Amount to be determined prior to the Settlement Effective Date by the 1st Lien Lenders in consultation with the Approved Broker. The Aggregate Minimum Credit Bid Amount and the Aggregate Maximum Credit Bid Amount shall be respectively allocated among the three Properties by the parties hereto in consultation with the Approved Broker prior to the Settlement Effective Date (the Aggregate Maximum Credit Bid Amount as so allocated in each case, the "Allocated Maximum Credit Bid Amount"). The 1st Lien Lenders shall be

5

entitled to increase their respective credit bid for each Property to an amount, to be determined prior to the Settlement Effective Date by the parties hereto in consultation with the Approved Broker, in excess of the highest competing bid for such Property, if any, up to the Allocated Maximum Credit Bid Amount with respect to such Property and up to the Aggregate Maximum Credit Bid Amount in the aggregate for all of the 1st Lien Lenders' credit bids with respect to the Properties (in each case with no set-offs, reductions or other defenses) in their discretion in accordance with the overbid procedures set forth herein.  If one or more of the Properties are successfully bid upon by a qualified bidder (as the same may be more particularly described in the Bidding Procedures, each a "Qualified Bidder"), the Trustee may, subject to the right of the 1st Lien Lenders to submit a greater bid, sell such Property(ies) to such third party free and clear of all Liens (including the lien of the 1st Lien Lenders) other than Permitted Liens (hereinafter defined).  Any Senior Liens and the lien of the 1st Lien Lenders shall each attach to any monies (other than the Trustee's Participation under paragraph R) received from the sale to a third party and such monies, net of any ordinary course sales costs and subject to the rights of any holders of Senior Liens, shall be paid to the 1st Lien Lenders.  Payment of the Trustee's Participation to the Trustee shall only be made at such time when all Senior Lien claims have been resolved (through settlement, payment or otherwise) or Fidelity has accepted responsibility for all remaining Senior Liens.  The 1st Lien Lenders shall have an allowed unsecured claim as set forth in paragraph B above.  For the avoidance of doubt, in accordance with paragraph B above, the calculation of the 1st Lien Lenders' allowed unsecured claim shall take into account (1) the 1st Lien Lenders' aggregate credit bids for those Properties that were included in their winning bids pursuant to and in accordance with the Bidding Procedures (as the same may be more particularly described in the Bidding Procedures, each a "Winning Bid") minus any liabilities (including, without limitation, liabilities in respect of any Senior Liens) assumed by the 1st Lien Lenders in connection with the transfer of title to such Properties to the 1st Lien Lenders pursuant to such Winning Bids and (2) any proceeds received by the 1st Lien Lenders from the sale pursuant to the Plan of any of the Properties that were not included in the 1st Lien Lenders' Winning Bids to one or more third parties.

**Use of Remaining Development Funds; Trustee Loss Collateral**

G.      During the period from the Settlement Effective Date until the transfer of title of all of the Properties to the 1st Lien Lenders and/or to any third party(ies), either pursuant to the Plan or by way of a foreclosure by the 1st Lien Lenders (the "Trustee Maintenance Period"), the Trustee shall be authorized to pay all expenses incidental to the ownership, operation and maintenance of the Properties from the Remaining Development Funds in amounts not to exceed those on the Approved Budget (plus a variance of 10% on a line-item basis of the amounts set forth therein), without the further consent of the 1st Lien Lenders.  Immediately upon the Settlement Effective Date, LCPI on behalf of and as agent for the 1st Lien Lenders shall deliver to the Trustee cash or one or more irrevocable letters of credit acceptable to the Trustee in his reasonable discretion (together, the "Trustee Loss Collateral") in the aggregate amount of $500,000 (in the case of cash, to be held in escrow and released solely in accordance with the terms and conditions of this Term Sheet).  During the Trustee

