WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

**NOTICE OF MOTION FOR AUTHORIZATION**
**TO REJECT EXECUTORY CONTRACT BETWEEN LEHMAN**
**BROTHERS SPECIAL FINANCING INC. AND E-CAPITAL PROFITS LIMITED**

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of Lehman Brothers Special Financing Inc. ("LBSF"), as debtor and debtor in possession (together with Lehman Brothers Holdings Inc. and their affiliated debtors in the above-referenced chapter 11 cases, the "Debtors"), for authorization to reject an executory contract between LBSF and E-Capital Profits Limited, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York, 10004 (the "Bankruptcy Court"), on **September 22, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections to the Motion, if any, shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York, 10004, Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York, 10153, Attn: Lori R. Fife, Esq., Robert J. Lemons, Esq. and Sunny Singh, Esq., attorneys for the Debtors; (iii) the

Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York, 10004, Attn:  Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; and (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York, 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases, so as to be so filed and received by no later than **September 15, 2010 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  September 7, 2010
      New York, New York

/s/ Robert J. Lemons
Lori R. Fife
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**Hearing Date and Time: September 22, 2010 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: September 15, 2010 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
**In re**                                                    :    **Chapter 11 Case No.**
                                                              :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :    **08-13555 (JMP)**
                                                              :
                                    **Debtors.**             :    **(Jointly Administered)**
------------------------------------------------------------------x

## MOTION FOR AUTHORIZATION
## TO REJECT EXECUTORY CONTRACT BETWEEN LEHMAN
## BROTHERS SPECIAL FINANCING INC. AND E-CAPITAL PROFITS LIMITED

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF"), as debtor and debtors-in-

possession (together with Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in

the above-referenced chapter 11 cases, the "Debtors" and, collectively with their non-debtor

affiliates, "Lehman"), files this Motion and respectfully represents:

## Background

1.  Commencing on September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.  On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.  On April 14, 2010, the Debtors filed a revised joint chapter 11 plan (the "Plan") and disclosure statement (the "Disclosure Statement") [Docket Nos. 8330 and 8332].

## Jurisdiction

4.  This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relief Requested

5.  LBSF requests the entry of an order pursuant to sections 365(a) and 562(a) of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014 (i) authorizing LBSF's rejection of the Agreement (defined below), including all confirmations and transactions thereunder, to be effective as of the date of entry of an order approving this Motion, and (ii) approving procedures for any claims that may be asserted against the Debtors as a result of such rejection.  A copy of the Agreement is annexed hereto as Exhibit A.

## The Agreement

6.      LBSF and E-Capital Profits Limited ("E-Capital") entered into a standard 1992 International Swap Deal Association ("ISDA") Master Agreement dated as of June 12, 2007 (the 1992 ISDA Master Agreement and schedule thereto, including the related credit support annex (the "CSA"), collectively referred to as, the "Master Agreement").  The Master Agreement provides the basic terms of the parties' contractual relationship and contemplates being supplemented by trade confirmations, which set forth, among other things, the economic terms and conditions of the specific transactions agreed to by the parties.

7.      Prior to the Commencement Date, LBSF and E-Capital entered into two credit default swap transactions (the "Transactions") that remain open under the Master Agreement, the terms of which were documented pursuant to separate trade confirmations (together with the Master Agreement, the "Agreement").  LBHI acted as credit support provider for the payment obligations of LBSF under the Agreement.  In connection with the Transactions, pursuant to the terms of the CSA, E-Capital posted certain securities as collateral (the "Collateral") to LBSF.  Although LBSF is owed a receivable on the Transactions, after taking into account the value of the Collateral, LBSF owes E-Capital the value of the Collateral in excess of LBSF's receivable.  LBSF believes that the value of the Collateral may continue to increase.

8.      E-Capital has not terminated the Agreement.  As a result, LBSF is not able to fix its liabilities under the Agreement unless E-Capital defaults or until the Transactions terminate upon their scheduled termination dates in 2018.  The Debtors run the risk that movements in the financial markets may cause the Agreement, which is "out-of-the money" (i.e., the Debtors would owe money upon termination of the contract), to go further "out-of-the

money," thereby providing a windfall to E-Capital at the expense of the Debtors and their

estates.  LBSF does not believe that it is likely that its receivable from E-Capital under the

Agreement will exceed the value of the Collateral.  Accordingly, LBSF has determined that it is

prudent to reject the Agreement to fix its liability under the Agreement as of the rejection date

and limit any increase in damages that could be claimed by E-Capital.

**Rejection of the Agreement Is a Sound
<u>Exercise of LBSF's Business Judgment and Should Be Approved</u>**

9.      Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession "subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  "[T]he purpose behind allowing

the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession

to use valuable property of the estate and to 'renounce title to and abandon burdensome

property.'"  *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4

F.3d 1095, 1098 (2d Cir. 1993).

10.      Courts defer to a debtor's business judgment in rejecting an executory

contract or unexpired lease, and upon finding that a debtor has exercised its sound business

judgment, approve such rejection under section 365(a) of the Bankruptcy Code.  *See NLRB v.

Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (recognizing the "business judgment" standard

used to authorize rejection of executory contracts); *Nostas Assocs. v. Costich* (*In re Klein Sleep

Products, Inc.*), 78 F.3d 18, 25 (2d Cir. 1996) (recognizing the "business judgment" standard

used to authorize rejection of executory contracts); *In re Minges*, 602 F.2d 38, 42-43 (2d Cir.

1979) (holding that the "business judgment" test is appropriate for determining when an

executory contract can be rejected).  Proper business reasons for rejecting a contract include that

it would be financially burdensome or not economically beneficial to the estate if the debtor was

required to perform its obligations through expiration of the contract.  *Minges*, 602 F.2d at 42; *In re RLR Celestial Homes, Inc.*, 108 B.R. 36, 43 (Bankr. S.D.N.Y. 1989).

11.    LBSF has determined in the sound exercise of its business judgment that the Agreement should be rejected.  The Transactions are not scheduled to terminate until 2018 and LBSF will owe E-Capital the value of the Collateral in excess of LBSF's receivable from E-Capital upon termination.  LBSF does not believe that it is likely that any receivable owed to LBSF by E-Capital will exceed the value of the Collateral such that LBSF will be owed a payment under the Agreement.  Accordingly, LBSF has determined that it is in the best interests of its estate and creditors to fix any damages arising under the Agreement now to minimize the escalation of E-Capital's unsecured claims.  In light of these factors and in furtherance of the LBSF's duty to preserve the value of its estate, rejection of the Agreement is an exercise of sound business judgment and should be approved.

**Procedures Governing Claims
Relating to Rejection of the Agreements**

12.    Section 562(a) of the Bankruptcy Code provides that damages arising upon the rejection of contracts such as the Agreement are measured as of the earlier of the rejection date or termination date.  *See* 11 U.S.C. § 562(a).

13.    To determine any claims that may be associated with the rejection of the Agreement, the Debtors propose that they have the option to calculate the damages arising under the Agreement as of the rejection date and deliver a statement (the "Damages Calculation") to E-Capital describing such calculations in reasonable detail within ten (10) business days from the entry of an order approving this Motion.

14.    If the Debtors do not deliver a Damages Calculation or E-Capital disputes the amount of damages set forth in the Damages Calculation, the Debtors request that E-Capital

be required to file a proof of claim in compliance with the terms of the Bar Date Order[1],

including the requirement to complete a Derivative Questionnaire and a Guarantee Questionnaire

(as such terms are defined in the Bar Date Order), for damages arising under the Agreement by

no later than thirty (30) days from the date of entry of an order granting the relief requested

herein; provided, however, that if E-Capital has already timely filed a proof of claim in

compliance with the Bar Date Order for damages arising under the Agreement, E-Capital does

not need to file an additional proof of claim to dispute the amount of the damages set forth in the

Damages Calculation or in the event that the Debtors do not deliver a Damages Calculation.

15.     If E-Capital (a) timely filed a proof of claim in accordance with the Bar

Date Order or (b) timely files a proof of claim no later than thirty (30) days from the date of

entry of an order granting the relief requested herein, then (i) E-Capital and the Debtors will each

have the ability to assert all rights in respect of claims arising under the Agreement and (ii) any

party in interest will have the right to object to such proof of claim arising under the Agreement.

16.     If the Debtors timely deliver a Damages Calculation and E-Capital does

not timely file, or has not already timely filed, a proof of claim in compliance with the terms

established by the Bar Date Order for damages under the Agreement, then E-Capital will be

deemed to have an allowed general unsecured claim against (i) LBSF and (ii) LBHI, as a creditor

support provider for the payment obligations of LBSF under the Agreement, in the amounts set

forth in the Damages Calculation delivered to E-Capital by the Debtors (subject to the treatment

of such claims under the Plan), and E-Capital will have no right to assert any other claims or

claim amounts under the Agreement against any Debtor.

---

[1] Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof, and Approving the Proof of Claim Form, entered on July 2, 2009 [Docket No. 4271] (the "Bar Date Order"). A copy of the Bar Date Order is annexed hereto as Exhibit B.

17.     If the Debtors do not timely deliver a Damages Calculation and E-Capital did not timely file a proof of claim in accordance with the Bar Date Order and does not timely file a proof of claim in compliance with the terms of the Bar Date Order no later than thirty (30) days from the date of entry of an order granting the relief requested herein, then E-Capital will not be allowed any claim against the Debtors in respect of the Agreement.

18.     The Court has previously granted relief in these chapter 11 cases similar to the relief requested by this Motion.  *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y.) [Docket No. 10226] (order authorizing rejection of certain derivative contracts and approving similar claim procedures); [Docket No. 4426] (order authorizing rejection of derivative contract between LBSF and Jana Master Fund, Ltd. and approving similar claim procedures).

### Notice

19.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [Docket No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) E-Capital; and (vii) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

20.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated: September 7, 2010
        New York, New York

/s/ Robert J. Lemons
Lori R. Fife
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## **Exhibit A**

**(Agreement)**

(Multicurrency-Cross Border)

# ISDA®

International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

dated as of June 12, 2007

### LEHMAN BROTHERS SPECIAL FINANCING INC.    and    E-CAPITAL PROFITS LIMITED

have entered and/or anticipate entering into one or more transactions (each a Transaction) that are or will be governed by this Master Agreement, which includes the schedule (the Schedule), and the documents and other confirming evidence (each a Confirmation) exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this Agreement), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i)  Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii)    *Liability*. If: —

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations*.

(i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

>    (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

>    (ii)    any other documents specified in the Schedule or any Confirmation; and

>    (iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

**ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)      *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

   (i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

   (ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

   (iii)    *Credit Support Default*.

      (1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

      (2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

      (3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

   (iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

   (v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

   (vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

ISDA® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                                              **ISDA® 1992**

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

        (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

        **ISDA® 1992**

**6.    Early Termination**

(a)    ***Right to Terminate Following Event of Default.*** If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    ***Right to Terminate Following Termination Event.***

(i)    ***Notice.*** If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    ***Transfer to Avoid Termination Event.*** If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    ***Two Affected Parties.*** If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    ***Right to Terminate.*** If: —

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

**ISDA® 1992**

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   *Effect of Designation.*

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   *Calculations.*

(i)   *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1)   *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)   *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)   *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  **Termination Events.**  If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties.* If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

**7.    Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.    Contractual Currency**

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

**9.    Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes  all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

> (i)    if in writing and delivered in person or by courier, on the date it is delivered;
>
> (ii)   if sent by telex, on the date the recipient's answerback is received;
>
> (iii)  if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);
>
> (iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or
>
> (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

> (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and
>
> (ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)     in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)     in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

**ISDA® 1992**

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

**ISDA® 1992**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

ISDA® 1992

***"Specified Indebtedness"*** means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

***"Specified Transaction"*** means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

***"Stamp Tax"*** means any stamp, registration, documentation or similar tax.

***"Tax"*** means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

***"Tax Event"*** has the meaning specified in Section 5(b).

***"Tax Event Upon Merger"*** has the meaning specified in Section 5(b).

***"Terminated Transactions"*** means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

***"Termination Currency"*** has the meaning specified in the Schedule.

***"Termination Currency Equivalent"*** means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

***"Termination Event"*** means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

***"Termination Rate"*** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

***"Unpaid Amounts"*** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been  but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

**ISDA® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

<table>
<tr><td align="center">LEHMAN BROTHERS<br>SPECIAL FINANCING INC.<br><em>(Name of Party)</em></td><td align="center">E-CAPITAL PROFITS LIMITED<br><br><em>(Name of Party)</em></td></tr>
<tr><td>By: _____<br>Name: <strong>Scott Willoughby</strong><br>Title: <strong>Managing Director</strong><br>Date: 11/21/07</td><td>By: _____<br>Name: Ip Tak Chuen, Edmond<br>Title: Director<br>Date: 12th June, 2007</td></tr>
</table>

(Multicurrency-Cross Border)

**SCHEDULE**
to the
**Master Agreement**
dated as of June 12, 2007
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A"),
a corporation organized under the laws of
the State of Delaware
and
**E-CAPITAL PROFITS LIMITED** ("Party B"),
a corporation organized under the laws of
the Territory of the British Virgin islands ("BVI")

**Part 1: Termination Provisions**

In this Agreement:

(a)    **"Specified Entity"** means:

in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)    **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement with the addition of the words "credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell back transaction" after the word "currency option" in the eighth line.

(c)    The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:

**"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

**"Threshold Amount"** means the lesser of (i) USD 100 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A (or its equivalent in any other currency), and the lesser of (i) USD 40 million and (ii) two percent (2%) of the Stockholders' Equity of the Credit Support Provider of Party B, in the case of Party B (or its equivalent in any other currency).

For purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)    The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers

19

Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

(e)    The **"Automatic Early Termination"** provision of <u>Section 6(a)</u> will <u>not</u> apply to Party A and will <u>not</u> apply to Party B.

(f)    **Payments on Early Termination.** For the purpose of <u>Section 6(e)</u> of this Agreement, Loss and the Second Method will apply.

(g)    **"Termination Currency"** means United States Dollars ("USD").

(h)    **Additional Termination Events** will not apply. Each of the following shall constitute an Additional Termination Event:

    (i)    **Ratings Decline.** Holdings, in the case of Party A (1) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least Baa3 (the "Moody's Rating") as determined by Moody's; or (2) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least BBB- (the "S&P Rating") as determined by S&P; or (3) ceases to be rated by either Moody's or S&P. For clarification, in the event either Moody's or S&P assigns a rating to Party B that is lower than the Moody's Rating or the S&P Rating, as the case may be, then such rating shall be determinative. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

    (ii)    **Ratings Decline.** Party B's Credit Support Provider (1) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least Baa3 (the "Moody's Rating") as determined by Moody's; or (2) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least BBB- (the "S&P Rating") as determined by S&P; or (3) ceases to be rated by either Moody's or S&P. For clarification, in the event either Moody's or S&P assigns a rating to Party B that is lower than the Moody's Rating or the S&P Rating, as the case may be, then such rating shall be determinative. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

## Part 2: Tax Representations

(a)    **Payer Tax Representations.** For the purpose of <u>Section 3(e)</u> of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Sections 2(e)</u>, <u>6(d)(ii)</u> or <u>6(e)</u> of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to <u>Section 3(f)</u> of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in <u>Section 4(d)</u> of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under <u>Section 4(a)(iii)</u> of this Agreement by reason of material prejudice to its legal or commercial position.

(b)    **Payee Tax Representations.** For the purpose of <u>Section 3(f)</u> of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is a corporation duly organized and validly existing under the laws of the British Virgin Islands.

(c)    **Tax Representations in Confirmations.** For purposes of <u>Sections 2(d)(i)(4)</u> and <u>3(f)</u>, any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

**Part 3: Agreement to Deliver Documents**

For the purpose of <u>Sections 4(a)(i)</u> and <u>(ii)</u> of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Party A and Party B will deliver forms and/or documents described in <u>Section 4(a)(iii)</u> of this Agreement upon reasonable demand by the other party.

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Authorized Signatory List or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report of its Credit Support Provider, containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |
| Party A and Party B | A copy of a letter from Process Agent in England and Wales acknowledging and confirming such agent's appointment as Process Agent | Upon execution of this Agreement | Yes |

**Part 4: Miscellaneous**

(a)    **Addresses for Notices.** For the purpose of <u>Section 12(a)</u> of this Agreement:

Address for notices or communications to **Party A**:

22

| Address: | Lehman Brothers Special Financing Inc. |
|---|---|
| | c/o Lehman Brothers Inc. |
| | Transaction Management Group |
| | Corporate Advisory Division |
| | 745 Seventh Avenue |
| | New York, NY 10019 |

| Attention: | Documentation Manager |
|---|---|
| Telephone No.: | (212) 526-7187 |
| Facsimile No.: | (212) 526-7672 |

For all purposes.

Address for notices or communications to **Party B**:

| Address: | E-Capital Profits Limited |
|---|---|
| | c/o 7th Floor, Cheung Kong Center |
| | 2 Queen's Road Central, Hong Kong |

| Attention: | Mr. Ip Tak Chuen, Edmond |
|---|---|
| Telephone No.: | (852) 2526-6911 |
| Facsimile No.: | (852) 2845-2940 |

For all purposes.

(b)   **Process Agent.** For the purpose of Section 13(c) of this Agreement:

| Party A appoints as its Process Agent: | Lehman Brothers International (Europe) |
|---|---|
| | Attention: Head of Transaction Management Group, Europe |
| | 25 Bank Street |
| | London E14 5LE |
| | England |

| Party B appoints as its Process Agent: | Cheung Kong International Ltd. |
|---|---|
| | 18 Bentinck Street |
| | London ~~W1M 5RL~~ United Kingdom |
| | W1U 2AR |

(c)   **Offices.** The provisions of Section 10(a) will apply to this Agreement.

(d)   **Multibranch Party.** For the purpose of Section 10(c) of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)   **Calculation Agent.** The Calculation Agent is Party A.

(f)   **Credit Support Document.**

In the case of **Party A**:

Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.
In the case of **Party B**:

Guarantee of Party B's obligations hereunder in the form annexed hereto as Exhibit B to this Schedule.

23

(g)     **Credit Support Provider.**

        Credit Support Provider means in relation to Party A:     Lehman Brothers Holdings Inc.

        Credit Support Provider means in relation to Party B:     Cheung Kong (Holdings) Limited

(h)     **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of England and Wales.

(i)     **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transactions.

(j)     **"Affiliate"** will have the meaning specified in Section 14 of this Agreement, provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.


**Part 5: Other Provisions**

(a)     **Representations.** Section 3 of this Agreement is hereby amended by adding the following additional subsections:

    (g)     *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

    (h)     *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

    (i)     *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

    (j)     *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

    (k)     *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(b)     **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

    (f)     *Set-off.*

    (i)     In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or

24

contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

(ii)    For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

(iii)    If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

(iv)    This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(c)    **Transfer.** Notwithstanding anything to the contrary in Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor.

(d)    **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(e)    **Service of Process.** The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(f)    **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(g)    **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(h)    **Accuracy of Specified Information.** Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(i)    **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

(j)    **Default Under Specified Transaction.** Section 5(a)(v) is hereby amended to read as follows:

(v)    *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

(1)    defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)    defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3)    defaults in making any delivery due under (including any delivery due on the last

25

delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)    disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(k)    **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(l)    **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(m)    **Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction. Promptly upon the request by a party, the other party will provide a copy of such recording to the party making the request.

**Part 6: Additional Terms for FX Transactions and Currency Options**

(a)    **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

(i)    <u>Incorporation of 1998 FX and Currency Option Definitions</u>. The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

(ii)    <u>Amendment of 1998 FX and Currency Option Definitions</u>. The following amendments are made

to the 1998 Definitions:

Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

**Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)     **Confirmations.** Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c)     **Netting and Related Provisions.** Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

(i)     <u>Netting, Discharge and Termination of FX Transactions</u>. The following provisions shall apply to FX Transactions:

Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

(ii)     <u>Netting, Discharge and Termination with Respect to Currency Option Transactions</u>. The following provisions shall apply to Currency Option Transactions:

Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d)     **Inconsistencies.** In the event of any conflict between:

(i)     the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

(ii)     the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

(iii)     the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)     **Definitions.** <u>Section 14</u> is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

| LEHMAN BROTHERS SPECIAL FINANCING INC. | E-CAPITAL PROFITS LIMITED |
|---|---|
| *(Name of Party)* | *(Name of Party)* |

By: _____

Name:  **Scott Willoughby**

Title:  **Managing Director**

Date:  11/21/07

By: _____

Name: Ip Tak Chuen, Edmond

Title: Director

Date: 12th June, 2007

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and E-CAPITAL PROFITS LIMITED ("Party B") have entered into a Master Agreement dated as of June 12, 2007 as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of any obligation of Party A under the Agreement , the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment with respect to any Event of Default or Potential Event of Default, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until receipt by Party B of a written notice of termination from Guarantor. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

(g)    Guarantor shall have no right of subrogation with respect to any payments made under this Guarantee until all obligations of the Guaranteed Party under the Agreement are paid in full.

(h)    Guarantor represents and warrants (which representations and warranties shall be deemed to have been made by Guarantor on the date of each Transaction) that:

      i.     Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware;

      ii.     Guarantor has the legal capacity and the legal right to execute and deliver this Guarantee and to perform Guarantor's obligations hereunder;

      iii.     no consent or authorization of, filing with, or other act by or in respect of, any governmental authority and no consent of any other person (including, without limitation, any creditor of Guarantor) is required in connection with the execution, delivery, performance, validity or enforceability of this Guarantee;

      iv.     this Guarantee has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws; and

      v.     the execution, delivery and performance of this Guarantee will not violate any provision of the certificate of incorporation, by laws or other organizational documents of Guarantor, or any law, treaty, rule or regulation or determination of an arbitrator, a court or other governmental authority, applicable to or binding upon Guarantor or any of its property or to which Guarantor or any of its property is subject.

      (i)     Any provision of this Guarantee which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

      (j)     No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege, and no waiver by Party B of any right or remedy hereunder on any one occasion shall be construed as a bar to any right or remedy which Party B would otherwise have on any future occasion. No failure to exercise, nor any delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

      (k)     If any term, provision, covenant, or condition of this Guarantee, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Guarantee had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Guarantee as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Guarantee and the deletion of such portion of this Guarantee will not substantially impair the respective benefits or expectations of the parties to this Guarantee.

      This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

Date:

EXHIBIT B to the Schedule

GUARANTEE OF CHEUNG KONG (HOLDINGS) LIMITED.

**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A") and **E-CAPITAL PROFITS LIMITED** ("Party B") have entered into a Master Agreement dated as of June 12, 2007 (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party B by Party A under the Agreement, **CHEUNG KONG (HOLDINGS) LIMITED**, a corporation organized and existing under the laws of the Hong Kong Special Administrative Region of the People's Republic of China ("Hong Kong") ("Guarantor"), hereby agrees to the following:

(a) Guarantor hereby unconditionally guarantees to Party A the due and punctual payment of all amounts payable by Party B under each Transaction when and as Party B's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party B to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party A, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c) Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party B (other than as a result of the unenforceability thereof against Party A), the absence of any action to enforce Party B's obligations under the Agreement, any waiver or consent by Party A with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived); provided, however, that Guarantor shall be entitled to exercise any right that Party B could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party A or any Affiliate, but only to the extent such right is provided to Party B under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d) This Guarantee shall remain in full force and effect until such time as Party A shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e) Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party A upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party B or Guarantor.

(f) Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party A exhaust any right to take any action against Party B or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of Hong Kong, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to CHEUNG KONG (HOLDINGS) LIMITED, Attention: Mr. Edmond Ip, at 7th Floor, Cheung Kong Center, 2 Queen's Road Central, Hong Kong (Facsimile No. (852) 2845-2940).

**IN WITNESS WHEREOF,** Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**CHEUNG KONG (HOLDINGS) LIMITED**

Name:

Title:

Date:

(Bilateral Form – Transfer)[1]                    (ISDA Agreements Subject to English Law)[2]



# ISDA®

International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

## ISDA Master Agreement

dated as of June 12, 2007

between

**LEHMAN BROTHERS**            and            **E-CAPITAL PROFITS LIMITED**
**SPECIAL FINANCING INC.**
**("Party A")**                                           **("Party B")**

This Annex supplements, forms part of, and is subject to, the ISDA Master Agreement referred to above and is part of its Schedule. For the purposes of this Agreement, including, without limitation, Sections 1(c), 2(a), 5 and 6, the credit support arrangements set out in this Annex constitute a Transaction (for which this Annex constitutes the Confirmation).

**Paragraph 1. Interpretation**

Capitalised terms not otherwise defined in this Annex or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 10, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 11 and the other

---

[1] This document is not intended to create a charge or other security interest over the assets transferred under its terms. Persons intending to establish a collateral arrangement based on the creation of a charge or other security interest should consider using the ISDA Credit Support Deed (English law) or the ISDA Credit Support Annex (New York law), as appropriate.

[2] This Credit Support Annex has been prepared for use with ISDA Master Agreements subject to English law. Users should consult their legal advisers as to the proper use and effect of this form and the arrangements it contemplates. In particular, users should consult their legal advisers if they wish to have the Credit Support Annex made subject to a governing law other than English law or to have the Credit Support Annex subject to a different governing law than that governing the rest of the ISDA Master Agreement (e.g., English law for the Credit Support Annex and New York law for the rest of the ISDA Master Agreement).

Copyright © 1995 by International Swaps and Derivatives Association, Inc.

provisions of this Annex, Paragraph 11 will prevail. For the avoidance of doubt, references to "transfer" in this Annex mean, in relation to cash, payment and, in relation to other assets, delivery.

**Paragraph 2. Credit Support Obligations**

(a)      *Delivery Amount.* Subject to Paragraphs 3 and 4, upon a demand made by the Transferee on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Transferor's Minimum Transfer Amount, then the Transferor will transfer to the Transferee Eligible Credit Support having a Value as of the date of transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 11(b)(iii)(D)). Unless otherwise specified in Paragraph 11(b), the "Delivery Amount" applicable to the Transferor for any Valuation Date will equal the amount by which:

(i)      the Credit Support Amount

exceeds

(ii)      the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date).

(b)      *Return Amount.*      Subject to Paragraphs 3 and 4, upon a demand made by the Transferor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Transferee's Minimum Transfer Amount, then the Transferee will transfer to the Transferor Equivalent Credit Support specified by the Transferor in that demand having a Value as of the date of transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 11(b)(iii)(D)) and the Credit Support Balance will, upon such transfer, be reduced accordingly. Unless otherwise specified in Paragraph 11(b), the "Return Amount" applicable to the Transferee for any Valuation Date will equal the amount by which:

(i)      the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date)

exceeds

(ii)      the Credit Support Amount.

**Paragraph 3. Transfers, Calculations and Exchanges**

(a)      *Transfers.*      All transfers under this Annex of any Eligible Credit Support, Equivalent Credit Support, Interest Amount or Equivalent Distributions shall be made in accordance with the instructions of the Transferee or Transferor, as applicable, and shall be made:

(i)      in the case of cash, by transfer into one or more bank accounts specified by the recipient;

2

(ii)    in the case of certificated securities which cannot or which the parties have agreed will not be delivered by book-entry, by delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, transfer tax stamps and any other documents necessary to constitute a legally valid transfer of the transferring party's legal and beneficial title to the recipient; and

(iii)    in the case of securities which the parties have agreed will be delivered by book-entry, by the giving of written instructions (including, for the avoidance of doubt, instructions given by telex, facsimile transmission or electronic messaging system) to the relevant depository institution or other entity specified by the recipient, together with a written copy of the instructions to the recipient, sufficient, if complied with, to result in a legally effective transfer of the transferring party's legal and beneficial title to the recipient.

Subject to Paragraph 4 and unless otherwise specified, if a demand for the transfer of Eligible Credit Support or Equivalent Credit Support is received by the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the date such demand is received; if a demand is received after the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the day after the date such demand is received.

(b)    *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 2 and 4(a) will be made by the relevant Valuation Agent as of the relevant Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or, in the case of Paragraph 4(a), following the date of calculation).

(c)    *Exchanges.*

(i)    Unless otherwise specified in Paragraph 11, the Transferor may on any Local Business Day by notice inform the Transferee that it wishes to transfer to the Transferee Eligible Credit Support specified in that notice (the "New Credit Support") in exchange for certain Eligible Credit Support (the "Original Credit Support") specified in that notice comprised in the Transferor's Credit Support Balance.

(ii)    If the Transferee notifies the Transferor that it has consented to the proposed exchange, (A) the Transferor will be obliged to transfer the New Credit Support to the Transferee on the first Settlement Day following the date on which it receives notice (which may be oral telephonic notice) from the Transferee of its consent and (B) the Transferee will be obliged to transfer to the Transferor Equivalent Credit Support in respect of the Original Credit Support not later than the Settlement Day following the date on which the Transferee receives the New Credit Support, unless otherwise specified in Paragraph 11(d) (the "Exchange Date"); *provided* that the Transferee will only be obliged to transfer Equivalent Credit Support with a Value as of the date of transfer as close as practicable to, but in any event not more than, the Value of the New Credit Support as of that date.

3                                              **ISDA® 1995**

**Paragraph 4. Dispute Resolution**

(a)      *Disputed Calculations or Valuations.* If a party (a "Disputing Party") reasonably disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, then:

      (1)      the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following, in the case of (I) above, the date that the demand is received under Paragraph 2 or, in the case of (II) above, the date of transfer;

      (2)      in the case of (I) above, the appropriate party will transfer the undisputed amount to the other party not later than the close of business on the Settlement Day following the date that the demand is received under Paragraph 2;

      (3)      the parties will consult with each other in an attempt to resolve the dispute; and

      (4)      if they fail to resolve the dispute by the Resolution Time, then:

            (i)      in the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 11(c), the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

                  (A)      utilising any calculations of that part of the Exposure attributable to the Transactions that the parties have agreed are not in dispute;

                  (B)      calculating that part of the Exposure attributable to the Transactions in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction, then fewer than four quotations may be used for that Transaction, and if no quotations are available for a particular Transaction, then the Valuation Agent's original calculations will be used for the Transaction; and

                  (C)      utilising the procedures specified in Paragraph 11(e)(ii) for calculating the Value, if disputed, of the outstanding Credit Support Balance;

            (ii)      in the case of a dispute involving the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, the Valuation Agent will recalculate the Value as of the date of transfer pursuant to Paragraph 11(e)(ii).

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) as soon as possible but in any event not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following such notice given by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraph 3(a), make the appropriate transfer.

4

(b)      *No Event of Default.* The failure by a party to make a transfer of any amount which is the subject of a dispute to which Paragraph 4(a) applies will not constitute an Event of Default for as long as the procedures set out in this Paragraph 4 are being carried out. For the avoidance of doubt, upon completion of those procedures, Section 5(a)(i) of this Agreement will apply to any failure by a party to make a transfer required under the final sentence of Paragraph 4(a) on the relevant due date.

**Paragraph 5. Transfer of Title, No Security Interest, Distributions and Interest Amount**

(a)      *Transfer of Title.* Each party agrees that all right, title and interest in and to any Eligible Credit Support, Equivalent Credit Support, Equivalent Distributions or Interest Amount which it transfers to the other party under the terms of this Annex shall vest in the recipient free and clear of any liens, claims, charges or encumbrances or any other interest of the transferring party or of any third person (other than a lien routinely imposed on all securities in a relevant clearance system).

(b)      *No Security Interest.* Nothing in this Annex is intended to create or does create in favour of either party any mortgage, charge, lien, pledge, encumbrance or other security interest in any cash or other property transferred by one party to the other party under the terms of this Annex.

(c)      *Distributions and Interest Amount.*

      (i)      *Distributions.* The Transferee will transfer to the Transferor not later than the Settlement Day following each Distributions Date cash, securities or other property of the same type, nominal value, description and amount as the relevant Distributions ("Equivalent Distributions") to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

      (ii)      *Interest Amount.* Unless otherwise specified in Paragraph 11(f)(iii), the Transferee will transfer to the Transferor at the times specified in Paragraph 11(f)(ii) the relevant Interest Amount to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

**Paragraph 6. Default**

If an Early Termination Date is designated or deemed to occur as a result of an Event of Default in relation to a party, an amount equal to the Value of the Credit Support Balance, determined as though the Early Termination Date were a Valuation Date, will be deemed to be an Unpaid Amount due to the Transferor (which may or may not be the Defaulting Party) for purposes of Section 6(e). For the avoidance of doubt, if Market Quotation is the applicable payment measure for purposes of Section 6(e), then the Market Quotation determined under Section 6(e) in relation to the Transaction constituted by this Annex will be deemed to be zero, and, if Loss is the applicable payment measure for purposes of Section 6(e), then the Loss determined under Section 6(e) in relation to the Transaction will be limited to the Unpaid Amount representing the Value of the Credit Support Balance.

ISDA® 1995

**Paragraph 7. Representation**

Each party represents to the other party (which representation will be deemed to be repeated as of each date on which it transfers Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions) that it is the sole owner of or otherwise has the right to transfer all Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions it transfers to the other party under this Annex, free and clear of any security interest, lien, encumbrance or other restriction (other than a lien routinely imposed on all securities in a relevant clearance system).

**Paragraph 8. Expenses**

Each party will pay its own costs and expenses (including any stamp, transfer or similar transaction tax or duty payable on any transfer it is required to make under this Annex) in connection with performing its obligations under this Annex, and neither party will be liable for any such costs and expenses incurred by the other party.

**Paragraph 9. Miscellaneous**

(a)      *Default Interest.*    Other than in the case of an amount which is the subject of a dispute under Paragraph 4(a), if a Transferee fails to make, when due, any transfer of Equivalent Credit Support, Equivalent Distributions or the Interest Amount, it will be obliged to pay the Transferor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value on the relevant Valuation Date of the items of property that were required to be transferred, from (and including) the date that the Equivalent Credit Support, Equivalent Distributions or Interest Amount were required to be transferred to (but excluding) the date of transfer of the Equivalent Credit Support, Equivalent Distributions or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)      *Good Faith and Commercially Reasonable Manner.*    Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(c)      *Demands and Notices.*    All demands and notices given by a party under this Annex will be given as specified in Section 12 of this Agreement.

(d)      *Specifications of Certain Matters.*    Anything referred to in this Annex as being specified in Paragraph 11 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**Paragraph 10. Definitions**

As used in this Annex:

*"Base Currency"* means the currency specified as such in Paragraph 11(a)(i).

6

*"Base Currency Equivalent"* means, with respect to an amount on a Valuation Date, in the case of an amount denominated in the Base Currency, such Base Currency amount and, in the case of an amount denominated in a currency other than the Base Currency (the "Other Currency"), the amount of Base Currency required to purchase such amount of the Other Currency at the spot exchange rate determined by the Valuation Agent for value on such Valuation Date.

*"Credit Support Amount"* means, with respect to a Transferor on a Valuation Date, (i) the Transferee's Exposure plus (ii) all Independent Amounts applicable to the Transferor, if any, minus (iii) all Independent Amounts applicable to the Transferee, if any, minus (iv) the Transferor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

*"Credit Support Balance"* means, with respect to a Transferor on a Valuation Date, the aggregate of all Eligible Credit Support that has been transferred to or received by the Transferee under this Annex, together with any Distributions and all proceeds of any such Eligible Credit Support or Distributions, as reduced pursuant to Paragraph 2(b), 3(c)(ii) or 6. Any Equivalent Distributions or Interest Amount (or portion of either) not transferred pursuant to Paragraph 5(c)(i) or (ii) will form part of the Credit Support Balance.

*"Delivery Amount"* has the meaning specified in Paragraph 2(a).

*"Disputing Party"* has the meaning specified in Paragraph 4.

*"Distributions"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance consisting of securities, all principal, interest and other payments and distributions of cash or other property to which a holder of securities of the same type, nominal value, description and amount as such Eligible Credit Support would be entitled from time to time.

*"Distributions Date"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance other than cash, each date on which a holder of such Eligible Credit Support is entitled to receive Distributions or, if that date is not a Local Business Day, the next following Local Business Day.

*"Eligible Credit Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 11(b)(ii) including, in relation to any securities, if applicable, the proceeds of any redemption in whole or in part of such securities by the relevant issuer.

*"Eligible Currency"* means each currency specified as such in Paragraph 11(a)(ii), if such currency is freely available.

*"Equivalent Credit Support"* means, in relation to any Eligible Credit Support comprised in the Credit Support Balance, Eligible Credit Support of the same type, nominal value, description and amount as that Eligible Credit Support.

*"Equivalent Distributions"* has the meaning specified in Paragraph 5(c)(i).

*"Exchange Date"* has the meaning specified in Paragraph 11(d).

7

*"Exposure"* means, with respect to a party on a Valuation Date and subject to Paragraph 4 in the case of a dispute, the amount, if any, that would be payable to that party by the other party (expressed as a positive number) or by that party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(1) of this Agreement if all Transactions (other than the Transaction constituted by this Annex) were being terminated as of the relevant Valuation Time, on the basis that (i) that party is not the Affected Party and (ii) the Base Currency is the Termination Currency; *provided* that Market Quotations will be determined by the Valuation Agent on behalf of that party using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11 (b)(iii)(A); if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the Base Currency Equivalents of the amounts of interest determined for each relevant currency and calculated for each day in that Interest Period on the principal amount of the portion of the Credit Support Balance comprised of cash in such currency, determined by the Valuation Agent for each such day as follows:

    (x)    the amount of cash in such currency on that day; multiplied by

    (y)    the relevant Interest Rate in effect for that day; divided by

    (z)    360 (or, in the case of pounds sterling, 365).

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the Local Business Day on which Eligible Credit Support or Equivalent Credit Support in the form of cash was transferred to or received by the Transferee) to (but excluding) the Local Business Day on which the current Interest Amount is transferred.

*"Interest Rate"* means, with respect to an Eligible Currency, the rate specified in Paragraph 11(f)(i) for that currency.

*"Local Business Day"*, unless otherwise specified in Paragraph 11(h), means:

    (i)    in relation to a transfer of cash or other property (other than securities) under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment;

    (ii)    in relation to a transfer of securities under this Annex, a day on which the clearance system agreed between the parties for delivery of the securities is open for the acceptance and execution of settlement instructions or, if delivery of the securities is contemplated by other means, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place(s) agreed between the parties for this purpose;

8

(iii)    in relation to a valuation under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place of location of the Valuation Agent and in the place(s) agreed between the parties for this purpose; and

(iv)    in relation to any notice or other communication under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place specified in the address for notice most recently provided by the recipient.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 11(b)(iii)(C); if no amount is specified, zero.

*"New Credit Support"* has the meaning specified in Paragraph 3(c)(i).

*"Notification Time"* has the meaning specified in Paragraph 11(c)(iv).

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 4; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 2 prior to the resolution of the dispute, then the *"Recalculation Date"* means the most recent Valuation Date under Paragraph 2.

*"Resolution Time"* has the meaning specified in Paragraph 11(c)(i).

*"Return Amount"* has the meaning specified in Paragraph 2(b).

*"Settlement Day"* means, in relation to a date, (i) with respect to a transfer of cash or other property (other than securities), the next Local Business Day and (ii) with respect to a transfer of securities, the first Local Business Day after such date on which settlement of a trade in the relevant securities, if effected on such date, would have been settled in accordance with customary practice when settling through the clearance system agreed between the parties for delivery of such securities or, otherwise, on the market in which such securities are principally traded (or, in either case, if there is no such customary practice, on the first Local Business Day after such date on which it is reasonably practicable to deliver such securities).

*"Threshold"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11(b)(iii)(B); if no amount is specified, zero.

*"Transferee"* means, in relation to each Valuation Date, the party in respect of which Exposure is a positive number and, in relation to a Credit Support Balance, the party which, subject to this Annex, owes such Credit Support Balance or, as the case may be, the Value of such Credit Support Balance to the other party.

*"Transferor"* means, in relation to a Transferee, the other party.

*"Valuation Agent"* has the meaning specified in Paragraph 11(c)(i).

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 11(c)(ii).

ISDA® 1995

*"Valuation Percentage"* means, for any item of Eligible Credit Support, the percentage specified in Paragraph 11(b)(ii).

*"Valuation Time"* has the meaning specified in Paragraph 11(c)(iii).

*"Value"* means, for any Valuation Date or other date for which Value is calculated, and subject to Paragraph 4 in the case of a dispute, with respect to:

     (i)       Eligible Credit Support comprised in a Credit Support Balance that is:

           (A)     an amount of cash, the Base Currency Equivalent of such amount multiplied by the applicable Valuation Percentage, if any; and

           (B)     a security, the Base Currency Equivalent of the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any; and

     (ii)     items that are comprised in a Credit Support Balance and are not Eligible Credit Support, zero.

10

**ISDA® 1995**

(Bilateral Form – Transfer)[1]    (ISDA Agreements Subject to English Law)[2]

## CREDIT SUPPORT ANNEX
Elections and Variables
dated as of June 12, 2007
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.**
(hereinafter referred to as either "Party A" or "Transferee")
and
**E-CAPITAL PROFITS LIMITED**
(hereinafter referred to as either "Party B" or "Transferor")

## PARAGRAPH 11.  ELECTIONS AND VARIABLES

(a)    **Base Currency and Eligible Currency.**

    (i)    **"Base Currency"** means United States Dollars.

    (ii)    **"Eligible Currency"** means the Base Currency.

(b)    **Credit Support Obligations.**

    (i)    **Delivery Amount, Return Amount and Credit Support Amount**

        (1)    **"Delivery Amount"** has the meaning specified in Paragraph 2(a).

        (2)    **"Return Amount"** has the meaning specified in Paragraph 2(b).

        (3)    **"Credit Support Amount"** has the meaning specified in Paragraph 10, *provided*, however, that in the event that the sum of the Independent Amount applicable to the Transferor exceed zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Transferor.

    (ii)    **Eligible Credit Support.**  The following items will qualify as **"Eligible Credit Support"** for the party specified:

| | Collateral Type | Party B | Valuation Percentage |
|---|---|---|---|
| (1) | Cash in an Eligible Currency. | Yes | 100% |
| (2) | Negotiable debt obligations issued by the Government of the United States of America having remaining maturity of 1 year or less. | Yes | 100% |
| (3) | Negotiable debt obligations issued by the Government of the United States of America having a remaining maturity of more than 1 but not more than 5 years. | Yes | 100% |
| (4) | Negotiable debt obligations issued by the Government of the United States of America having a remaining maturity of more than 5 but not more than 10 years. | Yes | 100% |
| (5) | Negotiable debt obligations issued by the Government of the United States of America having a remaining maturity of more than 10 years. | Yes | 100% |
| (6) | Such other Eligible Credit Support as may be agreed | Yes | As determined by |

11

between the parties                                                    Party A

(iii)   **Thresholds.**

(1)     **"Independent Amount"** shall mean an amount, if any, as set forth in a Confirmation with respect to Party B.

(2)     **"Credit Rating"** means the long-term senior unsecured debt (and any successor rating) of Party B's Credit Support Provider (if any), in the case of Party B, which is rated by Moody's Investors Service, Inc. (or any successor rating agency) ("Moody's") and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. (or any successor rating agency) ("S&P").

(3)     **"Threshold"** means, with respect to the Transferor, or its Credit Support Provider, as the case may be, the amount corresponding to the Credit Rating such entity as set forth in the table below, provided that (A) if Moody's and S&P have assigned ratings at different levels for any Credit Rating, the lower of such ratings shall be used for purposes hereof and (B) if (I) an Event of Default, Credit Event Upon Merger, or Additional Termination Event has occurred and is continuing, then the Threshold with respect to the Defaulting Party or the Affected Party shall be zero and (II) such entity ceases to be rated by either S&P or Moody's or ceases to have a Credit Rating, then the Threshold with respect to Transferor shall be zero:

| S&P's Rating | Moody's Rating | Threshold (USD) |
|:---:|:---:|:---:|
| AAA | Aaa | 10,000,000 |
| AA+ | Aa1 | 10,000,000 |
| AA | Aa2 | 10,000,000 |
| AA- | Aa3 | 10,000,000 |
| A+ | A1 | 10,000,000 |
| A | A2 | 10,000,000 |
| A- | A3 | 10,000,000 |
| BBB+ | Baa1 | 5,000,000 |
| BBB | Baa2 | 5,000,000 |
| BBB- | Baa3 | 2,000,000 |
| below BBB- or if Transferor ceases to have a Credit Rating | below Baa3 or if Transferor ceases to have a Credit Rating | Zero |

(4)     **"Minimum Transfer Amount"** means, with respect to the Transferor or its Credit Support Provider, as the case may be, the amount corresponding to the Credit Rating of such entity as set forth in the table below, provided that if Moody's and S&P have assigned ratings at different levels for any Credit Rating, the lower of such ratings shall be used for purposes hereof provided further that, notwithstanding anything to the contrary contained herein, the Minimum Transfer Amount shall not apply to the Independent Amount, and provided further that if (A) an Event of Default, Credit Event Upon Merger or Additional Termination Event with respect to Transferor has occurred and is continuing, then the Minimum Transfer Amount with respect to the Defaulting Party or the Affected Party shall be zero and (B) if Transferor, or its Credit Support Provider, as the case may be, ceases to be rated by either S&P or Moody's or ceases to have a Credit Rating, then the Minimum Transfer Amount with respect to Transferor shall be zero:

| S&P's Rating | Moody's Rating | Minimum Transfer Amount(USD) |
|---|---|---|
| AAA | Aaa | 250,000 |
| AA+ | Aa1 | 250,000 |
| AA | Aa2 | 250,000 |
| AA- | Aa3 | 250,000 |
| A+ | A1 | 250,000 |
| A | A2 | 250,000 |
| A- | A3 | 250,000 |
| BBB+ | Baa1 | 250,000 |
| BBB | Baa2 | 250,000 |
| BBB- | Baa3 | 100,000 |
| Below BBB- or if Transferor ceases to have a Credit Rating | Below Baa3 or if Transferor ceases to have a Credit Rating | Zero |

    (5)    **Rounding.**  The Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of USD 1,000.

(c)    **Valuation and Timing.**

    (i)    **"Valuation Agent"** means Party A.

    (ii)    **"Valuation Date"** means any Local Business Day.

    (iii)    **"Valuation Time"** means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

    (iv)    **"Notification Time"** means by 5:00 p.m., Tokyo time, on a Local Business Day.

(d)    **"Exchange Date"** has the meaning specified in Paragraph 3(c)(ii).

(e)    **Dispute Resolution.**

    (i)    **"Resolution Time"** means 1:00 p.m., Tokyo time on the Local Business Day following the time at which notice is given that gives rise to a dispute under Paragraph 4.

    (ii)    **Value.** For the purpose of Paragraphs 4(a)(4)(i)(C) and 4(a)(4)(ii), the Value of the outstanding Credit Support Balance or of Eligible Credit Support or Equivalent Credit Support other than cash, as the case may be, will be calculated as follows:

With respect to any Eligible Credit Support in the form of securities listed in Paragraph 11(b)(ii) (referred to herein as "Collateral Obligations") the sum of (1) (x) the bid price quoted on such date by a mutually acceptable principal market maker for such Collateral Obligations, or (y) if no such quotation is available from a principal market maker for such date, such bid price as of the day, next preceding such date, on which such quotation was available, in either case multiplied by the applicable Valuation Percentage, plus (2) the accrued interest on such Collateral Obligations (except to the extent Transferred to a party pursuant

to any applicable section of this Agreement or included in the applicable price referred to in (1) of this clause) as of such date.

(iii)   **Alternative.** Paragraph 4 will apply.

(f)   **Distributions and Interest Amount.**

**Interest Rates**

**With respect to:**

(i)   **USD Cash.** The Interest Rate will be the Federal Funds Rate. "Federal Funds Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day cash is held by the Transferee, as reported in Federal Reserve Publication H.15-519.

(ii)   **Transfer of Interest Amount.** The Transfer of the Interest Amount will be made on or before the fifth Local Business Day of each calendar month.

(iii)   **Alternative to Interest Amount.** Paragraph 5(c)(ii) will apply.

(g)   **Addresses for Transfers.**

Party A:    To be advised.

Party B:    To be advised.

(h)   **Other Provisions.**

(i)   **Paragraph 6.** For the purposes of determining the Credit Support Balance pursuant to Paragraph 6, the definition of Value in Paragraph 10 shall be amended by deleting the words "multiplied by the applicable Valuation Percentage, if any" from subsection (i)(A) and (B).

(ii)   **Agreement as to Single Transferee and Transferor.** Party A and Party B agree that, notwithstanding anything to the contrary in the recital to this Annex, or definitions in Paragraph 10, (1) the term "Transferee" as used in this Annex means only Party A and (2) the term "Transferor" as used in this Annex means only Party B.

(ii)   **No offset.** The following subparagraph (c) is hereby added to Paragraph 2 of this Annex:

(c)   *No offset.* On any Valuation Date, if either (i) each party is required to make a Transfer under Paragraph 2(a) or (ii) each party is required to make a transfer under Paragraph 2(b), then the amounts of those obligations will not offset each other.

The parties executing this Credit Support Annex have executed the Master Agreement and have agreed as to the contents of this Credit Support Annex.

| LEHMAN BROTHERS SPECIAL FINANCING INC. | E-CAPITAL PROFITS LIMITED |
|---|---|
| *Party A* | *Party B* |

By: _____

Name:

Title: Scott Willoughby

Date: Managing Director

4/21/07

By: _____

Name: Ip Tak Chuen, Edmond

Title: Director

Date: 12th June, 2007

6/21/2007 2:33 AM    PAGE    2/014    Fax Server

# LEHMAN BROTHERS

## Transaction

| | |
|---|---|
| Date: | 21 June, 2007 |
| To: | E-Capital Profits Limited |
| | Attention:    Documentation Unit |
| From: | Lehman Brothers Special Financing Inc. |
| | Confirmations Group |
| | Facsimile:    (+1) 646-885-9556 (United States of America) |
| | Telephone:   (+44) 207-102-6771 (United Kingdom) |
| Effort ID: | T1422226 |

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and E-Capital Profits Limited ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

**General Terms:**

| | |
|---|---|
| Transaction: | Credit Derivative Transaction |
| Trade Date: | 12 June, 2007 |
| Effective Date: | 20 June, 2007 |
| Scheduled Termination Date: | 20 March, 2018 |
| Floating Rate Payer: | Party B (the "Seller") |
| Fixed Rate Payer: | Party A (the "Buyer") |
| Calculation Agent: | The Buyer |
| Calculation Agent City: | London |
| Business Day: | London and New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Hutchison Whampoa Limited |

The obligation(s) identified as follows:

| | |
|---|---|
| Primary Obligor: | Hutchison    Whampoa International Limited |
| Guaranteed by: | Hutchison    Whampoa Limited |
| Maturity: | January 24, 2014 |
| Coupon: | 6.25% |
| CUSIP/ISIN: | USG4672CAB12 |

| | |
|---|---|
| All Guarantees: | Applicable |

**Fixed Payments:**

| | |
|---|---|
| Fixed Rate Payer Calculation Amount: | USD10,000,000.00 |

Risk ID: 726677 / Effort ID: 1422226 / Global Deal ID: 3112877

18/10 '07 THU 17:15 FAX +852 2877 0468        #5                                    ☒004
21. SEP. 2007 15:59   LEHMAN_BROTHERS                              NO. 510    P. 4

6/21/2007 2:38 AM   PAGE   4/014   Fax Server

Fixed Rate:

(3M USD LIBOR + 3.05%) x Index per annum

3M USD LIBOR means the rate for deposits in U.S. Dollars for a period of the Designated Maturity of 3 months, which appears two London Business Days prior to the start of each Fixed Rate Payer Calculation Period on the Reuters Page LIBOR01 as of 11:00 a.m., London time. If such rate does not appear on the Reuters Page LIBOR01, the Calculation Agent shall determine such rate in a commercially reasonable manner.

Index means with respect to each relevant Fixed Rate Payer Calculation Period, the number of calendar days during the applicable Fixed Rate Payer Calculation Period in respect of which the Reference Spread on the applicable Reference Spread Determination Date is equal to or greater than the Lower Accrual Barrier and equal to or less than the Upper Accrual Barrier divided by the number of calendar days in such Fixed Rate Payer Calculation Period.

Reference Spread means the level (expressed in basis points per annum) for a credit default swap in respect of the Reference Entity for a period of 5 years commencing on the relevant Reference Spread Determination Date displayed at Primary Source Screen at 11:00a.m., Hong Kong time on the Reference Spread Determination Date; provided that in the event that the Calculation Agent determines in its sole and absolute discretion that the level that appears on the Primary Source Screen does not reflect the correct pricing for a credit default swap in respect of the Reference Entity, the Calculation Agent will poll three credit default swap dealers on the Reference Spread Determination Date, one of which may be the Swap Counterparty. If at least two levels are so obtained, the average level will be deemed to be the Reference Spread and, if one level is so obtained, that level will be deemed to be the Reference Spread, and if no level is obtained, the Reference Spread will be determined by the Calculation Agent in its sole and absolute discretion.

Primary Source Screen means The mid price on Bloomberg's CHWAM1U5 Index

Reference Spread Determination Date means with respect to each Fixed Rate Payer Calculation Period:

(i)      each calendar day that falls in such Fixed Rate Payer Calculation Period that is a Business Day; and

(ii)     for each calendar day that falls in such Fixed Rate Payer Calculation Period that is not a Business Day, the immediately preceding Business Day;

provided that, for each calendar day that falls on or after the 5th Business Day prior to the final day of such Fixed Rate Payer Calculation Period (the "Final Day") up to but excluding such Final Day, the Reference Spread Determination Date shall be deemed to be such 5th Business Day prior to the Final Day.

Lower Accrual Barrier means 0.00%

Upper Accrual Barrier means 0.50%

| | |
|---|---|
| Fixed Rate Day Count Fraction: | Actual/360 |
| Fixed Rate Payer Payment Dates: | 20 September, 2007, and thereafter the 20th of each March, June, September, and December |

**Additional Floating Payments:**

| | |
|---|---|
| Additional Floating Rate Payer | Party B |
| Additional Floating Rate Payer Calculation Amount: | USD10,000,000.00 |
| Floating Rate in respect of Additional Floating Rate Payer Calculation Amount: | 3M USD LIBOR per annum |
| Additional Floating Rate Payer Payment Dates: | 20 September, 2007, and thereafter the 20th of each March, June, September, and December |
| Floating Rate Additional Payment Day Count Fraction: | Actual/360 |

**Floating Payments:**

| | |
|---|---|
| Floating Rate Payer Calculation Amount: | USD30,000,000.00 |
| Conditions to Settlement: | Credit Event Notice |
| | Notifying Party: Buyer or Seller |
| | Notice of Publicly Available Information: Applicable |
| | Notice of Physical Settlement |
| | Specified Number: 2 |
| Credit Event(s): | The following Credit Event(s) shall apply to this Transaction: |
| | Bankruptcy |
| | Failure to Pay |
| | Grace Period Extension: Inapplicable |
| | Payment Requirement: USD1,000,000.00, or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay |
| | Restructuring |

|  |  |
|---|---|
|  | Default Requirement: USD10,000,000.00, or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event . |
| Obligation(s): |  |
| Obligation Category: | Bond or Loan |
| Obligation Characteristic(s): | Obligation Characteristic(s) shall mean all of the following: Not Domestic Issuance Not Domestic Law . Not Sovereign Lender Not Subordinated . Not Domestic Currency |
| Settlement Terms: |  |
| Settlement Method: / | Cash Settlement in a notional amount equal to Floating Rate Payer Calculation Amount |
| Terms Relating to Cash Settlement: |  |
| Valuation Date: | Single Valuation Date: 5 Business Days |
| Valuation Time: | 11:00 a.m., Tokyo Time |
| Quotation Method: | Bid |
| Settlement Currency: |  |
| Cash Settlement Date: | USD 3 Business Days |
| Dealers. | 3, provided however, the Dealers shall include one dealer as may be nominated by the Seller |
| Quotations: | Exclude Accrued Interest |
| Valuation Method: | Highest, if at least 3 Full Quotations are obtained; or else Market |
| Deliverable Obligations: |  |
| Deliverable Obligation(s): |  |
| Deliverable Obligation Category: | Bond or Loan |
| Deliverable Obligation Characteristic(s): | Deliverable Obligation Characteristic(s) shall mean each of the following: Not Subordinated Specified Currency: Standard Specified Currencies Not Contingent Not Domestic Issuance, Not Domestic Law Assignable Loan Transferable . Maximum Maturity 30 years . Not Bearer . Not Sovereign Lender |
| 60 Business Day Cap on Settlement: | Applicable |

Risk ID: 726677 / Effort ID: 1422226 / Global Deal ID: 3112877

18/10 '07 THU 17:16 FAX +852 2877 0468   5
21. SEP. 2007  16:00   LEHMAN_BROTHERS                              NO. 510   P. 7
007

6/21/2007 2;33 AM  PAGE   7/014   Fax Server

**Optional Termination Date:**

The Buyer has the right to terminate this Transaction in whole and not in part on any Fixed Rate Payer Payment Date scheduled to fall on 20 June 2012 and quarterly thereafter; provided that the Buyer shall provide a notice to the Seller not less than 5 Business Days prior to such Fixed Rate Payer Payment Date.

| Collateral: | Party A and Party B agree that this provision will apply with respect to this Transaction and all other Transactions entered into between them until such time as they execute an ISDA Credit Support Annex to the Agreement. Party A hereinafter referred to as "Transferee", and Party B hereinafter referred to as "Transferor".

Paragraphs one through ten of the standard form ISDA Credit Support Annex (English law) (the "CSA") are incorporated by reference herein subject to the elections and modifications set out below. Terms defined in the CSA have this same meaning herein. |
| Elections and variables for the purposes of Paragraph 11 of the CSA: | "Eligible Credit Support" shall include (A) USD cash at a Valuation Percentage of 100% and/or (B) negotiable debt obligations issued by the U.S. Treasury Department having remaining maturity of not more than one year ("Treasury Bills") at a Valuation Percentage of 100% and/or (C) negotiable debt obligations issued by the U.S. Treasury Department having remaining maturity of more than one year but not more than ten years ("Treasury Notes") at a Valuation Percentage of 100% and/or (D) negotiable debt obligations issued by the U.S. Treasury Department having remaining maturity of more than ten years ("Treasury Bonds") at a Valuation Percentage of 100% and/or (E) such other Eligible Credit Support as may be agreed between the parties.

"Threshold" means, with respect to the Transferor, or its Credit Support Provider, as the case may be, the amount corresponding to the Credit Rating such entity as set forth in the table below, provided that (A) if Moody's and S&P have assigned ratings at different levels for any Credit Rating, the lower of such ratings shall be used for purposes hereof and (B) if (I) an Event of Default, Credit Event Upon Merger, or Additional Termination Event has occurred and is continuing, then the Threshold with respect to the Defaulting Party or the Affected Party shall be zero and (II) such entity ceases to be rated by either S&P or Moody's or ceases to have a Credit Rating, then the Threshold with respect to Transferor shall be zero:

| S&P's Rating | Moody's Rating | Threshold (USD) |
|---|---|---|
| AAA | Aaa | 10,000,000 |
| AA+ | Aa1 | 10,000,000 |
| AA | Aa2 | 10,000,000 |
| AA- | Aa3 | 10,000,000 |
| A+ | A1 | 10,000,000 |
| A | A2 | 10,000,000 |
| A- | A3 | 10,000,000 |
| BBB+ | Baa1 | 5,000,000 |
| BBB | Baa2 | 5,000,000 |
| BBB- | Baa3 | 2,000,000 |
| below BBB- or if Transferor ceases to have a Credit Rating | below Baa3 or if Transferor ceases to have a Credit Rating | Zero | |

Risk ID: 726677 / Effort ID: 1422225 / Global Deal ID: 3112877

"Minimum Transfer Amount" means, with respect to the Transferor or its Credit Support Provider, as the case may be, the amount corresponding to the Credit Rating of such entity as set forth in the table below, provided that if Moody's and S&P have assigned ratings at different levels for any Credit Rating, the lower of such ratings shall be used for purposes hereof provided further that, notwithstanding anything to the contrary contained herein, the Minimum Transfer Amount shall not apply to the Independent Amount, and provided further that if (A) an Event of Default, Credit Event Upon Merger or Additional Termination Event with respect to Transferor has occurred and is continuing, then the Minimum Transfer Amount with respect to the Defaulting Party or the Affected Party shall be zero and (B) if Transferor, or its Credit Support Provider, as the case may be, ceases to be rated by either S&P or Moody's or ceases to have a Credit Rating, then the Minimum Transfer Amount with respect to Transferor shall be zero:

| S&P's Rating | Moody's Rating | Minimum Transfer Amount(USD) |
|---|---|---|
| AAA | Aaa | 250,000 |
| AA+ | Aa1 | 250,000 |
| AA | Aa2 | 250,000 |
| AA- | Aa3 | 250,000 |
| A+ | A1 | 250,000 |
| A | A2 | 250,000 |
| A- | A3 | 250,000 |
| BBB+ | Baa1 | 250,000 |
| BBB | Baa2 | 250,000 |
| BBB- | Baa3 | 100,000 |
| Below BBB- or if Transferor ceases to have a Credit Rating | Below Baa3 or if Transferor ceases to have a Credit Rating | Zero |

"Valuation Agent" means Party A. Notwithstanding Paragraph 3(b), calculations will only be provided upon a demand made by Party B.

"Valuation Date" means any Local Business Day.

"Valuation Time" means the close of business in the relevant market on the Local Business Day immediately preceding the relevant Valuation Date provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date .

"Notification Time" means 5.00 p.m., Tokyo time, on a Local Business Day.

"Value" For the purpose of Paragraph 4(a)(4)(a)(i)(C) and 4(a)(4)(ii) of the CSA, the Value of the outstanding Credit Support Balance or of Eligible Credit Support or Equivalent Credit Support other than cash will be calculated as follows:

With respect to any Treasury Bills, Treasury Notes, or Treasury Bonds (referred to herein as "Government Obligations") the sum of (I) (x) the bid price quoted on such date by a mutually acceptable principal market maker for such Government Obligations, or (y) if no such quotation is available from a principal market maker for such date, such bid price as of

08-13555-mg   Doc 11199   Filed 09/07/10   Entered 09/07/10 16:14:55   Main Document
Pg 68 of 123
18/10 '07 THU 17:17 FAX +852 2877 0468   Lehman Brothers #5   ☒010
21. SEP. 2007 16:01   LEHMAN_BROTHERS   NO. 510   P. 10

6/21/2007 2:33 AM   PAGE   10/014   Fax Server

| | |
|---|---|
| | the day, next preceding such date, on which such quotation was available, in either case multiplied by the applicable Valuation Percentage, plus (II) the accrued interest on such Government Obligations (except to the extent transferred to a party pursuant to any applicable section of this Agreement or included in the applicable price referred to in (I) of this definition) as of such date.<br><br>"Interest Rate" means with respect to USD cash the rate per annum equal to the overnight Federal Funds Rate for each day cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519. |
| Independent Amount: | On or prior to the Trade Date, Seller shall post the Initial Independent Amount (defined below) to Buyer. Upon the occurrence of 1st Collateral Upsize Event and/or 2nd Collateral Upsize Event, Seller shall further post addition collateral which shall constitute an Independent Amount in respect of this Transaction. Buyer shall have no obligation to return the Independent Amount to Seller until this Transaction is fully and finally terminated.<br><br>Initial Independent Amount means the Independent Amount listed below opposite the lower of the S&P Rating and Moody's Rating applicable to the Reference Entity on the Effective Date: |

| S&P Rating | Moody's Rating | Independent Amount |
|---|---|---|
| AAA | Aaa | 15% of the Floating Rate Payer Calculation Amount |
| AA+ | Aa1 | 15% of the Floating Rate Payer Calculation Amount |
| AA | Aa2 | 15% of the Floating Rate Payer Calculation Amount |
| AA- | Aa3 | 15% of the Floating Rate Payer Calculation Amount |
| A+ | A1 | 15% of the Floating Rate Payer Calculation Amount |
| A | A2 | 15% of the Floating Rate Payer Calculation Amount |
| A- | A3 | 15% of the Floating Rate Payer Calculation Amount |
| BBB+ | Baa1 | 30% of the Floating Rate Payer Calculation Amount |
| BBB | Baa2 | 50% of the Floating Rate Payer Calculation Amount |
| below BBB or if Reference Entity ceases to have Rated Debt. | below Baa2 or if Reference Entity ceases to have Rated Debt. | 100% of the Floating Rate Payer Calculation Amount |

18/10 '07 THU 17:17 FAX +852 2877 0468                                        ☑011
21. SEP. 2007  16:01     LEHMAN_BROTHERS                      NO. 510    P. 11

6/21/2007 2:33 AM   PAGE  11/014   Fax Server

| | |
|---|---|
| 1ˢᵗ Collateral Upsize Event: | If, at any time from and including the Trade Date to and including the Scheduled Termination Date, the offer side of the 5 year Reference Entity Spread has ever touched 2.00% as determined by the Calculation Agent *in its reasonable discretion*, Seller shall, following the notice by the Calculation Agent of such event, have 3 Business Days to post additional collateral equal to 50% of the Floating Rate Payer Calculation Amount. |
| 2ⁿᵈ Collateral Upsize Event: | If, at any time from and including the Trade Date to and including the Scheduled Termination Date, the offer side of the 5 year Reference Entity Spread has ever touched 3.50% as determined by the Calculation Agent *in its reasonable discretion*, Seller shall, following the notice by the Calculation Agent of such event, have 3 Business Days to post additional collateral equal to 100% of the Floating Rate Payer Calculation Amount minus any collateral already posted on the trade. |

Risk ID: 726677 / Effort ID: 1422226 / Global Deal ID: 3112877

| | |
|---|---|
| **Additional Termination Events** | Each of the following shall constitute an Additional Termination Event (provided, however, that any provision(s) to the contrary in the Agreement, when executed, shall take precedence over these Additional Termination Events):- |

(i)      Party B fails to execute an ISDA Master Agreement in form and substance satisfactory to Party A within 90 calendar days of the Trade Date of this Transaction. For the purpose of the foregoing Additional Termination Event. Party B shall be the Affected Party.

(ii)     **Ratings Decline.** Holdings, in the case of Party A (1) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least Baa3 (the "Moody's Rating") as determined by Moody's; or (2) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least BBB- (the "S&P Rating") as determined by S&P; or (3) ceases to be rated by either Moody's or S&P. For clarification, in the event either Moody's or S&P assigns a rating to Party B that is lower than the Moody's Rating or the S&P Rating, as the case may be, then such rating shall be determinative. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iii)    **Ratings Decline.** Party B's Credit Support Provider (1) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least Baa3 (the "Moody's Rating") as determined by Moody's; or (2) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least BBB- (the "S&P Rating") as determined by S&P; or (3) ceases to be rated by either Moody's or S&P. For clarification, in the event either Moody's or S&P assigns a rating to Party B that is lower than the Moody's Rating or the S&P Rating, as the case may be, then such rating shall be determinative. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

| | |
|---|---|
| **Credit Support Provider** | Credit Support Provider means in relation to Party A : Lehman Brothers Holdings Inc. |
| | Credit Support Provider means in relation to Party B : Cheng Kong (Holdings) Limited |

**Miscellaneous:**

    Escrow:                           Applicable

    Office:                           For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party.

    Transfer:                      Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings") effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

    Governing Law:             English law; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

    Termination Currency:     USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

    Escrow:                         Applicable

    Office:                           For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party.

**Notice and Account Details:**

    Telephone, Telex and/or Facsimile Numbers and Contact Details for Notices:

        Buyer:                   Varun Varshney
                                  Telephone: +852 2252 6800

        Cc:                       Transaction Management
                                  Facsimile: 646-885-9556 (United States of America)

        Seller:                 Please advise Edmond Ip
                                       Telephone: (852) 2128 8888

    Account Details:                      Fax     : (852) 2845 2940

        Account Details of Buyer:     JP Morgan Chase Bank, New York
                                  ABA No: 021000021
                                  Account Number: 066-143543
                                  Account of: Lehman Brothers Special Financing Inc.

        Account Details of Seller:     Please advise
                                  HSBC Bank, U.S.A., New York
                                  For the account of HSBC, Hong Kong Branch,
                                  A/C No. 000-04442-3
                                  for further credit to Goldcent Investments Ltd.
                                  A/c# HK-511566960-IDD

Risk ID: 790334 / Effort ID: 1486304 / Global Deal ID: 3197022

6/21/2007 2:33 AM   PAGE   14/014   Fax Server

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9556 (United States of America), Attention: Confirmations Group.

Yours sincerely,

Lehman Brothers Special Financing Inc.

By: _Anatoly Kozlov_
Name: Anatoly Kozlov
Title: Authorized Signatory

Accepted and agreed to:

E-Capital Profits Limited

By:
Name:  Edmond Ip
Title:  Director

Execution time will be furnished upon Counterparty's written request.

Risk ID: 726677 / Effort ID: 1422226 / Global Deal ID: 3112877

18/10 '07 THU 17:14 FAX +852 2877 0468                    #5                     ☑001

# (RCH) CHEUNG KONG (HOLDINGS) LIMITED 長江實業（集團）有限公司

## Fax Transmission

| | | | |
|---|---|---|---|
| To : | Yuko Nakamura | From : | Betty Ng |
| Company : | Lehman Brothers Special Financing Inc. | Department : | Accounts Department |
| Fax : | 813 4582 5305 | Fax : | (852) 28770468 |
| Date : | 3 October 2007 | No. of Pages (including this page) : | 27 |

Resend on 18th October, 2007

E-Capital Profits Limited
Global ID No. 3112877 and 3197022

Please find enclosed the signed confirmation for the captioned for your record.

Betty Ng
Senior Accountant

Encl

(Please notify sender by telephone or fax if message received is incomplete or illegible.)

**CONFIDENTIALITY CAUTION :** This message is intended only for the use of the individual or entity to which it is addressed and contains information that is privileged and confidential. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the address below at our cost.

18/10 '07 THU 17:18 FAX +852 2877 0468                                    ☒015
21. SEP. 2007 16:02    LEHMAN_BROTHERS                    NO. 510    P. 17

# LEHMAN BROTHERS

## Transaction

Date:        7 August, 2007

To:          E-Capital Profits Limited
             Attention:        Documentation Unit

From:        Lehman Brothers Special Financing Inc.
             Confirmations Group
             Facsimile:      (+1) 646-885-9556 (United States of America)
             Telephone:      (+44) 207-102-6771 (United Kingdom)

Effort ID:   T1486304

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and E-Capital Profits Limited ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

18/10 '07 THU 17:19 FAX +852 2877 0468        Funds #5                    016
21. SEP. 2007 16:03      LEHMAN_BROTHERS                      NO. 510   P. 18

due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

**General Terms:**

| | |
|---|---|
| Transaction: | Credit Derivative Transaction |
| Trade Date: | 16 July, 2007 |
| Effective Date: | 30 July, 2007 |
| Scheduled Termination Date: | 20 March, 2018 |
| Floating Rate Payer: | Party B (the "Seller") |
| Fixed Rate Payer: | Party A (the "Buyer") |
| Calculation Agent: | The Buyer |
| Calculation Agent City: | London |
| Business Day: | London and New York |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Hutchison Whampoa Limited |

The obligation(s) identified as follows:

| | |
|---|---|
| Primary Obligor: | Hutchison Whampoa International Limited |
| Guaranteed by: | Hutchison Whampoa Limited |
| Maturity: | January 24, 2014 |
| Coupon: | 6.25% |
| CUSIP/ISIN: | USG4672CAB12 |

| | |
|---|---|
| All Guarantees: | Applicable |

**Fixed Payments:**

| | |
|---|---|
| Fixed Rate Payer Calculation Amount: | USD10,000,000.00 |

Fixed Rate:

(3M USD LIBOR + 3.05%) x Index per annum

3M USD LIBOR means the rate for deposits in U.S. Dollars for a period of the Designated Maturity of 3 months, which appears two London Business Days prior to the start of each Fixed Rate Payer Calculation Period on the Reuters Page LIBOR01 as of 11:00 a.m., London time. If such rate does not appear on the Reuters Page LIBOR01, the Calculation Agent shall determine such rate in a commercially reasonable manner.

Index means with respect to each relevant Fixed Rate Payer Calculation Period, the number of calendar days during the applicable Fixed Rate Payer Calculation Period in respect of which the Reference Spread on the applicable Reference Spread Determination Date is equal to or greater than the Lower Accrual Barrier and equal to or less than the Upper Accrual Barrier divided by the number of calendar days in such Fixed Rate Payer Calculation Period.

Reference Spread means the level (expressed in basis points per annum) for a credit default swap in respect of the Reference Entity for a period of 3 years commencing on the relevant Reference Spread Determination Date displayed at Primary Source Screen at 11:00a.m., Hong Kong time on the Reference Spread Determination Date; provided that in the event that the Calculation Agent determines in its sole and absolute discretion that the level that appears on the Primary Source Screen does not reflect the correct pricing for a credit default swap in respect of the Reference Entity, the Calculation Agent will poll three credit default swap dealers on the Reference Spread Determination Date, one of which may be the Swap Counterparty. If at least two levels are so obtained, the average level will be deemed to be the Reference Spread and, if one level is so obtained, that level will be deemed to be the Reference Spread, and if no level is obtained, the Reference Spread will be determined by the Calculation Agent in its sole and absolute discretion.

Primary Source Screen means The mid price on Bloomberg's CHWAM1U3 Index

Reference Spread Determination Date means with respect to each Fixed Rate Payer Calculation Period:
(i)       each calendar day that falls in such Fixed Rate Payer Calculation Period that is a Business Day; and

(ii)      for each calendar day that falls in such Fixed Rate Payer Calculation Period that is not a Business Day, the immediately preceding Business Day;

Risk ID: 790334 / Effort ID: 1486304 / Global Deal ID: 3197022

18/10 '07 THU 17:20 FAX +852 2877 0468        LEHMAN_BROTHERS                NO. 510   P. 20   @018
21. SEP. 2007 16:03        LEHMAN_BROTHERS

provided that, for each calendar day that falls on or after the 5th Business Day prior to the final day of such Fixed Rate Payer Calculation Period (the "Final Day") up to but excluding such Final Day, the Reference Spread Determination Date shall be deemed to be such 5th Business Day prior to the Final Day.

Lower Accrual Barrier means 0.00%

Upper Accrual Barrier means 0.45%

|  |  |
|---|---|
| Fixed Rate Day Count Fraction: | Actual/360 |
| Fixed Rate Payer Payment Dates: | 20 September, 2007, and thereafter the 20th of each March, June, September, and December |

**Additional Floating Payments:**

|  |  |
|---|---|
| Additional Floating Rate Payer | Party B |
| Additional Floating Rate Payer Calculation Amount: | USD10,000,000.00 |
| Floating Rate in respect of Additional Floating Rate Payer Calculation Amount: | 3M USD LIBOR per annum |
| Additional Floating Rate Payer Payment Dates: | 20 September, 2007, and thereafter the 20th of each March, June, September, and December |
| Floating Rate Additional Payment Day Count Fraction: | Actual/360 |

**Floating Payments:**

|  |  |
|---|---|
| Floating Rate Payer Calculation Amount: | USD30,000,000.00 |
| Conditions to Settlement: | Credit Event Notice |

          Notifying Party:      Buyer or Seller

Notice of Publicly Available Information: Applicable

Notice of Physical Settlement

Specified Number: 2

| | |
|---|---|
| Credit Event(s): | The following Credit Event(s) shall apply to this Transaction: |

Bankruptcy
Failure to Pay
    Grace Period Extension:   Inapplicable
Payment Requirement:   USD1,000,000.00, or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Failure to Pay

Restructuring

18/10 '07 THU 17:20 FAX +852 2877 0468                              @019
      21. SEP. 2007 16:03      LEHMAN_BROTHERS              NO. 510   P. 21

Default Requirement: USD10,000,000.00, or its equivalent in the relevant Obligation Currency as of the occurrence of the relevant Credit Event.

| | |
|---|---|
| **Obligation(s):** | |
| Obligation Category: | Bond or Loan |
| Obligation Characteristic(s): | Obligation Characteristic(s) shall mean all of the following: |
| | Not Domestic Issuance |
| | Not Domestic Law |
| | Not Sovereign Lender |
| | Not Subordinated |
| | Not Domestic Currency |

**Settlement Terms:**

| | |
|---|---|
| Settlement Method: | Cash Settlement in a notional amount equal to Floating Rate Payer Calculation Amount. |
| Terms Relating to Cash Settlement: | |
| Valuation Date: | Single Valuation Date: 5 Business Days |
| Valuation Time: | 11:00 a.m., Tokyo Time |
| Quotation Method: | Bid |
| Settlement Currency: | USD |
| Cash Settlement Date: | 3 Business Days |
| Dealers: | 3, provided however, the Dealers shall include one dealer as may be nominated by the Seller |
| Quotations: | Exclude Accrued Interest |
| Valuation Method: | Highest, if firm bid is available for the Floating Rate Payer Calculation Amount, else Market |

**Deliverable Obligations:**

| | |
|---|---|
| **Deliverable Obligation(s):** | |
| Deliverable Obligation Category: | Bond or Loan |
| Deliverable Obligation Characteristic(s): | Deliverable Obligation Characteristic(s) shall mean each of the following: |
| | Not Subordinated |
| | Specified Currency: Standard Specified Currencies |
| | Not Contingent |
| | Not Domestic Issuance |
| | Not Domestic Law |
| | Assignable Loan |
| | Transferable |
| | Maximum Maturity 30 years |
| | Not Bearer |
| | Not Sovereign Lender |
| 60 Business Day Cap on Settlement: | Applicable |

Risk ID: 790334 / Effort ID: 1486304 / Global Deal ID: 3197022

**Optional Termination Date:**

The Buyer has the right to terminate this Transaction
in whole and not in part on any Fixed Rate Payer
Payment Date scheduled to fall on 20 July 2012 and
quarterly thereafter; provided that the Buyer shall
provide a notice to the Seller not less than 5 Business
Days prior to such Fixed Rate Payer Payment Date.

18/10 '07 THU 17:21 FAX +852 2877 0468          P&B INC #5                      NO. 510    P. 23

21. SEP. 2007 16:04      LEHMAN_BROTHERS

⌀021

| Collateral; | Party A and Party B agree that this provision will apply with respect to this Transaction and all other Transactions entered into between them until such time as they execute an ISDA Credit Support Annex to the Agreement. Party A hereinafter referred to as "Transferee", and Party B hereinafter referred to as "Transferor". <br><br> Paragraphs one through ten of the standard form ISDA Credit Support Annex (English law) (the "CSA") are incorporated by reference herein subject to the elections and modifications set out below. Terms defined in the CSA have this same meaning herein. |
|---|---|
| Elections and variables for the purposes of Paragraph 11 of the CSA: | "Eligible Credit Support" shall include (A) USD cash at a Valuation Percentage of 100% and/or (B) negotiable debt obligations issued by the U.S. Treasury Department having remaining maturity of not more than one year ("Treasury Bills") at a Valuation Percentage of 100% and/or (C) negotiable debt obligations issued by the U.S. Treasury Department having remaining maturity of more than one year but not more than ten years ("Treasury Notes") at a Valuation Percentage of 100% and/or (D) negotiable debt obligations issued by the U.S. Treasury Department having remaining maturity of more than ten years ("Treasury Bonds") at a Valuation Percentage of 100% and/or (E) such other Eligible Credit Support as may be agreed between the parties. <br><br> "Threshold" means, with respect to the Transferor, or its Credit Support Provider, as the case may be, the amount corresponding to the Credit Rating such entity as set forth in the table below, provided that (A) if Moody's and S&P have assigned ratings at different levels for any Credit Rating, the lower of such ratings shall be used for purposes hereof and (B) if (I) an Event of Default, Credit Event Upon Merger, or Additional Termination Event has occurred and is continuing, then the Threshold with respect to the Defaulting Party or the Affected Party shall be zero and (II) such entity ceases to be rated by either S&P or Moody's or ceases to have a Credit Rating, then the Threshold with respect to Transferor shall be zero; <table><tr><td>**S&P's Rating**</td><td>**Moody's Rating**</td><td>**Threshold (USD)**</td></tr><tr><td>AAA</td><td>Aaa</td><td>10,000,000</td></tr><tr><td>AA+</td><td>Aa1</td><td>10,000,000</td></tr><tr><td>AA</td><td>Aa2</td><td>10,000,000</td></tr><tr><td>AA-</td><td>Aa3</td><td>10,000,000</td></tr><tr><td>A+</td><td>A1</td><td>10,000,000</td></tr><tr><td>A</td><td>A2</td><td>10,000,000</td></tr><tr><td>A-</td><td>A3</td><td>10,000,000</td></tr><tr><td>BBB+</td><td>Baa1</td><td>5,000,000</td></tr><tr><td>BBB</td><td>Baa2</td><td>5,000,000</td></tr><tr><td>BBB-</td><td>Baa3</td><td>2,000,000</td></tr><tr><td>below BBB- or if Transferor ceases to have a Credit Rating</td><td>below Baa3 or if Transferor ceases to have a Credit Rating</td><td>Zero</td></tr></table> |

18/10 '07 THU 17:21 FAX +852 2877 0468                                      ☒022
21. SEP. 2007 16:04      LEHMAN_BROTHERS                    NO. 510   P. 24

"Minimum Transfer Amount" means, with respect to the Transferor or its Credit Support Provider, as the case may be, the amount corresponding to the Credit Rating of such entity as set forth in the table below, provided that if Moody's and S&P have assigned ratings at different levels for any Credit Rating, the lower of such ratings shall be used for purposes hereof provided further that, notwithstanding anything to the contrary contained herein, the Minimum Transfer Amount shall not apply to the Independent Amount, and provided further that if (A) an Event of Default, Credit Event Upon Merger or Additional Termination Event with respect to Transferor has occurred and is continuing, then the Minimum Transfer Amount with respect to the Defaulting Party or the Affected Party shall be zero and (B) if Transferor, or its Credit Support Provider, as the case may be, ceases to be rated by either S&P or Moody's or ceases to have a Credit Rating, then the Minimum Transfer Amount with respect to Transferor shall be zero:

| S&P's Rating | Moody's Rating | Minimum Transfer Amount(USD) |
|---|---|---|
| AAA | Aaa | 250,000 |
| AA+ | Aa1 | 250,000 |
| AA | Aa2 | 250,000 |
| AA- | Aa3 | 250,000 |
| A+ | A1 | 250,000 |
| A | A2 | 250,000 |
| A- | A3 | 250,000 |
| BBB+ | Baa1 | 250,000 |
| BBB | Baa2 | 250,000 |
| BBB- | Baa3 | 100,000 |
| Below BBB- or if Transferor ceases to have a Credit Rating | Below Baa3 or if Transferor ceases to have a Credit Rating | Zero |

"Valuation Agent" means Party A. Notwithstanding Paragraph 3(b), calculations will only be provided upon a demand made by Party B.

"Valuation Date" means any Local Business Day.

"Valuation Time" means the close of business in the relevant market on the Local Business Day immediately preceding the relevant Valuation Date provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date .

"Notification Time" means 5.00 p.m., Tokyo time, on a Local Business Day.

"Value" For the purpose of Paragraph 4(a)(4)(a)(i)(C) and 4(a)(4)(ii) of the CSA, the Value of the outstanding Credit Support Balance or of Eligible Credit Support or Equivalent Credit Support other than cash will be calculated as follows:

With respect to any Treasury Bills, Treasury Notes, or Treasury Bonds (referred to herein as "Government Obligations") the sum of (I) (x) the bid price quoted on such date by a mutually acceptable principal market maker for such Government Obligations, or (y) if no such quotation is available from a principal market maker for such date, such bid price as of

18/10 '07 THU 17:21 FAX +852 2877 0468                                    NO. 510    P. 25
21. SEP. 2007 16:04        LEHMAN_BROTHERS

| | the day, next preceding such date, on which such quotation was available, in either case multiplied by the applicable Valuation Percentage, plus (II) the accrued interest on such Government Obligations (except to the extent transferred to a party pursuant to any applicable section of this Agreement or included in the applicable price referred to in (I) of this definition) as of such date. |
| | |
| | "Interest Rate" means with respect to USD cash the rate per annum equal to the overnight Federal Funds Rate for each day cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519. |
| Independent Amount: | On or prior to the Trade Date, Seller shall post the Initial Independent Amount (defined below) to Buyer. Upon the occurrence of 1st Collateral Upsize Event and/or 2nd Collateral Upsize Event, Seller shall further post addition collateral which shall constitute an Independent Amount in respect of this Transaction. Buyer shall have no obligation to return the Independent Amount to Seller until this Transaction is fully and finally terminated. |

Initial Independent Amount means the Independent Amount listed below opposite the lower of the S&P Rating and Moody's Rating applicable to the Reference Entity on the Effective Date:

| S&P Rating | Moody's Rating | Independent Amount |
|---|---|---|
| AAA | Aaa | 13.33% of the Floating Rate Payer Calculation Amount |
| AA+ | Aa1 | 13.33% of the Floating Rate Payer Calculation Amount |
| AA | Aa2 | 13.33% of the Floating Rate Payer Calculation Amount |
| AA- | Aa3 | 13.33% of the Floating Rate Payer Calculation Amount |
| A+ | A1 | 13.33% of the Floating Rate Payer Calculation Amount |
| A | A2 | 13.33% of the Floating Rate Payer Calculation Amount |
| A- | A3 | 13.33% of the Floating Rate Payer Calculation Amount |
| BBB+ | Baa1 | 30% of the Floating Rate Payer Calculation Amount |
| BBB | Baa2 | 50% of the Floating Rate Payer Calculation Amount |
| below BBB or if Reference Entity ceases to have Rated Debt. | below Baa2 or if Reference Entity ceases to have Rated Debt. | 100% of the Floating Rate Payer Calculation Amount |

Risk ID: 790334 / Effort ID: 1486304 / Global Deal ID: 3197022

|  |  |  |
|--|--|--|
| | 1st Collateral Upsize Event: | If, at any time from and including the Trade Date to and including the Scheduled Termination Date, the offer side of the 5 year Reference Entity Spread has ever touched 2.00% as determined by the Calculation Agent *in its reasonable discretion*, Seller shall, following the notice by the Calculation Agent of such event, have 3 Business Days to post additional collateral equal to 50% of the Floating Rate Payer Calculation Amount. |
| | 2nd Collateral Upsize Event: | If, at any time from and including the Trade Date to and including the Scheduled Termination Date, the offer side of the 5 year Reference Entity Spread has ever touched 3.50% as determined by the Calculation Agent *in its reasonable discretion*, Seller shall, following the notice by the Calculation Agent of such event, have 3 Business Days to post additional collateral equal to 100% of the Floating Rate Payer Calculation Amount minus any collateral already posted on the trade. |

**Additional Termination Events**

Each of the following shall constitute an Additional Termination Event (provided, however, that any provision(s) to the contrary in the Agreement, when executed, shall take precedence over these Additional Termination Events):-

(i)    Party B fails to execute an ISDA Master Agreement in form and substance satisfactory to Party A within 90 calendar days of the Trade Date of this Transaction. For the purpose of the foregoing Additional Termination Event, Party B shall be the Affected Party.

(ii)    Ratings Decline. Holdings, in the case of Party A (1) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least Baa3 (the "Moody's Rating") as determined by Moody's; or (2) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least BBB- (the "S&P Rating") as determined by S&P; or (3) ceases to be rated by either Moody's or S&P. For clarification, in the event either Moody's or S&P assigns a rating to Party B that is lower than the Moody's Rating or the S&P Rating, as the case may be, then such rating shall be determinative. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iii)    Ratings Decline. Party B's Credit Support Provider (1) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least Baa3 (the "Moody's Rating") as determined by Moody's; or (2) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least BBB- (the "S&P Rating") as determined by S&P; or (3) ceases to be rated by either Moody's or S&P. For clarification, in the event either Moody's or S&P assigns a rating to Party B that is lower than the Moody's Rating or the S&P Rating, as the case may be, then such rating shall be determinative. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Credit Support Provider**

Credit Support Provider means in relation to Party A : Lehman Brothers Holdings Inc.

Credit Support Provider means in relation to Party B : Cheng Kong (Holdings) Limited

**Miscellaneous:**

Escrow:                                  Applicable

Office:                                  For the purposes of this Transaction, Party A is not a
                                         Multibranch Party, and Party B is not a Multibranch
                                         Party.

Transfer:                                Notwithstanding Section 7 of the Agreement, Party A
                                         may assign its rights and obligations under this
                                         Transaction, in whole and not in part, to any Affiliate
                                         of Lehman Brothers Holdings Inc. ("Holdings")
                                         effective upon delivery to Party B of the guarantee by
                                         Holdings, in favor of Party B, of the obligations of
                                         such Affiliate; provided, however, any provision to
                                         the contrary in the Agreement, when executed, shall
                                         take precedence over this election.

Governing Law:                           English law; provided, however, any provision to the
                                         contrary in the Agreement, when executed, shall take
                                         precedence over this election.

Termination Currency:                    USD; provided, however, any provision to the
                                         contrary in the Agreement, when executed, shall take
                                         precedence over this election.

Escrow:                                  Applicable

Office:                                  For the purposes of this Transaction, Party A is not a
                                         Multibranch Party, and Party B is not a Multibranch
                                         Party.

**Notice and Account Details:**

Telephone, Telex and/or Facsimile
Numbers and Contact Details for Notices:

Buyer:                                   Varun Varshney
                                         Telephone: +852 2252 6800

Cc:                                      Transaction Management
                                         Facsimile: 646-885-9556 (United States of America)

Seller:                                  Please advise    Edmond Ip
                                                           Telephone: (852) 2128 8888
Account Details:                                           Fax       : (852) 2845 2940

Account Details of Buyer:                JP Morgan Chase Bank, New York
                                         ABA No: 021000021
                                         Account Number: 066-143543
                                         Account of: Lehman Brothers Special Financing Inc.
                                         Please advise

Account Details of Seller:               HSBC Bank, U.S.A., New York
                                         For the account of HSBC, Hong Kong Branch
                                         A/C No. 000-04442-3
                                         for further credit to Goldcent Investments Ltd.
Risk ID: 726677 / Effort ID: 1422226 / Global Deal ID: 3112877  A/c# HK-511566960-IDD

18/10 '07 THU 17:23 FAX +852 2877 0468        Confirmations #5                      Ø027
21. SEP. 2007 16:05      LEHMAN_BROTHERS                              NO. 510   P. 29

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9556 (United States of America), Attention: Confirmations Group.

Yours sincerely,                              Accepted and agreed to:

Lehman Brothers Special Financing Inc.        E-Capital Profits Limited

By: _Anatoly Kozlov_
Name: Anatoly Kozlov
Title: Authorized Signatory                    By: _____
                                               Name:  Edmond Ip
                                               Title: Director

Execution time will be furnished upon Counterparty's written request.

Risk ID: 790334 / Effort ID: 1486304 / Global Deal ID: 3197022

## Exhibit B

**(Bar Date Order)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
: 
In re                            :        Chapter 11 Case No.
: 
LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :       08-13555 (JMP)
: 
Debtors.          :       (Jointly Administered)
: 
: 
---------------------------------------------------------------x

## ORDER PURSUANT TO SECTION 502(b)(9) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3003(c)(3) ESTABLISHING THE DEADLINE FOR FILING PROOFS OF CLAIM, APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND APPROVING THE PROOF OF CLAIM FORM

Upon the motion, dated May 26, 2009 (the "<u>Motion</u>"),[1] of Lehman Brothers

Holdings Inc. and its affiliates, as debtors and debtors in possession in the above referenced

chapter 11 cases (collectively, the "<u>Debtors</u>"),[2] pursuant to sections 502(b)(9) of the Bankruptcy

Code and Bankruptcy Rule 3003(c)(3) seeking an order (i) establishing the deadline for filing

proofs of claim, (ii) approving the form and manner of notice thereof and (iii) approving the

proof of claim form, all as more fully set forth in the Motion; and the Court having jurisdiction to

consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed thereto in the Motion.

[2] Lehman Brothers Holdings Inc. (08-13555); LB 745 LLC (08-13600); PAMI Statler Arms LLC (08-13664); Lehman Brothers Commodity Services Inc. (08-13885); Lehman Brothers Special Financing Inc. (08-13888); Lehman Brothers OTC Derivatives Inc, (08-13893); Lehman Brothers Derivatives Products Inc. (08-13899); Lehman Commercial Paper Inc. (08-13900); Lehman Brothers Commercial Corporation (08-13901); Lehman Brothers Financial Products Inc. (08-13902); Lehman Scottish Finance L.P. (08-13904); CES Aviation LLC (08-13905); CES Aviation V LLC (08-13906); CES Aviation IX LLC (08-13907); East Dover Limited (08-13908); Luxembourg Residential Properties Loan Finance S.a.r.l. (09-10108); BNC Mortgage LLC (09-10137); Structured Asset Securities Corporation (09-10558); LB Rose Ranch LLC (09-10560); and LB Kalakaua Owners LLC (09-12516).

the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the

Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.); and consideration of

the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and venue being proper before this Court pursuant to 28 U.S.C. § § 1408 and 1409; and

due and proper notice of the Motion having been provided to the Notice Parties; and it appearing

that no other or further notice need be provided; and the Court having determined that the relief

sought in the Motion is in the best interests of the Debtors, its creditors and all parties in interest;

and upon the record of the hearings held on June 24, 2009 and June 29, 2009; and the Court

having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Rule 3003(c)(3) of the Bankruptcy Rules, and except

as otherwise provided herein, **September 22, 2009, at 5:00 p.m. (prevailing Eastern Time)** is

established as the deadline (the "Bar Date") for each person or entity (including, without

limitation, each individual, partnership, joint venture, corporation, estate, trust and governmental

unit) to file proofs of claim (each a "Proof of Claim") based on prepetition claims (as defined in

section 101(5) of the Bankruptcy Code) against the Debtors; and it is further

ORDERED that all Proofs of Claim filed against the Debtors must substantially

conform to the form attached as Exhibit B hereto ("Proof of Claim Form") and must be received

on or before the Bar Date by the official noticing and claims agent in the Debtors' chapter 11

cases, Epiq Bankruptcy Solutions, LLC ("Epiq") or the Court.  The original Proof of Claim Form

should be sent to the following address:

If by overnight mail, to:

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims
Processing
757 Third Avenue, 3rd Floor
New York, New York 10017

If by hand delivery, to:

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims
Processing
757 Third Avenue, 3rd Floor
New York, New York 10017

     or

Clerk of the United States Bankruptcy Court
Attn: Lehman Brothers Holdings Claims
Processing
One Bowling Green
New York, New York 10004

If by first-class mail, to:

Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5286
New York, New York  10150-5076

; and it is further

ORDERED that Proofs of Claim will be deemed timely filed only if **actually received** by Epiq or the Court on or before the Bar Date; and it is further

ORDERED that neither the Court nor Epiq shall be required to accept Proofs of Claim sent by facsimile, telecopy, or electronic mail transmission; and it is further

ORDERED that the following persons or entities are **not** required to file a Proof of Claim on or before the Bar Date:

(a)    any person or entity whose claim is listed on the Schedules and (i) whose claim is **not** described as "disputed," "contingent," or "unliquidated," and (ii) who does not dispute the amount, priority or nature of the claim set forth in the Schedules;

(b)    any person or entity whose claim has been paid in full by the Debtors;

(c)     any person or entity that holds an interest in the Debtors, which interest is based exclusively upon the ownership of common or preferred stock, membership interests, partnership interests, or warrants or rights to purchase, sell or subscribe to such a security or interest; **provided**, **however**, that interest holders who wish to assert claims (as opposed to ownership interests) against the Debtors that arise out of or relate to the ownership or purchase of an interest, including claims arising out of or relating to the sale, issuance, or distribution of the interest, must file Proofs of Claim on or before the Bar Date, unless another exception identified herein applies;

(d)     any person or entity that holds a claim that has been allowed by an order of this Court entered on or before the Bar Date;

(e)     any holder of a claim for which a separate deadline is fixed by this Court;

(f)     any holder of a claim who has already properly filed a Proof of Claim with the Clerk of the Court or Debtors' court-approved claims agent, Epiq, against the Debtors utilizing a claim form which substantially conforms to the Proof of Claim Form; **provided**, **however**, any holder that has filed a Proof of Claim based on a Derivative Contract or a Guarantee on or prior to the Bar Date, is required to amend such Proof of Claim to conform to the procedures set forth in this Motion for the filing of Proofs of Claims based on Derivative Contracts and Guarantees;

(g)     any holder of any claim solely against (i) Lehman Brothers Inc. or (ii) any other entity affiliated with the Debtors that is involved in a bankruptcy, insolvency proceeding or similar proceeding, in a foreign jurisdiction; **provided**, **however**, if such claim is based on an obligation guaranteed by a Debtor, the holder of such claim must file a Proof of Claim on or before the Bar Date;

(h)     any holder of a security listed on the Master List of Securities available on the Debtors' website http://www.lehman-docket.com (the "Master List of Securities") due to the fact that the indenture trustee for such securities will file a global proof of claim on behalf of all holders of securities issued thereunder; (Wilmington Trust Company, US Bank National Association, and the indenture trustee for each of the other securities included on the Master List of Securities, each will file a global proof(s) of claim on behalf of all holders of securities for which it is identified as Indenture Trustee on the Master List of Securities); **provided**, **however**, that security holders who wish to assert claims against the Debtors arising out of or relating to the sale, issuance, or distribution of a security, must file Proofs of Claim on or before the Bar Date, unless another exception identified herein applies; and

4

(i)    any entity included on the Exempt Entities List available on the Debtors'
website http://www.lehman-docket.com (the "Exempt Entities List") and
any subsidiary for which the entity on the Exempt Entities List owns at
least a fifty percent equity interest in such subsidiary, specifically
excluding any subsidiary that is in a bankruptcy, insolvency or similar
proceeding in a foreign jurisdiction and Lehman Brothers Inc.;

and it is further

ORDERED that, any holder of a security that is not listed on the Master List of

Securities may request that a security be added to the Master List of Securities by completing the

form entitled "Inquiry Regarding Security Not on Master List of Securities" available on the

Debtors' website http://www.lehman-docket.com and submitting it to the Debtors as directed on

such form on or prior to August 5, 2009.  The Debtors will investigate the inquiry and within 15

days of the receipt of such inquiry, the Debtors will (x) add the security to the Master List of

Securities (if appropriate) or (y) provide an explanation solely to the party submitting such

inquiry as to why the security will not be added to the Master List of Securities.  The Master List

of Securities listed on the website shall be **final** as of August 20, 2009; and it is further

ORDERED that any security that is listed on the Master List of Securities is not a

Derivative Contract and the holders of such security are not required to complete the Derivative

Questionnaire on account of such security; and it is further

ORDERED that a holder (or any other party authorized under the Bankruptcy

Code and the Bankruptcy Rules to submit a Proof of Claim on behalf of such holder) of a

security that is guaranteed by a Debtor shall be required to file a Proof of Claim against such

Debtor based on the Guarantee and complete the Guarantee Questionnaire; and it is further

ORDERED that any person or entity that holds a claim arising from the rejection

of an executory contract or unexpired lease must file a Proof of Claim based on such rejection by

the later of (i) the Bar Date and (ii) the date which is forty-five (45) days following the effective

date of such rejection or be forever barred from doing so; and it is further

ORDERED that each Proof of Claim must: (i) be written in the English language;

(ii) be denominated in lawful currency of the United States; (iii) conform substantially with the

Proof of Claim Form; (iv) state the name and case number of the specific Debtor against which it

is filed; (v) set forth with specificity the legal and factual basis for the alleged claim; (vi) include

supporting documentation or an explanation as to why documentation is not available; and (vii)

be signed by the claimant or by an authorized agent of the claimant; and it is further

ORDERED that for the purposes of this Order, the term "Derivative Contract"

shall mean any contract that is any of (i) a "swap agreement" as such term is defined in section

101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section

101(25) of the Bankruptcy Code; provided that a cash-market purchase or sale of a security or

loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement

cycle for the relevant market), exchange-traded future or option, securities loan transaction,

repurchase agreement in respect of securities or loans, and any guarantee or reimbursement

obligations which would otherwise be included in the definition of "swap agreement" or

"forward contract" pursuant to the definition of such terms in the Bankruptcy Code shall not be

considered a Derivative Contract for the purposes of this definition; provided further that, any

notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not

limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman

Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and

Lehman Brothers (Luxembourg) Equity Finance S.A.) shall not be considered "Derivatives

Contracts" within the meaning of this Order; and it is further

ORDERED that each holder of a claim against a Debtor based on amounts owed

pursuant to any Derivative Contract must:

(a)    on or before the Bar Date, fill-out and return a Proof of Claim in the same manner as all other claimants;

(b)    check the appropriate box on the Proof of Claim;

(c)    on or before **October 22, 2009, at 5:00 pm (prevailing Eastern Time)** (the "Questionnaire Deadline"), log on to http://www.lehman-claims.com, enter the unique identification number included (the "Unique ID Number") on the Proof of Claim mailed to such holder by the Debtors and complete the electronic Derivative Questionnaire, substantially in the form attached as Exhibit C hereto (the "Derivative Questionnaire"); and

(d)    on or before the Questionnaire Deadline, electronically upload supporting documentation on the website (as required in the Derivative Questionnaire), rather than attaching such documents to the Proof of Claim;

and it is further

ORDERED that each holder of a claim against a Debtor based on amounts owed

pursuant to a promise, representation or agreement to answer for the payment of some debt or the

performance of some duty in case of the failure of another person or entity who is liable in the

first instance (a "Guarantee") must:

(a)    on or before the Bar Date fill-out and return a Proof of Claim in the same manner as all other claimants;

(b)    on or before the Bar Date check the appropriate box on the Proof of Claim;

(c)    on or before the Questionnaire Deadline (**October 22, 2009, at 5:00 pm (prevailing Eastern Time)**), log on to http://www.lehman-claims.com, enter the Unique ID Number included on the Proof of Claim mailed to such holder by the Debtors and complete the electronic Guarantee Questionnaire, substantially in the form attached as Exhibit D hereto (the "Guarantee Questionnaire"); and

(d)    on or before the Questionnaire Deadline, electronically upload supporting documentation and evidence of the underlying claim amount on the

website, as required in the Guarantee Questionnaire, rather than attaching such documents to the Proof of Claim;

and it is further

ORDERED that, each holder of a claim against a Debtor based on a Guarantee by a Debtor of the obligations of a non-Debtor entity under a Derivative Contract must:

(a)    on or before the Bar Date, fill-out and return a Proof of Claim in the same manner as all other claimants;

(b)    check both boxes on the Proof of Claim that such claim is based on a Derivative Contract and based on a Guarantee;

(c)    on or before the Questionnaire Deadline (**October 22, 2009, at 5:00 pm (prevailing Eastern Time)**), log on to http://www.lehman-claims.com, enter the Unique ID Number of the Proof of Claim and complete the electronic Guarantee Questionnaire and electronically upload supporting documentation on the website (as required in the Guarantee Questionnaire), rather than attaching such documents to the Proof of Claim; and

(d)    on or before the Questionnaire Deadline, log on to http://www.lehman-claims.com, enter the Unique ID Number of the Proof of Claim and complete the electronic Derivative Questionnaire and electronically upload supporting documentation on the website (as required in the Derivative Questionnaire), rather than attaching such documents to the Proof of Claim;

and it is further

ORDERED that if a holder is required to complete the Derivative Questionnaire or Guarantee Questionnaire, such holder need only submit the documentation required by the applicable Questionnaire by the Questionnaire Deadline and need not submit the documentation required by the applicable Questionnaire with such holder's Proof of Claim by the Bar Date; and it is further

ORDERED that if a holder files a Proof of Claim based on a Derivative Contract or a Guarantee that does not have a Unique ID Number, such holder shall comply with the

procedures set forth in the prior three paragraphs, except that instead of entering a Unique ID

Number on the website, such holder shall instead indicate on the website that they filed a Proof

of Claim that did not have a Unique ID Number; and it is further

ORDERED that entities affiliated with the Debtors that are the subject of a

bankruptcy, insolvency proceeding or similar proceeding in a foreign jurisdiction that file a claim

against a Debtor shall not be required to complete the Derivative Questionnaire; and it is further

ORDERED that the information submitted on the website http://www.lehman-

claims.com in respect of Derivative Contracts and Guarantees will not be accessible on the

website other than by the party that submitted such information, the Debtors, the Creditors'

Committee and their respective advisors and counsel; and it is further

ORDERED that the website http://www.lehman-claims.com and the information

submitted thereon will remain accessible by the party that submitted such information following

the Bar Date and the information submitted on the website will be subject to the same rules and

standards as amendments and supplements to proofs of claim; and it is further

ORDERED that if a holder asserts a claim against more than one Debtor or has

claims against different Debtors, a separate Proof of Claim must be filed with respect to each

Debtor; and it is further

ORDERED that pursuant to Bankruptcy Rule 3003(c)(2), any holder of a claim

against the Debtors who is required, but fails to file a proof of such claim in accordance with the

Bar Date Order on or before the Bar Date, specifically, including filling out the Derivative

Questionnaire or the Guarantee Questionnaire and uploading required information to the website

http://www.lehman-claims.com (which Derivative Questionnaire or Guarantee Questionnaire

shall not be required to be completed until the Questionnaire Deadline), specifying the applicable

Debtor and other requirements set forth herein, shall be forever barred, estopped and enjoined

from asserting such claim against the Debtors (or filing a Proof of Claim with respect thereto),

and the Debtors and their property shall be forever discharged from any and all indebtedness or

liability with respect to such claim, and such holder shall not be permitted to vote to accept or

reject any chapter 11 plan filed in these chapter 11 cases, or participate in any distribution in the

Debtors' chapter 11 cases on account of such claim or to receive further notices regarding such

claim; and it is further

ORDERED that notice of the entry of this Order and of the Bar Date in

substantially the form attached as Exhibit A hereto (the "Bar Date Notice"), which Bar Date

Notice are approved in all respects, shall be deemed good, adequate, and sufficient notice if it is

served by deposit in the United States mail, first class postage prepaid, on or before July 8, 2009

upon:

| | |
|---|---|
| (a) | the U.S. Trustee; |
| (b) | attorneys for the Creditors' Committee; |
| (c) | all known holders of claims listed on the Schedules at the addresses stated therein; |
| (d) | all (i) current employees of the Debtors, (ii) all former employees of the Debtors terminated after September 1, 2006 and (iii) all of the Debtors' retirees; |
| (e) | all parties known to the Debtors as having potential claims against the Debtors' estates; |
| (f) | all counterparties to the Debtors' executory contracts and unexpired leases listed on the Schedules at the addresses stated therein; |
| (g) | all parties to litigation with the Debtors (as of the date of the entry of the Bar Date Order); |
| (h) | the Internal Revenue Service for the district in which the case is pending and, if required by Bankruptcy Rule 2002(j), the Securities and Exchange |

Commission and any other required governmental units (a list of such agencies is available from the Office of the Clerk of the Court); and

(i)    all parties who have requested notice pursuant to Bankruptcy Rule 2002; and it is further

ORDERED that the Debtors shall mail one or more Proof of Claim Forms (as appropriate) to all parties listed in the preceding paragraph, each with a Unique ID Number printed on the form, together with instructions for filing a Proof of Claim, except that the Proof of Claim Form shall be omitted from any mailing to holders of LBHI securities that are on the Master List of Securities; and it is further

ORDERED that, pursuant to Bankruptcy Rules 2002(f) and (*l*), the Debtors shall publish the notice substantially in the form of the Bar Date Notice once in <u>The New York Times</u> (International Edition), <u>The Wall Street Journal</u> (International Edition) and <u>The Financial Times</u>, each at least forty-five (45) days prior to the Bar Date, which publication is hereby approved in all respects and shall be deemed good, adequate, and sufficient publication notice of the Bar Date and the procedures for filing Proofs of Claim in these cases; and it is further

ORDERED that, if the Debtors amend or supplement their Schedules subsequent to the date hereof, the Debtors shall give notice of any amendment or supplement to the holders of claims affected thereby, and such holders shall be required to file Proofs of Claim in respect of their claims prior to the later of (i) the Bar Date and (ii) thirty (30) days from the date on which such notice is given, or be forever barred from doing so; and it is further

ORDERED that Proofs of Claims may only be filed by parties that are authorized to file such claims in accordance with Bankruptcy Code and the Bankruptcy Rules; and it is further

ORDERED that any current or former affiliate of the Debtors, other than affiliates

listed on the Exempt Entities List, that has a claim (as defined in section 101(5) of the

Bankruptcy Code) against any of the Debtors that arose prior to the applicable Commencement

Date must file a Proof of Claim in accordance with this Order or be forever barred from doing

so; and it is further

ORDERED that (other than stipulations, agreements and orders entered into by

the Debtors with JPMorgan Chase Bank, N.A, Pacific Investment Management Company LLC

and the Internal Revenue Service) the Debtors shall not enter into any stipulations or agreements

that modify the procedures set forth in this Order for the filing of Proofs of Claim based on

Derivative Contracts (including the completion of the Derivative Questionnaire) without either

the consent of the Creditors' Committee or the approval of the Court; and it is further

ORDERED that notwithstanding anything to the contrary contained in this Order, the

following procedures apply to the filing of any and all claims (including any claims under a related

Guarantee) against the Debtors arising from securities issued by the Debtors or any of the Debtors'

affiliates outside of the United States, solely to the extent identified on http://www.lehman-

docket.com under the heading "Lehman Programs Securities" (any such security, a "Lehman

Program Security") as of July 17, 2009 at 5:00 pm (prevailing Eastern Time):

(a)     **November 2, 2009, at 5:00 p.m. (prevailing Eastern Time)** is established as
the deadline (the "Securities Programs Bar Date") for each person or entity
(including, without limitation, each individual, partnership, joint venture,
corporation, estate, trust and governmental unit) (the "Filing Entities" and
each a "Filing Entity") to file proofs of claim based on any Lehman Program
Security;

(b)     the Debtors, in coordination with the Creditors' Committee, are authorized to,
and will, create a notice of the Securities Programs Bar Date (the "Securities
Programs Bar Date Notice") and a proof of claim form (the "Securities
Programs Proof of Claim Form") as necessary to provide notice of the
Securities Programs Bar Date;

12

(c)     the Debtors are authorized to, and will, translate the Securities Programs Bar Date Notice into relevant foreign languages; it being understood that claims submitted in respect of any Lehman Program Security must: (i) be written in the English language; (ii) to the extent a claim amount is reflected thereon, be denominated in lawful currency of the United States using the exchange rate as applicable as of September 15, 2008; (iii) conform substantially with the Securities Programs Proof of Claim Form; (iv) state the name and case number of the specific Debtor against which it is filed; (v) identify the International Securities Identification Number ("ISIN") and/or Committee on Uniform Securities Identification Procedures ("CUSIP") number, as applicable, for each Lehman Program Security; (vi) include either a Euroclear electronic instruction reference number or a Clearstream blocking reference number; (vii) be signed by the Filing Entity or by an authorized agent of the Filing Entity; and (viii) be submitted in hard copy form with an original signature;

(d)     the Debtors shall publish on http://www.lehman-docket.com a proposed list of "Lehman Programs Securities," to include at a minimum issuances under (i) that certain U.S.$100,000,000,000 Euro Medium Term-Note Program, (ii) that certain U.S.$4,000,000,000 German Note Issuance Programme, as described in a certain Base Prospectus, dated August 28, 2007, (iii) the Swiss Certificates Programme, as described in a certain Programme Prospectus, dated November 29, 2007 and (iv) the Italian Inflation Linked Notes, dated December 2005 – December 2017, which list will include the ISIN and/or CUSIP, as applicable, for each Lehman Program Security, no later than July 6, 2009 at 5:00 pm (prevailing Eastern Time), and the Debtors, the Creditors' Committee, the account holders or holders of any Lehman Program Security that identify themselves in writing to the Debtors, and the trustees for Lehman Brothers Treasury Co. B.V. and other applicable foreign proceedings will work in good faith to agree on a list of "Lehman Programs Securities" by no later than July 13, 2009;

(e)     in the event there are any disputes concerning the contents of the list of "Lehman Program Securities," the Court may consider such disputes on an expedited basis with notice to the disputing parties;

(f)     notice of the entry of this Order, of the Bar Date and of the Securities Programs Bar Date in the form of the Securities Programs Bar Date Notice shall be deemed good, adequate, and sufficient notice if (i) it is  served by deposit in the United States mail, first postage prepaid, and/or delivered by electronic mail on or before July 27, 2009 upon (1) the U.S. Trustee, (2) Euroclear, Clearstream and the Depository Trust Company and other similar clearing systems, as applicable (collectively, the "Clearing Systems") and (3) each of the issuers (and their representative or administrator) of the Lehman Program Securities (the "Issuers"), and (ii) the Debtors request that the Clearing Systems and the Issuers promptly distribute the Securities Program

13

Bar Date Notice to the account holders and/or holders of any Lehman Program Security;

(g)    pursuant to Bankruptcy Rules 2002(f) and (l), the Debtors shall publish notice (translated into the appropriate language, if necessary) substantially in the form of the Securities Programs Bar Date Notice at least once in one leading national newspaper in each of Italy, Spain, France, Germany, The Netherlands (in English), Switzerland, Luxembourg, United Kingdom, Hong Kong, Mexico, Belgium, Austria, Greece, Brazil, Argentina, Australia and Japan, each at least sixty (60) days prior to the Securities Programs Bar Date, which publication notice hereby is approved in all respects and shall be deemed good, adequate, and sufficient notice of the Bar Date and the Securities Programs Bar Date and the procedures for filing Proofs of Claim and Securities Programs Proofs of Claim in these cases;

(h)    any person or entity that files a claim based on both (i) a Lehman Program Security and (ii) any other claim, is not required to complete the Guarantee Questionnaire or Derivative Questionnaire in respect of the portion of the claim that relates to such Lehman Program Security, but is required to complete the Guarantee Questionnaire and Derivative Questionnaire, as applicable, prior to the Questionnaire Deadline with respect to all other claims that are not based on a Lehman Program Security;

(i)    persons or entities that file claims based on any Lehman Program Security are not required to attach or submit any documentation supporting any claim based on such Lehman Program Security; provided however that, the Debtors reserve the right to seek production of all documentation required by Bankruptcy Rule 3001(c) as part of the claims reconciliation process;

(j)    claims based on any Lehman Program Security shall not be disallowed on the ground that such claims were not filed by the proper party or an authorized agent, as contemplated by Bankruptcy Rule 3001(b);

(k)    a Filing Entity that files a claim based on any Lehman Program Security, by filing such claim, for the purposes of U.S. Bankruptcy proceedings, consents to and hereby is deemed to be the claimant for the purpose of receiving notices and distributions, if any, except as otherwise provided in a confirmation order related to a plan, and responding to any objection interposed as to such claim. For the avoidance of doubt, a Filing Entity that files a claim on behalf of multiple account holders or holders of any Lehman Program Security shall not be required to provide identifying information for such account holders or holders of any Lehman Program Security;

(l)    nothing in this Order shall impose a duty or obligation on any party to any agreement related to any Lehman Program Security to file a claim beyond whatever duty or obligation currently exists in the applicable agreements for the Lehman Program Security or applicable law;

14

(m)      nothing in this Order shall prevent a holder of a Lehman Program Security that has filed a proof of claim from buying or selling claims based on a Lehman Program Security in a manner consistent with the applicable clearing system practice; and

(n)      other than as specifically provided in clauses (a) through (m) above, all provisions of this Order apply to holders of claims under any Lehman Program Security and holders of claims based on such Lehman Program Security are required to comply with all provisions of this Order;

and it is further

ORDERED that nothing in this Order shall prejudice the right of the Debtors or any other party in interest to dispute or assert offsets or defenses to any claim reflected in the Schedules; and it is further

ORDERED that the Debtors and Epiq are authorized and empowered to take such steps and perform such acts as may be necessary to implement and effectuate the terms of this Order; and it is further

ORDERED that notification of the relief granted by this Order as provided herein and in the Motion is fair and reasonable and will provide good, sufficient, and proper notice to all creditors of their obligations in connection with claims they may have against the Debtors in these chapter 11 cases; and it is further

ORDERED that any person or entity who desires to rely on the Schedules will have the responsibility for determining that the claim is accurately listed in the Schedules; and it is further

15

ORDERED that entry of this Order is without prejudice to the right of the Debtors to seek a further order of this Court fixing the date by which holders of claims **not** subject to the Bar Date established herein must file such claims against the Debtors or be forever barred from voting upon any chapter 11 plan of the Debtors, from receiving any payment or distribution of property from the Debtors, Debtors' estates, or their successors or assigns with respect to such claims, and from asserting such claims against the Debtors.

Dated: New York, New York
         July 2, 2009

_____*s/ James M. Peck*_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A</u>**

**Notice of Bar Date**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                    :
In re                                               :      **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,       :      **08-13555 (JMP)**
                                                    :
                    Debtors.                         :      **(Jointly Administered)**
                                                    :
                                                    :
-------------------------------------------------------------------x

<u>**NOTICE OF DEADLINES FOR FILING PROOFS OF CLAIM**</u>

TO ALL PERSONS AND ENTITIES WITH
CLAIMS AGAINST THE DEBTOR LISTED BELOW:

       PLEASE TAKE NOTICE THAT, on July 2, 2009, the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>"), having jurisdiction over the chapter 11 cases of Lehman Brothers Holdings Inc. and certain of its affiliates, as debtors and debtors in possession in the above referenced chapter 11 cases (collectively, the "<u>Debtors</u>"), entered an order (the "<u>Bar Date Order</u>") establishing **September 22, 2009, at 5:00 p.m. (prevailing Eastern Time**) as the last date and time for each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) to file a proof of claim ("<u>Proof of Claim</u>") based on prepetition claims against the Debtors (the "<u>Bar Date</u>").  The Bar Date Order, the Bar Date and the procedures set forth below for the filing of Proofs of Claim apply to all claims against the Debtors (other than those set forth below as being specifically excluded) that arose prior to the applicable Commencement Date (the "<u>Commencement Date</u>"), the date on which the Debtors commenced their case under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), as set forth in Schedule A hereto.

       **If you have any questions with respect to this Notice, please feel free to contact the Debtors' court-approved claims agent Epiq Bankruptcy Solutions, LLC ("<u>Epiq</u>") at (866)-879-0688**.

       **A CLAIMANT SHOULD CONSULT AN ATTORNEY IF THE CLAIMANT HAS ANY QUESTIONS, INCLUDING WHETHER SUCH CLAIMANT SHOULD FILE A PROOF OF CLAIM. PLEASE NOTE THAT EPIQ IS NOT PERMITTED TO GIVE LEGAL ADVICE.**

       **Some parties are required to file a Proof of Claim in order to preserve their claim against the Debtors.  Other parties are not required to file a Proof of Claim in order to preserve their claim against the Debtors.  The following is a summary explanation of each.**

1.      **WHO MUST FILE A PROOF OF CLAIM**

       You **MUST** file a **Proof of Claim** to share in the Debtors' estates if you have a claim that arose prior to the applicable Commencement Date, and it is not one of the other types of claims described in Section 2 below.  Acts or omissions of the Debtors that arose before the applicable Commencement Date, may give rise to claims against the Debtors that must be filed by the Bar Date, notwithstanding that such claims may not have matured or become fixed or liquidated prior to the applicable Commencement Date.  Pursuant to section 101(5) of the Bankruptcy Code and as used herein, the word "claim" means:  (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**2.**     **WHO NEED _NOT_ FILE A PROOF OF CLAIM**

You need not file a Proof of Claim if:

(1)     Your claim is listed on the Schedules and (i) is **not** described as "disputed," "contingent," or "unliquidated," and (ii) you do **not** dispute the amount, priority or nature of the claim set forth in the Schedules;

(2)     Your claim has been paid in full by the Debtors;

(3)     You hold an interest in the Debtors, which interest is based exclusively upon the ownership of common or preferred stock, membership interests, partnership interests, or warrants or rights to purchase, sell or subscribe to such a security or interest; **provided**, **however**, that interest holders who wish to assert claims (as opposed to ownership interests) against the Debtors that arise out of or relate to the ownership or purchase of an interest, including claims arising out of or relating to the sale, issuance, or distribution of the interest, must file Proofs of Claim on or before the Bar Date, unless another exception identified herein applies;

(4)     You hold a claim that has been allowed by an order of this Court entered on or before the Bar Date;

(5)     You hold a claim for which a separate deadline is fixed by this Court;

(6)     You hold a claim for which you have already properly filed a Proof of Claim with the Clerk of the Court or Debtors' court-approved claims agent, Epiq, against the Debtors utilizing a claim form which substantially conforms to the Proof of Claim Form; **provided**, **however**, any holder that has filed a Proof of Claim based on a Derivative Contract (as defined below) or a Guarantee (as defined below) on or prior to the Bar Date, is required to amend such Proof of Claim to conform to the procedures set forth in this Motion for the filing of Proofs of Claims based on Derivative Contracts and Guarantee;

(7)     You hold a claim solely against (i) Lehman Brothers Inc. or (ii) any other entity affiliated with the Debtors that is involved in a bankruptcy or insolvency proceeding or similar proceeding, in foreign jurisdiction; **provided**, **however**, if such claim is based on an obligation guaranteed by a Debtor, the holder of such claim must file a Proof of Claim on or before the Bar Date;

(8)     You hold a security listed on the Master List of Securities available on the Debtors' website http://www.lehman-docket.com (the "Master List of Securities") due to the fact that the indenture trustee for such securities will file a global proof of claim on behalf of all holders of securities issued thereunder; (Wilmington Trust Company, US Bank National Association, and the indenture trustee for each of the other securities included on the Master List of Securities, each will file a global proof(s) of claim on behalf of all holders of securities for which it is identified as Indenture Trustee on the Master List of Securities); **provided**, **however**, that security holders who wish to assert claims against the Debtors arising out of or relating to the sale, issuance, or distribution of a security, must file Proofs of Claim on or before the Bar Date, unless another exception identified herein applies; and

(9)     You are an entity included on the Exempt Entities List available on the Debtors' website http://www.lehman-docket.com (the "Exempt Entities List") and any subsidiary for which the entity on the Exempt Entities List owns at least a fifty percent equity interest in such subsidiary, specifically excluding any subsidiary that is in a bankruptcy, insolvency or similar proceeding in a foreign jurisdiction and Lehman Brothers Inc.

If your claim falls within any of the above categories, your rights as the holder of such claim will be preserved without you filing of a Proof of Claim. Any other person or entity (including, without limitation, each individual, partnership, joint venture, corporation, estate, trust or governmental entity) that has a claim against a Debtor must file a Proof of Claim, as described herein, before the Bar Date.

**YOU SHOULD NOT FILE A PROOF OF CLAIM IF YOU DO NOT HAVE A CLAIM AGAINST THE DEBTORS.**

**THE FACT THAT YOU HAVE RECEIVED THIS NOTICE DOES NOT MEAN THAT YOU HAVE A CLAIM OR THAT THE DEBTORS OR THE COURT BELIEVE THAT YOU HAVE A CLAIM.  MANY PARTIES ARE REQUIRED TO BE SERVED WITH THIS NOTICE AND IT IS REQUIRED TO REACH A BROAD AUDIENCE OF POTENTIAL CLAIMANTS.**

---

**SPECIAL NOTE TO HOLDERS OF LEHMAN SECURITIES**

Holders of securities are **NOT** required to file a proof of claim on account of their ownership if, and only if, such security is listed on the Debtors' Master List of Securities because such security was issued under an indenture pursuant to which an indenture trustee will file a global proof of claim on behalf of all holders of securities issued thereunder; (Wilmington Trust Company, US Bank National Association, and the indenture trustee for each of the other securities included on the Master List of Securities, each will each file a global proof(s) of claim on behalf of all holders of securities for which it is identified as Indenture Trustee on the Master List of Securities). The Master List of Securities is available for review at http://www.lehman-docket.com. The list is fully searchable by code (CUSIP or ISIN) or by security description.

If you do not see your security listed on the Master List of Securities and you have a question about the Master List of Securities, please download the form entitled "Inquiry Regarding Security Not on Master List of Securities," and complete and return it as directed on the form prior to August 5, 2009.

Inquiries will be investigated, and within 15 days of the Debtors receipt of such inquiry, either the security will either be added to the Master List of Securities (if appropriate), or, if you have provided contact information, you will be notified that the security is not being added to the Master List of Securities and given further information.

The Master List of Securities shall be finalized on August 20, 2009 and not subject to further change.

A Proof of Claim form is being included with the Bar Date Notices being served on holders of LBHI securities other than to holders of securities that are on the Master List of Securities.

**IF YOU BELIEVE YOU HAVE A CLAIM AGAINST LBHI OTHER THAN ON ACCOUNT OF YOUR LEHMAN SECURITIES OWNERSHIP, YOU MUST FILE A PROOF OF CLAIM FORM, AS DIRECTED IN THIS BAR DATE NOTICE. A COPY OF THE PROOF OF CLAIM FORM IS AVAILABLE AT HTTP://WWW.LEHMAN-DOCKET.COM.**

---

3.      **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Any person or entity that holds a claim arising from the rejection of an executory contract or unexpired lease must file a Proof of Claim based on such rejection by the later of (i) the Bar Date, and (ii) the date which is forty-five (45) days following the effective date of such rejection or be forever barred from doing so.

4.      **WHEN AND WHERE TO FILE**

All Proofs of Claim must be filed so as to be **actually received** on or before the Bar Date at the following address:

If by overnight mail, to:                          If by first-class mail, to:

Epiq Bankruptcy Solutions, LLC                     Lehman Brothers Holdings Claims Processing
Attn: Lehman Brothers Holdings Claims Processing   c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor                        FDR Station, P.O. Box 5286
New York, New York 10017                           New York, New York  10150-5076

If by hand delivery, to:

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims Processing
757 Third Avenue, 3rd Floor
New York, New York 10017

       or

Clerk of the United States Bankruptcy Court
Attn: Lehman Brothers Holdings Claims Processing
One Bowling Green
New York, New York 10004

Proofs of Claim will be deemed timely filed only if **actually** **received** by Epiq or the Court on or before the Bar Date.  Proofs of Claim may **not** be delivered by facsimile, telecopy, or electronic mail transmission.

In the event the Debtors amend their Schedules to (a) designate a claim as disputed, contingent, unliquidated or undetermined, (b) change the amount of a claim reflected therein, or (c) add a claim that was not listed on the Schedules or remove a claim that was listed on the Schedules, then, and in such event, the Debtors will notify the affected claimant be notified of such amendment and be granted thirty (30) days from the date of such notification within which to file a claim or be forever barred from doing so.

5.    **WHAT TO FILE**

       If you file a Proof of Claim, your filed Proof of Claim must: (i) be written the English language; (ii) be denominated in the lawful currency of the United States; (iii) conform substantially with the form attached to this notice (the "Proof of Claim Form"); (iv) state the name and case number of the specific Debtor against which it is filed; (v) set forth with specificity the legal and factual basis for the alleged claim; (vi) include supporting documentation or an explanation as to why documentation is not available; and (vii) be signed by the claimant or by an authorized agent of the claimant.

If you are asserting a claim against more than one Debtor or have claims against different Debtors, a separate Proof of Claim must be filed with respect to each such Debtor.

**EXCEPT AS SET FORTH IN THE FOLLOWING THREE PARAGRAPHS, YOU SHOULD ATTACH TO YOUR COMPLETED PROOF OF CLAIM FORM COPIES OF ANY WRITINGS UPON WHICH YOUR CLAIM IS BASED. IF THE DOCUMENTS ARE VOLUMINOUS, ATTACH A SUMMARY.**

**CLAIMS BASED ON DERIVATIVE CONTRACTS**

**IF YOU FILE A PROOF OF CLAIM BASED ON AMOUNTS OWED PURSUANT TO A DERIVATIVE CONTRACT, YOU MUST: (A) ON OR BEFORE THE BAR DATE, FILL-OUT AND RETURN A PROOF OF CLAIM FORM IN THE SAME MANNER AS ALL OTHER CLAIMANTS INCLUDING CHECKING THE APPROPRIATE BOX ON THE PROOF OF CLAIM AND (B) ON OR BEFORE THE QUESTIONNAIRE DEADLINE, LOG ON TO http://www.lehman-claims.com, ENTER THE UNIQUE IDENTIFICATION NUMBER INCLUDED ON THE PROOF OF CLAIM FORM MAILED TO SUCH HOLDER BY THE DEBTORS AND COMPLETE THE ELECTRONIC DERIVATIVE QUESTIONNAIRE SUBSTANTIALLY IN THE FORM ATTACHED AS EXHIBIT C TO THE BAR DATE ORDER (THE "DERIVATIVE QUESTIONNAIRE") AND ELECTRONICALLY UPLOAD SUPPORTING DOCUMENTATION ON THE WEBSITE (AS REQUIRED IN THE DERIVATIVE QUESTIONNAIRE), RATHER THAN ATTACHING SUCH DOCUMENTS TO THE PROOF OF CLAIM FORM.**

**A "DERIVATIVE CONTRACT" IS A CONTRACT THAT IS ANY OF (I) A "SWAP AGREEMENT" AS SUCH TERM IS DEFINED IN SECTION 101(53B) OF THE BANKRUPTCY CODE OR (II) A "FORWARD CONTRACT" AS SUCH TERM IS DEFINED IN SECTION 101(25) OF THE BANKRUPTCY CODE.  A CASH-MARKET PURCHASE OR SALE OF A SECURITY OR LOAN (I.E. ANY PURCHASE OR SALE OF A SECURITY OR LOAN FOR SETTLEMENT WITHIN THE STANDARD SETTLEMENT CYCLE FOR THE RELEVANT MARKET), EXCHANGE-TRADED FUTURE OR OPTION, SECURITIES LOAN TRANSACTION, REPURCHASE AGREEMENT IN RESPECT OF SECURITIES OR LOANS, AND ANY GUARANTEE OR REIMBURSEMENT OBLIGATIONS WHICH WOULD OTHERWISE BE INCLUDED IN THE DEFINITION OF "SWAP AGREEMENT"**

OR "FORWARD CONTRACT" PURSUANT TO THE DEFINITION OF SUCH TERMS IN THE BANKRUPTCY CODE <u>SHALL NOT BE CONSIDERED</u> A DERIVATIVE CONTRACT FOR THE PURPOSES OF THIS DEFINITION NOR SHALL ANY NOTES, BONDS, OR OTHER SECURITIES ISSUED BY THE DEBTORS OR THEIR AFFILIATES (INCLUDING, BUT NOT LIMITED TO, LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS TREASURY CO. B.V., LEHMAN BROTHERS BANKHAUS AG, LEHMAN BROTHERS HOLDINGS PLC, LEHMAN BROTHERS SECURITIES N.V., AND LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A.).

THE "QUESTIONNAIRE DEADLINE" IS OCTOBER 22, 2009, AT 5:00 PM (PREVAILING EASTERN TIME).

<u>CLAIMS BASED ON A DEBTOR'S GUARANTEE</u>

IF YOU FILE A PROOF OF CLAIM BASED ON A GUARANTEE, YOU MUST: (A) ON OR BEFORE THE BAR DATE, FILL-OUT AND RETURN A PROOF OF CLAIM FORM IN THE SAME MANNER AS ALL OTHER CLAIMANTS INCLUDING CHECKING THE APPROPRIATE BOX ON THE PROOF OF CLAIM AND (B) ON OR BEFORE THE QUESTIONNAIRE DEADLINE, LOG ON TO http://www.lehman-claims.com, ENTER THE UNIQUE IDENTIFICATION NUMBER INCLUDED ON THE PROOF OF CLAIM FORM MAILED TO SUCH HOLDER BY THE DEBTORS AND COMPLETE THE ELECTRONIC GUARANTEE QUESTIONNAIRE SUBSTANTIALLY IN THE FORM ATTACHED AS <u>EXHIBIT D</u> TO THE BAR DATE ORDER (THE "<u>GUARANTEE QUESTIONNAIRE</u>") AND ELECTRONICALLY UPLOAD SUPPORTING DOCUMENTATION AND EVIDENCE OF THE UNDERLYING CLAIM AMOUNT ON THE WEBSITE (AS REQUIRED IN THE GUARANTEE QUESTIONNAIRE), RATHER THAN ATTACHING SUCH DOCUMENTS TO THE PROOF OF CLAIM FORM.

A "GUARANTEE" IS A PROMISE, REPRESENTATION OR AGREEMENT TO ANSWER FOR THE PAYMENT OF SOME DEBT OR THE PERFORMANCE OF SOME DUTY IN CASE OF THE FAILURE OF ANOTHER PERSON OR ENTITY WHO IS LIABLE IN THE FIRST INSTANCE.

THE "QUESTIONNAIRE DEADLINE" IS OCTOBER 22, 2009, AT 5:00 PM (PREVAILING EASTERN TIME).

<u>CLAIMS BASED ON A DEBTOR'S GUARANTEE OF A DERIVATIVE CONTRACT WITH A NON-DEBTOR</u>

IF YOU FILE A PROOF OF CLAIM BASED ON A DEBTOR'S GUARANTEE OF A DERIVATIVE CONTRACT ENTERED INTO WITH A NON-DEBTOR, YOU MUST: (A) ON OR BEFORE THE BAR DATE, FILL-OUT AND RETURN A PROOF OF CLAIM FORM IN THE SAME MANNER AS ALL OTHER CLAIMANTS INCLUDING CHECKING BOTH BOXES ON THE PROOF OF CLAIM THAT SUCH CLAIM IS BASED ON BOTH A DERIVATIVE CONTRACT AND BASED ON A GUARANTEE AND (B) ON OR BEFORE THE QUESTIONNAIRE DEADLINE, LOG ON TO http://www.lehman-claims.com, ENTER THE UNIQUE IDENTIFICATION NUMBER INCLUDED ON THE PROOF OF CLAIM FORM MAILED TO SUCH HOLDER BY THE DEBTORS AND COMPLETE THE ELECTRONIC GUARANTEE QUESTIONNAIRE AND ELECTRONICALLY UPLOAD SUPPORTING DOCUMENTATION ON THE WEBSITE (AS REQUIRED IN THE GUARANTEE QUESTIONNAIRE), RATHER THAN ATTACHING SUCH DOCUMENTS TO THE PROOF OF CLAIM FORM AND LOG ON TO http://www.lehman-claims.com, ENTER THE UNIQUE IDENTIFICATION NUMBER INCLUDED ON THE PROOF OF CLAIM FORM MAILED TO SUCH HOLDER BY THE DEBTORS AND COMPLETE THE ELECTRONIC DERIVATIVE QUESTIONNAIRE AND ELECTRONICALLY UPLOAD SUPPORTING DOCUMENTATION ON THE WEBSITE (AS REQUIRED IN THE DERIVATIVE QUESTIONNAIRE), RATHER THAN ATTACHING SUCH DOCUMENTS TO THE PROOF OF CLAIM FORM.

THE "QUESTIONNAIRE DEADLINE" IS OCTOBER 22, 2009, AT 5:00 PM (PREVAILING EASTERN TIME).

If a holder is required to complete the Derivative Questionnaire or Guarantee Questionnaire, such holder need only submit the documentation required by the applicable Questionnaire by the Questionnaire Deadline and need not submit the documentation required by the applicable Questionnaire with such holder's Proof of Claim by the Bar Date.

If any holder files a Proof of Claim based on a Derivative Contract or a Guarantee which for any reason does not have a Unique ID Number, such holder shall still be required to comply with the procedures set forth in the prior two paragraphs, except that instead of entering a Unique ID Number on the website, such holder shall instead indicate on the website that they filed a Proof of Claim that did not have a Unique ID Number.

A holder (or any other party authorized under the Bankruptcy Code and the Bankruptcy Rules to submit a Proof of Claim on behalf of such holder) of a security that is guaranteed by a Debtor shall be required to file a Proof of Claim against such Debtor based on the Guarantee and complete the Guarantee Questionnaire.

Any security that is listed on the Master List of Securities is not a Derivative Contract and the holders of such security are not required to complete the Derivative Questionnaire on account of such security.

The information submitted on the website http://www.lehman-claims.com in respect of Derivative Contracts and Guarantees will not be accessible on the website other than by the party that submitted such information and the Debtors and the Creditors' Committee and their respective advisors and counsel.

The website http://www.lehman-claims.com and the information submitted thereon will remain accessible by the party that submitted such information following the Bar Date and the information submitted on the website will be subject to the same rules and standards as amendments and supplements to proofs of claim.

**6.      CONSEQUENCES OF FAILURE TO FILE A PROOF OF CLAIM BY THE BAR DATE OR COMPLETE THE DERIVATIVE QUESTIONNAIRE PRIOR TO THE QUESTIONNAIRE DEADLINE**

**Except with respect to claims of the type set forth in Section 2 above, any creditor who fails to file a Proof of Claim in accordance with the Bar Date Order on or before the Bar Date, underlined specifically, including filling out the Derivative Questionnaire (if applicable) or the Guarantee Questionnaire (if applicable)  and uploading required information to the website http://www.lehman-claims.com  (which Derivative Questionnaire or Guarantee Questionnaire shall not be required to be completed until the Questionnaire Deadline), specifying the applicable Debtor and other requirements set forth in the Bar Date Order, for any claim such creditor holds or wishes to assert against the Debtors, will be forever barred, estopped, and enjoined from asserting such claim (and from filing a Proof of Claim with respect to such claim) against the Debtors and their estates, and their property will be forever discharged from any and all indebtedness or liability with respect to such claim, and the holder of such claim shall not be permitted to vote on any chapter 11 plan or participate in any distribution in the Debtors' chapter 11 cases on account of such claim or to receive further notices regarding such claim or with respect to the Debtors' chapter 11 cases.**

**7.      THE DEBTORS' SCHEDULES AND ACCESS THERETO**

You may be listed as the holder of a claim against the Debtors in the Schedules.  Copies of the Schedules may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at http://www.lehman-docket.com and www.nysb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov.).  Copies of the Schedules may also be examined by interested parties between the hours of 9:00 a.m. and 4:30 p.m. (prevailing Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 511, New York, New York 10004.

DATED:      June __, 2009                                    BY ORDER OF THE COURT
            New York, New York

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8000
Lori R. Fife
Shai Y. Waisman

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

Schedule A

| Debtor | Case Number | Commencement Date |
|---|---|---|
| Lehman Brothers Holdings Inc. | 08-13555 | September 15, 2008 |
| LB 745 LLC | 08-13600 | September 16, 2008 |
| PAMI Statler Arms LLC | 08-13664 | September 23, 2008 |
| Lehman Brothers Commodity Services Inc. | 08-13885 | October 3, 2008 |
| Lehman Brothers Special Financing Inc. | 08-13888 | October 3, 2008 |
| Lehman Brothers OTC Derivatives Inc. | 08-13893 | October 3, 2008 |
| Lehman Brothers Derivatives Products Inc. | 08-13899 | October 5, 2008 |
| Lehman Commercial Paper Inc | 08-13900 | October 5, 2008 |
| Lehman Brothers Commercial Corporation | 08-13901 | October 5, 2008 |
| Lehman Brothers Financial Products Inc. | 08-13902 | October 5, 2008 |
| Lehman Scottish Finance L.P. | 08-13904 | October 5, 2008; |
| CES Aviation LLC | 08-13905 | October 5, 2008 |
| CES Aviation V LLC | 08-13906 | October 5, 2008 |
| CES Aviation IX LLC | 08-13907 | October 5, 2008 |
| East Dover Limited | 08-13908 | October 5, 2008 |
| Luxembourg Residential Properties Loan Finance S.a.r.l. | 09-10108 | January 7, 2009 |
| BNC Mortgage LLC | 09-10137 | January 9, 2009 |
| Structured Asset Securities Corporation | 09-10558 | February 9, 2009 |
| LB Rose Ranch LLC | 09-10560 | February 9, 2009 |
| LB 2080 Kalakaua Owners LLC | 09-12516 | April 23, 2009 |

**<u>Exhibit B</u>**

**Proof of Claim Form**

| United States Bankruptcy Court/Southern District of New York | | **PROOF OF CLAIM** |
|---|---|---|

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al. Debtors. | Case No. 08-13555 (JMP) (Jointly Administered) |
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |

NOTE: This form should not be used to make a claim for an administrative expense arising _after_ the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:_____**
      _(If known)_

Filed on: _____

Telephone number:          Email Address:

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:          Email Address:

**NOTICE OF SCHEDULED CLAIM:**
Your Claim is scheduled by the indicated Debtor as:

**1.     Amount of Claim as of Date Case Filed:  $**_____
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐     Check this box if all or part of your claim is based on a Derivative Contract.*
☐     Check this box if all or part of your claim is based on a Guarantee.*

**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☐     Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2.     Basis for Claim:** _____
      (See instruction #2 on reverse side.)

**3.     Last four digits of any number by which creditor identifies debtor:** _____
      **3a.  Debtor may have scheduled account as:** _____
            (See instruction #3a on reverse side.)

**4.     Secured Claim** (See instruction #4 on reverse side.)
      Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
      Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
      Describe: _____
      Value of Property: $_____ Annual Interest Rate _____%
      Amount of arrearage and other charges as of time case filed included in secured claim, if any:
      $_____ Basis for perfection: _____
      **Amount of Secured Claim: $**_____ **Amount Unsecured: $**_____

**6.     Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $**_____
      (See instruction #6 on reverse side.)

**5.     Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).  If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$_____

**7.     Credits:**  The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8.     Documents:**  Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. _(See definition of "redacted" on reverse side.)_ If the documents are voluminous, attach a summary.
**DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.**
If the documents are not available, please explain:

**FOR COURT USE ONLY**

| Date: | Signature:  The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|

_Penalty for presenting fraudulent claim:  Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571._

# INSTRUCTIONS FOR PROOF OF CLAIM FORM
Pg 114 of 123

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Items to be completed in Proof of Claim form**

**Name of Debtor, and Case Number:**
Fill in the name of the Debtor in the bankruptcy case, and the bankruptcy case number.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

_____ **D E F I N I T I O N S** _____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:
**Lehman Brothers Holdings Claims Processing**
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured Claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

_____ **I N F O R M A T I O N** _____

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## Exhibit C

### Derivative Questionnaire

*Please note that information stated on or uploaded on this website is being submitted as part of the Proof of Claim form. As such, criminal penalties apply for making a false statement. The penalty for presenting fraudulent claim is a fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

YOU MUST COMPLETE ONE DERIVATIVE QUESTIONNAIRE PER PROOF OF CLAIM BASED ON AMOUNTS OWED PURSUANT TO A MASTER AGREEMENT. IF A MASTER AGREEMENT DOES NOT EXIST, YOU MUST COMPLETE ONE DERIVATIVE QUESTIONNAIRE PER DERIVATIVE CONTRACT.

General:_____

Name of Debtor (drop down of Lehman entities):

Name of Creditor:

Name and address where notices should be sent:

Creditor contact person and phone number:

Name and address where payment should be sent if different from above:

_____

**1. Is the Debtor identified above (i) a counterparty to the derivative contract or (ii) a guarantor or credit support provider? Please identify the counterparties, guarantors and/or credit support providers to the derivative contract.**

**2. Have Termination Agreement(s) related to the allowance of a claim in respect of derivatives been entered into with the debtor?**

If Yes---Enter the amount of the derivative claim $_____

Please attach Termination Agreement and go to ____(end).

If No, proceed to #3.

**3. Have the derivatives matured or been terminated?**

If Yes--Enter the derivative claim amount and each line item included in the calculation thereof on the provided table and provide the information in 4.

If No, STOP HERE.  For Derivative Contracts that have not matured or been terminated, you do not need to complete the rest of the Derivative Questionnaire or submit any of the documents or information requested below.

4. a. <u>Documentation of Transactions.</u>   Please provide copies of all master agreements and schedules thereto, netting agreements, credit support agreements, guarantees and other agreements (other than confirmations) evidencing the transactions, in each case that relate to the claim.

b. <u>Termination Notice.</u>  Please provide a copy of the termination notice, including evidence supporting delivery date of the termination notice.

c. <u>Valuation Statement</u>. Please provide a copy of the valuation statement.  Please identify any collateral that has been posted by any party in connection with the transactions and any claims of set-off against other transactions reflected in the claim.

d. <u>Individual Trade Level Detail</u>.  Please provide with respect to each transaction (i) the valuation date (to the extent not included in your valuation statement) and value and (ii) details for the purpose of identifying and reconciling each transaction (e.g. including, as applicable, trade id, electronic trade reference id, trade type, product, trade date, reference obligation or reference entity, factor and original contract notional amount, quantity/unit of measure, currency,  price or strike price, buy/sell, call or put, cap or floor, effective date, and maturity date. (For the avoidance of doubt, you are not required to submit each and every one of the foregoing)).  Please provide this information in Microsoft Excel format.

e. <u>Trade Valuation Methodology and Quotations</u>.  Please check the box next to each valuation methodology used to support the claim (if multiple methodologies were used, please check multiple boxes and identify the trade population listed in clause d. above to which each valuation method applies):

\_\_\_\_ ISDA Master Agreements Specifying Market Quotation Methodology:  If not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

\_\_\_\_ ISDA Master Agreements Specifying Loss Methodology.  To the extent applicable, if not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

\_\_\_\_ ISDA Master Agreements Specifying Close-Out Amount Methodology.  To the extent applicable, if not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

_____ ISDA Master Agreements Specifying Any Other Methodology. To the extent applicable, if not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

_____ Non-ISDA Master Agreements. To the extent applicable, if not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

_____ Replacement Transactions: If you replaced a terminated transaction with a transaction with the same economic terms as the terminated transaction, provide documentation evidencing such replacement transaction and the quotation(s) used, including specifying any cash (or other consideration) paid or received by or to any person to replace the transactions, the name of each entity that effectuated a replacement and when any such transactions were effected.

f. <u>Unpaid Amounts</u>. Please specify any unpaid amounts and interest accrued thereon included in calculation of any amounts due with respect to the transactions.

g. <u>Collateral</u>. Please provide CUSIP/ISIN for collateral listed, if applicable, or other information that reasonably identifies collateral reflected in the claim calculation and the valuation of such collateral. Please provide this information in Microsoft Excel format.

h. <u>Other costs</u>.

    i. If claim includes other costs, please include a schedule that lists each such cost by vendor and indicates the service provided and amount paid.

    ii. If claim includes interest charges, please provide calculation in Microsoft Excel format of interest including principal amount, interest rate, term and assumptions.

## Exhibit D

### Guarantee Questionnaire

*Please note that information stated on or uploaded on this website is being submitted as part of the Proof of Claim form.  As such, criminal penalties apply for making a false statement.  The penalty for presenting fraudulent claim is a fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571.*

General:_____

Name of Creditor:

Name and address where notices should be sent:

Creditor contact person and phone number:

Name and address where payment should be sent if different from above:

_____

1. Name of Debtor, or other entity, against which you have a direct claim (the "Obligor"):

2. If such Obligor is in a bankruptcy or insolvency proceeding, administration, receivership, conservatorship, liquidation or similar proceeding (and is not a Debtor in these chapter 11 cases), please provide the proof of claim and any attachments thereto filed against such Obligor or describe the claim against such Obligor if a proof of claim has not yet been filed.

3. List the agreement(s) under which your claim arises against the Obligor and, unless you have uploaded information in compliance with question 4a of the Derivative Questionnaire, provide documentation evidencing your claim <u>and</u> supporting the calculation of the claim amount.*

4. Amount of claim against Obligor: $_____.

5. Name of Debtor that guarantees the payment/obligations of the Obligor against which you have a direct claim (the "Guarantor"):

6. Please upload the specific promise, representation and/or agreement(s) (including any corporate resolutions) under which your claim arises against the Guarantor and describe the obligations/performance that is guaranteed.  If you do not have possession of such document, please upload a written explanation of such guarantee in reasonable detail. You do not need to comply with this question if you have uploaded information in compliance with question 4a of the Derivative Questionnaire.

7.  Amount of claim against the Guarantor: $_____.

\* Pursuant to Federal Rule of Bankruptcy Procedure 3001(c), if your claim is based on a written agreement, you are required to attach a copy of the writing evidencing such agreement.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
In re                                              :        Chapter 11 Case No.
                                                   :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,           :        08-13555 (JMP)
                                                   :
                      Debtors.                     :        (Jointly Administered)
----------------------------------------------------------------------x

### ORDER GRANTING MOTION FOR AUTHORIZATION TO REJECT EXECUTORY CONTRACT BETWEEN LEHMAN BROTHERS SPECIAL FINANCING INC. AND E-CAPITAL PROFITS LIMITED

Upon the motion dated September 7, 2010 (the "Motion") of Lehman Brothers

Special Financing Inc. ("LBSF"), as debtor and debtors-in-possession (together with Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases, the "Debtors"), pursuant to sections 365(a) and 562(a) of chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 6006 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") for (i) authorization to reject the ISDA Master

Agreement, dated as of June 12, 2007 (the ISDA Master Agreement and schedule thereto,

including the related credit support annex, collectively referred to as, the "Master Agreement"),

between LBSF and E-Capital Profits Limited ("E-Capital"), and all confirmations and

transactions thereunder governed by such Master Agreement (collectively, the "Agreement"),

and (ii) approval of procedures for any claims that may be asserted against the Debtors as a result

of such rejection, all as more fully described in the Motion; and the Court having jurisdiction to

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of

New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.);

and consideration of the Motion and the relief requested therein being a core proceeding pursuant

to 28 U.S.C. § 157(b); and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the amended order entered June 17, 2010 governing case management and administrative procedures [Docket No. 9635] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) E-Capital; and (vii) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to section 365(a) of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, the Agreement is hereby rejected; and it is further

ORDERED that, pursuant to section 562(a) of the Bankruptcy Code, any claim for damages arising as a result of the Debtors' rejection of the Agreement shall be determined as of the date of this Order; and it is further

ORDERED that the Debtors shall have the option to deliver to E-Capital within ten (10) business days of the date hereof a statement that describes in reasonable detail the calculations used to determine the damages arising under the Agreement as a result of the LBSF's rejection (the "Damages Calculation"); and it is further

ORDERED that if the Debtors do not deliver a Damages Calculation or E-Capital disputes the amount of damages set forth in the Damages Calculation, the Debtors request that E-Capital be required to file a proof of claim in compliance with the terms of the Bar Date Order[1], including the requirement to complete a Derivative Questionnaire and a Guarantee Questionnaire (as such terms are defined in the Bar Date Order), for damages arising under the Agreement by no later than thirty (30) days from the date of entry of an order granting the relief requested herein; provided, however, that if E-Capital has already timely filed a proof of claim in compliance with the Bar Date Order for damages arising under the Agreement, E-Capital does not need to file an additional proof of claim to dispute the amount of the damages set forth in the Damages Calculation or in the event that the Debtors do not deliver a Damages Calculation; and it is further

ORDERED that if E-Capital (a) timely filed a proof of claim in accordance with the Bar Date Order or (b) timely files a proof of claim no later than thirty (30) days from the date of entry of an order granting the relief requested herein, then (i) E-Capital and the Debtors will each have the ability to assert all rights in respect of claims arising under the Agreement and (ii) any party in interest will have the right to object to such proof of claim arising under the Agreement; and it is further

ORDERED the Debtors timely deliver a Damages Calculation and E-Capital does not timely file, or has not already timely filed, a proof of claim in compliance with the terms established by the Bar Date Order for damages under the Agreement, then E-Capital will be deemed to have an allowed general unsecured claim against (i) LBSF and (ii) LBHI, as a creditor

---

[1] Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof, and Approving the Proof of Claim Form, entered on July 2, 2009 [Docket No. 4271] (the "Bar Date Order").

support provider for the payment obligations of LBSF under the Agreement, in the amounts set forth in the Damages Calculation delivered to E-Capital by the Debtors (subject to the treatment of such claims under a confirmed chapter 11 plan of the Debtors), and E-Capital will have no right to assert any other claims or claim amounts under the Agreement against any Debtor; and it is further

ORDERED that if the Debtors do not timely deliver a Damages Calculation and E-Capital did not timely file a proof of claim in accordance with the Bar Date Order and does not timely file a proof of claim in compliance with the terms of the Bar Date Order no later than thirty (30) days from the date of entry of an order granting the relief requested herein, then E-Capital will not be allowed any claim against the Debtors in respect of the Agreement; and it if further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: September __, 2010
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE