Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555 (JMP)

5   Case No. 08-01420 (JMP) (SIPA)

6   - - - - - - - - - - - - - - - - - - - - - - -x

7   In the Matter of:

8   LEHMAN BROTHERS HOLDINGS INC., et al.,

9           Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - -x

11  In the Matter of:

12  LEHMAN BROTHERS INC.,

13          Debtor.

14  - - - - - - - - - - - - - - - - - - - - - - -x

15

16                U.S. Bankruptcy Court

17                One Bowling Green

18                New York, New York

19

20                August 27, 2010

21                9:33 AM

22

23  B E F O R E:

24  HON. JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2      CONTINUED EVIDENTIARY HEARING re (i) the Motion of Debtor to

3      Modify the September 20, 2008 Sale Order and Granting Other

4      Relief (Case No. 08-13555, Docket No. 5148); (ii) the Motion of

5      the Trustee for Relief Pursuant to the Sale Orders or,

6      Alternatively, for Certain Limited Relief Under Rule 60(b)

7      (Case No. 08-01420, Docket No. 1682); (iii) the Motion of

8      Official Committee of Unsecured Creditors of Lehman Brothers

9      Holdings Inc., Authorizing and Approving (A) Sale of Purchased

10     Assets Free and Clear of Liens and Other Interests and (B)

11     Assumption and Assignment of Executory Contracts and Unexpired

12     Leases, Dated September 20, 2008 (and Related SIPA Sale Order)

13     and Joinder in Debtors and SIPA Trustees' Motions for an Order

14     Under Rule 60(b) to Modify Sale Order (Case No. 08-13555,

15     Docket No. 5169; Case No. 08-01420, Docket No. 1686); (iv) all

16     joinders thereto and the related adversary proceedings;1 and

17     (v) the Motion of Barclays Capital Inc. to Enforce the Sale

18     Order and Secure Delivery of All Undelivered Assets (Case No.

19     08-13555, Docket No. 6814; Case No. 08-01420, Docket No. 2581):

20

21

22

23

24     Transcribed By:  Clara Rubin and Sharona Shapiro

25

Page 3

```
 1

 2    A P P E A R A N C E S:

 3    JONES DAY

 4         Attorneys for the Debtors and Debtors-in-Possession

 5         222 East 41st Street

 6         New York, NY 10017

 7

 8    BY:   ROBERT W. GAFFEY, ESQ.

 9          WILLIAM J. HINE, ESQ.

10          JAYANT W. TAMBE, ESQ.

11

12    BOIES, SCHILLER & FLEXNER LLP

13         Attorneys for Barclays Capital, Inc.

14         575 Lexington Avenue

15         7th Floor

16         New York, NY 10022

17

18    BY:   JONATHAN D. SCHILLER, ESQ.

19

20    BOIES, SCHILLER & FLEXNER LLP

21         Attorneys for Barclays Capital, Inc.

22         333 Main Street

23         Armonk, NY 10504

24

25    BY:   DAVID BOIES, ESQ.
```

Page 4

1

2    BOIES, SCHILLER & FLEXNER LLP

3         Attorneys for Barclays Capital, Inc.

4         10 North Pearl Street

5         4th Floor

6         Albany, NY 12207

7

8    BY:   TRICIA J. BLOOMER, ESQ.

9

10   HUGHES HUBBARD & REED LLP

11        Attorneys for James W. Giddens, Trustee for the SIPA

12         Liquidation of Lehman Brothers Inc.

13        One Battery Park Plaza

14        New York, NY 10004

15

16   BY:   WILLIAM R. MAGUIRE, ESQ.

17        NEIL J. OXFORD, ESQ.

18

19   KIRKLAND & ELLIS LLP

20        Attorneys for Michael Klein

21        601 Lexington Avenue

22        New York, NY 10022

23

24   BY:   JAY P. LEFKOWITZ, P.C., ESQ.

25

Page 5

```
 1
 2    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
 3          Attorneys for the Official Committee of Unsecured
 4           Creditors
 5          51 Madison Avenue, 22nd Floor
 6          New York, NY 10010
 7
 8    BY:   JAMES G. TECCE, ESQ.
 9
10    STUTMAN TREISTER & GLATT
11          Attorneys for Interested Party, Elliott Management
12          1901 Avenue of the Stars
13          12th Floor
14          Los Angeles, CA 90067
15
16    BY:   WHITMAN L. HOLT, ESQ. (TELEPHONICALLY)
17          REBECCA S. REVICH, ESQ. (TELEPHONICALLY)
18
19    FARALLON CAPITAL MANAGEMENT
20          Creditor
21    BY:   ANATOLY BUSHLER (TELEPHONICALLY)
22
23    KING STREET CAPITAL MANAGEMENT, LLC
24          Creditor
25    BY:   MITCHELL SOCKETT (TELEPHONICALLY)
```

Page 6

1              P R O C E E D I N G S

2              THE COURT:  Be seated, please.  Good morning.

3              UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

4              THE COURT:  I have another day to give you.  I had a

5    matter which was scheduled for September 8th that has been

6    adjourned and, as a result of that, you can have the 7th and

7    the 8th together.  I don't know what that does to scheduling of

8    witnesses, but I figured it would be useful to give it to you.

9    If you don't want it, I'll keep it for myself, but you might as

10   well know that day's available.

11             MR. GAFFEY:  Without -- with regard to that, Your

12   Honor, we have a -- we took the liberty of putting a calendar

13   together based on where we stood as of just a moment ago, which

14   I thought might be useful.  So we'll all keep the 8th in mind.

15             THE COURT:  I'm happy to have it, with the

16   understanding that the 8th is a possible day for trial.

17             MR. GAFFEY:  Okay.  Thank you.  May I approach, Your

18   Honor?

19             THE COURT:  Yes.  Thank you.

20        (Pause)

21             THE COURT:  Okay, let's proceed.

22             MR. BOIES:  Okay.  Thank you, Your Honor.  One other

23   brief housekeeping matter.  I've informed counsel this morning

24   that we have withdrawn our designations of the three Barclays

25   employees that we had designated deposition transcript

Page 7

1    references for.  I reviewed those over the evening, as I told

2    the Court I would, and none of those are essential to us, and

3    we've withdrawn them.

4             THE COURT:  Fine.

5             MR. BOIES:  We now call as our next witness Michael

6    Klein.

7             THE COURT:  If you'd come up here, Mr. Klein.  Please

8    raise your right hand.

9         (Witness duly sworn)

10            THE COURT:  Be seated, please.  And please speak up.

11            THE WITNESS:  Thank you.

12   DIRECT EXAMINATION

13   BY MR. BOIES:

14   Q.   Good morning, Mr. Klein.

15   A.   Good morning.

16   Q.   What was your role in connection with the sales

17   transaction that took place the week of September 15th, 2008

18   involving Lehman Brothers and Barclays?

19   A.   I served as an advisor or a consultant to Barclays in

20   their review of the acquisition of Lehman Brothers and its

21   assets in its brokerage business.

22   Q.   And when were you first contacted about possibly being

23   retained by Barclays in connection with a possible Lehman

24   Brothers transaction?

25   A.   I believe that I was first contacted approximately the

Page 8

```
 1    Thursday before the bankruptcy filing weekend.  I believe I was

 2    contacted sometime in that morning on that Thursday.

 3              MR. BOIES:  And I believe that, for the record, to be

 4    September 11th.

 5    Q.   And who contacted you?

 6    A.   The first call that I received was from a gentleman named

 7    Hans-Joerg Rudloff, who I had known, who was the chairman of

 8    Barclays Capital.  He indicated that there was some

 9    considerations, could I take a phone call from Mr. Bob Diamond.

10    Q.   And did you?

11    A.   I did take a phone call with Mr. Diamond.

12    Q.   And what did Mr. Diamond say?

13    A.   He asked me to come see him to consider the acquisition of

14    Lehman Brothers, which in fact I did.

15    Q.   And at that time with the acquisition being considered,

16    the acquisition of the entire Lehman Brothers public company?

17    A.   Yes, it was.  That's -- that was the understanding.  I had

18    to make it clear, when I first spoke to and met with Mr.

19    Diamond, that I was subject to a specific noncompete agreement.

20    So there was a time period between which he first contacted me

21    and we could begin that discussion.  But, yes.

22    Q.   And did you get that clearance?

23    A.   Yes.

24    Q.   Now, as you understood it, what was Barclays' goal in this

25    transaction?  Why was Barclays interested in this transaction?
```

Page 9

1   A.   Well, Barclays had developed over time a very large and

2   global fixed income business.  They also had a very strong

3   European operation.  They had not, over the many years that

4   they had built this business, built an equity or a merger and

5   acquisition or an advisory franchise.  They also didn't have

6   specifically a significant profile in either North America or

7   in Asia.  They had a view that they had prepared themselves

8   well by managing their business well and managing their

9   positions well, to be prepared to grow when others could not

10  grow, and they saw this as an opportunity, a very significant

11  opportunity, to advance their position on a global scale and to

12  add new business lines all, if you will, at one time.

13       They understood that this was a deeply risky endeavor.  It

14  was very binary.  It was either going to work and they would

15  have this very, very substantial addition to their overall

16  business, or it was going to be an incredibly difficult

17  integration of business like that by their nature because of

18  the large amounts of people or very challenging asset

19  positions, and understanding them in the best of times were

20  very challenging.

21       It was very clear at that point, given the challenges in

22  the market, and in particular the challenges that week, and in

23  particular the time frames that were put on putting this

24  forward, that the risks that they were potentially stepping

25  into and understanding the overall asset positions, the people

Page 10

1    that would continue to be there, the clients that would

2    continue to work with them, that was obviously a very binary

3    event.

4        It also, frankly, from their perspective was something

5    that, as they looked at this, they knew right upfront there

6    were certain assets that were in the public domain that they

7    really, really didn't want to own because they just couldn't,

8    they couldn't for their capital base and they couldn't because

9    there was no way that they could even remotely identify and

10   analyze them, and those were the commercial real estate assets,

11   those were some of the private equity assets, some of the

12   structured finance positions.

13       So while they are attempting to buy the global business

14   because they saw that as a very big opportunity for them, which

15   in fact it was, the risks were both those they knew in the

16   public domain, those they had a sense for from the standpoint

17   of the really challenging market period, and those that they

18   knew they would have really limited time to explore with regard

19   to what was the position of those businesses, the people, the

20   existing trading businesses and the clients that were looking

21   at them in a sense of weakness.

22       It was a very good opportunity, but that was an

23   unbelievably difficult week, as I think most everybody knows by

24   this point in time.  Post the Fannie and Freddie events, banks

25   and broker-dealers had such a dramatic change in their ability

Page 11

1   to fund their business that it was really unclear what

2   businesses were able to be done at that point in time, and it

3   was very, very unclear what businesses Lehman was going to be

4   able to do going into that weekend and coming out of the

5   weekend.

6        So they saw the very substantial opportunity but, as they

7   clearly explained to me, there were certain things they

8   absolutely couldn't take on, and they had a very, very defined,

9   if you will, risk profile.

10  Q.   Did there come a time when it was concluded that a

11  transaction involving the acquisition of all or essentially all

12  of the public company, Lehman, was not going to be possible?

13  A.   Yes, there was.  The work on the transaction, and, again,

14  I was involved on the whole company transaction from that

15  Thursday night into the weekend, was a very unusual work

16  process in that we weren't very engaged directly with -- it was

17  very clear that the selling company, Lehman, had other

18  activities that they were undertaking at the time.  So we had a

19  window that we were in discussions.  That brief window

20  realistically was a window that occurred around Saturday night

21  when we had come up with what we thought collectively Barclays

22  thought was a structure that might address in particular those

23  very, very risky assets.  That structure seemed to have some

24  life on that Saturday night.  By Sunday morning, we were

25  informed that that transaction could not occur and that

Page 12

1    transaction would not occur and, as a result, that the whole

2    company of Lehman Brothers would not be available for Barclays

3    and they would not continue.

4    Q.    Did there come a time when you became involved in a

5    possible transaction just for the North American business or

6    for the broker-dealer business?

7    A.    Yes.

8    Q.    When was that?

9    A.    On that following Monday morning, beginning early Monday

10   morning, there was a call that I participated in with some of

11   the Lehman professionals and some of the Barclays

12   professionals -- I believe it was in Mr. Diamond's Park Avenue

13   conference room -- which indicated that they felt that there

14   was a possibility to salvage the North American broker-dealer

15   business; that they felt that they had an idea how to do that;

16   that if it could be done by the end of the day, that they could

17   keep their people -- that they could keep their clients that

18   they could not have the entire business erode; but that we were

19   the only people that they could have that conversation with

20   because we were the only people that were still interested and

21   the only people that were, quote, "there" and willing to take

22   that call, and they could only do their work in a short time

23   period with that singular party, being us, and would we be in

24   fact interested in undertaking that exercise.  That was the

25   conference call or the recollection that I have in general of

Page 13

1   that conference call on that morning.

2   Q.   Now, what were the risks and rewards to Barclays, the

3   possible risks and rewards, of acquiring Lehman's North

4   American business?  And let me begin by asking you about what

5   the rewards were.  Why was Barclays, as you understood it,

6   interested in acquiring the Lehman American -- North American

7   broker-dealer business?

8   A.   As I understood it, and as I understand, Barclays is a

9   very substantial, very large bank, and had a very significant

10  presence in the fixed income business, and a very significant

11  presence in the U.K. and in Europe, and we're one of the

12  strongest competitors.  The business that they had the least

13  substance in, in terms of products and services, were advisory

14  businesses, equity businesses and the like.  And the geography

15  that they had the least significant activity was in North

16  America.

17       The ability to build those businesses in a reasonable time

18  period is really very, very challenging.  The ability to both

19  hire what are effectively 10,000 very well-regarded

20  professionals, including senior leaders, is in its own right an

21  extraordinary endeavor.  The ability to build the reputation,

22  the client relationships, these are not things that are by any

23  stretch easy to do on an organic basis.

24       Now, while inorganic transactions are difficult in that

25  regard, this opportunity to do so, if it was achievable, was an

Page 14

1    opportunity to really take them from what had become a very

2    well-regarded, very profitable fixed income business, into

3    being something that was both global in scale and could serve

4    their clients and customers with multiple products and

5    services.  That was what I understood to be the very, very

6    significant opportunity in taking on this particular business

7    and this particular set of people and this, if you will, set of

8    customer relationships and position in the marketplace.

9    Q.   Was that, in your evaluation, a valuable -- a very

10   valuable potential opportunity for Barclays?

11   A.   Well, certainly, if I may say, because of the time

12   period's relevance, it was certainly valuable on the weekend

13   before bankruptcy.  I think there was still possibly terrific

14   value after bankruptcy, but it was a much different question in

15   the sense that after bankruptcy, given that, at least to my

16   knowledge -- there aren't examples of broker-dealers that have

17   gone through bankruptcies and continued to serve clients and

18   customers in that type of fashion.  It wasn't very clear what

19   would continue to exist, what the people would be -- who would

20   be there, what the client response/client attitude would be.

21   It wasn't really clear what actual businesses would be there.

22        And I don't want to necessarily mix and match time

23   periods, but the -- there was so much going on in the market at

24   the time, the bankruptcy, when it was announced, caused a

25   cascade of asset sales into the marketplace, in particular from

Page 15

```
 1   Lehman Brothers.  It caused obviously a dramatic change in the

 2   markets.  The markets -- and the equity market fell, as I

 3   recall, precipitously.  The debt markets fell precipitously.

 4   Lehman was really hemorrhaging assets in that regard.  So,

 5   trying to understand what it is that would actually constitute

 6   that business -- the opportunity was clear if one could create

 7   the opportunity.  The risks embedded in that and what that

 8   would consist of and what else would happen in the marketplace

 9   really asked a question of could that value in fact be

10   realized.

11        And post-Sunday night with the bankruptcy, given the

12   reports -- the television reports of people flooding out of the

13   building, it really wasn't clear if you could keep that

14   business intact.  The people are obviously the most important

15   attribute in those kinds of businesses, as well as

16   relationships and customer respect and so forth.  It wasn't

17   clear that all those could be maintained through that.

18   Q.   We've heard a lot already in this court about the nature

19   of the markets during that period of time, and I don't think I

20   need to take you through that.  But did the Lehman bankruptcy

21   itself have any effect on the markets?

22   A.   Oh, my belief is, most definitely.  I think, as I

23   understood this both as a participant in this particular

24   transaction but in general, the events in the proceeding, a

25   year and a half, were obviously extremely complicated for the
```

Page 16

1    market.

2        One of the things that had taken place in terms of the

3    understanding for businesses, market participants, broker-

4    dealers, was after the JPMorgan acquisition of Bear Stearns,

5    and then the Fannie and Freddie transactions and government

6    involvement.

7        There wasn't an expectation that a business like this,

8    Lehman Brothers, could fail.  It was an enormous participant in

9    the markets.  It was extremely complicated.  I don't think

10   anyone -- well, I certainly didn't anticipate that that would

11   be the outcome by any stretch.  And the impact on the market,

12   both in terms of a 600 billion balance sheet being put into the

13   marketplace as well as what was all of the rippling impacts for

14   those, because the securities markets have participants that

15   hold relative securities, sometimes on a leveraged basis, and

16   they, at least as I understand, they tend to try to get out of

17   the way.  So, many of the market participants simply moved to

18   the sidelines.

19       The markets were, both because of the event itself,

20   because of the assets that were being disposed of, because of

21   the signaling impact, because of their potential use of Lehman

22   as a client or inactively, the markets really were quite

23   substantially impacted by this.

24   Q.   When you got into the work that took place starting on

25   September 15th, did you find out whether or not Lehman had an

Page 17

1    accurate balance sheet and an ability to provide reliable

2    information as to what its assets and liabilities actually

3    were?

4    A.   When we went over to see Lehman in the middle of the day

5    on that Monday afternoon, the transaction that was explained to

6    us was a transaction that we could -- or Barclays could buy the

7    entire North American capital markets business of Lehman.

8    There was no business that was constituted that way as a

9    balance sheet that someone could show us.  There was no

10   specific -- it was frankly very unusual in the sense that there

11   are -- typically in transactions like this, you have an entity;

12   you're made aware of that.  Clearly there had been public

13   documents prior to the weekend that could be looked at, but

14   there was no complete description or depiction of the business

15   as it was defined.  There was, I think, a real good-faith

16   attempt by all parties to create what that business was by

17   taking the data that Lehman had -- that Lehman was -- that data

18   was changing quite frequently but that that data that they had

19   to construct what were the core elements of the directly

20   attributable business that was being purchased.  But there was

21   no -- certainly I was never -- I don't recall ever seeing a

22   balance sheet or a complete depiction of the business in the

23   whole.

24   Q.   As you understood the nature of the transaction that was

25   being contemplated, was it a balance sheet transaction?

Page 18

1   A.   No.  To my knowledge, it was not at any point defined as a

2   balance sheet transaction.  The transaction at the outset,

3   prior to bankruptcy, was the acquisition of a global business,

4   a substantial expansion of Barclays' global franchise in

5   capital markets, advisory wholesale banking.  The transaction

6   that was attempted pre-bankruptcy was specifically, if you

7   will, to exclude elements of the balance sheet that was known

8   to be risky.  The transaction that then was contemplated on the

9   Monday and Tuesday was specifically an attempt to acquire the

10  business as had been described to us, the North American

11  capital markets business.  There was no sense of what, quote,

12  "balance sheet" may exist.

13       And the idea that one would step in Barclays with their

14  extremely strong business and put their complete business at

15  risk reputationally against this big announced expansion into

16  new business lines and a new geography, it was never -- well,

17  it was not described to me that it was ever contemplated as the

18  purchase of, quote, "a balance sheet" or a set of assets.

19  Q.   Based on your understanding of the nature of Lehman's

20  records and what Lehman understood and could demonstrate about

21  its assets and liabilities, would it have been possible to have

22  a balance sheet transaction?

23            MR. GAFFEY:  Objection, Your Honor.

24            THE COURT:  What's the basis of the objection?

25            MR. GAFFEY:  I think it goes beyond his fact

 1   knowledge --

 2        (Coughing)

 3           MR. GAFFEY:  I beg your pardon.

 4           It goes beyond factual knowledge and asks for an

 5   opinion.

 6           THE COURT:  Well, he's asking the witness if it's

 7   possible.  And given this witness' involvement in the

 8   transaction and the questions that have been asked to this

 9   point about the nature of the financial information, including

10   his comment that this was not a balance sheet transaction, I'll

11   treat it as a lay opinion, if in fact it's an opinion at all.

12   And he can answer the question, but the answer is not likely to

13   be given very much weight.

14   A.   The question of possible is -- it's a very big concept.  I

15   don't believe at the time that there was an ability -- as I

16   understand a balance sheet, which is a full listing of assets

17   and a full listing of liabilities -- that anyone could have

18   delivered or that there was a possibility to deliver, in the

19   time frame we were working, the specific listing and the

20   specific valuation of each asset that was provided to us as I

21   understood it at the time.

22   Q.   In connection with the transaction that was contemplated

23   and the transaction that was done, was Lehman guaranteeing the

24   value of any of the assets it was providing?

25   A.   No, not that I'm aware of.  I don't believe that Lehman

Page 20

1    could or attempted to warrant any valuation.

2    Q.   Was Lehman providing any warranty or representation or

3    guarantee of what its liabilities were?

4    A.   I don't -- my apologies in that those are some more

5    specific legal terms.  It's my understanding that there were

6    assumptions of specific liabilities as part of the overall

7    consideration.  There was an estimate of two groupings of

8    formal liabilities, what was an estimate for compensation, an

9    estimate of a potential exposure for something called cure,

10   which I learned about, frankly, in this process; I hadn't been

11   aware of it before.  There were ongoing expenses of doing

12   business, because this was an ongoing business and, with 10,000

13   employees, they would generate expenses, as by their nature.

14   There was clearly going to be potential exposure on a

15   commercial basis, not on a legal basis but for clients who

16   might have done business with Lehman who had just a concern

17   about some particular event.  That was a potential, not

18   necessarily legal but commercial.

19        And of course there was a grouping of liabilities that

20   were the directly attributable liabilities attached to the

21   trading book, because the trading book, which were part of the

22   direct overall assets associated with the broker-dealer, was a

23   net book at the time of the transaction.  It had hedged

24   positions, it had funding positions, as trading books, as I

25   understand, do.  So those liabilities were part -- the ability

Page 21

1    to guarantee what any of those particular liabilities were or

2    the totality of those liabilities, I'm not aware that was done.

3    Q.   Was Lehman, as you understood it, guaranteeing that the

4    employees would stay with the business?

5    A.   No, not that I'm aware of.  I think that, as I understood

6    it, Barclays committed to give roles for a defined time period

7    to the employees.  If they decided not to keep certain

8    employees, they would in fact terminate those employees and pay

9    them a severance.  There were a certain group of employees that

10   I believe there was an attempt to negotiate agreements with; I

11   wasn't part of that.  But I don't think Lehman did or could

12   guarantee that any individual employee or collective grouping

13   of employees could stay.

14   Q.   Was Lehman guaranteeing that its customers and

15   counterparties would stay with the business as opposed to

16   taking their business elsewhere?

17   A.   No, I don't believe that Lehman was making any

18   representations in terms of which clients existed and continued

19   to exist or could continue to exist.  No, I'm not aware of

20   that.

21   Q.   During the period of September 15th and 16th, what role

22   did you play in working with Lehman representatives to agree

23   upon a basic structure for the transaction?

24   A.   The 15th and the 16th was the Monday, Tuesday.  And as I

25   indicated, we got a call early in the morning at about, I

Page 22

```
 1   think, 7 o'clock.  There were several hours with which internal

 2   discussions occurred within Barclays that I was a part of,

 3   which was really asking the question first and foremost do we

 4   think that this actually had any relevance; could it be

 5   achievable, the proposal; was there any reason to believe that

 6   this could actually be successful.  There was a separate set of

 7   questions that asked do we think we know what might exist given

 8   the market conditions and given what we had been told about the

 9   runoff of the business.  And I don't know when exactly we

10   learned but, given the separation of the other entities, the

11   different geographies -- then there was a discussion of what

12   the team that should be -- that could go over there.  And I

13   think there were some legal additions as well.  I think

14   Sullivan & Cromwell joined that team.

15        From that point onward when we went over to the Lehman

16   building, which was around midday, there was really a large

17   number of people -- most people I didn't know then and I don't

18   know now -- in various different rooms.  My own specific role

19   was to be part of the overall team, understanding and trying to

20   understand what was being proposed in terms of this

21   re-creation, if you will, of the -- or creation of the North

22   American transaction that could take place, the entire business

23   transaction.

24        And then I had a specific role in discussions with one

25   counterparty at Lehman to discuss the elements of the purchase
```

Page 23

1   price that was taking place, the specific elements of that.

2   Q.   Who were the people who you were most directly negotiating

3   with who were representing Lehman?

4   A.   At which time period are you referring to?

5   Q.   On the 15th and 16th.

6   A.   The 15th and 16th there was really one individual that had

7   been for a little bit of time sort of the connectivity point

8   for us, but we didn't see a tremendous amount of this

9   individual on that weekend:  Mark Schaffer.  He became the

10  direct person that I most dealt with.  There were certainly

11  people coming in and out of rooms at various points in time.

12  It was -- this was realistically a half a day or so worth of

13  constant movement.  But that was the individual.

14  Q.   And what was Mark Schaffer's position?

15  A.   I -- I believe that he was the head of the Lehman Brothers

16  merger and acquisition group, and I think he was representing,

17  if you will, Lehman in part, in that regard.  They had another

18  representative from Lazard as well who played a role in parts,

19  but he was the representative for Lehman Brothers.

20  Q.   During the period of the 15th and 16th, did you believe

21  that it was important for both you and for Lehman that the

22  transaction, if it was going to be done, be done quickly?

23  A.   Yes, I did.  The call that we originally received -- and I

24  may have stated this earlier, I'm not sure -- was very clear

25  that, given the bankruptcy, the ability to keep the employees

Page 24

```
 1   and make sure the employees knew that they should not (a) leave

 2   to go to another firm or (b) simply not do their duties and

 3   have fails and have all kinds of future complexity -- they had

 4   to understand that there was some hope for them that the

 5   business would exist.  And it was explained to us that they

 6   needed to understand (1) that there was a transaction in

 7   negotiation and (2) that sometime by the end of the day Monday

 8   or no later than the open Tuesday that they could explain that

 9   the transaction would continue.

10       And it was proposed to us that that effectively would be

11   implicitly or to say that they were continuing the

12   conversations with Barclays but that it was critical that, if

13   it didn't get done, this was their statement to us.  It didn't

14   sound -- it didn't sound wrong in the sense of what we were

15   watching in the marketplace and then the extent of what we had

16   seen on television.  But that was their statement to us.

17   Q.   From Barclays' perspective, why was it important to do the

18   transaction before the business further disintegrated?  And

19   that may be an obvious question, but I just need to have your

20   testimony on it.

21   A.   Well, I think that Barclays -- Barclays has a really

22   extraordinary reputation in the marketplace and a very strong

23   business.  If Barclays put their name on something that was a

24   failure, that Barclays took on 10,000 employees and they all

25   were left, I mean, that -- or the key employees or important
```

Page 25

1   employees or substantial employees had left, if there had been

2   further damage to the sense that this was not a business that

3   could serve clients ongoing, then there wouldn't be -- well,

4   actually, as of that morning that question existed from that

5   morning.  Once the bankruptcy name was placed on Lehman, the

6   name of Lehman was obviously not of the value -- and the

7   question was would the clients continue to respect the

8   enterprise that you purchased, unless it became very clear that

9   the people itself were continued but also that this didn't stay

10  in the spectrum of the light for a very long time period of

11  people understanding that this was a business that no one

12  wanted.  And Barclays' ability to indicate that they themselves

13  thought there was value in itself provided value in that, from

14  their perspective, ongoing.

15  Q.   You mentioned in an earlier answer that one of the things

16  that you did was try to come up with a price for the business.

17  Initially what was your position as to what price Barclays

18  ought to pay?

19  A.   Well, my position specifically you're referring to?

20  Q.   Yes.

21  A.   First and foremost, in that many hours between 7 o'clock

22  in the morning and when we went over, there was a real question

23  of could anything be achieved, as I said, and I think there was

24  a real question as what would -- what was being proposed to us

25  and what could be left.

Page 26

```
 1        I did not believe that there was an ongoing business -- I

 2   did not believe that there was, as a result, an ongoing

 3   business value that could be attributed to this.  I frankly

 4   felt that stepping into the hiring of employees and the

 5   liabilities was a very, very big step for Barclays and quite a

 6   big risk.  I thought it was also obviously important for the

 7   market.  But from Barclays' perspective, this is in its own

 8   right was a big endeavor in terms of both the liabilities and

 9   in terms of putting themselves in the shoes of that business.

10   So I didn't believe that there was a purchase price value.

11   Q.   Now, did the Lehman representatives take a contrary -- or

12   did they express a contrary view?

13   A.   Well, there was a very clear negotiation when they put

14   forward, as I recall -- obviously this is quite some time ago,

15   so I'm giving you my general recollection -- or my recollection

16   of what took place.  They proposed the structure, which was to

17   buy the North American business, the capital markets business,

18   to do so in a process that they had developed, including the

19   SIPC trustee and some other complexity, again, that I wasn't

20   particularly aware of; that they could, if you will,

21   reconstitute or create or describe the business that we could

22   buy.  They made it very clear that they both needed and

23   deserved value, and there was a thorough negotiation of that.

24   And there was in fact an agreement reached.

25   Q.   And what kind of payment were the Lehman representatives
```

Page 27

1   asking for?

2   A.   I don't recall specifically what the number was, but we

3   said we would step into the shoes of the liabilities that were

4   specific to operating the business, and they indicated that

5   there needed to be a substantive purchase price.  Two items

6   were identified in terms of, if you will, certain cash, the

7   first of which was the purchase of buildings, both the main

8   headquarters building on Seventh Avenue and data centers.  That

9   in its own right was approximately 1.4 billion.  They indicated

10  that that had to be taken on in full at an appraised value,

11  appraised as if it was fully occupied.

12      I can recall that conversation because it was very clear

13  that I thought it was circular, because if you didn't buy the

14  business, there wouldn't be an occupied building.  So it would

15  seem circular that we were ending up having that payment.  But

16  that was the negotiated payment.  And later on, appraisals were

17  delivered.

18      The second part was they wanted additional incremental

19  cash consideration; of course there were the other liabilities,

20  but cash consideration.  And they called that, quote,

21  "goodwill".  They asked for a larger number than ended up being

22  attributed, but that number ended up being 250.  It was their

23  terms as 'We need more and we'll call it goodwill,' and that

24  was agreed to.

25  Q.   Let me try to be sure I understand the negotiations.

Page 28

1   First, there was a disagreement as to whether the real estate

2   should be valued on an as-occupied basis or as an unoccupied

3   basis, is that correct?

4   A.   Well, to be more precise, if I could, the first element

5   was there wasn't certainty that Barclays needed all of that

6   real estate.  I don't know that they understood that they

7   needed the data centers.  I think it was then decided that they

8   could live with owning those.  But then the second order was

9   that there was an appraisal that had to take place and that

10  that appraisal would be as-occupied, which was disagreed with.

11       There was a third; it's more minor in the scope of things,

12  I think, but there was a view that, if they had to sell these

13  assets, there'd be a significant brokerage fee, and we would

14  buy that on a net basis.  Eventually they negotiated that away.

15  Q.   Let me stick with the -- first just the

16  occupied/unoccupied issue.  If you appraised it on an occupied

17  basis, that would increase the amount that Barclays was paying,

18  correct?

19  A.   I have to say I didn't do the appraisals but, as it was

20  explained to me, the -- and as it makes sense to me, the

21  occupied basis, at that time in particular in the market --

22  obviously it was a different time than it is today -- was

23  substantially higher in value than having to rent out all the

24  space on Seventh Avenue.  So that was described to me as being

25  a meaningfully different value.  I don't have the elements of

Page 29

1   how big that description could be, but meaningful.

2   Q.   Without getting into the precise amounts that we differ

3   on, am I correct that Barclays must have believed that valuing

4   it on an occupied basis would result in a higher payment

5   because Barclays was trying to get it on an occupied basis?

6   Correct?

7   A.   Well, I -- to be precise, I think they simply viewed it

8   was -- as I understood it, that it was realistic to consider

9   the building as unoccupied, because that was -- if they were

10   taking on the obligation of the people and then the occupation

11   was a double count -- but I -- yes, they felt it was more to

12   take it on on an as-occupied basis, as I understood it.

13   Q.   And ultimately Barclays agreed to take the buildings on on

14   an occupied appraisal, is that correct?

15   A.   That's what I understand to be the case.

16   Q.   And ultimately Barclays agreed, contrary to its original

17   position, to pay an additional 250 million dollars of cash

18   consideration, is that correct?

19   A.   Yes, that's correct.

20   Q.   Now, you mention the issue of a commission, and I want to

21   be sure I understand that.  When you say that Barclays'

22   position was they should buy it on a net basis, do you mean

23   that they would pay the appraised value less a commission?

24   A.   I have -- this is quite some time ago.  The -- my

25   understanding was the initial agreement was an appraised value

Page 30

1    net of what would have been an assumed commission.  I don't --

2    yes, that's what I recall.

3    Q.   And when -- I just want to be clear what you mean by a net

4    basis.  Do you mean that the price that Barclays was going to

5    pay would be the appraised value minus an assumed commission?

6    A.   Yes, that's correct.

7    Q.   And was that in fact the way the buildings were ultimately

8    valued?

9    A.   No, I believe, as I understood it, they were valued

10   without the commission.  They were -- yes.

11   Q.   Let me ask you to turn -- you have a witness binder up

12   there, do you?

13   A.   I'm -- oh, yes, I do.  No, no, I don't.  There's someone

14   else's name on that witness binder.

15        MR. BOIES:  I think we have not yet handed out our

16   witness binder, Your Honor, so we will do that now.

17        (Pause)

18        THE WITNESS:  I don't know whose this is, but it may

19   be beneficial to retrieve.  This is something else.

20   Q.   I'd like you to turn to tab 12 of this binder, which is

21   the APA, Barclays' Exhibit 1, and in particular to paragraph

22   3.1, which is on page 14, entitled "Consideration".  Do you

23   have that?

24   A.   I'm sorry, what page is that?  Do you have a page?

25   Q.   It is page 14, paragraph 3.1.

Page 31

1    A.    Yes, sir.

2    Q.    And it says there "The Aggregate Consideration for the

3    Purchased Assets shall be (a) the Cash Amount, and (b) the

4    assumption of the Assumed Liabilities by Purchaser."  Do you

5    see that?

6    A.    Yes, I do.

7    Q.    And does that accurately state what you understood to be

8    the consideration that Barclays was paying for Lehman's North

9    American capital markets business?

10   A.    I think that's consistent with what I just described.

11   Q.    Now, when it talks about the assumed liabilities, those

12   assumed liabilities included, were not limited to necessarily

13   but included, certain trading liabilities, correct?

14   A.    Well, those are defined terms, which I -- as I understood

15   the transaction, the assumed liabilities included the trading

16   liabilities directly associated with the business that was

17   acquired.

18   Q.    Now, in addition to the trading liabilities, I think you

19   indicated earlier that Barclays was assuming certain

20   compensation liabilities, is that correct?

21   A.    Yes, I understood that to be the case.

22   Q.    And did you understand that there was an estimate of what

23   those compensation liabilities might be?

24   A.    Yes, I understood an estimate had been provided by Lehman.

25   I understood that.

Page 32

```
 1    Q.   And what was that estimate, as you understood it?

 2    A.   As I understood it, that estimate was two billion dollars.

 3    Q.   And did any Lehman representative explain what that two

 4    billion dollars covered?

 5    A.   I don't recall having discussions with Lehman

 6    representatives on the compensation number.  I can only recall

 7    one conversation internally that I had as part of Barclays.  I

 8    don't recall a Lehman representative describing that to me.

 9    Q.   Do you recall Harvey Miller describing what the two

10    billion dollar number included?

11    A.   As -- only as part of his general statements to the Court.

12    I don't recall more specific detail.

13    Q.   When you say 'in statements to the Court', do you mean

14    statements that Mr. Miller made to the Court on the -- at the

15    hearing on September 19th?

16    A.   I believe it was referenced at the hearing on the -- on

17    September 19th.

18    Q.   Were you familiar with Mr. Bart McDade?

19    A.   Yes.  I met Mr. McDade as part of the transaction.

20    Q.   And what role was Mr. McDade playing, as you understood

21    it, in connection with this transaction?

22    A.   Well, Mr. McDade was the leader, if you will, of Lehman

23    during this time period.  And during the Monday-Tuesday time

24    period, I didn't have substantial exposure to him, and I didn't

25    have substantial exposure to him until that end of that week
```

Page 33

1    and that weekend.  So I don't -- away from his operating

2    responsibilities, as I understood, running Lehman, I don't know

3    specifically what he was doing on a day-to-day basis.

4    Q.   Was Barclays involved in developing the estimate for what

5    the compensation payments that it was assuming would be?

6    A.   Not that I'm aware of.

7    Q.   Now, I think you also mentioned certain cure liabilities

8    or potential cure liabilities that Barclays was assuming; do

9    you recall that?

10   A.   I do, yes.

11   Q.   Was Barclays involved in developing any of those cure

12   estimates?

13   A.   Not to my knowledge.  My -- I first learned about the

14   concept or the term "cure" as part of a meeting that took place

15   as part of this transaction, and it was described to me that

16   Lehman Brothers had come up with an estimate of what this

17   exposure for their cure and contractual and other expenses

18   might be.  I didn't ever see a list of those, nor do I believe

19   that anyone from Barclays created that estimate.

20   Q.   Let me go back to the APA and ask you to look at page 6

21   where there's a definition of purchased assets.

22   A.   Yes, sir.

23   Q.   And do you see where it says "Purchased Assets means all

24   of the assets of Seller and its Subsidiaries, used in

25   connection with the Business, excluding the Excluded Assets"?

Page 34

1    You see that?

2    A.   Yes, I do see that.

3    Q.   And did you understand, in connection with the work that

4    you were doing, that Lehman was selling and Barclays was

5    acquiring all of the assets of Lehman's North American capital

6    markets business except those assets that were specifically

7    excluded?

8    A.   Yes, that's correct.  That's how I understood it.

9    Q.   By contrast, is it the case that the only liabilities that

10   Barclays was assuming were those liabilities that it expressly

11   agreed to assume?

12   A.   I'm sorry, am I supposed to be looking at anything in the

13   document?

14   Q.   I was asking you that question unrelated to a document,

15   but if -- I can --

16   A.   Could you -- I'm sorry, could you repeat the question?

17   Q.   Sure.  You testified that Barclays was acquiring all of

18   the assets of Lehman's North American capital markets business,

19   except those assets that were expressly excluded; remember

20   that?

21   A.   Yes, I do.

22   Q.   And now I'm shifting to liabilities and I'm asking, with

23   respect to liabilities, was it the case that, instead of

24   acquiring all liabilities except those that were excluded,

25   Barclays was acquiring only those liabilities that it expressly

1    agreed to assume?

2    A.   Yes, but can I explain that a bit further?

3    Q.   Sure.

4    A.   The -- as I said earlier, the construct was to buy the

5    whole North American traditional Lehman Brothers capital

6    markets business.  There was no, if you will, definitional

7    balance sheet or data set that said this is exactly what you're

8    buying.  I think there was an attempt to create as best as

9    possible the information that could be given to that for the

10   assets and the directly attributable assets and the direct

11   trading liabilities associated with that.  And then there was

12   an attempt to aggregate the key liabilities -- the comp, which

13   is the people issue; cure, which is the business expense

14   issue -- to understand that.

15        There were other liabilities that were ongoing with

16   expenses of the business that I understood Barclays knew that

17   they would have to operate the business.  That was an important

18   part, because the important element was keeping this business

19   going, both for Lehman, for its clients, its customers, and for

20   Barclays.

21        There was a whole element of liabilities that Barclays

22   very specifically was just generally concerned about.  They

23   didn't have the ability to do the kinds of diligence as to what

24   could come out of the woodwork from a liability perspective.

25   So they walked into, if you will -- as I understood it

Page 36

1    certainly, and I certainly did -- to the Monday proposal from

2    Lehman and their advisors with a sense very clearly from the

3    beginning that there were -- there was not going to be a

4    willingness to take anything that had an open-ended nature.  I

5    don't know if that answers your question.

6    Q.   Yes, I think it does.  And just to underscore that, let me

7    ask you to look at page 11, paragraph 2.3 where it says

8    "Assumption of Liabilities".  And --

9    A.   Yes, sir.

10   Q.   -- was it your understanding that the only liabilities

11   that Barclays was assuming were the liabilities that were

12   expressly listed here in paragraph 2.3?

13   A.   Shall I read this, 2.3?  (Pause).  As I think I indicated

14   earlier, the substance of the transaction in whole was to buy

15   the North American capital markets business of Lehman.  It was

16   clear a certain amount of cash that was certain that would be

17   put forward for the transaction.  It was clear the kinds of

18   businesses they were in and the kinds of assets.  There

19   obviously was no certainty of the value of those assets.

20        The liabilities that they took on, as I understood it,

21   were defined as the specifically identified comp, the potential

22   exposure of the cure, the operating expenses of the businesses

23   going forward, and the directly attributable trading

24   liabilities attached to the trading assets.  That was the

25   attempted construct to create both the entire business and the

Page 37

1    consideration that they were purchasing.

2    Q.   Let me focus on one of the elements of the liabilities,

3    and that's what you've referred to as the trading liabilities.

4    Was there, as you understood it, any understanding or agreement

5    that the transaction would result in a wash or an equal

6    assumption of assets and liabilities by Barclays?

7    A.   I'm not aware that there was an assumption of a, quote,

8    "wash".

9    Q.   As you understood it, was Barclays acquiring trading

10   assets that were greater than the trading liabilities that

11   Barclays was acquiring?

12   A.   As I understood it, Barclays acquired trading assets and

13   directly attributable liabilities attached to that trading

14   book.  The values of any of those were extremely uncertain both

15   going into the weekend, coming out of the weekend, and Monday,

16   Tuesday and, obviously, going forward.  It's clear that the

17   accounting and the announcements that Barclays made were that

18   the assets were in fact greater than the liabilities.  I think

19   there was uncertainty that was ongoing collectively at all

20   times.

21        So if you're asking me about the value as opposed to the

22   statements, I'm trying to answer that as clear as I can.

23   Q.   You used in your deposition an expression of "catching a

24   falling knife"; do you recall that?

25   A.   I do, yes.

Page 38

1    Q.    Can you explain what you meant by that phrase?

2    A.    Well, what I believe I meant -- obviously this was a year

3    ago, but in hindsight, the markets were in absolute freefall.

4    The fear factor -- I mean, this was a very critical, stressful,

5    fearful period, I think, for all market participants; certainly

6    for everyone participating in this transaction.  We understood

7    the weight of what was going on.

8         When the bankruptcy was played out over the newspaper and

9    we -- and the television, and we understood from being at the

10   Fed during that weekend that there was going to be a button

11   pushed where specific desks were going to unwind positions,

12   that there was a plan that at least we understood was in place

13   and in fact did take place as securities unwound, the ability

14   to understand what it was you exactly were acquiring at Lehman,

15   the ability to understand where the market would be, the

16   ability to understand what the business conditions might in

17   fact look like, the business conditions, the ability to -- it

18   was such a binary event.  This was either going to be a very,

19   very, very good event if it was integrated well without too

20   much risk, or it was going to tarnish the existing business of

21   thousands of Barclays employees and their reputation and

22   possibly be something that had some other substantial hits to

23   it.  So it was that binary.

24   Q.    Despite the difficulty of determining what the values were

25   actually for the assets and liabilities of Lehman, was there

Page 39

1   effort -- was there an effort made during negotiations to

2   estimate what those values were?

3   A.   There were many people in many rooms during that short

4   time period.  I wasn't part of a team that was evaluating any

5   of the specific financial assets or the trading book; that was

6   not something I was part of.  There were clearly people in

7   different rooms doing different things.  There were clearly

8   both, as I understood it -- because Barclays had to understand

9   and announce their acquisition, they were doing their work on

10  what the pieces and components were, including the trading

11  assets.  And Lehman had to understand as best as they could

12  what they were also selling.  So they also, as I understand,

13  were doing work; in some cases, they may have done that

14  together, I just don't know.  But there were definitely work

15  being done, as I understood it.  And, frankly, there were

16  numbers put forward when I was shown press releases, well, that

17  had estimates of those numbers.

18       So, yes, there was work being done to estimate, because,

19  as I said, there was no aggregate value of the -- there was no

20  balance sheet, there was no definition; there was just the

21  ability to define a purchase price and consideration and the,

22  if you will, groupings of assets that would come to the

23  business.

24  Q.   Recognizing that you were not able to be involved in this

25  yourself and that there were many rooms and you couldn't be in

Page 40

1    several places at once, did you at least have an understanding

2    that the estimates of value that were made by different people,

3    even at the same time, were materially different from each

4    other?

5    A.   Well, it was very clear, throughout the entire period that

6    I was involved in this, that the whole markets were moving and

7    the value, if you will, of any security on the market was

8    changing minute by minute.  It was also clear that data

9    delivered by Lehman might be outdated or might change at any

10   given moment because either collateral was being taken from the

11   estate or assets were specifically being sold or geographies

12   were being taken away.  So, clearly there was movements; those

13   movements, I'm sure, came to different assumptions by different

14   people in different ways.

15   Q.   Were you aware of any disagreements between Barclays

16   representatives and Lehman representatives as to what the

17   appropriate value was to ascribe to various assets?

18   A.   Is there a specific time frame that you're referring to,

19   or --

20   Q.   At any time during this week of September 15th.

21   A.   Well, clearly at the end of the week there were some

22   disagreements as to the aggregate value.  They weren't massive

23   disagreements, but there were disagreements and there were

24   (sic) back-and-forth on that.

25   Q.   In that connection, did you believe that what you were

Page 41

1    doing with the Lehman representatives was engaged in an arm's-

2    length good-faith negotiation?

3    A.   Yes.  This was -- even in a short time period, this was a

4    heavily negotiated transaction.  It was a substantially complex

5    transaction created by, I think, individuals certainly on the

6    other side that were very -- had some real understanding and

7    insight about the process of how to move this forward.  I think

8    it was one of the most complicated transactions I've ever been

9    involved in at all; it was not just because of the volatility

10   of the markets, not just because of the speed, not just because

11   of the lack of data, but the multiplicity of processes that had

12   to take place and the ability to keep the business open and

13   operational with the multiple different clearinghouses and

14   government and regulatory agencies.  I had never experienced

15   anything with that degree of complexity in my twenty-four,

16   twenty-five years in the business.

17       I think the transaction with that required a tremendous

18   amount of unusual cooperation to understand the structure and

19   the process, and that clearly took place, I think, in terms of

20   that cooperation.  And I must say I was very proud of that,

21   that that transaction and that the Lehman business could be

22   saved and 10,000 employees could be -- I was very proud.

23       But each side negotiated their positions and negotiated to

24   the extent of meaningful adjustments and consideration, as I

25   understood.

Page 42

1  Q.   There's been some suggestion in this proceeding that

2  Barclays representatives and some of the Lehman representatives

3  may have been in cahoots to try to understate the value of some

4  of Lehman's assets.  Did you participate in any such activity?

5  A.   Absolutely not, and I was not aware of any activity of

6  that kind.

7  Q.   Now, the APA was signed on September 16th, a Tuesday,

8  correct?

9  A.   I understand the transaction was agreed on the 16th.

10  Q.   Okay.  Now, after the transaction was initially agreed to

11  on the 16th, did, as you understand it, the transaction change?

12  A.   Well, the substance of Barclays' desire and Barclays'

13  completion of the purchase of the North American capital

14  markets business of Lehman, that did not change.  The principal

15  elements of what were the goals of, I think, Barclays and, as I

16  understood to be, Lehman did not change.  It was the purchase

17  of a business which would keep the business operating, keep the

18  employees, serve the clients, serve the customers.  There was,

19  as I understood it, several hundred thousand customer accounts.

20  None of that meaningfully changed, to my understanding.

21       There are also was no change in the sense that it was a

22  negotiated transaction.  I think it was, as it was refreshed --

23  expressed to me, the best transaction that could be achieved,

24  and it was clearly a negotiated transaction between two

25  parties.

Page 43

1        There were elements that changed during the week; in

2    particular, there were asset movements, as I understood it.

3    Some of the assets that had been directly attributable trading

4    assets had been either -- and I don't know if this is the right

5    technical term, but had been taken by other lenders.  And

6    obviously valuations in the markets had moved.  But that

7    movement in assets or the removal of substantial assets changed

8    the asset configuration and, as a result, also changed some of

9    the accounting and other elements, but changed the asset -- the

10   other change was that Barclays stepped into some of the funding

11   obligations to continue the business.

12       The business, as I understood it, could not -- or as I

13   understood at the time, that it wouldn't be able to fund itself

14   unless Barclays stepped in.  In doing so, they took on a far

15   different exposure in the sense that, rather than having a net

16   book with assets, long positions, liabilities that would move

17   and hedge themselves and where the assets were in excess of the

18   liabilities but were moving, they ended up with an acquisition

19   and putting forward what was all of the cash capital to replace

20   those trading movement liabilities.  The substance of the

21   transaction, the strategic elements of the transaction, the

22   consideration, if you will, in that sense, I don't believe

23   changed, but those elements changed.

24   Q.   I want to break that answer up, and let me begin this way:

25   You testified that the transaction that was agreed to on the

Page 44

```
 1    16th was a transaction in which Barclays was acquiring all of

 2    Lehman's North American capital markets business assets except

 3    those assets that were expressly excluded, correct?

 4    A.    Yes, that's what I understand to be the case.

 5    Q.    And you testified that Barclays was acquiring or assuming

 6    certain specified liabilities of that business, is that

 7    correct?

 8    A.    Yes, I think I've testified to that.

 9    Q.    And you testified that Barclays was paying certain stated

10    consideration that was identified in the APA, correct?

11    A.    Both in terms of cash, plus also the assumption of

12    liabilities and ongoing expenses, yes.

13    Q.    Now, did those three elements, that structure, change

14    between September 16th and the time of the closing?

15    A.    I think, on those elements, the appraisals came in on the

16    buildings, which had an adjustment, if you will, on the

17    appraisal.  Away from the appraised asset, I don't think the

18    structure changed other than as I've described it.

19    Q.    Now, was it the case that the assets that existed at

20    Lehman changed over that week?

21    A.    As I understand it, the assets had been clearly changing

22    and had chan -- the assets that were the trading assets of

23    Lehman and the directly associated trading liabilities changed

24    between that Tuesday and Friday, both because of market

25    activity and because of other market participants, as I
```

Page 45

1    understood, either exerting their claims or -- I don't have the

2    appropriate term.

3    Q.   Now, you testified that another thing that happened was

4    that Barclays had advanced a certain amount of cash; do you

5    recall that?

6    A.   Yes, I do.

7    Q.   And was that in connection with the so-called repo

8    transaction?

9    A.   As I learned at the end of that week, it was in relation

10   to what I understand to be the, quote, "Fed repo transaction".

11   Q.   Did you understand during the week of the 15th, from

12   Monday the 15th through Monday the 22nd, why Barclays had

13   advanced the forty-five billion dollars that it advanced in

14   connection with taking over the Fed repo?

15   A.   I didn't have any direct conversations certainly at that

16   time with the Fed, and I wasn't a participant in the creation

17   of those repo transactions, and I wasn't really aware of those

18   until -- at the end of the week.  I was aware that Barclays had

19   offered a willingness to be, quote, "supportive" as needed, but

20   the funding, as I understood it, as of the end of the week

21   could no longer be supported unless Barclays stepped in.  So

22   Barclays was requested to step in more fully into the shoes of

23   that full Fed repo amount what I understood to be somewhere in

24   the end of the week.  I was made aware of this, I think, if my

25   recollection is correct, either Thursday night or Friday

Page 46

1    morning, or sometime in that time period.

2    Q.   Did the changes that you have identified -- that is, the

3    changing assets and liabilities that Lehman had, the changing

4    value of the assets and liabilities that remained, and the

5    advancement by Barclays of the forty-five billion dollars in

6    connection with taking over the Fed repo -- change the risk

7    that Barclays was exposed to in connection with this

8    transaction?

9    A.   I believe so.  Can I explain that?

10   Q.   Yes.  Please do.

11   A.   I believe the risk to Barclays in this transaction

12   increased virtually at every step in the transaction.  I

13   believe the risk of a post-bankruptcy event was, other than the

14   element that one could segregate the toxic assets that was

15   attempted to be segregated before, and other than the processes

16   that occur within bankruptcy to have certain, if you will,

17   finality, that the risk of buying that business and buying a

18   business with the bankrupt name attached to it and buying a

19   business that had gone through that tumult in terms of

20   employees and customers and, no matter what you attempted to

21   preserve, you might not be able to recover, I think that was

22   more risky.

23       I think, however, the events that occurred between Tuesday

24   and the end of the week, as I understood it -- assets were

25   being seized; certain accounts were being closed; the, if you

Page 47

1   will, market activity was dramatic.  I don't have the specific

2   numbers, but Monday, Tuesday, Wednesday, Thursday, the

3   volatility in the equity and in the fixed income markets were

4   extraordinary.

5       I think the certainty of the assets that were being

6   transferred because of the moving pieces was definitively in

7   question.  I think, in addition -- again it's my opinion -- but

8   having to put forty-five billion of capital to buy long

9   positions, buying a hedged book that had net longs with

10  shorts -- shorts against longs for a net book that moved up and

11  down, is one thing.  Buying -- I don't think there were many

12  people, at least as I would understand, that were putting

13  forty-five or forty-six-plus billion of money up directly to

14  buy net long positions of many securities, and certainly not a

15  mixture of securities.  I think it was riskier, yes.

16  Q.   As you understood it, after the Fed repo had been taken

17  over by Barclays, was there an attempt to estimate what the

18  value was of the repo collateral?

19  A.   I'm sorry, can you ask that question again?

20  Q.   Yes.  During the week of September 15th, after Barclays

21  had stepped into the shoes of the Fed with respect to the repo,

22  was there an effort by Lehman and Barclays to estimate the

23  value of the repo collateral?

24  A.   As I understand it, there was efforts in various rooms to,

25  sort of on an ongoing basis, calculate what assets were -- I

Page 48

1    think, on that particular question of the collateral, I believe

2    that both Barclays and Lehman were doing work to determine what

3    securities existed, what was in that collateral pool.  I wasn't

4    directly doing that work.  But I believe they were, yes.

5    Q.   Recognizing that you were not directly doing that work,

6    did you have an understanding during the week of September 15th

7    as to whether Barclays and Lehman were able to agree on what

8    the value was of the repo collateral?

9    A.   There was a set of discussions that I was part of on

10   Friday where Barclays made very clear that the notional value

11   that had been put forward on the Fed repo collateral, they did

12   not believe, was the value of that collateral.  There was an

13   agreement that that in fact was correct, but there was a

14   disagreement that existed in the quantum of how much that mark,

15   if you will, should be.  That disagreement -- at least it was

16   not a very long meeting, as I recall -- was not a very big

17   disagreement.  Both sides understood that the value on the

18   notional amount of the repo was not the current value.  There

19   was a discussion about the differences in that value, and there

20   was no formal agreement that there was a defined value that was

21   a specific number.  There was simply an agreement that both

22   sides understood that they needed to move on and that the

23   differential was not that severe, as I understand it.

24        MR. GAFFEY:  Your Honor, I'm sorry to interrupt.  Mr.

25   Klein has a very soft voice and it's getting softer.  Could I

Page 49

1    ask that he sit a little closer to the microphone --

2            THE WITNESS:  I'm sorry.

3            MR. GAFFEY:  -- or speak up?  Thank you.

4            THE WITNESS:  My apologies.  Can I move this?

5            MR. BOIES:  You can actually move the microphone

6    closer to you.

7            THE WITNESS:  Okay.  Thank you.

8            My apologies.

9    Q.   As you understood it, given the structure of the

10   transaction, was it necessary for Lehman and Barclays to agree

11   on what the value of the repo collateral was?

12   A.   No, and in fact there -- can I explain this?

13   Q.   Yes.

14   A.   There -- as I said, there wasn't a defined specific value.

15   There was an agreement to move on, that it was close enough to

16   the value of the repo.  The reason why is, the overall

17   transaction was a transaction to purchase the entire business.

18   There were specific consideration put forward in the form of

19   the cash, the certain cash, both the buildings, the extra,

20   quote, "Lehman-defined goodwill", the comp and the cure

21   liabilities, the incremental expenses going forward.  There was

22   clearly a set of consideration put forward to acquire an

23   ongoing business.

24        There was -- I certainly wasn't part of any, and I don't

25   believe that there was any, separate purchase price paid for

Page 50

1   any separate assets.  This was not a, quote, "balance sheet

2   transaction", as I indicated.  This was the entirety of the

3   business.

4        Each side had to understand what the assets could be.  I

5   mean, of course Barclays had to book them and they had to

6   understand them.  They then had to mark them on their

7   accounting books.  They had to understand the capital impact.

8   And they were very clear that they couldn't have an impact to

9   capital in the short term or in the intermediate term.  And I'm

10  sure Lehman as well had to understand what they thought they

11  were, quote, "collectively selling".

12       But as the Friday process occurred, it was not -- it was

13  not essential in that way, as I understood it.

14  Q.   Based on the view of Barclays, and perhaps of Lehman as

15  well, as to the value of the repo collateral, as of Friday of

16  that week, was that repo collateral sufficient to justify

17  Barclays going through with the transaction?

18  A.   Barclays expressed to me a very clear concern, sometime

19  between that Thursday night and Friday, that the value of the

20  asset book, the direct trading book, because of the assets that

21  had been removed, had been so meaningfully changed in the

22  collection of that relative to the liability, which was now the

23  repo liability, that they had uncertainty, uncertainty as to

24  whether or not those tradable assets would be worth the loan or

25  not worth the loan.  And that impacted them, as I understood,

Page 51

1    in two ways.  One, they had made commitments to their

2    shareholders and to their regulators about capital and the

3    accounting going forward.  They had clearly been concerned from

4    the beginning about the impairment of their business going

5    forward and the risks they could undertake.  In addition,

6    because, as I stated earlier, this was a new long, if you will,

7    transaction in terms of the capital that they put forward;

8    there was greater financial risk embedded in that.  This

9    caused, in the people that I dealt with at Barclays, really

10   great trepidation.  They had announced publicly a transaction;

11   it was very clearly a transaction that they had hoped to and

12   intended to do.  They had announced it publicly.  And now the

13   elements of what could have been the transaction that they had

14   announced had now changed in terms of the asset configuration,

15   and thus their accounting.  And, yes, that was expressed.

16   Q.   Let me ask you to look at tab 34 in your book.  This is

17   Movants' Exhibit 52.  And at the top of the page there's an

18   e-mail from you to Bob Diamond Friday night; actually it's

19   2:38 a.m. Saturday morning.  Do you see that?

20   A.   Yes, I do.

21   Q.   And it begins "Bob, great day.  We clawed back 3 billion

22   dollars more value in the transaction and cut the building

23   prices by 160 million dollars tonight."  Do you see that?

24   A.   Yes, I do.

25   Q.   And the "tonight" is referring to Friday night, correct?

Page 52

1    A.    Yes, I do (sic).

2    Q.    What is the three billion dollars that you're referring to

3    there?

4    A.    Well, first and foremost, this was after the entire court

5    process, which the hearing was really an extraordinary thing

6    for me.  It was also the first that I can -- I'm aware of,

7    communication that I had had with Bob of any kind between the

8    morning when I had heard that the assets had been significantly

9    reduced and the fear that occurred within Barclays they had

10   pulled those assets out.

11        The three billion that was preserved or kept back, as best

12   as I can recollect, related to two asset categories that the

13   Lehman Brothers team proffered as part and parcel of the

14   discussions we had over the Fed repo collateral, the first of

15   which was their stated value of something called a box of

16   hammers, and the second of which was their stated, newly

17   identified to us, although you don't manufacture assets -- I'm

18   sure they were always there -- but newly identified to us,

19   something called a 15c3 account.  I believe that that's what

20   that referred to in terms of the assets that were, if you will,

21   recovered.

22   Q.    And with respect to the 15c3 account, as of Friday night,

23   what did you understand the value of that account was to

24   Barclays?

25   A.    Well, first, if I may, I didn't know what a 15c3 account

Page 53

1    was.  I -- when I first heard the term, I though it was the

2    political -- whatever, action committee.  It was explained to

3    me that this was some form of reserve that could be released

4    directly and that there was a document that had been handed to

5    us that was an e-mail from -- or purported to be from the SEC;

6    that there could be released an amount of value that was

7    somewhere between a billion and two billion.  I don't know --

8    didn't know that that would be -- was specifically the value;

9    nor did I know the value of the, quote, "box of hammers", other

10   than what people told me.  But that's the reference that I had.

11   Q.   When you say it was explained to you that the 15c3 account

12   was a reserve account that could be released, who explained

13   that to you?

14   A.   I -- I don't know for certain who explained.  I know that

15   the people that delivered to us the information about that was

16   Bart McDade and possibly Alex Kirk.  Others had to be asked to

17   explain, because I didn't know what that term was.  And there

18   were lawyers that reviewed and explained what specifically that

19   account was.  But I don't know who explained to me all the

20   details of that.

21   Q.   Were the people who explained them, even though you may

22   not know their names, were they Lehman representatives?

23   A.   Yes.

24   Q.   Now, you referred to -- in addition to the 15c3 account,

25   you referred to a box of hammers; you recall that?

Page 54

1    A.    That's correct.

2    Q.    Where did that nomenclature come from?

3    A.    Well, that nomenclature came from the meeting we had with

4    Lehman Brothers representatives, the discussion about the Fed

5    repo collateral.  And they came prepared to discuss the other

6    assets that we might not have been aware of, and they had a

7    list of something that they called the box of hammers.  I

8    hadn't heard that term before either, but it was described to

9    me as trading assets that were sort of not -- that had

10   accumulated on desks.  It didn't sound like a particularly

11   attractive definition or description, but that's how it was

12   described to me.

13   Q.    Did you become aware of nomenclature that described these

14   assets as clearance box assets at some point?

15   A.    I have had that -- I have heard that term, yes.

16   Q.    And were the clearance box assets the same as the

17   so-called box of hammers, as you understood it?

18   A.    I understand that to be the case, yes.

19   Q.    And was there any estimate of the value of this box of

20   hammers or clearance box assets?

21   A.    The only recollection I have was the stated 1.9 billion

22   that was stated to us in that room.  I'm not aware of any other

23   estimate provided to me at any point in time.

24   Q.    And who provided the 1.9 billion dollar estimate?

25   A.    I believe, the Lehman individuals.  I know Bart was part

Page 55

1    of that.  I -- it could well have been that Alex Kirk was as

2    well, but I don't know for sure.

3    Q.   Was it your understanding that the Lehman representatives

4    were telling you that the 15c3 account assets and the clearance

5    box assets, or box-of-hammer assets, were assets that Barclays

6    was acquiring as part of this transaction?

7    A.   I'm sorry, can you ask that again?

8    Q.   Yes.  Was it your understanding that the Lehman

9    representatives were telling you that the 15c3 account assets

10   and the clearance box assets, or box-of-hammer assets, were

11   assets that Barclays was acquiring as part of this transaction?

12   A.   They were making us aware of assets that had not been

13   identified specifically to us before.  As I said, the -- there

14   was no ability to manufacture assets.  There was a clear

15   understanding that the trading assets had been materially

16   reduced first by virtue of, of course, the assets that had been

17   taken out by other counterparties and, secondly, the valuation.

18   But this specific set of assets they had apparently just

19   identified.  I think there were other things that they thought

20   they might also have been able to identify but it turned out

21   they couldn't.  But these were newly identified to me in the

22   transaction.

23   Q.   When you say these were assets that were newly identified

24   by Lehman to you, were the Lehman representatives telling you

25   that these were assets that were included in the North American

Page 56

1   capital markets business assets that Barclays was acquiring?

2   A.   Well --

3           MR. GAFFEY:  Objection.  Leading.

4           THE WITNESS:  I'm sorry?

5           THE COURT:  Well, I think that's the first leading

6   objection we've had in the trial, but --

7           MR. GAFFEY:  I've been quite charitable up till now,

8   Your Honor.

9           THE COURT:  Well, I think that I'm going to not treat

10  it as a waiver of leading objections in the future, but I don't

11  have a problem with the question and I'm going to overrule the

12  objection.

13  A.   The assets were specifically described as within the

14  trading businesses and within the broker-dealer, and they were

15  specifically described as such by the Lehman professionals.

16  Q.   Now, after -- incidentally, you attended the Friday,

17  September 19th hearing before the Court?

18  A.   The --

19  Q.   Did you?

20  A.   Before court?

21  Q.   No, no.  Were you in attendance at the hearing that the

22  Court held --

23  A.   In this room?

24  Q.   -- on September 19th --

25  A.   Yes.

Page 57

1    Q.    -- in this room?

2    A     Yes, I was.

3    Q.    Okay.  And what did you do after that hearing?

4    A.    I -- I'm sorry, I don't know specifically.  I'm sure I

5    went to sleep.  I was -- I was very tired.  I don't know

6    specifically.

7    Q.    Did you go to Weil Gotshal at some point after the

8    hearing?

9    A.    Oh, yes.  We spent the remainder of that weekend dealing

10   with certain issues that had arisen.  Yes.

11   Q.    And during what period of time were you personally at the

12   Weil Gotshal offices the weekend of the 20th and 21st of

13   September?

14   A.    I -- I would say -- I don't specifically remember what

15   time I entered and left, but I was there, I think, virtually

16   all of the weekend.

17   Q.    During the weekend of September 20th and 21st, were there

18   meetings going on, in a large number of conference rooms at

19   Weil Gotshal, related to this transaction?

20   A.    Yes.  There was a -- the whole floor essentially was, or

21   it seemed to be, dedicated to this transaction.  There was

22   multiple rooms with multiple different constituencies.  Again,

23   just as in Lehman's building, I didn't know everybody that was

24   wandering in and out.  But there were certainly multiple rooms,

25   yes.

Page 58

1    Q.   At any time that weekend or prior to that weekend, was

2    there any attempt by anyone at Barclays or at Lehman to value

3    the totality of the assets that Barclays was acquiring in this

4    transaction?

5    A.   I -- I'm not aware that anyone that I was working with

6    provided or valued the totality of the assets.  The -- Barclays

7    had to account for the transaction specifically, and there were

8    teams of people that handled accounting-related matters.  And

9    there was, I think, the other bankers as well that were there.

10   I wasn't part of that, but I -- I'm not aware of a total

11   aggregate valuation of the assets or liabilities.

12   Q.   Were there assets that Barclays was acquiring as part of

13   the North American capital markets business assets of Lehman

14   that had significant value to Barclays but did not have

15   significant value to Lehman, under the circumstances?

16   A.   Well, yeah.  Yes, certainly, sir.  There was -- the

17   principal element of the business transaction was to acquire a

18   North American business, with thousands of trained and talented

19   bankers and traders, to acquire customer relationships, to

20   acquire ongoing customer activity, to acquire businesses that

21   were operational businesses.  Those were, you know, very

22   clearly only of value if they were part of both -- not simply

23   not in bankruptcy, and not simply had the ability to fund

24   themselves, because, as I understood it, the whole Lehman

25   estate, if this transaction didn't get done, couldn't fund

1  themselves in general.  But not only those two elements, but a

2  North American franchise separated and distinct from a global

3  franchise in this environment couldn't exist.  So all that

4  value, the people -- and to hire that many people would take

5  years and would be very hard to assemble -- all of that had

6  value only to a global buyer who needed a North American

7  footprint, and only done in that quick basis.

8        There were other assets that, by virtue of, as I

9  understood, counterparties just seizing things and requiring

10 fire sales to take place, that the stability put in place by

11 Lehman -- by the Barclays transaction for Lehman stopped that

12 from occurring.  So, clearly that was an additional impact of

13 assets that, by virtue of Barclays stepping into the shoes of

14 certain trades, would not have the assets simply go away for

15 what was an unwarrantedly low value.

16       So as I understood it, the substantive business was

17 clearly valuable and would have gone away, and the rippling

18 asset impact, if they had not stood in, would have had a

19 completely different -- well, a different value, as I

20 understood it, to both the entity and the Lehman estate.

21 Q.   Let me ask you to look at tab 38 in your book.

22 A.   Yes, sir.

23 Q.   This is Movants' Exhibit 410.  And this is a Xerox copy of

24 a manila folder, and I would ask you initially whether you

25 recognize this.

Page 60

1    A.    I recognize it as a photocopy, and I recognize pieces that

2    are on this.  I don't recognize all of it.

3    Q.    When did you prepare this?

4    A.    Well, my understanding is there was over that weekend time

5    period, and I've been subsequently told that this was on Sunday

6    evening -- I was requested by Harvey Miller, who asked me to

7    enter a room with a group of people that I had not met before,

8    but he asked me specifically to attempt to explain the flow of

9    funds, in particular in relation to the Fed repo transaction.

10   I entered that room and I gave a brief description of that.  It

11   was not a very long meeting.  I used what I think was a green

12   pen on a manila folder to try to sketch out some rough numbers

13   as to the Fed repo flows, which had become the main element of

14   complexity over that weekend, because the pipes could not be

15   opened because the flow of funds and the, quote, "JPMorgan

16   issues" that occurred had stopped, if you will, the ability to

17   be comfortable that the Monday transaction could in fact occur.

18   So that complexity was something we were dealing with, and that

19   was the bulk of the weekend.  And the bulk of the weekend was

20   dealing with the Fed and the DTC and all the different elements

21   of counterparties to make sure, quote, "the pipes could be

22   opened".

23        So there was some -- Harvey Miller asked me to explain

24   this flow of funds related to the Fed, and I tried as best as I

25   could to explain that in that short meeting.

Page 61

1  Q.   Was Harvey Miller present throughout the meeting that you

2  were in when you wrote this and talked about it?

3  A.   Yes.  Absolutely.

4  Q.   And did Mr. Miller make clear to the people who were there

5  that you were there as a representative of Barclays?

6  A.   I believe he did.  I believe that was known, yes.

7  Q.   Were you trying to identify all of the assets or all of

8  the liabilities that were being acquired or assumed by Barclays

9  in this transaction?

10 A.   No.  As I described, I was asked to focus on the flow of

11 funds and the Fed repo, and I attempted to do so.  And I used

12 some scribbling.  As you can see, I certainly didn't include

13 the entire transaction.  I certainly -- they were very round

14 numbers.  They were very they were very broad numbers.  I tried

15 to do the best I could in explaining that.  And clearly I was

16 not explaining the entirety of the transaction but that

17 specific flow of funds.

18        MR. BOIES:  Your Honor, would this be a convenient

19 time?

20        THE COURT:  This would be a perfectly good time for a

21 morning break.  We'll break till 11:30.

22     (Recess from 11:12 a.m. until 11:33 a.m.)

23        THE COURT:  Be seated, please.

24        MR. BOIES:  Thank you, Your Honor.

25        THE COURT:  Please proceed, Mr. Boies.

Page 62

1          MR. BOIES:  Thank you, Your Honor.

2     RESUMED DIRECT EXAMINATION

3     BY MR. BOIES:

4     Q.    Do you still have Movants' Exhibit 410, the Xerox copy of

5     your manila folder handwriting, in front of you, sir?

6     A.    I do.  Yes, I do.

7     Q.    Now, the bottom half of the page it says "timing of 49.9",

8     you see that?

9     A.    Yes, I do.

10    Q.    And what were you explaining when you wrote "timing of

11    49.9"?

12    A.    As I recall, one of the things that had transpired that we

13    were made aware of was the 49.9 of notional Fed-related

14    securities collateral was attempted to be transferred from a

15    JPMorgan account to a Barclays account.  It somehow was stopped

16    in transference.  I don't know the technical issue, but it did

17    not all make it through.  And as a result of that, some of the

18    wiring was held up.  And I learned that a placeholder of cash

19    was placed in that account because the wires, as I was -- it

20    was explained to me, were shut down.  There was an

21    understanding that they would simply be reversed, that the

22    securities, as I understood it, that were underlying that

23    notional number would be reversed when the -- on Monday morning

24    it would be reversed.  So the timing related to that.

25          And there was complexity in terms of those transactions

Page 63

1    that I -- I'm not an expert on those wiring instructions, but

2    that's the timing.

3    Q.   Now, I see that you wrote in the lower right-hand corner

4    "placeholder of 7.4 cash"; do you see that?

5    A.   I do, yes.

6    Q.   And did you explain in this brief meeting that your

7    understanding was that the cash was simply a placeholder?

8    A.   As I recollect as a general matter in the transaction that

9    that was my understanding, and that's what I appear to have

10   written there.

11   Q.   And what you were writing there was something that you

12   were writing at this meeting, is that correct?

13   A.   Yes.  This was a meeting that was impromptu.  I was pulled

14   into it.  It was brief.  And in attempting to explain that

15   degree of complexity, I jotted down just a few numbers on that,

16   again, as I said, on a manila folder that seemed to be in the

17   room.

18   Q.   And I think there's been some testimony that one of the

19   people who was there in the room actually took the folder with

20   him when he left; is that correct?

21   A.   I hadn't -- I was aware that I had had this meeting and

22   jotted things down.  I hadn't been aware of the folder at all

23   until in my deposition someone showed me a photocopy.  I didn't

24   know it existed in that sense.

25   Q.   Now, when you wrote "Monday a.m. reverse trade", what were

Page 64

1    you explaining there?

2    A.   Again, my understanding was that there were wiring of

3    securities that were held in an account that were held up,

4    because the wires on a given night close down; just, things

5    stop.  And as part of that, only a certain amount of the

6    securities had been transferred in order to allow for the

7    transaction accounting.  There was a placeholder of cash.  The

8    agreement, as I understood it, was the cash would be given back

9    and the securities would be transferred to make up the

10   remainder of that notional 49.9.

11   Q.   Now, did you have an understanding of what that 8.55 held

12   up, that you wrote there, represented?

13   A.   I knew that there was an amount.  And at the time I

14   clearly wrote that down, I knew there was an amount that was

15   held up in securities, in the notional value of securities.

16   And that 41 and the 8.55 seems to tie to the 49.9.

17   Q.   Do I understand what you're saying is that what you

18   explained was that the 8.55 in securities had been held up,

19   that there'd been a placeholder of cash provided, and that on

20   Monday the cash would be returned and the 8.55 billion of

21   notional value of securities would then flow to Barclays?

22   A.   Yes, but can I be clearer on this?

23   Q.   Yes.

24   A.   I -- in context, this was a very short meeting as part of

25   a very long weekend where we were dealing with this entire

Page 65

1    issue of whether the business could open on Monday.  And this

2    whole issue of the pipes being open and JPMorgan allowing

3    trading and the DTC, this was the work that all the people were

4    dealing with.  This specific meeting was brief.  My

5    understanding of the transaction -- and I think it's reflected

6    on this document -- of this particular subcomponent of the

7    transaction, is that that set of assets would be transferred on

8    Monday when the markets opened, and the cash would go back.

9    Q.   Now, the 8.55 billion of notional value of securities that

10   you believed was going to go to Barclays on Monday morning, did

11   you have an understanding as to what the actual value of those

12   securities was?

13   A.   No.  I didn't have an understanding specifically what

14   those securities were, nor the specific valuation of them.

15   Q.   Let me ask you to look at a document in evidence, which is

16   at tab 42; it's Barclays' Exhibit 144.  And these are a

17   document -- this is -- these are notes that have previously

18   been identified as the handwritten notes of an Alvarez & Marsal

19   employee, Mary Korycki.  And I'd like to ask you to turn to the

20   third page, which bears the document production stamp on the

21   bottom "4889".  And in particular I want to direct your

22   attention to what is sort of the second grouping of notes there

23   that begins "Sunday"; do you see that?

24   A.   I'm sorry, it's hard to see.  (Pause).  Yes, I see that.

25   I do see that.

Page 66

1    Q.    And beneath that it says "8.4 billion securities worth 1/2

2    amount".

3    A.    I see that, yes.

4    Q.    And right above that is a reference to the seven billion

5    dollars in cash; do you see that?

6    A.    I do, yes.  I see that.

7    Q.    Do you have any reason to either agree or disagree with

8    the reference here that the 8.4 billion dollars in securities

9    was worth one-half that amount?

10          MR. GAFFEY:  Objection, Your Honor.  No foundation.

11   There's no testimony at all that Mr. Klein spoke to the author

12   of these notes, that they relate to the meeting he's testifying

13   about.  He's just being asked to comment on someone else's

14   document.

15          THE COURT:  I sustain that objection, although the

16   question as asked, in effect, is asking him about a reference

17   back to his own note that we were looking at earlier in

18   connection with the same cash-for-securities equivalents.  So I

19   think you're right that there's no basis to ask him about

20   somebody else's document that he's never been connected to and

21   that there's a foundation problem, and I'm going to sustain the

22   objection on that basis, but I do see where Mr. Boies is going

23   with his question.

24   BY MR. BOIES:

25   Q.    Let me put the question this way:  Do you have any reason

Page 67

1    to agree or disagree with an assertion, regardless of who makes

2    it, that the 8.4 or 8.55 billion dollars of securities that was

3    scheduled to come to Barclays Monday morning was worth

4    approximately one-half of its notional value?

5    A.   Let me try to be as clear as I can.  I think the construct

6    of the 7 billion and the 8.4 or 8.5 are very consistent with

7    what I've described.  The -- as I've indicated earlier, and I

8    think it's also noted on this document, there was a clear

9    perspective that the 49.9 in total was worth not 49.9.  This

10   particular 8.5 billion at the time, I couldn't be specifically

11   aware of -- or couldn't be aware of what was in it.  I wasn't

12   aware.

13       I would only add one incremental comment, which may be

14   relevant and valuable in terms of understanding my own

15   knowledge.  A few hours thereafter, after this meeting, there

16   was a set of securities runs that were delivered from JPM to

17   Barclays; that was the run, or as I understood it to be the

18   run, of the securities that would be transferred.  And at that

19   time it was made aware to me -- or it was made -- I was made

20   aware that the securities that were in that run were worth

21   substantially less.  And in fact there was one particular

22   security that I can recall that Lehman's professional said was

23   worth next to zero, something called a RAZER or RACER, which

24   had a notional five billion number.  But, again, I don't --

25   that's the knowledge that I have in general on this question.

Page 68

1    Q.   At any time, did you make any effort to conceal

2    information from the creditors' committee or any representative

3    of the Lehman estates?

4    A.   No, absolutely not.  I wasn't a specific representative to

5    any creditors' committee, but I didn't conceal information from

6    anyone.  And we had multiple dialogues with multiple people

7    that were open and, while they were debates, were constructive

8    in moving the path of this transaction in an extraordinary time

9    period on a very nonstandard basis.  But there was a tremendous

10   amount of information-sharing as best as could be accumulated

11   by all parties, and that was really a very -- well, at least in

12   my experience, it was quite an open process.

13   Q.   Were you aware that over this weekend the creditors'

14   committee received a list of all the securities in the repo

15   collateral?

16   A.   Not that I'm aware of.  I wouldn't know that.

17   Q.   You don't know one way or the other?

18   A.   I wouldn't -- I don't know one way or the other.

19   Q.   At this meeting that you had when you wrote on a manila

20   folder, and indeed at any other meeting that you had over this

21   weekend, was it clear to all the participants that you were

22   representing Barclays?

23   A.   I believe that to be the case.

24   Q.   Did you ever purport to provide any information other than

25   simply what your own personal view was?

Page 69

1   A.   No, I was asked by Mr. Miller specifically to address a

2   specific question, which I attempted as best as I could do so

3   in what was a quick manner.  It was not a very long meeting.

4   It was -- I don't recall it to be contentious at all, and I

5   don't recall having heard anything about it, again, until this

6   process.  No one expressed at the time of the meeting any

7   concern with that description.  Mr. Miller was leading the

8   brief meeting, and then the meeting ended.

9   Q.   Were there any questions at this meeting that you were

10  asked that you did not respond to?

11  A.   I don't know that there were any specific questions, but

12  the purpose of the meeting was to answer questions that Mr.

13  Miller asked me to answer.  So I certainly would not have

14  anticipated that I wouldn't have answered questions.  I was

15  asked to go in voluntarily by Mr. Miller.

16  Q.   After the meeting, did anybody object that you had not

17  provided information that they had sought?

18  A.   Not to me.  No one came to me to review or discuss that

19  meeting in any form or fashion.  The only time I can recall

20  seeing the individual again -- or one of the individuals, a man

21  with glasses whose name I don't know, was at a time when he and

22  Mr. Miller and a group of people approached me outside of a

23  secretarial desk to discuss the so-called 15c3 account.  I

24  don't have any recollection of being -- of having a

25  communication about that subsequently.

Page 70

1    Q.   Did anyone complain, either at the meeting or after the

2    meeting, that the meeting that you'd had with these people had

3    been too short?

4    A.   No, no.  Mr. Miller thanked me.  He knew that this was --

5    there was multiple rooms.  There was so many things that were

6    moving around with regard to opening the pipes, and there were

7    negotiations now at this stage on multiple floors, because the

8    JPMorgan team had arrived and we had to negotiate keeping the

9    pipes open on a different floor.  And so there was so many

10   moving pieces that -- and I was -- at least my remit was

11   narrow, but I was only one person at one time.  I don't think

12   anyone -- no one objected to that.

13   Q.   Did anyone ever complain to you either at the meeting or

14   afterwards that Harvey Miller had cut the meeting or

15   conversation short?

16   A.   Not that I'm aware of.

17   Q.   Did Mr. Miller cut the conversation short or end the

18   meeting?

19   A.   It was a short meeting.  I don't believe there was any

20   part of the meeting that was cut short, to my knowledge, or

21   abbreviated.  It was -- the meeting was what it was; it was a

22   specific description of this moving repo-related funds flow,

23   and then it was done.

24   Q.   Now, you had mentioned on this manila folder that one of

25   the assets that Barclays was getting as part of the trading

Page 71

1   assets were the box-of-hammer or clearance box assets; do you

2   recall that?

3   A.   I do, yes.

4   Q.   At any time prior to closing, did anyone ever suggest to

5   you that the clearance box assets, or box-of-hammer assets,

6   were not going to be transferred to Barclays as part of this

7   deal?

8   A.   No.  To be clear, and this is, as I understand, a Sunday

9   night document, which is after the Court had approved the

10  transaction on Friday night and the Friday discussions about

11  the clearance box occurred prior to the Court -- no one

12  described to me that the box of hammers would not part of a

13  transaction.  And the only recollection I have as to the

14  definition of that, having never seen a run of securities

15  myself, was a 1.9 billion number attached to that.

16  Q.   Now, let me go to the 15c3 assets for a moment.  I think

17  you had testified that you saw an e-mail, someone showed you an

18  e-mail, confirming that 15c3 assets were available to be

19  transferred; do you recall that?

20  A.   Yes, and I recall that the reason I recall the e-mail was,

21  in the short time that we dealt -- there was so little in the

22  way of actual written documentation that was given to us that

23  it was -- this was -- made a sort of a specific event to show

24  us this e-mail.  And then because it had to be explained what

25  the 15c3 was and that somebody in the SEC had authorized it,

Page 72

1    that e-mail was reviewed and then, I think, given to counsel.

2    Q.   Did anyone ever tell you that the 15c3 assets that

3    Barclays was to get were contingent or conditional on anything?

4    A.    There was a negotiation as to the amount.  As I said, Mr.

5    Miller and others approached me, and Mr. Miller specifically

6    requested that, because there had been an indication of a

7    certain amount that could be released by the SEC, could

8    Barclays agree with only getting that amount.  I said, which of

9    course was the case, I could not agree to anything.  I was not

10   the client.  I was not a Barclays employee.  I was just in the

11   capacity of advisor.  I had to go back to the team, which I

12   did.  And they then agreed with Mr. Miller that if we got that

13   amount, whatever might be remaining above that we didn't need

14   to get.  That's the substance of what I understood to be in

15   terms of the request and the agreement.

16   Q.   Did you ever hear anyone say, or did anyone ever tell you,

17   that the 769 million dollars was in any way contingent or

18   conditional or that Barclays might not get it?

19   A.    No.  There was an e-mail that said the SEC had approved

20   this distribution.  That was the e-mail that I'm referring to.

21   Q.    Now, were you knowledgeable about, did anyone discuss with

22   you, the addition of words with respect to the 15c3 and the

23   clearance -- and the clarification letter that added "to the

24   extent permitted by applicable law" and added at the end "or

25   other securities of comparable value"?

Page 73

1   A.   I didn't draft those documents in the transaction, nor did

2   I review them in the clarification letter.  I don't recall

3   having reviewed at all that (sic).

4   Q.   Did you participate in any discussion of any of that

5   language?

6   A.   Not that I can recall.

7   Q.   Now, I showed you a document at tab 34, which was Movants'

8   Trial Exhibit 52, where you wrote Mr. Diamond about clawing

9   back three billion dollars more value, and you said that that

10  included the clearance box assets and the 15c3 assets; do you

11  recall that?

12  A.   As I recall, that was a reference to the value that had

13  been indicated, and thus preserved, relative to the value that

14  had gone away, and those were the two items that had been

15  identified to us as part and parcel of that meeting.

16  Q.   Did anyone ever indicate to you in any way that Barclays

17  was not going to get either one of those two assets or that

18  Barclays' obtaining of either of those two assets was

19  contingent or conditional on anything?

20  A.   I don't remember anyone sharing that with me at all.

21  Q.   Now, you mentioned in response to a question a few moments

22  ago that you were a consultant and that you had to go back to

23  the Barclays team for authorization; do you recall that?

24  A.   Yes, I do.

25  Q.   Were you the person who recommended this deal to the

LBHI, et al.; LBI

Page 74

1   Barclays board?

2   A.   No, I was not.

3   Q.   Did Barclays have other investment bankers who they were

4   relying on to evaluate the transaction and make whatever

5   recommendations needed to be made to the Barclays board?

6   A.   I believe they had several firms that were involved in

7   some capacity, including both analytics, opinions to the board

8   and corporate broking, I think the lead of which was Credit

9   Suisse First Boston that had a team on staff doing the

10  analytical work and the work that was backing the work for the

11  board presentations, which I wasn't party to at all times.

12  Q.   And do you know who made those board presentations, that

13  is, represented it as a fraught institution?

14  A.   I don't recall being on those board calls.  I don't -- I

15  just don't know.  I don't recall.

16          MR. BOIES:  Your Honor, I have no more questions.

17          THE COURT:  Cross-examine?

18          THE WITNESS:  May I trouble the Court and go to the

19  washroom quite quickly?  Is that --

20          THE COURT:  We're going to take a very quick bio

21  break.

22          THE WITNESS:  My apologies.

23          MR. GAFFEY:  I can use the three minutes, Your Honor,

24  so --

25          THE WITNESS:  I'll go quickly.

Page 75

1          (Recess from 11:57 a.m. until 12:02 p.m.)

2              THE COURT:  Be seated.

3              MR. GAFFEY:  May I proceed, Your Honor?

4              THE COURT:  Absolutely.

5              MR. GAFFEY:  And may I approach?  I have books for the

6     witness, Your Honor, and for the Court.

7              THE COURT:  Sure.

8          (Pause)

9              THE COURT:  Thank you.

10    CROSS-EXAMINATION

11    BY MR. GAFFEY:

12    Q.   Mr. Klein, I'm Bob Gaffey from Jones Day.  I represent the

13    debtor.  We've met before at your deposition in September of

14    last year, is that right?

15    A.   Yes, sir.

16    Q.   And we've not spoken since then?

17    A.   No, sir, I don't believe so.

18    Q.   All right.  And I have put before you, Mr. Klein, two

19    books, each with a green cover, which makes it a bit confusing;

20    one has your name on it, the Klein binder, and the other just

21    says "Witness Binder", and I'll be referring to those

22    alternatively through the day.  So if you could keep them

23    within reach, that would be --

24    A.   Yes, sir.

25    Q.   -- that would be helpful.

Page 76

1   A.   Is there one I should have to begin with?

2   Q.   I'll -- you can put -- if you're uncomfortable, put them

3   to the side.  We'll come to documents when you need them.

4   A.   Okay.

5   Q.   Now --

6   A.   Thank you.

7   Q.   -- did you meet with anyone to prepare for your testimony

8   today, other than your own lawyer?

9   A.   Yes, I have.  I met with the lawyers for the case, and my

10  own personal lawyer; both of them are lawyers for this.

11  Q.   And when you met with the lawyers for the case, did you go

12  over that handwritten chart that you testified about on direct?

13  A.   I was shown that chart.  I hadn't seen it in -- well, as I

14  said earlier, really since creating it, until the deposition.

15  Yes, I saw that again.

16  Q.   And did you review the asset purchase agreement, about

17  which you testified on direct, when you prepared for your

18  testimony?

19  A.   No, I have not reviewed the asset purchase agreement.

20  Q.   And were you shown any testimony of other witnesses who

21  have testified at this trial?

22  A.   I don't believe I -- I don't believe I've seen specific

23  testimony.

24  Q.   And was the witness -- was the testimony of any other

25  witness at this trial summarized for you in any way?

Page 77

1   A.   I may have had a general set of debriefings on -- in fact

2   I had general sets of debriefings on the process of the trial.

3   Q.   Okay, and in these general debriefings, were you -- when I

4   ask about whether you had any testimony summarized, what I

5   mean, sir, is were you told so-and-so in essence testified to

6   X, where -- you know, by name and a summary of their testimony.

7   A.   I may have as part of the general update.  I may have

8   got -- I can't answer that directly.  I may have, yes.

9   Q.   Okay, and in that preparation, did anything happen, sir,

10  that improved your memory about the terms of the asset purchase

11  agreement?

12  A.   The -- specifically the terms of the asset purchase

13  agreement?

14  Q.   Yes, sir.

15  A.   I don't think, in particular, about the asset purchase

16  agreement.  If I can, some of the -- I went back and reviewed

17  the -- from the court perspective, what -- some of the things

18  that took place.  So I have a general understanding.  I haven't

19  testified in court before, this is my first time, so I wanted

20  to make sure I understood and did a good job on that.  But I

21  didn't review the asset purchase agreement and I don't recall

22  that there's any material change to my knowledge of that

23  document.

24  Q.   And when you went back and reviewed, as you said -- I

25  don't have your exact words in mind, sir, but I think you just

Page 78

1  said you reviewed things to find out what the role of the asset

2  purchase agreement was?

3  A.   No, I don't think I said that.

4  Q.   Okay.

5  A.   I don't -- if I did, I didn't mean to say that.  I don't

6  think I said that.  I don't think I spent any material time on

7  the asset purchase agreement at all in preparation.  It was --

8  well, as I think we discussed last time, it was not a document

9  that was my -- under my specific purview at the time.

10  Q.   It wasn't part of your portfolio at the time of the events

11  you're testifying about, correct --

12  A.   The --

13  Q.   -- the asset purchase agreement?

14  A.   The spec -- to be clear, the specific drafting of that and

15  the specific agreement, the construct of the transaction with

16  which it described of course was, and the overall business

17  purchase was, and the consideration and components that I

18  specifically was party to the negotiation was, but the document

19  itself was not part of my purview, drafting or commenting.

20  Q.   My question -- well, let me put another question, sir.

21  When's the first time you actually read the asset purchase

22  agreement?

23  A.   I -- I'm not sure that I've read the complete asset

24  purchase agreement ever.

25  Q.   So when Mr. Boies put sections of it up on the screen and

Page 79

1  showed you copies of it, was that the first time you'd read the

2  words in the asset purchase agreement?

3  A.   I can't say that that was the first time I read any

4  particular set of words, but I know that I have not thoroughly

5  reviewed or reviewed in completeness the actual documentation.

6  Q.   And when Mr. Boies asked you questions on your direct

7  testimony about what the import or meaning was of particular

8  clauses in the asset purchase agreement, before he asked you

9  those questions, had you ever seen those clauses before?

10       MR. BOIES:  Object to the form of the question, Your

11  Honor.

12       THE COURT:  What's the objection to the form of the

13  question?

14       MR. BOIES:  I don't think that's what I asked him.

15       THE COURT:  Well, I'm overruling that objection

16  because I recall that you did ask him a series of questions

17  about particular sections of the asset purchase agreement, and

18  the question's a permissible one in my view.

19       You can answer the question.

20       THE WITNESS:  Okay, thank you.

21  A.   As I believe I testified when asked the questions, I tried

22  to answer regarding the entire transaction and specifically

23  what I understood about the transaction.  I think I might

24  actually have even said that that was a defined term, as I read

25  it on the page.  But I understood certainly the pieces of the

Page 80

1   transaction, the totality of the transaction, and I understood

2   the components of the transaction and the consideration that

3   was undertaken.

4   Q.   My question was a little different, sir.  You made a

5   reference just a moment ago to the words on the page.  Before

6   Mr. Boies put those words on the page here today in court, had

7   you ever read those words on those pages?

8   A.   I may well have read those specific --

9          MR. BOIES:  I'm going to object to the form, and

10  that's -- he didn't say -- I don't think he said 'words on

11  those pages'.

12         THE COURT:  Well, the objection's overruled.

13  A.   I -- I'm sorry, I didn't.  The asset purchase agreement in

14  total was not part of my specific -- neither was I the lawyer

15  or the drafter of that.  That being said, I may have seen those

16  particular words at some point but, as I stated, I have not

17  reviewed the asset purchase agreement in depth.

18  Q.   I think my question went to when, sir.  But let me put

19  another question.  Before you saw them on the screen today,

20  when was the first time you saw the words of the contract that

21  Mr. Boies showed you?

22  A.   I'm sorry, I just don't know.  I don't want to --

23  Q.   Was it at -- but did you see them as part of your

24  preparation?

25  A.   I saw a bunch of documents as part of my preparation.  I

Page 81

```
 1    don't know when I would have seen those specific words first.

 2    But as I've stated, the asset purchase agreement was not a

 3    document that I felt responsibility for during this

 4    transaction.

 5    Q.   Let me give you a time milestone here, sir.  You recall

 6    your deposition was taken on September 12th of 2009?  It was a

 7    Saturday.  Do you recall that?

 8    A.   Roughly, yes.

 9    Q.   Now, by September 12th of 2009, you were not able to say

10    that you had ever reviewed the asset purchase agreement, isn't

11    that correct?

12    A.   I still -- to the way I would describe the review of that

13    document, I still don't believe that I've done a review of that

14    document as I consider a review of documents, period.

15    Q.   Before your depositions, sir -- well, is it a fact, sir,

16    that your -- why don't you turn to page 58 of your deposition

17    transcript; it's in the book marked "Klein Witness Binder", and

18    it's got on a tab on it that says "Transcript".  Actually, if

19    you would turn to page 57, sir, and in particular -- let me

20    ask, have you got the transcript there?

21    A.   I'm sorry, I don't know which -- can you tell me which

22    exhibit it is?

23    Q.   In the Klein witness binder, sir, there should be a tab

24    that says "Deposition" or "Deposition Transcript".

25    A.   There's -- I'm sorry, there's no index.
```

Page 82

1        THE COURT:  It's at the very back of the book.

2    A.    My apologies.  Yes, I see it.

3    Q.    Okay.  Now, would you turn, please, to page 57 of that

4    transcript?

5    A.    Yes, sir.

6    Q.    And beginning at line 13, I'm going to read you some

7    questions and answers from your deposition:

8    "Q.  I have put before you, Mr. Klein, what we have marked in a

9    previous deposition as Exhibit 1.  Can you tell me if you have

10   seen that document before?

11   "A.  I have seen a document that was an asset purchase

12   agreement.  This one in particular I can't tell you for sure.

13   "Q.  You understand that an asset purchase agreement was

14   executed between Lehman Brothers Holdings Inc., Lehman Brothers

15   Inc., LB745 LLC and Barclays Capital, correct?

16   "A.  Yes.

17   "Q.  At the time, that agreement was finalized and you

18   understood that there was one that was actually signed by the

19   parties, correct?

20   "A.  I understood that there was an agreement between the

21   parties.

22   "Q.  Without regard to the particular exhibit in front of you,

23   did you see that agreement at or around the time it was signed?

24   "A.  I did not review this agreement at or around the time it

25   was -- or I don't recall reviewing this agreement at or around

Page 83

1    the time it was signed.

2    "Q.   Did there come a time when you did review the agreement

3    that had been signed between the parties?

4    "A.   I don't recall that I have ever reviewed this agreement."

5    Q.   Do you recall those questions and that testimony?

6    A.   Well, I don't recall the -- this discussion in particular,

7    but I think it's very consistent with what I've just said.   I

8    don't --

9    Q.   The answer's a yes or no, sir.  Do you recall the

10   testimony?

11   A.   I don't recall this specific testimony, but I do -- I

12   think it's very consistent with what I've just described to

13   you.

14   Q.   When you gave your answer at your deposition, were you

15   giving truthful answers then?

16   A.   Yes.

17   Q.   All right, so the fact is, sir, prior to September 12th,

18   2009, you never read the asset purchase agreement, yes or no?

19   A.   I think, as I said -- may I explain?

20   Q.   I'd prefer a yes or no.

21   A.   I would say it's -- your wording, unfortunately, is a

22   little complex for me.  If I might -- I said I hadn't reviewed

23   it.  I said I had seen it.  I hadn't reviewed it.  So I

24   don't -- when you say "read", I don't believe I had ever

25   reviewed it prior to that, and I don't believe I've reviewed it

Page 84

1    in depth to date.

2    Q.   Go back, sir, to your answer at page 58, lines 17 and 18

3    where you said the following, quote:  "I don't recall that I

4    have ever reviewed this agreement," end quote.

5         Is your testimony, sir, that by that answer you meant you

6    may have seen it but you didn't review it?

7    A.   I'm sorry, just to be clear, you showed me testimony a few

8    pages before that said I did see the -- an asset purchase

9    agreement, but I went on to say that I hadn't reviewed it.

10   Q.   Okay.

11   A.   And I don't believe it was part of my particular purview

12   to review the legal agreement.

13   Q.   Let me drill down on that a little bit.  You may have seen

14   it, but you're not sure if you reviewed it, is that your

15   testimony?

16   A.   I think that's what I said, and I --

17   Q.   All right.

18   A.   -- I think that's what I have said.

19   Q.   And you may seen it, but you hadn't read it, isn't that

20   right?

21   A.   I don't believe that's the -- an accurate reflection in

22   the sense that I may have seen pieces of it.  I hadn't reviewed

23   it.  I specifically said I hadn't reviewed it, and I don't

24   believe that I've reviewed it in depth but I had, I think, seen

25   it.

Page 85

1   Q.   So are you able, sitting here today, sir, to say one way

2   or the other whether the particular pieces of it that were put

3   up on the screen for you to read were pieces you had ever seen

4   before today?

5   A.   The words on the page -- can I definitively state that I

6   have read and seen those words on the page?

7   Q.   That's right.

8   A.   If that's the specific question --

9   Q.   Yes, it is.

10   A.   -- I would say I can't say for sure.  But can I give a bit

11   more context, sir?

12   Q.   I -- Mr. Boies gets his opportunity, sir.  I'd just prefer

13   a yes or no.  And the answer is you don't -- you can't say that

14   you ever saw those pieces of the APA before they were put on

15   the screen today at this proceeding, correct?

16   A.   As I stated, I have seen the document.  I didn't review

17   the document, to my knowledge.  I was aware of what was the

18   substance and, frankly, it was reviewed as well in court quite

19   a lot in terms of descriptions.  And I understood the substance

20   of the transaction, but I don't recall reviewing or being

21   responsible for the document.

22   Q.   And when you say it was reviewed in court quite a lot, are

23   you making reference to the hearings that took place before

24   this Court on the 17th of September, 2009 and the 19th of

25   September, 2009?  That is the first hearing and the sale

LBHI, et al.; LBI

Page 86

1    hearing.  Is that what you mean?

2    A.   I was only at one hearing, which was the Friday hearing,

3    and in that hearing I recall that there was a discussion of the

4    businesses that were being transferred, and there was a

5    testimony by Mr. Miller and testimony by Mr. McDade business by

6    business, but I -- that's what I'm referring to.

7    Q.   If you'd take a look in your book, sir.  I want to be sure

8    we're talking about the same thing.  It's Exhibit M-1; it's

9    the -- at the very beginning of the Klein witness book.  All

10   right, and that's the -- that's a copy of the same document Mr.

11   Boies asked you about on direct.

12       Is it your testimony, sir, that you heard discussion at

13   the sale hearing about the particular words and terms of this

14   agreement, as opposed to a description of the business

15   transaction?

16   A.   Well, I --

17   Q.   Let me withdraw the question and see if I can simplify it

18   a bit.

19       Did you hear any words from that agreement be read or

20   uttered at the sale hearing on the 19th?

21   A.   I think I heard, as I recall, both but, in particular,

22   fairly clear depiction of the business transaction, as I

23   recall.

24   Q.   Words from the agreement?

25   A.   I -- the agreement was certainly referenced in the court.

Page 87

1    I can't quote specific words that were put in from the court

2    from the agreement.

3    Q.   It's fair to say, sir, that at the time you were doing the

4    work you've described to us today advising Barclays with

5    respect to the business transaction, you were doing it without

6    benefit of having actually read the asset purchase agreement,

7    isn't that correct?

8    A.   The advisory period was very short.

9    Q.   I understand that.

10   A.   And during that period of time, there were teams of people

11   working on the asset purchase agreement; there were teams of

12   people working on different elements.  My remit was specific,

13   and it wasn't drafting that particular document.

14   Q.   So when you were doing the advisory work you were doing,

15   you were doing it without benefit of having seen the actual

16   terms of the asset purchase agreement, isn't that right?

17   A.   As I think I've said, I will have seen an agreement.  I

18   didn't review it.  I understood the terms of the business

19   transaction very clearly, as I've explained it.

20   Q.   And your understanding of the business terms of the

21   transaction was from some source other than the terms of the

22   asset purchase agreement, isn't that right?

23   A.   The terms of the business transaction, to my

24   understanding, and the terms of the asset purchase agreement

25   were the same sources and resulted in the same event is my

Page 88

1    understanding.

2    Q.    Now, Mr. Boies asked you some questions on your direct

3    examination, sir, about whether -- when he was going through

4    the asset purchase agreement with you, whether the asset

5    purchase agreement valued each and every one of the assets that

6    was going to be transferred over to Barclays, questions to that

7    effect; do you remember that?

8    A.    I'm sorry, I don't remember this --

9    Q.    He took you through the asset purchase agreement and asked

10   you if it identified all the assets that were going to

11   Barclays; do you recall that?

12   A.    No, I don't believe that that's what he did.  He pointed

13   me to specific sentences and he asked me if those sentences

14   were consistent with what I understood.  That's what I

15   understood to be the questions asked of me that I then

16   answered.

17   Q.    Well, let me ask you this:  At the time you were doing

18   your advisory work for Barclays, was it your view of the

19   business transaction, sir, that Barclays was to receive all

20   assets, except excluded assets, regardless of what the included

21   assets were worth?

22   A.    I don't think that would be a correct statement in the

23   sense of the following:  There was no separate price or worth

24   set aside for separate assets.  There was an aggregate

25   transaction that had a consideration, which I've described as

Page 89

```
 1    the cash for the buildings; the cash that was called by Lehman,

 2    quote, "goodwill"; the specific liabilities that were attached;

 3    the trading liabilities that were directly attached to the

 4    business; as well as the ongoing stepping into the expenses.

 5    That was the consideration.

 6        The business that was transferred was the best

 7    approximation, given no balance sheet, of what was the North

 8    American business.  And the North American business was a list

 9    of very specific -- the core, as I understood, specific

10    businesses as well as ongoing operations.

11        Then there was an attempt for both sides to understand the

12    magnitude or the quantum of the assets, and I say that because,

13    between the Sunday when Lehman was a 600 billion dollar

14    enterprise, and the transaction that occurred on Tuesday or

15    announced on Friday, the melting iceberg element of what

16    existed, both sides needed to try to get a snapshot of what the

17    business was:  Barclays needed a snapshot for which to

18    announce, and Lehman needed a snapshot, as I understood it, to

19    make sure that this was the best deal that they could get and

20    to make sure that this was a transaction that they would

21    support and was better than the liquidation.  That's my

22    understanding.

23    Q.   Do you have my question in mind, sir?

24    A.   Could you please repeat it, sir?

25    Q.   Let me see if I can reframe it.  The issue -- the
```

Page 90

1   question, sir, is whether, when you were rendering your

2   advisory services to Barclays during the week of September

3   15th, 2008, it was your belief that the business transaction

4   was such that the assets would be transferred to Barclays

5   without regard to what they were worth.  And it didn't matter

6   how much or how little they were worth; it was a body of

7   assets.  Was that your view?

8   A.   I'm sorry, I don't view that as -- no one can undertake a

9   transaction, when they initially undertook it, without having

10  whatever their own understanding was of the magnitude and

11  quantum.  But there was no guarantee of a value, nor was there

12  a cap of a value on the assets or the liabilities, nor was

13  there a price set.  There was a magnitude or a quantum that I

14  understood both sides defined.  So the transaction agreed was a

15  transaction based upon consideration to be paid for the

16  business as defined.

17  Q.   And the consideration was the 250 million, yes?

18  A.   That was a component of it.

19  Q.   And the price paid for the building, yes?

20  A.   A component, yes.

21  Q.   And the assumption of liabilities for compensation and

22  cure, yes?

23  A.   A component, yes.

24  Q.   And the assumption of liabilities, the short positions,

25  associated with the securities that were transferred, yes?

Page 91

1    A.    The directly associated liabilities attached to the

2    directly associated financial assets, plus the ongoing

3    operating expenses to run the business and continue and

4    maintain the business.  As I understand it, that was the

5    totality of the -- that was the business transaction.

6    Q.    And just so we're clear with each other, sir, when you

7    refer to the operating expenses, you're talking about the cure

8    costs, yes?

9    A.    No, sir, I'm not.

10   Q.    That was -- you include, then, in the consideration that

11   Barclays paid the cost it would have to run the business after

12   it bought it?

13   A.    I think, from Barcl -- from my perspective, sitting in the

14   seat of advising Barclays, the most important element of the

15   transaction was buying the ongoing business and the people.

16   And as a result of that, as they were looking forward, this was

17   a transaction where there were clearly going to be ongoing

18   expenses.  So from their perspective separately, as I

19   understood -- again, as I understood the Court-approved

20   transaction, there were multiple constituents.  One of those

21   constituents was the ongoing clients, accountholders; it was

22   the employees of this.  Those had to be sustained and, as a

23   result, the Barclays expenditures for that were sustaining

24   that.

25        Now, that had extra added benefits, as I understood it,

Page 92

1    not just for Barclays and for Lehman but, if those businesses

2    didn't continue, I understood that there might be rippling

3    other impacts at Lehman.  So, yes, I understood that to be part

4    and parcel of what Barclays understood to be what was their

5    overall understanding of the transaction, my understanding.

6    Q.   My question, sir, wasn't their understanding of the

7    transaction.  The question I actually asked you went to the

8    consideration that was paid.  So let me see if I can break down

9    the component parts again.

10        The consideration, in your view, that was paid was 250

11   million dollars cash, yes?

12   A.   It was a component of it, yes.

13   Q.   Okay.  The price for the building on an occupied basis,

14   yes?

15   A.   Yes, that was a component of it on an appraised basis

16   without a commission, yes.

17   Q.   That's a component of the consideration that goes to the

18   debtor, yes?

19   A.   Yes.

20   Q.   Okay.  And the assumption of liabilities, yes --

21   A.   Yes.

22   Q.   -- for compensation?

23   A.   Yes, cure and comp as well as --

24   Q.   And that those are also elements of consideration; goes to

25   the debtor, yes?

Page 93

1   A.   The --

2   Q.   Sir, yes?  The cure and the comp are consideration that go

3   to the debtor, yes?

4   A.   I'm sorry.  To be clear, and I don't mean to stop you, I'm

5   looking at consideration from the seat that my client -- in

6   terms of what your client -- or what goes to the debtor, I

7   can't define what per se --

8   Q.   That may be the problem we're having here, sir.  You're

9   talking about what it was going to cost Barclays to run the

10  business, yes?

11  A.   I -- there's been a number of questions, and I was

12  discussing what I believe Barclays was understanding was their

13  expenditures to purchase the business --

14  Q.   Okay, let me --

15  A.   -- and --

16  Q.   -- let me try and reframe it a bit, then.  I'm asking

17  about what my client got in the deal, not what it cost yours.

18  So my client, according to you, was getting 250 million

19  dollars, plus the cost of the building, plus the assumption of

20  liabilities for comp and the assumption of liabilities for

21  cure, and those are the four elements of consideration that, to

22  your understanding, the debtors were receiving; is that right?

23  A.   I'm sorry, I didn't say that.  I said --

24  Q.   Well, I'm asking.

25  A.   I said from Barclays' side --

Page 94

1    Q.   So the answer would be no?

2    A.   I -- from how you perceive to be what your client

3    received -- I'm sorry, I can't define this for you.  The

4    consideration that I understood was the 250 for the, quote,

5    "Lehman-defined goodwill"; the building prices; the two

6    defined -- one liability in terms of the comp that was

7    specifically identified; the potential exposures on the cure,

8    which was also identified, again, that was explained to me;

9    then the directly associated liabilities that were attached to

10   the business trading and financial assets; and then the ongoing

11   expenditures to run the business.  Some of those, I'm sure, had

12   benefit -- or some of those would have had specific cash

13   benefits to the estate; some of those might have had other

14   knock-on benefits to the estate.  Those are not for me to

15   define in that way.

16   Q.   To your knowledge, sir, and just to your knowledge, do you

17   know if anyone ever said to the Court, when approval was sought

18   for the sale transaction, that part of the consideration was

19   the ongoing expenditure to run the business?

20   A.   I think it was made clear to the Court that the ongoing

21   sustaining of the business, the hiring of the employees and the

22   operation of the business, it was an important part -- I'm

23   sorry to say this to Your Honor -- I think it was an important

24   part of the approval of the transaction; it was an important

25   component of the transaction.  With those people come expenses

Page 95

1    to operate.  So I do believe that that element of the

2    transaction was clear, as I understood it to be clear.

3    Q.   The question, sir, was, to your knowledge, whether any of

4    that was told to the Court.

5    A.   I --

6    Q.   "I don't know" is an acceptable answer, sir, but did --

7    "yes", "no" or "I don't know":  Do you know if any of that was

8    told to the Court --

9    A.   What I --

10   Q.   -- that the ongoing business expenditures were part of the

11   consideration?

12   A.   The ongoing business operations of Lehman, under Barclays,

13   and the hiring of the employees and the operating of the

14   business for the benefits of customers and consumers, et

15   cetera, I believe, was in fact told to the Court by Mr. Miller.

16   Whether -- yes, I believe that was told to the Court by Mr.

17   Miller.

18   Q.   Let me move on to another topic, sir, and that goes to the

19   terms under which you were rendering these advisory services to

20   Barclays.  I take it -- let me ask you first a bit about your

21   background, because Mr. Boies did not do that.  You were

22   employed by Citibank prior to -- and just chronologically; you

23   were employed by Citibank prior to the time that you rendered

24   these services to Barclays, yes?

25   A.   Yes, sir, I was.

Page 96

```
 1   Q.   And at the time that you were asked by Mr. Diamond to help

 2   him out on the transaction, you already had left Citibank, yes?

 3   A.   Yes, I had; approximately two months before.

 4   Q.   And the restrictive covenant you referred to on your

 5   direct was a gardening-leave type provision with regard to your

 6   separation from Citi, yes?

 7   A.   Yes, it was.  I had a noncompete period that was

 8   specifically defined, yes.

 9   Q.   And you got waivers for that in order to be able to do the

10   Barclays assignment, yes?

11   A.   Yes.  That's specifically for that.

12   Q.   And you entered into some sort of monetary agreement with

13   Barclays with regard to being paid for your services in

14   connection with the transaction that brings us here today, yes?

15   A.   Yes, I did.

16   Q.   And that agreement was recorded in a written contract?

17   A.   Yes, it was.

18   Q.   And can you tell us, was the compensation that you were to

19   receive contingent in any way on the closing of the

20   transaction?

21   A.   I believe it was a standard consulting engagement of this

22   kind which was only payable when the transaction was

23   consummated, yes.

24   Q.   And then if the transaction was not consummated, you would

25   not receive a fee?
```

Page 97

1   A.    I think that's true, yes.

2   Q.    And what were the financial arrangements, sir?  What did

3   Barclays promise to pay you?

4          MR. BOIES:  Your Honor, I understand that this raises

5   certain confidentiality and competitive concerns if it is

6   revealed publicly.  Obviously there's no problem in a copy of

7   this being presented to the Court for the Court's

8   consideration, but I would suggest that it's not necessary that

9   this kind of competitive sensitive information will be

10  broadcast publicly.

11         MR. BOIES:  Your Honor, we've had compensation

12  information for executives involved in this transaction put in

13  the record.  I think that the amount that Mr. Klein is paid in

14  connection with the transaction, where his payment is

15  contingent on the transaction closing, is a relevant piece of

16  evidence that deserves to be in the public record.

17         THE COURT:  I agree.

18         MR. BOIES:  Your Honor, he does have counsel here

19  present.

20         THE COURT:  Then I should hear from his counsel if

21  this is a matter of concern to the witness.  But Mr. Klein's

22  name and his role in this have been a subject of discussion

23  throughout the 60(b) hearings.  The nature of his engagement is

24  a matter of interest on my part.  And in a case which is a

25  matter of great interest to the public, that resides within a

Page 98

1    bankruptcy case that is, as we all know, the largest in

2    history, the circumstances surrounding Mr. Klein's engagement

3    to act as an agent for Barclays is a subject of not only great

4    interest, but it goes to the heart of his credibility as a

5    witness.  It's as simple as that.

6            MR. BOIES:  Your Honor, I had said from the beginning

7    that we had no objection to it being submitted to the Court.

8    During the examination of the people retained by the debtor, we

9    did not go into this.  If the Court wishes, obviously that's

10   the Court's decision.  But this is not something that we had

11   gone into or made a point of during our case and our

12   examination of their people.

13           I know the witness has counsel here, and if the Court

14   is willing to listen to that counsel, the Court can do that.

15           MR. GAFFEY:  Your Honor, may I?  Just for the sake of

16   full clarity in the record, Barclays has marked as exhibits,

17   and we have stipulated to the admission, of a series of fee

18   applications that relate to the professionals in this case, if

19   that's what Mr. Boies is referring to.  Nobody's testified

20   about it, but it's in the record, and the dollar numbers are in

21   the record.  And I think that Mr. Klein's dollar number should

22   be in the record too.

23           MR. LEFKOWITZ:  May I approach, Your Honor?

24           THE COURT:  Sure.  Please identify yourself.

25           MR. LEFKOWITZ:  Sure.

Page 99

1          THE COURT:  Well, I wouldn't approach quite that --

2          MR. LEFKOWITZ:  Okay.

3          THE COURT:  -- that close.

4          MR. LEFKOWITZ:  I didn't know if you wanted to do this

5    at the bar or not.

6          THE COURT:  Otherwise I'd call the marshals.  You can

7    stand right there.

8          MR. LEFKOWITZ:  Your Honor, Jay Lefkowitz from

9    Kirkland & Ellis, representing Mr. Klein.

10          Mr. Klein has a private consulting business at

11   present, and we believe that to disclose publicly in open court

12   the terms and nature of his various consulting agreements would

13   put him at a competitive disadvantage.  He doesn't share this

14   information with clients.  They're all done on a one-off basis.

15          Obviously we've no objection to the Court or the

16   counsel in the case having all of the relevant information that

17   you believe is important.  It's simply a question of protecting

18   his own business arrangements with respect to the various

19   matters he's engaged in.

20          THE COURT:  I'm not understanding one aspect of what

21   you just said.  I gather that the terms of each engagement may

22   be particularly negotiated and, in effect, unique based upon

23   the circumstances of the engagement.  So this is unlike

24   proprietary trading information that a hedge fund might be

25   concerned about in the context of a 2019 disclosure, which

Page 100

1   sometimes, in recent memory, have gotten heated over issues of

2   confidentiality.  This is a particular question that goes not

3   to the specific content of the terms of the engagement but

4   rather the compensation awarded by virtue of successfully

5   completing a transaction, which is either the same percent of

6   the deal if it's based on a percent that applies to every

7   engagement, or a uniquely negotiated arrangement.  It could be

8   a flat fee; I have no idea, and I don't care.  What I do care

9   about is how much money did Mr. Klein make when this deal

10  closed, and I believe that is a subject that doesn't affect his

11  competitive status, but it is a subject of enormous interest to

12  the public.  I don't think it's confidential.  And by virtue of

13  having assumed this role in so public a setting, in effect, he

14  agreed to open his kimono that far.

15         MR. LEFKOWITZ:  We take the Court's ruling, then.

16  Thank you, Your Honor.

17         THE COURT:  Okay.

18         THE WITNESS:  Yes, sir.

19  BY MR. GAFFEY:

20  Q.   So the question, Mr. Klein, is how much were you paid?

21  A.   I had an agreement, which I think you've seen the

22  agreement, which was a flat fee.  It was negotiated after the

23  Tuesday agreement, and it was not incented in any way for an

24  upward or downward movement in any valuation.  The total fee

25  paid was ten million dollars at consummation of the

Page 101

1   transaction.  That was the complete agreement.  It was -- I

2   think you've seen the agreement.  It's a very short standard

3   agreement that was put in place.

4   Q.   And in addition to the ten million dollar flat fee, you

5   were paid nothing else, is that your testimony?

6   A.   I was paid nothing else.

7            MR. GAFFEY:  Your Honor, I'm about to move into a

8   series of fairly substantive areas.  If this would be a

9   convenient time for a lunch break --

10           THE COURT:  I think we should go to lunch.  And we'll

11  be back at 2 o'clock.

12           MR. GAFFEY:  Thank you, Your Honor.

13       (Recess from 12:38 p.m. until 2:05 p.m.)

14           THE COURT:  Be seated, please.

15           MR. GAFFEY:  Thank you, Your Honor.

16           THE COURT:  Please proceed.

17  RESUMED CROSS-EXAMINATION

18  BY MR. GAFFEY:

19  Q.   Mr. Klein, for how long a period of time did you work on

20  the Lehman-Barclays transaction?  Over how many days?

21  A.   I don't know the precise amount of days.  But I started on

22  that Thursday prior to the weekend that occurred.  It went

23  through till, obviously, the closing of the transaction.  And

24  then there were selected issues that came up during

25  integration, related matters.  So it would have extended for an

Page 102

1    extended time period.  The intensity of the work engagement,

2    the deeply intense period, was that first couple of weeks.  But

3    there was matters that came up in integration and other issues

4    and thereafter.

5    Q.   And apart from integration, as you said, your work in

6    connection with talking to people from Lehman, talking to the

7    creditors' committee, doing that -- work of that kind of

8    nature, essentially ended on Monday, the 22nd of September.  Is

9    that right?

10   A.   Just to be clear, my principal work was involved in

11   advising Barclays not the other members that you spoke to.

12   That involvement was during that time period from pre the

13   bankruptcy through till that Monday.  And then there was work

14   thereafter in terms of other matters.

15   Q.   And the Monday -- I can show you a calendar if we need to

16   agree on the dates -- or Monday is Monday the 22nd of

17   September.  Is that right?

18   A.   I believe that would be the case.

19   Q.   Okay.  And Boies asked you some questions about a chart

20   that you drew in a meeting with some people at Weil Gotshal.

21   You did not speak to that group of people after Monday the

22   22nd, correct?

23   A.   I may well have seen Harvey Miller.  The people that

24   you're referring to in that room, I don't recall --

25   Q.   You know, I may not have been clear in the question.  The

Page 103

1    meeting where you -- however long it was, the meeting where you

2    drew that chart was before Monday the 22nd of September, right?

3    A.    I believe so.  In fact, I believe -- I believe so, yes.

4    Q.    Now, before you, sir -- would you take a look at the book

5    in front of you with the white cover.  It's the one that Mr.

6    Boies gave you on your direct testimony.  And I'm going to ask

7    you to take another look at Exhibit BCI-144.  Those are those

8    handwritten notes that Mr. Boies showed you.  I beg your

9    pardon.  It's tab 42 in that book.

10   A.    Tab 42?

11   Q.    Okay.  I'll get this straight.  No, it's tab 42.

12   A.    Okay.  Thank you very much.

13   Q.    And do you recall, Mr. Boies showed you this set of notes

14   in your testimony before lunch?

15   A.    I do.  Yes, I recall that.

16   Q.    All right.  And in particular, Mr. Boies asked you about

17   some entries on page 4889.  It's the third page of the

18   document.

19   A.    Yes, I have that in front of me.

20   Q.    Okay.  Are you there?  And in particular -- and more

21   particular still, he asked you about the phrase under "Sunday,

22   Barclays talked to JPM.  8.4 billion securities."  Do you see

23   that?

24   A.    Yes.

25   Q.    All right.

Page 104

1   A.   That's the line he showed me, yes.

2   Q.   Now, you weren't at the meeting that these notes reflect,

3   were you, sir?

4   A.   I don't know when this -- I don't know when the meeting

5   that -- I don't know this document --

6   Q.   Okay.

7   A.   -- so I can speak to when the meeting is or whether I was

8   or wasn't.  I don't know what this document is.

9   Q.   Or, for that matter, who was there?

10  A.   This particular document?

11  Q.   Yeah.

12  A.   I don't believe I've seen this document.  I don't know,

13  necessarily, who drafted it --

14  Q.   Okay.

15  A.   -- or where it came from.

16  Q.   So let's turn to the first page of Exhibit BCI-144, same

17  document.  And up at the top, you'll see a date that says "9/29

18  meeting"?  Do you see that?

19  A.   Yes, I do.  I see that.

20  Q.   Does that indicate to you, sir, that you wouldn't have

21  been at that meeting?

22  A.   I don't -- I don't believe I would have been.  I don't --

23  I don't know about the meeting -- I don't know which meeting

24  this is, and I don't believe I would have been at it.

25  Q.   All right.  So let's go back to the entry that Mr. Boies

Page 105

1    showed you at page 4889.  Now, the fact of the matter, sir, is

2    you have no clue what those notes mean, do you?

3    A.   I think that's -- I think that's stronger than I had

4    indicated.  I think, the question, when it was asked to me,

5    that I responded to, was that the numbers reflected a similar

6    statement to the numbers that were on that other sheet of

7    paper.

8    Q.   The numbers were, essentially, identical, yes?  That's

9    what your testimony was?

10   A.   I -- I'm sorry, I can't speak to what I specifically said.

11   But as I recall, when he showed me that, that to me, seemed

12   consistent with the prior document that had been shown to me.

13   That's all, I think -- that's all, I believe, I stated.

14   Q.   Because -- and the only basis you have to give that

15   testimony is that the 8.4 billion number is identical to the

16   8.4 that you saw in your chart or an 8 billion dollar number

17   you saw in your chart.  Isn't that right?

18        MR. BOIES:  Objection, Your Honor.  I think counsel

19   just has misstated the other chart.

20        MR. GAFFEY:  I'll withdraw the question, Your Honor,

21   and I'll work with both charts.

22        THE COURT:  Okay.

23        MR. GAFFEY:  Actually, could we take the chart down?

24   Q.   Let me ask you this.  Were you aware, sir, that there was

25   a preexisting repurchase agreement between Barclays and Lehman

Page 106

1   for 15.8 billion --

2   A.   I --

3   Q.   -- other than the repo you talked about this morning?

4   A.   -- I wasn't -- I wasn't party to that.

5   Q.   Any knowledge about that at all?

6   A.   I -- not that specific repo, no.

7   Q.   And were you aware that Barclays declined to roll that

8   15.8 billion dollar repo in September 18th?

9   A.   Not -- not what you just described.

10  Q.   Okay.  And were you aware that as a consequence of

11  Barclays' decision not to roll that 15.8 billion dollar repo,

12  Lehman had to take a box loan from Chase?  Were you aware of

13  that?

14  A.   I wouldn't be -- I wouldn't have an understanding of that.

15  Q.   And you don't know if that item I showed you on BCI

16  Exhibit 144 relates to that repo, do you?

17  A.   I -- as I -- the document that I had in front of me, the

18  reference relating to the numbers seemed entirely consistent

19  with the numbers on the other page, but that's all I did or

20  could testify to.

21  Q.   And in connection with the Lehman-Barclays transaction,

22  sir, you've never met with anyone from Alvarez & Marsal, have

23  you?

24  A.   I'm not aware that I have.

25  Q.   Now, I'd like to go back, sir, and do a little bit of --

Page 107

1   well, actually, before I do a little bit of chronological work

2   on here, I'd like to go through some things that you did not do

3   with respect to the Lehman-Barclays transaction, okay?

4        You, sir, you said on your direct you played no role in

5   drafting or approving or dealing with the asset purchase

6   agreement.  Right?

7   A.   I don't -- as I said, I don't believe I was the drafter

8   or -- that was not my document.

9   Q.   Okay, you said you "don't believe".  Are --

10  A.   I wasn't the drafter.  That was --

11  Q.   Okay.  And there was work done -- you talked a bit about

12  discussions between the Lehman and Barclays people about the

13  value of securities that were to be transferred as part of the

14  transaction, yes?

15  A.   I'm sorry.  Are you referring to a specific point in time

16  or a specific testimony?

17  Q.   Let me ask you generally with respect to the early part of

18  the week, the Monday and the Tuesday.  You know there are

19  discussions going on between Lehman folks and Barclays folks

20  about what the securities are worth, yes?

21  A.   I know that there are people in various different rooms

22  doing work on various components of the transaction, a part of

23  which I understood to be working on the list of, or the number,

24  or the elements of the financial securities involved, yes.

25  Q.   The point, though, sir, is -- my point is that you,

Page 108

1   yourself, were not involved in any of the work to determine the

2   value of the securities.  Is that right?

3   A.   I don't believe that I was, no.

4   Q.   Well, you say you don't believe, sir.

5   A.   No, no.  I was -- I didn't do a valuation of those

6   securities.

7   Q.   Okay.  And you mentioned in your testimony this morning,

8   some work done by Credit Suisse?

9   A.   Yes.

10  Q.   Do you recall testifying about that?

11  A.   I understand -- yes.

12  Q.   Did you ever see any of the analytics that Credit Suisse

13  did?

14  A.   I don't believe that I saw the Credit Suisse output or the

15  work that would have been done for the board.  I don't believe

16  so.

17  Q.   Do you know if there was any Credit Suisse output?

18  A.   Only by the sense that they were there and an assumption.

19  But I don't -- I hadn't seen it myself, no.

20  Q.   So to the extent Credit Suisse actually did these

21  analytics, you don't know what the fruit of those analytics

22  were, do you?

23  A.   I wasn't a party to that work product, no.

24  Q.   And you spoke a bit this morning about difficulties in

25  finding dependable Lehman ledgers and records concerning

Page 109

1    valuation.  Is that right?  Do you recall that?

2    A.   I don't believe I said precisely that -- I believe I said

3    that there wasn't a full accounting for the business that was

4    being purchased.  There wasn't a balance sheet or a

5    description -- asset -- there wasn't a balance sheet for the

6    business that was purchased, and there was moving data, both

7    because of the markets and because of activity at Lehman.  I

8    believe that's what I testified.

9    Q.   And again, sir, that's something you know only

10   anecdotally.  You didn't review balance sheets, did you?

11   A.   I don't think I reviewed any specific balance sheets.

12   Q.   And you didn't review ledgers, correct?

13   A.   I don't believe that I've reviewed ledgers.

14   Q.   And you didn't review valuation analyses, correct?

15   A.   I don't believe I reviewed valuation analyses.

16   Q.   Your work in the early part of the work, in terms of

17   negotiation, was essentially limited to the building and the

18   250 million dollar cash payment, right?

19   A.   That wouldn't be entirely precise.  The work starting from

20   Thursday, Friday, into the weekend --

21   Q.   Let's just talk about bankruptcy and after, okay?  Let's

22   forget Thursday through Sunday.  I'm in the point where we're

23   talking about the deal that's brought us here today?

24   A.   The Monday morning onward is what I think you're referring

25   to.  The Monday morning onward, my role was first and foremost

Page 110

1    work to determine if a transaction could be done; to understand

2    the framework of the overall transaction that was put forward.

3    But my specific remit during those midday of Monday through

4    till when the transaction, was negotiating elements of the

5    consideration.

6    Q.   At a higher level, to understand the framework of the

7    transaction, yes?

8    A.   I think, obviously, in part, at a higher level would be

9    correct.  In part -- if I may -- please, if I could --

10   Q.   What I'm --

11   A.   -- because there were specific elements that were

12   obviously not at a higher level, of course, like, as I've

13   described the building and the cash consideration and

14   understanding the framework.  But if you want to describe that

15   bit as a higher level.

16   Q.   I guess what I'm pushing for here is, you were not

17   sharpening your pencil, taking out a pad, and figuring out what

18   the long position, what the securities were worth, while the

19   asset purchase agreement was being negotiated, were you?

20   A.   No.  That was --

21   Q.   Okay.  And to the extent you got information about asset

22   values, about securities values, you got them from other

23   people, correct?

24   A.   I think that would be a fair statement, yes.

25   Q.   And the people from whom you got that information were

Page 111

1    Barclays' team, whoever they were, who were working on

2    assessing what Barclays' view was of the value of the

3    securities, correct?

4    A.   No, I don't think that would be entirely correct.  I think

5    there was -- there came a time when the Barclays team gave

6    estimates to me.  There were times when Lehman teams gave

7    estimates.  I can't go through each example.  But clearly on

8    the Friday meeting there was estimates -- there clearly was an

9    estimate of the clearance box and box of hammers.  So the

10   Lehman teams would have given me data estimates, yes.

11   Q.   The point remains, and we can agree, that to the extent

12   you did get data, you got it from other people, you didn't

13   develop it yourself?

14   A.   I think that's fair.  I didn't do the analytics of the

15   assets.

16   Q.   Now, I thought -- correct me if I'm wrong, sir.  Did I

17   hear you testify this morning that your original view, your

18   view going in, was that you didn't think there was any value to

19   the ongoing business?

20   A.   I think -- and I don't know exactly what I precisely said,

21   but I believe what I said -- I believe what I thought at the

22   time was, there was not an ongoing business, or we certainly

23   had a very important question as to whether or not there was an

24   ongoing business.  And as part and parcel of that, stepping in

25   to taking on the liabilities of the business, the liabilities

Page 112

1    relating to the people, preserving what was some element of

2    this melting iceberg, was a big value and a risk in its own

3    right.  I don't know if those are the exact words I used.

4        But as part and parcel of that, my view was, paying some

5    incremental consideration above and beyond that, I didn't see

6    that as -- I thought the stepping into those liabilities was

7    already quite a big risk.

8    Q.   And to your view, in understanding the overall framework

9    of the deal, you did not understand this to be a, quote-

10   unquote, "balance sheet deal," correct?

11   A.   As I think I said earlier, as I understood it, there was a

12   purchase of a business and that the business -- in the whole,

13   of course, there was associated assets and directly associated

14   liabilities.

15   Q.   I suspect I'm going to ask you this a couple of times

16   today, sir, but if you could work on keeping your voice up and

17   be a little closer to the microphone, I'd be grateful.

18   A.   I'm sorry.  I apologize.

19   Q.   Thank you.  Now --

20   A.   Is this better?

21   Q.   This is better, thanks.

22   A.   Okay.

23   Q.   Did you ever have a discussion with Mr. McDade about his

24   view of whether or not this was a transaction where the assets

25   conveyed were to equal roughly the liabilities assumed?

Page 113

1    A.   I don't believe I had that specific conversation.  I don't

2    believe I had that conversation.  The conversations that I had

3    with Mr. McDade were really centered on that Friday, as I can

4    understand it.  He was not the counterparty that I dealt with.

5    I dealt with principally Mr. Schaffer in the days coming into

6    the Tuesday agreement.

7    Q.   Well, we're going to come back to a little more detail

8    about it.  But by Friday, when you're having a discussion on

9    Friday morning about value shortfalls in the deal, Mr.

10   Schaffer's gone from the scene, isn't he?

11   A.   Yes, that's correct.

12   Q.   Because Mr. Schaffer left Lehman on the Thursday night,

13   the 18th, correct?

14   A.   I don't know specifically when he left, but he left after

15   the --

16   Q.   Okay.

17   A.   -- transaction on Tuesday, yes.

18   Q.   Well, you do know, when you come in on Friday, there's no

19   Mr. Schaffer?

20   A.   Yes.  I was not dealing with Mr. Schaffer at that point.

21   Q.   Okay.  And the lead person you're talking to in the Friday

22   morning meeting is Mr. McDade, correct?

23   A.   I believe that was true, yes.

24   Q.   All right.  And in your meeting with Mr. McDade on the

25   Friday morning, did you have any discussion with him about

Page 114

1    whether he understood the deal to be a rough equivalent of

2    exchange of assets and liabilities?

3    A.   I don't believe that conversation occurred.  I don't

4    believe I took part in that conversation.

5    Q.   Did anyone at Barclays ever tell you that -- anyone who

6    worked for Barclays ever tell you that Mr. McDade had allowed

7    as how that was his view of the deal?

8    A.   That hadn't been described to me, no.

9    Q.   Now, at one point, one of the possibilities you considered

10   was that Barclays might just do a business deal without the

11   securities assets, correct?

12   A.   Well, we alw -- Barclays always did a business deal.  To

13   be clear, they always were purchasing the North American

14   business.  At one point there was a consideration, it was just

15   my own consideration, when the assets had been removed from the

16   trading book, and had had been reduced substantially, I raised

17   the specter of should we just not have any of those assets in

18   the transaction.  I recall that, yes.

19   Q.   Now, you said to Mr. Boies this morning that you weren't

20   part of the team that was evaluating any of the specific assets

21   on the trading book, but you did have an understanding that

22   data delivered by Lehman was outdated.  Do you recall that?

23   A.   Yes.  I recall a statement along those lines.

24   Q.   And the information that was given to you about whether

25   Lehman's data was outdated, also was -- you didn't conduct your

Page 115

1   own investigation of that, right?

2   A.   No, sir.  I did not independently conduct --

3   Q.   That was also information that was rendered to you by

4   other people, correct?

5   A.   Barclays people, Lehman people, other advisors, yes.

6   Q.   You, yourself, did not check or diligence or examine that

7   question, correct?

8   A.   I don't -- I don't remember doing a specific review of

9   that, no -- a review of that, no.

10  Q.   And again, you were not involved in any of the specific

11  valuation exercises associated with dealing with an issue of

12  outdated data, were you?

13  A.   I did not do independent valuation analysis of the

14  securities, no.

15  Q.   Now, I'm going to ask you -- I'm sorry to make you bounce

16  around from book to book.

17  A.   That's okay.

18  Q.   You need the green book with your name on the cover.

19  A.   Yes, sir.  Can I put the second book down?

20  Q.   Just keep it handy, sir, but you don't need it right in

21  front of you, that one.

22  A.   Yes, sir.

23  Q.   All right, sir.  And if you would turn in that book to

24  what's labeled as Exhibit M-2?

25  A.   Yes, sir.

Page 116

1    Q.   Did you ever see that document before?

2    A.   I have seen this document before, yes.

3    Q.   Did you see it at or around the time you were working on

4    the Lehman-Barclays transaction?

5    A.   I don't know when in particular, but I recall having seen

6    it, yes.

7    Q.   I guess my question is, did you see that document sometime

8    during the week or so you were working on the transaction, as

9    opposed to sometime later?

10   A.   I don't recall specifically when I saw the document.  It

11   wasn't -- it wasn't a central part of my work.  I don't recall

12   specifically when I saw it, no.

13   Q.   Had you seen any document that put the value of assets at

14   roughly seventy-two billion and the total of related

15   liabilities at roughly sixty-eight billion?

16   A.   The -- well, there was a press release from Barclays that

17   had a seventy-two and a sixty-eight which are on this page.  In

18   terms of the -- as I understand it, the -- and I had seen the

19   press release or a draft of the press release, I believe.

20   Q.   I'm afraid it's not in your book, sir.  Maybe the stand

21   isn't crowded enough yet with documents.

22           MR. GAFFEY:  Your Honor, may I approach?  I have a --

23           THE COURT:  Yes.

24           MR. GAFFEY:  -- copy of a document for the witness.

25   Thank you.

Page 117

```
 1              THE COURT:  Thank you.
 2    Q.   Mr. Klein, I've put before you what is Movants' Trial
 3    Exhibit 133, in evidence.  And I'll ask you, is that the press
 4    release you're talking about?
 5    A.   I don't know if this is the press release I'm referring
 6    to, because I don't know if I saw a final form or a draft,
 7    but --
 8    Q.   Do you want to take a minute to look through the document?
 9    Can you take a look at the second page, which is where the
10    press release actually starts, sir?
11    A.   Just after the cover?
12    Q.   Right.
13    A.   I see that, yes.  I see the cover, yes.
14    Q.   Okay.  And take a look at the second paragraph in the text
15    of the press release.  Take a moment to familiarize yourself
16    with what it says, sir?
17    A.   Yes, I see that.
18    Q.   And do you see a reference there to seventy-two billion
19    U.S. and sixty-eight billion U.S.?
20    A.   Yes, I do.
21    Q.   Is this the press release where you gained an under --
22    where you saw that as the relative relationship between long
23    and short positions?
24    A.   Again, I don't know if I saw a draft or this final.  I
25    just don't know which document I would have seen.
```

Page 118

1    Q.    But you do think that you got the numbers seventy-two and

2    sixty-eight from a press release?

3    A.    Or I think I was informed, as part of what I understood to

4    be the press announcement.  Whether it was this final press

5    release or something else, I don't know.

6    Q.    Well, without regard to what particular document it may

7    have been sir -- you don't need that exhibit any longer --

8    A.    Okay.

9    Q.    -- other than your memory --

10   A.    Do you want me to put this somewhere?

11   Q.    You can put that aside.  Other than your memory that you

12   saw it in a press release, draft or final, do you have any

13   other basis to tell us how you could have -- how you understood

14   that the relative relationship between the long and the short

15   position was seventy-two and sixty-eight?

16   A.    I don't -- that is a specific recollection I have of that

17   particular document.  I don't recall -- I don't recollect any

18   other specific document.

19   Q.    Now, let's take a look at -- if you could put M-2 back

20   there, sir?  Do you still have it in front of you, that

21   financial schedule?

22   A.    I see that, yes.

23   Q.    All right.  And you see on the financial schedule in the

24   lower right-hand schedule, on the liabilities side, there's a

25   reference to cure payment and comp.  Do you see that?

Page 119

```
 1    A.    Yes, I do.

 2    Q.    And you see that the cure payment is put at 2.25?

 3    A.    Yes, I see that.

 4    Q.    And the comp is put at 2.0.  Do you see that?

 5    A.    I do, yes.

 6    Q.    And even my math puts that at 4.25?

 7    A.    Yes, I see that.

 8    Q.    Okay.  So did you come to understand at any point that

 9    Barclays would assume liabilities for cure and compensation on

10    those amounts?

11    A.    I believe, as I think I testified earlier, that I

12    understood that there was a compensation amount of

13    approximately two billion.  There was a potential exposure on

14    the so-called cure.  Again, I didn't know the cure or what it

15    meant, but it had been explained to me that night as being in

16    that range of 2 billion or 2.25 billion.  I -- those were

17    expense items that I was made aware of, yes.

18    Q.    And you don't know, sir -- you can't tell us the source of

19    your information of cure being put at around 2.25 and comp

20    being put at around 2?

21    A.    That wouldn't be correct.  Both the comp numbers, as I

22    understand, were provided by Lehman as estimates.  And I was in

23    a meeting where cure was explained to me by a big group of

24    people.  I think it was in one of the Lehman dining rooms.  And

25    that number was put forward.  There was no schedule.  Again, I
```

Page 120

1   didn't know what cure was.  But that number came from Lehman.

2   I don't know that that number put on that sheet came from that.

3   But the number, as explained to me, in that parameter, came

4   from that meeting.

5   Q.   You, yourself, played no role in the calculation of the

6   cure number, yes?

7   A.   No, sir.  I did not.

8   Q.   And you, yourself, played no role in the calculation of

9   the comp number, correct?

10  A.   No, I did not.

11  Q.   And you, yourself, were not involved in any negotiations

12  between Barclays and Lehman about the comp number, were you?

13  A.   No, no.  I was not.

14  Q.   And you, yourself, were not involved in any negotiations

15  between Barclays and Lehman about the cure number, were you?

16  A.   I'm not aware that there was negotiations about the

17  exposure.  It was a number given.  But I certainly wasn't party

18  to any negotiation.

19       (Pause)

20  Q.   Now, I'd like to turn, sir, to the testimony that you gave

21  us this morning about the events of Thursday night and Friday

22  that led to this early-morning Friday meeting.

23  A.   Yes, sir.

24  Q.   Now, you get a call, I think on Thursday night, from one

25  of the Barclays executives.  Is it Mr. Ricci?

Page 121

1    A.   I'm -- I wish I could be more precise.  What I do know is

2    that I had been scheduled at some point to go to Europe,

3    because there was -- at a point in time, they hoped that

4    perhaps the European business and/or other businesses could be

5    businesses which could be separately acquired.  Given some of

6    the issues that were arising, I was -- I didn't go.  I don't

7    know specifically who -- I don't specifically know whether that

8    was a telephonic briefing and by whom.

9    Q.   And in any event, you are given to understand that your

10   task is to go in to Lehman and demand more assets, correct?

11   A.   To be a bit more precise, if I may; I was instructed that

12   the change in the assets that the trading assets, a substantial

13   amount had been removed, first and foremost, and that secondly,

14   the remaining value might not be in excess of the loan and

15   could be significantly less, and that the resulting impact on

16   Barclays had two impacts.  One, the accounting that they

17   thought they would have, both to preserve their capital near-

18   term and long-term, was at risk, and they had made commitments

19   and statements to regulators and to the public.  Secondly, they

20   informed me that they had stepped in to provide this loan

21   amount for this amount of capital, which changed the dynamic of

22   exposure.

23        They made both of those aware to me.  And I must say, they

24   did so with great concern, really quite concerned; because it's

25   one thing to try to make a deal and fail, it's one thing to

Page 122

1    make a transaction and then fail.  They were at this position

2    of having announced this publicly, and they very much wanted to

3    own the business, because the business had the transformative

4    value, but the risk had changed in their view.

5        And I was informed that we needed to express this very

6    directly and find a solution to this and find more -- find the

7    solution, find the assets that would solve this.

8    Q.   Let's back up a little.  When you refer to the loan,

9    you're talking about the repurchase transaction where Barclays

10   stepped into the shoes of the Fed, yes?

11   A.   I am.  But I learned more about that loan as the weekend

12   went on.  It wasn't something I had been involved in the

13   creation of.

14   Q.   I'm about to cover that very topic, sir.  You were not

15   involved in the negotiation of the repurchase agreement, were

16   you?

17   A.   No.  No, sir, I was not.

18   Q.   And you were not, before this Friday meeting, aware of the

19   economics of the repurchase agreement, correct?

20   A.   No.  No, sir, I was not.

21   Q.   And you had never seen the documentation concerning the

22   repurchase agreement, correct?

23   A.   No, sir.  I don't think I had.

24   Q.   And did it ever come to your attention that the repurchase

25   agreement was terminated by Barclays on Friday, September 19th?

Page 123

1   A.   I -- I don't -- I'm sorry, I don't understand the terms

2   that you're describing when you say "terminated".

3   Q.   Ended.  Killed.  Ended.  Dead.  Terminated.

4   A.   At the agreement -- upon the agreement of the transaction

5   to be completed.  Is that what you're referring to?

6   Q.   Did it ever come to your attention that Barclays issued a

7   notice of termination of the repo?

8   A.   I don't -- I understood that the repo was extinguished as

9   part of the transaction, if that's what you're referring to.  I

10  don't --

11  Q.   Take a look in the book with your name on it, at Exhibit

12  M-38.

13  A.   Yes, sir.

14  Q.   See that's a document dated September 19, 2008?

15  A.   It says -- yes I see it's on the screen.  September 19th?

16  Q.   My first question, sir, is have you ever seen that

17  document before?

18  A.   I don't believe so.

19  Q.   Okay.  And no such document came to your attention at or

20  around the time you were doing your work for Barclays?

21  A.   I don't believe so.

22  Q.   And in any event, you were not involved in structuring or

23  designing or negotiating the repurchase agreement, correct?

24  A.   No.  No, sir, I was not.

25  Q.   And you were not involved, were you, sir, in any of the

Page 124

1   work, valuing the assets that were exchanged in the repo, were

2   you?

3   A.   No, sir, I was not involved in the valuation of

4   securities.

5   Q.   And when you had communications from your clients at

6   Barclays about going to Lehman and expressing concern about the

7   value of the repo collateral, the concerns were -- you were the

8   messenger; you hadn't come to this conclusion yourself, had

9   you?

10  A.   That's correct.

11  Q.   All right.  And you did not know, did you, the analytics

12  that had been performed to determine whether the assets in the

13  repo were inadequate?

14  A.   No, I had not reviewed any analytics.

15  Q.   And you referred a little in your testimony before lunch,

16  sir, to some history of the repo, that you came to learn at

17  some point, where the Fed -- you were told that the Fed had

18  requested that Barclays step into its shoes in a repurchase

19  agreement between the Fed and Lehman.  Is that right?

20  A.   That's -- well, I'm sorry, I want to be precise.  That the

21  Fed had requested that Barclays step into the shoes of the

22  financing.  You've referenced counterparties, and I don't have

23  all those specific counterparties.

24  Q.   Okay.  And did you learn whether the Fed had given any

25  inducements to Barclays to step into its shoes with regard to

Page 125

1    the repurchase agreement?

2    A.   I'm not aware of any.

3    Q.   You're aware that there are none, or you're not -- or you

4    don't know one way or the other?

5    A.   It's never been mentioned to me at all that there was any

6    form of inducement.  In fact, the Fed, from the weekend before,

7    had made it very clear that there was no inducements.  This was

8    part of the bankruptcy weekend issue.  I'm not aware of any

9    inducements that had been --

10   Q.   So you're not aware of any agreement that may have existed

11   between Barclays and the Fed concerning Barclays stepping into

12   the Fed's shoes in the repurchase agreement?

13   A.   I'm not aware of an agreement that existed, no.

14   Q.   You don't know, for example, whether the Fed told

15   Barclays, if you step into the shoes of the Fed, the Fed would

16   offer financing to Barclays the next day for a period of weeks

17   or months thereafter?

18   A.   I wouldn't have been party to that, no, sir.

19   Q.   And your -- so the result as you understood it, is your

20   client, Barclays, takes over a forty-five billion dollar

21   loan -- repurchase agreement, yes?

22   A.   They took over a forty-five billion -- they exposed their

23   capital of forty-five billion against a set of securities, yes.

24   Q.   And you have no knowledge one way or the other as to how

25   the value of the securities that supported that, the collateral

Page 126

1   that supported that, was determined, correct?

2   A.   That would not be correct.  It was told to me by my client

3   that they had reviewed the value of the collateral, and they

4   had determined that it was very likely not to exceed the value

5   of the loan or match the value of the loan.

6   Q.   And did they give you any description, when they told you

7   they had made that determination, of the process that they had

8   followed to come to that conclusion?

9   A.   They made it aware that they had teams of people that were

10  expert in that.  But I was not described what was the

11  underlying collateral and/or how that underlying collateral was

12  valued, just simply that they had teams of their professionals

13  that were working on that.

14  Q.   And you don't know if the values that they determined with

15  regard to the repo collateral were market values or liquidation

16  values or agreed values.  You just don't know, do you?

17  A.   No, I think that's a bit strong.  The values that they had

18  given or had been explained to me, were what they thought the

19  values were at that date.  I don't think that they had an

20  indication that this was some form of fire sale, if they had to

21  simply sell them at that moment.  I don't believe that that was

22  reflected to me.  They were --

23  Q.   Did anyone from Barclays ever tell you in sum or substance

24  that the valuation method that they applied was determined --

25  to determine what would happen if there was an orderly

Page 127

1    disposition in the shortest possible time?

2    A.   I don't recall those specific words.

3    Q.   All right, sir, do you recall -- that's why I said "in

4    essence".  I'm not asking you if those were --

5    A.   I'm sorry, I --

6    Q.   -- the precise words anybody said to you --

7    A.   -- apologies.

8    Q.   -- I'm asking if in essence, anybody said that to you?

9    A.   What they described to me was their view of market value.

10   And they're -- Barclays is a big trading firm and have real

11   traders.  And they were trying to estimate the market value.

12   It wasn't that far off of what the Lehman market value had been

13   of their view of that collateral.  It was a sense of what their

14   expectation was of market value beyond the definition of market

15   value.  I don't have a further discussion.

16   Q.   When you were looking at this issue, did anybody tell you

17   what the collateral agent in the repurchase agreement, Bank of

18   New York, had determined was the value of the repo collateral.

19   A.   No.  No, sir, they had not.

20   Q.   And when you were looking at this issue, did anyone tell

21   you that you should look at or that they had looked at the

22   value of the Fed repo collateral that had -- that was the

23   repurchase agreement where Barclays stepped into the shoes -- I

24   mean -- let me --

25            MR. GAFFEY:  I withdraw that question.

Page 128

1    Q.   Did anybody talk to you about what values the Fed or its

2    collateral agent had put on the repo collateral?

3    A.   The collateral which -- you're referring to the

4    securities, the 49.9 securities that were underlying that

5    discussion?

6    Q.   Yeah.

7    A.   Is that what you're referring to?

8    Q.   Yeah.

9    A.   In terms of what the Fed had valued it at?

10   Q.   Yeah.

11   A.   No, sir, I didn't have that valuation.

12   Q.   So I take it then -- this may be self-evident -- you

13   wouldn't know what the range of difference was between how the

14   Fed valued it and BoNY valued it and how your client, Barclays,

15   valued it?

16   A.   The -- to be clear, the only opinions that were expressed

17   in my presence were the Barclays opinion and the Lehman

18   opinion, as it -- as a sense, I don't know how the other

19   entities that you're describing would have valued it.

20   Q.   Okay.  And who expressed the Barclays opinion to you?

21   A.   At this stage, during the week, the principal players that

22   I had been working with was Rich Ricci and Archie Cox; on legal

23   matters, Jonathan Hughes.  I think it would clearly have been

24   either or both of them would have expressed that to me in that

25   morning period.

Page 129

1    Q.   Did you ever speak to a man named Jasen Yang about that

2    topic?

3    A.   I don't know a Jasen Yang.

4    Q.   Did you ever speak to a man named Stephen King about that

5    topic?

6    A.   I didn't.  I know who Stephen King is, but I didn't speak

7    to him about the valuations.

8    Q.   And did you ever speak to a man named James Seery about

9    that topic?

10   A.   I don't know a Jim Seery -- James Seery.

11   Q.   You don't know Jim Seery?

12   A.   I don't know Jim Seery.

13   Q.   So I take it you recall no conversations with Jim Seery in

14   the course of conversations about the inadequacy of the

15   collateral supporting the repo?

16   A.   I don't recall a specific conversation with him.  I --

17   Q.   And I take it, then, sir --

18   A.   -- if I can -- can I add just a bit?

19   Q.   Beyond "I don't know Jim"?  Sure.

20   A.   There were so many people coming in and out of rooms that

21   I --

22   Q.   It's a fair comment --

23   A.   -- I may have talked to people, that I just don't know

24   what their names are.  I'm sorry.  I just don't know.

25   Q.   All right.  It's a fair -- we should just -- for me to be

Page 130

1   fair, we should establish that.  There are meetings you're in

2   during that week where there are people you've never seen

3   before or since, and you don't know who they are, right?

4   A.   I think that's --

5   Q.   Okay.

6   A.   -- thank you for that.  That's a very fair comment.

7   Q.   All right.  So to your knowledge, you've never spoken to

8   Jim Seery?

9   A.   To my knowledge, I have not had a conversation with Jim

10  Seery.

11  Q.   Or -- and the same question:  to your knowledge, you've

12  never spoken to Jasen Yang?

13  A.   No, sir.  To my knowledge, I have not.

14  Q.   And to your knowledge, you've never spoken to either of

15  those gentlemen about the topic of how the value in the repo --

16  how the collateral in the repo was valued?

17  A.   I don't mean to be self-evidently cute, but if I hadn't

18  spoken to them, I couldn't speak to them about a specific

19  subject.

20  Q.   Thank you.  Now, when you -- I just want to review a bit

21  the facts concerning the Friday meeting.  And forgive me if I'm

22  being a little bit repetitive.  You get instructions from your

23  client to go relay to Lehman that the value in the repo is

24  lower than it should be, yes?

25  A.   Yes.  But there's a -- it was more involved than that.

Page 131

1   Q.   I'm sure it was.  But for this purpose, yes or no will do.

2   You got that kind of instruction from your client?

3   A.    No.  I was instructed in more detail than that.  I was

4   instructed very clearly that this was a substantial issue for

5   my client, which for me, in my position, was something I had to

6   pay substantial attention to, that this put at risk the

7   accounting for the transaction, the announcements that they had

8   made, and it changed the -- from their perspective, the

9   potential doability of the transaction.  And they indicated to

10  me that this was something that they were significantly

11  concerned about and that I should express that concern very

12  clearly, in addition to express the need to somehow rectify

13  that.  So it was --

14  Q.   And in fact, the --

15  A.    -- a wider --

16  Q.    -- instructions you got from your client were to let

17  Lehman know that the transaction was going to fail because of

18  what was the diminution in the original plan?

19  A.    I think I tried to answer that they indicated that I

20  should give the broad issues, and make it very clear that the

21  transaction might not be able to be done, from their

22  perspective, on that basis.  Yes.

23  Q.   Well, you made it known to the parties, sir, that -- the

24  parties that were involved -- that there needed to be more

25  assets, because if there weren't more assets, the transaction

Page 132

1    couldn't take place.  Isn't that right?

2    A.   In a general sense, yes.  As I've said, I made it very

3    clear that this was a very big issue, what the issue was, and

4    that this issue had to be resolved, and the discussions that

5    ensued very clearly -- and I believe there had been other

6    people that had had discussions as well, because when we had

7    this conversation, the Lehman professionals came prepared with

8    assets and solutions.

9    Q.   My point's a little narrower, sir.  I want to make sure

10   we're not speaking past each other.

11   A.   I'm sorry.

12   Q.   Let me ask you to take a look --

13   A.   My -- I apologize.

14   Q.   -- at your deposition at page 95.

15   A.   Which book am I in?  I'm sorry.

16   Q.   It's the book that says "Michael Klein" on the cover.

17   A.   Yes, sir.

18   Q.   And it's that tab that says "Deposition transcript" near

19   the back of the book.

20   A.   Yes, sir.  Can you direct me to a page, if you don't mind?

21   Q.   Yes, 95, please.

22   A.   Yes, sir.

23   Q.   And just -- for the moment, sir, just so you get some

24   context, take a look at the top of page 94.

25   A.   Yes, sir.

Page 133

1    Q.   Okay?  At lines 3 to 4 -- sufficiently to familiarize

2    yourself, sir, with the fact that we're talking about that

3    Friday meeting at your deposition.

4    A.   So begin on line 3?

5    Q.   Yeah, yeah.  I'm not sure you have to read the whole

6    thing.  But I want your agreement that what we're talking about

7    here is the Friday meeting about the repo collateral?

8    A.   Yes, sir.  That 94 -- I think that seems consistent with

9    what we just discussed.

10   Q.   Okay.  And down at the bottom of 94, you talk about the

11   instructions you got to go see Lehman, yes?  Well, let me just

12   move to page 95.

13   A.   Yes, sir.

14   Q.   Start at line 2 --

15   A.   Yes, sir.

16   Q.   -- and go through line 9:

17   "Q.  So did you make that request?  Did you come in and say,

18   did you in sum or substance -- did you make it known to Lehman

19   that you needed more value?

20   "A.  Well, I made it known to the parties that were involved

21   that there needed to be more assets, because if there weren't

22   more assets, the transaction couldn't take place.  Now, to say

23   I -- it was made known, and I was part of the discussions that

24   were around that -- what could solve that gap.  I don't know

25   that I was the person that specifically stated it or not."

Page 134

1   A.   I see that, yes.

2   Q.   Okay.  So, again, sir, what I said is, I want to be sure

3   we're on the same page.  You or someone else in the meeting

4   said in sum or substance, if we don't get more value, we're not

5   closing?

6   A.   I think we made it clear on a wider basis what the issues

7   were, what the specific focus was, what we needed to solve very

8   specifically.  So we gave a sense of perspective of that.  But

9   I think that message was clear, yes.

10  Q.   And the message that was clear, amidst the bigger picture

11  you describe, is if there isn't more value, the deal's not

12  going to close.  Barclays is going to walk.  Yes?

13  A.   No.  I'm sorry, you've used a different word in terms of

14  value.  There was -- as I said, there was a few issues that

15  were all being dealt with.  There was the issue that Barclays

16  had made an announcement about their accounting and their

17  capital and disclosed this to their regulators.  And they had a

18  specific concern about that.  Secondly, they were fearful that

19  the value of the assets that now existed, after assets had been

20  removed, might not be equivalent to the value of the repo loan.

21  And third, that putting the capital up for the repo loan meant

22  it was riskier for them to do that.  All those things then

23  resulted in the need to solve that gap.

24  Q.   How big a gap had to be made up?

25  A.   I don't know.  I was never told specifically what that

Page 135

1    value was.

2    Q.   At the time you were having the discussion on Friday, you

3    didn't have a number for the gap.  Is that right?

4    A.   I -- no.  And I have to say --

5    Q.   I'm sorry, sir, is that right?

6    A.   I'm sorry.

7    Q.   Is it correct that at the time, you didn't have a number

8    to put on the gap?

9    A.   I didn't have one, and I didn't put one.  The solution

10   that was being requested was how can we save this transaction.

11   We have a really big problem, and we've announced this, and

12   we'd like to close this transaction.  How can we solve this?

13   And we went in to try to solve that.  But, no, I didn't have a

14   specific number, nor do I know that there was or wasn't a

15   specific number that needed to be achieved.

16   Q.   So no one gave you an instruction that you needed to get X

17   or Y.  But you were told we need to get more.  Yes?

18   A.   I was told --

19   Q.   Yes?

20   A.   Yes.  With a longer statement that was given to me, yes.

21   Q.   And no specific number ever was put forward?

22   A.   No, sir.  Not to me.

23   Q.   Now, among the assets that were identified to provide more

24   value were, I believe you said the 15c3 asset, yes?

25   A.   Yes, sir, that was one of the identified assets, yes.

Page 136

1    Q.   And you recall that the value of that identified asset was

2    somewhere in the range of 800 million dollars?

3    A.   No, that would not be correct.  The value that was stated

4    as part of that discussion was possibly a billion to two

5    billion.  It didn't have a degree of certainty.  There was an

6    e-mail that specifically indicated -- again, I recall them

7    bringing in that e-mail into that office meeting that

8    specifically indicated that that 750 million was approved to be

9    released, but that wasn't defined as the total value of the,

10   quote, "15c3".

11   Q.   So your understanding at the Friday meeting or as a result

12   of the Friday meeting is, it could be as much as two billion in

13   15c3 and later find out it's about 800 as a result of that

14   e-mail?  Is that right?

15   A.   I think there was a -- not an enormous amount of clarity

16   on the magnitude of that billion to two billion, and later

17   there was clarification on the weekend that Barclays accepted

18   the initial SEC release that was in that e-mail, yes.

19   Q.   And what was the amount?

20   A.   I think that amount was close to the 800 million -- 800

21   million, I believe that you're discussing.  I don't think it

22   was that exact number.  But --

23   Q.   Somewhere in that range?

24   A.   -- I believe so, yes.

25   Q.   Okay.  And another category of additional assets was what

Page 137

1    you referred to, I think, sir, as the box of hammers.  That's

2    the --

3    A.   It's not my term.

4    Q.   -- what someone called the box of hammers?

5    A.   Yes sir.

6    Q.   Okay.  And the box of hammers was the unencumbered -- the

7    contents of the unencumbered collateral box of about 1.9

8    billion, yes?

9    A.   Yes.  What was related to us was there was 1.9 billion in

10   a general trading account called the box of hammers.  The list

11   was in the hands of those individuals, yes.

12   Q.   And in the context of these discussions about additional

13   value, do you recall any discussions about exchange-traded

14   derivative margins?

15   A.   I'm sorry, can I -- if I can, just to be clear.  These

16   were additional, if you will, identified assets to us, in terms

17   of -- I just want to be clear in terms of your message of the

18   word "additional value".  Those were additional identified

19   assets.  I don't know what the value was then or now, for

20   instance, of the clearance box, as an example.

21   Q.   You don't know what the value was then or now of the

22   contents of the clearance box, sir?

23   A.   I know what was related to me in that room was 1.9

24   billion.

25   Q.   Okay.  And another category -- another category of assets

Page 138

1    that was discussed was -- well, let me ask you.  Do you know if

2    another category of assets discussed was exchange-traded

3    derivative margins?

4    A.    I don't recall in that Friday discussion.  There were

5    several categories of possibilities that the management in

6    their good-faith effort to get this over and done -- closed --

7    identified these are other assets that we wanted to highlight

8    to you.  The only two that seemed to be workable that I recall

9    directly, were the two items that I've referenced.

10   Q.    That's the 15c3 and the so-called box of hammers?

11   A.    Yes, sir.

12   Q.    But you are certain that both of those, 15c3 and box of

13   hammers, were discussed with you as additional value that, to

14   use your word, was identified?

15   A.    I'm sorry, you keep using the term additional value, and I

16   have to just be clear.  They were additional identified assets.

17   They were always tradable trading assets and broker-dealer

18   assets.  They had not been specifically identified to us

19   before.  And that was part of what the management, as I

20   understood was doing, was highlighting things that we might not

21   have taken into account.  There were other items that were

22   highlighted that either we had taken into account or didn't

23   exist, as I understand it.

24   Q.    So as I understand your testimony, sir, Barclays' view

25   was, we're going to get it anyway; somebody's just identifying

1   it to us?

2   A.   I don't -- I can't speak to what Barclays' view --

3   Q.   Well, sir, you're their agent.

4   A.   I --

5   Q.   You were negotiating for them.  What was Barclays' view at

6   the time?  These were assets that they were just being told

7   'Lucky you, these have always been in the bag of what you're

8   getting,' or they were additional to the deal as it stood?

9   A.   To be clear, there were many people at Barclays who

10  perhaps had multiple views.  My understanding was this was the

11  first time these had been specifically identified.  There was

12  an agreement to buy all of the trading assets.  I don't -- my

13  own knowledge, I don't know whether any of them had ever been

14  highlighted to other people, but certainly not to me.

15  Q.   Did you come to learn, sir, that the -- I'll use your

16  verb -- that the identification of the 15c3 and the clearance

17  box assets was dealt with in a so-called clarification letter?

18  A.   I'm sorry.  I missed the beginning of the question.

19  Q.   Did you come to learn at any point, sir, that the 15c3 and

20  the clearance box was dealt with in a so-called clarification

21  letter?

22  A.   I didn't -- I didn't -- I wasn't -- I didn't review the

23  clarification letters, so, I'm sorry, I didn't.

24  Q.   You knew there was one, yes?

25  A.   As I think I understand that there actually was more than

Page 140

1    one clarification letter at some point, but I don't know.

2    Q.   Whatever it was, you never reviewed it?

3    A.   No, sir.  I don't believe I reviewed the clarification

4    letter.

5         (Pause)

6    Q.   Now, you said this morning, sir, that you attended the

7    sale hearing on the 19th of September, correct?

8    A.   In this courtroom?

9    Q.   Yes.

10   A.   Yes, sir.

11   Q.   And where were you in the courtroom?

12   A.   I believe I was in the very back in that back --

13   somewhere.  Not under the clock and not next to the door, but

14   somewhere --

15   Q.   You were in the back of the room?

16   A.   Yes, sir.

17   Q.   Could you hear?

18   A.   I could hear -- well, I remember very clearly Your Honor

19   describing a Geiger counter and making sure everybody was very

20   quiet during his process.  So yes, I could hear that process.

21   Q.   And you were listening carefully to the proceedings, I

22   take it?

23   A.   Yes.  There were -- so I can be as clear as I can --

24   Q.   Sir, I think that one's really a yes or no.  Were you

25   listening carefully to the proceedings?

Page 141

1    A.    I was listening very carefully to the official

2    proceedings.  There was lots of people milling about before the

3    proceedings.  But the proceedings, the official process, yes, I

4    was listening -- I believe I was listening carefully.

5    Q.    And having spent the morning negotiating this -- dealing

6    with this serious issue, the repurchase agreement, the

7    inadequacy of the collateral, the identification of the bag of

8    hammers and the 15c3, did you listen carefully to see if

9    anything was said in the proceedings about that?

10   A.    I listened carefully to the proceedings and the

11   descriptions by Ms. Fife and Mr. Miller and Mr. McDade and Mr.

12   Ridings.  I did listen to that, yes.

13   Q.    And do you recall if in those presentations there was any

14   reference whatsoever to the role the repurchase agreement had

15   come to play in the transaction?

16   A.    I don't recall specific discussions away from discussions

17   about the Fed and financing and liquidity.  And there was

18   significant discussions that, at least as I understood, that if

19   the transaction didn't close, there would be no liquidity and

20   the parent company liquidity would be significantly diminished,

21   and in particular, that the DIP financing facility would come

22   to an end.  I don't know if I'm answering your question

23   specifically.

24   Q.    Respectfully, sir, I don't think you are.  The question

25   was, do you recall if, in those presentations, there was any

Page 142

1    reference whatsoever to the role the repurchase agreement had

2    come to play in the transaction?

3    A.   I --

4    Q.   That was my question.  Did anybody mention that the repo

5    had become the center of the deal?

6    A.   I don't believe the repo had become the center of the

7    deal.  I think the deal was, at the beginning and at the end,

8    the purchase of an entire business.  I think that purchase of

9    the business was described, and I think the amount of the

10   liability of the Fed repurchase agreement was described as

11   well.  And I think the details that Mr. Miller gave in quite

12   extensive -- as I recall -- and that he then proffered for --

13   or Mr. McDade gave, I think it was quite detailed.

14   Q.   Now, sir, you recall that immediately prior to the sale

15   hearing start, going on the record, there were -- as you said,

16   there were people milling around?

17   A.   Yes, sir.

18   Q.   Did you talk to anyone about the changes that had occurred

19   in the deal during the week at that time?

20   A.   Before coming down, we had a conference call with the

21   lawyers, including the Weil team and the Lehman team that had

22   agreed.  That occurred on the -- there was a wrap-up, if you

23   will, when Barclays agreed that this was a sufficient path to

24   go to court -- there was a wrap-up call that members -- I

25   believe, Mr. Miller, but I don't know specifically.

Page 143

1      And then we came down.  I'm sure I talked to people as I

2      walked in.  I don't know if you're referring to a specific

3      event, but --

4      Q.   You come in the courtroom, there's people here.  Did you,

5      yourself, talk to any of them about how the deal had changed,

6      here in the courtroom?

7      A.   I'm sure that I spoke to people.  But I don't -- I came

8      down by subway with Mr. LaRocca, and I came in the room, and it

9      was very active.  There were people here who had been part and

10     party of the transaction.  And then I ended up sitting in the

11     back.  I don't recall specifically the actions I took on the

12     way in.

13     Q.   And when you heard Ms. Fife and Mr. Miller address the

14     Court about the transaction, did you hear one of them give an

15     estimate of the value of the securities in the transaction?

16     A.   I heard both of them give various different estimates.  I

17     heard -- I remember Mrs. Fife -- Ms. Fife --

18     Q.   Fife, yeah.

19     A.   -- Ms. Fife in particular, because when she gave the

20     description, she was very -- it was a very clear description of

21     the trading book of 70 -- I think was a number she

22     referenced -- reducing to the trading assets of 47.4.  And the

23     reason I remember that was I remember thinking that when she

24     indicated that the events that caused that were, quote, "market

25     events", I felt that that was a bit of a shorthand for market

Page 144

1   movements as well as market participants, which then, as time

2   went on, Mr. Miller then gave more extensive comments regarding

3   that.  But that's why I recall her comments.

4   Q.   To your mind, was there any relationship between Ms.

5   Fife's description of the value and the exercise that you had

6   been engaged in that morning, trying to determine what the

7   value of the repo collateral was?

8   A.   I believe that when she gave her description of the

9   changes to the trading assets, she was attempting -- I don't

10  know, because I didn't -- she didn't brief me on what she was

11  going to say, and I haven't discussed it with her.  But the way

12  it appeared to me was a description of the movement in the

13  trading assets, from what had been on Tuesday to what was now

14  on Friday.  That's what I believed.

15  Q.   Now, after the sale hearing was over -- well, take a look

16  in the book, sir, at Exhibit M-52.  That --

17  A.   Same book I'm in, sir?  The same book that I'm in, sir?

18  Q.   The one with your name on the front, yes.

19  A.   Yes, sir.  M-52?  Yes, sir.  I see that.

20  Q.   Okay.  Now, that document, Mr. Boies asked you a few

21  questions about that document this morning.  Do you remember,

22  sir?

23  A.   Yes, sir, I do.

24  Q.   And he asked you about the statement at the top in your

25  e-mail to Mr. Diamond about clawing back three billion, "We

Page 145

1   clawed back three billion more of value in the transaction."

2   Do you see that?

3   A.   Yes, sir, I do.

4   Q.   And you were able to tell him what you meant when you said

5   that?

6   A.   I told him what I believed that I meant or what -- yes.

7   Q.   I take it, sir, then, that you recall actually sending

8   this e-mail to Mr. Diamond?

9   A.   I don't recall sending any particular -- specifically

10  sending any particular --

11  Q.   What about that one?  Do you recall sending that e-mail to

12  Mr. Diamond?

13  A.   I don't specifically recall sending it, no.  I mean, it's

14  clearly from me.

15  Q.   But as you sit here today, you have no independent

16  recollection of sending it, do you?

17  A.   I'm sorry, I don't remember sending it specifically, no.

18  I don't remember sending any individual e-mail.  I apologize.

19      (Pause)

20  Q.   Now, I'd like to ask you, sir, to take a look at Exhibit

21  M-410.  Same book.

22  A.   Same book?

23  Q.   Yeah.

24  A.   Yes, sir.

25  Q.   Okay.  Now, that's -- Mr. Boies showed you that document

Page 146

1   before lunch too?

2   A.   Yes, sir.

3   Q.   Do you recall that?  Okay.  And it's a photocopy of your

4   chart that you drew in the meeting you described to him this

5   morning, yes?

6   A.   Yes, sir.

7   Q.   Any difficulty dealing with the photocopy?

8   A.   Well, because I drew it very quickly and because it was on

9   a manila folder, it -- it's obviously a different sight.

10  There's some numbers on there that don't look like my

11  handwriting, but --

12  Q.   Well, the two numbers that are not your handwriting are

13  the 2.5 and the 3.5 under the word "resis", right?

14  A.   I believe that wouldn't be my handwriting.

15  Q.   Okay.  And other than that handwriting, you're able to

16  recognize all the rest of the document as your handwriting,

17  correct?

18  A.   I believe -- I just don't know, given that there's other

19  handwriting on it that's not mine.  I don't know the circles.

20  I just don't know all of what would be mine.  But those are the

21  specific items that appear not to be in my numericals.

22  Q.   Okay.  Well, Mr. Boies asked you some questions about the

23  lower boxes, the timing of the 49.9 et cetera.  Do you see

24  that?

25  A.   Yes.

Page 147

1   Q.   And the reverse trade and all that stuff?

2   A.   Yes, sir.  Yes, sir.

3   Q.   When you were answering his questions, any problem with

4   the handwriting?

5   A.   No, sir.

6   Q.   Okay.  And he asked you a couple questions about the top

7   boxes.  And you didn't have any problem with your handwriting

8   then, right?

9   A.   No, sir.  Not on the parts that I recognize my

10  handwriting.

11  Q.   Okay.

12  A.   No, sir.

13  Q.   Now, the meeting where you -- oh, and did I understand you

14  correctly, sir, to say that it was not the purpose of your

15  chart to explain all the assets that were being transferred?

16  A.   It was not the purpose, as I understood it, of the meeting

17  or the -- or my chart, to describe the entire transaction, and

18  certainly the entire transaction is not reflected on this.

19  Q.   So this chart is not meant to answer the question:  What's

20  Barclays getting and what's Lehman getting?

21  A.   I don't think that I had been asked nor would I be

22  proffering, if you will, an opinion, on -- what I was asked to

23  describe, as I recollect, was the flow of funds around the repo

24  transaction and what that consisted of.

25  Q.   And that's all this chart is meant to show?

Page 148

1    A.   Well, that's what this chart shows, with some explanations

2    to it.

3    Q.   And the reference on right in the upper right-hand box to

4    "Fed liability 45.5," do you see that?

5    A.   Yes, sir, I do.

6    Q.   Do you know why it refers to a Fed liability?

7    A.   I think that relates to the repo.

8    Q.   The repo where Barclays stepped into the shoes?

9    A.   That's what I understand it to be from --

10   Q.   And the number 45.5 attributed to that Fed liability, do

11   you know the source of that number?

12   A.   I know -- I don't remember all the specifics of the

13   conversation.  But I recall that I believed that the Fed

14   liability that was stepped into by Barclays was approximately

15   that number.

16   Q.   Well, that's what you wrote.

17   A.   Yes.

18   Q.   And I don't doubt that.  But I guess my question is, did

19   you know, at the time, where the number came from?

20   A.   I would have gotten it through the dealings throughout the

21   day and the weekend.  I don't know specifically what the source

22   document would have been.

23   Q.   And you have an entry there on the -- I take it the right-

24   hand side is the liabilities side, yes?

25   A.   Well, the right-hand side has really --

Page 149

1    Q.   Well, Fed liability, and below that it says "extra

2    liabilities", yes?

3    A.   That's correct.  That's what it has there.

4    Q.   And the left-hand side reflects assets, yes?

5    A.   Well, the left-hand side reflects both assets and, if you

6    will, changes.  I mean it was -- I was scrawling the flow of

7    funds and changes and movements.  And the left-side --

8    Q.   In the assets?

9    A.   -- well, movements in the specific related Fed liability

10   and related events around that, yes.

11   Q.   Sir the left-hand side of the chart adds up assets, and

12   the right-hand side shows liabilities.  Isn't that right?

13   A.   Yes, the right -- the left is --

14   Q.   Now --

15   A.   -- but to be clear, the left-hand side adds up specific

16   assets, and the right-hand side describes liabilities.  It

17   doesn't add them up.  I don't know if you said that, but I --

18   Q.   Now, the entry "extra liability" -- am I reading your

19   handwriting correctly?

20   A.   That's what it looks like, yes.

21   Q.   All right.  And you write there "4.25"?

22   A.   I see that, yes.

23   Q.   See that?  Where'd that number come from?

24   A.   I -- if I had to take a view based upon it right at the

25   moment -- right at this moment, I believe that would have been

Page 150

1    the comp and the cure numbers.

2         MR. GAFFEY:  And can we put M-2 up on the screen for a

3    moment?

4    Q.   That's the sheet I showed you a little while ago, sir,

5    with the 2.25 and the 2.0.  Do you see that?

6    A.   I do, yes.

7         MR. GAFFEY:  Okay.  Now, let's put Mr. Klein's chart

8    back up, please, Steve.

9    Q.   Is that the source of the 4.25?

10   A.   That document?

11   Q.   Yeah.

12   A.   Those numbers were common numbers discussed throughout the

13   entire week.  Not -- there was no source document that --

14   Q.   And the asset numbers on the left-hand side where it says

15   "assets, pre-marked, post-marked".  Have I got your handwriting

16   right?

17   A.   I believe so, yes.

18   Q.   Okay.  And the 49.9 next to the entry "pre-marked", what

19   is that supposed to reflect?

20   A.   As I recollect, that's the notional value of the trading

21   book that had been remaining that was underlying this Fed

22   liability which became the subject we've discussed --

23   Q.   When you say "notional value", sir, who determined that

24   notional value?  Do you know?

25   A.   I -- this is -- what had been explained to me is the

Page 151

1    notional value of those securities pre any mark-to-market.  But

2    that would have come to me from others.

3    Q.    You don't mean par value, do you?

4    A.    I don't mean par value, no.

5    Q.    Okay.  You mean somebody else's assessment of the market

6    value?

7    A.    No, sir.  I mean a value of a list that might or might not

8    have been current or dated; but a notional value that didn't

9    reflect the perception of the market value at that time.

10   Q.    And the numbers at the top, the seventy-two and the sixty-

11   eight, what are they meant to reflect?

12   A.    I can only infer at this time, because I don't recall all

13   the specific conversations.  But I can only infer --

14   Q.    Well, we just want your best memory, sir.  That is your

15   handwriting, right?

16   A.    It could well be.  I suspect it.  It could well be.

17   Q.    Sir, as best you can tell us?

18   A.    As best as I can tell, yes.

19   Q.    As best you can tell, that is your handwriting?

20   A.    Yes, sir.

21   Q.    Right?  Okay.  You wrote those numbers on the manila

22   folder?

23   A.    As best as I can tell.

24   Q.    Okay.  And what are they meant to represent?

25   A.    Again, as I indicated, I was attempting to show the

Page 152

1    movements and the funds flows.  The conversation -- I don't

2    remember all the conversation, but I scribbled out things to

3    answer what were questions on the minds in the room, I presume.

4    I don't remember.  It was a very brief conversation.  I was

5    literally pulled into this conversation for people that I

6    hadn't known before and hadn't seen before, and I was trying to

7    explain something that Mr. Miller asked me to do, which was the

8    Fed liability, the flow of funds.  And I was attempting to

9    explain as best as I could, that element.

10   Q.   Do you know what the numbers seventy-two and sixty-eight

11   would have to do with the Fed liability flow of funds?

12   A.   I -- to be clear, as I said, the flow of funds and the

13   confusion related to asset transfer, which is at the bottom,

14   raised questions about the assets -- the trading assets.  There

15   was a placeholder of cash and there was securities that had

16   been held up.  I can only, if you will, infer from looking at

17   this, that this was a statement of movements, if you will, in

18   the, quote, "trading assets and trading liabilities", from a

19   trading book on a net basis which was the original transaction,

20   to the reduced assets that took place against the Fed

21   liability.  That's what I can only infer from this specific.

22   Q.   Wasn't the seventy-two and the sixty-eight and what

23   followed below meant to show the difference between the deal at

24   the beginning of the week and the deal as it stood on Friday?

25   A.   I think it was clearly meant to clarify the movements in

Page 153

1    the trading book and trading liabilities, not the difference in

2    the deal.  The deal was a business transaction, and the

3    business transaction, it was neither asked of me to opine upon

4    nor to describe, and it was not reflected on this.

5    Q.   Let's take another look at M-2.

6    A.   I'm sorry, which one is M-2?

7    Q.   That's the -- it's up on the screen there, sir.  That's

8    the financial schedule I showed you a little earlier.  And I

9    asked you before, you remember, about whether you had seen a

10   seventy-two billion dollars some-odd billion -- seventy-two

11   some-odd number applied to assets and a sixty-eight billion

12   dollar number applied to liabilities.  Is it possible, sir,

13   that that seventy-two and sixty-eight are what you're writing

14   at the top of your chart?

15   A.   The numbers, if that reflects the trading assets and

16   trading liabilities --

17   Q.   I'm asking you a different --

18   A.   -- at some point in time --

19   Q.   -- question, sir.  Does that reflect your recollection as

20   to whether you took the seventy-two and the sixty-eight off of

21   that chart?

22   A.   I don't believe I did.  I believe I had seventy-two and

23   sixty-eight in my mind from some description of the press

24   release.  I remember when it was announced that this was going

25   to be this size disclosure of assets and liabilities, that that

Page 154

1    was -- I remember that event.

2    Q.   Let's talk a bit about the meeting.  When you met -- when

3    you had this meeting that you described that Mr. Miller pulled

4    you into, did you know who you were meeting with?

5    A.   I know I was meeting with Mr. Miller and individuals that

6    he wanted me to meet with.

7    Q.   Okay.

8    A.   I didn't know the specific names.

9    Q.   And apart --

10   A.   They may have mentioned their names, in fairness, they may

11   have mentioned their names.

12   Q.   -- at the time, apart from Mr. Miller, you didn't know any

13   of the other people in the room?

14   A.   I did not know the people in the room.

15   Q.   And you didn't know who they represented?

16   A.   I didn't know the organizations they were part of, no, I

17   didn't.  To be fair, they may have introduced themselves.

18   There was a lot of people moving in and out.  This meeting was

19   a small event in a weekend of discussion about these pipes

20   issues that were so complex, that this meeting was just not a

21   big -- for me -- event.  And I don't -- there -- they may have

22   introduced themselves.  I just don't recall that.

23   Q.   The best you remember is, it was Mr. Miller, some lawyers

24   from Weil and guy with glasses, right?

25   A.   I think it might have been more than one guy that wasn't a

Page 155

1   Weil person, but there was a guy with glasses.

2   Q.   Okay.

3   A.   Thank you for remembering.

4   Q.   And it wasn't me?

5   A.   No, sir.

6   Q.   Now, you did this because Mr. Miller asked you to.  And

7   you understood there was some kind of creditors' meeting,

8   correct?

9   A.   I did understand that there was a creditors' meeting.

10  The -- yes, Mr. Miller did ask me to come into this room to

11  have a discussion.

12  Q.   And the meeting that you're describing took place on

13  either the Saturday or the Sunday of the weekend after the sale

14  hearing, correct?

15  A.   I think that I've been told, but I didn't have this

16  recollection, that it was on Sunday.  But I didn't -- I didn't

17  independently recollect.

18  Q.   I'm more -- I'm not going to ask you about the Saturday or

19  the Sunday for the moment, sir.  I just want to know if it was

20  on the weekend?

21  A.   Yes, I believe it was on the weekend.  It was certainly --

22  Q.   Okay.  It was after the sale hearing?

23  A.   -- it was after the transaction was approved on Friday

24  evening, yes.

25  Q.   Okay.  And the meeting lasted a couple of minutes?

Page 156

```
 1    A.    I -- it was short.  I don't have a view of whether it was

 2    a couple minutes or fifteen minutes.  It just wasn't -- in my

 3    memory --

 4    Q.    Well, you described it, sir, in your deposition, as long

 5    enough for you to draw just a box diagram of the flow of funds

 6    on a manila folder and answer one or two questions.  Is that an

 7    accurate description?

 8    A.    That's my recollection of that meeting.  I don't -- I

 9    didn't view it as a very long meeting, no.

10    Q.    And Mr. Miller asked you to describe these aspects of the

11    repurchase agreement, this flow of funds, yes?

12    A.    Yes.  He --

13    Q.    Did you ask Mr. Miller why he wasn't describing it to

14    them?

15    A.    No, I didn't ask Mr. Miller that.

16    Q.    Did you know whether Mr. Miller already had an

17    understanding of the transaction you described?

18    A.    I believe Mr. Miller had an understanding of -- well, I

19    don't know what Mr. Miller knew, but I believe he had a very

20    clear understanding of the whole transaction.

21    Q.    Did you ask Mr. Miller -- did you say in sum or substance,

22    "Harvey, I'm kind of busy.  Why am I doing this?  Why aren't

23    you?"

24    A.    Harvey was an important element of the whole process and

25    procedure, and someone who, while negotiating his own position,
```

Page 157

1    was very clearly someone who was attempting to, quote, "solve

2    issues".  When he asked me to attend a meeting of this kind, I

3    simply did.  I didn't think to ask.  If I had felt it was

4    something that was beyond that or meaningful in that regard,

5    perhaps I would have or perhaps I would have brought other

6    people.  But I simply went into a room, as I happened multiple

7    times over those several days, please come in the room here to

8    sit down.  That's what I understood.

9    Q.   Now, you remember it was a short meeting.  You remember

10   you drew the file folder.  You remember Mr. Miller asked you to

11   do.  And you remember you had time to answer one or two

12   questions.  Beyond that, you don't have a substantive memory of

13   what took place that meeting.  Isn't that right?

14   A.   Well, I remember the -- what you just described about the

15   meeting, and I remember explaining the flow of funds,

16   substantively, because that issue of the cash and the exchange

17   was a complexity.  I remember that, yes.

18        MR. GAFFEY:  Can we put the chart back up, please?

19   Q.   You don't remember, sir, specifically whether the

20   assumption of liabilities for comp and cure was discussed at

21   the meeting, do you?

22   A.   Well, there's the reference to extra liabilities

23   specifically on that page that you pointed out.  But I don't

24   recall specifically discussing it, no.

25   Q.   You have no -- you have no recollection of what, if

Page 158

1    anything, you said about the assumption of comp or cure

2    liabilities, correct?

3    A.    I don't recall that --

4    Q.    And nothing about that chart refreshes your recollection,

5    correct?

6    A.    No, sir.  Those were numbers that were in my mind

7    throughout the entire week and had been discussed openly

8    throughout the entire week.  But I don't have a specific

9    recollection of that discussion.

10   Q.    Now, when you talked about this chart this morning, Mr.

11   Klein, you were able to talk to Mr. Boies about the meaning of

12   the 7.4 cash placeholder item on the lower right-hand corner,

13   yes?

14   A.    Yes, I understood the --

15   Q.    Okay.

16   A.    -- events around that, yes.

17   Q.    And you were able to give him some information about the

18   8.55 billion dollar item in the lower left-hand corner,

19   correct?

20   A.    I think I gave him a context of what I understood upon

21   looking at that, yes.

22   Q.    And you were able to talk to him about the meaning of the

23   phrase "Monday a.m., reverse trade," correct?

24   A.    Yes, that was consistent with my recollection of what was

25   taking place in the transaction.

Page 159

1   Q.   And you were able to tell him about the meaning of the

2   phrase "timing of 49.9"?

3   A.   Yes, in light of the reverse trade.  Yes, I had an

4   understanding of -- or it certainly sparked the recollection of

5   what I understood the events to be.

6   Q.   All right.  And you were able to talk to them about the

7   entry "41, 42, transferred to BarCap," correct?

8   A.   Well, in the context of what we've just discussed, I was

9   able to, if you will, fill in that this related to this

10  placeholder of cash and the flow and the wire not working.

11  Q.   And you were able to talk to Mr. Boies this morning about

12  the asset items in the upper left-hand corner, correct?  In

13  that upper left-hand box?

14  A.   I don't know all the specific questions he asked me.  But

15  I have addressed today the 49.9 notion -- I have addressed

16  today those issues, yes.

17  Q.   And you were able to address today, off of this photocopy

18  of your chart, the phrasing about the Fed liability and the

19  extra liability, correct?

20  A.   Yes, in that all of these were commonly discussed parts of

21  the events of that weekend, and --

22  Q.   And you think you can tell us what the seventy-two and the

23  sixty-eight mean in terms of value movements over the week and

24  all of that, correct?

25  A.   Well, I -- again, as I've testified, I believe it relates

Page 160

1    to -- and consistent with the numbers that I certainly saw in

2    the press release.  But yes.

3    Q.    Okay.  Now -- and you were able to do all of that from a

4    photocopy of this exhibit, correct?

5    A.    Because these are --

6    Q.    This is a photocopy, yes?

7    A.    Yes, so these are numbers that have had a life in the

8    transaction.  I'm not -- I'm not referring specifically to

9    understanding what I drew at that moment.  If -- I don't know

10   if that's an appropriate way to answer it.  But --

11   Q.    Well --

12   A.    -- these numbers had a life to them in the transaction.

13   Q.    -- that's what I wanted to ask you.  You recall being

14   shown this photocopy of your chart marked today as Movants'

15   Exhibit 410, marked in the upper right-hand corner as

16   Deposition Exhibit 338B, at your deposition on September 12th

17   last year, right?

18   A.    Well, this was --

19   Q.    Do you recall being asked about the document?

20   A.    I hadn't seen it in a year, and yes I was asked.  And I

21   was surprised that it was in a photocopy, because it -- I had

22   drawn in green on a manila and there --

23   Q.    Your surprise aside, sir, the fact of the matter is, at

24   your deposition you said you weren't even sure if it was the

25   document that you drew, because you'd never seen it in

Page 161

1    photocopy form?

2    A.   Well, and --

3    Q.   Isn't that right?

4    A.   -- and if I may --

5    Q.   Sir, is that right?

6    A.   Yes --

7    Q.   Do you recall saying that at your deposition?

8    A.   I believe I said something like that, in particular, in

9    reflection of the fact that that there was additional writing

10   on it that wasn't my writing, and I hadn't seen it since -- but

11   if I'm not mistaken, and you can correct me if I am -- I

12   believe, in my deposition I described the meeting and described

13   drawing on a manila folder.  It was certainly not a secret that

14   I had been party to that meeting.

15   Q.   And when you were shown this document and asked if it was

16   the drawing -- well, let me ask you to turn to page 166 of your

17   deposition.

18   A.   Yes, sir.

19   Q.   Again, it's behind that tab marked "Transcript" at the

20   back of your book.

21   A.   Yes, sir.

22   Q.   Okay.  And in particular, sir, I'm directing your

23   attention to -- starting at line 12 --

24   A.   I'm sorry, which page, sir?

25   Q.   166.  Are you there?

Page 162

```
 1    A.    I'm on 165.  Sorry.

 2    Q.    Okay.  You on 166?

 3    A.    Yes, sir.

 4    Q.    Go to line 12.  And I'm going to read to you through line

 5    20.

 6    A.    Okay.

 7    Q.    "MR. TECCE:  I'd like the record to reflect that I'm

 8    handing the witness a document that was previously marked 338,

 9    Exhibit 338B.

10    "Q.  Mr. Klein, have you ever seen this document?

11    "A.  I don't know if it's this specific document that I'm

12    referring to so -- I haven't seen it in this form.

13    "Q.  Okay, is this your handwriting?

14    "A.  Looks like it could be."

15    Q.    Has your memory about this document improved since your

16    deposition was taken last year?

17    A.    Well, now seeing it --

18          MR. GAFFEY:  Put that chart back up, please.

19    A.    I've now seen it again.  It was put in front of me in

20    complete surprise with numbers that I hadn't recognized and

21    without being manila or in green so it was -- it just -- it

22    didn't -- it didn't -- I'm sorry, I'm not answering your

23    question.

24    Q.    It's a simple question, sir, has your memory about this

25    document improved in the last year?  At your deposition you
```

Page 163

1    weren't even able to say whether it was the chart you drew

2    because you'd not seen it in a photocopied form, and today

3    you're able to testify about it at some length.  Has your

4    memory about this document improved?

5    A.   You all have put it in as being a document that you have

6    the original manila folder, and I'm taking you at your word

7    that it is the document that it is, so I'm responding to

8    questions of what's specifically on a document that I've

9    admitted that I've drawn because I've been told that you have

10   the manila document and that this is a true reflection that

11   you've told me.  I didn't even think to question whether it was

12   a true reflection because in fact you've told me that.

13   Q.   So you're able now to know that this is your handwriting,

14   not just that it could be your handwriting.

15   A.   You --

16   Q.   Yes?

17   A.   You've told me so by submitting it --

18   Q.   Sir, I haven't said a word to you about who wrote this

19   document.

20   A.   My --

21   Q.   My question --

22   A.   My apologies.

23   Q.   -- is whether you now have a better memory about this

24   document in this court than you had when you gave your sworn

25   deposition testimony a year ago in these proceedings?

Page 164

1    A.   Based upon my understanding --

2    Q.   Sir, I think it's a yes or no question.

3    A.   I don't know that I've had a better recollection of the

4    document.  I have an understanding this is a document that has

5    been stated as being true and I was told has been put into

6    evidence as such.  I haven't seen the manila folder since then.

7    Q.   Well, you were able to talk to Mr. Boies this morning

8    about the entries on the bottom without questioning whether

9    that was your handwriting, correct?

10   A.   Under the presumption that I just put forward to you that

11   this was a true to form photocopy of the manila folder which I

12   have not seen, I just took it at its honest face value that

13   someone had that and was submitting that into evidence.

14   Q.   Now, at your deposition, sir, when you were asked about

15   this document and you said -- you told us that it could be your

16   handwriting but you weren't able to tell us whether it was the

17   one you actually drew because it was in that form, you said

18   that other than those things you didn't know what more you

19   could say about the document, do you recall that?

20   A.   I don't recall specifically, but I recall being concerned

21   that there was other people's handwriting on here and I didn't

22   know how to --

23   Q.   Well --

24   A.   -- reflect to that.

25   Q.   -- the other people's handwriting, sir, is that little box

Page 165

1    in the middle that says "resis, 2.5 and 3.5".  That's the other

2    people's handwriting you're talking about?

3    A.   Yes, and I hadn't seen --

4    Q.   All right, is there any other part of that other than the

5    exhibit tag that you think might be somebody else's

6    handwriting?

7    A.   Other than the circles and otherwise, I don't believe that

8    I would question the other -- the other data.

9    Q.   Well, let me ask you to turn to page 170 of your

10   deposition.

11   A.   Yes, sir.

12   Q.   Let me know when you get there.

13   A.   I'm here, yes, sir.

14   Q.   And go down to line 23 and I'm going to read the question

15   and answer that goes over onto page 171.

16   A.   Yes, sir.

17   "Q.  Do you have any reason to believe that this could be a

18   Xerox copy of your manila folder that you referenced

19   previously?"

20   Q.   And then Mr. Bernick, your lawyer at the time, says "The

21   fact that this is his handwriting or may be his handwriting?"

22   "A.  I don't -- I don't know what more I can say to this than

23   I've said to this."

24   Q.   Did you give that question and -- did you hear that

25   question and give that answer?

Page 166

1   A.   I believe it's -- it's in the deposition so I -- I believe

2   so.

3   Q.   My next question, sir, is was it true when you said that

4   you couldn't say anything more about the document at your

5   deposition?

6   A.   I believe I was truthful in my deposition.  I didn't have

7   the stipulation that this was a formal copy of the manila

8   folder, that someone had the manila folder.  I didn't --

9   Q.   Have you at any point now seen the color version of the

10  exhibit?

11  A.    No, sir.  I'm only told that it exists and this is a true

12  replica.

13  Q.   So when you prepared to testify and talked to the people

14  that you talked to and reviewed your recollection, you did all

15  of that off of the photocopy of the chart --

16  A.   I --

17  Q.   -- yes?

18  A.   I've not seen a manila folder, no, sir.

19  Q.   So yes to my question, the only thing you looked at while

20  you prepared to testify was the photocopy that we showed you at

21  your deposition, is that correct?

22  A.   I believe so, yes.

23  Q.   Yes?

24        MR. GAFFEY:  Okay, let's put the chart back up,

25  please, Steve.

Page 167

1      Your Honor, again, I'm about to go to a fairly long

2   line of some numbers.  If it's a convenient time for -- but I

3   can proceed if you like but I wasn't sure what you --

4      THE COURT:  An afternoon break makes sense.  But let

5   me give you a couple of questions, and I'm going to ask the

6   other movants as well about length of examination.

7   Approximately how much longer do you think you're going to be?

8      MR. GAFFEY:  I think I'm another forty-five minutes,

9   Your Honor.

10      THE COURT:  And are there other questioners among the

11   movants?

12      MR. MAGUIRE:  Yes, Your Honor.  I would anticipate

13   about forty-five minutes.

14      MR. TECCE:  Your Honor, I have questions but I don't

15   think I'm going to be forty-five minutes.  Depending on where

16   this goes it may even be shorter, so I'm thinking approximately

17   twenty minutes.

18      THE COURT:  Okay.  Now I'm going to do some simple

19   math.  I'm hearing forty-five and forty-five; that's an hour

20   and a half.  And I'm hearing maybe twenty minutes which I'm

21   going to round up, and I'm going to call that about two hours?

22      UNIDENTIFIED SPEAKER:  Yeah.

23      THE COURT:  I'm assuming that Mr. Boies will have some

24   redirect?

25      MR. BOIES:  Right now I've got about between five and

Page 168

1    ten minutes, Your Honor.

2        THE COURT:  Okay.  I will simply note a truism.  It's

3    a Friday in August.  And in the ordinary course of Fridays in

4    August people are on the road now to go someplace.  No one's

5    going on the road now.

6        UNIDENTIFIED SPEAKER:  Okay.

7        THE COURT:  We're going to stay here till we're done,

8    provided that staying past 5:30 doesn't inconvenience our

9    reporter, and we'll find that out during the break.

10       But let me also ask Mr. Klein if he's available to

11   return on Monday morning should that be required?

12       THE WITNESS:  Unfortunately I have a commitment.  I'm

13   prepared to stay here as long as you need tonight if that's --

14   if that's appropriate.  I'm in your hands.  But I have a

15   separate commitment Monday, I apologize.

16       MR. BOIES:  Your Honor, I also -- I'm scheduled to be

17   in trial in California that day.  Mr. Schiller was going to be

18   here Monday and Tuesday.

19       THE COURT:  Okay, we'll do what we can to finish Mr.

20   Klein this evening, recognizing that the estimates of forty-

21   five, forty-five, twenty, and five to ten may or may not be

22   accurate, and we'll do what's necessary to complete Mr. Klein.

23   But if it becomes burdensome he'll have to come back.

24       MR. GAFFEY:  Your Honor, I'll do what I can during the

25   break to see if I can be a bit brisker.

Page 169

1            THE COURT:  Okay.  We're adjourned till about a --

2       (Audio ends mid-sentence)

3       (Recess from 3:33 p.m. until 3:50 p.m.)

4            THE COURT:  Be seated, please.  Just for planning

5    purposes, we're going to have to take a short break at about

6    5:20 or 5:25 to change reporters to go past 5:30.  So whoever

7    may be questioning at that point, just either you'll stop

8    yourselves because you'll remember or I'll stop you because I'm

9    looking at the clock.

10           MR. GAFFEY:  Thank you, Your Honor.  May I proceed?

11           THE COURT:  Please.

12   RESUMED CROSS-EXAMINATION

13   BY MR. GAFFEY:

14   Q.   Mr. Klein, I've put Movants' Exhibit 410 back on the

15   screen.  That's your handwritten chart.  And directing your

16   attention to the numbers and where it is annotated "post-mark

17   44 plus 45", do you see that?

18   A.   Yes, sir, I do.

19   Q.   And now I believe you said to Mr. Boies in your testimony

20   before lunch that there was a degree of disagreement between

21   Lehman and Barclays about the value of the repo collateral,

22   yes?

23   A.   I gave -- yes, I said that.

24   Q.   And that it was not necessary for Lehman and Barclays to

25   actually agree on the value of the collateral.

Page 170

1    A.   Barclays and Lehman in that room agreed that they would

2    proceed with the view that the collateral was roughly equal to

3    the Fed loan.  There wasn't a need to put a specific, quote,

4    "price tag" on that.  But they agreed to move forward with the

5    view that that was the understanding to move forward, plus or

6    minus, in that sense.  Barclays had a view it was worth less;

7    the Lehman folks thought it could be worth more.

8    Q.   Okay.  And does your forty-four and forty-five on your

9    chart indicate the degree of difference between the two sides?

10   A.   I don't believe so.  I believe -- well, I believe my

11   understanding was that Barclays had a perspective, from

12   Barclays' view, that the value was at or slightly below -- or

13   possibly slightly below the Fed liability.

14   Q.   And you don't know the source or the basis for that

15   Barclays view that it was below the amount of the Fed

16   liability?

17   A.   Well, the description that was given to me prior to the

18   Friday morning meeting was that the amount of the collateral

19   that had been reduced to the 49.9, that that 49.9 was or could

20   be less than the Fed liability; that was what was communicated

21   directly to me.

22   Q.   Now, when you met with the people -- when you had your

23   meeting when you drew this chart, you told the people assembled

24   that the difference between the 49.9 and this 44, 45 range was

25   due to a drop in market value, isn't that right?

Page 171

 1    A.   I don't -- I don't know that I -- I'm sorry, I don't know

 2    that I said that specifically.

 3    Q.   You don't know one way or the other?

 4    A.   I don't know one way or another about the drop in market

 5    value.  I don't know specifically how I communicated that, no.

 6    Q.   Did you know at the time you were drawing this chart and

 7    having this meeting that Barclays had conducted its own haircut

 8    analysis of the repo collateral?

 9    A.   I know what I described to you which was that Barclays had

10    given me an estimate of what they thought was the value or what

11    they had directed me, but --

12    Q.   Did they give you a document showing that estimate?

13    A.   No, sir, that was communicated to me prior to the Friday

14    meeting.

15    Q.   And I take it they didn't tell you how they -- you know,

16    how they came up with that number as the estimate?

17    A.   Other than, as I testified I believe earlier, that they

18    had their teams of people that had been analyzing it.  I didn't

19    get a breakdown of an analysis of the securities or the

20    mathematics, no, sir.

21    Q.   Take a look in your book, sir, at Exhibit -- or on the

22    screen if you prefer at Exhibit M-45.  If you're comfortable

23    using the screen, sir, that's fine; they're the same document.

24    A.   Whichever you prefer, sir.

25         MR. GAFFEY:  M-45, please.

Page 172

1    Q.   This is Movants' Exhibit 45 in evidence, sir.

2         MR. GAFFEY:  I'm going to ask that it be blown up a

3    little bit so we can see the text.

4    A.   I have it also here in the --

5    Q.   Okay.  Have you ever seen that document before?

6    A.   No, not that I'm aware of.

7    Q.   You never spoke to Patrick Clackson or Rich Ricci about

8    it?

9    A.   I don't believe I spoke about this document.  I don't

10   believe I've seen this document.

11   Q.   Okay.  And if you take a look at the second page of M-45,

12   you ever seen that document before?

13   A.   No, sir, I don't believe I have.

14   Q.   And you -- just there's a column called Haircut, it totals

15   down to 6.04, you see that?

16   A.   In the second column from the right?

17   Q.   Yes, sir.

18   A.   Yes, sir, I see that.

19   Q.   Did anybody from Barclays tell you that that was the

20   haircut Barclays has determined should be taken off the Fed

21   valuation of the repo collateral?

22   A.   No, I don't remember anyone giving me a percentage.

23   Q.   You had no conversations with anyone at Barclays along

24   those lines, did you?

25   A.   I don't recall having a conversation about a percentage

Page 173

1   haircut, no, sir.

2   Q.   Has anybody summarized for you Mr. King's testimony in

3   these proceedings about that document?

4   A.   No, sir, not that I can recollect.

5   Q.   So you would have no basis to agree or disagree with Mr.

6   King when he described it as "based on an orderly runoff, as

7   orderly a runoff as one can contemplate in the months following

8   a bankruptcy" of the repo collateral, would you?

9   A.   I'm sorry, I just can't comment on the document.  I don't

10  know the document.

11  Q.   And would you take a look, again either on the screen or

12  in your book, sir, at Exhibit M -- I beg your pardon, why don't

13  you look at it on the screen because it's easier.

14  A.   Okay.

15  Q.   Exhibit M-147.

16  A.   Yes, sir.

17  Q.   Or alternatively it's in the book with just Witness on it.

18  Those are your choices.

19  A.   The big -- oh, it's the big other book.

20  Q.   Okay.

21  A.   I've got them here.

22       MR. GAFFEY:  And I'm going to ask that we turn to the

23  last page of Exhibit M-147.

24  A.   Do you think I'll need this again, or --

25  Q.   Just leave it handy; we'll be back.

Page 174

1    A.   Okay.

2         MR. GAFFEY:   And can we blow that up a little bit?

3    Q.   Now, this is a similar document with some handwriting on

4    it, sir, do you see that?

5    A.   Yes, I do see that, yes.

6    Q.   You don't know whose handwriting that is?

7    A.   No, sir, I don't believe I've seen that document before.

8    Q.   Okay.  You've never seen that document before?

9    A.   No, sir, I don't believe so.

10   Q.   Do you see the number 1.9 billion on that document?

11   A.   I do, yes, sir.

12   Q.   Do you have any reason to know one way or the other what

13   constitutes that 1.9 billion?

14   A.   I'm only aware of 1.9 billion that floated around in this

15   transaction but I don't have enough data from that page to

16   comment on the page.  I'm sorry.

17   Q.   So other than the fact that the numbers are identical, you

18   don't know whether there's any relationship at all between that

19   1.9 and the 1.9 you drew on your chart?

20   A.   I'm sorry, I just can't comment on the page and there's

21   no -- there's no clarifier or descriptor to that on --

22   Q.   Did any --

23   A.   -- on what you're showing me.

24   Q.   Did anyone described Mr. Seery's testimony in these

25   proceedings to you?

Page 175

1    A.   I've heard the name and then you've spoken to the name.  I

2    don't have any detail -- I don't believe that I've been given a

3    description of his testimony, no, sir.

4    Q.   So you have no knowledge, I take it, of an exercise

5    conducted, at Mr. Seery's direction, where Lehman traders

6    determined liquidation values for the assets in the repo --

7    A.   No.

8    Q.   -- do you?

9    A.   No, sir, I'm not aware of that.

10   Q.   And you don't know, sir, if the 45.5 number you see in

11   handwriting there is in any way a basis for the numbers that

12   you were told anecdotally and then drew on your chart at that

13   meeting, do you?

14   A.   I'm sorry, sir, I don't -- you've mixed me --

15   Q.   Take a look -- you've got -- you've got --

16   A.   A forty-five --

17   Q.   -- a forty-five billion dollar number.

18   A.   I have a for -- I have only one 45.5 --

19   Q.   Okay.

20   A.   -- which is the Fed liability.

21   Q.   Are you able to tell us, sir, one way or the other -- let

22   me back up.  The forty-four and forty-five billion dollar

23   numbers on your chart came to you from other people, yes?

24   A.   Yes, sir.

25   Q.   And you're not able to tell us whether the forty-five

Page 176

1    billion dollar number on your chart bears any relation to the

2    45.5 we just saw on Exhibit 147, are you?

3    A.   I'm sorry, I don't believe I know what 147 specifically

4    was.

5         MR. GAFFEY:  Put 147 back up, please, Steve.

6    A.   I mean, I saw what you showed me but I don't know that

7    I've seen it before --

8    Q.   Okay.

9    A.   -- or that I know what it was.

10   Q.   So I take it the answer's no, you can't tell me whether

11   there's any relationship between the two?

12   A.   I don't think I could.  I don't know the document.  I'm

13   sorry.

14   Q.   Now, if we can go back to your chart, Exhibit 410 --

15   A.   Yes, sir.

16   Q.   -- if I add up the asset side, sir, and I use the higher

17   asset number, the forty-five --

18   A.   Yes, sir.

19   Q.   -- I come to a total of 46.9 when you add in the 1.9

20   billion dollar item there, right?

21   A.   Yeah, they're forty-seven, just below that.

22   Q.   Okay.  And you denominated it as roughly forty-seven

23   billion on your chart, correct?

24   A.   It seems that on approximation there's some big movements

25   there and it's -- it seems an approximation, yes.

Page 177

1    Q.   Okay.  And if I add up the liabilities side, the 45.5 and

2    the 4.25 I come to 49.75, correct?

3    A.   Wait -- yes, I believe the math is correct but the --

4    Q.   Okay.

5    A.   -- the 4.25 -- I didn't total them.  I didn't think of the

6    4.25 -- I viewed those as expense items as opposed to purely

7    booked.  I mean, this is compensation expense that was going to

8    occur.  If you're asking for an addition of that liability --

9    I'm sorry, I may have -- I may have jumped in a different path

10   than your question.

11   Q.   No, that's okay.  I was just a little -- I want to follow

12   up on your statement you didn't think they should be added

13   together.  In order to assess the value of the transaction to

14   Lehman, don't you have to take the assets and the liabilities?

15   Don't you have to subtract the liabilities from the assets and

16   see who's benefiting from this transaction?

17   A.   Well, I think there -- as I've tried to described there

18   was a transaction for the whole business, there was a

19   consideration paid in the form of cash plus the specifically

20   assigned liabilities of comp and cure plus the incremental

21   liabilities of operating the business plus the directly

22   associated liabilities attached to the trading assets.  There

23   clearly would have been an accounting that, as you say, Lehman

24   would have made for what they deemed that to be worth as well

25   as what their advisors would have and whether that was a value

Page 178

1   and a transaction that they wanted to do or their best

2   transaction they could get or -- but I'm not sure if that's the

3   question you're asking.  I apologize.

4   Q.   Well, sir, let me just put it to you, isn't it a fact that

5   at this meeting where you drew this chart you told the people

6   assembled that it was -- that the numbers added up to the

7   benefit of the estate and the creditors should be happy with

8   the deal?

9   A.   I didn't give an opinion on, quote, "the deal".  I wasn't

10  advising the creditors nor did I list the entire transaction.

11  As I look at it now there's no buildings, there's no discussion

12  of the operations of the business and the people.  There's --

13  it's by no means a complete description of the transaction, nor

14  do I think it was my role at all --

15  Q.   And that relates to your view of the structure of the

16  transaction that it's all the assets, except excluded assets,

17  and that you don't look at the overall values --

18  A.   No --

19  Q.   -- correct?

20  A.   -- each side looks at what they perceive to be --

21  Q.   I'm asking a question of whether I've correctly described

22  your view, sir?

23  A.   I --

24  Q.   It's all the assets, except the excluded assets, without

25  regard to the overall value.  Is that a correct summary of your

Page 179

1    view of the structure of the transaction?

2    A.    Not precisely, sir, because your second comment "without

3    regard", I think each side had their regard for what they view

4    all the assets they were getting.  And Barclays had certain

5    assets that were worth things to them that weren't worth

6    anything to the estate.  But I -- and I hope this is directly

7    responsive to your question, this meeting was not my providing,

8    nor was I ever asked to provide an opinion as to the value for

9    the creditors --

10   Q.    Okay.

11   A.    -- nor could I --

12   Q.    Your testimony was just flow of funds on the loan, on the

13   repo agreement, is that right?  That's your testimony?

14   A.    Not precisely.  That I was asked by Mr. Miller to come in

15   to describe and explain that.  It was a quick meeting, and I've

16   clearly drawn more than just the flow of funds to be

17   explanatory so that it was more in that discussion but it

18   clearly was not, nor would I --

19   Q.    Well, the 1.9, sir, that's the -- I keep forgetting if

20   it's box or bag, but that's the box of hammers, right?

21   A.    It says box, yes, I believe so.

22   Q.    And that's what's more formally referred to as the

23   clearance box assets, right?

24   A.    I believe that's the case, yes.

25   Q.    And the clearance box assets were one of the categories of

Page 180

1   additionally identified assets that were to make up this gap,

2   correct?

3   A.   That's correct, yes.

4   Q.   And another one was the 15c3 category of assets, correct?

5   A.   In terms of the -- you're referring --

6   Q.   Making up the gap between the --

7   A.   You're referring to the Friday discussion?

8   Q.   Yes.

9   A.   Yes, sir.

10  Q.   Okay.  And can you give us an explanation of why there's

11  no mention of the 15c3, the 800 million dollar 15c3 item on

12  your chart?

13  A.   Well, first and foremost, as I think I referred to

14  earlier -- and I don't know the timing of all of the events --

15  the glasses individual was one of the people that approached me

16  with Mr. Miller on the 15c3.  I mentioned that, I think,

17  earlier, although Mr. Miller then negotiated it with me.  But

18  leaving that aside, I don't -- I don't have specifics on the

19  whole conversation but this was relating to the Fed repo and

20  trading assets.  At least as I understood it and as I

21  understand it now, the 1.9 box of hammers is a trading asset

22  and it was from the trading floor.

23  Q.   So the 15c3 was identified as assets that would help make

24  up this gap, correct?

25  A.   Which gap now are you ref --

Page 181

1    Q.    When you're talking about identifying additional assets

2    with the Lehman folks, you said there were two things: the 1.9

3    billion on the unencumbered box and the 15c3, do you recall

4    that?

5    A.    Yes, I do, but it was your --

6    Q.    Now, one of those things --

7    A.    Yes.

8    Q.    -- your unencumbered box, is on the chart you drew for the

9    people at the meeting, correct?

10   A.    But sir, I wasn't describing the, quote, "gap".  You're

11   referring to the Friday meeting as the gap meeting.  This was

12   not a meeting, as I recall, to describe the, quote, "gap".

13   This was a meeting with a different purpose and Mr. Miller

14   asked me to --

15   Q.    This had nothing to do with the meeting you had the day

16   before about closing the gap?

17   A.    Well --

18   Q.    I just want to know, is that your testimony, sir?

19   A.    I don't think anything relating to the inter-moving parts

20   of this transaction can -- well, let me say it differently.

21   The numbers and the moving pieces all relate to events that

22   took place, but the discussion was not -- to my understanding,

23   was not driven by a discussion of, quote, "how that gap" -- the

24   gap discussion was the Friday discussion that was with Mr.

25   McDade, just so we're clear on the different discussions.

Page 182

1    Q.    My question, sir, is, is it your testimony that the chart

2    you drew at this meeting over the weekend, the one we have up

3    here as Exhibit 410 --

4    A.    Yes, sir.

5    Q.    -- has nothing to do with the meeting on Friday morning

6    about closing the gap between assets Barclays wanted and assets

7    it thought it was going to get.

8    A.    Well, nothing to do in the sense -- the Fed liability and

9    the assets attached to the Fed liability are an event that was

10   discussed in the Friday meeting, and the flow of funds relating

11   to the Fed liability is certainly related to what you're

12   describing.  I don't know if that answers your question, but

13   clearly --

14   Q.    Well, it goes back to the question that I -- that had

15   started this particular line of questioning which is, is that

16   your explanation for why there's no reference to the 15c3 item

17   on this chart you drew in that meeting?

18   A.    As I said earlier, I think that I reflect that the

19   trading -- specific trading assets that were discussed,

20   that's -- 1.9 as a clearance box was described to me -- I

21   hadn't heard the term clearance box or box of hammers as a

22   trading book asset, it just was a set of odds and ends.  I

23   think they said hammers and something, but --

24   Q.    Now, the forty-five -- the forty-four, forty-five range,

25   sir, to your knowledge on that weekend, expressed to the people

Page 183

1    in the meeting Barclays' view of the value of the assets in the

2    repo plus the box, yes?

3    A.    The --

4    Q.    I beg your pardon.  Let me -- I just misstated that.  The

5    forty-four and forty-five billion dollar item on your chart was

6    meant to express Barclays' view of the assets in the repo, yes?

7    A.    Well, to be fair, it was meant to express my understanding

8    of what had been expressed to me --

9    Q.    Fine.

10   A.    -- as Barclays' view.

11   Q.    As Barclays' view of the assets in the repo, yes?

12   A.    Again, my understanding, yes.

13   Q.    Yes, okay.  Now, at around that same time period, over --

14   did your client, Barclays, ever put that value of the assets at

15   somewhere closer to fifty-two billion dollars?

16   A.    I -- I don't -- I'm not aware that they valued them at

17   fifty-two.  I wasn't appraised that they valued them at fifty-

18   two.

19   Q.    In the book with your name on it, sir, or up on the

20   screen, if you prefer, is a copy of Movants' Exhibit 47.

21        MR. GAFFEY:  Blow it up a little bit so it's easy to

22   read.

23   Q.    Now, this e-mail is not addressed to you sir.  It's M-47

24   in evidence.  My question is did you ever see that e-mail?

25   A.    Let me just make sure I'm looking at the same one.  This

Page 184

1    is the Gerard LaRocca?  Is that -- I'm just looking at it on

2    the screen.  I'm sorry.  No, I -- I don't recall having seen

3    it.  I don't recall having seen that, no.

4    Q.   One of the people you were dealing with as Mr. LaRocca,

5    correct?

6    A.   He took me down here in the subway on the Friday meeting.

7    Q.   Yeah, you mentioned that before.  He was one of the people

8    that you -- one of the people you were actually -- you knew and

9    you were dealing with in connection with the Barclays

10   transaction, yes?

11   A.   A bit.  I mean, he wasn't -- as I understood Mr. LaRocca,

12   he's the operations person and he -- I didn't come across him

13   very much although I had come across him.  And of course he

14   took me down in the subway, he knew the --

15   Q.   All I'm trying to establish, sir, is Mr. LaRocca is

16   somebody that you did speak to about the transaction at or

17   around this time, yes?

18   A.   I -- I would have spoken to him --

19   Q.   Okay.  And in any of the conversations you had with him,

20   did Mr. LaRocca tell you, 'Gee, I got an e-mail that said the

21   total securities and cash received through the repo was 52.19

22   billion dollars'?

23   A.   No, that -- that hadn't been described to me, no, sir, not

24   that I can recollect.

25   Q.   Did you ever have a conversation with Mr. LaRocca where he

Page 185

1  explained that the repo was about forty-five billion in

2  collateral and then there was the cash substitution by Barclays

3  which brought it to a range of fifty-two?

4  A.   No, sir.

5  Q.   Did Mr. LaRocca say anything like that to you?

6  A.   No, sir, not that I can recollect.

7  Q.   And another person that you communicated with probably a

8  bit more was Mr. Ricci, yes?

9  A.   Yes, sir.

10  Q.   And Mr. Ricci was Barclays' lead negotiator, correct?

11  A.   He was -- it varied at various points in time.  If you can

12  be a bit more specific --

13  Q.   He's pretty high up there in the Barclays hierarchy?

14  A.   He is -- yes, he is.  He's a senior man -- yes.

15  Q.   Did you ever have any conversation or other communications

16  with Mr. Ricci where he put the number at about fifty-two?

17  A.   In terms of the value of the --

18  Q.   Yeah.

19  A.   I'm not aware that he told me the value was fifty-two at

20  any point in time, no, sir.

21  Q.   Would you take a look at Exhibit M-362, either in your

22  book or we'll put it up on the screen, sir.  And at the top, in

23  the top e-mail on that you'll see an e-mail from Mr. Ricci to

24  you sent on 21 September, 2008, this Sunday.  Do you see that?

25  A.   Yes, sir, I do.

Page 186

1    Q.   Yes?

2    A.   Yes, I do.

3    Q.   And Mr. Ricci writes, quote, "Pretty convinced resis not

4    in fifty-two after talking to a few people.  Will confirm but

5    more confident."  And then he goes on about the resis and some

6    other things.  You see that sentence?

7    A.   I do, yes.

8    Q.   Did you understand when you got this e-mail from Mr. Ricci

9    on Sunday at 9:52 p.m. that he understood that the value to

10   Barclays was more in the range of fifty-two billion?

11   A.   I don't recall this e-mail and I don't recall --

12   Q.   Did you have an understanding when you got the e-mail

13   that -- well, did you ask him, what do you mean by the fifty-

14   two?

15   A.   I don't recall the e-mail and I don't recall anybody

16   expressing to me that they felt there was fifty-two billion of

17   value.  I just don't recall any of that.

18   Q.   So you have no recollection of any conversation with Mr.

19   Ricci, Mr. LaRocca, or for that matter any of the other

20   Barclays folks where at least at one point over the weekend

21   they were assessing the value of what they were recovering

22   as -- at fifty-two billion dollars?

23   A.   I don't believe that anyone expressed to me they had a

24   view that there was fifty-two billion of value in the

25   collateral pool that you're describing at all.  I don't recall

Page 187

1   that, no, sir.

2   Q.   And you have no recollection of asking -- of rather

3   receiving this e-mail or asking Mr. Ricci what he meant when he

4   talked about resis being in the fifty-two.

5   A.   I'm sorry, no, I do not.

6   Q.   You didn't -- do you know what he meant by res -- can I

7   ask you if you understand now what he means by resis?

8   A.   Well, I believe the reference to resis represents or

9   reflects residential mortgages.

10  Q.   Okay.  And you just have no clue what he's writing about

11  when he talks to you about the resis not being in fifty-two

12  after talking to a few people?

13  A.   I don't -- I don't have any recollection of a fifty-two

14  number.  I -- at this time I don't remember anyone describing

15  fifty-two billion of value.

16  Q.   Mr. Ricci also writes to you a little further down, "TBA

17  is a big client issue" -- in that same section, "TBA is a big

18  client issue.  Can you touch base with Gerard?"  Do you see

19  that?

20  A.   I do, yes.

21  Q.   All right.  And do you recall -- what's a TBA?

22  A.   I don't know.

23  Q.   Is that --

24  A.   I've heard the phrase; I don't know what it is.

25  Q.   Is that a to-be-acquired mortgage-backed security?

Page 188

1    A.   I'm sorry, I don't know.  It could be; I just don't know.

2    Q.   Do you remember TBAs being a topic of discussion around

3    the transaction over the weekend?

4    A.   I've certainly heard the phrase.  I don't recall anything

5    of that --

6    Q.   Do you have any recollection at all as to why your

7    client's writing to you about TBAs as a big client issue?

8    A.   There was clearly -- and I'm -- I'd like to try to answer

9    this if I can with a --

10   Q.   I would too, sir.

11   A.   -- with a mention of the -- there's a DTC -- there was a

12   DTC issue of whether the DTCC would allow the pipes to open.

13   And that was part of this whole room where we had all the

14   regulators and DTCC folks and JPMorgan folks and all the

15   players.  And the issue, as I recalled in Sunday, and frankly,

16   Saturday going into Sunday was all about the issue of could the

17   pipes stay open, could you actually trade, could you clear for

18   clients, could you not.  And the DTCC required, as I generally

19   understand, the collateral.  Other than that statement I

20   don't -- I don't have a -- I don't have a good recollection of

21   TBA.

22   Q.   You're reading that as some connection between the

23   sentence referring to DTC and then the sentence beginning "Also

24   TBA is a big client issue"?  Do you see those two as connected?

25   A.   I'm sorry, I'm just reading the e-mail and --

Page 189

1    Q.   So I take it you -- let me just ask you this, do you know

2    if TBAs were excluded from the purchased assets?

3    A.   I don't have a good enough recollection of what a TBA was.

4    Q.   Okay.

5    A.   I apologize.  If there's another descriptor that maybe I

6    would understand.  I just don't; I apologize.

7    Q.   All right.  And to your -- I take it then you have no

8    knowledge as to whether in fact Barclays stepped into Lehman's

9    position as the recipient of net proceeds on any TBA

10   transaction?

11   A.   I referred to the DTCC because of the stepping into which

12   I understood that Barclays had to undertake an agreement with

13   regard to the DTCC and collateral.  I just don't -- and I

14   apologize, I just -- a TBA, I recognize the term, it just

15   doesn't -- it doesn't connect.

16   Q.   You don't have to apologize, sir.  If the answer is I

17   don't know just say I don't know.

18   A.   I'm sorry.

19   Q.   Is it I don't know?

20   A.   I know about the DTC issue but on the TBA issue I don't --

21   I don't know what the TBA is.  I don't have a good enough

22   recollection of what TBA is other than having heard the name.

23   Q.   Okay.  Now, a little further down in this exhibit, sir,

24   Exhibit 362, is your original e-mail on that line, and it says,

25   "Team" -- this is to Rich Ricci, Victor Lewkow, Archie Cox.  Do

Page 190

1    you see that down at the bottom?

2    A.    I do, yes, sir.

3    Q.    And you write the following:  "Team, we need a brief call

4    with Rich, subject to the schedule, to review the language

5    regarding the expense accruals and to ensure that BarCap has

6    appropriate flexibility to run their business as they deem

7    appropriate," end quote.  Do you see that?

8    A.    I do, yes, sir.

9    Q.    And do you know what language you were referring to there?

10   A.    The only call that I think that this relates to -- and I

11   don't have a -- the only call that I think that this relates to

12   was a call that I might have referenced earlier, a discussion

13   that we had regarding comp, on the comp accrual, what does it

14   mean.

15   Q.    And it was an issue at or around this time within

16   Barclays, sir, as to Barclays determining what exactly it had

17   agreed to with regard to how much it had to spend on bonuses.

18   Does that refresh your recollection?

19   A.    Well, there was an understanding of -- there was a

20   discussion on what the, quote, "comp" number provided by Lehman

21   meant.

22   Q.    And you wanted to be sure that the language -- I take it

23   by that you mean the language of the agreement?

24   A.    I only recollect the call being a conversation with

25   lawyers and HR people to try to understand what comp meant in

Page 191

1   that sense.  I had a rec -- I had, from my background, an

2   understanding a little bit of comp, but --

3   Q.   And you wanted to be sure that with respect to this comp

4   item that your client Barclays had flexibility -- your word in

5   the e-mail, is that right?

6   A.   I think Rich asked for a conversation about this item.  We

7   had a call regarding the, quote, "comp", what it -- yeah.

8   Q.   You recall the two billion dollar comp number we've talked

9   about --

10   A.   Yes, I do.

11   Q.   -- today, yes?

12   A.   Yes, I do.  Yes, I do.

13   Q.   The purpose of this call, this brief call you wanted, was

14   to discuss whether Barclays could spend less than that two

15   billion on comp, wasn't it?

16   A.   No, that's not correct.

17   Q.   Isn't that what you meant by "flexibility to run their

18   business as they deem appropriate"?

19   A.   No.  Comp, at least as I understand it in investment

20   banking terms, is a total compensation line item and it's got

21   many different ways to look at it.  There's comp, there's

22   severance, there's bonus.  Some people include salary.  Some

23   people include deferrals.  The clear description of the

24   transaction was that Barclays was going to hire all the people

25   but after a few months if they didn't -- certain people they

Page 192

1    didn't need or didn't fit or didn't want they could have a

2    severance agreement with them --

3    Q.   My question, sir; forgive me for interrupting; my

4    question's a bit simpler.

5    A.   Sorry.

6    Q.   Over that weekend, Barclays was trying to determine

7    whether it needed to spend all of the two billion dollars on

8    comp, wasn't it?

9    A.   I understand that Barclays was trying to understand the

10   number and understand the number and how it related to the

11   transaction.

12   Q.   And by how it related to the transaction you mean what it

13   had agreed to do in the asset purchase agreement.  That's --

14   A.   I mean relating specifically to the people they were

15   hiring and those that may be terminated.  I think it was a

16   general question to understand that it was not a number that we

17   created.

18   Q.   And by appropriate flexibility, you meant leave to

19   Barclays' decision-making power, Barclays' discretion, how much

20   or how little to spend on comp, isn't that right?

21   A.   The issue that I understand was an issue that was being

22   discussed and I don't -- I may not speak and I apologize

23   specifically to the words of the e-mail was what is comp?  Is

24   it severance?  Is it fed bonuses?  What is it?  That was the

25   number -- the number was a number.

Page 193

1   Q.   And my question goes to your words here, sir, about BarCap

2   having appropriate flexibility to run their business as they

3   deem appropriate.  Isn't it a fact that what you were referring

4   to there was a discussion to determine how Barclays could

5   determine how much it was going to spend as opposed to amounts

6   that were in the asset purchase agreement?

7   A.   No, I don't believe that's the case.  It's how Barclays

8   could operate and what they could do in terms of the people and

9   what the results of that could be.  I don't -- I'm not aware or

10  certainly no one shared with me a desire to not pay people.

11  I'm not aware of that.

12          MR. GAFFEY:  Your Honor, may I have one moment to just

13  consult?  I may be able to put a line of question forth.

14          THE COURT:  Sure.

15          MR. GAFFEY:  I have nothing further, Your Honor.

16          THE COURT:  Thank you.

17          THE WITNESS:  Shall I keep these books, sir?

18          MR. GAFFEY:  Some others may have some questions about

19  them.  So, just leave them.  We'll get them after your

20  questioning is done.

21          THE WITNESS:  Thank you for your time.

22          MR. MAGUIRE:  If it please the Court, Bill Maguire for

23  SIPC trustee.  If I might approach, Your Honor?

24          THE COURT:  Mr. Klein is about to get some more books.

25          THE WITNESS:  Shall I excuse myself of these books,

Page 194

```
 1    sir?  Do you need me to --

 2            MR. MAGUIRE:  You're not going to need, just leave

 3    them.

 4            THE COURT:  You're not going to need those books right

 5    now.

 6            MR. MAGUIRE:  Not right now but maybe later.

 7            THE COURT:  Thank you.

 8            THE WITNESS:  Thank you, sir.

 9    CROSS-EXAMINATION BY

10    MR. MAGUIRE:

11    Q.   Sir, I'd like to begin by asking you some questions about

12    the Friday of the sale hearing and specifically about the

13    closing of the gap conversation that happened Friday morning.

14        Once the Lehman people went off to do their work on that

15    closing the gap exercise, all of that culminated in a meeting

16    between Barclays and Lehman later that day, right?

17    A.   I think there was, to be precise, there was a -- almost an

18    ongoing meeting in the sense that there was a discussion, there

19    was data brought to already help close it because there had

20    been previous communications that this had been an issue.

21    There was a discussion about those particular items.  There was

22    then, as I can recollect the SEC document or that e-mail where

23    the SEC was then brought in.  There was then a separate

24    conversation as I recall that I don't know what the Lehman

25    people did and then Barclays said go forward and there was a
```

Page 195

1    quote, "wrap-up" call of some kind which included the lawyers

2    and the Barclays' team and the members of the Lehman team and

3    then we went down to court.

4    Q.   So, at first in the morning, the Lehman team was told of

5    this problem, this closing the gap problem, right?

6    A.   Well, the meeting that I was in that discussion occurred.

7    As I said, I think others had been communicating that because

8    there was an awareness in that meeting already and then there

9    was potential solutions as I recall.  But, yes, that was the

10   principal subject of the conversation, yes.

11   Q.   And they then came back to the Barclays group with the

12   newly identified assets that they were able to show at Barclays

13   or describe to Barclays, right?

14   A.   Well, as I said, I apologize, it was a bit of a fluid

15   morning and I don't know which items they came in and discussed

16   specifically in that room and which they brought back.  I just

17   remember that the e-mail was brought in separately.  So, I

18   don't have the specific recollection of which breaks and events

19   brought which parts to the fore.

20   Q.   And specifically, you recall that there were two

21   additional assets that were specifically identified by Lehman

22   to Barclays, is that right?

23   A.   Well, there were a series of potential items that they

24   discussed.  The two items that became relevant, if you will, or

25   that were identified in that discussion as being of relevance,

Page 196

1    if you will, were those two items, yes, sir.

2    Q.   And the two items you were very clear on, were already,

3    you understood, in the deal because they were already part of

4    the business, right?

5    A.   I want to be clear; I had not seen those identified to me

6    at any time before.  They were described to us as these are

7    already here.  You haven't seen these.  These are assets that

8    exist.  These are trading book assets.  We've got this.  I

9    didn't -- I had not seen --

10   Q.   This was a new description?  You have not heard these

11   assets described before?

12   A.   I had not heard these assets described before.

13   Q.   But it's your position that they were assets of the

14   business and, therefore, they were not now being added to the

15   deal.  It was your understanding that all of these assets were

16   already in the deal, it's just that you hadn't heard about them

17   before?

18   A.   These were described as assets in the businesses that were

19   part of the business that we were purchasing to be.  I hope

20   that's as precise as I can be.  That's how it was described to

21   us and to me in the room, but I had not had those assets

22   identified to me in the past.  There was a attempt to create a

23   complete business and an understanding of the business which

24   was the North American business.  There were groupings of

25   assets in some cases just identified as there are these assets

Page 197

 1   but there weren't necessarily a quantum.  Teams were doing as

 2   best as they could to quantify because the 600 billion balance

 3   sheet had migrated down to this event that was 70 billion.

 4   I -- there were items that were either identified in name that

 5   I certainly hadn't understood specific numbers were not even

 6   identified to me directly in name.  These were two categories

 7   that had not been directly identified to me in the name before.

 8   Q.   I'm going to try to move --

 9   A.   I hope that's responsive.

10   Q.   -- I'm going to try to move through this.

11   A.   I'm sorry.

12   Q.   And I ask you, sir, if you please answer questions

13   directly yes or no.  And if you feel you need to add an

14   explanation --

15   A.   Yes, sir.

16   Q.   -- can you just indicate that?  Is that okay?

17   A.   That's fine, thank you.

18   Q.   There were two such assets, right?

19   A.   Yes, sir.  There were two assets.

20   Q.   One was the box of hammers?

21   A.   Yes, sir.

22   Q.   Did you use the expression "odds and ends" when you were

23   talking to Mr. Gaffey?

24   A.   Well, I was trying to describe what had been described to

25   me.  It was a general trading assets that were a box of

Page 198

1    hammers, odds and ends, different phrases that were used.  I

2    didn't create that, no, sir.

3    Q.    And the box of hammers, you told Mr. Boies that was not a

4    particularly attractive term.  You recall saying that?

5    A.    I didn't mean to be off the cuff.  That was just my own

6    opinion of the phrase.

7    Q.    But you recall at the time that the list was brought into

8    the room and given to you and the other Barclays'

9    representatives.

10   A.    It wasn't given to me.

11   Q.    Do you recall it was given to Michael Keegan?

12   A.    I don't recall that Keegan was part of that meeting.  I

13   don't remember.

14   Q.    Do you recall Michael Keegan in a meeting with you on that

15   Friday looking at a schedule of the box of hammers and saying

16   "I can't put any positive number on these"?  Do you recall

17   that?

18   A.    I don't recall a meeting with Mr. Keegan.

19   Q.    Do you recall Michael Keegan participating in a meeting

20   with you on that Friday specifically saying to you, Bob Diamond

21   and Rich Ricci, "I would be very nervous putting any positive

22   value on these"?  Do you recall that?

23   A.    No, sir, I don't recall a meeting with Mr. Keegan.

24   Q.    Now, the other asset was a 15c3 asset, right?

25   A.    Yes, sir.

Page 199

1    Q.   And you told us that the backup for that was this

2    document, an e-mail, right?

3    A.   Yes, sir.  The e-mail was provided to us, yes, sir.

4    Q.   And did you remember specifically the e-mail because there

5    were so few written documents or data that you were provided

6    with that Friday, isn't that right?

7    A.   Well, that I was provided with in general, not

8    specifically that Friday.  And more importantly, when you have

9    an e-mail that is referencing the SEC and something it just has

10   a -- well, it had a different import to me.

11   Q.   And that e-mail contained a reference to somebody at the

12   SEC saying that a certain amount could be released, that's your

13   recollection?

14   A.   That's my recollection, yes, sir.

15   Q.   And the amount -- the 15c3 assets, these assets that we're

16   talking about, you understood that to be in the range of one to

17   two billion dollars based on this e-mail, correct?

18   A.   Based upon both the statements made to me and the e-mail.

19   I don't know if the e-mail specifically identified what the

20   total amounts of these, I don't know that.  I know the e-mail

21   referred to the SEC's willingness to release what I recall

22   being described that the numbers could be to that range.  But I

23   don't -- I don't know what was specifi -- I don't believe I've

24   seen that e-mail since, so, I don't recall what's in the e-mail

25   specifically, sir.

1    Q.   And that e-mail was the only document that you were

2    provided concerning this 15c3 asset?

3    A.    That I was provided, yes, sir.

4    Q.    And you reviewed this and you told us that you then

5    provided it to counsel or it was provided to counsel, do you

6    recall saying that?

7    A.    Yes, sir.

8    Q.    And to whom were you referring?

9    A.    To whom what?  Sorry.

10   Q.    When you said it was provided to counsel, who are you

11   talking about?

12   A.    Every document that -- well, I don't know.  I don't know

13   who gave it --

14   Q.    Did you give it to Mr. Lewkow?

15   A.    I could have.

16   Q.    And did you do that on Friday?

17   A.    Well, it would have been right after that meeting.

18   Q.    And that's right after the meeting and before you came

19   down to court?

20   A.    I don't know the specific timing that I gave the e-mail.

21   I know I gave the e-mail to a lawyer.  It could well have been

22   Mr. Lewkow.  I don't remember the specific timing.  I don't

23   know.  If I got that document, I would have given it when I got

24   it because it seemed important but I don't know when I did

25   that, sir.

Page 201

1   Q.   Now, sir, if you could -- if you wouldn't mind, could you

2   turn, sir, to tab 4 of your binder, the small binder that I

3   just handed you at.  You'll see Barclays' Exhibit 221.

4   A.   Yes, sir.

5   Q.   And if you look at this, you'll see it's an e-mail, sir.

6   You see that?

7   A.   Yes, sir.

8   Q.   And the title of it is "Forwarding final 15c3-3 reserve

9   lockup as of 9/17/08".  You see that sir?

10  A.   I do, yes.

11  Q.   Now, if you skip down to the middle of the page, you'll

12  see a sentence in the main body, the text, that begins "Below

13  is the final 15c3 reserve lockup."  Do you see that sentence,

14  sir?

15  A.   I do, yes, sir.

16  Q.   And you'll see it says, "It's a lockup" -- "As of 9/17/08,

17  in thousands, the decrease of one billion dollars in the lockup

18  was approved by Mike Macchiaroli of the SEC."  And that's a

19  reference to somebody at the SEC.

20  A.   Yes, sir.

21  Q.   You understand that?

22  A.   Yes, sir.

23  Q.   Somebody saying that some certain amount could be

24  released.  You see that?

25  A.   Yes, sir.

Page 202

1    Q.   And is that the reference you're referring to in your

2    testimony earlier?

3    A.   I believe so.  I haven't seen this e-mail in such a long

4    time, but I believe it's consistent with that, yes, sir.

5    Q.   Now, sir, if you look just below that, you'll see a

6    reference to "customer".  You see that?

7    A.   I do, yes, sir.

8    Q.   Right beside that, it says, "769", and it's thousand, but

9    you understand that these numbers are all in thousands, so that

10   really is 769 million dollars?

11   A.   Yes, sir.

12   Q.   "All in qualified securities".  You see that?

13   A.   I see the phrase, yes, sir.

14   Q.   And if you skip down two lines further, you'll see "A

15   billion dollars cash with Wells Fargo."  You see that?

16   A.   I do, yes, sir.

17   Q.   And you understand these were two components of the 15c3

18   reserve account?

19   A.   Yes, that's clearly what it says there.

20   Q.   "And the total of the billion dollars of cash with Wells

21   Fargo and the 769 million in qualified securities was 1.769

22   billion dollars," and that was the 15c3 asset?

23   A.   Yes, that's what I see, yes, sir.

24   Q.   And this is the document that you were provided prior to

25   the sale hearing?

1    A.   I haven't seen the document but for the moment that I saw

2    it that day.  I haven't seen it since.  It definitely seems

3    consistent with it but I don't know for a fact that it is.  I

4    apologize.

5    Q.   To the best of your belief based on the evidence that we

6    have covered, let me ask you do you have any reason to doubt at

7    all that this is that important document that you were provided

8    on that day?

9    A.   No, no, sir, I don't.

10   Q.   Now, sir, you testified about how you attended the sale

11   hearing and how you listened carefully to the presentations.

12   Do you recall that earlier testimony?

13   A.   Yes, sir.  Yes, sir.

14   Q.   You recall in the course of Ms. Fife's presentation, a

15   representation was made to the Court that no Lehman cash was

16   going to Barclays, you recall that?

17   A.   Well, I -- can I be a bit more specific?  You said I have

18   to after a yes or no --

19   Q.   If you need to explain, by all means.

20   A.   Yes.  As I recollect that there had been originally a

21   retained cash amount in the transaction that had diminished and

22   as she went through her summary of, quote, "changes", she

23   talked about the changes in the market value of the asset

24   securities and the changes and that that cash had gone.  I

25   think, if I'm not mistaken, that's what she was referring to.

Page 204

1   Q.   Well, let's look at what she was referring to.  If we turn

2   to tab 6, you'll see the sale hearing transcript --

3   A.   Yes, sir.

4   Q.   -- at page 53.  And at the bottom of that page, Ms. Fife

5   says --

6   A.   I'm sorry; I have -- oh, 53 not -- there's a 241.  53 on

7   the left?

8   Q.   Page 53 --

9   A.   Yes, sir.

10  Q.   -- of the sale hearing transcript.

11  A.   Yes, sir.

12  Q.   At the bottom of the page, Ms. Fife says, starting at line

13  20, "Thank you, Your Honor.  I'll continue going through some

14  of the changes if that's okay.  There was a provision in the

15  deal originally which required the debtors to transfer 700

16  million dollars in cash to Barclays and that is no longer the

17  case.  There is no cash that is being transferred to Barclays."

18  A.   That reference is consistent with my recollection of the

19  cash -- retained cash leaving the transaction.  That's what I

20  believe that I heard.

21  Q.   That statement was consistent with your understanding, is

22  that correct?

23  A.   Again, can I be clear again, sir?

24  Q.   Well, let me ask you a different question.  Ms. Fife says

25  "There's no cash that's being transferred to Barclays."  You

1    see those words?

2    A.    She gave a ramble there which included a specific

3    reflection of the changes and that that cash which was a

4    specific cash item was no longer being transferred.  I think

5    she then -- I don't know what she was thinking but as I thought

6    I heard it, she was describing specific changes to specific

7    assets.

8    Q.    I'd like you to focus on the highlighted sentence in front

9    of you which is, "There is no cash that's being transferred to

10   Barclays."  You see that?

11   A.    I see that sentence, yes, sir.

12   Q.    You understand that statement to be there is no cash that

13   is being transferred to Barclays?

14   A.    I understand that to be in the context of the cash that

15   she was just describing.  That's what I understand it to be,

16   sir.

17   Q.    Did you understand Ms. Fife to be making an unqualified

18   statement?

19   A.    I didn't because I didn't understand that there was any

20   form of cash sweep type mechanism embedded in the transaction.

21   It hadn't been described to me that there was some sweep of

22   every account that could rollover otherwise.  I just didn't

23   understand that mechanic.  But I don't -- I'm not by any

24   stretch an expert on what Ms. Fife was thinking.  But I don't

25   recall that she indicated specifically that there was

Page 206

1    absolutely no cash that would ever be there.  I just don't

2    recall that, sir.

3    Q.   Did you understand that this statement at the time to be a

4    qualified statement by Ms. Fife?

5    A.   I must say, I don't recall the specific statement at the

6    time.  I think I've attempted to testify to what I think I

7    recalled her comments on the changes to the transaction.  I

8    just don't recall that specific of a statement, I'm sorry.

9    Q.   You understand it's important to be precise and accurate

10   when making representations to the Court?

11   A.   Yes, sir.  Absolutely.

12   Q.   And you understand -- in fact, all day today you have had

13   as many, many qualifiers to your answers and to propositions

14   that have been put to you by counsel because it is important in

15   your mind to be precise when addressing the Court.  Isn't that

16   correct, sir?

17   A.   Yes, sir.  I believe that to be true.

18   Q.   And that statement that is highlighted before you,

19   "There's no cash that's been transferred to Barclays," there is

20   no qualification in that statement, isn't that correct?

21   A.   I'm sorry, sir.  There's a whole paragraph there that's --

22   a run of a paragraph.  I don't have an ability to debate a

23   sentence.  I just don't.  I only have an ability to read the

24   paragraph and remember what I heard.  My apologies.

25   Q.   And the critical issue, sir, is that it's your position

Page 207

1  that when Ms. Fife said "There's no cash that's been

2  transferring to Barclays," it's your position that there could,

3  indeed, in this deal, very well have been cash that was being

4  transferred to Barclays?

5  A.    I don't think that's an accurate reflection of my

6  position.  My reflection is that I just don't recall her saying

7  emphatically other than the cash that had been originally in

8  the transaction was removed.  I just don't recall her stating

9  that there was no ca -- I just don't recall that.  So, that's

10 my position.

11 Q.    Sir, if you turn to page 241 of the sale hearing that is

12 before you, you can see Mr. Miller addresses the Court.  You

13 see that?

14 A.    I do, yes, sir.

15 Q.    And if you turn to the next page, you'll see that

16 Mr. Miller addresses the Court --

17 A.    Am I on 241, sir, or --

18 Q.    No, 242 now.  It's the carryover.

19 A.    Yes, sir.

20 Q.    And Mr. Miller, starting at line 11, says, "Now, what

21 we're talking about, Your Honor, is eight billion or five

22 billion, whatever it might be, Your Honor, that was a cash

23 sweep.  Cash, we're not transferring any cash to Barclays.

24 That's out of the agreement."  Do you see that, sir?

25 A.    I do, yes.

Page 208

1    Q.   That was an unqualified statement, was it not?

2    A.   I think the statement is what the statement says.  I can

3    read it here, yes.

4    Q.   Did you understand the statement by Ms. Fife and the

5    statement by Ms. (sic) Miller to leave open the possibility

6    that Lehman cash, any Lehman cash, would go to Barclays?

7    A.   I understood what I believed at the time which was the

8    cash that had originally been in the transaction accounts had

9    been taken away by one or another of the exchanges or clearance

10   folks, I don't know exactly where it went but it went away.

11   That's what I understood to be the references.  I didn't

12   understand anything else.  As I read this, he's referring to

13   this big LBIE issue which was in the press.  I'm sorry; I don't

14   want to infer to what he's saying.  I don't have an ability to

15   make an inference.

16   Q.   You recall that Lehman cash was a major issue at the sale

17   hearing?

18   A.   No, sir.  I recall that the Lehman (Europe) cash was a

19   major issue to my understanding.  I don't recall that -- to how

20   I would define a major issue, I don't recall that cash was a

21   major issue.

22   Q.   Do you recall that in the lead-up to the sale hearing,

23   there was a claim by Lehman (Europe) or by people with interest

24   in Lehman (Europe) that some five or eight billion dollars in

25   Lehman (Europe) cash had been swept by a cash sweep to New

Page 209

1    York?  Do you recall that?

2    A.   I don't recall the specifics.  I recall having read in the

3    press and I recall it being an issue that was a big issue in

4    the press and that was raised in the hearing.  I didn't

5    understand how then nor now how that Europe issue correlates

6    with the North American transaction.  But, yes, I understand

7    that issue was raised in the court and I understand it was in

8    the press at the time, yes, sir.

9    Q.   Well, you understood people were very concerned that their

10   cash from Europe, the Lehman (Europe) cash, did not make its

11   way to Barclays?

12   A.   I understood that the Lehman (Europe) cash was being

13   expressed as being generally a concern, an unaccountable.

14   That's how I understood it to be the case.  But I don't have

15   any expertise on that subject at all, sir.  I only remember the

16   press at the time and that it came up at the hearing.  I really

17   have not looked into that issue even one bit since then.  I

18   just don't have any expertise on that, I'm sorry.

19   Q.   You knew at the time that people who claimed an interest

20   in the Lehman (Europe) cash were objecting to this sale.  You

21   knew that?

22   A.   Right.  I knew that the people who -- I knew that people

23   were trying to understand the Lehman (Europe) cash issue and

24   what had taken place, yes, sir.

25   Q.   And you knew that their concern was that if any Lehman

Page 210

1    cash was going to Barclays, they could lose their rights in

2    that cash?

3    A.   I didn't -- you're asking me.  I didn't link those

4    elements -- I didn't link those elements.  I apologize.

5    Q.   If you turn, sir, to page 253 of the transcript, this

6    is -- concerns the resolution of the cash issue.  And starting

7    at line 5 the Court says "I'm satisfied that given the fact

8    that Barclays is not taking cash and the only thing that came

9    into the debtor from Europe was cash, that in practical terms

10   we should be safe."  You see that?

11   A.   Yes, sir, I do.

12   Q.   Did you understand that the Court was relying on

13   representations that Barclays was not taking any Lehman cash?

14   A.   I'm trying to state what I think I've stated.  I believe

15   that Ms. Fife said that the cash that was there was no longer

16   there and it wasn't being transferred.  Yes, I agree with that

17   statement and that's what I believed at the time was that the

18   cash that was meant to go was no longer there and thus was

19   gone.  Yes, I agree with that statement.

20   Q.   And you understood that the Court was relying on

21   representations that Barclays is not taking cash?

22   A.   I understood that they weren't taking that cash.  Yes, I

23   did understand that.

24   Q.   But you had been provided a document, an important

25   document, just before you came to this sale hearing which

Page 211

1    showed you and was provided to you to show you that Barclays

2    would take one billion dollars of Lehman cash at the Wells

3    Fargo Bank.  Isn't that correct?

4    A.   I didn't at all consider the 15c3 account.  I wasn't

5    considering that, quote, "cash".  I just -- that wasn't part

6    and parcel of how I was considering it.  It was an account that

7    was not something I fully understood.  It was an account that

8    could be released.  I just -- I didn't link those two.

9    Q.   The e-mail you were provided with specifically referred to

10   the Wells Fargo Bank, correct?

11   A.   Yes, you showed me that, yes, sir.

12   Q.   It specifically designated and identified that billion

13   dollars as cash, isn't that right?

14   A.   That e-mail certainly said that, yes, sir.

15   Q.   So, when you attended this sale hearing, you were in no

16   doubt that Lehman was providing or offering to provide one

17   billion dollars in cash to Barclays from the Wells Fargo

18   account?

19   A.   No, sir.  Just to be clear, there was a reference that

20   there was 15c3 account and that 750 was approved to come out.

21   That was the reference that we had; that that was approved.

22   That there was some amount approved.  That's what I recollected

23   to being approved.  I did not consider that cash or they,

24   quote, "retained cash" or that element of the transaction.  I

25   did not consider that to be the asset that was being described.

Page 212

1   And I thought of the 15c3, I'm recollecting now, two years ago,

2   I thought of the 15c3 as a separate event.  I just -- I didn't

3   consider what you're describing in the 15c3 as being the same

4   event.  I apologize.  I just didn't.

5   Q.   The e-mail doesn't say 750.  It says "The decrease of one

6   billion dollars in the lockup was approved by Mike Macchiaroli

7   of the SEC."  The reference is to one billion dollars, right?

8   A.   That's what that e-mail says.  My recollec --

9   Q.   And that's the one billion dollars -- is that the one

10  billion dollars cash?

11  A.   Well, your one billion cash that you're referring to, I

12  refer to a 750 release that I recollected.

13  Q.   The e-mail specifically refers to one billion.  It does

14  not refer to 750.

15  A.   It -- I don't have the e-mail in front of me.  I can

16  look --

17  Q.   You do, actually, at tab 4.  That's Barclays' Exhibit 221.

18  You can see there is no reference anywhere in that document to

19  750.

20  A.   No, but there's -- I'm sorry; I don't want to debate the

21  e-mail because it's the first I've seen it in some time but

22  there's a billion release and then there's a billion cash at

23  Wells Fargo.  It doesn't necessarily say which one is which and

24  I don't know that that was referred to me that there was a

25  billion cash was there to be delivered.  I don't recall that

Page 213

1    part of the conversation.

2    Q.   There's no reference to 750 anywhere in the e-mail, right?

3    A.   That's -- there's a 768 in securities and I recollect that

4    we ended up with an agreement at 750.  But that's my

5    recollection, sir.

6    Q.   There's no reference to 750 anywhere in the document,

7    isn't that correct?

8    A.   That's a correct statement.

9    Q.   The one billion reference is a one billion dollars cash

10   with Wells Fargo.  You see that?

11   A.   I don't see that the one billion and the one billion are

12   stated as the same item but there are two one billions in the

13   document, sir, yes.

14   Q.   And the one billion beside the word "cash" is the one

15   billion with Wells Fargo?

16   A.   Sir, in reading this e-mail for the first time really in

17   quite some time, there is a billion dollars cash with Wells

18   Fargo and there's separately a decrease of one billion lockup

19   was approved.  It doesn't state to me that the decrease was

20   approved and put in Wells Fargo and the Wells Fargo cash was

21   the cash that was being given that doesn't state to me nor was

22   it to my recollection ever stated to me in that fashion.

23   Q.   And you understood that Wells Fargo is a bank?

24   A.   It still is, yes, sir.

25   Q.   And you understood that the one billion dollars was cash

Page 214

1    with Lehman that was deposited with that bank?

2    A.   I haven't seen this e-mail in some time.  I don't know

3    specifically what I understood at the time, sir.  I just don't.

4    Q.   Now, sir, you told us on your direct testimony about a

5    request that was made by Harvey Miller over the weekend

6    following the sale hearing.  In fact, you had an argument with

7    Harvey Miller and his offices of Weil Gotshal, did you not?

8    A.   I don't recall having an argument, sir.

9    Q.   Concerning this asset, the 15c3 asset, you had a debate

10   with Harvey Miller, did you not?

11   A.   I don't think I had a debate with Mr. Miller, sir.

12   Q.   Sir, I would ask you did you not have an argument with

13   Harvey Miller in which he made the point that the 15c3 asset

14   was a customer account that Barclays was not entitled to?

15   A.   No, sir.

16   Q.   Do you recall that?

17   A.   No, sir, I don't recall that.

18   Q.   Is it not a fact, sir, that you had an argument with

19   Harvey Miller in which he said to you that it had come to his

20   attention that within that account one billion dollars of that

21   account was cash and that a representation had been made to the

22   Court that no Lehman cash was going to Barclays and, therefore,

23   there was no way that Barclays could have that cash?

24   A.   Sir, I recollect two conversations with Harvey Miller.  A

25   conversation --

Page 215

1   Q.   Sir, my question is did that happen?  Please answer yes or

2   no and if you feel you need to make an explanation then by all

3   means do so.

4   A.   Yes, sir.  Well, no and I'd like to make an explanation,

5   sir.

6   Q.   Please.

7   A.   I don't recall what you've stated.  I recall two

8   discussions with Mr. Miller regarding the 15c3 and that

9   weekend.  Again, it was two years ago but I recall one.  A

10   group of people came to me at one of the secretarial desks and

11   said that this 15c3 there's more in it, there's too much,

12   something of that nature.  And then, Mr. Miller pulled me into

13   a room and he said, 'You have to help here.  Go to your client.

14   There's -- you don't need all of this.  Can you get them to

15   take less?'  Very clearly.  And I said, 'What is it?  What do

16   you mean?  How much less?'  He said, 'You take 750; we take the

17   rest.'  And I said, 'I can't approve anything,' because I

18   couldn't approve anything.  So, I went back to the other room

19   where other people in our group were and it was passed onto the

20   Barclays people.  I think it might have been Archie Cox, it

21   might have been Rich Ricci and they approved it and then I came

22   back in and told them that that was okay.  That's my

23   recollection of the two events relating to the 15c3.  I

24   don't -- I don't recall any argument with Mr. Miller in that

25   sense, no, sir.

Page 216

1   Q.   Sir, I'll ask you to turn to the testimony of Harvey

2   Miller to this Court on April 28th of this year at -- starting

3   at page 82 of the transcript.  And you'll find that at tab 7 of

4   your binder.

5   A.   Yes, sir.

6   Q.   Starting at the top of that page, Mr. Miller says, answer,

7   "During the early morning hours of Monday, whatever the day

8   Monday was, the 22nd, it came to my attention that Barclays

9   asserted that it was entitled to the transfer of the 15c3-3

10  account which, as you said, had something, like, 769 million

11  dollars in securities and I think close to a billion dollars in

12  cash.  And I got into a debate with -- I think it was Michael

13  Klein who was advising Barclays, that Barclays was not entitled

14  to that account.  It was a customer protection account.  It was

15  subject to approval by the SEC in terms of release."  Do you

16  deny that that happened, sir?

17  A.   I have immense respect for Mr. Miller and his view of

18  things clearly.  I recall a conversation where Mr. Miller asked

19  us to take a certain amount and not take -- ask Barclays to

20  take a certain amount and not the remainder.  I just don't

21  remember it to be an argument as you called it or a debate as

22  this word is referenced, but I have immense respect for

23  Mr. Miller and his recollection of the tone of the conversation

24  may be better than mine.

25  Q.   Let me ask you to pick up your reading at line 16.

Page 217

1      Mr. Miller goes on to say, "Barclays' position was that since

2      they were taking the customer accounts of the LBI business,

3      they were entitled to that account.  I previously have been

4      engaged in cases where I had transferred customer accounts and

5      I did not transfer the 15c3-3 account.  It was held back to

6      protect customers.  So, there was an argument which involved

7      certainly Mr. Klein, myself, Tom Roberts and representatives of

8      the creditors' committee were there.  I think somebody may have

9      been there from your office.  I can't recall directly.  And

10     there were two points we were -- I was making.  One, it's a

11     customer protection account.  You can't have it unless the SEC

12     releases it, number one.

13          "Number two, we had made a representation to the Court

14     that no cash was going to Barclays and there was no way we were

15     going to let that billion dollars go to Barclays."

16          You see that, sir?

17     A.    I do, yes, sir.

18     Q.    Do you deny that Mr. Miller made those two points to you

19     during that argument?

20     A.    Sir, I don't recollect an argument with Mr. Miller.  I've

21     shared with you what I understand about the 15c3.  It was a new

22     thing for me that weekend.  It was a new thing that I recall

23     the two conversations some of which seem consistent with what

24     you describe.  The first of which was a group of people

25     approaching me at a desk, a secretarial desk.  I said one of

Page 218

1   them was the men in the glasses and that's consistent with what

2   was referred to.  I remember being called into a room as well

3   and asked if we could take a piece but not all.  I do recall

4   that.  I just -- maybe it's my demeanor or the time or the

5   perspec -- I just don't recall it being, quote, "a debate", and

6   I don't recall any more specifics about the conversation than

7   that.  I just recall any more specifics.

8   Q.   Very specifically, do you recall that Harvey Miller had a

9   concern about Lehman cash going to Barclays based on the

10  representation that had been made to the Court.  Do you have

11  any recollection of that subject at all?

12  A.   Sir, he may well have and he may well not have, I don't

13  know.  Mr. Miller is someone who I have immense respect for.  I

14  just don't -- I just don't have a recollection, sir.

15  Q.   Would you accept, sir, that Mr. Miller's recollection on

16  this subject may be better than yours?

17  A.   It certainly could be better than mine.  I don't -- it

18  could well be better than mine.

19  Q.   Now, sir, if you continue, you'll see that Mr. Miller

20  describes the resolution of this argument.  And starting at

21  line 14 he says:

22  "Q.  So, the billion dollars in cash was going to stay with

23  Lehman?

24  "A.  Correct.

25  "Q.  And the 769 million dollars subject to what's been

Page 219

1   regulatorily (sic) appropriate, would be transferred as part of

2   the purchase price?

3   "A.   That's the essence of the agreement."

4   Q.   That was the essence of the agreement, was it not, sir?

5   A.   The essence of the agreement to me as I understood it was

6   that we, Barclays, would get 750 million and would not get the

7   rest above that.  That was my understanding of the essence of

8   the agreement.  I may not have been as, if you will, in detail

9   knowledge of the 15c3 accounts as Mr. Miller appears to have

10  been in his testimony, but the essence of understanding as I

11  understood it was a request to cap what we could get to the 750

12  which I communicated to my client and brought back in that they

13  would agree to that.  That's really all I -- that's really all

14  I remember about an essence.

15  Q.   Would you agree that the number that was going to go to

16  Barclays subject to release by the SEC was 769 million, not 750

17  million in securities?

18  A.   I don't recall 769.  I only recall 750.  But I -- I just

19  don't recall.

20  Q.   If it were, in fact, 769 million, that would correspond

21  with the amount of securities that you'd seen in the e-mail,

22  correct?

23  A.   You're asking me to be hypothetical in tying these

24  together.  I just only have a recollection that he asked us to

25  have a cap.  That's all I recollect and that was the number

Page 220

1    that I recollect, sir.

2    Q.   And if the billion dollars was not going to Barclays and

3    was staying with Lehman, that billion dollars would correspond

4    with the billion dollars in cash that was reflected since being

5    in the Wells Fargo Bank and that document you saw, the e-mail

6    that was provided to you Friday?

7    A.   Your connection of predicates, I don't know if that's the

8    right term, would go down that path.  I just don't know that to

9    be the case.

10   Q.   But it's your testimony that you did not know at the time

11   in the course of this discussion that you had with Harvey

12   Miller and this whole issue about c3, you do not recall ever

13   connecting the dots in terms of Lehman cash not going to

14   Barclays and any representation having been made to the Court

15   and the significance or importance of that representation.

16   A.   I had --

17   Q.   It's your testimony that you never connected those dots or

18   that never came to your attention?

19   Q.   I don't link the 15c3 in my recollection to that.  The

20   15c3 was explained to me as a reserve account that when people

21   like -- well, companies like Barclays who had their own broker-

22   dealer stepped in, there were releases.  I don't -- and,

23   frankly to this day, I've not gone and studied what a 15c3

24   account has in any detail.  So, I know that there was e-mail

25   that said the SEC had approved a release and there was an

Page 221

1    agreement with Mr. Miller that we would cap it at 750.  I just

2    don't have any more recollection beyond that about the

3    specifics, sir.  There were many moving pieces at this point in

4    time.  Those are the specifics that I recollect.

5    Q.   You did understand at the time that this account was a

6    customer protection account?

7    A.   I understood it to be a reserve.  I don't recognize the

8    term "customer protection account".  I just don't recognize

9    that term, sir.

10   Q.   You understood that this was a matter that was regulated

11   by the SEC?

12   A.   Yes, sir.  That's the SEC e-mail.  Yes, sir, I made that

13   clear.

14   Q.   And you understood that Lehman was not making any

15   unconditional commitment that Barclays would get this 769

16   million?

17   A.   Well, in the Friday room, it made the commitment that that

18   was part of the newly identified assets and they gave us an SEC

19   document or a document that referred to the SEC that said they

20   could, in fact, deliver that.  It was then given to the lawyers

21   to determine how that would then work.  But if you're stating

22   that Lehman didn't say they would give that to Barclays, they

23   said they would and that they had approval in the meeting that

24   I was in on Friday.  That's how I understood it to be the case.

25   But that's my understanding.

Page 222

1    Q.   In your meeting with Harvey Miller, he did not give any

2    commitment that Barclays would get the 769 million.  Isn't that

3    right?

4    A.   Again, sir, and I've tried to answer this, I only

5    recollect the meeting with -- the two meetings with Mr. Miller.

6    The one at the desk and the one where he asked to cap at 750.

7    That's all I recollect.

8    Q.   Only question is, are you saying that at any point, Harvey

9    Miller gave a commitment that Barclays would get the 769

10   million securities?

11   A.   Right.  I think that commitment had been made previously

12   to the Harvey Miller conversation.  Harvey was capping in the

13   conversations with me what that commitment was.  I -- that's

14   how I understood that conversation at the time to be.

15   Q.   Sir, if you turn to Mr. Miller's testimony at page 83 --

16   A.   Yes, sir.

17   Q.   -- of the trial transcript for April 28the starting at

18   line 21:

19   "Q.  Did you at any time enter into any commitment on behalf of

20   Lehman that Barclays would get the 769 million dollars

21   unconditionally?

22   "A.  I assume when you say me, you're talking about Lehman?

23   "Q.  I'm referring actually to you personally or anyone you

24   know acting on behalf of Lehman.

25   "A.  Absolutely no commitment.

Page 223

1    "Q.  Did you or anyone that you know acting on behalf of Lehman

2    undertake or give Michael Klein or anyone at Barclays a

3    commitment that if there was a regulatory problem and the 769

4    million dollars in securities could not be transferred from

5    inside the 15c3 account, Lehman would be required to substitute

6    and provide 769 million dollars from somewhere outside that

7    account?

8    "A.  Absolutely not."

9    Q.   Are you in any position, sir, do you have any basis to

10   contradict that testimony?

11   A.   I don't think I considered that issue personally at all.

12   I understood the meeting on Friday that there was a 15c3

13   account and that there was an e-mail saying that certain

14   amounts could come out and then Mr. Miller capped that at 750.

15   I just didn't consider any other permutations thereafter.  I

16   didn't draft the documents relating to that and I just didn't

17   consider the permutations that Mr. Miller is describing.  I

18   just didn't consider that.

19   Q.   Didn't Mr. Miller warn Barclays that its chances of

20   getting this asset were slim to none?

21   A.   I don't know.

22   Q.   You don't recall that?

23   A.   I don't recall a lot about the 15c3 other than the things

24   that I've very specifically given you because it was not a

25   subject that I knew very well.  Mr. Miller may have known it

Page 224

1    far better than I have known it.  I only know specifically what

2    I specifically stated.  And, again, I haven't learned anything

3    more subsequent to that, so --

4    Q.    Sir, you mentioned earlier in your testimony that there

5    was a major issue over the weekend concerning DTCC.  Do you

6    recall that?

7    A.    Yes, I recall addressing the DTCC issue, yes, sir.

8    Q.    And that was an issue that threatens the entire

9    transaction, isn't that right?

10   A.    Well, there was a -- as I tried to describe, I think --

11   Q.    If you could answer yes or no.

12   A.    I'm sorry.

13   Q.    And then if you feel you need to give an explanation, then

14   by all means do so.  If you don't need to give an explanation,

15   you don't have to.

16   A.    I apologize.  Yes in the following sense.  There was an

17   issue with the ability to open business Monday.  I understood

18   that issue related to the various different trading and

19   clearing.  DTCC was part of that and their clearing bank,

20   JPMorgan, was part of that.  The issue of whether or not you

21   could clear for your customers was critical for the many, many

22   institutional customers where there were hundreds of thousands

23   and, of course, all the personal individuals that then became

24   part of or were part of that business.  The -- that was an

25   issue because not being able to open for business Monday was --

Page 225

1    well, you couldn't contemplate that.  That's what I understood

2    to be a PIPE's issue as I've referred to it, sir.

3    Q.   Sir, if you turn to tab 8 of your binder, you'll see

4    Movants' Trial Exhibit 522.  You see that, sir?

5    A.   Yes, sir.

6    Q.   If you look at the bottom, there's an e-mail that Archie

7    Cox sent to Bob Diamond at --

8    A.   Did you say 8, sir?  Yes, sir.

9    Q.   Are you with me?

10   A.   Yes, sir, I am.

11   Q.   You'll see the Archie Cox e-mail?

12   A.   Yes, sir.

13   Q.   It's concerning closing?

14   A.   Yes, sir.

15   Q.   You were copied on that?

16   A.   I don't see that I'm copied at that top there, sir.

17   Q.   You'll see the CC.  Reading from the bottom, sir; the

18   beginning of the chain.  The Archie Cox e-mail.

19   A.   Oh, I see.  On the bottom, yes, sir.

20   Q.   Do you see that you're copied on the e-mail?

21   A.   Yes, sir.

22   Q.   Archie Cox's e-mail is on the subject of closing, right?

23   A.   I see that, yes, sir.

24   Q.   And he tells Bob Diamond, "You should be aware there may

25   be that there are issues around clearing which could be

Page 226

1    significant and thus affect closing.  The issues have been

2    addressed but a resolution is not yet clear."  You see that?

3    A.   I see that, yes, sir.

4    Q.   And you were copied on Mr. Diamond's response to Mr. Cox

5    and to all of the other recipients of Mr. Cox's e-mail, right?

6    A.   I see that, yes, sir.

7    Q.   And that text of Mr. Diamond's e-mail was "Thanks so much.

8    This is Rich's responsibility."  You see that?

9    A.   I do, yes, sir.

10   Q.   And when you got that e-mail, you understood that that was

11   a reference to Mr. Ricci, right?

12   A.   I don't recall the e-mail but I'm sure that was Mr. Ricci.

13   Q.   Mr. Diamond goes onto say "Please be sure to get his

14   approval on everything.  I know you know this but too much

15   slipping through the cracks as you say."

16   A.   I see that, yes, sir.

17   Q.   You understood that Mr. Diamond had put Rich as the person

18   responsible for making sure that this closing happened, right?

19   A.   Well, Rich became the day-to-day lead on the transaction

20   during the week, yes, sir.

21   Q.   Now, sir, I'd invite you to turn to tab 10 of your binder

22   and you'll see the trial testimony from May 7, 2010 at page

23   237, this testimony of Mr. Ricci.

24   A.   Yes, sir.

25   Q.   Starting at line 6, Mr. Ricci testified as follows --

Page 227

1   A.   I'm sorry, which line did you say?

2   Q.   Line 6.

3   A.   Thank you.

4   "Q.  You understood at this time that there were issues, very

5   serious issues, concerning DTC which affected the closing?

6   "A.  The potential closing, yes.

7   "Q.  And you knew that this was your responsibility?

8   "A.  Yes.

9   "Q.  And Barclays wanted to close this deal, did it not?

10  "A.  Yes."

11  Q.   And the testimony then goes on at line 13:

12  "Q.  You certainly did not want to lose this deal over any

13  problem with DTTC, isn't that correct?

14  "A.  If we could avoid it, absolutely correct, yes.

15  "Q.  And on this Sunday, Mr. Diamond has made clear that this

16  deal was your responsibility.  Isn't that right?

17  "A.  He made it very clear this responsibility, Archie was

18  saying, was mine.  Yes."

19  Q.   And then it continues, "Now, the person that you," this

20  was Mr. Ricci, "put in charge of dealing with DTTC was Gerard

21  LaRocca, correct?

22  "A.  That's correct."

23  Q.   Sir, is that testimony of Mr. Ricci consistent with your

24  observations at the time?

25  A.   Well, there's many pieces to it.  Do you mind if I give

Page 228

1    you the pieces of my recollection?

2    Q.   Let me ask you if you have any basis to disagree with the

3    testimony of Mr. Ricci that he provided to this Court?

4    A.   I don't have any specific basis to disagree with what was

5    just described.

6    Q.   And I have no further questions.

7    A.   Thank you.

8         THE COURT:  It's your turn.

9    CROSS-EXAMINATION BY

10   MR. TECCE:

11   Q.   Good afternoon, Mr. Klein.  For the record and may it

12   please the Court, James Tecce of Quinn Emanuel on behalf of the

13   official committee of unsecured creditors.

14       Mr. Klein, I have a binder for you as well.

15        THE WITNESS:  A new one.

16        THE COURT:  Another binder.

17        THE WITNESS:  Can I leave these other ones on the

18   floor for now?

19        MR. TECCE:  Yes, you can, sir.  You won't need to

20   consult them.

21        THE WITNESS:  Okay.  I will need to or I won't?

22        MR. TECCE:  You will not.

23        THE WITNESS:  Okay.  Thank you, sir.

24        Will anybody else need me to look at these any time

25   soon?  That's two binders.

Page 229

1          THE COURT:  Thank you.  Somehow this doesn't look like

2    fifteen minutes.

3          MR. TECCE:  It's misleading, Your Honor, in terms of

4    the bulk of the book.

5          THE COURT:  These binders often are misleading.

6          MR. TECCE:  It's disproportionate to the length of the

7    examination.  I know it's been a long day, Mr. Klein, and I

8    will be brief in my examination.

9          THE WITNESS:  Thank you, sir.

10          MR. TECCE:  I would, however, like to ask you a few

11    follow up questions with respect to the meeting that has been

12    discussed at length today with Mr. Miller and representatives

13    of creditors' committee in the offices of Weil Gotshal.

14    BY MR. TECCE:

15    Q.   Mr. Klein --

16    A.   Shall I be looking at anything here, sir, or --

17    Q.   Not yet, sir.

18    A.   Thank you.

19    Q.   Do you have an understanding of whether representatives of

20    Houlihan Lokey were present during that meeting?

21    A.   I've learned subsequently, in fact, that they were.  I

22    don't know that I knew that at the time because, again, I don't

23    recall people being introduced.  But, subsequently, I learned

24    that to be the case, yes, sir.

25    Q.   Okay.  And that was my question was as you sit here today

Page 230

1   you know that during -- that in that meeting there were

2   representatives of Houlihan Lokey?

3   A.   Yes, I've learned that subsequent to the meeting, sir.

4   Q.   I'm sorry.  Did I take it off?

5   A.   No.

6   Q.   Okay.  Can I ask you to turn to -- in your binder now to

7   Exhibit M-381 which should be the first tab in the binder that

8   I gave you?

9   A.   M-381?  Is the M for my purpose or just general?

10  Q.   I'm sorry, Mr. Klein.  I'm having a hard time hearing you.

11  A.   I can get closer.

12  Q.   Can you --

13  A.   No, no, that's fine.  I'm sorry.  I'm just asking you

14  about the exhibit number.  Sorry.

15  Q.   And this document, M-381, this is in your binder is a

16  large document, correct?  There's an attached -- well, there's

17  an e-mail, correct, from Brian Kelly at Milbank, correct, at

18  the top, you see, on Sunday, September 21?

19  A.   I see that, yes, sir.

20  Q.   You see that?

21  A.   Yes, sir.

22  Q.   To an Ann McCominsky (ph.), with a copy to a Michael

23  Fazio, do you see that?

24  A.   Yes, I see that, yes, sir.

25  Q.   Okay.  And I'll represent to you, sir, that Michael Fazio

Page 231

1   is managing director with Houlihan Lokey.

2   A.   Okay, sir.

3   Q.   Okay?  And if you turn to the next page of this document,

4   you'll see a small chart there, correct?

5   A.   I do, yes, sir.

6   Q.   And you see that it says "Market" -- it says "Collateral"

7   on the left?

8   A.   Yes, sir.

9   Q.   And it says "Market value" on the right?

10  A.   I do.  I see that, yes.

11  Q.   And the total there at the bottom of that chart is

12  49,902,924,897.20.  Do you see that?

13  A.   Yes, sir, I see that.

14  Q.   And if we could just go back to the cover e-mail for one

15  second.  I don't know that I said this.  The date of this e-

16  mail is Sunday, September 21, 2008, correct?

17  A.   Yes, sir.

18  Q.   And that is the weekend of the closing, correct?

19  A.   Yes, sir.

20  Q.   And that is also the weekend when the conversation that

21  we've -- that you've discussed extensively with Mr. Boies and

22  Mr. Gaffey took place with the representatives of the

23  creditors' committee, correct?

24  A.   Yes, sir.

25  Q.   And you'll see there's a long schedule of securities

Page 232

1    that's attached, correct?  Several hun -- could be over 100 to

2    200 pages, correct?

3    A.   Yes, sir, I see that.

4    Q.   During the closing weekend, did Mr. Miller or anyone else

5    at Lehman or Barclays tell you that one of the reasons why the

6    committee representatives requested a meeting with Lehman

7    and/or Barclays was because they had questions about schedules

8    of assets that they had received over the closing weekend?

9    A.   No, sir.  I wasn't aware of this schedule of asset at all

10   or its delivery, no, sir.

11   Q.   Right.  But my question is whether anyone, Mr. Miller,

12   anyone from Lehman, anyone from Barclays, told you that one of

13   the reasons why the creditors' committee representatives wanted

14   a meeting with Barclays and Lehman representatives was because

15   they had questions about schedules of assets that they had

16   received over the weekend?

17   A.   No, sir.  I was not party to schedules of assets and that

18   was not brought to my attention, sir.

19        MR. TECCE:  Could you pull up 410, please?

20   Q.   Can I ask you, sir, to turn in your binder to 410 which is

21   the Xerox copy of the manila folder?

22   A.   Yes, sir.

23   Q.   And so you see in the left-hand box of this chart that was

24   created by you and you testified previously, sir, that this was

25   created by you contemporaneously with this meeting with the

Page 233

1    creditors' representatives, correct?

2    A.   I think this was my scribbling in that meeting, yes, sir.

3    Q.   Okay.

4    A.   The meeting with man with the glasses and Mr. Miller, yes,

5    sir.

6    Q.   Okay.  And in the left-hand side there, the upper left-

7    hand box, it says "assets", correct?

8    A.   Yes, sir.

9    Q.   And then you'll see it says, "Pre-mark"?

10   A.   Yes, sir.

11   Q.   And it says, "49.9", correct?

12   A.   Yes, sir.

13   Q.   Okay.  And what is the source of the 49.9?

14   A.   As I recollect, it was the notional amount of the

15   securities that as of the conversations and going into the

16   weekend related to the, quote, "Fed liability" or at least my

17   understanding of that.

18   Q.   And, sir, but you did not, sir, place the word, "notional"

19   next to 49.9, did you?

20   A.   Well, I put pre-mark, which in my mind -- notional, which

21   is not par.  It's not fair value.  It's the notional.  It's the

22   amount that was in some schedule before it was marked.  That's

23   what I understood it to be the case.

24   Q.   And, sir, you know that a broker-dealer marks its books to

25   market, do you not, sir?

Page 234

1    A.   I'm aware, yes, sir.

2    Q.   And below that 49.9 figure, you have post-mark, correct,

3    and it say 44 and 45, correct?

4    A.   I see that, yes, sir.

5    Q.   At any point during this meeting, sir --

6         MR. TECCE:   Strike that.

7    Q.   Isn't it true that at no point during this meeting did you

8    ever advise the committee representatives that that 44 to 45

9    figure was a liquidation valuation?

10   A.   I don't think I advised the creditor committee people.  I

11   wasn't there to advise them of anything.  I was there to

12   discuss the flow of funds and all the elements around that.

13   So, I don't think I provided them with any advice whatsoever.

14   That certainly was not my intention and I don't believe I did

15   that.

16   Q.   All right, but my question was actually a little more

17   precise than whether you provided them with advice.  The

18   question I'm asking is isn't it true that you never told them

19   that the 44 to 45 was a liquidation valuation?

20   A.   I don't believe I would have said that and I don't

21   believe, per se, that it implied a liquidation.  The numbers

22   that were given to me related to Barclays' estimates of the

23   value at that moment in time in that market condition.

24   Q.   Earlier today, Mr. Boies asked you, Mr. Klein, if you

25   answered all the questions of the committee representatives

Page 235

1    during that meeting.  Do you remember that?

2    A.    I do.  I believe he asked me.

3    Q.    He asked you that question.  Do you remember him asking you

4    that question?

5    A.    I think somebody asked me that question today.

6    Q.    And then you answered that you did answer all the

7    questions of the community representatives group?

8    A.    I can be even more precise.  I don't recall that anyone

9    asked me questions that I didn't answer that later people asked

10   me later.  I don't recall any of that.

11   Q.    I'd like to show you the sworn testimony of Mr. Saul

12   Burian who I'll represent to you is a managing director of

13   Houlihan as well.

14   A.    Fine.

15   Q.    With respect to that meeting, it appears in the trial

16   transcript from May 6th, 2010, and I apologize you don't have

17   this in your book but I often don't know what questions are

18   going to be asked by your -- by Barclays' counsel before

19   hearing, so, I didn't have an opportunity to put a copy of the

20   transcript in your book.  But it starts on page 157 and we'll

21   put it up here on the big screen for you.

22   A.    Okay.  Thank you.

23   Q.    Starting on line 8, this is a question that's presented to

24   Mr. Burian during the trial that day:

25   "Q.  Did you ask Mr. Klein or did Mr. Fazio ask Mr. Klein when

Page 236

```
 1    this decline in market value occurred?

 2    "A.   In a more leading way than that.  I mean Mike jumped in

 3    and say, 'Wait a minute, what's going on here?  Some of these

 4    government security issues have gone up in value.  Like, what

 5    do you mean pre-mark and post-mark, you know?  The market has

 6    dropped?'

 7    "Q.   What did either Mr. Klein or Mr. Miller, what did anybody

 8    say to you?

 9    "A.   Mr. Klein sort of made a face, you know, as if we do not

10    understand what's going on the world, you know.  But I don't

11    know what he was really thinking.  Harvey jumped in and said,

12    quote, 'We're here to tell you what the deal is that we're

13    closing.  We're not here' -- I don't remember his exact words

14    but basically you can get whatever information you want.

15    'We're not here to answer your questions.  You know, it is what

16    it is.  We've raised the issue and I'm positive Mr. Klein sever

17    times during that meeting used the word 'market value.'"

18    Q.    Mr. Klein, do you remember that colloquy between Mr. Fazio

19    and yourself?

20    A.    Which are you referring to?  Are you -- are you refer --

21    is the "Mike", me, that's in here?  Who's the Mike?  There's a

22    Mike and a Mr. Klein.  Are you referring -- I'm sorry; I'm just

23    a bit confused.

24    Q.    I'm sorry, Mr. Klein.  Did you jump up and ask -- let me

25    rephrase the question.
```

Page 237

1        The Mike in that colloquy is Mike Fazio who is a managing

2    director of Houlihan.

3    A.    Okay.  I understand.

4    Q.    Okay.  Do you remember the colloquy that is recounted by

5    Mr. Burian in that trial testimony?

6    A.    That this Mike jumped in and Mr. Miller cut him off?

7    Q.    And asked you a question.

8    A.    And that Mr. Miller then cut him off?  That phrasing that

9    you're referring to?

10   Q.    I'm asking you if you remember Mr. Fazio asking you that

11   question.

12   A.    I don't.  I don't remember the specific questions in the

13   meeting.  I don't recall that.

14   Q.    Mr. Boies also asked you this morning if anyone objected

15   to you that sufficient information was not provided during that

16   meeting.  Do you remember that question?

17   A.    No, sir.  Could you repeat it, please?

18   Q.    He asked you if anyone had lodged any objections with you

19   to the effect that they had not received sufficient information

20   from you during that meeting.  Do you remember that?

21   A.    I don't remember the specific question.  If you ask me

22   again, I could answer it.  I'm sorry.

23   Q.    Well, do you recall anyone -- well, let me rephrase the

24   question.

25        At the conclusion of this meeting, no one from the

Page 238

1    committee's representatives asked any additional questions of

2    you after the meeting was over that weekend, correct?

3    A.   Not that I'm aware of or not that I can recall, no.

4    Q.   Do you have an understanding as to whether or not the

5    committee representatives requested additional information

6    about the sale transaction from counsel to the Lehman estates

7    and counsel to Barclays ultimately?

8    A.   I'm not aware of what requests that they put in.  I don't

9    think that came from me.  Again, this was a very brief meeting

10   and I don't recall that I had any specific takeaways or that

11   after that meeting anyone asked me specifically for anything

12   from that, no, sir.

13   Q.   Can I ask you to turn to Exhibit 713 in your book, sir?

14   A.   Yes, sir.

15            THE COURT:  I'm just going to break in and say that if

16   it's going to be more than a few minutes of additional cross,

17   that we should probably take a break and relieve our current

18   ECRO reporter.

19            MR. TECCE:  It's really just asking about one

20   document, Your Honor.

21            THE COURT:  And then you're going to be done?

22            MR. TECCE:  And then I'm going to be done.  Is that

23   sufficient?

24            THE COURT:  Well, that will be a good time to take a

25   break then.

Page 239

```
 1              MR. TECCE:  I'm sorry?

 2              THE COURT:  That will then be a good time for us to

 3    take a break.

 4    BY MR. TECCE:

 5    Q.    Can I just direct your attention to M-713, sir?

 6    A.    Yes, sir.

 7    Q.    Okay.  And you'll see this is an e-mail string.  The top

 8    e-mail is Monday, September 22nd.  That would be the Monday

 9    after the transact -- that'd be actually the day the

10    transaction closed, correct?

11    A.    Yes, sir.

12    Q.    Okay.  And I'd like to actually just direct your attention

13    down to the bottom of this page, this first page, you'll see an

14    e-mail from Saul Burian who is, as I've told you, a managing

15    director of Houlihan Lokey to Dennis O'Donnell, who I'll

16    represent to you, sir, is at attorney at Milbank Tweed.  And if

17    you turn the page, you'll see what this is.  It's an e-mail

18    from Mr. Burian to the committee of Lehman unsecured creditors.

19    Do you see that?

20    A.    I do. I see that, yes, sir.

21    Q.    Okay. And it says, "From Saul Burian, Houlihan Lokey."

22    And in the first paragraph he says, "As you know, the Barclays'

23    transaction closed this morning.  Thanks again for

24    participating last night in the committee conference call.  It

25    was critical to get your input and we appreciate your time and
```

Page 240

1    effort.  Following our committee call and the resolution of

2    multi-billion dollar trading and clearing issues, we

3    participated in discussions/explanations regarding our critical

4    open issues and questions."  It says, "The resolution was much

5    better than we expected, nevertheless, to preserve all rights,

6    we did not consent."

7         And then he says, "For your information, I have attached a

8    version of the clarification letter."  And he says, "Here's a

9    summary of where we came out on the three most material

10   issues."

11        Now, can I direct you to number 3, Mr. Klein?

12   A.   Yes, sir.

13   Q.   He says, "According to the Lehman, there is no five

14   billion dollar issues.  This is what they all think happened.

15   Barclays was supposed to transfer a full 45.5 billion to take

16   out the Fed loan and was to receive collateral from JPMorgan.

17   They sent the full amount but found out the next morning that

18   they only got assets marked at 41 to 42 billion for some

19   reason.  Approximately 8.55 billion of weak assets were not

20   transferred.  Surprisingly, JPMorgan under pressure from the

21   Fed returned 7.4 billion of cash to Barclays.  Now, at the

22   closing, Barclays is sending back the 7.4 billion and the 8.55

23   billion which they think is probably worth 7.4 billion or less

24   was included in the purchased assets.  Bottom line netting

25   appears to be following:  The total purchased assets were

Page 241

1    booked at approximately 49.4 billion but dropping in value to

2    about 44 or 45 billion.  Barclays was then given additional

3    assets of 1.9 billion to be included in the deal prior to the

4    Friday hearing.  As noted earlier, the 8.55 billion coming from

5    JPMorgan is included in these numbers all in approximate value

6    of 47 billion.  They are forgiving the Fed loan of 45.5 billion

7    and assumed liabilities of 4.25 billion for a total 49 plus

8    billion.  Depending on how they do liquidating the book, they

9    will make or lose money."  Do you see that?

10   A.    I do, yes.

11   Q.    The description in Mr. Burian's e-mail to the creditors'

12   committee, sir?

13   A.    I so, yes, sir.

14   Q.    And this e-mail was sent the transaction closed, correct?

15   September 12 -- 22nd?

16   A.    Yes, sir.

17   Q.    Okay.  Is there anything in Mr. Burian's recollection of

18   his discussions and explanations that's inconsistent with your

19   recollection of the meeting that you had with the creditors'

20   committee representatives?

21   A.    The -- you're talking about number 3 or the entire e-mail,

22   sir?

23   Q.    I'm talking about the two paragraphs we just read.

24   A.    Well, there's some phrasing, but the general movements --

25   there's some phrasing that might be different, yes, but there's

Page 242

1   some general movements I think is a reasonable summary of the

2   general movements.

3   Q.   And just --

4         MR. TECCE:  Can you pull up, Steve, 410 one more time

5   for me, please?

6   Q.   Is there anything in Mr. Burian's recollection of the

7   conversation that's inconsistent with your markings on the

8   folder?

9         MR. BOIES:  Objection, Your Honor.  Form of question.

10         THE COURT:  Is there anything about the markings and

11   Mr. Burian inconsistent?  What's the objection to the form of

12   the question?

13         MR. BOIES:  The last question --- the first -- his

14   questions up to now, I've not had this problem.  But his last

15   question suggests that Mr. Burian in this memo is referring to

16   the conversation with the witness.  Whereas, it says it is

17   according to Lehman not according to this witness.

18         THE COURT:  All right.  I accept the objection to the

19   form but I don't think there's any dispute that even if this

20   witness doesn't remember Mr. Burian by name, he may be the man

21   with glasses.  We're not sure.  That there was a meeting that

22   both parties are referring to that took place at Weil Gotshal

23   and that both have testified to those meetings.  Whether or not

24   there's proper linkage between the Burian memo and that

25   document, this witness may not know, but I know because I've

Page 243

1    actually seen the folder.  It was on my bench during

2    Mr. Burian's testimony a number of months ago.  So, there's no

3    question in my mind as to the linkage but let's get a proper

4    question.  But we're also out of time for the reporter.  So,

5    let's get a proper question and answer the question.  If you

6    have more questions, it will happen after the break.

7           MR. TECCE:  I think that will be it for me, Your

8    Honor.

9           THE COURT:  Okay.

10          MR. TECCE:  I'll ask the question.

11   BY MR. TECCE:

12   Q.   Are there any -- let me ask the question this way, are

13   there any numbers referred to in Mr. Burian's description in

14   those two paragraphs that are inconsistent with the numbers on

15   the manila folder?

16   A.   I'm just reviewing this for the first time and the only

17   numerical point that seems to be different is the 49 plus

18   totaling which isn't -- doesn't appear on the folder anyplace.

19   But I don't just looking at this and seeing that, that plus the

20   49.4 number that I don't know where that specifically comes

21   from.  But again I'm looking at this for the first time.

22          MR. TECCE:  Your Honor, I have no further questions

23   for the witness.

24          THE COURT:  Okay.  I'm assuming that there will be

25   some questioning after the break.  Okay.  We're going to take

Page 244

1    about a ten minute break.

2            (Recess from 5:28 p.m. to 5:40 p.m.)

3            THE COURT:  Be seated, please.  Mr. Boise, you may

4    proceed.

5            MR. BOIES:  Thank you, Your Honor.

6    REDIRECT EXAMINATION

7    BY MR. BOISE:

8    Q.    Good afternoon, Mr. Klein.

9    A.    Good afternoon.

10   Q.    Getting tired?

11   A.    Long day.

12   Q.    We'll try to make this short.

13          You were asked a number of questions by counsel for the

14   movants whether anyone ever told the Court that part of the

15   consideration that Barclays was paying was the ongoing expenses

16   incurred in the operation of the business after closing.  Do

17   you recall that?

18   A.    Yes, sir.

19   Q.    And you recall you were asked that a number of times?

20   A.    Yes, sir.

21   Q.    Let me ask you to look at Movants' Exhibit Number 1, the

22   APA, and, in particular, let me go to page 11 and paragraph

23   2.3(a).  You can look at it on the screen; it may go faster.

24   A.    Okay.

25   Q.    And it talks about assumption of liabilities and it says,

Page 245

1    "The Purchaser shall assume certain liabilities," and the first

2    one is, quote, "all liabilities of Seller incurred after the

3    closing in connection with the Business."  Correct, sir?

4    A.   Yes, sir.

5    Q.   And was that what you were talking about?

6    A.   That's consistent with my understanding of the ongoing

7    operating expenses of running a business -- the business, yes.

8    Q.   Now, you were also asked whether you listened carefully at

9    the hearing on September 19th and whether there was any mention

10   of the Fed repo, do you recall that?

11   A.   Yes, sir.

12   Q.   Let me ask you to look at Barclays' Exhibit 49-A, and, in

13   particular, page 63, lines 16 to 22 and this is Mr. Miller

14   talking to the Court.  Do you see that?

15   A.   I'm sorry.  Just for my edification, what document am I

16   looking at now, sir?

17   Q.   You are looking at the transcript of the hearing on

18   September 19th.

19   A.   Yes, sir.  Thank you.

20   Q.   And Mr. Miller says, "Barclays, Your Honor, has extended

21   the sale to enable this extraordinary transaction and hopefully

22   to be consummated.  Yesterday as Your Honor has heard, Barclays

23   basically stepped into the shoes of the Federal Reserve in

24   connection with a primary dealer credit facility as to the 45.5

25   billion dollars Lehman borrowed last Monday and received the

Page 246

1    collateral that Lehman had posted in connection therewith."  Do

2    you recall hearing that at the hearing?

3    A.    Yes, sir.   That's consistent with what I said and yes I

4    recall that.

5    Q.    Mr. Gaffey and Mr. Tecce asked you questions about

6    Movants' Exhibit 410, and perhaps we can put that up on the

7    screen, and this is the photocopy of your manila folder.  And

8    Mr. Gaffey, in particular, directed your attention to various

9    questions that had been asked you at your deposition.  Do you

10   recall that?

11   A.    Yes, sir.

12   Q.    Did anyone at that dep -- now both Mr. Gaffey and

13   Mr. Tecce were at that deposition, correct, sir?

14   A.    Yes, sir.

15   Q.    Did either of them or anyone else represent to you at your

16   deposition that the photocopy that they were showing you was,

17   in fact, a copy of your manila folder?

18   A.    They -- there was no description of the manila folder to

19   my recollection or confirmation of the manila -- I don't recall

20   being confirmed that the manila folder existed specifically.

21   Well, I'm sorry; could you ask your question again?

22   Q.    Yes.  Let me begin by showing you your deposition.  And

23   let me go first to page 160 of your deposition, line 23.  And

24   you talk about getting pulled -- let's go back to the question

25   so that we -- so the Court has the context.  And the question

Page 247

1    is:

2    "Q.   Prior to the sale hearing, did you engage in any

3    conversations or discussions with Houlihan Lokey or Milbank

4    Tweed concerning the sales transaction?"

5    Q.   And those are representatives of the creditors' committee.

6    And you say:

7    "A.   There were series of events and meetings."

8    Q.   And then -- and you do talk about there was a guy with

9    glasses and then you say that you got pulled into a meeting at

10   Weil, Gotshal and then at line 8 you say:

11   "A.   And I remember specifically that meeting only because I

12   drew on a manila folder such as that with a green marker the

13   components of both this forty-five and the assets were then

14   collateralized against it separately and distinctly."

15   Q.   And the other quote:

16   "A.   Moving pieces is what I understood to be the fund flows

17   was not a very long conversation."

18   Q.   You then go on and talk about that for about ten pages and

19   then at line 171 -- page 171, line 4, you say, what was

20   directed -- what you directed to during your examination:

21   "A.   I don't know what more I can say to this other than I have

22   said."

23   Q.   See that?

24   A.   Yes, sir.

25   Q.   And in the course of that, they had shown you a photocopy

Page 248

1   of what we now know as your manila folder, correct?

2   A.   Yes, sir.

3   Q.   And at that time, did anyone represent to you or say to

4   you that what they were showing you in terms of the photocopy

5   was in fact a copy of your manila folder?

6   A.   Well, to be specific, I think they handed me the photocopy

7   and asked me questions regarding the photocopy, specifically.

8   And the photocopy was not something -- well, the manila folder

9   was not something I had seen in a year.  I didn't even know it

10  was still around and the photocopy didn't strike me as, coming

11  off the pages, the same.  In part because there were different

12  numbers on it that other people had written.

13  Q.   No, let me turn to -- go back to Movants' Exhibit 410 for

14  a minute.  And you see a number 45.5 up there in the right-hand

15  corner?

16  A.   Yes, sir.

17  Q.   Now counsel for movants showed you the last page of

18  Movants' Exhibit 147 and let's try to put that up, the last

19  page.  And he then showed you the 45.5 on the last page of

20  Movants' Exhibit 147.  Do you see that?

21  A.   Yes, sir.

22  Q.   And he said:

23  "Q.  Is there any relationship between the 45.5 on Movants'

24  Exhibit 147 and the 45.5 on your handwritten manila folder?"

25  Q.   Remember him asking you that?

Page 249

1    A.    Yes, sir.

2    Q.    Now, the 45.5 on your manila folder has to do with

3    liabilities.  Correct, sir?

4    A.    Yes, sir.

5    Q.    Does the 45.5 on 147 have anything to do with liabilities?

6    A.    No, that's an asset breakdown.  That's an asset-type --

7    Q.    Thank you.

8    A.    -- it's not a liability.

9    Q.    Now, counsel for the movants also showed you Movants

10   Exhibit 47 and asked you about the 52.9 billion dollar figure

11   there.  You --

12   A.    Yes, sir.

13   Q.    -- see that?

14   A.    Yes, sir.

15   Q.    Do you know whether that figure includes resis or not?

16   A.    No, sir.

17   Q.    There's a reference there to DTC cash, a 15.9 billion and

18   DTC cash of 300 million and today DTC collateral of 390

19   million.  Do you see that?

20   A.    Yes, sir.

21   Q.    Do you know which, if any, of those relate to repo

22   securities?

23   A.    No, sir, I don't.

24   Q.    Do you know whether the 52.9 -- the 52.19 number is what

25   you referred to as a notational value or whether it's market

Page 250

1    value or something else?

2    A.   I don't know what it represents.  No, sir.

3    Q.   You were asked at the end -- and I'd like to put up the

4    last exhibit you were asked about.

5         MR. BOIES:  What was the last exhibit number?

6         MR. TECCE:  713.  Movants' 713.

7         MR. BOIES:  Thank you.  Can we put 713 up on the

8    board?

9    Q.   And you were asked about paragraph 3 of this, a memo by

10   Mr. Burian.  Do you recall that?

11   A.   Yes, sir.

12   Q.   And you said the numbers here most of them, were the same

13   numbers as were on your manila folder, correct?

14   A.   Numerically, yes, sir.

15   Q.   Numerically.  There were some differences in terms of 49.4

16   as opposed to 49.9, but the numbers were generally the same,

17   correct?

18   A.   Yes, sir.

19   Q.   Now, you see that this is ascribed -- this information is

20   ascribed by Mr. Burian as coming from Lehman.  Do you see that?

21   A.   Yes, sir.

22   Q.   And there's nothing here that suggests that that came from

23   you, is there?

24   A.   No, sir.  There's no reference to me that I can see.

25   Q.   And nothing here that suggests it came from Barclays,

Page 251

1   correct?

2   A.   No, sir, not any place there.

3   Q.   And is it that consistent with your understanding that the

4   information that you were being provided here was primarily

5   coming from Lehman?

6   A.   I'm sorry; I didn't follow the question.

7   Q.   These numbers that you have and that you told people about

8   in this short meeting, where had those numbers primarily come

9   from?

10  A.   Well, the primary flow of information was Lehman to the

11  Barclays team.  In some cases, the Barclays team reviewed and

12  analyzed them but the source of information and the original

13  source of all information would have come from Lehman.

14  Q.   Now I want to talk -- turn to the subject of cash.  And

15  you were shown discussions at the Sept 19th hearing, Mr. Miller

16  talking about cash in the context of the Lehman European cash.

17  Do you recall that?

18  A.   Yes, sir.

19  Q.   And Ms. Fife talking about cash in the context of the

20  retained cash --

21  A.   Yes, sir.

22  Q.   -- do you recall that?

23  A.   Yes, sir.

24  Q.   And then you were asked whether in light of these comments

25  why you thought that you could get for Barclays cash from the

Page 252

1    15c3 account.  Do you recall that?

2    A.   Yes, sir.

3    Q.   And did the cash in the 15-3c (sic) account have anything

4    to do with the definition of retained cash under the APA?

5    A.   No, sir, not to my understanding of what was my

6    understanding of the transaction.

7    Q.   Did it have anything to do with the Europe Lehman cash?

8    A.   No, sir, not to my understanding.

9    Q.   Let me ask you to look at Barclays Exhibit 231A and in

10   particular page 7.  This is a document where you can see that

11   it is signed by Mr. Kobak for the trustee.  Do you see that?

12   A.   I can just, yes.

13   Q.   And it says that -- first paragraph there talks about

14   completing the transfer of certain business assets and

15   liabilities by LBI to Barclays and it says that in connection

16   with such transfer LBI is assigned to Barclays, all rights and

17   securities, cash and other property, quote, "collateral", close

18   quote, pledged LBI to the options clearing corporation, OCC,

19   and held for OCC's benefit at JPMorgan Chase.  Do you see that?

20   A.   Yes, sir.

21   Q.   And was that consistent with your understanding that such

22   cash where it was held as collateral or margin would be

23   transferred to Barclays by LBI to the extent that Barclays was

24   getting the underlying securities or trading positions?

25          MR. MAGUIRE:  Objection, Your Honor.  No foundation.

Page 253

1          THE COURT:  I'm going to -- I'm going to think about

2     that objection.

3          MR. MAGUIRE:  Specifically, Your Honor, I don't

4     believe there's --

5          THE COURT:  I'm just going to take another look --

6          MR. MAGUIRE:  Sure.

7          THE COURT:  -- at the question.

8          Explain your objection on foundation.

9          MR. MAGUIRE:  I believe there's no foundation this

10    witness has any knowledge or participated in any discussions on

11    the subject of margin.

12         THE COURT:  I'll sustain the foundation objection, but

13    Mr. Boies is obviously prepared, if he wishes, to ask some

14    preliminary questions that gets us to the same point.

15    Q.   You were asked by movants a number of questions about what

16    you understood the statements by Ms. Fife and Mr. Miller at the

17    September 19th hearing concerning cash to relate to.  Do you

18    recall that?

19    A.   Yes, sir.

20    Q.   At the time you heard those statements, did you think they

21    related at all to margin or collateral cash?

22    A.   Well, as I think I testified earlier, I believed the cash

23    discussion related to a change in the retained cash and then

24    separately there was a discussion about the European issue.

25    That's what I understood to have heard from the court hearing.

Page 254

1    Q.   Now let me show you a couple of statements by Mr. Miller

2    and, in particular, let me go to page 89 of the official

3    transcript --

4              MR. BOIES:  what's the date?

5              UNIDENTIFIED SPEAKER:  April 28th.

6    Q.   -- the 28th, April 28th.  And let me start at line 12 and

7    go down to line 21.  And there's a reference back to the

8    September 19th hearing, transcript page 242 of that hearing.

9    And the question is:

10   "Q.  And you'll see there, again, and this time you represent

11   to the Court, quote, 'Cash -- we're not transferring any cash

12   to Barclays.  That's out of the agreement.'

13   "A.  Yes.

14   "Q.  And the representation that you made and Ms. Fife made to

15   the Court, that was entirely consistent with your understanding

16   of the transaction, isn't that correct?

17   "A.  Yes, in referring to free cash, unencumbered cash."

18   Q.   Do you see that?

19   A.   Yes, sir.

20   Q.   And with respect to 15c3, let me ask you to look at the

21   transcript of a hearing before this Court on October 16th,

22   2008.  I want to go particularly to page 58 if I can do that.

23   And perhaps start around line 4 where Mr. Miller says to this

24   Court, "The only money at LBI, and the SIPA trustee can tell us

25   that also, was in the 15c3-3 account which was the reserve

1   account for protection of customers.  And in that account there

2   was a billion dollars in cash and there was 700-odd million

3   dollars in securities for customers.  And then there was

4   another account for broker customers which had about 460-odd

5   million dollars in it.  And as part of the Barclays closing,

6   because Barclays was taking the customer accounts, they got the

7   700-odd million dollars in securities."

8       Do you see that?

9   A.   Yes, sir.

10  Q.   Is that consistent with your understanding of the

11  transaction that you negotiated?

12  A.   Well, it is but, as I stated or stated earlier, I

13  understood that there would be 750 million that would be a

14  capped amount going to Barclays.  I don't think that I

15  specifically stated nor necessarily was I aware what form that

16  would be distributed.

17  Q.   Let me ask you to look at one more piece of evidence and

18  that is the 30(b)(6) deposition of Simpson Thatcher who was

19  counsel for Lehman along with Weil, Gotshal.

20  A.   Yes, sir.

21  Q.   And I want to go to page 78 and this is a --

22       MR. GAFFEY:  Your Honor.  Excuse me, objection.  Could

23  I just have a representation that that's amongst deposition

24  testimony that's been designated into the trial record?

25       MR. BOIES:  It has -- it is.

Page 256

1          MR. GAFFEY:  Thank you.

2          MR. MAGUIRE:  Your Honor, for the record, we do have

3    an objection to that testimony.

4          THE COURT:  At the moment I don't know what that

5    testimony is, so --

6          MR. BOIES:  if you look at --

7          THE COURT:  -- let's see what it is and then we'll

8    deal with the objection.

9    Q.    If you look at starting at line 12 --

10   A.    Yes, sir.

11   Q.    -- and this is referring to the clarification letter, and

12   it says, the parenthetical that's in the clarification letter,

13   Roman numeral II, part C, and then it quotes:

14   "Q.  And any property that may be held to secure obligations

15   under such derivatives.  Do you understand that to be referring

16   to collateral associated with the exchange traded derivatives?

17   "A.  Yes.

18   "Q.  And that would be referring to all collateral, whether it

19   were securities or cash or some other type of collateral?"

20   Q.    There's an objection.

21   "A.  I would read the words, quote, "any property referring

22   back to such depravities", yes, collateral for such

23   derivatives.

24   "Q.  Which would include securities and cash and any other type

25   of property?

1      "A.  Any property.

2      "Q.  I'm sorry.  Was that a yes?

3      "A.  I would read 'property' to include cash.

4      "Q.  And is that consistent with your reading of it at the

5      time?

6      "A.  Yes."

7      Q.  And it was your understanding of the transaction you

8      negotiated, the same as the understanding that the 30(b)(6)

9      witness for Simpson Thatcher, counsel for Lehman, testified to

10     here?

11          MR. MAGUIRE:  Foundation, Your Honor.  I believe the

12     witness specifically testified earlier that he's never read the

13     clarification letter, certainly is therefore not in a position

14     to offer any view on it.  With respect to this, which is not in

15     evidence, the witness here testified that he was not involved

16     in the negotiations and was simply offering his backseat view.

17          Therefore we have a separate objection to the offering

18     of a legal view, a legal opinion, as to the clarification

19     letter by a lawyer who did not participate in any of the

20     negotiations.  But as to this witness who's present with us,

21     Mr. Klein, today, he specifically testified he never saw the

22     clarification letter.  So I believe there's no foundation for

23     any testimony from him on this point.

24          THE COURT:  Mr. Boies, you have any comments on that?

25          MR. BOIES:  Yes, Your Honor.  I'm not asking him to

1    interpret the clarification letter.  My question asks whether

2    his understanding of the deal he negotiated is consistent with

3    what the Simpson Thatcher 30(b)(6) witness testifies was his

4    understanding of the transaction.  It is true that the Simpson

5    Thatcher lawyers' understanding may very well have come from

6    the clarification letter, but I'm not asking this witness about

7    the clarification letter.  I'm simply asking this witness

8    whether the testimony that I've just read is consistent with

9    his understanding of the deal he negotiated.

10            THE COURT:  And Mr. Maguire?

11            MR. MAGUIRE:  Your Honor, there's been no foundation

12   that t his witness negotiated anything with respect to anything

13   that's a subject of this, specifically margin.  And in fact

14   that the witness has testified at his deposition that he was

15   not involved in any such negotiations, much less negotiated

16   such a provision.

17            So I believe there's no foundation that has been laid

18   and no foundation that can be laid for any view by him as to

19   this.

20            THE COURT:  I think Mr. Maguire is right, unless you

21   are connecting this snippet of testimony to the only evidence

22   which came out during cross-examination on this subject which

23   dealt with Mr. Miller's conversations characterized in some

24   questions as an argument with Mr. Klein concerning the 15c3

25   assets and the evidence associated with cross-examination

Page 259

1    concerning that.  I think this is improper linkage of testimony

2    that this witness can't know anything about and amounts to

3    leading the witness in a way that I think is also

4    inappropriate.

5           So I'm sustaining the objection on a foundation basis,

6    but also noting that I think that this is an inappropriate way

7    to get this witness to talk about something that never came up

8    in cross.

9           MR. BOIES:  Your Honor, may I be heard?

10          THE COURT:  Absolutely.

11          MR. BOIES:  They opened the door on this.  They asked

12   him over and over again about whether what Mr. Miller said and

13   Ms. Fife said was consistent with his understanding about cash.

14   They have shown this witness, they have shown other witnesses,

15   they've shown their own witnesses documents and transcript

16   pages that led them no more than this witness could conceivably

17   be led and I think the Court will know and I think the record

18   will show that this witness, on neither direct nor cross, is

19   led very easily.  His answers are his own answers, to put it

20   mildly.

21          But to suggest that this is somehow different from the

22   kind of procedure that movants' counsel has followed with

23   witness after witness, I think this is the point.

24          THE COURT:  Well, I think this is doubly indirect.  I

25   don't even know who the lawyer is from Simpson Thatcher who

Page 260

1    gave this testimony.  I understand there to be some objections

2    concerning the use of the testimony even as designated trial

3    testimony and there's certainly no connection between this

4    witness and these comments.

5          MR. BOIES:  Your Honor, I --

6          THE COURT:  I'm --

7          MR. BOIES:  -- I'll withdraw the question.

8          THE COURT:  I'm happy to have you withdraw it.

9          MR. BOIES:  I'll withdraw it.  If the Court does not

10   find it useful, I'll withdraw the question.

11         THE COURT:  Well, I think it's --

12         MR. BOIES:  I will --

13         THE COURT:  -- I think it's a challenging issue to

14   have arise after 6 p.m. on a Friday evening.

15         MR. BOIES:  Part of my calculation was that exactly,

16   Your Honor.  Thank you.

17         MR. GAFFEY:  One question.

18         THE COURT:  It can be more; you have as much time as

19   you want.

20         MR. BOIES:  Thank you, Your Honor.

21         MR. GAFFEY:  Steve, could you put up page 169 of Mr.

22   Klein's deposition?

23   RECROSS-EXAMINATION

24   BY MR. GAFFEY:

25   Q.   And as that page is coming up, Mr. Klein, let me ask you.

Page 261

1    Do you remember a point in your deposition where a squabble

2    broke out amongst the lawyers over the green file folder and

3    the photocopy and what turned out to be Exhibit 410 today?

4    A.   I remember there was a debate as to why this hadn't come

5    before and whether it was a copy or the manila and did someone

6    have the manila --

7    Q.   All right.

8    A.   -- is that the squabble you're referring to?

9    Q.   I'm just going to ask that Mr. Tecce's statement at lines

10   3 through line 8 be highlighted:

11        "MR. TECCE:   I don't know who specifically was maintaining

12   it of the three of them, but they are the advisors to the

13   creditors' committee and they provided us with an actual manila

14   envelope and this is Xerox copy of it."

15        Do you recall that being said at your deposition?

16   A.   I recall there being a specific debate over what that copy

17   was --

18   Q.   All right --

19   A.   -- where it was --

20   Q.   -- but let me ask you this.  Seeing that statement from

21   Mr. Tecce, do you want to withdraw your testimony that nobody

22   represented that was a copy of the original?

23   A.   I don't want to instigate --

24   Q.   It's a yes or no question, sir.  Do you want to withdraw

25   your testimony that nobody represented that the document shown

Page 262

1    to you at your deposition was a photocopy of the original file

2    folder that you wrote on?  It's your decision, sir.  Do you

3    want to stand by it or withdraw it?

4    A.   The -- I just want to be clear here.  The actual original

5    manila was my handwriting and nothing else.

6    Q.   Sir, Mr. Boies just asked you if anyone represented to you

7    that the document shown to you was a photocopy of the original

8    that you drew and you said no.  Now I'm giving you an

9    opportunity to either stand by or withdraw that answer, based

10   on what Mr. Tecce said --

11          THE COURT:  Mr. Boies is rising to interject.

12          MR. BOIES:  Objection, Your Honor.  I don't think that

13   was his answer.  Fortunately, we can look it up.

14          MR. GAFFEY:  I'm going to be guided by Mr. Boies.  Its

15   6:30 and I'll withdraw the question, Your Honor.

16          THE COURT:  It's okay.  I've already seen what the

17   deposition said and the issue is joined on this relatively

18   small point.

19          MR. GAFFEY:  Thank you, Your Honor.  Nothing further.

20          THE COURT:  All right.  Is there anybody else who has

21   anything further?

22      (No response)

23          THE COURT:  Mr. Klein, my suggestion is that you have

24   a good and relaxing weekend.

25          THE WITNESS:  Thank you, sir.

Page 263

1          THE COURT:  You're excused.

2      (Witness excused)

3          THE COURT:  And that suggestion goes to everybody

4      else.  I'll see you on Monday morning at 9:30.

5          MR. BOIES:  Your Honor, for planning purposes, I

6      think --

7          THE COURT:  Everybody should sit down, then.

8          MR. BOIES:  -- I think we will be probably finished on

9      Monday by lunch or maybe shortly thereafter.  I just wanted to

10     advise the Court of that, so that if the Court were making

11     plans, you have our status -- we have one witness who I think

12     will not be a long witness, Ms. James, and then we may or may

13     not depending on how things work out with some of the

14     objections, some video.  But even if we have video, we'll be

15     finished, I think, by the luncheon recess or shortly

16     thereafter.

17         THE COURT:  And there's nothing to do with the

18     afternoon, then?  So that --

19         MR. BOIES:  Exactly, Your Honor.

20         THE COURT:  Okay.  And you have the 31st with Mr.

21     Lewkow?

22         MR. BOIES:  Yes, Your Honor.

23         MR. GAFFEY:  And, Your Honor, we've also agreed that

24     we will submit to the Court on Monday those letter briefs we

25     talked about with regard to the foundation for the GFS

LBHI et al.; LBI

Page 264

1    documents that came up last week.  So you'll have some advance

2    notice -- on that gripping issue.

3            THE COURT:  All right, fine.  We really are adjourned

4    now.

5            IN UNISON:  Thank you, Your Honor.

6        (Proceedings concluded at 6:11 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 265

1                          I N D E X

2

3                    T E S T I M O N Y

4    WITNESS                EXAM BY              PAGE      LINE

5    Michael Klein          Mr. Boies              7        14

6    Michael Klein          Mr. Gaffey            75        12

7    Michael Klein          Mr. Maguire          194        11

8    Michael Klein          Mr. Tecce            228        11

9    Michael Klein          Mr. Boies            244         8

10   Michael Klein          Mr. Gaffey           260        25

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 266

1

2                         C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    _____

8    Clara Rubin

9    AAERT Certified Electronic Transcriber (CET**D-491)

10   Also transcribed by:    Sharona Shapiro (CET**D-492)

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date: August 31, 2010

18

19

20

21

22

23

24

25