Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 08-13555-JMP

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS, INC.,

9

10          Debtor.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14                United States Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                August 30, 2010

19                9:33 AM

20

21    B E F O R E:

22    HON. JAMES M. PECK

23    U.S. BANKRUPTCY JUDGE

24

25

1

2    Evidentiary Hearing RE: 60(b) Motions.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Pnina Eilberg

25

Page 3

1

2    A P P E A R A N C E S :

3    JONES DAY

4           Attorneys for LBHI

5           222 East 41st Street

6           New York, NY 10017

7

8    BY:   WILLIAM J. HINE, ESQ.

9           JAYANT W. TAMBE, ESQ.

10          ROBERT W. GAFFEY, ESQ.

11

12

13   BOIES, SCHILLER & FLEXNER LLP

14          575 Lexington Avenue

15          7th Floor

16          New York, NY 10022

17

18   BY:   JONATHAN D. SCHILLER, ESQ.

19          DAVID BOIES, ESQ.

20

21

22

23

24

25

Page 4

1

2   BOIES, SCHILLER & FLEXNER LLP

3         10 North Pearl Street

4         4th Floor

5         Albany, NY 12207

6

7   BY:   TRICIA J. BLOOMER, ESQ.

8

9

10  BOIES, SCHILLER & FLEXNER LLP

11        5301 Wisconsin Avenue NW

12        Washington, DC 20015

13

14  BY:   HAMISH P.M. HUME, ESQ.

15

16

17  HUGHES HUBBARD & REED LLP

18        One Battery Park Plaza

19        New York, NY 10004

20

21  BY:   WILLIAM R. MAGUIRE, ESQ.

22

23

24

25

Page 5

1

2   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

3        Attorneys for Official Committee

4        51 Madison Avenue

5        22nd Floor

6        New York, NY 10010

7

8   BY:   JAMES C. TECCE, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2          THE COURT:  Be seated, please.  Good morning.  Let's

 3    proceed.

 4          MR. SCHILLER:  Good morning, Your Honor.  For the

 5    record, Jonathan Schiller.

 6          In terms of our plan for today and this week, as the

 7    Court knows from Friday, we will be calling Liz James, a

 8    Barclay's executive, whose testimony relates to the dispute

 9    over the transfer of margin that's held to secure the exchange

10    traded derivatives.  That dispute concerns the amount of margin

11    in issue, delivered -- some delivered, some undelivered in the

12    order of magnitude of three to four billion dollars in margin

13    assets.

14          Ms. James, who's not in the courtroom, she's outside

15    the courtroom waiting to come in; will explain her discussions,

16    in terms of where she fits in, Judge.  She will explain her

17    discussions with Lehman personnel concerning the transfer of

18    Lehman's exchange traded futures business to Barclays.

19          She will describe her discussions with Lehman of the

20    margin or collateral of that business and that all margin or

21    collateral associated with those accounts would transfer to

22    Barclays upon sale.

23          She'll also describe her efforts with Lehman to gather

24    information and assemble a plan to facilitate the transfer of

25    that futures business.  She'll describe the difficulties
```

Page 7

1   Barclays encountered prior to the sale in obtaining information

2   about its exchange traded derivatives accounts and the risks

3   that Barclays assumed by taking over the obligations associated

4   with those accounts.

5          She'll testify about her interactions with the trustee

6   that led to the transfer of some Lehman futures accounts,

7   including the margin or collateral associated with those

8   accounts to Barclays upon sale.  And she will detail for Your

9   Honor, finally, the amounts and locations of the margin and the

10  collateral that the trustee has yet to deliver to Barclays.

11         After Ms. James' testimony we planned to present the

12  video deposition of Andrew Keller, who is a 30(b)(6) witness

13  from Simpson Thacher, as Your Honor knows that's one of the law

14  firms that represented Lehman in negotiating the sale

15  transaction.  Mr. Keller was a witness designated by Simpson

16  Thacher to address certain 30(b)(6) topics.  His deposition is

17  about thirty-five minutes long.  The trustee has objected to

18  one portion of that video and we've agreed, with Your Honor's

19  permission, to briefly argue that for you after this

20  examination and before the video is played.

21         THE COURT:  Okay.  Fine.

22         MR. SCHILLER:  We will now call Liz James.  Mr. Hume

23  will conduct the examination, Judge.  Thank you.

24         THE COURT:  Thank you.

25      (Pause)

Page 8

```
 1          THE COURT:  Come here.  Please raise your right hand,
 2    Ms. James.
 3        (Witness duly sworn)
 4          THE COURT:  Please be seated and please speak up.
 5          THE WITNESS:  Thank you.
 6          MR. HUME:  Good morning, Your Honor.
 7          THE COURT:  Good morning.
 8    DIRECT EXAMINATION
 9    BY MR. HUME:
10    Q.   Good morning, Ms. James.
11    A.   Good morning.
12    Q.   Ms. James, could you begin by telling the Court what your
13    position is at Barclays?
14    A.   I am a director in the futures business at Barclays
15    Capital.
16    Q.   And did you work on matters related to the Barclays
17    acquisition of Lehman during the week of September 15th, 2008?
18    A.   I worked on how we would take over the futures business
19    and originally from the 15th it was to deal with the customer
20    side because Barclays was taking that regardless of whether the
21    broker/dealer worked through or not.
22    Q.   Before we get into the details of that I just want to have
23    you explain, if you would, could you explain your background,
24    generally, in working in the business of exchange traded
25    derivatives?
```

1   A.   Certainly.  I have been in the business for twenty-five

2   years, between options -- operations and the business.  So I've

3   covered all aspects of the futures business.

4   Q.   And do exchange traded derivatives consist of both options

5   and futures?

6   A.   Yes, they do and also options on futures.  So we make the

7   distinction, options aren't only the equity options and index

8   options that are cleared on the OCC and then futures and

9   options on futures, which are what cleared on the other

10   exchanges and clearing houses.

11   Q.   And does the exchange traded derivative business also

12   include margin or collateral that's posted to secure

13   obligations related to the exchange traded positions?

14   A.   Yes, it does.  The clearing houses actually take margin to

15   protect themselves.

16   Q.   And is that true both for options and futures?

17   A.   Yes, it is.

18   Q.   Are you currently -- do you currently have any positions

19   with the Options Clearing Corporation or on a committee related

20   to the Options Clearing Corporation?

21   A.    Yes, I do.  I actually chair the futures subcommittee for

22   the OCC, which actually means that what I do, I organize cause

23   between the FCMs, the futures commission merchants that are in

24   that business, with the exchanges that clear out the OCC and

25   the OCC themselves to try and iron out any issues, concerns,

Page 10

1    new products, new systems.  Just to try and resolve anything

2    prior to anything going live.

3    Q.   Can you explain, again, what an FCM is?

4    A.   An FCM is a futures commission merchant and it is actually

5    somebody that is a clearing member on a clearing house that it

6    allowed to clear business on behalf of customers and

7    proprietary business if they trade for themselves by house

8    business, as we call it.

9    Q.   You mentioned the phrase clearing member, can you explain

10   what that means?

11   A.   A clearing member is somebody that has a relationship with

12   a clearing house that has guaranty funds, default funds in

13   place, is adequately capitalized as well to actually clear

14   customers' business and they, for the futures side, are

15   adhering to the CFTC regulations, the Commodities Futures

16   Trading Commission, and for the options side with the SEC rules

17   and regulations.

18   Q.   And before the Lehman liquidation in September 2008, was

19   the Lehman broker/dealer, the entity LBI, a clearing member

20   with the Options Clearing Corporation?

21   A.   Yes, they were.

22   Q.   Did LBI also trade in exchange traded derivatives on

23   exchanges where it was not the clearing member?

24   A.   Yes, they did and that's where we use, what we call, their

25   affiliates or third-party brokers.

Page 11

1    Q.    Now on the subject of margin that we're here to -- that

2    you're here to give testimony about, can you explain why it is

3    that margin has to be posted with an exchange or clearing

4    house?

5    A.    Margin -- the clearing house -- what the clearing house

6    does is actually stands in between every single transaction

7    that's done.  So every buy and every sell the clearing house

8    stands in the middle.  But what it does is it protects itself

9    so it takes margin, collateral, whichever terminology you're

10   used to, they both get used, to insure that trading each day

11   they are never at risk.

12        So in the futures markets we have what we call limit up

13   and limit down.  And what this does is the initial margin is

14   set by the clearing house to determine the maximum amount they

15   will allow the market to move, up or down, in one given day.

16   If you go outside of that range the exchange normally halts

17   trading and will actually take more collateral from you to

18   protect themselves.

19   Q.    And is that true, conceptually, both with options and

20   futures?

21   A.    Yes, it is.

22   Q.    And let me make sure some of that is made clear.  Can an

23   exchange traded derivative position, either an option or a

24   future, create liability or exposure for the clearing member?

25   A.    Yes, it can.  The problem is is the markets can be very

Page 12

1   volatile, as they were between the 15th and two, three, four

2   weeks after.  So you don't know how the market's going to

3   react, the way it's going to move, so the liabilities can be

4   fairly horrendous.

5   Q.   And does a clearing member have liabilities both for its

6   own positions and for any other positions that are traded

7   through that clearing member by customers?

8   A.   Yes, it does.  So for its own positions of course it

9   doesn't know where the market's going to go but it's

10  responsible for settling those.

11       In regards to the customer's business, you hope that your

12  customer is credit worthy but when the markets are as volatile

13  as it was they may not be.  They may be in trouble which means

14  as their clearing member you, as their XEM, you are responsible

15  for settling that margin on their behalf.

16  Q.   So does -- the clearing member has an absolute obligation

17  to the clearing house or exchange for all positions traded

18  through that clearing member?

19  A.   Yes, they do.

20  Q.   And that's true whether the positions relate to customers,

21  affiliates, other brokers or the clearing member itself?

22  A.   Yes.  It's any positions that they are clearing at that

23  clearing house.

24  Q.   Now LBI, in addition to being a clearing member on certain

25  exchanges, did LBI also trade exchange traded derivatives

Page 13

1    through intermediate brokers on other exchanges?

2    A.   Yes, they did.   In the Asian exchanges and there was a

3    company in the U.S. where they're not clearing members.

4    Q.   And in those overseas exchanges, were they part of LBI's

5    North American futures commissions business?

6    A.   Yes, they are and the reason being is the way it works is

7    that when LBI is trading, as in when anybody is trading their

8    proprietary business, you're actually trading the markets

9    globally.   So you're not just trading in the U.S. even though

10   they were a U.S. entity.   They're actually trading everything.

11   Q.   When LBI traded exchange traded derivatives through an

12   intermediate broker, was its obligations and exposure to

13   satisfy all obligations to the clearing member any less than

14   its obligations when it's a clearing member?

15   A.   No.   It's no difference whatsoever.   You are responsible

16   for the positions and the margin requirements, initial margin

17   requirements, that you have.

18   Q.   Now in your experience in the business, have you ever

19   worked on transactions in the past in which exchange traded

20   derivative businesses were acquired?

21   A.   Yes, I have.

22   Q.   And how many times?

23   A.   Probably two to three.

24   Q.   And in those prior transactions, was the collateral or

25   margin associated with the exchange traded derivative business

LEHMAN BROTHERS HOLDINGS, INC.

Page 14

1    transferred to the acquirer?

2    A.   Yes, they were.  That is the normal practice in the

3    futures industry, the exchange traded derivatives business, is

4    that the margin, which is securing the positions that you have

5    on, is actually transferred.  You wouldn't be taking a position

6    without the margin because your risks could be unbelievable.

7    Q.   If you took the positions without the margin would you

8    have an immediate obligation to post margin?

9    A.   Yes, you would.

10   Q.   And if you acquire an account where exchange traded

11   derivatives are traded would you also acquire the margin in

12   that account or pledge to that account?

13   A.   Yes, you would.

14   Q.   And is that what happened in the past transactions you

15   worked on?

16   A.   Yes, in every transaction in the past I've worked on that

17   is exactly what happens.

18   Q.   What were those transactions, briefly, if you remember?

19   A.   There was -- when I worked at ABM (ph.) back in 2000 they

20   actually made two acquisitions.  They acquired the Merrill

21   Lynch Energy business and they also acquired the Lemura (ph.)

22   Futures business.  And then the summer of, actually, 2008, at

23   Barclays, Barclays actually took over Sem energy business as

24   well.

25   Q.   And when you say energy business, do you mean futures on

Page 15

1   energy commodities?

2   A.   Yes, I do.

3   Q.   So they're exchange traded derivatives?

4   A.   Yes, they are.

5   Q.   They're futures?

6   A.   Yes.   Sorry.

7   Q.   And in all of those transactions margin was transferred

8   with the business?

9   A.   Yes, they were and in fact, just to let you know with the

10   Sem one, the margin was actually physically transferred by the

11   clearing house themselves because the positions were so large.

12   Q.   Now coming to the events of the week of September 15th,

13   2008, do you recall Lehman filing for bankruptcy on or around

14   September 15th?

15   A.   Yes, I do.

16   Q.   And based upon -- well let me first begin, do you recall

17   what your first involvement was with a potential acquisition of

18   Lehman's exchange traded derivatives business?

19   A.   My first involvement was on the Sunday night on the way

20   home, actually in the car with my boss Tim Slack (ph.), Tim

21   actually received a phone call from Kim Taylor at the CME

22   asking us if we would be prepared to talk to Jeff Jennings from

23   Lehman about taking over the customers' futures business that

24   they had.

25        We agreed.   We then actually went into my house to use a

Page 16

```
 1    speaker phone, called them back and had a very brief

 2    conversation with Jeff that said yes we would be willing to

 3    talk to them and made arrangements to go into Lehman's office

 4    at 7:45 the following morning.

 5    Q.    Now, did you say -- did the phone call come from the CME?

 6    A.    Yes, it did.

 7    Q.    And what is the CME?

 8    A.    The CME is the Chicago Mercantile Exchange.  That's the

 9    clearing member that clears the business for NYMEX, COMEX, CBT

10    which is the energy business, the gold and silver business and

11    the treasury.

12    Q.    And all of that relates to futures trading?

13    A.    Yes, it does.

14    Q.    Exchange traded futures?

15    A.    Yes, it does.

16    Q.    And based on your experience in the industry, was it your

17    expectation at the time that the Lehman bankruptcy would impact

18    the ability of LBI to act as a clearing member in the various

19    exchanges where it had exchange traded derivatives?

20    A.    Yes, it would and one of the biggest reasons being because

21    if they have no money -- the CFTC states very clearly that when

22    you're managing customer money you have to protect it and it

23    has to be in what we call segregated money and secured money,

24    which means that you are keeping that safe and it cannot be

25    actually held by anyone else.
```

Page 17

1        You're also never allowed to go under secured at any point

2   during the day.  So you have to make sure at all times the

3   customers are protected.  So one of the problems is, with

4   Lehman going out of business, potentially if they had no money

5   of their own they wouldn't be able to keep that satisfied.

6   Q.   And so was it your expectation that when the Lehman parent

7   company went bankrupt the broker/dealer would not be able to

8   fulfill its obligations to the clearing members or intermediate

9   brokers who had had exchange traded derivatives accounts?

10  A.   That is.  Yes.  Yes.

11  Q.   And is that -- as an example of that when the CME called

12  Barclays to ask if it would acquire the futures customer

13  business at the CME?

14  A.   Yeah.  I think they were very concerned and I think it was

15  actually proven on the Wednesday when Lehman actually couldn't

16  satisfy their CME margin for their proprietary business.

17  Q.   So your initial contact with Lehman was actually

18  independent of the overall sale transaction, is that correct?

19  A.   Correct.  On the Sunday I actually had no idea.

20  Q.   Did you then come to learn that there was a larger

21  transaction in which Barclays would acquire the entire

22  broker/dealer business?

23  A.   Yes, I did.

24  Q.   And did you come to learn that that larger acquisition

25  would include the exchange traded derivatives business?

Page 18

1    A.    Yes, I did.

2    Q.    And did you learn that it was both options and futures?

3    A.    Yeah, it was everything that we class under the exchange

4    traded derivatives world.

5    Q.    During the remainder of the week did you make an effort to

6    learn as much as you could about the positions and the margin

7    associated with the Lehman exchange traded derivatives

8    business?

9    A.    We spent a lot of time with the Lehman futures employees,

10   trying to understand where they had positions, what brokers

11   they used, where they held their bank accounts, where they held

12   their money market funds.  Very much concentrated on the

13   customer side of the business but the house as well, in case

14   there was any house positions when and if we took over.  And

15   there was lots of communications backwards and forwards.  We

16   didn't actually get any of the open positions that there were

17   or the size of the amount of money on collateral that they were

18   holding and the reason being is Lehman's books and records were

19   in such a mess, I don't even actually think they knew

20   themselves where they were.

21   Q.    Would you characterize what you did as due diligence?

22   A.    I wouldn't call it due diligence, no.

23   Q.    Why not?

24   A.    Because to me due diligence is where you're actually

25   looking at their physical books and records.  You're looking at

Page 19

```
 1    are they in SEG, are they in secured, are they fully funded,

 2    are any of their customers in deficit, are their customers

 3    fully paid up.  That, to me, is due diligence in the business.

 4    Q.   So did you think you did not have either the time or

 5    information to conduct what you would call due diligence?

 6    A.   Definitely not.

 7    Q.   Did you, notwithstanding the constraints of time and

 8    limited information, make an effort to learn what you could

 9    learn?

10    A.   Yes, we made every effort that we possible could to

11    understand what we were walking into.

12    Q.   In your -- and did you have discussions with your Lehman

13    counterparts in the exchange traded derivatives business?

14    A.   Yes, I did.  We spoke to them on the Monday, the Tuesday,

15    the Wednesday, I think pretty much every day that week.

16    Q.   And in your discussions with Lehman did Lehman indicate

17    that Barclays, if the transaction went forward, would be

18    acquiring the margin or collateral associated with the exchange

19    traded derivatives business?

20    A.   Yes.  I mean, that is normal practice in the exchange

21    traded derivatives business.  You -- I hate to say this but

22    you'd be crazy if you didn't take it.  Sorry.

23    Q.   It's okay.  So let me just -- was it always your

24    understanding that the margin would be transferred with the

25    exchange traded derivatives business?
```

Page 20

1    A.    Yeah.  Definitely.

2    Q.    Did anyone ever say to you or suggest to you that the

3    margin, some or all of it, associated with the exchange traded

4    derivatives business, would not be transferred?

5    A.    No.

6    Q.    Did -- was there an actual discussion in which it was

7    expressly discussed that margin would be transferred?

8    A.    Yes.  Definitely.

9    Q.    You should have a binder of exhibits in front of you.

10   A.    Yup.

11   Q.    Which I think has been handed out.  And could you turn to

12   tab 2 of the binder, please.

13          MR. HUME:  Tab 2 of the binder please, Your Honor.

14   Q.    Tab 2 is BCI exhibit 217, it's in evidence and it is an e-

15   mail from Sean Burne (ph.) in futures sales to Liz James and a

16   number of other people at Barclays dated September 19th, 2008

17   at 14:50 GMT, which I think is about 10:50 in the morning New

18   York time.  Do you see the document, Ms. James?

19   A.    Yes, I do.

20   Q.    And can you tell the Court who Sean Burne is?

21   A.    Sean Burne was actually my boss at this time.

22   Q.    Despite being --

23   A.    He was the head of the U.S. futures business.

24   Q.    Despite being your boss, did you ask him to prepare this

25   summary?

Page 21

```
 1   A.   Yes, I did.

 2   Q.   And what was -- the first sentence in the e-mail says,

 3   "This is an outline of what was discussed yesterday with

 4   Lehman."  Do you see that?

 5   A.   Yes, I do.

 6   Q.   And what does that refer to?

 7   A.   There is a spreadsheet that follows of where we

 8   actually -- following discussions with Lehman we actually put

 9   together a list of things that we need to insure that we did or

10   didn't miss.  So get an understanding of what exchange is, who

11   their brokers were, what bank accounts they used, i.e. get full

12   information on the futures business itself and this was

13   particularly to do with the futures business rather than with

14   the OCC options business.

15   Q.   It refers to a discussion the day before with Lehman, do

16   you remember that discussion?

17   A.   Yes, I do.

18   Q.   And was it in person or over the phone?

19   A.   It was over the phone on the Thursday.

20   Q.   And do you recall generally who the people were from

21   Lehman who were on the call?

22   A.   I'm pretty sure it was the same people that we had met on

23   the Monday.  So Jeff Jennings who ran the global business for

24   Lehman, Ron Filler who was their legal counsel who actually

25   came back as a consultant, Donna Moran (ph.) who was in their
```

Page 22

1   sales.  Adam Cohen (ph.) who was their -- one of their

2   relationship managers, Mike Macnavernia (ph.) who was in the

3   business on their IT side.

4   Q.   Let me ask you, the document -- the attachment doesn't

5   actually have page numbers so I think we may have taken the

6   liberty of putting a tag on the page I wanted to ask you about

7   but if not it's one, two, three -- the fourth physical page on

8   the back of that if yours is double sided, which mine is.

9   A.    Yeah.

10  Q.   The one which at the top of it, on the top left, says U.S.

11  positions and trades.

12  A.    Okay.

13  Q.   Do you see that page?

14  A.    Yes, I do.

15  Q.   I want to make sure others are there.  Can you describe

16  for the Court, generally, what is set forth on this page?

17  A.    Generally what is set forth is a list of the exchanges

18  where they were clearing business.  The questions on where were

19  their bank accounts held, where were the money market funds

20  accounts held, the top was actually giving us what their

21  memberships numbers were at the CME and NYBOT (ph.) which is

22  now the ICE Exchange, the status of the accounts both where

23  they were and pretty much -- most -- nearly all of the

24  information that you would need and require for taking over the

25  business.

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 23 of 121

Page 23

1    Q.    When you refer to house accounts can you explain --

2    A.    Sorry.

3    Q.    -- does that refer to Lehman accounts generally or Lehman

4    positions?

5    A.    Yes, it does.  It's position -- when I refer to house,

6    sorry and I know it's terminology, when we refer to house we're

7    referring to business that is being traded by Lehman itself.

8    Q.    As opposed to customers?

9    A.    Correct or its affiliates because normally you do carry

10    your affiliate position in house as well, in the futures side

11    of the business.  Different in the OCC world.

12    Q.    We'll come back to that later but was it sometimes unclear

13    whether affiliates were treated as customers or in-house?

14    A.    Yes.

15    Q.    On this page that we're looking at, is there anything on

16    this page that reflects a discussion you had with Lehman that

17    margin for the exchange traded derivatives business would be

18    transferred to Barclays as part of the overall acquisition?

19    A.    Oh yeah.  Definitely.  One hundred percent.  It actually

20    says very clearly margin with U.S. exchanges in clearing house

21    customers in-house.

22    Q.    You're pointing to the third set of points

23    A.    Sorry.  Yes.

24    Q.    It's highlighted up on the screen now.

25    A.    Okay.  And then margin with carrying brokers for customers

LEHMAN BROTHERS HOLDINGS, INC.

Page 24

1    and house.

2    Q.   And the reference to customer house, does that indicate a

3    discussion that both the margin associated with customer

4    accounts and positions as well as margin with house accounts

5    and positions would all be transferred?

6    A.   That is correct.  Yes.

7    Q.   And was that discussed with Lehman in the teleconference

8    the day before?

9    A.   Yes, it was.

10   Q.   In the middle set of points there's a reference to

11   segregated and secured bank accounts.

12   A.   Yup.

13   Q.   You mentioned something about that earlier in your

14   testimony.  Can you explain again what segregated and secured

15   accounts are?

16   A.   Certainly.  The CFTC sets segregated and secured and what

17   segregated means, it's the rules that CFTC uses, what that's

18   saying is any money for customers that has to be held true to

19   the CFTC rules and regulations and has to be held with --

20   inside the U.S. -- the United States.  It cannot be held

21   outside of the U.S.

22       In regards to the secured money, it's actually normally

23   for where you're trading foreign business so while the money

24   can be held outside of the U.S. it can also be held inside the

25   U.S. but both of these accounts are actually designated as

Page 25

```
 1    customer segregated accounts or a customer secured account.  So
 2    it's very clear, this is, you know, it is money that is there
 3    to protect the customers and it's customers' money or
 4    collateral.
 5         The seg and securities also, you have to actually insure
 6    those accounts never ever go under seg or secured at any time
 7    during the day.  So normal practice is you actually have a
 8    buffer of your own money in those accounts to insure that
 9    doesn't happen because you could be in trouble.
10    Q.   When you say you have to have a buffer of your own
11    money --
12    A.   Yes.
13    Q.   -- are you referring to the broker/dealer --
14    A.   Yes.
15    Q.   -- having to put its proprietary assets in the seg and
16    secured customer accounts?
17    A.   Yes, I am.
18    Q.   And it puts that money in over and above the amount that
19    is customer assets?
20    A.   That's correct.  Yes.
21    Q.   And explain again why it does that.
22    A.   So the reason it does it is that the CFTC states you are
23    never allowed to go under segged or undersecured.  So, i.e. you
24    have to make sure that at any time your assets for your
25    customers are always higher than your liabilities and that's
```

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 26 of 121

Page 26

 1    intraday, which of course can be pretty hard to do especially

 2    when you've got extremely volatile markets.  So all of the FCMs

 3    on the street actually put in a buffer that actually protects

 4    that.  You're insuring that at any time you are protected and

 5    the customer is protected.

 6    Q.   Let me make sure I understand one other thing.

 7    A.   Certainly.

 8    Q.   In seg and secured accounts, you said something about them

 9    being in the United States versus overseas?

10    A.   Yes.

11    Q.   If a seg and secured account is in the United States --

12    A.   Yeah.

13    Q.   -- can it still be pledged to secure obligations

14    associated with exchange traded derivatives in an overseas

15    account?

16    A.   Segregated is purely for the exchanges within the U.S.

17    Secured is for exchanges outside of the U.S. and there are now

18    a couple of products that are inside.

19    Q.   If there's a seg and secured account, either one, can the

20    exchange where the associated derivatives are trading, draw

21    down on that as security for the exposure created by the

22    derivative positions?

23    A.   Yes, they can.  They actually have what we term direct

24    debit authority over the bank accounts, to actually immediately

25    take the money.  You can then go in and switch the money out

1    and put in collateral but, you know, treasuries or government

2    securities.

3    Q.    So while the money's there to protect customers, is it

4    also pledged to be exchanged, directly or indirectly, so that

5    it can draw it down to protect itself against the exposure

6    created by the derivative positions?

7    A.    Yes, it does.

8    Q.    And so even if there's money in the account at all times,

9    it can be taken by the exchange?

10   A.    Yes, it can and most of the exchanges take twice a day.

11   Q.    And on this page, at the top line, there's a reference to

12   client business in CME 835 and NYBOT 858 question mark.  Was

13   there an attempt, at this time and in this discussion you had

14   with Lehman, to identify where all of their different exchange

15   traded derivative accounts were?

16   A.    Yes, it was.  The main ones being CME and ICE, NYBOT

17   sorry; they've changed their name.  One of the things about

18   that is, is that's where the largest set of positions were for

19   the customers so the easiest way, when you transfer, is to

20   actually rename those firms, which is why we have the firm

21   numbers up there.

22   Q.    And were you able -- and did you want to know where the

23   accounts were so that you would know what's in the accounts and

24   what the exposure was?

25   A.    Yes.  The other thing is, certainly with the bank accounts

08-13555-mg    Doc 11244    Filed 09/01/10    Entered 09/10/10 13:09:55    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 28 of 121

Page 28

1    and the money market funds; we actually had to have letters

2    drafted to actually go to them approving them to transfer over

3    the collateral to us.

4    Q.    Were you able, that week before the closing, to assure

5    yourself that you definitely had at least a list of knowing

6    where all the accounts were?

7    A.    I can actually say, quite happily now, no we didn't.  We

8    thought we did but we did not.  This was the list that was

9    given to us, was that the definitive list -- actually, it

10    wasn't.

11        (Pause)

12    Q.    You understand, Ms. James, that eventually, once Barclays

13    got all the information on all of the exchange traded

14    derivatives accounts and margin, under its accounting

15    statements Barclays showed some net value, positive value with

16    those accounts.  Were you generally aware of that?

17    A.    I am generally aware of that.

18    Q.    As of the time of the closing of the transaction, on

19    September 22nd, 2008, did Barclays know and was it possible for

20    Barclays to know what, if any net value might be in these

21    exchange traded derivatives accounts?

22    A.    No.

23    Q.    Was it possible to know what the full extent of Barclays

24    risk exposure was with respect to these exchange traded

25    derivatives accounts?

1    A.    No, not at all.  And the thing that you have to remember

2    is we didn't know who the customers were.  We didn't know

3    whether they were in credit or in deficit.  The markets were

4    also extremely volatile so we didn't know what we were walking

5    into on the Monday morning in the ETD world.

6    Q.    Was there concern at Barclays about the negative risk

7    exposure it was taking on by acquiring these exchange traded

8    derivatives accounts?

9    A.    Yes, there was.

10   Q.    With respect to options, did you receive any information

11   at all that helped you or that you used to attempt to analyze

12   what the exposure was?

13   A.    We, on the -- I believe it was the Sunday or Saturday, I'm

14   sorry, the weekend gets very confusing, there was some

15   information actually sent to Tim Stack, who was my boss,

16   actually giving details of the equity options but unfortunately

17   the information that was sent was not sufficient to actually

18   figure out what the positions were.  Plus, if we had got the

19   information Barclays wasn't an equities house.  There's no way

20   we could have actually priced what was there known what was

21   there and known what the risk was.

22   Q.    Let me ask you to turn, if you would, to tab 5 of the

23   binder which is Movant's Trial Exhibit 738.

24   A.    Yes.

25   Q.    This is an e-mail, I'm probably going to mispronounce his

Page 30

1    name, but Christopher Minczek (ph.) --

2    A.    Okay.

3    Q.    -- to a number of different people.  You are not on the e-

4    mail but it says "I've included short options, long shorts as

5    of yesterdays close."  Do you see that?

6    A.    Yes, I do.

7    Q.    And it attaches a list of what are called long options.

8    It says, "LBI derivatives" at the top left of the attachment.

9    Do you see that?

10   A.    Yes, I do.

11   Q.    And you would understand LBI to be a reference to the

12   Lehman broker/dealer?

13   A.    Yes.

14   Q.    And are you familiar with this document?

15   A.    Yes.  I was actually shown it and asked to explain it.

16   Q.    So you were asked -- were the people who were asking you

17   to do that people who didn't understand how to read it?

18   A.    Correct.  My boss Tim Stack.

19   Q.    And when you looked at it, were you able to determine what

20   it was showing?

21   A.    Unfortunately there's some key pieces of information

22   missing from this report.  One of the biggest things being is

23   under where it says long, in the normal practice we talk in lot

24   size.  We actually don't know what this number is.  What I know

25   for a fact is there is no way that Lehmans had 152 million of

LEHMAN BROTHERS HOLDINGS, INC.

Page 31

1    the SNP December puts, a strike of 1,400.  You don't trade that

2    many lots in the exchange.  There is no way.

3    Q.    Right.

4    A.    So we didn't actually know what that meant.  Plus the

5    other thing is, is where it says price at the end we don't know

6    if that's the original trade price, if it's the closing price.

7    There's also no designation that tells us if this was house

8    positions or customer positions, which are some key pieces of

9    information that you need to look at the options.

10   Q.    So is it your testimony that this information was simply

11   incomplete and insufficient to tell Barclays what the risk

12   exposure was with respect to the options positions held in the

13   Lehman OCC account?

14   A.    Yes, I do.

15   Q.    Let me ask you to turn to tab 6, which is BCI exhibit 263.

16   This is an e-mail from Frances Pern (ph.) who I'll represent, I

17   believe, is in the Lehman finance department, to Tim Stack whom

18   you reported to, correct?

19   A.    Yes.

20   Q.    And this e-mail says, "Tim, here are the OCC statements

21   for LBI as of 9/22, reflecting our cash and securities

22   collateral held for LBI account O74."  Are you familiar with

23   the fact that Lehman's main account at the OCC was the 074

24   account for options?

25   A.    Yes, I was made aware in this e-mail.

Page 32

```
 1   Q.   And were you also asked to try to look at this document to

 2   decipher what information it contained?

 3   A.   Yes, I was.

 4   Q.   And I should note for the record, this document was sent

 5   Sunday, September 21st, the day before the closing.

 6   A.   Yes.

 7   Q.   Do you see that?

 8   A.   Yes, I do.

 9   Q.   And were you working that weekend at Barclays in an effort

10   to try to assess the risk exposure associated with Lehman's

11   exchange traded derivatives accounts?

12   A.   We were actually working that weekend to insure that when

13   we took over, if we took over, if everything was approved, that

14   we had everything in place that we immediately needed to do to

15   transfer the bank accounts, to transfer the exchange

16   relationships, to transfer the broker/dealer -- the third party

17   brokers, to get an idea of what the customers positions were,

18   the house positions if there were any.  It was a complete have

19   we got all our ducks in a row for Monday morning.

20   Q.   Is one of the reasons you were doing that because Barclays

21   was hoping that the customers who came over on the futures side

22   would become its customers?

23   A.   Yes, that's exactly what we were hoping for.

24   Q.   And was one of the things you were trying to do to make

25   sure the customer accounts on the futures side transferred
```

Page 33

```
 1    smoothly and that those customers would be protected?

 2    A.    Yes.  That's exactly what we were doing.

 3    Q.    Now, did you attempt to analyze the data attached to

 4    Exhibit 263?  Analyze or summarize it?

 5    A.    I summarized it.  I didn't necessarily analyze it but I

 6    summarized it.

 7    Q.    And can you turned to tab 7, which is BCI 958 -- well,

 8    actually I think the one in your binder is Exhibit 963.

 9    A.    Yeah.

10    Q.    This is an e-mail from you, to Tim Stack, Sunday,

11    September 21st at 22:01 GMT, which I think is about 6 o'clock

12    in the evening New York time.

13    A.    Yeah.

14    Q.    And I believe if you look at the time stamp on the

15    earlier, this shows you sent this about two hours after Tim

16    Stack received the other OCC statements.  Does that look

17    correct?

18    A.    That looks correct.

19    Q.    And what are you sending to Tim Stack here?

20    A.    I am actually sending Tim the balances for the house

21    accounts that Lehman had with the OCC for all of their exchange

22    traded derivatives, the futures and the options.

23    Q.    And the balances are the amount of margin that is

24    deposited there versus the amount of requirement at that time?

25    A.    Yes, it is.  You can actually get a feel, when you look at
```

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 34 of 121

Page 34

1    the requirements, for the size of their position.

2    Q.    Now on the first page of the spreadsheet, and I apologize

3    we have to turn the binder around to see it properly, you list

4    a series of numbers and on the right-hand side there are two

5    numbers which we could blow up.  One is called rolled up margin

6    deficit of a negative 379 million.  Do you see that?

7    A.    Yes, I do.

8    Q.    And the other is called requirement of a negative 699

9    million.  Do you see that?

10    A.    Yes, I do.

11    Q.    Now, to determined the total requirement for margin

12    deposits for these house accounts at that time.  Did you have

13    to add those two numbers together?

14    A.    Yes, I did.

15    Q.    And so -- and I'm saying as of that time, are we talking -

16    - is this showing data as of the Friday?

17    A.    This is actually showing data as of the Sunday which is

18    after the option expires.  So the OCC actually had an option

19    expiry weekend that weekend.  So these are the numbers after

20    all the exercises and assignments on the options.

21    Q.    Now if you add those two numbers together you get to, I

22    believe, just under 1.1 billion dollars.

23    A.    Yes.

24    Q.    Does that sound correct?

25    A.    Yeah.

Page 35

1  Q.   Now to the left of those two numbers does it list three

2  different types of margin collateral that's posted at the OCC

3  for Lehman?

4  A.   Yes, it does.

5  Q.   It lists cash of 881 million dollars, government

6  collateral 410 million dollars, are those government treasury

7  securities?

8  A.   They would be treasury securities and that's the market

9  value with a haircut so that's a movable number.

10  Q.   And then there's a letter of credit of 251 million, do you

11  see that?

12  A.   Yes, I do, which we would not be taking because normal

13  practice is left over credits don't come.

14  Q.   So let me make sure I understand that.  Was it your

15  understanding at the time that the normal practice would be

16  that Barclays would eventually need to replace that with its

17  own letter of credit?

18  A.   Correct.  Yes, they would.

19  Q.   So the total collateral shown there is just less than 1.5

20  million, if my math's correct.  Maybe it's easier if we look at

21  the next page.  Does the excess deficit column, on the next

22  page, show the difference between the three types of collateral

23  added up minus the total requirement that we talked about?

24  A.   Yes, it does.

25  Q.   So just so it's clear for everyone --

Page 36

1    A.    Sorry.

2    Q.    -- based on these numbers on this document this shows an

3    excess of 464 million dollars?

4    A.    That Lehman had with the OCC at this time, yes.

5    Q.    For those house accounts?

6    A.    For those house accounts.

7    Q.    Now, would it have been your understanding at the time

8    that 250 million of that 464 million would not be of any

9    benefit to Barclays because Barclays would have to go out and

10   pay for its own letter of credit?

11   A.    Correct.  Yes.

12   Q.    So that, in a sense, reduces the excess down to 210

13   million?

14   A.    Yeah.  But that's excess as per this day.

15   Q.    Right.  Are you saying that that excess may not be enough

16   to cover the exposure that Barclays was taking on?

17   A.    The markets at that time were really volatile and you

18   don't know where you're going to be the following day and

19   whether your excess is now actually a deficit.  Twenty-four

20   hours, which is when we eventually took over the positions, is

21   a long time in those markets.

22   Q.    Looking at that, on September 21st, 2008, would you have

23   thought that's great we made 250 million -- 210 million dollars

24   or would you have thought it's good that we're covered but we

25   still have risk that excess could be eaten up over night?

LEHMAN BROTHERS HOLDINGS, INC.

Page 37

1    A.   Oh, my thought would have been we're at risk because we've

2    got no idea what the positions are; we had no idea what

3    products there in.  The market was moving so much.  Even on the

4    Barclays' side, the week from the 15th onwards, our margin

5    calls were, within Barclays, were two to three hundred million

6    a day.

7    Q.   Of additional margin --

8    A.   Of additional margin on top of what you're already paying.

9    Q.   We may come back to this but I want to move to tab 8 of

10   the binder, which is another sideways document.

11            MR. HUME:  I apologize, Your Honor.

12   Q.   It's BCI Exhibit 646.  And if we could go, please, to the

13   last page in the document.  This document -- do you recognize

14   this document, Ms. James?

15   A.   I have seen this recently, yes.

16   Q.   Do you recognize that it lists on the document all of

17   Lehman's OCC accounts that it held at the time of the

18   transaction?

19   A.   Yes, it does.

20   Q.   And it shows, for each count -- for each date from

21   September 15th through October, what the requirements were for

22   margin and what the different kinds of margin were that were

23   posted.  Do you see that?

24   A.   Yes, I do.

25   Q.   I'd like to look starting with September 15th; does it

Page 38

1    show that the total requirement from that date was 789.6

2    million?

3    A.   Yes, it does.

4    Q.   And does it show that on September 16th that requirement

5    went up to 1.359 billion dollars?

6    A.   Yes, it does.

7         MR. MAGUIRE:  Your Honor, I don't have an objection to

8    the witness reading the document but I don't believe the

9    witness has any foundation to testify to any of what is set

10   forth in this document.

11        THE COURT:  I don't know that yet but it sounds like

12   it's a foundation objection to this line of questioning.

13        MR. MAGUIRE:  Yes, Your Honor.

14        MR. HUME:  It's an objection to a pending question.

15   I'm happy to make sure we lay the foundation for the question

16   I'm going to ask.

17        THE COURT:  Okay.  At the moment I don't even know

18   what this document is.  So why don't we figure out what we're

19   dealing with and then we can find out if the witness is in a

20   position to talk about it.

21   Q.   Ms. James, are you aware -- are you familiar -- have you

22   seen this document before?

23   A.   Yes, I have.

24   Q.   Is it your understanding that this document sets forth

25   information gathered from the Options Clearing Corporation

Page 39

```
 1    showing the amount of margin requirements Lehman's accounts had

 2    for each of these days and the amount of margin posted to those

 3    accounts for each of these days?

 4    A.   Yes, it does.

 5         MR. MAGUIRE:  No foundation, Your Honor.

 6    Q.   Ms. James, did you work on the exchange traded derivatives

 7    part of this transaction in trying to learn this kind of

 8    information at the time of the sale?

 9    A.   Yes, I did.

10    Q.   And did you just testify that at the time that you

11    summarized a set of information from the OCC showing the amount

12    of margin requirement and excess, you believe there was a

13    concern that that excess could be eaten up very quickly?

14    A.    Yes, I did and this document proves that.

15         MR. MAGUIRE:  Your Honor, I don't believe the witness

16    has established that she prepared this document or has any

17    basis to testify about what this document proves.

18         THE COURT:  I think she's established that she didn't

19    prepare it.  That it was somebody else's document that she

20    looked at and she has a view of the information that she is

21    reading off of the document.  Do I understand that correct?

22         MR. HUME:  I think that's accurate, Your Honor.

23         THE COURT:  I think she can certainly testify as to

24    her interpretation of somebody else's document and you an can

25    certainly cross examine all you want on it.  So the foundation
```

08-13555-mg    Doc 11244    Filed 09/01/10    Entered 09/10/10 13:09:55    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 40 of 121

Page 40

1    objection is overruled at this point.

2            MR. HUME:  Let me just do two more days -- two or

3    three more days anyway.

4    BY MR. HUME:

5    Q.    So between the 15th and the 16th is it your understanding

6    that this document shows that the margin requirement for the

7    Lehman accounts went up by almost 600 million dollars?

8    A.    Yes, it does.

9    Q.    And then on the 17th the requirement went up to 1.4

10   billion?

11   A.    Yes, it does.

12   Q.    And on the 18th the requirement went up to over two

13   billion dollars?

14   A.    Yes, it does.

15   Q.    And so this document shows that from the 15th of September

16   to the 18th of December, in those three days, the margin

17   requirement for Lehman went up by over 1.2 billion dollars?

18   A.    Yeah.  It reflects --

19   Q.    And is that consistent with the risk exposure that you

20   were testifying about earlier?

21   A.    Yes, it does.

22   Q.    Now these accounts shown on this document, you're familiar

23   with those account numbers?

24   A.    Yes, I am.  They are Lehman's OCC account numbers.

25   Q.    Let me ask you quickly to turn to tab 9 of the binder.

Page 41

1    Tab 9 is BCI exhibit 3A, which is a transfer and assumption

2    agreement.  The first whereas clause says, underneath

3    witnesseth, says, "Whereas Lehman is a clearing member of OCC

4    and carries one or more accounts, number 74, 84, and 273,

5    collectively the account."  Do you see that?

6    A.   Yes, I do.

7    Q.   And do you understand, from your own personal knowledge,

8    those to be the Lehman accounts at the OCC?

9    A.   Yes, I do.

10   Q.   Down under paragraph 1A of this agreement it states, "For

11   good and valuable consideration the receipt and sufficiency of

12   which are hereby acknowledge, Lehman hereby sells, assigns,

13   transfers and sets over to Barclays, without recourse or

14   without representation or warranty other than expressly

15   provided herein, all of Lehman's rights, title, interests,

16   powers, privileges, remedies, obligations and duties into,

17   under and in respect of the account as of the effective date,

18   including with respect to the clearing fund deposit, all margin

19   deposits held by OCC with respect to the account and all

20   settlement obligations with regard to transactions in cleared

21   contracts and all rights and obligations in respect of exercise

22   of option contracts and assignments of such exercises."

23       Is that provision, Ms. James, consistent with your

24   understanding at the time, working on this transaction, of what

25   was happening with respect to Lehman's OCC accounts?

Page 42

1    A.   Yes.  And this is normal, standard practice when you're

2    taking over a business.

3    Q.   And is it consistent with your understanding that Barclays

4    was taking both obligations and whatever --

5              MR. HUME:  Strike that.

6    Q.   Is it consistent with your understanding that Barclays was

7    taking both the obligations with respect to the account and

8    whatever margin deposits were in the account to protect against

9    those obligations?

10   A.   Yes, I am.  You would not take the accounts without taking

11   the collateral, the margin that protects them.

12   Q.   Now with respect to futures, were you able to get more or

13   less information than you did with options?

14   A.   Less.  We got none.

15   Q.   Did you ever get a listing of all futures positions that

16   Lehman had?

17   A.   No.

18   Q.   Did you ever get a listing of all of the margin or

19   collateral posted to the Lehman futures accounts?

20   A.   No.  We were given bits of information but we never got an

21   exhaustive list.

22   Q.   Let me ask you to turn to tab 3 of your binder. Movant's

23   Trial Exhibit 30 is an e-mail from Tim Stack, again, to Stephen

24   King, and others from Barclays, dated Sunday, September 21.

25   The subject heading is status of VIX and equity options

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 43 of 121

Page 43

```
1    accounts.  Let me ask you first, what is VIX, V-I-X?

2    A.   VIX is the volatility index futures product that is

3    actually traded on the CFE, which is the Chicago Futures

4    Exchange, which is owned by the CBOE, which is the Chicago

5    Board Options Exchange which clears at the OCC.

6    Q.   And did there come a time over the weekend before the

7    closing that Barclays came to learn that Lehman had a

8    significant position these VIX futures?

9    A.   Yes.

10   Q.   Are they futures or options?

11   A.   They're futures.  There's both.  There's actually -- the

12   VIX is actually both.  In this regards we're actually talking

13   about futures because the options actually clear in the equity

14   options accounts for the VIX.

15   Q.   To state the question again --

16   A.   Sorry.

17   Q.   -- more clearly.  Did there come a time, over the weekend

18   before the closing, that Barclays came to learn of a large

19   Lehman VIX position?

20   A.   Yes.  I was actually sitting in Tim Stacks office when

21   somebody came running in saying there's a huge position we're

22   going to need to take over in VIX and equity options, with pure

23   panic in her voice.

24   Q.   Why did that cause panic?

25   A.   One, because where Barclays is not equity options experts
```

Page 44

```
 1    or even VIX experts at that time and we were originally under

 2    the impression that all of the house positions had been closed

 3    down.  We then, of course, found out that they had not been

 4    unliquidated.

 5    Q.   And was the VIX position one that you believed created

 6    significant exposure for Barclays?

 7    A.   Very significant exposure for Barclays.

 8    Q.   Is that because those positions can create large

 9    liabilities when the financial markets are extremely volatile?

10    A.   Yeah.  It's a volatility index.  It's a very, very

11    volatile product.  It moves around very fast.

12    Q.   The rest of this e-mail refers to other futures positions.

13    The second line says, as an aside, "Just have been advised of

14    futures position on LBI futures for SFE, Sidney Futures

15    Exchange, and for Montreal."  Was that consistent with your

16    recollection that you were learning about new positions right

17    up until the closing and then after the closing?

18    A.   Yes, that's correct.

19    Q.   And it goes down to say, in that next paragraph it talks

20    about the Sydney house position.  It says something about the

21    initial margin and how much they're holding and it says "We're

22    not too concerned."  So for that one you weren't too concerned

23    because there looked to be enough margin.  Is that what that

24    says?

25    A.   That's exactly what that says.
```

Page 45

1   Q.   But then it says, "Sydney markets are opening in forty

2   minutes."  This is at 6:11 p.m. Sunday before the closing, is

3   that right?

4   A.   That's correct.  Yes.

5   Q.   It then talks about a Montreal position on the Montreal

6   exchange.  It says, "Not material."  And at the last sentence

7   it says, "I have people here that can liquidate the Aussie

8   piece, Stephen can you call me on this."  This is Tim Stack,

9   your boss, who's writing this?

10  A.   Yes, it is.

11  Q.   Was Barclays able, on Sunday night or Monday morning to

12  take control of these positions and these various overseas

13  exchanges to liquidate them and control their exposure?

14  A.   No we're not because at this point they don't belong to

15  Barclays so we have no authority to go in and sell out -- close

16  out those Sydney positions.  So it was actually Monday evening,

17  Tuesday morning Sydney time before we could actually deal with

18  them.

19  Q.   Did that create additional risk and exposure for Barclays?

20  A.   Yes, because you've got a whole day's worth of trading on

21  the Sydney exchanges, the Asian exchanges, the European

22  exchanges and even the U.S. exchanges that could impact where

23  those markets go.

24  Q.   Now you said earlier, when we started talking about what

25  Barclays knew at the time of closing, that Lehman's records

Page 46

1    were in a mess.  With respect to the futures was there a

2    problem specifically in extracting the information about

3    futures positions from Lehman?

4    A.    There was a huge issue with extracting positions from the

5    Lehman systems.  Lehmans actually shared their books and

6    records between LBI and LBIE; they had a shared futures system.

7    They also, within that, had their FX trading for customers so

8    that actually comingled futures trading and FX traded in the

9    same account, which is not normal practice.

10         So one of the problems is you have to break them apart to

11   figure out what's FX, what is futures.  The other thing is,

12   because LBIE had already -- was already in bankruptcy, they

13   were having positions moving all over the place, attempting to

14   close them out.  Things weren't being booked so things were not

15   clean.  You couldn't tell what were our positions, you know,

16   was a customer's account correct, was a house account correct.

17   There was no way of knowing.  The information couldn't be given

18   to us.

19   Q.    And just so the record's clear, by FX do you mean foreign

20   exchange?

21   A.    Yes.  Sorry.

22   Q.    And that is a business that Barclays does not acquire?

23   A.    Correct.  We did not take over the foreign exchange

24   business.

25   Q.    So the difficulty was in extracting the information on the

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 47 of 121

Page 47

 1   futures business, which you were acquiring, from the FX

 2   business, which you were not acquiring?

 3   A.    That's correct.  Yes.

 4   Q.    Now with respect to options, did you testify earlier that

 5   Barclays did not have a significant equity options business

 6   before this transaction?

 7   A.    Correct, we did not.

 8   Q.    And the information that you received from Lehman, both

 9   before and after the transaction, was it difficult for Barclays

10   to read it on its system?

11   A.    Yes.  I mean the information, as we went through the

12   spreadsheet earlier, did not contain all the information.

13   Plus, Barclays had no systems for doing the risk on the equity

14   options.  It wasn't our business.

15   Q.    And what about the Lehman system, was it able, even after

16   the closing, to give you a clear statement of information about

17   what Lehman's risk position was?

18   A.    Not easily.  I believe it took a fair couple of months

19   before the finance guys actually managed to establish what the

20   risk was on those option positions.

21   Q.    Can I ask you to turn to tab 4 of your binder?  Tab 4 is

22   BCI Exhibit 290, which is in evidence, which I believe was

23   shown last week to Stephen King in his testimony.

24        It's an e-mail from Stephen King to you, Liz James in

25   futures sales, as well as many of your colleagues in the

Page 48

1   futures sale, dated Monday, September 22nd at 19:38 GMT, which

2   I believe is about 3:38 in the afternoon New York time.  Do you

3   see that?

4   A.   Yes, I do.

5   Q.   And in that e-mail -- so this is after the closing, is

6   that right?

7   A.   Yes, it is.

8   Q.   In that e-mail he writes at the top, "It is clear that

9   LB," would you have understood that to be Lehman Brothers?

10  A.   Yes, I would.

11  Q.   He writes, "It is clear that LB has absolutely no idea

12  what it's OCC risk position is.  We know it is between two

13  billion short and four billion long.  They do not know what has

14  been booked to what entity.  We cannot see, we are now four

15  days into making zero progress on this with them."

16       Is that consistent with your recollection of the

17  difficulties Barclays had understanding the risks it had taken

18  over with respect to the Lehman OCC positions?

19  A.   Yes.  That's exactly my understanding.

20  Q.   And when he says in there that thy do not know what has

21  been booked to what entity, do you have an understanding of

22  what that means?  Why that's relevant?

23  A.   It's relevant because we now know that a lot of the

24  positions in the customer account at the OCC were actually

25  affiliate positions, they weren't customer positions.  And

Page 49

```
 1   because they were affiliates Barclays was actually liable for

 2   all of those positions too, because of the state of the

 3   affiliates at that time.

 4   Q.   So let me make sure I understand that.  For customers --

 5   for any position in any of the accounts Barclays acquired,

 6   Barclays had an obligation to fulfill the obligations on those

 7   positions, is that right?

 8   A.   Yes, they did.

 9   Q.   So if the positions were out of the money did Barclays

10   have to satisfy margin calls or any other liability associated

11   with those positions, even though those positions belonged to

12   customers?

13   A.   Yes, you do.

14   Q.   And in the normal practice Barclays or the broker would

15   turn to the customers to obtain more margin or more money to

16   cover the liability on the position, is that right?

17   A.   Yeah, that's normal practice.

18   Q.   What happens if the customer is bankrupt?

19   A.   Then it means that you are now responsible and liable for

20   those positions.

21   Q.   And at the time of this transaction was there a general

22   concern that there could be credit risks across all customers?

23   A.   Yes there was because we had no idea who their customers

24   were.

25   Q.   Was that concern especially pronounced for customers who
```

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 50 of 121

Page 50

1    were Lehman affiliates?

2    A.    Yes, very much so.

3    Q.    And why is that?

4    A.    Because most of the Lehman affiliates were in trouble and

5    bankrupt, exactly the same as LBI, LBIE were.

6    Q.    Now after the closing you said it took months to get some

7    of the information on the futures accounts and the options

8    accounts, you were saying.  Once Barclays finally did get all

9    the information did Barclays have any -- incur any costs or

10   liabilities associated with, to begin with, the futures

11   accounts it had acquired?

12   A.    Yes, we did.  A fair amount of costs.

13   Q.    You had settlement obligations with respect to all those

14   futures accounts, is that right?

15   A.    We had settlement obligation to the exchange, just to give

16   you a full list, you've got the settlement obligation, there

17   were customers' accounts that were in deficit so you don't know

18   for definite whether we're going to get that money.

19        Lehman had actually also taken all of the currency that

20   was owned by any of the customer and converted it to U.S.

21   dollars.  So when we actually took over we were only given U.S.

22   dollars.  So we then had an FX exposure, a foreign exchange

23   exposure, to actually put all the money from U.S. dollars back

24   into the underlying currency to give it to the customers.  And

25   we actually still have amounts outstanding now that we need to

Page 51

1    deal with.

2    Q.    And do you remember approximately how much that exposure

3    has been?

4    A.    I think we're now up to around sixty million dollars.

5    Q.    Were there also costs incurred with respect to liquidating

6    house accounts that included customer positions?

7    A.    Yes.  In London, the London clearing house who looks after

8    the LIFE exchange, which is the London International Financial

9    Futures Exchange, Lehman -- LBIE had comingled some of the

10   customer positions with the house positions and the LCH, the

11   clearing house, actually sold off LBIE's house positions

12   because they were in default and weren't able to pay and

13   unfortunately it meant those customer positions were sold off

14   too.  We, as Barclays, actually made the customer whole to the

15   tune of twenty million sterling.

16   Q.    On the options side, are you aware, personally, of what

17   happened on the Lehman house accounts at the OCC and whether

18   they went up or down in value after the closing?

19   A.    I am aware that they went down to the tune of roughly 700

20   million dollars.

21   Q.    During the months after the closing, did you also work

22   with the trustee to try to identify all of the futures accounts

23   and the margin deposits in those accounts?

24   A.    Yes, we did and the trustee was very helpful at the

25   beginning.

LEHMAN BROTHERS HOLDINGS, INC.

Page 52

1    Q.   And the trustee's representatives worked directly with you

2    and your colleagues?

3    A.   Yes, they did.  Most of the communication was done via a

4    designated person within Lehman.

5    Q.   And they helped you track down these various accounts that

6    are overseas?

7    A.   Yes, and they actually produced the letters giving those

8    accounts authority to transfer the positions and collateral to

9    us.

10   Q.   At some point did the trustee change his position and did

11   you learn that the trustee was taking the position that

12   Lehman -- that Barclays was not entitled to any of the margin?

13   A.   That's correct.  They did.  They stopped.

14   Q.   But that was many months after the closing?

15   A.   It was many months.  Yeah.

16   Q.   And is it your understanding that Barclays is currently

17   owed additional collateral that was posted in these exchange

18   traded derivatives accounts?

19   A.   Yes, they are.

20   Q.   I'd just briefly like to show the work you've done on that

21   which is at tab 12 of the binder, which is a declaration you

22   gave in this case marked as BCI Exhibit 353 and which is in

23   evidence.  And do you recall giving this declaration?

24   A.   Yes, I do.

25   Q.   And attached to it are a series of three exhibits listing

Page 53

1   undelivered margin related to the futures accounts.  Did you

2   create those schedules?

3   A.   Yes, I did.

4   Q.   I'd like to turn your attention first to Exhibit 1.

5   Exhibit 1 is titled "Undelivered Margin from Proprietary

6   Futures Account Valued as of Account Closing."  It shows a

7   total of 457.2 million dollars.  Do you see that?

8   A.   Yes, I do.

9   Q.   And can you explain what that is and how you prepared it?

10  A.   This is the balances on the brokers accounts, third party

11  and affiliates, for the positions that LBI held in their house

12  accounts after they have actually been closed out.  So i.e.

13  they're no longer long or short, they have a flat position and

14  this is the resulting amounts that were sitting on those

15  accounts.

16  Q.   Those resulted after close outs that took place after the

17  Barclays acquisition?

18  A.   Correct.  They did.

19  Q.   And some of the amounts are held in cash, some of them in

20  T-bills, some of them in other collateral, is that what the

21  column type indicates?

22  A.   Correct.  It does.

23  Q.   Regardless of whether it's T-bills, cash or other types of

24  collateral, is it your understanding that these balances all

25  represent assets that were held to secure obligations with

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 54 of 121

Page 54

1   respect to exchange traded derivatives?

2   A.   Yes, they are.  And just to clarify, the reason that some

3   of them are held in cash is because some of the exchanges

4   actually won't take collateral.  The best example of that is

5   actually Korea.

6   Q.   They require cash?

7   A.   They require cash.

8   Q.   And that cash is pledged to secure exchange traded

9   derivative obligations?

10   A.   Yes, it is and you actually -- with Korea you actually

11   have to do what we call prefunding.  So prior to trading you

12   have to have the money in place.

13   Q.   On the left-hand column it says broker custodian and lists

14   a number of different custodians, including several Lehman

15   affiliates.  Do you see that?

16   A.   Yes, I do.

17   Q.   Are these examples of where LBI traded exchange traded

18   derivatives through an intermediate clearing member?

19   A.   That's correct, yes.

20   Q.   So these brokers or custodians would presumably be

21   clearing members on the respected exchanges?

22   A.   That's right.  Yeah.

23   Q.   And with respect to the amounts deposited at the Lehman

24   affiliates, is there a collection risk with respect to those?

25   A.   Yes, there is.  Very much so because I believe all of

Page 55

1    those entities are actually in bankruptcy too.

2    Q.    Exhibit 2 of your declaration lists customer collateral

3    delivered to date, valued as of September 19, 2008.  This has

4    been -- then the total at the bottom is 2.2 billion, do you see

5    that?

6    A.    Yes, I do.

7    Q.    And did you prepare this chart?

8    A.    Yes, I did.

9    Q.    And what does it show?

10   A.    It shows all of the money market funds and collateral that

11   we actually received into Barclays, with help from the trustee.

12   Q.    The trustee assisted you in gathering this information?

13   A.    It assisted us in acquiring this from the respective money

14   market accounts and the third party brokers.

15   Q.    So the trustee approved the transfer of all this money?

16   A.    Yes, they did.

17   Q.    And this margin is what you were describing earlier as the

18   stuff in the customer seg and security accounts?

19   A.    Yes, this is all customer money.

20   Q.    And it may include both amounts up to the seg and secured

21   amount and proprietary amounts above it?

22   A.    Yes.

23   Q.    All held to protect customers?

24   A.    It's all held to protect the customers, correct.

25   Q.    Exhibit 3 is entitled "Customers Futures Collateral

Page 56

```
 1    Undelivered to Date," do you see that?

 2    A.   Yes, I do.

 3    Q.   And it has a total of 488.6 million, do you see that?

 4    A.   Yes, I do.

 5    Q.   Did you prepare this chart?

 6    A.   Yes, I did.

 7    Q.   And can you explain what it shows?

 8    A.   At the time of my declaration this is the amount that was

 9    outstanding from the foreign brokers, the reserve money market

10    fund and the Lehman affiliates for customers' collateral that

11    Barclays has not received.  We have, since this date, received

12    a very small portion of the reserve primary fund.

13    Q.   Is that from the reserve primary fund?

14    A.   Yeah, it is.

15    Q.   Is the majority of the 488 million held with Lehman

16    affiliates?

17    A.   Yes, it is.

18    Q.   Can you show the Court which portion?

19    A.   It's actually the one that says total not received NEHI

20    entities, the second one up from the one you've got

21    highlighted, the 289 -- 239 --

22    Q.   The 289 million is with Lehman affiliates?

23    A.   Yes, it is.

24    Q.   And the ninety-five million is with Lehman affiliates?

25    A.   Yes, it is.
```

Page 57

1    Q.    So if you combine those and get to something on the order

2    of 380 plus million, that total is held with Lehman affiliates?

3    A.    Yes, it is.

4    Q.    And this is valued as of what date?  As of September 19th?

5    A.    Yes.

6    Q.    So the values may have changed but does this represent

7    margin deposits held to secure exchange traded derivatives that

8    you understand Barclays is demanding in this case?

9    A.    Yes, I do.

10    Q.    And is the same true of what is shown on Exhibit 1?

11    A.    Yes, it is.

12    Q.    And that relates to the futures business.  Do you

13    understand that there is also undelivered margin assets with

14    respect to options?

15    A.    Yes.  I have been told there is.

16    Q.    Now I asked you earlier whether you were generally aware

17    that after Barclays got all the information regarding all the

18    futures accounts, all the options accounts, the positions and

19    the margin, that under its accounting there was some net value

20    there on day one and you are generally aware of that?

21    A.    Yes, I am.

22    Q.    And I'll represent to you that that amount is somewhere

23    between two to three billion dollars.  Based upon your

24    experience in the industry and your experience working on this

25    transaction did you expect, at the time, in September 2008,

08-13555-mg    Doc 11244    Filed 09/01/10    Entered 09/10/10 13:09:55    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 58 of 121

Page 58

```
 1    that if Barclays did not acquire the Lehman exchange traded

 2    derivative accounts, that the exchanges and clearing

 3    corporations would then seize control of those accounts and

 4    liquidate the assets in those accounts in a fire sale?

 5    A.   Yes.  I am very much aware that's what they do.  Exactly

 6    the same as what the CME did and also what the LCH did in

 7    London.

 8    Q.   So you know for a fact it happened with respect to the

 9    CME?

10    A.   (No audible response).

11    Q.   Yes?

12    A.   Yes.

13    Q.   And was it your expectation that if there was no sale it

14    would have happened with the other clearing corporations and

15    exchanges?

16    A.   Yes, it would.

17    Q.   Based upon your experience in the industry and that

18    testimony and your experience that week, do you therefore

19    believe that the net value that Barclays identified under its

20    accounting, with respect to all of these Lehman exchange traded

21    derivative accounts, would have been available to the Lehman

22    estate in a liquidation had there been no sale to Barclays?

23    A.   No, not all.  It would all have been gone plus more.

24    Q.   What do you mean by plus more?

25    A.   The -- for an exchange to go in and close out a position
```

LEHMAN BROTHERS HOLDINGS, INC.

Page 59

1    and certainly when we're looking at the OCC equity options,

2    it's a huge position.  The OCC doesn't have traders that are

3    used to trading in those markets so they would have literally

4    gone in and dumped all of the positions in one go, which means

5    you're now at a fire sale.  The market is going to go through

6    the floor in everything you're trading.  So your margin will

7    go.  I'm pretty sure they would have cashed in the LOCs, you're

8    then into your default fund, you're then into other clearing

9    members.  And you've got to remember these were extremely

10   volatile markets.

11        MR. HUME:  Your Honor, I have no more questions.

12        MR. MAGUIRE:  May I be excused for one moment, Your

13   Honor?  I'll be right back.

14        THE COURT:  Absolutely.

15     (Pause)

16        THE COURT:  Mr. Maguire, if your examination is likely

17   to be lengthy we might take a morning break at this time.  If

18   not, we'll take the break after your examination.

19        MR. MAGUIRE:  I would anticipate about half an hour,

20   maybe forty-five minutes, Your Honor.

21        THE COURT:  Why don't we take a morning break till 11

22   o'clock?

23     (Recess from 10:50 a.m. until 11:05 a.m.)

24        THE COURT:  Be seated, please.  Mr. Maguire, please

25   proceed.

08-13555-mg    Doc 11244    Filed 09/01/10    Entered 09/10/10 13:09:55    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 60 of 121

Page 60

1          MR. MAGUIRE:  If I may approach, Your Honor?

2          THE COURT:  Surely.

3       (Pause)

4          THE COURT:  Thank you.

5          THE WITNESS:  Thank you.

6   CROSS EXAMINATION

7   BY MR. MAGUIRE:

8   Q.   Now Ms. James, sorry, Bill Maguire for the SIPA trustee.

9   A.   Hi.

10  Q.   You were not involved in any negotiations for the asset

11  purchase agreement?

12  A.   No, I was not.

13  Q.   You're not suggesting that you participated in any

14  negotiations or discussions concerning the negotiation of this

15  sale?

16  A.   No, I was not.

17  Q.   And indeed you have no knowledge of those discussions?

18  A.   No.

19  Q.   And the people that you met at Lehman, they were not

20  involved in the discussions or negotiations concerning the sale

21  to Barclays?

22  A.   No, they were not.  As far as I'm aware they were not.

23  I'm sorry.

24  Q.   The people that you mentioned; Jeff Jennings and Ron

25  Filler and Donna Moore and the other names, as far as you were

Page 61

1    aware those people were not in any way involved in or privy to

2    the negotiations concerning this sale?

3    A.   Correct.

4    Q.   Now if you turn to the small binder that you have before

5    you, you'll see a copy of a document that you testified earlier

6    to Mr. Hume and that's your declaration and I believe it's at

7    tab 5.

8    A.   Yeah.

9    Q.   If you turn, Ms. James, to page 4 of that declaration

10   you'll see you have a paragraph 14 that starts "The futures

11   customers," do you see that?

12   A.   Yes, I do.

13   Q.   In your direct testimony, as I understand it, you were

14   careful to distinguish between the options business and the

15   futures business of Lehman, right?

16   A.   Yes.

17   Q.   And this specifically relates, this paragraph 14, to the

18   futures business, right?

19   A.   Yes, it does.

20   Q.   And you're referring here to customers, the futures

21   customers?

22   A.   Yes, I am.

23   Q.   And it's true, is it not, that the futures customers of

24   Lehman had provided -- had given money to Lehman to support

25   their derivatives training?

LEHMAN BROTHERS HOLDINGS, INC.

Page 62

1    A.    And bills, government securities.

2    Q.    Right.  And you say in paragraph 14 that the futures

3    customers, and that's Lehman's futures customers, right?

4    A.    Yes.

5    Q.    "Had deposited collateral, including initial margin, with

6    LBI prior to the closing to secure their futures trading

7    activity."

8    A.    Yes.

9    Q.    Right.  "LBI maintains this collateral, along with

10   additional collateral that constituted LBI's own property."

11   A.    Yeah.

12   Q.    So there were two things in the futures customers'

13   accounts.  There was the customer money, the customer property,

14   and then there was additional money that Lehman put in, right?

15   A.    Correct.  The buffer as we call it.

16   Q.    Now you note in the next paragraph, in the final sentence

17   -- actually, it starts off -- paragraph 15 starts off "Barclays

18   took over LBI's liabilities to the LBI futures customers in the

19   amount of any collateral those customers had posted prior to

20   the closing to secure their futures trading activity and it's

21   since complied with its obligations to the LBI futures

22   customers in this regard."  Do you see that?

23   A.    Yes, I do.

24   Q.    Now you go on to say, "Although to my knowledge Barclays

25   was not aware of the total amount of these liabilities at

Page 63

1    closing, I understand that Barclays has since determined that

2    the total amount of such liabilities, as of that time, was

3    approximately two billion dollars."

4    A.   Yup.

5    Q.   Now that basically is saying that as of the time of the

6    closing there was two billion dollars of customer property that

7    had been deposited with Lehman in respect of its futures

8    business?

9    A.   No, this is saying that it's two billion dollars that is

10   being paid back to the customers.

11   Q.   That's owed to customers?

12   A.   Yes.

13   Q.   That's what the business owes the customers?

14   A.   Correct.  Yes.

15   Q.   All right.  And in respect of that the trustee transferred

16   property to Barclays, isn't that right?

17   A.   Correct.  It transferred everything in the seg and secured

18   accounts, normal practice.

19   Q.   And in fact the total amount of the transfers, you say,

20   was not two billion dollars but over two billion dollars?

21   A.   Correct.

22   Q.   In fact it was something over 2.2 billion dollars that the

23   trustee transferred to Barclays?

24   A.   That's right, because of the buffer that is held to

25   protect the seg and secured.

LEHMAN BROTHERS HOLDINGS, INC.

Page 64

1    Q.    And when you say the buffer, now what you're talking about

2    is not the property that's owed to customers, you're talking

3    about property that actually is proprietary Lehman owned

4    property that Lehman put into those customer accounts as a

5    buffer?

6    A.    That is correct because that is normal practice in the

7    futures business.

8    Q.    And I think you testified on direct that the trustee

9    changed his position and are taking the position that Barclays

10   was not entitled to any margin.  You're not suggesting that the

11   trustee ever took the position that Barclays was not entitled

12   to customer margin that customers had put up or that was owed

13   to customers?  You're not suggesting the trustee ever changed

14   his position on that?

15   A.    Can you say that again?  Sorry.

16   Q.    Yes.  I want to ask you about the trustee's position, it

17   has been very consistent with respect to customer property,

18   isn't that right?

19   A.    Yes.

20   Q.    So there was two billion dollars that we now know was owed

21   to customers at the closing?

22   A.    Yes.

23   Q.    And the trustee has transferred; it turns out now, not

24   only two billion dollars but 2.2 billion dollars, right?

25   A.    Correct, because we were taking over the futures business.

Page 65

1    Q.    And Barclays is not satisfied with the 2.2 billion dollars

2    because you say you were taking over the futures business and

3    you should get the entire buffer?

4    A.    Because that is normal.  When you take over a futures

5    business you take everything in the seg and secured accounts to

6    insure you can satisfy all the requirements back to the

7    customers.  Plus you have to copy -- you have to cover any

8    costs that are involved.

9    Q.    So it's not sufficient, from Barclay's position, for the

10   trustee to provide, to transfer to Barclays, enough money to

11   pay in full all of the liabilities to customers.  It's Barclays

12   position that the trustee also has to transfer hundreds of

13   millions of dollars of Lehman property as well, which was, as

14   you said, a buffer in those accounts?

15   A.    The trustee should -- as -- when you acquire a futures

16   business, when you take over a futures business normal practice

17   is you take everything in the customer's seg and secured

18   accounts.

19   Q.    So you're saying the additional hundreds of millions of

20   dollars of Lehman proprietary property in those accounts should

21   be transferred to Barclays?

22   A.    For running the business, yes.  But you have to remember

23   that at this time of the closing we had no idea what these

24   numbers were.

25   Q.    And you now know that it's some hundreds of millions of

LEHMAN BROTHERS HOLDINGS, INC.

Page 66

1    dollars?

2    A.    I know the numbers that you're quoting, yes.

3    Q.    Now if you turn to tab 4 in your binder you'll see

4    Barclays Exhibit 333 and that's an e-mail from Gary Romain is?

5    A.    Yes, I am.

6    Q.    And you'll see there a number of other finance people;

7    Barclays finance people, on this exchange.  Do you see that?

8    A.    Yes, I do.

9    Q.    Now if you turn in, five pages into the document, to the

10   document that has a Bates number at the bottom 110001.

11   A.    Okay.

12   Q.    You'll see an e-mail there from Lee Bowel (ph.) at

13   Barclays Finance, London, right?

14   A.    Yes.

15   Q.    And that's to a number of people at Barclays finance,

16   right?

17   A.    I believe so.  Yes.

18   Q.    And the subject is futures?

19   A.    Yes.

20   Q.    And if you scroll down under background, you'll see this

21   e-mail which is dated mid-October of 2008.  Under Background it

22   says, "Barclays Capital took on the futures customer business

23   from 22nd September, which included taking on all balances

24   related to client activity."  Do you see that?

25   A.    Yes, I do.

Page 67

1   Q.   And if you go down five more lines you'll see Lehman did

2   provide excess cash to this business to insure there was always

3   sufficient cash to meet margin calls, etcetera.  The business

4   usually carried at least 800 million dollars of assets in

5   addition to the customer liabilities, however this figure

6   fluctuated daily."  Do you see that?

7   A.   Yes, I do.

8   Q.   And that is consistent with your understanding, is it not?

9   A.   Correct.  It is.  But can I just clarify something?  The

10  reason it's that high is based on -- your buffer is based on

11  how much money you're holding for customers.

12  Q.   I understand.  Now you referred us to a couple of exhibits

13  to your declaration and that was back again at tab 5 of the

14  small binder you have in front of you.  And if you turn to

15  Exhibit 3, that was entitled customer's future collateral

16  undelivered to date, valued as of September 19, 2008, do you

17  see that?

18  A.   Yes, I do.

19  Q.   And you said in your direct that that was valued as of

20  September 19, 2008, right?

21  A.   Yes.

22  Q.   That's not in fact the case, isn't that right?

23  A.   Is this the one that we actually mended the date in the

24  declaration that I did?

25  Q.   Yeah, this is not in fact valued as of September 19, 2008.

Page 68

1  That's not a correct statement, isn't that right?

2  A.   I would have to check my declaration because I believe we

3  did clarify it.

4  Q.   If you turn to the first tab of your binder, I believe

5  you'll fine a copy of your deposition transcript.

6  A.   Sorry, I'm muddled the two off.

7  Q.   Sorry?

8  A.   I muddled up declaration and deposition, I'm sorry.

9  Q.   Okay.  Are you with me on your deposition transcript?

10 A.   Yes.

11 Q.   And if you look at page 159 and reading at line 16 you'll

12 see you were asked the question:

13 "Q.  I think that is all I have for that exhibit right now.  If

14 you can turn to Exhibit 3, please, this is Exhibit 3 to your

15 deposition."

16      You're not the only one who's confused.

17      "It is entitled customers future collateral undelivered to

18 date, valued as of September 19, 2008.

19 "A.  Yes.

20 "Q.  Did you create Exhibit 3, Ms. James?

21 "A.  Yes.

22 "Q.  How did you go about creating Exhibit 3?"

23      And you answer:

24 "A.  We took the same information that I took from operations

25 and what were the money market funds we had not received,

Page 69

1   what's the foreign broker's money that was still sitting in the

2   brokers' statements we had not received and what was the money

3   in the Lehman entity broker statements that we had not received

4   for the customer designated accounts.

5   "Q.  I don't think I asked you this but if I did I apologize.

6   Where did you get the foreign broker statements that you used

7   to compile this information?

8   "A.  From the operations team.

9   "Q.  Now there's a clarifying question

10  "A.  No.

11  "Q.  The clarifying question is, if I could ask a clarifying

12  question, is the title correct on this?

13  "A.  No.  It's January as well.  Sorry, because they, Exhibit 2

14  and Exhibit 3 were done at the same time.

15  "Q.  Then I have -- thanks for that, Trish, the same set of

16  question that I just went through with Exhibit 2, do the values

17  that are reflected on Exhibit 3 of 488 million or so, would

18  they change if you were to recalculate this with the valuation

19  as of September 19, 2008?

20  "A.  Yes.

21  "Q.  Would it be up or down?

22  "A.  I don't know."

23      Those were the questions you were asked and that was the

24  testimony that you provided, isn't that right?

25  A.  Correct.  It is.

Page 70

1    Q.    Now keeping with our split of the Lehmans derivatives

2    business into options on the one hand and futures on the other,

3    I'd like to ask you a few questions focusing specifically now

4    on the futures business, okay?

5    A.    Okay.

6    Q.    Are you with me?

7    A.    Yup.

8    Q.    You had some discussions, you told us, on the Monday and

9    then, I believe on the Thursday, right, with some people --

10   some folks at Lehman?

11   A.    Correct.  Yes.

12   Q.    And that was concerning the futures business, right?

13   A.    Yes, it was.

14   Q.    And the risk that you were concerned with at that time,

15   the key risk, was that in transferring the business some of the

16   clients might not come over, right?

17   A.    That's not the only key risk, because your other risks are

18   were they actually segged correctly.  Were they secured

19   correctly?  Were the customers actually fully paid up?  There's

20   a bunch of risks involved.  It's not just were they coming to

21   Barclays.

22   Q.    Let's take the loss of clients.  If you could turn to tab

23   6 of your small binder, and that is Movant's Trial Exhibit 506.

24   You see that?

25   A.    Yes, I do.

Page 71

1   Q.   And that's an e-mail from Tuesday, September 16, right?

2   A.   Yes.

3   Q.   And you'll see Mr. Stack is copied on that, and this

4   includes a memo that covers the Monday meeting, does it not?

5   A.   Yes, it does.

6   Q.   If you turn to that memo, on the second page of the

7   exhibit, you'll see at the bottom key risk.  All right?

8   A.   Yes.

9   Q.   And there's only one key risk, right?

10   A.   Correct.

11   Q.   And that's loss of key clients due to inability to execute

12   an expedient transaction, right?

13   A.   I'm not quite sure why there's only one key risk, but I

14   didn't write it.

15   Q.   Well, the other risk you just mentioned to us about the

16   customers, the risk there is that you're going to get in

17   trouble because a customer is going to default, right?

18   A.   Yes.

19   Q.   The customer is creditworthy and takes a flier on some

20   futures and loses a bucket load of money.  That's not really

21   your problem.  It's the customer's problem, unless the customer

22   is not creditworthy or unless the customer defaults, right?

23   A.   Well, it's the -- it is my issue if the customer can't

24   pay.

25   Q.   That's exactly right.  If there's a customer default, are

Page 72

1    the customers not creditworthy, right?

2    A.   Correct.

3    Q.   That's the key risk.  And the risk here, the way you deal

4    with that risk is by making sure that there are sufficient

5    funds in the seg and secured accounts, right?

6    A.   But the only way you know that is by looking, is taking

7    all the assets and liabilities, which is not on here, so I

8    don't know, and we didn't know, whether Lehman's was fully

9    segged and secured prior to the closing.  That is a key risk

10   and should have been on this document.  As I said, I didn't

11   write it.

12   Q.   I know you made a major point of this on your direct

13   testimony, that you didn't know what customers were in deficit.

14   You didn't know what the risk was.  You didn't know what you

15   were walking into, because you didn't know whether there were

16   sufficient assets in the SEG and secured accounts, right?

17   A.   Correct.

18   Q.   In fact, that's not what you told the United States

19   government, though, is it?

20   A.   I'm sorry?

21   Q.   Didn't Barclays tell, specifically tell, the United States

22   government that there were sufficient assets in the SEG and

23   secured accounts?

24   A.   I have no idea what Barclays told the United States

25   government.

1   Q.   Well, maybe you could turn, please, to tab 3 of your

2   binder, and you'll see an e-mail that was sent Friday,

3   September 19 from Kenneth Raisler at Sullivan & Cromwell to a

4   number of people, including you and Tim Stack.  You see that?

5   A.   Yes, I do.

6   Q.   And the subject of this is Barclays letter, and it

7   attaches the Friday 19th Barclays letter, right?

8   A.   Yup.

9   Q.   It says "This is the CFTC approval letter we were

10  expecting", right?

11  A.   Yup.

12  Q.   And that was a letter from the United States Commodity

13  Futures Trading Commission giving Barclays an approval that

14  Barclays had requested, right?

15  A.   Yes.

16  Q.   Now, if you turn to the second page of that approval

17  letter, page 2 of 3, you see that?

18  A.   Yup.

19  Q.   And if you go to the second full paragraph that starts

20  "You request relief for three categories of accounts".  You see

21  that?

22  A.   Yup.

23  Q.   The second sentence there says "In your letter".  You

24  understand that that's a reference to Barclays' letter?

25  A.   Yeah.  I have no idea what the Barclays -- is this the

LEHMAN BROTHERS HOLDINGS, INC.

Page 74

1   Barclays' letter?  Sorry.

2   Q.   You see that this is a letter.  If you go back to the

3   first page you'll see this is a letter addressed to Kenneth

4   Raisler.

5   A.   Yup.

6   Q.   You understood that Kenneth Raisler was working with you.

7   He's a lawyer at Sullivan & Cromwell, and he's --

8   A.   Yes.

9   Q.    -- representing Barclays.

10  A.   Yes.  I knew who Ken --

11  Q.   And this is a response.  This letter on page 1 says "This

12  is in response to your letter dated September 19, 2008".

13  A.   Okay.  But do we have a copy of the Barclays' letter?

14  Q.   Absolutely.

15  A.   Sorry.

16  Q.   We'll get to that.  So if you turn now to the second page

17  you'll see that Mr. Lukken, the acting director of the

18  Commodity Futures Trading Commission, says "in your letter",

19  referring to Mr. Raisler, "in your letter you state that you",

20  you understand he's referring to Mr. Raisler, "you state that

21  you, quote, 'understand that LBI has sufficient segregated and

22  secured amount funds as well as sufficient regulatory capital

23  pursuant to the provisions of the Commodity Exchange Act and

24  the Commission's regulations thereunder'".  So at the time that

25  the Commodity Futures Trading Commission gave this approval to

Page 75

1    Barclays it understood that it had a representation from

2    Barclays that LBI had sufficient segregated and secured funds,

3    right?

4    A.   Which is normal practice, because if they didn't have they

5    would have been in trouble with the CFTC, because they would

6    have been underseg and secured.

7    Q.   Barclays had to represent that there was sufficient seg

8    and secured or it wouldn't have gotten approval from the CFTC,

9    right?

10   A.   Which is correct.  They have to be.  If not, Lehman's

11   would have been in violation at the CFTC.

12   Q.   And, in fact, if you turn to tab 2 of your binder you'll

13   see an e-mail from David Gilberg, same date, Friday, September

14   19, subject "Barclays Capital Lehman Brothers", and it starts

15   "Attached is a revised version of the letter we sent to you

16   earlier today, along with a blackline".  You see that?  You see

17   the e-mail?

18   A.   Yes, I do.  Sorry.

19   Q.   And, then, if you turn to the attachment you'll see the

20   attachment is a letter from Sullivan & Cromwell, dated

21   September 19, 2008, addressed to Ananda Radhakrishnan,

22   director, Division of Clearing & Intermediary Oversight at the

23   Commodity Futures Trading Commission.  You see that?

24   A.   Yes, I do.

25   Q.   And if you turn to the second page, end of the first full

08-13555-mg    Doc 11244    Filed 09/01/10    Entered 09/10/10 13:09:55    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 76 of 121

Page 76

 1   paragraph, you'll see a sentence there that says, quote, "We

 2   understand that LBI has sufficient segregated and secured

 3   amount funds as well as sufficient regulatory capital pursuant

 4   to the provisions of the Commodity Exchange Act and the

 5   Commission's regulations thereunder", right?

 6   A.   Yes.

 7   Q.   So Barclays felt comfortable making that representation to

 8   the government on Friday, September 19th.  Isn't that correct?

 9   A.   Well, what it's saying is that we believe they are.  We

10   don't know that for definite, because we actually haven't

11   looked at what they have in their accounts.  But based on the

12   rules of the CFTC that if, at any time, you go underseg or

13   secured you are supposed to report yourself to the CFTC you

14   assume that they are.

15   Q.   And Barclays made that representation?

16   A.   Yes.

17   Q.   Now, we've been talking about the customer business, and

18   you had mentioned the CME, I believe.  That's the Chicago

19   Mercantile Exchange?

20   A.   Yes, it is.

21   Q.   The Chicago Mercantile Exchange asked Barclays to

22   guarantee customer positions at the CME for the opening of

23   business on Monday morning.  Isn't that right?

24   A.   Correct.  They did.

25   Q.   And that was important to do, because if the exchange was

LEHMAN BROTHERS HOLDINGS, INC.

Page 77

1   nervous there was a risk that customer positions could be

2   closed out unless Barclays stepped up and gave that guarantee?

3   A.   The concern was that if the approval to transfer the

4   business from Barclays -- from Lehman to Barclays did not go

5   through Lehman's would not be able to satisfy that call on the

6   Monday morning, and the CME would have to have put customers

7   into deficit, which they did not want to do.

8   Q.   So to prevent that Barclays stepped up and gave a

9   guarantee to the CME of all of the customer margin requirements

10  as of Monday morning.

11  A.   For the Monday morning only.

12  Q.   Right.

13  A.   Not for any other.  Just for the Monday morning.

14  Q.   And Barclays made that guarantee?

15  A.   Yes, they did.

16  Q.   Now, we've been talking all about the customer property

17  and the customer's business, that part of the futures business

18  up to now, right?

19  A.   Yes.

20  Q.   I believe you testified a little bit earlier about how you

21  had discussions with Lehman concerning not just customer margin

22  but house margin.  You recall that testimony?

23  A.   Yes, I do.

24  Q.   And that was all in connection with house, or proprietary

25  positions that Lehman had?

Page 78

```
 1   A.    Correct.

 2   Q.    Now, isn't it a fact, Ms. James, that you were not even

 3   aware that Lehman had any firm or proprietary futures trading?

 4   That was information that did not even come to your attention

 5   until after the closing.

 6   A.    No, we were actually given some of the information on the

 7   Sunday, but it -- one of the question -- one of the things that

 8   you do, which is what was in the spreadsheet that we put

 9   together -- is to establish is there any house positions?

10   Q.    I understand you're now disagreeing with that, but if you

11   could turn, please, to your deposition transcript at page 46,

12   starting at line 17, you testified at your deposition at

13   follows:

14   "Q.  Did you ever come to learn that Lehman had house positions

15   on futures?

16   "A.  There I came to learn after the fact, so after the 22nd,

17   that there were positions for their affiliates that were

18   trading that were sitting in the house accounts for futures and

19   for their equity options.  I had found out that they had house

20   equity options and then they had affiliates trading and their

21   positions were actually in customer and house.  But that was

22   after -- that was after the 22nd.  I didn't know prior."

23         You were asked that question and you gave that answer, did

24   you not?

25   A.    Yes, I did give that answer.
```

Page 79

1    Q.   In fact, you did not even ask for any information from

2    anyone at Lehman concerning the firm's proprietary future

3    trading positions.  Isn't that right?

4    A.   That's not correct.  If you actually look at the

5    spreadsheet that we spoke about earlier in my testimony it

6    actually is on there as house and customer.

7    Q.   If you turn, please, to page 78 of your deposition

8    transcript, starting at line 12, you were asked the following

9    question and gave the following answer:

10   "Q.  Do you know whether or not Barclays asked Lehman prior to

11   the closing for information about its proprietary future

12   trades?

13   "A.  I don't know."

14        You were asked that question and you gave that answer.

15   Q.   Now, I'd like to switch from the futures piece of the

16   business that we've been talking about to that other piece of

17   the business, which is the options side of the business, okay?

18   A.   Yup.

19   Q.   Can you keep that straight?

20   A.   Yes.

21   Q.   You are not an expert on options, right?

22   A.   I am not an expert on equity option clearing, no.

23   Q.   In fact, the information that you gave at your deposition

24   on the whole subject of options you got from either Mr.

25   Dziemian or Mr. Jones.  Isn't that right?

Page 80

1    A.    Correct.  Yes, I did.

2    Q.    Now, you were not a member of the options team.

3    A.    Nope.

4    Q.    And you've told us earlier that Barclays was not an equity

5    option house, right?

6    A.    Correct.

7    Q.    It didn't have the risk systems for valuing those

8    positions, right?

9    A.    The proprietary trading, correct.

10    Q.    You did look at a document for Mr. Hume, and you made a

11    point that it was missing certain information, and you

12    specified lots and house positions, right?

13    A.    Correct.

14    Q.    But you don't know if Barclays ever asked Lehman for that

15    information.

16    A.    I don't believe so, no.  I don't know.

17    Q.    You told us on your direct examination that Barclays lost

18    700 million dollars closing out positions, right?

19    A.    Yes.

20    Q.    Now, you didn't mean to suggest that Barclays didn't

21    protect itself against those losses by hedging?

22    A.    I'm not sure.

23    Q.    The number that you gave, the 700 million dollar losses,

24    you're not suggesting that Barclays lost 700 million dollars

25    after hedging was taken into account?

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 81 of 121

Page 81

1    A.   I don't know.

2    Q.   You mentioned a number of other deals, and you talked

3    about normal practice, and I don't know if I got all the deals

4    down, but one, I think, was ABN.  Was that right?

5    A.   Correct, yes.

6    Q.   Is that Merrill Lynch's energy futures?

7    A.   Yes.

8    Q.   And another was Sems?

9    A.   Sem.  The SemGroup.  Yes.

10   Q.   And was there a third?

11   A.   The other one was -- hang on.  ABN, it was the Nomura

12   business that ABN took over.

13   Q.   The Nomura business?

14   A.   ABN took over Nomura's futures business.

15   Q.   Okay.  Now, are you aware in connection with any of those

16   deals how they were structured?  Whether there was a purchase

17   of a company or whether there was an asset purchase agreement?

18   A.   I wasn't involved in the legal side, so I honestly don't

19   know.

20   Q.   You didn't see the contracts?

21   A.   No.

22   Q.   And you don't know whether, in connection with any of

23   those, what the actual legal terms were?

24   A.   No.

25   Q.   You don't know whether there was an exclusion for cash in

Page 82

1    any of those contracts?

2    A.    No, I don't know.

3    Q.    Thank you.

4          MR. MAGUIRE:  I have nothing further, Your Honor.

5          THE COURT:  Redirect?

6          MR. HUME:  Just a few, Your Honor.

7    REDIRECT EXAMINATION

8    BY MR. HUME:

9    Q.    Ms. James, you were asked some questions a moment ago by

10   Mr. Maguire about your deposition testimony, that you didn't

11   know whether Barclays asked Lehman prior to the closing about

12   its proprietary futures trades.  In your deposition you said I

13   don't know.  Do you recall that?

14   A.    Yes, I do.

15   Q.    If you turn to tab 2 of the binder I gave you and we go to

16   the same page we were looking at before it references house

17   margin and collateral at the bottom.  Do you see that?

18   A.    Yes.

19   Q.    And does this document -- is this the spreadsheet you

20   referenced and responded to Mr. Maguire.

21   A.    Yes, this is the --

22   Q.    So this document is actually a spreadsheet?

23   A.    Yes.

24   Q.    And it reflects notes from a discussion you had with

25   Lehman on Thursday, September 18th?

1    A.    Yes, it does.

2    Q.    And it reflects that in that discussion there was a

3    discussion about the transfer of house margin and collateral

4    associated with the proprietary futures business?

5    A.    Yes, it does.

6    Q.    That's the Lehman proprietary futures business?

7    A.    Yes.

8    Q.    And if we go to tab 3 of the binder, on the VIX positions,

9    do you remember talking about that?

10   A.    Yes, I do.

11   Q.    Were those house futures positions that you were learning

12   about?

13   A.    Yes, they were.

14   Q.    So the night before the closing you started to learn about

15   house proprietary Lehman futures positions?

16   A.    Correct.

17   Q.    But you learned a lot more after the closing.

18   A.    An awful lot more after the closing.

19   Q.    And, so, in your deposition you said you learned it after

20   the closing.  Is it more accurate after you reviewed the

21   documents you remembered that you actually learned some just

22   before the closing?

23   A.    Yes.

24   Q.    You were also asked about the customer seg and secured

25   account and the representation made by Mr. Raisler that he

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 84 of 121

Page 84

 1  understood that Lehman was in compliance.  Do you recall that?

 2  A.   Yes, I do.

 3  Q.   Now, do you recall that you were told that they were in

 4  compliance?

 5  A.   I --

 6  Q.   Do you recall one way or the other?

 7  A.   I don't -- I don't think I was told one way or the other.

 8  Sorry.

 9  Q.   Does it make sense to you that Lehman would represent to

10  Barclays that it was in compliance?

11  A.   Yes, because if you're not you have to report yourself to

12  the CFTC.

13  Q.   So they represented, it would be your understanding from

14  what Mr. Maguire showed you that Lehman represented that they

15  were in compliance?

16  A.   Correct.

17  Q.   And had enough in their customer seg and secured accounts.

18  A.   Correct.  But until we, as Barclays, could get in and

19  actually take a look at them we wouldn't know for definite.

20  Q.   And were you trying to get in and actually look to verify

21  and see what was there?

22  A.   Yes, we were.

23  Q.   Were you able to do that before the closing?

24  A.   No, we were not.

25  Q.   Were you also trying to see whether there might be Lehman

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 85 of 121

Page 85

1   proprietary assets, what you've referred to as the buffer

2   there, to protect against downside exposure on those accounts?

3   A.   The biggest thing that you're looking at when you're

4   taking over a business, you don't necessarily say what's the

5   buffer.  You're looking at are we protected.  Are the customers

6   protected?  Do we have enough to pay the customers back?

7   That's the key piece that you're looking for.

8   Q.   And Mr. Maguire said that there's a risk a customer might

9   have taken a flier on some risky position and it goes out of

10  the money.  If that happens, isn't it true -- is it correct

11  that the amount in the customer seg and secured account might

12  not be enough to cover all of Barclays's risk.

13  A.   That's correct.  Yes.

14  Q.   So even if they are in compliance there is still exposure,

15  depending on what the positions are.

16  A.   Yes, there is exposure.

17  Q.   You were asked about your experience in options.  Mr.

18  Maguire asked you if you were an expert in options.  Have you

19  worked on options as well as futures in your career?

20  A.   Yes, I have.

21  Q.   And are you on a number of committees at the Options

22  Clearing Corporation?

23  A.   Yes, I am, and I do sit on the OCC options round table,

24  which is held four times a year.

25  Q.   You were asked about whether the trustee's position with

Page 86

1    respect to customers, the transfer of customer assets, has

2    changed.  Do you recall that?

3    A.    Sorry.  Say that again.

4    Q.    Mr. Maguire asked you whether you were aware of whether

5    the trustee had changed its position with respect to customer

6    assets.

7    A.    Yes.

8    Q.    He didn't ask you whether you believe the trustee has

9    changed his position with respect to proprietary assets.  Is it

10   your understanding the trustee has changed his position with

11   respect to proprietary futures assets?

12   A.    The trust --

13          MR. MAGUIRE:  Foundation, Your Honor.

14          THE COURT:  Well, I'm going to overrule that

15   objection.  And it's a question of what her understanding is.

16   She either has an understanding or she doesn't.

17   Q.    You may answer.

18   A.    Oh, sorry.  The trustee has not paid us or passed over the

19   collateral for the house, which I'm making an assumption means

20   that he has changed his position.

21   Q.    You were asked some questions by Mr. Maguire about cash

22   posted as margin, and I just want to return briefly to Exhibit

23   963, which is tab 7 of your binder, of the binder I gave you.

24   A.    Yup.

25   Q.    And to the page with the spreadsheets on it attachment.

Page 87

1    A.    Yup.

2    Q.    Now, first of all, did you prepare this document?

3    A.    Yes, I did.

4    Q.    And did you prepare it to summarize information received

5    from Lehman about its OCC statements?

6    A.    Yes, I did.

7          MR. HUME:  Now, Your Honor, this document hasn't been

8    admitted.  The one thing I neglected to do is just have it

9    admitted.  I don't know if there's an objection.

10         MR. MAGUIRE:  No objection, Your Honor.

11         THE COURT:  It's admitted.

12   (Information received from Lehman about its OCC statements was

13   hereby received as Barclays's Exhibit 963 for identification,

14   as of this date.)

15         MR. MAGUIRE:  Thank you.

16   Q.    Now, very briefly on the subject of cash, Ms. James, does

17   the information on this sheet show that some of the margin was

18   deposited as cash?

19   A.    Yes, it does.

20   Q.    Is the cash that was deposited in these house Lehman OCC

21   accounts sufficient to satisfy the margin requirement in that

22   account?

23   A.    For that day just the cash?

24   Q.    Yes.

25   A.    No.

Page 88

1   Q.   If you had no cash transferred to Barclays from this

2   account would the other collateral in the account be sufficient

3   to satisfy the margin requirement?

4   A.   No, it would not.  And you have to remember the LOC

5   wouldn't come.

6   Q.   Is it your understanding -- do you have any understanding

7   or knowledge about whether Lehman was able to withdraw any cash

8   from its OCC accounts on Friday, September 19th?

9   A.   They actually were not.  They made a request to the OCC to

10  actually take back money on the Friday, which the OCC actually

11  declined to allow them to do, and the reason being was because

12  we were going into an exercise and assignment weekend and the

13  OCC was concerned about the volatility and whether Lehman would

14  be capable of paying.  So they actually declined any money or

15  collateral going back to Lehman on the Friday.

16  Q.   Based on your understanding and your knowledge of what you

17  just said, would you have thought that Lehman had excess cash

18  in that account over that weekend that it could withdraw and

19  use?

20  A.   Looking at the reports now, yes, you can see that, but at

21  the time, if the exchange is stopping you from taking it it

22  means they have a concern.

23  Q.   And it means that -- was Lehman actually functionally and

24  practically able to use that cash, given that the OCC didn't

25  allow them to withdraw?

08-13555-mg    Doc 11244    Filed 09/01/10    Entered 09/10/10 13:09:55    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 89 of 121

Page 89

1    A.    Well, they could use it to cover their OCC positions, but

2    they couldn't take it away to do anything else with it.

3    Q.    No more questions.  Thank you.

4         THE COURT:  Anything more?

5         MR. MAGUIRE:  Very briefly, Your Honor.

6    RECROSS EXAMINATION

7    BY MR. MAGUIRE:

8    Q.    Just on that last point, Ms. James, about the OCC not

9    allowing cash to be withdrawn on Friday the 19th.  That

10   testimony you just gave is not based on any knowledge that you

11   had at the time.  Is that right?

12   A.    It was given to me for my declaration.

13   Q.    You learned about it much later in connection with

14   preparing for your 30(b)(60) deposition?

15   A.    Correct.

16   Q.    It was something that somebody told you in connection with

17   that.

18   A.    That's correct, yes.

19   Q.    And that's the kind of thing that you haven't seen in any

20   written document for the OCC or something that you wouldn't

21   expect the OCC to document in its records.  Isn't that right?

22   A.    No, I believe there's an e-mail, but I'm not sure who the

23   e-mail is from.

24   Q.    If you turn, please, to page 121 of your deposition

25   transcript.

LEHMAN BROTHERS HOLDINGS, INC.

Page 90

```
 1    A.   Sorry.  Which book?

 2    Q.   That would be in the --

 3    A.   The little black --

 4    Q.   I think it's in both books, but certainly in the small

 5    one.  It should be right at the beginning.

 6    A.   Sorry.

 7    Q.   And, then, starting at line 8 you were asked the following

 8    question.

 9    "Q.  Well, I'm not sure I quite understand that.  I thought you

10    said there was an additional margin call made to Lehman on

11    Friday the 19th of September.

12    "A.  Right.  "And if you read Craig's declaration"

13         And that's a reference to Craig Jones?

14    A.   Yes, it is.

15    Q.   What he says is they went to withdraw money on Friday from

16    the OCC, which was a requirement above and beyond the initial

17    requirement they had there, so they chose to pull it back into

18    their normal regular bank account, I'm assuming to satisfy

19    other requirements.  When they called the money back the OCC

20    said no, and the OCC said no, we are keeping that money as an

21    additional requirement.  Then you were asked the following

22    question:

23    "Q.  And would you expect the OCC to update their books and

24    records to reflect that?

25    "         UNIDENTIFIED SPEAKER:  Objection.  Foundation.
```

Page 91

 1    "A.   No.  No, because they haven't changed anything there is

 2    nothing for the OCC to reflect."

 3           You were asked those questions --

 4    A.   Correct.

 5    Q.    -- and you gave those answers.  Thank you.

 6           MR. MAGUIRE:  Nothing further.

 7    A.   But there isn't anything for them to change.  Sorry.

 8           THE COURT:  You're excused, and thank you.

 9           THE WITNESS:  Thank you very much, Your Honor.

10           THE COURT:  Do we need a little time for the video?

11           MR. SCHILLER:  No, Your Honor.  I think we're ready to

12    go.  We do have an objection to a portion of it.  I should

13    probably wait for the objection and respond.  However you want

14    to proceed, Judge.

15           THE COURT:  Are we going to hear the objection before

16    or after playing the video?

17           MR. MAGUIRE:  It's probably easier to do it after the

18    video, because Your Honor will have seen what we're arguing

19    about.

20           MR. MAGUIRE:  Let's do that.

21           MR. SCHILLER:  Okay.  So we offer the deposition of

22    Andrew Keller.  As I said, he was a 30(b)(6) for Simpson

23    Thacher, which, along with Fox Rothschild represented the

24    estate through the preparation and finalization of the

25    clarification agreement.

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 92 of 121

Page 92

 1          THE COURT:  Okay.

 2      (Pause)

 3          THE COURT:  Thank you.

 4          MR. SCHILLER:  We're providing binders with the

 5  transcript, Your Honor.

 6      (Pause)

 7      (Video Deposition Testimony Played)

 8  "Q.  Can you tell me how long you've been with Simpson Thacher?

 9  "A.  I started in 1983.

10  "Q.  And what is your area of practice?

11  "A.  Corporate finance.

12  "Q.  And within corporate finance do you have any particular

13  specialty or area of practice?

14  "A.  I did a combination of advising clients such as Lehman in

15  their disclosure documentation and then also do a number of

16  securities offering and had done a number of securities

17  offering as underwriter's counsel for Lehman and various other

18  investment banking clients.

19  "Q.  So Simpson has done a lot of work for Lehman over the

20  years?

21  "A.  Yes.

22  "Q.  When did you first become involved in any way in a

23  possible transaction with Lehman and Barclays?

24  "A.  That probably would have been the Thursday before what

25  unfortunately turned out to be the bankruptcy filing, when we

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 93 of 121

Page 93

1   got the call to help with the potential sale of the company.

2   "Q.   September 11, 2008?

3   "A.   Yes.

4   "Q.   And what was your individual personal involved role with

5   that process?

6   "A.   They -- Lehman called us to -- at that point Lehman called

7   and said that they were talking to two potential buyers, Bank

8   of America and Barclays, and Sullivan & Cromwell had been

9   helping Lehman over the past couple of months also, and the way

10  that Lehman was going to split the work was that although

11  everybody would be involved in helping Lehman, but Sullivan &

12  Cromwell would take the principal responsibility for the BOA,

13  potential BOA transaction, and we would do the documentation

14  for the potential sale to Barclays.

15  "Q.   And when you say documentation you also mean the legal

16  advice concerning the transaction too, right?

17  "A.   Yes.

18  "Q.   And did that have an essential draw-up change at all after

19  the bankruptcy filing by then?

20  "A.   Well, we were drafting a merger agreement with Barclays

21  over that weekend, and then got the call roughly sometime mid-

22  day Sunday that the deal had died for whatever reason.  And,

23  essentially, went home at that point.  Sometime during the day,

24  late morning that Monday, I think we got a call from Lehman to

25  come on over to their offices, that there was now another

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 94 of 121

Page 94

1    potential deal with Barclays.  And we showed up there, and at

2    that point already there were, at Lehman's conference room

3    floor, Weil, Gotshal was there representing Lehman.  And

4    Sullivan & Cromwell and Cleary Gottlieb representing Barclays,

5    and many people from Lehman and Barclays in many conference

6    rooms on that floor.

7        So we were called over to help, give them our knowledge of

8    the company and just help review the documents that were being

9    drafted.

10   "Q.  Do you understand that you've been designated to give

11   testimony on behalf of Simpson on certain issues for them?

12   "A.  Well, that's -- on behalf of the firm?

13   "Q.  Yes.

14   "A.  Yes.

15   "Q.  And what did you do that first day, Monday?

16   "A.  That Monday and Monday night we essentially would -- that

17   the process would be that, for the most part, the lawyers would

18   be in a room going over the contract.  Lawyers from both sides

19   giving comments and then the contract would be done.  And we

20   would wait and review the contract and more comments back and

21   forth.  So it was just a typical negotiation drafting process.

22   "Q.  And Simpson was involved in that drafting process of that

23   original contract?

24   "A.  Yes."

25            MR. SCHILLER:  Your Honor, the witness is about to be

08-13555-mg    Doc 11244    Filed 09/01/10    Entered 09/10/10 13:09:55    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 95 of 121

Page 95

1    asked about BCI, Exhibit 11, which is the first tab in your

2    binder.  Thank you.

3        (Video Deposition Testimony Played)

4    "Q.  Again, do you know the document?

5    "A.  This is --

6    "Q.  Let me give you a document marked.  It's been previously

7    marked as 440.  Do you recognize Exhibit 440?

8    "A.  As I recall, this is the version that was submitted to the

9    Bankruptcy Court.

10   "Q.  When you say this is the version, you're referring to the

11   second exhibit, which is a version of the original asset

12   purchase agreement that has a number of hand marks and writing

13   on it.

14   "A.  Assume that matches this one.

15   "Q.  Let me ask you, then, about the exhibit -- the version of

16   the original asset purchase agreement attached.  Do you know

17   whose handwriting that is showing the marks on that version of

18   the agreement?

19   "A.  Yes, it's Elizabeth Cooper, an associate at this point.

20   "Q.  Do you know why there was no values put on these various

21   assets for any total valuation placed on the assets?

22   "A.  No.

23   "Q.  Do you know if that was important?  I mean, was that a

24   element of the deal that certain assets be worth certain

25   amounts?

Page 96

1    "A.  That would -- no, I wasn't -- I wasn't part of the

2    discussions between the principals as to exactly how the deal

3    was cut, and, so, I can't say what elements of the deal were

4    important to them.

5    "Q.  But, as, and since Simpson was involved in the drafting

6    out of this contract, can you explain why that it wasn't

7    necessary to try to total up the value of the assets and the

8    value of the liabilities?

9    "A.  Again, my experience in the M&A world, which is, as I

10   said, a little limited, it does not strike me as unusual that

11   at least the values of these listed assets weren't broken down.

12   That, obviously, the principals would agree to, essentially,

13   how you define the business, and in an asset purchase agreement

14   lay out the assets, describe the assets that are being

15   purchased and describe the liabilities that are being assumed

16   in that key section is what it was, but to break down each, the

17   value of each item by item does not, the fact that it was not

18   broken down is not unusual.

19   "Q.  Is it not necessary to do that because the deal wasn't

20   predicated on assets having certain values or liabilities on

21   certain items?

22   "A.  I don't -- I don't know what -- again, I just don't know

23   how the buyer and seller approached the overall valuation of

24   the business or how they got to it.  By the time we got the

25   call that seemed to have already taken place.  And, with, based

Page 97

 1 │ upon the contract the conclusion on that would have been that

 2 │ it didn't matter, nor the deal wasn't predicated on assets

 3 │ having certain values or liabilities having certain values,

 4 │ look, rather than Barclays was, essentially, buying the

 5 │ business.

 6 │        UNIDENTIFIED SPEAKER:  Objection to form of question.

 7 │        UNIDENTIFIED SPEAKER:  You can answer him.

 8 │        UNIDENTIFIED SPEAKER:  Did he understand what the

 9 │ question is?

10 │ "A.  Well, I think, to my understanding of your question you're

11 │ asking how the buyer and seller, the principals, approached the

12 │ deal.  And, again, I just wasn't part of those conversations,

13 │ and to assert, and, so, I don't know to what extent value of

14 │ particular assets was important or factored into the decision

15 │ of what discussions they had on it.

16 │ "Q.  You remember yourself?

17 │ "A.  At this point it was, just from my perspective, just

18 │ running through what the lawyers would go back to their

19 │ clients, principally Weil and Cleary Gottlieb, and say do we

20 │ have the description of the assets that are being transferred

21 │ and the liabilities that we can assume correct?

22 │ "Q.  You're not aware of any reason to believe that there was a

23 │ disconnect between Simpson and the other attorneys in drafting

24 │ this contract in what the principals wanted, are you?

25 │ "A.  Not that I know of.

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 98 of 121

Page 98

1    "Q.  And from everything you know did it appear to be a good

2    faith, arm's length, negotiating process.

3    "A.  Yes.

4    "Q.  At the top of page 7 you'll see there's a section (d) that

5    says "Government securities, commercial paper", and this is

6    before the changes were made where it says "Government

7    securities, commercial paper, mortgage loans, corporate debt,

8    corporate equity, exchange-traded derivates, and collateralized

9    short-term agreements".  Do you see that?

10   "A.  Yes.

11   "Q.  And in your handwritten changes made, including at the end

12   there is a phrase added "with a book value as of the date

13   hereof of approximately 70 billion dollars".  Do you see that?

14   "A.  Yes.

15   "Q.  Do you know why that was added?

16   "A.  No.

17   "Q.  Do you know who added it?

18   "A.  Well, again, the language -- the words were actually

19   written by Elizabeth Cooper, but this was as a result of part

20   of the negotiations between the two sides and agreed to.

21   "Q.  And you've spoken with Ms. Cooper about this edit?

22   "A.  No.

23   "Q.  Do you know if anyone at Simpson had spoken with her

24   about --

25   "A.  That particular edit?

Page 99

```
 1    "Q.  Yes.

 2    "A.  Not to my knowledge.

 3    "Q.  Do you know who directed her to make that edit?

 4    "A.  Well, it would have been a markup that both sides had

 5    agreed to, and, essentially, instead of giving it to the word

 6    processor to type it in somebody handed it to Elizabeth to just

 7    do by hand.  She volunteered to do it.

 8    "Q.  Do you know was she at a meeting or visiting?

 9    "A.  She was there at the -- at the conference.  At the

10    conference room floor is where everybody was negotiating the

11    agreement.

12    "Q.  At 7:45?

13    "A.  Yes.

14    "Q.  And do you know who also from Simpson was there?

15    "A.  I was, until I left that morning.  John Finley was there

16    and Alvin Brown may or may not -- was at least there for part

17    of the time.

18    "Q.  And do you know which side or who -- what person suggested

19    this inclusion?

20    "A.  I don't know where it originated from.

21    "Q.  Do you understand the inclusion to be describing some

22    subset of assets listed in Section (d)?

23    "A.  Yes, I would agree that to lend description to what assets

24    were covered by (d).

25    "Q.  And is it fair to say that at least one earlier version of
```

Page 100

1   the contract did not have that language in it, that

2   description?

3   "A.  That's what it looks like.

4   "Q.  Do you have any knowledge of where that 70 billion dollar

5   figure came from?

6   "A.  No.

7   "Q.  Do you have any knowledge of what it represents?

8   "A.  Well, other than reading the words represent -- for

9   Simpson it represents the book value of those long positions as

10  defined.

11  "Q.  Let me ask you to turn and he -- execute a copy of the

12  original APA, to section 2.5, please.  If you'd take it on to

13  review that section, please.

14  "A.  Okay.

15  "Q.  And do you see this section entitled "Cure amounts

16  obligates the purchaser to pay a couple of different types or

17  assume a couple different types of liability, one being cure

18  amounts for past amounts owed under the contact that they elect

19  to assume, and the other being certain ordinary course

20  amounts".

21  "A.  Yes.

22  "Q.  Why was there no value placed on the liability that's

23  being assumed here by the purchaser?

24  "A.  My understanding was that this is typical in a bankruptcy

25  situation, and as you can, as reading this paragraph, as of the

Page 101

1   day of this contract I could not tell you what the ultimate

2   obligation was going to be, because it's forward looking.

3   "Q.  So it's impossible to know the amount of liability that

4   would be assumed by the purchaser?

5   "A.  Impossible is a tough standard, but I would -- I do not

6   know, I mean, to put an exact dollar amount on it, probably

7   not.  Could somebody knowing, having a good knowledge of the

8   business make a reasonable estimate?  That I don't know.

9   "Q.  Well, if it's up to the discretion of the purchaser which

10  contracts he elects to assume --

11  "A.  Yes.

12  "Q.  -- I mean, couldn't the purchaser elect to assume zero

13  contracts and assume zero --

14  "A.  The way I understand it, yes.

15  "Q.  So the actual amount of liability here could be zero?

16  "A.  It is possible, yes.

17  "Q.  Did you attend any of the court hearings?

18  "A.  No.

19  "Q.  Did anyone from Simpson attend any of the court hearings?

20  "A.  Not to my knowledge.

21  "Q.  You made reference to statements made to the Court.  Was

22  that because you needed the transcripts from those hearings?

23  "A.  Just a couple of pages that were referenced by Lori Fife

24  to those dollars amounts.

25  "Q.  How did Simpson have an understanding of what was going on

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 102 of 121

Page 102

1  in court?  Was somebody reporting back to Simpson?

2  "A.  There's not something that was being formally done.  We

3  heard, you know, high level summaries.  Obviously everybody was

4  interested in what was going on in court, but -- "

5          UNIDENTIFIED SPEAKER:  Let me go in.

6          MR. SCHILLER:   Your Honor, the witness is about to be

7  asked about Exhibit 104, minutes of a Lehman board meeting.

8      (Video Deposition Testimony Played)

9  "Q.  I show you a document that's been previously marked as 49.

10  Please take a moment to read that.

11  "A.  Yes.

12  "Q.  Is this the board meeting that you attended --

13  "A.  Yes.

14  "Q.  If you would turn to page 3, please, the second paragraph

15  that reads "Mr. Roberts resumed by describing that it is a

16  condition to the transaction that a specific firm employees

17  enter into employment agreement with Barclays.  He stated that

18  Mr. McGee was one of those employees, so interested firm

19  employees were involved in the transaction negotiations on

20  behalf of the firm".  Can you see that?

21  "A.  Yes.

22  "Q.  Were you aware at this time that certain employees were

23  negotiating, acquiring contracts, certain Lehman employees that

24  were also involved with the transaction negotiations were also

25  negotiating employment transactions with Barclays?

Page 103

1    "A.  Yes.

2    "Q.  Did that strike you as odd or inappropriate or problematic

3    in any way?

4    "A.  As Mr. Roberts pointed out, it was something to point out

5    to people who presumed potential conflicts, but seeing as given

6    the circumstances, unavoidable.

7    "Q.  So the board, Weil and Simpson were aware of the situation

8    with respect to what you referred to as interested firm

9    employees --

10   "A.  Yes.

11   "Q.  -- negotiating the transaction at the same time they were

12   also negotiating employment and bonus agreements with Barclays?

13   "A.  Yes.

14   "Q.  I'm going to show you a document marked as 523."

15         MR. SCHILLER:  Again, Your Honor, 523 in the big --

16   Barclays Exhibit 434, the next Exhibit in book -- in front of

17   you.

18   "Q.  Do you recognize this e-mail from John Finley?  I'm going

19   to show you dated September 18, 2008?

20   "A.  Yes.

21   "Q.  And the lower e-mail, earlier in time e-mail, from Weil,

22   and attached is a draft clarification letter for discussion,

23   and, then, Mr. Finley writes back consider at what point the

24   changes will be significant enough that he would want to run

25   through the board.  Do you see that?

Page 104

1    "A.  Yes.

2    "Q.  Is it fair to say that Simpson was just giving

3    consideration to the issue of whether any changes were

4    significant enough to have to bring them back to the board?

5    "A.  And from -- certainly from this e-mail I could see that

6    since changes were made -- were being made to the agreement

7    that it is something that people should consider, that as

8    John -- Simpson stated here that Weil was closer to what

9    discussions had been having with the board and the agreement,

10   was in a better position to make that judgment, at least in our

11   opinion.

12   "Q.  Although Simpson did attend the board meeting on the sale

13   transaction?

14   "A.  Yes.  But, presumably, there were discussions with the

15   board before that that they were not so --

16   "Q.  Are you aware of any determination by anyone at Simpson or

17   Weil, Gotshal prior to September 30th where any of the changes

18   that were being made to the sale transaction after September

19   16th were significant enough to require going back to either

20   the LBHI or LBI boards?

21   "A.  No.

22   "Q.  Let me show you a document."

23           MR. SCHILLER:  Your Honor, the witness is now going to

24   be shown BCI Exhibit 530, the next tab in your book.  It is a

25   draft clarification letter.  He will also be shown the

Page 105

1    following exhibit in your book as well, BCI Exhibit 238, a

2    further version of the clarification letter.

3         (Video Deposition Testimony Played)

4    "A.  They're all marked as 524.

5    "Q.  The e-mails I'll show you are not all marked as 525.  On

6    525 it's sending you the latest version of the clarification

7    letter.  And, then, Exhibit 524, they're being sent another,

8    more updated, version of the clarification letter showing

9    changes being made.  Is that all right?

10   "A.  Yes.

11   "Q.  Is this consistent with your prior testimony that you

12   remain involved in the sale transaction and the negotiation

13   draft and process throughout that week?

14   "A.  Yes.

15   "Q.  Was it your understanding that the trustee, or

16   representatives of the trustee, were also involved in the

17   drafting of the negotiation for the clarification letter?

18   "A.  It was my understanding that they were.  They are.  But --

19   I don't know what you mean by involved in the drafting.  They

20   were not drafting.

21   "Q.  Were they involved in the discussions about it?

22        UNIDENTIFIED SPEAKER:  Strike that.

23   "Q.  When you say there, you mean physically at Weil, Gotshal's

24   office?

25   "A.  They were physically at Weil.

LEHMAN BROTHERS HOLDINGS, INC.

Page 106

```
 1    "Q.  And that's where the clarification was being finalized?

 2    "A.  Yes, but I was not aware of any direct conversations with

 3    the trustee.

 4    "Q.  Do you recall, generally, the parties having reached

 5    agreement on Friday about changes to the deal prior to the

 6    Court hearing but that then the actual drafting and

 7    finalization of the document continued over the weekend?

 8    "A.  That would, again, our role was more that -- more of a

 9    backseat.  I was not aware of the direct conversations between

10    the principals.  Some of that merely would come first to Weil

11    and to Cleary, and then, through them, to us.

12    "Q.  But --

13    "A.  So to what extent people had agreed to the deal as of a

14    particular point in time is very difficult for me to say.

15    "Q.  Well, Simpson -- part of Simpson's role, I mean, wanted --

16    heard, was informed about the terms to make sure that the

17    contract document -- documents reflected the agreement of the

18    principals, correct?

19    "A.  At least to the extent that we understood I think it was.

20    Before it raised questions, or just assist where we could.

21    "Q.  Is it fair to say that Simpson was conscious of making

22    sure that any approvals or agreements necessary for the deal

23    were obtained?

24    "A.  At least where we could think of what approvals might be

25    necessary or ask if approvals were necessary.
```

1    "Q.  Was there ever a time when you concluded that a necessary

2    approval was not obtained?

3    "A.  No.

4    "Q.  And were you over at Weil that weekend --

5    "A.  Both days."

6              UNIDENTIFIED SPEAKER:  Let me get on.

7              MR. SCHILLER:  Your Honor, the Exhibit 5, which is the

8    next tab, would be the subject of questioning next.

9        (Video Deposition Testimony Played)

10   "Q.  The document that's previously been marked Exhibit 25.  Do

11   you recognize that as the letter agreement or clarification

12   letter that the parties were finalizing over the weekend of

13   September 20th and September 21st?

14   "A.  Yes.

15   "Q.  And you received them?  In addition to the revisions going

16   on over the weekend you also received a copy of the final

17   version of this at the time, correct?

18   "A.  Yes.

19   "Q.  The parenthetical that says -- let's see the parenthetical

20   that's in the clarification letter.  (2)(c)  "And any property

21   that may be held to secure obligations under such derivatives".

22   Do you understand that to be referring to collateral associated

23   with the exchange-traded derivatives?

24   "A.  Yes.  Yes.

25   "Q.  And, now, are you referring to all collateral, whether

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 108 of 121

Page 108

```
 1    it's securities or cash or some other type of collateral?

 2              UNIDENTIFIED SPEAKER:  Objection.

 3    "A.  I would agree with the words any property referring back

 4    to such derivatives, yes.  Collateral for such derivatives.

 5    "Q.  Which would include securities and cash and any other

 6    types of property?

 7    "A.  Any property.

 8    "Q.  I'm sorry.  You said yes?

 9    "A.  I would read property to include cash.

10    "Q.  Is that consistent with your reading of it at the time?

11    "A.  Yes.

12    "Q.  Let me show you a document we'll mark as 527.

13              MR. SCHILLER:  The next document, Your Honor, the

14    witness will be shown is BCI 413, the last tab in your binder.

15        (Video Deposition Testimony Played)

16    "Q.  Do you recognize this document?

17    "A.  Yes.

18    "Q.  Would you describe what it is, please?

19    "A.  It's an AK that Lehman Brothers Holdings, as a public

20    reporting company, had to file under the AK rules given in the

21    entry into the asset purchase agreement, it's a material

22    contract.

23    "Q.  You were involved in the drafting of the AK?

24    "A.  Yes, reviewing it.

25    "Q.  Did you offer -- did Simpson review and revise the
```

Page 109

1    document before it was issued?

2    "A.  I'd say reviewed and commented.

3    "Q.  Okay.

4    "A.  I don't recall who was actually the draftsman.

5    "Q.  But Simpson would have reviewed it?

6    "A.  Yes.

7    "Q.  Make sure it was accurate and appropriate?

8    "A.  Yes.

9    "Q.  And if you would turn back to the actual AK itself,

10   there's a description, looking at the first two paragraphs, it

11   says "Asset purchase agreement, Barclays, Inc." and about half

12   way down the first paragraph it says, "In addition Lehman and

13   Barclays entered into a letter agreement dated as of September

14   20th, 2008 (it was a letter agreement) and together with the

15   original agreement and the first amendment, the asset purchase

16   agreement," do you see that language?

17   "A.  Yes.

18   "Q.  And was that in fact an accurate description of the

19   documents that constituted the transaction?

20   "A.  Yes.

21   "Q.  And in the second paragraph, at the end, it notes that the

22   bankruptcy court granted the sale on September 20th, 2008.  Do

23   you see that?

24   "A.  Yes.

25   "Q.  Was it your view that the sale that was granted was the

Page 110

1    sale defined by the agreements identified in the former

2    paragraph?

3    "A.  That is my understanding although I wasn't involved, as I

4    said, with the bankruptcy court proceedings so I don't know

5    what was described and actually approved.

6    "Q.  You knew that the bankruptcy court approval of the

7    transaction came late on the night of Friday, September 19th or

8    early in the morning of the 20th?

9    "A.  Yes.

10   "Q.  You knew that?

11   "A.  Yes.

12   "Q.  And you knew at that time the clarification letter had not

13   been finalized, at least in writing, correct?

14   "A.  Correct.

15   "Q.  And you knew that the clarification eventually was --

16   letter was finalized on the morning of September 22nd, correct?

17   "A.  Yes.

18   "Q.  And you knew there was no further approval of the sale

19   documents, including the clarification letter, after

20   September -- the early morning hours of September 20th,

21   correct?

22   "A.  I did not know of any others.

23   "Q.  You didn't believe there was any other court hearing or

24   approval process?

25   "A.  I was not aware.

Page 111

1  "Q.  Okay.  Did anyone -- did Simpson or anyone else, any other

2  party, to your knowledge, express any belief that any further

3  court approval of the clarification letter or sale transaction

4  was necessary?

5  "A.  I don't know of anyone at Simpson that did and I can't

6  speak for others.  But that's something I would have assumed

7  Weil was responsible for.

8  "Q.  But you were at Weil during the negotiations of the

9  clarification letter and to your knowledge no one took the

10 position that any further court approval was needed for the

11 clarification letter, correct?

12 "A.  I don't recall anyone taking that position.

13 "Q.  And in the subsequent week, after the closing of the deal,

14 do you recall anyone, at Simpson or otherwise, expressing that

15 point of view that further court approval was necessary?

16 "A.  No.

17 "Q.  I'm going to ask you to turn to page 3 of the APA, under

18 key assets sold by Lehman, do you see that section?

19 "A.  Yes.

20 "Q.  It says "Lehman's United States and Canadian investment

21 banking and capital markets business," do you see that?

22 "A.  Yes.

23 "Q.  Is that consistent with your view of this transaction,

24 that it was essentially a sale of the business?

25 "A.  Yes.

Page 112

1    "Q.  And in the broad sense.  So just to be clear, at no point

2    were you told that the deal was supposed to be -- was supposed

3    to somehow be predicated on or involve the value of assets,

4    ultimately became the value of liabilities?

5    "A.  I'm unclear as to the exact meaning of the question.

6    There's certainly a portion of the business that was sold

7    referred to as the matched book but that was part of the assets

8    and liabilities.  That was, sort of, viewed generally; my

9    understanding was, as assets equals liabilities.  But that was

10   part of the overall transaction.

11   "Q.  Because the intent of the original agreement was to sell

12   the business, not to sell some particular value of assets or

13   liabilities?

14   "Q.  Not necessarily because the language used in the

15   definition of purchased assets, my sense was I was not

16   surprised to see a clarification letter putting a final line on

17   what may have been intended and definition of purchased assets

18   and liabilities, more of a description as to what particular

19   assets, in broader terms, might have covered in part.  If there

20   were actual changes to the agreement then that again was

21   something that was in discussions between the principals that

22   we weren't a part of.

23   "Q.  I'm not sure I understand.  The clarification letter

24   changed the assets that were being conveyed.

25   "A.  Something that could have been a combination of two

Page 113

1    things.  It was changes in language that could have changed

2    assets or added more detailed explanation of the original

3    assets that were intended to be covered as to exactly what that

4    encompassed in further detail.  And between the two and having

5    not been part -- each part of those discussions.

6    "Q.  Did you make -- did Simpson make any effort to add a total

7    value of the assets being conveyed after the revisions made in

8    the clarification letter to the original APA?

9    "A.  No.

10   "Q.  You didn't consider it important?

11   "A.  What I considered important was making sure that the

12   language that the lawyers put together reflected the

13   understanding between the principals and just making sure that

14   people did go back to the principals and have them look at the

15   language, say is this the deal.

16   "Q.  And as you sit here today, do you think that you did that

17   successfully?

18   "A.  I hope so.

19   "Q.  Well, putting aside the specific element, did you ever

20   hear that the deal that was struck between the parties involved

21   a -- did you hear or understand that the deal between the

22   parties involved any type of agreement that there was a cap on

23   assets such that assets over some dollar figure couldn't be

24   transferred?

25   "A.  No."

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 114 of 121

Page 114

1          MR. SCHILLER:  That concludes the deposition, Your

2     Honor.

3          THE COURT:  Okay.  Do you want to present your

4     objection?

5          MR. MAGUIRE:  If it please the Court.  Yes, Your

6     Honor.  Specifically, our objection is as to the testimony that

7     appears on pages 78 and 79 of the transcript.  And that is

8     testimony concerning the parenthetical that the witness was

9     shown that appears in the final executed clarification letter.

10    The witness testifies repeatedly that he was not involved in

11    the negotiations.  Therefore, there is no foundation for him to

12    say anything about the business deal, what the understanding

13    was between the parties, what the negotiations were, or what

14    the discussions were.  The witness, I believe, testified at

15    page 18 at line 7 "Well, I wasn't part of the discussions

16    between the principals as to exactly how the deal was cut, and

17    so I can't say what elements of the deal were important to

18    them.  Then on page 20 he says again, at line 7, "I mean,

19    again, I just wasn't part of those conversations".  And there

20    are several other references, that I'm happy to refer the Court

21    to, where the witness repeatedly confirms that he had no

22    involvement in any discussions between the principals, and,

23    therefore, is in no position to provide any understanding based

24    on what the parties had.

25          What that leaves us with is no foundation for any such

Page 115

1    understanding, and we're left with nothing other than a

2    witness, a lawyer, who has provided us with an executed

3    contract and is giving the reading that he gave of an executed

4    contract.  That, of course, is nothing other than a legal

5    opinion, which is, of course, reserved for the province of the

6    Court.  And, so, I think on both of those grounds it's

7    improper, and, of course, I think it is particularly improper

8    to try to use testimony such as this to suggest that prior to

9    the execution of the agreement there was some sort of

10   understanding by the debtors' counsel that Lehman cash would be

11   transferred to Barclays.  So that's the objection, both

12   foundation and improper legal opinion.

13   "Q.  Okay.

14        MR. SCHILLER:  Your Honor, Mr. Keller was a 30(b)(6)

15   designee on topics including Simpson's understanding that

16   Barclays was acquiring exchange-traded derivatives and the

17   margin and his understanding of the drafting process.  Both of

18   those topics are laid forth in the notice that we presented to

19   the Court.  And he's asked if he understood, Simpson understood

20   at the time of the transaction the exchanged-traded provision

21   of the clarification letter, referred to collateral including

22   cash, and he said yes.  His answer, and the firm's answer, is

23   based on their participation in the drafting process, the back-

24   and-forth they observed.  They were there.  They did receive

25   it.  He received drafts, he acknowledged.  He said he read them

08-13555-mg   Doc 11244   Filed 09/01/10   Entered 09/10/10 13:09:55   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 116 of 121

Page 116

1    at the time.  And he testified to what his understanding was at

2    the time.  It's not being offered as an opinion, a lay witness.

3    It's not being offered as a legal conclusion, Judge.  That is

4    your conclusion to make.  It is offered for Simpson Thatcher's

5    state of mind, as the lawyers for the estate, throughout this

6    process of finalizing the clarification agreement.

7          And the objection that there's no foundation because

8    he lacked persona, he testified to what his knowledge was, his

9    contemporaneous knowledge and his state of mind, when he read

10   it.  And we offer it for that purpose.  He says he had that

11   state of mind then and he has it now.  So he has personal

12   knowledge, and under both a 30(b)(6) notice and the question he

13   was asked there's adequate foundation for that answer, Judge.

14         THE COURT:  I'm going to strike the testimony from my

15   consideration, principally because Mr. Keller makes clear that

16   he was in the backseat throughout this process, had no personal

17   involvement in the drafting of the language in question, was

18   not sufficiently connected to the development of this

19   parenthetical to be a meaningful fact witness with respect to

20   the subject matter, and, in effect, as I read the testimony and

21   as I heard and observed the testimony as it was being played,

22   Mr. Keller was simply answering questions, at least as to this

23   subject matter, as a lawyer interpreting language in a

24   contract.  To that extent it doesn't assist me as finder of

25   fact, and I don't view it as appropriate testimony under the

Page 117

1    circumstances.  So the objection is granted.

2            Now, it's 12:30, and we've filled the morning.

3            MR. SCHILLER:  Your Honor, before we adjourn may I

4    just address to Your Honor what will happen tomorrow to avoid

5    any surprise and to mention one issue that's come up?

6            THE COURT:  I prefer knowing in advance, although

7    surprise is occasionally amusing.

8            MR. SCHILLER:  Your Honor, as you know, Mr. Lewkow

9    will testify tomorrow.  Vic Lewkow, Cleary Gottlieb, who is the

10   lead lawyer for Barclays.  In addition, over the weekend we

11   wrote our friends and asked that they withdraw objections to

12   certain exhibits which we want to offer.  Those exhibits are e-

13   mails of creditor committee advisors or Lehman employees which

14   are party admissions, so they're not hearsay.  And some

15   Barclays' e-mails that constitute business records.  We want to

16   offer those to the Court without having to put custodians on

17   the stand for authentication.

18           And, tomorrow, if the objections are not withdrawn,

19   then we might -- will raise with the Court, offer those

20   exhibits and talk briefly about the several documents we wanted

21   admitted.

22           THE COURT:  Okay.

23           MR. SCHILLER:  Thank you.

24           THE COURT:  Is there anything more for today?

25           MR. SCHILLER:  Not on Barclays part, Your Honor.

LEHMAN BROTHERS HOLDINGS, INC.

Page 118

 1    Thank you.

 2           MR. GAFFEY:  Your Honor will recall that on Friday we

 3    promised you a letter brief.  Are you guys ready on this?

 4        (Pause)

 5           You'll have it by the end of the day.  Both parties

 6    sets of briefs on the GFS point, Your Honor, because we ended

 7    early today, and I got lucky and they did not unveil a binding.

 8    I think we need about another two hours or so.  End of the

 9    business day, yes.

10           UNIDENTIFIED SPEAKER:  That's fine.

11           MR. GAFFEY:  Okay.

12           THE COURT:  Are they going to be submitted

13    simultaneously?

14           MR. GAFFEY:  Yes, they are.  That's what we had

15    agreed, Your Honor.

16           THE COURT:  Fine.  So I'll wait until they're both

17    ready for submission.

18           MR. GAFFEY:  Your Honor, just one question I wanted to

19    ask as we're proceeding that goes to our witness planning.  I

20    think for Thursday we have both Mr. Romain and Ms. Leventhal on

21    the calendar.

22           THE COURT:  Yes.

23           MR. GAFFEY:  And I wanted to get a sense of -- because

24    we're assigning those differently.  I assume that will be a

25    full day, as to the two, and I wondered if we could be told who

Page 119

1    would go first, as between them.

2         MR. SCHILLER:  Mr. Romain will go first, Judge.  The

3    government advised that Ms. Leventhal is not available until

4    the afternoon, and we do expect that to be a full day..

5         THE COURT:  I expect it to be a full day too.

6         MR. GAFFEY:  Yes, I'm actually a little concerned that

7    we'll finish both in the day, Your Honor.

8         THE COURT:  Well, if we don't there's always the 7th.

9         MR. GAFFEY:  Right.  Thank you, Your Honor.

10         THE COURT:  And we also have additional time on the

11    8th that I've made available, with one exception, which is I

12    have a conference call, which has been scheduled that morning

13    at 11 a.m., that will probably take around forty-five minutes.

14    So to the extent you're choosing to use September 8th just take

15    that into account for scheduling purposes.  Okay?  I'll see you

16    tomorrow then.  Thank you.  We're adjourned.

17         (Proceedings concluded at 12:33 PM)

18

19

20

21

22

23

24

25

Page 120

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Liz James | Mr. Hume | 8 |
| Liz James | Mr. Maguire | 60 |
| Liz James | Mr. Hume | 82 |
| Liz James | Mr. Maguire | 89 |

E X H I B I T S

| BARCLAYS'S | DESCRIPTION | PAGE |
|---|---|---|
| 963 | Information received from Lehman about its OCC statements | 87 |

Page 121

1

2                    C E R T I F I C A T I O N

3

4    I, Pnina Eilberg, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    Pnina Eilberg (CET**D-488)

9    AAERT Certified Electronic Transcriber

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  September 1, 2010

17

18

19

20

21

22

23

24

25