Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5   - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC., et al.

9              Debtors.

10  - - - - - - - - - - - - - - - - - - - - -x

11  In the Matter of:

12

13  LEHMAN BROTHERS INC.

14             Debtor.

15  - - - - - - - - - - - - - - - - - - - - -x

16             United States Bankruptcy Court

17             One Bowling Green

18             New York, New York

19

20             August 31, 2010

21             9:32 AM

22

23  B E F O R E:

24  HON. JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2    CONTINUED EVIDENTIARY HEARING re (i) Motion of Debtor to Modify

3    the September 20, 2008 Sale Order and Granting Other Relief;

4    (ii) Motion of the Trustee for Relief Pursuant to the Sale

5    Orders or, Alternatively, for Certain Limited Relief Under Rule

6    60(b); (iii) the Motion of Official Committee of Unsecured

7    Creditors of Lehman Brothers Holdings Inc., Authorizing and

8    Approving (A) Sale of Purchased Assets Free and Clear of Liens

9    and Other Interests and (B) Assumption and Assignment of

10   Executory Contracts and Unexpired Leases, Dated September 20,

11   2008 (and Related SIPA Sale Order) and Joinder in Debtors' and

12   SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify

13   Sale Order; (iv) All Joinders Thereto and Related Adversary

14   Proceedings; and (v) Motion of Barclays Capital Inc. to Enforce

15   the Sale Order and Secure Delivery of All Undelivered Assets

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 3

1

2    A P P E A R A N C E S :

3    JONES DAY

4         Attorneys for the Movant, LBHI

5         222 East 41st Street

6         New York, NY 10017

7

8    BY:   ROBERT W. GAFFEY, ESQ.

9          WILLIAM J. HINE, ESQ.

10         JAYANT W. TAMBE, ESQ.

11

12   HUGHES HUBBARD & REED LLP

13        Attorneys for Movant, James W. Giddens, SIPC Trustee

14        One Battery Park Plaza

15        New York, NY 10004

16

17   BY:   WILLIAM R. MAGUIRE, ESQ.

18         NEIL J. OXFORD, ESQ.

19

20

21

22

23

24

25

Page 4

```
 1
 2     QUINN EMANUEL URQUHART & SULLIVAN, LLP
 3          Attorneys for the Movant, Official Committee of Unsecured
 4           Creditors
 5          51 Madison Avenue
 6          22nd Floor
 7          New York, NY 10010
 8
 9     BY:   JAMES C. TECCE, ESQ.
10
11     BOIES, SCHILLER & FLEXNER LLP
12          Attorneys for Barclays Capital, Inc.
13          333 Main Street
14          Armonk, NY 10504
15
16     BY:   DAVID BOIES, ESQ.
17          JONATHAN D. SCHILLER, ESQ.
18
19     BOIES, SCHILLER & FLEXNER LLP
20          Attorneys for Barclays Capital, Inc.
21          10 North Pearl Street
22          4th Floor
23          Albany, NY 10504
24
25     BY:   TRICIA J. BLOOMER, ESQ.
```

Page 5

1

2    BOIES, SCHILLER & FLEXNER LLP

3         Attorneys for Barclays Capital, Inc.

4         5301 Wisconsin Avenue NW

5         Washington, DC 20015

6

7    BY:   HAMISH P.M. HUME, ESQ.

8

9    STUTMAN TREISTER & GLATT LLP

10        Attorneys for Elliott Management

11        1901 Avenue of the Stars

12        12th Floor

13        Los Angeles, CA 90067

14

15   BY:   WHITMAN L. HOLT, ESQ.

16         REBECCA S. REVICH, ESQ.

17         (TELEPHONICALLY)

18

19

20

21

22

23

24

25

Page 6

1              P R O C E E D I N G S

2              THE COURT:  Be seated, please.  Good morning.

3              MR. SCHILLER:  Good morning, Your Honor.  Your Honor,

4    last night both parties filed their letter briefs with the

5    court and we would like both parties to hand up copies for the

6    Court.

7              THE COURT:  Okay.

8         (Pause)

9              THE COURT:  Just as a point of information for me, do

10   the parties wish to have this resolved simply on the basis of

11   the submissions or are you looking for argument as well?

12             MR. GAFFEY:  Your Honor, it's a pleasure.  I'm fine

13   with the decision on the letters.

14             MR. SCHILLER:  I agree with that, Your Honor.

15             THE COURT:  Okay.  Fine.  And when do you need a

16   ruling?

17             MR. SCHILLER:  Well, as promptly as practical so we

18   can determine whether we need to bring in a witness which is

19   what this is about.

20             THE COURT:  So as promptly as practicable.

21             MR. SCHILLER:  For the Court -- practicable for the

22   Court, yes.

23             THE COURT:  I am probably not going to get a chance to

24   read these until the end of the day today.  And I have a

25   general calendar tomorrow which includes a miscellaneous

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 7 of 253

Page 7

1    morning calendar and an afternoon of Lehman claims issues.  I

2    will do my best to digest these submissions and give you a

3    ruling by Thursday if that's at all possible -- if that works

4    for the parties.

5            MR. SCHILLER:  That's fine, Your Honor.  And fine even

6    if -- the other side understands what would happen if you were

7    to require a witness and they know who that is so there would

8    be no surprise.  And that can come later than earlier if Your

9    Honor.

10           MR. GAFFEY:  Absolutely right, Your Honor.  If they

11   bring a witness, we're ready to cross-examine her.

12           THE COURT:  Okay.  So it's a matter of importance but

13   not urgency.

14           MR. SCHILLER:  Right.

15           THE COURT:  Is that a fair characterization?

16           MR. GAFFEY:  Yes, Your Honor.

17           THE COURT:  Okay.  Fine.

18           MR. SCHILLER:  One other scheduling issue.  We called

19   the government yesterday to inform the New York Fed Reserve

20   that because of what we understood might be the length of Mr.

21   Romain's cross-examination, Ms. Leventhal might be held over.

22   And they ask, given her schedule, that she appear and testify

23   at once.  And we said yes.  So we'll call her on the morning of

24   the 7th.  She and Mr. Raisler will be concluded that day

25   without issue.  Mr. Raisler will be examined for about the same

Page 8

1    length of time, we believe, as Ms. James yesterday.  So the 7th

2    will be adequate for both Ms. Leventhal and Mr. Raisler.

3                THE COURT:  Okay.

4                MR. SCHILLER:  We now call Victor Lewkow, Your Honor,

5    Cleary Gottlieb.

6                THE COURT:  Good morning, Mr. Lewkow.  Please raise

7    your right hand.

8          (Witness duly sworn)

9                THE COURT:  Be seated, please.

10   DIRECT EXAMINATION

11   BY MR. SCHILLER:

12   Q.   Good morning, Mr. Lewkow.

13   A.   Good morning.

14   Q.   Would you please describe for Judge Peck your professional

15   experience and background?

16   A.   Yes.  I'm a partner at Cleary Gottlieb Steen & Hamilton

17   here in New York.  I'm a senior mergers and acquisitions

18   partner and worked on many transactions over the thirty plus

19   years I've been doing this.

20   Q.   And did there come a time when you were engaged to

21   represent in connection with a purchase -- possible purchase of

22   Lehman?

23   A.   Yes.  We were first contacted on the morning of Friday,

24   September 12th, early that morning, about our possible

25   representation of Barclays.  This was to be prior to the

Page 9

1   bankruptcy filing.

2   Q.   Could you describe generally your responsibilities that

3   weekend?

4   A.   That weekend, the weekend of the 12th through the 14th --

5   Q.   Yes.

6   A.   -- I headed the team and spent time at Barclays as there

7   were a number of conversations about the possibility.  I was in

8   Mr. Dimon's office when he had conversations on speakerphone

9   with Treasury and the Fed.  And I spent part of the weekend,

10  Saturday and Sunday, down at the New York Fed with the Barclays

11  team.

12  Q.   During the telephone conversation with the United States

13  Treasury and in your meetings at the Fed over the weekend, did

14  you develop an understanding whether Barclays would receive

15  government assistance with respect to its future liabilities

16  should it acquire Lehman?

17  A.   Yes.  The backdrop to this is the JPMorgan/Bear Stearns

18  transaction six or seven months before that where, in order to

19  induce Morgan -- JPMorgan to acquire Bear Stearns, the

20  government -- and given the delay between when a deal would be

21  signed and when it closed given that it was a public company

22  that was acquired, there were all sorts of liabilities,

23  contingent liabilities, and continuing new liabilities that

24  would be created in that time period.  And JPMorgan refused to

25  do the transaction except the Treasury -- I think it was

Page 10

1   Treasury; it might have been the Fed but I'm pretty sure it was

2   the Treasury -- guarantied a whole series of liabilities,

3   contingent liabilities, and the like and therefore limited very

4   heavily the amount of JPMorgan liabilities.  When it was my

5   understanding over the weekend that the -- and in that phone

6   call, it was made clear that Treasury was not going to do that

7   again and that was not possible.

8   Q.   So the United States government did not guaranty any loss

9   for Barclays from the liabilities it acquired from Lehman, is

10  that correct?

11  A.   That's correct.  That's a later point in time once we did

12  the deal.  But that remained correct.

13  Q.   So once you did the deal, if the businesses of Lehman that

14  Barclays acquired upon closing fail, that risk and that loss

15  was upon Barclays, correct?

16  A.   Oh, absolutely.  I mean, one of the -- I know this case a

17  lot is about the financial assets and the like and obviously

18  they're very important.  But Barclays was buying the business.

19  And they were taking enormous risks given what the state of the

20  market was.  Even in stable times, a lot of people have -- a

21  lot of smart acquirers have bought investment banking, broker-

22  dealer companies, not only paid the purchase price but then

23  spent a lot of money build -- trying to build that business,

24  retain that business.  The one that comes to mind is GE who

25  bought Kidder Peabody, spent a lot of money to buy it and spent

Page 11

```
 1    a lot of money to try to build it and ended up selling it at a

 2    very substantial loss.  There are other examples.

 3        So, yes.  And there was no government guaranty on this.

 4    Q.    If after the closing on September 22nd U.S. financial

 5    markets, indeed global markets, collapsed, then the risk and

 6    the loss of that collapse was upon Barclays not the United

 7    States government, correct?

 8    A.    That's correct.

 9    Q.    It was not risk and loss for U.S. taxpayers, was it?

10    A.    No.  There was -- I mean, there was a short term -- on

11    Thursday night -- or, I guess, Thursday night, the Barclays

12    replaced the Fed as the lender to LBI.  And in order to -- for

13    forty-five billion or so.  And in order to finance that, it's

14    my understanding that Barclays in turn used the so-called Fed

15    window and borrowed with collateral against that from Treasury.

16    So to that extent, as with any normal short term window lending

17    by the Fed, the Fed had exposure if the collateral were to drop

18    precipitously.  So in that sense, there was -- the Fed at least

19    had some liability.  The Treasury did not.  And so --

20    Q.    Did Barclays repay those short term loans quickly?

21    A.    That's my understanding but I don't know the details.

22    Q.    What was the result of the pre-bankruptcy negotiations

23    between Barclays and Lehman over that first weekend, September

24    12th, 13th, 14th?

25    A.    I don't know how much detail people want.  But it felt
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 12

1    apart.  It felt apart, in part, because the JPMorgan/Bear

2    Stearns model was not available, as I said, because Treasury

3    was unwilling to provide that guaranty.  Work was done to try

4    to find another structure that would work.  And a variety of

5    things just made that impossible.

6    Q.   And was there another transaction considered on Monday the

7    15th?

8    A.   Yes.  I got a call early Monday the 15th saying, as we

9    thought might happen Sunday when we broke, Lehman has filed in

10   bankruptcy last night.  And there have been some preliminary

11   conversations this morning about whether or not we could do

12   a -- quickly a bankruptcy sale that would preserve some value

13   both for the estate and for us.  And could you come up?  We're

14   going to start assembling at Lehman and can you come up and

15   join us and see if we can put together such a deal?

16   Q.   Did you participate in the negotiating process between

17   Barclays and Lehman that morning?

18   A.   Yes.  I went up to Lehman -- I put back together or

19   reassembled the team and went up to Lehman and was there

20   through Monday and Tuesday until the early hours of Wednesday

21   morning.

22   Q.   Who was representing Lehman?

23   A.   On the legal side, both Weil Gotshal and Simpson Thacher

24   were counsel for Lehman on that --

25   Q.   Was an --

LEHMAN BROTHERS HOLDINGS INC., et al.

1    A.    -- negotiation.

2    Q.    -- investment bank present for Lehman?

3    A.    I knew Lazard was representing them.  I think someone was

4    there.  But I -- it was -- there a lot of new faces for

5    me.  And I'm not absolutely sure.  But I believe Lazard was

6    present.

7    Q.    Can you describe generally that process that day on

8    Tuesday for Judge Peck?

9    A.    Well, it was --

10   Q.    I'm talking about the process of negotiation.

11   A.    Excuse me?

12   Q.    I'm describing the process of negotiation.

13   A.    Yeah.  There was a lot going on.  There were -- we were

14   spread out over this one floor.  There were a lot of rooms

15   where different people were meeting on different things to --

16   consistent with trying to move a deal forward.  There was one

17   room in the corner, as I recall, that most of the lawyers spent

18   most of their time in.  And there were business people and

19   other advisors in the room for a portion of that.  We had been

20   told that Weil and Simpson were working on a draft of an asset

21   purchase agreement and that they would get it to us.  And as

22   these things always do, it takes longer for people to produce

23   than they had hoped.  I don't think it showed up until fairly

24   into the evening on that Monday evening.

25          And then it was all being done in sort of real time.  We

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 14

1     read it.  We sat and talked about it.  People talked about

2     changes and the like.  There -- we may have done one markup

3     quickly, and the like, but it wasn't -- there weren't a lot of

4     time the way there are in a lot of deals to -- for the lawyers

5     to prepare a draft markup and show it to their client.  Their

6     client looks at it.  Then you send it to the other side.  They

7     send -- there just wasn't time.  It was all being done very

8     quickly.  Weil Gotshal controlled the -- Weil and Simpson -- I

9     can't recall which but I think it was Weil -- controlled the

10    document to the extent anyone controlled it and had it on their

11    computers.  And we worked -- you know, we were representing our

12    respective clients but we were all working cooperatively to try

13    to see if there was a deal that made sense both for Lehman and

14    the estate and for Barclays.

15    Q.   When you say everyone was working cooperatively, was that

16    unusual for a merger or acquisition in your experience?

17    A.   Sometimes it is; sometimes it isn't.

18    Q.   Was it an open and transparent discussion among the

19    parties?

20    A.   I think more so than usual because of the fact that we

21    were all -- you know, when I first got the call, I was told we

22    wanted to get it done tonight.  That was Monday.  And as I

23    said, we didn't even see a first draft till Monday evening.

24    And there were a lot of issues, a lot of complexities that had

25    to be addressed.  And -- but there was still -- even going

Page 15

1    through, you know, signing up Tuesday late at night or early

2    Wednesday morning -- was an incredible process.  Things that

3    would have taken weeks and weeks got done in forty-eight hours.

4    So that forced it to be a pretty open process just by the

5    inherent nature.  And we were all together.

6    Q.   Why did the process become compressed?  Why is it that

7    something that ordinarily would take weeks and months had to be

8    done in forty-eight hours?

9    A.   There was the belief that was articulated by everyone in

10   the various rooms that -- those days that this was -- to the

11   extent there was value to be preserved, things had to be moved

12   incredibly quickly.  One had to try to keep the people together

13   at Lehman.  You know, to state the obvious, it's a people

14   business.  Try to keep clients from deserting, customers from

15   deserting.  We had meanwhile the financial markets a mess.

16   Banks not lending to each other.  LIBOR spiking and rumors that

17   other banks might fail.  And I think AIG showed up Tuesday on

18   the radar screen.  It was a -- it was an awful week.

19        And so, all of those things came together.  From Lehman's

20   perspective, they wanted to try to preserve the business.  From

21   Barclays' perspective, again, we were trying to buy a business.

22   And the more time that passed, the less clear it was that there

23   was any business really to buy.

24   Q.   Did Harvey Miller and the Federal Reserve state their

25   concerns about timing before this Court at the September 17th

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 16 of 253

Page 16

1    hearing, if you recall?

2    A.   Yeah.  That's my recollection.  Both the 17th and maybe on

3    the 19th as well.  I have to admit, I don't remember exactly

4    what happened at which of the two hearings, but yes.

5    Q.   In this compressed time frame, during these cooperative

6    open and transparent negotiations, from your observations, did

7    everyone act in good faith and at arm's length?

8    A.   That was certainly -- everything I saw was consistent with

9    that, yes.

10   Q.   Even in this cooperative mood, were there disagreements

11   between Lehman and Barclays?

12   A.   Yes.

13   Q.   Did you have disagreements in negotiations in which you

14   participated?

15   A.   Yes.

16   Q.   Could you describe or provide examples to the Court of

17   disagreements between you and lawyers representing Lehman in

18   the first two days of the week?

19   A.   I know there were disagreements on the breakup fee.  I

20   think there were disagreements on -- I'm not sure of this one

21   on -- but how long -- how quickly we had to close.  I can't --

22   I don't recall the other --

23   Q.   Do you recall whether there was --

24   A.   -- contractual decisions.

25   Q.   -- a question of whether Barclays should be obligated to

Page 17

1    pay severance to employees who had ultimately terminated?

2    A.    There were negotiations on the terms -- Lehman -- step

3    back.  It was important that Barclays keep the people.  As I

4    indicated, there were, again, buying a people business.  And

5    Barclays wanted them.  Lehman wanted to provide assurances to

6    people to help keep the team together and the groups together

7    and the like.  And so, it was important that there be

8    arrangements to induce people to stay and give them comfort

9    that that was going to happen.  There were some negotiations

10   although the terms of that I was not terribly directly

11   involved.  It was mostly other people.

12   Q.    During this process from your observations, did you form a

13   view as to whether the Lehman participants acted in good faith?

14   A.    That was certainly my impression at the time, absolutely.

15   Q.    Could the same be said of Barclays?

16   A.    Absolutely.

17   Q.    Based on your experience during that week and what you

18   know now, do you believe you were kept in the dark during the

19   sale process?

20   A.    No.

21   Q.    Was there a point Monday or Tuesday in which the two

22   parties reached an agreement on the basic terms of the

23   transaction.

24   A.    Yes.

25   Q.    And do you recall when that was, how early that was?

Page 18

```
 1    A.   I don't recall.  It evolved -- it certainly wasn't until

 2    sometime Tuesday.  But there was progress along the way as to

 3    structure and the like.  But I don't have a precise point in

 4    time.  And the lawyer in me would say it wasn't until we signed

 5    the agreement.

 6    Q.   Now you mentioned earlier to Judge Peck that Barclays was

 7    buying a business.  What was the fundamental term -- what were

 8    the fundamental terms of the transaction as you saw them?

 9    A.   Well, the agreement -- the deal was that Barclays was

10    buying the business.  It was structured as these things

11    normally would be under these sorts of situations an asset

12    purchase agreement in which Barclays was acquiring all of the

13    assets used in the business with certain discreet exceptions.

14    So the presumption on the asset side was it came in unless it

15    showed up as a so-called excluded asset.  And on the other

16    hand, Barclays was assuming specified liabilities, assumed

17    liabilities but was not assuming other liabilities.  In

18    addition, Barclays was making a cash payment, 250 million plus

19    the appraised value of the real estate -- the appraised -- how

20    the appraisal was going to work on the real estate was another

21    issue that was heavily negotiated, to go back to your prior

22    question.  And we were -- Barclays was making those payments.

23    And Barclays was also agreeing to pay certain cure costs, the

24    amount which was not known.  There was an estimate that Lehman

25    had provided but it was not known.  And Barclays was also
```

Page 19

1   agreeing to pay certain estimated compensation costs in

2   connection with the deal.

3        And Barclays, at least from my perspective, was also

4   buying -- by buying a business, they were picking up the costs

5   in the future of running that business and the risks associated

6   with that and the liabilities that would be created in running

7   a business post-closing under an incredibly unstable

8   environment.

9   Q.   Do you recall Harvey Miller -- do you recall generally?

10  I'm not asking whether you recall word for word.  But do you

11  recall generally that Harvey Miller explained that basic

12  structure to the Court at the September 19th hearing?

13  A.   I believe he did, yes.

14  Q.   Do you recall his comment with respect to that business

15  that was being purchased:  "The substance of this transaction

16  is to continue a business for the benefit of the general

17  economy, the employees' lives who are at stake and to fit a

18  small piece into the jigsaw puzzle of maintaining a stable

19  economy."

20  A.   He said many other things more detailed about the deal

21  itself but I do remember him saying that.  And I -- it was not

22  your typical M&A deal in that -- he obviously believed, as did

23  I, that we were -- as well as representing our clients, we were

24  doing our own little bit to try to help preserve the economy

25  and the like.  So, yes, I do recall him saying something along

Page 20

1    that line.

2    Q.   That this sale, if approved, would help the economy.

3    A.   Or at least try to prevent bad things -- further bad

4    things from happening, yeah.

5    Q.   Did this sale, as approved, help the economy in the days

6    following it?

7    A.   I can't prove it but, you know, things look a lot better.

8    We'll never know what would have happened otherwise.

9    Q.   Let me return to the specifics of the agreement that was

10   reached.  What was the consideration that Barclays was paying

11   for the Lehman business it was acquiring?

12   A.   Well, it was paying cash payment, as I said earlier -- as

13   I testified earlier, of the 250 million dollars plus the

14   appraised value of several pieces of real estate, the principle

15   building plus I think there were two pieces in New Jersey.  We

16   were assuming the -- certain liabilities as I described

17   including that were specified.  We were -- Barclays was also

18   agreeing that under certain scenarios, if certain of the

19   trading assets -- if Barclays chose to sell them within twelve

20   months, a portion of certain profits or payments would go to

21   Lehman.  I think that was pretty much the economics of the

22   deal.

23   Q.   On Monday or Tuesday, did Barclays have the opportunity to

24   appraise all of the assets contemplated in the transaction and

25   all of the liabilities?

1    A.    No.   There was no time for that.

2    Q.    And is that something that Mr. Miller also explained to

3    the Court on September 19th, if you recall?

4    A.    My recollection is he did make that point, yes.

5    Q.    But I defer to the transcript.

6    A.    Let me show you the transcript of the September 19th

7    hearing.  At page 59, lines 19 through 25, please.  And Mr.

8    Miller's addressing Judge Peck and he says in those lines:  "

9    In making those decisions that the government or the parties

10   involved wait for ordered reports, appraisals, physical

11   inventories, a review of each and every document relating to

12   the transaction, I think, Your Honor, the answer is no.  They

13   had to do what was necessary to protect the greater good and

14   not to lose the forest for the trees."

15       Do you recall that generally?

16   A.    Yes.  I wouldn't have -- yes.  I see it there and it's

17   consistent with my recollection in a general sense, yes.

18   Q.    The United States government did not want to wait for

19   further reports or analysis of each and every item that was

20   coming in the business, is that right?

21   A.    The government -- there were calls -- look, the government

22   was very concerned what was going to happen.  They encouraged

23   Barclays -- it was my understanding, encouraged Barclays Monday

24   to see if the deal could be put together.  And they were being

25   kept up to date.  And they -- they, like Barclays and Lehman,

Page 22

1    were -- wanted to see things move quickly that uncertainty was

2    a bad thing.

3    Q.    Did the creditors' committee ask Judge Peck to delay

4    approval so that there would be for their consideration a

5    further analysis of the securities that would be transferred

6    upon closing?

7    A.    I recall that there were some people -- I don't know if it

8    was the creditors' committee itself, but I do recall there were

9    objections.  I don't know -- I guess objections isn't the right

10   word.  But there were people at the hearing on the 19th who --

11   creditors or others who urged the Court to delay any approval

12   in order to permit more time for those purposes.  I do recall

13   that, yes.

14   Q.    And what was the Court's response?

15   A.    The Court decided, Your Honor, that you had a basis for

16   proceeding and His Honor ruled appro -- made a ruling.

17   Q.    In taking over that business, following that ruling, was

18   Barclays taking on the cost of running the business under the

19   purchase agreement?

20   A.    Yeah.  As I testified earlier, in addition to -- in

21   addition to the specific liabilities that existed that Barclays

22   was taking on, Barclays was buying a business.  They were doing

23   this in the hope that it would be a smart investment and the

24   like and they knew that they were going to have to put a lot

25   more money in it, as you do, in order to hopefully make it a

Page 23

1    successful acquisition.  So, yes.

2    Q.   Did anyone attempt to estimate at that time the cost of

3    running that business going forward?

4    A.   Not to my knowledge.

5    Q.   Was that future liability brought to the Court's attention

6    through the purchase agreement?

7    A.   I don't recall anything in particular in the purchase

8    agreement.  I mean, it is an inherent situation when you buy a

9    company that you've got to run it.  And this was not -- and the

10   nature of this business and under those circumstances, I think

11   it was self-evident that when you buy it, you're going to have

12   to spend money to try to keep it going and make it work and

13   make it successful.  But I don't -- I can't recall a provision

14   in the asset purchase agreement that says it in those words.

15   It may be in there but it doesn't occur to me at the moment.

16   Q.   Let's look at the APA that was filed with His Honor on

17   September 17th, 2008, which is BCI Exhibit 1 --

18        MR. SCHILLER:  -- and is tab 4 in the binder, Your

19   Honor.

20   Q.   And I'd like to direct your attention to page 2, the

21   definition of "business", Mr. Lewkow, and ask you does that

22   define the business you've been describing?

23   A.   Yes, it does.

24   Q.   And if you turn to page 6 where there are definitions, do

25   those definitions set forth the assets that Barclays was

Page 24

1    acquiring?

2    A.    Yeah.    There's a definition of purchased assets which

3    means all the assets of Seller and its subsidiaries used in

4    connection with the business excluding the excluded assets.

5    And then it goes on to say "including" and there's another

6    provision that makes it clear, as is often in the case in these

7    sorts of things that "including" was not intended to limit this

8    list.

9    Q.    That is at page 10 if I may turn you and Your Honor to the

10   definition of "including".  Is that what you're referring to,

11   sir?

12   A.    Yeah.  Yes, it is.

13   Q.    And was it your understanding that Barclays was acquiring

14   all the assets used in connection with the business regardless

15   of whether they were expressly listed?

16   A.    Oh, absolutely.

17   Q.    Now, let me turn your attention to the definition of

18   "excluded assets" on page -- to go back to page 2 and ask

19   whether that's a narrower approach from the definition of

20   "purchased assets".

21   A.    Yes.  "'Excluded Assets' shall mean the following assets,

22   properties, interests and rights of Seller and its

23   Subsidiaries".  It didn't -- it wasn't all liabilities except.

24   It was these specified liabilities -- I'm sorry.  Let me start

25   over.  Excluded assets were these specified assets.

Page 25

1    Q.   Now there are a number of assets set forth in the APA that

2    Barclays is acquiring.  Was there a total valuation for all of

3    these purchased assets?

4    A.   No.

5    Q.   What was the consideration specifically -- I asked you

6    this earlier but I'm going to ask you again, if you can provide

7    it in a bit of detail.

8    A.   Well, there was --

9    Q.   There was some cash consideration.

10   A.   There was cash which was going to be in the amount of 250

11   million plus the appraised value.  And those appraisals were

12   prepared by outsiders on that Wednesday and Thursday as I -- or

13   Friday morning even.  I can't recall but certainly by Friday

14   afternoon when they were in.  So those were purchased price --

15   those were the cash purchased amount.  Barclays was assuming

16   certain liabilities that were specified in the document.  Those

17   included the -- certain compensation amounts that were

18   described in the document.  It included cure costs that were --

19   the amount of which would depend on which contracts were or

20   weren't assumed which Barclays hadn't begun -- that was going

21   to take a period of time to figure out which ones needed to be

22   assumed, which ones didn't and what the related --

23   Q.   Did Lehman provide estimates of that potential exposure?

24   A.   Yes, they did.  Monday, Tuesday, they had provided

25   estimates of that.  And my recollection is that the

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 26 of 253

Page 26

1    compensation number was two billion and the cure costs was

2    originally higher and then -- their first number they suggested

3    at some point was, I think, started with two and -- but I think

4    it ended up being estimated at one and a half billion if I

5    recall correctly.  I may have that number wrong.  But it was an

6    estimate by Lehman and it had to be an estimate because we

7    didn't know what -- no one knew which contracts were going to

8    be assumed.

9    Q.   In looking at consideration, which is at page 14,

10   paragraph 3.1, Mr. Lewkow --

11   A.   Just give me a second, please.  Yes.

12   Q.   -- was consideration defined there or at any time in terms

13   of book value?

14   A.   No.  And I never finished my last answer, Mr. Schiller,

15   because there was other consideration including the fact, under

16   the asset purchase agreement, that if Barclays sold certain of

17   the trading assets within twelve months that there might be a

18   further payment made to the estate.

19   Q.   Thank you.  In terms of this definition of consideration

20   that I've asked you to look at, in addition to my last question

21   with respect to book value, was consideration based on the

22   estimation of the value of purchased assets as you read it?

23   A.   No.  The consideration was what's specified in here.

24   There was no -- there's no representations and warranties as to

25   what the value of any assets were going to be.  There was no

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 27 of 253

Page 27

1    provision that -- for an audit at closing with valuations and

2    appraisals and then a price adjustment going either direction

3    as you see in deals.  The one prior private broker-dealer deal

4    I had ever worked on where part of the deal involved positions

5    was in much more stable situations.  The seller was financially

6    viable; it was a healthy bank.  They were just getting out of

7    the business.  And there were provisions that -- first of all,

8    there was a balance sheet.  Okay?  You had a balance sheet that

9    wasn't being -- it was a stand alone business.  Here's there

10   wasn't a stand alone U.S. business.  They had to, in effect,

11   create it.  And there was a balance sheet.  And there was going

12   to be a delay before closing, in that case potentially longer.

13   And at the closing, if people couldn't -- there would be an

14   adjustment depending on what the value of the trading assets

15   were, the net value at the closing.  And if the parties

16   couldn't agree, some third party would quickly do its own

17   appraisal and you would adjust the price accordingly.  And to

18   the extent a payment had to go one way or another, there was a

19   provision for that.  There was nothing like that in this deal.

20   Q.    Why, in your view, was there nothing like representations

21   or warranties as to what the values of the assets were that

22   Barclays was acquiring or the liabilities it was incurring?

23   A.    Well, I -- I think that -- my understanding at the time --

24   I mean, I'm not sure it was ever put quite that way.  But we

25   were working in a bankruptcy context.  The seller has limited

Page 28

```
 1    information.  We had even less information.  There were no

 2    appraisals.  People did mark -- attempt to mark-to-market their

 3    securities positions. There's, of course -- a lot of assets

 4    that weren't securities positions at all go into the assets.

 5    And there was no balance sheet, as I said earlier, from which

 6    to represent warran -- also if you did an adjust -- to have an

 7    adjustment provision when one side of the transaction might

 8    have no money to make a further payment if it moves -- supposed

 9    to go in one direction would create a sort of an unfair

10    situation where the payment could only go the other way.  But

11    it was never really discussed.

12    Q.    Let me finish up with a couple questions on that

13    consideration definition that I put in front of you.

14    A.    Sure.

15    Q.    Was consideration allocated to certain purchased assets in

16    any way?

17    A.    No, it wasn't.

18    Q.    Were assumed liabilities allocated to specific purchased

19    assets?

20    A.    No.

21    Q.    Now you've explained your experience in transactions and

22    you, a moment ago, distinguished this transaction from a

23    balance sheet transaction like deal that you participated in

24    the past.  So briefly for the Court, this was not a balance

25    sheet deal, is that correct?
```

Page 29

1    A.    Not as -- no, it wasn't.

2    Q.    And there were no representations or warranties as to the

3    valuations of any assets --

4    A.    That's correct.

5    Q.    Now, you mentioned a post-closing audit concept.  Did the

6    APA provide for a true-up or a post-closing audit of any kind?

7    A.    No, it did not.

8    Q.    Can you look at the APA Section 3.3 with us, please?

9    A.    Yes.

10         MR. SCHILLER:  That's in, again, the same tab, Your

11   Honor.

12   Q.    Is this a -- can this be generally referred to as a true-

13   up provision?

14   A.    No.  It was a provision that basically -- it was in

15   Barclays' control.  If it, in fact, chose to sell out positions

16   and it resulted in a profit and if it did that within one year

17   then a certain portion, the first 500 million, would go to

18   Lehman.  And after that there was sharing up to a certain

19   point.  But it was not a true-up because it was -- it would

20   depend on subsequent market conditions.  I mean, this was a

21   provision that was what would happen later not what was the

22   balance sheet really worth at closing.  And it was -- Lehman

23   had hoped -- we all hoped but Lehman, in particular, had hoped

24   that things were going to improve and that, over time, the

25   value of these assets would improve.  And Lehman still wasn't

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 30 of 253

Page 30

1   entitled to it unless Barclays chose to sell them and it

2   resulted in a net profit.  And in those events, there would be

3   this additional payment made to Lehman.

4   Q.   By the end of the week, was this provision taken out of

5   the purchased asset agreement by the parties?

6   A.   Yes, it was as described to the Court on that Friday as I

7   recall and as reflected in the clarification letter that was

8   signed early Monday morning.

9   Q.   Let me turn to another subject.  Do you recall a press

10  release by Barclays announcing an anticipated multi-billion

11  dollar accounting gain on acquisition in the middle of the

12  week?

13  A.   My recollection is that on Wednesday morning London time

14  they did put out a press release along that line, yes.

15  Q.   And do you recall whether it was announced in the public

16  domain through that release that Barclays was acquiring trading

17  assets with an estimated value of seventy-two billion dollars

18  and trading liabilities with a current estimated value of

19  sixty-eight billion?

20  A.   Yes.

21  Q.   Did that press release thereby show that there was a

22  buffer between the trading assets and the trading liabilities?

23  A.   I certainly think so, yes.

24  Q.   Let me show you a document that you haven't seen before,

25  BCI 198, which is at tab 6 --

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 31

1    A.    Are you allowed to do that?

2    Q.    -- of your binder.

3    A.    Okay.

4    Q.    And you'll see it's from Ann Marie Miller who I'll

5    represent to you is senior vice president at Houlihan Lokey.

6    And there she makes -- and advisor to the creditors' committee.

7    And there she makes reference in the first sentence that

8    Lehman's operations to be acquired with estimated trading

9    assets of seventy-two billion and sixty-eight billion in

10   liabilities.  And she explains that the business would be

11   merged into Barclays Capital.

12        Those are the same numbers that you read in the press

13   release that day, is that right?

14   A.    Yes.

15   Q.    Do you recall at the September 19th sale hearing whether

16   certain creditors objected to the sale on the basis that it

17   would result in a fire sale discount or windfall profit?

18   A.    I'm not sure I remember the words precisely "windfall

19   profit".  They may well be in there.  But I do remember that

20   certain creditors did object on those -- basically on those

21   kind of grounds, yes.

22   Q.    Let me show you from the transcript of the hearing on

23   September 19th comments by Mr. Golden, at page 170, lines 8

24   through 14, who was representing the group of noteholders.  And

25   there, he advises the Court that "for whatever reason, the

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 32 of 253

Page 32

1    debtor has failed to meet its burden with respect to the

2    appropriateness of the sale.  We have heard the dire

3    consequences as to what will occur or may occur if this

4    transaction is not approved, but we have not heard credible,

5    cogent testimony as to whether the proposed purchase price

6    represents a fair value for these assets."  Do you recall that

7    generally?

8    A.    Generally, yes.

9    Q.    And --

10   A.    Couldn't have told you who it was that made that objection

11   but I remember those kind of objections being made, yes.

12   Q.    At page 174, line 6 through 8, the same gentleman advised

13   the Court that "Nobody ever suggested maybe there's an

14   alternative here that is something less than selling assets on

15   what we perceive to be a discount value."

16        Do you see that?

17   A.    Yes, I do.

18   Q.    Turning to the APA once again, was Barclays acquiring

19   these purchased assets that we've looked at, by definition,

20   irrespective of the monetary value?

21   A.    Yes.  Yes.  As I said, there was no representation or

22   warranty as to the value of the assets Barclays was buying.

23   And there was no adjustment if they turned out to be worth less

24   or more than we had expected based on what limited diligence

25   had been possible.

Page 33

```
 1    Q.   You were the lead lawyer for Cleary Gottlieb, is that

 2    right, in this negotiation?

 3    A.   That's correct.

 4    Q.   And Harvey Miller was the lead counsel for Lehman?

 5    A.   That's correct.  Obviously, a lot of -- his colleagues and

 6    my colleagues were involved, yes.

 7    Q.   Let me show you Mr. Miller's testimony at trial before His

 8    Honor at page 106, line 4 through 21, on this question of value

 9    of assets:  "Now I may have covered this once before but I

10    would like to cover the subject again, if it's not duplicative.

11    And that is, that the APA provided to the Court had no

12    contractual limitations on the value of the purchased assets

13    that were being acquired by Barclays in the sale."

14         Mr. Miller answers me, "That's correct."

15         And then I asked, "Indeed, the purchased assets were being

16    acquired by Barclays in the sale irrespective of what their

17    values may have been that week, correct?"

18    "A.   Technically, yes."

19         Do you agree with Mr. Miller?

20    A.   Yes, I do, absolutely.

21    Q.   Now did that make the values of trading assets or other

22    assets irrelevant to the deal?

23    A.   No.  Again, from -- there were two sides, as always, to

24    this.  From Barclays' perspective, we -- there was concern what

25    was -- what were these assets, what were their values and the
```

Page 34

1    like.  You want to know what it is you're buying and the more

2    information you have the better to have a sense of that.  I

3    think Barclays -- you mentioned the press release that they

4    issued that showed that there was a positive difference between

5    the value of the trading assets and the trading liabilities.

6    And that was important -- it was very important to Barclays

7    given the markets that existed.  We had seen this over the

8    Friday and over the prior weekend, that Friday, Saturday,

9    Sunday.  It was important if Barclays was going to do this that

10   it appear to be knowing what it was doing in the public

11   environment and to its regulators and the like and that was all

12   important.  So they cared on the assets.  And Lehman, obviously

13   -- I mean, they were advised by Mr. Miller and others and

14   obviously with great expertise and they needed to have a sense

15   of value, as much information as they could to conclude

16   whether, in fact, this was in the best alternative available to

17   Lehman in terms of that there was no other bid and that they

18   wouldn't be better off liquidating the portfolio, et cetera.

19   So it was important to both sides, sure.

20   Q.   Was there a lot of effort as you observed it by Barclays'

21   traders to value these assets in order to determine whether

22   there was a positive difference as you've defined it?

23   A.   Yes.  There were -- and as I said -- I testified earlier

24   there were a lot of rooms and a lot of things going on at one

25   point all over that Monday and Tuesday at Lehman Brothers on

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 35 of 253

Page 35

1    that one floor.  And in one of the rooms there were traders

2    from both Lehman and Barclays who were going through the Lehman

3    portfolio.  Those of us in the -- what I referred to earlier as

4    the corner lawyers' room, we'd get reports from time to time.

5    And both sides were in there.  It was -- we were told that

6    there were differences, substantial differences in views as to

7    the appropriateness of the marks.  Lehman -- there had been

8    lots of newspaper stories and other things for some months

9    suggesting that -- weeks, at least -- that suggested that maybe

10   Lehman had unrealistic marks on some of its portfolio.

11   Barclays was going through that.  There were traders sitting

12   together, as I understood it.  I may have walked past that room

13   at least once.  But the -- and so that was going on.  There was

14   also the question of even if they hadn't been overstated

15   previously whether they were stale with each passing day and

16   each passing hour and therefore overstated.  And there was at

17   least, at one page, the story was reported in the room that I

18   was in, again, with lawyers from both sides present, and maybe

19   some businesspeople, in which it was mentioned as an example of

20   why the Barclays traders were dubious about the marks.  There

21   was some security that Barclays had on its own -- in its own

22   portfolio that where Barclays had a senior tranche of the

23   security and had marked it at a lower percentage of nominal

24   value then Lehman had a junior tranche marked at.  Well, that

25   certainly makes one dubious as to not only that mark but other

Page 36

1    marks that were on the Lehman -- in the Lehman portfolio.  So

2    there was -- there were discussions of that sort.

3         I've rambled.  I apologize, Your Honor.

4    Q.   Well, that's all right, Mr. Lewkow.  It's important.  You

5    mentioned that there was an effort on the part of Barclays, if

6    not both parties, to understand what some of these trading

7    assets were at that point in the week.  You mentioned, I think,

8    in your answer that there was some confusion about that.

9         Let me show you Exhibit 106 which has been referred to as

10   Mr. Berkenfeld's document, BCI 106.  Do you recall seeing this

11   document during the negotiations?

12   A.   Yeah.  At some point, Mr. Berkenfeld came into the -- back

13   into the room -- or came into the room.  We were close to

14   finalizing -- it was pretty late Tuesday night.  I couldn't put

15   a time on it.  But -- is there -- there may even be a time on

16   this document.  But -- and --

17   Q.   There's a date in the upper right-hand corner handwritten.

18   It says September 16th.

19   A.   Yeah.  9/16/08, yeah.  It was that Tuesday -- and said

20   just want to make sure this is what we're talking about.  These

21   are the categories of assets and liabilities we're talking

22   about.  And at some point, he said, with a little bit of flare,

23   said let's initial it.  So we know when he initialed it.

24   Q.   Can you move the microphone just a bit closer to you --

25   A.   Oh, I'm sorry.  I --

Page 37

1    Q.    -- so His Honor can hear you.

2    A.    -- came down with a cold last night.  So I'm getting a

3    little bit of laryngitis.  I apologize.

4    Q.    Thank you.  Don't hesitate to drink water.

5    A.    I've gone almost through a bottle.

6    Q.    Now, you had mentioned initialing the document.  And you

7    see there that there are some initials below that signature.

8    Did this schedule include all of the purchased assets or all of

9    the assumed liabilities that Barclays was acquiring from

10   Lehman?

11   A.    Well, it certainly didn't include all of the assets.  It

12   was, at most, certain of the -- certain of the assets we

13   were -- we were buying all the assets except, as I said

14   earlier, except as expressly excluded.  And even the specific

15   enumeration in the agreement of assets went beyond these kind

16   of purely financial assets.

17   Q.    Mr. Lewkow, this exhibit which is in evidence has only one

18   individual signature on it.  Did Barclays sign this document in

19   any way, put initials on it, do you know?

20   A.    Not that I recall but I wouldn't swear to it one way or

21   the other.

22   Q.    Well, let me ask you this, 'cause you are under oath --

23   A.    Yes, I know.  That's why --

24   Q.    Did the lawyers for the parties discuss -- did you discuss

25   with Lehman's lawyers whether this document should be a part of

Page 38

```
 1   the APA or attached to the APA?

 2   A.   Yes.   There was a discussion.   Someone suggested on the

 3   Lehman -- I think it was on the Lehman side.   Someone

 4   suggested -- it might have been Mr. Berkenfeld, I just don't

 5   recall.   Let's attach it as an exhibit or something along that

 6   line.   And we said -- and I say "we" but I'm pretty sure it was

 7   me -- said no.   This is -- we just spent the last thirty-six

 8   hours negotiating this thing, the asset purchase agreement.   It

 9   lays out a whole bunch of aspects of this transaction.   It

10   can't be replaced by what this one page, which we haven't

11   really audited and reviewed or anything -- and I don't want to

12   attach it as an exhibit and sort of imply the entire asset

13   purchase agreement should be interpreted as based on this

14   document.   I don't know what the implications of doing that

15   would be and we're not prepared to do that.   And it was

16   dropped.

17   Q.   So did Mr. Miller --

18   A.   There was one mention made of this document, but --

19   Q.   Did Mr. Miller agree with you not to attach it to the APA?

20   A.   Yeah.   As I said, somebody suggested -- might have been

21   Mr. Berkenfeld, I don't recall.   I gave my little speech.   And

22   it was totally dropped.   This was not heavily negotiated or

23   anything like that.

24   Q.   Did the figures that are set forth in this document change

25   during the week as far as you know?
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 39

1   A.   Everything changed constantly during the week.  It was

2   that kind of week, yes.

3   Q.   Now let me ask you about the reference in the APA to a

4   book value.  Do you recall the circumstances under which the

5   words "with a book value as of the date hereof of approximately

6   seventy billion dollars" was added to the description of the

7   long positions in the APA?

8   A.   Yes.  I know that -- Exhibit 4, which is what I'm

9   looking -- or tab 4 which is whatever exhibit number it is

10  that's in this book that you asked me to look at earlier.

11  Q.   It's BCI --

12  A.   When I looked at it --

13  Q.   -- Exhibit --

14  A.   -- the first thing I looked at is which version of the

15  execution version was this included.  The version I remember

16  best was the one that had inked in changes that I know is the

17  version we filed early hours of Wednesday morning because we

18  were anxious to get it on file.  And word processing those last

19  minute changes would have possibly delayed things further.  So

20  we filed it and then it was refiled with the word processing

21  changes made.  One of -- those were last minute changes made as

22  we all sat around the room.  One of the young lawyers on the

23  Lehman side of the table sat between me and one of the

24  partners -- in fact, it was a Simpson Thacher partner and not a

25  Weil partner but the Weil partners were also in the room.  And

Page 40

1    when we -- if there was a change, it went in in ink.  And she

2    had much better handwriting than I would have had.  And those

3    were the last minute changes.  And there was -- somebody made

4    the suggestion that to give some order of magnitude in the

5    document, some sort of -- just to be helpful, it was useful to

6    add that reference, the approximately seventy billion.  And

7    there's a similar language on the short positions,

8    approximately sixty-eight or whatever the numbers -- I would

9    have to look -- billion.  And the person who originally -- and

10   again, I don't remember who it was.  The person who originally

11   proposed adding words of that nature used the term "marks".

12   And someone -- and again, it may have been me.  I don't -- it

13   could well have been.  But somebody said well, "marks" isn't a

14   very technical term.  Don't we mean book value?  And that's the

15   words that we used in the document when it was written in hand.

16   Q.   Did the lawyers for the parties or, to your knowledge, the

17   parties discuss whether the figures of approximately seventy

18   billion and approximately sixty-nine billion were intended to

19   be representations or warranties of approximate value?

20   A.   It was clearly not that, absolutely not.

21   Q.   Now, comparing the long positions as a purchased asset and

22   a short -- the short positions that you've just outlined -- and

23   you may have mentioned this earlier.  Was there a buffer

24   between the two?

25   A.   Well, it wasn't -- there was but it's not just that.  I

Page 41

```
 1    mean, there were other -- in the first place, again, there were

 2    other assets including nonfinancial assets.  But there was

 3    also, as part of the financial assets, there were a number of

 4    other things that added to -- I don't know if at the time I

 5    used the word "buffer" but what I -- furthermore, it was a

 6    positive difference.  It included the fact that in addition to

 7    the net long and net short positions you're referring to, we

 8    were -- Barclays was going to get in the so-called resis, the

 9    residential mortgage portfolio.  And there was also the

10    provision for the retained cash concept that was also, I

11    believe, was in the APA for a billion two or a billion three

12    that we were -- that Barclays was going to get.

13    Q.    So the retained cash estimated at a billion two or a

14    billion three would add to the positive difference between the

15    trading assets and the trading liabilities that you saw in the

16    APA?

17    A.    Yes.

18    Q.    And these resis that you mentioned, do you recall hearing

19    whether they had value as far as Lehman was concerned?

20    A.    Yes.  Lehman thought -- I mean, in that environment,

21    knowing what value anything was was hard.  But Lehman thought

22    it had very substantial value in -- well into the single digit

23    billions.  I don't remember if it was six or seven or eight or

24    something.  But they thought it had a substantial value and

25    that over time might have a lot more value.
```

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 42 of 253

Page 42

1    Q.    And that value then, in your mind, was added to the

2    positive difference --

3    A.    That was something else.  To the extent you're looking at

4    the spread between the financial assets we were going to get

5    and the liabilities, when you add a half interest in something

6    that's worth six or eight billion dollars, that adds to the

7    positive difference, yes.

8    Q.    Let me turn to the clarification letter.  At some point,

9    after the APA was finalized, did Lehman and Barclays begin to

10   work on a clarification letter for Judge Peck?

11   A.    No.  We started working on a clarification letter that --

12   yes.

13   Q.    And when was that?

14   A.    I think it actually began on Wednesday.  I mean, given the

15   speed with which this was done, I think by some point

16   Wednesday, someone had identified at least one minor thing that

17   needed some clarification.  And not surprisingly, over the --

18   as the time -- I can't really say days but the hours passed,

19   people found other things.  Then as things got -- there were

20   substantive issues that developed on the day, Friday, it became

21   a much more serious element.

22   Q.    Let me just return to the 17th, Wednesday, September 17th,

23   and ask you to look at BCI Exhibit 460, tab 10 in your binder.

24   A.    Yes.

25   Q.    Was this an initial draft of the clarification letter?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 43

1    A.    I believe so, yes.

2    Q.    And you're copied on it --

3    A.    Yes.

4    Q.    -- and the recipients include three or four partners from

5    Weil Gotshal:  Tom Roberts, David Murgio.  See that?

6    A.    Yes, as well as some Simpson Thacher lawyers, yes.

7    Q.    And what was the nature of the issues that you wanted

8    clarified that early in the week?

9    A.    Hold on.  I -- let me look at the attachments.  I think it

10   was fairly modest clarifications and the like.  I know -- one

11   thing I recall is -- and I'm looking at paragraph 8 of the

12   draft.  It quickly became clear.  And I don't know whether it

13   had been a mistake when it was 1.3 billion as retained cash or

14   it was that between Tuesday and Wednesday Lehman discovered it

15   didn't have a billion three sitting around as free cash to run

16   the business.  It only had 700 million.  I don't recall.  But I

17   -- it wasn't -- someone -- and this is an example of something,

18   Mr. Schiller, that who did a draft during these days on both

19   the original asset purchase agreement and the clarification

20   letter doesn't necessarily mean they were asserting a position,

21   that they were negotiating.  I mean, here it is.  My colleague,

22   Lillian Raben, sent this draft.  And it included "reducing", in

23   paragraph 8, "the retained cash from a billion three to 700

24   million."  Well, that wasn't because we wanted to reduce it.

25   we would have preferred to get a billion three than 700

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 44 of 253

Page 44

1    million.  It just -- it was something -- there as a

2    conversation in which we heard that this was either a mistake

3    or no longer existed as a billion three.  And so we sent out a

4    draft that included that provision.

5    Q.    Thank you.  On Friday morning or late morning or early

6    afternoon -- not trying to be specific about the time, did Weil

7    Gotshal indicate to you that there was a serious question as to

8    whether this sale was doable, referring to the 19th of

9    September?

10   A.    I recall -- we were waiting for a new draft of the

11   clarification letter that Friday.  And at some point, I think

12   we had a conversation with somebody at Weil.  I don't recall

13   who.  And I say we had it.  I may have had it directly or I may

14   have heard about it from one of my colleagues.  Where is it;

15   what's going on.  And were told that there were major issues

16   that they understood had arisen as to -- and I think I heard

17   something similar from Mr. Klein at about the same time.  But

18   again, it's fairly vague.  But what I learned some point Monday

19   morning or midday was that there were substantial -- that the

20   amount of -- that Lehman had of the financial assets that they

21   could transfer and at closing would -- Barclays would own of

22   the -- was substantially less than the seventy billion number

23   that had been talked about on Tuesday and that this raised

24   substantial issues.  And people were trying to figure out if

25   the deal still could be done.

Page 45

1    Q.   So the amount that it was approximated for His Honor on

2    the 17th in terms of long positions, that had changed and there

3    was substantially less in the value of financial assets that

4    Lehman could transfer to Barclays?  That what you were

5    informed?

6    A.   That's what I -- I mean, there was more over the next

7    hours that came, but yes, that's what I started to hear about.

8    Q.   You attended the hearing on the 19th, did you not?

9    A.   I did.

10   Q.   And did you have discussions before the hearing concerning

11   the questions as to substantial value not having been

12   delivered, not being in a position to be delivered to Barclays

13   by Lehman?

14   A.   Yes, I did.

15   Q.   Could you describe that conversation for the Court,

16   please?

17   A.   Yeah.  Shortly after I came up to this courtroom, which I

18   recollect being larger than it seems today.  But -- it was

19   crowded.  And in the area where -- so sort of near where the

20   screen -- in front of, I guess, what, the jury box, but in

21   front of the table where Mr. Gaffey and his colleagues are,

22   there were a few of us that had a conversation.  And I would

23   say five or six people but I don't remember everyone who was

24   there and it may have been more than that.  But it definitely

25   included Michael Klein and Lori Fife.  I believe somebody from

Page 46

```
 1   Lehman was also -- or Lazard or both -- was also among the five

 2   or six people who were there.  And in it -- in that

 3   conversation, Mr. Klein described for us his understanding of

 4   what had been agreed to in the hour or two just before the

 5   court hearing had started.  And he described the fact that --

 6   referenced the fact that there were a lot less assets that --

 7   in terms of value that Lehman could deliver and would be

 8   delivering at closing.  On the other hand, that among the

 9   assets that we were purchasing -- Barclays was purchasing when

10   we were buying the -- substantially all of the assets, all of

11   the assets used in the business except what was explicitly

12   excluded, that there were two categories of financial assets

13   that were -- we were entitled to but we had not been aware of,

14   specifically in any of our numbers.  So that when what door --

15   you referred to as the buffer -- when we thought there was a

16   buffer, we weren't looking to them because we didn't know about

17   them.  We thought there was a buffer from other things.  And

18   there were two categories that we hadn't known about and it

19   helped ameliorate the problem from the large shortfall in

20   positions that we were going to get.  Those two categories that

21   we heard about, that he described, were two things I was not

22   familiar with.  One was a so-called 15c3-3 account which he

23   said -- he reported that Lehman had indicated that they had

24   talked to the SEC staff, that they could transfer it to us and

25   that had a value of about a billion seven.  And he also
```

Page 47

1   referred to the clearance box and that that was also something

2   that we had not focused on in our prior -- our -- I mean I

3   didn't look at any numbers, but what Barclays had been looking

4   at.  Previously, there was about a billion nine as I recall, or

5   something like that, that they had available that they could

6   transfer as part of when they transferred all the assets used

7   in the business.  And that helped ameliorate the very large

8   shortfall.  The shortfall, he also mentioned, included the fact

9   that there was the 700 million that the Court had been told

10  about on Wednesday of the so-called retained cash that we were

11  to get.  It turned out that Lehman did not have any cash to run

12  the business.  They didn't have a pile of cash used to run the

13  business.  And so that 700 million was not going to be

14  available either.  There was -- in partial -- in addition to

15  the fact that these additional categories of assets have been

16  identified and there was the shortfall and the lack of -- the

17  retained cash concept.  But there was also that we were not --

18  we were going to get rid of the provision that I testified

19  about earlier that if the -- if certain of the long positions

20  were sold at a profit within twelve months that we would share

21  some of that profit with Lehman, that that provision had gone

22  away.

23  Q.   That provision had gone away --

24  A.   Yes.

25  Q.   -- between the negotiators?  And you mentioned that you

Page 48

1   and Lori Fife were in this meeting.  Was Mr. Miller a part of

2   this discussion with --

3   A.   I don't think so.  He was in the vicinity but I -- this

4   was Mr. Klein reporting it.  I believe there was someone there

5   from Lehman.  I assumed that Mr. Miller and/or Ms. Fife had

6   heard some or all of this before.  But I only learned it that

7   afternoon.

8   Q.   Did Mr. Klein's explanation cause you to believe that the

9   basic structure of the transaction had changed in any way?

10  A.   No.  No.  The concept is we were buying all the assets

11  with certain exceptions and we were assuming only certain

12  specified liabilities.  And -- but the basic structure in the

13  deal hadn't changed, no.

14  Q.   And the basic structure of the deal as presented to the

15  Court and the APA on September 17th hadn't changed?

16  A.   Well, as filed with the Court on the morning of the 17th

17  and then as having been described as part of the hearing late

18  on the day of the 17th, yes.

19        MR. SCHILLER:  Your Honor, if this is a good time for

20  a morning break --

21        THE COURT:  It is a good time.  Let's break till 11.

22        MR. SCHILLER:  Thank you.

23     (Recess from 10:46 a.m. until 11:05 a.m.)

24        THE COURT:  Please be seated.  Mr. Schiller, please

25  proceed.

Page 49

1          MR. SCHILLER:  Thank you, Your Honor.

2    RESUME DIRECT EXAMINATION

3    BY MR. SCHILLER:

4    Q.   Mr. Lewkow, before continuing on the subject of the

5    hearing before His Honor on the 19th of September, I reviewed

6    my notes of my earlier examination, particularly the beginning

7    of it.  And I want to go back over one thing and get your

8    testimony on it.

9          Do you recall that I asked you in terms of risk whether

10   after closing the financial markets collapsed then the risk and

11   the loss of that collapse was on Barclays?  Do you recall that

12   question?

13   A.   Yes.

14   Q.   And your answer, I think, was yes.

15   A.   Correct.

16   Q.   And I said the risk and the loss of that collapse was not

17   on the United States government in terms of that sale.

18   A.   That is correct.

19   Q.   And I said it was not on the U.S. taxpayers.  Do you

20   recall that?

21   A.   Yes.  I guess, yes.

22   Q.   And then you referred to the Fed's offer of financing of

23   the forty-five billion dollar repo later in the week --

24   A.   Right.

25   Q.   -- that Barclays would pay to take over.

Page 50

1    A.    Right.

2    Q.    Let me ask you this question so we can be clear on this.

3    Question of risk.  If Barclays had not refinanced that

4    borrowing in the private repo market, which I think you said

5    you thought it had, would Barclays have been fully obligated to

6    pay the Fed regardless of what happened to the value of the

7    collateral it was acquiring?

8    A.    Yeah.  That's my understanding, yes.

9    Q.    So then the Fed's only risk with respect to the short term

10   loan was Barclays' credit risk, correct?

11   A.    If both -- if both the value of the security dropped

12   precipitously and Barclays couldn't make up the difference,

13   that was the only risk the Fed would be taking, yes.

14   Q.    It was not a risk associated with Lehman or the value of a

15   collateral transferred in the sale?

16   A.    That's -- if it was not -- that's my understanding,

17   correct.

18   Q.    Now, in terms of the sale hearing on the 19th, which we've

19   talked a little bit about and I've shown you some excerpts

20   from, did you have the opportunity to review with Weil Gotshal

21   before appearing before His Honor what their presentation was

22   going to be?

23   A.    No.

24   Q.    If you or other Cleary partners in the courtroom during

25   that long and important hearing thought that the Court was

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 51

1   being misled in any way by anyone, would you have spoken up?

2   A.   Absolutely.  And probably in the first instance by

3   speaking with Mr. Miller and pointing out the issue to him.

4   And if he wasn't going to address it, if need be, we would have

5   addressed it, of course.

6   Q.   Looking back at that evening, was there any material

7   aspect of the transaction His Honor was asked to approve that

8   was not disclosed to Judge Peck?

9   A.   Not to my knowledge.  It was -- I believed then and I

10  believe now that actually Mr. Miller and Ms. Fife did a

11  remarkably good job under the circumstances of summarizing what

12  had changed from Wednesday and from the asset purchase

13  agreement and what the deal was.

14  Q.   Let me show you one of Mr. Miller's statements to the

15  Court on the September 19th hearing at page 43, lines 14

16  through 20:  "In any event, Your Honor, as we described last

17  Wednesday, there are a lot of moving parts to this transaction.

18  And they've been moving with great velocity over the last days

19  since Wednesday.  And as a consequence, Your Honor, there has

20  had to be some major changes in the transaction.  And

21  unfortunately, they weren't finalized until about a half hour

22  ago."

23      Do you believe that was a good description?

24  A.   It was absolutely right.  Things were moving very quickly

25  at great velocity and were continuing to move but there was --

Page 52

1    had just been finalized as I've described.

2    Q.   Overall --

3            MR. GAFFEY:  Your Honor, sorry to interrupt.  Could

4    the witness pull the microphone closer?

5            THE WITNESS:  Yeah.  Sorry.  I apologize.

6            THE COURT:  So the record's clear, a request has been

7    made for the witness to speak more directly into the microphone

8    so that all counsel and those in attendance can hear.

9    Q.   What was your overall view of the description of the

10   transaction provided to the Court by Harvey Miller and Lori

11   Fife?

12   A.   Well, to me, what they were describing is what had

13   changed.  The asset purchase agreement had been filed with the

14   Court.  There had been a dis -- a summary of the transaction

15   provided at the hearing on Wednesday and that the focus by Mr.

16   Miller and Ms. Fife had been on the changes.  And I thought

17   that all the major aspects, as I knew them and as people knew

18   them, were described.

19   Q.   Did you believe, as you listened, that Mr. Miller was

20   describing to Judge Peck a wash or a balance sheet transaction?

21   A.   No, absolutely not.

22   Q.   Do you recall whether Mr. Miller explained to Judge Peck

23   that the documentation for the purchase agreement was as yet

24   not completed and that there was a clarification letter or

25   document of some kind that was underway?

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 53 of 253

Page 53

1   A.   Yes.  I definitely remember that.  There was -- that

2   became an issue.  As I recall at least, one or more of the

3   creditors had urged Your Honor not to -- suggested maybe that

4   you couldn't approve the deal without having those papers and

5   they were not yet available.  But it was -- the Court approved

6   the transaction, concluded as Your Honor did, and -- despite

7   that objection and despite the fact that the clarification

8   letter was not yet available.  It was referenced in the sale

9   order and it was filed Monday morning as soon as we closed.

10  Q.   Before I ask you to look at the sale order, let me just

11  show you what Mr. Miller said concerning what you've just

12  testified about at page 60, lines 23, through 61, line 1:  We

13  cannot take the risk of rejecting this transaction because of

14  ambiguities, the lack of a piece of paper to support every

15  element of the assets to be transferred, the lack of definition

16  as to particular items."

17       Do you see that?

18  A.   I do.

19  Q.   Now you mentioned the sale order a moment ago.  Was the

20  Court asked to approve the transaction even in the absence of

21  this documentation that Mr. Miller referenced?

22  A.   Yes.  That was my understanding.

23  Q.   Let me ask you to turn to BCI Exhibit 16.  It's tab 11 in

24  your binder.  And I address your attention to page 1.  And that

25  is all I'm going to ask you to look at.  Where it defines the

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 54 of 253

Page 54

1   purchase agreement, you notice the sale order says, "With

2   respect to that certain asset purchase agreement dated

3   September 16th, 2008, among the Debtors, Lehman Brothers, LBI,

4   and, (collectively, the Debtors/the Seller), and Barclays

5   Capital, the Purchaser, collectively, with the First Amendment,

6   clarifying Asset Purchase Agreement, dated September 19, 2008,

7   and that letter agreement clarifying and supplementing the

8   Asset Purchase Agreement dated September 20, 2008."

9       Was that a reference to the clarification letter?

10  A.   That was my understanding, yes.

11  Q.   When did the parties continue their work on the

12  clarification letter?

13  A.   My -- well, it was ongoing but my recollection is that the

14  Court approved sale transaction.  It was around midnight.

15  There was then some time spent while the parties and the

16  trustee, I believe, and the creditors' committee and some other

17  creditors who stayed worked out the details of the proposed

18  form of sale order for submission to Your Honor.  And at some

19  point during that process, Mr. Miller or Mr. Roberts, his

20  partner, and I had a conversation about timing and process and

21  the like.  And one of them -- and it was probably Mr. Roberts,

22  who's their senior M&A partner on this, who said I know my guys

23  sent you a draft and your colleagues during the evening a new

24  draft of the clarifying letter, but suggest you not pay

25  attention to it because it doesn't -- it was prepared by them

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 55

1    before the events of the hour or two leading up to the court

2    hearing.  So we're going to prepare a new draft for you that

3    you'll see in the morning.  And so you should -- let's meet in

4    our offices Saturday at some -- I forget what time.  And let's

5    try to get this thing done.  And that was the process.  And we

6    met up at Weil Gotshal, spent most of the weekend there through

7    around 9 a.m. or so Monday morning.

8    Q.    And during that weekend, were representatives of the

9    trustee and the creditors' committee present?

10   A.    Yes.

11   Q.    Do you recall whether lawyers for the committee and the

12   trustee were given copies of the draft clarification letter as

13   drafts came out?

14   A.    I certainly believe so, yes.

15   Q.    Do you recall whether lawyers for the creditors' committee

16   and the trustee were given final versions of the clarification

17   letter?

18   A.    I believe so.  I didn't personally see it but I certainly

19   believe so.

20   Q.    On Sunday, the 21st of September, and before the closing

21   on Monday morning, did representatives of the creditors'

22   committee tell you, in words or in substance, that the Lehman

23   guys were in cahoots with their soon-to-be bosses or partners

24   at Barclays?

25   A.    Absolutely not.  I never heard that.

Page 56

1    Q.    Did they say to you that the Lehman guys had negotiated a

2    sweetheart deal that camouflaged the amount, the value of the

3    securities that were to be transferred?

4    A.    Not then and not for months thereafter did I ever hear any

5    such claim by them, no.

6    Q.    Did representatives of the committee tell you Sunday at

7    the offices of Weil Gotshal that the securities that were

8    transferred to Barclays were worth five billion more dollars

9    than both the Lehman and the BarCap guys said they were worth?

10   A.    Absolutely not.

11   Q.    Did they tell you, representatives of the creditors'

12   committee, that they thought there should be a 47.4 billion

13   dollar cap on the value of the trading assets transferred to

14   Barclays?

15   A.    I never heard any such suggestion.

16   Q.    And was any such cap included in the clarification letter?

17   A.    No.

18   Q.    Did --

19   A.    There was also no minimum value for the -- I mean, it's

20   nice that they might have wanted that if they had proposed it,

21   but there was also no minimum value as I testified.  There were

22   no reps and warranties whatsoever as to the value of these

23   assets.

24   Q.    On that point, did representatives of the creditors'

25   committee say to you, in words or substance, on Sunday at the

Page 57

1    offices of Weil Gotshal that if it turned out that the repo

2    collateral was worth more than 47.4 billion and that the marks

3    of 49.9 billion were accurate, then Barclays would have to give

4    assets back to the estate?

5    A.    It was never -- no one ever suggested that to my

6    knowledge.

7    Q.    No one said anything like that Sunday night to those --

8    A.    Nothing --

9    Q.    -- who were assembled?

10   A.    Nothing remotely like that that I ever heard.

11   Q.    Did the committee advise you -- by the way, do you recall

12   whether representatives of Houlihan Lokey were present over the

13   weekend?

14   A.    At least one person from Houlihan was there.

15   Q.    Do you remember whether Houlihan stated to you or to

16   others that they had independently valued the securities on

17   Schedule A, the repo collateral, and concluded that they were

18   worth billions more than the committee had been told?

19   A.    No one ever said that to me or in my hearing and I never

20   heard anyone report any such conversation.

21   Q.    Let me ask you to turn to the clarification letter.  It's

22   tab 2 in your binder -- and address your attention to paragraph

23   1.

24   A.    Tab 2 in my binder?

25   Q.    Paragraph (sic) 12, I apologize.  I crossed out the 1.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 58

1   A.    Yes.

2   Q.    What did Section 1 confirm?

3   A.    Well, it confirmed two things.  One is that that the

4   purchased assets meant all of the assets that the seller used

5   primarily in the business or necessary for the operation of the

6   business.  I think the word "primarily" had not been in the

7   asset purchase agreement.  I'm not comparing right now.  That

8   was to deal with -- they might be shared assets.  And if they

9   weren't primarily relating to the LBI business then we didn't

10  want -- Lehman was trying to sell other assets at the same time

11  and they wanted to make sure they had them available.  They

12  could sell them to the people who things were primarily for.

13  So it did that.  And it -- also, there had been concerned

14  raised by some people that were we asking that -- were we --

15  there had been assurances made that assets that were not in

16  subsidiaries that were part of the estate that we were not

17  purporting to transfer assets that were in other subsidiaries.

18  And that's one Roman clause II is about.

19  Q.    Would you look at 1A(ii)(a)?

20  A.    1A(ii)(a).  Yes.

21  Q.    Did that -- what did that provide regarding the

22  acquisition of repo collateral?

23  A.    Yeah.  So what we discovered was -- what had been learned

24  was that what had previously been the long positions, the only

25  long positions were what had been in the repo that Barclays had

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 59 of 253

Page 59

1    taken the Fed out of and replaced Thursday night.  And that

2    was -- so we were dealing with that in that clause.  I think

3    that's the clause.

4    Q.   And on 1A(ii)(b), on the first page there, what is

5    indicated with respect to the clearance box?

6    A.   Yeah.  So as I testified earlier, in addition to the -- to

7    what was in the repo as part of what Lehman had told Barclays

8    on Monday afternoon when they were trying to keep the deal

9    together given the shortfall in the assets that Lehman was

10   going to be able to transfer, they had, as I testified,

11   indicated that one other category of assets that they could

12   deliver was the so-called clearance box.  And so that's what

13   this is.

14   Q.   And let me address your attention then to 1A(ii)(c) and

15   ask you what that set forth with respect to "exchange trade

16   derivatives" and property securing those obligations.

17   A.    Yeah.  So there had -- the original asset purchase

18   agreement had covered all the assets except for certain

19   excluded assets.  And that included, as far as everyone I ever

20   heard at the time, assumed was -- included the margin that went

21   with the exchange traded derivatives.  At some point, in the

22   middle of the night Monday morning, a Weil draft came around

23   that in dealing with another problem, took out -- we believed

24   accidentally and then confirmed with Weil that it was not

25   intentional, took out some other language that sort of

Page 60

1   implied -- and thereby implied that we were not getting the

2   margin.  And so, we put it back in in a more clear cut way up

3   as clause (c).

4   Q.   Let me ask you to turn to Section 8, Mr. Lewkow --

5   A.   Section 8.

6   Q.   Yes, at page 4.

7   A.   Yep.

8   Q.   -- and ask you to explain to Judge Peck what that says

9   about Lehman's 15c3-3 account.

10  A.   Yeah.  So it says that there was -- we had been told there

11  was the 15c3-3 account we learned on Sunday -- let me step

12  back, if I may, Your Honor.

13          THE COURT:   Sure.

14  A.   As I testified earlier, I had been told in the

15  conversation -- I had heard Mr. Klein in describing, first to

16  me in a private conversation and then again in the conversation

17  that I testified to earlier, that Ms. Fife and others were

18  present at, had described the fact that Lehman representatives

19  had told him and Barclays people that this 15c3-3 account had a

20  billion seven something of -- in it that the SEC had confirmed

21  was available and could be transferred as part of the deal.  On

22  Sunday -- at some point Sunday -- we asked on Saturday when we

23  were at Weil Gotshal -- we said we had heard there was some e-

24  mail that, at least as I thought it had been described that I

25  may have misheard it at the time, we thought it was an email

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 61 of 253

Page 61

1    from the SEC on this subject.  And we asked to see that on

2    Saturday.  And some point on Sunday as I was walking in the

3    hallway at Weil Gotshal -- we had taken over the entire floor.

4    There was nothing else going on except Lehman stuff.  And

5    walking down the hall by the sort of secretarial carol, some of

6    the Weil lawyers -- there may have been other people but some

7    of the Weil lawyers called me over and said we now have this e-

8    mail.  Take a look at it.  And they handed me this e-mail.  And

9    the first thing I saw -- they may have pointed it out to me or

10   I may have noticed it on my own, I don't recall.  The first

11   thing I saw is it wasn't from the SEC.  It was an internal

12   Lehman e-mail that makes reference to a conversation that

13   somebody had with somebody at the SEC.  And one of the people

14   present from Weil, I believe it was Mr. Miller, said take a

15   look.  You'll see of that billion seven sixty-nine, as I

16   recall -- of that amount, one billion is sitting in cash at

17   Wells Fargo.  And I said, Yeah?  And they said nobody seems to

18   know exactly what Lori -- Ms. Fife told the -- told Judge Peck

19   on Friday evening when she was describing that the retained

20   cash was no longer in the deal.  And the question is do you

21   know what she said?  Did she say something that would seem to

22   exclude this billion dollars of cash.  And I said, I don't

23   recall.  I remember her describing that the retained cash

24   concept had dropped out of the deal because Lehman didn't have

25   any cash.  I mean, that was why it had dropped out, we were

Page 62

```
1    told.  It didn't have any free cash available for these to run

2    the business.  And I said is there any way to get a transcript

3    of what exactly happened on Friday.  And they said they were

4    going to try.  And there were a couple of conversations over

5    the course of several hours.  I don't know if there were two

6    conversations or three conversations, all in the hallway.  We

7    never talked about this in the room; it was always in the

8    hallway.  And at some point we learned that it was not feasible

9    to get a transcript, that the courtroom was locked, that the --

10   it was a tape that would have been there and it would have been

11   in the courtroom and we had no way to get that.  And again, the

12   three -- the two or three -- I think there were three

13   conversations, sort of merge in my mind, so I don't remember

14   precisely in what order these things happened.  But the point

15   was made by Mr. Miller legitimately that if we didn't know,

16   could we transfer this billion dollars or would it be

17   inconsistent with what Your Honor had been told about it.  And

18   it was a problem.  I recognized it was a problem.

19        And at some point, in one of the -- after -- certainly not

20   in the first conversation, but at some point when this group,

21   this ad hoc group and more people this time reassembled in the

22   last conversation on the subject, among those present were

23   Michael Klein, my partner, Ed Rosen, and various other people.

24   Instead of being four or five people, it was now ten or twelve

25   people as best as I recall.  And Mr. Klein, or maybe it was Mr.
```

Page 63

1    Cox -- if he was there, I don't recall -- said, okay, we will -
2    - we will give up the cash on the, like --
3    Q.   The billion dollars cash.
4    A.   The billion dollars of -- yes.  We were talking about that
5    piece of -- that e-mail that I'm sure is probably in one of
6    these documents here somewhere.  But we were talking about that
7    e-mail, that billion dollars, and we were going to give up that
8    billion dollars that we had thought as of Friday we were
9    getting to help ameliorate the shortfall.  And we would give
10   that up.  But -- and then Weil -- somebody from Weil raised the
11   issue of, well, okay.  But even 769 of securities -- don't we
12   need SEC approval for that?  And Ed Rosen, my partner, said no,
13   you don't need that.  That's not required.  And Mr. Miller or
14   one of his colleagues, but I think it was Mr. Miller, said
15   well, I'm not sure that's right.  And Ed repeated his strong
16   view that we did not need approval.  And then someone
17   suggested, I think on the Weil side, well, can we at least put
18   in language that says subject to applicable law.  And hard to
19   argue with that and we agreed to put in that the 769 transfer
20   of those securities was subject to applicable law.  And then
21   Michael Klein said something, but we've given up the billion.
22   We want to make sure we get the 769.  If we can't get it there,
23   we should get it some other way.  And Weil people said okay.
24   And that was the conversation.
25        I've lost track of the question.  I hope I've answered it.

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 64 of 253

Page 64

1    Q.   And in terms of that proposal that Barclays would get that

2    769 million in that event that there was a government approval,

3    were words added as a result of that conversation to the

4    clarification letter, "or securities of substantially the same

5    nature and value"?

6    A.   Yes, it was.  The first draft -- so after the conversation

7    I've just testified to, Weil, at some point, showed us a draft

8    that headed those words but said "substantially the same

9    nature" and we looked at it and said, what does that mean.

10   "Substantially the same nature"?  If you don't say how valuable

11   it is, that doesn't mean anything.  It'd be the same nature and

12   one dollar of securities.  That's not what we talked about in

13   the hallway.  And they put in the words "and value".

14   Q.   Did anyone suggest in those conversations or in any other

15   conversations Sunday that the clearance box assets would be

16   removed as purchased assets as a result of a DTCC letter

17   agreement?

18   A.   Never suggested it at any time.

19   Q.   Were you aware Sunday night of a letter agreement between

20   Barclays and the DTCC?

21   A.   I knew it was being worked on.  I was not personally

22   involved in that.

23   Q.   Let me ask you about the termination of the repo.  Do you

24   recall whether there came a time over the weekend before

25   closing when Barclays terminated the replacement repo?

Page 65

1    A.    Well, what -- I mean, certainly it terminated when we

2    closed on Monday.  I recall being told at some point that

3    somebody -- that someone within Barclays, some back office

4    person, had sent a letter that talked about that and said that

5    and that that was unintentional.  And so, a provision went in

6    to the clarifying letter making void -- I'd have to find the

7    provision in here -- but undoing whatever was in that back

8    office letter, yes.

9    Q.    Were there discussions with Weil Gotshal about that back

10   office letter and the inadvertent notice that was sent?

11   A.    I think there was.  I mean, we couldn't have put -- they

12   were controlling the master.  We had to explain why we -- that

13   we were putting it in.  And they agreed to it.  I don't

14   remember any detailed conversation.

15   Q.    Let me ask you to turn to paragraph 13.3 in the

16   clarification letter.  Section 13.

17   A.    Yep.

18   Q.    And do you see the words "Barclays' repurchase agreement

19   shall terminate additionally the notice of termination relating

20   to the Barclays' purchase agreement dated September 19th is

21   hereby deemed rescinded and void ab initio in all respects."

22   A.    Yes.

23   Q.    Is that what you were referring to?

24   A.    That's the clause I was referring to, yes.

25         (Pause)

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 66 of 253

Page 66

1   Q.   Following those discussions or perhaps in parallel on

2   Sunday, do you recall a dispute between Barclays and JPMorgan

3   that was threatening to derail the closing after His Honor

4   authorized the sale?

5   A.   Yes, I do.

6   Q.   What was that about?

7   A.   Well, one of the things that -- in order for this deal to

8   work, and it was important from everyone's perspective, is that

9   when the deal closed, people who had trades on either side with

10  Lehman and the like that Barclays would step into their shoes

11  and that things would smoothly happen.  And a term I had never

12  heard used in this context before was that the "pipes had to be

13  open" to permit trading.  I've never thought of trading as

14  required pipes but so it did.  And that -- that had

15  implications for clearing and the like.  And as I recall,

16  Lehman cleared through JPMorgan and JPMorgan said we've got to

17  work out how we're going to do that.  We're not prepared to

18  keep clearing.  And there was an issue of substance relating to

19  the repo that something had -- as I testified earlier, at some

20  point Thursday night, I learned over the weekend that the

21  repo -- when Barclays agreed to take the Fed out and replace it

22  as provided with financing, it was done late in the day.  And

23  even though things may have stayed open late, not the entire

24  repo had -- in all of the securities that Barclays had thought

25  they were supposed to get Thursday night had not come across.

1    There was a shortfall, a very substantial shortfall.  I no

2    longer remember the amount.  But there was -- it was well into

3    the billions of dollars of securities that had not been

4    received.  And so, Barclays said well, we need to get the rest

5    of the security for our loan to Lehman.  And there was a

6    dispute between JPMorgan and Barclays as to whether or not we

7    were going to get that.  And it led to major discussions and

8    negotiations, at some point in separate rooms.  By this time,

9    it was late at night.  The Fed and the SEC had been advised all

10   weekend about the status of the discussions and what was going

11   on.  On this issue, someone -- and I believe on behalf of

12   Barclays but it may have been JPMorgan; it may have been

13   Lehman, I don't recall -- had advised the Fed and the SEC of

14   the problem.  At some point, they had offered, can we try to

15   mediate, try to encourage people to figure out a solution to

16   this problem.  This had led to in a big board room at Weil, to

17   a big open conference -- a big conference call was set up.

18   Lots of people were talking from the ceiling including people

19   from the Fed and from the SEC.  There were people from, either

20   in the room or on the phone, from JPMorgan, from the creditors'

21   committee, I believe and the trustee.

22   Q.   And did this address the securities that JPMorgan was

23   considering -- proposing to transfer to Barclays to complete

24   the repo that --

25   A.   So --

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 68 of 253

Page 68

1    Q.    -- the part that hadn't --

2    A.    Well, the problem was -- we didn't talk about the details

3    on that.  But the problem was asserted -- and at some point,

4    they said well, why don't -- everyone agreed that JPMorgan and

5    Barclays would go off in a room and try to work this out.  And

6    at some point in the middle of the night -- we kept

7    occasionally bringing the SEC and the Fed up to date.  And at

8    some point reported that a deal had been reached between

9    JPMorgan and Barclays in which JPMorgan -- that was described

10   to the -- in general terms to the open mic and that would

11   permit the pipes to open on Monday morning, it was believed.

12   Q.    Do you recall whether JPMorgan had proposed providing

13   Barclays with a security referred to as "racers"?

14   A.    Well, that came a few hours later.  So they said okay,

15   we'll transfer the rest of the securities to you.  And there

16   were some other things.  We agreed to settle a litigation.  And

17   there were some other odds and ends as part of that deal that

18   was described at 3 in the morning or whenever it was.  And

19   since they were now going to deliver the rest of these

20   securities, one of the things is they had brought down a list

21   and they were now going to show us this list so we could get

22   comfortable before 8 a.m. because we had not seen the list of

23   what they were going to deliver.  And at some point between 3

24   a.m. and 6 a.m. -- I would say 6:30 -- I don't know.  But in

25   those hours, one or more of the Barclays people who were

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 69 of 253

Page 69

```
 1   familiar with the kind of assets and trader types looked at

 2   this schedule that JPMorgan had provided and was dismayed

 3   because when they saw it, there were securities including

 4   something called razors or racers or something like that which

 5   was some sort of structured security that Barclays had thought

 6   had limited, if any, value potentially.

 7       And there were other things -- and that was a big part.

 8   It wasn't a little part of the missing collateral.  It was a

 9   big portion of it.  And they thought it had limited value.  And

10   they thought that this wasn't what we had been told the Fed

11   security had been.  They were different assets than we had been

12   led to believe.  And so we were dismayed.  We -- Barclays was

13   dismayed.  I was dismayed, too.

14   Q.   Barclays was unwilling to accept those securities?

15   A.   Yeah.  They said this doesn't fly.  And so, we -- at

16   least -- there might have been some JPMorgan person who left

17   but the senior decision make -- who had stayed and were still

18   at Weil Gotshal.  But at least some of the senior JPMorgan

19   people had left physically.  And the Barclays team talked and

20   decided that this was unacceptable.  And we arranged to set up

21   a conference call with JPMorgan.  I don't know who else was on

22   it -- in which we gave JPMorgan three choices of how to

23   proceed.

24       As I recall, one was that they go back and transfer us the

25   securities that had been the securities that the Fed have had
```

Page 70

1    securing their repo to the extent we hadn't gotten them.  The

2    second was that we have a provision that if we would go to an

3    arbitrator -- we would close on the basis of what they had

4    given us.  And then we would go to some -- we would agree now

5    as to who -- some arbitrator at some independent firm or

6    whatever would, in effect, arbitrate.  And to the extent they

7    agreed with our view and there was a shortfall in the position

8    that JPMorgan would make up the difference.  Or the third

9    choice was that the -- remember, we had -- when we had taken

10   the repo, we had provided cash, forty-five billion or so of

11   cash and was supposed to get back all of these repo securities

12   that were -- we thought what the Fed had.  And the cash -- so

13   we had paid too much cash, in effect, because we hadn't gotten

14   all these securities.  And that cash, we believed, was in a

15   bank account at JPMorgan and that we would get the cash back

16   for the shortfall.  So those were the three choices that we

17   proposed to JPMorgan at -- I think it was already light.  I

18   think it was like 7 in the morning.  And JPMorgan said, okay.

19   We'll do the cash approach.  And that was the basis of how we

20   were -- thought we were closing Monday morning.

21   Q.   Was the clarification letter also completed that morning?

22   A.   Yes.  It was everything -- it was all being done at the

23   same time, yes.

24   Q.   Very early in the morning?

25   A.   Very early in the morning.

Page 71

1   Q.   Was there a discussion among the lawyers at Weil Gotshal,

2   to your knowledge, concerning whether to go back to Judge Peck

3   for his review of the clarification letter that had been agreed

4   by the parties that morning.

5        MR. GAFFEY:  Objection, Your Honor.  There's been no

6   foundation for that as framed.  I believe Mr. Schiller may have

7   misspoken when he asked if there was a discussion amongst

8   lawyers at Weil Gotshal.  Do you mean -- I wouldn't object to

9   the question if it was a discussion with lawyers at Weil

10  Gotshal.

11       THE COURT:  Well, that's really parsing it finally.

12       MR. GAFFEY:  I'm watching the screen very carefully,

13  Your Honor.

14  Q.   Was there a discussion among the lawyers at Weil Gotshal?

15       THE COURT:  I think the question is really fine.  And

16  the -- I'll overrule the objection.  The question is whether

17  there were any discussions when the lawyers were gathered at

18  Weil Gotshal on that subject.  Isn't that what the question is

19  asking?  And with that understanding of the question, do you

20  have --

21       MR. GAFFEY:  I have no objection to that, Your Honor.

22       THE COURT:  Fine.

23  A.   They were both with the Weil Gotshal lawyers and at Weil

24  Gotshal.  Yes.  There was a discussion at some point Sunday

25  morning.  Let me step back to the 15c3-3 discussion and the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 72

1    like that I testified to earlier that took place sometime

2    earlier on Sunday.  In that context with the billion dollars in

3    that cash bank account that was mentioned and we didn't have a

4    transcript and the like and -- it was mentioned therefore that

5    unless we all got comfortable that what Ms. Fife and Mr. Miller

6    had told the Court on Friday would not seem -- about the

7    retained cash concept -- unless we were comfortable that it

8    might not tend to pick up this billion dollar bank account once

9    the SEC said it could be used for other purposes, in that

10   context if we had said we insist on the billion dollars, the

11   concept had come up that we would have to go back to the Court

12   which raised a timing issue given the desire to get this closed

13   before the opening on Monday morning.

14        But there was a later more general conversation some

15   point -- some point in the middle of the night Sunday night,

16   Monday morning -- I can't put a time on it.  I think it was

17   very early Monday morning in which there were a number of us in

18   a room.  Mr. Miller came into the room.  It was mostly his

19   colleagues.  I was present.  Some of my colleagues may have

20   been present.  There may have been other people there, I don't

21   recall.  And Mr. Miller said something to the effect -- I don't

22   remember his words but said something to the effect, it seems

23   to me that we haven't done anything in this clarification

24   letter in consistent with what we told the Court, that we don't

25   have to go back.  We can close as desired without having to go

Page 73

1    back to the Court.  Does anyone disagree?  And most of us don't

2    like to disagree with Mr. Miller.  But no one did disagree.

3    And that was -- and we proceeded on that basis.

4    Q.   Let me ask you a question.  I asked Mr. Miller during this

5    trial -- I read to him a comment, an assertion, presented to

6    Judge Peck on April 9th, during the parties' opening arguments

7    as to this decision that you've just testified about.  At page

8    58, line 1 through 3, movants' counsel said, and I quote, said

9    to Judge Peck, "But the fact remains not bringing the

10   clarification back to Court is a mistake and an egregious one."

11        What is your comment on that assertion?

12   A.   I don't -- at the time when Mr. Miller -- the conversation

13   I just testified to when he said what he said then seemed right

14   to me.  I didn't think we had changed any of the substance

15   certainly to the negative to the estate.  So it didn't seem to

16   me we needed to go back then.  And I agree with Mr. Miller's

17   testimony.

18   Q.   In the week after --

19   A.   And so I disagree with that -- movants' assertion, to

20   answer your question.

21   Q.   In the week after the clarification letter was filed --

22   and it was filed on Monday, I take it?

23   A.   Yes.  It was filed I think early Monday.

24   Q.   At any point, in the week after that, do you know whether

25   the Court or Barclays or Lehman was told that the clarification

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 74 of 253

Page 74

1    letter was inconsistent with what Weil Gotshal had presented to

2    the Court on September 19th?

3    A.   I never heard anyone assert that until many months later,

4    no.  Nothing in that week.

5           MR. SCHILLER:  Thank you.  Thank you, Your Honor.

6           THE COURT:  Thank you.  Cross-examine, please.

7    CROSS-EXAMINATION

8    BY MR. GAFFEY:

9    Q.   Good morning, Mr. Lewkow.

10   A.   Good morning.

11   Q.   How you doing for water up there?

12   A.   I'll need another one in due course.  But I --

13   Q.   All right.  We're going to bring you --

14   A.   No, no.  I can't take --

15   Q.   No.  That's okay.

16          MR. GAFFEY:  Sorry.  Your Honor, if we might approach

17   with witness binders for Mr. Lewkow and for the Court.

18          THE COURT:  Binders only, no water.

19          MR. GAFFEY:  No water, okay.

20          THE COURT:  Thank you.

21          THE WITNESS:  Can I put the other -- Mr. Gaffey, can I

22   put the other --

23          MR. GAFFEY:  You may need access to that.  I'm going

24   to ask -- this is heavy.

25          THE WITNESS:  Okay.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 75

1    Q.   What you have before you, Mr. Lewkow, ought to be two

2    binders.  One has your name on it, one just says witness

3    binder, and I'll be referring to them from time to time, as

4    well as to the binder that Mr. Schiller --

5    A.   I only --

6    Q.   -- gave you.  You'll get the other one --

7    A.   I only have one so far.

8    Q.   You have the second one now.

9    A.   Second one's coming, all right.

10   Q.   For the record, sir, I'm Bob Gaffey from Jones, Day.  I

11   represent the debtor.  You said, Mr. Lewkow, that you first

12   contacted by Barclays on or around September 12th?

13   A.   That Friday morning, yes.

14   Q.   That's just before the bankruptcy weekend, yes?

15   A.   Correct.

16   Q.   And had you done work for Barclays before?

17   A.   I had not done work, any significant work for Barclays

18   prior to that, no.

19   Q.   So you and I take it, your team, sir, are meeting your

20   Barclays clients for the first time on the 12th and in that

21   initial work you did over the weekend on the firs?

22   A.   That's correct.

23   Q.   Okay.

24   A.   I had not met them previously.

25   Q.   And I'd like to address an issue Mr. Schiller started with

Page 76

1    regard to whether the United States Government guaranteed

2    Barclays' risk -- I think you said -- you described the

3    Thursday night -- that would be the 18th, the Thursday night

4    where Barclays stepped into the shoes of the Fed on a

5    repurchase agreement?

6    A.   Correct.

7    Q.   Okay.  That was not something of which you were aware

8    contemporaneously?  You didn't know about that on the 18th,

9    right?

10   A.   No, I didn't learn about that until some time on the next

11   day, the 19th, I believe.

12   Q.   Okay.  And no one from Cleary Gottlieb, as far as you

13   know, was involved in any way in the negotiations of that step,

14   of Barclays stepping into the shoes of the Fed repo?  Is that

15   right?

16   A.   I believe that's correct.

17   Q.   And nobody from Cleary Gottlieb was involved in

18   documenting the repo, correct?

19   A.   I believe that's correct.

20   Q.   And nobody form Cleary Gottlieb was involved in any way in

21   valuing the assets that were in the repo, correct?

22   A.   At no point were we involved with valuing assets, that's

23   correct.

24   Q.   And that's true both with respect to the assets in the Fed

25   repo that existed before Barclays stepped into the shoes,

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 77 of 253

Page 77

1    right?

2    A.    We never valued any assets; that's not our job.

3    Q.    Now, you mentioned in response to Mr. Schiller's question

4    that the Fed had offered to Barclays an opportunity to come to

5    the window and get financing once it had stepped into the repo

6    shoes.  Yes?

7    A.    Well, I think what I testified to, I hope, is that as I

8    underst - came to understand it Friday or Saturday -- I

9    don't -- again, I wasn't there at the time as I've already

10   indicated, but as I came to understand it, on Thursday, the Fed

11   went to Barclays and said we want you to take us out of this

12   thing, this repo where we are providing the financing to

13   Lehman.

14        And, you know, forty-five billion dollars, I guess,

15   Barclays did not have sitting around available and so the way

16   it was done was that Barclays itself borrowed from the Fed

17   window which it was qualified to do as had Lehman Brothers.

18   And it was - so the Fed was dealing with Barclays and Barclays

19   was dealing with Lehman, rather than the Fed being -- dealing

20   directly with Lehman.

21   Q.    So, once Barclays takes the collateral to the Fed window

22   and gets it financed, Barclays is essentially stepping into

23   Lehman's shoes?  Now it's the borrower, the Fed's the lender

24   and the collateral is with the Fed, right?

25   A.    Well, I don't know what collateral -- whether it was

Page 78

1    identical collateral that Barclays provided to the Fed or it

2    was other collateral.  I don't know the answer to that.

3    Q.   I take it, then, you --

4    A.   But in any event, it was Barclays' credit rather than

5    Lehman's credit to the extent there was a shortfall and

6    obviously Barclays had better credit.

7    Q.   I take it from your comment that you're not aware of the

8    exact collateral that you -- neither you nor anyone at Cleary

9    were involved in the taking of these steps and advising

10   Barclays with regard to these steps?

11   A.   I was not -- I'm not absolutely sure about my colleagues,

12   but I certainly was not.

13   Q.   Now, you spoke to Mr. Schiller too, sir, about the pace of

14   the negotiations saying all of it was being done very quickly,

15   things were unusually transparent and it was a very complex

16   deal.  I'm summarizing.  Do you recall that portion of your

17   testimony?

18   A.   I do.

19   Q.   And you mentioned that there were disagreements; one of

20   the disagreements -- one of the things that had to be

21   negotiated was the size of the breakup fee.  Do you recall

22   that?

23   A.   Yes, I did.

24   Q.   Okay.  And representing the purchaser, sir, you came into

25   that negotia -- you had that negotiation with Mr. Shapiro, is

that right?
A. I don't -- my recollection is that it was done in a room, in that room that I've talked about earlier. There were a number of people there who spoke most vociferously at any one point in time. I don't recall if it was Mr. Shapiro or somebody else.
Q. In any event, in the negotiations that took place with regard to the breakup fee, you took the position that you wanted as big a breakup fee as you could get. Yes?
A. Absolutely.
Q. That's the role you would play in representing the purchaser?
A. Right. One that we thought could be approved by the Court. We didn't want to ask for something that was totally ludicrous.
Q. And do you recall, sir, that in the negotiations about the breakup fee, you arrived at an agreed breakup fee of approximately 125 million dollars?
A. I would have to check the number but we did reach an agreement as to the number --
Q. All right. We can come back to the number, sir, I won't take your time now. But do you recall that in discussing the size of the breakup fee, the Lehman negotiators took the position that among the things that needed to be considered was the amount of cure liability that Barclays was undertaking?

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 80 of 253

Page 80

1    A.   Well, I don't recall that being brought up in the

2    negotiations.  I think as -- my recollection is not terribly

3    vivid on this point; my recollection is we wanted more and they

4    wanted less.

5    Q.   And beyond that sort of familiar position to the buyer and

6    a seller, do you recall what the nature of the conversation was

7    about how you got to an agreement on the breakup, then?

8    A.   I don't recall those discussions.

9    Q.   Did you attend the sale hearing on the 17th of September?

10   A.   Yes -- is that called the sale hearing, I --

11   Q.   You know, I --

12   A.   -- terminology --

13   Q.   -- it's not.  I misspoke.

14   A.   Okay.

15   Q.   Did you --

16   A.   I was present in this courtroom on the 17th, yes.

17   Q.   And so I'm clear and don't confuse the record with my

18   questions.  There were two hearings that week; one was the

19   Wednesday, one was the Friday, yes?

20   A.   Right, and on Wednesday the 17th, one of the matters for

21   the Court was to approve the breakup fee and the DIP loan and

22   some other various things.

23   Q.   And do you have a recollection of the portion of the

24   hearing on the 17th where the breakup fee was the subject of

25   discussion?

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 81 of 253

Page 81

1   A.   I remember it, yes, just generally. I don't remember the

2   details, but yes.

3   Q.   And do you recall that one of the questions that the Court

4   asked with regard to that portion of the proceedings was how to

5   assess the overall value of the transaction?

6   A.   I know there was general discussion on that subject; I

7   can't remember precisely what His Honor asked and what the

8   exact formulation was, but I do recall that one of the issues

9   was in looking at the breakup fee in accordance with the way

10  Bankruptcy Courts normally look at breakup fees.  It required

11  some consideration of what was the value of the deal, yes.

12  Q.   And one of the things that was taken into account in

13  describing to the Court the value of the deal was the estimated

14  cure liability that Barclays was assuming as part of the

15  transaction, is that right?

16  A.   Yes.

17  Q.   And another aspect that was described to the Court as part

18  of the estimated value of the deal was the compensation

19  liability that Barclays was undertaking.  Correct?

20  A.   Yes, that was referred to also by Mr. Miller, I believe.

21  Yes.

22  Q.   And another aspect of the transaction that was described

23  to the Court in that portion of the proceedings was the price

24  that was being paid for the building.  Do you recall that?

25  A.   Yes, I do.

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 82 of 253

Page 82

```
 1    Q.    Okay.

 2    A.    I believe so.

 3    Q.    And one -- and another component of the transaction --

 4    A.    I'm not sure we had the appraisals yet, by Wednesday, so

 5    I'm not sure we knew the precise amount.  I don't remember when

 6    in that -- I'd be - I'm pretty sure we did not yet have the

 7    appraisals on the building yet.

 8    Q.    Right.  Actually, sir, do you recall a discussion at that

 9    hearing on the 17th about the fact that there was a price

10    agreed, but the buildings had not yet been appraised?

11    A.    It may be, I just don't recall it, no.

12    Q.    Well, then, let me ask you.  Do you have any recollection

13    of the Court specifically asking about the appraisal process

14    with respect to the real estate?

15    A.    I don't recall specifically.

16    Q.    And back to the topic that I was pursuing there for a

17    while, the components that were described to the Court in

18    connection with the breakup fee, we've got the cure assumption

19    of liability, the comp assumption of liability.  I asked you

20    about the buildings.  Was the cash, the 250 million dollars

21    cash, also --

22    A.    That -- I'm sure that was referred to, sure.

23    Q.    Do you recall any mention then, sir, of the post-

24    acquisition costs of running the business being amongst the

25    components of consideration in the deal?
```

Page 83

1    A.    I don't recall.

2    Q.    In you attendance at the hearings at the Wednesday and the

3    Friday, do you recall that being described as a component of

4    the consideration being given in the deal?

5    A.    I don't -- I don't recall.

6    Q.    In response to one of Mr. Schiller's questions, you said

7    that -- when you were describing the structure of the agreement

8    you included amongst the components of value that Barclays was

9    giving, you said, "Barclays was taking on the costs and future

10   of the business and the risk associated with that and the

11   liabilities that would be created in running a business post-

12   closing under an incredibly unstable environment."

13        Do you recall, in essence, that answer?

14   A.    Yes.

15   Q.    And it was your view, sir, that Barclays was purchasing a

16   business in this transaction, yes?

17   A.    That's correct.

18   Q.    All right.  And was it also your view, sir, that the costs

19   that Barclays would incur when it owned that business were

20   somehow value to the seller?

21   A.    I think it's not in the precisely the same way. I think

22   from the seller's perspective their choices, as I understand

23   it, are, what are their alternatives, is there a higher bidder.

24   If not, what would liquidation result in and therefore, as to

25   whether or not it meets the requirements of the Bankruptcy Code

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 84 of 253

Page 84

1    and whether or not the Court would approve it.  I'm not, as I

2    told you in my deposition, I'm not a bankruptcy lawyer by

3    training.

4        So it's not -- it's a cost, it is a risk being undertaken

5    by the buyer.  It is a cost to the buyer.  It doesn't directly

6    flow to the seller except tot the extent that the seller

7    doesn't have to make payments to try to shut down the business

8    or to run the business or whatever.  So it's not quite the same

9    thing, but it is, I think, of some relevance.

10   Q.   So when you describe the post-acquisition cost of running

11   the business as a component of value given in the deal you

12   didn't mean to suggest that such things as paying the electric

13   bill six months after the acquisition was somehow value to the

14   seller, did you, sir?

15   A.   Well, you know, it might be if the seller would have

16   otherwise had to have that as an additional claim against that.

17   In some sense, yes.

18   Q.   Now --

19   A.   But, I -- you know, I wasn't getting into the level of

20   that detail.

21   Q.   Bottom line, sir, and I'm not a mergers and acquisition

22   lawyer, so if I'm simplifying -- over-simplifying this, forgive

23   me.  But at the end of the transaction, in your view, Barclays

24   owns the business, yes?

25   A.   That's correct.

Page 85

1    Q.    All right.  And if there are costs to be incurred in the

2    running of the business, those fall on Barclays' lap, yes?

3    A.    Absolutely.

4    Q.    And if there are profits to be made in that business,

5    Barclays gets to keep them, yes?

6    A.    Absolutely.

7    Q.    And if there's a gain on trading assets, for example, that

8    are transferred, Barclays get to keep the gain, yes?

9    A.    Except as I've testified in the original asset purchase

10   agreement, there was a provision on some of that, but that

11   dropped away as the Court had been told on Friday.  And so they

12   were -- both the gains and the losses, as they might occur

13   to -- on the trading position, were Barclays.  Yes.

14   Q.    And in no sense, sir, did you mean to suggest that the

15   creditors of the bankrupt estate somehow benefited from

16   Barclays undertaking costs of the business post-acquisition,

17   did you?

18   A.    Well, in a sense I did.  I mean, what -- I was testifying

19   a few minutes ago, you gave the example of the electric bill.

20   If, in fact, because Barclays assumed the electrical bill -- I

21   don't know how, for business -- I've never turned off the

22   electricity, I don't know how quickly you can shut that down,

23   et cetera.  But to the extent Barclays was taking those costs

24   over and therefore Lehman didn't have to pay them, therefore

25   the creditors had fewer payments that the estate had to make.

Page 86

1    So in some sense, they benefited.

2    Q.   And do you have any recollection, sir, of that type of

3    analysis being given to the Court on either the 17th or the --

4    A.   No, no --

5    Q.   -- 19th of September?

6    A.   No, I don't.

7    Q.   Now, one of the elements of the structure of the deal that

8    you talked to Mr. Schiller about had to do with this assumption

9    of liabilities for cure.  Do you recall that?

10   A.   I do.

11   Q.   The topic in general.

12   A.   Yes.

13   Q.   And were you privy to any analysis or calculations that

14   Barclays conducted about what it actually would wind up paying

15   in cure costs?

16   A.   No, I was not.

17   Q.   Was anybody at Cleary Gottlieb privy to or invited to join

18   any discussions about what Barclays actually would pay in cure

19   cost?

20   A.   At that point in time, through -- not to my knowledge, no.

21   Q.   And -- so I take it, sir, that through the proceedings

22   here up through the closing, neither you nor any of the lawyers

23   on your team had a concept one way or the other about what

24   Barclays thought it was going to wind up paying in cure cost?

25   A.   No.  What I recall is that Lehman had come up with an

Page 87

1    estimate, Lehman who knew a lot more about the business than

2    Barclays.  I'm not -- wasn't surprised later to learn Barclays

3    was trying to get a handle on, you know, on that but I don't

4    know how much they accomplished at any given point and how

5    comfortable they felt with the conclusions, but we certainly

6    were not aware at that point of how far Barclays might have

7    gotten in that process or what numbers that people might have

8    started to agree to, internally at Barclays.

9    Q.    And with specific reference, sir, to the point before the

10   closing as opposed to --

11   A.    That's what I'm talking --

12   Q.    Okay.

13   A.    -- all of my response to your last question related to the

14   period prior to the closing, yes.

15   Q.    Did it ever come to your attention, sir, that one estimate

16   that Barclays put on its potential post-acquisition cure cost

17   was in the range of 200 million dollars?

18   A.    I had heard something with a number in preparation for my

19   deposition that -- which you took, I was told that there was

20   some piece of paper that I don't recall if I was shown it, but

21   some piece of paper internally at Barclays that indicated a

22   number.  And I don't remember the number, but well below the

23   billion five that had been described as the estimate in -- by

24   Lehman in the court hearings.

25   Q.    And your deposition was taken -- I forget the exact date,

Page 88

1    but about a year ago, right?

2        Actually, less than a year ago.

3    A.   No, I think it was much less than a year ago.

4    Q.   And you saw this piece of paper in connection with

5    preparation for your deposition?

6    A.   I don't know that I saw the piece of paper.  I do recall

7    in preparation -- and I don't recall whether you asked me a

8    question on it.  I'd have to reread the transcript.  But I do

9    recall at or around that time being told there was some, some

10   indication that at least some person at Barclays had put some

11   much lower number on a piece of paper.

12   Q.   I --

13   A.   Some estimate or I don't know whether -- what it was.

14   Q.   I want to go back in time, Mr. Lewkow, to the period

15   before the closing on September 22nd, 2008.

16   A.   Okay.

17   Q.   Had anyone ever told you anything like that before that

18   date?

19   A.   No, that's what I think I've testified.  No.

20   Q.   So the first time you knew there may be any indication

21   Barclays was planning on paying less was when you were told

22   about this in your deposition prep?

23   A.   I'm not sure I agree with your characterization of my

24   prior testimony about them not paying less.  I think, again,

25   the fact -- all I've heard and, you know, I don't know anything

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 89 of 253

Page 89

1    about what's on this piece of paper.  I just had been told that

2    at some point, there's some indication that at least some

3    person had scribbled on some piece of paper some number that

4    was well below the billion five.

5        So, I can't comment on that.  With that as background, if

6    you want to repeat the question, I'll try to answer it.

7    Q.   Having given you all those books, sir, I have to give you

8    another document.

9            MR. GAFFEY:  Your Honor, may I approach?

10           THE COURT:  Yes.  Thank you.

11           MR. GAFFEY:  Thank you.

12   Q.   Mr. Lewkow, I've given you what has been marked as

13   Movants' Trial Exhibit 11.  We could put up on the screen if

14   it's easier for you to see.

15       You made a reference, sir, to a document that had some

16   notes scribbled on it regarding contract costs.  Is that the

17   document you were referring to?

18   A.   I'm sorry.

19   Q.   Let me highlight the notes on the right-hand side there.

20   A.   Right.  I've never seen this document before.

21   Q.   Okay.  You were not shown that document in your deposition

22   prep?

23   A.   No.  I don't believe I was.

24   Q.   You were given to understand there was a document with

25   some scribblings on it that had to do with Barclays -- someone

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 90 of 253

Page 90

1    at Barclays thinking they'd pay less than the amount shown.

2    A.    I'm sorry.  What I testified to was that at some point in

3    preparation for my deposition, someone told me that -- and I

4    don't recall who, that there was some piece of paper that

5    indicated that some person at Barclays had put down on a piece

6    of paper some potential number for cure cost that was well

7    below the billion five that Lehman had estimated and had been

8    referenced in the court hearings.

9    Q.    Okay.  And the billion five you referred to is the

10   estimate you recall being given to the Court, the parties'

11   estimate of what the cure cost would be, is that right?

12   A.    Well, I think it was Lehman's estimate, sir.

13   Q.    let me ask you to take a look at the binder you have in

14   front of you that just says "Witness Binder", not your name.

15   A.    Okay.

16   Q.    And if you would turn within that, sir, to tab number 3.

17   Behind that you'll find a copy of Movants' Trial Exhibit 118,

18   which is the sale motion that was submitted to the Court.

19   A.    Okay.

20   Q.    And let me ask you, sir, did either you or others at

21   Cleary review these sale motion papers before they were

22   submitted?

23   A.    I don't think I did but I do believe that one of more of

24   colleagues did, yes.

25   Q.    And I'd ask you, sir, to turn to page 6 of that exhibit

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 91 of 253

Page 91

```
 1    and you'll find a section entitled "The Purchase Agreement."

 2    Below that is paragraph 14 and then there are some bullet

 3    points.  Let me know when you've gotten there.

 4    A.    I see that.

 5    Q.    All right.  And I'll direct your attention, sir, to the

 6    fourth bullet point entitled "Assumption of Contracts".

 7    A.    I see that.

 8    Q.    And to the last sentence of that which says, "The parties

 9    estimate that the cure cost associated with such assumptions

10    and assignments will be approximately 15 billion dollars."  Do

11    you see that?

12    A.    I do see that.

13    Q.    And you understand this as you read it and understood it

14    at the time to be an estimate that the parties, both parties,

15    gave to the Court on cure cost.  Is that correct, sir?

16    A.    I never read this at the time.  I did not look at this at

17    the time, so I can't comment on any understanding at the time.

18    I see the sentence and it does say what it says it says, but I

19    tell you that whatever it was and whatever it says that it was

20    Lehman's estimate that resulted in that billion five number in

21    there.

22    Q.    So, sir, where it says, "The parties estimate that the

23    cure cost associated with such assumptions and assignment will

24    be approximately 1.5 billion dollars," do you view that as

25    some -- as a misstatement?
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 92

1    A.    I do not have -- I do not know.  What I know is that

2    Lehman had come up with the number.  I don't know what date

3    this was done, I don't know what Barclays -- whether Barclays

4    had formed any preliminary views at that point or not.  This

5    document was produced by Weil, Gotshal.  It was reviewed by one

6    or more of my colleagues and I don't -- it what it is.  I'm not

7    saying it's wrong.  I'm just not saying I read it at the time

8    or I have a view on it.  I hear what you're saying; I still

9    don't know that it wasn't Barclays' estimate at the time.

10        All I'm saying, you know, you've told me there's a piece

11   of paper that has someone's writing which I still hav -- which

12   I've never seen before today.  I had heard there was some piece

13   of paper.  I don't know that this is not true that it was our

14   estimate, Barclays' estimate at the time.  It may not be true;

15   it may be true, I have no personal knowledge.

16   Q.    You don't know one way or the other whether it's so that

17   both parties estimated 1.5 billion dollars in cure cost?

18   A.    I do not believe, to my knowledge, that Barclays had

19   enough information to have an estimate.  Based on what I saw

20   that Tuesday when this was being negotiated.  So, again,

21   whatever's on this piece of paper, it may be inconsistent with

22   that but my understanding was that Lehman came up with this and

23   said it to Barclays and it was their estimate.  It was all

24   going to turn on which contracts we did assume, which ones we

25   didn't.  We had not even started to review that process.

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 93 of 253

Page 93

1        What I recall that one of the issues in one of the

2    hearings -- and I now forget which hearing it was, is that a

3    number of people who had contracts with LBI were in the

4    courtroom and they were -- one of their big concern (sic) was

5    the time period, that they would have a sufficient time to put

6    in their objections and the like.  And Ms. Granfield, my

7    partner, made it clear that we were not going -- that we were

8    going to use an approach that would give people who had

9    contracts sufficient time to make their claims.  And so -- but

10   nobody knew what contracts we were going to assume so I don't

11   know how Barclays could have really had a meaningful estimate

12   and I do see the sentence on the page and it does say that.

13   Q.   And with respect to the calculation of cure amounts, sir,

14   I take it, like asset valuation, nobody at Cleary Gottlieb was

15   involved in that process?  Is that right?

16   A.   We were later involved, after the closing.

17   Q.   Before the closing, sir?

18   A.   No.

19   Q.   All right.  And before the closing neither you nor any of

20   the lawyers on your team participated in coming up with a cure

21   number?

22   A.   That's correct.

23   Q.   And neither you nor anyone on your team reviewed documents

24   that would help anybody calculate the cure amount?

25   A.   We reviewed the sale order application or I forget the

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 94 of 253

Page 94

1   title that you're showing me, somebody did review it.  Whether

2   it was a person who had, you know -- I don't know who reviewed

3   what document, but it woul -- I'm not denying that somebody in

4   my firm reviewed it.  Underlying pieces of paper or information

5   about contracts and what contracts and how much it would cost

6   to cure, I do not believe prior to closing we had any

7   involvement in.

8   Q.   Whatever numbers there were, they were --

9   A.   I do not believe --

10  Q.   -- supplied to you?

11  A.   -- we had any involvement with any numbers.

12  Q.   So whatever numbers there were, were supplied to you by

13  the clients?

14  A.   I don't recall the client providing any numbers to us

15  or -- the only number I recall having heard is the billion five

16  that Lehman estimated.  That's the only number I recall, prior

17  to the hearings, having heard.

18  Q.   And when this set of motion papers was reviewed at Cleary

19  Gottlieb, sir, do you recall anyone there asking anyone there

20  where did this come from, "The parties estimate that the cure

21  cost associated with such assumptions and assignments will be

22  approximately 1.5 billion dollars"?

23  A.   I have no personal recollection of that.

24  Q.   Just on a --

25  A.   As a point of personal --

Page 95

```
 1            THE WITNESS:  Can someone get me a water, please?

 2    Thank you.

 3         Thank you.  Don't touch it, I've been infectious.

 4            MR. GAFFEY:  We can take that down.  Thanks, Steve.

 5    Q.    Now, sir, one of the other components that you talked

 6    about with Mr. Schiller was the assumption of compensation

 7    liabilities, correct?

 8    A.    That's correct.

 9    Q.    And I take it that, again, neither you nor anyone on your

10    team at Cleary Gottlieb participated in the process of

11    estimating or determining what the comp number would be.  Is

12    that right?

13    A.    I certainly didn't.  And, yeah, I think that's accurate.

14    Q.    Like the cure number, that was supplied to you by the

15    client?

16    A.    Well, it was Lehman's number, yes.

17    Q.    Do you know if it was an agreed number between Lehman and

18    Barclays or an estimate?

19    A.    Well, there's language in the asset purchase agreement on

20    this subject.  It was my understanding at the time is that it

21    was an estimate.  As a business matter it was an estimate;

22    there were references, you know, that one -- that sheet -- one

23    sheet, it refers to certain compensation costs that were both

24    reflected on that sheet of paper that I testified to you

25    earlier and accrued.  It had to be both accrued on the books
```

Page 96

```
 1    and on that piece of paper and then we were agreeing to pick up

 2    certain costs.

 3    Q.   Just to be clear about that piece of your testimony, sir,

 4    I'm going to ask you to take a look in the book, tab 6 of the

 5    book in front of you.  It's Exhibit M2.  And that's another

 6    copy of the --

 7    A.   Is the same precise document that I --

 8    Q.   It is, yes.

 9    A.   -- testified about earlier?

10    Q.   It's just got a different tag on it.

11    A.   It's the same precise document then?

12    Q.   Yes.  Okay.  And that's the document you were referring to

13    as the one that's addressed in the asset purchase agreement?

14    A.   I believe so, if -- yes --

15    Q.   If you could take a look at tab 1 of that book, that's the

16    asset purchase agreement, sir.

17    A.   Okay, I remember the asset purchase agreement, yes.

18    Q.   And if you turn to page 35 of that agreement --

19    A.   Sure.

20    Q.   -- which is section 9.1(C) of the agreement.

21    A.   Yes.

22    Q.   And that's the -- just for context, sir, we're going to

23    trun -- if you just turn quickly back to page 34 you'll see --

24    A.   All right.

25    Q.   -- where an Article 9 concerning compensation?
```

Page 97

1    A.    Yeah.

2    Q.    Okay.  And at the top of 35 of section 9.1(C) and you'll

3    see in there a reference to a financial schedule delivered to

4    purchaser.  Do you see that?

5    A.    Yes.

6    Q.    And to your understanding, the financial schedule's that

7    referred to there is the one I just showed you marked as

8    Exhibit M2?

9    A.    Yes, I believe so.

10   Q.    Now, while we have the agreement -- the asset pu --

11   A.    The reason I say I be -- just to be clear, the reason I

12   say "I believe" is -- and I have no reason not to believe you

13   or Mr. Schiller.  My recollection is Berkenfeld -- Mr.

14   Berkenfeld came into the room, had a piece of paper, he may --

15   and he even initialed it, then realized it wasn't right and

16   came in with another one and threw out the first one.  I'm

17   assuming this is the latter one at all that you and Mr.

18   Schiller are showing me.

19   Q.    Let's just nail that down.  Take a look at M2 in the book.

20   That's at tab 6.

21   A.    Yeah, that's -- got here.  Having trouble with this book.

22   Q.    And I'd ask you to take a look, sir, at Mr. Berkenfeld's

23   initials up in the top and I'll represent to you, sir, that his

24   testimony about the word next to the date was "Final."

25         Do you recall now he signed one then came back and signed

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 98

1   another one and wrote final next to it?

2   A.   I don't recall that but it's entirely possible.  I've

3   worked on too many deals and I had too many documents called

4   final and only one of them was final, but I have no reason not

5   to believe that, if that's what he testified.

6   Q.   Okay.  And just to go back to the issue I was asking

7   about.  9.1(C) refers to a financial schedule and as best you

8   can tell us, the financial schedule on the screen, M2, is the

9   financial schedule referred to in 9.1(C), the asset purchase

10  agreement, yes?

11  A.   Yes.  Thanks.

12  Q.   Okay.  Thank you.

13       Now, while you have the asset purchase agreement there,

14  sir, you talked a bit to Mr. Schiller about -- he asked you

15  whether the consideration in the deal was allocated to assets.

16  Do you recall that?

17  A.   Yes, I do.

18  Q.   It was supposed to be, wasn't it?

19  A.   I don't know what you mean.

20  Q.   Take a look, if you would, sir, at section 12.3 of the

21  asset purchase agreement.  Let's see if I can get you a page

22  number.

23  A.   I'll try to find 3.

24  Q.   Asset page 38 --

25  A.   Yep.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 99

1   Q.   -- entitled "Purchase Price Allocation".  Do you see that?

2   A.   Yep.

3   Q.   All right.  And it says, sir, "Seller and purchaser shall

4   allocate the purchase price, including the assumed liabilities

5   among the purchased assets as specified in schedule 12.3 and in

6   accordance with such allocation," et cetera, et cetera.  Do you

7   see that?

8   A.   I do.

9   Q.   Okay.  Do you know if any such schedule was ever prepared?

10  A.   It may have been at some point.  I have no recollection.

11  Q.   Okay.  But having now taken a look at section 12.3 of the

12  asset purchase agreement, does that affect your view that there

13  was no allocation of consideration to the purchased assets?

14  A.   12.3 is a tax provision that's not unusual in deals

15  because -- so as to avoid the purchaser and seller taking

16  inconsistent positions with the IRS.  I don't recall as a

17  business matter, okay, this was saying something's going to

18  happen.  As a business matter, I don't think there was an

19  allocation of consideration.  I am aware this provision is in

20  there, that the parties were supposed to come up with a

21  schedule for tax purposes.

22  Q.   And whatever its ultimate tax benefits might be, it is a

23  provision that required the seller to create a schedule that

24  allocated the purchase price to the purchased assets, correct?

25  A.   Well, it said, "The seller and purchaser shall" -- okay.

Page 100

```
 1    So it wasn't just the seller.  Then the purchaser -- then

 2    there's deliveries and the like --

 3    Q.    All right.

 4    A.    -- but you start with, there had to be an agreement as to

 5    an allocation that was supposed to take place.  I don't know

 6    when if at all that ever took place.

 7    Q.    So the asset purchase agreement that you negotiated

 8    contemplated, for whatever purpose --

 9    A.    Yes, yes.

10    Q.    -- an allocation of the consideration to the purchased

11    assets, yes?

12    A.    For tax purposes, correct.

13    Q.    But it can -- it contemplated an allocation of the

14    consideration to purchased assets, correct?

15    A.    For tax purposes, sir.

16    Q.    For tax purposes, yes?

17    A.    Yes --

18    Q.    Okay.

19    A.    -- I've already testified to that.

20    Q.    Now, on your --

21          MR. GAFFEY:  We could take that down, thanks, Steve.

22    Q.    Now, on your direct testimony, sir, you -- when you were

23    talking to Mr. Schiller about Barclays' undertaking the cost of

24    running the business, you said, and I'm summarizing here not

25    quoting you, that they were doing this in the hope that they
```

Page 101

1    would make it a successful acquisition.  So that's sort of

2    inherent in the nature of the deal.  Do you know if there were

3    buffers built into the deal to help Barclays achieve that hope?

4    A.   I think you have to -- yes, in a sense.  Barclays was not

5    buying a balance sheet of assets; they were not buying a

6    portfolio.  That's not what this deal was about.  This deal was

7    about buying a business.  For Barclays to move to the United

8    States and become a major investment banking firm, which is was

9    not.  It had a small presc -- I mean, Barclays is a great --

10   PLC is a great bank in the U.K. and they do other things around

11   the world and they had certain businesses in the United States,

12   but they were not a major investment banking broker-dealer

13   party in the United States.

14        They were doing this to change that.  They were doing this

15   to become a major player in the U.S. markets as a broker-

16   dealer.  They had started on the prior Friday about buying the

17   Worldwide Investment Banking business.  That proved impossible

18   and so we continued and here we are.  But, that is what they

19   were trying to do.  There was no buffer as to whether that was

20   going to be successful.  There was no guarantee that was going

21   to b successful.  I mentioned my GE-Kidder, Peabody example and

22   the like.  There is no guarantee of that.  Okay?

23        But one aspect of the deal is we were being asked to

24   assume these trading positions as part of the deal that Lehman

25   had both long positions and short positions and as indicated, I

Page 102

 1    think Mr. Schiller asked me about the press release that

 2    Barclays put out in London Wednesday morning that had a number

 3    of, like, seventy-two billion and a number of sixty-eight

 4    billion, which is the word -- you're using the word buffer.

 5    It's not a bad word.  In their -- I don't remember the word

 6    buffer being used at the time, but the concept -- I did

 7    understand that the net long positions exceeded the net short

 8    positions.  It didn't include our interest in the resis which

 9    were substantial.  It didn't include the retained cash we were

10    supposed to get and yes, the set of those assets, which was

11    just a part of the deal, the positive exceeded the negative.

12    Q.    And the press release -- I'm sorry with all the books.

13    But you have the -- you should have the book in front of you

14    that says "Witness Book" without your name.  Does that --

15    A.    That's what I have.

16    Q.    Okay.  Turn to tab 8 of that, please, Mr. Lewkow.

17    A.    Yes.

18    Q.    And you'll find behind it a copy of Movants' Exhibit 133.

19    Just, could you tell us, sir, is that the press release you're

20    referring to?  Look through the document, if you would.

21    A.    It looks -- it certainly looks like it, yes.

22    Q.    And you'll see in the second paragraph of the text of the

23    press release, you'll see a reference to seventy-two billion

24    and sixty-eight billion --

25    A.    As --

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 103

1    Q.   -- describing the long and the short positions, yes?

2    A.   -- as -- well, as current -- current, an important word,

3    and estimated, an important word.  Yes.

4    Q.   Okay.  So the current estimated value of the long and the

5    short positions on the 17th of September was seventy-two and

6    sixty-eight, that's --

7    A.   That's what the press release says, yes.

8    Q.   All right.  And that's -- the difference between that long

9    and that short position are what I've called the buffer and

10   you've said isn't a bad word?

11   A.   It's approximately right, yes.

12   Q.   Okay.  And do you know the source of the seventy-two

13   billion dollar number there, sir?

14   A.   I don't know precisely how it was calculated.  It was in

15   an order of magnitude, certainly correct.  In terms of the

16   spread there and the numbers, but I don't know precisely how

17   they calculated it.

18   Q.   I'm asking a question slightly different from that.  I see

19   the spread between the seventy-two and the sixty-eight.  I'd

20   like you to focus on the seventy-two.  Do you --

21   A.   Yes.

22   Q.   -- know how the seventy-two was calculated?

23   A.   I don't.

24   Q.   Okay.  Do you know who calculated it?

25   A.   I don't.

Page 104

1    Q.    You were -- do you know, sir, if that seventy-two billion

2    dollar number already reflects a mark down, a write down, a

3    diminishment from Lehman's book value to reflect Barclays' view

4    of the value of the long position?

5    A.    I don't know.  I have testified that the marks that

6    Barclays -- that Lehman originally gave Barclays which

7    purported to be as of the prior Friday night, that Barclays on

8    Monday and Tuesday had long conversations with -- between

9    Barclays traders and Lehman traders in which -- that were

10   talked about openly throughout the floor up at Lehman in which

11   Barclays made it clear that it believed that those marks were

12   not appropriate and you heard my giving the one example which I

13   think I gave on my deposition as well, that stood out in my

14   mind of a particular example with the senior tranche and the

15   junior tranche.

16   Q.    I --

17   A.    But I don't know how this was calculated.

18   Q.    All right.  What you do know --

19   A.    I already testified.  I don't know how this was

20   calculated.

21   Q.    What you do know is that during the negotiations of the

22   transaction, there were-- Barclays negotiators -- Barclays

23   folks discussing with Lehman folks whether or not Lehman's

24   marks were overstated.

25   A.    Yes, I do recall that.

Page 105

1    Q.   And what you were also aware of, sir, was that in those

2    discussions, the Barclays folks were expressing the view that

3    they were?

4    A.   That's correct.

5    Q.   And you came to understand, did you not, that when -- that

6    Barclays said it wouldn't do a deal unless Lehman took a fresh

7    look at its books to determine whether Lehman's marks needed to

8    be revised?  Isn't that right?

9    A.   I'm not sure I'd use quite those words, but in concept,

10   yes, they were not prepared, as I understood, to move forward,

11   given the fact that they thought those marks were totally

12   unjustified.

13   Q.   And to use your words, sir, Barclays was not prepared to

14   do a deal with Lehman where there were overestimated marks on

15   the Lehman books of large amounts.  Correct?

16   A.   I think that's correct, yes.

17   Q.   Okay.  And as a result of these negotiations, you came to

18   understand that Lehman's marks were adjusted to reflect

19   Barclays' view of their lower value, isn't that right?

20   A.   No, what I -- not quite.  What I came to understand was

21   that Lehman acknowledged that we were going to use a lower

22   number for purposes of the deal because they understood where

23   we were coming from.  And they got comfortable that using a

24   lower number was appropriate and I believe they said they were

25   going to take the marks.  Whether they actually took them or

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 106 of 253

Page 106

1    not I had no way of knowing -- it's -- what was done is the

2    back office.  I didn't even know if Lehman, you know, in that

3    craziness of those couple of days, whether anyone was doing the

4    back office --

5    Q.    You don't know --

6    A.    -- kind of work at that point.

7    Q.    -- one way or the other?

8    A.    No, I don't.  Absolutely not.

9    Q.    And you have no way of knowing whether Lehman changed its

10   book value -

11   A.    I --

12   Q.    -- to reflect those discussions?

13   A.    I do not know if that actually happened, no.

14   Q.    And do you know, sir, if the seventy-two billion dollar

15   number in the press release reflects this negotiation between

16   Barclays and Lehman to reduce the Lehman marks?

17   A.    Well, I'm not sure I would use the word "negotiations",

18   Mr. Gaffey.  As --

19   Q.    Let's find a word.  Discuss -- discussion?

20   A.    Fine.

21   Q.    Okay.  Do you know if this seventy-two billion dollars

22   reflects the discussions between Barclays and Lehman where

23   Barclays allowed -- as how Lehman's books were overstated?

24   A.    I'm not certain, no.

25           MR. GAFFEY:  Your Honor, would this be a convenient

Page 107

1    time for a break?

2           THE COURT:  Absolutely.  We'll break for lunch,

3    resuming at 2 o'clock.

4           MR. GAFFEY:  Thank you, Your Honor.

5       (Recess from 12:36 pm until 2:02 p.m.)

6           THE COURT:  Be seated, please.

7           MR. GAFFEY:  May I proceed, Your Honor?

8           THE COURT:  Please proceed, Mr. Gaffey.

9    RESUME CROSS-EXAMINATION

10   BY MR. GAFFEY:

11   Q.   Now, Mr. Lewkow, in your direct testimony this morning,

12   Mr. Schiller asked you if there were representations or

13   warranties concerning the value of the assets as part of this

14   transaction; do you recall that?

15   A.   Yes, I do.

16   Q.   Did you consider the statements made to the Court with

17   regard to the description of the values in the deal to be a

18   representation of any kind?

19   A.   I think the description of -- to the Court were -- was

20   important because the Court was hearing about it.  I don't

21   think -- I think, as -- my understanding and recollection is,

22   on the whole, and it doesn't mean that every time all the

23   caveats were put in, but I think it was made clear by Mr.

24   Miller and Ms. Fife that this was mostly in the nature of

25   estimates.

Page 108

1    Q.   You told Mr. Schiller this morning that you understood

2    that, were there a misstatement in the court, you had an

3    obligation to speak up and correct it, or to talk to Weil and

4    correct it, but to have it corrected, do you recall that?

5    A.   I said something along that line, yes.

6    Q.   All right, and in that sense, sir, did you consider the

7    descriptions that were given on the 17th and the 19th of the

8    transaction to be representations that warranted your review

9    for that purpose, were they correct or not correct?

10   A.   Well, I think they were clearly important, but I think

11   they were made clear that they were not absolute statements of

12   value.  I think they were made clear by Mr. Miller and Ms. Fife

13   that they were estimates.  And Mr. Miller, on the 19th, talked

14   about the repetity (sic) of how things had been changing and

15   was continuing to change.  So I thought they were important.

16   And if something definitively wrong was said, I would have

17   thought it would have been appropriate to address, yes.  But I

18   don't think those were representations as to actual value.

19   Q.   Just to drill down on this a little bit, I want to review

20   with you what were and were not representations to the Court.

21   You agree with me, do you not, sir, that the sale motion that

22   we looked at a little while ago was a representation to the

23   Court about the terms of the transaction that was asked (sic)

24   to approve, is that right?

25   A.   I think what I would say, as I -- obviously the sale

Page 109

1   motion was important.  There was a lot of documents that were

2   prepared quickly.  I think that it's all -- in a totality, I

3   think what was essential and, I think, happened is that the

4   Court, in the totality, got the facts about the deal.  And I

5   don't think if in one particular sentence in one particular

6   document it doesn't necessarily use the same words as used

7   somewhere else, written or oral, that that raises to that

8   magnitude.  But they were all important documents, sure.

9   Q.   We may be at slightly cross-purposes here, sir.  What I

10  wanted to talk about were means and mechanisms of describing to

11  the Court the transaction.  You agree with me, do you not, that

12  the sale motion that was filed was one means or mechanism of

13  describing the transaction to the Court, yes?

14  A.   I believe so, yes.

15  Q.   All right, and you agree with me, do you know, that the

16  representations made to the Court at the hearing on the 17th

17  were means and mechanism of describing the transaction to the

18  Court?

19  A.   What I'm resisting is the word "representations".  I

20  believe everything that Mr. Miller or anyone else said to the

21  Court were important; I agree with that.

22  Q.   My question, sir, was means or mechanism or describing.

23  The word "representation" wasn't in there.  Do you agree that

24  the hearing on the 17th of September was the means or mechanism

25  of describing the transaction to the Court?

Page 110

1    A.    Absolutely.

2    Q.    All right, and you agree with me, do you not, that the

3    sale hearing on the 19th was another means or mechanism of

4    describing the transaction to the Court?

5    A.    I do.

6    Q.    And in addition to the sale motion that was filed, the

7    hearing that was held on the 17th, and the hearing that was

8    held on the 19th, there were, to your knowledge, no other means

9    or mechanisms of describing the transaction to the Court; is

10    that right?

11    A.    Well, the asset purchase agreement had been filed; that

12    was a pretty important means or mechanism.

13    Q.    Sure, and that was an exhibit to the sale motion, right?

14    A.    Okay.

15    Q.    All right, so we can put that into the sale motion.  So

16    the sale motion and the two hearings, apart from those three

17    events, you're not aware of any other means or mechanism by

18    which the transaction was described to the Court, are you, sir?

19    A.    The only other thing was, on Monday morning after the

20    closing, the clarification letter was filed with the Court, as

21    we talked about earlier.

22    Q.    Let me modify the questions, then, sir, to say means or

23    mechanisms describe the transaction to the Court before the

24    sale order was issued.

25    A.    I believe that's correct.

Page 111

1    Q.   All right, so I have a clear record, let me put the

2    question.   You're not aware, are you, sir, of means or

3    mechanisms of describing the transaction to the Court before

4    the sale order was issued, apart from the sale motion and the

5    two hearings, is that right?

6    A.   I believe that's correct.   Relying on you, I must say, I'm

7    assuming the asset purchase agreement was attached as an

8    exhibit to the sale motion.   I have no reason not to believe

9    that.

10   Q.   I'll represent to you, sir, that it was, and as a matter

11   of fact --

12   A.   Then I agree with your characterization.

13   Q.   Okay.  You, for example -- neither you nor anyone else at

14   Cleary Gottlieb considered press releases to be a means or

15   mechanism of describing the transaction to the Court, did you?

16   A.   No.  On the other hand, on the other hand, you know,

17   certainly no one was keeping secrets, no one was trying to keep

18   secrets.   It was certainly known, I assume, to the trustee and

19   to the creditors and to Houlihan Lokey and the creditors'

20   committee and the lawyers.   So it wasn't a secret, but it was

21   not an official document that was furnished to the Court.   I

22   totally agree.

23   Q.   You didn't consider it to be a mechanism to describe the

24   transaction to the Court, a press release?

25   A.   No, I don't.

Page 112

```
 1    Q.   All right.  And you didn't consider an analyst call to

 2    which people were invited on Barclays' Web site to be a means

 3    or mechanism of describing the transaction to the Court,

 4    correct?

 5    A.   That's correct.

 6    Q.   Now, Mr. Schiller asked you, sir, if -- he asked you some

 7    questions about Barclays' gain on the transaction; do you

 8    recall that?

 9    A.   I do.

10    Q.   And he asked you if you recalled it being announced in a

11    press release; do you recall that?

12    A.   Yeah, I think it was -- I think it refers to an accounting

13    gain, but yes.

14    Q.   I'll use that term, sir.

15    A.   Yes.

16    Q.   It's really not the point of my question.

17    A.   Yes --

18    Q.   Do you recall Mr. --

19    A.   -- it was in the press release, and I did so testify,

20    that's correct.

21    Q.   All right.  And you did not consider that press release

22    that you recall to be a means of disclosing the gain to the

23    Court, correct?

24    A.   Well, what I said before, no.  But as I said before, it

25    certainly was not a secret.  It was -- I would assume, was well
```

Page 113

1   known by the creditors, the creditors' committee, the trustee,

2   their advisors, et cetera.  But it was not addressed to the

3   Court.  It was not specifically brought to the Court's

4   attention --

5   Q.   And the press --

6   A.   -- that's correct.

7   Q.   -- the press releases that you recall, sir, do you

8   recall --

9   A.   I think there was only one, sir.

10  Q.   Only one.  Well, take a look at tab 6 of the book with the

11  white cover; that's the one that Mr. Schiller gave you.

12  A.   Tab 6?

13  Q.   Yes, sir.

14  A.   Yes.

15  Q.   Is the press statement that's in tab 6 something that you

16  recall?

17  A.   It's not clear to me what this is.  It was described to me

18  and it appears to be an e-mail -- an internal e-mail from

19  somebody at Houlihan Lokey.

20  Q.   Okay.  Well, let's try in the book marked "Witness Book",

21  tab 8 in the book  marked "Witness Book".  Movants' Exhibit

22  133. .

23  A.   Tab 8?

24  Q.   Yes, sir.

25  A.   I see Exhibit 344A; is that what we're talking about?

Page 114

1    Q.    Yes, sir.  And you'll see next to it a tab that says

2    "Movants' Exhibit 133" on the first page next to 344A.

3    A.    Yes --

4    Q.    Okay.

5    A.    -- Movants' Exhibit 133, yes.

6    Q.    And that's the press release you were referring to?

7    A.    Yes, attached to that first page is the 17th of September

8    press release.

9    Q.    I take it, sir, that Cleary Gottlieb had no input into the

10   contents of that press release?

11   A.    We were furnished a draft and, I believe, gave some

12   comments on it.

13   Q.    And to your mind, sir, is the accounting gain described in

14   that press release?

15   A.    I would have to read the totality of it.  I think that it

16   does describe in the second paragraph, as I believe I tested

17   (sic) earlier that there is a statement

18   that -- about the trading assets being acquired and the trading

19   liabilities and some estimated values of --

20   Q.    And that's --

21   A.    -- seventy-two and sixty-eight billion that created a

22   positive margin --

23   Q.    All right, and --

24   A.    -- if you will, for the --

25   Q.    And that positive margin --

Page 115

 1    A.   -- for Barclays.

 2    Q.   -- as I understood your testimony, sir, is the positive

 3    margin between the long position and the short position, which

 4    was a subset of the deal?

 5    A.   No, I don't think that's quite accurate.  I think it --

 6    again, I testified that I don't know precisely how they

 7    computed it, but I believe I also testified that, in addition

 8    to the long and the short position, there were the resis that

 9    we were getting a half interest that Lehman had thought were

10    worth six, eight billion dollars; we were getting either a

11    billion three or 700 million, depending on as of what time we

12    learned that it wasn't going to be a billion three; I don't

13    know.  But I call it a billion dollars of cash and the like.

14    So -- and I don't know if that was included in there.  So it's

15    not just the short and long positions, as defined in the asset

16    purchase agreement, that I would have assumed were covered by

17    these two numbers.

18    Q.   And after the transaction changed as a result of the

19    events you described to us this morning, that is, the search

20    for additional assets and the 1.3 billion in the unencumbered

21    box, et cetera, et cetera, was another press release issued?

22    A.   I don't recall.

23    Q.   You don't recall one being issued, do you?

24    A.   I said I don't recall.

25    Q.   Now, Mr. Schiller also asked you if you agreed that this

Page 116

1    purchase was a purchase by Barclays of the debtors' assets

2    irrespective of their monetary value; do you recall that?

3    A.    Something along that line, yes.

4    Q.    And do you recall that you agreed to something along that

5    line?

6    A.    Well, I think what I said was that there were no -- we saw

7    in the contract -- we had a -- if the conditions were

8    satisfied, we would close and we would own it without regard to

9    what -- whether in fact the assets went up, went down, were

10   different.  It was our business once we close.

11   Q.    And was it Cleary Gottlieb's view that the Court was asked

12   to approve this deal without regard to the value of the

13   debtors' assets that were being transferred?

14   A.    No, it was -- what the Court was being asked to do was --

15   listen, I'm not the person who asked, I'm not the person who

16   had to decide; that was the Court.  But I think what was going

17   on was the Court was descri -- was being told, through the

18   various, to use your term, means and mechanisms, what the

19   nature of the deal was, and certain things were described.  And

20   there was never any precision brought as to the value or any

21   description of -- other than what was presented to the Court in

22   those -- in the presentations made by Weil Gotshal, and the

23   testimony and the proffer in Wednesday's hearing as well as

24   Friday's, and in the sale motion, including the asset purchase

25   agreement.

Page 117

1    Q.    And in the -- without regard to precision, sir, without

2    regard to precision of the numbers, we talked a bit before

3    about a point in the hearing on the 17th where the Court asked

4    how to assess the overall value of the transaction, correct?

5    A.    I believe so.

6    Q.    When the Court asked that question, did you say to anybody

7    at your table 'Why is he asking that?  Because this is

8    irrespective of monetary value'?

9    A.    Well, I --

10   Q.    Were you curious as to why the Court was asking that

11   question, sir?

12   A.    Well, I wasn't curious.  I understood why the Court was

13   asking that question.  And I think -- that doesn't mean that --

14   I don't think it takes away from the fact that, once we --

15   we -- you know, everyone was interested:  Lehman was

16   interested, because they had to have a conclusion that it was

17   the most attractive alternative for the estate that they sell

18   this.  Barclays was interested because we were going to own

19   the -- not just the ongoing business but would also own the

20   trading assets.  So we were interested.  I mean, I'm not saying

21   it wasn't important.  It was important.  But --

22   Q.    So it wasn't irrespective of monetary value; it was

23   important --

24   A.    No --

25   Q.    -- what the value was?

Page 118

1   A.   No -- I stand by what I testified, okay?

2   Q.   Well, sir --

3   A.   What -- no, let me finish.

4   Q.   Sure.

5   A.   What -- once we owned it, the question that I was asked, I

6   believe, and at least what I'm trying to address, is there were

7   no representations and warranties as to value.  We owned the

8   company, we owned the position, without regard to what they

9   actually ended up being worth that day, the next day, the day

10  before or any other day.  And in that sense, the deal was a

11  deal.  And there was contingent -- there was no adjustment

12  provisions or the like.  So that's what I'm talking about.

13  Q.   So you don't mean it was without regard to what the value

14  of the assets being transferred was, sir, do you?

15  A.   I don't know what you're asking that I haven't already

16  answered.

17  Q.   Well, what I'm --

18  A.   I'm sorry.

19  Q.   -- what I'm trying to ask, sir, is -- well, you referred

20  before to the proffers that you heard.  Did you hear, on the

21  19th, testimony from Mr. McDade when asked about the value of

22  the securities, about a line-by-line valuation?

23  A.   I don't recall.

24  Q.   Do you recall any testimony by Mr. McDade about the

25  valuation of the securities that were being transferred?

Page 119

1    A.    I haven't gone back and re-read that portion of the

2    transcript.

3    Q.    You do recall the Court's questions about whether there

4    was an appraisal of the real estate being transferred, right?

5    A.    I do, and I recall that being discussed.  And I believe

6    Mr. Miller made it clear that there was not time for, and had

7    not been, appraisals of any of the other assets.

8    Q.    And --

9    A.    I believe that was in the --

10   Q.    My question goes to a slightly different point -

11   A.    -- presentation.

12   Q.    -- though, sir.  When the Court asked those questions, did

13   it raise a question in your mind as to whether this really was

14   a transfer irrespective of what the value of the assets was?

15   A.    I was listening with great attention, I thought, to the

16   description of the totality of the deal, as described by Ms.

17   Fife, as described by Mr. Miller, in the context of what had

18   been presented in terms of written documentation leading up to

19   the Court hearings as to the proffers and the testimony.  And I

20   believed that, on the whole, there was a full and accurate

21   description of the transaction.

22   Q.    Again, sir, my question at this point doesn't go to the

23   accuracy of the representations; it goes to the reason that

24   they were made.  When you heard descriptions made to the Court

25   about the values that were being transferred, did it affect

Page 120

1    your view that this was a transfer of assets irrespective of

2    what their value was?

3    A.    No, because there -- it did not change my view.  My view

4    was it was made very clear that we weren't valuing all the

5    assets.  There was no appraisal of the assets.  I think that

6    was made clear.  There were a lot of assets that had -- didn't

7    even have approximate numbers associated with them anywhere in

8    any document.  And no one ever described them to the Court as

9    to what approximate values there were.  For some things, there

10   were approximate values, based on what Lehman's estimates were,

11   that were described to the Court, and appropriately so.

12   Q.    And for other things there was no description at all?

13   A.    Well, that's not what I said, okay?

14   Q.    That's what I'm asking.

15   A.    What -- well, then all right, I'll answer, then.  It

16   was -- the agreement was furnished; it was the part of the sale

17   order, as you've pointed out.  It included the sale motion.  It

18   included -- said we're getting all of the assets, with certain

19   exceptions.  It listed ten or twelve or fifteen, including, but

20   not limited to, including examples, and most of them, with the

21   exception of the long position and the short position, none of

22   those had numbers associated with them.

23         So on its face, and consistent with Mr. Miller's

24   description, there was no valuation placed on them for purposes

25   of the Court's consideration.

Page 121

1    Q.   So was it your view, sir, that, standing by itself, the

2    asset purchase agreement disclosed everything there was to

3    disclose about the deal?

4    A.   I did not say that.

5    Q.   Well, that's what I'm asking.

6    A.   Firstly --

7    Q.   Yes or no, was that your view.

8    A.   -- the deal had changed, as Mr. Miller described and Ms.

9    Fife had described, by Friday.  So in certain respect it's

10   clear the asset purchase agreement didn't.  But I think the

11   asset purchase agreement, together with the presentations made

12   to the Court and the testimony in the court, I thought,

13   accurately described the deal.

14   Q.   You understood that, in the proceedings before the Court,

15   one of the things that needed to be shown was whether the

16   debtors were receiving fair consideration, correct?

17   A.   Yes.

18   Q.   And you knew that, in order to assess whether the debtors

19   were receiving fair consideration, the Court would have to take

20   into account the values in the transaction, did you not?

21   A.   I'm not a bankruptcy lawyer, okay?  My understanding was

22   that the Court needed to understand the deal, what was being

23   transferred, what condi -- what liabilities were being assumed,

24   what payments were being made.  All of that needed to be

25   disclosed to the Court, and then the Court needed to conclude

Page 122

1    whether or not there was a higher -- there was a higher price,

2    fair value -- to me -- again, I'm not a bankruptcy lawyer.  So

3    to me, fair value means what a willing buyer and a willing

4    seller will agree, okay?

5         And there -- as far as I knew, and as far as the Court was

6    told by Mr. Miller and Mr. Ridings, I believe that there were

7    no apparent other alternatives available.  The other

8    possibility, of course, was liquidation, and I assume that --

9    so some of this is relevant to that issue.  But to me that's

10   what fair value is all about is there -- is there -- what's a

11   willing seller and a willing buyer are willing to agree.  And I

12   think that what the Court needed was the totality of what it

13   received in the written record and the Wednesday and Friday

14   hearings.

15   Q.   And you don't recall Mr. Ridings giving any testimony at

16   all about value, do you, sir?

17   A.   I don't recall.

18   Q.   Okay.  Now --

19   A.   I don't think he did, but I don't recall.

20   Q.   You mentioned that -- you understood, did you not, that

21   the values that needed to be shown to the Court -- a couple of

22   times you've mentioned a best possible alternative for

23   Lehman -- you knew it had to be better than liquidation value,

24   correct?

25   A.   I assume so, yes.

Page 123

1    Q.   Did it ever come to your attention that liquidation values

2    were applied to the assets in the repo?

3    A.   I don't understand that question.

4    Q.   Did anyone ever inform you, sir, at any point during the

5    week that an exercise had been conducted to determine the

6    liquidation values of the assets in the repurchase agreement?

7    A.   Not that I recall.

8    Q.   Did anyone ever inform you, sir, that within Barclays an

9    exercise was undertaken to determine what haircuts should be

10   put on the assets in the repo?

11   A.   No.  It doesn't surprise me.  They have an accounting

12   obligation when they closed on the deal.  They have, under, I

13   don't know IFRS; I don't even know U.S. GAAP that well, but

14   what their obligations were, but it doesn't shock me that they

15   would be conducting an exercise along that line.

16   Q.   And no one ever told you, sir, I take it, what value Bank

17   of New York, as collateral agent, put on the assets in the repo

18   once Barclays stepped into the shoes of the Fed, is that right?

19   A.   I don't think I knew that, no.

20   Q.   Did you know Bank of New York had put values on the

21   assets?

22   A.   I don't think I knew that.

23   Q.   No one ever told you, sir, whether the Fed had put values

24   on the assets in the repo before it was -- before Barclays

25   stepped into the Fed's shoes, correct?

Page 124

1    A.   I don't know what the Fed did.  I did know -- you'll

2    recall that I testified this morning that we didn't end up

3    getting the same securities that the Fed had.

4    Q.   So is that a no?  Nobody told you --

5    A.   I said no.

6    Q.   -- that the Fed had valued it --

7    A.   That's correct.  No one told me --

8    Q.   All right, so as you --

9    A.   -- whether the Fed had --

10   Q.   -- as you sat in the sale hearing -- excuse me, sir.  As

11   you sat in the sale hearing on the 19th, you were unaware of

12   any valuation Bank of New York had put on the assets to be

13   transferred, correct?

14   A.   That's correct.

15   Q.   And you were unaware of any value the Fed had put on the

16   assets to be transferred, correct?

17   A.   Well, but I'm not sure those were the assets to be

18   transferred.  As I told you, the Fed -- it turned out that --

19   Q.   Well, let me --

20   A.   -- that the Fed assets were not the assets that Barclays

21   was given.

22   Q.   Sir, you weren't aware of any Fed valuations at all, were

23   you?

24   A.   Absolutely not.

25   Q.   Okay.  And you weren't aware of the valuations that your

Page 125

1  client had applied to the assets in the repo, were you?

2  A.    No, not at that time, no.

3  Q.    And you weren't aware of the valuations that Lehman had

4  put on the assets in the repo, correct?

5  A.    No, except I will remind you I have testified at

6  considerable length about the fact that I knew there were

7  differences in values, that I described the discussions that I

8  knew had taken place between Barclays traders and Lehman

9  traders, and I also knew, as I think, you know, everyone knew

10  at the time, that it was a highly volatile situation.  Market

11  prices were changing all the time.  Different people had

12  different values.  Sometimes people may have had themselves,

13  over the passage of time, different values; even the same

14  person.  So it's all -- you're -- I agree with what you're

15  asking, but this was a -- this was not a static situation as to

16  valuation.

17  Q.    And apart from knowing that the discussion was taking

18  place and there was a disagreement, you didn't know the

19  numerical extent of the disagreement, did you?

20  A.    I knew it was a very large number, okay?  Did I know a

21  precise number?  I no longer recollect.

22  Q.    And when we looked before -- well, it's up there still --

23  at the press release, with the seventy-two billion dollar

24  number on the long position, you did not know if that number

25  was the result of a resolution of the disagreement, right?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 126

1    A.    Well -- no, I didn't know that, but I did not --

2    Q.    You said you were --

3    A.    Let me finish, please, if I may.  Can I --

4    Q.    Go right ahead, yeah.

5    A.    Let's go back to the asset -- remember, this was a press

6    release they put out on Wednesday morning, I believe London

7    time.  We had signed the asset purchase agreement Tuesday

8    night/Wednesday morning New York time, the early -- at 12, 1,

9    2 a.m.  It contained, written in hand, as I've testified, a --

10    an approximate number that Lehman had generated for the long

11    positions and the short positions of seventy and sixty-nine, I

12    believe.  I could have that wrong.  And as I mentioned --

13    testified earlier, that didn't include the fifty percent

14    interest in the residentials, in the resis.

15        So it wasn't the press release; it was what was in the

16    asset purchase agreement that reflect, to the extent it did or

17    it didn't, the discussions between the traders.

18    Q.    I'm going to come to the asset purchase agreement in a

19    moment, sir.  But --

20    A.    Okay.

21    Q.    -- before I do, you didn't know whether the seventy

22    billion dollars in the asset purchase agreement was the result

23    of the discussions between Barclays and Lehman where Barclays

24    allowed is how Lehman's were overstated, did you?

25    A.    I did not know where that seventy million -- billion

Page 127

1    number came from.

2    Q.   You were kind of in the dark about where that seventy

3    billion came from, weren't you?

4    A.   I wouldn't use that word, but I was -- as I've testified,

5    that was an estimate that was put in there largely for

6    identification purposes and to give some sense of things.  It

7    was Lehman's estimate at the time, and they were the ones who

8    suggested putting that in.

9    Q.   Sir, I'm going to ask you to turn to the witness binder,

10   without your name on it.

11   A.   Okay.

12   Q.   And what I'd like you take a look at, please, is behind

13   tab 3.  It's Movants' Trial Exhibit 118; it's the sale motion

14   again.  Are you with me?

15   A.   Yep.

16   Q.   Now, we're going to have to work at this one a little bit,

17   because there's no Bates numbers, Mr. Lewkow.  But could you

18   leaf through that until you get through the asset purchase

19   agreement that was attached to the sale motion?  You'll

20   identify it on the -- it's the first page where it's got the

21   word --

22   A.   Yeah, this is the one that has -- is the one that has the

23   handwritten question?

24   Q.   Yes, it is.

25   A.   I see it, yeah.

Page 128

1    Q.    Okay, are you with me there?

2    A.    Yep.

3    Q.    And if you would, sir, turn to page 7 of that.  Are you

4    there?

5    A.    I'm working on it.

6    Q.    Okay.

7    A.    Yep.

8    Q.    And you may just have answered this question, but that's

9    the handwritten interlineations you've talked about today, yes?

10   A.    That's correct.

11   Q.    All right.  And those are the ones written by the

12   associate with the good handwriting?

13   A.    So it appears.

14   Q.    All right.

15   A.    Better than mine, anyway.

16   Q.    Well, probably better than mine too.

17         And this is the seventy billion dollar number that you

18   describe as an approximation, correct?

19   A.    Yes.

20   Q.    And it says "approximately seventy billion", does it not?

21   A.    That's correct, yes.

22   Q.    All right.  And it also says "book value"; do you see

23   that?

24   A.    Yes, I do.

25   Q.    "with a book value as of the date hereof"?

Page 129

1    A.    That's correct.

2    Q.    And the date of the agreement was September 16th, 2008,

3    correct?

4    A.    That's correct.

5    Q.    All right.  Now, I believe you said in your testimony with

6    Mr. Schiller that the word "book value" was chosen because

7    "marks" was a complex term or a complicated term?

8    A.    No, I said it was a nontechnical term.

9    Q.    A nontechnical term.  So you understood "book value" to be

10   a technical term, yes?

11   A.    It's 11 o'clock at night.  We've been up all night for two

12   days.  And it struck me at the time, I think it was me, that we

13   should use the term "book value" instead of marks, and --

14   Q.    Well --

15   A.    -- there it goes.

16   Q.    -- sir, I want to follow-on a little about the reason you

17   didn't use "marks".  You didn't use "marks" because it was not

18   a technical term, yes?

19   A.    It seemed to me at the time that the better term, I

20   believe, that went -- it was my understanding that a broker-

21   dealer marks-to-market, if there's -- if there is a trading

22   market for a position, they mark-to-market and that becomes the

23   book value.  There were other securities -- if there was no

24   comparable trading market, it's valued for book purposes, I

25   believe, in a somewhat different way because there is no

Page 130

1   market.  And that's my knowledge.  I'm not the world's leading

2   expert.

3   Q.   And within that answer, sir, just to clarify one thing,

4   you knew and intended that the term "book value" was to be

5   understood as Lehman's book value?

6   A.   That's correct.

7   Q.   Okay.  And you knew that Lehman was a regulated broker-

8   dealer, correct?

9   A.   I did.

10  Q.   And you knew that regulated broker-dealers keep their

11  books on a mark-to-market basis, correct?

12  A.   Well, yes, but I also -- yes.

13  Q.   And in your experience up to the 16th of September, 2008,

14  at least you had never heard of a broker-dealer marking its

15  book based on a number negotiated with a single purchaser, have

16  you?

17  A.   I still don't know that to this day.  That's not what I've

18  been testifying about, okay?  Things had changed.  The book

19  value that the -- the numbers that had been provided to

20  Barclays started on Monday and Tuesday, were what Lehman had

21  marked them to as of Friday close of business; that's my

22  understanding.  Okay, it was a volatile situation.  There had

23  been lots of stories in the press and elsewhere that Lehman had

24  been -- had not appropriately marked some of its portfolio.  In

25  addition, that was even before what happened Friday and the

Page 131

1    impact on the markets of what was going on Monday and Tuesday.

2        So I don't think that it was a negotia -- as I say, I

3    don't think it was that they changed their marks because of the

4    negotiation.  I do think Barclays, my understanding, had

5    expressed their views as to what the proper marks were.  And

6    the Lehman people reached a conclusion that it was appropriate

7    to reduce the marks.  But they had -- you're absolutely right;

8    they were a registered broker-dealer; they do have obligations

9    to market as they thought appropriate.

10   Q.   Well, here, sir, it was as they thought appropriate with a

11   little bit of input from Barclays, wasn't it?

12   A.   Well, it was, but it's also with a little bit of input

13   when in fact, as I've testified, there were examples, and I've

14   told one, in which Barclays could almost prove that they were

15   overstated, unless Barclays had wrong values for the senior

16   tranche of a security.

17   Q.   So it was Lehman's book value with some input from

18   Barclays?

19   A.   It was --

20   Q.   Yes?

21   A.   It was with input, absolutely.

22   Q.   And in this handwritten interlineation, sir, in the asset

23   purchase agreement, is there any part of that, sir, that to

24   your mind tells a reader this is Lehman's book value after

25   input from Barclays?

Page 132

1    A.    Well, it's with -- Lehman's book value.  No, it doesn't

2    say it in those words, no.

3    Q.    And you were aware, were you not, of media reports

4    published prior to the events of the week of September 15th to

5    the effect that the book value of certain securities held by

6    Lehman had been overstated even prior to the market disruptions

7    of the prior few days?  Isn't that right?

8    A.    I think that's what I testified, yes.

9    Q.    And bearing in mind that those media reports of which you

10   were aware were out there, sir, isn't it fair to say a reader

11   of the asset purchase agreement would think these are the marks

12   of Lehman that the press is saying they're overstating?

13   A.    I don't know that I would draw that inference.

14   Q.    Well, sir, you were aware -- when you chose the term book

15   val -- when the term "book value" was chosen, you were aware of

16   media reports that Lehman's books were overstated, correct?

17   A.    Had been overstated.

18   Q.    All right.

19   A.    That didn't mean they were still overstated.

20   Q.    Well, you hadn't seen any media reports on the 16th or

21   15th of September saying things are just fine with Lehman's

22   books now, had you?

23   A.    No.

24   Q.    All right, so on the 16th of September, when those

25   interlineations were made, the state of your knowledge with

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 133 of 253

Page 133

1    respect to public reports about Lehman's books is that they

2    were overstated, yes?

3    A.    The reports -- the media stories had been in the past;

4    they were out there.  That's all true.

5    Q.    And when the term "book value" was chosen, a reader of

6    that clause, sir, without the qualification that these are book

7    value with some input from Barclays, would think these are

8    Lehman's overstated book values, wouldn't he?

9    A.    I don't -- I don't draw that inference.  This was a

10   contract.  It was put in to try to identify the assets and give

11   approximate values, and that's what it did.

12   Q.    Well, I think we've also agreed, sir, though, that it was

13   also a disclosure document; haven't we?

14   A.    Well, it disclo --

15   Q.    All right.  And it terms of it being a disclosure

16   document, where in that clause would it tell a reader that this

17   is Lehman's book value after Barclays' input?

18   A.    It does not say that.  I already agreed it doesn't --

19   Q.    And where would it say in this clause that this is not the

20   overstated Lehman book values the press is talking about, these

21   are the book values adjusted by Barclays' view of the marks?

22   A.    I don't believe -- it does not say "Footnote:  This is not

23   an overstated value as Lehman has heretofore done."  There's

24   nothing like that in here.  I agree with that.

25   Q.    And in the other means and mechanisms that we've spoken

Page 134

1    about of disclosing to the Court the terms of the transaction,

2    the rest of the sale motion and the two hearings on the 17th

3    and the 19th, there's no disclosure of that fact elsewhere, is

4    there?

5    A.   What there is disclosure is that the assets and the

6    liabilities that the long position -- and it of course dropped

7    by Friday when the Court was being asked to approve it, because

8    there was a lot less value being presented to the Court that

9    Lehman had capability of delivering.  What the Court was told

10   was that the assets -- using the same words about book value,

11   the exact same words were used on the short position as on the

12   long position, and the long position was greater than the short

13   position.  And there were also the residential -- resis, and

14   there was supposed to be cash in the deal.

15   Q.   I think my question, sir, was, in the other means and

16   mechanisms we've spoken about of disclosing to the Court the

17   transaction, there was no explanation that this seventy billion

18   was Lehman's book value after Barclays' input?

19   A.   I've already said yes three times to that question, sir.

20   Q.   And when you heard the proffers at the hearing on the

21   19th -- you heard a proffer for Mr. McDade, yes?

22   A.   That's correct.

23   Q.   And you heard a proffer from Mr. Ridings, correct?

24   A.   That's correct.

25   Q.   And you heard both of them cross-examined, correct?

Page 135

1   A.   I remember at least one of them was cross-examined.  I'm

2   not sure whether they both were or not, though.

3   Q.   And apart from those two proffers, you heard no other

4   testimony at the hearing on the 19th, correct?

5   A.   No testimony as such.  There were presentations made by

6   the lawyers, yes.

7   Q.   And as we talk about these presentations, is your

8   recollection refreshed that Mr. McDade testified that there had

9   been a line-by-line valuation of the securities?

10  A.   I would have to re-read the transcript.  I don't recall.

11  Q.   And if you had heard that testimony, you wouldn't have

12  been in a position to correct or not correct it, because you

13  didn't know where those numbers came from, correct?

14  A.   That's correct.

15  Q.   And you didn't hear any questions put to Mr. Ridings about

16  valuation of the assets, did you?

17  A.   I don't think so.

18  Q.   You heard Mr. Ridings testify that there were no other

19  buyers, right?

20  A.   That is consistent with my recollection.

21  Q.   And you recall him talking about the dire economic

22  circumstances extant at the time?

23  A.   I believe he did.  Again, I have not re-read his

24  testimony.

25  Q.   And it was not Cleary's or Barclays' view, sir, was it,

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 136

1    that because there were not other buyers, that the disclosure

2    rules that applied with respect to seeking the Court's approval

3    were in any way relaxed or diminished, was it?

4    A.    No.

5    Q.    You didn't view a single buyer as a substitute for fair

6    consideration, did you?

7    A.    Well, I think it was not inconsistent with fair

8    consideration.  That was discussed at the time in the court

9    hearings, as I recall.  But it didn't guarantee or assure that

10   it was fair consideration, of course not.

11   Q.    Now, in your testimony before lunch, sir, you talked a bit

12   about the repurchase agreement.

13   A.    Yes.

14   Q.    All right.  And I want to frame the issue around that.

15   A.    Okay.

16   Q.    During the course of the week, from the time the asset

17   purchase agreement was signed until the sale hearing on the

18   Friday, the 19th, you came to understand that there were

19   changes in the transaction, yes?

20   A.    That is true.

21   Q.    And in between the signing of the asset purchase agreement

22   and the conclusion of the sale agreement, with those as

23   mileposts, you knew really nothing about the repurchase

24   agreement, isn't that right?

25   A.    Well --

Page 137

1              MR. GAFFEY:  Let me withdraw that.

2    Q.   Other than the fact that there was a repo, you didn't know

3    anything about it, right?

4    A.   I'm not sure that's accurate.  I did -- I was not involved

5    in the creation of the repo, I didn't learn about it until

6    Friday.  I'm trying to recall if there's something in

7    particular you want to know if I knew about it.  I'd be happy

8    to answer that, but --

9    Q.   I think we're okay for the moment with maybe just a

10   reiteration of what you said before.  Cleary's not involved in

11   structuring or designing or negotiating the repo, right?

12   A.   That is my understanding.

13   Q.   All right, and Cleary -- neither you nor anyone else at

14   Cleary are involved in valuing the assets in the repo, correct?

15   A.   We didn't value any assets at any time.

16   Q.   And you haven't seen at this point, that is, by the 16th,

17   any valuations that have been conducted of the assets in the

18   repo, correct?

19   A.   Well, the 16th is before the repo existed.

20   Q.   Between the 16th and 19th?

21   A.   I had not seen any valuations of the assets in the repo,

22   that's correct.

23   Q.   And on the 19th, you heard Ms. Fife -- I believe this

24   morning you said it was Mr. Miller, but let me represent to you

25   it's Ms. Fife who makes a description to the Court about the

Page 138

1    difference in values, how the values have dropped; do you

2    recall that?

3    A.    Yes, and I think that was Ms. Fife initially, although I

4    think Mr. Miller, later in the hearing, certainly alluded to it

5    as well in a question.

6    Q.    And you heard Ms. Fife give this description to the Court

7    after the meeting -- the conversation with Mr. Klein and Ms.

8    Fife and yourself and some others, correct?

9    A.    That's correct.

10   Q.    And in that conversation, Mr. Klein had described how

11   there had been a shortfall in value, yes?

12   A.    That's correct.

13   Q.    And he described to you how that shortfall had been

14   filled, yes?

15   A.    Well, I wouldn't say it had been filled.  How -- I had

16   used the word "ameliorated".  I think there was the -- it was

17   the -- both the long positions and the short positions had come

18   down, there was still a positive spread between the long and

19   short, but that part of the overall assets that we were going

20   to get that had been identified to help get comfortable with

21   all of that was the -- and to get -- and to deal also with the

22   fact that the retained cash had dropped away -- was that we

23   were going to get -- the 15c3-3 and the clearance box assets

24   were among the assets that we were entitled to received under

25   the purchase agreement.

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 139 of 253

Page 139

1    Q.   All right, and you recall, sir, that -- well, do you

2    recall, sir, any description to the Court, after that

3    conversation, of 15c3-3 or unencumbered box, or anything

4    relating to the work that had gone on that morning to

5    ameliorate the shortfall?

6    A.   No, that was not -- nothing was put that way.

7    Q.   And what you heard Ms. Fife say was that the assets now

8    had a value of 47.4 billion dollars; do you recall that?

9    A.   I would want to see exactly what she said and in what

10   context.

11   Q.   Okay, you have the book in front of you, just "Witness

12   Book" without your name on it.

13   A.   Yep.

14   Q.   Go to tab 5, please.

15   A.   Okay.

16   Q.   And behind tab 5 you will find Movants' Exhibit 261, which

17   is the transcript of the hearing on the 19th.

18   A.   I see it.

19   Q.   And if you would turn, sir, to page 46 within that

20   document.

21   A.   46?

22   Q.   46.  And I'm going to direct your attention --

23        MR. GAFFEY:  And I'm going to ask that we highlight

24   the following lines: 46, line 19; through 47, line 4.

25   Q.   Let me know when you've had a chance to look that through.

Page 140

```
 1       (Pause)

 2   Q.   Have you had a chance to look at that, Mr. Lewkow?

 3   A.   Yes.

 4   Q.   All right.  Now, you see that Ms. Fife says to the Court,

 5   and she's summarizing the changes that were made to the

 6   transaction, and I'm starting at line 21:  "In terms of the

 7   economic changes, it was largely because of the markets,

 8   unfortunately."  Do you see that?

 9   A.   Yes.

10   Q.   All right.  Was that your understanding that the changes

11   in the transaction were the result largely because of the

12   markets?

13   A.   I think it was a mixture of factors directly and

14   indirectly relating to the market; some was just valuation;

15   some was that, given what was going on, people had -- who had

16   interest in securities, had taken them back from Lehman or

17   there was some double-counting by Lehman and some of the

18   members that had been seen.  So it was not entirely as a

19   result -- entirely directly as a result of the changes in

20   market valuation.

21   Q.   And did you -- at the time when you heard her say that,

22   did you suggest to anybody that that should be corrected?

23   A.   No.  I'd like to go back to what I've testified.  What I

24   have said is that what I was looking at at the end -- you know,

25   the test -- the hearing went on, and at the end of the hearing,
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 141

1    was there, in my view, full disclosure to the Court of the

2    substance of the changes that had been made from Wednesday to

3    Friday, and I thought it had.  It isn't to say that every word

4    said by Ms. Fife or every word said by anyone else was,

5    standing by itself, necessarily the be-all and end-all.  That

6    wasn't what I was talking about.  What I was talking about is,

7    on the whole, did the Court hear what had changed in the deal.

8    Q.    So just so I know where to look in the record, sir, your

9    answer's no, you didn't think that should be corrected?

10   A.    I did not believe, when I considered that at the end and

11   thought back to the fullness of the Wednesday hearing, the

12   Friday hearing, the documentary record, I believed that the

13   Court had gotten the full description of the deal.

14   Q.    And further down in Ms. Fife's statement to the Court, and

15   now I'm on page 47, lines 1 to 4, she says, quote, "So,

16   originally we were selling assets that had a value of seventy,

17   approximately seventy billion dollars."  You understood that to

18   be a reference to the seventy billion dollar long position, did

19   you not?

20   A.    That's correct.

21   Q.    All right.  And then she continues, quote, "And today,

22   Your Honor, we're only selling assets that have a value of 47.4

23   billion dollars," end quote.  Do you see that?

24   A.    I do see that.

25   Q.    Did you know the component parts of the 47.4 billion

Page 142

1    dollar that Ms. Fife gave the Court?

2    A.    I did not do the -- do any math in connection with this,

3    no.

4    Q.    Did you know if the 47.4 billion dollars, about which Ms.

5    Fife told the Court, included the 15c3 assets?

6    A.    Well, the 15c3 was -- I don't know -- the answer's I don't

7    know for sure.

8    Q.    And you didn't know at the time, did you?

9    A.    No, although I did know -- I didn't think -- to me, the

10   15c3, and I was not a great expert on it, I will concede, but

11   the 15c3 account, as I understood it, was not really -- she was

12   talking about the changes in the long positions and the like.

13   15c3 was in the nature of a -- to comply a segregation of

14   certain assets to protect customers that was held separately.

15   So --

16   Q.    You talked a bit this morning too about the contents of

17   the unencumbered box.

18   A.    I referred to it because that's what I --

19   Q.    Okay.

20   A.    -- recall having heard it called that day, and the

21   clearance --

22   Q.    It's had some various names, sir.

23   A.    -- the clearance box -- I don't know, whatever.  Yes, I --

24   there is a box.

25   Q.    All right.  And others have called it the bag of hammers.

Page 143

1   Did you ever hear it called that?

2   A.    I -- I've -- I know it has been called that.

3   Q.    Okay.  Let's go with "unencumbered box".  Did you know

4   whether the contents of the unencumbered box were included

5   within the 47.4 billion dollar number that Ms. Fife gave to the

6   Court?

7   A.    I thought it was, but I didn't -- again, I didn't do the

8   math on that.

9   Q.    And do you know, sir, whether the value of the assets in

10  the Barclays-Lehman repo were within the 47.4 billion?

11  A.    No.  I believe that the long positions that we were

12  entitled to under the asset purchase agreement included the

13  assets, as I understood them, in the repo.

14  Q.    And let me ask you please, sir, to turn to -- in the

15  witness book, the one without your name --

16  A.    That's where I am.

17  Q.    -- tab 14, which is Movants' Trial Exhibit 147.

18  A.    Yes, I see it.

19  Q.    Have you ever seen that document before, sir?  Actually,

20  let me -- I can make this a bit more efficient.  Take a look at

21  the last page of the document, sir, Bates number 70.

22  A.    Yeah, I see the page.

23  Q.    Have you ever seen that document before, sir?

24  A.    I don't believe so.

25  Q.    Did anyone ever talk to you about an exercise headed up by

Page 144

1    a man named Jim Seery regarding valuing the assets in the

2    repurchase agreement?

3    A.    Well, I don't know as of what time we're talking --

4    Q.    As of the 19th of September, 2008.

5    A.    I -- I'm not shocked that somebody was trying to look at

6    what it is we had gotten.

7    Q.    Sir, the question is --

8    A.    That's --

9    Q.    -- whether anybody had told you about it at the time, not

10   whether you're shocked now.  Did anybody tell you at the time

11   about an exercise that had been conducted, under the

12   supervision of Jim Seery, to value the assets in the repo?

13   A.    No.

14   Q.    All right.  And you never saw the document that's on the

15   screen, page 70 of Exhibit 147?

16   A.    I don't believe I did.

17   Q.    And as you sat in court on the 19th, you were unaware of

18   any exercise where traders had been instructed to apply

19   liquidation values to the assets in the repo, isn't that

20   correct?

21   A.    I never heard that at the time, no.

22   Q.    And if you take notes, sir, the handwritten notes at the

23   bottom, 45.5 and 1.9, do you recognize those numbers as part --

24   as totaling the 47.4 that Ms. Fife gave to the Court?

25   A.    Well, I see the number 45.5; I see the number 1.9.  I

Page 145

1    can't begin to tell you that that's the source of Ms. Fife's

2    47.4.

3    Q.    Okay, you understood that the value of the assets in the

4    unencumbered box were approximately 1.9 billion, yes?

5    A.    I understood that that's what Lehman had told Barclays.

6    Q.    All right.  And in Ms. Fife's presentation to the Court,

7    she talked about a 45.5 billion dollar liability; do you recall

8    that?

9    A.    That sounds about right.  If -- I would have to check the

10   precise number, but it sounds about right.

11   Q.    And as you sit here, sir, you don't know the relationship,

12   if any, between the calculations on that page and the 47.4 that

13   Ms. Fife gave to the Court on September 19th, do you?

14   A.    That's correct.

15   Q.    And you didn't know it at the time either, did you?

16   A.    That's correct.

17   Q.    You were not in a position at the hearing to correct Ms.

18   Fife when she described the value of the assets, because you

19   didn't know how the 47.4 had been calculated, isn't that right?

20   A.    That's correct.

21   Q.    And in the conversation with Mr. Klein that took place

22   before the sale hearing began, did Mr. Klein tell you -- did he

23   give you that 47.4 billion dollar number as well?

24   A.    I don't believe so.

25   Q.    Did he sketch out the deal for you at all?

Page 146

1    A.   On paper?

2    Q.   Yeah.

3    A.   No.

4    Q.   Did you ever see a sketch that Mr. Klein prepared

5    outlining --

6    A.   At the time?

7    Q.   Yes.

8    A.   No.

9    Q.   I'd like to turn your attention, sir, to the clarification

10   letter.

11   A.   Okay.

12   Q.   Now --

13   A.   You want to -- can you point me to it, or --

14   Q.   Beg your pardon, sir?

15   A.   You want to point me to the tab number?

16   Q.   You know what, why don't you close up all the books,

17   because we're going to start on a new line, and I'm going to

18   move you over to Mr. Schiller's book.

19   A.   Okay.   That's smaller and easier to deal with.

20   Q.   In the book that Mr. Schiller gave you, you'll find behind

21   tab 10 a copy of BCI Exhibit 460.   See that, sir?

22   A.   Yes, I do.

23   Q.   All right, and BCI Exhibit 460 -- Mr. Schiller asked you,

24   if my notes are correct, what that -- the clarification letter

25   attached to that e-mail was meant to confirm; see that?

Page 147

```
 1    A.    (Pause).

 2    Q.    Right, but do you recall that?

 3    A.    Well, this -- I'm sorry, this was the first draft of the

 4    clarification letter.

 5    Q.    No, I understand that, sir.  I just -- I'm asking you if

 6    you recall that Mr. Schiller's question to you was what was the

 7    clarification letter dated September 17 supposed to confirm.

 8    A.    I'm going to resist that characterization.  It wasn't the

 9    clarification letter; it was a draft --

10    Q.    All right.

11    A.    -- of the clarification letter.

12    Q.    Let me rephrase the --

13          UNIDENTIFIED SPEAKER:  Well, to a corporate lawyer,

14    there's a big difference.

15    Q.    I'll withdraw the question, sir.  Turn to page 2 of that

16    document --

17    A.    Yes.

18    Q.    -- the second page of the document, which is the first

19    page of the letter.  It's Bates page 8458.

20    A.    Yep.

21    Q.    All right, Mr. Schiller asked you what this document was

22    meant to confirm; do you recall that?

23    A.    Yes.

24    Q.    And this document is a -- that's Barclays' Exhibit 460.

25    And this document is an early draft of what turned out to be
```

Page 148

1    the so-called clarification letter, isn't that right?

2    A.    That's correct.

3    Q.    And it went through multiple drafts between the 17th of

4    September and the morning of the 22nd of September, is that

5    right?

6    A.    That's correct.

7    Q.    Although the final clarification letter is dated 20

8    September, in fact it was finalized on the Monday morning, the

9    22nd, is that right?

10   A.    It was finalized on Monday morning, the 22nd, that's

11   correct.

12           THE COURT:  Mr. Schiller, you have something to say?

13           MR. SCHILLER:  Yes.  I have an objection just to the

14   characterization.  My question confirmed, I believe -- went to

15   the final clarification letter that I put before the witness,

16   Your Honor.

17           THE COURT:  Well --

18           MR. GAFFEY:  I'll -- Your Honor, it's irrelevant.  I

19   can move on to another --

20           THE COURT:  Here's how I'm going to treat this.  I

21   know there were some questions asked on direct relating to this

22   early draft of the document that became the clarification

23   letter, and all that's really happened so far is that you've

24   gotten the witness to remember that question and to identify

25   this as 'Yes, that's the document.'  I'm not sure what more

Page 149

1    we've gotten from the witness on cross.

2           MR. GAFFEY:  Let me move on to my real point.

3           THE COURT:  Fine.  Let's do that.

4    Q.  This was -- I think I just asked, but let me ask again,

5    that this was an early draft of what wound up being the

6    clarification letter five days later, yes?

7    A.  That's correct.

8    Q.  All right, and the clarification letter went through

9    changes from day to day --

10   A.  There were a seri --

11   Q.  -- over that --

12   A.  There were a series of draft, each one revising what I've

13   done in the prior draft.

14   Q.  And this version says, in the last sentence of the first

15   paragraph, "This letter agreement clarifies the meaning of

16   certain provisions of the Agreement and is binding on the

17   Parties hereto upon its execution and delivery;" do you see

18   that?

19   A.  Yes, I do.

20   Q.  All right.  And the agreement to which it refers is the

21   asset purchase agreement that we've been discussing, correct?

22   A.  That is correct.

23   Q.  And the purpose of this letter was to clarify it, yes?

24   A.  Well, it was to clarify, pursuant to the -- I mean, it was

25   a first draft; that's exactly what it was.

Page 150

1   Q.   Even a first draft, sir, as an experienced M&A letter, you

2   choose your verbs carefully, don't you?

3   A.   We try.

4   Q.   Okay.  Now, did there come a time when a draft of the

5   clarification letter added the term "amend"?

6   A.   Yes, there did.

7   Q.   Okay.  And that occurred on Friday the 19th, is that

8   right?

9   A.   I would have to go through each of the drafts to tell you

10  when it first appeared.

11  Q.   You recall that the word "amendment" was added when things

12  got, as you have said, more complicated?  Do you recall that?

13  A.   I think at some point there were sufficient changes that

14  we thought it was -- this was a binding agreement and that it

15  was not all in the nature of clarification.  And I think we

16  added the words "amendment", "supplement" or -- I think there

17  was a third verb as well as "clarify" and "amend", but I would

18  have to look at it to see --

19  Q.   The three verbs you wound up using were "clarify",

20  "supplement" and "amend", right?

21  A.   Okay.

22  Q.   And there came a point where you chose the word "amend" to

23  describe what it was the clarification letter was doing,

24  correct?

25  A.   Well, as one of three verbs that -- in that clause, yes.

Page 151

1   Q.   Could you turn -- okay, one more book, sir.  Now you have

2   to go to the book with your name on the cover.

3   A.   Okay.

4   Q.   You could put the others aside for a couple minutes,

5   because we're going to spend some time in this one.

6   A.   Okay.

7   Q.   Okay.  Have the one with your name on it?

8   A.   That's the one.

9   Q.   All right.  And in that, sir, you'll find exhibits with

10  tab numbers by exhibit number, and I'd ask you to turn, please,

11  to Exhibit number 131.

12  A.   I have it.

13  Q.   All right.  And within Exhibit 131, which is in evidence,

14  sir -- again, you're going to have to work with me a little

15  bit -- I want you to move, please, to the first page you see in

16  the document that contains blacklining, and you'll know that

17  page because it's the first one that has the number at the

18  bottom "10279851".

19  A.   There's a whole bunch of pages that end in "50".  You're

20  saying --

21  Q.   Right, and right after those, there's a whole bunch of

22  pages that end with "51".

23  A.   I see that.

24  Q.   All right, now, if you'd take a look at the blackline

25  here, sir.  You'll see, sir -- just keep your finger on that

Page 152

```
 1   page and take a look at the first page so we can get the date

 2   that this was sent.  And this is under cover of an e-mail

 3   from -- I'm looking at the bottom e-mail on the first page;

 4   it's To V. Lewkow at Cleary, and some others, and it's from

 5   Robert Messineo at Weil.  And it bears the date September 19th,

 6   2008, 12:09 p.m.  Do you see that?

 7   A.   Yes, I do.

 8   Q.   All right.  So based on this document, sir, it's a fact,

 9   is it not, that it was on the afternoon of the 19th of

10   September that the phrase "amend" was first added to the

11   clarification agreement, correct?

12   A.   It so appears.  I don't have in front of me all the

13   intermediate drafts, and I don't know if it went in and went

14   out.  But I see it shown as a blackline here as including the

15   word "amend" and "supplement", yes.

16   Q.   And that was before the sale hearing commenced, yes?

17   A.   Yes, that should -- this is a draft sent, as you point

18   out, by Weil to us.

19   Q.   And it was before the sale hearing --

20   A.   Yes.

21   Q.   -- commenced?

22   A.   Yes.

23   Q.   Okay, and you did not hear anyone at the sale hearing tell

24   the Court that the asset purchase agreement was being amended;

25   you only heard a reference to a clarification letter, isn't
```

Page 153

1    that right?

2    A.   No, I don't think that is right.  The word "amendment" may

3    not have been used, but Mr. Miller made it, I think, very clear

4    that day that there were substantial changes that had been made

5    and needed to be made, and that those documentation had not yet

6    been created.  So while the word "amend" wasn't there, the idea

7    that there were substantial changes in the -- being made in the

8    transaction and in the documentation was definitely told to the

9    Court.

10   Q.   Among the changes that you heard Mr. Miller describe, you

11   did not hear Mr. Miller tell the Court that the definition of

12   "purchased assets" in an asset purchase agreement was going to

13   change, did you?

14   A.   I'm going to state -- he didn't say how the changes were

15   being implemented.  He described -- Ms. Fife described -- in

16   the totality it was described as to what the fundamental

17   changes that needed to be made to reflect what had been --

18   arisen on Friday.

19   Q.   Well, sir, on the 19th of September when you were at the

20   sale hearing, you didn't hear anyone say a word to the Court

21   about redefining the purchased assets to include the assets

22   transferred in the repo, did you?

23   A.   We were entitled -- not those words, but -- no, no, no --

24   Q.   So is that a yes, sir?  You did not hear anyone say that

25   the definition of "purchased assets" would be changed to

Page 154

1    include the assets included in the repo?

2    A.    What I heard -- what -- the assets in the repo were the

3    securities that had been and still were part of the long

4    position.  There was no change.  Yes, the lawyers, as we sat

5    on -- and revised the document to make it all fit together and

6    work, we used some words.  We did not change the fact that we

7    were buying all the assets of the business, and we did not

8    change the fact that that included what had been the long

9    position.  What turned out was that the long position was

10   noth -- there was nothing in the long position other than what

11   was in the repo, okay?  Plus we had the clearance box, and that

12   got added in in the final version of the clarification letter

13   also.  But there were no other trading assets that had been in

14   the long position other than had been in the repo plus the

15   clearance box.

16   Q.    And although there was no change, sir, other than the

17   total amount, for some reason the lawyers decided they needed

18   to reflect this redefinition in the clarification letter --

19   A.    What was conclu --

20   Q.    -- is that your testimony?

21   A.    What was concluded was that, in order to make it all fit

22   together that it was a lot easier, and I think this was a Weil

23   person who suggested this; I don't remember whether it was Mr.

24   Messineo or some -- who it was, but one of the Weil -- he said,

25   'You know, given that there's nothing in the long positions

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 155

1   other' -- this was on Saturday -- 'in the repurchase agreement

2   other than' -- I believe it was on Saturday -- 'other than what

3   was in the repo.'  Plus we've got to deal with the clearance

4   box.  There really is nothing left of the concept of the long

5   positions, and it would be simplifying if we were to just refer

6   to the repo agreement.

7   Q.   Well, to refer to the repo and to refer to the -- I'm

8   sorry, to refer to the repo collateral and to the clearance

9   box, yes?

10  A.   That's correct.

11  Q.   And to the 15c3?

12  A.   Well, the 15c3 was separately dealt with in the repurchase

13  agreement --

14  Q.   And it was necessary --

15  A.   -- in the

16  Q.   -- in the drafter's view --

17  A.   -- in the clarifi -- I didn't finish my sentence.

18  Q.   Go right ahead.

19  A.   -- in the clarification letter.

20  Q.   Are you done?

21  A.   I'm done.

22  Q.   Okay.  And it was necessary, in the lawyer's view, in the

23  drafter's view, in order to be clear about what the transaction

24  was, to change the language from "long position" to describe

25  the assets in the repo, add in the unencumbered box and refer

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 156

1    to the 15c3 assets, correct?

2    A.    As I said, one of the partners at Weil Gotshal suggested

3    that we change the document to do it that way.  It was believed

4    that that was a simpler way to address it.  Seemed sensible

5    when they suggested it.  This was not a negotiation; it was

6    just trying to get the thing to work and trying to reflect the

7    deal as it had been revised and as it had been described to the

8    Court.

9    Q.    When you say "the deal as it had been revised", do you

10   mean the deal as it had been amended, or is there a difference

11   in those words, in your view?

12   A.    No, I think -- I'm not -- it was amended.  Mr. Miller made

13   it clear that there were major changes that had been made to

14   the deal.  What would a major change be that it's not an

15   amendment?

16   Q.    Well, let me --

17   A.    I'm sorry, I shouldn't get rhetoric.

18   Q.    No, that's okay.

19   A.    I didn't answer the question, but --

20   Q.    But let me suggest to you, sir, that a major change would

21   include changing the definition of "purchased assets" in an

22   asset purchase agreement.  Would you agree with me that's a

23   major change?

24   A.    Well, it depends on what the -- how it's done.  If in fact

25   the substance -- if the long positions are now in the repo and

Page 157

```
 1    we switch from one set of words to another set of words, that

 2    doesn't nec -- it's not necessarily a material change.

 3    Q.   Maybe I'm lapsing into the rhetorical, sir, but if the

 4    deal is Barclays gets everything except that which is

 5    excluded --

 6    A.   Yes.

 7    Q.   -- why do you have to change the definition at all?

 8    A.   It was being -- it was proposed because the -- I don't

 9    remember the full point.  What I -- I distinctly remember a

10    Weil lawyer suggesting we change it.  It seemed sensible at the

11    time.  And I don't think it changed the substance, because we

12    were getting all of the assets except the excluded assets.

13    Q.   Now, what we -- what I think we've agreed, sir, with

14    respect to this document is that, as of the Friday, before the

15    sale hearing had commenced, the terms of the clarification

16    letter had changed from "clarifying" to "clarifying and

17    amending".  We agree on that?

18    A.   What we would agree to -- what I would agree to is that

19    Weil sent a draft that used the word "amend" as well as

20    "clarify".

21    Q.   And that word ultimately wound up --

22    A.   And that --

23    Q.   -- in the clarification agreement that you agreed to, yes?

24    A.   That my client agreed to, yes.

25    Q.   All right.  Which our client agreed to.  And at no point
```

Page 158

```
 1   after that word appeared, sir -- you never suggested taking it

 2   out, did you?

 3   A.    No.

 4   Q.    All right.  So it looks like the word "amended" got added

 5   before the sale hearing began; can we agree on that?

 6   A.    So it appears.

 7   Q.    All right.  Now, when did the change in wording concerning

 8   the definition of "purchased assets" occur?  Do you recall

 9   that?

10   A.    I believe sometime on Saturday or Sunday, but I don't

11   remember precisely when.

12   Q.    All right, well, let me ask you, sir, to take a look at,

13   in the same book, Exhibit M-53.  Let me know when you're there.

14   A.    I'm there.

15   Q.    Okay.  Now, Exhibit M-53, sir, you'll see, comes under an

16   e-mail, again from Mr. Messineo, again to you; this one dated

17   Saturday, September 20th at 2:39 p.m.  See that?

18   A.    I do.

19   Q.    All right.  And again, Mr. Lewkow, if you'd turn into the

20   document to the first place that you see, the blackline pages,

21   and here I'm not even able to help you with a Bates number;

22   just where the blacklining begins.

23   A.    Yep, I've got it.  It's --

24   Q.    All right.  And --

25   A.    It's the one with the optimist word "WGM Final September
```

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 159 of 253

Page 159

1    20th".

2    Q.   Yes, sir.  We know that things go on for two more days.

3    A.   I told you -- remember I testified earlier in connection

4    with that with the Berkenfeld initials that "Final" is not

5    always final.  Yes.

6    Q.   I promise I'm not going to ask you a question about that

7    word "Final".

8    A.   Okay.

9    Q.   Okay?

10   A.   Fair enough.

11   Q.   But I am going to ask you about the definition of

12   "purchased assets".  Take a look through that --

13   A.   Okay.

14   Q.   -- see what's blacklined and what's been taken out.

15   A.   Okay.

16   Q.   And in particular, sir, if you would take a look at the

17   changes in paragraph 1(a), subsection (2).  It begins "Plus,

18   the securities owned by LBI".

19        (Pause)

20   Q.   And as you look through it, sir, my question to you is

21   going to be do you agree with me that this is the blackline

22   that indicates this is when the reference to long position

23   comes out and the reference to the repo assets and the

24   clearance box comes in?

25   A.   Let me review this whole section, if I may.  (Pause).

Page 160

Yes, it appears to be.

Q.    All right.  Now, at that point, sir, just at this point,

the word "amends" has come into the clarification letter on

Friday.

A.    Yes.

Q.    And this change from "long position" to the definition

that you see before you comes in on Saturday.  Is there any

discussion at this point 'Maybe the changes are significant

enough we need to show them to the Court'?

A.    No.

Q.    You were aware, were you not, that at the hearing on

Friday, the Court announced that it would be present on

Saturday in case there were issues that needed to be hashed

out?

A.    I recall Your Honor had said something about his

availability over the weekend, if --

Q.    All right, so just as --

A.    -- if need be.

Q.    I beg your pardon.  So just as a timepost, when this draft

is generated, the optimistically named "Final Draft" which

comes across on an e-mail Saturday at 2:39 p.m., nobody had

said the Court never saw this clarification letter; we ought to

go hash this out with the Court?

A.    No.  I will note that, as I testified earlier, the Court

had been told that the clarification letter was in the works.

Page 161

1    The Court had heard objections from at least a couple of

2    creditors suggesting that the Court could not -- could not

3    even, I believe, and should not approve it -- the transaction

4    until the Court had seen such documents.  And yet the Court had

5    gone on to approve it.  I also believe that the sale order that

6    was negotiated after the initial approval by the Court but

7    before the Court signed the sale order was negotiated in the

8    courtroom with the trustee, with the creditors' committee, with

9    some other creditors who were there with counsel and the like.

10   And it included references to the fact that -- it, in fact, I

11   believe, defined for purposes of the sale order the purchase

12   agreement to include an as amended pursuant to the

13   clarification letter which no one had yet seen.

14   Q.   Well, take a look, sir -- sorry.  Stay where you are in

15   that book, but take a look at the white book, the one Mr.

16   Schiller gave you.  And open it to tab 5.  You'll find the sale

17   order there.  And that's BCI Exhibit 5.

18   A.   Which -- what tab number?

19   Q.   I beg your pardon.  It's tab 12 in Mr. Schiller's book.

20   A.   Tab 12 is the --

21   Q.   No.  I have that wrong.  Hold on.  Tab 11.  And you'll see

22   that's BCI Exhibit 16.  So now I have my record right.  But let

23   me know when you're at the document.

24   A.   I have it.

25   Q.   All right.  And I think you said that the negotiated order

Page 162

 1    reflected an agreement that the clarification letter could

 2    amend the transaction?

 3    A.   Well, what I said is that there was reference to it.  I

 4    think that the sale order I'm looking at -- about six, eight

 5    lines down.  And it says after referring to the asset purchase

 6    agreement and a first amendment.  It said "And the letter

 7    agreement clarifying and supplementing the asset purchase

 8    agreement" and it references that letter.  It does not use the

 9    word "amending".

10    Q.   No, it doesn't, sir.  It says "clarifying and

11    supplementing", doesn't it?

12    A.   It does say that, yes.

13    Q.   And you didn't view the fact that the Court was told the

14    clarification letter was in process as a permission to put

15    anything the parties wanted in a clarification letter, right?

16    A.   Not to put anything they wanted, no.

17    Q.   There was some -- there was some limits on what could be

18    put in the clarification letter, correct?

19    A.   It was my understanding based in part on what Mr. Miller

20    said as well as what I was told is that -- and it made sense

21    certainly to me that we needed to be consistent with, in all

22    material respects, with what the Court had been told in the

23    combination of the documents that the Court had received as

24    well as the two hearings, yes.

25    Q.   And as of Saturday when this definitional change is made

Page 163

1    through the clarification letter, the Court's not been told

2    that what's being transferred are the assets and the repo.  The

3    Court's not been told about the unencumbered box and the

4    Court's not been told about 15c3, isn't that right?

5    A.   What the Court had been told was that all of the assets

6    except excluded assets were going to --

7    Q.   Well, again, sir, I'm a little reluctant to get into a

8    drafting fight with an M&A lawyer.  But the clarification

9    letter doesn't say all the assets except the excluded assets,

10   does it?

11   A.   The -- where is the clarification letter?

12   Q.   Take your time to find it, sir.  But I know the answer to

13   this one.

14   A.   It's under --

15   Q.   It doesn't say all the assets except the excluded assets,

16   right?

17   A.   It says the "Purchased Asset means:  1(i) all of the

18   assets of the Seller used primarily in the business or

19   necessary for the operation of the business (in each case

20   excluding the Excluded Assets)."

21   Q.   And for some reason, sir, the drafters had to go on to

22   describe those, with particularity, by referring to the assets

23   transferred in the repo, the unencumbered box and the 15c3

24   assets, yes?

25   A.   What -- I don't agree with that characterization.  From

Page 164

1   the beginning, from the asset purchase agreement, as I've

2   previously testified, "Purchased Asset" was defined as

3   everything.  There were certain things that were specifically

4   referenced with the word "including" leading to those

5   references.  And a page or two later, it was explicitly stated

6   as is common that "including" should not be interpreted to mean

7   it was limiting to only those that were specifically

8   designated.

9   Q.   And yet, sir, the description of the assets needed to be

10  clarified, correct?

11  A.   We were doing a letter to try to memorialize what had

12  happened as best we could.  And that's what we did.

13  Q.   So I think where we are with respect to the drafts of the

14  clarification letter is that on Friday, the word "amends" is

15  decided to be used and on Saturday, the change in definition of

16  the "Purchased Assets" arises, yes?

17  A.   Weil sent us a draft on Friday with the word "amends".  It

18  may have reflected discussions we may have had.  I don't

19  recall.  But they sent a draft that has the word "amends".  And

20  on Saturday, Weil drafted language that focused on because the

21  long positions -- because of what had happened and that the

22  entirety of the long positions was in the repo, we had learned

23  to reference that.  It seemed like a good idea at the time.  We

24  didn't think we were making a fundamental change from what the

25  Court had been told by using different words.  And I continue

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 165

1    to believe that.

2              MR. GAFFEY:  Your Honor, could I ask, if this is a

3    convenient for our mid-afternoon break, or --

4              THE COURT:  This would be fine.

5              MR. GAFFEY:  Thank you.

6              THE COURT:  Let's resume at 3:35.

7              MR. GAFFEY:  Thank you, Your Honor.

8         (Recess from 3:22 p.m. until 3:43 p.m.)

9              THE COURT:  Be seated, please.  Before we resume, I

10   just want to get a sense, not a binding commitment of timing,

11   but a sense as to about how much more time I should anticipate

12   this afternoon for the examination of the witness, not only by

13   Mr. Gaffey but also by the other movants.  And my reason for

14   asking that is it's a quarter to 4.  It's a very big witness

15   book and we haven't really delved into most of it.  It may be

16   that we won't.  But I can't tell what we're talking about in

17   terms of anticipated scope and duration.

18             MR. GAFFEY:  I think I'm about another half hour, Your

19   Honor.

20             THE COURT:  Okay.

21             MR. MAGUIRE:  I would anticipate about an hour, Your

22   Honor.

23             MR. TECCE:  Your Honor, I probably don't -- I only

24   have a few minutes.

25             THE COURT:  All right.  We may finish today then.

Page 166

1    There's a -- I bring this up because -- and I don't want to

2    inconvenience the witness at all.  But I can't stay late this

3    evening.  I have to prepare for tomorrow's calendars.  And I

4    also would like to read the letter briefs that have been

5    submitted.  So I don't want to stay much past 5:45 at the

6    latest.  But I also don't want to inconvenience the witness.

7    And we don't want to limit the parties in their examination.

8    So let's just keep the next two hours as being sort of the

9    window of best opportunity for the balance of the day.

10            MR. GAFFEY:  I'll do what I can to hue to the half

11   hour, Your Honor.

12            THE COURT:  Okay.

13            MR. GAFFEY:  I think I can --

14   RESUME CROSS-EXAMINATION

15   BY MR. GAFFEY:

16   Q.   Now, Mr. Lewkow, we're back -- just to direct your

17   attention back again to the weekend of the 20th and the 21st,

18   we've talked about some changes made, some drafting in the

19   clarification letter.

20        Another event that occurred on Saturday the 20th was that

21   you learned about the termination of the repurchase agreement.

22   Do you recall that?

23   A.   What I testified to, I believe, this morning was that I

24   learned that a -- some sort of back office letter had been sent

25   from Barclays to Lehman in the nature of purporting to

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 167 of 253

Page 167

1    terminate the repo, that's correct.

2    Q.   It's not a point I want to spend a lot of time on.   In

3    substance, somebody at Barclays not involved in the

4    negotiations sent a notice terminating the repo.   And you found

5    out about that event on Saturday after the sale hearing, yes?

6    A.   That is correct, yes.

7    Q.   Okay.   And you understood, at least as a general matter,

8    that the termination of a repurchase agreement has certain

9    implications in a bankruptcy proceeding, correct?

10        (Pause)

11   A.   Can I hear the question again, please?

12   Q.   You understood, at least as a general matter, that the

13   termination of a repo has certain implications in a bankruptcy

14   proceeding, correct?

15   A.   I don't know that I knew that at that time.

16   Q.   You came to learn it over the weekend, didn't you?

17   A.   No.   When I say at that time, I mean over the weekend.   I

18   -- you know, I've since been told that I do not recall that

19   being pointed out to me at that point in time.   It may have

20   been but I don't have a recollection of it.

21   Q.   Do you recall, sir, that at the hearing on the 19th, that

22   is, on the Friday, the Court asked some questions of your

23   partner, Ms. Granfield concerning safe harbor provisions?

24   A.   I do recall something, yes.

25   Q.   And you recall, sir, as a general matter, that Ms.

Page 168

1   Granfield told the Court that, in essence, that safe harbor

2   provisions were not at issue, were not being affected by the

3   deal, yes?

4   A.   If that's what's in the transcript.  It's entirely

5   possible.  It would have -- it's not something that would have

6   registered with me because it's not something I was familiar

7   with.

8   Q.   And there had been communications between one of your

9   partners, Mr. Rosen and the SEC, again, concerning generally

10  the topic of safe harbor provisions including Section 559 of

11  the Bankruptcy Code.  Do you recall that?

12  A.   I do not recall that.  I know Mr. Rosen has some

13  conversations with the SEC on some issues in connection with

14  the deal but I can't tell you what.

15  Q.   And it came to your attention over the weekend when you

16  learned that the repurchase agreement had been terminated that

17  some drafting would need to be done to address the fact that

18  the repo had been terminated in the context of a bankruptcy

19  proceeding, correct?

20  A.   What I recall, yes, in the sense that I recall that -- I

21  learned it all at once.  Okay.  It wasn't I learned that there

22  was a notice of termination had gone out and then some point

23  later I learned something else.  I learned that there had been

24  a notice of termination of some sort sent out by some back

25  office person at Barclays and that that created complexities

Page 169

1   and notice requirements and the like is what I recall.

2   Conceivably, I was told more and don't recollect it, and

3   therefore, we wanted -- that it was desired to -- to undo that

4   back office letter.  I do recall that.

5   Q.   Did you come to understand in substance, sir, over the

6   weekend that when a repurchase agreement is terminated, the

7   lender is entitled under certain provisions to take back the

8   amount lent, but that overage, that is, the haircut, needs to

9   be paid back into the estate?

10  A.   I don't recall being told that over the weekend.

11  Q.   Was there any discussion of that topic at all over the

12  weekend?

13  A.   With the other side?

14  Q.   With anyone.

15  A.   Not that I recall.

16  Q.   And there certainly was no discussion of that topic

17  between the folks on the Lehman side of the table and the folks

18  on the Barclays side of the table, right?

19  A.   Not that I was a party to.

20  Q.   And you were there all weekend, weren't you?

21  A.   Well, I was somewhere while -- pretty much all weekend,

22  but I wasn't at every conversation that any two people had.

23  Q.   As far as you know, there was no conversation between

24  Cleary and Barclays and that side of the table with Weil and

25  Lehman and that side of the table over the implications of the

Page 170

```
 1    termination of the repo, correct?

 2    A.    Not to my knowledge.

 3    Q.    One of the other firms representing -- advising Barclays

 4    in connection with the transaction was Sullivan & Cromwell, is

 5    that correct?

 6    A.    That's correct.

 7    Q.    All right.  And Sullivan & Cromwell drafted a provision to

 8    be inserted into the clarification letter regarding the

 9    termination of the repo, is that right?

10    A.    I don't recall who drafted it, but it could well have been

11    Sullivan & Cromwell.

12    Q.    In the -- and I think we're staying in just this book,

13    sir, the book with your name on the front, turn to Exhibit 138.

14    Do you see that?

15    A.    I've got the wrong -- 138?

16    Q.    Green cover, has your name on it.

17    A.    Oh, I have this book inside that book.  That's my problem.

18    All right, hold on.  Yes, 138.

19    Q.    All right, are you there?  At that exhibit?

20    A.    I am.

21    Q.    All right, and you see, sir, that Exhibit 138 is an -- the

22    bottom e-mail in the chain is an e-mail to -- I'll murder this

23    name -- Dave [Leenwald] at Cleary Gottlieb?

24    A.    [Linewand].

25    Q.    [Linewald], okay.  From --
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 171

1    A.    Leinwand, but it doesn't matter, okay.

2    Q.    -- Ken Myers at Sullivan & Cromwell, correct?

3    A.    I see that, um-hum.

4    Q.    All right, and Mr. Myers is sending a new paragraph 13,

5    you see that?  It's the title of the underlying e-mail.

6    A.    I do see that, yeah.

7    Q.    All right, and in that is some language -- the new

8    paragraph 13 is entitled, "Barclays Repurchase Agreement".  Do

9    you see that?

10   A.    I do see that, yes.

11   Q.    All right, and that language, I won't take the time to

12   read it all to you, sir, but that language addresses the

13   termination of the repo in the sense that it deems the

14   termination to be void ab initio.  Do you see that?

15   A.    I do see that.

16   Q.    All right, and that paragraph, sir, word-for-word, is the

17   paragraph that wound up in the final of the clarification

18   letter as paragraph 13, is that right?

19   A.    I would have to compare it word-for-word.  Certainly,

20   there was a similar provision.

21   Q.    Okay.

22   A.    If you --

23   Q.    Again, in the interest --

24   A.    I have no reason not to believe it's not identical.

25   Q.    Okay, in the interest of time, I'll represent to you --

Page 172

1    A.    Okay.

2    Q.    -- that it is, word-for-word --

3    A.    Fine.

4    Q.    -- in the final of the clarification letter.  And my

5    question to you, sir, is did anyone ask why do we need all this

6    language, why do we need this provision, why do we need to

7    terminate the termination of the repo ab initio.

8    A.    I can't say that there was no discussion.  I can only say

9    that this was, you know, there was a lot going on.  I was not

10   involved in -- personally, in this provision.  There was a

11   draft by -- from Sullivan & Cromwell, that was apparent, that I

12   see somebody from the client was copied on and then sent to

13   Dave Leinwand, and he put it -- proposed it to Weil, and they

14   put it in.  But I was not involved in that process.

15   Q.    I take it, sir --

16   A.    To the best of my recollection.

17   Q.    Okay.  And I take it, given your answers in this line of

18   questioning, that there was no discussion at this point, when

19   the new paragraph 13 gets put in on Sunday, about going back to

20   the Court to discuss the implications of the termination of the

21   repo.

22   A.    I do not recall any such thing at all, no.

23   Q.    All right, and at the time that this language was put into

24   the clarification letter --

25   A.    I mean, I also don't know that the Court was ever told

Page 173

1    that there had been this back office notice of termination.  So

2    it's --

3    Q.   I don't think it was, sir.

4    A.   Well, okay, so we're --

5    Q.   Okay, so -- so the Court's not told about the termination.

6    A.   Ab initio is ab initio.

7    Q.   All right, and --

8    A.   But go on.  I'm not -- fine.

9    Q.   Okay.  So we're agreed, the Court's not told about the

10   termination and the Court's not told about the insertion of

11   paragraph 13 until it sees the clarification letter the

12   following week.

13   A.   On Monday, yes.

14   Q.   All right, and you understood -- well, isn't it so, sir,

15   that the reason the repo was retroactively terminated,

16   terminated ab initio, was because the effect of the termination

17   of the repo was to amplicate provisions of the Bankruptcy Code

18   that required the excess collateral to be paid back into the

19   estate.

20   A.   I just do not know the answer to that.

21   Q.   And there was no discussion about going to the Court to

22   seek relief from any provisions of the Code that might affect a

23   terminated repo?

24   A.   Not to my recollection, no.  Other than to the extent the

25   conversation I testified earlier about in which Mr. Miller

Page 174

```
 1   suggested that in his view, that nothing that had been done

 2   over the weekend -- and this is within the "everything that had

 3   been done in the weekend" -- that in his view, that nothing we

 4   had done over the weekend required that and that nobody

 5   disagreed with Mr. Miller.  So in that sense, there was a

 6   discussion, but it never -- never in my -- to my knowledge was

 7   there a discussion of thi -- as this of a specific provision.

 8   Q.   As I understand your description of that point, sir, and

 9   I'm educated a bit by your deposition, essentially what

10   happened there is Mr. Miller looked at the assembled group, and

11   he said something like, "Does anyone think we've done anything

12   inconsistent that we've told the Court and have to bring this

13   back," and nobody said anything.

14   A.   Yeah, I think he -- he -- he suggested first -- I don't

15   know if it was in my deposition, but he suggested that he

16   didn't believe there was anything required, and nobody

17   disagreed with him.

18   Q.   And nobody from the Barclays team, nobody on the Barclays

19   side of the table said in sum or substance, you know, we're

20   going to keep the haircut in the repo, and we need to go get

21   relief from the Court in order to do that.

22   A.   No one said that.

23   Q.   And the thinking -- isn't it a fact that the thinking on

24   the Barclays side of the table was, if we retroactively

25   terminate the repo, we can get around that provision and not
```

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 175 of 253

Page 175

```
 1    have to go to the Court and talk about where the excess

 2    collateral is going?

 3    A.    To my knowl -- I have -- I was not a party to any such

 4    conversation.  I am not aware of any such conversation.

 5    Q.    Now, I'd like to talk to you a bit, sir, about the

 6    decision not to go to the Court with the clarification letter,

 7    all right?  As I heard your testimony this morning to Mr.

 8    Schiller, you talked a bit about a -- the hallway -- I don't

 9    know what to call it -- the hallway meeting, the hallway

10    conversation about the 15c3s.

11    A.    Conversations, plural, yes.

12    Q.    All right, and you said someone said -- and I don't know

13    if you attributed -- someone said, we're not quite sure what

14    Lori -- Lori Fife said to the judge about this issue, yes?

15    A.    No, what I said is, somebody said -- and my guess is it's

16    Mr. Miller -- but it was somebody, one of the Weil partners, it

17    was not Ms. Fife, she was not in the -- there at the moment,

18    one of the Weil partners said that we don't recall the --

19    precisely what was said about -- by Ms. Fife when she was

20    describing the deletion of the retained cash provision of the

21    asset purchase agreement, and whether it was said in a way that

22    would implicate the fact that now that we know there's cash, a

23    billion dollars of cash in the 15c3-3 account, yes.

24    Q.    I'm not going to visit with you, sir, on the whole 15c3

25    topic --
```

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 176 of 253

Page 176

```
1    A.    Okay.

2    Q.    -- except in this limited way.  Someone says, nobody seems

3    to know exactly what Lori Fife told Judge Peck.

4    A.    That's correct.

5    Q.    And a billion dollar issue is resolved by negotiation,

6    rather than wait till Monday and get the transcript.  Is that

7    right?

8    A.    I'm not sure I would call it by negotiation.  Barclays --

9    and I was not a party to any internal conversations that

10   Barclays and Mr. Klein and potentially others had on that

11   subject except that at some point, an hour, two hours, three

12   hours later when we resumed our hallway conversations, it was

13   reported by somebody on our side, I think it was Mr. Klein,

14   that we would give up the billion dollars in cash.

15   Q.    So rather than wait till Monday and come back to court and

16   get the transcript, Barclays gives a billion dollars?

17   A.    I think yes, given the enormous desire to close before

18   Monday morning, yes.

19   Q.    And these changes we've talked about are made, the change

20   in the definition of purchased assets, the addition of the word

21   "amends", and the insertion of a new paragraph 13 to deal with

22   the repo termination.  And then nobody decides, between that

23   and the billion dollar issue, we should go to the Court on

24   Monday.

25   A.    Well the -- but we gave up the billion dollars.  I think
```

Page 177

1    the focus was, in the totality, did Lehman, after compared to

2    what the Court had been told on Friday, after Wednesday, and

3    after the filing, was there material changes to the detriment

4    of Lehman, the estate, such that we had to go back.  If

5    Barclays giving up stuff is not the kind of thing that I think

6    would have led anyone to think we had to go back.

7    Q.   Now, there was no drop-dead date or time on the closing,

8    was there?

9    A.   I think there was in the asset purchase agreement.  I

10   would have to look, but I believe there was.

11   Q.   The asset purchase agreement provided, sir, that the time

12   for the closing could be extended by agreement of the parties.

13   Do you recall that?

14   A.   Well, that doesn't -- as you know, I'm sure, but certainly

15   as a corporate lawyer, that doesn't add anything to what -- any

16   contract has the parties can extend.  But unless they

17   affirmatively agree to extend, there was a drop-dead date.

18   Q.   And --

19   A.   That's what a drop date (sic) means.

20   Q.   And what I'm trying to distinguish between, sir, is the

21   desire to close before the markets open on Monday and the

22   requirement there be a closing --

23   A.   Well --

24   Q.   -- before the markets open.

25   A.   Well --

Page 178

1    Q.   The desire was there, but the requirement was not,

2    correct?

3    A.   Well, the requirement -- I forget the exact date, and I

4    don't think it was Monday.  I think it might have been Tuesday.

5    But the point is, there was a very strong desire.  The

6    government was urging us to get it closed; the Court had over-

7    optimistically been told that they hope to close Friday night

8    after the Court ruled, but that whole hearing took a long time

9    to go through everything, and then the sale order and the like,

10   and as I've testified previously, we didn't have a

11   clarification letter that worked, and we also hadn't figured

12   out how to deal with the pipes and those sorts of issues.  And

13   so it took some time.

14        But the market, if you haven't gone back and looked at

15   the newspapers of Saturday and Sunday, but it was in there, the

16   Court's approval was in there, the expectation that we would

17   close over the weekend was in there, and there was a real

18   concern that Barclays had, that the Lehman executives had, and

19   that we were being told by the SEC and the Fed that they had,

20   that it was important that we get this thing closed before the

21   market opened on Monday.

22   Q.   Right, so given that importance of closing before the

23   market opens on Monday, with doubts as to what was told to the

24   Court about a billion dollar issue --

25   A.   But we gave up the billion dollars.

Page 179

1    Q.   You know, a couple times, sir, you've asked me to let you

2    finish.

3    A.   I'm sorry, you're right.  I apologize.

4    Q.   Okay.  With doubts about what the Court was actually told

5    about a billion dollar issue, with changes made to the

6    definition of purchased assets in an asset purchase agreement,

7    with the addition of the word "amend" to a letter that

8    previously had only been a clarification, with language

9    inserted to deal with the termination of a forty-five billion

10   dollar repo, and with no requirement in the contract or the

11   Court's order that this deal close before Monday, is it your

12   testimony it never once occurred to any of the lawyers in the

13   room to go back to the Court and run these changes by the judge

14   to see if further proceedings were necessary?

15   A.   As I told you, there was a conversation as to whether the

16   changes were material -- in any material way inconsistent with

17   what the totality of what the Court had been provided in

18   writing, and in Wednesday's and Friday's hearings.  As you went

19   through your litany of provisions, I think I've testified about

20   each one of them and why, in my mind, either except for the one

21   about the repo and the Bankruptcy Code where I have conceded I

22   had not been party to and I was not very knowledgeable, if at

23   all, about the implications of that, but on that one, as I've

24   testified, the Court had never been told that there was some --

25   some termination that would have -- I mean, to the extent the

Page 180

 1   Court was described the deal, nothing happened on that in a net

 2   basis, because I didn't know that because I was not focusing on

 3   that.  I didn't know about that.

 4   Q.   Well, the fact is, sir --

 5   A.   But -- but the other provisions that you did talk about as

 6   you gave your litany, on each one of them, I don't believe it

 7   was a fundamental change in the deal as it had been described

 8   to the Court.  And obviously, Mr. Miller and his colleagues

 9   were of the same view because I've described that -- that

10   conversation.

11   Q.   And since that time, sir, have you come to understand that

12   there are implications under the Bankruptcy Code to the

13   termination of a repo?

14   A.   Yes.

15   Q.   And you have come to understand that under the Bankruptcy

16   Code, when a repo is terminated that involves a debtor, the

17   haircut gets put back into the estate.

18   A.   I'm not going to get into --

19   Q.   Well, yes or no, sir.

20   A.   I'm not enough expert.  I -- the answer is --

21   Q.   The question is do you understand that's so.  I don't want

22   you to analyze the Bankruptcy Code, but do you understand

23   that's the bottom line?

24   A.   I'm not sure.

25   Q.   You're not sure, even as you sit here today?

Page 181

1    A.    I believe it's something like that, but I just -- I'm not

2    going to testify as to the Bankruptcy Code.

3              MR. GAFFEY:  May I consult for one second, Your Honor?

4              THE COURT:  Sure.

5    Q.    You mentioned, sir, that it was important to the public,

6    it had been reported that there would be a closing on -- before

7    the markets opened on Monday?

8    A.    I believe there had been such reports on the radio and

9    on --

10   Q.    I'm going to break a small promise to you.  You need to go

11   back to Mr. Schiller's book --

12   A.    It's all right.

13   Q.    -- the one with the white cover, and turn to tab 6,

14   please.

15   A.    Okay.  I have it.

16   Q.    Okay, and behind tab 6, you'll find Barclays Exhibit 198.

17   A.    I see it.

18   Q.    And you see in that, sir, in the third paragraph, there's

19   a reference.  It says, as follows:  "The deal needs to be

20   approved by the U.S. Bankruptcy Court in New York and can be

21   terminated if it is not completed by September 24th.  Lehman is

22   filing an emergency motion to seek approval."  Do you see that?

23   A.    I do see that.

24   Q.    And you mentioned before that you thought the closing

25   could take place at least as late as Tuesday?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 182

1    A.    Yeah, I don't remember the exact -- it was not Monday.  It

2    was a day or two later, so.

3    Q.    So Monday was available, should anybody have decided --

4    A.    Yes.

5    Q.    -- we'll go to the Court and sort all this out.

6    A.    As I testified, yes.

7    Q.    Okay.

8          MR. GAFFEY:  I have nothing further, Your Honor.

9          THE COURT:  Yes, you may approach with more books.

10         MR. MAGUIRE:  Thank you, Your Honor.

11         THE WITNESS:  Can I -- can I --

12         MR. MAGUIRE:  Bill Maguire for the SIPA trustee.

13         THE WITNESS:  Can I put these down, please?

14         THE COURT:  Thank you.

15   CROSS-EXAMINATION

16   BY MR. MAGUIRE:

17   Q.    Now, sir, you've spent a good portion of the day

18   testifying about the asset purchase agreement, and you'll find

19   that in -- at tab 2 of the small binder I've provided you.

20   Okay?

21   A.    I see it.  This is the version that incorporates the

22   written comments rather than with the written comments, I see.

23   Q.    Yeah.  And specifically, you testified about the provision

24   purchased assets on page 6 of the document which is Movants'

25   Exhibit 1.

Page 183

1    A.    Yes.

2    Q.    Indeed, you testified specifically about subdivision D of

3    purchased assets, and the language that was added, "with a book

4    value as of the date hereof of approximately seventy billion

5    dollars."

6    A.    That's correct.

7    Q.    Now, I believe you testified earlier about how there were

8    no representations and warranties as to value.

9    A.    That's correct.

10   Q.    You recall that testimony?

11   A.    I have.

12   Q.    You did understand, however, sir, that this document, the

13   asset purchase agreement, was going to be filed with the Court.

14   A.    Yes.

15   Q.    You understood that it was a matter of great public

16   interest?

17   A.    Yes.

18   Q.    You understood that, in particular, creditors who had a

19   particular stake in the outcome of the motion to seek approval

20   of this deal would be interested in that document?

21   A.    Yes.

22   Q.    And when the parties added those words, "with a book value

23   as of the date hereof", you didn't mean to suggest in your

24   earlier testimony that they had a license to put in any number

25   they wanted into that provision?

Page 184

1    A.   No, my recollection is that somebody from the Lehman side

2    suggested that we add those words to give some indication of

3    what we were talking about.  And you'll remember I testified

4    that we weren't going to include that one page Berkenfeld

5    document, et cetera, but someone suggested let's put something

6    in there and proposed that language, and we put it in.

7    Q.   At a minimum, there had to be a good faith belief on the

8    part of the parties that what you were talking about in

9    subdivision D was assets that had a book value as of the date

10   hereof of approximately seventy billion dollars, isn't that

11   right?

12   A.   It was -- it was, yes, based on Lehman's estimates, but

13   yes, I agree.

14   Q.   Had the principals told you that they were adding another

15   four billion dollars of book value to that, you would have had

16   to -- the parties would have to change that to seventy-four

17   billion dollars' book value, isn't that correct?

18   A.   I don't know whether we had to or would have, or whatever.

19   It's speculation.  But I certainly agree that -- that it -- it

20   was in there and it was an estimate that was of the approximate

21   amount of these securities on Lehman's books.  The book value

22   means on Lehman's books.  And that's what Lehman had proposed,

23   using the words.  Mark -- marks, the aggregate marks was the

24   term they originally suggested, somebody.

25   Q.   You're aware that there's a dispute in this case between

Page 185

1    Barclays and Lehman on the subject of Lehman's cash, are you

2    not?

3    A.    Yes.

4    Q.    Are you aware that the amount in dispute is some four

5    billion dollars?

6    A.    I know there's a lot of disputes here, yes.

7    Q.    And had four billion dollars been added to this division

8    B, subdivision B of purchased assets, that would have to read

9    seventy-four billion dollars, isn't that correct, sir?

10   A.    I -- I'm not -- I'm not sure I understand the question,

11   Mr. Maguire.

12   Q.    Well, you refer to speculation, and in fact, it is

13   speculation, sir, because you had no conversations with anyone

14   about adding four billion dollars of Lehman margin to this

15   provision D, isn't that correct?

16   A.    This was not about margin.  This was about the long

17   positions and an estimate on the long positions.

18   Q.    Are you aware, sir, of -- that Mr. Rich Ricci has

19   testified in this court?

20   A.    Yes, I'm aware vaguely that he testified in court, yes.

21   Q.    Are you aware of the subject of Mr. Ricci's testimony as

22   to where margin was in this provision D?  Are you aware of that

23   testimony?

24   A.    Not specifically.

25   Q.    It's your testimony, however, sir, that there's no margin

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 186

1    in division D, isn't that correct?  Isn't that what you just

2    told us?

3    A.    When --

4    Q.    This is not about margin.

5    A.    No, this was --

6    Q.    Isn't that what you just said?

7    A.    -- what we were talking about is the positions, okay?  The

8    long positions.  It's my understanding, and I don't know what

9    else is involved, but the -- we have, in addition to the --

10   that when you buy -- when you buy a portfolio of assets, that

11   you can't -- you don't separate out the margin.  The margin

12   comes with it.  You're buying a portfolio of this nature.  And

13   that was my understanding.

14   Q.    I understand that's your position now, sir.  Two questions

15   ago, you were asked the question,

16   "Q.  You refer to speculation, and in fact, it is speculation,

17   isn't it, because you had no conversations with anyone about

18   adding four billion dollars of Lehman margin to this provision

19   D, isn't that correct?

20   "A.  This was not about margin.  This was about the long

21   positions and an estimate on the long positions."

22        You were asked that question; you gave that answer just a

23   moment ago.  Isn't that correct, sir?

24   A.    I believe you, yes.

25   Q.    That's true, is it not, this division D is not about

Page 187

1    margin.

2    A.   No, that's not.  If I said that, that isn't what I meant

3    to say.  We were getting the long positions; we were getting

4    the margin.  That was always the understanding.  And what I was

5    focusing on was the seventy billion which is what was the focus

6    of your question and your hypothetical about seventy-four

7    billion.  I cannot tell you what numbers that Lehman gave us,

8    what was in their numbers, I do not know.

9    Q.   Are you now telling me, sir, that division D is about

10   margin?

11   A.   What I have told you is that when you buy a portfolio of

12   ass -- of trading assets that have deriv -- particularly

13   derivatives, you need margin because if they can go down in

14   value and there is margin associated with that, you don't buy

15   derivatives without buying -- without getting the margin along

16   with it.  You need to have the margin.

17   Q.   I don't want you to tell me what you told me because I

18   have your previous testimony that this was not about margin.  I

19   want to ask you -- I want to start with a clean slate, here.  I

20   want you to tell me, is it your testimony now that there is

21   margin in division D?

22   A.   What I am testifying is that when you buy derivatives, and

23   that is part of the long position, that part of that is the

24   margin.  What I am saying, and what I was trying to say -- I

25   may not have said it very articulately, but what I was trying

Page 188

```
 1   to say is I don't know what's in the seventy billion.

 2   Q.   Did you know -- did you have any discussions with anyone

 3   at Lehman or Weil about Lehman's margin?

 4   A.   No, I don't think I did at that time, no.

 5   Q.   Now, sir, I'd ask you to please go back a couple of --

 6   actually, go forward a couple of pages to -- let me -- let me

 7   follow up a little bit more on Lehman cash.  The parties in

 8   negotiating the asset purchase agreement basically agreed to

 9   split Lehman's cash between Barclays and Lehman, isn't that

10   right?

11   A.   I'd -- I think that's right.  I don't remember the exact

12   source of the billion three number that's in the asset purchase

13   agreement.  But there was an agreement that Lehman said they

14   had that much cash, they could deliver it, it was used in the

15   business as the free cash to operate, and that they would

16   transfer that and -- as part of the deal.

17   Q.   If you could try, sir, to answer my questions yes or no,

18   and if you need to add an explanation, by all means, do so.

19   A.   I -- I do try, and it goes against all of what I do for a

20   living, but I will continue to try.  I apologize.

21   Q.   The split was that some specified amount of cash was going

22   to be designated as retained cash, right?

23   A.   That's correct.

24   Q.   And that was kind of a strange name, was it not, because

25   the retention was not by Lehman.  It was cash that was being
```

Page 189

1    retained by the business that was being sold by Lehman to

2    Barclays?

3    A.   I think I said that in my deposition.

4    Q.   So the retained cash was cash that was actually leaving

5    Lehman and going to Barclays.

6    A.   Well, it was being retained in the business that Barclays

7    was buying, and that's why it, I guess, ended up that way but I

8    share your view that it was sort of a strange formulation.

9    Q.   And the other cash -- there was an exclusion for the other

10   cash which was staying with Lehman?

11   A.   Correct.

12   Q.   And the retained cash, I believe you said, was 1.3 billion

13   dollars?

14   A.   As provided in the asset purchase agreement.

15   Q.   And that then got reduced to 700 million dollars?

16   A.   And then to zero.

17   Q.   And you recall how -- what happened to that retained cash?

18   You recall Bart McDade testifying at the sale hearing that that

19   had all gone to deal with the liquidation at the Chicago

20   Mercantile Exchange?

21   A.   Something like that, yes.

22   Q.   Lehman had been liquidated at the Chicago Mercantile

23   Exchange, that 700 million dollars was securing its positions

24   there, and now Lehman was left with no cash.  You recall that?

25   A.   I don't recall, specifically, his testimony on that front.

Page 190

```
1    Q.    So ultimately, the parties agreed that Barclays would get

2    none of the retained cash.

3    A.    Well, I would put it differently.  What we were told is

4    there was no retained cash and, therefore, we wouldn't get it.

5    That they did not have cash of that nature that they could just

6    give us as they had led us to believe.

7    Q.    So Barclays was getting none of the retained cash.

8    A.    The concept -- the concept that had been contemplated when

9    we signed the asset purchase agreement that there was retained

10   cash that would go with the business, that Barclays would get

11   it, that was being eliminated.

12   Q.    So the retained that was going to Barclays went from 1.3

13   billion dollars to 700 million dollars, to zero?

14   A.    That's correct.

15   Q.    The whole concept of retained cash fell out of the

16   agreement?

17   A.    The defined term, "retained cash", disappeared from the

18   deal, yes.

19   Q.    But that was at the end of the week.  As of the date that

20   the agreement was signed, the deal was that there was going to

21   be a split of Lehman cash between the retained cash that was

22   going to Barclays and the other cash that was not, right?

23   A.    Yes, based on what Lehman had indicated about their

24   availability of cash.

25   Q.    And Barclays was getting the retained cash, right?
```

Page 191

1   A.   Yes, I've said that.

2   Q.   And Lehman was keeping all other cash, right?

3   A.   Well, I think "all other cash" is an overstatement, okay?

4   What we were talking about is the -- go back to the

5   agreement --

6   Q.   Sir, if you're going back to the agreement --

7   A.   I'm looking for the reference to the billion three, if you

8   could help me find it.

9   Q.   Yeah, the billion three, you'll find in the definition of

10  purchased assets.

11  A.   Now, purchased assets refers to the retained cash.  Now

12  I'm looking for the definition of retained cash.

13  Q.   Okay, so then if you turn, sir, to page 6 -- page 2 of the

14  agreement, and you'll see a definition of retained cash down

15  there at the bottom under item B.

16  A.   Ah, right, okay --

17  Q.   Okay.

18  A.   -- because this was the split that you were referring to.

19  Q.   So we're on the same page?

20  A.   Yup.

21  Q.   You've got the 1.3 billion --

22  A.   Um-hum.

23  Q.   -- that was the retained cash, right?

24  A.   Um-hum.

25  Q.   You say "um-hum", but for our record --

Page 192

1    A.    Yes, yes.

2    Q.    -- thank you.  Now, just by way of introduction, this is

3    part of the excluded assets definition, right?

4    A.    That's correct.

5    Q.    And the deal here was that "excluded assets shall mean the

6    following assets, properties, interests and rights of seller

7    and its subsidiaries", right?

8    A.    That's correct.

9    Q.    And item B provided that "all cash, cash equivalents, bank

10   deposits, or similar cash items of LBI and its subsidiaries

11   (the "retained cash") other than the 1.3 billion dollars in

12   cash, cash equivalents, bank deposits, or similar cash items."

13   Okay?

14   A.    Yes.

15   Q.    And you understood that the retained cash that was going

16   to Barclays was the 1.3 billion dollars, right?

17   A.    That's correct.

18   Q.    And you understood that all other cash, cash equivalents,

19   bank deposits, or similar cash items of Lehman and its

20   subsidiaries were excluded assets from the deal, right?

21   A.    I think that it was my understanding at the time that that

22   was cash of that nature, cash used, available to be used in the

23   business to run the business, and I can't tell you the words

24   say that, but that was what had been described and what was my

25   understanding of what this was about.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 193

1    Q.   Well, let's see what the words do say, sir.  You see those

2    words?

3    A.   I do.

4    Q.   See the words "cash, cash equivalents, bank deposits, or

5    similar cash items", you see those?

6    A.   I do.

7    Q.   You see the little word right before that?

8    A.   "All"?  Yes I see that word, thank you.

9    Q.   At the time that the asset purchase agreement was

10   negotiated and signed, did you have an understanding that the

11   word "all" in division B of excluded assets meant all?

12   A.   My understanding was it meant all cash of the nature that

13   I'm talking about.  That was my understanding.

14   Q.   Did you tell anyone --

15   A.   It does not -- it does not say that in there, but the

16   discussion, to the extent I recall the limited discussions

17   about this is that's what we were talking about that day.

18   Q.   Did you ever tell anyone at Weil that you had a special

19   understanding of the word "all"?

20   A.   No.

21   Q.   Specifically, did you ever tell anyone at Weil Gotshal or

22   at Lehman that in your understanding, "all cash" meant all cash

23   of a certain nature and excluded in your mind some other cash

24   of some other nature such as Lehman's cash margin?

25   A.   My recollection is that this was in here, it was

Page 194

1   described, and it was put in -- and I haven't gone back to look

2   at the original draft from Weil of the asset purchase

3   agreement, but my understanding is that this was described as

4   talking about the free cash being used in the -- available to

5   be used in the business is what it was talking about.  It was

6   not talking about the positions.  We had another provision

7   dealing with the long positions, as we've been talking about,

8   and it was not my understanding, and it was never described by

9   anyone that this was a margin.  It might have been securities,

10  it might be cash, one minute, might be cash, one minute might

11  be securities.  No one ever suggested on Monday or Tuesday or

12  Wednesday or Thursday or Friday or Saturday or Sunday or Monday

13  that the intention was that the margin should not be as part of

14  the positions that Barclays was assuming.  No one ever said

15  that.

16  Q.   And you never took anyone's use of the word "all cash" to

17  mean that people were referring to all cash, including Lehman's

18  margin cash?

19  A.   No.

20  Q.   Would you agree, sir, that others perhaps less

21  sophisticated than yourself, in reading the reference to all

22  Lehman cash could have taken that, reasonably, to mean all

23  Lehman cash?

24        MR. SCHILLER:  Objection to "others", Your Honor.

25        THE COURT:  I'll sustain the objection in that it

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 195

1  calls for the witness to speculate as to what people other than

2  himself might read in the language.  And I don't think any

3  witness can answer that without having some extrinsic proof

4  through data, surveys, and the like, as to what other people

5  actually believed.  So I'll sustain the objection.

6  Q.   Sir, you attended the sale hearing, you told us, on the

7  Friday night?

8  A.   That's correct.

9  Q.   And you have the transcript of the sale hearing at tab 5

10  of your binder.

11  A.   Okay, yes, I have it.

12  Q.   If you turn to page 53 of the transcript, you'll see the

13  testimony of Ms. Fife that you were referring to in your

14  earlier testimony concerning the --

15  A.   What page am I looking at?

16  Q.   Page 53 of the transcript.

17  A.   I --

18  Q.   Top right hand corner.

19  A.   Oh.  So let me just state for the record here, I do not

20  have the transcript; I have some excerpts of the transcript.

21  Q.   Precisely.

22  A.   Yes, I see page 53.

23  Q.   And you'll see at the very bottom of the page, Ms. Fife

24  makes the statement, "There's no cash that's being transferred

25  to Barclays."

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 196

1   A.    I see that sentence, yes.

2   Q.    That was the statement that occupied you and your

3   colleagues over the weekend when Harvey Miller raised the issue

4   of the representation that had been made to the Court, right?

5   A.    Well, what you've given me is page 53.  I recall page 54

6   is relevant, here, too.  This topic, yes, is what we -- when we

7   had the conversations in the hallway and Mr. Miller raised the

8   issue of what did -- what did Lori -- what did Ms. Fife tell

9   the Court, it was this, together with the other statements that

10  had been made to the Court about the whole subject and the

11  whole -- what had been told to the Court.  And that was the

12  topic that we discussed in the context of the 15c3-3 account.

13  Q.    You testified earlier that you were resisting the word

14  "representation" with respect to certain things that were said

15  by Lori Fife or Harvey Miller to the Court.  Did you understand

16  that this statement was a representation that was made to the

17  Court?

18  A.    I understood that Ms. Fife and Mr. Miller were describing

19  the transaction and, in particular, what had changed in the

20  transaction.  There is -- I understood this sentence and I --

21  it really bothers me that I have one -- one standalone page and

22  not the page before or the page after, okay.  But my

23  recollection, and I think if I turn to page 54, which you

24  haven't given me, I believe it made it -- to me, together with

25  what Mr. Miller said later in the conversations and what other

Page 197

1    things were done, I thought in the totality it was quite clear

2    that what she was talking about was the retained cash provision

3    had dropped out of the deal.  We were not getting that billion

4    three that had become 700 million.

5    Q.   At the time that you were present and attended this Court

6    hearing, were you aware of any Lehman cash that was being

7    transferred from Lehman to Barclays?

8    A.   I was aware that we were getting margin.  I did not know

9    what form the margin took.  I hadn't thought about it; I didn't

10   know.

11   Q.   At the time you attended this Court's sale hearing, were

12   you aware that billions of dollars of Lehman cash was, in

13   Barclays view, supposed to go from Lehman to Barclays as part

14   of the sale?

15   A.   No.

16   Q.   Do you know whether Michael Klein was aware of that?

17   A.   If I wasn't aware of it, how can I possibly know if Mr.

18   Klein was aware of it?

19   Q.   Do you know if Archie Cox was aware?

20   A.   I have no way of knowing that, sir.

21   Q.   You mentioned earlier, you referred to wanting to see

22   Harvey Miller's statements on this point, and we'll get to

23   that.  But did you understand at the sale hearing that there

24   was an issue about Lehman cash, and specifically, cash that had

25   been caught up in a cash sweep from Europe?

Page 198

```
 1    A.    Yes, I do recall there was -- there was a discussion of

 2    that, and Mr. Miller referenced it at some point during the

 3    hearing.

 4    Q.    So you remember the people in Europe were very upset that

 5    billions of dollars of their cash had been swept up to New York

 6    and were concerned that none of that cash get caught up in this

 7    deal and go to Barclays where it would be outside their ability

 8    to recover.

 9    A.    I remember there were stories.  It wasn't clear what had

10    happened, and there was concern of that -- on that general

11    topic.  I am -- I do recall that.

12    Q.    And do you recall Harvey Miller explaining to the Court

13    that there was no need for concern on that point because there

14    was no Lehman cash going to Barclays and, therefore, there was

15    no issue about the European cash.

16    A.    Well I, again, I -- as -- as -- I believe Mr. Miller was

17    addressing -- and I can look at the language, you can look at

18    the language, the Court can look at the language -- but as I

19    recall, he was describing that very thing, that there was no --

20    that there was no five or seven billion of cash that had flown

21    into Leh -- come in on Friday into Lehman in the United States

22    that was going to go to Barclays.  And that was his point.

23    And -- and it was accurate, to my knowledge.

24    Q.    Well, do you recall more specifically, his point was, we

25    didn't need to worry about that because there was no cash going
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 199

1    to Barclays.

2    A.   I don't remember his words.  I believe at one time, one of

3    his statements did not get into the -- was somewhat broader

4    than other statements he made.

5    Q.   If you turn to page 242 of the transcripts that are

6    excerpts -- should be in your binder -- you'll see that

7    statement by Mr. Miller.  At page 242 of the sale hearing

8    transcript, starting at line 11, "Now what we're talking about,

9    Your Honor, is eight billion or five billion, whatever it might

10   be, Your Honor, that was a cash sweep."  And then at line 13,

11   "Cash, we're not transferring any cash to Barclays.  That's out

12   of the agreement."

13   A.   Yes, I see he said that.

14   Q.   That's the state -- the broad statement --

15   A.   That's the broad statement, yes.

16   Q.   -- that you refer to in your previous answer.

17   A.   Yeah, I think it is, yes.

18   Q.   And --

19   A.   But -- but --

20   Q.   -- did you understand at the time that, in fact, Lehman

21   was not transferring any cash to Barclays?

22   A.   What I understood at that time was that there was not a

23   pile of cash that Lehman had previously told us was available,

24   and that they could transfer that we could keep in the

25   business, the retained cash, that that was no longer in the

Page 200

1    deal because they didn't have that cash.  That's what I

2    understood; that's what I understood he was talking about in

3    this sentence.

4    Q.   So you understood Mr. Miller's statement to be somewhat on

5    the broad side?

6    A.   I just char -- I just told you.  It -- it speaks for

7    itself.  My understanding is what he was talking about was what

8    I said, which is the retained cash concept that there was a

9    bundle of cash sitting somewhere, used in the business as --

10   for operating the business, and that we could keep to use for

11   that same purpose.  That cash was no longer available; they

12   didn't have it and we weren't going to get it.  That was my

13   understanding, and that's my understanding of what he was

14   saying here, that that being the case, if there had been a

15   billion three and you had added five billion to it, and so

16   there was now 6.3 billion, and then we got scot a billion three

17   of cash, how do you know which cash it was, et cetera.  That --

18   that issue had gone away because they didn't have any of that

19   cash.  We weren't getting a bundle of cash of that sort that

20   could be used in the business.  There was no -- no flow of

21   funds from London to Lehman that was going to Barclays.  That

22   was my understanding of what he was saying.

23   Q.   You testified that he made a broader statement.  This is

24   the sentence you were referring to.

25   A.   Well, he does not -- he says -- I mean, it says what it

Page 201

1    says.  It says we're not transferring any cash to Barclays.  I

2    see those words.  I admit them.  That -- those words are there.

3    He did say that.  I'm telling you that in the context of what

4    he was talking, it was my understanding -- you can ask him what

5    his understanding was, but it was my understanding, that day,

6    listening to it, was that he was talking about cash available

7    of the sort that I have described that was intended to be the

8    retained cash when Lehman told us they had it and then told us

9    they didn't have it.

10   Q.   Did it occur to you that anyone should raise with the

11   Court or with Lehman whether the statement that Mr. Harvey

12   Miller had made was overly broad or exceeded your understanding

13   in any way?

14   A.   No.

15   Q.   If you turn, sir, to page 253 of the transcript before

16   you, I'll represent to you that this is part of the Court's

17   resolution of the cash issue.  And reading from line 5, you'll

18   see the statement in the court record at page 253 is, "I'm

19   satisfied that given the fact that Barclays is not taking cash,

20   and the only thing that came into the debtor from Europe was

21   cash that, in practical terms, we should be safe."

22   A.   I see those words, yes.

23   Q.   And you had no concern that the Court had been given an

24   impression that was overly broad from any of the

25   representations that had been made to the Court.

Page 202

```
 1   A.   I wouldn't dare to speculate on what Your Honor was

 2   saying.  I do see, if you read back a couple lines above that,

 3   it's talking about the concern that I guess Mr. Rosner, whoever

 4   he was, I believe he was -- he may have been the Linklater's

 5   lawyer, is that who Mr. Rosner was?

 6   Q.   The only question is whether you --

 7   A.   No, let me answer.  Yeah, go ahead, ask the question.

 8   Q.   The only question is whether you had a concern when you

 9   heard those words that an overly broad representation had been

10   made to the Court in your understanding?

11   A.   No, I interpreted -- maybe wrongly, I, you know, first

12   place, this was all being heard in real-time.  I didn't have

13   any transcripts of anything.  No one had a transcript of

14   anything.  What I thought the Court was saying -- but I defer

15   to the Court; I mean, I'm not the Court -- but what I thought

16   he was saying was accurate, that the concern raised by Mr.

17   Rosner that somehow or other, the European cash was going to

18   Barclays had been answered.  It wasn't, and that's accurate.

19   Q.   Sir, I understand -- let me ask you, at the time of the

20   sale hearing, were you aware that Barclays was contemplating

21   taking one billion dollars of cash from Lehman's 15c3 account

22   at the Wells Fargo Bank?

23   A.   Well, as I testified at the time of the hearing, I learned

24   just before the hearing, that afternoon, that given the

25   shortfalls in what Barclays -- what Lehman could deliver to
```

Page 203

1    Barclays that, on the other hand, Lehman had identified a

2    couple things that were within all the assets of the business

3    and, therefore, Barclays was entitled to under the asset

4    purchase agreement but which had not been previously identified

5    in any -- with any specificity, and one of them, what I had

6    been told that afternoon, was the so-called 15c3-3 account

7    which had the value of a billion seven.  No one mentioned what

8    was in it.  I'm not sure anyone knew what was in it, which is

9    what led to the Sunday conversation that I've testified to.

10   Q.   So as of the sale hearing, you didn't know that there was

11   a billion dollars of cash there?

12   A.   No, I knew there was supposedly a billion seven of value.

13   I did not know or think to ask what form it took, and since I

14   don't know that anyone would have known, but I did not, no.

15   Q.   So you knew that the entire account was -- the 15c3

16   account was 1.7 billion dollars, right?

17   A.   We knew that Lehman had told us that it was 1.7 billion

18   dollars, that's correct.

19   Q.   And that's what Barclays expected to get.

20   A.   That's correct.

21   Q.   But you didn't know that of that, one billion dollars was

22   cash.

23   A.   No, I didn't.

24   Q.   And that's something you learned afterwards?

25   A.   That's correct.

Page 204

1    Q.   And you had been told about an e-mail, you told us, and

2    you subsequently got that e-mail, right?

3    A.   On Sunday, yes.

4    Q.   And you had thought in your own mind that that was an e-

5    mail from the SEC, but when you saw the e-mail, you recognized

6    that it was an e-mail, an internal Lehman e-mail describing a

7    conversation with the SEC.

8    A.   In part described a conversation, yes.

9    Q.   If you turn to tab 6 of your binder, you'll see Barclays'

10   Exhibit 221.  And you'll see that that is a Lehman e-mail.  Do

11   you see that, sir?

12   A.   Yes.

13   Q.   And the subject of it is "Final 15c3-3 Reserve Lockup as

14   of 9/17/08".  Do you see that?

15   A.   Yes.

16   Q.   And then the text reads, "Below is the final 15c3-3

17   reserve lockup as of 9/17/08 in thousands.  The decrease of one

18   billion dollars in the lockup was approved by Mike Macchiaroli

19   of the SEC."

20   A.   I see that, yes.

21   Q.   And this is the e-mail, is it not, sir, that you were

22   provided with and that showed you that there was one billion

23   dollars of cash with Well Fargo?

24   A.   That's correct.

25   Q.   And then you came to learn that -- well, you saw that this

Page 205

1    e-mail was not, in fact, from the SEC, right?

2    A.   That's correct.

3    Q.   If you turn to the next tab, 7, it's Movants' Trial

4    Exhibit 437, you'll see that that's an e-mail from Raymond

5    Doherty to various people at Lehman dated Monday, September 15,

6    2008.

7    A.   I see that, I see that.

8    Q.   And you'll see this says, "Tony/Bill, we understand that

9    the firm erroneously withdrew 1.1 billion from the reserve

10   account today.  As we did not authorize this withdrawal, the

11   firm will need to increase the reserve deposit tomorrow morning

12   by any shortfall.  Please let me know if you have any

13   questions."  Do you see that?

14   A.   I do see that.

15   Q.   Were you provided with this e-mail?

16   A.   I never saw that until right now.

17   Q.   Were you aware that Raymond Doherty of the Securities and

18   Exchange Commission's Division of Trading and Markets had sent

19   such an e-mail to Lehman?

20   A.   Absolutely not.

21   Q.   Were you aware after the closing that Alastair Blackwell

22   visited with the SEC to obtain a signoff on the 15c3 account?

23   A.   I don't know.

24   Q.   Were you present in the hallway of the Weil Gotshal

25   conference center when Harvey Miller told Barclays'

Page 206

1    representatives that their chance of getting the 15c3 asset was

2    slim-to-none?

3    A.    I know that there's been some testimony to that effect.  I

4    do not -- I believe I was in all the conversations, but I do

5    not recall that.

6    Q.    Now, you and your colleagues were working over the weekend

7    on the clarification letter, correct, sir?

8    A.    That is correct.

9    Q.    And in the course of that work, you understood that your

10   colleagues were working on drafting a clarification of language

11   that would allow Barclays to get both the 15c3 cash and also

12   Lehman's margin cash, right?

13   A.    No, I don't think that's accurate.  My recollection is

14   that there was a rider drafted by my colleagues that addressed

15   the 15c3 cash.  I believe we believed we were entitled to the

16   margin beforehand.  The 15c3, we believed also we were entitled

17   to, but we were proposing to reference that in the

18   clarification letter, and that at some later point, there was a

19   draft by Weil in the middle of the night that, in making some

20   other changes, had the side effect of taking margin out of the

21   deal as we understood it.  And it's my understanding that at

22   that point, someone on our team raised it with Weil and said is

23   this intentional that you're taking that out?  If so it's a big

24   issue, we'll have to talk to our client.  Or, is this a

25   drafting error, and Weil corrected it and put in the language

Page 207

1    that we had drafted instead -- then drafted instead to put

2    specifically margin up in the other clause.

3    Q.   And the deletion of the language was a side effect, in

4    your understanding of some other change that Weil was making?

5    A.   It was -- it was my understanding that it was not a

6    substantive change.  It was not intended by Weil to take margin

7    out of the deal, and that when it was pointed out to them that

8    that's what they had done, they put it back in.  I don't think

9    it was disputed; I don't think it was argued; I don't think it

10   was negotiated.  The draftsperson, whoever it was at Weil, said

11   no, that was -- we weren't trying to do that, and they agreed

12   to then put it in in a different way to make it clearer than

13   the -- than trying to create -- it was a complicated provision

14   that had gotten in there, and it was put in in a more

15   straightforward way when it was fixed.

16   Q.   If you turn to tab 10 of your binder, you'll see the Weil

17   draft.  It's Movants' Trial Exhibit 447.  This is where that

18   language was removed.

19   A.   Right, I see it.

20   Q.   If you turn, sir, to page 2 of the draft, under excluded

21   assets, you'll see the second part of that.  It starts (ii).

22   A.   What page are you on?  I'm sorry.

23   Q.   This is on page 2 of the draft, the redline.

24   A.   Right, okay.

25   Q.   And you'll see under "excluded assets" scrolling down to

Page 208

1   (ii), it reads "cash, cash equivalents, bank deposits or

2   similar cash items" --

3   A.   Right.

4   Q.   -- and then you'll see there's a reference to 15c3.   Do

5   you see that?

6   A.   Yes.

7   Q.   And then after that, just after "the Security Exchange Act

8   of 1934 or otherwise" --

9   A.   Correct.

10   Q.   -- then there's the language, "or by or on behalf of any

11   clearing agency or clearing organization to collateralize,

12   guarantee, secure whether as margin, guarantee funds deposit,

13   or in any other form."

14   A.   Yes.

15   Q.   See those words?

16   A.   Yes.

17   Q.   And it's your understanding that that language was deleted

18   inadvertently, accidentally, and not intentionally by Weil

19   Gotshal?

20   A.   My understand -- we -- my partner, Ed Rosen, I believe,

21   had added that language.   It was to make explicit what we

22   believe was implicit and clear beforehand, but trying to avoid

23   disputes of the sort that the Court is now having to address,

24   obviously, that -- to be explicit that margin was included when

25   you bought the -- that to the extent margin is held by a

Page 209

```
 1    clearing agency, as it is, that that was part of the deal as
 2    was our understanding all along.  He put that in explicitly.
 3    Weil took it out when they took out the reference to the 15c3
 4    cash, and as I said, it was my understanding that we said, wait
 5    a second, is this -- is this -- we believe it's in the deal.
 6    Find out of there -- if they've got language issues or whether
 7    they have substance issues and are saying that margin is not in
 8    the deal.  If they're saying margin is not in the deal, then
 9    we've got to go talk to the client; we've got a big issue here.
10    If they're saying it's a question of how to draft it, then
11    let's get it drafted so that everyone's happy with it.
12    Q.    In your direct testimony to Mr. Schiller, I believe you
13    testified that you got the draft from Weil, accidentally
14    removing this, and you confirmed with Weil that the deletion
15    was not intentional.  Do you recall giving that testimony?
16    A.    Yes, that it was not intentional to stop -- to not cover
17    margin.  That having added -- we thought margin was covered by
18    other provisions.  Once you add a provision to clarify, which
19    is what we had tried to do in this clause, and then someone
20    deletes it, you say wait a second; are you deleting it to try
21    to go back to the status quo that it was in but it wasn't
22    specifically laid out in detail, but by having put it in and
23    taking it out, you would have created the impression that there
24    was a substantive intent to not include margin.  We then
25    confirmed that that was not their intention, and they put it
```

Page 210

 1   back in, as controlling the draft, they went in a little bit

 2   later in the middle of the night.

 3   Q.   Now, Mr. Lewkow, you didn't confirm anything with Weil,

 4   isn't that right?

 5   A.   No, my partners did.

 6   Q.   You had no personal knowledge, you weren't privy to any

 7   communication with Weil on the subject of margin, isn't that

 8   correct, sir?

 9   A.   I don't know how to answer that because I was -- I don't

10   know what to do.  I was -- I was advised of such a

11   conversation.

12   Q.   Sir, you're not suggesting that you had any conversation

13   about Lehman's margin with anyone at Lehman or at Weil?

14   A.   I did not personally, no.

15   Q.   And you were not the 30(b)(6) witness for Cleary Gottlieb

16   on the subject of Lehman's margin?

17   A.   That's -- I forget what the line is.  That's correct, yes.

18   Mr. Rosen was, although I seem to recall that you or Mr. Gaffey

19   asked me some questions anyway.

20   Q.   So your testimony, however, is that you did understand

21   that it was necessary to confirm with Weil whether the deletion

22   of language concerning Lehman's cash margin was accidental or

23   intentional?

24   A.   Well, I think --

25   Q.   You recognized the need to do that?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 211

1    A.   Well, what I recognized the need was to try to finalize

2    the document in a manner that both people were prepared to do,

3    and the first step to doing that was to find out whether or not

4    there was a substantive issue that we weren't getting margin,

5    in their view, and if so, that was a business issue.  If it was

6    not a substantive conclusion by Weil at the senior most level,

7    and we could -- it could be fixed, it should be fixed.

8    Q.   Is that a yes?  You recognized the need to confirm with

9    Weil whether, in fact, margin was in the deal or not in the

10   deal?

11   A.   In order to finalize the agreement, absolutely.

12   Q.   And you did not talk to Harvey Miller about that or to

13   anyone at Weil?

14   A.   I did not directly talk to Weil.  One or more of my

15   partners did.

16   Q.   But you were not present for any such conversation, were

17   you, sir.

18   A.   I -- I -- no, I wasn't.

19   Q.   You have no personal knowledge of any such conversation.

20   A.   Only --

21   Q.   You weren't there.

22   A.   I said I wasn't there.

23   Q.   The language we've been talking about in "Excluded Assets"

24   also appears in section 8 of the draft, Barclays -- Movants'

25   Trial Exhibit 447 that you have before you.  And that section 8

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 212 of 253

Page 212

1    is entitled "Transfer of Customer Accounts".  Do you see that

2    that same language is there?

3    A.   I see language in -- let me look at paragraph 8 --

4    Q.   At the very top of page 5, carryover part of that

5    provision --

6    A.   Let me read all -- let me -- can I read all of paragraph

7    8, please?

8    Q.   Please.  AS much time as you need.  Just let me know when

9    you're ready.

10   A.   Sure.

11        I see the language, yes.

12   Q.   And that's the same language that was deleted here as was

13   deleted in the earlier provision, section 1.

14   A.   I think that's right, yes.

15   Q.   And it was your understanding, I think you're telling us,

16   that that deletion in section 8 was also accidental and not

17   intentional.

18   A.   The word accidental which I used is probably not the

19   perfect word, okay.  What our understanding of the deal was and

20   that we were trying to clarify, was that margin was included.

21   And that was always our understanding, and no one had ever

22   suggested otherwise.  We had added some language in the prior

23   provision, and I guess in this provision, that had laid that

24   out explicitly, and someone at Weil who was carrying the pen on

25   this document, and I believe Mr. Messineo was the one who sent

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 213 of 253

Page 213

1   this document, although whether he's the one -- well, no,

2   that's who we -- who sent it to the other people.  I don't know

3   who was -- I don't know who at Weil was controlling the master.

4   Okay?  I don't recall.  It might have been Mr. Messineo; it

5   might have been one of his colleagues.  But they deleted this

6   language, and it may have been in response to the whole issue

7   that I've talked about, about cash and the like, I don't know.

8   But margin, to us, from our perspective, margin was whether it

9   was securities or cash, it was margin, and -- and it wasn't the

10  kind of -- it wasn't cash of the nature that when the retained

11  amount was deleted from the deal was being talked about.  And

12  so when he deleted cash here and in the other place and

13  basically took margin out of the deal, that was not our

14  understanding of how margin worked and what people did when

15  they bought a derivatives portfolio.  And so, as I've testified

16  previously, it was part of this discussion that I was told

17  would take place between one of my partners and somebody at

18  Weil.

19  Q.   And in this draft, Weil Gotshal took out the reference to

20  margin not once but twice, in two separate sections, correct?

21  A.   Yes.  I've conceded my use of the word "accidental" was

22  not the right word.  You're right, it wasn't.

23  Q.   And the fact that Weil had taken that language out in not

24  one section but in two sections, that only confirmed the need

25  for Barclays to confirm with Weil Gotshal what the business

Page 214

1  deal was concerning margin, isn't that correct?

2  A.   We had always understood that.  What our -- what we needed

3  to find out was why somebody at Weil -- and Mr. Miller was not

4  the one controlling the document at that stage, but that

5  somebody at Weil had deleted all the references to margin and

6  if that was the intention of Lehman, that was a fundamental

7  problem that we needed to bring to the attention of our client.

8  Q.   And that issue of whether Lehman's margin was in the deal

9  or not in the deal was squarely raised by Weil's deletion of

10  that language, right?

11  A.   Well, what we were trying to find out --

12  Q.   If you could answer yes or no, and then, by all means, add

13  however lengthy an explanation you wish.

14  A.   It was -- yes, it was raised by that language, and the

15  first thing we needed to find out was whether it was a

16  substantive issue or it was an effort to deal with the words

17  "cash", et cetera, whether or not there was an issue and

18  whether or not Weil was making that change at the highest level

19  and -- and whether it was an issue.  And then Weil changed the

20  draft to put it back, to put in our language that made it clear

21  that margin was in the deal, which had been our understanding

22  and, I believe, had been Weil's understanding.  But I'm not the

23  best one to testify for Weil Gotshal, obviously.

24  Q.   Now, sir, I'd like to ask you some questions about the

25  15c3 assets that you testified about previously.

Page 215

1   A.    Sure.

2   Q.    At the time that you saw the e-mail we've been discussing,

3   you understood that there was a billion dollars in cash as part

4   of this account?

5   A.    That's correct.

6   Q.    And indeed, Harvey Miller had learned the same fact; that

7   had come to his attention, as well?

8   A.    Yes, he or one of his colleagues, as I said previously,

9   brought it to my attention in the hall that -- that Sunday.

10   Q.    And he brought to your attention the fact that this cash

11   could not go from Lehman to Barclays, isn't that right?

12   A.    No, that's not how it was characterized.  What he

13   characterized -- and, you know, maybe he was also negotiating

14   with me.  I understand.  I respect him.  But what he was --

15   what he raised was we now see this cash in this account, okay?

16   Nobody remembers exactly what Lori Fife told the Court in

17   describing how the -- we had -- there was not going to be the

18   retained amount coming to Barclays and now that we know there's

19   a billion dollars of cash that the SEC seems to be willing to

20   release, and is, according to that e-mail, that that's -- if

21   it's free cash, then it sort of starts looking like the cash

22   that was available, we thought, when we signed the agreement on

23   Tuesday, that there as free cash, we thought, that Barclays had

24   been told about that was used in the business that could be

25   transferred as a retained amount to be retained in the

Page 216

1    business.  And once this billion dollars was there, gee, it

2    sort of looks like that, doesn't it, I wonder what she said

3    and -- and -- and how are we going to deal with it.  And that

4    was the discussion.

5    Q.   This was not a friendly conversation, now, was it, sir?

6    A.   It was, actually.  It was -- it was -- it may have been

7    Mr. Miller at his finest in the negotiation standard and the

8    like, but it was all -- there was not -- this was -- it was

9    exactly what I said.  I remember it.  He raised it as, gee,

10   what are we going to do?  Does anyone remember what Ms. Fife --

11   he didn't call her Ms. Fife -- what Lori had told the Court on

12   the subject of retained cash because we -- there's an issue

13   here as to whether or not we would need to go back to the Court

14   in order -- now that we know that this money -- this -- this

15   account includes a billion of cash, only 700 million-something

16   of securities.

17   Q.   What happened in that hallway at Weil Gotshal over that

18   weekend was an argument, isn't that right, sir?

19   A.   No.  No, I don't believe it was an argument, at all.  On

20   this issue?

21   Q.   If Harvey Miller were to testify about what happened at

22   his offices that weekend, in which he participated, was an

23   argument, a debate, do you have a basis to disagree with that?

24   A.   That is not how I would characterize it.  There was no

25   voices yelled.  It was brought out, again, it may have been a

Page 217

1   negotiating technique, but it was brought out as gee, we have

2   this problem, what are we all going to do.  It was not brought

3   out as a demand, an argument.  That is not at all what it took.

4   And Barclays, as you know, gave up the billion dollars in cash

5   that it thought it had been agreed to be receiving on Friday.

6   Q.   Harvey Miller made a specific point that a representation

7   had been made to the Court that no Lehman cash was going to

8   Barclays.  Isn't that correct?

9   A.   No, as -- no, it is not correct.  My recollection is, as

10  I've des -- as I've testified, that he said, gee, does anyone

11  know what Ms. Fife -- what Lori said to the Court because in

12  talking about the retained amount, this cash could be -- could

13  be viewed in the same light, and we have to decide whether or

14  not what she told the Court would prevent us from transferring

15  this even though we had agreed on Friday to transfer the 15c3

16  account.  And so the first step was, okay, people went off to

17  try to see if they could get a transcript, and that proved not

18  feasible.  And at some point soon thereafter, as you know,

19  Barclays said, okay, we will give up the billion dollars in

20  cash and then we want, you know, the 7 -- but we have to get

21  the 769.

22  Q.   In fact, Mr. Miller took the position that there was no

23  way that any Lehman cash could go to Barclays, isn't that

24  right, sir?

25  A.   No, that is not my understanding of what he said that --

Page 218

1   at that time.

2   Q.   It's your testimony that Barclays agreed to give up the

3   billion dollars?

4   A.   Yes.

5   Q.   And when Barclays did that, there was no longer any

6   dispute, any open dispute about whether Lehman cash would go to

7   Barclays?

8   A.   There was no dispute -- that's correct.  That's correct.

9   Q.   In all of those discussion about Lehman's cash and about

10   what had been said to the Court, at no point did any

11   representative of Barclays raise the issue of Lehman's cash at

12   the OCC, isn't that right?

13   A.   I believe that's correct.  It was not raised by Barclays

14   or by Lehman.

15   Q.   Nobody said, Mr. Miller, we understand there's an issue

16   that you have raised about the representation that was made to

17   the Court on the subject of Lehman's cash.  And we understand

18   we're having this big discussion about a 15c3 account with a

19   billion dollars in it.  We need to clarify what your position

20   is with respect to this much larger cash asset, Lehman's cash

21   margin.  No one made any reference to that, isn't that correct?

22   A.   Well, I don't know if it was much larger; I certainly

23   didn't know then whether it was much larger.  But putting aside

24   your characterization of "much larger", no, the discussion --

25   all of the discussion about the 15c3-3 cash was its similarity

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 219 of 253

Page 219

1    to the retained amount concept that the Court had been told had

2    been withdrawn from the deal.  And that was the background for

3    that discussion.

4    Q.    You testified earlier that Barclays recognized that it was

5    a problem, and you were talking there, specifically, of the

6    representation that Ms. Fife had made to the Court, correct?

7    A.    What I said, I believe, was we recognized, when we saw the

8    e-mail that you have shown me, that its reference to a billion

9    dollars now free and usable sitting in a bank account at Wells

10   Fargo looked a lot like the concept of retained cash that the

11   Court had been told was no longer in the deal.  That's what I

12   was testifying to, I believe.

13   Q.    So Barclays recognized it was a problem for cash that was

14   in the c3 account, that's what you're telling us?

15   A.    Yes, that's correct.

16   Q.    But it's your position that Barclays did not recognize the

17   same problem with respect to cash that was sitting in Lehman's

18   margin accounts.

19   A.    We didn't then, and I really don't think so now.

20   Q.    Regardless, the c3 cash, you understood was set aside in a

21   special account to protect the interest of customers, right?

22   A.    Well, yes, but I would -- I'd note that the customers were

23   coming to Barclays.  They weren't going to be Lehman customers,

24   and the SEC had, we were told, consented to the release of that

25   becoming available.  And so -- I don't know where that takes

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 220 of 253

Page 220

 1    me.  I've lost the question.

 2    Q.    Let's keep going, if we can, on this line, and if you can,

 3    again, try to answer yes or no, and if you need to add an

 4    explanation --

 5    A.    I've been trying --

 6    Q.    -- please do.

 7    A.    -- and I do apologize and I do apologize to the Court that

 8    I --

 9    Q.    So Barclays recognized the problem concerning the

10    representation to the Court with respect to the c3 cash that

11    had been set aside in a special account to protect the interest

12    of Lehman's customers, right?

13    A.    We recog -- yes, we recognized -- Barclays recognized that

14    that cash, once it was being released by the SEC and could be

15    used for any purposes as we had been told by Lehman that the

16    SEC had said, that that being the case, it looked the same as

17    cash that could be used in the business, generally, and

18    therefore, looked like retained cash.  And that was, in our

19    view, was what created the issue.

20    Q.    But although Barclays recognized the problem with respect

21    to c3 cash, it didn't recognize the very same problem with

22    respect to Lehman's cash margin that was set aside in special

23    accounts to protect positions of Lehman and its customers.

24            MR. SCHILLER:  Objection, Your Honor, to "very same

25    cash".  Witness has testified for, I think, now, fifteen

Page 221

1    minutes on what he meant.  He's been asked and asked again.

2    And there's no foundation for that question.

3                 THE COURT:  Well, I'm not sure I understand if your

4    objection is one of asked and answered multiple times or lack

5    of foundation or both.

6                 MR. SCHILLER:  My objection is based on asked and

7    answered many times, and no rel -- and lack of foundation by

8    trying to tie those answers to this other concept.

9                 THE COURT:  I'm going to sustain the objection on the

10   basis of asked and answered.  And I think it's time to move on

11   to other subjects or to rephrase the question in a way that

12   differentiates it from earlier questions.

13                MR. MAGUIRE:  I'll move on, Your Honor.

14   Q.   Sir, you testified earlier about how Barclays didn't need

15   to come back to the Court because it had dropped the one

16   billion dollar issue.  Do you recall that?

17   A.   I agree -- yes, I did so testify.

18   Q.   And therefore, that was --

19                MR. MAGUIRE:  Let me strike that.

20   Q.   The issue that had been raised here about whether the 15c3

21   cash was consistent with the representation that had been made

22   to the Court or not consistent, that was something that did

23   not, in fact, need to get resolved before closing, right?

24   A.   Well, I think it needed to be if we were going to get the

25   billion dollars --

Page 222

1    Q.    Yes.

2    A.    -- which is what, on Friday, we'd been told we were going

3    to get.

4    Q.    But if you were ready to close without the billion

5    dollars, then you didn't need to resolve that issue.

6    A.    That's correct.

7    Q.    All Barclays needed to do was to reserve its rights, to

8    say that the one billion dollars will stay with Lehman pending

9    an application after closing to the Court to clarify exactly

10   what the representations were and what the Court understood

11   them to mean, right?

12   A.    That was -- that was never discussed.

13   Q.    That's my point, sir.  That was never discussed.  Barclays

14   did not preserve the right to come back to the Court concerning

15   that one billion dollars.

16   A.    That's correct.

17   Q.    There was no downside to Barclays in coming back to the

18   Court to seek that one billion dollars, right?

19   A.    It was not -- maybe there was, maybe there wasn't.  It was

20   never discussed, as I've testified.  To my knowledge, it was

21   never discussed.

22   Q.    Now, sir, we -- I've been talking about the hallway

23   interchange with Harvey Miller on the subject of 15c3.  And I

24   believe I believe the disposition of the cash issue was only

25   one of the issues that was dealt with between the parties in

Page 223

1    the course of those discussions, right?

2    A.   Yes, there was some further dis -- once we -- once

3    Barclays said that they would give up the billion dollars,

4    there was some further discussion about other aspects of the

5    provision.

6    Q.   Specifically, Mr. Miller raised the question whether the

7    account could be moved at all because of the need for SEC

8    approval, right?

9    A.   He raised the issue of do we need SEC approval.  Don't

10   we -- I think he even put it in the negative, don't we need SEC

11   approval in order to transfer that, given the nature of 15c3-3.

12   Q.   And your partner, Ed Rosen, took the position that SEC

13   approval was not necessary?

14   A.   Yeah, Mr. Miller said I'm not an expert in this, but do we

15   need -- don't we need approval to do this, and Mr. Rosen said,

16   no, you don't need that approval.

17   Q.   And nevertheless, Weil insisted that there be some

18   language, subject to or to the extent permitted by applicable

19   law, to be inserted here to protect Lehman, right?

20   A.   It -- I would -- I would, again, these were not

21   contentious discussions.  They really weren't.  It was -- the

22   word insisted implies there was a dispute over it.  Someone

23   said -- might have been Mr. Miller, might have been one of his

24   colleagues, I don't recall -- well, just to make sure, can we

25   put in a provision sub -- about referencing to subject to

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 224

1    applicable law.  Corporate lawyers do that all the time to

2    avoid issues.  Mr. Rosen said we have no problem with that, so

3    insisted is -- makes it sound like there was, you know, people

4    pounding the table.  That's not what happened.  They suggested

5    adding the words; we said fine.

6    Q.    And those words were inserted?

7    A.    That's correct.

8    Q.    Now, you say that Michael Klein then asked for an

9    agreement, a commitment that if for any reasons, Barclays

10   couldn't get the remaining 769 million in securities, that --

11   from inside the 15c3 account, there was a commitment that they

12   would get those securities from outside the account, right?

13   A.    Yes.  Mr. Klein said something along the line of, well,

14   we've given up the billion dollars that we thought we were

15   getting.  If there's some -- if, in fact, we can't get that 769

16   and there's other securities that can be transferred instead

17   that -- that we can get, we want -- we want to make sure we get

18   them somewhere else because that was part of the deal, and

19   language -- and that was agreed to.  That was my --

20   Q.    But there was no discussion as to where the estate would

21   get this 769 million in securities if it couldn't get them from

22   the customer protection account?

23   A.    There was not any real discussion of where it would come

24   from, no.

25   Q.    There was no discussion of what would happen if there was

Page 225

```
 1   a deficiency or a shortfall in customer property?

 2   A.   No, all the focus was on Lehman telling us there was a

 3   surplus, not a deficiency.

 4   Q.   And nobody said, well, is it really fair, here, that the

 5   risk of any deficiency should be born by customers instead of

 6   by Barclays.  You're saying there was no such discussion.

 7   A.   There was no such discussion.

 8   Q.   And I believe it's your testimony that when Mr. Klein made

 9   this request for a commitment, that Weil agreed that there

10   would be such a commitment to give Barclays the 769 from

11   outside the account if it couldn't be obtained inside.

12   A.   That is my -- that's my recollection, yes.

13   Q.   But you don't recall who it was at Weil who --

14   A.   No --

15   Q.   -- gave that commitment.

16   A.   -- I mean, again.  Mr. Miller took the lead in this

17   discussion, but there were two or three of his colleagues with

18   him, and just in the nature of these things, I -- nothing was

19   done by anyone at Weil in that context.  Whenever Mr. Miller

20   was there, no one did anything at Weil without his -- if he

21   didn't want it to happen.  So did he say it?  I don't know.

22   But he certainly didn't say, you know, he didn't slap anyone's

23   hand or say no.  So it was probably him who said it, but I

24   don't -- I don't really recall.

25   Q.   You don't know who said it?
```

Page 226

1    A.    No, somebody from Weil, but I don't remember who.

2    Q.    And you don't remember what "it" was.  You don't remember

3    what they said.

4    A.    No, I've testified as to my recollection of what they

5    said.  Mr. Klein said okay, we're not going to get the billion.

6    If there's a problem getting the 769 from this account, we want

7    to get -- we want to get it from somewhere else if there are

8    similar securities somewhere else that can be delivered.  And

9    they said okay, we'll agree to that.

10    Q.    I'm just asking you about "it".

11    A.    Well, that's what I'm describing as "it".

12    Q.    Okay, you don't recall what the person who said "it"

13    actually said?  You don't recall if that person said --

14    A.    I don't know if he said -- if you're referring to my

15    deposition, when I was asked did he say yes, okay, sure, that's

16    fine, I don't remember what word he used, but they agreed.

17    That's -- in my deposition, you're right.  I did not remember

18    what word he used.  That's correct.  I still don't.

19    Q.    But you did come away from the conversation with a feeling

20    that you'd get a draft from Weil that would confirm that

21    Barclays was getting 769 million dollars from outside the

22    account if it didn't get it from inside the account, right?

23    A.    It was my understanding that that was what was agreed to,

24    and it would get reflected, eventually, in the document, yes.

25    Q.    And then you got a draft which is the draft that Weil

Page 227

1   circulated -- it's at tab 10 of your binder, Movants' Trial

2   Exhibit 447 -- and you recognized that that draft didn't work,

3   isn't that right?

4   A.   Well, let me find the -- can you point me to the

5   provision, please, Mr. Maguire?

6   Q.   Of course.  If you turn to page 5 and you look at the top

7   of the page.

8   A.   Yes, this is the language that they then served up, and it

9   was as -- as I described it, with one exception.  It was as I

10  described it in that it said 769 million of -- to the extent

11  permitted by applicable law, 769 million of securities is held

12  pursuant to 15c3-3 or securities of substantially the same

13  nature.  And so that was fine, and it reflected our

14  understanding, except it didn't say the amount of those

15  securities of the same nature.  And so some -- we raised with

16  Weil -- this doesn't -- it could be one dollar of such

17  securities.  Is that what you mean?  It was our understanding

18  it was the same amount, and they added it in when the draft got

19  returned later that evening.

20  Q.   So you saw that it didn't work?

21  A.   It didn't reflect what had been agreed as I understood it

22  in the hallway; yes.

23  Q.   And you and your colleagues said what does this mean.

24  A.   What does it mean to say "of the same nature" and not say

25  anything about amount?  It just -- it was a -- it was a

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 228

1    meaningless clause as written, and we didn't think we had

2    agreed to a meaningless clause.  And they said, you're right,

3    and they put "and amount".  I believe the words were "and

4    amount" in the final agreement.

5    Q.    And you never went and asked the draftsman, Mr. Messineo,

6    at Weil Gotshal what he meant by the words that you recognized

7    didn't work?

8    A.    Somebody on our team said -- I think it was me but I, it

9    may not have been, I don't recall -- said it doesn't mean

10   anything to say the same nature.  It needs to say and amount,

11   and he agreed, and it went in.

12   Q.    And you never went to Mr. Messineo and asked him what he

13   meant by the draft that he'd sent you?

14   A.    I don't -- I do not recall it being put in that way, no.

15   That is not how corporate lawyers negotiate, sir, and hold

16   discussions.  That's not the way it is.  You see a language, it

17   doesn't seem to work, you say is that an issue, because we --

18   it was our understanding it should be "and amount" and he put

19   it in.  You don't have to ask him why he did it; you just fix

20   it by agreement.  I'm sorry.  It's been a long day.  I

21   apologize, Your Honor.

22   Q.    I understand your position, sir, and you did testify

23   earlier that everybody was working together in a cooperative

24   way in this deal, right?

25   A.    Well, consistent with their obligations to their clients,

08-13555-mg    Doc 11274    Filed 09/02/10    Entered 09/13/10 15:06:15    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 229 of 253

Page 229

1    absolutely.

2    Q.    And in a way that was open and transparent?

3    A.    I believe that was in the context of the asset purchase

4    agreement, but yes, it was all being done as a -- as in a

5    transparent manner.  People were trying, under the most

6    difficult circumstances in my thirty years of work, people were

7    working together to try to do a deal that Lehman thought it was

8    in its interests, Barclays thought it was in their interest,

9    and both sides and the lawyers at Weil and Simpson and Sullivan

10   & Cromwell and Cleary Gottlieb thought we were -- if we could

11   do it for our clients, was also helping the country and the

12   economy.  And in that sense, absolutely, we were working

13   together to try to get a deal done if our clients could find a

14   way to get it done.

15   Q.    And do you recall you told us earlier that Harvey Miller,

16   very late in the process, right before the closing, turned, in

17   the presence of a large room that included you, looked at

18   everybody and said, are we sure?  Does anyone think that we

19   have done anything inconsistent with what we told the Court,

20   right?

21   A.    It was -- it was -- I do remember the room.  It was not

22   the big room that we had had the open mic to the Fed and the

23   SEC, but it was a large room.  There weren't a huge number of

24   people in the room.  Whether it was five or eight or ten, I

25   don't recall, but yes, I've testified to a conversation along

Page 230

1    that line.

2    Q.    And you understood the importance of that question, did

3    you not?

4    A.    Absolutely.

5    Q.    And this occurred just a couple of hours after Harvey

6    Miller had raised the issue of Lehman cash in connection with

7    the 15c3 account.

8    A.    It was about -- it was a long Sunday and Monday.  It was

9    more than a couple of hours.  It was the -- the conversation,

10   the best I can recall, on the 15c3-3 cash was in the -- over

11   the course of several hours in the afternoon on Sunday.  I

12   don't know precisely the time.  The conversation I'm now

13   talking about was Monday morning at 5, 6, 7 a.m.

14   Q.    And at no time after Harvey Miller raised this question

15   for everyone, did anyone from Barclays raise with anyone at

16   Lehman or Weil the issue of Lehman's cash margin and whether

17   that was consistent with the representation that had been made

18   to the Court?

19   A.    There was no such discussion, no.

20   Q.    Thank you, sir.

21         MR. MAGUIRE:  I have no further questions.

22         MR. TECCE:  May it please the Court, Your Honor, James

23   Tecce of Quinn Emanuel on behalf of the official committee of

24   unsecured creditors.

25   CROSS-EXAMINATION

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 231 of 253

Page 231

 1    BY MR. TECCE:

 2    Q.   Good afternoon, Mr. Lewkow.  I'm James Tecce of Quinn

 3    Emanuel, and we are counsel to the official committee of

 4    unsecured creditors in these cases.  You were present, Mr.

 5    Lewkow, in the offices of Weil Gotshal over the closing weekend

 6    of Saturday and Sunday, correct, before the transaction closed

 7    on Monday?

 8    A.   That's -- that's correct.

 9    Q.   That's correct?  And this morning, counsel for Barclays

10    asked you a series of questions about whether or not, during

11    that closing weekend, the creditors' committee made statements

12    to you about the sale transaction.  Do you remember that

13    colloquy with counsel for Barclays?

14    A.   More or less.  It's been a long day, but yes.

15    Q.   Okay, and Mr. Lewkow, isn't it true that during the

16    closing weekend, you, sir, did not personally engage in any

17    direct discussions with the committee or attend any  meetings

18    with the committee during that weekend, is that correct?

19    A.   That's correct.  There were people from there who were in

20    rooms where things were being discussed, but I had -- I don't

21    recall any direct conversation I had with any representative of

22    the committee.  That's correct.

23    Q.   Okay.  And just quickly, sir, I hate to ask you to do

24    this, but can you turn to the binder that Mr. Gaffey gave you.

25    I know it's a very big binder.

Page 232

```
 1    A.   Which of -- which of the two?

 2    Q.   It's the --

 3    A.   The one with my name or the one without my name?

 4    Q.   It has your name on it, sir.  It's very large.

 5    A.   Hold on a second.

 6    Q.   Sure.

 7    A.   Okay.

 8    Q.   And if I could just ask you to turn to your deposition

 9    which appears at the back.  I'm on page 208.

10    A.   Yup, okay, hold on a second.

11    Q.   Sure.

12    A.   I'm there.

13    Q.   And you'll see, sir, starting on line 13, the question's

14    presented to you, "Sir, over the course of the weekend prior to

15    closing, did you participate in any meetings with the

16    creditors' committee?"  And your answer is, "No, let me add to

17    that.  That is not to say that one or more members of the

18    creditors' committee may have been present when meetings took

19    place, but I certainly did not have any, to my knowledge, any

20    particular meetings with the creditors' committee."  Correct?

21    A.   That's what I testified to, and I just retestified to it.

22    Q.   Okay.

23         MR. TECCE:  That's all I have for the witness, Your

24    Honor.

25         Thank you for your time.
```

Page 233

```
 1              THE COURT:  Okay.  Redirect?

 2    REDIRECT EXAMINATION

 3    BY MR. SCHILLER:

 4    Q.   I know it's been a long afternoon, Vic, and His Honor has

 5    to go back to work.  So I'm going to try to meet the 5:45

 6    request and --

 7              THE COURT:  You can even make it 5:30.

 8              THE WITNESS:  I agree.

 9    Q.   You were asked about discussions and you testified about

10    discussions that you were aware of between the traders for

11    Barclays and Lehman earlier today in the course of examination.

12    A.   Correct.

13    Q.   And you said earlier, from my notes, that you think Lehman

14    people reached their own conclusion, after the discussion with

15    Barclays, that it was appropriate to reduce their marks on

16    certain assets?

17    A.   That was my understanding, yes.

18    Q.   Do you know for a fact, one way or another, whether Lehman

19    changed its marks --

20    A.   I don't.

21    Q.   -- if at all?

22    A.   I think someone asked me that question.  I don't know

23    whether they actually did it, no.

24    Q.   You were also questioned at length about the September

25    19th hearing before His Honor.  And I asked you a question or
```

08-13555-mg   Doc 11274   Filed 09/02/10   Entered 09/13/10 15:06:15   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 234 of 253

Page 234

```
 1   two about that, myself.  Let me just come back to that very

 2   briefly.  On the 19th of September, was the court given a good

 3   description of what was happening, as good a description as

 4   could have been given at the time?

 5   A.   Well, I think as good as could have been given is a -- is

 6   a funny standard, but I certainly thought at the time that,

 7   especially given what had been going on that day, et cetera,

 8   and what had been going on that week, I thought, at the time,

 9   that the Court, the combination of the filing -- the written

10   submissions together with the Wednesday hearing and the

11   descrip -- and the descriptions on Friday at the hearing, I did

12   think that a good job had been done by Mr. Miller and Ms. Fife

13   and the witnesses, et cetera, in describing the deal.  I did

14   think that, yes.

15   Q.   Earlier, you referred to a buffer built into the deal.  Do

16   you remember, generally, testifying to that?

17   A.   Yeah, that was never my word, but yes.

18   Q.   Were you referring, there, to the positive differences

19   which you did testify about that Barclays hoped to achieve?

20   A.   Yes, I was talking about -- I was testifying about the

21   fact that the estimated of the long positions minus the short

22   positions plus the fifty percent interest in the resis plus the

23   retained cash that we thought we were getting, that that

24   created a positive difference of buffer, if you will, for the

25   benefit of Barclays.  That was my understanding, yes.
```

Page 235

1   Q.   Did Barclays continue in its interest in a positive

2   difference throughout the sale, up through the hearing and the

3   closing?

4   A.   That was my understanding, yes.

5   Q.   Was a positive difference guaranteed to Barclays through

6   the purchase agreement?

7   A.   No, because there was no guarantee as to the value of any

8   of the assets.  There was no guarantee as to what the assets,

9   the long positions were going to end up being worth, what the

10  short positions were going to end up costing Barclays.  There

11  was no guarantee that the resis would have any value, so there

12  was no -- no assurances, whatsoever.

13  Q.   Let me turn to cure.  Regarding cure, Mr. Gaffey showed

14  you a sentence in this sale motion earlier this afternoon, and

15  he asked whether Barclays and Lehman on agreed on the estimate

16  of 1.5 billion in that motion.  Do you recall that?

17  A.   I do recall that.

18  Q.   And you testified that this was Lehman's estimate.

19  A.   That was my understanding, yes.

20  Q.   And did this estimate, at that time, represent Barclays'

21  potential exposure to cure payments?

22  A.   Well, it could have been even more.  I mean, there was

23  no -- there was no guarantee that it wouldn't be more than

24  that; there was no guarantee it wouldn't be less than that.  It

25  was going to depend -- we hadn't reviewed -- we hadn't come --

Page 236

1    we hadn't reviewed, probably, any of the contracts, or more

2    than maybe a few.  We certainly hadn't reviewed all of them,

3    made any decisions as to which ones we needed to -- to approve

4    and to take on as opposed to have them terminated.  Thus, there

5    had been -- I was not aware of any clear answers to what the

6    amount of the cure would be, and it could have been more or

7    less as far as I knew at that time.

8    Q.   But you had no reason to question Lehman's estimate of

9    cure?

10   A.   No, I knew it was an estimate.  They didn't represent that

11   they had done a scientific study.  They said they estimated

12   that it was going to be on the -- about a billion and a half or

13   could be about a billion and a half.  It was, you know, it

14   was -- it was going to depend on how many contracts we assumed.

15   Q.   Let me show you Mr. Miller's statements to the Court at

16   the hearing on the 19th of September, page 100, lines 1 through

17   4 on this question of cure payments.  Judge Peck was told by

18   Harvey Miller that Barclays was also "assuming the cure

19   payments relating to contracts and leases that will be assumed

20   pursuant to the asset purchase agreement, and that has a

21   potential exposure, Your Honor, of 1.5 billion dollars that he

22   would testify to," referencing Mr. McDade.

23   A.   Yes.

24   Q.   Did you agree with Mr. Miller's representation to the

25   Court?

Page 237

1    A.    Well, I thought it conceivably could be more than a

2    billion five, but I certainly thought that this was accurate,

3    yes.

4    Q.    Now, Mr. Gaffey, in his questions this afternoon, said to

5    you that -- asked you whether you knew that Barclays put its

6    potential post-acquisition costs in the range of 200 million

7    dollars.  You remember him saying that to you?

8    A.    He did ask -- postacqui -- cure costs.

9    Q.    And you told him you heard --

10   A.    You're talking about cure costs, there?

11   Q.    Yes.

12   A.    Yes, I do remember him --

13   Q.    Thank you for correcting me.

14   A.    -- him asking me a question along those lines, yes.

15   Q.    And you said you'd heard about a document.  Do you recall

16   that?

17   A.    I -- I -- I heard about something -- that there was some

18   document, at some point whether --

19   Q.    Right.

20   A.    -- in preparation for my deposition or something, I heard

21   that there was some document that had something -- that -- that

22   the moving parties suggested implied that there had been some

23   sort of conclusion by somebody at Barclays that it was going to

24   be a lot less than a billion and a half.  But that's all I

25   knew.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 238

```
 1    Q.   What I want His Honor to understand is whether this

 2    discussion you're referencing is in connection with your having

 3    been a 30(b)(6) witness and were you talking to your partners

 4    in preparation for your deposition?

 5    A.   No, I believe you or one of your colleagues mentioned it

 6    to me.  I don't believe it was --

 7    Q.   Well, let me show you --

 8    A.   -- in a convers -- I don't believe it was anyone,

 9    certainly, who knew -- to my knowledge, none of my colleagues

10    knew any such thing at the time of the deal that week.

11    Absolutely none.

12    Q.   Cleary Gottlieb had to put in on the 19th a closing date

13    contract submission to the Court, didn't it?  You were asked

14    about --

15    A.   On the 19th is Friday.

16    Q.   Yes.

17    A.   Okay, and what are you asking?

18    Q.   Let me show you BCI 12.

19         MR. SCHILLER:  And may I ask to hand that out?

20         THE COURT:  Oh, this?  Yes.

21    Q.   This is a filing with the Court on the 19th, and if you

22    see -- well, let me wait for you and the Court and counsel to

23    have that.

24         Now, you were asked, earlier, about the means and the

25    mechanism.
```

Page 239

1    A.    Right.

2    Q.    And you didn't make any reference to this submission on

3    the 18th, but does this refresh your recollection that Cleary

4    Gottlieb, on behalf of Barclays -- well, the submission is made

5    by Weil Gotshal.

6    A.    Yeah, it was made -- but it was made by Weil.  I'm not

7    enough of a litigator or a bankruptcy lawyer to know what was

8    part of the sale motion and what was part of something else.

9    As I testified earlier today that, at some point, there had

10   been concerns expressed by counterparties of contracts with

11   Lehman about how much time they were going to have to put in

12   their claims.  And that usually, usually there was a long time

13   period between when there was a first hearing to schedule a

14   sale hearing when people could make their claims, as it was

15   explained to me, and since here, we were going from a Wednesday

16   evening to a sale hearing on Friday, people who had contracts

17   with Lehman were coming up and saying, wait, we need more time.

18   What can we do?  And as I recall, Ms. Granfield explained to

19   people that we were putting in place a mechanism so that people

20   would have time, post-closing, to make their claims about

21   contracts.  And this was memorializing that, yes.

22   Q.    And in that first paragraph, "Notice to Contracting

23   Partners," there was a reference to cure amount and a notice to

24   that posting on the website.

25   A.    Correct, and this was all aimed at that.

Page 240

1   Q.   Now, Mr. Gaffey showed you a document that you hadn't

2   seen, Movants' Exhibit 11.  I'd like you to look at that again.

3   A.   That's this one?

4   Q.   Yeah.

5   A.   Yup.

6   Q.   Now, we just looked at the closing date contract

7   submission, and that was on the 18th of -- the evening of the

8   18th of September, according to the Court's records.  I just

9   want to point out on the side, there, you see it says

10  "September 18th facts from Weil Gotshal"?  That's the day on

11  that document.

12  A.   Where?

13  Q.   On the right side.

14  A.   I do see that.  I can't -- I have no way of knowing

15  whether the writing was before -- it was on a copy that was

16  already faxed --

17  Q.   Right.

18  A.   -- or it was faxed after this.  I can't tell.

19  Q.   Now, Archie Cox has testified at trial that this is his

20  handwriting, all right?

21  A.   Okay, good.

22  Q.   Now, in terms of Mr. Gaffey's suggestion to you that

23  Barclays put its potential post-acquisition costs in the range

24  of 200 million, let me point out to you what the handwriting on

25  the right side says in the second line -- in the third line.

Page 241

1    The 200 million, do you see that?  The 200 million is for "up

2    to 3,000 mission critical contracts".  Mission critical, do you

3    see that?

4    A.    I do see that, yes.

5    Q.    Now, did you hear the words "mission critical" in

6    connection with what Barclays needed to keep the business open

7    on Monday?

8    A.    I don't remember precisely those words.  What I do

9    remember is that there were a few -- and I think I alluded to

10   this in my testimony earlier today -- that nobody had reviewed

11   all the contracts.  But somebody had -- people on the

12   operations side had talked to Lehman operations people and

13   said, what do we need to be able to open for business Monday

14   morning?  What do we have to have in place in order to open?

15   And that's -- and there was a -- those we assume at closing.

16   Others, we went through this process, as evidenced by the --

17   the notice of assumption assignment that created the web site

18   and allowed people to make their claims post-closing.  But

19   there were certain contracts that we couldn't -- we couldn't

20   process anything, we couldn't open for business unless they had

21   been assumed Monday morning when we closed, and that's --

22   Q.    Mission critical.

23   A.    I don't remember those precise words; I do remember that

24   concept, absolutely.

25   Q.    Mr. Lewkow, you were asked about cash.  You testified to

Page 242

```
 1    your understanding of how the words "free cash" were referenced

 2    before His Honor.  Let me turn to the trial testimony of April

 3    28th, and Mr. Miller's testimony at lines 12 through 21

 4    regarding free cash.

 5              MR. SCHILLER:  Can you put that up?  April 28th.  But

 6    you will need a page, won't you?  Page 89.  I apologize.

 7              THE COURT:  What lines?

 8              MR. SCHILLER:  Lines 12 through 21.

 9    Q.   First, my question to Mr. Miller:  "I won't delay you on

10    that.  I'll ask you, sir, to turn to page 242, starting at line

11    13" -- referring to the hearing before His Honor -- "and you'll

12    see there, again, and this time you represented to the Court

13    'Cash, we're not transferring any cash to Barclays.  That's out

14    of the agreement.'"  And he answered me, "Yes."  Do you see

15    that?

16    A.   I do see that.

17    Q.   And then I asked, "And the representations that you made

18    and that Ms. Fife made to the Court, that was entirely

19    consistent with your understanding of the transaction, isn't

20    that correct?"

21    A.   I see that.

22    Q.   Mr. Miller's answer:  "Yes, in referring to free cash,

23    unencumbered cash."  And that's consistent with your

24    understanding, isn't it?

25              MR. MAGUIRE:  Your Honor, I know it's late, but if we
```

Page 243

1    could have just the next question and answer for completeness.

2         THE COURT:  Let's get your next question and answer.

3    Q.   I'll read the next question.  "I believe you said that

4    we're not transferring any cash to Barclays, that's out of the

5    agreement.  When you say 'free cash', that's obviously cash,

6    sir.  But I understand that you said to the Court we're not

7    transferring free cash.  Was that -- was there some variety of

8    cash that you were excluding from your representation?"  "Yes,

9    that was margin cash associated with the customer's account" --

10   and they were not -- "and they were taking the customer's

11   account, they were taking the whole account, so if there was

12   collateral cash into that account, that would go with the

13   customer's account."

14   A.   Yes.

15   Q.   Let me ask you again to turn to --

16   A.   Is there a question about that?

17   Q.   No.  There is none.

18        THE COURT:  When you put it in context, the question

19   evaporates.

20   Q.   The -- at page 27 of the April 28th examination, there was

21   also a reference by Mr. Miller to free cash.

22   A.   Yeah, I think is what I testified to earlier about the

23   European cash.  Yes.

24   Q.   And at pages -- at lines 14 through 16 on 27, he says the

25   transaction changed, and the deal that was proposed for

Page 244

1   approval did not include the transfer of cash, free cash.  Is

2   that consistent with your understanding?

3   A.   Yes, it's exactly what I was testifying about.  I think

4   that -- that what our understanding was of the deal was that

5   there was -- the retained cash was a concept of free cash that

6   was just available for the running of the business, and that

7   had evaporated and was not available.

8   Q.   You were asked about excess cash in the repo by Mr.

9   Gaffey.  You recall that assertion on his part in a question to

10  you that there was excess cash in the repo?

11  A.   I don't recall that question.  I'm sorry.

12  Q.   Excess collateral --

13  A.   Okay.

14  Q.   -- in the repo.  That was -- let me ask the question

15  again.  Do you recall being asked whether Mr. Miller

16  described -- you were being asked about excess collateral in

17  the repo today, earlier, by -- do you remember that?  Whether

18  there was any?

19  A.   In the repo?

20  Q.   Yes.  Excess collateral in the repo is what Mr. Gaffey

21  asked you about.

22  A.   Okay.

23  Q.   Let me show you --

24  A.   Oh, yes.  I -- yes.  I'm sorry, yes.

25  Q.   Let me show you Mr. Miller's statement to the Court on

Page 245

1    September 19th on this point.  At page 63, lines 16 through 64,

2    line 17.

3        Harvey Miller addresses His Honor:  "Barclays, Your Honor,

4    has extended the sale to enable this extraordinary transaction,

5    hopefully to be consummated.  Yesterday, as Your Honor heard,

6    Barclays basically stepped into the shoes of the Federal

7    Reserve, in connection with the primary dealer credit facility,

8    the PDCF, as to the 45.5 billion dollars Lehman borrowed last

9    Monday and received the collateral that Lehman had posted in

10   connection therewith."

11   A.   Except for -- that's correct.  I recall that.  But of

12   course, as we learned over the weekend, we hadn't actually

13   received that collateral, at least not all of it.

14   Q.   Do you know whether Barclays had a view over the weekend

15   and before closing whether the value of the Fed repo and the

16   securities that Barclays had actually received was of an amount

17   below, equal to, or more than forty-five billion dollars?

18   A.   Well, as I testified earlier, there was a big dispute with

19   JPMorgan on Sunday that we had not gotten -- we had transferred

20   the forty-five billion dollars in cash within -- it was within

21   JPMorgan.  They had it; it was in an account of Barclays' at

22   JPMorgan and we had tran -- we had -- they were supposed to

23   deliver the collateral when we were standing -- wait a second.

24   They were supposed to deliver the collateral, we thought, that

25   the Fed had had to secure its obligation.  And it took a long

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 246

1    time to transfer it, and we didn't get all of it.  And so we

2    said we needed the rest.  And on sometime Sunday, after this

3    big dispute that I've -- with JPMorgan that I've testified to,

4    they said, okay, we'll give it to you, and they gave us the

5    list of what was going to come.

6            And that was when the issue -- when we saw the RAZORS

7    (sic) or RACERS, or whatever that -- they were called, and

8    other provisions in there, that it did not have anything like,

9    in our view, the val -- in our view -- in Barclays' view -- I

10   had no view -- in Barclays' view, it did not have anything

11   approaching the value, and it was, therefore, a real shortfall

12   in what we were getting.

13   Q.   To your knowledge, did Barclays believe there was any

14   excess collateral --

15   A.   We --

16   Q.   -- in the repo it received?

17   A.   We were concerned about exactly the opposite.  We did --

18   had no reason to believe there was excess collateral at that

19   stage.

20   Q.   You were asked by Mr. Gaffey about whether the Court was

21   apprised about valuation during the September 19th hearing.  Do

22   you remember him asking you about that earlier this afternoon?

23   A.   Yes, I do.

24   Q.   First, with respect to Mr. McDade, and then with respect

25   to Mr. Ridings?

Page 247

1    A.   Yes, and I said I didn't remember the details of their

2    proffers of testimony.

3    Q.   Let me try to refresh your recollection by taking you to

4    the hearing transcript of the 19th, page 109, lines 5 through

5    110.

6    A.   I see it.  I don't know who the Q is and who the A is.

7    Whose testimony is this, Mr. Schiller?

8    Q.   This is Mr. McDade.

9    A.   This was -- okay.

10   Q.   If I have my pages right.  Maybe not.

11   A.   "Well, in the absence of a closing balance sheet, can you

12   describe how it was that the debtor determined the fair value,"

13   is that what you're looking at?

14   Q.   Yes.

15   A.   Yeah, this is where -- this is the language that I think

16   Mr. Gaffey or Mr. Maguire asked me about which is

17   referencing -- I see the testimony, yes, the -- in line 11

18   where it references that the individual assets --

19   Q.   On the balance sheet.

20   A.   -- on the balance sheet had been individual line item

21   detail had -- was bottom up.  So I do see that.

22   Q.   And he was asked by Mr. Miller, or by who was questioning

23   him, then -- I'm not sure who the questioner was -- "Does

24   Lehman have any valuations, internal valuations of any of the

25   assets that are being transferred to Barclays?"  And the answer

Page 248

```
 1    is "Absolutely.  There are many complex securities involved,

 2    many different models that are used to evaluate the

 3    securities."  You see that?

 4    A.    I do see that, yes.

 5    Q.    "And so is it your testimony, then, that a valuation was

 6    conducted within Lehman of all of the assets that are being

 7    transferred to Barclays.  When was that conducted?"  And at

 8    page 110, the answer is, "The portfolio moved during the week,

 9    but that was conducted all last evening, all through and up to

10    the arrangement -- to the argument today."  Does that refresh

11    your recollection of Mr. McDade's comments on valuation?

12    A.    Yes, I --

13    Q.    Let me now turn --

14    A.    Yes

15    Q.    Let me turn to Mr. Ridings at page 143, 144.  I believe

16    Mr. Gaffey said that you didn't hear anyone stating to the

17    Court what the value -- valuation of assets, something in that

18    nature, Mr. Gaffey asked you.  Remember that?

19    A.    Something along those lines, yes.

20    Q.    Let me, at page 143, turn to Harvey Miller's proffer as to

21    what Mr. Ridings would testify.  At line 17 through 19 on page

22    143, Mr. Miller advises Judge Peck, "Mr. Ridings would also

23    testify that the sale of LBI must be immediately consummated or

24    there will be little or nothing to sell."  And then at page

25    144, Mr. Miller's proffer continues at line 18 through 24, "He
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 249

1   would testify that these assets have substantially greater

2   value if they are sold as a going concern.  Despite the

3   tremendous publicity associated with this case, not one firm

4   other than Barclays showed up with an interest in the assets as

5   a whole.  Without Barclays, Lehman would be forced to sell

6   discrete assets for a fraction of the value that will be

7   realized from this transaction."

8   A.   Yes, I do recall that.

9   Q.   There was a lot of discussion this afternoon about whether

10  the clarification letter, in changing the definition of

11  purchased assets, did something this Court was not advised of

12  on the 19th.  You recall those questions --

13  A.   I certainly do.

14  Q.   -- about your firm's work and Weil Gotshal's work on the

15  clarification letter?

16  A.   I recall those questions.

17  Q.   Let me ask you to turn to page 48 of the hearing on the

18  19th, please.  And lines 5 through 7 where Ms. Fife is

19  addressing the Court, and do you see there at line 5, Ms. Fife

20  says to Judge Peck, "Some other changes that were made to the

21  contracts affect what are called purchase assets and what are

22  excluded assets."  Do you see that?

23  A.   I do.

24  Q.   And was one of the things you did in the clarification

25  letter was to make changes to the definition of purchase

Page 250

1    assets?

2    A.    I've already testified what we did on that front, yes.

3    Q.    Thank you.

4           MR. SCHILLER:  Thank you, Your Honor.

5           THE COURT:  Is there anymore?

6           MR. GAFFEY:  Nothing from the debtor, Your Honor.

7           THE COURT:  We are done for the day.  You're excused,

8    and I'm sure you'll be pleased to hear that.  We're resuming on

9    Thursday at 9:30.  And just to be clear, you mentioned that the

10   testimony of Shari Leventhal will be on September 7th, not on

11   Thursday?

12          MR. SCHILLER:  Yes, Your Honor, at the request of her

13   office.

14          THE COURT:  Okay, so Thursday will be one witness, and

15   presumably a day that will end before the close of business

16   that day.

17          MR. SCHILLER:  Yes.

18          THE COURT:  Is there any other use --

19          MR. SCHILLER:  I'm not --

20          THE COURT:  Is there any other use of the day that

21   anybody has in mind?

22          MR. SCHILLER:  Yeah, actually, their cross-examination

23   of this financial witness, they said, would be extensive.  So

24   we thought it would extend most of the day.  I had asked you

25   today whether we would -- Gary Romain.  I'd asked you today

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 251

1    whether we might discuss with you some objections to exhibits.

2    We've reduced those, through cooperation with my friends over

3    here, to just a couple of exhibits, and we can do that on our

4    next -- on Thursday, as well.

5              THE COURT:  We can do that on Thursday.

6              MR. SCHILLER:  Thank you, Judge.

7              THE COURT:  Okay, fine.  We're adjourned until then.

8         (Whereupon these proceedings were concluded at 5:48 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 252

```
 1
 2                          I N D E X
 3
 4                      T E S T I M O N Y
 5
 6    WITNESS                 EXAM BY                PAGE      LINE
 7    Victor Lewkow           Mr. Schiller             8        10
 8    Victor Lewkow           Mr. Gaffey              74         7
 9    Victor Lewkow           Mr. Maguire            182        15
10    Victor Lewkow           Mr. Tecce              231         2
11    Victor Lewkow           Mr. Schiller           233         2
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

VERITEXT REPORTING COMPANY

212-267-6868          www.veritext.com          516-608-2400

Page 253

1

2                    C E R T I F I C A T I O N

3

4      I, Lisa Bar-Leib, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      _____

8      LISA BAR-LEIB

9      AAERT Certified Electronic Transcriber (CET**D-486)

10

11     Also transcribed by:     Dena Page

12

13     Veritext

14     200 Old Country Road

15     Suite 580

16     Mineola, NY 11501

17

18     Date:  September 2, 2010

19

20

21

22

23

24

25