Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 08-13555-jmp

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  LEHMAN BROTHERS HOLDINGS INC.,

9

10          Debtor.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14                U.S. Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                September 7, 2010

19                9:32 AM

20

21  B E F O R E:

22  HON. JAMES M. PECK

23  U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    Continued Evidentiary Hearing on Rule 60(b) and Related Motions

3    and Adversary Proceedings

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dena Page

Page 3

1

2   A P P E A R A N C E S :

3   JONES DAY

4        Attorneys for LBHI

5        222 East 41st Street

6        New York, NY 10017

7

8   BY:   ROBERT W. GAFFEY, ESQ.

9        JAYANT W. TAMBE, ESQ.

10

11

12   HUGHES HUBBARD & REED LLP

13        Attorneys for SIPC Trustee

14        One Battery Park Plaza

15        New York, NY 10004

16

17   BY:   WILLIAM R. MAGUIRE, ESQ.

18

19

20

21

22

23

24

25

Page 4

1

2    QUINN EMANUEL URQUHART & SULLIVAN, LLP

3          Attorneys for Official Committee of Unsecured

4            Creditors

5          51 Madison Avenue

6          22nd Floor

7          New York, NY 10010

8

9    BY:   JAMES C. TECCE, ESQ.

10

11

12   BOIES, SCHILLER & FLEXNER LLP

13          Attorneys for Barclays Capital, Inc.

14          333 Main Street

15          Armonk, NY 10504

16

17   BY:   JONATHAN D. SCHILLER, ESQ.

18

19

20   BOIES, SCHILLER & FLEXNER LLP

21          Attorneys for Barclays Capital, Inc.

22          5301 Wisconsin Avenue NW

23          Washington, DC 20015

24

25   BY:   HAMISH P.M. HUME, ESQ.

Page 5

```
 1                    P R O C E E D I N G S

 2          THE COURT:  Be seated, please.  Good morning.  Please

 3   proceed.

 4          MR. SCHILLER:  Good morning, Your Honor.  Jonathan

 5   Schiller for Barclays for the record.  This morning, we will

 6   call Shari Leventhal of the New York Fed, whom the Court knows

 7   well, and it will be a shorter day than usual, as we discussed

 8   last week.

 9          Before I call Ms. Leventhal to the stand, let me just

10   give you an overview to what we will be raising with her and

11   how she fits into the examination.

12          I will take her through, briefly, the Fed's agreement

13   with Lehman at the beginning of the week of the 15th for

14   overnight funding.  I'll ask her about the Fed's agreement with

15   Barclays on the 17th on Tuesday that required Barclays to step

16   in and replace the Fed in that repo.  I'll ask her about the

17   Court's order of the 17th that required all qualified bidders

18   to replace the Fed in their repo landing with Lehman.  I'll ask

19   her about her appearances before Your Honor on the 17th and the

20   19th, and then again on the 22nd of September, and the Fed's

21   support through her testimony before Your Honor, her

22   presentations to Your Honor for your important sale order on

23   the 19th and for the settlement on the 22nd.  I'll ask her to

24   describe the hitch in the repo where the transfers of the

25   securities to Barclays were incompleted (sic) on that Thursday
```

Page 6

1    of that week.  I'll ask her about her involvement in a dispute

2    between J.P. Morgan and Barclays over the weekend, involving

3    the securities to replace the seven billion in cash that had

4    been in a Barclays account.  I'll ask her about the Fed's

5    efforts after closing to facilitate negotiation of another

6    dispute between J.P. Morgan and Barclays over that seven

7    billion dollars in cash.  And finally, I'll ask her about her

8    appearance before Your Honor on the 22nd in support of the

9    trustee's motion to return securities and cash to Barclays as

10   part of Your Honor's order on the 22nd.

11          With that introduction overview, Judge, I call Ms.

12   Leventhal.

13          THE COURT:  Good morning.

14          MS. LEVENTHAL:  Good morning, Your Honor.

15          THE COURT:  Please raise your right hand.  I know

16   you're an attorney, but this is how we do it here.

17          MS. LEVENTHAL:  Sure.

18      (Witness sworn)

19          THE COURT:  Be seated, please.

20   DIRECT EXAMINATION

21   BY MR. SCHILLER:

22   Q.   Good morning, Ms. Leventhal.

23   A.   Good morning.

24   Q.   I don't think I've seen you since I took your deposition

25   in April, but I want to ask you about some of the subjects we

Page 7

1   canvassed there and some additional ones.  Let me first begin

2   for you stating for the record your position with the New York

3   Fed.

4   A.   Certainly.  I'm an assistant general counsel and senior

5   vice president at the Federal Reserve Bank of New York.

6   Q.   And was that -- were those your positions in September of

7   2008?

8   A.   Yes.

9   Q.   Let me turn to the subject of the Fed's short-term

10  financing of LBI during the week of September 15th, after the

11  bankruptcy on the weekend.  You submitted a declaration, you'll

12  recall, to the Court on December 5th.  It's tab 2 in the binder

13  in front of you, and it may be of help, at paragraphs 6 and

14  paragraph 9, in terms of the New York Fed's agreement to

15  finance LBI overnight.  If you could briefly describe that to

16  the Court.

17  A.   After the Lehman Holding Company filed its bankruptcy

18  petition early in the morning on September 15th, that filing

19  was part of what we've considered our second contingency plan

20  which basically involved allowing the holding company to file

21  but winding down the broker-dealer in an orderly manner.  In

22  order to do that, it was important that the broker-dealer be

23  financed, in contrast to what happened in the United Kingdom

24  where, obviously, LBI was not.  In order to do that financing,

25  we were going to use the primary dealer credit facility, the

Page 8

1    PDCF, which had been established by the Federal Reserve

2    pursuant to its Section 13.3 authority back in March of 2008

3    during the time when Bear Stearns was in distress.  Basically,

4    the plan was that we would continue to finance the broker-

5    dealer, fully secured using its collateral, to allow for an

6    orderly wind-down.  Obviously, things changed when Barclays

7    reappeared and was interested in acquiring assets of the

8    broker-dealer and assuming liabilities because at that point,

9    it didn't make sense for the Fed to sort of be facilitating

10   that transaction by financing the broker-dealer, and we sought

11   to ensure that any purchaser -- in this case it was Barclays --

12   of those assets would take the Fed out and would assume the

13   responsibility for financing the broker-dealer from that point

14   on until closing of the transaction.

15   Q.   I take it that once there was a sale on the horizon --

16   A.   Um-hum.

17   Q.   -- you didn't want the taxpayers to pay -- to bear the

18   burden of this lending, since no unwinding was now necessary?

19   A.   Right.  The concept was we were going to finance for an

20   unwind, an orderly unwind to ensure stability in the markets.

21   But once there was an acquisition, it became the purchaser's

22   obligation to ensure that the value of the assets were

23   maintained, pending closing.

24   Q.   And did you require Barclays, through an agreement on

25   September 17th, to take out the Fed's exposure to LBI?

Page 9

1    A.    Yes, we did.  We required Barclays to agree to assume the

2    obligation to finance LBI.

3    Q.    And do you recall whether that was reflected in a letter

4    agreement between the Fed and Barclays?

5    A.    It was.

6    Q.    Incidentally, before I turn to that, do you recall that

7    all qualified bidders -- that is, if any bidder were to emerge

8    in addition to Barclays that week -- Judge Peck ordered that

9    that bidder take out Fed's positions with respect to Lehman, as

10   well?

11   A.    Yes, I do recall, that was exactly correct.

12   Q.    Let me just point you to His Honor's order in that

13   respect, which is at tab 4 of the binder.

14        MR. SCHILLER:  Judge, that's BCI Exhibit 961.

15   Q.    And you see, at the heading for the order, it refers to

16   certain matters relating to competing bids, if any.

17   A.    Um-hum.

18   Q.    And then there is an attachment to His Honor's order

19   beginning at -- after the order's signed, about nine pages in,

20   Exhibit A.  And at the third page of Exhibit A, I simply want

21   to address your attention to "qualified bidder".

22   A.    Um-hum, yes, I see that.

23   Q.    And as the Court will see, as you will see, qualified

24   bidder means a third party, about six lines down.  And then,

25   (ii) arranges for the termination of any master repurchase

1    agreement, et cetera, between the debtors and Federal Reserve

2    Bank of New York, no later than the opening of business, New

3    York time, on Monday, 22nd and provides adequate assurance of

4    performance of such obligations in a manner satisfactory to the

5    New York Fed.  So if any qualified bidder other than Barclays

6    were to arrive on the scene, they, too, must arrange to take

7    out the Fed's exposure to Lehman, is that right?

8    A.    Correct.

9    Q.    And that was dated the -- His Honor's order was dated on

10   the 17th of September.

11        Let me ask you to turn to the letter agreement, which is

12   tab 3 of your binder.

13        MR. SCHILLER:  Your Honor, that's BCI Exhibit 4.

14   Q.    And does this letter reflect the basic terms of the

15   agreement between Barclays and the Fed?

16   A.    Yes, it does.

17   Q.    At the time that -- did you work on this letter of

18   agreement of September 17th?

19   A.    Yes, I did.

20   Q.    At the time of the discussions between Barclays and the

21   New York Fed over this September 17th agreement, did you also

22   discuss with Barclays whether Barclays would need Fed financing

23   for a short period while Barclays refinanced in the private

24   repo market?

25   A.    Yes, we did.  I recall that there was an overnight

Page 11

```
 1    negotiation session, and off-hand, I can't recall whether it

 2    was the Tuesday night or Wednesday night of that week, but I

 3    believe it was the Tuesday night.  And during the course of

 4    that session, I recall that counsel for Barclays raised the

 5    question of whether Barclays would be able to finance through

 6    the PDCF, whether BarCap, the broker-dealer, would be able to

 7    finance through the PDCF.  I remember checking with our

 8    operations people that Barclays had sufficient credit at the

 9    window, learning that they did, and responding that it would

10    not be an issue, they had the same access as anyone else did to

11    the PDCF at that point.

12    Q.   So then the Fed advised Barclays that Barclays'd be

13    permitted to access the PDCF facility, the same facility

14    through which you had financed Lehman's pre-bankruptcy.

15    A.   That -- through which we had financed the broker-dealer,

16    LBI, post-petition from the holding company.  Yes, that's

17    correct.

18    Q.   Incidentally, do you recall that the examiner, in his

19    report to His Honor, wrote about the Fed repo and about the

20    short-term borrowing?

21    A.   I do.

22    Q.   And did the examiner interview you in the course of

23    preparing his report?

24    A.   Yes he did.

25    Q.   For the Court's understanding, at pages 2161 of the
```

Page 12

1   examiner's report through 2162 which appears at tab 15 of the

2   book is a discussion of --

3          MR. GAFFEY:  Objection, Your Honor.

4          THE COURT:  What's the objection?

5          MR. GAFFEY:  The examiner's report is not in evidence

6   and it's not admissible in evidence.  It's hearsay.

7          THE COURT:  Well, so far, all that's happening is a

8   reference to the --

9          MR. GAFFEY:  Mr. Schiller's about to read from it,

10  Your Honor.  That's why I stood at this point.  But --

11         THE COURT:  Well, if the objection is that he's

12  reading from a document that's not in evidence, I'm overruling

13  that.  I'm going to let him ask that question.

14         MR. GAFFEY:  Thank you, Your Honor.

15  Q.   At page 2161 at tab 15, if I may, Ms. Leventhal --

16  A.   Um-hum.  I'm sorry, it doesn't show up very well on the

17  screen, so I'm looking at the hard copy.

18  Q.   I'm just -- I'm not going to spend a long time on it.

19  A.   Okay.

20  Q.   But midway down the page --

21  A.   Um-hum.

22  Q.   -- you'll see in the last sentence of the full -- of the

23  first full paragraph, the -- it says that the Federal Bank

24  needed Barclays to take out the Fed's exposure to LBI prior to

25  the closing of the transaction.  That is similar to testimony

1   that you've given His Honor this morning.

2       In the next paragraph, in the second sentence, it says

3   that the Federal Reserve asked Barclays that (sic) it could use

4   the PDCF to finance LBI securities that Barclays would receive

5   as collateral in the transaction because the Fed anticipated

6   that it would take Barclays time to find third-party financing

7   sources.  Was that one of the reasons that you provided that

8   financing to Barclays?

9   A.   We provided the financing to Barclays because Barclays

10  informed us that they would need time to find the third-party

11  financing sources.  But we provided the financing to Barclays

12  because they were eligible to borrow at the window under the

13  terms of the PDCF.

14  Q.   Incidentally, do you recall how quickly Barclays was able

15  to refinance the forty-five billion in PDCF borrowings that

16  week?

17  A.   To the best of my recollection, it was within a matter --

18  I think it was within a week, but I am not a hundred percent

19  clear on my recollection, there.

20  Q.   And after Barclays took out the Fed's exposure to the LBI

21  that week of the 15th --

22  A.   Um-hum.

23  Q.   -- was, then, the New York Fed's exposure related to

24  Barclays ability to repay or refinance through the private repo

25  market?

LEHMAN BROTHERS HOLDINGS INC.

Page 14

1    A.   I'm sorry.  Could you repeat that question?

2    Q.   Was the Fed's exposure as of Barclays' standing in its

3    shoes --

4    A.   Um-hum.

5    Q.   -- limited to Barclays' ability to repay on the loan or

6    refinance through the private repo market?

7    A.   Yes.

8    Q.   And --

9    A.   Just, if I may clarify that?

10   Q.   Sure.

11   A.   We no longer had exposure to LBI at that point in time.

12   Our only exposure at the PDCF, once Barclays began to finance,

13   was to Barclays.  We had other exposures at the PDCF to other

14   borrowers, obviously.

15   Q.   Other than the letter of the 17th, which we've

16   discussed --

17   A.   Um-hum.

18   Q.   -- and the loan that you advanced for the PDCF that was

19   repaid by Barclays as short-term financing --

20   A.   Um-hum.

21   Q.   -- did the New York Fed reach with Barclays any

22   understanding or agreement that would protect Barclays against

23   the risk that the collateral it received in exchange for the

24   forty-five billion dollar payment could not later be sold for

25   that amount?

LEHMAN BROTHERS HOLDINGS INC.

Page 15

1    A.    Absolutely not.

2    Q.    Did the Fed reach with Barclays any understanding or

3    agreement that would protect Barclays against the risk of loss

4    on the Lehman transaction?

5    A.    Absolutely not.

6    Q.    Incidentally, and this is reaching back, so I will show

7    you a transcript, do you recall whether the Court was informed

8    at the hearing on the 19th that Barclays would, indeed, have

9    access to the PDCF, generally?

10   A.    I don't recall.

11         MR. SCHILLER:  May I show Ms. Leventhal and the Court

12   the September 19th hearing, page 98, lines 1.3 through 9,

13   please?

14   Q.    Now, this is a proffer to His Honor of what Mr. Ridings

15   would testify to, if called.  You were in the courtroom that

16   evening, that important evening.  And it says in the paragraph,

17   "He would also testify, Your Honor, that Barclays, unlike some

18   of the larger and healthier financial institutions that might

19   qualify for access to the PDCF does not have a North American

20   broker-dealer of this scale.  Therefore, the sale is a national

21   extension of Barclays' business.  Barclays would have access to

22   the PDCF and also will assume Lehman's broad-spectrum broker-

23   dealer license."  And they did have that access, did they not?

24   A.    Yes.  Just to be clear, to my knowledge, they had --

25   BarCap had that access prior to the acquisition, as well.

Page 16

```
 1    Q.    Okay, thank you.  Let me turn to the New York Fed's

 2    support for the sale, if I may.

 3    A.    Um-hum.

 4    Q.    When you appeared before His Honor on the 17th and the

 5    19th of September and later in December, were you appearing on

 6    behalf of the New York Fed?

 7    A.    Yes, I was.

 8    Q.    And were you articulating for the Court the New York Fed's

 9    position with respect to the difficult issues he had before

10    him.

11    A.    Yes, I was.

12    Q.    In terms of the timing of the sale, you first appeared

13    before the judge on the 17th of September, as I recall.  And

14    from looking at the transcript, you testified about the

15    financial stability issue that was presented that week with

16    regard to LBI in that market and the interest of going forward

17    as quickly as possible.  Can you comment on the sense of

18    urgency that the Fed felt Tuesday, Wednesday of that week?

19    A.    Certainly.  This was a very turbulent time in financial

20    markets, as been well-documented and well-reported.  We, you

21    know, it started in March with Bear Stearns.  It continued over

22    the summer leading into the early part of September with the

23    collapse of the government-sponsored entities, Fannie and

24    Freddie.  And then, of course, the issue that arose with

25    Lehman.  And so we were talking about a time where the markets
```

Page 17

 1    were incredibly volatile and very unstable.  And we were

 2    concerned with trying to restore confidence and stability in

 3    any way that we could, and that included, obviously, what was

 4    going to happen with the Lehman Brothers broker-dealer.  There

 5    were, you know, multiple thousands of customer accounts that

 6    were affected; there were employee jobs that were affected.

 7    And as far as we were concerned, anything that could be done to

 8    stabilize the broker-dealer and either ensure an orderly wind-

 9    down or ensure an acquisition was something that would be good

10    for the market.

11    Q.   And did the Fed believe that an orderly acquisition was

12    preferential to a wind-down and liquidation?

13    A.   Yes, because we felt that the customer accounts would more

14    smoothly transition, and that, also, there was obviously

15    opportunity to save some jobs.

16    Q.   And looking back at the 72,000 plus customers who

17    transferred, was that goal achieved through His Honor's order?

18    A.   Yes, it was.

19    Q.   In terms of the timing of the closing, today, in 2010,

20    there are questions being raised as to whether it might have

21    occurred not on Monday but on Tuesday or Wednesday or even a

22    little later.  Do you remember articulating the Fed's position

23    to the Court in the course of the hearings on the 17th or the

24    19th that the closing occur as fast as possible, and if that

25    was your position, could you explain to Your Honor why?

1    A.   Yes, it was our position then and our concern was and

2    continued to be for a period after that, the value of the

3    broker-dealer was going to deteriorate, that customers were

4    going to start running away.  There was already a run in place

5    on the bank over the course of "Lehman weekend" which was what

6    prompted the holding company filing.  We were seriously

7    concerned that that would extend into counterparties of the

8    broker-dealer and that the value of the broker-dealer would

9    deteriorate dramatically, and at the same time, there would be

10   increased instability in the markets.

11   Q.   Your concern about greater instability in the markets, was

12   that offset by the sale His Honor ordered?

13   A.   Well, there was, obviously, still instability in the

14   markets.  We had AIG; there were other things going on.  But

15   yes, to the extent that there was a shining light, the sale of

16   the Lehman Brother broker-dealer was certainly something that

17   increased stability and restored some confidence, albeit, you

18   know, very, very bad market, nonetheless.

19   Q.   His Honor heard a number of proffers the evening of his

20   great order, and you were present for those.  You testified

21   generally, today, that it was the view of the Fed that this

22   sale was preferable to liquidation.  And you've said that the

23   transaction was better than a liquidation would've been.  Let

24   me ask you to consider Mr. McDade's testimony as Lehman

25   proffered it to His Honor, briefly.  At the sale hearing on the

Page 19

1    19th, at page 101, lines 18 through 22, Judge Peck was told

2    that "If the sale with Barclays is consummated, customer

3    accounts would continue on a seamless, uninterrupted basis and

4    trading would continue on a normal basis, thereby maintaining

5    billions of dollars of value."  Did the Feds share that view at

6    that time?

7    A.   Yes, we did.

8    Q.   And was it important to the Fed that customers have

9    immediate access to their accounts with a solvent broker-dealer

10   rather than the risk of having their accounts frozen in a SIPC

11   liquidation?

12   A.   Yes, for the reasons that I already articulated, it --

13   that would inspire greater confidence.

14   Q.   At your deposition, as I recall, you indicated an

15   awareness of an investor call that was conducted by senior

16   management of Barclays on September 17th.  And I believe you

17   said you had reviewed that transcript before the closing of the

18   sale.  Let me show you at tab 14 of your binder that

19   announcement.

20   A.   Um-hum.

21   Q.   And that analyst session of questions and answers.  And

22   did you have the opportunity back in that week to review this

23   announcement and the analyst call?

24   A.   Yes, I did.

25   Q.   And you'll see at page 2 of the --

Page 20

1          MR. SCHILLER:  -- of BCI Exhibit 110, Your Honor,

2     which is admitted.

3     Q.   In the middle of the page, there's a discussion by the

4     chairman of the "acquisition of the core of old Lehman based

5     around the U.S. broker-dealer operations.  We have acquired the

6     associated infrastructure.  We will be taking on about 10,000

7     employees.  We are acquiring trading assets with a current

8     estimated value of 72 billion in trading liabilities, current

9     estimated value of 68 billion for cash consideration of 250

10    million."  Two paragraphs down, he says in the second sentence,

11    "In fact, the transaction is capital ratio accretive without

12    additional equity insurance, and the source of that accretion

13    is the negative goodwill from the transaction which amounts to

14    about two billion U.S. dollars."  Now, was the hope and

15    expectation reflected here of an accounting gain of negative

16    goodwill in the amount of two billion dollars in any way

17    inconsistent with the Fed's support of the sale before His

18    Honor up to that point?

19    A.   No, it was not.

20    Q.   Is the accounting gain that they were reporting they

21    expected there relevant to public policy issues surrounding the

22    Fed's participation in the sale?

23    A.   Yes, it was; it was irrelevant to us.

24    Q.   It was irrelevant to you?

25    A.   Right.

Page 21

1    Q.   Was there surprise that the Feds -- that Barclays expected

2    to have an accounting gain on the sale, as it announced

3    publicly?

4    A.   I'm not sure about whether the accounting gain was a

5    surprise.  But we assumed that as a business venture, Barclays

6    entered into this transaction expecting to come out of it doing

7    well.

8    Q.   You haven't been a participant in this trial until now,

9    and I take it you haven't had the opportunity to follow the

10   trial closely; is that right?

11   A.   That's correct.  I followed bits and pieces here and

12   there.

13   Q.   I did ask you about the Rule 60 motions when I deposed

14   you --

15   A.   Um-hum.

16   Q.   -- which, of course, is what this trial's based on.

17   A.   Yes.

18   Q.   Let me ask you whether, at the time of the transaction,

19   that is the week of the 15th through September 22nd --

20   A.   Um-hum.

21   Q.   -- from your participation --

22   A.   Um-hum.

23   Q.   -- in that process with the parties who are here today --

24   A.   Um-hum.

25   Q.   -- did you form a view whether the participants whom you

Page 22

1   observed acted in good faith in that process?

2   A.   We believed that they had, yes.

3   Q.   Now, when I asked you about the Rule 60 motions, and I

4   recognize it's prior to His Honor's important trial, here, but

5   at the time that you read them -- and did you read them in the

6   declarations and the exhibits that were attached?

7   A.   I did, but it was a while ago.

8   Q.   But at the time that you read them, was there anything in

9   the exhibits you saw or in the declarations you read or in the

10  arguments you read that caused the Fed to change its view that

11  the sale was in the best interest of customers?

12  A.   No.

13  Q.   Do you continue to believe the Fed support for the sale

14  was well-founded?

15  A.   Yes.

16  Q.   Is there, in your view, a public policy interest in

17  protecting the finality of the sale of LBI to Barclays?

18  A.   On this point, I'm not -- I can't really speak for the Fed

19  because it's not an issue that we've taken to that level.  But

20  from my own perspective, I think it's difficult to unscramble

21  an omelet.  I think that doing so sends a message to would-be

22  acquirers that might come forward in the future should there

23  be, God forbid, this kind of situation again, that it's not

24  worth getting into it.  And it could be damaging to the ability

25  to affect these kinds of transactions going forward if there

Page 23

```
 1    isn't finality when they're done.

 2    Q.   Let me move on to later in the week and the repo agreement

 3    that Barclays entered with Lehman.

 4    A.   Um-hum.

 5    Q.   It occurs to me that in my moving around, I did not cover

 6    with you the letter agreement itself, which I think it may be

 7    important just to take Judge Peck through briefly because it

 8    hasn't been discussed in trial before today.

 9             MR. SCHILLER:  And Your Honor, that is at tab 3 of

10    your binder.

11    Q.   So at paragraph 2 on page 2, is it discussed that Barclays

12    would assume the repo?

13    A.   Yes.

14    Q.   And at the very end of that paragraph, it's provided that

15    Barclays shall have no obligation if it is not the successful

16    bidder?

17    A.   That's correct.

18    Q.   Do you recall whether the Fed wanted Barclays to go

19    forward and execute the repo replacement before the closing?

20    A.   Yes.

21    Q.   Could you explain that to His Honor?

22    A.   Again, I mean, the concept here was that we were looking

23    for Barclays as the would-be acquirer to finance LBI pending

24    the closing rather than having the Fed, or the taxpayers as Mr.

25    Schiller put it, but having the Fed do it, because from our
```

Page 24

1    perspective, once it was clear that there was going to be an

2    acquisition, it made sense for the purchaser to be the one

3    doing the financing of Lehman and maintaining the value of the

4    purchased assets, and that's why we wanted it done before the

5    closing because it didn't seem -- we didn't know exactly when

6    the closing would take place, but we were hoping it would be

7    quickly.  But for that reason, it made sense for it to be the

8    purchaser who would step in and do it as quickly as possible.

9    Q.   Now, when the repo transaction took place operationally on

10   September 18th, Thursday --

11   A.   Um-hum.

12   Q.   -- did it run into a hitch?

13   A.   Well, let's be clear.  What happens was we financed LBI --

14   the Fed financed LBI overnight on the 17th.  On the morning of

15   the 18th, the repos that the Fed had entered into with LBI were

16   unwound.  Chase, as the clearing bank, financed LBI intraday,

17   and then that evening, Barclays was going to step in and

18   finance LBI overnight, again, using repo facilities that it was

19   entering into.  And yes, in the course of transferring

20   collateral to secure Barclays' position, Barclays had extended

21   forty-five billion dollars in cash to LBI and it was

22   anticipating receiving over forty-nine billion in collateral,

23   or in securities.  There was a hitch.  We kept Fedwire, which

24   was one of the vehicles, open late.  DTC stayed open late.  But

25   notwithstanding that, all of the collateral was not able to be

Page 25

1    transferred to Barclays' account, and consequently, Barclays

2    was short collateral.

3    Q.   And do you recall whether that shortfall in the delivery

4    of the collateral was of approximately seven billion dollars in

5    value?

6    A.   Yes, I believe that was exactly the number.

7    Q.   Do you also recall that Barclays complained that what it

8    received in terms of certain securities in the transfer were

9    different than those that had been pledged to the Fed?

10   A.   I don't recall that from that weekend, but I do recall it

11   later.  It's possible that Barclays raised that issue at that

12   time.  I wasn't party to those discussions.  But I do know that

13   after, when the situation arose and it became clear that there

14   had been some confusion over the course of the weekend that

15   Barclays did complain that it had not received the same

16   securities that the Fed had held in its repo transactions with

17   LBI on the night of the 17th.

18   Q.   So you were a direct participant in discussions where that

19   was said?

20   A.   Yes.

21   Q.   And that was after the closing in connection with another

22   dispute with JPM that I'll get to in a minute.

23   A.   Correct.

24   Q.   But before the closing and after the argument before His

25   Honor --

1    A.    Um-hum.

2    Q.    -- which led to his important sale order, was there a

3    dispute that you and the Fed were exposed to Sunday between

4    J.P. Morgan and Barclays relating to securities that J.P.

5    Morgan was tendering in return for the seven billion dollars in

6    cash?

7    A.    Yes, there was a dispute.  There was a lengthy conference

8    call that went on pretty much all day on Sunday.  At various

9    points in time, participants were on and off the call.  I was

10   on the call the entire day; Stephanie Heller from the Federal

11   Reserve was also on the call the entire day.  But there were

12   portions of conversations with parties that we were not privy

13   to because they happened off-line.  But yes, I do recall there

14   was a long conference call and that was one of the issues that

15   was discussed during the conference call.

16   Q.    In the part of the call that you were able to listen to,

17   did J.P. Morgan propose completing the replacement memo by

18   sending Barclays collateral that JPM had marked in the billions

19   but that Barclays asserted would be worth much less?

20   A.    I do recall that there were discussions to that effect.

21   Q.    Do you recall a liquid asset called RACERS?

22   A.    Yes, I do recall that the RACERS security was raised

23   during the call.

24   Q.    And that J.P. Morgan had tendered these to Barclays and

25   Barclays had refused them because they believed their value was

Page 27

1   much less than what J.P. Morgan had marked them at?

2   A.   Yes, I do recall that.

3   Q.   And then early in the morning of the 22nd, an agreement

4   was reached over this dispute regarding the seven billion

5   dollars in cash.  Do you recall that?

6   A.   I do recall, but I also recall that we were -- that in

7   retrospect, and this came to light later, we believe that the

8   parties really were talking past each other --

9   Q.   Um-hum.

10  A.   -- and that the agreement that was reached may not have

11  actually been reached with full understanding on both sides.

12  Q.   Of this seven billion dollar issue?

13  A.   Yes, yes.

14  Q.   And what you're referring to there is the fact that

15  Barclays thought they had seven billion in their account.

16  A.   Correct.

17  Q.   And perhaps J.P. Morgan had a different view?

18  A.   Correct.

19  Q.   Did Barclays report to the Fed on September 23rd, the day

20  after closing, that the cash it thought was there wasn't there,

21  and did it solicit your help?

22  A.   Yes, they did.

23  Q.   And did you, then -- did the New York Fed, then, attempt,

24  as your affidavit before His Honor states, to facilitate a

25  negotiation among the parties to resolve this post-closing

Page 28

1   dispute?

2   A.   Yes, we did.

3   Q.   Did you, Ms. Leventhal, have a mediation role in that

4   effort?

5   A.   Not a formal mediation role because I don't have that

6   title, but yes, we acted, in a sense, as a mediator of that

7   dispute.

8   Q.   And in that mediation effort, did you discuss with one

9   side the concerns of the other?

10   A.   Yes, we -- and we actually had meetings at the Fed where

11   we brought all the parties together so that we could sort of

12   mediate face-to-face and allow each side to sort of express its

13   views and try to reach resolution.

14   Q.   In addition to meetings, did you have telephone calls with

15   each party?

16   A.   Many.

17   Q.   Did you share e-mails with parties in furtherance of your

18   mediation?

19   A.   Yes.

20   Q.   Do you recall whether the debtor had the opportunity to do

21   due diligence on this settlement process during this period,

22   September 23 through December 22nd when you appeared before His

23   Honor?

24   A.   Yes, I recall that there came a point in time where we

25   presented the settlement to the SIPC trustee, and my

Page 29

```
 1    recollection is that the SIPC trustee then consulted with the

 2    debtor and allowed the debtor to explore the terms of the

 3    settlement and the underlying basis for it.

 4    Q.   And did the settlement -- did the trustee come to a view

 5    that was supportive of the settlement?

 6    A.   Yes, he did.

 7    Q.   And did the trustee ask His Honor to approve that

 8    settlement?

 9    A.   Yes, he did.  He made a motion to that effect.

10    Q.   And you submitted, I believe, a declaration to His Honor

11    on December 5th.  I pointed to it earlier, and it's in the

12    binder.  In preparing that declaration, did you discuss what

13    would be in it with the trustee or the debtor or Barclays, the

14    different parties?

15    A.   We discussed what would be in it with the trustee and with

16    Barclays and with Chase.  I do not recall having direct

17    discussions with the debtor, but I believe that the SIPC

18    trustee did have those discussions with the tru -- with the

19    debtor.

20    Q.   And was that reflective of a cooperative effort to present

21    His Honor with a record that was complete and supported by the

22    participants in the courtroom on the 22nd?

23    A.   Yes.

24    Q.   Do you recall whether the trustee's lawyers at Hughes

25    Hubbard and their financial advisors at Deloitte through this
```

Page 30

```
 1    mediation process had the opportunity to review, for example,

 2    the schedules of the repo collateral that Barclays had received

 3    before the settlement?

 4    A.   Yes, they did.

 5    Q.   And did they have the chance -- I think you've made this

 6    clear -- to review the settlement document itself before it was

 7    put before His Honor?

 8    A.   Absolutely.  In fact, we had a meeting where we presented

 9    it to them piece by piece and explained it and went through our

10    analysis of it, and whatnot.

11    Q.   Let me turn your attention to BCI Exhibit 9.  If it's not

12    in the binder, we can put it up on the screen, which is the

13    settlement agreement.

14    A.   Tab --

15    Q.   It's tab 24, I'm told.

16         MR. SCHILLER:  Your Honor.

17    A.   Ah, yes.

18    Q.   And just briefly, I want to point you to the first

19    paragraph as background for this agreement.

20    A.   Um-hum.

21    Q.   And it says BarCap was asked by the Fed and agreed to

22    purchase a group of securities as of the evening of the 17th

23    had been pledged by LBI to the Fed by entering a reverse repo

24    transaction by LBI in which BarCap would refund forty-five

25    billion to LBI for the Fed portfolio.  And then it defines it
```

Page 31

```
 1    as the replacement transaction.

 2    A.    Um-hum.

 3    Q.    That's Barclays' repo with Lehman.

 4    A.    Correct.

 5    Q.    Do you see that?

 6    A.    Yes, I do.

 7    Q.    And then if you turn to paragraph D, you see there a

 8    release, and it provides upon receipt of the settlement

 9    consideration the trustee, on behalf of LBI and the LBI estate

10    shall be deemed to forever release -- and it goes on to say all

11    claims, and at the bottom of that paragraph, relating to the

12    replacement transaction.  Do you see that?

13    A.    Yes, I do.

14    Q.    And do you recall that from the agreement that you put

15    before His Honor?

16    A.    Yes, I do.  Well, I didn't put it before His Honor; the

17    trustee did.  But yes, I do recall it.

18    Q.    Now, you were aware that a clarification agreement was

19    being prepared on Friday of the court hearing, the 19th of

20    September?

21    A.    Yes, a clarification letter?  Yes.

22    Q.    And that the clarification letter, unfortunately, was not

23    completed by the close of the hearing, was it?

24    A.    That's correct, to my recollection.

25    Q.    And over that weekend, did you participate in discussions
```

Page 32

1    about the clarification letter?

2    A.   Other than the conference call on Sunday where there were

3    points of the clarification letter that were addressed, no, I

4    did not participate in discussions about the letter.

5    Q.   And do you recall receiving on the 22nd of September the

6    final clarification letter that had been filed with the Court

7    and served on all the parties?

8    A.   Yes, I do.

9    Q.   Thank you.

10        MR. SCHILLER:  Your Honor, I'm open to questions from

11   the Court in my examination.  If there's anything I have not

12   covered that you would like me to cover, I'd welcome that

13   guidance.

14        THE COURT:  That's an unusual request.

15        MR. SCHILLER:  That completes my exam.

16        THE COURT:  Fine.  If I have questions, I'll wait

17   until the end.

18        MR. SCHILLER:  Thank you, Ms. Leventhal.

19   CROSS-EXAMINATION

20   BY MR. GAFFEY:

21   Q.   Good morning, Ms. Leventhal.  For the record, I'm Bob

22   Gaffey from Jones Day.  I represent the debtor.  We met briefly

23   this morning.

24   A.   Yes, good morning.

25   Q.   And we haven't met before?

Page 33

1     A.    No, we have not.

2     Q.    Did you meet with anyone to prepare for your testimony

3     other than lawyers at the Fed?

4     A.    No, I did not.

5     Q.    Mr. Schiller asked you some questions about the public

6     policy implications of the sale order at issue in this case and

7     the proceedings in this case, and you said that it would be

8     difficult to unscramble an omelet and that you thought that

9     some of the relief requested might send a message to acquirers

10    that sales like this are not worth getting into.  Do you recall

11    that portion of your testimony?

12    A.    Yes, I do.

13    Q.    You don't mean to suggest with that statement that a

14    message should be sent that the disclosure requirements under

15    Section 363 of the Bankruptcy Code should be relaxed when the

16    circumstances are difficult, do you?

17    A.    No.

18    Q.    Obviously, you also agree with me that when -- whatever

19    message might be sent to potential acquirers about how hard or

20    easy it is, a message that should be sent to potential

21    acquirers is it's important that the Court be told all the

22    material facts and circumstances surrounding a transaction

23    before it's asked to approve it, yes?

24    A.    Obviously.

25    Q.    Obviously.  And the Fed's concern that the deal at issue

Page 34

```
 1    here be closed, I take it at no point did the Fed believe that
 2    the disclosure obligations with respect to this particular sale
 3    transaction were any different than the disclosure obligations
 4    for any other 363 sale, right
 5    A.    No.
 6    Q.    Okay.  Now, Mr. Schiller also showed you -- and it's in
 7    tab 14 of the book that he gave you, and for the moment, I'll
 8    relieve of the burden of the book that I'm going to give you --
 9    but in tab 14 --
10    A.    I saw that book in the box.  It's larger than this one.
11    Q.    They always are because I don't know what's coming.
12          The analyst call at tab 14, you -- the Fed did not view
13    the analyst call as any means or mechanism of disclosure in
14    this Court with regard to the sale transaction, did it?
15    A.    I have no view on that.
16    Q.    All right, and you said, when Mr. Schiller asked you about
17    the accounting gain that's discussed in that analyst call --
18    A.    Um-hum.
19    Q.    -- whether the Fed was concerned or not concerned about a
20    gain.  I believe you said whether Barclays had an accounting
21    gain was irrelevant to "us", to the Fed, yes?
22    A.    Yes.  From the --
23    Q.    And that the Fed assumed that Barclays entered into the
24    transaction -- I think these were your words -- "expecting to
25    come out of it doing well."
```

Page 35

```
 1    A.    Yeah, they're a business concern.  We would expect that

 2    they had done their due diligence and had entered the

 3    transaction for business reasons.

 4    Q.    Okay, now, I'll cover this in a bit more detail as we go

 5    through your examination, but --

 6    A.    Um-hum.

 7    Q.    -- the Fed had played no role whatsoever in the valuation

 8    negotiations that took place between the parties to the asset

 9    purchase agreement, is that right?

10    A.    That's absolutely correct.

11    Q.    All right, and the Fed was not involved on site in the

12    negotiations that took place between Barclays and Lehman at 745

13    Fifth Avenue?

14    A.    No, we were not.

15    Q.    All right, and the Fed was not aware, one way or the

16    other, whether the description of a certain long position in

17    the asset purchase agreement is book value was a true or false

18    statement, was it?

19    A.    I have no knowledge.

20    Q.    And wouldn't have known that because it wasn't involved in

21    the negotiations, correct?

22    A.    Correct.

23    Q.    And the Fed would not have known whether the valuation

24    information that was given to the Court was inaccurate in the

25    sense that what was described as book value was actually a
```

Page 36

1    lower negotiated price, would it?

2    A.    I would not know that.

3    Q.    And Mr. Schiller asked you, also, about the Fed's view or

4    your view -- and we'll keep it as the Fed's view -- as to

5    whether the Fed believed that the persons involved in the

6    transaction acted in good faith.  Do you recall that?

7    A.    Yes.

8    Q.    And you said the Fed believed that they did.

9    A.    As far as we knew, yes.

10   Q.    Okay, as far as you knew.  And one thing the Fed did not

11   know is what, if any, compensation offers had been made to

12   Lehman insiders during the course of the negotiations, is that

13   right?

14   A.    Correct.

15   Q.    And one thing the Fed did not know, for example, is that

16   the chief financial officer of Lehman was under contract to

17   Barclays and entitled to a six million dollar bonus if the deal

18   closed by the 18th of September.  The  Fed didn't know that,

19   did it?

20   A.    No, we did not.

21   Q.    And that was not an area that the Fed inquired into when

22   it formed the view that it has that the people involved acted

23   in good faith, is that right?

24   A.    No, that's correct.

25   Q.    And the Fed had no knowledge, one way or the other,

1    whether certain assumed liabilities that were part of the asset

2    purchase agreement had been deliberately written up to

3    overstate the price, did it?

4    A.    I don't know one way or the other.

5    Q.    One way or the other.  And the Fed had no view as to

6    whether negotiations regarding compensation liabilities to be

7    undertaken were overstated as well, is that right?

8    A.    No.

9    Q.    And the Fed had no knowledge as to what Barclays' internal

10   valuations of what it actually would assume, post-transaction,

11   were revealed to the Court, did it?

12   A.    I'm sorry --

13   Q.    Well --

14   A.    I'm not sure which way I'm supposed to go on that.

15   Q.    -- let me try a simpler question.  I mean, the Fed -- the

16   Fed had no knowledge about how compensation liabilities were

17   calculated or agreed.

18   A.    That's correct, we had no knowledge.

19   Q.    All right, so bottom line, when the Fed formed its view

20   that the people involved acted in good faith, it was based only

21   on their dealings with the Fed, yes?

22   A.    Correct.

23   Q.    All right, you have no idea, really, one way or the other

24   whether the executives involved in negotiating this, the

25   individual executives, acted in good faith and properly at all

1    times, do you?

2    A.    No, in that sense, we do not.

3    Q.    Okay.  Now, you referred on your -- in your testimony to

4    Mr. Schiller, you referred to I think what you called the Fed's

5    second contingency plan.

6    A.    Um-hum.

7    Q.    All right, I want to be sure we're clear.  Did you mean a

8    second contingency plan or a contingency plan.

9    A.    It was the contingency plan.

10    Q.    Okay.

11    A.    Our first plan was to have an acquisition of the entire

12    broker-dealer -- of the entire Lehman operation, rather, not

13    just the broker-dealer.  And that, obviously, didn't come to

14    pass because we couldn't get the guarantee.  There were two

15    pieces that were necessary for that transaction to happen.  We

16    had to have a willing and able buyer with financing and we had

17    to have a guarantee of Lehman's obligations between he contract

18    date and the closing.  We had the financing in place, which was

19    the role that the Fed played in the Bear Stearns transaction,

20    where we provided the financing of the illiquid Bear Stearns

21    assets, the thirty billion.  In this case, it was private

22    sector, a private sector consortium that was prepared to

23    provide that type of financing.  However, in the Bear Stearns

24    transaction, JPMorgan Chase provided the guarantee of Bear

25    Stearns' trading obligations pending closing.  Here, we were

Page 39

```
 1   looking for Barclays, as the only available buyer, to provide

 2   that guarantee, and Barclays couldn't do that absent a

 3   shareholder vote, and the timing was such that we didn't know

 4   how long it would take to get a shareholder vote or whether the

 5   vote would even be successful.  So there was no willing and

 6   able buyer at that point which put us to our contingency plan

 7   which was the filing by the holding company and the orderly

 8   unwind of the broker-dealer.

 9   Q.   Okay, now, the events that you're describing here, just so

10   we can put this in a time context --

11   A.   Um-hum.

12   Q.   -- you're talking about events that occur in the days

13   preceding and over the two days of what have come to be known

14   as "Lehman weekend", yes?

15   A.   Correct.

16   Q.   And that -- the Lehman weekend, for your own recollection,

17   if it's not as clear as I suspect it is, was the 13th and the

18   14th of September.

19   A.   That's absolutely correct.  2008.

20   Q.   All right, and it was over Lehman weekend that Plan A, a

21   term that Mr. Baxter, the general counsel of the Fed, has used

22   was to find an appropriate acquisition -- appropriate merger

23   partner or buyer for Lehman.

24   A.   That's correct.

25   Q.   All right, and the consortium that you referred to was a
```

Page 40

1   consortium of about thirty banks who had been asked to provide

2   funding for the so-called "bad assets", yes?

3   A.   It was a consortium of a number of banks.  I won't say

4   thirty.

5   Q.   And whatever the number --

6   A.   Um-hum.

7   Q.   -- the purpose of the consortium was they were asked or

8   requested to sit down with the Fed and try to come up with a

9   financing, a funding plan with regard to the so-called "bad

10  assets" of Lehman, yes?

11  A.   I'd prefer to term them "illiquid assets", but yes.

12  Q.   Okay.  And that was because in the discussions that were

13  taking place over the weekend, Barclays had made clear they

14  weren't going to take those illiquid assets?

15  A.   Right, it was -- the idea was, just as in the J.P.

16  Morgan -- we were using the same model, essentially, as the

17  JPMorgan Chase-Bear Stearns transaction, and in order to make

18  the deal attractive to the acquirer, there was a need to

19  finance a certain portfolio of assets, the same thing that --

20  the Fed did that -- performed that function in the Bear Stearns

21  transaction.  We were not performing it here; we were looking

22  for a private sector financing solution.

23  Q.   And --

24  A.   And we had it.

25  Q.   And come the Sunday --

Page 41

```
 1    A.    Um-hum.

 2    Q.    -- of Lehman weekend, come the 14th --

 3    A.    Um-hum.

 4    Q.    -- I just want to put a few events in place.

 5    A.    Um-hum.

 6    Q.    By the Sunday, Bank of America is no longer a viable buyer

 7    for Lehman, right?

 8    A.    I believe that was by Saturday --

 9    Q.    Okay.

10    A.    -- Bank of America was no longer a viable buyer.

11    Q.    So by Sunday, still true, no Bank of America on the scene.

12    A.    Correct.  Bank of America had gone off to buy Merrill

13    Lynch.

14    Q.    All right, and had the Fed played any role in Bank of

15    America's decision to go off and buy Merrill Lynch?

16    A.    Not that I'm aware of.

17    Q.    Okay, but in any event, by Sunday, Bank of America's off

18    the table.  We're down to Barclays as the potential buyer of

19    Lehman, yes?

20    A.    Um-hum.  That's correct.

21    Q.    And sometime on the Sunday, it becomes evident that

22    Barclays is not going to go forward with the global deal, the

23    purchase of the Lehman firm, yes?

24    A.    It becomes clear that the guarantee, which is a

25    prerequisite for that transaction to happen, that Barclays
```

Page 42

1   cannot give the guarantee absent a shareholder vote.  So that

2   at that point, they no longer are an able buyer from our

3   perspective.

4   Q.   And is it your understanding that Barclays' inability to

5   give the guarantee derived solely from the inability to have a

6   shareholder vote?

7   A.   It's our under -- that is our under -- my understanding.

8   I don't know if there are others who have a different

9   understanding.  But my understanding of the events of that

10  weekend was that they could not give us the guarantee absent

11  the shareholder vote.

12  Q.   Okay, and --

13  A.   It was a UK legal requirement.

14  Q.   And you're not party, yourself, to the conversations in

15  which the reason the guarantee can't be given is revealed by

16  Barclays, yes?

17  A.   That's correct.

18  Q.   Okay.  So by Sunday morning or mid-afternoon, Bank of

19  America's off the table and Barclays is off the table, and Plan

20  A is not going to work?

21  A.   Correct.

22  Q.   Okay, and it became known to the Fed, did it not, that

23  Lehman's boards, the boards of Lehman Brothers Holdings Inc.

24  and Lehman Brothers Inc. were going to meet on the Sunday.

25  A.   Yes, I believe we were aware that the boards had been

Page 43

1    convened.

2    Q.   And to your knowledge, Mr. Baxter, the general counsel of

3    the Fed, along with Christopher Cox from the SEC, called in to

4    that board meeting, is that right?

5    A.   That's correct.

6    Q.   All right.  Now --

7    A.   That was sometime on the early evening of that Sunday.

8    Q.   And also on the 14th, the Fed communicated that PDCF

9    funding would be made available to Lehman but only post-

10   bankruptcy filing, right?

11   A.   That's not accurate.

12   Q.   All right, there comes a point on the 14th of September

13   when the Fed communicates to Lehman that funding -- that it has

14   access to the PDCF window, yes?

15   A.   The broker-dealer -- just to be clear, the PDCF, the

16   primary dealer credit facility, was established back in March

17   of 2008.

18   Q.   Um-hum.

19   A.   It's a facility available to primary dealers.  Not to the

20   holding companies, and that's true for all the investment

21   banks, Lehman included.  And Lehman was advised, to my

22   knowledge, and I was not the person who did the advising, but

23   my understanding is Lehman was advised that their holding

24   company would not have access to the broker -- to the PDCF.  No

25   holding company of any investment bank had access.

1    Q.   I'm not being clear on my question.

2    A.   Okay.

3    Q.   I -- let's just talk in terms of the broker-dealer.

4    A.   Okay.

5    Q.   I understand that piece.  The point is, though, that with

6    respect to the broker-dealer, the Fed makes clear that it will

7    offer access to the window post-bankruptcy filing, yes?

8    A.   The broker-dealer had access to the window prior to the

9    weekend, as well.  In fact, it had made some borrowings back

10   in -- I'm going to get my dates wrong, but I believe it was in

11   April of 2008 at the PDCF.  So the broker-dealer had had access

12   that that didn't change.  Over the course of the weekend, there

13   was a decision made to expand collateral, the types of

14   collateral that would be accepted at the window, and that was

15   true, again, of all participants.  And that was what was made

16   clear, that LBI, the dealer, would have access to the PDCF even

17   after the holding company filed because this was part of the

18   plan to allow for the orderly unwind of the broker-dealer.

19   Q.   Well, now you've done it.  I'm going to give you the book

20   fairly soon, the big, fat one.

21   A.   That's fine.

22   Q.   But before I do that, I want to drill down a bit on this

23   contingency plan.  It's been recently described by Mr. Baxter

24   as follows:  "A contingency plan developed by the SEC, the

25   Treasury, and the New York Fed was the best option.  Under this

Page 45

1    plan, Lehman's parent will file a Chapter 11 petition, but the

2    broker-dealer subsidiary would continue to operate.  It would

3    operate with intraday credit from JPMorgan Chase and overnight

4    financing from the Federal Reserve."  Is that an accurate

5    description of what happened?

6    A.    Absolutely.

7    Q.    Okay, and now, there's been testimony in this case that --

8          THE COURT:  Mr. Gaffey, I hate to break in in the

9    midst of your questioning.  You were referencing something that

10   Mr. Baxter said.  What's the source of that?

11         MR. GAFFEY:  Oh, it's Mr. Baxter's statement from the

12   FCIC, Your Honor, which I'm prepared to show the witness to --

13         THE COURT:  Fine.  I think this proves the point that

14   it's possible to ask a question with a document that's not in

15   evidence.

16         MR. GAFFEY:  Okay.

17   Q.    Now, we're really going to do it.  Now you're getting the

18   book.

19   A.    Oh, I think I'm going to need an extra desk here.

20   Q.    Ms. Leventhal, what you're going to get are three books.

21   A.    Three?

22   Q.    It's okay.  We're not going to use them all.  One is a

23   book that has your name on it.

24   A.    Okay.

25   Q.    The other is a book called "witness book" and it contains

Page 46

1   some documents that we refer to fairly often in the case.  And

2   the third is a smaller book called FCIC documents, and that'll

3   contain Mr. Baxter's statement.

4   A.   Okay.

5   Q.   I'm told that the FCIC documents are in your bin -- in the

6   fat binder with your name on it.

7   A.   Okay.

8   Q.   So we're short one book.

9   A.   No, the other book is down here.

10  Q.   Okay.

11  A.   This one?

12  Q.   Yes.

13  A.   Okay.  It was here when I got here.

14  Q.   All right, if you would turn within the book, Ms.

15  Leventhal, to tab M-883, behind it is Mr. Baxter's statement to

16  the Financial Crisis Inquiry Commission.

17  A.   Yup.

18  Q.   And did you have any role in preparing this statement?

19  A.   Yes, I did.

20  Q.   Okay, and I take it, then, that you have no reason to

21  disagree with any of the statements Mr. Baxter makes to the

22  FCIC?

23  A.   No, I do not.

24  Q.   And you would adopt them as your own if I asked you these

25  questions here today?

 1   A.   Yes, I would.

 2        MR. GAFFEY:  Your Honor, I offer, on that basis, Mr.

 3   Baxter's statement to the FCIC in evidence.

 4        MR. SCHILLER:  No objection, Your Honor.

 5        THE COURT:  It's admitted.

 6   (Mr. Baxter's Statement to the FCIC was hereby received into

 7   evidence as Movants' Exhibit 883, as of this date.)

 8   Q.   Now, I was asking you a moment ago about the board meeting

 9   at Lehman on Sunday.  To your knowledge, Mr. Cox and Mr. Baxter

10   called into that meeting, is that right?

11   A.   That's correct.

12   Q.   And there's been testimony in this case that Mr. Cox and

13   Mr. Baxter essentially instructed Lehman that it was necessary

14   for it to file a petition in bankruptcy.

15   A.   That's not correct.

16   Q.   All right, has that testimony been described to you?

17   A.   Yes, it has, and I've heard it in other places, as well.

18   Q.   Okay.  And let me ask you in the book to turn to Exhibit

19   882.  And that is the statement of Mr. Harvey Miller to the

20   Financial Crisis Inquiry Commission.  And I would ask you to

21   turn to pages 9 to 10 of that.  And for context, on page 9,

22   you'll see that Mr. Miller is describing a meeting of Lehman's

23   boards of directors on the afternoon of Sunday.  And at the

24   bottom of page 9, he says, "In substance, Messrs. Cox and

25   Baxter stated that it was in the best interest of the financial

Page 48

1    system and the United States economy for Lehman's board of

2    directors to pass a resolution approving the commencement of a

3    bankruptcy case prior to 12 midnight of that day.  Several

4    directors asked Messrs. Cox and Baxter whether they, on behalf

5    of the New York Fed and SEC, were directing the board of

6    directors to adopt a bankruptcy resolution.  In response, Mr.

7    Cox hesitated and Mr. Baxter suggested they hold an off-line

8    caucus.  After five or ten minutes, Messrs. Cox and Baxter

9    rejoined the conference call with the directors."  Have you

10   reviewed Mr. Miller's statements before the FCIC?

11   A.   Yes, I have, and I would not adopt all of his statements

12   as my own.

13   Q.   Okay, and I'm not asking whether you adopt them.  I'm

14   going to ask you something slightly more contentious, which is

15   is there a part of this where you think Mr. Miller is wrong?

16   A.   Well, he continues -- he goes on to say that Mr. Cox

17   stated that he and Mr. Baxter were not issuing a direction to

18   the Lehman board of directors to pass a resolution.  And my

19   understanding -- and again, I was not on this call -- but my

20   understanding from Mr. Baxter is that the -- that his view and

21   Mr. Cox shared that is that they were very clearly not

22   directing Lehman's board to file bankruptcy.  The decision was

23   Lehman's boards' decision to make.

24   Q.   Do you know why Mr. Cox and Mr. Baxter called into a

25   meeting of Lehman's boards of director?

Page 49

1    A.   Because obviously, the decision was very consequential,

2    and everyone wanted to know what the board was going to do.

3    Q.   You've not heard any report of that meeting where Mr. Cox

4    and Mr. Baxter call to inquire what the plans of the board are,

5    have you?

6    A.   No.  My understanding is that the purpose of the call was

7    to make sure that the board was convened and that the board

8    understood the urgency of the situation, but there was never

9    any direction to the board to file bankruptcy.  And Mr. Miller

10   doesn't say that there was.

11   Q.   I beg your pardon?

12   A.   Mr. Miller's statement does not say that there was a

13   direction to file.  He says that they were not issuing a

14   direction.

15   Q.   Well, you disagree with Mr. Miller where he says at page 9

16   to 10, in substance, Messrs. Cox and Baxter stated that it was

17   in the best interest of the financial system and the U.S.

18   economy for Lehman's board of directors to pass a resolution

19   approving the commencement of a bankruptcy case prior to

20   midnight of that day.  You do disagree with that?

21   A.   I'm not going to disagree that perhaps that was an

22   opinion, but I don't know that that was actually said on the

23   call in the way that it's phrased, here.

24   Q.   Mr. Miller prefaces his statement with the phrase, "in

25   essence".  You don't disagree that "in essence" --

Page 50

1    A.    It actually says "in substance".

2    Q.    Okay, "in substance".

3    A.    I'm not sure.  I wasn't on the call.  And that's not

4    exactly consistent with the account that I've been given.

5    Q.    Now, I'd ask you, Ms. Leventhal, if you would turn to tab

6    M-863 --

7    A.    Um-hum.

8    Q.    -- in your binder.

9    A.    I don't think I have a -- there's nothing behind M-863 in

10   the binder.

11   Q.    Is that right?  That's not a good development.

12         MR. GAFFEY:  Your Honor, can I take a minute to just

13   make sure the books are right?

14         THE COURT:  I have 863.

15         THE WITNESS:  Yeah, I have a tab, but there's nothing

16   behind it in this one.  Unless it's before it.

17         THE COURT:  If it's going to be on the screen, I can

18   simply pass over mine.

19         MR. GAFFEY:  May I approach, Your Honor.

20         THE COURT:  Oh, sure.

21         MR. GAFFEY:  Excuse me.

22   Q.    Ms. Leventhal, I've given you another copy of Movants'

23   Exhibit 863.  Have you seen the document before?

24   A.    Yes, I have.

25   Q.    And what is the document?

Page 51

1   A.    It's a letter dated September 14th addressed to a senior

2   vice president at Lehman Brothers and an assistant vice

3   president at JPMorgan Chase, and it's from our markets -- one

4   of our markets officers, Christopher Burke.

5   Q.    And this letter is the letter stating the terms under

6   which access could be had to the PDCF, yes?  It's got the new

7   haircuts on it?

8   A.    It has the -- yes, it has different haircuts on it, and my

9   understanding is it also reflects -- and I'm -- this may be a

10  different one, but let me double check.  Yes, I believe this

11  one also reflects the expanded collateral that the board

12  approved -- board of governors approved --

13  Q.    Okay.

14  A.    -- on that Sunday.

15          MR. GAFFEY:  Your Honor, I offer M-863 in evidence.

16          MR. SCHILLER:  No objection.

17          THE COURT:  It's admitted.

18  (Letter Stating New Terms for Access to PDCF was hereby

19  received into evidence as Movants Exhibit 863, as of this

20  date.)

21  Q.    Now, Ms. Leventhal, you made a reference to the expanded

22  collateral.  I just want to see if I can be clear about that.

23  In sum, what these criteria do is they expand the nature of the

24  collateral that can be accepted, yes?

25  A.    Correct.

Page 52

1    Q.  And they -- I'm searching for a description.  They

2    increase the required haircuts with respect to some categories

3    of that collateral, yes?

4    A.  That's correct.

5    Q.  All right, now, I want to see if we can agree on some

6    terms with regard to haircuts.  In the context of repos and

7    PDCF haircuts, are the additional collateral that the

8    borrower's required to deposit in order to obtain the PDCF

9    loan, yes, over an above the loan amount?

10   A.  I'm sorry, can you repeat that?

11   Q.  If I want to borrow a thousand bucks --

12   A.  Um-hum.

13   Q.  -- from PDCF --

14   A.  Right.

15   Q.  -- and the haircut's twenty percent --

16   A.  Um-hum.

17   Q.  I have to put in 1,200 dollars, yes?

18   A.  Correct.

19   Q.  All right, and the 1,000 bucks is the amount of the loan

20   and the 200 bucks is the so-called haircut, right?

21   A.  Correct.

22   Q.  And both parts of that, that is, the part that matches the

23   loan and the haircut, are measured at market value, yes?

24   A.  I'm a lawyer.

25   Q.  So am I.

Page 53

```
 1    A.   And so I hesitate to ever give answers on this kind of

 2    thing without qualifying it, but yes, that's my understanding.

 3    Q.   That's your understanding?

 4    A.   Yes.

 5    Q.   Okay, and it's not your understanding that -- and I ask

 6    this because the term "haircut" is a bit counterintuitive,

 7    here.

 8    A.   Um-hum.

 9    Q.   It's not your understanding that a haircut is a discount

10    off the notional value of the collateral?

11    A.   No, it's -- no, it's -- well, it's at the hair -- the

12    value of the collateral is discounted to the extent that you

13    have to put more collateral forward than the value of the loan.

14    Q.   All right, but each and every aspect of the total

15    collateral, that is, the amount that matches the underlying

16    loan and the haircut --

17    A.   Um-hum.

18    Q.   -- are calculated by someone at market value, yes?

19    A.   That's my understanding.

20    Q.   Okay.  And the haircuts that were set out in the September

21    14th letter were stricter or higher haircuts.  You needed to

22    deposit more collateral in order to get that thousand bucks,

23    yes?

24    A.   That's correct.

25    Q.   Okay.  And the fact that in this setting, the borrower has
```

Page 54

```
 1   to deposit more collateral than the amount it actually borrows

 2   is to protect the lender, the Fed, yes?

 3   A.   That's correct.

 4   Q.   And the risk that the Fed has here is two-fold.  It is the

 5   creditworthiness of the borrower itself, is this a good or a

 6   bad borrower --

 7   A.   Correct.

 8   Q.   -- yes?  Yes?

 9   A.   Yes, we term it counterparty credit risk, yes.

10   Q.   Counterparty credit risk, and also the risk inherent in

11   the potential for drops in the market value of the collateral

12   deposited against the loan, yes?

13   A.   Correct.

14   Q.   And that -- that risk is present in a repo situation

15   because you're holding the collateral, yes?

16   A.   That's correct.

17   Q.   So if the borrower defaults on its repayment or repurchase

18   obligation, you're holding collateral, and you hope it's worth

19   at least the amount that the Fed lent?

20   A.   Correct.

21   Q.   And if you have a counterparty which is not

22   creditworthy --

23   A.   Um-hum.

24   Q.   -- it's more likely to default because it's less

25   creditworthy, yes?
```

Page 55

1    A.    That's -- sounds right to me.

2    Q.    All right, but if you have a counterparty that is more

3    creditworthy, that has no bearing on the market risk that we

4    just talked about, the risk of a downward slide in the value of

5    the underlying collateral?

6    A.    Correct.

7    Q.    Okay, that can happen no matter who your borrower is?

8    A.    Generally true.

9    Q.    All right, now, on the letter, I just want to get some --

10   and this is Exhibit 863 if you're not there.  Who is Chris

11   Burke?

12   A.    He is one of our markets officers.  He's an assistant vice

13   president in the markets group at the Fed, and at the time in

14   question, he was principally responsible for the primary dealer

15   credit facility.

16   Q.    Now, when did the Fed first learn about the filing of the

17   Lehman Holdings bankruptcy?

18   A.    The decision to file?  Or the actual filing?

19   Q.    Well, let's talk about both.  When did you learn about the

20   decision to file?

21   A.    I believe we knew that the board had made the decision

22   sometime in that -- on that Sunday evening, the 14th.  The

23   actual filing, I believe, took place in the wee hours of the

24   morning of the 15th, some time around 2 a.m. -- between 2 and 3

25   a.m.

Page 56

1    Q.    Okay.  Now, when did the Fed first become aware of --

2    there came a time when the Fed became aware of renewed

3    negotiations between Lehman and Barclays after the bankruptcy

4    filing, correct?

5    A.    Correct.

6    Q.    When did the Fed first become aware of the renewed

7    negotiations?

8    A.    I'd like to say it was on Tuesday morning, but the days do

9    run together quite a bit at that point in time.

10   Q.    And by the Tuesday morning, and because I --

11   A.    I would mean the 16th.

12   Q.    -- I know the days also were long.  By the Tuesday

13   morning, are you talking about the wee hours after midnight or

14   over your breakfast coffee?

15   A.    I'm thinking early in the actual daylight hours --

16   Q.    Okay.

17   A.    -- of Tuesday morning on the 16th, but I could be off with

18   that.

19   Q.    And we've established that the Fed was in no way directly

20   involved in negotiating what came to be the asset purchase

21   agreement during that week, yes?

22   A.    That's correct.

23   Q.    And did there come a time -- well, obviously, there came a

24   time when the Fed learned that an agreement had been reached

25   between Lehman and Barclays, yes?

Page 57

1    A.    Yes.

2    Q.    And your understanding of the agreement was that Barclays

3    was not actually purchasing the broker-dealer, but rather, this

4    was an asset purchase agreement, so Barclays was purchasing

5    assets to the broker-dealer and that there were excluded

6    assets, yes?

7    A.    That's correct.

8    Q.    Now, at the time that it learned about the transac --

9    about the agreement, the Fed had no first-hand knowledge of

10   whether the transaction was meant to be a balance deal, an

11   equivalent exchange of assets and liabilities, is that right?

12   A.    Correct.

13   Q.    I think you've told us that was irrelevant to the Fed.

14   A.    Right.

15   Q.    So the Fed had no knowledge one way or the other about

16   whether the deal that was agreed was a so-called wash.

17   A.    Right.

18   Q.    And the Fed had no knowledge about whether there was an

19   embedded first-day gain or not --

20   A.    Correct.

21   Q.    -- for Barclays.  Correct?  Okay.  Did the Fed ever learn

22   whether Lehman's principals and Barclays' principals in the

23   negotiation had different views about that issue?

24   A.    No, I don't recall.  I mean, I believe much later I may

25   have learned that, but not at the time.

Page 58

1    Q.    Okay.    Now, has there come a time when the Fed has learned

2    one way or the other whether the agreement that was reached

3    between Lehman and Barclays involved an overall five billion

4    dollar loss against Lehman's marks?

5    A.    I'm sorry, I don't understand the question.

6    Q.    Let me ask you -- this is where we're going to have to

7    work with the books a little bit.    Take the book that just says

8    "witness" on the front.

9    A.    Okay.

10    Q.    You'll want to keep the one you're closing handy.    That's

11    where we're going to spend most of the day.    And I'd ask you

12    please to turn to tab 9 of that book which is Exhibit M-7 in

13    evidence, which we'll put up on the screen.

14    A.    Okay.

15    Q.    And I -- let me just ask you.    Have you ever seen this

16    document before?

17    A.    No, I have not.

18    Q.    All right.

19         MR. GAFFEY:    And I'm going to ask us to blow up the

20    bottom paragraph on the e-mail.

21    Q.    It's an e-mail that we've had a fair amount of testimony

22    about in this case.    And the writer says, "It took all night,

23    lots of back and forth, but the deal is done and ready for the

24    board.    Final price did not change meaningfully, approx a five

25    billion, all-in, economic loss versus our marks."    And then et

1    cetera, et cetera.  Do you see that?

2    A.    Yes, I do.

3    Q.    Did any information about that or anything like that come

4    to the Fed's attention on or around the 16th of September?

5    A.    It may have come to someone at the Fed's attention.  It

6    didn't come to mine.

7    Q.    But not yours.  And as far as you know -- as far as you're

8    able to testify --

9    A.    Um-hum.

10   Q.    -- you don't know if anyone at the Fed knew this?

11   A.    No, I don't know.

12   Q.    Now, I take, then, that the Fed, also, at no point during

13   what I'm calling the week -- that would be the week from the

14   15th of September when the bankruptcy filing took place through

15   the 22nd of September when the closing took place -- the Fed at

16   no point during that week ever learned whether personnel within

17   Lehman or Barclays were applying liquidation values for the

18   purpose of assessing the value of collateral to be transferred

19   in the case?

20   A.    No.

21   Q.    In the transaction?

22   A.    I have no knowledge of that.

23   Q.    And was there any Fed involvement -- and again, I'm in

24   the -- now I'm in the early days, on the Monday and the

25   Tuesday, the 15th and the 16th.

LEHMAN BROTHERS HOLDINGS INC.

Page 60

```
 1    A.    Um-hum.

 2    Q.    Was there any Fed involvement or decision-making in

 3    connection with what needed to be disclosed or did not need to

 4    be disclosed to the Court in connection with getting approval

 5    of the transaction?

 6    A.    No, there was no Fed involvement in that.

 7    Q.    And I take it -- Mr. Schiller mentioned before that you

 8    attended the hearing on the 17th of September.  That's the one

 9    on the Wednesday.

10    A.    Yes.

11    Q.    You also attended the sale hearing on the 19th, yes?

12    A.    Correct.

13    Q.    And in fact, you attended a hearing on the 16th as well

14    that had to do with debtor-in-possession financing.

15    A.    Yes, that was a Chase motion.  Yes.

16    Q.    All right, with regard to the hearing on the 17th, did you

17    recall certain descriptions being made by Mr. Miller about the

18    transaction in response to questions put by the Court?

19    A.    I have a vague recollection of them, though I don't know

20    what I remember from the 17th versus the 19th, at this point.

21    Q.    And having had no role in the negotiations of the

22    transaction or the documenting of the transaction, I take it,

23    right?

24    A.    Correct.

25    Q.    Okay, having had no role in that, the Fed was in no
```

Page 61

```
 1     position to determine, one way or the other, the accuracy of

 2     those disclosures?

 3     A.    Correct.

 4     Q.    Now, did you know who was -- you knew that Mr. Miller from

 5     Weil Gotshal was representing Lehman in the bankruptcy, yes?

 6     A.    Oh, yeah, absolutely.

 7     Q.    And did you know who was representing Barclays?

 8     A.    Yes, it was Cleary Gottlieb.

 9     Q.    And --

10     A.    Lindsee Granfield, I recall.

11     Q.    And as a general matter, apart from Ms. Granfield, a team

12     of lawyers from Cleary Gottlieb were involved in representing

13     Barclays in connection with the transaction, yes?

14     A.    Yes.

15     Q.    And do you know if Sullivan & Cromwell also represented

16     Barclays?

17     A.    Yes, they represented them in connection with the

18     negotiations that we had over the replacement transaction and

19     the agreement that the Fed entered with Barclays.

20     Q.    Now, did the Fed have any contact with lawyers at Cleary

21     while the negotiations were going on about the status of the

22     negotiations?

23     A.    We were represented by Cleary's bankruptcy counsel, but

24     there was a Chinese wall in place, so we did not have any

25     contact with the Cleary lawyers that were representing Barclays
```

LEHMAN BROTHERS HOLDINGS INC.

Page 62

1    on the transaction.  Our contact was strictly with bankruptcy

2    counsel at Cleary.

3    Q.    Just for clarity of the record, my question is -- I hear

4    what you say about a Chinese wall --

5    A.    Um-hum.

6    Q.    -- but for clarity of the record, the question is whether

7    any lawyers from Cleary --

8    A.    Um-hum.

9    Q.    -- communicated to the Fed about the status of the

10   negotiations between the parties while the negotiations were

11   going on?

12   A.    The status of the negotiations as to what?

13   Q.    They're close to a deal, they've made a deal, these are

14   the terms of the deal, anything like that?

15   A.    I believe that we were given some updates at various

16   points that there was a deal in process, but I don't know how

17   much detail we received at the time.

18   Q.    Now, how did these updates come to the Fed.  Did they --

19   through Cleary.  I want to go back to the Chinese wall.

20   A.    I don't --

21   Q.    You've got a team of Cleary lawyers --

22   A.    I don't believe they came through Cleary.  I believe they

23   came to us through Sullivan & Cromwell --

24   Q.    Okay.

25   A.    -- in the course of the negotiations over the letter

Page 63

1    agreement that the Fed entered into with --

2    Q.    All right, so Cleary's representing Barclays in the sale

3    negotiations.

4    A.    Um-hum.

5    Q.    Another team at Cleary is representing the Fed --

6    A.    On the bankruptcy side.

7    Q.    -- on the bankruptcy side.  And Sullivan & Cromwell is

8    representing --

9    A.    Barclays.

10   Q.    -- Barclays.

11   A.    Um-hum.

12   Q.    Is there ever a point where Sullivan & Cromwell is

13   representing the Fed?

14   A.    No.

15   Q.    Now, did the Fed see any drafts of the asset purchase

16   agreement before it was signed?

17   A.    I believe we -- yes, well, there were drafts that were

18   presented to the Court during that week as exhibits in various

19   motions.  I believe we saw those.

20   Q.    Okay, I -- I may not be being clear, and I can take the

21   time to go through the book, but let me represent to you that

22   on the 17th of September --

23   A.    Um-hum.

24   Q.    -- a sale motion was filed with the Court --

25   A.    Right.

LEHMAN BROTHERS HOLDINGS INC.

Page 64

1   Q.   -- that contained a copy of the asset purchase

2   agreement --

3   A.   Yes.

4   Q.   -- with some hand-written interlineations.

5   A.   Yes.

6   Q.   Do you recall that?

7   A.   Yes, I do.

8   Q.   Okay, that's actually signed.

9   A.   Um-hum.

10   Q.   My question is, before there was a signed final with some

11   hand-written interlineations or not --

12   A.   Um-hum.

13   Q.   -- did the Fed see interim drafts of the asset purchase

14   agreement?

15   A.   I don't recall.

16   Q.   So the first time the Fed would have seen the asset

17   purchase agreement would have been when  it was filed in the

18   sale motion?

19   A.   That's my recollection.

20   Q.   Now, when -- there came a time when the Fed agreed with

21   Barclays that it would support the sale motion, correct?

22   A.   We -- it wasn't that we agreed only with Barclays.  We

23   agreed generally that we would support the sale motion.  I

24   mean, my understanding was that the -- that the Lehman estate

25   was also supporting the sale motion, and the SIPC trustee,

Page 65

1    obviously, was involved at that point in time because there was

2    a SIPC filing that Friday morning.

3    Q.    My question's a little more specific.

4    A.    Um-hum.

5    Q.    There come a time when the Fed agreed with Barclays that

6    the Fed will support the sale motion?

7    A.    No, we never had an agreement with Barclays that we would

8    support the sale motion.

9    Q.    Now, in the book with your name on it --

10   A.    Yup.

11   Q.    You'll find a copy of BCI Exhibit 4.  That's also a

12   document that Mr. Schiller showed you.

13   A.    What tab is it under?

14   Q.    The BCI exhibit should be toward the back.

15   A.    Okay, is this the letter agreement?

16   Q.    Yes, ma'am.

17   A.    Okay.

18   Q.    You got it there?

19   A.    I don't.  No, I don't know what tab it's under.

20   Q.    If you have the white cover binder that Mr. Schiller gave

21   you, it's tab 3 behind that.

22   A.    Okay, that one I have.  Um-hum.

23   Q.    Okay, you have it there?

24   A.    Yup.

25   Q.    All right, and that's the --

LEHMAN BROTHERS HOLDINGS INC.

Page 66

```
 1    A.    Oh, yeah, you're right.

 2    Q.    Okay, that's the agreement you told Mr. Schiller about

 3    regarding the --

 4    A.    Yes, and you're absolutely right.

 5    Q.    -- Barclays takeout.

 6    A.    And I didn't recall that line, but we did agree to support

 7    it.

 8    Q.    Okay, just so we're clear what line we're talking about,

 9    you're referring to --

10    A.    But I didn't recall that.

11    Q.    -- paragraph 5 of this takeout agreement dated September

12    17th?

13    A.    Um-hum.

14    Q.    And it says, "At the hearing before the Court on the

15    motion, the Federal Reserve Bank of New York shall support the

16    motion."  Yes?

17    A.    That's correct.  You're right.

18    Q.    So as of the signing of this agreement, the Fed was

19    contractually obliged to support the sale motion.

20    A.    Correct.

21    Q.    All right, and if I understand the sequence properly, at

22    the time the Fed agreed with Barclays to support the sale

23    motion, it had not yet seen the asset purchase agreement.

24    A.    Right, although as -- again, to be clear, that's because

25    the terms of that asset purchase agreement weren't what we were
```

1    interested in.  And we had made a decision prior to these

2    negotiations -- which is why I didn't actually remember that we

3    did agree as part of this deal -- but, we had essentially made

4    a decision that it was in the best interest of the financial

5    stability that we were seeking to promote for there to be an

6    acquisition of the Lehman Brothers assets, the LBI assets,

7    rather than a liquidation.  And the terms of that sale

8    agreement were something that we felt the parties were in the

9    best position to negotiate.  It wasn't for the Fed to be

10   involved in.  What we wanted was an orderly transition of the

11   customer accounts, and to the extent that it was possible,

12   preservation of jobs.

13   Q.    All right, so the Feds agreement to support the motion --

14   A.    Um-hum.

15   Q.    -- in paragraph 5 --

16   A.    Um-hum.

17   Q.    -- is regardless of whatever the asset purchase agreement

18   might or might not have said.

19   A.    That we felt the terms of that agreement were to be worked

20   out by the parties.  It wasn't for the Fed to decide who was

21   going to get what.  Our interest in supporting it was in

22   supporting a sale.  That was something that we felt there was a

23   strong public policy interest in.  We continue to feel that.

24   Q.    Whatever the terms of the sale were.  All right, and the

25   Fed's contrac --

Page 68

1   A.   And the decision to support that motion, just to be clear,

2   predated our entering this agreement.  It was from the time we

3   knew that Barclays was back into the picture.  This agreement's

4   dated the 17th.  From the morning of the 16th, when we knew

5   Barclays was back in the picture, we were happy about it.  It

6   was something that we felt --

7   Q.   Okay.

8   A.   -- was something we wanted to see --

9   Q.   Well --

10  A.   -- take place because of the public policy interests in a

11  sale.

12  Q.   You're happy that Barclays has reemerged as a buyer of

13  something, yes?

14  A.   Um-hum.

15  Q.   And so happy that Barclays has emerged as a buyer of

16  something that the Fed agrees it will support the sale and the

17  motion before it even sees the asset purchase agreement or the

18  motion itself?

19  A.   Well, again, I had not seen the asset purchase agreement.

20  I cannot say that no one at the Fed had.  I was taking my

21  marching orders from senior people as to our support, but from

22  a public policy perspective, it didn't matter.  The terms were

23  going to be negotiated by the parties.  As long as we knew that

24  the customer accounts were moving -- which is what we did know,

25  that was represented and we knew that -- that was what we cared

Page 69

1    about.

2    Q.    And we talked a bit at the beginning about the public

3    policy perspective.

4    A.    Yes.

5    Q.    That, I take it, is the public policy perspective that's

6    of interest to the Fed --

7    A.    Um-hum.

8    Q.    -- concerning the general economy --

9    A.    Right.

10    Q.    -- but is irrelevant in the Fed's view one way or the

11    other -- that it doesn't bear on the other public policy we

12    talked about, which is full and accurate disclosure to a

13    bankruptcy court when it's asked to approve a sale transaction.

14    A.    Right.

15    Q.    The Fed was out of that second part, right?

16    A.    Correct.

17    Q.    The Fed was happy to agree to support the motion before it

18    was made or seen?

19    A.    Yes.  I mean, it's the way you're putting it, yes.

20    Q.    All right, in fact, the Fed made this agreement on the

21    16th of September, isn't that right?

22    A.    No, it was overnight on the 17th.

23    Q.    Okay, there was a draft on this agreement by the 16th that

24    contained this provision -- at the hearing before the Court on

25    the motion, the Federal Reserve Bank shall support the motion.

Page 70

1   Isn't that right?

2   A.   That's -- I can't speak to when -- I recall negotiating

3   this agreement overnight on Tuesday.  I recall the final

4   agreement being agreed to on Wednesday morning.  But there may

5   well have been a draft on Tuesday night.  I don't know.

6   Q.   Let me ask you to take a look, if you would, in your book,

7   at tab M-874.

8   A.   This is which book, now?

9   Q.   The big one.

10  A.   I got it.  The big one.

11  Q.   Yeah.

12  A.   Okay.  Okay.

13  Q.   All right, and let me ask you to take a look through tab

14  874.  It begins with an e-mail from a David [A-mann'] or [A'-

15  min].

16  A.   David [Ay-min].  Um-hum.

17  Q.   Aman.

18  A.   Um-hum.

19  Q.   David Aman to Hydee Feldstein at Sullivan & Cromwell,

20  HaeRan Kim at the New York Fed, and to you, Mr. Baxter, and

21  some others.  Do you see that?

22  A.   Yes, I do.

23  Q.   All right, and attached to it is a draft agreement between

24  FRBNY and Barclays relating to LBI.  "Please let me and Shari

25  know if you have any questions or comments."  Do you see that?

Page 71

1    A.    Yup.

2    Q.    Shari's a reference to you?

3    A.    Yes.

4    Q.    All right, and this is a copy of the draft that you and

5    the other addressees received from one of your lawyers at

6    Cleary Gottlieb, correct?

7    A.    Correct.

8              MR. GAFFEY:  Your Honor, I offer M-874 in evidence.

9              MR. SCHILLER:  No objection.

10             THE COURT:  It's admitted.

11   (Draft Agreement between FRBNY and Barclays and Cover E-mail

12   was hereby received into evidence as Movants' Exhibit 874, as

13   of this date.)

14   Q.    Now, first I'd like you to take a look -- you see that the

15   e-mail on the cover was sent at 1:37 a.m.?

16   A.    Correct.

17   Q.    All right, and that's 1:37 a.m., very early in the morning

18   on the 17th.

19   A.    On Wednesday, correct.

20   Q.    And attached to this e-mail from Cleary Gottlieb is a

21   draft from the takeout agreement bearing a date of 9/16/08.

22   Yes?

23   A.    It bears two dates.  It bears a 9/16/08 and a September

24   17th, '08 date.

25   Q.    All right, the draft date indicates the draft was -- the

Page 72

1   draft is dated September 16th?

2   A.   It says, draft, 9/16/08.  Yes.

3   Q.   So, so just to back up into what the sequence would be,

4   sometime before 1:37 in the morning on the 17th --

5   A.   Um-hum.

6   Q.   -- this draft is generated as a result of negotiations

7   between Barclays and the Fed, yes?

8   A.   Correct.

9   Q.   All right, and that -- if you take a look at the draft,

10   you'll see it, too, contains the paragraph we looked at before.

11   A.   Um-hum.

12   Q.   "At the hearing before the Court on the motion, the FRBNY

13   shall support the motion."  Correct?

14   A.   Correct.

15   Q.   All right, so does that indicate to you that as early as

16   the 16th of September, the Fed had already evinced it agreement

17   to Barclays to support the sale motion that had not yet been

18   made?

19   A.   As I told you, my recollection of the timing of this, and

20   it's, again, just my recollection, is that I recall negotiation

21   this into the night.  I recall starting the negotiation on the

22   evening of the 16th, going through very, very early in the

23   morning of the 17th, well past the 1:37.  When exactly this

24   draft was prepared in that time frame, I don't know.

25   Q.   Okay.

Page 73

```
 1   A.    But sometime --

 2   Q.    Sometime before --

 3   A.    -- yeah, sometime between the -- I'd say about 8 o'clock

 4   in the evening on the 16th and 1:37 in the morning on the 17th.

 5   Q.    Okay, and we're agreed that by 1:37 in the morning on the

 6   17th, you haven't seen the sale motion and you haven't seen the

 7   APA?

 8   A.    I don't recall having seen is, though I can't say with

 9   certainty what had been told to me at that point in time --

10   Q.    Okay.

11   A.    -- by Barclays' counsel.

12   Q.    All right.  And I want to sort out some of the personnel

13   on this, if we could go back to the e-mail on the cover.

14   A.    Um-hum.

15   Q.    Ms. Feldstein at Sullivan & Cromwell is representing the

16   Fed?

17   A.    No.

18   Q.    I beg your pardon.  Is representing Barclays, right?

19   A.    Correct.

20   Q.    Okay, and Mr. Aman from Cleary is representing the Fed in

21   these negotiations?

22   A.    That's correct.

23   Q.    All right, and was there a man named Ken Myerson (ph.)

24   from Sullivan & Cromwell involved in these negotiations?

25   A.    The name does not ring a bell to me.
```

Page 74

1    Q.   Okay, now, if you would turn in your book to tab 876?

2    A.   Um-hum.  Um-hum.

3    Q.   And you'll see 876 appears to be an e-mail from Mr. Aman

4    at Cleary Gottlieb --

5    A.   Um-hum.

6    Q.   -- to, well, among others, you and then Mr. Baxter and Ms.

7    Feldstein at Sullivan & Cromwell and some others.  Do you see

8    that?

9    A.   Yup.

10   Q.   And it contains a revised version of the agreement, yes?

11   A.   Yes, I see that.

12   Q.   All right, and now if you take a --

13              MR. GAFFEY:  Your Honor, I offer M-876 into evidence.

14              MR. SCHILLER:  No objection.

15              THE COURT:  It's admitted.

16   (E-mail with Revised Version of Agreement from Mr. Aman to Ms.

17   Leventhal, Mr. Baxter, et al. was hereby received into evidence

18   as Movants' Exhibit 876, as of this date.)

19              THE COURT:  And just at this juncture, let me ask a

20   question about duration of the examination.  I'm wondering if

21   this is time for a morning break or not.

22              MR. GAFFEY:  It's a fine time now, Your Honor.

23              THE COURT:  And then, just to remind everybody, I need

24   to break early today, so my inclination would be to simply go

25   until we're done and not take a lunch break.

Page 75

```
 1              MR. GAFFEY:  That's fine with me, Your Honor.

 2              THE COURT:  Okay.  That work for everybody?

 3              MR. GAFFEY:  We'll bring a peanut butter and jelly for

 4     the witness.

 5              THE COURT:  I expect we're not going to need that.

 6              THE WITNESS:  Please no.

 7              THE COURT:  We can probably do better.  We have snacks

 8     downstairs.

 9              MR. GAFFEY:  All right.

10              THE COURT:  Okay, we'll take a break for ten minutes.

11              MR. GAFFEY:  Thank you, Your Honor.

12              THE WITNESS:  Can I step down?

13         (Recess from 11:05 a.m. until 11:22 a.m.)

14              THE COURT:  Be seated, please.

15              MR. GAFFEY:  May I proceed, Your Honor?

16              THE COURT:  Absolutely.

17     RESUMED CROSS-EXAMINATION

18     BY MR. GAFFEY:

19     Q.   Ms. Leventhal, I just wanted to ask you a couple more

20     questions about the Chinese wall arrangement within Cleary.  Do

21     you know what steps, if any, were taken within Cleary Gottlieb

22     to enforce the wall between the team working for the Fed

23     negotiating against Barclays and the team representing Barclays

24     negotiating against Lehman?

25     A.   I don't know.
```

Page 76

1    Q.   Okay.  Do you know if a similar wall was set up within

2    Sullivan & Cromwell?

3    A.   I don't know.

4    Q.   Okay, you don't know one way or the other whether the

5    Sullivan & Cromwell team involved in negotiating the takeout

6    agreement were walled off from the negotiations of the asset

7    purchase agreement?

8    A.   I don't know.

9    Q.   Okay.  Now, it may be self-evident from the document, but

10   I want to confirm -- we're on the 16th and the 17th -- there's

11   no involvement in these discussions concerning the Barclays

12   takeout of the Fed's financing of LBI in which counsel for any

13   Lehman entity is involved?

14   A.   Correct.

15   Q.   And I take it counsel for the Lehman entities --

16   A.   Um-hum.

17   Q.   -- and I'm using the plural because of LBHI and the

18   broker-dealer --

19   A.   Yes.

20   Q.   -- counsel for the Lehman entities were not invited into

21   these discussions, yes?

22   A.   No, they were not.

23   Q.   All right, at some point, I take it, in connection --

24   well, let me ask you.  At any point, in connection with the

25   negotiations of the takeout agreement -

1    A.    Um-hum.

2    Q.    -- did anyone, any of your lawyers go get a copy of the

3    asset purchase agreement from the other side of the wall?

4    A.    I don't believe they did, but I don't know.  Again, it

5    wasn't relevant to us what the specific terms were.  We were

6    concern with the public policy of a transaction that would

7    facilitate the transfer of the customer accounts.

8    Q.    And not concerned one way or the other with whether the

9    asset purchase agreement accurately described the transaction

10   or the disclosure implications of it, yes?

11   A.    We -- our understanding was that that agreement was being

12   negotiated by able counsel on both sides.

13   Q.    Could I ask you to pull the mic a little closer?

14   A.    Sorry.  The binder's in the way.  It was our understanding

15   that that agreement was being negotiated by able counsel on

16   both sides.

17   Q.    Now, if you would turn -- it's in several of the books.

18   It's in Mr. Schiller's book.  Let's use that; it's a little

19   slimmer.

20   A.    Okay.

21   Q.    I'll ask you to turn to BCI Exhibit 4.  I'm not sure what

22   tab number that is.  Tab number 3 --

23   A.    3.

24   Q.    -- in the book.  This is a copy of the final takeout

25   agreement that's agreed between Barclays and the Fed, yes?

Page 78

1   A.   Correct.

2        MR. GAFFEY:  Your Honor, I'm not sure if BCI-4 has

3   been offered in evidence, and if it hasn't been, I offer it

4   now.

5        THE COURT:  Has it been offered?  Is it in?

6        MR. SCHILLER:  It's in evidence, admitted, yes.

7        THE COURT:  Okay, it's definitely in because I would

8   have admitted it, even if it weren't.

9        MR. GAFFEY:   I had a suspicion.

10  Q.   Now -- now, the reason -- I'm going to direct your

11  attention to paragraphs 1 and 2 of the takeout agreement.  And

12  actually, no, if you'd look at the first paragraph, you see

13  there are -- there's a reference in there that says, in the

14  very first paragraph, capitalized terms used but not defined in

15  this letter agreement have the meanings given to those terms in

16  the motion.

17  A.   Yes.

18  Q.   I take it at the time this agreement is signed, nobody has

19  those defined terms?

20  A.   I'm not sure about that at this point, anymore, because by

21  the 17th, that was the date of the hearing.  I felt like by

22  then, we may very well have had the terms.

23  Q.   Well, you know that the hearing does not take place until

24  the afternoon?

25  A.   Yes, I do know that.

Page 79

1   Q.   All right, and you know that this agreement was agreed in

2   the morning, right?

3   A.   Well, this -- my recollection was it was around, like,

4   1:30.  It was afternoon that we originally -- that we had the

5   final agreement.

6   Q.   All right.

7   A.   But I could be wrong on my timing.

8   Q.   Okay.  And there's another reference in terms of defined

9   terms.  It's at the bottom of the third paragraph.  There's a

10  reference to bidding procedures.

11  A.   Um-hum.

12  Q.   Do you see that?

13  A.   Yeah.

14  Q.   Did you understand at the time that there were provisions

15  in the asset purchase agreement and in the other proceedings

16  for the possibility of another bidder?

17  A.   Yes.

18  Q.   All right, and in fact, you learned at the hearing that

19  you attended on the 17th that one of the issues the Court was

20  asked to approve that day was a breakup fee, yes?

21  A.   Yes.

22  Q.   And you understood from your experience as a lawyer that a

23  breakup fee is a fee paid to the original bidder if another

24  bidder comes in?

25  A.   Correct.

Page 80

1   Q.   All right, and so you understood that the agreement that

2   was being offered to the Court at least contemplated the

3   possibility of another bidder?

4   A.   Correct.

5   Q.   All right, but now taking a look -- and then, if you would

6   briefly take a look through paragraphs 1 and 2.

7   A.   Um-hum.

8   Q.   And in essence, in sum, what they describe is the

9   agreement that's made between Barclays and the Fed concerning

10  Barclays takeout of the Fed repo, yes?

11  A.   Correct.

12  Q.   All right, and as we've discussed, down in paragraph 5,

13  this is where in this agreement, the Fed's decided it's picked

14  its bidder, right?  It's going to support Barclays in the sale

15  motion?

16  A.   No.  We were not -- if there had been another bidder,

17  which there never was -- to be clear, and we represented that

18  to the Court that no one else ever came forward interested in

19  bidding no LBI's assets -- but if there had been another

20  bidder, the provisions were in place that they would have to

21  enter a takeout agreement with us, and we were not committed to

22  supporting Barclays' bid.  We were committed to supporting a

23  sale motion.

24  Q.   And you understood when you saw the sale motion --

25  A.   Um-hum.

Page 81

1    Q.   -- that the sale motion was to seek approval of an

2    agreement between Lehman and Barclays, yes?

3    A.   Correct.

4    Q.   All right, so the sale motion seeks approval of the sale

5    of the assets to Barclays, yes?

6    A.   That is correct.

7    Q.   And that is the sale motion that the Fed agreed to support

8    in the takeout agreement.

9    A.   Right, but I just want to be clear that there was never,

10   in my understanding of this -- as I said, I didn't recall that

11   we had put this in the agreement, but there was never any view

12   on my part, certainly, as the lawyer for the Fed that we would

13   have only supported Barclays' efforts.  That wasn't the deal,

14   here.

15   Q.   Ms. Leventhal, there's a reason --

16   A.   It was that -- the assumption here was that this takeout

17   agreement only came into effect of Barclays was going to be the

18   purchaser.  If there was another purchaser, there would have

19   been a different takeout agreement, and we would have agreed to

20   support that sale motion.

21   Q.   Now, there's a reason, is there not, that the Fed's

22   support of the sale motion is contained in the same agreement

23   it makes with Barclays to take the Fed out of its financing of

24   the broker-dealer.

25   A.   I don't under --

1    Q.    It's a quid pro quo, isn't it?

2    A.    There was no quid pro quo.

3    Q.    So paragraph 5 is put there for convenience?

4    A.    Paragraph 5 was put there because we were clearly, from

5    the get-go, from the moment that we knew that Barclays was back

6    in the room and wanting to purchase LBI's assets, we were

7    committed to supporting a sale because we believed it was in

8    the best interest.

9    Q.    And the Fed was committing to supporting a sale to

10   Barclays because it believed it was in the best interest,

11   regardless of no knowledge of the terms of the agreement, no

12   sight of the sale motion, and in return for Barclays agreeing

13   to take the Fed out of its exposure to the broker-dealer, isn't

14   that right?

15   A.    There was no -- no, that's not right.

16   Q.    So that -- wouldn't that mean that paragraph 5 has no role

17   in the takeout agreement?  Why is it in there?

18   A.    Honestly, why it's in there is a question I'm trying to

19   figure out, and I mentioned it to my counsel a moment ago.  I

20   really don't know why it's in there because we intended to

21   support the sale motion.  I think we were just codifying that

22   fact.  There was no quid pro quo here.  it was never part of

23   our negotiation strategy.  It was never part of the deal that

24   we were going to support the sale only if Barclays agreed to

25   take us out.  Clearly, we were not going to continue to finance

Page 83

1   LBI if Barclays was going to proceed with the sale and not

2   agree to take us out.  That was what our consequence would have

3   been; that's what our action would've been.  We were not going

4   to continue to expose the Fed's funds to the risk of supporting

5   LBI if we didn't have a takeout where there was no longer an

6   unwind in the picture, but rather, an acquisition.  That's what

7   our deal was.

8   Q.   Is that the understanding of the deal you discussed with

9   your counsel over the break?

10  A.   I'm sorry?

11  Q.   You said you had a conversation with your counsel --

12  A.   No, I mentioned to my counsel, I just didn't know where

13  that line came from.  That's all I said to them.

14  Q.   And just for clarity --

15  A.   And I'm willing to say that for the purposes of the

16  hearing.

17  Q.   -- the counsel you consulted with was not Boies Schiller,

18  it was --

19  A.   No, it was my Fed counsel, my colleagues.

20  Q.   So back to why paragraph 5 is in this two-page

21  agreement --

22  A.   Um-hum.

23  Q.   -- it's your testimony that paragraph 5, the Fed's

24  agreement to support the motion to sell the assets to Barclays

25  was not in exchange for the agreements that Barclays made to

1  take the Fed out of its financing in that same two-page

2  agreement.

3  A.   No, it wasn't.  We had no -- our remedy here was clear.

4  We didn't have to continue to support LBI, and that's what we

5  told them when we negotiated.  If you don't want to take us

6  out, if you won't agree, we're not going to continue to finance

7  LBI.

8  Q.   And yet the agreement doesn't say, in return for the Fed's

9  agreement to continue financing LBI until the takeout.  It

10  says, "At the hearing before the Court on the motion, the Fed

11  shall support the motion."  Is that what paragraph 5 was meant

12  to say, what you just described?

13  A.   Paragraph 5 -- I'm not -- I don't understand your

14  question.

15  Q.   That it was -- the Fed comes and says, if you want to buy

16  it, you have to take us out.

17  A.   No.

18  Q.   So as you look at paragraph 5 now, having forgotten it was

19  in there and looking at it now --

20  A.   Um-hum.

21  Q.   -- is it your testimony that paragraph 5 is not an

22  agreement the Fed makes in return for the provisions of

23  paragraphs 2 and 3.

24  A.   Absolutely, that's correct.  We did not -- there was no

25  quid pro quo, here.  We had no reason for a quid pro quo.

Page 85

```
 1    We -- I mean, obviously, the Court was going to order the sale

 2    one way or the other.  Without overstating our own importance,

 3    I don't think that the Fed's support of the sale was

 4    dispositive, here.

 5    Q.   Did the Fed ever, at any point, deviate from the agreement

 6    it made on the 17th of September to support the sale motion?

 7    A.   No.

 8    Q.   Did the Fed deliberate about the terms of the asset

 9    purchase agreement or the sale motion in determining whether to

10    keep to that agreement?

11    A.   As I told you, those weren't the terms that mattered to

12    us.  What mattered to us was the stability that the sale was

13    going to promote.

14    Q.   Did it evidence that was put on at the sale hearing matter

15    to you, in terms of the Fed's support of the sale motion?

16    A.   Which evidence?

17    Q.   The evidence from Mr. McDade and the evidence from Mr.

18    Ridings, and the presentations by Weil Gotshal about the terms

19    of the deal.

20    A.   As to the valuations of the deal?  No, those were not

21    relevant to us.

22    Q.   Were any of the presentations made to the Court at the

23    bidding procedures hearing on the 17th matter to the Fed in

24    terms of its agreement to support the sale motion?

25    A.   What mattered to the Fed was that the customer accounts
```

Page 86

1    were going to be transferred in a seamless manner.  And also,

2    we were happy to hear that there would be jobs that would be

3    preserved through the agreement.

4    Q.   And did the Fed ask at any point what the effect of the

5    sale motion would be on the creditors of the Lehman estate?

6    A.   No, we did not

7    Q.   That was irrelevant to the Fed, too?

8    A.   Yup.

9    Q.   Now, if you would take a look at paragraph 2 of the

10   agreement --

11   A.   Those creditors, by the way, I think were ably represented

12   as evidenced by the fact that we're sitting here today.

13   Q.   You know that the creditors' committee was formed a half

14   hour before the hearing on the 17th, right?

15   A.   Um-hum.

16   Q.   Okay.

17   A.   Um-hum.

18   Q.   Take a look at paragraph 2.

19   A.   Paragraph 2 of?

20   Q.   Of the takeout agreement.

21   A.   Oh, sure.

22   Q.   BCI Exhibit 4.

23   A.   Okay.

24   Q.   Actually, just for context, let's go back to paragraph 1

25   and let's go through each paragraph -- each provision of the

Page 87

1    agreement.  Paragraph 1 essentially provides that until

2    Barclays takes out the Fed, if the collateral on deposit with

3    the Fed for financing to Lehman drops below certain levels,

4    Barclays will top it off, right?

5    A.   Um-hum, yes.

6    Q.   And the collateral that Barclays contributes in that

7    manner, if it did, would be considered part of the so-called

8    LBI collateral.

9    A.   Correct.

10   Q.   You see that defined there in paragraph 1?

11   A.   Yes, um-hum.

12   Q.   All right.  So that's a means of protecting the Fed from

13   one of the risks we talked about before.  You have two risks.

14   You have counterparty risk, yes?

15   A.   Um-hum, correct.

16   Q.   And you have risk relating to the value of the collateral.

17   A.   Correct.

18   Q.   And this provision in paragraph 1 protects the Fed from

19   that second risk, that is from deterioration on the value of

20   the collateral.

21   A.   Correct.

22   Q.   All right, keeps the Fed topped up so there's an

23   acceptable level of collateral in the Fed financing of LBI?

24   A.   Correct.

25

Page 88

1    Q.   All right.  And now, now, if you take a look at paragraph

2    2, it opens by saying, "By not later than the opening of

3    business on Monday, September 22nd, 2008, or if the Court

4    extends the date of the sale hearing beyond September 19th, the

5    earlier of September 29th or such later date as may be

6    designated by the Fed in its sole discretion."  Do you see

7    that?

8    A.   Yes, I do.

9    Q.   So the original contemplation of this agreement was that

10   Barclays would take the Fed out after closing?

11   A.   That's not correct.  It was by closing.

12   Q.   By the closing.

13   A.   Correct.

14   Q.   All right, I understand.  So it was contemplated that

15   the -- by this agreement, that the closing would take place

16   before the opening of business on Monday.

17   A.   Because -- yeah, because the theory was that the hearing

18   was going to be on the 19th if the court approved it the -- we

19   believed the closing could take place over the course of the

20   weekend.

21   Q.   Now, what paragraph 2 does is it gives Barclays two

22   options, right?

23   A.   Um-hum.

24   Q.   Barclays can purchase from the Fed without recourse the

25   entirety of the Fed position under, what are called here, the

Page 89

1   agreements.  That's under the financing agreements with Lehman,

2   right?

3   A.   That would be the repo agreements, yes.

4   Q.   Okay.  And when it does that, it'll release the Fed from

5   its obligations under the agreements, right?  With me in (ii)

6   there?

7   A.   Yes.

8   Q.   All right, and right after that is this sentence:  "Upon

9   receiving such purchase price and release or termination, the

10  FRBNY, the Fed, shall deliver all LBI collateral to Barclays."

11  Do you see that?

12  A.   Yes.

13  Q.   And then the rest of the paragraph lays out Barclays'

14  second option which is to novate --

15  A.   Um-hum.

16  Q.   -- in substitute, right?

17  A.   Right.  And then there's another option that I believe the

18  -- there's number 4, which is a different option.

19  Q.   You're in paragraph 4?

20  A.   3 and 4 together essentially created a different option

21  which was basically that Barclays could finance Lehman itself.

22  Q.   That -- okay, all right.  I want to go back up to the

23  sentence that says, "Upon receiving such purchase price and

24  release or termination, the Fed shall deliver all LBI

25  collateral to Barclays."  Do you see that?

Page 90

1    A.    Yes, I do.

2    Q.    All right, so going back to what we talked about before

3    with respect to the collateral that equals the amount advanced

4    plus the haircut.

5    A.    Um-hum.

6    Q.    Right, do you recall that?

7    A.    Yes.

8    Q.    We're talking about a body of collateral that is in excess

9    of the amount the Fed advanced.   Correct?

10   A.    The collateral -- the value of the collateral is in excess

11   of the amount of the cash loan that the Fed advanced, yes,

12   that's correct.

13   Q.    And just for argument's sake, and I don't want to hold you

14   to these numbers, but if the amount advanced by the Fed is

15   forty-five billion --

16   A.    Um-hum, yes.

17   Q.    -- and the combination of the haircuts requires an

18   additional five billion, you'd have a body of collateral of

19   fifty against a loan of forty-five, right?

20   A.    Essentially, yes.

21   Q.    Okay, and what this provision gives Barclays is the right

22   to purchase the entire body of collateral including the haircut

23   for the lower amount, for the amount of the loan advanced, yes?

24   A.    I'm sorry, can you repeat that.

25   Q.    Well, where is says this, it says, "Upon receiving such

Page 91

1    purchase price and release or termination" --

2    A.    Um-hum.

3    Q.    -- those are the two things Barclays will deliver to the

4    Fed, right?

5    A.    Right.

6    Q.    -- "the Fed shall deliver" --

7    A.    Um-hum.

8    Q.    -- "all LBI collateral to Barclays."

9    A.    Correct.

10    Q.    It's mandatory, right?

11    A.    Um-hum.

12    Q.    So if Barclays tenders to the Fed, on my hypothetical, the

13    forty-five billion, it gets all fifty billion in collateral, is

14    that right?

15    A.    Correct.  That's correct.

16    Q.    Okay, and then the rest of the paragraph runs the other

17    option -- another option, the novation option.  And we come to

18    the last sentence of that paragraph, it is expressly agreed

19    that Barclays shall have no obligation under this paragraph 2

20    if it is not the successful bidder, right?

21    A.    Correct.

22    Q.    So the contemplation there, again, is there might be a

23    successful bidder.  You might have a view about whether that's

24    going to happen, but the contemplation is there might be one?

25    A.    Um-hum.

1    Q.    Right?

2    A.    Correct.

3    Q.    And Barclays has no obligation to tender the purchase

4    price that we discussed, the amount of the loan advanced,

5    right?

6    A.    Um-hum, yes.

7    Q.    But if it does, this agreement requires the Fed to deliver

8    all the collateral to Barclays, is that right?  In my

9    fifty/forty-five example, Barclays can pony up forty-five

10   billion and get fifty billion of collateral?

11   A.    Correct, yeah, if that's the amount of collateral the Fed

12   was holding.

13   Q.    All right, and at no point is this agreement rescinded or

14   terminated, right?

15   A.    I don't follow you.  I mean, if Barclays was not the

16   successful bidder, then that agreement wouldn't exist -- then

17   the agreement would no longer exist.

18   Q.    Well, nothing in this agreement says if Barclays is not

19   the successful bidder, this agreement terminates.  It just says

20   Barclays has no obligation.  Barclays has no obligation to

21   tender the price.  But if it does --

22   A.    Um-hum.

23   Q.    -- the Fed is required to turn that body of collateral

24   over to Barclays, under the language of that agreement.  Is

25   that not so?

1    A.   Right, because at that point, Barclays would be financing

2    Lehman.  Yes.  Okay.

3    Q.   If they do, right --

4    A.   Um-hum.

5    Q.   -- when you make the agreement on the 17th --

6    A.   Um-hum, um-hum.

7    Q.   -- it says Barclays is going to take out the Fed sometime

8    before the opening of business on the 22nd.

9    A.   Right --

10   Q.   Okay, and --

11   A.   -- because we were financing Lehman and the idea was that

12   Barclays would take over that obligation.

13   Q.   And it -- and it says that if Barclays -- I beg your

14   pardon -- yeah, if Barclays proffers the purchase price, the

15   Fed is -- shall -- is required to deliver the collateral over

16   to Barclays, correct?

17   A.   Right.

18   Q.   And it says --

19   A.   Following the date on which an order approving a

20   successful bidder has been entered, Barclays agreed.

21   Q.   Well, nothing in this agreement gives Barclays the right

22   to tender the lower amount only if it's the successful bidder.

23   It's just got the right, based on that language in paragraph 2,

24   doesn't it?

25   A.   That's not how we interpreted it at the time.

1    Q.   That's what it says, isn't it?

2    A.   I don't read it that way, but fine.  You can -- lawyers

3    can differ.

4    Q.   Well --

5    A.   The intention here was --

6    Q.   -- this says, "Upon receiving such purchase price and

7    release or termination, the Fed shall deliver all LBI

8    collateral to Barclays."  And lawyers, we know the word "shall"

9    has a mandatory meaning, don't we?

10   A.   Yeah, but it's following -- the timing is said.  It's

11   following the date on which an order approving a successful

12   bidder has been entered, Barclays agrees to purchase from the

13   Federal Reserve without recourse, et cetera, et cetera.  This

14   was all done in the context of Barclays was the successful

15   bidder; Barclays would then take out the Fed because --

16   Q.   All right, but --

17   A.   -- the idea was that the Fed wasn't going to finance

18   before an acquisition.

19   Q.   -- let's backup to the portion you were talking about,

20   about following the date on which an order which has not yet

21   been stayed, approving a successful bidder has been entered.

22   That's defined as the takeout date.

23   A.   Um-hum.

24   Q.   The takeout date is defined as a successful bidder, any

25   successful bidder.  Not necessarily Barclays, right?  Yes?

1    A.    Correct.

2    Q.    So even taking your point, Barclays still keeps the option

3    of tendering the lower amount to get all the collateral under

4    the language of paragraph 2.  Isn't that right?

5    A.    Okay, yeah, correct, sure.

6    Q.    Okay.  Now, Mr. Schiller asked you about the -- when he

7    was talking to you about BCI-4, about the takeout agreement,

8    Mr. Schiller asked you about the -- my words, not yours or

9    his -- the exchange of a more -- for the Fed of a more

10   creditworthy borrower.  You get Barclays instead of LBI.

11   A.    Correct.

12   Q.    Okay, and that was because the Fed made known to Barclays

13   that it would, if Barclays took out -- took the Fed out of the

14   repo, the Fed would then finance the same collateral if

15   Barclays offered it to the window, yes?

16   A.    Yes, but not exactly under that term.  The idea here was

17   Barclays was going to acquire the assets of LBI.  We were not

18   going to finance their acquisition.  We didn't want to be

19   doing -- financing LBI for purposes of keeping it stable so

20   that they could acquire the assets.  We wanted them to assume

21   that risk and do that.  And then the term would be that they

22   would -- in order to facilitate that, they were going to borrow

23   from the PDCF.  They inquired whether that was going to be a

24   problem.  It wasn't because they were eligible to do so.  And

25   that was it.  But if you're asking whether our consideration

Page 96

1    here was that we were going to have a more creditworthy

2    borrower, no.  Our consideration was we weren't going to

3    finance LBI to assist Barclays in its acquisition.  We could

4    finance Barclays because they were eligible to do so; they were

5    a creditworthy borrower.

6    Q.   I'd like you to take a look, if you would, at tab M-844 in

7    the witness book with your name on it, please.

8         Actually, just before you do that, before I make you work

9    through all those documents again, I just want to go back for a

10   moment to this idea of a -- of the Fed's support for the sale

11   motion being its quid pro quo for Barclays' agreement to take

12   out the Fed.  Do you know if Mr. Baxter had any discussions

13   with Jonathan Hughes, the general counsel of Barclays, about

14   that?

15   A.   I don't know, but I don't believe that he did.

16   Q.   Okay.  I'd like to show you some testimony that Mr. Hughes

17   gave in his -- in a deposition in this action.

18   A.   Okay.

19   Q.   And it's -- I don't think you have it there.  If you look

20   at it on the screen, that would be helpful.

21        MR. GAFFEY:  I'm going to put up Hughes transcript,

22   page 386.

23   Q.   And let's just go back to 385 for a little context.  And

24   you'll see by scanning that page, there, you're talking -- Mr.

25   Hughes is being asked about the agreement to take over the

Page 97

```
 1    repo.  You see there at the bottom?

 2    A.    Yes.

 3    Q.    Okay, and now back to page 386.

 4    A.    Um-hum.

 5    Q.    And directing your attention to the question that begins

 6    at line 11 and through the answer at 20, let me read it.  It

 7    says:

 8    "Q.  Who at the Fed articulated it to you?

 9    "A.  Tom Baxter.

10    "Q.  What did Tom Baxter say to you, and what did you say to

11    him?

12    "A.  He, in effect or in substance, said to me that if Barclays

13    was going to take over assets of LBI and was going to conclude

14    a transaction, the Fed would want Barclays to replace the Fed

15    in that repo, and that its support for the transaction would

16    likely be conditioned upon our approval of that."

17    Q.    Do you see Mr. Hughes' answer there?

18    A.    I do.

19    Q.    Did Mr. -- do you have any reason to think Mr. Hughes

20    misunderstood the message that he says he got from Mr. Baxter

21    that the Fed's support for the transaction would likely be

22    conditioned on our approval of that?

23    A.    I've never heard Mr. Baxter say that.  I was not a party

24    to the conversation, so.

25    Q.    So you have no basis to dispute or agree with Mr. Hughes'
```

Page 98

```
 1   characterization of what he was told by the general counsel of

 2   the Fed that it was conditioned upon approval?

 3   A.   Only my own conversations with Mr. Baxter and the fact

 4   that I was negotiating the deal at the time and that was never

 5   conveyed to me.

 6   Q.   You know that Mr. Baxter did speak to Mr. Hughes from time

 7   to time around this agreement, yes?

 8   A.   I'm not surprised to hear that.  Yes, I do know that.

 9   Q.   Are you surprised to hear Mr. Hughes describe it as a quid

10   pro quo?

11   A.   Absolutely.

12   Q.   And just to close the loop on this.  This agreement was

13   fina -- by the time this agreement was finalized, that is BCI-

14   4, the takeout agreement --

15   A.   Um-hum, yes.

16   Q.   -- I asked you a moment before about any conversations

17   with Lehman lawyers.  Up through the point where the agreement

18   was signed --

19   A.   Yes.

20   Q.   -- there was no conversation with counsel for Lehman?

21   A.   I did not have any conversations with counsel for Lehman.

22   Q.   Now, this agreement, BCI-4 is finalized on Wednesday the

23   17th.  And I think you told me it was finalized before the

24   hearing that took place in this court that day?

25   A.   That's correct.
```

Page 99

```
 1    Q.   Was there any discussion about bringing this agreement to

 2    the attention of the Court?

 3    A.   I believe we did bring it to the attention of the Court at

 4    a certain point.  But I don't offhand remember when it was

 5    during that week.

 6    Q.   Is it your understanding that BCI-4 was at any point filed

 7    or put into evidence before this Court?

 8    A.   That I don't recall.  I don't know.

 9    Q.   And on a more general level, you don't know if the Fed's

10    agreement to support the sale motion in the takeout agreement

11    was brought to the attention of the Court --

12    A.   No.

13    Q.   -- that the Court was not told that an agreement where

14    Barclays said we'll take out the findings and the Fed agreed to

15    support the sale motion?

16    A.   I don't know that.  I do recall this agreement being

17    brought to the Court.  I just don't recall when.

18    Q.   Now, I had asked you -- let me ask you to turn back to

19    Exhibit M-844 in your book, please.

20    A.   Um-hum.

21    Q.   And this document and some questions I have for you will

22    address this issue of what happens after the takeout.

23    A.   Okay.

24    Q.   Okay?  Now, as I understand it, after the takeout

25    agreement was entered into, there comes a point where the
```

Page 100

1    parties immediately start talking about when Barclays will take

2    out the Fed, right?

3    A.    Yes, I think.

4    Q.    Okay.

5    A.    I wasn't party to the operational discussions.

6    Q.    And if you take a look at Exhibit 844, at the top it's --

7    the e-mail is from HaeRan Kim?

8    A.    HaeRan Kim, yes.

9    Q.    HaeRan Kim to Mr. Baxter and to you?

10   A.    Yes.

11   Q.    Entitled "Important LBI/BCI transactions tomorrow".

12   A.    She was --

13   Q.    Do you see that?

14   A.    -- she was forwarding the e-mail from Lucinda Brickler

15   that was titled that, yes.

16   Q.    Now, who is Lucinda Brickler?

17   A.    She is an operations person in our payments policy area.

18   Q.    Okay.  And Ms. Brickler (sic) forwards to you and to Mr.

19   Baxter the underlying memorandum from Ms. Brickler to a series

20   of addressees within the Fed, yes?

21   A.    Ms. Kim forwarded the memo from Lucinda Brickler --

22   Q.    Okay.

23   A.    -- yes.

24          MR. GAFFEY:  And, Your Honor, I offer Exhibit M-844 in

25   evidence.

Page 101

1              MR. SCHILLER:  No objection.

2              THE COURT:  It's admitted.

3    (Memo from Ms. Brickler to people in the Fed re Lehman

4    transaction was hereby received in evidence as Movant's Exhibit

5    844, as of this date.)

6    Q.   Now, in the underlying e-mail, Ms. Brickler describes a

7    meeting that took place on the evening of the 17th.  She says,

8    "We just met," and her e-mail is dated 7:53 p.m.  Do you see

9    that?

10   A.   Yes, I do.

11   Q.   And the meeting is with BCI, LBI and BNYM folks.  BNYM is

12   Bank of New York Mellon, yes?

13   A.   Yes, that's correct.

14   Q.   And what they're discussing -- what she's describing in

15   this e-mail is a meeting to -- that addresses how Barclays will

16   now take the collateral and put it back to the Fed to get

17   financing, right?

18   A.   Correct.

19   Q.   And she's speaking in terms of a total amount of about

20   forty-seven billion.  Do you see that?

21   A.   Yep.

22   Q.   All right.  And why is Bank of New York Mellon at that

23   meeting?  Do you know?

24   A.   I believe they were a clearing bank for Barclays.

25   Q.   And Ms. Brickler, in her e-mail, when she says, "We met

Page 102

1   with the BCI, LBI and BNYM folks.  Names at bottom of e-mail."

2   Let's turn to the bottom of the e-mail and see who was at the

3   meeting.

4   A.   Um-hum.

5   Q.   That's on the second page.  The Barclays attendees are

6   Gerard LaRocca and David Petrie.  Do you see that?  Ian Prior

7   and Elena Matrullo and Alan Kaplan --

8   A.   I see that.

9   Q.   -- all described by their titles there?

10  A.   Yes.

11  Q.   And there's an Art -- I'm going to murder this --

12  Certossimo from Bank of New York Mellon.  And the sole Lehman

13  attendee, as far as I can tell, is Ian Lowitt.  Do you see

14  that?

15  A.   Yes, I do.

16  Q.   Do you know why Mr. Lowitt was chosen to go to this

17  meeting?

18  A.   Do not know.

19  Q.   Do you know Mr. Lowitt?

20  A.   I've seen his testimony of the night of the hearing, I

21  believe.  But I don't know him.

22  Q.   You've seen Mr. Lowitt --

23  A.   Not his actual -- in person, but I saw something that

24  he --

25  Q.   You saw the fact that he testified?

Page 103

1    A.    Yeah.  Yeah.

2    Q.    Now, back on the first page, Ms. Brickler's memo says, at

3    the end of -- in the middle sentence of her first paragraph,

4    "Barclays plans to bring all the collateral to the PDCF

5    tomorrow for a PDCF loan, forty-seven billion."  Do you see

6    that?

7    A.    Yes.

8    Q.    And you understand that to mean that forty-seven billion

9    is the amount that Barclays is going to borrow, not the amount

10   it's going to deposit as collateral, right?

11   A.    I can't -- I didn't write this e-mail and I was copied on

12   it later.  I didn't ask Lucinda what she meant by it.

13   Q.    She goes on to describe how, "The transaction will also

14   require Barclays Bank to overdraft its account with us for the

15   forty-seven billion early in the day tomorrow."  Do you see

16   that?

17   A.    Yes.

18   Q.    "And Barclays Bank will lend this amount intraday to BCI

19   to pay down its overdraft at JPMC that results from the unwind

20   triparty repo tomorrow."  Do you see that?

21   A.    Um-hum.  Yes, I do.

22   Q.    Do you understand this to mean that the Fed was going to

23   allow Barclays Bank a forty-seven billion dollar overdraft to

24   finance the takeout?

25   A.    I don't want to speak for what Lucinda was --

Page 104

1    Q.   Well, it was sent to you.  What's your understanding of

2    it?

3    A.   Honestly, I don't know that I focused on it when it was

4    sent to me.  And to be honest with you, sitting here today, I

5    really don't know what this means.

6    Q.   Okay.  As you focus on it now, you don't know what it

7    means when it talks about a forty-seven billion dollar

8    overdraft in Barclays' favor?

9    A.   Overdrafts in discount-windows-speak are different than

10   overdrafts in -- like when you and I go to our checking

11   account.  So I really don't want to opine on this, because I

12   think I will misspeak.

13   Q.   Okay.  And back up in the first paragraph when it talks

14   about "Barclays plans to bring all the collateral to the PDCF

15   tomorrow," it says, "They expect to be able to finance all this

16   collateral in the market within two weeks.  They need this time

17   to get all the cusips into their systems and find

18   counterparties.  They expect the loan amount to decline each

19   day as they get up to speed."  Do you see that?

20   A.   Yes, I do.

21   Q.   All right.  And as you focus on that, you understand that

22   this is a description of what Barclays' plan is with regard to

23   the first day and thereafter, after the take-out?

24   A.   So it appears.

25   Q.   It's going to bring all the collateral to the Fed.  The

Page 105

1    Fed's going to finance it, at least on day one, right?

2    A.   Not to play lawyer, but the document says what it says.  I

3    can't give you any more information on it, because this is not

4    an area that I consider myself sufficiently expert in.

5    Q.   The next exhibit I'd like you to look at is Barclays --

6    BCI-969.  It should be at the back of your book.  And if it's

7    not there, I think Mr. Schiller has it with his book.

8    A.   Can you tell me what tab I should be looking for it?

9    Q.   In my book it would be under a tab with its number, BCI-

10   969.

11   A.   Oh --

12   Q.   You there?

13   A.   -- got it.

14         MR. GAFFEY:  Your Honor, I must confess, I'm not sure

15   if this is in evidence.  I'm going to have to ask my friend --

16         MR. SCHILLER:  It's not.

17         MR. GAFFEY:  Then I offer it.  I'm wondering if

18   Barclays has an objection to it, because I'd like to ask the

19   witness some questions about it.

20         THE COURT:  Whose document is it?

21         MR. SCHILLER:  It's an interrogatory --

22         MR. GAFFEY:  Barclays Exhibit --

23         MR. SCHILLER:  -- answer, Judge, in the case.

24         MR. GAFFEY:  And it's a Barclays exhibit.  If it's an

25   interrogatory answer, I offer it as an admission, Your Honor.

08-13555-mg    Doc 11279    Filed 09/08/10    Entered 09/13/10 15:33:59    Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 106 of 179

Page 106

1          THE COURT:  Answered by Barclays?  Who answered it?

2          MR. SCHILLER:  Yes, it's a Barclays answer to it.

3          THE COURT:  It's pretty tough not to admit this.

4          MR. GAFFEY:  I think so.

5          THE COURT:  It's admitted.

6    (Barclays answers to interrogatories was hereby received in

7    evidence as BCI's Exhibit 969, as of this date.)

8          MR. GAFFEY:  Thank you.

9    Q.   Now, looking at this chart entitled "PDCF usage", Ms.

10   Leventhal --

11   A.   Yes.

12   Q.   -- you'll see that on September 18, 2008, Barclays' PDCF

13   usage is put at 47,942,000,000 dollars.  Do you see that?

14   A.   Yes, I do.

15   Q.   All right.  Does that indicate to you that Barclays

16   borrowed from the Fed, 47.9 billion dollars?

17   A.   It would appear to.  But again, I didn't prepare this

18   document.  I don't know --

19        (CourtCall announcement)

20   Q.   It appears to be --

21          THE COURT:  So much for CourtCall.

22   A.   It appears to be, but I don't know enough about this

23   document to answer that.

24   Q.   What we have agreed on, even as lawyers, understanding

25   what we do understand about haircuts, is if Barclays borrows

08-13555-mg    Doc 11279    Filed 09/08/10    Entered 09/13/10 15:33:59    Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 107 of 179

Page 107

1  47.9 billion, it deposits collateral in excess of that

2  amount --

3  A.    Correct.

4  Q.    -- with the Fed to get the financing.

5  A.    Correct.

6  Q.    And based on the haircuts that we've seen, for example, in

7  the September 14th letter, that would put the collateral given

8  to the Fed -- the collateral that Barclays brings back at north

9  of fifty billion dollars?

10  A.    It depends on what haircuts were in place for Barclays at

11  the time.

12  Q.    It would have to be some pretty slim haircuts for it to be

13  under fifty billion dollars in collateral.  Isn't that right?

14  A.    Probably true.

15  Q.    And I think, when we talked about those stricter, higher

16  haircuts in the 9/14 letter, you said they applied to

17  everybody.  Those weren't just Lehman?

18  A.    No, no, no.  The expanded collateral applied to everybody.

19  Q.    Okay. The hair --

20  A.    The haircuts were specific to Lehman.  Recognizing, as you

21  put it, the account party credit risk that Lehman presented.

22  Q.    So what we can agree on here is, if 47.9 billion is the

23  amount borrowed under the PDCF program, we don't know the

24  number, but we do know the Fed didn't lend it flat.  It would

25  have required excess collateral?

Page 108

1    A.    Yeah, unless the collateral were Treasuries or something,

2    yes.

3    Q.    And now, once Barclays has put that collateral back to the

4    fed, going through those two components of risk we talked about

5    before, the Fed's got whatever counterparty risk it has with

6    Barclays, right?

7    A.    Right.

8    Q.    But now the Fed has the collateral risk, right?

9    A.    Yes.

10    Q.    If the value of the collateral drops significantly, it's

11    the Fed that's stuck with the bad collateral, right?

12    A.    If Barclays were to default.

13    Q.    If Barclays were to default.  And if the amount of the

14    drop in a volatile market is sufficiently large, good credit

15    risk or bad credit risk, that's still a risk that the Fed has,

16    not Barclays?

17    A.    Correct.

18    Q.    Because the Fed's got the collateral?

19    A.    Right.

20    Q.    And it's a repurchase agreement.  The Fed owns the

21    collateral?

22    A.    If Barclays -- well, if Barclays defaults, yes, and the

23    triparty doesn't unwind, yes.

24    Q.    All right.  And PDCF usage would be overnight, right?

25    A.    Correct.

Page 109

1    Q.   All right.  So this would reflect overnight PDCF usage --

2    overnight from the 18th into the 19th, right?

3    A.   Correct.

4    Q.   And the 19th is the day on which the sale hearing was

5    held, right?

6    A.   Correct.

7    Q.   So as the sale hearing's being held, it's the Fed that's

8    got collateral risk, not Barclays, right?

9    A.   Correct.

10   Q.   Okay.  And because that's a Friday, if it finances again

11   over into the 19th, at least the sixteen billion, that goes

12   over the weekend to Monday, right?

13   A.   Correct.

14   Q.   All right.  So as of the point where the sale hearing

15   ends, shortly after midnight on the 19th of September, it's not

16   Barclays that has the risk of a collateral, it's the Fed,

17   right?

18   A.   Correct.  Well -- yeah.

19   Q.   Now, the e-mail that we looked at a moment ago -- let me

20   just get my exhibit number.  If you'd turn back to 844.  That's

21   the e-mail we were talking about a moment ago concerning the

22   meeting.

23   A.   Um-hum.  Yes, I see it.

24   Q.   Do you know if any arrangements made or discussions had at

25   the meeting that Ms. Brickler describes in this e-mail were

Page 110

1    conveyed to the lawyers at -- excuse me -- to the lawyers at

2    Weil Gotshal who would be making representations to the Court

3    about the transaction?

4    A.   I have no idea.

5    Q.   And do you have any idea if the contents of the

6    arrangements made or the discussions had at the meeting Ms.

7    Brickler describes were conveyed to anybody at Cleary Gottlieb

8    who might be addressing the Court -- that is, on the other side

9    of the wall?

10   A.   I do not know.

11   Q.   Okay.  So you have no way to know if this arrangement

12   where, when Barclays put the collateral right back to the Fed,

13   before the sale hearing, was disclosed to the Court?

14   A.   I do not know.

15   Q.   And you don't know if anybody who was making disclosures

16   to the Court, was in a position to say that to the Court, that

17   the collateral risk was with the Fed, not with Barclays?

18   A.   I have no idea.

19   Q.   Okay.  Now, further down in the e-mail, there's a

20   description of a so-called key risk factor.  It's the second

21   paragraph from the bottom of the page.  And it says, "A key

22   risk factor is that JPMC will try to use the forty-seven

23   billion in cash paid from Barclays to pay down other Lehman

24   Brothers obligations and refuses to release the collateral.

25   This would be a disaster."  Do you see that?

08-13555-mg   Doc 11279   Filed 09/08/10   Entered 09/13/10 15:33:59   Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 111 of 179

Page 111

1    A.    Yeah, I do.

2    Q.    All right.  And now, what's your understanding of why, in

3    this context, JPMC may be a risk factor?

4    A.    I don't really know what Ms. Brickler is referring to.

5    Q.    Okay.  Did you know at the time -- you knew on or around

6    the 17th of September that JPMC -- JPMorgan Chase -- was the

7    Fed's collateral agent on its repos, yes?

8    A.    Yes, they were the -- they valued our collateral for us,

9    yes.

10   Q.    And I note that JPMC was not invited to the meeting,

11   although Bank of New York Mellon, Barclays' collateral agent,

12   was?

13   A.    I had nothing to do with who was invited to the meeting.

14   Q.    Do you -- can you enlighten us at all as to why there was

15   a key risk factor that JPMC would try to use the forty-seven

16   billion in cash?

17   A.    I think this was one of the reasons why we were eager to

18   see the sale completed in a timely matter, is that there was a

19   concern that a lot of Lehman's counterparties, in various ways,

20   would try to engage in self help.  And I'm imagining that's

21   what -- again, this is speculation, because I can't speak for

22   what Lucinda really intended here -- but my read of this is

23   that she was concerned that JPMC might try to engage in some

24   self help exercises with respect to LBI to the detriment of LBI

25   and the Fed at that point in time.

Page 112

1    Q.   And did you have an understanding, when Hanrey (sic)

2    Kim --

3    A.   HaeRan Kim.

4    Q.   -- HaeRan Kim forwarded this to you, that for some reason

5    she thought it should come to the attention of the Fed's legal

6    counsel?

7    A.   Well, she is a part of the Fed's legal counsel.  She's a

8    lawyer at the Fed.  So I don't know why she -- I mean, I assume

9    she forwarded it to me and to Yuni Greene (ph.) and to Tom

10   Baxter, because we were all involved in Lehman matters at that

11   time, and she wanted to keep us informed.  But again, there was

12   a lot of e-mail going on at that time, and a lot of work going

13   on, so --

14   Q.   So you have no recollection of seeing this one way or the

15   other at the time?

16   A.   Not really.

17   Q.   Okay.

18   A.   I mean, I'm not saying I didn't, but I honestly don't

19   recall it.

20   Q.   And Ms. Brickler continued saying that the Bank of New

21   York Mellon and Barclays folks had been in contact with JPMC.

22   And then it says, "I wonder if we should reach out to Barry

23   Zubrow or higher to make sure they behave tomorrow.  What do

24   you think?"

25        Do you know who Barry Zubrow is?

Page 113

1    A.   Yes.  He's the chief risk officer at JPMC.

2    Q.   And do you know if anyone reached out to Barry Zubrow,

3    chief risk officer at JPMC?

4    A.   I do not know.  I know there were a lot of conversations

5    going on with JPMC during this time period.  But I don't know

6    if they reached out on this particular issue.

7    Q.   Would you take a look, Ms. Leventhal, at tab M-845 in the

8    book with your name on it?

9    A.   Yep.  Okay.

10   Q.   And tab 845 is an e-mail from Hal Novikoff at Wachtell

11   Lipton, to Ken Caputo at SIPC, copied to Jonathan Hughes and to

12   you.  Do you see that?

13   A.   Yes.

14   Q.   Do you recall receiving this e-mail from Mr. Novikoff?

15   A.   Yes.  I mean, I recall having seen it, but it's been a

16   while.

17           MR. GAFFEY:  And, Your Honor, I offer M-845 in

18   evidence.

19           MR. SCHILLER:  No objection, Judge.

20           THE COURT:  It's admitted.

21   (E-mail from Hal Novikoff to Ken Caputo was hereby received in

22   evidence as Movant's Exhibit 845, as of this date.)

23   Q.   Now, you'll see that Mr. Novikoff -- you understood Mr.

24   Novikoff represented JPMorgan Chase, right?

25   A.   Yes, I did.

Page 114

1    Q.    All right.  And he, in his e-mail to Ken Caputo, it talks

2    about speaking to Ricky Mason and it says, "At your request,

3    I'm sending this e-mail to summarize my message to you

4    regarding J.P. Morgan's concerns."  Right?

5    A.    May I have a moment to just read this?

6    Q.    Oh, sure.

7    A.    Because it's been a long time since I've seen it.

8         (Pause)

9    A.    Okay.

10    Q.    You've had a chance to look it through?

11    A.    Yeah.

12    Q.    All right.  And you see that amidst the message regarding

13    J.P. Morgan's concerns that Mr. Novikoff summarizes, he says,

14    near the bottom, "J.P. Morgan will also require satisfactory

15    protection from SIPC and/or Barclays to assure that J.P. Morgan

16    will be paid promptly for any overdrafts or liabilities arising

17    from the operating accounts during this period," right?

18    A.    Yes.

19    Q.    And did you generally have an understanding when you got

20    this e-mail that the possibility existed for disputes between

21    J.P. Morgan and Barclays over who would get what from Lehman?

22    A.    Clearly there was a SIPC proceeding.  There was also a

23    bankruptcy proceeding.  The possibility for disputes among

24    creditors and others, yes, obviously.

25    Q.    Did the Fed -- the Fed is a regulator of JPMorgan Chase?

Page 115

1   A.   We are -- yeah, we regulate the holding company.  We don't

2   regulate the bank.

3   Q.   Okay.  Did the Fed recommend or instruct J.P. Morgan to

4   cooperate?

5   A.   We couldn't instruct them to cooperate.  But as the

6   regulator, that's not our function.  We requested their

7   cooperation and encouraged it, clearly.  But obviously J.P.

8   Morgan is going to make its own business decisions and take its

9   own action to protect its own interests.

10  Q.   And when the Fed encouraged it, did it make clear to J.P.

11  Morgan it had already decided -- it had already picked its

12  horse, it had already decided that Barclays was the bidder it

13  was going to support in the sale motion?

14  A.   I've already said that that's not true.  We didn't decide

15  that Barclays was the bidder.  It was the only bidder.  There

16  was no one else to support.

17  Q.   So the answer's no?

18  A.   I don't know whether J.P. Morgan -- J.P. Morgan was

19  clearly aware -- Hal Novikoff was clearly aware of the

20  proceedings.  He knew what was going on.  So I don't think it

21  was any secret that we were supporting the sale.

22  Q.   Well, was it any secret that the Fed and Barclays had

23  reached a takeout agreement?

24  A.   J.P. Morgan would have been aware of it because they were

25  the clearing bank for Lehman and they were involved in the

Page 116

1    transfer of collateral.

2    Q.   Do you know when J.P. Morgan became aware of it?

3    A.   I'm not sure.

4    Q.   J.P. Morgan didn't sign it, right?

5    A.   No, clearly not.  They didn't have to.

6    Q.   J.P. Morgan didn't negotiate it, right?

7    A.   No.

8    Q.   J.P. Morgan wasn't on the communications back and forth

9    about it, right?

10   A.   No.

11   Q.   And with all those lawyers, there were no lawyers from

12   Wachtell included in the negotiations?

13   A.   Absolutely not.

14   Q.   So when you say J.P. Morgan would have known about it,

15   they would have known about it once it was acted on, because

16   they would have had to act as custodial or clearing agent?

17   A.   Correct.

18   Q.   All right.  But you have no reason to know that J.P.

19   Morgan knew about it on the 17th?

20   A.   No.  But this e-mail is dated --

21   Q.   And when you say no secret --

22   A.   -- on the 18th at 9:47 p.m., which is during the time that

23   the actual transfer of collateral was taking place.

24   Q.   And the terms of the agreement -- the terms of the

25   agreement -- you used the phrase it was no secret -- the terms

Page 117

1    of the agreement were never disclosed until discovery in this

2    case.  Isn't that right?

3    A.   I don't know that.

4    Q.   Well --

5    A.   I don't know.

6    Q.   -- if the Fed had made a filing, you would know it, right?

7    You were the lawyer in charge of the Fed's representation here?

8    A.   Right.  But I don't know what Barclays filed.

9    Q.   Let's just deal with what the Fed did.  The Fed did

10   nothing to bring that agreement to the attention of the Court,

11   correct?

12   A.   To my knowledge, we did not file it.  That's correct.

13   Q.   And you don't know whether --

14   A.   Until -- well, we did in December, but that's a

15   different --

16   Q.   I'm at the point of the sale hearing?

17   A.   No, we did not.

18   Q.   All right.  And the Fed was reviewing the motion papers

19   when they were filed, yes?

20   A.   Which motion papers?

21   Q.   The sale motion that it had --

22   A.   Yes.

23   Q.   -- agreed to support in the --

24   A.   Yes.

25   Q.   -- contract, yes?

08-13555-mg    Doc 11279    Filed 09/08/10    Entered 09/13/10 15:33:59    Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 118 of 179

Page 118

1    A.    Yes.

2    Q.    And the Fed didn't see that in the sale motion?

3    A.    No.

4    Q.    And the Fed never said to Barclays, gee, you ought to get

5    that agreement in amongst the disclosures to the Court?

6    A.    I honestly do not know what Barclays filed during that

7    period.

8    Q.    The Fed never said to Barclays, you should file that

9    agreement with the Court?

10    A.    That's correct.

11    Q.    Now, I want to review with you some of the -- some of the

12    events that took place when Barclays did take out the Fed,

13    which you've described in your affidavit that was submitted in

14    connection with the December settlement.

15    A.    Um-hum.

16    Q.    All right?  If I've set up my books the right way, you

17    should have a copy of your -- just your affidavit, in front of

18    you, rather than have you work all the way through the motion

19    papers.  If you would, just keep that handy, because I think

20    there's some descriptions in there that I want to be precise

21    about.  And if your memory is not there, I want you to refer to

22    your affidavit and tell us that you're doing that.  Okay?

23    A.    Okay.

24    Q.    Overnight on the 17th and into the 18th, the Fed advanced

25    to Lehman 46.22 billion in cash.  And I'm referring to

Page 119

1    paragraph 9 of your declaration.

2    A.   I see that.

3    Q.   Is that right?

4    A.   Yes.

5    Q.   And in return, the Fed received 50.62 billion in

6    collateral, correct?

7    A.   Yes.

8    Q.   And the difference between the 46.22 and the 50.62, is

9    what we've been referring to as the haircut?

10   A.   Correct.

11   Q.   And we've agreed that both the amount that is the same as

12   the loan and the amount attributable to the haircut, both those

13   components are market values, yes?

14   A.   As I said, that's my understanding.

15   Q.   Okay.  And when you did this --

16   A.   But I'm not  an expert on it.

17   Q.   -- when you did this affidavit, that was your

18   understanding?

19   A.   Yes.  My understanding was that we took 50.62 billion in

20   collateral as security for 46.2 billion in cash loaned to LBI.

21   Q.   And the 50.62 valuation of the collateral was a valuation

22   put on it by the Fed, right?

23   A.   The collateral is valued for the Fed by JPMorgan Chase.

24   To be clear, though, I misspoke a moment ago, because some of

25   the lending that made up this 46.2 billion was actually under

Page 120

1     the Treasury -- the term securities lending facility, the TSLF,

2     which is a Treasury securities for securities --

3     Q.    Okay.

4     A.    -- so it's not actually a cash lending --

5     Q.    And some it was open market operations?

6     A.    Open market operation's always a cash loan.  It's -- yeah.

7     Q.    And in any event, that's what adds up to the --

8     A.    Yes.

9     Q.    -- 46.22?

10    A.    Yes.

11    Q.    And that's the loan to which the 50.62 is attributable as

12    collateral, yes?

13    A.    Correct.

14    Q.    And the value of the 50.62 is a market value, in your

15    understanding, yes?

16    A.    It is a value that is ascribed to the collateral by

17    JPMorgan Chase as our collateral agent.

18    Q.    And it's ascribed to the collateral by JPMorgan Chase

19    because JPMorgan Chase is acting as the Fed's collateral

20    agent --

21    A.    Correct.

22    Q.    -- here, right?

23    A.    Correct.

24    Q.    So it's fair to say -- we're lawyers -- that that's the

25    Fed's value attributed to the collateral?

Page 121

1    A.   Correct.

2    Q.   Yes, okay.  So now, as you describe in your affidavit,

3    overnight from the 18th to the 19th, Barclays takes the Fed out

4    of the repo, as agreed, right?

5    A.   Correct.

6    Q.   All right.  And here, Barclays advances forty-five billion

7    in cash to LBI, yes?

8    A.   Correct.

9    Q.   And we're not clear whether Ms. Brickler's memo that I

10   showed you before indicates that it over -- it got that money

11   in an overdraft.  We don't know -- you don't know one way or

12   the other?

13   A.   I don't believe that that's the case, but I don't know.

14   Q.   But in any event, you're able to say in your declaration

15   that Barclays advances forty-five billion in cash?

16   A.   Correct.

17   Q.   That reminds me.  You do say in your declaration that you

18   have personal knowledge of the matters set forth in the

19   declaration except where stated otherwise, right?

20   A.   Correct.

21   Q.   And you had personal knowledge of the forty-five billion

22   dollar advance by Barclays?

23   A.   Yes, I was -- I saw the Fed wire.

24   Q.   Okay.  And Barclays, according to your declaration, was

25   supposed to receive -- that is LBI was supposed to provide --

Page 122

1    49.7 billion in collateral, right?

2    A.   Correct.

3    Q.   And again, the difference between the 45 and the 49.7

4    would be what we're calling the haircut, right?

5    A.   Correct.  I'm not sure that's actually right, but okay.

6    That's what we've been calling it.

7    Q.   And as you discuss it in your affidavit, again, these

8    values, the 45 that Barclays advanced as cash, and the 49.7

9    that's collateral, are market values.  They're not liquidation

10   values or some other kind of value, right?

11   A.   No, they were the values that were ascribed to the

12   collateral by the Fed's collateral agent.

13   Q.   And you described -- and I won't take you through it --

14   because of the operational difficulties with DTC and Fed wire,

15   not all of the 49.7 made it over.  This is --

16   A.   Correct.

17   Q.   -- that's the state of everybody's knowledge from the 18th

18   going over into the 19th, right?

19   A.   Correct.

20   Q.   Okay.  So, to your understanding, to make up for that 7

21   billion dollar value shortfall between the 49.7 that was

22   supposed to be provided and the 42.7 that actually made it

23   over, LBI agrees to transfer 7 billion in cash to make up the

24   difference?

25   A.   Correct.

08-13555-mg    Doc 11279    Filed 09/08/10    Entered 09/13/10 15:33:59    Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 123 of 179

Page 123

1   Q.   Okay.  And that brings us back up to 49.7, the amount that

2   LBI was supposed to provide?

3   A.   Correct.

4   Q.   42.7 market value collateral and 7 billion in cash, right?

5   A.   Correct.

6   Q.   Okay.  And did you know that the 7 billion was advanced to

7   LBI by Chase on a so-called box loan?

8   A.   No.

9   Q.   At the time you did your declaration, did you know where

10  the 7 billion came from?

11  A.   My understanding was that it had come from LBI into -- but

12  it went into an account at JPMC.  So if there was an advance,

13  there very well could have been, but it would have been --

14  Q.   I'm one step back.  You don't know where LBI got the

15  money?

16  A.   No.

17  Q.   Okay.  So the reason I'm being so precise about this is, I

18  want to go to the state of play on the morning of the 19th,

19  without regard to disputes that arise later, which we will talk

20  about.  But on the morning of the 19th, it was your

21  understanding that Barclays had totaled market value of 49.7

22  billion in securities and cash, correct?

23  A.   Correct.

24  Q.   And did you understand it was the intention, through the

25  mechanism of the asset purchase agreement, if it was approved

Page 124

1    that Barclays would keep all that collateral and all that cash?

2    A.    My understanding was, the expectation on the morning of

3    the 19th was that there would be -- the balance of the

4    securities would transfer over and the cash would then go back

5    to LBI, not that there would be a cash component.  But that

6    never happened.

7    Q.    Now, you attended the sale hearing, we've esta -- you told

8    Mr. Schiller about that this morning, right?

9    A.    Yes.

10   Q.    And I take it you were there for the whole thing?

11   A.    Yes, I was.

12   Q.    Okay.  And were you in a position to hear the proceedings?

13   A.    Pretty much, yes.

14   Q.    Okay.

15   A.    I don't think any of us could hear all of it.

16   Q.    And well, you heard the presentations that Mr. Miller --

17   A.    Yes.

18   Q.    -- and Ms. Fife from Weil Gotshal made to the Court about

19   the transaction, yes?

20   A.    Yes.

21   Q.    All right.  And did you hear Ms. Fife describe the value

22   of the deal to the Court?

23   A.    Yes.

24   Q.    And did you hear her describe the value of what was being

25   transferred at 47.4 billion dollars?

Page 125

1   A.   Yes, I did.

2   Q.   And was it your understanding at the time -- your

3   understanding at the time was that Barclays had in its

4   possession, at least, 49.7 in cash and collateral, as we just

5   talked about?

6   A.   There's another way to look at this, which at the time, to

7   be honest with you, my understanding of the terms of the deal

8   were not comprehensive enough to say that I understood that Ms.

9   Fife was saying 47.4 and that referred to the repo.  So to be

10  clear, I didn't view it that way, because there were other

11  parameters and other pieces of the deal.  But just looking at

12  it, there's the other piece which was that 7 billion, never

13  happened.  So essentially, it's as if Barclays -- instead of

14  saying that Barclays loaned 45 to 49.7, there's 38 to 42.

15  Q.   Now, this is why I asked you a moment ago, why I said I

16  wanted to approach this with some degree of precision about the

17  state of play on that morning.

18  A.   Um-hum.

19  Q.   I know there's a dispute later --

20  A.   Right.

21  Q.   -- about where the 7 billion went and who took it and who

22  got it back.

23  A.   Um-hum.

24  Q.   But on that -- when the sale hearing begins --

25  A.   Right.

Page 126

```
 1    Q.    -- that dispute hasn't happened yet?

 2    A.    Right.

 3    Q.    Okay.  So when the presentations are made to the Court at

 4    the sale hearing --

 5    A.    Um-hum.

 6    Q.    -- your understanding is, 42.7 plus 7, 49.7?

 7    A.    No, because at that point, because the additional

 8    transfers didn't take place on the morning of the 19th, in

 9    other words, the securities for that 7 billion in cash never

10    happened because of the filing took place, as a result, it

11    really became that the repo that Barclays had with LBI on the

12    night of the 18th was a 38 billion dollar in cash for 42.7

13    billion in collateral.

14    Q.    And when did you learn that?  That's over the weekend?

15    A.    No, because we knew as of Friday morning that the transfer

16    hadn't happened.  We knew that there was -- we believed there

17    was 7 billion in Barclays' box at -- you know, Barclays'

18    account, rather, at Chase.  And we believed that -- we knew

19    that the securities hadn't actually transferred.

20    Q.    So you know 42.7's been transferred?

21    A.    Yes.

22    Q.    You said that in your declaration?

23    A.    Right.

24    Q.    And you know 7 billion's been added?

25    A.    Well, but that would mean that you could also look it as
```

Page 127

1    opposed to the 45 billion they originally transferred in cash,

2    they now only transferred 38 billion, because they basically

3    got 7 billion back.

4    Q.   You don't know -- so the 7 billion would be a credit?

5    A.   Well, it basically changes the terms of the repo.  You no

6    longer have a 45 billion dollar repo --

7    Q.   Well, wasn't it --

8    A.   -- you have a 38 billion dollar repo.

9    Q.   -- it was your understanding that the 7 billion was put

10   there as a placeholder to be replaced by securities?

11   A.   But it never -- but it didn't happen prior to --

12   Q.   I'm still on what --

13   A.   -- on Friday, yes.

14   Q.   -- what people's understanding is on Friday?

15   A.   Yeah, on Friday.

16   Q.   We'll talk about what happened and didn't happen.  But on

17   Friday, the understanding was, 42 billion made it over and 7

18   billion was put in, to bring it to a total of 49.7 billion?

19   A.   That's not how we looked at it at that point in time,

20   because we knew by the time -- when the SIPC filing happened,

21   we knew that these securities hadn't transferred over for that

22   7 billion, which is what was intended the night of the 18th.

23   So by the morning of the 19th, it's clear that there's a

24   different repo.  It's a 38 to 42.7.

25   Q.   And did you hear any of those numbers described to the

08-13555-mg   Doc 11279   Filed 09/08/10   Entered 09/13/10 15:33:59   Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 128 of 179

Page 128

1   Court on --

2   A.   No, but again, I didn't look at numbers being described.

3   Q.   And those number didn't approach the 47 -- one way or the

4   other, they were not the 47.4 that Ms. Fife described, right?

5   A.   There were a lot of numbers that evening.

6   Q.   All right.  I guess --

7   A.   That's -- I mean --

8   Q.   -- knowing what you knew and not knowing what you didn't

9   know, you were not in a position to determine --

10   A.   Right.

11   Q.   -- whether Ms. Fife's description of 47.4 was accurate or

12   inaccurate?

13   A.   Correct.

14   Q.   Okay.  It was a number she gave, but you don't know its

15   basis?

16   A.   Correct.

17   Q.   You don't know how it's calculated?

18   A.   Correct.

19   Q.   You don't know, for example, if it's calculated by market

20   value of the assets she's talking about, right?

21   A.   Right.

22   Q.   Or a liquidation value?

23   A.   Correct.

24   Q.   I take it you have no knowledge of exercises taking place

25   within Barclays and Lehman to attribute a liquidation value to

08-13555-mg    Doc 11279    Filed 09/08/10    Entered 09/13/10 15:33:59    Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 129 of 179

Page 129

1    the assets in the repo?

2         MR. SCHILLER:  Objection, lack of foundation, Your

3    Honor.

4         MR. GAFFEY:  I'm establishing that she didn't know,

5    Your Honor.

6         THE COURT:  Well, I'm going to overrule that.  It's a

7    question of what knowledge she has.  So she can certainly agree

8    she has no knowledge.

9    A.    I had no knowledge.

10   Q.    And so our record's clear, you have no knowledge whether

11   or not that took place?

12   A.    Correct.

13   Q.    Now, did there ever come a time in between the end of the

14   sale hearing and the time when you submit your declaration,

15   when you became concerned about the accuracies of the

16   disclosures made to the Court in terms of the value of the

17   assets?

18   A.    I'm sorry?

19   Q.    Did you ever develop a concern that the 47.4 that the

20   Court was told about might not have been accurate?

21   A.    No.  I mean, just to be clear, I knew there were

22   clarifications going on, I knew that there were numbers and I

23   knew there were things.  So to that extent, yeah, I mean -- but

24   I didn't have a specific concern on the 47.4.

25   Q.    Okay.  Now, Mr. Schiller asked you a bit about the so-

Page 130

```
 1   called clarification letter.  Do you recall that general topic?

 2   A.    Yes, I do.

 3   Q.    Okay.  And do you recall whether the Fed supported the

 4   entry of the sale order at the hearing on the 19th, even though

 5   certain changes to the purchase agreement had not yet been

 6   finalized?

 7   A.    Yes.  I think, as I said, that wasn't what our basis

 8   for -- the basis for our support was not the specific terms of

 9   the transaction other than the assurance that the customer

10   accounts were going to move and that this transaction would

11   inspire market confidence and stability, generally.

12   Q.  So the Fed had determined that that was more important

13   than knowing the details of the agreement?

14   A.    The details were for the parties to work out.

15   Q.    And the Court?

16   A.    And the Court, of course.

17   Q.    And the Fed had determined that it was more important that

18   the accounts be transferred and that those -- when you're

19   balancing the two against those details being known to the

20   Court?

21   A.    No, we weren't balancing those two.  Our concern, as we

22   stated to the Court, we were supporting the sale because of the

23   public policy interest that we believed the sale promoted.  We

24   were not taking an opinion, nor do I take an opinion today, on

25   the specifics of the asset purchase agreement or whether there
```

Page 131

1    was clarity in those terms.

2    Q.   And you don't take an opinion today, I take it, to whether

3    or not the clarification letter should have been shown to the

4    Court before the sale order was issued?

5    A.   I do not take an opinion.

6    Q.   But whether -- it was not a factor for the Fed whether the

7    clarification letter was approved by the Court on the 19th?

8    A.   No, it was not.

9    Q.   And you were on some conference calls over the weekend.

10   A.   On in particular on Sunday.  I was on others that had

11   nothing to do with --

12   Q.   I should be clear here just for the record.

13   A.   Right.

14   Q.   Now we're after the sale hearing and we're into the

15   weekend of the 20th and 21st.

16   A.   Correct.

17   Q.   You were on a, I'm suspecting quite long, conference call

18   about the clarification letter over the weekend, right?

19   A.   On the 21st, yes.

20   Q.   Okay.  And that -- the topics in that conference call that

21   you -- you were involved in that conference call to discuss

22   this transfer of customer accounts issue, yes?

23   A.   Yes.  There were a number of other -- there were a lot of

24   issues.  I will tell you there was probably more silence for us

25   on the call than there were actual conversations, because there

Page 132

1    were lots of conversations going on offline.

2    Q.   I take it -- now by my understanding you did not see the

3    clarification letter, the final clarification letter until

4    Monday?

5    A.   That's correct.

6    Q.   All right.  Had you seen drafts of it over the weekend?

7    A.   I don't recall.

8    Q.   Okay.  To your best recollection, do you recall having a

9    copy of a draft of the clarification letter at any time?

10   A.   I don't know.  Honestly, I do not recall.

11   Q.   Okay.  And when you were on this conference --

12   A.   I don't think I did but I don't recall.

13   Q.   When you were on this conference call I take it you're in

14   your office or you're home, you're not in with the Barclays and

15   Lehman folks?

16   A.   No, we were online.  I was that fed for part of it, I was

17   at home for part of it.

18   Q.   Okay.  And did you, at any point in that conference call,

19   suggest or offer any language to be put into the clarification

20   letter?

21   A.   I don't believe I did.  There was another lawyer for the

22   fed on the call.

23   Q.   Who was that?

24   A.   Stephanie Heller.

25   Q.   Stephanie Heller.  Did Ms. Heller, to your hearing, offer

Page 133

1  any language or provisions to be included in the clarification

2  letter?

3  A.   I don't think she did.

4  Q.   Now there was some language in the clarification letter

5  concerning the repo, that is now the Barclays Lehman repo, do

6  you recall that?

7  A.   Yes, I do.

8  Q.   Did you have any involvement in drafting that language?

9  A.   No.

10  Q.   Did you offer anything in the conference call regarding

11  that language?  I don't believe that I did.  I can't be sure if

12  Stephanie did or did not.

13  Q.   Do you recall if the provisions in the clarification

14  letter addressing the Lehman Barclays repo were of any concern

15  to the fed at that point?

16  A.   I don't believe they were.

17  Q.   Okay.  And you don't believe they were the topic of

18  anything you offered or said or heard on the conference call in

19  which you participated?

20  A.   I don't recall.

21  Q.   Okay.  And you don't believe they were the topic of

22  anything you offered or said or heard on the conference call in

23  which you participated?

24  A.   I don't recall.

25  Q.   There did arise, over the weekend and into the early days

Page 134

1   of post-closing to the late days of September and into early

2   October, a dispute between Barclays and J.P. Morgan about the

3   famous seven billion dollars, right?

4   A.   Yeah.  My recollection, though, is there was, sort of, a

5   dispute on Sunday.  Both sides didn't -- well, at least I know

6   Barclays I don't think really knew what was going on because

7   they believed the seven billion was in their account and what

8   they were saying was assuming that.  The real involvement the

9   fed had with that dispute really started on Tuesday, on the

10  23rd.

11  Q.   All right.  And in essence that dispute boiled down, as I

12  understand it, to the following.  Barclays says we had seven

13  billion dollars in an account in our name and J.P. Morgan took

14  it, right?

15  A.   Correct.

16  Q.   J.P. Morgan says that seven billion dollars is ours

17  because you, Barclays, agreed to take out all of Lehman's

18  financing?

19  A.   Correct.

20  Q.   And you, Barclays, did not take out all of Lehman's

21  financing --

22  A.   Right.

23  Q.   -- therefore we have to take the seven billion to pay a

24  liability that Lehman owes to JPMorgan Chase?

25  A.   Correct.

Page 135

1    Q.   And now you have two members -- two substantial members of

2    your regulated community in a fairly nasty fight?

3    A.   Correct.

4    Q.   And this is where the fed played the role; I think you

5    said your role was more Mr. Schiller (ph.) offered it.  You

6    took the point and said it's not a technical term but you were

7    a mediator?

8    A.   Correct.

9    Q.   All right.  Now let me ask you to turn -- let me ask you

10   first, did it ever come to your attention, now again I'm on the

11   days on the 19th, the 20th and the 21st, that's the Friday of

12   the sale hearing and over the weekend.

13   A.   Uh-huh.

14   Q.   Did it come to your attention during those three days that

15   the Lehman Barclays repo had been terminated by Barclays?

16   A.   Well, repos are at night and I'm not quite sure I follow

17   that question.  I'm sorry.

18   Q.   There comes a point on Friday where the broker-dealer

19   files?

20   A.   Correct.

21   Q.   Okay.  And did you ever learn that upon the filing of the

22   broker-dealer a notice of termination was issued out of a

23   Barclays back office that terminated the repo?

24   A.   It does ring a vague bell.  Yes.

25   Q.   Okay.  And the vague bell that it's ringing let's now --

Page 136

1    let's move it to a time period.  Was that an issue in which you

2    were involved in discussions on the Friday, the Saturday, the

3    Sunday we're talking about?

4    A.    No.

5    Q.    All right.  And you never addressed any language that had

6    to address that issue?

7    A.    No.

8    Q.    Did you ever have any discussions with Mr. Kaplan, the

9    deputy general counsel of Barclays, about that?

10   A.    No.

11   Q.    Any discussions --

12   A.    Not that I recall.

13   Q.    Okay.  Any discussion with Mr. Loucal (ph.) the partner of

14   Cleary Gottlieb about that?

15   A.    Not that I recall.

16   Q.    And I take it no discussions with anybody at Weil about

17   that?

18   A.    Not that I recall.

19   Q.    All right.  Do you know if any part of the clarification

20   letter, as it finally was signed, addressed that issue?

21   A.    I don't recall.  I haven't looked at the clarification

22   letter very recently.

23   Q.    Okay.

24   A.    I did before my deposition but not since.

25   Q.    In your -- the book with your name on it there there ought

Page 137

1    to be a tab for M-3, that's a copy of the clarification letter.

2    A.    M what?

3    Q.    The book that has your name on it.

4    A.    Yeah, I know.  I have -- what's the tab?

5    Q.    M-3.

6    A.    Oh, okay, the first exhibit.

7         (Pause)

8    Q.    Now that's the clarification letter that you saw sometime

9    on or after the Monday on which it was filed with the Court,

10   right?

11   A.    Yes.

12   Q.    All right.  And would you turn to paragraph 13 of that

13   document.

14   A.    Yes.

15   Q.    It's on page 5, are you there?

16   A.    Yeah, I see it.  Uh-huh.

17   Q.    All right.  And you see that that addresses -- that

18   paragraph addresses the Barclays repurchase agreement, yes?

19   A.    Yes, I do.

20   Q.    And effective at the closing, etcetera, etcetera, etcetera

21   --

22   A.    Yeah.

23   Q.    -- it refers to a notice of termination at the bottom?

24   A.    Right.  But as I recall from the Sunday call and from what

25   we learned later, I think Barclays was under the impression at

Page 138

1    the time that it had the seven billion in its account at Chase.

2    Q.    And that -- the reason you raise that is because of the

3    language in paragraph 13 that says, "Seller and purchaser shall

4    be deemed to have no further obligations under the repurchase

5    agreement," right?

6    A.    Right.

7    Q.    And that's by way of your explaining the reason -- the

8    argument, I suppose, why Barclays shouldn't be bound by that,

9    because it thought it had the seven billion but it didn't?

10   A.    I'm not going to argue on behalf of Barclays but they can

11   do that themselves.  But my understanding, when we entered

12   into, sort of, the mediator role that was one of the issues

13   that was raised and the Sunday call came up because that

14   paragraph, I guess, had been negotiated over that Sunday call.

15   And I remember Ms. Heller specifically saying that, you know,

16   the intention of the parties seems to be off because Barclays

17   clearly was operating under the false assumption that it had

18   seven billion in its account.

19   Q.    All right.  Let me ask you to look at your declaration at

20   paragraph 19.

21   A.    Uh-huh.

22   Q.    Where you're describing the settlement agreement.

23   A.    Okay.

24   Q.    And you say, in the first line of paragraph 19, "Only

25   after the purchase transaction closed on Monday, September

08-13555-mg   Doc 11279   Filed 09/08/10   Entered 09/13/10 15:33:59   Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 139 of 179

Page 139

1    22nd, did Barclays learn that the subject funds it believed

2    were in its account at JPMC had been transferred to LBI's

3    account."  Yes?

4    A.    Exactly.

5    Q.    You had personal knowledge of that?

6    A.    Yeah.  We were told by Barclays that they did not know it

7    and everything that we had seen over the weekend confirmed that

8    they had no idea that the seven billion wasn't in that account.

9    Q.    So you were in a position, as a government lawyer, to put

10   in a declaration as to the state of mind of a private entity?

11   A.    Well we also had seen the account statements for Barclays,

12   the Chase account statements that showed the seven billion in

13   their accounts so we were under the same impression as well.

14   Q.    Okay.  And you were able to say, as a matter of personal

15   knowledge, that it was only after September 22nd that Barclays

16   learned that?

17   A.    Yeah.

18   Q.    And the basis of your personal knowledge was what?

19   A.    The documentary evidence that Barclays had in front of it

20   and what we were told by Barclays as well at the time, both

21   over the course of the weekend and again on Tuesday the 23rd.

22   Q.    And you go on to say, This is crucial to understanding

23   paragraph 13 of the September 20 letter from Barclays to Lehman

24   Holdings sought to clarify the intention of the parties with

25   respect to certain provisions of the asset purchase agreement."

Page 140

1    Do you see that?

2    A.    Uh-huh.  Yeah.

3    Q.    All right.

4    A.    Yes.

5    Q.    All right.  And -- why was it, Ms. Leventhal, that you, in

6    your affidavit, were undertaking to describe the meaning of a

7    paragraph you had no role in drafting?

8    A.    Because we were a party to discussions.  As I say here,

9    "During those calls Barclays representatives made statements

10   that clearly reflected their belief that the subject funds were

11   in Barclays account at JPMC."

12        And that paragraph is not consistent with -- would

13   otherwise be completely inconsistent with what happened.

14   Q.    Well otherwise it would be a release of its claim by

15   Barclays?

16   A.    I didn't look at it quite that way.

17   Q.    Is that what you mean by inconsistent?

18   A.    No, but the idea is that if Barclays terminated the repo

19   believing that it had the seven billion in its account, that it

20   terminated the repo under false pretenses and --

21   Q.    Well, do you know why Barclays terminated the repo?

22   A.    Our understanding was that they believed they had seven

23   billion in their account that they didn't actually have in

24   their account.

25   Q.    Has anyone told you that the repo was terminated

Page 141

1   accidentally by Barclays back office?

2   A.   That I did not know.

3   Q.   Okay.  Have you ever reviewed the declaration submitted in

4   the motion at issue here by Allan Kaplan, the deputy general

5   counsel of Barclays?

6   A.   No, I have not.

7   Q.   Has it ever been brought to your attention that Mr. Kaplan

8   describes the termination of the repo as inadvertent?  No?

9   A.   To my knowledge -- I don't recall that.  It may have been

10  but --

11  Q.   All right.  And it's not been brought to your attention

12  that Mr. Kaplan describes paragraph 13 as meant to correct that

13  error, the erroneous termination of the repo?

14  A.   Not to my knowledge.

15  Q.   All right.  So at the time you put your affidavit into the

16  Court you were unaware of any of those facts?

17  A.   Correct.

18  Q.   Your understanding was that paragraph 13 was meant to

19  rectify the fact that Barclays only terminated the repo because

20  it thought it had the seven billion dollars?

21  A.   I can't say only but our understanding was they terminated

22  the repo under false pretenses.  Now whether it was an

23  accidental termination, I don't know.

24  Q.   Do you have any knowledge, as you sit here now, as to when

25  the principal players involved, the lawyers and the Barclays

08-13555-mg    Doc 11279    Filed 09/08/10    Entered 09/13/10 15:33:59    Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 142 of 179

                                                        Page 142

1    executives involved in the negotiations learned the repo had

2    been terminated?

3    A.    I don't know that.

4    Q.    Do you know it wasn't until the weekend?

5    A.    I don't recall.

6    Q.    You don't know how they learned --

7    A.    I mean, I'm sure I knew it at the time on Sunday because

8    it was the subject of the call, but I just don't recall.

9    Q.    All right.  So as you examine your memory about this

10   particular issue --

11   A.    Uh-huh.

12   Q.    -- you really don't have a reason to know, one way or the

13   other, whether Barclays terminated the repo because it thought

14   it had the seven billion dollars, do you?

15   A.    My recollection of the call on Sunday was that

16   representations were made by Barclays about the seven billion

17   being in their account.

18   Q.    Okay.

19   A.    That understanding was clearly false and it was our

20   understanding that paragraph 13 of the clarification letter

21   derived from the false impression that Barclays was under.

22   Q.    All right.  And you got that understanding from Barclays,

23   didn't you?

24   A.    From the calls that we were on.  From the call on Sunday

25   and from the conversations with Barclays, yes.

Page 143

1   Q.   Well, in the call on Sunday --

2   A.   Uh-huh.

3   Q.   -- where you were listening for issues about transfer of

4   customer accounts I think you told me there wasn't a discussion

5   of paragraph 13 that you remember?

6   A.   I don't recall the language of paragraph 13 being

7   discussed.  I do recall the issue in paragraph 13 being

8   discussed.

9   Q.   Okay.

10  A.   Because in fact Ms. Heller was very focused on that issue

11  for quite some time afterwards.

12  Q.   Do you know when this language was put in the

13  clarification letter?

14  A.   No.

15  Q.   All right.  And your understanding -- your statement in

16  your declaration about something being crucial to understanding

17  paragraph 13 is a view derived from information you learned

18  from Barclays?  Yes?

19  A.   I don't understand the question.

20  Q.   Well let me ask you as a general matter, did anybody from

21  Barclays have any input into your declaration?

22  A.   They saw it after it was drafted and they had some

23  comments on it, some of which we took, some of which we didn't.

24  But as to the facts in this paragraph, no they did not.

25  Q.   Do you recall being asked at your deposition about the

08-13555-mg    Doc 11279    Filed 09/08/10    Entered 09/13/10 15:33:59    Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 144 of 179

Page 144

1    process by which your affidavit was prepared?

2    A.    Yes.

3    Q.    Do you recall saying these three words, "I wrote it"?

4    A.    Yeah, and I did.

5    Q.    And did you describe then that Barclays had also seen

6    drafts and had some input?

7    A.    There were exhibits put in front of me, there were tons of

8    documents that indicated that.  Nobody asked me did Barclays

9    have input, they asked how it was prepared.  I wrote it.

10   Q.    You didn't see any drafts of your affidavit shown to you

11   at your deposition, did you?

12   A.    No.  I don't --

13   Q.    Okay.

14   A.    -- I don't recall if I did.

15   Q.    Now going back to paragraph 19 --

16   A.    There weren't a lot of changes between this draft, the

17   final and what was shown to Barclays just shortly before it was

18   filed.  They were almost identical.

19   Q.    We'll go through some of those.

20   A.    Okay.

21   Q.    Actually, let me ask you, did J.P. Morgan get a shot at

22   input into your affidavit?

23   A.    Yes, they did.

24   Q.    Did they send back changes?

25   A.    I believe they did.

08-13555-mg   Doc 11279   Filed 09/08/10   Entered 09/13/10 15:33:59   Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 145 of 179

Page 145

1    Q.   Does the fed have them?  The drafts that J.P. Morgan sent?

2    A.   I don't know.  I don't think so.  I mean, whatever we have

3    we've turned over to the examiner.  I don't know what is the --

4    Q.   Whatever you have, have you turned them over to me?

5    A.   I'd have to ask my counsel.

6    Q.   Okay.

7    A.   I haven't been involved in that.

8    Q.   So it's your understanding that paragraph 13 --

9    A.   Uh-huh.

10   Q.   -- was put into the clarification letter expressly

11   because -- there's a direct connection between paragraph 13 and

12   the seven billion dollar cash transfer?

13   A.   I believe -- my understanding was, and continues to be,

14   that paragraph 13 reflected a misunderstanding on the part of

15   Barclays --

16   Q.   Okay.

17   A.   -- as to the state of play on that Sunday.

18   Q.   Do you know who drafted paragraph 13?

19   A.   Of the clarification letter?

20   Q.   Yes.

21   A.   No, I don't.

22   Q.   Okay.  Let me show you what's in evidence as Exhibit 138,

23   it should be in your book.

24        THE COURT:  Mr. Gaffey, let me just interject for

25   planning purposes.  Can you give me an estimate as to how long

08-13555-mg   Doc 11279   Filed 09/08/10   Entered 09/13/10 15:33:59   Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 146 of 179

Page 146

1    you're going to be?  I'm not trying to cut you off at all; I'm

2    just trying to get a sense of it because it may be appropriate

3    to take a short break.  I'm just concerned --

4              MR. GAFFEY:  I think if we took --

5              THE COURT:  I'm concerned that the witness is just on

6    the stand for a long time.

7              MR. GAFFEY:  I understand that, Your Honor.  I think

8    if we took a break now I can -- we will certainly be done by

9    the time that we have to end today and I'll try to get it done

10   in an hour.

11             THE COURT:  Okay.  Let me just ask if anyone else

12   anticipates questioning on behalf of the movants?

13             UNIDENTIFIED SPEAKER:  If there's any it would be very

14   short.  Just a few minutes.

15             UNIDENTIFIED SPEAKER:  I would have a little bit.

16   Yes, Your Honor.

17             THE COURT:  Okay.  Well it occurs to me that we may

18   have some difficulty meeting out 2 o'clock cut off date and I'm

19   wondering whether or not Ms. Leventhal can come back tomorrow

20   morning at 9:30 should that be required?

21             THE WITNESS:  I can.

22             THE COURT:  Okay.  That raises a question in my mind

23   as to whether heroic efforts are in order for today but let's

24   take a ten minute break and see if we can, at least, deal with

25   Mr. Gaffey's examination.  We'll break for ten minutes.

08-13555-mg   Doc 11279   Filed 09/08/10   Entered 09/13/10 15:33:59   Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 147 of 179

Page 147

 1           (Recess from 12:43 p.m. until 12:59 p.m.)

 2           THE COURT:  Be seated, please.  Just in terms of

 3    scheduling, it seems to me that we don't have to punish

 4    ourselves by trying to get to 2 o'clock, and under the

 5    circumstances maybe it makes sense, and I give you your options

 6    here, to go for a half hour now till about 1:30 and then break.

 7    Given my schedule tomorrow I need to break at about 5 to 11 to

 8    participate in this conference call that has been long

 9    scheduled, so there will be an 11 o'clock break for, maybe,

10    forty-five minutes.  If we could finish, realistically, with

11    Ms. Leventhal tomorrow between 9:30 and 11, which seems

12    reasonable if we take a half hour now.  We could then resume

13    after an early lunch break, maybe at 1:30 tomorrow afternoon,

14    with the other witness scheduled.  I just want to make sure

15    that works for counsel and for the witness.

16           MR. GAFFEY:  It works for me, Your Honor.  I think, if

17    it's okay with everybody, with Your Honor and with the witness,

18    if we take the half hour now --

19           THE COURT:  Yes.

20           MR. GAFFEY:  -- I stand a much better shot of fitting

21    that schedule, and I think that would be fine.  I can break

22    whenever it's convenient now.

23           THE COURT:  Let's plan to break today at around 1:30

24    and resume tomorrow at around 9:30 a.m.

25           MR. GAFFEY:  Fine, Your Honor.

Page 148

1          THE COURT:  With the understanding that I have a break

2     that I must take at just about 5 to 11.

3          MR. GAFFEY:  Okay.

4          THE WITNESS:  And, Your Honor, that's fine.  My only

5     hesitation is I have to leave here at 12:30, so if there was

6     any intention of coming back in the afternoon I'd have to do

7     that.

8          THE COURT:  No, no.  The idea is --

9          THE WITNESS:  If I'm done by 11 that's perfectly fine.

10          THE COURT:  The idea is you will be done by 11 o'clock

11     tomorrow, and we're committing ourselves to meet that

12     objective.

13          MR. GAFFEY:  I will commit, Your Honor.  If I go the

14     full half hour, and I will now, I will spend some time tonight

15     getting to the minimum for tomorrow --

16          THE COURT:  Fine.

17          MR. GAFFEY:  -- and we will get done in the morning.

18          THE WITNESS:  That's fine.

19          MR. GAFFEY:  Not that I'm not doing the minimum now.

20     RESUMED CROSS-EXAMINATION

21     BY MR. GAFFEY:

22     Q.   Ms. Leventhal, in these -- conference call over the

23     weekend about the clarification level and with specific

24     reference to paragraph 13, the one about the repo that we've

25     been talking about.

Page 149

1    A.    Yes.

2    Q.    Were you party to any discussions concerning the

3    bankruptcy code implications of the termination of a repo?

4    A.    No, I was -- if I was, I don't recall.  This conference

5    call went on for twelve hours, so, I'm just --

6    Q.    Okay.  In any of the twelve hours, and during the part of

7    the twelve hours where you were on the call and listening or

8    speaking, was there any discussion about the fact that the

9    termination of a repo with regard to a debtor that's already

10   filed implicated certain safe harbor provisions of the code?

11   A.    I mean, I'm familiar with the safe harbor provisions

12   you're talking about, but I do not recall whether that was

13   discussed on that conference call.

14   Q.    All right.  And you were familiar with the safe harbor

15   provisions I'm talking about before you were on the call?

16   A.    Yes.

17   Q.    All right.  And you don't recall hearing anything about

18   those safe harbor provisions with which you were familiar

19   during the call?

20   A.    I just do not recall.  They may have come up.  There were

21   discussions about those safe harbor provisions on a number of

22   occasions within the Fed.  I do not recall whether there were

23   discussions on the call as well.

24   Q.    And were you part of any discussions, either in that very

25   long conference call or otherwise over the weekend, about

Page 150

1    whether or not the clarification letter should be brought to

2    the Court for its review before the closing?

3    A.    I don't recall.  I don't recall being a party to those

4    conversations.

5    Q.    I know that you mentioned this morning to Mr. Schiller

6    that it was the Feds view that the deal needed to close as soon

7    as possible.

8    A.    Correct.

9    Q.    But the Fed did not lay down a deadline or a drop-dead

10   date that it had to close -- it had to close before open of

11   business on Monday.

12   A.    No.

13   Q.    That was its desire, but not its mandate.

14   A.    Correct.

15   Q.    And the Fed wasn't in a position to mandate that, was it?

16   A.    Correct.

17   Q.    All right.  And from the Feds point of view, with regard

18   to the policy issues that were its concern, that is market

19   stability, et cetera, et cetera, closing at -- before the open

20   of business and closing at 11 a.m. is not a huge difference.

21   A.    No.

22   Q.    Now --

23   A.    It could be under certain circumstances, but in that

24   particular situation I don't think it was.

25   Q.    There was no part over the weekend where the Feds said, in

Page 151

1   sum or substance, no matter what happens this deal's got to

2   close before open of the markets on Monday?

3   A.   Not that I recall, no.

4   Q.   And the Fed had no input into that decision?

5   A.   Certainly not that I know of, no.

6   Q.   Now, we talked a bit, and you spoke a bit to Mr. Schiller

7   about problems that arose between Barclays and J.P. Morgan

8   after the closing.

9   A.   Correct.

10  Q.   All right.  And this is where the Fed had what you called,

11  what Mr. Schiller called, and you roughly agreed, was a

12  mediation role.

13  A.   Correct.

14  Q.   And the problems, just to, sort of, frame it, the problem

15  is that J.P. Morgan initially refuses to release funds and

16  collateral unless Barclays takes over all of LBI's financing.

17  We talked about this a bit before.  That's the Fed's side of

18  the argument.

19          MR. GAFFEY:  Let me withdraw that and be a little

20  clearer.

21          THE WITNESS:  Okay.

22  Q.   The Feds side of the fight is you, Barclays, were supposed

23  to take over all of Lehman's financing.  And the Barclays side

24  of the fight is no, we're not taking over financing for you.

25  A.   The Fed didn't have a side of the fight.

Page 152

1    Q.   Okay.  I'm --

2    A.   That's why I'm confused.

3    Q.   I'm more tired than I should be.  As you understood it,

4    the J.P. Morgan side of the fight --

5    A.   Okay.

6    Q.    -- was Barclays should have taken over all of Lehman's

7    financing, correct?

8    A.   Yes.

9    Q.   And the Barclays side of the fight was no, we weren't

10   taking over it all.  We were just taking over what we agreed to

11   take over.

12   A.   Correct.

13   Q.   All right.  And within that dispute was the fact that

14   Chase wanted Barclays to assume a loan that Chase had given

15   Lehman to fund the repayment of a different Barclays' repo with

16   Lehman.  Yes?  You remember --

17   A.   Yes, I vaguely -- yeah.

18   Q.   All right.  And that was a repo --

19   A.   And I don't remember which security it was called, but,

20   yes.

21   Q.   Roughly in the amount of 15.8 billion dollars?

22   A.   Yes. That I do recall from it.

23   Q.   All right.  And that's not the repo we've been talking

24   about.  That was a separate --

25   A.   No.

1    Q.    -- Barclays repo.

2    A.    Correct.

3    Q.    All right.  And Barclays refused, declined, to roll that

4    repo, that 15.8.

5    A.    My understanding is that Barclays had that repo, I

6    believe, on the night of the 17th.  Chase unwound it on the

7    morning of the 18th.  On the night of the 18th when Barclays

8    entered the replacement transaction with LBI it did not include

9    that 15.8 billion dollar repo.

10   Q.    And it was the Chase view of things in this dispute that

11   Barclays should have rolled that repo.

12   A.    That's correct.

13   Q.    And what happens now is Lehman has to pay back the 15.8.

14   A.    Correct.

15   Q.    And it goes to Chase and borrows it.

16   A.    Correct.

17   Q.    And it was that financing that Chase wants Barclays to

18   take out.

19   A.    That's my understanding, yes, of Chase's position.

20   Q.    And to secure that loan that Lehman took from Chase to pay

21   down, to unwind the 15.8 billion dollar repo, Lehman puts the

22   RACERS, which you talked about before, with Chase.

23   A.    Correct.

24   Q.    All right.  Now, the dispute between Barclays and JPMorgan

25   Chase comes to a head, or gets a little bit heated, come, at

Page 154

```
 1   least, Sunday the 21st, right?

 2   A.   There -- on the conference call, yes there is a dispute,

 3   but at that point in time it was -- it was a dispute over the

 4   15.8 billion, and Barclays was arguing from -- with the clear

 5   understanding, in their minds, that they had the seven billion

 6   in cash in their account.

 7   Q.   And one issue.  Barclays had a clear understanding in its

 8   mind?

 9   A.   They articulated on a number of occasion in a way that --

10   Q.   So --

11   A.   And we believe that, too, having seen the documentation,

12   having seen the transfers.

13   Q.   And, well, over the weekend, if I understood your

14   declaration correctly, we're not at the point where Barclays

15   realizes it's gone.

16   A.   No, no, no.

17   Q.   Okay.

18   A.   To the contrary.  Barclays was at -- was speaking with the

19   clear impression that it had the seven billion in its account.

20   Q.   And when the time came to make up the difference between

21   the 42.7 and the 49.7 that was supposed to come over in

22   collateral on the takeout of the Fed repo it was the Fed that

23   prevailed on JPM to deposit 7 billion.  It resolved that issue.

24   Is that right?

25   A.   I was not in the room during the operational phase of that
```

Page 155

1    piece.  I saw the Fed wires and the various TTC memos that went

2    through.  My understanding was there was a phone call.  My

3    understanding was that LBI prevailed on Chase to do that seven

4    billion dollar transfer.

5    Q.   And, in any event -- you're just moving ahead a little

6    bit -- in any event, this dispute about a very big amount of

7    money between two very big banks gets pretty heated.

8    A.   Yes.

9    Q.   And the Fed gets involved.

10   A.   We were asked to get involved, yes.

11   Q.   And you were asked to get involved by Barclays.

12   A.   Initially by Barclays, and then Chase also agreed that

13   they would like to see us involved.

14   Q.   And it comes to your attention that the dispute is so

15   heated that Barclays' general counsel accuses J.P. Morgan of

16   theft and fraud, right?

17   A.   Yeah, that was one of the claims.

18   Q.   Take a look, if you would, in your book at tab M-856.

19        (Pause)

20   Q.   And M-856, Ms. Leventhal, is a --

21   A.   Fine.

22   Q.    -- and e-mail chain, the top of which is a transmittal of

23   the chain from Gerard LaRocca to you, with copies to Mr.

24   Hughes, Ms. Brickler --

25   A.   Well, it's actually to Stephanie Heller.

08-13555-mg    Doc 11279    Filed 09/08/10    Entered 09/13/10 15:33:59    Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 156 of 179

Page 156

 1    Q.   I beg your pardon.  To Stephanie Heller, and then with a

 2    copy to you.  Do you see that?

 3    A.   Yes, I do.

 4    Q.   All right.  And do you recall receiving this?

 5    A.   Yes. I do.

 6    Q.   And within that e-mail chain --

 7         MR. GAFFEY:  Well, Your Honor, I move Exhibit M-856

 8    into evidence.

 9         MR. SCHILLER:  No objection, Your Honor.

10         THE COURT:  It's admitted.

11   (E-mail chain starting with Gerard LaRocca was hereby received

12   as LBHI's Exhibit M-856 for identification, as of this date.)

13    Q.   And within that e-mail chain, Ms. Leventhal, is an e-mail

14    from Jonathan Hughes, then general counsel of Barclays, to

15    Stephen M. Cutler, who I understand was general counsel of

16    Chase.  Is that right?

17    A.   I'm just looking for that one.

18    Q.   It starts at the bottom of the first page.

19    A.   Yeah.  Yes.

20    Q.   Okay.  And that's where you see some fairly strong

21    language by one member of your regulated community against

22    another, where Mr. Hughes says, among other things, "Your

23    firm's continuing refusal to give back the money, together with

24    these documents, make the whole thing start to look like

25    fraud".  Do you see that?

08-13555-mg    Doc 11279    Filed 09/08/10    Entered 09/13/10 15:33:59    Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 157 of 179

Page 157

1    A.    Yes.

2    Q.    And Mr. Hughes allows as how he's hoping that Chase will

3    be able to send the funds by return.  Do you see that?

4    A.    Wait.  Now, I don't.

5    Q.    It's the last sentence of Mr. Hughes.

6          MR. GAFFEY:  You know what?  I'll withdraw the

7    question.  It doesn't matter.

8    Q.    Move on to the e-mail from Mr. LaRocca that's distributed

9    to you, and you'll see that at the end of his e-mail Mr.

10   LaRocca says to Ms. Heller, copy to you, quote, "Barclays very

11   much appreciates the Federal Reserve's assistance and asks for

12   your continued support.  We believe your support is critical to

13   Barclays in enabling this critical matter to get resolved early

14   this morning."  Do you see that?

15   A.    Yes, I do.

16   Q.    Was there any point where you responded to Mr. LaRocca

17   saying well, you know, we're not supporting Barclays.  We're

18   not supporting Chase.  We're in a mediation role here.

19   A.    I think we -- we made that clear on a number of phone

20   calls and in the meeting, in one of the meetings that we held

21   at the Fed, where we were very clear.  Tom Baxter attended the

22   meeting and was very, very clear as to what our role was.

23   Q.    And when it came time to submit affidavits about this

24   dispute, that's why you have a recollection that those

25   affidavits were also put to Chase's counsel for comment?

Page 158

1    A.   Yeah, I -- and I recall having discussions with Steve

2    Cutler about them.  And I confirmed with my counsel that you've

3    received all the documents that we have.  With respect to

4    Chase's comments I don't recall whether those were sent by e-

5    mail or whether we discussed them on the phone, but I did have

6    a lot of phone conversations, far more phone conversations with

7    Mr. Cutler than e-mail exchanges.

8    Q.   We'll come back to that, because over the same break I'm

9    trying to confirm whether my sense that we never got any

10   writings reflecting that is true.  But we'll come back to that

11   and resolve it.  Now --

12        MR. GAFFEY:

13        MR. SCHILLER:  Your Honor, just for the record,

14   because it's not reflected in the transcript.  The answer was

15   they had a lot more phone conversations with Mr. Cutler than e-

16   mails, but counsel talked over the witness and so it didn't get

17   into the transcript.  If you'd permit me, Your Honor?

18        MR. GAFFEY:  That's correct.

19        MR. SCHILLER:  I'm okay with that, Your Honor.

20        THE COURT:  I have no idea what's in the official

21   transcript.  If it didn't make it into live note that's a

22   matter of no moment.

23   Q.   Now, the dispute between Barclays and Chase continues into

24   early October, right?

25   A.   Yes.

Page 159

1    Q.   Well, it's not resolved until --

2    A.   Well, it's --

3    Q.    -- December.

4    A.   I was going to say, it continued longer than that, to my

5    recollection.

6    Q.   Okay.  And, in any event, it's still an active dispute in

7    early October.

8    A.   Yes.

9    Q.   All right.  And you exchange e-mails during this period

10   with Mr. Hughes from Barclays about strategies that might be

11   employed to resolve the dispute.  Is that right?

12   A.   I exchange e-mails with Mr. Hughes in our mediation role

13   in an effort to resolve this dispute, yes.  That's correct.

14   Q.   Now, when you were acting in your mediation role did you

15   ever send an e-mail that copied both Mr. Hughes and Chase?

16   A.   I don't recall if I did.  I may have.  There certainly

17   were meeting and phone calls that involved both.

18   Q.   Okay.  Well, I will say I -- well, let me ask you to take

19   a look at Exhibit 705, which was admitted into evidence in May.

20   And it's an e-mail.  The top of it is an e-mail from Jonathan

21   Hughes to you dated October 5th, 12:47 p.m.  Do you see that?

22   A.   Yes, I do.

23   Q.   And this e-mail chain reflects correspondence with you and

24   Mr. Hughes concerning the dispute between Barclays and JPMorgan

25   Chase, right?

Page 160

```
 1    A.    Yes.  I do.  I see this.

 2    Q.    And one of the things you're discussing with Mr. Hughes,

 3    both in e-mail and in conversation at the time, are amounts of

 4    money that might resolve the issue, yes?

 5    A.    We were discussing what Barclays was hoping to get out of

 6    a settlement.  We were having similar discussions on the other

 7    side with Chase as to what they were looking for.

 8    Q.    And one of the things that you were discussing with Mr.

 9    Hughes in connection with that, sort of, searching around for

10    the right number to resolve it, was the ratio between the

11    haircut and the amount lent on the Fed repo and the haircut and

12    the amount lent on the Barclays/Lehman repo.

13    A.    Yup, that's correct.

14    Q.    And Mr. Hughes had sent you analyses done by internal

15    Barclays people, including Stephen King.

16    A.    Yes.

17    Q.    With an analysis of these respective comparative ratios.

18    A.    Right.

19    Q.    All right.  And in this e-mail, marked as 705, you send to

20    Mr. Hughes, and I'm on page 773.  That is the second page of

21    the document.  The definition of market value used in the PDCF

22    program.  Do you see that?

23    A.    Sorry.  My eyes are failing me a bit.  Oh, yes.

24    Q.    All right.  And you refer to a Jeff Moore.

25    A.    Correct.  Yes.
```

08-13555-mg   Doc 11279   Filed 09/08/10   Entered 09/13/10 15:33:59   Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 161 of 179

Page 161

1    Q.   Who's Jeff Moore?

2    A.   He was one of our operations people in the markets group

3    responsible for dealing with valuation issues for the PCF.

4    Q.   All right.  So one lawyer to another, he's the guy that

5    crunches the numbers, right?

6    A.   Sort of.  He's the guy who receives the numbers and

7    matches things up.  Yes.

8    Q.   And why are you sending -- this appears to be cut and

9    paste from a document.  Why are you --

10   A.   That's a public document that was cut and pasted from.

11   Q.   All right.  Why are you sending it to Mr. Hughes at the

12   time?

13   A.   Because we were trying to get their determination.  There

14   was a issue that was coming up about the fact that Chase -- not

15   Chase -- that Barclays had not received the same collateral

16   that we had held in our repo on the night of the 17th, and

17   there was a question that Barclays kept raising as to whether

18   the collateral that they were holding was of a lesser value,

19   and they were asking how we had valued what we held on the

20   night of the 17th, and so this is publicly available

21   information on how market value is determined for the PDCF, so

22   we were giving them that as a basis so that they could attempt

23   to value what they had using the same measures that we used.

24   And then there was an issue as to whether, because they

25   believed the collateral might be of lesser value, that some --

Page 162

1    what they had received, whether that changed the ratio.  And my

2    concern was that we needed to be consistent with the ratio,

3    because in my mind that was what the Court knew.

4    Q.   All right.  And just to break that down for my benefit a

5    little bit, the question that's being asked is what definition

6    did the Fed apply to valuing the collateral in the Fed repo.

7    A.   Correct.

8    Q.   So that we're using the same definition to value the

9    collateral in the Lehman Barclays repo --

10   A.   That's my understanding.

11   Q.   Barclays having contended to you that the composition of

12   the collateral was different one to the other.

13   A.   Correct.

14   Q.   And did the Fed ever conduct its own analysis to determine

15   whether that was so, whether --

16   A.   Whether what was so?

17   Q.   Whether the collateral was different and the degree to

18   which it was different.

19   A.   Yeah, we did.  We attempted to do quite a comprehensive

20   analysis of what had actually been transferred to Barclays, and

21   it was rather confusing at one point, because there was some

22   transact -- some CUSIPs that had been what we call decayed.

23   They were rejected, but it turned out there were some

24   operational issues, and it became a rather complicated

25   exercise.  But, ultimately, yes, we were able to determine that

Page 163

```
 1   Barclays had not received all of the same collateral that the

 2   Fed had the night of the 17th, in part because some of that

 3   collateral was encumbered on the 18th during the course of the

 4   day, so it wasn't available to LBI to transfer to Barclays that

 5   evening.

 6   Q.   Did you share the fruits of that analysis with Mr. Hughes?

 7   A.   I -- the analysis was conducted by a number of our markets

 8   people, investigators and by Ms. Heller.  I believe we shared

 9   it with both Chase and Mr. Hughes at the meeting that we had at

10   the Fed, that's my recollection.  But I, sitting here today,

11   can't recall exactly what we shared because there was volumes

12   of doc -- of back and forth, you know, with our analysis.

13   Q.   One of the concerns that you had in reaching a resolution

14   of the JPMorgan Chase-Barclays dispute was adhering to the

15   events and representations made on the 19th, right?

16   A.   Yes.

17   Q.   Okay.  And let me show you, back on the first page of the

18   document, the penultimate paragraph beginning, "Also".  We're

19   going to blow it up on the screen there.

20   A.   All right.

21   Q.   This is you to Mr. Hughes.

22   A.   Um-hum.

23   Q.   "Also, we're thinking about the ratio.  I think we also

24   need to be mindful of what was represented to the Bankruptcy

25   Court about the deal."
```

Page 164

1  A.   Um-hum.

2  Q.   "We can't really deviate from the representation in a way

3  that would be to the detriment of the estate if we hope to get

4  approval for this from the Court and the SIPC trustee."

5       Do you see that?

6  A.   Yes, I do.

7  Q.   All right.  And the concern you're expressing there is

8  that the ratios that you're discussing with Mr. Hughes may be

9  different, may be different or show a difference between what

10 happened in the repo and what the Court was told.

11 A.   No, actually --

12 Q.   Is that right?

13 A.   No.  I mean, as I recall, I had a discussion actually with

14 the SIPC trustee about this issue but I can't recall the

15 timing.  But my recollection on this was this was in response

16 to a conversation where we were discussing the specific

17 collateral and the fact that the collateral that Barclays had

18 actually received wasn't as "good" as the collateral that the

19 Fed had held the night before and that therefore the ratio

20 should be different because the collateral quality wasn't as

21 good so the haircuts, to use your way of referring to it,

22 should be higher because the collateral wasn't as high a

23 quality as what the Fed had.

24       And my response to that was we had to be careful because

25 that argument would have to be explained very well because the

Page 165

1    Court was under the impression that there was a particular

2    ratio which was the Fed's ratio and we needed to be consistent

3    with that.

4    Q.   Was there any -- at any point, in early October, did you

5    or anyone, as far as you know, go to the people who made the

6    representations to the Court and involve them in this

7    conversation?

8    A.   Not at this point in time.

9    Q.   I take it --

10   A.   But we knew we were going to, which is what my concern was

11   about; that if we were going to make sure that this transaction

12   met with everyone's approval, the ratios were going to have to

13   be consistent.

14   Q.   And when the settlement ultimately was filed and motion

15   sought for its approval, were those ratios filed?

16   A.   Well, my declaration talked about the ratios.

17   Q.   Can you show me where in your declaration?

18   A.   The ratio -- it's paragraph 12.  The last sentence says,

19   "The ratio was consistent with the ratio of cash to securities

20   used in the New York Fed's Reached Purchase Agreement with LBI

21   on the night of September 17th."

22   Q.   Was there ever a draft of this affidavit where your -- the

23   one you wrote, where the idea was to actually put the ratio in

24   the declaration?

25   A.   There may have been.  But I will be honest with you; I

Page 166

1    wasn't a hundred percent comfortable attesting to numbers.

2    And, in fact, Jeff Moore (ph.) filed a declaration that went

3    through the numbers that were lent and in more detail than I

4    was comfortable with.

5    Q.    And, in fact, Mr. Hughes suggested you take out of your

6    declaration a specific reference to the ratios, right?

7    A.    He may very well have, I don't know.  But I think we were

8    inclined to do that, to be honest with you, because I wasn't a

9    hundred percent comfortable with it.

10   Q.    Now, your discussions with Mr. Hughes in this portion of

11   early October continue.  If you would turn in your book to tab

12   701, also in evidence.

13        Actually, if you would first, turn to Exhibit 846.  Okay?

14   Are you with me at 846?

15   A.    Yup (sic).

16   Q.    All right.  In 846 you'll see is an e-mail from Jonathan

17   Hughes to you and again it forwards a chain of other e-mails.

18   A.    Yes.

19   Q.    Do you recognize that as such?

20   A.    I do

21            MR. GAFFEY:  Your Honor, I move M-846 into evidence.

22            MR. SCHILLER:  No objection.

23            THE COURT:  It's admitted.

24   (E-mail from Jonathan Hughes to Shari Leventhal was hereby

25   received into evidence as Movants' Exhibit 846, as of this

Page 167

1    date.)

2    Q.   And, Ms. Leventhal, you'll see, taking a look at this e-

3    mail chain, it's a back and forth between you and Mr. Hughes

4    entitled "Privileged Confidential for Purposes of Settlement

5    Discussions".  And within it is an e-mail from Hughes to you --

6    I'm at page 391 where he forwards an e-mil from Stephen King.

7         Would you go there?

8    A.   Yes, I see it.

9    Q.   And this is an analysis that Barclays did of the ratios

10   we've been talking about, yes?

11   A.   I believe this was an analysis in connection with their

12   settlement proposal, but yes.

13   Q.   And when you read this, did you understand the analysis

14   that Barclays was undertaking was to use the haircut as a means

15   of discounting market value?

16   A.   Honestly, I recall referring this to Jeff Moore and asking

17   him to figure out what they were talking about.  And that's --

18   Q.   Maybe I can save us some time.  Did you understand it?

19   A.   To some extent, yes.

20   Q.   All right.  And when you understood it -- to the extent

21   you understood it, did you understand it to be an undertaking,

22   an exercise by Barclays, by Mr. Stephen King at Barclays, to

23   take the haircut and use it as a means of arriving at a

24   discount from market value?

25   A.   I'm not sure that's exactly how I understood it, but --

Page 168

```
 1    Q.    Roughly?

 2    A.    -- roughly, yes.

 3    Q.    Okay.  And you and I agreed before that a haircut is

 4    actually excess collateral in market -- measured by market

 5    value over and above the amount advanced, right?

 6    A.    Yes, that's how you've defined haircut and I'll accept it

 7    for purposes -- I mean, I don't define haircut exactly the same

 8    way, but --

 9    Q.    Well, we're agreed the amount against the loan is measured

10    by market value?

11    A.    Um-hum.

12    Q.    And we're agreed that the haircut, the amount over and

13    above, the amount advanced on the loan --

14    A.    Is to --

15    Q.    -- is measured by market value?

16    A.    Right.  And it's recognition of the risks that the

17    collateral faces and the counterparty faces.  It's both of

18    those.

19    Q.    And nothing about that definition suggests to you, you can

20    take the haircut piece, the excess piece, and discount the

21    other component by that percent?

22    A.    I don't understand that question, I'm sorry.

23    Q.    Did you understand that's what Mr. King was doing --

24    A.    No, I --

25    Q.    -- in this e-mail?
```

Page 169

1    A.    I don't think I did.

2    Q.    Did Mr. Moore ever suggest to you that's what Mr. King is

3    doing in this e-mail?

4    A.    I don't recall him suggesting that, but --

5    Q.    Now, if you would --

6    A.    -- I don't understand -- I don't recall it in those words.

7    Q.    Would you turn to tab 701 now, please?

8    A.    Um-hum.

9    Q.    And 701 is another e-mail between you and Mr. Hughes.

10    It's dated October 6th, it's in evidence.  And in it, you say

11    to Mr. Hughes, again, in the discussion of these ratios, "Your

12    ratio appears to be different, 'We actually loaned 46.1 billion

13    against the 50.6 billion.'"

14        Right?

15    A.    Right.

16    Q.    And my question to you about the 50.6 is, at this point,

17    the 6th of October, 2008, that's still the Fed's view of the

18    market value of the repo collateral in the Fed repo?

19    A.    Yes.  That's the view of the value that we assigned to

20    that collateral.

21    Q.    All right.  Market value?

22    A.    I'm not going to say market value or not because that term

23    has connotations in different contexts.  It's the value that we

24    assigned to it.  It's not a liquidation value, I'll grant you

25    that.

Page 170

1    Q.   Okay.  And will you grant me that it's market value within

2    the definition contained in --

3    A.   Yes.

4    Q.   -- Exhibit 705?

5    A.   Yes.

6    Q.   Okay.

7    A.   But that's my point is that that definition differs for

8    different people.

9    Q.   Okay.  And that definition refers to market value being

10   determined as made available to the bank by a recognized

11   pricing service which bank uses for pricing such security?

12   A.   Correct.

13   Q.   And in this case, that would be JPMorgan Chase, your

14   collateral agent, right?

15   A.   Correct --

16   Q.   And so --

17   A.   -- they used a pricing service.

18   Q.   -- the 50.6 is the market value ascribed by your agent

19   within the terms of the Fed's definition of market value?

20   A.   Correct.

21   Q.   Okay.

22   A.   That works.

23   Q.   Now, just maybe lastly before we take our break, I have

24   one other document that I want to ask you about.

25        While you're having these discussions with Mr. Hughes

08-13555-mg    Doc 11279    Filed 09/08/10    Entered 09/13/10 15:33:59    Main Document
LEHMAN BROTHERS HOLDINGS INC.
Pg 171 of 179

Page 171

1    about the dispute with JPMorgan Chase, who's right and who's

2    wrong, and who's accusing who of what, and who's accusing who

3    of fraud, did he ever relay to you that accusations had been

4    made by JPMorgan Chase against Barclays?

5    A.    Well, I knew from JPMorgan Chase directly that --

6    Q.    Okay.

7    A.    -- they were making accusations that Barclays hadn't lived

8    up to what they understood to be Barclays' intentions.

9    Q.    All right.  Would you take a look in your book at what's

10    been marked and is in evidence as Exhibit M-360?

11        Now, M-360 in evidence, Ms. Leventhal, is a letter sent by

12    Jamie Dimon at Chase to John Varley at Barclays.  And you'll

13    see from the cover that it's the very first page.  It's on an

14    e-mail also forwarded to Mr. Hughes.

15        Do you see that?

16    A.    Yes, I do.

17    Q.    All right.  In the course of -- and it's dated October

18    11th.  That's roughly in the middle of the October time you're

19    communicating with Mr. Hughes?

20    A.    Um-hum, yes.

21    Q.    All right.  And have you ever seen this letter before?

22        MR. SCHILLER:  Your Honor, before that question's

23    answered, I just want to clarify for the Court that this has

24    not been admitted for all purposes as the Court may recall.  I

25    want the witness to know this is admitted for the limited

Page 172

1    purpose of showing J.P. Morgan had already made the statements

2    included.  Barclays' counsel simply said, admit it, and it is

3    admitted with a limited purposes pursuant to Your Honor's

4    order.

5              MR. GAFFEY:  I take the point, Your Honor.  It doesn't

6    affect my question.

7              THE COURT:  Okay.

8    Q.   Have you ever seen this document before?

9    A.   I don't believe that I have.

10   Q.   And did Mr. Hughes ever tell you that a letter like this

11   had come in from Mr. Dimon?

12   A.   I don't recall.  I know that there were discussions and I

13   know that Mr. Hughes communicated his understanding of Chase's

14   position.  We got information from Chase directly as to its

15   position.  I don't recall whether it was ever told to me that

16   there had been this letter.  It may have been, I just don't

17   know.

18   Q.   Well, take a look again if you would.  And, again, not for

19   the truth, just for the fact that it was said.  At page 5 of

20   Mr. Jamie Dimon's letter, top paragraph --

21   A.   Okay, yes.

22   Q.   And the top paragraph on that page says, "On Friday night

23   for the first time as far as we know, the Bankruptcy Court was

24   apprised of a different deal between Barclays Capital and

25   Lehman brothers.  And that Barclays Capital was no longer

Page 173

1    purchasing seventy billion in assets and assuming sixty-nine

2    billion in debt.  But the Court was not apprised of the

3    purchase that Barclays Capital now says it agrees to make.

4    Instead, the Court, being told that Barclays Capital" --

5    "instead of the Court being told that Barclays Capital was

6    purchasing approximately 49.7 billion in securities for 45

7    billion in cash.  The Court was told that Barclays Capital was

8    purchasing 47.4 billion in securities for 45 billion in cash.

9    In addition, the Court was told that the reason for the change

10   was deterioration in market prices, an explanation that we now

11   know to be incorrect."

12       Now, do you recall we spoke a bit before about the 49.7 --

13   A.   Um-hum.

14   Q.   -- issue with regarding to the value of the repo

15   collateral?

16   A.   Yes.

17   Q.   And my -- I don't want you to comment one way or the

18   other; I'm not asking you to comment one way or the other about

19   the truth of Mr. Dimon's statement.  But while you were

20   involved in this mediation role, trying to sort out this

21   dispute between two members of your regulated community, did

22   Mr. Hughes ever tell you that Jamie Dimon was accusing Barclays

23   of misleading the Court?

24   A.   I don't recall that he ever said that Jamie Dimon was

25   accusing Barclays of misleading the Court, but I will tell you

Page 174

1    that Chase accused Barclays of misleading the Court.  And --

2    but then, subsequently, changed that.  So --

3    Q.   All right.  And at the time before they changed, I take it

4    what you just said is that Chase, in the course of these

5    discussions you were having with the banks, says that, says the

6    Bankruptcy Court was mislead.

7    A.   Not exactly in those words, but --

8    Q.   Something you understood to mean --

9    A.   -- they questioned --

10   Q.   -- that?

11   A.   No.  It was -- they questioned whether the represent --

12   whether -- what Barclays was seeking in settlement was

13   consistent with what had been represented to the Court.

14   Q.   And you understood that to be Chase making an accusation,

15   direct or veiled, that the Court was mislead at the sale

16   hearing about what Barclays got?

17   A.   I wouldn't say that they were making an accusation direct

18   or veiled, what I would say is that Chase was concerned that

19   there -- you -- that the settlement offer that Barclays was

20   presenting wasn't consistent with what had been presented to

21   the Court.

22   Q.   And what steps did the Fed take to determine whether or

23   not that was so?

24   A.   We were looking at this, again -- our view was that what

25   was represented toe h Court may have been under less than

Page 175

1    perfect circumstances.  There was clearly a lot that went on

2    over the course of that week and that weekend that were, you

3    now, a bit of confusion.  There was clearly clarification that

4    was required.

5        Our concern was that the agreement that Barclays made,

6    which was to finance Lehman and to take us out, that the

7    settlement complied with the ratios and with the terms of that

8    deal because we believed that that's what had been represented

9    to the Court as to what was going to happen.

10   Q.   So the Fed made sure that its deal with Barclays was

11   abides by and that the ratios were the same, that take out

12   agreement?

13   A.   Well, we felt that's what the agreement had been, that's

14   what the parties understood and that's what we wanted to see

15   conveyed.

16   Q.   And the Fed did not view itself as having any role in

17   making sure a member of its regulated community had not mislead

18   the Bankruptcy Court?

19   A.   We didn't believe that there had been any intentional

20   effort to mislead the Bankruptcy Court.

21   Q.   What about a mistaken misleading of the Bankruptcy Court?

22   Did the Fed try and --

23   A.   I don't think we --

24   Q.   -- find out if that had happened?

25   A.   I don't think we believed there was any effort to mislead

Page 176

1 1 the Bankruptcy Court at this point in time.

2 2 Q. The question I asked is did the fed did to find out if

3 3 that had happened?

4 4 A. No.

5 5   MR. GAFFEY: Your Honor, this would be a good time to

6 6 take a break.

7 7   THE COURT: Let's break. We'll resume at -- tomorrow.

8 8 Tomorrow at 9:30 a.m.

9 9   MR. GAFFEY: Thank you, Your Honor.

10 10  (Proceedings concluded at 1:34 PM)

11 11

12 12

13 13

14 14

15 15

16 16

17 17

18 18

19 19

20 20

21 21

22 22

23 23

24 24

25 25

Page 177

1

2                          I N D E X

3

4    WITNESS                EXAMINATION BY        PAGE

5    Shari Leventhal        Mr. Schiller          6

6    Shari Leventhal        Mr. Gaffey            32

7

8                          E X H I B I T S

9    MOVANTS'               DESCRIPTION           PAGE

10   883                    Mr. Baxter's          47

11                          Statement to the

12                          FCIC

13   863                    Letter Stating New    51

14                          Terms for Access

15                          to PDCF

16   874                    Draft Agreement       71

17                          between FRBNY and

18                          Barclays and Cover

19                          E-mail

20   876                    E-mail with           74

21                          Revised Version of

22                          Agreement from Mr.

23                          Aman to Ms.

24                          Leventhal, Mr.

25                          Baxter, et al.

Page 178

| | | | |
|---|---|---|---|
| 1 | 844 | Memo from Ms. | 101 |
| 2 | | Brickler to people | |
| 3 | | in the Fed re | |
| 4 | | Lehman transaction | |
| 5 | 969 | Barclays answers | 106 |
| 6 | | to interrogatories | |
| 7 | 845 | E-mail from Hal | 113 |
| 8 | | Novikoff to Ken | |
| 9 | | Caputo | |
| 10 | 856 | E-mail chain | 156 |
| 11 | | starting from | |
| 12 | | Gerard LaRocca | |
| 13 | 846 | E-mail from | 166 |
| 14 | | Jonathan Hughes to | |
| 15 | | Shari Leventhal | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Page 179

1

2                      C E R T I F I C A T I O N

3

4

5    I, Dena Page, certify that the foregoing transcript is a true

6    and accurate record of the proceedings.

7

8

9    _____

10   Dena Page

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date:  September 8, 2010

18

19

20

21

22

23

24

25