Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9              Debtors.

10   - - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14              Debtor.

15   - - - - - - - - - - - - - - - - - - - - -x

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              September 8, 2010

21              9:36 AM

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

Page 2

1

2    CONTINUED EVIDENTIARY HEARING re (i) Motion of Debtor to Modify

3    the September 20, 2008 Sale Order and Granting Other Relief;

4    (ii) Motion of the Trustee for Relief Pursuant to the Sale

5    Orders or, Alternatively, for Certain Limited Relief Under Rule

6    60(b); (iii) the Motion of Official Committee of Unsecured

7    Creditors of Lehman Brothers Holdings Inc., Authorizing and

8    Approving (A) Sale of Purchased Assets Free and Clear of Liens

9    and Other Interests and (B) Assumption and Assignment of

10   Executory Contracts and Unexpired Leases, Dated September 20,

11   2008 (and Related SIPA Sale Order) and Joinder in Debtors' and

12   SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify

13   Sale Order; (iv) All Joinders Thereto and Related Adversary

14   Proceedings; and (v) Motion of Barclays Capital Inc. to Enforce

15   the Sale Order and Secure Delivery of All Undelivered Assets

16

17

18

19

20

21

22

23

24   Transcribed by: Dena Page

25

Page 3

1

2    A P P E A R A N C E S :

3    JONES DAY

4         Attorneys for the Movant, LBHI

5         222 East 41st Street

6         New York, NY 10017

7

8    BY:   ROBERT W. GAFFEY, ESQ.

9

10   HUGHES HUBBARD & REED LLP

11        Attorneys for Movant, James W. Giddens, SIPC Trustee

12        One Battery Park Plaza

13        New York, NY 10004

14

15   BY:   WILLIAM R. MAGUIRE, ESQ.

16        NEIL OXFORD, ESQ.

17

18   QUINN EMANUEL URQUHART & SULLIVAN, LLP

19        Attorneys for the Movant, Official Committee of Unsecured

20         Creditors

21        51 Madison Avenue, 22nd Floor

22        New York, NY 10010

23

24   BY:   JAMES C. TECCE, ESQ.

25        ERIC M. KAY, ESQ.

Page 4

1

2   BOIES, SCHILLER & FLEXNER LLP

3          Attorneys for Barclays Capital, Inc.

4          575 Lexington Avenue

5          New York, NY 10022

6

7   BY:   JONATHAN D. SCHILLER, ESQ.

8

9   BOIES, SCHILLER & FLEXNER LLP

10          Attorneys for Barclays Capital, Inc.

11          5301 Wisconsin Avenue NW

12          Washington, DC 20015

13

14   BY:   HAMISH P.M. HUME, ESQ.

15

16   STUTMAN TREISTER & GLATT LLP

17          Attorneys for Elliott Management

18          1901 Avenue of the Stars

19          12th Floor

20          Los Angeles, CA 90067

21

22   BY:   WHITMAN L. HOLT, ESQ.

23          ANTHONY ARNOLD, ESQ.

24          (TELEPHONICALLY)

25

1

2   ALSO PRESENT:   (TELEPHONICALLY)

3

4   MR. ANATOLY BUSHLER

5    For: FARALLON CAPITAL MANAGEMENT

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Be seated, please.

3            MR. GAFFEY:  May we proceed, Your Honor?  We asked Ms.

4    Leventhal to take the stand.

5            MR. SCHILLER:  We had one scheduling question if we

6    may ask before the --

7            THE COURT:  Sure.

8            MR. SCHILLER:  -- examination commences, Judge.

9            Because of the --

10           THE COURT:  But you can certainly come to the stand

11   while you ask that question.

12           MR. SCHILLER:  Mr. Gaffey and I, we're not clear as to

13   whether we could resume from 11:45 to 12:30 today and begin

14   with the next witness before lunch break.

15           THE COURT:  If you'd like to do it, that's fine.

16           MR. SCHILLER:  Thank you.  We would.

17           THE COURT:  Then we will.

18           MR. SCHILLER:  Thank you, Your Honor.

19               SHARI LEVENTHAL, WITNESS, PREV. SWORN

20                   CROSS-EXAMINATION, CONTINUED

21   BY MR. GAFFEY:

22   Q    Good morning, Ms. Leventhal.

23   A    Good morning.

24   Q    Before you is the ubiquitous book with your name on it.

25   If you could turn in that book to Exhibit 851.  And as you do

Page 7

1   that, the topic I want to address is a topic we were talking

2   about it a bit yesterday, and that is your exchanges with Mr.

3   Hughes -- well, with regard to the JPM issue.

4        And if you take a look at Exhibit 851, it is an e-mail

5   from Mr. Hughes to you, a copy to Mr. Baxter, and it contains

6   an e-mail chain that he has forwarded on to you.  Do you

7   recognize that document?

8   A    Yes, just let me read it again because --

9            MR. GAFFEY:  Your Honor, I move M-851 into evidence.

10           MR. SCHILLER:  No objection, Judge.

11           THE COURT:  It's admitted.

12  (Movant's Exhibit No. 851 was received.)

13  BY MR. GAFFEY:

14  Q    Now, Ms. Leventhal, Mr. Hughes begins in that e-mail and

15  commenting on the e-mail chain below by referring to an action

16  of J.P. Morgan that quote, looks actively prejudicial to our

17  interests, end quote.

18       Do you see that?

19  A    Yes.  May I read this, please?

20  Q    Sure.

21  A    Thank you.  It's been a while.

22       All right.  Yes, I see it.

23  Q    Okay.  You've had a chance to look the e-mail through?

24  A    Yes, I have.

25  Q    Why don't we start then at the first -- the earliest e-

Page 8

```
 1    mail in the chain at the bottom of the second page.

 2    A    Yes.

 3    Q    And that's an e-mail from Lindsee Granfield to Harold

 4    Novikoff with a copy to Robert Davis at Cleary.

 5         Do you see that?

 6    A    Yes, I do.

 7    Q    Now, Mr. Davis at Cleary, just for clarity, was Mr. Davis

 8    a member of the team that represented the fed or the team that

 9    represented Barclays?

10    A    The team that represented Barclays.

11    Q    Okay.  And in Ms. Granfield's e-mail, which Mr. Hughes

12    forwards to you, she begins by saying, I have just heard

13    something very disturbing, James Kobak, counsel for the

14    trustee, said that a meeting that he was having with

15    representatives of LBHI today, that LBHI brought up whether

16    there was some settlement in the offing between JPM and

17    Barclays, saying that JPM had told them of a settlement.  Kobak

18    said that the trustee did not reveal that a settlement was in

19    the offing before LBHI asked the question.  When did JPM tell

20    LBHI of the settlement, what was said, and why was this done?

21    This could be quite explosive, as to Barclays Capital.

22         Do you see that?

23    A    Yes, I do.

24    Q    All right.  And was there some -- at this time, this e-

25    mail chain -- well, this e-mail is dated November 21st, so
```

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 9 of 190

Page 9

1    we've moved down the chronological chain a little bit toward

2    the December settlement.  Was there some plan or effort to keep

3    the fact of the settlement negotiations from LBHI?

4    A    I don't recall an active decision.  I do recall that there

5    was concern about release of the specific securities involved,

6    because Barclays was still holding those in their portfolio,

7    and there was concern that disclosure of the securities would

8    impact Barclays' positions.

9    Q    Barclays' position --

10   A    In holding the securities that it was holding in its

11   portfolio.

12   Q    And if that were the reason, there was then a decision.

13   Maybe plan or strategy is too strong a point, but there was a

14   decision as late as November not to bring LBHI into the loop on

15   whatever discussions were going on concerning the JPM/Barclays

16   dispute?

17   A    I believe at that point there was discussion as to whether

18   the identity of the securities would be kept under seal,

19   whether there'd be an application made to the Court to keep it

20   under seal.  So at that point I don't believe it had been

21   disclosed.  But I don't think there was ever an intention that

22   there wouldn't be disclosure at some point prior to bringing it

23   to the Court.

24   Q    At some point.  My questions go more to this point, which

25   is around the 21st of November.  Ms. Granfield seems to be

Page 10

1    speaking not in terms of the identity of the particular

2    securities, but about the fact of the settlement negotiations

3    at all.  Did you understand that to be what she meant when she

4    said this could be quite explosive as to Barclays Capital?

5    A    I honestly don't know what she meant by that statement.

6    Q    Did you ever follow up to ask what Ms. Granfield meant

7    when she said this could be quite explosive as to Barclays

8    Capital?

9    A    As I just said, I understood from Mr. Hughes, from a

10   conversation with Mr. Hughes, I do recall that there was

11   definitely concern about disclosure of the securities that were

12   involved in the settlement.  And so as a result, that's my

13   recollection as to what the concern of disclosure was.

14   Q    Okay.  And so you don't have a recollection as you're here

15   today about the larger question that I've asked, which is

16   whether the plan was to keep LBHI out of the settlement

17   negotiations?

18   A    Well, they weren't a party to the settlement negotiations,

19   but in terms of whether to keep them out of knowledge of it,

20   no, I know that there was always an intention at some point

21   that they were going to have to be brought in.

22   Q    And the plan was, in fact, to tell them as late as

23   possible in the process, wasn't it?

24   A    No.  I don't think that was ever the plan.

25   Q    You'll see that in further up the chain Mr. Novikoff

Page 11

1  writes back and explains how he thinks LBHI found out about it,

2  and that's in his e-mail back to Ms. Granfield, a copy to Mr.

3  Davis.  Where he explains that J.P. Morgan has been seeking

4  information from LBHI as to the loans and other assets

5  underlying some very large ABCP and ABS positions.

6      And it's up on the screen there, you'll see that he

7  explains that there was a meeting, and that further in the e-

8  mail, we made a highly confidential presentation to Weil and

9  A&M on November 6th, as to the then current state of the

10  collateral liquidations at LBI.

11  A    Uh-huh.

12  Q    And then he says the following, unfortunately, the fact

13  that we have held approximately six billion collateral value of

14  securities from the liquidations stuck out like a sore thumb.

15  We disclosed that they were being held for a proposed

16  settlement, but did not give any of the terms or background

17  information.

18      Do you see that?

19  A    Yes, I do.

20  Q    Did you have any conversations yourself with Mr. Novikoff

21  about six billion in collaterals sticking out like a sore

22  thumb, and that's how Weil may have cottoned on to the fact

23  that there were settlement negotiations going on?

24  A    No.  I don't recall any conversations like that.

25  Q    And I take note that at this point in November, was it

Page 12

1    your understanding that J.P. Morgan Chase is valuing the

2    collateral piece here of the proposed settlement at $6 billion?

3    A    That's what it appears to say.

4    Q    Okay.  Now, further up in the chain, we come to the e-mail

5    -- well, Mr. Novikoff writes again and says, also, just to be

6    clear, none of the securities set aside were identified.  That

7    goes to your point, doesn't it, about the identity of the

8    particular securities at issue?

9    A    Correct.

10   Q    All right.  And then Mr. Hughes writes to you and

11   describes all this as actively prejudicial to our interests.

12        Do you see that?

13   A    Uh-huh, yes.

14   Q    And who did you understand Mr. Hughes to be referring to

15   when he talked about our interests?

16   A    Barclays' interests.

17   Q    All right.  And I see -- I note that Mr. Hughes has copied

18   no one other than you and Mr. Baxter from the fed.  You didn't

19   understand them to be talking about the joint interests of the

20   fed and Barclays, did you?

21   A    Absolutely not.

22   Q    And did you determine from Mr. Hughes why he believed it

23   was actively prejudicial to Barclays' interests that LBHI had

24   learned there were settlement discussions going on?

25   A    Well, as the e-mail continues to say, it makes all the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 13

1    more critical -- crucial the need to file the motion.  Again,

2    that was the motion to put the identity of the securities under

3    seal, which is consistent with what I've been saying, which is

4    the concern was, that those security identifies, the CUSIPs

5    would be disclosed, that in turn, would affect Barclays'

6    ability to manage that portfolio.

7    Q    Was the concern that LBHI might have questions about the

8    settlement and what it was about, and what the underlying

9    dispute was?

10   A    That was never a subject of discussion that I had with

11   anyone.

12   Q    So your understanding of Mr. Hughes is urging that the

13   motion be filed as soon as possible, and under seal, if we can,

14   doesn't read to you as if Mr. Hughes wants to move quickly

15   under seal and not bring LBHI into the loop before all that's

16   done?

17   A    The idea as I understood it, was for filing with respect

18   to requests that we file the identity of the securities under

19   seal.  That's my recollection.

20   Q    And before I move on to another document, --

21   A    Uh-huh.

22   Q    -- as we've talked about this document --

23   A    Uh-huh.

24   Q    -- as you've looked at it more, you don't have -- do you

25   any other explanation for why Ms. Granfield would've thought

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 14

1   this was all potentially explosive as to Barclays Capital?

2   A    Not that I recall.  My recollection was the securities.

3   There may have been something else, but my recollection was the

4   securities.

5   Q    And you don't recall following up on that sentiment, of

6   trying to find out why it was potentially explosive to Barclays

7   Capital?

8   A    No.  I remember having discussions with Mr. Hughes about

9   the securities.

10  Q    Now, further into November, by a couple of days, and I'd

11  ask you to turn now to Exhibit 849, you'll find there an e-mail

12  from you to Mr. Hughes entitled follow-up, dated November 25th,

13  '08.

14  A    Yes.

15  Q    Would you take a look through it sufficiently to tell me

16  whether you recognize the document?

17  A    Yes, I do.

18  Q    All right.  And that's an e-mail that you sent to Mr.

19  Hughes attaching a draft of the declaration that ultimately

20  came to be filed in the settlement motion, yes?

21  A    Yes.

22       MR. GAFFEY:  Your Honor, I move Exhibit M-849 into

23  evidence.

24       MR. SCHILLER:  No objection.

25       THE COURT:  It's admitted.

1    (Movant's Exhibit No. 849 was received.)

2    BY MR. GAFFEY:

3    Q    Now, Ms. Leventhal, we talked a bit yesterday about the

4    fed's role as a -- and again, I'm using Mr. Schiller's word,

5    mediator here.  I note that your e-mail does not copy anybody

6    from J.P. Morgan Chase.  Did you send a draft of your e-mail of

7    your declaration to J.P. Morgan Chase at any point?

8    A    Yes, we did.

9    Q    And you did that after Mr. Hughes had had an opportunity

10   to look at it and suggest changes of his own; isn't that right?

11   A    No.  Actually, I believe we had sent it to the trustee,

12   and I believe the trustee had shared it with Chase.  The

13   trustee also gave me the okay to share it with Mr. Hughes.  We

14   weren't going to share it with either of the parties until the

15   trustee said it was okay, because it was the trustee's motion

16   that we were supporting.

17   Q    I will tell you, we had a small discussion about this

18   yesterday --

19   A    Uh-huh.

20   Q    -- and I've gone -- we'll mark in a moment.  I've gone

21   back and checked the document productions.

22   A    Uh-huh.

23   Q    And we find -- and I'll show it to you.  The earliest we

24   have found who's sending your declaration to Mr. Novikoff is in

25   early December.  So the reason -- that's the reason why I ask

08-13555-mg   Doc 11281   Filed 09/10/10   Entered 09/13/10 15:46:36   Main Document
Pg 16 of 190
LEHMAN BROTHERS HOLDINGS INC., et al.

Page 16

1    the following question.

2    A    Uh-huh.

3    Q    Was the process that was followed here, Mr. Hughes gets to

4    look at the declaration, makes his suggestions, and that

5    revised declaration is sent off to J.P. Morgan Chase?

6    A    My recollection is we shared the declaration with the

7    trustee.  The trustee then said that it was all right if we

8    shared it with Mr. Hughes, because apparently, as I think is

9    reflected in here somewhere, there was some communication back

10   and forth between the trustee, and Mr. Hughes had some concerns

11   about the accuracy of something that was in the declaration.

12       I don't recall the timing precisely, but there was never a

13   plan as to how it was going to be shared.  It was our view that

14   it was the trustee's call as to when this was shared with the

15   parties.

16   Q    And apart from whether you remember it wasn't planned, do

17   you remember one way or the other whether that was, in fact,

18   the sequence?

19   A    No, I don't remember.

20   Q    All right.  And if you would turn now please to Exhibit

21   848 -- actually, just before you do, would you take a look at

22   paragraph 12 of your draft that you sent to Mr. Hughes?

23   A    Uh-huh.

24   Q    And one thing we talked about a bit yesterday was in

25   paragraph 12, which is at page 76404 -- there you go.

1    A    Uh-huh.

2    Q    Whether or not Mr. Hughes has suggested any changes

3    regarding revealing the ratio of cash to collateral.  Do you

4    recall that?

5    A    Yes.

6    Q    And you pointed me to this paragraph and what was the

7    final, where you say, this ratio is consistent with the ratio

8    of cash and collateral, et cetera.

9         Do you see that?

10   A    Yes, I do.

11   Q    All right.  I'd just like you to keep that paragraph in

12   mind as we move on to the next exhibit.

13   A    Okay.

14   Q    And the next exhibit is 848.

15   A    Okay.

16   Q    Now, 848, Ms. Leventhal, again is an exchange between Mr.

17   Hughes and you, and it's an e-mail from Jonathan Hughes to you

18   dated November 28th, 2008.

19        Do you see that?

20   A    Yes.

21   Q    Again, I'll ask you to take a look at it and tell me

22   whether you recognize it to be correspondence between you and

23   Mr. Hughes?

24   A    I do.

25        MR. GAFFEY:  And, Your Honor, I move in Exhibit 848.

Page 18

```
 1            MR. SCHILLER:  No objection.

 2            THE COURT:  It's admitted.

 3    (Movant's Exhibit No. 848 was received.)

 4    BY MR. GAFFEY:

 5    Q    Now, Ms. Leventhal, in this e-mail, Mr. Hughes sends back

 6    to you some suggested changes to your drafts.

 7            Do you see that he's saying that there?

 8    A    Yes, I do.

 9    Q    All right.  And the copy that's attached at least to this,

10    and I'm not sure if it's a function of how documents are kept

11    on our system or Mr. Hughes', but it's not black lined.

12    A    Right.

13    Q    But take a look at paragraph 12 if you would.

14    A    Yes.

15    Q    And you'll see that it says here, the ratio was

16    consistent, and that's the same paragraph 12 that we spoke

17    about a moment ago, right?

18    A    Yes.

19    Q    Okay.

20    A    And the word collateral is changed to the word securities,

21    yes, I see that.

22    Q    Yes, okay.

23            Now, did you take the changes that Mr. Hughes suggested in

24    your affidavit?

25    A    I don't believe I took all of them, but I do recall that
```

Page 19

1    he had an issue with using the word collateral, and I brought

2    it to some of our -- some lawyers who are more expert in repos

3    than I am, and asked them what their view was.  And they, as I

4    recall, took the position that he was correct, that collateral

5    really wasn't the most accurate word to use in connection with

6    a repo and the appropriate term would've been securities,

7    because it's a repurchase agreement, not a loan.

8    Q    Okay.  Now, I have to confess to error here, I asked you

9    to keep the wrong paragraph in mind.  Could you turn back to

10   849 for a moment?

11   A    Sure.

12   Q    And within 849, which is the draft that you sent off to

13   Mr. Hughes, take a look at paragraph 9.

14   A    Yes.

15   Q    Okay.  And in the last sentence of paragraph 9 of that

16   draft, which you sent to Mr. Hughes --

17   A    Uh-huh.

18   Q    -- the last sentence said, in total, the New York Fed had

19   loaned LBI $46.22 billion in cash and treasury securities

20   against 50.62 billion in collateral, reflecting a 1 to 1.1

21   ratio of cash or cash equivalents loaned to non-cash collateral

22   received.

23        Do you see that?

24   A    Yes, I do.

25   Q    All right.  And then if you'd turn to 848 --

Page 20

```
 1    A     Uh-huh.

 2    Q     -- again to that paragraph, and again look at the last

 3    sentence.  One of Mr. Hughes' suggestions was to remove the

 4    reference to the specific ratio; is that right?

 5    A     Yes, I believe that is right.

 6    Q     And that's a change that you took in the -- that you put

 7    -- that made its way all the way into the final of your

 8    declaration.

 9    A     That's correct.  And in part that was because I wasn't

10    comfortable making a declaration as to the ratio, because there

11    was some concern as to how that had been calculated.

12    Q     All right.  And Mr. Hughes, apparently, was uncomfortable

13    with it, too, because he's the one that suggested it come out.

14    A     He did.  But I will be honest with you, that we were

15    debating whether that was to stay in for a while.  I had talked

16    to the same people that I was talking to about the word

17    collateral weren't comfortable, I wasn't a hundred percent

18    comfortable as a lawyer making that kind of an assertion, so.

19    Q     Well, the word collateral's still in there.  My question

20    goes to this --

21    A     Yeah, because they were fine on that.

22    Q     My question goes to the removal of the --

23    A     Yep.

24    Q     -- specific ratio.

25    A     Exactly, yeah.
```

Page 21

1    Q    And do you have a recollection of the degree to which you

2    accepted the changes that Mr. Hughes suggested in your

3    declaration?

4    A    I don't recall.  I mean, they were fairly minor changes as

5    I remember.  I remember the collateral securities issue in

6    particular, because I remember raising that with people.  I

7    don't offhand remember the rest of them, but I don't think they

8    were particularly extensive.

9    Q    Okay.  Would you take a look in your book at Exhibit M-850

10   -- M-885?

11   A    Yes.

12   Q    Now, I will tell you, Ms. Leventhal, I'm going to offer

13   this document as a demonstrative.  We prepared this in our

14   office, and it's a black lined version that --

15   A    Uh-huh.

16   Q    -- compares the version Mr. Hughes sent back to you

17   against the version that you sent to him.

18   A    Uh-huh.

19   Q    And the black line indicates the changes that were made.

20   A    Uh-huh.

21   Q    Can you take a look through that, and tell me whether this

22   -- let's just leaf through the pages a little bit.

23        Go to page 2, you'll see he's made a change in paragraph

24   3.

25   A    Yep.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 22

```
 1    Q     And go to page three, and you'll see he's made changes in

 2    paragraphs 8 and 9.

 3    A     Right.

 4    Q     And if you go to page 4, you'll see he's made changes in

 5    paragraphs 10, 11, 12 and 14?

 6    A     Honestly without going line-by-line through what he sent

 7    me and what I had sent him, I can't actually tell you if this

 8    is correct, but if you're telling me you did it, I'm not -- it

 9    looks about right, in terms of number of changes that were

10    proposed.

11          MR. GAFFEY:  Okay.  Your Honor, I offer this for

12    demonstrative purposes only.

13          MR. SCHILLER:  Your Honor, we haven't had a chance to

14    do this comparison.

15          THE WITNESS:  Right.

16          MR. SCHILLER:  We prefer to do that before readily

17    agreeing to its admission.

18          THE COURT:  I'm sorry.  What was that?

19          MR. SCHILLER:  I would prefer to have the opportunity

20    to check a demonstrative like this --

21          THE WITNESS:  Yeah.

22          MR. SCHILLER:  -- before I readily agree.  The witness

23    can't tell and I can't tell.

24          THE COURT:  Fine.  Why don't we do this.  It's being

25    offered for demonstrative purposes only, subject to the ability
```

Page 23

1    of Barclays through counsel to verify that this is, in fact, a

2    fair representation of the changes made in the drafts, and I'm

3    going to accept it, subject to such modification as may be

4    required upon a further check, but it's really just for

5    illustrative purposes and nothing more.

6            But if it turns out that there's some mistake made in

7    the black lining we'll find  --

8            MR. GAFFEY:  If there's a mistake.

9            THE COURT:  -- that out soon enough.

10   (Movant's Exhibit No. 885 was received.)

11           MR. GAFFEY:  Thank you, Your Honor.

12   BY MR. GAFFEY:

13   Q    Would you turn to paragraph 24?

14   A    Just looking -- just offhand looking at this --

15   Q    Uh-huh.

16   A    -- some of the change, I don't know if you're trying to

17   say that these were the changes he proposed that we took,

18   because there are changes in here that are not in the final

19   declaration.

20   Q    Yeah.  These are the changes that Mr. Hughes proposed.

21   A    Oh.

22   Q    Okay?

23   A    Okay.  So --

24   Q    I could, if you want to take the time, I can highlight the

25   ones that wound up in the final.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 24

```
 1   A    All right.  Well, I don't have a view on that.  If you

 2   want to do it, go right ahead, but.

 3   Q    Well, I think I won't take your time, and whatever I want

 4   to argue about that, I can argue later.

 5   A    Okay.

 6   Q    All right.  So this reflects the changes from Mr. -- from

 7   your draft --

 8   A    Uh-huh.

 9   Q    -- that Mr. Hughes put --

10   A    Right.

11   Q    And we've agreed that the change with regard to removing

12   the specific collateral ratio is one that wound up in the

13   final, right?

14   A    Correct.

15   Q    And I'll ask you again, I'll ask you to take a look at

16   paragraph 24, where it reflects Mr. Hughes proposed a change to

17   the last sentence.  It read in your version, and I'll read

18   without the black line, it is also in the New York Fed's

19   opinion consistent with what Barclays intended to represent to

20   the Court in the clarification link.

21        Do you see that through the black line?

22   A    Yes.

23   Q    And what Mr. Hughes suggest it be changed to, is it also

24   in the New York Fed's opinion consistent with the intent of the

25   clarification letter.
```

Page 25

 1    A     Correct.

 2    Q     And do you remember if you took that change in the final?

 3    A     I believe I did.

 4    Q     All right.  And do you know why Mr. Hughes wanted to

 5    remove a reference to what Barclays intended to represent to

 6    the Court?

 7    A     No.  I think, though, from my perspective it was cleaner,

 8    the language looked cleaner, and I didn't really see any

 9    difference in the meaning.

10    Q     So I take it you had no conversation that you recall with

11    Mr. Hughes about the change where he took out a reference to

12    Barclays' --

13    A     No.

14    Q     -- intention to represent something to the Court?

15    A     No.  The only discussion I recall specifically is on the

16    collateral versus securities, because he felt strongly that it

17    was the wrong word.  I wasn't convinced.  I went to people, and

18    so I do recall that.  I don't recall this particular change,

19    because it didn't seem significant in any way.

20    Q     I'd like to move a little further along in time toward the

21    December settlement, and ask you to turn to Exhibit M-850 in

22    your book.

23          Now, Exhibit 850, Ms. Leventhal, is another e-mail from

24    Jonathan Hughes to you in an e-mail chain below, same question.

25    Would you look through it and tell me sufficiently whether you

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 26 of 190

Page 26

1    recognize it?

2    A    Okay.  Yes.

3            MR. GAFFEY:  All right.  And, Your Honor, I offer

4    Exhibit M-850 into evidence.

5            MR. SCHILLER:  No objection, Judge.

6            THE COURT:  It's admitted.

7    (Movant's Exhibit No. 850 was received.)

8    BY MR. GAFFEY:

9    Q    Now, Ms. Leventhal, if you would turn to -- again, I want

10    to move sequentially, so go to the last e-mail in the chain.

11    A    Yes.

12    Q    And it's an e-mail from you to Jonathan Hughes.

13    A    Uh-huh.  Uh-huh.

14    Q    In which you say, here is the current version of my

15    declaration.  As you will see, I accepted most of your proposed

16    changes.  And then you referred to Jeff Moore (ph) reviewing

17    suggested edits to his declaration.

18    A    Uh-huh.

19    Q    And while he thinks they are fine, he would like to see

20    the actual Schedule A, et cetera, et cetera.

21        Do you see that?

22    A    Yes, I do.

23    Q    Do you recall that the fed put in two affidavits in

24    connection with the December settlement motion?

25    A    Yes, I do.

Page 27

1    Q    And one was yours and one was Mr. Moore's; is that right?

2    A    Correct, yes.

3    Q    And what did Mr. Moore do?  What's his job?

4    A    As I think I said yesterday, he was the valuation person

5    in our markets group and --

6    Q    And do you know what changes Mr. Hughes suggested to the

7    declaration of the valuation guide from the feds?

8    A    I certainly don't recall them now.

9    Q    Have you seen copies of the changes Mr. Hughes suggested

10   to Mr. Moore's declaration?

11   A    I'm sure I did at the time, but I have no recollection as

12   to what they were now.

13   Q    Do you know where those documents would be now?  I have

14   not seen them?

15   A    I don't know.  Mr. Moore's e-mails may not have been on a

16   litigation hold at that point, so I'm not sure that they still

17   exist, but we can look.

18   Q    So -- now further up in the chain, Mr. Hughes responds to

19   you, and he's checking the schedule, that's what you referred

20   to and Mr. -- with regard to Mr. Moore's declaration, he says

21   he'll send it.

22        And then in the second paragraph he says this, on the

23   assumption that the two fed affidavits and our affidavit can be

24   concluded today, do you think we can shoot for a filing on

25   Wednesday?  We may need to have a meeting with LBHI just ahead

Page 28

1    of the filing, but my hope is that all parties might be able to

2    do that tomorrow.

3         Do you see that?

4    A    Yes, I do.

5    Q    All right.  And again, we have -- now, this is on December

6    1st, 2008.  Do you know if LBHI has yet been brought into the

7    loop that there's a settlement in the offing?

8    A    I don't know, although it does sound like the file, you

9    know, you showed me said that they had -- that they were aware

10   that there was a settlement in the offing.  I don't know what

11   they knew or when they knew it.

12   Q    Let's distinguish between two things.  I'm not asking you

13   whether LBHI began to figure out there might be settlement

14   discussions.

15   A    Uh-huh.

16   Q    I'm asking if anybody in this conversation, between you

17   and Mr. Hughes --

18   A    Uh-huh.

19   Q    -- brought LBHI in the loop and told them there were

20   settlement discussions?

21   A    I certainly did not.  I don't -- I do recall the trustee

22   was having discussions.  I don't know when those took place in

23   the timeline.

24   Q    And you weren't party to those discussions?

25   A    No.

Page 29

1    Q    Okay.  And when Mr. Hughes sent you this suggestion that

2    we may have to have a meeting with LBHI just ahead of the

3    filing --

4    A    Uh-huh.

5    Q    -- did you know why he didn't want to have it till just

6    ahead of the filing?

7    A    I didn't get the sense that it was that he didn't want to

8    have it until just ahead.  It was just that he was in a hurry

9    to get the settlement done and was looking to have LBHI, if

10   they were going to be, it was going to be just ahead of it.  I

11   didn't take it as a plan, more as a fact of where we were in

12   the timeline.

13   Q    Well, the reason I ask is he doesn't say something like,

14   we should meet with LBHI as soon as possible.  He says, we may

15   need to have a meeting with LBHI just ahead of the filing.

16        Does that suggest to you that the plan was to keep LBHI

17   out of the loop until the last possible minute?

18   A    Well, given that the e-mail was sent on Monday, and he's

19   talking about filing on Wednesday, there doesn't seem to be a

20   whole lot of time in between those two, so.

21   Q    Well, it's a settlement that involves some seven billion

22   dollars, right?

23   A    Right.

24   Q    So with a seven billion dollar settlement, if you wanted

25   to get something done, you might pick up the phone and make the

Page 30

1    call on Monday, right?

2    A    I can't say what Mr. Hughes was thinking.

3    Q    So my question then is, in a seven billion dollar matter,

4    do you know why Mr. Hughes is writing to you that we may need

5    to have a meeting with LBHI just ahead of the filing?

6    A    Again, I didn't put any import on the just ahead, other

7    than that it was a temporal comment.

8    Q    Now, the next document I want to show you, Ms. Leventhal,

9    is not in your book.

10          MR. GAFFEY:  Can I have --

11          THE WITNESS:  I thought everything was in this book,

12   given the size.

13          MR. GAFFEY:  Your Honor, may I approach?

14          THE COURT:  Yes.  Thank you.

15   BY MR. GAFFEY:

16   Q    Now, Ms. Leventhal, Exhibit 887 is an e-mail from Robert

17   Davis to you with bccs, blind copies, to M. Huang at Boies

18   Schiller, Jonathan Schiller at Boies Schiller, Lindsee

19   Granfield at Cleary, and Jonathan Hughes at Barclays Capital.

20   A    Uh-huh.

21   Q    Do you see that?

22   A    Yes, I do.

23   Q    And it's regarding a declaration.

24   A    Yes.

25   Q    All right.  Now, would you take a look through this, again

Page 31

1    the same question, sufficiently to let me know whether you

2    recognize the document.

3    A     Yeah, I recognize it, it's an e-mail chain.

4          MR. GAFFEY:  All right.  Your Honor, I move M-887 into

5    evidence.

6          MR. SCHILLER:  No objection.

7          THE COURT:  It's admitted.

8    (Movant's Exhibit No. 887 was received.)

9    BY MR. GAFFEY:

10   Q     Now, Ms. Leventhal, here we have Mr. Davis, who's

11   representing Barclays, saying to you, I cannot sign on that

12   change tonight without first speaking to Hughes and others.  I

13   will try to revert to you about this first thing in the

14   morning, assuming I catch Hughes in time.  Please do not

15   circulate this to anyone else until I'm able to obtains

16   Barclays' views, thanks.

17         Do you see that?

18   A     Yes, I do.

19   Q     Do you recall the context of this conversation, this e-

20   mail conversation?

21   A     I recall that we had received a mark-up or some kind of

22   requested change from counsel for JPMC.  I believe the change

23   had to do with how the account that was Chase's account at

24   JPMC, the account that had been holding the seven billion, how

25   that was characterized in the declaration.

Page 32

1        I recall JPMC wanted to characterize differently.  We

2    didn't have a problem with their proposed characterization, but

3    we wanted to make sure that Barclays was also comfortable with

4    it, since we would be characterizing an account that was theirs

5    too.  So we sent it to Barclays.  I sent it to Robert, I guess,

6    and I guess this was his response.

7    Q    And do you know why Mr. Davis -- that's who you mean by

8    Robert, right?

9    A    Yes.

10   Q    All right.  Do you know who Mr. Davis -- why Mr. Davis

11   bcc'd Ms. Granfield, who was counsel to Barclays, and Mr.

12   Schiller, who by now is counsel to Barclays, and Mr. Hughes?

13   A    No, I don't know why, although I can take an educated

14   guess.

15   Q    I'm not going to ask you to do that.  I just want to know

16   what your personal knowledge is.  You don't know why?

17   A    No, I do not.

18   Q    All right.  And you'll see at the bottom of this first

19   page, just to put this e-mail into context is an e-mail from

20   Mr. -- from you to Mr. Davis --

21   A    Uh-huh.

22   Q    -- where you say, Bob, Hal Novikoff proposed the changes

23   reflected in the attached mark-up.  I have no objection to the

24   characterization to be counted to you.  And that's the e-mail

25   to which Mr. Davis is responding, saying he's got to check with

Page 33

1    Hughes, and don't share it with anybody else until I do, right?

2    A    Right.

3    Q    Okay.  Now, if you would take a look at the -- we're on

4    the 2nd of December now.  You see that from the top of the e-

5    mail, right?

6    A    Yes.

7    Q    And that's also the date of your e-mail to Mr. Davis at

8    Cleary, right?

9    A    Correct.

10   Q    All right.  Now, take -- and you attach the mark-up that

11   you received from Mr. Novikoff at Wachtell, right?

12   A    Yes.

13   Q    And he's counsel to J.P. Morgan Chase, yes?

14   A    Yes.

15   Q    Okay.  Take a look again at paragraph 9.

16   A    Yes.

17   Q    And you'll see that in a black line that Mr. -- well, just

18   so we know it's a black line, take a look, for example, at page

19   17.  I'm sorry, paragraph 17.

20   A    Yes.

21   Q    And paragraph 15 above it?

22   A    Right.

23   Q    And you see that there's black line changes there and

24   they're reflected both by a change in the wording and a line

25   down the margin.

Page 34

1    A    Yes.

2    Q    And a blank paragraph in there that would indicate no

3    changes on that particular text offered by Mr. Novikoff, right?

4    A    Correct.

5    Q    All right.  Take a look again at paragraph 9.

6    A    All right.

7    Q    And again, the last sentence there, there's no reference

8    in that sentence to the particular collateral ratios.

9    A    Correct.

10   Q    Does that indicate to you that Mr. Novikoff only got a

11   mark-up, a draft to mark up after Mr. Hughes was done with it?

12   A    No.

13   Q    Have you found any evidence of any earlier sharing of your

14   declaration with Mr. Novikoff than the draft that's attached

15   here?

16   A    I honestly don't know, because I again don't know when the

17   trustee shared a draft with Mr. Novikoff or with anyone at

18   Chase.  It may have been Steve Cutler.  I don't recall if we

19   shared it at any other point.  This just indicates this

20   particular draft that was going back and forth was the draft

21   that no longer had the ratio in it.

22   Q    Let me show you what we've marked as Exhibit 886.  Again,

23   not in your book.

24        MR. GAFFEY:  So if I may approach, Your Honor?

25        THE COURT:  Yes.

Page 35

1    Q    Now, Exhibit 886, Ms. Leventhal, is a copy of the same e-

2    mail, this time produced by the fed.  You'll be able to tell

3    that from the Bates numbers at the bottom.

4    A    Yes.

5    Q    Well, that one is not black lined.  Do you recognize that

6    document?

7    A    Yes.

8         MR. GAFFEY:  I move M-886 into evidence, Your Honor.

9         MR. SCHILLER:  No objection.

10        THE COURT:  It's admitted.

11   (Movant's Exhibit No. 886 was received.)

12   BY MR. GAFFEY:

13   Q    Now, Ms. Leventhal, I will represent to you, we've gone

14   through the fed's production, which you mentioned yesterday.

15   We did that last night.

16   A    Uh-huh.

17   Q    This is the earliest version we find of an e-mail -- of

18   that e-mail of anything sent to the fed.  Are you --

19   A    Right.

20   Q    -- in a position today to say that a draft was sent any

21   earlier than this one?  That is --

22   A    No.

23   Q    -- at any point before Mr. Hughes made changes to your

24   declaration?

25   A    I'm not in a position to say one way or another.

Page 36

1    Q    Okay.  Now, if you'd go back to 850.

2    A    Yes.  Okay.

3    Q    I wanted to ask you a question about -- this is back on

4    December 1.  I wanted to ask you a question about one more e-

5    mail in here, and that's yours to Mr. Hughes.  It's here on the

6    first page dated December 1.

7    A    Uh-huh.

8    Q    Where you say, thank you for the schedule, I will review

9    your affidavit as soon as you send it.

10        I take it you're referring there to a draft affidavit of

11   the Barclays person who's going to put in an affidavit?

12   A    Yes, that's why --

13   Q    And that we find out later, turns out to be Mr. Laraca

14   (ph), correct?

15   A    Correct.

16   Q    All right.  And you reviewed Mr. Laraca's declaration

17   before it was put in on the 7th?

18   A    I believe that's correct.

19   Q    All right.  And then you say the following in the bottom,

20   we will support an application to seal those portions of the

21   papers that we all agree should be sealed.  Tom does not think

22   calling the judge about the notice schedule is a good idea.

23        Do you see that?

24   A    Yes.

25   Q    And the Tom you referred to there is Mr. Baxter?

Page 37

1    A    Yes, it is.

2    Q    And do you have a recollection as to why Mr. Baxter

3    thought not calling the judge about a notice schedule was a

4    good idea?

5    A    I don't.  I remember there was some issue with scheduling

6    and we decided we didn't want to raise it, but I don't recall

7    what it was.

8    Q    Let me suggest to you that between keeping LBHI out of the

9    loop and between Mr. Hughes' urging that the meeting with LBHI

10   take place at the last minute, file as soon as possible, and

11   under seal, that the plan is to rush this motion through so it

12   gets as little comment as possible?

13   A    No.  I don't believe that was ever the plan.  In fact, I

14   know that was never the plan.

15        The sealing was with respect to the CUSIPs as I've said, I

16   recall that.  And then as far as the notion that we were

17   keeping something from LBHI, the motion was going to be filed,

18   LBHI was going to have an opportunity to respond to it.

19        I'm not sure I follow what your argument is here, other

20   than that  --

21   Q    Well, the plan was to get the motion on file before LBHI

22   got an opportunity to say anything about it, right?

23   A    No.  I don't think that was ever the plan, in fact, I note

24   we were saying we'll host -- we would be happy to host the LBHI

25   meeting.  But beyond that, it doesn't make sense, because if

Page 38

1    you're filing a motion, obviously any party can object to it,

2    so I'm not clear as to what we would've been keeping from LBHI.

3    Q    And beyond that, you're not able to tell the Court why Mr.

4    Baxter thought calling the judge about the notice schedule was

5    not a good idea?

6    A    Because I recall there was an issue that we were

7    discussing raising on the scheduling, and I think at the end,

8    we decided we were going to just go with whatever schedule the

9    judge said, and we weren't going to try to change.  Because I

10   think there were some concern about the holiday period

11   approaching, and we decided we were just going to go with it.

12   Q    Would you turn in your book --

13   A    But I don't recall specifically.

14   Q    I'm sorry to interrupt.  Would you turn in your book to

15   Exhibit 119.

16   A    Uh-huh.

17   Q    And 119 you'll see is a copy of the settlement motion

18   itself.

19   A    Right.

20   Q    And I show that to you just to secure your agreement that

21   was filed on or around the 5th of December 2008.

22   A    Correct.

23   Q    All right.  And would you turn now to Exhibit 858?

24   A    Yes.

25   Q    Actually, if you would instead, would you turn to 859.  I

1   had the number wrong.

2        Now, Exhibit M-859, Ms. Leventhal, is an e-mail from

3   Robert Davis at Cleary to you.  Take a look at it, please, and

4   tell me whether you recognize the document.

5   A    Yes, I do.

6   Q    And you recognize this to be correspondence between the

7   two of you about the settlement motion, yes?

8   A    Yes, I believe so.

9            MR. GAFFEY:  Your Honor, I offer M-859.

10           MR. SCHILLER:  No objection.

11           THE COURT:  It's admitted.

12  (Movant's Exhibit No. 859 was received.)

13  BY MR. GAFFEY:

14  Q    Now, Ms. Leventhal, in 859, the first paragraph is Mr.

15  Davis relating to you his understanding that Jonathan Hughes

16  sent you an e-mail with respect to the cryptic voice mail

17  message he received from Weil, --

18  A    Uh-huh.

19  Q    -- today indicating that they will not be objecting to our

20  settlement.  I believe Jonathan plans to speak to them directly

21  to confirm later today.

22       Do you see that?

23  A    Yes, I do.

24  Q    Did you ever get any further detail on that?

25  A    I don't believe I did or if I did, I don't remember what

Page 40

1    it was.

2    Q    And then the second paragraph asks, when would be a

3    convenient time Friday afternoon for Lindsee Granfield and

4    Jonathan Schiller to meet with you and your in-house counsel to

5    prep for the hearing.

6        Do you see that?

7    A    Yes, I do.

8    Q    Did you ever sit down with counsel for J.P. Morgan Chase

9    to be prepped for the hearing?

10   A    I don't believe I did, because I was scheduled to leave

11   for Colorado, and I recall I left with my family and then flew

12   back for the hearing, so I don't believe there ever ended up

13   being an opportunity to sit down to talk about the hearing.

14   Q    Okay.  Just so I understand your answer, are you saying

15   there was no opportunity to meet with Ms. Granfield and Mr.

16   Schiller?

17   A    Correct.

18   Q    All right.  Let me rephrase my question then.  Was there

19   ever any plan to sit down with anybody from Weil, Gotshal and

20   prep for the hearing?

21   A    No, there was not.

22   Q    Was there ever any plan to sit down with anybody from J.P.

23   Morgan Chase to prep for the hearing?

24   A    No.  And there was never a plan to meet with them because

25   it never happened.  They requested it and we couldn't do it.

Page 41

 1   Now, I don't recall if at the time we decided we didn't want to

 2   do it, which may have been the case, but we ultimately didn't

 3   do it.

 4   Q    Did you write back to anybody and say I don't want to meet

 5   with -- we're a mediator here, I don't want to meet with just

 6   one party to prep for the hearing.  Do you recall doing that?

 7   A    I don't recall whether we did or didn't.  I don't know.

 8   Q    Do you recall allowing to anybody involved that there was

 9   -- of asking why a proposal was made to meet with Ms. Granfield

10   representing Barclays and Mr. Schiller representing Barclays

11   and no one else to prep for the hearing?

12   A    If Chase had wanted to meet, I'm sure we would've had the

13   same reaction.  It would've been -- we weren't looking to favor

14   one side over another.

15   Q    Now --

16   A    We were looking to have the settlement approved because we

17   felt that it was in the best interests of all parties.

18   That's --

19   Q    Not quite what I asked.  What I asked is, whether you ever

20   expressed the sentiment at the time that you weren't going to

21   meet with counsel for only one party in this settlement, to

22   prep for the hearing?

23   A    I don't recall.  I know I never met with them.

24   Q    Would you turn to Exhibit 398, please?  At 398 you'll see,

25   Ms. Granfield (sic), which is in evidence, is the objection of

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 42 of 190

Page 42

1    the creditors' committee to the proposed settlement.

2        Do you see that?

3    A    Yes, I do.

4    Q    And I put that in front of you again just for a time post.

5    The motion's filed, then the creditors' committee objects

6    during December, and you recall that there was a hearing on the

7    22nd of December of 2008; is that right?

8    A    Yes.

9    Q    All right.  Now, do you recall being given to understand

10   that one of the objections of the creditors' committee that

11   ultimately was made to the settlement was, the fact that it

12   felt it didn't have enough information about the transaction?

13   A    I do recall that vaguely.

14   Q    Okay.  And do you recall that at the hearing, Mr. Miller

15   from Weil, Gotshal expressed similar sentiments?

16   A    That I don't recall, but I do recall the creditors'

17   committee.

18   Q    You do recall at the hearing the creditors' committee

19   saying they wanted to conduct further inquiry or investigation

20   into the facts concerning the sale transaction?

21   A    Yes, I do recall that.

22   Q    And you recall -- do you generally recall Mr. Miller also

23   saying that there wasn't enough information to approve the

24   settlement, although he wasn't going to object to it going

25   forward as long as rights were reserved?

08-13555-mg   Doc 11281   Filed 09/10/10   Entered 09/13/10 15:46:36   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 43 of 190

Page 43

1    A    Yeah.  That rings a bell.

2    Q    Okay.  And do you recall Mr. Schiller here agreeing with

3    that sentiment saying there was nothing about the settlement

4    that inhibited anybody's rights to investigate further or bring

5    claims?

6    A    I don't know.  I assume there's a transcript, though.

7    Q    And -- I'm asking what your recollection was.

8    A    I don't recall offhand sitting here now.

9    Q    All right.  But you did take note that the creditors'

10   committee was asking for information about the sale transaction

11   at the time, yes?

12   A    I don't know that I'd say I took note of it, but, yes, I

13   do have a recollection that that was the case.

14   Q    Okay.  Now, in the -- let me ask you to turn now to

15   Exhibit 860.  860 is an e-mail from Mr. Davis, who represents

16   Barclays, right?

17   A    Yep.

18   Q    To you dated December 19th, 2008.  Do you recognize it to

19   be a communication between you and Mr. Davis concerning the

20   settlement?

21   A    Yes, I see it.  I see the e-mail.  What is the question?

22   Q    Do you recognize the document?

23   A    Yes.

24   Q    Okay.

25        MR. GAFFEY:  Your Honor, I move in Exhibit M-860.

Page 44

1          MR. SCHILLER:  No objection.

2          THE COURT:  It's admitted.

3   (Movant's Exhibit No. 860 was received.)

4   BY MR. GAFFEY:

5   Q    Now, this is a -- if you read, take a look through here,

6   the discussion in here concerns your attendance or not at the

7   settlement hearing, right?

8   A    Correct.

9   Q    And it begins with Mr. Davis, Barclays' counsel, writing

10  to you saying, quote, I think the current plan subject to

11  seeing what the objections actually look like, is to have all

12  the witnesses present, unfortunately, because of the sense that

13  the judge doesn't like to be a rubber-stamp, and especially on

14  short notice, would not be pleased if the declarant for a $7

15  billion motion didn't appear.  We should discuss at four.

16       Do you see that?

17  A    Yes.

18  Q    Do you recall having a discussion on about the 19th of

19  December with counsel for Barclays about planning, with regard

20  to your attendance and potential testimony at the hearing?

21  A    Yes.  Because I recall that I was in Colorado.  They were

22  forecasting storms.  I was worried I wasn't going to be able to

23  make it, and I was -- certainly would've been happy not to have

24  to appear, given that I was flying back for it, but I

25  understood that the judge would likely want the declarants

Page 45

1    there.

2    Q    Okay.  And the question I have about this is, again, I

3    take note that it's only with Barclays' counsel you're having

4    this discussion?

5    A    And although I do recall also calling Steve Cutler and

6    letting him know there was a chance I wasn't going to be there.

7    Q    And in the final e-mail in the sequence, that is at the

8    top of the first page, after you've discussed the storm and the

9    potential travel issues and --

10   A    Uh-huh.

11   Q    -- Mr. Davis writes back, that's our thinking.  It looks

12   like creditors' committee at LBHI is putting in some sort of

13   general objection on the entire Barclays' deal, about the

14   entire Barclays' deal and wanting more time to investigate the

15   whole deal.  They plan to file an objection this afternoon.

16        Putting that aside, I think what we have in mind is just a

17   short statement from the fed, after statements from the trustee

18   and SIPC, just to the effect that the feds support the

19   settlement, et cetera.

20   A    Uh-huh.

21   Q    So, so long as no one is taking issue with the facts

22   underlying the declaration, it's hard to see any need to have

23   you testify at all, but you never know if the judge may want to

24   ask questions.

25        Do you see that?

08-13555-mg   Doc 11281   Filed 09/10/10   Entered 09/13/10 15:46:36   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 46 of 190

Page 46

```
 1    A    Yes, I do.

 2    Q    And did you have any similar conversations with other

 3    lawyers involved in the settlement, other than counsel for

 4    Barclays?

 5    A    I recall having a discussion with the trustee, with Jim

 6    Kobak from the trustee's counsel about my appearance and

 7    statement.  As I recall, the idea was that if there was going

 8    to be testimony, Barclays was going to be putting me up as a

 9    witness, so that I believe was why Mr. Davis was putting in the

10    statement about, you know, hard to see and need to have you

11    testify, because they were the ones who were going to be

12    putting me up.

13    Q    And again, not to beat a dead horse, no conversation with

14    LBHI?

15    A    No.

16    Q    All right.  And I'd ask you to please turn to --

17    A    I'm trying to remember if at some point prior to the

18    hearing, I feel like there was a point where I did get a call

19    from -- it might've been Mr. Miller asking some questions about

20    the settlement, but it's a vague recollection.

21    Q    Do you recall answering those questions?

22    A    If they were asked, I'm sure I answered them.  I'm just

23    trying to remember whether he was going to call or whether he

24    did, in fact, call, but I have a vague recollection of speaking

25    to him at some point about this.
```

1  Q   Okay.  And as you're recalling that, are you recalling too

2  Mr. Miller at the December 22nd settlement hearing saying that

3  while he wouldn't support the transaction because there were

4  additional questions that needed to be answered?

5  A   I recall that there were issues raised about preserving

6  rights, that I remember.  I don't recall specifically what he

7  said.

8  Q   And now would you turn, please, to Exhibit 852.

9      Now, Exhibit 852 again begins with an e-mail between Mr.

10 Davis at Cleary and you with copies to Lindsee Granfield and

11 Jonathan Hughes.

12     Do you see that?

13 A   Yes, I do.

14 Q   And do you recognize this as an e-mail exchange between

15 you and them, concerning the settlement motion?

16 A   Yes.

17         MR. GAFFEY:  And I offer Exhibit M-852, Your Honor.

18         MR. SCHILLER:  No objection, Your Honor.

19         THE COURT:  It's admitted.

20 (Movant's Exhibit No. 852 was received.)

21 BY MR. GAFFEY:

22 Q   Now, further down within the e-mail, Ms. Granfield,

23 there's an -- I beg your pardon, Ms. Leventhal.  There's an e-

24 mail from Ms. Granfield --

25 A   Uh-huh.

Page 48

1    Q    -- to a group of people including Mr. Schiller, Mr.

2    Caputo, Mr. Kiplok at Hughes Hubbard, others at Boies Schiller,

3    et cetera.

4        Do you see that?

5    A    Yes, I do.

6    Q    And --

7    A    And also Steve Cutler at J.P. Morgan.

8    Q    I see that, yes, good point.  And Wilton at Hughes

9    Hubbard, right?

10   A    Uh-huh.  Yes.

11   Q    Now, at this point, these are the proponents of the

12   settlement motion.

13   A    Correct.

14   Q    And I want to ask you about what's in the second paragraph

15   of that.

16   A    Uh-huh.

17   Q    Where it says, quote, we would also ask that the e-mail to

18   the creditors' committee counsel state that the revised order

19   addresses any concern about facts being binding for any issues

20   other than the approval of the settlement and the authorization

21   for the transfer of the settlement consideration to Barclays.

22       As to the creditors' committee, we think that the e-mail

23   should go on to say that the settlement parties are not willing

24   to agree to other demands of the creditors' committee, an order

25   requiring delivery by January 15th of a vast amount of

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 49 of 190

Page 49

1    information relating in general to the details of sale of

2    assets to Barclays Capital, Inc. in September, as that

3    information is irrelevant to the settlement under consideration

4    on Monday, and such requests were made for the first time to

5    the settlement parties on the afternoon of December 19th.

6        Nevertheless, the settlement parties are willing on an

7    informal basis to discuss with the creditors' committee after

8    the first of the year, reasonable requests for information

9    concerning the sale, that it has sought from LBHI and been

10   unable to obtain from LBHI.

11       Do you see that?

12   A    Yes.

13   Q    Okay.  Does that -- do you recall discussions taking place

14   about putting off until after the first of the year satisfying

15   a request from the creditors' committee for information about

16   the sale transaction?

17   A    I was not a party to those discussions.

18   Q    Well, you are a party to -- an e-mail was forwarded to you

19   about it.  Does that refresh your recollection as to whether

20   you understood this to be the case at the time?  The plan was

21   to put the creditors' committee request for information off

22   until after the first of the year?

23   A    That's what the e-mail seems to say.

24   Q    Finally, Ms. Leventhal, Mr. Schiller asked you yesterday

25   whether it was consistent with the fed's view of the deal that

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 50

1    Barclays might have some sort of accounting gain after the deal

2    was closed, and you gave him an answer along the lines of you

3    thought Barclays expected to do well out of the transaction.

4         Do you recall that?

5    A    What I said is that I assumed Barclays would expect to do

6    well.  They're a business, they wouldn't enter into a deal if

7    they didn't think that they were going to come out of it in a

8    good place for whatever reason that may be, whether it was an

9    accounting gain or some other kind of gain.

10   Q    At any point during those early days, we were talking

11   about yesterday, the early days of the deal, --

12   A    Uh-huh.

13   Q    -- the Monday, the Tuesday, the Wednesday of the week

14   after Lehman did that.

15   A    Right.

16   Q    Did it ever come to your attention, or did anybody ever

17   say to you that the deal was structured in a way to ensure

18   Barclays had a gain on the very first day?

19   A    No.

20        MR. GAFFEY:  Your Honor, I have nothing further for

21   Ms. Leventhal.  Thank you for your time.

22        THE COURT:  Thank you.

23        MR. MAGUIRE:  No questions, Your Honor.

24        MR. TECCE:  No questions.

25        THE COURT:  Redirect.

Page 51

1                    REDIRECT EXAMINATION

2     BY MR. SCHILLER:

3     Q     Good morning, Ms. Leventhal.

4     A     Good morning.  What book would you like me to have?

5     Q     For the moment, no book.

6     A     Okay.

7     Q     I would love -- like to begin on the issues of valuation,

8     which as an attorney you resisted yesterday somewhat,

9     particularly you recall counsel trying to press upon you

10    agreement over market value in connection with repo

11    collateral --

12    A     Uh-huh.

13    Q     -- and values assigned to it.

14    A     Yes.

15    Q     And with respect to that, do you recall that J.P. Morgan,

16    during the settlement process, provided valuation information

17    concerning the collateral that secured the fed as of September

18    17th?

19    A     Yes, I do.

20    Q     That was the last evening that the fed provided financing.

21    A     Yes.

22    Q     And counsel asked you what the fed's view of the market

23    value was of the 50.6 billion that was assigned to that

24    collateral.  And you said to counsel in response to his

25    question, I'll read you his question:

Page 52

1      So my question to you about the 50.6, at this point, the

2   6th of October, it's still the fed's view -- that it's still

3   the fed's view of the market value of the repo collateral in

4   the fed repo, referring to the 50.6.

5      And you said in response, it is the view of the value we

6   assigned to that collateral.

7   A    Uh-huh.

8   Q    And he went on and said, all right, market value?  And you

9   said, I'm not going to say market value or not, because that

10  term has connotations in different context.

11     And then he said, well, what about pricing services, don't

12  they determine market value?  And you resisted again, and you

13  said, my point is that the definition is different for

14  different people.

15  A    Uh-huh.

16  Q    Now, one reason that you resisted agreeing that market

17  value was ascribed to the 50.6, is that J.P. Morgan had told

18  you and the trustee and Barclays, during the settlement

19  process, that the pricing services for J.P. Morgan's marks on

20  the 17th of September, the marks of the securities in the fed

21  repo, were not reliable indicators of realizable value.

22  A    Correct.

23  Q    J.P. Morgan told you in substance that the collateral for

24  many of the securities that made up the September 17th fed repo

25  list were illiquid structured debt instruments, with assigned

Page 53

1    overstated values, correct?

2            MR. GAFFEY:  Your Honor, I haven't made many leading

3    objections, but this is really leading.

4            THE COURT:  Sustained, without prejudice to making

5    further objections in the future if you're so moved.

6            THE WITNESS:  I'm not sure about the last statement

7    that you made.  I don't recall that.  I do recall that even our

8    own markets people, when we were trying to analyze what

9    securities Barclays had received versus what we had and the

10   differences, pointed out that valuation --

11           THE COURT:  How did that happen?  I just sustained an

12   objection and you're answering the question.

13           THE WITNESS:  Oh, I'm sorry.

14   BY MR. SCHILLER:

15   Q    Let me rephrase the question.

16        Do you recall your people internally looking at the J.P.

17   Morgan --

18           THE WITNESS:  Sorry about that.

19   Q    -- values of the collateral as of the September 17th list?

20   A    Yes, I do recall that.

21   Q    And could you tell the Court what you learned from them?

22   A    Well, I recall that they -- when we were trying to do this

23   analysis that I had talked about of what collateral we had on

24   the 17th versus what Barclays had received on the night of the

25   18th, and we were looking, I recall that Jeff Moore, among

Page 54

1   others, commented that valuations at that point in time, given

2   the turbulent state of the market, were a very inexact science,

3   and it was very difficult to actually ascribe values to some of

4   these securities because they were illiquid.

5       And I recall also that that was made the analysis of what

6   Barclays had received versus what we had particularly

7   difficult.

8   Q    Right.  And Jeff Moore had done a comparison, did he, of

9   what Barclays had received versus what was on that list on the

10  17th?

11  A    He tried to.  I'm not sure we ever were able to

12  successfully do that comparison, because there was a lot of

13  question at that point in time as to what Barclays had actually

14  received.

15  Q    But it was clear they had received different securities

16  than what was on your list?

17  A    We knew that there were different securities, yes, than

18  what we had had on the night of the 17th.

19  Q    And he was sensitive to evaluating the valuation

20  differences in those securities?

21  A    He was sensitive to looking at, yes, what the differences

22  would be between the securities, but acknowledged that it would

23  be very difficult to value some of them in that particular

24  market time period.

25  Q    Now, in terms of J.P. Morgan's communications, its

Page 55

1    admission, if you will, that its marks for the September 17th

2    collateral were not reliable, let me ask you to look at M-640

3    of Movant's Trial Exhibit.

4           MR. SCHILLER:  Which is admitted, Judge.

5           THE WITNESS:  Is it -- which binder is it in?

6    Q    Oh, we're going to hand it up.

7    A    Okay.  That'll make life a little easier.

8           THE COURT:  Thank you.

9    Q    Now, you see this is from Hal Novikoff, who was

10   participating on behalf of J.P. Morgan in this settlement

11   effort; is that right?

12   A    That's my understanding, yes.

13   Q    And the date is October 31st, and the trustee, Mr.

14   Giddens, is copied on this --

15   A    Correct.

16   Q    -- as are you.

17   A    Uh-huh.

18   Q    No, you're not copied on this.

19   A    No, I'm not.

20   Q    As is Mr. Kobak.  And in the first two sentences, Mr.

21   Novak (sic) reports, I've attached the spreadsheet with quote,

22   collateral values, as of September 17th, which was the last

23   evening on which the fed provided financing.  Quote, I

24   understand that these collateral values referred us principally

25   by third party pricing sources, and we caution against using

Page 56

1    those values as reliable indicators of realizable value, close

2    quote.

3         Do you recall learning that information in the course of

4    your settlement efforts?

5    A    I recall hearing very similar things from our markets

6    people, and I don't recall specifically hearing it from Chase's

7    counsel, but I do recall hearing it from our markets people

8    who, in turn, had been in touch with Chase as our collateral

9    agent.

10   Q    And do you recall Chase cautioning the trustee and

11   Barclays and the fed against relying on its September 17th

12   marks of what was in -- what securities were in the fed

13   collateral?

14   A    I'm sorry.  Would you say that again?

15   Q    Certainly.  Do you recall being cautioned by J.P. Morgan

16   as to the reliability of its marks for the September 17th

17   securities that were part of the fed repo?

18   A    I was not cautioned to that effect.  I do recall again

19   when our markets people were doing their analysis, that they

20   were in touch with J.P. Morgan as our collateral agent, and

21   they reported back to me that there was concern about the

22   reliability of the marks.

23   Q    Let me ask you to look at 641, Movant's 641.

24        MR. SCHILLER:  Which is also admitted, Judge, and

25   we're handing that out.

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 57 of 190

Page 57

1    Q    This is another e-mail from Mr. Novikoff dated November

2    3rd in this settlement effort.  And in the second full

3    paragraph he says, quote, please note that the collateral value

4    was obtained from third party pricing sources, and J.P. Morgan

5    cautions that collateral value may not be a reliable indicator

6    of realizable value, close quote.

7         Do you recall hearing that information from your

8    evaluation people?

9    A    Yeah, that's the same idea of what I was told by our

10   markets people and not --

11   Q    And by --

12   A    -- by J.P. Morgan Chase.

13   Q    And by realizable value, does that mean to you what a

14   willing buyer will buy from a willing seller, the realizable

15   value upon sale in the market?

16        MR. GAFFEY:  Objection, leading.

17        THE COURT:  Sustained.

18   BY MR. SCHILLER:

19   Q    What is your understanding of realizable value as Mr.

20   Novikoff uses it there?

21   A    You know, not being a markets person but my understanding

22   as a lawyer is that it's the value you can get if you have to

23   sell something.

24   Q    Now, yesterday you were asked about Movant's Exhibit 701.

25        MR. SCHILLER:  If I can just put the first page of it

Page 58

1    up on the screen.

2    Q    It is in the big book.

3    A    Yep, I got it.

4    Q    And you'll see on this 1.1 ratio business, in the second

5    sentence it says, the hold up at the moment is that Jeff is

6    matching the types of collateral that you received, referring

7    to Barclays, overall to what we had on 9/17 to determine

8    whether the quality matches up or not.

9        Do you see that?

10    A    Yes, I do.

11    Q    That's the second sentence there.  And Jeff is Jeff Moore?

12    A    Correct.

13    Q    And he was trying to determine whether the quality was

14    matching up.

15    A    That's correct.

16    Q    And at page 0098, five pages in, there is a memo that was

17    provided to you from Mr. Hughes that offers two principles from

18    Stephen King, a Barclays' trader, as to the values being quote,

19    worse.

20        If you look at principle two at page 0098, Stephen King

21    writes, given the quality of the collateral being delivered is

22    worse that the average of the pool, the fed facility haircut

23    ratio should be applied to that collateral.

24        Do you see that?

25    A    Yes, I do.

Page 59

1   Q    And he's saying there in substance that the market pricing

2   is worse, the value is worse than the average of the pool,

3   correct?

4   A    That's what I interpret that to mean, yes.

5   Q    Now, these pool services that were referenced in the

6   questions you were asked yesterday --

7   A    You mean pricing services?

8   Q    Yes, exactly, pricing services, thank you.

9       These pricing services are available to any institution

10  that wants their use, right?

11  A    That's my understanding.

12      MR. GAFFEY:  Your Honor, objection.  Could I have a

13  reference to the transcript where I used the word pricing

14  services in a question?

15      THE COURT:  That's a fair inquiry.

16      MR. SCHILLER:  The definition Mr. Gaffey asked, the

17  definition refers to market value being determined as made

18  available to bank by a recognized pricing service, which uses

19  -- which the bank uses for pricing security -- that's a

20  question.  Answer, correct.

21      MR. GAFFEY:  I just wanted the page number.

22      THE COURT:  The page number?

23      MR. SCHILLER:  65161.17.

24  BY MR. SCHILLER:

25  Q    Now, these pricing services which J.P. Morgan apparently

Page 60

```
 1    used to price the federal collateral, that J.P. Morgan has

 2    written here and the Court and you have now seen was

 3    unreliable, according to their e-mail that we looked at, M-4640

 4    a moment ago, right?

 5    A    There -- my recollection again, I can't speak for what

 6    J.P. Morgan put in those e-mails, I wasn't copied on them.  My

 7    understanding from our markets people was that there was

 8    concern, not necessarily than that the pricing services were

 9    unreliable, but that given the market situation, the pricing

10    services values may not have necessarily reflected what could

11    be obtained in the market at that time.

12    Q    And pricing services, were they available to the credit

13    committee -- creditors' committee and their financial advisors

14    in September 2008?

15          MR. GAFFEY:  Objection, foundation.

16          THE COURT:  Sustained.

17    BY MR. SCHILLER:

18    Q    The creditors' committee had the opportunity to review the

19    schedules of the collateral that Barclays had received --

20          THE COURT:  Well, this witness has absolutely nothing

21    to do with the creditors' committee.  It's going to be very

22    difficult for you to lay a foundation that makes any series of

23    questions to this witness about what the creditors' committee

24    knew or could've known appropriate questions.  So any objection

25    like that, I will sustain.
```

Page 61

1          MR. SCHILLER:  Okay.  Thank you, Judge.

2          THE COURT:  Don't go there.

3          MR. SCHILLER:  I will have one series of questions

4     when it comes to the December hearing I'd like you to consider.

5          THE COURT:  You're free to ask any questions you like

6     that are proper.

7     BY MR. SCHILLER:

8     Q    You were asked some questions yesterday about testimony

9     before the financial crisis inquiry committee by Mr. Baxter and

10    by Mr. Miller, and I believe their statements to the committee

11    that were admitted into evidence.  Do you recall that?

12    A    Yes, I do.

13    Q    And you were also asked about J.P. Morgan's chief risk

14    officer, Mr. Zubrow.  Do you recall that?

15    A    Barry Zubrow, yes.

16    Q    And was Mr. Zubrow also present and providing testimony at

17    the hearings last week in Washington?

18    A    Yes, he was.

19    Q    And did you review generally his statement of September

20    1st, 2010 to the Commission?

21    A    September -- yes, I did.  Sorry.

22    Q    Can I ask you to turn to tab 11 in the book that we've

23    provided.

24    A    Okay.  I've got to get rid of this one first.

25          MR. SCHILLER:  And that's BCI Exhibit 974, Your Honor.

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 62 of 190

Page 62

1          THE WITNESS:  What tab did you say, I'm sorry?

2     Q    11.

3     A    Okay.  Thank you.

4     Q    The written statement of Barry Zubrow before the Financial

5     Crisis Inquiry Commission.

6     A    I have it.

7     Q    And did you review this last week?

8     A    Yes, I did.

9          MR. SCHILLER:  I move Mr. Zubrow's statement into

10    evidence

11         MR. GAFFEY:  No objection, Your Honor.

12         THE COURT:  It's admitted.

13    (BCI's Exhibit No. 974 was received.)

14    BY MR. SCHILLER:

15    Q    J.P. Morgan provided, I believe you testified yesterday,

16    intra-day financing to LBI before LBI was put into SIPA

17    liquidation; is that correct?

18    A    Yes, it is.

19    Q    Now, if you look at page 3 of Mr. Zubrow's statement to

20    the commission, going over to page 4, I'm going to pick a

21    couple of sentences in that last paragraph to read aloud.

22         Quote, J.P. Morgan, unlike any single triparty investor,

23    took on a broker dealer's entire triparty repo book each day.

24    That meant it would face far greater risks in a liquidation

25    scenario, close quote.

Page 63

1          Do you see that sentence?

2     A     Yes, I do.

3     Q     And then at the bottom, moreover, the head quote --

4     moreover, the haircuts negotiated between investors and broker

5     dealers did not, in many cases, fully reflect the liquidation

6     risk for the increasingly large amount of structured difficult

7     to value securities that were being financed by the triparty

8     repo program, close quote.

9          Do you see that?

10    A     Yes, I do.

11    Q     Now, as a general matter, at that time in September 2008,

12    was the collateral used by LBJ to secure the intra-day funding

13    by J.P. Morgan also to a large extent used to secure the fed

14    repo overnight funding?

15    A     You mean LBI?

16    Q     I do mean LBI.  Let me ask it again.

17         As a general matter, was the collateral used by LBI to

18    secure intra-day funding also, to a large extent used to secure

19    overnight repo funding by the fed?

20    A     That's my understanding, but I should qualify that by

21    saying I did not review the collateral portfolios to that

22    degree, nor do I know exactly what J.P. Morgan was using to

23    secure itself intra-day, so that's my understanding, but I'm

24    not sure it's correct.

25    Q     Let me turn your attention to page 5 where Mr. Zubrow

Page 64

```
 1    states in the middle of the first full paragraph.  Quote --

 2    referring to late August and early September 2008.

 3         Quote, in addition, it came to light that many of the

 4    securities Lehman had pledged to J.P. Morgan in June were

 5    illiquid structured debt instruments, and that appeared to have

 6    been assigned overstated values, close quote.

 7         Do you see that?

 8    A    Yes, I do.

 9    Q    And did your operations people discuss with you that

10    concern by J.P. Morgan in September?

11    A    No.  Again, my recollection is that the schedules were the

12    collateral -- I'm sorry, rather the securities that had been

13    valued in connection with the fed's repo on the 17th whether

14    those valuations were reliable from a standpoint of realizable

15    market value, what you could sell them for if you use the way

16    I've defined realizable.  I recall those discussions, but I do

17    not recall whether there was something that they were

18    overstated in value.  I think it was more a question of how you

19    would value these.

20    Q    In terms of the how to value, meaning the difficulty in

21    valuing?

22    A    Yes.

23    Q    Let me ask you to look at page 7 of Barry Zubrow's --

24    A    Uh-huh.

25    Q    -- testimony last week at the top of the page.
```

Page 65

1        Quote, J.P. Morgan meanwhile continued to evaluate its

2   margin positions with respect to Lehman.  Its daily margin

3   requirements for triparty repo clearance were rising as Lehman

4   was increasing the amount of illiquid securities in its

5   triparty repo book.

6        During the second week of September 2008, J.P. Morgan

7   analysts conducted a broad review of Lehman's collateral

8   securities.  This review indicated that some of the largest

9   pieces of collateral pledged to J.P. Morgan were illiquid,

10  could not reasonably be valued, and were supported largely by

11  Lehman's own credit.  This was inappropriate collateral,

12  essentially claims against Lehman pledged to secure other

13  claims against Lehman.

14       When the true nature of Lehman's collateral came to light

15  on September 11th, 2008, it became apparent that J.P. Morgan

16  was holding a substantial amount of inappropriate collateral,

17  and that it would need additional collateral if it were to

18  continue supporting Lehman.

19       Was the fed informed at that time of this reason, a

20  substantial amount of inappropriate collateral for JPM's

21  request of Lehman for five billion dollars additional

22  collateral?

23  A    I was not informed of that.

24  Q    You were asked a number of questions yesterday, as I

25  suggested earlier, about the value of securities that were

08-13555-mg   Doc 11281   Filed 09/10/10   Entered 09/13/10 15:46:36   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 66 of 190

Page 66

1    transferred to Barclays.

2        At the time of the sale, was the fed aware that market

3    conditions contributed to uncertainty concerning the value of

4    certain categories of securities in the sale?

5    A    I can't speak for in the sale, but clearly we were aware

6    that there were market conditions that were contributing to

7    uncertainty.

8    Q    Uncertainty in the values of securities at that time?

9    A    Generally, yes.

10   Q    And was that especially true of mortgage backed securities

11   and structured securities?

12   A    There were liquidity issues with those securities, yes.

13   Q    And was that uncertainty concerning the value of certain

14   securities -- let me withdraw that question.

15       With regard to the value of the repo securities at the

16   time that were taken by the fed, did the fed independently

17   value that collateral, or did it rely on J.P. Morgan to assign

18   values?

19   A    J.P. Morgan Chase acts as the fed's collateral agent.  My

20   understanding is that they do all of the valuation for the

21   collateral that we take -- that we took into the PDCF.

22   Q    You were asked yesterday questions concerning the fed's

23   risk in connection with Barclays taking out the fed's exposure

24   by stepping into the shoes.  And you were asked by Mr. Gaffey

25   about two different kinds of risk that the fed faced in

Page 67

1    providing repo financing.

2        First, you were asked about credit risk associated with a

3    particular borrower.  Do you remember that?

4    A    Counter **(indiscernible - 01:14:29) credit

5    (indiscernible), yes.

6    Q    And then you were separately asked about market risk,

7    quote, a downward slide in the value of the underlying

8    collateral.  Do you remember that?

9    A    Yes, I do.

10   Q    And then you agreed with Mr. Gaffey that the

11   creditworthiness of the borrower had no bearing on the market

12   risk that he alluded to.  Do you remember that?

13   A    In certain circumstances, that's correct.

14   Q    But I take it that you meant there, for the Court, that a

15   borrower's creditworthiness does not impact the market value of

16   the securities that the borrower pledges?

17   A    Right.

18   Q    And if the value of the fed collateral turns out not to be

19   worth the marks that were on it, then Barclays gets stuck and

20   must make up the difference, correct?

21   A    I'm sorry, I don't understand your question.

22   Q    If the value of the securities turns out -- the market

23   value, the actual value, the realizable value, turns out to be

24   not worth what the marks are on that collateral, then Barclays

25   gets stuck with making up the difference to the fed, correct?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 68

1   A    Under what circumstances?  I don't understand the

2   hypothetical.

3   Q    Well, there's a market risk of a downward slide in the

4   value of the underlining collateral, right?

5   A    Are you talking about when Barclays pledged collateral to

6   the PDCF?

7   Q    Yes.

8   A    Okay.

9   Q    That's what I'm talking about.

10  A    Uh-huh.

11  Q    And I'm talking about the fed's risk in that respect.

12  A    Yes.

13  Q    And the risk is only if Barclays were to default on its

14  repayment obligation.

15  A    Correct.

16  Q    Because Barclays was creditworthy and did repay the loan,

17  the fed had no realistic exposure.

18          MR. GAFFEY:  Objection.

19          THE COURT:  The objection is because Barclays was

20  creditworthy?  We know they were.

21          MR. GAFFEY:  I didn't hear Your Honor, I'm sorry?

22          THE COURT:  I'm sorry.  Barclays was creditworthy.

23          MR. GAFFEY:  The objection is to its leading and I'm

24  not sure that the witness has the knowledge necessary to

25  pronounce on Barclays' creditworthiness.

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 69 of 190

Page 69

1          THE COURT:  Well, I'm confident she doesn't have --

2          THE WITNESS:  I was going to say.

3          THE COURT:  -- the ability to do that.

4          MR. SCHILLER:  I withdraw the question, Judge.

5     BY MR. SCHILLER:

6     Q    Yesterday, you were asked about paragraph 13 of the

7     clarification letter and paragraph 20 of your declaration.

8          MR. SCHILLER:  Can we put them up side-by-side on the

9     screen?  Paragraph 13, side-by-side with declaration paragraph

10    20.

11    Q    On your cross-examination, you were shown paragraph 13 and

12    paragraph 20, and you were asked if you knew anything about an

13    inadvertent termination notice by Barclays in connection with

14    the forty-five billion dollars repo.

15         Do you remember generally the questions about the

16    inadvertent termination?

17    A    Yes, I do remember those.

18    Q    And if you look at paragraph 13 of the clarification

19    letter, apart from any inadvertent termination, that provision

20    also effects a termination of the repo as part of the sales

21    transaction, as you read that provision?

22    A    I'm sorry.  I don't understand your question.

23    Q    The provision itself --

24    A    Yes.

25    Q    -- provides for termination of the repo as part of the

08-13555-mg   Doc 11281   Filed 09/10/10   Entered 09/13/10 15:46:36   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 70 of 190

Page 70

1   sale transaction, correct?

2   A    That's how I read it, yes.

3   Q    And when you refer to this part of the clarification

4   letter in paragraph 20 of your declaration, --

5   A    Yes.

6   Q    -- is that what you're referring to?

7   A    Yes.

8   Q    You were shown M-848, an e-mail exchanges during the

9   settlement process.  And I can do this without you looking at

10  it, I think, to save time.

11  A    Okay.  Well, I can't read the document.

12  Q    And it was an exchange with Mr. Hughes, and in terms of

13  edits to the declaration that Mr. Hughes proposed --

14  A    Uh-huh.

15  Q    -- do you recall whether he said to you, in the course of

16  your conversations that he was proposing certain edits to

17  address concerns raised by the trustee?

18  A    Honestly, sitting here I don't recall that, but it's

19  possible.

20  Q    In terms of the secrecy or confidentiality of the

21  settlement negotiations, was there sensitivity on the part of

22  both Barclays and J.P. Morgan about the confidentiality of this

23  problem until they could get it resolved before His Honor?

24  A    Oh, absolutely, yes.

25  Q    And was Harvey Miller and his client given a full

Page 71

1    opportunity to consider the motion and comment on it in court?

2    A    I'm not sure I'm capable of answering that, but it seems

3    that way.

4    Q    Okay.

5           MR. SCHILLER:  That concludes our examination.  Happy

6    New Year and thank you, Ms. Leventhal.

7           THE WITNESS:  Thank you.

8           MR. GAFFEY:  A little recross, Your Honor.

9           THE COURT:  Sure.  I'm just going to note that I have

10   about five minutes before I --

11          MR. GAFFEY:  I should be done by then, Your Honor.

12          THE COURT:  Okay.

13          MR. GAFFEY:  Just very briefly.

14                    RECROSS-EXAMINATION

15   BY MR. GAFFEY:

16   Q    Ms. Leventhal, would you -- do you have your declaration

17   there?  If not, take a look behind --

18   A    Yeah, no, I have it.

19   Q    You have 119-A.

20   A    Yep, I have it.

21   Q    Okay.  And again, go to paragraph 9 of your declaration.

22   This is the final that was submitted in connection with the

23   settlement agreement.

24   A    Yes.

25   Q    All right.  And you refer there, and we talked about this

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 72

```
 1    a bit yesterday.  In total, the New York Fed has funded LBI

 2    46.22 billion in cash and Treasury securities against the 56.2

 3    billion in collateral.

 4    A    Correct.

 5    Q    Was there a reason at the time you didn't say anything in

 6    your declaration to the Court about market volatility making it

 7    difficult to put that market valuation on the collateral?

 8    A    Because those were the values that we assigned to the

 9    securities.

10    Q    And Mr. Schiller asked you about how difficult that was

11    and what doubts there might be and about market volatility.  My

12    question is, do you recall --

13    A    No, I did not put it in my --

14    Q    -- any draft of your declaration where --

15    A    No.

16    Q    -- it was considered to qualify that number at all when it

17    was put to the Court?

18    A    No.  Because those were the values the fed assigned the

19    collateral when we had them.

20    Q    Okay.  And if you could take a look, too, at -- why don't

21    you turn to tab 119-B, that's a separated out copy of Mr.

22    Moore's declaration which is also within 119 --

23    A    Wait.  I'm in the wrong book, hold on.

24    Q    -- the entire settlement motion.

25    A    Yes.
```

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 73 of 190

Page 73

1    Q    Okay.  And take a look at Mr. Moore's -- now, Mr. Moore is

2    the valuation guy at the fed, right?

3    A    Yeah.  He's the specialist in our markets group, yes.

4    Q    Okay.  Take a look at paragraph 4 of Mr. Moore's

5    declaration.

6    A    Uh-huh.

7    Q    And Mr. Moore says, as you did, in paragraph 4, on the

8    night of September 17th, the New York Fed valued the fed

9    securities at 50.62.

10   A    Correct.

11   Q    When you were reviewing these papers for their filing, did

12   you consider putting in a qualification about how difficult or

13   volatile markets made it impossible to come to a market

14   valuation?

15   A    No.

16        MR. GAFFEY:  Okay.  I have nothing further, Your

17   Honor.

18        THE COURT:  Anything more, Mr. Schiller?

19              FURTHER REDIRECT EXAMINATION

20   BY MR. SCHILLER:

21   Q    Just to note, Ms. Leventhal, that at the hearing

22   transcript December 22nd, 2008 at page 32, see if this

23   refreshes your recollection, at lines 22 through 24, Mr.

24   Miller's addressing the Court --

25        MR. GAFFEY:  Objection, Your Honor.  The witness has

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 74

1    expressed no failure of recollection.

2         THE COURT:  I'm not sure this is about refreshing

3    recollection, as much as it's a preface to a question, but I

4    don't know.  What is it?

5         MR. SCHILLER:  It's a preface to a question.

6         THE COURT:  In that case, let's hear what the question

7    is, and then we can reserve further objections.

8    BY MR. SCHILLER:

9    Q    Do you recall whether Mr. Miller and his colleagues spent

10   a considerable amount of time with the SIPC trustee, with the

11   staff, and with the former Lehman people in going through the

12   facts relating to the settlement transaction?

13   A    I --

14        MR. GAFFEY:  Objection, foundation.

15        THE COURT:  I'm going to sustain the objection.  It's

16   not clear to me what it is about the very limited questioning

17   of Mr. Gaffey that leads to this line of inquiry concerning the

18   witness' recollection of conversations that took place with

19   other parties in interest, but --

20        MR. SCHILLER:  Sure.

21        THE COURT:  But I'm not raising it -- I'm not raising

22   the objection, it's just not clear what path we're going down

23   right now.

24        MR. SCHILLER:  It's a limited path to show that Mr.

25   Gaffey's suggestion that LBHI was shut out isn't accurate, and

Page 75

 1    that Mr. Miller reported to this Court in the presence of Ms.

 2    Leventhal that they'd spent considerable time on this motion

 3    before Your Honor decided it.

 4            MR. GAFFEY:  Well then my objection is beyond the

 5    scope of my recross, Your Honor.

 6            THE COURT:  Well, that's what I think it is, too.  So

 7    to the extent that you're now going to object that it's beyond

 8    the scope of the recross, that objection is sustained.  He

 9    didn't raise that issue just now.

10            MR. SCHILLER:  Thank you, Judge.

11            THE COURT:  Okay.  I actually have a question for the

12    witness, and if it opens up further questioning, so be it.

13                            EXAMINATION

14    BY THE COURT:

15    Q    One of the things that has been bothering me is the timing

16    of the take-out prior to the sale hearing.  And in looking at

17    BCI Exhibit 4, which you were shown yesterday and it's at tab

18    three of Mr. Schiller's book.

19    A    That's the agreement, right, the --

20    Q    And I'm sure you're familiar with the document.

21    A    Hold on.  Let me just --

22    Q    Paragraph 2 -- but let me give you time to find it.

23    A    Thank you.  Okay.  Yes.

24    Q    Paragraph 2 includes a defined term, the take-out date.

25    And the take-out date is a date that isn't any later than the

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 76 of 190

Page 76

1    opening of business on Monday, September 22, or it could be

2    even a later date if the sale hearing is postponed.

3    A    Correct.

4    Q    Do you know how it came about that the take-out occurred

5    prior to the sale hearing, instead of after the sale hearing?

6    A    Yes.  Because as I recall, while we were negotiating this,

7    Barclays was indicating to us, and I believe that's the

8    paragraphs 3 and 4 essentially refer to this, as of the date

9    Barclays has extended 10.5 billion of credit to LBI, Barclays

10    intends to and will use its commercially reasonable efforts to

11    make or arrange, that paragraph.

12        My recollection was that in the course of negotiations,

13    one of the things Barclays said is that if they could, their

14    goal was to essentially take over financing LBI as quickly as

15    possible, once it was clear that they were, you know, likely to

16    succeed in their bid.

17        Now, obviously they didn't know whether the Court would

18    approve the sale, but there were no other bidders.  They were

19    it.  So they were prepared to move forward on the notion of

20    taking out over financing LBI in anticipation that they were

21    going to then close on this deal, and my understanding is they

22    begin that process earlier in the week and continued over the

23    course of the week to effect that, and the agreement was

24    designed to allow them the options of either novating, taking

25    us out different ways or just taking over the financing, and

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 77 of 190

Page 77

1    that's what they, in fact, did.

2    Q    Okay.  And did the fed say or do anything in its dealings

3    with Barclays that week --

4    A    Uh-huh.

5    Q    -- to encourage an earlier take-out date?

6    A    No.

7    Q    Okay.

8    A    We just wanted to make sure that when the deal was done,

9    we were no longer in the position of financing LBI, because it

10    didn't make sense to us that we would be facilitating an

11    acquisition, and it seemed right that the purchaser should be

12    the one financing LBI, and that's why there's -- this whole

13    line of questions on quid pro quo had me somewhat confused,

14    because as the person who was sitting there negotiating this,

15    in my mind, our view was, there would be a problem with this

16    deal if Barclays had said to us, we're not going to finance

17    LBI, but we are the purchaser, because then at a certain point,

18    we would've had exactly the chaos we were trying to avoid.

19        But on the other hand, in terms of needing to say we will

20    support this deal, you know, only if you do this, that wasn't

21    what was in my head.  What was in my head was, we're not going

22    to finance something to make it easier for you to acquire it.

23    We're financing for -- we were financing with the purpose of

24    avoiding a disorderly unwind.

25    Q    And what would have happened in your mind if the sale to

08-13555-mg   Doc 11281   Filed 09/10/10   Entered 09/13/10 15:46:36   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 78 of 190

Page 78

1   Barclays had not been approved during the early morning hours

2   of September 20th and Barclays was then in a position of having

3   financed an acquisition that was not approved?

4   A    Well, remember, at that point, there would've been a

5   problem because Barclays, you know, would've been financing

6   overnight.  The assumption would've been then that the Chase

7   would have had a take-out on Monday morning, they would've had

8   an unwind and finance intra-day.  Chase wouldn't have been

9   prepared to do that if the fed wasn't going to step back in and

10  finance.  If Barclays hadn't been approved as the buyer, we

11  would've had to have go back to the plan of an orderly unwind,

12  and we would've probably, I mean, and I can't make the decision

13  what the powers that be would've decided, but I think there

14  would've been a discussion as to whether the fed should step

15  back in to finance overnight, so that Chase would unwind in the

16  morning on Monday.

17  Q    And were there any discussions about that plan B, if we

18  can call it that, approach to financing LBI around the time of

19  the drafting and execution of the document we've just been

20  referring to, this September 17th letter agreement?

21  A    Discussions with Barclays?

22  Q    Yes.

23  A    No.  Not -- no, I don't believe we ever had those

24  discussions.

25          THE COURT:  All right.  Those are my questions.  If

Page 79

1    that prompts any further questions, go right ahead.

2              MR. SCHILLER:  Not on our part, Judge, thank you.

3              MR. GAFFEY:  None from me, Your Honor.

4              THE COURT:  Okay.  We're going to -- you're excused.

5    Thank you.

6              THE WITNESS:  Thank you.

7              THE COURT:  I'm late for my call.  We'll resume at

8    11:45 or so.

9              MR. SCHILLER:  Thank you, Judge.

10   (Recessed at 11:06 a.m.; reconvened at 11:51 a.m.)

11             THE COURT:  Be seated, please.  It's time for Kenneth

12   Raisler.

13             MR. HUME:  Yes.  Good morning, Judge Peck.

14             THE COURT:  Good morning.

15             MR. HUME:  We're -- our next witness is Ken Raisler.

16   He's a partner at Sullivan and Cromwell, and was involved in

17   work related to the exchange traded derivatives and margin.

18             THE COURT:  Mr. Raisler, please raise your right hand.

19                  KENNETH RAISLER, WITNESS, SWORN

20             THE COURT:  Be seated, please.

21                  DIRECT EXAMINATION

22   BY MR. HUME:

23   Q    Good morning, Mr. Raisler.

24   A    Good morning.

25   Q    Could you state for the record what your position is at

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 80

1    Sullivan and Cromwell?

2    A    I'm a partner at Sullivan and Cromwell in the New York

3    office.

4    Q    And what is your background prior to your time at Sullivan

5    and Cromwell?

6    A    I had clerked in the Southern District of New York, and

7    after that, I went to the U.S. Attorney's office in Washington,

8    D.C. for five years, practiced in the criminal and civil

9    divisions there.  And then from there, I went to the Commodity

10   Futures Trading commission, CFTC, from 1982 to '87.

11        I joined the CFTC as deputy general counsel in charge of

12   their litigation program, and after a year I was made the

13   general counsel, so I served there as general counsel.

14        After leaving the CFTC, I began in private practice,

15   basically in the area of commodities futures and derivatives.

16   It's a practice group at Sullivan and Cromwell, which I head,

17   and I've been in that position for a number of years since

18   then.

19   Q    And other than the work you just described, have you -- do

20   you have any other involvement in the area of exchange traded

21   derivatives?

22   A    I have been on the board of an industry trade associates,

23   the Futures Industry Association, so-called FIA, which

24   represents the market participants, and to some extent, the

25   brokers and other users of the exchange.  I've been on the

1   board for the last eighteen years, and I've been involved as

2   well through bar association work, including the city bar,

3   where I headed the -- their committee on futures regulation

4   some years ago, and the ABA, where I'm vice-chair of that

5   committee, also looking at derivatives and exchange traded

6   products.

7   Q    And for how long have you been the head of Sullivan and

8   Cromwell's commodities, futures and derivatives group?

9   A    Since I joined Sullivan Cromwell, basically eighteen years

10  ago.

11  Q    During the week of September 15th, 2008, what involvement

12  did you have in the Barclays' acquisition of Lehman's North

13  American business?

14  A    If I can answer this at the high level.  Sullivan Cromwell

15  was instructed and I was instructed to work with Barclays and

16  Lehman to facilitate a transfer of all of the proprietary and

17  customer accounts, margin, and collateral from Lehman to

18  Barclays.  And that involved, among other things, working to

19  find out what was there at Lehman, so we knew what was needed

20  to be moved, and also working with the exchanges and the

21  regulators to facilitate that movement.

22  Q    How did your involvement in the transaction begin?

23  A    On Sunday, the 14th, I received a call from some of the

24  folks at Barclays and was asked to appear at a meeting to start

25  on Monday morning.  My best recollection is Monday morning we

Page 82

1    first met over at Barclays and then we went over to Lehman.

2         So it really was -- started Sunday sometime in the

3    afternoon, but the real work began Monday morning.

4    Q    And was that meeting precipitated by calls from the

5    Chicago Mercantile Exchange?

6    A    Yes.  My understanding was that CME, having heard about

7    the Lehman parent bankruptcy, had issues about insecurity with

8    respect to Lehman, in terms of its broker dealer and FCM, FCM

9    being their Futures Commission Merchant, which is the

10   equivalent of a broker dealer for the trading of futures

11   contracts.

12        And the CME wished to facilitate an orderly movement of

13   the positions and the accounts and the collateral from Lehman

14   to a secure broker who could handle those positions.

15        When that call came in on Sunday, it was really just that

16   transaction that was in front of us, and we met on Monday

17   morning, it was for purposes of moving the positions to a safer

18   location at Barclays and at least exploring that opportunity.

19   Q    And did you understand why the CME had this, what you call

20   insecurity?

21   A    I spoke to the CME starting Monday, I didn't know

22   precisely on Sunday what their insecurity was.  I had a better

23   idea when I spoke to them on Monday, but certainly based on

24   experience in light of a bankruptcy filing of a parent, the

25   ability of the sub, in this case, the FCM broker dealer to meet

1   its responsibilities, would be in doubt.  And given the turmoil

2   in the market that week combined with that bankruptcy, the

3   responsibility of the exchange in this case, the CME, other

4   exchanges I'm sure we'll have a chance to talk about as well,

5   was to make sure that the market continued to operate smoothly,

6   and that there were no defaults.

7        And so their goal, from the very start, would be to look

8   to find a safe home for an entity that might otherwise be in

9   trouble or might not be able to perform.

10  Q    Did you come to learn on Monday, September 15th that there

11  was a larger transaction involving Barclays' acquisition of the

12  entire Lehman business?

13  A    Yes.  Sometime in the afternoon on Monday.  We started

14  meeting relatively early on Monday morning to discuss the

15  transfer, as a separate transaction.  In the afternoon on

16  Monday, we heard word about and actually others of my partners

17  at Sullivan and Cromwell were working on negotiating an asset

18  purchase agreement that would involve the transfer of a broader

19  range of businesses, not just the futures accounts as I've

20  described them.

21  Q    Did that, learning of the larger transaction change in any

22  way what you were doing?

23  A    It did not.  My responsibilities and what I was to

24  accomplish were, from my point of view, identical.  It was

25  basically to facilitate that movement and to make sure that all

08-13555-mg   Doc 11281   Filed 09/10/10   Entered 09/13/10 15:46:36   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 84 of 190

Page 84

1   the necessary commissions were achieved.

2   Q    Did you have meetings with people at Lehman who were

3   involved in the exchange traded derivatives business?

4   A    Yes.  Starting sometime Monday morning, we gathered in a

5   conference room at Lehman.  I don't precisely remember all of

6   the people who attended, but two of the people on the Lehman

7   side were Jeff Jennings, who ran their futures -- their global

8   futures business, and a gentleman by the name of Ron Filler,

9   who was then a consultant to Lehman, but Ron had run the

10  futures business for a number of years, probably more than a

11  decade, up until May of 2008.

12  Q    In those meetings, was it your understanding that all of

13  the margin or collateral pledged to secure exchange traded

14  derivatives would be transferred to Barclays?

15       MR. MAGUIRE:  Objection.  Leading, Your Honor.

16  Q    Was it your -- what was your understanding --

17       THE COURT:  By the way, I'm sustaining --

18  Q    -- with respect to margin?

19       THE COURT:  -- the objection so it's clear and we can

20  -- now that he has a leading question in his mind, you can ask

21  him a general one.

22  Q    What was your general understanding with respect to --

23  A    My understanding from starting on Sunday through the week

24  never changed.  Which was that there was to be effectuated a

25  transfer of the accounts that were at Lehman.  That would

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 85

```
 1   include the house accounts, so-called proprietary business, and

 2   the customer accounts.  And when we talk about account, it's

 3   everything that's in the account, which would be all of the

 4   positions and all of the collateral.

 5        So there was never a discussion that deviated from that.

 6   That would be what the exchanges would expect.  That would be

 7   what the CFTC would expect, and that frankly, would be what I

 8   would expect, because that's in history what -- the way it's

 9   always happened.

10   Q    Have you been involved -- prior to this transaction, had

11   you been involved in other transactions in which exchange

12   traded derivatives business had been transferred from one

13   broker to another?

14             MR. MAGUIRE:  Objection, Your Honor.

15             THE COURT:  What's the objection?

16             MR. MAGUIRE:  This witness was not identified as an

17   expert, and therefore, any specialized knowledge or anything

18   beyond his factual knowledge in connection with this

19   transaction I don't believe is properly presented by this

20   witness.

21             THE COURT:  Well, I think the only thing I'm

22   understanding is being asked in the question is whether he's

23   been involved in other transactions involving the transfer of

24   exchange traded derivatives.  And I recall that a Barclays'

25   witness was asked a similar question.  I'm going to overrule
```

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 86 of 190

Page 86

 1    the objection.  It goes to his relevant experience, but it

 2    doesn't make him an expert.

 3         THE WITNESS:  The -- I have been involved directly and

 4    indirectly in a number of those transfers over the years.  When

 5    I say indirectly, it usually was in my capacity with the FIA or

 6    -- that is the industry association being concerned and

 7    involved to make sure these things are orderly.  Or, in some

 8    cases, involved on behalf of clients who were not the parties

 9    who were transferors or transferees, but were parties who were

10    doing business with the entity that was in trouble.

11         And I go back, actually the first example was when I

12    was actually at the CFTC, a company called Volume Investors, a

13    small FCM that I think became insolvent and had its positions

14    transferred, and there -- in all of these examples, the

15    positions, as I recall them, were that the futures and options

16    on futures accounts, as well as the -- all of the collateral

17    and margin that were in  those accounts.

18         Following that, there was the matter of Drexel, which

19    I recall probably in the late '80s.  My best recollection and

20    I'm not precisely sure of this, I think the Drexel futures

21    positions were transferred to Prudential Bache, I think, at

22    that time, and again, my best recollection is that the

23    positions and margin went with the transfer.

24         There were two small bankruptcies around in the early

25    -- in the first decade in 2000, 2003 to 5, one called Griffin

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 87

1  and another called Cline (ph), those two also, to my best

2  recollection, involved transfers of collateral and margin.

3        And then most recently in 2005, there was a transfer

4  of -- there was an insolvency of a parent of Revco, which was

5  -- Revco itself is a large financial house, but particularly

6  they were a large FCM, and their positions and their margin

7  were moved to, in that case, the Man Group and that was one

8  that was probably a little bit closer to it.

9  BY MR. HUME:

10 Q    If margin were not to be transferred as part of the

11 transfer of an exchange traded derivatives account, would there

12 need to be some kind of special provision mechanically to make

13 that happen?

14 A    Yes.  I mean, it sort of -- it's strange even to

15 contemplate, because that's sort of not the way business would

16 be done, but in order to move a position from one clearing

17 member -- I guess we should probably go back a step.

18        In addition to being a broker, Lehman was also a clearing

19 member, and let's focus on the CME, since that's the largest

20 U.S. futures exchange, which has about ninety-five percent of

21 the futures volume, they would also be a clearing member of the

22 CME.  And the CME in calling and asking about Barclays'

23 involvement was to move from one clearing member, Lehman, which

24 was in trouble, to a solvent and secured clearing member,

25 Barclays.

Page 88

1    In order to move positions, a position, an individual

2    futures position has to have, not just a contract that entitles

3    you to upside and downside movement in a price in an individual

4    commodity, but it also has to include the initial margin that

5    -- and margin pool associated with that account.

6    So if you were not to transfer margin, the exchange would

7    not accept the transfer because the account was not complete.

8    It was missing margin.  And so the only way to do it, and I

9    haven't seen it done before, would be, you would basically have

10   to fund the margin before the exchange would permit the

11   transfer.

12   Q    In your discussions with Lehman throughout the week of

13   September 15th, 2008, did anyone at ever -- at any time ever

14   suggest or indicate to you that Barclays would not be acquiring

15   any of the margin associated with LBI's exchanged traded

16   derivative accounts?

17   A    No.  That never came up, and it was never discussed, no.

18   Q    Now, I think you mentioned before that your role was to

19   contact the various exchanges.  Can you remember which

20   exchanges or clearing houses you contacted?

21   A    Yes.  We, starting on Monday, divided up that

22   responsibility.  My primary responsibility was the U.S. and so

23   I reached out to the exchanges in the U.S., which would be

24   primarily the CME, ICE futures, which has previously been

25   called the New York Board of Trade, the Chicago Climate Futures

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 89

1    Exchange and its clearer, which was the Clearing Corp.  The

2    CBOE Futures Exchange, also called CFE and its clearer, which

3    was OCC, and of course, the CFTC itself.

4        I did some very little bit of work internationally, but

5    most of the responsibilities to reach out to the exchanges and

6    regulators was left with the folks at Lehman, and I think in

7    particular, Ron Filler.  Most of my work was domestic.

8    Q    Why was it necessary to seek approval from the exchanges

9    for this transfer?

10   A    You're not permitted to move positions.  In the futures

11   world, the bias of futures and the regulatory regime requires

12   all futures to be traded through a central marketplace.  It

13   used to be a pit, now it's an electronic marketplace.

14       The idea being that the public can see the transaction,

15   there's effective price discovery, and people can use that

16   market effectively for hedging, because the volume comes

17   through it.  You're not allowed to privately negotiate a

18   transaction away from the market, absent certain very specified

19   exceptions.

20       One of those exceptions is something called the bulk

21   transfer rule.  And the exchanges, each exchange has something

22   that permits a bulk transfer.  In order to qualify for a bulk

23   transfer, you've got to get permission from the exchange, and

24   the permission focuses on several things.

25       One is the solvency and creditworthiness of the recipient.

Page 90

1    Two, it focuses on, and this is an easy one, because the CME

2    had already raised the point, convincing the exchange that the

3    entity that is transferring is in trouble and needs to

4    transfer.  And fundamentally the rule talks in terms of a

5    decision that is non recurring.  You can't get these bulk

6    transfers every week and move positions at will.  It really is

7    a finality event, in this case would be appropriate because

8    Lehman would be getting out of the futures business and

9    transferring its business to someone else.

10        So we went to the exchanges and asked them about

11    permitting that bulk transfer.

12    Q    Can you explain why the solvency of the transferee is

13    important to the exchange or clearing house?

14    A    Well, obviously starting on Sunday when the CME raises a

15    concern, they're concerned about the market's continuing

16    ability to function.  That is, basically people meeting their

17    debts, they're not being in default, and if there's a default,

18    there's all sorts of cataclysmic consequences in terms of

19    required liquidation.

20        So they're very concerned, and I think when they sought

21    Barclays out, they realized that Barclays was effectively

22    strong hands for a transaction of this type.  They would not

23    want to move from a solvent but troubled clearing member to an

24    equally troubled new clearing member because they wouldn't have

25    accomplished anything.  They were looking to go from weak hands

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 91 of 190

Page 91

1    to strong hands.

2    Q    Can you just explain generally what it is that the

3    clearing house or exchange does, and what it is that a clearing

4    member does?

5    A    Okay.  A very good question.

6        The way in which futures functions is that the clearing

7    house is basically people trade in an environment where your

8    counter party is anonymous to you.  If you buy, you don't know

9    who the seller is, but there, of course, is a seller.  Both of

10   you effectively have a relationship with the clearing house.

11   If I buy, the clearing house is my seller, and if I sell, the

12   clearing house is my buyer.  The clearing house stands in the

13   middle.

14       In order to be effective as a clearing house standing in

15   the middle, it handles all of the cash flow issues.  Each day

16   in futures, unlike in securities, each day in futures, there is

17   something called mark-to-market.  So each day if the position

18   moves in my favor, I get a credit paid through the clearing

19   house to me, and the clearing house pays that to me because

20   they've gone to the other side, who had a debit, and collected.

21       So the clearing house also assures the performance of each

22   clearing member, effectively.  So if a clearing member is to

23   default, the clearing house would take over the positions of

24   that clearing member and manage those positions for the

25   defaulting clearing member.

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 92 of 190

Page 92

1      And so the clearing house performs this very important

2    solvency function.  Clearing is a very popular concept.  It's a

3    huge concept today in the recent legislation that was passed by

4    Congress, because of a strong feeling that this is a very

5    effective way to manage risk, by putting it into a central

6    location.

7      The clearing member is basically the intermediary between

8    the customers and the clearing house.  The clearing house

9    technically only knows the clearing member.  It doesn't know

10   the customers.  The customers trade through the clearing member

11   into the clearing house.

12     So Lehman was acting as a broker for their customers, it,

13   Lehman would collect margin from their customers and put it

14   into the clearing house.  And that would be the variation

15   margin I discussed, daily mark-to-market, but in addition,

16   there's something called initial margin.

17     Initial margin is there to secure the performance of the

18   clearing member, and the customer ultimately, in terms of daily

19   moves.  It's not a guarantee of performance, but it's a bond,

20   it's sort of a good faith deposit, if you will, to support the

21   position of the customer in the market.

22   Q    Lehman, as a clearing member, would have those margin

23   deposits with the clearing exchange, correct?

24   A    The -- it's actually in two locations.  They would be

25   posting the initial margin with the clearing house, although

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 93 of 190

Page 93

1    it's a little bit complicated, because in some exchanges

2    there's a gross margin regime.  Other exchanges, a net margin

3    regime, but if they don't post it at the clearing house because

4    it's a net margin, they would hold it at a clearing bank in

5    their name, pledged to the clearing house.

6        So they can't take action at will to move money, they have

7    to get the blessing of the clearing house to do it.

8    Q    So is the clearing house protected, to some degree, by

9    those pledged margin deposits?

10   A    Absolutely.  They rely on that margin as assurance.  They

11   -- you can't touch that margin.  Each day you have to make

12   these variation calls, but if you're unable to make those

13   calls, they would seize that margin and try to use that margin

14   to manage you out of the position.

15   Q    Did the CME feel insecurity -- was it your understanding

16   that the CME felt insecurity with respect to Lehman as a

17   clearing member, notwithstanding the existence of those margin

18   deposits?

19   A    Correct.  As I indicated, I was not privy to the calls

20   with the CME on Sunday, but I did have a series of calls with

21   them at the beginning of the week, Monday through Wednesday,

22   and they expressed to me that in security, the reality is that

23   that initial margin is, in no sense, sufficient to give comfort

24   to a clearing house if the clearing member is in trouble.

25       They rely on the margin as the first call, but then they

Page 94

```
 1   rely on the capital and solvency and creditworthiness of the

 2   clearing member as the second call.

 3         Given the chaos and volatility in the market that week of

 4   September 15th, the CME was emphatic about their insecurity,

 5   notwithstanding the fact that there was never a default, and

 6   never brought to my attention that they actually went through

 7   any of those margin positions.

 8   Q    Now, you referenced earlier something called a bulk

 9   transfer.

10   A    Correct.

11   Q    What is included in the concept of a bulk transfer from

12   Lehman to Barclays?

13   A    In this context and in all other contexts in which I am

14   familiar, it would be permitting by the individual exchange to

15   move all of the positions that the clearing member, in this

16   case, Lehman, was carrying at that exchange, and all of the

17   collateral and margin associated with those positions.

18         Each exchange would have its own bulk transfer rule, each

19   exchange would permit the bulk transfer of the positions at

20   that exchange.

21   Q    With respect to the CME and the other exchanges that you

22   contacted, did Lehman have both customer accounts and

23   proprietary accounts?

24   A    It certainly did at the CME.  There were several exchanges

25   where they only had proprietary accounts, and I believe one
```

08-13555-mg   Doc 11281   Filed 09/10/10   Entered 09/13/10 15:46:36   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 95 of 190

Page 95

1    exchange where I think they only had customer accounts.

2    Q    Can you just briefly explain the difference between --

3    A    Right.

4    Q    -- a proprietary account and a customer account?

5    A    Right.  In futures, the -- Lehman is wearing two hats, and

6    Lehman as a clearing member is clearing for two communities.

7    One community would be customers, in which it would act as an

8    agent, and act formally as an FCM, futures commission merchant,

9    brokering those transactions and handling the pays and collects

10   for those customers, and typically charging those customers a

11   brokerage commission for trading.

12        And then separately, Lehman, the clearing member was also

13   clearing for the house, so-called proprietary accounts.  And

14   this would be Lehman using the futures market to hedge their

15   cash exposure in treasuries or securities or other instruments.

16   It also potentially could be to have proprietary trading of

17   Lehman be speculative trading, if Lehman had a view of the

18   market, they could take a speculative position.

19        At the clearing house that -- Lehman would have two

20   accounts.  One is an omnibus customer account, the clearing

21   house would know that account, and that account is subject to a

22   segregation regime.  And then a proprietary or house account.

23   That account is not subject to a segregation regime, because

24   it's Lehman or Lehman affiliates' money, and therefore, doesn't

25   -- is not entitled to the same protection.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 96

1       In the event of a bankruptcy, a bit of digression, but in

2   the event of a bankruptcy under the rules, the customer's seg

3   account is entitled to very specified preferences, in order

4   that the customers are protected.

5   Q    Can you explain what it is when you mean subject to a

6   segregated regime?

7   A    Right.  Basically, the CFTC has a series of rules, which

8   among other things, require that the bank that is banking that

9   customer's segregated account, has to represent in a letter to

10  the clearing member, in this case, Lehman, that the bank will

11  not seek to any offset or lien against this customer's

12  segregated account on account of any default or nonpayment or

13  debt owing from any third party, including the FCM itself.

14      So if the FCM were to be insolvent and owe the bank money,

15  the bank could not go after this segregated account to collect.

16  The segregated account is pristine, and so in the event of that

17  bankruptcy, the hope would be that that account could move in

18  bulk to a safe location, because it would be full.  That's an

19  assumption that oftentimes is not the case, because in many

20  cases, again I'm sorry for a digression, but in many cases, the

21  bankruptcy is as a result of a non-performance of a customer,

22  and then the account may not be full.

23  Q    Is it standard practice, in your experience, for the

24  broker dealer, in this case, Lehman, to have proprietary assets

25  in the customer account to ensure that the seg or secured

1   requirements are always met?

2   A    Yes.  That would be absolutely standard.  Some people call

3   it a buffer.  They would put that in because on each day, the

4   market moves, and in many cases, customers could be a little

5   bit slow in putting up money.

6        And so in order not to be under seg'd, which is a report

7   that they have to give to CFTC daily, in order not to be under

8   seg'd, they typically put in some money.  It will vary from

9   firm-to-firm as to how much, but there typically is some buffer

10  and some cushion, so that they don't have to report being under

11  seg'd.

12       If they report being under seg'd, there are all kinds of

13  collateral consequences to them of that, and that's obviously a

14  bad development from a customer protection perspective, and so

15  something that they desperately seek to avoid.

16  Q    So is that buffer of proprietary assets, that's in the

17  customer account, put there for the benefit of the customers?

18  A    Absolutely.  It is -- and the entire account, that entire

19  segregated account, as I indicated, is subject to effectively a

20  lien by the clearing house.  And so it becomes the broad

21  property, again subject to whatever happens on dissolution, but

22  broadly stated, the property that the clearing house would look

23  to for protection.

24  Q    In all of your discussions during the week of September

25  15th, 2008, did anyone ever distinguish between the various

Page 98

1   categories of margin you just described, those in the

2   proprietary account, those in the customer account that are up

3   to the seg and secured limit, or what you've called the

4   proprietary buffer?  Was any distinction made amongst those

5   different categories in terms of what would transfer to

6   Barclays?

7   A     No.  There were no distinctions, and in fact, there was

8   really no discussion on the topic.  In my view, based on my

9   experience and knowing how these things happen, this would be

10  what would be expected, and anything else would be awkward and

11  novel.

12  Q    Now, what were your subsequent discussions with the CME

13  during the week of September 15th after the Monday?

14  A    We had a series of discussions during the week about their

15  insecurity.  And they wanted progress reports, as did a lot of

16  others, as to what was happening in terms of Barclays' decision

17  whether to take over the account or not.

18       I particularly remember one conversation that I had on

19  Wednesday evening, which would be the 17th.  I was at a dinner

20  that night, and when I returned from the dinner, I checked

21  messages, and realized I'd received several messages from the

22  CME.  I called them back between midnight -- 11:00 o'clock and

23  midnight.

24       I reached the leadership of the exchange, the president of

25  the exchange, the general counsel, their outside counsel, and

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 99

1   the head of their clearing house, all were at the CME's offices

2   when I called them between 11:00 and midnight.

3        They indicated that they were dissatisfied with Lehman.

4   They had hoped that Lehman would be -- would have radically

5   reduced their position over the first few days of the week.

6   They hadn't seen a lot of movement.  They were concerned that

7   Lehman was not being responsive and they were generally

8   concerned about the solvency of Lehman, the broker dealer, FCM,

9   and that they, as a result, they were prepared to take action

10  to take over the accounts, the proprietary accounts that were

11  at CME, and auction them off.

12       The reason for the call to me, was they wanted to know

13  whether Barclays was prepared to guarantee those positions, in

14  which case, they would forestall, based on a guarantee from

15  Barclays, whose solvency they expressed to me they were not

16  concerned about.

17       I told them that it was, you know, approaching midnight, I

18  wasn't sure who I could reach at Barclays, could I get back to

19  them in the morning when -- you know, as soon as trading and

20  business opened.  They said no, that was not satisfactory, I

21  needed to get back to them within the hour, that if I didn't

22  get back to them within the hour, they would take action, they

23  were not prepared to wait, but they would hold off for another

24  hour to hear back from me.

25       Obviously, in my experience, you know, given the time and

Page 100

1    the hour and the like, that's a pretty high level of expression

2    of distress.

3    Q    What happened next?

4    A    I reached out to Barclays, informed them of my

5    conversation.  I was able to reach them within the hour, and

6    communicated back to the CME that the transaction had not

7    matured to a level that Barclays was comfortable stepping up

8    and guaranteeing.

9         Somewhat of a digression, but during the course of the

10   first several days of the week, in addition to the work with

11   the exchanges, there were people in operations at Barclays

12   trying to get a better handle on the Lehman positions, and I

13   think that was another reason.  They didn't really have the

14   kind of information that they wanted to be able to make an

15   assessment.  But a guarantee, given the tumult in the market

16   was really, in this case, a classic blank check, and they were

17   not prepared to write it.

18        And I informed the CME of that, and to my knowledge, the

19   auction took place before the opening on Thursday morning.  So

20   that by the time the market opened on Thursday morning, all of

21   the proprietary positions of Lehman at the CME had been moved

22   to the winning bidders in this auction.

23   Q    Can you turn -- you should have a witness binder, which I

24   think was handed out.  Can you turn to tab two of that, where

25   there is -- there are excerpts from a document the trustee

Page 101

1    filed with the Court within the last ten days or so entitled

2    trustee's preliminary investigation report and recommendations.

3        Do you see that?

4    A    I do.

5    Q    And this is BCI Exhibit 970.  And the excerpt I'd like to

6    direct your attention to is marked as page 68 and paragraph

7    142.

8        MR. HUME:  Which can also be put up on the screen.

9    Right.  If we could just blow up paragraph 142 and highlight

10   the first sentence.

11   Q    It says, in the aggregate, along with LBI's proprietary

12   positions, the CME transferred to the winning bidders more than

13   $465 million in equity to offset the net short value of the

14   positions, as well as more than one billion dollars in risk

15   related concessions, representing nearly all of the performance

16   bond or quote, margin, that LBI had posted with the CME's

17   exchanges associated with those positions.

18       Do you see that?

19   A    Yes, I do.

20   Q    Is that consistent with your recollection of what happened

21   after the CME decided to auction off Lehman's proprietary

22   positions?

23   A    My knowledge at the time was a bit more general and less

24   precise than this.  I had understood that the auction bidders

25   basically in each case, took over the positions in the account

Page 102

1    that they took over, and all of the collateral and margin

2    associated with that account, those positions.

3         I had heard, and this is not first-hand, I'd read it in

4    the press, and also heard it from the various reports, that it

5    was about 1.6 billion.  This number is a little bit less, and I

6    hadn't seen until this document, how it was broken down between

7    net short option equity value versus margin.

8         But it's generally consistent with what I had heard, which

9    is that associated with the transfer of the positions, the

10   contracts themselves, was a transfer of all of the margin that

11   was up at the exchange with respect to those positions.

12   Q    Can you explain why it is that the CME would be

13   transferring assets to the winning bidders?  Normally one

14   thinks in normal parlance, a bidder pays something to take over

15   whatever it's bidding on.

16   A    Right.

17   Q    Does this say that the CME is actually sending assets to

18   the bidders?

19   A    Absolutely right.  And that would be expected, because

20   what we have here is the bidder is being asked to take on a

21   number of futures contracts.  Those futures contracts represent

22   to the bidder, risk.  It also potentially represents up side,

23   but it certainly represents risk.

24        And the bidder's first thought is, what do I have to

25   protect me from losing money on these positions.  Because if

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 103 of 190

Page 103

1   theoretically in most of the cases this is true, the bidder

2   will be wanting to sell those positions, because in fact, if

3   the bidder really wanted those positions, they would already

4   have them.

5        In other words, if hypothetically the bidder was a

6   commercial hedging their exposure, they would've already put on

7   the hedge.  So they're taking on positions that expose them.

8   And so their first thought is, if I liquidate these positions,

9   I need -- I'm expected when you sell something, it typically

10  will have a negative impact on price.  And if you're a

11  distressed seller as Lehman or Lehman's family would be, it

12  would probably be more dramatic effect on price.

13       So the question for the buyer is, what do I have to give

14  me some security that I can get out of these positions and not

15  lose a lot of money, and that would be the margin associated

16  with the position.

17       Even with that margin, the bidder would be taking risk,

18  because he wouldn't know that the margin would be sufficient.

19  And given the volatility of the market that week, this was

20  significantly a risk for any one of these bidders and buyers.

21  Q    So does the bidder bid by stating how much margin it needs

22  to take on the positions?

23  A    Yes.  Basically, what would be assumed is, what the CME

24  has gone to the bidder with is, we're telling you to take on,

25  you know, 50,000 crude oil futures contracts.  And to be clear,

08-13555-mg   Doc 11281   Filed 09/10/10   Entered 09/13/10 15:46:36   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 104 of 190

Page 104

1    there's no value technically in that contract, because as I

2    indicated earlier, there is each day, a mark-to-market

3    payments.  There's no embedded value in the futures contract.

4    So it basically represents risk or reward, depending upon which

5    way the market moves.

6        And how much margin do you need to carry that -- to take

7    on that position, take on that risk.  And not surprisingly,

8    that negotiation would revolve typically around the amount of

9    margin that was up at the exchange.

10   Q    Other than the CME, were there any other exchanges or

11   clearing houses that you spoke with and that took action that

12   week to protect themselves?

13   A    Yes.  The second largest futures exchange is something

14   called ICE futures, that's an acronym for the Intercontinental

15   Exchange, they bought a futures exchange called the New York

16   Board of Trade, they were -- they had a much smaller exposure.

17   I don't recall its exact size, but it was significantly smaller

18   than the CME did.  But they were in constant communication with

19   me during the course of the week.

20       When they heard that the CME had taken action on Thursday

21   morning, they informed me that they too were going to be taking

22   action.  I informed -- they didn't ask us about a guarantee, I

23   didn't offer one, and my recollection is that they liquidated

24   they -- the position -- I'm sorry, they auctioned off the

25   positions that they had sometime Thursday or early Friday.

Page 105

```
 1        I'm not aware of the other exchanges I've talked about who
 2   actually took action.  There were exchanges outside of the U.S.
 3   who took a variety of action that we learned about later.
 4   Q    Did you have any discussions that week with the Options
 5   Clearing Corporation or the OCC?
 6   A    Yes.  Had a series of discussions with the OCC.  As I
 7   indicated early on, we reached out to them to talk about what
 8   positions they had and the possibility of bulk transfer.
 9        As I indicated, the -- for these purposes, OCC, as I think
10   you're aware, OCC has a clearing operation for securities, but
11   they have a separate clearing corporation for futures.  And
12   they clear, in addition to clearing CBOE, Chicago Board of
13   Options Exchange and the other options, securities options
14   exchanges, they clear futures and particularly for an
15   organization called the CBOE futures exchange.
16        At my earlier conversations with them, it was just sort of
17   to inform them that we were involved, we were looking to do a
18   transaction, we wanted to keep them in the loop, and it was
19   pretty high level.
20        Toward the end of the week, they indicated to me, and I
21   have a long-standing relationship with both their inside
22   general counsel and their outside counsel, probably know both
23   of them for over twenty years.  They were indicating some
24   nervousness about the securities portfolio, but on -- some time
25   on, I believe it was late Friday, I learned about it, and I
```

Page 106

1    think it was from them, that they realized that a Lehman

2    affiliate had a very large position in a contract that was

3    traded on the CBOE futures exchange, a so-called volatility

4    index contract.

5         And they informed us of that, that was the first time that

6    Barclays had heard of that.  Lehman had not informed us of it.

7    The position, in addition to being very large, was actually

8    short volatility.  That is, the bet, if you will, that the

9    Lehman entity was taking, was that volatility would go down,

10   and bear in mind, the week we're talking about, the volatility

11   was going through the roof.  And so this was a very risky, a

12   very risky position.

13        And so certainly, the OCC was concerned about it, and when

14   Barclays heard about it, they too were very concerned about it.

15   Q    I'm going to come back to that, but before I leave this

16   document, let me ask you to turn to the first page I've

17   excerpted in the binder, page 37 under paragraph 73, it talks

18   about other actions by U.S. exchanges, and it has the first

19   bullet point.  This is page 37.  It's in your binder if not on

20   the screen.

21   A    I do see it.

22   Q    The first bullet point says, the Options Clearing

23   Corporation invoked its exchange rules as a basis to refuse to

24   release over $400 million of computed excess margin on

25   September 19th, 2008.

Page 107

1        At the time, were you aware of that event?

2   A    I was not.  I was generally aware that OCC, during the

3   course of the week, that OCC, as with the other exchanges I've

4   highlighted and other clearing corporations, was increasingly

5   nervous about what was going on with Lehman.  And I also was

6   aware -- I didn't know till after exactly the numbers, but that

7   there were very significant movements in the positions that

8   Lehman had up at the OCC, and therefore, very significant

9   changes in the margin requirements.

10       I didn't hear about this event on Friday until sometime

11  thereafter.  But it certainly wouldn't surprise me the exchange

12  has the discretion to do that, and if they're insecure, they're

13  going to make sure to collect and keep as much money as they

14  can, because they don't know, you know, whether Lehman is going

15  to pony up when the next margin call comes.

16       I did on Friday and through the weekend have discussions

17  with OCC about their insecurity, and they -- while they never

18  liquidated or auctioned off any positions, they did indicate

19  over the weekend, that they were prepared to do that, and would

20  do it unless Barclays stood up and basically stood behind those

21  positions before and met the margin call on Monday morning, and

22  that's a topic we may want to discuss as well.

23            MR. HUME:  Your Honor, we may come back to this

24  document, but we'd like to move BCI Exhibit 970, this trustee

25  report, into evidence.

1    THE COURT:  The whole report or just these excerpts?

2    MR. HUME:  I think the whole report is the exhibit.

3    We've only used the excerpts just to save space in the binder.

4    MR. MAGUIRE:  No objection, Your Honor.

5    THE COURT:  The whole report is in.

6    (BCI's Exhibit No. 970 was received.)

7    MR. HUME:  Thank you.

8    THE COURT:  And it's about five minutes past our

9    typical lunch break.  I just wanted to get some sense of

10   anticipated scope?

11   MR. HUME:  I'm about half -- about halfway through,

12   maybe a little more.

13   THE COURT:  Okay.  I think we should break for lunch.

14   But since a number of people may need to leave early today, I

15   think we should make the lunch hour a little bit shorter than

16   usual, so let's return at 1:45.

17   MR. HUME:  Your Honor, I neglected to say earlier,

18   Judge, that the witness, for the holiday has to leave at 4:00,

19   so we would appreciate starting earlier, and I'll try to move a

20   little more quickly, so that in the hopes that we can finish

21   everything today.

22   THE COURT:  I need to leave early, too, so with that

23   in mind, we're not going to past some reasonable hour this

24   afternoon, and what's the anticipated cross for this witness?

25   MR. MAGUIRE:  I don't anticipate we'll have a problem,

Page 109

1    Your Honor, if Mr. Hume is, as he says, on time, I think we

2    should comfortably leave at 4:00 p.m.

3           THE COURT:  Let's see if we can leave by 3:30 or 4:00

4    at the latest.

5           MR. HUME:  Thanks.

6           THE COURT:  Okay.  We're adjourned till 1:45.

7    (Recessed at 12:37 p.m.; reconvened at 1:50 p.m.)

8           THE COURT:  Be seated, please.  And please proceed.

9           MR. HUME:  Thank you.

10   BY MR. HUME:

11   Q    Afternoon, Mr. Raisler.

12   A    Afternoon.

13   Q    Before the lunch break, you had given some testimony about

14   the CME and its concerns and its requests in the middle of the

15   week that Barclays guarantee proprietary accounts of Lehman.

16   Do you recall that?

17   A    Yes, I do.

18   Q    Was that request from the CME for Barclays to provide a

19   guarantee similar or dissimilar to a request that Barclays take

20   over the account?

21   A    As I understand it -- as I understood it from the CME at

22   that time, they were merely asking us to be a backstop.  That

23   is to say that if hypothetically Lehman were to run through all

24   of the margin in their account, they -- the exchange would look

25   to Barclays to meet that shortfall.

1      Taking over the account would give, theoretically would

2    give, Barclays the right to liquidate as they saw fit.  I

3    didn't see that as part of the guarantee to manage the account

4    in any way they wanted to, and to the extent that the account

5    were to make money, or in those situations, that would be for

6    the benefit of Barclays.

7      I saw the guarantee merely as being just a you stand

8    behind the position, and whatever happens, happens, and I think

9    that's certainly I'm sure the way that Barclays understood it

10   as well.

11   Q    And you used -- I think you used the phrase writing a

12   blank check.  Can you explain what you meant by that?

13   A    Well, basically if the positions, and again, we have to be

14   reminded how volatile the market was during that week, if the

15   positions ran away from Lehman, then basically the exchange

16   would be coming -- the clearing house would be coming to

17   Barclays to make good on that shortfall, and whatever that

18   amount was, it was not I say blank, because the exchange was

19   not saying guarantee us up to a hundred million dollars, they

20   were saying, provide an unlimited guarantee.

21     So whatever the loss would happen to be, it would be a

22   decision by Barclays to step up and meet that loss.

23   Q    Now, more generally, and not just with respect to the CME,

24   you explained that they were Lehman proprietary accounts and

25   customer accounts at many of these exchanges.

Page 111

1   A    Correct.

2   Q    Do you know or do you recall one way or the other, whether

3   Lehman affiliates were uniformly in the proprietary account or

4   the customer account?

5   A    As a matter of rule, the affiliate would be a proprietary

6   account, and so it would be carried by Lehman in their

7   proprietary accounts at each of the exchanges and clearing

8   house locations.

9   Q    Do you recall looking at Lehman's options proprietary

10  accounts and whether affiliates -- excuse me, Lehman's customer

11  accounts with respect to its options trading and whether

12  affiliates were treated as customers in those accounts?

13  A    And here we're talking about equity options, not options

14  on futures?

15  Q    Correct.

16  A    I don't purport to be an expert on the equity option

17  rules, and I candidly don't recall.

18  Q    Okay.  And regardless of which account they're in, do you

19  know one way or the other -- let me ask another question, sir.

20       Was it your understanding that the collateral posted in

21  all of these various accounts was LBI collateral owned by LBI,

22  the broker dealer?

23  A    We're talking again here with respect to the equity

24  options positions, correct?

25  Q    More generally on the futures positions you looked at, the

Page 112

1    futures accounts you looked at.

2    A    Okay.  With respect to the futures accounts in the

3    proprietary world, for the proprietary, the house accounts, my

4    understanding is that those assets were those of LBI.

5    Obviously, on the customer side, it would be combined customer

6    money as well as what we talked about earlier in terms of

7    buffer.

8    Q    And when you were talking about the options clearing

9    corporation, you distinguished between what I think you called

10   securities and the fact that futures also clear there.  Do you

11   recall that?

12   A    Correct.  There are actually two separate clearing

13   organizations within one umbrella of the OCC.

14   Q    And when you refer to securities as opposed to futures

15   clearing through the OCC, do you mean by securities, equity

16   options?

17   A    That's correct.

18   Q    Which are options on equities?

19   A    Correct.  As a result of machinations that only Congress

20   could contemplate, the world is divided between equity options

21   which are subject to an SEC regime, and options on futures

22   including stock index options, which are subject to the CFTC's

23   regime.  So that's the distinction I'm really focusing on.

24   Q    Can I ask you to turn tab 3 of your binder, the witness

25   binder, which is BCI Exhibit 220.  And at the top of that

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 113

1    exhibit is an internal e-mail exchange at Weil Gotshal dated

2    September 19th, 2:13 p.m.

3         Do you see that?

4    A    Yes, I do.

5    Q    And the subject is, urgent, Options Clearing Corp. issue

6    re: Barclays/Lehman transaction.

7         Do you see that?

8    A    I do.

9    Q    And the first e-mail is from Shia Waisman at Weil Gotshal

10   and it says, another sale order change.

11        Do you see that?

12   A    Correct.

13   Q    Did it come to your attention during that week that the

14   OCC requested a provision to be inserted in the sale order that

15   would be issued by the Court to approve the sale?

16   A    Yes.  The OCC, as we discussed earlier, had insecurities

17   with respect to performance by Lehman, and in particular that

18   Friday, the 19th was what is called a triple witching day.

19   Such days occur four times a year where options on securities,

20   options on futures, and futures themselves expire, and so

21   that's a particularly volatile and sensitive day.

22        OCC wanted to be assured that when they opened on Monday,

23   that all of the collateral calls would have been met, and it

24   was that in which they were seeking security from Barclays in

25   the sale order, that Barclays would stand behind those

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 114

1   obligations Monday morning.

2   Q    And if you turn to the second page of this document, and

3   the second half of that page is an e-mail from James McDaniel

4   at Sidley & Austin.  Do you know him?

5   A    Yes, I do.  I mentioned earlier that both Bill Navin,

6   who's the general counsel of OCC and Jim McDaniel, who is

7   outside counsel at Sidley to OCC are long time friends, yes.

8   Q    And this is e-mail is from him to a lawyer at Cleary

9   Gottlieb and then it's forwarded on to Weil Gotshal, which

10  lists -- he says, Seth, below is the language that OCC would

11  like to have inserted in the sale order.

12       Do you see that?

13  A    Yes, I do.

14  Q    And below that, he has the proposed insert, that begins

15  with the phrase, notwithstanding the foregoing.

16       Do you see that?

17  A    Yes, I do.

18  Q    And it goes on to say, we can read it on the screen,

19  notwithstanding the foregoing as of the closing date, all

20  obligations to the Options Clearing Corporation with respect to

21  purchased assets, that are within the possession or control of

22  OCC, shall have been assigned to the purchaser, and the

23  purchaser shall have assumed all of such obligations, including

24  without limitation, all obligations with regard respect to

25  short option positions, futures contracts, and stock loan or

Page 115

1    borrow positions that are transferred to the accounts of

2    purchaser at OCC, as of the closing date, in accordance with

3    the purchase agreement.

4         Do you see that?

5    A    Yes, I do.

6    Q    And is that consistent with your recollection that the OCC

7    was trying to protect itself and ensure that Barclays would

8    take over all of the settlement obligations associated with

9    Lehman's accounts at the OCC?

10   A    That is correct.

11   Q    Now, the next sentence says, from and after the closing

12   date, all securities, cash, collateral and other property

13   transferred to accounts of the purchaser at OCC shall be

14   subject to all rights of OCC therein, in accordance with the

15   bylaws and rules of OCC, including without limitation, the

16   security interests and set-off rights of OCC with respect

17   thereto.

18        Is that sentence consistent with your understanding that

19   all of the margin in the LBI accounts would be transferred to

20   Barclays as of the closing date?

21   A    Yes.  And that once transferred, they would be subject to

22   OCC rights, as a -- as I mentioned earlier, each of the

23   clearing houses have a security interest, a preferential

24   security interest in each of these accounts, and that sentence

25   reflects the fact that OCC is not giving that up upon the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 116

1   transfer of that margin to Barclays.

2   Q    It says, all securities, cash, collateral, and other

3   property.

4        Do you see that?

5   A    Correct.

6   Q    And did you understand that margin deposits, to secure

7   exchanged traded derivative obligations could be held either in

8   the form of cash, or in the form of other collateral?

9   A    Of course.

10  Q    Did anyone at any time during that week suggest to you

11  that Barclays would acquire some of the margin collateral that

12  was not in the form of cash, but would not acquire collateral

13  that was in the form of cash?

14  A    No.  It was -- I mean, as we discussed earlier, the

15  broader issue never came up, and the subset that you've

16  described never came up in all of our discussions and all of

17  our efforts, it was to move the accounts which included the

18  positions and all of the collateral in whatever form.

19       Collateral takes a variety of forms.  In fact, very often,

20  people will put up treasuries, they may expire, they turn to

21  cash, they get reinvested, there's a whole variety of ways in

22  which that money is managed by the clearing firm, and in some

23  cases, by the clearing house.

24  Q    Let me -- and to your recollection, did anyone object to

25  the insertion of this language into the sale order?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 117

```
 1   A    Not to my knowledge, no.  It went in and was also the

 2   transfer and assumption agreement which reflects the same sort

 3   of -- the same sort of rights that OCC had and the comfort that

 4   they needed to not act to liquidate these positions.

 5   Q    Let me, if I could, refer you back to the excerpts of the

 6   trustee report that's at tab 2 of the binder, and to the last

 7   page of the excerpt, in paragraph 248.

 8        The first sentence of that paragraph says, similarly, on

 9   the evening following the liquidation filing, and during a

10   recess at the hearing itself, the OCC threatened not to

11   transfer any accounts unless Barclays stepped into LBI's shoes

12   at the OCC.

13        Do you see that?

14   A    Yes, I do.

15   Q    Do you recall over that weekend between the sale hearing

16   approval of this Court and the closing on Monday, that the OCC

17   was still threatening to liquidate Lehman's accounts if

18   Barclays did not agree to take them over?

19   A    That was my distinct recollection from conversations I had

20   and were reported to me over the weekend with OCC.

21   Q    And were you generally aware that Barclays was concerned

22   about the risks that might be associated with those accounts?

23   A    Certainly, and as I discussed earlier, one small example

24   of that was the VIX position which had very significant risk in

25   it, and that was just a small example of the risks that
```

Page 118

1    Barclays was worried about.

2    Q    On the next sentence I'd like to direct your attention to

3    in the trustee's report says, Barclays agreed when it realized

4    that this arrangement was likely to produce a substantial

5    windfall for itself.  Do you see that sentence?

6    A    I do.

7    Q    Did it ever come to your attention that week, before the

8    closing at any time or after the closing, that Barclays

9    believed it had received a substantial windfall in connection

10   with the OCC accounts?

11   A    No.  That never came up in any discussions we had.  The

12   focus uniformly was on the risks associated with it, not -- and

13   no one that I interacted with talked in terms of any profits,

14   and certainly not any windfall profits.

15   Q    Let me refer you to tab 4 of the binder, BCI Exhibit 267,

16   which is an e-mail exchange between again the lawyers at the

17   OCC, lawyers for the SIPC trustee and SIPC itself and lawyers

18   for Barclays.

19        If I can refer you first to the second page, which is an

20   e-mail from Jim McDaniel again, counsel for -- outside counsel

21   for OCC, sent Sunday afternoon.  He lists out three different

22   points.  The third of which is, if the transaction does not

23   close tonight, OCC would need to immediately liquidate and

24   close out the LBI accounts and is preparing to do so.

25        Do you see that?

Page 119

1    A    Yes.

2    Q    In response to that e-mail, Stephen Harbeck sends a reply

3    e-mail.  And Stephen Harbeck -- do you know who Stephen

4    Harbeck?

5    A    I know he's with SIPC.

6    Q    He's listed in this e-mail as President and CEO of SIPC.

7         Do you see that?

8    A    Yes.

9    Q    His e-mail says in the first sentence, to Jim and Bill,

10   those would be the lawyers for the OCC?

11   A    Yes.

12   Q    It says, Jim and Bill, I urge you in the strongest

13   possible terms not to take precipitous action.  I have every

14   confidence that if all parties act responsibly, that all

15   parties will actually be acting in their own best interests.

16        Do you see that?

17   A    Yes, I do.

18   Q    Is that consistent with your understanding that SIPC and

19   the trustee did not want these clearing corporations to seize

20   and liquidate the exchange traded derivative accounts?

21   A    That was my understanding and recollection because of the

22   disruption and the costs associated with that.  And obviously,

23   they had a precedent insofar as the CME had done effectively

24   the same thing only two days prior, three days prior.

25   Q    Now, in the e-mail in response to Steve Harbeck, the OCC's

08-13555-mg   Doc 11281   Filed 09/10/10   Entered 09/13/10 15:46:36   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 120 of 190

Page 120

1   lawyer, Jim McDaniel responds, saying, Bill has asked me to

2   express OCC's intention not to act precipitously.

3       Do you see that?

4   A   Yes.

5   Q   If you go down that paragraph, he has a sentence that

6   begins, however.  However, OCC cannot allow the positions to

7   remain in place if no transaction is concluded tonight, because

8   OCC will then be exposed to loss, if the market moves against

9   LBI's positions.

10      Do you see that?

11  A   I do.

12  Q   Now, based on your understanding of your -- from your

13  involvement in these events, who would've been in a better

14  position to know the extent of Lehman's margin deposits at the

15  OCC, the OCC or Barclays?

16  A   Well, certainly the OCC has a responsibility to know that

17  to the detail.  I don't know, I mean, certainly Barclays only

18  got whatever Lehman gave them, and as I indicated earlier, that

19  was inconsistent and generally incomplete.

20  Q   If the OCC believed there were sufficient excess margin to

21  create a windfall for Barclays, would they have been concerned

22  about being exposed to loss?

23  A   Hard for me to getting into their head to figure out what

24  their thinking is, but it seems to me that what they're

25  expressing here is that the market is extremely disruptive,

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 121

1   volatile, and they are not confident of the consequences of the

2   opening even on Monday morning, where there had been a lot of

3   tumult over the weekend specifically associated with Lehman,

4   and a lot of people probably concerned that there would be non-

5   performance.  So that would be my look at it.

6   Q    Now, you mentioned discovering the VIX positions at some

7   point.  During that week, were you involved in attempts to

8   gather information relating to Lehman's exchange traded

9   derivative accounts?

10  A    Yes.  Starting on Monday morning, we were a team.  So it

11  was myself, but it was also operations people at Barclays, we

12  were trying to obtain information about what exchanges Lehman

13  had positions through, and what were the contours broadly

14  stated of those positions, because we needed to -- I

15  specifically needed to visit with those exchanges to get

16  permission to do the block transfers.  And in addition,

17  Barclays was trying to assess the risk of those positions, so

18  more information for them the better.

19  Q    Now, let me refer you, if I could, to tab 5 of your

20  binder, which is Movant's Trial Exhibit 746.  It has a cover e-

21  mail from David Gilberg to a series of people at the CFTC, and

22  then it says cc to you.

23       Do you see that?

24  A    Yes, I do.

25  Q    And can you explain who David Gilberg is?

Page 122

1    A    David Gilberg is my partner and another partner in the

2    Commodities, Futures and Derivatives Group and we worked

3    closely together on all matters, including this one.

4    Q    And it attaches, I believe, a series of drafts of the same

5    letter, which you can see if you flip a couple of pages back.

6         Do you see that?

7    A    Yes, I do.

8    Q    Can you explain what this letter is?

9    A    As I indicated earlier, in addition to getting exchange

10   approval for the block transfer, we needed to get specific

11   approval from the CFTC for the transfer that we wanted to

12   engage in at each of the exchanges in the U.S.  This was a

13   letter that we prepared to the CFTC seeking that relief and

14   that approval.

15        The exchanges are permitted to do block transfers, but as

16   the letter reflects, there's certain things that the CFTC has

17   to approve, the exchanges themselves cannot do.

18   Q    I'd like to direct your attention to the second page of

19   the letter, and the last sentence of the first paragraph, which

20   says, we understand that LBI has sufficient segregated and

21   secured amount funds, as well as sufficient regulatory capital,

22   pursuant to the provisions of the Commodity Exchange Act, and

23   the Commission's regulations thereunder.

24        Do you see that?

25   A    Yes, I do.

Page 123

1    Q    And can you explain the basis for that statement?

2    A    Yes.  I think that as of the time of this letter, we had

3    no indication from any of the clearing houses around the U.S.

4    that Lehman was in any way default on any of its obligations.

5         So by definition, they would've had sufficient regulatory

6    capital again and secured seg funds.  That doesn't tell you

7    what their position might be tomorrow, based on market moves,

8    but as of that time, having not been in default, they were in

9    compliance with their regulatory requirements, and therefore,

10   their funds were sufficient.

11   Q    Does this say anything at all about LBI's margin with

12   respect to any of its proprietary accounts?

13   A    Not as such.  The segregated and secured funds are both

14   referencing customer accounts.

15   Q    Does it --

16   A    But the sufficient regulatory capital does have a

17   relationship to proprietary accounts.

18   Q    If you knew this information, was there other information

19   beyond this that you and Barclays were trying to find out that

20   week?

21   A    Well, we were trying to find out more about the positions

22   themselves, and the risks associated with those positions, in

23   order to assess what would be involved in taking over the

24   positions in terms of risk reduction and risk management.

25        The fact that they had sufficient regulatory capital at

Page 124

```
 1    any point in time is hardly comfort in a volatile moving

 2    market.

 3    Q    Would you -- was the information you were able to find

 4    that week before the closing, complete or incomplete?

 5    A    It was dramatically incomplete.  One example I indicated

 6    earlier, is we didn't find out until Friday afternoon about

 7    this very large short volatility, this VIX position, which had

 8    not been disclosed to us, which was a position of a Lehman

 9    affiliate.

10        My best recollection it was brought to our attention not

11    by Lehman, but by the OCC itself, and that position alone,

12    again just as an example, represented a lot of risk to the

13    extent that Barclays was being asked to take it over.  My

14    recollection as well is we didn't learn about some of the

15    foreign exchange positions until several days after the

16    closing, or in fact, even a longer time after the closing.

17    Q    So were there both accounts and positions that you learned

18    about even after the closing?

19    A    That's correct.  I mean, we didn't even know that they --

20    we actually until the VIX position came up, we didn't know they

21    had any open positions at the CBOE Futures Exchange.  Equally,

22    we found out about information Montreal and Sidney, where they

23    had positions we didn't know they had.

24    Q    Based upon your experience in the industry and your

25    experience in the events of that week, what is your
```

08-13555-mg   Doc 11281   Filed 09/10/10   Entered 09/13/10 15:46:36   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 125 of 190

Page 125

1   understanding about the extent to which any margin deposits

2   that Lehman held in any of its exchanged traded derivative

3   accounts would've been available for the estate in the

4   liquidation had there been no transaction with Barclays?

5           MR. MAGUIRE:  Objection, Your Honor.  This witness is

6   not being proffered as an expert witness, and any testimony

7   that he would give based on specialized knowledge would come

8   within Rule 702.

9           THE COURT:  Sounds right to me.  It sounds to me as if

10  the question does not delve into his activities during the

11  relevant period, but rather his general observations as to what

12  might have happened, and under those circumstances, the

13  objection is sustained.

14          MR. HUME:  Let me see if I can just do it briefly

15  another way, Your Honor.

16  BY MR. HUME:

17  Q   Did you have personal knowledge that week, Mr. Raisler,

18  that the CME had closed out Lehman's proprietary positions, and

19  that that had wiped out Lehman's margin deposits with respect

20  to those positions?

21  A   Yes, that's correct.  We talked about that as something

22  that had occurred before the opening on Thursday, the 18th of

23  September.

24  Q   Was it your understanding that other exchanges, at least

25  one, the ICE exchange did the same thing?

Page 126

1   A    That is correct.  And as we discussed, OCC was threatening

2   to do the same thing as well.

3   Q    My question, to your understanding --

4   A    I'm sorry.

5   Q    -- others were threatening to do the same?

6   A    That's correct.

7   Q    And so was it your understanding at the time that there

8   was a serious risk, but if there was no transaction to

9   Barclays, all the other exchanges would do the same thing?

10  A    Yes.  That risk was very clear and highlighted by the OCC

11  communication that if the exchanges were to auction or

12  liquidate positions, it would result in the transfer or

13  utilization of all the outstanding margin, as was the case with

14  the CME, leaving nothing in terms of positions or assets in the

15  accounts for the Lehman estate.

16  Q    Could the clearing houses -- do you have an understanding

17  based on your expertise in this field, could the clearing

18  houses either liquidate those positions or auction them?

19  A    The exchanges -- the clearing houses have discretion as to

20  how to manage the positions.  The preferred route is auction,

21  but if there aren't -- if there's no requirement that they go

22  the auction route typically, they will liquidate if it's a

23  relatively small amount of positions, but if it's a huge

24  position and they're, if you will, dumping it on the market,

25  they're probably going to be more inclined to auction.  But

Page 127

1    it's up to them.

2    Q    Can either a liquidation or an auction create a liability

3    for the -- for Lehman?

4    A    Absolutely.  It's not -- I mean, the CME was able to

5    auction off the positions on the morning of the 18th without

6    having to put up additional funds, because the buyers of those

7    positions were willing to take the margin.  But the reality is

8    that particularly shortly thereafter, and depending upon the

9    positions, there could be bidders for those positions who

10   wanted not just the margin but more, in order to take those

11   positions on.

12       The clearing house would have to make a judgment whether

13   to put that money up and seek it against the estate, or try

14   some other recourse.  So to the extent that the margin was

15   insufficient to get the auction done, there would be additional

16   money needed, and that additional money would be a debt of the

17   estate.

18   Q    After the sale transaction closed on Monday, September

19   22nd, did you work with the trustee and his representatives at

20   Hughes Hubbard to identify Lehman's futures accounts to arrange

21   for their transfer to Barclays?

22   A    Correct.  Most of that work was with respect to non-U.S.

23   locations, and unlike the U.S, in many cases in the non-U.S.

24   environments positions were either liquidated or moved, but the

25   collateral was left behind, stuck in bankruptcy or other

Page 128

1    regimes in foreign jurisdictions.

2         So we worked with the trustee, and in particular, I had

3    regular communications with Chris Kiplock during the months

4    after the closing to make sure that the rights of Barclays

5    derivative of LBI were protected in those bankruptcy regimes,

6    and that money was accounted for, and our hope was that that

7    money got transferred back to Barclays.

8    Q    And did that work that you did with Mr. Kiplock at Hughes

9    Hubbard involve both Lehman proprietary futures accounts and

10   customer futures accounts?

11   A    Yes, it did.

12   Q    And during those first few months after the closing, was

13   there ever any mention by Mr. Kiplock that the trustee didn't

14   believe Barclays was entitled to any of the margin or

15   collateral associated with any of those accounts?

16   A    Absolutely not.  I mean, our communications were

17   consistent with what I said before, a moving of the accounts,

18   which includes the positions and the collateral.

19   Q    Let me refer you briefly to tab 6 of your binder, which is

20   BCI Exhibit 470, and involves internal e-mail at the top

21   between Mr. Kiplock, whom you just mentioned and his colleagues

22   at Hughes Hubbard, Carolyn Levine, and I think Laura Vecchio

23   may have been a former Lehman employee.  Do you know Carolyn

24   Levine as well?

25   A    Yes.  Carolyn Levine was somebody in addition to Chris

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 129 of 190

Page 129

1    Kiplock who we worked with at Hughes Hubbard during the time

2    period.

3    Q    He is responding to an e-mail chain below, and I'd like to

4    direct your attention to the first e-mail in the chain, which

5    again is from Jim McDaniel at the OCC, or at Sidley Austin who

6    represents the OCC?

7    A    That is correct.

8    Q    And Mr. McDaniel is writing to Mr. Kiplack -- Kiplock on

9    October 2nd, and says, Chris, to confirm my comments on the

10    phone, clearing accounts under the 074 number on OCC's books

11    that were formerly accounts of Lehman Brothers, Inc. have been

12    transferred to Barclays.

13         Do you see that?

14    A    Yes, I do.

15    Q    And he references the transfer and assumption agreement.

16         Do you see that?

17    A    Yes, I do.

18    Q    It goes on, I'd like to just go down to the last line of

19    that paragraph.  As all accounts, under both numbers are

20    accounts of BCI, meaning Barclays, OCC will continue to follow

21    the directions of BCI and to transfer positions between these

22    clearing member numbers, and otherwise act with respect to

23    positions and collateral carried under both numbers, at the

24    direction of BCI without consent from the trustee.

25         Do you see that?

Page 130

1    A    Yes, I do.

2    Q    Is that consistent with your understanding at the time of

3    how Barclays was taking over Lehman's exchange traded

4    derivative accounts?

5    A    Yes.  Absolutely that is correct.

6    Q    And at the top of the e-mail chain, Mr. Kiplock writes to

7    his colleagues, I think we are okay with the below, we should

8    revisit the LOC issue later, after transfers of collateral are

9    affected.

10        Do you see that?

11   A    Yes, I do.

12   Q    Is that consistent with your understanding of Mr.

13   Kiplock's approach to transferring collateral to Barclays after

14   the sale closed?

15   A    Yes.  I don't recall any impediments or any issues raised

16   about moving collateral until much, much later.

17   Q    There is a letter sent, if you go to tab 7, on November

18   14th, 2008 from Mr. Kobak of Hughes Hubbard to again, Mr.

19   McDaniel of Sidley Austin representing the OCC.

20        Do you see that letter?

21   A    Yes, I do, November 14th.

22   Q    And you see that you are copied on that letter?

23   A    Yes, I was, right.

24   Q    And the beginning of that letter says, the trustee is

25   aware of the transfer and assumption agreement dated September

Page 131

```
 1    19, 2008, which of course, I executed on his behalf, and the

 2    trustee fully intends to comply with its terms.

 3         Do you see that?

 4    A    Yes, I do.

 5    Q    And are you familiar with the transfer and assumption

 6    agreement?

 7    A    I am.

 8    Q    What is your understanding of what the transfer and

 9    assumption agreement provides with respect to margin deposits

10    and Lehman's accounts at the OCC?

11    A    I don't have the words memorized, but it provided for the

12    transfer of those accounts to Barclays, and subject to OCC's

13    rights with respect to that account, consistent with the sale

14    order provisions we discussed a few minutes ago.

15    Q    Now, he goes on to say there remain between Barclays and

16    Lehman estate certain open issues.  And the beginning of his

17    next paragraph says this, our position is that this collateral

18    can be transferred to Barclays and the trustee will gladly

19    consent if Barclays will live up to its bargain and assume the

20    obligations involved for all customers, not just those in the

21    so-called PIM accounts.

22         Do you see that?

23    A    Yes, I do.

24    Q    Now, at the time you received this letter and as of now,

25    are -- do you have an understanding of whether Barclays has
```

Page 132

1    lived up to its obligations with respect to customers?

2    A    Yes, I believe they have.  I'm confused a little bit by

3    this letter, and I believe I was at the time, because while the

4    PIM accounts were formerly transferred, the other accounts were

5    still carried on the books at Barclays and Barclays had all of

6    the obligations associated with those accounts vis-a-vie, the

7    OCC.  And I thought that would be all that would be necessary

8    to satisfy the trustee.

9    Q    As of the time you received this letter, did you have any

10   understanding that the trustee was taking the position that

11   Barclays was not entitled to any of the collateral associated

12   with the exchange traded derivatives accounts it had acquired

13   from Lehman?

14   A    Absolutely the opposite.  I mean, the language of this

15   letter, but the whole history of communication including with

16   the trustee was, that the collateral would move.

17   Q    Let me refer you now to the next exhibit, tab 8 of your

18   binder, BCI Exhibit 979, which is an e-mail exchange between

19   you and Mr. Kiplock at Hughes Hubbard, a representative of the

20   trustee.

21       The first e-mail at the bottom half of the page is from

22   you dated December 23rd, 2008, an e-mail from you to Mr.

23   Kiplock.

24       Do you see that?

25   A    Yes, I do.

Page 133

1    Q    And you say, Chris, following our earlier discussion, we

2    are attaching a chart showing the various accounts and balances

3    along with copies of the account statements.

4         Can you explain what your e-mail was saying, and what is

5    attached to your e-mail?

6    A    Right.  this was a combination of a regular dialogue with

7    myself and Chris and the folks at Hughes Hubbard, trying to

8    make sure that we had collectively identified all of the Lehman

9    assets futures exchange traded derivatives, collateral assets

10   outside of the U.S. and most particularly, that they, LBI, were

11   filing protective claims with respect to those assets, because

12   it was Barclays' view and the view expressed by me in this e-

13   mail that we were entitled to those -- that collateral and

14   those positions.

15        So I provided to Mr. Kiplock a profile of what we

16   understood to be the positions around the world in exchange

17   traded derivatives and the associated collateral, asking him to

18   confirm that that collateral was to be transferred to us, and

19   that they were filing all of the appropriate protections to

20   secure for us our rights in those, in that collateral to the

21   extent that they were stuck in various bankruptcy regimes

22   around the world.

23   Q    Your e-mail, I don't know if you just explained this or

24   not, but it draws a distinction between accounts where there

25   were no open positions at the time of transfer.  You say in the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 134

1    third sentence, in those situations where there were no open

2    positions at the time of the transfer, BCI would not be seeking

3    the collateral in those accounts, and is simply identifying

4    those accounts for your benefit.

5    A    Correct.

6    Q    Can you explain that?

7    A    Yes.  It was only those accounts at the time of the

8    transfer that had open positions, and therefore, had in fact,

9    collateral associated with the exchange traded derivatives that

10   we were seeking to recover.

11       To the extent that there was an account that had no open

12   positions and just had money it in whatever form, cash,

13   securities, of whatever, that was not, as we interpreted,

14   associated with the exchange traded derivatives business, and

15   therefore we were not seeking those assets, just -- but

16   nonetheless, in order to be complete, we identified those

17   assets in this communication, so that we would hopefully agree

18   on what we learned around the world in terms of what was

19   available.

20   Q    Now, when you wrote this in December 2008, and you

21   explained what you'd identified, did you hear back from the

22   trustee telling you that Barclays had absolutely no right to

23   any of the collateral associated with these traded derivative

24   accounts?

25   A    My best recollection it was a fair amount of radio silence

Page 135

1    after that, and a letter was sent probably almost six months

2    later.  But at no time, did anybody raise with us the question

3    that somehow we were not entitled to the collateral as asserted

4    in this communication and prior communications.

5    Q    There's a response from Carolyn Levine above this e-mail

6    dated February 25th, 2009.  She says, Ken, I wanted to touch

7    base with you about the collateral related to futures accounts.

8    Is there a time, Thursday or Friday, that would be good for me

9    to give you a call.

10        Do you recall whether she ever, at that time in February

11   2009, told you that the trustee believed Barclays was not

12   entitled to any margin and any exchanged traded derivative

13   account?

14   A    No, it did not come up.  The discussions and

15   communications I had with Mr. Kiplock and Carolyn Levine were

16   all about agreeing to what the assets were and telling us about

17   the protections that they had filed with respect to them, and

18   basically trying to coordinate.

19             MR. HUME:  Your Honor, I'd like to move BCI 979 into

20   evidence.

21             THE COURT:  Any objection?

22             MR. MAGUIRE:  No objection.

23             THE COURT:  It's admitted.

24   (BCI's Exhibit No. 979 was received.)

25             MR. HUME:  Thank you.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 136

```
 1   BY MR. HUME:

 2   Q    Mr. Raisler, at tab 9 of your binder is BCI Exhibit 920,

 3   which is a letter to you from Hughes Hubbard dated July 15th,

 4   2009.

 5        Do you see that?

 6   A    Yes.  This is the letter I referred to a while ago that

 7   was a -- I think the first -- my best recollection the first

 8   formal response we received to the communication I'd sent on

 9   December 3rd.

10   Q    And it references in the second paragraph underneath that

11   heading on December 23rd, 2008, we received a chart of

12   accounts.

13        Do you see that?

14   A    Yes, I do.

15   Q    Did you understand that to be a reference to the e-mail

16   we'd just looked at?

17   A    I do, yes.

18   Q    And can you just again explain what is happening here

19   mechanically in terms of identifying all these accounts in July

20   of 2009?

21   A    Well, we were concerned that obviously the money was not

22   moving, the assts were not moving back to Barclays, and the

23   chart reflects assets in locations, in Asia, Europe, and other

24   places, and the amounts were relatively substantial.

25        We wanted to make sure that the trustee agreed with us
```

Page 137

1    about what the assets were, that the trustee was filing

2    protective claims in those bankruptcy regimes where

3    appropriate, and the trustee was doing all that they could to

4    move those assets back to Barclays and consistent with the APA

5    and the agreement we had with them.

6         And so the communication in December was to give them our

7    understanding of the universe.  This communication back in July

8    is their response to our request by telling them -- telling us

9    what they had done, and how they and we essentially and largely

10   agreed on the amounts, the locations, and the protections with

11   respect to this primarily collateral.

12   Q    And you can take a minute to review the letter if you

13   don't remember it, but does the letter say anything about the

14   trustee taking the position that Barclays was not entitled to

15   any margin associated with exchanged traded derivatives?

16   A    Absolutely not.  I've reviewed this letter and I remember

17   it.  There is nothing in the letter that speaks to Barclays not

18   being entitled to part of the margin or any of the margin.

19   It's completely silent on the issue.  But it is responsive on

20   the point of what we had requested in terms of documenting what

21   the universe of assets were, and how and what protections had

22   been filed with respect to them.

23   Q    Now, you were not involved in negotiating the terms, were

24   you, of the contractual documents, documenting the overall sale

25   transaction?

Page 138

1    A    I was not.

2    Q    I'd still like to refer you to tab 23 of the binder, which

3    is BCI Exhibit 5, which is the clarification letter.  Are you

4    familiar with this document?

5    A    Yes.  I was not a drafter of it, and I would've seen it

6    after the fact and would've worked with it in terms of some of

7    the issues that we're now discussing, including some dealings

8    with the trustee.

9    Q    And in paragraph 1(a) clarifies the definition of

10   purchased assets.  Says at the end of that paragraph, purchased

11   assets shall include.

12        Do you see that?

13   A    Yes, I do.

14   Q    And 1(a)(II)(C) includes within that definition of

15   purchased assets exchange traded derivatives and any property

16   that may be held to secure obligations under such derivatives.

17        Do you see that?

18   A    Yes, I do.

19   Q    And did you understand that phrase, when you first saw it,

20   to reference margin or collateral pledged to secure exchanged

21   traded derivatives?

22        MR. MAGUIRE:  Objection, Your Honor.

23        THE COURT:  What's the objection?

24        MR. MAGUIRE:  I don't believe this witness' legal

25   opinion or interpretation of the contracts that he saw after

Page 139

1    the fact is admissible.

2        THE COURT:  The question is whether the question

3    should be asked, and I'm going to sustain the objection.  He's

4    already confirmed that he had nothing to do with the document,

5    but he worked with the document, and so his views as to what it

6    might mean are no better than that of any other lawyer.

7        MR. HUME:  Right.  I'm not trying to elicit an opinion

8    on its meaning.  Let me ask the question this way.

9    BY MR. HUME:

10   Q   Was this language, Mr. Raisler, consistent with your

11   understanding of the transaction from the perspective that you

12   had?

13   A    Yes.  And to put a finer point on that, the e-mail that we

14   had discussed a few minutes ago that I had sent to Mr. Kiplock,

15   where I said we were not seeking collateral where there was not

16   an open exchanged traded derivative decision is also consistent

17   with the statement, it was only those accounts that open

18   exchange traded derivatives, because that would be the

19   collateral and those accounts would be property that may be

20   held to secure obligations under such derivatives.

21       So, yes, this did inform me and help me prepare that e-mil

22   of December 23rd that we focused on a minute ago.

23   Q   And in your dealings with the trustee through to at least

24   July of 2009, did the trustee ever express a view that was at

25   odds with your understanding that all property held to secure

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 140 of 190

Page 140

1  obligations under exchange traded derivatives were to be

2  transferred to Barclays?

3  A    No.  The -- and in fact, the July communication doesn't

4  take issue with it.  It's silent.  So even through July, from

5  my point of view, there was no disagreement between us and the

6  trustee about Barclays entitlement to that collateral.

7  Q    And if I could just briefly direct your attention to tab

8  24, you referenced a moment ago the transfer and assumption

9  agreement that was signed by the trustee the night of the sale

10  hearing.

11      In paragraph 1(a), it provides that for good and valuable

12  consideration, Lehman hereby sells, assigns, transfers, and

13  sets over to Barclays, I'm paraphrasing, but all of Lehman's

14  rights, title, interest, powers, privileges, remedies,

15  obligations and duties into and under in respect to the

16  account, with respect to and romanet two says, all margin

17  deposits held by OCC with respect to the account.

18      Do you see that language?

19  A    Yes, I do.

20  Q    And is that consistent with your understanding of the

21  transaction from the perspective you had?

22  A    Definitely.

23  Q    And did the trustee, at any time, at least through July of

24  2009 ever directly or indirectly suggest to you that they had a

25  different understanding of the transaction?

08-13555-mg   Doc 11281   Filed 09/10/10   Entered 09/13/10 15:46:36   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 141 of 190

Page 141

1    A    No.  Not to my recollection, no.

2    Q    Let me refer you to tab 10 of the binder.  Are you -- do

3    you recall generally, Mr. Raisler, that there was a inter-

4    pleader filed by the OCC in this court, relating to certain

5    letters of credit that were drawn down by the OCC at around the

6    time of the sale transaction?

7    A    Yes, I am generally familiar with that.

8    Q    BCI Exhibit 978 is the trustee's answer to that inter-

9    pleader complaint.  I'll represent to you that the inter-

10   pleader complaint puts at issue eighty million dollars that

11   were posted as letters of credit by four different banks, drawn

12   down by the OCC, and at some point, put into a suspense

13   account, allegedly rather than Lehman's normal trading account.

14       And the trustee's answer, I'd refer you to page 12 on

15   paragraph 51, his answer was filed February 6th, 2009.

16   Paragraph 51 asserts, in the alternative, without the benefit

17   of discovery, upon information and belief, LBI may be entitled

18   to the funds, the funds is this eighty million dollars I

19   referenced.

20       LBI may be entitled to the funds for several reasons, and

21   under several possible scenarios, including without limitation

22   the following:  One, to the extent that the September 19th,

23   2008 draw on the letters of credit by the OCC was in violation

24   of OCC Rule 604(c), but the LC issuers are not as a result

25   entitled to have the funds returned to them.

Page 142

1      Do you see that?

2    A    Yes, I do.

3    Q    Okay.  Romanet two says, to the extent that the LC

4    proceeds were held by the OCC in a suspense account, and never

5    deposited in LBI's or Barclays' margin account at the OCC, and

6    accordingly, do not constitute purchased assets within the

7    meaning of the purchase agreement, or margin deposits, or are

8    not otherwise part of LBI's account within the meaning of the

9    TAA, the transfer assumption agreement, LBI is entitled to the

10   funds, and Barclays has acquired no interest in the funds.

11      Now, does this allegation by the trustee in February 2009

12   suggest to you that the trustee was taking the position that

13   Barclays had no entitlement to any margin deposits in any of

14   Lehman's exchange traded derivatives accounts?

15      MR. MAGUIRE:  Objection, Your Honor, to a lawyer being

16   asked to construe a pleading, which he was not involved in or

17   was not addressed to him, or directed to him, and which he did

18   not prepare.

19      THE COURT:  I'll sustain that objection, although it

20   may be possible to get at the subject matter with a different

21   question, and you have the ability, if you wish, to ask another

22   question.

23      MR. HUME:  This is when my questioning skills get put

24   to the test.

25      THE COURT:  Absolutely.

Page 143

BY MR. HUME:

Q    Mr. Raisler, does this phrase, reading it now, does it

suggest to you that the trustee is taking the position here

that Barclays is not entitled to any margin deposits in any

Lehman exchange traded derivative account?

A    No.  By its terms it suggests the opposite.  Because if

the funds were in the margin account implicitly under romanet

two, the inference from this language is that they would be

available to be included in the account, and therefore,

transferred.

Q    Now, you are familiar with the fact that the trustee filed

a Rule 60(b) motion in September 2009, generally familiar?

A    Generally.  Don't quiz me on that one either.

Q    That's why we're here, one of the reasons.  I'd like to

refer you to tab 17, which is an excerpt from that trustee

brief, and on page 25, the trustee has a new section of the

brief entitled, the agreements do not convey exchange margin

and clearing funds.

Do you see that?

A    I do.

Q    And in the next page, paragraph 71 says, the drafting

history also indicates that the parties did not intend under

the clarification letter to transfer any margin or clearing

funds to Barclays.

Do you see that?

Page 144

1    A    I see that, yes.

2    Q    Is that consistent with your understanding of the

3    transaction that you worked on?

4    A    Absolutely not.

5            MR. MAGUIRE:  Objection.

6            THE COURT:  What's the objection?

7            MR. MAGUIRE:  I don't believe there's any foundation.

8    This witness had nothing to do with the drafting history.

9            THE COURT:  Well, you're absolutely right.  He's

10   already said he had nothing to do with drafting the

11   clarification letter.  The objection is sustained, but you can

12   ask another question.

13           MR. HUME:  Your Honor, I'll -- maybe I'll refine and

14   more precisely ask the question as I did before.

15   BY MR. HUME:

16   Q    Are these assertions consistent with the understanding you

17   had of the transaction from the perspective you had and the

18   work that you did that week September 15th, 2008?

19           MR. MAGUIRE:  Same objection, Your Honor, with respect

20   to these assertions specifically referring to the drafting

21   history.

22           THE COURT:  Sustained.

23           MR. HUME:  Maybe I'll just ask the question on the

24   previous assertion.

25   BY MR. HUME:

Page 145

1  Q    Does the assertion that no margin of any kind was being

2  transferred, is that assertion consistent or inconsistent with

3  the perspective you had of the transaction during September

4  15th, 2008?

5  A    Completely inconsistent as I have testified.  It was my

6  understanding throughout that week and thereafter, and the work

7  that I did with the trustee, that margin and collateral would,

8  in fact, be transferred.

9  Q    So is this assertion inconsistent with all of your

10  dealings with the trustee through to at least July 2009?

11  A    Yes, it is.

12  Q    Do you remember the first time you learned that the

13  trustee was taking this position?

14  A    I don't remember precisely.  It would've been after that

15  July letter.  My best recollection is that we, after receiving

16  the July letter, we asked for a meeting with the trustee, but

17  my recollection's quite vague as to when that took place, and I

18  think it was at that meeting for the first time that they

19  raised questions about our entitlement to the margin.  That was

20  the first time I'd heard that assertion.  So I think the second

21  half of 2009.

22  Q    Let me -- I don't think this is in your binder, but I want

23  to pull up on the screen if I could the deposition of the

24  trustee's 30(b)(6) representative, Mr. Jim Kobak to page 282

25  and 283.  And starting on page 282 at line 14, Mr. Kobak is

Page 146

1    being shown something called the collateral agreement that was

2    presented to him by the OCC and that he signed, and it says,

3    quote, LBI has assigned to Barclays all rights and securities,

4    cash and other property, defined as collateral, pledged by LBI

5    to the Options Clearing Corporation and held for OCC's benefit

6    at JP Morgan Chase.

7         Do you see that?

8         Answer, yes.

9         Question, and was it your understanding that that's what

10   the trustee was authorizing when you signed this?

11        Answer, yes.

12        And was it your understanding that that's -- excuse me.

13        Yes.

14        And was it, yes, consistent with the overall deal that

15   there be no cash excess that would go to Barclays, because that

16   would be inconsistent with the no cash, and that this wouldn't

17   make the deal so rich that it went way beyond the parameters

18   that we discussed earlier?

19        Just two more questions and answers.

20        Question, did you tell anyone this, when you say you

21   signed as consistent with the idea that there would be no cash,

22   this says cash.  This says cash will be transferred to

23   Barclays.

24        Answer, yeah, but cash will be transferred against the

25   liabilities.  What I'm saying is, nobody told us there might be

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 147 of 190

Page 147

1  in excess of a billion dollars of cash, or something like that,

2  that would end up at Barclays when the deal was no cash, and

3  when there was an economic parameter to the deal.

4       Last question and answer.

5       So to the extent the cash was simply needed to cover the

6  liabilities, you thought it was possible to be included in the

7  deal; is that correct?

8       Answer, yes.

9       Now, did anyone from the trustee, in your dealings with

10  the trustee, from the time of the sale transaction through the

11  summer of 2009, ever express this view of what margin should be

12  transferred to Barclays and what should not?

13  A    This is the first time I've seen this view expressed in,

14  you know, in the middle of 2010.  I've never seen this before

15  and it was never discussed or raised in any of the meetings or

16  discussions I had including discussions with the trustee.

17  Q    Is your understanding that this view is inconsistent with

18  the dealings you had with the trustee?

19  A    Yes.  It is inconsistent with my clear understanding of

20  the transfer of all of the collateral and margins supporting

21  exchanged traded derivatives in whatever form, whether it be

22  cash, or securities, or any other instruments.

23  Q    Do you understand sitting here now that I've shown you

24  this, and shown you what the trustee said in his Rule 60 brief,

25  is this consistent with what you were shown that the trustee

Page 148

1    said in the Rule 60 brief?

2    A    I think not.  I mean, this is a very interesting but hard

3    to reconcile position, at least with respect to the exchange

4    traded derivatives.

5    Q    This deposition was in December 2009.  The Rule 60 brief

6    was in September 2009.  In March 2009, the trustee filed a

7    reply brief, which is located at tab 25 of your binder.  And if

8    you'd turn to the last page excerpted, which is page 45,

9    paragraph 101, it refers to the parenthetical expression, and

10   this is the parenthetical expression in the clarification

11   letter that you saw earlier.  Do you recall that?

12   A    Yes, I do.

13   Q    And the title says, the parenthetical expression refers to

14   two billion dollars in customer property, that LBI held, and

15   does not give Barclays an additional four billion dollars in

16   the margin assets that LBI posted.

17       The first sentence elaborates upon that assertion.  The

18   parenthetical, and it quotes with the parenthetical says, any

19   property that may be held to secure obligations under such

20   derivatives does not purport to transfer any margin, other than

21   property that LBI held for its customers.

22       Is that position consistent or inconsistent with the

23   dealings you had with the trustee from the time of the sale

24   transaction all the way through the summer of 2009?

25   A    For the record, I think you mean 2010, when you referred

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 149 of 190

Page 149

1    to the date of this document, but this is incompletely

2    inconsistent.  There was no limitations.  This was not strictly

3    with respect to customer property.  I testified extensively

4    that the transfer was of the house or proprietary positions and

5    all collateral, as well as the customer positions and all

6    collateral, as well as, you know, any buffers and anything else

7    that was in those accounts.

8    Q    Did anyone at any time, Mr. Raisler -- did you have a

9    general understanding at the time of the sale transaction that

10   the collateral could be in the form of either cash or other

11   forms of property and securities?

12   A    Yes, absolutely.  That traditionally would be the way in

13   which collateral was held by a clearing member through a

14   clearing bank or by the clearing house.  It's a variety of

15   instruments, including cash.

16   Q    Did anyone -- I think I asked you before.  Did anyone at

17   any time suggest that whether the collateral would be

18   transferred would depend upon whether it was cash or securities

19   or other types of collateral?

20   A    That issue never came up.

21   Q    Did anyone ever address whether the transfer of the

22   collateral would depend upon the maturity life of the

23   securities, whether it was a three-month security, a six-month

24   security or a longer maturity?

25   A    That never came up.

Page 150

1    Q    Would it have made sense to you if it had?

2    A    It would not.  Basically, margin and collateral have a

3    clear meaning.  As I indicated earlier, that's the standard

4    transfer instrument with the positions, goes all the collateral

5    in whatever form, because that collateral supports the

6    positions in the same way that what you see in the auction on

7    the morning of the 18th, they were auctioning the positions and

8    the buyers of those positions took all of the collateral.  They

9    didn't care whether it was cash or securities or bonds or

10   whatever it was.

11           MR. HUME:  Your Honor, I don't have any more

12   questions, but I think I neglected to move two documents into

13   evidence.  I don't know whether I moved the letter at tab 9,

14   BCI Exhibit 920.

15           MR. MAGUIRE:  I have no objection to BCI 920, Your

16   Honor.

17           THE COURT:  It's admitted.

18   (BCI's Exhibit No. 920 was received.)

19           MR. HUME:  And BCI 978 at tab 10, the answer to the

20   inter-pleader.

21           THE COURT:  It's in the public record.

22           MR. MAGUIRE:  No objection, Your Honor.

23           THE COURT:  It's admitted.

24   (BCI's Exhibit No. 978 was received.)

25           MR. HUME:  Did I -- if I didn't move it in, BCI

Page 151

1    Exhibit 979, which is the e-mail exchange between Mr. Raisler

2    and Mr. Kiplock.

3              MR. MAGUIRE:  No objection, Your Honor.

4              THE COURT:  It's admitted.

5    (BCI's Exhibit No. 979 was received.)

6              MR. HUME:  Thank you, Your Honor.

7              MR. MAGUIRE:  Bill Maguire for the SIPC trustee, if I

8    might approach, Your Honor.

9              THE COURT:  Sure.  Thank you.

10             MR. HUME:  Thank you.

11                        CROSS-EXAMINATION

12   BY MR. MAGUIRE:

13   Q    Now, sir, you told us that you were not involved in the

14   negotiations for the asset purchase agreement.

15   A    That is correct.  Actually, some of my partners at

16   Sullivan & Cromwell were involved, but I was not.

17   Q    And you understand that's the transaction that's at issue

18   here, the asset purchase agreement?

19   A    I think as a general matter, yes, they're obviously

20   associated agreements we've talked about.

21   Q    If we say, just so we're on the same wave length, if I

22   refer to the deal or the transaction or the APA, what I'll be

23   referring to is the asset purchase agreement.

24   A    Fine.

25   Q    And it's -- I believe it's true, is it not, sir, that you

Page 152

```
 1    never saw the APA until at least a substantial time after it

 2    had been entered into?

 3    A    I certainly didn't see it contemporaneously.  I might have

 4    been told about -- I certainly was told about it, and it might

 5    have been something that was on some desk or some place, but I

 6    don't recall sort of spending any time with it until a

 7    substantial period after, yes.

 8    Q    And if you ever saw the clarification letter, that would

 9    only have been at the same time, that is a substantial time

10    after it had been entered into.

11    A    That's correct.  I think the question of substantial, it

12    could've been a matter of week or ten days, if that's your

13    definition of substantial, I think we would agree.

14    Q    And in terms of the events that you've talked about this

15    morning and this afternoon about what you did during that week,

16    the Lehman week, in the course of that, you had not spoken to

17    anyone who was actually involved in negotiating the APA?

18    A    I might've had a conversation with one of my partners and

19    potentially had a negotiation with somebody from Cleary, but I

20    don't recall any discussions about the substance of the APA.

21    Q    And the people that you were dealing with on the Lehman

22    side, you mentioned at least a Jeff Jennings, Ron Filler, you

23    remember mentioning them.

24    A    Yes, I do.

25    Q    The people that you were dealing with that week, those
```

Page 153

1    Lehman people were not responsible for negotiating the APA.

2    A    They were not.

3    Q    And none of your meetings with any of the Lehman people

4    was a negotiation of the APA or of the clarification letter?

5    A    It was not.

6    Q    And so you don't know what the parties, what the business

7    principals and their representatives agreed to in terms of the

8    business negotiations?

9    A    I have to take a little bit of issue with that, insofar as

10   our instructions and the work we did throughout the week had

11   embedded in it a set of assumptions.  I would have --

12   Q    And that's my point, sir.  I want to put aside embedded

13   assumptions, and ask you to direct yourself to your personal

14   knowledge, and as a lawyer, you understand what personal

15   knowledge is.

16   A    Right.

17   Q    You had no personal knowledge, you were not personally

18   participating in any of the negotiations.

19   A    That is correct.

20   Q    You did not personally -- you were not present when any

21   discussions occurred concerning the terms that were going into

22   the APA.

23   A    That is correct.

24   Q    You were not present when the principles decided what the

25   business agreement was.

Page 154

1    A    That is correct.

2    Q    You do not therefore know what the business people said to

3    each other on the subject of what would go into the APA?

4    A    I think that's a fair statement.

5    Q    You do not know what the business people said to each

6    other or communicated to each other, specifically on the issue

7    of Lehman's margin?

8    A    I do not.

9    Q    You do not know what they agreed amongst each other, what

10   they specifically communicated to each other with respect to

11   Lehman's cash?

12   A    Also correct.

13   Q    Or with respect to Lehman's cash equivalence?

14   A    Also correct.

15   Q    Now, you told us about your meeting on Monday,

16   Sunday/Monday, I believe, this was a discussion about acquiring

17   the futures business, and that was a siloed discussion, was it

18   not?

19   A    Yes, it was, at least until sometime late Monday, right.

20   Q    Okay.  And your understanding, however, didn't really

21   change throughout the whole week.  The understanding that you

22   told us about this morning, you said basically it stayed the

23   same.

24   A    That is correct, with the signing and the announcement of

25   the APA which we heard about, our mission did not change.

Page 155

```
 1    Q    The idea of acquiring just the futures business, that

 2    however was totally overtaken by events, by the APA, right?

 3    A    Well, when you say totally overtaken, yes, we -- it

 4    obviously was overtaken in that sense, but the acquisition and

 5    transfer of those assets was still the mission statement that I

 6    was instructed to comply with.

 7    Q    The APA was a different deal than an acquisition in the

 8    futures business.  It involved the whole markets business of

 9    Lehman, did it not?

10    A    It was a different deal insofar as it was broader.  But as

11    with respect to my instructions and my responsibility, it was

12    the same deal.

13    Q    That was your under -- your embedded understanding from

14    Sunday, Monday on in your siloed discussion, your understanding

15    was -- remained the same throughout that whole week?

16    A    That is correct.

17    Q    And there was also some additional agreements that you had

18    some involvement with, and that was addressing concerns of

19    certain exchanges like the CME and the OCC?

20    A    Right, and the COTC as well, right.

21    Q    Okay.  Now, you mentioned some other transactions that you

22    had some experience in.  One I believe was the FIA.

23    A    The FIA is a trade association, Futures Industry

24    Association, that I have been actively a member of.  I've been

25    on the board of the FIA for eighteen years.  It itself is just
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 156

1    an industry trade association representing brokers and other

2    market participants.

3         My comment was that it is through the work of the FIA that

4    I was familiar with a number of these bankruptcies or near

5    bankruptcy transfers of positions.  Those position transfer

6    activities occurred on their own, that is what I described

7    Drexel or Kline or Griffin or whatever, it was in many cases,

8    through the FIA that I learned about them.

9    Q    So when you testified about the other deals that you were

10   aware of, you're not suggesting that you were representing the

11   transferor or the transferee in any of those deals?

12   A    In the Drexel deal, to the best of my knowledge, we were

13   one of the counsel involved in representing Drexel in the

14   transfer of their futures business.  With respect to the others

15   I highlighted, there's one I believe I left out, in which we

16   were more directly counsel, and that's a transfer from the SIM

17   Group to Barclays.  We represented Barclays in portions of that

18   transaction that also was a transfer of futures positions and

19   futures collateral.

20   Q    And --

21   A    But the others, you're correct, I was not representing any

22   of the transferor or transferee parties.

23   Q    And it's your understanding in those deals, that the

24   business intent of the parties was that margin was included in

25   the deal?

Page 157

```
 1   A    And that was, in fact, what occurred, yes.

 2   Q    All right.  And in none of those deals, did you understand

 3   it, did the parties have a business intent to exclude margin?

 4   A    Not to my knowledge, that's correct.

 5   Q    And so far as you're aware, in none of those deals, was

 6   there an explicit exclusion of all of the transferor's cash,

 7   cash equivalence, and highly liquid government securities?

 8   A    To my knowledge, each of those deals were consistent with

 9   what I testified earlier to, which is a pretty straight forward

10   transfer of all the positions and assets and collateral in

11   those accounts, yes.

12   Q    And I believe you mentioned that if margin was to be --

13   was not being transferred, then there would need to be some

14   special provision, right?

15   A    Yes, that's correct, particularly, vis-a-vie the

16   regulators and the exchanges, because they need to have the

17   margins to support the positions.

18   Q    There would have to be a replacement margin?

19   A    At a minimum, yes.

20   Q    Were you privy to any of the communications between,

21   e-mails between the OCC and Ed Rosen concerning replacement

22   margin in connection with the APA?

23   A    I probably did see some of those.

24   Q    Were you involved in any discussions with the OCC or with

25   Ed Rosen concerning the issue of replacement margin?
```

Page 158

1    A     I don't recall.

2    Q     I believe you mentioned just a little while ago that you

3    had not -- that the trustee had not taken issue with the notion

4    that all margin was going to Barclays until sometime after July

5    of 2009.

6    A     That is correct.

7    Q     And that the -- it was only after July of 2009 that the

8    trustee first raised questions about Barclays' entitlement to

9    margin.

10   A     That's my best recollection.

11   Q     In fact, you met the trustee's legal team before July of

12   2009, specifically with respect to the dispute between the

13   parties concerning Lehman's margin; did you not?

14   A     My best recollection is when we transmitted the e-mail on

15   December 23rd that we have discussed, that as of that time, we

16   transmitted that e-mail to codify our position with respect,

17   not just to the collateral issue, but also with respect to the

18   getting an understanding about protecting the assets and

19   identification of those assets.

20         As of that time, I do not recall any concerns being raised

21   by the trustee to our rights to that collateral, but that

22   December 23rd e-mail sought confirmation that the collateral

23   was transferred.

24   Q     You don't recall meeting with the trustee's litigators on

25   this issue?

Page 159

```
 1   A    I will confess we had a lot of meetings, and it certainly

 2   is possible, I don't recall it.

 3   Q    Do you recall visiting my office and meeting me?

 4   A    Please take no offense, I do not.

 5   Q    No offense taken.  I obviously did not make much of an

 6   impression.

 7        Do you recall whether there were meetings specifically

 8   before July of 2009, in which it was clear that the trustee did

 9   not accept Barclays' position with respect to margin?

10   A    I don't recall them.  As I say that in 2009, as I

11   indicated in my testimony earlier, sometime in 2009, I thought

12   it was after July, there was a meeting in which the issue of

13   collateral was contested.

14        If it occurred before July, I can't say that that would be

15   wrong, I just don't recall it.

16   Q    You mentioned that following your e-mail to my partner,

17   Carolyn Levine, there was radio silence, and you didn't receive

18   anything indicating the trustee's position until July 15 of the

19   following year.  Do you recall that testimony?

20   A    Right.  As we --

21             MR. HUME:  I think he's mischaracterizing the

22   testimony, Your Honor, and the document.

23             THE COURT:  Okay.  I'll take that as an objection.

24   the objection is that the question has just mischaracterized

25   his testimony and a document.  Maybe you just want to start
```

08-13555-mg   Doc 11281   Filed 09/10/10   Entered 09/13/10 15:46:36   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 160 of 190

Page 160

1    over.

2              MR. MAGUIRE:  Sure.

3    BY MR. MAGUIRE:

4    Q    With respect to the testimony you gave about radio

5    silence, with respect to the trustee's position, are you with

6    me?

7    A    So far.

8    Q    Okay.

9    A    I'm waiting for a question.

10   Q    Did you not hear from your client Barclays about a whole

11   series of correspondence between the trustee and Barclays,

12   specifically, Jonathan Hughes on the issue of disputed assets,

13   including margin?

14             MR. HUME:  Your Honor, the way that question is

15   phrased does call for privileged communications.  He's free to

16   show the correspondence between Barclays and the trustee, and I

17   think it'd be more helpful if he did, but this is asking what

18   his client may have told him, so I object on privilege.

19             THE COURT:  That objection is sustained.

20   BY MR. MAGUIRE:

21   Q    Did you not, sir, personally receive an e-mail from my

22   partner, Carolyn Levine, in April of 2009 specifically stating

23   we do not concede Barclays' entitlement to each such deposit?

24   A    Sitting here today, I don't recall it.  I wouldn't dispute

25   it, because I do recall that after December -- well, after

Page 161

1    December 23rd's e-mail which we've discussed, there was a

2    response from Ms. Levine in February, which is included in the

3    e-mail chain.  And then after that, as I indicated some time in

4    2009, disputes were highlighted, but I don't remember whether

5    -- I thought it was after the July letter.  It could've been

6    before.

7            MR. MAGUIRE:  If I might approach, Your Honor.

8            THE COURT:  Sure.

9    (Pause)

10   Q    Sir, I've showing you a document that's being marked as

11   Movant's Trial Exhibit 888, and that is an e-mail that you and

12   others received from Carolyn Levine on April 3, 2009; is that

13   correct?

14   A    Yes.

15   Q    And you'll notice in the second sentence of the e-mail,

16   Ms. Levine says, quote, I did want to clarify that while we are

17   working diligently to take the necessary steps including claims

18   in relevant foreign proceedings, to secure any property held as

19   margin on the various foreign exchanges, we do not concede

20   Barclays' entitlement to each such deposit.

21           And that was your understanding, was it not, sir?

22   A    As I indicated earlier, I do recall that the issue of

23   collateral was contested at some point in 2009.  This e-mail

24   would indicate that that was as early as April, rather than

25   after the July communication.  I didn't recall this

Page 162

1    communication, but I think the substance of it is consistent

2    with what I indicated I thought occurred after July.

3    Q    And it's clear that that happened well before July.

4    A    It happened in April.

5    Q    Now, sir, your understanding was that Barclays was taking

6    over Lehman's futures business, and in that connection, there

7    was a connection about whether there was sufficient seg and

8    secured property, right?

9    A    I'm sorry, I'm having a little trouble with your question.

10   Q    Whether there was sufficient property that Lehman had in

11   the customer seg and secured account.

12   A    I'm sorry, I still need a little bit of context.  There

13   were a lot of issues that were of concern, that was one of

14   them.

15   Q    You wrote a letter to the CFTC.

16   A    Yes.

17   Q    And the basis for that letter, you testified to before,

18   specifically to the representation that you understood there

19   was sufficient property in Lehman's seg and secured accounts.

20   The basis for that representation, what you told us you had to

21   go on, was the fact that there was no default.

22   A    That is correct.

23   Q    And if there was no default in any of the exchanges, then

24   you could infer that Lehman was compliant.

25   A    Correct.

Page 163

1   Q    And, of course, we are -- you testified also about the

2   Lehman buffer, and if I understand right, that is excess

3   property that Lehman put into the customer seg and secured

4   account, so that there would never be any deficiency with the

5   exchange.

6   A    I would radically disagree with the word never.  I think

7   that the buffer is put there to reduce the risk of the account

8   being under seg'd.  But it certainly is no guarantee because

9   the market can move in ways that eat up whatever that buffer

10  is, no matter how large it is.  But it's a way in which firms

11  put money in an account to avoid the risk or to reduce -- I'm

12  sorry, to reduce the risk of being in a shortfall position.

13  Q    There's two types of Lehman proprietary property, I

14  believe you testified about.  And one is the Lehman property

15  that it had in its own accounts, and the other is the Lehman

16  property that it put in the customer seg and secured accounts;

17  is that right?

18  A    Right.  If you use Lehman broadly, because there's also

19  Lehman affiliates, but yes.

20  Q    Right.  And Lehman affiliates were customers of Lehman,

21  but their positions were in the house account, and their margin

22  was in the house margin account.

23  A    Under the regulations, the positions of affiliates are

24  proprietary if there's any -- if there's ten percent or more

25  overlapping ownership.

Page 164

```
 1   Q    But with the correction that you make, and just reading

 2   Lehman broadly, the Lehman proprietary property was in two

 3   places.  It was in the Lehman accounts or it was the excess

 4   that Lehman had put into the customer seg and secured.

 5   A    Right.  And we're talking futures here, right?

 6   Q    Yeah.

 7   A    Yes.

 8   Q    And the excess you had used the term buffer.

 9   A    Correct.

10   Q    That was the term that you used for the excess that Lehman

11   put in the customer seg and secured accounts.

12   A    Correct.

13   Q    Now, at the time, you did not actually know that there was

14   any -- that there were any Lehman assets in the customer seg

15   and secured accounts, as well as the customer property.

16   A    I would say I'm not familiar with any accounts that don't

17   have a buffer in it.  So I guess it would be to me quite -- I

18   mean, you're correct in the sense that I didn't literally know

19   it, but the fact is that would be standard and routine in the

20   industry.

21   Q    And you made a point about how that would be standard and

22   routine.  But as a fact, you did not have -- you didn't even

23   have an understanding, one way or the other, at the time, as to

24   whether there were any Lehman assets in the customer seg and

25   secured accounts.
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 165

1   A    Not sure that's right.  The -- I'm not -- my recollection

2   is not precise about this, in terms of what kind of information

3   we received.  But I certainly would have assumed, based on

4   general knowledge, and perhaps specific knowledge that there

5   was a buffer there.

6   Q    If you turn, sir, to the deposition transcript.  You

7   should have in the small binder I just gave you, and it should

8   be, I think, in tab 1.  Do you have it there?

9   A    I do.

10  Q    If you could turn to page 130, reading at line 11.  You'll

11  see you were asked the following questions, and gave the

12  following answers.

13       Question, did the accounts and the funds, the segregated

14  and secured funds that were being moved in October, did they

15  include LBI assets, as well as assets that were the property of

16  customers?

17       Answer, I think I can answer that question this way.  It

18  was my understanding that all of the property that was in the

19  seg and secured accounts moved to Barclays.

20       The next question, and at the time it was moved, sir, did

21  you have an understanding one way or the other, as to whether

22  the property included property of LBI, as well as property of

23  customers?

24       Answer, I don't believe I had an understanding one way or

25  the other, other than my best recollection was, that all of the

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 166

1    collateral in those accounts moved to Barclays.

2         You were asked those questions and you gave those answers;

3    is that correct?

4    A    That is correct.

5    Q    Now, sir, you told us with respect to the Lehman

6    proprietary positions, that you had limited information, and in

7    fact, you gave us just a small example, you called it, was the

8    VIX positions, those are the volatility index.

9    A    Yes.

10   Q    And I believe you gave that to us as a small example of

11   proprietary positions that you understood were part of this

12   deal.

13   A    I gave that as an example of proprietary positions that we

14   didn't learn about in our meetings with Lehman during the

15   course of the week, and that we found out about late in the

16   transaction, yes.

17   Q    But they had been on the books all week was your

18   understanding, right?

19   A    They were not new positions, that's correct.  They had

20   been on the books, and they were positions, to the best of my

21   recollection of affiliates of Lehman, and had not been brought

22   to our attention.

23   Q    And you felt they should've been brought to your

24   attention.

25   A    That is correct.

Page 167

1    Q    And it was your understanding at the time that they were

2    part of the deal.

3    A    That was our understanding, yes.

4    Q    Okay.  Now, did you discuss your understanding with Ed

5    Rosen?

6    A    I honestly don't recall.

7    Q    If you'd turn to tab 5 of your binder, you'll see Movant's

8    Trial Exhibit 736.  And that is an e-mail from Ed Rosen to

9    Robert Colby at the SEC.

10        Do you see that, sir?

11   A    Yes, I do.

12   Q    And if you look down at the body of the text you'll see he

13   says, Bob, I tracked it down, just a junior associate at

14   outside counsel to OCC that did not understand the conversation

15   he was listening to.  There are VIX futures positions in an

16   account at OCC that are not part of the deal, but that as a

17   practical matter, we have to take what the LBI OCC accounts.

18        Do you see that?

19   A    I do, yes.

20   Q    Now, that is not consistent with your understanding.  Your

21   understanding was that these were VIX were part of the deal;

22   isn't that right?

23   A    Yes.

24   Q    So we have a disconnect between you and Ed Rosen on this

25   subject; is that right?

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 168 of 190

Page 168

1    A    I don't know what Mr. Rosen's saying here, and I don't

2    recall specifically talking to him about it.  I do recall,

3    though, that we spent a considerable amount of time over the

4    weekend of the 20th, 21st of September discussing the

5    consequences of taking on this position as part of the

6    proprietary account of Lehman.

7    Q    And because you personally were not privy to the

8    negotiations of the deal, you're not in a position to tell us

9    one way or the other from your personal knowledge, whether

10   these VIX positions were part of the deal or were not part of

11   the deal?

12   A    I can only say I was doing an awful lot of work

13   unnecessarily if they were not part of the deal.

14   Q    But you have no knowledge either way, no personal

15   knowledge?

16   A    Well, my history tells me that clients don't usually ask

17   me to do work unnecessarily, so my inference is a pretty safe

18   one.

19   Q    We're all capable of leaping to inferences and judgments,

20   and some of them may be entirely right, and some of them may

21   not be, and that's why I'm really not asking you for your

22   inference.  I'm asking for your personal knowledge.  And as a

23   lawyer, you understand exactly what I'm asking you for; isn't

24   that right, sir?

25   A    I just disagree with you on the word leap, yes.

Page 169

1    Q    Okay.  Leaving aside your inferences, you have no personal

2    knowledge of what the negotiators of the APA put in the deal or

3    didn't put in the deal.

4    A    We've agreed on that earlier, yes.

5    Q    Okay.  Now, you did testify about Lehman's margin that it

6    had posted on his proprietary future positions, and

7    specifically referred to initial margin, right?

8    A    Yes.

9    Q    And you understood that that was part of the deal, right?

10   A    Yes.

11   Q    Now, were you aware that on the Thursday night and the

12   Friday morning, and through Friday, Barclays' negotiators set

13   off a scramble to find additional assets to add to this deal?

14   A    I'm not aware of that.

15   Q    You were not in any way involved in the Friday asset

16   scramble?

17   A    I was not.

18   Q    If you turn, sir, to tab 6 of your binder.  There, sir,

19   you'll see an e-mail exchange between two Barclays senior

20   executives.  That's Movant's Trial Exhibit 620.

21        And you'll see at the bottom, Stephen King says to Patrick

22   Clackson on Thursday night, why don't we add the initial margin

23   on the repos.

24        Do you see that, sir?

25   A    I do.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 170

1    Q    And you'll see the response, a further follow-up rather

2    from Mr. King again to his colleague, Patrick Clackson.  He

3    says, sorry, I meant, exchanges and clearing houses.

4         Do you see that?

5    A    I do.

6    Q    So you see that here Stephen King is suggesting adding

7    initial margin at the exchanges and clearing houses.

8         Do you see that?

9    A    I must confess I don't have a context for this e-mail to

10   understand what it means.

11   Q    You were not aware that there was any suggestion by any

12   senior Barclays' executive that Lehman margin be added to the

13   deal; isn't that right?

14   A    Lehman margin was already in the deal, I don't understand

15   what you're saying.

16   Q    Well, exactly.  If Lehman margin was already in the deal,

17   then there would be no need to add it on Thursday night, right?

18   A    I have no basis to comment on what you're saying, because

19   this e-mail doesn't give me any insight at all to what was

20   going on.

21   Q    And you certainly weren't privy to any discussions with

22   either Mr. King or Mr. Clackson, right?

23   A    That is correct.

24   Q    And you don't know what Mr. Clackson, if anything, what he

25   did in response to the suggestion that margin be added to the

Page 171

1    deal?

2    A    I do not.

3    Q    You testified, sir, about the liquidation at the CME,

4    Chicago Mercantile Exchange.

5    A    Correct.

6    Q    That was an auction, it was auctioned off?

7    A    That was what I was informed of, yes.

8    Q    Now, you understand that one of the winning bidders in

9    that auction was none other than Barclays itself?

10   A    I learned that after.  I don't recall how soon after, yes.

11   Q    Now, are you aware, sir, whether the winning bid contained

12   a specific language requiring the transfer of Lehman margin, as

13   the price for that bid?

14   A    I'm not privy to those negotiations or the terms of those

15   deals.  What I was told is that the margin moved with the

16   positions, but I don't know how that was reflected or

17   memorialized.

18   Q    And so you can't tell us whether any of that language was,

19   in any way, put into the APA or the clarification letter?

20   A    I'm sorry.  I lost you on APA.

21   Q    The bid language.  When Barclays bid for the winning

22   position at the CME, and said, we'll take this position, but

23   we've got to have the margin.  When Barclays said that, you

24   don't know whether the language that Barclays used, Barclays

25   also put in the APA or the clarification letter.

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 172 of 190

Page 172

1    A    I'm sorry, I'm just having trouble making the, I'll use

2    your word, leaps that you're proposing here.  I don't follow

3    your question, I'm sorry.

4    Q    Okay.  But you haven't seen the Barclays' bid?

5    A    The Barclays' bid at the auction?

6    Q    Right.

7    A    I have not.

8    Q    Okay.  I believe there came a time, did there not, where

9    the CME asked for a guarantee of customer positions; is that

10   right?

11   A    No, the CME asked -- well, actually, it's two parts.  The

12   CME asked for a guarantee of the proprietary positions on

13   Wednesday evening.

14   Q    Not then.

15   A    Then on some time on Friday, the CME asked for a guarantee

16   of the customer positions for purposes of the opening on

17   Monday.

18   Q    And Barclays agreed?

19   A    Yes.

20   Q    And gave that guarantee?

21   A    Yes.

22   Q    Have you seen that guarantee?

23   A    Yes.

24   Q    Is it in writing?

25   A    Yes.

Page 173

```
 1   Q    The discussions that you had with the exchanges, they were

 2   at a very high level, were they not?

 3   A    I'm sorry?

 4   Q    Well, for example, you weren't looking at what nature or

 5   types of positions the Lehman positions were at the exchanges.

 6   You were focused really on whether the exchanges saw, if there

 7   was any impediment, to moving positions to Barclays, right?

 8   A    I think there were two things.  I mean, you're correct, I

 9   wasn't looking at details of positions, because among other

10   things, that was proprietary to Lehman and not us, but we

11   needed to know in terms of whether there were any impediments,

12   whether -- what the positions were, what the contours generally

13   speaking of those positions were.

14   Q    And --

15   A    So there were some specifics not going beyond just were

16   there any impediments, in terms of understanding what those

17   positions were.

18   Q    And there came a time when the OCC made a similar demand,

19   certainly a request of Barclays that the CME had made, they

20   wanted a guarantee as well.

21   A    That is correct.

22   Q    And, in fact, you spoke with the CME and that was

23   specifically a request by the OCC for a guarantee with respect

24   to customer positions, right?

25   A    I'm sorry, can I get that question read back.
```

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 174

1    Q    Sure.  Let me give you a new question.

2    A    Because I think you added something in that I didn't

3    follow.

4    Q    Okay.  You did get a demand from the OCC, right?

5    A    Yes.

6    Q    And they wanted a guarantee.  They were insecure, right?

7    A    That is correct.

8    Q    And they wanted to make sure that the positions would be

9    secured by Barclays over the weekend?

10   A    They specifically wanted to be assured that when Monday

11   opened that the margin that was required, would be posted by

12   Barclays, if necessary.

13   Q    Again, over the weekend, over the settlement period?

14   A    That is correct.  We're talking about the 20th and 21st.

15   Q    And here specifically, customer positions.

16   A    I'd have to look again, I thought it was both customer and

17   house, but it may have been limited to customer.

18   Q    If you'd turn to page 51 of your deposition transcript,

19   sir, you'll see starting at line 7.

20   A    I'd be more comfortable on relying on the actual documents

21   than my deposition transcript, but.

22   Q    I want to give your recollection and your testimony at

23   your deposition and that is,

24        Question, to your knowledge, sir, was Barclays asked to

25   guarantee any other of Lehman's customer positions at any time

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 175 of 190

Page 175

1    between the 15th of September and the closing of the

2    transaction on the 22nd?

3         Witness, I'm sorry, could I have that read back.

4         Record is read back.

5         Answer, OCC made a similar demand.  I think before the

6    break, I was not certain about conversations with OCC that

7    week, but I did have conversations with OCC that Thursday and

8    Friday, in which they were insecure.

9         Friday is actually an expiration date for options and they

10   wanted to make sure that the positions would be secured by

11   Barclays, again, over the weekend, during the settlement

12   period, and here specifically customer positions.

13        So you were asked that question and you gave that answer;

14   is that correct, sir?

15   A    Yes, that's correct.

16        MR. HUME:  Your Honor, I know that sometimes the Court

17   refers this on redirect, but for completeness, I would ask the

18   question and answer on page 52, lines 12 to 15 also be read

19   back.

20        THE COURT:  Why don't we put the context in now.

21        MR. MAGUIRE:  Sure.

22   BY MR. MAGUIRE:

23   Q    At page 52, line 12,

24        Question, was the demand made by the OCC for a guarantee

25   of customer positions at the OCC, or firm positions at the OCC

Page 176

1    or both?

2        Answer, my recollection it was both.

3    A    That is my best recollection.

4    Q    And then it goes on, starting at line 16,

5        Question, and did the demand, sir, to your knowledge

6    relate only to the futures that were cleared through the OCC or

7    was all positions, including equity options that were cleared

8    through the OCC?

9        Answer, it's interesting because as of Thursday and Friday

10   we were not aware that there were any futures positions.  So it

11   would have been at least in our thinking exclusively with

12   respect to the options positions.

13       Right?

14   A    Correct, as of Thursday or Friday.

15   Q    So as of then, you weren't even aware that there were any

16   Lehman futures positions.

17   A    That was the VIX discussion we alluded to earlier, yes.

18   Q    Now, sir, you testified a little earlier about the

19   transfer and assumption agreement, and I think you'll find that

20   at tab 7 of the small binder that I gave you.

21       And I believe you testified that you were not aware of any

22   substantial windfall that Barclays got as a result of entering

23   into the transfer and assumption agreement.  Do you recall

24   generally that testimony?

25   A    Not in that context, no.  I recall talking about the

Page 177

```
 1    transfer and assumption agreement.  I talked -- I also

 2    responded to questions that I was not aware of any windfall or

 3    substantial windfall.  I don't recall any connection between

 4    the two.

 5    Q    Sure.

 6    A    That is, signing has had any effect on windfalls or non-

 7    windfalls.

 8    Q    Sure.  Now, on tab 7, we have Barclays' Exhibit No. 286.

 9         Do you see that?

10    A    Yes.

11    Q    And if you turn in a couple of pages, you'll see -- well,

12    you see first of all in the first page, it's 7:51 a.m., and

13    it's from Michael A. Masuki (ph), and he says, sorry for the

14    delay on this, the executed agreement is attached in connection

15    with the closing call, which is starting now.

16         Do you see that?

17    A    Yes.

18    Q    So this is the signed transfer and assumption agreement

19    that's attached to this e-mail.

20         Do you see that?

21    A    Yes.

22    Q    And that's being provided to the OCC just as the closing

23    of the APA is underway.

24    A    I candidly am not familiar with the exact timing of the

25    closing of the APA, so I can't comment on that, but it is at
```

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 178 of 190

Page 178

1    751.

2    Q    But you are aware, I believe you saw earlier in the course

3    of Mr. Hume's testimony, that the OCC was pressing, indeed

4    threatening liquidation if it did not get the signed transfer

5    and assumption agreement from Barclays.

6        Do you remember seeing that?

7    A    That is correct.

8    Q    Do you know why Barclays did not provide the executed

9    transfer and assumption agreement to the OCC, despite all of

10   those demands until nearly 8:00 o'clock on Monday morning?

11   A    As I testified earlier, I wasn't a participant in the

12   drafting or the delivery of this document, so I don't know.

13   Q    If you'd turn, sir, to page 2 of the document, and I say

14   the document, I'm referring to the attached transfer and

15   attachment agreement.

16   A    Correct.

17   Q    You'll see there's a section called representations and

18   warranties, heading two at the top.  And if you scroll down to

19   item C, you'll see that Barclays hereby, little I, represents

20   and warrants, that it has received such documents and other

21   information as it has deemed appropriate to make its own credit

22   analysis and decision to enter into this agreement.

23   A    I do see that.

24   Q    Do you know who did that credit analysis?

25   A    I do not.

Page 179

```
 1    Q    Do you know when that credit analysis was completed?

 2    A    I do not.

 3    Q    I take it, sir, that you told us you had not negotiated

 4    the transfer and assumption agreement, right?

 5    A    Right.

 6    Q    And you have never submitted this agreement to this Court

 7    for approval; is that right?

 8    A    Having never seen and negotiated it, no, I have not

 9    submitted it to the Court for approval, right.

10              MR. MAGUIRE:  I have no further questions, Your Honor.

11              THE COURT:  Any other questions by the movants?

12              MR. GAFFEY:  No questions, not from the debtor, Your

13    Honor.

14              THE COURT:  Any redirect?

15              MR. HUME:  Very brief, Your Honor.

16                        REDIRECT EXAMINATION

17    BY MR. HUME:

18    Q    Mr. Raisler, you were asked some questions by Mr. Maguire

19    about what month in 2009 you may have heard the trustee raising

20    questions about Barclays' entitlement to margin.  Do you recall

21    that?

22    A    Correct.  The testimony was some time in 2009, and there

23    was some disagreement whether it was earlier or later in the

24    year.

25    Q    Now, the record will capture my questions as they were
```

Page 180

1    stated, but I believe my questions to you were, when do you

2    recall the trustee first taking the position that Barclays was

3    not entitled to any margin?  Do you know the answer to that?

4    A    I do not.  The document that Mr. Maguire showed me in

5    April just basically reserved their rights in saying that we

6    reserve our rights with respect to collateral.  It didn't say

7    anything about entitlement or non-entitlement.

8    Q    Mr. Maguire mentioned a meeting that he recalls you

9    attending, where you didn't recall meeting him.  Do you recall

10   generally attending a meeting at Hughes Hubbard with a lot of

11   lawyers?

12   A    I do recall more than one meeting at Hughes Hubbard

13   probably in the same calendar year.

14   Q    Do you recall in any of those meetings being not just

15   having entitlement to certain margin questioned, maybe without

16   a reason, but being told point blank, the trustee doesn't think

17   Barclays is entitled to any margin for exchanged traded

18   derivatives?

19   A    I do not recall that being said at any meeting.

20   Q    You were shown some deposition testimony on page 130

21   regarding your understanding -- whether you had an

22   understanding one way or the other, of whether a customer seg

23   and security account would include LBI property.  Do you

24   remember that?

25   A    Correct.

Page 181

1    Q    Your testimony was that you would normally -- your normal

2    experience would tell you that it is, but you didn't know for

3    certain literally what was in Lehman's accounts.  Do you recall

4    that?

5    A    That is correct.

6    Q    And Mr. Maguire showed you the testimonies about not

7    having an understanding one way or the other at the bottom of

8    page 130, 131.  I just for completeness, want to show you the

9    next question and answer.

10        On 131, line 4,

11        Question, just based on your general experience and

12   familiarity with the industry, sir, would you have expected the

13   property in those seg and secured accounts that moved to

14   Barclays to include LBI property, as well as customer property?

15        Answer, yes.

16        Do you see that?

17   A    Correct.  And that's consistent with my testimony in

18   answering Mr. Maguire's question that I would be surprised if

19   there were not some buffer funds, the amounts would vary, but

20   that would be typical, and that's what my testimony at the

21   deposition reflected as well.

22   Q    And that -- was that to your testimony to Mr. Maguire even

23   before he showed you the deposition?

24   A    Yes, it was.

25   Q    Now, Mr. Maguire also asked you about the VIX positions,

Page 182

```
 1    and whether you had an understanding that the VIX positions

 2    were in the deal, and Mr. Rosen had an understanding that they

 3    were not in the deal.  Do you recall that?

 4    A    Yes.

 5    Q    And he pointed you to an e-mail at tab f5 of his binder.

 6    A    Correct.

 7    Q    Now, when Mr. Maguire asked you that question, was it one

 8    hundred percent clear to you what he meant by the words, in the

 9    deal?

10    A    As I think I testified and answered to Mr. Maguire, I

11    didn't understand what Mr. Rosen is saying here.  I did

12    understand, based on the work I was doing and the discussions I

13    had with Barclays and Lehman, that the VIX were in the deal,

14    and that we were going to have to absorb the risks associated

15    with those positions, and nothing that I recall disputed that.

16    Q    All right.

17    A    And no document I saw was different than that.

18    Q    And what I would like to do, and my question is, be

19    precise as possible as to what is meant by, in the deal.

20         Did you understand, based on what you were doing that

21    week, that Barclays was assuming settlement obligations at the

22    OCC for all the positions traded through Lehman's accounts at

23    the OCC?

24    A    Yes.

25    Q    If there were accounts -- if there were positions held by
```

Page 183

1   a Lehman affiliate, that were traded in those LBI accounts at

2   OCC, are those in the deal or not in the deal?

3   A    Yes.  You've made a useful clarification and it's one that

4   is referenced in an earlier document that we discussed in

5   questions you asked me.  And that is that to the extent that an

6   affiliate transaction was part of the transfer, Barclays

7   assumed all of the risks to the exchange clearing house, in

8   this case OCC, associated with the settlement.  And to the

9   extent that they could not recover those funds from the Lehman

10  affiliate they would, if you will, eat or write a blank check

11  associated with those losses.

12       And in that sense I considered the VIX deal and all of the

13  activities that had occurred under the umbrella of the Lehman

14  clearing member to be in the deal.  But I appreciate that as

15  far as the distinctions, if you will, between the PIM account

16  and the non-PIM customers that we talked about earlier, that in

17  the deal and out of the deal could be more subtle.

18       But as far as the risk goes, which was what I was focused

19  on, it was absolutely a risk to the clearing house that

20  Barclays was assuming with respect to those VIX transactions.

21  Q    And is that risk impacted by the reality that a Lehman

22  affiliate might own positions, and a Lehman affiliate might be

23  bankrupt?

24  A    Absolutely.  I mean the risk was profound, in that the

25  question of recovering the same risks that OCC and the CME had

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 184

1    expressed to me and to Barclays are reflected in that dialogue

2    as well.  The ability of these affiliates to perform and meet

3    margin calls on a position that's a very large short volatility

4    exposure was a real risk, and that was a risk that Barclays was

5    assuming and was, if you will, stuck with as part of the deal.

6    Q    And looking now back at the e-mail that Mr. Maguire showed

7    you, do you believe there was a disconnect between what your

8    understanding was and what Mr. Rosen's understanding was?

9    A    If Mr. Rosen is talking about being not part of the deal

10   in the way we've just described it, that is the risk of

11   settlement and the risk to the clearing house being absorbed by

12   Barclays, but the ownership of the position not being, because

13   the position continues to be owned by the Lehman affiliate, I

14   don't think there's any disconnect.  I think Mr. Rosen and I

15   agree as to what was transpiring with respect to those

16   transactions.

17   Q    And finally, Mr. Raisler, you were asked a number of

18   questions about what you knew about what was specifically

19   communicated between negotiators that week.  Do you recall

20   that?

21   A    I do.

22   Q    And did you agree that you didn't know what was

23   specifically communicated that week regarding certain issues?

24   A    That is correct.  I was not in the room, and was not privy

25   to those discussions.

Page 185

1   Q    Did you mean by that testimony to suggest that even after

2   the closing, when you saw the transfer and assumption

3   agreement, and saw other documents, you never knew what was

4   communicated in any way in writing, or did you mean you didn't

5   know what was specifically said orally between negotiators?

6   A    My comment was more contemporaneous, that as not being a

7   participant in the negotiation and development of these

8   documents, I didn't have a real-time view, but obviously after

9   the fact, I participated in a lot of discussions with a lot of

10  participants who were in the room, and did from that glean

11  information, yes.

12          MR. HUME:  No further questions.

13          THE COURT:  Is there anything more?

14          MR. MAGUIRE:  Nothing further, Your Honor.

15          THE COURT:  Mr. Raisler, we thank you very much.

16  You're excused.

17          THE WITNESS:  Thank you.

18          THE COURT:  We're adjourning for the day.  I just

19  wanted to inquire about the Daubert motions that are scheduled

20  for Friday, and to get an idea assuming counsel can provide me

21  with when as to approximately how long it's assumed that

22  argument will take, whether or not any demonstratives will be

23  required, and what I should be expecting.

24          MR. GAFFEY:  I think they're having some discussions,

25  Your Honor, that put the estimates of the time the parties need

08-13555-mg    Doc 11281    Filed 09/10/10    Entered 09/13/10 15:46:36    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 186 of 190

Page 186

1   at roughly an hour and a quarter each.  There will be some

2   demonstratives.  We'll have the screen.  There will be a couple

3   of charts and things, so we're going to leave the equipment, to

4   the extent that we can.

5           THE COURT:  I'm expecting you to leave the equipment

6   for the duration, frankly, but it's yours to take away if you

7   wish.

8           I'm just wondering whether or not we should start,

9   since we don't have witnesses to deal with, let's start at

10  10:00 instead of at 9:30.

11          MR. GAFFEY:  That's fine, Your Honor.  On that issue,

12  I wanted to inquire, I think there are no fact witnesses, and I

13  wondered if we can establish whether Barclays has now concluded

14  with its factual case?

15          MR. SCHILLER:  No, we have not.

16          THE COURT:  According to my schedule, they have, but I

17  don't know if there's another witness waiting in the wings.

18          MR. SCHILLER:  We have two video depositions to play

19  that are in total an hour and forty-two minutes, and I may have

20  a witness in the wings based on Your Honor's question -- first

21  question to Ms. Leventhal as to timing.  I've looked at

22  deposition transcripts this afternoon that I may want to call

23  someone to -- for fifteen minutes, twenty minutes of testimony

24  on that issue on September 20th, Your Honor.

25          THE COURT:  Okay.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 187

1          MR. SCHILLER:  Thank you.

2          MR. GAFFEY:  Can I know who that is, Your Honor?

3          MR. SCHILLER:  I'll let you know once I decide which

4     would probably --

5          MR. GAFFEY:  Could I have some notice, Your Honor?

6          MR. SCHILLER:  Yeah, I'll give you notice on Monday.

7     It's a week in advance.

8          MR. GAFFEY:  Thank you, Your Honor.

9          THE COURT:  Okay.  10:00 o'clock tomorrow.

10         MR. SCHILLER:  Thank you.

11         THE COURT:  Early dismissal today.

12         MR. UNIDENTIFIED:  Friday, Your Honor.

13         THE COURT:  I'm sorry, Friday.

14    (Whereupon, the proceedings were concluded at 3:39 p.m.,

15    September 8, 2010.)

16                          * * * * *

17

18

19

20

21

22

23

24

25

Page 188

I N D E X

T E S T I M O N Y

| WITNESS | EXAM BY | PAGE |
|---|---|---|
| Shari Leventhal | Mr. Gaffey | 6 |
| Shari Leventhal | Mr. Schiller | 51 |
| Shari Leventhal | Mr. Gaffey | 71 |
| Shari Leventhal | Mr. Schiller | 73 |
| Shari Leventhal | Judge Peck | 75 |
| Kenneth Raisler | Mr. Hume | 79 |
| Kenneth Raisler | Mr. Maguire | 151 |
| Kenneth Raisler | Mr. Hume | 179 |

VERITEXT REPORTING COMPANY

212-267-6868          www.veritext.com          516-608-2400

Page 189

1

2                        E X H I B I T S

3    NO.               IDENTIFICATION                    RECEIVED

4    Movant's:

5     851              E-mail chain                          7

6     849              E-mail chain                         15

7     848              E-mail chain                         18

8     885              Demonstrative exhibit                23

9     850              E-mail chain                         26

10    887              E-mail chain                         31

11    886              E-mail chain                         35

12    859              E-mail chain                         39

13    860              E-mail chain                         44

14    852              E-mail chain                         47

15

16   BCI's:

17    974              Zubrow's statement                   62

18    970              Trustee's report                    107

19    979              E-mail chain                        135

20    920              Letter                              150

21    978              Answer to the inter-pleader         150

22    979              E-mail chain                        151

23

24

25

Page 190

1

2                           C E R T I F I C A T I O N

3

4      I, Dena Page, certify that the foregoing transcript is a true

5      and accurate record of the proceedings.

6

7      _____

8      Dena Page

9

10     Veritext

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:  September 10, 2010

16

17

18

19

20

21

22

23

24

25