**DAY PITNEY LLP**
Joshua W. Cohen (JC-2978)
James J. Tancredi (JT-3269)
One Audubon Street
New Haven, CT 06511-6433
Telephone:   (203) 752-5000
Facsimile:    (203) 752-5001

– and –

7 Times Square
New York, NY  10036-7311
Telephone:   (212) 297-5800
Facsimile:    (212) 916 2940

*Counsel to Fidelity National Title Insurance Company*

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., et al.,<br><br>        Debtors. | Chapter 11<br><br>Case No. 08-13555 (JMP)<br><br>Jointly Administered |

**FIDELITY NATIONAL TITLE INSURANCE COMPANY'S
LIMITED OBJECTION AND RESERVATION OF RIGHTS
IN RESPONSE TO MOTION OF LEHMAN COMMERCIAL PAPER INC. FOR
APPROVAL OF AMENDED AND RESTATED COMPROMISE BY AND AMONG
LEHMAN COMMERCIAL PAPER INC., ALFRED H. SIEGEL, AS CHAPTER 11
TRUSTEE FOR THE SUNCAL DEBTORS, AND THE OFFICIAL COMMITTEE OF
<u>UNSECURED CREDITORS IN THE SUNCAL BANKRUPTCY CASES</u>**

  Fidelity National Title Insurance Company ("Fidelity"), party-in-interest in these jointly

administered Chapter 11 cases, by its undersigned counsel, respectfully submits this limited

objection and reservation of rights in response to the Motion of Lehman Commercial Paper Inc.

Pursuant to Section 105 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019

for Approval of that Certain Amended and Restated Compromise By and Among Lehman

42148724.8

Commercial Paper Inc., Alfred H. Siegel, As Chapter 11 Trustee for the SunCal Debtors, and the Official Committee of Unsecured Creditors in the SunCal Bankruptcy Cases ("Motion for Approval"). In the Motion for Approval, Debtor Lehman Commercial Paper Inc. ("LCPI") seeks approval of that certain Binding and Amended Term Sheet (the "Amended Term Sheet")[1] that establishes the framework for a settlement between LCPI, Alfred H. Siegel, As Chapter 11 Trustee for the SunCal Debtors (the "SunCal Trustee") and the Official Committee of Unsecured Creditors in the SunCal Bankruptcy Cases (the "SunCal Committee"). In part, the Amended Term Sheet addresses the disposition of certain real estate development Projects (as described herein) and the liens on these Projects. As an issuer of certain title insurance Policies (as identified herein) with respect to LCPI's liens on the referenced Projects, Fidelity has an interest in the Amended Term Sheet.

Fidelity previously asserted extensive substantive objections to the Binding Term Sheet (the "Original Term Sheet") presented by the SunCal Trustee for approval before the United States Bankruptcy Court for the Central District of California (the "California Bankruptcy Court") in October 2009. While LCPI and the SunCal Trustee have addressed many of Fidelity's objections in connection with their negotiation of the Amended Term Sheet, certain issues remain that necessitate this limited objection and reservation of rights. Specifically, as discussed more fully below, the proposed settlement under the Amended Term Sheet: (a) improperly seeks to allocate funds located in the Development Account Fund in a manner that is contrary to the terms of the title insurance Policies and applicable state law; (b) purports to transfer to the SunCal Trustee LCPI's duty under the Policies to cooperate with Fidelity in its defense of certain Foreclosure Actions (as described herein), as well as LCPI's obligations to cooperate in

---

[1] To the extent practicable, for the sake of clarity and ease of reference, Fidelity will maintain the naming conventions employed by LCPI in its Motion for Approval.

42148724.8                                                          -2-

Fidelity's coverage investigation under the Policies; and (c) may, in its implementation, affect the rights and obligations of Fidelity and LCPI under the referenced title insurance Policies. As the proposed settlement, by its terms, may provide grounds for Fidelity to deny coverage under the referenced Policies and may, in its implementation, adversely impact coverage, Fidelity presents this limited objection and expressly reserves all rights with respect to the duties and obligations of Fidelity and LCPI under the Policies. Furthermore, Fidelity is not obligated to issue new or further title insurance policies nor to modify the existing Policies. Thus, if the transactions contemplated in the Amended Term Sheet are approved and consummated, Fidelity is not obligated to, and will not, issue title insurance for those transactions unless it can perform its normal underwriting and its underwriting requirements are met.

## I.    FACTUAL BACKGROUND:

### UNDERLYING LOANS

1. LCPI is (or was) the Administrative Agent on three syndicated loans made to finance certain real estate development projects in Southern California known as "McAllister Ranch," "McSweeny Farms" and "Summerwind Ranch" (collectively, the "Projects"). LCPI also participated in each of those syndicated loans as a lender. A different single-purpose entity holds title to each of the Projects: LBREP/L-SunCal McAllister Ranch LLC holds title to McAllister Ranch; LBREP/L-SunCal McSweeny Farms LLC holds title to McSweeny Farms; and LBREP/L-SunCal Summerwind Ranch LLC holds title to Summerwind Ranch. These three single-purpose entities collectively shall be referred to herein as the "Owners."

2. The Owners are wholly owned subsidiaries of LBREP/L-SunCal Master I LLC (the "Parent"). The Parent and the Owners are debtors in the jointly administered Chapter 11 bankruptcy cases styled In re LBREP/L-SunCal Master I, LLC, et al., pending in the California Bankruptcy Court and consolidated under Case No. 8:08-bk-15588-ES (the "SunCal Master

42148724.8                                    -3-

Bankruptcy"). Alfred H. Siegel has been appointed Chapter 11 Trustee in the SunCal Master Bankruptcy.

3. LCPI, as Syndication Agent and Administrative Agent for different pools of lenders, agreed to advance funds to the Parent totaling $395 million to finance the development of the Projects. These advances are evidenced by three separate loans.

4. The first loan ("First Loan"), in the amount of $235 million, closed escrow on January 19, 2006. The Owners guaranteed the Parent's repayment of the First Loan to LCPI and offered their respective Projects as security for their guarantees. Accordingly, each Owner executed a deed of trust in favor of LCPI, which provided security for the First Loan. The deeds of trust were recorded on January 23, 2006, in first position against title to each of the Projects ("First Deeds of Trust").

5. The second loan ("Second Loan"), in the amount of $85 million, also closed escrow on January 19, 2006. As with the First Loan, the Owners guaranteed the Parent's repayment of the Second Loan to LCPI and offered their respective Projects as security for their guarantees. Each Owner executed a separate deed of trust in favor of LCPI, as security for its guarantee of the Parent's repayment of the Second Loan. These deeds of trust were also recorded on January 23, 2006, in second position against each of the Projects ("Second Deeds of Trust").

6. The third loan ("Third Loan"), in the amount of $75 million, closed escrow on February 6, 2007. Once again, the Owners guaranteed the Parent's repayment of the Third Loan to LCPI and offered their respective Projects as security for their guarantees. Each Owner executed a separate deed of trust in favor of LCPI, as security for its guarantee of the Parent's repayment of the Third Loan. These deeds of trust were recorded on February 9, 2007, in third

position against title to the Projects ("Third Deeds of Trust"). The three loans, totaling $395 million, collectively are referred to herein as the "Loans."

7. On information and belief, the proceeds from the Loans were intended, among other things, to finance the acquisition, construction, and development of the Projects.

## TITLE INSURANCE POLICIES

### The Policies

8. Fidelity issued a 1970 form ALTA Loan Policy (10-17-70 and 10-17-84) No. 27-44-94-120334 (the "First Loan Policy"), dated January 19, 2006, naming as insured LCPI and its successors and/or assigns as their interests may appear insuring that the First Deeds of Trust were recorded in first position against the Projects. (See Exhibit A hereto and made a part hereof).

9. Fidelity issued a 1970 form ALTA Loan Policy (10-17-70 and 10-17-84) No. 27-44-94-120335 (the "Second Loan Policy"), dated January 19, 2006, naming as insured LCPI and its successors and/or assigns as their interests may appear, insuring that the Second Deeds of Trust were recorded junior only to the First Deeds of Trust. (See Exhibit B hereto and made a part hereof).

10. Fidelity thereafter issued three separate 1992 form ALTA Loan Policies, Nos. CAFNT0925-0925-0199-0259902517 (McAllister Ranch), CAFNT0925-0925-0199-0259902518 (McSweeny Farms), and CAFNT0925-0925-0199-0259902519 (Summerwind Ranch) (collectively, the "Third Loan Policies" and, together with the First Loan Policy and the Second Loan Policy, the "Policies"), each dated February 9, 2007, naming as insured LCPI, as Administrative Agent, and its successors and/or assigns as their interests may appear, insuring

that the Third Deeds of Trust were recorded junior only to the First Deeds of Trust and the Second Deeds of Trust.  (See Exhibits C, D and E hereto and made a part hereof).

## TENDER OF CLAIMS UNDER THE POLICIES

11.  In or about February, 2008, the Parent defaulted on the Loans and the Owners failed to complete development of the Projects.

12.  After the Owners ceased work on the Projects, many contractors recorded mechanics' liens against the Projects.  On information and belief, mechanics' liens in face amounts totaling $27,232,695.54 have been recorded against title to the Projects ($15,215,594.22 against McAllister Ranch; $5,213,720.12 against McSweeny Farms; and $6,785,381.20 against Summerwind Ranch).

13.  A number of the mechanics' lien holders have commenced suit in California seeking to foreclose on their mechanics' liens, to recover money damages or both.  In each of the pending actions that seeks to foreclose a mechanics' lien, the holder of the mechanics' lien asserts that its lien has priority over LCPI's deeds of trust.

14.  In early Spring 2008, LCPI and/or its assignees under the Policies tendered claims (the "Initial Claims") to Fidelity under the Policies, seeking defense and indemnification with respect to eleven (11) actions pending in California related to the Projects.  Since that time, LCPI has tendered three (3) additional claims (collectively, the "Additional Claims" and, together with the Initial Claims, the "Claims") to Fidelity, seeking defense and indemnification with respect to three (3) additional pending actions.  Of the pending actions tendered to Fidelity for defense and indemnification, ten (10) of the actions seek to foreclose mechanics' liens recorded against the Projects (collectively, the "Foreclosure Actions").

15. Fidelity is currently providing a defense to the Foreclosure Actions on behalf of LCPI subject to a broad reservation of rights that Fidelity reaffirms herein. Fidelity has declined to agree to indemnify LCPI pending conclusion of its review and investigation of the Claims, determination of loss and LCPI's compliance with its Policy obligations.[2]

## THE ORIGINAL TERM SHEET

16. Upon information and belief, in 2009, LCPI engaged in settlement negotiations with the SunCal Trustee and the SunCal Committee that included mechanisms for resolving the mechanics' lien claims asserted against the Projects. On October 9, 2009, the SunCal Trustee filed his Motion to Approve Compromise Between Trustee, The Official Committee of Unsecured Creditors, And Lehman Commercial Paper Inc., As Administrative Agent For First Lien Lenders (the "Compromise Motion") in the SunCal Master Bankruptcy. The Compromise Motion sought approval of the Original Term Sheet.

17. Because certain provisions in the Original Term Sheet, if implemented, would have contravened LCPI's duties and obligations under the Policies and potentially would have provided Fidelity with grounds to deny coverage of the Claims, Fidelity objected to the Compromise Motion. Presumably as a result of Fidelity's objection and objections asserted by several other interested parties, the SunCal Trustee ultimately abandoned the Compromise Motion and the proposed settlement outlined in the Original Term Sheet.

---

[2] Fidelity's ability to complete its investigation of the Claims has been hindered and delayed by LCPI's failure to cooperate with Fidelity and to provide Fidelity with information and documentation necessary to complete its coverage assessment and to defend the Foreclosure Actions. Fidelity anticipates filing a motion in the coming days seeking to compel LCPI to cooperate and to provide the information and documentation requested by Fidelity, all as required by the Policies.

42148724.8                                -7-

## THE AMENDED TERM SHEET

18. During a hearing on July 14, 2010 to consider the SunCal Trustee's motion for relief from stay for authority to sell the Properties on which the Projects were to be built and to commence an action in the SunCal Bankruptcy against LCPI, this Court admonished LCPI and the SunCal Trustee to resume their settlement negotiations that had given rise to Original Term Sheet.

19. At the August 18, 2010 omnibus hearing in this case, LCPI advised the Court that it had reached agreement on a new settlement term sheet with the SunCal Trustee. Fidelity received a copy of the Amended Term Sheet for the first time on September 2, 2010 when LCPI filed its Motion for Approval.

20. Although LCPI, the SunCal Trustee and the SunCal Committee did not invite Fidelity to participate in their negotiation of the Amended Term Sheet, the Amended Term Sheet appears to address many of the issues Fidelity asserted in opposition to the Original Term Sheet. However, the Amended Term Sheet presents several issues pertaining to coverage, and Fidelity's and LCPI's rights and obligations, under the Policies. Consequently, Fidelity presents this limited objection and reservation of rights.

## II.    LEGAL ARGUMENT:

### THE ALLOCATION OF FUNDS FROM THE DEVELOPMENT ACCOUNT UNDER THE PROPOSED SETTLEMENT IS CONTRARY TO THE TERMS OF, AND MAY RESULT IN DENIAL OF COVERAGE UNDER, THE POLICIES

21. The treatment of certain Development Account Funds proposed under the Amended Term Sheet is contrary to the terms of, and may support denial of coverage under, the Policies. As discussed below, under the terms of the Policies and applicable law, LCPI's failure to utilize all of the Development Account Funds for construction-related work at the Projects may result in LCPI's inability to demonstrate that it has suffered a covered loss under the

Policies and/or may provide Fidelity with grounds to deny coverage as to one or all of the Claims.

22.  The Amended Term Sheet acknowledges that several million dollars currently reside in the Development Account Funds.  (See Amended Term Sheet, ¶ C(1)).  These funds, which constitute a small percentage of the Loan proceeds, were intended to pay for construction work related to the Projects.  Rather than allocate these funds to pay off certain contractors who have performed work on the Projects, the Amended Term Sheet proposes the allocation of $3.5 million from the Development Account to the SunCal Trustee to pay administrative claims and $2 million for maintenance related to the Projects.  (See Amended Term Sheet, ¶¶ C(1)).  The Amended Term Sheet also proposes distribution of any funds remaining in the Development Account Funds directly to the First Lien Lenders.  (See Amended Term Sheet, ¶¶ C(1), D.)

23.  Each of the Policies excludes coverage for defects, liens, encumbrances, adverse claims, or other matters that were "created, suffered, assumed or agreed to by the insured claimant."  (See Exhibit A, First Loan Policy, at 2, Exclusion 3(a); Exhibit B, Second Loan Policy, at 2, Exclusion 3(a); Exhibits C, D and E, Third Loan Policies, at 55, Exclusion 3(a)).  Thus, the Claims do not trigger coverage under the Policies unless and until LCPI has disbursed the entirety of the Loan proceeds.  This includes, without limitation, any funds set aside for "development" or funds intended to pay for contractor work, because a title insurer does not assume the obligation to pay for the development of a project when the lender refuses to use existing, committed funds to pay for work performed.  Bankers Trust Co. v. Transamerica Title Ins. Co., 594 F.2d 231, 234 (10th Cir. 1979) (holding "[w]here . . . work was performed and payment was not made up to the amount of the lender's loan commitment, the resulting mechanic's liens must be considered to have been created or suffered by the insured claimant

and such liens are expressly excluded from coverage"); Brown v. St. Paul Title Ins. Corp., 634 F.2d 1103 (8th Cir. 1980); American Sav. and Loan Ass'n v. Lawyers Title Ins. Corp., 793 F.2d 780, 785 (6th Cir. 1986) (holding that "[s]ince full payment [of the loan commitment] could have satisfied the lien claims against the property, the lender's failure to pay satisfied the definitional requirement of the term 'created'").

24.     Title insurance is indemnity insurance, not guaranty insurance. See Lawrence v. Chicago Title Ins. Co., 192 Cal. App. 3d 70, 74 (1987).  "[A] title insurance policy is a contract of indemnity, not one of guarantee.  The insurer . . . only agrees to indemnify to the extent the insured suffers a loss caused by defects in title or encumbrances on the title." Karl v. Commonwealth Land Title Ins. Co., 20 Cal. App. 4th 972, 978 (1993).  Under these basic principles of title insurance law, an insured does not have a valid claim under a title insurance policy unless it suffers a covered loss.

25.     The Bankers Trust court stated:

> In effect, it is claimed that by the issuance of a title insurance policy, [the title insurer] became a guarantor of payment for all work actually performed.  That is more than the insurance contract calls for.  Where, as here, work was performed and payment was not made up to the amount of the lender's loan commitment, the resulting mechanic's liens must be considered to have been created or suffered by the insured claimant and such liens are expressly excluded from coverage by the language of the policy.

(Bankers Trust, supra, 594 F.2d at 234.)  The Brown court addressed the priority between a lender's lien and a mechanics' lien by stating:

> While [the insured lender] admittedly was under no obligation to continue funding the project after the default, it seems clear that the parties contemplated that [the insured] would provide adequate funds to pay for work completed prior to the default.  To hold otherwise would give the insured an unwarranted windfall and place the title insurer in the untenable position of guaranteeing payment of work for which funds were never advanced. Under these circumstances, we find that any liens attributable to work

> performed [before the default] were created and suffered as a result of [the insured's] failure to furnish the necessary funds to cover the costs.

(Brown, supra, 634 F.2d at 1109-1110.

26. Thus, in the event that LCPI has caused or contributed to the creation of any lien or encumbrance on the Projects by its failure to utilize the proceeds of the Loans to pay contractors who have performed work on the Projects, LCPI may not be entitled to coverage under the Policies.

27. While Fidelity does not seek a coverage determination under the Policies at this time, in light of the potential effect of the proposed disposition of the Development Account Funds on coverage, Fidelity reserves all rights with respect to coverage under the Policies arising out of such disposition.

## THE AMENDED TERM SHEET'S ALLOCATION OF FUNDS FROM THE DEVELOPMENT ACCOUNT MAY RESULT IN EXCLUSION OF COVERAGE BECAUSE THE DEVELOPMENT ACCOUNT SHOULD BE APPLIED TO PAY BONDED STOP NOTICE CLAIMS

28. Fidelity also has a statutory basis to deny coverage on the Claims in the event that LCPI and the SunCal Trustee disburse the Development Account Funds as proposed in the Amended Term Sheet.

29. Under California law, upon receipt of any bonded stop notices, LCPI was required to "withhold . . . sufficient money to answer the claim and any claim of lien that may be recorded therefor." Cal. Civ. Code, § 3162 (emphasis added). To the extent LCPI received bonded stop notices from one or more of the contractors providing services on the Projects, LCPI was required to draw from the Development Account Funds and to segregate funds adequate to pay the contractors' invoices. Accordingly, upon receipt of a bonded stop notice, LCPI may not use any undisbursed Loan proceeds (including funds contained in the Development Account

Funds) to pay down the First Loan, the Second Loan and/or the Third Loan or for any other purpose unless and until the contractor serving the bonded stop notice has been paid in full, even if the applicable Loan agreement provided for such use of the Loan proceeds. Familian Corp. v. Imperial Bank, 213 Cal. App. 3d 681, 685-686 (1989) (citing, inter alia, A-1 Door & Materials Co. v. Fresno Guar. Sav. & Loan Assn., 61 Cal. 2d 728, 734 (1964)); see Cal. Civ. Code, § 3166 (bonded stop notices take priority over previous fund allocation agreements); Cal. Civ. Code, § 3264 (limiting claims on unexpended construction funds).

30. Any contrary or limiting provisions in the Loan agreements between LCPI and the Parent and/or the Owners (and, by extension, the SunCal Trustee) are subject and subordinate to these statutory provisions governing the disposition of construction loan proceeds in the context of bonded stop notices.

31. Furthermore, California Civil Code § 3166 embodies and articulates the strong public policy against permitting owners and/or lenders to obtain the benefit of both the value of a materialman's work and the construction funds intended to pay for that work. Section 3166 states:

> No assignment by the owner or contractor of construction loan funds, whether made before or after a stop notice or bonded stop notice is given to a construction lender, shall be held to take priority over the stop notice or bonded stop notice, and such assignment shall have no effect insofar as the rights of claimants who give the stop notice or bonded stop notice are concerned.

32. Case law interpreting Civil Code § 3166 consistently bars custodians of construction funds from invalidating bonded stop notice claims by "transferring those funds to other creditors or using them to advance its own interests." Familian, supra, 213 Cal. App. 3d at 684; see also A-1 Door & Materials Co. v. Fresno Guarantee Sav. & Loan Ass'n, 61 Cal. 2d 728, 734 (1964).

33.     Section 3166 "requires that funds earmarked for construction purposes be used to pay suppliers of labor and materials who file claims under the subsection and therefore supersedes the private arrangements of borrower and lender." A-1 Door, supra, 61 Cal. 2d at 734. This includes circumstances where the lender retains the funds and agrees to disburse them according to a progress payment schedule. Familian, supra, 213 Cal. App. 3d at 685. Lenders are not permitted to use undisbursed funds to "reduce the owner's debt or to complete the buildings." A-1 Door, supra, 61 Cal. 2d at 734. Nor can lenders conduct an end-run around the priority scheme and achieve priority by depositing unexpended construction funds into a general fund or separate escrow for pro rata distribution. Idaco Lumber Co. v. Northwestern Sav. & Loan Ass'n, 265 Cal. App. 2d 490, 499 (1968). Pre-disbursement allocation of construction funds to costs owed to the lender also constitutes an assignment under section 3166. Familian, supra, 213 Cal. App. 3d at 688. The claims of laborers and materialmen retain priority over the claims of lenders and other creditors "because the lender has a secured position and benefits from the increased value of the security due to the claimant's labor and materials." Id. at 686.

34.     LCPI has lodged the Claims and has sought indemnity from Fidelity for the mechanics' liens recorded against the Projects. If Fidelity were to accept the Claims and agree to defend the Foreclosure Actions, final resolution of the mechanics' lien claims, either through defense, settlement, or satisfaction, will result. In that event, LCPI will receive both the value of the work performed and the value of the unexpended funds from the Loans, which are currently held in the Development Account Funds, while Fidelity is left to foot the bill for the work that was performed on the Projects. Under well-settled California law, the bonded stop notice claims that were served when there were undisbursed Loan proceeds held by LCPI in the Development

Account Funds take priority over any attempt by LCPI to assign those funds—to itself or otherwise—pursuant to the provisions of the Amended Term Sheet.

### LCPI'S DUTY TO COOPERATE WITH FIDELITY'S DEFENSE OF THE FORECLOSURE ACTIONS AND COVERAGE INVESTIGATION CANNOT BE ASSIGNED TO THE SUNCAL TRUSTEE NOTWITHSTANDING THE SUNCAL TRUSTEE'S AGREEMENT TO COOPERATE

35. Paragraph I of the Amended Term Sheet contemplates that:

> [p]romptly upon execution of this [Amended] Term Sheet LCPI will provide the Trustee with all documents and information reasonably related to the [First Loan Policy] and any and all claims made by the 1st Lien Lenders thereunder so as to allow the Trustee to comply with the requirements of paragraphs J ["Resolution of Senior Liens; Availability of Title Insurance"] and K ["Release"] below and otherwise to proceed with such matters to conclusion.

By virtue of this provision, the SunCal Trustee apparently has agreed to cooperate with Fidelity and/or the First Lien Lenders in connection with Fidelity's defense of the Foreclosure Actions. According to Paragraph I of the Amended Term Sheet, such cooperation may take the form of providing Fidelity and/or the First Lien Lenders access to certain documents and information related to the First Loan Policy and the Claims. However, Paragraph I of the Amended Term Sheet should not be construed as an assignment of LCPI's own duties and obligations under the Policies and California law to cooperate with Fidelity in its claim investigation and in its defense of the Foreclosure Actions.[3] Moreover, while Fidelity welcomes the anticipated cooperation of the SunCal Trustee, Fidelity does not consent to the SunCal Trustee's assumption of LCPI's duties and obligations under the Policies.

---

[3] Under the provisions of the Debtors' amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. And Its Affiliated Debtors (the "Plan") [Doc. ID 8330] and the corresponding Debtors' Disclosure Statement For Joint Chapter 11 Plan Of Lehman Brothers Holdings Inc. And Its Affiliated Debtors Pursuant to Section 1125 Of The Bankruptcy Code (the "Disclosure Statement") [Doc. ID 8332], LCPI has expressed its intent to treat all insurance policies, presumably including the Policies at issue here, as executory contracts and to assume those policies.

36.     Under each of the Policies, LCPI owes Fidelity a duty of cooperation in conjunction with Fidelity's investigation of the Claims and must provide Fidelity with all reasonable aid in connection with its defense of the Foreclosure Actions.  LCPI's contractual duties include, among other things, an obligation by LCPI to secure evidence and to obtain witnesses necessary to the investigation and defense of any claims.  (See Exhibit A, First Loan Policy, Section 3(e); Exhibit B, Second Loan Policy, Section 3(e); Exhibits C, D & E, Third Loan Policy, Section 4(d)).  LCPI also has a duty to cooperate with Fidelity by providing Fidelity with all information in its possession, custody or control reasonably required by Fidelity to determine the parties' respective rights and obligations under the Policies.  This duty to cooperate derives from:  (a) the language of the Policies themselves (see Exhibits C, D & E, Third Loan Policies, Section 5; Joyce Palomar, Title Insurance Law (2009), App. C2, at 16 (discussing that the cooperation provisions contained in what is described as the Third Loan Policies herein are implicit in what is the First Loan Policy and the Second Loan Policy described herein)); and (b) LCPI's duty of good faith and fair dealing under the Policies.  See Kransco v. International Insurance Company, 23 Cal. 4th 390, 400 (S. Ct. Cal. 2000) (quoting Comunale v. Traders & General Ins. Co., 50 Cal. 2d 654, 658 (S. Ct. Cal. 1958)).[4]

37.     As the insured who has asserted a Claim under the First Loan Policy, LCPI bears the burden of establishing coverage under the Policy.  Under the Amended Term Sheet, LCPI will remain as the owner of the indebtedness secured by the insured deeds of trust.  The

---

[4] As noted previously, LCPI's duty to cooperate under the Policies will be discussed more fully in Fidelity's "Motion To Compel Compliance With Requirements of Title Insurance Policies Insuring Deeds of Trust Held By The Bankruptcy Estate of Debtor Lehman Commercial Paper Inc. Pursuant To Sections 105, 362, 365 And 1107 of The Bankruptcy Code," which Fidelity will be filing with the Court shortly for consideration at the omnibus hearing scheduled for October 20, 2010.

settlement does not alter this fact: LCPI plans to assert its priority over the mechanics' liens regardless of whether it credit bids or a third party pays cash for the subject properties. (See Amended Term Sheet, ¶ E). Accordingly, LCPI will continue to be the holder of the claim for coverage under the First Loan Policy. Consequently, as a matter of contract law, LCPI is the party who is obligated to cooperate with Fidelity's efforts to defend the Foreclosure Actions and with Fidelity's evaluation of the Claims and available coverage. Simply put, LCPI cannot unilaterally assign its duties and obligations under the Policies to a third party by separately entering a settlement agreement with the third party.

38. Furthermore, on information and belief, LCPI controls the percipient witnesses and persons most knowledgeable about the Loan and the Projects, not the Trustee. Fidelity's access to these individuals through LCPI's cooperation is critical to Fidelity's vigorous defense of the Foreclosure Actions. For example, in the mechanics' lien Foreclosure Actions, Fidelity is evaluating the defense of equitable subrogation, claiming that LCPI is equitably subrogated to the first priority lien position of Lehman ALI, Inc. ("Lehman ALI") by virtue of LCPI's satisfaction of Lehman ALI's liens from proceeds of LCPI's First Loan.[5] To pursue this defense adequately, Fidelity must ascertain whether LCPI (or any participant lender) had actual knowledge of mechanics' liens at the time the First Loan closed and must understand how the loan proceeds were disbursed at closing and throughout the administration of the First Loan. See Lawyers Title Ins. Corp. v. Feldsher, 42 Cal. App. 4th 41, 53-54 (Cal. App. Ct. 1996). This

---

[5] Upon Fidelity's information and belief, a portion of the proceeds from the First Loan were used to satisfy first priority liens on the Projects in favor Lehman ALI. Lehman ALI provided financing to the owners of the Projects that they utilized to acquire the properties on which the Projects were to be built. The first liens on the Projects in favor of Lehman ALI, which were satisfied by a portion of the proceeds of the First Loan, were recorded prior to the commencement of any work on the Projects.

information is uniquely in the possession of LCPI.  The Trustee cannot reasonably be expected to know or to have this information, and certainly has no access to the witnesses at LCPI who do.

39.     Furthermore, to the extent LCPI seeks to assign its duty of cooperation to the SunCal Trustee, Paragraph J of the Amended Term Sheet purports to alter the benefit of Fidelity's bargain under the Policies by qualifying the nature and scope of the cooperation to be provided.  The Amended Term Sheet purports to limit the SunCal Trustee's obligation to providing "reasonable" cooperation to Fidelity unless and until such cooperation "cause[s] the Trustee or the Debtors' bankruptcy estates to incur material cost or liability."  (See Amended Term Sheet, ¶ J).  The Amended Term Sheet also purports to vest all discretion in the determination of what constitutes "material cost or liability" with the SunCal Trustee.  (See id.). These limitations on "cooperation" are not what Fidelity bargained for when it agreed to issue the Policies to LCPI and are not restrictions fairly imposed upon Fidelity.

40.     Accordingly, Fidelity objects to the Amended Term Sheet to the extent that LCPI seeks to shift from LCPI to the SunCal Trustee LCPI's burden to cooperate with Fidelity's defense of the Foreclosure Actions and with Fidelity's coverage investigation and/or otherwise qualify Fidelity's right to LCPI's cooperation.  Fidelity reserves the right to continue to demand LCPI's full cooperation under the Policies and to deny coverage under the Policies if LCPI withholds cooperation.

## AMBIGUITIES IN THE AMENDED TERM SHEET AND AS TO ITS EVENTUAL IMPLEMENTATION NECESSITATE A BROAD RESERVATION OF RIGHTS IN FAVOR OF FIDELITY

41. The Amended Term Sheet provides that the properties shall be sold subject to "Permitted Liens," among other encumbrances. (See Amended Term Sheet, ¶ E.) LCPI and the SunCal Trustee define Permitted Liens in the Amended Term Sheet with reference to the definition of "Permitted Exceptions" from the First Lien Credit Agreement (the "Credit Agreement") between LCPI and the borrower. (See Amended Term Sheet, ¶ E.) The First Lien Credit Agreement defines "Permitted Exceptions" as all items shown in Schedule B Part 1 of any title insurance policy related to the McAllister, McSweeny and Summerwind properties (Credit Agreement, part (b)), all Qualified Sales Agreements (Credit Agreement, part (c)), and any other exceptions permitted by the mortgage documents (e.g., the note, deed of trust), the Agent, or as evidenced in writing (Credit Agreement, part (d)). However, the information included in the Approval Motion and in the Amended Term Sheet are inadequate to allow third parties to fully understand the scope of liens included within the term "Permitted Liens." Thus, the Amended Term Sheet is ambiguous on this point.

42. As an example of the ambiguity identified above, under Fidelity's analysis of the term "Permitted Liens" under the Amended Term Sheet, each of the mechanics' liens on the properties would qualify as Permitted Liens, as they are all items that would be shown on Schedule B Part 1 of any title insurance policy. Additionally, all lis pendens identifying lawsuits seeking to foreclose such mechanics' liens would qualify as Permitted Liens. Yet it appears that LCPI and the SunCal Trustee intended a different definition of "Permitted Liens" because, in the case of a third party buyer, the Amended Term Sheet contemplates that the mechanics' liens on the properties will attach to the sale proceeds, not to the real property.

43. With regard to implementation of the settlement articulated in the Amended Term Sheet, it is unclear what coverage, if any, the parties intend to seek from a title insurer (Fidelity or any other) in any application for title insurance for the transactions contemplated by the Amended Term Sheet. Fidelity identifies this issue since neither LCPI nor the SunCal Trustee has consulted Fidelity on the issue. Given the ambiguity, identified above, with respect to the definition of "Permitted Liens," LCPI or any hypothetical third party buyer may have difficulty obtaining title insurance for the contemplated transactions. For clarity, Fidelity is not obligated to insure the contemplated transactions, and will not be willing to do so if Fidelity cannot be satisfied that its underwriting requirements for the transactions are met.

44. Furthermore, given the number of variables that exist with respect to the ultimate implementation of the settlement outlined in the Amended Term Sheet, such implementation may raise additional issues concerning the Claims, the Policies and/or coverage under the Policies. It is impossible for Fidelity (or any other party-in-interest) to anticipate each and every one of these variables and the issues they may create.

45. Given the ambiguities referenced above and the uncertainties surrounding the implementation of the proposed settlement, Fidelity asserts this limited objection and reserves all rights with respect to the Claims, the Policies and coverage under the Policies as well as its rights to seek clarification and/or to contest the provisions of the proposed settlement, as appropriate.

## III. CONCLUSION:

46. Subject to: (i) Fidelity's limited objections with respect to the proposed allocation of the Development Account Funds under the Amended Term Sheet and the proposed transfer of LCPI's duty of cooperation under the Policies, and (ii) the reservations of rights articulated herein, Fidelity supports the approval of the Amended Term Sheet.

Dated at New Haven, Connecticut, this 15th day of September, 2010.

                FIDELITY NATIONAL TITLE INSURANCE
                COMPANY

By:    /s/ Joshua W. Cohen
        Joshua W. Cohen (JC-2978)
        James J. Tancredi (JT-3269)
        DAY PITNEY LLP
        One Audubon Street
        New Haven, CT 06511-6433
        Tel:   (203) 752-5008
        Fax:  (203) 752-5001
        E-mail: jwcohen@daypitney.com

*Counsel for Fidelity National Title Insurance Company*