# EXHIBIT C

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | **Chapter 11** |
| **THE GRAND UNION COMPANY,** also d/b/a Big Star, | **Case No. 95-84 (PJW)** |
| Debtor. | |

## DISCLOSURE STATEMENT
### FOR SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF THE GRAND UNION COMPANY

**WILLKIE FARR & GALLAGHER**
One Citicorp Center
153 East 53rd Street
New York, New York 10022
Attn: Myron Trepper
      Barry N. Seidel
Phone: (212) 821-8000

**DONOVAN LEISURE NEWTON & IRVINE**
30 Rockefeller Plaza
New York, New York 10112
Attn: John J. McCann
Phone: (212) 632-3000

**YOUNG, CONAWAY, STARGATT & TAYLOR**
P.O. Box 391
11th Floor, Rodney Square North
Wilmington, Delaware 19899
Attn: James L. Patton, Jr.
      Laura Davis Jones
Phone: (302) 571-6600

The Grand Union Company (the "Debtor"), as debtor in possession under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), hereby proposes and files this Disclosure Statement (the "Disclosure Statement") for the Second Amended Chapter 11 Plan of Reorganization of The Grand Union Company, dated April 19, 1995 (the "Plan").

THE DEBTOR STRONGLY URGES ALL HOLDERS OF CLAIMS IN IMPAIRED CLASSES TO ACCEPT THE PLAN.

THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO ENABLE HOLDERS OF CLAIMS AGAINST THE DEBTOR TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. ALL HOLDERS OF CLAIMS ARE HEREBY ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED HERETO AS APPENDIX "A", OTHER APPENDICES ANNEXED HERETO AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE COURT BEFORE OR CONCURRENTLY WITH THE FILING OF THIS DISCLOSURE STATEMENT. FURTHERMORE, THE PROJECTED FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL CONTINUE TO BE MATERIALLY ACCURATE; AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

ALL HOLDERS OF IMPAIRED CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT AS A WHOLE, INCLUDING THE SECTION ENTITLED "RISK FACTORS," PRIOR TO VOTING ON THE PLAN. IN MAKING A DECISION TO ACCEPT OR REJECT THE PLAN, EACH CREDITOR MUST RELY ON ITS OWN EXAMINATION OF THE DEBTOR AS DESCRIBED IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. IN ADDITION, CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CONDITIONS PRECEDENT THAT COULD LEAD TO DELAYS IN CONSUMMATION OF THE PLAN. ALSO, THERE CAN BE NO ASSURANCE THAT EACH OF THESE CONDITIONS WILL BE SATISFIED OR WAIVED (AS PROVIDED IN THE PLAN) OR THAT THE PLAN WILL BE CONSUMMATED. EVEN AFTER THE EFFECTIVE DATE, DISTRIBUTIONS UNDER THE PLAN MAY BE SUBJECT TO SUBSTANTIAL DELAYS FOR CREDITORS WHOSE CLAIMS ARE DISPUTED.

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT WITH RESPECT TO VOTING TO ACCEPT OR REJECT THE PLAN. HOWEVER, THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION OR DETERMINATION BY THE BANKRUPTCY COURT WITH RESPECT TO THE MERITS OF THE PLAN.

NO PARTY IS AUTHORIZED BY THE DEBTOR TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS OR INFORMATION CONCERNING THE DEBTOR, ITS FUTURE BUSINESS OPERATIONS OR THE VALUE OF ITS PROPERTIES HAVE BEEN AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH HEREIN. ANY INFORMATION OR REPRESENTATIONS GIVEN TO OBTAIN YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH ARE DIFFERENT FROM OR

INCONSISTENT WITH THE INFORMATION OR REPRESENTATIONS CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY CREDITOR IN VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, OR SECURITIES OF, THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS SUCH COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE INFORMATION CONTAINED HEREIN SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS GOVERNED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OR STATUTE OF SIMILAR IMPORT.

THIS DISCLOSURE STATEMENT SHALL NEITHER BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY NOR BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN. EACH CREDITOR SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN OR THE TRANSACTIONS CONTEMPLATED THEREBY.

This Disclosure Statement, the Plan annexed hereto as Appendix "A" (and the other appendices hereto), the accompanying form of Ballot, and the related materials delivered together herewith are being furnished by the Debtor to holders of Impaired Claims pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation by the Debtor of votes to accept or reject the Plan (and the transactions contemplated thereby), as described herein.

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION AND SUMMARY | 1 |
| A. | The Solicitation | 1 |
| B. | The Plan | 1 |
| 1. | Exchange of Senior Note Claims for New Senior Notes | 1 |
| 2. | Subordinated Debt Conversion and Equity Recapitalization | 1 |
| 3. | Post-Confirmation Credit Agreement and Credit Agreement Claims | 2 |
| 4. | Interest Rate Protection Agreement Claims | 2 |
| 5. | Trade Creditors | 3 |
| 6. | General Unsecured Claims | 3 |
| 7. | The Zero Settlement | 4 |
| 8. | Board of Directors | 4 |
| 9. | Restated Certificate of Incorporation | 4 |
| C. | Summary of Classification and Treatment of Claims and Interests | 5 |
| D. | Conditions to Confirmation and the Occurrence of the Effective Date of the Plan | 5 / 11 |
| II. | BACKGROUND | 13 |
| A. | The Debtor | 13 |
| B. | Significant Events Preceding Commencement of the Chapter 11 Case | 13 |
| 1. | 1992 Recapitalization and The Present Capital Structure | 13 |
| 2. | Asset Dispositions | 13 |
| 3. | Failure to Make Certain Interest Payments | 14 |
| 4. | Retention of Financial Advisors | 14 |
| C. | Recent Financial Performance | 15 / 15 |
| III. | SUPPORT OF THE PLAN BY PARTIES IN INTEREST | 16 |
| IV. | THE BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES | 16 |
| A. | General | 16 |
| B. | Holders of Claims Entitled to Vote | 16 |
| C. | Vote Required for Class Acceptance | 16 |
| D. | Counting of Ballots for Determining Acceptance of the Plan | 16 |
| E. | Voting Deadline | 17 |
| F. | Voting Procedures | 17 |
| 1. | Beneficial Owners of Credit Agreement Debt | 17 |
| 2. | Beneficial Owners of Old Securities | 17 |
| 3. | Brokerage Firms, Banks, and Other Nominees | 18 |
| 4. | Defects, Irregularities, Etc. | 18 |
| G. | Miscellaneous | 18 / 18 |
| V. | THE CHAPTER 11 CASE | 19 |
| A. | Continuation of Business; Stay of Litigation | 19 |
| B. | Significant Events During the Chapter 11 Case | 19 |
| 1. | First Day Orders | 19 |
| 2. | Prepetition Wage and Benefits Order | 19 |
| 3. | Cash Collateral Order | 19 |
| 4. | DIP Facility | 20 |
| 5. | Trade Creditor Order | 20 |
| 6. | Appointment of Official Committee | 20 |
| C. | Chapter 11 Cases of Holdings and Capital | 21 |
| D. | Zero Settlement | 21 / 22 |

|  |  | Page |
|---|---|---|
| **VI.** | **THE PLAN** | 23 |
| A. | General | 23 |
| B. | Classification and Treatment of Claims and Interests Under the Plan | 24 |
|  | 1. Treatment of Administrative Expenses and Certain Priority Claims | 25 |
|  |  a. Administrative Expenses | 25 |
|  |  b. Priority Tax Claims | 26 |
|  | 2. Class 1 — Credit Agreement Claims | 26 |
|  | 3. Class 2 — Interest Rate Protection Agreement Claims | 28 |
|  | 4. Class 3 — Miscellaneous Secured Claims | 28 |
|  | 5. Class 4 — Senior Note Claims | 29 |
|  | 6. Class 5 — Priority Claims | 29 |
|  | 7. Class 6 — Trade Claims | 29 |
|  | 8. Class 7 — General Unsecured Claims | 31 |
|  | 9. Class 8 — Senior Subordinated Note Claims | 32 |
|  | 10. Class 9 — Senior Zero Note Claims | 33 |
|  | 11. Class 10 — Junior Zero Note Claims | 33 |
|  | 12. Class 11 — Subordinated Claims | 34 |
|  | 13. Class 12 — Interests | 34 |
| C. | Effects of Plan Confirmation | 34 |
|  | 1. Discharge | 34 |
|  | 2. Binding Effect | 35 |
|  | 3. Releases | 35 |
|  | 4. Release of Claims of the Debtor | 36 |
|  | 5. Exculpation | 36 |
|  | 6. Injunction | 36 |
|  | 7. Revesting | 37 |
| D. | Executory Contracts and Unexpired Leases | 37 |
|  | 1. General | 37 |
|  | 2. The Plan | 37 |
| E. | Termination of Indemnification Obligations | 39 |
| F. | Claims of Holders of Zero Notes and Capital Indenture Trustees | 39 |
| G. | Retention and Enforcement of Causes of Action | 39 |
| H. | Registration Rights | 39 |
| I. | Distributions Under the Plan | 39 |
|  | 1. Time of Distributions Under the Plan | 40 |
|  | 2. Fractional Securities | 41 |
|  | 3. Compliance with Tax Requirements | 41 |
|  | 4. Allocation Between Principal and Accrued Interest | 41 |
|  | 5. Distribution of Unclaimed Property | 41 |
|  | 6. Set-Offs | 41 |
|  | 7. Manner of Payment | 41 |
|  | 8. Indenture Trustee Reserve | 42 |
| J. | Surrender and Cancellation of Instruments | 43 |
| K. | Procedures for Resolving Disputed Claims | 43 |
|  | 1. Objections to Claims | 43 |
|  | 2. Payments and Distributions With Respect to Disputed Claims | 43 |
| L. | Retention of Jurisdiction | 44 |
| M. | Claims of Subordination | 44 |
| N. | Amendment and Modification to the Plan | 44 |
| O. | Withdrawal of the Plan | 44 |
| P. | Conditions to Modification, Withdrawal and Waiver Rights | 45 |

| | | Page |
|---|---|---|
| Q. | Conditions to Confirmation and the Occurrence of the Effective Date of the Plan | 45 |
| 1. | Entry of Confirmation Order and Settlement Order | 45 |
| 2. | Regulatory Approvals | 46 |
| 3. | Trust Indenture Act | 46 |
| 4. | Credit Conditions | 46 |
| 5. | Delivery of Documents | 46 |
| 6. | Other Orders | 46 |
| R. | Directors of Reorganized Grand Union | 46 |
| S. | Dissolution of Committees | 46 |
| VII. | ACCEPTANCE AND CONFIRMATION OF THE PLAN | 47 |
| A. | Solicitation of Acceptance | 48 |
| B. | Confirmation Hearing | 48 |
| C. | Requirements for Confirmation of the Plan | 48 |
| 1. | The Plan is Fair and Equitable | 48 |
| 2. | The Best Interests Test | 49 |
| a. | The Debtor's Estimate of Liquidation Value | 49 |
| i. | Assumptions | 50 |
| ii. | Liquidation Analysis | 50 |
| iii. | Recoveries under the Plan | 51 |
| b. | Conclusion | 53 |
| 3. | Feasibility | 54 |
| VIII. | CREDITORS' COMMITTEES | 54 |
| IX. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 54 |
| A. | Liquidation Under Chapter 7 | 55 |
| B. | Alternative Plan | 55 |
| X. | RISK FACTORS | 55 |
| A. | Business Risks | 56 |
| 1. | Tax Issues | 56 |
| 2. | Financial Condition of the Debtor; Payment at Maturity; Dividends | 56 |
| 3. | Capital Expenditure Program | 56 |
| 4. | Environmental Regulation and Litigation | 57 |
| 5. | Competition | 57 |
| 6. | Collective Bargaining Agreements | 57 |
| B. | Bankruptcy Risks | 58 |
| 1. | Objection to Classifications | 58 |
| 2. | Risk of Nonconfirmation of the Plan | 58 |
| 3. | Potential Effect of Bankruptcy on Certain Relationships | 58 |
| C. | Liquidity Risks | 58 |
| 1. | Restrictions on Transfer | 59 |
| 2. | Potential Illiquidity of Plan Securities | 59 |
| XI. | DESCRIPTION OF POST-CONFIRMATION CREDIT AGREEMENT | 59 |
| XII. | DESCRIPTION OF NEW SENIOR NOTES | 59 |
| XIII. | DESCRIPTION OF NEW CAPITAL STOCK | 59 |
| A. | General | 60 |
| B. | New Common Stock | 60 |
| C. | Corporate Governance | 60 |
| D. | Preferred Stock | 61 |
| XIV. | SELECTED HISTORICAL FINANCIAL DATA | 61 |
| | | 61 |

|  |  | Page |
|---|---|---|
| XV. | **CERTAIN INFORMATION CONCERNING THE DEBTOR** | 62 |
|  |  | 62 |
| A. | Store Formats | 62 |
| B. | Merchandising Strategy | 62 |
|  | 1. Value | 62 |
|  | 2. Merchandise Assortment | 62 |
|  | 3. Efficiencies of Distribution | 62 |
| C. | Selected Data | 63 |
| D. | Summary of Operations | 63 |
|  | 1. Northern Region | 63 |
|  | 2. New York Region | 64 |
| E. | Capital Investment | 64 |
| F. | Distribution, Supply and Management Information Systems | 64 |
|  | 1. Distribution | 64 |
|  | 2. Montgomery, New York Distribution Agreement | 65 |
|  | 3. Management-Information Systems | 65 |
|  | 4. Suppliers | 65 |
|  | 5. Commissary | 65 |
| G. | Properties | 65 |
|  | 1. Location and Number of Stores | 66 |
|  | 2. Other Properties | 66 |
| H. | Employees | 67 |
| I. | Regulatory and Legal Matters | 67 |
|  | 1. Federal Trade Commission | 68 |
|  | 2. Environmental | 69 |
|  | 3. Other | 69 |
| J. | Trade Names, Service Marks and Trademarks | 69 |
| K. | Competition | 69 |
| L. | Outstanding Pension Plans and Liabilities | 71 |
| M. | Executive Officers | 71 |
| N. | Executive Compensation | 72 |
| O. | Related Party Transactions | 72 |
|  | 1. MTH Management Agreement | 72 |
|  | 2. P&C Foods | 73 |
|  | 3. Montgomery Warehouse | 73 |
|  | 4. Other | 73 |
| XVI. | **EXEMPTIONS FROM SECURITIES ACT REGISTRATION** | 73 |
| XVII. | **ABSENCE OF PUBLIC TRADING MARKET; AVAILABLE INFORMATION; FILINGS WITH THE COMMISSION AND RELATED MATTERS** | 74 |
| XVIII. | **CERTAIN FEDERAL INCOME TAX CONSEQUENCES** | 75 |
| A. | Tax Consequences to Creditors | 75 |
|  | 1. Holders of Senior Note Claims and Senior Subordinated Note Claims | 75 |
|  | 2. Original Issue Discount | 76 |
|  | 3. Market Discount | 77 |
|  | 4. Market Discount, Treatment of Receipt of New Common Stock or New Senior Notes | 77 |
|  | 5. Holders of Credit Agreement Claims | 78 |
|  | 6. Allocation of Consideration Received | 78 |
|  | 7. Distribution of Warrants to Holders of Zero Notes | 79 |
|  | 8. Backup Withholding and Information Reporting | 79 |

|   |   |   | Page |
|---|---|---|------|
| B. | Tax Consequences to Reorganized Grand Union | | |
|   | 1. | Cancellation of Indebtedness | 79 |
|   | 2. | Limitation on Net Operating Losses | 79 |
|   | 3. | Liability of Reorganized Grand Union for Prior Federal Income Taxes | 80 |
| XIX. | FINANCIAL AND LEGAL ADVISORS: FEES AND EXPENSES | | 80 |
| XX. | CONCLUSION | | 82 |

## APPENDICES

Appendix A — Second Amended Chapter 11 Plan of Reorganization of The Grand Union Company, dated April 19, 1995

Appendix B — Pro Forma Capitalization and Financial Projections

Appendix C — Term Sheet of New Senior Notes

Appendix D — Debtor's 10-K for the Fiscal Year ended April 2, 1994 and 10-Q for the Fiscal Quarter ended January 7, 1995

# I. INTRODUCTION AND SUMMARY

The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement. References herein to a "fiscal" year refer to the fiscal year of the Debtor ended the Saturday closest to the last day of March in the calendar year indicated (*e.g.*, references to fiscal 1994 are references to the Debtor's fiscal year ended April 2, 1994), except as otherwise indicated. All capitalized terms used in this Disclosure Statement have the meanings ascribed to such terms in the Plan, a copy of which is annexed hereto as Appendix "A", except as otherwise indicated.

## A. The Solicitation

The Debtor is hereby soliciting (the "Solicitation") votes for acceptance of the Plan under the Bankruptcy Code from the holders of (i) Credit Agreement Claims, (ii) Interest Rate Protection Agreement Claims, (iii) (a) the Debtor's 11¼% Senior Notes and (b) the Debtor's 11⅜% Senior Notes, (iv) Priority Claims, (v) General Unsecured Claims, (vi) (a) the Debtor's 13% Senior Subordinated Notes, (b) the Debtor's 12¼% Senior Subordinated Notes and (c) the Debtor's 12¼% Senior Subordinated Notes, Series A, (vii) Grand Union Capital Corporation's Senior Zero Notes and (viii) Grand Union Capital Corporation's Junior Zero Notes. The Debtor is not soliciting votes from holders of, among others, Trade Claims, which are not Impaired by the Plan. If the requisite acceptances of the Plan are obtained, the Debtor intends to use such acceptances to obtain confirmation of the Plan by the Bankruptcy Court. The Bankruptcy Court has fixed the close of business (Eastern Standard Time) on April 19, 1995 as the record date for the determination of those holders of Claims entitled to vote on the Plan.

## B. The Plan

Set forth below is a summary of the significant principles upon which the Plan is founded.

### 1. Exchange of Senior Note Claims for New Senior Notes

On or about the Effective Date and subject to Section 12.02 of the Plan, the Senior Note Claims (equal to the aggregate face amount of the 11¼% Senior Notes due 2000 and the 11⅜% Senior Notes due 1999, plus accrued but unpaid interest and interest on overdue interest as of the Effective Date) will be exchanged for the New Senior Notes. The Debtor estimates that the aggregate amount of the Senior Note Claims is approximately $570,807,000, assuming an Effective Date of April 29, 1995, calculated as follows (all numbers are rounded to the nearest thousand):

| Senior Note Issue | Principal Amount | Interest Amount | Compound Interest Amount | Total |
|---|---|---|---|---|
| 11¼% Senior Notes.......................... | $350,000,000 | $30,953,000 | $634,000 | $381,587,000 |
| 11⅜% Senior Notes.......................... | 175,000,000 | 13,990,000 | 230,000 | 189,220,000 |
| Total................................... | | | | $570,807,000 |

For a more detailed description of the New Senior Notes, see "DESCRIPTION OF NEW SENIOR NOTES" and the Term Sheet of New Senior Notes, annexed hereto as Appendix "C".

*2. Subordinated Debt Conversion and Equity Recapitalization*

The Debtor estimates that the aggregate amount of the Senior Subordinated Note Claims is approximately $602,494,000, calculated as follows (all numbers are rounded to the nearest thousand):

| Senior Subordinated Note Issue | Principal Amount | Interest Amount | Compound Interest Amount | Total |
|---|---|---|---|---|
| 13% Senior Subordinated Notes ............... | $ 16,150,000 | $ 671,000 | $ N/A | $ 16,821,000 |
| 12¼% Senior Subordinated Notes .............. | 500,000,000 | 32,326,000 | 104,000 | 532,430,000 |
| 12¼% Senior Subordinated Notes, Series A ...... | 50,000,000 | 3,233,000 | 10,000 | 53,243,000 |
| Total .................................. | | | | $602,494,000 |

On or about the Effective Date, the Senior Subordinated Notes will be cancelled and, subject to Section 12.02 of the Plan, the holders thereof will be entitled to receive 100% of the 10,000,000 shares of New Common Stock to be issued under the Plan. All of the issued and outstanding shares of the old common stock will be cancelled. The following table sets forth the expected ownership of the New Common Stock after giving effect to the Plan:

### Shares of New Common Stock
### Post-Restructuring

| Senior Subordinated Note Issue | Number of Issued Shares | % of Issued Shares |
|---|---|---|
| 13% Senior Subordinated Notes ........................................ | 279,190 | 2.79% |
| 12¼% Senior Subordinated Notes ...................................... | 8,837,100 | 88.37% |
| 12¼% Senior Subordinated Notes, Series A ................................. | 883,710 | 8.84% |
| Total.......................................................... | 10,000,000 | 100.00% |

For a discussion of the terms of the New Common Stock, see "DESCRIPTION OF NEW CAPITAL STOCK."

*3. Post-Confirmation Credit Agreement and Credit Agreement Claims*

(a) On the Effective Date, each holder of an Allowed Credit Agreement Claim will receive with respect to such Claim the treatment set forth in subparagraph (i) hereof, unless, at the sole option of the Debtor (which option will be exercised not later than five (5) days prior to the commencement of the confirmation hearing), such holder will receive the treatment described in subparagraph (ii) below:

(i)   (x) Reorganized Grand Union will execute the Post-Confirmation Credit Documents and such documents will become effective (provided that the other conditions contained in the Commitment Letter and the Credit Facility Term Sheet, as and if amended by consent of Bankers Trust and the Debtor, have been satisfied). Pursuant to the Post-Confirmation Credit Agreement, the commitment with respect to the amount of the Revolving Credit Facility and the Term Facility will be increased in the aggregate by not less than $65 million;

(y) The Post-Confirmation Facility will be secured by a perfected, first priority lien and security interest in all of the tangible and intangible assets (including, without limitation, all assets as described in the Commitment Letter, including leases) of Reorganized Grand Union and its subsidiaries, whether in existence at the Effective Date or acquired thereafter, subject only to such liens as may be permitted pursuant to the Post-Confirmation Credit Documents. Pursuant to the Intercreditor Agreement, the Additional Facility Lenders will have priority (with respect to the Additional Facility and with respect to those loans owed to, and letter of credit exposure of, such Additional Facility Lenders under the Existing Credit Agreement as set forth in the Intercreditor Agreement) over Existing Banks who do not contribute to the Additional Facility; and

2

(z) Upon confirmation of the Plan, but effective as of the Effective Date, the Debtor, Reorganized Grand Union, any Entity issuing securities under the Plan, any Entity acquiring property under the Plan, and any Creditor and/or equity security holder of the Debtor, will be deemed contractually to subordinate any present or future claim, right or other interest they may have in and to any proceeds received from the disposition, release, or liquidation of any Leasehold Interest, or any funds or proceeds received as a result of a subsequent pledge of such Leasehold Interest, to the obligations owed to the Post-Confirmation Banks pursuant to the Post-Confirmation Credit Documents until such obligations are paid in full; or

(ii) The Debtor will obtain a binding Alternative Commitment Letter from an alternative lender for the provision of not less than $204 million in loan facilities (of which not less than $57 million will be term facilities) on the Effective Date on terms satisfactory to the Debtor and reasonably satisfactory to the Official Committee and the Informal Committee of Senior Noteholders, in which event:

(x) The holder of an Allowed Credit Agreement Claim will receive on the Effective Date, cash payments equal to 100% of such Allowed Credit Agreement Claim; and

(y) Upon payment in full of the Allowed Credit Agreement Claims, the Existing Credit Agreement will be terminated and the notes issued pursuant thereto will be cancelled.

(b) On the Effective Date, all interest, fees, expenses and other charges that have accrued pursuant to the terms of the Existing Credit Documents but have not been paid as of the Effective Date will be paid to the Senior Bank Agent for distribution to those parties entitled to receive such interest, fees, expenses and other charges pursuant to the Existing Credit Documents.

For a more detailed description of the terms of the Post-Confirmation Credit Agreement, see "DESCRIPTION OF POST-CONFIRMATION CREDIT AGREEMENT" and the Commitment Letter and the Credit Facility Term Sheet, both of which are annexed to the Plan as Exhibit "A".

*4. Interest Rate Protection Agreement Claims*

With respect to each Allowed Interest Rate Protection Agreement Claim, at the sole option of Reorganized Grand Union, to be exercised on the Effective Date: (a) the legal, equitable and contractual rights to which the Allowed Interest Rate Protection Agreement Claim entitles the holder of such Allowed Interest Rate Protection Agreement Claim will be unaltered by the Plan and the Debtor shall, on the Effective Date, cure any defaults with respect thereto; or (b) on the Effective Date, the holder of an Allowed Interest Rate Protection Agreement Claim will receive a cash payment equal to 100% of such Allowed Interest Rate Protection Agreement Claim.

*5. Trade Creditors*

THE PLAN PROVIDES FOR ANY UNPAID PREPETITION TRADE CLAIMS TO BE PAID IN FULL AND SUCH CLAIMS ARE UNIMPAIRED UNDER THE PLAN. SINCE THE COMMENCEMENT OF THE BANKRUPTCY CASE, THE DEBTOR HAS REMAINED IN POSSESSION OF AND CONTINUES TO OPERATE ITS BUSINESS IN THE ORDINARY COURSE AND TO PAY ALL POSTPETITION CLAIMS OF TRADE CREDITORS IN FULL ON A TIMELY BASIS. THE DEBTOR HAS OBTAINED THE APPROVAL OF THE BANKRUPTCY COURT TO PAY IN THE ORDINARY COURSE THE PREPETITION CLAIMS OF EACH TRADE CREDITOR WHO AGREES (I) TO CONTINUE TO SUPPLY PRODUCTS TO THE DEBTOR ON CUSTOMARY TRADE TERMS (INCLUDING PRIOR ALLOWANCES AND PRACTICES) AND (II) THAT IF THIS "TRADE PAYMENT PROGRAM" OR SUCH TRADE CREDITOR'S PARTICIPATION IS TERMINATED, THEN ANY PAYMENTS BY THE DEBTOR TO SUCH TRADE CREDITOR IN RESPECT OF ANY PREPETITION CLAIMS WILL BE DEEMED TO HAVE BEEN MADE IN PAYMENT OF THEN OUTSTANDING POSTPETITION OBLIGATIONS OWED TO SUCH TRADE CREDITOR AND SUCH TRADE CREDITOR WILL IMMEDIATELY REPAY TO THE DEBTOR

ANY PAYMENTS MADE TO SUCH CREDITOR ON ACCOUNT OF PREPETITION CLAIMS TO THE EXTENT THE AGGREGATE AMOUNT OF SUCH PAYMENTS EXCEEDS THE POSTPETITION OBLIGATIONS THEN OUTSTANDING (WITHOUT THE RIGHT OF ANY SETOFFS, CLAIMS, PROVISIONS FOR PAYMENT OF RECLAMATION OR TRUST FUND CLAIMS, OR OTHERWISE). SEE "THE CHAPTER 11 CASE—TRADE CREDITOR ORDER." THE DEBTOR BELIEVES THAT IT WILL HAVE SUFFICIENT FUNDS FROM OPERATIONS, THE DIP FACILITY AND THE USE OF CASH COLLATERAL FOR THE TIMELY PAYMENT OF ITS TRADE CREDITORS IN THE ORDINARY COURSE THROUGH THE CONCLUSION OF THE BANKRUPTCY PROCEEDING, AND TO HAVE SUFFICIENT LIQUIDITY FROM OPERATIONS AND THE POST-CONFIRMATION CREDIT AGREEMENT TO MAKE SUCH PAYMENTS THEREAFTER.

Under the Plan, each trade creditor asserting, in the aggregate, less than $25,000 in Trade Claims, will not be required to file a proof (or proofs) of claim with respect to such Trade Claims. Each trade creditor asserting, in the aggregate, $25,000 or more in Trade Claims, will be required to file a proof (or proofs) of claim with respect to such Trade Claims. For further information, see "THE PLAN—Classification and Treatment of Claims and Interests under the Plan—Class 6—Trade Claims."

### 6. General Unsecured Claims

On the latest of (a) the Effective Date, (b) the date such General Unsecured Claim becomes an Allowed Claim, and (c) the date, or dates, on which Reorganized Grand Union or the Debtor, as the case may be, and the holder of such General Unsecured Claim otherwise agree or have agreed, each holder of an Allowed General Unsecured Claim will be entitled to receive payment in full in an amount equal to 100% of such Allowed General Unsecured Claim. General Unsecured Claims include, among other things, the fees and expenses of the Indenture Trustees pursuant to the Indentures whether accruing before or after the Filing Date (except to the extent such fees and expenses are Miscellaneous Secured Claims or Administrative Expenses).

### 7. The Zero Settlement

In settlement of various actions brought by the Official Committee of Unsecured Creditors of Grand Union Capital Company, the Debtor's parent company and also a debtor in possession under chapter 11 of the Bankruptcy Code, the Debtor has agreed to provide Warrants for the right to purchase a certain number of shares of New Common Stock to holders of the Zero Notes issued by Grand Union Capital Corporation.

For a more complete description of the terms of the Debtor's settlement with the Official Committee of Unsecured Creditors of Grand Union Capital Corporation and the terms of the warrants, see "THE CHAPTER 11 CASE—Zero Settlement" and "THE PLAN—Classification and Treatment of Claims and Interests Under the Plan—Class 9—Senior Zero Note Claims and Class 10—Junior Zero Note Claims."

### 8. Board of Directors

The Debtor's Board of Directors currently consists of Messrs. Hirsch (Chairman), Fox, McCaig (Chief Executive Officer), Louttit (Chief Operating Officer) and Baum (Chief Financial Officer). In addition, the Debtor is a party to the MTH Management Agreement.

On the Effective Date, each of the existing members of the Board of Directors will be deemed to have resigned. The initial Post Reorganization Board of Directors will consist of seven (7) members who will be selected by the members of the Official Committee which were members of the Informal Committee of certain holders of Senior Subordinated Notes. Such board members will be identified not less than five (5) days prior to the Confirmation Date; *provided that* if and to the extent that any member(s) of the Post Reorganization Board are not so identified by five (5) days prior to the Confirmation Date, the Debtor will designate such member(s). The composition of the Post Reorganization Board of Directors will be subject to approval of the

4

Bankruptcy Court. A list of such directors will be filed at or prior to the Confirmation Hearing. See "THE PLAN—Directors of Reorganized Grand Union." From and after the Effective Date, selection of the members of the Post Reorganization Board will be governed by the Restated Bylaws and/or the Restated Certificate of Incorporation, as the case may be.

The Debtor anticipates that (i) Reorganized Grand Union will maintain officer and director insurance liability coverage comparable to that currently in effect and (ii) while the precise amount of the compensation to outside directors will be determined by the Post Reorganization Board of Directors, Reorganized Grand Union will compensate its outside directors in a manner consistent with compensation provided to outside directors of companies of a similar size and nature.

Messrs. Hirsch and Fox have informed the Debtor that they do not intend to be candidates for election as directors of Reorganized Grand Union. Further, on the Effective Date, the MTH Management Agreement will be terminated and Reorganized Grand Union will execute the MTH Settlement Agreement. See "The Plan—Directors of Reorganized Grand Union." A copy of the MTH Settlement Agreement is annexed to the Plan as Exhibit "B". There can be no assurances that the Post Reorganization Board will not make one or more changes in senior management after the Effective Date. It is anticipated that any changes which are intended to be made prior to the confirmation hearing will be disclosed at such hearing.

*9. Restated Certificate of Incorporation*

On the Effective Date, Reorganized Grand Union will adopt the Restated Certificate of Incorporation, the principal effects of which are: (i) to authorize 30,000,000 shares of New Common Stock (of which up to 10,000,000 shares will be issued under the Plan) and 10,000,000 shares of Preferred Stock; (ii) to provide for the cancellation of the old common stock; and (iii) to prohibit the issuance of non-voting equity securities, as and to the extent required by section 1123(a)(6) of the Bankruptcy Code.

The Restated Certificate of Incorporation will provide that a director of Reorganized Grand Union will not be personally liable to Reorganized Grand Union or its stockholders for monetary damages for any breach of fiduciary duty as a director, except in certain cases where liability is mandated by the Delaware General Corporation Law (the "DGCL"). The provision has no effect on any non-monetary remedies that may be available to Reorganized Grand Union for non-compliance with federal or state securities laws. The Restated Certificate of Incorporation provides, among other things, for indemnification, to the fullest extent permitted by the DGCL, of any person who is or was involved in any manner in any investigation, claim or other proceeding by reason of the fact that such person is or was a director or officer of Reorganized Grand Union, or is or was serving at the request of Reorganized Grand Union as a director or officer of another corporation, against all expenses and liabilities actually and reasonably incurred by such person in connection with the investigation, claim or other proceeding.

## C. Summary of Classification and Treatment of Claims and Interests

The Plan categorizes the Claims against and Interests in the Debtor into twelve (12) Classes. The Plan also provides that expenses incurred by the Debtor during the Chapter 11 Case will be paid in full and specifies the manner in which the Claims and Interests in each Class are to be treated. To the extent that the terms of this Disclosure Statement vary with the terms of the Plan, the terms of the Plan shall be controlling. The table below provides a summary of the treatment of Claims and Interests under the Plan:

| Class | Type of Claim or Interest | Treatment |
|---|---|---|
| N/A | Administrative Expenses | Allowed Administrative Expenses will be paid in full in cash by Reorganized Grand Union, at its option, on (a) the later of (i) the Effective Date and (ii) the date on which the Bankruptcy Court enters an order allowing such Administrative Expense, or (b) the |

5

| Class | Type of Claim or Interest | Treatment |
|---|---|---|
| N/A | Administrative Expenses (cont'd) | date, or dates, on which Reorganized Grand Union or the Debtor, as the case may be, and the Entity claiming such Allowed Administrative Expense otherwise agree or have agreed; *provided, however,* that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business by the Debtor during the Chapter 11 Case will be paid by the Debtor or Reorganized Grand Union, as the case may be, in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto. Any final request for payment of Administrative Expenses, including, without limitation, applications for compensation and reimbursement of expenses by professionals employed by the Debtor and the Official Committee, must be filed no later than forty-five (45) days after the Effective Date; *provided that,* no request for payment of an Administrative Expense need be filed with respect to an Administrative Expense which is paid or payable by the Debtor or Reorganized Grand Union in the ordinary course, including, without limitation, any Administrative Expense which would have been a Trade Claim had it arisen prior to the Filing Date. |
| N/A | Priority Tax Claims | With respect to each Allowed Priority Tax Claim, at the sole option of Reorganized Grand Union, the holder of an Allowed Priority Tax Claim will be entitled to receive on account of such Allowed Priority Tax Claim: (a) equal cash payments made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding six (6) years after the assessment of the tax on which such Claim is based, totalling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date; (b) such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Debtor or Reorganized Grand Union, as the case may be, provided such treatment is on more favorable terms to the Debtor or Reorganized Grand Union, as the case may be, than the treatment set forth in clause (a) hereof; or (c) payment in full, provided that, with respect to paragraphs (b) and (c) hereof, such treatment is approved by the Bankruptcy Court. |
| 1 | Credit Agreement Claims | *Impaired.* (a) On the Effective Date, each holder of an Allowed Credit Agreement Claim will receive with respect to such Claim the treatment set forth in subsection (i) below, unless, at the sole option of the Debtor (which option will be exercised not later than five (5) days prior to the commencement of the confirmation hearing), such holder will receive the treatment described in subsection (ii) below: (i)(x) Reorganized Grand Union will execute the Post-Confirmation Credit Documents and such documents will become effective (provided that the other conditions contained in the Commitment Letter and the Credit Facility Term Sheet, as and if amended by consent of Bankers Trust and the Debtor, have been satisfied); pursuant to the Post-Confirmation Credit |

6

| Class | Type of Claim or Interest | Treatment |
|-------|---------------------------|-----------|
| | | Agreement, the commitment with respect to the amount of the Revolving Credit Facility and the Term Facility will be increased in the aggregate by not less than $65 million; (y) the Post-Confirmation Facility will be secured by a perfected, first priority lien and security interest in all of the tangible and intangible assets (including, without limitation, all assets as described in the Commitment Letter, including leases) of Reorganized Grand Union and its subsidiaries, whether in existence at the Effective Date or acquired thereafter, subject only to such liens as may be permitted pursuant to the Post-Confirmation Credit Documents; pursuant to the Intercreditor Agreement, the Additional Facility Lenders will have priority (with respect to the Additional Facility and with respect to those loans owed to, and letter of credit exposure of, such Additional Facility Lenders under the Existing Credit Agreement as set forth in the Intercreditor Agreement) over Existing Banks who do not contribute to the Additional Facility; and (z) upon confirmation of the Plan, but effective as of the Effective Date, the Debtor, Reorganized Grand Union, any Entity issuing securities under the Plan, any Entity acquiring property under the Plan, and any Creditor and/or equity security holder of the Debtor, will be deemed contractually to subordinate any present or future claim, right or other interest they may have in and to any proceeds received from the disposition, release, or liquidation of any Leasehold Interest, or any funds or proceeds received as a result of a subsequent pledge of such Leasehold Interest, to the obligations owed to the Post-Confirmation Banks pursuant to the Post-Confirmation Credit Documents until such obligations are paid in full; or (ii) the Debtor will obtain a binding Alternative Commitment Letter from an alternative lender for the provision of not less than $204 million in loan facilities (of which not less than $57 million will be term facilities) on the Effective Date, in which event: (x) the holder of an Allowed Credit Agreement Claim will receive on the Effective Date, cash payments equal to 100% of such Allowed Credit Agreement Claim; and (y) upon payment in full of the Allowed Credit Agreement Claims, the Existing Credit Agreement will be terminated and the notes issued pursuant thereto will be cancelled. (b) On the Effective Date, all interest, fees, expenses and other charges that have accrued pursuant to the terms of the Existing Credit Documents but have not been paid as of the Effective Date will be paid to the Senior Bank Agent for distribution to those parties entitled to receive such interest, fees, expenses and other charges pursuant to the Existing Credit Documents. |
| 2 | Interest Rate Protection Agreement Claims | *Impaired.* With respect to each Allowed Interest Rate Protection Agreement Claim, at the sole option of Reorganized Grand Union, to be exercised on the Effective Date: (a) the legal, equitable and contractual rights to which the Allowed Interest Rate Protection Agreement Claim entitles the holder of such Allowed Interest Rate Protection Agreement Claim will be unaltered by the Plan and the Debtor shall, on the Effective Date, |

| Class | Type of Claim or Interest | Treatment |
|---|---|---|
| 2 | Interest Rate Protection Agreement Claims (cont'd) | cure any defaults with respect thereto; or (b) on the Effective Date, the holder of an Allowed Interest Rate Protection Agreement Claim will receive a cash payment equal to 100% of such Allowed Interest Rate Protection Agreement Claim. |
| 3 | Miscellaneous Secured Claims | *Unimpaired.* With respect to each Allowed Miscellaneous Secured Claim, at the sole option of Reorganized Grand Union to be exercised on the Effective Date: (a) the legal, equitable and contractual rights of such Allowed Miscellaneous Secured Claim will remain unaltered, or (b) Reorganized Grand Union will provide such other treatment that will render such Allowed Miscellaneous Secured Claim Unimpaired under section 1124 of the Bankruptcy Code; *provided that* the Miscellaneous Secured Claims, if any, of the Indenture Trustees for the Senior Notes will be treated in accordance with Section 12.07 of the Plan. |
| 4 | Senior Note Claims | *Impaired.* On the Effective Date, the Senior Notes will be cancelled, Reorganized Grand Union will execute the New Senior Note Indenture, and, subject to Section 12.02 of the Plan, each holder of an Allowed Senior Note Claim will be entitled to receive its pro rata share of New Senior Notes. Such pro rata share will be determined by the ratio between the amount of such holder's Allowed Senior Note Claims and the aggregate amount of Allowed Senior Note Claims, each calculated as of the Filing Date without taking into account any interest on overdue interest or Sections 7.02 and 7.03 of the Plan, and pursuant to Section 12.02 of the Plan. |
| 5 | Priority Claims (other than Administrative Expenses and Priority Tax Claims) | *Impaired.* On the latest of (a) the Effective Date, (b) the date such Priority Claim becomes an Allowed Claim, or (c) the date, or dates, on which Reorganized Grand Union or the Debtor, as the case may be, and the holder of such Allowed Priority Claim otherwise agree or have agreed, each holder of a Priority Claim will receive payment in full of 100% of such Allowed Priority Claim. |
| 6 | Trade Claims | *Unimpaired.* (a) Each Creditor asserting Trade Claim(s) that, in the aggregate, are less than $25,000 in amount (Class 6(a) Claims), need not file a proof of claim with respect to such Trade Claim(s) in order to receive a distribution under the Plan. (b) Each Creditor asserting Trade Claim(s) that, in the aggregate, are $25,000 or more in amount (Class 6(b) Claims), must file a proof of claim with respect to such Trade Claim(s) on or before the Claims Bar Date. In the Event that any such Creditor does not timely file a proof of claim with respect to its Trade Claim(s), all Trade Claim(s) asserted by such Creditor will be barred and discharged; *provided, however,* that such Trade Creditor will be treated as having filed a proof of claim with respect to its Trade Claim(s) in the amount(s), if any, that is/are listed in the Schedules regardless of whether such Trade Claim(s) are listed in the Schedules as disputed, contingent or unliquidated. (c) With respect to each Trade Claim included in either Class 6(a) or in Class 6(b) that is |

| Class | Type of Claim or Interest | Treatment |
|---|---|---|
| | | not barred or discharged pursuant to Section 6.06(b) of the Plan, and subject to the terms of any Trade Agreement and to the rights set forth in Section 6.06(e) of the Plan, at the sole option of the Debtor, (i) the legal, equitable and contractual rights to which the Trade Claim entitles the holder of such Claim will remain unaltered or (ii) the Debtor will provide such other treatment that will render such Trade Claim an Unimpaired Claim under section 1124 of the Bankruptcy Code. (d) Unless a Creditor asserting Trade Claim(s) files a written objection to the Plan, such Creditor will be deemed to have waived and forever released any right to assert or claim that it may be entitled to interest accruing with respect to such Creditor's Trade Claim(s) and any such claims or assertions for interest will be forever barred and discharged. In the event that a Creditor asserting Trade Claim(s) objects to the Plan in writing, such objecting Creditor's Trade Claim(s) will be deemed included in Class 7 of the Plan (General Unsecured Claims) and will be deemed to have voted to reject the Plan. In the event included in Class 7, the objecting Creditor asserting a Trade Claim will be subject to the proof of claim and bankruptcy claims administration requirements that are applicable to other Class 7 Creditors. Notwithstanding anything herein to the contrary, a Creditor whose Claim would have been included in either Class 6(a) or 6(b) but for the objection referenced in this paragraph: (i) with respect to a Creditor which would have been included in Class 6(a), (y) such Creditor may rely on the amount of its Claim as set forth in the Schedules in the event that its Claim is not listed as contingent, disputed or unliquidated, or, (z) in the event that its Claim is so designated, or not scheduled, such Creditor will have ten (10) days from the date its objection is filed within which to file a proof claim which Claim may not exceed $25,000 plus any Claim for interest on such Claim; and (ii) with respect to a Creditor which would have been included in Class 6(b), such Creditor will either (y) have filed a proof of claim by the Claims Bar Date or (z) its Claim will be limited by the amount of such Claim as set forth in the Schedules unless such Claim is listed as contingent, disputed or unliquidated and, in the event of such designation, such Creditor will have ten (10) days from the date its objection is filed within which to file a proof of claim which Claim will not exceed the amount for which it was scheduled plus any claim for interest on such Claim. (e) The Debtor's failure to file an objection with the Bankruptcy Court to a Trade Claim will be without prejudice to Reorganized Grand Union's right to contest or otherwise defend against such Trade Claim in the appropriate forum, including the Bankruptcy Court, when and if such Trade Claim is sought to be enforced by the holder thereof. |
| 7 | General Unsecured Claims | *Impaired.* On the latest of (a) the Effective Date, (b) the date on which such General Unsecured Claim becomes an Allowed Claim, or (c) the date, or dates, on which Reorganized Grand Union or the Debtor, as the case may be, and the holder of such General |

| Class | Type of Claim or Interest | Treatment |
|-------|---------------------------|-----------|
| 7 | General Unsecured Claims (cont'd) | Unsecured Claim otherwise agree or have agreed, each holder of an Allowed General Unsecured Claim will receive payment in full of 100% of such Allowed General Unsecured Claim. Subject to Section 12.07 of the Plan, any General Unsecured Claims of an Indenture Trustee will be paid in full on the Effective Date or on such later date as agreed to by the parties. |
| 8 | Senior Subordinated Note Claims | *Impaired.* On the Effective Date, the Senior Subordinated Notes will be cancelled, and, subject to Section 12.02 of the Plan, each holder of an Allowed Senior Subordinated Note Claim will be entitled to receive its pro rata share of the 10,000,000 shares of New Common Stock to be issued under the Plan. Such pro rata share will be determined by the ratio between the amount of such holder's Allowed Senior Subordinated Note Claim and the aggregate amount of all Allowed Senior Subordinated Note Claims as of the Effective Date, and pursuant to Section 12.02 of the Plan. Senior Subordinated Note Claims will be allowed in an amount equal to the principal amount of such notes plus accrued but unpaid interest to the Filing Date. |
| 9 | Senior Zero Note Claims | *Impaired.* (a) Subject to the terms and conditions set forth in the Zero Settlement, and solely for purposes of effectuating such settlement, on the Effective Date, the Senior Zero Note Claims will be allowed as set forth in Section 7.09 of the Plan (subordinate to all Claims and Administrative Expenses against the Debtor, other than Claims set forth in Classes 10 and 11), in the amount allowed pursuant to Section 7.09 of the Plan, the Senior Zero Notes will be cancelled, and, subject to Section 12.02 of the Plan, each holder of an Allowed Senior Zero Note Claim will be entitled to receive its pro rata share of 240,000 Series 1 Warrants and of 480,000 Series 2 Warrants to be issued under the Plan as its full recovery against the Debtor and Reorganized Grand Union on its Senior Zero Note Claims. Such pro rata share will be determined by the ratio between the face amount of such holder's Senior Zero Notes and the aggregate face amount of all Senior Zero Notes and pursuant to Section 12.02 of the Plan. (b) Notwithstanding anything in the Plan to the contrary, it will be a condition to the issuance of the Warrants (i) with respect to the Senior Zero Note Claims held by a particular Entity holding Senior Zero Notes that, in the aggregate, are $200,000 or more in face amount, that such Entity execute and deliver a Zero Claims Release, and (ii) with respect to each holder of a Senior Zero Note Claim, that such holder not have filed a written objection to confirmation of the Plan (which is not withdrawn prior to commencement of the hearing on confirmation of the Plan). Any Warrants not issued by operation of the foregoing before the later of (i) two (2) years from the Effective Date, and (ii) six (6) months following the date such holder's Claim becomes an Allowed or Ultimately Allowed Claim will be deemed to be unclaimed property and cancelled. (c) The Debtor has not and shall not be deemed to have assumed any liability related to or arising from the Zero Notes. |

| Class | Type of Claim or Interest | Treatment |
|---|---|---|
| 10 | Junior Zero Note Claims | *Impaired.* (a) Subject to the terms and conditions set forth in the Zero Settlement, and solely for purposes of effectuating such settlement, on the Effective Date, the Junior Zero Note Claims will be allowed as set forth in Section 7.10 of the Plan (subordinate to all Claims and Administrative Expenses against the Debtor, other than Claims set forth in Class 11) in the amount allowed pursuant to Section 7.10 of the Plan, the Junior Zero Notes will be cancelled, and, subject to Section 12.02 of the Plan, each holder of an Allowed Junior Zero Note Claim will be entitled to receive its pro rata share of 60,000 Series 1 Warrants and of 120,000 Series 2 Warrants to be issued under the Plan as its full recovery against the Debtor and Reorganized Grand Union on its Junior Zero Note Claims. Such pro rata share will be determined by the ratio between the face amount of such holder's Junior Zero Notes and the aggregate amount of all Junior Zero Notes, and pursuant to Section 12.02 of the Plan. (b) Notwithstanding anything in the Plan to the contrary, it will be a condition to the issuance of the Warrants (i) with respect to the Junior Zero Note Claims held by a particular Entity holding Junior Zero Notes that, in the aggregate, are $200,000 or more in face amount, that such Entity execute and deliver a Zero Claims Release, and (ii) with respect to each holder of a Junior Zero Note Claim, that such holder not have filed a written objection to the Plan (which is not withdrawn prior to commencement of the hearing on confirmation of the Plan). Any Warrants not issued by operation of the foregoing before the later of (i) two (2) years from the Effective Date, and (ii) six (6) months following the date such holder's Claim becomes an Allowed or Ultimately Allowed Claim will be deemed to be unclaimed property and cancelled. (c) The Debtor has not and shall not be deemed to have assumed any liability related to or arising from the Zero Notes. |
| 11 | Subordinated Claims | *Impaired.* On the Effective Date, all Subordinated Claims will be discharged. No distributions will be made on account of Class 11. |
| 12 | Interests | *Impaired.* On the Effective Date, all Interests of the Debtor will be cancelled. No distributions will be made in respect of Class 12. |

For a more detailed description of the treatment of the foregoing classes of Claims and Interests, see "THE PLAN—Classification and Treatment of Claims and Interests Under the Plan."

## D. Conditions to Confirmation and the Occurrence of the Effective Date of the Plan

Prior to confirmation of the Plan, the following conditions must occur and be satisfied or (a) have been waived by the Debtor, with the consent of the Senior Bank Agent (if the alternative funding option pursuant to Section 6.01(a)(ii) of the Plan is not elected), the Official Committee, and the Informal Committee of Senior Noteholders, or (b) have been waived by the Senior Bank Agent (if the alternative funding option pursuant to Section 6.01(a)(ii) of the Plan is not elected), the Official Committee, and the Informal Committee of Senior Noteholders, such waiver having been approved by order of the Bankruptcy Court upon motion of the Senior Bank Agent (if applicable), the Official Committee, and the Informal Committee of Senior Noteholders:

(a) If the Debtor elects the treatment set forth in Section 6.01(a)(i) of the Plan with respect to Credit Agreement Claims: (i) the Post-Confirmation Credit Documents (including the Intercreditor Agreement)

11

shall have been filed with the Bankruptcy Court not less than five (5) Business Days prior to the Voting Deadline; and (ii) the Debtor shall have received authority to execute, and the Bankruptcy Court shall have approved, the Post-Confirmation Credit Documents and all documents necessary to effectuate the Post-Confirmation Credit Documents, which authority and approval will be contained in the Confirmation Order.

(b) If the Debtor elects the treatment set forth in Section 6.01(a)(ii) of the Plan with respect to Credit Agreement Claims: (i) the Debtor shall have entered into an Alternative Commitment Letter, which shall have been approved by the Bankruptcy Court; (ii) the Alternative Credit Documents shall have been filed with the Bankruptcy Court not less than five (5) Business Days prior to the Confirmation Date; and (iii) the Debtor shall have received authority to execute, and the Bankruptcy Court shall have approved, the Alternative Credit Documents and all other documents necessary to effectuate the Alternative Credit Documents.

(c) The Settlement Order approving the Zero Settlement shall have been entered.

(d) The Claims Bar Date shall have been established by the Bankruptcy Court as a date which is no less than five (5) Business Days prior to the Confirmation Date.

(e) As of a date which is three (3) Business Days prior to the Confirmation Date, the Official Committee shall not have filed a written notice that is not withdrawn asserting that such Committee has determined in the exercise of its fiduciary duties to unsecured creditors generally that the amount of the General Unsecured Claims has rendered the Plan not feasible pursuant to section 1129 of the Bankruptcy Code.

Before the Effective Date occurs, the following conditions must occur and be satisfied or have been waived (a) by the Debtor, with the consent of the Senior Bank Agent (if the alternative funding option pursuant to Section 6.01(a)(ii) of the Plan is not elected), the Official Committee, and the Informal Committee of Senior Noteholders, or (b) by the Senior Bank Agent (if the alternative funding option pursuant to Section 6.01(a)(ii) of the Plan is not elected), the Official Committee, and the Informal Committee of Senior Noteholders, such waiver having been approved by order of the Bankruptcy Court upon motion of the Senior Bank Agent (if applicable), the Official Committee, and the Informal Committee of Senior Noteholders: (i) the Confirmation Order and Settlement Order shall have become Final Orders; (ii) unless otherwise waived by the Debtor with the consent of the Official Committee and the Informal Committee of Senior Noteholders (and the Senior Bank Agent, if the Debtor does not elect the treatment set forth in Section 6.01(a)(ii) of the Plan with respect to Credit Agreement Claims), which consent shall not be unreasonably withheld, there shall have been obtained all regulatory approvals required in connection with the consummation of the Plan; (iii) the New Senior Note Indenture shall have been qualified under the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbb) as currently in effect; (iv) the Post-Confirmation Credit Documents or the Alternative Credit Documents, as the case may be, shall be executed by all necessary parties thereto and delivered and all conditions to the effectiveness of such documents shall have been satisfied or waived as provided therein subject to the occurrence of the Effective Date; (v) all other documents provided for in the Plan shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited by such documents; and (vi) any order necessary to satisfy any condition to effectiveness of the Plan shall be a Final Order. The Effective Date of the Plan shall be that day that is five (5) Business Days after the conditions to the occurrence of the Effective Date of the Plan have been satisfied or waived, or such earlier day after such conditions have been satisfied or waived that is designated by the Debtor.

A hearing to consider confirmation of the Plan has been scheduled for May 31, 1995 at 10:00 a.m., as a result of which, if all conditions to confirmation of the Plan have occurred or been waived, the Confirmation Order will be entered by the Bankruptcy Court.

The Debtor believes that all conditions to the Effective Date of the Plan will likely be satisfied within thirty (30) days of the Confirmation Date, and that the Effective Date of the Plan could occur by the middle of June 1995.

## II. BACKGROUND

### A. The Debtor

The Debtor is one of the largest food retailers in the Northeast, operating 234 supermarkets in six states under the "Grand Union" name. The Debtor is a wholly-owned subsidiary of Grand Union Capital Corporation ("Capital"), which in turn is a wholly-owned subsidiary of Grand Union Holdings Corporation ("Holdings").

The Debtor currently operates 128 stores in its Northern Region, including forty stores in Vermont, eighty-five stores in upstate New York and three stores in New Hampshire. The Debtor believes it generally operates in excellent locations, having operated in most of the markets it currently serves in the Northern Region for more than twenty-five years, and in many communities for over fifty years.

The Debtor currently operates 106 stores in its New York Region. The Debtor's primary New York Region marketing area comprises the more affluent suburban communities of central and northern New Jersey (forty-four stores), Westchester, Orange, Rockland, Dutchess and Putnam Counties in New York (twenty-seven stores), Long Island (fifteen stores) and Fairfield County, Connecticut (fifteen stores). The Debtor also has a limited presence in New York City (three stores) and Pennsylvania (two stores).

In general, the Debtor's merchandising strategy is directed toward providing value to its customers through competitive pricing, a wide assortment of national brand and private label products, high quality produce and a number of service departments. An important component of the Debtor's business strategy is its capital investment program directed toward renovating and upgrading the existing store base and opening new and replacement stores in existing market areas (see "RISK FACTORS—Business Risks—Capital Expenditures"). Capital investments in new and replacement stores and store enlargements have improved store sales and profitability due to the wider assortment of grocery and general merchandise products offered as well as expanded perishable service departments offering high quality, higher margin products.

See "CERTAIN INFORMATION CONCERNING THE DEBTOR" for a more complete description of the business of the Debtor.

### B. Significant Events Preceding Commencement of the Chapter 11 Case

#### 1. 1992 Recapitalization and The Present Capital Structure

In July 1992, the Debtor and its direct and indirect parent companies engaged in a series of transactions which included the merger of GU Acquisition Corporation ("GUAC"), a wholly-owned subsidiary of Holdings and the direct parent company of the Debtor, with and into the Debtor, and the formation of Capital as a wholly-owned subsidiary of Holdings and the new direct parent company of the Debtor. The July 1992 transactions included the sale to institutional investors of approximately 28.4% of the common stock of Holdings on a fully diluted basis for approximately $25 million and the repurchase of (i) shares and an option to purchase shares owned by Salomon Brothers Holding Company Inc, (ii) certain warrants held by the parties to the Debtor's bank credit agreements existing prior to the July 1992 transactions, and (iii) approximately 3.4% of the common stock of Holdings held by the management of the Debtor at that time. Purchases and sales of Holdings common stock interests, including options and warrants, were made through a disbursement equity account established for the purpose of effecting various transfers of interests in Holdings common stock. The transactions involving Holdings' common stock interests did not involve any payments by the Debtor, Capital or Holdings.

As part of the July 1992 series of transactions, Capital sold to institutional investors $343 million principal amount of its 15% Zero Coupon Notes due 2004, Series A and B (together, the "Senior Zero Notes") and $745 million principal amount of its 16½% Senior Subordinated Zero Coupon Notes due 2007, Series A and B (together, the "Junior Zero Notes," and, together with the Senior Zero Notes, the "Zero Notes"). The purchasers of the Zero Notes, who paid aggregate consideration of approximately $200 million,

13

also received warrants to purchase at a nominal price shares representing approximately 19.9% of the common stock of Holdings on a fully diluted basis. All of the proceeds of the sale of the Zero Notes were applied to repayment of indebtedness of Holdings, including the approximately $493 million of Holdings Senior Increasing Rate Notes. The balance of the funds required to retire Holdings' outstanding indebtedness was provided by a portion of the proceeds of the funds raised by the Debtor, as described below. No proceeds of the sale of Zero Notes were transferred to the Debtor.

As part of its recapitalization in 1992, the Debtor entered into the Existing Credit Agreement with the Existing Banks which provided for a $210 million term loan facility and a $100 million revolving credit facility, and also issued $350 million principal amount of 11¼% Senior Notes due 2000 and $500 million principal amount of 12¼% Senior Subordinated Notes due 2002. Proceeds of this new indebtedness were applied to payment of substantially all of the previous outstanding indebtedness of the Debtor (including previously outstanding indebtedness of GUAC) and to payment of a dividend from the Debtor to Capital and from Capital to Holdings which was used for payment of a portion of the outstanding indebtedness of Holdings.

On January 28, 1993, the Debtor sold $175 million principal amount of 11⅜% Senior Notes due 1999 in a private placement. Net proceeds of the sale of such notes were used to repay indebtedness under the Existing Credit Agreement. An additional $20.9 million of the indebtedness under the Existing Credit Agreement was repaid from the proceeds of the sale of the Southern Region in 1993. See "BACKGROUND —Significant Events Preceding Commencement of Chapter 11 Case—Asset Dispositions."

*2. Asset Dispositions*

On March 29, 1993, the Debtor sold forty-eight of its fifty-one Southern Region stores to The Great Atlantic & Pacific Tea Company, Inc. ("A&P"). The three Southern Region stores not sold to A&P were closed and the properties have been subleased. The Debtor received net cash proceeds of approximately $25 million and was relieved of approximately $4.5 million of capital lease obligations.

*3. Failure to Make Certain Interest Payments*

The Debtor made interest payments of approximately $53.4 million on its Senior Notes, 12¼% Senior Subordinated Notes and 12¼% Senior Subordinated Notes, Series A on July 15, 1994, payments of approximately $10 million on its Senior Notes on August 15, 1994, and payments of approximately $1 million on its 13% Senior Subordinated Notes on September 30, 1994. After giving effect to those payments, the Debtor believed that it had sufficient liquidity, when supplemented by the sale of underperforming assets, to allow it to continue operations and to make its next interest payment.

On November 29, 1994, the Debtor announced that after giving effect to committed capital expenditures, cash from operations would not be sufficient to fund cash and interest payments due in early calendar 1995, and that asset sales which were able to be arranged by the interest-payment date were not likely to generate an amount of net proceeds which, together with cash from operations, would be adequate to fund such interest payments. The Debtor promptly began discussions with its creditors concerning the possibility that the interest payments would not be made when due.

At the time of its announcement on November 29, 1994, the Debtor was not in default under any of its loan documents. However, on December 6, 1994, the Debtor obtained from the Existing Banks a Limited Waiver and Agreement pursuant to which the Existing Banks waived any event of default which might subsequently arise under the Existing Credit Agreement in the event of the Debtor's failure to make the payments of interest due on January 15, 1995 on its Senior and Senior Subordinated Notes. The Limited Waiver and Agreement also waived compliance with certain covenants in the Existing Credit Agreement, thereby permitting the Debtor to continue to make borrowings in the ordinary course under its revolving line of credit through February 14, 1995.

Throughout the period following the November 29 announcement and the December limited waiver, the Debtor continued to discuss its financial condition with its lenders and trade creditors. On January 15,

1995, the Debtor did not make the interest payments which were due, but intense negotiations continued over the next few weeks. Those discussions resulted in an agreement in principle with the Existing Banks and the three Informal Committees regarding the Debtor's capital restructuring. The three Informal Committees consisted of certain holders of: (i) Senior Notes (represented by Stroock & Stroock & Lavan and Rosenthal, Monhait, Gross & Goddess, P.A.), (ii) Senior Subordinated Notes (represented by Ropes & Gray), and (iii) Trade Claims (represented by Pepper, Hamilton & Scheetz).

The Informal Committee of certain holders of Senior Subordinated Notes was composed of (i) Putnam Investments Management (holding $183.5 million face amount of Senior Subordinated Notes on the Filing Date) and (ii) Federated Research Corporation (holding $21.175 million face amount of Senior Subordinated Notes on the Filing Date). Both entities are now members of the Official Committee (as defined below).

According to Stroock & Stroock & Lavan, counsel to the Informal Committee of certain holders of Senior Notes, such Informal Committee is currently composed of: (i) Angelo Gordon & Co., (ii) Lehman Brothers, Inc., (iii) Soros Fund Management, (iv) Trust Company of the West, and (v) State Street Bank and Trust Company, as Indenture Trustee. The members of such Informal Committee currently hold Senior Notes in the aggregate face amount of $118,820,000.

*4. Retention of Financial Advisors*

On November 28, 1994, the Debtor entered into a letter agreement pursuant to which the Debtor engaged Goldman, Sachs & Co. ("Goldman Sachs") and BT Securities Corporation ("BT Securities," and together with Goldman Sachs, the "Financial Advisors") as its financial advisors to consider financial alternatives available to it, including evaluating appropriate capital structures and financing or refinancing alternatives. The arrangement provided for a $300,000 per month cash fee, and an $8 million "Restructuring Fee" payable upon the consummation of a "Restructuring Transaction." On January 22, 1995, the parties agreed to reduce the Restructuring Fee to $5 million and the Financial Advisors agreed, in addition to their previous commitment, to prepare a valuation of the Debtor (and to testify, if requested, concerning it) and to attempt to obtain commitments to a restructuring plan. The Debtor paid an aggregate of approximately $785,000 in cash fees prior to the commencement of this Chapter 11 Case; $5 million remains outstanding under such fee arrangement. The term sheet, dated as of January 23, 1995, respecting the terms of the proposed restructuring of the Debtor, provided that advisory fees for financial advisors to be paid by the Debtor would be agreed upon by the Informal Committees representing certain holders of Senior Subordinated Notes and certain holders of Senior Notes. The Official Committee has not advised the Debtor that it assents to the fee arrangement and reserves the right to object thereto. (The Plan classifies such fees as General Unsecured Claims. See "THE PLAN—Classification and Treatment of Claims and Interests Under the Plan—General Unsecured Claims.")

## C. Recent Financial Performance

|  | 12 weeks ended | | 40 weeks ended | |
|---|---|---|---|---|
|  | January 8, 1994 | January 7, 1995 | January 8, 1994 | January 7, 1995 |
|  | (Dollars in millions) | | | |
| Sales | $583.5 | $563.3 | $1,904.4 | $1,867.6 |
| Gross profit | 171.1 | 149.5 | 545.9 | 540.0 |
| Operating and administrative expense | 127.4 | 127.9 | 408.8 | 420.1 |
| Depreciation and amortization | 18.3 | 21.2 | 59.4 | 67.2 |
| Provision for store closings and nonrecurring item | — | 10.6 | — | 10.6 |
| Restructuring costs | — | 1.9 | — | 1.9 |
| Interest expense | 42.4 | 47.4 | 139.6 | 154.2 |
| Cumulative effect of accounting change | — | — | 30.3 | — |
| Net loss | 16.9 | 59.5 | 92.2 | 114.0 |
| EBITDA (1) | 43.5 | 21.8 | 137.7 | 120.7 |

(1) Earnings before LIFO provision, depreciation and amortization, provision for store closings and nonrecurring item, restructuring costs, interest expense, income taxes and cumulative effect of accounting change. EBITDA for the 40 weeks ended January 8, 1994 was reduced by approximately $8 million due to the 22-day work stoppage in May 1993.

See the Debtor's 10-Q for the 12 and 40 weeks ended January 7, 1995, for a complete discussion and analysis of recent financial performance, attached hereto as Appendix "D".

## III. SUPPORT OF THE PLAN BY
## PARTIES IN INTEREST

The Official Committee has voted to support the Plan and recommends that creditors vote in favor of the Plan.

The Informal Committee of certain holders of Senior Notes supports the Plan and recommends that holders of Senior Notes vote in favor of the Plan.

## IV. THE BANKRUPTCY PLAN VOTING
## INSTRUCTIONS AND PROCEDURES

### A. General

The Debtor is seeking the acceptance of the Plan by holders of (i) Credit Agreement Claims (Class 1), (ii) Interest Rate Protection Agreement Claims (Class 2), (iii) Senior Note Claims (Class 4), (iv) Priority Claims (Class 5), (v) General Unsecured Claims (Class 7), (vi) Senior Subordinated Note Claims (Class 8), (vii) Senior Zero Note Claims (Class 9) and (viii) Junior Zero Note Claims (Class 10). Holders of Miscellaneous Secured Claims (Class 3) and Trade Claims (Class 6) are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan. Holders of Subordinated Claims (Class 11) and holders of the Debtor's Interests (Class 12) will not receive any distribution in respect of such Claims or Interests and thus are deemed to have rejected the Plan.

### B. Holders of Claims Entitled to Vote

As more fully described below, the Plan designates twelve (12) separate Classes of Claims and Interests. See "THE PLAN—Classification and Treatment of Claims and Interests Under the Plan." Generally, a claim or interest as to which legal, equitable or contractual rights are altered is "impaired." A holder of an allowed impaired claim or interest that will receive a distribution under a plan of reorganization is entitled to vote to accept or reject such plan. The Claims in Classes 1, 2, 4, 5, 7, 8, 9, 10 and 11 and the Interests in Class 12 are Impaired under the Plan. Of these Classes, only the holders in Classes 1, 2, 4, 5, 7, 8, 9 and 10 whose Claims are not disputed are being solicited and are entitled to vote to accept or reject the Plan. Classes 11 and 12 will not receive any distribution under the Plan and therefore are conclusively presumed to have rejected the Plan.

A Ballot to be used to accept or reject the Plan has been enclosed with all copies of this Disclosure Statement mailed to holders of Claims whose Claims are Impaired by the Plan but who have not been conclusively presumed to reject the Plan as a matter of law. Accordingly, this Disclosure Statement (and the appendices hereto), together with the accompanying Ballot and the related materials delivered together herewith, are being furnished to holders of Credit Agreement Claims (Class 1), Interest Rate Protection Agreement Claims (Class 2), Senior Note Claims (Class 4), Priority Claims (Class 5), General Unsecured Claims (Class 7), Senior Subordinated Note Claims (Class 8), Senior Zero Note Claims (Class 9) and Junior Zero Note Claims (Class 10) and may not be relied upon or used for any purpose by such holders other than to determine whether or not to vote to accept or reject the Plan.

### C. Vote Required for Class Acceptance

The Bankruptcy Court will determine whether sufficient acceptances have been received to confirm the Plan. A class of impaired claims is deemed to have accepted a chapter 11 plan if votes to accept the plan

have been cast by creditors (other than any entity designated under section 1126(e) of the Bankruptcy Code) that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class held by creditors that have voted to accept or reject the plan. Because Classes 11 and 12 will not receive any distribution under the Plan and thus will be conclusively presumed to have rejected the Plan as a matter of law, the Debtor must request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code. The Debtor also may seek confirmation of the Plan under section 1129(b) with respect to Classes 7, 8, 9 and/or 10, as the case may be, to the extent such Classes reject the Plan.

### D. Counting of Ballots for Determining Acceptance of the Plan

The Debtor intends to count all validly executed Ballots received prior to the Voting Deadline (as defined below) for purposes of determining whether each Impaired voting Class has accepted or rejected the Plan.

### E. Voting Deadline

Ballots will not be accepted after 5:00 p.m., Eastern Standard Time, on May 24, 1995 (the "Voting Deadline"), unless the Bankruptcy Court, at the request of the Debtor, extends the Voting Deadline, in which event the solicitation period will terminate at such extended time on such extended date. Except to the extent permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be accepted or used by the Debtor in connection with the Debtor's request for confirmation of the Plan (or any permitted modification thereof).

Consistent with the provisions of Rule 3017 of the Bankruptcy Rules, the Bankruptcy Court has fixed the record date—the time and date for the determination of holders of record of Claims who are entitled to vote on the Plan—as the close of business, Eastern Standard Time, on April 19, 1995 (the "Record Date").

### F. Voting Procedures

The Debtor is providing copies of this Disclosure Statement, Ballots, and where appropriate, Summary Ballots, to all known holders of Impaired Claims, including the Existing Banks (as holders of Credit Agreement Claims), all known holders of General Unsecured Claims and all registered holders of the Senior Notes, the Senior Subordinated Notes, the Senior Zero Notes and the Junior Zero Notes (collectively, the Senior Notes, the Senior Subordinated Notes, the Senior Zero Notes and the Junior Zero Notes are the "Old Securities"). Registered holders may include brokerage firms, commercial banks, trust companies, or other nominees. Any such nominee who requires additional copies of the Disclosure Statement and Ballots for distribution to beneficial holders may obtain them from the Debtor's balloting agent, Bankruptcy Services, Inc., by calling (212) 527-0727 (Attn: Kathy Gerber). If such entities do not hold for their own account, then they are required to provide promptly copies of this Disclosure Statement and appropriate Ballots to their customers and to beneficial owners. Any beneficial owner who has not received a Ballot should contact his or its brokerage firm, nominee, or the Debtor. **The following is only a summary of the voting rules. Reference should be made to the "Order Approving the Disclosure Statement, Establishing Voting Procedures and Setting Confirmation Hearing" prior to voting.**

#### 1. Beneficial Owners of Credit Agreement Debt

Under the Existing Credit Agreement, the Existing Banks may have granted participants certain rights with respect to the approval of waivers or amendments to the Existing Credit Agreement. For purposes of voting on the Plan, the Debtor will recognize only the Existing Banks as the holders of the Credit Agreement Debt. Each Existing Bank that has granted any such participation may complete a Summary Ballot to reflect the votes of itself and its respective participants, provided that such Summary Ballot shall be counted as a single vote in favor of the Plan to the extent it contains one or more acceptances of the Plan (in an aggregate amount of such acceptances) and/or as a single vote against the Plan to the extent it contains one or more

17

rejections of the Plan (in an aggregate amount of such rejections). Accordingly, each such Summary Ballot may contain, at most, one each of a vote accepting the Plan and a vote rejecting the Plan.

*2. Beneficial Owners of Old Securities*

For purposes of voting to accept or reject the Plan, the beneficial owners of Old Securities as of the Record Date will be deemed to be the "holders" of such Claims represented by such Old Securities. The beneficial owner of an Old Security is any person who possesses investment power with respect to such Old Security, including the power to dispose, or to direct the disposition of, such Old Security. Any beneficial owner holding Old Securities in "street name" through a brokerage firm, bank, trust company, or other nominee can vote only by following these instructions:

1. Fill in all the applicable information on the Ballot.

2. Sign the Ballot (unless the Ballot has already been signed by the brokerage firm, bank, trust company, or other nominee).

3. Return the Ballot to your brokerage firm, bank, trust company, or other nominee. If you have any questions, contact Bankruptcy Services, Inc. or the Debtor or your brokerage firm, bank, trust company, or other nominee for instructions.

Any Ballot submitted to a brokerage firm or proxy intermediary will not be counted until such brokerage firm or proxy intermediary properly completes and delivers a corresponding Summary Ballot to the Debtor (as discussed below).

Any beneficial owner holding Old Securities in its own name (*i.e.*, the beneficial holder is the record holder) can vote by completing and signing the enclosed Ballot and returning it directly to the Debtor's balloting agent (using the enclosed pre-addressed envelope).

*3. Brokerage Firms, Banks, and Other Nominees*

A brokerage firm which is the registered holder of Old Securities for a beneficial owner may vote on behalf of such beneficial owner by (i) distributing a copy of this Disclosure Statement and all appropriate Ballots to such owner, (ii) collecting all such Ballots, and (iii) completing a Summary Ballot compiling the votes and other information from the Ballots collected and transmitting such Summary Ballot together with the Ballots completed by the beneficial owners to Bankruptcy Services, Inc. at the address set forth on the Ballot. A proxy intermediary acting on behalf of a brokerage firm or bank may follow the procedures outlined in the preceding sentence to vote on behalf of such beneficial owner.

*4. Defects, Irregularities, Etc.*

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Bankruptcy Court after notice and a hearing, pursuant to Bankruptcy Rule 3018(a). Any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Bankruptcy Court determines. Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.

## G. Miscellaneous

No statements or information concerning the Debtor or Reorganized Grand Union (particularly as to future business, results of operations or financial condition, or with respect to the distributions to be made under the Plan) or any of the assets or business of the Debtor or Reorganized Grand Union have been authorized by the Debtor or should be relied upon, other than as set forth in this Disclosure Statement.

IN ORDER FOR YOUR BALLOT TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH ON THE BALLOT AND THE "ORDER APPROVING THE DISCLOSURE STATEMENT, ESTABLISHING VOTING PROCEDURES AND SETTING CONFIRMATION HEARING."

IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT:

> Bankruptcy Services, Inc.
> 400 Park Avenue, 9th Floor
> New York, New York 10022
> (800) 344-8624

## V. THE CHAPTER 11 CASE

### A. Continuation of Business; Stay of Litigation

On January 25, 1995 (the "Filing Date"), the Debtor commenced the Chapter 11 Case. Since the Filing Date, the Debtor has continued to operate as a debtor in possession subject to the supervision of the Bankruptcy Court in accordance with the Bankruptcy Code. Thus, the Debtor's management remained in place and has continued to date to manage the Debtor's affairs. The Debtor is authorized to operate in the ordinary course of business. Transactions out of the ordinary course of business have required Bankruptcy Court approval. In addition, the Bankruptcy Court has supervised the Debtor's employment of attorneys, accountants and other professionals.

An immediate effect of the filing of the bankruptcy petition was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, enforcement of liens against the Debtor and litigation against the Debtor. This injunction remains in effect, unless modified or lifted by order of the Bankruptcy Court, until consummation of a plan of reorganization.

### B. Significant Events During the Chapter 11 Case

#### 1. First Day Orders

The Debtor submitted numerous so-called "first day orders," along with supporting motions, to the Bankruptcy Court on the Filing Date, which were approved. These first day orders include, among others, (i) orders authorizing the retention of Young, Conaway, Stargatt & Taylor and Willkie Farr & Gallagher as bankruptcy counsel to the Debtor and Donovan Leisure Newton & Irvine as special corporate counsel to the Debtor; (ii) an order authorizing the retention of Price Waterhouse LLP as accountants and consultants to the Debtor; (iii) an order authorizing the Debtor to pay certain prepetition employee wages, reimbursable expenses and benefits and workers' compensation benefits (further discussed below); (iv) an order authorizing the Debtor to maintain its prepetition bank accounts, business forms, stationery, checks, and cash management system and granting additional time to comply with investment guidelines; (v) an order extending the time in which the Debtor is required to file certain information, including schedules and lists; (vi) an order authorizing the Debtor to continue certain consumer related practices; (vii) an order determining adequate assurance of payment for future utility services and restraining utility companies from discontinuing, altering or refusing service; (viii) an interim order authorizing use of cash collateral and providing adequate protection (further discussed below); (ix) an order authorizing the Debtor to pay the prepetition claims of certain service providers; (x) an order authorizing the Debtor to pay sales, use, cigarette and tobacco taxes in the ordinary course; and (xi) an order authorizing the Debtor to mail initial notices and to file a list of creditors in lieu of a matrix.

*2. Prepetition Wage and Benefits Order*

On the Filing Date, the Bankruptcy Court approved an order authorizing the Debtor to pay certain prepetition (i) employee wages, salaries and other compensation and reimbursable employee expenses, (ii) employee medical, dental and similar benefits, and (iii) workers' compensation benefits (the "Prepetition Wage and Benefits Order"). Pursuant to such order, the Debtor has paid approximately (i) $8.7 million in various categories of employee compensation owing as of the Filing Date, (ii) $100,000 in prepetition reimbursable business expenses (for employees whose gross pay equals $104,000 per year or less), and (iii) $7.2 million in employee benefits, and workers' compensation claims. The Debtor believes such relief was necessary to avoid serious disruption to its business at a critical juncture in the Debtor's reorganization. Payments made pursuant to such order will reduce the amount of Priority Claims and General Unsecured Claims payable by the Debtor on the Effective Date. See "THE PLAN—Classification and Treatment of Claim and Interests Under the Plan—Class 5—Priority Claims."

*3. Cash Collateral Order*

On the Filing Date, the Bankruptcy Court approved an interim order authorizing the Debtor's use of cash collateral and providing adequate protection (the "Interim Cash Collateral Order"). Pursuant to such order, the Debtor obtained authority to, *inter alia*, use cash collateral (as defined in section 363(c)(2)(A) of the Bankruptcy Code) that secures the obligations to certain of the Debtor's secured creditors in order to permit the Debtor to continue to make ordinary course and other approved payments. The Debtor believes such relief was required to permit the Debtor to continue to operate its business without disruption and to preserve the good will and value of the Debtor's business. The Debtor obtained the consent of the required Existing Banks and certain holders of Senior Notes to the use of cash collateral (as provided in the Interim Cash Collateral Order). In return for such consent, the Debtor was required to provide such Creditors with adequate protection with regard to any decline in the value of their prepetition collateral by way of certain superpriority Claims and liens. On February 16, 1995, the Bankruptcy Court granted final approval of the Debtor's use of cash collateral (the "Final Cash Collateral Order").

*4. DIP Facility*

On January 30, 1995, the Bankruptcy Court gave interim approval of debtor-in-possession financing (the "DIP Facility"), pursuant to which Bankers Trust Company ("Bankers Trust") provided the Debtor with debtor-in-possession financing of up to $150 million in the form of a revolving credit facility to be used by the Debtor for its working capital and general corporate requirements. The interim approval allowed the Debtor to immediately utilize $50 million of the revolving credit facility. On February 16, 1995, the Bankruptcy Court granted final approval of the DIP Facility. The DIP Facility will mature on the earliest of (i) July 31, 1996, (ii) the effective date of a plan of reorganization for the Debtor, and (iii) the date of substantial consummation of such plan of reorganization. Pursuant to the Bankruptcy Court's approval of the DIP Facility, Bankers Trust has a priority over virtually all other Claims in the Chapter 11 Case, including Administrative Expenses, and a lien that is senior to substantially all liens, Claims, and encumbrances arising before or after the Filing Date.

A commitment fee of .5% per annum on the average unused portion of the DIP Facility (which may be reduced unilaterally by the Debtor), covering the period from January 20, 1995 until the termination of the DIP Facility, will be paid by the Debtor. In addition, the Debtor will pay a Facility Fee of 1.5% of the total amount of the DIP Facility, and an annual administrative agency and collateral monitoring fee of $100,000.

The DIP Facility includes certain restrictive covenants that apply to the Debtor, including restrictions on other indebtedness, liens, sales of assets, dividends and distributions, capital expenditures, mergers, acquisitions, divestitures, reorganizations, payments of pre-Filing Date debt (with certain exceptions) and transactions with affiliates, and requirements regarding satisfaction of certain financial ratios and insurance coverage. The DIP Facility also includes typical events of default, including entry of an order granting relief to prepetition creditors from the automatic stay, a conversion of the Chapter 11 Case into a case under chapter 7, and/or a change of ownership or control of the Debtor.

*5. Trade Creditor Order*

On February 10, 1995, the Bankruptcy Court approved an order authorizing provisional payment of prepetition Trade Claims (the "Trade Creditor Order"). The Trade Creditor Order provides a mechanism by which the Debtor is authorized (but not obligated) to pay outstanding prepetition Trade Claims (other than Trade Claims of "insiders" as such term is defined in section 101(31) of the Bankruptcy Code) provided that certain requirements are satisfied (the "Trade Payment Program"). Among other things, the Debtor may only make payment on account of a trade creditor's outstanding prepetition Trade Claims to the extent of the value of any unpaid goods shipped by the relevant trade creditor to the Debtor after February 10, 1995. In addition, the Debtor may not make such payments unless and until the relevant trade creditor executes a written agreement, the form of which is attached to the Trade Creditor Order (the "Trade Agreement"), setting forth, *inter alia*: the trade creditor's prepetition Claims against the Debtor, the customary trade terms between the trade creditor and the Debtor in effect up to November 28, 1994, and the trade creditor's agreement to continue to ship goods to the Debtor in accordance with such customary trade terms.

A Trade Agreement will be deemed to have terminated if the relevant trade creditor has failed to comply with the terms of the Trade Agreement. The Trade Payment Program will also be deemed to have terminated if: (i) the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, (ii) the Senior Bank Agent delivers notice subsequent to the entry of an order appointing the election of a trustee or an examiner with expanded powers in the Chapter 11 Case, or (iii) the Debtor fails to confirm and substantially consummate a plan of reorganization acceptable to the Senior Bank Agent by May 31, 1995 and June 16, 1995, respectively. If the Trade Payment Program or any trade creditor's participation therein is terminated, then any payments made by the Debtor to any such trade creditor in respect of any prepetition Claims will be deemed to have been made in payment of then outstanding postpetition obligations owed to such trade creditor and such trade creditor will immediately repay to the Debtor any payments made to such creditor on account of prepetition Claims to the extent the aggregate amount of such payments exceeds the postpetition obligations then outstanding (without the right of any setoffs, claims, provisions for payment of reclamation or trust fund claims, or otherwise).

*6. Appointment of Official Committee*

On February 6, 1995, the United States Trustee for the District of Delaware appointed the following Entities to the Official Committee of Unsecured Creditors of The Grand Union Company (the "Official Committee"): (i) the United States Trust Company of New York, as Indenture Trustee ("U.S. Trust"), (ii) Putnam Investment Management, (iii) Federated Research Corporation, (iv) Chemical Bank, as Indenture Trustee, (v) Leland Zaubler, (vi) White Rose Division of DiGiorgio Corporation, (vii) Kraft Foods/Kraft General Foods, (viii) Nestle USA, Inc., and (ix) the Pension Benefit Guaranty Corporation (the "PBGC"). The Official Committee is represented by the law firms of Ropes & Gray and Pepper, Hamilton & Scheetz.

Following the appointment of the Official Committee, the Informal Committees representing certain holders of Senior Subordinated Notes and certain trade creditors ceased independent activity. However, the Informal Committee representing certain holders of Senior Notes continues to participate in the Plan process.

## C. Chapter 11 Cases of Holdings and Capital

On February 6, 1995, certain members of an unofficial committee (the "Informal Zero Committee") purporting to represent certain holders of the Zero Notes, commenced an involuntary chapter 11 bankruptcy case against Capital, the Debtor's parent company, in the Bankruptcy Court (the "GUCC Chapter 11 Case"). The Informal Zero Committee's advisors consisted of The Argosy Group, L.P, Marcus Montgomery Wolfson P.C. and Williams, Hershman & Wisler, P.A. On February 16, 1995, Capital filed a response to the involuntary petition in which it consented to the entry of an order for relief. In addition, on February 16, 1995, Holdings, the Debtor's indirect parent company (and the parent company of Capital), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "GUHC Chapter 11 Case").

## D. Zero Settlement

On February 23, 1995, the Informal Zero Committee filed a motion to substantively consolidate the Debtor's Chapter 11 Case with the GUCC Chapter 11 Case (the "Substantive Consolidation Motion"). Substantive consolidation generally is the merging of the assets and liabilities of affiliated entities in a bankruptcy proceeding so that the combined assets and liabilities are treated as though held and incurred by a single entity. The consolidated assets create a single fund from which claims against the consolidated debtors are to be satisfied. In addition, all intercompany claims and guarantees between the consolidated debtors are extinguished. Specifically, the Substantive Consolidation Motion sought to consolidate the unsecured claims against the Debtor and Capital and pool the assets of both entities to satisfy these claims.

On March 3, 1995, with the addition of other creditors, the Informal Zero Committee was replaced by the Official Committee of Unsecured Creditors of Grand Union Capital Corporation (the "Capital Committee"), which was appointed by the United States Trustee. Thereafter, the Capital Committee continued the prosecution of the Substantive Consolidation Motion. The Capital Committee's advisors consist of The Argosy Group, L.P, Peterson Consulting, L.P., Marcus Montgomery Wolfson P.C. and Williams, Hershman & Wisler, P.A.

The Informal Zero Committee and/or the Capital Committee filed the following additional pleadings: (1) an objection to the Debtor's motion for an order authorizing the interim and final DIP Facility orders; (2) a response to the Debtor's motion to strike such objection; (3) an objection each to the Debtor's disclosure statements, dated February 6, 1995 and March 22, 1995, respectively; (4) a motion to vacate the interim and final orders approving the DIP Facility; (5) a motion to disqualify Goldman Sachs and BT Securities from appearing on behalf of the Debtor in the Chapter 11 Case; and (6) a motion to have the GUCC Chapter 11 Case jointly administered with the Debtor's Chapter 11 Case (collectively, the "Additional Motions").

After negotiation, the Debtor and the Capital Committee reached an agreement to resolve the Substantive Consolidation Motion and the Additional Motions (the "Zero Settlement"), a copy of which is annexed to the Plan as Exhibit "G". Pursuant to and solely for the purposes of the Zero Settlement, the Senior Zero Note Claims and the Junior Zero Note Claims shall be allowed in an amount equal to the value as of the Effective Date of the distributions made on account of such Claims under the Plan. Warrants for the right to purchase the New Common Stock of Reorganized Grand Union (the "Warrants") will be distributed to Classes 9 and 10, consisting of the holders of the Zero Notes.

Two series of Warrants will be issued pursuant to the Warrant Agreement, a copy of which is annexed as Exhibit "E" to the Plan. Both series of Warrants shall have a term of five (5) years from the Effective Date of the Plan. Series 1 Warrants shall consist of 300,000 Warrants with a strike price of $30 per share of New Common Stock. Series 2 Warrants shall consist of 600,000 Warrants with a strike price of $42 per share of New Common Stock.

In connection with the Zero Settlement, the members of the Capital Committee and certain holders of Zero Notes that are parties to the Zero Settlement, and their affiliates, agents, and assigns (collectively, the "Releasors"), have executed releases in favor of the Debtor, Capital, and Holdings, the respective affiliates of the Debtor, Capital, and Holdings, present and former stockholders, directors, or officers of the Debtor, Capital, or Holdings, including Miller Tabak & Hirsch & Co. ("MTH") and its present and former partners, officers, employees, advisors, attorneys, consultants, agents, and representatives including, without limitation, Messrs. Martin A. Fox, Glenn L. Goldberg, Claude Incaudo and James A. Lash, and any person or entity that directly or indirectly controls MTH, including Gary Hirsch, Jeffrey Miller and Jeffrey Tabak, the members of each of the Official Committee and the Informal Committee, each of the Post-Confirmation Banks, BT Securities, Goldman Sachs, and each of the foregoing entity's and/or person's respective attorneys, advisors, financial advisors, investment bankers, employees, successors, agents, and assigns, and any other person and/or entity against whom any of the Releasors may have a Released Claim, as defined below (collectively, the "Released Persons"), from any and all claims, demands, actions, causes of action,

suits, costs, dues, sums of money, accounts, bills, bonds, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, expenses, and liability whatsoever, known or unknown, at law or in equity, irrespective of whether such claims arise out of contract, tort, violation of laws or other regulations or otherwise, which the Releasors ever had or now have against the Released Persons or any of them, for, or by reason of, any matter, cause or thing whatsoever from the beginning of the world to and including the date of the Zero Settlement arising out of or in connection with, or related in any manner to, the issuance, ownership, purchase, and/or sale of the Zero Notes including without limitation, any claim for substantive consolidation of the Debtor's Chapter 11 Case and the GUCC Chapter 11 Case, any claims arising under any state or federal securities law and/or any claims arising under sections 544, 548 and 550 of the Bankruptcy Code or under similar state laws, including fraudulent conveyance claims (the "Zero Releases"), except for such Releasor's right to receive warrants pursuant to the Plan or any Allowed Claim in Classes 1, 2, 3, 4 or 8 of the Plan held by such Releasor. The Zero Releases have been delivered to the Debtor and will be deemed effective, subject to delivery of the global certificates provided for under Section 2.1 of the Warrant Agreement, upon the Effective Date of the Plan; provided, however, that the releases by the noteholders set forth above (in Section 8 of the Zero Settlement) and the Debtor's release of the noteholders in Section 11 of the Zero Settlement, shall not be effective if, prior to the commencement of the distribution of Warrants by the Warrant Agent (as defined in the Warrant Agreement), in whole or in part, such distribution is enjoined by an Entity other than a holder (present, former or future) of a Zero Note; and provided further that the immediately preceding proviso shall be of no force and effect if such injunction is dissolved.

Pursuant to the Zero Settlement, Capital and Holdings will each deliver similar releases. Capital and Holdings will need to obtain the approval of the Bankruptcy Court to deliver these releases.

Further pursuant to the Zero Settlement and upon the Effective Date of the Plan, the Capital Committee will withdraw, with prejudice, the Substantive Consolidation Motion and the Additional Motions.

Finally, the reasonable fees and expenses of the Informal Zero Committee's and the Capital Committee's professional advisors after the Filing Date will be allowed as Administrative Expenses in the Debtor's Chapter 11 Case, on the terms and conditions set forth in the Plan, subject to a cap in the aggregate amount of $750,000.

The Zero Settlement remains subject to Bankruptcy Court approval in accordance with Rule 9019 of the Federal Rules of Bankruptcy Procedure. A separate motion will be filed by the Debtor seeking approval of the Zero Settlement and will be heard by the Bankruptcy Court on or before the Confirmation Date.

## VI. THE PLAN

THE FOLLOWING IS A SUMMARY OF CERTAIN SIGNIFICANT PROVISIONS OF THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS APPENDIX "A". TO THE EXTENT THAT THE TERMS OF THIS DISCLOSURE STATEMENT VARY WITH THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL BE CONTROLLING.

### A. General

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself and its creditors and stockholders.

Formulation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. In general, a chapter 11 plan of reorganization (i) divides claims and equity interests into separate classes, (ii)

specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to the reorganization of the debtor. Chapter 11 does not require each holder of a claim or interest to vote in favor of the plan of reorganization in order for the bankruptcy court to confirm the plan. However, a plan of reorganization must be accepted by the holders of at least one class of claims that is impaired (as defined above) without considering the votes of "insiders" within the meaning of the Bankruptcy Code.

Distributions to be made under the Plan will be made after confirmation of the Plan, on the Effective Date or as soon thereafter as is practicable, or at such other time or times specified in the Plan.

## B. Classification and Treatment of Claims and Interests Under the Plan

Section 1122 of the Bankruptcy Code requires that a plan of reorganization classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim or interest of a creditor or equity holder in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Plan places Credit Agreement Claims, Interest Rate Protection Agreement Claims, Miscellaneous Secured Claims, Senior Note Claims, Priority Claims, Trade Claims, General Unsecured Claims, Senior Subordinated Note Claims, Senior Zero Note Claims, Junior Zero Note Claims, Subordinated Claims and Interests in separate Classes. The Debtor believes it has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code. If a Creditor or Interest holder challenges such classification of Claims of Interests and the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor, to the extent permitted by the Bankruptcy Court, intends to make such reasonable modifications to the classification of Claims or Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for confirmation; *provided, however,* the Debtor will not reclassify Class 1 (Credit Agreement Claims), Class 6 (Trade Claims), Class 7 (General Unsecured Claims) and Class 8 (Senior Subordinated Note Claims) without first receiving the acceptance of the Senior Bank Agent (in the case of Class 1) and the Official Committee (in the case of Classes 6, 7 and 8).

**Except to the extent that such modification of classification adversely affects the treatment of a holder of a Claim and requires resolicitation, acceptance of the Plan by any holder of a Claim pursuant to this Solicitation will be deemed to be a consent to the Plan's treatment of such holder of a Claim regardless of the Class as to which such holder of a Claim is ultimately deemed to be a member.**

The Bankruptcy Code also requires that a plan of reorganization provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest. The Debtor believes that it has complied with such standard. If the Bankruptcy Court finds otherwise, it could deny confirmation of the Plan if the Creditors or equity holders affected do not consent to the treatment afforded them under the Plan.

The PBGC has requested that the following explanation be included in this Disclosure Statement:

In the event that the Grand Union Employees' Retirement Plan terminates prior to confirmation of the Debtor's Plan of Reorganization, the Pension Benefit Guaranty Corporation asserts that it will have an administrative expense claim, a priority tax claim, and/or, in the alternative, a general unsecured claim against the Debtor in the approximate amount of $46.3 million (see *infra*, SectionXV(L)).

The Debtor believes that much or all the claim referred to above would be properly characterized as a General Unsecured Claim. Moreover, based on the most recent actuarial data and asset information, the Debtor's actuary has calculated that the appropriate amount of the PBGC's claim, using the PBGC's own methods and assumptions, would not exceed $32.0 million, and the PBGC has indicated that it will review these calculations. The Debtor's actuary has also determined that, in the event of a liquidation, the Debtor

could adopt certain amendments to the Retirement Plan which could eliminate any underfunded pension liability, and could even result in overfunding. The Debtor does not intend to make such amendments to the Retirement Plan in the context of its reorganization under the Plan. Moreover, the PBGC has asserted that if the above-referenced amendments are made, they would not necessarily affect the calculation of the unfunded benefit liabilities in the event the Retirement Plan terminates.

*1. Treatment of Administrative Expenses and Certain Priority Claims*

a. *Administrative Expenses.* Administrative Expenses consist of (a) any cost or expense of administration of the Chapter 11 Case allowable under section 503(b) of the Bankruptcy Code, including, without limitation, the fees and expenses of the professionals employed by the Debtor, the Official Committee, the Informal Committee(s) and the Indenture Trustees (if and to the extent the fees and expenses of the Indenture Trustees are not General Unsecured Claims or Miscellaneous Secured Claims), to the extent allowed or, as applicable, agreed to by the Debtor and/or Reorganized Grand Union pursuant to Sections 2.02, 2.03 or 2.04 of the Plan, and (b) any fees or charges assessed against the Debtor's estate under title 28, United States Code, section 1930. Such expenses include, for example, costs incurred in the operation of the Debtor's business after the commencement of the Chapter 11 Case, postpetition taxes, if any, and certain other obligations arising after the commencement of the Chapter 11 Case. See "CERTAIN INFORMATION CONCERNING THE DEBTOR—Regulatory and Legal Matters—Environmental."

Assuming that neither significant litigation nor objections are filed with respect to the Plan and assuming the Plan is confirmed in May 1995, the Debtor estimates that unpaid Administrative Expenses as of the Effective Date are not expected to exceed approximately $130 million (which includes, *inter alia*, ordinary course Trade Claims and fees and expenses of professionals from the Filing Date through the Effective Date, anticipated to be in the amount of $7.5 million). Such amount also includes the statutory fees payable to the United States Trustee, which the Debtor estimates should not exceed $10,000. The Debtor's estimate of Administrative Expenses does not include amounts that will be payable in the ordinary course of business by Reorganized Grand Union under the Debtor's retiree health programs that will be assumed under the Plan.

Under the Plan, all Allowed Administrative Expenses (not paid prior to the Effective Date) will be paid in full in cash by Reorganized Grand Union, at its option, on (a) the later of (i) the Effective Date and (ii) the date on which the Bankruptcy Court enters an order allowing such Administrative Expense, or (b) the date, or dates, on which Reorganized Grand Union or the Debtor, as the case may be, and the Entity claiming such Allowed Administrative Expense otherwise agree or have agreed; *provided, however,* that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business by the Debtor during the Chapter 11 Case will be paid by the Debtor or Reorganized Grand Union, as the case may be, in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto. Any final request for payment of an Administrative Expense, including, without limitation, applications for compensation and reimbursement of expenses by professionals employed by the Debtor and the Official Committee, must be filed no later than forty-five (45) days after the Effective Date; *provided that* no request for payment of an Administrative Expense need be filed with respect to an Administrative Expense which is paid or payable by the Debtor or Reorganized Grand Union in the ordinary course, including, without limitation, any Administrative Expense which would have been a Trade Claim had it arisen prior to the Filing Date.

The reasonable fees and expenses incurred on or after the Filing Date (which may, as such fees relate to financial advisors, include a request by such professionals for success fees) by the counsel and financial advisors retained by agreement with the Debtor prior to the Filing Date by the Informal Committees (together with the reasonable fees and expenses of local counsel) or the Indenture Trustees (to the extent they are not General Unsecured Claims or Miscellaneous Secured Claims, and subject to Section 12.07 of the Plan) with respect to the Chapter 11 Case will be paid (without application by or on behalf of any such professionals to the Bankruptcy Court, and without notice and a hearing, unless specifically requested by the Bankruptcy Court upon request of a party in interest) by Reorganized Grand Union as an Administrative

Expense under the Plan. If Reorganized Grand Union and any professional retained by an Informal Committee or an Indenture Trustee cannot agree on the amount of fees and expenses to be paid to such professional, the amount of any such fees and expenses will be determined by the Bankruptcy Court. Notwithstanding anything contained in the Plan to the contrary, the fees and expenses of the legal and financial advisors to the Informal Committee of Senior Noteholders will be paid as set forth in the Final Cash Collateral Order.

In addition, the reasonable fees and expenses incurred on or after the Filing Date by the Capital Committee Advisors or the Informal Zero Committee Advisors with respect to this Chapter 11 Case or the GUCC Chapter 11 Case will be paid by Reorganized Grand Union after notice and a hearing in accordance with the procedures established by the Bankruptcy Court for professionals employed by the Debtor or the Official Committee; provided, however, that the aggregate maximum amount of fees and expenses for the Capital Committee Advisors and the Informal Zero Committee Advisors that shall be payable in this Chapter 11 Case shall not exceed $750,000 (plus the amount of any prepetition retainer). Applications for such compensation and reimbursement of expenses by such professionals must be filed no later than forty-five (45) days after the Effective Date.

Finally, the reasonable fees and expenses incurred on or after the Filing Date through the Effective Date by the GUHC and GUCC Legal Advisors with respect to this Chapter 11 Case, the GUCC Chapter 11 Case or the GUHC Chapter 11 Case will be paid (after application of any retainer held by any such professional) by Reorganized Grand Union after notice and a hearing in accordance with the procedures established by the Bankruptcy Court for professionals employed by the Debtor or the Official Committee. Applications for compensation and reimbursement of expenses by such professionals must be filed no later than forty-five (45) days after the Effective Date. On and after the Effective Date, Reorganized Grand Union will pay the reasonable fees and expenses of the GUHC and GUCC Legal Advisors incurred with respect to the dissolution of GUCC and GUHC. Notwithstanding anything in the Plan to the contrary, the aggregate amount of fees and expenses payable to the GUHC and GUCC Legal Advisors pursuant to Section 2.04 of the Plan will not exceed, in the aggregate, $150,000, in addition to the amount of any retainers paid to such professionals.

b. *Priority Tax Claims.* A Priority Tax Claim is any Claim against the Debtor of the type specified in section 507(a)(8) of the Bankruptcy Code. These Claims consist of certain unsecured Claims of governmental units for taxes. The Debtor estimates that Priority Tax Claims will not exceed $5 million.

Under the Plan, with respect to each Allowed Priority Tax Claim, at the sole option of Reorganized Grand Union, the holder of an Allowed Priority Tax Claim will be entitled to receive on account of such Allowed Priority Tax Claim: (a) equal cash payments made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding six (6) years after the assessment of the tax on which such Claim is based, totalling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date; (b) such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Debtor or Reorganized Grand Union, as the case may be, provided such treatment is on more favorable terms to the Debtor or Reorganized Grand Union, as the case may be, than the treatment set forth in clause (a) hereof; or (c) payment in full, provided that, with respect to paragraphs (b) and (c) hereof, such treatment is approved by the Bankruptcy Court.

2. *Class 1—Credit Agreement Claims.* Class 1 consists of any Claims against the Debtor by the Existing Banks pursuant to the Existing Credit Documents. The Credit Agreement Claims are secured. The Credit Agreement Claims will be allowed in full. On or prior to fifteen (15) days prior to the date first set for the hearing on confirmation of the Plan, the Senior Bank Agent will file with the Bankruptcy Court and serve on counsel for the Debtor, the Official Committee and the Informal Committee of Senior Noteholders a schedule setting forth the proposed amounts of Allowed Credit Agreement Claims (on a per Entity basis) of each of the Existing Banks to be estimated as of the Confirmation Date. If no objection is filed by the Debtor, the

Official Committee or the Informal Committee of Senior Noteholders and served on the Senior Bank Agent within five (5) days after receipt of such schedule, the Credit Agreement Claims will be deemed Allowed in the amount set forth on the schedule together with such additional amounts which may accrue subsequent to the Confirmation Date through and including the Effective Date. In the event the Debtor, the Official Committee or the Informal Committee of Senior Noteholders objects to the scheduled amounts, the only issue that will be determined by the Bankruptcy Court is the amount of each Existing Bank's Allowed Credit Agreement Claims. Notwithstanding anything contained in the Plan to the contrary the fees and expenses incurred on account of the Credit Agreement Claims will be paid as set forth in the Final Cash Collateral Order. For purposes of the Plan, the Debtor estimates that the aggregate principal amount of the Credit Agreement Claims will be $93 million (not including outstanding letters of credit), which reflects amounts due and owing under the Existing Credit Documents.

(a) On the Effective Date, each holder of an Allowed Credit Agreement Claim will receive with respect to such Claim the treatment set forth in subparagraph (i) hereof, unless, at the sole option of the Debtor (which option will be exercised not later than five (5) days prior to the commencement of the confirmation hearing), such holder will receive the treatment described in subparagraph (ii) below:

(i) (x) Reorganized Grand Union will execute the Post-Confirmation Credit Documents and such documents will become effective (provided that the other conditions contained in the Commitment Letter and the Credit Facility Term Sheet, as and if amended by consent of Bankers Trust and the Debtor, have been satisfied). Pursuant to the Post-Confirmation Credit Agreement, the commitment with respect to the amount of the Revolving Credit Facility and the Term Facility will be increased in the aggregate by not less than $65 million;

(y) The Post-Confirmation Facility will be secured by a perfected, first priority lien and security interest in all of the tangible and intangible assets (including, without limitation, all assets as described in the Commitment Letter, including leases) of Reorganized Grand Union and its subsidiaries, whether in existence at the Effective Date or acquired thereafter, subject only to such liens as may be permitted pursuant to the Post-Confirmation Credit Documents. Pursuant to the Intercreditor Agreement, the Additional Facility Lenders will have priority (with respect to the Additional Facility and with respect to those loans owed to, and letter of credit exposure of, such Additional Facility Lenders under the Existing Credit Agreement as set forth in the Intercreditor Agreement) over Existing Banks who do not contribute to the Additional Facility; and

(z) Upon confirmation of the Plan, but effective as of the Effective Date, the Debtor, Reorganized Grand Union, any Entity issuing securities under the Plan, any Entity acquiring property under the Plan, and any Creditor and/or equity security holder of the Debtor, will be deemed contractually to subordinate any present or future claim, right or other interest they may have in and to any proceeds received from the disposition, release, or liquidation of any Leasehold Interest, or any funds or proceeds received as a result of a subsequent pledge of such Leasehold Interest, to the obligations owed to the Post-Confirmation Banks pursuant to the Post-Confirmation Credit Documents until such obligations are paid in full; or

(ii) The Debtor will obtain a binding Alternative Commitment Letter from an alternative lender for the provision of not less than $204 million in loan facilities (of which not less than $57 million will be term facilities) on the Effective Date on terms satisfactory to the Debtor and reasonably satisfactory to the Official Committee and the Informal Committee of Senior Noteholders, in which event:

(x) The holder of an Allowed Credit Agreement Claim will receive on the Effective Date, cash payments equal to 100% of such Allowed Credit Agreement Claim; and

(y) Upon payment in full of the Allowed Credit Agreement Claims, the Existing Credit Agreement will be terminated and the notes issued pursuant thereto will be cancelled.

27

(b) On the Effective Date, all interest, fees, expenses and other charges that have accrued pursuant to the terms of the Existing Credit Documents but have not been paid as of the Effective Date will be paid to the Senior Bank Agent for distribution to those parties entitled to receive such interest, fees, expenses and other charges pursuant to the Existing Credit Documents.

(c) Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all prepetition liens on property of the Debtor held by or on behalf of the holders of Claims in this Class with respect to such Claims will survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such holders until, as to each such holder, the Allowed or Subsequently Allowed Claims of such holder in this Class are paid in full; provided, however, on and after the Effective Date, such liens will not attach to the Warrants, the New Senior Notes or New Common Stock. Class 1 is Impaired.

*3. Class 2—Interest Rate Protection Agreement Claims.* Class 2 consists of the Claims against the Debtor for payment of amounts due under the Interest Rate Protection Agreement. The Interest Rate Protection Agreement Claims will be allowed in full. On or prior to fifteen (15) days prior to the date first set for hearing on confirmation of the Plan, the Senior Bank Agent will file with the Bankruptcy Court and serve on counsel for the Debtor, the Official Committee and the Informal Committee of Senior Noteholders written notice of the proposed amount of the Allowed Interest Rate Protection Agreement Claims to be estimated as of the Confirmation Date. If no objection is filed by the Debtor, the Official Committee or the Informal Committee of Senior Noteholders and served on the Senior Bank Agent within five (5) days after receipt of such notice, the Interest Rate Protection Agreement Claims will be deemed Allowed in the amount asserted by the Senior Bank Agent in such schedule together with such additional amounts which may accrue subsequent to the Confirmation Date through and including the Effective Date. In the event the Debtor, the Official Committee or the Informal Committee of Senior Noteholders objects to the proposed amount, the only issue that will be determined by the Bankruptcy Court is the amount of the Interest Rate Protection Claims. For purposes of the Plan, the Debtor estimates that the aggregate amount of the Interest Rate Protection Agreement Claims will be $4,519,500 million.

With respect to each Allowed Interest Rate Protection Agreement Claim, at the sole option of Reorganized Grand Union, to be exercised on the Effective Date: (a) the legal, equitable and contractual rights to which the Allowed Interest Rate Protection Agreement Claim entitles the holder of such Allowed Interest Rate Protection Agreement Claim will be unaltered by the Plan and the Debtor shall, on the Effective Date, cure any defaults with respect thereto; or (b) on the Effective Date, the holder of an Allowed Interest Rate Protection Agreement Claim will receive a cash payment equal to 100% of such Allowed Interest Rate Protection Agreement Claim.

Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all prepetition liens on property of the Debtor held by or on behalf of the holders of Claims in this Class with respect to such Claims will survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such holders until, as to each such holder, the Allowed or Subsequently Allowed Claims of such holder in this Class are paid in full; provided, however, on and after the Effective Date, such liens will not attach to the Warrants, the New Senior Notes or New Common Stock. Class 2 is Impaired.

*4. Class 3—Miscellaneous Secured Claims.* Class 3 consists of all Miscellaneous Secured Claims under section 506(a) of the Bankruptcy Code (including, without limitation, the Claims of the Indenture Trustees for the Senior Notes for fees and expenses, if and to the extent such Claims are secured Claims), other than Credit Agreement Claims, Interest Rate Protection Agreement Claims and Senior Note Claims. The Debtor estimates that Miscellaneous Secured Claims will aggregate approximately $3 million.

Pursuant to the terms of the Plan, with respect to each Allowed Miscellaneous Secured Claim, at the sole option of Reorganized Grand Union to be exercised on the Effective Date: (a) the legal, equitable and contractual rights to which the Allowed Miscellaneous Secured Claim entitles the holder of such Claim will remain unaltered by the Plan, or (b) Reorganized Grand Union will provide such other treatment that will

render such Allowed Miscellaneous Secured Claim an Unimpaired Claim under section 1124 of the Bankruptcy Code; *provided that* the Miscellaneous Secured Claims, if any, of the Indenture Trustees for the Senior Notes will be treated in accordance with Section 12.07 of the Plan. The Debtor's failure to object to such Claim in the Chapter 11 Case will be without prejudice to Reorganized Grand Union's right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the holder thereof.

Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all prepetition liens on property of the Debtor held by or on behalf of the holders of Claims in this Class with respect to such Claims will survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such holders until, as to each such holder, the Allowed or Subsequently Allowed Claims of such holder in this Class are paid in full. Class 3 is not Impaired.

*5. Class 4—Senior Note Claims.* Class 4 consists of all Senior Note Claims. The Senior Note Claims are secured. On the Effective Date, the Senior Notes will be cancelled, Reorganized Grand Union will execute the New Senior Note Indenture and, subject to Section 12.02 of the Plan, each holder of an Allowed Senior Note Claim will be entitled to receive its pro rata share of New Senior Notes. Such pro rata share will be determined by the ratio between the amount of such holder's Allowed Senior Note Claim and the aggregate amount of Allowed Senior Note Claims, each calculated as of the Filing Date without taking into account any interest on overdue interest or Sections 7.02 and 7.03 of the Plan, and pursuant to Section 12.02 of the Plan. Pursuant to the Plan, Senior Note Claims have been allowed in the aggregate amount of $525 million (representing the face amount of the Senior Notes giving rise to such Claims) plus accrued but unpaid interest and interest on overdue interest on such Senior Notes as of the Effective Date. Assuming an Effective Date of April 29, 1995, the Debtor estimates that Senior Note Claims will aggregate approximately $570,807,000. The New Senior Notes will not be secured by any property of Reorganized Grand Union. See "DESCRIPTION OF NEW SENIOR NOTES" and the Term Sheet of New Senior Notes, annexed hereto as Appendix "C".

In addition, Reorganized Grand Union will enter into a Registration Rights Agreement with each Entity which, as of the Effective Date (i) holds Senior Notes entitling such holder to the New Senior Notes to be issued under the Plan and (ii) requests in writing that Reorganized Grand Union execute such Registration Rights Agreement. The final draft of such Registration Rights Agreement will be filed by the Debtor with the Bankruptcy Court no later than a date which is five (5) days prior to the first date set by the Bankruptcy Court as the Voting Deadline. Such Registration Rights Agreement will be in form and substance reasonably satisfactory to the Senior Bank Agent, the Official Committee and the Informal Committee of Senior Noteholders. Class 4 is Impaired.

*6. Class 5—Priority Claims.* Class 5 consists of all Claims which are entitled to priority in payment under section 507(a) of the Bankruptcy Code, other than Administrative Expenses and Priority Tax Claims. Priority Claims include Claims for wages, salaries and contributions to employee benefit plans, to the extent that such Claims are entitled to priority under section 507(a) of the Bankruptcy Code. In light of the payments already made pursuant to the Prepetition Wage and Benefits Order (see "THE CHAPTER 11 CASE—Prepetition Wage and Benefits Order"), the Debtor estimates that remaining Priority Claims will not exceed $1 million.

Pursuant to the terms of the Plan, on the latest of (a) the Effective Date, (b) the date such Priority Claim becomes an Allowed Priority Claim, or (c) the date, or dates, on which Reorganized Grand Union or the Debtor, as the case may be, and the holder of such Priority Claim otherwise agree or have agreed, each holder of an Allowed Priority Claim will receive payment in full of 100% of such Allowed Priority Claim. Class 5 is Impaired.

*7. Class 6—Trade Claims.* Class 6 consists of all Claims against the Debtor for goods provided prior to the Filing Date to the Debtor for resale to the general public in the ordinary course of business. Class 6 is composed of two subclasses: (i) Class 6(a) consists of Trade Claim(s) asserted by a Creditor whose aggregate

asserted Trade Claim(s) total less than $25,000; and (ii) Class 6(b) consists of Trade Claim(s) asserted by a Creditor whose aggregate asserted Trade Claim(s) total $25,000 or more. As of the Filing Date, approximately $100 million of Trade Claims were outstanding. However, the Debtor estimates that as of the Effective Date, Trade Claims will aggregate less than $20 million due to the implementation of the Trade Payment Program, as discussed below.

Pursuant to the Trade Creditor Order, the Debtor is authorized to pay during the Chapter 11 Case prepetition Trade Claims to the extent of the value of any unpaid goods shipped by the relevant trade creditor to the Debtor after February 10, 1995. However, the Debtor may not make such payments unless and until the relevant trade creditor first executes a Trade Agreement with the Debtor. See "THE CHAPTER 11 CASE—Trade Creditor Order." If the Trade Payment Program or any trade creditor's participation therein is terminated, then any payments made by the Debtor to any such trade creditor in respect of any prepetition Claims will be deemed to have been made in payment of then outstanding postpetition obligations owed to such trade creditor and such trade creditor will immediately repay to the Debtor any payments made to such creditor on account of prepetition Claims to the extent the aggregate amount of such payments exceeds the postpetition obligations then outstanding (without the right of any setoffs, claims, provisions for payment of reclamation or trust fund claims, or otherwise).

Subject to Section 6.06(b) of the Plan, Unimpaired Claims which are Trade Claims will neither be deemed Allowed nor Disputed for purposes of the Plan. The right to payment on such Claim will be determined, resolved or adjudicated, as the case may be, as if the Chapter 11 Case had not been commenced, subject to the following sentence. Notwithstanding the foregoing, the Plan is without prejudice to the Debtor's or Reorganized Grand Union's rights to contest or otherwise defend against such Claims in the appropriate or Reorganized Grand Union's rights to contest or otherwise defend against such Claims in the appropriate forum, including the Bankruptcy Court, when and if such Claim is sought to be enforced by the holder thereof.

(a) Each Creditor asserting Trade Claim(s) that, in the aggregate, are less than $25,000 in amount (Class 6(a) Claims), need not file a proof of claim with respect to such Trade Claim(s) in order to receive a distribution under the Plan.

(b) Each Creditor asserting Trade Claim(s) that, in the aggregate, are $25,000 or more in amount (Class 6(b) Claims), must file a proof of claim with respect to such Trade Claim(s) on or before the Claims Bar Date. In the Event that any such Creditor does not timely file a proof of claim with respect to its Trade Claim(s), all Trade Claim(s) asserted by such Creditor will be barred and discharged; *provided, however, that* such Trade Creditor will be treated as having filed a proof of claim with respect to its Trade Claim(s) in the amount(s), if any, that is/are listed in the Schedules regardless of whether such Trade Claim(s) are listed in the Schedules as disputed, contingent or unliquidated.

(c) With respect to each Trade Claim included in either Class 6(a) or in Class 6(b) that is not barred or discharged pursuant to Section 6.06(b) of the Plan, and subject to the terms of any Trade Agreement and to the rights set forth in Section 6.06(e) of the Plan, at the sole option of the Debtor, (i) the legal, equitable and contractual rights to which the Trade Claim entitles the holder of such Claim will remain unaltered or (ii) the Debtor will provide such other treatment that will render such Trade Claim an Unimpaired Claim under section 1124 of the Bankruptcy Code.

(d) Unless a Creditor asserting Trade Claim(s) files a written objection to the Plan, such Creditor will be deemed to have waived and forever released any right to assert or claim that it may be entitled to interest accruing with respect to such Creditor's Trade Claim(s) and any such claims or assertions for interest will be forever barred and discharged. In the event that a Creditor asserting Trade Claim(s) objects to the Plan in writing, such objecting Creditor's Trade Claim(s) will be deemed included in Class 7 of the Plan (General Unsecured Claims) and will be deemed to have voted to reject the Plan. In the event included in Class 7, the objecting Creditor asserting a Trade Claim will be subject to the proof of claim and bankruptcy claims administration requirements that are applicable to other Class 7 Creditors. Notwithstanding anything herein

to the contrary, a Creditor whose Claim would have been included in either Class 6(a) or 6(b) but for the objection referenced in this paragraph: (i) with respect to a Creditor which would have been included in Class 6(a), (y) such Creditor may rely on the amount of its Claim as set forth in the Schedules in the event that its Claim is not listed as contingent, disputed or unliquidated, or, (z) in the event that its Claim is so designated, or not scheduled, such Creditor will have ten (10) days from the date its objection is filed within which to file a proof claim which Claim may not exceed $25,000 plus any Claim for interest on such Claim; and (ii) with respect to a Creditor which would have been included in Class 6(b), such Creditor will either (y) have filed a proof of claim by the Claims Bar Date or (z) its Claim will be limited by the amount of such Claim as set forth in the Schedules unless such Claim is listed as contingent, disputed or unliquidated and, in the event of such designation, such Creditor will have ten (10) days from the date its objection is filed within which to file a proof of claim which Claim will not exceed the amount for which it was scheduled plus any claim for interest on such Claim.

(e) The Debtor's failure to file an objection with the Bankruptcy Court to a Trade Claim will be without prejudice to Reorganized Grand Union's right to contest or otherwise defend against such Trade Claim in the appropriate forum, including the Bankruptcy Court, when and if such Trade Claim is sought to be enforced by the holder thereof. Classes 6(a) and 6(b) are not Impaired.

*8. Class 7—General Unsecured Claims.* Class 7 consists of all Unsecured Claims against the Debtor other than Senior Subordinated Note Claims, Subordinated Claims, Senior Zero Note Claims, Junior Zero Note Claims or Trade Claims. General Unsecured Claims also include, without limitation, Intercompany Claims and any Unsecured Claims arising from or with respect to the leasing of real estate and equipment, utility service, employee benefits, claims brought by associations or entities for reimbursement of workers' compensation claims, the fees and expenses of the Indenture Trustees pursuant to the Indentures whether accruing before or after the Filing Date (except to the extent such fees and expenses are Miscellaneous Secured Claims or Administrative Expenses), or the provision of financial, legal and other professional services to the Debtor or for which the Debtor has agreed to pay (including payment for services provided by the Debtor's Financial Advisors (see "BACKGROUND—Certain Events Preceding Commencement of the Chapter 11 Case—Retention of Financial Advisors")). Claims brought by associations or entities for reimbursement of workers' compensation claims that arise after the Filing Date will be classified as Administrative Expenses. Solely for purposes of effectuating the Zero Settlement, the reasonable fees and expenses of the Capital Indenture Trustees (whether accruing before or after the Filing Date) will constitute General Unsecured Claims. The Debtor believes that Intercompany Claims, if any, will not have a material impact on the Plan or the distributions to be made thereunder. See also "CERTAIN INFORMATION CONCERNING THE DEBTOR—Regulatory and Legal Matters—Environmental."

The Debtor estimates that the aggregate amount of General Unsecured Claims that will be allowed is approximately $80 million. The Debtor's estimate assumes that lease rejection damages will not exceed $12 million, in aggregate, not including Claims related to rejection of leases for distribution facilities currently operated by the Debtor. The Debtor intends to file a motion to reject the leases on its Waterford, New York distribution facilities. However, the Debtor intends to enter into discussions with the landlord for those facilities and with the unions representing the Waterford employees. The outcome of those discussions may affect the Debtor's intention to reject these leases. The Debtor is also reviewing its options related to its lease on its Montgomery, New York warehouse, operated under an agreement with The Penn Traffic Company. See "CERTAIN INFORMATION CONCERNING THE DEBTOR—Related Party Transactions— Montgomery Warehouse." No determination on assumption or rejection of this lease has been made. If the leases for both distribution facilities mentioned above were rejected, General Unsecured Claims could increase by approximately $9 million. In addition, the $80 million estimate includes approximately $30 million of workers' compensation, general liability and automobile liability claims against the Debtor. Since the Filing Date, the Debtor has made payments on account of such claims in the ordinary course of business to the extent such claims are within the scope of the Prepetition Wage and Benefits Order or otherwise would cause a draw under a letter of credit issued by the Existing Banks, as provided by the Final Cash Collateral Order.

The Debtor believes that any workers' compensation obligations accrued, but not yet paid, as of the Effective Date, will be paid in the ordinary course of business by Reorganized Grand Union, thus reducing significantly the amount of General Unsecured Claims that will be paid on the Effective Date. In addition, the Debtor's estimate includes approximately $14 million of other liabilities under its self-insurance program that the Debtor believes will be liquidated over time, further reducing the Debtor's cash needs on the Effective Date.

On the latest of (a) the Effective Date, (b) the date, or dates, on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, or (c) the date, or dates, on which Reorganized Grand Union or the Debtor, as the case may be, and the Entity claiming such Allowed General Unsecured Claim otherwise agree or have agreed, each holder of an Allowed General Unsecured Claim will receive payment in full of 100% of such Allowed General Unsecured Claim. Subject to Section 12.07 of the Plan, any General Unsecured Claims of an Indenture Trustee will be paid in full on the Effective Date or on such later date as agreed to be the parties. Class 7 is Impaired.

9. *Class 8—Senior Subordinated Note Claims.* Class 8 consists of all Senior Subordinated Note Claims. The Plan provides for Senior Subordinated Note Claims to be allowed in the principal amount of such notes plus accrued but unpaid interest and interest on interest, if any, as follows (all numbers are rounded to the nearest thousand):

| | |
|---|---|
| 13% Senior Subordinated Note Claims | $ 16,821,000 |
| 12¼% Senior Subordinated Note, Series A Claims | 53,243,000 |
| 12¼% Senior Subordinated Note Claims | 532,430,000 |
| TOTAL | $602,494,000 |

Unlike the 13% Senior Subordinated Notes, both series of 12¼% Senior Subordinated Notes are guaranteed by Capital. Because, under their respective Indentures, the three series of Senior Subordinated Notes are *pari passu* in the priority of their claims against the Debtor, they receive equal treatment under the Plan with respect to their Allowed Claims.

On the Effective Date the Senior Subordinated Notes will be cancelled. Also on the Effective Date, and, subject to Section 12.02 of the Plan, each holder of an Allowed Senior Subordinated Note Claim will be entitled to receive its pro rata share of the New Common Stock to be issued under the Plan. Such pro rata share will be determined by the ratio between such holder's Allowed Senior Subordinated Note Claim and the aggregate amount of all Allowed Senior Subordinated Note Claims as of the Effective Date, and pursuant to Section 12.02 of the Plan. The holders of Allowed Senior Subordinated Note Claims will receive in the aggregate, on a pro rata basis, 100% of the New Common Stock to be issued under the Plan. See "DESCRIPTION OF NEW CAPITAL STOCK."

In addition, Reorganized Grand Union will enter into a Registration Rights Agreement with each Entity which, as of the Effective Date, (i) holds Senior Subordinated Notes entitling such holder to receive ten percent (10%) or more of the shares of New Common Stock to be issued under the Plan and (ii) requests in writing that Reorganized Grand Union execute such Registration Rights Agreement. The final draft of such Registration Rights Agreement will be filed by the Debtor with the Bankruptcy Court no later than a date which is five (5) days prior to the first date set by the Bankruptcy Court as the Voting Deadline. Such Registration Rights Agreement will be in form and substance reasonably satisfactory to the Senior Bank Agent and the Official Committee. Class 8 is Impaired.

To assure that the Senior Subordinated Noteholders receive their New Common Stock without reduction for the fees and expenses and as an integral part of the distributions to such Noteholders and their bargained for consideration, a cash reserve will be established in respect of the Indenture Trustees' fees and expenses.

U.S. Trust, the Indenture Trustee for the 12¼% Senior Subordinated Notes and the 12¼% Senior Subordinated Notes, Series A, estimates that its compensation and expenses will not exceed $250,000 if the

Plan is consummated on or prior to May 31, 1995 without substantial opposition. As discussed above, the Plan provides that U.S. Trust's Claim (and the Claims of the other Indenture Trustees) will be paid in cash in full on the Effective Date of the Plan from a reserve to be established for that purpose. U.S. Trust asserts that it has the right to recover its compensation and expenses from the distributions to be made to the holders of the two series of 12¼% Senior Subordinated Notes if its compensation and expenses are not paid by the Debtor. U.S. Trust has reserved its right to seek payment from the distributions if a satisfactory reserve is not established. Exercise of this right would reduce the stated distributions to the holders of the 12¼% Senior Subordinated Notes. U.S. Trust does not presently anticipate seeking to recover any part of its compensation and expenses as an Administrative Expense of the Chapter 11 Case. See "THE PLAN—Classification and Treatment of Claims and Interests Under the Plan—General Unsecured Claims."

10. *Class 9—Senior Zero Note Claims.* Class 9 consists of any Claims asserted against the Debtor by a holder of a Senior Zero Note relating to or arising from ownership of a Senior Zero Note issued by Capital. For purposes of effectuating the Zero Settlement only, the Senior Zero Note Claims will be allowed in an amount equal to the value as of the Effective Date of the distributions made on account of such Claims under the Plan.

(a) Subject to the terms and conditions set forth in the Zero Settlement, and solely for purposes of effectuating such settlement, on the Effective Date, the Senior Zero Note Claims will be allowed as set forth in Section 7.09 of the Plan (subordinate to all Claims and Administrative Expenses against the Debtor, other than Claims set forth in Classes 10 and 11), in the amount allowed pursuant to Section 7.09 of the Plan, the Senior Zero Notes will be cancelled, and, subject to Section 12.02 of the Plan, each holder of an Allowed Senior Zero Note Claim will be entitled to receive its pro rata share of 240,000 Series 1 Warrants and of 480,000 Series 2 Warrants to be issued under the Plan as its full recovery against the Debtor and Reorganized Grand Union on its Senior Zero Note Claims. Such pro rata share will be determined by the ratio between the face amount of such holder's Senior Zero Notes and the aggregate face amount of all Senior Zero Notes and pursuant to Section 12.02 of the Plan.

(b) Notwithstanding anything in the Plan to the contrary, it will be a condition to the issuance of the Warrants (i) with respect to the Senior Zero Note Claims held by a particular Entity holding Senior Zero Notes that, in the aggregate, are $200,000 or more in face amount, that such Entity execute and deliver a Zero Claims Release, and (ii) with respect to each holder of a Senior Zero Note Claim, that such holder not have filed a written objection to confirmation of the Plan (which is not withdrawn prior to commencement of the hearing on confirmation of the Plan). Any Warrants not issued by operation of the foregoing before the later of (i) two (2) years from the Effective Date, and (ii) six (6) months following the date such holder's Claim becomes an Allowed or Ultimately Allowed Claim will be deemed to be unclaimed property and cancelled.

(c) The Debtor has not and shall not be deemed to have assumed any liability related to or arising from the Zero Notes. Class 9 is Impaired.

11. *Class 10—Junior Zero Note Claims.* Class 10 consists of any Claims asserted against the Debtor by a holder of a Junior Zero Note relating to or arising from the ownership of a Junior Zero Note issued by Capital. For purposes of effectuating the Zero Settlement only, the Junior Zero Note Claims will be allowed in an amount equal to the value as of the Effective Date of the distributions made on account of such Claims under the Plan.

(a) Subject to the terms and conditions set forth in the Zero Settlement, and solely for purposes of effectuating such settlement, on the Effective Date, the Junior Zero Note Claims will be allowed as set forth in Section 7.10 of the Plan (subordinate to all Claims and Administrative Expenses against the Debtor, other than Claims set forth in Class 11) in the amount allowed pursuant to Section 7.10 of the Plan, the Junior Zero Notes will be cancelled, and, subject to Section 12.02 of the Plan, each holder of an Allowed Junior Zero Note Claim will be entitled to receive its pro rata share of 60,000 Series 1 Warrants and of 120,000

33

Series 2 Warrants to be issued under the Plan as its full recovery against the Debtor and Reorganized Grand Union on its Junior Zero Note Claims. Such pro rata share will be determined by the ratio between the face amount of such holder's Junior Zero Notes and the aggregate amount of all Junior Zero Notes, and pursuant to Section 12.02 of the Plan.

(b) Notwithstanding anything in the Plan to the contrary, it will be a condition to the issuance of the Warrants (i) with respect to the Junior Zero Note Claims held by a particular Entity holding Junior Zero Notes that, in the aggregate, are $200,000 or more in face amount, that such Entity execute and deliver a Zero Claims Release, and (ii) with respect to each holder of a Junior Zero Note Claim, that such holder not have filed a written objection to confirmation of the Plan (which is not withdrawn prior to commencement of the hearing on confirmation of the Plan). Any Warrants not issued by operation of the foregoing before the later of (i) two (2) years from the Effective Date, and (ii) six (6) months following the date such holder's Claim becomes an Allowed or Ultimately Allowed Claim will be deemed to be unclaimed property and cancelled.

(c) The Debtor has not assumed and shall not be deemed to have assumed any liability related to or arising from the Zero Notes. Class 10 is Impaired.

12. *Class 11—Subordinated Claims.* Class 11 consists of any Claim against the Debtor subject to subordination pursuant to sections 510(b) or (c) of the Bankruptcy Code. Class 11 does not include Senior Subordinated Note Claims. On the Effective Date, all Subordinated Claims will be discharged and no distributions will be made on account of Class 11. Class 11 is Impaired.

13. *Class 12—Interests.* Class 12 consists of all equity interest in the Debtor including, but not limited to, those represented by shares of capital stock of the Debtor and any options, warrants, calls, subscriptions or other similar rights or other agreements, commitments or outstanding securities obligating the Debtor to issue, transfer or sell any shares of capital stock of the Debtor. On the Effective Date, all Interests will be cancelled and no distributions will be made in respect of Class 12. Class 12 is Impaired.

## C. Effects of Plan Confirmation

The PBGC has asked the Debtor to clarify the impact of Plan confirmation on liabilities related to the Debtor's Retirement Plan. In accordance with that request, nothing contained in the Plan shall be construed as discharging, releasing or relieving the Debtor, Reorganized Grand Union, or any other party, in any capacity, from any liability with respect to the Grand Union Employees' Retirement Plan to which any such party is subject as of immediately prior to the Effective Date under any law or regulatory provision, and neither the PBGC nor the Retirement Plan will be enjoined from enforcing such liability as a result of the Plan's provisions for satisfaction, release and discharge of Claims.

1. *Discharge.* Except as otherwise specifically provided by the Plan, the confirmation of the Plan (subject to the occurrence of the Effective Date) will discharge the Debtor and Reorganized Grand Union from any debt (including, without limitation, Class 11 Claims and Claims related to Class 12 Interests) that arose before the Confirmation Date, and any debt of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, whether or not a proof of claim for such debt is filed or is deemed filed, whether or not such Claim is Allowed, and whether or not the holder of such Claim has voted on the Plan. The effect of discharging a Claim is to release the Debtor and Reorganized Grand Union from any obligations to make payments with respect to such debt, other than those specifically provided by the Plan, and to prohibit any collection efforts by the holder of the Claim.

2. *Binding Effect.* The provisions of the Plan will be binding upon and inure to the benefit of the Debtor, Reorganized Grand Union, any holder of a Claim or Interest, their respective predecessors, successors, assigns, agents, officers and directors and any other Entity affected by the Plan.

3. *Releases.* Except as otherwise specifically provided by the Plan, the distributions and rights that are provided in the Plan will be in complete satisfaction, discharge and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date) of (i) all Claims and Causes of Action against, liabilities of, liens on, obligations of and Interests in the Debtor or Reorganized Grand Union or the direct or indirect assets and properties of the Debtor or Reorganized Grand Union, whether known or unknown, and (ii) all Causes of Action (whether known or unknown, either directly or derivatively through the Debtor or Reorganized Grand Union) against, claims (as defined in section 101 of the Bankruptcy Code in the case of GUCC and GUHC) against, liabilities (as guarantor of a Claim or otherwise) of, liens on the direct or indirect assets and properties of, and obligations of successors and assigns of the Debtor, Affiliates of the Debtor and their successors and assigns, and present and former stockholders, directors, officers, agents (including MTH), attorneys, advisors, financial advisors, investment bankers and employees of the Debtor and such Affiliates based on the same subject matter as any Claim or Interest, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or Interest, in each case regardless of whether a proof of claim or interest was filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on the Plan.

Further, except as otherwise specifically provided by the Plan, any Entity accepting any distribution pursuant to the Plan will be presumed conclusively to have released the Debtor, Reorganized Grand Union, and any other Entity accepting any distribution pursuant to the Plan, successors and assigns of the Debtor and such Entities, Affiliates of the Debtor, Reorganized Grand Union and such Entities, successors and assigns of such Affiliates, present and former stockholders, directors, officers, agents (including MTH), attorneys, advisors, financial advisors, investment bankers and employees of the Debtor, such Affiliates and such Entities, and any Entity claimed to be liable derivatively through any of the foregoing, from any Cause of Action based on the same subject matter as the Claim or Interest on which a distribution is received. The release described in the preceding sentence will be enforceable as a matter of contract against any Entity that accepts any distribution pursuant to the Plan.

Notwithstanding anything contained in the Plan to the contrary, the foregoing releases will be enforced only to the extent permitted by applicable law.

In informal comments, the staff of the Securities and Exchange Commission (the "Commission") indicated to the Debtor its concerns about the enforceability of third party releases under the Plan. In response to such comments, the Debtor modified the scope of the releases, such that they will "be enforced only to the extent permitted by applicable law." After reviewing the Debtor's modification to the Plan, the staff of the Commission informed the Debtor that it would reserve its right to address the enforceability of the releases, as modified, at confirmation of the Plan.

4. *Release of Claims of the Debtor.* On the Effective Date, the Debtor and the Debtor-In-Possession will be conclusively deemed to release (i) all professionals (including, but not limited to, advisors and attorneys) retained by (aa) the Debtor (that were retained as of November 1, 1994 in connection with the Debtor's restructuring, but only as to claims which arise in connection with such restructuring, or were retained by order of the Bankruptcy Court), (bb) the Senior Bank Agent, the Official Committee or the Informal Committees, provided that such professionals were disclosed to the Debtor prior to the Filing Date or retained by order of the Bankruptcy Court, (cc) the Indenture Trustees, or (dd) the Capital Indenture Trustees, the Informal Zero Committee, or the Capital Committee, (ii) MTH and (iii) all directors and officers of the Debtor holding such offices at any time during the period from and including the Filing Date through and including the Confirmation Date from all liability based upon any act or omission related to past service with, for or on behalf of the Debtor or the Debtor-In-Possession except for: (a) any indebtedness of any such person to the Debtor for money borrowed by such person; (b) any setoff or counterclaim the Debtor or Debtor-In-Possession may have or assert against any such person, provided that the aggregate amount thereof will not exceed the aggregate amount of any Claims held or asserted by such person against the Debtor or Debtor-In-Possession, as the case may be; (c) the uncollected amount of any claim made by the Debtor or Debtor-In-

Possession (whether in a filed pleading, by letter or otherwise asserted in writing) prior to the Effective Date against such person which claim has not been adjudicated to Final Order, settled or compromised; or (d) claims arising from the fraud, willful misconduct or gross negligence of such persons.

In addition, on the Confirmation Date, subject to the occurrence of the Effective Date, the Debtor will be deemed to have released all Causes of Action against the members of the Official Committee, the members of the Informal Committees, the members of the Capital Committee, the members of the Informal Zero Indenture Committee, the Additional Facility Lenders, the Existing Banks, the holders of Senior Notes, the Indenture Trustees, the Capital Indenture Trustees or the holders of Senior Subordinated Notes, in their respective capacities as such.

Notwithstanding anything contained in the Plan to the contrary, the foregoing releases will be enforced only to the extent permitted by applicable law.

Nothing in the Plan will be construed as discharging, releasing or relieving the Debtor, Reorganized Grand Union, or any other party, in any capacity, from any liability with respect to the Retirement Plan to which any such party is subject as of immediately prior to the Effective Date under any law or regulatory provision.

The releases embodied in the Plan are in addition to, and not in lieu of, any other release separately given, conditionally or unconditionally, by the Debtor or Debtor-In-Possession to any other person or Entity.

5. *Exculpation.* Neither Reorganized Grand Union, the Official Committee, any of the Informal Committees, the Capital Committee, the Informal Zero Committee, the Senior Bank Agent, nor (as applicable) any of their respective members, officers, directors, shareholders, employees, agents (including MTH), attorneys, accountants or other advisors, will have or incur any liability to any holder of a Claim or Interest for any act or failure to act in connection with, or arising out of, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for any act or failure to act that constitutes willful misconduct or recklessness as determined pursuant to a Final Order, and in all respects, such Entities (a) will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan, and will be fully protected from liability in acting or in refraining from action in accordance with such advice, and (b) will be fully protected from liability with respect to any act or failure to act that is approved or ratified by the Bankruptcy Court.

6. *Injunction.* The satisfaction, release and discharge pursuant to Section 14.01 of the Plan will also act as an injunction against any Entity's commencing or continuing any action, employment of process, or act to collect, offset or recover any Claim or Cause of Action satisfied, released or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof. Nothing in the Plan will be construed as discharging, releasing or relieving the Debtor, Reorganized Grand Union, or any other party, in any capacity, from any liability with respect to the Retirement Plan to which any such party is subject as of immediately prior to the Effective Date under any law or regulatory provision, and neither the PBGC nor the Retirement Plan will be enjoined from enforcing such liability as a result of the Plan's provisions for satisfaction, release and discharge of Claims.

7. *Revesting.* On the Effective Date, pursuant to section 1141 of the Bankruptcy Code, title to all property of the Debtor's estate will pass to Reorganized Grand Union, free and clear of all Claims of Creditors and Interests (except as otherwise provided in the Plan). Reorganized Grand Union may pay any expenses, including any fees and expenses of professionals, accruing from and after the Confirmation Date without any application to the Bankruptcy Court. Confirmation of the Plan (subject to occurrence of the Effective Date) will be binding and the Debtor's debts will, without in any way limiting Section 14.01 of the Plan, be discharged as provided in section 1141 of the Bankruptcy Code. The previous sentence notwithstanding, nothing in the Plan will be construed as discharging, releasing or relieving the Debtor, Reorganized Grand

Union, or any other party, in any capacity, from any liability with respect to the Retirement Plan to which any such party is subject as of immediately prior to the Effective Date under any law or regulatory provision.

## D. Executory Contracts and Unexpired Leases

1. *General.* Subject to the approval of the Bankruptcy Court, the Bankruptcy Code empowers a debtor in possession to assume or reject executory contracts and unexpired leases. Generally, an "executory contract" is a contract under which material performance is due from both parties. If an executory contract or unexpired lease is rejected by a debtor in possession, the other parties to the agreement may file a claim for damages incurred by reason of the rejection, which claim is treated as a prepetition claim. If an executory contract or unexpired lease is assumed by a debtor in possession, the debtor in possession has the obligation to perform its obligations thereunder in accordance with the terms of such agreement and failure to perform such obligations could result in a claim for damages which may be entitled to administrative expense status.

2. *The Plan.* Any unexpired lease or executory contract that has not been expressly rejected by the Debtor with the Bankruptcy Court's approval on or prior to the Confirmation Date will, as of the Confirmation Date (subject to the occurrence of the Effective Date), be deemed to have been assumed by the Debtor unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to reject such unexpired lease or executory contract or such executory contract or unexpired lease is otherwise designated for rejection, provided that such lease or executory contract is ultimately rejected; *provided, however,* that, as of the Confirmation Date (subject to the occurrence of the Effective Date), any executory contracts or unexpired leases to which an Insider or Affiliate of the Debtor is party shall be deemed to have been rejected by the Debtor unless, by such date, either (i) such unexpired lease or executory contract has been expressly assumed by the Debtor or Reorganized Grand Union, as the case may be, or (ii) a motion seeking such assumption has been filed, provided that such motion is ultimately allowed; *provided, however,* that no executory contract or unexpired lease will be subject to the foregoing deemed rejection (subject to explicit assumption) solely by virtue of the fact that one or more wholly owned subsidiaries of the Debtor is party to such contract or lease.

For purposes of the Plan, leases of nonresidential real property which were assigned by the Debtor prior to the Filing Date will be treated as being neither executory nor unexpired, and notwithstanding Section 9.01 of the Plan, will be deemed neither assumed nor rejected pursuant to the Plan.

With respect to any executory contract or unexpired lease rejected by the Debtor, the rejection will be deemed to constitute a breach of such contract or lease immediately before the Filing Date and may result in a pre-Filing Date Claim against the Debtor for damages. A Claim for damages against the Debtor arising from the rejection of any executory contract or unexpired lease pursuant to a Final Order will be forever barred and will not be enforceable against the Debtor, Reorganized Grand Union, any of their affiliates or their respective property or interests in property, and no holder of any such Claim will participate in any distributions under the Plan, unless a proof of claim is filed with the Bankruptcy Court within (a) the time period established by the Bankruptcy Court in such Final Order approving such rejection or (b) if no such time period is or was established, thirty (30) days from and after the date of entry of such Final Order.

The Debtor estimates that rejection of executory contracts and unexpired leases from the Chapter 11 Case will give rise to General Unsecured Claims aggregating no more than $12 million, not including Claims related to rejection of the leases for distribution facilities, if such leases are ultimately rejected. See "THE PLAN—Classification and Treatment of Claims and Interests Under the Plan—Class 7—General Unsecured Claims."

## E. Termination of Indemnification Obligations

(a) Except as and to the extent set forth in subsections (b) and (c) of Section 14.06 of the Plan and in the MTH Settlement Agreement, and notwithstanding any other provision of the Plan, all obligations of the

Debtor to indemnify, or pay contribution or reimbursement to, its present or former directors, officers, agents (including, without limitation, MTH), employees and representatives holding such positions at any time prior to the Confirmation Date whether pursuant to its certificate of incorporation, bylaws, contractual obligations or any applicable laws or otherwise in respect of all past, present and future actions, suits and proceedings against any of such directors, officers, agents, employees and representatives based upon any act or omission related to service with, for or on behalf of the Debtor or Debtor-In-Possession or any present or former Affiliate will be discharged under the Plan, all such undertakings and agreements will be rejected and terminated, and Reorganized Grand Union will have no obligation thereunder pursuant to the Plan or otherwise.

(b) The obligations of the Debtor pursuant to law or its certificate of incorporation or bylaws or otherwise to indemnify, or to pay contribution or reimbursement to, the Indemnified Persons, as defined below, in respect of all past, present or future actions, suits and proceedings, whether commenced or threatened, against such Indemnified Persons, which include obligations based upon any act or omission arising out of the performance by an Indemnified Person of services to the Debtor, its present or former subsidiaries, Capital or Holdings, for or at the request of the Debtor, prior to the Effective Date, whether prior to the Filing Date or not, will not be discharged or impaired by confirmation of the Plan and will not be subordinated under section 510 of the Bankruptcy Code or otherwise, or be disallowed by reason of section 502(e) of the Bankruptcy Code or otherwise; provided, however, that the limited continuing obligations preserved by Section 14.06(b) of the Plan will not cover any claim for indemnification, contribution, reimbursement or other payment by an Indemnified Person arising out of or related, directly or indirectly, to any action, suit or proceeding against any Indemnified Person (i) brought by Capital or Holdings, (ii) brought by any other person or any other person which is a present or former purchaser, seller, underwriter or owner, in each case acting in such capacity, of present or former securities of the Debtor, its predecessors or any present or former Affiliate thereof, including, without limitation, Capital or Holdings in such capacity, (iii) brought by any trustee, receiver or other representative of asserting the rights of Capital, Holdings or any other person described in (i) hereof, or (iv) brought by any other person (a "Third Party Claimant") against an Indemnified Person asserting claims for contribution, reimbursement or indemnity by such Third Party Claimant arising out of or related to any action, suit or proceeding against such Third Party Claimant which, had it been brought against an Indemnified Person, would be described in (i), (ii) or (iii) hereof (such claims being hereinafter referred to as the "Excluded Claims"). As used herein, the term "Indemnified Persons" will mean (x) the Debtor's present and former directors, officers and employees which have held such position with the Debtor at any time during the period from and including one year prior to the Filing Date through and including the Confirmation Date, (y) persons who retired as directors, officers or employees of the Debtor ("Retirees") prior to the Effective Date and (z) MTH and the MTH Entities, as defined in the MTH Settlement Agreement. Any liability of the Debtor under the foregoing provision of the Plan which is attributable to the period from the Filing Date to the Effective Date and which under the Bankruptcy Code has the priority of an expense of administration will be entitled to such priority, but no aggregate amount of dollars will be paid by reason of such priority which is greater than the absolute maximum payable under this paragraph.

(c) Notwithstanding the provisions of subsections (a) and (b) of Section 14.06 of the Plan, the obligations of the Debtor pursuant to law or its certificate of incorporation or bylaws or otherwise to indemnify, or to pay contribution or reimbursement to, the Continuing Indemnified Persons, as defined below, in respect of legal fees, costs, expert advice and witnesses and expenses ("Defense Expenses") incurred by the Continuing Indemnified Persons in the defense of Excluded Claims will not be discharged or impaired by reason of confirmation of the Plan or otherwise and will not be subordinated under section 510 of the Bankruptcy Code or otherwise and will not be disallowed under section 502(e) of the Bankruptcy Code or otherwise. As used herein, the term "Continuing Indemnified Persons" will mean those persons who are entitled to indemnification under the certificate of incorporation or bylaws of the Debtor as in effect prior to the Filing Date and who shall have served as directors, officers or employees of the Debtor at any time, from and after one year before the Filing Date and Retirees, but will not include any MTH Entity. Upon written request of

any one or more Continuing Indemnified Person, the Board of Directors may, in its reasonable discretion, apply funds that would be used in respect of the defense of an Excluded Claim to the settlement thereof if such settlement payment will be less than the reasonably anticipated Defense Expenses which would be incurred in respect of such Excluded Claim and such application would be in the best interest of Reorganized Grand Union. Any liability of the Debtor under the foregoing provision of the Plan which is attributable to the period from the Filing Date to the Effective Date and which under the Bankruptcy Code has the priority of an expense of administration will be entitled to such priority, but no aggregate amount of dollars will be paid by reason of such priority which is greater than the absolute maximum payable under this paragraph.

(d) No Indemnified Person or Continuing Indemnified Person will be required to file any Claim or Administrative Expense to establish rights preserved under subsections (b) and (c) of Section 14.06 of the Plan.

## F. Claims of Holders of Zero Notes and Capital Indenture Trustees

As of the Effective Date, the holders of the Zero Notes will not be heard, either directly or indirectly, other than with respect to any post-confirmation modifications to the Plan or the Confirmation Order or with respect to matters concerning distribution of the Warrants, applications by professionals for compensation or reimbursement of expenses or payment of Claims of the Capital Indenture Trustees.

## G. Retention and Enforcement of Causes of Action

Except as expressly provided in Section 14.01 of the Plan, and except for any avoidance actions against holders of Unimpaired Class 6 Trade Claims or any Causes of Action released pursuant to Article 14 of the Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, Reorganized Grand Union will retain, with the exclusive right to enforce in its sole discretion, any and all Causes of Action of the Debtor or Debtor-In-Possession, including all Causes of Action which may exist under sections 510, 542, 544 through 550 and 553 of the Bankruptcy Code or under similar state laws, including, without limitation, fraudulent conveyance claims, if any, and all other Causes of Action of a trustee and debtor in possession under the Bankruptcy Code. The Debtor or Reorganized Grand Union, as the case may be, may, but will not be required to, set off against any Claim and the distributions to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever which the Debtor or Debtor-in-Possession may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan will constitute a waiver or release of any such claim the Debtor or Debtor-in-Possession may have against such holder.

## H. Registration Rights

Reorganized Grand Union will enter into a Registration Rights Agreement with each Entity which, as of the Effective Date, (a) (i) holds Senior Subordinated Notes entitling such holder to received ten (10%) percent or more of the shares of New Common Stock or (ii) holds Senior Notes entitling such holder to the New Senior Notes to be issued under the Plan, and (b) requests in writing that Reorganized Grand Union execute such agreement. The final drafts of such Registration Rights Agreements will be filed by the Debtor with the Bankruptcy Court no later than a date which is five (5) days prior to the first date set by the Bankruptcy Court as the Voting Deadline. Such Registration Rights Agreements will be in form and substance reasonably satisfactory to the Senior Bank Agent, the Official Committee and, with respect to the Registration Rights Agreement for the New Senior Notes, the Informal Committee of Senior Noteholders.

## I. Distributions Under the Plan

1. *Time of Distributions Under the Plan.* Except as otherwise provided in the Plan and without in any way limiting Section 11.02 and Article 13 of the Plan, payments and distributions in respect of Allowed Claims will be made by Reorganized Grand Union (or its designee) on or as promptly as practicable after the Effective Date. Cash or securities otherwise distributable with respect to Disputed Claims will be held by

Reorganized Grand Union pending resolution of all objections to each such Claim. When such objections have been resolved and the Claim has become an Ultimately Allowed Claim, Reorganized Grand Union will make an appropriate distribution with respect to such Ultimately Allowed Claim. See "THE PLAN—Procedures for Resolving Disputed Claims."

2. *Fractional Securities.* (a) Fractional shares of New Common Stock, fractional Warrants and New Senior Notes in non-integral multiples of $1,000 will not be distributed. Instead, on the date of final distribution of such securities to the persons entitled thereto, the aggregate of all fractional interests (including, for such purposes, New Senior Notes in a principal amount less than $1,000) that would otherwise be issued to such persons will instead be placed in two separate pools in respect of each such securities (hereinafter the "Fractional Securities Pools") provided Section 12.02 of the Plan will not affect the distributions to such holders of whole shares of New Common Stock, whole Warrants or New Senior Notes in $1,000 increments, but solely the fractional portion thereof. There will be a single Fractional Securities Pool for the fractional interests in New Common Stock and a single Fractional Securities Pool for the fractional interests in New Senior Notes. With respect to the Warrants, there will be separate Fractional Securities Pools established for each of (i) the fractional interests in Series 1 Warrants to be distributed to holders of Class 9 Claims, (ii) the fractional interests in Series 1 Warrants to be distributed to holders of Class 10 Claims, (iii) the fractional interests in Series 2 Warrants to be distributed to holders of Class 9 Claims, (iv) the fractional interests in Series 2 Warrants to be distributed to holders of Class 10 Claims.

(b) All holders of Allowed or Ultimately Allowed Claims entitled to a fractional interest in New Common Stock, as the case may be, will be placed on a list (hereinafter a "Distribution List") in descending order according to the size of the fractional interest in the New Common Stock to which each such holder is entitled. In the event two or more holders of Allowed or Ultimately Allowed Claims are entitled to the same fractional interest (rounded to six decimal places) in New Common Stock, their relative ranking on the Distribution List will be determined by lot. A whole share of New Common Stock will be distributed to holders entitled to the largest fractions of New Common Stock until all of the whole shares of the New Common Stock, in the Fractional Securities Pool for the New Common Stock will have been distributed.

(c) (i) Subject to subparagraph (ii), the holders of Allowed or Ultimately Allowed Claims entitled to a fractional interest in the New Senior Notes (i.e., New Senior Notes in a principal amount less than $1,000) will be entitled to receive either, at the election of the Debtor or Reorganized Grand Union (which election will be exclusive of the other option) (x) cash equal to the principal amount of the fractional New Senior Notes to which they would otherwise be entitled, and the New Senior Notes which would otherwise have been issued in respect of such fractional interests will be cancelled by the Debtor or Reorganized Grand Union, or (y) (a) the holders entitled to a fractional interest which is greater than $500 will receive an additional $1,000 New Senior Note (subject to subparagraph (ii) hereof) and (b) the holders entitled to a fractional interest which is $500 or less will not be entitled to any distribution with respect to such fractional interest.

(ii) Notwithstanding subparagraph (i) hereof, in the event that the aggregate amount of the cash which would be distributed pursuant to subparagraph (i)(x) is less than $100,000, then the Debtor or Reorganized Grand Union must elect option (x). Notwithstanding subsection (i)(y)(a), in no event will the aggregate New Senior Notes distributed pursuant to the Plan exceed $595,475,922 in aggregate principal amount, and if the New Senior Notes to be distributed pursuant to subparagraph (c)(i)(y) would cause the aggregate to exceed this amount, then, in ascending order according to the size of their respective fractional interests, the holders entitled to receive New Senior Notes pursuant to subsection (c)(i)(y)(a) will be deemed to instead fall under subsection (c)(i)(y)(b) with respect to such fractional interests.

(d) All holders of Allowed or Ultimately Allowed Claims entitled to a fractional interest in Warrants will be treated as follows with respect to such fractional interests. In descending order of size of fractional interests, the holders of fractional interests in each of the four (4) separate Fractional Securities Pools

established with respect to the Warrants pursuant to Section 12.02(a) of the Plan will receive (in addition to the number of whole Warrants to which each is otherwise entitled) a whole Warrant with respect to such fractional interest until the aggregate number of each Series of Warrants to be distributed, respectively (x) to holders of Claims in Class 9 pursuant to Section 6.09(a) of the Plan and (y) to holders of Claims in Class 10 pursuant to Section 6.10(a) of the Plan have been distributed; provided that, in the event two or more holders of Allowed or Ultimately Allowed Claims in the same Fractional Securities Pool are entitled to the same fractional interest (rounded to six decimal places) with respect to the Warrants to be distributed with respect to that pool, their relative ranking on the distribution list will be determined by lot.

3. *Compliance with Tax Requirements.* Reorganized Grand Union will comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities in connection with making distributions pursuant to the Plan.

In connection with each distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) and/or withholding is required, Reorganized Grand Union will file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, and/or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any Entity from whom a tax identification number, certified tax identification number of other tax information required by law to avoid withholding has not been received by Reorganized Grand Union (or its distribution agent), Reorganized Grand Union may, at its sole option, withhold the amount required and distribute the balance to such Entity or decline to make such distribution until the information is received; *provided, however*, Reorganized Grand Union will not be obligated to liquidate New Senior Notes, Warrants or New Common Stock to perform such withholding.

4. *Allocation Between Principal and Accrued Interest.* Except as specifically provided in the Plan, on the Effective Date, the aggregate consideration paid to creditors in respect of their Claims will be treated as allocated first to the principal amount of such Claims and then to any accrued interest thereon; *provided, however*, that the foregoing will not apply to distributions with respect to Claims in Classes 9 and 10 (*i.e.*, there shall be no mandatory reporting requirement by operation of the Plan).

5. *Distribution of Unclaimed Property.* Any distribution of property under the Plan that is unclaimed after two years following the Effective Date will irrevocably revert to Reorganized Grand Union, without regard to any state escheatment laws.

6. *Set-Offs.* Except as otherwise expressly provided in the Plan, the Plan is not intended to, and will not, abrogate or impair any rights of setoff of the Debtor or Reorganized Grand Union.

7. *Manner of Payment.* Except with respect to Credit Agreement Claims and Interest Rate Protection Agreement Claims, payment of which will be made by wire transfer of same day funds, payments provided under the Plan may be made, at the option of the Debtor or Reorganized Grand Union, in cash, by wire transfer or by check drawn on any money market center bank.

8. *Indenture Trustee Reserve.* (a) To the extent that, as of the Effective Date, (i) any pending General Unsecured Claims, Miscellaneous Secured Claims or Administrative Expenses of an Indenture Trustee (including a good faith estimate submitted to the Debtor by each Indenture Trustee of its estimated fees and expenses accruing through the Effective Date) are not paid on the Effective Date, or (ii) any pending General Unsecured Claims, Miscellaneous Secured Claims or Administrative Expenses of an Indenture Trustee for its fees and expenses are not yet Allowed or Ultimately Allowed Claims as of the Effective Date, the Debtor will establish on the Effective Date a separate cash reserve (a "Reserve") for each Indenture Trustee in the amount of any such amounts then outstanding, to consist of cash equal to the total of the above unpaid or pending fees and expenses of each Indenture Trustee (including such good faith estimate of fees and expenses through the Effective Date), as of the Effective Date.

41

(b) The obligation of Reorganized Grand Union to pay each Indenture Trustee its fees and expenses owing to it under its applicable Indenture and the Plan, including, without limitation, its General Unsecured Claims, Miscellaneous Secured Claims and Administrative Expenses, will be secured by the amounts in the Reserve established for that Indenture Trustee; *provided, however*, that the Lien Rights of the Indenture Trustees under their respective Indentures will be deemed to attach to the cash in the applicable Reserve to the same extent as if the cash in the Reserve were property received by the Indenture Trustee pursuant to its Indenture; and *provided, further*, that each Indenture Trustee will be conclusively deemed to have taken any and all action required, including under its respective Indenture or applicable law, to perfect its Lien Rights as to the cash in the Reserve established for its benefit, including, without limitation, any requirement of possession for such perfection.

(c) In consideration of the foregoing, and subject to the establishment of the Reserves in the specified amounts and under the foregoing terms and conditions, the Indenture Trustees each are deemed to have waived their Lien Rights in the New Senior Notes and the New Common Stock to be distributed under the Plan to holders of, respectively, the Senior Notes and the Senior Subordinated Notes, and will be deemed to have waived and released any and all right, title and interest in and to property of the Debtor or Reorganized Grand Union other than in and to the cash in the applicable Reserve. Each Indenture Trustee will be entitled to Allowed Claims for the reasonable fees and expenses incurred by such Indenture Trustee under the respective Indenture. Upon payment by the Debtor or Reorganized Grand Union of such Claims, the respective Lien Rights of the Indenture Trustee will be extinguished. Objections to such Claims will be governed by the provisions respecting Impaired Claims set forth in Section 13.01 of the Plan.

**J. Surrender and Cancellation of Instruments**

On the Effective Date, any outstanding security, note or instrument evidencing an Impaired Claim or Impaired Interest will become a Cancelled Security. On the Effective Date, each of the respective transfer books maintained for the Cancelled Securities will be closed. Except for the right to receive the distributions, if any, called for by the Plan, the holder of a Cancelled Security will have no rights arising from or relating to such Cancelled Security after the Effective Date, including, without limitation, any rights of subordination or subrogation that may be construed to be contained in such Cancelled Security. Each holder of a Cancelled Security evidencing an Allowed Claim or Ultimately Allowed Claim will surrender such Cancelled Security to Reorganized Grand Union (or its designee), and Reorganized Grand Union (or its designee) will distribute to the holder thereof the appropriate consideration therefor in accordance with the Plan as promptly as is reasonably practicable. No distribution under the Plan will be made to or on behalf of any holder of an Allowed Claim or Ultimately Allowed Claim evidenced by a Cancelled Security unless and until such Cancelled Security is received by Reorganized Grand Union (or its designee). If a Cancelled Security is lost or destroyed, the holder of such Cancelled Security must deliver an affidavit of loss or destruction to the Debtor or Reorganized Grand Union (or their designee), as well as an agreement to indemnify the Debtor, Reorganized Grand Union (and post a bond if so requested by Reorganized Grand Union or the Debtor), in form and substance reasonably acceptable to Reorganized Grand Union, before such holder may receive any distribution under the Plan in respect of such lost or destroyed Cancelled Security. Any holder of an Allowed Claim or an Ultimately Allowed Claim that fails to surrender a Cancelled Security in accordance with the foregoing before the later to occur of (i) two (2) years from the Effective Date and (ii) six (6) months following the date such holder's Claim becomes an Allowed Claim or Ultimately Allowed Claim will be deemed to have no further Claim and no distributions will be made under the Plan in respect of such Claim. The Debtor or Reorganized Grand Union may waive the above requirements respecting cancellation and surrender of Cancelled Securities. Each Indenture and Capital Indenture, and the obligations of the respective Indenture Trustee and the Capital Indenture Trustee thereunder, and, subject to the implementation of Section 12.07 of the Plan (to the extent of applicable), any Lien Rights of the Indenture Trustees or Capital Indenture Trustees thereunder, will be cancelled and discharged on the Effective Date.

U.S. Trust, the Indenture Trustee for the 12¼% Senior Subordinated Notes and the 12¼% Senior Subordinated Notes, Series A, asserts that the protections of the above provisions of the Plan, relating to the

requirement that holders of Cancelled Securities whose Securities have been lost or destroyed supply evidence of loss and adequate indemnity to protect against claims from any other party which may later present the certificates in order to receive a distribution under the Plan, should be extended to the Indenture Trustees. The Debtor disagrees and believes that, because the Indenture Trustees perform no services in connection with consummation of the Plan and have no role in connection therewith, there is no basis for providing such protections to the Indenture Trustees.

Notwithstanding anything contained in the Plan to the contrary, if Reorganized Grand Union does not elect to treat Credit Agreement Claims in the manner described in Section 6.01(a)(ii) of the Plan and Bankers Trust effects the Post-Confirmation Facility by way of an amendment and restatement of existing documents, the Existing Credit Documents will not be cancelled, discharged, satisfied and/or otherwise expunged except to the extent provided in such amendments and restatements.

## K. Procedures for Resolving Disputed Claims

*1. Objections to Claims.* Any party in interest may object to an Impaired Claim, other than an Impaired Claim otherwise allowed as provided in the Plan, by filing an objection with the Bankruptcy Court and serving such objection upon the holder of such Claim not later than the last to occur of (a) the 45th day following the Effective Date, (b) thirty (30) days after the filing of the proof of claim of such Claim or (c) such other date set by order of the Bankruptcy Court (the application for which may be made on an *ex parte* basis), whichever is later. Only Reorganized Grand Union will have the authority to file objections to Unimpaired Claims. Objections to Unimpaired Claims may be filed by Reorganized Grand Union at any time.

Unless otherwise ordered by the Bankruptcy Court or agreed to by written stipulation of the Debtor or Reorganized Grand Union, or until the Debtor's or Reorganized Grand Union's objection thereto is withdrawn, the Debtor or Reorganized Grand Union will litigate the merits of each Disputed Claim until determined by a Final Order; *provided, however,* subject to the approval of the Bankruptcy Court, if necessary, the Debtor or Reorganized Grand Union, as the case may be, may compromise and settle any objection to any Claim.

*2. Payments and Distributions With Respect to Disputed Claims.* No payments or distributions will be made in respect of a Disputed Claim unless and until and unless such Disputed Claim becomes an Ultimately Allowed Claim.

Subject to the provisions of the Plan, payments and distributions with respect to each Disputed Claim that becomes an Ultimately Allowed Claim, which would have been otherwise been made on the Effective Date had the Ultimately Allowed Claim been an Allowed Claim on the Effective Date, will be made within thirty (30) days after the date that such Disputed Claim becomes an Ultimately Allowed Claim. Holders of Disputed Claims that become Ultimately Allowed Claims will be bound, obligated and governed in all respects by the provisions of the Plan.

## L. Retention of Jurisdiction

The business and the assets of the Debtor will remain subject to the jurisdiction of the Bankruptcy Court until the Effective Date. From and after the Effective Date, the Plan provides for the retention of jurisdiction by the Bankruptcy Court over Reorganized Grand Union and the Chapter 11 Case to the fullest extent permissible by law, including, but not limited to, for the purposes of determining all disputes and other issues presented by or arising under the Plan including, without limitation, exclusive jurisdiction to: (i) determine and adjudicate all disputes relating to Claims and Administrative Expenses (including those allowed by operation of law), including the allowance, amount and classification thereof, *provided, however,* the Bankruptcy Court's jurisdiction shall be concurrent, not exclusive, after the Effective Date with respect to the enforcement or adjudication of any Unimpaired Claim, (ii) determine all other matters, including any matter arising in an adversary proceeding related to the Chapter 11 Case, pending on the Effective Date, (iii)

consider and allow any and all applications for compensation for professional services rendered and disbursements incurred in connection therewith, (iv) remedy any defect or omission or reconcile any inconsistency in the Confirmation Order, (v) interpret and enforce the provisions of the Plan, and issue such orders, consistent with section 1142 of the Bankruptcy Code, as may be necessary to effectuate consummation and full and complete implementation of the Plan, and (vi) determine other such matters as may be set forth in the Confirmation Order or that may arise in connection with the implementation of the Plan.

## M. Claims of Subordination

(a) Subject to the Confirmation Order becoming a Final Order (or the requirement therefor being waived in accordance with Sections 15.02(a) and 16.07 of the Plan) and subject to the distributions that are required to be made under the Plan as of the Effective Date to Classes 1, 2 and 4 having been made, as of the Effective Date, each holder of an Allowed or Ultimately Allowed Claim, (i) by virtue of the acceptance of the Plan by such holder's Class in accordance with section 1126 of the Bankruptcy Code, (ii) by virtue of the acceptance of the Plan by such holder, (iii) by virtue of the acceptance of any distribution under the Plan on account of such Claim, or (iv) by virtue of the confirmation of the Plan, waives, releases and relinquishes any and all rights, claims or causes of action arising under and in any way related to any subordination agreement in effect as of the Filing Date, whether arising out of contract or under applicable law, including without limitation, any claim or security interest in the Debtor's common stock or subsections (a) or (c) of section 510 of the Bankruptcy Code and the provisions of the Indentures, to the payment and distributions of consideration made or to be made hereunder or otherwise consistent with the Plan to any holder of an Allowed or Ultimately Allowed Claim against the Debtor; provided, however, that the holders of Credit Agreement Claims will retain all rights under subordination agreements entered into prior to the Filing Date, if any, as to all persons, other than claims against (x) holders of Senior Note Claims, Senior Subordinated Note Claims, and the Indenture Trustees with respect thereto and (y) distributions made with respect to Junior Zero Note Claims, Senior Zero Note Claims, and Capital Indenture Trustees hereunder; and provided further that the foregoing will not affect the rights of any party to seek subordination under section 510(b) or (c) of the Bankruptcy Code of any Claim that otherwise would constitute a General Unsecured Claim.

(b) Pursuant to Bankruptcy Rule 9019, and any applicable state law, and as consideration for the distributions and other benefits provided under the Plan, the provisions of Section 14.05 of the Plan will constitute a good faith compromise and settlement of any Cause of Action relating to the matters described in Section 14.05 which could be brought by any holder of a Claim or Interest against or involving another holder of a Claim or Interest, which compromise and settlement is in the best interests of Creditors and holders of Interests and is fair, equitable and reasonable. This settlement will be approved by the Bankruptcy Court as a settlement of all such Causes of Action. The Bankruptcy Court's approval of this settlement pursuant to Bankruptcy Rule 9019 and its finding that this is a good faith settlement pursuant to any applicable state law, including, without limitation, the laws of the states of New York, New Jersey and Delaware, given and made after due notice and opportunity for hearing, will bar any such Cause of Action relating to the matters described in Section 14.05 of the Plan which could be brought by any holder of a Claim or Interest against or involving another holder of a Claim or Interest.

## N. Amendment and Modification to the Plan

Subject to the provisions of Section 16.16 of the Plan, the Plan may be altered, amended, or modified by the Debtor, before or after the Confirmation Date, as provided in section 1127 of the Bankruptcy Code.

## O. Withdrawal of the Plan

Subject to the provisions of Section 16.16 of the Plan, the Debtor reserves the right, at any time prior to the entry of the Confirmation Order, to revoke or withdraw the Plan. If the Debtor revokes or withdraws the Plan or if the Confirmation Date does not occur, then the Plan will be deemed null and void.

## P. Conditions to Modification, Withdrawal and Waiver Rights

Notwithstanding any provisions of the Plan to the contrary, including, without limitation, Sections 16.06, 16.07, 16.11 and 16.15 of the Plan, the Debtor may: (a) withdraw the Plan after having first given four (4) Business Days notice in writing to counsel for the Senior Bank Agent, the Official Committee and the Informal Committee of Senior Noteholders (to be served via facsimile and overnight delivery) of the date of the proposed withdrawal and the reason therefor; provided, however, that the Senior Bank Agent, the Official Committee or the Informal Committee of Senior Noteholders may object to such withdrawal and seek an order of the Bankruptcy Court preventing the occurrence thereof; or (b) amend or modify the Plan; *provided, however*, that the Debtor must first obtain the consent of the Senior Bank Agent, the Official Committee, and/or the Informal Committee of Senior Noteholders, as the case may be, if the Claims or Interests of their respective constituencies (in their capacities as such) are adversely and materially affected by such amendment or modification.

## Q. Conditions to Confirmation and the Occurrence of the Effective Date of the Plan

Prior to confirmation of the Plan, the following conditions must occur and be satisfied or (a) have been waived with the consent of the Senior Bank Agent (if the alternative funding option pursuant to Section 6.01(a)(ii) of the Plan is not elected), the Official Committee, and the Informal Committee of Senior Noteholders, or (b) have been waived by the Senior Bank Agent (if the alternative funding option pursuant to Section 6.01(a)(ii) of the Plan is not elected), the Official Committee, and the Informal Committee of Senior Noteholders, such waiver having been approved by order of the Bankruptcy Court upon motion of the Senior Bank Agent (if applicable), the Official Committee, and the Informal Committee of Senior Noteholders:

(a) If the Debtor elects the treatment set forth in Section 6.01(a)(i) of the Plan with respect to Credit Agreement Claims:

(i) The Post-Confirmation Credit Documents (including the Intercreditor Agreement) shall have been filed with the Bankruptcy Court not less than five (5) Business Days prior to the Voting Deadline; and

(ii) The Debtor shall have received authority to execute, and the Bankruptcy Court shall have approved, the Post-Confirmation Credit Documents and all other documents necessary to effectuate the Post-Confirmation Credit Documents, which authority and approval will be contained in the Confirmation Order.

(b) If the Debtor elects the treatment set forth in Section 6.01(a)(i) of the Plan with respect to Credit Agreement Claims:

(i) The Debtor shall have entered into an Alternative Commitment Letter, which shall have been approved by the Bankruptcy Court;

(ii) The Alternative Credit Documents shall have been filed with the Bankruptcy Court not less than five (5) days prior to the Confirmation Date; and

(iii) The Debtor shall have received authority to execute, and the Bankruptcy Court shall have approved, the Alternative Credit Documents and all other documents necessary to effectuate the Alternative Credit Documents.

(c) The Settlement Order shall have been entered.

(d) The Claims Bar Date shall have been established by the Bankruptcy Court as a date which is no less than five (5) Business Days prior to the Confirmation Date.

(e) As of a date which is three (3) Business Days prior to the Confirmation Date, the Official Committee shall not have filed a written notice that is not withdrawn asserting that such Committee has determined in

the exercise of its fiduciary duties to unsecured creditors generally that the amount of the General Unsecured Claims has rendered the Plan not feasible pursuant to section 1129 of the Bankruptcy Code.

Before the Effective Date occurs, the following conditions must occur and be satisfied or have been waived (x) by the Debtor, with the consent of the Senior Bank Agent (if the alternative funding option pursuant to Section 6.01(a)(ii) of the Plan is not elected), the Official Committee, and the Informal Committee of Senior Noteholders, or (y) by the Senior Bank Agent (if the alternative funding option pursuant to Section 6.01(a)(ii) of the Plan is not elected), the Official Committee, and the Informal Committee of Senior Noteholders, such waiver having been approved by order of the Bankruptcy Court upon motion of the Senior Bank Agent (if applicable), the Official Committee, and the Informal Committee of Senior Noteholders:

   *1. Entry of Confirmation Order and Settlement Order.* The Confirmation Order and Settlement Order shall have become Final Orders;

   *2. Regulatory Approvals.* Unless otherwise waived by the Debtor with the consent of the Official Committee and the Informal Committee of Senior Noteholders (and the Senior Bank Agent, if the Debtor does not elect the treatment set forth in Section 6.01(a)(ii) of the Plan with respect to Credit Agreement Claims), which consent shall not be unreasonably withheld, there shall have been obtained all regulatory approvals required in connection with the consummation of the Plan;

   *3. Trust Indenture Act.* The New Senior Note Indenture shall have been qualified under the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbb) as currently in effect;

   *4. Credit Conditions.* The Post-Confirmation Credit Documents or the Alternative Credit Documents, as the case may be, shall be executed by all necessary parties thereto and delivered and all conditions to the effectiveness of such documents shall have been satisfied or waived as provided therein, subject to the occurrence of the Effective Date;

   *5. Delivery of Documents.* All other documents provided for in the Plan shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited by such documents; and

   *6. Other Orders.* Any order necessary to satisfy any condition to effectiveness of the Plan shall be a Final Order.

The Effective Date of the Plan shall be that day that is five (5) Business Days after the conditions to the occurrence of the Effective Date of the Plan have been satisfied or waived, or such earlier day after such conditions have been satisfied or waived that is designated by the Debtor.

A hearing to consider confirmation of the Plan has been scheduled for May 31, 1995 at 10:00 a.m., as a result of which, if all conditions to confirmation of the Plan have occurred or been waived, the Confirmation Order will be entered by the Bankruptcy Court.

The Debtor believes that all conditions to the Effective Date of the Plan will likely be satisfied within thirty (30) days of the Confirmation Date, and that the Effective Date of the Plan could occur by the middle of June 1995.

## R. Directors of Reorganized Grand Union

On the Effective Date, each of the existing members of the Board of Directors will be deemed to have resigned. The initial Post Reorganization Board of Directors will consist of seven (7) members who will be selected by the members of the Official Committee which were members of the Informal Committee of certain holders of Senior Subordinated Notes. Such board members will be identified not less than five (5) days prior to the Confirmation Date; *provided that* if and to the extent that any member(s) of the Post Reorganization Board are not so identified by five (5) days prior to the Confirmation Date, the Debtor will designate such

46

member(s). The composition of the Post Reorganization Board of Directors will be subject to approval of the Bankruptcy Court. A list of such directors will be filed at or prior to the Confirmation Hearing.

From and after the Effective Date, selection of the members of the Post Reorganization Board shall be governed by the Restated Bylaws and/or the Restated Certificate of Incorporation, as the case may be. See "DESCRIPTION OF NEW CAPITAL STOCK—Corporate Governance." The Debtor anticipates that (i) Reorganized Grand Union will maintain officer and director insurance liability coverage comparable to that currently in effect and (ii) while the precise amount of the compensation to outside directors will be determined by the Post Reorganization Board of Directors, Reorganized Grand Union will compensate its outside directors in a manner consistent with compensation provided to outside directors of companies of a similar size and nature.

There can be no assurances that the Post Reorganization Board will not make one or more changes in senior management after the Effective Date. It is anticipated that any changes which are intended to be made prior to the confirmation hearing will be disclosed at such hearing.

In addition, Reorganized Grand Union will execute the MTH Settlement Agreement, pursuant to which, *inter alia*: (a) the MTH Management Agreement (see "CERTAIN INFORMATION CONCERNING THE DEBTOR—Related Party Transactions") will be terminated as of the Effective Date; (b) MTH will be paid all amounts due and owing under the MTH Management Agreement for fees accrued prior to the Effective Date; and (c) all further obligations of the Debtor and/or Reorganized Grand Union under the MTH Management Agreement shall cease as of the Effective Date, including, without limitation, the Debtor's obligation to compensate MTH for the period from and after the Effective Date through July 22, 1997 (the date the MTH Management Agreement otherwise would have expired on its own terms). The MTH Settlement Agreement further provides that Reorganized Grand Union will indemnify and hold harmless MTH and certain Entities related to MTH (the "MTH Entities") from certain losses, claims, damages or liabilities, subject to the provisions and restrictions of the MTH Settlement Agreement. The MTH Settlement Agreement requires the Debtor or Reorganized Grand Union, as the case may be, to pay or reimburse MTH and the MTH Entities for the first $3 million of any liability on certain claims and two-thirds of any additional amount above $3 million, not to exceed $13 million in the aggregate, subject to adjustment if certain releases are not received. The first $3 million of the fund must be deposited in an escrow account on the Effective Date, which moneys will be returned to Reorganized Grand Union as provided in the governing escrow agreement. Finally, the amount paid by Reorganized Grand Union to the GUHC and GUCC Legal Advisors for services rendered in connection with the dissolution of Capital and Holdings, as provided in Section 2.04(b) of the Plan, shall be applied against the first $3,000,000 (or greater amount, if adjusted) of the above-referenced fund and shall reduce Reorganized Grand Union's aggregate liability under the MTH Settlement Agreement by a like amount.

Reference should be made to the MTH Settlement Agreement, a copy of which is annexed as Exhibit "B" to the Plan, for the full and complete provisions of the MTH Settlement Agreement.

## S. Dissolution of Committees

Except as otherwise provided below, on the Effective Date all Committees, including the Official Committee and the Informal Committees, will cease to exist and their members and employees or agents (including, without limitation, attorneys, investment bankers, financial advisors, accountants and other professionals) will be released and discharged from all further authority, duties, responsibilities and obligations relating to, arising from or in connection with the Chapter 11 Case. The Official Committee will continue to exist after such date solely with respect to (i) any objections made by the Official Committee pursuant to Section 13.01 of the Plan or other matters pending before the Bankruptcy Court to which the Official Committee is party, until such objections or matters are resolved; (ii) all fee applications filed pursuant to section 330 of the Bankruptcy Code or Claims for fees and expenses by professionals employed by the Debtor or agreed to be paid by the Debtor; and (iii) any post-confirmation modifications to the Plan or

Confirmation Order. The Informal Committee of Senior Noteholders will continue to exist after such date (x) until substantially all of the distributions to be made with respect to Senior Note Claims under the Plan have been made and (y) solely with respect to any matters pending before the Bankruptcy Court to which such Informal Committee is party, until such matters are resolved.

## VII. ACCEPTANCE AND CONFIRMATION OF THE PLAN

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

### A. Solicitation of Acceptance

The Debtor is soliciting the acceptance of the Plan from all beneficial owners of Claims in certain Classes of Claims that are "impaired" under the Plan. The solicitation of acceptances from holders of Claims in Unimpaired Classes is not required under the Bankruptcy Code. The solicitation of acceptances of the Plan from the holders of Claims and Interests in Classes 11 and 12 is not required because under the Bankruptcy Code, such holders are conclusively presumed to have rejected the Plan. The following Classes are Impaired and are entitled to vote on the Plan (with regard to Classes 1, 2, 4, 8, 9 and 10, holders of Claims in such Classes will be entitled to vote regardless of whether such Claims have been theretofore Allowed):

<blockquote>

| Class | |
|---|---|
| Class 1 | — Credit Agreement Claims |
| Class 2 | — Interest Rate Protection Agreement Claim |
| Class 4 | — Senior Note Claims |
| Class 5 | — Priority Claims |
| Class 7 | — General Unsecured Claims |
| Class 8 | — Senior Subordinated Note Claims |
| Class 9 | — Senior Zero Note Claims |
| Class 10 | — Junior Zero Note Claims |

</blockquote>

The Record Date for determining whether holders of Impaired Claims are entitled to accept or reject the Plan is April 19, 1995.

### B. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Notice of the Confirmation Hearing will be provided to all holders of Claims and Interests and other parties in interest (the "Confirmation Notice"). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof. Objections to confirmation of the Plan must be made in writing, specifying in detail the name and address of the person or entity objecting, the grounds for the objection, and the nature and amount of the Claim or Interest held by the objector. Objections must be filed with the Bankruptcy Court, together with proof of service, and served upon the parties so designated in the Confirmation Notice, on or before the time and date designated in the Confirmation Notice as being the last date for serving and filing objections to confirmation of the Plan. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and the local rules of the Bankruptcy Court.

### C. Requirements for Confirmation of the Plan

As discussed below, the Debtor intends to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court will confirm

the Plan despite the lack of acceptance by an Impaired Class or Classes if the Bankruptcy Court finds that (a) the Plan does not discriminate unfairly with respect to each non-accepting Impaired Class, (b) the Plan is "fair and equitable" with respect to each non-accepting Impaired Class, (c) at least one Impaired Class has accepted the Plan (without counting acceptances by insiders) and (d) the Plan satisfies the requirements set forth in Bankruptcy Code section 1129(a) other than section 1129(a)(8).

The Debtor believes that, upon acceptance of the Plan by at least one impaired Class, determined without including any acceptance of the Plan by any insider, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of chapter 11, and that the Plan has been proposed in good faith.

### 1. The Plan is Fair and Equitable

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims and unsecured claims. With respect to a Class of Unsecured Claims that does not accept the Plan, the Debtor must demonstrate to the Bankruptcy Court that either (a) each holder of an Unsecured Claim of the dissenting Class receives or retains under the Plan property of a value equal to the Allowed amount of its Unsecured Claim or (b) the holders of Claims or Interests that are junior to the Claims of the holders of such Unsecured Claims will not receive or retain any property under the Plan. With respect to a Class of secured Claims that does not accept the Plan, the Debtor must demonstrate to the Bankruptcy Court that either (a) the holders of such Claims are retaining the liens securing such Claims and that each holder of a Claim of such Class will receive on account of such Claim deferred cash payments totalling at least the Allowed amount of such Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in such property, or (b) the holders of such Claims will realize the indubitable equivalent of such Claims under the Plan. The Debtor believes the Plan is fair and equitable.

### 2. The Best Interests Test

Whether or not the Plan is accepted by each Impaired Class of Claims entitled to vote on the Plan, in order to confirm the Plan the Bankruptcy Court must, pursuant to section 1129(b)(7) of the Bankruptcy Code, independently determine that the Plan is in the best interests of each holder of a Claim or Interest Impaired by the Plan if the Plan is not unanimously accepted. Thus, the Plan must provide each holder of a Claim or Interest in such Impaired Class a recovery on account of such holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution each such holder would receive in a liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

To determine the value that holders of Impaired Claims and Interests would receive if the Debtor were liquidated under chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtor's assets if the Debtor's Chapter 11 Case were converted to a chapter 7 liquidation case and the Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value would consist of the net proceeds from the disposition of the Debtor's assets, augmented by cash held by the Debtor and reduced by certain increased costs and Claims that arise in a chapter 7 liquidation case that do not arise in a chapter 11 reorganization case.

The Liquidation Value available for satisfaction of general creditors and Interests in the Debtor would be reduced by: (a) the Claims of Secured Creditors to the extent of the value of their collateral, and (b) the costs, fees and expenses of the liquidation under chapter 7, which would include: (i) the compensation of a trustee and its counsel and other professionals retained, (ii) disposition expenses, (iii) all unpaid expenses incurred by the Debtor during the Chapter 11 Case (such as compensation for attorneys, financial advisors, investment bankers, brokers, auctioneers and accountants and the costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other such appointed committee) which are allowed in a chapter 7 case, (iv) litigation costs, and (v) Claims arising from the operation of the Debtor during the pendency of the Chapter 11 Case and the chapter 7 liquidation case. The liquidation itself would trigger certain Claims, such as Claims

for severance pay and would accelerate other priority payments which would otherwise be paid in the ordinary course. These Claims would be paid in full out of the liquidation proceeds before the balance would be made available to pay most other Claims or to make any distribution in respect of Interests.

Liquidation would also involve the rejection of additional executory contracts and unexpired leases of the Debtor and substantial additional rejection damage Claims. The Debtor believes that the liquidation would also generate an increase in other General Unsecured Claims.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of the liquidation of the Debtor's assets and properties, after subtracting the amounts attributable to the foregoing Claims, costs, fees and expenses, are then compared with the value of the property offered to such Classes of Claims and Interests under the Plan on the Effective Date.

### a. The Debtor's Estimate of Liquidation Value

#### (i) Assumptions

The analysis is based on the projected assets and liabilities of the Debtor as of April 29, 1995. Underlying the liquidation analysis are a number of estimates and assumptions that are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Debtor. Accordingly, there can be no assurances that the values assumed in the following analysis would be realized if the Debtor were in fact liquidated. Accordingly, although the analysis that follows is necessarily presented with numerical specificity, the actual liquidation values could vary significantly from the amounts set forth below. This analysis has been prepared solely for purposes of estimating proceeds in a complete chapter 7 liquidation, and do not represent values that are appropriate for any other purpose. Variance from the estimates may be caused by, among others, the following:

*1. Nature and timing of sales process.* Under section 704 of the Bankruptcy Code, a chapter 7 trustee must, along with its other duties, collect and convert the property of the estate as expeditiously as is compatible with the best interest of the parties. The liquidation analysis assumes there would be pressure to complete the liquidation of the Debtor's operating properties and financial assets over a period of approximately 6-9 months. It is possible that the disposition of certain assets could reasonably exceed 12 months, causing deterioration in the value of the Debtor's estate. The liquidation analysis assumes that the Debtor's business has ceased, that assets are sold for their fair market values on an asset by asset basis, and that realization of any going concern value is not possible.

*2. Discount factor applied to assets.* The precise discount attributable to assets in a chapter 7 case cannot be computed on the basis of any known empirical data. Accordingly, for purposes of the liquidation analysis, assets are valued based on the Debtor's best estimates, which would vary on an asset by asset (and category by category) basis.

*3. Estimated liquidation expenses.* Such expenses were estimated to be incurred upon liquidation of the Debtor's assets, excluding cash and cash equivalents.

*4. Estimated Claims.* A conversion to a chapter 7 case would likely result in additional Claims, including Claims resulting from the rejection of executory contracts.

Liquidation values of major operating properties and non-operating assets were based in part upon the financial projections prepared by the Debtor and assume a discount applied to each asset to account for the nature and timing of the sales process. The Debtor applied a discount to all assets, other than cash and cash equivalents, ranging from 0 to 100 percent of their respective going concern values. The precise discount factors attributable to a chapter 7 liquidation are subject to various circumstances. Total chapter 7 expenses are estimated to be approximately $10 million. For purposes of the liquidation analysis, the Debtor has assumed any tax liability would be *de minimis.* This assumption was based upon the utilization of available tax benefits to offset any gains in the disposition of assets.

In analyzing the priorities and the amount of Claims to be satisfied out of the Liquidation Value, the Debtor made the assumption that recoveries under a liquidation scenario adhere to all contractual subordination provisions in the Indentures under which the Senior Subordinated Notes were issued with respect to the determination of the priority of distributions.

*(ii) Liquidation Analysis*

## LIQUIDATION ANALYSIS AS OF APRIL 29, 1995*
### (all numbers in thousands)

### ASSETS

| | Net Proceeds(a) | DIP Lender Liens | Adequate Protection Liens(c) | Miscellaneous Liens(d) | Senior Secured Creditor Liens(e) | Unencumbered Proceeds(f) |
|---|---|---|---|---|---|---|
| Cash | $ 59,828(b) | $0 | $0 | $ 0 | $ 58,828(g) | $ 1,000(g) |
| Inventory (h) | 120,000 | 0 | 0 | 0 | 120,000 | 0 |
| Real estate (i) | 50,000 | 0 | 0 | 1,350 | 48,650 | 0 |
| Equipment (j) | 60,000 | 0 | 0 | 1,650 | 58,350 | 0 |
| Favorable leases (k) | 44,000 | 0 | 0 | 0 | 0 | 44,000 |
| Other (l) | 5,000 | 0 | 0 | 0 | 5,000 | 0 |
| Total asset value | $338,828 | $0 | $0 | $3,000 | $290,828 | $45,000 |

### CLAIMS AND EQUITY INTERESTS

| | Estimated Claim | Estimated Liquidation $ | Recovery % | Unencumbered Proceeds Consumed | Unencumbered Proceeds Remaining |
|---|---|---|---|---|---|
| **Post-Petition Secured Debt** | | | | | |
| DIP Facility Loans | $ 0 | $ 0 | 100.00% | 0 | $45,000 |
| Adequate Protection Claims (c) | 0 | 0 | 100.00% | 0 | 45,000 |
| **Post-Petition Unsecured Debt** | | | | | |
| Administrative Expenses (m) | 45,000 | 45,000 | 100.00% | 45,000 | 0 |
| **Pre-Petition Secured Debt (n)** | | | | | |
| Credit Agreement Claim | 132,000 | 55,514 | 42.06% | 0 | 0 |
| Interest Rate Protection Agreement Claim | 4,519.5 | 1,900 | 42.06% | 0 | 0 |
| Senior Note Claims | 555,000 | 233,414 | 42.06% | 0 | 0 |
| Total Senior Secured Claims | 691,519.5 | 290,828 | 42.06% | 0 | 0 |
| Miscellaneous Secured Claims (d) | 3,000 | 3,000 | 100.00% | 0 | 0 |
| **Pre-Petition Unsecured Debt** | | | | | |
| Priority Claims | 1,000 | 0 | 0.00% | 0 | 0 |
| Priority Tax Claims | 5,000 | 0 | 0.00% | 0 | 0 |
| **General Unsecured Claims** | | | | | |
| Trade Claims (o) | 100,000 | 0 | 0.00% | 0 | 0 |
| Other General Unsecured Claims (p) | 73,000 | 0 | 0.00% | 0 | 0 |
| Rejection Damage Claims | 72,000 | 0 | 0.00% | 0 | 0 |
| Secured Creditor Deficiency Claims (q) | 400,691.5 | 0 | 0.00% | 0 | 0 |
| Senior Subordinated Note Claims | 602,494 | 0 | 0.00% | 0 | 0 |
| Total General Unsecured Claims | 1,248,185.5 | 0 | 0.00% | 0 | 0 |
| Subordinated Claims | 0 | 0 | 0.00% | 0 | 0 |
| **Pre-Petition Interests** | | | | | |
| Equity Interests | n/a | n/a | n/a | 0 | 0 |