* Assumes hypothetical liquidation of the Debtor under chapter 7 of the Bankruptcy Code on April 29, 1995. All amounts set forth herein are included solely for the purposes of this liquidation analysis.

(a) Amounts set forth are the Debtor's estimated liquidation recoveries, net of direct costs of liquidation. Such amounts have been reduced to their present value as of April 29, 1995 (where appropriate) to reflect the liquidation of assets after April 29, 1995.

(b) Cash reflects a reduction of $8 million on account of PACA/PASA proceeds held in constructive trust by the Debtor for prepetition claims of PACA/PASA trust beneficiaries. Such claims would be reinstated because the Trade Program terminates in the event of a liquidation.

(c) For presentation purposes only, it is assumed that no such Adequate Protection claims exist. If any Adequate Protection Claims exist, they will be paid prior to Administrative Expenses, subject to a $5 million carve out for certain expenses, and will reduce amounts available to unsecured prepetition creditors. For a discussion concerning the Adequate Protection claims, see "THE CHAPTER 11 CASE —Cash Collateral Order."

(d) For a discussion concerning such liens, see "THE PLAN—Classification and Treatment of Claims and Interests Under the Plan—Miscellaneous Secured Claims."

(e) Refers to security interests held by creditors in Classes 1 (Credit Agreement Claims), 2 (Interest Rate Protection Agreement Claims) and 4 (Senior Note Claims).

(f) Unencumbered proceeds are those net proceeds not subject to a valid lien or encumbrance.

(g) Assumes that projected cash on hand on April 29, 1995, includes proceeds resulting from the sale or other disposition of assets not subject to the prepetition liens of the creditors in Classes 1 (Credit Agreement Claims), 2 (Interest Rate Protection Agreement Claim) and 4 (Senior Note Claims).

(h) Assumed at 60% of book value.

(i) Assumption based on past appraisals and the Debtor's experience in the relevant real estate markets.

(j) Assumed at 20% of book value based on the Debtor's experience in equipment sales.

(k) Assumption based on the Debtor's experience in the relevant real estate markets.

(l) Estimated value of miscellaneous other tangible and intangible assets, other than Causes of Action.

(m) Includes Administrative Expenses from the Chapter 11 Case and additional administrative expenses after conversion to chapter 7, including the chapter 7 trustee's fees. Assumes that the Trade Program is terminated and that all postpetition Trade Claims are deemed paid in full as a result thereof, pursuant to the terms of the Trade Creditor Order.

(n) It is the position of the Senior Bank Agent and the Informal Committee of certain holders of Senior Notes that in a liquidation, the Claims of senior secured creditors would be paid in full prior to payment of all unsecured claims, including Administrative Expenses, Priority Tax Claims, Priority Claims, Trade Claims and General Unsecured Claims.

(o) Assumes that the Trade Program is terminated and that payments on account of prepetition Trade Claims made pursuant to the Trade Creditor Order are deemed to be payments on account of postpetition advances by trade creditors.

(p) In the event of a liquidation, which would cause the termination of the Debtor's Retirement Plan, the Debtor's actuary has informed the Debtor that it could adopt certain amendments to the Retirement Plan which could eliminate any underfunded pension liability, and could even result in overfunding. The Debtor does not intend to make such amendments to the Retirement Plan in the context of its reorganization under the Plan. As noted above, however, the PBGC's estimate of what the Retirement Plan's unfunded benefit liability would be upon termination is $46.3 million, and the PBGC asserts that, if the above-referenced amendments are made, they would not necessarily affect the calculation of unfunded benefit liabilities in the event the Retirement Plan terminates. Solely for the purpose of this chart, General Unsecured Claims do not include claims arising from the rejection of unexpired leases and executory contracts. In addition, in the event of a liquidation, General Unsecured Claims would be increased by approximately $5 million, reflecting amounts owed under the Debtor's retiree health programs.

(q) Any recovery on account of the senior secured deficiency claims would be increased because the holders of Credit Agreement Claims, Interest Rate Protection Agreement Claims and Senior Note Claims are, until such holders are compensated in full, entitled to any recovery otherwise payable to holders of Senior Subordinated Note Claims.

*(iii) Recoveries under the Plan*

In the table below, the Debtor presents a comparison between estimated reorganization recoveries and liquidation recoveries by Class of Claims and Interests. The Plan recovery data presented in the table below are based, in part, upon the Debtor's assumption of the reorganization value of the Debtor.

### Comparison of Recoveries under the Plan versus Liquidation (1)

| Claim Class and Type | Estimated Amount of Allowed Claims Under Plan | Estimated Recovery Under Plan (%) | Estimated Amount of Allowed Claims in Liquidation | Estimated Recovery in Liquidation (%) |
|---|---|---|---|---|
| DIP Facility Loans | $    N/A | N/A | $    0 | 100.00% |
| Adequate Protection Claims | N/A | N/A | 0 | 100.00% |
| Administrative Expenses | 130,000,000 | 100.00% | 45,000,000 | 100.00% |
| Priority Tax Claims | 5,000,000 | 100.00% | 5,000,000 | 0.00% |
| 1—Credit Agreement Claims (2) | 93,000,000 | 100.00% | 132,000,000 | 42.06% |
| 2—Interest Rate Protection Agreement Claim | 4,519,500 | 100.00% | 4,519,500 | 42.06% |
| 3—Miscellaneous Secured Claims | 3,000,000 | 100.00% | 3,000,000 | 42.06% |
| 4—Senior Note Claims (3) | 570,807,000 | 100.00% | 555,000,000 | 42.06% |
| 5—Priority Claims | 1,000,000 | 100.00% | 1,000,000 | 0.00% |
| 6—Trade Claims (4) | 20,000,000 | 100.00% | 100,000,000 | 0.00% |
| 7—General Unsecured Claims (5) | 80,000,000 | 100.00% | 73,000,000 | 0.00% |
| Rejection Damage Claims | N/A | N/A | 72,000,000 | 0.00% |
| Secured Creditor Deficiency Claims | N/A | N/A | 400,691,500 | 0.00% |
| 8—Senior Subordinated Note Claims (6) | 602,494,000 | 28.21% | 602,494,000 | 0.00% |
| 9—Senior Zero Note Claims (7) | — | — | 0 | 0.00% |
| 10—Junior Zero Note Claims (7) | — | — | 0 | 0.00% |
| 11—Subordinated Claims | 0 | 0.00% | 0 | 0.00% |
| 12—Interests | N/A | N/A | N/A | N/A |

(1) The Debtor has assumed a reorganization value of $950 million. Reference should be made to the Debtor's Pro Forma Capitalization and Financial Projections, annexed hereto as Appendix "B", for a discussion of how this value was derived. The total reorganization value includes a value attributed to the New Common Stock, based on the current trading value of the Senior Subordinated Notes, of $170 million, and the long term indebtedness contemplated by the Plan.

(2) The amount of Credit Agreement Claims would be increased in the event of a liquidation because of draws upon outstanding letters of credit.

(3) The amount of Senior Note Claims is greater under the Plan because the Plan includes the claims of the holders of Senior Notes for interest and interest on overdue interest through the Effective Date. The figure of $570,807,000 represents the sum of (i) the principal amounts of the 11¼% Senior Notes due 2000 and the 11⅜% Senior Notes due 1999 ($350,000,000 and $175,000,000, respectively), plus (ii) interest on the Senior Notes through an assumed Effective Date of April 29, 1995 ($30,953,000 and $13,990,000, respectively), plus (iii) interest on overdue interest through such assumed Effective Date ($634,000 and $230,000, respectively).

(4)  The amount of Trade Claims would be increased in the event of a liquidation because of the termination of the Trade Program and the reinstatement of prepetition Trade Claims, which reduces dollar for dollar the amount of Administrative Expenses.

(5)  The Debtor has chosen to transfer the $12 million in estimated rejection damages that are currently contemplated under the Plan (and which would constitute General Unsecured Claims) to the category of Rejection Damage Claims, which includes both rejection damages contemplated under the Plan and those resulting from a liquidation. In addition, in the event of a liquidation, General Unsecured Claims would increase by approximately $5 million, reflecting amounts owed under the Debtor's retiree health programs.

(6)  The figure of $602,494,000 represents the sum of (i) the principal amounts of the 13% Senior Subordinated Notes, the 12¼% Senior Subordinated Notes, and the 12¼% Senior Subordinated Notes, Series A ($16,150,000, $500,000,000 and $50,000,000, respectively), plus (ii) interest on the Senior Subordinated Notes through the Filing Date ($671,000, $32,326,000 and $3,233,000, respectively), plus (iii) interest on overdue interest, if any, through the Filing Date ($0, $104,000 and $10,000, respectively).

(7)  For purposes of effectuating the Zero Settlement only, the Zero Note Claims will be allowed in amounts equal to the value as of the Effective Date of the distributions made on account of such Claims under the Plan, which amounts have not been determined as of the date hereof.

### b. Conclusion

Due to the numerous uncertainties and time delays associated with liquidation under chapter 7, it is not possible to predict with certainty the outcome of liquidation of the Debtor or the timing of any distribution to creditors. As the Liquidation Analysis and Comparison of Recoveries under the Plan versus Liquidation demonstrate, however, liquidation under chapter 7 of the Bankruptcy Code would result in much lower distributions for most Creditors than that provided for in the Plan.

### 3. Feasibility

Even if the Plan is accepted by each Class of Claims voting on the Plan, and even if the Bankruptcy Court determines that the Plan satisfies the best interests test, the Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan. As part of such analyses, the Debtor has prepared forecasts of Reorganized Grand Union's cash flow (assuming the transactions contemplated by the Plan are consummated) for the five (5) fiscal years through April 1, 2000. These forecasts, and the significant assumptions on which they are based, are set forth in Appendix "B" hereto. Based on such forecasts, the Debtor believes that Reorganized Grand Union will be able to make all payments required to be made pursuant to the Plan.

## VIII. CREDITORS' COMMITTEES

Pursuant to section 1102(a) of the Bankruptcy Code, following the commencement of a chapter 11 case, the United States Trustee may appoint a committee of creditors holding unsecured claims against the chapter 11 debtor, and may appoint additional committees of creditors or of equity holders as deemed appropriate to assure the adequate representation of holders of claims and interests in the chapter 11 case.

On February 6, 1995, the United States Trustee appointed the Official Committee. The Official Committee retained the law firms of Ropes & Gray and Pepper, Hamilton & Scheetz as its co-counsel and Ernst & Young as its accountants. See "THE CHAPTER 11 CASE—Appointment of Official Committee."

In addition, prior to the Filing Date, the Debtor entered into discussions with the three Informal Committees in connection with a restructuring of the Debtor. See "BACKGROUND—Significant Events

Preceding Commencement of the Chapter 11 Case—Failure to Make Certain Interest Payments"). The three Informal Committees consisted of certain holders of: (i) Senior Notes (represented by Stroock & Stroock & Lavan and Rosenthal, Monhait, Gross & Goddess, P.A.), (ii) Senior Subordinated Notes (represented by Ropes & Gray), and (iii) Trade Claims (represented by Pepper, Hamilton & Scheetz).

Following the appointment of the Official Committee, the Informal Committees representing certain holders of Senior Subordinated Notes and certain trade creditors ceased independent activity. However, the Informal Committee representing certain holders of Senior Notes continues to participate in the Plan process as an independent entity paid by the Debtor for its reasonable fees and expenses pursuant to the Plan.

In connection with these prepetition negotiations and with the approval of the Debtor, each of the Informal Committees retained legal and financial advisors. Pursuant to the Plan, the reasonable fees and expenses incurred (which may, as such fees relate to financial advisors, include a request by such professionals for success fees) on or after the Filing Date by such advisors will be paid (without application by or on behalf of any such advisors to the Bankruptcy Court, and without notice and a hearing, unless specifically requested by the Bankruptcy Court upon request of a party in interest) by Reorganized Grand Union as an Administrative Expense. If Reorganized Grand Union and any such professional cannot agree on the amount of fees and expenses to be paid to such professional, the amount of such fees and expenses will be determined by the Bankruptcy Court. See "THE PLAN—Classification and Treatment of Claims and Interests Under the Plan—Treatment of Administrative Expenses and Certain Priority Claims."

The reasonable fees and expenses of the legal and financial advisors to the Informal Committees incurred prior to the Filing Date will be treated as General Unsecured Claims.

# IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives to the Plan include (a) liquidation of the Debtor under chapter 7 of the Bankruptcy Code and (b) an alternative plan of reorganization.

## A. Liquidation Under Chapter 7

If no plan can be confirmed, the Debtor's Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtor for distribution to creditors and Interest holders in accordance with the priorities established by the Bankruptcy Code. For the reasons discussed above, under "ACCEPTANCE AND CONFIRMATION OF THE PLAN—Best Interests Test," the Debtor believes that confirmation of the Plan will provide each holder of a Claim entitled to receive a distribution under the Plan with a recovery that is not less (and is expected to be substantially more) than it would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

## B. Alternative Plan

If the Plan is not confirmed, the Debtor (or if the Debtor's exclusive period in which to file a plan of reorganization has expired, any other party in interest) may be entitled to file a different plan. Such a plan might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of its assets. The Debtor has explored various other alternatives in connection with the formulation and development of the Plan. The Debtor believes the Plan enables holders of Claims to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtor's assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, probably resulting in somewhat greater (but indeterminate) recoveries than would be obtained in a chapter 7 liquidation. Further,

if a trustee were not appointed (such appointment is not required in a chapter 11 case) the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case. Although preferable to a chapter 7 liquidation, the Debtor believes that liquidation under chapter 11 would result in substantially lower recoveries than provided for by the Plan. Further, any alternative plan would likely be less favorable to holders of Claims because, *inter alia*, distributions would be delayed.

## X. RISK FACTORS

HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

### A. Business Risks

#### 1. Tax Issues

Reorganized Grand Union expects that all or substantially all its net operating loss carryovers ("NOLs") will be eliminated as a consequence of the Plan. In addition, certain other tax attributes of Reorganized Grand Union may under certain circumstances be eliminated or reduced as a consequence of the Plan. The elimination or reduction of NOLs and such other tax attributes may substantially increase the amount of tax payable by Reorganized Grand Union following the consummation of the Plan as compared with the amount of tax payable had no such attribute reduction been required. For a further discussion of the federal income tax consequences of the Plan, see "CERTAIN FEDERAL INCOME TAX CONSEQUENCES—Tax Consequences to Reorganized Grand Union."

#### 2. Financial Condition of the Debtor; Payment at Maturity; Dividends

The Debtor is currently, and after the Effective Date Reorganized Grand Union will continue to be, highly leveraged. There can be no assurance that the operating cash flow of Reorganized Grand Union, after giving effect to operating requirements, will be adequate to fully fund the payment of interest under its post-confirmation indebtedness when due as well as all capital expenditures contemplated in the Debtor's cash-flow projections.

The Debtor believes that its capital investment program is crucial to the Debtor's future profitability and its ability to generate the cash flow necessary for its operating requirements, to pay interest on its debt and for payment of the principal amounts of the Post-Confirmation Credit Agreement debt and New Senior Notes at maturity. There can be no assurance that the financial resources available under the Plan will be sufficient to fund the capital expenditures which are necessary to keep the Debtor competitive and enable it to be sufficiently profitable to service its debt.

The ability of Reorganized Grand Union to service its indebtedness and to repay or refinance it at maturity may depend on its ability to raise sufficient new equity capital, or, possibly, on its ability to sell selected assets of Reorganized Grand Union or Reorganized Grand Union as a whole. If Reorganized Grand Union meets the forecasts described in Appendix "B" hereto, the Debtor believes that, based on current market conditions, such refinancing and new equity capital should be obtainable. However, there can be no assurance that the projections can be met, that such financing will be obtained, that, if obtained, it will be on terms favorable to Reorganized Grand Union, or that Reorganized Grand Union will be able to be sold in whole or in part on terms that will yield sufficient proceeds to pay off Reorganized Grand Union's obligations.

The pendency of the Chapter 11 Case has negatively affected the operations of the Debtor and its results of operations, and adverse effects of the Chapter 11 Case may affect future periods as well.

56

The Post-Confirmation Credit Agreement will contain restrictive financial and operating covenants and prohibitions, including provisions which will limit Reorganized Grand Union's ability to make capital expenditures and pay cash dividends and make other distributions to holders of New Common Stock and Preferred Stock (if any shares thereof are issued). Restrictions on capital investment are expected to be more restrictive when Reorganized Grand Union's cash flow and profitability are lower than projected and less restrictive if they are higher than projected. There may be further capital expenditure restrictions if certain agreed-upon financial tests are not met. As noted above, failure to make necessary capital expenditures could have an adverse effect on Reorganized Grand Union's ability to remain competitive and on profitability.

There can be no assurance that Reorganized Grand Union will be able to achieve or maintain the financial performance tests expected to be contained in the Post-Confirmation Credit Agreement. Failure to meet such financial tests or other covenants would result in a default thereunder. If any such default were not remedied within the applicable grace period, if any, the lenders under the Post-Confirmation Credit Agreement would be entitled to declare the amounts outstanding thereunder due and payable, accelerate the payment of all such amounts and foreclose upon all of the tangible and intangible assets (including leases) of Reorganized Grand Union and its subsidiaries. See "DESCRIPTION OF POST-CONFIRMATION CREDIT AGREEMENT."

There can be no assurance that Reorganized Grand Union's performance and its ability to satisfy its debt service obligations will not be adversely affected by one or a combination of the above or other factors.

### 3. Capital Expenditure Program

The Debtor's performance will be dependant upon, among other things, its ability to make major capital expenditures over the next several years in order to remain competitive in certain markets. As noted above, financial resources provided for after the consummation of the Plan may not be sufficient to fund the capital expenditures which are necessary to enable the Debtor to achieve a level of profitability which will allow the Debtor to service its debt. (See "RISK FACTORS—Business Risks—Financial Condition of the Debtor: Payment at Maturity; Dividends.")

### 4. Environmental Regulation and Litigation

The Debtor is subject to extensive regulation under environmental and occupational health and safety laws and regulations. In addition, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") generally imposes joint and several liability for clean-up and enforcement costs, without regard to fault on parties allegedly responsible for contamination at a site. While the Debtor believes it has provided adequate reserves for its share of potential costs associated with the clean-up of hazardous substances at various sites no assurance can be given that the reserved amounts will be sufficient to satisfy Reorganized Grand Union's obligations. See "CERTAIN INFORMATION CONCERNING THE DEBTOR—Regulatory and Legal Matters."

### 5. Competition

The food retailing business is highly competitive. The Debtor competes with numerous national, regional and local supermarket chains, particularly A&P, Price Chopper, Hannaford Brothers, Inc., ShopRite, Pathmark, Foodtown and Stop & Shop. The Debtor also competes with convenience stores, stores owned and operated or otherwise affiliated with large food wholesalers, unaffiliated independent food stores, warehouse/merchandise clubs, discount drugstore chains and discount general merchandise chains. Most of the Debtor's principal competitors have had greater financial resources than the Debtor and have used those resources to take steps which have already adversely affected and could in the future adversely affect the Debtor's competitive position and financial performance, including the opening of competitive stores with better physical facilities.

Existing store sales growth has experienced a negative trend in the Northern Region, especially in the Albany metropolitan area and Mid-Hudson Valley markets. This trend may continue, especially if the Debtor

lacks sufficient capital to make investments in these markets. The projections included in Appendix "B" hereto assume that this negative sales trend can be mitigated during 1996 and reversed in subsequent years. There can be no assurance that this assumption will prove correct. Competitive store openings are expected to continue and during the pendency of the Chapter 11 Case certain competitors may perceive a vulnerability on the part of the Debtor and may make additional attempts to increase sales and build market share, to the detriment of the Debtor. The Debtor has had to respond to this competitive environment in a manner that has, in some instances, adversely affected its operating results and may continue to do so in the future. The Debtor's ability to compete may also be adversely affected by its high leverage and the limitations imposed by its debt agreements. See "CERTAIN INFORMATION CONCERNING THE DEBTOR—Competition."

### 6. Collective Bargaining Agreements

As of January 31, 1995, the Debtor had approximately 17,000 employees, of whom approximately 60% were employed on a part-time basis. Approximately 50% of the Debtor's employees are covered by collective bargaining agreements negotiated with fourteen unions. Approximately 88% of the employees covered by these collective bargaining agreements are employed in store locations and approximately 12% are employed in distribution facilities. These contracts expire at various times through December 1998. The Debtor's labor contract with United Food and Commercial Workers, Local 1262, covering approximately 1,900 clerks working in thirty-three Grand Union stores located in New York City, Long Island, Westchester County, New York, Putnam County, New York, and Dutchess County, New York, expires in June 1995. Discussions with Local 1262 regarding a new labor agreement or an extension of the existing contract are presently underway. A prolonged labor dispute could have a material adverse effect on the Debtor. See "CERTAIN INFORMATION CONCERNING THE DEBTOR—Employees."

## B. Bankruptcy Risks

### 1. Objection to Classifications

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

### 2. Risk of Nonconfirmation of the Plan

Even if all Classes of Claims that are entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan satisfies all the requirements for confirmation of a plan of reorganization under the Bankruptcy Code. There can be no assurance, however, that the Bankruptcy Court would also conclude that the requirements for confirmation of the Plan have been satisfied. See "ACCEPTANCE AND CONFIRMATION OF THE PLAN."

### 3. Potential Effect of Bankruptcy on Certain Relationships

The effect, if any, which the commencement of the Chapter 11 Case may have upon the operations of Reorganized Grand Union cannot be accurately predicted or quantified. The Debtor believes the filing of the Chapter 11 Case and consummation of the Plan will have a minimal future effect on relationships with employees and suppliers, especially in view of the fact that the Debtor intends to pay the Claims of such parties in full, in the ordinary course of business. If confirmation and consummation of the Plan do not occur

expeditiously, the Chapter 11 Case could adversely affect the Debtor's relationships with its customers, suppliers and employees, resulting in a material adverse impact on the operations of the Debtor. Moreover, even an expedited Chapter 11 Case could have a detrimental impact on future sales and patronage due to the possibility that the Chapter 11 Case may create a negative image of the Debtor in the eyes of its customers.

## C. Liquidity Risks

### 1. Restrictions on Transfer

Holders of New Common Stock or New Senior Notes who are deemed to be "underwriters" as defined in subsection 1145(b) of the Bankruptcy Code, or who are otherwise deemed to be "affiliates" or "control persons" of Reorganized Grand Union within the meaning of the Securities Act of 1933, as amended (the "Securities Act"), will be unable to offer or sell their New Common Stock or New Senior Notes after the Effective Date, except pursuant to an available exemption from registration under the Securities Act and under equivalent state securities or "blue sky" laws. See "EXEMPTIONS FROM SECURITIES ACT REGISTRATION."

### 2. Potential Illiquidity of Plan Securities

No established trading market exists for the Warrants, the New Common Stock or the New Senior Notes, and no assurance can be given that such a trading market will develop following the effectiveness of the Plan or, if a trading market for the Warrants, the New Common Stock or the New Senior Notes develops, no assurance can be given as to the liquidity of such a trading market.

As provided in the Plan, Reorganized Grand Union will use its reasonable best efforts to cause the New Senior Notes, the New Common Stock and the Warrants to be listed on one or more stock exchanges or quoted on the National Market System on or before the date which is one hundred twenty (120) days after the Effective Date. Moreover, the Warrant Agreement provides that, if the New Common Stock is so listed or quoted, the Debtor shall use its best efforts to have the Warrants listed on such stock exchange(s) or quoted on the National Market System, as applicable. There can be no assurance, however, that the Warrants, the New Common Stock or the New Senior Notes will be listed on any stock exchange or quoted on the National Market System.

## XI. DESCRIPTION OF POST-CONFIRMATION CREDIT AGREEMENT

The salient provisions of the Post-Confirmation Credit Agreement are set forth in the Commitment Letter and the Credit Facility Term Sheet, both of which are annexed to the Plan, collectively marked as Exhibit "A". The Debtor anticipates that the Post-Confirmation Credit Agreement will be in all respects substantially the same as the Existing Credit Agreement except to the extent that Reorganized Grand Union's financial condition may give rise to different financial tests and ratios and that the obligations under the Post-Confirmation Credit Agreement will be secured by liens on substantially all of Reorganized Grand Union's assets. Unless the Debtor elects to obtain alternative financing, the Post-Confirmation Credit Documents will be filed with the Bankruptcy Court not less than five (5) Business Days prior to the Voting Deadline.

## XII. DESCRIPTION OF NEW SENIOR NOTES

The New Senior Notes will be issued under an indenture between the Debtor and the IBJ Schroder Bank & Trust Company, as Trustee. The New Senior Notes are limited to $595,475,922 aggregate original principal amount and will mature September 1, 2004. The New Senior Notes will bear interest at a rate of 12% per annum, commencing September 1, 1995, notwithstanding that the original date of issuance may be prior to that date. Interest on the Senior Notes will be payable semi-annually on each March and September, commencing March 1, 1996, to the holders of record of Senior Notes as of the close of business on the

February 15th and August 15th immediately preceding such interest payment date. Interest on the Senior Notes will commence to accrue from September 1, 1995 and, after the initial interest payment, will accrue from the most recent date to which interest has been paid. Interest will be computed on the basis of a year comprised of twelve 30-day months. The Senior Notes will be issued in fully registered form only, in denominations of $1,000 and integral multiples thereof. The New Senior Notes will be unsecured obligations of Reorganized Grand Union.

As provided in the Plan, Reorganized Grand Union will use its reasonable best efforts to cause the New Senior Notes to be listed on one or more stock exchanges or quoted on the National Market System on or before the date which is one hundred twenty (120) days after the Effective Date. There can be no assurance, however, that the New Senior Notes will be listed on any stock exchange or quoted on the National Market System.

For a further description of the terms of the New Senior Notes, see the Term Sheet of New Senior Notes annexed hereto as Appendix "C". The form of the indenture respecting the New Senior Notes will be filed with the Bankruptcy Court prior to the Voting Deadline.

## XIII. DESCRIPTION OF NEW CAPITAL STOCK

### A. General

Pursuant to its certificate of incorporation, the Debtor's authorized capital stock consists of 900 shares of common stock, par value $50,000 per share. As of the date hereof, 801.5 shares of the Debtor's common stock are issued and outstanding, all of which are owned by Capital. Pursuant to the Plan, the Debtor's certificate of incorporation will be amended and restated, the old common stock of the Debtor that is outstanding immediately prior to the Effective Date will be cancelled and New Common Stock will be issued to certain creditors of the Debtor.

Under the Restated Certificate of Incorporation, Reorganized Grand Union's authorized capital stock will consist of (i) 30,000,000 shares of New Common Stock (of which up to 10,000,000 shares will be issued under the Plan) and (ii) 10,000,000 shares of preferred stock ("Preferred Stock"), none of which will be issued and outstanding as of the Effective Date. All shares of the New Common Stock, when issued pursuant to the Plan, will be fully paid and nonassessable. Pursuant to the terms of the Plan, as of the Effective Date, all shares of the New Common Stock to be issued under the Plan will be issued to holders of Allowed Senior Subordinated Note Claims. See the Restated Certificate of Incorporation and Restated Bylaws annexed to the Plan as Exhibit "D" and Exhibit "C", respectively.

### B. New Common Stock

Subject to the preferential rights of any series of Preferred Stock which may be issued by Reorganized Grand Union, and to any restrictions on payment of dividends imposed by the Post-Confirmation Credit Agreement or the Alternative Credit Documents, as the case may be, the holders of New Common Stock will be entitled to such dividends (whether payable in cash, property or capital stock) as may be declared from time to time by the Post Reorganization Board of Directors from funds, property or stock legally available therefor, and will be entitled after payment of all prior claims, to receive pro rata all assets of Reorganized Grand Union upon the liquidation, dissolution or winding up of Reorganized Grand Union. Holders of New Common Stock have no redemption, conversion or preemptive rights to purchase or subscribe for securities of Reorganized Grand Union. Any offer to redeem, purchase or reacquire any shares of New Common Stock by Reorganized Grand Union shall be made pro rata to all holders of New Common Stock.

As provided in the Plan, Reorganized Grand Union will use its reasonable best efforts to cause the New Common Stock to be listed on one or more stock exchanges or quoted on the National Market System on or

before the date which is one hundred twenty (120) days after the Effective Date. Moreover, the Warrant Agreement provides that, if the New Common Stock is so listed or quoted, the Debtor shall use its best efforts to have the Warrants listed on such stock exchange(s) or quoted on the National Market System, as applicable. There can be no assurance, however, that the New Common Stock or Warrants will be listed on any stock exchange or quoted on the National Market System.

Except as required by law, the respective holders of New Common Stock shall vote on all matters as a single class and each holder of New Common Stock shall be entitled to one vote for each share of the New Common Stock that it owns. Holders of New Common Stock will not have cumulative voting rights.

## C. Corporate Governance

The initial board of directors of Reorganized Grand Union will consist of seven (7) directors, who will be chosen by the members of the Official Committee which were members of the Official Committee of certain holders of Senior Subordinated Notes or, if and to the extent not chosen by such holders in a timely fashion, by the Debtor. The initial board of directors shall be approved by the Bankruptcy Court. Two of the present directors, Messrs. Hirsch and Fox, have informed the Debtor they do not intend to be candidates for election as directors of Reorganized Grand Union.

Any vacancy in the board of directors of Reorganized Grand Union, whether arising from death, resignation, or any other cause, may be filled by a majority of the remaining directors. Each director so elected will hold office until his successor shall have been elected and qualified.

The Debtor anticipates that (i) Reorganized Grand Union will maintain officer and director insurance liability coverage comparable to that currently in effect and (ii) while the precise amount of the compensation to outside directors will be determined by the Post Reorganization Board of Directors, Reorganized Grand Union will compensate its outside directors in a manner consistent with compensation provided to outside directors of companies of a similar size and nature.

## D. Preferred Stock

The authorized capital stock of Reorganized Grand Union will include 10,000,000 shares of Preferred Stock, none of which will be issued or outstanding upon the consummation of the Plan. The Post Reorganization Board of Directors is authorized to divide the Preferred Stock into series and, with respect to each series, to determine the preferences and rights and the qualifications, limitations or restrictions thereof, including the dividend rights, conversion rights, voting rights, redemption rights and terms, liquidation preferences, sinking fund provisions, the number of shares constituting the series and the designation of such series. The Post Reorganization Board may, without stockholder approval, issue Preferred Stock with voting and other rights that could adversely affect the voting power of the holders of New Common Stock and could have certain antitakeover effects. The payment of dividends, if any, on such Preferred Stock would be subject to any restrictions on payment of dividends imposed by the Post-Confirmation Credit Agreement or the Alternative Credit Documents, as the case may be.

## XIV. SELECTED HISTORICAL FINANCIAL DATA

Reference should be made to the Debtor's 10-K for the Fiscal Year ended April 2, 1994 and 10-Q for the Fiscal Quarter ended January 7, 1995, included as Appendix "D" to this Disclosure Statement.

## XV. CERTAIN INFORMATION CONCERNING THE DEBTOR

Reference should be made to the Debtor's 10-K for the Fiscal Year ended April 2, 1994 and 10-Q for the Fiscal Quarter ended January 7, 1995, included as Appendix "D" to this Disclosure Statement, which contain a discussion and analysis of the Debtor's financial condition and results of operations.

The Debtor is a leading food retailer in the northeastern United States. The Debtor has been engaged in the food retailing business for 120 years, making it one of the oldest major retail food companies in the United States. The Debtor currently operates 234 supermarkets and food stores under the "Grand Union" name in six states.

### A. Store Formats

The Debtor's store sizes and formats vary depending upon the demographics and competitive conditions in each location, as well as the availability of real estate. Grand Union supermarkets offer a wide selection of national brand and private label products as well as high-quality produce, meat and general merchandise. The majority of the Debtor's sales are generated from stores which also contain a number of high margin specialty and service areas for such goods as imported and domestic produce, salads, hot and cold prepared foods, seafood and fresh-baked goods. Select stores feature in-store kitchens and pharmacies. Liquor and wine departments are included where permitted by local law. The Debtor's supermarkets range in size from 14,000 to 64,000 square feet and newly constructed stores are typically in excess of 40,000 square feet.

### B. Merchandising Strategy

The Debtor's current merchandising strategy is premised upon the following:

*1. Value.* The Debtor's strategy is to provide value to the customer by offering competitive prices and a wide variety of advertised and unadvertised specials, sponsoring special promotions and offering a wide selection of private label products.

*2. Merchandise Assortment.* The Debtor believes that many consumers prefer food stores that not only offer the wide variety of food and non-food items carried by conventional supermarkets, but also sell an expanded assortment of high-quality food items and produce. Accordingly, the Debtor continues to upgrade existing departments with new selections and, where appropriate, has added specialty departments, including full service butcher and seafood shops, floral departments, delicatessens and bakeries. This merchandising strategy provides consumers with a broader product offering and a more convenient shopping experience, while shifting the Debtor's sales mix toward higher margin products.

*3. Efficiencies of Distribution.* The Debtor's distribution system has contributed to its ability to pursue efficiently its strategy of offering the consumer a wide assortment of quality products at competitive prices. Strategically located distribution centers make it possible for the Debtor to minimize in-store stockroom space, thereby increasing store selling space.

### C. Selected Data

The table below sets forth certain statistical information with respect to the Debtor's supermarkets, excluding the stores formerly operated in the Southern Region, for the periods indicated.

|  | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 | 40 Weeks Ended January 7, 1995 |
|---|---|---|---|---|
| Number of stores (at end of period) | 251 | 250 | 254 | 236 |
| Total selling square feet (in thousands) | 4,213 | 4,276 | 4,532 | 4,353 |
| Average gross square feet per store | 23,439 | 23,922 | 24,966 | 25,841 |
| Average sales per selling square foot per week | $11.69 | $11.23 | $10.76 | $10.34 |

## D. Summary of Operations

*1. Northern Region.* The Debtor currently operates 128 stores in its Northern Region including forty stores in Vermont, eighty-five stores in upstate New York and three stores in New Hampshire. The Debtor believes it generally operates in excellent locations, having operated in most of the markets it currently serves in the Northern Region for more than twenty-five years, and in many communities for over fifty years.

In Vermont, the Debtor operates forty stores throughout the state in virtually every significant community. The Debtor has the preeminent market share in the state, having more sales than all other chain-store operators combined. The Debtor's strong position in Vermont allows it to achieve significant economies in purchasing, distribution, advertising and field supervision. Zoning and environmental regulations in the state have long restricted commercial development (including supermarkets). Accordingly, the competitive environment in Vermont evolves very slowly. The Debtor's long-standing presence in Vermont was enhanced through the acquisition in 1990 of certain stores operated by P&C Foods, a division of The Penn Traffic Company ("Penn Traffic"). The Debtor has focused its capital expenditures in Vermont on improving existing locations and replacing stores where possible. The largest competitors to the Debtor in Vermont are Golub Corporation ("Price Chopper"), Hannaford Brothers, Inc. ("Hannaford") and A&P. Price Chopper has recently enlarged or replaced certain of the facilities in Vermont which it acquired from P&C Foods in 1990. See "CERTAIN INFORMATION CONCERNING THE DEBTOR—Related Party Transactions."

In upstate New York, the Debtor generally operates in small cities and rural communities, where the Debtor estimates it typically has the leading market share, and in the Albany, New York metropolitan area (the "Capital District") where, according to Debtor estimates, it has the second largest market share with thirty-four stores. Although generally not as restrictive as Vermont, commercial development in the upstate New York market place has been and continues to be constrained by zoning and environmental restrictions, particularly in areas regulated by the Adirondack Park Commission. In the more urban Capital District, where Price Chopper has the larger market share and Hannaford operates nine stores, the Debtor's competitors have opened several stores in the last two years. Such newly opened stores are generally larger and more modern than the Debtor's stores in the relevant markets. These openings have had an adverse effect on the Debtor's sales and profitability. Victory Markets, Inc. ("Great American") competes against the Debtor in a number of communities in the Hudson and Mohawk River Valleys.

In the Mid-Hudson Valley area of New York (fourteen stores), the Debtor estimates that it has the leading market share. Principal competitors are Big V Supermarkets Inc. (operating under the ShopRite name), Price Chopper, Hannaford and A&P. Weak economic conditions in the Mid-Hudson Valley area have been accompanied by a number of competitive openings in recent years.

A number of stores in the Northern Region (particularly in the Adirondack area and Vermont) are in resort areas and generally experience significant increases in sales in the summer months and in some cases during the winter ski season.

*2. New York Region.* The Debtor currently operates 106 stores in its New York Region. The Debtor's primary New York Region marketing area comprises the more affluent suburban communities of central and northern New Jersey (forty-four stores), Westchester, Orange, Rockland, Dutchess and Putnam Counties in New York (twenty-seven stores), Long Island (fifteen stores) and Fairfield County, Connecticut (fifteen stores). The Debtor also has a limited presence in New York City (three stores) and Pennsylvania (two stores).

Within its primary New York Region marketing areas, the Debtor generally operates stores in mature, densely populated markets where it believes its below-market long-term leases generally provide it with a significant cost advantage over new supermarkets. These stores serve communities with demographics particularly well-suited for store formats emphasizing specialty departments. Accordingly, the sales mix in this region includes a larger percentage of higher margin perishable department items than in the Northern Region. In addition, the high population density as well as the geographic concentration of stores in the region

provide substantial opportunities to achieve additional economies of scale, particularly in advertising and distribution.

Because the New York Region is a fragmented market with no single food retailer having a dominant market share, competition is market specific. In New Jersey, the Debtor competes primarily against Pathmark Stores, Inc. ("Pathmark"), A&P and various supermarkets supplied by the Wakefern ("ShopRite") and Twin County ("Foodtown") cooperatives. In Westchester, Orange, Rockland, Dutchess and Putnam Counties in New York, the Debtor generally competes with A&P, Edwards Supermarkets, Inc. and ShopRite. On Long Island, the Debtor's principal competitors are A&P/Waldbaums, Pathmark, King Kullen Grocery Co., Inc. and Foodtown. The Debtor's main competitors in Fairfield County, Connecticut are the Stop & Shop Company and A&P.

## E. Capital Investment

The Debtor's capital spending is primarily directed toward renovating and upgrading the existing Grand Union store base and opening new and replacement stores in existing marketing areas. Since 1992, the Debtor has increased its rate of capital investment from the level in the 1989-1992 period. Capital expenditures, including capitalized leases other than real estate leases, for the fiscal year ending April 2, 1994 were approximately $86 million and are expected to be approximately $70 million for the fiscal year ending April 1, 1995.

The Debtor anticipates that the terms of the proposed financing will likely limit its ability to make capital expenditures to approximately $45-$50 million per annum over the next several years as against the Debtor's earlier plans for a higher level of capital investment. There can be no assurance that financial resources adequate to maintain the projected level will be available, or that the expenditure of such amount will result in sufficient levels of profitability to allow the Debtor to service its debt. See "RISK FACTORS—Business Risks—Capital Expenditure Program."

## F. Distribution, Supply and Management Information Systems

*1. Distribution.* The Debtor believes its distribution system enhances its ability to offer consistently fresh and high quality dairy products, meats, baked goods, produce and frozen foods. Moreover, this system enables the Debtor to take advantage of cost saving, volume purchase opportunities.

The Debtor currently operates five distribution centers aggregating approximately 2.1 million square feet. In addition, the Debtor utilizes a frozen food distribution facility operated by a third party and also leases space in three additional storage facilities and, from time to time, utilizes limited space in several other facilities.

The strategic location of the distribution centers makes it possible for the Debtor to make frequent shipments to stores, which reduces the amount of in-store stockroom space, thereby limiting nonproductive store inventories.

The Debtor intends to file a motion to reject the leases on its Waterford, New York distribution facilities. However, the Debtor intends to enter into discussions with the landlord for those facilities and with the unions representing the Waterford employees. The outcome of those discussions may affect the Debtor's intention to reject these leases. The Debtor also is reviewing its options related to its lease on its Montgomery, New York warehouse, operated under an agreement with Penn Traffic. No determination on assumption or rejection of this lease has been made.

*2. Montgomery, New York Distribution Agreement.* In September 1993, the Debtor entered into a program to consolidate the purchasing and distribution of health and beauty care products and general merchandise with Penn Traffic (the "Montgomery Agreement"). Under this program, the Debtor purchases

health and beauty care products for both the Debtor and Penn Traffic and is reimbursed by Penn Traffic for such portion of those products as is sold by Penn Traffic; Penn Traffic purchases general merchandise for both Penn Traffic and the Debtor and is reimbursed by the Debtor for such portion of such merchandise as is sold by the Debtor. The Debtor's general merchandise warehouse in Montgomery, New York is used to store and distribute general merchandise and health and beauty care products to Grand Union stores and to certain of Penn Traffic's stores and wholesale customers. Under the arrangement, Penn Traffic owns the inventory of general merchandise and health and beauty care products located at the Montgomery warehouse and shares the cost of operating the warehouse in an amount proportionate to Penn Traffic's usage of the facility. Under the agreement governing such arrangement, either Penn Traffic or the Debtor may terminate the program from and after July 1, 1995, upon six (6) months prior written notice. See "CERTAIN INFORMATION CONCERNING THE DEBTOR—Related Party Transactions—Montgomery Warehouse."

Under the Bankruptcy Code, moreover, the Debtor may unilaterally terminate such arrangement pursuant to section 365 of the Bankruptcy Code. In the event the program is terminated, the Debtor will be required to purchase merchandise of the type now located in the warehouse but owned by Penn Traffic. Whether purchased from Penn Traffic or third-party vendors, the cost to the Debtor of bringing the Debtor's inventory level to the level maintained by the Debtor prior to the execution of the Montgomery Agreement is estimated to be $15 million.

*3. Management-Information Systems.* Financial, distribution, purchasing and operating system requirements are supported through a central computer system located in Wayne, New Jersey. The Debtor currently utilizes scanning systems in 166 stores (representing approximately 85% of total sales) and intends to continue to invest in scanning and other store systems in the future.

*4. Suppliers.* Products sold, including private label products, are purchased through a large group of unaffiliated suppliers. The Debtor is not dependent upon any single supplier, and its grocery purchases are of a sufficient volume to qualify for minimum price brackets for most products sold.

*5. Commissary.* The Debtor operates a 20,000 square foot commissary located in Newburgh, New York in which high quality cooked meat products, salads and soups are prepared for sale in the Debtor's delicatessen departments.

## G. Properties

The Debtor conducts its operations primarily in leased stores, distribution centers and offices. The following table indicates the current location and number of stores.

*1. Location and Number of Stores*

| | |
|---|---:|
| **Northern Region:** | |
| Vermont | 40 |
| New York | 85 |
| New Hampshire | 3 |
| **New York Region:** | |
| New York | 45 |
| New Jersey | 44 |
| Connecticut | 15 |
| Pennsylvania | 2 |
| TOTAL | 234 |

The Debtor currently owns fifteen and leases 219 of its store sites pursuant to commercial leases. Management believes that none of such leases is individually material to the Debtor. Most of these leases

contain several renewal options. Eighteen store leases which do not contain renewal options will expire over the next five years and management anticipates that it will be able to renegotiate acceptable lease terms for most of these locations, if so desired.

In the first half of Fiscal 1995, the Debtor has closed a total of four stores (not including stores which were closed but replaced), two in the Northern Region and two in the New York Region. Five stores were closed in the New York Region and nine in the Northern Region during the third quarter of Fiscal 1995. Three stores have been closed during the fourth quarter of Fiscal 1995 and three additional stores may be closed by the end of Fiscal 1995. In the aggregate, stores that were or are expected to be closed and not replaced in Fiscal 1995 represent an aggregate of approximately 566,000 square feet of closed store space and generated approximately $130 million in annual revenues.

*2. Other Properties.* The Debtor currently operates five distribution centers which are leased and a commissary, which is housed in a building owned by the Debtor on a ground-leased site in Newburgh, New York. The Debtor owns a 66,160 square foot site which is part of its Carlstadt, New Jersey Grocery Distribution Center and a 101,000 square foot facility in Waverly, New York. The Debtor's leased distribution centers each have approximately thirty years or more remaining on the respective leases including options.

## H. Employees

As of January 31, 1995, the Debtor had approximately 17,000 employees, of whom approximately 60% were employed on a part-time basis. Approximately 50% of the Debtor's employees are covered by collective bargaining agreements negotiated with fourteen unions. Approximately 88% of the employees covered by these collective bargaining agreements are employed in store locations and approximately 12% are employed in distribution facilities.

The Debtor's labor agreement with United Food and Commercial Workers, Local 1262, covering approximately 1,900 clerks working in thirty-three Grand Union stores located in New York City, Long Island, Westchester County, New York, Putnam County, New York, and Dutchess County, New York, expires in June 1995. Discussions with Local 1262 regarding a new labor agreement or an extension of the existing agreement are presently underway. In addition, the Debtor's labor agreements with each of the United Food and Commercial Workers, Locals 1, 174, 342-50, 371 and 464A are set to expire, depending upon the applicable labor agreement, between October 1995 and December 1998. If an extension or replacement of any of these existing agreements is not obtained, the applicable United Food and Commercial Workers local retains the right to strike. The consequences of such an action may be adverse to the Debtor and/or Reorganized Grand Union.

On May 29, 1993, the Debtor settled a labor dispute with United Food and Commercial Workers, Local 1262, which represents clerks working in 61 Grand Union stores located in northern New Jersey and in Orange County, New York, and Rockland County, New York. The expiration of the Debtor's contract on April 24, 1993, after an extension from the contract's original expiration date on April 10, 1993, resulted in work stoppages at some, and eventually all, of the 61 Grand Union stores involved during the period from May 7, 1993 through May 29, 1993, as well as work stoppages at 251 Foodtown, Pathmark and ShopRite stores whose employees are covered by identical collective bargaining agreements. On June 17, 1993, a new four year agreement with Local 1262 was ratified by the approximately 3,600 members of Local 1262 employed by the Debtor and by the approximately 23,000 members of Local 1262 employed by Foodtown, Pathmark and ShopRite.

The Debtor is a party to seventeen labor contracts, which cover a number of employees and have the expiration dates set forth below:

### Collective Bargaining Agreements

| Bargaining Unit | Region | Approximate Number of Employees | Contract Inception Date | Contract Expiration Date |
|---|---|---|---|---|
| UFCW 1, Store #1825 | Northern | 23 | 9/11/94 | 9/13/97 |
| Bakery 3, Bakers | New York | 42 | 2/1/93 | 1/31/96 |
| UFCW 174, Meat & Deli | New York | 21 | 12/15/91 | Indefinite |
| UFCW 342, Meat & Deli | New York | 279 | 10/18/92 | 10/21/95 |
| UFCS 371, All Store Departments | New York | 900 | 6/26/94 | 6/28/97 |
| Teamsters 445, Whse. Employees | New York | 196 | 4/3/94 | 4/4/98 |
| Teamsters 456, Whse. Employees | New York | 144 | 7/26/93 | 7/26/97 |
| Teamsters 456, Drivers & Loaders | New York | 110 | 9/4/94 | 9/5/98 |
| UFCS 464A Meat & Deli | New York | 982 | 1/1/95 | 12/19/98 |
| UFCW 464A (formerly 489) Meat & Deli | New York | 163 | 5/1/94 | 3/14/98 |
| Teamsters 560 Drivers & Loaders | New York | 99 | 4/1/94 | 3/31/98 |
| Teamsters 863, Whse. Employees | New York | 105 | 10/16/94 | 10/10/98 |
| Local 1199 Pharmacists | New York | 6 | 10/19/93 | 10/19/96 |
| UFCS 1262 Grocery, Produce, & Front-End Clerks | New York | 1,873 | 3/15/92 | 6/95 |
| UFCW 1262 Grocery, Produce, & Front-End Clerks | New York | 3,337 | 4/11/93 | 4/12/97 |
| ITEA Drivers, Loaders & Mechanics | Northern | 188 | 10/31/94 | 11/1/97 |
| IWEA Warehouse Employees | Northern | 252 | 5/8/94 | 5/2/98 |

## I. Regulatory and Legal Matters

### 1. Federal Trade Commission

At the time of the acquisition of the Debtor by Holdings in July 1989, the Debtor and P&C Foods (then a subsidiary and currently a division of Penn Traffic, which is under common control with the Debtor) operated stores in some of the same geographic areas in Vermont and upstate New York. In order to satisfy the concerns of federal and state antitrust authorities arising therefrom in connection with the acquisition of the Debtor by Holdings, prior to consummation thereof (i) the Debtor, GUAC, MTH Holdings, Inc., a New York corporation ("MTH Holdings") and an affiliate of MTH, and P&C Foods entered into an "Assurance Pursuant to 9 Vermont Statutes Annotated Section 2459," dated July 5, 1989 (the "Vermont Assurance"), and an "Agreement to Hold Separate" with the Attorney General of the State of Vermont and (ii) MTH Holdings and GUAC entered into an "Agreement Containing Consent Order" with the Bureau of Competition of the Federal Trade Commission ("FTC") and an "Agreement to Hold Separate" with Salomon Inc and the FTC (collectively, the "FTC Agreements").

As required by the FTC Agreements, the Debtor has advised the FTC that it is anticipated that upon consummation of the Plan there will be a change of control of the Debtor. No such notice is required to be given to the State of Vermont. Each of the Agreements to Hold Separate was, by its terms, applicable only until certain stores identified therein could be divested. All required divestitures have occurred and following consummation of the Plan there will no longer be any control affiliation between Penn Traffic and Reorganized Grand Union, which may in the future be direct competitors in certain market areas. Consummation of the Plan is not expected, by itself, to result in any change in the applicability of either the Vermont Assurance or the FTC Agreements.

The FTC Agreements required the divestiture by MTH Holdings and/or the Debtor (including in each case their respective subsidiaries and affiliates) of sixteen stores located in Vermont and upstate New York.

Such divestitures were completed on July 30, 1990. Thirteen of the sixteen stores divested were P&C Foods stores and three of the sixteen stores divested were Grand Union stores. In a related transaction, the Debtor and P&C Foods entered into the Operating Agreement, pursuant to which the Debtor acquired the right to operate P&C Foods' thirteen remaining stores in New England under the Grand Union name until July 2000, for an average annual rent of approximately $10.7 million with an option to extend the term of such operation for an additional five years. The Debtor paid P&C Foods $7.5 million for an option to purchase the stores at an amount defined in the Operating Agreement. Pursuant to the terms of the Operating Agreement, a $15 million prepayment of the annual fee was made to P&C Foods in connection with the July 1992 recapitalization of the Debtor.

The FTC Agreements also provide, among other things, that the Debtor (including its subsidiaries and affiliates) shall not acquire, for a period of ten years, any retail grocery stores in specified counties in Vermont and New York without the prior approval of the FTC.

### 2. Environmental

Soil and ground-water contamination has been detected at a shopping center owned by the Debtor which is located in Connecticut. The Debtor is investigating whether such contamination was caused by improper disposal of perchloroethylene wastes by a dry cleaner previously operating at this location or by an off-site source. The Debtor has undertaken, under approval by the Connecticut Department of Environmental Protection, a proposal for a remedial investigation designed to identify the sources of such soil and ground-water contamination and to determine the length, depth and breadth of the contamination on and off-site. Sampling analyses for the ground-water at the shopping center and for drinking water in private residences located in the immediately surrounding area confirm that the source of the on-site contamination, in part, is an off-site shopping center and a gasoline station located nearby. In May 1993, a Remedial Action and Investigation Report was submitted to the Connecticut Department of Environmental Protection. The Debtor is awaiting a response from the Connecticut Department of Environmental Protection.

The Debtor's potential responsibility does not arise from any aspect of its operation of a supermarket at the shopping center but from the actions of a former tenant. Any contamination caused on-site by a source located off-site would be the responsibility of another party. The Debtor believes that the current intention of the Connecticut Department of Environmental Protection is to seek reimbursement of past costs and clean up from some or all of these other parties. The Debtor is unable to determine the amount of its potential liability arising from the on-site contamination, but does not believe, based upon the results of investigations made to date, that the amount of potential liability is likely to be materially adverse to the Debtor's results of operations or financial condition. Management presently estimates, based upon investigations made by the Debtor's environmental consultant to date, that such liability should not exceed $2 million. Investigations are continuing, and there can be no assurance that the amount of such liability will not exceed $2 million.

In 1991, the Debtor's landlord brought an action (entitled *James A. Klein, d/b/a James A. Klein Enterprises v. The Grand Union Company, et al.,* 91 CIV 8469 (CLB)) against the Debtor, two other tenants at the Apple Valley Shopping Center in LaGrange, New York, and a supplier of hazardous substances to one of the tenants, seeking approximately $1,600,000 in response costs within the meaning of CERCLA and consequential damages (pursuant to the court's supplemental jurisdiction). The plaintiff claims that the Debtor and other tenants discharged hazardous substances from their premises which caused the plaintiff to incur response costs. At the time this Chapter 11 Case was filed, the Debtor's motion for summary judgment had been denied and the matter was awaiting trial in the Southern District of New York before District Judge Charles Brieant. The gravamen of the plaintiff's claim is that the Debtor placed household cleaning products containing volatile organics in a compactor situated at the rear of its premises which were released into the environment. The Debtor believes that the evidence will not support the allegation and that it will not be found liable to the plaintiff. Region II U.S. Environmental Protection Agency carried out a removal action at this site and recently notified the Debtor that it was a potentially responsible party within the meaning of Section 107(a) of CERCLA, 42 U.S.C. 9607(a). The EPA notice letter relates to the same facts that form the basis of the plaintiff's claim before the Southern District of New York.

Except as provided above, the Debtor believes that there are no other material, outstanding environmental actions involving the Debtor.

### 3. Other

The Debtor is involved in various legal proceedings arising out of its business, none of which is expected to have a material effect upon its results of operations or financial position.

## J. Trade Names, Service Marks and Trademarks

The Debtor uses a variety of trade names, service marks and trademarks. Except for "Grand Union," the Debtor does not believe any of such trade names, service marks or trademarks is material to its business.

## K. Competition

The food retailing business is highly competitive. The Debtor competes with numerous national, regional and local chains, convenience stores, stores owned and operated and otherwise affiliated with large food wholesalers, unaffiliated independent food stores, warehouse clubs, discount drugstore chains and discount general merchandise chains. Some of the Debtor's competitors (which may include Penn Traffic) have greater financial resources than the Debtor and could use those resources to take steps which could adversely affect the Debtor's competitive position. See "RISK FACTORS—Business Risks—Competition."

## L. Outstanding Pension Plans and Liabilities

The Debtor currently maintains two tax-qualified employee benefit arrangements, The Grand Union Savings Plan (the "Savings Plan") and The Grand Union Employees' Retirement Plan (the "Retirement Plan"). Participation in both Plans is open to salaried and hourly employees of the Debtor, other than members of a collective bargaining unit that has bargained with the Debtor regarding benefits. The Savings Plan is a profit-sharing plan with a cash or deferred arrangement under which participants may make before-tax contributions of up to 10% of compensation, subject to the $9,240 calendar year limitation in effect for 1994. After-tax contributions may also be made. The Debtor matches 25% of the first 4% of compensation contributed on a before-tax basis. The Retirement Plan is a defined benefit pension plan under which a participant's benefit paid in the form of a single life annuity at age 65 is generally (i) 1.5% of his "highest annual compensation" multiplied by years of service not in excess of 35 minus (ii) 1.5% of primary social security benefit multiplied by years of service not in excess of 35. For 1994, the pension benefit which may be paid under the Retirement Plan is subject to a limit of $118,800 and the amount of a participant's compensation that may be taken into account under the Retirement Plan is limited to $150,000 for 1994.

The Debtor also maintains The Grand Union Supplemental Retirement Program for Key Executives, a non-qualified pension arrangement pursuant to which certain key employees of the Debtor and its affiliates earn a pension in addition to the benefit to which they are entitled under the Retirement Plan.

As reflected in the most recent valuation reports prepared by the Debtor's actuary, as of April 1, 1994, the fair value of the Retirement Plan's assets exceeded the accumulated benefit obligation (for both vested and non-vested benefits) by approximately $12.4 million, and the Retirement Plan continued to meet the minimum funding requirements set forth under the Internal Revenue Code and the Employee Retirement Income Security Act of 1974, as amended. Assuming certain actuarial assumptions are satisfied, the Debtor expects that the Retirement Plan's funding reserve requirement would remain overfunded at a sufficient level on a market value basis to preclude any required cash contribution at least through March 31, 1996. However, a change in prevailing interest rates could have a significant effect, either positive or negative, on the amount of the Debtor's pension liability.

The filing of a petition under the Bankruptcy Code does not automatically terminate a defined benefit pension plan. However, upon the termination of a defined benefit pension plan there could be further increases

or decreases in unfunded pension liability to reflect the use of different actuarial assumptions than those used for purposes of the valuation reports. Although the Debtor necessarily reserves in itself the right to amend, modify or terminate the Retirement Plan, as well as the Savings Plan, the Debtor expects to continue both plans indefinitely.

The PBGC has requested that the following explanation be included in this Disclosure Statement:

The PBGC administers the mandatory pension plan termination insurance program established under Title IV of ERISA. Upon termination of an underfunded pension plan covered by Title IV, the PBGC becomes trustee of the plan and, within certain statutory limits, guarantees the payment of pension benefits to participants and beneficiaries. See 29 U.S.C. § 1322.

The Debtor is a "contributing sponsor" of the Retirement Plan, which is covered by Title IV of ERISA. See 29 U.S.C. § 1301(a)(13). A "contributing sponsor" of a single-employer pension plan is a person who is responsible for meeting the funding requirements under 29 U.S.C. § 1082 or 26 U.S.C. § 412.

According to the Debtor's actuary, the Retirement Plan is overfunded for all benefit liabilities on an on-going basis. The PBGC, however, has determined that the Retirement Plan is underfunded for all benefit liabilities on a termination basis. The different actuarial assumptions mandated by Title IV of ERISA to calculate the Retirement Plan's funding status as of an assumed date of plan termination of February 1, 1995, have resulted in an estimated underfunding for all benefit liabilities of $46.3 million. The PBGC expects to file a contingent estimated priority claim with respect to the Retirement Plan's unfunded benefit liabilities, as well as a contingent, unliquidated claim for funding contributions. These claims generally would be contingent upon the termination of the Retirement Plan. As noted below, the Debtor intends to continue the Retirement Plan post-confirmation and the PBGC has advised the Debtor that it supports such intent. The PBGC also intends to file a priority claim for approximately $31,000 related to pension termination insurance premiums.[1]

Under ERISA, the Debtor and each member of the Debtor's controlled group are jointly and severally liable to the PBGC for the "total amount of unfunded benefit liabilities" of the Retirement Plan, see 29 U.S.C. §§ 1362(a), (b), and for the payment of premiums due with respect to the Retirement Plan, see 29 U.S.C. § 1307(e)(2). Under ERISA, the Debtor and each member of the Debtor's controlled group also are jointly and severally liable to the Retirement Plan for contributions necessary to satisfy the minimum funding standards of ERISA and the Internal Revenue Code. See 29 U.S.C. §§ 1082(c)(11), 1362(c); 26 U.S.C. § 412(c)(11).

As defined by ERISA, a "controlled group" includes a parent-subsidiary and/or brother-sister group of corporations, trades or businesses connected through common ownership and control, as defined under Sections 414(b) and (c) of the Internal Revenue Code and regulations promulgated thereunder. See 29 U.S.C. § 1301(a)(14).

The Debtor is part of a controlled group which includes Grand Union Capital Corporation and Grand Union Holdings Corporation. If the Retirement Plan were to terminate prior to confirmation of the Debtor's proposed Plan of Reorganization, these companies and any others in the Debtor's controlled group would incur joint and several liability under ERISA for any unfunded obligations with respect to the Retirement Plan. However, the Debtor's proposed Plan of Reorganization contemplates the cancellation of the equity interest in the Debtor presently held by Grand Union Capital Corporation, which cancellation would remove Grand Union Capital Corporation and Grand Union Holdings Corporation from the Debtor's controlled group.

---

[1] The Debtor believes that substantive defenses are available with respect to the PBGC's assertion that its claims for unfunded benefit liabilities and statutorily required funding contributions would be entitled to priority status. Rather, the Debtor believes that most or all of such claims would be properly characterized as General Unsecured Claims.

A pension plan covered by Title IV of ERISA may only be terminated in accordance with that statute. The PBGC has discretionary authority to seek termination of a pension plan whenever it determines that the PBGC's possible long-run loss may increase unreasonably unless the plan is terminated. The filing of a petition under the Bankruptcy Code does not automatically result in termination, but the Debtor could voluntarily seek termination of the Retirement Plan under certain circumstances. However, the Debtor intends to continue the Retirement Plan post-confirmation. Based on the PBGC's understanding of the current status and value of the Debtor's controlled group, the fact that the Debtor is in compliance with statutory minimum funding requirements, the current terms of the proposed Plan of Reorganization, and the fact that the proposed Plan of Reorganization does not impair any claims of or relating to the Retirement Plan, the PBGC has advised the Debtor that it supports the Debtor's intention to maintain the Retirement Plan as the Debtor emerges from Chapter 11.

## M. Executive Officers

The names, ages and present principal occupations of the executive officers of the Debtor are set forth below.

| Name | Age | Positions |
|------|-----|-----------|
| Joseph J. McCaig | 50 | Director, President and Chief Executive Officer |
| William A. Louttit | 48 | Director, Executive Vice President and Chief Operating Officer |
| Kenneth R. Baum | 46 | Director, Senior Vice President, Chief Financial Officer, Secretary |
| Darrell W. Stine | 57 | Executive Vice President—New York Region |

**Mr. McCaig** became Chief Executive Officer of the Debtor in July 1989 and was appointed President, Chief Operating Officer and a Director of the Debtor prior to 1983. Mr. McCaig has been employed by the Debtor for over thirty years.

**Mr. Louttit** has been Executive Vice President and Chief Operating Officer of the Debtor since 1989 and has been a Director since 1981. He joined the Debtor in 1964, serving in a variety of positions before being elected a Vice President in 1980. He was named Executive Vice President in charge of Merchandising in 1984 and was promoted to Chief Operating Officer in 1989.

**Mr. Baum** was appointed Senior Vice President, Chief Financial Officer, Secretary and a Director of the Debtor in July 1994. He joined the Debtor in 1982 and was named Vice President and Controller in 1983.

**Mr. Stine** was appointed Executive Vice President of the Debtor in July 1994. He joined the Debtor in 1954 and was named a Vice President with responsibility for the Debtor's New York Region in 1985 and Senior Vice President in 1988.

Executive officers of the Debtor are appointed and serve at the discretion of the Board of Directors.

For further information regarding the Debtor's executive officers, see the Debtor's Annual Report on Form 10-K for the 52 Weeks ended April 2, 1994, a copy of which is annexed hereto as Appendix "D".

## N. Executive Compensation

The following table sets forth the compensation paid or accrued by the Debtor to each of the four (4) most highly-compensated executive officers of the Debtor for services rendered to the Debtor in all capacities during the calendar year ended December 31, 1994. The Debtor made no grants of stock options or stock appreciation rights in Calendar 1994 nor did the Debtor make any awards in Calendar 1994 under any long-term incentive plan.

## SUMMARY COMPENSATION TABLE

| Compensation<br>Name and Principal Position | Salary | Bonus | Other<br>Compensation (1) |
|---|---|---|---|
| Joseph J. McCaig<br>Chief Executive Officer, President and Director | $512,437 | $123,479 | $27,552 |
| William A. Louttit<br>Executive Vice President, Chief Operating Officer and Director | 342,454 | 66,392 | 9,507 |
| Darrell W. Stine<br>Executive Vice President—New York Region | 256,923 | 17,446 | 10,794 |
| Kenneth R. Baum<br>Senior Vice President, Chief Financial Officer and Secretary | 149,862 | 20,603 | 4,086 |

(1)  Includes benefits such as 401(k) contributions and life insurance.

## O. Related Party Transactions

### 1. MTH Management Agreement

On July 22, 1992, MTH entered into the MTH Management Agreement for a term ending in July 1997, under which MTH provides certain financial consulting and business management services to the Debtor, Capital and Holdings, for which MTH receives an annual fee of $900,000. In connection with the corporate reorganization and overhead reduction program announced on July 26, 1994, MTH agreed to reduce the annual fee to $750,000. During the period from July 1989 through July 1992, MTH received an annual fee of $600,000 for its services performed. On the Effective Date, the MTH Management Agreement will be terminated and Reorganized Grand Union will execute the MTH Settlement Agreement. See "THE PLAN—Directors of Reorganized Grand Union." A copy of the MTH Settlement Agreement is annexed as Exhibit "B" to the Plan.

### 2. P&C Foods

As described above (see "CERTAIN INFORMATION CONCERNING THE DEBTOR—Regulatory and Legal Matters"), in order to satisfy certain obligations under agreements entered into with federal and state antitrust authorities in connection with the acquisition of the Debtor by Holdings in July 1989, thirteen P&C Foods stores were divested by Penn Traffic and certain of the Debtor's stores were divested by the Debtor in July 1990. In a related transaction, on July 30, 1990, the Debtor entered into an Operating Agreement with P&C Foods pursuant to which it acquired the right to operate P&C Foods' thirteen remaining stores in New England under the Grand Union name until July 2000, with an option to extend the term of such operation for an additional five years. P&C Foods also granted the Debtor an option to purchase such stores. In connection with these transactions, the Debtor agreed to pay P&C Foods a minimum annual fee averaging $10.7 million per year (since reduced to its present level of approximately $8 million per year) during the ten-year lease term plus, beginning with the year commencing July 31, 1992, additional contingent fees of up to $700,000 per year based upon sales performance of the stores operated by the Debtor. In addition, the Debtor paid P&C Foods $7.5 million for the option to purchase the stores. Pursuant to the terms of the Operating Agreement, a $15 million prepayment of the annual fee was made to P&C Foods in connection with the July 1992 recapitalization of the Debtor.

Pursuant to the terms of the Operating Agreement, in April 1992, the Debtor purchased P&C Foods' White River Junction, Vermont warehouse for cash consideration of approximately $5 million.

The Debtor also maintains additional arrangements with Penn Traffic, which either party has the right to terminate at any time. Such arrangements include (i) the coordinated purchasing of certain products for resale and packaging supplies; (ii) the Debtor's purchase of frozen dough from Penn Traffic's Penny Curtis Bakery; and (iii) occasionally, the Debtor's sale of certain products from its commissary to Penn Traffic.

### 3. Montgomery Warehouse

During its fiscal year ended April 2, 1994, the Debtor entered into a program to consolidate the purchasing and distribution of health and beauty care products and general merchandise with Penn Traffic. The agreement is terminable on six months' notice, by either party, after July 1, 1995. Under this program, the Debtor purchases health and beauty care ("HBC") products for both itself and certain divisions of Penn Traffic, and Penn Traffic purchases general merchandise ("GM") products for both itself and the Debtor. The Debtor's general merchandise warehouse in Montgomery, New York is used to store and distribute HBC and GM products to the Debtor's stores and to certain of Penn Traffic's stores and wholesale customers. Under the arrangement, Penn Traffic owns the inventory of GM and HBC products located at the Montgomery warehouse and shares the cost of operating the warehouse in an amount proportionate to Penn Traffic's usage of the facility. In connection with this agreement, in September 1993, Penn Traffic purchased all of the HBC and GM inventories previously owned by the Debtor for approximately $12.8 million. During its fiscal year ended April 2, 1994, the Debtor purchased from vendors approximately $75.3 million of HBC products under the agreement which amounts were reimbursed to the Debtor by Penn Traffic. Additionally, the Debtor purchased approximately $48.2 million from Penn Traffic's inventory of HBC and GM products at cost. At January 7, 1995, the Debtor had recorded a net receivable of approximately $2.9 million related to this agreement. See "CERTAIN INFORMATION CONCERNING THE DEBTOR—Distribution, Supply and Management Information Systems—Montgomery, New York Distribution Agreement."

### 4. Other

Mr. Hirsch, who is Chairman and a director of the Debtor, Chairman and a director of Capital and Chairman and a director of Holdings, is Chairman and a director of Penn Traffic. Mr. Fox, who is a director, Vice President and Assistant Secretary of the Debtor, a director, Vice President, Secretary and Treasurer of Capital, and a director, Vice President, Secretary and Treasurer of Holdings, is Vice Chairman—Finance and a director of Penn Traffic. Messrs. Hirsch and Fox do not receive salaries from Penn Traffic and do not participate in cash bonus plans of Penn Traffic, and receive no compensation in their capacities as executive officers of the Debtor, Capital or Holdings. Messrs. Hirsch and Fox receive compensation solely from MTH. Penn Traffic has engaged MTH as a financial advisor and investment banker. As described above, MTH has entered into the MTH Management Agreement, which will be terminated on the Effective Date, pursuant to which MTH has received fees for services provided to the Debtor. Mr. McCaig is a member of the Board of Directors of Penn Traffic. Mr. Incaudo, a director of Holdings, is a director, of Penn Traffic and was President and Chief Executive Officer of Penn Traffic until his retirement in January 1995.

## XVI. EXEMPTIONS FROM SECURITIES ACT REGISTRATION

The New Common Stock, the New Senior Notes and the Warrants to be issued on the Effective Date will be issued pursuant to the exemption from the registration requirements of the Securities Act (and of equivalent state securities or "blue sky" laws) provided by section 1145(a)(1) of the Bankruptcy Code. Generally, section 1145(a)(1) of the Bankruptcy Code exempts from the registration requirements of the Securities Act and equivalent state securities and "blue sky" laws the issuance of securities directly or through a warrant to purchase such securities if the following conditions are satisfied: (a) the securities are issued by a debtor (or its successor) under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or a claim for an administrative expense against, the debtor, and (c) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" for cash or property. Section 1145(a)(2) of the Bankruptcy Code also exempts from such registration requirements offers of securities through warrants and similar rights distributed pursuant to the exemption set forth in section 1145(a)(1). The Debtor believes that the issuance of the New Common Stock, the New Senior Notes and the Warrants will satisfy the aforementioned requirements.

The New Common Stock, the New Senior Notes and the Warrants may be resold by the holders thereof without registration unless, as more fully described below, any such holder is deemed to be an "underwriter"

with respect to such securities, as defined in section 1145(b)(1) of the Bankruptcy Code. Generally, section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who (a) purchases a claim against, or interest in, a bankruptcy case, with a view towards the distribution of any security to be received in exchange for such claim or interest, (b) offers to sell securities issued under a bankruptcy plan on behalf of the holders of such securities, (c) offers to buy securities issued under a bankruptcy plan from persons receiving such securities, if the offer to buy is made with a view towards distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan or with the offer of sale of securities under the plan, or (d) is an issuer as contemplated by section 2(11) of the Securities Act. Although the definition of the term "issuer" appears in section 2(4) of the Securities Act, the reference (contained in section 1145(b)(1)(D) of the Bankruptcy Code) to section 2(11) of the Securities Act purports to include as "underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities by contract, or otherwise.

The New Senior Note Indenture will be governed by the Trust Indenture Act of 1939.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING, AND DOES NOT HEREBY PROVIDE ANY OPINION OR ADVICE WITH RESPECT TO, THE SECURITIES LAW AND BANKRUPTCY LAW MATTERS DESCRIBED ABOVE. IN LIGHT OF THE COMPLEX AND SUBJECTIVE INTERPRETIVE NATURE OF WHETHER A PARTICULAR RECIPIENT OF NEW COMMON STOCK, NEW SENIOR NOTES OR WARRANTS MAY BE DEEMED TO BE AN "UNDERWRITER" WITHIN THE MEANING OF SECTION 1145(b)(1) OF THE BANKRUPTCY CODE UNDER APPLICABLE FEDERAL AND STATE SECURITIES LAWS AND, CONSEQUENTLY, THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND EQUIVALENT STATE SECURITIES AND "BLUE SKY" LAWS, THE DEBTOR ENCOURAGES EACH CREDITOR TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISOR(S) WITH RESPECT TO SUCH (AND ANY RELATED) MATTERS.

## XVII. ABSENCE OF PUBLIC TRADING MARKET; AVAILABLE INFORMATION; FILINGS WITH THE COMMISSION AND RELATED MATTERS

The Debtor's 11¼% Senior Notes and 12¼% Senior Subordinated Notes were issued in a registered public offering pursuant to the Securities Act and are publicly-traded. The remainder of the Debtor's other securities (the 11¾% Senior Notes, the 13% Senior Subordinated Notes and the 12¼% Senior Subordinated Notes, Series A) were privately placed pursuant to section 144 of the Securities Act. Certain of these other securities were subsequently registered.

The Debtor currently complies with the informational and periodic reporting requirements of the Securities Exchange Act of 1934, as amended, and, in accordance therewith, files periodic reports and other documents and information with the Commission. Such reports, documents and information may be inspected and copied at the public reference facilities maintained by the Commission at Room 1024 Judiciary Plaza, 450 Fifth Street, N.W., Washington, D.C. 20549, and at its regional offices at Northwestern Atrium Center, 500 West Madison Street, Suite 1400, Chicago, Illinois 60661 and at 75 Park Place, 14th Floor, New York, New York 10007.

No established trading market exists for the New Common Stock, the New Senior Notes or the Warrants. As provided in the Plan, Reorganized Grand Union will use its reasonable best efforts to cause the New Senior Notes, the New Common Stock and the Warrants to be listed on one or more stock exchanges or quoted on the National Market System on or before the date which is one hundred twenty (120) days after the Effective Date. Moreover, the Warrant Agreement provides that, if the New Common Stock is so listed or quoted, the Debtor shall use its best efforts to have the Warrants listed on such stock exchange(s) or quoted on the National Market System, as applicable. There can be no assurance, however, that the New Senior Notes, the New Common Stock or Warrants will be listed on any stock exchange or quoted on the National Market System. Moreover, no assurance can be given that a trading market for such securities will develop following the effectiveness of the Plan or, if a trading market for the New Common Stock, the Warrants or the New Senior Notes develops, no assurance can be given as to the liquidity of such a trading market. The Debtor anticipates that Reorganized Grand Union will comply with public reporting obligations.

## XVIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain federal income tax consequences of the Plan to holders of Senior Notes, Senior Subordinated Notes, Credit Agreement Claims and Zero Notes based upon the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury regulations (including temporary and proposed regulations) promulgated thereunder (the "Regulations"), judicial authorities and current administrative rulings and practice. The tax consequences of certain aspects of the Plan are uncertain because of the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below. The Debtor has not requested a ruling from the Internal Revenue Service ("IRS") with respect to these matters, and no opinion of counsel has been sought or obtained by the Debtor with respect thereto. The following discussion does not address state, local or foreign tax considerations that may be applicable to creditors. **ACCORDINGLY, ALL CREDITORS OF THE DEBTOR ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN TO THEM AND TO REORGANIZED GRAND UNION. THE DEBTOR IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR, NOR IS THE DEBTOR RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.**

### A. Tax Consequences to Creditors

The federal income tax consequences to creditors arising from the Plan may vary depending upon, among other things, whether the Senior Notes, the Senior Subordinated Notes, the New Senior Notes or the Credit Agreement Claims constitute "securities" for federal income tax purposes. The determination of whether such debt instruments constitute "securities" depends upon an evaluation of the nature of the debt instruments. Important factors to be considered include, among other things, the length of time to maturity, the degree of continuing interest in the issuer, the similarity of the debt instrument to a cash payment, and the purpose of the borrowing. Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities, and corporate debt instruments with maturities when issued of ten years or more are considered securities. Although the treatment of the Senior Notes and Senior Subordinated Notes as "securities" is not entirely certain because their stated terms are less than ten years, the Debtor believes and intends to take the position that the Senior Notes, the Senior Subordinated Notes and the New Senior Notes should be treated as "securities" for federal income tax purposes. The Debtor further believes and intends to take the position that the Credit Agreement Claims should not be treated as "securities" for federal income tax purposes.

*1. Holders of Senior Note Claims and Senior Subordinated Note Claims.* Provided the Senior Notes, Senior Subordinated Notes and New Senior Notes constitute "securities" for federal income tax purposes (as

75

discussed above), the exchange of Senior Notes and Senior Subordinated Notes for, respectively, the New Senior Notes and the New Common Stock should constitute a "recapitalization" for federal income tax purposes. Accordingly, except as discussed below with respect to accrued market discount (see "CERTAIN FEDERAL INCOME TAX CONSEQUENCES—Tax Consequences to Creditors—Market Discount, Treatment of Receipt of New Common Stock or New Senior Notes") and Claims for accrued interest, holders of Senior Notes and Senior Subordinated Notes should not recognize any gain or loss on the exchange. In such case, a holder's tax basis in the New Common Stock or New Senior Notes (other than the New Common Stock or New Senior Notes received for accrued interest) should be equal to its tax basis in the Senior Notes or Senior Subordinated Notes, as the case may be, exchanged therefor (exclusive of any basis attributable to accrued interest), and such Creditor's holding period for the New Common Stock or New Senior Notes (other than the New Common Stock or New Senior Notes received for accrued interest) will include the holding period of the Senior Notes or the Senior Subordinated Notes, provided that the Senior Notes or the Senior Subordinated Notes are held as capital assets on the Effective Date.

If any of the Senior Notes, the Senior Subordinated Notes or the New Senior Notes were not treated as "securities," the exchange of Senior Notes for New Senior Notes, or the exchange of Senior Subordinated Notes for New Common Stock, as the case may be, would be treated as a taxable exchange. In such case, a holder of Senior Notes or Senior Subordinated Notes would generally recognize taxable gain or loss on the exchange equal to the difference between the issue price of the New Senior Notes or the fair market value of the New Common Stock, as the case may be, over such holder's basis in the exchanged debt instruments (exclusive of any basis attributable to accrued interest). A holder's tax basis in New Senior Notes so received would generally be equal to the issue price of such New Senior Notes and a holder's tax basis in New Common Stock so received would generally be equal to the fair market value of such New Common Stock. The holding period for any New Senior Notes or New Common Stock will begin on the day after the Effective Date.

As noted below (see "CERTAIN FEDERAL INCOME TAX CONSEQUENCES—Tax Consequences to Creditors—Allocation of Consideration Received"), under the Plan, some New Common Stock and New Senior Notes may be distributed to holders of Senior Notes or Senior Subordinated Notes with respect to their Claims for accrued interest. Holders of such Claims for accrued interest which have not previously included such accrued interest in taxable income will be required to recognize ordinary income equal to the fair market value of the New Common Stock or the issue price of the New Senior Notes, as the case may be, received with respect to such Claims for accrued interest. Holders of such Claims for accrued interest which have included such accrued interest in taxable income generally may take an ordinary deduction to the extent that such Claim is not fully satisfied under the Plan (after allocating the distribution between principal and accrued interest as described below), even if the underlying Claim is held as a capital asset. The tax basis of the New Common Stock or New Senior Notes received in exchange for such Claims for accrued interest will be the fair market value of the New Common Stock on the Effective Date or the issue price of the New Senior Notes, as the case may be, and the holding period for the New Common Stock or New Senior Notes received in exchange for such Claims will begin on the day after the Effective Date.

*2. Original Issue Discount.* Under the IRC, a holder of a debt instrument which has original issue discount ("OID") must include a portion of the OID in gross income in each taxable year or portion thereof in which the holder holds the debt instrument even if the holder has not received a cash payment in respect of such OID. The IRC defines OID as the difference between the issue price and the stated redemption price at maturity of a debt instrument (assuming the difference exceeds a *de minimis* amount). The stated redemption price at maturity is generally the total of all payments due the holder of the instrument, other than certain interest payments based on a fixed rate and payable unconditionally at fixed periodic intervals of one year or less during the entire term of the instrument. The issue price of a debt instrument issued for property (such as an outstanding debt instrument) depends on the circumstances surrounding its issuance. The issue price of a debt instrument that is publicly-traded is generally the fair market value of the debt instrument when issued. The fair market value is generally determined from the price at which such debt instrument trades on the first day on which it trades after issuance. If the new debt instrument is not publicly-

traded and is issued for property (such as an outstanding debt instrument) that is publicly-traded, then the issue price is generally determined from the price at which such property trades on the issue date. Under the IRC as interpreted by Treasury Regulations, a holder acquiring a debt instrument in a reorganization exchange may exclude all of the OID on such debt instrument from such holder's taxable income if it is acquired at a "premium" (that is, if the adjusted tax basis in the acquired debt instrument exceeds the sum of all payments due on the instrument after the acquisition date less certain stated interest) and may exclude a part of the OID on such debt instrument from such holder's taxable income if it is acquired at an "acquisition premium" (that is, if the adjusted tax basis in the acquired debt instrument exceeds its adjusted issue price). It is not possible at present to determine the issue price of the New Senior Notes and whether the New Senior Notes will be issued with OID, due to the uncertainty of the trading price.

Section 1275(c) of the IRC and the relevant Treasury Regulations require information to be set forth on the face of certain debt instruments issued with OID that are not publicly-offered (within the meaning of the applicable Treasury Regulations), including the amount of OID and the issue date of the instrument. If the instrument is publicly-offered, the issuer must instead furnish certain information to the Secretary of the Treasury. The Debtor or Reorganized Grand Union or their agents will appropriately legend the New Senior Notes or furnish such information if they are issued with OID in accordance with the IRC and the relevant Treasury Regulations.

If the New Senior Notes are issued with OID, a portion of Reorganized Grand Union's interest deduction with respect to the OID of the New Senior Notes may be deferred until paid and the remainder disallowed if the New Senior Notes are considered "applicable high yield discount obligations." The disallowed portion of the OID may qualify for the dividends received deduction for a corporate holder of New Senior Notes. An applicable high yield discount obligation must meet three requirements: (i) maturity of greater than five years; (ii) a yield to maturity greater than or equal to a specified rate (five percentage points plus the applicable federal rate for the calendar month in which the obligation is issued); and (iii) significant OID within the meaning of Section 163(i)(2) of the IRC. Because it is not possible at present to determine the OID, if any, on the New Senior Notes or the yield to maturity when the New Senior Notes are issued, it cannot be determined whether the high yield discount obligation rules will apply.

*3. Market Discount.* The market discount provisions of the IRC may apply to holders of certain Claims. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having OID, the revised issue price) exceeds the tax basis of the bond in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory *de minimis* amount. Gain recognized by a creditor with respect to a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the creditor's period of ownership, unless the creditor elected to include accrued market discount in taxable income currently. A holder of a market discount bond that was required under the market discount rules of the IRC to defer deduction of all or a portion of interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on disposition of such bond; however, continued deferral of the deduction for all or a portion of the interest on indebtedness incurred or maintained to acquire or carry a Claim that is a market discount bond may be required. Any such deferred interest expense would be attributed to the New Common Stock or New Senior Notes received in exchange for the Claim, and would be treated as interest paid or accrued in the year in which the New Common Stock or New Senior Notes are disposed of.

*4. Market Discount, Treatment of Receipt of New Common Stock or New Senior Notes.* Under the market discount rules, any accrued but unrecognized market discount with respect to Senior Notes or Senior Subordinated Notes would not (subject to the discussion below) be recognized upon the exchange of such debt instruments for New Senior Notes or New Common Stock, as the case may be. In the case of accrued

but unrecognized market discount with respect to the Senior Notes, such market discount would generally be treated as market discount with respect to the New Senior Notes. In the case of accrued but unrecognized market discount with respect to the Senior Subordinated Notes, such market discount would generally be treated as ordinary income to the extent of gain recognized upon the subsequent disposition of New Common Stock. The treatment of accrued market discount in nonrecognition transactions is, however, subject to the issuance of Treasury Regulations that have not yet been promulgated. In the absence of such regulations, the application of the market discount rules in the present transaction is uncertain.

In addition, because the exchange of New Common Stock for Senior Subordinated Notes would qualify as an exchange under Section 351 of the IRC as well as a recapitalization, it is possible that Treasury Regulations authorized but not yet promulgated will provide that holders of Senior Subordinated Notes will be required to recognize accrued but unrecognized market discount upon such exchange to the extent of gain realized.

It may be noted generally that the Treasury Department is authorized to issue regulations that may affect or change the rules discussed above. Creditors should consult their tax advisors regarding the application of the market discount rules to them.

*5. Holders of Credit Agreement Claims.* Under the Plan, holders of Allowed Credit Agreement Claims will, at the Debtor's discretion, be entitled to receive certain consideration described above. See "THE PLAN —Classification and Treatment of Claims and Interests Under the Plan—Credit Agreement Claims." In the event the Debtor exercises its option to execute the Post-Confirmation Credit Documents, such execution may (subject to the discussion below) constitute a taxable exchange of such Allowed Credit Agreement Claims. In addition, in the event the Debtor exercises its option to terminate the Existing Credit Agreement, such termination will constitute a taxable exchange of such Allowed Credit Agreement Claims. In the case of a taxable exchange, holders of Allowed Credit Agreement Claims will (subject to the accrued interest and market discount rules discussed above) generally recognize taxable gain or loss equal to the difference between the fair market value of the consideration received over such holders' basis in the Allowed Credit Agreement Claims.

As noted above, the execution of the Post-Confirmation Credit Documents pursuant to the Debtor's option under the Plan may, depending on the terms of the Post-Confirmation Credit Documents, be treated as an exchange under Section 1001 of the IRC of the Existing Credit Agreement for a modified debt instrument (*i.e.*, the Post-Confirmation Credit Documents) that differs materially either in kind or in extent. In such case, such execution would give rise to a taxable exchange with respect to the Allowed Credit Agreement Claims. Because of the uncertainty relating to the terms of the Post-Confirmation Credit Documents, the Debtor is currently unable to determine whether such execution would give rise to a taxable exchange. In addition, the federal income tax consequences to holders of Allowed Credit Agreement Claims is uncertain due to the potential application of Treasury regulations applicable to modifications of debt instruments currently promulgated in proposed form. Holders of Allowed Credit Agreement Claims are urged to consult their tax advisors regarding the application of the above rules.

*6. Allocation of Consideration Received.* Reorganized Grand Union intends to take the position that consideration distributed to Creditors will be allocated first in satisfaction of such Creditors' Claims for principal to the extent thereof and thereafter, to the extent of any excess, for accrued interest. Certain legislative history indicates that an allocation provided in a bankruptcy plan may be binding for federal income tax purposes. However, the IRS may take the position that consideration distributed to Creditors should be allocated (i) to Claims for principal and Claims for accrued interest in proportion to the relative amounts thereof, or (ii) first in satisfaction of such Creditors Claims for accrued interest to the extent thereof and thereafter, to the extent of any excess, to the principal amount of Claims held by such Creditors. Creditors should consult their own tax advisors as to the proper allocation of consideration between principal and interest.

*7. Distribution of Warrants to Holders of Zero Notes.* Pursuant to the Plan, the Debtor will issue the Series 1 Warrants and Series 2 Warrants to the holders of the Zero Notes. For federal income tax purposes, the Debtor intends to take the position that the Warrants were issued to the holders of the Zero Notes in exchange for the release of such holders' asserted Claims against the Debtor, and, accordingly, the holders of the Zero Notes should realize ordinary income in an amount equal to the fair market value of the Warrants on the date such Warrants are issued. On that basis, the distribution of the Warrants to the holders of the Zero Notes should not effect the tax basis of such holders in the Zero Notes.

*8. Backup Withholding and Information Reporting.* A noncorporate holder of Senior Notes, Senior Subordinated Notes, New Senior Notes or New Common Stock may be subject to backup withholding at the rate of 31% with respect to "reportable payments," which include dividends or interest paid on or the proceeds of a sale, exchange or redemption of such securities. The payor will generally be required to deduct and withhold the prescribed amounts if (a) the payee fails to furnish a taxpayer identification number to the payor in the manner required, (b) the IRS notifies the payor that the taxpayer identification number furnished by the payee is incorrect, or (c) there has been a failure of the payee to certify under penalty of perjury that the payee is not subject to withholding under Section 3406(a)(1)(D) of the IRC. In general, if any one of these events occurs, the Debtor would be required to withhold an amount equal to 31% from any dividend payment made with respect to New Common Stock, or any payment of interest or principal pursuant to the terms of the Senior Notes, the Senior Subordinated Notes or the New Senior Notes. In such case, Reorganized Grand Union may not be required pursuant to the Plan to make any distribution to any Entity. See "THE PLAN—Distributions Under the Plan—Compliance with Tax Requirements." Amounts paid as backup withholding do not constitute an additional tax and will be credited against the holder's federal income tax liabilities, so long as the required information is provided to the IRS. The Debtor will report to the holders of Senior Notes, Senior Subordinated Notes, New Senior Notes or New Common Stock and to the IRS the amount of any "reportable payments" for each calendar year on the appropriate IRS Form 1099.

For holders of the Senior Notes, Reorganized Grand Union does not intend to report the payment of any interest by reason of the exchange of the New Senior Notes for Senior Notes unless the issue price of the New Senior Notes (see "CERTAIN FEDERAL INCOME TAX CONSEQUENCES—Tax Consequences to Creditors—Original Issue Discount") exceeds the principal amount of the Senior Notes exchanged therefore, in which case Reorganized Grand Union will report the amount of such excess attributable to accrued interests to holders and the IRS as interest on IRS Form 1099-INT.

## B. Tax Consequences to Reorganized Grand Union

### 1. Cancellation of Indebtedness

Under general tax principles, Reorganized Grand Union would realize cancellation of debt ("COD") income to the extent that a Creditor receives from Reorganized Grand Union pursuant to the Plan an amount of consideration in respect of a Claim against the Debtor that is worth less than the amount of such Claim. For this purpose, the amount of consideration received by a Creditor would equal the fair market value of the New Common Stock or the issue price of the New Senior Notes, as the case may be, received by such Creditor. Because the Debtor will be in a bankruptcy case at the time the COD income is realized, it will not be required to include COD income in gross income, but rather will be required to reduce its net operating loss carryovers ("NOLs") by the amount so excluded (and, if such amount exceeds the amount of NOLs, certain other tax attributes). As noted above, it is possible that the New Senior Notes will be issued with OID. In that case, Reorganized Grand Union would realize an amount of COD income equal to the excess of the stated principal amounts of the Senior Notes over the issue price of the New Senior Notes. The Debtor believes that all or substantially all of its NOLs will be eliminated as a consequence of the recognition of COD income.

### 2. Limitation on Net Operating Losses.

The Debtor believes that the transactions contemplated by the Plan will cause an ownership change under section 382 of the IRC. While the Debtor believes that all or

substantially all of its NOLs will be eliminated as a consequence of the recognition of COD income, such ownership changes could have a significant adverse effect on the Debtor's utilization of any remaining NOLs as well as certain built-in losses. Moreover, events outside the control of the Debtor may cause or have caused an ownership change under Section 382 of the IRC to occur prior to the consummation of the Plan.

3. *Liability of Reorganized Grand Union for Prior Federal Income Taxes.* Under the Treasury Regulations, corporations which are members of an affiliated group filing consolidated federal income tax returns are severally liable for the federal income tax liability of the affiliated group for each taxable year for which they were a member of such group during all or any part of such taxable year. Since July 1989, the Debtor has been a member of the affiliated group filing federal income tax returns of which Holdings is the common parent (the "Holdings Group"). The consummation of the Plan will result in the Debtor ceasing to be a member of the Holdings Group as of the day following the day that the Plan is consummated. Furthermore, the consummation of the Plan will result in the recognition of certain built-in gains within the Holdings Group. As a result of the substantial net operating losses of Holdings, such gains are not expected to result in any regular income tax liability, but because of limitations on the carryforward of alternative minimum net operating losses, ten percent (10%) of such recognized gains will be subject to the alternative minimum income tax.

As a former member of the Holdings Group, Reorganized Grand Union may be held liable for the income taxes of the Holdings Group for taxable years during which the Debtor was a member of the Holdings Group, including the alternative minimum tax liability of the Holdings Group for the entire taxable year during which the Plan is consummated. In view of the substantial losses of the Holdings Group during years which the Debtor has been a member of the Holdings Group, the Debtor believes that the income tax liability (including the alternative minimum tax liability) of the Holdings Group for which the Debtor may be severally liable would be less than $1 million.

THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY RESPECTS, UNCERTAIN. THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND, AS SUCH, DOES NOT THE DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR CREDITOR OR HOLDER OF INTERESTS IN THE DEBTOR. ALL CREDITORS AND HOLDERS OF INTERESTS IN THE DEBTOR ARE STRONGLY URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN THAT ARE RELEVANT TO THEIR PARTICULAR CIRCUMSTANCES.

## XIX. FINANCIAL AND LEGAL ADVISORS; FEES AND EXPENSES

The Debtor has engaged Willkie Farr & Gallagher and Young Conaway Stargatt & Taylor to act as bankruptcy co-counsel, Price Waterhouse LLP, the Debtor's regular outside accountants and consultants, to act as the Debtor's accountants and consultants, and Donovan Leisure Newton & Irvine, the Debtor's regular corporate counsel, to act as special corporate counsel. For their services to the Debtor in connection with the Chapter 11 Case, these professionals will receive customary hourly fees and will be reimbursed for all reasonable out-of-pocket expenses.

The three Informal Committees, with the Debtor's consent and at its expense, engaged the following legal and financial advisors in connection with the Debtor's restructuring: (a) for the committee representing certain holders for Senior Notes, the law firms of Stroock & Stroock & Lavan and Rosenthal, Monhait, Gross & Goddess, P.A. and the investment banking firm of Houlihan Lokey Howard & Zukin; (b) for the committee representing certain holders of Senior Subordinated Notes, the law firm of Ropes and Gray and the investment banking firm of Donaldson, Lufkin & Jenrette; and (c) for the committee representing certain trade creditors, the law firm of Pepper, Hamilton & Scheetz.

The Plan provides that the reasonable fees and expenses incurred on or after the Filing Date (which may, as such fees relate to financial advisors, include a request by such professionals for success fees) by the counsel and financial advisors retained by agreement with the Debtor prior to the Filing Date by the Informal Committees (together with the reasonable fees and expenses of local counsel) with respect to the Chapter 11 Case will be paid (without application by or on behalf of any such professionals to the Bankruptcy Court, and without notice and a hearing, unless specifically requested by the Bankruptcy Court upon request of a party in interest) by Reorganized Grand Union as an Administrative Expense. If Reorganized Grand Union and any professional cannot agree on the amount of fees and expenses to be paid to such professional, the amount of any such fees and expenses will be determined by the Bankruptcy Court.

The reasonable fees and expenses of the legal and financial advisors to the Informal Committees incurred prior to the Filing Date will be treated as General Unsecured Claims.

In addition, the fees and expenses of the professionals retained by the Official Committee (and any other committee appointed in this case) will be payable as Administrative Expenses, subject to application of and approval by the Bankruptcy Court, on notice and a hearing, on the later of the Effective Date or the date such fees and expenses are approved by the Bankruptcy Court.

The reasonable fees and expenses incurred on or after the Filing Date by the Capital Committee Advisors or the Informal Zero Committee Advisors with respect to this Chapter 11 Case or the GUCC Chapter 11 Case will be paid by Reorganized Grand Union after notice and a hearing in accordance with the procedures established by the Bankruptcy Court for professionals employed by the Debtor or the Official Committee; provided, however, that the aggregate maximum amount of fees and expenses for the Capital Committee Advisors and the Informal Zero Committee Advisors that shall be payable in this Chapter 11 Case shall not exceed $750,000 (plus the amount of any prepetition retainer). Applications for such compensation and reimbursement of expenses by such professionals must be filed no later than forty-five (45) days after the Effective Date.

Finally, the reasonable fees and expenses incurred on or after the Filing Date through the Effective Date by the GUHC and GUCC Legal Advisors with respect to this Chapter 11 Case, the GUCC Chapter 11 Case or the GUHC Chapter 11 Case will be paid (after application of any retainer held by any such professional) by Reorganized Grand Union after notice and a hearing in accordance with the procedures established by the Bankruptcy Court for professionals employed by the Debtor or the Official Committee. Applications for compensation and reimbursement of expenses by such professionals must be filed no later than forty-five (45) days after the Effective Date. On and after the Effective Date, Reorganized Grand Union will pay the reasonable fees and expenses of the GUHC and GUCC Legal Advisors incurred with respect to the dissolution of GUCC and GUHC. Notwithstanding anything in the Plan to the contrary, the aggregate amount of fees and expenses payable to the GUHC and GUCC Legal Advisors pursuant to Section 2.04 of the Plan will not exceed, in the aggregate, $150,000, in addition to the amount of any retainers paid to such professionals.

The Debtor estimates that the aggregate amount of all such administrative fees and expenses will be approximately $7.5 million.

## XX. CONCLUSION

The Debtor believes that confirmation of the Plan is desirable and in the best interests of all holders of Claims and Interests. The Debtor therefore urges you to vote to accept the Plan.

Dated:  Wilmington, Delaware
        April 19, 1995

THE GRAND UNION COMPANY

By: /s/  FRANCIS E. NICASTRO
    Francis E. Nicastro
    An Officer

WILLKIE FARR & GALLAGHER
Co-Counsel for the Debtor
  and Debtor-in-Possession

One Citicorp Center
153 East 53rd Street
New York, New York 10022
Phone: (212) 821-8000

YOUNG, CONAWAY, STARGATT & TAYLOR
Co-Counsel for The Grand Union
  Debtor and Debtor-in-Possession

P.O. Box 391
11th Floor, Rodney Square North
Wilmington, Delaware 19899
Phone: (302) 571-6600

DONOVAN LEISURE NEWTON & IRVINE
Special Corporate Counsel for the
  Debtor and Debtor-in-Possession

30 Rockefeller Plaza
New York, New York 10112
Phone: (212) 632-3000

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

THE GRAND UNION COMPANY,
d/b/a Big Star,

Debtor.

SECOND AMENDED CHAPTER 11 PLAN
OF THE GRAND UNION COMPANY

# Appendix A

April 19, 1995

WILLKIE FARR & GALLAGHER
Attorneys for the Debtor
and Debtor-in-Possession
One Citicorp Center
153 East 53rd Street
New York, NY 10022-4677
(212)

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

THE GRAND UNION COMPANY,
also d/b/a Big Star,

                                        Debtor.

Chapter 11

Case No. 95-84 (PJW)

---

# SECOND AMENDED CHAPTER 11 PLAN
## OF THE GRAND UNION COMPANY

---

April 19, 1995

WILLKIE FARR & GALLAGHER
Co-Counsel for the Debtor
and Debtor-in-Possession
One Citicorp Center
153 East 53rd Street
New York, NY 10022-4677
Attn: Myron Trepper
      Barry N. Seidel
      (212) 821-8000

YOUNG, CONAWAY, STARGATT & TAYLOR
Co-Counsel for the Debtor
and Debtor-in-Possession
11th Floor
Rodney Square North
P.O. Box 391
Wilmington, DE 19899-0391
Attn: James L. Patton, Jr.
      Laura Davis Jones
      (302) 571-6600

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **ARTICLE 1** | **RULES OF INTERPRETATION AND DEFINITIONS** | 1 |
| | 1.01. Rules of Interpretation | 1 |
| | 1.02. Definitions | 1 |
| **ARTICLE 2** | **PROVISIONS FOR TREATMENT OF ADMINISTRATIVE EXPENSES** | 9 |
| | 2.01. Administrative Expenses | 9 |
| | 2.02. Compensation to Legal Counsel and Financial Advisors to the Informal Committees/Indenture Trustees | 9 |
| | 2.03. Compensation to the Capital Committee Advisors and the Informal Zero Committee Advisors | 9 |
| | 2.04. Compensation to GUHC and GUCC Legal Advisors | 9 |
| **ARTICLE 3** | **PROVISIONS FOR TREATMENT OF PRIORITY TAX CLAIMS** | 10 |
| | 3.01. Priority Tax Claims | 10 |
| **ARTICLE 4** | **CLASSIFICATION OF CLAIMS AND INTERESTS** | 10 |
| | 4.01. Secured Claims | 10 |
| | 4.02. Priority Claims | 10 |
| | 4.03. Unsecured Claims | 10 |
| | 4.04. Interests | 11 |
| **ARTICLE 5** | **IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS IMPAIRED AND NOT IMPAIRED BY THIS PLAN** | 11 |
| | 5.01. Classes of Claims Impaired by this Plan and Entitled to Vote | 11 |
| | 5.02. Classes Receiving No Property Deemed to Reject this Plan | 11 |
| | 5.03. Unimpaired Classes Conclusively Presumed to Accept this Plan | 11 |
| **ARTICLE 6** | **PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS** | 11 |
| | 6.01. Credit Agreement Claims (Class 1) | 11 |
| | 6.02. Interest Rate Protection Agreement Claims (Class 2) | 12 |
| | 6.03. Miscellaneous Secured Claims (Class 3) | 12 |
| | 6.04. Senior Note Claims (Class 4) | 13 |
| | 6.05. Priority Claims (Class 5) | 13 |
| | 6.06. Trade Claims (Class 6) | 13 |
| | 6.07. General Unsecured Claims (Class 7) | 14 |
| | 6.08. Senior Subordinated Claims (Class 8) | 14 |
| | 6.09. Senior Zero Note Claims (Class 9) | 14 |
| | 6.10. Junior Zero Note Claims (Class 10) | 15 |
| | 6.11. Subordinated Claims (Class 11) | 15 |
| | 6.12. Interests (Class 12) | 15 |
| **ARTICLE 7** | **ALLOWANCE OF CLAIMS** | 15 |
| | 7.01. Credit Agreement Claims | 15 |
| | 7.02. 11¼% Senior Note Claims | 15 |
| | 7.03. 11⅜% Senior Note Claims | 16 |
| | 7.04. 13% Senior Subordinated Note Claims | 16 |
| | 7.05. 12¼% Senior Subordinated Note A Claims | 16 |
| | 7.06. 12¼% Senior Subordinated Note Claims | 16 |
| | 7.07. Unimpaired Trade Claims | 16 |
| | 7.08. Interest Rate Protection Claims | 16 |

|  |  |  | Page |
|---|---|---|---|
| 7.09. | Senior Zero Note Claims | | 16 |
| 7.10. | Junior Zero Note Claims | | 16 |
| **ARTICLE 8** | **ACCEPTANCE OR REJECTION OF THIS PLAN; EFFECT OF REJECTION BY ONE OR MORE IMPAIRED CLASSES OF CLAIMS OR INTERESTS** | | 17 |
| 8.01. | Each Impaired Class of Claims Entitled to Vote | | 17 |
| 8.02. | Acceptance by an Impaired Class of Creditors | | 17 |
| 8.03. | Presumed Acceptances by Unimpaired Classes | | 17 |
| 8.04. | Deemed Rejection by Class 11 and Class 12 | | 17 |
| 8.05. | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | | 17 |
| **ARTICLE 9** | **UNEXPIRED LEASES AND EXECUTORY CONTRACTS** | | 17 |
| 9.01. | Assumption and Rejection of Unexpired Leases and Executory Contracts | | 17 |
| **ARTICLE 10** | **OPERATION AND MANAGEMENT OF REORGANIZED GRAND UNION** | | 18 |
| 10.01. | Resignation of Board of Directors | | 18 |
| 10.02. | Board of Directors | | 18 |
| 10.03. | Termination of MTH Agreement | | 18 |
| 10.04. | Listing of New Senior Notes, New Common Stock and Warrants | | 18 |
| **ARTICLE 11** | **IMPLEMENTATION OF THIS PLAN** | | 18 |
| 11.01. | Vesting of Property | | 18 |
| 11.02. | Surrender and Cancellation of Securities, Notes or Other Instruments; Discharge of Indenture Obligations | | 18 |
| 11.03. | The Debtor's Causes of Action | | 19 |
| 11.04. | Restated Certificate of Incorporation; Restated Bylaws | | 19 |
| 11.05. | Registration Rights | | 19 |
| 11.06. | Filing of Credit Documents/Indenture/Registration Rights Agreements | | 20 |
| **ARTICLE 12** | **PROVISIONS COVERING DISTRIBUTIONS** | | 20 |
| 12.01. | Time of Distributions Under this Plan | | 20 |
| 12.02. | Fractional Securities | | 20 |
| 12.03. | Compliance With Tax Requirements | | 21 |
| 12.04. | Persons Deemed Holders of Registered Securities | | 21 |
| 12.05. | Allocation Between Principal and Accrued Interest | | 22 |
| 12.06. | Distribution of Unclaimed Property | | 22 |
| 12.07. | Indenture Trustee Reserves | | 22 |
| **ARTICLE 13** | **RESOLUTION OF DISPUTED CLAIMS** | | 23 |
| 13.01. | Objections to Claims | | 23 |
| 13.02. | Procedure | | 23 |
| 13.03. | Payments and Distributions With Respect to Disputed Claims | | 23 |
| 13.04. | Timing of Payments and Distributions With Respect to Disputed Claims | | 23 |
| **ARTICLE 14** | **DISCHARGE, RELEASES AND SETTLEMENTS OF CLAIMS** | | 23 |
| 14.01. | Discharge of All Claims and Interests and Releases | | 23 |
| 14.02. | Exculpation | | 25 |
| 14.03. | Injunction | | 25 |

| | | Page |
|---|---|---|
| 14.04. | Preservation of Rights | 25 |
| 14.05. | Claims of Subordination | 25 |
| 14.06. | Termination of Indemnification Obligations | 25 |
| 14.07. | Preservation of Insurance | 26 |
| 14.08. | Claims of Holders of Zero Notes and Capital Indenture Trustees | 27 |

**ARTICLE 15  CONFIRMATION AND CONSUMMATION OF THE PLAN** ........... 27

| 15.01. | Conditions to Confirmation | 27 |
| 15.02. | Conditions to the Effective Date | 28 |

**ARTICLE 16  MISCELLANEOUS PROVISIONS** ........... 29

| 16.01. | Bankruptcy Court to Retain Jurisdiction | 29 |
| 16.02. | Binding Effect of this Plan | 29 |
| 16.03. | Nonvoting Stock | 29 |
| 16.04. | Authorization of Corporate Action | 30 |
| 16.05. | Retiree Benefits | 30 |
| 16.06. | Withdrawal of this Plan | 30 |
| 16.07. | Final Order | 30 |
| 16.08. | Method of Notice | 30 |
| 16.09. | Dissolution of any Committee | 30 |
| 16.10. | Continued Confidentiality Obligations | 31 |
| 16.11. | Amendments and Modifications to Plan | 31 |
| 16.12. | Time | 31 |
| 16.13. | Section 1145 Exemption | 31 |
| 16.14. | Section 1146 Exemption | 32 |
| 16.15. | Severability | 32 |
| 16.16. | Conditions to Modification, Withdrawal and Waiver Rights | 32 |
| 16.17. | Setoff Rights Unaffected | 32 |
| 16.18. | Manner of Payment | 32 |

**EXHIBITS:**

| Exhibit A | Commitment Letter and Credit Facility Term Sheet |
| Exhibit B | MTH Settlement Agreement |
| Exhibit C | Restated Bylaws |
| Exhibit D | Restated Certificate of Incorporation |
| Exhibit E | Warrant Agreement |
| Exhibit F | Zero Claims Release |
| Exhibit G | Zero Settlement |

# DEBTOR'S CHAPTER 11 PLAN

THE GRAND UNION COMPANY, the above-captioned Debtor and Debtor-In-Possession, proposes the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

## ARTICLE 1
### RULES OF INTERPRETATION AND DEFINITIONS

1.01. *Rules of Interpretation*. Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter. The words "herein," "hereof," "hereto," "hereunder" and others of similar import, refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. Captions and headings to articles, sections and exhibits are inserted for convenience of reference only and are not intended to be part of or to affect the interpretation of the Plan. The rules of construction set forth in section 102 of the Bankruptcy Code shall apply. In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) and Section 16.12 hereof shall apply; *provided, however*, that in the event of any inconsistency, Bankruptcy Rule 9006(a) shall govern.

1.02. *Definitions*. Unless the context requires otherwise, the following words and phrases shall have the meanings set forth below when used in initially-capitalized form in this Plan:

*Additional Facility*: The amounts by which the Revolving Credit Facility and the Term Facility shall increase as set forth in Section 6.01(a)(i) of this Plan.

*Additional Facility Lenders*: Bankers Trust or Bankers Trust and the syndicate of commercial banks and other financial lenders arranged by Bankers Trust to provide the Additional Facility.

*Administrative Expense*: Collectively, (a) any cost or expense of administration of the Chapter 11 Case allowable under section 503(b) of the Bankruptcy Code, including, without limitation, the fees and expenses of professionals employed by the Debtor, the Official Committee, the Informal Committee(s) and the Indenture Trustees (if and to the extent the fees and expenses of the Indenture Trustees are not General Unsecured Claims or Miscellaneous Secured Claims), to the extent allowed or, as applicable, agreed to by the Debtor and/or Reorganized Grand Union pursuant to Sections 2.02, 2.03 or 2.04 of the Plan, and (b) any fees or charges assessed against the Debtor's estate under title 28, United States Code, section 1930.

*Affiliate(s)*: shall have the meaning set forth in section 101 of the Bankruptcy Code and shall include GUCC and GUHC.

*Allowed*: Subject to Section 7.07 hereof, with respect to Administrative Expenses or Claims, (a) any Administrative Expense or Claim against the Debtor, proof of which is timely filed or by order of the Bankruptcy Court is not or will not be required to be filed, (b) any Claim that has been or is hereafter listed in the Schedules as liquidated in amount and not disputed or contingent, or (c) any Administrative Expense or Claim allowed pursuant to this Plan and, in each such case in (a) and (b) above, as to which either (i) no objection to the allowance thereof has been interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (ii) such an objection is so interposed and the Administrative Expense or Claim shall have been allowed by a Final Order (but only to the extent so allowed).

*Alternative Commitment Letter*: If the Debtor elects the treatment set forth in Section 6.01(a)(ii) hereof with respect to the Credit Agreement Claims, a binding commitment to provide Reorganized Grand Union not less than $204 million in loan facilities (of which not less than $57 million shall be term facilities) on the

Effective Date on terms satisfactory to the Debtor and reasonably satisfactory to the Official Committee and the Informal Committee of Senior Noteholders, which loan facility shall in part be used to pay Credit Agreement Claims in full on the Effective Date, as provided in Section 6.01(a)(ii)(x) herein.

*Alternative Credit Documents*: New credit documents to be executed on the Effective Date by Reorganized Grand Union and which will contain those terms set forth in the Alternative Commitment Letter.

*Ballot*: The form of ballot distributed, together with the Disclosure Statement, to holders of Claims entitled to vote for the purpose of acceptance or rejection of this Plan.

*Bankers Trust*: Bankers Trust Company.

*Bankruptcy Code*: Title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

*Bankruptcy Court*: The United States Bankruptcy Court for the District of Delaware.

*Bankruptcy Rules*: The Federal Rules of Bankruptcy Procedure, as amended, promulgated under section 2075 of title 28 of the United States Code and the Local Rules of the Bankruptcy Court, as applicable from time to time during the Chapter 11 Case.

*Board of Directors*: The board of directors of the Debtor as it exists immediately prior to the Effective Date.

*Business Day*: Any day other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

*Cancelled Security*: A security, note or other instrument evidencing an Impaired Claim or Impaired Interest outstanding immediately prior to the Effective Date.

*Capital Committee*: The Official Committee of Unsecured Creditors of Grand Union Capital Corporation.

*Capital Committee Advisors*: Collectively, The Argosy Group, L.P., Peterson Consulting L.P., Marcus Montgomery Wolfson P.C., and Williams, Hershman & Wisler, P.A., in their capacity as advisors to the Capital Committee.

*Capital Indenture Trustees*: The trustees under the Capital Indentures, in their capacity as such (*i.e.*, First Trust National Association and Marine Midland Bank, and any of their successors and assigns).

*Capital Indentures*: The indentures governing the Zero Notes.

*Causes of Action*: Any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

*Chapter 11 Case*: The case under chapter 11 of the Bankruptcy Code concerning the Debtor which was commenced on the Filing Date.

*Claim*: Any right to (a) payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

secured or unsecured, or (b) an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

*Claims Bar Date*: The date fixed by the Bankruptcy Court as the deadline for filing proofs of claim applicable to Creditors whose Claims are included in Class 3, Class 5, Class 6(b), Class 7 and Class 11 of the Plan.

*Commission*: The Securities and Exchange Commission.

*Commitment Letter*: The agreement with Bankers Trust, dated January 24, 1995, as amended from time to time, pursuant to which Bankers Trust agreed to provide Reorganized Grand Union with no less than an additional $65 million of secured loan facilities (in addition to the facilities currently outstanding under the Existing Credit Agreement), upon those terms and conditions set forth in the Commitment Letter and the Credit Facility Term Sheet. Conformed copies of the Commitment Letter and the Credit Facility Term Sheet are collectively annexed hereto as Exhibit A.

*Committee(s)*: Any committee or committees appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Case, including, without limitation, the Official Committee.

*Confirmation Date*: The date and time on which the Confirmation Order is entered on the docket maintained by the Clerk of the Bankruptcy Court.

*Confirmation Order*: The order entered by the Bankruptcy Court confirming the Plan.

*Credit Agreement Claim*: Any Claim against the Debtor by the Existing Banks pursuant to the Existing Credit Documents.

*Credit Facility Term Sheet*: The term sheet, dated February 2, 1995, as amended from time to time, by and between the Debtor and Bankers Trust, as contemplated in the Commitment Letter. Conformed copies of the Commitment Letter and the Credit Facility Term Sheet are collectively annexed hereto as Exhibit A.

*Creditor*: Any Entity that is the holder of a Claim against the Debtor that arose on or before the Filing Date or a Claim against the Debtor's estate of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code.

*Debtor*: The Grand Union Company.

*Debtor-In-Possession*: The Debtor as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

*Disclosure Statement*: The disclosure statement distributed to holders of Claims entitled to vote for the purpose of acceptance or rejection of this Plan in accordance with section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018.

*Disputed*: With respect to Administrative Expenses or Impaired Claims, any Administrative Expense or Impaired Claim that is not yet Allowed or disallowed.

*Effective Date*: That day that is five (5) Business Days after the conditions to the occurrence of the Effective Date of the Plan set forth in Section 15.02 have been satisfied or waived, or such earlier day after such conditions have been satisfied or waived that is designated by the Debtor.

*11¼% Senior Note Claim*: Any Claim against the Debtor by a holder of an 11¼% Senior Note for principal and interest.

A-3

*11¼% Senior Notes*: Collectively, the 11¼% Senior Notes due 2000, as amended, modified, restated or supplemented from time to time, issued by the Debtor.

*11⅜% Senior Note Claim*: Any Claim against the Debtor by a holder of an 11⅜% Senior Note for principal and interest.

*11⅜% Senior Notes*: Collectively, the 11⅜% Senior Notes due 1999, as amended, modified, restated or supplemented from time to time, issued by the Debtor.

*Entity*: Includes, without limitation, any individual, corporation, limited or general partnership, joint venture, association, joint stock company, estate, entity, trust, trustee, United States trustee, unincorporated organization, government, governmental unit (as defined in the Bankruptcy Code), agency or political subdivision thereof.

*Exchange Act*: The Securities Exchange Act of 1934, as amended.

*Existing Banks*: Collectively, the banks and other financial institutions party to the Existing Credit Agreement, or their successors and assigns, as the case may be, as of the date to which reference to the Existing Banks is made.

*Existing Credit Agreement*: The Credit Agreement, dated as of July 14, 1992, among the Company, the Existing Banks, Bankers Trust, as administrative agent, and Midlantic National Bank, as co-agent, and various other lending institutions, as amended.

*Existing Credit Documents*: The Credit Documents as defined in the Existing Credit Agreement.

*Filing Date*: January 25, 1995.

*Final Order*: An order or judgment entered on the docket by the Clerk of the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties (a) that has not been reversed, stayed, modified or amended, (b) as to which no appeal, certiorari proceeding, reargument or other review or rehearing has been requested or is still pending, and (c) as to which the time for filing a notice of appeal or petition for certiorari or request for reargument or further review or rehearing has expired.

*General Unsecured Claim*: Any Unsecured Claim against the Debtor other than a Senior Subordinated Claim, a Subordinated Claim, Senior Zero Note Claim, Junior Zero Note Claim or a Trade Claim. General Unsecured Claims shall include, without limitation, Intercompany Claims and any Unsecured Claims arising from or with respect to the leasing of real estate and equipment, utility service, employee benefits, the fees and expenses of Indenture Trustees pursuant to the Indentures whether accruing before or after the Filing Date (except to the extent such fees and expenses are Miscellaneous Secured Claims or Administrative Expenses), or the provision of financial, legal or other professional services to the Debtor or for which the Debtor has agreed to pay. Solely for purposes of effectuating the Zero Settlement, the reasonable fees and expenses of the Capital Indenture Trustees (whether accruing before or after the Filing Date) shall constitute General Unsecured Claims.

*GUCC*: Grand Union Capital Corporation.

*GUCC Chapter 11 Case*: The case under chapter 11 of the Bankruptcy Code concerning GUCC which was commenced on February 6, 1995.

*GUHC*: Grand Union Holdings Corporation.

*GUHC and GUCC Legal Advisors*: Saul, Ewing, Remick & Saul and Patterson, Belknap, Webb & Tyler, L.L.P., in their capacity as attorneys for GUHC and GUCC.

*GUHC Chapter 11 Case*: The case under chapter 11 of the Bankruptcy Code concerning GUHC which was commenced on February 16, 1995.

*Impaired*: Any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

*Indenture Trustees*: The trustees under the Indentures in their capacity as such (*i.e.*, First Trust National Association; First Trust of California, National Association; United States Trust Company of New York; Chemical Bank; and State Street Bank and Trust Company; and any of their successors and assigns).

*Indentures*: The indentures governing the Senior Notes and Senior Subordinated Notes.

*Informal Committee(s)*: The informal committees established prior to the Filing Date consisting of certain holders of: (a) Senior Notes (represented by Stroock & Stroock & Lavan and Rosenthal, Monhait, Gross & Goddess, P.A.), (b) Senior Subordinated Notes (represented by Ropes & Gray) and (c) Trade Claims (represented by Pepper, Hamilton & Scheetz).

*Informal Zero Committee*: The informal committee established prior to the Filing Date consisting of certain holders of Zero Notes (represented by Marcus Montgomery Wolfson, P.C.).

*Informal Zero Committee Advisors*: Collectively, The Argosy Group L.P., Marcus Montgomery Wolfson, P.C., and Williams, Hershman & Wisler, P.A., in their capacity as advisors to the Informal Zero Committee.

*Insider*: As defined in section 101 of the Bankruptcy Code; provided that MTH and Penn Traffic, and any Affiliate of such entities other than the Debtor, shall be deemed to be Insiders for purposes of this Plan.

*Intercompany Claim*: Any Claim arising prior to the Filing Date against the Debtor originally held by GUCC or GUHC or any wholly-owned subsidiary of the Debtor.

*Intercreditor Agreement*: The agreement between the Additional Facility Lenders and the Existing Banks who do not become Additional Facility Lenders to be executed on and become effective as of the Effective Date. If the Intercreditor Agreement is included in an amendment and restatement of the Existing Credit Agreement (*i.e.*, the Post-Confirmation Credit Agreement), reference herein to the Intercreditor Agreement shall be to the Post-Confirmation Credit Agreement.

*Interest Rate Protection Agreement*: The Interest Rate and Currency Exchange Agreement, dated as of July 19, 1992, by and between the Debtor and Bankers Trust.

*Interest Rate Protection Agreement Claims*: Any Claims against the Debtor for payment of amounts due under the Interest Rate Protection Agreement.

*Interests*: The equity interests in the Debtor including, but not limited to, those represented by shares of capital stock of the Debtor and any options, warrants, calls, subscriptions or other similar rights or other agreements, commitments or outstanding securities obligating the Debtor to issue, transfer or sell any shares of capital stock of the Debtor.

*Junior Zero Note Claims*: Any Claim asserted against the Debtor by a holder of a Junior Zero Note relating to or arising from the ownership of a Junior Zero Note issued by GUCC.

*Junior Zero Notes*: Collectively, the 16.5% Senior Subordinated Zero Coupon Notes due January 15, 2007, Series A and B, as amended, modified, restated or supplemented from time to time, issued by GUCC.

*Leasehold Interest*: All real property leasehold interests (a) assumed by the Debtor either pursuant to this Plan or by separate order of the Bankruptcy Court and/or (b) acquired by Reorganized Grand Union on or after the Effective Date.

A-5

*Lien Rights*: (a) the rights of each Indenture Trustee or Capital Indenture Trustee under the Indentures or Capital Indentures to collect and receive any property deliverable in respect of the Claims of the respective securityholders and to apply the property in accordance with the priorities in the applicable Indenture or Capital Indenture, as the case may be, and (b) its lien, prior to the Securities (as defined in the respective Indenture or Capital Indenture), on that property.

*Miscellaneous Secured Claim*: Any Claim that is a secured claim under section 506(a) of the Bankruptcy Code (including, without limitation, the Claims of the Indenture Trustees for the Senior Notes for fees and expenses, if and to the extent such Claims are secured claims), other than Credit Agreement Claims, Interest Rate Protection Agreement Claims and Senior Note Claims.

*MTH*: Miller Tabak Hirsch & Co. and its Affiliates.

*MTH.Management Agreement*: The management agreement, dated July 22, 1992, by and between MTH and the Debtor.

*MTH Settlement Agreement*: An agreement substantially in the form annexed hereto as Exhibit B, pursuant to which: (a) MTH shall be paid all amounts due and owing under the MTH Management Agreement for services provided through the Effective Date; and (b) MTH shall waive any rights to damages for termination of the MTH Management Agreement, including, without limitation (x) compensation for the period from and after the Effective Date through July 22, 1997 (the date the MTH Management Agreement otherwise would have expired on its own terms); and (y) except to the extent set forth in Section 14.06 below and in the MTH Settlement Agreement, any indemnification claims arising under the MTH Management Agreement.

*New Common Stock*: The shares of Common Stock to be issued by Reorganized Grand Union pursuant to the terms of the Plan (or issuable after the Effective Date) and having the relative rights as set forth in the Restated Certificate of Incorporation.

*New Senior Note Indenture*: An indenture, dated as of the Effective Date, satisfactory to the Debtor to be entered into by Reorganized Grand Union with respect to the New Senior Notes.

*New Senior Notes*: Collectively, the notes to be issued on or promptly after the Effective Date by Reorganized Grand Union pursuant to the New Senior Note Indenture in the aggregate principal amount of $595,475,922, which notes shall be unsecured and bear interest at 12% per annum from September 1, 1995, to the holders of Allowed Senior Note Claims.

*Official Committee*: The Official Committee of Unsecured Creditors of The Grand Union Company appointed by the United States Trustee on February 6, 1995, pursuant to section 1102(a) of the Bankruptcy Code.

*Plan*: This Second Amended Chapter 11 Plan, as amended or modified from time to time.

*Post-Confirmation Banks*: The Existing Banks and the Additional Facility Lenders.

*Post-Confirmation Credit Agreement*: Either a new credit agreement or the amendment and restatement of the Existing Credit Agreement (whichever Bankers Trust, in its sole discretion, may select) which is to be executed as of the Effective Date by Reorganized Grand Union and which will contain those terms set forth in the Commitment Letter and the Credit Facility Term Sheet and which will evidence the Revolving Credit Facility and the Term Facility on and after the Effective Date.

*Post-Confirmation Credit Documents*: Either new documents of the type included in the definition of Credit Documents in the Existing Credit Agreement replacing such Credit Documents or amendments and restatements of such documents (whichever Bankers Trust, in its sole discretion, may select).

*Post-Confirmation Facility*: The loans and other financial accommodations provided pursuant to the Post-Confirmation Credit Documents including the Revolving Credit Facility and the Term Facility.

*Post Reorganization Board*: The board of directors of Reorganized Grand Union as determined pursuant to Section 10.02 hereof.

*Priority Claim*: Any Claim, other than a Priority Tax Claim or an Administrative Expense, which is entitled to priority in payment under section 507(a) of the Bankruptcy Code.

*Priority Tax Claim*: Any Claim which is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

*Registration Rights Agreement(s)*: The agreements to be entered into by Reorganized Grand Union pursuant to Section 11.05 of this Plan.

*Reorganized Grand Union*: The Debtor from and after the Effective Date.

*Restated Bylaws*: The bylaws of Reorganized Grand Union, as amended and restated pursuant to this Plan, substantially in the form of Exhibit C hereto.

*Restated Certificate of Incorporation*: The certificate of incorporation of Reorganized Grand Union, as amended and restated pursuant to this Plan, substantially in the form of Exhibit D to this Plan.

*Retirement Plan*: The Grand Union Employees' Retirement Plan.

*Revolving Credit Facility*: As the text requires, either the revolving credit facility in the Existing Credit Agreement or in the Post-Confirmation Credit Agreement.

*Schedules*: The Schedules of Assets and Liabilities and the Statement of Affairs for Debtor Engaged in Business, including any amendment thereto, that are required to be filed by the Debtor on or prior to April 4, 1995.

*Senior Bank Agent*: Bankers Trust as agent pursuant to the Existing Credit Agreement.

*Senior Note Claim*: Any Claim against the Debtor by a holder of a Senior Note for any principal and interest due and owing on such Senior Note.

*Senior Noteholders*: The holders of Senior Notes.

*Senior Notes*: The 11¼% Senior Notes and the 11⅜% Senior Notes.

*Senior Subordinated Claim*: Any Claim against the Debtor by the holder of a Senior Subordinated Note for principal and interest due and owing on such Senior Subordinated Note.

*Senior Subordinated Notes*: Collectively, the 12¼% Senior Subordinated Notes, the 12¼% Senior Subordinated Notes, Series A, and the 13% Senior Subordinated Notes.

*Senior Zero Note Claims*: Any Claim asserted against the Debtor by a holder of a Senior Zero Note relating to or arising from the ownership of a Senior Zero Note issued by GUCC.

*Senior Zero Notes*: Collectively, the 15% Senior Zero Coupon Notes due July 15, 2004, Series A and B, as amended, modified, restated or supplemented from time to time, issued by GUCC.

*Series 1 Warrants*: The Series 1 Warrants to be issued under the Plan pursuant to a warrant agreement substantially in the form annexed hereto as Exhibit E.

A-7

*Series 2 Warrants*: The Series 2 Warrants to be issued under the Plan pursuant to a warrant agreement substantially in the form annexed hereto as Exhibit E.

*Settlement Order*: An order of the Bankruptcy Court approving the Zero Settlement in this Chapter 11 Case.

*Subordinated Claim*: Any Claim against the Debtor subject to subordination pursuant to sections 510(b) or (c) of the Bankruptcy Code.

*Term Facility*: As the text requires, either the term loan facility in the Existing Credit Agreement or in the Post-Confirmation Credit Agreement.

*13% Senior Subordinated Note Claim*: Any Claim against the Debtor by a holder of a 13% Senior Subordinated Note for principal and interest due and owing on such notes.

*13% Senior Subordinated Notes*: Collectively, the 13% Senior Subordinated Notes due 1998, as amended, restated or supplemented from time to time, issued by GU Acquisition Corporation.

*Trade Agreement*: An agreement executed by and between the Debtor and a holder of a Trade Claim as contemplated pursuant to the Order Granting Authority for Provisional Payment of Prepetition Trade Claims entered by the Bankruptcy Court on February 10, 1995.

*Trade Claim*: A Claim of an Entity against the Debtor for goods provided prior to the Filing Date by such Entity to the Debtor for resale to the general public in the ordinary course of business.

*12¼% Senior Subordinated Note A Claim*: Any Claim against the Debtor by a holder of a 12¼% Senior Subordinated Note, Series A for principal and interest due and owing on such note.

*12¼% Senior Subordinated Note Claim*: Any Claim against the Debtor by a holder of a 12¼% Senior Subordinated Note for principal and interest due and owing on such note.

*12¼% Senior Subordinated Notes*: Collectively, the 12¼% Senior Subordinated Notes due 2002, as amended, restated or supplemented from time to time, issued by the Debtor.

*12¼% Senior Subordinated Notes, Series A*: Collectively, the 12¼% Senior Subordinated Notes due 2002, Series A, as amended, restated or supplemented from time to time, issued by the Debtor.

*Ultimately Allowed Claim*: Any Disputed Claim to the extent that it becomes an Allowed Claim in accordance with Section 13.02 of this Plan.

*Unimpaired Claim*: A Claim which is not Impaired.

*Unsecured Claim*: Any Claim other than a Credit Agreement Claim, an Interest Rate Protection Agreement Claim, a Senior Note Claim, a Miscellaneous Secured Claim, an Administrative Expense, a Priority Claim or a Priority Tax Claim.

*Warrants*: Collectively, the Series 1 Warrants and the Series 2 Warrants.

*Zero Claims Release*: A release substantially in the form of Exhibit F hereto (all terms not defined therein shall have the meanings ascribed to such terms in this Plan).

*Zero Notes*: Collectively, the Senior Zero Notes and the Junior Zero Notes.

*Zero Settlement*: A settlement, substantially in the form annexed hereto as Exhibit G (all terms not defined therein shall have the meanings ascribed to such terms in this Plan), concerning, among other things, the Senior Zero Note Claims and the Junior Zero Note Claims.

## ARTICLE 2

### PROVISIONS FOR TREATMENT OF ADMINISTRATIVE EXPENSES

2.01. *Administrative Expenses.* Each holder of an Allowed Administrative Expense shall be entitled to payment in full in cash by Reorganized Grand Union, at its option, on (a) the later of (i) the Effective Date and (ii) the date on which the Bankruptcy Court enters an order allowing such Administrative Expense, and (b) the date, or dates, on which Reorganized Grand Union or the Debtor, as the case may be, and the Entity claiming such Allowed Administrative Expense otherwise agree or have agreed; *provided, however,* that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business by the Debtor during the Chapter 11 Case shall be paid by the Debtor or Reorganized Grand Union, as the case may be, in the ordinary course of business and in accordance with any terms and conditions of the particular transaction, and any agreements relating thereto. Any final request for payment of an Administrative Expense, including, without limitation, applications for compensation and reimbursement of expenses by professionals employed by the Debtor and the Official Committee must be filed no later than 45 days after the Effective Date; *provided that* no request for payment of an Administrative Expense need be filed with respect to an Administrative Expense which is paid or payable by the Debtor or Reorganized Grand Union in the ordinary course, including, without limitation, any Administrative Expense which would have been a Trade Claim had it arisen prior to the Filing Date.

2.02. *Compensation to Legal Counsel and Financial Advisors to the Informal Committees/Indenture Trustees.* The reasonable fees and expenses incurred on or after the Filing Date by the counsel and financial advisors retained by agreement with the Debtor prior to the Filing Date by the Informal Committees (together with the reasonable fees and expenses of local counsel) or the Indenture Trustees (to the extent they are not General Unsecured Claims or Miscellaneous Secured Claims, and subject to Section 12.07 hereof) with respect to this Chapter 11 Case shall be paid (without application by or on behalf of any such professionals to the Bankruptcy Court, and without notice and a hearing, unless specifically required by the Bankruptcy Court upon request of a party in interest) by Reorganized Grand Union as an Administrative Expense under the Plan. If Reorganized Grand Union and any such professional retained by an Informal Committee or an Indenture Trustee cannot agree on the amount of fees and expenses to be paid to such professional, the amount of any such fees and expenses shall be determined by the Bankruptcy Court. Notwithstanding anything contained in this Plan to the contrary, the fees and expenses of the legal and financial advisors to the Informal Committee of Senior Noteholders shall be paid as set forth in the final cash collateral order entered by the Bankruptcy Court on February 16, 1995.

2.03. *Compensation to the Capital Committee Advisors and the Informal Zero Committee Advisors.* The reasonable fees and expenses incurred on or after the Filing Date by the Capital Committee Advisors or the Informal Zero Committee Advisors with respect to this Chapter 11 Case or the GUCC Chapter 11 Case shall be paid by Reorganized Grand Union after notice and a hearing in accordance with the procedures established by the Bankruptcy Court for professionals employed by the Debtor or the Official Committee; provided, however, that the aggregate maximum amount of fees and expenses for the Capital Committee Advisors and the Informal Zero Committee Advisors that shall be payable in this Chapter 11 Case shall not exceed $750,000 (plus the amount of any prepetition retainer). Applications for such compensation and reimbursement of expenses by such professionals must be filed no later than 45 days after the Effective Date.

2.04. *Compensation to GUHC and GUCC Legal Advisors.*

(a) The reasonable fees and expenses incurred on or after the Filing Date through the Effective Date by the GUHC and GUCC Legal Advisors with respect to this Chapter 11 Case, the GUCC Chapter 11 Case or the GUHC Chapter 11 Case shall be paid (after application of any retainer held by any such professional) by Reorganized Grand Union after notice and a hearing in accordance with the procedures established by the Bankruptcy Court for professionals employed by the Debtor or the Official Committee. Applications for compensation and reimbursement of expenses by such professionals must be filed no later than 45 days after the Effective Date.

A-9

(b) On and after the Effective Date, Reorganized Grand Union shall pay the reasonable fees and expenses of the GUHC and GUCC Legal Advisors incurred with respect to the dissolution of GUCC and GUHC.

(c) Notwithstanding anything in this Plan to the contrary, the aggregate amount of fees and expenses payable pursuant to this Section 2.04 shall not exceed, in the aggregate, $150,000, in addition to the amount of any retainers paid to such professionals.

## ARTICLE 3

### PROVISIONS FOR TREATMENT OF PRIORITY TAX CLAIMS

3.01. *Priority Tax Claims.* With respect to each Allowed Priority Tax Claim, at the sole option of Reorganized Grand Union, the holder of an Allowed Priority Tax Claim shall be entitled to receive on account of such Allowed Priority Tax Claim: (a) equal cash payments made on the last Business Day of every three month period following the Effective Date, over a period not exceeding six years after the assessment of the tax on which such Claim is based, totalling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date; (b) such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Debtor or Reorganized Grand Union, provided such treatment is on more favorable terms to the Debtor or Reorganized Grand Union, as the case may be, than the treatment set forth in paragraph (a) hereof; or (c) payment in full, provided that, with respect to paragraphs (b) and (c) hereof, such treatment is approved by the Bankruptcy Court.

## ARTICLE 4

### CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims and Interests. Administrative Expenses and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code (set forth in Articles 2 and 3, above) have not been classified and are excluded from the following classes in accordance with section 1123(a)(1) of the Bankruptcy Code.

4.01. *Secured Claims.*

*Class 1.* Class 1 consists of all Credit Agreement Claims.

*Class 2.* Class 2 consists of all Interest Rate Protection Agreement Claims.

*Class 3.* Class 3 consists of all Miscellaneous Secured Claims.

*Class 4.* Class 4 consists of all Senior Note Claims.

4.02. *Priority Claims.*

*Class 5.* Class 5 consists of all Priority Claims.

4.03. *Unsecured Claims.*

*Class 6(a).* Class 6(a) consists of Trade Claim(s) asserted by a Creditor whose aggregate asserted Trade Claim(s) total less than $25,000.

*Class 6(b).* Class 6(b) consists of all Trade Claim(s) asserted by a Creditor whose aggregate asserted Trade Claims(s) total $25,000 or more.

*Class 7.* Class 7 consists of all General Unsecured Claims.

*Class 8.* Class 8 consists of all Senior Subordinated Claims.

*Class 9.* Class 9 consists of all Senior Zero Note Claims.

*Class 10.* Class 10 consists of all Junior Zero Note Claims.

*Class 11.* Class 11 consists of all Subordinated Claims.

4.04. *Interests.*

*Class 12.* Class 12 consists of all Interests.

## ARTICLE 5
### IDENTIFICATION OF CLASSES AND CLAIMS AND INTERESTS IMPAIRED AND NOT IMPAIRED BY THIS PLAN

5.01. *Classes of Claims Impaired by this Plan and Entitled to Vote.* Credit Agreement Claims (Class 1), Interest Rate Protection Agreement Claims (Class 2), Senior Note Claims (Class 4), Priority Claims (Class 5), General Unsecured Claims (Class 7), Senior Subordinated Claims (Class 8), Senior Zero Note Claims (Class 9) and Junior Zero Note Claims (Class 10), are Impaired by this Plan and the holders of Allowed Claims in such Classes are entitled to vote to accept or reject this Plan; *provided, however,* that the holders of Claims to be Allowed pursuant to Article 7 of this Plan shall be entitled to vote on the Plan, regardless of whether they have filed a proof of claim.

5.02. *Classes Receiving No Property Deemed to Reject this Plan.* Claims in Class 11 and Interests in Class 12 are Impaired and do not receive or retain any property under this Plan. Under section 1126(g) of the Bankruptcy Code, the holders of such Interests and Claims are deemed to reject this Plan and the votes of such holders will not be solicited.

5.03. *Unimpaired Classes Conclusively Presumed to Accept this Plan.* Miscellaneous Secured Claims (Class 3) and Trade Claims (Class 6), are not Impaired by this Plan. Under section 1126(f) of the Bankruptcy Code, the holders of such Claims are conclusively presumed to accept this Plan, and the votes of such holders will not be solicited.

## ARTICLE 6
### PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS

6.01. *Credit Agreement Claims (Class 1).*

(a) On the Effective Date, the holder of an Allowed Credit Agreement Claim shall receive with respect to such Claim the treatment set forth in subparagraph (i) of this Section 6.01(a), unless, at the sole option of the Debtor (which option shall be exercised not later than five (5) days prior to the commencement of the confirmation hearing), such holder shall receive the treatment described in subparagraph (ii) of this Section 6.01(a).

(i) (x) Reorganized Grand Union shall execute the Post-Confirmation Credit Documents and such documents shall become effective (provided that the other conditions contained in the Commitment Letter and the Credit Facility Term Sheet, as and if amended by consent of Bankers Trust and the Debtor, have been satisfied). Pursuant to the Post-Confirmation Credit Agreement, the commitment with respect to the amount of the Revolving Credit Facility and the Term Facility shall be increased in the aggregate by not less than $65 million.

(y) The Post-Confirmation Facility shall be secured by a perfected, first priority lien and security interest in all of the tangible and intangible assets (including, without limitation, all assets as described in the Commitment Letter, including leases) of Reorganized Grand Union and its subsidiaries, whether in existence at the Effective Date or acquired thereafter, subject only to such liens as may be permitted pursuant to the Post-Confirmation Credit Documents. Pursuant to the Intercreditor Agreement, the Additional Facility Lenders shall have priority (with respect to the Additional Facility and with respect to those loans owed to, and letter of credit exposure of, such Additional Facility Lenders under the Existing Credit Agreement as set forth in the Intercreditor Agreement) over Existing Banks who do not contribute to the Additional Facility.

(z) Upon confirmation of the Plan, but effective as of the Effective Date, the Debtor, Reorganized Grand Union, any Entity issuing securities under the Plan, any entity acquiring property under the Plan, and any Creditor and/or equity security holder of the Debtor, shall be deemed contractually to subordinate any present or future claim, right or other interest they may have in and to any proceeds received from the disposition, release, or liquidation of any Leasehold Interest, or any funds or proceeds received as a result of a subsequent pledge of such Leasehold Interest, to the obligations owed to the Post-Confirmation Banks pursuant to the Post-Confirmation Credit Documents until such obligations are paid in full.

(ii) (x) The holder of an Allowed Credit Agreement Claim shall receive on the Effective Date, cash payments equal to 100% of such Allowed Credit Agreement Claim.

(y) Upon payment in full of the Allowed Credit Agreement Claims, the Existing Credit Agreement shall be terminated and the notes issued pursuant thereto shall be cancelled.

(b) On the Effective Date, all interest, fees, expenses and other charges that have accrued pursuant to the terms of the Existing Credit Documents but have not been paid as of the Effective Date shall be paid to the Senior Bank Agent for distribution to those parties entitled to receive such interest, fees, expenses and other charges pursuant to the Existing Credit Documents.

(c) Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all prepetition liens on property of the Debtor held by or on behalf of the holders of Claims in this Class with respect to such Claims shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such holders until, as to each such holder, the Allowed or Subsequently Allowed Claims of such holder in this Class are paid in full; provided, however, on and after the Effective Date, such liens shall not attach to the Warrants, the New Senior Notes or New Common Stock. Class 1 is Impaired.

6.02. *Interest Rate Protection Agreement Claims (Class 2).* With respect to each Allowed Interest Rate Protection Agreement Claim, at the sole option of Reorganized Grand Union to be exercised on the Effective Date: (a) the legal, equitable and contractual rights to which the Allowed Interest Rate Protection Agreement Claim entitles the holder of such Claim shall be unaltered by the Plan and the Debtor shall, on the Effective Date, cure any defaults with respect thereto; or (b) on the Effective Date, the holder of an Allowed Interest Rate Protection Agreement Claim shall receive a cash payment equal to 100% of such Allowed Interest Rate Protection Agreement Claim. Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all prepetition liens on property of the Debtor held by or on behalf of the holders of Claims in this Class with respect to such Claims shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such holders until, as to each such holder, the Allowed or Subsequently Allowed Claims of such holder in this Class are paid in full; provided, however, on and after the Effective Date, such liens shall not attach to the Warrants, the New Senior Notes or New Common Stock. Class 2 is Impaired.

6.03. *Miscellaneous Secured Claims (Class 3).* With respect to each Allowed Miscellaneous Secured Claim, at the sole option of Reorganized Grand Union to be exercised on the Effective Date: (a) the legal, equitable and contractual rights to which the Allowed Miscellaneous Secured Claim entitles the holder of

such Claim shall be unaltered by the Plan, or (b) Reorganized Grand Union shall provide such other treatment that will render such Allowed Miscellaneous Secured Claim an Unimpaired Claim under section 1124 of the Bankruptcy Code; *provided that* the Miscellaneous Secured Claims, if any, of the Indenture Trustees shall be treated in accordance with Section 12.07 of this Plan. The Debtor's failure to object to such Claim in the Chapter 11 Case shall be without prejudice to Reorganized Grand Union's right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the holder thereof. Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all prepetition liens on property of the Debtor held by or on behalf of the holders of Claims in this Class with respect to such Claims shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such holders until, as to each such holder, the Allowed or Subsequently Allowed Claims of such holder in this Class are paid in full. Class 3 is not Impaired.

6.04. *Senior Note Claims (Class 4)*. On the Effective Date, the Senior Notes shall be cancelled, Reorganized Grand Union shall execute the New Senior Note Indenture, and, subject to section 12.02 hereof, each holder of an Allowed Senior Note Claim shall be entitled to receive, in exchange for such Allowed Senior Note Claim, its pro rata share of New Senior Notes. Such pro rata share shall be determined by the ratio between the amount of such holder's Allowed Senior Note Claims and the aggregate amount of Allowed Senior Note Claims, each calculated as of the Filing Date without taking into account any interest on overdue interest or Sections 7.02 and 7.03 hereof, and pursuant to Section 12.02 hereof. Class 4 is Impaired.

6.05. *Priority Claims (Class 5)*. On the latest of (a) the Effective Date, (b) the date such Priority Claim becomes an Allowed Claim, or (c) the date, or dates, on which Reorganized Grand Union or the Debtor, as the case may be, and the holder of such Priority Claim otherwise agree or have agreed, each holder of an Allowed Priority Claim shall be entitled to receive payment in full of 100% of such Allowed Priority Claim. Class 5 is Impaired.

6.06. *Trade Claims (Class 6)*.

(a) *Class 6(a)*. Each Creditor asserting Trade Claim(s) that, in the aggregate, are less than $25,000 in amount, need not file a proof of claim with respect to such Trade Claim(s) in order to receive a distribution under this Plan.

(b) *Class 6(b)*. Each Creditor asserting Trade Claim(s) that, in the aggregate, are $25,000 or more in amount, must file a proof of claim with respect to such Trade Claim(s) on or before the Claims Bar Date. In the event that any such Creditor does not timely file a proof of claim with respect to its Trade Claim(s), all Trade Claim(s) asserted by such Creditor shall be barred and discharged: *provided, however, that such Trade* Creditor shall be treated as having filed a proof of claim with respect to its Trade Claim(s) in the amount(s), if any, that is/are listed in the Schedules regardless of whether such Trade Claim(s) are listed in the Schedules as disputed, contingent or unliquidated.

(c) With respect to each Trade Claim included in either Class 6(a) or in Class 6(b) that is not barred or discharged pursuant to Section 6.06(b) hereof, and subject to the terms of any Trade Agreement and to the rights set forth in Section 6.06(e) hereof, at the sole option of the Debtor, (i) the legal, equitable and contractual rights to which the Trade Claim entitles the holder of such Claim shall remain unaltered or (ii) the Debtor shall provide such other treatment that will render such Trade Claim an Unimpaired Claim under section 1124 of the Bankruptcy Code.

(d) Unless a Creditor asserting Trade Claim(s) files a written objection to the Plan, such Creditor shall be deemed to have waived and forever released any right to assert or claim that it may be entitled to interest accruing with respect to such Creditor's Trade Claim(s) and any such claims or assertions for interest shall be barred and discharged. In the event that a Creditor asserting Trade Claim(s) objects to the Plan in writing, such objecting Creditor's Trade Claim(s) shall be deemed included in Class 7 of the Plan and shall be deemed to have voted to reject the Plan. In the event included in Class 7, the objecting Creditor asserting a Trade

Claim shall be subject to the proof of claim and bankruptcy claims administration requirements that are applicable to other Class 7 Creditors. Notwithstanding anything herein to the contrary, a Creditor whose Claim would have been included in either Class 6(a) or 6(b) but for the objection referenced in this paragraph: (i) with respect to a Creditor which would have been included in Class 6(a), (y) such Creditor may rely on the amount of its Claim as set forth in the Schedules in the event that its Claim is not listed as contingent, disputed or unliquidated, or, (z) in the event that its Claim is so designated, or not scheduled, such Creditor shall have ten (10) days from the date its objection is filed within which to file a proof of claim which Claim may not exceed $25,000 plus any Claim for interest on such Claim; and (ii) with respect to a Creditor which would have been included in Class 6(b), such Creditor shall either (y) have filed a proof of claim by the Claims Bar Date or (z) its Claim shall be limited by the amount of such Claim as set forth in the Schedules unless such Claim is listed as contingent, disputed or unliquidated and, in the event of such designation, such Creditor shall have ten (10) days from the date its objection is filed within which to file a proof of claim which Claim shall not exceed the amount for which it was scheduled plus any claim for interest on such Claim.

(e) The Debtor's failure to file an objection with the Bankruptcy Court to a Trade Claim shall be without prejudice to Reorganized Grand Union's right to contest or otherwise defend against such Trade Claim in the appropriate forum, including the Bankruptcy Court, when and if such Trade Claim is sought to be enforced by the holder thereof. Neither Class 6(a) nor Class 6(b) is Impaired.

6.07. *General Unsecured Claims (Class 7)*. On the latest of (a) the Effective Date, (b) the date such General Unsecured Claim becomes an Allowed Claim, and (c) the date, or dates, on which Reorganized Grand Union or the Debtor, as the case may be, and the holder of such General Unsecured Claim otherwise agree or have agreed, each holder of an Allowed General Unsecured Claim shall be entitled to receive payment in full of 100% of such Allowed General Unsecured Claim. Subject to Section 12.07 hereof, any General Unsecured Claims of an Indenture Trustee shall be paid in full on the Effective Date or on such later date as agreed to by the parties. Class 7 is Impaired.

6.08. *Senior Subordinated Claims (Class 8)*. On the Effective Date, the Senior Subordinated Notes shall be cancelled, and, subject to Section 12.02 hereof, each holder of an Allowed Senior Subordinated Claim shall be entitled to receive its pro rata share of the New Common Stock to be issued under the Plan. Such pro rata share shall be determined by the ratio between the amount of such holder's Allowed Senior Subordinated Claim and the aggregate amount of all Allowed Senior Subordinated Claims as of the Effective Date, and pursuant to Section 12.02 hereof. The holders of Allowed Class 8 Claims shall receive in the aggregate, on a pro rata basis, 100% of the New Common Stock to be issued under the Plan. Class 8 is Impaired.

6.09. *Senior Zero Note Claims (Class 9)*.

(a) Subject to the terms and conditions set forth in the Zero Settlement, and solely for purposes of effectuating such settlement, on the Effective Date, the Senior Zero Note Claims shall be allowed as set forth in Section 7.09 hereof (subordinate to all Claims and Administrative Expenses against the Debtor, other than Claims set forth in Classes 10 and 11), the Senior Zero Notes shall be cancelled, and, subject to Section 12.02 hereof, each holder of an Allowed Senior Zero Note Claim shall be entitled to receive its pro rata share of 240,000 Series 1 Warrants and 480,000 Series 2 Warrants to be issued under the Plan as its full recovery against the Debtor and Reorganized Grand Union on its Senior Zero Note Claims. Such pro rata share shall be determined by the ratio between the face amount of such holder's Senior Zero Notes and the aggregate face amount of all Senior Zero Notes and pursuant to Section 12.02 hereof.

(b) Notwithstanding anything in this Plan to the contrary, it shall be a condition to the issuance of the Warrants (i) with respect to Senior Zero Note Claims held by a particular Entity holding Senior Zero Notes that, in the aggregate, are $200,000 or more in face amount, that such Entity execute and deliver a Zero Claims Release, and (ii) with respect to each holder of a Senior Zero Note Claim, that such holder not have filed a written objection to confirmation of the Plan (which is not withdrawn prior to commencement of the

hearing on confirmation of this Plan). Any Warrants not issued by operation of the foregoing before the later of (i) two years from the Effective Date, and (ii) six months following the date such holder's Claim becomes an Allowed or Ultimately Allowed Claim shall be deemed to be unclaimed property and cancelled.

(c) The Debtor has not assumed and shall not be deemed to have assumed any liability related to or arising from the Zero Notes.

6.10. *Junior Zero Note Claims (Class 10)*.

(a) Subject to the terms and conditions set forth in the Zero Settlement, and solely for purposes of effectuating such settlement, on the Effective Date, the Junior Zero Note Claims shall be allowed as set forth in Section 7.10 hereof (subordinate to all Claims and Administrative Expenses against the Debtor, other than Claims set forth in Class 11), the Junior Zero Notes shall be cancelled, and, subject to Section 12.02 hereof, each holder of an Allowed Junior Zero Note Claim shall be entitled to receive its pro rata share of 60,000 Series 1 Warrants and 120,000 Series 2 Warrants to be issued under the Plan as its full recovery against the Debtor and Reorganized Grand Union on its Junior Zero Note Claims. Such pro rata share shall be determined by the ratio between the face amount of such holder's Junior Zero Notes and the aggregate amount of all Junior Zero Notes, and pursuant to Section 12.02 hereof.

(b) Notwithstanding anything in this Plan to the contrary, it shall be a condition to the issuance of the Warrants (i) with respect to Junior Zero Note Claims held by a particular Entity holding Junior Zero Notes that, in the aggregate, are $200,000 or more in face amount, that such Entity execute and deliver a Zero Claims Release, and (ii) with respect to each holder of a Junior Zero Note Claim, that such holder not have filed a written objection to the Plan (which is not withdrawn prior to commencement of the hearing on confirmation of this Plan). Any Warrants not issued by operation of the foregoing before the later of (i) two years from the Effective Date, and (ii) six months following the date such holder's Claim becomes an Allowed or Ultimately Allowed Claim shall be deemed to be unclaimed property and cancelled.

(c) The Debtor has not and shall not be deemed to have assumed any liability related to or arising from the Zero Notes.

6.11. *Subordinated Claims (Class 11)*. No distributions shall be made in respect of Class 11. On the Effective Date, any Claims in Class 11 shall be discharged. Class 11 is Impaired.

6.12. *Interests (Class 12)*. No distributions shall be made in respect of Class 12. On the Effective Date, all Interests shall be cancelled. Class 12 is Impaired.

# ARTICLE 7

## ALLOWANCE OF CLAIMS

7.01. *Credit Agreement Claims*. Credit Agreement Claims shall be allowed in full as set forth herein. On or prior to fifteen (15) days prior to the date first set for hearing on confirmation of the Plan, the Senior Bank Agent shall file with the Bankruptcy Court and serve on counsel for the Debtor, the Official Committee and the Informal Committee of Senior Noteholders a schedule setting forth the proposed amounts of Allowed Credit Agreement Claims (on a per Entity basis) of each of the Existing Banks to be estimated as of the Confirmation Date. If no objection is filed by the Debtor, the Official Committee or the Informal Committee of Senior Noteholders and served on the Senior Bank Agent within five (5) days after receipt of such schedule, the Credit Agreement Claims shall be deemed Allowed in the amount set forth on the schedule, together with such additional amounts which may accrue subsequent to the Confirmation Date through and including the Effective Date. In the event the Debtor, the Official Committee or the Informal Committee of Senior Noteholders objects to the scheduled amounts, the only issue that will be determined by the Bankruptcy Court is the amount of each Existing Bank's Allowed Credit Agreement Claim. Notwithstanding anything

contained in this Plan to the contrary, the fees and expenses incurred on account of the Credit Agreement Claims shall be paid as set forth in the final cash collateral order entered by the Bankruptcy Court on February 16, 1995.

7.02. *11¼% Senior Note Claims.* 11¼% Senior Note Claims shall be allowed in the aggregate amount equal to $350 million in principal plus accrued but unpaid interest and interest on overdue interest on the 11¼% Senior Notes to the Effective Date.

7.03. *11⅜% Senior Note Claims.* 11⅜% Senior Note Claims shall be allowed in the aggregate amount equal to $175 million in principal plus accrued but unpaid interest and interest on overdue interest on the 11⅜% Senior Notes to the Effective Date.

7.04. *13% Senior Subordinated Note Claims.* 13% Senior Subordinated Note Claims shall be allowed in the aggregate amount of $16,820,673.61, representing principal plus accrued but unpaid interest and interest on interest, if any, on the 13% Senior Subordinated Notes to the Filing Date.

7.05. *12¼% Senior Subordinated Note A Claims.* 12¼% Senior Subordinated Note A Claims shall be allowed in the aggregate amount of $53,243,059.90, representing principal plus accrued but unpaid interest and interest on interest, if any, on the 12¼% Senior Subordinated Notes, Series A to the Filing Date.

7.06. *12¼% Senior Subordinated Note Claims.* 12¼% Senior Subordinated Note Claims shall be allowed in the aggregate amount of $532,430,598.96, representing principal plus accrued but unpaid interest and interest on interest, if any, on the 12¼% Senior Subordinated Notes to the Filing Date.

7.07. *Unimpaired Trade Claims.* Subject to Section 6.06(b) of this Plan, Unimpaired Claims which are Trade Claims shall neither be deemed Allowed nor Disputed for purposes of this Plan. The right to payment on such Claim shall be determined, resolved or adjudicated, as the case may be, as if the Chapter 11 Case had not been commenced, subject to the following sentence. The Plan shall be without prejudice to the Debtor's or Reorganized Grand Union's rights to contest or otherwise defend against such Claims in the appropriate forum, including the Bankruptcy Court, when and if such Claim is sought to be enforced by the holder thereof.

7.08. *Interest Rate Protection Claims.* The Interest Rate Protection Claims shall be allowed in full as set forth herein. On or prior to fifteen (15) days prior to the date first set for hearing on confirmation of the Plan, the Senior Bank Agent shall file with the Bankruptcy Court and serve on counsel for the Debtor, the Official Committee and the Informal Committee of Senior Noteholders written notice of the proposed amount of the Allowed Interest Rate Protection Claims to be estimated as of the Confirmation Date. If no objection is filed by the Debtor, the Official Committee or the Informal Committee of Senior Noteholders and served on the Senior Bank Agent within five (5) days after receipt of such schedule, the Interest Rate Protection Claims shall be deemed Allowed in the amount asserted by the Senior Bank Agent in such schedule together with such additional amounts which may accrue subsequent to the Confirmation Date through and including the Effective Date. In the event the Debtor, the Official Committee or the Informal Committee of Senior Noteholders objects to the proposed amount, the only issue that will be determined by the Bankruptcy Court is the amount of the Interest Rate Protection Claims.

7.09. *Senior Zero Note Claims.* For purposes of effectuating the Zero Settlement only, the Senior Zero Note Claims shall be allowed in an amount equal to the value as of the Effective Date of the distributions made on account of such Claims under the Plan.

7.10. *Junior Zero Note Claims.* For purposes of effectuating the Zero Settlement only, the Junior Zero Note Claims shall be allowed in an amount equal to the value as of the Effective Date of the distributions made on account of such Claims under the Plan.

## ARTICLE 8

### ACCEPTANCE OR REJECTION OF THIS PLAN;
### EFFECT OF REJECTION BY ONE OR MORE IMPAIRED
### CLASSES OF CLAIMS OR INTERESTS

8.01. *Each Impaired Class of Claims Entitled to Vote.* Subject to Section 8.04 hereof, the holders of Claims and Interests in each Impaired Class of Claims are entitled to vote as a class to accept or reject this Plan. Holders of Claims in Classes 1, 2, 4, 8, 9 and 10 shall be entitled to vote on the Plan whether or not such claims have theretofore been Allowed.

8.02. *Acceptance by an Impaired Class of Creditors.* Consistent with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

8.03. *Presumed Acceptances by Unimpaired Classes.* Miscellaneous Secured Claims (Class 3) and Trade Claims (Class 6), which are not Impaired under this Plan, are conclusively presumed to have accepted this Plan, and the Debtor will not solicit acceptances from such Classes.

8.04. *Deemed Rejection by Class 11 and Class 12.* Class 11 (Subordinated Claims) and Class 12 (Interests), which are Impaired under this Plan, are deemed to have rejected this Plan, and the Debtor will not solicit votes from holders of Claims and Interests in such Classes.

8.05. *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.* The Debtor intends to request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code because Class 11 and Class 12 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. The Debtor also may seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to Class 7, Class 8, Class 9 and Class 10, as the case may be, to the extent such Classes reject the Plan.

## ARTICLE 9

### UNEXPIRED LEASES AND EXECUTORY CONTRACTS

9.01. *Assumption and Rejection of Unexpired Leases and Executory Contracts.*

(a) Any unexpired lease or executory contract that has not been expressly rejected by the Debtor with the Bankruptcy Court's approval on or prior to the Confirmation Date shall, as of the Confirmation Date (subject to the occurrence of the Effective Date), be deemed to have been assumed by the Debtor unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to reject such unexpired lease or executory contract or such executory contract or unexpired lease is otherwise designated for rejection, provided that such lease or executory contract is ultimately rejected; *provided, however,* that, as of the Confirmation Date (subject to the occurrence of the Effective Date), any executory contracts or unexpired leases to which an Insider or Affiliate of the Debtor is party shall be deemed to have been rejected by the Debtor unless, by such date, either (i) such unexpired lease or executory contract has been expressly assumed by the Debtor or Reorganized Grand Union or (ii) a motion seeking such assumption has been filed, provided that such motion is ultimately granted; *provided, however,* that no executory contract or unexpired lease shall be subject to the foregoing deemed rejection (subject to explicit assumption) *solely* by virtue of the fact that one or more wholly owned subsidiaries of the Debtor is party to such contract or lease.

(b) For purposes of this Plan, leases of nonresidential real property which were assigned by the Debtor prior to the Filing Date shall be treated as being neither executory nor unexpired, and notwithstanding this Section 9.01, shall be deemed neither assumed nor rejected pursuant to this Plan.

## ARTICLE 10

### OPERATION AND MANAGEMENT
### OF REORGANIZED GRAND UNION

10.01. *Resignation of Board of Directors.* Upon the inauguration of the Post Reorganization Board on the Effective Date, each of the members of the Debtor's Board of Directors shall be deemed to have resigned.

10.02. *Board of Directors.*

(a) On the Effective Date, the operation of Reorganized Grand Union shall become the general responsibility of the Post Reorganization Board, in accordance with applicable law.

(b) The initial members of the seven (7) member Post Reorganization Board shall be selected by the members of the Official Committee which were members of the Informal Committee of certain holders of Senior Subordinated Notes. Such board members shall be identified not less than five (5) days prior to the Confirmation Date; *provided that*, if and to the extent that any member(s) of the Post Reorganization Board are not so identified by five (5) days prior to the Confirmation Date, the Debtor shall designate such member(s).

(c) From and after the Effective Date, selection of members of the Post Reorganization Board shall be governed by the Restated Bylaws and/or the Restated Certificate of Incorporation, as the case may be.

10.03. *Termination of MTH Agreement.* On the Effective Date, the MTH Management Agreement shall be terminated and Reorganized Grand Union shall execute the MTH Settlement Agreement.

10.04. *Listing of New Senior Notes,· New Common Stock and Warrants.* Reorganized Grand Union will use its reasonable best efforts to cause the New Senior Notes, the New Common Stock and the Warrants to be listed on one or more stock exchanges or quoted on the National Market System on or before the date which is one hundred twenty (120) days after the Effective Date.

## ARTICLE 11

### IMPLEMENTATION OF THIS PLAN

11.01. *Vesting of Property.* On the Effective Date, pursuant to section 1141 of the Bankruptcy Code, title to all property of the Debtor's estate shall pass to Reorganized Grand Union free and clear of all Claims and Interests (except as otherwise provided in this Plan). Reorganized Grand Union may pay any expenses, including any fees and expenses of professionals, accruing from and after the Confirmation Date without any application to the Bankruptcy Court. Confirmation of this Plan (subject to the occurrence of the Effective Date) shall be binding and the Debtor's debts shall, without in any way limiting Section 14.01 of this Plan, be discharged as provided in section 1141 of the Bankruptcy Code. The previous sentence notwithstanding, nothing in the Plan shall be construed as discharging, releasing, or relieving the Debtor, Reorganized Grand Union, or any other party, in any capacity, from any liability with respect to the Retirement Plan to which any such party is subject as of immediately prior to the Effective Date under any law or regulatory provision.

11.02. *Surrender and Cancellation of Securities, Notes or Other Instruments; Discharge of Indenture Obligations.*

(a) On the Effective Date, each of the respective transfer books maintained for the Cancelled Securities will be closed. Except for the right to receive the distributions, if any, called for by this Plan, the holder of a Cancelled Security shall have no rights arising from or relating to such Cancelled Security after the Effective Date, including, without limitation, any rights of subordination or subrogation that may be construed to be contained in such Cancelled Security. Each holder of a Cancelled Security evidencing an Allowed or

Ultimately Allowed Claim shall surrender such Cancelled Security to Reorganized Grand Union (or its designee), and Reorganized Grand Union (or its designee) shall distribute to the holder thereof the appropriate consideration therefor in accordance with this Plan as promptly as is reasonably practicable. No distribution under this Plan shall be made to or on behalf of any holder of an Allowed or Ultimately Allowed Claim evidenced by a Cancelled Security unless and until such Cancelled Security is received by Reorganized Grand Union (or its designee). If a Cancelled Security is lost or destroyed, the holder of such Cancelled Security must deliver an affidavit of loss or destruction to the Debtor or Reorganized Grand Union (or their designee), as well as an agreement to indemnify the Debtor and Reorganized Grand Union (and post a bond if so requested by Reorganized Grand Union or the Debtor), in form and substance reasonably acceptable to Reorganized Grand Union, before such holder may receive any distribution under this Plan in respect of such lost or destroyed Cancelled Security. Any holder of an Allowed or Ultimately Allowed Claim that fails to surrender a Cancelled Security related thereto or deliver an affidavit and an indemnity agreement before the later to occur of (i) two years from the Effective Date, and (ii) six months following the date such holder's Claim becomes an Allowed or Ultimately Allowed Claim shall be deemed to have no further Claim and no distributions shall be made under this Plan in respect of such Claim. The Debtor or Reorganized Grand Union may waive the requirements of this Section.

(b) Each Indenture and Capital Indenture, and the obligations of the Indenture Trustee and Capital Indenture Trustee thereunder, and, subject to the implementation of Section 12.07 hereof (to the extent applicable), any Lien Rights of the Indenture Trustees or Capital Indenture Trustees thereunder, shall be cancelled and discharged on the Effective Date.

(c) Notwithstanding anything contained herein to the contrary, if Reorganized Grand Union does not elect to treat Credit Agreement Claims in the manner described in Section 6.01(a)(ii) hereof and Bankers Trust effects the Post-Confirmation Facility by way of an amendment and restatement of existing documents, the Existing Credit Documents shall not be cancelled, discharged, satisfied and/or otherwise expunged except to the extent provided in such amendments and restatements.

11.03. *The Debtor's Causes of Action*. Except as expressly provided in Section 14.01 hereof, and except for any avoidance actions against holders of Unimpaired Class 6 Trade Claims or any Causes of Action released pursuant to Article 14 hereof, pursuant to section 1123(b)(3) of the Bankruptcy Code, Reorganized Grand Union shall retain, with the exclusive right to enforce in its sole discretion, any and all Causes of Action of the Debtor or Debtor-In-Possession, including all Causes of Action which may exist under sections 510, 542, 544 through 550 and 553 of the Bankruptcy Code or under similar state laws, including, without limitation, fraudulent conveyance claims, if any, and all other Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code. The Debtor or Reorganized Grand Union, as the case may be, may, but shall not be required to, set off against any Claim and the distributions to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever which the Debtor or Debtor-In-Possession may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claim the Debtor or Debtor In Possession may have against such holder.

11.04. *Restated Certificate of Incorporation; Restated Bylaws*. On or prior to the Effective Date, the Debtor shall file its restated certificate of incorporation and the restated bylaws shall be deemed adopted, such that they become the Restated Certificate of Incorporation and Restated Bylaws.

11.05. *Registration Rights*. Reorganized Grand Union shall enter into Registration Rights Agreements with each Entity which, as of the Effective Date (a) holds Senior Subordinated Notes entitling such holder to received ten percent (10%) or more of the shares of New Common Stock and requests in writing that the Debtor execute such Registration Rights Agreement or (b) holds Senior Notes entitling such holder to New Senior Notes to be issued under the Plan and requests in writing that the Debtor execute such Registration Rights Agreement.

11.06. *Filing of Credit Documents/Indenture/Registration Rights Agreements.* The Post-Confirmation Credit Agreement (and such other of the Post-Confirmation Credit Documents as the Debtor, the Official Committee or the Informal Committee of Senior Noteholders shall reasonably request) and the final drafts of the New Senior Note Indenture and the Registration Rights Agreements shall be filed by the Debtor with the Bankruptcy Court no later than a date which is five (5) days prior to the first date set by the Bankruptcy Court as the deadline for voting to accept or reject the Plan. The Post-Confirmation Credit Documents shall be in form and substance satisfactory to the Debtor and the Senior Bank Agent (if the Debtor does not elect the treatment set forth in Section 6.01(a)(ii) hereof). Notice of any modification to the Post-Confirmation Credit Documents after their filing with the Bankruptcy Court shall be provided to the Official Committee and the Informal Committee of Senior Noteholders. The New Senior Note Indenture and the Registration Rights Agreements shall be in form and substance reasonably satisfactory to the Senior Bank Agent, the Official Committee and, with respect to the New Senior Notes, the Informal Committee of Senior Noteholders. In the event the Debtor chooses the treatment to be afforded to the Existing Banks as set forth in Section 6.01(a)(i) hereof, the terms and conditions of the Post-Confirmation Credit Documents shall include in all respects the terms and conditions of the Commitment Letter and the Credit Facility Term Sheet except to the extent that the Debtor and Bankers Trust otherwise agree. In the Confirmation Order, the Bankruptcy Court shall approve the Post-Confirmation Credit Documents in substantially the form filed with the Bankruptcy Court and authorize the Debtor to execute the same together with such other documents as Bankers Trust may reasonably require in order to effectuate the treatment afforded to the Post-Confirmation Banks hereunder.

## ARTICLE 12

### PROVISIONS COVERING DISTRIBUTIONS

12.01. *Time of Distributions Under this Plan.* Except as otherwise provided in this Plan and without in any way limiting Section 11.02 and Article 13 of this Plan, payments and distributions in respect of Allowed Claims shall be made by Reorganized Grand Union (or its designee) on or as promptly as practicable after the Effective Date.

12.02. *Fractional Securities.*

(a) Fractional shares of New Common Stock, fractional Warrants and New Senior Notes in non-integral multiples of $1,000 shall not be distributed. Instead, on the date of final distribution of such securities to the persons entitled thereto, the aggregate of all fractional interests (including, for such purposes, New Senior Notes in a principal amount less than $1,000) that would otherwise be issued to such persons shall instead be placed in two separate pools in respect of each such securities (hereinafter the "Fractional Securities Pools") provided this Section 12.02 shall not affect the distributions to such holders of whole shares of Common Stock, whole Warrants or New Senior Notes in $1,000 increments, but solely the fractional portion thereof. There shall be a single Fractional Securities Pool for the fractional interests in New Common Stock and a single Fractional Securities Pool for the fractional interests in New Senior Notes. With respect to the Warrants, there shall be separate Fractional Securities Pools established for each of (i) the fractional interests in Series 1 Warrants to be distributed to holders of Class 9 Claims, (ii) the fractional interests in Series 1 Warrants to be distributed to holders of Class 10 Claims, (iii) the fractional interests in Series 2 Warrants to be distributed to holders of Class 9 Claims and (iv) the fractional interests in Series 2 Warrants to be distributed to holders of Class 10 Claims.

(b) All holders of Allowed or Ultimately Allowed Claims entitled to a fractional interest in New Common Stock, as the case may be, shall be placed on a list (hereinafter the "Distribution List") in descending order according to the size of the fractional interest in the New Common Stock to which each such holder is entitled. In the event two or more holders of Allowed or Ultimately Allowed Claims are entitled to the same fractional interest (rounded to six decimal places) in New Common Stock, their relative

ranking on the Distribution List shall be determined by lot. A whole share of New Common Stock shall be distributed to holders entitled to the largest fractions of New Common Stock until all of the whole shares of the New Common Stock in the Fractional Securities Pool for the New Common Stock shall have been distributed.

(c) (i) Subject to subparagraph (ii), the holders of Allowed or Ultimately Allowed Claims entitled to a fractional interest in the New Senior Notes (i.e., New Senior Notes in a principal amount less than $1,000) shall be entitled to receive either, at the election of the Debtor or Reorganized Grand Union (which election shall be exclusive of the other option) (x) cash equal to the principal amount of the fractional New Senior Notes to which they would otherwise be entitled, and the New Senior Notes which would otherwise have been issued in respect of such fractional interests shall be cancelled by the Debtor or Reorganized Grand Union, or (y) (a) the holders entitled to a fractional interest which is greater than $500 shall receive an additional $1,000 New Senior Note (subject to subparagraph (ii)) and (b) the holders entitled to a fractional interest which is $500 or less shall not be entitled to any distribution with respect to such fractional interest.

(ii) Notwithstanding subparagraph (i) hereof, in the event that the aggregate amount of the cash which would be distributed pursuant to subparagraph (i)(x) is less than $100,000, then the Debtor or Reorganized Grand Union must elect option (x). Notwithstanding subsection (i)(y)(a), in no event shall the aggregate New Senior Notes distributed pursuant to this Plan exceed $595,475,922 in aggregate principal amount, and if the New Senior Notes to be distributed pursuant to subparagraph (c)(i)(y) would cause the aggregate to exceed this amount, then, in ascending order according to the size of their respective fractional interests, the holders entitled to receive New Senior Notes pursuant to subsection (c)(i)(y)(a) shall be deemed to instead fall under subsection (c)(i)(y)(b) with respect to such fractional interests.

(d) All holders of Allowed or Ultimately Allowed Claims entitled to a fractional interest in Warrants shall be treated as follows with respect to such fractional interests. In descending order of size of fractional interests, the holders of fractional interests in each of the four separate Fractional Securities Pools established with respect to the Warrants pursuant to subparagraph (a) of this Section 12.02 shall receive (in addition to the number of whole Warrants to which each is otherwise entitled) a whole Warrant with respect to such fractional interest until the aggregate number of each Series of Warrants to be distributed, respectively (x) to holders of Claims in Classes 9 pursuant to Section 6.09(a) hereof and (y) to holders of Claims in Class 10 pursuant to Section 6.10(a) hereof have been distributed; provided that, in the event two or more holders of Allowed or Ultimately Allowed Claims in the same Fractional Securities Pool are entitled to the same fractional interest (rounded to six decimal places) with respect to the Warrants to be distributed with respect to that pool, their relative ranking on the distribution list shall be determined by lot.

12.03. *Compliance With Tax Requirements.* In connection with each distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) and/or withholding is required, Reorganized Grand Union shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, and/or effect any such withholding and deposit all moneys so withheld as required by law. With respect to any Entity from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received by Reorganized Grand Union (or its distribution agent), Reorganized Grand Union may, at its option, withhold the amount required and distribute the balance to such Entity or decline to make such distribution until the information is received; *provided, however,* that Reorganized Grand Union shall not be obligated to liquidate New Senior Notes, Warrants or New Common Stock to perform such withholding.

12.04. *Persons Deemed Holders of Registered Securities.* Except as otherwise provided herein and subject to Section 11.02, the Debtor and Reorganized Grand Union (or their designee) shall be entitled to treat the record holder of a registered security as the holder of the Claim or Interest in respect thereof for purposes of all notices, payments or other distributions under this Plan unless the Debtor or Reorganized Grand Union,

as the case may be, shall have received written notice specifying the name and address of any new holder thereof (and the nature and amount of the interest of such new holder) at least ten (10) Business Days prior to the date of such notice, payment or other distribution. In the event of any dispute regarding the identity of any party entitled to any payment or distribution in respect of any Claim under this Plan, no payments or distributions will be made in respect of such Claim until the Bankruptcy Court resolves that dispute pursuant to a Final Order.

12.05. *Allocation Between Principal and Accrued Interest.* Except as specifically provided in this Plan, on the Effective Date, the aggregate consideration paid to Creditors in respect of their Claims shall be treated as allocated first to the principal amount of such Claims and then to the accrued interest thereon; *provided, however,* that the foregoing shall not apply to distributions with respect to Claims in Classes 9 and 10. (*i.e.,* there shall be no mandated reporting requirement by operation of this Plan).

12.06. *Distribution of Unclaimed Property.* Any distribution of property under this Plan that is unclaimed after two years following the Effective Date shall irrevocably revert to Reorganized Grand Union, without regard to state escheatment laws.

12.07. *Indenture Trustee Reserves.*

(a) To the extent that, as of the Effective Date, (i) any pending General Unsecured Claims, Miscellaneous Secured Claims or Administrative Expenses of an Indenture Trustee (including a good faith estimate submitted to the Debtor by each Indenture Trustee of its estimated fees and expenses accruing through the Effective Date) are not paid on the Effective Date, or (ii) any pending General Unsecured Claims, Miscellaneous Secured Claims or Administrative Expenses of an Indenture Trustee for its fees and expenses are not yet Allowed or Ultimately Allowed Claims as of the Effective Date, the Debtor shall establish on the Effective Date a separate cash reserve (a "Reserve") for each Indenture Trustee in the amount of any such amounts then outstanding, to consist of cash equal to the total of the above unpaid or pending fees and expenses of each Indenture Trustee (including such good faith estimate of fees and expenses through the Effective Date), as of the Effective Date.

(b) The obligation of Reorganized Grand Union to pay each Indenture Trustee its fees and expenses owing to it under its applicable Indenture and this Plan, including, without limitation, its General Unsecured Claims, Miscellaneous Secured Claims and Administrative Expenses, shall be secured by the amounts in the Reserve established for that Indenture Trustee; *provided, however,* that the Lien Rights of the Indenture Trustees under their respective Indentures shall be deemed to attach to the cash in the applicable Reserve to the same extent as if the cash in the Reserve were property received by the Indenture Trustee pursuant to its Indenture; and *provided, further,* that each Indenture Trustee shall be conclusively deemed to have taken any and all action required, including under its respective Indenture or applicable law, to perfect its Lien Rights as to the cash in the Reserve established for its benefit, including, without limitation, any requirement of possession for such perfection.

(c) In consideration of the foregoing, and subject to the establishment of the Reserves in the specified amounts and under the foregoing terms and conditions, the Indenture Trustees each are deemed to have waived their Lien Rights in the New Senior Notes and the New Common Stock to be distributed under the Plan to the holders of, respectively, the Senior Notes and the Senior Subordinated Notes, and shall be deemed to have waived and released any and all right, title and interest in and to property of the Debtor or Reorganized Grand Union other than in and to the cash in the applicable Reserve. Each Indenture Trustee shall be entitled to Allowed Claims for the reasonable fees and expenses incurred by such Indenture Trustee under the respective Indenture. Upon payment by the Debtor or Reorganized Grand Union of such Claims, the respective Lien Rights of the Indenture Trustee shall be extinguished. Objections to such claims shall be governed by the provisions respecting Impaired Claims set forth in Section 13.01 hereof.

## ARTICLE 13
### RESOLUTION OF DISPUTED CLAIMS

13.01. *Objections to Claims.* Any party in interest may object to an Impaired Claim, other than an Impaired Claim otherwise allowed as provided in this Plan, by filing an objection with the Bankruptcy Court and serving such objection upon the holder of such Claim not later than the last to occur of (a) the 45th day following the Effective Date, (b) 30 days after the filing of the proof of claim of such Claim, or (c) such other date set by order of the Bankruptcy Court (the application for which may be made on an *ex parte* basis), whichever is later. Only Reorganized Grand Union shall have the authority to file objections to Unimpaired Claims. Objections to Unimpaired Claims may be filed by Reorganized Grand Union at any time.

13.02. *Procedure.* Unless otherwise ordered by the Bankruptcy Court or agreed to by written stipulation of the Debtor or Reorganized Grand Union, or until the objection of the Debtor or Reorganized Grand Union is withdrawn, the Debtor or Reorganized Grand Union shall litigate the merits of each Disputed Claim until determined by a Final Order; *provided, however,* subject to the approval of the Bankruptcy Court, if necessary, the Debtor or Reorganized Grand Union, as the case may be, may compromise and settle any objection to any Claim.

13.03. *Payments and Distributions With Respect to Disputed Claims.* No payments or distributions shall be made in respect of a Disputed Claim until and unless such Disputed Claim becomes an Ultimately Allowed Claim.

13.04. *Timing of Payments and Distributions With Respect to Disputed Claims.* Subject to the provisions of this Plan, payments and distributions with respect to each Disputed Claim that becomes an Ultimately Allowed Claim, which would have otherwise been made had the Ultimately Allowed Claim been an Allowed Claim on the Effective Date shall be made within thirty (30) days after the date that such Disputed Claim becomes an Ultimately Allowed Claim. Holders of Disputed Claims that become Ultimately Allowed Claims shall be bound, obligated and governed in all respects by the provisions of this Plan.

## ARTICLE 14
### DISCHARGE, RELEASES AND SETTLEMENTS OF CLAIMS

14.01. *Discharge of All Claims and Interests and Releases.*

(a) Except as otherwise specifically provided by this Plan, the confirmation of this Plan (subject to the occurrence of the Effective Date) shall discharge the Debtor and Reorganized Grand Union from any debt (including, without limitation, Class 11 Claims and Claims related to Class 12 Interests) that arose before the Confirmation Date, and any debt of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a proof of Claim is filed or is deemed filed, whether or not such Claim is Allowed, and whether or not the holder of such Claim has voted on this Plan.

(b) Except as otherwise specifically provided by this Plan, the distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date) of (i) all Claims and Causes of Action against, liabilities of, liens on, obligations of and Interests in the Debtor or Reorganized Grand Union or the direct or indirect assets and properties of the Debtor or Reorganized Grand Union, whether known or unknown, and (ii) all Causes of Action (whether known or unknown, either directly or derivatively through the Debtor or Reorganized Grand Union) against, claims (as defined in section 101 of the Bankruptcy Code in the case of GUCC and GUHC) against, liabilities (as guarantor of a Claim or otherwise) of, liens on the direct or indirect assets and properties of, and obligations of successors and assigns of the Debtor, Affiliates of the Debtor and their successors and assigns, and present and former stockholders, directors, officers, agents (including MTH), attorneys, advisors, financial advisors, investment bankers and employees of the Debtor and such Affiliates

based on the same subject matter as any Claim or Interest, in each case regardless of whether a proof of Claim or Interest was filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on this Plan, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or Interest, in each case regardless of whether a proof of Claim or Interest was filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on this Plan.

(c) Except as otherwise specifically provided by this Plan, any Entity accepting any distribution pursuant to this Plan shall be presumed conclusively to have released the Debtor, Reorganized Grand Union and any other Entity accepting any distribution pursuant to this Plan, successors and assigns of the Debtor and such Entities, Affiliates of the Debtor and such Entities, successors and assigns of such Affiliates, present and former stockholders, directors, officers, agents (including MTH), attorneys, advisors, financial advisors, investment bankers and employees of the Debtor, such Affiliates and such Entities, and any Entity claimed to be liable derivatively through any of the foregoing, from any Cause of Action based on the same subject matter as the Claim or Interest on which the distribution is received. The release described in the preceding sentence shall be enforceable as a matter of contract against any Entity that accepts any distribution pursuant to this Plan.

(d) On the Effective Date, the Debtor and the Debtor-In-Possession will be conclusively deemed to release (i) all professionals (including, but not limited to, advisors and attorneys) retained by (aa) the Debtor (that were retained as of November 1, 1994 in connection with the Debtor's restructuring, but only as to claims which arise in connection with such restructuring, or were retained by order of the Bankruptcy Court), (bb) the Senior Bank Agent, the Official Committee or the Informal Committees, provided that such professionals were disclosed to the Debtor prior to the Filing Date or retained by order of the Bankruptcy Court, (cc) the Indenture Trustees, or (dd) the Capital Indenture Trustees, the Informal Zero Committee, or the Capital Committee, (ii) MTH and (iii) all directors and officers of the Debtor holding such offices at any time during the period from and including the Filing Date through and including the Confirmation Date from all liability based upon any act or omission related to past service with, for or on behalf of the Debtor or the Debtor-In-Possession except for:

(i) any indebtedness of any such person to the Debtor or Debtor-In-Possession for money borrowed by such person;

~~(ii) any setoff or counterclaim the Debtor or Debtor-In-Possession may have or assert against any~~ such person, provided that the aggregate amount thereof shall not exceed the aggregate amount of any Claims held or asserted by such person against the Debtor or Debtor-In-Possession, as the case may be;

(iii) the uncollected amount of any claim made by the Debtor or Debtor-In-Possession (whether in a filed pleading, by letter or otherwise asserted in writing) prior to the Effective Date against such person which claim has not been adjudicated to Final Order, settled or compromised; or

(iv) claims arising from the fraud, willful misconduct or gross negligence of such persons.

(e) On the Confirmation Date, subject to the occurrence of the Effective Date, the Debtor shall be deemed to have released all Causes of Action against the members of the Official Committee, the members of the Informal Committees, the members of the Capital Committee, the members of the Informal Zero Committee, the Additional Facility Lenders, the Existing Banks, the holders of Senior Notes, the Indenture Trustees, the Capital Indenture Trustees or the holders of Senior Subordinated Notes, in their respective capacities as such.

(f) Notwithstanding anything herein to the contrary, the foregoing releases shall be enforced only to the extent permitted by applicable law.

(g) Nothing in the Plan shall be construed as discharging, releasing or relieving the Debtor, Reorganized Grand Union, or any other party, in any capacity, from any liability with respect to the Retirement Plan to which any such party is subject as of immediately prior to the Effective Date under any law or regulatory provision.

The Releases embodied in this Plan are in addition to, and not in lieu of, any other release separately given, conditionally or unconditionally, by the Debtor or Debtor-In-Possession to any other person or entity.

14.02. *Exculpation*. Neither Reorganized Grand Union, the Official Committee, any of the Informal Committees, the Capital Committee, the Informal Zero Committee, the Senior Bank Agent, nor (as applicable) any of their respective members, officers, directors, shareholders, employees, agents (including MTH), attorneys, accountants or other advisors, shall have or incur any liability to any holder of a Claim or Interest for any act or failure to act in connection with, or arising out of, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for any act or failure to act that constitutes willful misconduct or recklessness as determined pursuant to a Final Order, and in all respects, such Entities (a) shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan, and shall be fully protected from liability in acting or in refraining from action in accordance with such advice, and (b) shall be fully protected from liability with respect to any act or failure to act that is approved or ratified by the Bankruptcy Court.

14.03. *Injunction*. The satisfaction, release and discharge pursuant to Section 14.01 of this Plan shall also act as an injunction against any Entity commencing or continuing any action, employment of process, or act to collect, offset or recover any Claim or Cause of Action satisfied, released or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof. Nothing in the Plan shall be construed as discharging, releasing or relieving the Debtor, Reorganized Grand Union, or any other party, in any capacity, from any liability with respect to the Retirement Plan to which any such party is subject as of immediately prior to the Effective Date under any law or regulatory provision, and neither the Pension Benefit Guaranty Corporation nor the Retirement Plan shall be enjoined from enforcing such liability as a result of the Plan's provisions for satisfaction, release and discharge of Claims.

14.04. *Preservation of Rights*. Notwithstanding any provision of this Plan or the Disclosure Statement, or any exhibit hereto or thereto, or the Confirmation Order, nothing herein or in the Disclosure Statement, in any exhibit hereto or thereto or in the Confirmation Order shall affect any rights preserved pursuant to Section 14.06 of this Plan.

14.05. *Claims of Subordination*.

(a) Subject to the Confirmation Order becoming a Final Order (or the requirement therefor being waived in accordance with Sections 15.02(a) and 16.07) and subject to the distributions that are required to be made under the Plan as of the Effective Date to Classes 1, 2 and 4 having been made, as of the Effective Date, each holder of an Allowed or Ultimately Allowed Claim, (i) by virtue of the acceptance of the Plan by such holder's Class in accordance with section 1126 of the Bankruptcy Code, (ii) by virtue of the acceptance of the Plan by such Holder, (iii) by virtue of the acceptance of any distribution under the Plan on account of such Claim or (iv) by virtue of the confirmation of the Plan, waives, releases and relinquishes any and all rights, claims or causes of action arising under and in any way related to any subordination agreement in effect as of the Filing Date, whether arising out of contract or under applicable law, including, without limitation, any claim or security interest in the Debtor's common stock or subsections (a) or (c) of section 510 of the Bankruptcy Code and the provisions of the Indentures, to the payment and distributions of the consideration made or to be made hereunder or otherwise consistent with the Plan to any holder of an Allowed or Ultimately Allowed Claim against the Debtor; provided, however, that the holders of Credit Agreement Claims shall retain all rights under subordination agreements in effect as of the Filing Date, if any, as to all persons, other than claims against (x) holders of Senior Note Claims, Senior Subordinated Claims, and the Indenture Trustees

with respect thereto and (y) distributions made with respect to Junior Zero Note Claims, Senior Zero Note Claims, and Capital Indenture Trustees hereunder; and provided further that the foregoing shall not affect the rights of any party to seek subordination under section 510(b) or (c) of the Bankruptcy Code of any Claim that otherwise would constitute a General Unsecured Claim.

(b) Pursuant to Bankruptcy Rule 9019, and any applicable state law, and as consideration for the distributions and other benefits provided under this Plan, the provisions of this Section 14.05 shall constitute a good faith compromise and settlement of any Causes of Action relating to the matters described in this Section 14.05 which could be brought by any holder of a Claim or Interest against or involving another holder of a Claim or Interest, which compromise and settlement is in the best interests of Creditors and holders of Interests and is fair, equitable and reasonable. This settlement shall be approved by the Bankruptcy Court as a settlement of all such Causes of Action. The Bankruptcy Court's approval of this settlement pursuant to Bankruptcy Rule 9019 and its finding that this is a good faith settlement pursuant to any applicable state law, including, without limitation, the laws of the states of New York, New Jersey and Delaware, given and made after due notice and opportunity for hearing, shall bar any such Cause of Action relating to the matters described in this Section 14.05 which could be brought by any holder of a Claim or Interest against or involving another holder of a Claim or Interest.

### 14.06. *Termination of Indemnification Obligations.*

(a) *Termination of Indemnification Obligations.* Except as and to the extent set forth in subsections (b) and (c) of this Section 14.06 and in the MTH Settlement Agreement, and notwithstanding any other provision of the Plan, all obligations of the Debtor to indemnify, or to pay contribution or reimbursement to, its present or former directors, officers, agents (including, without limitation, MTH), employees and representatives holding such positions at any time prior to the Confirmation Date whether pursuant to its certificate of incorporation, bylaws, contractual obligations or any applicable laws or otherwise in respect of all past, present and future actions, suits and proceedings against any of such directors, officers, agents, employees and representatives based upon any act or omission related to service with, for or on behalf of the Debtor or Debtor-In-Possession or any present or former Affiliate shall be discharged under the Plan, all such undertakings and agreements shall be rejected and terminated, and Reorganized Grand Union shall have no obligation thereunder pursuant to this Plan or otherwise.

(b) *Limited Continuing Indemnification.* The obligations of the Debtor pursuant to law or its certificate of incorporation or bylaws or otherwise to indemnify, or to pay contribution or reimbursement to, the Indemnified Persons, as defined below, in respect of all past, present and future actions, suits and proceedings, whether commenced or threatened, against such Indemnified Persons, which include obligations based upon any act or omission arising out of the performance by an Indemnified Person of services to the Debtor, its present or former subsidiaries, GUCC, or GUHC, for or at the request of the Debtor, prior to the Effective Date, whether prior to the Filing Date or not, shall not be discharged or impaired by confirmation of this Plan and shall not be subordinated under Section 510 of the Code or otherwise, or be disallowed by reasons of Section 502(e) of the Code or otherwise; provided, however, that the limited continuing obligations preserved by this Section 14.06(b) shall not cover any claim for indemnification, contribution, reimbursement or other payment by an Indemnified Person arising out of or related, directly or indirectly, to any action, suit or proceeding against any Indemnified Person (i) brought by GUCC or GUHC, (ii) brought by any other person which is a present or former purchaser, seller, underwriter or owner, in each case acting in such capacity, of present or former securities of the Debtor, its predecessors or any present or former Affiliate thereof, including, without limitation, GUCC or GUHC, in such capacity or (iii) brought by any trustee, receiver or other representative of or asserting the rights of GUCC, GUHC or any other person described in (i) of this Section 14.06(b) or (iv) brought by any other person (a "Third Party Claimant") against an Indemnified Person asserting claims for contribution, reimbursement or indemnity by such Third Party Claimant arising out of or related to any action, suit or proceeding against such Third Party Claimant which, had it been brought against an Indemnified Person, would be described in (i), (ii) or (iii) of this Section

14.06(b) (such claims being hereinafter referred to as the "Excluded Claims"). As used in this Section 14.06(b), the term "Indemnified Persons" shall mean (x) the Debtor's present and former directors, officers and employees which have held such position with the Debtor at any time during the period from and including one year prior to the Filing Date through and including the Confirmation Date, (y) persons who retired as directors, officers or employees of the Debtor ("Retirees") prior to the Effective Date and (z) MTH and the other MTH Entities, as defined in the MTH Settlement Agreement. Any liability of the Debtor under this paragraph which is attributable to the period from the Filing Date to the Effective Date and which under the Bankruptcy Code has the priority of an expense of administration shall be entitled to such priority, but no aggregate amount of dollars shall be paid by reason of such priority which is greater than the absolute maximum payable under this paragraph.

(c) *Additional Limited Indemnification for Costs.* Notwithstanding the provisions of subsections (a) and (b) of this Section 14.06, the obligations of the Debtor pursuant to law or its certificate of incorporation or bylaws or otherwise to indemnify, or to pay contribution or reimbursement to, the Continuing Indemnified Persons, as defined below, in respect of legal fees, costs, expert advice and witnesses and expenses ("Defense Expenses") incurred by the Continuing Indemnified Persons in the defense of Excluded Claims shall not be discharged or impaired by reason of confirmation of this Plan or otherwise and shall not be subordinated under Section 510 of the Code or otherwise and shall not be disallowed under Section 502(e) of the Code or otherwise. As used in this Section 14.06(c), the term "Continuing Indemnified Persons" shall mean those persons who are entitled to indemnification under the certificate of incorporation or bylaws of the Debtor as in effect prior to the Filing Date and who shall have served as directors, officers or employees of the Debtor at any time from and after one year before the Filing Date and Retirees, but shall not include any MTH Entity. Upon written request of any one or more Continuing Indemnified Person, the Board of Directors may, in its reasonable discretion, apply funds that would be used in respect of the defense of an Excluded Claim to the settlement thereof if such settlement payment will be less than the reasonably anticipated Defense Expenses which would be incurred in respect of such Excluded Claim and such application would be in the best interest of Reorganized Grand Union. Any liability of the Debtor under this paragraph which is attributable to the period from the Filing Date to the Effective Date and which under the Bankruptcy Code has the priority of an expense of administration shall be entitled to such priority, but no aggregate amount of dollars shall be paid by reason of such priority which is greater than the absolute maximum payable under this paragraph.

(d) No Indemnified Person or Continuing Indemnified Person shall be required to file any Claim or Administrative Expense to establish rights preserved under subsections (b) and (c) of this Section 14.06.

14.07. *Preservation of Insurance.* The Debtor's discharge and release as provided herein, except as necessary to be consistent with this Plan, shall not diminish or impair the enforceability of any insurance policies that may cover claims against the Debtor or any other person or entity.

14.08. *Claims of Holders of Zero Notes and Capital Indenture Trustees.* As of the Effective Date, the holders of the Zero Notes shall not be heard, either directly or indirectly, other than with respect to any post-confirmation modifications to the Plan or the Confirmation Order or with respect to matters concerning distribution of the Warrants, applications by professionals for compensation or reimbursement of expenses or payment of Claims of the Capital Indenture Trustees.

## ARTICLE 15
### CONFIRMATION AND CONSUMMATION OF THE PLAN

15.01. *Conditions to Confirmation.* Prior to confirmation of the Plan, the following conditions must occur and be satisfied or (a) have been waived by the Debtor, with the consent of the Senior Bank Agent (if the alternative funding option pursuant to Section 6.01(a)(ii) is not elected), the Official Committee, and the Informal Committee of Senior Noteholders, or (b) have been waived by the Senior Bank Agent (if the alternative funding option pursuant to Section 6.01(a)(ii) is not elected), the Official Committee, and the

Informal Committee of Senior Noteholders, such waiver having been approved by order of the Bankruptcy Court upon motion of the Senior Bank Agent (if applicable), the Official Committee, and the Informal Committee of Senior Noteholders:

(a) If the Debtor elects the treatment set forth in Section 6.01(a)(i) hereof with respect to Credit Agreement Claims:

(i) The Post-Confirmation Credit Documents (including the Intercreditor Agreement) shall have been filed with the Bankruptcy Court not less than five (5) days prior to the Confirmation Date; and

(ii) The Debtor shall have received authority to execute, and the Bankruptcy Court shall have approved, the Post-Confirmation Credit Documents and all other documents necessary to effectuate the Post-Confirmation Credit Documents, which authority and approval shall be contained in the Confirmation Order;

(b) If the Debtor elects the treatment set forth in Section 6.01(a)(ii) hereof with respect to Credit Agreement Claims:

(i) The Debtor shall have entered into an Alternative Commitment Letter, which shall have been approved by the Bankruptcy Court;

(ii) The Alternative Credit Documents shall have been filed with the Bankruptcy Court not less than five (5) days prior to the Confirmation Date;

(iii) The Debtor shall have received authority to execute, and the Bankruptcy Court shall have approved, the Alternative Credit Documents and all other documents necessary to effectuate the Alternative Credit Documents;

(c) The Settlement Order shall have been entered;

(d) The Claims Bar Date shall have been established by the Bankruptcy Court as a date which is no less than five Business Days prior to the Confirmation Date; and

(e) As of a date which is three (3) Business Days prior to the Confirmation Date, the Official Committee shall not have filed a written notice that is not withdrawn asserting that such Committee has determined in the exercise of its fiduciary duties to unsecured creditors generally that the amount of the General Unsecured Claims has rendered the Plan not feasible pursuant to section 1129 of the Bankruptcy Code.

15.02. *Conditions to the Effective Date*. Before the Effective Date occurs, the following conditions must occur and be satisfied or have been waived (a) by the Debtor, with the consent of the Senior Bank Agent (if the alternative funding option pursuant to Section 6.01(a)(ii) is not elected), the Official Committee, and the Informal Committee of Senior Noteholders, or (b) by the Senior Bank Agent (if the alternative funding option pursuant to Section 6.01(a)(ii) is not elected), the Official Committee, and the Informal Committee of Senior Noteholders, such waiver having been approved by order of the Bankruptcy Court upon motion of the Senior Bank Agent (if applicable), the Official Committee, and the Informal Committee of Senior Noteholders:

(a) *Confirmation Order and Settlement Order*. The Confirmation Order and Settlement Order shall have become Final Orders;

(b) *Regulatory Approval*. Unless otherwise waived by the Debtor with the consent of the Official Committee and the Informal Committee of Senior Noteholders (and the Senior Bank Agent, if the Debtor does not elect the treatment set forth in Section 6.01(a)(ii) hereof with respect to Credit Agreement Claims), which consent shall not be unreasonably withheld, there shall have been obtained all regulatory approvals required in connection with the consummation of this Plan;

(c) *TIA*. The New Senior Note Indenture shall have been qualified under the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbb) as currently in effect;

(d) *Credit Conditions*. The Post-Confirmation Credit Document or Alternative Credit Agreements, as the case may be, shall be executed by all necessary parties thereto and delivered and all conditions to effectiveness of such documents shall have been satisfied or waived as provided therein, subject to the occurrence of the Effective Date;

(e) *Delivery of Documents*. All other documents provided for under this Plan shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited by such documents; and

(f) *Other Orders*. Any order necessary to satisfy any condition to effectiveness of this Plan shall be a Final Order.


## ARTICLE 16

### MISCELLANEOUS PROVISIONS

16.01. *Bankruptcy Court to Retain Jurisdiction*. The business and assets of the Debtor shall remain subject to the jurisdiction of the Bankruptcy Court until the Effective Date. From and after the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over Reorganized Grand Union and the Chapter 11 Case to the fullest extent permissible by law, including, but not limited to, for the purposes of determining all disputes and other issues presented by or arising under this Plan including, without limitation, exclusive jurisdiction to:

(a) determine any and all disputes relating to Claims and Administrative Expenses, including those allowed by operation of the Plan, and the allowance, amount and classification thereof; *provided, however*, the Bankruptcy Court's jurisdiction shall be concurrent, not exclusive, after the Effective Date with respect to the enforcement or adjudication of any Unimpaired Claim,

(b) determine any and all disputes among Creditors with respect to their Claims,

(c) consider and allow any and all applications for compensation for professional services rendered and disbursements incurred in connection therewith,

(d) determine any and all applications, motions, adversary proceedings and contested or litigated matters pending on the Effective Date and arising in or related to the Chapter 11 Case or this Plan,

(e) remedy any defect or omission or reconcile any inconsistency in the Confirmation Order,

(f) issue such orders, consistent with section 1142 of the Bankruptcy Code, as may be necessary to effectuate the consummation and full and complete implementation of this Plan,

(g) enforce and interpret any provisions of this Plan,

(h) determine such other matters as may be set forth in the Confirmation Order or that may arise in connection with the implementation of this Plan,

(i) determine the final amounts allowable as compensation or reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code, and

(j) determine any and all disputes among Creditors with respect to the Zero Claims Release.

16.02. *Binding Effect of this Plan*. The provisions of this Plan shall be binding upon and inure to the benefit of the Debtor, Reorganized Grand Union, any holder of a Claim or Interest, their respective predecessors, successors, assigns, agents, officers and directors and any other Entity affected by this Plan.

16.03. *Nonvoting Stock*. In accordance with section 1123(a)(6) of the Bankruptcy Code, the certificate of incorporation of Reorganized Grand Union shall contain a provision prohibiting the issuance of nonvoting equity securities by Reorganized Grand Union.

16.04. *Authorization of Corporate Action*. The entry of the Confirmation Order shall constitute authorization for the Debtor and Reorganized Grand Union to take or cause to be taken any corporate action necessary or appropriate to consummate the provisions of this Plan prior to and through the Effective Date (including, without limitation, the filing of or amending or restating the certificate of incorporation of Reorganized Grand Union), and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court. All matters provided for under the Plan involving the corporate structure of the Debtor and/or Reorganized Grand Union in connection with the Plan, and any corporate action required by the Debtor and/or Reorganized Grand Union in connection with the Plan, and any corporate action required by the Debtor and/or Reorganized Grand Union in connection with the Plan, shall be deemed to have occurred and shall be in effect pursuant to section 303 of the Delaware General Corporation Law and the Bankruptcy Code, without any requirement of further action by the stockholders or directors of the Debtor and/or Reorganized Grand Union. On the Effective Date, the appropriate officers of Reorganized Grand Union and members of the Post Reorganization Board are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan and the Disclosure Statement in the name of and on behalf of Reorganized Grand Union.

16.05. *Retiree Benefits*. On and after the Effective Date, Reorganized Grand Union shall continue to pay all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, to the extent required by section 1129(a)(3) of the Bankruptcy Code, without prejudice to Reorganized Grand Union's rights under applicable non-bankruptcy law to modify, amend or terminate the foregoing arrangements.

16.06. *Withdrawal of this Plan*. Subject to the provisions of Section 16.16 of this Plan, Debtor reserves the right, at any time prior to the entry of the Confirmation Order, to revoke or withdraw this Plan. If the Debtor revokes or withdraws this Plan or if the Confirmation Date does not occur, then this Plan shall be deemed null and void.

16.07. *Final Order*. Subject to the provisions of Sections 15.02(a) and 16.16 of this Plan, any requirement in the Plan for a Final Order may be waived by the Debtor upon written notice to the Bankruptcy Court; *provided, however*, that nothing contained herein shall prejudice the right of any party in interest to seek a stay pending appeal with respect to such Final Order.

16.08. *Method of Notice*. All notices required to be given under this Plan, if any, shall be in writing and shall be sent by first class mail, postage prepaid, or by overnight courier:

If to the Debtor to:

The Grand Union Company
201 Willowbrook Boulevard
Wayne, New Jersey 07470
Attn: Mr. Francis E. Nicastro
(201) 890-6000

with copies to:

Willkie Farr & Gallagher
One Citicorp Center
153 East 53rd Street
New York, New York 10022-4677
Attn: Myron Trepper
        Barry N. Seidel
(212) 821-8000

and

Young, Conaway Stargatt & Taylor
11th Fl., Rodney Square North
P.O. Box 391
Wilmington, Delaware 19899-0391
Attn: James L. Patton, Jr.
        Laura Davis Jones
(302) 571-6600

Any of the above may, from time to time, change its address for future notices and other communications hereunder by filing a notice of the change of address with the Bankruptcy Court. Any and all notices given under this Plan shall be effective when received.

16.09. *Dissolution of any Committee.* Except as otherwise provided in this Section 16.09, on the Effective Date all Committees, including the Official Committee and the Informal Committees, shall cease to exist and their members and employees or agents (including, without limitation, attorneys, investment bankers, financial advisors, accountants and other professionals) shall be released and discharged from all further authority, duties, responsibilities and obligations relating to, arising from or in connection with the Chapter 11 Case. The Official Committee shall continue to exist after such date solely with respect to (i) any objections made by the Official Committee pursuant to Section 13.01 of this Plan or other matters pending before the Bankruptcy Court to which the Official Committee is party, until such objections or matters are resolved; (ii) all fee applications filed pursuant to section 330 of the Bankruptcy Code or Claims for fees and expenses by professionals employed by the Debtor or agreed to be paid by the Debtor; and (iii) any post-confirmation modifications to the Plan or Confirmation Order. The Informal Committee of Senior Noteholders shall continue to exist after such date (x) until substantially all of the distributions to be made with respect to Senior Note Claims under this Plan have been made and (y) solely with respect to any matters pending as of the Effective Date before the Bankruptcy Court to which the Informal Committee of Senior Noteholders is party, until such matters are resolved.

16.10. *Continued Confidentiality Obligations.* Pursuant to the terms thereof, members of and advisors to any Committee, Informal Committee, the Informal Zero Committee or the Capital Committee, any other holder of a Claim or Interest and their respective predecessors and successors shall continue to be obligated and bound by the terms of any confidentiality agreement executed by them in connection with the Chapter 11 Case or the Debtor, to the extent that such agreement, by its terms, may continue in effect after the Confirmation Date.

16.11. *Amendments and Modifications to Plan.* Subject to the provisions of Section 16.16 of this Plan, this Plan may be altered, amended or modified by the Debtor, before or after the Confirmation Date, as provided in section 1127 of the Bankruptcy Code.

16.12. *Time.* Unless otherwise specified herein, in computing any period of time prescribed or allowed by the Plan, the day of the act or event from which the designated period begins to run shall not be included.

A-31

The last day of the period so computed shall be included, unless it is not a Business Day, in which event the period runs until the end of the next succeeding day which is a Business Day.

16.13. *Section 1145 Exemption*. Pursuant to, in accordance with, and solely to the extent provided under, section 1145 of the Bankruptcy Code, the issuance of the New Senior Notes, the New Common Stock, the Warrants and the New Common Stock to be issued upon the exercise of the Warrants under this Plan is exempt from the registration requirements of Section 5 of the Securities Act of 1933, as amended, and any state or local law requiring registration or licensing of an issuer, underwriter, broker or dealer in, such New Senior Notes, New Common Stock or Warrants, and is deemed to be a public offering of the New Senior Notes, New Common Stock and Warrants.

16.14. *Section 1146 Exemption*. To the extent permitted by section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, or the revesting, transfer or sale of any real property of the Debtor pursuant to, in implementation of or as contemplated by the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

16.15. *Severability*. If any provision of the Plan is determined to be unenforceable, such determination shall not limit or affect the enforceability and operative effect of any other provisions of the Plan. Subject to the provisions of Section 16.16 of this Plan, to the extent any provision of the Plan would, by its inclusion in the Plan, prevent or preclude the Bankruptcy Court from entering the Confirmation Order, the Bankruptcy Court, on the request of the Debtor, may modify or amend such provision, in whole or in part, as necessary to cure any defect or remove any impediment to the confirmation of the Plan existing by reason of such provision.

16.16. *Conditions to Modification, Withdrawal and Waiver Rights*. Notwithstanding any provisions contained herein to the contrary, including, without limitation, Sections 16.06, 16.07, 16.11 and 16.15, the Debtor may: (a) withdraw the Plan after having first given four (4) Business Days notice in writing to counsel for the Senior Bank Agent, the Official Committee and the Informal Committee of Senior Noteholders (to be served via facsimile and overnight delivery) of the date of the proposed withdrawal and the reason therefor; provided, however, that the Senior Bank Agent, the Official Committee or the Informal Committee of Senior Noteholders may object to such withdrawal and seek an order of the Bankruptcy Court preventing the occurrence thereof; or (b) amend or modify the Plan; *provided, however*, that the Debtor must first obtain the consent of the Senior Bank Agent, the Official Committee, and/or the Informal Committee of Senior Noteholders, as the case may be, if the Claims or interests of their respective constituencies (in their capacities as such) are adversely and materially affected by such amendment or modification.

16.17. *Setoff Rights Unaffected*. Except as otherwise expressly provided in this Plan, this Plan is not intended to, and shall not, abrogate or impair any rights of setoff of the Debtor or Reorganized Grand Union.

16.18. *Manner of Payment*. Except with respect to Credit Agreement Claims and Interest Rate Protection Agreement Claims, payment of which shall be made by wire transfer of same day funds, payments provided hereunder may be made, at the option of the Debtor or Reorganized Grand Union, in cash, by wire transfer or by check drawn on any money market center bank.

Dated: Wilmington, Delaware
April 19, 1995

Respectfully submitted,

THE GRAND UNION COMPANY

By: /S/   FRANCIS E. NICASTRO
_____
  Francis E. Nicastro
  An Officer

WILLKIE FARR & GALLAGHER
Co-counsel for Debtor and
  Debtor-In-Possession
One Citicorp Center
153 East 53rd Street
New York, New York 10022-4677
(212) 821-8000

By: /S/   MYRON TREPPER
_____
  Myron Trepper (MT-2636)
  Barry N. Seidel (BNS-1945)
  A Member of the Firm

            - and -

YOUNG, CONAWAY, STARGATT
  & TAYLOR
Co-counsel for Debtor and
  Debtor-In-Possession
11th Fl., Rodney Square North
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6642

By: /S/   JAMES L. PATTON, JR.
_____
  James L. Patton, Jr. (#2202)
  Laura Davis Jones (#2436)
  A Member of the Firm

**Exhibit A**