

**Bankers Trust Company**

One Bankers Trust Plaza, New York, New York 10006

Mailing Address:
P.O. Box 318, Church Street Station
New York, New York 10008

**[CONFORMED COPY]**

January 24, 1995

<u>VIA HAND</u>

The Grand Union Company
201 Willowbrook Boulevard
Wayne, New Jersey 07470

Attention:  Mr. Francis E. Nicastro
Vice President and Treasurer

Re:    The Grand Union Company Credit Facility --
<u>Additional Facility Commitment Letter</u>

Gentlemen:

You have advised us that, in connection with a contemplated plan of reorganization of The Grand Union Company (the "Company"), in order to provide for (a) the working capital needs of the Company and its subsidiaries as set forth in the Company's Five Year Business Plan revised as of January 17, 1995 and (b) the issuance of additional letters of credit necessary to the operations of the Company and its subsidiaries, the Company desires the aggregate principal amount of credit provided for in the Credit Agreement dated as of July 14, 1992 among the Company, Grand Union Holdings Corporation (formerly known as GND Holdings Corporation) ("Holdings"), Grand Union Capital Corporation ("GU Capital"), the lending institutions party thereto (the "Existing Lenders"), Bankers Trust Company ("BTCo"), as agent, and Midlantic Bank, N.A., as co-agent (as amended through the date hereof, the "Existing Credit Agreement") to be increased by $65,000,000 to an aggregate principal committed amount of approximately $204,144,371.

Specifically, you have advised us that the Company requests from us a commitment to amend the Existing Credit Agreement pursuant to an Amended and Restated Credit Agreement (the "Amended and Restated Credit Agree-

The Grand Union Company
January 24, 1995
Page 2

ment") to provide (a) an additional $18,000,000 secured term loan facility (the "C Term Loan Facility") for the purpose of borrowing one term loan on the closing date of the Amended and Restated Credit Agreement and (b) $47,000,000 in additional secured revolving credit facilities on the closing date of the Amended and Restated Credit Agreement (collectively referred to as the "Additional Facility").

The Company's request for us to consider the Additional Facility has been made in the context of, and is materially related to, a proposed restructuring of the Company's capital structure that will be consummated in connection with a prenegotiated reorganization case under Chapter 11 of Title 11 of the United States Code (the "Reorganization Plan"). You have further advised us that as part of the Reorganization Plan: (a) the holders of the Company's 11-¼% Senior Notes due July 15, 2000 (the "11-¼% Notes"), and the Company's 11-⅜% Senior Notes due February 15, 1999 (the "11-⅜% Notes"; and together with the 11-¼% Notes, the "Senior Notes"), have agreed in principle to release the liens and security interests of the Senior Notes in the Collateral (as defined in the Existing Credit Agreement); and (b) the holders of the Company's 12-¼% Senior Subordinated Notes due July 15, 2002 (the "12-¼% Notes"), the Company's 12-¼% Senior Subordinated Notes due July 15, 2002, Series A (the "Series A Notes"), and the Company's 13% Senior Subordinated Notes due March 2, 1998 (the "13% Notes"; and together with the 12-¼% Notes and Series A Notes, the "Subordinated Notes"), have agreed in principle to convert the Company's obligations under the Subordinated Notes into all of the issued shares of the Company's common stock. Additionally, you have advised us that the Company will provide for the full principal payment of other claims against the Company as allowed in the Chapter 11 case.

BTCo, on the terms and subject to the conditions set forth or referred to herein, is pleased to advise you of its commitment to provide the Additional Facility. All revolving loans will mature on the fifth anniversary of the date of the effectiveness of the Loan Documentation (as hereinafter defined) (the "Closing Date"). The B Term Loan Facility (as defined in the Existing Credit Agreement) and the C Term Loan Facility will mature on the seventh anniversary of the Closing Date; provided, however, that the term loans will be amortized in eight equal quarterly mandatory prepayments beginning on the fifth anniversary of the Closing Date.

The Grand Union Company
January 24, 1995
Page 3

In connection with the Additional Facility, BTCo, at its election, may arrange a syndicate of commercial banks and other financial institutions (BTCo and such other financial institutions being collectively referred to as the "Additional Facility Lenders") to provide a portion of the Additional Facility. Additionally, BTCo is prepared to act as Agent for the Additional Facility Lenders and to recommend that the Existing Lenders commit to contribute to the Additional Facility.

This commitment letter is based in material part on the Company's representations that the Company has successfully completed all required negotiations to promptly implement the Reorganization Plan and that the Reorganization Plan is feasible and there is no known impediment to confirmation and consummation of the Reorganization Plan in a Chapter 11 case on an expedited basis. Additionally, it is BTCo's position that the relative status quo among the Company's creditors must be maintained during the brief duration of the pre-confirmation Chapter 11 case to be pursued by the Company. Accordingly, in addition to the other requirements and conditions set forth in this letter, our commitment is subject to the following specific conditions precedent:

- Timeline for Consummation of Reorganization Plan:  The Disclosure Statement for Second Amended Chapter 11 Plan of Reorganization of The Grand Union Company filed on April 19, 1995 and the order approving the adequacy thereof entered on April 19, 1995 shall not be materially amended or modified.  A plan of reorganization that is acceptable to the Existing Lenders and Additional Facility Lenders which incorporates the Reorganization Plan and an identified and qualified management team to execute the Reorganization Plan must be confirmed by order of the Bankruptcy Court on or prior to June 2, 1995 and must be substantially consummated on or prior to June 16, 1995.

- Conversion of Other Debt:  On the Effective Date of the Reorganization Plan, the Senior Notes shall be converted to unsecured debt and all secured liens held by the Senior Noteholders shall be released.  The terms of the indenture to be executed in favor of the Senior Notes as contemplated by the Reorganization Plan shall be acceptable to BTCo.  (In that regard, the Company is advised that, subject to reinvestment provisions to be negotiated in the Amended and Restated Credit Agreement: (a) all pro-

The Grand Union Company
January 24, 1995
Page 4

ceeds of our collateral must be used to repay the lenders under the Amended and Restated Credit Agreement; and (b) all proceeds of any future debt or equity offering must first be used to repay the C Term Loan Facility and, thereafter, must be used to repay the B Term Loan Facility and Senior Notes on a pro rata basis.)  Additionally, the Subordinated Notes shall be exchanged for common stock of the Company.  The only liens on the Company's assets shall be those securing the obligations owed pursuant to the Amended and Restated Credit Agreement except with respect to lessors' interests in capitalized leases and existing purchase money security interests and other liens on assets having an aggregate value not exceeding $15,000,000.

- Lien Priority and Collateral:  On the Effective Date of the Reorganization Plan, the Company's obligations under the Amended and Restated Credit Agreement shall be secured by a perfected, first priority security interest in all of the assets (including leases) of the Company, Holdings, GU Capital and each of their respective subsidiaries; provided, however, that the Additional Facility Lenders shall be entitled to priority over Existing Lenders who do not contribute to the Additional Facility up to the entire amount owed to such Additional Facility Lenders pursuant to the Amended and Restated Credit Agreement, on terms that must be agreed to in an intercreditor agreement between the Existing Lenders and the Additional Facility Lenders.  Additionally, the Existing Lenders must also consent to the Amended and Restated Credit Agreement.

- Payment of Other Claims:  On the later of allowance or the Effective Date of the Reorganization Plan, the Company shall pay the allowed claims of administrative and unsecured creditors of the Company (unless such creditors have agreed to different treatment), including prepetition and reclamation obligations owed to trade creditors.  BTCo will not support the accelerated payment of prepetition unsecured claims (except usual and customary prepetition priority claim payments with respect to the Company's employees) during the brief reorganization case planned by the Company; provided, however, that if the Court authorizes such payments such authorization in and of itself shall not constitute cause for termination of this commitment letter.

The Grand Union Company
January 24, 1995
Page 5

- Cash Collateral and DIP Financing Facility:  Any interim cash collateral order and any debtor in possession financing facility that may be offered by the Company for approval in any bankruptcy case shall be on terms that are acceptable to BTCo as Agent for the Existing Lenders.

- Payment of Interest, Fees and Expenses:  During the pendency of any bankruptcy case filed by the Company, BTCo and the remaining Existing Lenders will agree to accrue interest payable under the Existing Credit Agreement; provided, however that: (a) all such accrued interest is paid in cash on the Effective Date of the Reorganization Plan; and (b) BTCo and the Existing Lenders receive prompt periodic reimbursement of fees and expenses as provided in the Existing Credit Agreement and in this letter.

BTCo reserves the sole right to apportion in any manner it deems appropriate the total amount of the Additional Facility among the Additional Facility Lenders that agree to be a part of the syndicate for the Additional Facility.  The Company understands and agrees that BTCo may employ the services of any of its affiliates in connection with the syndication of the Additional Facility (the "Syndication") and that BTCo may share any information relating to the Company and its subsidiaries with such affiliates and such affiliates may share any such information relating to the Company and its subsidiaries with BTCo.

By its acceptance of the terms of this letter in the manner provided below, the Company agrees that BTCo will act as sole and exclusive administrative agent and arranger or, if BTCo so requests, as Co-Agent, for the Amended and Restated Credit Agreement, or if BTCo so requests, any other financing facility contemplated by the Reorganization Plan (including any amendments or modifications thereto), unless you and BTCo after reasonable efforts and in good faith are unable to agree on the terms of such financing.

The Company also agrees to assist and fully cooperate, to the extent requested by BTCo or any of its affiliates, in achieving the Syndication, and acknowledges that the Syndication of the Additional Facility may occur in whole or in part after definitive documentation for the Amended and Restated Credit Agreement has been executed.  The Syndication will be accomplished by a variety of means, including direct contact during such Syndication between senior management and advisors of the Company and the proposed syndicate members.

The Grand Union Company
January 24, 1995
Page 6

The Company's assistance in connection with the Syndication of the Additional Facility will also include, if BTCo or any of its affiliates so requests at any time prior to the closing of the Amended and Restated Credit Agreement, the restructuring, in a manner mutually acceptable to BTCo and the Company, of the terms and conditions of the Amended and Restated Credit Agreement if, in BTCo's sole judgment, any portion of the Syndication of the Additional Facility shall have been unsuccessful.

Without limitation of the foregoing, to assist BTCo in the Syndication of the Additional Facility, the Company hereby agrees both before and after the closing of the Amended and Restated Credit Agreement to (a) provide and cause its advisors to provide BTCo, BTCo's affiliates and actual and prospective syndicate members upon request with all information deemed necessary by BTCo or any of its affiliates to complete such Syndication, including but not limited to (i) information and evaluations prepared by the Company and its advisors or on its behalf relating to the transactions contemplated hereby and (ii) information, projections and valuations described herein or in the Company's Reorganization Plan in support of the Company's Reorganization Plan, (b) assist BTCo and its affiliates upon their request in the preparation of an Information Memorandum to be completed by March 1, 1995 and used in connection with the Syndication of the Additional Facility, and (c) make available officers of the Company from time to time for purposes of the foregoing and to attend and make presentations regarding the Additional Facility and the Company's and its subsidiaries' businesses and prospects, as appropriate, at a meeting or meetings of prospective syndicate members.

BTCo's obligations hereunder are subject to the negotiation, execution and delivery of a definitive term sheet (the "Term Sheet") and the negotiation, execution and delivery of definitive documentation for the Amended and Restated Credit Agreement that, in each case, is in form and substance satisfactory to BTCo (collectively, the "Loan Documentation"). The Term Sheet and Loan Documentation shall be prepared by special counsel to BTCo and shall contain the loan pricing and such covenants, representations and warranties, events of default, conditions precedent, security arrangements, indemnities and other terms and provisions as shall be satisfactory to BTCo. The Loan Documents shall consist of an amendment and restatement of the Existing Credit Agreement and each other Credit Document (as defined in the Existing Credit Agreement) and such

The Grand Union Company
January 24, 1995
Page 7

other documents as BTCo may reasonably require in light of the transactions contemplated hereby.

As you are aware, BTCo has not had the opportunity to complete its business, financial or legal due diligence analysis and review of the Company or its subsidiaries, their respective businesses or the Reorganization Plan or the other transactions contemplated hereby. BTCo's willingness and obligations hereunder to provide all or any of the Additional Facility in the manner contemplated hereby are therefore subject, without limitation, to (a) the completion of such analysis and review and BTCo's satisfaction with the results thereof, (b) BTCo's satisfaction with the structure and terms and the financial, accounting and tax aspects of the Reorganization Plan and the other transactions contemplated thereby, including the effect of any prepetition trade payments that may be authorized by the Court on the Company's capital structure and/or Reorganization Plan and (c) BTCo's determination that there has not occurred or become known any condition or any change in the business, operations, assets, condition of the Company or any of its subsidiaries which in the judgment of BTCo is material and adverse.

Without limiting the foregoing, if after completing such review and analysis, BTCo is not satisfied with respect to the business, property, operations, assets, liabilities, condition (financial or otherwise) or prospects of the Company or its subsidiaries or their respective businesses, the feasibility of the Reorganization Plan or the other transactions contemplated hereby or the ability of the Company to satisfy its obligations under the Amended and Restated Credit Agreement after giving effect thereto, BTCO may decline to provide all or any of the Additional Facility. Any determination or election to be made by BTCo under this letter shall be made in BTCo's sole discretion. BTCo shall not be responsible or liable for any damages which may be alleged as a result of its failure to arrange or participate in the Additional Facility in the event that it declines to arrange or participate in the proposed financing contemplated by the Amended and Restated Credit Agreement in accordance with the terms outlined in this letter or the Term Sheet.

The Company hereby represents, warrants and covenants that all information (other than projections, if any) and data concerning the Company and its subsidiaries which has been or is hereafter furnished or otherwise made avail-

The Grand Union Company
January 24, 1995
Page 8

able to BTCo and its affiliates by the Company is and will be complete and cor-
rect in all material respects and does not and will not contain any untrue state-
ment of a material fact or omit to state a material fact necessary in order to make
the statements contained therein not misleading in light of the circumstances
under which such statements are made. Projections, if any, will constitute the
Company's good faith estimate of the items projected.

The costs and expenses of BTCo (including the fees and expenses
of Skadden, Arps, Slate, Meagher & Flom, special counsel to BTCo, and
Policano & Manzo, financial advisors to such special counsel) in connection with
(a) the preparation, execution, delivery and enforcement of this letter or any other
document (including, without limitation, the Term Sheet, the Fee Letter (as
hereinafter defined) and the Loan Documentation), (b) BTCo's due diligence with
respect to the Company and its subsidiaries, the Additional Facility, the Amended
and Restated Credit Agreement, the other transactions contemplated hereby and
the Reorganization Plan, (c) the Syndication (including the preparation of any
information for prospective syndicate members as described above and costs and
expenses incurred by BTCo in connection with any assignment of all or any
portion of the Additional Facility after the initial funding thereof), and (d) the
other transactions contemplated hereby shall be paid by the Company promptly
upon request therefor, regardless of whether the Additional Facility, the Amended
and Restated Credit Agreement, any Syndication or each or any other transaction
contemplated hereby is consummated.

The Company agrees to indemnify and hold harmless BTCo, each
Existing Lender, each prospective and actual member of a syndicate for the Addi-
tional Facility and each of the foregoing entities' respective affiliates, advisors,
directors, officers, agents, attorneys and employees and each other person or
entity, if any, controlling such persons or entities (all such persons and entities
being referred to hereafter as "Indemnified Persons") from and against all losses,
claims, damages, liabilities, proceedings, actions, suits, investigations, inquiries
or expenses of any kind or nature whatsoever which may be incurred by, asserted
against or involve any Indemnified Person as a result of or arising out of or in
any way related to any of the transactions contemplated hereby (whether or not
consummated) or the preparation, execution, delivery and enforcement of this
letter or the Fee Letter and, upon demand by BTCo, to pay or reimburse any
such Indemnified Person for any legal or other out-of-pocket expenses incurred in

The Grand Union Company
January 24, 1995
Page 9

connection with investigating, defending, or preparing to defend any such action, suit, proceeding (including any inquiry or investigation) or claim (whether or not such Indemnified Person is named as a party to any action or proceeding out of which any such expenses arise); provided that the Company shall not be responsible to any such Indemnified Person for any losses, claims, damages, liabilities or expenses which resulted primarily from such Indemnified Person's gross negligence or willful misconduct. If and to the extent the foregoing obligations are unenforceable for any reason or are insufficient to hold any Indemnified Person harmless as so provided, the Company agrees to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under applicable law. Neither BTCo, any Existing Lender, any prospective or actual member of any syndicate for the Additional Facility nor any affiliate of any of the foregoing persons or entities shall be responsible or liable to the Company or any other person or entity for consequential damages which may be alleged as a result of this letter.

By its acceptance of this letter, the Company hereby agrees to pay, or cause to be paid, to BTCo the non-refundable fees as set forth in the letter addressed to the Company from BTCo of even date herewith (the "Fee Letter"). The provisions of this paragraph and the immediately preceding two paragraphs shall survive any termination of this letter and the consummation of the transactions contemplated hereby.

By its acceptance of delivery of this letter, the Company agrees that the Company shall not disclose to any person or entity (other than on a confidential basis to its directors, officers, employees, auditors and financial and legal advisors who need to know about this letter and the Fee Letter) the existence or terms of this letter or the Fee Letter; provided that after the execution and delivery by the Company of this letter and the Fee Letter in accordance with the terms hereof, the Company may disclose this letter or the terms hereof.

This letter may not be assigned by the Company without the prior written consent of BTCo. BTCo shall have the right to effect the Syndication as provided above and BTCo, each Existing Lender and each actual member of a syndicate for the Additional Facility shall have the right to assign and sell participations in any interest in the Additional Facility and the Amended and

The Grand Union Company
January 24, 1995
Page 10

Restated Credit Agreement in accordance with the Term Sheet and the applicable provisions of the Loan Documentation.

This letter will terminate at 5:00 p.m., New York time, on February 6, 1995, unless, prior to such time, the Company: (a) notifies BTCo in writing that the commitment letter is to be extended and (b) causes to be wire transferred to BTCo the Extension Fee provided for in the Fee Letter; provided, however, that if prior to February 6, 1995 the Company files a motion with the Bankruptcy Court seeking authority to extend the commitment letter, then the February 6, 1995 termination date set forth above shall be extended by the number of days required to obtain a hearing on the motion but shall not in any event be extended beyond February 15, 1995. If the commitment letter is extended by the Company and unless earlier terminated in accordance with the terms hereof, the obligations of BTCo hereunder shall terminate at 5:00 p.m., New York time, on June 16, 1995.

This letter may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which shall be an original but all of which shall constitute one and the same instrument. This letter is solely for the benefit of the Company, BTCo and its affiliates and, to the extent specified herein, the Existing Lenders and prospective and actual members of the syndicate for the Additional Facility, and no provision hereof shall be deemed to confer rights on any other person or entity. THIS LETTER WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS. This letter and the Fee Letter supersede all prior discussions and agreements, and set forth the sole and complete agreement of BTCo and the Company in respect of the transactions contemplated hereby. Any term of this letter may be amended, supplemented or otherwise modified and the observance of any term of this letter may be waived (either generally or in a particular instance and either retroactively or prospectively), only by a written document signed by the Company and BTCo.

If the Company is in agreement with the foregoing, please execute the enclosed copy of this letter and return the same to BTCo, attention Mary Kay Coyle, no later than 2:00 p.m., New York time, on Tuesday, January 24, 1995, whereupon the undertakings of the parties shall become effective to the extent and

The Grand Union Company
January 24, 1995
Page 11

in the manner provided hereby and in the Fee Letter. This offer shall terminate if not so accepted by the Company on or prior to 2:00 p.m., New York City time, on January 24, 1995, in which case the Company shall return all copies and originals of this letter and the Fee Letter to BTCo as promptly as possible.

Very truly yours,

BANKERS TRUST COMPANY

By: /s/ Michael R. Shraga
   Name: Michael R. Shraga
   Title: Managing Director

ACCEPTED AND AGREED TO
AS OF THE DATE FIRST
WRITTEN ABOVE:

THE GRAND UNION COMPANY

By: /s/ Gary D. Hirsch
   Name: Gary D. Hirsch
   Title: Chairman of the Board



# Bankers Trust Company
One Bankers Trust Plaza, New York, New York 10006

Mailing Address:
P.O. Box 318, Church Street Station
New York, New York 10008

**[CONFORMED COPY]**

February 2, 1995

<u>VIA HAND</u>

The Grand Union Company
201 Willowbrook Boulevard
Wayne, New Jersey 07470

      Attention:  Mr. Francis E. Nicastro
                   Vice President and Treasurer

              Re:    The Grand Union Company Credit Facility --
                      <u>Additional Facility Term Sheet</u>

Gentlemen:

        Reference is made to the commitment letter dated January 24, 1995 (the "Commitment Letter") addressed to you from Bankers Trust Company ("BTCo"). The parties hereto agree that this letter together with the preliminary summary of certain terms and conditions of the Amended and Restated Credit Agreement (as defined in the Commitment Letter) attached as Exhibit A hereto, constitute the Term Sheet referenced in the Commitment Letter and that the terms hereof are incorporated in and made a part of the Commitment Letter. This letter supersedes any prior letters (other than the Commitment Letter and the Fee Letter (as defined in the Commitment Letter)) from BTCo with respect to the subject matter hereof.

        This letter may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which shall be an original but all of which shall constitute one and the same instrument.   THIS LETTER AND THE TERM SHEET ATTACHED HERETO AS EXHIBIT A WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS.

The Grand Union Company
February 2, 1995
Page 2

If the Company is in agreement with the foregoing and the Term Sheet, please execute the enclosed copy of this letter and return the same to BTCo, attention Mary Kay Coyle, no later than 5:00 p.m., New York time, on Thursday, February 2, 1995, whereupon the undertakings of the parties shall become effective to the extent and in the manner provided hereby and in the Commitment Letter and the Fee Letter.

Very truly yours,

BANKERS TRUST COMPANY

By: /s/ Michael R. Shraga
   Name: Michael R. Shraga
   Title: Managing Director

ACCEPTED AND AGREED TO
AS OF THE DATE FIRST
WRITTEN ABOVE:

THE GRAND UNION COMPANY

By: /s/ Francis E. Nicastro
   Name: Francis E. Nicastro
   Title: Vice President and Treasurer

<u>Exhibit A</u>

$204,144,371 OF
<u>SENIOR SECURED CREDIT FACILITIES</u>

Summary of Certain Terms and Conditions
<u>Subject to the Commitment Letter Dated January 24, 1995</u>

Capitalized terms used but not defined herein shall have the respective meanings assigned thereto in the Commitment Letter.

**Borrower:**

The Grand Union Company (the "Borrower")

**Total Commitment:**

A total initial commitment amount of $204,144,371 (the "Total Commitment"), to be allocated among the facilities set forth below in a manner which is mutually satisfactory to BTCo and the Borrower.

**Revolving Facility:**

(a) <u>Facility</u>. A revolving credit facility (the "Revolving Facility"), with tranches to be allocated in accordance with an intercreditor agreement (the "Intercreditor Agreement") among the Lenders (as hereinafter defined), in an initial commitment amount of up to $147,000,000 (the "Total Revolving Loan Commitment"), of which up to (a) $60,000,000 shall be available for the issuance of standby letters of credit ("SBLC's"), and (b) $15,000,000 shall be available for the borrowing of swingline loans ("Swingline Loans"). Loans (including Swingline Loans) made pursuant to the Revolving Facility ("Revolving Loans") may be repaid and reborrowed to the extent of the unutilized portion of the Total Revolving Loan Commitment at the time of reborrowing. The SBLC's will not extend beyond the Final Revolving Loan Maturity Date. In no even will Revolving Loans outstanding and outstanding SBLC exposure ever exceed the Total Revolving Loan Commitment as then in effect.

(b) <u>Final Revolving Loan Maturity Date</u>. Fifth anniversary of the Closing Date.

**Term Loan Facility:**

(a) <u>Facility</u>. A term loan credit facility (the "Term Loan Facility"; and, together with the Revolving Facility, the "Facilities"), with tranches to be allocated in accordance with the terms of the Intercreditor Agreement, in an amount not less than $57,144,371.

(b) <u>Final Term Loan Maturity Date</u>. Seventh anniversary of the Closing Date. Beginning on the fifth anniversary of the Closing Date, Loans made pursuant to the Term Loan Facility (the "Term Loans") shall amortize in eight equal quarterly payments. The Term Loans together with the Revolving Loans shall hereafter be referred to as the "Loans."

**Purpose:**

Loans may be utilized to provide for working capital and other general corporate purposes of the Borrower.

**Agent:**

Bankers Trust Company ("BTCo")

**Lenders:**

The lenders under the Existing Credit Agreement and syndicates of commercial banks and other financial institutions to be formed by BTCo.

**Closing Date:**

That date, which is not earlier than the effective date of the Reorganization Plan, on or before June 16, 1995 (the "Closing Date").

**Guaranties:**

Each now and hereafter existing subsidiary of the Borrower shall be required to provide a guaranty of all amounts and other obligations owing under the Facilities (collectively, the "Guaranties"), subject to such exceptions, if any, as are acceptable to BTCo and the Required Lenders.

The Guaranties shall contain terms and conditions substantially similar to those contained in the guaranties entered into in connection with the Existing Credit Agreement, with such changes as BTCo or the Lenders shall require.

**Security:**

The Facilities (and all obligations under the Guaranties) shall be secured by a perfected first priority security interest in all of the tangible and intangible assets (including, without limitation, all assets as described in the Commitment Letter) of the Borrower and its subsidiaries, whether in existence at the Closing Date or acquired thereafter; provided, however, that, pursuant to the Intercreditor Agreement, the Additional Facility Lenders shall have priority (with respect to the Additional Facility and with respect to those loans owed to and letter of credit exposure of such Additional Facility Lenders under the Existing Credit Agreement as set forth in the Intercreditor Agreement) over Existing Lenders who do not contribute to the Additional Facility.

**Optional Revolving Loan Commitment Reductions:**

Upon 3 business days' prior written notice, the Borrower may terminate entirely, or reduce permanently, in whole or in part, in $2,000,000 increments, the unutilized portion of the Total Revolving Loan Commitment.

**Mandatory Revolving Loan Commitment Reductions:**

In addition, on terms and conditions substantially similar to those in the Existing Credit Agreement, once the Term Loans have been repaid in full, the Total Revolving Loan Commitment shall automatically be reduced on each day a mandatory prepayment of Term Loans would have been required under the circumstances described in clauses (i) and (ii) in the section below entitled "Mandatory Prepayments" if the Term Loans were then outstanding in such amount by an amount equal to the amount of the required mandatory prepayment of Term Loans that would have been so required.

**Optional Prepayments:**

Permitted in whole or in part in an amount equal to $2,000,000 upon 2 business days' prior notice, without any premium or penalty; provided that Eurodollar Rate Loans shall only be prepayable on the last day of the interest period applicable thereto. Optional prepayments that are to be applied to the Term Loans shall be applied ratably to the respective scheduled prepayments thereof in the inverse order of maturity.

### Mandatory Prepayments:

(a) Mandatory Prepayment of Term Loans.  Mandatory Prepayments of Term Loans shall be required on terms and conditions substantially similar to those contained in the Existing Credit Agreement; provided, that, (i) subject to negotiated reinvestment baskets, all proceeds of collateral securing the Facilities shall be applied to the prepayment of the Term Loans, (ii) subject to negotiated baskets, all proceeds of any future indebtedness of the Borrower for money borrowed, sale-leaseback and other similar transactions shall be used to prepay the Term Loans and (iii) all proceeds up to $65,000,000 of any future equity offerings by the Borrower shall be used to prepay the Loans in accordance with the Intercreditor Agreement.

Mandatory prepayments of Term Loans will be applied to reduce future scheduled amortization payments in the order and on terms substantially similar to those contained in the Existing Credit Agreement subject to such additional provisions relating to allocations between the Term Loan Facility tranches.

(b) Mandatory Prepayments of Revolving Loans.  Revolving Loans shall be required to be prepaid (and after all Revolving Loans have been repaid in full, outstanding SBLC's shall be required to be cash collateralized) at any time that the sum of the aggregate principal amount of outstanding Revolving Loans plus the outstanding SBLC exposure exceeds the Total Revolving Loan Commitment as then in effect, in an amount equal to such excess.

### Interest Rates:

At the Borrower's option, outstanding Loans may be maintained from time to time as:

(a) loans ("Base Rate Loans") which bear interest at a rate equal to the sum (the "Base Rate") of (i) the higher of (A) the Prime Lending Rate (as defined in the Existing Credit Agreement), (B) the sum of 1/2 of 1% plus the Adjusted Certificate of Deposit Rate (as defined in the Existing Credit Agreement), and (C) the sum of 1/4 of 1% plus the Federal Funds Rate (as defined in the Existing Credit Agreement), plus (ii) the Applicable Margin; and/or

(b) loans ("Eurodollar Rate Loans") which bear interest at a rate equal to the sum of the relevant one, two, three or six months Eurodollar Rate (as defined in the Existing Credit Agreement), plus the Applicable Margin;

provided that: (i) all Loans will be subject to terms and conditions substantially similar to those contained in the Existing Credit Agreement and (ii) Swingline Loans shall only be maintained as Base Rate Loans.

"Applicable Margin" shall mean with respect to:  (i) the Revolving Loans, (A) 1-1/2% in the case of any such Loans that are Base Rate Loans and (B) 3% in the case of any such Loans that are Eurodollar Rate Loans and (ii) the Term Loans, (A) 2% in the case of any such Loans that are Base Rate Loans and (B) 3-1/2% in the case of any such Loans that are Eurodollar Rate Loans.

Interest on Loans shall be payable as set forth in the Existing Credit Agreement.  Interest periods for Eurodollar Loans shall be one, two, three or six months.

### Default Rate:

Overdue amounts under the Facilities shall bear interest at a rate equal to the greater of (a) the Base Rate in effect from time to time plus the sum of 2% and the applicable base rate margin, and (b) the interest rate otherwise applicable thereto (without giving effect to any reductions to such rate) plus 2% per annum.  Interest at the Default Rate shall be payable on demand.

### Unused Commitment Fee:

1/2 of 1% per annum of the average daily unused amount of the Total Revolving Loan Commitment, commencing on the Closing Date and payable monthly in arrears on the last day of each month.

**SBLC Fees:**

3% per annum on the amount available under each outstanding SBLC, commencing on the Closing Date and payable in arrears on the last day of each month for the account of all the Lenders. In addition, a 1/4 of 1% per annum facing fee as well as customary issuance and drawing charges, in respect of each outstanding SBLC will be payable by the Borrower.

**Assignment Fees:**

$3,500 per assignment payable upon execution to the Agent (such fee not to be paid by the Borrower). An additional fee to be negotiated will be payable to any other facing bank upon any assignment.

**Calculation of Fees and Interest:**

Interest, Unused Commitment Fees and SBLC Fees shall be calculated on the basis of a 360-day year for the actual number of days elapsed.

**Notification Schedule:**

| | |
|---|---|
| Eurodollar Rate Loans - | 3 business days |
| Base Rate Loans - | 1 business day |
| Swingline Loans - | same day, if notice given by 11:00 A.M., New York City time |

**Conditions to Initial Loans:**

Usual conditions for facilities of this type and such other conditions as may be appropriate in the context of the proposed Reorganization Plan, including but not limited to the conditions set forth in the Commitment Letter and the following:

(a) Execution of the Amended and Restated Credit Agreement, the Intercreditor Agreement and the other credit documents in form and substance satisfactory to BTCo and the Existing Lenders.

(b) The Guaranties shall have been executed and delivered.

(c) All orders, including without limitation the confirmation order, of the Bankruptcy Court entered in connection with the Reorganization Plan (as amended or supplemented from time to time and approved by BTCo, the Existing Lenders and the other Lenders (the "Confirmation Orders")) shall be satisfactory to BTCo (which orders shall, except as agreed to by BTCo, be final orders on the Closing Date) and, as of the Closing Date and after giving effect to the initial Loans, such Reorganization Plan shall have been substantially consummated in accordance with the terms thereof and the terms of the Confirmation Orders.

(d) All aspects of the equity ownership and corporate and operational governance (including the composition of the Board of Directors and the management of the Borrower) of the Borrower and its subsidiaries, to the extent not expressly set forth in the Reorganization Plan, shall be satisfactory to BTCo. Additionally, all agreements relating to, and the corporate and capital structure of, the Borrower and its subsidiaries after giving effect to the transactions contemplated hereby, and all organizational documents of such entities, to the extent not expressly set forth in the Reorganization Plan, shall be satisfactory to BTCo.

(e) All necessary governmental and all material third party approvals and/or consents in connection with the consummation of the Reorganization Plan and the Facilities shall have been obtained and remain in effect, and all applicable waiting periods shall have expired without any action being taken by any competent authority which restrains, prevents, or imposes materially adverse conditions upon, the consummation of the

Reorganization Plan and the Facilities. Additionally, there shall not exist any judgement, order, injunction or other restraint prohibiting or imposing materially adverse conditions upon the Facilities.

(f) No litigation, investigation or inquiry by any entity (private or governmental) shall be pending or threatened with respect to the Facilities, any of the other transactions contemplated hereby or any documentation executed in connection herewith, or with respect to any material debt of the Borrower or its subsidiaries which is to remain outstanding after the Closing Date, or which BTCo or the Required Lenders shall determine could have a materially adverse effect on the ability of the Borrower and its subsidiaries to perform their obligations to the Lenders or the business, property, assets, condition (financial or otherwise) or prospects of the Borrower and its subsidiaries taken as a whole.

(g) The Lenders shall have received legal opinions from counsel, and covering matters, acceptable to BTCo (including, without limitation, the absence of any conflict with any of the agreements and instruments governing the Borrowers indebtedness, and local counsel opinions in respect of all mortgages and other security documents securing the Facilities).

(h) The indebtedness of the Borrower and its subsidiaries existing on the Closing Date, including without limitation capital leases, shall be as described in the Reorganization Plan (including, without limitation, the Borrower's proposed amendment of the Senior Notes and the conversion of the Subordinated Notes on the terms set forth in the Commitment Letter) and, to the extent not described in the Reorganization Plan, shall be satisfactory to BTCo, and the Borrower and its subsidiaries shall have no outstanding indebtedness other than as described in the Reorganization Plan and the Post-Confirmation Projections defined below (with exceptions, if any, as may be acceptable to BTCo in its sole discretion).

(i) The Lenders shall have received the five-year annual financial projections included in the BTCo confidential Information Memorandum regarding the Borrower and monthly projections through the Fiscal Year ended in the year 1996 and annual projections through the Fiscal Year ended in the year 2000 of the Borrower and its subsidiaries (collectively, the "Post-Confirmation Projections"), and BTCo shall be satisfied with the accounting practices and procedures to be utilized by the Borrower and its subsidiaries, and any changes to such Post-Confirmation Projections prior to the Closing Date shall be satisfactory to BTCo.

(j) BTCo shall be satisfied on the Closing Date (i) that the Borrower's cash-on-hand, trade support and other operations are as set forth in the Post-Confirmation Projections and (ii) with the results of operations set forth in the most recent financial statements delivered by the Borrower prior to such date.

(k) To the extent not previously received, BTCo shall have received audited financial statements for the most recent fiscal year of the Borrower.

(l) To the extent not previously established, a cash management system, together with cash concentration accounts for the Borrower shall have been established to the satisfaction of BTCo.

(m) To the extent not previously delivered, the Lenders shall have received (i) financial statements for the most recent fiscal period ending at least 30 days prior to the Closing Date certified by the chief financial officer of the Borrower, and (ii) such inventory analyses as BTCo shall request, in each case satisfactory to BTCo.

(n) To the extent not previously accomplished, the termination of, and repayment of all amounts owing under, or with respect to letters of credit, provisions for payment of reimbursement obligations by cash collateralization or the issuance of Letters of Credit in accordance with the terms thereof, under the debtor in possession financing facility.

(o) All franchises, licenses, permits, certifications, accreditation and other rights, consents and approvals which are necessary for the operations of the Borrower's and its subsidiaries' respective businesses after giving effect to the transactions contemplated hereby shall be in full force and effect.

(p) All loans and other financing to the Borrower and its subsidiaries shall be in full compliance with all applicable requirements of the margin regulations.

(q) All costs, fees, expenses (including, without limitation, legal fees and expenses) and other compensation contemplated hereby and by the Commitment Letter and the Fee Letter that are payable to the Lenders and/or BTCo shall have been paid to the extent due.

(r) The Lenders shall have received, and shall be satisfied with, all appropriate information and advice of professional consultants, including, without limitation, (A) environmental and hazardous substance (including hazardous or toxic materials and waste, or medical waste) assessments, reports or analyses, which, in each such case, shall be in scope, and in form and substance, acceptable to BTCo and (B) insurance certificates that are in form and substance substantially similar to the ones required by the Existing Credit Agreement.

(s) All labor and related employee agreements and liabilities, and all pension and other employee benefit plans and liabilities of the Borrower and its subsidiaries after giving effect to the Reorganization Plan shall be satisfactory to BTCo.

(t) Subject to the qualifications and exceptions referred to under the "Security" section above, the Lenders shall have a perfected first priority security interest in all of the assets of the Borrower and its subsidiaries pursuant to documentation that is satisfactory in form and substance to BTCo and the Lenders; provided, however, that liens with respect to lessors' interests in capitalized leases and existing purchase money security interest, interests of consignors in goods shipped to the Borrower on consignment, and other liens on assets having an aggregate value not exceeding $15,000,000 in the aggregate will be permitted.

(u) There shall not have occurred and be continuing a material disruption of or material adverse change since the date of the Commitment Letter in financial, banking or capital markets that in the sole discretion of BTCo has materially adversely impaired the syndication of loans or the placement of securities of generally the same type and size as any of the types of loans contemplated by the Revolving Facility or the Term Loan Facility in such markets; and the Closing Date occurs on a date that is no earlier than April 17, 1995.

### Conditions to All Loans and SBLC's:

Usual for facilities of this type, including but not limited to the following:

(a) No Event of Default or default (including, but not limited to, cross-defaults) under the Facilities;

(b) All representations and warranties are true and correct on the date of such borrowing or issuance, as applicable, as though made on and as of such date, except for those representations and warranties expressly relating to a particular point in time;

(c) Since January 28, 1995, nothing shall have occurred (and the Lenders shall have become aware of no facts or conditions not previously known) which BTCo or the Required Lenders shall determine (i) could have a material adverse effect on the rights or remedies of the Lenders or the Agent or on the ability of the Borrower and its subsidiaries to perform their obligations to the Lenders, or (ii) has had or could have a materially adverse effect on the business, property, assets, conditions (financial or otherwise) or prospects of the Borrower and its subsidiaries taken as a whole; and

(d) Receipt of borrowing notices and other documents or opinions as requested by the Agent or any Lender.

### Representations and Warranties:

Usual for facilities of this type and such additional ones as may be appropriate in the context of the proposed Reorganization Plan, including but not limited to representations and warranties regarding corporate powers and organization, good standing, third party approvals, enforceability of the documentation for the Facilities, no violation, use of proceeds, financial statements, government approvals, Investment Company Act, Public Utility Holding Company Act, litigation or governmental investigations materially affecting the business, assets, property, condition (financial or otherwise) or prospects of the Borrower and its subsidiaries taken as a whole, no material ad-

verse change in the business, assets, property, condition (financial or otherwise) or prospects of the Borrower and its subsidiaries taken as a whole, compliance with laws (including, but not limited to ERISA, environmental and labor), taxes, title to properties, patents and trademarks, disclosure, employee benefit plans, labor relations, collective bargaining agreements, existing indebtedness, restrictions on subsidiaries and the first priority nature of the security interests in the property intended to secure the Facilities; it being understood that each such representation and warranty shall contain materiality thresholds substantially similar to those set forth for such type of representation and warranty in the Existing Credit Agreement.

## Affirmative Covenants:

Usual for facilities of this type and such additional ones as may be appropriate in the context of the proposed Reorganization Plan, including but not limited to affirmative covenants concerning the maintenance of properties and insurance, good repair, access to and inspection of books, records, property and business, payment of taxes and other liabilities, compliance with statutes (including, but not limited to, environmental statutes, ERISA and worker health and safety), maintenance of corporate existence and franchises, maintenance of corporate separateness, maintenance of fiscal years and fiscal quarters, additional security, further assurances, interest rate protection and delivery of reports, financial statements, certificates, notices of litigation, defaults, ERISA events and other adverse actions and other information requested from time to time by any Lender, through the Agent.

## Negative and Financial Covenants:

Usual for facilities of this type and such additional ones as may be appropriate in the context of the proposed Reorganization Plan, it being understood that the negative and financial covenants and the exceptions thereto shall be substantially similar to those contained in the Existing Credit Agreement, but with such changes and additions thereto (including, without limitation, such changes to (i) the required ratios and other financial maintenance and incurrence tests contained therein, and (ii) the respective amounts of the numerous indebtedness, lien, investment, dividend and other baskets contained therein) as BTCo may require in light of the Reorganization Plan and the other transactions contemplated thereby and the capital structure of the Borrower after giving effect thereto. Although the negative and financial covenants have not yet been specifically determined, it is anticipated that the negative and financial covenants shall in any event include, without limitation, with respect to the Borrower and its subsidiaries: (a) Limitations on mergers, consolidations, sale or purchase of assets, etc.; (b) Limitations on liens; (c) Limitations on indebtedness; (d) Restrictions on capital expenditures; (e) Restrictions on advances, investments and loans, etc.; (f) Limitations on dividends; (g) Restrictions on transactions with affiliates; (h) Restrictions on changes in business; (i) Financial covenants, including the following: (i) EBITDA tests; (ii) Fixed charge coverage ratio tests; (iii) EBITDA to total cash interest expense tests; (iv) Cumulative EBITDA minus adjusted consolidated capital expenditures tests; and (v) Certain additional financial covenants; (j) Limitation on voluntary payments, preferred stock, etc.; (k) Restrictions on issuance of subsidiary stock; (l) Limitations on restrictions affecting subsidiaries; (m) No other post closing designated senior indebtedness; and (n) Restrictions on voluntary prepayments of debt, amendments to the transaction documents, etc.

## Events of Default:

Usual for facilities of this type and such additional ones as may be appropriate in the context of the proposed Reorganization Plan, it being understood that the events of default shall be substantially similar to those contained in the Existing Credit Agreement, but with such changes and additions thereto as BTCo may require in light of the Reorganization Plan and the other transactions contemplated hereby and the capital structure of the Borrower after giving effect thereto.

## Increased Costs and Yield Protection:

Customary for facilities of this type, including protective provisions for such matters as defaulting banks, capital adequacy, increased costs, funding losses, illegality and withholding taxes.

**Required Lenders:**

As set forth in the Intercreditor Agreement, but in any event not more than 51% of the Total Commitment.

**Assignments and Participations:**

The Borrower may not assign its rights or obligations without the consent of the Lenders. Assignments by the Lenders will be permitted with the consent of the Agent and, in the case of assignments of Revolving Loans to non-Lenders, the facing bank, which consents shall not be unreasonably withheld, in minimum amounts of $5,000,000 in the case of assignments to non-Lenders. Assignments to Federal Reserve Banks shall not require consent.

Participations by the Lenders shall be permitted and participants may be granted voting rights limited to decisions affecting changes in amount, rate, fees, and maturity date. Participants will be entitled to the same benefits as the Lenders with respect to the provision of information and also with respect to increased costs and yield protection, but only to the extent the participating Lender would have incurred such costs.
Assignments and participations shall be subject to such other limitations as BTCo may require.

**Expenses and Indemnifications:**

All out-of-pocket expenses and costs of the Agent in connection with the syndication of the Facilities (including but not limited to printing, duplicating, mailing, travel expenses) and in connection with the preparation, execution, and delivery of documentation evidencing the Facilities, and waivers, consents and amendments thereof (including fees and expenses of Skadden, Arps, Slate, Meagher & Flom, special counsel to BTCo, and Policano & Manzo, L.L.C., financial advisors to such special counsel) shall be paid by the Borrower. Out-of-pocket costs and expenses of the Lenders and the Agent with respect to stamp and documentary taxes and enforcement shall be paid by the Borrower. The Borrower shall indemnify the Agent and each Lender for, among other customary items, costs, losses, liabilities and damages of the Lenders and the Agent arising from litigation, proceedings or other claims.

**Governing Law:**

State of New York

THE TERMS AND CONDITIONS OF THIS TERM SHEET ARE NOT LIMITED TO THOSE CONTAINED IN THIS SUMMARY.

# Exhibit B

4/18/95
MTH Settlement Agreement

**Miller Tabak Hirsch & Co.**
**331 Madison Avenue**
**12th Floor**
**New York, New York 10017**

, 1995

The Grand Union Company
201 Willowbrook Boulevard
Wayne, New Jersey 07470

Dear Sirs:

In connection with, among other things, (i) the agreement dated July 22, 1992 (the "Agreement") between MILLER TABAK HIRSCH & Co. ("MTH") and THE GRAND UNION COMPANY (the "Company") and (ii) the Second Amended Plan of Reorganization dated April  , 1995 (the "Plan") of the Company filed on April  , 1995 in connection with the chapter 11 case filed by the Company on January 25, 1995 in the United States Bankruptcy Court for the District of Delaware, this will confirm our agreement as follows:

1. *Termination of Agreement.* The Agreement shall be terminated as of the Effective Date, as such term is defined in the Plan, and the obligations of the Company under the Agreement, including its obligation to pay fees to MTH in the amount of $750,000 per year for financial services rendered by MTH, shall cease as of the Effective Date. The Company shall remain obligated to pay to MTH all fees accrued prior to the Effective Date.

2. *Indemnification of MTH Entities.* The Company hereby confirms that, notwithstanding the termination of the Agreement, it will indemnify, pay contribution to, reimburse and hold harmless MTH and its present and former partners, officers, employees, advisors, attorneys, consultants, agents and representatives, including Messrs. Martin A. Fox, Glenn L. Goldberg, Claude Incaudo and James A. Lash, and any person or entity that directly or indirectly controls MTH, including Gary Hirsch, Jeffrey Miller and Jeffrey Tabak (MTH and any such partner, officer, employee, advisor, attorney, consultant, agent, representative, person or entity being hereinafter referred to individually as an "MTH Entity" and collectively as the "MTH Entities"), from and against any losses, claims, damages or liabilities, joint or several, including the reimbursement of legal and other expenses (including costs of investigation) in connection with any action, suit or proceeding, whether commenced or threatened, incurred by any MTH Entity or to which any MTH Entity may become subject, in connection with the services or matters which are the subject of the Agreement, which services the parties agree include the performance of services of any of the MTH Entities to the Company or any direct or indirect subsidiary thereof, Grand Union Capital Corporation ("GUCC") or Grand Union Holding Corporation ("GUHC") (GUCC, GUHC or any such other subsidiary hereinafter referred to individually as an "Affiliate" and collectively as the "Affiliates") for or at the request of the Company, prior to the Effective Date, whether prior to the Filing Date (as defined in the Plan) or not; provided, however, that the indemnification, contribution, reimbursement or hold harmless provisions of this paragraph 2 shall not cover any claim to be indemnified, reimbursed or held harmless by any MTH Entity arising out of or related, directly or indirectly, to any action, suit or proceeding against any MTH Entity (i) brought by GUCC or GUHC, (ii) brought by any person which is a present or former purchaser, seller, underwriter or owner of present or former securities of the Company, its predecessors or any present or former Affiliate thereof, including, without limitation, GUCC or GUHC, in such capacity, (iii) brought by any trustee, receiver or other representative on behalf of, or asserting the rights of GUCC, GUHC or any other person described in clause (i) hereof, or (iv) brought by any other person (a "Third Party Claimant") against an MTH Entity asserting claims for contribution, reimbursement or indemnity by such Third Party

Claimant arising out of or related to any action, suit or proceeding against such Third Party Claimant which, had it been brought against an MTH Entity, would be described in clauses (i), (ii) or (iii) hereof (such claims described in clauses (i), (ii), (iii) and (iv) being hereinafter referred to as the "Excluded Claims"); and provided further, however, that the Company shall not be liable to any MTH Entity as an indemnified party hereunder in respect of any loss, claim, damage or liability to the extent that a court having jurisdiction shall have determined by a final judgment that such loss, claim, damage or liability of such indemnified party resulted from the willful misfeasance or gross negligence of such indemnified party. In the event that the foregoing indemnity, contribution or reimbursement is unavailable or insufficient to indemnify and hold such MTH Entity harmless, then the Company shall contribute to amounts paid or payable by such MTH Entity in respect of such losses, claims, damages and liabilities in such proportion as appropriately reflects all equitable considerations, including but not limited to the relative benefits received by, and fault of, the Company or such Affiliate on the one hand, and such MTH Entity, on the other hand, in connection with the matters as to which such losses, claims, damages or liabilities relate. For purposes of this agreement, the term "MTH Entity" shall exclude any advisor, financial advisor, investment banker (including Goldman, Sachs & Co., BT Securities Corporation and Nomura Securities International), attorney, or consultant directly engaged by the Company or any Affiliate of the Company and shall also exclude any person or entity other than the individuals expressly named above who are designated by MTH to be excluded from being an MTH Entity.

3. *Limited Liability Relating to Excluded Claims.*

(a) To the extent that any losses, claims, damages or liabilities (including the reimbursement of legal and other expenses, including costs of investigation), arise out of Excluded Claims ("Excluded Claims Liability"), the Company shall indemnify, pay contribution or reimburse MTH or any other MTH Entity in respect of Excluded Claims as set forth in this paragraph 3.

(b) The Company and MTH agree that the Company shall indemnify, pay contribution or reimburse MTH and the other MTH Entities for the first $3,000,000 of any Excluded Claims Liability and that any Excluded Claims Liability above $3,000,000 shall be shared, 66⅔% to be borne by the Company and 33⅓% to be borne by MTH or such other MTH Entities; provided that the Company's indemnity, contribution and reimbursement obligations under this paragraph 3 shall not exceed $13,000,000 in the aggregate; and provided further that the first $3,000,000 of any Excluded Claims Liability shall be increased to $3,150,000 and the limit on the Company's indemnity, contribution and reimbursement obligations under this paragraph shall be increased to $14,000,000 in the aggregate if the release by Federated Research Corp. referred to in paragraph 5 hereof is not delivered for any reason to MTH and any claim is asserted by or on behalf of Federated Research Corp. (including any claim for contribution or reimbursement) against MTH or any MTH Entity or Federated Research Corp. commences an action, suit or proceeding against MTH or any MTH Entity in connection with the Company or any Affiliate of the Company (the Company's obligations as set forth and limited in this clause (b) of this paragraph 3 are hereinafter referred to as the "Excluded Claims Fund").

(c) The Company agrees that the Excluded Claims Fund may be used, subject to the limitations and allocations thereof as set forth in clause (b) of this paragraph 3, to pay any judgment, settle any claim, pay any legal or other expense or pay any contribution or reimbursement and, in the sole and absolute discretion of Gary Hirsch or his designee, any loss, claim, damage or liability incurred by or asserted against any present or former officer or director of the Company, GUCC or GUHC that is not an MTH Entity (the "Continuing Management Group") arising out of Excluded Claims (as used here such term shall have the definition as set forth in Section 15.06(b) of the Plan), and that any such settlement in respect of any asserted Excluded Claims Liability or such Excluded Claims shall be in the sole and absolute discretion of Gary Hirsch or his designee.

(d) The Company agrees to pay promptly its share, as determined under the provisions of clause (b) of this paragraph 3, of (i) any Excluded Claims Liability that is a legal or other expense incurred in connection with defending or preparing to defend any Excluded Claims Liability promptly upon being furnished an

2

invoice for such expense that has been approved by Gary Hirsch or his designee (whether for an expense of MTH or any MTH Entity) with a certification of Gary Hirsch or his designee that such expense is subject to reimbursement hereunder, (ii) any judgment against MTH or any other MTH Entity unless a stay of execution of such judgment is obtained within 20 days after the date of such judgment and such stay is thereafter fully maintained in effect, and (iii) any settlement approved by Gary Hirsch or his designee described in clause (c) of this paragraph 3.

(e) The Company agrees that the first $3,000,000 of the Company's obligation for the Excluded Claims Fund shall be deposited in escrow on the Effective Date on the terms and with the escrow agent described in the Escrow Agreement annexed hereto as Exhibit A.

(f) For purposes of this paragraph 3 and the determination of Excluded Claims, the term "partners" as used in paragraph 2 above with respect to an MTH Entity shall include all partnerships or other persons or entities which may be general or limited partners of MTH and their respective partners, shareholders, directors, officers and employees.

(g) The Company has agreed as provided in the Plan to pay certain legal fees and expenses of the "GUHC and GUCC Legal Advisors" (as such term is defined in the Plan). MTH agrees that the amount paid by the Company to the GUHC and GUCC Legal Advisors for services rendered in connection with the dissolution of GUCC and GUHC as provided in Section 2.04(b) of the Plan shall be applied against the first $3,000,000 or $3,150,000, as the case may be, of the Excluded Claims Fund and reduce the Company's Excluded Claims Liability under clause (b) of this paragraph 3 by such amount.

4. *Insurance.* The Company agrees that any insurance presently in effect covering officers and directors of the Company, GUCC or GUHC will remain in full force and effect with coverage substantially similar in amounts and terms at the sole expense of the Company for not less than six years after the Effective Date of the Plan.

5. *Releases of MTH and Other MTH Entities.* The Company shall release MTH and each other MTH Entity from all claims, losses, damages and liabilities and all suits, actions or d causes of action which the Company has or may have against MTH or any other MTH Entity arising out of any act or failure to act of MTH or any other MTH Entity in connection with the Company or any Affiliate of the Company, including any transaction or agreement to which the Company or any Affiliate of the Company was or is a party and any security, note, instrument or other obligation issued by the Company or any Affiliate of the Company, and MTH shall similarly release the Company and such Affiliates, all such releases to become effective upon the Effective Date of the Plan. In addition, Putnam Investment Management and various funds managed by it or its affiliates, Federated Management and various funds managed by it or its affiliates, and Leland Zaubler shall execute releases in favor of MTH and the other MTH Entities by which MTH and such MTH Entities shall be released from all claims arising in connection with the Company, GUHC, and GUCC and shall on or before April 21, 1995 deliver such releases to counsel for MTH to be held in escrow pursuant to the Escrow Agreement annexed hereto as Exhibit B until the Effective Date of the Plan or any plan which is substantially similar to the Plan, whereupon such releases shall be delivered to MTH, provided that the releases executed by Federated Management and various funds managed by it and its affiliates and by Leland Zaubler shall be delivered to MTH only if the Plan or such substantially similar Plan, the terms of which are not less advantageous to such parties in any material respect, as confirmed by the Bankruptcy Court includes the same or substantially similar release provisions as those contained in Sections 14.01 (b)(i) and 14.01 (c) of the Plan. Notwithstanding anything in the Plan to the contrary, neither MTH nor any MTH Entity shall have waived or released or be deemed to have waived or released any rights it may have against any person or entity which has not released or is not deemed to have released MTH or such MTH Entity of all claims arising in connection with the Company, GUHC or GUCC. The provisions of this agreement shall not affect or release any agreement or obligation between the Company and Penn Traffic Company.

6. *Amended Plan of Reorganization of Company.* Except to the extent that any such release prevents confirmation of the Plan, the Company agrees (i) to provide for the release and settlement of all claims, losses,

3

damages and liabilities and Causes of Action (as such term is defined in the Plan) against MTH and the other MTH Entities as set forth in the Plan and (ii) to otherwise provide for the rights and remedies of MTH and the other MTH Entities and benefits to MTH and the other MTH Entities as set forth in the Plan.

7. *Legal Expenses*. The reasonable legal expenses of MTH for services of Denis F. Cronin and Gilmartin, Poster & Shafto incurred in connection with the negotiation and preparation of this agreement, the Plan, and otherwise in connection with the Company's pending chapter 11 case in the United States Bankruptcy Court for the District of Delaware, will be paid by the Company.

8. *Effective Date*. This agreement shall become effective on the Effective Date of the Plan.

9. *Headings*. Headings are for reference only and are to be ignored in interpreting this agreement.

10. *Counterparts*. This agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument.

11. *Entire Agreement*. This agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, integrates all of the terms and conditions mentioned herein or incidental hereto, and supersedes all oral and written negotiations and agreements with respect to the subject matter hereof.

12. *Governing Law*. This agreement may not be changed orally, shall be binding on the respective successors and assigns of the parties hereto, and shall be governed by and construed and interpreted in accordance with the laws of the State of New York.

Very truly yours,

MILLER TABAK HIRSCH & CO.

By _____

ACCEPTED AND AGREED:

THE GRAND UNION COMPANY

By _____

BY ITS SIGNATURE BELOW, EACH OF THE UNDERSIGNED AGREES TO EXECUTE AND DELIVER THE RELEASE ON THE TERMS DESCRIBED IN THE SECOND SENTENCE OF PARAGRAPH 5 OF THIS AGREEMENT:

EACH OF PUTNAM DIVERSIFIED INCOME TRUST, PUTNAM HIGH INCOME CONVERTIBLE AND BOND FUND, PUTNAM MANAGED HIGH YIELD TRUST, PUTNAM CAPITAL MANAGER TRUST—PCM HIGH YIELD FUND, PUTNAM MASTER INCOME TRUST, PUTNAM PREMIER INCOME TRUST, PUTNAM MASTER INTERMEDIATE INCOME TRUST, PUTNAM CAPITAL MANAGER TRUST—PCM DIVERSIFIED IN-

4

COME, PUTNAM ASSET ALLOCATION FUNDS—BALANCED PORTFOLIO, PUTNAM ASSET ALLOCATION FUNDS—CONSERVATIVE PORTFOLIO, PUTNAM ASSET ALLOCATION FUNDS—GROWTH PORTFOLIO, PUTNAM HIGH YIELD MUNICIPAL TRUST, PUTNAM GLOBAL GOVERNMENTAL INCOME TRUST, PUTNAM HIGH YIELD ADVANTAGE FUND, PUTNAM HIGH YIELD TRUST AND PUTNAM MANAGED HIGH YIELD TRUST

By: _____

PUTNAM DIVERSIFIED INCOME PORTFOLIO/SMITH BARNEY/TRAVELERS SERIES FUND BY PUTNAM INVESTMENT MANAGEMENT

By: _____

EACH OF SOUTHERN FARM BUREAU ANNUITY INSURANCE COMPANY TRAVELERS SERIES FUND, AMERITECH PENSION TRUST, US BOND TRUST 93, US BOND TRUST 91, US BOND TRUST 92, US BOND TRUST 94-03, US BOND TRUST 93-11, CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, US BOND TRUST 91-12, US BOND TRUST 90, MARSH & McLENNAN COMPANIES, INC. U.S. RETIREMENT PLAN AND PUTNAM EMBASSY FUNDS LTD. DIVERSIFIED INCOME FUND BY THE PUTNAM ADVISORY COMPANY, INC.

By: _____

FEDERATED ADVISERS AS ATTORNEY-IN-FACT FOR FEDERATED HIGH YIELD TRUST, FIXED INCOME SECURITIES, INC. ON BEHALF OF ITS STRATEGIC INCOME FUND, INVESTMENT SERIES FUNDS, INC. ON BEHALF OF ITS FORTRESS BOND FUND, INSURANCE MANAGEMENT SERIES ON BEHALF OF ITS CORPORATE BOND FUND, AND LIBERTY HIGH INCOME BOND FUND, INC.

By: _____

_____
LELAND ZAUBLER

5

**EXHIBIT A**

[To be provided and executed on or
prior to the Effective Date of the Plan]

**EXHIBIT B**

[To be provided and executed on or
prior to the Effective Date of the Plan]

# Exhibit C

# THE GRAND UNION COMPANY

## BY-LAWS

### As restated on                    , 1995.

### ARTICLE I.

#### STOCKHOLDERS

SECTION I. The annual meeting of the stockholders of the Corporation for the purpose of electing directors and for the transaction of such other business as may properly be brought before the meeting shall be held at such place, within or without the State of Delaware, and at such hour, as may be determined by the Board of Directors, on the third Wednesday in June of each year (or if said day be a legal holiday then on the next succeeding day not a legal holiday), or on such later date, not later than 30 days thereafter, as may be fixed by the Board of Directors.

SECTION II. Special meetings of the stockholders may be held upon call of the Board of Directors or of the Executive Committee or of the Chairman of the Board (and shall be called by the Chairman of the Board at the request in writing of stockholders owning a majority of the outstanding shares of the Corporation entitled to vote at the meeting) at such time and at such place within or without the State of Delaware, as may be fixed by the Board of Directors or by the Executive Committee or the Chairman of the Board or by the stockholders owning a majority of the outstanding stock of the Corporation entitled to vote, as the case may be, and as may be stated in the notice setting forth such call.

SECTION III. Notice of the time and place of every meeting of stockholders shall be delivered personally or mailed at least ten days previous thereto to each stockholder of record entitled to vote at the meeting, who shall have furnished a written address to the Secretary of the Corporation for the purpose. Such further notice shall be given as may be required by law. Meetings may be held without notice if all stockholders entitled to vote at the meeting are present, or if notice is waived by those not present.

SECTION IV. The holders of record of a majority of the issued and outstanding shares of the Corporation, which are entitled to vote at the meeting, shall, except as otherwise provided by law, constitute a quorum at all meetings of the stockholders. If there be no such quorum present in person or by proxy, the holders of a majority of such shares so present or represented may adjourn the meeting from time to time.

SECTION V. Meetings of the stockholders shall be presided over by the Chairman of the Board or, if the Chairman is not present, by the President or a Vice-President or, if no such officer is present, by a chairman to be chosen at the meeting. The Secretary of the Corporation, or in his absence, an Assistant Secretary shall act as secretary of the meeting, if present.

SECTION VI. Each stockholder entitled to vote at any meeting shall have one vote in person or by proxy for each share of stock held by him which has voting power upon the matter in question at the time; but no proxy shall be voted after three years from its date, unless such proxy expressly provides for a longer period.

SECTION VII. When a quorum is present at any meeting, a plurality of the votes properly cast for election to any office shall elect to such office and a majority of the votes properly cast upon any question other than election to an office shall decide the question, except when a larger vote is required by law, by the certificate of incorporation or by these by-laws. No ballot shall be required for any election unless requested by a stockholder present or represented at the meeting and entitled to vote in the election. In the event a ballot shall be required, the chairman of each meeting at which directors are to be elected shall appoint two inspectors of election, unless such appointment shall be unanimously waived by those stockholders present

or represented by proxy at the meeting and entitled to vote in the election of directors. No director, or candidate for the office of director, shall be appointed as such inspector. The inspectors shall first take and subscribe an oath or affirmation faithfully to execute the duties of inspector at such meeting with strict impartiality and according to the best of their ability, and shall take charge of the polls and after the balloting shall make a certificate of the result of the vote taken. Except where the stock transfer books of the Corporation shall have been closed or a date shall have been fixed as a record date for the determination of the stockholders entitled to vote, as hereinafter provided, no share of stock shall be voted at any election of directors which shall have been transferred on the books on the Corporation within twenty days next preceding such election.

SECTION VIII. The Board of Directors may close the stock transfer books of the Corporation for a period not exceeding sixty days preceding the date of any meeting of stockholders or the date for payment of any dividend or the date for the allotment of rights or the date when any change or conversion or exchange of stock shall go into effect; or, in lieu of closing the stock transfer books, the Board of Directors may fix in advance a date, not exceeding sixty days preceding the date of any meeting of stockholders or the date for the payment of any dividend, or the date for allotment of rights, or the date when any change or conversion or exchange of stock shall go into effect, as a record date for the determination of the stockholders entitled to notice of, and to vote at, any such meeting, or entitled to receive payment of any such dividend, or to any such allotment of rights, or to exercise the rights in respect of any such change, conversion or exchange of stock, and in such case only such stockholders as shall be stockholders of record on the date so fixed shall be entitled to such notice of, and to vote at, such meeting, or to receive payment of such dividend, or to receive such allotment of rights, or to exercise such rights, as the case may be, notwithstanding any transfer of any stock on the books of the Corporation after any such record date as aforesaid.

## ARTICLE II.

### BOARD OF DIRECTORS

SECTION I. The Board of Directors of the Corporation shall consist of not less than three nor more than twelve persons, who shall hold office until the annual meeting of the stockholders next ensuing after their election and until their respective successors are elected and shall qualify and shall initially consist of seven directors. Within the limits above specified, the number of directors shall be determined by resolutions of the Board of Directors or by the stockholders at an annual meeting. Newly created directorships resulting from any increase in the authorized number of Directors shall be filled in the same manner and with the same effect prescribed in Section 2 of this Article II with respect to vacancies. A majority of the Board of Directors shall constitute a quorum.

SECTION II. Vacancies in the Board of Directors shall be filled by a majority of the remaining directors, though less than a quorum, and the directors so chosen shall hold office until the next annual election and until their successors shall be duly elected and qualified, unless sooner displaced pursuant to law.

SECTION III. Meetings of the Board of Directors shall be held at such place within or without the State of Delaware as may from time to time be fixed by resolution of the Board or as may be specified in the call of any meeting. Regular meetings of the Board of Directors shall be held at such times as may from time to time be fixed by resolution of the Board; and special meetings may be held at any time upon the call of the Executive Committee or the Chairman of the Board, by oral, telegraphic or written notice, duly served on or sent or mailed to each director not less than two days before the meeting. A meeting of the Board may be held without notice immediately after the annual meeting of stockholders at the same place at which such meeting is held. Notice need not be given of regular meetings of the Board held at times fixed by resolutions of the Board. Meetings may be held at any time without notice if all the directors are present or if those not present waive notice of the meeting in writing.

2

SECTION IV. Except as may be otherwise provided by law, by the certificate of incorporation or by these by-laws, when a quorum is present at any meeting the vote of a majority of the directors present shall be the act of the Board of Directors.

SECTION V. Any action required or permitted to be taken at any meeting of the Board of Directors or a committee thereof may be taken without a meeting if all the members of the Board or of such committee, as the case may be, consent thereto in writing, and such writing or writings are filed with the records of the meetings of the Board or of such committee. Such consent shall be treated for all purposes as the act of the Board or of such committee, as the case may be.

SECTION VI. Members of the Board of directors, or any committee designated by such Board, may participate in a meeting of such Board or committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other or by any other means permitted by law. Such participation shall constitute presence in person at such meeting.

SECTION VII. The Board of Directors may also, by resolution or resolutions passed by a majority of the whole Board, designate one or more committees, each committee to consist of two or more of the directors of the Corporation, which, to the extent provided in said resolution or resolutions, shall have and may exercise the powers of the Board of Directors in the management of the business and affairs of the Corporation, and may have power to authorize the seal of the Corporation to be affixed to all papers which may require it. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board of Directors. A majority of the members of any such committee may determine its action and fix the time and place of its meetings unless the Board of Directors shall otherwise provide. The Board of Directors shall have power at any time to fill vacancies in, to change the membership of, or to dissolve any such committee.

## ARTICLE III.

### OFFICERS

SECTION I. The Board of Directors as soon as may be after the election held in each year shall choose a President of the Corporation, one or more Vice Presidents, a Secretary, Treasurer, such Assistant Secretaries, Assistant Treasurers and such other officers, agents, and employees as it may deem proper.

SECTION II. The term of office of all officers shall be one year, or until their respective successors are chosen; but any officer may be removed from office at any time by the affirmative vote of a majority of the members of the Board.

SECTION III. Subject to such limitations as the Board of Directors, or the Executive Committee may from time to time prescribe, the officers of the Corporation shall each have such powers and duties as generally pertain to their respective offices, as well as such powers and duties as from time to time may be conferred by the Board of Directors or by the Executive Committee.

## ARTICLE IV.

### CERTIFICATES OF STOCK

SECTION I. The interest of each stockholder of the Corporation shall be evidenced by a certificate or certificates for shares of stock in such form as the Board of Directors may from time to time prescribe. The shares in the stock of the Corporation shall be transferable on the books of the Corporation by the holder thereof in person or by his attorney, upon surrender for cancellation of a certificate or certificates for the same number of shares, with an assignment and power of transfer endorsed thereon or attached thereto, duly executed, and with such proof of the authenticity of the signature as the Corporation or its agents may reasonably require.

3

SECTION II. The certificates of stock shall be signed by the Chairman of the Board or the President or a Vice President and by the Secretary or the Treasurer or an Assistant Secretary or an Assistant Treasurer, shall be sealed with the seal of the Corporation (or shall bear a facsimile of such seal), and shall be countersigned and registered in such manner, if any, as the Board of Directors may by resolution prescribe.

SECTION III. Certificates for shares of Stock in the Corporation may be issued in lieu of certificates alleged to have been lost, stolen, destroyed or mutilated, upon the receipt of (1) such evidence of loss, theft, destruction or mutilation, and (2) a bond of indemnity in such amount, upon such terms and with such surety, if any, as the Board of Directors may require in each specific case or in accordance with general resolutions.

## ARTICLE V.
### CORPORATE BOOKS

The books of the Corporation, except the original or duplicate stock ledger, may be kept outside of the State of Delaware, at the office of the Corporation in Wayne, New Jersey or at such other place or places as the Board of Directors may from time to time determine.

## ARTICLE VI.
### CHECKS, NOTES, ETC.

All checks and drafts on the Corporation's bank accounts and all bills of exchange and promissory notes, and all acceptances, obligations and other instruments for the payment of money, shall be signed by such officer or officers or agent or agents as shall be thereunto authorized from time to time by the Board of Directors.

## ARTICLE VII.
### FISCAL YEAR

The fiscal year of the Corporation shall end on the Saturday nearest the thirty-first day of March in each year.

## ARTICLE VIII.
### CORPORATE SEAL

The corporate seal shall have inscribed thereon the name of the Corporation and the words "Incorporated Delaware 1928." In lieu of the corporate seal, when so authorized by the Board of Directors or a duly empowered committee thereof, a facsimile thereof may be impressed or affixed or reproduced.

## ARTICLE IX.
### OFFICES

The Corporation and the stockholders and the directors may have offices outside of the State of Delaware at such places as shall be determined from time to time by the Board of Directors.

## ARTICLE X.
### AMENDMENTS

The by-laws of the Corporation, regardless of whether made by the stockholders or by the Board of Directors, may be amended, added to, rescinded or repealed at any meeting of the Board of Directors or of the stockholders, provided notice of the proposed change is given in the notice of the meeting. No change of the time or place for the annual meeting of the stockholders for the election of directors shall be made except in accordance with the laws of the State of Delaware.

# Exhibit D

# CERTIFICATE OF AMENDMENT

## OF

# CERTIFICATE OF INCORPORATION

## OF

# THE GRAND UNION COMPANY

Pursuant to Section 303 of the General Corporation Law
of the State of Delaware and Orders of the United States
Bankruptcy Court for the District of Delaware

THE GRAND UNION COMPANY, a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (hereinafter called the "Corporation"), DOES HEREBY CERTIFY:

1. The name of the Corporation is The Grand Union Company and the date of filing of its original Certificate of Incorporation in the office of the Secretary of State was May 17, 1928.

2. Pursuant to a court order issued in the Chapter 11 Proceedings of the Corporation before the United States Bankruptcy Court for the District of Delaware, Case No. 95-84-PJW, all authorized and issued and outstanding shares of common stock of the Corporation are hereby cancelled.

3. The following Restated Certificate of Incorporation was duly adopted in accordance with the applicable provisions of Section 303 of the General Corporation Law of the State of Delaware.

4. The text of the Certificate of Incorporation as amended or supplemented heretofore, is further amended and restated hereby to read in its entirety as follows:

FIRST: The name of the Corporation is THE GRAND UNION COMPANY (hereinafter called the "Corporation").

SECOND: The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

THIRD: The purpose of the Corporation is to engage in any lawful act or activity for which a Corporation may be organized under the General Corporation Law of the State of Delaware (the "DGCL").

FOURTH: (A) The total number of shares of all classes of capital stock which the Corporation shall have authority to issue is 40,000,000, of which 10,000,000 shares shall be Preferred Stock of the par value of $1.00 per share and 30,000,000 shares shall be Common Stock of the par value of $1.00 per share.

(B) The Board of Directors is expressly authorized, by resolution or resolutions, to provide for the issue of all or any shares of the Preferred Stock, in one or more series, and to fix for each such series such voting powers, full or limited, and such designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereon, as shall be stated and expressed in the resolution or resolutions adopted by the Board of Directors providing for the issue of such series (a "Preferred Stock Designation") and as may be permitted by the DGCL and as are consistent with paragraph (C) of this Article FOURTH. The number of authorized shares of Preferred Stock may be increased or decreased (but

not below the number of shares thereof then outstanding) by the affirmative vote of a majority of the holders of the voting power of all the then outstanding shares of the capital stock of the Corporation entitled to vote generally in the election of directors (the "Voting Stock") voting together as a single class, without a separate vote of the holders of the Preferred Stock, or any series thereof, unless a vote of any such holders is required pursuant to any Preferred Stock Designation.

(C) The Corporation is subject to the requirements of Section 1123(a)(6) of the United States Bankruptcy Code (11 U.S.C. 1123(a)(6)) ("Section 1123(a)(6)") and shall be prohibited from issuing any nonvoting equity securities, and shall, at all times, provide, as to the several classes of securities from time-to-time possessing voting power, an appropriate distribution of power among such classes. A Preferred Stock Designation shall not authorize the issuance of such nonvoting equity securities, and shall include in its provisions, if the class designated by such Preferred Stock Designation has a preference in respect of dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends consistent with the requirements of Section 1123(a)(6).

FIFTH: The following provisions are inserted for the management of the business and the conduct of the affairs of the Corporation:

(1) Election of directors of the Corporation need not be by written ballot unless the By-Laws so provide.

(2) All the powers of this Corporation, insofar as the same may be lawfully vested by this Restated Certificate of Incorporation in the Board of Directors, are hereby conferred upon the Board of Directors of this Corporation. In furtherance and not in limitation of that power the Board of Directors is authorized to make, adopt, alter, amend and repeal from time to time the By-Laws of the Corporation, by vote of a majority of the directors present at any regular meeting of the Board, or at any special meeting of the Board, provided that notice of such proposed alternation, amendment, repeal or adoption of new By-Laws is given in the notice of such special meeting, or by written consent without a meeting signed by all directors. The power of the Board of Directors to adopt, amend or repeal By-Laws is subject to the right of stockholders entitled to vote with respect thereto to alter and repeal By-Laws made by the Board of Directors.

(3) The Corporation shall, to the maximum extent permitted from time to time under the DGCL, indemnify and upon request shall advance expenses to any person who is or was a party or is threatened to be made a party to any threatened, pending, or completed action, suit, proceeding or claim, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was or has agreed to be a director or officer of the Corporation or while a director or officer is or was serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent of any corporation, partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, against expenses (including attorney's fees and expenses), judgment, fines, penalties and amounts paid in settlement incurred in connection with the investigation, preparation to defend or defense of such action, suit proceeding or claim; *provided, however,* that the foregoing shall not require the Corporation to indemnify or advance expenses to any person in connection with any action, suit, proceeding, claim or counterclaim initiated by or on behalf of such person. Such indemnification shall not be exclusive of other indemnification rights arising under any by-law, agreement, vote of directors or stockholders or otherwise and shall inure to the benefit of the heirs and legal representatives of such person. Any person seeking indemnification under this paragraph (3) of ARTICLE FIFTH shall be deemed to have met the standard of conduct required for such indemnification unless the contrary shall be established. Any repeal or modification of the foregoing provisions of this paragraph (3) of ARTICLE FIFTH shall not adversely affect any right or protection of a director or officer of the Corporation with respect to any acts or omissions of such director or officer occurring prior to such repeal or modification.

(4) A director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent that exculpation from

liability is not permitted under the DGCL at the time such liability is determined. No amendment or repeal of this paragraph (4) of ARTICLE FIFTH shall apply to or have any effect on the liability or alleged liability to any director of the Corporation for or with respect to any acts or omissions of such director occurring prior to such amendment or repeal.

SIXTH: The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Restated Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights preferences and privileges of whatever nature conferred upon stockholders, directors or any other persons whomsoever, by and pursuant to this Restated Certificate of Incorporation in its present form or as amended are granted subject to this reservation.

SEVENTH: If at any time the Corporation shall have a class of stock registered pursuant to the provisions of the Securities Exchange Act of 1934, for so long as such class is so registered, any action by the stockholders of such class must be taken at an annual or special meeting and may not be taken by written consent.

IN WITNESS WHEREOF, The Grand Union Company has caused this Certificate of Amendment of Certificate of Incorporation to be signed on its behalf by                    , its Chairman of the Board, and its corporate seal to be hereunto affixed by                    , its Secretary, this        day of                    , 1995.

THE GRAND UNION COMPANY

By: _____
   Chairman of the Board

By: _____
   Secretary

# Exhibit E

# WARRANT AGREEMENT

between

# THE GRAND UNION COMPANY

and

(                                        )

as Warrant Agent

**300,000 Series 1 Warrants**

**600,000 Series 2 Warrants**

**Dated as of May    , 1995**

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 1 |
| ARTICLE 2 | ISSUANCE OF WARRANTS | 4 |
| | 2.1 Initial Issuance | 4 |
| | 2.2 Initial Share Amount | 4 |
| | 2.3 Form of Warrant Certificates | 4 |
| | 2.4 Execution of Warrant Certificates | 4 |
| | 2.5 Countersignature of Warrant Certificates | 5 |
| ARTICLE 3 | EXERCISE PERIOD | 5 |
| ARTICLE 4 | EXERCISE PRICES | 5 |
| | 4.1 Series 1 | 5 |
| | 4.2 Series 2 | 5 |
| ARTICLE 5 | EXERCISE OF WARRANTS | 5 |
| | 5.1 Manner of Exercise | 5 |
| | 5.2 When Exercise Effective | 6 |
| | 5.3 Delivery of Certificates, etc. | 6 |
| | 5.4 Fractional Shares | 6 |
| ARTICLE 6 | ADJUSTMENT OF THE AMOUNT OF COMMON STOCK ISSUABLE AND THE EXERCISE PRICES UPON EXERCISE | 6 |
| | 6.1 Stock Dividends, Split-ups and Combinations of Shares | 6 |
| | 6.2 Distributions | 7 |
| | 6.3 Common Stock (or Other Securities) Issued for less than Fair Value | 7 |
| | 6.4 Adjustments for Mergers and Consolidations | 8 |
| | 6.5 Calculation to Nearest Cent and One-hundredth of Share | 8 |
| | 6.6 Notice of Adjustment in Exercise Price | 8 |
| | 6.7 Other Notices | 8 |
| | 6.8 No Change in Warrant Terms on Adjustment | 8 |
| | 6.9 Treasury Shares | 9 |
| ARTICLE 7 | CONSOLIDATION, MERGER, ETC. | 9 |
| | 7.1 Cancellation of Warrants upon Non-Surviving Merger | 9 |
| | 7.2 Assumption of Obligations | 9 |
| ARTICLE 8 | LISTING RIGHTS | 9 |
| ARTICLE 9 | NO DILUTION OR IMPAIRMENT | 9 |
| ARTICLE 10 | REPORTS | 10 |
| ARTICLE 11 | NOTIFICATION OF CERTAIN EVENTS | 10 |
| | 11.1 Corporate Action | 10 |
| | 11.2 Available Information | 11 |
| ARTICLE 12 | RESERVATION OF STOCK | 11 |
| | 12.1 Reservation; Due Authorization, etc. | 11 |
| | 12.2 Compliance with Law | 11 |

|  |  |  | Page |
|---|---|---|---|
| ARTICLE 13 | PAYMENT OF TAXES | | 11 |
| ARTICLE 14 | LOSS OR MUTILATION | | 12 |
| ARTICLE 15 | WARRANT REGISTRATION | | 12 |
| | 15.1 | Registration | 12 |
| | 15.2 | Transfer or Exchange | 12 |
| | 15.3 | Valid and Enforceable | 12 |
| | 15.4 | Endorsement | 13 |
| | 15.5 | No Service Charge | 13 |
| | 15.6 | Cancellation | 13 |
| ARTICLE 16 | WARRANT AGENT | | 13 |
| | 16.1 | Obligations Binding | 13 |
| | 16.2 | No Liability | 13 |
| | 16.3 | Instructions | 13 |
| | 16.4 | Agents | 13 |
| | 16.5 | Cooperation | 14 |
| | 16.6 | Agent Only | 14 |
| | 16.7 | Right to Counsel | 14 |
| | 16.8 | Compensation | 14 |
| | 16.9 | Accounting | 14 |
| | 16.10 | No Conflict | 14 |
| | 16.11 | Resignation; Termination | 14 |
| | 16.12 | Change of Warrant Agent | 15 |
| | 16.13 | Successor Warrant Agent | 15 |
| ARTICLE 17 | REMEDIES, ETC. | | 15 |
| | 17.1 | Remedies | 15 |
| | 17.2 | Warrant Holder Not Deemed a Stockholder | 15 |
| | 17.3 | Right of Action | 16 |
| ARTICLE 18 | MISCELLANEOUS | | 16 |
| | 18.1 | Notices | 16 |
| | 18.2 | Governing Law and Consent to Forum | 16 |
| | 18.3 | Benefits of this Agreement | 16 |
| | 18.4 | Agreement of Holders of Warrant Certificates | 17 |
| | 18.5 | Counterparts | 17 |
| | 18.6 | Amendments | 17 |
| | 18.7 | Consent to Jurisdiction | 17 |
| | 18.8 | Headings | 17 |

EXHIBITS
    Exhibit A:  Forms of Warrant Certificate
                A-1:   Series 1 Warrant Certificate
                A-2:   Series 2 Warrant Certificate
    Exhibit B:  Release

## WARRANT AGREEMENT

THIS WARRANT AGREEMENT, is made and entered into as of May      , 1995 (the "Agreement"), by and between THE GRAND UNION COMPANY, a Delaware corporation (the "Company"), and [                    ] as Warrant Agent (the "Warrant Agent").

## WITNESSETH:

WHEREAS, in connection with the financial restructuring of the Company pursuant to its plan of reorganization (the "Plan"), and in settlement of certain litigation in the Bankruptcy Case and in the Capital Case (each as defined herein) (the "Settlement"), the Company proposes, *inter alia*, to issue two series of warrants which, in aggregate, are exercisable to purchase up to 900,000 shares of Common Stock (as defined herein), subject to adjustment as provided herein (the "Warrants"), to the holders of the Zero Coupon Notes (as defined herein) in exchange for such Zero Coupon Notes and any and all claims such holders may have against the Company and in exchange for the release by such holders of any and all claims against or interests in the Released Persons; and

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to act, in connection with the issuance, transfer, exchange, replacement and exercise of the Warrant Certificates and other matters as provided herein; and

WHEREAS, the Company desires to enter into this Agreement to set forth the terms and conditions of the Warrants and the rights of the holders thereof;

NOW, THEREFORE, in consideration of the foregoing premises and of the mutual agreements set forth herein, the Company and the Warrant Agent hereby agree as follows:

## ARTICLE 1

### DEFINITIONS

As used herein, the following terms have the following respective meanings:

"*Affiliate*" means with respect to any Person, any Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person. For purposes of this definition, (a) "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting Common Stock (or equivalent equity interests), by contract or otherwise, and the terms "controlling" or "controlled" have meanings correlative to the foregoing, and (b) a subsidiary of a Person is an Affiliate of such Person and of each other subsidiary of that Person.

"*Agreement*" means this Warrant Agreement, as the same may be amended or modified from time to time hereafter.

"*Bankruptcy Code*" means title 11, United States Code.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

"*Business Day*" means any day other than a Saturday or a Sunday or a day on which commercial banking institutions in New York City, New York are authorized or required by law to be closed; *provided that*, in determining the period within which certificates or Warrants are to be issued and delivered at a time when shares of Common Stock (or Other Securities) are listed or admitted to trading on any national securities exchange or in the over-the-counter market and in determining the Fair Value of any securities listed or

admitted to trading on any national securities exchange or in the over-the-counter market, "Business Day" shall mean any day when the principal exchange on which such securities are then listed or admitted to trading is open for trading or, if such securities are traded in the over-the-counter market in the United States, such market is open for trading; *and provided further* that any reference in this Agreement to "days" (unless Business Days are specified) shall mean calendar days.

"*Capital*" means Grand Union Capital Corporation, a Delaware corporation, and the corporate parent of the Company prior to the Effective Date.

"*Capital Case*" means the case under chapter 11 of the Bankruptcy Code concerning Capital which was commenced on February 6, 1995 before the Bankruptcy Court.

"*Chapter 11 Case*" means the case under Chapter 11 of the Bankruptcy Code concerning the Company which was commenced January 25, 1995 before the Bankruptcy Court.

"*Common Stock*" means the Company's Common Stock par value $      per share as authorized from and after the Effective Date.

"*Commission*" means the Securities and Exchange Commission or any other Federal agency at the time administering the Securities Act or the Exchange Act, whichever is the relevant statute for the particular purpose.

"*Company*" means The Grand Union Company, a Delaware corporation.

"*Effective Date*" has the meaning specified in the Plan.

"*Exchange Act*" means the Securities Exchange Act of 1934, or any successor Federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be amended and in effect at the time. Reference to a particular section of the Securities Exchange Act of 1934 shall include a reference to the comparable section, if any, of any such successor Federal statute.

"*Exercise Period*" has the meaning specified in Article 3.

"*Exercise Price*" has the meaning specified in Article 4.

"*Fair Value*" means (i) with respect to Common Stock or any Other Security, in each case if such security is listed on one or more stock exchanges or quoted on the National Market System of NASDAQ (the "National Market System"), the average of the closing sales prices of a share of such Common Stock or, if an Other Security in the minimum denomination in which such security is traded, on the primary national or regional stock exchange on which such security is listed or on the National Market System if quoted thereon or (ii) if the Common Stock or Other Security, as the case may be, is not so listed or quoted but is traded in the over-the-counter market (other than the National Market System), the average of the closing bid and asked prices of a share of such Common Stock or Other Security, in each case for the 30 Business Days (or such lesser number of Business Days as such Common Stock or other security shall have been so listed, quoted or traded) next preceding the date of measurement; *provided*, that if no such sales price or bid and asked prices have been quoted during the preceding 30-day period or there is otherwise no established trading market for such security, then "Fair Value" means the value of such Common Stock or Other Security as determined reasonably and in good faith by the Board of Directors of the Company; *and provided, further, however*, that in the event the current market price of a share of such Common Stock or of the minimum traded denomination of such Other Security is determined during a period following the announcement by the Company of (i) a dividend or distribution on the Common Stock or Other Security payable in shares of Common Stock or in such Other Security, or (ii) any subdivision, combination or reclassification of the Common Stock or Other Security, and prior to the expiration of 30 Business Days after the ex-dividend date for such dividend or distribution, or the record date for such subdivision, combination

2

or reclassification, then, and in each such case, the "Fair Value" shall be appropriately adjusted to take into account ex-dividend trading. Anything herein to the contrary notwithstanding, in case the Company shall issue any shares of Common Stock, rights, options, or Other Securities in connection with the acquisition by the Company of the stock or assets of any other Person or the merger of any other Person into the Company, the Fair Value of the Common Stock or Other Securities so issued shall be determined as of the date the number of shares of Common Stock, rights, options or Other Securities was determined (as set forth in a written agreement between the Company and the other party to the transaction) rather than on the date of issuance of such shares of Common Stock, rights, options or Other Securities.

"*Junior Zero Coupon Notes*" means the aggregate $745 million principal amount 16.50% Junior Subordinated Zero Coupon Notes of Capital due January 15, 2007.

"*Original Issue Date*" has the meaning specified in Section 2.1.

"*Other Securities*" means any stock (other than Common Stock) and other securities of the Company or any other Person (corporate or otherwise) that the holders of the Warrants at any time shall be entitled to receive, or shall have received, upon the exercise of the Warrants, in lieu of or in addition to Common Stock, or that at any time shall be issuable or shall have been issued in exchange for or in replacement of Common Stock or Other Securities.

"*Person*" means any individual, partnership, association, joint venture, corporation, business, trust, unincorporated organization, government or department, agency or subdivision thereof, or other person or entity.

"*Plan*" means the plan of reorganization of the Company, as confirmed by order of the Bankruptcy Court entered on May   , 1995.

"*Public Offering*" means any offering of Common Stock (or Other Securities) to the public pursuant to an effective registration statement under the Securities Act.

"*Release*" means the release to be executed by the holders of the Zero Coupon Notes which hold, (i) in aggregate, $200,000 or more in face amount of the Senior Zero Coupon Notes or (ii) in aggregate, $200,000 or more in face amount of the Junior Zero Coupon Notes, as a condition to their receipt of the Warrants, such release in the form attached hereto as Exhibit B.

"*Released Persons*" means the beneficiaries of the Release, as set forth therein.

"*Securities Act*" means the Securities Act of 1933, or any successor Federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be amended and in effect at the time. Reference to a particular section of the Securities Act of 1933 shall include a reference to the comparable section, if any, of any such successor Federal statute.

"*Senior Zero Coupon Notes*" means the aggregate $343 million principal amount 15.00% Senior Zero Coupon Notes of Capital due July 15, 2004.

"*Series 1 Warrants*" means the Warrants to purchase, in aggregate, 300,000 shares of Common Stock at the Exercise Price described herein, subject to adjustment as provided herein, issued in exchange for Zero Coupon Notes pursuant to the Plan and the Settlement.

"*Series 2 Warrants*" means the Warrants to purchase, in aggregate, 600,000 shares of Common Stock at the Exercise Price described herein, subject to adjustment as provided herein, issued in exchange for Zero Coupon Notes pursuant to the Plan and the Settlement.

"*Settlement*" means the settlement of certain litigation in the Capital Case and the Chapter 11 Case effected pursuant to the Plan pursuant to which the Company has assumed claims arising from and relating to the Zero Coupon Notes.

"*Warrant Agent*" means

"*Warrant Certificates*" has the meaning specified in Section 2.3.

"*Warrants*" means, collectively, the two series of the Company's Warrants to purchase up to an aggregate of 900,000 shares of Common Stock at the Exercise Price specified for each such series, subject to adjustment as provided herein, issued in exchange for the Zero Coupon Notes pursuant to the Plan and the Settlement.

"*Zero Coupon Notes*" means, collectively, the Senior Zero Coupon Notes and the Junior Zero Coupon Notes.

## ARTICLE 2

### ISSUANCE OF WARRANTS

2.1 *Initial Issuance*. On the date hereof (the "Original Issue Date"), which is also the Effective Date, the Company shall, pursuant to the Plan and the Settlement, deliver to the Company's disbursing agent under the Plan for re-distribution to the holders of the Zero Coupon Notes, global certificates for an aggregate of 900,000 Warrants, consisting of 300,000 Series 1 Warrants and 600,000 Series 2 Warrants. The global certificates shall be issued in the following denominations: (i) for the holders of the Senior Zero Coupon Notes, a global certificate for 240,000 Series 1 Warrants and a global certificate for 480,000 Series 2 Warrants; and (b) for the holders of the Junior Zero Coupon Notes, a global certificate for 60,000 Series 1 Warrants and a global certificate for 120,000 Series 2 Warrants. Subject, solely with respect to any holder of Zero Coupon Notes which holds, (i) in aggregate, $200,000 or more in face amount of the Senior Zero Coupon Notes or (ii) in aggregate, $200,000 or more in face amount of the Junior Zero Coupon Notes, to the delivery by such holder to the Company of an executed Release in the form attached hereto as Exhibit B by each holder of a Zero Coupon Note which is to receive a Warrant as a condition to such receipt, and upon the direction of the Company, the Warrant Agent shall issue and deliver such additional Warrant Certificates, as increments of, and in reduction of, the global certificates described above, as are required from time to time in order to effect the distributions with respect to the Zero Coupon Notes provided under the Plan and Settlement.

2.2 *Initial Share Amount*. The number of shares of Common Stock purchasable upon exercise of the Warrants shall be one (1) Warrant to one (1) share of Common Stock, subject to adjustments from and after the Original Issue Date as provided in Article 6 of this Agreement.

2.3 *Form of Warrant Certificates*. The Series 1 Warrants and Series 2 Warrants shall be evidenced, respectively, by certificates substantially in the forms attached hereto as Exhibit A-1 and A-2 (collectively, the "Warrant Certificates"). Each Warrant Certificate shall be dated as of the date on which it is countersigned by the Warrant Agent, which shall be on the Original Issue Date or, in the event of a division, exchange, substitution or transfer of any of the Warrants, on the date of such event. The Warrant Certificate may have such further legends and endorsements stamped, printed, lithographed or engraved thereon as the Company may deem appropriate and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation pursuant thereto or with any rule or regulation of any securities exchange on which the Warrants may be listed.

2.4 *Execution of Warrant Certificates*. Warrant Certificates shall be executed on behalf of the Company by its President, any Vice President, its Treasurer or Secretary, either manually or by facsimile signature printed thereon. In case any such officer of the Company whose signature shall have been placed upon any Warrant Certificate shall cease to be such officer of the Company before countersignature by the Warrant Agent or issuance and delivery thereof, such Warrant Certificate nevertheless may be countersigned by the Warrant Agent and issued and delivered with the same force and effect as though such person had not ceased to be such officer of the Company.

4

2.5 *Countersignature of Warrant Certificates*. Warrant Certificates shall be manually countersigned by an authorized signatory of the Warrant Agent and shall not be valid for any purpose unless so countersigned. Such manual countersignature shall constitute conclusive evidence of such authorization. The Warrant Agent is hereby authorized to countersign, in accordance with the provisions of this Section 2.5, and deliver any new Warrant Certificates, as directed by the Company pursuant to Section 2.1 and as and when required pursuant to the provisions of Articles 14 and 15. Each Warrant Certificate shall, when manually countersigned by an authorized signatory of the Warrant Agent, entitle the registered holder thereof to exercise the rights as the holder of the number of Warrants set forth thereon, subject to the provisions of this Agreement.

## ARTICLE 3

### EXERCISE PERIOD

Each Warrant shall entitle the holder thereof to purchase from the Company one (1) share of Common Stock (subject to the adjustments provided herein), at any time during the five (5) year period that commences on the First Business Day that is one (1) day after the Original Issue Date, and that terminates at 5:00 p.m., New York City time on the First Business Day that is five (5) years after the Original Issue Date (the "Exercise Period"); *provided, however*, that in the event of a reorganization of the Company of the nature described in Article 7.1 hereof, any Warrants that are not exercised prior to consummation of such transaction shall be cancelled upon consummation of such transaction, and the holders of such cancelled Warrants shall not be entitled to receive any property with respect to their cancelled Warrants.

## ARTICLE 4

### EXERCISE PRICES

4.1 *Series 1*. The Exercise Price for the Series 1 Warrants shall be $30.00 per share of Common Stock (subject to adjustment pursuant to Article 6 hereof).

4.2 *Series 2*. The Exercise Price for the Series 2 Warrants shall be $42.00 per share of Common Stock (subject to adjustment pursuant to Article 6 hereof).

## ARTICLE 5

### EXERCISE OF WARRANTS

5.1 *Manner of Exercise*. All or any of the Warrants represented by a Warrant Certificate may be exercised by the registered holder thereof during normal business hours on any Business Day, by surrendering such Warrant Certificate, with the subscription form set forth therein duly executed by such holder, by hand or by mail to the Warrant Agent at its office addressed to [Warrant Agent: Address], or, if such exercise shall be in connection with an underwritten Public Offering, at the location designated by the Company. Such Warrant Certificate shall be accompanied by payment in respect of each Warrant that is exercised, which shall be made by certified or official bank or bank cashier's check payable to the order of the Company, except as otherwise provided herein. Such payment shall be in an amount equal to the product of the number of shares of Common Stock (without giving effect to any adjustment therein) designated in such subscription form multiplied by the original Exercise Price for the Series of Warrants being exercised (plus such additional consideration as may be provided herein). Upon such surrender and payment, such holder shall thereupon be entitled to receive the number of duly authorized, validly issued, fully paid and nonassessable shares of Common Stock (or Other Securities) determined as provided in Articles 2 and 3, and as and if adjusted pursuant to Article 6.

5

5.2 *When Exercise Effective*. Each exercise of any Warrant pursuant to Section 5.1 shall be deemed to have been effected immediately prior to the close of business on the Business Day on which the Warrant Certificate representing such Warrant, duly executed, with accompanying payment shall have been delivered as provided in Section 5.1, and at such time the Person or Persons in whose name or names the certificate or certificates for Common Stock (or Other Securities) shall be issuable upon such exercise as provided in Section 5.3 shall be deemed to have become the holder or holders of record thereof.

5.3 *Delivery of Certificates, etc.* (a) As promptly as practicable after the exercise of any Warrant, and in any event within five (5) Business Days thereafter (or, if such exercise is in connection with an underwritten Public Offering, concurrently with such exercise), the Company at its expense (other than as to payment of transfer taxes which will be paid by the holder) will cause to be issued and delivered to such holder, or as such holder may otherwise direct in writing (subject to Article 14), .

(i) a certificate or certificates for the number of shares of Common Stock (or Other Securities) to which such holder is entitled, and

(ii) if less than all the Warrants represented by a Warrant Certificate are exercised, a new Warrant Certificate or Certificates of the same tenor and for the aggregate number of Warrants that were not exercised, executed and countersigned in accordance with Sections 2.4 and 2.5.

(b) The Warrant Agent shall countersign any new Warrant Certificate, register it in such name or names as may be directed in writing by such holder, and shall deliver it to the person entitled to receive the same in accordance with this Section 5.3. The Company, whenever required by the Warrant Agent, will supply the Warrant Agent with Warrant Certificates executed on behalf of the Company for such purpose.

5.4 *Fractional Shares*. No fractional shares of Common Stock (or Other Securities) shall be issued upon any exercise of Warrants. If more than one Warrant Certificate shall be delivered for exercise at one time by the same holder, the number of full shares or securities that shall be issuable upon exercise shall be computed on the basis of the aggregate number of Warrants exercised. As to any fraction of a share of Common Stock (or Other Securities), the Company shall pay a cash adjustment in respect thereto in an amount equal to the product of the Fair Value per share of Common Stock (or Other Securities) as of the Business Day next preceding the date of such exercise multiplied by such fraction of a share.

## ARTICLE 6

### ADJUSTMENT OF THE AMOUNT OF COMMON STOCK
### ISSUABLE AND THE EXERCISE PRICES UPON EXERCISE

6.1 *Stock Dividends, Split-ups and Combinations of Shares*. If after the date hereof the number of outstanding shares of Common Stock is increased by a dividend or share distribution in each case payable in shares of Common Stock or by a split-up or other reclassification of shares of Common Stock, then, in the case of such events, the amount of Common Stock issuable for each Warrant and the Exercise Price will be adjusted as follows: on the day following the date fixed for the determination of holders of shares of Common Stock entitled to receive such dividend or share distribution, and in the cases of split-ups, combinations and other reclassifications, on the day following the effective date thereof: (a) the Exercise Price in effect immediately prior to such action shall be adjusted to a new Exercise Price that bears the same relationship to the Exercise Price in effect immediately prior to such event as the total number of shares of Common Stock outstanding immediately prior to such action bears to the total number of shares of Common Stock outstanding immediately after such event, and (b) the number of shares of Common Stock purchasable upon the exercise of any Warrant after such event shall be the number of Shares of Common Stock obtained by multiplying the number of shares of Common Stock purchasable immediately prior to such adjustment upon the exercise of such Warrant by the Exercise Price in effect immediately prior to such adjustment and dividing the product so obtained by the Exercise Price in effect after such adjustment.

6.2 *Distributions.* If after the date hereof the Company shall distribute to all holders of its shares of Common Stock evidences of its indebtedness or assets (excluding cash distributions made as a dividend payable out of earnings or out of surplus legally available for dividends under the laws of the jurisdiction of incorporation of the Company) or rights to subscribe to shares of Common Stock expiring more than 45 days after the issuance thereof, then in each such case the Exercise Price in effect immediately prior to such distribution shall be decreased to an amount determined by multiplying such Exercise Price by a fraction, the numerator of which is the Fair Value of a share of the Common Stock at the date of such distribution less the Fair Value per share of Common Stock outstanding at such date of the assets or evidences of indebtedness so distributed or of such subscription rights (as determined by the Board of Directors of the Company, whose determination shall be conclusive, and described in a statement filed with the Warrant Agent) and the denominator of which is the Fair Value of a share of Common Stock at such date. Such adjustment shall be made whenever any such distribution is made, and shall become effective retroactively on the date immediately after the record date for the determination of stockholders entitled to receive such distribution.

6.3 *Common Stock (or Other Securities) Issued for less than Fair Value.* (a) If at any time or from time to time after the Original Issue Date shares of Common Stock (or Other Securities) shall be issued, distributed or sold to holders of Common Stock for a consideration less than Fair Value (or, with respect to distributions of Other Securities, for no consideration), then the equivalent number of shares of Common Stock (or such Other Securities) shall also be issuable upon exercise of the Warrants, and the Exercise Price shall be adjusted to include the Fair Value of the consideration paid by holders of Common Stock for such shares of Common Stock (or Other Securities), if any; *provided, however,* that only such shares of Common Stock (or Other Securities) issued for consideration less than Fair Value (or, with respect to Other Securities, without consideration) shall be taken into account for purposes of this adjustment; *and provided further,* that any consideration paid, in whatever form, by the holders of Common Stock for such Common Stock (or Other Securities) shall be taken into account for purposes of determining the adjustment required to be made hereunder, such that an adjustment shall be made solely if and to the extent that the Fair Value of such Common Stock (or Other Securities) exceeds the Fair Value of any consideration paid.

(b) For purposes of this Section 6.3, Common Stock (or Other Securities) shall be deemed to have been issued for Fair Value if issued to the Company's employees or directors under *bona fide* employee benefit or stock option plans, or issued by the Company pursuant to an employment agreement or consulting agreement, which plan or agreement has been adopted or approved by the board of directors of the Company and, when required by law, approved by the holders of Common Stock.

(c) All options or convertible securities issued or delivered in payment of any dividend or other distribution on any class of stock of the Company, shall be deemed to have been issued without consideration.

(d) For purposes of this Section 6.3, and except as otherwise provided herein, options or convertible securities shall be deemed to have been issued for a consideration per share determined by dividing

(i) the total amount, if any, received and receivable by the Company as consideration for the issuance, sale, grant or assumption of the relevant options or convertible securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision thereof for subsequent adjustment of such consideration) payable to the Company upon the exercise in full of such options or the conversion or exchange of such convertible securities (and in the case of options for convertible securities, the exercise of such options and the conversion or exchange of such convertible securities),

by

(ii) the maximum number of shares of Common Stock issuable (as set forth in the instruments relating thereto, without regard to any provision thereof for subsequent adjustment of such number) upon the exercise of such options or the conversion or exchange of such convertible securities (and in

7

the case of options for convertible securities, the exercise of such options and the conversion or exchange of such convertible securities).

6.4 *Adjustments for Mergers and Consolidations.* In case the Company, after the date hereof, shall merge or consolidate with another Person, other than in a Non-Surviving Merger (upon which, pursuant to Section 7.1, the Warrants shall be cancelled), then, in the case of any such transaction, proper provision shall be made so that, upon the basis and terms and in the manner provided in this Warrant Agreement, the holders of the Warrants, upon the exercise thereof at any time after the consummation of such transaction (subject to the Exercise Period), shall be entitled to receive (at the aggregate Exercise Price in effect at the time of the transaction for all Common Stock or Other Securities issuable upon such exercise immediately prior to such consummation), in lieu of the Common Stock or Other Securities issuable upon such exercise prior to such consummation, the greatest amount of securities, cash or other property to which such holder would have been entitled as a holder of Common Stock (or Other Securities) upon such consummation if such holder had exercised the rights represented by the Warrants held by such holder immediately prior thereto, subject to adjustments (subsequent to such consummation) as nearly equivalent as possible to the adjustments provided for in Sections 6.1, 6.2 and 6.3 hereof.

6.5 *Calculation to Nearest Cent and One-hundredth of Share.* All calculations under this Article 6 shall be made to the nearest cent or to the nearest one-hundredth of a share, as the case may be.

6.6 *Notice of Adjustment in Exercise Price.* Whenever the Exercise Price and securities issuable shall be adjusted as provided in this Article 6, the Company shall forthwith file with the Warrant Agent a statement, signed by the Chairman of the Board of Directors, the Vice Chairman of the Board of Directors, the President or any Vice President of the Company and by its Treasurer or an Assistant Treasurer or its Secretary or an Assistant Secretary, stating in detail the facts requiring such adjustment, the Exercise Price that will be effective after such adjustment and the impact of such adjustment on the number and kind of securities issuable upon exercise of the Warrants. The Company shall also cause a notice setting forth any such adjustments to be sent by mail, first class, postage prepaid, to each registered holder of Warrants at his address appearing on the Warrant register. The Warrant Agent shall have no duty with respect to any statement filed with it except to keep the same on file and available for inspection by registered holders of Warrants during reasonable business hours. The Warrant Agent shall not at any time be under any duty or responsibility to any holder of a Warrant to determine whether any facts exist which may require any adjustment to the Exercise Price or securities issuable, or with respect to the nature or extent of any adjustment of the Exercise Price or securities issuable when made or with respect to the method employed in making such adjustment.

6.7 *Other Notices.* In case the Company after the date hereof shall propose to take any action of the type described in sections 6.1, 6.2, 6.3 or 6.4 of this Article 6, the Company shall give notice to the Warrant Agent and to each registered holder of a Warrant in the manner set forth in subsection 6.6 of this Article 6, which notice shall specify, in the case of action of the type specified in subsection 6.2, 6.3 or 6.4, the date on which a record shall be taken with respect to any such action. Such notice shall be given, in the case of any action of the type specified in subsection 6.2, 6.3 or 6.4, at least ten days prior to the record date with respect thereto. Failure to give such notice, or any defect therein, shall not affect the legality or validity of any such action. Where appropriate, such notice may be given in advance and may be included as part of a notice required to be mailed under the provisions of subsection 6.6 of this Article 6.

6.8 *No Change in Warrant Terms on Adjustment.* Irrespective of any adjustments in the Exercise Price or the number of shares of Common Stock (or any inclusion of Other Securities) issuable upon exercise, Warrants theretofore or thereafter issued may continue to express the same prices and number of shares as are stated in the similar Warrants issuable initially, or at some subsequent time, pursuant to this Agreement, and the Exercise Price and such number of shares issuable upon exercise specified thereon shall be deemed to have been so adjusted.

8

6.9 *Treasury Shares*. Shares of Common Stock at any time owned by the Company shall not be deemed to be outstanding for the purposes of any computation under this Article 6.

## ARTICLE 7

### CONSOLIDATION, MERGER, ETC.

7.1 *Cancellation of Warrants upon Non-Surviving Merger*. In the event of a merger or consolidation of the Company with another Person in which (i) the Company is not the continuing or surviving corporation of such consolidation or merger *and* (ii) immediately prior to the transaction either (x) such continuing or surviving corporation was not an Affiliate of the Company or (y) such continuing or surviving corporation was an Affiliate of the Company but the board of directors of the Company has determined in good faith that the merger or consolidation is an arms length transaction, i.e., on terms comparable to those on which the Company would enter into a transaction with a non-Affiliate, then any Warrants which are not exercised prior to consummation of such merger or consolidation (a "Non-Surviving Merger") shall be cancelled upon consummation of the transaction, and the holders of such cancelled Warrants shall not be entitled to receive any property with respect to their cancelled Warrants.

7.2 *Assumption of Obligations*. Notwithstanding anything contained herein to the contrary, the Company will not effect a merger or consolidation other than a Non-Surviving Merger unless, prior to the consummation of such transaction, each Person (other than the Company) which may be required to deliver any Common Stock, Other Securities, securities, cash or property upon the exercise of this Warrant as provided herein shall assume, by written instrument delivered to the Warrant Agent, with a copy delivered to each holder of a Warrant hereunder, the obligations of the Company under this Warrant Agreement and under each of the Warrants, including, without limitation, the obligation to deliver such shares of Common Stock, Other Securities, cash or property as may be required pursuant to Article 6 hereof.

## ARTICLE 8

### LISTING RIGHTS

If the Common Stock is listed on one or more stock exchanges or quoted on the National Market System, then the Company shall use its best efforts to have the Warrants listed on such stock exchange(s) or quoted on the National Market System, as applicable.

## ARTICLE 9

### NO DILUTION OR IMPAIRMENT

The Company will not, by amendment of its certificate of incorporation or through any consolidation, merger, reorganization, transfer of assets, dissolution, issuance or sale of securities or any other voluntary action or omission, avoid or seek to avoid the observance or performance of any of the terms of this Agreement or any of the Warrants issued hereunder, but will at all times in good faith observe and perform all such terms and take all such action as may be necessary or appropriate in order to protect the rights of each holder of a Warrant against dilution or other impairment of the kind specified herein *provided, however,* that, subject to compliance with the applicable provisions of this Agreement, the Company shall not be prohibited by this Article 9 or by any provision of this Agreement from making decisions providing for, *inter alia,* the merger or consolidation of the Company or the sale of its assets which transactions, in the judgment of the Company's board of directors, are in the best interests of the Company and the shareholders. Without limiting the generality of the foregoing, the Company (a) will not permit the par value of any shares of stock receivable upon the exercise of any Warrant to exceed the amount payable therefor upon such exercise, (b) will take all such action as may be necessary or appropriate in order that the Company may validly and

legally issue fully paid and nonassessable shares of stock upon the exercise of all of the Warrants from time to time outstanding, (c) will not take any action that results in any adjustment of the shares issuable upon exercise of the Warrants (or which entitles the holders of the Warrants to receive Other Securities upon such exercise) if the total number of shares of Common Stock (or Other Securities) issuable after the action upon the exercise of all of the Warrants would exceed the total number of shares of Common Stock (or Other Securities) then authorized by the Company's certificate of incorporation and available for the purpose of issuance upon such exercise and (d) will not issue any capital stock of any class that is preferred as to dividends or as to the distribution of assets upon voluntary or involuntary dissolution, liquidation or winding-up, unless such stock is sold for a cash consideration at least equal to the amount of such preference upon voluntary or involuntary dissolution, liquidation or winding-up.

## ARTICLE 10

### REPORTS

In each case of any adjustment or readjustment in the shares of Common Stock (or Other Securities) issuable upon the exercise of the Warrants, the Company at its expense will promptly compute such adjustment or readjustment after giving effect to such, in accordance with the terms of this Agreement and shall prepare a report setting forth such adjustment or readjustment and showing in reasonable detail the method of calculation thereof and the facts upon which such adjustment or readjustment is based. The Company will forthwith mail a copy of each such report to the Warrant Agent, which shall promptly mail a copy to each holder of a Warrant. The Warrant Agent will cause the same to be available for inspection at its principal office during normal business hours by any holder of a Warrant or any prospective purchaser of a Warrant designated by the holder thereof.

## ARTICLE 11

### NOTIFICATION OF CERTAIN EVENTS

11.1 *Corporate Action*. In the event of:

(a) any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend (other than a regular periodic dividend payable in cash out of earned surplus) or other distribution of any kind, or any right to subscribe for, purchase or otherwise acquire any shares of stock of any class or any other securities or property, or to receive any other right or interest of any kind; or

(b) (i) any capital reorganization of the Company, (ii) any reclassification of the capital shares of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a split-up or combination), (iii) the consolidation or merger of the Company with or into any other corporation (other than a consolidation or merger in which the Company is the continuing corporation and which does not result in any change in the shares of Common Stock) including a consolidation or merger which would result in the cancellation of any outstanding Warrants pursuant to Section 7.1 hereof, (iv) the sale of the properties and assets of the Company as, or substantially as, an entirety to another Person, or (v) an exchange offer for Common Stock (or Other Securities); or

(c) the voluntary or involuntary dissolution, liquidation, or winding up of the Company,

the Company shall cause to be filed with the Warrant Agent and mailed to each holder of a Warrant a notice specifying (x) the date or expected date on which any such record is to be taken for the purpose of such dividend, distribution, rights, event, transaction or amendment (or vote thereon) and the amount and character of any such dividend, distribution, exchange, rights, or vote, or, if a record is not to be taken, the

date as of which the holders of Common Stock of record to be entitled to such dividend, distribution, exchange or rights are to be determined, and the amount and character of such dividend, distribution or rights, or (y) the date or expected date on which any such reorganization, reclassification, recapitalization, consolidation, merger, sale, transfer, exchange offer, dissolution, liquidation or winding up is expected to become effective, and the time, if any such time is to be fixed, as of which holders of record of Common Stock (or Other Securities) shall be entitled to exchange their shares of Common Stock (or Other Securities) for the securities or other property deliverable upon such reorganization, reclassification, recapitalization, consolidation, merger, sale, transfer, exchange offer, dissolution, liquidation or winding up and in the case of a transaction which would cause the cancellation of any outstanding Warrants, the effect of such transaction, if known. Such notice shall be delivered not less than 20 days prior to such date therein specified, in the case of any such date referred to in clause (x) of the preceding sentence, and not less than 30 days prior to such date therein specified, in the case of any such date referred to in clause (y) of the preceding sentence. Failure to give such notice within the time provided or any defect therein shall not affect the legality or validity of any such action.

11.2 *Available Information*. The Company shall promptly file with the Warrant Agent copies of its annual reports and of the information, documents and other reports (or copies of such portions of any of the foregoing as the Commission may by rules and regulations prescribe) that the Company is required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act. If the Company is not required to make such filings, the Company shall promptly deliver to the Warrant Agent copies of any annual, quarterly or other reports and financial statements that are provided to any holders of equity or debt securities of the Company (other than bank debt) in their capacity as holders of such securities.

## ARTICLE 12
### RESERVATION OF STOCK

12.1 *Reservation; Due Authorization, etc*. The Company shall at all times reserve and keep available, free from preemptive rights, out of its authorized but unissued Common Stock (or out of authorized Other Securities), solely for issuance and delivery upon exercise of Warrants, the full number of shares of Common Stock (and Other Securities) from time to time issuable upon the exercise of all Warrants and any other outstanding warrants, options or similar rights, from time to time outstanding. All shares of Common Stock (and Other Securities) shall be duly authorized and, when issued upon such exercise, shall be duly and validly issued, and (in the case of shares) fully paid and nonassessable, and free from all taxes, liens, charges, security interests, encumbrances and other restrictions created by or through the Company.

12.2 *Compliance with Law*. The Company will use its best efforts, at its expense and on a continual basis, to assure that all shares of Common Stock (and Other Securities) that may be issued upon exercise of Warrants may be so issued and delivered without violation of any Federal or state securities law or regulation, or any other law or regulation applicable to the Company or any of its subsidiaries, *provided that* with respect to any such exercise involving a sale or transfer of Warrants or any such securities issuable upon such exercise, the Company shall have no obligation to register such Warrants or securities under any such securities law except as provided in Article 8 hereof or in a registration rights agreement entered into by the parties.

## ARTICLE 13
### PAYMENT OF TAXES

The Company will pay any and all documentary stamp or similar issue taxes payable to the United States of America or any State, or any political subdivision or taxing authority thereof or therein, in respect of the issuance or delivery of shares of Common Stock (or Other Securities) on exercise of Warrants, *provided that* the Company shall not be required to pay any tax that may be payable in respect of any transfer of a Warrant

or any transfer involved in the issuance and delivery of Common Stock (or Other Securities) in a name other than that of the registered holder of the Warrants to be exercised, and no such issuance or delivery shall be made unless and until the person requesting such issuance has paid to the Company the amount of any such tax or has established, to the reasonable satisfaction of the Company, that such tax has been paid.

## ARTICLE 14

### LOSS OR MUTILATION

Upon receipt by the Company and the Warrant Agent of evidence reasonably satisfactory to them of the ownership of and the loss, theft, destruction or mutilation of any Warrant Certificate and of an indemnity bond reasonably satisfactory to them in form or amount, and (in the case of mutilation) upon surrender and cancellation thereof, then, in the absence of notice to the Company or the Warrant Agent that the Warrants represented thereby have been acquired by a bona fide purchaser, the Company shall execute and deliver to the Warrant Agent and, upon the Company's request, an authorized signatory of the Warrant Agent shall manually countersign and deliver, to the registered holder of the lost, stolen, destroyed or mutilated Warrant Certificate, in exchange for or in lieu thereof, a new Warrant Certificate of the same tenor and for a like aggregate number of Warrants. Upon the issuance of any new Warrant Certificate under this Article 14, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the reasonable fees and expenses of the Warrant Agent) in connection therewith. Every new Warrant Certificate executed and delivered pursuant to this Article 14 in lieu of any lost, stolen or destroyed Warrant Certificate shall be entitled to the same benefits of this Agreement equally and proportionately with any and all other Warrant Certificates, whether or not the allegedly lost, stolen or destroyed Warrant Certificate shall be at any time enforceable by anyone. The provisions of this Article 14 are exclusive and shall preclude (to the extent lawful) all other rights or remedies with respect to the replacement of mutilated, lost, stolen or destroyed Warrant Certificates.

## ARTICLE 15

### WARRANT REGISTRATION

15.1 *Registration*. The Warrant Certificates shall be issued in registered form only and shall be registered in the names of the record holders of the Warrant Certificates to whom they are to be delivered. The Company shall maintain or cause to be maintained a register in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Warrants and of transfers or exchanges of Warrant Certificates as provided in this Agreement. Such register shall be maintained at the office of the Company or the Warrant Agent located at the respective address therefor as provided in Section 17.1. Such register shall be open for inspection upon notice at all reasonable times by the Warrant Agent and each holder of a Warrant.

15.2 *Transfer or Exchange*. Subject to Section 2.1 hereof, at the option of the holder, Warrant Certificates may be exchanged or transferred for other Warrant Certificates for a like aggregate number of Warrants, upon surrender of the Warrant Certificates to be exchanged at the office of the Company or the Warrant Agent maintained for such purpose at the respective address therefor as provided in Section 17.1, and upon payment of the charges herein provided. Whenever any Warrant Certificates are so surrendered for exchange or transfer, the Company shall execute, and an authorized signatory of the Warrant Agent shall manually countersign and deliver, the Warrant Certificates that the holder making the exchange is entitled to receive.

15.3 *Valid and Enforceable*. All Warrant Certificates issued upon any registration of transfer or exchange of Warrant Certificates shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Warrant Certificates surrendered for such registration of transfer or exchange.

15.4 *Endorsement.* Every Warrant Certificate surrendered for registration of transfer or exchange shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by an instrument of transfer in form reasonably satisfactory to the Company and the Warrant Agent and duly executed by the registered holder thereof or such holder's officer or representative duly authorized in writing.

15.5 *No Service Charge.* No service charge shall be made for any registration of transfer or exchange of Warrant Certificates.

15.6 *Cancellation.* Any Warrant Certificate surrendered for registration of transfer, exchange or the exercise of the Warrants represented thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent. Any such Warrant Certificate shall not be reissued by the Company and, except as provided in this Article 15 in case of an exchange or transfer, in Article 14 in case of a mutilated Warrant Certificate and in Article 3 in case of the exercise of less than all the Warrants represented thereby, no Warrant Certificate shall be issued hereunder in lieu thereof. The Warrant Agent shall deliver to the Company from time to time or otherwise dispose of such cancelled Warrant Certificates in a manner reasonably satisfactory to the Company.

## ARTICLE 16

### WARRANT AGENT

16.1 *Obligations Binding.* The Warrant Agent undertakes the duties and obligations imposed by this Agreement upon the terms and conditions set forth in this Article 16. The Company, and the holders of Warrants by their acceptance thereof, shall be bound by all of such terms and conditions.

16.2 *No Liability.* The Warrant Agent shall not by countersigning Warrant Certificates or by any other act hereunder be accountable with respect to or be deemed to make any representations as to the validity or authorization of the Warrants or the Warrant Certificates (except as to its countersignature thereon), as to the validity, authorization or value (or kind or amount) of any Common Stock or of any Other Securities or other property delivered or deliverable upon exercise of any Warrant, or as to the purchase price of such Common Stock, securities or other property. The Warrant Agent shall not (i) be liable for any recital or statement of fact contained herein or in the Warrant Certificates or for any action taken, suffered or omitted by the Warrant Agent in good faith in the belief that any Warrant Certificate or any other document or any signature is genuine or properly authorized, (ii) be responsible for determining whether any facts exist that may require any adjustment of the purchase price and the number of shares of Common Stock purchasable upon exercise of Warrants, or with respect to the nature or extent of any such adjustments when made, or with respect to the method of adjustment employed, (iii) be responsible for any failure on the part of the Company to issue, transfer or deliver any Common Stock or Other Securities or property upon the surrender of any Warrant for the purpose of exercise or to comply with any other of the Company's covenants and obligations contained in this Agreement or in the Warrant Certificates or (iv) be liable for any act or omission in connection with this Agreement except for its own bad faith, negligence or willful misconduct.

16.3 *Instructions.* The Warrant Agent is hereby authorized to accept instructions with respect to the performance of its duties hereunder from the President, any Vice President, the Treasurer or any Assistant Treasurer of the Company and to apply to any such officer for advice or instructions. The Warrant Agent shall not be liable for any action taken, suffered or omitted by it in good faith in accordance with the instructions of any such officer.

16.4 *Agents.* The Warrant Agent may execute and exercise any of the rights and powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, provided reasonable care has been exercised in the selection and in the continued employment of any such attorney, agent or employee. The Warrant Agent shall not be under any obligation or duty to institute, appear in, or

defend any action, suit or legal proceeding in respect hereof, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper. The Warrant Agent shall promptly notify the Company in writing of any claim made or action, suit or proceeding instituted against the Warrant Agent arising out of or in connection with this Agreement.

16.5 *Cooperation*. The Company will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further acts, instruments and assurances as may reasonably be required by the Warrant Agent in order to enable the Warrant Agent to carry out or perform its duties under this Agreement.

16.6 *Agent Only*. The Warrant Agent shall act solely as agent. The Warrant Agent shall not be liable except for the performance of such duties as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Warrant Agent, whose duties and obligations shall be determined solely by the express provisions hereof.

16.7 *Right to Counsel*. The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Company) and the Warrant Agent shall incur no liability or responsibility to the Company or to any Warrant holder for any action taken, suffered or omitted by the Warrant Agent in good faith in accordance with the opinion or advice of such counsel.

16.8 *Compensation*. The Company agrees to pay the Warrant Agent reasonable compensation for its services hereunder and to reimburse the Warrant Agent for its reasonable expenses hereunder; and further agrees to indemnify the Warrant Agent and hold it harmless against any and all liabilities, including, but not limited to, judgments, costs and counsel fees, for anything done, suffered or omitted by the Warrant Agent in the execution of its duties and powers hereunder, except for any such liabilities that arise as a result of the Warrant Agent's bad faith, negligence or willful misconduct.

16.9 *Accounting*. The Warrant Agent shall account promptly to the Company with respect to Warrants exercised and concurrently pay to the Company all moneys received by the Warrant Agent on behalf of the Company on the purchase of shares of Common Stock (or Other Securities) through the exercise of Warrants.

16.10 *No Conflict*. The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

16.11 *Resignation; Termination*. The Warrant Agent may resign its duties and be discharged from all further duties and liabilities hereunder (except liabilities arising as a result of the Warrant Agent's negligence or willful misconduct), after giving 30 days' prior written notice to the Company. The Company may remove the Warrant Agent upon 30 days written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as to liabilities arising as a result of the Warrant Agent's bad faith, negligence or willful misconduct. The Company shall cause to be mailed (by first class mail, postage prepaid) to each registered holder of a Warrant at such, holder's last address as shown on the register of the Company, at the Company's expense, a copy of such notice of resignation or notice of removal, as the case may be. Upon such resignation or removal the Company shall promptly appoint in writing a new warrant agent. If the Company shall fail to make such appointment within a period of 30 days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a new warrant agent. Pending appointment of a successor to the Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company. Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation, incorporated under the

laws of the United States or of any State thereof and authorized under such laws to exercise corporate trust powers, be subject to supervision and examination by Federal or State authority, and have a combined capital and surplus of not less than $100,000,000 as set forth in its most recent published annual report of condition. After acceptance in writing of such appointment by the new warrant agent it shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent. Not later than the effective date of any such appointment the Company shall file notice thereof with the resigning or removed Warrant Agent and shall forthwith cause a copy of such notice to be mailed (by first class mail, postage prepaid) to each registered holder of a Warrant at such holder's last address as shown on the register of the Company. Failure to give any notice provided for in this Section 16.11, or any defect in any such notice, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a new warrant agent, as the case may be.

16.12 *Change of Warrant Agent.* If at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignature under its prior name and deliver Warrant Certificates so countersigned; and if at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force and effect provided in the Warrant Certificates and this Agreement.

16.13 *Successor Warrant Agent.* Any corporation into which the Warrant Agent or any new warrant agent may be merged or any corporation resulting from any consolidation to which the Warrant Agent or any new warrant agent shall be a party or any corporation succeeding to all or substantially all the agency business of the Warrant Agent or any new warrant agent shall be a successor Warrant Agent under this Agreement without any further act, *provided* that such corporation would be eligible for appointment as a new warrant agent under the provisions of Section 16.11 of this Article 16. The Company shall promptly cause notice of the succession as Warrant Agent of any such successor Warrant Agent to be mailed (by first class mail, postage prepaid) to each registered holder of a Warrant at his last address as shown on the register of the Company.

## ARTICLE 17

### REMEDIES, ETC.

17.1 *Remedies.* The Company stipulates that the remedies at law of each holder of a Warrant in the event of any default or threatened default by the Company in the performance of or compliance with any of the terms of this Warrant Agreement are not and will not be adequate and that, to the fullest extent permitted by law, such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any of the terms hereof or otherwise.

17.2 *Warrant Holder Not Deemed a Stockholder.* Prior to the exercise of the Warrants represented thereby no holder of a Warrant Certificate, as such, shall be entitled to any rights of a stockholder of the Company, including, but not limited to, the right to vote, to receive dividends or other distributions, to exercise any preemptive right or, except as otherwise provided herein, to receive any notice of meetings of stockholders, and no such holder shall be entitled to receive notice of any proceedings of the Company except as provided in this Agreement. Nothing contained in this Agreement shall be construed as imposing any liabilities on such holder to purchase any securities or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors or stockholders of the Company or otherwise.

15

17.3 *Right of Action.* All rights of action in respect of this Agreement are vested in the registered holders of the Warrants. Any registered holder of any Warrant, without the consent of the Warrant Agent or the registered holder of any other Warrant, may in such holder's own behalf and for such holder's own benefit enforce, and may institute and maintain any suit, action or proceeding against the Company suitable to enforce, or otherwise in respect of, such holder's right to exercise such holder's Warrants in the manner provided in the Warrant Certificate representing such Warrants and the Company's obligations under this Agreement and the Warrants.

## ARTICLE 18

### MISCELLANEOUS

18.1 *Notices.* Any notice, demand or delivery authorized by this Agreement shall be sufficiently given or made if sent by first class mail, postage prepaid, addressed to any registered holder of a Warrant at such holder's last known address appearing on the register of the Company, and to the Company or the Warrant Agent as follows:

If to the Company:

The Grand Union Company
201 Willowbrook Boulevard
Wayne, New Jersey 07470
Attn: Mr. Kenneth Baum
Telephone: (201) 890-6000
Facsimile: (201) 890-6012

If to the Warrant Agent:

[Warrant Agent]

or such other address as shall have been furnished in writing, in accordance with this Section 18.1, to the party giving or making such notice, demand or delivery.

18.2 *Governing Law and Consent to Forum.* THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS APPLIED TO CONTRACTS MADE AND PERFORMED WITHIN THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. THE COMPANY AND THE PARTIES EACH HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK OR ANY FEDERAL COURT SITTING IN THE CITY OF NEW YORK IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO. THIS AGREEMENT, AND EACH IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF. ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PERSON TO SERVE PROCESS IN ANY MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE COMPANY IN ANY OTHER JURISDICTION.

18.3 *Benefits of this Agreement.* This Agreement shall be binding upon and inure to the benefit of the Company and the Warrant Agent and their respective successors and assigns, and the registered and beneficial holders from time to time of the Warrants and of holders of the Common Stock, where applicable. Nothing in this Agreement is intended or shall be construed to confer upon any other person, any right, remedy or claim under or by reason of this Agreement or any part hereof.

18.4 *Agreement of Holders of Warrant Certificates.* Every holder of a Warrant Certificate, by accepting the same, covenants and agrees with the Company, the Warrant Agent and with every other holder of a Warrant Certificate that the Warrant Certificates are transferable on the registry books of the Warrant Agent only upon the terms and conditions set forth in this Agreement, and the Company and the Warrant Agent may deem and treat the person in whose name the Warrant Certificate is registered as the absolute owner for all purposes whatsoever and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

18.5 *Counterparts.* This Agreement may be executed in any number of counterparts and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

18.6 *Amendments.* The Warrant Agent may, without the consent or concurrence of the holders of the Warrants, by supplemental agreement or other writing, join with the Company in making any amendments or modifications of this Agreement that they shall have been advised by counsel (a) are required to cure any ambiguity or to correct any defective or inconsistent provision or clerical omission or mistake or manifest error herein contained and which do not accurately reflect the understanding of the parties hereto, (b) add to the covenants and agreements of the Company in this Agreement further covenants and agreements of the Company thereafter to be observed, or surrender any rights or power reserved to or conferred upon the Company in this Agreement or (c) do not and will not adversely affect, alter or change the rights, privileges or immunities of the registered holders of Warrants or of any person entitled to the benefits of this Agreement who has not assented to such change, in writing. Any other amendment to this Agreement may be effected only with the consent of all of the parties entitled to benefit hereunder who would be affected by such change.

18.7 *Consent to Jurisdiction.* The parties hereby expressly acknowledge and agree that, to the extent permitted by applicable law, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any and all disputes concerning the distribution of Warrants hereunder to holders of Zero Coupon Notes pursuant to the Plan. The Warrant Agent hereby assents to the jurisdiction of the Bankruptcy Court with respect to any such disputes and waives any argument of lack of such jurisdiction.

18.8 *Headings.* The table of contents hereto and the descriptive headings of the several sections hereof are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, as of the day and year first above written.

THE GRAND UNION COMPANY

By: _____
    Name:
    Title:

[Warrant Agent]

By: _____
    Name:
    Title:

17

**EXHIBIT A**

**FORMS OF WARRANT CERTIFICATE**

**EXHIBIT A-1**

**FORM OF SERIES 1 WARRANT CERTIFICATE**

**[FORM OF FACE OF SERIES 1 WARRANT CERTIFICATE]**

Series 1 Warrant
No.

Number of Series 1 Warrant(s):

Exercisable During the Period Commencing May        , 1995
and Terminating at 5:00 p.m. May        , 2000
except as provided below

## SERIES 1 WARRANT TO PURCHASE
## COMMON STOCK
## OF

### THE GRAND UNION COMPANY

This Certifies that                or registered assigns, is the owner of the number of SERIES 1 WARRANTS set forth above, each of which represents the right, at any time after May        , 1995 and on or before 5:00 p.m., New York City time, on May        , 2000, subject to acceleration as provided below, to purchase from The Grand Union Company, a Delaware corporation (the "Company"), at the price of $30.00 (the "Exercise Price"), one share of Common Stock, $[        ] par value, of the Company as such stock was constituted as of May        , 1995, subject to adjustment as provided in the Warrant Agreement hereinafter referred to, upon surrender hereof, with the subscription form on the reverse hereof duly executed, by hand or by mail to [Warrant Agent, address], Attention: Corporate Trust Operations, or to any successor thereto, as the warrant agent under the Warrant Agreement, at the office of such successor maintained for such purpose (any such warrant agent being herein called the "Warrant Agent") (or, if such exercise shall be in connection with an underwritten Public Offering of shares of such Common Stock (or Other Securities) (as such term and other capitalized terms used herein are defined in the Warrant Agreement) subject to the Warrant Agreement, at the location at which the Company shall have agreed to deliver such securities), and simultaneous payment in full (by certified or official bank or bank cashier's check payable to the order of the Company) of the Exercise Price in respect of each Warrant represented by this Warrant Certificate that is so exercised, all subject to the terms and conditions hereof and of the Warrant Agreement.

Upon any partial exercise of the Warrants represented by this Warrant Certificate, there shall be issued to the holder hereof a new Warrant Certificate representing the Warrants that were not exercised.

No fractional shares may be issued upon the exercise of rights to purchase hereunder, and as to any fraction of a share otherwise issuable, the Company will make a cash adjustment in lieu of such issuance, as provided in the Warrant Agreement.

This Warrant Certificate is issued under and in accordance with a Warrant Agreement, dated as of May        , 1995 (the "Warrant Agreement"), between the Company and [Warrant Agent], as Warrant Agent, and is subject to the terms and provisions contained therein, all of which terms and provisions the holder of this Warrant Certificate consents to by acceptance hereof. Copies of the Warrant Agreement are on file at the above-mentioned office of the Warrant Agent and may be obtained by writing to the Warrant Agent.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Dated:

THE GRAND UNION COMPANY

By: ___  _____
    Title: ___

Countersigned:

[Warrant Agent], as Warrant Agent

By: _____
    Authorized Signatory

**[FORM OF REVERSE OF WARRANT CERTIFICATE]**

**THE GRAND UNION COMPANY**

The transfer of this Warrant Certificate and all rights hereunder is registrable by the registered holder hereof, in whole or in part, on the register of the Company upon surrender of this Warrant Certificate at the office or agency of the Company or the office of the Warrant Agent maintained for such purpose at [Warrant Agent, address], Attention: Corporate Trust Operations, duly endorsed or accompanied by a written instrument of transfer duly executed and in form satisfactory to the Company and the Warrant Agent, by the registered holder hereof or his attorney duly authorized in writing and upon payment of any necessary transfer tax or other governmental charge imposed upon such transfer or registration thereof. Upon any partial transfer the Company will cause to be delivered to such holder a new Warrant Certificate or Certificates with respect to any portion not so transferred.

This Warrant Certificate may be exchanged at the office or agency of the Company or the office of the Warrant Agent maintained for such purpose at [Warrant Agent, address], Attention: Corporate Trust Operations, for Warrant Certificates representing the same aggregate number of Warrants, each new Warrant Certificate to represent such number of Warrants as the holder hereof shall designate at the time of such exchange.

Prior to the exercise of the Warrants represented hereby, the holder of this Warrant Certificate, as such, shall not be entitled to any rights of a stockholder of the Company, including, but not limited to, the right to vote, to receive dividends or other distributions, to exercise any preemptive right or, except as provided in the Warrant Agreement, to receive any notice of meetings of stockholders, and shall not be entitled to receive notice of any proceedings of the Company except as provided in the Warrant Agreement. Nothing contained herein shall be construed as imposing any liabilities upon the holder of this Warrant Certificate to purchase any securities or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors or stockholders of the Company or otherwise.

This Warrant Certificate shall be void and all rights represented hereby shall cease unless exercised on or before the close of business on May    , 2000.

PRIOR TO THE EXPIRATION OF THE EXERCISE PERIOD, THE COMPANY MAY ENGAGE IN A CONSOLIDATION OR MERGER AS TO WHICH IT IS NOT THE SURVIVING COMPANY AND IN CERTAIN SUCH EVENTS ANY WARRANTS WHICH ARE NOT EXERCISED PRIOR TO THE CONSUMMATION OF SUCH TRANSACTION WILL BE CANCELED. WARRANTHOLDERS WILL RECEIVE PRIOR NOTICE OF ANY SUCH TRANSACTION, AND WILL HAVE THE OPPORTUNITY TO EXERCISE THEIR WARRANTS AND, UPON SUCH EXERCISE, EXERCISE THEIR RIGHTS AS HOLDERS OF COMMON STOCK, PRIOR TO ITS CONSUMMATION.

This Warrant Certificate shall not be valid for any purpose until it shall have been manually countersigned by an authorized signatory of the Warrant Agent.

Witness the facsimile seal of the Company and the signature of its duly authorized officer.

## SUBSCRIPTION FORM
### (To be executed only upon exercise of warrant)

TO THE GRAND UNION COMPANY
[Warrant Agent], as Warrant Agent
   Attention: Corporate Trust Operations

The undersigned (i) irrevocably exercises the Warrants represented by the within Warrant Certificate, (ii) purchases one share of Common Stock of The Grand Union Company (before giving effect to the adjustments provided in the Warrant Agreement referred to in the within Warrant Certificate) for each Warrant so exercised and herewith makes payment in full of the purchase price of $30.00 in respect of each Warrant so exercised as provided in the Warrant Agreement (such payment being by certified or official bank or bank cashier's check payable to the order of The Grand Union Company, all on the terms and conditions specified in the within Warrant Certificate and the Warrant Agreement, (iii) surrenders this Warrant Certificate and all right, title and interest therein to The Grand Union Company and (iv) directs that the securities or other property deliverable upon the exercise of such Warrants be registered or placed in the name and at the address specified below and delivered thereto.

Dated:           , 19

_____
(Owner)*

_____
(Signature of Authorized
Representative)

_____
(Street Address)

_____
(City) (State) (Zip Code)

Securities or property to be
issued and delivered to:

_____
Signature Guaranteed**

   Please insert social
   security or other
   identifying number

_____

Name _____

Street Address _____

City, State and Zip Code _____

## FORM OF ASSIGNMENT

FOR VALUE RECEIVED, the undersigned registered holder of the within Warrant Certificate hereby sells, assigns and transfers unto the Assignee named below all of the rights of the undersigned under the within Warrant Certificate, with respect to the number of warrants set forth below:

| Name of Assignee | Address | No. of Warrants |
|---|---|---|

Please insert social
security or other
identifying number
of Assignee

_____

and does hereby irrevocably constitute and appoint            attorney to make such transfer on the books of The Grand Union Company maintained for the purpose, with full power of substitution in the premises.

Dated:            , 19

Name _____*

Signature of Authorized
Representative _____

Signature Guaranteed _____**

_____

    * The signature must correspond with the name as written upon the face of the within Warrant Certificate in every particular, without alteration or enlargement or any change whatsoever.

    ** The signature must be guaranteed by a securities transfer agents medallion program ("stamp") participant or an institution receiving prior approval from the Warrant Agent.

**EXHIBIT A-2**

**FORM OF SERIES 2 WARRANT CERTIFICATE**

**[FORM OF FACE OF SERIES 2 WARRANT CERTIFICATE]**

Series 2 Warrant                                          Number of Series 2 Warrant(s):
No.

Exercisable During the Period Commencing May    , 1995
and Terminating at 5:00 p.m. May    , 2000
except as provided below

## SERIES 2 WARRANT TO PURCHASE
### Common Stock
### OF
### THE GRAND UNION COMPANY

This Certifies that            or registered assigns, is the owner of the number of SERIES 2 WARRANTS set forth above, each of which represents the right, at any time after May    , 1995 and on or before 5:00 p.m., New York City time, on May    , 2000 subject to acceleration as provided below, to purchase from The Grand Union Company, a Delaware Corporation (the "Company"), at the price of **$42.00** (the "Exercise Price"), one share of Common Stock, [ ] par value, of the Company as such stock was constituted as of May    , 1995, subject to adjustment as provided in the Warrant Agreement hereinafter referred to, upon surrender hereof, with the subscription form on the reverse hereof duly executed, by hand or by mail to [Warrant Agent] as Warrant Agent under the Warrant Agreement, at [Warrant agent address], Attention: Corporate Trust Operations, or to any successor thereto, as the warrant agent under the Warrant Agreement, at the office of such successor maintained for such purpose (any such warrant agent being herein called the "Warrant Agent") (or, if such exercise shall be in connection with an underwritten Public Offering of shares of such Common Stock (or Other Securities) (as such term and other capitalized terms used herein are defined in the Warrant Agreement) subject to the Warrant Agreement, at the location at which the Company shall have agreed to deliver such securities), and simultaneous payment in full (by certified or official bank or bank cashier's check payable to the order of the Company) of the Exercise Price in respect of each Warrant represented by this Warrant Certificate that is so exercised, all subject to the terms and conditions hereof and of the Warrant Agreement.

Upon any partial exercise of the Warrants represented by this Warrant Certificate, there shall be issued to the holder hereof a new Warrant Certificate representing the Warrants that were not exercised.

No fractional shares may be issued upon the exercise of rights to purchase hereunder, and as to any fraction of a share otherwise issuable, the Company will make a cash adjustment in lieu of such issuance, as provided in the Warrant Agreement.

This Warrant Certificate is issued under and in accordance with a Warrant Agreement, dated as of May    , 1995 (the "Warrant Agreement"), between the Company and [            ], as Warrant Agent, and is subject to the terms and provisions contained therein, all of which terms and provisions the holder of this Warrant Certificate consents to by acceptance hereof. Copies of the Warrant Agreement are on file at the above-mentioned office of the Warrant Agent and may be obtained by writing to the Warrant Agent.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT SET FORTH ON THE REVERSE HEREOF, WHICH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH AT THIS PLACE.

Dated:                                          THE GRAND UNION COMPANY

                                               By: _____
                                                    Title:

Countersigned:

[Warrant Agent], as Warrant Agent

By: _____
     Authorized Signatory

### [FORM OF REVERSE OF WARRANT CERTIFICATE]

### THE GRAND UNION COMPANY

The transfer of this Warrant Certificate and all rights hereunder is registrable by the registered holder hereof, in whole or in part, on the register of the Company upon surrender of this Warrant Certificate at the office or agency of the Company or the office of the Warrant Agent maintained for such purpose at [Warrant Agent, address], Attention: Corporate Trust Operations, duly endorsed or accompanied by a written instrument of transfer duly executed and in form satisfactory to the Company and the Warrant Agent, by the registered holder hereof or his attorney duly authorized in writing and upon payment of any necessary transfer tax or other governmental charge imposed upon such transfer or registration thereof. Upon any partial transfer the Company will cause to be delivered to such holder a new Warrant Certificate or Certificates with respect to any portion not so transferred.

This Warrant Certificate may be exchanged at the office or agency of the Company or the office of the Warrant Agent maintained for such purpose at [Warrant Agent, address], Attention: Corporate Trust Operations, for Warrant Certificates representing the same aggregate number of Warrants, each new Warrant Certificate to represent such number of Warrants as the holder hereof shall designate at the time of such exchange.

Prior to the exercise of the Warrants represented hereby, the holder of this Warrant Certificate, as such, shall not be entitled to any rights of a stockholder of the Company, including, but not limited to, the right to vote, to receive dividends or other distributions, to exercise any preemptive right or, except as provided in the Warrant Agreement, to receive any notice of meetings of stockholders, and shall not be entitled to receive notice of any proceedings of the Company except as provided in the Warrant Agreement. Nothing contained herein shall be construed as imposing any liabilities upon the holder of this Warrant Certificate to purchase any securities or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors or stockholders of the Company or otherwise.

This Warrant Certificate shall be void and all rights represented hereby shall cease unless exercised on or before the close of business on May      , 2000.

PRIOR TO THE EXPIRATION OF THE EXERCISE PERIOD, THE COMPANY MAY ENGAGE IN A CONSOLIDATION OR MERGER AS TO WHICH IT IS NOT THE SURVIVING COMPANY AND IN CERTAIN SUCH EVENTS ANY WARRANTS WHICH ARE NOT EXERCISED PRIOR TO THE CONSUMMATION OF SUCH TRANSACTION WILL BE CANCELED. WARRANT HOLDERS WILL RECEIVE PRIOR NOTICE OF ANY SUCH TRANSACTION, AND WILL HAVE THE OPPORTUNITY TO EXERCISE THEIR WARRANTS AND, UPON SUCH EXERCISE, EXERCISE THEIR RIGHTS AS HOLDERS OF COMMON STOCK, PRIOR TO ITS CONSUMMATION.

This Warrant Certificate shall not be valid for any purpose until it shall have been manually countersigned by an authorized signatory of the Warrant Agent.

Witness the facsimile seal of the Company and the signature of its duly authorized officer.

## SUBSCRIPTION FORM
(To be executed only upon exercise of warrant)

TO THE GRAND UNION COMPANY
[Warrant Agent], as Warrant Agent
   Attention: Corporate Trust Operations

   The undersigned (i) irrevocably exercises the Warrants represented by the within Warrant Certificate, (ii) purchases one share of Common Stock of The Grand Union Company (before giving effect to the adjustments provided in the Warrant Agreement referred to in the within Warrant Certificate) for each Warrant so exercised and herewith makes payment in full of the purchase price of $42.00 in respect of each Warrant so exercised as provided in the Warrant Agreement (such payment being by certified or official bank or bank cashier's check payable to the order of The Grand Union Company), all on the terms and conditions specified in the within Warrant Certificate and the Warrant Agreement, (iii) surrenders this Warrant Certificate and all right, title and interest therein to The Grand Union Company and (iv) directs that the securities or other property deliverable upon the exercise of such Warrants be registered or placed in the name and at the address specified below and delivered thereto.

Dated:        , 19

_____
(Owner)*

_____
(Signature of Authorized
Representative)

_____
(Street Address)

_____
(City) (State) (Zip Code)

Securities or property to be
issued and delivered to:

_____
Signature Guaranteed**

Please insert social
security or other
identifying number

Name _____

Street Address _____

City, State and Zip Code _____

## FORM OF ASSIGNMENT

FOR VALUE RECEIVED, the undersigned registered holder of the within Warrant Certificate hereby sells, assigns and transfers unto the Assignee named below all of the rights of the undersigned under the within Warrant Certificate, with respect to the number of warrants set forth below:

| Name of Assignee | Address | No. of Warrants |
|---|---|---|

Please insert social
security or other
identifying number
of Assignee

_____

and does hereby irrevocably constitute and appoint _____ attorney to make such transfer on the books of The Grand Union Company maintained for the purpose, with full power of substitution in the premises.

Dated: _____ , 19 _____

Name _____ *

Signature of Authorized
Representative _____

Signature Guaranteed _____ **

_____

\* The signature must correspond with the name as written upon the face of the within Warrant Certificate in every particular, without alteration or enlargement or any change whatsoever.

\*\* The signature must be guaranteed by a securities transfer agents medallion program ("stamp") participant or an institution receiving prior approval from the Warrant Agent.