**EXHIBIT B**

**RELEASE**

### Release

For good and valuable consideration, the receipt of which is hereby acknowledged, including, without limitation, the issuance of warrants to purchase common stock of Reorganized Grand Union pursuant to the Plan, the undersigned hereby unconditionally and irrevocably re eases the following persons, subject to the Warrants having been released for distribution: the Company, Capital, and Holdings, the respective affiliates of the Company, Capital, and Holdings, present and former stockholders, directors, and officers of the Company, Capital, and Holdings, including Miller Tabak Hirsch & Co. ("MTH") and its present and former partners, directors, officers, employees, advisors, attorneys, consultants, agents, and representatives including, without limitation, Mssrs. Martin A. Fox, Glenn L. Goldberg, Claude Incaudo and James A. Lash, and any person or entity that directly or indirectly controls MTH, including Gary Hirsch, Jeffrey Miller and Jeffrey Tabak, the members of each of the Official Committee and the Informal Committees, each of the Post-Confirmation Banks, BT Securities Corporation, Goldman, Sachs & Co., and each of the foregoing entity's and/or person's respective attorneys, advisors, financial advisors, investment bankers, employees, successors, agents, and assigns, and any other person and/or entity against whom the undersigned may have a Released Claim, as defined below (collectively, the "Released Persons"), from any and all claims, demands, actions, causes of action, suits, costs, dues, sums of money, accounts, bills, bonds, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments expenses, and liability whatsoever, known or unknown, at law or in equity, irrespective of whether such claims arise out of contract, tort, violation of laws or other regulations or otherwise, which the undersigned ever had or now has against the Released Persons or any of them, for, or by reason of, any matter, cause or thing whatsoever from the beginning of the world to and including the date hereof arising out of or in connection with, or related in any manner to, the issuance, ownership, purchase, and/or sale of the Zero Coupon Notes including, without limitation, any claim for substantive consolidation of the Company's Bankruptcy Case and Capital's Bankruptcy Case, any claims arising under any state or federal securities law and/or any claims arising under Sections 544, 548 and 550 of the Bankruptcy Code or under similar state laws, including fraudulent conveyance claims (the "Released Claims"); provided, however, that the undersigned is not hereby releasing the right to receive Warrants pursuant to the Plan or any Allowed Claim in Classes 1, 2, 3, 4 or 8 of the Plan held by the undersigned.

_____  _____
                  /s/

**Exhibit F**

### Zero Claims Release

For good and valuable consideration, the receipt of which is hereby acknowledged, including, without limitation, the issuance of warrants to purchase common stock of Reorganized Grand Union pursuant to the Plan, the undersigned hereby unconditionally and irrevocably releases the following persons, subject to the Warrants having been released for distribution: the Company, Capital, and Holdings, the respective affiliates of the Company, Capital, and Holdings, present and former stockholders, directors, and officers of the Company, Capital, and Holdings, including Miller Tabak Hirsch & Co. ("MTH") and its present and former partners, directors, officers, employees, advisors, attorneys, consultants, agents, and representatives including, without limitation, Mssrs. Martin A. Fox, Glenn L. Goldberg, Claude Incaudo and James A. Lash, and any person or entity that directly or indirectly controls MTH, including Gary Hirsch, Jeffrey Miller and Jeffrey Tabak, the members of each of the Official Committee and the Informal Committees, each of the Post-Confirmation Banks, BT Securities Corporation, Goldman, Sachs & Co., and each of the foregoing entity's and/or person's respective attorneys, advisors, financial advisors, investment bankers, employees, successors, agents, and assigns, and any other person and/or entity against whom the undersigned may have a Released Claim, as defined below (collectively, the "Released Persons"), from any and all claims, demands, actions, causes of action, suits, costs, dues, sums of money, accounts, bills, bonds, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, expenses, and liability whatsoever, known or unknown, at law or in equity, irrespective of whether such claims arise out of contract, tort, violation of laws or other regulations or otherwise, which the undersigned ever had or now has against the Released Persons or any of them, for, or by reason of, any matter, cause or thing whatsoever from the beginning of the world to and including the date hereof arising out of or in connection with, or related in any manner to, the issuance, ownership, purchase, and/or sale of the Zero Coupon Notes including, without limitation, any claim for substantive consolidation of the Company's Bankruptcy Case and Capital's Bankruptcy Case, any claims arising under any state or federal securities law and/or any claims arising under Sections 544, 548 and 550 of the Bankruptcy Code or under similar state laws, including fraudulent conveyance claims (the "Released Claims"); provided, however, that the undersigned is not hereby releasing the right to receive Warrants pursuant to the Plan or any Allowed Claim in Classes 1, 2, 3, 4 or 8 of the Plan held by the undersigned.

/s/

**Exhibit G**

## AGREEMENT

This Agreement (the "Agreement"), dated as of April    , 1995, is made among The Grand Union Company (the "Company"), Grand Union Capital Corporation ("Capital"), Grand Union Holdings Corporation ("Holdings"), the Official Committee of Unsecured Creditors of Grand Union Capital Corporation (the "Capital Committee"), certain holders, that are signatories to this Agreement, of the 15% Senior Zero Coupon Notes Due 2004, Series A and B (the "Senior Zero Coupon Notes") and the 16.5% Senior Subordinated Zero Coupon Notes Due 2007, Series A and B (the "Senior Subordinated Zero Coupon Notes" and, together with the Senior Zero Coupon Notes, the "Zero Coupon Notes") issued by Capital and guaranteed by Holdings (each such holder of Zero Coupon Notes, in its capacity as such, a "Noteholder" and collectively with the Company, Capital, Holdings, and the Capital Committee, the "Parties"). All terms not otherwise defined herein shall have the meanings ascribed to such terms in the Second Amended Chapter 11 Plan of the Company dated April 19, 1995, as amended as provided in Section 1(d) hereof (the "Plan") annexed hereto as Exhibit A. This Agreement is made in consideration of, and in reference to, the following:

## RECITALS

WHEREAS, on January 25, 1995, the Company filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), commencing Case No. 95-84 (PJW) (the "Company Bankruptcy Case"); and

WHEREAS, on February 6, 1995, certain members of a then unofficial committee of holders of Zero Coupon Notes (the "Unofficial Capital Committee") commenced an involuntary chapter 11 bankruptcy case against Capital, Case No. 95-130 (PJW), in the Bankruptcy Court, in response to which Capital consented to an entry of an order for relief on February 16, 1995 (the "Capital Bankruptcy Case"); and

WHEREAS, on February 16, 1995, Holdings filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, commencing Case No. 95-172 (PJW) (the "Holdings Bankruptcy Case," together with the Company Bankruptcy Case and the Capital Bankruptcy Case, the "Bankruptcy Cases"); and

WHEREAS, the Company, Capital and Holdings remain in possession of their respective assets and continue to manage their affairs as debtors and debtors-in-possession in their respective Bankruptcy Cases; and

WHEREAS, the Company is a wholly-owned subsidiary of Capital which, in turn, is a wholly-owned subsidiary of Holdings; and

WHEREAS, both prior to and after the commencement of the Bankruptcy Cases, the Unofficial Capital Committee made certain allegations including that (i) Capital had breached certain fiduciary obligations that it purportedly owed to the Noteholders, and (ii) certain purported transfers by Capital to Holdings of proceeds received from the sale of Zero Coupon Notes were avoidable; and

WHEREAS, on February 23, 1995, the Unofficial Capital Committee filed a motion in the Bankruptcy Court to substantively consolidate the Company Bankruptcy Case and the Capital Bankruptcy Case (the "Motion"); and

WHEREAS, on March 3, 1995, the United States Trustee appointed the Capital Committee; and

WHEREAS, the Capital Committee adopted and continues to prosecute the Motion and, additionally, either has filed or continues to prosecute various other motions, applications, and objections in the Bankruptcy Cases including, without limitation, the following:

1. Objection of the Unofficial Committee of Bondholders of Grand Union Capital Corporation to Debtor's Motion for an Order Authorizing Interim and Final DIP Financing filed in the Company Bankruptcy Case on February 7, 1995;

2. Response of the Unofficial Committee of Zero Coupon Noteholders of Grand Union Capital Corporation to Debtor's Motion to Strike Objections filed in the Company Bankruptcy Case on February 15, 1995;

3. Objection of the Committee of Zero Coupon Noteholders to Debtor's Disclosure Statement for the Plan of Reorganization of Grand Union Company filed in the Company Bankruptcy Case on March 2, 1995;

4. Motion Pursuant to Rule 60(b) Vacating the Orders Approving Post-Petition Financing Agreement of the Debtor With Bankers Trust Company and Exit Financing Commitment Fee and Reopening Hearing on the Motions filed in the Company Bankruptcy Case on March 16, 1995;

5. Motion of the Capital Committee to Disqualify Goldman Sachs and BT Securities filed in the Company Bankruptcy Case on March 17, 1995;

6. Objection of the Capital Committee to Debtor's First Amended Disclosure Statement for the First Amended Plan of Reorganization of Grand Union Company filed in the Company Bankruptcy Case on April 3, 1995; and

7. Application for Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure for Joint Administration of Grand Union Capital Corporation and Grand Union Holdings Corporation filed in both the Capital and Holdings Bankruptcy Cases on March 15, 1995.

(Hereinafter, the claims, allegations and/or contentions that are the subject of or are asserted by either the Unofficial Capital Committee or the Capital Committee in any of the matters described in these recitals (including, without limitation, the Motion), and any appeals related thereto, are collectively referred to as the "Capital Claims"); and

WHEREAS, the Company, Capital, and Holdings dispute any liability to the Noteholders, the Unofficial Capital Committee or the Capital Committee with respect to the Capital Claims; and

WHEREAS, due to the complexities of the various issues raised by the Capital Claims, and in order to avoid the inherent uncertainty and expense involved therein, the parties hereto believe that it is in their respective best interests to compromise and settle all of the controversies which exist among them upon the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the Parties hereby memorialize their agreement as follows:

SECTION 1. *Support of the Plan.* Each of the Noteholders and the Capital Committee agree that, so long as (x) with respect to each Noteholder, such Noteholder is the beneficial owner of, or has investment authority or discretion as to, any Zero Coupon Notes and (y) no Material Change, as defined below, or a Disabling Contingency, as defined in Section 12(a) of this Agreement, shall have occurred:

(a) Each Noteholder and the Capital Committee will (i) support and assist in the filing of the Plan, (ii) support and assist in the filing of the Disclosure Statement for the Plan, (iii) support and use its reasonable efforts to obtain acceptance of the Plan, (iv) take, or cause to be taken, any and all such other actions as are necessary to cause such Zero Coupon Notes beneficially owned, or as to which such Noteholder has investment authority or discretion, to be voted on the Plan, and (v) not agree to, consent to, or vote for any plan, other than the Plan as it may be amended, that does not contain the terms set forth in the Plan.

(b) Each Noteholder and the Capital Committee will not object to or otherwise commence any proceeding to oppose or alter either the Plan or the Disclosure Statement for the Plan, will withdraw any pending objection to the Disclosure Statement for the Plan, and will not take any action that is inconsistent with, or that would delay approval of the Disclosure Statement for the Plan or acceptance, confirmation, effectiveness or substantial consummation of the Plan.

(c) While the Noteholders and the Capital Committee have agreed to support and use their reasonable efforts to obtain acceptance of the Plan as set forth in (a) above, it is understood that the Noteholders can have no legally binding obligation to vote to accept the Plan. Nothing contained herein shall be construed as a solicitation of an acceptance or rejection of, or require any party to accept or reject, the Plan.

(d) The Noteholders and the Capital Committee acknowledge that the Plan may be modified or amended, and any such modification or amendment which does not constitute a Material Change shall not affect the Parties' obligations set forth in this Section 1. For purposes hereof, a "Material Change" means any modification or amendment of the Plan proposed or supported for approval by the Company such that the Plan contains terms that are different from those set forth in the Plan and which materially and adversely affect a Noteholder's treatment (either absolutely or relatively as compared to the treatment of other claims), unless the affected Noteholder agrees to such terms.

SECTION 2. *Transfer of Claims, Interests and Securities*. No Noteholder shall, directly or indirectly, sell, assign, hypothecate or otherwise dispose of (collectively, "transfer") (x) any Zero Coupon Notes beneficially owned by it or as to which such Noteholder has investment authority or discretion, (including Zero Coupon Notes acquired after the date hereof), (y) any claim (as that term is defined in Section 101(5) of the Bankruptcy Code) arising from, based on or related to, Zero Coupon Notes or (z) any option, warrant, interest in, or right to acquire, any Zero Coupon Notes or claims referred to in clauses (x) or (y) above, provided that a party shall be permitted to transfer Zero Coupon Notes, claims or interests therein to (i) another Noteholder that is a party to this Agreement, (ii) an Affiliate (as that term is defined in Rule 12b-2 of the General Rules and Regulations promulgated under the Securities Act of 1934, as amended) of a Noteholder, which agrees in writing to be bound by the terms of this Agreement or (iii) any person or entity that is not a Noteholder and a party to this Agreement, or an Affiliate of a Noteholder, that agrees in writing to be bound by the terms of this Agreement. Such an Affiliate, person or entity which enters into the agreements required by clauses (ii) or (iii) of the preceding sentence shall be deemed to be a party to this Agreement for all purposes. Nothing contained in this Agreement is intended to or shall restrict the transfer of the warrants referred to in Section 4 of this Agreement subsequent to their issuance.

SECTION 3. *Ownership of Zero Coupon Notes*. Each Noteholder represents and warrants that (i) Exhibit B sets forth the total principal amount of Zero Coupon Notes beneficially owned, or as to which such Noteholder, or its Affiliates have investment authority or discretion, and such Zero Coupon Notes constitute all of such securities so owned or controlled by such Noteholder and its Affiliates.

SECTION 4. *Plan Treatment*. The Plan shall contain provisions providing for the issuance to Noteholders of warrants for the purchase of Reorganized Grand Union's common stock.

SECTION 5. *Other Representations and Warranties*. (a) By their execution of this Agreement, each Noteholder and the Capital Committee represent and warrant that they (i) have read and understand the Plan, (ii) have had the opportunity to discuss and negotiate the terms of the Plan with the assistance of legal, financial and other advisors of their choosing ("Advisors"), and have had the opportunity to consult with their Advisors with respect to their decision to execute this Agreement, (iii) have read and understand the Disclosure Statement for the Plan, and (iv) have had adequate access, directly or through such Advisors, to such financial, business or other information relating to the Company, Capital, and Holdings that they deemed necessary or advisable to enter into this Agreement.

3

(b) The Parties further represent and warrant to one another as follows: (i) Each party is the sole and lawful owner of all right, title and interest in and to every claim and other matter which the party releases herein, and that the party has not heretofore assigned or transferred, or purported to assign or transfer, to any person, firm or entity, any such claim or other matters herein released; and (ii) except as expressly stated in this Agreement, no party has made any statement or representation to any other party regarding any facts relied upon by said party in entering into this Agreement, and each party specifically does not rely upon any statement, representation or promise of any other party in executing this Agreement or in making the settlement provided for herein, except as expressly stated in this Agreement.

(c) Capital and Holdings each represents and warrants to the Capital Committee that, after giving effect to the releases contained in or contemplated by this Agreement and the Plan, it has no material assets except as disclosed in its schedules and statements filed, as amended, in the Bankruptcy Cases.

SECTION 6. *Authorization.* Each Noteholder, the Capital Committee, the Company, Capital, and Holdings each represents and warrants, subject to Bankruptcy Court approval with respect to the Company, Capital, and Holdings, that it has the power, and is authorized, to enter into this Agreement.

SECTION 7. *Withdrawal and/or Dismissal of Capital Claims.* Each of the Parties and those entities that have indicated their lack of objection to this Agreement on page 16 hereof agrees to forbear and stand still on all litigation, including pre-trial discovery, relating to the Capital Claims. Upon the Effective Date of the Plan, the Noteholders and the Capital Committee will withdraw and/or dismiss the Capital Claims with prejudice. The Company agrees to forbear and stand still on any appeal from the order of the United States District Court for the District of Delaware granting the Unofficial Capital Committee standing to appear in the Company's Bankruptcy Case (the "Standing Order") until a Material Change or a Disabling Contingency, as defined in Section 12 of this Agreement, occurs. This standstill shall not, however, preclude the Company from filing a notice of appeal from the Standing Order or the Capital Committee from responding to such appeal if it is not stayed.

SECTION 8. *Noteholder and Capital Committee Releases.* For good and valuable consideration, the receipt of which is hereby acknowledged, including, without limitation, the issuance of warrants to purchase common stock of Reorganized Grand Union pursuant to the Plan, each of the Noteholders and the Capital Committee, and their affiliates, agents, and assigns (the "Releasors") hereby unconditionally and irrevocably release the following persons: the Company, Capital, and Holdings, the respective affiliates of the Company, Capital, and Holdings, present and former stockholders, directors, and officers of the Company, Capital, and Holdings, including Miller Tabak Hirsch & Co. ("MTH") and its present and former partners, directors, officers, employees, advisors, attorneys, consultants, agents, and representatives including, without limitation, ~~Messrs. Martin A. Fox, Glenn L. Goldberg, Claude Incaudo and James A. Lash, and any person or entity~~ that directly or indirectly controls MTH, including Gary Hirsch, Jeffrey Miller and Jeffrey Tabak, the members of each of the Official Committee and the Informal Committees, each of the Post-Confirmation Banks, BT Securities Corporation, Goldman, Sachs & Co., and each of the foregoing entity's and/or person's respective attorneys, advisors, financial advisors, investment bankers, employees, successors, agents, and assigns, and any other person and/or entity against whom any of the Releasors may have a Released Claim, as defined below in this section (collectively, the "Released Persons"), from any and all claims, demands, actions, causes of action, suits, costs, dues, sums of money, accounts, bills, bonds, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, expenses, and liability whatsoever, known or unknown, at law or in equity, irrespective of whether such claims arise out of contract, tort, violation of laws or other regulations or otherwise, which the Releasors ever had or now have against the Released Persons or any of them, for, or by reason of, any matter, cause or thing whatsoever from the beginning of the world to and including the date hereof arising out of or in connection with, or related in any manner to, the issuance, ownership, purchase, and/or sale of the Zero Coupon Notes including, without limitation, any claim for substantive consolidation of the Company's Bankruptcy Case and Capital's Bankruptcy Case, any claims arising under any state or federal securities law and/or any claims arising under Sections 544, 548 and 550 of the Bankruptcy Code or under similar state laws, including fraudulent

4

conveyance claims (the "Released Claims"); provided, however that a Releasor is not releasing hereby such Releasor's right to receive warrants pursuant to the Plan or an / Allowed Claim in Classes 1, 2, 3, 4 or 8 of the Plan held by such Releasor.

SECTION 9. *Capital Release.* For good and valuable co sideration, the receipt of which is hereby acknowledged, including, without limitation, the issuance c warrants to purchase common stock of Reorganized Grand Union pursuant to the Plan and the Relea es contained in this Agreement, Capital and its affiliates (other than the Company), agents, and assigns (the "Releasors") hereby unconditionally and irrevocably release the following persons: the Company, H ldings, the Noteholders, and the Capital Committee, the respective affiliates of the Company, Holdings, i he Plan, and the Capital Committee, present and former stockholders, directors, and officers of th Company and Holdings, including Miller Tabak Hirsch & Co. ("MTH") and its present and former partners, directors, officers, employees, advisors, attorneys, consultants, agents, and representatives including, without limitation, Mssrs. Martin A. Fox, Glenn L. Goldberg, Claude Incaudo and James A. Lash, and a y person or entity that directly or indirectly controls MTH, including Gary Hirsch, Jeffrey Miller and Jeffre / Tabak, the members of each of the Official Committee and the Informal Committees, each of the Post-Con irmation Banks, BT Securities Corporation, Goldman, Sachs & Co., each of the foregoing entity's and/or per son's respective attorneys, advisors, financial advisors, investment bankers, employees, successors, agents, and assigns, each holder of a Zero Coupon Note that executes and delivers a Zero Claims Release pursuant to tl e Plan, and any other person and/or entity against whom any of the Releasors may have a Released Claim, is defined below in this section (collectively, the "Released Persons"), from any and all claims, demands, acti ns, causes of action, suits, costs, dues, sums of money, accounts, bills, bonds, covenants, contracts, cont oversies, agreements, promises, variances, trespasses, damages, judgments, expenses, and liability whatsoe er, known or unknown, at law or in equity, irrespective of whether such claims arise out of contract, tort. violation of laws or other regulations or otherwise, which the Releasors ever had or now have against the Released Persons or any of them, for, or by reason of, any matter, cause or thing whatsoever from the begin ning of the world to and including the date hereof arising out of or in connection with, or related in any ma nner to, the issuance, ownership, purchase, and/or sale of the Zero Coupon Notes including without limit: tion, any claims arising under any state or federal securities law and/or any claims arising under Sections 5 44, 548 and 550 of the Bankruptcy Code or under similar state laws, including fraudulent conveyance claims (the "Released Claims").

SECTION 10. *Holdings Release.* For good and valuable co sideration, the receipt of which is hereby acknowledged, including, without limitation, the issuance of warrants to purchase common stock of Reorganized Grand Union pursuant to the Plan and the Releases contained in this Agreement, Holdings and its affiliates (other than the Company), agents, and assigns (th "Releasors") hereby unconditionally and irrevocably release the following persons: the Company, C ipital, the Noteholders, and the Capital Committee, the respective affiliates of the Company, Capital, the Noteholders, and the Capital Committee, present and former stockholders, directors, and officers of the Company or Capital, including Miller Tabak Hirsch & Co. ("MTH") and its present and former partne s, directors, officers, employees, advisors, attorneys, consultants, agents, and representatives including, without limitation, Mssrs. Martin A. Fox, Glenn L. Goldberg, Claude Incaudo and James A. Lash, and a y person or entity that directly or indirectly controls MTH, including Gary Hirsch, Jeffrey Miller and Jeffrey Tabak, the members of each of the Official Committee and the Informal Committees, each of the Post-Con irmation Banks, BT Securities Corporation, Goldman, Sachs & Co., each of the foregoing entity's and/or per son's respective attorneys, advisors, financial advisors, investment bankers, employees, successors, agents, and assigns, each holder of a Zero Coupon Note that executes and delivers a Zero Claims Release pursuant to t ie Plan and any other person and/or entity against whom any of the Releasors may have a Released Claim, as defined below in this section (collectively, the "Released Persons"), from any and all claims, demands, acti ns, causes of action, suits, costs, dues, sums of money, accounts, bills, bonds, covenants, contracts, cont oversies, agreements, promises, variances, trespasses, damages, judgments, expenses, and liability whatsoe er, known or unknown, at law or in equity, irrespective of whether such claims arise out of contract, tor :, violation of laws or other regulations or otherwise, which the Releasors ever had or now have against the Released Persons or any of them, for, or by

reason of, any matter, cause or thing whatsoever from the beginning of the world to and including the date hereof arising out of or in connection with, or related in any manner to, the issuance, ownership, purchase, and/or sale of the Zero Coupon Notes including without limitation, any claims arising under any state or federal securities law and/or any claims arising under Sections 544, 548 and 550 of the Bankruptcy Code or under similar state laws, including fraudulent conveyance claims (the "Released Claims").

SECTION 11. *Company Release.* For good and valuable consideration, the receipt of which is hereby acknowledged, including, without limitation, the Releases contained in this Agreement, the Company and its affiliates, agents, and assigns (the "Releasors") hereby unconditionally and irrevocably release the following persons: Capital, Holdings, the Noteholders, and the Capital Committee, the respective affiliates of the Noteholders and the Capital Committee, and the respective officers, directors, employees, advisors, attorneys and consultants, in such capacities, of the Noteholders and the Capital Committee (collectively, the "Released Persons"), from any and all claims, demands, actions, causes of action, suits, costs, dues, sums of money, accounts, bills, bonds, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, expenses, and liability whatsoever, known or unknown, at law or in equity, irrespective of whether such claims arise out of contract, tort, violation of laws or other regulations or otherwise, which the Releasors ever had or now have against the Released Persons or any of them, for, or by reason of, any matter, cause or thing whatsoever from the beginning of the world to and including the date hereof arising out of or in connection with, or related in any manner to, the issuance, ownership, purchase, and/or sale of the Zero Coupon Notes including without limitation, any claims arising under any state or federal securities law and/or any claims arising under Sections 544, 548 and 550 of the Bankruptcy Code or under similar state laws, including fraudulent conveyance claims.

SECTION 12. *Occurrence of Certain Events.* (a) The Noteholders and the Capital Committee shall be released of their obligations under this Agreement in the event of either a Material Change, as defined in Section 1 of this Agreement, or: (i) the Company withdraws or otherwise fails to prosecute the Plan; (ii) the Bankruptcy Court enters an order that becomes a Final Order denying the Joint Motion to Compromise Controversies, as defined in Section 14 of this Agreement, in the Company's Bankruptcy Case; (iii) the Bankruptcy Court enters an order that becomes a Final Order denying confirmation of the Plan; or (iv) the Bankruptcy Court does not enter an order confirming the Plan on or before August 15, 1995 (a "Disabling Contingency").

(b) In the event of a Material Change in the Plan, or a Disabling Contingency, the Company shall not schedule a hearing on any of the Capital Claims, or on a new plan of reorganization, such that any such hearing occurs prior to 20 days after the occurrence of the Material Change, or the Disabling Contingency, as applicable.

SECTION 13. *Covenant Not to Sue.* Each Noteholder and the Capital Committee hereby covenant not to commence any action against any Released Person, as defined in Section 8 of this Agreement, asserting a Released Claim, as defined in that section.

SECTION 14. *Bankruptcy Court Motion for Approval.* In order to effectuate a timely resolution of these matters, certain of the parties hereto shall jointly file a motion in the Bankruptcy Cases requesting Bankruptcy Court approval of this Settlement Agreement pursuant to Bankruptcy Rule 9019 (the "Joint Motion to Compromise Controversies"). The Parties to this Agreement will cooperate fully with one another and will use their respective best efforts to secure the entry of a Final Order approving the Joint Motion to Compromise Controversies as promptly as possible.

SECTION 15. *Effective Date.* This Agreement shall be effective upon its execution by each of the Parties, subject to Bankruptcy Court approval of the Joint Motion to Compromise Controversies; *provided, however,* that notwithstanding such Bankruptcy Court approval, with respect to the provisions of this Agreement relating to the releases contained in Sections 8, 9, 10 and 11, above, this Agreement shall be deemed effective, subject to delivery of the global certificates provided for in Section 2.1 of the Warrant Agreement, upon the

occurrence of the Effective Date of the Plan (assuming the order approving the Joint Motion to Compromise Controversies is a Final Order) and provided further that the releases by the Noteholders set forth in Section 8 and the Company's release of the Noteholders in Section 11, above, shall not be effective if prior to the commencement of the distribution of the Warrants by the Warrant Agent (as defined in the Warrant Agreement), in whole or in part, such distribution is enjoined by an Entity other than a holder (present, former or future) of a Zero Note; and provided further that the immediately preceding proviso shall be of no force and effect if such injunction is dissolved. To the extent a particular term or provision of this Agreement is not approved by the Bankruptcy Court, this Agreement may nonetheless become effective if the party that is the intended beneficiary of such term or provision agrees in writing to the deletion of such term from this Agreement. In addition, if orders approving this Agreement have been entered in the Capital Bankruptcy Case and the Holdings Bankruptcy Case, the Company may waive the requirement that any such order be a Final Order with the consent of the Official Committee, which consent shall not be unreasonably withheld. If the Company waives such requirement, this Agreement shall not be binding upon Capital or Holdings if a Final Order approving it has not been entered in its Bankruptcy Case.

SECTION 16. *Specific Performance.* It is understood and agreed by the Noteholders and the Capital Committee that money damages would not be a sufficient remedy for any breach of this Agreement by any Noteholder or the Capital Committee and that the Company shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach, and each Noteholder and the Capital Committee agree to waive any requirement for the securing or posting of a bond in connection with such remedy.

SECTION 17. *No Admission of Liability.* The settlement set forth herein is in the best interest of all of the Parties, and the estates of the Company, Capital, and Holdings, because of, among other reasons, the substantial risks inherent in and the significant expenses arising from continuing litigation with respect of the Capital Claims. This Agreement is in compromise of disputed claims and nothing contained herein shall be construed or offered as an admission of liability, or of the amount of any claim, on behalf of, or with respect to, any claims asserted by or against the Parties. The Company, Capital, and Holdings expressly deny such alleged liability to the Noteholders and the Capital Committee.

SECTION 18. *Joint Negotiation.* This Agreement is a product of negotiation among the Parties and represents jointly conceived, bargained for, and agreed upon, language that has been mutually determined by the Parties to express their intentions in entering into this Agreement. Any ambiguity or uncertainty in this Agreement shall be deemed to be caused by or attributable to all Parties hereto collectively.

SECTION 19. *Final Agreement.* Except as set forth in the Plan, this Agreement is the complete, final and exclusive statement of all of the agreements, conditions, promises and covenants among the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, negotiations, representations, statements, understandings and discussions among the Parties and/or their respective counsel with respect to the subject matter covered. Except as set forth in the Plan, there exist no prior or contemporaneous negotiations, statements, promises or agreements that survive the execution of this Agreement.

SECTION 20. *Disclosure.* The Parties contemplate that this Agreement will be disclosed in the Disclosure Statement for the Plan and/or a press release issued by the Company, Capital, and/or Holdings, and consent to such disclosure.

SECTION 21. *Amendments or Modifications.* To be legally binding, any amendment or modification to this Agreement must be in writing, must refer specifically to this Agreement and must be signed by duly-authorized representatives of all Parties hereto.

SECTION 22. *Binding Effect.* This Agreement shall be binding on the Parties and any and all of their successors and assigns including, without limitation, any trustee that may be appointed in any of the Bankruptcy Cases.

SECTION 23. *No Waiver of Breach.* The failure of any party to require the performance of any of the terms or provisions of this Agreement or the waiver by any party of any breach under this Agreement shall neither prevent a subsequent enforcement of such term or provision nor be deemed a waiver of any such subsequent breach.

SECTION 24. *Headings.* The descriptive headings of the several sections of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

SECTION 25. *Governing Law.* In all respects, including all matters of construction, validity and performance, this Agreement and the obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York applicable to contracts made and performed in such state, without regard to the principles thereof regarding conflicts of law, and any applicable laws of the United States of America.

SECTION 26. *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall, collectively and separately, constitute one agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement the      day of April, 1995.

THE GRAND UNION COMPANY

By: _____

GRAND UNION CAPITAL CORPORATION

By: _____

GRAND UNION HOLDINGS CORPORATION

By: _____

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
GRAND UNION CAPITAL CORPORATION

By: _____

DEAN WITTER HIGH YIELD SECURITIES

By: _____

VARIABLE HIGH YIELD

By: _____

DEAN WITTER DIVERSIFIED INCOME TRUST

By: _____

HIGH INCOME ADVANTAGE TRUST

By: _____

HIGH INCOME ADVANTAGE TRUST II

By: _____

HIGH INCOME ADVANTAGE TRUST III

By: _____

DEAN WITTER HIGH INCOME SECURITIES

By: _____

LUTHERAN BROTHERHOOD HIGH YIELD FUND

By: _____

LB SERIES FUND, INC. HIGH YIELD PORTFOLIO

By: _____

FRANKLIN AGE HIGH INCOME FUND

By: _____

FRANKLIN INCOME FUND

By: _____

FRANKLIN VALUEMARK FUND-INCOME

By: _____

BARRE & COMPANY INC.

By: _____

LOCAL 68 IUOE ANNUITY FUND

By: _____

LOCAL 68 IUOE PENSION FUND

By: _____

The Official Committee of Unsecured Creditors of The Grand Union Company and The Informal Committee of Senior Secured Noteholders, which entities are not parties to this Agreement, have reviewed it, have no objection to it, and consent to Section 7 of it.

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF THE GRAND UNION COMPANY

By: _____

INFORMAL COMMITTEE OF SENIOR
SECURED NOTEHOLDERS

By: _____

# EXHIBIT A

[See Appendix "A" to the Disclosure Statement, The Second Amended Plan of Reorganization]

## EXHIBIT B

| Member | 15% Zero Coupon Notes | 16.5% Zero Coupon Notes |
|---|---|---|
| Dean Witter High Yield Securities<br>Two World Trade Center<br>New York, NY 10048 .................................... | $58,415,000 | $123,220,000 |
| Variable High Yield<br>Two World Trade Center<br>New York, NY 10048 .................................... | 19,558,000 | 26,950,000 |
| Dean Witter Diversified Income Trust<br>Two World Trade Center<br>New York, NY 10048 .................................... | 18,000,000 | 45,750,000 |
| High Income Advantage Trust<br>Two World Trade Center<br>New York, NY 10048 .................................... | 19,000,000 | 34,000,000 |
| High Income Advantage Trust II<br>Two World Trade Center<br>New York, NY 10048 .................................... | 21,500,000 | 55,500,000 |
| High Income Advantage Trust III<br>Two World Trade Center<br>New York, NY 10048 .................................... | 10,000,000 | 20,000,000 |
| Dean Witter High Income Securities<br>Two World Trade Center<br>New York, NY 10048 .................................... | 6,000,000 | 2,000,000 |
| LB Series Fund, Inc. High Yield Portfolio<br>625 Fourth Avenue South<br>Minneapolis, MN 55415 .................................... | 23,200,000 | 23,500,000 |
| Lutheran Brotherhood High Yield Fund<br>625 Fourth Avenue South<br>Minneapolis, MN 55415 .................................... | 19,000,000 | 20,000,000 |
| Franklin AGE High Income Fund<br>777 Mariners Island Blvd.<br>7th Floor<br>San Mateo, CA 94404 .................................... | 12,500,000 | 99,850,400 |
| Franklin Income Fund<br>777 Mariners Island Blvd.<br>7th Floor<br>San Mateo, CA 94404 .................................... | 25,000,000 | 47,700,000 |
| Franklin Valuemark Fund—Income<br>777 Mariners Island Blvd.<br>7th Floor<br>San Mateo, CA 94404 .................................... | 1,648,000 | 3,933,000 |
| Barre & Company Incorporated<br>717 N. Harwood, Suite 560<br>Dallas, TX 75201 .................................... | 3,400,000 | –0– |

| Member | 15% Zero Coupon Notes | 16.5% Zero Coupon Notes |
|---|---|---|
| Marine Midland Bank, as Indenture Trustee for the 16.5% Zero Coupon Notes 140 Broadway—12th Floor New York, NY 10005 | N/A | N/A |
| First Trust National Assn., as Indenture Trustee for the 15% Zero Coupon Notes 180 East 5th Street St. Paul, MN 55101 | N/A | N/A |
| Local 68 IUOE Pension Fund & Annuity Fund 14 Fairfield Place West Caldwell, NJ 07006 | –0– | 3,000,000 |

**Appendix B**

## PRO FORMA CAPITALIZATION AND FINANCIAL PROJECTIONS

### I. PRO FORMA CAPITALIZATION

The following table summarizes  i) the consolidated capitalization of the Debtor as of April 29, 1995 before giving effect to the transactions contemplated by the Plan and (ii) the capitalization of Reorganized Grand Union as of April 29, 1995 as adjusted to give effect to the transactions contemplated by the Plan.

**The Grand Union Company**
**Pro Forma Capitalization**

| | Pre–Confirmation April 29, 1995 | Post–Confirmation April 29, 1995 |
|---|---:|---:|
| | (in thousands) | |
| Current maturities of long–term debt and capital lease obligations | $8,444 | $8,444 |
| | | |
| Long–term debt and capital lease obligations: | | |
| Grand Union: | | |
| Prepetition Revolving Credit Facility | 54,000 | –– |
| Debtor–in–Possession Revolving Credit Facility | –– | –– |
| New Revolving Credit Facility | –– | 12,781 |
| Term Loan | 39,144 | 57,144 |
| New Senior Notes | –– | 572,151 |
| 11 1/4% Senior Notes | 350,000 | –– |
| 11 3/8% Senior Notes | 175,000 | –– |
| Mortgage Notes | 1,938 | 1,938 |
| 12 1/4% Senior Subordinated Notes | 500,000 | –– |
| 12 1/4% Senior Subordinated Notes, Series A | 50,000 | –– |
| 13% Senior Subordinated Notes | 16,150 | –– |
| Capital lease obligations | 142,038 | 122,364 |
| Capital: (1) | | |
| Senior Zero Coupon Notes | 170,239 | –– |
| Senior Subordinated Zero Coupon Notes | 100,965 | –– |
| Holdings: (1) | | |
| Junior Notes | 7,862 | –– |
| Total long–term debt and capital lease obligations | 1,607,336 | 766,378 |
| | | |
| Redeemable stock of Holdings (1) | 174,199 | –– |
| | | |
| Stockholder's deficit: | | |
| Common stock | 1 | 170,000 |
| Accumulated deficit | (846,582) | |
| Total Stockholder's deficit | (846,581) | 170,000 |
| Total capitalization | $943,398 | $944,822 |

(1) Obligations of Capital and Holdings included herein result from the application of push down accounting to the accounts of the Debtor.

## II. FINANCIAL PROJECTIONS

### A.   Projected Financial Information

As a condition of the confirmation of a plan of reorganization, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation of the plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor.   In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtor has analyzed the ability of Reorganized Grand Union to meet its obligations under the Plan with sufficient liquidity and capital resources to conduct it business.   The Debtor has prepared certain unaudited projections of Reorganized Grand Union's operating profit, cash flow, and related balance sheets for the five (5) fiscal years ending on March 30, 1996 through April 1, 2000 (the "Projections").   Such projections, and the major assumptions which underlie them, are set forth below.

As a matter of course, the Debtor does not make public projections or forecasts of its anticipated financial position or results of operations.   The Debtor does not intend to, and disclaims any obligation to, furnish updated business plans or projections to shareholders or creditors after the Effective Date or to make any such information public, whether or not the Projections, in light of events or occurrences after the date hereof, cease to have a reasonable basis.

The Projections should be read in conjunction with the assumptions and explanations included herein, the historical financial statements of Grand Union, and the other information contained in this disclosure statement, including the information set forth in the section entitled "RISK FACTORS."

The independent auditors of Grand Union have not examined or compiled the Projections presented herein, and, accordingly, assume no responsibility for them.

### B.   Principal Assumptions

The Projections are based on and assume the successful implementation of the Debtor's business plans, and reflect numerous assumptions, including assumptions with respect to the future performance of the Debtor, the performance of the industry, general business and economic conditions, and other matters, most of which are beyond the control of the Debtor. Therefore, while the projections are necessarily presented with numerical specificity, the actual results achieved during the projection period will vary from the projected results, and may

vary substantially.  No representation can be or is being made
with respect to the accuracy of the Projections or the ability of
the Debtor to achieve the projected results.  While the Debtor
believes that the assumptions which underlie the Projections are
reasonable in light of current circumstances and in light of the
information available to the Debtor, in deciding whether to vote
to accept the Plan, holders of claims must make their own
determinations as to the reasonableness of the assumptions and
the reliability of the projections.

Additional information concerning the assumptions underlying
the projections is as follows:

1.    **Plan Terms and Effective Date.** The Projections assume
that the Plan will be confirmed in accordance with its terms,
that all transactions contemplated by the Plan will be
consummated by the Effective Date, which, for purposes of these
Projections only, is assumed to be April 29, 1995.  Results of
operations for the 52 weeks ended April 1, 1995 have been
significantly affected by reduced amounts of promotional
allowances and other vendor support which had formerly been, but
is not currently, available to the Debtor.  Any significant delay
of the Effective Date of the Plan could have a significant
negative impact on projected EBITDA for the 52 weeks ended March
30, 1996, and could result in additional reorganization expenses.

2.    **General Economic Conditions.**  The Projections were
prepared assuming that economic conditions in the markets served
by the Debtor do not differ markedly over the next five (5) years
from current economic conditions.  Inflation in revenues and
costs are assumed to remain relatively low.

3.    **Sales.**  Sales reflect the assumed effect of store
openings and closings as well as enlargements.  Additionally,
sales reflect the assumed impact of competitive store openings.
These assumptions, in conjunction with an assumed inflation rate
of 1.5%, yield a 1.5% decrease in sales for FYE 1996 versus FYE
1995, and an overall compound increase in sales over the entire
five (5) year projection period of 2.1% per annum.  The
Projections assume certain negative sales trends can be mitigated
or reversed during 1996 and subsequent years.  In addition, the
Projections assume that there will be no significant lingering
effect of the bankruptcy process on the Company.  See the section
entitled "RISK FACTORS."

4.    **Gross Profit.**  The Projections assume that margins will
increase as a result of a fully resumed forward buy program,
product mix improvements and more effective marketing and
decrease by a moderation in pricing in certain markets.

**5.   Operating and Administrative Expenses.**  Operating and administrative expenses are assumed to be impacted by the changing sales volume (including the effect of the fixed or semi-fixed nature of certain expenses as sales levels change), the Debtor's capital expenditure program and by moderate inflationary pressures.

**6.   Income Taxes.**  The Projections assume that Reorganized Grand Union will not succeed to any net operating loss carryforwards for income tax purposes, and that the combined federal, state and local income tax rate is 41%.  See "CERTAIN FEDERAL INCOME TAX CONSEQUENCES."

**7.   Capital Expenditures.**  Capital expenditures consist of investments in new and replacement stores, store enlargements, store upgrades, technological improvements, and expenditures necessary to maintain store and warehouse facilities.  The Debtor believes that the level of operating profit which the Company can achieve is highly dependant on the level of capital Reorganized Grand Union is able to invest.  The Projections assume a level of capital expenditures which, under the assumptions in the Projections, can be supported by the capital structure and operating results of Reorganized Grand Union.

As more fully discussed in the section entitled "RISK FACTORS," the projected operating results are highly dependant on the successful implementation of the capital expenditure program assumed.  In addition, there can be no assurances that Reorganized Grand Union can achieve the assumed results of such capital expenditure program or that Reorganized Grand Union will be able to fund the capital expenditure program assumed.

**8.   EBITDA.**  EBITDA is defined for purposes of this Disclosure Statement as earnings before LIFO provision, depreciation and amortization, provision for store closings, provision for pension settlement, interest expense, reorganization items, income tax benefit (provision) and extraordinary item.

**9.   "Fresh Start" Accounting.**  The projections have been prepared under the principles of "fresh start" accounting for periods beginning and after April 30, 1995.  These principles are contained in the American Institute of Certified Public Accountants Statement of Position 90-7 "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code."  Under fresh start accounting principles, the Company will determine the reorganization value of the reorganized company.  This value will be allocated, based on estimated fair market values, to specific tangible or identifiable intangible assets, and the Company will record an intangible asset equal to the reorganization value in excess of amounts allocable to identifiable assets.  The Projections assume that the reorganization value in excess of

amounts allocable to identifiable assets will be amortized over
twenty (20) years.

10. **Reorganization Value.** For purposes of this
Disclosure Statement and in order to prepare the financial
projections required under the Bankruptcy Code, the Debtor has
estimated the reorganization value of Reorganized Grand Union as
of April 29, 1995 at approximately $950 million. The total
reorganization value includes a value attributed to common stock,
based on the current trading value of the Senior Subordinated
Notes, of $170 million, and the long term indebtedness
contemplated by the Plan. The common stock amount in the fresh
start balance sheet at April 29, 1995 is not an estimate of the
trading value of Reorganized Grand Union's common stock after
confirmation of this Plan, which value is subject to many
uncertainties and cannot be reasonably estimated at this time.
Neither the Debtor nor its financial advisors make any
representation as to the trading value of the shares to be issued
under this Plan.

11. **Working Capital.** Projected inventory levels in FYE 1996
through 2000 reflect a full investment in forward buy
inventories. Elements of working capital are projected on the
basis of historic patterns applied to projected levels of
operation.

## C.    Projected Balance Sheets

The following tables summarize (i) (a) the projected balance sheets of the Debtor as of April 1, 1995 and April 29, 1995, respectively, before giving effect to the transactions contemplated by the Plan, (b) the pro forma adjustments to the Debtor's balance sheet that would result from the transactions contemplated by the Plan and (c) the projected balance sheet of Reorganized Grand Union as of April 29, 1995 as adjusted to give effect to the transactions contemplated by the Plan and (ii) projected balance sheets of Reorganized Grand Union as of March 30, 1996, March 29, 1997, March 28, 1998, April 3, 1999 and April 1, 2000.

The Grand Union Company
Projected Balance Sheets
April 1, 1995 and April 29, 1995
(Unaudited)
(In thousands)

| | April 1, 1995 | April 29, 1995 | Debt Discharge | Fresh Start Adjustments | Fresh Start April 29, 1995 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and temporary cash investments | 89,505 | 67,828 | (23,219) | | 44,609 |
| Receivables | 18,592 | 21,119 | | | 21,119 |
| Inventories | 186,508 | 185,659 | | 9,642 | 195,301 |
| Other current assets | 16,800 | 14,934 | | | 14,934 |
| Total current assets | 311,405 | 289,540 | (23,219) | 9,642 | 275,963 |
| Property, net | 428,243 | 426,305 | | (1,184) | 425,121 |
| Goodwill, net | 545,451 | 544,234 | | (544,234) | |
| Reorganization value in excess of amounts allocable to identifiable assets | | | | 520,200 | 520,200 |
| Beneficial leases, net | 27,218 | 26,768 | | | 26,768 |
| Deferred financing fees, net | 44,069 | 43,673 | | (43,673) | |
| Other assets | 36,813 | 39,980 | | 98 | 40,078 |
| | 1,393,199 | 1,370,500 | (23,219) | (59,151) | 1,288,130 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | | | | |
| Current liabilities: | | | | | |
| Obligations under revolving credit facility | | | 12,781 | | 12,781 |
| Current maturities of long−term debt | | | 1,011 | | 1,011 |
| Current portion of obligations under capital leases | 8,383 | 7,433 | | | 7,433 |
| Accounts payable and accrued liabilities | 120,067 | 113,342 | 15,400 | 124,673 | 253,415 |
| Total current liabilities | 128,450 | 120,775 | 29,192 | 124,673 | 274,640 |
| Long−term debt | | | 631,233 | | 631,233 |
| Obligations under capital leases | | | | 122,364 | 122,364 |
| Other noncurrent liabilities | | | | 89,893 | 89,893 |
| Liabilities subject to compromise | 1,918,324 | 1,922,107 | (1,585,177) | (336,930) | |
| Redeemable stock subject to compromise | 174,199 | 174,199 | (174,199) | | |
| Common stock | 1 | 1 | 169,999 | | 170,000 |
| Accumulated deficit | (827,775) | (846,582) | 905,733 | (59,151) | |
| | 1,393,199 | 1,370,500 | (23,219) | (59,151) | 1,288,130 |

| | April 1, 1995 | April 29, 1995 | Debt Discharge | Fresh Start Adjustments |
|---|---|---|---|---|
| **Liabilities subject to compromise** | | | | |
| Revolver | 54,000 | 54,000 | (54,000) | |
| Accounts payable and accrued liabilities | 120,000 | 120,000 | | (120,000) |
| Current portion of long−term debt | 1,011 | 1,011 | (1,011) | |
| Interest payable | 81,066 | 86,280 | (81,607) | (4,673) |
| Long−term debt | 1,411,346 | 1,411,298 | (1,411,298) | |
| Obligations under capital leases | 141,466 | 142,038 | (19,674) | (122,364) |
| Unfunded pension liability | 3,816 | 3,741 | | (3,741) |
| Other noncurrent liabilities | 105,619 | 103,739 | (17,587) | (86,152) |
| Total liabilities subject to compromise | 1,918,324 | 1,922,107 | (1,585,177) | (336,930) |

## The Grand Union Company
### Projected Balance Sheets
### As of Fiscal Years Ending 1996 Through 2000
### (Unaudited)
### (In thousands)

| | March 30, 1996 | March 29, 1997 | March 28, 1998 | April 3, 1999 | April 1, 2000 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and temporary cash investments | 44,609 | 45,857 | 47,143 | 48,467 | 49,831 |
| Inventories | 202,096 | 210,158 | 216,897 | 221,880 | 230,756 |
| Other current assets | 29,908 | 38,697 | 35,030 | 38,235 | 41,370 |
| Total current assets | 276,613 | 294,712 | 299,070 | 308,582 | 321,957 |
| Property, net | 418,467 | 404,975 | 401,427 | 393,063 | 384,866 |
| Reorganization value in excess of amounts allocable to identifiable assets | 496,191 | 470,181 | 444,171 | 418,161 | 392,151 |
| Beneficial leases, net | 21,368 | 15,518 | 9,668 | 3,818 | |
| Other assets | 43,408 | 49,846 | 55,170 | 59,865 | 63,752 |
| | 1,256,047 | 1,235,232 | 1,209,506 | 1,183,489 | 1,162,726 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | | | | |
| Current liabilities: | | | | | |
| Obligations under revolving credit facility | 53,245 | 54,231 | 50,096 | 38,341 | 31,918 |
| Current maturities of long-term debt | 1,011 | 1,011 | 1,011 | 891 | |
| Current portion of obligations under capital leases | 8,033 | 8,533 | 9,033 | 10,533 | 12,033 |
| Accounts payable and accrued liabilities | 194,762 | 203,945 | 209,431 | 213,486 | 214,387 |
| Total current liabilities | 257,051 | 267,720 | 269,571 | 263,251 | 258,338 |
| Long-term debt | 653,985 | 653,465 | 652,945 | 652,623 | 652,623 |
| Obligations under capital leases | 118,231 | 114,358 | 110,548 | 106,303 | 102,247 |
| Other noncurrent liabilities | 86,246 | 85,227 | 82,962 | 80,320 | 80,063 |
| Common stock | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 |
| Accumulated deficit | (29,466) | (55,538) | (76,520) | (89,008) | (100,545) |
| | 1,256,047 | 1,235,232 | 1,209,506 | 1,183,489 | 1,162,726 |

## D.    Projected Statements of Operations

The following table sets forth projected statements of operations for (i)(a) the Debtor for the fiscal year ended April 1, 1995, (b) the Debtor for the period from April 2, 1995 through April 29, 1995 and (c) Reorganized Grand Union after giving effect to the transactions contemplated by the Plan for the period from April 30, 1995 through March 30, 1996, and (ii) Reorganized Grand Union for the fiscal years ended March 30, 1996, March 29, 1997, March 28, 1998, April 3, 1999 and April 1, 2000.

### The Grand Union Company
### Projected Statements of Operations
### Fiscal Years Ended April 1, 1995 and March 30, 1996
#### (Unaudited)
#### (In thousands)

|  | 52 Weeks Ending April 1, 1995 | 4 Weeks Ending April 29, 1995 | 48 Weeks Ending March 30, 1996 | 52 Weeks Ending March 30, 1996 |
|---|---|---|---|---|
| Sales | 2,391,694 | 176,572 | 2,209,101 | 2,385,673 |
| Cost of sales | (1,706,165) | (123,060) | (1,545,169) | (1,668,229) |
| Gross profit | 685,529 | 53,512 | 663,932 | 717,444 |
| Operating and administrative expense | (550,915) | (43,428) | (515,503) | (558,931) |
| Depreciation and amortization | (87,097) | (6,287) | (86,084) | (92,371) |
| Provision for store closings | (14,250) | | | |
| Provision for pension settlement | (3,213) | | | |
| Interest expense, net | (181,841) | (7,082) | (93,814) | (100,896) |
| Loss before reorganization items and taxes | (151,787) | (3,285) | (31,469) | (34,754) |
| Reorganization items | | | | |
| Professional fees | (11,477) | (15,523) | | (15,523) |
| Fresh start adjustment | | (59,151) | | (59,151) |
| Income tax benefit (provision) | | | 2,003 | 2,003 |
| Loss before extraordinary item | (163,264) | (77,959) | (29,466) | (107,425) |
| Extraordinary item | | 905,733 | | 905,733 |
| Net income (loss) | (163,264) | 827,774 | (29,466) | 798,308 |
| Accrued preferred stock dividends | (19,479) | | | |
| Net income applicable to common stock | (182,743) | 827,774 | (29,466) | 798,308 |
| EBITDA   (a) | 135,590 | 10,185 | 151,729 | 161,914 |

(a) Earnings before LIFO provision, depreciation and
    amortization, provision for store closings, provision for
    pension settlement, interest expense, reorganization items,
    income tax benefit (provision) and extraordinary item.

The Grand Union Company
Projected Statements of Operations
Fiscal Years Ended 1996 Through 2000
(Unaudited)
(In thousands)

| | Pro Forma (*) 52 Weeks Ending March 30, 1996 | 52 Weeks Ending March 29, 1997 | 52 Weeks Ending March 28, 1998 | 53 Weeks Ending April 3, 1999 | 52 Weeks Ending April 1, 2000 |
|---|---|---|---|---|---|
| Sales | 2,385,673 | 2,482,365 | 2,568,570 | 2,658,869 | 2,678,110 |
| Cost of sales | (1,668,229) | (1,726,256) | (1,777,089) | (1,829,207) | (1,833,579) |
| Gross profit | 717,444 | 756,109 | 791,481 | 829,662 | 844,531 |
| Operating and administrative expense | (558,931) | (585,315) | (613,359) | (636,849) | (653,385) |
| Depreciation and amortization | (92,371) | (94,558) | (94,305) | (94,534) | (94,268) |
| Interest expense | (100,896) | (102,350) | (101,305) | (101,370) | (98,357) |
| Income (loss) before taxes | (34,754) | (26,114) | (17,488) | (3,091) | (1,479) |
| Income tax benefit (provision) | 2,003 | 43 | (3,494) | (9,397) | (10,058) |
| Net loss | (32,751) | (26,071) | (20,982) | (12,488) | (11,537) |
| | | | | | |
| EBITDA  (a) | 161,914 | 173,994 | 181,522 | 196,413 | 194,946 |

(*)  Pro Forma without the effects of the bankruptcy proceeding.

(a)  Earnings before LIFO provision, depreciation and
amortization, interest expense, reorganization items,
income tax benefit (provision) and extraordinary item.

### E.   Projected Statements of Cash Flows

The following table sets forth projected cash flow data for
(i)(a) the Debtor for the fiscal year ended April 1, 1995, (b)
the Debtor for the period from April 2, 1995 through April 29,
1995 and (c) Reorganized Grand Union after giving effect to the
transactions contemplated by the Plan for the period from April
30, 1995 through March 30, 1996, and (ii) Reorganized Grand Union
for the fiscal years ended March 30, 1996, March 29, 1997, March
28, 1998, April 3, 1999 and April 1, 2000.

**The Grand Union Company**
**Projected Statements of Cash Flows**
**Fiscal Years Ended April 1, 1995 and March 30, 1996**
**(Unaudited)**
**(In thousands)**

| | 52 Weeks Ending April 1, 1995 | 4 Weeks Ending April 29, 1995 | 48 Weeks Ending March 30, 1996 | 52 Weeks Ending March 30, 1996 |
|---|---|---|---|---|
| **OPERATING ACTIVITIES:** | | | | |
| Net loss from operations | (151,787) | (3,285) | (29,465) | (32,750) |
| Adjustments to reconcile net loss from operations to net cash provided by (used for) operating activities: | | | | |
| Depreciation and amortization | 92,200 | 6,682 | 86,360 | 93,042 |
| Noncash interest | 33,318 | | 23,328 | 23,328 |
| Receivables | 18,480 | (2,527) | 6,348 | 3,821 |
| Inventories | 19,555 | 849 | (6,795) | (5,946) |
| Other current assets | 82 | 1,866 | (6,958) | (5,092) |
| Accounts payable and accrued liabilities | 76,542 | (40,391) | (48,794) | (89,185) |
| Other | 754 | (3,310) | 1,493 | (1,817) |
| Net cash provided by (used for) operating activities before reorganization items | 89,144 | (40,116) | 25,517 | (14,599) |
| Operating cash flows from reorganization items: | | | | |
| Professional fees paid for services rendered in connection with the Chapter 11 proceeding | (9,800) | (2,000) | (15,200) | (17,200) |
| Net cash provided by (used for) operating activities | 79,344 | (42,116) | 10,317 | (31,799) |
| | | | | |
| **INVESTMENT ACTIVITIES:** | | | | |
| Capital expenditures | (63,493) | (2,250) | (44,825) | (47,075) |
| Disposals of property | 10,399 | | | |
| Net cash provided by used for investment activities | (53,094) | (2,250) | (44,825) | (47,075) |
| | | | | |
| **FINANCING ACTIVITIES:** | | | | |
| Retirement of long-term debt | (962) | | (576) | (576) |
| Net change in financing under the revolving credit facility | 29,000 | | 40,464 | 40,464 |
| Obligations under capital leases discharged | (9,077) | (530) | (5,380) | (5,910) |
| Net cash provided by (used for) financing activities | 18,961 | (530) | 34,508 | 33,978 |
| | | | | |
| Increase (decrease) in cash and temporary cash investments | 45,211 | (44,896) | | (44,896) |
| Cash and temporary cash investments at beginning of period | 44,294 | 89,505 | 44,609 | 89,505 |
| Cash and temporary cash investments at end of period | 89,505 | 44,609 | 44,609 | 44,609 |

## The Grand Union Company
### Projected Statements of Cash Flows
### Fiscal Years Ended 1996 Through 2000
#### (Unaudited)
#### (In thousands)

| | Pro Forma (*) 52 Weeks Ending March 30, 1996 | 52 Weeks Ending March 29, 1997 | 52 Weeks Ending March 28, 1998 | 53 Weeks Ending April 3, 1999 | 52 Weeks Ending April 1, 2000 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES:** | | | | | |
| Net loss | (32,751) | (26,071) | (20,982) | (12,488) | (11,537) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | | | |
| Depreciation and amortization | 93,042 | 94,558 | 94,305 | 94,534 | 94,268 |
| Receivables | 3,821 | (7,434) | 3,649 | 931 | (2,388) |
| Inventories | (5,946) | (8,061) | (6,740) | (4,983) | (8,876) |
| Other current assets | (5,092) | (1,355) | 18 | (4,136) | (747) |
| Accounts payable and accrued liabilities | (30,956) | 5,144 | 760 | (1,551) | (1,899) |
| Other | (1,817) | (7,026) | (6,459) | (5,343) | (5,186) |
| Net cash provided by operating activities | 20,301 | 49,755 | 64,551 | 66,964 | 63,635 |
| **INVESTMENT ACTIVITIES:** | | | | | |
| Capital expenditures | (47,075) | (43,600) | (53,300) | (48,700) | (50,400) |
| Net cash used for investment activities | (47,075) | (43,600) | (53,300) | (48,700) | (50,400) |
| **FINANCING ACTIVITIES:** | | | | | |
| Retirement of long-term debt | (576) | (520) | (520) | (442) | (891) |
| Net cash flow from the issuance/repayment of debt | 40,464 | 986 | (4,135) | (11,754) | (6,424) |
| Obligations under capital leases discharged | (5,910) | (5,373) | (5,310) | (4,744) | (4,556) |
| Net cash provided by (used for) financing activities | 33,978 | (4,907) | (9,965) | (16,940) | (11,871) |
| Increase in cash and temporary cash investments | 7,204 | 1,248 | 1,286 | 1,324 | 1,364 |
| Cash and temporary cash investments at beginning of period | 37,405 | 44,609 | 45,857 | 47,143 | 48,467 |
| Cash and temporary cash investments at end of period | 44,609 | 45,857 | 47,143 | 48,467 | 49,831 |

(*)Pro Forma without the effects of the bankruptcy proceeding.

# Appendix C

## TERM SHEET OF NEW SENIOR NOTES

### General

The Senior Notes will be issued under an indenture dated as of          , 1995 (the "Indenture") between the Company and IBJ Schroder Bank & Trust Company, as Trustee (the "Trustee").

The terms of the Senior Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as in effect on the date of the Indenture (the "Trust Indenture Act"). The statements under this caption relating to the Senior Notes and the Indenture are summaries and do not purport to be complete, although they do include all material terms of the Senior Notes and the Indenture.

The Senior Notes are limited to $595,475,922 aggregate original principal amount and will mature September 1, 2004. The Senior Notes shall bear interest at a rate of 12% per annum, commencing September 1, 1995, notwithstanding that the original date of issuance (the "Issue Date") may be prior to that date. Interest on the Senior Notes will be payable semi-annually on each March and September, commencing March 1, 1996, to the holders of record of Senior Notes as of the close of business on the February 15th and August 15th immediately preceding such interest payment date. Interest on the Senior Notes will commence to accrue from September 1, 1995 and, after the initial interest payment, will accrue from the most recent date to which interest has been paid. Interest will be computed on the basis of a year comprised of twelve 30-day months. The Senior Notes will be issued in fully registered form only, in denominations of $1,000 and integral multiples thereof.

### Certain Definitions

Set forth is a summary of certain of the defined terms used in the Indenture.

"*Additional Assets*" means any Property or assets substantially related to the Company's primary business.

"*Affiliate*" means, with respect to any referenced Person, a Person (i) which directly or indirectly through one or more intermediaries controls, or is controlled by, or is under direct or indirect common control with, such referenced Person, (ii) which directly or indirectly through one or more intermediaries beneficially owns or holds 5% or more of the combined voting power of the total Voting Stock of such referenced Person or (iii) of which 5% or more of the combined voting power of the total Voting Stock (or in the case of a Person which is not a corporation, 5% or more of the equity interest) directly or indirectly through one or more intermediaries is beneficially owned or held by such referenced Person, or a Subsidiary of such referenced Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided, however,* that beneficial ownership of 5% or more of the voting securities of another Person, shall be deemed to be control. When used herein without reference to any Person, Affiliate means an Affiliate of the Company.

"*Asset Sale*" means the sale or other disposition, in a transaction which is not a Sale and Leaseback Transaction permitted under the terms of the Indenture, by the Company or any of its Subsidiaries to any Person other than the Company or another of its Subsidiaries of (i) any of the Capital Stock of any of the Subsidiaries of the Company or (ii) any other assets of the Company or any other assets of its Subsidiaries outside the ordinary course of business of the Company or such Subsidiary.

"*Average Life*" means, as of the date of determination, with respect to any debt security, the quotient obtained by dividing (i) the sum of the products of (x) the numbers of years from the date of determination

to the dates of each successive scheduled principal payment of such debt security multiplied by (y) the amount of such principal payment by (ii) the sum of all such principal payments.

"*Bank Credit Agreement*" means either the (i) Amended and Restated Credit Agreement dated as of        , 1995 among the Company, Bankers Trust Company, for itself and as Agent, and the other financial institutions party thereto, (ii) the Alternative Credit Documents, if the Company has made the election provided for in Section 6.01(a)(ii) of the Plan, or (iii) any successor agreement, together with documents related thereto, including, without limitation, any security agreements, pledge agreements, mortgages or guarantees in each case as such agreements may be amended, restated, supplemented or otherwise modified from time to time and includes any agreement renewing, extending the maturity of, refinancing (including by way of placement or issuance of notes) or restructuring (including the inclusion of additional borrowers, guarantors or lenders) all or any portion of the Indebtedness under such agreements.

"*Bankruptcy Code*" means Title 11 of the United States Code, as from time to time in effect.

"*Borrowing Subsidiary*" means any direct or indirect wholly-owned Subsidiary of the Company which is permitted to incur Indebtedness under the terms of the Indenture pursuant to the "Limitations on Indebtedness and Preferred Stock of Subsidiaries (other than Non-Borrowing Subsidiaries)" and which is primarily engaged in any business in which a supermarket chain is at the time engaged or any related business or in any business in which the Company is engaged on the issue date of the Senior Notes.

"*Capital Stock*" means, with respect to any Person, any and all shares, interests, participations, rights in or other equivalents (however designated) of such Person's capital stock, including, without limitation, preferred or preference stock, and any rights (other than debt securities convertible into capital stock), warrants or options exchangeable for or convertible into such capital stock.

"*Capitalized Lease Obligations*" means, at the time any determination thereof is made, as to any Person, the obligation of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) real or personal Property which obligation is required to be classified and accounted for as a capital lease obligation on a balance sheet of such Person under GAAP and, for purposes of the Indenture, the amount of such obligation at any date shall be the outstanding amount thereof at such date, determined in accordance with GAAP.

"*Change of Control*" means the occurrence of any of the following events: (a) any Person or Persons acting together which would constitute a "group" (a "Group") for purposes of Section 13(d) of the Exchange Act, or any successor provision thereto, together with any Affiliates thereof (other than a Permitted Holder or Permitted Holders), is or becomes the beneficial owner of more than 50% of the total Voting Stock of the Company; (b) the Company consolidates with, or merges into, another Person or sells, assigns, conveys, transfers, leases or otherwise disposes of all or substantially all of its assets to any Person in one transaction or a series of related transactions, or any Person consolidates with, or merges with or into, the Company, in any such event pursuant to a transaction in which the outstanding Voting Stock of the Company is converted into or exchanged for cash, securities (other than Voting Stock) or other property with the effect that any Person or Group (other than a Permitted Holder or Permitted Holders) becomes the beneficial owner of more than 50% of the total Voting Stock of the Company or any successor corporation or securities representing more than 50% of the total Voting Stock of the Company or any successor corporation; (c) during any consecutive two-year period, commencing as of the date of the Indenture, individuals who at the beginning of such period constituted the Board of Directors of the Company (together with any new directors whose election by such Board or whose nomination for election by the stockholders of the Company was approved by a vote of 66⅔% of the directors then still in office, who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason (other than death or disability) to constitute a majority of the Board of Directors of the Company then in office; (d) any order, judgment or decree shall be entered against the Company decreeing the dissolution or split-up of the Company and such order shall remain undischarged or unstayed for a period in excess of 60 days;

*provided, however,* that none of the events described in the foregoing clauses (a) through (d) shall constitute a "Change of Control" unless Standard & Poor's Corporation or Moody's Investors Service, Inc. shall within 180 days after the occurrence of such event (such 180-day period to be extended by that number of days, not exceeding 45 days, during which the Securities shall have been placed after the date of such event on credit watch with negative implications status) have downgraded the rating assigned by such agency to the Senior Notes on the date of such event.

*"Consolidated Interest Coverage Ratio"* means, with respect to the Company for any period, the ratio of (i) the aggregate amount of Consolidated Operating Income of the Company for the four consecutive fiscal quarters for which financial information in respect thereof is available immediately prior to the Transaction Date to (ii) the aggregate amount of Consolidated Interest Expense of the Company for the four consecutive fiscal quarters for which financial information in respect thereof is available immediately prior to the Transaction Date; *provided, however,* that, for purposes of calculating the Consolidated Interest Coverage Ratio of the Company, (a) Consolidated Operating Income shall be calculated on the basis of the first-in, first-out method of inventory valuation, as determined in accordance with GAAP, (b) the Consolidated Operating Income and Consolidated Interest Expense of the Company shall include the Consolidated Operating Income and Consolidated Interest Expense of any Person to be acquired by the Company or any of its Subsidiaries in connection with the transaction giving rise to the need to calculate the Consolidated Interest Coverage Ratio, on a pro forma basis for the four consecutive fiscal quarters for which financial information in respect thereof is available immediately prior to the Transaction Date and shall also include the Consolidated Operating Income and Consolidated Interest Expense of any other Person which has been acquired during such four consecutive fiscal quarters, on a pro forma basis from the beginning of such four consecutive fiscal quarters through the date first included in the Company's Consolidated Operating Income and Consolidated Interest Expenses, such pro forma Consolidated Operating Income and Consolidated Interest Expense to be determined on the same basis as used in determining such items for the Company, and (c) Consolidated Interest Expense and Redeemable Dividends shall be calculated as if (i) any Indebtedness incurred or proposed to be incurred or issued since the beginning of the four consecutive fiscal quarters for which financial information in respect thereof is available immediately prior to the Transaction Date, or to be incurred or issued at or prior to the time of the transaction giving rise to the need to calculate the Consolidated Interest Coverage Ratio is effected (the "Transaction Time"), had been incurred or issued as of the beginning of such four quarter period, and (ii) any Indebtedness repaid since the beginning of such four quarter period or to be repaid with the proceeds of such Indebtedness or equity incurred or issued or to be incurred or issued at or prior to the Transaction Time, had been repaid as of the beginning of such four quarter period. For purposes of determining the Consolidated Interest Coverage Ratio of the Company for any period, (i) any Indebtedness incurred or proposed to be incurred or Redeemable Stock issued or proposed to be issued which for purposes of clause (c) above is deemed to have been incurred or issued as of the beginning of the four quarter period described in clause (c) which bears interest at a fluctuating rate will be deemed to have borne interest during such four quarter period at the rate in effect on the Transaction Date and (ii) "Subsidiary" shall mean any Subsidiary of the Company other than any Subsidiary (and Subsidiaries of such Subsidiary) of which the Company does not own or control, directly or indirectly, a sufficient amount of Voting Stock in order to cause a merger of such Subsidiary into the Company or another Subsidiary without the approval of any other holder of Voting Stock of such Subsidiary.

*"Consolidated Interest Expense"* means, for any period, without duplication (A) the sum of (i) the aggregate amount of interest recognized by the Company and its Subsidiaries during such period in respect of Indebtedness of the Company and its Subsidiaries (including, without limitation, all interest capitalized by the Company or any of its Subsidiaries during such period and all commissions, discounts and other fees and charges owed by the Company and its Subsidiaries with respect to letters of credit and bankers' acceptance financing and the net costs associated with Interest Swap Obligations of the Company and its Subsidiaries), (ii) to the extent any Indebtedness of any Person is guaranteed by the Company or any of its Subsidiaries, the aggregate amount of interest paid or accrued by such Person during such period attributable to any such Indebtedness, and (iii) any cash Redeemable Stock dividend accrued and payable, and less (B) amortization

or write-off of deferred financing costs of the Company and its Subsidiaries during such period and, to the extent included in (A) above, any charge related to any premium or penalty paid in connection with redeeming or retiring any Indebtedness prior to its stated maturity and in the case of both (A) and (B) above, elimination of intercompany accounts among the Company and its Subsidiaries and as determined in accordance with GAAP.

"*Consolidated Net Income*" means, for any period, the aggregate net income of the Company and its Subsidiaries for such period on a consolidated basis, determined in accordance with GAAP but excluding for such purpose the impact of any Fresh Start Accounting adjustment; *provided, however*, that there shall be excluded therefrom, after giving effect to any related tax effect, (i) gains and losses from Asset Sales or reserves relating thereto, (ii) items classified as extraordinary or nonrecurring, including without limitation income relating to the cancellation of indebtedness resulting from the Restructuring, (iii) the income (or loss) of any Joint Venture, except to the extent of the amount of cash dividends or other distributions in respect of its capital stock or interest in the Joint Venture actually paid to, and received by, the Company or any of its Subsidiaries during such period by such Joint Venture out of funds legally available therefor, (iv) except to the extent includable pursuant to clause (iii), the income (or loss) of any Person accrued or attributable to any period prior to the date it becomes a Subsidiary of the Company or is merged into or consolidated with the Company or any of its Subsidiaries or that Person's assets (or a portion thereof) are acquired by the Company or any of its Subsidiaries and (v) the cumulative effect of changes in accounting principles in the year of adoption of such change.

"*Consolidated Operating Income*" means, with respect to the Company for any period, the Consolidated Net Income of the Company and its Subsidiaries for such period (A) increased by the sum of (i) Consolidated Interest Expense of the Company for such period, (ii) income tax expense of the Company and its Subsidiaries, on a consolidated basis, for such period (after giving effect to any income tax expense adjustments made in arriving at Consolidated Net Income), (iii) depreciation expense of the Company and its Subsidiaries, on a consolidated basis, for such period, (iv) amortization expense of the Company and its Subsidiaries, on a consolidated basis, for such period, (v) amortization or write-off of deferred financing costs of the Company and its Subsidiaries, on a consolidated basis, for such period and (vi) other non cash items, but only to the extent the items referred to in subclauses (i) through (vi) of this clause (A) reduced such Consolidated Net Income and (B) decreased by the sum of (i) non cash items increasing such Consolidated Net Income and (ii) any revenues received or accrued by the Company or any of its Subsidiaries from any Person (other than the Company or any of its Subsidiaries) in respect of any Investment for such period (other than revenue from any Qualified Investment), but only to the extent that subclauses (i) and (ii) of this clause (B) increased such Consolidated Net Income, all as determined in accordance with GAAP.

"*Default*" means an event or condition that is, or, with the lapse of time or the giving of notice or both, would become, an Event of Default as set forth in "Events of Default."

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fair Market Value*" means, with respect to any Asset Sale or any non-cash consideration received by or transferred to any Person, the sale value that would be obtained in an arm's length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer, as determined in good faith by the Board of Directors of the Company.

"*Fresh Start Accounting*" means Fresh Start Accounting as described in Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code" (Am. Inst. of Certified Public Accountants 1990), as then in effect, or such comparable statement then in effect.

"*GAAP*" means, at any particular time, generally accepted accounting principles as in effect in the United States of America at such time.

"*Guarantee*" means any direct or indirect obligation, contingent or otherwise, of a Person guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person in any manner.

"*Indebtedness*," as applied to any Person, means, without duplication, (i) any obligation, contingent or otherwise, for borrowed money (whether or not the recourse of the lender is to the whole of the assets of such Person or only to a portion thereof), (ii) any obligation owed for all or any part of the purchase price of Property or other assets or for the cost of Property or other assets constructed or of improvements thereto (including any obligation under or in connection with any letter of credit related thereto), other than accounts payable included in current liabilities incurred in respect of Property and services purchased in the ordinary course of business which are not overdue by more than 90 days, according to the terms of sale, unless being contested or negotiated in good faith, (iii) any obligation of a Person under or in connection with any letter of credit issued for the account of such Person, and all drafts drawn, or demands for payment honored, thereunder, (iv) any obligation, contingent or otherwise, as set forth in subclauses (i) and (ii) of this definition, secured by any Lien in respect of Property even though the Person owning the Property has not assumed or become liable for payment of such obligation, (v) any Capitalized Lease Obligation, (vi) any note payable, bond, debenture, draft accepted or similar instrument representing an extension of credit (other than extensions of credit for Property and services purchased in the ordinary course of business which are not overdue by more than 90 days, according to the terms of sale, unless being contested or negotiated in good faith), whether or not representing an obligation for borrowed money, (vii) the maximum fixed repurchase price of any Redeemable Stock, (viii) any obligations of such Person in respect of Interest Swap Obligations and (ix) any Guarantees and any obligation which is in economic effect a Guarantee, regardless of its characterization, with respect to Indebtedness (of a kind otherwise described in this definition) of another Person. For purposes of the preceding sentence, the maximum fixed repurchase price of any Redeemable Stock which does not have a fixed repurchase price shall be calculated in accordance with the terms of such Redeemable Stock as if such Redeemable Stock were repurchased on any date on which Indebtedness shall be required to be determined pursuant to the Indenture. The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability of any such contingent obligations at such date.

"*Interest Swap Obligations*" means the obligations of any Person pursuant to any interest rate swap agreement, interest rate cap, collar or floor agreement or other similar agreement or arrangement.

"*Investment*" means, with respect to any Person (such Person being referred to in this definition as the "Investor"), (i) any amount paid by the Investor, directly or indirectly, or any transfer of Property by the Investor, directly or indirectly (such amount to be the Fair Market Value of such Property at the time of transfer by the Investor), to any other Person for Capital Stock of, or as a capital contribution to, any other Person; (ii) any direct or indirect loan or advance to any other Person (other than accounts receivable of such Investor arising in the ordinary course of business); and (iii) Guarantees of the Indebtedness of another Person.

"*Joint Venture*" means any Person (other than a Subsidiary of the Company) in which any Person other than the Company or any of its Subsidiaries has a joint or shared equity interest with the Company or any of its Subsidiaries.

"*Lien*" means any mortgage, lien (statutory or other), charge, pledge, hypothecation, conditional sales agreement, adverse claim, title retention agreement or other security interest, encumbrance or title defect in or on, or any interest or title of any vendor, lessor, lender or other secured party to or of such Person under any conditional sale, trust receipt or other title retention agreement with respect to, any Property or asset of such Person.

"*Material Acquisition*" means any merger, consolidation, acquisition or lease of assets, acquisition of securities or other business combination or acquisition, or any two or more such transactions if part of a common plan to acquire a business or group of businesses, if the assets thus acquired in the aggregate would

have constituted a Material Subsidiary if they had been acquired as a Subsidiary, based upon the consolidated financial statements of the Company and its Subsidiaries for the most recent fiscal year for which financial statements are available.

"*Material Subsidiary*" means, with respect to the Company, at any time, each existing Subsidiary and each Subsidiary hereafter acquired or formed which (i) for the most recent fiscal year of the Company for which financial statements are available accounted for more than 10% of the consolidated revenues of the Company and its Subsidiaries or (ii) as at the end of such fiscal year, was the owner (beneficial or otherwise) of more than 10% of the consolidated assets of the Company and its Subsidiaries, all as shown on the consolidated financial statements of the Company and its Subsidiaries for such fiscal year.

"*Net Proceeds*" means, with respect to an Asset Sale by the Company or any of its Subsidiaries, (i) the gross proceeds received by the Company or its Subsidiary in connection with such Asset Sale (the amount of any non-cash consideration received as proceeds to be the Fair Market Value of such consideration, provided that liabilities assumed by the buyer shall not be deemed proceeds received by the Company or its Subsidiary), minus (ii) the sum of (a) reasonable fees and expenses incurred by the Company or such Subsidiary in connection with such Asset Sale, including any tax on income resulting from the gain realized from such Asset Sale, (b) payments made with respect to liabilities associated with the assets which are the subject of the Asset Sale, including without limitation, trade payables and other accrued liabilities, and payments made to retire Indebtedness where the assets disposed of in such Asset Sale constituted security for or had been pledged to secure such Indebtedness and payment of such Indebtedness is required in connection with such Asset Sale and (c) appropriate amounts to be provided by the Company or any Subsidiary thereof, as the case may be, as a reserve, in accordance with GAAP, against any liabilities associated with such assets and retained by the Company or any Subsidiary thereof, as the case may be, after such Asset Sale, including, without limitation, liabilities under any indemnification obligations and severance and other employee termination costs associated with such Asset Sale.

"*Non-Borrowing Subsidiary*" means any direct or indirect wholly-owned Subsidiary of the Company which (i) is not permitted to incur Indebtedness and does not at any time, in the present or the future, have outstanding Indebtedness and (ii) is not permitted to issue preferred or preference stock, pursuant to its certificate of incorporation or otherwise, and does not at any time, in the present or the future, have outstanding preferred or preference stock.

"*Permitted Holders*" means any Person which directly or indirectly through one or more intermediaries beneficially owns or holds or is entitled to receive on the Issue Date 20% or more of the combined voting power of the Voting Stock of the Company, or any Affiliate of any such Person.

"*Person*" means any individual, corporation, limited or general partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"*Plan*" means the plan of reorganization of the Company, as confirmed by the United States Bankruptcy Court for the District of Delaware on          , 1995.

"*Property*" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"*Qualified Investment*" means the following kinds of instruments if, on the date of purchase or other acquisition of any such instrument by the Company or any Subsidiary the remaining term to maturity thereof is not more than one year: (i) obligations issued or unconditionally guaranteed as to principal and interest by the United States of America or by any agency or authority controlled or supervised by and acting as an instrumentality of the United States of America; (ii) obligations (including, but not limited to, demand or time deposits, bankers' acceptances and certificates of deposit) issued by (a) a depository institution or trust

company incorporated under the laws of the United States of America, any state thereof or the District of Columbia, or (b) a United States branch office or agency of any foreign depository institution guaranteed by such U.S. bank or depository, provided that such U.S. bank trust company or United States branch office or agency has, at the time of the Company's or any Subsidiary's investment therein or contractual commitment providing for such investment, capital, surplus and undivided profits (as of the date of such institution's most recently published financial statements) in excess of $100 million and the long-term unsecured debt obligations (other than such obligations rated on the basis of the credit of a person or entity other than such institution) of such institution, at the time of the Company's or any Subsidiary's investment therein or contractual commitment providing for such investment, is rated at least A-1 by Standard & Poor's Corporation or A3 by Moody's Investors Service, Inc.; and (iii) debt obligations (including, but not limited to, commercial paper and medium-term notes) issued or unconditionally guaranteed as to principal and interest by any corporation, state or municipal government or agency or instrumentality thereof, or foreign sovereignty if the commercial paper of such corporation, state or municipal government or foreign sovereignty has, at the time of the Company's or any Subsidiary's investment therein or contractual commitment providing for such investment, credit ratings of A-1 by Standard & Poor's Corporation, or P-1 by Moody's Investors Service, Inc., or the debt obligations of such corporation, state or municipal government or foreign sovereignty, at the time of the Company's or any Subsidiary's investment therein or contractual commitment providing for such investment, have credit ratings of at least A-1 by Standard & Poor's Corporation or A3 by Moody's Investors Service, Inc.

"*Redeemable Dividend*" means, for any dividend payable with regard to Redeemable Stock, the quotient of the dividend divided by the difference between one and the maximum statutory federal income tax rate (expressed as a decimal number between 1 and 0) then applicable to the issuer of such Redeemable Stock.

"*Redeemable Stock*" means, with respect to any Person, any equity security that by its terms or otherwise is required to be redeemed or is redeemable at the option of the holder thereof at any time prior to the maturity of the Senior Notes.

"*Restricted Payment*" means (i) a dividend or other distribution declared and paid on the Capital Stock of the Company to its stockholders (in their capacity as such), other than dividends or distributions consisting of shares of the Company's Capital Stock (or rights or warrants to subscribe for or purchase shares of such Capital Stock), (ii) a payment made by the Company or any Subsidiary to purchase, redeem, acquire or retire any Capital Stock of the Company (or rights or warrants to subscribe for or purchase shares of such Capital Stock), (iii) a payment made by the Company or any Subsidiary to acquire, retire or redeem any debt of or equity interest in any Affiliate of the Company or any of its Subsidiaries, (iv) any other Investment in any Affiliate of the Company or any of its Subsidiaries (other than in any Non-Borrowing Subsidiary) or (v) a payment made in purchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Debt.

"*Restructuring*" means the restructuring of the Company's debt and equity capitalization pursuant to the Plan.

"*Revolving Credit Facility*" means (i) the revolving credit facility (or any similar facility) available under the Bankers Trust Bank Credit Agreement, including any related letters of credit, or (ii) any other credit facility secured by accounts receivable, inventory and proceeds thereof.

"*Sale and Leaseback Transaction*" means any direct or indirect arrangement with any Person or to which such Person is a party, providing for the leasing to the Company or a Subsidiary of any Property, whether owned at the date of the Indenture or thereafter acquired, which has been or is to be sold or transferred by the Company or such Subsidiary to such Person, or to any other Person to whom funds have been or are to be advanced by such Person, on the security of such Property.

"*Senior Indebtedness*" means, at any date, (i) Indebtedness under the Bank Credit Agreement and the Senior Notes including, in each case, interest thereon accruing at the contract rate, whether or not an allowed claim in a case under the Bankruptcy Code, and all other obligations and indemnities owing thereunder; (ii) any renewals, extensions, modifications, amendments or refundings of Indebtedness under the Senior Notes; (iii) Indebtedness arising as a result of Interest Swap Obligations of the Company or any Subsidiary; and (iv) any other Indebtedness of the Company for money borrowed or under letters of credit, in either case entered into in compliance with the Indenture, unless the instrument under which such Indebtedness is created, incurred, assumed or guaranteed expressly provides that such Indebtedness is subordinated in right of payment to any Indebtedness.

"*Subordinated Debt*" means, at any date, any Indebtedness of the Company that is expressly subordinated in any respect in right of payment to the Senior Notes, Indebtedness under the Bank Credit Agreement or to any other Senior Indebtedness, including, without limitation, principal, premium, interest, fees, indemnities and amounts in respect of claims and rights of rescission.

"*Subsidiary*" means, with respect to any Person, any corporation, association or other business entity of which securities representing more than 50% of the combined voting power of the total Voting Stock (or in the case of an association or other business entity which is not a corporation, more than 50% of the equity interest) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof. When used herein without reference to any Person, Subsidiary means a Subsidiary of the Company.

"*Transaction Date*" means the date of the transaction giving rise to the need to calculate the Consolidated Interest Coverage Ratio, provided that if such transaction is related to or in connection with any acquisition of any Person, the Transaction Date shall be the earlier of (i) the date on which the Company or any of its Subsidiaries enters into an agreement with such Person to effect such acquisition, (ii) the date on which the Company or any of its Subsidiaries first makes a public announcement of any offer or proposal to effect such acquisition, (iii) the date on which the Company or any of its Subsidiaries first makes a filing with the Securities and Exchange Commission or the Federal Trade Commission in connection with any proposed acquisition, and (iv) the date such acquisition is consummated, *provided, however,* that if subsequent to the occurrence of an event described in clause (i), (ii) or (iii) above or clause (A), (B) or (C) below the Company or any of its Subsidiaries shall amend the terms of such acquisition with respect to the consideration payable by the Company or any of its Subsidiaries in connection with such acquisition, the Transaction Date shall be the earlier of (A) the date on which the Company or any of its Subsidiaries enters into a binding written agreement with such Person to effect such acquisition on such amended terms, (B) the date on which the Company or any of its Subsidiaries makes a public announcement of any offer or proposal to effect such acquisition on such amended terms and (C) the date on which the Company or any of its Subsidiaries first makes a filing disclosing such amended terms with the Commission or the Federal Trade Commission in connection with any proposed acquisition.

"*Voting Stock*" means any class or classes of Capital Stock pursuant to which the holders thereof have the general voting power under ordinary circumstances to vote for the election of directors, managers or trustees of any Person (irrespective of whether or not at the time stock of any class or classes will have or might have voting power by the reason of the happening of any contingency).

## Redemption

The Senior Notes are not redeemable at the option of the Company prior to September 1, 2000, except as set forth below. On or after such date, the Senior Notes are redeemable at the option of the Company, in whole or any time or in part, from time to time, on not less than 30 nor more than 60 days' prior notice, mailed by first-class mail to the holders' last addresses as they shall appear upon the register for the Senior Notes, at the following prices (expressed in percentages of the principal amount), if redeemed during the respective twelve month periods indicated below, in each case together with interest accrued to the redemption date:

| Year | Percentage |
|------|------------|
| September 1, 2000—August 31, 2001 | 104% |
| September 1, 2001—August 31, 2002 | 102% |

and thereafter at the principal amount thereof, together with interest accrued to the redemption date.

Notwithstanding the foregoing, the Senior Notes may be redeemed prior to September 1, 1998 with the proceeds of one or more issuances of equity securities, so long as such redemption, when aggregated with all prior redemptions, shall not result in more than 33⅓% of the principal amount of Senior Notes originally issued having been redeemed, at the redemption prices (expressed in percentages of principal amount) set forth below, if redeemed during the respective twelve month periods indicated below, in each case together with interest accrued to the redemption date:

| Year | Percentage |
|------|------------|
| September 1, 1995—August 31, 1996 | 103% |
| September 1, 1996—August 31, 1997 | 106% |
| September 1, 1997—August 31, 1998 | 106% |

If less than all the Senior Notes are to be redeemed, selection of Senior Notes for redemption will be made by the Trustee or the registrar for the Senior Notes pro rata or by lot or by any means acceptable to the Trustee.

## Covenants

The Indenture contains covenants including, among others, the following:

*Restricted Payments.* The Indenture provides that the Company shall not, nor will it permit any of its Subsidiaries to, make any Restricted Payment (other than Investments in (i) Affiliates which are not wholly-owned Subsidiaries in an aggregate amount not to exceed $20 million at any time outstanding and (ii) Borrowing Subsidiaries in an aggregate amount at any time outstanding not to exceed the sum of (x) $30 million less (y) the aggregate amount of outstanding Investments in Affiliates which are not wholly-owned Subsidiaries permitted by clause (i) hereof) if, after giving effect thereto, (A) any Default shall have occurred and be continuing, or (B) the Company could not incur at least $1.00 of additional Indebtedness pursuant to the terms of the Indenture described in the first paragraphs of "Limitation on Indebtedness" below, or (C) the aggregate amount of Restricted Payments made subsequent to the date of the Indenture by the Company and its Subsidiaries (other than (i) Investments in Affiliates which are not wholly-owned Subsidiaries in an amount not to exceed $20 million in the aggregate and (ii) Investments in Borrowing Subsidiaries in an aggregate amount not to exceed the sum of (x) $30 million less (y) the aggregate amount of outstanding Investments in Affiliates which are not wholly-owned Subsidiaries permitted by clause (i) hereof) would exceed the sum of (a) 50% (or minus 100% in the event of a deficit) of aggregate Consolidated Net Income (which is defined to exclude the impact of any Fresh Start Accounting adjustment and any extraordinary income, including income relating to cancellation of indebtedness resulting from the Restructuring) of the Company for the period commencing on April 2, 1995 and ending on the last day of the fiscal quarter immediately preceding the date of such payment, and (b) the aggregate Net Proceeds, including cash and the Fair Market Value of Property other than cash, received by the Company subsequent to the date on which the Senior Notes are issued from capital contributions from any of its stockholders or from the issuance or sale (other than to a Subsidiary) subsequent to the date on which the Senior Notes are issued of shares of its Capital Stock (other than Redeemable Stock) of any class (or rights or warrants to subscribe for or purchase shares of such capital stock) or of any convertible securities or debt obligations which have been converted into, exchanged for or satisfied by the issuance of shares of the Company's Capital Stock (other than Redeemable Stock).

The foregoing limitations do not prevent the Company from paying a dividend on Capital Stock within 60 days after the declaration thereof if, on the date when the dividend was declared, the Company could have paid such dividend in accordance with the provisions of the Indenture. In addition, the foregoing limitations will not prevent the Company from making payments to purchase, redeem, defease or otherwise acquire or retire for value Subordinated Debt to the extent that any such purchase, redemption, defeasance or other acquisition or retirement for value is made out of the proceeds of the issuance of (i) Subordinated Debt having a final maturity no earlier than the final maturity of, and an Average Life equal to or longer than, the Indebtedness being retired or repurchased or (ii) Capital Stock (other than Redeemable Stock) of the Company.

The Indenture does not prevent the Company from repurchasing shares of its Capital Stock (a) solely in exchange for other shares of its Capital Stock (other than Redeemable Stock) or (b) pursuant to a court order.

In addition, the Indenture provides that the covenant limiting Restricted Payments will not apply to redemptions or repurchases of common stock in connection with repurchase provisions under employee stock option or stock purchase agreements or other agreements to compensate management employees; *provided*, that such redemptions or purchases shall not exceed $2,000,000 in any fiscal year or $5,000,000 in the aggregate subsequent to the date of the Indenture.

*Limitation on Indebtedness.* The Indenture provides that the Company shall not create, incur, assume, guarantee or otherwise become liable with respect to, or become responsible for the payment of, any Indebtedness, unless, after giving effect thereto, the Consolidated Interest Coverage Ratio of the Company on a pro forma basis for the four consecutive fiscal quarters for which financial information in respect thereof is available immediately prior to any Transaction Date that is prior to September, 1997 would be greater than 1.85:1 and for any Transaction Date thereafter would be greater than 2.0:1.

Notwithstanding the foregoing, the Company may incur, create, assume, guarantee or otherwise become liable with respect to, any or all of the following Indebtedness:

(i) Indebtedness evidenced by the Senior Notes, and Indebtedness under the Bank Credit Agreement (including any refinancings thereof permitted by the following clause) in a maximum principal amount at any time outstanding not to exceed the greater of (x) $250 million or (y) the sum of $100 million plus 65% of the total inventory of the Company and its Subsidiaries (calculated on a "first-in" "first-out" basis) plus 85% of the total accounts receivable of the Company and its Subsidiaries, subject to one or more permanent reductions of both (x) and (y) as provided in the "Limitation on Sale and Leaseback Transactions" and in the proviso to the "Limitation on Asset Sales."

(ii) Indebtedness the proceeds of which are used to refinance (x) all or a portion of the Indebtedness evidenced by the Senior Notes or (y) Indebtedness under the Bank Credit Agreement (as limited by the preceding paragraph) or other (z) Indebtedness of the Company and its Subsidiaries, in each case in a principal amount not to exceed the principal amount so refinanced (or, if such Indebtedness provides for an amount less than the principal amount thereof to be due and payable upon a declaration of acceleration of the maturity thereof, in an amount not greater than such lesser amount) plus any prepayment penalties and premiums, accrued and unpaid interest on the Indebtedness so refinanced, plus customary fees, expenses and costs related to the incurrence of such refinancing Indebtedness, provided that, in the case of this clause (ii), (1) if the Senior Notes are refinanced in part, such new Indebtedness is expressly made pari passu or subordinate in right of payment to the remaining Senior Notes, (2) if the Indebtedness to be refinanced is subordinate in right of payment to the Senior Notes, such new Indebtedness is subordinate in right of payment to the Senior Notes at least to the extent that the Indebtedness to be refinanced is subordinate in right of payment to the Senior Notes, (3) if the Indebtedness to be refinanced is pari passu in right of payment to the Senior Notes, such new Indebtedness is expressly made pari passu or subordinate in right of payment to the Senior Notes, and (4) if the Senior Notes are refinanced in part or if the Indebtedness to be refinanced is pari passu or

subordinate in right of payment to the Senior Notes and scheduled to mature after the maturity date of the Senior Notes, such new Indebtedness as of the date of incurrence does not mature prior to the final scheduled maturity date of the Senior Notes and has an Average Life equal to or greater than the remaining Average Life of the Senior Notes;

(iii) Indebtedness of the Company remaining outstanding immediately after the issuance of the Senior Notes;

(iv) Indebtedness to a Subsidiary of the Company;

(v) Indebtedness incurred in connection with the refurbishment, improvement, construction or acquisition (whether by acquisition of stock, assets or otherwise) of any Property or Properties of the Company or a Subsidiary of the Company that constitute a part of the then present business of the Company or any Subsidiary of the Company (or incurred within twelve months of any such acquisition or the completion of such refurbishment, improvement or construction), *provided*, that at the time of the incurrence thereof:

(a)    (1) such Indebtedness, together with any other then outstanding Indebtedness incurred during the most recently completed four consecutive fiscal quarter period in reliance upon either this clause (v) or clause (vi) under "Limitations on Indebtedness and Preferred Stock of Subsidiaries (other than Non-Borrowing Subsidiaries)" does not exceed, in the aggregate, 3% of consolidated net sales of the Company and its Subsidiaries during the four consecutive fiscal quarter period ended immediately prior to the date of calculation; *provided*, that for purposes of this clause (a)(1), such Indebtedness shall include, without limitation, an amount equal to (x) the aggregate outstanding principal amount of any mortgages that the Company or any Subsidiary is deemed to have entered into in connection with any Sale and Leaseback Transaction that the Company or any Subsidiary has entered into during the four consecutive fiscal quarter period ended immediately prior to the date of calculation, less (y) the aggregate principal amount of any Senior Indebtedness that has been repaid with the Net Proceeds of any Sale and Leaseback Transaction that the Company or any Subsidiary has entered into within twelve months of the acquisition, or completion of construction or refurbishment, of the Property that is the subject of any such transaction; and

(2) such Indebtedness, together with all then outstanding Indebtedness incurred in reliance upon either this clause (v) or clause (vi) under "Limitations on Indebtedness and Preferred Stock of Subsidiaries (other than Non-Borrowing Subsidiaries)" does not exceed, in the aggregate, 3% of the consolidated net sales of the Company and its Subsidiaries during the most recently completed twelve consecutive fiscal quarter period; *provided that*, for purposes of this clause (a)(2), such Indebtedness shall include, without limitation, an amount equal to (x) the aggregate outstanding principal amount of any mortgages that the Company or any Subsidiary is deemed to have entered into in connection with any Sale and Leaseback Transactions to which the Company or any Subsidiary is then a party less (y) the aggregate principal amount of any Senior Indebtedness that has been repaid with the Net Proceeds of any Sale and Leaseback Transaction that the Company or any Subsidiary has entered into within twelve months of the acquisition, or completion of construction or refurbishment, of the Property that is the subject of any such transaction; *except that*, for purposes of calculating the limitation set forth in clause (a)(2) the seven Sale and Leaseback Transactions identified in clause (ii) under "Limitation on Sale and Leaseback Transactions" shall not be included; or

(b)    such Indebtedness (including an amount equal to the sum of (x) the aggregate outstanding principal amount of any mortgages that the Company or any Subsidiary is deemed to have entered into in connection with any Sale and Leaseback Transaction to which the Company or any Subsidiary is then a party less (y) the aggregate principal amount of any Senior Indebtedness that has been repaid with the Net Proceeds of any Sale and Leaseback

Transaction) does not exceed the amount of proceeds received by the Company or any of its Subsidiaries from insurance maintained by the Company or any Subsidiary in respect of such Property or Properties;

(vi) Indebtedness consisting of Guarantees by the Company of Indebtedness of any Subsidiary, provided that such Indebtedness is otherwise permitted under the Indenture;

(vii) Indebtedness under Interest Swap Obligations, provided that such Interest Rate Swap Obligations are related to payment obligations on Indebtedness otherwise permitted under this covenant;

(viii) commercial letters of credit and standby letters of credit incurred in the ordinary course of business by the Company;

(ix) Indebtedness represented by industrial revenue or development bonds, provided that the aggregate amount of Indebtedness incurred in reliance upon the exception of this clause (ix) or clause (x) under "Limitations on Indebtedness and Preferred Stock of Subsidiaries (other than Non-Borrowing Subsidiaries)" shall not exceed at any one time an aggregate principal amount outstanding of $25,000,000;

(x) Capitalized Lease Obligations relating to Property used in the business of the Company;

(xi) Indebtedness incurred in respect of performance bonds and performance and completion Guarantees incurred in the ordinary course of business;

(xii) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within five business days of its incurrence; and

(xiii) other Indebtedness for borrowed money in an amount not to exceed $75,000,000 in the aggregate.

*Limitation on Liens.* The Indenture provides that neither the Company nor any Subsidiary shall create, incur, assume or permit to exist any Lien on or with respect to any Property or assets of the Company or any such Subsidiary or any interest therein or any income or profits therefrom other than (i) any Lien existing as of the date of the Indenture, and any Lien securing Indebtedness under the Bank Credit Agreement pursuant to the terms of such Bank Credit Agreement as in effect on the issue date of the Senior Notes; (ii) any Lien arising in the ordinary course of business, other than in connection with Indebtedness for borrowed money; (iii) any Lien on the Company's or a Subsidiary's accounts receivable, inventories, and proceeds thereof securing Indebtedness incurred pursuant to the provisions of the Revolving Credit Facility; (iv) any Lien on Property acquired by the Company or any Subsidiary after the date of the Indenture created solely to secure Indebtedness incurred to finance such acquisition or assumed in connection with such acquisition, whether by acquisition of stock, assets or otherwise (or entered into in connection with Indebtedness that is permitted under the terms of the Indenture described in clause (v) of the second paragraph under "Limitation on Indebtedness" above or clause (vi) under "Limitations on Indebtedness and Preferred Stock of Subsidiaries (other than Non-Borrowing Subsidiaries)"), provided that in each case such acquisition does not constitute a Material Acquisition; (v) any Lien on Property acquired by the Company or any Subsidiary which constitutes a Material Acquisition created solely to secure Indebtedness incurred to finance such Material Acquisition or assumed in connection with such Material Acquisition, provided that after giving effect to such Indebtedness the Consolidated Interest Coverage Ratio would be greater than the then applicable Consolidated Interest Coverage Ratio described in the first paragraph under "Limitation on Indebtedness" above; (vi) any Lien on any asset of the Company or any Subsidiary created solely to secure Indebtedness incurred to finance the refurbishment, improvement, construction or acquisition (whether by acquisition of stock, assets or otherwise) of such assets (or created within twelve months of any such acquisition or the completion of such refurbishment, improvement or construction) or relating to Indebtedness assumed in connection with any such acquisition, provided that such Lien secures Indebtedness permitted under the terms of the Indenture

described in clause (v) of the second paragraph under "Limitation on Indebtedness" above or clause (vi) under "Limitations on Indebtedness and Preferred Stock of Subsidiaries (other than Non-Borrowing Subsidiaries)"; (vii) any Lien created in connection with a Capitalized Lease Obligation that the Company or a Subsidiary is permitted to enter into under the terms of the Indenture; (viii) any Lien relating to judgments or awards that the Company or any Subsidiary is contesting in good faith; (ix) any Lien for taxes that are not yet due or that the Company or any Subsidiary is contesting in good faith and (x) any Lien extending, renewing or replacing any Liens permitted by clauses (i), (iv), (v), (vi) or (vii). In the case of Liens permitted under clauses (i), (iv), (v), (vi), (vii) and (x), such Liens may relate solely to the Property (including any improvements thereon) subject thereto as of the date of the Indenture or the date such Lien was incurred, as the case may be (and, in the case of Indebtedness under the Bank Credit Agreement, any after acquired Property), and may secure the payment only of the Indebtedness so secured as of such date.

*Limitation on Sale and Leaseback Transactions.* The Indenture provides that the Company shall not, and shall not permit any Subsidiary to, enter into, assume, guarantee or otherwise become liable with respect to any Sale and Leaseback Transaction, *provided*, that the Company may enter into (i) a Sale and Leaseback Transaction, that had such Sale and Leaseback Transaction been structured as a mortgage rather than as a Sale and Leaseback Transaction, the Company would have been permitted to enter into such transaction pursuant to the terms of the Indenture described in clause (v) of "Limitation on Indebtedness," in clause (vi) of "Limitations on Liens" and in clause (vi) of "Limitation on Indebtedness and Preferred Stock of Subsidiaries (other than Non-Borrowing Subsidiaries)", *provided, however*, that such Sale and Leaseback Transaction is entered into within twelve months of the acquisition, or completion of construction or refurbishment, of the Property that is the subject of any such transactions; (ii) a Sale and Leaseback Transaction with respect to the Company's property located in New Fairfield, Connecticut, Dumont, New Jersey, Valatie, New York, Morrisville, Vermont, Corinth, New York, Tannersville, New York and Manchester Center, Vermont; and (iii) a Sale and Leaseback Transaction if within 90 days of entering into such arrangement either (1) the Company applies the Net Proceeds of the sale of the Property leased pursuant to such Sale and Leaseback Transaction to the payment of Senior Indebtedness other than Indebtedness incurred under the Bank Credit Agreement (except that Indebtedness under the Bank Credit Agreement may be repaid from such Net Proceeds to the extent the principal amount of Indebtedness under the Bank Credit Agreement permitted by the second paragraph of "Limitation on Indebtedness" is permanently reduced by an amount equal to the principal amount of the Indebtedness under the Bank Credit Agreement so repaid from Net Proceeds), or (2) (a) if such arrangement is entered into prior to September 1, 2000, the Company makes a pro rata offer to all holders of Senior Notes to repurchase such Senior Notes at 104% of their principal amount, plus accrued and unpaid interest through the date of repurchase; or (b) if such arrangement is entered into on or after September 1, 2000, the Company redeems the Senior Notes (as described under "Redemption"), in either case at par plus the then applicable premium, if any, and in an aggregate amount equal to the greater of the Net Proceeds of the sale of the Property leased pursuant to such Sale and Leaseback Transaction or the Fair Market Value of the Property so leased at the time of entering into such Sale and Leaseback Transaction.

*Limitation on Asset Sales.* The Indenture provides that the Company shall not consummate, and shall not permit any Subsidiary to consummate, any Asset Sale unless (i) such sale is for Fair Market Value and (ii) at least 75% of the Net Proceeds thereof received by the Company or such Subsidiary is in the form of cash; provided, that for purposes of this covenant securities received by the Company or any Subsidiary from such transferee that are promptly converted by the Company or such Subsidiary into cash shall be deemed to be cash, and provided further, that notwithstanding any other provision in this paragraph, the Company or any Subsidiary may consummate Asset Sales for which it receives, in a single transaction or in a series of related transactions, aggregate Net Proceeds in an amount not to exceed $25,000,000, without regard to the foregoing limitation on receiving a specified percentage of the Net Proceeds in cash. To the extent the Company has not reinvested such Net Proceeds in Additional Assets or used such Net Proceeds to repay Senior Indebtedness (other than Senior Notes) within twelve months following the consummation of the Asset Sale (or in the case of Net Proceeds received in the form of securities, within twelve months after such

securities are converted into cash), the Company shall either apply such Net Proceeds (or any portion thereof) to the repayment of Senior Indebtedness or apply such Net Proceeds (or the remaining portion thereof) in accordance with the following sentence; *provided, however,* that if Net Proceeds of Asset Sales are applied to reduce the Indebtedness under the Bank Credit Agreement (or any refinancing or renewal thereof), the principal amount of Indebtedness under the Bank Credit Agreement permitted by the second paragraph of "Limitation on Indebtedness" shall be reduced permanently by an amount equal to the principal amount of the Indebtedness under the Bank Credit Agreement so repaid from Net Proceeds. If (1) no Senior Indebtedness other than Senior Notes is outstanding at such time or the Company does not apply any or applies only a portion of such Net Proceeds to the repayment of Senior Indebtedness other than Senior Notes or (2) the application of such Net Proceeds results in the payment of all outstanding Senior Indebtedness other than Senior Notes, then such Net Proceeds or any remaining portion thereof, in each case not so applied to the payment of Senior Indebtedness other than Senior Notes, shall be applied to a pro rata offer to repurchase the Senior Notes at a purchase price in cash equal to 102% of their principal amount plus accrued and unpaid interest through the date of repurchase. Notwithstanding the foregoing, in the event the Net Proceeds resulting from any Asset Sale, after giving effect to any related repayment of Senior Indebtedness other than Senior Notes, are less than $25,000,000, the Company may defer extending such pro rata offer to repurchase the Senior Notes until such time as such Net Proceeds, plus the aggregate amount of Net Proceeds resulting from any subsequent Asset Sale or Asset Sales not otherwise reinvested in Additional Assets or applied to repay Senior Indebtedness other than Senior Notes, are equal to at least $25,000,000, at which time the Company shall apply the aggregate amount of such Net Proceeds to a pro rata offer to repurchase the Senior Notes at a purchase price in cash equal to 102% of their principal amount, plus accrued and unpaid interest through the date of repurchase.

Pending application thereof in accordance with the foregoing paragraph, the Company shall either apply the Net Proceeds of any Asset Sale to repay temporarily any Senior Indebtedness other than Senior Notes or invest such Net Proceeds in Qualified Investments.

*Transactions with Affiliates.* The Indenture provides that the Company shall not, and shall not permit any Subsidiary to, enter into any transaction after the date of the issuance of the Senior Notes with any Affiliate (other than the Company or a Subsidiary) unless (i) the Board of Directors of the Company determines, in its reasonable good faith judgment, that such transaction is in the best interests of the Company or such Subsidiary, based on full disclosure of all relevant facts and circumstances, (ii) such transaction is on terms no less favorable to the Company or such Subsidiary than those that could be obtained in a comparable arm's length transaction with an entity that is not an Affiliate, and (iii) the transaction is otherwise permissible under the Indenture.

The covenant limiting Transactions with Affiliates does not apply to redemptions or repurchases of common stock in connection with repurchase provisions under employee stock option or stock purchase agreements or other agreements to compensate management employees, provided that such redemptions or purchases shall not exceed $2,000,000 in any fiscal year or $5,000,000 in the aggregate subsequent to the date of the Indenture.

In addition, the covenant limiting Transactions with Affiliates will not prevent the Company from (i) paying a dividend on Capital Stock within 60 days after the declaration thereof if, on the date when the dividend was declared, the Company could have paid such dividend in accordance with the provisions of the Indenture, or (ii) repurchasing shares of its Capital Stock (x) solely in exchange for other shares of its Capital Stock (other than Redeemable Stock) or (y) pursuant to a court order.

*Limitation on Indebtedness and Preferred Stock of Subsidiaries (other than Non-Borrowing Subsidiaries).* The Indenture provides that the Company shall not permit any Subsidiary to create, incur, guarantee, assume or issue any Indebtedness or issue any preferred or preference stock, except for:

(i) Indebtedness or preferred stock outstanding on the date of the Indenture;

(ii) Indebtedness or preferred stock issued to and held by the Company or a wholly-owned Subsidiary (but only so long as held or owned by the Company or a wholly-owned Subsidiary);

(iii) Indebtedness or preferred stock issued by a Person prior to the time (a) such Person becomes a Subsidiary, (b) such Person merges with or into a Subsidiary or (c) a Subsidiary merges with or into such Person, provided that such Indebtedness or preferred stock was not issued or incurred by such Person in anticipation of the type of transaction contemplated by subclauses (a), (b) or (c);

(iv) Indebtedness under the Bank Credit Agreement;

(v) Indebtedness the proceeds of which are used to refinance any other Indebtedness of any Subsidiary, in each case in a principal amount not to exceed the principal amount so refinanced (or, if such Indebtedness provides for an amount less than the principal amount thereof to be due and payable upon a declaration of acceleration of the maturity thereof, in an amount not greater than such lesser amount), plus any prepayment penalties and premiums, accrued and unpaid interest on the Indebtedness so refinanced, plus customary fees, expenses and costs related to the incurrence of such refinancing Indebtedness;

(vi) Indebtedness incurred in connection with the refurbishment, improvement, construction or acquisition (whether by acquisition of stock, assets or otherwise) of any Property or Properties of a Subsidiary of the Company that constitute a part of the then present business of the Company or any Subsidiary of the Company (or incurred within twelve months of any such acquisition or the completion of such refurbishment, improvement or construction), provided that either:

(a) (1) such Indebtedness, together with any other Indebtedness incurred during the most recently completed four consecutive fiscal quarter period in reliance upon either this clause (vi) or clause (v) under "Limitation on Indebtedness" does not exceed in the aggregate 3% of consolidated net sales of the Company and its Subsidiaries during the four consecutive fiscal quarter period ended immediately prior to the date of calculation; *provided* that (a) for purposes of this clause (a)(1), such Indebtedness shall include, without limitation, an amount equal to (x) the aggregate outstanding principal amount of any mortgages that the Company or any Subsidiary is deemed to have entered into in connection with any Sale and Leaseback Transaction that the Company or any Subsidiary has entered into during the four consecutive fiscal quarter period ended immediately prior to the date of calculation, less (y) the aggregate principal amount of any Senior Indebtedness that has been repaid with the Net Proceeds of any Sale and Leaseback Transaction that the Company or any Subsidiary has entered into within twelve months of the acquisition, or completion of construction or refurbishment, of the Property that is the subject of any such transaction; and

(2) such Indebtedness, together with all then outstanding indebtedness incurred in reliance upon either this clause (vi) or clause (v) under "Limitation on Indebtedness" does not exceed in the aggregate 3% of the consolidated net sales of the Company and its Subsidiaries during the most recently completed twelve consecutive fiscal quarter period; *provided that*, for purposes of this clause (a)(2), such Indebtedness shall include, without limitation, an amount equal to (x) the aggregate outstanding principal amount of any mortgages that the Company or any Subsidiary is deemed to have entered into in connection with any Sale and Leaseback Transactions to which the Company or any Subsidiary is then a party less (y) the aggregate principal amount of any Senior Indebtedness that has been repaid with the Net Proceeds of any Sale and Leaseback Transaction that the Company or any Subsidiary has entered into within twelve months of the acquisition, or completion of construction or refurbishment, of the Property that is the subject of any such transaction; *except that*, for purposes of calculating the limitation set forth in clause (a)(2), the seven Sale and Leaseback Transactions identified in clause (ii) under "Limitation on Sale and Leaseback Transactions" shall not be included; or

(b)   such Indebtedness (including an amount equal to the sum of (x) the aggregate outstanding principal amount of any mortgages that the Company or any Subsidiary is deemed to have entered into in connection with any Sale and Leaseback Transaction to which the Company or any Subsidiary is then a party less (y) the aggregate principal amount of any Senior Indebtedness that has been repaid with the Net Proceeds of any Sale and Leaseback Transaction) does not exceed the amount of proceeds received by the Company or any of its Subsidiaries from insurance maintained by the Company or any Subsidiary in respect of such Property or Properties;

(vii) Indebtedness consisting of Guarantees by a Subsidiary of Indebtedness of the Company or any other Subsidiary, provided that such Indebtedness is otherwise permitted under the Indenture;

(viii) Indebtedness under Interest Swap Obligations, provided that such Interest Swap Obligations are related to payment obligations on Indebtedness otherwise permitted under this covenant;

(ix) commercial letters of credit and standby letters of credit incurred in the ordinary course of business by a Subsidiary;

(x) Indebtedness represented by industrial revenue or development bonds, provided that the aggregate amount of Indebtedness incurred in reliance upon this clause (x) or clause (ix) under "Limitation on Indebtedness" shall not exceed at any one time an aggregate principal amount outstanding of $25,000,000;

(xi) Capitalized Lease Obligations relating to Property used in the business of a Subsidiary;

(xii) Indebtedness incurred in respect of performance bonds and performance and completion Guarantees incurred in the ordinary course of business; and

(xiii) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within five business days of its incurrence.

*Limitation on Indebtedness of Non-Borrowing Subsidiaries.* The Indenture provides that the Company shall not permit any Non-Borrowing Subsidiary to create, incur, assume or guarantee any Indebtedness or issue any preferred or preference stock, or to engage in any Sale and Leaseback Transaction.

*Limitation on Payment Restrictions Affecting Subsidiaries.* The Indenture provides that the Company shall not, and shall not permit any Subsidiary to, create or otherwise cause to suffer to exist or become effective any consensual encumbrance or restriction which encumbrance or restriction by its terms expressly restricts the ability of any such Subsidiary to (i) pay dividends or make any other distributions on such Subsidiary's capital stock or pay any Indebtedness owed to the Company or any Subsidiary, (ii) make any loans or advances to the Company or any Subsidiary or (iii) transfer any of its Property to the Company or any Subsidiary, other than, with respect to clauses (ii) and (iii), encumbrances or restrictions specifically: (a) permitted under the terms of any instrument or agreement relating to any Indebtedness of the Company or any Subsidiary existing on the date of the Indenture, including, without limitation, the Indenture or the Bank Credit Agreement; (b) relating to any Property acquired by the Company or any of its Subsidiaries after the date of the Indenture, provided that such encumbrance or restriction relates only to the Property which is acquired and, in the case of any encumbrance or restriction that constitutes a Lien, the Company or such Subsidiary would be permitted to incur the Lien under the covenant limiting Liens; (c) relating to (x) any industrial revenue or development bond, (y) any obligation of the Company or any Subsidiary incurred in the ordinary course of business to pay the purchase price of Property acquired by the Company or such Subsidiary, or (z) any lease of Property by the Company or such Subsidiary in the ordinary course of business, provided that such encumbrance or restriction relates only to the Property which is the subject of such industrial revenue or development bond, such Property purchased or such Property leased and any such lease,

as the case may be; (d) relating to any Indebtedness of any Subsidiary at the date of acquisition of such Subsidiary by the Company or any Subsidiary of the Company, provided that such Indebtedness was not incurred in connection with or in anticipation of such acquisition, and provided further that the Company would be permitted to incur any Lien securing such Indebtedness under the covenant limiting Liens; or (e) under any replacement or refinancing agreements or instruments referred to in clauses (a), (b), and (c), provided that the provisions relating to such encumbrance or restriction contained in any such replacement or refinancing agreement or instrument are no more restrictive than the provisions relating to such encumbrance or restriction contained in such original agreement or instrument.

*Investment Company Act.* The Indenture provides that the Company shall not become an investment company within the meaning of the Investment Company Act of 1940.

### Mergers and Consolidations

The Company shall not consolidate with or merge into, or transfer, sell or lease all or substantially all of its Property to, another Person unless (i) the successor corporation is a United States corporation, (ii) the successor corporation is bound by all the terms of the Indenture, (iii) immediately after giving effect to such transaction no Default or Event of Default exists, (iv) the consolidated net worth (determined in accordance with GAAP) of the successor corporation is equal to or greater than the consolidated net worth of the Company immediately prior to such transaction and (v) in the case of any such consolidation, merger, transfer, sale or lease other than into or to a wholly-owned Subsidiary of the Company, immediately after and giving effect to any such consolidation, merger, transfer, sale or lease and any financings or other transactions in connection therewith the Consolidated Interest Coverage Ratio of the surviving corporation would be greater than the then applicable Consolidated Interest Coverage Ratio described under the first paragraph of "Limitation on Indebtedness" above. Certain mergers may constitute a Change of Control that would give each Holder the right to require the Company to repurchase any Senior Note held by such Holder at a purchase price in cash equal to 101% of its principal amount plus accrued interest. See "Change of Control" below.

### Change of Control

In the event of a Change of Control, the Company will be obligated to make an offer to purchase all of the then outstanding Senior Notes at a purchase price in cash equal to 101% of its principal amount plus accrued interest, after the occurrence of such Change of Control. The Company shall give holders notice of such right of repurchase not less than 20 nor more than 60 business days prior to the consummation of a merger, consolidation, transfer, sale or lease that would constitute a Change of Control and not more than 45 business days following any other event constituting a Change of Control, mailed by first-class mail to the holders' last addresses as they appear upon the register. Holders will have the right to have their Senior Notes repurchased if such Senior Notes are tendered for repurchase no later than five business days prior to the applicable repurchase.

### Events of Default

Each of the following events are defined in the Indenture as "Events of Default": (i) the failure by the Company to pay interest on any Senior Note issued under the Indenture for a period of 30 days after such interest becomes due and payable; (ii) the failure by the Company to pay the principal of (or premium, if any, on) any Senior Note issued under the Indenture when such principal becomes due and payable, whether at the stated maturity or upon application, redemption or otherwise; (iii) a default in the observance of any other covenant contained in the Indenture that continues for 30 days after the Company has been given notice of the default by the Trustee or the holders of 25% in principal amount of the Senior Notes then outstanding; (iv) a default or defaults on other Indebtedness of the Company or any Subsidiary, which Indebtedness has an outstanding principal amount of more than $15,000,000 individually or in the aggregate if such Indebtedness has attained final maturity or if the holders of such Indebtedness have accelerated payment

thereof under the terms of the instrument under which such Indebtedness is or may be outstanding and, in each case, it remains unpaid; (v) one or more judgments or decrees is entered against the Company or any Subsidiary involving a liability (not paid or fully covered by insurance) of $5,000,000 or more in the case of any one such judgment or decree and $10,000,000 or more in the aggregate for all such judgments and decrees for the Company and all its Subsidiaries and all such judgments or decrees have not been vacated, discharged or stayed or bonded pending appeal within 30 days from the entry thereof; and (vi) events of bankruptcy, insolvency, or reorganization, as specified in the Indenture, affecting the Company or any Material Subsidiary.

The Indenture provides that the Trustee, within 90 days after the occurrence of an Event of Default that is continuing, will give notice thereof to the holders of the Senior Notes issued under the Indenture; *provided*, *however*, that, except in the case of a default in payment of principal of or interest on the Senior Notes issued under the Indenture, the Trustee may withhold such notice as long as it in good faith determines that such withholding is in the interest of the holders of the Senior Notes issued under the Indenture.

In case an Event of Default (other than an Event of Default resulting from bankruptcy, insolvency, or reorganization of the Company or a Material Subsidiary) shall have occurred and be continuing, the Trustee or the holders of at least 25% in principal amount of the Senior Notes issued under the Indenture, by notice in writing, may declare to be due and payable the principal amount of the Senior Notes issued under the Indenture, plus accrued interest, and such amounts shall become due and payable upon the earlier of (i) five days from the date of such notice, so long as the Event of Default giving rise to such notice has not been cured or waived and (ii) the acceleration of the Indebtedness under the Bank Credit Agreement (or any renewal or refinancing thereof). In case an Event of Default resulting from bankruptcy, insolvency, or reorganization of the Company or a Material Subsidiary shall occur, such amount shall *ipso facto* become immediately due and payable without any declaration or any act on the part of the Trustee or the holders of the Senior Notes issued under the Indenture. Such declaration or acceleration by the Trustee or the Holders may be rescinded and past defaults may be waived (except, unless theretofore cured, a default in payment of principal of or interest on the Senior Notes issued under the Indenture) by the holders of a majority in principal amount of the Senior Notes issued under the Indenture upon conditions provided in the Indenture. Except to enforce the right to receive payment of principal or interest when due, no holder of a Senior Note issued under the Indenture may institute any proceeding with respect to the Indenture or for any remedy thereunder unless such holder has previously given to the Trustee written notice of a continuing Event of Default and unless the holders of at least 25% in principal amount of the Senior Notes issued under the Indenture have requested the Trustee to pursue remedies in respect of such Event of Default and have offered the Trustee indemnity satisfactory to the Trustee against loss, liability, or expense to be thereby incurred and the Trustee has failed so to act for 60 days after receipt of the same and no contrary instructions have been received during 20 days. Subject to certain restrictions, the holders of a majority in principal amount of the Senior Notes issued under the Indenture are given the right to direct the time, method, and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture, that is unduly prejudicial to the rights of any holder of a Senior Note issued thereunder, or that would subject the Trustee to personal liability.

The Company is required to deliver to the Trustee, within 120 days after the end of each fiscal year, an officers' certificate indicating whether the Company has complied with the terms of the Indenture and whether an Event of Default exists.

### Satisfaction and Discharge of the Indenture; Defeasance

The Company may terminate its obligations under the Indenture at any time by delivering all outstanding Senior Notes issued thereunder to the Trustee for cancellation. The Company, at its option, (i) will be discharged (as defined) from any and all obligations with respect to the Senior Notes issued under the Indenture (except for certain obligations of the Company to register the transfer or exchange of such Senior

Notes, replace stolen, lost, or mutilated Senior Notes, maintain paying agencies, hold moneys for payment in trust) and compensate the Trustee as provided in Section 6 07 of the Indenture or (ii) need not comply with certain restrictive covenants in the Indenture (including those described under "Covenants"), in each case if the Company deposits with the Trustee, in trust, money or U.S. Government Obligations which, through the payment of interest thereon and principal thereof in accordance with their terms, will provide money in an amount sufficient to pay all the principal of and interest on the Senior Notes on the dates such payments are due in accordance with the terms of the Senior Notes. To exercise any such option, the Company is required to deliver to the Trustee (a) an opinion of counsel to the effect that the deposit and related defeasance would not cause the holders of the Senior Notes to recognize income, gain or loss for federal income tax purposes and, in the case of a discharge pursuant to clause (i) above, accompanied by a ruling to such effect received from or published by the United States Internal Revenue Service and (b) an officers' certificate and an opinion of counsel to the effect that all conditions precedent to the defeasance have been complied with.

**Reports to Holders of the Senior Notes**

So long as the Company is subject to the periodic reporting requirements of the 1934 Act it will continue to furnish the information required thereby to the Securities Exchange Commission and to the holders of the Senior Notes. The Indenture provides that even if the Company is entitled under the 1934 Act not to furnish such information to the Commission or to the holders of the Senior Notes, it will nonetheless continue to furnish such information to the Commission, the Trustee and the holders of the Senior Notes as if it were subject to such period reporting requirements.

In addition, the Company has agreed that, for as long as any Senior Notes remain outstanding, it will furnish to holders and to beneficial owners of Securities and to prospective purchasers of Senior Notes that are designated by holders, upon their request, the information required to be delivered pursuant to Rule 144(A)(d)(4) under the Securities Act of 1933, as amended

**No Personal Liability of Shareholders, Officers, Directors and Employees**

No shareholder, officer, director, or employee, as such, past, present, or future of the Company or any successor corporation shall have any personal liability in respect of the Company's obligations under the Indenture or the Senior Notes by reason of his or its status as such shareholder, officer, director, or employee.

SECURITIES AND EXCHANGE COMMISSION

FORM 10-K

The GRAND UNION COMPANY

(Exact name of registrant as specified in its charter)

(Zip Code)

07470

# Appendix D

Not Applicable

# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended April 2, 1994

Commission File Number 33-48282

## THE GRAND UNION COMPANY
(Exact name of registrant as specified in its charter)

| Delaware | 22-1518276 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 201 Willowbrook Boulevard, Wayne, New Jersey | 07470 |
| (Address of principal executive offices) | (Zip Code) |
| Registrant's telephone number, including area code | 201-890-6000 |

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Not Applicable | Not Applicable |

Securities registered pursuant to Section 12(g) of the Act:

Not Applicable
(Title of Class)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes   X   No_____

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.         [X]

As of July 1, 1994, there were issued and outstanding 801.5 shares of the Registrant's common stock. The common stock is not traded in a public market.

Documents incorporated by reference:  None

# THE GRAND UNION COMPANY

## PART I

### Item 1. Business

#### General

Grand Union Holdings Corporation ("Holdings"), a Delaware corporation, and Grand Union Capital Corporation ("Capital"), a Delaware corporation which is a wholly owned subsidiary of Holdings, have no operations independent of those of The Grand Union Company ("Grand Union" or the "Company"), a Delaware corporation and a wholly owned subsidiary of Capital. Grand Union currently operates 254 supermarkets and food stores under the "Grand Union" name in seven states.

#### Store Formats

Grand Union's store sizes and formats vary depending upon the demographics and competitive conditions in each location, as well as the availability of real estate. Grand Union supermarkets offer a wide selection of national brand and private label products as well as high-quality produce, meat and general merchandise. The majority of the Company's sales are generated from stores which also contain a number of high margin specialty and service areas for such goods as imported and domestic produce, salads, hot and cold prepared foods, seafood and fresh-baked goods. Select stores feature in-store kitchens and pharmacies. Liquor and wine departments are included where permitted by local law. Grand Union's supermarkets range in size from 14,000 to 64,000 square feet and newly constructed stores are typically in excess of 40,000 square feet.

#### Merchandising Strategy

Grand Union's current merchandising strategy is premised upon the following:

*Value.* The Company's strategy is to provide value to the customer by offering competitive prices, offering a wide variety of advertised and unadvertised specials, sponsoring special promotions and offering a wide selection of private label products.

*Merchandise Assortment.* Management believes that many consumers prefer food stores that not only offer the wide variety of food and non-food items carried by conventional supermarkets, but also sell an expanded assortment of high-quality food items and produce. Accordingly, Grand Union continues to upgrade existing departments with new selections and, where appropriate, has added specialty departments, including full service butcher and seafood shops, floral departments, delicatessens and bakeries. This merchandising strategy provides consumers with a wider selection of better and more convenient foods, while shifting the Company's sales mix toward higher margin products.

*Efficiencies of Distribution.* Grand Union's distribution system has contributed to its ability to efficiently pursue its strategy of offering the consumer a wide assortment of quality products at competitive prices. Strategically located distribution centers make it possible for Grand Union to minimize in-store stockroom space, thereby increasing store selling space.

#### Selected Data

The table below sets forth certain statistical information with respect to Grand Union retail stores, excluding the stores formerly operated in the Southern Region, for the periods indicated.

| | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 |
|---|---|---|---|
| Number of stores (at end of period) | 251 | 250 | 254 |
| Total selling square feet (in thousands) | 4,213 | 4,276 | 4,532 |
| Average gross square feet per store | 23,439 | 23,922 | 24,966 |
| Average sales per selling square foot per week | $11.69 | $11.23 | $10.76 |

## Summary of Operations
### Northern Region

Grand Union currently operates 142 stores in its Northern Region including 40 stores in Vermont, 96 stores in upstate New York, five stores in New Hampshire and a single store in Massachusetts. The Northern Region had sales of approximately $1.1 billion for the 52 weeks ended April 2, 1994. The Company believes it generally operates in excellent locations, having operated in 85% of the markets it currently serves in the Northern Region for more than 25 years, and in many communities for over 50 years.

In Vermont, Grand Union operates 40 stores throughout the state in virtually every significant community. Grand Union has the preeminent market share in the state, having more sales than all other chain-store operators combined. The Company's strong position in Vermont allows it to achieve significant economies in purchasing, distribution, advertising and field supervision. Zoning and environmental regulations in the state have long restricted commercial development (including supermarkets). Accordingly, the competitive environment in Vermont evolves very slowly. Grand Union's long-standing presence in Vermont was enhanced through the acquisition in 1990 of certain stores operated by R&C Foods, a division of The Penn Traffic Company ("Penn Traffic"). Grand Union has focused its capital expenditures in Vermont on improving existing locations and replacing stores where possible. The largest competitors to Grand Union in Vermont are Golub Corporation ("Price Chopper") (11 stores), Hannaford Brothers, Inc. ("Hannaford") (six stores) and The Great Atlantic & Pacific Tea Company, Inc. ("A&P") (three stores).

In upstate New York, Grand Union generally operates in small cities and rural communities, where the Company estimates it typically has the leading market share, and in the Albany, New York metropolitan area (the "Capital District") where, according to Company estimates, it has the second largest market share with 40 stores. Although generally not as restrictive as Vermont, commercial development in the upstate New York market place has been and continues to be constrained by zoning and environmental restrictions, particularly in areas regulated by the Adirondack Park Commission. In the more urban Capital District, where Price Chopper has the larger market share and Hannaford operates nine stores, Grand Union's competitors have opened several stores in the last two years. Victory Markets, Inc. (Great American) competes against the Company in a number of communities in the Hudson and Mohawk River Valleys.

In the Mid-Hudson Valley area of New York (16 stores), the Company estimates that it has the leading market share. Principal competitors are Big V Supermarkets Inc. (operating under the ShopRite name), Price Chopper and A&P.

A number of stores in the Northern Region (particularly in the Adirondack area and Vermont) are in resort areas and generally experience significant increases in sales in the summer months and in some cases during the winter ski season.

### New York Region

Grand Union currently operates 112 stores in its New York Region. The New York Region generated approximately $1.4 billion of sales for the 52 weeks ended April 2, 1994. Grand Union's primary New York Region marketing area comprises the more affluent suburban communities of central and northern New Jersey (45 stores), Westchester, Orange, Rockland, Dutchess and Putnam Counties in New York (the "Lower Hudson Valley") (29 stores), Long Island (17 stores) and Fairfield County, Connecticut (15 stores). The Company also has a limited presence in New York City (four stores) and Pennsylvania (two stores).

Within its primary New York Region marketing areas, the Company generally operates stores in mature, densely populated markets where it believes its below-market long-term leases generally provide it with a significant cost advantage over new supermarkets. These stores serve communities with demographics particularly well-suited for store formats emphasizing specialty departments. Accordingly, the sales mix in this region includes a larger percentage of higher margin perishable department items than in the Northern Region. In addition, the high population density as well as the geographic concentration of stores in the region provide substantial opportunities to achieve additional economies of scale, particularly in advertising and distribution.

2

Because the New York Region is a fragmented market with no single food retailer having a dominant market share, competition is market specific. In New Jersey, the Company competes primarily against Pathmark Stores, Inc. ("Pathmark"), A&P and various supermarkets supplied by the Wakefern ("ShopRite") and Twin County ("Foodtown") cooperatives. In the Lower Hudson Valley, the Company generally competes with A&P, Edwards Supermarkets, Inc. and ShopRite. On Long Island, the Company's principal competitors are A&P/Waldbaums, Pathmark, King Kullen Grocery Co., Inc. and Foodtown. Grand Union's main competitors in Fairfield County, Connecticut are the Stop & Shop Company and A&P.

**Capital Investment**

The Company's capital spending is primarily directed toward renovating and upgrading the existing Grand Union store base and opening replacement stores and incremental stores in existing marketing areas. Store renovations and replacements have resulted in an upgrade of the Company's merchandise mix and an improvement in store profitability with the expansion of specialty departments offering high quality, higher margin products. Since the recapitalization (the "Recapitalization") of Holdings and its subsidiaries which occurred on July 22, 1992 (see "Recent History — The Recapitalization" below), the Company has increased its rate of capital investment. Capital expenditures, including capitalized leases, other than real estate leases for the fiscal year ending April 2, 1994 were approximately $86 million.

**Distribution, Supply and Management Information Systems**

*Distribution.* Management believes that Grand Union's distribution system enhances its ability to offer consistently fresh and high quality dairy products, meats, baked goods, produce and frozen foods. Moreover, this system enables Grand Union to take advantage of cost saving, volume purchase opportunities.

Grand Union currently operates five distribution centers aggregating approximately 2.1 million square feet. In addition, Grand Union utilizes a frozen food distribution facility operated by a third party. Grand Union also leases space in three additional storage facilities and, from time to time, utilizes limited space in several other facilities.

The strategic location of the distribution centers makes it possible for Grand Union to make frequent shipments to stores, which reduces the amount of in-store stockroom space, thereby limiting nonproductive store inventories.

In September 1993, Grand Union entered into a program to consolidate the purchasing and distribution of health and beauty care products and general merchandise with Penn Traffic. Under this program, Grand Union purchases health and beauty care products for both Grand Union and Penn Traffic, and Penn Traffic purchases general merchandise for both Penn Traffic and Grand Union. Grand Union's general merchandise warehouse in Montgomery, New York is used to store and distribute general merchandise and health and beauty care products to Grand Union stores and to certain of Penn Traffic's stores and wholesale customers. Under the arrangement, Penn Traffic owns the inventory of general merchandise and health and beauty care products located at the Montgomery warehouse and shares the cost of operating the warehouse in an amount proportionate to Penn Traffic's usage of the facility. Grand Union expects that this program will improve the variety of general merchandise products offered to the consumer and will reduce product procurement costs for general merchandise and health and beauty care products.

*Management Information Systems.* Financial, distribution, purchasing and operating system requirements are supported through a central computer system located in Wayne, New Jersey. Grand Union currently utilizes scanning systems in 142 stores (representing approximately 73% of total sales) and intends to continue to invest in scanning and other store systems in the future.

*Suppliers.* Products sold, including private label products, are purchased through a large group of unaffiliated suppliers. Grand Union is not dependent upon any single supplier, and its grocery purchases are of a sufficient volume to qualify for minimum price brackets for most products sold.

*Commissary.* Grand Union operates a 20,000 square foot commissary located in Newburgh, New York in which high quality cooked meat products, salads and soups are prepared for sale in the Company's delicatessen departments.

3

## Employees

As of April 2, 1994, Grand Union had approximately 17,000 employees, of whom approximately 60% were employed on a part-time basis. Approximately 49% of Grand Union's employees are covered by collective bargaining agreements negotiated with 13 unions. Approximately 88% of the employees covered by these collective bargaining agreements are employed in store locations and approximately 12% are employed in distribution facilities. These contracts expire at various times through May 1998.

On May 29, 1993, Grand Union settled a labor dispute with United Food and Commercial Workers, Local 1262, which represents clerks working in 61 Grand Union stores located in northern New Jersey and in Orange County, New York, and Rockland County, New York. The expiration of Grand Union's contract on April 24, 1993, after an extension from the contract's original expiration date on April 10, 1993, resulted in work stoppages at some, and eventually all, of the 61 Grand Union stores involved during the period from May 7, 1993 through May 29, 1993, as well as work stoppages at 251 Foodtown, Pathmark and ShopRite stores whose employees are covered by identical collective bargaining agreements.  On June 17, 1993, a new four year agreement with Local 1262 was ratified by the approximately 3,600 members of Local 1262 employed by Grand Union and by the approximately 23,000 members of Local 1262 employed by Foodtown, Pathmark and ShopRite.

## Trade Names, Service Marks and Trademarks

Grand Union uses a variety of trade names, service marks and trademarks. Except for Grand Union®, Grand Union does not believe any of such trade names, service marks or trademarks is material to its business.

## Competition

The food retailing business is highly competitive. Grand Union competes with numerous national, regional and local chains, convenience stores, stores owned and operated and otherwise affiliated with large food wholesalers, unaffiliated independent food stores, warehouse clubs, discount drugstore chains and discount general merchandise chains. Some of Grand Union's competitors have greater financial resources than the Company and could use those resources to take steps which could adversely affect the Company's competitive position.

## Recent History

### October 1993 Acquisition

On October 18, 1993, Grand Union acquired five supermarket locations on Long Island from Foodarama Supermarkets, Inc. ("Foodarama") for consideration of approximately $16 million, plus the value of the inventory at the stores (approximately $2 million). The total gross square footage of these five stores is approximately 160,000 square feet. The acquisition was financed through the application of a portion of the proceeds of the sale to institutional investors of $50 million aggregate principal amount of 12¼% Senior Subordinated Notes due 2002, Series A (the "Series A Notes") on October 18, 1993.  Grand Union plans to renovate and enlarge certain of the acquired store locations.

### Sale of the Southern Region

On March 29, 1993, Grand Union sold 48 of its 51 Southern Region stores to A&P. The three Southern Region stores not sold to A&P were closed, and have been subleased. Grand Union received net cash proceeds of approximately $25 million and was relieved of approximately $4.5 million of capital lease obligations.

### The Recapitalization

On July 22, 1992, Holdings, Capital, a newly formed corporation, and Grand Union completed the Recapitalization. In connection with the Recapitalization, Grand Union entered into a new bank credit agreement (as amended from time to time, the "Bank Credit Agreement") providing for a $210 million term loan facility (the "Term Loan") and a $100 million revolving credit facility (the "Revolving Credit Facility"). Additionally, Grand Union issued $350 million principal amount of 11¼% Senior Notes due 2000 ( the "11¼% Senior Notes") and $500 million principal amount of 12¼% Senior Subordinated Notes due 2002 (the "12¼% Senior Subordinated Notes"). The Recapitalization also included the sale to institutional investors of $343 million principal amount of Capital 15% Series A Senior Zero Coupon Notes due 2004 (the "Senior Zero Coupon Notes"), $745 million principal amount of Capital 16.5% Series A Senior Subordinated Zero Coupon Notes due 2007 (the "Senior Subordinated Zero Coupon Notes") and warrants to purchase at a nominal price shares representing approximately 19.9% of the common stock of Holdings on a fully diluted basis for aggregate gross proceeds of approximately $200 million. The

Recapitalization also included the sale to institutional investors of approximately 28.4% of the common stock of Holdings on a fully diluted basis for approximately $25 million. The proceeds were used to retire substantially all of the debt of Holdings, GU Acquisition Corporation ("GUAC"), a wholly owned subsidiary of Holdings, and Grand Union as well as to repurchase the shares and an option to purchase shares owned by Salomon Brothers Holding Company Inc ("SBHC"), certain warrants held by the parties to the Company's bank credit agreements existing prior to the Recapitalization, and approximately 3.4% of the common stock of Holdings held by Grand Union management.

At the time of the Recapitalization, GUAC and its wholly-owned subsidiary Cavenham Holdings Inc., the former parent of Grand Union, were merged (the "Merger") into Grand Union. After the consummation of the Merger, Grand Union became a wholly owned subsidiary of Capital.

As of April 2, 1994, the ownership of Holdings on a fully diluted basis was as follows:

| | |
|---|---|
| GAC Holdings, Limited Partnership ("GAC Holdings") (an affiliate of Miller Tabak Hirsch + Co., a New York limited partnership ("MTH")) and its affiliates | 38.9% |
| Grand Union management | 12.7 |
| Various institutional investors (including Warrants to purchase at a nominal price approximately 19.9% of the common stock of Holdings on a fully diluted basis) | 48.4 |
| | 100.0% |

### Financial Information about Foreign and Domestic Operations and Export Sales

Grand Union has no significant foreign operations or export sales.

### Item 2. Properties

Grand Union conducts its operations primarily in leased stores, distribution centers and offices. The following table indicates the location and number of stores as of April 2, 1994.

| Locations | Number of Stores |
|---|---|
| Northern: | |
| Vermont | 40 |
| New York | 96 |
| New Hampshire | 5 |
| Massachusetts | 1 |
| New York: | |
| New York | 50 |
| New Jersey | 45 |
| Connecticut | 15 |
| Pennsylvania | 2 |
| Total | 254 |

As of April 2, 1994, Grand Union owns 15 and leases 239 of its store sites pursuant to commercial leases. Management believes that none of such leases is individually material to Grand Union. Most of these leases contain several renewal options. Twenty store leases which do not contain renewal options will expire over the next five years and management anticipates that it will be able to renegotiate favorable lease terms for most of these locations, if so desired.

Grand Union currently operates five distribution centers which are leased and a commissary, which is housed in a building owned by Grand Union on a ground-leased site in Newburgh, New York. Grand Union owns a 66,160 square foot site which is part of its Carlstadt, New Jersey Grocery Distribution Center and a 101,000 square foot facility in Waverly, New York. Grand Union's leased distribution centers each have approximately 30 years or more

remaining on the respective leases including options. See Note 9 to the Consolidated Financial Statements, Property Leases, for information on leases and annual rents.

## Item 3. Legal Proceedings

At the time of the acquisition of Grand Union by Holdings in July 1989, Grand Union and P&C Foods (then a subsidiary and currently a division of Penn Traffic, which is under common control with Grand Union) operated stores in some of the same geographic areas in Vermont and upstate New York. In order to satisfy the concerns of federal and state antitrust authorities arising therefrom in connection with the acquisition of Grand Union by Holdings, prior to consummation thereof (i) Grand Union, GUAC, MTH Holdings, Inc., a New York corporation ("MTH Holdings") and an affiliate of Miller Tabak Hirsch + Co., a New York limited partnership, and P&C Foods entered into an Assurance Pursuant to 9 Vermont Statutes Annotated Section 2459 and an Agreement to Hold Separate with the Attorney General of the State of Vermont and (ii) MTH Holdings and GUAC entered into an Agreement Containing Consent Order (the "Order") with the Bureau of Competition of the Federal Trade Commission ("FTC") and an Agreement to Hold Separate with Salomon Inc and the FTC (collectively, the "FTC Agreements").

The FTC Agreements required the divestiture by MTH Holdings and/or Grand Union (including in each case their respective subsidiaries and affiliates) of sixteen stores located in Vermont and upstate New York. Such divestitures were completed on July 30, 1990. Thirteen of the sixteen stores divested were P&C Foods stores and three of the sixteen stores divested were Grand Union stores. In a related transaction, Grand Union and P&C Foods entered into an operating agreement (the "Operating Agreement"), pursuant to which Grand Union acquired the right to operate P&C Foods' thirteen remaining stores in New England under the Grand Union name until July 2000, for an average annual rent of approximately $10.7 million with an option to extend the term of such operation for an additional five years. Grand Union paid P&C Foods $7.5 million for an option to purchase the stores at an amount defined in the Operating Agreement. Pursuant to the terms of the Operating Agreement, the Recapitalization triggered a $15 million prepayment obligation to P&C Foods.

The FTC Agreements also provide, among other things, that MTH Holdings and Grand Union (including in each case their respective subsidiaries and affiliates) shall not acquire, for a period of ten years, any retail grocery stores in Vermont and certain specified counties in New York without the prior approval of the FTC and (in the case of stores in Vermont) the Attorney General of the State of Vermont.

Soil and ground-water contamination has been detected at a shopping center owned by Grand Union which is located in Connecticut. The Company is investigating whether such contamination was caused by improper disposal of perchloroethylene wastes by a dry cleaner previously operating at this location or by an off-site source. Grand Union has undertaken, under approval by the Connecticut Department of Environmental Protection, a proposal for a remedial investigation designed to identify the sources of such soil and ground-water contamination and to determine the length, depth and breadth of the contamination on and off-site. Sampling analyses for the ground-water at the shopping center and for drinking water in private residences located in the immediately surrounding area confirm that the source of the on-site contamination, in part, is an off-site shopping center and a gasoline station located nearby. In May 1993, a Remedial Action and Investigation Report was submitted to the Connecticut Department of Environmental Protection on May 21, 1993. The Company is awaiting a response from the Connecticut Department of Environmental Protection.

The Company's potential responsibility does not arise from any aspect of its operation of a supermarket at the shopping center but from the actions of a former tenant. Any contamination caused on-site by a source located off-site would be the responsibility of another party. The Company believes that the current intention of the Connecticut Department of Environmental Protection is to seek reimbursement of past costs and clean up from some or all of these other parties. The Company is unable to determine the amount of its potential liability arising from the on-site contamination, but does not believe, based upon the results of investigations made to date, that the amount of potential liability is likely to be materially adverse to the Company's financial condition. Management presently estimates, based upon investigations made by the Company's environmental consultant to date, that such liability should not exceed $2 million. Investigations are continuing, and there can be no assurance that the amount of such liability will not exceed $2 million.

Grand Union is involved in various legal proceedings arising out of its business, none of which is expected to have a material effect upon its results of operations or financial position.

## Item 4. Submission of Matters to a Vote of Security Holders

No matter was submitted to a vote of security holders during the fourth quarter of the year covered by this Report on Form 10-K.

## PART II

## Item 5. Market for the Registrant's Common Equity and Related Stockholders Matters

### Market Information

The common stock of Grand Union is not publicly traded. See Item 12. Security Ownership of Certain Beneficial Owners and Management.

### Holders

The common stock of Grand Union is wholly owned by Capital.

### Dividends

There have been no cash dividends declared or paid during the three fiscal years ended April 2, 1994. The payment of dividends to holders of common stock of the Registrant is restricted by various debt agreements of Holdings and its subsidiaries.

## Item 6. Selected Financial Data

The data for the 16 weeks ended July 22, 1989 reflects the historical basis of GUAC prior to its acquisition by Holdings (predecessor basis). The data as of March 31, 1990 and for the 36 weeks then ended, as of March 30, 1991 and March 28, 1992 and for the 52 week periods then ended, as of April 3, 1993 and for the 53 weeks then ended and as of April 2, 1994 and for the 52 weeks then ended are derived from the consolidated financial statements of Holdings. This information should be read in conjunction with the historical financial statements of Holdings, including the notes thereto, included elsewhere herein.

| | GUAC (predecessor) 16 Weeks Ended July 22, 1989 | Holdings (successor) | | | | |
|---|---|---|---|---|---|---|
| | | 36 Weeks Ended March 31, 1990 | 52 Weeks Ended March 30, 1991 | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 |
| | | (dollars in millions except per share amounts) | | | | |
| **Statement of Operations:** | | | | | | |
| Sales | $903.0 | $2,013.2 | $2,996.6 | $2,968.5 | $2,834.0 | $2,477.3 |
| Gross profit | 224.4 | 514.7 | 784.5 | 818.1 | 801.5 | 711.0 |
| Operating and administrative expense | 176.7 | 397.2 | 603.6 | 619.9 | 606.2 | 531.8 |
| Depreciation and amortization | 13.5 | 52.0 | 76.9 | 78.7 | 80.6 | 78.6 |
| Charge relating to early retirement program | - | - | - | - | - | 4.5 |
| Loss on disposal of the Southern Region | - | - | - | - | 198.0 | - |
| Merger expense | 13.9 | 4.1 | - | - | - | - |
| Store closure expense | 13.9 | - | - | - | - | - |
| Recapitalization expense | - | - | - | - | 3.5 | - |
| Interest expense: | | | | | | |
| Debt | 28.3 | 95.0 | 145.6 | 141.7 | 151.9 | 164.0 |
| Capital lease obligations | 2.8 | 7.1 | 11.0 | 12.3 | 13.2 | 15.0 |
| Amortization of deferred financing fees | 0.5 | 2.9 | 7.4 | 18.0 | 9.4 | 4.8 |
| Loss before income taxes, extraordinary charges and cumulative effect of accounting change | 25.3 | 43.6 | 60.0 | 52.5 | 261.2 | 87.6 |
| Extraordinary charges | - | - | - | - | 47.7 | - |
| Cumulative effect of accounting change | - | - | - | - | - | 30.3 |
| Net loss | 16.7 | 37.1 | 71.0 | 65.1 | 313.4 | 118.0 |
| Net loss per share applicable to common stock | - | 595.53 | 1,100.49 | 1,038.79 | 4,359.45 | 1,780.06 |
| Ratio of earnings to fixed charges (1) | - | - | - | - | - | - |
| Deficiency in earnings available to cover fixed charges | 25.3 | 43.6 | 60.0 | 52.5 | 261.2 | 87.6 |
| **Balance Sheet Data:** | | | | | | |
| Total assets | (2) | $1,566.5 | $1,569.6 | $1,536.8 | $1,418.2 | $1,394.2 |
| Total debt and capital lease obligations | (2) | 1,180.0 | 1,223.8 | 1,251.1 | 1,402.5 | 1,532.2 |
| Redeemable stock | (2) | 106.4 | 117.0 | 128.9 | 139.8 | 154.7 |
| Nonredeemable stock and stockholders' deficit | (2) | 30.1 | 112.6 | 190.8 | 510.3 | 644.8 |
| **Operating and Other Data:** | | | | | | |
| EBITDA (3) | $49.6 | $120.4 | $185.8 | $196.3 | $196.7 | $180.1 |
| EBITDA as a percentage of sales | 5.5% | 6.0% | 6.2% | 6.6% | 6.9% | 7.3% |
| Capital expenditures(4) | $15.7 | $37.3 | $34.3 | $34.6 | $66.2 | $86.2 |
| LIFO provision | 1.9 | 2.8 | 4.9 | (1.9) | 1.4 | 0.9 |
| Number of stores at the end of the year | N/A | 301 | 307 | 304 | 250 | 254 |

(1) The ratio of earnings to fixed charges is computed by dividing (i) earnings before income taxes, extraordinary charges, the cumulative effect of accounting change and fixed charges by (ii) fixed charges. Fixed charges consist of total interest expense plus the estimated interest component of operating leases. No ratio is indicated where the ratio is less than one.

(2) Balance sheet data is not applicable at this date.

(3) Earnings before interest expense, depreciation, amortization, LIFO provision, charge relating to early retirement program, store closure expense, merger expense, recapitalization expense, loss on disposal of the Southern Region, extraordinary charges, cumulative effect of accounting change and income taxes.

(4) Includes capitalized leases other than real estate capitalized leases.

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

**Results of Operations**

The following table sets forth certain statement of operations data.

|  | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | Pro Forma 53 Weeks Ended April 3, 1993 (a) | 52 Weeks Ended April 2, 1994 |
|---|---|---|---|---|
|  | (dollars in millions) | | | |
| Sales | $2,968.5 | $2,834.0 | $2,562.8 | $2,477.3 |
| Gross profit | 818.1 | 801.5 | 730.1 | 711.0 |
| Operating and administrative expense | 619.9 | 606.2 | 542.1 | 531.8 |
| Depreciation and amortization | 78.7 | 80.6 | 71.7 | 78.6 |
| Charge relating to early retirement program | - | - | - | 4.5 |
| Loss on disposal of the Southern Region | - | 198.0 | - | - |
| Recapitalization expense | - | 3.5 | 3.5 | - |
| Interest expense | 172.0 | 174.5 | 173.8 | 183.8 |
| Income tax provision | 12.5 | 4.5 | 4.5 | - |
| Extraordinary charge | - | 47.7 | 47.7 | - |
| Cumulative effect of accounting change | - | - | - | 30.3 |
| Net loss | 65.1 | 313.4 | 113.1 | 118.0 |
| EBITDA | 196.3 | 196.7 | 189.5 | 180.1 |
| LIFO provision (income) | (1.9) | 1.4 | 1.4 | .9 |
| | | | | |
| Sales percentage increase (decrease): | | | | |
| Including Southern Region in prior year | (0.9)% | (4.5)% | N/A | (12.6)% |
| Excluding Southern Region in prior year | N/A | N/A | N/A | (3.3) |
| Gross profit as a percentage of sales | 27.6 | 28.3 | 28.5% | 28.7 |
| Operating and administrative expense as a percentage of sales | 20.9 | 21.4 | 21.2 | 21.5 |
| EBITDA as a percentage of sales | 6.6 | 6.9 | 7.4 | 7.3 |

(a)  Pro Forma without the Southern Region.

Comparison of results of operations for the 52 weeks ended April 2, 1994 ("Fiscal 1994"), the 53 weeks ended April 3, 1993 ("Fiscal 1993") and the 52 weeks ended March 28, 1992 ("Fiscal 1992") are impacted by the extra week in Fiscal 1993 and the inclusion of the operations of the Company's Southern Region (sold on March 29, 1993) for 40 weeks in Fiscal 1993 and 52 weeks in Fiscal 1992. The analysis and discussion of Fiscal 1994 as compared to Fiscal 1993 presented below compares Fiscal 1994 operations with the pro forma operations for Fiscal 1993, which has been prepared excluding the Southern Region. The analysis and discussion of Fiscal 1993 as compared to Fiscal 1992 presented below compares actual results for Fiscal 1993 (which includes the Southern Region for 40 weeks) to Fiscal 1992 (which includes the Southern Region for 52 weeks).

Sales for Fiscal 1994 decreased $85.5 million or 3.3% as compared to Fiscal 1993 and decreased 1.6% after adjusting for the extra week in Fiscal 1993. The sales decrease for Fiscal 1994 was attributable to continued unfavorable economic conditions, particularly in the Northern Region, new competitive store openings in the mid-Hudson Valley and Capital District areas of the Northern Region and low food price inflation, partially offset by the favorable impact of the acquisition of five supermarkets on Long Island (see Liquidity and Capital Resources) and the Company's expanded capital expenditure program which began after the recapitalization of Holdings in July 1992. Additionally, sales for Fiscal 1994 were impacted by a 22 day work stoppage, which ultimately affected sales in 61 Grand Union stores located in northern New Jersey and in Orange and Rockland Counties, New York.

Same store sales (sales of stores which were operated during the comparable periods of the two fiscal years), influenced by the same factors mentioned above, decreased 3.0% during Fiscal 1994 after adjusting for the 53rd week in Fiscal 1993. Beginning in Fiscal 1994, the Company has revised its method of calculating same store sales to include replacement stores. This method is used by many supermarket chains for comparing relative sales performance. Same store sales, excluding replacement stores and after adjusting for the 53rd week in Fiscal 1993, decreased 4.0% during Fiscal 1994. Same store sales for the first, second and third quarters of Fiscal 1994 were previously reported as decreases of 5.6%, 4.2% and 3.8%, respectively. Including replacement stores, same store sales decreased 4.8%, 3.3% and 2.7%, respectively. During Fiscal 1994, the Company opened nine new stores (including the five acquired stores on Long Island) and five replacement stores, enlarged or renovated 23 stores and closed 10 stores (including replaced stores).

Total selling square footage increased from 4.276 million as of April 3, 1993 to 4.532 million as of April 2, 1994 as a result of the Company's expanded capital expenditure program and the acquisition of the five Long Island stores. Average sales per selling square foot per week was $10.76 during Fiscal 1994 as compared to $11.23 during Fiscal 1993. The decrease is partially attributable to the same factors discussed above. Additionally, new and enlarged stores include more specialty departments and devote a greater percentage of selling space to general merchandise products, each of which typically produces lower sales per square foot.

Sales for Fiscal 1993 decreased $134.5 million or 4.5% compared to Fiscal 1992. During Fiscal 1993 sales performance was affected by continued unfavorable economic conditions, low food price inflation, the adverse summer weather conditions experienced in the northeastern resort areas, the announcement made in June 1992 that the Company was seeking offers to purchase its Southern Region stores and the exclusion of the sales and operating results of the Southern Region for the fourth quarter of Fiscal 1993. If the sales of the Southern Region had also been excluded from the fourth quarter of Fiscal 1992, total sales for Fiscal 1993 would have decreased 1.7% as compared to Fiscal 1992. Same store sales (including replacement stores) for Fiscal 1993, excluding the Southern Region, decreased 2.6% after adjusting for the 53rd week in Fiscal 1993, as compared to Fiscal 1992. During Fiscal 1993, the Company opened two new and two replacement stores, enlarged or renovated 12 stores, closed seven stores (including replaced stores) and sold or subleased 51 stores in connection with the disposal of the Southern Region.

Total selling square footage in the Company's ongoing operations (not including the 51 Southern Region stores) increased from 4.213 million as of March 28, 1992 to 4.276 million as of April 3, 1993 as a result of the Company's capital expenditure program in which two new and two replacement stores were opened, 12 stores were enlarged or renovated and seven stores were closed. Average sales per selling square foot per week was $11.23 during Fiscal 1993 compared to $11.69 during Fiscal 1992. This decrease is attributable to the same factors that affected total sales in the ongoing operations: continued unfavorable economic conditions, low food price inflation and the adverse summer weather conditions experienced in the northeastern resort areas. Additionally, new and enlarged stores include more service departments and devote a greater percentage of selling space to general merchandise products, each of which typically produces lower sales per square foot.

The increase in gross profit, as a percentage of sales, for Fiscal 1994 resulted from reduced grocery product procurement costs and a greater proportion of higher margin produce and general merchandise sales, partially offset by lower health and beauty care pricing for the entire year. As discussed in Note 15 to the financial statements included elsewhere herein, gross profit was reduced by $4.5 million in Fiscal 1994 due to the effect of promotional allowance adjustments.

The increase in gross profit in Fiscal 1993, as a percentage of sales, resulted primarily from increased promotional allowance income and a greater proportion of higher margin produce and general merchandise sales, partially offset by a reduction in health and beauty care pricing in certain trade areas and a LIFO charge in Fiscal 1993 compared to a credit in Fiscal 1992.

The increase in operating and administrative expenses, as a percentage of sales, in Fiscal 1994 resulted primarily from increases, as a percentage of sales, in store labor and fringe benefits, occupancy expense and utilities expense principally resulting from the decline in sales. In addition, the reduced sales which resulted from the work stoppage which occurred in May 1993 had a negative impact on operating and administrative expense

10

as a percentage of sales. The increase in operating and administrative expense for Fiscal 1994 was partially offset by a $3.8 million credit to operating and administrative expense resulting from a reduction of the Company's self insurance reserves.

The increase in operating and administrative expense, as a percentage of sales, in Fiscal 1993 resulted primarily from increases, as a percentage of sales, in store labor and fringe benefits, store advertising and promotion and store occupancy costs.

Depreciation and amortization was $78.6 million for the 52 weeks ended April 2, 1994 compared to $71.7 million for the 53 weeks ended April 3, 1993. The increase was attributable to the Company's expanded capital expenditure program which began after the Recapitalization in July 1992.

During Fiscal 1994, the Company incurred a $4.5 million charge relating to an early retirement plan offered to certain employees.

During Fiscal 1993, the Company recognized a loss of $198 million relating to the disposal of the Southern Region. The loss is comprised of 1) write-off of goodwill and beneficial leases of $106.4 million, 2) difference between proceeds received and the book value of tangible assets of $37.3 million, 3) reserve for remaining Southern Region real estate of $26.9 million, 4) employee termination expenses of $9.8 million, 5) operating loss of the Southern Region subsequent to the date the decision was made to sell the region of $7.0 million and 6) other miscellaneous items of $10.6 million.

Interest expense increased $10.0 million in Fiscal 1994 and $2.5 million in Fiscal 1993. The Fiscal 1994 increase was primarily due to the increased level of debt outstanding, partially offset by the decrease in amortization of loan placement fees. The Fiscal 1993 increase was primarily due to the extra week included in Fiscal 1993 and the increased level of debt incurred as a result of the Recapitalization in July 1992 (see "Liquidity and Capital Resources"), partially offset by a decrease in the Company's average borrowing rate and the decrease in amortization of loan placement fees.

There was no income tax provision for Fiscal 1994 as a result of the Recapitalization. The income tax provision for Fiscal 1993 represents state income taxes. The Company adopted Statement of Financial Accounting Standards No. 109, "Accounting For Income Taxes" ("FAS No. 109"), during Fiscal 1993. The adoption of FAS No. 109 had no effect on the Consolidated Statement of Operations.

During Fiscal 1994, the Company recorded a $30.3 million charge as the cumulative effect of an accounting change relating to the adoption of Statement of Financial Accounting Standards No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions". This charge represents the portion of future retiree benefit costs related to service already rendered by both active and retired employees up to the date of adoption.

During Fiscal 1993, Holdings recorded a $3.5 million charge relating to expenses incurred in connection with the Recapitalization and extraordinary charges totaling $47.7 million relating to the early retirement of debt.

EBITDA was $180.1 million or 7.3% of sales for the 52 weeks ended April 2, 1994, compared to $189.5 million or 7.4% of sales for the 53 weeks ended April 3, 1993. The Company estimates that the 22 day work stoppage in May 1993 had the effect of reducing Fiscal 1994 EBITDA by approximately $8.0 million as a result of lost sales, product losses and other costs associated with the work stoppage.

In general, the Company has not experienced significant inflationary cost increases during the periods covered by this report.

**Liquidity and Capital Resources**

Resources used to finance significant expenditures for the three fiscal years ended April 2, 1994 are reflected in the following table:

|  | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 |
|---|---|---|---|
|  |  | (in millions) |  |
| Resources used: |  |  |  |
| Capital expenditures | $29.3 | $58.1 | 81.0 |
| Debt repayment | 66.5 | 1,358.4 | 8.7 |
| Loan placement fees | 5.3 | 63.6 | 1.8 |
| Purchase of redeemable Class A common stock | - | - | .2 |
| Premiums on debt repayment | - | 24.1 | - |
| Prepayment under P&C Foods operating agreement | - | 15.0 | - |
|  | $101.1 | $1,519.2 | $91.7 |
| Financed by: |  |  |  |
| Debt incurred | $15.6 | $1,443.4 | $77.7 |
| Operating activities, including cash and temporary cash investments | 80.0 | 31.2 | 13.4 |
| Property disposals | 4.8 | 1.4 | .6 |
| Proceeds relating to the sale of the fixed assets of the Southern Region | - | 25.0 | - |
| Refunded insurance deposits | 0.7 | 11.6 | - |
| Capital contribution | - | 5.0 | - |
| Proceeds from issuance of warrants | - | 1.2 | - |
| Proceeds from the issuance of common stock | - | 0.4 | - |
|  | $101.1 | $1,519.2 | $91.7 |

During Fiscal 1994, the cash requirements listed above were principally obtained from borrowings and from cash provided by operating activities. The borrowings included proceeds from the sale of $50 million principal amount of Series A Notes and $25 million borrowed under the Revolving Credit Facility. Debt repayment for Fiscal 1994 and Fiscal 1993, other than the debt refinanced as part of the Recapitalization, consisted of scheduled repayments of capital leases and various mortgages.

During Fiscal 1993, Holdings completed a Recapitalization, as discussed below, which included the refinancing of substantially all of its debt and the purchase of certain common stock and warrants to purchase common stock. As a result of the Recapitalization, a prepayment of rent under the P&C Foods Operating Agreement was required and certain cash insurance deposits were refunded. Cash from operating activities during Fiscal 1993 compared to Fiscal 1992 decreased primarily due to the increase in cash interest expense during Fiscal 1993 and an increase in net working capital investment for the Company's ongoing operations.

In connection with the Recapitalization completed on July 22, 1992, Grand Union entered into a new Bank Credit Agreement providing for a $210 million Term Loan consisting of the A Term Loan and B Term Loan and a $100 million Revolving Credit Facility. Additionally, Grand Union issued $350 million of 11¼% Senior Notes and $500 million of 12¼% Senior Subordinated Notes. The Recapitalization also included the sale to institutional investors of $343 million principal amount of Senior Zero Coupon Notes, $745 million principal amount of Senior Subordinated Zero Coupon Notes and warrants to purchase at a nominal price shares representing approximately 19.9% of the common stock of Holdings on a fully diluted basis for aggregate gross proceeds of approximately $200 million. The Recapitalization also included the sale to institutional investors of approximately 28.4% of the common stock of Holdings on a fully diluted basis for approximately $25 million. The proceeds were used to retire substantially all of the debt of Holdings, GUAC and Grand Union as well as to repurchase the shares and an option to purchase shares owned by SBHC, certain warrants held by the parties to the Company's bank credit agreements existing prior to the Recapitalization, and approximately 3.4% of the common stock of Holdings held by Grand Union management.

On March 29, 1993, Grand Union sold 48 of its 51 Southern Region stores to A&P. The three Southern Region stores not sold to A&P were closed and subsequently subleased. Grand Union received net cash proceeds of approximately $25 million and was relieved of approximately $4.5 million of capital lease obligations. The Company recognized a loss of $198 million on the disposal of the Southern Region.

On January 28, 1993, Grand Union sold $175 million principal amount of 11 3/8% Senior Notes due 2000 (the "11 3/8% Senior Notes") in a private placement. Net proceeds of the sale of the 11 3/8% Senior Notes were used to repay $142 million of indebtedness under the Term Loan and the remainder was used to repay indebtedness under the Revolving Credit Facility. An additional $20.9 million of the Term Loan was repaid from the proceeds of the sale of the Southern Region on March 29, 1993. All of such repaid indebtedness under the Term Loan and under the Revolving Credit Facility had been incurred in connection with the Recapitalization.

At April 2, 1994, there was $25.0 million of borrowings outstanding under the Company's $100 million revolving credit facility and $32.4 million was available for additional borrowings or letters of credit. Maturities of long-term debt during each of the next five fiscal years are approximately $.9 million, $1.0 million, $1.1 million, $45.5 million and $217.9 million, respectively.

In May 1993, Grand Union experienced a work stoppage by United Food and Commercial Workers, Local 1262, which ultimately affected 61 Grand Union stores located in northern New Jersey and in Orange and Rockland Counties, New York. The Company estimates that its Fiscal 1994 EBITDA was reduced by approximately $8 million as a result of the work stoppage. On June 28, 1993, the Company and the banks party to the bank credit agreement entered into an amendment which provided that certain financial covenants for periods through April 2, 1994 were calculated excluding the impact of costs, expenses and lost revenue of up to $8 million resulting from the May 1993 work stoppage. After giving effect to this amendment, the Company was in compliance with the terms and restrictive covenants of its debt obligations for Fiscal 1994.

On October 18, 1993, Grand Union acquired five supermarket locations on Long Island from Foodarama for consideration of approximately $16.1 million, plus the value of the inventory at the stores (approximately $2 million). The total gross square footage of these five stores is approximately 160,000 square feet. The acquisition was financed through the application of a portion of the proceeds of the sale to institutional investors of the Series A Notes on October 18, 1993. Grand Union plans to renovate and enlarge certain of the acquired store locations.

During Fiscal 1994, the Company opened nine new stores (including the five acquired stores on Long Island) and five replacement stores, and completed the remodeling of 23 stores. Capital expenditures for Fiscal 1994, including capitalized leases other than real estate capitalized leases, were approximately $86 million (including expenditures related to the acquisition). Capital expenditures, including capitalized leases other than real estate capitalized leases, for the year ending April 1, 1995 are expected to be approximately $70 million. Capital expenditures will be principally for new stores, replacement stores, remodeled stores and expansions. The Company plans to finance capital expenditures and scheduled debt repayments primarily through cash provided by operations. The Company will finance a limited amount of capital expenditures through purchase money mortgages and equipment leases.

**Goodwill**

Management periodically reassesses the appropriateness of both the carrying value and remaining life of goodwill, principally based on forecasts of operating cash flow less significant anticipated cash requirements such as capital expenditures and debt repayments. Additionally, the Company considers other factors such as its anticipated ability to access capital markets in the future. The recoverability of goodwill is at risk to the extent the Company is unable to achieve its forecast assumptions regarding sales growth and operating cash flow, or to the extent the Company is unable to continue to access capital markets. Management believes, at this time, that the goodwill carrying value and useful life continue to be appropriate.

**Impact of New Accounting Standards**

In November 1992, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 112, "Employers' Accounting for Postemployment Benefits" ("FAS No. 112"). This new statement is effective for fiscal years beginning after December 15, 1993 and requires an accrual for certain benefits paid to

former or inactive employees after employment but before retirement. The Company does not believe that the adoption of FAS No. 112 will have a material impact on the Company's results of operations or financial position.

### Item 8. Financial Statements and Supplementary Data

**Index to Financial Statements:**

| | |
|---|---|
| Report of Independent Accountants | F-1 |
| Consolidated Statement of Operations for the 52 weeks ended March 28, 1992, the 53 weeks ended April 3, 1993 and the 52 weeks ended April 2, 1994 | F-2 |
| Consolidated Balance Sheet at April 3, 1993 and April 2, 1994 | F-3 |
| Consolidated Statement of Cash Flows for the 52 weeks ended March 28, 1992, the 53 weeks ended April 3, 1993 and the 52 weeks ended April 2, 1994 | F-4 |
| Notes to Consolidated Financial Statements | F-5 |

**Financial Statement Schedules:**

For the three years ended April 2, 1994

| | |
|---|---|
| Schedule II - Amounts Receivable From Related Parties and Underwriters, Promoters and Employees Other Than Related Parties | F-23 |
| Schedule III - Condensed Financial Information of Registrant | F-24 |
| Schedule IV - Indebtedness to Related Parties - Noncurrent | F-27 |
| Schedule V - Property, Plant & Equipment | F-28 |
| Schedule VI - Accumulated Depreciation, Depletion & Amortization of Property, Plant & Equipment | F-29 |

All other schedules are omitted because they are not applicable or the required information is shown in the consolidated financial statements or notes thereto.

The financial statements and related notes of Grand Union have not been separately presented herein since such financial statements reflect the accounts of Holdings pushed down to the accounts of Grand Union, and consequently are substantially identical to the financial statements of Holdings.

### Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None

## PART III

### Item 10. Directors and Executive Officers of the Registrant

**Directors and Executive Officers:**

The names, ages and present principal occupations of the directors and executive officers of Grand Union are as set forth below.

| Name | Age | Positions |
|---|---|---|
| Gary D. Hirsch | 44 | Director and Chairman. |
| Joseph J. McCaig | 49 | Director, President and Chief Executive Officer |
| William A. Louttit | 48 | Director, Executive Vice President and Chief Operating Officer |
| Robert Terrence Galvin | 51 | Director, Senior Vice President, Chief Financial Officer, Secretary |
| Darrell W. Stine | 56 | Senior Vice President - New York Region |
| Martin A. Fox | 41 | Director, Vice President and Assistant Secretary |
| Charles J. Barrett | 54 | Senior Vice President - Personnel |