**Mr. Hirsch** has been Chairman and a Director of Holdings since July 1989 and was President and Treasurer of Holdings from July 1989 until May 1993. Mr. Hirsch became Chairman and a Director of Capital in May 1992, was President of Capital from May 1992 until May 1993 and Treasurer of Capital from July 1992 until May 1993. Mr. Hirsch became Chairman and a Director of Grand Union in July 1992. Mr. Hirsch has been a general partner of the managing partner of MTH (broker-dealer) since March 1982 and Managing Director of MTH Holdings since November 1983. Mr. Hirsch was elected a Director and Chairman of Penn Traffic in 1987.

**Mr. McCaig** became Chief Executive Officer of Grand Union in July 1989 and was appointed President, Chief Operating Officer and a Director of Grand Union prior to 1983. Mr. McCaig has been employed by Grand Union for 30 years. Mr. McCaig became a Director of Holdings in July 1989, a Director of Capital in July 1992, and a Director of Penn Traffic in September 1992. Mr. McCaig became President of Holdings and Capital in May 1993.

**Mr. Louttit** has been Executive Vice President and Chief Operating Officer of Grand Union since 1989 and has been a Director since 1981. He joined Grand Union in 1964, serving in a variety of positions before being elected a Corporate Vice President in 1980. He was named Executive Vice President in charge of Merchandising in 1984 and was promoted to Chief Operating Officer in 1989.

**Mr. Galvin** was appointed Senior Vice President, Chief Financial Officer, Secretary and a Director of Grand Union in 1986.

**Mr. Stine** was elected a Senior Vice President of Grand Union in 1988. He joined Grand Union in 1954 and was named a Corporate Vice President with responsibility for the Company's New York Region in 1985.

**Mr. Fox** became a Director, Vice President and Secretary of Capital in May 1992 and Treasurer of Capital in May 1993. Mr. Fox was appointed as Vice President, Assistant Secretary and a Director of Grand Union and as Vice President, Secretary and a Director of Holdings in July 1992. Mr. Fox became Treasurer of Holdings in May 1993. Mr. Fox has been Executive Vice President of MTH from March 1988 to the present. Mr. Fox became Vice Chairman - Finance and a Director of Penn Traffic in February 1993 and Assistant Secretary in 1989. Mr. Fox had been a Vice President of Penn Traffic since 1989.

**Mr. Barrett** has been Senior Vice President of Personnel of Grand Union since 1989. He joined Grand Union in 1961, serving in a variety of functions until being elected a Corporate Vice President in 1984.

Mr. Hirsch is Chairman and a Director, Mr. McCaig is President and a Director and Mr. Fox is Vice President, Secretary, Treasurer and a Director of Capital. Mr. Hirsch is Chairman and a Director, Mr. McCaig is President and a Director, Mr. Fox is Vice President, Secretary, Treasurer and a Director, and Claude J. Incaudo is a Director of Holdings. Mr. Incaudo (age 60) has been a Director since 1988 and President and Chief Executive Officer of Penn Traffic since February 1990. Mr. Incaudo has been the President of P&C Foods, a division of Penn Traffic or its predecessors, since 1982. Mr. Incaudo joined P&C Foods in 1977 as Director of Store Operations and became Senior Vice President of Store Operations in 1979.

Executive officers of each of Holdings, Capital and Grand Union are appointed and serve at the discretion of the Board of Directors. Each director of Holdings, Capital and Grand Union is elected for a period of one year and serves until his successor is duly elected and qualified.

## Item 11. Executive Compensation

See "Certain Transactions" for a description of the agreement pursuant to which MTH provides financial consulting and business management services to Holdings and to its subsidiaries. Mr. Hirsch is a general partner of the managing partner of MTH and Mr. Fox is an executive officer of MTH.

The following table sets forth the compensation paid or accrued by Grand Union to each of the six most highly-compensated executive officers of the Company for services rendered to the Company in all capacities during the three fiscal years ended April 2, 1994. Officers of Holdings and Capital are not compensated for their services

as such. The Company made no grants of stock options or stock appreciation rights in Fiscal 1994 nor did the Company make any awards in Fiscal 1994 under any long-term incentive plan.

## SUMMARY COMPENSATION TABLE

| | Fiscal Year | Salary ($) | Bonus ($) | Other Annual Compensation ($) (1) | All Other Compensation ($) (2) |
|---|---|---|---|---|---|
| Joseph J. McCaig | 1994 | 523,712 | 120,140 | - | 30,109 |
| Chief Executive Officer, | 1993 | 518,077 | 133,707 | - | 27,076 |
| President and Director | 1992 | 493,269 | 125,642 | - | - |
| William A. Louttit | 1994 | 349,731 | 65,943 | - | 14,038 |
| Executive Vice President, Chief | 1993 | 345,385 | 85,932 | - | 7,479 |
| Operating Officer and Director | 1992 | 328,846 | 76,736 | - | - |
| Darrell W. Stine | 1994 | 251,134 | 45,460 | - | 14,535 |
| Senior Vice President - | 1993 | 248,336 | 63,334 | - | 12,193 |
| New York Region | 1992 | 236,192 | 51,218 | - | - |
| Robert J. Saba (3) | 1994 | 226,903 | 72,511 | - | 14,592 |
| Senior Vice President - | 1993 | 248,336 | 105,813 | - | 14,334 |
| Northern Region | 1992 | 236,192 | 104,497 | - | - |
| Robert Terrence Galvin | 1994 | 245,635 | 46,676 | - | 9,687 |
| Senior Vice President, Chief Financial | 1993 | 242,789 | 59,578 | - | 8,551 |
| Officer, Secretary and Director | 1992 | 231,192 | 50,175 | - | - |
| Brooke D. Lennon (4) | 1994 | 186,000 | 35,130 | - | 15,982 |
| Senior Vice President - Merchandising | 1993 | 169,177 | 41,398 | - | 13,250 |
| | 1992 | 159,158 | 39,579 | - | - |

(1) No information is provided in the "Other Annual Compensation" column since the aggregate amount of perquisites and other personal benefits in respect of each of Fiscal 1994 and Fiscal 1993 is less than the lower of $50,000 and 10% of the total annual salary and bonus reported for each of the named officers and no other compensation of the type required to be described in the "Other Annual Compensation" column was paid in Fiscal 1994 or Fiscal 1993. Pursuant to Securities and Exchange Commission rules, disclosure of "Other Annual Compensation" is required only for amounts earned in Fiscal 1994 and Fiscal 1993.

(2) "All Other Compensation" includes the following: (i) contributions to the Company's Savings Plan under Section 401(k) made by the Company in Fiscal 1994 and Fiscal 1993, respectively, for each of the named executive officers as follows: Mr. McCaig $2,964 and $1,928; Mr. Louttit $2,331 and $0; Mr. Stine $2,313 and $2,136; Mr. Saba $2,278 and $2,157; Mr. Galvin $2,470 and $2,128; and Mr. Lennon $2,106 and $2,359, and (ii) premium payments for term life insurance made by the Company in Fiscal 1994 and Fiscal 1993, respectively, for each of the named executive officers as follows: Mr. McCaig $27,145 and $25,148; Mr. Louttit $11,707 and $7,479; Mr. Stine $12,222 and $10,057; Mr. Saba $12,314 and $12,177; Mr. Galvin $7,217 and $6,423; and Mr. Lennon $13,876 and $10,891. Pursuant to Securities and Exchange Commission rules, disclosure of "All Other Compensation" is required only for amounts earned in Fiscal 1994 and Fiscal 1993.

(3) Mr. Saba retired on February 1, 1994.

(4) Mr. Lennon held the position of Senior Vice President - Merchandising until his death in June 1994.

### The Grand Union Company Employees' Retirement Plan

Grand Union maintains and makes cash contributions to The Grand Union Company Employees' Retirement Plan (the "Retirement Plan"), a qualified retirement plan, for retirement benefits for its salaried and hourly non-union employees, union employees not covered by other pension plans, and all its officers. Under the Retirement Plan, a participant's benefit, paid in the form of a single life annuity at age 65, is generally (a) 1.5% of his "highest annual

compensation" multiplied by years of service not in excess of 35 minus (b) 1.5% of primary social security benefit multiplied by years of service not in excess of 35. Grand Union intends to amend the Retirement Plan to take into account recently issued regulations regarding the integration of plan benefits with social security, to limit the amount of compensation that can be taken into account under the Retirement Plan to $200,000 per year and to incorporate other nonsubstantive amendments. Grand Union anticipates that such amendments will not have a material adverse effect on the financial condition of the Company. However, the limit on compensation that can be taken into account under the Retirement Plan could limit future benefit accruals under the Retirement Plan and, consequently, could increase benefits payable under the Supplemental Retirement Program for Key Executives discussed below.

The Code places certain limits on pension benefits which may be paid under plans qualified under the Code. The current limit of such pension benefit is $118,800 per annum.

### Supplemental Retirement Program for Key Executives

Grand Union maintains The Grand Union Company Supplemental Retirement Program for Key Executives (the "Supplemental Plan"), a non-qualified pension plan pursuant to which certain key employees of Grand Union and its affiliates ("Participants"), including Messrs. McCaig, Louttit, Stine, Saba and Galvin, earn a pension in addition to the pension benefit to which they are entitled under the Retirement Plan. The pension benefit under the Supplemental Plan is calculated as an annual pension payable monthly (i) if the Participant is not married on his retirement date, for the Participant's life, or (ii) if the Participant is married on his retirement date, the same amount as described in clause (i) for the duration of the Participant's life and thereafter 50% of such amount for the duration of the life of the Participant's surviving spouse. The amount of the annual pension payable upon retirement at age 62 or later is determined as the "target benefit" minus the "plan offsets". The "target benefit" is an annual pension equal to (i) for a Participant having at least 15 years of credited service under the Plan, 65% of the Participant's final year's base salary, or (ii) for a Participant having less than 15 years of credited service under the Plan, the product of 4-1/3% of the Participant's final year's base salary multiplied by the Participant's number of years of credited service under the Plan. "Plan offsets" for Participants retiring at age 62 are equal to the sum of the Participant's (i) primary Social Security benefits payable at the later of age 62 or the Participant's actual retirement age, (ii) benefits under the Retirement Plan payable at the later of age 62 or the Participant's actual retirement age in the form of a single life annuity, and (iii) benefits, if any, payable from qualified retirement plan(s) of the Participant's previous employer(s). Participants may also retire early (i) at or after attaining age 50 but prior to attaining age 55, with the consent of Grand Union (the consent requirement is waived if the Participant becomes disabled or is involuntarily terminated other than for cause), or (ii) at or after age 55, without any requirement for consent by Grand Union. For Participants who retire early, the "target benefit" is reduced by 5% per year for each year the Participant is under age 62. Plan benefits are payable in an actuarially determined single sum no later than 30 days following the Participant's date of retirement or other termination of employment. In general, no Plan benefits will be paid to a Participant whose employment with Grand Union terminates prior to the Participant's attaining age 50.

In August 1993, in consideration of non-competition and confidentiality agreements entered into by certain executives of Grand Union, including Messrs. McCaig, Louttit, Stine, Saba and Galvin, Grand Union agreed to transfer to a custodial account to be held by an independent custodian securities having a value of approximately $4.45 million, which amount approximates the benefits payable to the specified executives under the Supplemental Retirement Plan (plus a reserve of $225,000 for claims and expenses of the custodian). Such securities are to be transferred to the custodian over a four-year period, except that in the event of a "change in control" of Grand Union (as defined in the non-competition and confidentiality agreements), all such securities not previously transferred to the custodian must be transferred to the custodian. The securities are distributable to the specified executives only if Grand Union enters bankruptcy while the executives are still in the employ of Grand Union, and the value of any securities distributed to each executive reduces the amount payable to the executive pursuant to the Supplemental Plan. If an executive terminates his employment with Grand Union for any reason whatsoever prior to that event, including his retirement or death, the securities held by the custodian for his benefit are forfeited to Grand Union.

The table below shows, on a combined basis for the Supplemental Plan and the Retirement Plan, the estimated annual benefit payable upon retirement to specified compensation and years of service classifications up to the maximum of 15 years of service. The credited years of service under these Plans for Messrs. McCaig, Louttit, Stine, Saba and Galvin are 20 years, 18 years, 26 years, 29 years and 8 years, respectively. The current compensation

set forth in the Summary Compensation Table does not differ substantially from covered compensation under these Plans. The retirement benefits shown are based upon retirement at age 62 and the payment of a single-life annuity to the employee. The benefits shown do not reflect any offset as a result of primary Social Security benefits.

| Final Average Compensation | Years of Service | | |
|---|---|---|---|
| | 5 | 10 | 15 or more |
| $100,000 | $21,667 | $43,333 | $65,000 |
| 150,000 | 32,500 | 65,000 | 97,500 |
| 200,000 | 43,333 | 86,667 | 130,000 |
| 250,000 | 54,167 | 108,333 | 162,500 |
| 300,000 | 65,000 | 130,000 | 195,000 |
| 350,000 | 75,833 | 151,667 | 227,500 |
| 400,000 | 86,667 | 173,333 | 260,000 |
| 450,000 | 97,500 | 195,000 | 292,500 |
| 500,000 | 108,333 | 216,667 | 325,000 |
| 550,000 | 119,167 | 238,333 | 357,500 |
| 600,000 | 130,000 | 260,000 | 390,000 |

**Compensation Committee Interlocks and Insider Participation**

The Board of Directors of Grand Union, consisting of Messrs. Hirsch, McCaig, Fox, Louttit and Galvin, has no separate compensation committee, and compensation decisions are considered by the entire Board of Directors, subject to final approval by the Board of Directors of Holdings. Mr. McCaig is President and Chief Executive Officer of Grand Union, President and a director of Capital and President and a director of Holdings, Mr. Louttit is Executive Vice President and Chief Operating Officer of Grand Union and Mr. Galvin is Senior Vice President, Chief Financial Officer and Secretary of Grand Union. Mr. McCaig does not participate in deliberations of the Grand Union or Holdings Boards of Directors regarding his own compensation as an executive officer of Grand Union, and neither Mr. Louttit nor Mr. Galvin participates in deliberations of the Grand Union Board of Directors regarding his own compensation.

Mr. Hirsch, who is Chairman and a director of Grand Union, Chairman and a director of Capital and Chairman and a director of Holdings, is Chairman and a director of Penn Traffic. Mr. Fox, who is a director, Vice President and Assistant Secretary of Grand Union, a director, Vice President, Secretary and Treasurer of Capital, and a director, Vice President, Secretary and Treasurer of Holdings, is Vice Chairman - Finance and a director of Penn Traffic. Messrs. Hirsch and Fox did not receive salaries from Penn Traffic and do not participate in cash bonus plans of Penn Traffic, and receive no compensation in their capacities as executive officers of Grand Union, Capital and Holdings. As described below, Messrs. Hirsch and Fox receive compensation from MTH. Penn Traffic has engaged MTH as a financial advisor and investment banker for a term ending in January 1995. Mr. McCaig is a member of the Board of Directors of Penn Traffic, for which he receives compensation of $10,000 per annum and $1,000 per Board meeting attended. Mr. Incaudo, a director of Holdings, is a director, President and Chief Executive Officer of Penn Traffic.

The directors and officers of Holdings and Capital, and the directors of Grand Union, are not compensated for their services as such. Directors of Holdings, Capital and Grand Union receive reimbursement of reasonable expenses incidental to attendance at meetings of the Board of Directors and all committees.

Messrs. Hirsch and Fox receive compensation from MTH. Mr. Hirsch is a general partner of the managing partner of MTH, and Mr. Fox is Executive Vice President of MTH. As described below, Grand Union has engaged MTH as a financial advisor for a term ending in July 1997.

MTH has entered into a financial advisory agreement for a term ending in July 1997 under which MTH provides certain financial consulting and business management services to Holdings and its subsidiaries. During the period from July 1989 through July 1992, MTH received an annual fee of $600,000 for its services performed under this agreement. In connection with the Recapitalization, the agreement was amended to provide for an annual fee of

$900,000 after a reevaluation of the nature and extent of the services that have been provided by MTH from the inception of the agreement.

In July 1992, Mr. McCaig became indebted to Holdings in the amount of $227,676, equal to income taxes incurred by him as a result of receipt of additional shares of Holdings common stock at the time of the Recapitalization. Such indebtedness is evidenced by a promissory note with a maturity of seven years, bearing no interest unless Mr. McCaig should leave the Company's employ, and is secured by, and with recourse limited to, the shares received.

As compensation for his services in connection with the acquisition of the Company by Holdings in 1989, Mr. Hirsch received an option to purchase shares of Holdings common stock. In connection with the Recapitalization, Mr. Hirsch transferred such option and a note payable to Holdings in the amount of approximately $3.6 million to a disbursement escrow account established for the purpose of effecting various transfers of interest in Holdings common stock (the "Equity Escrow") in exchange for 8,229 shares of Holdings common stock. The note payable to Holdings has a maturity of 10 years, provides for interest equal to any cash dividends paid on the 8,229 shares of Holdings common stock and is secured by, and with recourse limited to, the 8,229 shares of Holdings common stock and any property (other than cash) distributed on or with respect to such shares.

**Limitation of Directors' Liabilities**

Section 102 of the Delaware General Corporation Law allows a corporation to eliminate the personal liability of directors of a corporation to the corporation or to any of its stockholders for monetary damages for a breach of fiduciary duty as a director, except in the case where the director breached his duty of loyalty, failed to act in good faith, engaged in intentional misconduct or knowingly violated a law, authorized the payment of a dividend or approved a stock repurchase in violation of the Delaware General Corporation Law or obtained an improper personal benefit. Under Holdings' Certificate of Incorporation, a director of Holdings shall not be liable to Holdings or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the General Corporation Law of Delaware.

**Item 12. Security Ownership of Certain Beneficial Owners and Management**

As of the date of this Report, 48,505 shares of Holdings voting Class A Common Stock, par value $.01 per share, are outstanding. As of the date of this Report, Warrants to purchase 18,750 shares of Holdings' Class A Common Stock at an exercise price of $.01 per Warrant and 26,719 shares of non-voting Class B Common Stock are also outstanding. The information in the table below presents the beneficial ownership of (i) each person known by Holdings to own beneficially more than five percent of the outstanding voting common stock of Holdings, (ii) each director of Holdings and (iii) all directors and officers of Holdings as a group.

There are 801.5 shares of common stock, $50,000 par value per share, of Grand Union outstanding, all of which outstanding shares of common stock are beneficially owned by Capital, and 1,000 shares of common stock, $1.00 par value per share, of Capital are currently outstanding, all of which are beneficially owned by Holdings. Holdings has sole voting and investment power with respect to all shares of common stock of Capital and Capital has sole voting and investment power with respect to all shares of common stock of Grand Union.

| Beneficial Owner | Number of Shares of Common Stock Beneficially Owned | Percentage of Outstanding Shares of Common Stock (1) |
|---|---|---|
| GAC Holdings, Limited Partnership (2)<br>331 Madison Avenue<br>New York, New York 10017 | 28,344 | 58.4% |
| Gary D. Hirsch (2)<br>331 Madison Avenue<br>New York, New York 10017 | 36,573 | 75.4 |
| Joseph J. McCaig<br>201 Willowbrook Boulevard<br>Wayne, New Jersey 07470 | 3,380 | 7.0 |
| Martin A. Fox (2)<br>331 Madison Avenue<br>New York, New York 10017 | - | - |
| Claude J. Incaudo (2)<br>1200 State Fair Boulevard<br>Syracuse, New York 13221 | - | - |
| Fidelity Devonshire Trust:<br>Fidelity Equity-Income Fund<br>82 Devonshire Street, F7E<br>Boston, Massachusetts 02109 | 8,728 | 15.2 |
| Fidelity Magellan Fund<br>82 Devonshire Street, F7E<br>Boston, Massachusetts 02109 | 8,728 | 15.2 |
| Fidelity Puritan Trust:<br>Fidelity Puritan Fund<br>82 Devonshire Street, F7E<br>Boston, Massachusetts 02109 | 8,105 | 14.3 |
| Fidelity Fixed-Income Trust:<br>Spartan High Income Fund<br>82 Devonshire Street, F7E<br>Boston, Massachusetts 02109 | 3,088 | 6.0 |
| Nomura Securities International<br>2 World Financial Center, 22nd Floor<br>Building B<br>New York, New York 10281 | 4,844 | 9.1 |
| All directors and officers of Holdings as a group (4 persons) (2) | 39,953 | 82.4 |

(1)  For purposes of the computation of percentages of common stock ownership of Holdings presented in this table, a holder is deemed to beneficially own all shares which may be acquired by such holder upon exercise of warrants or conversion of shares of Class B Common Stock held by such holder which warrants are exercisable or shares of Class B Common Stock are convertible within 60 days, and such shares which may be acquired by such holder (but no shares which may be acquired by any other holder upon exercise of warrants or conversion of such shares of Class B Common Stock held by such other holder) are deemed to be outstanding. If ownership were determined on a fully diluted basis after giving effect to exercise of Warrants to purchase 18,750 shares of Class A Common Stock and including 26,719 shares of Class B Common Stock, percentages of common stock ownership would be as follows: GAC Holdings 30.2%; Gary D. Hirsch 38.9%; Joseph J. McCaig 3.6%; Fidelity Devonshire Trust: Fidelity Equity-Income Fund 9.3%; Fidelity Magellan Fund 9.3%; Fidelity Puritan Trust: Fidelity Puritan Fund 8.6%; Fidelity Fixed-Income Trust: Spartan High Income Fund 3.3%; Nomura Securities International 5.2%; and all directors and officers of Holdings as a group 42.4%.

(2) GAC Holdings Partners, Inc., a corporation controlled by MTH Holdings, is the sole general partner of GAC Holdings. MTH and certain other investors, including Mr. Hirsch, Mr. Fox, Mr. Incaudo and certain individuals affiliated with MTH, and including Penn Traffic, of which Mr. Incaudo is President and Chief Executive Officer, are limited partners of Grand Acquisition Company, Limited Partnership, which is the sole limited partner of GAC Holdings. Mr. Hirsch is a general partner of the managing partner of MTH. MTH and Mr. Hirsch may be deemed to share voting and dispositive power with respect to shares of common stock of Holdings owned by GAC Holdings and may be deemed the beneficial owners of such shares.

Various investment funds and other institutional investors for which Fidelity Management & Research Company or affiliated entities ("FMR Co.") acts as investment advisor, including Fidelity Devonshire Trust: Fidelity Equity-Income Fund, Fidelity Magellan Fund, Fidelity Puritan Trust: Fidelity Puritan Fund and Fidelity Fixed-Income Trust: Spartan High Income Fund, the common stock holdings of which are set forth on the foregoing table, own shares representing approximately 26.5% of the shares of common stock of Holdings on a fully diluted basis, all of which shares are shares of Class B Common Stock (see "Description of the Holdings Capital Stock-Class B Common Stock"). Various investment funds and other institutional investors for which FMR Co. acts as investment advisor, including the entities named in the preceding sentence, the common stock holdings of which are set forth on the foregoing table, also acquired Warrants to purchase for a nominal price approximately 10.2% of the common stock of Holdings on a fully diluted basis in connection with purchases of Senior Zero Coupon Notes and Senior Subordinated Zero Coupon Notes issued by Capital as part of the Recapitalization.

## The Management Subscription Agreements

Pursuant to the terms of subscription agreements which were entered into shortly before the closing of the acquisition of GUAC by Holdings (collectively, the "Management Subscription Agreements"), between Holdings and the Management Investors, the Management Investors purchased shares (the "Management Shares") of common stock of Holdings representing (prior to the Recapitalization) approximately 13.4% of the Holdings common stock on a fully diluted basis for consideration of $1,000 per share in cash or the contribution of 1.45748 shares of GUAC common stock for one share of Holdings common stock. The Management Subscription Agreements were amended in connection with the Recapitalization. Pursuant to the terms of the Management Subscription Agreements, as amended, each Management Investor has agreed that, for a period of five years from the date of consummation of the Recapitalization, no Management Investor will sell, distribute, transfer, assign, pledge, hypothecate or otherwise dispose of or encumber any of their Management Shares, except under the circumstances and on the terms and conditions specified in the Management Subscription Agreements. The Management Subscription Agreements, as amended, provide that the Management Investors will have demand registration rights with respect to the Management Shares after the earlier of (x) the sale of 20% or more of the then outstanding shares of Holdings common stock in a registered public offering, (y) the fifth anniversary of the date of the consummation of the Recapitalization or (z) the occurrence of certain other events specified therein. The Management Subscription Agreements, as amended, also provide that if a Management Investor ceases to be employed by the Company under certain circumstances or, upon the seventh anniversary of the date of the consummation of the Recapitalization, the Management Investor will have the right to require Holdings to repurchase all of such Management Investor's Management Shares at a price equal to the fair market value of such Management Shares. Holdings would not be obligated to purchase any Management Shares, however, if such a purchase would result in an event of default under its preferred stock or under any of its indebtedness. In connection with the Recapitalization, certain Management Investors received, through the Equity Escrow, approximately 2,530 shares of Holdings common stock. After giving effect to the receipt of such shares and to certain purchases and sales of shares of Holdings common stock by members of management of Grand Union in connection with the Recapitalization and in connection with the sale of the Southern Region, the Management Investors own shares representing approximately 12.7% of the shares of Holdings common stock on a fully diluted basis.

## Item 13. Certain Relationships and Related Transactions

Those members of the management of Grand Union who received additional shares of Holdings common stock at the time of the Recapitalization (as described under "The Management Subscription Agreements" above), became indebted to Holdings in amounts (aggregating approximately $500,000 for all management investors) equal to income taxes incurred by them as a result of receipt of such shares. Such indebtedness is evidenced by individual promissory notes with a maturity of seven years, bearing no interest unless the obligor should leave the

Company's employ, and are secured by, and with recourse limited to, the shares received. Among the management investors from whom Holdings holds such notes is Mr. McCaig, who is indebted to Holdings in the amount of $227,676.

As compensation for his services in connection with the acquisition of GUAC by Holdings, Mr. Hirsch received an option to purchase shares of Holdings common stock. In connection with the Recapitalization, Mr. Hirsch transferred such option and a note payable to Holdings in the amount of approximately $3.6 million to the Equity Escrow in exchange for 8,229 shares of Holdings common stock. The note payable to Holdings has a maturity of 10 years, provides for interest equal to any cash dividends paid on the 8,229 shares of Holdings common stock and is secured by, and with recourse limited to, the 8,229 shares of Holdings common stock and any property (other than cash) distributed on or with respect to such shares.

MTH has entered into a financial advisory agreement for a term ending in July 1997 under which MTH provides certain financial consulting and business management services to Holdings and its subsidiaries. During the period from July 1989 through July 1992, MTH received an annual fee of $600,000 for its services performed under this agreement. In connection with the Recapitalization, the agreement was amended to provide for an annual fee of $900,000 after a reevaluation of the nature and extent of the services that have been provided by MTH from the inception of the agreement.

At the time of the acquisition of GUAC by Holdings in July 1989, Grand Union and P&C Foods, which is controlled by MTH, operated stores in some of the same geographic areas in Vermont and upstate New York. In connection with the acquisition, agreements were entered into with federal and state antitrust authorities which required the divestiture of 16 Grand Union stores or P&C Foods stores. The divestitures required by these agreements were completed on July 30, 1990. Thirteen of the sixteen stores divested were P&C Foods stores.

In a related transaction, on July 30, 1990, P&C Foods and Grand Union entered into an operating agreement (the "Operating Agreement") pursuant to which Grand Union acquired the right to operate P&C Foods' thirteen remaining stores in New England under the Grand Union name until July 2000, with an option to extend the term of such operation for an additional five years. P&C Foods also granted Grand Union an option to purchase such stores. In connection with these transactions, Grand Union agreed to pay P&C Foods a minimum annual fee which will average $10.7 million per year during the ten-year lease term plus, beginning with the year commencing July 31, 1992, additional contingent fees of up to $700,000 per year based upon sales performance of the stores operated by Grand Union. In addition, Grand Union paid P&C Foods $7.5 million for the option to purchase the stores. Pursuant to the terms of the Operating Agreement, a $15 million prepayment of the annual fee was made to P&C Foods in connection with the Recapitalization.

Pursuant to the terms of the Operating Agreement, in April 1992, Grand Union purchased P&C Foods' White River Junction, Vermont warehouse for cash consideration of approximately $5 million.

In September 1993, Grand Union entered into a program to consolidate the purchasing and distribution of health and beauty care products and general merchandise with Penn Traffic. Under this program, Grand Union procures health and beauty care products for both Grand Union and Penn Traffic, and Penn Traffic procures general merchandise for both Penn Traffic and Grand Union. Grand Union's general merchandise warehouse in Montgomery, New York is used to store and distribute general merchandise and health and beauty care products to Grand Union stores and to certain of Penn Traffic's stores and wholesale customers. Under the arrangement, Penn Traffic owns the inventory of general merchandise and health and beauty care products located at the Montgomery warehouse and shares the cost of operating the warehouse in an amount proportionate to Penn Traffic's usage of the facility. Grand Union expects that this program will improve the variety of general merchandise products offered to the consumer in the Company's stores and will reduce product procurement costs for general merchandise and health and beauty care products.

## PART IV

## Item 14. Exhibits, Financial Statement Schedules and Reports on Form 8-K

### The following documents are filed as a part of this report:

See Item 8.

### Reports on Form 8-K

No reports on Form 8-K have been filed by the Registrant during the last quarter of the period covered by this Report.

### Exhibits (Regulation S-K Item 601)

| Exhibit Number | Description of Document |
|---|---|
| 2.1 | Stock Purchase Agreement dated as of April 8, 1989 among GU Acquisition Corporation ("GUAC"), GND Holdings Corporation (which has changed its name to Grand Union Holdings Corporation) ("Holdings") and the stockholders of GUAC named therein, incorporated by reference to Exhibit No. 2.1 to The Grand Union Company's Registration Statement on Form S-1 (Registration No. 33-29707) (the "1989 Grand Union Registration Statement"). |
| 3.1 | Certificate of Incorporation of Grand Union, as amended , incorporated by reference to Exhibit No. 3.1 to the Registration Statement on Form S-1 of Grand Union and Grand Union Capital Corporation ("Capital") and Holdings (Registration No. 33-48282) (the "1992 Grand Union Registration Statement"). |
| 3.2 | By-laws of Grand Union, incorporated by reference to Exhibit No. 3.4 to the 1992 Grand Union Registration Statement. |
| 3.2A | Amendment to By-laws of Grand Union, incorporated by reference to Exhibit No. 3.4A to the 1992 Grand Union Registration Statement. |
| 4.1 | Indenture dated as of October 18, 1993, among Grand Union, as Issuer, Capital, as Guarantor and United States Trust Company of New York ("U.S. Trust"), as Trustee for the $12^1/_4$% Senior Subordinated Notes Due 2002, Series A, including form of the $12^1/_4$% Senior Subordinated Note Due 2002, incorporated by reference to Exhibit No. 4.1 to Grand Union's Registration Statement on Form S-1 (Registration No. 33-70956) ( the "October 1993 Grand Union Registration Statement"). |
| 4.2 | Indenture dated as of January 28, 1993, among Grand Union, as Issuer, Capital and Holdings, as Guarantors and First Trust of California, National Association, as Trustee for the $11^3/_8$% Senior Notes Due 1999, including form of the $11^3/_8$% Senior Note Due 1999, incorporated by reference to Exhibit No. 4.11 to The Grand Union Company's Report on 10-Q dated February 2, 1993 (the "Grand Union 10-Q"). |
| 4.3 | Indenture dated as of July 22, 1992, among Grand Union, Capital, Holdings and First Trust National Association, as Trustee ("First Trust") for the Grand Union $11^1/_4$% Senior Notes Due 2000, including form of $11^1/_4$% Senior Note Due 2000, incorporated by reference to Exhibit No. 4.1 to the Registration Statement on Form S-1 of Capital and Holdings (Registration No. 33-50496) (the "Capital Registration Statement"). |
| 4.4 | Indenture dated as of July 22, 1992, among Grand Union, Capital, Holdings and U.S. Trust, as Trustee for the Grand Union $12^1/_4$% Senior Subordinated Notes Due 2002, including form of $12^1/_4$% Senior Subordinated Note Due 2002, incorporated by reference to Exhibit No. 4.2 to the Capital Registration Statement. |
| 4.5 | Borrower Pledge Agreement dated as of July 22, 1992 made by Grand Union to Bankers Trust Company ("Bankers Trust"), as Collateral Agent, incorporated by reference to Exhibit No. 10.9 to the Capital Registration Statement. |
| 4.5A | First Amendment dated as of January 28, 1993 to the Pledge Agreement filed as Exhibit No. 4.5, incorporated by reference to Exhibit No. 4.13A to the Grand Union 10-Q. |

| Exhibit Number | Description of Document |
|---|---|
| 4.6 | Borrower Security Agreement dated as of July 22, 1992, between Grand Union and Bankers Trust, as Collateral Agent, incorporated by reference to Exhibit No. 10.12 to the Capital Registration Statement. |
| 4.6A | First Amendment dated as of January 28, 1993 to the Borrower Security Agreement filed as Exhibit No. 4.6, incorporated by reference to Exhibit No. 4.14A to the Grand Union 10-Q. |
| 4.7 | Certificate of Incorporation of Holdings, having attached Certificate of Designation for the Series A, B and C Preferred Stock and setting forth the terms of Holdings' Zero Coupon Junior Subordinated Notes Due 1999, incorporated by reference to Exhibit No. 4.2 to Holdings' Registration Statement on Form S-1 (Registration No. 33-32879) (the "Holdings Registration Statement"). |
| 4.7A | Supplemental Indenture dated as of August 10, 1989 to the Indenture filed as Exhibit No. 4.7, incorporated by reference to Exhibit No. 4.1A to the GUAC Registration Statement. |
| 4.7B | Supplemental Indenture dated as of December 19, 1990 to the Indenture filed as Exhibit No. 4.7, incorporated by reference to Exhibit No. 4.1B to the GUAC Registration Statement. |
| 4.7C | Supplemental Indenture dated as of July 22, 1992 to the Indenture filed as Exhibit No. 4.7, incorporated by reference to Exhibit No. 4.7C to the Capital Registration Statement. |
| 4.8 | Registration Rights Agreement dated as of March 2, 1988 by and among GUAC and the purchasers of the GUAC 13% Senior Subordinated Notes Due 1998 listed on the signature page thereof, incorporated by reference to Exhibit No. 4.2 to the GUAC Registration Statement. |
| 4.9 | Note Purchase Agreement dated as of October 18, 1993, among Grand Union, Capital and BT Securities Corporation incorporated by reference to Exhibit No. 4.1 to the October 1993 Grand Union Registration Statement. |
| 4.10 | Form of Note Purchase Agreement dated as of January 28, 1993, among Grand Union, Capital, Holdings and the Purchasers named therein, incorporated by reference to Exhibit No. 4.12 to the Grand Union 10-Q. |
| 10.1 | Form of Management Subscription Agreement entered into by and between Holdings and each of certain members of management of Grand Union, all dated as of July 14, 1989, providing, in the aggregate, for the purchase of 12,358 shares of common stock of Holdings, incorporated by reference to Exhibit No. 10.3 to 1989 Grand Union Registration Statement. |
| 10.1A | Form of Amendment to Management Subscription Agreement entered into by and between Holdings and each of certain members of management of Grand Union, all dated as of July 22, 1992, incorporated by reference to Exhibit No. 10.1A to the Capital Registration Statement. |
| 10.2 | Agreement to Hold Separate dated July 17, 1989 by and among MTH Holdings Inc. ("MTH Holdings"), GUAC, Salomon Inc and the Federal Trade Commission (the "FTC") entered into in the matter of MTH Holdings and GUAC before the FTC, incorporated by reference to Exhibit No. 10.5 to the 1989 Grand Union Registration Statement. |
| 10.3 | Agreement containing Consent Order among MTH Holdings, GUAC and the FTC entered into in the matter of MTH Holdings and GUAC before the FTC, incorporated by reference to Exhibit No. 10.6 to the 1989 Grand Union Registration Statement. |
| 10.4 | Assurance dated July 6, 1989 pursuant to 9 Vermont Statutes Annotated Section 2459 by and among MTH Holdings, P&C Food Markets, Inc. ("P&C Foods"), GUAC and the Attorney General of the State of Vermont, incorporated by reference to Exhibit No. 10.7 to the 1989 Grand Union Registration Statement. |
| 10.5 | Asset Purchase Agreement, dated as of January 25, 1990, by and between Grand Union and Price Chopper Operating Co. of Vermont, Inc., incorporated by reference to Exhibit No. 10.15 to Holdings Registration Statement on Form S-1 (Registration No. 33-32879) (the "Holdings Registration Statement"). |
| 10.6 | Asset Purchase Agreement, dated as of February 9, 1990, by and between Grand Union and Price Chopper Operating Co., Inc., incorporated by reference to Exhibit No. 10.49 to the GUAC Registration Statement. |
| 10.7 | Agreement and Master Sublease dated as of July 30, 1990, by and between Grand Union and P&C Foods, incorporated by reference to Exhibit No. 10.18 to Holdings' Report on Form 10-Q dated July 21, 1990 (Commission File No. 33-29707). |

| Exhibit Number | Description of Document |
|---|---|
| 10.8 | Credit Agreement dated as of July 14, 1992, among Grand Union, Capital, Holdings, the lending institutions party thereto, Bankers Trust, as Agent, and Midlantic National Bank, as Co-Agent, incorporated by reference to Exhibit No. 10.8 to the Capital Registration Statement. |
| 10.8A | First Amendment dated as of January 15, 1993 to the Credit Agreement filed as Exhibit No. 10.8, incorporated by reference to Exhibit No. 10.32A to the Grand Union 10-Q. |
| 10.8B | Second Amendment dated as of January 16, 1993 to the Credit Agreement filed as Exhibit No. 10.8, incorporated by reference to Exhibit No. 10.32B to the Grand Union 10-Q. |
| 10.8C | Third Amendment dated as of April 1, 1993 to the Credit Agreement filed as Exhibit No. 10.8, incorporated by reference to Exhibit No. 10.8C to the Registration Statement on Form S-1 of Grand Union and Capital (Registration No. 33-58438) (the "1993 Grand Union Registration Statement"). |
| 10.8D | Fourth Amendment dated as of June 28, 1993 to the Credit Agreement filed as Exhibit No. 10.8, incorporated by reference to Holdings Report on Form 10-K for the fiscal year ended April 3, 1993. |
| 10.8E | Fifth Amendment dated as of July 13, 1993 to the Credit Agreement filed as Exhibit No. 10.8, incorporated by reference to Exhibit No. 10.8E to the 1993 Grand Union Registration Statement. |
| 10.8F | Sixth Amendment dated as of September 8, 1993 to the Credit Agreement filed as Exhibit 10.8 incorporated by reference to Exhibit No. 10.8F to the October 1993 Grand Union Registration Statement. |
| 10.9 | Borrower Pledge Agreement dated as of July 22, 1992, made by Grand Union to Bankers Trust, as Collateral Agent (included in Exhibit No. 4.5), incorporated by reference to Exhibit No. 10.9 to the Capital Registration Statement. |
| 10.9A | First Amendment dated as of January 28, 1993 to the Borrower Pledge Agreement filed as Exhibit No. 10.09, incorporated by reference to Exhibit No. 4.13A to the Grand Union 10-Q. |
| 10.10 | Pledge Agreement, dated as of July 22, 1992, made by Holdings to Bankers Trust, as Collateral Agent, incorporated by reference to Exhibit No. 10.10 to the Capital Registration Statement. |
| 10.10A | First Amendment dated as of January 28, 1993 to the Pledge Agreement filed as Exhibit No. 10.10, incorporated by reference to Exhibit No. 10.35A to the Grand Union 10-Q. |
| 10.11 | Pledge Agreement, dated as of July 22, 1992, made by Capital to Bankers Trust, as Collateral Agent, incorporated by reference to Exhibit No. 10.11 to the Capital Registration Statement. |
| 10.11A | First Amendment dated as of January 28, 1993 to the Pledge Agreement filed as Exhibit No. 10.11, incorporated by reference to Exhibit No. 10.36A to the Grand Union 10-Q. |
| 10.12 | Borrower Security Agreement dated as of July 22, 1992, between Grand Union and Bankers Trust, as Collateral Agent, incorporated by reference to Exhibit No. 10.12 to the Capital Registration Statement. |
| 10.12A | First Amendment dated as of January 28, 1993 to the Borrower Security Agreement filed as Exhibit No. 10.12, incorporated by reference to Exhibit No. 4.14A to the Grand Union 10-Q. |
| 10.13 | Escrow Agreement dated as of July 22, 1992, between Holdings and Bankers Trust, as Escrow Agent, incorporated by reference to Exhibit No. 10.13 to the Capital Registration Statement. |
| 10.14 | Stock Purchase Agreement dated as of July 22, 1992, by and between Holdings and the purchasers of Class B Common Stock of Holdings named therein, incorporated by reference to Exhibit No. 10.14 to the Capital Registration Statement. |
| 10.15 | Agreement dated as of July 22, 1992, by and among GAC Holdings Limited Partnership ("GAC Holdings"), Holdings and Gary D. Hirsch, incorporated by reference to Exhibit No. 10.15 to the Capital Registration Statement. |
| 10.16 | Financial Advisory Agreement dated July 22, 1992, by and between Grand Union and Miller Tabak Hirsch + Co., incorporated by reference to Exhibit No. 10.16 to the Capital Registration Statement. |
| 10.17 | Equity Escrow Agreement dated as of July 22, 1992, by and among GAC Holdings, Holdings, Salomon Brothers Holding Company Inc, and Gary D. Hirsch and U.S. Trust, as Escrow Agent, incorporated by reference to Exhibit No. 10.17 to the Capital Registration Statement. |
| 10.18 | Asset Purchase Agreement dated as of February 4, 1993, between The Great Atlantic & Pacific Tea Company, Inc. and Grand Union, incorporated by reference to Exhibit No. 2.1 to The Grand Union Company's Report on Form 8-K dated February 4, 1993. |

| Exhibit Number | Description of Document |
|---|---|
| 10.19 | Asset Purchase Agreement dated as of September 20. 1993 among Foodarama Supermarkets, Inc., ShopRite of Malverne, Inc. and Grand Union. |
| *10.20 | Second Amendment and Restatement of The Grand Union Company Supplemental Retirement Program for Key Executives adopted as of April 1, 1993, incorporated by reference to Exhibit No. 10.20 to Holdings' Report on Form 10-K dated July 1, 1994. |
| *10.21 | Form of Non-Competition and Confidentiality Agreement entered into by Grand Union and certain executives (including Messrs. McCaig, Louttit, Saba. Stine, Galvin and Lennon) dated as of August 25, 1993, incorporated by reference to Exhibit No. 10.21 to Holdings' Report on Form 10-K dated July 1, 1994. |
| 10.22 | Custodian Agreement dated as of August 25, 1993 between Grand Union and United States Trust Company of New York, incorporated by reference to Exhibit No. 10.22 to Holdings' Report on Form 10-K dated July 1, 1994. |
| 21.1 | Subsidiaries of Grand Union, incorporated by reference to Exhibit No. 22.1 to the 1993 Grand Union Registration Statement. |

---

* Compensatory plan or arrangement.

## SIGNATURES

Pursuant to the requirements of Section 13 of 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

THE GRAND UNION COMPANY
(Registrant)

/s/ Martin A. Fox
_____
Martin A. Fox
Vice President and Assistant Secretary

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Gary D. Hirsch<br>Gary D. Hirsch | Director and Chairman | July 1, 1994 |
| /s/ Martin A. Fox<br>Martin A. Fox | Director, Vice President and Assistant Secretary | July 1, 1994 |
| /s/ Joseph J. McCaig<br>Joseph J. McCaig | Director, President and Chief Executive Officer (Principal Executive Officer) | July 1, 1994 |
| /s/ William A. Louttit<br>William A. Louttit | Director, Executive Vice President and Chief Operating Officer | July 1, 1994 |
| /s/ Robert Terrence Galvin<br>Robert Terrence Galvin | Director, Senior Vice President, Chief Financial Officer and Secretary (Principal Financial Officer) | July 1, 1994 |
| /s/ Kenneth R. Baum<br>Kenneth R. Baum | Vice President and Controller (Principal Accounting Officer) | July 1, 1994 |

### REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and Stockholders of
Grand Union Holdings Corporation

In our opinion, the consolidated financial statements listed in the index appearing under Item 8 on page 14 present fairly, in all material respects, the financial position of Grand Union Holdings Corporation and its subsidiaries at April 3, 1993 and April 2, 1994, and the results of their operations and their cash flows for the 52 weeks ended March 28, 1992, the 53 weeks ended April 3, 1993 and the 52 weeks ended April 2, 1994, in conformity with generally accepted accounting principles. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with generally accepted auditing standards which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for the opinion expressed above.

As described in Note 1 to the consolidated financial statements, the Company adopted Statement of Financial Accounting Standards No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions", effective April 4, 1993 and Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes", effective March 29, 1992.

PRICE WATERHOUSE
New York, New York
June 1, 1994

## GRAND UNION HOLDINGS CORPORATION
## CONSOLIDATED STATEMENT OF OPERATIONS

| | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 |
|---|---|---|---|
| | (in thousands except share data) | | |
| Sales | $2,968,466 | $2,833,987 | $2,477,339 |
| Cost of sales | (2,150,338) | (2,032,481) | (1,766,303) |
| Gross profit | 818,128 | 801,506 | 711,036 |
| Operating and administrative expenses | (619,927) | (606,178) | (531,839) |
| Depreciation and amortization | (78,721) | (80,551) | (78,577) |
| Charge relating to early retirement program | - | - | (4,468) |
| Loss on disposal of the Southern Region | - | (198,000) | - |
| Recapitalization expense | - | (3,516) | - |
| Interest expense: | | | |
| Debt: | | | |
| Obligations requiring current cash interest | (76,357) | (107,644) | (128,661) |
| Obligations requiring no current cash interest | (65,325) | (44,271) | (35,354) |
| Capital lease obligations | (12,301) | (13,191) | (14,951) |
| Amortization of deferred financing fees | (18,018) | (9,378) | (4,831) |
| Loss before income taxes, extraordinary charges and cumulative effect of accounting change | (52,521) | (261,223) | (87,645) |
| Income tax provision | (12,532) | (4,535) | - |
| Loss before extraordinary charges and cumulative effect of accounting change | (65,053) | (265,758) | (87,645) |
| Extraordinary charges relating to early extinguishment of debt | - | (47,663) | - |
| Cumulative effect of accounting change | - | - | (30,308) |
| Net loss | (65,053) | (313,421) | (117,953) |
| Accrued preferred stock dividends | (12,856) | (14,623) | (16,011) |
| Net loss applicable to common stock | $(77,909) | $(328,044) | $(133,964) |
| | | | |
| Weighted average number of common shares outstanding | 75,000 | 75,249 | 75,258 |
| Per Share Data: | | | |
| Loss applicable to common stock before extraordinary charges and cumulative effect of accounting change (after accrued preferred stock dividends) | $(1,038.79) | $(3,726.05) | $(1,377.34) |
| Extraordinary charges | - | $(633.40) | - |
| Cumulative effect of accounting change | - | - | $(402.72) |
| Net loss applicable to common stock | $(1,038.79) | $(4,359.45) | $(1,780.06) |

See accompanying notes to consolidated financial statements.

## GRAND UNION HOLDINGS CORPORATION
## CONSOLIDATED BALANCE SHEET

| | April 3, 1993 | April 2, 1994 |
|---|---|---|
| | (in thousands) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and temporary cash investments | $69,651 | $44,294 |
| Receivables | 24,567 | 37,072 |
| Inventories | 235,222 | 206,063 |
| Other current assets | 16,141 | 17,444 |
| Total current assets | 345,581 | 304,873 |
| Property | 360,179 | 400,554 |
| Goodwill | 567,500 | 563,276 |
| Beneficial leases | 39,039 | 33,074 |
| Deferred financing fees | 51,777 | 48,721 |
| Other assets | 54,089 | 43,726 |
| | $1,418,165 | $1,394,224 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Current maturities of long-term debt | $466 | $914 |
| Current portion of obligations under capital leases | 6,144 | 7,099 |
| Accounts payable and accrued liabilities | 283,032 | 238,225 |
| Total current liabilities | 289,642 | 246,238 |
| Long-term debt | 1,291,097 | 1,404,089 |
| Obligations under capital leases | 104,791 | 120,140 |
| Other noncurrent liabilities | 103,191 | 113,810 |
| Commitments and contingencies | | |
| Redeemable stock: | | |
| Class A common stock, $.01 par value | 9,547 | 9,407 |
| Preferred stock (liquidation preference $145,312,000 in aggregate) | 130,240 | 145,312 |
| Total redeemable stock | 139,787 | 154,719 |
| Nonredeemable common stock and stockholders' deficit: | | |
| Class A common stock, $.01 par value; authorized 473,281 shares; issued and outstanding 48,669 and 48,505 shares (net of treasury shares) less 12,096 and 11,932 shares, respectively, shown as redeemable common stock | 1 | 1 |
| Class B common stock, $.01 par value; 26,719 authorized, issued and outstanding | - | - |
| Treasury stock; 164 shares of Class A common stock at cost | - | (156) |
| Accumulated deficit | (510,344) | (644,617) |
| Total nonredeemable common stock and stockholders' deficit | (510,343) | (644,772) |
| | $1,418,165 | $1,394,224 |

See accompanying notes to consolidated financial statements.

## GRAND UNION HOLDINGS CORPORATION
## CONSOLIDATED STATEMENT OF CASH FLOWS

|  | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 |
|---|---|---|---|
|  | (in thousands) | | |
| **OPERATING ACTIVITIES:** | | | |
| Net loss | $(65,053) | $(313,421) | $(117,953) |
| Adjustments to reconcile net loss to net cash provided by (used for) operating activities: | | | |
| Extraordinary charges on early extinguishment of debt | - | 47,663 | - |
| Cumulative effect of accounting change | - | - | 30,308 |
| Write-off of goodwill and beneficial leases and loss on fixed assets related to the disposal of the Southern Region | - | 137,017 | - |
| Depreciation and amortization | 78,721 | 80,551 | 78,577 |
| Charge relating to early retirement program | - | - | 4,468 |
| Noncash interest | 65,325 | 44,271 | 35,354 |
| Amortization of deferred financing fees | 18,018 | 9,378 | 4,831 |
| Receivables | (4,333) | (878) | (12,505) |
| Inventories | (13,833) | (14,467) | 29,159 |
| Other current assets | 768 | (3,485) | (1,303) |
| Accounts payable and accrued liabilities | 13,606 | 27,160 | (44,807) |
| Other | (5,930) | 13,393 | (18,039) |
| Net cash provided by (used for) operating activities | 87,289 | 27,182 | (11,910) |
| **INVESTMENT ACTIVITIES:** | | | |
| Capital expenditures | (29,293) | (58,089) | (81,029) |
| Disposals of property | 4,787 | 1,394 | 584 |
| Proceeds relating to the sale of the fixed assets of the Southern Region | - | 25,000 | - |
| Refunded insurance deposits | 650 | 11,636 | - |
| Prepayment under P&C Food Markets, Inc. operating agreement | - | (15,000) | - |
| Net cash used for investment activities | (23,856) | (35,059) | (80,445) |
| **FINANCING ACTIVITIES:** | | | |
| Proceeds from the issuance of long-term debt | 15,660 | 1,443,421 | 77,661 |
| Obligations under capital leases discharged | (7,629) | (9,644) | (8,218) |
| Loan placement fees | (5,310) | (63,643) | (1,775) |
| Retirement of long-term debt | (58,852) | (1,348,762) | (514) |
| Purchase of redeemable Class A common stock | - | - | (156) |
| Capital contribution | - | 5,004 | - |
| Proceeds from issuance of warrants | - | 1,187 | - |
| Proceeds from issuance of common stock | - | 369 | - |
| Premiums on debt retirement | - | (24,086) | - |
| Net cash provided by (used for) financing activities | (56,131) | 3,846 | 66,998 |
| Increase (decrease) in cash and temporary cash investments | 7,302 | (4,031) | (25,357) |
| Cash and temporary cash investments at beginning of year | 66,380 | 73,682 | 69,651 |
| Cash and temporary cash investments at end of year | $73,682 | $69,651 | $44,294 |

See accompanying notes to consolidated financial statements.

## GRAND UNION HOLDINGS CORPORATION
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 1 - Organization and Summary of Significant Accounting Policies

Grand Union Holdings Corporation ("Holdings" or the "Company"), a Delaware corporation, and Grand Union Capital Corporation ("Capital"), a Delaware corporation which is a wholly owned subsidiary of Holdings, are companies whose principal asset is the capital stock of The Grand Union Company ("Grand Union"), a Delaware corporation and a wholly owned subsidiary of Capital.    Grand Union operates retail food stores in seven northeastern states.

*Fiscal Year.*
The Company's fiscal year ends on the Saturday nearest the last day of March.

*Principles of Consolidation.*
The consolidated financial statements include the accounts of Holdings and its subsidiaries, all of which are wholly owned.    Intercompany transactions and balances have been eliminated.

*Temporary Cash Investments.*
For purposes of the Statement of Cash Flows, temporary cash investments consist of short-term investments in highly liquid securities and cash equivalents, with initial maturities of three months or less, including certificates of deposit, banker's acceptances, commercial paper, repurchase agreements and investments in direct obligations of the Government of the United States of America.

*Inventory Valuation.*
Grocery and general merchandise inventories are valued at the lower of last-in, first-out ("LIFO") cost or market in order to more accurately match costs and related revenues.    At April 3, 1993 and April 2, 1994, approximately $200,377,000 and $173,661,000, respectively, of grocery and general merchandise inventories were valued using the LIFO method.    Replacement cost exceeded LIFO cost of these inventories by approximately $5,799,000, $7,178,000 and $8,106,000 at March 28, 1992, April 3, 1993 and April 2, 1994, respectively.    During the current year, inventory levels were reduced resulting in a liquidation of LIFO inventories carried at a value lower than current cost.    Net loss was decreased by approximately $1,160,000 as a result of this liquidation.    Perishable inventories are valued at the lower of average cost or market, which adequately provides for the matching of costs and related revenues due to the rapid turnover of such inventories.

*Property.*
Buildings, fixtures and equipment and leasehold improvements are recorded at cost and include interest on the funds borrowed to finance construction.    Depreciation and amortization of buildings, fixtures and equipment and leasehold improvements is computed using the straight line method over estimated useful lives ranging from three to forty years.    Properties held under capital leases are capitalized net of gains on sale leaseback transactions and are amortized using the straight line method over the life of each lease.

*Pre-opening Costs.*
Store pre-opening costs are charged to expense as incurred.

*Goodwill.*
Goodwill is amortized using the straight-line method over a 40 year life.    Management periodically reassesses the appropriateness of both the carrying value and remaining life of goodwill, principally based on forecasts of operating cash flow less significant anticipated cash requirements such as capital expenditures and debt repayments.    Additionally, the Company considers other factors such as its anticipated ability to access capital markets in the future.    At April 3, 1993 and April 2, 1994, accumulated amortization was $57,723,000 and $73,779,000, respectively.

**NOTE 1 - Organization and Summary of Significant Accounting Policies (continued)**

*Beneficial Leases.*
Amortization of beneficial leases is computed using the straight line method over the average lease life, which approximates ten years. At April 3, 1993 and April 2, 1994, accumulated amortization was $21,702,000 and $27,570,000, respectively.

*Deferred Financing Fees.*
Financing fees are deferred and amortized over the expected life of the related loan. At April 3, 1993 and April 2, 1994, accumulated amortization was $3,780,000 and $8,610,000, respectively.

*Income Taxes.*
In the fiscal year ended April 3, 1993, the Company adopted Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes" ("FAS No. 109"), retroactive to March 29, 1992. FAS No. 109 is an asset and liability approach that requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in the Company's financial statements or tax returns. In estimating future tax consequences, FAS No. 109 generally considers all expected future events other than enactments of changes in the tax law or tax rates. The retroactive adoption of FAS No. 109 had no effect on the Company's financial statements.

*Pension Plans.*
The Company maintains a noncontributory, trusteed pension plan covering eligible employees and a supplemental nonqualified, nontrusteed plan for certain executives. The Company's policy is to fund pension amounts which satisfy the requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

*Postretirement Benefits.*
Effective April 4, 1993, the Company adopted Statement of Financial Accounting Standards No. 106 "Employers' Accounting for Postretirement Benefits Other Than Pensions" ("FAS No. 106"), which requires the Company to accrue the estimated cost of retiree benefit payments during the years each employee provides services. The Company has elected to recognize the cumulative effect of this obligation, an increase in accrued postretirement benefit costs and in net loss of $30,308,000 ($402.03 per share), at April 4, 1993.

*Self Insurance.*
Grand Union self insures workers' compensation, automobile liability, general liability and non-union employee medical costs up to varying deductible limits. Grand Union carries third party insurance in excess of such limits. Reserves are provided for the estimated whole dollar settlement value up to the deductible limits of all claims occurring during each policy year.

*Store Closure Expense.*
Estimated whole dollar net costs of holding and disposing of closed stores are provided as of the date the store is closed.

*Fair Value of Financial Instruments.*
The carrying amount of cash and temporary cash investments, receivables and accounts payable and accrued liabilities approximates fair value. The fair value of long-term debt and redeemable stock is based on quoted market prices provided by an investment banking firm. The fair value of interest rate swap agreements is the amount at which such agreements could be settled, based on estimates from counter parties.

*Net Loss Per Share of Common Stock.*
Net loss per share of common stock is based upon the weighted average number of shares of common stock outstanding. Fully diluted net loss per share has not been presented since the amounts are antidilutive.

**NOTE 1 - Organization and Summary of Significant Accounting Policies (continued)**

*Reclassifications*
  Certain reclassifications have been made in the prior years' financial statements to conform to classifications used in the current year.


**NOTE 2 - Acquisition of Long Island Stores**

  On October 18, 1993, Grand Union acquired five supermarket locations on Long Island. The cost of the acquisition included cash consideration of approximately $16,100,000 (of which approximately $6,000,000 was allocated to property, equipment and leasehold improvements and approximately $10,100,000 was allocated to goodwill) and approximately $2,200,000 for store inventory. The goodwill is being amortized over 40 years. The acquisition was financed through the application of a portion of the proceeds of the sale to institutional investors of $50,000,000 principal amount of 12 1/4% Senior Subordinated Notes Due 2002, Series A (the "Series A Senior Subordinated Notes") on October 18, 1993.


**NOTE 3 - Loss on Disposal of the Southern Region**

  On March 29, 1993, Grand Union sold 48 of its 51 Southern Region stores to a single buyer and closed and subleased the remaining three stores. The transaction yielded total gross proceeds of approximately $43,000,000, excluding the assumption of capital leases of approximately $4,500,000, of which $25,000,000 related to fixed assets and $17,500,000 related to inventory.

  The Company recognized a loss of $198,000,000 on the disposal of the Southern Region. The loss is comprised of the following (in thousands):

| | |
|---|---|
| Write-off of goodwill and beneficial leases | $106,389 |
| Difference between proceeds received and the book value of tangible assets | 37,244 |
| Reserve for remaining Southern Region real estate | 26,948 |
| Employee termination expenses | 9,846 |
| Operating loss of the Southern Region subsequent to the date the decision was made to sell the region | 6,971 |
| Other | 10,602 |
| | $198,000 |

  The following unaudited pro forma summary represents the consolidated results of the operations of the Company as though the disposal of the Southern Region had taken place as of the beginning of the period presented (in thousands except per share amount).

| | 53 Weeks Ended April 3, 1993 |
|---|---|
| Sales | $2,562,796 |
| Gross profit | 730,146 |
| Loss before income taxes and extraordinary charges | (60,205) |
| Net loss applicable to common stock | (127,026) |
| Net loss per share applicable to common stock | (1,688.08) |

**NOTE 4 - Recapitalization and Extraordinary Charges**

On July 22, 1992, Holdings, Capital, a newly formed corporation, and Grand Union completed a recapitalization (the "Recapitalization"). In connection with the Recapitalization, Holdings, through Capital and Grand Union, entered into a new bank credit agreement (as amended from time to time, the "Bank Credit Agreement") providing for a $210,000,000 term loan facility (the "Term Loan") and a $100,000,000 revolving credit facility (the "Revolving Credit Facility"), issued $350,000,000 principal amount of Grand Union 11.25% Senior Notes due 2000 (the "11.25% Senior Notes") and $500,000,000 principal amount of Grand Union 12.25% Senior Subordinated Notes due 2002 (the "12.25% Senior Subordinated Notes"), and sold $343,000,000 principal amount of Capital 15.00% Senior Zero Coupon Notes due 2004 (the "Senior Zero Coupon Notes") and $745,000,000 principal amount of Capital 16.50% Senior Subordinated Zero Coupon Notes due 2007 (the "Senior Subordinated Zero Coupon Notes"), together with warrants to purchase at a nominal price approximately 19.9% of the common stock of Holdings on a fully diluted basis, for aggregate gross proceeds of approximately $200,000,000. The Recapitalization also included the sale to institutional investors of approximately 28.4% of the common stock of Holdings on a fully diluted basis for approximately $25,000,000. The proceeds were used to retire substantially all of the debt of Holdings, GU Acquisition Corporation ("GUAC"), a wholly owned subsidiary of Holdings, and Grand Union as well as to repurchase the shares and option to purchase shares owned by Salomon Brothers Holding Company Inc, certain warrants held by the parties to the term loan and revolving credit facility existing prior to the Recapitalization and approximately 3.4% of the common stock of Holdings held by Grand Union management.

At the time of the Recapitalization, GUAC and its wholly-owned subsidiary Cavenham Holdings Inc., the former parent of Grand Union, were merged into Grand Union and Grand Union became a wholly owned subsidiary of Capital.

On January 28, 1993, Grand Union sold $175,000,000 principal amount of 11.375% Senior Notes due 2000 (the "11.375% Senior Notes") in a private placement. Net proceeds of the sale of the 11.375% Senior Notes were used to repay $142,000,000 of indebtedness under the Term Loan and the remainder was used to repay indebtedness under the Revolving Credit Facility. An additional $20,856,000 of the Term Loan was repaid from the proceeds of the sale of the Southern Region on March 29, 1993. All of such repaid indebtedness under the Term Loan and under the Revolving Credit Facility had been incurred in connection with the Recapitalization.

During the 53 weeks ended April 3, 1993, the Company recorded $3,516,000 relating to expenses incurred in connection with the Recapitalization and extraordinary charges of $47,663,000 relating to early retirement of debt. The Company had an operating loss in the year ended April 3, 1993 and was in a net operating loss carryforward position and, accordingly, no tax benefit was recorded in connection with the extraordinary charges. The extraordinary charges are comprised of the following (column in thousands):

| | |
|---|---:|
| Premiums paid in connection with the Recapitalization | $24,086 |
| Deferred financing fees written off in connection with the Recapitalization | 16,407 |
| Deferred financing fees written off in connection with the refinancing and prepayment of $142,000,000 of the term loan | 6,252 |
| Deferred financing fees written off in connection with the prepayment of $20,856,000 of the term loan resulting from the disposal of the Southern Region | 918 |
| | $47,663 |

## NOTE 5 - Property

Property, at cost, consists of the following:

|  | April 3, 1993 | April 2, 1994 |
|---|---|---|
|  | (in thousands) | |
| Property owned: | | |
| Land | $18,875 | $19,315 |
| Buildings | 51,165 | 53,686 |
| Fixtures and equipment | 207,508 | 248,230 |
| Leasehold improvements | 118,360 | 133,777 |
|  | 395,908 | 455,008 |
| Less: accumulated depreciation and amortization | 125,534 | 158,277 |
| Property owned, net | 270,374 | 296,731 |
| | | |
| Property held under capital leases: | | |
| Land and buildings | 88,418 | 103,228 |
| Equipment | 12,831 | 16,905 |
|  | 101,249 | 120,133 |
| Less: accumulated amortization | 11,444 | 16,310 |
| Property held under capital leases, net | 89,805 | 103,823 |
| Property | $360,179 | $400,554 |

Depreciation and amortization of owned and leased property for the 52 weeks ended March 28, 1992, the 53 weeks ended April 3, 1993 and the 52 weeks ended April 2, 1994 was $49,853,000, $53,335,000 and $52,760,000 respectively.

## NOTE 6 - Receivables and Accounts Payable and Accrued Liabilities

Receivables at April 3, 1993 and April 2, 1994 are net of allowance for doubtful accounts of $605,000 and $809,000, respectively.

Accounts payable and accrued liabilities consist of the following:

|  | April 3, 1993 | April 2, 1994 |
|---|---|---|
|  | (in thousands) | |
| Accounts and drafts payable | $163,152 | $136,707 |
| Accrued liabilities: | | |
| Payroll | 23,992 | 25,073 |
| Interest | 25,709 | 27,258 |
| Self insurance | 19,696 | 15,480 |
| Southern Region disposal | 16,284 | 4,334 |
| Taxes other than income taxes | 9,555 | 9,036 |
| Store closure reserves | 4,762 | 4,003 |
| Other | 19,882 | 16,334 |
|  | $283,032 | $238,225 |

**NOTE 7 - Income Taxes**

The components of the income tax provision are as follows:

| | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 |
|---|---|---|---|
| | | (in thousands) | |
| Currently payable | | | |
| State | $10,973 | $4,535 | $ - |
| Federal | - | - | - |
| | 10,973 | 4,535 | - |
| Deferred, resulting from: | | | |
| Store closure provision | 1,455 | (9,243) | 5,816 |
| Accrued insurance | (183) | (717) | 2,267 |
| Deferred financing | (1,802) | (320) | 554 |
| Deferred compensation | (60) | 1,258 | (114) |
| Beneficial lease amortization | (3,093) | (2,488) | (2,054) |
| Effect of change in rate on temporary differences | - | - | (3,099) |
| Excess of book over tax depreciation | (2,692) | (14,240) | (4,171) |
| Postretirement benefits other than pension | - | - | (11,407) |
| Interest expense | - | (7,341) | (12,132) |
| Net operating loss | (13,811) | (27,884) | (13,121) |
| Write-off of deferred tax debits | 16,592 | - | - |
| Other | 5,153 | (2,908) | (451) |
| Deferred tax asset valuation allowance | - | 63,883 | 37,912 |
| | 1,559 | - | - |
| Total income tax provision | $12,532 | $4,535 | $ - |

The reconciliation of the income tax provision computed at the federal statutory rate to the reported income tax provision is as follows:

| | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 |
|---|---|---|---|
| | | (in thousands) | |
| Benefit computed at federal statutory tax rate | $(17,857) | $(105,021) | $(41,284) |
| (Increase) decrease in the benefit resulting from: | | | |
| Write-off of goodwill and beneficial leases from the disposal of the Southern Region | - | 36,172 | - |
| Effect of change in rate on temporary differences | - | - | (3,099) |
| Amortization of goodwill | 6,231 | 6,011 | 5,486 |
| State and local taxes, net of federal tax benefit | 7,242 | 2,738 | - |
| Deferred tax asset valuation allowance | - | 63,883 | 37,912 |
| Limitation on recognition of deferred tax debits | 16,592 | - | - |
| Alternative minimum tax | 503 | - | - |
| Other | (179) | 752 | 985 |
| Total income tax provision | $12,532 | $4,535 | $ - |

## NOTE 7 - Income Taxes (continued)

As of April 2, 1994, the Company had a net operating loss carryforward of approximately $290,268,000 for tax purposes expiring in the years 2002 through 2009. The Recapitalization resulted in an "ownership change" of the Company within the meaning of Section 382 of the Internal Revenue Code of 1986, as amended, as a consequence of which utilization of the existing net operating loss carryforward in post-change periods will be limited.

## NOTE 8 - Debt

Debt of the respective companies consists of the following:

|  | April 3, 1993 | April 2, 1994 |
|---|---|---|
|  | (in thousands) | |
| **Grand Union:** | | |
| Bank Credit Agreement | | |
| Term Loan | $39,144 | $39,144 |
| Revolving Credit Facility | - | 25,000 |
| 11.25% Senior Notes | 350,000 | 350,000 |
| 11.375% Senior Notes | 175,000 | 175,000 |
| Equipment mortgage notes | 1,813 | 3,960 |
| 12.25% Senior Subordinated Notes | 500,000 | 500,000 |
| 12.25% Senior Subordinated Notes, Series A | - | 50,000 |
| 13% Senior Subordinated Notes | 16,150 | 16,150 |
| **Capital:** | | |
| 15% Senior Zero Coupon Notes | 129,366 | 150,482 |
| 16.50% Senior Subordinated Zero Coupon Notes | 74,569 | 88,116 |
| **Holdings:** | | |
| 12% Junior Subordinated Notes | 5,521 | 7,151 |
|  | 1,291,563 | 1,405,003 |
| Less: current maturities of long-term debt | 466 | 914 |
| Long-term debt | $1,291,097 | $1,404,089 |

The Term Loan and Revolving Credit Facility provide for interest at either a floating rate of 2% and 1.5%, respectively, per annum above the prime rate, as defined, or 3.5% and 3%, respectively, per annum above the LIBOR rate, as defined, at the option of Grand Union. As of April 2, 1994, borrowings under the Term Loan and the Revolving Credit Facility were at weighted interest rates of 7.32% and 7.75%, respectively. The Term Loan requires quarterly payments of approximately $9,786,000 from September 30, 1997 through June 30, 1998. In addition, the Bank Credit Agreement provides for mandatory prepayments of the Term Loan Facility or commitment reductions under the Revolving Credit Facility based on certain asset sales outside the ordinary course of business of Grand Union and its subsidiaries, the proceeds of certain debt and equity issuances and a percentage of Excess Cash Flow (as defined).

The Revolving Credit Facility provides for borrowings or issued letters of credit aggregating $100,000,000 through February 28, 1998. At April 2, 1994, there were $25,000,000 of borrowings outstanding and $42,646,000 of letters of credit issued under the Revolving Credit Facility. Grand Union is charged commitment fees of 1/2 of 1% per annum on the average unused portion of the Revolving Credit Facility.

The Bank Credit Agreement contains certain financial and other restrictive covenants with respect to Grand Union relating to, among other things, minimum financial performance and limitations on the incurrence of additional indebtedness, asset sales, capital expenditures, prepayment of other indebtedness and payment of dividends. In addition, in each fiscal year, there is a clean-down period whereby for a 30 consecutive day period selected by Grand Union, which commences on or after April 15 of each calendar year and terminates on or before June 29 of such calendar year, there can be no outstanding revolving loans in excess of $35,000,000.

**NOTE 8 - Debt (continued)**

The 11.25% Senior Notes, due July 15, 2000, and the 12.25% Senior Subordinated Notes and Series A Senior Subordinated Notes, both due July 15, 2002, require semi-annual interest payments each January 15 and July 15.

The 11.375% Senior Notes are due February 15, 1999 and require semi-annual interest payments each February 15 and August 15.

The 13% Senior Subordinated Notes (the "13% Notes") are due March 1998 and require semi-annual interest payments each March 31 and September 30.

Indebtedness under the Bank Credit Agreement, the 11.25% Senior Notes and the 11.375% Senior Notes is guaranteed by Capital and by Holdings on a pari passu basis and is secured by a pledge of substantially all of the assets of Grand Union (other than leasehold interests and assets secured by permitted liens). Capital's guarantee of the Bank Credit Agreement, the 11.25% Senior Notes and the 11.375% Senior Notes is secured by a pledge of the common stock of Grand Union and Holdings' guarantee of the Bank Credit Agreement, the 11.25% Senior Notes and the 11.375% Senior Notes is secured by a pledge of the common stock of Capital. Indebtedness under the Series A Senior Subordinated Notes is guaranteed by Capital on a pari passu basis with Capital's guarantee of the 12.25% Senior Subordinated Notes. Capital's guarantee of the Series A Senior Subordinated Notes is not secured.

Capital has outstanding $343,000,000 principal amount at maturity of Senior Zero Coupon Notes due July 15, 2004. The original issue discount of $226,855,000 is being amortized recognizing a yield to maturity of 15.71% per annum. The carrying value represents the principal at maturity less the unamortized discount. On July 15, 1999, cash interest will begin accruing and is payable semi-annually on January 15 and July 15 at a rate of 15.00% on the unpaid principal amount. The Senior Zero Coupon Notes were issued with detachable warrants to purchase common stock of Holdings.

Capital has outstanding $745,000,000 principal amount at maturity of Senior Subordinated Zero Coupon Notes, due January 15, 2007. The original issue discount of $678,802,000 is being amortized recognizing a yield to maturity of 17.41% per annum. The carrying value represents the principal at maturity less the unamortized discount. The Senior Subordinated Zero Coupon Notes were issued with detachable warrants to purchase common stock of Holdings.

Interest on the 12% Junior Subordinated Notes (the "Junior Notes") is compounded semi-annually each March 1 and September 1. Based upon current restrictions, such interest is not payable until either maturity (March 1999) or redemption of the Junior Notes.

At April 2, 1994, the fair value of long-term debt, including the current maturities, of Grand Union, Capital and Holdings was approximately $1,405,000,000.

In connection with the Bank Credit Agreement, Grand Union entered into an interest rate protection agreement on $75,000,000 of its borrowings. The effect of the interest rate protection agreement is to limit LIBOR to 6.5% and 7.0% on $40,000,000 and $35,000,000 of borrowings, respectively, through April 1995. Grand Union is exposed to credit loss in the event of nonperformance by the other party to the interest rate protection agreement. Grand Union does not anticipate nonperformance by the counterparty.

In addition Grand Union entered into an interest rate swap agreement which converts $150,000,000 of fixed rate debt into variable rate debt. Under the terms of this agreement Grand Union receives a fixed rate of 4.53% on $150,000,000 and pays a floating rate based on three month LIBOR, as determined in three month intervals. The floating rate at April 2, 1994 was 3.5%. The net amount received or paid is included in interest expense. Grand Union is exposed to credit loss in the event of nonperformance by the other party to the swap agreement. Grand Union does not anticipate nonperformance by the counterparty.

## NOTE 8 - Debt (continued)

At April 2, 1994, the estimated fair value of the interest rate swap agreement was a liability of approximately $1,821,000; this liability has not been recorded on the books of the Company.

At April 2, 1994, the estimated fair value of the interest rate protection agreement was an asset of approximately $42,000; this asset has not been recorded on the books of the Company.

Maturities of long-term debt during each of the next five fiscal years are approximately $914,000, $1,000,000, $1,100,000, $45,518,000 and $217,873,000, respectively.

The Company was in compliance with the terms and restrictive covenants of its debt obligations as of April 2, 1994 and for the 52 weeks then ended.

## NOTE 9 - Property Leases

The Company operates principally in leased stores, distribution facilities and offices, and in most cases holds renewal options with varying terms.  Many of the leases contain clauses which provide for increased rentals based upon increases in real estate taxes and lessors' operating expenses.

The following is a schedule by year of future minimum payments under capital leases together with the present value of net minimum lease payments as of April 2, 1994 (in thousands):

| Years ended March: | |
|---|---|
| 1995 | $22,734 |
| 1996 | 21,301 |
| 1997 | 19,845 |
| 1998 | 18,984 |
| 1999 | 18,190 |
| Later years | 191,058 |
| Total minimum lease payments | 292,112 |
| Less: estimated executory costs included in total minimum lease payments | 847 |
| Net minimum lease payments | 291,265 |
| Less: portion representing interest | 164,026 |
| Present value of net minimum lease payments | 127,239 |
| Less: current portion of capital lease obligations | 7,099 |
| Capital lease obligations | $120,140 |

The minimum lease payments shown above do not include future minimum sublease rental income of $991,000 under non-cancelable subleases or payments for contingent rentals under certain store leases on the basis of sales in excess of stipulated amounts.

Contingent rentals incurred on capital leases for the 52 weeks ended March 28, 1992, for the 53 weeks ended April 3, 1993 and for the 52 weeks ended April 2, 1994 were $423,000, $358,000 and $313,000, respectively.

**NOTE 9 - Property Leases (continued)**

The following is a schedule by year of future minimum rental payments, less minimum sublease rental income, under operating leases that have initial lease terms in excess of one year as of April 2, 1994 (in thousands):

| Years ended March: | |
|---|---|
| 1995 | $28,331 |
| 1996 | 28,075 |
| 1997 | 26,626 |
| 1998 | 25,303 |
| 1999 | 23,637 |
| Later years | 136,547 |
| Total minimum payments | 268,519 |
| Less: sublease rental income | 5,879 |
| Net minimum rentals | $262,640 |

Total rental expense for all operating leases is as follows:

|  | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 |
|---|---|---|---|
|  |  | (in thousands) |  |
| Minimum rentals | $37,003 | $34,764 | $26,512 |
| Contingent rentals | 4,029 | 3,963 | 3,658 |
|  | $41,032 | $38,727 | $30,170 |

As of April 2, 1994, the Company is contingently liable to third parties arising from assignment of various leases, which resulted primarily from the disposals of unprofitable operations during the mid 1980s. The average remaining term of these leases is approximately three years, with varying rental terms. The Company is exposed to credit loss in the event of nonperformance by various assignees. The Company has not experienced and does not anticipate any material nonperformance by these assignees.

## NOTE 10 - Redeemable Stock and Nonredeemable Common Stock and Stockholders' Deficit

Changes in Redeemable Common Stock and Nonredeemable Common Stock and Stockholders' Deficit were as follows:

| | Redeemable Common Stock | Nonredeemable Common Stock and Stockholders' Deficit | | |
| | | Common Stock | Additional Paid-in-Capital | (Deficit) |
|---|---|---|---|---|
| | | (in thousands) | | |
| Balance at March 30, 1991 | $12,358 | $1 | $ - | $(112,644) |
| Net loss | - | - | - | (65,053) |
| Pension adjustment | - | - | - | (259) |
| Accrued preferred stock dividends | - | - | - | (12,856) |
| Balance at March 28, 1992 | 12,358 | 1 | - | (190,812) |
| Net loss | - | - | - | (313,421) |
| Capital contribution | - | - | 5,004 | - |
| Proceeds from the sale of warrants | - | - | 1,187 | - |
| Reclassification of redeemable common stock sold by management to third parties | (3,180) | - | 3,180 | - |
| Accrued preferred stock dividends | - | - | (9,371) | (5,252) |
| Notes receivable from management investors | - | - | - | (501) |
| Pension adjustment | - | - | - | (358) |
| Proceeds from sale of common stock to management investors | 369 | - | - | - |
| Balance at April 3, 1993 | 9,547 | 1 | - | (510,344) |
| Net loss | - | - | - | (117,953) |
| Accrued preferred stock dividends | - | - | - | (16,011) |
| Pension adjustment | - | - | - | (456) |
| Reclassification of redeemable common stock purchased from management investors | (140) | - | - | 140 |
| Payments of notes receivable from former management investors | - | - | - | 7 |
| Balance at April 2, 1994 | $9,407 | $1 | $ - | $(644,617) |

The redeemable common stock represents shares held by management investors, which are redeemable under certain limited circumstances at the option of the holder.

Prior to the Recapitalization, 75,000 shares of common stock of Holdings were issued and outstanding and 17,500 shares of common stock of Holdings were reserved for issuance pursuant to exercise of outstanding options and warrants.

The Recapitalization included the sale of shares of common stock and of options and warrants to purchase common stock held by Salomon Brothers Holding Company Inc, by the banks party to Grand Union's bank credit agreements which were terminated in connection with the Recapitalization and by certain members of management, as well as the purchase of shares of common stock and of warrants to purchase shares of common stock by various investment funds and institutional investors. Purchases and sales of Holdings common stock interests, including options and warrants, in connection with the Recapitalization (the "Stock Transactions") were made through a disbursement escrow account established for the purpose of effecting various transfers of interests in Holdings common stock (the "Equity Escrow"). Holdings issued 1,250 new warrants for proceeds of approximately $1,187,000 in connection with the Recapitalization. The Stock Transactions did not involve any payments by Grand Union or Holdings. Holdings received a capital contribution from the Equity Escrow of approximately $5,004,000

**NOTE 10 - Redeemable Stock and Nonredeemable Common Stock and Stockholders' Deficit (continued)**

as a result of the net transfer of interests. As part of the Stock Transactions, the Company's Chairman transferred to the Equity Escrow an option, granted in connection with the acquisition of Grand Union by Holdings in July 1989, and a note payable to Holdings in the amount of approximately $3,563,000 in exchange for 8,229 shares of Holdings common stock. The note payable to Holdings has a maturity of 10 years, provides for interest equal to any cash dividends paid on the 8,229 shares of Holdings common stock and is secured by, and with recourse limited to, the 8,229 shares of Holdings common stock and any property (other than cash) distributed on or with respect to such shares. The note has been recorded as an offset to the attributed value of the common shares issued.

At the time of the Recapitalization, Holdings issued 388 shares of common stock to certain members of Grand Union management, for which Holdings received cash proceeds of approximately $369,000. After giving effect to the Stock Transactions and the sale of such 388 shares to management investors, there were 75,388 shares of common stock of Holdings outstanding (including 26,719 shares of non-voting, Class B common stock) and 18,750 shares of common stock of Holdings are reserved for issuance pursuant to exercise of outstanding warrants which may be exercised, at a nominal price, at any time prior to July 23, 2007.

During the 52 weeks ended April 2, 1994, Holdings purchased 164 shares of common stock from former management investors for approximately $156,000 (of which $140,000 was carried as Redeemable Common Stock) and in related transactions was repaid $7,000 to fully satisfy notes receivable from these management investors.

Changes in Redeemable Preferred Stock were as follows:

| | Redeemable Preferred Stock | | | |
| --- | --- | --- | --- | --- |
| | Series A Preferred Stock | Series B Preferred Stock | Series C Preferred Stock | Total |
| | (in thousands) | | | |
| Balance at March 30, 1991 | $42,968 | $7,903 | $53,770 | $104,641 |
| Accrued preferred stock dividends | 5,294 | 936 | 6,626 | 12,856 |
| Preferred stock dividends | - | (941) | - | (941) |
| Balance at March 28, 1992 | 48,262 | 7,898 | 60,396 | 116,556 |
| Accrued preferred stock dividends | 6,071 | 955 | 7,597 | 14,623 |
| Preferred stock dividends | - | (939) | - | (939) |
| Balance at April 3, 1993 | 54,333 | 7,914 | 67,993 | 130,240 |
| Accrued preferred stock dividends | 6,697 | 936 | 8,378 | 16,011 |
| Preferred stock dividends | - | (939) | - | (939) |
| Balance at April 2, 1994 | $61,030 | $7,911 | $76,371 | $145,312 |

The Company has outstanding at April 2, 1994 three classes of preferred stock. The Series A cumulative exchangeable redeemable preferred stock ("Series A preferred stock") has a $.01 par value; 500,000 shares authorized; and 351,745 shares issued and outstanding. The Series B cumulative redeemable convertible preferred stock ("Series B preferred stock") has a $.01 par value; 500,000 shares authorized; and 78,256 shares issued and outstanding. The Series C cumulative redeemable convertible preferred stock ("Series C preferred stock") has a $.01 par value; 500,000 shares authorized; and 440,771 shares issued and outstanding.

The Series A, Series B and Series C preferred stock each carry dividend rates of 12% per annum. At the discretion of the Company cash dividends are payable on the Series A, Series B and Series C preferred stock semi-annually each March 1 and September 1; however, no cash dividends may be declared or paid on the Series A, Series B or Series C preferred stock while the Bank Credit Agreement is outstanding or if such declaration or payment would violate the terms of indebtedness incurred to refinance the 13% Notes or the Bank Credit Agreement. So long as cash dividends are prohibited, dividends on the Series B preferred stock are payable in Junior Notes annually each March 1. Series B preferred stock, and accrued and unpaid dividends thereon, may

**NOTE 10 - Redeemable Stock and Nonredeemable Common Stock and Stockholders' Deficit (continued)**

be converted at any time, at the holder's option, into shares of Series C preferred stock. Series C preferred stock, and accrued and unpaid dividends thereon, may be converted at any time, at the holder's option, into shares of Series B preferred stock; or the Series C preferred shares may be converted at any time, at the holder's option, into the same number of shares of Series B preferred stock and the accrued and unpaid dividends on such stock into a principal amount of Junior Notes. Holdings preferred stock has no voting rights except as required by law and except that holders of each series have a class vote as to any matter which would change the preferences, rights or powers of such series and the vote of all series of preferred stock, voting together, is required to issue any prior ranking preferred stock.

The dividend rate on the Series A, Series B and Series C preferred stock increases from 12% to 20% as of July 14, 1996. The Company expects to redeem the Series A, Series B and Series C preferred stock on or before the date of the dividend step-up. Accordingly, accrued undeclared dividends have been recorded at a rate of 12% as a reduction in additional paid-in-capital or as an increase in stockholders' deficit, and as an increase in the respective preferred stock carrying values.

Series A preferred stock may be exchanged into Junior Notes at the sole option of the Company, in whole, or in part. Series A, Series B and Series C preferred stock may be redeemed at any time at the option of the Company, in whole, or in part. The redemption of Series A, Series B and Series C preferred stock must be in pro rata amounts. Series A, Series B and Series C preferred stock is redeemable at the holders' option under certain limited circumstances relating to change of control and, accordingly, outstanding amounts of these classes of preferred stock are shown as Redeemable stock in the accompanying Consolidated Balance Sheet. The redemption price of Series A, Series B and Series C preferred stock is one hundred dollars per share plus accrued and unpaid dividends as of the date of redemption. The liquidation preference of Series A, Series B and Series C preferred stock is one hundred dollars per share plus accrued and unpaid dividends.

Upon the liquidation or dissolution of the Company the priority of amounts payable to holders of preferred stock is as follows: (i) the amount of accrued and unpaid dividends on the Series B preferred stock, and any outstanding principal and accrued interest on Junior Notes; (ii) the amount of accrued and unpaid dividends on the Series A and Series C preferred stock; (iii) one hundred dollars per share for outstanding Series A and Series C preferred stock; and (iv) one hundred dollars per share for outstanding Series B preferred stock.

At April 2, 1994, the fair value of Holdings' redeemable preferred stock was approximately $98,378,000. The redeemable common stock of Holdings is neither traded nor a quoted security and an estimate of fair value has not been presented since it cannot be determined without incurring excessive costs.

## NOTE 11 - Pension Plans

The Company's net periodic pension expense for the 52 weeks ended March 28, 1992, for the 53 weeks ended April 3, 1993 and for the 52 weeks ended April 2, 1994 was $1,661,000, $3,867,000 and $6,744,000, respectively, and included the following components:

| | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 |
|---|---|---|---|
| | | (in thousands) | |
| Service cost - benefits earned during the period | $5,627 | $5,629 | $5,212 |
| Interest costs on projected benefit obligations | 13,161 | 13,726 | 13,742 |
| Return on plan assets | (19,165) | (21,504) | (9,068) |
| Net amortization and deferral | 2,038 | 4,337 | (7,610) |
| Charge relating to early retirement program | - | - | 4,468 |
| Curtailment loss | - | 1,679 | - |
| Net periodic pension expense | $1,661 | $3,867 | $6,744 |

As a result of the disposal of the Southern Region and an early retirement program offered to certain employees, a net curtailment loss of approximately $1,679,000 was incurred for the 53 weeks ended April 3, 1993. During the 52 weeks ended April 2, 1994, the Company incurred a charge of $4,468,000 relating to an early retirement program offered to certain employees.

The actuarial present value of benefit obligations and the funded status of the Company's qualified pension plan as of April 3, 1993 and April 2, 1994 are as follows:

| | April 3, 1993 | April 2, 1994 |
|---|---|---|
| | (in thousands) | |
| Actuarial present value of benefit obligations: | | |
| Vested benefits | $156,921 | $160,910 |
| Nonvested benefits | 4,160 | 4,503 |
| Total benefits | $161,081 | $165,413 |
| | | |
| Projected benefit obligations | $(181,021) | $(177,518) |
| Plan assets, primarily stocks and bonds, at fair value | 196,259 | 181,337 |
| Funded status | 15,238 | 3,819 |
| Unrecognized net loss | 13,579 | 18,299 |
| Unrecognized prior service cost | 1,032 | 1,736 |
| Pension asset | $29,849 | $23,854 |

**NOTE 11 - Pension Plans (continued)**

The actuarial present value of benefit obligations of the Company's unqualified and unfunded pension plan as of April 3, 1993 and April 2, 1994 is as follows:

|  | April 3, 1993 | April 2, 1994 |
|---|---|---|
|  | (in thousands) | |
| Actuarial present value of benefit obligations: | | |
| Vested benefits | $5,654 | $5,739 |
| Nonvested benefits | 180 | 624 |
| Total benefits | $5,834 | $6,363 |
|  | | |
| Projected benefit obligations | $(6,432) | $(7,110) |
| Unrecognized net loss | 1,595 | 2,033 |
| Unrecognized prior service cost | - | (32) |
| Adjustment required to recognize minimum liability | (997) | (1,254) |
| Pension obligation | $(5,834) | $(6,363) |

The pension asset and pension obligation are included in Other assets and Other liabilities, respectively, in the accompanying Consolidated Balance Sheet.

Significant actuarial assumptions used in all Company sponsored plans were as follows:

|  | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 |
|---|---|---|---|
| Discount rates | 8.0% - 8.8% | 8.0% - 8.8% | 7.0% - 8.0% |
| Rates of increase in future compensation | 4.7% - 5.3% | 4.9% - 5.3% | 3.9% - 4.3% |
| Long-term rate of return on plan assets | 9.8% | 9.5% | 9.5% |

**NOTE 12 - Postretirement Health Care and Life Insurance Benefits**

The Company provides certain health care and life insurance benefits for substantially all of its full-time non-union employees and union employee groups. The Company's union employee groups are participants in multi-employer plans which require monthly contributions and which are not subject to the provisions of Statement of Financial Accounting Standards No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions" ("FAS No. 106"). In the fiscal years ended March 28, 1992 and April 3, 1993, the Company recognized $2,110,000 and $2,329,000, respectively, as an expense for postretirement health care and life insurance benefits for its non-union employees, as claims were paid (pay-as-you-go basis). The Company's postretirement plans currently are not funded. Additionally, at April 3, 1993, in connection with the disposition of the Southern Region, Grand Union provided approximately $2,920,000 relating to anticipated postretirement health care and life insurance benefits of Southern Region employees.

Effective April 4, 1993, the Company adopted FAS No. 106, which requires the Company to accrue the estimated cost of retiree benefit payments during the years each employee provides services. The Company recognized the cumulative effect of this obligation, an increase in accrued postretirement benefit costs of $30,308,000 and a decrease in net earnings of $30,308,000 ($402.03 per share), at April 4, 1993.

**NOTE 12 - Postretirement Health Care and Life Insurance Benefits (continued)**

The unfunded accumulated postretirement benefit obligation consists of the following at April 4, 1993, including amounts provided at April 3, 1993 in connection with the disposition of the Southern Region, and April 2, 1994:

|  | April 4, 1993 (date of adoption) | April 2, 1994 |
|---|---|---|
|  | (in thousands) | |
| Retirees | $18,129 | $17,050 |
| Fully eligible active plan participants | 5,807 | 2,411 |
| Other active plan participants | 9,292 | 15,645 |
| Unrecognized net loss | - | (1,412) |
|  | $33,228 | $33,694 |

Net postretirement benefit cost for the 52 weeks ended April 2, 1994 consisted of the following components (in thousands):

| | |
|---|---|
| Service cost - benefits earned during the period | $728 |
| Interest cost on accumulated postretirement benefit obligation | 2,571 |
| | $3,299 |

The assumed health care trend cost rate used in measuring the accumulated postretirement obligation as of April 4, 1993 was 15% for associates pre-age 65 and ranges from 12% to 15% for associates post-age 65 for 1993 decreasing each successive year by 1% until the respective trend rates reach 6.5% after which the trend rate remains constant. As of April 2, 1994, the rate used in measuring the accumulated postretirement obligation was 14% for associates pre-age 65 and 11% for associates post-age 65, decreasing each successive year by 1% until the respective trend rates reach 5% after which the trend rate remains constant. An increase of 1% in the assumed health care cost trend rate for each year would increase the accumulated postretirement benefit obligation and the net postretirement health care cost by approximately $800,000 and $100,000, respectively.

Prior to January 1, 1994, Grand Union provided medical benefits which were, in part, dependent upon the health care cost rate. Effective January 1, 1994, Grand Union modified its postretirement health care benefits to provide benefits for all future retirees based on a service related flat dollar premium allowance. Accordingly, the health care trend rate will not be a significant factor in determining Grand Union's liability for future retirees under its postretirement health care arrangements. The modification to the plan did not have a material effect on the accumulated postretirement benefit obligation. The assumed discount rate used in determining the accumulated postretirement benefit obligation was 8% and 7.5% at April 4, 1993 and April 2, 1994, respectively, and the interest cost component of the net periodic cost was 8%.

**NOTE 13 - Related Party Transactions**

The Company is party to a financial advisory agreement with Miller Tabak Hirsch + Co. ("MTH") under which MTH provides certain financial consulting and business management services to the Company through July 1997. During the 52 weeks ended March 28, 1992, the 53 weeks ended April 3, 1993 and the 52 weeks ended April 2, 1994 the Company paid $600,000, $825,000 and $900,000, respectively, to MTH.

## NOTE 13 - Related Party Transactions (continued)

In conjunction with the Recapitalization, Holdings, through Grand Union, made a $15,000,000 prepayment as called for under an agreement (the "Operating Agreement") between Grand Union and P&C Food Markets ("P&C Foods"), an affiliated company controlled by MTH, whereby Grand Union in July 1990 acquired the right to operate 13 P&C Foods' stores in New England under the Grand Union name until July 2000 for an average annual rent of approximately $10,700,000, with an option to extend the term of such operation for an additional five years. The prepayment results in a reduction of rent payments over the remaining life of the lease. In July 1990, P&C Foods also granted Grand Union an option (the "P&C Foods Purchase Option"), at a cost of $7,500,000, to purchase such stores at an amount defined in the Operating Agreement which approximates fair market value.

During the year ended April 2, 1994, Grand Union entered into a program to consolidate the purchasing and distribution of health and beauty care products and general merchandise with Penn Traffic. Under this program, Grand Union purchases health and beauty care ("HBC") products for both Grand Union and Penn Traffic, and Penn Traffic purchases general merchandise ("GM") products for both Penn Traffic and Grand Union. Grand Union's general merchandise warehouse in Montgomery, New York is used to store and distribute HBC and GM products to Grand Union stores and to certain of Penn Traffic's stores and wholesale customers. Under the arrangement, Penn Traffic owns the inventory of GM and HBC products located at the Montgomery warehouse and shares the cost of operating the warehouse in an amount proportionate to Penn Traffic's usage of the facility. In connection with this agreement, Penn Traffic purchased all of the HBC and GM inventories previously owned by Grand Union for approximately $12,821,000. During the year ended April 2, 1994, Grand Union purchased from vendors approximately $75,262,000 of HBC products under the agreement which amounts are reimbursable to Grand Union by Penn Traffic. Additionally, Grand Union purchased approximately $48,163,000 from Penn Traffic's inventory of HBC and GM products at cost. At April 2, 1994, Grand Union has recorded a net receivable of approximately $5,014,000 related to this agreement.

## NOTE 14 - Supplemental Disclosure of Cash Flow Information

|  | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 |
|---|---|---|---|
|  |  | (in thousands) |  |
| Cash paid for interest | $89,457 | $115,612 | $142,501 |
| Cash paid for income taxes | 8,969 | 3,380 | - |
| Capital lease obligations incurred | 11,810 | 22,146 | 24,522 |
| Accrued dividends on preferred stock | 12,856 | 14,623 | 16,011 |
| Issuance of Junior Notes | 941 | 939 | 939 |

**NOTE 15 - Quarterly Financial Data (Unaudited)**

53 Weeks Ended April 3, 1993:

| | 1st (a) | 2nd | 3rd | 4th (b) |
|---|---|---|---|---|
| | (in thousands, except per share data) | | | |
| Sales | $907,970 | $660,947 | $660,830 | $604,240 |
| Gross profit | 253,800 | 187,243 | 183,176 | 177,287 |
| Loss on disposal of the Southern Region | - | - | - | (198,000) |
| Loss before income taxes and extraordinary charges | (16,680) | (15,113) | (13,880) | (215,550) |
| Extraordinary charges | - | (40,493) | - | (7,170) |
| Net loss | (20,843) | (55,975) | (13,880) | (222,723) |
| Accrued preferred stock dividends | (4,253) | (3,275) | (3,369) | (3,726) |
| Net loss applicable to common stock | (25,096) | (59,250) | (17,249) | (226,449) |
| Net loss per share applicable to common stock | (334.61) | (785.93) | (228.80) | (3,009.33) |

52 Weeks Ended April 2, 1994:

| | 1st (a) | 2nd | 3rd | 4th |
|---|---|---|---|---|
| | (in thousands, except per share data) | | | |
| Sales | $761,098 | $559,769 | $583,492 | $572,980 |
| Gross profit | 215,102 | 159,614 | 171,145 | 165,175 |
| Charge relating to early retirement program | - | - | - | (4,468) |
| Loss before income taxes and cumulative effect of accounting change | (28,457) | (16,546) | (16,933) | (25,709) |
| Cumulative effect of accounting change | (30,308) | - | - | - |
| Net loss | (58,765) | (16,546) | (16,933) | (25,709) |
| Accrued preferred stock dividends | (4,743) | (3,667) | (3,760) | (3,841) |
| Net loss applicable to common stock | (63,508) | (20,213) | (20,693) | (29,550) |
| Net loss per share applicable to common stock | (843.20) | (268.65) | (275.09) | (392.83) |

(a)  Represents 16 weeks, all other quarters except footnote (b) are 12 weeks.
(b)  Represents 13 weeks.

Grand Union regularly records as reductions to cost of goods sold, and correspondingly deducts from payments to vendors, promotional allowances offered by vendors. During the 52 weeks ended April 2, 1994, Grand Union recognized that its level of repayments of vendor allowances was greater than that customarily experienced by it. Beginning in the second quarter of the year ended April 2, 1994, Grand Union modified its procedures relating to the recording and deduction of promotional allowances. These changes are expected to improve the consistency of inter-period income recognition by reducing required adjustments to previously deducted amounts. As a result of these changes, the Company estimates that it experienced increases in net loss of approximately $4,200,000 during the 12 weeks ended October 16, 1993, $1,400,000 during the 12 weeks ended January 8, 1994 and $600,000 during the 12 weeks ended April 2, 1994. Grand Union estimates that the impact of promotional allowance adjustments was to decrease net loss during the 16 weeks ended July 24, 1993 by $1,700,000. Accordingly, the estimated impact for the 52 weeks ended April 2, 1994 was an increase in net loss of approximately $4,500,000. The impact of promotional allowance adjustments was not material to prior years. Grand Union believes that such impact will be minimal for periods subsequent to April 2, 1994.

During the 12 weeks ended October 16, 1993, Grand Union recorded a $3,800,000 credit to operating and administrative expense resulting from a reduction in the Company's estimate of its required level of self insurance reserves.

**Financial Statements Schedules**

### GRAND UNION HOLDINGS CORPORATION
### SCHEDULE II- AMOUNTS RECEIVABLE FROM RELATED PARTIES AND UNDERWRITERS, PROMOTERS AND EMPLOYEES OTHER THAN RELATED PARTIES
### For the Years Ended March 28, 1992, April 3, 1993 and April 2, 1994

| Name of Debtor | Balance at Beginning of Year | Additions | Deductions | Balance at End of Year Noncurrent |
|---|---|---|---|---|
| Year Ended March 28, 1992 | | | | |
| Joseph J. McCaig, President | $    - | $    - | $    - | $    - |
| Year Ended April 3, 1993 | | | | |
| Joseph J. McCaig, President | $    - | $227,676 | $    - | $227,676 |
| Year Ended April 2, 1994 | | | | |
| Joseph J. McCaig, President | $227,676 | $    - | $    - | $227,676 |

## GRAND UNION HOLDINGS CORPORATION
### SCHEDULE III - CONDENSED FINANCIAL INFORMATION OF REGISTRANT
### STATEMENT OF OPERATIONS

|  | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 |
|---|---|---|---|
|  | (in thousands except per share data) | | |
| Administrative expense | $(15) | $    - | $(10) |
| Equity income (loss) of subsidiary before extraordinary charges and cumulative effect of accounting change | 5,832 | (237,777) | (86,944) |
| Recapitalization expense | - | (3,516) | - |
| Interest expense: | | | |
|  Debt | (65,120) | (22,674) | (691) |
|  Amortization of deferred financing fees | (5,718) | (1,789) | - |
| Loss before income taxes, extraordinary charges and cumulative effect of accounting change | (65,021) | (265,756) | (87,645) |
| Income tax provision | (32) | (2) | - |
| Loss before extraordinary charge and cumulative effect of accounting change | (65,053) | (265,758) | (87,645) |
| Extraordinary charge relating to early extinguishment of debt of subsidiary | - | (38,827) | - |
| Extraordinary charges relating to early extinguishment of debt | - | (8,836) | - |
| Cumulative effect of accounting change of subsidiary | - | - | (30,308) |
| Net loss | (65,053) | (313,421) | (117,953) |
| Accrued preferred stock dividends | (12,856) | (14,623) | (16,011) |
| Net loss applicable to common stock | $(77,909) | $(328,044) | $(133,964) |
| | | | |
| Weighted average number of common shares outstanding | 75,000 | 75,249 | 75,258 |
| Per Share Data: | | | |
| Loss applicable to common stock before extraordinary charge and cumulative effect of accounting change (after accrued preferred stock dividends) | $(1,038.79) | $(3,726.05) | $(1,377.34) |
| Extraordinary charge | - | $(633.40) | - |
| Cumulative effect of accounting change | - | - | $(402.72) |
| Net loss applicable to common stock | $(1,038.79) | $(4,359.45) | $(1,780.06) |

See accompanying notes to consolidated financial statements.

# GRAND UNION HOLDINGS CORPORATION
## SCHEDULE III - CONDENSED FINANCIAL INFORMATION OF REGISTRANT
### BALANCE SHEET

|  | April 3, 1993 | April 2, 1994 |
|---|---|---|
|  | (in thousands) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and temporary cash investments | $611 | $183 |
| Receivables | - | 269 |
| Total current assets | $611 | $452 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Long-term debt | $5,521 | $7,151 |
| Accumulated losses of subsidiary in excess of investment | 365,646 | 483,354 |
| | | |
| Commitments and contingencies | | |
| | | |
| Redeemable stock: | | |
| Common stock, $.01 par value | 9,547 | 9,407 |
| Preferred stock (liquidation preference $145,312,000 in aggregate) | 130,240 | 145,312 |
| Total redeemable stock | 139,787 | 154,719 |
| Nonredeemable common stock and stockholders' deficit: | | |
| Class A common stock, $.01 par value; authorized 473,281 shares; issued and outstanding 48,669 and 48,505 shares (net of treasury shares) less 12,096 and 11,932 shares, respectively, shown as redeemable common stock | 1 | 1 |
| Class B common stock, $.01 par value; 26,719 shares authorized, issued and outstanding | - | - |
| Treasury stock; 164 shares of Class A common stock at cost | - | (156) |
| Accumulated deficit | (510,344) | (644,617) |
| Total nonredeemable common stock and stockholders' deficit | (510,343) | (644,772) |
| | $611 | $452 |

See accompanying notes to consolidated financial statements.

### GRAND UNION HOLDINGS CORPORATION
### SCHEDULE III - CONDENSED FINANCIAL INFORMATION OF REGISTRANT
### STATEMENT OF CASH FLOWS

| | 52 Weeks Ended March 28, 1992 | 53 Weeks Ended April 3, 1993 | 52 Weeks Ended April 2, 1994 |
|---|---|---|---|
| | | (in thousands) | |
| **OPERATING ACTIVITIES:** | | | |
| Net loss | $(65,053) | $(313,421) | $(117,953) |
| Adjustments to reconcile net loss to net cash provided by (used for) operating activities: | | | |
| Cumulative effect of accounting change of subsidiary | - | - | 30,308 |
| Extraordinary charge of subsidiary | - | 38,827 | - |
| Extraordinary charge on early extinguishment of debt | - | 8,836 | |
| Noncash interest | 65,325 | 22,678 | 691 |
| Equity in (income) loss of subsidiary | (5,832) | 237,777 | 86,944 |
| Amortization of deferred financing fees | 5,718 | 1,789 | - |
| Receivables | (111) | 111 | (269) |
| Accrued liabilities | (177) | - | - |
| Other | 29 | (1,873) | 7 |
| Net cash used for operating activities | (101) | (5,276) | (272) |
| **FINANCING ACTIVITIES:** | | | |
| Dividend from subsidiary | - | 498,925 | - |
| Capital contribution | - | 5,004 | - |
| Proceeds from issuance of warrants | - | 1,187 | - |
| Proceeds from issuance of common stock | - | 369 | - |
| Retirement of long-term debt | (10) | (500,000) | - |
| Purchase of redeemable Class A common stock | - | - | (156) |
| Net cash provided by (used for) financing activities | (10) | 5,485 | (156) |
| Increase (decrease) in cash and temporary cash investments | (111) | 209 | (428) |
| Cash and temporary cash investments at beginning of year | 513 | 402 | 611 |
| Cash and temporary cash investments at end of year | $402 | $611 | $183 |

See accompanying notes to consolidated financial statements.

## GRAND UNION HOLDINGS CORPORATION
### SCHEDULE IV - INDEBTEDNESS TO
### RELATED PARTIES - NONCURRENT
**For the Years Ended March 28, 1992, April 3, 1993 and April 2, 1994**

| Name of Person | Balance at Beginning of Year | Additions | Deductions | Balance at End of Year |
|---|---|---|---|---|
| Year Ended March 28, 1992 | | | | |
| Salomon Brothers Holding Company Inc | $155,962 | $17,298 | $5,435 | $167,825 |
| Year Ended April 3, 1993 | | | | |
| Salomon Brothers Holding Company Inc | $167,825 | $22,765 | $190,590 | $ - |
| Year Ended April 2, 1994 | | | | |
| Salomon Brothers Holding Company Inc | $ - | $ - | $ - | $ - |

**GRAND UNION HOLDINGS CORPORATION**
**SCHEDULE V - PROPERTY, PLANT & EQUIPMENT**
**For the Years Ended March 28, 1992, April 3, 1993 and April 2, 1994**

| Classification | Balance at Beginning of Year | Additions at Cost | Retirements (in thousands) | Other | Balance at End of Year |
|---|---|---|---|---|---|
| **Year Ended March 28, 1992** | | | | | |
| Property owned: | | | | | |
| Land | $19,508 | $26 | $(752) | $1,149 * | $19,931 |
| Buildings | 42,355 | 1,015 | (2,370) | 4,072 * | 45,072 |
| Fixtures and equipment | 209,142 | 21,541 | (2,511) | - | 228,172 |
| Leasehold improvements | 108,294 | 6,711 | (2,360) | - | 112,645 |
| Property owned | $379,299 | $29,293 | $(7,993) | $5,221 | $405,820 |
| Property leased: | | | | | |
| Land and buildings | $103,613 | $6,539 | $(169) | $(5,221) * | $104,762 |
| Equipment | 2,273 | 5,271 | - | - | 7,544 |
| Property leased | $105,886 | $11,810 | $(169) | $(5,221) | $112,306 |
| | | | | | |
| **Year Ended April 3, 1993** | | | | | |
| Property owned: | | | | | |
| Land | $19,931 | $250 | $(1,306) | $ - | $18,875 |
| Buildings | 45,072 | 12,644 | (6,551) | - | 51,165 |
| Fixtures and equipment | 228,172 | 29,540 | (50,204) | - | 207,508 |
| Leasehold improvements | 112,645 | 15,654 | (9,939) | - | 118,360 |
| Property owned | $405,820 | $58,088 | $(68,000) | $ - | $395,908 |
| Property leased: | | | | | |
| Land and buildings | $104,762 | $14,038 | $(30,382) | $ - | $88,418 |
| Equipment | 7,544 | 8,108 | (2,821) | - | 12,831 |
| Property owned | $112,306 | $22,146 | $(33,203) | $ - | $101,249 |
| | | | | | |
| **Year Ended April 2, 1994** | | | | | |
| Property owned: | | | | | |
| Land | $18,875 | $1,110 | $(670) | $ - | $19,315 |
| Buildings | 51,165 | 4,426 | (1,905) | - | 53,686 |
| Fixtures and equipment | 207,508 | 42,340 | (1,618) | - | 248,230 |
| Leasehold improvements | 118,360 | 21,321 | (5,904) | - | 133,777 |
| Property owned | $395,908 | $69,197 | $(10,097) | $ - | $455,008 |
| Property leased: | | | | | |
| Land and buildings | $88,418 | $19,311 | $(4,501) | $ - | $103,228 |
| Equipment | 12,831 | 5,211 | (1,137) | - | 16,905 |
| Property owned | $101,249 | $24,522 | $(5,638) | $ - | $120,133 |

* Represents the buyout of a capital lease obligation.

GRAND UNION HOLDINGS CORPORATION
SCHEDULE VI - ACCUMULATED DEPRECIATION, DEPLETION & AMORTIZATION
OF PROPERTY, PLANT & EQUIPMENT
For the Years Ended March 28, 1992, April 3, 1993 and April 2, 1994

| Classification | Balance at Beginning of Year | Additions | Retirements (in thousands) | Other | Balance at End of Year |
|---|---|---|---|---|---|
| **Year Ended March 28, 1992** | | | | | |
| Property owned: | | | | | |
| Buildings | $2,393 | $1,409 | $(169) | $1,091 * | $4,724 |
| Fixtures and equipment | 50,069 | 29,966 | (2,045) | - | 77,990 |
| Leasehold improvements | 18,128 | 10,791 | (992) | - | 27,927 |
| Property owned | $70,590 | $42,166 | $(3,206) | $1,091 | $110,641 |
| Property leased: | | | | | |
| Buildings | $10,403 | $6,544 | $(169) | $(1,091) * | $15,687 |
| Equipment | 671 | 1,143 | - | - | 1,814 |
| Property leased | $11,074 | $7,687 | $(169) | $(1,091) | $17,501 |
| **Year Ended April 3, 1993** | | | | | |
| Property owned: | | | | | |
| Buildings | $4,724 | $1,684 | $(501) | $      - | $5,907 |
| Fixtures and equipment | 77,990 | 31,849 | (23,808) | - | 86,031 |
| Leasehold improvements | 27,927 | 10,687 | (5,018) | - | 33,596 |
| Property owned | $110,641 | $44,220 | $(29,327) | $      - | $125,534 |
| Property leased: | | | | | |
| Buildings | $15,687 | $8,170 | $(12,670) | $      - | $11,187 |
| Equipment | 1,814 | 945 | (2,502) | - | 257 |
| Property leased | $17,501 | $9,115 | $(15,172) | $      - | $11,444 |
| **Year Ended April 2, 1994** | | | | | |
| Property owned: | | | | | |
| Buildings | $5,907 | $3,162 | $(249) | $      - | $8,820 |
| Fixtures and equipment | 86,031 | 29,565 | (6,626) | - | 108,970 |
| Leasehold improvements | 33,596 | 10,138 | (3,247) | - | 40,487 |
| Property owned | $125,534 | $42,865 | $(10,122) | $      - | $158,277 |
| Property leased: | | | | | |
| Buildings | $11,187 | $6,282 | $(3,892) | $      - | $13,577 |
| Equipment | 257 | 3,613 | (1,137) | - | 2,733 |
| Property leased | $11,444 | $9,895 | $(5,029) | $      - | $16,310 |

*    Represents the buyout of a capital lease obligation.

F - 29

# FORM 10-Q

## SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended January 7, 1995

Commission File Number 33-59438

### THE GRAND UNION COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 22 - 1518276 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| 201 Willowbrook Boulevard, Wayne, New Jersey | 07470 - 0966 |
| (Address of principal executive offices) | (Zip Code) |

201-890-6000
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes  X .    No ___ .

As of February 21, 1995, there were issued and outstanding 801.5 shares of the registrant's common stock.

1

## THE GRAND UNION COMPANY

## INDEX

**PART I - FINANCIAL INFORMATION (Unaudited)**                                  **Page No.**

**Item 1. Financial Statements.**

Consolidated Statement of Operations - 12 and 40 weeks ended January 7, 1995  and January          3
8, 1994

Consolidated Balance Sheet -  January 7, 1995 and April 2, 1994                                     4

Consolidated Statement of Cash Flows - 40 weeks ended January 7, 1995 and January 8,                5
1994

Notes to Consolidated Financial Statements                                                          6

**Item 2.  Management's Discussion and Analysis of Financial Condition and Results of**             8
**Operations.**


**PART II - OTHER INFORMATION**

Item 1 - Legal Proceedings                                                                          13

Item 3 - Defaults on Senior Securities                                                              13

Item 5 - Other Information                                                                          13

Item 6 - Exhibits; Reports on Form 8-K                                                              14

All items which are not applicable or to which the answer is negative have been omitted from this report.

The financial statements and related notes of Grand Union have not been separately presented herein since such financial statements reflect the accounts of Grand Union Capital Corporation pushed down to the accounts of Grand Union.

## PART I - FINANCIAL INFORMATION

### Item 1. Financial Statements.

### GRAND UNION CAPITAL CORPORATION
### CONSOLIDATED STATEMENT OF OPERATIONS
(unaudited)

| | 12 Weeks Ended | | 40 Weeks Ended | |
|---|---|---|---|---|
| | January 7, 1995 | January 8, 1994 | January 7, 1995 | January 8, 1994 |
| | (in thousands) | | | |
| Sales | $563,281 | $583,492 | $1,867,636 | $1,904,359 |
| Cost of sales | (413,757) | (412,347) | (1,327,601) | (1,358,498) |
| Gross profit | 149,524 | 171,145 | 540,035 | 545,861 |
| Operating and administrative expense | (127,947) | (127,436) | (420,106) | (408,815) |
| Depreciation and amortization | (21,204) | (18,285) | (67,224) | (59,369) |
| Provision for store closings and nonrecurring item | (10,630) | - | (10,630) | - |
| Restructuring costs | (1,882) | - | (1,882) | |
| Interest expense: | | | | |
| Debt: | | | | |
| Obligations requiring current cash interest | (31,893) | (29,648) | (104,583) | (98,216) |
| Obligations requiring no current cash interest | (9,564) | (8,286) | (31,154) | (26,751) |
| Capital lease obligations | (4,735) | (3,283) | (14,507) | (10,955) |
| Amortization of deferred financing fees | (1,187) | (1,140) | (3,914) | (3,691) |
| Loss before income taxes and cumulative effect of accounting change | (59,518) | (16,933) | (113,965) | (61,936) |
| Income tax provision | - | - | - | - |
| Loss before cumulative effect of accounting change | (59,518) | (16,933) | (113,965) | (61,936) |
| Cumulative effect of accounting change | - | - | - | (30,308) |
| Net loss | (59,518) | (16,933) | (113,965) | (92,244) |
| Accrued preferred stock dividends of Grand Union Holdings Corporation | (6,469) | (3,760) | (18,173) | (12,170) |
| Net loss applicable to common stock | ($65,987) | ($20,693) | ($132,138) | ($104,414) |

| | | | | |
|---|---|---|---|---|
| Other Data: | | | | |
| Earnings before LIFO provision, depreciation and amortization, provision for store closings and nonrecurring item, restructuring costs, interest expense, income taxes and cumulative effect of accounting change (EBITDA) | $21,802 | $43,509 | $120,679 | $137,654 |

See accompanying notes to consolidated financial statements (unaudited).

3

## GRAND UNION CAPITAL CORPORATION
## CONSOLIDATED BALANCE SHEET
(unaudited)

| | January 7, 1995 | April 2, 1994 |
|---|---|---|
| | (in thousands) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and temporary cash investments | $43,300 | $44,294 |
| Receivables | 20,651 | 37,072 |
| Inventories | 187,671 | 206,063 |
| Other current assets | 16,865 | 17,444 |
| Total current assets | 268,487 | 304,873 |
| Property, net | 433,253 | 400,554 |
| Goodwill, net | 549,113 | 563,276 |
| Beneficial leases, net | 28,570 | 33,074 |
| Deferred financing fees, net | 45,257 | 48,721 |
| Other assets | 42,144 | 43,726 |
| | $1,366,824 | $1,394,224 |
| | | |
| **LIABILITIES AND STOCKHOLDER'S DEFICIT** | | |
| Current liabilities: | | |
| Current maturities of long-term debt | $919 | $914 |
| Current portion of obligations under capital leases | 7,513 | 7,099 |
| Accounts payable and accrued liabilities | 263,863 | 238,225 |
| Total current liabilities | 272,295 | 246,238 |
| Long-term debt | 1,444,520 | 1,404,089 |
| Obligations under capital leases | 142,032 | 120,140 |
| Other noncurrent liabilities | 112,252 | 113,810 |
| | | |
| Commitments and contingencies | | |
| | | |
| Redeemable stock of Grand Union Holdings Corporation | | |
| (liquidation preference $163,485,000 in aggregate) | 172,892 | 154,719 |
| | | |
| Stockholder's deficit: | | |
| Common stock, $.01 par value; authorized, issued and outstanding 1,000 shares | 1 | 1 |
| Treasury stock of Grand Union Holdings Corporation | (156) | (156) |
| Accumulated deficit | (777,012) | (644,617) |
| Total stockholder's deficit | (777,167) | (644,772) |
| | $1,366,824 | $1,394,224 |

See accompanying notes to consolidated financial statements (unaudited).

## GRAND UNION CAPITAL CORPORATION
## CONSOLIDATED STATEMENT OF CASH FLOWS
(unaudited)

|  | 40 Weeks Ended | |
|---|---|---|
|  | January 7, 1995 | January 8, 1994 |
|  | (in thousands) | |
| **OPERATING ACTIVITIES:** | | |
| Net loss | ($113,965) | ($92,244) |
| Adjustments to reconcile net loss to net cash provided by (used for) operating activities: | | |
| Cumulative effect of accounting change | - | 30,308 |
| Depreciation and amortization | 67,224 | 59,369 |
| Noncash interest | 31,154 | 26,751 |
| Amortization of deferred financing fees | 3,914 | 3,691 |
| Net changes in assets and liabilities: | | |
| Receivables | 16,421 | (14,643) |
| Inventories | 18,392 | 31,915 |
| Accounts payable and accrued liabilities | 25,638 | (20,364) |
| Other current assets | 579 | (408) |
| Other | 1,660 | (14,980) |
| Net cash provided by (used for) operating activities | 51,017 | 9,395 |
| **INVESTMENT ACTIVITIES:** | | |
| Capital expenditures | (56,777) | (62,636) |
| Disposals of property | 2,016 | - |
| Net cash used for investment activities | (54,761) | (62,636) |
| **FINANCING ACTIVITIES:** | | |
| Proceeds from issuance of long-term debt | 10,000 | 50,011 |
| Obligations under capital leases discharged | (6,532) | (5,184) |
| Loan placement fees | - | (1,775) |
| Retirement of long-term debt | (718) | (360) |
| Purchase of Grand Union Holdings Corporation common stock | - | (156) |
| Net cash provided by financing activities | 2,750 | 42,536 |
| Decrease in cash and temporary cash investments | (994) | (10,705) |
| Cash and temporary cash investments at beginning of period | 44,294 | 69,651 |
| Cash and temporary cash investments at end of period | $43,300 | $58,946 |

| Supplemental disclosure of cash flow information: | | |
|---|---|---|
| Cash paid for interest | $84,226 | $74,587 |
| Capital lease obligations incurred | 28,838 | 12,863 |
| Accrued dividends on preferred stock of Grand Union Holdings Corporation | 18,173 | 12,170 |

See accompanying notes to consolidated financial statements (unaudited).

# GRAND UNION CAPITAL CORPORATION
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

**NOTE 1 - Basis of Accounting**

The accompanying interim consolidated financial statements of Grand Union Capital Corporation ("Capital" or the "Company") have not been audited by independent accountants. However, in the opinion of management the results of operations include all adjustments, which consist only of normal recurring adjustments, necessary for a fair presentation of operating results for the interim periods. The accompanying consolidated financial statements have been prepared on a going concern basis which contemplates the realization of assets and satisfaction of liabilities in the normal course of business. As discussed in Note 2 below, subsequent to January 7, 1995, Grand Union Holdings Corporation ("Holdings"), Capital, a wholly-owned subsidiary of Holdings, and The Grand Union Company ("Grand Union"), a wholly-owned subsidiary of Capital, each filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code. The accompanying consolidated financial statements do not include any adjustments relating to the recoverability and classification of recorded assets and liabilities that may result from the outcome of the bankruptcy proceedings.

These consolidated financial statements should be read in conjunction with the consolidated financial statements and related notes contained in the Company's Annual Report on Form 10-K for the fiscal year ended April 2, 1994. Operating results for the periods presented are not necessarily indicative of the results for the full fiscal year.

**NOTE 2 - Restructuring**

On November 29, 1994, Grand Union announced that it was not likely that it would be able to fund cash interest payments due in early calendar 1995, and that it intended to develop a capital restructuring plan. On December 21, 1994, Grand Union entered into a Limited Waiver and Agreement with the banks party to the Bank Credit Agreement which waived any event of default which might exist under the Bank Credit Agreement should Grand Union fail to make payments of interest due on January 16, 1995 in respect of Senior and Subordinated Notes of Grand Union. The Limited Waiver and Agreement also waived compliance with certain covenants in the Bank Credit Agreement, thereby permitting Grand Union to continue to make borrowings in the ordinary course under its revolving line of credit through February 15, 1995. On January 16, 1995, Grand Union announced that, consistent with its previously announced expectations, it had not made the interest payments due January 16 on certain of its outstanding debt obligations.

On January 24, 1995, Grand Union announced that it had reached an agreement in principle with Grand Union's bank lenders and with members of informal committees of holders of Grand Union's Senior Notes and Senior Subordinated Notes on the terms of a restructuring of Grand Union's capital structure. On January 25, 1995, as part of the implementation of such agreement, Grand Union filed with the United States Bankruptcy Court, District of Delaware (the "Bankruptcy Court"), a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code.

On January 30, 1995, Grand Union (as debtor and as debtor-in-possession) entered into a credit agreement (the "DIP Facility") with the banks party thereto and with Bankers Trust Company, as Agent, providing for borrowings of up to $150 million on a revolving credit basis. Borrowings under the DIP Facility are secured by liens upon substantially all of the assets of Grand Union (with certain exceptions). The DIP Facility provides for an interest rate of 1.375% above the prime rate (as defined) or 2.375% above the LIBOR rate (as defined). The DIP Facility also provides for a commitment fee equal to 0.5% of the average unused portion. In addition, up to $20 million of letters of credit may be issued under the DIP Facility at an annual cost equal to 2 5/8% of the letters of credit issued. The DIP Facility includes covenants restricting indebtedness, liens, sales of assets, dividends, capital expenditures and investments, and provides minimum cash flow requirements. On January 30, 1995, the Bankruptcy Court issued an order approving the DIP Facility on an interim basis. The Bankruptcy Court issued an order of final approval for the DIP Facility on February 16, 1995. On that date, the Bankruptcy Court also issued a Final Cash Collateral Order which will allow Grand Union to use cash collateral to pay operating expenses in the ordinary course of business.

Grand Union filed its proposed plan of reorganization (the "Plan") and related disclosure statement with the Bankruptcy Court on February 6, 1995. The Plan contemplates a five-year revolving credit facility of at least $148 million and a seven-year term loan facility of at least $57 million, all on terms to be finalized with Grand Union's bank lenders.. The new bank debt will be secured by a lien on substantially all of the assets of Grand Union. The Plan provides that holders of Grand Union's existing Senior Notes will receive new nine-year senior notes in a principal amount equal to the principal amount of Senior Notes presently outstanding ($525 million), plus an amount equal to the accrued interest on the existing Senior Notes through September 1, 1995. The term sheet describing the new senior notes (the "Term Sheet") filed as part of the Plan states that the new senior notes will bear interest at the rate of 12% per annum, or 11.75% per annum if the new senior notes are secured by a second lien on Grand Union's assets. Grand Union believes that it is unlikely that the new senior notes will be secured by a second lien. In addition, there is a dispute as to whether the Term Sheet should be interpreted to provide for interest to begin to accrue on the new senior notes on (i) the earlier of the effective date of the Plan and September 1, 1995, or (ii) September 1, 1995. Recognizing that there is no difference in the interpretation if the effective date of the Plan is on or after September 1, 1995, the Plan provides that Grand Union can delay consummation of the Plan until September 1, 1995, even if all conditions to consummation of the Plan are satisfied or waived by Grand Union earlier.

The Plan also provides that the holders of Grand Union's existing Senior Subordinated Notes ($566 million principal amount currently outstanding) will exchange their Senior Subordinated Notes for 100% of the common equity of Grand Union. The existing common stock of Grand Union (which constitutes the principal asset of Capital, and indirectly of Holdings) would be cancelled. The Plan provides only for securities issued by Grand Union and consequently makes no provision for the 15% Senior Zero Coupon Notes and 16.50% Senior Subordinated Zero Coupon Notes issued by Capital or the 12% Junior Subordinated Notes and various classes of redeemable and nonredeemable common and preferred stock of Holdings.

Grand Union hopes to achieve completion of the restructuring, including confirmation of the Plan by the Bankruptcy Court, within 90 to 120 days of the date of filing of the bankruptcy proceedings. However, consummation of the Plan will be subject to a number of contingencies, including receipt of requisite creditor approvals. There can be no assurance as to whether the restructuring will be consummated, or whether it will be consummated as contemplated by the Plan.

On February 6, 1995, an involuntary Chapter 11 petition was filed in the Bankruptcy Court against Capital, by entities purporting to be holders of Capital's Senior Zero Coupon Notes and Senior Subordinated Zero Coupon Notes. On February 16, 1995, Capital commenced a voluntary Chapter 11 case in the Bankruptcy Court by consenting to the entry of an order for relief on that involuntary Chapter 11 petition. Following the entry of an order for relief, Capital expects to file a Plan of Reorganization and a Disclosure Statement within the time period provided by applicable law.

On February 16, 1995, Holdings filed a voluntary Chapter 11 petition in the Bankruptcy Court. Holdings expects to file a Plan of Reorganization and a Disclosure Statement within the time period provided by applicable law.

During the 12 weeks ended January 7, 1995, Grand Union recorded $1.9 million of professional fees and expenses incurred in connection with the restructuring of its debt. The costs associated with the restructuring, including advisory, accounting and legal fees, will increase net loss during the remainder of Grand Union's current fiscal year and during the fiscal year ended March 30, 1996.

## NOTE 3 - Store Closings and Nonrecurring Item

During the 12 weeks ended January 7, 1995, Grand Union established a provision for store closings and a nonrecurring item totaling $10.6 million. The provision includes a charge of $14.6 million relating to the closure of fourteen stores principally consisting of the remaining book value of store fixed assets, store closing costs and estimated carrying costs through expected dates of disposition. Additionally, Grand Union realized $4.0 million of proceeds from the termination of a warehouse sublease.

## NOTE 4 - Intangibles

Grand Union periodically reassesses the appropriateness of both the carrying value and remaining life of goodwill. Based on its assessment of the enterprise value of Grand Union after the restructuring, Grand Union believes that the carrying value and useful life of goodwill continue to be appropriate.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**Results of Operations**

The following table sets forth certain statement of operations data:

|  | 12 Weeks Ended | | 40 Weeks Ended | |
|---|---|---|---|---|
|  | January 7, 1995 | January 8, 1994 | January 7, 1995 | January 8, 1994 |
|  | (dollars in millions) | | | |
| Sales | $563.3 | $583.5 | $1,867.6 | $1,904.4 |
| Gross profit | 149.5 | 171.1 | 540.0 | 545.9 |
| Operating and administrative expense | 127.9 | 127.4 | 420.1 | 408.8 |
| Depreciation and amortization | 21.2 | 18.3 | 67.2 | 59.4 |
| Provision for store closings and nonrecurring item | 10.6 | - | 10.6 | - |
| Restructuring costs | 1.9 | - | 1.9 | - |
| Interest expense | 47.4 | 42.4 | 154.2 | 139.6 |
| Cumulative effect of accounting change | - | - | - | 30.3 |
| Net loss | 59.5 | 16.9 | 114.0 | 92.2 |
| EBITDA | 21.8 | 43.5 | 120.7 | 137.7 |
| LIFO provision (benefit) | 0.2 | (0.2) | 0.8 | 0.6 |
| Sales percentage decrease (increase) | 3.5% | (0.7)% | 1.9% | 2.8% |
| Gross profit as a percentage of sales | 26.5 | 29.3 | 28.9 | 28.7 |
| Operating and administrative expense as a percentage of sales | 22.7 | 21.8 | 22.5 | 21.5 |
| EBITDA as a percentage of sales | 3.9 | 7.5 | 6.5 | 7.2 |

Sales for the 12 and 40 weeks ended January 7, 1995 decreased $20.2 million and $36.7 million, or 3.5% and 1.9%, as compared to the 12 and 40 weeks ended January 8, 1994, respectively.   Sales declined in both the 12 and 40 week periods of the current year due to the continuing effects of competitor store openings and weak economic conditions, particularly in the Northern Region, and increased emphasis on value-oriented products in the Northern Region, partially offset by increased sales from newly built or renovated stores. Additionally, approximately $7.5 million of the sales decline in both the 12 and 40 week periods resulted from the closure or sale of fourteen stores during the third quarter.  Sales comparisons for the 40 week periods are also affected by the timing of Easter (the first quarter of the current fiscal year did not include the pre-Easter holiday shopping period, while the first quarter of the prior fiscal year included the pre-holiday period) and by the effect of the work stoppage experienced during the first quarter of the prior fiscal year.  Existing store sales, influenced by the factors mentioned above (other than the store closures), decreased 3.2% and 4.2% for the 12 and 40 weeks ended January 7, 1995, respectively.

The decrease in gross profit, as a percentage of sales, for the 12 weeks ended January 7, 1995 resulted from increased product procurement costs related to Grand Union's announcement on November 29, 1994 that it was undertaking to restructure its debt, Grand Union's inability to make investments in lower cost forward buy inventory due to liquidity constraints and the marketing program introduced in the Northern Region during the second quarter of the current fiscal year.  For the 40 weeks ended January 7, 1995, the gross profit rate reflected lower overall product procurement costs than the prior year, despite the higher product procurement costs in the third quarter, and increases in the sales mix of higher margin private label, general merchandise, bakery and produce products.

The increase in operating and administrative expense, as a percentage of sales, for the 12 and 40 weeks ended January 7, 1995 resulted primarily from increases, as a percentage of sales, in store labor and fringe benefits, utilities and occupancy costs.  In addition to the factors mentioned above, the comparison of insurance expense for the 40 weeks ended January 7, 1995 to the prior year period is influenced by the reduction of self-insurance reserves of $3.8 million in the 40 weeks ended January 8, 1994.

Depreciation and amortization increased $2.9 million and $7.8 million  for the 12 and 40 weeks ended January 7, 1995, respectively, as a result of Grand Union's capital expenditure program.

During the 12 weeks ended January 7, 1995, Grand Union established a provision for store closings and a nonrecurring item totaling $10.6 million. The provision includes a charge of $14.6 million relating to the closure of fourteen stores principally consisting of the remaining book value of store fixed assets, store closing costs and estimated carrying costs through expected dates of disposition. Additionally, Grand Union realized $4.0 million of proceeds from the termination of a warehouse sublease.

Grand Union incurred professional fees and expenses of $1.9 million during the 12 weeks ended January 7, 1995 in connection with the restructuring of its debt. The costs associated with the restructuring, including advisory, accounting and legal fees, will increase net loss during the remainder of Grand Union's current fiscal year and during the fiscal year ended March 30, 1996.

Interest expense increased $5.0 million and $14.6 million for the 12 and 40 weeks ended January 7, 1995, respectively, primarily due to the increased level of debt outstanding.

During the 40 weeks ended January 8, 1994, Grand Union recorded a $30.3 million charge as the cumulative effect of an accounting change relating to the adoption of Statement of Financial Accounting Standards No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions". This charge represents the portion of future retiree benefit costs related to service already rendered by both active and retired employees up to the date of adoption.

EBITDA (earnings before LIFO provision, depreciation and amortization, provision for store closings and nonrecurring item, restructuring costs, interest expense, income taxes and cumulative effect of accounting change) was $21.8 million or 3.9% of sales and $120.7 million or 6.5% of sales for the 12 and 40 weeks ended January 7, 1995, respectively, compared to $43.5 million or 7.5% of sales and $137.7 million or 7.2% of sales for the 12 and 40 weeks ended January 8, 1994, respectively. EBITDA was significantly affected during the 12 and 40 weeks ended January 7, 1995 by increased product procurement costs resulting from Grand Union's restructuring announcement, low levels of forward buy inventories due to liquidity constraints and the marketing program introduced earlier in the fiscal year in the Northern Region. These factors are expected to continue to affect the operations of Grand Union during the remainder of Grand Union's current fiscal year. EBITDA during the 40 weeks ended January 8, 1994 was reduced by an estimated $8.0 million as a result of lost sales, product losses and other costs experienced during the 22-day work stoppage in May 1993.

Grand Union anticipates that EBITDA for the current fiscal year ending April 1, 1995 will be approximately $140 million. EBITDA for the current fiscal year may be further reduced by additional declines in promotional allowances and other vendor support which had formerly been, but is not currently, available to Grand Union. This estimate of EBITDA for the current fiscal year does not consider any non-recurring income or expense such as that resulting from store closings, employee separation costs, lease cancellations or items of income or expense arising from or attributable to the restructuring process.

During the 12 weeks ended October 15, 1994, Grand Union commenced a new marketing program in certain of its Northern Region markets. The program includes both lower everyday prices and stronger feature programs. Grand Union believes it must continue and extend these investments in its store operations. Although these investments adversely affect gross profit in periods in which they are made, and there is no assurance that they will succeed in improving gross profit over the long term, Grand Union believes that they are necessary in order to preserve and expand Grand Union's sales base.

Due to Grand Union's reduced operating cash flow, Grand Union has reduced its investment in forward buy inventory. This reduction of Grand Union's forward buy inventory adversely affected Grand Union's gross profit during the third quarter and will continue to adversely affect Grand Union's gross profit in future periods until its investment in forward buy inventory can be restored.

**Liquidity and Capital Resources**

Resources used to finance significant expenditures for the 40 weeks ended January 7, 1995 and January 8, 1994 are reflected in the following table:

| | 40 Weeks Ended | |
|---|---|---|
| | January 7, 1995 | January 8, 1994 |
| | (in millions) | |
| Resources used for: | | |
| Capital expenditures | $56.8 | $62.6 |
| Debt and capital lease repayments | 7.3 | 5.5 |
| Loan placement fees | - | 1.8 |
| Purchase of Grand Union Holdings Corporation common stock | - | 0.2 |
| | $64.1 | $70.1 |
| Financed by: | | |
| Operating activities, including cash and temporary cash investments | $52.1 | $20.1 |
| Debt incurred | 10.0 | 50.0 |
| Property disposals | 2.0 | - |
| | $64.1 | $70.1 |

During the 40 weeks ended January 7, 1995, funds for capital expenditures and scheduled debt repayments (principally capitalized leases) were obtained from cash provided by operating activities, borrowings under the Revolving Credit Facility and from property disposals. During the 40 weeks ended January 8, 1994, funds for capital expenditures, debt repayments and loan placement fees were obtained from cash provided by operating activities and from proceeds of the sale of $50 million principal amount of Senior Subordinated Notes, Series A.

On October 18, 1993, Grand Union acquired five supermarket locations on Long Island from Foodarama Supermarkets, Inc. for consideration of approximately $16.1 million, plus the value of the inventory at the stores (approximately $2 million). The acquisition was financed through the application of a portion of the proceeds of the sale to institutional investors of the 12¼% Senior Subordinated Notes, Series A on October 18, 1993.

During the 12 weeks ended January 7, 1995, Grand Union recorded $1.9 million of professional fees and expenses incurred in connection with the restructuring of its debt. The costs associated with the restructuring, including advisory, accounting and legal fees, will increase net loss during the remainder of Grand Union's current fiscal year and during the fiscal year ended March 30, 1996.

On November 29, 1994, Grand Union announced that it was not likely that it would be able to fund cash interest payments due in early calendar 1995, and that it intended to develop a capital restructuring plan. On December 21, 1994, Grand Union entered into a Limited Waiver and Agreement with the banks party to the Bank Credit Agreement which waived any event of default which might exist under the Bank Credit Agreement should Grand Union fail to make payments of interest due on January 16, 1995 in respect of Senior and Subordinated Notes of Grand Union. The Limited Waiver and Agreement also waived compliance with certain covenants in the Bank Credit Agreement, thereby permitting Grand Union to continue to make borrowings in the ordinary course under its revolving line of credit through February 15, 1995. On January 16, 1995, Grand Union announced that, consistent with its previously announced expectations, it had not made the interest payments due January 16 on certain of its outstanding debt obligations.

On January 24, 1995, Grand Union announced that it had reached an agreement in principle with Grand Union's bank lenders and with members of informal committees of holders of Grand Union's Senior Notes and Senior Subordinated Notes on the terms of a restructuring of Grand Union's capital structure. On January 25, 1995, as part of the implementation of such agreement, Grand Union filed with the United States Bankruptcy Court, District of Delaware (the "Bankruptcy Court"), a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code.

On January 30, 1995, Grand Union (as debtor and as debtor-in-possession) entered into a credit agreement (the "DIP Facility") with the banks party thereto and with Bankers Trust Company, as Agent, providing for borrowings of up to $150 million on a revolving credit basis. Borrowings under the DIP Facility are secured by liens upon substantially all of the assets of Grand Union (with certain exceptions). The DIP Facility provides for an interest rate of 1.375% above the prime rate (as defined) or 2.375% above the LIBOR rate (as defined). The DIP Facility also provides for a commitment fee equal to 0.5% of the average unused portion. In addition, up to $20 million of letters of credit may be issued under the DIP Facility at an annual cost equal to 2 5/8% of the letters of credit issued. The DIP Facility includes covenants restricting indebtedness, liens, sales of assets, dividends, capital expenditures and investments, and provides minimum cash flow requirements. On January 30, 1995, the Bankruptcy Court issued an order approving the DIP Facility on an interim basis. The Bankruptcy Court issued an order of final approval for the DIP Facility on February 16, 1995. On that date, the Bankruptcy Court also issued a Final Cash Collateral Order which will allow Grand Union to use cash collateral to pay operating expenses in the ordinary course of business.

Grand Union filed its proposed plan of reorganization and related disclosure statement with the Bankruptcy Court on February 6, 1995. The Plan contemplates a five-year revolving credit facility of at least $148 million and seven-year term loan facility of at least $57 million, all on terms to be finalized with Grand Union's bank lenders. The new bank debt will be secured by a lien on substantially all of the assets of Grand Union. The Plan provides that holders of Grand Union's existing Senior Notes will receive new nine-year senior notes in a principal amount equal to the principal amount of Senior Notes presently outstanding ($525 million), plus an amount equal to the accrued interest on the existing Senior Notes through September 1, 1995. The term sheet describing the new senior notes (the "Term Sheet") filed as part of the Plan states that the new senior notes will bear interest at the rate of 12% per annum, or 11.75% per annum if the new senior notes are secured by a second lien on Grand Union's assets. Grand Union believes that it is unlikely that the new senior notes will be secured by a second lien. In addition, there is a dispute as to whether the Term Sheet should be interpreted to provide for interest to begin to accrue on the new senior notes on (i) the earlier of the effective date of the Plan and September 1, 1995, or (ii) September 1, 1995. Recognizing that there is no difference in the interpretation if the effective date of the Plan is on or after September 1, 1995, the Plan provides that Grand Union can delay consummation of the Plan until September 1, 1995, even if all conditions to consummation of the Plan are satisfied or waived by Grand Union earlier.

The Plan also provides that the holders of Grand Union's existing Senior Subordinated Notes ($566 million principal amount currently outstanding) will exchange their Senior Subordinated Notes for 100% of the common equity of Grand Union. The existing common stock of Grand Union (which constitutes the principal asset of Capital, and indirectly of Holdings) would be cancelled. The Plan provides only for securities issued by Grand Union and consequently makes no provision for the 15% Senior Zero Coupon Notes and 16.50% Senior Subordinated Zero Coupon Notes issued by Capital or the 12% Junior Subordinated Notes and various classes of redeemable and nonredeemable common and preferred stock of Holdings.

Grand Union hopes to achieve completion of the restructuring, including confirmation of the Plan by the Bankruptcy Court, within 90 to 120 days of the date of filing of the Bankruptcy proceedings. However, consummation of the Plan will be subject to a number of contingencies, including receipt of requisite creditor approvals. There can be no assurance as to whether the restructuring will be consummated, or whether it will be consummated as contemplated by the Plan.

On February 6, 1995, an involuntary Chapter 11 petition was filed in the Bankruptcy Court against Capital, by entities purporting to be holders of Capital's Senior Zero Coupon Notes and Senior Subordinated Zero Coupon Notes. On February 16, 1995, Capital commenced a voluntary Chapter 11 case in the Bankruptcy Court by consenting to the entry of an order for relief on that involuntary Chapter 11 petition. Following the entry of an order for relief, Capital expects to file a Plan of Reorganization and a Disclosure Statement within the time period provided by applicable law.

On February 16, 1995, Holdings filed a voluntary Chapter 11 petition in the Bankruptcy Court. Holdings expects to file a Plan of Reorganization and a Disclosure Statement within the time period provided by applicable law.

At January 7, 1995, there was $35.0 million of borrowings outstanding and $41.6 million of letters of credit outstanding under Grand Union's Revolving Credit Facility. As of January 25, 1995, the date of filing of Grand Union's Chapter 11 petition, there were $54.0 million of borrowings under the Revolving Credit Facility. No further amounts can be borrowed under the Revolving Credit Facility.

During the 40 weeks ended January 7, 1995, Grand Union opened four replacement stores and completed the remodeling of eight stores. Capital expenditures, including capitalized leases other than real estate leases, for the year ending April 1, 1995 are expected to be approximately $70 million. Grand Union's capital expenditures during the current fiscal year have been financed through funds generated from operations, borrowings under the revolving credit facility and equipment leases. Prior to the completion of the restructuring, in order to improve liquidity, Grand Union's capital expenditures have been curtailed.

During the 12 weeks ended January 7, 1995, Grand Union closed eleven stores and sold an additional three stores. Three additional stores are expected to be closed by the end of the current fiscal year.

## PART II - OTHER INFORMATION

### Item 1. Legal Proceedings.

On January 24, 1995, Grand Union announced that it had reached an agreement in principle with Grand Union's bank lenders and with members of informal committees of holders of Grand Union's Senior Notes and Senior Subordinated Notes on the terms of a restructuring of Grand Union's capital structure.

On January 25, 1995, as part of the implementation of such agreement, Grand Union filed with the United States Bankruptcy Court, District of Delaware (the "Bankruptcy Court"), a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code, styled In re: The Grand Union Company also d/b/a Big Star, Chapter 11 Case No. 95-84 (PJW).

On January 30, 1995, the Bankruptcy Court approved on an interim basis a credit agreement entered into between Grand Union and the banks party thereto and Bankers Trust Company, as Agent (the "DIP Facility"). The Bankruptcy Court issued an order of final approval for the DIP Facility on February 16, 1995. On that date, the Bankruptcy Court also issued a Final Cash Collateral Order which will allow Grand Union to use cash collateral to pay operating expenses in the ordinary course of business.

On February 6, 1995, Grand Union filed its proposed plan of reorganization (the "Plan") and related disclosure statement with the Bankruptcy Court. See Note 2 - Restructuring in the Financial Statements included elsewhere herein for a description of the terms of the Plan.

Consummation of the Plan will be subject to a number of contingencies, including receipt of requisite creditor approvals. There can be no assurance as to whether the restructuring will be consummated, or whether it will be consummated as contemplated by the Plan.

On February 6, 1995, an involuntary Chapter 11 petition, styled In re: Grand Union Capital Corporation, Chapter 11 Case No. 95-130 (PJW), was filed in the Bankruptcy Court against Capital, by entities purporting to be holders of Capital's Senior Zero Coupon Notes and Senior Subordinated Zero Coupon Notes. On February 16, 1995, Capital commenced a voluntary Chapter 11 case in the Bankruptcy Court by consenting to the entry of an order for relief on that involuntary Chapter 11 petition. Following the entry of an order for relief, Capital expects to file a Plan of Reorganization and a Disclosure Statement within the time period provided by applicable law.

On February 16, 1995, Holdings filed a voluntary Chapter 11 petition, styled In re: Grand Union Holdings Corporation, Chapter 11 Case (PJW), in the Bankruptcy Court. Holdings expects to file a Plan of Reorganization and a Disclosure Statement within the time period provided by applicable law.

### Item 3. Defaults Upon Senior Securities.

Grand Union did not make interest payments of $19,687,500 on its outstanding Senior Notes and of $33,687,500 on its outstanding Senior Subordinated Notes which were due on January 16, 1995. Such interest payments were subject to a thirty-day grace period. As of February 21, 1995, the amount of interest in arrears on the outstanding Senior Notes is $23,678,938 and the amount of interest in arrears on the outstanding Senior Subordinated Notes is $40,517,294. As a result of Grand Union's pending bankruptcy proceeding, the automatic stay provisions of the United States Bankruptcy Code preclude the holders from enforcing remedies with respect to the occurrence of an event of default.

### Item 5. Other Information.

Gary D. Hirsch, Chairman of the Board of Directors of Grand Union, and Martin A. Fox, Vice President and Assistant Secretary and a Director of Grand Union, have informed Grand Union that they intend to resign all of their positions with Grand Union upon consummation of the restructuring.

Item 6.

(a)    Exhibits

Exhibit Number                    Description of document

2.1          Chapter 11 Plan of Reorganization of The Grand Union Company, filed by
Grand Union with the United States Bankruptcy Court, District of Delaware,
on February 6, 1995. (Exhibits to the Plan have been omitted in reliance on
Item 601(b)(2) of Regulation S-K.  Grand Union agrees to furnish
supplementally to the Commission a copy of any omitted exhibit upon request.)

10.23        Credit Agreement, dated as of January 30, 1995, as amended through
February 15, 1995, among The Grand Union Company, as debtor and debtor-
in-possession under Chapter 11 of Title 11 of the United States Code entitled
to Bankruptcy, the Banks party thereto and Bankers Trust Company, as Agent.

27.1         Financial Data Schedule.

(b)        On December 21, 1994, Grand Union filed a report on Form 8-K relating to the Limited Waiver and
Agreement dated as of December 6, 1994, among Grand Union Holdings Corporation, Grand Union
Capital Corporation, The Grand Union Company, the lending institutions party to the Credit Agreement
dated as of July 14, 1992, and Bankers Trust Company, as Agent.

On January 24, 1995, Grand Union filed a report on Form 8-K relating to a press release issued with
respect to an agreement in principle with certain holders of Grand Union debt as to a restructuring of that
indebtedness and containing an outline of the proposed restructuring terms.

On January 25, 1995, Grand Union filed a report on Form 8-K relating to a press release issued by
Grand Union stating what certain indebtedness and interest expense of Grand Union will be, assuming
the successful completion of the proposed restructuring as contemplated by the Plan.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

THE GRAND UNION COMPANY
(Registrant)

Date: February 21, 1995

/s/ Kenneth R. Baum

Kenneth R. Baum

Senior Vice President, Chief Financial Officer and Secretary (Principal Financial Officer and Principal Accounting Officer)