**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Paul M. Basta
Mark E. McKane (*pro hac vice* pending)
paul.basta@kirkland.com
mark.mckane@kirkland.com

*Attorneys for LBREP Lakeside SC Master I, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**LBREP LAKESIDE SC MASTER I, LLC'S OPPOSITION TO THE MOTION OF
LEHMAN COMMERCIAL PAPER INC. PURSUANT TO SECTION 105 OF THE
BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019
FOR APPROVAL OF THAT CERTAIN AMENDED AND RESTATED COMPROMISE
BY AND AMONG LEHMAN COMMERCIAL PAPER, INC., ALFRED H. SIEGEL, AS
CHAPTER 11 TRUSTEE FOR THE SUNCAL DEBTORS, AND THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS IN THE SUNCAL BANKRUPTCY
CASES**

The Court should deny the settlement as fundamentally unfair, inequitable and

inappropriate. In 2006, Lehman Commercial Paper, Inc. ("LCPI") financed a dividend to

another Lehman affiliate, LBREP Lakeside SC Master I, LLC ("LBREP Lakeside"), which owns

the equity in the SunCal debtors. Now, LCPI and the Chapter 11 Trustee for the SunCal Debtors

in the SunCal bankruptcy cases (the "SunCal Trustee") propose a settlement that gives LCPI and

other lenders that knowingly financed the dividend recapitalization a direct financial stake in the

recovery on the SunCal Trustee's fraudulent transfer litigation challenging such dividend recapitalization. Even the most basic analysis of the proposed settlement raises a serious red flag: LCPI and the other lenders are key participants in the allegedly fraudulent transfer.

By this settlement, LCPI and the other lenders switch sides in the dispute and seek a direct, monetary recovery that would necessarily be based on LPCI's own financing decisions and the other lenders' knowing participation in the transaction. A party cannot profit from his own mistakes and the proposed settlement is prohibited as a matter of equity. Further, the proposed settlement is contrary to the law of New York (and more than twenty-five other states) prohibiting settling parties from taking a recovery from non-settling defendants.

By releasing all claims against LCPI and the other lenders and providing LCPI and the 36 lenders who participate in the first lien credit facility (the "First Lien Lenders") with a 50% interest in claims against LBREP Lakeside, the SunCal Trustee has created perverse incentives for LCPI. LCPI will not have any reason to defend its actions in sizing, arranging and syndicating the transaction that expressly disclosed and highlighted that its proceeds will be used for the $144 million dividend at issue in the fraudulent transfer claims. Additionally, the 36 non-LCPI First Lien Lenders all participated in these loans with full knowledge of the dividend and obviously came to a view regarding whether SunCal was solvent and could make such a dividend. This settlement structure creates perverse incentives for the First Lien Lenders to back away from their own views of solvency.

For months LBREP Lakeside has sought a seat at the table to discuss the SunCal restructuring. LCPI and the SunCal Trustee locked it out.[1] That is their choice. They cannot, however, choose to take an interest in a lawsuit that implicates their own conduct. The Court should not approve this settlement.

---

[1]    *See* Keegan Declaration in Support of Opposition ("Keegan Decl.") at ¶¶ 2-6.

## BACKGROUND

The Amended and Restated Compromise by and among Lehman Commercial Paper, Inc., Alfred H. Siegel, as Chapter 11 Trustee for the SunCal Debtors, and the Official Committee of Unsecured Creditors in the SunCal Bankruptcy Cases (the "Proposed Settlement") will have a significant and wide-reaching impact on the outstanding fraudulent transfer litigation in the SunCal bankruptcies.

While this is the second attempt by these parties to have this settlement approved, LCPI and the SunCal Trustee still do not address any of the concerns related to giving LCPI and the First Lien Lenders a direct stake in the outcome of a claim based on their actions in the underlying transactions. In a continued effort to avoid the issue – raised by LBREP Lakeside in its objection to the original settlement proposal – LCPI's Motion presents only minimal facts about LCPI's key role in the underlying litigation and the First Lien Lenders' involvement and knowledge. *See* Keegan Decl. at Ex. 1. Further, LCPI's Motion does not address the concerns created by the individuals controlling the bankruptcy cases directing one Lehman affiliate to fund litigation against another Lehman affiliate. There is no discussion or analysis of the potential claims that LBREP Lakeside or its limited partners could make against its general partner and the wholly owned Lehman subsidiaries that control it for directing the financing of this litigation. *See* Keegan Decl. at Ex. 1.

### A.    LCPI And The First Lien Lender Group Are Key Parties To Any Fraudulent Transfer Litigation.

The SunCal Trustee's fraudulent transfer claims are based on a January 2006 transaction that resulted in a $235 million first lien facility (a $75 million revolver and a $160 million term loan facility) (the "First Lien Loans"), a $85 million second lien term loan facility (the "Second Lien Loans") and a $144 million dividend received by LBREP Lakeside and other equity

3

08-13555-mg    Doc 11407    Filed 09/16/10    Entered 09/16/10 15:49:22    Main Document
Pg 4 of 17

owners.    For the January 2006 First and Second Lien Loans, LCPI was sole original administrative agent and was the sole syndication agent.    LCPI was the party responsible for sizing the loans and then syndicating the loans to the other lenders.    In response to LBREP Lakeside's earlier discovery requests, LCPI stated that:

> LCPI's real estate group conducted standard due diligence and underwriting with regard to then-current and potential values of the properties ... and to the creditworthiness of the sponsor, including without limitation reviewing appraisals, environmental studies, entitlement status reviews, market studies, cash flow projections and financial records of the sponsor.    LCPI's credit committee reviewed the results of the due diligence and underwriting and, based on the appraised value of the underlying properties and the projects for future developments and lot sales, ***approved the real estate group's recommendation for a first lien not to exceed $235 million and a second lien loan not to exceed $75 million.***

Keegan Decl. Ex. 2 at 5 (emphasis added).    While in its Motion LCPI states that it was the "sole administrative agent" for the First and Second Lien Loans and Lehman Brothers, Inc. ("LBI") was the syndication agent, that statement is contradicted by the credit facility agreements for the First and Second Lien Loans, the Offering Memorandum and LCPI's earlier discovery responses. The First and Second Lien Credit Facility Agreements list LCPI, not LBI, as the syndication agent.    Keegan Decl. Exs. 3, 4.    The Offering Memorandum includes a list of six LCPI employees as contacts on the "Syndication Contact List." Keegan Decl. Ex. 5 at *ix*. Likewise, in discovery responses, LCPI stated that "LCPI served as syndication agent and administrative agent for the January 2006 Loans." Keegan Decl. Ex. 6 at 5.

LCPI was involved with and responsible for syndicating the $320 million First and Second Lien Loans.    And the syndication efforts were successful as the First and Second Lien Loans were fully subscribed.    The First Lien Lenders consist of 36 members and LCPI, all of whom were on notice of the $144 million dividend.    LCPI itself owns approximately $64 million of the First Lien revolver and nearly $5 million of the term loan.    Bank Midwest N.A. owns the

remaining portion of the revolver and the term loan is split between the other 36 entities and LCPI.

Each entity that purchased the debt claims did so with full disclosure that $144 million of the proceeds would be used for a dividend to the equity owners. Both the Offering Memorandum and the Credit Facility documents disclosed the payment. The first paragraph of the Executive Summary of the Offering Memorandum states: "Proceeds from the Facility will be used to … (iii) fund a $144 million return on principal equity." Keegan Decl. Ex. 5 at I-1. The $144 million payment is disclosed two other times as well. *Id.* at I-4, I-6. The First Lien and Second Lien Credit Facility Agreement discloses the dividend as well: "the Borrower may pay a dividend on the Closing Date … in an aggregate amount not exceeding $144 million." Keegan Decl. Ex. 3 at 79, Ex. 4 at 70.

LCPI's role in the transactions underlying the fraudulent transfer claims is pervasive. While LBREP Lakeside contends that the fraudulent transfer claims are meritless, it recognizes that it will have to defend itself against those claims. A substantial part of that defense – through documents and corporate witnesses – will come from LCPI, a key participant in the sizing, arranging and syndication of the transaction that expressly disclosed and highlighted the $144 million dividend at issue in the fraudulent transfer claims. Additional evidence will come from the First Lien Lenders – whose diligence efforts and view of SunCal's solvency will be relevant to any fraudulent transfer litigation.

**B.     LBREP Lakeside And LCPI Share Common Ultimate Decision-Makers In The Lehman Estates.**

LBREP Lakeside is the Lehman entity that received a portion of the $144 million return on equity as a result of the January 2006 First and Second Lien Loan transaction. LBREP Lakeside is a corporate entity owned by various Lehman-affiliated funds that are controlled by

their general partners. The ultimate owner of the general partner of the Lehman-affiliated funds is Real Estate Private Equity, Inc. ("REPE"), a wholly-owned subsidiary of LBHI, and it is controlled by the debtors in Lehman's chapter 11 cases. Those same entities and agents are also advising LCPI in its bankruptcy cases. Key decisions of LBREP Lakeside need, and in practice require, the approval of those decision-makers. Because of the common control, those decision-makers have not fulfilled their duties to LBREP Lakeside by directing an affiliate, LCPI, to finance and take a direct financial stake in litigation against LBREP Lakeside.

## ARGUMENT

LCPI cannot establish that the Proposed Settlement is fair and equitable under Federal Rule of Bankruptcy Procedure 9019 or section 105 of the Bankruptcy Code and this Court should not approve the Motion. LCPI fails to show that the Proposed Settlement is fair and equitable for four independent reasons.

*First*, the Proposed Settlement violates the longstanding and self evident principle that a party cannot benefit from its own wrongdoing. If the 2006 Transaction a fraudulent conveyance, LCPI and the First Lien Lenders should be paying the SunCal Trustee's recovery, not receiving a pro rata share of half of the recovery from Lehman affiliate LBREP Lakeside.

*Second*, the Proposed Settlement violates New York common and statutory law by giving LCPI and the First Lien Lenders the right to a recovery after they settle their claims and receive a release.

*Third*, the Proposed Settlement may create claims against REPE or LBHI as one Lehman entity is funding and authorizing litigation against another. It does not appear that those potential claims were properly addressed by LCPI and they are not discussed in the Motion.

*Fourth*, the Proposed Settlement prejudices LBREP Lakeside's ability to defend itself in the fraudulent transfer litigation by irreparably tainting the evidence around solvency that will be

6

uncovered in the fraudulent transfer litigation.

## LEGAL STANDARD

Under Federal Rule of Bankruptcy Procedure 9019, bankruptcy courts are authorized to approve a compromise or settlement after notice and a hearing based on its informed, independent judgment that the proposed settlement is fair and equitable. *See Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (explaining that "[t]here can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.").[2] The Bankruptcy Court's determination in this case should be based on a review of all key facts and an understanding of the various issues raised by this unconventional settlement. As set forth below, LCPI fails to meet its burden and the Court should deny the Motion.

## I.  LCPI Cannot Establish That The Settlement Is Fair And Equitable Because It Allows LCPI And The First Lien Lenders To Benefit From Their Own Conduct.

If the Proposed Settlement is approved, LCPI and the First Lien Lenders will be entitled to receive *half* of all recoveries from the SunCal Trustee's fraudulent transfer lawsuit. Currently, the SunCal Trustee's primary focus in the fraudulent transfer litigation is LCPI – removing LCPI from the lawsuit does not remove LCPI's role in the underlying transaction and the need to prove LCPI and the First Lien Lenders mistakenly financed a dividend when SunCal was insolvent. It only shifts who has to pay for any recovery.[3] If the SunCal Trustee were successful in pursuing

---

[2]     *See also In re Kopexa Realty Venture Co.*, 213 B.R. 1020, 1022 (B.A.P. 10th Cir. 1997) (stating, in reversing order approving settlement, the decision of a bankruptcy court to approve a settlement must be "an informed one based upon an objective evaluation of developed facts" (quoting *Reiss v. Hagemann*, 881 F.2d 890, 892 (10th Cir. 1989)).

[3]     LBREP Lakeside reiterates that it does not believe that the proposed fraudulent transfer claims have any

7

his claims, he would necessarily need to prove that LCPI, whether intentionally or unintentionally, improperly sized the First and Second Lien Loans. There cannot be a recovery without a finding that LCPI made a mistake in concluding that SunCal was solvent. And if there is a recovery, LCPI gets a direct financial benefit. Likewise, the 36 other First Lien Lenders purchased their debt claims with full knowledge of the dividend. Therefore, they purchased with the risk of liability and potential claims against them. *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 637 (2d Cir. 1995) (upholding avoidance of mortgage where mortgagee had constructive knowledge that mortgage proceeds given to debtor could be fraudulently transferred to debtor's majority shareholder). The First Lien Lenders cannot discard the risk of liability and reap a benefit from the transaction any more than LCPI.

The Proposed Settlement is not fair and equitable because it is contrary to the longstanding common law rule that a party should not profit from its own mistakes. *See Carr v. Hoy*, 2 N.Y.2d 185 (1957); *Riggs v. Palmer*, 115 NY 506 (1889). In *Barker v. Kallash*, 459 N.Y.S.2d 296 (Sup. Ct. 1983) the New York Supreme Court dismissed a personal injury lawsuit because the plaintiff was engaged in an unlawful act when he was injured. *Id* at 375-76. The court cited *Riggs* and noted the "fundamental maxim of common law that: no one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim on his own iniquity, or to acquire property by his own crime." *Id.* at 376. While commonly applied to parties engaged in criminal behavior, courts in equity reject claims in other situations where the claimant seeks to be rewarded for its own conduct. *See Imperator Realty Co. v. Tull*, 228 N.Y. 447, 457 (1920) (Cardozo, J., concurring) (stating that a party could not seek benefit of Statute of Frauds based on his own conduct).

---

merit; however, resolving that issue will likely involve litigation which necessarily involves LCPI and the First Lien Lenders.

More recently, courts in New York have applied the common law principal to bar a defendant from reaping the benefit of lower damages arising from its conduct. In *Tucker v. Mashomack Fish and Game Preserve Club, Inc.*, 606 N.Y.S.2d 79 (Sup. Ct. 1993), the plaintiff brought an action against defendants for damages caused by an improper *lis pedens* filed on his property, asserting a claim for specific damages based on his lost profits from a failed transaction. *Id.* at 80. After plaintiff completed a second transaction, the defendants argued that they should be able to set off any profits from the successful transaction against the plaintiff's asserted damages. *Id.* The trial court rejected defendants' argument and the court of appeals affirmed holding that "defendants cannot minimize their liability for damages occasioned by their wrongful acts and benefit from the appreciation in sale price." *Id.* As with the defendant in *Tucker*, it is fundamentally unfair for LCPI and the First Lien Lenders to profit from their own actions.

LCPI cannot justify this settlement as a "Mary Carter" or sliding scale settlement agreement. Such agreements, which are disfavored in New York, require the settling defendant to pay the plaintiff a settlement amount, which may then be reduced in proportion to the plaintiff's recovery against a non-settling defendant. *See Wausau Business Ins. Co. v. Turner Const. Co.*, No. 99 CIV. 0682(RWS), 2001 WL 604188, at *1 (S.D.N.Y. June 4, 2001); *Stiles v. Batavia Atomic Horseshoes, Inc.*, 579 N.Y.S.2d 790, 793 (App. Div. 1992), *rev'd on other grounds* 81 N.Y.2d 950 (1993). A Mary Carter settlement agreement acts to cap the settling defendant's liability, but does not allow the settling defendant to obtain a windfall above the amount of the settlement.[4] It does not allow the settling defendant to obtain a windfall above the

---

[4]    Under California law, Mary Carter agreements are allowed only to the extent they are entered into in good faith and are proven in a hearing to be a fair apportionment of the settling defendant's potential liability. *See Abbott Ford, Inc. v. Superior Court*, 43 Cal. 3d 858, 878 (1987) (stating that Mary Carter agreements can be valid if the settling defendant has paid fair consideration in the "ballpark" of its own potential liability). LCPI's settlement

9

amount of its paid settlement by granting it a percentage of the plaintiff's potential recovery. Here, by obtaining 50% of the Trustee's recovery against LBREP Lakeside and the other equity owners – regardless of the value of its own settlement or its own potential liability – LCPI stands to profit from its wrongdoing rather than limit its liability.

Here, LCPI and the other lenders should not be able to create a court-approved settlement agreement that pays it a pro rata share of half of any recovery from the SunCal Trustee's fraudulent transfer litigation. Absent the release in the Proposed Settlement, LCPI would remain a defendant in the litigation and would presumably vigorously defend itself. LCPI cannot control and LCPI and the First Lien Lenders cannot participate in the underlying transaction, then reap benefits if that transaction is found to be the result of a mistaken view of solvency. To approve the Proposed Settlement will enable the participants to "profit by [their] own fraud ... to take advantage of [their] own wrong" in violation of common law and public policy. *Riggs v. Palmer*, 115 N.Y. 506, 511 (1889).

## II.    The Proposed Settlement Should Not Be Approved Because It Is Contrary To New York Law.

LCPI asks this Court to approve a settlement agreement that violates New York General Obligations Laws section 15-108 and New York's public policy (and the public policy of more than twenty-five other states).[5] This Court should not do so. Under New York General Obligations Law section 15-108 a "tortfeasor who has obtained his own release from liability" is

---

would not pass muster under this test as it gains to benefit from the Proposed Settlement without any connection to its own potential liability.

[5]    New York's public policy applies even if the Proposed Settlement is not analyzed under New York statutory laws. "It is well established that settlements are void against public policy if they directly contravene a state or federal statute or policy." *In re Rosenberg*, No. 09-46326-CEC, 2010 WL 475131, at *5 (Bankr. E.D.N.Y. Feb 5, 2010) (internal quotation marks and citation omitted). The court in *In re Rosenberg* held that whether the settlement violated another law or policy was a "threshold" issue and the settlement should be denied without analyzing if it were "fair and equitable" under Rule 9019. *Id.* at *4.

barred from seeking "contribution from any other person." *See* N.Y. Gen. Oblig. Law. § 15-108;

*Overseas National Airways. Inc. v. United States*, 766 F.2d 97, 99 (2d Cir. 1985). Both New

York's General Obligations statute and public policy prohibit LCPI and the First Lien Lenders

from obtaining a recovery from other defendants and potential defendants after they have settled

their claims and obtained a release.[6]

Yet that is precisely what the Proposed Settlement allows here – LCPI and the First Lien

Lenders will receive a recovery from LBREP Lakeside and any other party pursued by the

SunCal Trustee in the fraudulent transfer litigation. The fact that LCPI and the First Lien

Lenders do not have to pursue the claims on their own does not change the analysis – New York

law bars them from recovering from other tortfeasors after they settle their claims and obtain a

release. *See Fromer v. Yogel*, 50 F. Supp. 2d 227, 239-40 (S.D.N.Y. 1999) (dismissing claims

for contribution under New York state law because of signed settlement agreement between

plaintiff and other defendants); *Merchants Bank of New York v. Credit Suisse Bank*, 585 F. Supp.

304, 309 (S.D.N.Y. 1984) (bank could not pursue contribution claims against other potential

tortfeasors because it settled with customer-plaintiff and obtained a release); *see also Glaser v.*

*Fortunoff*, 71 N.Y.2d 643, 644-45 (1988) (recharacterizing claim for reimbursement as one for

contribution and dismissing claim); *HSBC Bank USA v. Bond*, 866 N.Y.S.2d 469 (Sup. Ct. 2008)

(recharacterizing implied indemnification claims as ones for contribution and dismissing claim

on appeal).

The purpose of the statute is to "ensure equity" by preventing settlements from unfairly

impacting non-settling defendants. *Whalen v. Kawasaki Motors Corp., U.S.A.*, 92 N.Y.2d 288,

---

[6]      Courts in both New York and California treat fraudulent transfer claims as torts. *See Morgenthau v. A.J. Travis Ltd.*, 708 N.Y.S.2d 827, 829 (N.Y. Sup. Ct. 2000) ("A cause of action for fraudulent conveyance is a species of tort"); *In re Ryan*, Case No. 05-32933, 2008 WL 4829947, at *2 (Bankr. N.D. Cal. Oct. 29, 2008) ("California courts have held that a fraudulent transfer is tortious conduct.").

292 (1998). The Proposed Settlement unfairly impacts the non-settling defendants because it provides LCPI and the First Lien Lenders the benefit of a release (potentially barring claims against it from the other defendants) with the ability to recover from non-settling defendants. New York law bars the Proposed Settlement.

Two recent New York cases raise similar concerns as the Proposed Settlement. In *Gonzalez v. Armac Industries, Ltd.*, 81 N.Y.2d 1 (1993), the court addressed whether a settlement between plaintiff and Armac that limited Armac's liability to 2% of any damages was a "release" within the scope of section 15-108 and barred Armac's claims against a purported joint tortfeasor, GTC. The court noted that the agreement "effectively ended the dispute" between plaintiff and Armac and that because "Armac paid to limit its exposure" it could not seek any further recovery from GTC. *Id.* at 7. In *Perno v. For-Med Medical Group, P.C.*, 673 N.Y.S.2d 849 (Sup. Ct. 1998), the court analyzed a settlement agreement between a bankruptcy estate and a medical group defendant, Astoria. The bankruptcy estate and Astoria agreed to limit Astoria's damages to only those amounts Astoria could recover in indemnification from the other defendants. *Id.* at 861. The court affirmed the trial court's ruling that Astoria could not seek leave to pursue claims against the remaining defendants. The court stated "Astoria has made an agreement with [plaintiff] which limits [plaintiff's] rights to enforcement to 0% of any judgment … Astoria now faces no liability to [plaintiff] despite the pendency of suit against it." *Id.* at 861. The court further held that because Astoria "effectively terminated its adversarial relationship" with the plaintiff and had "no motivation to aggressively pursue any of its defenses against plaintiff, since it knows full well it will suffer no loss whatsoever should plaintiff obtain a judgment" then "Astoria's continuing obligation to defend itself is illusory." *Id.* Therefore, Astoria could not pursue its claims against the other defendants and could not obtain any

12

recovery from the other defendants.

Just as in *Perno* and *Gonzalez*, LCPI and the SunCal Trustee have crafted a Proposed Settlement that resolves all the potential liability of LCPI and the First Lien Lenders and grants releases to LCPI and the First Lien Lenders. Just as in *Perno* and *Gonzalez*, if the Proposed Settlement is approved there is no need for LCPI and the First Lien Lenders to defend themselves. Even more troubling, the Proposed Settlement gives them a strong incentive ***not*** to defend themselves. Therefore, just as in *Perno* and *Gonzalez*, LCPI and the First Lien Lenders should not be able to receive a recovery from the other defendants and they cannot benefit from the SunCal Trustee's continued litigation.

It is clear New York law that a settling joint tortfeasor is not permitted to seek recovery from other parties to the action. The Proposed Settlement cannot be reconciled with New York's laws and public policy and this Court should deny LCPI's Motion.

## III. The Proposed Settlement Should Not Be Approved Because It May Give Rise To Potential Claims Against The Lehman Estates.

LCPI and REPE, the ultimate owner of the general partner of the funds that control LBREP Lakeside, share a common parent corporation and both are controlled by agents of LBHI. As the Court knows, Lehman Brothers, including LCPI, is liquidating and that liquidation is being run by Lehman Brothers' ultimate parent and a team of advisors for the various Lehman Brothers debtors in those consolidated proceedings, including LCPI. Those same entities are also advising and controlling the ultimate general partner of the Lehman Brothers Real Estate Private Equity Fund that includes LBREP Lakeside.[7] By providing LCPI the right to recovery in the potential fraudulent transfer action, the Proposed Settlement places LCPI and LBREP

---

[7]    LBREP Lakeside served discovery on LCPI in an effort to analyze the role of the agents in authorizing the Proposed Settlement and the return date for that discovery has not yet occurred. LBREP Lakeside reserves the right to supplement its Opposition or to present additional evidence at any hearing on the Motion when LCPI responds to the discovery requests.

Lakeside in an adversarial position.

With the Proposed Settlement, the decision-makers decided to authorize and fund litigation against LBREP Lakeside, exposing them to potential claims.[8] They did so while at the same time having a duty to maximize those investors' recoveries. The conflicts created by the agents of the Lehman entities could lead to additional claims being asserted against REPE or LBHI from those harmed by the ultimate general partner and LBHI related to their conduct in this matter. LCPI's Motion fails to disclose whether it took any steps to protect the Lehman estates from such claims. While it is not clear that the decision-makers at Lehman could have crafted adequate protective measures to shield against the claims of the LBREP Lakeside investors, there is *no* evidence of any protective steps taken to separate the duties to the investors in LBREP Lakeside. Moreover because of the common control, there is no evidence that any such measure could be effective.

## IV.    LCPI Fails To Establish That The Proposed Settlement Is Fair And Equitable Because It Will Prejudice LBREP Lakeside In The Fraudulent Transfer Litigation.

The Proposed Settlement prejudices LBREP Lakeside by impairing its ability to defend itself in any fraudulent transfer claim. Such prejudice is a factor the Court can evaluate in this proceeding in deciding to deny LCPI's Motion. When the rights of a non-settling party are implicated by the terms of a settlement, the Court should not approve the settlement without considering the interests of the non-settling party. *See In re Drexel Burnham Lambert Group*, 995 F.2d 1138, 1146-47 (2d Cir. 1993) (applying class action standards of fairness in a bankruptcy case). The *Drexel* Court cited *In re Masters Mates & Pilots Pension Plan and IRAP Litigation*, 957 F.2d 1020 (2d Cir. 1992), which itself explains further that

---

[8]    Recently, the general partner of the fund that indirectly owns LBREP Lakeside entered into a new Investment Advisory Agreement which gives certain control and decision making rights to a separate investment management company. All fiduciary duties remain with such general partner, which is controlled by Lehman decision-makers

14

> where the rights of one who is not a party to a settlement are at stake, the fairness
> of the settlement to the settling parties is not enough to earn the judicial stamp of
> approval . . . if third parties complain to a judge that a 'decree will be inequitable
> because it will harm them unjustly, he cannot just brush their complaints aside.'

*Id.* at 1026 (citation omitted). Indeed, ignoring the effects of a bankruptcy settlement on the non-settling parties "contravenes a basic notion of fairness." *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984), *cert. denied*, 469 U.S. 880 (1984); *see also In re Stanwich Financial Services Corp.*, 377 B.R. 432, 437 (Bankr. D. Conn. 2007) (finding that a proposed settlement could prejudice objecting defendants in their pending district court action and thus it could not be approved). In *In re Stanwich Financial Services Corp.*, the Bankruptcy Court rejected a settlement proposed by the Liquidating Agent when some defendants objected that the terms might prejudice them in other pending litigation. The court found that the settlement was not simply to end the litigation, but also intended to be used as evidence of liability in the pending district litigation. As such, the court properly rejected the settlement.

In making its informed and independent judgment regarding the Proposed Settlement, this Court should consider the rights of LBREP Lakeside in addition to those of the settling parties especially because LBREP Lakeside shares common control with LCPI. The prejudice to LBREP Lakeside is clear. Because LCPI and the First Lien Lenders will not face any potential liability and will directly benefit from a finding that the transaction was fraudulent, LBREP Lakeside will be forced to defend itself faced with the challenge of obtaining substantial discovery from both LCPI and the First Lien Lenders that is irreparably tainted by their self-interest.

As this Court well knows, independent market data at the time of the transaction is the best measure of value and is critical in making solvency determinations. *In re Iridium Operating LLC*, 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2003) ("[T]he public trading market constitutes an

impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation."). Likewise, the opinions of third parties willing to invest are important criteria as well. *In re Granite Broad. Corp.*, 369 B.R. 120, 143 (Bankr. S.D.N.Y. 2007). Both LCPI and the entire group of First Lien Lenders will be critical sources of testimony and critical sources of documents.

LCPI conducted due diligence and underwriting of the transaction, including analysis of appraisals, market studies, cash flow projections and financial records of the sponsor among other records. Keegan Decl. Ex. 2 at 5. LCPI's real estate group then recommended to its credit committee that LCPI size a first lien not to exceed $235 million and a second lien loan not to exceed $75 million. *Id.* That recommendation was evaluated and approved by the credit committee. If LCPI were a defendant, it would be expected to defend itself vigorously and support the transaction it sized, arranged, participated in and syndicated and would produce all necessary documents and testimony necessary to defeat the claim that it mistakenly financed a dividend by an insolvent entity. Likewise, the First Lien Lenders – as third party market participants that purchased debt claims – will also be a critical source of discovery. The First Lien Lenders likely conducted their own independent diligence of the transaction and formed an opinion of solvency at the time. The documents and testimony underlying that opinion are of substantial significance to LBREP Lakeside's defense against the SunCal Trustee's claims.

In order to defend against the fraudulent transfer claims, LBREP Lakeside will need to obtain testimony from LCPI regarding the scope and extent of its diligence and underwriting and the bases for its recommendations. LBREP Lakeside will also need to obtain testimony from LCPI regarding its credit committee's decision to size the first and second liens as it did. Same

16

for the First Lien Lender group, whose own diligence, market analysis and independent review would be critical for the court to make an ultimate solvency determination. *In re Iridium*, 373 B.R. at 293.

With a full release from the SunCal Trustee, however, there is potentially no future liability for LCPI and the First Lien Lenders from any finding that the $144 million dividend was a fraudulent transfer. Instead, they will have millions of dollars in economic incentives to maximize any finding of liability, so that they can recover more money at the end of the day. LCPI and the First Lien Lenders will have no incentive to search for relevant documents and to provide complete testimony regarding its diligence and underwriting. LBREP Lakeside will be handicapped in its defense if those documents and materials are not produced. LBREP Lakeside will further be prejudiced because all testimony will be tainted and highly unreliable because of LCPI's and the First Lien Lenders' right to profit directly from any recovery.

## CONCLUSION

For all of the reasons set forth above, the Court should deny LCPI's Motion.

DATED: September 16, 2010

                             Respectfully submitted,

                             KIRKLAND & ELLIS LLP

                             By: */s/ Mark E. McKane*
                                 Paul M. Basta
                                 Mark E. McKane

                               *Attorneys for*
                               *LBREP Lakeside SC Master I, LLC*