**Hearing Date: September 22, 2010 at 10:00 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
In re:                                                  :        Chapter 11
                                                        :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                :        Case No.: 08-13555 (JMP)
                                                        :
            Debtors.                                    :        (Jointly Administered)
------------------------------------------------------------------------ x

**DECLARATION OF F. ROBERT BRUSCO IN SUPPORT OF
MOTION OF LEHMAN COMMERCIAL PAPER INC. PURSUANT TO
SECTION 105 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF
BANKRUPTCY PROCEDURE 9019 FOR APPROVAL OF THAT CERTAIN
AMENDED AND RESTATED COMPROMISE BY AND AMONG LEHMAN
COMMERCIAL PAPER INC., ALFRED H. SIEGEL, AS CHAPTER 11 TRUSTEE
FOR THE SUNCAL DEBTORS, AND THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS IN THE SUNCAL BANKRUPTCY CASES**

I, F. Robert Brusco, do hereby declare and depose as follows:

1.  I am employed by LAMCO, LLC ("LAMCO"), a wholly owned subsidiary of LBHI[1] and an affiliate of LCPI, which are both debtors in possession in the above-captioned Chapter 11 cases. LAMCO is the asset manager for LCPI's estate holdings and responsible for the asset management of the SunCal Master Debtors' loans. As an employee of LAMCO, I am the person primarily responsible for the direct management of the SunCal loans and have been involved in these loans since January, 2008.

2.  I make this declaration ("Declaration") in support of the LCPI Settlement Motion. I am over the age of 21 and fully competent to testify to the matters set forth in this Declaration. I am fully familiar with the facts stated herein based upon the information provided

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Motion of Lehman Commercial Paper Inc. Pursuant to Section 105 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 for Approval of that Certain Amended and Restated Compromise by and Among Lehman Commercial Paper Inc., Alfred H. Siegel, as Chapter 11 Trustee for the SunCal Debtors, and the Official Committee of Unsecured Creditors in the SunCal Bankruptcy Cases*, dated September 2, 2010 [Docket No. 11153] (the "LCPI Settlement Motion").

NYC_IMANAGE-1197799.9

to me by the Debtors, my counsel, the SunCal Trustee and through my work as an employee of LAMCO. If called to testify at the September 22, 2010 hearing on the LCPI Settlement Motion, the following would be my direct testimony.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, information provided to me by counsel or employees working under my supervision, or my opinion based upon my experience, knowledge, and information concerning the SunCal loans and the Amended Term Sheet.

4. Pursuant to the LCPI Settlement Motion, LCPI seeks approval of a settlement pursuant to the terms set forth in an amended and restated term sheet (the "Amended Term Sheet") by and among (a) LCPI, on its own behalf and as agent for the First Lien Lenders, (b) Alfred H. Siegel (the "SunCal Trustee"), the chapter 11 trustee of the SunCal Debtors, and (c) the official committee of unsecured creditors in the SunCal Bankruptcy Cases (the "SunCal Committee"). A copy of the Amended Term Sheet is attached to the LCPI Settlement Motion as Exhibit "A."

5. As further explained below, in 2006 and 2007, the SunCal Parent entered into certain credit agreements with LCPI, as agent, pursuant to which the SunCal Parent borrowed approximately $395 million. The SunCal Subsidiaries guaranteed the SunCal Parent's obligations under such credit agreements. On or about September 10, 2008, involuntary chapter 11 cases were filed against the SunCal Debtors. On or about October 9, 2009, the SunCal Trustee filed a motion in the SunCal Bankruptcy Cases (the "Original Settlement Motion") seeking the approval of a settlement pursuant to the terms of that certain original term sheet by and among LCPI, the SunCal Trustee, and the SunCal Committee (the "Original Term Sheet").

NYC_IMANAGE-1197799.9                                    2

Following the filing of the Original Settlement Motion, a dispute arose between LCPI, on the one hand, and the SunCal Trustee and the SunCal Committee, on the other hand, regarding the interpretation of a provision in the Original Term Sheet. The parties were initially unable to resolve their differences.

6. On June 17, 2010, the SunCal Trustee filed the SunCal Stay Relief Motion seeking, among other things, stay relief to sell the real property of the SunCal Debtors (the "Properties") free and clear of LCPI and the other First Lien Lenders' asserted liens and to deny LCPI's credit bid rights. The SunCal Trustee also sought permission to commence a complex litigation against LCPI. At an initial hearing on the SunCal Stay Relief Motion held on July 14, 2010, this Court continued the hearing until August 18, 2010 and suggested to the parties that they focus their attention on resolving their differences and reaching a settlement, as opposed to planning for expensive and protracted litigation against each other. As suggested by this Court, the parties resumed negotiations, and as a result of the renewed discussions, LCPI, the SunCal Trustee, and the SunCal Committee have now resolved their differences regarding the interpretation of the Original Term Sheet and have executed the Amended Term Sheet. At a status conference held on August 18, 2010, LCPI reported to this Court that it was seeking internal approval to sign the Amended Term Sheet and would shortly thereafter be filing the LCPI Settlement Motion.

**A.    The Properties**

7. The Properties consist of three real estate development projects located in California:

> LBREP/L-SunCal McAllister Ranch ("McAllister Ranch") is located near Bakersfield in Kern County, California. I understand that McAllister Ranch is designed to be a community featuring a golf course, lake, and approximately 6,087 homes across 2,070 acres.

LBREP/L-SunCal McSweeny Farms, LLC ("McSweeney Farms") is located near Hemet in Riverside County, California. I understand that McSweeney Farms is scheduled to include 1,640 lots over 643 acres.

LBREP/L-SunCal Summerwind Ranch, LLC ("Summerwind Ranch") is located near Climesa in Riverside County, California. I understand that Summerwind Ranch will contain 3,683 lots over 2,591 acres.

**B.    The Loan Facilities**

8.    The SunCal Parent is a holding company established to fund the real estate development projects owned by each of its operating subsidiaries (*i.e.*, the SunCal Subsidiaries). Approximately ninety percent (90%) of the SunCal Parent is owned by LBREP Lakeside, which is an affiliate of Lehman Bros. Real Estate Partners, LP ("LBREP"). The remaining equity interests in the SunCal Parent are owned by SCC Ranch, which is an affiliate of SCC Inc. d/b/a SunCal Companies. LBREP Lakeside is the managing member of the SunCal Parent.

9.    The SunCal Parent's primary asset, other than cash, is its interests in the SunCal Subsidiaries. The SunCal Parent is the sole equity member of the SunCal Subsidiaries, each of which, in turn, owns a real estate development project bearing a similar name. The SunCal Parent also has cash in accounts with a current aggregate balance of over $13 million, which funds were formerly held in a "Development Account" and/or "Operating Accounts" established under the LCPI loan documents.

10.    The SunCal Parent, as borrower, entered into three Lien Credit Agreements with LCPI (collectively, the "Lien Credit Agreements").

11.    Pursuant to the First and Second Lien Credit Agreements, which were entered into on or about January 19, 2006, the SunCal Parent borrowed a total of $320 million (collectively, the "January 2006 Loans") as follows: (1) a revolving credit facility of $75 million and term loan facility of $160 million under the First Lien Credit Agreement entered into with

the First Lien Lenders); and (2) an $85 million term loan facility under the Second Lien Credit Agreement entered into with the Second Lien Lenders. The SunCal Parent's obligations under the First and Second Lien Credit Agreements were guaranteed by the SunCal Subsidiaries, and these guaranties were secured by first and second liens against the Properties. LCPI was a lender under the January 2006 Loans, and acted as the administrative and syndication agent, and Lehman Brothers Inc. ("LBI"), served as the sole lead arranger and bookrunner. Later, Gramercy Warehouse Funding I, LLC, replaced LCPI as the administrative agent under the Second Lien Credit Agreement. As of the date of the LCPI Settlement Motion, LCPI (a) holds approximately $69 million (or approximately thirty percent (30%)) of the debt outstanding under the First Lien Credit Agreement in its capacity as a First Lien Lender, and (b) holds approximately $13 million (or approximately fifteen percent (15%)) of the debt outstanding under the Second Lien Credit Agreement in its capacity as a Second Lien Lender.

12. On or about February 6, 2007, a Third Lien Credit Agreement was entered into by the SunCal Parent and certain lenders party thereto (collectively, the "Third Lien Lenders" and together with the First Lien Lenders and the Second Lien Lenders, the "Lien Lenders"), which provided for an additional $75 million term loan (the "February 2007 Loan," and together with the January 2006 Loans, the "Loans"). The February 2007 Loan was also guaranteed by the SunCal Subsidiaries and secured by third priority liens against the Properties. Just as with the January 2006 Loans, LCPI was a lender and served as the administrative agent. Square Mile Structured Debt (One), LLC, and Square Mile Structured Debt (Two), LLC, collectively, replaced LCPI as the administrative agent under the Third Lien Credit Agreements. As of the date of the LCPI Settlement Motion, LCPI holds approximately sixty-five percent

(65%) of the debt outstanding under the Third Lien Credit Agreement in its capacity as a Third Lien Lender.

13. Under certain intercreditor agreements, the Second Lien Lenders and the Third Lien Lenders agreed and confirmed that their liens and right to payment from collateral pledged by the SunCal Debtors were subordinated in favor of the First Lien Lenders.

C. **The SunCal Bankruptcy**

14. On or about September 10 and 11, 2008, involuntary petitions under Chapter 11 of the Bankruptcy Code were filed against the SunCal Debtors. On or about October 29, 2008, the SunCal Court entered an order approving Alfred H. Siegel's appointment as the Chapter 11 trustee for the SunCal Debtors, and on October 30, 2008, orders for relief were entered in the SunCal Bankruptcy Cases.

15. At the time of the filing of the SunCal Bankruptcy Cases, I was aware that there were defaults under the First, Second and Third Lien Credit Agreements. LCPI, as administrative agent for the First Lien Lenders, has asserted a first priority lien against the Properties and the SunCal Parent's cash for the full amount of the Loans extended to the SunCal Parent under the First Lien Credit Agreement (and guaranteed by the SunCal Subsidiaries). Likewise, the Second and Third Lien Lenders have also asserted liens against the Properties and the SunCal Parent's cash for the full amount of their respective Loans. Based on appraisals received by LCPI and offers received by the SunCal Trustee, I believe that the value of the Properties is substantially less than the amount of the First Lien Lenders debt.

D. **The LCPI Stay Relief Motions**

16. On or about October 2, 2008, LCPI, in its capacity as agent to the First Lien Lenders, filed the LCPI Stay Relief Motions, seeking, among other things, to foreclose on

the First Lien Lenders' liens in the Properties and cash held by the SunCal Debtors. The LCPI Stay Relief Motions were originally scheduled for hearing on October 28, 2008, but the SunCal Court continued the hearing to November 20, 2008 to allow the SunCal Trustee an opportunity to analyze the motions and prepare a response thereto. Both the SunCal Trustee and the SunCal Committee opposed the LCPI Stay Relief Motions, in part, because both parties allegedly disputed the amount and validity of LCPI's liens.

17.     In an effort to facilitate an amicable settlement among the parties, the evidentiary hearing on the LCPI Stay Relief Motions was continued by agreement of the parties on multiple occasions. Currently, LCPI and the SunCal Trustee are parties to a stipulation, pursuant to which they agreed to take the evidentiary hearing related to the LCPI Stay Relief Motions off the calendar, and further agreed to suspend the related deadlines and discovery, subject to the parties' rights to re-notice and/or reinstate the same. Absent a settlement, I believe LCPI will have no other option but to re-notice the evidentiary hearing and pursue expensive and protracted litigation in order to obtain the stay relief necessary to foreclose on its interests in the Properties and the SunCal Parent's cash.

**E.     SunCal Cash Collateral Disputes**

18.     Although LCPI and the SunCal Trustee were able to ultimately agree upon the use of the First Lien Lenders' cash collateral during the early stages of the SunCal Bankruptcy Cases, the parties were unable to reach an agreement regarding the use of cash collateral beyond November 30, 2009 (due to the breakdown in negotiations related to the Original Term Sheet, as discussed further below). Accordingly, the SunCal Trustee filed motions in the SunCal Bankruptcy Cases for the use of cash collateral through December 31, 2009, March 31, 2010, and June, 30, 2010.  LCPI filed a limited objection to each motion, and each

motion was granted over LCPI's limited objection. On May 27, 2010, the SunCal Trustee filed a *Motion for Order Authorizing Use of Cash Collateral Through September 30, 2010* in the SunCal Bankruptcy Cases. LCPI filed an opposition to the motion. On June 17, 2010, the SunCal Court heard and granted the motion over LCPI's opposition. On June 25, 2010, the SunCal Court entered the Cash Collateral Order. On July 9, 2010, LCPI filed a notice of appeal of the Cash Collateral Order ( "Appeal"). In light of the Amended Term Sheet, LCPI and the SunCal Trustee are in the process of memorializing a stipulation staying the Appeal pending the outcome of the LCPI Settlement Motion and the SunCal Approval Motion, which, if granted, will result in the dismissal of the Appeal.

**F.    LCPI's Claim in the SunCal Master Debtors' Bankruptcy Case**

19.    LCPI and the first lien lenders have a claim in the SunCal Master Debtors' bankruptcy cases of approximately $235 million. In 2008, the Properties were appraised at $62 million ("Appraised Amount"). Indeed, the SunCal Trustee was prepared to take a "stalking horse" bid for the Properties at $41 million. In all events, it is the position of the First Lien Lenders, which includes LCPI, that they are the true economic owners of the Properties.

**G.    The Original Term Sheet with the SunCal Master Debtors**

20.    As referenced above, in the fall of 2009, the Trustee filed the Original Settlement Motion to approve the Original Term Sheet. The Original Term Sheet essentially provided that: (a) the Trustee would sell the Properties free and clear of liens and claims, including without limitation, the Senior Liens, and the first lien lenders would make an initial credit bid of $62 million, which was also the last appraised value of the Properties; (b) the Trustee would be paid (i) $3 million (essentially to cover anticipated administrative expenses in the SunCal Master Debtors' cases) from the first lien lenders' cash collateral (ii) up to $1.5

million to pay mechanic's liens to the extent the holders held superior liens to the first lien lenders in the Properties and there was no available title insurance to cover same, (iii) 3.5% of the net proceeds received by the first lien lenders relating to a future sale of the Properties, (iv) up to $2 million of cash collateral to preserve the Properties until sale, and (v) 50% of the Other Recoveries until the SunCal Master Debtors' trade creditors were paid in full; and (c) in addition to the Properties, the balance of the cash collateral and the residual bankruptcy estate would be transferred to the first lien lenders. The Original Settlement Motion was, for various reasons, opposed by multiple third parties.

21. Thereafter, the SunCal Trustee raised what he saw as an ambiguity in the Original Term Sheet, the interpretation of which resulted in a dispute between the settling parties. Specifically, the Original Term Sheet required that the SunCal Trustee settle and obtain a release of any mechanic's and similar liens determined to be senior to the liens of LCPI ("Senior Liens") using LCPI's title insurance and $1.5 million of cash collateral set aside for that purpose. The title insurance company, Fidelity National Title Insurance Company, objected to the Original Settlement Motion. I am aware that the SunCal Trustee became concerned that there was a possibility that he might not be able to discharge all of the Senior Liens. The Original Term Sheet contemplated what would occur if the SunCal Trustee could not discharge all of the Senior Liens, and the SunCal Trustee became concerned that, based on an interpretation of that provision, there could be negative ramifications to the SunCal estates.

22. LCPI, the SunCal Trustee, and the SunCal Committee attempted to resolve the dispute regarding the interpretation of the Original Term Sheet, and the hearing on the Original Settlement Motion was continued on multiple occasions. Ultimately, on January 25, 2010, the SunCal Trustee filed a notice of withdrawal of the Original Settlement Motion in the

SunCal Bankruptcy Cases. After being unable to engage the SunCal Trustee to resolve their differences, by letter dated March 30, 2010, LCPI notified the SunCal Trustee of its termination of the proposed settlement embodied in the Original Term Sheet and reserved all of its rights related thereto.

**H.    SunCal Stay Relief Motion**

23.    On or about June 17, 2010, the SunCal Trustee filed the SunCal Stay Relief Motion in these cases, seeking, among other things, stay relief to sell the Properties free and clear of LCPI's asserted liens and to deny LCPI's credit bid rights. The SunCal Trustee also sought permission to assert affirmative claims against LCPI. LCPI filed an opposition to the SunCal Stay Relief Motion. The SunCal Stay Relief Motion was initially heard on July 14, 2010 and continued by this Court to August 18, 2010. The parties engaged in further settlement discussions following the July 14, 2010 hearing and were able to resolve their disputes concerning the Original Term Sheet.

**I.    SunCal Claims Against LCPI**

24.    In the SunCal Stay Relief Motion and in the responses of the SunCal Trustee and the SunCal Committee to the LCPI Stay Relief Motions, the SunCal Trustee and the SunCal Committee have repeatedly alleged that the SunCal Debtors' estates have numerous claims against LCPI. Among others, the SunCal Trustee and the SunCal Committee have stated that they believe that the SunCal Debtors' have claims against LCPI to: (1) equitably subordinate the claims of LCPI and cause the liens securing LCPI's claims to be transferred to the SunCal Debtors' estates; (2) avoid the security interests held by LCPI against the Properties as fraudulent transfers and preserve those security interests for the benefit of the SunCal Debtors' estates; and (3) recover damages against LCPI for lender liability (collectively, the "SunCal Estate Claims").

25. LCPI disputes each of the SunCal Estate Claims. I believe that LCPI has valid defenses to each claim. However, I further believe that litigating these claims would be expensive and subject to the vagaries and risk of litigation, and until such litigation is resolved, there will be a stalemate spanning two different bankruptcy courts as to how to deal with the Properties.

**J.    The Settlement Set Forth in the Amended Term Sheet Should Be Approved**

26. The salient terms of the Amended Term Sheet are set forth in paragraph 32 of the LCPI Settlement Motion.

27. I believe that the Amended Term Sheet is a fair and reasonable compromise, and its approval is in the best interests of LCPI's bankruptcy estate. The Amended Term Sheet resolves all of the disputes between LCPI on its own behalf and for the other First Lien Lenders, on the one hand, and the bankruptcy estates of the SunCal Debtors, on the other hand. In particular, the Amended Term Sheet resolves all pending litigation between the parties, all disputes between the parties related to the SunCal Trustee's use of LCPI's and the other First Lien Lenders' cash collateral, and provides for a consensual process for the sale of the Properties (which are subject to the lien of LCPI, as agent for the First Lien Lenders). I believe that approval of the Amended Term Sheet will save LCPI's bankruptcy estate significant administrative expense, will eliminate the risk associated with litigation, and will substantially preserve LCPI's secured claims in the SunCal Bankruptcy Cases for the benefit of LCPI's bankruptcy estate and creditors. Moreover, as discussed below, I believe that the Amended Term Sheet puts into place an acceptable structure relating to the disposition of the Properties (*i.e.*, the First Lien Lenders' collateral), which will help ensure that the Properties are liquidated in a

timely, efficient and beneficial manner (thereby allowing LCPI's share of the proceeds to be available to its bankruptcy estate much faster than in the absence of a settlement).

28. Under the Amended Term Sheet, the Properties will be sold through a plan of reorganization, subject to LCPI's right to credit bid as provided in the Amended Term Sheet. Pursuant to the Amended Term Sheet, the SunCal Trustee and the SunCal Committee have agreed, among other things, that (a) the First Lien Lenders will have an allowed secured claim in the SunCal Bankruptcy Cases equal to the proceeds realized by them from the sale of the Properties plus certain cash proceeds to be remitted to the First Lien Lenders by the SunCal Trustee (after each amount is adjusted to account for certain "carve outs" and/or obligations, as set forth in greater detail in the LCPI Settlement Motion), (b) the First Lien Lenders will have an allowed general unsecured claim in the SunCal Bankruptcy Cases in the amount of their deficiency claims, and (c) the SunCal Trustee, the SunCal Committee and the SunCal Debtors' estates will provide broad releases to the First Lien Lenders, LCPI, and their respective officers, directors, employees, agents and attorneys.[2]

29. In return, under the Amended Term Sheet, LCPI on its own behalf and as agent for the First Lien Lenders, has agreed that certain of the First Lien Lenders' cash collateral will be "carved out" for the benefit of the administration of the SunCal Debtors' estates, and that certain other cash collateral held by the SunCal Debtors may be used to preserve the Properties until sale. In addition, the First Lien Lenders have agreed to share with the unsecured, non-lender creditors in the SunCal Bankruptcy Cases a portion of (a) the proceeds from the sale of the Properties, and (b) their right to certain recoveries.

---

[2] As set forth in the LCPI Settlement Motion, the releases specifically do not include a release of LBREP Lakeside SC Master I LLC ("LBREP Lakeside"), SCC Acquisitions, Inc. ("SCC Inc."), SCC Acquisitions, LLC ("SCC LLC"), or SCC Ranch Ventures LLC ("SCC Ranch" and together with SCC Inc. and SCC LLC, "SCC").

30. Specifically, upon the entry of orders granting the LCPI Settlement Motion and the SunCal Approval Motion, the SunCal Debtors' estates will receive $5.5 million in cash. Of this sum, $3.5 million (the "Administrative Fund") will be available for use by the SunCal Trustee to administer the SunCal Debtors' cases. The remaining $2 million will be used by the SunCal Trustee to maintain and preserve the Properties' pending sale (with any unused residual amount to be transferred to the First Lien Lenders after the sale of the Properties has closed). The First Lien Lenders are also sharing the Yucaipa Funds with the SunCal Trustee.

31. Also, through the SunCal Debtors' plan of reorganization contemplated under the Amended Term Sheet, the proceeds of any other recoveries by the SunCal Trustee (excluding proceeds from the sale of the Properties and the Yucaipa Funds) will be split 50/50 between (a) the First Lien Lenders, and (b) the SunCal Debtors' estates for distribution to the SunCal Debtors' unsecured non-lender creditors.

32. The Amended Term Sheet recognizes that the 50/50 split will be achieved either through the enforcement of an intercreditor agreement in favor of the First Lien Lenders, or if such remedy is not available, to the extent necessary, by the assignment for the benefit of unsecured non-Lender creditors of unsecured claims of LCPI and/or the First Lien Lenders to the SunCal Trustee.

33. Finally, the SunCal Debtors' estates will also be entitled to 3.5% of any net recovery from the sale of the Properties to a third party (the "Trustee Participation"), whether through the plan or subsequently by LCPI (after a credit bid). The Amended Term Sheet recognizes that there could be mechanics liens encumbering the Property that are senior to the lien of the First Lien Lenders. To the extent title insurance is not available to cover such claims, these senior mechanics liens, if any, will either be paid from the proceeds of a third party sale of

the Properties, or in the event of an LCPI credit bid, will remain a lien on the Properties. In essence, the 3.5% recovery for the SunCal Debtors estate comes out of the sale proceeds otherwise payable to the First Lien Lenders. I believe that the concessions made by LCPI under the Amended Term Sheet are reasonable in view of the benefits derived therefrom.

34. I believe that that the Amended Term Sheet (and the settlement embodied therein) provides the best framework for globally resolving the numerous disputes by and among LCPI, the SunCal Trustee and the SunCal Committee, including, without limitation, disputes and claims arising from or relating to the LCPI Stay Relief Motions, the SunCal Stay Relief Motion, the Appeal and related cash collateral disputes, and the SunCal Estate Claims.

35. As discussed above and in the LCPI Settlement Motion, the SunCal Trustee has alleged that the SunCal Debtors' estates have claims to equitably subordinate LCPI's secured claims, avoid LCPI's liens, and to recover damages against LCPI for lender liability (*i.e.*, the SunCal Estate Claims). The SunCal Estate Claims are resolved by the Amended Term Sheet by and through the release of such claims by the SunCal Debtors' estates, as well as the grant of an allowed secured claim to LCPI, as agent for the First Lien Lenders, in an amount equal to the successful bid for the Properties, plus any cash collateral received by the First Lien Lenders on the Settlement Effective Date, plus the amount of the Yucaipa Funds received by the First Lien Lenders.

36. In exchange for the release of the SunCal Estate Claims, the grant of the allowed secured claim (including the right to credit bid such claim), and the other benefits received by LCPI and the First Lien Lenders under the Amended Term Sheet, LCPI, as agent for the First Lien Lenders, has agreed to "carve out" certain amounts of its collateral and transfer that collateral to the SunCal Trustee for the benefit of the SunCal Debtors' estates (*i.e.*, the

Administrative Funds, the Trustee's share of the Yucaipa Funds, amounts payable under the 50/50 Allocation that would otherwise have been paid to LCPI and the First Lien Lenders, and the Trustee's Participation). Additionally, LCPI, as agent for the First Lien Lenders, has agreed to allow the SunCal Trustee to use certain additional cash collateral to maintain the Properties prior to their disposition (i.e., the Remaining Development Funds) and has agreed to post the Trustee's Loss Collateral.

37. As previously stated, while I believe that LCPI has valid defenses to each of the SunCal Estate Claims, in order to successfully defend the SunCal Estate Claims, I believe that LCPI would be required to engage in expensive and protracted litigation with the SunCal Trustee and the SunCal Committee. Additionally, absent the settlement set forth in the Amended Term Sheet, I believe that LCPI and the other First Lien Lenders would not be able to recover their collateral (*i.e.*, the Properties and cash) or the proceeds of their collateral in the foreseeable future. I believe that, absent the settlement, if LCPI wishes to obtain the Properties, LCPI will be required to pursue the LCPI Stay Relief Motions in the SunCal Bankruptcy Cases and convince the SunCal Court that lifting the automatic stay is appropriate. Again, I believe this litigation would likely be expensive and protracted, and would come with many of the same aforementioned uncertainties. By contrast, I believe that the Amended Term Sheet not only provides a framework for LCPI and the other First Lien Lenders to obtain the benefit of their collateral through an imminent plan sale of the Properties, it also preserves LCPI's credit bidding rights and gives LCPI significant input with respect to the conduct of the sale of the Properties.

38. In sum, I believe the Amended Term Sheet provides a framework that will (a) facilitate the sale of the Properties in the near future (with a substantial portion of the sale proceeds to be paid to LCPI ) in a manner that has a material, direct and tangible benefit to

LCPI's estate; (b) minimize further erosion of the First Lien Lenders' cash collateral; and (c) minimize further legal expenditures relating to the SunCal matter in general.

39. Based on the foregoing and the arguments made in the LCPI Settlement Motion, I believe that the Amended Term Sheet is reasonable and in the best interests of LCPI and its estate and creditors, and should be approved.

40. I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

41. Executed this 20th day of September, 2010 at New York, New York.

                                                         /s/ F. Robert Brusco
                                                             F. Robert Brusco