WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Perez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                :
**In re**                                       :    **Chapter 11 Case No.**
                                                :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,    :    **08-13555 (JMP)**
                                                :
                            Debtors.            :    **(Jointly Administered)**
                                                :
                                                :
------------------------------------------------------------------x

**DECLARATION OF DOUGLAS LAMBERT IN SUPPORT OF DEBTORS'
MOTIONS FOR (I) APPROVAL OF A SETTLEMENT AGREEMENT WITH
AURORA BANK FSB REGARDING THE MASTER FORWARD AGREEMENT AND
OTHER MATTERS, (II) APPROVAL OF A SETTLEMENT AGREEMENT WITH
WOODLANDS COMMERCIAL BANK, AND (III) CERTAIN RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Douglas Lambert, declare:

1. I am over the age of 18 years and make these statements of my own personal knowledge. If called to testify, I could testify to the truth of the matters set forth herein.

2. I submit this declaration in support of the motions, dated September 1, 2010,[1] of Lehman Brothers Holdings Inc. ("LBHI") and certain of its affiliated debtors in the above-referenced chapter 11 cases, including Lehman Commercial Paper Inc. ("LCPI"), Lehman

---

[1] The motion to approve the Debtors' settlement with Aurora Bank FSB ("FSB") is filed at docket number 11141 (the "FSB Settlement Motion"). The motion to approve the Debtors' settlement with Woodlands Commercial Bank ("Woodlands," together with FSB, the "Banks") is filed at docket number 11142 (together with the FSB Settlement Motion, the "Motions").

Brothers Special Financing Inc. ("LBSF"), Luxembourg Residential Properties Loan Finance S.a.r.l. ("Luxco") and Lehman Brothers Commodities Services Inc. ("LBCS," together with LBHI, LCPI, LBSF and Luxco, the "Debtors"), as debtors and debtors-in-possession, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 363 of title 11 of the United States Code (the "Bankruptcy Code"), for (i) approval of a settlement agreement between the Debtors and FSB regarding the master forward agreement and other matters (the "FSB Settlement"), (ii) approval of a settlement agreement between the Debtors and Woodlands (the "Woodlands Settlement," together with the FSB Settlement, the "Settlements"), and (iii) certain related relief with respect to both Settlements, all as more fully described in the Motions.

3.    I am a Managing Director with Alvarez and Marsal. I was assigned to the Lehman matter on October 1, 2008. My areas of responsibility include managing the combined loan book and the bank platform assets of LBHI, in particular, dealing with issues related to FSB and Woodlands. I am also the Chief Executive Officer of Lamco, LLC.

4.    I am the primary representative on behalf of the Debtors regarding the Debtors' affairs with the Banks, including in connection with the negotiation of the Settlements that are the subject of the Motions. In that role, I have been intimately involved with the Banks' affairs since approximately October 1, 2008. Since that time, I have independently reviewed or have overseen employees of the Debtors that assist me in carrying out my responsibilities regarding the Banks and have been advised of the Banks' businesses, their operations, records, financial statements and data as well as their regulatory requirements and restrictions. I have been in constant communication with the Bank's management, the Creditors' Committee and each of the Banks' respective counsel and professionals on behalf of the Debtors. I have also been in direct

and indirect contact with the regulators for the Banks as appropriate – the Office of Thrift Supervision (the "OTS") for FSB and the Federal Deposit Insurance Corporation (the "FDIC") and the Department of Financial Institutions for the State of Utah for Woodlands (collectively, with the OTS and the FDIC, the "Regulators").

   5. LBHI has maintained an open dialogue with the Creditors' Committee regarding the Banks subject to appropriate confidentiality restrictions. Information concerning the Banks has been shared with the Creditors' Committee and its professionals on a real-time basis, and the Creditors' Committee has had meaningful input regarding LBHI's strategy for the Banks. LBHI will continue to work with the Creditors' Committee to ensure that the interests of all unsecured creditors are represented and protected. All of LBHI's prior motions to take various actions to support the Banks have been based upon consultation with and the support of the Creditors' Committee. The Creditors' Committee supports the Settlements.

Incorporation of the Motions

   6. The situation of the Banks is detailed in the Motions. To avoid repetition, I incorporate the recitation of the Banks' circumstances, the regulatory restrictions imposed on their operations, the Debtors' prior actions in support of the Banks and the terms of the Settlements. I affirm that the factual statements in the Motions, including the terms of the Settlements, are true and accurate.

Value of the Banks

   7. Since the beginning of these cases, LBHI has believed and continues to believe that the Banks are valuable assets of LBHI's estate and LBHI's creditors would benefit from the preservation of the Banks. This is based upon an independent review and evaluation by LBHI, overseen by me personally, of the Banks' assets – primarily the Banks' respective loan portfolios

and FSB's ownership of Aurora Loan Services LLC ("Aurora"), which generates significant mortgage servicing fee revenues. The Debtors' have also investigated and reviewed the Banks' liabilities, which are primarily their deposit liabilities, and their business operations. Based upon this continuous review, LHBI believes that, if the regulatory restrictions on the Banks are modified as set forth in the Motions and FSB can resume originating new loans and refund its deposit liabilities, FSB can operate at a profit and Woodlands can be wound down in an orderly manner that will maximize the value realizable from its assets and permit payment of a cash liquidating dividend or a roll-up of selected assets into LBHI. Based on their June 30, 2010 regulatory reports, the values of LBHI's equity interest in FSB and Woodlands were reported, on a fair value accounting basis, at $677.6 million and $741.6 million, respectively, for a combined value of $1.42 billion.

Considerations in Entering Into the Settlements

8. The negotiations of the Settlements were extensive and robust. The negotiations lasted over six months, involved multiple exchanges of terms and conditions and then drafts of settlement agreements and incorporate substantial concessions by all parties. The Settlements are package deals that position LBHI to achieve its ultimate purpose in recovering the value of the Banks. The negotiations of the Settlements were overseen on the part of the Banks by a committee of their respective independent directors. All parties were represented by their counsel throughout the negotiations and LBHI consulted with the Creditors' Committee's professionals during the negotiations of the Settlements.

9. LBHI recognizes that the Settlements require substantial contributions to the Banks' capital. However, as discussed herein, the contributions being made by LBHI are appropriate and necessary to preserve the value of the Banks and avoid the ramifications of the

potential allowance of a section 365(o) claim by the Regulators against LBHI, which could be materially adverse.  In negotiating the Settlements, not only did LBHI and the other Debtors try to resolve their issues with the Banks at the lowest possible cost to their estates, LBHI also had to ensure that the Settlement would not reduce the Banks' respective capital levels, and, indeed, would raise their capital levels sufficiently so that each Bank would qualify for relief from the regulatory restrictions which today prevent them from operating in an optimal manner.  Specifically, LBHI had to ensure that the Banks' capital was raised to a level sufficient to enable (i) FSB to carry out its business plan to originate new loans and fund its existing deposit liabilities by regaining limited access to the market for brokered certificates of deposit and (ii) Woodlands to wind-down its affairs without significant regulatory restrictions.  These considerations played a primary role in LBHI's negotiation of the Settlements and its ultimate decision to agree to the terms of the Settlements.  LBHI also considered that it would recover the investments being made in the Banks pursuant to the Settlement.  Finally, by making these contributions, LBHI is materially enhancing its ability to recover the value of its pre-existing equity interest in the Banks.  LBHI fully expects that, as the Banks will be positioned after the Settlement, LBHI will recover its entire investment in the Banks.

365(o) Claims and Cross Liability

10.  In early 2009, when the Regulators threatened to seize the Banks if the Banks' capital issues were not immediately addressed, LBHI had a clear choice.  It could have allowed the Banks to fail and litigated with the Regulators over their section 365(o) claims.  Or LBHI could decide to support the Banks and preserve their value, which LBHI recognized would entail a substantial long term commitment.  Both alternatives were given serious consideration and were fully vetted by some of the most senior members of the Debtors' management, Debtors'

counsel, LBHI's Board of Directors and the Creditors' Committee and its professionals. Ultimately, LBHI determined, with the full support of the Creditors' Committee, that the Banks should be preserved.

11. LBHI has reviewed and evaluated the facts and evidence that would be considered in connection with litigation over the Regulators' section 365(o) claims. In that regard, LBHI has reviewed relevant documents, consulted with bankruptcy and bank regulatory counsel and evaluated the additional potential consequences of such claims, including the cross-liability banking statute (which would expose both Banks if one of them were seized). Although LBHI believes that it has valid defenses to such claims, LBHI has determined that the risks to its estate and the heavy litigation costs that would be involved should be avoided.

Capital Maintenance Agreements

12. In order to secure regulatory approval of the Settlements and the associated modifications of the regulatory restrictions on the Banks' operations that are described in the Motions, LBHI had to enter into capital maintenance agreements with respect to both Banks, pursuant to which LBHI will agree that, as long as LBHI's ownership or control of the Banks continues, in the event that either FSB's or Woodland's capital falls below the 11% Tier-1 capital level or 15% total risk-based capital level, LBHI will promptly make capital contributions to FSB or Woodlands, respectively, sufficient to restore their capital at the 11% or 15% level, as appropriate. In the Capital Maintenance Agreements, LBHI has agreed that it will sell FSB and Woodlands within 18 months of the effective date of the Settlements, and, subject to extensions in certain circumstances, if the sales cannot be completed by that date, LBHI will cause the dissolution and wind-down of the Banks in connection with which LBHI will purchase their

respective remaining assets. LBHI believes that this 18-month period is sufficient to allow LBHI to accomplish its objective of attaining fair value for the Banks.

13. During the negotiations, it was clear that the Regulators would not accept a settlement and modify the regulatory restrictions on the Banks' operations without the capital maintenance agreements. LBHI has considered the reasonable worse case scenario for the Banks and has determined that the capital maintenance agreements do not expose LBHI's estate to unacceptable risk. Woodlands has limited liabilities and is not expected to require issuing brokered certificate of deposits to operate its business. While FSB will access the brokered certificate of deposit market in a limited way, it should have sufficient liquidity to operate its business. As a result of the Settlement Agreement, FSB's capital level is expected to rise substantially, reaching an estimated 20% total risk-based capital ratio. On June 30, 2010, Woodlands reported a total risk-based capital ratio of 32.75%, which is also expected to rise with the additional contributions being made by the Settlement. At these levels, it is highly unlikely that the Banks will require additional support from LBHI over the next 18 months.

<u>Extension of the Durations of the Repurchase Agreement and Financing Facility</u>

14. LBHI has also agreed to extend the duration of the amended master repurchase agreement with FSB and the financing facility with Aurora throughout the period of its ownership of FSB to ensure that FSB has sufficient sources of liquidity even under a reasonable worse case scenario. Extending the terms of these facilities was a requirement of the OTS in order to obtain the modifications of the regulatory restrictions on FSB's operations. These facilities are on market terms, are fully secured and represent good investments of LBHI's cash. FSB and Aurora have both timely made all required principal and interest payments under both facilities since they were entered into. FSB's business plan does not contemplate the use of

either facility, but they will be available to provide liquidity if there is a need under adverse circumstances. Under these circumstances, LBHI determined that extending the terms of the facilities to obtain regulatory approval was appropriate.

Consideration of Inter-Debtor Issues

15.    Throughout the negotiations of the Settlements, I and other representatives of the Debtors were fully aware of, and sensitive to, inter-Debtor issues, in particular the allocation of costs of the Settlements amongst the respective Debtor entities. As detailed in the Motions, LBHI considered what each other Debtor was gaining from the Settlements, what it was giving up and whether it would be appropriate to enter into additional arrangements to assure that each Debtor's participation in the Settlements was reasonable. Since the filing of the Motions, the Debtors have continued to evaluate these issues and had discussions about these matters with the professionals of the Creditors' Committee and other creditors that have approached the Debtors. Each of the Debtors' participation in the Settlement is consistent with the Bankruptcy Code, takes into account the corporate integrity of each Debtor and does not favor FSB or Woodlands over other similarly situated creditors of such entities. In addition, with respect to the arrangements that LBHI has made with LCPI and Luxco regarding their payment of 90% of the value of their respective interests in the Joinder Collateral (as defined in the FSB Settlement Motion), the parties intend to agree upon the fair market value of such loans at the time of closing of the Settlement to ensure that a fair portion of the costs of recovering those assets will be allocated to each of the respective Debtors. Furthermore, as it relates to inter-Debtor issues involved in the Settlements, all Debtors reserve their rights to reallocate the costs of the Settlements among the Debtors to reflect additional information.

<u>The Settlements are in the Best Interests of the Debtors and their Estates</u>

16.     The Settlements are in the best interests of creditors and should be approved. Although LBHI believes that it has defenses to the Regulators' claims under section 365(o), if the Banks are seized and the Regulators claims under section 365(o) are allowed, LBHI would lose the value of the assets of both Banks, which LBHI estimates to have a liquidation value of $2.0 billion in the aggregate, inclusive of the fair value of pledged collateral that will be recovered pursuant to the Settlement. LBHI has also estimated that the allowed unsecured priority claim avoided by its support of the Banks could be as great as $2.7 billion (as of February 2009 when LBHI made its first capital contribution to the Banks). Thus, by entering into the Settlements, LBHI avoids these total losses of approximately $4.7 billion. Even after all contributions made to the Banks are deducted, which total approximately $1.6 billion, LBHI still preserves approximately $3.0 billion in value for its creditors. A cost-benefit analysis of the Settlements is attached hereto at <u>Exhibit A</u>.

17.     The Settlements are in the best interests of the Debtors and should be approved. Although every aspect of the Settlements may not be the best possible result for LBHI, when viewed in their entirety and under the circumstances, including giving effect to the potential consequences to LBHI's estate if the Settlements are not approved, the Settlements are fair and reasonable. LBHI has invested substantial time and money to achieve a resolution of the Banks. The Settlements will allow LBHI to begin to extract its equity interest and investments in the Banks. For all of these reasons, the Settlements should be approved.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 20th day of September 2010.

/s/ Douglas Lambert
Douglas Lambert

US_ACTIVE:\43485783\03\58399.0003                9

## Exhibit A

**(Cost Benefit Analysis)**

**Lehman Bank Platforms**
**Recovery Analysis**
($ millions)

|  | Combined Expected Recovery |  |
|---|---:|---|
| Expected Liquidation Recovery, including collateral recovered | $ 2,000 | |
| Priority Deficiency Claim Avoided (Feb 2009) | 2,700 | |
| **Value Preserved** | **$ 4,700** | |
|  |  |  |
| Less Assets Contributed: |  |  |
| Cash | 932 | |
| MSR | 453 | (x) |
| Debt Forgiveness- intercompany | 98 | (x) |
| Other Assets | 131 | (x) |
| **Total Contributions** | **$ 1,614** | |
|  |  |  |
| **Net Preserved Value** | **$ 3,086** | |

(x)- Amounts reflect deemed fair value contributed, not net realizable value in the hands of LBHI.