WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Ralph I. Miller
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------------------x
In re                                          :    Chapter 11 Case No.
                                               :
LEHMAN BROTHERS HOLDINGS INC., et al.,         :    08-13555 (JMP)
                                               :
                        Debtors.               :    (Jointly Administered)
---------------------------------------------------------------------x
```

### NOTICE OF DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR APPROVAL OF A SETTLEMENT AGREEMENT AMONG LBSF, LBHI, AND SOCIÉTÉ GÉNÉRALE, NEW YORK BRANCH AND OTHER RELATED RELIEF

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers Holdings Inc. ("LBHI"), as debtors and debtors-in-possession (together, the "Debtors"), pursuant to sections 105(a), 363 and 365 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for (i) approval of a settlement agreement among LBSF, LBHI, and Société Générale, New York Branch ("SG"), relating to certain swap transactions with MKP Vela CBO, Ltd. and Libra CDO Limited, (ii) the assumption, assignment, and sale of LBSF's interest in the Libra Credit Default Swap Agreement to SG, (iii) the assumption, assignment, and sale of LBSF's interest in the Vela Credit Default Swap Agreement to SG, and (iv) other related relief, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **October 20, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Lori R. Fife, Esq., Ralph I. Miller, Esq. and Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Tracy Hope Davis, Esq., Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., and Linda Riffkin, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Evan Fleck, Esq., and Dennis O'Donnell, Esq. and Quinn Emanuel, 865 S. Figueroa Street, 10th Floor, Los Angeles, California 90017, Attn: Eric Winston, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; (v) Mayer Brown LLP, 1675 Broadway, New York, New York 10019, Attn: Steven Wolowitz, Esq.; (vi) Libra CDO Limited, c/o Deutsche Bank (Cayman) Limited, P.O. Box 1984 GT, Elizabethan Square, Grand Cayman, Cayman Islands, Attn: Global Transaction Banking, Trust & Securities Services – Corporate Services Division; (vii) Alston & Bird LLP, One Atlantic Center, 1201 West Peachtree Street, Atlanta, Georgia 30309-3424, Attn: John C. Weitnauer, Esq.; (viii) MKP Vela CBO, Ltd., c/o Walkers SPV Limited, Walker House, Mary Street, George Town, Grand Cayman, Cayman Islands; (iv) The Bank of New York Trust Company, National Association, 601 Travis Street, 16th Floor, Houston, Texas 77002, so as to be so filed and received by no later than **October 13, 2010 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: September 20, 2010
      New York, New York

/s/ Jacqueline Marcus
Lori R. Fife
Ralph I. Miller
Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Ralph I. Miller
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

**DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a), 363 AND 365 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR APPROVAL
OF A SETTLEMENT AGREEMENT AMONG LBSF, LBHI, AND SOCIÉTÉ
GÉNÉRALE, NEW YORK BRANCH AND CERTAIN RELATED RELIEF**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers

Holdings Inc. ("LBHI"), as debtors and debtors-in-possession (together, the "Debtors"), file this

Motion and respectfully represent:

**Preliminary Statement**

1.    The Debtors seek approval of a settlement agreement (the "Settlement

Agreement")[1] among LBSF, LBHI, and Société Générale, New York Branch ("SG") relating to

certain swap transactions with two special purpose entities:  Libra CDO Limited ("Libra") and

---

[1] A copy of the Settlement Agreement is annexed hereto as Exhibit A.  Capitalized terms used but not defined in this
Motion shall have the meanings ascribed to them in the Settlement Agreement.

MKP Vela CBO, Ltd. ("Vela").  If the Settlement Agreement is approved, LBSF's estate is likely to recover at least $445 million and preserve the right to pursue the remaining assets in Libra and Vela against the other parties to the transactions, thereby maximizing its opportunity to potentially recover up to an additional approximately $72 million.  Approval of the Settlement Agreement also will put LBSF in a better position to request that the Libra Trustee promptly return approximately $128 million in collateral that LBSF posted with Libra before its bankruptcy filing.

        2.      Libra is a special purpose entity that invested in various securities backed directly or indirectly by mortgages.  In October 2006, LBSF and Libra entered into a credit default swap agreement,[2] pursuant to which LBSF purchased credit protection (similar, in concept, to insurance) from Libra and agreed to make "premium" payments to Libra in exchange for Libra's agreement to pay LBSF if losses were incurred on certain mortgage-related securities.  LBSF's payment obligations under the Libra CDSA are guaranteed by LBHI.  At the same time that Libra entered into the Libra CDSA with LBSF, it also entered into a separate derivative transaction with SG (the "Libra Senior Swap Agreement"), pursuant to which SG is obligated to advance funds to Libra for Libra to meet certain payment obligations to LBSF under the Libra CDSA in the event that Libra does not have sufficient available funds to make such payments.

        3.      LBSF and SG are also parties to substantially similar transactions in which they have identical roles with Vela, another special purpose entity that invested in various securities backed directly or indirectly by mortgages.  In November 2006, LBSF and Vela

---

[2] The Libra credit default swap agreement consists of a 1992 ISDA Master Agreement, dated as of October 17, 2006, together with the schedule and confirmations thereto, each dated October 17, 2006 (the "Libra CDSA").

entered into a credit default swap agreement,[3] pursuant to which LBSF purchased credit

protection from Vela and agreed to make "premium" payments to Vela in exchange for Vela's

agreement to pay LBSF if losses were incurred on certain mortgage-related securities. LBSF's

payment obligations under the Vela CDSA also are guaranteed by LBHI. At the same time that

Vela entered into the Vela CDSA with LBSF, it also entered into a separate derivative

transaction with SG (the "Vela Senior Swap Agreement," and, when referred to with the Libra

Senior Swap Agreement, the "Senior Swap Agreements"), pursuant to which SG is obligated to

advance funds to Vela for Vela to meet certain payment obligations to LBSF under the Vela

CDSA in the event that Vela does not have sufficient available funds to make such payments.[4]

      4.     The indenture trustees of Libra and Vela purported to designate an Early

Termination Date under the Libra CDSA and the Vela CDSA as of October 10, 2008 and

September 30, 2008, respectively (the "Libra Early Termination" and the "Vela Early

Termination"). The Debtors have challenged the propriety and validity of both terminations (the

"Termination Claim"). In May 2009, the Debtors commenced an adversary proceeding seeking,

among other things, a declaration that the Libra Early Termination was invalid and ineffective.[5]

SG, Libra, and the Libra Trustee also commenced an adversary proceeding seeking a declaration

that the Libra Early Termination was valid and effective. If the Termination Claim succeeds,

Libra and Vela remain obligated to make substantial credit-protection payments to LBSF

---

[3] The Vela credit default swap agreement consists of a 1992 ISDA Master Agreement, dated as of November 16, 2006, together with the amended and restated schedule, credit support annex, and amended and restated confirmations thereto, each dated April 23, 2008 (the "Vela CDSA," and, together with the Libra CDSA, the "CDSAs").

[4] A diagram overview of the CDSAs is attached hereto as Exhibit B. Copies of the Libra CDSA and the Vela CDSA are annexed hereto as Exhibit C and Exhibit D, respectively.

[5] Although the Debtors have not yet commenced an adversary proceeding challenging the validity of the Vela Early Termination or the modification of LBSF's payment priority, the Debtors anticipate filing such a complaint as contemplated by the Settlement Agreement.

pursuant to the terms of the respective contracts, and Libra and Vela could request funding from

SG according to the terms of the Senior Swap Agreements.

5.      Alternatively, if the Termination Claim is ultimately not successful and,

therefore, the Libra Early Termination and/or the Vela Early Termination were found to be

effective, then LBSF would be entitled to pursue early termination payments under the contracts.

However, the Debtors anticipate that the indenture trustees will argue that, under the terms of the

indentures governing each collateralized debt obligation ("CDO"), termination payments caused

by LBSF's bankruptcy default would have a lower priority than payments to other parties –

which would effectively leave no money to pay LBSF.  According to this Court's decision in

*LBSF v. BNY Corp. Tr. Serv.*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) and for other reasons, such

terms are unenforceable (the "Priority Claim").  Therefore, if the Termination Claim fails as to

one or both CDOs, LBSF would pursue the Priority Claim.  If LBSF succeeds on the Priority

Claim as to both CDOs, it could recover the approximately $195 million held by the CDOs.  If

both the Termination Claim and Priority Claim fail, LBSF would recover nothing absent the

Settlement Agreement.

6.      SG is unwilling to make any settlement payment to the Debtors – much

less the substantial payments proposed here – if there were a possibility that, after the settlement

became effective, SG might still be required to make advances under the Senior Swap

Agreements.  That funding requirement could result if the Termination Claim were to succeed

and the Senior Swap Agreements were drawn upon to fund credit-protection payments to LBSF.

To induce SG to make the settlement payments while preserving LBSF's ability to pursue the

Termination Claim against Libra and Vela (in addition to preserving LBSF's ability to pursue the

Priority Claim), LBSF and SG have agreed, among other things, that as a precondition to LBSF's

ability to pursue the Termination Claim beyond the pleading stage, LBSF will assume, assign and sell its interest in both CDSAs to SG, to be effective as of the fulfillment of the Libra Assignment Closing Conditions or the Vela Assignment Closing Conditions, respectively. Those conditions, which are described more fully below, include the entry of a Final Judgment[6] by the Court resolving the Termination Claim in LBSF's favor with respect to Libra and/or Vela, as applicable. If SG becomes the assignee of the CDSAs, subject to a sharing agreement as described further below, it will remit to LBSF a substantial share of any credit-protection payments received from the CDOs. In return, the Assignment Closing Conditions would protect against the risk that SG would have to make unnecessary payments *to* the CDOs that are not set forth in the Settlement Agreement.

> 7.    The Settlement Agreement avoids the inherent risk for the Debtors in the current litigation against SG and provides:

> (i)    an immediate recovery by LBSF of $370 million;

> (ii)    a guaranteed further recovery by LBSF of $75 million;[7]

---

[6] "Final Judgment" means a judgment entered by the Court that (i) has not been stayed and the time for any motion to stay has expired and (ii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the judgment and the time for any further appeals has expired.

[7] While the SG Guarantee is subject to reduction to the extent SG makes Advances to Libra or Vela and such Advances are not reimbursed to SG from the Global Escrow Account, it is highly doubtful that such a reduction would ever arise. Advances are comprised largely of premium payments and reimbursement payments, and any premium or reimbursement obligations owed by SG would almost certainly be offset by the far greater credit-protection payments that SG would be owed by the CDO's. In addition, Advances are repaid to SG at the top of the waterfall from amounts contained in the Global Escrow Account. Given the relatively small amounts of premium that could become owing on the two CDSAs, and the remoteness that any underlying Reference Obligations would actually experience write-ups that give rise to a reimbursement obligation, it seems highly unlikely that Advances would exceed amounts contained in the Global Escrow Account and thereby give rise to a reduction of the SG Guarantee.

      (iii)     the right for LBSF to pursue litigation against the CDOs which could yield

yet further potential recoveries of approximately $72 million, plus any

proceeds from the liquidation or repayment of securities;

      (iv)     an enhanced ability for LBSF to request the prompt return of an additional

approximately $128 million in previously posted collateral; and,

      (v)     an extinguishment of LBHI's guarantee of LBSF's obligations under the

CDSAs.

The $445 million to LBSF alone more than doubles what LBSF's estate would receive if it were

to win only the Priority Claim.  By contrast, continued litigation with SG would take years and

substantial expenditures to fully prosecute, with no certainty of any recovery at all, much less

any certainty of a greater recovery than that provided under the Settlement Agreement.

      8.     Accordingly, as set forth more fully below and in the Declaration of

Robert Hershan in Support of this Motion, filed contemporaneously herewith, entry into the

Settlement Agreement is in the Debtors' best interests, and, the Debtors have exercised sound

business judgment in entering into the Settlement Agreement as a reasonable resolution of very

complex and difficult issues.  The Debtors have been advised that the Creditors' Committee

(defined below) supports the Settlement Agreement and the relief requested herein.  The

Debtors, therefore, request that the Motion be granted.

### **Background**

      9.     Commencing on September 15, 2008, and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  LBSF filed with this Court a voluntary petition for relief under chapter 11

of the Bankruptcy Code on October 3, 2008.  The Debtors' chapter 11 cases have been

consolidated for procedural purposes only and are being jointly administered pursuant to Rule

1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors

are authorized to operate their businesses and manage their properties as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.    On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors for the Debtors pursuant to section 1102 of the Bankruptcy Code (the "Creditors'

Committee").

## Jurisdiction

11.    This Court has subject matter jurisdiction to consider and determine this

motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relief Requested

12.    The Debtors request the entry of an order pursuant to sections 105(a), 363

and 365 of the Bankruptcy Code and Bankruptcy Rule 9019 for approval of:

- the Settlement Agreement;

- the assumption, assignment, and sale of LBSF's interest in the Libra CDSA to

   SG, free and clear of all claims and interests, on the terms and conditions set

   forth in the Settlement Agreement and in the Form of Libra CDSA

   Assignment Agreement (the "Libra CDSA Assignment Agreement"), a copy

   of which is annexed hereto as Exhibit E;

- the assumption, assignment, and sale of LBSF's interest in the Vela CDSA to

   SG, free and clear of all claims and interests, on the terms and conditions set

   forth in the Settlement Agreement and in the Form of Vela CDSA Assignment

Agreement (the "Vela CDSA Assignment Agreement" and, when referred to with the Libra Assignment Agreement, the "Assignment Agreements"), a copy of which is annexed hereto as Exhibit F; and

▪ other related relief, as set forth more fully in this Motion.

**Background of the Credit Default Swap Transactions**

The Libra CDSA

13.    Pursuant to the Libra CDSA, Libra sold credit protection to LBSF on certain specified residential mortgage-backed securities and other securities ultimately backed by mortgages (collectively, "Reference Obligations").  LBHI acts as a "credit support provider" (similar to a guarantor) for payment of obligations of LBSF under the Libra CDSA.  If Libra is required to pay LBSF credit-protection payments under the terms of the Libra CDSA as to a loss or credit impairment on a Reference Obligation but does not have sufficient available funds to make such payment in full, then, under the Libra Senior Swap Agreement, SG must advance funds to Libra as needed for Libra to satisfy those obligations to LBSF.

14.    The Libra CDSA between LBSF and Libra is part of a complex CDO transaction.  Libra issued bonds (the "Libra Notes") to third-party investors (the "Libra Noteholders") and invested the proceeds of the Libra Notes in certain qualified investments, such as asset-backed securities and money-market securities (collectively, the "Libra Investments"). The Libra Investments, along with Libra's rights under various contracts (including the Libra CDSA and the Libra Senior Swap Agreement), constitute collateral, securing Libra's obligations to pay (among other obligations): (i) amounts due to LBSF under the Libra CDSA, (ii) amounts due to SG under the Libra Senior Swap Agreement, and (iii) amounts due to investors under the Libra Notes.

15.     Libra pledged its rights under the Libra CDSA to LaSalle Bank National Association as the trustee for Libra's secured parties (the "Libra Trustee")[8] under the governing indenture for the Libra Notes (the "Libra Indenture").[9]  By letter dated October 10, 2008, the Libra Trustee declared the Libra Early Termination based upon the commencement of LBHI's chapter 11 case.  The Debtors, joined by the Creditors' Committee, have challenged the validity and effectiveness of the Libra Early Termination and have commenced an adversary proceeding seeking, among other things, a declaratory judgment that the Libra Early Termination is null and void.  SG, Libra, and the Libra Trustee, jointly, commenced another adversary proceeding (together with the Debtors' adversary proceeding, the "Adversary Proceedings"), requesting, among other things, a declaratory judgment that the Libra Early Termination is valid and effective.  On June 19, 2009, the Debtors filed a motion for summary judgment.  On June 26, 2009, the Libra parties and SG filed a cross-motion for summary judgment.

16.     If the Libra Early Termination were invalidated, the Libra CDSA would continue in effect until the Reference Obligations fully amortize or experience total losses, which would likely occur in the next few years, but could occur as late as 2046.  Until that happens, LBSF would continue to accrue premium payments to Libra, and Libra would continue to owe credit-protection payments to LBSF.  In addition, pursuant to section 365 of the Bankruptcy Code, the Libra CDSA could be assumed and assigned by LBSF.

17.     On June 1, 2009 [Docket No. 3709], the Court approved a stalking horse letter agreement and break-up fee for the assignment and sale of the Libra CDSA to Deutsche Bank, AG (London Branch) ("DB") (the "Letter Agreement").  That potential assignment and

---

[8] Subsequently, LaSalle Bank National Association assigned its rights as Libra Trustee to Bank of America, N.A.

[9] A copy of the Libra Indenture without its attachments is attached hereto as Exhibit G.

sale is conditioned upon a final judicial determination that the Libra Early Termination is null

and void.  Thus, the Letter Agreement with DB provides LBSF with no benefit unless LBSF

prevails on the Termination Claim.  Subject to that litigation contingency, an analysis provided

to the Court in June 2009 anticipated that if the transaction with DB closed under the terms of the

Letter Agreement, LBSF's estate might realize between $694 million and $733 million under the

Libra transaction.  DB was committed to close under the Letter Agreement for 90 days, subject

to mutual extensions agreed to by the parties.  DB has agreed, from time to time, to extend the

closing deadline and, currently, the DB transaction must close by November 1, 2010.  DB has an

unrestricted contractual right to determine not to further extend the closing deadline.  In

consideration of DB's keeping its offer open to attract new bidders, LBSF agreed to pay (and the

Court approved) a break-up fee of up to $20 million that is payable if LBSF enters into a

settlement agreement or other transaction with SG.  If the Settlement Agreement is approved,

and the Libra CDSA Assignment Agreement with SG closes, LBSF will pay up to a $20 million

break-up fee to DB subject to the terms and conditions of the Letter Agreement, and the

minimum recoveries to LBSF's estate will be more than twenty-two times that break-up fee.

<u>The Vela CDSA</u>

        18.     LBSF is party to a substantially similar credit default swap transaction

with Vela (the Vela CDSA).  Similar to the Libra transaction, the Vela CDSA between LBSF

and Vela is part of a complex CDO transaction.  LBHI acts as a "credit support provider" for

payment obligations of LBSF under the Vela CDSA.  Vela is also a party to the Vela Senior

Swap Agreement, pursuant to which SG agreed to advance funds to Vela to enable Vela to

satisfy certain payment obligations to LBSF under the Vela CDSA in the event that Vela does

not have sufficient available funds to make those payments.

19.     Vela issued bonds (the "Vela Notes") to third-party investors (the "Vela Noteholders") and invested the proceeds of the Vela Notes in certain qualified investments, such as asset-backed securities and money-market securities (collectively, the "Vela Investments"). The Vela Investments, along with Vela's rights under various contracts (including the Vela CDSA and the Vela Senior Swap Agreement) constitute collateral securing Vela's obligations to pay (among other obligations): (i) amounts due to LBSF under the Vela CDSA, (ii) amounts due to SG under the Vela Senior Swap Agreement, and (iii) amounts due to investors under the Vela Notes.

20.     By letter dated September 30, 2008, The Bank of New York Mellon Trust Company, National Association, as trustee on behalf of Vela (the "Vela Trustee") under the indenture that governs the Vela Notes (the "Vela Indenture"),[10] declared the Vela Early Termination based upon the commencement of LBHI's chapter 11 case.  Although the Debtors have challenged the validity and effectiveness of such termination, litigation challenging the Vela Early Termination has not yet been commenced.

21.     If the Vela Early Termination were invalidated, then the Transactions under the Vela CDSA would continue in effect until the Reference Obligations fully amortize or experience total losses, which would likely occur in the next few years, but could occur as late as 2046.  Until that happens, LBSF would continue to accrue premium payments to Vela and Vela would continue to owe credit-protection payments to LBSF.  In addition, pursuant to section 365 of the Bankruptcy Code, the Vela CDSA could be assumed and assigned by LBSF.  Insofar as the composition, notional amount and performance of the Vela CDSA is comparable to that of the Libra CDSA, it is to be expected that the amount that the Debtors might net if the Vela Early

---

[10] A copy of the Vela Indenture without its attachments is annexed hereto as Exhibit H.

Termination were invalidated and the Vela CDSA assigned to a third party would be comparable

to the amount that the Debtors might net from a transaction such as that contemplated by the

Letter Agreement with respect to Libra.

### The Settlement Agreement

22.     The Settlement Agreement includes the following salient terms:[11]

- **Settlement Payment.**  On the 5th Business Day after the order approving the Settlement Agreement has become a Final Order[12] (the "Payment Date"), SG shall pay $370 million to LBSF.

- **SG Guarantee.**  In addition to the $370 million payment on the Payment Date, SG shall guarantee that the Debtors' recovery from Libra and Vela shall be not less than an additional $75 million in the aggregate, subject to reduction for Advances paid by SG.  The guaranteed amount will be paid after all amounts that are receivable from the CDOs have been received by the Debtors or SG and distributed.

- **Sharing Agreement.**  SG and LBSF will deposit any further recoveries that either of them may receive from the assets of Libra and Vela (currently estimated to be $195 million) into a Global Escrow Account, and agree to share such proceeds pursuant to section 9.10 of the Settlement Agreement as follows: (i) first, to reimburse SG and the Debtors for any premium payments or reimbursements made under the CDSAs and for certain expenses incurred by SG and the Debtors in litigation related to the Settlement Agreement, in separate order of priority in respect of each of the Libra and Vela transactions; (ii) second, to reimburse SG and the Debtors, *pro rata*, for all unreimbursed indemnified claims payable to them pursuant to the Settlement Agreement; (iii) third, to the payment of $100 million to LBSF; and (iv) fourth, to the payment to LBSF and SG of all remaining amounts recovered on a 50:50 basis.

- **Recovery of Posted Collateral.**  Prior to the Commencement Date, LBSF deposited portions of certain credit-protection payments aggregating approximately $128 million in an "Issuer Collateral Account" to secure possible reimbursements LBSF could be required to make to Libra under the

---

[11] To the extent there is any inconsistency between this summary and the Settlement Agreement, the Settlement Agreement controls.

[12] "Final Order" means an order entered by the Court that (i) has not been stayed and the time for any motion to stay has expired and (ii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the order and the time for any further appeals has expired.

Libra CDSA.[13]  If and when SG becomes the assignee, its current credit rating should help eliminate the need to continue to post that collateral.  All recoveries from the Issuer Collateral Account will go solely and directly to LBSF.  The proceeds of the Issuer Collateral Account are carved out from the sharing agreement and are in addition to LBSF's share (pursuant to the sharing agreement) of the approximately $195 million of assets in Libra and Vela.

▪ <u>Indemnification</u>.  SG and the Debtors will indemnify one another for liabilities incurred as a result of entering into and performing their respective obligations under the Settlement Agreement and the Assignment Agreements. The indemnities address the potential for a timing mismatch that would occur if either party, after funds are distributed under the sharing agreement, incurs costs that (had they been incurred earlier) would have been recoverable under step (ii) of the sharing agreement.  The indemnities thereby serve to guarantee that LBSF recovers a minimum of $445 million and that SG pays a maximum of $445 million.  Liabilities arising out of or related to actions taken or omitted prior to the entry into the Settlement Agreement are not subject to indemnification.  The Debtors' indemnification exposure is capped at $71,644,336 and any indemnification that may be payable by the Debtors would as a general matter be paid only from additional recoveries realized on the transactions from Libra or Vela, and not the $445 million guaranteed recovery from SG.

▪ <u>Releases</u>.  The Parties will release one another from all claims arising out of or relating to the Libra and Vela Transactions, including those asserted in the Adversary Proceedings; however, the release does not reduce or otherwise limit the Parties' obligations to one another under the Settlement Agreement. The releases shall be effective as of the Payment Date.

▪ <u>Priority Claim Preserved</u>.  At any time, the Debtors may pursue against the Other Libra Parties or the Other Vela Parties (all parties to the transactions other than SG) the Libra Priority Claim and/or Vela Priority Claim.

▪ <u>Termination Claim Preserved</u>.  Subject to the Libra Assignment Determinations and the Vela Assignment Determinations being included in the Final Order, and satisfaction of the Libra Termination Claim Preconditions and the Vela Termination Claim Preconditions, respectively, the Debtors may pursue the Termination Claim against the Other Libra Parties and the Other Vela Parties.

---

[13] The Libra CDSA and the Vela CDSA both provide that amounts paid to the "buyer", i.e., LBSF, may be subject to reimbursement to Libra or Vela, as applicable, if the underlying Reference Obligation that gave rise to such payment performs in a manner that reverses the original loss.  To secure these potential reimbursement obligations, pursuant to the terms of the Libra CDSA, LBSF deposited a portion of the proceeds received from Libra into an "Issuer Collateral Account."  No such account was established for Vela.

**The Assumption, Assignment and Sale Agreements**

23.     As part of the Settlement Agreement, SG and LBSF have agreed to the assumption, assignment and sale of LBSF's rights and interests in the Libra CDSA and the Vela CDSA to SG to be effective immediately, and without further Court order, upon the satisfaction of the Libra Assignment Closing Conditions or the Vela Assignment Closing Conditions, respectively, as such terms are defined in the Settlement Agreement (primarily the entry of a Final Judgment invalidating the Libra Early Termination or the Vela Early Termination). Effective upon a Final Order approving the Settlement Agreement, LBSF is to receive a payment of $370 million from SG and a guaranty from SG that LBSF will recover an additional $75 million from Libra and Vela.  The payment and receipt of the $445 million is conditioned only on the approval of the Settlement Agreement in a Final Order and is not conditioned on the effectiveness of the Assignment Agreements.

24.     The salient terms of the Assignment Agreements (which are virtually identical) and the relevant provisions in the Settlement Agreement include: [14]

- Proposed Transactions.  LBSF shall assume, assign and transfer all of its interest in the Libra CDSA and/or the Vela CDSA to SG pursuant to the terms of the Libra CDSA Assignment Agreement or the Vela CDSA Assignment Agreement, respectively, free and clear of any claims or interests as of the Effective Date.

- Effective Date.  The assumption, assignment and sale of LBSF's interest in the Libra CDSA and/or the Vela CDSA shall each be effective automatically and without further Court order on the date that the Libra Assignment Closing Conditions or the Vela Assignment Closing Conditions, as applicable, are satisfied.

---

[14] To the extent there is any inconsistency between this summary and the Libra CDSA Assignment Agreement, the Vela CDSA Assignment Agreement or the Settlement Agreement, the Libra CDSA Assignment Agreement, the Vela CDSA Assignment Agreement, and the Settlement Agreement, as applicable, controls.  Capitalized terms used but not defined in this summary shall have the meanings ascribed to them in the Libra Assignment Agreement, the Vela Assignment Agreement or the Settlement Agreement, as applicable.

- <u>Closing Conditions</u>. The following closing conditions must be satisfied (or be waived by SG in its sole and absolute discretion) for the Libra CDSA Assignment Agreement and/or the Vela CDSA Assignment Agreement to be effective:

  - either (i) the Libra Trustee or the Vela Trustee must initiate an interpleader action and name all of the Libra Noteholders or Vela Noteholders as third-party defendants, or (ii) the Debtors must file (in the case of Vela) or amend (in the case of Libra) a complaint and name each of the Vela Noteholders or Libra Noteholders as defendants; and

  - a judgment must be issued by the Court declaring the Libra Early Termination or the Vela Early Termination invalid, and such judgment must be binding on the Other Libra Parties or the Other Vela Parties, as applicable, and shall have become a Final Judgment.

- <u>Notice</u>. LBSF will file and serve a notice on the Libra Trustee or the Vela Trustee that the Libra Assignment Closing Conditions or the Vela Assignment Closing Conditions, as applicable, have been satisfied (or waived) and that the Libra CDSA Assignment Agreement or the Vela CDSA Assignment Agreement has become effective.

- <u>Deferral of Payment Due Date</u>. The Debtors shall be permitted to defer the payment due date in respect of any payment payable to them under the Libra CDSA and the Vela CDSA, and the deferral contemplated in Sections 7.4 and 7.5 of the Settlement Agreement shall be binding on the Other Libra Parties and the Other Vela Parties, as applicable.

- <u>Reimbursement Account</u>. Upon satisfaction of the Libra Assignment Closing Conditions or the Vela Assignment Closing Conditions, resulting in the effectiveness of the Libra CDSA Assignment Agreement or the Vela CDSA Assignment Agreement, LBSF shall deposit with SG 25% of the amount of credit-protection payments it received prior to the Commencement Date that may be subject to reimbursement to Libra or Vela under the terms of the Libra CDSA or the Vela CDSA, as applicable.[15] To the extent reimbursement obligations exceed the amounts on deposit, they will be paid by SG. Any amounts paid by SG as reimbursement to Libra or Vela will be entitled to reimbursement from recoveries from Libra and Vela at the top of the Global Escrow Account priority of payment and will also be entitled to administrative expense treatment. The Debtors believe that the probability of any reimbursement obligations is highly remote.

---

[15] *See* footnote 13, *supra*.

- ▪ <u>LBHI Guarantee</u>.  LBHI's guarantees of LBSF's obligations under the CDSAs are not being assumed and LBHI shall not be responsible for any post-assignment obligations of SG, as assignee, under the CDSAs.

- ▪ <u>Restrictions on Other Assignments/Sales</u>.  LBSF has agreed that it will not assign or sell its interest in the Libra CDSA or the Vela CDSA to any party other than SG.

### <u>The Controlling Legal Standard Under Bankruptcy Rule 9019</u>

25.    Compromises are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).  The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court.  *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  A settlement must not "fall below the lowest point in the range of reasonableness." *Vaughn v. Drexel Burnham Lambert Group, Inc. (Drexel Burnham Lambert Group)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).  Discretion may be exercised by the court "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).  A proposed compromise and settlement implicates the issue of whether it is "fair and equitable, and in the best interest of the [debtor's] estate." *In re Best Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).

26.    The following factors are considered in determining whether a settlement should be approved:  (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (ii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; (iii) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; and (iv) the extent to which the

settlement is truly the product of arm's-length bargaining and not the product of fraud or

collusion. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. at

424; *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998); *In re Best Prods.*

*Co.*, 168 B.R. at 50.

27.     While a court must "evaluate … all … factors relevant to a fair and full

assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court

need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699

F.2d at 608, or conduct a full independent investigation. *Drexel Burnham Lambert Group*, 134

B.R. at 496. "[T]he bankruptcy judge does not have to decide the numerous questions of law and

fact…. The court need only canvass the settlement to determine whether it is within the accepted

range of reasonableness." *Nellis*, 165 B.R. at 123 (internal citations omitted).

28.     The court may give weight to the "informed judgments of the … debtor-

in-possession and their counsel that a compromise is fair and equitable, and consider the

competency and experience of counsel who support the compromise." *Drexel Burnham Lambert*

*Group*, 134 B.R. at 505 (internal citations omitted); *see also In re Purofied Down Prods. Corp.*,

150 B.R. 519, 522 (S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr.

S.D.N.Y. 1998) ("Significantly, that test does not contemplate that [the court] substitute [its]

judgment for the Trustee's, but only that [the court] test his choice for reasonableness…. If the

Trustee chooses one of two reasonable choices, [the court] must approve that choice, even if, all

things being equal, [the court] would have selected the other.").

29.     Significantly, there is no requirement that "the value of the compromise …

be dollar-for-dollar the equivalent of the claim." *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 427

(S.D.N.Y. 1993). While not the settlement at bar, "there is no reason, at least in theory, why a

satisfactory settlement could not amount to a hundredth or even a thousandth part of a single

percent of the potential recovery." *Id.* at 427-28 (quoting *City of Detroit v. Grinnell Corp.*, 495

F.2d 448 (2d Cir. 1974)).

**The Settlement Agreement Meets the Legal Standard
Established Under Rule 9019 and Is in the Best Interests of the Debtors' Estates**

30.     The Settlement Agreement readily satisfies the standard for approval.  The

Debtors have comprehensively analyzed and considered the issues relating to the Libra and Vela

transactions, and have concluded that the Settlement Agreement represents a fair and equitable

resolution of the issues and is in the best interests of their estates.  As a result of the Settlement

Agreement, LBSF will likely receive a minimum of $445 million ($370 million immediately and

an additional $75 million guaranteed by SG).  The Settlement Agreement also allows LBSF to

continue to assert all of its claims against the Other Libra Parties and the Other Vela Parties.  The

prosecution of those claims may increase the total amount that LBSF may recover from the

CDOs to approximately $516.6 million.  In addition, because if and when SG becomes the

assignee, its current credit rating should help eliminate the need to continue to post collateral

under the Libra CDSA, LBSF will be in a better position to recover the approximately $128

million in collateral that LBSF had posted with Libra.

31.     Significantly, the Settlement Agreement avoids continued litigation with

SG and eliminates the risks associated with that litigation while providing for a substantial

guaranteed recovery as well as the ability to pursue additional recoveries as noted above.  That

guaranteed recovery is more than double the amount that the Debtors could obtain with a

successful Priority Claim alone.  The results of litigation are never certain and further litigation

(including the potential for a long drawn out appellate process) necessarily would be time

consuming, complex and expensive for the Debtors.  The Libra Adversary Proceedings (which

are representative of (but not identical to) the issues in dispute with respect to the Vela Early

Termination) show that the controversies present extremely complicated transactions involving

multiple parties and issues of first impression.  The transactions represent some of the most

complicated financial transactions created during the boom years of 2004-2007, as reflected by

the Settlement Agreement and its supporting documents.  As such, they present highly difficult

issues.

32.    The Settlement Agreement is better for the Debtors' estates than the

stalking-horse bid by DB.  Although the Letter Agreement with DB or a potential sale

transaction for the Vela CDSA *could* result in a greater recovery to LBSF's estate, there are

significant contingencies and litigation risks associated therewith that might prevent LBSF from

ever recovering *any* value at all.  Otherwise stated, the Settlement Agreement will result in a

definite, substantial and immediate payment and receipt of cash and will also provide the

strongest opportunity for future recoveries.  In contrast, recovery under the DB transaction is

contingent upon:  (i) the entry of a fully litigated judgment nullifying the Libra Early

Termination, (ii) success on all appeals, and (iii) approval of the assignment transaction.  This

process could take years to complete and there is risk that LBSF's potential recoveries from the

transaction with DB may be significantly limited.  From that perspective, and in the exercise of

the Debtors' business judgment, the Settlement Agreement is in the best interests of the Debtors

and should be approved.  Moreover, the potential benefits of the Settlement Agreement far

outweigh the limited cost of the break-up fee payable to DB if the Settlement Agreement is

approved.

33.    The Settlement Agreement is the result of extensive arm's-length

bargaining over a long period of time.  It is not the product of fraud or collusion.  The Debtors

and SG have been represented by competent and experienced professionals.  Significant

resources have been invested in evaluating the Settlement Agreement, including fully briefed

competing motions for summary judgment in the Libra Adversary Proceedings.  The Settlement

Agreement is the product of a well-informed judgment by the Debtors and supported by their

professionals.

### LBSF Has Exercised Sound Business Judgment in Entering Into the Libra Assignment Agreement and the Vela Assignment Agreement

34.    Section 365(a) of the Bankruptcy Code provides, in relevant part, that a

debtor in possession, "subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  In determining whether an

executory contract or unexpired lease should be assumed, courts apply the "business judgment"

test.  *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures*), 4 F.3d 1095, 1099

(2d Cir. 1993); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th

Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and

increase its cost, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially"); *In re

Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) ("The decision to assume or reject an

executory contract is within the sound business judgment of the debtor-in-possession. . . .").

Under this test, a court should approve the assumption of a contract under section 365(a) of the

Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in

determining that assumption of an agreement is in the best interests of its estate.  *See, e.g.*, *In re

Child World, Inc.*, 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992).

35.    LBSF's entry into the Assignment Agreements is an integral aspect of the

Settlement Agreement and likewise should be approved.  Without the Assignment Agreements,

SG would not settle with the Debtors unless the Debtors waived and agreed to not to prosecute

the Termination Claim against the other parties to the CDO transactions, which would reduce the

potential for recovery of assets in the CDOs.  Thus, as a result of the Assignment Agreements,

LBSF will maximize its ability to recover significant additional amounts from Libra and Vela.

The Assignment Agreements, in effect, allow LBSF to enjoy the best alternative.  LBSF will

recover a substantial payment from SG and still possess the ability to continue to assert the

Termination Claim against the other parties to the transactions.

36.    The Assignment Agreements are in the best interests of the Debtors and

their estates, because their inclusion maximizes LBSF's potential for substantial further

recoveries if it succeeds in the litigation against Libra and Vela, while also permitting LBSF to

receive an immediate guaranteed payment and maintain its economic interest in the transactions.

Under the sharing agreement, if there is any recovery under the Libra CDSA or the Vela CDSA,

then, after reimbursement of costs, the parties have agreed to share the proceeds of such

recoveries with LBSF enjoying a right of priority to collect the first $100 million (with $75

million guaranteed by SG).  LBSF's entry into the Assignment Agreements represents a

reasonable exercise of LBSF's business judgment, is in the best interests of the Debtors and

should be approved.

### LBSF Will Cure any Default Upon Assumption
### But Does Not Need to Cure *Ipso Facto* Defaults Under the Agreement

37.    Section 365(b) of the Bankruptcy Code establishes certain conditions that

must be satisfied prior to the assumption of an executory contract if the contract contains a

default:

> (b)(1) If there has been a default in an executory contract or unexpired
> lease of the debtor, the trustee may not assume such contract or lease
> unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default…

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

38.    Certain defaults, however, need not be cured and do not require a debtor to provide adequate assurance of future performance.  Specifically, section 365(b)(2) provides an exception to the requirements of section 365(b)(1) for certain defaults:

(2) Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; [or]

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement…

39.    11 U.S.C. § 365(b)(2).  The purpose of section 365(b)(2) is to ensure that "the requirements of section 365(b)(1) do not apply to defaults triggered by provisions relating to the insolvency or financial condition of the debtor, the commencement of a Chapter 11 case, or the appointment of a trustee in the case or a custodian before the case."  *L.R.S.C. Co. v. Rickel Home Cents., Inc. (In re Rickel Home Centers)*, 209 F.3d 291, 298 (3d Cir. 2000).

40.    There is one default that needs to be cured to satisfy section 365(b) of the Bankruptcy Code.  If the Libra Early Termination or the Vela Early Termination is determined to be ineffective, then LBSF would have been required to make premium payments under the Libra CDSA and the Vela CDSA, as applicable, and Libra and Vela would have been required to make

substantial credit-protection payments to LBSF.  Assuming the respective Early Terminations are

invalidated, LBSF estimates missed premium payments of $17,520,316 to Libra and $15,304,759

to Vela as of August 25, 2010.  LBSF proposes that upon the assumption of the Libra CDSA and

the Vela CDSA, it will promptly cure its missed payment obligations by permitting Libra and

Vela, as applicable, to set off LBSF's missed premium payments against credit-protection

payments under the Libra CDSA and the Vela CDSA that Libra and Vela would have been

required to make to LBSF. [16]  This is consistent with section 2(c) of the Libra CDSA and the

Vela CDSA, which provides that amounts owed between the parties will be netted with the party

owing the larger amount making a single net payment to other party.  If there are insufficient

credit-protection payments to set-off all of the missed premiums, LBSF will pay the balance of

such missed premiums and will be entitled to reimbursement of such payments at the top of the

Global Escrow Account priority of payments.

41.    The other defaults that might be asserted by Libra or Vela are the

commencement of LBHI's and/or LBSF's chapter 11 cases and need not be cured.  Pursuant to

section 365(b)(2),  LBSF does not need to cure such defaults because they are unenforceable *ipso

facto* provisions that are based upon the commencement of a case under the Bankruptcy Code.

*See Summit Inv. and Dev. Corp. v. LeRoux (In re LeRoux)*, 69 F.3d 608, 610 (1st Cir. 1995); *In

re Texaco Inc.*, 73 B.R. 960, 965 (Bankr. S.D.N.Y. 1987) (holding that counterparty could not

accelerate notes because such right was only triggered upon a bankruptcy default clause, which

was void pursuant to section 365(e)(1)); s*ee also In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 759

(Bankr. M.D. Fla. 2009) (holding that counterparty's enforcement of right to terminate contract

---

[16] Under the Settlement Agreement, to the extent that any portion of the credit protection payments against which
the missed premiums are set off is subject to reimbursement under the Libra CDSA or the Vela CDSA, LBSF shall
remit a corresponding amount into the Global Escrow Account and will be paid back such amount from the Global
Escrow Account upon the expiration of the related reimbursement period.

at will was unenforceable under section 365(e)(1) where the sole basis for termination was the debtor's bankruptcy filing).

### Adequate Assurance of Future Performance by SG Has Been Provided

42.     Pursuant to 365(f)(2) of the Bankruptcy Code, a debtor may only assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).  Under section 365(f)(2), the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *Carlisle Homes, Inc. v. Arrari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (internal citations omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (explaining that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygraph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

43.     SG is a large financial institution with extensive experience in derivatives transactions of this size and scope.  SG also has more than sufficient financial capability to satisfy any obligations that may arise under the Libra CDSA and the Vela CDSA, thus enabling the Libra and Vela transactions to continue unimpeded, and LBSF to thereby benefit from both CDOs.  As of October 17, 2006 and November 16, 2006, the dates that LBSF entered into the CDSAs, LBHI's credit ratings were: A1 (long-term) and P-1 (short-term) from Moody's Investor

Services, and A+ (long-term) and A-1 (short-term) from Standard & Poor's.  Currently, SG's

credit ratings are:  Aa2 (long-term) and P-1 (short-term) from Moody's Investor Services, and

A+ (long-term) and A-1 (short-term) from Standard and Poor's.  As such, there can be no serious

dispute that SG is an appropriate, creditworthy counterparty.

## The Assignment Determinations Should Be Made

44.    Given that any payments by SG under the Senior Swap Agreements would

ultimately be paid to SG as the new "buyer" under the CDSAs upon the effectiveness of the

Assignment Agreements, the Debtors request that the Court approve two protections that would

reduce administrative burden on all parties and reduce risk that the flow of funds would not

match the economic settlement negotiated between the Debtors and SG.  Section 105(a) of the

Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title," gives the Court broad powers to grant

the relief requested in furtherance of the settlement.

45.    First, the Debtors request that the Court direct that the maximum

aggregate amount of all credit-protection payments and termination payments payable by Libra

and Vela under the CDSAs shall be reduced, in each case, to an amount equal to the aggregate

funds available to Libra and Vela for making such payments without causing a draw on the

related Senior Swap Agreement, with the effect that draws on the Senior Swap Agreements are

forever foreclosed.

46.    Second, the Debtors request that the court direct that:  (a) LBSF (until the

effectiveness of the Assignment Agreements) and SG (following the effectiveness of the

Assignment Agreements) shall have full discretion as to when and if to deliver to Libra or Vela

notices of amounts due with respect to outstanding Floating Amount Events under the CDSAs

and full discretion to seek an amount equal to or less than the Floating Amount due to the

"buyer" under the CDSAs in respect of any outstanding Floating Amount Events; (b) the

exercise of such discretion shall be deemed to satisfy any applicable requirements under the

CDSAs; and (c) in the event draws are made on the Senior Swap Agreements, SG need not go

through the exercise of advancing funds to Libra or Vela or their respective trustees in order for

such funds to be paid right back to SG.  There is no economic impact to the other parties to the

transaction if the Court simply permits SG to retain these funds.

47.     The requested relief is in furtherance of the settlement.  It avoids the

needless step of SG advancing funds to Libra and Vela only for such funds to be paid back to

SG.  The direction also will protect SG from third-party attempts to wrongfully interfere with

funds paid into Libra or Vela, which could trigger an indemnification under the Settlement

Agreement and thereby dilute LBSF's recoveries.  Such relief will maximize the value of the

settlement because, without this relief, there can be no Assignments, and the Assignments are

necessary for LBSF to pursue the Termination Claim against the Other Libra Parties and the

Other Vela Parties.

### **Anti-Assignment Provisions Are Not Enforceable**

48.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign

executory contracts free from anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or
> unexpired lease of the debtor, or in applicable law, that prohibits,
> restricts, or conditions the assignment of such contract or lease, the
> trustee may assign such contract or lease under paragraph (2) of
> this subsection.

11 U.S.C. § 365(f)(1).  Section 365(f)(1) invalidates provisions that prohibit, restrict, or

condition assignment of an executory contract or unexpired lease.  *See, e.g., In re Jamesway

Corp.*, 201 B.R. 73, 76 (Bankr. S.D.N.Y., 1996) ("Section 365(f)(1) works by operation of law to

invalidate lease provisions which restrict or discourage a debtor-in-possession from assigning the lease.").

49.    It is well settled that, in addition to provisions that prohibit assignment outright, provisions that have the effect of restricting assignments – *i.e.*, *de facto* anti-assignment provisions – are also unenforceable. *See In re Adelphia Commn'cs Corp.*, 359 B.R. 65, 85-86 (Bankr. S.D.N.Y. 2007) ("Among the types of provisions that have been held to be unenforceable under section 365(f) are rights of first refusal, and for good reason. They always "restrict" assignment… ."); *In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."), *aff'd*, 209 F.3d 291 (3d Cir.), *cert. denied*, 531 U.S. 873 (2000). Similarly, in *In re Mr. Grocer, Inc.*, the court noted:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves *ipso facto* anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Manifestly, *de facto* anti-assignment provisions, such as rights to consent or withhold consent to assignments, are not enforceable.

50.    Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. 11 U.S.C. § 365(f)(3). *See, e.g., In re Jamesway Corp.*, 201 B.R. at 78 (section 365(f)(3) prohibits enforcement of any lease clause

creating right to terminate lease because it is being assumed or assigned, thereby indirectly

barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment

clauses, are subject to court's scrutiny regarding anti-assignment effect).

51.     LBSF's assignment of its interests in the Libra CDSA and the Vela CDSA

is expressly authorized by such agreements subject to the satisfaction of the "Ratings Condition,"

which generally requires ratings agencies to issue a statement that affirms that the assignee's

financial strength and stability.  *See* Libra CDSA subpt. 5(e)(2) (permitting assignment to an

appropriate, creditworthy, replacement counterparty subject to Ratings Condition); Vela CDSA

subpt. 5(e)(2) (same).  Although the Debtors believe that the spirit of the Ratings Condition is

satisfied because SG is a qualified counterparty, to the extent the ratings agencies do not issue a

statement in satisfaction of the Ratings Condition, such a technical requirement should be

deemed unenforceable as an anti-assignment provision within the meaning of section 365(f) of

the Bankruptcy Code.

### SG is Entitled to Protection Under Sections 363(m) and (n)

52.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

53.     "The legislative history of § 363(m) confirms that the purpose of § 363(m)

is to protect good faith purchasers of property from reversal of sale authorization on appeal

unless authorization and the sale itself were stayed pending appeal."  *In re Int'l Union, United

Auto., Aerospace and Agr. Implement Workers of Am.*, 85 B.R. 666, 667 (D. Mass. 1988).  Thus,

the purpose of the protections afforded to a good faith purchaser is to "encourage optimum bids for 'property of the estate' from entities not otherwise privy to the bankruptcy proceedings, by ensuring that orders approving such sales promptly become final . . . ."  *In re Healthco Int'l, Inc.*, 136 F.3d 45, 49 (1st Cir. 1998); *see Cinicola v. Scharfenberger*, 248 F.3d 110, 122 (3d Cir. 2001) ("The provision's blunt finality is harsh but its certainty attracts investors and helps effectuate debtor rehabilitation.").

54.    Section 363(m) has been held to apply to assumption and assignment of executory contracts under section 365 because such assumption and assignment is a "use, sale, or lease of property" governed by section 363.  *In re Am. Banknote Corp.*, 2000 U.S. Dist. LEXIS 8796, at *6 (S.D.N.Y. 2000) ("At least three circuits have held that section 363(m) does apply to lease assignments governed by section 365.").  Consequently, an assignment of an interest in estate property is "also covered by section 363, although the procedure for their transfer is delineated by section 365.  Therefore, section 363(m) governs . . . notwithstanding that section 365 applies to the particular mechanics of conveyance."  *In re Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc. (In re Valley Motors, Inc.)*, 141 F.3d 490, 498 (3d Cir. 1998).

55.    Section 363(n) of the Bankruptcy Code provides:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.  In addition…the court may grant judgment for punitive damages in favor of the estate against any party that entered into such an agreement in willful disregard of this subsection.

11 U.S.C. § 363(n).

56.    The proposed assumption, assignment, and sale transactions are the result of arms' length, good faith negotiations.  *See In re Gucci*, 126 F.3d 380 (2d Cir. 1997) (a good

faith purchaser is shown by integrity of his conduct during the course of the sale proceedings); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998) (a determination of bad faith must be based on untoward conduct by the purchaser, such as fraud or collusion) (citing *Gucci*, 126 F.3d 380); *Comty. Thrift & Loan v. Suchy (In re Suchy)*, 786 F.2d 900, 902 (9th Cir. 1985) (a good faith purchaser is one that has not engaged in conduct involving fraud or collusion nor has sought to take grossly unfair advantage of other bidders). SG has not, in connection with the Assignment Agreements or the Settlement Agreement, engaged in any conduct that demonstrates a lack of good faith or collusion. Accordingly, the Debtors submit that SG is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

### A Private Sale of the Vela CDSA is Appropriate Under the Circumstances

57.     Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." In accordance therewith, a chapter 11 debtor may be allowed to sell or assign assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale or assignment is permissible. *See, e.g., In re Loral Space & Commc'ns Ltd.*, Ch. 11 Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Sep. 30, 2005) (Docket No. 2393); *In re Int'l Wire Group, Inc.*, Ch. 11 Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. June 10, 2004) (Docket No. 176); *Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.),* 233 B.R. 619 (D.P.R. 1999) (upholding bankruptcy court's approval of private sale conducted by chapter 11 debtor); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving private sale of chapter 11 debtor's assets).

58.     A private sale of the Vela CDSA to SG is appropriate. The Vela CDSA Assignment Agreement is part of the package deal in the Settlement Agreement that is likely to

enable LBSF to recover at least $445 million and assert the Termination Claim in pursuit of the remaining assets of Vela against the Other Vela Parties. And even if LBSF could find a potential purchaser for the Vela CDSA that would be prepared to pay an amount that is materially higher than the Settlement Agreement, any such payment would be contingent upon: (i) the entry of a judgment nullifying the Vela Early Termination, (ii) success on all appeals, and (iii) approval of the assignment transactions. Thus, unlike the Settlement Agreement, another transaction with a third party could not offer the complete resolution of litigation with SG or even guarantee a single dollar of recovery to LBSF, let alone $445 million.

**The Sale of the Agreement Should be Free and Clear of Liens and Claims**

59.     The sale of LBSF's interests in the Libra CDSA and the Vela CDSA to SG should be free and clear of any and all liens, claims, encumbrances and other interests in accordance with section 363(f) of the Bankruptcy Code. A debtor may sell property of its estate free and clear of any interest in such property if one of the conditions in section 363(f)(1) – (5) is satisfied. *See* 11 U.S.C. § 365(f); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.); *Circus Time, Inc. v. Oxford Bank & Trust (In re Circus Time, Inc.)*, 5 B.R. 1, 8 (Bankr. D. Me. 1979) (finding the court's power to sell property free and clear of liens has long been recognized); *see also In re Riverside Inv. P'ship*, 674 F.2d 634, 640 (7th Cir. 1982) ("Generally, in a 'free and clear' sale, the liens are impressed on the proceeds of the sale and discharged at the time of sale.").

60.     The Debtors are not aware of any parties that have any liens, claims, encumbrances, or interests in the Libra CDSA or the Vela CDSA. To the extent that any party

asserts a lien, claim, encumbrance or other interest in the Libra CDSA or the Vela CDSA,

subject to any claims and defenses the Debtors may possess with respect thereto, such party's

interests will be adequately protected because LBSF will be able to satisfy one or more of the

conditions set forth in section 363(f).  Thus, the sale of the Libra CDSA or the Vela CDSA free

and clear of liens, claims, encumbrances, and interests will satisfy the statutory prerequisites of

section 363(f) of the Bankruptcy Code.

### Notice

61.     No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in the second

amended order entered on June 17, 2010 governing case management and administrative

procedures for these cases [Docket No. 9635] to (i) the U.S. Trustee; (ii) the attorneys for the

Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue

Service; (v) the United States Attorney for the Southern District of New York; (vi) SG, (vii)

Libra, (viii) Vela; and (ix) all parties who have requested notice in these chapter 11 cases.

62.     In addition, the Debtors served a copy of the Motion with all exhibits

thereto on (i) the Libra Trustee; (ii) the Libra Noteholders; (iii) the Libra Collateral Manager;

(iv) Libra CDO, LLC; (v) the Vela Trustee, (vi) the Vela Noteholders; (vii) the Vela Collateral

Manager; and (viii) MKP Vela CBO, LLC.  Service on the Libra Noteholders and the Vela

Noteholders was completed by delivering a copy of the Motion and the Publication Notice

(defined below) to (i) the care of the Libra Trustee or the Vela Trustee, as applicable, with

instructions to forward a copy of the Settlement Motion and Publication Notice to each registered

Libra Noteholder or Vela Noteholder, and (ii) directly to the original Libra Noteholders and Vela

Noteholders (as of the issuance date thereof) as and to the extent listed in the Debtors' records.

Additionally, the Debtors caused notice of this Motion to be published in *The Wall Street*

*Journal* and *Investor's Business Daily* for three successive Business Days after its filing (the

"Publication Notice").  The Publication Notice states that the Motion and all related documents

thereto can be retrieved at no cost at www.lehman-docket.com or by request to the Lehman

Legal Hotline at lehmanteam@weil.com or (212) 310-8040.  Notice of the Settlement

Agreement and the Motion has also been posted on the Debtors' website at www.lehman-

docket.com.  The Debtors submit that no other or further notice is required.

63.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated: September 20, 2010
       New York, New York

/s/ Jacqueline Marcus
Lori R. Fife
Ralph I. Miller
Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession