# **Exhibit A**

## **(The Settlement Agreement)**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Settlement Agreement"), dated as of September 20, 2010, is entered into by and among Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Brothers Holdings Inc. ("LBHI" and, together with LBSF, the "Debtors") and Société Générale, New York Branch ("SG" and, together with the Debtors, the "Parties").

WHEREAS, the Debtors filed for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on September 15, 2008 (in the case of LBHI) and October 3, 2008 (in the case of LBSF), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

WHEREAS, the Debtors' chapter 11 cases and the chapter 11 cases of certain other LBHI affiliates are being jointly administered as In re Lehman Brothers Holdings Inc., et al., Chapter 11 Case No. 08-13555 (JMP) (the "Bankruptcy Case"); and

WHEREAS, LBHI is LBSF's "credit support provider" under each of (i) that certain ISDA Master Agreement, dated as of October 17, 2006 (together with the Schedule and Confirmations thereto, each dated October 17, 2006, the "Libra CDSA"), between LBSF and Libra CDO Limited ("Libra"), and (ii) that certain ISDA Master Agreement, dated as of November 16, 2006 (together with the Amended and Restated Schedule, Credit Support Annex and Amended and Restated Confirmations thereto, each dated April 23, 2008, the "Vela CDSA"), between LBSF and MKP Vela CBO, Ltd. ("Vela"); and

WHEREAS, under each of the Libra CDSA and the Vela CDSA (collectively, the "CDSAs"), LBHI's chapter 11 filing constituted an "event of default" as to which LBSF is the "defaulting party"; and

WHEREAS, in connection with LBHI's chapter 11 filing, (i) The Bank of New York Mellon Trust Company, National Association, as Trustee on behalf of Vela (the "Vela Trustee"), designated September 30, 2008 as the "early termination date" in respect of all outstanding transactions under the Vela CDSA (the "Vela Early Termination") and (ii) Bank of America, N.A., as Trustee on behalf of Libra (the "Libra Trustee"), designated October 10, 2008 as the "early termination date" in respect of all outstanding transactions under the Libra CDSA (the "Libra Early Termination"); and

WHEREAS, the Debtors have challenged the validity and effectiveness of the Libra Early Termination and the Vela Early Termination; and

WHEREAS, on May 5, 2009, (i) the Debtors commenced Adversary Proceeding No. 09-01177 (the "Debtors' Libra Adversary Proceeding" and, the complaint filed by the Debtors in such proceeding, the "Debtors' Libra Complaint") requesting, among other things, a declaratory judgment that the Libra Early Termination was null and void, and (ii) SG, Libra and the Libra Trustee commenced Adversary Proceeding No. 09-01178 (the "Libra Parties' Adversary Proceeding" and, together with the Debtors' Libra Adversary Proceeding, the "Libra Adversary Proceedings") requesting, among other things, a declaratory judgment that the Libra Early Termination is valid; and

WHEREAS, by stipulation dated July 2, 2009, approved by the Bankruptcy Court on July 16, 2009 [Dkt. 17], the Official Committee of Unsecured Creditors of LBHI and its affiliated debtors and debtors in possession was authorized to intervene in the Libra Adversary Proceedings; and

WHEREAS, the Debtors will file a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Sections 363 and 365 of the Bankruptcy Code to seek, among other things, court approval of their entry into this Settlement Agreement;

NOW, THEREFORE, for and in sufficient consideration of the promises and the mutual covenants contained herein, and subject to Bankruptcy Court approval, the Parties hereby agree as follows:

1. <u>Definitions</u>. As used in this Settlement Agreement, the following terms have the respective meanings indicated in this <u>Section 1</u>.

1.1 "<u>Advance</u>" shall mean each Premium Advance, Legacy Reimbursement, SG Litigation Expense and Lehman Litigation Expense.

1.2 "<u>Affiliate</u>" shall mean, as to any specified Person, any other Person that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Person. As used in this definition, "<u>control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of equity of that Person, by contract or otherwise).

1.3 "<u>Aggregate Debtors Parties Indemnified Claims</u>" shall have the meaning set forth in <u>Section 8.2(b)</u> hereof.

1.4 "<u>Aggregate SG Parties Indemnified Claims</u>" shall have the meaning set forth in <u>Section 8.1(c)</u> hereof.

1.5 "<u>Assignments</u>" shall mean, collectively, the Libra CDSA Assignment and the Vela CDSA Assignment.

1.6 "<u>Bankruptcy Case</u>" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.7 "<u>Bankruptcy Code</u>" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.8 "<u>Bankruptcy Court</u>" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.9 "<u>Business Day</u>" shall mean any day, other than a Saturday or Sunday, that is a day on which commercial banks are generally open for business in the City of New York.

1.10 "CDSAs" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.11 "Debtors" shall have the meaning set forth in the preamble hereof.

1.12 "Debtors Indemnification Cap" shall have the meaning set forth in Section 8.1(b) hereof.

1.13 "Debtors' Libra Adversary Proceeding" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.14 "Debtors' Libra Complaint" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.15 "Debtors Parties Indemnified Claims" shall have the meaning set forth in Section 8.2 hereof.

1.16 "Disbursable Recoveries" shall mean (x) with respect to the Libra Transaction, a portion of the aggregate Libra Funds standing to the credit of the Global Escrow Account at any time that is equal to the aggregate Advances made by SG *plus* the aggregate Advances made by the Debtors under the Libra CDSA that remain unreimbursed to SG and/or the Debtors (as applicable) from recoveries from Libra or the Libra Trustee at such time and (y) with respect to the Vela Transaction, a portion of the aggregate Vela Funds standing to the credit of the Global Escrow Account at any time that is equal to the aggregate Advances made by SG *plus* the aggregate Advances made by the Debtors under the Vela CDSA that remain unreimbursed to SG and/or the Debtors (as applicable) from recoveries from Vela or the Vela Trustee at such time.

1.17 "DTC" shall mean The Depository Trust Company.

1.18 "Entitlement Holder" shall have the meaning specified in Section 8-102(a)(7) of the UCC.

1.19 "Escrow Accounts" shall have the meaning set forth in Section 6.3 hereof.

1.20 "Final Libra Funds Settlement Distribution Date" shall mean the Business Day following the first date on which all Libra Funds standing to the credit of the Global Escrow Account are no longer subject to reimbursement under the Libra CDSA.

1.21 "Final Vela Funds Settlement Distribution Date" shall mean the Business Day following the first date on which all Vela Funds standing to the credit of the Global Escrow Account are no longer subject to reimbursement under the Vela CDSA.

1.22 "First Libra Funds Settlement Distribution Date" shall mean the Business Day following the first date on which all litigation in respect of the Libra Transaction is concluded with finality.

1.23    "First Vela Funds Settlement Distribution Date" shall mean the Business Day following the first date on which all litigation in respect of the Vela Transaction is concluded with finality.

1.24    "Global Escrow Account" shall have the meaning set forth in Section 9.1 hereof.

1.25    "ICA Recoveries" shall mean recoveries from Libra or the Libra Trustee of any amounts contained in the Libra Issuer Collateral Account that directly or indirectly relate to collateral posted by LBSF under the Libra CDSA.

1.26    "Indemnified Debtors Parties" shall have the meaning set forth in Section 8.2 hereof.

1.27    "Indemnified SG Parties" shall have the meaning set forth in Section 8.1 hereof.

1.28    "LBHI" shall have the meaning set forth in the preamble hereof.

1.29    "LBSF" shall have the meaning set forth in the preamble hereof.

1.30    "Legacy Reimbursement" shall mean any out-of-pocket reimbursement payment paid by SG or the Debtors to Libra or Vela under the Libra CDSA or the Vela CDSA, respectively, following the date of this Settlement Agreement with respect to Libra Credit Protection Payments or Vela Credit Protection Payments paid to LBSF under the Libra CDSA or the Vela CDSA, respectively, prior to September 15, 2008.

1.31    "Lehman Litigation Expense" shall mean all legal fees and expenses incurred by the Debtors in defense of any Debtors Parties Indemnified Claim.

1.32    "Libra" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.33    "Libra Adversary Proceedings" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.34    "Libra Assignment Closing Conditions" shall mean all of the following:

(a)    either:

(i)    the Libra Trustee has initiated an interpleader proceeding and named all Libra Noteholders as third-party defendants; or

(ii)    the Debtors have amended the Debtors' Libra Complaint to name the Libra Noteholders as defendants and have notified the Libra Noteholders through each of the following methods: (1) sending the Debtors' Libra Complaint to each Libra Noteholder care of the Libra Trustee, as the Libra Note Registrar, with instructions to the Libra Trustee to forward the Debtors' Libra Complaint to

the registered holder of each Libra Note, (2) sending the Debtors' Libra Complaint directly to the original holders of the Libra Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates), (3) publication in *The Wall Street Journal* and *Investor's Business Daily* for three successive Business Days, and (4) any other method required by the court;

(b)  a judgment (the "Libra Judgment") is entered by the Bankruptcy Court in either of the foregoing proceedings declaring the Libra Early Termination to be invalid and without force and effect;

(c)  the Libra Judgment includes, among others, the following findings and holdings:

(i)  the manner in which notice of the Libra Termination Claim was provided to the Libra Noteholders and all other parties entitled to such notice effected proper service and is adequate, appropriate, reasonable and sufficient for all purposes and is approved; and

(ii)  the Libra Judgment is and shall be binding on the Other Libra Parties and each of their predecessors and successors; and

(d)  the Libra Judgment (i) has not been stayed and the time for any motion to stay has expired and (ii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the Libra Judgment and the time for any further appeals has expired;

*provided that* SG shall have the right, in its sole and absolute discretion, to waive any of the foregoing Libra Assignment Closing Conditions with the effect that any Libra Assignment Closing Condition so waived shall be deemed to have been satisfied for purposes of this Settlement Agreement.

1.35  "Libra Assignment Closing Date" shall mean the first date on which the Libra Assignment Closing Conditions shall have been satisfied.

1.36  "Libra Assignment Determinations" shall mean the following findings and holdings:

(a)  approval of the Libra CDSA Assignment, including but not limited to the closing conditions set forth therein in respect of (x) the assumption of the Libra CDSA by LBSF and (y) the assignment by LBSF to SG, and the assumption by SG, of all of LBSF's rights, duties and obligations as "buyer" and "calculation agent" under the Libra CDSA;

(b)  the Debtors are authorized to (x) enter into and perform each of their respective obligations under the Libra CDSA Assignment and all related agreements and (y) execute all further documents and take such further steps necessary and appropriate to effectuate the purposes of the Libra CDSA Assignment;

(c)     notice of the Libra CDSA Assignment (including, where applicable, notice through DTC), given in accordance with the methods set forth in subsections (i)-(iii) below, to the Libra Noteholders, all other parties in interest to the Libra CDSA and the Libra Indenture and to any other persons entitled to such notice in the Bankruptcy Case, constitutes sufficient notice of the Libra CDSA Assignment to such persons:

(i)     sending the Settlement Motion to each such person; *provided, that* in the case of the Libra Noteholders, the Settlement Motion shall be sent (1) to each Libra Noteholder care of the Libra Trustee, as the Libra Note Registrar, with instructions to the Libra Trustee to forward the Settlement Motion to the registered holder of each Libra Note and (2) directly to the original holders of the Libra Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates);

(ii)    publication in *The Wall Street Journal* and *Investor's Business Daily* for three successive Business Days; and

(iii)   any other method required by the court;

(d)     any objections to the Libra CDSA Assignment, if not then withdrawn, are deemed to have been waived or are overruled;

(e)     the transactions contemplated in and evidenced by the Libra CDSA Assignment shall not be prohibited under the terms of the Libra CDSA, the Libra Indenture or any other agreement, or, alternatively, shall be deemed to be consistent with the terms of the Libra CDSA, the Libra Indenture and any other agreement;

(f)     any provisions in the Libra CDSA, the Libra Indenture or any other agreement (i) that prohibit, restrict, or condition the Libra CDSA Assignment or the transactions contemplated thereby (including, without limitation, any purported prerequisite that the Libra Rating Condition be satisfied), (ii) that require the consent of Libra or any other person in order for the Libra CDSA Assignment to be valid, or (iii) that allow Libra as a party thereto, or any other third parties, to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition in respect of the Libra CDSA, the Libra CDS Transactions, the Libra Indenture or any other agreement upon or as a result of the assignment of the Libra CDSA and the Libra CDS Transactions are deemed (as applicable) satisfied or void and of no force and effect as to the Libra CDSA Assignment;

(g)     the rights and obligations to be assigned to SG by the Libra CDSA Assignment are property of LBSF's estate that will be assigned free and clear of any adverse claims;

(h)     the Libra CDSA Assignment was negotiated extensively in good faith and at arms' length without any collusion by the Debtors and SG and entered into in good faith by the Debtors and SG;

(i)      the assumption of the Libra CDSA by LBSF and the assignment by LBSF to SG, and the assumption by SG, of all of LBSF's rights, duties and obligations under the Libra CDSA will each take effect, automatically and without any additional court order or action, upon satisfaction of the closing conditions set forth in the Libra CDSA Assignment;

(j)      with effect as of the Libra Assignment Closing Date, SG, as a successor credit protection buyer, would be permitted to trigger any and all Libra Floating Amount Events and Libra Credit Events that occurred during the period beginning on October 10, 2008 and ending on the Libra Assignment Closing Date, regardless of the passage of time from the date on which any such Libra Floating Amount Event or Libra Credit Event has occurred;

(k)      the Debtors are permitted to unilaterally defer the payment due date in respect of any payment payable to them under the Libra CDSA and the deferral contemplated in Section 7.4 of the Settlement Agreement shall be binding on the Other Libra Parties and is hereby authorized and approved;

(l)      the rating requirement set forth in <u>clause (ii)(A)</u> of the definition of "Rating Requirement" in each of the Libra CDSA Confirmations shall be satisfied with respect to a "buyer" whose long-term debt obligations, or the long-term debt obligations of its "credit support provider," are rated "A+" by Standard & Poor's if the Libra Rating Condition with respect to Standard & Poor's has been obtained; and

(m)     at least one of the following:

(i)      the maximum aggregate amount of all Libra Credit Protection Payments and Libra CDS Termination Payments payable by Libra under the Libra CDSA shall be reduced to an amount equal to the aggregate funds available to Libra for making Libra Credit Protection Payments and Libra CDS Termination Payments without implicating the Libra Senior Swap, with the effect that draws on the Libra Senior Swap are forever rendered impossible; or

(ii)     with effect as of the Libra Assignment Closing Date, (x) the "buyer" and the "calculation agent" under the Libra CDSA shall have full discretion as to when and if to deliver notices of Libra Floating Amounts due with respect to outstanding Libra Floating Amount Events under the Libra CDSA and full discretion to seek an amount equal to less than the Libra Floating Amount due to the "buyer" under the Libra CDSA in respect of any outstanding Libra Floating Amount Events; (y) the exercise of such discretion by the "calculation agent" or the "buyer" under the Libra CDSA shall be deemed to satisfy any applicable timing requirements under the Libra CDSA and, in the case of the "calculation agent," any applicable obligation under Section 1.14 of the 2003 ISDA Credit Derivatives Definitions; and (z) either (A) all funds drawn by Libra from the Libra Senior Swap must be paid directly by the Libra Senior Swap Counterparty to the "buyer" under the Libra CDSA as the party rightfully entitled to such funds or (B) all funds drawn by Libra from the Libra Senior Swap may be retained by

the Libra Senior Swap Counterparty, as irrevocable assignee of the "buyer" under the Libra CDSA and party rightfully entitled to such funds;

*provided that* SG shall have the right, in its sole and absolute discretion, to waive the requirement that one or more of the foregoing findings and/or holdings be included in the Settlement Approval Order, in which case the "Libra Assignment Determinations" shall mean all of the foregoing findings and/or holdings other than those explicitly waived by SG.

1.37    "Libra CDSA" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.38    "Libra CDSA Assignment" shall mean an agreement, substantially in the form attached hereto as Exhibit 2, for the assumption, assignment and sale of the Libra CDSA. The Libra CDSA Assignment will provide that LBSF assumes the Libra CDSA and assigns to SG, and SG assumes, all of LBSF's rights, duties and obligations under the Libra CDSA, with effect, automatically and without any additional court order or action, from and including the Libra Assignment Closing Date.

1.39    "Libra CDS Termination Payment" shall mean a "CDS Termination Payment" as defined in the Libra Indenture.

1.40    "Libra CDS Transactions" shall mean the "CDS Agreement Transactions" as defined in the Libra Indenture.

1.41    "Libra Collateral Manager" shall mean the "Collateral Manager" as defined in the Libra Indenture.

1.42    "Libra Credit Event" shall mean a "Credit Event" as defined in the Libra CDSA.

1.43    "Libra Credit Protection Payment" shall mean "Credit Protection Payment" as defined in the Libra Indenture.

1.44    "Libra Credit Protection Premium" shall mean the amount specified as "Fixed Amount" in the Libra CDSA.

1.45    "Libra Early Termination" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.46    "Libra Floating Amount" shall mean a "Floating Amount" as defined in the Libra CDSA.

1.47    "Libra Floating Amount Event" shall mean a "Floating Amount Event" as defined in the Libra CDSA.

1.48    "Libra Funds" shall have the meaning set forth in Section 9.10(b) hereof.

1.49    "Libra Funds Advance Reimbursement Date" shall mean the Business Day following the Business Day on which any Libra Funds on deposit in the Global Escrow Account constituting Disbursable Recoveries are no longer subject to reimbursement under the Libra CDSA.

1.50    "Libra Funds Settlement Distribution Date" shall mean any Business Day following the First Libra Funds Settlement Distribution Date on which Libra Funds on deposit in the Global Escrow Account are no longer subject to reimbursement under the Libra CDSA.

1.51    "Libra Indenture" shall mean the Indenture, dated as of October 17, 2006, by and among Libra, as issuer, Libra CDO, LLC, as co-issuer, and the Libra Trustee, as amended, supplemented, waived or otherwise modified from time to time.

1.52    "Libra Interim Period" shall mean the time period beginning on the date of the Libra Judgment, up to and including the Libra Assignment Closing Date.

1.53    "Libra Issuer Collateral Account" shall mean the "Issuer Collateral Account" as defined in the Libra Indenture.

1.54    "Libra Judgment" shall have the meaning set forth in Section 1.34(b) hereof.

1.55    "Libra Note Registrar" shall mean the "Note Registrar" as defined in the Libra Indenture.

1.56    "Libra Noteholder" shall mean a "Noteholder" as defined in the Libra Indenture.

1.57    "Libra Notes" shall mean the "Notes" as defined in the Libra Indenture.

1.58    "Libra Parties' Adversary Proceeding" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.59    "Libra Physical Settlement Amount" shall mean a "Physical Settlement Amount" as defined in the Libra CDSA.

1.60    "Libra Principal Collection Account" shall mean the "Principal Collection Account" as defined in the Libra Indenture.

1.61    "Libra Priority Claim" shall mean LBSF's claims concerning the enforceability of contractual payment priority provisions with respect to the Remaining Libra Assets.

1.62    "Libra Rating Condition" shall mean the "Rating Condition" as defined in the Libra Indenture.

1.63    "Libra Reimbursement Escrow Account" shall have the meaning set forth in Section 9.8(a) hereof.

1.64 "Libra Reserve Account" shall mean the "Reserve Account" as defined in the Libra Indenture.

1.65 "Libra Senior Swap" shall mean, collectively, the ISDA Master Agreement, Schedule, Credit Support Annex and Confirmation, each dated as of October 17, 2006, between Libra and the Libra Senior Swap Counterparty.

1.66 "Libra Senior Swap Counterparty" shall mean SG.

1.67 "Libra Termination Claim" shall mean, collectively, all of LBSF's claims in respect of the validity and/or effectiveness of the Libra Early Termination.

1.68 "Libra Termination Claim Preconditions" shall have the meaning set forth in Section 3.2 hereof.

1.69 "Libra Transaction" shall mean the Libra CDO Limited transaction relating to, among others, the (i) Libra CDSA, (ii) Libra Senior Swap, and (iii) Libra Indenture.

1.70 "Libra Triggering Sequence" shall mean the triggering of Libra Credit Protection Payments in respect of outstanding Libra Floating Amount Events in the following order: *first*, all Libra Credit Protection Payments for which the reimbursement period under the Libra CDSA has ended (without regard to any specific order) and, *second*, the remaining Libra Credit Protection Payments, starting with that Libra Credit Protection Payment for which the remaining reimbursement period under the Libra CDSA is the shortest followed by the Libra Credit Protection Payment for which the remaining reimbursement period is the second shortest and so forth until that Libra Credit Protection Payment for which the remaining reimbursement period is the longest.

1.71 "Libra Trustee" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.72 "Libra Uninvested Proceeds Account" shall mean the "Uninvested Proceeds Account" as defined in the Libra Indenture.

1.73 "Other Libra Parties" shall mean, collectively, Libra, the Libra Trustee, the Libra Collateral Manager and the Libra Noteholders.

1.74 "Other Vela Parties" shall mean, collectively, Vela, the Vela Trustee, the Vela Collateral Manager and the Vela Noteholders.

1.75 "Parties" shall have the meaning set forth in the preamble hereof.

1.76 "Payment Date" shall mean the 5th Business Day after the Settlement Effective Date.

1.77 "Permitted Investments" shall mean short-term highly-liquid investments to be agreed upon by the Parties prior to the Payment Date.

1.78 "Permitted Netting" shall mean (x) with respect to the Libra CDSA, a netting under the Libra CDSA of any Libra Credit Protection Premium and/or reimbursement payment in respect of any Libra Credit Protection Payment payable by SG and/or the Debtors to Libra on a specific date against an outstanding Libra Credit Protection Payment that is owed by Libra to SG and/or the Debtors on such date; *provided* that either (i) such Libra Credit Protection Payment is not subject to reimbursement under the Libra CDSA on such date or (ii) the Party effecting the netting remits to the Global Escrow Account on such date an amount equal to the Libra Credit Protection Payment against which the netting is effected, in which case the amount remitted to the Global Escrow Account shall constitute an Advance by the remitting Party and the reimbursement period applicable to the amount remitted to the Global Escrow Account shall be equal to the reimbursement period applicable to the Libra Credit Protection Payment against which the netting is effected, and (y) with respect to the Vela CDSA, a netting under the Vela CDSA of any Vela Credit Protection Premium and/or reimbursement payment in respect of any Vela Credit Protection Payment payable by SG and/or the Debtors to Vela on a specific date against an outstanding Vela Credit Protection Payment that is owed by Vela to SG and/or the Debtors on such date; provided that either (i) such Vela Credit Protection Payment is not subject to reimbursement under the Vela CDSA on such date or (ii) the Party effecting the netting remits to the Global Escrow Account on such date an amount equal to the Vela Credit Protection Payment against which the netting is effected, in which case the amount remitted to the Global Escrow Account shall constitute an Advance by the remitting Party and the reimbursement period applicable to the amount remitted to the Global Escrow Account shall be equal to the reimbursement period applicable to the Vela Credit Protection Payment against which the netting is effected.

1.79 "Person" shall mean any natural person, entity, estate, trust, union or employee organization or governmental authority.

1.80 "Plan" shall mean, collectively, the joint chapter 11 plans of liquidation for the Debtors and certain other affiliates of LBHI, filed on April 15, 2010, as subsequently amended in accordance with the provisions thereof and applicable bankruptcy law or any other chapter 11 plan in the Bankruptcy Case of which the Debtors are proponents.

1.81 "Premium Advance" shall mean any out-of-pocket Libra Credit Protection Premium or Vela Credit Protection Premium paid by SG or the Debtors under the Libra CDSA or the Vela CDSA, respectively, following the date of this Settlement Agreement.

1.82 "Remaining Libra Assets" shall mean the assets of Libra, other than its rights under the Libra CDSA and the Libra Senior Swap, which as of September 5, 2010 were comprised of (i) approximately $48,533,031 of cash assets and (ii) the ABS and CDO securities listed on Schedule B hereto.

1.83 "Remaining Vela Assets" shall mean the assets of Vela, other than its rights under the Vela CDSA and the Vela Senior Swap, which as of September 20, 2010 were comprised of approximately $144,755,641 of cash assets.

1.84 "Settlement Agreement" shall have the meaning set forth in the preamble hereof.

1.85 "Settlement Approval Determinations" shall have the meaning set forth in Section 1.86 hereof.

1.86 "Settlement Approval Order" shall mean an order entered by the Bankruptcy Court, in form and substance satisfactory to the Parties, approving all of the terms of the Settlement Agreement that includes, but is not limited to, in substance, the findings and holdings listed below (the "Settlement Approval Determinations"), and, if the court so holds, that may also include the Libra Assignment Determinations and/or the Vela Assignment Determinations:

(a) The manner in which notice of the Settlement Motion was provided to all parties entitled to such notice is adequate, appropriate, reasonable and sufficient for all purposes and is approved;

(b) The Settlement Approval Order and the Settlement Agreement are and shall be binding on the Debtors, SG and each of their predecessors and successors;

(c) The execution and delivery of the Settlement Agreement by the Parties and the settlement and compromises set forth therein are approved;

(d) The compromises and settlement set forth in the Settlement Agreement are fair and reasonable to, and are in the best interest of, the Debtors, and, in entering into the Settlement Agreement, the Debtors have exercised sound business judgment and the Debtors' entry into the Settlement Agreement is reasonable under the circumstances;

(e) The releases contained in the Settlement Agreement shall be effective as of the Payment Date, and each Party shall be deemed to have released and is permanently enjoined from asserting, pursuing or prosecuting in any manner and in any forum any and all claims released pursuant to the Settlement Agreement; *provided that* LBSF shall be permitted to (i) pursue the Libra Termination Claim and the Libra Priority Claim as against the Other Libra Parties (but in the case of the Libra Termination Claim, only if the Libra Termination Claim Preconditions have been satisfied) and (ii) pursue the Vela Termination Claim and Vela Priority Claim as against the Other Vela Parties (but in the case of the Vela Termination Claim, only if the Vela Termination Claim Preconditions have been satisfied);

(f) Prosecution of Debtors' claims in the Libra Adversary Proceedings, as against SG, shall be stayed pending the Payment Date and satisfaction of the SG Payment, at which time they will be dismissed with prejudice. Prosecution of Debtors' claims in the Libra Adversary Proceedings, as against Libra and the Libra Trustee, shall be stayed, and the Debtors shall not prosecute or in any litigation take a position regarding the Libra Termination Claim, as against the Other Libra Parties, in each case, unless and until LBSF and SG shall have entered into the Libra CDSA Assignment;

(g) The Debtors shall not prosecute or in any litigation take a position regarding the Vela Termination Claim, as against the Other Vela Parties, unless and until LBSF and SG shall have entered into the Vela CDSA Assignment;

(h)	The Libra CDSA shall only be assumed by LBSF as part of the Libra CDSA Assignment and no party other than SG may become LBSF's assignee under the Libra CDSA;

(i)	The Vela CDSA shall only be assumed by LBSF as part of the Vela CDSA Assignment and no party other than SG may become LBSF's assignee under the Vela CDSA; and

(j)	The terms of this Settlement Agreement and/or the Settlement Approval Order shall not be modified, altered or amended by any Plan or any order confirming a Plan in the Bankruptcy Case;

*provided that* SG shall have the right, in its sole and absolute discretion, to waive the requirement that one or more of the foregoing findings and/or holdings described in clauses (f) through (j) above be included in the Settlement Approval Order, in which case the "Settlement Approval Determinations" shall mean all of the foregoing findings and/or holdings other than those explicitly waived by SG.

1.87	"Settlement Date" shall mean September 20, 2010.

1.88	"Settlement Effective Date" shall mean the first date on which all of the following shall have occurred:

(a)	The Settlement Approval Order has been entered by the Bankruptcy Court;

(b)	The Settlement Approval Order has not been stayed and the time for any motion to stay has expired; and

(c)	The Settlement Approval Order (i) has not been appealed and the time for any appeals has expired, or (ii) was appealed and all appeals have been dismissed or have resulted in the affirmance of the Settlement Approval Order, and the time for any further appeals has expired.

1.89	"Settlement Motion" shall mean a motion, substantially in the form attached hereto as Exhibit 1, that would be filed by the Debtors with the Bankruptcy Court in accordance with this Settlement Agreement, and would seek, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Sections 363 and 365 of the Bankruptcy Code, court approval of (i) this Settlement Agreement, (ii) the Libra CDSA Assignment and (iii) the Vela CDSA Assignment.

1.90	"Settlement Motion is Denied with Finality" shall mean that the Settlement Motion has been denied and such denial (1) has not been appealed and the time for any appeals has expired or (2) was appealed and all appeals have been dismissed or have resulted in the affirmance of the denial of the Settlement Motion, and the time for any further appeals has expired.

1.91	"SG" shall have the meaning set forth in the preamble hereof.

1.92 "SG Escrow Agent" shall have the meaning set forth in Section 6.3(a) hereof.

1.93 "SG Guarantee" shall have the meaning set forth in Section 7.2 hereof.

1.94 "SG Guarantee Payment Date" shall have the meaning set forth in Section 10.1 hereof.

1.95 "SG Indemnification Cap" shall have the meaning set forth in Section 8.2(a) hereof.

1.96 "SG Litigation Expense" shall mean all legal fees and expenses incurred by SG in defense of any SG Parties Indemnified Claim.

1.97 "SG Parties Indemnified Claims" shall have the meaning set forth in Section 8.1 hereof.

1.98 "SG Payment" shall have the meaning set forth in Section 7.1 hereof.

1.99 "SSA Recoveries" shall mean (x) in the case of the Libra Transaction, any recovery from Libra or the Libra Trustee that directly or indirectly relates to a funding under the Libra Senior Swap and (y) in the case of the Vela Transaction, any recovery from Vela or the Vela Trustee that directly or indirectly relates to a funding under the Vela Senior Swap.

1.100 "UCC" shall mean the Uniform Commercial Code as in effect in the State of New York.

1.101 "Vela" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.102 "Vela Assignment Closing Conditions" shall mean all of the following:

(a) either:

(i) the Vela Trustee has initiated an interpleader proceeding and named all Vela Noteholders as defendants; or

(ii) the Debtors have filed an adversary proceeding asserting the Vela Termination Claim (the "Vela Complaint"), naming the Vela Noteholders as defendants, and have notified the Vela Noteholders through each of the following methods: (1) sending the Vela Complaint to each Vela Noteholder care of the Vela Trustee, as the Vela Note Registrar, with instructions to the Vela Trustee to forward the Vela Complaint to the registered holder of each Vela Note, (2) sending the Vela Complaint directly to the original holders of the Vela Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates), (3) publication in *The Wall Street Journal* and *Investor's Business Daily* for three successive Business Days and (4) any other method required by the court;

(b)     a judgment (the "Vela Judgment") is entered by the Bankruptcy Court in either of the foregoing proceedings declaring the Vela Early Termination to be invalid and without force and effect;

(c)     the Vela Judgment includes, among others, the following findings and holdings:

(i)     the manner in which notice of the Vela Termination Claim was provided to the Vela Noteholders and all other parties entitled to such notice effected proper service and is adequate, appropriate, reasonable and sufficient for all purposes and is approved; and

(ii)    the Vela Judgment is and shall be binding on the Other Vela Parties and each of their predecessors and successors; and

(d)     the Vela Judgment (i) has not been stayed and the time for any motion to stay has expired and (ii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the Vela Judgment and the time for any further appeals has expired;

*provided that* SG shall have the right, in its sole and absolute discretion, to waive any of the foregoing Vela Assignment Closing Conditions with the effect that any Vela Assignment Closing Condition so waived shall be deemed to have been satisfied for purposes of this Settlement Agreement.

1.103   "Vela Assignment Closing Date" shall mean the first date on which the Vela Assignment Closing Conditions shall have been satisfied.

1.104   "Vela Assignment Determinations" shall mean the following findings and holdings:

(a)     approval of the Vela CDSA Assignment, including but not limited to the closing conditions set forth therein in respect of (x) the assumption of the Vela CDSA by LBSF and (y) the assignment by LBSF to SG, and the assumption by SG, of all of LBSF's rights, duties and obligations as "buyer" and "calculation agent" under the Vela CDSA;

(b)     the Debtors are authorized to (x) enter into and perform each of their respective obligations under the Vela CDSA Assignment and all related agreements and (y) execute all further documents and take such further steps necessary and appropriate to effectuate the purposes of the Vela CDSA Assignment;

(c)     notice of the Vela CDSA Assignment (including, where applicable, notice through DTC), given in accordance with all of the methods set forth in subsections (i)-(iii) below, to the Vela Noteholders, all other parties in interest to the Vela CDSA and the Vela Indenture and to any other persons entitled to such notice in the Bankruptcy Case, constitutes sufficient notice of the Vela CDSA Assignment to such persons:

(i)     sending the Settlement Motion to each such person; *provided, that* in the case of the Vela Noteholders, the Settlement Motion shall be sent (1) to each Vela Noteholder care of the Vela Trustee, as the Vela Note Registrar, with instructions to the Vela Trustee to forward the Settlement Motion to the registered holder of each Vela Note and (2) directly to the original holders of the Vela Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates);

(ii)    publication in *The Wall Street Journal* and *Investor's Business Daily* for three successive Business Days; and

(iii)   any other method required by the court;

(d)     any objections to the Vela CDSA Assignment, if not then withdrawn, are deemed to have been waived or are overruled;

(e)     the transactions contemplated in and evidenced by the Vela CDSA Assignment shall not be prohibited under the terms of the Vela CDSA, the Vela Indenture or any other agreement, or, alternatively, shall be deemed to be consistent with the terms of the Vela CDSA, the Vela Indenture and any other agreement;

(f)     any provisions in the Vela CDSA, the Vela Indenture or any other agreement (i) that prohibit, restrict, or condition the Vela CDSA Assignment or the transactions contemplated thereby (including, without limitation, any purported prerequisite that the Vela Rating Condition be satisfied), (ii) that require the consent of Vela or any other person in order for the Vela CDSA Assignment to be valid, or (iii) that allow Vela as a party thereto, or any other third parties, to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition in respect of the Vela CDSA, the Vela CDS Transactions, the Vela Indenture or any other agreement upon or as a result of the assignment of the Vela CDSA and the Vela CDS Transactions are deemed (as applicable) satisfied or void and of no force and effect as to the Vela CDSA Assignment;

(g)     the rights and obligations to be assigned to SG by the Vela CDSA Assignment are property of LBSF's estates that will be assigned free and clear of any adverse claims;

(h)     the Vela CDSA Assignment was negotiated extensively in good faith and at arms' length without any collusion by the Debtors and SG and entered into in good faith by the Debtors and SG;

(i)     the assumption of the Vela CDSA by LBSF and the assignment by LBSF to SG, and the assumption by SG, of all of LBSF's rights, duties and obligations under the Vela CDSA will each take effect, automatically and without any additional court order or action, upon satisfaction of the closing conditions set forth in the Vela CDSA Assignment;

(j)     with effect as of the Vela Assignment Closing Date, SG, as a successor credit protection buyer, would be permitted to trigger any and all Vela Floating Amount Events and Vela Credit Events that occurred during the period beginning on September 30, 2008 and ending on the Vela Assignment Closing Date, regardless of the passage of time from the date on which any such Vela Floating Amount Event or Vela Credit Event has occurred;

(k)     the Debtors are permitted to unilaterally defer the payment due date in respect of any payment payable to them under the Vela CDSA and the deferral contemplated in Section 7.5 of the Settlement Agreement shall be binding on the Other Vela Parties and is hereby authorized and approved; and

(l)     at least one of the following:

(i)     the maximum aggregate amount of all Vela Credit Protection Payments, Vela CDS Termination Payments, Vela Premium Reserve payments and Vela Net Issuer Premium payments payable by Vela under the Vela CDSA shall be reduced to an amount equal to the aggregate funds available to Vela for making Vela Credit Protection Payments, Vela CDS Termination Payments, Vela Premium Reserve payments and Vela Net Issuer Premium payments without implicating the Vela Senior Swap, with the effect that draws on the Vela Senior Swap are forever rendered impossible; or

(ii)     with effect as of the Vela Assignment Closing Date, (x) the "buyer" and the "calculation agent" under the Vela CDSA shall have full discretion as to when and if to deliver notices of Vela Floating Amounts due with respect to Vela Floating Amount Events under the Vela CDSA and full discretion to seek an amount equal to less than the Vela Floating Amount due to the "buyer" under the Vela CDSA in respect of such Vela Floating Amount Events; (y) the exercise of such discretion by the "calculation agent" or the "buyer" under the Vela CDSA shall be deemed to satisfy any applicable timing requirements under the Vela CDSA and, in the case of the "calculation agent," any applicable obligation under Section 1.14 of the 2003 ISDA Credit Derivatives Definitions; and (z) either (A) all funds drawn by Vela from the Vela Senior Swap must be paid directly by the Vela Senior Swap Counterparty to the "buyer" under the Vela CDSA as the party rightfully entitled to such funds or (B) all funds drawn by Vela from the Vela Senior Swap may be retained by the Vela Senior Swap Counterparty, as irrevocable assignee of the "buyer" under the Vela CDSA and party rightfully entitled to such funds;

*provided that* SG shall have the right, in its sole and absolute discretion, to waive the requirement that one or more of the foregoing findings and/or holdings be included in the Settlement Approval Order, in which case the "Vela Assignment Determinations" shall mean all of the foregoing findings and/or holdings other than those explicitly waived by SG.

1.105  "Vela CDS Termination Payment" shall mean an "Issuer CDS Termination Payment" as defined in the Vela Indenture.

1.106 "Vela CDS Transaction" shall mean a "CDS Agreement Transaction" as defined in the Vela Indenture.

1.107 "Vela CDSA" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.108 "Vela CDSA Assignment" shall mean an agreement, substantially in the form attached hereto as Exhibit 3, for the assumption, assignment and sale of the Vela CDSA. The Vela CDSA Assignment will provide that LBSF assumes the Vela CDSA and assigns to SG, and SG assumes, all of LBSF's rights, duties and obligations as "buyer" and "calculation agent" under the Vela CDSA, with effect, automatically and without any additional court order or action, from and including the Vela Assignment Closing Date.

1.109 "Vela Collateral Manager" shall mean the "Collateral Manager" as defined in the Vela Indenture.

1.110 "Vela Complaint" shall have the meaning set forth in Section 1.102(a)(ii).

1.111 "Vela Credit Event" shall mean a "Credit Event" as defined in the Vela CDSA.

1.112 "Vela Credit Protection Payment" shall mean a "Floating Payment" as defined in the Vela Indenture.

1.113 "Vela Credit Protection Premium" shall mean the amount specified as "Fixed Amount" in the Vela CDSA.

1.114 "Vela Early Termination" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.115 "Vela Floating Amount" shall mean a "Floating Amount" as defined in the Vela CDSA.

1.116 "Vela Floating Amount Event" shall mean a "Floating Amount Event" as defined in the Vela CDSA.

1.117 "Vela Funds" shall have the meaning set forth in Section 9.10(c) hereof.

1.118 "Vela Funds Advance Reimbursement Date" shall mean the Business Day following the Business Day on which any Vela Funds on deposit in the Global Escrow Account constituting Disbursable Recoveries are no longer subject to reimbursement under the Vela CDSA.

1.119 "Vela Funds Settlement Distribution Date" shall mean any Business Day following the First Vela Funds Settlement Distribution Date on which Vela Funds on deposit in the Global Escrow Account are no longer subject to reimbursement under the Vela CDSA.

1.120 "Vela Indenture" shall mean the Indenture, dated as of November 16, 2006, by and among Vela, as issuer, MKP Vela CBO, LLC, as co-issuer, and the Vela Trustee, as amended, supplemented, waived or otherwise modified from time to time.

1.121 "Vela Interim Period" shall mean the time period beginning on the date of the Vela Judgment, up to and including the Vela Assignment Closing Date.

1.122 "Vela Judgment" shall have the meaning set forth in Section 1.102(b) hereof.

1.123 "Vela Net Issuer Premium" shall mean a "Net Issuer Premium" as defined in the Vela Indenture.

1.124 "Vela Note Registrar" shall mean the "Note Registrar" as defined in the Vela Indenture.

1.125 "Vela Noteholders" shall mean the "Noteholders" as defined in the Vela Indenture.

1.126 "Vela Notes" shall mean the "Notes" as defined in the Vela Indenture.

1.127 "Vela Physical Settlement Amount" shall mean a "Physical Settlement Amount" as defined in the Vela CDSA.

1.128 "Vela Premium Reserve" shall mean a "Premium Reserve" as defined in the Vela Indenture.

1.129 "Vela Principal Collection Account" shall mean the "Principal Collection Account" as defined in the Vela Indenture.

1.130 "Vela Priority Claim" shall mean LBSF's claims concerning the enforceability of contractual payment priority provisions with respect to the Remaining Vela Assets.

1.131 "Vela Rating Condition" shall mean the "Rating Condition" as defined in the Vela Indenture.

1.132 "Vela Reimbursement Escrow Account" shall have the meaning set forth in Section 9.9(a) hereof.

1.133 "Vela Reserve Account" shall mean the "Reserve Account" as defined in the Vela Indenture.

1.134 "Vela Senior Swap" shall mean, collectively, the ISDA Master Agreement, Schedule, Credit Support Annex and Confirmation, each dated November 16, 2006, between Vela and the Vela Senior Swap Counterparty.

1.135 "Vela Senior Swap Counterparty" shall mean SG.

1.136 "Vela Termination Claim" shall mean, collectively, all of LBSF's claims in respect of the validity and/or effectiveness of the Vela Early Termination.

1.137 "Vela Termination Claim Preconditions" shall have meaning set forth in Section 4.2 hereof.

1.138 "Vela Transaction" shall mean the MKP Vela CBO, Ltd. transaction relating to, among others, the (i) Vela CDSA, (ii) Vela Senior Swap, and (iii) Vela Indenture.

1.139 "Vela Triggering Sequence" shall mean the triggering of Vela Credit Protection Payments in respect of outstanding Vela Floating Amount Events in the following order: *first*, all Vela Credit Protection Payments for which the reimbursement period under the Vela CDSA has ended (without regard to any specific order) and, *second*, the remaining Vela Credit Protection Payments, starting with that Vela Credit Protection Payment for which the remaining reimbursement period under the Vela CDSA is the shortest followed by the Vela Credit Protection Payment for which the remaining reimbursement period is the second shortest and so forth until that Vela Credit Protection Payment for which the remaining reimbursement period is the longest.

1.140 "Vela Trustee" shall have the meaning set forth in the recitals to this Settlement Agreement.

1.141 "Vela Uninvested Proceeds Account" shall mean the "Uninvested Proceeds Account" as defined in the Vela Indenture.

2. Suspension of Parties' Claims in respect of the Libra Early Termination and the Vela Early Termination. The Parties agree that, as of the Settlement Date, their respective claims in respect of the Libra Early Termination and the Vela Early Termination shall be stayed and suspended, as follows:

2.1 Prosecution of (i) Debtors' claims in the Libra Adversary Proceedings, as against SG, and (ii) SG's claims in the Libra Adversary Proceedings, as against the Debtors, shall, in each case, be stayed until either (x) the Payment Date, at which time they will be dismissed with prejudice, or (y) the Settlement Motion is Denied with Finality.

2.2 Prosecution of Debtors' claims in the Libra Adversary Proceedings, as against Libra and the Libra Trustee, shall be stayed, and the Debtors shall not prosecute or in any litigation take a position regarding the Libra Termination Claim, as against the Other Libra Parties, in each case, until either (i) the date on which the Libra Termination Claim Preconditions shall have been satisfied or (ii) the Settlement Motion is Denied with Finality.

2.3 The Debtors shall not prosecute or in any litigation take a position regarding the Vela Termination Claim, (i) as against SG, until either (x) the Payment Date, at which time SG will be released from the Vela Termination Claim, or (y) the Settlement Motion is Denied with Finality, and (ii) as against the Other Vela Parties until either (x) the date on which the Vela Termination Claim Preconditions shall have been satisfied or (y) the Settlement Motion is Denied with Finality.

2.4    SG shall not prosecute or in any litigation take a position regarding any claims in respect of the Vela Transaction, as against the Debtors, until either (i) the Payment Date, at which time the Debtors will be released from such claims, or (ii) the Settlement Motion is Denied with Finality.

3.    Execution and Delivery of the Libra CDSA Assignment; Pursuit of the Libra Termination Claim and/or the Libra Priority Claim.

3.1    If, on the Settlement Effective Date, the Settlement Approval Order includes the Libra Assignment Determinations, LBSF and SG shall execute and deliver the Libra CDSA Assignment as soon as reasonably practicable and no later than the Payment Date, it being understood and agreed that:

(a)    the assumption of the Libra CDSA by LBSF and the assignment by LBSF to SG, and the assumption by SG, of all of LBSF's rights, duties and obligations under the Libra CDSA will each take effect, automatically and without any additional court order or action, on the Libra Assignment Closing Date;

(b)    notwithstanding Debtors' entry into the Libra CDSA Assignment, at any time prior to the entry by the Bankruptcy Court of the Libra Judgment, LBSF may elect to pursue the Libra Priority Claim in lieu of the Libra Termination Claim; and

(c)    for the avoidance of doubt, the Parties' Payment Date obligations and releases under Section 7 of this Settlement Agreement are not conditioned upon inclusion in the Settlement Approval Order of the Libra Assignment Determinations or the occurrence of the Libra Assignment Closing Date.

3.2    If (w) the Settlement Approval Order, as in effect on the Settlement Effective Date, approves the Libra CDSA Assignment, and expressly includes the Libra Assignment Determinations, (x) all terms and conditions necessary for the Libra CDSA Assignment to be valid have been satisfied or are deemed to be satisfied by the terms of the Settlement Approval Order (as in effect on the Settlement Effective Date) and the Libra Rating Condition with respect to SG's current long-term rating by Standard & Poor's has been obtained or is deemed to have been obtained by the terms of the Settlement Approval Order (as in effect on the Settlement Effective Date), (y) LBSF has delivered to Libra, the Libra Trustee and the Libra Collateral Manager the deferral notice required to be delivered pursuant to Section 7.4 hereof and (z) LBSF and SG have entered into the Libra CDSA Assignment (the conditions set forth in clauses (w), (x), (y) and (z), collectively, the "Libra Termination Claim Preconditions"), LBSF shall be permitted to prosecute or in any litigation take a position regarding the Libra Termination Claim against the Other Libra Parties. For the avoidance of doubt, LBSF shall also be permitted to allege facts to support the Libra Priority Claim in any such proceeding.

3.3    If (w) on the Payment Date the Libra Termination Claim Preconditions have not been satisfied, (x) the Libra Termination Claim Preconditions have been satisfied on or prior to the Payment Date but LBSF elects not to pursue the Libra Termination Claim, (y) LBSF pursues the Libra Termination Claim and prior to the entry by the Bankruptcy Court of the Libra Judgment LBSF elects to abandon the Libra Termination Claim, or (z) LBSF loses the Libra

Termination Claim, then, in each case, so long as Libra still has assets with a fair market value in excess of $5,000,000, LBSF shall pursue the Libra Priority Claim against the Other Libra Parties with respect to the Remaining Libra Assets.

4.  **Execution and Delivery of the Vela CDSA Assignment; Pursuit of the Vela Termination Claim and/or the Vela Priority Claim.**

4.1  If, on the Settlement Effective Date, the Settlement Approval Order includes the Vela Assignment Determinations, LBSF and SG shall execute and deliver the Vela CDSA Assignment as soon as reasonably practicable and no later than the Payment Date, it being understood and agreed that:

(a)  the assumption of the Vela CDSA by LBSF and the assignment by LBSF to SG, and the assumption by SG, of all of LBSF's rights, duties and obligations under the Vela CDSA will each take effect, automatically and without any additional court order or action, on the Vela Assignment Closing Date;

(b)  notwithstanding Debtors' entry into the Vela CDSA Assignment, at any time prior to the entry by the Bankruptcy Court of the Vela Judgment, LBSF may elect to pursue the Vela Priority Claim in lieu of the Vela Termination Claim; and

(c)  for the avoidance of doubt, the Parties' Payment Date obligations and releases under Section 7 of this Settlement Agreement are not conditioned upon inclusion in the Settlement Approval Order of the Vela Assignment Determinations or the occurrence of the Vela Assignment Closing Date.

4.2  If (w) the Settlement Approval Order, as in effect on the Settlement Effective Date, approves the Vela CDSA Assignment, and expressly includes the Vela Assignment Determinations, (x) all terms and conditions necessary for the Vela CDSA Assignment to be valid have been satisfied or are deemed to be satisfied by the terms of the Settlement Approval Order (as in effect on the Settlement Effective Date), (y) LBSF has delivered to Vela, the Vela Trustee and the Vela Collateral Manager the deferral notice required to be delivered pursuant to Section 7.5 hereof and (z) LBSF and SG have entered into the Vela CDSA Assignment (the conditions set forth in clauses (w), (x), (y) and (z), collectively, the "Vela Termination Claim Preconditions"), LBSF shall be permitted to prosecute or in any litigation take a position regarding the Vela Termination Claim against the Other Vela Parties. For the avoidance of doubt, LBSF shall also be permitted to allege facts to support the Vela Priority Claim in any such proceeding.

4.3  If (w) on the Payment Date the Vela Termination Claim Preconditions have not been satisfied, (x) the Vela Termination Claim Preconditions have been satisfied on or prior to the Payment Date but LBSF elects not to pursue the Vela Termination Claim, (y) LBSF pursues the Vela Termination Claim and prior to the entry by the Bankruptcy Court of the Vela Judgment LBSF elects to abandon the Vela Termination Claim, or (z) LBSF loses the Vela Termination Claim, then, in each case, so long as Vela still has assets with a fair market value in excess of $5,000,000, LBSF shall pursue the Vela Priority Claim against the Other Vela Parties with respect to the Remaining Vela Assets.

5.    Restrictions on the Assumption and Assignment of the CDSAs. The Debtors hereby agree, that, unless the Settlement Motion is Denied with Finality, LBSF shall not do any of the following:

5.1    assume the Libra CDSA other than as part of the Libra CDSA Assignment;

5.2    assume the Vela CDSA other than as part of the Vela CDSA Assignment;

5.3    assign the Libra CDSA or any of its rights and/or obligations thereunder to any party other than SG; and

5.4    assign the Vela CDSA or any of its rights and/or obligations thereunder to any party other than SG.

6.    The Settlement Motion; Establishment of Escrow Accounts.

6.1    The Debtors shall file the Settlement Motion with the Bankruptcy Court no later than September 20, 2010 and do all things necessary and proper to (i) seek approval of the Settlement Motion, (ii) seek entry of the Settlement Approval Order, and (iii) prosecute and defend any motions to stay and any appeals relating to the Settlement Approval Order.

6.2    Promptly following the filing of the Settlement Motion, the Debtors shall effect service of the Settlement Motion on the Libra Noteholders and the Vela Noteholders through each of the following methods:

(a)    sending the Settlement Motion to each Libra Noteholder care of the Libra Trustee, as the Libra Note Registrar, with instructions to the Libra Trustee to forward the Settlement Motion to the registered holder of each Libra Note;

(b)    sending the Settlement Motion directly to the original holders of the Libra Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates);

(c)    sending the Settlement Motion to each Vela Noteholder care of the Vela Trustee, as the Vela Note Registrar, with instructions to the Vela Trustee to forward the Settlement Motion to the registered holder of each Vela Note;

(d)    sending the Settlement Motion directly to the original holders of the Vela Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates);

(e)    publication in *The Wall Street Journal* and *Investor's Business Daily* for three successive Business Days; and

(f)    any other method required by the Bankruptcy Court.

6.3    As described in <u>Section 9</u>, SG shall cause the Global Escrow Account, the Libra Reimbursement Escrow Account and the Vela Reimbursement Escrow Account (collectively, the "<u>Escrow Accounts</u>") to be established upon mutually agreeable terms, which terms shall include the following:

(a)    each Escrow Account shall be maintained within the State of New York at Société Générale, New York Branch or at an affiliated broker-dealer organized under the laws of a jurisdiction within the United States and registered as a broker or dealer with the Securities Exchange Commission (as applicable and in such capacity, the "<u>SG Escrow Agent</u>");

(b)    each Escrow Account shall be governed by an agreement under New York law that expressly provides for purposes of Sections 8-110 and 9-304 of the UCC that the jurisdiction of the SG Escrow Agent is the State of New York;

(c)    each Escrow Account shall be held in the name of "Société Générale, New York Branch, as Customer and Entitlement Holder in trust for the benefit of Société Générale, New York Branch, Lehman Brothers Special Financing Inc. and Lehman Brothers Holdings Inc.";

(d)    the SG Escrow Agent shall at all times maintain the Escrow Accounts as separate segregated accounts and shall not commingle the Permitted Investments or other credits to the Escrow Accounts with the assets of SG or any other Person;

(e)    SG shall agree that it shall not create or agree to create or permit to exist any assignment by way of security, charge, right of set-off, any other security interest or any other agreement or arrangement having the commercial effect of conferring security over all or any part of the Escrow Accounts or sell, transfer, assign, factor or otherwise deal with or dispose of all or any part of the Escrow Accounts;

(f)    the SG Escrow Agent shall grant a valid, perfected and enforceable security interest over its right, title and interest in and to the Escrow Accounts to Société Générale, New York Branch, Lehman Brothers Special Financing Inc. and Lehman Brothers Holdings Inc. to secure the performance of its obligations under the Settlement Agreement and shall take all reasonable actions to recognize and perfect that security interest under the UCC;

(g)    remittances into the Escrow Accounts shall promptly be invested and, upon maturity, be re-invested solely in Permitted Investments; and

(h)    all interest and other income from such Permitted Investments shall be deposited in the applicable Escrow Account, and any gain realized from such Permitted Investments shall be credited to the applicable Escrow Account.

6.4    SG and LBSF shall remit into the Global Escrow Account certain recoveries from the Libra and Vela Transactions as described in <u>Section 9</u>. The Debtors shall pay into the Libra Reimbursement Escrow Account and the Vela Reimbursement Escrow Account the amounts set forth in <u>Sections 9.8(a)</u> and <u>9.9(a)</u>.

7. <u>Parties' Payment Date Obligations; Releases</u>.  On the Payment Date, the Parties shall do all of the following:

7.1    SG shall pay LBSF $370,000,000 (the "<u>SG Payment</u>");

7.2    In addition to the SG Payment, SG shall guarantee to LBSF a recovery of up to $75,000,000 from the Libra and Vela Transactions as set forth in <u>Section 10</u> hereof (the "<u>SG Guarantee</u>"), it being understood that receipt by LBSF of any ICA Recoveries shall not affect their rights with respect to the SG Guarantee;

7.3    The Parties, their respective affiliates and, where applicable, their respective estates, will fully and forever release one another, their respective affiliates and, where applicable, their respective estates from any and all claims that arise, in whole or in part, from or relate to the Libra and Vela Transactions, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, foreseeable or unforeseeable, in law, equity or otherwise, which as of such date shall be fully and forever discharged, waived, released and settled; *provided that* such release shall not reduce or otherwise limit the Parties' obligations to one another under this Settlement Agreement and, if applicable, the Assignments. Without limiting the generality of the foregoing, the Parties' claims in the Libra Adversary Proceedings as against each other will be dismissed with prejudice;

7.4    LBSF shall deliver written notice to Libra, the Libra Trustee and the Libra Collateral Manager, substantially in the form attached hereto as <u>Exhibit 4</u>, advising that notwithstanding anything to the contrary in the Libra CDSA, LBSF, in its capacity as "credit protection buyer" under the Libra CDSA and as the sole third party beneficiary under the Libra Senior Swap, irrevocably agrees that to the extent any portion of any Libra Credit Protection Payment and any Libra CDS Termination Payment payable to it under the Libra CDSA would cause the Libra Collateral Manager or the Libra Trustee to request a funding under the Libra Senior Swap, the due date for payment of such portion shall be deferred, and Libra shall be released from its obligations to make such payment, in each case, until such time (if any) that Libra is able to make such payment without causing the Libra Collateral Manager or the Libra Trustee to request a funding under the Libra Senior Swap, with the effect that in respect of any Libra Credit Protection Payment and any Libra CDS Termination Payment payable to LBSF under the Libra CDSA, any portion of any such payment that Libra is unable to make without causing the Libra Collateral Manager or the Libra Trustee to request a funding under the Libra Senior Swap shall not become due, and the obligation of Libra to pay such portion shall not arise, until such time (if any) that Libra is able to make such payment from amounts on deposit in the Libra Uninvested Proceeds Account, the Libra Principal Collection Account and the Libra Reserve Account without causing the Libra Collateral Manager or the Libra Trustee to request a funding under the Libra Senior Swap; and

7.5    LBSF shall deliver written notice to Vela, the Vela Trustee and the Vela Collateral Manager, substantially in the form attached hereto as <u>Exhibit 5</u>, advising that notwithstanding anything to the contrary in the Vela CDSA, LBSF, in its capacity as "credit protection buyer" under the Vela CDSA and as the sole third party beneficiary under the Vela Senior Swap, irrevocably agrees that to the extent any portion of any Vela Credit Protection Payment, any Vela CDS Termination Payment, any Vela Premium Reserve payment and any

Vela Net Issuer Premium payment payable to or for the benefit of LBSF under the Vela CDSA would cause the Vela Collateral Manager or the Vela Trustee to request a funding under the Vela Senior Swap, the due date for payment of such portion shall be deferred and Vela shall be released from its obligations to make such payment, in each case, until such time (if any) that Vela is able to make payment thereof without causing the Vela Collateral Manager or the Vela Trustee to request a funding under the Vela Senior Swap, with the effect that in respect of any Vela Credit Protection Payment, any Vela CDS Termination Payment, any Vela Premium Reserve payment and any Vela Net Issuer Premium payment payable to or for the benefit of LBSF under the Vela CDSA, any portion of any such payment that Vela is unable to make without causing the Vela Collateral Manager or the Vela Trustee to request a funding under the Vela Senior Swap shall not become due, and the obligation of Vela to pay such portion shall not arise, until such time (if any) that Vela is able to make such payment from amounts on deposit in the Vela Uninvested Proceeds Account, the Vela Principal Collection Account and the Vela Reserve Account without causing the Vela Collateral Manager or the Vela Trustee to request a funding under the Vela Senior Swap.

If the Settlement Approval Order (as in effect on the Settlement Effective Date) includes the Libra Assignment Determinations and/or the Vela Assignment Determinations, it is a condition to SG's obligations under Sections 7.1 and 7.2 above and the releases by SG under Section 7.3 above that LBSF and LBHI shall have executed and delivered to SG the Libra CDS Assignment and/or the Vela CDSA Assignment, as applicable.

8.   Indemnification.

8.1   The Debtors shall jointly and severally indemnify SG, its affiliates and SG's and its affiliates' respective officers and directors, employees, agents and attorneys (collectively, the "Indemnified SG Parties"), against any and all claims and actions against any such Indemnified SG Parties brought by or on behalf of an Other Libra Party or Other Vela Party, or an affiliate, successor, assign or agent thereof, and shall hold SG and the Indemnified SG Parties harmless against any loss, liability or expense incurred (including, without limitation, attorneys fees and interest) that, in each case, arise out of or in connection with SG's entering into, complying with, or enforcing the Settlement Agreement and the Assignments (any such claim or actions, "SG Parties Indemnified Claims"); provided that no loss, liability, or expense shall be deemed to arise out of or in connection with the Settlement Agreement or the Assignments solely because the claim it relates to was asserted in litigation brought by the Debtors to pursue the Libra Termination Claim, Libra Priority Claim, Vela Termination Claim or Vela Priority Claim; and provided further that the indemnification under this Section 8.1 (i) shall not in the aggregate exceed the Debtors Indemnification Cap, (ii) shall be payable, first, by application of funds on deposit in the Global Escrow Account in accordance with Section 9.10(d)(ii) herein, and second, to the extent such indemnification is not paid in full in accordance with clause first, by the Debtors, (iii) shall not apply to (x) any cost or expense incurred in connection with the review, negotiation or documentation of the Settlement Agreement, the Assignments and the documents entered into in connection therewith or with SG's internal, routine or periodic compliance activities, (y) any loss, liability or expense incurred solely as a result of the gross negligence or willful misconduct of SG or any Indemnified SG Party, or (z) any loss, liability or expense incurred by SG or any Indemnified SG Party resulting solely from SG's capacity as Senior Swap Counterparty or Controlling Class or out of actions taken or

not taken by SG in either such capacity, in each case in this clause (z) other than actions taken or not taken by SG in order to enter into, enforce and/or comply with the Settlement Agreement and, if applicable, the Assignments, and (iv) shall apply only so long as the net value of LBSF's estate and/or LBHI's estate (or, in each case, one or more successor liquidating trusts) is greater than $1,000,000,000 and $1,000,000,000, respectively, and only to SG Parties Indemnified Claims of which the Debtors are notified in writing on or prior to the sixth anniversary of the latter of the Final Libra Funds Settlement Distribution Date and the Final Vela Funds Settlement Distribution Date.

(a)     Any indemnification payable by the Debtors to SG or any Indemnified SG Party under the Settlement Agreement shall be treated as priority administrative expense claims under Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

(b)     The "Debtors Indemnification Cap" shall mean an amount equal to (i) the total amount actually paid to SG from the Global Escrow Account pursuant to clauses (iii) and (iv) of Section 9.10(d) hereof, minus (ii) the amount that SG would have been paid from the Global Escrow Account pursuant to clauses (iii) and (iv) of Section 9.10(d) hereof if the total amount paid to the Parties from the Global Escrow Account pursuant to clauses (iii) and (iv) of Section 9.10(d) hereof were equal to the excess of (A) the total amount actually paid to the Parties from the Global Escrow Account pursuant to clauses (iii) and (iv) of Section 9.10(d) hereof over (B) the Aggregate SG Parties Indemnified Claims, minus (iii) all SG Parties Indemnified Claims previously paid by the Debtors under the Settlement Agreement, plus (iv) all Debtors Parties Indemnified Claims previously paid by SG under the Settlement Agreement; provided that, if the amount calculated pursuant to the preceding clauses (i)-(iv) is less than zero, the "Debtors Indemnification Cap" shall be zero; and provided further that, if the amount calculated pursuant to the preceding clauses (i)-(iv) is greater than $71,644,336, the "Debtors Indemnification Cap" shall be $71,644,336.

(c)     "Aggregate SG Parties Indemnified Claims" shall mean, at any time of determination, the sum of all previously asserted SG Parties Indemnified Claims plus all presently asserted SG Parties Indemnified Claims, in each case (i) payable by the Debtors to SG under this Settlement Agreement and (ii) determined without regard to the Debtors Indemnification Cap.

(d)     The Debtors shall be entitled to participate in and, upon notice to the Indemnified SG Party, assume the defense of any action or proceeding in respect of any SG Parties Indemnified Claim in reasonable cooperation with, and with the reasonable cooperation of, the Indemnified SG Party; provided that the Debtors shall not settle any such action or proceeding without the prior written consent of SG, which consent shall not be unreasonably withheld, conditioned or delayed. The Indemnified SG Party shall have the right to employ separate counsel in any such action or proceeding and to participate in the defense thereof at the expense of the Indemnified SG Party; provided, however, that the fees and expenses of such separate counsel shall be at the expense of the Debtors if (i) the Debtors have agreed to pay such fees and expenses, (ii) the Debtors shall have failed to assume the defense of such action or proceeding and employ counsel satisfactory to the Indemnified SG Party in any such action or proceeding or (iii) the

named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified SG Party and either or both of the Debtors, and the Indemnified SG Party shall have been advised by counsel that: (A) there may be one or more legal defenses available to it that are different from or additional to those available to the Debtors and (B) the representation of the Debtors and the Indemnified SG Party by the same counsel would be inappropriate or contrary to prudent practice, in which case, if the Indemnified SG Party notifies the Debtors in writing that it elects to employ separate counsel at the expense of the Debtors, the Debtors shall not have the right to assume the defense of such action or proceeding on behalf of such Indemnified SG Party; *it being understood, however,* that the Debtors shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one firm of attorneys in any jurisdiction at any time for all Indemnified SG Parties, which firm shall be designated in writing by SG. The Debtors shall not be liable for any settlement of any such action or proceeding effected without their written consent, which consent shall not be unreasonably withheld, conditioned or delayed, but, if settled with their written consent, the Debtors agree to indemnify and hold the Indemnified SG Party harmless from and against any loss or liability by reason of such settlement. Any Lehman Litigation Expense shall be reimbursable to the Debtors from Disbursable Recoveries as provided herein.

8.2    SG shall indemnify the Debtors and their respective officers and directors, employees, agents and attorneys (collectively, the "Indemnified Debtors Parties"), against any and all claims and actions against any such Indemnified Debtors Parties brought by or on behalf of an Other Libra Party or Other Vela Party, or an affiliate, successor, assign or agent thereof, and shall hold the Debtors and the Indemnified Debtors Parties harmless against any loss, liability or expense incurred (including, without limitation, attorneys fees and interest), that, in each case, arise out of or in connection with the Debtors' entering into, complying with, or enforcing the Settlement Agreement and the Assignments (any such claim or actions, "Debtors Parties Indemnified Claims"); *provided that* no loss, liability, or expense shall be deemed to arise out of or in connection with the Settlement Agreement or the Assignments solely because the claim it relates to was asserted in litigation brought by the Debtors to pursue the Libra Termination Claim, Libra Priority Claim, Vela Termination Claim or Vela Priority Claim; and *provided further that* the indemnification under this Section 8.2 (i) shall not in the aggregate exceed the SG Indemnification Cap, (ii) shall be payable, *first*, by application of funds on deposit in the Global Escrow Account in accordance with Section 9.10(d)(ii) herein, and *second*, to the extent such indemnification is not paid in full in accordance with clause first, by SG, (iii) shall not apply to (x) any cost or expense incurred in connection with the review, negotiation or documentation of the Settlement Agreement, the Assignments and the documents entered into in connection therewith or with the Debtors' internal, routine or periodic compliance activities, (y) any loss, liability or expense incurred solely as a result of the gross negligence or willful misconduct of any of the Debtors or any Indemnified Debtors Party, or (z) any loss, liability or expense incurred by any of the Debtors or any Indemnified Debtors Party resulting solely from LBSF's capacity as "credit default swap counterparty" and "calculation agent" and LBHI's capacity as LBSF's "credit support provider" under the Libra CDSA or the Vela CDSA or out of actions taken or not taken by the Debtors in such capacities, in each case in this clause (z) other

than actions taken or not taken by the Debtors in order to enter into, enforce and/or comply with the Settlement Agreement and, if applicable, the Assignments, and (iv) shall apply only so long as the net value of LBSF's estate and/or LBHI's estate (or, in each case, one or more successor liquidating trusts) is greater than $1,000,000,000 and $1,000,000,000, respectively, and only to Debtors Parties Indemnified Claims of which SG is notified in writing on or prior to the sixth anniversary of the latter of the Final Libra Funds Settlement Distribution Date and the Final Vela Funds Settlement Distribution Date.

(a)     The "SG Indemnification Cap" shall mean an amount equal to (i) the total amount actually paid to the Debtors (1) from the Global Escrow Account pursuant to clauses (iii) and (iv) of Section 9.10(d) hereof and (2) if applicable, from the SG Guarantee pursuant to Section 10 hereof, *minus* (ii) the amount that the Debtors would have been paid (1) from the Global Escrow Account pursuant to clauses (iii) and (iv) of Section 9.10(d) hereof and (2) if applicable, from the SG Guarantee pursuant to Section 10 hereof if the total amount paid to the Parties from the Global Escrow Account pursuant to clauses (iii) and (iv) of Section 9.10(d) hereof were equal to the excess of (A) the total amount actually paid to the Parties from the Global Escrow Account pursuant to clauses (iii) and (iv) of Section 9.10(d) hereof *over* (B) the Aggregate Debtors Parties Indemnified Claims, *minus* (iii) all Debtors Parties Indemnified Claims previously paid by SG under the Settlement Agreement, *plus* (iv) all SG Parties Indemnified Claims previously paid by the Debtors under the Settlement Agreement; *provided that*, if the amount calculated pursuant to the preceding clauses (i)-(iv) is less than zero, the "SG Indemnification Cap" shall be zero; and *provided further that*, if the amount calculated pursuant to the preceding clauses (i)-(iv) is greater than $121,644,336, the "SG Indemnification Cap" shall be $121,644,336.

(b)     "Aggregate Debtors Parties Indemnified Claims" shall mean, at any time of determination, the sum of all previously asserted Debtors Parties Indemnified Claims *plus* all presently asserted Debtors Parties Indemnified Claims, in each case (i) payable by SG to the Debtors under this Settlement Agreement and (ii) determined without regard to the SG Indemnification Cap.

(c)     SG shall be entitled to participate in and, upon notice to the Indemnified Debtors Party, assume the defense of any action or proceeding in respect of any Debtors Parties Indemnified Claim in reasonable cooperation with, and with the reasonable cooperation of, the Indemnified Debtors Party; provided that SG shall not settle any such action or proceeding without the prior written consent of Debtors, which consent shall not be unreasonably withheld, conditioned or delayed. The Indemnified Debtors Party shall have the right to employ separate counsel in any such action or proceeding and to participate in the defense thereof at the expense of the Indemnified Debtors Party; provided, however, that the fees and expenses of such separate counsel shall be at the expense of SG if (i) SG has agreed to pay such fees and expenses, (ii) SG shall have failed to assume the defense of such action or proceeding and employ counsel satisfactory to the Indemnified Debtors Party in any such action or proceeding or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified Debtors Party and SG, and the Indemnified Debtors Party shall have been advised by counsel that: (A) there may be one or more legal defenses available to it

that are different from or additional to those available to SG and (B) the representation of SG and the Indemnified Debtors Party by the same counsel would be inappropriate or contrary to prudent practice, in which case, if the Indemnified Debtors Party notifies SG in writing that it elects to employ separate counsel at the expense of SG, SG shall not have the right to assume the defense of such action or proceeding on behalf of such Indemnified Debtors Party; *it being understood, however*, that SG shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one firm of attorneys in any jurisdiction at any time for all Indemnified Debtors Parties, which firm shall be designated in writing by the Debtors. SG shall not be liable for any settlement of any such action or proceeding effected without their written consent, which consent shall not be unreasonably withheld, conditioned or delayed, but, if settled with their written consent, SG agrees to indemnify and hold the Indemnified Debtors Party harmless from and against any loss or liability by reason of such settlement. Any SG Litigation Expense shall be reimbursable to SG from Disbursable Recoveries as provided herein.

9.      Recoveries from the Libra and Vela Transactions.

9.1     All recoveries from the Libra and Vela Transactions (exclusive of, (x) in the case of the Libra Transaction, ICA Recoveries and (y) in respect of the Libra Transaction and the Vela Transaction, SSA Recoveries), whether by LBSF or by SG, shall be deposited into a segregated escrow account that SG shall cause to be established promptly following the Settlement Effective Date in accordance with Section 6.3 hereof, entitled the "Libra and Vela Global Escrow Account" (the "Global Escrow Account") and will be released therefrom as set forth in Section 9.10 hereof.

(a)     Following the Settlement Effective Date, the SG Escrow Agent shall notify the Parties in writing of the account number of the Global Escrow Account and shall thereafter give the Parties written notice of any change of the location or account number of the Global Escrow Account on or prior to the date of such change.

(b)     Prior to the release of funds from the Global Escrow Account as set forth in Section 9.10 hereof, the SG Escrow Agent shall furnish, on a monthly basis, to the Parties a statement setting forth in reasonable detail the total Libra Funds and Vela Funds standing to the credit of the Global Escrow Account and, separately with respect to such Libra Funds and Vela Funds, the portion thereof that is not subject to reimbursement under the applicable CDSA.

9.2     Any SSA Recoveries will be for the sole benefit of SG, and the Debtors shall have no right or claim whatsoever with respect to such funds. Without limiting the generality of the foregoing:

(a)     any SSA Recoveries from the Libra and Vela Transactions by SG, will remain with SG; and

(b)     any SSA Recoveries from the Libra and Vela Transactions by LBSF will be immediately paid through by LBSF to SG and, while held by LBSF, will be deemed to be held in trust for SG.

9.3     Any ICA Recoveries will be for the sole benefit of LBSF, and SG shall have no right or claim whatsoever with respect to such funds.  Without limiting the generality of the foregoing:

(a)     any ICA Recoveries from Libra or the Libra Trustee by LBSF, will remain with LBSF; and

(b)     any ICA Recoveries that are recovered from Libra or the Libra Trustee by SG will be immediately paid through by SG to LBSF and, while held by SG, will be deemed to be held in trust for LBSF.

9.4     To the extent SG and/or the Debtors have paid any Advances, such Advances shall be repaid to SG and/or the Debtors, as applicable, from Disbursable Recoveries to the extent permitted by and as set forth in Section 9.10.

9.5     If LBSF is paid any amount by Libra or the Libra Trustee in respect of the Libra CDSA (whether upon prevailing on the Libra Priority Claim or otherwise), LBSF shall promptly remit such payment to the Global Escrow Account except to the extent such amount constitutes SSA Recoveries (in which case it will be handled in accordance with Section 9.2 above) or ICA Recoveries (in which case it will be handled in accordance with Section 9.3 above).

9.6     If LBSF is paid any amount by Vela or the Vela Trustee in respect of the Vela CDSA (whether upon prevailing on the Vela Priority Claim or otherwise), LBSF shall promptly remit such payment to the Global Escrow Account except to the extent such amount constitutes SSA Recoveries (in which case it will be handled in accordance with Section 9.2 above).

9.7     (a)     If the Libra Judgment has been entered by the Bankruptcy Court, then, if during the Libra Interim Period (x) the Debtors are required to pay under the Libra CDSA any Libra Credit Protection Premiums and/or reimbursements in respect of any Libra Credit Protection Payments and (y) the Debtors are unable to exercise a Permitted Netting under the Libra CDSA with respect to the foregoing payments, the Debtors shall pay the related Premium Advances and/or Legacy Reimbursements to Libra in a timely manner; *provided that* during the Libra Interim Period the Debtors shall not fail to make, when due, any payment under the Libra CDSA required to be made by them, after giving effect to any notice or grace period under the Libra CDSA, that, if not made, would entitle Libra to designate an early termination date in respect of all outstanding transactions under the Libra CDSA.

(b)     If the Vela Judgment has been entered by the Bankruptcy Court, then, if during the Vela Interim Period (x) the Debtors are required to pay under the Vela CDSA any Vela Credit Protection Premiums and/or reimbursements in respect of any Vela Credit Protection Payments and (y) the Debtors are unable to exercise a Permitted Netting under the Vela CDSA with respect to the foregoing payments, the Debtors shall

pay the related Premium Advances and/or Legacy Reimbursements to Vela in a timely manner; *provided that* during the Vela Interim Period the Debtors shall not fail to make, when due, any payment under the Vela CDSA required to be made by them, after giving effect to any notice or grace period under the Vela CDSA, that, if not made, would entitle Vela to designate an early termination date in respect of all outstanding transactions under the Vela CDSA.

9.8     If the Libra Assignment Closing Date shall have occurred, then:

(a)     No later than 5 Business Days following the Libra Assignment Closing Date, the Debtors will pay into a segregated escrow account that SG shall cause to be established promptly following the Libra Assignment Closing Date in accordance with Section 6.3 hereof (the "Libra Reimbursement Escrow Account"), an amount equal to 25% of an amount equal to the portion of all Libra Credit Protection Payments listed on Schedule A-1 hereto that remain subject to reimbursement under the Libra CDSA on such date; *it being understood* that unless the Libra Judgment (as in effect on the Libra Assignment Closing Date) includes an express determination that the reimbursement period in respect of each of the foregoing Libra Credit Protection Payments continued to run during the period from the designation of early termination date under the Libra CDSA through the date of the Libra Judgment, such period shall be disregarded for purposes of determining the portion of all Libra Credit Protection Payments listed on Schedule A-1 hereto that remain subject to reimbursement under the Libra CDSA. Amounts standing to the credit of the Libra Reimbursement Escrow Account shall be used as follows:

(i)     all reimbursement payments required to be made by the "credit protection buyer" under the Libra CDSA in respect of Libra Credit Protection Payments listed on Schedule A-1 will be paid by the SG Escrow Agent from funds on deposit in the Libra Reimbursement Escrow Account and shall be deemed Legacy Reimbursement payments made by the Debtors; and

(ii)     at any time a Libra Credit Protection Payment for which there are funds on deposit in the Libra Reimbursement Escrow Account is no longer subject to reimbursement under the Libra CDSA, the SG Escrow Agent shall return the funds related to such Libra Credit Protection Payment (representing, for the avoidance of doubt, 25% of such Libra Credit Protection Payment) to the Debtors.

(b)     Following the Libra Assignment Closing Date, SG will pay Libra Credit Protection Premiums to Libra from its own funds subject to Section 10.2 hereof and receive Libra Credit Protection Payments and Libra Physical Settlement Amounts from Libra in respect of Libra Floating Amount Events and Libra Credit Events, respectively. In addition, the SG Escrow Agent will pay Legacy Reimbursements to Libra from the Libra Reimbursement Escrow Account; *provided that* after all funds standing to the credit of the Libra Reimbursement Escrow Account have been exhausted, SG shall pay Legacy Reimbursements to Libra from its own funds subject to Section 10.2 hereof. Without limiting the foregoing, to the extent that pursuant to the Settlement Approval Order (as in

effect on the Settlement Effective Date) SG can control the triggering of Libra Credit Protection Payments in respect of outstanding Libra Floating Amount Events, SG will exercise reasonable efforts to cause Libra Credit Protection Payments to be payable to it on such dates as will allow it to exercise a Permitted Netting in respect of any outstanding Libra Credit Protection Premiums or Legacy Reimbursement payments; *provided that* if at any time SG is unable to accomplish a Permitted Netting, (x) SG shall pay the requisite Premium Advance(s) in respect of such Libra Credit Protection Premium(s) from its own funds subject to Section 10.2 hereof or (y) the SG Escrow Agent shall pay the requisite Legacy Reimbursement payment(s) from the Libra Reimbursement Escrow Account or, if there are no funds standing to the credit of such account, SG shall pay such Legacy Reimbursement payments from its own funds subject to Section 10.2 hereof.

(c)     To the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG can control the triggering of Libra Credit Protection Payments in respect of outstanding Libra Floating Amount Events, SG will exercise reasonable efforts to periodically trigger Libra Credit Protection Payments under the Libra CDSA in accordance with the Libra Triggering Sequence that would yield (after giving effect to the netting described in clause (b) above) an aggregate payout of Libra Credit Protection Payments by Libra in an amount at least equal to the funds then available to Libra for making such payments without implicating a funding under the Libra Senior Swap and, except to the extent such funds constitute SSA Recoveries or ICA Recoveries, promptly following receipt of such funds will deposit them in the Global Escrow Account.    In furtherance of the foregoing, to the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG is free to control the triggering of Libra Credit Protection Payments in respect of outstanding Libra Floating Amount Events (both in its capacity as credit protection buyer and in its capacity as calculation agent), SG shall exercise reasonable efforts to periodically trigger Libra Credit Protection Payments in accordance with the Libra Triggering Sequence and demand Libra Floating Amounts in an amount sufficient to recover funds building up in the Libra Reserve Account from Libra Credit Protection Premiums, Legacy Reimbursements and from the proceeds of the assets of Libra and, except to the extent such funds constitute SSA Recoveries or ICA Recoveries, remit such funds to the Global Escrow Account.

(d)     To the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG can control the triggering of Libra Credit Protection Payments in respect of outstanding Libra Floating Amount Events, the triggering of any Libra Credit Protection Payments under the Libra CDSA in addition to those set forth in clauses (b) and (c) above would be in SG's sole discretion (and to the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG would be permitted to specify a Libra Floating Amount equal to less than the Libra Floating Amount payable in respect of any such Libra Floating Amount Event, SG shall have sole discretion to do so) and, except to the extent such funds constitute SSA Recoveries or ICA Recoveries, all amounts received in respect of such Libra Credit Protection Payments will be remitted to the Global Escrow Account.

(e)  To the extent SG cannot control and/or delay the triggering of Libra Credit Protection Payments in respect of outstanding Libra Floating Amount Events as they occur, all payments from Libra in respect of Libra Floating Amount Events (or Libra Credit Events) that constitute SSA Recoveries will remain with SG and the Debtors will not have any right or claim with respect to such funds, and all other such payments (unless constituting ICA Recoveries) will be deposited into the Global Escrow Account.

(f)  SG acknowledges that LBSF advised it that following the Settlement Effective Date it intends to effect a release by the Libra Trustee of all of LBSF's funds currently held in the Libra Issuer Collateral Account.  SG shall exercise reasonable efforts to assist LBSF to release such funds, including such efforts as may involve dealing with the Libra Trustee or any rating agency whose consent may be required in connection with such release, and SG agrees that, to the extent any such funds are paid by the Libra Trustee to SG, SG shall promptly transfer all amounts so received to LBSF; *provided that* prior to the Libra Assignment Closing Date SG shall not be required to post any collateral in connection with the foregoing, and *provided further that* reasonable efforts of SG as used herein expressly exclude any offer of indemnity by SG to the Libra Trustee in connection with the release of the foregoing funds.

9.9  If the Vela Assignment Closing Date shall have occurred, then:

(a)  No later than 5 Business Days following the Vela Assignment Closing Date, the Debtors will pay into a segregated escrow account that SG shall cause to be established promptly following the Vela Assignment Closing Date in accordance with Section 6.3 hereof (the "Vela Reimbursement Escrow Account"), an amount equal to 25% of an amount equal to the portion of all Vela Credit Protection Payments listed on Schedule A-2 hereto that remain subject to reimbursement under the Vela CDSA on such date; *it being understood* that unless the Vela Judgment (as in effect on the Vela Assignment Closing Date) includes an express determination that the reimbursement period in respect of each of the foregoing Vela Credit Protection Payments continued to run during the period from the designation of early termination date under the Vela CDSA through the date of the Vela Judgment, such period shall be disregarded for purposes of determining the portion of all Vela Credit Protection Payments listed on Schedule A-2 hereto that remain subject to reimbursement under the Vela CDSA. Amounts standing to the credit of the Vela Reimbursement Escrow Account shall be used as follows:

(i)  all reimbursement payments required to be made by the "credit protection buyer" under the Vela CDSA in respect of Vela Credit Protection Payments listed on Schedule A-2 hereto will be paid by the SG Escrow Agent from funds on deposit in the Vela Reimbursement Escrow Account and shall be deemed Legacy Reimbursement payments made by the Debtors; and

(ii)  at any time a Vela Credit Protection Payment for which there are funds on deposit in the Vela Reimbursement Escrow Account is no longer subject to reimbursement under the Vela CDSA, the SG Escrow Agent shall return the

funds related to such Vela Credit Protection Payment (representing, for the avoidance of doubt, 25% of such Vela Credit Protection Payment) to the Debtors.

(b)     Following the Vela Assignment Closing Date, SG will pay Vela Credit Protection Premiums to Vela from its own funds subject to <u>Section 10.2</u> hereof and receive Vela Credit Protection Payments and Vela Physical Settlement Amounts from Vela in respect of Vela Floating Amount Events and Vela Credit Events, respectively. In addition, the SG Escrow Agent will pay Legacy Reimbursements to Vela from the Vela Reimbursement Escrow Account; *provided* that after all funds standing to the credit of the Vela Reimbursement Escrow Account have been exhausted, SG shall pay Legacy Reimbursements to Vela from its own funds subject to <u>Section 10.2</u> hereof. Without limiting the foregoing, to the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG can control the triggering of Vela Credit Protection Payments in respect of outstanding Vela Floating Amount Events, SG will exercise reasonable efforts to cause Vela Credit Protection Payments to be payable to it on such dates as will allow it to exercise a Permitted Netting in respect of any outstanding Vela Credit Protection Premiums or Legacy Reimbursement payments; *provided that* if at any time SG is unable to accomplish a Permitted Netting, (x) SG shall pay the requisite Premium Advance(s) in respect of such Vela Credit Protection Premium(s) from its own funds subject to <u>Section 10.2</u> hereof or (y) the SG Escrow Agent shall pay the requisite Legacy Reimbursement payment(s) from the Vela Reimbursement Escrow Account or, if there are no funds standing to the credit of such account, SG shall pay such Legacy Reimbursement payments from its own funds subject to <u>Section 10.2</u> hereof.

(c)     To the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG can control the triggering of Vela Credit Protection Payments in respect of outstanding Vela Floating Amount Events, SG will exercise reasonable efforts to periodically trigger Vela Credit Protection Payments under the Vela CDSA in accordance with the Vela Triggering Sequence that would yield (after giving effect to the netting described in <u>clause (b)</u> above) an aggregate payout of Vela Credit Protection Payments by Vela in an amount at least equal to the funds then available to Vela for making such payments without implicating a funding under the Vela Senior Swap and, except to the extent such funds constitute SSA Recoveries, promptly following receipt of such funds will deposit them in the Global Escrow Account. In furtherance of the foregoing, to the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG is free to delay the triggering of Vela Credit Protection Payments in respect of outstanding Vela Floating Amount Events (both in its capacity as credit protection buyer and in its capacity as calculation agent), SG shall exercise reasonable efforts to periodically trigger Vela Credit Protection Payments in accordance with the Vela Triggering Sequence and demand Vela Floating Amounts in an amount sufficient to recover funds building up in the Vela Reserve Account from Vela Credit Protection Premiums, Legacy Reimbursements and from the proceeds of the assets of Vela and, except to the extent such funds constitute SSA Recoveries, remit such funds to the Global Escrow Account.

(d)     To the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG can control the triggering of Vela Credit Protection

Payments in respect of outstanding Vela Floating Amount Events, the triggering of any Vela Credit Protection Payments under the Vela CDSA in addition to those set forth in clauses (b) and (c) above would be in SG's sole discretion (and to the extent that pursuant to the Settlement Approval Order (as in effect on the Settlement Effective Date) SG would be permitted to specify a Vela Floating Amount equal to less than the Vela Floating Amount payable in respect of any such Vela Floating Amount Event, SG shall have sole discretion to do so) and, except to the extent such funds constitutes SSA Recoveries, all amounts received in respect of such further Vela Credit Protection Payments will be remitted to the Global Escrow Account.

(e)     To the extent SG cannot control and/or delay the triggering of Vela Credit Protection Payments in respect of outstanding Vela Floating Amount Events as they occur, all payments from Vela in respect of Vela Floating Amount Events (or Vela Credit Events) that constitute SSA Recoveries will remain with SG and the Debtors will not have any right or claim with respect to such funds, and all other such payments will be deposited into the Global Escrow Account.

9.10    Payments from the Global Escrow Account.

(a)     If at any time following the Settlement Effective Date LBSF or SG is required to (x) make a reimbursement payment under the Libra CDSA or the Vela CDSA in respect of a Libra Credit Protection Payment or a Vela Credit Protection Payment that had been paid to SG or LBSF by Libra or Vela, as applicable, after the Settlement Effective Date, or (y) without duplication with amounts covered under clause (x), pay back to Libra or Vela, pursuant to a judicial determination or otherwise, any payment paid to SG or the Debtors by Libra or Vela under the Libra CDSA or the Vela CDSA, after the Settlement Effective Date, the SG Escrow Agent shall, in each such case, make such payment from Libra Funds or Vela Funds (as applicable) on deposit in the Global Escrow Account on the applicable payment date.

(b)     Recoveries from the Libra Transaction standing to the credit of the Global Escrow Account (all such recoveries, collectively, the "Libra Funds"), if any, shall be distributed to the Parties as follows:

(i)     On any Libra Funds Advance Reimbursement Date, the SG Escrow Agent shall release from the Global Escrow Account an amount equal to the lesser of (A) the excess of (x) the Libra Funds standing to the credit of the Global Escrow Account on such Libra Funds Advance Reimbursement Date *over* (y) the aggregate amount of Libra Funds standing to the credit of the Global Escrow Account on such Libra Funds Advance Reimbursement Date that, as of such date, remain subject to reimbursement under the Libra CDSA, and (B) the aggregate amount of unreimbursed Advances paid with respect to the Libra CDSA; and apply such amount in the order of priority set forth in clause (d) below.

(ii)     On the First Libra Funds Settlement Distribution Date, the SG Escrow Agent shall release from the Global Escrow Account an amount equal to

the excess of (x) the Libra Funds standing to the credit of the Global Escrow Account on the First Libra Funds Settlement Distribution Date *over* (y) the aggregate amount of Libra Funds standing to the credit of the Global Escrow Account on the First Libra Funds Settlement Distribution Date that, as of such date, remain subject to reimbursement under the Libra CDSA, and apply such amount in the order of priority set forth in clause (d) below.

(iii)    On each Libra Funds Settlement Distribution Date and on the Final Libra Funds Settlement Distribution Date, the SG Escrow Agent shall apply all Libra Funds standing to the credit of the Global Escrow Account that are not subject to reimbursement under the Libra CDSA on such date in accordance with the order of priority set forth in clause (d) below.

(c)    Recoveries from the Vela Transaction standing to the credit of the Global Escrow Account (all such recoveries, collectively, the "Vela Funds"), if any, shall be distributed to the Parties as follows:

(i)    On any Vela Funds Advance Reimbursement Date, the SG Escrow Agent shall release from the Global Escrow Account an amount equal to the lesser of (A) the excess of (x) the Vela Funds standing to the credit of the Global Escrow Account on such Vela Funds Advance Reimbursement Date *over* (y) the aggregate amount of Vela Funds standing to the credit of the Global Escrow Account on such Vela Funds Advance Reimbursement Date that, as of such date, remain subject to reimbursement under the Vela CDSA, and (B) the aggregate amount of unreimbursed Advances paid with respect to the Vela CDSA; and apply such amount in the order of priority set forth in clause (d) below.

(ii)    On the First Vela Funds Settlement Distribution Date, the SG Escrow Agent shall release from the Global Escrow Account an amount equal to the excess of (x) the Vela Funds standing to the credit of the Global Escrow Account on the First Vela Funds Settlement Distribution Date *over* (y) the aggregate amount of Vela Funds standing to the credit of the Global Escrow Account on the First Vela Funds Settlement Distribution Date that, as of such date, remain subject to reimbursement under the Vela CDSA, and apply such amount in the order of priority set forth in clause (d) below.

(iii)    On each Vela Funds Settlement Distribution Date and on the Final Vela Funds Settlement Distribution Date, the SG Escrow Agent shall apply all Vela Funds standing to the credit of the Global Escrow Account that are not subject to reimbursement under the Vela CDSA on such date in accordance with the order of priority set forth in clause (d) below.

(d)    On each Libra Funds Advance Reimbursement Date, the First Libra Funds Settlement Distribution Date, the Final Libra Funds Settlement Distribution Date and any other Libra Funds Settlement Distribution Date and on each Vela Funds Advance Reimbursement Date, the First Vela Funds Settlement Distribution Date, the Final Vela Funds Settlement Distribution Date and any other Vela Funds Settlement Distribution

Date, the SG Escrow Agent will apply, as applicable, all Libra Funds available for distribution under <u>clause (b)</u> above or all Vela Funds available for distribution under <u>clause (c)</u> above, in each case in accordance with the following order of priority:

(i) *first*, (x) in respect of Libra Funds, in the following order: (1) to the payment to SG of all Legacy Reimbursement payments paid by SG in respect of the Libra Transaction not yet reimbursed to SG until such Legacy Reimbursements are reimbursed in full to SG, (2) then to the payment to the Debtors of all Legacy Reimbursement payments paid (or deemed pursuant to <u>Section 9.8(a)(i)</u> to have been paid) by the Debtors in respect of the Libra Transaction not yet reimbursed to the Debtors until such Legacy Reimbursements are reimbursed in full to the Debtors, (3) then to the payment to SG and the Debtors, *pro rata*, of any Premium Advances in respect of the Libra Transaction not yet reimbursed to SG and/or the Debtors, as applicable, until such Premium Advances are reimbursed in full, and (4) then to the payment to SG and the Debtors, *pro rata*, of any SG Litigation Expense pertaining to the Libra Transaction or Lehman Litigation Expense pertaining to the Libra Transaction, as applicable, not yet reimbursed to SG and/or the Debtors, as applicable, until such expenses are reimbursed in full; and (y) in respect of Vela Funds, in the following order: (1) to the payment to SG of all Legacy Reimbursement payments paid by SG in respect of the Vela Transaction not yet reimbursed to SG until such Legacy Reimbursements are reimbursed in full to SG, (2) then to the payment to the Debtors of all Legacy Reimbursement payments paid (or deemed pursuant to <u>Section 9.9(a)(i)</u> to have been paid) by the Debtors in respect of the Vela Transaction not yet reimbursed to the Debtors until such Legacy Reimbursements are reimbursed in full to the Debtors, (3) then to the payment to SG and the Debtors, *pro rata*, of any Premium Advances in respect of the Vela Transaction not yet reimbursed to SG and/or the Debtors, as applicable, until such Premium Advances are reimbursed in full, and (4) then to the payment to SG and the Debtors, *pro rata*, of any SG Litigation Expense pertaining to the Vela Transaction or Lehman Litigation Expense pertaining to the Vela Transactions, as applicable, not yet reimbursed to SG and/or the Debtors, as applicable, until such expenses are reimbursed in full;

(ii) *second*, to the payment, *pro rata*, (a) to SG of all unreimbursed SG Parties Indemnified Claims incurred by SG that are payable by the Debtors under the Settlement Agreement and (b) to the Debtors of all unreimbursed Debtors Parties Indemnified Claims incurred by the Debtors that are payable by SG and not yet reimbursed to the Debtors;

(iii) *third*, to the payment to LBSF until the aggregate amount received by LBSF under this subsection (iii) on all previous Libra Funds Settlement Distribution Dates and Vela Funds Settlement Distribution Dates, and, if applicable, the current Libra Funds Settlement Distribution Date and/or Vela Funds Settlement Distribution Date is equal to $100,000,000; and

(iv)    *fourth*, to the payment to LBSF on the one hand and SG on the other of all remaining amounts, split evenly on a 50:50 basis;

*provided that*, references above to "*pro rata*" means payments in proportion to the respective amount to which each of SG on the one hand and the Debtors (or, where applicable, LBSF) on the other is entitled.

10.    Recourse to the SG Guarantee.

10.1    If (x) on both the First Libra Funds Settlement Distribution Date and the First Vela Funds Settlement Distribution Date there are no funds standing to the credit of the Global Escrow Account or (y) following the later to occur of the Final Libra Funds Settlement Distribution Date and the Final Vela Funds Settlement Distribution Date the aggregate amount of distributions made to LBSF in accordance with Section 9.10(d)(iii) above is less than $75,000,000, then LBSF shall be entitled to recourse from the SG Guarantee on, in the case of clause (x) above, the later to occur of the First Libra Funds Settlement Distribution Date and the First Vela Funds Settlement Distribution Date, and in the case of clause (y) above, the later to occur of the Final Libra Funds Settlement Distribution Date and the Final Vela Funds Settlement Distribution Date (in each case, the "SG Guarantee Payment Date"), in an amount equal to the SG Top-up Amount set forth in Section 10.2 below.

10.2    The SG Top-up Amount shall mean, as of the SG Guarantee Payment Date, an amount equal to the greater of (x) zero and (y) the excess of (i) $75,000,000 *over* (ii) an amount equal to (A) the aggregate amount of distributions made to LBSF in accordance with Section 9.10(d)(iii) above *plus* (B) all Advances paid by SG under the Libra CDSA and under the Vela CDSA (other than Legacy Reimbursements paid from funds on deposit in the Libra Reimbursement Escrow Account and/or the Vela Reimbursement Escrow Account) that have not been reimbursed to SG as of such date.

11.    Post Petition Claim.

11.1    SG shall have a post-petition administrative expense claim under Sections 503(b) and 507(a)(2) of the Bankruptcy Code against the Debtors to the extent of any Advances paid or to be paid by SG under the Libra CDSA (other than Legacy Reimbursements paid from funds on deposit in the Libra Reimbursement Escrow Account) that have not been either reimbursed to SG from Disbursable Recoveries or resulted in a reduction of the SG Top-up Amount.

11.2    SG shall have a post-petition administrative expense claim under Sections 503(b) and 507(a)(2) of the Bankruptcy Code against the Debtors to the extent of any Advances paid or to be paid by SG under the Vela CDSA (other than Legacy Reimbursements paid from funds on deposit in the Vela Reimbursement Escrow Account) that have not been either reimbursed to SG from Disbursable Recoveries or resulted in a reduction of the SG Top-up Amount.

11.3    Upon confirmation of a Plan for the Debtors, the Debtors shall establish a cash reserve to secure payment of the contingent claims set forth in Sections 11.1 and 11.2 above in an amount equal to 25% of Advances outstanding at such time.

12. Representations and Warranties.

12.1 Each of LBSF and LBHI represents and warrants to SG (which representations and warranties shall be deemed to be repeated by LBSF and LBHI on the date they execute and deliver the Libra CDSA Assignment and on the date they execute and deliver the Vela CDSA Assignment, and shall be subject in all cases to entry and effectiveness of all terms of the Settlement Approval Order) that:

(a) it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

(b) subject to Bankruptcy Court Approval, it has the power to execute this Settlement Agreement and any other documentation relating to this Settlement Agreement to which it is a party, to deliver this Settlement Agreement and any other documentation relating to this Settlement Agreement that it is required by this Settlement Agreement to deliver and to perform its obligations under this Settlement Agreement and has taken all necessary action to authorize such execution, delivery and performance;

(c) such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(d) all governmental and other consents that are required to have been obtained by it with respect to this Settlement Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(e) subject to Bankruptcy Court Approval, its obligations under this Settlement Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)); and

(f) there is not pending or, to its knowledge, threatened against it or any of its affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Settlement Agreement or its ability to perform its obligations under this Settlement Agreement (other than any appeal of the Settlement Approval Order).

12.2 SG represents and warrants to LBSF and LBHI (which representations and warranties shall be deemed to be repeated by SG on the date it executes and delivers the Libra CDSA Assignment and on the date it executes and delivers the Vela CDSA Assignment, and shall be subject in all cases to entry and effectiveness of all terms of the Settlement Approval Order) that:

(a)　it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

(b)　it has the power to execute this Settlement Agreement and any other documentation relating to this Settlement Agreement to which it is a party, to deliver this Settlement Agreement and any other documentation relating to this Settlement Agreement that it is required by this Settlement Agreement to deliver and to perform its obligations under this Settlement Agreement and has taken all necessary action to authorize such execution, delivery and performance;

(c)　such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(d)　all governmental and other consents that are required to have been obtained by it with respect to this Settlement Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(e)　its obligations under this Settlement Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)); and

(f)　there is not pending or, to its knowledge, threatened against it or any of its affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Settlement Agreement or its ability to perform its obligations under this Settlement Agreement (other than any appeal of the Settlement Approval Order).

12.3　If the Libra Assignment Closing Date shall have occurred, SG shall not (i) fail to make, when due, any payment under the Libra CDSA required to be made by it, after giving effect to any notice or grace period under the Libra CDSA, that, if not made, would entitle Libra to designate an early termination date in respect of all outstanding transactions under the Libra CDSA and (ii) fail to timely take actions required to be taken by it under the Libra CDSA in connection with a change to its credit ratings that, if not taken, would result in the occurrence of an "additional termination event" that would allow Libra to designate an early termination date in respect of all outstanding transactions under the Libra CDSA.

12.4　If the Vela Assignment Closing Date shall have occurred, SG shall not (i) fail to make, when due, any payment under the Vela CDSA required to be made by it, after giving effect to any notice or grace period under the Vela CDSA, that, if not made, would entitle Vela to designate an early termination date in respect of all outstanding transactions under the Vela CDSA and (ii) fail to timely take actions required to be taken by it under the Vela CDSA in

connection with a change to its credit ratings that, if not taken, would result in the occurrence of an "additional termination event" that would allow Vela to designate an early termination date in respect of all outstanding transactions under the Vela CDSA.

13. <u>Incorporation into the Assignments</u>.

13.1 By executing the Libra CDSA Assignment, LBSF and SG agree that the terms of this Settlement Agreement applicable to the Libra CDSA shall be deemed to have been incorporated by reference into the Libra CDSA Assignment and form an integral part thereof.

13.2 By executing the Vela CDSA Assignment, LBSF and SG agree that the terms of this Settlement Agreement applicable to the Vela CDSA shall be deemed to have been incorporated by reference into the Vela CDSA Assignment and form an integral part thereof.

14. <u>Notices</u>.

14.1 All notices, requests and demands to or upon the respective Parties to be effective shall be in writing (including by email, unless a non-delivery response has been received by the sender) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made (a) in the case of delivery by hand, when delivered, (b) in the case of delivery by mail, three (3) Business Days after being deposited in the mails, properly addressed and postage prepaid or (c) in the case of delivery by email, when sent, addressed as follows or to such other address as may be hereafter notified by the respective parties hereto:

(a) <u>LBSF</u>:

Lehman Brothers Special Financing Inc.
1271 Sixth Avenue, 40th Floor
New York, New York 10020
Att: General Counsel

(b) <u>LBHI</u>:

Lehman Brothers Holdings Inc.
1271 Sixth Avenue, 40th Floor
New York, New York 10020
Att: General Counsel

(c) <u>SG</u>:

Société Générale, New York Branch
1221 Avenue of the Americas
New York, NY 10020
Attention: Dansby White
Telephone: (212) 278-6085
Email: dansby.white@sgcib.com

with a copy to:

Mayer Brown LLP
1675 Broadway
New York, NY 10019
Attention: Paul A. Jorissen, Esq.
Telephone: (212) 506-2555
Email: pjorissen@mayerbrown.com.

15. <u>Miscellaneous.</u>

15.1    The Parties agree that SG's total cost of settlement of the Libra and Vela Transactions (including any liability or expenditure related thereto except for (x) SG's legal fees and expenses, and (y) all amounts excluded from the indemnification set forth in <u>Section 8.1</u>) shall in no event exceed $445,000,000. No provision of this Settlement Agreement or the Assignments shall be construed to require a different result.

15.2    Each of the Debtors on the one hand and SG on the other will bear its own costs and expenses (including legal fees and expenditures) incurred in connection with the review, negotiation or documentation of this Settlement Agreement, the Assignments and the documents entered into in connection therewith as well as the costs and expenses (including legal fees and expenditures) incurred in connection with the review, preparation, filing and prosecution of the Settlement Motion.

15.3    All amounts payable or to be remitted pursuant to this Settlement Agreement shall be paid or remitted or caused to be paid or remitted in U.S. Dollars by wire transfer of immediately available funds to an account specified in writing by the recipient thereof.

15.4    This Settlement Agreement may be executed in several counterparts (including by facsimile transmission or electronic transmission of a PDF file), each of which when so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Settlement Agreement.

15.5    This Settlement Agreement shall be binding on the Parties, their successors, assigns, transferees and any other Persons who have asserted or seek to assert claims on behalf of the Debtors' estates.

15.6    The descriptive headings of the various sections of this Settlement Agreement are inserted for convenience of reference only and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

15.7    Whenever the context and construction so require, all words used in the singular number herein shall be deemed to have been used in the plural, and vice versa, and the masculine gender shall include the feminine and neuter and the neuter shall include the masculine and feminine.

15.8    This Settlement Agreement sets forth the entire understanding and agreement between the Parties as to the matters covered herein and supersedes and replaces any

prior understanding, agreement or statement of intent, in each case, written or oral. No supplement, modification, amendment, waiver or termination of this Settlement Agreement shall be binding unless executed in writing by each of the Parties (or their successors and assigns) to be bound thereby, or by their authorized counsel. This Settlement Agreement is executed without reliance on any representations by any person or entity concerning the nature, cause or extent of injuries, or legal liability therefor, or any other representations of any type or nature except as set forth herein. No contrary or supplementary oral agreement shall be admissible in a court to contradict, alter, supplement, or otherwise change the meaning of this Settlement Agreement. This Settlement Agreement has been negotiated by the Parties adequately represented by counsel, none of whom shall be deemed the "drafter" of the agreement, and no provision of this Settlement Agreement shall be applied or interpreted by reference to any rule construing provisions against the drafter.

15.9  The Debtors' obligations under this Settlement Agreement shall be joint and several.

15.10  This Settlement Agreement shall be governed by and shall be construed in accordance with, in all respects, the laws of the State of New York, without giving effect to principles of conflicts of law. During the pendency of the Debtors' bankruptcy cases, any litigation arising out of or in connection in any way with this Settlement Agreement shall be brought in the Bankruptcy Court and each of LBSF, LBHI and SG submits itself to the exclusive jurisdiction of the Bankruptcy Court and waives any defense of lack of jurisdiction, improper venue or inconvenient forum that may be available to any action brought in such court. Upon the closing of the Debtors' bankruptcy cases, any litigation arising out of or in connection in any way with this Settlement Agreement shall be brought in a state or federal court of competent jurisdiction in New York County, State of New York, and each of LBSF, LBHI and SG submits to the exclusive jurisdiction of such courts and waives any defense of lack of jurisdiction, improper venue or inconvenient forum that may be available to any action brought in such courts.

15.11  LBSF, LBHI AND SG HEREBY IRREVOCABLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS SETTLEMENT AGREEMENT.

15.12  Nothing in this Settlement Agreement shall be construed as an admission of liability or fault by any Party, which liability and fault are expressly denied.

15.13  The provisions of this Settlement Agreement shall be breached and a cause of action accrued thereon immediately on any Party's commencement of any claim or action prohibited by this Settlement Agreement, and in any such action this Settlement Agreement may be asserted both as a defense and as a counterclaim or cross-claim.

15.14  The Parties acknowledge and agree that a breach of the provisions of this Settlement Agreement by any Party would cause irreparable damage to the other Parties and that such other Parties would not have an adequate remedy at law for such damage. Therefore, the obligations of the Parties set forth in this Settlement Agreement shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate

injunctive relief may be applied for and granted in connection therewith. Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies that the Parties may have under this Settlement Agreement or otherwise.

15.15 No failure or delay by any party in exercising any right or remedy provided by law under or pursuant to this Settlement Agreement shall impair such right or remedy or be construed as a waiver or variation of it or preclude its exercise at any subsequent time, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have duly executed this Settlement Agreement as of the day and year first above written.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By: _____

Name: ROBERT HERSHAN

Title: VICE PRESIDENT

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

    Name: ROBERT HERSHAN

    Title: SENIOR VICE PRESIDENT

**SOCIÉTÉ GÉNÉRALE, NEW YORK BRANCH**

By: _Daniel White_
Name: Dansby White
Title: Managing Director

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | Definitions | 2 |
| 2. | Suspension of Parties' Claims in respect of the Libra Early Termination and the Vela Early Termination | 20 |
| 3. | Execution and Delivery of the Libra CDSA Assignment; Pursuit of the Libra Termination Claim and/or the Libra Priority Claim | 21 |
| 4. | Execution and Delivery of the Vela CDSA Assignment; Pursuit of the Vela Termination Claim and/or the Vela Priority Claim | 22 |
| 5. | Restrictions on the Assumption and Assignment of the CDSAs | 23 |
| 6. | The Settlement Motion; Establishment of Escrow Accounts | 23 |
| 7. | Parties' Payment Date Obligations; Releases | 25 |
| 8. | Indemnification | 26 |
| 9. | Recoveries from the Libra and Vela Transactions | 30 |
| 10. | Recourse to the SG Guarantee | 39 |
| 11. | Post Petition Claim | 39 |
| 12. | Representations and Warranties | 40 |
| 13. | Incorporation into the Assignments | 42 |
| 14. | Notices | 42 |
| 15. | Miscellaneous | 43 |

17619833

SCHEDULE A-1

LIST OF LIBRA LEGACY CREDIT PROTECTION PAYMENTS
SUBJECT TO REIMBURSEMENT UNDER THE LIBRA CDSA

[ATTACHED]

Schedule A-1

| Global ID | CUSIP | Ticker | Type | Initial Reference Notional | 8/25/2008 Write Down |
|---|---|---|---|---|---|
| 2704594 | 46626LGQ7 | JPMAC_06_HE1_M9 | RMBS | 10,000,000 | 6,904,636.48 |
| 2704596 | 46626LJD3 | JPMAC_06_WMC1_M9 | RMBS | 15,000,000 | 12,217,217.42 |
| 2704521 | 46628TAP6 | JPMAC_06_WMC2_M9 | RMBS | 5,000,000 | 5,000,000.00 |
| 2704598 | 46628TAP6 | JPMAC_06_WMC2_M9 | RMBS | 10,000,000 | 10,000,000.00 |
| 2704600 | 59020U4K8 | MLMI_06_WMC1_B3 | RMBS | 10,000,000 | 5,042,469.00 |
| 2704522 | 59020U6Y6 | MLMI_06_WMC2_B3A | RMBS | 15,000,000 | 15,000,000.00 |
| 2704559 | 61749KAP8 | MSAC_06_WMC2_B2 | RMBS | 15,000,000 | 4,039,913.21 |
| 2704526 | 61749GAN2 | MSHEL_06_3_B3 | RMBS | 15,000,000 | 5,045,416.10 |
| 2704528 | 75406DAN3 | RASC_06_EMX4_M9 | RMBS | 7,500,000 | 188,839.78 |
| 2704608 | 75406DAN3 | RASC_06_EMX4_M9 | RMBS | 7,500,000 | 188,839.78 |
| 2704584 | 813765AJ3 | SABR_06_FR3_B3 | RMBS | 10,000,000 | 6,247,378.70 |
| 2714155 | 00082WAD2 | ACABS_06_1A_A3L | CDO | 15,000,000 | 13,784,599.61 |
| 2714156 | 000829AD3 | ACABS_06_AQA_A3 | CDO | 15,000,000 | 15,000,000.00 |
| 2788365 | 15719RAF7 | CETUS_06_3A_C1 | CDO | 9,000,000 | 9,000,000.00 |
| 2714158 | 612180AJ8 | MNPT_06_1A_D | CDO | 14,844,020 | 14,501,028.34 |
| 2714159 | 74956AAC0 | RFCCD_05_2A_C | CDO | 15,000,000 | 4,310,634.77 |
| | | | | 188,844,020 | 126,470,973.18 |

SCHEDULE A-2

LIST OF VELA LEGACY CREDIT PROTECTION PAYMENTS
SUBJECT TO REIMBURSEMENT UNDER THE VELA CDSA

[ATTACHED]

Schedule A-2

| Global ID | CUSIP | Ticker | Type | Initial Reference Notional | 8/25/2008 Write Down |
|---|---|---|---|---|---|
| 2749038 | 542514UC6 | LBMLT_06_2_M8 | RMBS | 15,000,000 | 15,000,000 |
| 2748942 | 54251MAP9 | LBMLT_06_4_M9 | RMBS | 15,000,000 | 15,000,000 |
| 2748952 | 362463AP6 | GSAMP_06_NC2_M9 | RMBS | 5,000,000 | 3,297,502 |
| 2748951 | 362463AP6 | GSAMP_06_NC2_M9 | RMBS | 10,000,000 | 6,595,003 |
| 2749176 | 813765AJ3 | SABR_06_FR3_B3 | RMBS | 13,000,000 | 8,121,592 |
| 2749656 | 49916RAE0 | KNOLL_06_2A_C | CDO | 15,000,000 | 15,000,000 |
| 2749654 | 000829AD3 | ACABS_06_AQA_A3 | CDO | 15,000,000 | 15,000,000 |
| 2749661 | 92534FAD0 | VRGO_06_1A_A3 | CDO | 6,000,000 | 6,000,000 |
| 2749660 | 925345AE0 | VERT_06_1A_A3 | CDO | 15,000,000 | 15,000,000 |
| 2749658 | 52902WAF6 | LEXN_06_1A_D | CDO | 15,000,000 | 15,000,000 |
| 2755809 | 87337WAD2 | TABS_06_5A_A3 | CDO | 15,000,000 | 15,000,000 |
| 2795613 | 15719MAC5 | CETUS_06_2A_B | CDO | 15,000,000 | 15,000,000 |
| 2869924 | 26139UAD4 | DRACO_2007_1A_A3 | CDO | 15,000,000 | 15,000,000 |
| | | | | 169,000,000 | 159,014,097 |

SCHEDULE B

LIST OF ABS AND CDO SECURITIES OWNED BY LIBRA
AS OF SEPTEMBER 5, 2010

[ATTACHED]

Schedule B

| CUSIP | Issue Name and Tranche | Stated Maturity | Notional Amount |
|---|---|---|---|
| 05950MAQ3 | BAFC 2006-G M6 | 7/20/36 | 2,646,000 |
| 144528AL0 | CARR 2006-NC3 M7 | 8/25/36 | 2,450,000 |
| 14453MAQ7 | CARR 2006-NC4 M10 | 10/25/36 | 4,285,000 |
| 14453MAM6 | CARR 2006-NC4 M7 | 10/25/36 | 4,000,000 |
| 161571BS2 | CHAIT 2007-C1 C1 | 4/15/19 | 3,000,000 |
| 59025TAB9 | FFMER 2007-H1 1A2 | 10/25/37 | 15,000,000 |
| 32027NNX5 | FFML 2004-FF8 B4 | 10/25/34 | 2,957,505 |
| 36242DUH4 | GSAMP 2005-NC1 M2 | 2/25/35 | 3,677,244 |
| 46629BBC2 | JPMAC 2006-CW2 MV10 | 8/25/36 | 21,296 |
| 46629BAZ2 | JPMAC 2006-CW2 MV7 | 8/25/36 | 4,250,000 |
| 49916RAE0 | KNOLL 2006-2A C | 7/13/46 | 4,711,083 |
| 68389FKE3 | OOMLT 2005-5 M7 | 12/25/35 | 1,500,000 |
| 76113RAC8 | RESIF 2006-B B5 | 7/15/38 | 9,207,943 |
| 76113VAC9 | RESIF 2006-C B5 | 7/15/38 | 12,614,033 |
| 76113VAD7 | RESIF 2006-C B6 | 7/15/38 | 2,227,307 |
| 86361EAM3 | SASC 2006-WF3 M7 | 9/25/36 | 3,000,000 |

75,547,410

EXHIBIT 1

FORM OF SETTLEMENT MOTION

[ATTACHED]

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Ralph I. Miller
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
|  |  |  |
|---|---|---|
| In re | : | Chapter 11 Case No. |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (JMP) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
----------------------------------------------------------------x

## NOTICE OF DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR APPROVAL OF A SETTLEMENT AGREEMENT AMONG LBSF, LBHI, AND SOCIÉTÉ GÉNÉRALE, NEW YORK BRANCH AND OTHER RELATED RELIEF

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers Holdings Inc. ("LBHI"), as debtors and debtors-in-possession (together, the "Debtors"), pursuant to sections 105(a), 363 and 365 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for (i) approval of a settlement agreement among LBSF, LBHI, and Société Générale, New York Branch ("SG"), relating to certain swap transactions with MKP Vela CBO, Ltd. and Libra CDO Limited, (ii) the assumption, assignment, and sale of LBSF's interest in the Libra Credit Default Swap Agreement to SG, (iii) the assumption, assignment, and sale of LBSF's interest in the Vela Credit Default Swap Agreement to SG, and (iv) other related relief, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **October 20, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Lori R. Fife, Esq., Ralph I. Miller, Esq. and Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Tracy Hope Davis, Esq., Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., and Linda Riffkin, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Evan Fleck, Esq., and Dennis O'Donnell, Esq. and Quinn Emanuel, 865 S. Figueroa Street, 10th Floor, Los Angeles, California 90017, Attn: Eric Winston, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; (v) Mayer Brown LLP, 1675 Broadway, New York, New York 10019, Attn: Steven Wolowitz, Esq.; (vi) Libra CDO Limited, c/o Deutsche Bank (Cayman) Limited, P.O. Box 1984 GT, Elizabethan Square, Grand Cayman, Cayman Islands, Attn: Global Transaction Banking, Trust & Securities Services – Corporate Services Division; (vii) Alston & Bird LLP, One Atlantic Center, 1201 West Peachtree Street, Atlanta, Georgia 30309-3424, Attn: John C. Weitnauer, Esq.; (viii) MKP Vela CBO, Ltd., c/o Walkers SPV Limited, Walker House, Mary Street, George Town, Grand Cayman, Cayman Islands; (iv) The Bank of New York Trust Company, National Association, 601 Travis Street, 16th Floor, Houston, Texas 77002, so as to be so filed and received by no later than **October 13, 2010 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: September 20, 2010
       New York, New York

_____

Lori R. Fife
Ralph I. Miller
Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Ralph I. Miller
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re                                 :      Chapter 11 Case No.
                                      :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :      08-13555 (JMP)
                                      :
                Debtors.         :      (Jointly Administered)
------------------------------------------------------------x

**DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a), 363 AND 365 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR APPROVAL
OF A SETTLEMENT AGREEMENT AMONG LBSF, LBHI, AND SOCIÉTÉ
GÉNÉRALE, NEW YORK BRANCH AND CERTAIN RELATED RELIEF**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers

Holdings Inc. ("LBHI"), as debtors and debtors-in-possession (together, the "Debtors"), file this

Motion and respectfully represent:

<u>**Preliminary Statement**</u>

        1.      The Debtors seek approval of a settlement agreement (the "Settlement

Agreement")[1] among LBSF, LBHI, and Société Générale, New York Branch ("SG") relating to

certain swap transactions with two special purpose entities:  Libra CDO Limited ("Libra") and

---

[1] A copy of the Settlement Agreement is annexed hereto as <u>Exhibit A</u>.  Capitalized terms used but not defined in this Motion shall have the meanings ascribed to them in the Settlement Agreement.

MKP Vela CBO, Ltd. ("Vela").  If the Settlement Agreement is approved, LBSF's estate is

likely to recover at least $445 million and preserve the right to pursue the remaining assets in

Libra and Vela against the other parties to the transactions, thereby maximizing its opportunity to

potentially recover up to an additional approximately $72 million.  Approval of the Settlement

Agreement also will put LBSF in a better position to request that the Libra Trustee promptly

return approximately $128 million in collateral that LBSF posted with Libra before its

bankruptcy filing.

        2.      Libra is a special purpose entity that invested in various securities backed

directly or indirectly by mortgages.  In October 2006, LBSF and Libra entered into a credit

default swap agreement,[2] pursuant to which LBSF purchased credit protection (similar, in

concept, to insurance) from Libra and agreed to make "premium" payments to Libra in exchange

for Libra's agreement to pay LBSF if losses were incurred on certain mortgage-related securities.

LBSF's payment obligations under the Libra CDSA are guaranteed by LBHI.  At the same time

that Libra entered into the Libra CDSA with LBSF, it also entered into a separate derivative

transaction with SG (the "Libra Senior Swap Agreement"), pursuant to which SG is obligated to

advance funds to Libra for Libra to meet certain payment obligations to LBSF under the Libra

CDSA in the event that Libra does not have sufficient available funds to make such payments.

        3.      LBSF and SG are also parties to substantially similar transactions in which

they have identical roles with Vela, another special purpose entity that invested in various

securities backed directly or indirectly by mortgages.  In November 2006, LBSF and Vela

---

[2] The Libra credit default swap agreement consists of a 1992 ISDA Master Agreement, dated as of October 17, 2006, together with the schedule and confirmations thereto, each dated October 17, 2006 (the "Libra CDSA").

entered into a credit default swap agreement,[3] pursuant to which LBSF purchased credit protection from Vela and agreed to make "premium" payments to Vela in exchange for Vela's agreement to pay LBSF if losses were incurred on certain mortgage-related securities. LBSF's payment obligations under the Vela CDSA also are guaranteed by LBHI. At the same time that Vela entered into the Vela CDSA with LBSF, it also entered into a separate derivative transaction with SG (the "Vela Senior Swap Agreement," and, when referred to with the Libra Senior Swap Agreement, the "Senior Swap Agreements"), pursuant to which SG is obligated to advance funds to Vela for Vela to meet certain payment obligations to LBSF under the Vela CDSA in the event that Vela does not have sufficient available funds to make such payments.[4]

4.    The indenture trustees of Libra and Vela purported to designate an Early Termination Date under the Libra CDSA and the Vela CDSA as of October 10, 2008 and September 30, 2008, respectively (the "Libra Early Termination" and the "Vela Early Termination"). The Debtors have challenged the propriety and validity of both terminations (the "Termination Claim"). In May 2009, the Debtors commenced an adversary proceeding seeking, among other things, a declaration that the Libra Early Termination was invalid and ineffective.[5] SG, Libra, and the Libra Trustee also commenced an adversary proceeding seeking a declaration that the Libra Early Termination was valid and effective. If the Termination Claim succeeds, Libra and Vela remain obligated to make substantial credit-protection payments to LBSF

---

[3] The Vela credit default swap agreement consists of a 1992 ISDA Master Agreement, dated as of November 16, 2006, together with the amended and restated schedule, credit support annex, and amended and restated confirmations thereto, each dated April 23, 2008 (the "Vela CDSA," and, together with the Libra CDSA, the "CDSAs").

[4] A diagram overview of the CDSAs is attached hereto as Exhibit B. Copies of the Libra CDSA and the Vela CDSA are annexed hereto as Exhibit C and Exhibit D, respectively.

[5] Although the Debtors have not yet commenced an adversary proceeding challenging the validity of the Vela Early Termination or the modification of LBSF's payment priority, the Debtors anticipate filing such a complaint as contemplated by the Settlement Agreement.

pursuant to the terms of the respective contracts, and Libra and Vela could request funding from SG according to the terms of the Senior Swap Agreements.

5.      Alternatively, if the Termination Claim is ultimately not successful and, therefore, the Libra Early Termination and/or the Vela Early Termination were found to be effective, then LBSF would be entitled to pursue early termination payments under the contracts. However, the Debtors anticipate that the indenture trustees will argue that, under the terms of the indentures governing each collateralized debt obligation ("CDO"), termination payments caused by LBSF's bankruptcy default would have a lower priority than payments to other parties – which would effectively leave no money to pay LBSF. According to this Court's decision in *LBSF v. BNY Corp. Tr. Serv.*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) and for other reasons, such terms are unenforceable (the "Priority Claim"). Therefore, if the Termination Claim fails as to one or both CDOs, LBSF would pursue the Priority Claim. If LBSF succeeds on the Priority Claim as to both CDOs, it could recover the approximately $195 million held by the CDOs. If both the Termination Claim and Priority Claim fail, LBSF would recover nothing absent the Settlement Agreement.

6.      SG is unwilling to make any settlement payment to the Debtors – much less the substantial payments proposed here – if there were a possibility that, after the settlement became effective, SG might still be required to make advances under the Senior Swap Agreements. That funding requirement could result if the Termination Claim were to succeed and the Senior Swap Agreements were drawn upon to fund credit-protection payments to LBSF. To induce SG to make the settlement payments while preserving LBSF's ability to pursue the Termination Claim against Libra and Vela (in addition to preserving LBSF's ability to pursue the Priority Claim), LBSF and SG have agreed, among other things, that as a precondition to LBSF's

ability to pursue the Termination Claim beyond the pleading stage, LBSF will assume, assign and sell its interest in both CDSAs to SG, to be effective as of the fulfillment of the Libra Assignment Closing Conditions or the Vela Assignment Closing Conditions, respectively. Those conditions, which are described more fully below, include the entry of a Final Judgment[6] by the Court resolving the Termination Claim in LBSF's favor with respect to Libra and/or Vela, as applicable. If SG becomes the assignee of the CDSAs, subject to a sharing agreement as described further below, it will remit to LBSF a substantial share of any credit-protection payments received from the CDOs. In return, the Assignment Closing Conditions would protect against the risk that SG would have to make unnecessary payments *to* the CDOs that are not set forth in the Settlement Agreement.

       7.     The Settlement Agreement avoids the inherent risk for the Debtors in the current litigation against SG and provides:

    (i)      an immediate recovery by LBSF of $370 million;

    (ii)     a guaranteed further recovery by LBSF of $75 million;[7]

---

[6] "Final Judgment" means a judgment entered by the Court that (i) has not been stayed and the time for any motion to stay has expired and (ii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the judgment and the time for any further appeals has expired.

[7] While the SG Guarantee is subject to reduction to the extent SG makes Advances to Libra or Vela and such Advances are not reimbursed to SG from the Global Escrow Account, it is highly doubtful that such a reduction would ever arise. Advances are comprised largely of premium payments and reimbursement payments, and any premium or reimbursement obligations owed by SG would almost certainly be offset by the far greater credit-protection payments that SG would be owed by the CDO's. In addition, Advances are repaid to SG at the top of the waterfall from amounts contained in the Global Escrow Account. Given the relatively small amounts of premium that could become owing on the two CDSAs, and the remoteness that any underlying Reference Obligations would actually experience write-ups that give rise to a reimbursement obligation, it seems highly unlikely that Advances would exceed amounts contained in the Global Escrow Account and thereby give rise to a reduction of the SG Guarantee.

(iii)    the right for LBSF to pursue litigation against the CDOs which could yield yet further potential recoveries of approximately $72 million, plus any proceeds from the liquidation or repayment of securities;

(iv)    an enhanced ability for LBSF to request the prompt return of an additional approximately $128 million in previously posted collateral; and,

(v)    an extinguishment of LBHI's guarantee of LBSF's obligations under the CDSAs.

The $445 million to LBSF alone more than doubles what LBSF's estate would receive if it were to win only the Priority Claim. By contrast, continued litigation with SG would take years and substantial expenditures to fully prosecute, with no certainty of any recovery at all, much less any certainty of a greater recovery than that provided under the Settlement Agreement.

8.    Accordingly, as set forth more fully below and in the Declaration of Robert Hershan in Support of this Motion, filed contemporaneously herewith, entry into the Settlement Agreement is in the Debtors' best interests, and, the Debtors have exercised sound business judgment in entering into the Settlement Agreement as a reasonable resolution of very complex and difficult issues. The Debtors have been advised that the Creditors' Committee (defined below) supports the Settlement Agreement and the relief requested herein. The Debtors, therefore, request that the Motion be granted.

## Background

9.    Commencing on September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). LBSF filed with this Court a voluntary petition for relief under chapter 11

of the Bankruptcy Code on October 3, 2008. The Debtors' chapter 11 cases have been

consolidated for procedural purposes only and are being jointly administered pursuant to Rule

1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors

are authorized to operate their businesses and manage their properties as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.     On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors for the Debtors pursuant to section 1102 of the Bankruptcy Code (the "Creditors'

Committee").

### Jurisdiction

11.     This Court has subject matter jurisdiction to consider and determine this

motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Relief Requested

12.     The Debtors request the entry of an order pursuant to sections 105(a), 363

and 365 of the Bankruptcy Code and Bankruptcy Rule 9019 for approval of:

- the Settlement Agreement;

- the assumption, assignment, and sale of LBSF's interest in the Libra CDSA to

  SG, free and clear of all claims and interests, on the terms and conditions set

  forth in the Settlement Agreement and in the Form of Libra CDSA

  Assignment Agreement (the "Libra CDSA Assignment Agreement"), a copy

  of which is annexed hereto as Exhibit E;

- the assumption, assignment, and sale of LBSF's interest in the Vela CDSA to

  SG, free and clear of all claims and interests, on the terms and conditions set

  forth in the Settlement Agreement and in the Form of Vela CDSA Assignment

Agreement (the "Vela CDSA Assignment Agreement" and, when referred to with the Libra Assignment Agreement, the "Assignment Agreements"), a copy of which is annexed hereto as Exhibit F; and

- other related relief, as set forth more fully in this Motion.

**Background of the Credit Default Swap Transactions**

The Libra CDSA

13.     Pursuant to the Libra CDSA, Libra sold credit protection to LBSF on certain specified residential mortgage-backed securities and other securities ultimately backed by mortgages (collectively, "Reference Obligations"). LBHI acts as a "credit support provider" (similar to a guarantor) for payment of obligations of LBSF under the Libra CDSA. If Libra is required to pay LBSF credit-protection payments under the terms of the Libra CDSA as to a loss or credit impairment on a Reference Obligation but does not have sufficient available funds to make such payment in full, then, under the Libra Senior Swap Agreement, SG must advance funds to Libra as needed for Libra to satisfy those obligations to LBSF.

14.     The Libra CDSA between LBSF and Libra is part of a complex CDO transaction. Libra issued bonds (the "Libra Notes") to third-party investors (the "Libra Noteholders") and invested the proceeds of the Libra Notes in certain qualified investments, such as asset-backed securities and money-market securities (collectively, the "Libra Investments"). The Libra Investments, along with Libra's rights under various contracts (including the Libra CDSA and the Libra Senior Swap Agreement), constitute collateral, securing Libra's obligations to pay (among other obligations): (i) amounts due to LBSF under the Libra CDSA, (ii) amounts due to SG under the Libra Senior Swap Agreement, and (iii) amounts due to investors under the Libra Notes.

8

15.     Libra pledged its rights under the Libra CDSA to LaSalle Bank National

Association as the trustee for Libra's secured parties (the "Libra Trustee")[8] under the governing

indenture for the Libra Notes (the "Libra Indenture").[9] By letter dated October 10, 2008, the

Libra Trustee declared the Libra Early Termination based upon the commencement of LBHI's

chapter 11 case.  The Debtors, joined by the Creditors' Committee, have challenged the validity

and effectiveness of the Libra Early Termination and have commenced an adversary proceeding

seeking, among other things, a declaratory judgment that the Libra Early Termination is null and

void.  SG, Libra, and the Libra Trustee, jointly, commenced another adversary proceeding

(together with the Debtors' adversary proceeding, the "Adversary Proceedings"), requesting,

among other things, a declaratory judgment that the Libra Early Termination is valid and

effective.  On June 19, 2009, the Debtors filed a motion for summary judgment.  On June 26,

2009, the Libra parties and SG filed a cross-motion for summary judgment.

16.     If the Libra Early Termination were invalidated, the Libra CDSA would

continue in effect until the Reference Obligations fully amortize or experience total losses, which

would likely occur in the next few years, but could occur as late as 2046.  Until that happens,

LBSF would continue to accrue premium payments to Libra, and Libra would continue to owe

credit-protection payments to LBSF.  In addition, pursuant to section 365 of the Bankruptcy

Code, the Libra CDSA could be assumed and assigned by LBSF.

17.     On June 1, 2009 [Docket No. 3709], the Court approved a stalking horse

letter agreement and break-up fee for the assignment and sale of the Libra CDSA to Deutsche

Bank, AG (London Branch) ("DB") (the "Letter Agreement").  That potential assignment and

---

[8] Subsequently, LaSalle Bank National Association assigned its rights as Libra Trustee to Bank of America, N.A.

[9] A copy of the Libra Indenture without its attachments is attached hereto as Exhibit G.

9

sale is conditioned upon a final judicial determination that the Libra Early Termination is null and void. Thus, the Letter Agreement with DB provides LBSF with no benefit unless LBSF prevails on the Termination Claim. Subject to that litigation contingency, an analysis provided to the Court in June 2009 anticipated that if the transaction with DB closed under the terms of the Letter Agreement, LBSF's estate might realize between $694 million and $733 million under the Libra transaction. DB was committed to close under the Letter Agreement for 90 days, subject to mutual extensions agreed to by the parties. DB has agreed, from time to time, to extend the closing deadline and, currently, the DB transaction must close by November 1, 2010. DB has an unrestricted contractual right to determine not to further extend the closing deadline. In consideration of DB's keeping its offer open to attract new bidders, LBSF agreed to pay (and the Court approved) a break-up fee of up to $20 million that is payable if LBSF enters into a settlement agreement or other transaction with SG. If the Settlement Agreement is approved, and the Libra CDSA Assignment Agreement with SG closes, LBSF will pay up to a $20 million break-up fee to DB subject to the terms and conditions of the Letter Agreement, and the minimum recoveries to LBSF's estate will be more than twenty-two times that break-up fee.

The Vela CDSA

       18.    LBSF is party to a substantially similar credit default swap transaction with Vela (the Vela CDSA). Similar to the Libra transaction, the Vela CDSA between LBSF and Vela is part of a complex CDO transaction. LBHI acts as a "credit support provider" for payment obligations of LBSF under the Vela CDSA. Vela is also a party to the Vela Senior Swap Agreement, pursuant to which SG agreed to advance funds to Vela to enable Vela to satisfy certain payment obligations to LBSF under the Vela CDSA in the event that Vela does not have sufficient available funds to make those payments.

19.     Vela issued bonds (the "Vela Notes") to third-party investors (the "Vela Noteholders") and invested the proceeds of the Vela Notes in certain qualified investments, such as asset-backed securities and money-market securities (collectively, the "Vela Investments"). The Vela Investments, along with Vela's rights under various contracts (including the Vela CDSA and the Vela Senior Swap Agreement) constitute collateral securing Vela's obligations to pay (among other obligations): (i) amounts due to LBSF under the Vela CDSA, (ii) amounts due to SG under the Vela Senior Swap Agreement, and (iii) amounts due to investors under the Vela Notes.

20.     By letter dated September 30, 2008, The Bank of New York Mellon Trust Company, National Association, as trustee on behalf of Vela (the "Vela Trustee") under the indenture that governs the Vela Notes (the "Vela Indenture"),[10] declared the Vela Early Termination based upon the commencement of LBHI's chapter 11 case.  Although the Debtors have challenged the validity and effectiveness of such termination, litigation challenging the Vela Early Termination has not yet been commenced.

21.     If the Vela Early Termination were invalidated, then the Transactions under the Vela CDSA would continue in effect until the Reference Obligations fully amortize or experience total losses, which would likely occur in the next few years, but could occur as late as 2046.  Until that happens, LBSF would continue to accrue premium payments to Vela and Vela would continue to owe credit-protection payments to LBSF.  In addition, pursuant to section 365 of the Bankruptcy Code, the Vela CDSA could be assumed and assigned by LBSF.  Insofar as the composition, notional amount and performance of the Vela CDSA is comparable to that of the Libra CDSA, it is to be expected that the amount that the Debtors might net if the Vela Early

---

[10] A copy of the Vela Indenture without its attachments is annexed hereto as Exhibit H.

Termination were invalidated and the Vela CDSA assigned to a third party would be comparable to the amount that the Debtors might net from a transaction such as that contemplated by the Letter Agreement with respect to Libra.

## The Settlement Agreement

22. The Settlement Agreement includes the following salient terms:[11]

- Settlement Payment. On the 5th Business Day after the order approving the Settlement Agreement has become a Final Order[12] (the "Payment Date"), SG shall pay $370 million to LBSF.

- SG Guarantee. In addition to the $370 million payment on the Payment Date, SG shall guarantee that the Debtors' recovery from Libra and Vela shall be not less than an additional $75 million in the aggregate, subject to reduction for Advances paid by SG. The guaranteed amount will be paid after all amounts that are receivable from the CDOs have been received by the Debtors or SG and distributed.

- Sharing Agreement. SG and LBSF will deposit any further recoveries that either of them may receive from the assets of Libra and Vela (currently estimated to be $195 million) into a Global Escrow Account, and agree to share such proceeds pursuant to section 9.10 of the Settlement Agreement as follows: (i) first, to reimburse SG and the Debtors for any premium payments or reimbursements made under the CDSAs and for certain expenses incurred by SG and the Debtors in litigation related to the Settlement Agreement, in separate order of priority in respect of each of the Libra and Vela transactions; (ii) second, to reimburse SG and the Debtors, *pro rata*, for all unreimbursed indemnified claims payable to them pursuant to the Settlement Agreement; (iii) third, to the payment of $100 million to LBSF; and (iv) fourth, to the payment to LBSF and SG of all remaining amounts recovered on a 50:50 basis.

- Recovery of Posted Collateral. Prior to the Commencement Date, LBSF deposited portions of certain credit-protection payments aggregating approximately $128 million in an "Issuer Collateral Account" to secure possible reimbursements LBSF could be required to make to Libra under the

---

[11] To the extent there is any inconsistency between this summary and the Settlement Agreement, the Settlement Agreement controls.

[12] "Final Order" means an order entered by the Court that (i) has not been stayed and the time for any motion to stay has expired and (ii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the order and the time for any further appeals has expired.

Libra CDSA.[13]  If and when SG becomes the assignee, its current credit rating should help eliminate the need to continue to post that collateral.  All recoveries from the Issuer Collateral Account will go solely and directly to LBSF.  The proceeds of the Issuer Collateral Account are carved out from the sharing agreement and are in addition to LBSF's share (pursuant to the sharing agreement) of the approximately $195 million of assets in Libra and Vela.

- Indemnification.  SG and the Debtors will indemnify one another for liabilities incurred as a result of entering into and performing their respective obligations under the Settlement Agreement and the Assignment Agreements.  The indemnities address the potential for a timing mismatch that would occur if either party, after funds are distributed under the sharing agreement, incurs costs that (had they been incurred earlier) would have been recoverable under step (ii) of the sharing agreement.  The indemnities thereby serve to guarantee that LBSF recovers a minimum of $445 million and that SG pays a maximum of $445 million.  Liabilities arising out of or related to actions taken or omitted prior to the entry into the Settlement Agreement are not subject to indemnification.  The Debtors' indemnification exposure is capped at $71,644,336 and any indemnification that may be payable by the Debtors would as a general matter be paid only from additional recoveries realized on the transactions from Libra or Vela, and not the $445 million guaranteed recovery from SG.

- Releases.  The Parties will release one another from all claims arising out of or relating to the Libra and Vela Transactions, including those asserted in the Adversary Proceedings; however, the release does not reduce or otherwise limit the Parties' obligations to one another under the Settlement Agreement.  The releases shall be effective as of the Payment Date.

- Priority Claim Preserved.  At any time, the Debtors may pursue against the Other Libra Parties or the Other Vela Parties (all parties to the transactions other than SG) the Libra Priority Claim and/or Vela Priority Claim.

- Termination Claim Preserved.  Subject to the Libra Assignment Determinations and the Vela Assignment Determinations being included in the Final Order, and satisfaction of the Libra Termination Claim Preconditions and the Vela Termination Claim Preconditions, respectively, the Debtors may pursue the Termination Claim against the Other Libra Parties and the Other Vela Parties.

---

[13] The Libra CDSA and the Vela CDSA both provide that amounts paid to the "buyer", i.e., LBSF, may be subject to reimbursement to Libra or Vela, as applicable, if the underlying Reference Obligation that gave rise to such payment performs in a manner that reverses the original loss.  To secure these potential reimbursement obligations, pursuant to the terms of the Libra CDSA, LBSF deposited a portion of the proceeds received from Libra into an "Issuer Collateral Account."  No such account was established for Vela.

## The Assumption, Assignment and Sale Agreements

23.     As part of the Settlement Agreement, SG and LBSF have agreed to the assumption, assignment and sale of LBSF's rights and interests in the Libra CDSA and the Vela CDSA to SG to be effective immediately, and without further Court order, upon the satisfaction of the Libra Assignment Closing Conditions or the Vela Assignment Closing Conditions, respectively, as such terms are defined in the Settlement Agreement (primarily the entry of a Final Judgment invalidating the Libra Early Termination or the Vela Early Termination). Effective upon a Final Order approving the Settlement Agreement, LBSF is to receive a payment of $370 million from SG and a guaranty from SG that LBSF will recover an additional $75 million from Libra and Vela. The payment and receipt of the $445 million is conditioned only on the approval of the Settlement Agreement in a Final Order and is not conditioned on the effectiveness of the Assignment Agreements.

24.     The salient terms of the Assignment Agreements (which are virtually identical) and the relevant provisions in the Settlement Agreement include: [14]

- Proposed Transactions. LBSF shall assume, assign and transfer all of its interest in the Libra CDSA and/or the Vela CDSA to SG pursuant to the terms of the Libra CDSA Assignment Agreement or the Vela CDSA Assignment Agreement, respectively, free and clear of any claims or interests as of the Effective Date.

- Effective Date. The assumption, assignment and sale of LBSF's interest in the Libra CDSA and/or the Vela CDSA shall each be effective automatically and without further Court order on the date that the Libra Assignment Closing Conditions or the Vela Assignment Closing Conditions, as applicable, are satisfied.

---

[14] To the extent there is any inconsistency between this summary and the Libra CDSA Assignment Agreement, the Vela CDSA Assignment Agreement or the Settlement Agreement, the Libra CDSA Assignment Agreement, the Vela CDSA Assignment Agreement, and the Settlement Agreement, as applicable, controls. Capitalized terms used but not defined in this summary shall have the meanings ascribed to them in the Libra Assignment Agreement, the Vela Assignment Agreement or the Settlement Agreement, as applicable.

- <u>Closing Conditions</u>. The following closing conditions must be satisfied (or be waived by SG in its sole and absolute discretion) for the Libra CDSA Assignment Agreement and/or the Vela CDSA Assignment Agreement to be effective:

  - either (i) the Libra Trustee or the Vela Trustee must initiate an interpleader action and name all of the Libra Noteholders or Vela Noteholders as third-party defendants, or (ii) the Debtors must file (in the case of Vela) or amend (in the case of Libra) a complaint and name each of the Vela Noteholders or Libra Noteholders as defendants; and

  - a judgment must be issued by the Court declaring the Libra Early Termination or the Vela Early Termination invalid, and such judgment must be binding on the Other Libra Parties or the Other Vela Parties, as applicable, and shall have become a Final Judgment.

- <u>Notice</u>. LBSF will file and serve a notice on the Libra Trustee or the Vela Trustee that the Libra Assignment Closing Conditions or the Vela Assignment Closing Conditions, as applicable, have been satisfied (or waived) and that the Libra CDSA Assignment Agreement or the Vela CDSA Assignment Agreement has become effective.

- <u>Deferral of Payment Due Date</u>. The Debtors shall be permitted to defer the payment due date in respect of any payment payable to them under the Libra CDSA and the Vela CDSA, and the deferral contemplated in Sections 7.4 and 7.5 of the Settlement Agreement shall be binding on the Other Libra Parties and the Other Vela Parties, as applicable.

- <u>Reimbursement Account</u>. Upon satisfaction of the Libra Assignment Closing Conditions or the Vela Assignment Closing Conditions, resulting in the effectiveness of the Libra CDSA Assignment Agreement or the Vela CDSA Assignment Agreement, LBSF shall deposit with SG 25% of the amount of credit-protection payments it received prior to the Commencement Date that may be subject to reimbursement to Libra or Vela under the terms of the Libra CDSA or the Vela CDSA, as applicable.[15] To the extent reimbursement obligations exceed the amounts on deposit, they will be paid by SG. Any amounts paid by SG as reimbursement to Libra or Vela will be entitled to reimbursement from recoveries from Libra and Vela at the top of the Global Escrow Account priority of payment and will also be entitled to administrative expense treatment. The Debtors believe that the probability of any reimbursement obligations is highly remote.

---

[15] *See* footnote 13, *supra.*

- **LBHI Guarantee.** LBHI's guarantees of LBSF's obligations under the CDSAs are not being assumed and LBHI shall not be responsible for any post-assignment obligations of SG, as assignee, under the CDSAs.

- **Restrictions on Other Assignments/Sales.** LBSF has agreed that it will not assign or sell its interest in the Libra CDSA or the Vela CDSA to any party other than SG.

## The Controlling Legal Standard Under Bankruptcy Rule 9019

25.     Compromises are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)). The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court. *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994). A settlement must not "fall below the lowest point in the range of reasonableness." *Vaughn v. Drexel Burnham Lambert Group, Inc. (Drexel Burnham Lambert Group)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997). Discretion may be exercised by the court "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998). A proposed compromise and settlement implicates the issue of whether it is "fair and equitable, and in the best interest of the [debtor's] estate." *In re Best Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).

26.     The following factors are considered in determining whether a settlement should be approved:  (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (ii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; (iii) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; and (iv) the extent to which the

settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.,* 390 U.S. at 424; *In re Ashford Hotels, Ltd.,* 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998); *In re Best Prods. Co.,* 168 B.R. at 50.

      27.    While a court must "evaluate … all … factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson,* 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.,* 699 F.2d at 608, or conduct a full independent investigation. *Drexel Burnham Lambert Group,* 134 B.R. at 496. "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact…. The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness." *Nellis,* 165 B.R. at 123 (internal citations omitted).

      28.    The court may give weight to the "informed judgments of the … debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise." *Drexel Burnham Lambert Group,* 134 B.R. at 505 (internal citations omitted); *see also In re Purofied Down Prods. Corp.,* 150 B.R. 519, 522 (S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.,* 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that [the court] substitute [its] judgment for the Trustee's, but only that [the court] test his choice for reasonableness…. If the Trustee chooses one of two reasonable choices, [the court] must approve that choice, even if, all things being equal, [the court] would have selected the other.").

      29.    Significantly, there is no requirement that "the value of the compromise … be dollar-for-dollar the equivalent of the claim." *In re Ionosphere Clubs, Inc.,* 156 B.R. 414, 427 (S.D.N.Y. 1993). While not the settlement at bar, "there is no reason, at least in theory, why a

satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 427-28 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)).

### The Settlement Agreement Meets the Legal Standard
### Established Under Rule 9019 and Is in the Best Interests of the Debtors' Estates

30.     The Settlement Agreement readily satisfies the standard for approval. The Debtors have comprehensively analyzed and considered the issues relating to the Libra and Vela transactions, and have concluded that the Settlement Agreement represents a fair and equitable resolution of the issues and is in the best interests of their estates. As a result of the Settlement Agreement, LBSF will likely receive a minimum of $445 million ($370 million immediately and an additional $75 million guaranteed by SG). The Settlement Agreement also allows LBSF to continue to assert all of its claims against the Other Libra Parties and the Other Vela Parties. The prosecution of those claims may increase the total amount that LBSF may recover from the CDOs to approximately $516.6 million. In addition, because if and when SG becomes the assignee, its current credit rating should help eliminate the need to continue to post collateral under the Libra CDSA, LBSF will be in a better position to recover the approximately $128 million in collateral that LBSF had posted with Libra.

31.     Significantly, the Settlement Agreement avoids continued litigation with SG and eliminates the risks associated with that litigation while providing for a substantial guaranteed recovery as well as the ability to pursue additional recoveries as noted above. That guaranteed recovery is more than double the amount that the Debtors could obtain with a successful Priority Claim alone. The results of litigation are never certain and further litigation (including the potential for a long drawn out appellate process) necessarily would be time consuming, complex and expensive for the Debtors. The Libra Adversary Proceedings (which

18

are representative of (but not identical to) the issues in dispute with respect to the Vela Early

Termination) show that the controversies present extremely complicated transactions involving

multiple parties and issues of first impression. The transactions represent some of the most

complicated financial transactions created during the boom years of 2004-2007, as reflected by

the Settlement Agreement and its supporting documents. As such, they present highly difficult

issues.

      32.    The Settlement Agreement is better for the Debtors' estates than the

stalking-horse bid by DB. Although the Letter Agreement with DB or a potential sale

transaction for the Vela CDSA *could* result in a greater recovery to LBSF's estate, there are

significant contingencies and litigation risks associated therewith that might prevent LBSF from

ever recovering *any* value at all. Otherwise stated, the Settlement Agreement will result in a

definite, substantial and immediate payment and receipt of cash and will also provide the

strongest opportunity for future recoveries. In contrast, recovery under the DB transaction is

contingent upon: (i) the entry of a fully litigated judgment nullifying the Libra Early

Termination, (ii) success on all appeals, and (iii) approval of the assignment transaction. This

process could take years to complete and there is risk that LBSF's potential recoveries from the

transaction with DB may be significantly limited. From that perspective, and in the exercise of

the Debtors' business judgment, the Settlement Agreement is in the best interests of the Debtors

and should be approved. Moreover, the potential benefits of the Settlement Agreement far

outweigh the limited cost of the break-up fee payable to DB if the Settlement Agreement is

approved.

      33.    The Settlement Agreement is the result of extensive arm's-length

bargaining over a long period of time. It is not the product of fraud or collusion. The Debtors

and SG have been represented by competent and experienced professionals. Significant resources have been invested in evaluating the Settlement Agreement, including fully briefed competing motions for summary judgment in the Libra Adversary Proceedings. The Settlement Agreement is the product of a well-informed judgment by the Debtors and supported by their professionals.

### LBSF Has Exercised Sound Business Judgment in Entering Into the Libra Assignment Agreement and the Vela Assignment Agreement

34.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). In determining whether an executory contract or unexpired lease should be assumed, courts apply the "business judgment" test. *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures)*, 4 F.3d 1095, 1099 (2d Cir. 1993); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially"); *In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) ("The decision to assume or reject an executory contract is within the sound business judgment of the debtor-in-possession. . . ."). Under this test, a court should approve the assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate. *See, e.g., In re Child World, Inc.*, 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992).

35.     LBSF's entry into the Assignment Agreements is an integral aspect of the Settlement Agreement and likewise should be approved. Without the Assignment Agreements,

SG would not settle with the Debtors unless the Debtors waived and agreed to not to prosecute the Termination Claim against the other parties to the CDO transactions, which would reduce the potential for recovery of assets in the CDOs. Thus, as a result of the Assignment Agreements, LBSF will maximize its ability to recover significant additional amounts from Libra and Vela. The Assignment Agreements, in effect, allow LBSF to enjoy the best alternative. LBSF will recover a substantial payment from SG and still possess the ability to continue to assert the Termination Claim against the other parties to the transactions.

36.     The Assignment Agreements are in the best interests of the Debtors and their estates, because their inclusion maximizes LBSF's potential for substantial further recoveries if it succeeds in the litigation against Libra and Vela, while also permitting LBSF to receive an immediate guaranteed payment and maintain its economic interest in the transactions. Under the sharing agreement, if there is any recovery under the Libra CDSA or the Vela CDSA, then, after reimbursement of costs, the parties have agreed to share the proceeds of such recoveries with LBSF enjoying a right of priority to collect the first $100 million (with $75 million guaranteed by SG). LBSF's entry into the Assignment Agreements represents a reasonable exercise of LBSF's business judgment, is in the best interests of the Debtors and should be approved.

### LBSF Will Cure any Default Upon Assumption
### But Does Not Need to Cure *Ipso Facto* Defaults Under the Agreement

37.     Section 365(b) of the Bankruptcy Code establishes certain conditions that must be satisfied prior to the assumption of an executory contract if the contract contains a default:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—