> (A) cures, or provides adequate assurance that the trustee will
> promptly cure, such default...
>
> (B) compensates, or provides adequate assurance that the trustee will
> promptly compensate, a party other than the debtor to such contract or
> lease, for any actual pecuniary loss to such party resulting from such
> default; and
>
> (C) provides adequate assurance of future performance under such
> contract or lease.

11 U.S.C. § 365(b)(1).

38.    Certain defaults, however, need not be cured and do not require a debtor to

provide adequate assurance of future performance.  Specifically, section 365(b)(2) provides an

exception to the requirements of section 365(b)(1) for certain defaults:

> (2) Paragraph (1) of this subsection does not apply to a default that is a
> breach of a provision relating to—
>
> (A) the insolvency or financial condition of the debtor at any time
> before the closing of the case;
>
> (B) the commencement of a case under this title; [or]
>
> (C) the appointment of or taking possession by a trustee in a case
> under this title or a custodian before such commencement...

39.    11 U.S.C. § 365(b)(2).  The purpose of section 365(b)(2) is to ensure that

"the requirements of section 365(b)(1) do not apply to defaults triggered by provisions relating to

the insolvency or financial condition of the debtor, the commencement of a Chapter 11 case, or

the appointment of a trustee in the case or a custodian before the case." *L.R.S.C. Co. v. Rickel*

*Home Cents., Inc. (In re Rickel Home Centers)*, 209 F.3d 291, 298 (3d Cir. 2000).

40.    There is one default that needs to be cured to satisfy section 365(b) of the

Bankruptcy Code.  If the Libra Early Termination or the Vela Early Termination is determined to

be ineffective, then LBSF would have been required to make premium payments under the Libra

CDSA and the Vela CDSA, as applicable, and Libra and Vela would have been required to make

substantial credit-protection payments to LBSF.  Assuming the respective Early Terminations are

invalidated, LBSF estimates missed premium payments of $17,520,316 to Libra and $15,304,759

to Vela as of August 25, 2010.  LBSF proposes that upon the assumption of the Libra CDSA and

the Vela CDSA, it will promptly cure its missed payment obligations by permitting Libra and

Vela, as applicable, to set off LBSF's missed premium payments against credit-protection

payments under the Libra CDSA and the Vela CDSA that Libra and Vela would have been

required to make to LBSF. [16]  This is consistent with section 2(c) of the Libra CDSA and the

Vela CDSA, which provides that amounts owed between the parties will be netted with the party

owing the larger amount making a single net payment to other party.  If there are insufficient

credit-protection payments to set-off all of the missed premiums, LBSF will pay the balance of

such missed premiums and will be entitled to reimbursement of such payments at the top of the

Global Escrow Account priority of payments.

     41.    The other defaults that might be asserted by Libra or Vela are the

commencement of LBHI's and/or LBSF's chapter 11 cases and need not be cured.  Pursuant to

section 365(b)(2),  LBSF does not need to cure such defaults because they are unenforceable *ipso

facto* provisions that are based upon the commencement of a case under the Bankruptcy Code.

*See Summit Inv. and Dev. Corp. v. LeRoux (In re LeRoux)*, 69 F.3d 608, 610 (1st Cir. 1995); *In

re Texaco Inc.*, 73 B.R. 960, 965 (Bankr. S.D.N.Y. 1987) (holding that counterparty could not

accelerate notes because such right was only triggered upon a bankruptcy default clause, which

was void pursuant to section 365(e)(1)); *see also In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 759

(Bankr. M.D. Fla. 2009) (holding that counterparty's enforcement of right to terminate contract

---

[16] Under the Settlement Agreement, to the extent that any portion of the credit protection payments against which
the missed premiums are set off is subject to reimbursement under the Libra CDSA or the Vela CDSA, LBSF shall
remit a corresponding amount into the Global Escrow Account and will be paid back such amount from the Global
Escrow Account upon the expiration of the related reimbursement period.

at will was unenforceable under section 365(e)(1) where the sole basis for termination was the
debtor's bankruptcy filing).

### Adequate Assurance of Future Performance by SG Has Been Provided

42.    Pursuant to 365(f)(2) of the Bankruptcy Code, a debtor may only assign an
executory contract if "adequate assurance of future performance by the assignee of such contract
or lease is provided." 11 U.S.C. § 365(f)(2). Under section 365(f)(2), the meaning of "adequate
assurance of future performance" depends on the facts and circumstances of each case, but
should be given "practical, pragmatic construction." *Carlisle Homes, Inc. v. Arrari* (*In re
Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (internal citations omitted); *see
also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (explaining that adequate
assurance of future performance does not mean absolute assurance that debtor will thrive and pay
rent). Among other things, adequate assurance may be given by demonstrating the assignee's
financial health and experience in managing the type of enterprise or property assigned. *See In
re Bygraph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance
of future performance is present when prospective assignee of lease has financial resources and
expressed willingness to devote sufficient funding to business to give it strong likelihood of
succeeding; chief determinant of adequate assurance is whether rent will be paid).

43.    SG is a large financial institution with extensive experience in derivatives
transactions of this size and scope. SG also has more than sufficient financial capability to
satisfy any obligations that may arise under the Libra CDSA and the Vela CDSA, thus enabling
the Libra and Vela transactions to continue unimpeded, and LBSF to thereby benefit from both
CDOs. As of October 17, 2006 and November 16, 2006, the dates that LBSF entered into the
CDSAs, LBHI's credit ratings were: A1 (long-term) and P-1 (short-term) from Moody's Investor

24

Services, and A+ (long-term) and A-1 (short-term) from Standard & Poor's. Currently, SG's

credit ratings are: Aa2 (long-term) and P-1 (short-term) from Moody's Investor Services, and

A+ (long-term) and A-1 (short-term) from Standard and Poor's. As such, there can be no serious

dispute that SG is an appropriate, creditworthy counterparty.

### The Assignment Determinations Should Be Made

44.    Given that any payments by SG under the Senior Swap Agreements would

ultimately be paid to SG as the new "buyer" under the CDSAs upon the effectiveness of the

Assignment Agreements, the Debtors request that the Court approve two protections that would

reduce administrative burden on all parties and reduce risk that the flow of funds would not

match the economic settlement negotiated between the Debtors and SG. Section 105(a) of the

Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title," gives the Court broad powers to grant

the relief requested in furtherance of the settlement.

45.    First, the Debtors request that the Court direct that the maximum

aggregate amount of all credit-protection payments and termination payments payable by Libra

and Vela under the CDSAs shall be reduced, in each case, to an amount equal to the aggregate

funds available to Libra and Vela for making such payments without causing a draw on the

related Senior Swap Agreement, with the effect that draws on the Senior Swap Agreements are

forever foreclosed.

46.    Second, the Debtors request that the court direct that: (a) LBSF (until the

effectiveness of the Assignment Agreements) and SG (following the effectiveness of the

Assignment Agreements) shall have full discretion as to when and if to deliver to Libra or Vela

notices of amounts due with respect to outstanding Floating Amount Events under the CDSAs

and full discretion to seek an amount equal to or less than the Floating Amount due to the

"buyer" under the CDSAs in respect of any outstanding Floating Amount Events; (b) the

exercise of such discretion shall be deemed to satisfy any applicable requirements under the

CDSAs; and (c) in the event draws are made on the Senior Swap Agreements, SG need not go

through the exercise of advancing funds to Libra or Vela or their respective trustees in order for

such funds to be paid right back to SG.  There is no economic impact to the other parties to the

transaction if the Court simply permits SG to retain these funds.

47.     The requested relief is in furtherance of the settlement.  It avoids the

needless step of SG advancing funds to Libra and Vela only for such funds to be paid back to

SG.  The direction also will protect SG from third-party attempts to wrongfully interfere with

funds paid into Libra or Vela, which could trigger an indemnification under the Settlement

Agreement and thereby dilute LBSF's recoveries.  Such relief will maximize the value of the

settlement because, without this relief, there can be no Assignments, and the Assignments are

necessary for LBSF to pursue the Termination Claim against the Other Libra Parties and the

Other Vela Parties.

## Anti-Assignment Provisions Are Not Enforceable

48.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign

executory contracts free from anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or
> unexpired lease of the debtor, or in applicable law, that prohibits,
> restricts, or conditions the assignment of such contract or lease, the
> trustee may assign such contract or lease under paragraph (2) of
> this subsection.

11 U.S.C. § 365(f)(1).  Section 365(f)(1) invalidates provisions that prohibit, restrict, or

condition assignment of an executory contract or unexpired lease.  *See, e.g., In re Jamesway

Corp.*, 201 B.R. 73, 76 (Bankr. S.D.N.Y., 1996) ("Section 365(f)(1) works by operation of law to

26

invalidate lease provisions which restrict or discourage a debtor-in-possession from assigning the lease.").

49.    It is well settled that, in addition to provisions that prohibit assignment outright, provisions that have the effect of restricting assignments – *i.e.*, *de facto* anti-assignment provisions – are also unenforceable. *See In re Adelphia Commn'cs Corp.*, 359 B.R. 65, 85-86 (Bankr. S.D.N.Y. 2007) ("Among the types of provisions that have been held to be unenforceable under section 365(f) are rights of first refusal, and for good reason. They always "restrict" assignment... ."); *In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."), *aff'd*, 209 F.3d 291 (3d Cir.), *cert. denied*, 531 U.S. 873 (2000).  Similarly, in *In re Mr. Grocer, Inc.*, the court noted:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves *ipso facto* anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).  Manifestly, *de facto* anti-assignment provisions, such as rights to consent or withhold consent to assignments, are not enforceable.

50.    Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  11 U.S.C. § 365(f)(3).  *See, e.g., In re Jamesway Corp.*, 201 B.R. at 78 (section 365(f)(3) prohibits enforcement of any lease clause

27

creating right to terminate lease because it is being assumed or assigned, thereby indirectly

barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment

clauses, are subject to court's scrutiny regarding anti-assignment effect).

51.     LBSF's assignment of its interests in the Libra CDSA and the Vela CDSA

is expressly authorized by such agreements subject to the satisfaction of the "Ratings Condition,"

which generally requires ratings agencies to issue a statement that affirms that the assignee's

financial strength and stability. *See* Libra CDSA subpt. 5(e)(2) (permitting assignment to an

appropriate, creditworthy, replacement counterparty subject to Ratings Condition); Vela CDSA

subpt. 5(e)(2) (same).  Although the Debtors believe that the spirit of the Ratings Condition is

satisfied because SG is a qualified counterparty, to the extent the ratings agencies do not issue a

statement in satisfaction of the Ratings Condition, such a technical requirement should be

deemed unenforceable as an anti-assignment provision within the meaning of section 365(f) of

the Bankruptcy Code.

### SG is Entitled to Protection Under Sections 363(m) and (n)

52.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

53.     "The legislative history of § 363(m) confirms that the purpose of § 363(m)

is to protect good faith purchasers of property from reversal of sale authorization on appeal

unless authorization and the sale itself were stayed pending appeal." *In re Int'l Union, United*

*Auto., Aerospace and Agr. Implement Workers of Am.*, 85 B.R. 666, 667 (D. Mass. 1988).  Thus,

28

the purpose of the protections afforded to a good faith purchaser is to "encourage optimum bids

for 'property of the estate' from entities not otherwise privy to the bankruptcy proceedings, by

ensuring that orders approving such sales promptly become final . . . ." *In re Healthco Int'l, Inc.*,

136 F.3d 45, 49 (1st Cir. 1998); *see Cinicola v. Scharfenberger*, 248 F.3d 110, 122 (3d Cir.

2001) ("The provision's blunt finality is harsh but its certainty attracts investors and helps

effectuate debtor rehabilitation.").

54.    Section 363(m) has been held to apply to assumption and assignment of

executory contracts under section 365 because such assumption and assignment is a "use, sale, or

lease of property" governed by section 363. *In re Am. Banknote Corp.*, 2000 U.S. Dist. LEXIS

8796, at *6 (S.D.N.Y. 2000) ("At least three circuits have held that section 363(m) does apply to

lease assignments governed by section 365."). Consequently, an assignment of an interest in

estate property is "also covered by section 363, although the procedure for their transfer is

delineated by section 365. Therefore, section 363(m) governs . . . notwithstanding that section

365 applies to the particular mechanics of conveyance." *In re Krebs Chrysler-Plymouth, Inc. v.

Valley Motors, Inc. (In re Valley Motors, Inc.)*, 141 F.3d 490, 498 (3d Cir. 1998).

55.    Section 363(n) of the Bankruptcy Code provides:

> The trustee may avoid a sale under this section if the sale price was
> controlled by an agreement among potential bidders at such sale,
> or may recover from a party to such agreement any amount by
> which the value of the property sold exceeds the price at which
> such sale was consummated, and may recover any costs, attorneys'
> fees, or expenses incurred in avoiding such sale or recovering such
> amount. In addition...the court may grant judgment for punitive
> damages in favor of the estate against any party that entered into
> such an agreement in willful disregard of this subsection.

11 U.S.C. § 363(n).

56.    The proposed assumption, assignment, and sale transactions are the result

of arms' length, good faith negotiations. *See In re Gucci*, 126 F.3d 380 (2d Cir. 1997) (a good

29

faith purchaser is shown by integrity of his conduct during the course of the sale proceedings); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998) (a determination of bad faith must be based on untoward conduct by the purchaser, such as fraud or collusion) (citing *Gucci*, 126 F.3d 380); *Comty. Thrift & Loan v. Suchy (In re Suchy)*, 786 F.2d 900, 902 (9th Cir. 1985) (a good faith purchaser is one that has not engaged in conduct involving fraud or collusion nor has sought to take grossly unfair advantage of other bidders). SG has not, in connection with the Assignment Agreements or the Settlement Agreement, engaged in any conduct that demonstrates a lack of good faith or collusion. Accordingly, the Debtors submit that SG is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

**A Private Sale of the Vela CDSA is Appropriate Under the Circumstances**

57.    Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." In accordance therewith, a chapter 11 debtor may be allowed to sell or assign assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale or assignment is permissible. *See, e.g., In re Loral Space & Commc'ns Ltd.*, Ch. 11 Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Sep. 30, 2005) (Docket No. 2393); *In re Int'l Wire Group, Inc.*, Ch. 11 Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. June 10, 2004) (Docket No. 176); *Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.)*, 233 B.R. 619 (D.P.R. 1999) (upholding bankruptcy court's approval of private sale conducted by chapter 11 debtor); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving private sale of chapter 11 debtor's assets).

58.    A private sale of the Vela CDSA to SG is appropriate. The Vela CDSA Assignment Agreement is part of the package deal in the Settlement Agreement that is likely to

30

enable LBSF to recover at least $445 million and assert the Termination Claim in pursuit of the

remaining assets of Vela against the Other Vela Parties. And even if LBSF could find a potential

purchaser for the Vela CDSA that would be prepared to pay an amount that is materially higher

than the Settlement Agreement, any such payment would be contingent upon: (i) the entry of a

judgment nullifying the Vela Early Termination, (ii) success on all appeals, and (iii) approval of

the assignment transactions. Thus, unlike the Settlement Agreement, another transaction with a

third party could not offer the complete resolution of litigation with SG or even guarantee a

single dollar of recovery to LBSF, let alone $445 million.

### The Sale of the Agreement Should be Free and Clear of Liens and Claims

59.    The sale of LBSF's interests in the Libra CDSA and the Vela CDSA to SG

should be free and clear of any and all liens, claims, encumbrances and other interests in

accordance with section 363(f) of the Bankruptcy Code. A debtor may sell property of its estate

free and clear of any interest in such property if one of the conditions in section 363(f)(1) – (5) is

satisfied. *See* 11 U.S.C. § 365(f); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d

Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and

clear of third-party interests, the third party is adequately protected if his interest is assertable

against the proceeds of the disposition.); *Circus Time, Inc. v. Oxford Bank & Trust (In re Circus

Time, Inc.)*, 5 B.R. 1, 8 (Bankr. D. Me. 1979) (finding the court's power to sell property free and

clear of liens has long been recognized); *see also In re Riverside Inv. P'ship*, 674 F.2d 634, 640

(7th Cir. 1982) ("Generally, in a 'free and clear' sale, the liens are impressed on the proceeds of

the sale and discharged at the time of sale.").

60.    The Debtors are not aware of any parties that have any liens, claims,

encumbrances, or interests in the Libra CDSA or the Vela CDSA. To the extent that any party

31

asserts a lien, claim, encumbrance or other interest in the Libra CDSA or the Vela CDSA,

subject to any claims and defenses the Debtors may possess with respect thereto, such party's

interests will be adequately protected because LBSF will be able to satisfy one or more of the

conditions set forth in section 363(f).  Thus, the sale of the Libra CDSA or the Vela CDSA free

and clear of liens, claims, encumbrances, and interests will satisfy the statutory prerequisites of

section 363(f) of the Bankruptcy Code.

### Notice

61.     No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in the second

amended order entered on June 17, 2010 governing case management and administrative

procedures for these cases [Docket No. 9635] to (i) the U.S. Trustee; (ii) the attorneys for the

Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue

Service; (v) the United States Attorney for the Southern District of New York; (vi) SG, (vii)

Libra, (viii) Vela; and (ix) all parties who have requested notice in these chapter 11 cases.

62.     In addition, the Debtors served a copy of the Motion with all exhibits

thereto on (i) the Libra Trustee; (ii) the Libra Noteholders; (iii) the Libra Collateral Manager;

(iv) Libra CDO, LLC; (v) the Vela Trustee, (vi) the Vela Noteholders; (vii) the Vela Collateral

Manager; and (viii) MKP Vela CBO, LLC.  Service on the Libra Noteholders and the Vela

Noteholders was completed by delivering a copy of the Motion and the Publication Notice

(defined below) to (i) the care of the Libra Trustee or the Vela Trustee, as applicable, with

instructions to forward a copy of the Settlement Motion and Publication Notice to each registered

Libra Noteholder or Vela Noteholder, and (ii) directly to the original Libra Noteholders and Vela

Noteholders (as of the issuance date thereof) as and to the extent listed in the Debtors' records.

Additionally, the Debtors caused notice of this Motion to be published in *The Wall Street*

32

*Journal* and *Investor's Business Daily* for three successive Business Days after its filing (the

"Publication Notice"). The Publication Notice states that the Motion and all related documents

thereto can be retrieved at no cost at www.lehman-docket.com or by request to the Lehman

Legal Hotline at lehmanteam@weil.com or (212) 310-8040. Notice of the Settlement

Agreement and the Motion has also been posted on the Debtors' website at www.lehman-

docket.com. The Debtors submit that no other or further notice is required.

   63. No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

   WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated: September 20, 2010
   New York, New York

           _____

           Lori R. Fife
           Ralph I. Miller
           Jacqueline Marcus

           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York 10153
           Telephone: (212) 310-8000
           Facsimile: (212) 310-8007

           Attorneys for Debtors
           and Debtors in Possession

**<u>Exhibit A</u>**

**(The Settlement Agreement)**

**<u>Exhibit B</u>**

**(Diagram Overview of the CDSAs)**

**Exhibit C**

**(Libra CDSA)**

**Exhibit D**

**(Vela CDSA)**

## Exhibit E

**(Libra CDSA Assignment Agreement)**

## Exhibit F

**(Vela CDSA Assignment Agreement)**

**<u>Exhibit G</u>**

**(Libra Indenture)**

**<u>Exhibit H</u>**

**(Vela Indenture)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Ralph I. Miller
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                                                 :
**In re**                                                        :    **Chapter 11 Case No.**
                                                                 :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,                     :    **08-13555 (JMP)**
                                                                 :
                                      **Debtors.**               :    **(Jointly Administered)**
                                                                 :
                                                                 :
-----------------------------------------------------------------x

**DECLARATION OF ROBERT HERSHAN IN SUPPORT OF THE DEBTORS'**
**MOTION, PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE**
**BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR APPROVAL OF**
**A SETTLEMENT AGREEMENT AMONG LBSF, LBHI, AND SOCIÉTÉ**
**GÉNÉRALE, NEW YORK BRANCH AND CERTAIN RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Robert Hershan, declare:

1.    I am over the age of 18 years and make these statements of my own

personal knowledge, my review of the business records of Lehman Brothers Special

Financing Inc. ("LBSF") and Lehman Brothers Holdings Inc. ("LBHI") (together with

LBSF, the "Debtors"), and/or my consultation with employees of the Debtors.  If called

to testify, I could testify to the truth of the matters set forth herein.

2.    I submit this declaration in support of the Debtors' Motion, Pursuant to

Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rule 9019, for

Approval of a Settlement Agreement Among LBSF, LBHI, and Société Générale, New York Branch ("SG") and Certain Related Relief (the "Motion").[1]

3.      I am a Managing Director with Alvarez and Marsal North America, LLC. I was assigned to the LBHI matter on September 17, 2008. One of my primary areas of responsibility includes managing a portfolio of the Debtors' derivatives transactions with counterparties that are special purpose entities. In that role I have independently reviewed, have become familiar with and have personal knowledge regarding certain transactions that the Debtors entered into before their bankruptcy with special purposes entities, including the transactions with Libra CDO Limited ("Libra") and MKP Vela CBO, Ltd. ("Vela") that are the subject of the Motion. I have been the primary representative for the Debtors in connection with the Libra and Vela transactions, including the negotiation of the Settlement Agreement with SG. I have reviewed the Motion and it accurately reflects the terms of the Settlement Agreement.

### The Libra and Vela CDSA Transactions

4.      The Libra credit default swap agreement is governed by a 1992 ISDA Master Agreement, dated as of October 17, 2006 (together with the schedule and confirmations thereto, each dated October 17, 2006, the "Libra CDSA"). The Vela credit default swap agreement is governed by a 1992 ISDA Master Agreement, dated as of November 16, 2006 (together with the amended and restated schedule, credit support annex, and amended and restated confirmations thereto, each dated April 23, 2008, the "Vela CDSA," and, together with the Libra CDSA, the "CDSAs").

5.      The obligations of both Libra and Vela to LBSF under the Libra CDSA and Vela CDSA are secured by separate credit default swap agreements with SG,

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

2

pursuant to which SG is obligated to advance funds to Libra and/or Vela, as applicable, so that Libra and/or Vela can meet their respective obligations to LBSF under the CDSAs (the "Senior Swap Agreements").

6.      In connection with the commencement of the Debtors' chapter 11 cases, the indenture trustees of Libra and Vela purported to designate an Early Termination Date under the Libra CDSA and the Vela CDSA as of October 10, 2008 and September 30, 2008, respectively.  The Debtors have challenged the propriety and validity of both purported terminations.  In May 2009, the Debtors commenced an adversary proceeding seeking, among other things, a declaration that the purported termination of the Libra CDSA was invalid and ineffective.  Although the Debtors have not yet commenced an adversary proceeding challenging the validity of the early termination of the Vela CDSA or the modification of LBSF's payment priority, the Debtors anticipate filing such a complaint as contemplated by the Settlement Agreement.

**LBSF's Efforts to Market Its Interest in the Libra CDSA**

7.      The Debtors have invested significant resources to comprehensively analyze the issues in dispute with respect to the Libra and Vela transactions.  The decision to enter into the Settlement Agreement was made after a careful analysis of, among other things, the uncertainties surrounding the litigation, the market for potential assignees and negotiations with several such parties.  Prior to entering the Settlement Agreement, LBSF engaged an advisor (the "Advisor") to market and sell or assign its interest in the Libra CDSA.  LBSF, together with its Advisor, undertook a process of identifying potential assignees on the basis of a variety of factors, including the credit rating required to satisfy the rating condition set out in the Libra CDSA, familiarity with

3

complex commercial transaction such as the CDSAs and the financial capabilities of potential assignees, to facilitate a timely analysis and competitive bid.

8.    Due to the current economic environment, several potential assignees were not qualified or were otherwise unable to become assignees. LBSF and its advisors identified five potential assignees that met the criteria for assignment, and LBSF entered into confidentiality agreements with those parties. LBSF then continued more detailed discussions on the terms of assignment with potential assignees and provided documentation of the Libra CDSA to facilitate diligence and bidding. In the spring of 2009, LBSF's marketing efforts culminated in a stalking-horse offer by Deutsche Bank, AG London Branch ("DB") that provided for LBSF's assumption and assignment of its interest in the Libra CDSA upon the entry of a final judgment invalidating the Libra Early Termination.

9.    After LBSF received the offer from DB, LBSF eventually consummated a stalking horse letter agreement for the assignment and sale of the Libra CDSA and negotiated a break-up fee with DB (the "Letter Agreement"). On June 1, 2009, the Court approved the Debtors' entry into the Letter Agreement and break-up fee with DB, and entered the Order Pursuant to Section 363 of the Bankruptcy Code Approving the Letter Agreement, Including the Payment of the Break-Up Fee, Among Deutsche Bank AG, London Branch and Certain Debtors [Docket No. 3709]. Following the Court's approval of the Letter Agreement, LBSF and SG briefed their respective cross-motions for summary judgment, which were argued on August 26, 2009.

**LBSF's Efforts to Market Its Interest in the Vela CDSA**

10.     Similar to efforts made with respect to the Libra CDSA, LBSF and its

Advisor took steps to market the Vela CDSA. Although there was general interest in

LBSF's position in the Vela CDSA and potential assignees were identified, LBSF was

not able to reach an agreement to assume and assign the Vela CDSA.

**The Settlement Agreement Was Reached After Arms'-Length Bargaining**

11.     The Settlement Agreement was negotiated over a period of eight months,

in good faith, and as a result of arm's length bargaining. It is not a product of fraud or

collusion. The Settlement Agreement is the product of well-informed judgment by the

Debtors and achieves a very fair result for the Debtors that will provide significant value

– likely, at least four hundred forty-five million dollars – to LBSF's estate.

12.     The Debtors have been negotiating the terms of the settlement with SG

since late November of 2009. Over the course of eight months, representatives of the

Debtors and SG had numerous communications regarding potential settlement

parameters, including settlement value and the mechanics of structuring a potential

settlement. While the initial settlement offers of SG were unacceptable to the Debtors, as

a result of continued settlement negotiations, SG increased its offer over time and

eventually reached the level that is now acceptable to the Debtors. During this time, as

the Debtors and SG continued to negotiate a settlement, the Debtors were engaged with

their counsel and also with the official committee of unsecured creditors appointed in

these cases ("the "Creditors' Committee") and its professionals in substantive discussions

regarding potential settlement ranges and other issues related to the settlement, and also

during this time the Creditors' Committee and/or its professionals met with SG on at least

two separate occasions to discuss the settlement terms.

5

## The Settlement Agreement Is Reasonable and Satisfies the Standard for Approval.

13.    The Settlement Agreement is reasonable and in the best interests of the Debtors, their estates and their creditors. As a result of the Settlement Agreement, it is likely LBSF will receive a minimum of $445 million consisting of an immediate payment of $370 million and $75 million guaranteed by SG.[2] The Settlement Agreement also allows LBSF to assert the Termination Claim against the parties to the Vela and Libra CDSAs, other than SG, thereby maximizing its opportunity to increase the total amount that LBSF may recover to approximately $516.6 million (minus expenses).

14.    Although the Letter Agreement with DB or a potential sale transaction for the Vela CDSA *could in theory* result in a greater recovery for LBSF's estate, there are significant risks associated with those transactions that might prevent LBSF from ever recovering *any* value from SG. Specifically, realization of any proceeds from the DB transaction or a potential transaction involving the Vela CDSA are contingent upon: (i) the entry of a fully litigated judgment nullifying the Libra Early Termination or the Vela Early Termination, as applicable, (ii) success on all appeals, and (iii) approval of the assignment transactions. This process could take years to complete, and there is risk that LBSF's recoveries from the transactions may be significantly limited. The Debtors have considered these potential alternatives and their associated risks and believe, in the exercise of the Debtors' business judgment, that the Settlement Agreement is the best available transaction for the Debtors.

15.    The Settlement Agreement also avoids continued litigation with SG with respect to the Libra and Vela transactions and eliminates the risks and costs associated

---

[2] While the SG Guarantee is theoretically subject to reduction to the extent SG makes Advances to Libra or Vela and such Advances are not reimbursed to SG from the Global Escrow Account, it is highly doubtful that such a reduction would ever arise.

6

with that litigation. I am familiar with and have been advised by counsel of the risks to

the Debtors of continued litigation against SG. The results of litigation are not certain

and further litigation (including the potential for a drawn out appellate process)

necessarily will be time-consuming and costly to the Debtors. The certainty of an

immediate cash payment by SG is a better alternative for the Debtors than continued

litigation with SG.

16.    In addition, if the Settlement Agreement is approved, LBSF will be in a

better position to recover the approximately $128 million in collateral that LBSF had

posted with Libra, because if and when SG becomes the assignee, its current credit rating

should help eliminate the need to continue to post that collateral.

17.    Based upon all of these considerations, and after consultation with various

employees of the Debtors, counsel and other estate advisors, I believe that the Debtors'

decision to enter into the Settlement Agreement is supported by sound business reasons

and is in the best interests of the Debtors, their estates and creditors. Indeed, it is the

collective view of the most senior employees of the Debtors and their professionals

familiar with these transactions that this proposed settlement is a fair and equitable result

for creditors and is in the best interests of the Debtors. Moreover, the Creditors'

Committee supports the Settlement Agreement.

18.    LBHI's participation in the Settlement Agreement is reasonable and

necessary to allow a global resolution between SG and the Debtors. LBHI played a

limited role in the Libra and Vela Credit Default Swap transactions as credit support

provider for LBSF. LBHI has no claim to affirmative recoveries under the Libra and

Vela Credit Default Swap transactions, but only an obligation to pay LBSF's obligations

7

to the extent LBSF cannot satisfy such obligations. As such, LBHI's release of its claims against SG with respect to the Libra and Vela transactions is unlikely to have any economic impact on LBHI's estate and should be approved.

**LBSF Has Exercised Sound Business Judgment in Agreeing to Enter into the Libra Assignment Agreement and the Vela Assignment Agreement.**

19.    The Assignment Agreements are immensely beneficial to LBSF's estate. The Assignment Agreements are integral components of the Settlement Agreement, will enable LBSF to recover substantial amounts from SG, and will maximize LBSF's opportunity to realize additional recoveries from the transactions. Without the Assignment Agreements, SG will not enter into a settlement with the Debtors that allows the Debtors to continue to assert the Termination Claim because SG will not bear the risk that, after a settlement in which SG makes a substantial payment, a court may find that SG is required to continue to perform under the Senior Swap Agreements.

20.    Notwithstanding the assignment of LBSF's interest in the CDSAs to SG, LBSF is maintaining an economic interest in both transactions. Under the sharing agreement, as set forth in the Settlement Agreement, if there is any recovery under the Libra CDSA and the Vela CDSA by SG, as assignee, then, after reimbursement of costs, the parties have agreed to share the proceeds of such recoveries. LBSF has a right of priority to collect the first $100 million with $75 million guaranteed by SG. Thus, other than the break-up fee payable to DB of $20 million, there is no economic loss to LBSF's estate as a result of the Assignment Agreements. Accordingly, LBSF's entry into the Assignment Agreements represents a reasonable exercise of LBSF's business judgment and is in the best interests of creditors.

8

21.    I am not aware of any parties that have any liens, claims, encumbrances, or interests in the Libra CDSA or the Vela CDSA.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 20th day of September, 2010.

/s/ Robert Hershan
Robert Hershan

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re                                                    :    Chapter 11 Case No.
                                                         :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                 :    08-13555 (JMP)
                                                         :
                                  Debtors.               :    (Jointly Administered)

-----------------------------------------------------------------x

ORDER APPROVING SETTLEMENT AGREEMENT AMONG
LEHMAN BROTHERS SPECIAL FINANCING INC., LEHMAN BROTHERS
HOLDINGS, INC., AND SOCIÉTÉ GÉNÉRALE, NEW YORK BRANCH,
RELATING TO CERTAIN SWAP TRANSACTIONS WITH MKP VELA
CBO, LTD. AND LIBRA CDO LIMITED AND GRANTING RELATED RELIEF

Upon the motion, dated September 20, 2010 (the "Motion"),[1] of Lehman Brothers

Special Financing Inc. ("LBSF") and Lehman Brothers Holdings Inc. ("LBHI"), as debtors and

debtors-in-possession (together, the "Debtors), pursuant to sections 105(a), 363 and 365 of

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6004,

6006 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for (i)

approval of a settlement agreement (the "Settlement Agreement") among LBSF, LBHI, and

Société Générale, New York Branch ("SG") relating to certain swap transactions with MKP Vela

CBO, Ltd. ("Vela") and Libra CDO Limited ("Libra"), (ii) the assumption, assignment, and sale

of LBSF's interest in that certain Credit Default Swap Agreement, dated October 17, 2006,

consisting of an ISDA Master Agreement, a Schedule, and Confirmations (collectively, the

"Libra CDSA") to SG on the terms and conditions set forth in the Settlement Agreement and in

the Form of Libra CDSA Assignment Agreement attached as Exhibit 2 to the Settlement

Agreement (the "Libra CDSA Assignment Agreement"), (iii) the assumption, assignment, and

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Settlement Agreement, a copy of which is annexed hereto as Exhibit A.

sale of LBSF's interest in that certain Credit Default Swap Agreement, consisting of an ISDA

Master Agreement, dated November 16, 2006, and an amended and restated schedule, a credit

support annex, and amended and restated confirmations, dated April 23, 2008 (collectively, the

"Vela CDSA"), to SG on the terms and conditions set forth in the Settlement Agreement and in

the Form of Vela CDSA Assignment Agreement attached as Exhibit 3 to the Settlement

Agreement (the "Vela CDSA Assignment Agreement"), and (iv) other related relief, all as more

fully described in the Motion; and a hearing having been held to consider the Motion; and upon

the Court's consideration of the Motion and the record of the hearing to consider the relief

requested in the Motion; and the Court having found and determined that the relief sought in the

Motion is in the best interests of the Debtors and their estates and that the legal and factual bases

set forth in the Motion establish just cause for the relief granted by the Order; and after due

deliberation and sufficient cause appearing therefor, it is

      ADJUDGED, FOUND AND DETERMINED:

      A.    **Jurisdiction and Venue**.  The Court has jurisdiction to consider this

Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

      B.    **Statutory and Rule Predicates**.  The statutory predicates for the relief

sought in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy

Rules 2002, 6004, 6006 and 9019.

      C.    **Notice**.  As set forth in the Motion and evidenced by the affidavits of

service filed with the Court, due, proper, timely, adequate and sufficient notice of the Motion, the

Settlement Agreement, the Libra CDSA Assignment Agreement and the Vela CDSA Assignment

Agreement has been provided in accordance with Bankruptcy Rule 2002(a), (l) and (m) and the

procedures set forth in the order entered on June 17, 2010 governing case management and

administrative procedures for these cases [Docket No. 9635] to (i) the United States Trustee for

the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured

Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; (vi) SG; (vii) Libra; (viii) the

Libra Trustee; (ix) the Libra Noteholders; (x) the Libra Collateral Manager; (xi) Libra CDO,

LLC; (xii) Vela; (xiii) the Vela Trustee, (xiv) the Vela Noteholders; (xv) the Vela Collateral

Manager, (xvi) MKP Vela CBO, LLC, and (xvii) all parties who have requested notice in these

chapter 11 cases.  No other or further notice is required.

       D.     **Opportunity to Object**.  A reasonable opportunity to object and to be

heard as to the Motion and the relief requested has been given as required by the Bankruptcy

Code and Bankruptcy Rules to all persons entitled to notice.

       E.     **Best Interests and Reasonableness**.  Good and sufficient reasons for

approval of the Settlement Agreement and the transactions contemplated by such Agreement,

including the Libra CDSA Assignment Agreement and the Vela CDSA Assignment Agreement,

have been demonstrated, and the Debtors' entry into the Settlement Agreement, the Libra CDSA

Assignment Agreement and the Vela CDSA Assignment Agreement is each (i) a decision within

the sound exercise of the Debtors' business judgment; (ii) in the best interests of the Debtors,

their estates, their creditors, and other parties in interest; and (iii) reasonable and appropriate

under the circumstances.  The Settlement Agreement falls within the range of reasonableness and

satisfies the standard for approval under Bankruptcy Rule 9019.

       F.     **Arm's-Length Transactions**.  The Settlement Agreement, the Libra

CDSA Assignment Agreement and the Vela CDSA Assignment Agreement were each

negotiated extensively, proposed and entered into (or, in the case of the Libra CDSA Assignment

Agreement and the Vela CDSA Assignment Agreement, may be entered into in accordance with

the Settlement Agreement) by the Debtors and SG, without collusion, after good faith, arm's-

length bargaining and negotiations.  SG is not an "insider" of the Debtors within the meaning of

section 101(31) of the Bankruptcy Code.  Neither the Debtors nor SG have engaged in any

conduct that would cause or permit the Libra CDSA Assignment Agreement or the Vela CDSA

Assignment Agreement to be avoided under section 363(n) of the Bankruptcy Code.

G.    **Good Faith Purchaser**.  SG is a good faith purchaser of LBSF's rights,

title and interest in the Libra CDSA and the Vela CDSA within the meaning of section 363(m) of

the Bankruptcy Code.

H.    **Free and Clear**.  LBSF's rights, obligations and interests in the Libra

CDSA and the Vela CDSA constitute property of its estate.  Pursuant to section 363(f) of the

Bankruptcy Code, LBSF may sell its interests under the Libra CDSA and the Vela CDSA to SG

free and clear of any claims or interests.  The assumption, assignment and sale of LBSF's rights

and obligations under the Libra CDSA and the Vela CDSA to SG pursuant to the Libra CDSA

Assignment Agreement and the Vela CDSA Assignment Agreement, respectively, will be a

legal, valid, and effective transfer of such rights and obligations, and will vest SG with all right,

title, and interest of LBSF under the Libra CDSA and the Vela CDSA, as applicable, free and

clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code) (including,

without limitation, successor liability claims), encumbrances, obligations, liabilities, contractual

commitments, rights of first refusal or interests of any kind or nature whatsoever (collectively,

the "Interests").

4

I.    **Cure/Adequate Assurance**.  LBSF has: (i) cured or provided adequate assurance of cure, of any default existing prior to the date hereof with respect to the Libra CDSA and the Vela CDSA, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, (ii) to the extent necessary, provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Libra CDSA and the Vela CDSA, within the meaning of sections 365(b)(1)(B) and 365(f)(2)(A) of the Bankruptcy Code, and (iii) provided adequate assurance of future performance by the assignee, SG, within the meaning of section 365(f)(2)(B) of the Bankruptcy Code.

J.    **Section 365(f) of the Bankruptcy Code**.  The transactions contemplated in and evidenced under the Libra CDSA Assignment Agreement and the Vela CDSA Assignment Agreement are not prohibited under the terms of the Libra CDSA or the Libra Indenture or the Vela CDSA or the Vela Indenture, as applicable, and any such terms that purport to prohibit, restrict or condition the assignment of LBSF's interest in the Libra CDSA or the Vela CDSA, are unenforceable pursuant section 365(f) of the Bankruptcy Code.

NOW, THEREFORE, IT IS ORDERED:

1.    **Motion Granted**.  The Motion and the relief requested therein is GRANTED in its entirety and APPROVED.

2.    **Objections Overruled**.  Objections, if any, to the Motion and entry of this Order, including to the Settlement Agreement, the Libra CDSA Assignment Agreement and the Vela CDSA Assignment Agreement, that have not been withdrawn, waived, settled, or otherwise resolved pursuant to the terms hereof are denied and overruled on the merits in their entirety with prejudice.

5

3.    **Settlement Agreement Approved**. Pursuant to Bankruptcy Rule 9019, the Settlement Agreement, inclusive of all of the terms and conditions thereto, is approved and shall be binding on the Debtors and SG, and each of their predecessors and successors and assigns. The Debtors are authorized to enter into and perform their respective obligations under the Settlement Agreement and to execute all further documents and take such further actions as may be required, necessary or appropriate, including, without limitation, the posting and/or use of cash as provided in the Settlement Agreement, to implement the transactions contemplated by the Settlement Agreement.

4.    **The SG Payment and the SG Guarantee**. On the 5th business day after this Order becomes a "Final Order" (the "Payment Date"), SG shall, subject to the terms and conditions of the Settlement Agreement, (i) pay LBSF $370,000,000 (the "SG Payment") and (ii) guarantee to LBSF a recovery of up to $75,000,000 from the Libra and Vela Transactions (the "SG Guarantee"). The SG Guarantee shall be satisfied by SG in accordance with, and subject to, the terms and conditions of the Settlement Agreement. Notwithstanding anything to the contrary, after this Order becomes a "Final Order," the Parties' obligations under Section 7 of the Settlement Agreement, including SG's obligation to make the SG Payment and to perform the SG Guarantee, shall not be conditioned or dependent upon the effectiveness of the Libra CDSA Assignment Agreement or the Vela CDSA Assignment Agreement in accordance with paragraph 8 of this Order. As used in this paragraph, a "Final Order" means a Settlement Approval Order, as defined in the Settlement Agreement, that (i) has not been stayed and the time for any motion to stay has expired and (ii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the order and the time for any further appeals has expired.

6

5.    **Deferral of Payment Due Date under Libra CDSA and Vela CDSA**

**Approved**. The Debtors are permitted to unilaterally defer the payment due date in respect of

any payment payable to them under the Libra CDSA and the Vela CDSA, and the deferral

contemplated in Sections 7.4 and 7.5 of the Settlement Agreement shall be binding on the Other

Libra Parties and the Other Vela Parties, as applicable, and is hereby authorized and approved.

6.    **Assumption, Assignment and Sale of Libra CDSA Approved**.

Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to paragraph 8

below, (i) the Libra CDSA Assignment Agreement, and all of the terms and conditions thereto, is

approved and shall be binding on LBSF and SG, and each of their successors and assigns and (ii)

LBSF's assumption, assignment and sale of its interests, rights and obligations under the Libra

CDSA to SG pursuant to the Libra CDSA Assignment Agreement is approved.  LBSF is

authorized to enter into and perform its obligations under the Libra CDSA Assignment

Agreement, and to execute all further documents and take such further actions as may be

necessary and appropriate to implement the transactions contemplated by the Libra CDSA

Assignment Agreement.  On the Libra Assignment Closing Date, the current defaults of LBSF

and LBHI under the Libra CDSA shall be deemed cured, and any provision in such agreement,

or any other agreement, that (i) purports to prohibit or condition the assignment (including,

without limitation, any purported prerequisites that the Libra Rating Condition be satisfied) of

the Libra CDSA, (ii) requires the consent of Libra or any other person in order for the

assignment of LBSF's interest to be valid, or (iii) allows Libra, or any other third party, to

terminate, recapture, impose any penalty or condition on renewal or extension, or modify any

term or condition in respect of the Libra CDSA, the Libra CDS Transactions, the Libra Indenture

or any other agreement upon or as a result of such assignment are void, of no force and effect
and shall not be enforceable against SG.

       7.      **Assumption, Assignment and Sale of Vela CDSA Approved**.

Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to paragraph 8

below, (i) the Vela CDSA Assignment Agreement, and all of the terms and conditions thereto, is

approved and shall be binding on LBSF and SG, and each of their successors and assigns and (ii)

LBSF's assumption, assignment and sale of its interests, rights and obligations under the Vela

CDSA to SG pursuant to the Vela CDSA Assignment Agreement is approved.  LBSF is

authorized to enter into and perform its obligations under the Vela CDSA Assignment

Agreement, and to execute all further documents and take such further actions as may be

necessary and appropriate to implement the transactions contemplated by the Vela CDSA

Assignment Agreement.  On the Vela Assignment Closing Date, the current defaults of LBSF

and LBHI under the Vela CDSA shall be deemed cured, and any provision in such agreement, or

any other agreement, that (i) purports to prohibit or condition the assignment (including, without

limitation, any purported prerequisites that the Vela Rating Condition be satisfied) of the Vela

CDSA, (ii) requires the consent of Vela or any other person in order for the assignment of

LBSF's interest to be valid, or (iii) allows Vela, or any other third party, to terminate, recapture,

impose any penalty or condition on renewal or extension, or modify any term or condition in

respect of the Vela CDSA, the Vela CDS Transactions, the Vela Indenture or any other

agreement upon or as a result of such assignment are void, of no force and effect and shall not be

enforceable against SG.

       8.      **Effective Date of Assumption and Assignment**.  The assumption,

assignment, and sale of the Libra CDSA by LBSF to SG shall be effective automatically and

without any additional Court order or action on the Libra Assignment Closing Date. The assumption, assignment, and sale of the Vela CDSA by LBSF to SG shall be effective automatically and without any additional Court order or action on the Vela Assignment Closing Date. Within seven business days of the satisfaction of the Libra Assignment Closing Conditions or the Vela Assignment Closing Conditions, LBSF shall file and serve on Libra and the Libra Trustee or Vela and the Vela Trustee, as applicable, notice of such event. LBSF may assume the Libra CDSA only pursuant to the Libra CDSA Assignment Agreement, and LBSF may not assign and/or sell its interest in the Libra CDSA to any party other than SG. LBSF may assume the Vela CDSA only pursuant to the Vela CDSA Assignment Agreement, and LBSF may not assign and/or sell its interest in the Vela CDSA to any party other than SG.

9. **Libra Floating Amounts and Credit Events**. Effective as of the Libra Assignment Closing Date:

i.    the maximum aggregate amount of all Libra Credit Protection Payments and Libra CDS Termination Payments payable by Libra under the Libra CDSA shall be reduced to an amount equal to the aggregate funds available to Libra for making such payments without causing a draw on the Libra Senior Swap Agreement, with the effect that draws on the Libra Senior Swap Agreement are forever foreclosed;

ii.   SG, as successor credit protection buyer, is permitted to trigger any and all Libra Floating Amount Events and Libra Credit Events that occurred during the period beginning on October 10, 2008 and ending on the Libra Assignment Closing Date, regardless of the passage of time from the date on which any such Libra Floating Amount Event or Libra Credit Event has occurred;

9

iii.     the rating requirement set forth in clause (ii)(A) of the definition of "Rating Requirement" in each of the Libra CDSA Confirmations shall be satisfied with respect to a "buyer" whose long term debt obligations, or the long terms debt obligations of its "credit support provider," are rated "A+" by Standard & Poor's if the Libra Rating Condition with respect to Standard & Poor's has been obtained;

iv.     (a) SG shall have full discretion as to when and if to deliver to Libra notices of Libra Floating Amounts due with respect to outstanding Libra Floating Amount Events under the Libra CDSA and full discretion to seek an amount equal to or less than the Libra Floating Amount due to the "buyer" under the Libra CDSA in respect of any outstanding Libra Floating Amount Events; (b) the exercise of such discretion is deemed to satisfy any applicable requirements under the Libra CDSA; and (c) in the event draws are made on the Libra Senior Swap Agreement, all such funds may be retained by the Libra Senior Swap Counterparty, as irrevocable assignee of the "buyer" under the Libra CDSA and party rightfully entitled to such funds; and

v.     any determination of the portion of the Libra Floating Payments made prior to the Debtors' bankruptcy filings that remains subject to reimbursement under the Libra CDSA shall not disregard the period from the purported designation of an early termination date under the Libra CDSA through the date of the Libra Judgment.

10.     **Vela Floating Amounts and Credit Events**. Effective as of the Vela Assignment Closing Date:

i.    the maximum aggregate amount of all Vela Credit Protection Payments, Vela

CDS Termination Payments, Vela Premium Reserve payments and Vela Net

Issuer Premium payments by Vela under the Vela CDSA shall be reduced to an

amount equal to the aggregate funds available to Vela for making such payments

without causing a draw on the Vela Senior Swap Agreement, with the effect that

draws on the Vela Senior Swap Agreement are forever foreclosed;

ii.    SG, as successor credit protection buyer, is permitted to trigger any and all Vela

Floating Amount Events and Vela Credit Events that occurred during the period

beginning on September 30, 2008 and ending on the Vela Assignment Closing

Date, regardless of the passage of time from the date on which any such Vela

Floating Amount Event or Vela Credit Event has occurred;

iii.    (a) SG shall have full discretion as to when and if to deliver to Vela notices of

Vela Floating Amounts due with respect to outstanding Vela Floating Amount

Events under the Vela CDSA and full discretion to seek an amount equal to or

less than the Vela Floating Amount due to the "buyer" under the Vela CDSA in

respect of any outstanding Vela Floating Amount Events; (b) the exercise of such

discretion is deemed to satisfy any applicable requirements under the Vela CDSA;

and (c) in the event draws are made on the Vela Senior Swap Agreement, all such

funds may be retained by the Vela Senior Swap Counterparty, as irrevocable

assignee of the "buyer" under the Vela CDSA and party rightfully entitled to such

funds; and

iv.    any determination of the portion of the Vela Floating Payments made prior to the

Debtors' bankruptcy filings that remains subject to reimbursement under the Vela

11

CDSA shall not disregard the period from the purported designation of an early

termination date under the Vela CDSA through the date of the Vela Judgment.

11.    **Section 365(k) of the Bankruptcy Code**.  Immediately upon the Libra

Assignment Closing Date and the Vela Assignment Closing Date, the Debtors shall be relieved,

pursuant to section 365(k) of the Bankruptcy Code, of all further obligations under the Libra

CDSA and the Vela CDSA, respectively.

12.    **Ipso Facto Clauses Ineffective**.  Upon the Libra Assignment Closing

Date, no Event of Default or Termination Event affecting the "buyer" shall exist under the Libra

CDSA, and no party shall be permitted to declare a default, terminate, cease payment, delivery or

any other performance under the Libra CDSA, the Libra Indenture, or any agreement relating to

either thereof, or otherwise modify any such agreement, assert any claim or right to termination

payment, or impose any penalty or otherwise take action against SG under the Libra CDSA as a

result of the financial condition, bankruptcy or failure to perform any of obligations under the

Libra CDSA of the Debtors.  Upon the Vela Assignment Closing Date, no Event of Default or

Termination Event affecting the "buyer" shall exist under the Vela CDSA, and no party shall be

permitted to declare a default, terminate, cease payment, delivery or any other performance

under the Vela CDSA, the Vela Indenture, or any agreement relating to either thereof, or

otherwise modify any such agreement, assert any claim or right to termination payment, or

impose any penalty or otherwise take action against SG under the Vela CDSA as a result of the

financial condition, bankruptcy or failure to perform any of obligations under the Vela CDSA of

the Debtors.

13.    **Free and Clear**.  Pursuant to sections 105(a) and 363(f) of the

Bankruptcy Code, upon the Libra Assignment Closing Date and the Vela Assignment Closing

12

Date, SG shall take title to and possession of LBSF's interests in the Libra CDSA and the Vela

CDSA, respectively, free and clear of all Interests.

14. **Cure and Adequate Assurance**. Upon (i) the Libra Assignment

Closing Date, LBSF shall pay $17,520,316 to Libra in cure payments and (ii) the Vela

Assignment Closing Date, LBSF shall pay $15,304,759 to Vela in cure payments, in each case as

follows. Cure payments shall be deducted from payments due to LBSF from Libra or Vela under

the Libra CDSA or the Vela CDSA, respectively, including payments not made to LBSF upon

reliance of the purported termination of the Libra CDSA or the Vela CDSA. If payments to

LBSF are insufficient to cover the full cure payment due to Libra or Vela, then LBSF shall pay

the difference of such amounts to Libra or Vela, as applicable, within 30 days of the Libra

Assignment Closing Date or Vela Assignment Closing Date or such other time as may be agreed

to by LBSF and the payee. No other or further cure payments shall be required of LBSF. LBSF

has provided adequate assurance of future performance by the assignee, SG, within the meaning

of section 365(f)(2)(B) of the Bankruptcy Code.

15. **Section 363(n) of the Bankruptcy Code**. The consideration provided

by SG for LBSF's interest in the Libra CDSA and the Vela CDSA is fair and reasonable and may

not be avoided under section 363(n) of the Bankruptcy Code.

16. **Good Faith**. SG is a good-faith purchaser of the LBSF's interests in the

Libra CDSA and the Vela CDSA and shall be entitled to all the benefits and protections afforded

in section 363(m) of the Bankruptcy Code.

17. **Stay of Debtors' Claims**. Prosecution of the Debtors' claims against SG

in the Libra Adversary Proceedings is stayed until the Payment Date, at which time such claims

against SG will be dismissed with prejudice without notice or further order of the Court.

13

Prosecution of the Debtors' claims in the Libra Adversary Proceedings against Libra and the

Libra Trustee is stayed and the Debtors shall not prosecute or in any litigation take a position

regarding the Libra Termination Claim against the Other Libra Parties, in each case, until the

date on which the Libra Termination Claim Preconditions shall have been satisfied. The Debtors

shall not prosecute or in any litigation take a position regarding the Vela Termination Claim

against SG until the Payment Date, at which time such claims against SG will be dismissed with

prejudice without notice or further order of the Court. The Debtors shall not prosecute or in any

litigation take a position regarding the Vela Termination Claim against the Other Vela Parties

until the date on which the Vela Termination Claim Preconditions shall have been satisfied.

      18.    **Releases Authorized**. The releases contained in the Settlement

Agreement shall be effective as of the Payment Date and SG, LBSF and LBHI shall be deemed

to have released and are each permanently enjoined from asserting, pursuing or prosecuting in

any manner, and in any forum, any and all claims released pursuant to the Settlement

Agreement; provided, however, that (i) the Debtors shall be permitted to pursue the Libra

Termination Claim and the Libra Priority Claim against the Other Libra Parties or the Other Vela

Parties (but in the case of the Libra Termination Claim, only if the Libra Termination Claim

Preconditions have been satisfied) and (ii) the Debtors shall be permitted to pursue the Vela

Termination Claim and the Vela Priority Claim as against the Other Vela Parties (but in the case

of the Vela Termination Claim, only if the Vela Termination Claim Preconditions have been

satisfied).

      19.    **Payment of Break-Up Fee**. Pursuant to the Court's order, dated June 1,

2009 [Docket No. 3709], approving a break-up fee payable to Deutsche Bank AG, London

Branch ("DB") in connection with the Libra CDSA, LBSF is authorized to pay $20,000,000 to

DB in accordance with and subject to the terms of the letter agreement, dated May 5, 2009,

between the Debtors and DB regarding the same.

    20.    **No Modifications**. Nothing contained in any chapter 11 plan confirmed

in any Debtor's bankruptcy case, any order confirming any such plan or any other order entered

in these chapter 11 cases (including any order entered after any conversion of a chapter 11 case

of any of the Debtors to a case under chapter 7 of the Bankruptcy Code) shall supersede, alter,

amend or modify the provisions of the Settlement Agreement or this Order.

    21.    **Retention of Jurisdiction**. The Court retains jurisdiction, pursuant to its

statutory powers under 28 U.S.C. § 157(b)(2), to hear and determine all matters arising from or

relating to the implementation of this Order.

Dated: New York, New York
                  , 2010

                                HONORABLE JAMES M. PECK
                                UNITED STATES BANKRUPTCY JUDGE

EXHIBIT 2

FORM OF LIBRA CDSA ASSIGNMENT

[ATTACHED]

## ASSUMPTION, ASSIGNMENT AND SALE AGREEMENT

dated as of [●], 2010 among:

**Lehman Brothers Special Financing Inc.** (the "Assignor")

**Lehman Brothers Holdings Inc.** ("LBHI")

AND

**Société Générale, New York Branch** (the "Assignee").

Reference is made to that certain settlement agreement (the "Settlement Agreement"), dated as of September 20, 2010, among the Assignor, LBHI and the Assignee. All capitalized terms used herein but not defined herein shall have the meanings assigned thereto in the Settlement Agreement.

By entering into this Assumption, Assignment and Sale Agreement (the "Agreement"), each of the Assignor, LBHI and the Assignee acknowledges and agrees that the Settlement Approval Order, as in effect on the Settlement Effective Date (the "Final Order"), includes the Libra Assignment Determinations and authorizes the Assignment (as defined below). The Final Order is attached hereto as Annex I.

With respect to that certain ISDA Master Agreement, dated as of October 17, 2006 (together with the Schedule and Confirmations thereto, each dated October 17, 2006, the "Libra CDSA"), between the Assignor and Libra CDO Limited ("Libra") and all of the Assignor's rights and obligations under each transaction document that is related to the Libra CDSA (including, without limitation, the Libra Indenture and the Libra Senior Swap) specified in Annex II (each such transaction document, a "Libra Transaction Document") (all of the foregoing together with all of the Assignor's rights and obligations under each Affected Transaction (as defined below), collectively, the "Assigned Asset"), the Assignor and Libra, as the credit protection seller under the Assigned Asset (the "Remaining Party"), have entered into multiple Libra CDS Transactions, each such Libra CDS Transaction evidenced by one of the two Confirmations attached hereto as Annex III (each such Confirmation, an "Affected Confirmation"). A list of the Libra CDS Transactions outstanding as of the Libra Assignment Closing Date (each, an "Affected Transaction") shall be provided by the Assignor to the Assignee no later than [●] Business Days following the date on which the Libra Judgment (i) has been entered by the Bankruptcy Court, (ii) has not been stayed and the time for any motion to stay has expired and (iii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the Libra Judgment and the time for any further appeals has expired.

With effect from and including the first date on which the Libra Assignment Closing Conditions (as defined below) shall have been satisfied (the "Libra Assignment Closing Date"), the Assignor wishes to assign to the Assignee, and the Assignee wishes to accept the assignment of, all the rights, liabilities, duties and obligations (other than (x) any rights, liabilities, duties or obligations with respect to payments or other obligations due and payable or due to be performed on or prior

1

to the Libra Assignment Closing Date except for payment obligations the Assignee has expressly agreed to perform in, and only to the extent set forth in, Section 9 of the Settlement Agreement and (y) any obligations under the Settlement Agreement) of the Assignor under and in respect of the Assigned Asset (the "Assignment"), as more particularly described below.

Pursuant to the Final Order, the Assignor and Assignee are permitted to enter into this Agreement and to effectuate the Assignment without any consent that may be required from the Remaining Party under the Libra CDSA or any other party.

Pursuant to the Final Order, the Assignment shall take effect automatically and without any additional court order or action on the Libra Assignment Closing Date, as of which date each of the Assignor and LBHI shall be released from any and all of its obligations (other than (x) any obligations with respect to payments or other obligations due and payable or due to be performed on or prior to the Libra Assignment Closing Date except for payment obligations the Assignee has expressly agreed to perform in, and only to the extent set forth in, Section 9 of the Settlement Agreement and (y) any obligations under the Settlement Agreement) in connection with the Assigned Asset.

Accordingly, the parties agree as follows:

## 1.   References.

Except where a reference is explicitly made to the ISDA Master Agreement (Multicurrency-Cross Border) as published in 1992 by ISDA (the "1992 ISDA Master Agreement"), no reference to the 1992 ISDA Master Agreement shall be otherwise implied and the terms of the 1992 ISDA Master Agreement shall not otherwise have any implication on this Agreement.

## 2.   Transfer and Undertakings.

With effect from and including the Libra Assignment Closing Date and in consideration of the mutual representations, warranties and covenants contained in this Agreement and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties):

(a)   The Assignor hereby assigns to the Assignee, and the Assignee hereby assumes, all rights, liabilities, duties and obligations (other than (x) any rights, liabilities, duties or obligations with respect to payments or other obligations due and payable or due to be performed on or prior to the Libra Assignment Closing Date except for payment obligations the Assignee has expressly agreed to perform in, and only to the extent set forth in, Section 9 of the Settlement Agreement and (y) any obligations under the Settlement Agreement) of the Assignor under and in respect of the Assigned Asset; *provided, however*, that nothing contained herein shall act as an assignment of the Assignor's rights, liabilities, duties and obligations under any other agreement (including, without limiting the generality of the foregoing, the Settlement Agreement); and *provided further*, that nothing contained herein shall affect any rights, duties, liabilities or obligations of any of the Assignor or LBHI with respect to payments or other obligations due and payable or due to be performed on or prior to the Libra Assignment Closing Date

2

and all such payments and obligations shall be paid or performed by the Assignor and/or LBHI in accordance with the terms of the Final Order;

(b)     The Assignee does not assume, and shall have no liability to the Assignor, LBHI or any other person for, any acts or omissions of the Assignor and/or LBHI under the Libra CDSA, any Affected Transaction or any related Libra Transaction Document prior to the Libra Assignment Closing Date, including, without limitation, with respect to any liabilities, duties or obligations of the Assignor and/or LBHI with respect to payments or other obligations due and payable or due to be performed on or prior to the Libra Assignment Closing Date except for payment obligations the Assignee has expressly agreed to perform in, and only to the extent set forth in, Section 9 of the Settlement Agreement; and

(c)     Each Affected Transaction shall be governed by and form part of the Libra CDSA, which Libra CDSA, as deemed modified to be consistent with the Assignment, shall constitute an agreement between the Remaining Party and the Assignee. Without limiting the generality of the foregoing, the office of the Assignee for purposes of each Affected Transaction shall be the offices listed in Annex IV.

3.     **Libra Assignment Closing Conditions.**  The "Libra Assignment Closing Conditions" shall mean all of the following:

(a)     either:

(i)     the Libra Trustee has initiated an interpleader proceeding and named all Libra Noteholders as third-party defendants; or

(ii)     the Debtors have amended the Debtors' Libra Complaint to name the Libra Noteholders as defendants and have notified the Libra Noteholders through each of the following methods: (1) sending the Debtors' Libra Complaint to each Libra Noteholder care of the Libra Trustee, as the Libra Note Registrar, with instructions to the Libra Trustee to forward the Debtors' Libra Complaint to the registered holder of each Libra Note, (2) sending the Debtors' Libra Complaint directly to the original holders of the Libra Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates), (3) publication in *The Wall Street Journal* and *Investor's Business Daily* for three successive Business Days, and (4) any other method required by the court;

(b)     a judgment (the "Libra Judgment") is entered by the Bankruptcy Court in either of the foregoing proceedings declaring the Libra Early Termination to be invalid and without force and effect;

(c)     the Libra Judgment includes, among others, the following findings and holdings:

(i)     the manner in which notice of the Libra Termination Claim was provided to the Libra Noteholders and all other parties entitled to such notice

3

effected proper service and is adequate, appropriate, reasonable and sufficient for all purposes and is approved; and

(ii)     the Libra Judgment is and shall be binding on the Other Libra Parties and each of their predecessors and successors; and

(d)     the Libra Judgment (i) has not been stayed and the time for any motion to stay has expired and (ii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the Libra Judgment and the time for any further appeals has expired;

*provided that* the Assignee shall have the right, in its sole and absolute discretion, to waive any of the foregoing Libra Assignment Closing Conditions with the effect that any Libra Assignment Closing Condition so waived shall be deemed to have been satisfied for purposes of this Agreement.

**4.      Representations and Warranties.**

(a)     On the Libra Assignment Closing Date:

(i)     Each of the Assignor and LBHI represents and warrants to the Assignee that the Assignor and LBHI have obtained authorization for their entry into this Agreement and their performance of their respective obligations hereunder pursuant to the Final Order, and have complied with all steps required by the Final Order and, consequently, the Assignment is authorized by, and subject to the terms set forth in, the Final Order.

(ii)     Each of the Assignor and LBHI represents and warrants to the Assignee (which representations and warranties shall be subject in all cases to effectiveness of all terms of the Final Order) that:

(A)     it has made no prior transfer (whether by way of security or otherwise) of the Libra CDSA, or any corresponding Libra Transaction Document, as applicable, or any interest or obligation in or under the Libra CDSA, or any corresponding Libra Transaction Document, as applicable, or any interest or obligation in or under any Affected Confirmation, or any Libra corresponding Transaction Document, as applicable, or in respect of any Affected Transaction or any corresponding Libra Transaction Document, as applicable; and

(B)     as of the Libra Assignment Closing Date, all obligations of the Assignor and LBHI under the Libra CDSA, each Affected Transaction and each corresponding Libra Transaction Document required to be performed on or before the Libra Assignment Closing Date (except for payment obligations the Assignee has expressly agreed to perform in, and only to the extent set forth in,

4

17627190

Section 9 of the Settlement Agreement) have been fulfilled pursuant to the terms of the Final Order; *provided*, that one or more Events of Default (as defined in the 1992 ISDA Master Agreement) and/or Termination Events (as defined in the 1992 ISDA Master Agreement) have occurred in respect of the bankruptcy, ratings and/or other credit standing of Assignor and its Credit Support Provider (as defined in the Libra CDSA), which Events of Default or Termination Events shall, pursuant to the Final Order, be deemed to have been cured by the terms of this Agreement; *provided further*, that no such Events of Default or Termination Events shall occur as a result of the Assignor or LBHI entering into or performing its respective obligations under this Agreement.

(iii)    Each of the Assignor and LBHI represents and warrants to the Assignee (which representations and warranties shall be subject in all cases to effectiveness of all terms of the Final Order) that:

(A)    it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, is in good standing;

(B)    it has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and has taken all necessary action to authorize such execution, delivery and performance;

(C)    such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(D)    all governmental and other consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(E)    its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles

5

of general application (regardless of whether enforcement is sought in a proceeding in equity or at law));

(F)     there is not pending or, to its knowledge, threatened against it or any of its affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or its ability to perform its obligations under this Agreement; and

(G)     all applicable information that is furnished in writing by or on behalf of it to the Assignee is, as of the date of this Agreement, true and accurate in every material respect and does not omit any fact that would be material to the Assignee.

(iv)     The Assignee represents and warrants to the Assignor (which representations and warranties shall be subject in all cases to effectiveness of all terms of the Final Order) that:

(A)     it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, is in good standing;

(B)     it has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and has taken all necessary action to authorize such execution, delivery and performance;

(C)     such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(D)     all governmental and other consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(E)     its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles

6

of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)); and

(F)    there is not pending or, to its knowledge, threatened against it or any of its affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or its ability to perform its obligations under this Agreement.

(b)    Each of the Assignor and LBHI makes no representation or warranty and does not assume any responsibility with respect to the condition, financial or otherwise, of the Remaining Party under the Libra CDSA, the Assignee or any other person or for the performance and observance by the Remaining Party under the Libra CDSA, the Assignee or any other person of any of its obligations under any Affected Transaction or the Libra CDSA or any document relating thereto and any and all such conditions and warranties, whether express or implied by law or otherwise, are hereby excluded.

## 5.    Counterparts.

This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

## 6.    Costs and Expenses.

The parties will each pay their own costs and expenses (including legal fees) incurred in connection with this Agreement and as a result of the negotiation, preparation and execution of this Agreement.

## 7.    Amendments.

No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

## 8.    (a)    Governing Law.

This Agreement will be governed by and construed in accordance with New York law.

##     (b)    Jurisdiction.

With respect to any suit, action or proceedings relating to this Agreement brought while LBSF and LBHI's chapter 11 cases are pending before the Bankruptcy Court, each party agrees that such suit, action or proceedings shall be brought

17627190

before the Bankruptcy Court and irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court and waives any defense of lack of jurisdiction, improper venue or inconvenient forum that may be available to any action brought in such court. Upon the closing of LBSF and LBHI's chapter 11 cases, any suit, action or proceedings relating to this Agreement shall be brought in courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and each party irrevocably submits to the exclusive jurisdiction of such courts and waives any defense of lack of jurisdiction, improper venue or inconvenient forum that may be available to any action brought in such courts.

17627190

IN WITNESS WHEREOF the parties have executed this Assumption, Assignment and Sale Agreement on the respective dates specified below with effect from and including the Libra Assignment Closing Date.

**LEHMAN BROTHERS SPECIAL FINANCING, INC.**

By:_____
     Name:
     Title:

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____
     Name:
     Title:

**SOCIÉTÉ GÉNÉRALE, NEW YORK BRANCH**

By:_____
     Name:
     Title:

17627190

<u>ANNEX I</u>

[FINAL ORDER]

<u>ANNEX II</u>

[ASSIGNED ASSET]

## ANNEX III

[AFFECTED CONFIRMATIONS]

<u>ANNEX IV</u>

[LIST OF OFFICES]

EXHIBIT 3

FORM OF VELA CDSA ASSIGNMENT

[ATTACHED]

## ASSUMPTION, ASSIGNMENT AND SALE AGREEMENT

dated as of [●], 2010 among:

### Lehman Brothers Special Financing Inc. (the "Assignor")

### Lehman Brothers Holdings Inc. ("LBHI")

AND

### Société Générale, New York Branch (the "Assignee").

Reference is made to that certain settlement agreement (the "Settlement Agreement"), dated as of September 20, 2010, among the Assignor, LBHI and the Assignee. All capitalized terms used herein but not defined herein shall have the meanings assigned thereto in the Settlement Agreement.

By entering into this Assumption, Assignment and Sale Agreement (the "Agreement"), each of the Assignor, LBHI and the Assignee acknowledges and agrees that the Settlement Approval Order, as in effect on the Settlement Effective Date (the "Final Order"), includes the Vela Assignment Determinations and authorizes the Assignment (as defined below). The Final Order is attached hereto as Annex I.

With respect to that certain ISDA Master Agreement, dated as of November 16, 2006 (together with the Amended and Restated Schedule, Credit Support Annex and Amended and Restated Confirmations thereto, each dated April 23, 2008, the "Vela CDSA"), between the Assignor and Vela CBO, Ltd. ("Vela") and all of the Assignor's rights and obligations under each transaction document that is related to the Vela CDSA (including, without limitation, the Vela Indenture and the Vela Senior Swap) specified in Annex II (each such transaction document, a "Vela Transaction Document") (all of the foregoing together with all of the Assignor's rights and obligations under each Affected Transaction (as defined below), collectively, the "Assigned Asset"), the Assignor and Vela, as the credit protection seller under the Assigned Asset (the "Remaining Party"), have entered into multiple Vela CDS Transactions, each such Vela CDS Transaction evidenced by one of the two Amended and Restated Confirmations attached hereto as Annex III (each such Confirmation, an "Affected Confirmation"). A list of the Vela CDS Transactions outstanding as of the Vela Assignment Closing Date (each, an "Affected Transaction") shall be provided by the Assignor to the Assignee no later than [●] Business Days following the date on which the Vela Judgment (i) has been entered by the Bankruptcy Court, (ii) has not been stayed and the time for any motion to stay has expired and (iii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the Vela Judgment and the time for any further appeals has expired.

With effect from and including the first date on which the Vela Assignment Closing Conditions (as defined below) shall have been satisfied (the "Vela Assignment Closing Date"), the Assignor wishes to assign to the Assignee, and the Assignee wishes to accept the assignment of, all the rights, liabilities, duties and obligations (other than (x) any rights, liabilities, duties or obligations

1

with respect to payments or other obligations due and payable or due to be performed on or prior to the Vela Assignment Closing Date except for payment obligations the Assignee has expressly agreed to perform in, and only to the extent set forth in, Section 9 of the Settlement Agreement and (y) any obligations under the Settlement Agreement) of the Assignor under and in respect of the Assigned Asset (the "Assignment"), as more particularly described below.

Pursuant to the Final Order, the Assignor and Assignee are permitted to enter into this Agreement and to effectuate the Assignment without any consent that may be required from the Remaining Party under the Vela CDSA or any other party.

Pursuant to the Final Order, the Assignment shall take effect automatically and without any additional court order or action on the Vela Assignment Closing Date, as of which date each of the Assignor and LBHI shall be released from any and all of its obligations (other than (x) any obligations with respect to payments or other obligations due and payable or due to be performed on or prior to the Vela Assignment Closing Date except for payment obligations the Assignee has expressly agreed to perform in, and only to the extent set forth in, Section 9 of the Settlement Agreement and (y) any obligations under the Settlement Agreement) in connection with the Assigned Asset.

Accordingly, the parties agree as follows:

1.      **References.**

Except where a reference is explicitly made to the ISDA Master Agreement (Multicurrency-Cross Border) as published in 1992 by ISDA (the "1992 ISDA Master Agreement"), no reference to the 1992 ISDA Master Agreement shall be otherwise implied and the terms of the 1992 ISDA Master Agreement shall not otherwise have any implication on this Agreement.

2.      **Transfer and Undertakings.**

With effect from and including the Vela Assignment Closing Date and in consideration of the mutual representations, warranties and covenants contained in this Agreement and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties):

       (a)     The Assignor hereby assigns to the Assignee, and the Assignee hereby assumes, all rights, liabilities, duties and obligations (other than (x) any rights, liabilities, duties or obligations with respect to payments or other obligations due and payable or due to be performed on or prior to the Vela Assignment Closing Date except for payment obligations the Assignee has expressly agreed to perform in, and only to the extent set forth in, Section 9 of the Settlement Agreement and (y) any obligations under the Settlement Agreement) of the Assignor under and in respect of the Assigned Asset; *provided, however*, that nothing contained herein shall act as an assignment of the Assignor's rights, liabilities, duties and obligations under any other agreement (including, without limiting the generality of the foregoing, the Settlement Agreement); and *provided further*, that nothing contained herein shall affect any rights, duties, liabilities or obligations of any of the Assignor or LBHI with respect to payments or other obligations due and

2

payable or due to be performed on or prior to the Vela Assignment Closing Date and all such payments and obligations shall be paid or performed by the Assignor and/or LBHI in accordance with the terms of the Final Order;

(b)    The Assignee does not assume, and shall have no liability to the Assignor, LBHI or any other person for, any acts or omissions of the Assignor and/or LBHI under the Vela CDSA, any Affected Transaction or any related Vela Transaction Document prior to the Vela Assignment Closing Date, including, without limitation, with respect to any liabilities, duties or obligations of the Assignor and/or LBHI with respect to payments or other obligations due and payable or due to be performed on or prior to the Vela Assignment Closing Date except for payment obligations the Assignee has expressly agreed to perform in, and only to the extent set forth in, Section 9 of the Settlement Agreement; and

(c)    Each Affected Transaction shall be governed by and form part of the Vela CDSA, which Vela CDSA, as deemed modified to be consistent with the Assignment, shall constitute an agreement between the Remaining Party and the Assignee. Without limiting the generality of the foregoing, the office of the Assignee for purposes of each Affected Transaction shall be the offices listed in Annex IV.

3.    **Vela Assignment Closing Conditions.** The "Vela Assignment Closing Conditions" shall mean all of the following:

(a)    either:

(i)    the Vela Trustee has initiated an interpleader proceeding and named all Vela Noteholders as defendants; or

(ii)    the Debtors have filed an adversary proceeding asserting the Vela Termination Claim (the "Vela Complaint"), naming the Vela Noteholders as defendants, and have notified the Vela Noteholders through each of the following methods: (1) sending the Vela Complaint to each Vela Noteholder care of the Vela Trustee, as the Vela Note Registrar, with instructions to the Vela Trustee to forward the Vela Complaint to the registered holder of each Vela Note, (2) sending the Vela Complaint directly to the original holders of the Vela Notes (as of the issuance date thereof), as listed in the records of the Debtors (or any of their affiliates), (3) publication in *The Wall Street Journal* and *Investor's Business Daily* for three successive Business Days and (4) any other method required by the court;

(b)    a judgment (the "Vela Judgment") is entered by the Bankruptcy Court in either of the foregoing proceedings declaring the Vela Early Termination to be invalid and without force and effect;

(c)    the Vela Judgment includes, among others, the following findings and holdings:

3

17639342

(i)      the manner in which notice of the Vela Termination Claim was provided to the Vela Noteholders and all other parties entitled to such notice effected proper service and is adequate, appropriate, reasonable and sufficient for all purposes and is approved; and

(ii)      the Vela Judgment is and shall be binding on the Other Vela Parties and each of their predecessors and successors; and

(d)      the Vela Judgment (i) has not been stayed and the time for any motion to stay has expired and (ii) has not been appealed and the time for any appeals has expired, or was appealed and all appeals have been dismissed or have resulted in the affirmance of the Vela Judgment and the time for any further appeals has expired;

*provided that* the Assignee shall have the right, in its sole and absolute discretion, to waive any of the foregoing Vela Assignment Closing Conditions with the effect that any Vela Assignment Closing Condition so waived shall be deemed to have been satisfied for purposes of this Agreement.

**4.    Representations and Warranties.**

(a)      On the Vela Assignment Closing Date:

(i)      Each of the Assignor and LBHI represents and warrants to the Assignee that the Assignor and LBHI have obtained authorization for their entry into this Agreement and their performance of their respective obligations hereunder pursuant to the Final Order, and have complied with all steps required by the Final Order and, consequently, the Assignment is authorized by, and subject to the terms set forth in, the Final Order.

(ii)      Each of the Assignor and LBHI represents and warrants to the Assignee (which representations and warranties shall be subject in all cases to effectiveness of all terms of the Final Order) that:

(A)      it has made no prior transfer (whether by way of security or otherwise) of the Vela CDSA, or any corresponding Vela Transaction Document, as applicable, or any interest or obligation in or under the Vela CDSA, or any corresponding Vela Transaction Document, as applicable, or any interest or obligation in or under any Affected Confirmation, or any Vela corresponding Transaction Document, as applicable, or in respect of any Affected Transaction or any corresponding Vela Transaction Document, as applicable; and

(B)      as of the Vela Assignment Closing Date, all obligations of the Assignor and LBHI under the Vela CDSA, each Affected Transaction and each corresponding Vela Transaction Document required to be performed on or before the Vela Assignment Closing Date (except for payment obligations the Assignee has

4

expressly agreed to perform in, and only to the extent set forth in, Section 9 of the Settlement Agreement) have been fulfilled pursuant to the terms of the Final Order; *provided*, that one or more Events of Default (as defined in the 1992 ISDA Master Agreement) and/or Termination Events (as defined in the 1992 ISDA Master Agreement) have occurred in respect of the bankruptcy, ratings and/or other credit standing of Assignor and its Credit Support Provider (as defined in the Vela CDSA), which Events of Default or Termination Events shall, pursuant to the Final Order, be deemed to have been cured by the terms of this Agreement; *provided further*, that no such Events of Default or Termination Events shall occur as a result of the Assignor or LBHI entering into or performing its respective obligations under this Agreement.

(iii)   Each of the Assignor and LBHI represents and warrants to the Assignee (which representations and warranties shall be subject in all cases to effectiveness of all terms of the Final Order) that:

(A)   it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, is in good standing;

(B)   it has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and has taken all necessary action to authorize such execution, delivery and performance;

(C)   such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(D)   all governmental and other consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(E)   its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles

5

of general application (regardless of whether enforcement is sought in a proceeding in equity or at law));

(F)    there is not pending or, to its knowledge, threatened against it or any of its affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or its ability to perform its obligations under this Agreement; and

(G)    all applicable information that is furnished in writing by or on behalf of it to the Assignee is, as of the date of this Agreement, true and accurate in every material respect and does not omit any fact that would be material to the Assignee.

(iv)    The Assignee represents and warrants to the Assignor (which representations and warranties shall be subject in all cases to effectiveness of all terms of the Final Order) that:

(A)    it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, is in good standing;

(B)    it has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and has taken all necessary action to authorize such execution, delivery and performance;

(C)    such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(D)    all governmental and other consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(E)    its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles

6

of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)); and

 (F) there is not pending or, to its knowledge, threatened against it or any of its affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or its ability to perform its obligations under this Agreement.

(b) Each of the Assignor and LBHI makes no representation or warranty and does not assume any responsibility with respect to the condition, financial or otherwise, of the Remaining Party under the Vela CDSA, the Assignee or any other person or for the performance and observance by the Remaining Party under the Vela CDSA, the Assignee or any other person of any of its obligations under any Affected Transaction or the Vela CDSA or any document relating thereto and any and all such conditions and warranties, whether express or implied by law or otherwise, are hereby excluded.

## 5. Counterparts.

This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

## 6. Costs and Expenses.

The parties will each pay their own costs and expenses (including legal fees) incurred in connection with this Agreement and as a result of the negotiation, preparation and execution of this Agreement.

## 7. Amendments.

No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

## 8. (a) Governing Law.

This Agreement will be governed by and construed in accordance with New York law.

## (b) Jurisdiction.

With respect to any suit, action or proceedings relating to this Agreement brought while LBSF and LBHI's chapter 11 cases are pending before the Bankruptcy Court, each party agrees that such suit, action or proceedings shall be brought

before the Bankruptcy Court and irrevocably submits to the exclusive jurisdiction
of the Bankruptcy Court and waives any defense of lack of jurisdiction, improper
venue or inconvenient forum that may be available to any action brought in such
court.  Upon the closing of LBSF and LBHI's chapter 11 cases, any suit, action or
proceedings relating to this Agreement shall be brought in courts of the State of
New York and the United States District Court located in the Borough of
Manhattan in New York City and each party irrevocably submits to the exclusive
jurisdiction of such courts and waives any defense of lack of jurisdiction,
improper venue or inconvenient forum that may be available to any action
brought in such courts.

8

IN WITNESS WHEREOF the parties have executed this Assumption, Assignment and Sale Agreement on the respective dates specified below with effect from and including the Vela Assignment Closing Date.

**LEHMAN BROTHERS SPECIAL FINANCING, INC.**

By:_____
    Name:
    Title:


**LEHMAN BROTHERS HOLDINGS INC.**

By:_____
    Name:
    Title:


**SOCIÉTÉ GÉNÉRALE, NEW YORK BRANCH**

By:_____
    Name:
    Title:

## ANNEX I

[FINAL ORDER]

# ANNEX II

[ASSIGNED ASSET]

## ANNEX III

## [AFFECTED CONFIRMATIONS]

## ANNEX IV

[LIST OF OFFICES]

EXHIBIT 4

FORM OF LBSF LIBRA NOTICE

[ATTACHED]

17619833

# FORM OF

## NOTICE OF IRREVOCABLE DEFERRAL OF PAYMENTS DUE DATE

**Date:**      [●] [●], 2010

**To:**      **Libra CDO Limited ("Libra")**
c/o Deutsche Bank (Cayman) Limited
P.O. Box 1984 GT
Elizabethan Square
Grand Cayman, Cayman Islands

**Attention:**  Global Transaction Banking, Trust & Securities Services – Corporate Services
Division

**Fax:**      (345) 989-8244

**To:**      **Bank of America, N.A. (successor by merger to LaSalle Bank National
Association), as trustee on behalf of Libra (the "Libra Trustee")**
540 West Madison, Suite 2500
Chicago, IL 60661

**Attention:**  Global Trust Services—Libra CDO Limited

**Fax:**      [●]

**To:**      **Lehman Brothers Asset Management LLC, as collateral manager (the
"Collateral Manager")**
190 South LaSalle Street, Suite 2400
Chicago, IL, 60603

**Attention:**  CDO Portfolio Management Group

**Fax:**      +1 312 559 0143

**With a
copy to:**     Bell, Boyd & Lloyd LLC
70 West Madison, Suite 3100
Chicago, Illinois 60606

**Attention:**  Kevin J. McCarthy

**Fax:**      +1 312 827 8128

**From:**      **Lehman Brothers Special Financing, Inc. ("LBSF")**

**RE:**      **The ISDA Master Agreement, dated as of October 17, 2006 (together with
the Schedule and Confirmations thereto, each dated October 17, 2006, the
"Libra CDSA"), between LBSF and Libra; and the ISDA Master Agreement,
Schedule, Credit Support Annex and Confirmation, each dated as of October
17, 2006, between Libra and Société Générale, New York Branch
(collectively, the "Libra Senior Swap")**

17638196

Dear Ladies and Gentlemen:

Reference is made to the Libra Indenture dated as of October 17, 2006, as amended, restated or otherwise modified from time to time, by and between Libra, as issuer, Libra CDO, LLC, as co-issuer, and the Libra Trustee (the "Libra Indenture"). All terms used and not otherwise defined herein shall have the meanings ascribed to them in the Libra Indenture.

This letter is sent to you in accordance with LBSF's obligations under a settlement agreement, dated September 20, 2010 (the "Settlement Agreement"), among LBSF, Lehman Brothers Holdings Inc. ("LBHI") and Société Générale, New York Branch ("SG"), as approved in an order entered by the United States Bankruptcy Court for the Southern District of New York on [●] [●], 2010, a copy of which order is attached as Annex I hereto, and constitutes a notice of an irrevocable deferral of the payment due date for certain Credit Protection Payments and/or CDS Termination Payments payable to LBSF under the Libra CDSA.

Notice is hereby given that notwithstanding anything to the contrary in the Libra CDSA, LBSF, in its capacity as "credit protection buyer" under the Libra CDSA, hereby irrevocably agrees that, to the extent that any Credit Protection Payment or any portion thereof and/or any CDS Termination Payment or any portion thereof, in each case, payable to LBSF under the Libra CDSA, would cause the Collateral Manager or the Libra Trustee to request a funding under the Libra Senior Swap, then the payment due date for such Credit Protection Payment (or the applicable portion thereof) and/or CDS Termination Payment (or the applicable portion thereof) shall be and is hereby deferred and Libra shall be and is hereby released from its obligation to make such payment until such time (if any) that Libra is able to make such payment without causing the Collateral Manager or the Libra Trustee to request a funding under the Libra Senior Swap (the "Deferral").

The Deferral shall have the effect that no Credit Protection Payment (or the applicable portion thereof) and no CDS Termination Payment (or the applicable portion thereof) payable to LBSF under the Libra CDSA can become due, and the obligation of Libra to make payment in respect thereof shall not arise, until such time (if any) that Libra is able to make such payment from amounts on deposit in the Uninvested Proceeds Account, the Principal Collection Account and the Reserve Account without causing the Collateral Manager or the Libra Trustee to request a funding under the Libra Senior Swap.

[SIGNATURE PAGE FOLLOWS]

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING,
INC.

By: _____
    Name:
    Title:

## Annex I

[Settlement Approval Order]

17638196

EXHIBIT 5

FORM OF LBSF VELA NOTICE

[ATTACHED]

## FORM OF

## NOTICE OF IRREVOCABLE DEFERRAL OF PAYMENTS DUE DATE

**Date:**   [●] [●], 2010

**To:**   **MKP Vela CBO, Ltd. ("Vela")**
c/o Walkers SPV Limited
Walker House
87 Mary Street, George Town
Grand Cayman, KY1-9002
Cayman Islands
**Attention:**   The Directors
**Fax:**   (345) 945-4757

**To:**   **The Bank of New York Mellon Trust Company, National Association, as trustee on behalf of Vela (the "Vela Trustee")**
601 Travis Street, 16th Floor
Houston, Texas 77002
**Attention:**   Corporate Trust Services – MKP Vela CBO, Ltd.
**Fax:**   (713) 483-6001

**To:**   **MKP Capital Management, L.L.C., as collateral manager  (the "Collateral Manager")**
600 Lexington Avenue, 18th Floor
New York, New York 10022
**Attention:**   Legal
**Fax:**   (212) 223-9505

**From:**   **Lehman Brothers Special Financing, Inc. ("LBSF")**

**RE:**   **The ISDA Master Agreement, dated as of November 16, 2006 (together with the Amended and Restated Schedule, Credit Support Annex and Amended and Restated Confirmations thereto, each dated April 23, 2008, the "Vela CDSA"), between LBSF and Vela; and the ISDA Master Agreement, Schedule, Credit Support Annex and Confirmation, each dated as of November 16, 2006, between Vela and Société Générale, New York Branch (collectively, the "Vela Senior Swap")**

Dear Ladies and Gentlemen:

Reference is made to the Vela Indenture dated as of November 16, 2006, as amended, restated or otherwise modified from time to time, by and between Vela, as issuer, MKB Vela CBO, LLC, as co-issuer, and the Vela Trustee (the "Vela Indenture").  All terms used and not otherwise defined herein shall have the meanings ascribed to them in the Vela Indenture.

17638198

This letter is sent to you in accordance with LBSF's obligations under a settlement agreement, dated September 20, 2010 (the "Settlement Agreement"), among LBSF, Lehman Brothers Holdings Inc. ("LBHI") and Société Générale, New York Branch ("SG"), as approved in an order entered by the United States Bankruptcy Court for the Southern District of New York on [●] [●], 2010, a copy of which order is attached as Annex I hereto, and constitutes a notice of an irrevocable deferral of the payment due date for certain Floating Payments, Issuer CDS Termination Payments, Premium Reserve payments and/or Net Issuer Premium payments payable to or for the benefit of LBSF under the Vela CDSA.

Notice is hereby given that notwithstanding anything to the contrary in the Vela CDSA, LBSF, in its capacity as "credit protection buyer" under the Vela CDSA, hereby irrevocably agrees that, to the extent that any Floating Payment or any portion thereof, any Issuer CDS Termination Payment or any portion thereof, any Premium Reserve payment or any portion thereof and/or any Net Issuer Premium payment or any portion thereof, in each case, payable to or for the benefit of LBSF under the Vela CDSA, would cause the Collateral Manager or the Vela Trustee to request a funding under the Vela Senior Swap, then the payment due date for such Floating Payment (or the applicable portion thereof), Issuer CDS Termination Payment (or the applicable portion thereof), Premium Reserve payment (or the applicable portion thereof) and/or Net Issuer Premium payment (or the applicable portion thereof) shall be and is hereby deferred and Vela shall be and is hereby released from its obligation to make such payment until such time (if any) that Vela is able to make such payment without causing the Collateral Manager or the Vela Trustee to request a funding under the Vela Senior Swap (the "Deferral").

The Deferral shall have the effect that no Floating Payment (or the applicable portion thereof), no Issuer CDS Termination Payment (or the applicable portion thereof), no Premium Reserve payment (or the applicable portion thereof) and no Net Issuer Premium payment (or the applicable portion thereof), payable to or for the benefit of LBSF under the Vela CDSA, can become due, and the obligation of Vela to make payment in respect thereof shall not arise, until such time (if any) that Vela is able to make such payment from the amounts on deposit in the Uninvested Proceeds Account, the Principal Collection Account and the Reserve Account without causing the Collateral Manager or the Vela Trustee to request a funding under the Vela Senior Swap.

[SIGNATURE PAGE FOLLOWS]

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING,
INC.

By: _____
    Name:
    Title:

17638198

**<u>Annex I</u>**

[Settlement Approval Order]

17638198