Maintenance Period, in the event the Trustee incurs proven losses (not otherwise covered by insurance) based upon claims of simple negligence or strict liability in connection with his ownership, operation, maintenance and management of the Properties, but not in the event of any gross negligence or gross malfeasance on the part of the Trustee, the Trustee shall have the right to draw and recover from the Trustee Loss Collateral an amount not to exceed in the aggregate the lesser of (i) the amount of such losses multiplied by a fraction, the numerator of which is the amount of the 1st Lien Lenders Retained Settlement Funds actually paid over to the 1st Lien Lenders (including any unused Remaining Development Funds actually paid over to the 1st Lien Lenders pursuant to paragraph C above) and the denominator of which is the aforementioned amount plus $5.5 million[1], and (ii) the full amount of the Trustee Loss Collateral, and in the event such recovery from the Trustee Loss Collateral is insufficient to cover such losses, the Trustee shall have the right, but not the obligation, to apply Administrative Funds to cover such losses.  Upon the earlier to occur of (i) a Termination Event or (ii) the effective date of the Plan, the Trustee shall deliver any remaining cash Trustee Loss Collateral to LCPI for the benefit of the 1st Lien Lenders.  Further, LCPI on behalf of and as agent for the 1st Lien Lenders hereby fully and forever releases and discharges the Trustee both in his capacity as trustee and in his individual capacity with respect to any acts or omissions occurring or claims arising in any way related to the subject matter hereof or the Trustee's actions or duties with respect to the Debtors or the Properties prior to the conclusion of the Trustee Maintenance Period, except to the extent of any gross negligence or gross malfeasance on the part of the Trustee.

H.      To the extent that the Remaining Development Funds are inadequate to fund the Trustee's reasonable and necessary expenses with respect to the ownership, preservation and maintenance (but not development) of the Properties through and including January 31, 2011, the 1st Lien Lenders agree to pay for such reasonable and necessary expenses to the extent they are (i) consistent in nature and amount with expenses provided for in prior cash collateral budgets approved by the California Bankruptcy Court and (ii) in an aggregate amount not to exceed fifty percent (50%) of the amount of the 1st Lien Lenders Retained Settlement Funds actually received by the 1st Lien Lenders.  These expenses shall be paid within ten (10) days following written request accompanied by reasonable back-up documentation by the Trustee to LCPI and LCPI's good faith determination that such expenses are reasonable and necessary; however, if there is a dispute as to the reasonableness or necessity of any of the expenses incurred by the Trustee, the California Bankruptcy Court shall retain jurisdiction to hear and determine the Trustee's motion to compel payment of such expenses.  Pending payment of such expenses by the 1st Lien Lenders, the Trustee shall be authorized to use the Administrative Funds for the purposes set forth in this paragraph H.

---

[1] As an example only, in the case of an $800,000 loss, if the amount of 1st Lien Lenders Retained Settlement Funds actually paid over to the 1st Lien Lenders is $8.5 million, then the numerator will be $8.5 million, the denominator will be $14 million (i.e. $8.5 million plus $5.5 million), the resulting fraction will be 8.5/14 (= 0.6071428571) and the Trustee's recovery would be $485,714.29 ($800,000 multiplied by 0.6071428571) which is less than $500,000 (i.e., the full amount of the Trustee's Loss Collateral).

7

**Information Regarding Title Insurance Policy**

I.    LCPI has heretofore provided the Trustee with a complete copy of that certain Title Insurance Policy number 27-44-94-120334 (the "Title Insurance Policy") issued by Fidelity National Title Insurance Company ("Fidelity") for the benefit of LCPI as administrative agent for the 1st Lien Lenders for the Properties.  Promptly upon execution of this Term Sheet LCPI will provide the Trustee with all documents and information reasonably related to the Title Insurance Policy and any and all claims made by the 1st Lien Lenders thereunder so as to allow the Trustee to comply with the requirements of paragraphs J and K below and otherwise to proceed with such matters to conclusion.

**Resolution of Senior Liens; Availability of Title Insurance**

J.    The Trustee shall reasonably cooperate with the 1st Lien Lenders in their efforts to determine whether any Liens are superior to the 1st Lien Lenders' lien in the applicable Properties and to determine the proper amount of any such superior Liens ("Senior Liens"); provided, however, the Trustee shall not be obligated to take any action that would cause the Trustee or the Debtors' bankruptcy estates to incur material cost or liability.

**Release**

K.    1.    As of the Settlement Effective Date, (A) the Debtors' estates through the Trustee shall be deemed to have released the 1st Lien Lenders and LCPI (in its individual capacity and in its capacity as administrative agent for the 1st Lien Lenders), and, subject to the second-to-last sentence of this paragraph K, their respective affiliated parties, officers, directors, employees, agents and attorneys, and (B) LCPI (in its individual capacity as a 1st Lien Lender and in its capacity as administrative agent for the 1st Lien Lenders but not in any other capacity) and the 1st Lien Lenders will be deemed to have released the Debtors' estates and the Trustee and the Trustee's agents and attorneys, in each case for and from all claims (as defined in Section 101(5) of the Bankruptcy Code and including any claims that could be brought by or against the Trustee pursuant to the Bankruptcy Code) other than the allowance of the Lenders' claims as set forth in paragraph B above and the rights to receive distributions based on those allowed claims.  Notwithstanding the foregoing and for the avoidance of doubt, the releases to be exchanged shall not include claims and causes of action against any third parties other than the 1st Lien Lenders and LCPI and their respective affiliated parties, officers, directors, employees, agents and attorneys acting in their capacities as lenders, agents, loan administrators or advisors thereto, and such releases specifically shall *not* include a release of LBREP Lakeside SC Master I LLC ("LBREP Lakeside"); SCC Acquisitions, Inc. ("SCC Inc."); SCC Acquisitions, LLC ("SCC LLC"); or SCC Ranch Ventures LLC (collectively with SCC Inc. and SCC LLC, "SCC") or any claims related to the acts of the owners of any of the Debtors including any transfers of funds by any of the owners of any of the Debtors. Notwithstanding anything above, nothing in this paragraph K shall be deemed a release of the respective parties' obligations under this Term Sheet.  If the Settlement

8

Effective Date does not occur for any reason, the foregoing releases shall be of no force or effect.

2.   As to the matters released pursuant to paragraph K(1) above, the parties hereby expressly waive all rights under the provisions of Section 1542 of the Civil Code of the State of California and any similar rights in any state or territory or under any similar statute or regulation of the United States or any of its agencies.  Section 1542 of this California Civil Code reads as follows:

**"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

Each party waives and relinquishes any rights and benefits that any of them may have under California Civil Code Section 1542 pertaining to the subject of their releases set forth in paragraph K(1) above, and acknowledges that it is aware that it may hereafter discover facts in addition to or different from those which it now knows or believes to be true with respect to the matters released pursuant to paragraph K(1) above, but its intention hereby is to fully, finally and forever waive and release the claims released pursuant to paragraph K(1) above.  Each party represents, warrants and agrees that this waiver is a material term of this Term Sheet, without which neither party would have entered into this Term Sheet.

## Support of the Plan

L.   LCPI hereby agrees that, subject to its receipt of a Disclosure Statement and other solicitation materials in respect of the Plan, which Disclosure Statement and other solicitation materials (i) implement this Term Sheet and (ii) are not otherwise materially inconsistent with such terms, it being recognized that this Term Sheet shall not constitute an agreement by LCPI to take any step or action that would violate any provision of applicable bankruptcy law or any other applicable laws, and to the extent any provision hereof shall be construed as constituting such a violation, such provision shall be deemed stricken herefrom and of no force and effect without liability to any of the parties, LCPI will, as promptly as practicable following the California Bankruptcy Court's approval of the Disclosure Statement and solicitation materials, present the Plan and related materials to the 1st Lien Lenders and recommend that the 1st Lien Lenders vote to accept the Plan, provided that to the extent the Plan contains additional terms and provisions unrelated to the substantive provisions of the Term Sheet, such additional terms and provisions are reasonably acceptable to LCPI and the 1st Lien Lenders.  Also, subject to the occurrence of the Settlement Effective Date, LCPI and those other 1st Lien Lenders who have signed this Term Sheet agree, prior to the occurrence of a Termination Event, not to vote in favor of any other plan that fails to incorporate the substantive provisions of this Term Sheet until such time (if any) as the provisions set forth in paragraph T below are in effect.

M.   All 1st Lien Lenders who are on the "steering committee" are parties to this Term Sheet.  All parties to this Term Sheet agree, prior to the occurrence of a Termination

Event, to support confirmation of the Plan provided the same is consistent in all material respects with the terms of this Term Sheet and does not contain material terms and provisions which have not been approved by LCPI and the "steering committee" of 1st Lien Lenders.  Notwithstanding anything to the contrary contained herein, nothing in this Term Sheet shall constitute a representation or warranty by LCPI that the 1st Lien Lenders will vote in favor of the Plan by the requisite majorities under the Bankruptcy Code to obtain acceptance of the Plan by the class of 1st Lien Lenders nor shall LCPI have any liability in respect of such voting by the 1st Lien Lenders (subject to LCPI's obligation to recommend approval as provided above).

N.    Nothing contained in this Term Sheet shall limit or interfere, in any way, with the ability of any 1st Lien Lender or member of the "steering committee" to transfer or assign its interests under the First Lien Credit Agreement.  However, if such transferor or assignor has signed this Term Sheet, its transferees or assignees shall be bound by the provisions of this Term Sheet to the same extent such transferor or assignor was bound thereby.  The transfer or assignment of all or part of such transferor's or assignor's interests under the First Lien Credit Agreement shall constitute a novation, whereby, such transferor or assignor shall automatically receive a release of its obligations under this Term Sheet by and to the same extent that its transferee or assignee is bound by the provisions of this Term Sheet.

**Key Plan Provisions**.

O.    The 1st Lien Lenders will be classified as a separate class under the Plan.

P.    The Plan will provide that the Trustee will sell the Properties (including without limitation any related personal property) pursuant to 11 U.S.C. Section 1123(a)(5)(d) and in accordance with the terms and conditions of this Term Sheet and the Bidding Procedures to the 1st Lien Lenders and/or one or more successful third party Qualified Bidders, as the case may be, free and clear of Liens other than (i) Permitted Liens in the case of a sale to a third party Qualified Bidder or (ii) Senior Liens, Permitted Liens and the Liens of the 1st Lien Lenders in the case of a sale to the 1st Lien Lenders pursuant to a credit bid.

Q.    1.  The Plan will provide that until such time as the earliest to occur of (a) all holders of allowed claims, other than the Lenders, have been paid in full the allowed amounts of their respective claims according to their respective legal priorities, (b) the Lenders have been paid the full amount of their allowed claims, or (c) this Term Sheet terminates in accordance with the terms hereof, any recovery of proceeds from any avoidance action, litigation (including, without limitation, litigation in respect of any claims of fraudulent conveyance), asset disposition (excluding the sale of the Properties), or other recovery by the Trustee prior to or after Plan confirmation (the "Other Recoveries"), after payment in full of all allowed administrative and other priority unsecured claims in all four of the SunCal Bankruptcy Cases (collectively, the "Unsecured Priority Claims"), shall be split 50/50 between the 1st Lien Lenders (based on the understanding of the parties hereto that, and only if, all such proceeds

10

would be distributed to the 1st Lien Lenders under the Intercreditor Agreement, defined below in this paragraph) and the holders of allowed claims other than the Lenders (the "Trade Creditors", which term excludes any and all claims by the Lenders). The portion of the Other Recoveries that is allocated to the Trade Creditors (the "Trade Creditor Allocation") shall be distributed to Trade Creditors pursuant to a confirmed administratively-consolidated chapter 11 plan on a pro rata basis among those Trade Creditors based on the allowed amount of their respective claims. Distributions to Trade Creditors shall be made out of a single fund consisting of Other Recoveries that shall be administered by an appropriate fiduciary. This division of Other Recoveries shall be enforceable in the Bankruptcy Courts and any court of competent jurisdiction notwithstanding (1) the effect or terms of any agreement among the Lenders; (2) that assets, claims or causes of action may be held or pursued on behalf of one or only some of the Debtors; and (3) that Parent Debtor has few if any creditors other than the Lenders. After all Trade Creditors of the Debtors' estates are paid in full, the balance of the funds in the Debtors' estates, if any, shall be distributed to the Lenders in accordance with their respective priorities but subject to that certain Amended and Restated Intercreditor Agreement among the 1st Lien Lenders, the 2nd Lien Lenders and the 3rd Lien Lenders dated as of February 6, 2007 (the "Intercreditor Agreement"). If the foregoing allocations are either altered without the consent of the parties hereto or not approved by one or both of the Bankruptcy Courts, then any allowed unsecured claim of the 1st Lien Lenders (the "Assigned 1st Lien Lenders' Claim") shall be deemed assigned to the Debtors' bankruptcy estates for the benefit of all non-Lender claims, free and clear of any claims, liens or interests of the 1st Lien Lenders, but without representation or warranty and only for the purpose of effectuating the 50/50 distribution scheme provided for in this paragraph Q. To the extent that the Assigned 1st Lien Lenders' Claim does not provide the Debtors' estates with the equivalent of what they otherwise would have received under the 50/50 distribution scheme, then any allowed unsecured claim of (x) LCPI 2nd Lien Lender (the "Assigned LCPI 2nd Lien Lender's Claim") and (y) LCPI 3rd Lien Lender (the "Assigned LCPI 3rd Lien Lender's Claim", and collectively with the Assigned 1st Lien Lenders' Claim and the Assigned LCPI 2nd Lien Lender's Claim, the "Assigned Lenders' Claims") shall each be deemed assigned to the Debtors' bankruptcy estates for the benefit of all non-Lender claims, free and clear of any claims, liens or interests of the 1st Lien Lenders, LCPI 2nd Lien Lender and LCPI 3rd Lien Lender, but without representation or warranty and only to the extent necessary to provide the Debtors' estates with the equivalent of what they otherwise would have received pursuant to this paragraph Q. The proceeds from the Assigned Lenders' Claims shall be distributed first, to all unpaid Unsecured Priority Claims and second, to all Trade Creditors on a pro rata basis. After all of the Unsecured Priority Claims (to the extent that same were not previously paid out of the Administrative Claims) and Trade Creditors are paid in full, the remaining proceeds from (i) the Assigned 1st Lien Lenders' Claim shall be paid to the 1st Lien Lenders, (ii) the Assigned LCPI 2nd Lien Lender's Claim shall be paid to the 2nd Lien Lenders, and (iii) the Assigned LCPI 3rd Lien Lender's Claim shall be paid to the 3rd Lien Lenders.

R.    In addition, the Trustee shall be entitled to, and shall recover and receive from the Proceeds (hereinafter defined) of dispositions of the Properties, the lesser of (1) the amount sufficient to pay in full the allowed amount of the claims of the holders of allowed claims other than the Lenders to the extent not previously paid, and (2) 3.5% of such Proceeds (the "Trustee's Participation"); provided that, at the time of any such subsequent disposition the holders of allowed claims other than the Lenders shall not have otherwise been paid the full allowed amount of their claims.    The Trustee's Participation in each portion of any Proceeds that consists of cash shall be immediately due and payable to the Trustee from the 1st Lien Lenders in cash upon the 1st Lien Lenders' receipt of such portion of the applicable Proceeds.    The Trustee's Participation shall be transferred to the Trustee free and clear of Lender liens for the sole benefit of all allowed non-Lender unsecured claims.    As used herein, "Proceeds" shall mean all cash and other property constituting proceeds of the disposition of each Property, including the proceeds from the sale of any of the Properties under paragraph E to a party other than the 1st Lien Lenders (but excluding any transfer of a Property to the 1st Lien Lenders pursuant to a credit bid) and including the proceeds from any disposition of the Property by the 1st Lien Lenders or any of their affiliates following their acquisition thereof pursuant to a credit bit, whether such proceeds are received in a single lump sum or on a piecemeal basis over time, less (a) customary and reasonable costs and expenses of the sale, and (b) cash and other property used to satisfy any Senior Liens not otherwise satisfied under the Title Insurance Policy or the Plan.    For the avoidance of doubt, in the case of such property actually received that consists of promissory notes, equity interests (direct or indirect) in any entities taking title to the Properties and/or other deferred or contingent payment arrangements or mechanisms, the Trustee shall be entitled to receive, at the time such promissory notes, equity interests and/or deferred or contingent payment arrangements or mechanisms are received or implemented by the 1st Lien Lenders or their applicable affiliates or principals, a profits participation or similar contractual right to receive the applicable amount representing the Trustee's Participation from all cash actually received by such entities taking title to each Property from the disposition of such Property and by the Lenders and their applicable affiliates and principals in respect of such promissory notes, which profits participation or similar right shall be provided for in the operating, partnership, or similar governing documents of such entities and in such promissory notes or other deferred or contingent payment documentation (as the case may be), in a form and substance reasonably acceptable to the Trustee with Trustee being a direct contracted beneficiary of such provisions with the legal right to contractually enforce same.    The California Bankruptcy Court shall retain jurisdiction with respect to the determination of the value of any component of each Proceeds.    Without limiting the foregoing, if the 1st Lien Lenders form a joint venture with, or borrow funds from, any party, including any 1st Lien Lender or affiliates of a 1st Lien Lender to obtain funding necessary to develop one or more of the Properties or to maintain and/or operate the Properties prior to any disposition, the funds required to repay such unaffiliated equity or debt, as the case may be, shall reduce dollar-for-dollar the Proceeds for the applicable Properties.    The 1st Lien Lenders agree to act in good faith to carry out the terms of this paragraph R and to effectuate this participation interest of the Trustee.

12

The 1st Lien Lenders will, at their sole expense, provide a report and accounting to the Trustee or the Trustee's successor-in-interest as soon as possible following receipt of Proceeds and shall provide semi-annual financial reports relating to the Properties. In addition, the 1st Lien Lenders will provide such documents and other information reasonably requested by the Trustee or the Trustee's successor in interest to monitor the 1st Lien Lenders' compliance with this <u>paragraph R</u>.  LCPI shall provide the Trustee with information reasonably necessary to verify the amount of Proceeds. Finally, the Plan may contain such other reasonable provisions as may be required to effectuate the performance of the terms of this <u>paragraph R</u>.

S.    Intentionally omitted.

**Certain Rights and Releases Upon Termination Event**

T.    If a Final Order confirming the Plan shall not have been obtained by February 28, 2011 (or such later date as may be mutually agreed upon by the Trustee, LCPI and the Creditors' Committee, such later date in no event to be later than March 31, 2011) (a "Termination Event"), then:

i.    The 1st Lien Lenders immediately will be granted relief from stay to foreclose on the Properties.  The Bankruptcy Court will grant this relief upon the presentation of an order by LCPI, accompanied by a declaration signed by an authorized representative of LCPI, confirming that a Termination Event has occurred.  No party in interest, including without limitation the Trustee and the Creditors' Committee, shall be entitled to or permitted (A) to challenge the presentation of or entry of the order granting LCPI relief from stay with respect to the Properties, except to the extent no Termination Event has in fact occurred or (B) to challenge or otherwise interfere with the foreclosure of the Properties.  Upon the entry of such order, the Trustee shall cooperate with the 1st Lien Lenders' foreclosure actions.

ii.    The Trustee shall retain the Administrative Funds and the Trustee's YFP free from the secured claims of the Lenders.

iii.    The 1st Lien Lenders shall retain the 1st Lien Lenders Retained Settlement Funds and the Trustee shall immediately pay over to the 1st Lien Lenders (A) the unused portion of the Remaining Development Funds, and (B) the unused portion of the Trustee Loss Collateral, in each case free and clear of any claims or interests (including without limitation any right to recovery) of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors.

iv.    Intentionally omitted.

v.    LCPI and the 1st Lien Lenders shall in no event be deemed to have waived any right to object to the substantive consolidation of the Debtors' cases.

vi.    Intentionally omitted.

vii. Except as provided in this paragraph T, this Term Sheet shall be of no further force or effect, including any obligation contained in paragraphs L and M.

**No Substantive Consolidation**

U.     The parties hereto acknowledge and agree that neither any provision of this Term Sheet nor any of the transactions contemplated herein, including without limitation the contemplated terms and provisions of the Plan, do nor shall (i) effect substantive consolidation of any one or more of the Debtors with any one or more of the other Debtors, (ii) suggest that any such substantive consolidation is or might be possible, or (iii) affect the right of the 1st Lien Lenders to object to the substantive consolidation of any one or more of the Debtors with any one or more of the other Debtors.  However, nothing here shall constitute a waiver of the rights of the parties to seek substantive consolidation of one or more of the Debtors if such is necessary or appropriate in the interests of creditors.

**Miscellaneous Provisions**

V.     1.   Upon the last of the Compromise Orders becoming a Final Order, this Term Sheet shall be binding upon the parties hereto and their respective heirs, representatives, transferees, successors and assigns.  Notwithstanding the foregoing, this Term Sheet and the rights and obligations hereunder may not be assigned by a party hereto without the prior written consent of the other parties.

2.   LCPI will use reasonable efforts to obtain by September 30, 2010, an agreement from the 1st Lien Lenders tolling the statute of limitations within which the Trustee must file a complaint against the 1st Lien Lenders based on the operative facts alleged in the draft attached to his proof of claims previously filed in the LCPI chapter 11 case or to avoid the 1st Lien Lenders' asserted lien against the funds currently held by the Yucaipa Valley Water District until March 31, 2011.

3.   In the event of any dispute between the parties hereto arising out of the subject matter of this Term Sheet, the prevailing party in such action shall be entitled to have and to recover from the other party its reasonable attorneys' fees and other reasonable expenses (including expert witness fees) in connection with such action or proceeding in addition to its recoverable court costs.

4.   This Term Sheet shall be construed in accordance with the laws of the State of California in effect at the time of the execution of this Term Sheet except to the extent superseded by the laws of the United States.  The parties hereto agree that the California Bankruptcy Court shall have jurisdiction to hear and to determine all matters, disputes and controversies related to this Term Sheet and the subject matter hereof, and each party hereby submits to the jurisdiction and venue of the California Bankruptcy Court with respect thereto.  Notwithstanding the foregoing, if the California Bankruptcy Court will not accept jurisdiction or otherwise hear any such matter, then such matter shall be heard by the Orange County Superior Court for the

State of California, and each party hereby submits to the jurisdiction and venue of such court with respect thereto.

5. This Term Sheet contains the entire understanding between the parties relating to the transactions and matters contemplated hereby and all prior or contemporaneous agreements, term sheets, understandings, representations and statements, oral or written are merged herein and shall be of no further force or effect.

6.   If any term, provision, condition or covenant of this Term Sheet or the application thereof to any party or circumstances shall, to any extent, be held invalid or unenforceable, the remainder of this Term Sheet, or the application of such term, provision, condition or covenant to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Term Sheet shall be valid and enforceable to the fullest extent permitted by law.

7.   Any alteration, change or modification of or to this Term Sheet, in order to become effective, shall be made by written modification hereof executed by all of the parties hereto.

8.   This Term Sheet and any modifications, amendments or supplements thereto may be executed in several counterparts, and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all parties are not signatories to the original or the same counterpart.   The parties may also deliver executed copies of this Term Sheet to each other by facsimile or by electronic delivery (e.g., .pdf), which facsimile or electronic signatures shall be binding upon the parties as if they were originals.

9.   The parties hereto each agree in good faith to undertake such further actions and deliver such further documentation as may be reasonably necessary in order to facilitate the transactions contemplated in this Term Sheet and to implement the terms hereof, provided that no party shall be obligated to incur expenses or liabilities in connection therewith which exceed those expenses and liabilities which they would otherwise incur complying with the express terms hereof.

[Signatures appear on the following page]

15

_____                    Dated:_____

Alfred H. Siegel, solely in his capacity as the Chapter 11 Trustee
of the administratively consolidated estates
of LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch

[Signatures continue on the following page]

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS
of LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch

By: _____

    Lennar Homes of California, Inc., solely in its capacity as chairperson

By:_____        Dated:_____
    _____

[Signatures continue on the following page]

LEHMAN COMMERCIAL PAPER INC., as
administrative agent of the 1st Lien Lenders
to LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch


By:_____          Dated:_____
     Name:
     Title:  Its Authorized Signatory


[Signatures continue on the following page]

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:


1ST LIEN LENDER:

[_____]


By:_____                    Dated:_____
    Name:
    Title:

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY
LCPI 2nd LIEN LENDER HEREIN:


LCPI 2nd LIEN LENDER:

[_____]


By:_____        Dated:_____
   Name:
   Title:

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY
LCPI 3rd LIEN LENDER HEREIN:


LCPI 3rd LIEN LENDER:

[_____]


By:_____          Dated:_____
    Name:
    Title:

EXHIBIT "A"

BUDGET

[See Attached]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                      :
In re                                                 :    **Chapter 11 Case No.**
                                                      :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,          :    **08-13555 (JMP)**
                                                      :
                              **Debtors.**            :    **(Jointly Administered)**
                                                      :
-------------------------------------------------------------------x

### ORDER PURSUANT TO
### SECTION 105 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF
### BANKRUPTCY PROCEDURE 9019  APPROVING THAT
### CERTAIN AMENDED AND RESTATED COMPROMISE BY AND AMONG
### LEHMAN COMMERCIAL PAPER INC., ALFRED H. SIEGEL, AS CHAPTER 11
### TRUSTEE FOR THE SUNCAL DEBTORS, AND THE OFFICIAL COMMITTEE
### OF UNSECURED CREDITORS IN THE SUNCAL BANKRUPTCY CASES

Upon the motion, dated September 2, 2010 ( "Motion"),[1] of Lehman Commercial

Paper Inc. ("LCPI" and, together with its affiliated debtors in the above-referenced chapter 11

cases, the "Debtors"), pursuant to section 105 of Title 11 of the United States Code (the

"Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure ( "Bankruptcy

Rules") for authorization to enter into and approval of a settlement pursuant to the amended and

restated term sheet annexed to the Motion as Exhibit A (the "Amended Term Sheet"); and the

Court having jurisdiction to consider the Motion and the relief requested therein in accordance

with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges

for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10,

1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being

a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided in accordance with the procedures set forth in the amended order entered June 17, 2010

governing case management and administrative procedures [Docket No. 9635] to (i) the United

States Trustee for the Southern District of New York; (ii) the attorneys for the Official

Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the

Internal Revenue Service; (v) the United States Attorney for the Southern District of New York;

(vi) counsel to the SunCal Trustee, (vii) counsel to the SunCal Committee, and (viii) all parties

who have requested notice in these chapter 11 cases, and it appearing that no other or further

notice need be provided; and the Court having found and determined that the relief sought in the

Motion is in the best interests of LCPI and its estate  and that the legal and factual bases set forth

in the Motion and on the record establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefore, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Section 105 of the Bankruptcy Code and Bankruptcy

Rule 9019, the Amended Term Sheet is approved, and LCPI is duly authorized to

(i) consummate all of the transactions contemplated thereby and (ii) execute and deliver such

documents and instruments and to take such other actions as may be reasonably necessary to

consummate the transactions contemplated by the Amended Term Sheet, it being understood that

any actions described in this paragraph taken by LCPI or its affiliates may be taken without the

necessity of any further Court proceedings or approval and shall be conclusive and binding in all

respects on all parties in interest in these cases; and it is further

ORDERED that the Amended Term Sheet and any related agreements, documents

or other instruments may be modified, amended or supplemented by the parties thereto, in a

writing signed by such parties, and in accordance with the terms thereof, without further order of

the Court, *provided* that any such modification, amendment or supplement does not have a

material adverse effect on LCPI's estate; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.


Dated: September ___, 2010
       New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE